## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION c/o Cogency Global 1025 Vermont Ave, NW, Ste. 1130 Washington, DC 20005,<br><br>Plaintiffs,<br><br>v.<br><br>MY PILLOW, INC. and MICHAEL J. LINDELL 343 E 82nd Str #102 Chaska, MN 55318,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 1:21-cv-00445-CJN |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
## OF DEFENDANT MICHAEL J. LINDELL'S MOTION TO DISMISS
## OR, IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE

**JURIS DAY, PLLC**
Earl N. "Trey" Mayfield, III (D.C. Bar No. 459998)
10521 Judicial Drive
Suite 200
Fairfax, Virginia 22030
Telephone: (703) 268-5600
tmayfield@jurisday.com

*Counsel for Defendant Michael J. Lindell*

**DANIELS & TREDENNICK, PLLC**
Douglas A. Daniels (TX Bar No. 00793579)*
Heath A. Novosad (TX Bar No. 2407199)*
6363 Woodway Drive, Suite 700
Houston, TX 77057-1759
Telephone: (713) 917-0024
doug.daniels@dtlawyers.com
heath.novosad@dtlawyers.com

* D.D.C. Bar Admission Pending

*Counsel for Defendant Michael J. Lindell*

## TABLE OF CONTENTS

I. BACKGROUND ...................................................................................................3

II. ARGUMENT AND AUTHORITY ....................................................................5

   A. THE COURT SHOULD DISMISS DOMINION'S DEFAMATION CLAIM PURSUANT TO FED. R. CIV. P. 12(B)(6) BECAUSE DOMINION FAILED TO PROPERLY PLEAD ACTUAL MALICE. ...........................................................................................5

      1. *Alleged Defamation Against A Public Official Or Public Figure And/Or About Matters Of Public Concern Requires "Actual Malice."* ...........................................7

         a. Dominion Is An All-Purpose Public Figure. .......................................................8

         b. Dominion Is Also A Limited Purpose Public Figure. .......................................10

         c. Lindell's Statements Relate To Matters Of Public Concern. ............................12

      2. *Dominion Has Not Pleaded Actual Malice.* ........................................................12

      3. *Lindell Had No Doubts That His Statements Were, And Are, True.* .......................14

         a. There Is A Mountain Of Evidence Supporting Lindell's Statements. ...............15

            i. Legislators Across The Political Spectrum Have Decried Security Flaws In Electronic Voting Machines. .................................................................16

            ii. *Curling v. Raffensperger.* ..........................................................................18

            iii. Texas Refused To Certify Dominion Machines Due To Security Flaws.....20

            iv. Dominion's Security Flaws Have Been The Subject Of Extensive Examination And Discussion By Experts And End-Users..........................21

            v. Academic Papers Have Detailed Security Flaws........................................24

            vi. Media Reports Have Publicized Security Problems With Electronic Voting Machines, Including Dominion's. ..................................................25

            vii. Experts Have Determined That Dominion Nefariously Impacted The 2020 Presidential Election. .......................................................................27

         b. Mike Lindell Has Never Wavered In His Convictions. ....................................28

   B. THE COURT SHOULD ALSO DISMISS DOMINION'S MDTPA CLAIM. .............................30

   C. THE COURT SHOULD DISMISS THIS CASE FOR LACK OF PERSONAL JURISDICTION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(2). ....................................31

1.  *The Legal Standard To Determine Jurisdiction.* ......................................... 32

2.  *This Court Does Not Have Personal Jurisdiction Over Lindell.* ............................. 33

    a.  Lindell Did Not "Transact Business" In The District Of Columbia. ................. 33

    b.  Dominion Did Not Suffer Any Injury, Especially Not In The District Of Columbia. ......................................................................... 35

    c.  No "Plus Factor" Applies. ......................................................... 36

    d.  Jurisdiction Over Lindell Would Offend Traditional Notions Of Fair Play And Substantial Justice. .................................................... 37

D.  IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THIS CASE TO THE DISTRICT COURT FOR THE DISTRICT OF MINNESOTA PURSUANT TO 28 U.S.C. § 1404(A). ........... 38

1.  *This Case Could Have Been Brought In The District of Minnesota.* ...................... 39

    a.  The District Of Minnesota Has Diversity Jurisdiction. ...................................... 40

    b.  The District Of Minnesota Has Personal Jurisdiction. ...................................... 40

    c.  The District Minnesota Is A Proper Venue. ...................................... 40

2.  *Both Considerations Of Convenience And The Interest Of Justice Weigh In Favor Of Transfer To The U.S. District Court For The District Of Minnesota.* ....... 41

    a.  The Private Interests Weigh In Favor Of Transfer. ........................................... 41

    b.  The Public Interests Weigh In Favor of Transfer. ............................................. 43

III.  LINDELL SHOULD BE AWARDED HIS ATTORNEYS' FEES ................................... 44

IV.  CONCLUSION ................................................................................ 44

## TABLE OF AUTHORITIES

**Cases**

*Abbas v. Foreign Policy Group*,
   783 F.3d 1328 (D.C. Cir. 2015) ........................................................................................44

*Akhmetshin v. Browder*,
   983 F.3d 542 (D.C. Cir. 2020) ..........................................................................................37

*Am. Ass'n of Cruise Passengers v. Cunard Line, Ltd.*,
   691 F. Supp. 379 (D.D.C. 1987) ................................................................................35, 37

*Arpaio v. Cottle*,
   No. 18-CV-02387 (APM), 2019 WL 11322515 (D.D.C. Dec. 3, 2019) ..............................14

*Arpaio v. Zucker*,
   414 F. Supp. 3d 84  (D.D.C. 2019)....................................................................................14

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................................................................5

*Ashhab-Jones v. Cherokee Nation Strategic Programs, LLC*,
   No. 1:19-CV-00089 (CJN), 2020 WL 6262090 (D. D.C. Oct. 23, 2020) ...................32, 33, 38

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ............................................................................................................5

*Brannen v. Nat'l R.R. Passenger Corp.*,
   403 F. Supp. 2d 89 (D.D.C. 2005).....................................................................................41

*Burman v. Phoenix Worldwide Indus.*,
   437 F. Supp. 2d 142 (D.D.C. 2006)..................................................................32, 34, 35, 37

*Caluyo v. DaVita, Inc.*,
   938 F. Supp. 2d 67 (D.D.C. 2013) .....................................................................................39

*Campbell v. Citizens for an Honest Gov't, Inc.*,
   255 F.3d 560 (8th Cir. 2001)..............................................................................................14

*Chafoulias v. Peterson*,
  668 N.W.2d 642 (Minn. 2003)............................................................................ 7, 10, 11, 14

*Competitive Enterprise Institute v. Mann*,
  150 A.3d 1213 (D.C. 2016)............................................................................................ 44

*Connelly v. Nw. Publ'ns, Inc.*,
  448 N.W.2d 901 (Minn. Ct. App. 1989)......................................................................... 28

*Connick v. Myers*,
  461 U.S. 138 (1983) ......................................................................................................... 7

*Copeland-Jackson v. Oslin*,
  555 F. Supp. 2d 213 (D.D.C. 2008)............................................................................... 38

*Corsi v. Stone*,
  No. CV 19-324 (TJK), 2020 WL 999053 (D.D.C. Mar. 1, 2020)................................... 36

*Crane v. Carr*,
  814 F.2d 758 (D.C. Cir. 1987) ...................................................................................... 36

*Crane v. N.Y. Zoological Soc'y*,
  894 F.2d 454 (D.C. 1990) ........................................................................................ 32, 35

*Curling v. Raffensperger*,
  493 F. Supp. 3d 1264 (N.D. Ga. 2020)................................................................... 2, 10, 18

*Democratic National Committee v. Wisconsin State Legislature*,
  141 S. Ct. 28 (2020).......................................................................................................... 1

*Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*,
  603 N.W.2d 336 (Minn. Ct. App. 1999)......................................................................... 31

*Dooley v. United Techs. Corp.*,
  786 F. Supp. 65 (D.D.C. 1992) ...................................................................................... 34

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
  472 U.S. 749 (1985) .................................................................................................. 7, 8, 12

*Exelon Generation Co. v. Grumbles,*
  380 F. Supp. 3d 1 (D.D.C. 2019) ....................................................................40

*Farah v. Esquire Magazine,*
  736 F.3d 528 (D.C. Cir. 2013) ........................................................................30

*Fay v. Humane Soc'y of the U.S.,*
  No. 20-CV-1893 (RCL), 2021 WL 184396 (D.D.C. Jan. 19, 2021)....................32

*First Chi. Int'l v. United Exch. Co.,*
  836 F.2d 1375 (D.C. Cir. 1988) ......................................................................32

*Fridman v. Bean LLC,*
  2019 WL 231751 (D.D.C. 2019)......................................................................44

*Fridman v. Orbis Bus. Intel. Ltd.,*
  229 A.3d 494 (D.C. Cir. 2020)..................................................................10, 11

*Gerritsen v. Warner Bros. Entm't, Inc.,*
  112 F. Supp. 3d 1011 (C.D. Cal. 2015) ..........................................................15

*Gertz v. Robert Welch, Inc.,*
  418 U.S. 323 (1974) ...................................................................................8, 10

*GTE New Media Servs., Inc. v. BellSouth Corp.,*
  199 F.3d 1343 (D.C. Cir. 2000) ......................................................................33

*Gulf Restoration Network v. Jewell,*
  87 F. Supp. 3d 303 (D.D.C. 2015) ..................................................................42

*Harte-Hanks Commc'n, Inc. v. Connaughton,*
  491 U.S. 657 (1989) ................................................................................13, 14

*HTC Corp. v. IPCom GmbH & Co., KG,*
  671 F. Supp. 2d 146 (D.D.C. 2009)................................................................15

*Illinois Bd. of Elections* v. *Socialist Workers Party,*
  440 U.S. 173 (1979) .........................................................................................1

*IMAPizza LLC v. At Pizza, Ltd.*,
    334 F. Supp. 3d 95 (D.D.C. 2018) ......................................................................33

*In re Lorazepam & Clorazepate Antitrust Litig.*,
    No. 0-1650, 2004 WL 7081446 (D.D.C. May 18, 2004) ......................................15

*Int'l Shoe Co. v. State of Wash., Off. of Unemp't Comp. & Placement*,
    326 U.S. 310 (1945) .................................................................................... 31, 38

*Jankovic v. Int'l Crisis Grp.*,
    822 F.3d 576 (D.C. Cir. 2016) ............................................... 6, 11, 13, 28

*Lapointe v. Van Note*,
    No. CIV.A. 03-2128(RBW), 2004 WL 3609346 (D.D.C. Nov. 9, 2004) ...................33, 38

*Lewy v. S. Poverty L. Ctr., Inc.*,
    723 F. Supp. 2d 116 (D.D.C. 2010) ................................... 32, 34, 37, 38

*Lohrenz v. Donnelly*,
    350 F.3d 1272 (D.C. Cir. 2003) ............................................... 13, 14

*Maethner v. Someplace Safe, Inc.*,
    929 N.W.2d 868 (Minn. 2019) ........................................................8, 12

*Margoles v. Johns*,
    483 F.2d 1212 (D.C. Cir. 1973) ......................................................................38

*Mar-Jac Poultry, Inc. v. Katz*,
    773 F. Supp. 2d 103 (D.D.C. 2011) ...............................................................35

*Mastro v. Potomac Elec. Pwr. Co.*,
    447 F.3d 843 (D.C. Cir. 2006) .......................................................................35

*Moldea v. New York Times Co.*,
    22 F.3d 310 (D.C. Cir. 1994) .........................................................................30

*Montgomery v. Risen*,
    875 F.3d 709 (D.C. Cir. 2017) .......................................................................30

*Moss v. Stockard*,
    580 A.2d 1011 (D.C. Cir. 1990) ............................................................................7, 10

*Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*,
    951 F.3d 952 (8th Cir. 2020) ......................................................................................6

*Nelson v. Am. Family Mut. Ins. Co.*,
    262 F. Supp. 3d 835 (D. Minn. 2017), *aff'd*, 899 F.3d 475 (8th Cir. 2018) ............................31

*New York Times v. Sullivan*,
    376 U.S. 254 (1964) ..........................................................................................6, 7, 12

*Piper Aircraft Co. v. Reyno*,
    454 U.S. 235 (1981) ..............................................................................................42

*Plackett v. Washington Deluxe Bus, Inc.*,
    No. 1:19-CV-00794 (CJN), 2020 WL 376511 (D.D.C. Jan. 23, 2020) ...................................42

*Purcell v. Gonzalez*,
    549 U.S. 1 (2006) ...................................................................................................1

*Relf v. Gasch,*
    511 F.2d 804 (D.C. Cir. 1975) ..................................................................................40

*Republican Party of Penn. v. Degraffenreid*,
    141 S. Ct. 732 (2021)...............................................................................................1

*Rosenblatt v. Baer*,
    383 U.S. 75 (1966) .................................................................................................7

*Second Amendment Found. v. U.S. Conf. of Mayors*,
    274 F.3d 521 (D.C. Cir. 2001) ..................................................................................32

*Secord v. Cockburn*,
    747 F. Supp. 779 (D.D.C. 1990) ...............................................................................14

*Shoppers Food Warehouse v. Moreno*,
    746 A.2d 320 (D.C. 2000) .......................................................................................34

*Sierra Club v. Flowers*,
　276 F. Supp. 2d 62 (D.D.C. 2003) ........................................................................ 39, 41, 43

*Snyder v. Phelps*,
　562 U.S. 443 (2011) .............................................................................................. 8, 12

*St. Amant v. Thompson*,
　390 U.S. 727 (1968) .............................................................................................. 14, 28

*Stewart Org., Inc. v. Ricoh Corp.*,
　487 U.S. 22 (1988) ................................................................................................. 39

*Tah v. Glob. Witness Publ'g, Inc.*,
　991 F.3d 231 (D.C. Cir. 2021) ............................................................................... *passim*

*Tavoulareas v. Piro*,
　817 F.2d 762 (D.C. Cir. 1987) ............................................................................... 11, 13, 14

*The Urb. Inst. v. FINCON Servs.*,
　681 F. Supp. 2d 41 (D.D.C. 2010) ......................................................................... 34

*Trout Unlimited v. U.S. Dep't of Agric.*,
　944 F. Supp. 13 (D.D.C. 1996) ............................................................................... 41, 43

*United States v. Philip Morris Inc.*,
　116 F. Supp. 2d 116 (D.D.C. 2000) ....................................................................... 33, 34

*United States v. Yennie*,
　No. 18-CV-3268 (WMW/SER), 2019 WL 3325862 (D. Minn. Apr. 30, 2019),
　*report and recommendation adopted*, 2019 WL 3325439 (D. Minn. July 24, 2019) ............... 40

*Van Dusen v. Barrack*,
　376 U.S. 612 (1964) .............................................................................................. 39

*Vasquez v. Whole Foods Mkt., Inc.*,
　302 F. Supp. 3d 36 (D.D.C. 2018) ......................................................................... 36, 37

*Virts v. Prudential Life Ins. Co. of Am.*,
　950 F. Supp. 2d 101 (D.D.C. 2013) ....................................................................... 40

*Waldbaum v. Fairchild Pubs.*,
  627 F.2d 1287 (D.C. Cir. 1980) ............................................................................. 8, 9, 10, 11

**Statutes**

28 U.S.C. § 1332 ...................................................................................................................40

28 U.S.C. § 1391 .............................................................................................................40, 41

28 U.S.C. § 1404 .............................................................................................................39, 43

D.C. CODE § 13-423 ...............................................................................................32, 33, 35, 37

MINN. STAT. § 325D.44 ..........................................................................................................30

MINN. STAT. § 325D.45 ..........................................................................................................31

**Other Authorities**

U.S. Const. Amend. XIV.........................................................................................................31

Restatement (Second) of Conflict of Laws, § 150 (1971).........................................................35

**Rules**

FED. R. CIV. P. 12.............................................................................................................6, 31

FED. R. CIV. P. 4............................................................................................................32, 40

## INDEX OF EXHIBITS

EXHIBIT A:     Declaration of J. Alex Halderman (Aug. 19, 2020)………………..…………     1

EXHIBIT B:     Declaration of Harri Hursti……………………………………………...…….     33

EXHIBIT C:     Declaration of J. Alex Halderman (Oct. 4, 2019)…………………….……….     81

EXHIBIT D:     *Summary of Testimony from December 3, 2020 Hearing, Chairman's Report
                of the Election Law Study, Subcommittee of the Standing Senate Judiciary
                Comm.*, 2019 Legislature, 155th Session, (Ga. Dec. 17, 2020) (William T.
                Ligon, Chairman of the Election Law Study Subcommittee), available at
                http://www.senatorligon.com/THE_FINAL%20REPORT.PDF (last visited
                Apr. 15, 2021)……………………………………………………………...     93

EXHIBIT E:     Letter from William T. Ligon, Member, Judiciary Comm., Ga. Gen.
                Assembly, to President Donald J. Trump, Request for Assistance under the
                DHS Cyber Hunt and Incident Response Teams Act of 2019, (Jan. 2, 2021)..   109

EXHIBIT F:     Letters from Elizabeth Warren, Amy Klobuchar, & Ron Wyden, United
                States Senators, and Mark Pocan, United States Representative, to the co-
                CEOs of H.I.G. Capital, LLC, the Chairman of McCarthy Group, LLC, and
                the Managing Directors of Staple Street Capital Group, LLC (Dec. 6, 2019),
                available at
                https://www.warren.senate.gov/imo/media/doc/H.I.G.%20McCarthy,%20&
                %20Staple%20Street%20letters.pdf (last visited Apr. 15, 2021)…………….   112

EXHIBIT G:     BRANDON HURLEY, INSPECTION OF THE DOMINION VOTING SYSTEMS'
                DEMOCRACY SUITE 5.5-A CONDUCTED ON OCTOBER 2 AND 3, 2019 (TEX.
                SEC. OF STATE, Nov. 4, 2019), available at
                https://www.sos.texas.gov/elections/forms/sysexam/oct2019-hurley.pdf (last
                visited Apr. 15, 2021)……………………………………………...........   128

EXHIBIT H:     BRIAN MECHLER, VOTING SYSTEM EXAMINATION OF DOMINION VOTING
                SYSTEMS DEMOCRACY SUITE 5.5-A (TEX. SEC. OF STATE, Nov. 3, 2019),
                available at https://www.sos.texas.gov/elections/forms/sysexam/oct2019-
                mechler.pdf (last visited Apr. 15, 2021)……………………………………...   134

EXHIBIT I:     CHUCK PINNEY, DOMINION VOTING SYSTEMS – DEMOCRACY SUITE 5.5-A
                VOTING SYSTEM EXAMINATION (TEX. SEC. OF STATE, Nov. 4, 2019),
                available at https://www.sos.texas.gov/elections/forms/sysexam/oct2019-
                pinney.pdf (last visited Apr. 15, 2021)………………………………………   149

EXHIBIT J:     JAMES SNEERINGER, VOTING SYSTEM EXAMINATION DOMINION VOTING
                SYSTEMS DEMOCRACY SUITE 5.5-A (TEX. SEC. OF STATE, Nov. 3, 2019),

available at https://www.sos.texas.gov/elections/forms/sysexam/oct2019-sneeringer.pdf (last visited Apr. 15, 2021)……………………………………... 155

EXHIBIT K: TOM WATSON, DEMOCRACY SUITE 5.5A (TEX. SEC. OF STATE, Oct. 2019), available at https://www.sos.texas.gov/elections/forms/sysexam/oct2019-watson.pdf (last visited Apr. 15, 2021)…………………………………… 161

EXHIBIT L: Andrew W. Appel, Richard A. DeMillo & Philip B. Stark, *Ballot-Marketing Devices (BMDs) Cannot Assure the Will of the Voters*, 19 ELECTION LAW JOURNAL 3, at 432 (Sep. 17, 2020), available at https://www.liebertpub.com/doi/10.1089/elj.2019.0619 (last visited Apr. 15, 2021)……………………………………………………………….……… 167

EXHIBIT M: Kellie Ottoboni & Philip B. Stark, *Election Integrity and Electronic Voting Machines in 2018 Georgia, USA* (Jul. 24, 2019), E-VOTE-ID 2019 PROCEEDINGS, available at https://ssrn.com/abstract=3426250 (last visited Apr. 20, 2021)……………………………………………………….……... 196

EXHIBIT N: Matt Blaze, et al., *Def Con 27 Voting Machine Hacking Village* (Aug. 5, 2019), https://media.defcon.org/DEF%20CON%2027/voting-village-report-defcon27.pdf (last visited Apr. 15, 2021)……………………………………… 213

EXHIBIT O: Affidavit of Amy Gilleo……………………………………………………... 268

EXHIBIT P: Affidavit of Mellissa A. Carone………………………….………………... 273

EXHIBIT Q: Declaration of Misty Martin………………………………………………… 277

EXHIBIT R: Bowen Xiao, *A History of Foreign Ties Behind Voting Machines Used in US*, THE EPOCH TIMES (Dec. 8, 2020), https://www.theepochtimes.com/foreign-ties-behind-dominion-smartmatic-voting-machines-including-to-an-adversary_3602603.html ………………… 281

EXHIBIT S: SCIENCE DEFIES POLITICS, *Dominion Voting Systems Is Caught* (Nov. 13, 2020), https://defyccc.com/dominion-voting-systems-is-caught/ …………... 297

EXHIBIT T: Matt Vasilogambros, *Feds Don't Regulate Election Equipment, So States Are On Their Own*, STATELINE, (Jul. 10, 2019)……………………………… 303

EXHIBIT U: Mollie Ziegler Hemingway, *Media's Entire Georgia Narrative Is Fraudulent, Not Just the Fabricated Trump Quotes*, THE FEDERALIST, (Mar. 17, 2021), available at https://thefederalist.com/2021/03/17/medias-entire-georgia-narrative-is-fraudulent-not-just-the-fabricated-trump-quotes/ ……... 310

EXHIBIT V: Kevin Monahan, Cynthia McFadden & Didi Martinez, *'Online and Vulnerable': Experts Find Nearly Three Dozen U.S. Voting Systems*

*Connected to Internet*, NBC NEWS, (Jan. 10, 2020), available at
https://www.nbcnews.com/politics/elections/online-vulnerable-experts-find-nearly-three-dozen-u-s-voting-n1112436 ........................................................ 322

EXHIBIT W:    Robert F. Kennedy, Jr., *Will the Next Election Be Hacked?*, ROLLINGSTONE,
(Sep. 21, 2006), available at https://www.rollingstone.com/politics/politics-news/will-the-next-election-be-hacked-69421 (last visited Apr. 20,
2021)…………………………………………………………………………. 331

EXHIBIT X:    Russell Ramsland, *Antrim Michigan Forensics Report, Revised Preliminary
Summary, v2*, ALLIED SECURITY OPERATIONS GROUP, (Dec. 13, 2020),
available at
https://www.depernolaw.com/uploads/2/7/0/2/27029178/antrim_michigan_forensics_report_[121320]_v2_[redacted].pdf (last visited Apr. 15, 2021)…... 339

Exhibit Y:    Ben Turner, *Statistical Evidence of Dominion Election Fraud? Time to
Audit the Machines*, FRAUDSPOTTERS, (Nov. 21, 2020), available at
https://www.fraudspotters.com/statistics-about-dominion-election-fraud/
(last visited Apr. 15, 2021)……………………………………………….... 363

Exhibit Z:    UNITED STATES COURTS JUDICIAL BUSINESS, U.S. COURT OF APPEALS—
SOURCES OF APPEALS, ORIGINAL PROCEEDINGS AND MISCELLANEOUS
APPLICATIONS COMMENCED, BY CIRCUIT, DURING THE 12-MONTH PERIOD
ENDING SEPTEMBER 30, 2016 THROUGH 2020, Table B-3, (Sep. 30, 2020),
available at
https://www.uscourts.gov/sites/default/files/data_tables/jb_b3_0930.2016.pdf ....................................................................................................................... 376

Exhibit AA:   Alexa Corse, *Dominion Sues MyPillow, CEO Mike Lindell Over Election
Claims*, WALL STREET JOURNAL, Feb. 22, 2021…………………………… 388

Exhibit BB:   *Not Used*………………………………………………………………….... 393

Exhibit CC:   Douglas G. Frank, Ph.D., Resume, available at
https://www.depernolaw.com/uploads/2/7/0/2/27029178/ex_4.pdf (last
visited April 23, 2021)……………………………….................................. 397

Exhibit DD:   Frank, Douglas G, Ph.D., NINE MICHIGAN COUNTIES, COLLECTED
DEMOGRAPHICS FOR POPULATIONS, REGISTRATIONS, & BALLOTS WITH
STATISTICAL CONFIRMATION OF ALGORITHM USE, NOVEMBER 2020 UNITED
STATES GENERAL ELECTION, (Apr. 6, 2021), available at
https://www.depernolaw.com/uploads/2/7/0/2/27029178/ex_1-3.pdf (last
visited April 23, 2021)……………………………………………………….. 399

Exhibit EE:   Arizona State Senate Republican Caucus, Senate Chooses Qualified
Auditing Firm to Conduct Forensic Audit of Maricopa County Election

Results, (Jan. 29, 2021), https://www.azsenaterepublicans.com/post/senate-chooses-qualified-auditing-firm-to-conduct-forensic-audit-of-maricopa-county-election-results ...................................................................................... 426

Exhibit FF:   Chad Groening, *Dominion Gets Caught Shorting GOP Candidates*, ONENEWSNOW.COM, (Mar. 5, 2021), https://onenewsnow.com/politics-govt/2021/03/05/dominion-gets-caught-shorting-gop-candidates ................... 429

Exhibit GG:   Scott Bauer, Wisconsin Assembly OKs Investigation into 2020 Election, Fox6 News Milwaukee, (Mar. 23, 2021), https://www.fox6now.com/news/wisconsin-assembly-approves-election-investigation.......................................................................................... 431

Exhibit HH:   M.D. Kittle, *Emails: Green Bay's 'Hidden" Election Networks*, WISCONSIN SPOTLIGHT (Mar. 21, 2021), https://wisconsinspotlight.com/emails-green-bays-hidden-election-networks/ ………………………………………… 434

Exhibit II:   *Curling v. Raffensperger*, 493 F. Supp. 3d 1264 (N.D. Ga. 2020) ………….. 439

Voting security is not a conservative issue.  It is not a liberal issue.  It is not a concern

limited to only those Americans of a particular race, sex, religion, creed, social class or any other

group.  Voting security concerns all Americans, regardless of similarities or differences because

without secure elections, our republic cannot exist.  As Senator Ron Wyden, D-OR, stated:

> American democracy depends on the notion that elected representatives are chosen
> in elections that are free and fair, so that the government reflects the will of the
> people.  Anything that undermines confidence in that principle strikes at the heart
> of our national security and identity.[1]

Before the 2020 general election, prominent Democratic lawmakers including Senators Elizabeth

Warren, D-MA, and Amy Klobuchar, D-MN, sounded the alarm about the threat to our democracy

posed by electronic voting machines:

> Election security experts have noted for years that our nation's election systems
> and infrastructure are under serious threat…voting machines are reportedly falling
> apart across the country…researchers recently uncovered previously undisclosed
> vulnerabilities in "nearly three dozen backend election systems in 10
> states"….These problems threaten the integrity of our elections and demonstrate
> the importance of election systems that are strong, durable, and not vulnerable to
> attack.[2]

As Supreme Court Justice Clarence Thomas said, election security is so important because:

> Elections are "of the most fundamental significance under our constitutional
> structure." See *Illinois Bd. of Elections* v. *Socialist Workers Party*, 440 U.S. 173,
> 184 (1979). Through them, we exercise self-government. But elections enable self-
> governance only when they include processes that "giv[e] citizens (including the
> losing candidates and their supporters) confidence in the fairness of the election."
> See *Democratic National Committee v. Wisconsin State Legislature*, 141 S. Ct. 28,
> 31 (KAVANAUGH, J., concurring in denial of application to vacate stay); accord,
> *Purcell* v. *Gonzalez*, 549 U.S. 1, 4 (2006) (*per curiam*) ("Confidence in the integrity
> of our electoral processes is essential to the functioning of our participatory
> democracy").[3]

---

[1] Index at 216.

[2] Index at 114-15, 119-20, 124-25.

[3] *Republican Party of Penn. v. Degraffenreid*, 141 S. Ct. 732, 734 (2021) (Thomas, J., dissenting)
(punctuation in original).

Dominion[4] claims it has stepped up to the challenge of providing secure, trustworthy electronic voting options for governments across the country. Dominion proudly proclaims that it has grown into one of the key gatekeepers of American voting security, serving:

- More than 40% of American voters (and growing);

- 28 states;

- 9 of the top 20 and 4 of the top 10 counties in the U.S.[5]

But while Dominion's management is pitching the narrative of election integrity, its voting machines are executing another plan: access to votes by those who want to undermine our democracy. As renowned cybersecurity expert Hari Hursti, Ph.D. testified regarding Dominion's suite of machines leading up to the 2020 general election in Georgia:

> The voting system is being deployed, configured and operated in Fulton County in a manner that escalates the security risk to an extreme level and calls into question the accuracy of the election results.[6]

Based in part on Dr. Hursti's testimony, a federal court in Georgia concluded:

> The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of "might this actually ever happen?" - but "when it will happen," especially if further protective measures are not taken. **Given the masking nature of malware and the current systems described here, if the State and Dominion simply stand by and say, "we have never seen it," the future does not bode well**.[7]

---

[4] Plaintiffs US Dominion, Inc., Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation are collectively referred to as "Plaintiffs" or "Dominion."

[5] https://www.dominionvoting.com/about/ (last visited April 23, 2021).

[6] Index at 66.

[7] *Curling v. Raffensperger*, 493 F. Supp. 3d 1264 (N.D. Ga. 2020) (emphasis added) (pagination pending), Index at 486. *Curling* was assigned its F. Supp. Designation on April 22, 2021, but the version on Westlaw did not include page numbers. For the Court's convenience, a copy of *Curling* is attached as Exhibit II, and pinpoint citations will be made to the Index herein.

Despite the overwhelming evidence demonstrating the inadequate security of electronic voting machines, including those manufactured, sold and serviced by Dominion, Dominion failed to fix the known flaws in its voting systems that left them wide open to hacking and manipulation.

Dominion could have subjected its machines and software to independent inspection, testing and validation.  Dominion could have labored to protect its systems for the benefit of all Americans.  Instead, it chose to threaten and/or sue into silence anyone who has the courage to ask questions, demand answers and inform the public of the very real security issues that have infected Dominion's machines.

Dominion's lawsuit is an affront to the First Amendment and is nothing more than a media-driven ploy to discredit or silence anyone who exposes Dominion's voting systems as the hackable and exploitable threat to American democracy that they are.  Accordingly, Michael J. Lindell ("Lindell" or "Defendant") submits this memorandum of law in support of his Motion to Dismiss or in the alternative, Motion to Transfer Venue for good cause and states as follows:

## I.     <u>BACKGROUND</u>

As Dominion is happy to tout, its machines touch the votes of more than 40% of American voters.  As such, Dominion has positioned itself as one of the gatekeepers of American democracy. Jurisdictions in 28 states have entrusted Dominion to record the will of their electorates accurately. Very little could be more sacred to the democratic process than the services Dominion provides.

By the very nature of its business, Dominion has thrust itself into the public eye and public conversation by providing the core governmental function of recording and tabulating votes.  And when they stepped into that spotlight of public figure status, they opened themselves up to question and criticism.  Dominion has faced such criticism for years from elected officials, experts in the fields of cybersecurity and election integrity and the media on both the political left and right.

Criticizing a company that counts the votes for almost half of Americans is not only allowed, it is a necessary component of a functioning republic.  Blind trust in those who determine election outcomes is a step on a dangerous downward spiral toward the end of democracy.

The criticism of Dominion's flawed products is not only vital to our democracy, it is warranted by the substantial security flaws inherent in Dominion's products.  Countless articles, experts, politicians and courts have identified flaws such as Internet connectivity, the ease with which malware can be loaded onto the machines, the inability for voters to confirm their votes and the adjudication process whereby the machines can be programmed to classify a vote as purportedly unreadable thus requiring a human to "interpret" the intent of the voter.  And Dominion admitted that its machines are hackable.  The flaws in Dominion's machines are what led the State of Texas to twice reject Dominion's request for certification of its machines in 2019 for use in Texas elections.

Were Dominion actually concerned with voting integrity, it would welcome criticism.  A company whose products count the votes of over 40% of Americans (and growing), in a country whose elections regularly have incredibly narrow margins of victory, must be completely transparent in all respects.  Prior to the 2020 election, when most of the criticisms of Dominion's machines and software came from prominent Democrats and liberal media outlets, it did not threaten to sue, nor actually sue, its critics.  Nor did Dominion fix its security flaws.

After the 2020 general election, a number of irregularities and instances of vote switching were reported, leading to numerous investigations.  Arizona's Senate ordered post-election forensic audits that include Dominion's voting machines.  The New Hampshire Senate voted 24 to 0 to conduct a complete examination of Dominion-made voting machines after suspicious shorting of votes was discovered.  Litigation involving Dominion voting machines is ongoing in

Antrim County, Michigan. The Wisconsin Assembly ordered an investigation into the 2020 election.  And the Georgia Senate Judiciary Subcommittee on Elections issued a public report detailing a myriad of voting irregularities and potential fraud in Georgia's 2020 general election.

Dominion's response to the widespread evidence of the irregularities, vote switching, and hacking was to file and publicize at least four billion-dollar lawsuits, including the present action, and to publicly boast that it has sent more than 150 cease-and-desist letters to news media outlets and individuals alike.

Mike Lindell is a concerned American who cares deeply about his country and the fundamental democratic concept of election integrity.  He has an absolute First Amendment right to speak about election security, provide a platform for the voices of others who have done the same and to draw conclusions based on evidence he has reviewed.  And the Constitution does not allow Dominion to silence him or anyone else providing evidence on the issue of electronic voting machines being used to steal an election – an issue that is of the utmost public concern.

Dominion has not met its burden to plausibly plead that Lindell knew his statements were false or that Lindell harbored substantial doubt as to the truth of his statements.  Dominion has failed to adequately plead actual malice by Lindell because it cannot.  Dominion's political gamesmanship and weaponization of the legal process should not be tolerated, and its Complaint should be dismissed.

## II.     ARGUMENT AND AUTHORITY

### A.     The Court Should Dismiss Dominion's Defamation Claim Pursuant To FED. R. CIV. P. 12(b)(6) Because Dominion Failed To Properly Plead Actual Malice.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

Although the truth of all well-pleaded factual allegations is assumed and the reasonable inferences from those allegations are construed in the plaintiff's favor, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 239 (D.C. Cir. 2021) (cleaned up).  Calling Dominion's allegations threadbare would be generous.

To avoid dismissal under Rule 12(b)(6), Dominion "must still lay out enough facts from which [actual] malice might be reasonably inferred." *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 958 (8th Cir. 2020). "Every circuit that has considered the matter has applied the *Iqbal/Twombly* standard and held that a defamation suit may be dismissed for failure to state a claim where the plaintiff has not pled facts sufficient to give rise to a reasonable inference of actual malice." *Id.*

"An action for defamation can be maintained only to the extent it does not interfere with First Amendment rights of free expression." *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 584 (D.C. Cir. 2016).  The Supreme Court has enshrined "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Id.* (quoting *New York Times v. Sullivan*, 376 U.S. 254, 270 (1964)).  Recognizing that speech relating to public officials and public figures enjoys a greater protection than speech directed at private persons, a public figure may not recover damages for defamation without a showing of actual malice.  *Id.*

Here, Dominion uses the word "malice" only once in its entire 115-page Complaint, under Count One, followed by the conclusory statement that "Lindell knew or recklessly disregarded that his statements about Dominion rigging the election and using algorithms to manipulate vote counts

were false." Compl. at ¶ 164. This bare-bones assertion does not satisfy Dominion's burden to plausibly plead facts sufficient to establish that Lindell acted with actual malice, and the Court should not infer actual malice based on nothing more than Dominion's *ipse dixit*. The Complaint, which amounts to nothing more than "Mike Lindell said things we disagree with," is, therefore, insufficient to maintain a defamation cause of action.

### 1. Alleged Defamation Against A Public Official Or Public Figure And/Or About Matters Of Public Concern Requires "Actual Malice."

The Supreme Court requires public officials and public figures suing for defamation to prove actual malice by clear and convincing evidence. *Moss v. Stockard*, 580 A.2d 1011, 1029 (D.C. Cir. 1990) (citing *New York Times*, 376 U.S. at 279-80); *Chafoulias v. Peterson*, 668 N.W.2d 642, 648-49 (Minn. 2003). The greater degree of factual certainty required of a public official to prove defamation stems from (1) the public's strong interest in "robust and unfettered debate" regarding issues concerning governmental affairs, and (2) the fact that public officials often enjoy superior access to the media and may accordingly affect the outcome of those affairs. *Moss*, 580 A.2d at 1029. At the very least, the public official designation may apply to those "among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Id.* (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 85-86 (1966)). A defamation plaintiff's status as a public official is a question of law for the court to decide. *Rosenblatt*, 383 U.S. at 88; *Chafoulias*, 668 N.W.2d at 649.

Speech on "matters of public concern is at the heart of the First Amendment's protection." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-59 (1985) (internal quotation omitted). Such speech is more than self-expression; "it is the essence of self-government." *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)). It is the private or public concern of the statements at issue – not the identity of the speaker as a media or non-media

defendant – that provides the heightened protection of the First Amendment.  *See id.* at 759-60;
*Maethner v. Someplace Safe, Inc.*, 929 N.W.2d 868, 878 (Minn. 2019).  Whether speech involves
a matter of public concern is also a question of law for the court to decide.  *Snyder v. Phelps*, 562
U.S. 443, 453-54 (2011); *Maethner*, 929 N.W.2d at 881.

**a.**      **Dominion Is An All-Purpose Public Figure.**

In certain instances, a plaintiff "may achieve such pervasive fame or notoriety that he
becomes a public figure for all purposes and in all contexts," and as such is subject to the same
requirements imposed on a public official to plead and prove that the defendant acted with actual
malice in allegedly defaming the plaintiff.  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351
(1974).  The plaintiff must have assumed a "role of special prominence in the affairs of society,"
based upon a clear showing "of general fame or notoriety in the community, and pervasive
involvement in the affairs of society."  *Waldbaum v. Fairchild Pubs.*, 627 F.2d 1287, 1294 (D.C.
Cir. 1980) (internal quotation omitted).

By providing the machines that recorded and/or counted the votes of more than 40% of
American voters, Dominion carried out the government's primary function related to the election
and is thus also a governmental actor.  In our republic, there can be little more of a core
governmental function than to administer an election and tabulate the votes to determine who has
been elected to office.  By performing those functions, Dominion became a governmental actor
and a public figure.

An all-purpose public figure has "assumed the risk that public exposure might lead to
misstatements about him."  *Waldbaum*, 627 F.2d at 1294.  To determine whether a plaintiff has
achieved the requisite degree of notoriety and influence necessary to become a public figure in all
contexts, the court may look to several factors, keeping in mind the voluntariness of the plaintiff's

prominence and the availability of self-help through press coverage of its responses. *Id*. at 1295. The factors include, but are not limited to, the previous press coverage of the plaintiff, plaintiff's name recognition, and whether others alter or reevaluate their conduct or ideas in light of the plaintiff's actions. *Id*.

Dominion is unquestionably an all-purpose public figure by virtue of its role as a gatekeeper of American democracy. It holds itself out as a supplier of election equipment used by more than 40% of U.S. voters. Index at 390. Poulos further admitted that Dominion's public prominence brings public criticism when, on January 9, 2021, he testified before the House Administration Committee that:

> **Supporting elections is a full-time proposition for our company. This past year alone, Dominion assisted state and local election officials in conducting nearly 300 elections. Complete with a rigorous public scrutiny that comes with it. … Our systems ensure federal protections for privacy and equal voting rights, and ballot casting options for all, including American service members abroad.** The existence of nation state threats means that we must actively defend against any attempts to undermine faith in our democratic institutions.[8]

Dominion's public statements show that it holds itself out to the public as substantially responsible for ensuring stable, secure elections across the United States (which is a core governmental function). Index at 390; *see also* https://www.c-span.org/video/?467976-1/2020-election-security, at 19:50 – 22:10. As such, Dominion is an all-purpose public figure for purposes of its defamation claim.[9]

---

[8]  *See* https://www.c-span.org/video/?467976-1/2020-election-security, at 19:50 – 22:10 (last visited April 23, 2021).

[9] Indeed, Dominion recognizes its status as a public figure with its poor attempt to plead actual malice. Compl. at ¶ 164. If Dominion did not believe itself to be a public figure, it would not have attempted to reach for such a daunting standard.

### b. Dominion Is Also A Limited Purpose Public Figure.

Alternatively, Dominion easily meets the requirements of a limited purpose public figure. A plaintiff who thrusts itself "to the forefront of a particular public controversy in order to influence the resolution of the issues involved" becomes a public figure for a limited range of issues. *Waldbaum*, 627 F.2d at 1296; *Fridman v. Orbis Bus. Intel. Ltd.*, 229 A.3d 494, 504 (D.C. Cir. 2020). A person may be a limited purpose public figure depending upon: (1) whether a public controversy existed; (2) whether the plaintiff played a meaningful role in the controversy; and (3) whether the allegedly defamatory statement related to the controversy. *Gertz*, 418 U.S. at 352; *Chafoulias*, 668 N.W.2d at 651. Dominion is a limited purpose public figure under this test.

First, Dominion is engaged in a public controversy. A public controversy inquiry has two components: (1) whether the controversy to which the defamation relates was the subject of public discussion *prior* to the alleged defamation; and (2) whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution. *Moss*, 580 A.3d at 1030; *Chafoulias*, 668 N.W.2d at 652. Issues surrounding Dominion's ability to provide a secure and verifiable election outcome long preceded Lindell's statements about which Dominion complains. *See, e.g., Curling*, 493 F. Supp. 3d 1264, Index at 445-49 (public interest group plaintiffs alleged Dominion voting machines were vulnerable to access, hacking, unauthorized intrusion, and manipulation). Questions regarding Dominion's ability to provide a secure means of voting for Georgia permeated public discourse since as early as the summer of 2019. Index at 446-49. The resolution of these questions reaches well beyond just Dominion and Mike Lindell; all Americans have an interest in knowing that their votes are reliably counted. Thus, Dominion's role in guaranteeing the security and integrity of electronic voting is plainly a public controversy.

Second, Dominion is playing a meaningful role in the public controversy by either (a) purposely trying to influence the outcome, or (b) by realistic expectation, because of its position in the controversy, to have an impact on its resolution.  *Waldbaum*, 627 F.2d at 1297.  The truth underlying the claims against Dominion, whether voiced by the public interest group plaintiffs in *Curling* or by Lindell after the election, directly impacts the issue of election integrity.  Similarly, Dominion's public proclamations after the election show that it is actively engaged in a public relations campaign to persuade the public to believe that its machines and voting software are safe.  *See*, *e.g.*, Index at 390; *see also* https://www.c-span.org/video/?467976-1/2020-election-security, at 19:50 – 22:10.  Dominion's "lawfare" campaign, which includes (1) lawsuits against Lindell, Sidney Powell, Rudy Giuliani and Fox News for defamation and (2) sending at least 150 cease and desist letters to people it perceives as critics (including people who have never made public statements about Dominion), and having some of those letters published in national outlets, shows that it is purposely trying to influence the outcome of this controversy.  *See Tavoulareas v. Piro*, 817 F.2d 762, 774 (D.C. Cir. 1987); *Chafoulias*, 668 N.W.2d at 653-54.

Finally, Lindell's statements on their face are germane to Dominion's participation in the election integrity controversy.  "Misstatements *wholly unrelated* to the controversy are not protected, but statements, including those highlighting a plaintiff's talents, education, experience, and motives can be germane."  *Jankovic*, 822 F.3d at 589 (cleaned up).  Lindell's statements go directly to Dominion's motives, role, and actions with respect to electronic voting in the 2020 election; therefore, they are germane to the public controversy.  *See id*. at 587; *Fridman,* 229 A.3d at 509; *Tavoulareas*, 817 F.2d at 774.

### c.   Lindell's Statements Relate To Matters Of Public Concern.

Because Lindell's speech relates to matters of public concern, it is protected by the heightened standards of the First Amendment.  Whether speech is of public or private concern requires an examination of the "content, form, and context" of the speech based on "a totality of circumstances."  *Snyder*, 562 U.S. at 454 (citing *Dun & Bradstreet*, 472 U.S. at 761); *Maethner*, 929 N.W.2d at 881.  No single factor is dispositive, and in consideration of content, form, and context, courts should "evaluate all of the circumstances of the speech, including what was said, where it was said, and how it was said."  *Id*.

Lindell's speech involves matters of public concern.  The Complaint catalogs numerous tweets, speeches and statements from Lindell, President Trump and other public officials regarding the outcome of the 2020 presidential election and the reliability of that outcome.  Lindell's statements regarding Dominion's machines directly relate to concerns about election integrity and the very means of self-government.  Lindell's statements were made in public speeches and broadcast nationally through various news outlets, social media and a docu-movie he produced.  Lindell's speech can fairly be considered as relating to matters of political and social concerns to the community.  *See Snyder*, 562 U.S. at 453.  The broad reporting and dissemination of his speech further show that it "is a subject of legitimate news interest [and] a subject of general interest and of value and concern to the public."  *See id*.

### 2.   Dominion Has Not Pleaded Actual Malice.

Actual malice is a famously "daunting" standard.  *Tah*, 991 F.3d at 240.  A public figure plaintiff must prove by clear and convincing evidence that the speaker made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not."  *Id*.; *Maethner*, 929 N.W.2d at 873 (citing *New York Times*, 376 U.S. at 278-80).  Although reckless disregard may not be infallibly defined, it is clear that "the defendant must have made the

publication with a high degree of awareness of probable falsity," or "must have entertained serious doubts as to the truth of his publication." *Tah*, 991 F.3d at 240 (quoting *Harte-Hanks Commc'n, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989)). Further, reckless disregard is not measured by an objective standard; the speaker must have actually harbored subjective doubt as to the truth of his statements.[10] *Id*. Dominion's claims fail because its Complaint does not plausibly plead that Lindell subjectively (a) knew his statements were false when he made them or (b) had either (i) a high degree of awareness of probable falsity or (ii) serious doubts as to the truth of his statements.

None of Dominion's allegations can support an inference of actual malice. After a conclusory statement that as of December 12, 2020, "Lindell knew or recklessly disregarded that his statements about Dominion … were false," Dominion argues that: (1) Lindell set out to make facts conform to a "preconceived narrative;" (2) Lindell purportedly lied to improve My Pillow's profitability; (3) Lindell relied on bad evidence; and (4) that after the "de-platforming" of Powell and Giuliani and receipt of Dominion's cease and desist letters, Lindell did not retract his statements. Compl. at ¶ 164. Even if Dominion's allegations are considered together, they wholly fail to state a plausible set of facts upon which the Court may infer actual malice. *See Lohrenz v. Donnelly,* 350 F.3d 1272, 1283 (D.C. Cir. 2003); *Tavoulereas*, 817 F.2d at 794 n. 43; *Tah*, 991 F.3d at 241.

First, generic statements of someone acting with reckless disregard "simply cannot be read to shoehorn in every conceivable actual malice theory." *Tah*, 991 F.3d at 241. A preconceived narrative by itself is not antithetical to the truthful presentation of facts, and it does "little to show actual malice." *Id*. (quoting *Jankovic*, 822 F.3d at 597). Dominion's claim that Lindell is

---

[10] If the Court denies Lindell's motion to dismiss, Lindell will assert an affirmative defense of truth. But the Court need not reach that issue at this stage of the proceedings.

attempting to improve My Pillow's "bottom-line" also fails to allege any plausible inference of actual malice.  *See* Compl. at ¶ 164.  Allegations of a defendant's ill-will or profit motive alone do not satisfy the actual malice standard.  *Harte-Hanks*, 491 U.S. at 666-67; *Tavoulereas*, 817 F.3d at 795; *Tah*, 991 F.3d at 243; *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 91-92 (D.D.C. 2019).  Indeed, "if profit motive could somehow strip communications of the otherwise available constitutional protection, our cases from *New York Times* to *Hustler Magazine* would be little more than empty vessels."  *Harte-Hanks*, 491 U.S. at 667; *see also Campbell v. Citizens for an Honest Gov't, Inc.*, 255 F.3d 560, 571 (8th Cir. 2001) (finding that a political and profit motivation behind the speech at issue was insufficient evidence to support a finding of actual recklessness).

Finally, Dominion's allegations that Lindell relied upon evidence provided by his two allegedly "de-platformed" allies and failed to retract after receiving Dominion's cease and desist letters do not support any inference that Lindell knew his statements were false.  *See Lohrenz*, 350 F.3d at 1284.  The "mere failure to investigate is not dispositive of actual malice."  *Chafoulias*, 668 N.W.2d at 655 (citing *St. Amant v. Thompson*, 390 U.S. 727, 733 (1968)).  With respect to Lindell's own sources, Dominion has not even pleaded that Lindell was subjectively aware of any alleged unreliability.  *See Secord v. Cockburn*, 747 F. Supp. 779, 789 (D.D.C. 1990).  Nor does Dominion's allegation that Lindell purposefully avoided consulting publicly available sources that allegedly refuted his claims support a reasonable inference of actual malice.  *See Arpaio v. Cottle*, No. 18-CV-02387 (APM), 2019 WL 11322515, at *1 (D.D.C. Dec. 3, 2019).  The fact that many of Lindell's sources signed affidavits under penalty of perjury may even lend additional credence to his reliance. *See Campbell*, 255 F.3d at 575.

### 3.  Lindell Had No Doubts That His Statements Were, And Are, True.

If there is one thing Dominion got right in its Complaint, it is that Lindell is absolutely positive that the 2020 election was stolen from Donald Trump in favor of Joe Biden, that

Dominion's machines played a key role in that outcome and that Lindell has repeatedly presented evidence supporting the truth of his beliefs to the world. Dominion has thus not met its burden to plausibly plead that Lindell *knew* any of the 27 statements he made between December 12, 2020 and February 19, 2021 concerning Dominion's lead role undermining the 2020 election were false, nor has it pleaded that Lindell *harbored substantial doubts* about the truth of these statements.

### a.   There Is A Mountain Of Evidence Supporting Lindell's Statements.[11]

Mike Lindell is far from the first person to cast aspersions on Dominion's insecure, flawed voting machines. And nor are Sidney Powell, Rudy Giuliani or Fox News (other defendants sued by Dominion), or the 150 recipients of Dominion's cease and desist letters (some of whom never said a word about Dominion prior to being threatened by Dominion). Substantiated complaints about electronic voting security vulnerabilities, switched and unrecorded votes generally, and Dominion's machines specifically on those issues, date back many years.

Publicly known facts like those described below make it impossible for Dominion to plausibly allege facts showing that Lindell "knew or recklessly disregarded" the truth, that he "purposefully disregarded" the truth, "deliberately misrepresented," and "knowingly lied" as

---

[11] The exhibits in the Index are news articles, court filings, legislative documents and other publicly available documents. These exhibits are not offered to prove the truth of the matters asserted therein, but rather to provide the Court a more complete picture of the public debate regarding election security dating back to 2006. The Court may take judicial notice of these documents to show what existed and exists in the public realm regarding the issues of voting security that underlie this matter. *See HTC Corp. v. IPCom GmbH & Co., KG*, 671 F. Supp. 2d 146, 151 (D.D.C. 2009); *Gerritsen v. Warner Bros. Entm't, Inc.,* 112 F. Supp. 3d 1011, 1028 (C.D. Cal. 2015) (stating that judicial notice of press releases and news articles can be used to "'indicate what was in the public realm at the time, not whether the contents of those articles were in fact true.'" (cleaned up)). And the Court's judicial notice of such documents does not turn a motion to dismiss into a motion for summary judgment. *In re Lorazepam & Clorazepate Antitrust Litig.*, No. 0-1650, 2004 WL 7081446, at *1 n.1 (D.D.C. May 18, 2004). All of the exhibits in the Index are incorporated by reference as if fully set forth herein, and the most relevant portions of the exhibits are highlighted for the Court's convenience.

Dominion claims.  Compl. ¶¶ 34, 41, 70, 164.  Dominion's bare conclusory allegations are not *plausible facts* which could support an inference of subjective knowledge and thus are insufficient to maintain this suit.  *See Tah*, 991 F.3d at 243.

        **i.**        **Legislators Across The Political Spectrum Have Decried Security Flaws In Electronic Voting Machines.**

In August 2019, Def Con 27 Voting Machine Hacking Village ("Def Con 27") issued its report, co-authored by Harri Hursti, who is one of the experts relied upon in the *Curling* case discussed below.  The forward to the report was written by Senator Ron Wyden, D-OR, a long-tenured member of the Senate Select Committee on Intelligence, who said that "nearly three years after Russia showed it was willing and able to penetrate our election systems…our election infrastructure is still far too vulnerable to attacks [and] far too much of the equipment that American democracy depends [SIC] is fundamentally insecure."  Index at 216.  Senator Wyden went on to say that "[m]aybe, someday, there will be electronic voting machines that can stand up against dedicated hacking campaigns.  **That day certainly won't arrive in time for the 2020 elections, or the 2022 elections, for that matter.**"  *Id.*  (emphasis added).

The afterword to the Def Con 27 report was written by Congresswoman Jackie Speier, D-CA, a member of the House Intelligence Committee.  Rep. Speier wrote that "[t]he apparent technological ease of direct-recorded, entry touchscreen systems has been warmly embraced by many.  But those systems also open up new avenues for interference."  Index at 247.

In December 2019, Senators Elizabeth Warren, D-MA, Amy Klobuchar, D-MN, Ron Wyden, D-OR, and Congressman Mark Pocan, D-WI, wrote letters to 3 hedge funds regarding ownership in electronic voting companies, where they noted that ES&S, Dominion and Hart InterCivic collectively facilitate voting for more than 90% of all voters in the United States.  Index

at 113-14, 118-19, 123-24.  They went on to identify serious flaws in electronic voting machines that "threaten the integrity of our elections."  Index at 114-15, 119-20, 124-25.

On December 3, 2020, around the same time as Lindell's publicized criticisms of Dominion's machines began, the State of Georgia's Election Law Study Subcommittee of the Standing Senate Judiciary Committee held a hearing to examine, in part, the 2020 general election in Georgia.  Index at 94-95.  Georgia used Dominion machines statewide in the 2020 general election.  The subcommittee's report found that the 2020 general election "was chaotic and any reported results must be viewed as untrustworthy."  Index at 95.  The subcommittee heard evidence that:

- Dominion's "machines can duplicate fraudulent ballots;"

- Dominion's system can respond wirelessly to a reset;

- Trained personnel could not tell the difference between real and test ballots;

- "Dominion machines can be programmed with algorithms that reallocate votes between candidates;"

- "Dominion machines are programmed to count votes using percentages of whole numbers rather than actual votes;" and

- Dominion's origins and ownership are unclear and implicate "foreign interference in the U.S. election."

Index at 96.  The Subcommittee concluded "that the 2020 Georgia General Election was so compromised by systemic irregularities and voter fraud that it should not be certified."  Index at 105.

On January 2, 2021, Georgia State Senator William Ligon, Chairman of the Senate Judiciary Committee on the Election, sent a letter asking the President to "send an outside team of cyber experts to investigate potential hacking and other irregularities associated with [Dominion]

scanners, ballot marking devices, ballots and polling pads used in the 2020 general election in Georgia." Index at 110. Senator Ligon identified three primary bases for his request:

- Dominion's machines had a 93.67% error rate in Fulton County, compared to the national average of 1.2%;

- Evidence of Dominion's machines switching thousands of votes from Donald Trump to Joe Biden; and

- A demonstration that a Dominion poll pad could be hacked in realtime.

Index at 111.

Multiple states have instituted investigations into irregularities in the 2020 election. Arizona is attempting to "restore integrity to the election process" by ordering post-election forensic audits that include Dominion's voting machines. Index at 427-28. The New Hampshire Senate voted 24-0 last month to conduct a complete examination of Dominion-owned voting machines after suspicious shorting of votes was discovered. Index at 430. On March 23, 2021 the Wisconsin Assembly ordered an investigation into the 2020 election. Index at 432. Notably, Dominion machines that were not supposed to be connected to the internet were in fact connected to a "hidden" Wi-Fi network during voting in Wisconsin, access to which was given to a political operative. Index at 436.

### ii. *Curling v. Raffensperger.*

In *Curling v. Raffensperger*, 493 F. Supp. 3d 1264, two sets of plaintiffs[12] sued the Georgia Secretary of State and others challenging, in part, Georgia's 2019 contract with Dominion and the state's implementation of its April 2, 2019 law requiring the use of electronic voting machines.

---

[12] The plaintiffs in *Curling* were considered left of center on the political spectrum. For example, Rachel Maddow called the Coalition for Good Governance (one of the *Curling* plaintiffs) the "good government group." *See https://coalitionforgoodgovernance.org/* (last visited April 23, 2021).

Index at 445.  The *Curling* plaintiffs alleged that Dominion's systems "in its design and operation, is not voter-verifiable, secure or reliable" and that it "suffers from some of the same major cybersecurity vulnerabilities posed by" Georgia's previous voting system.  Index at 445.  The plaintiffs questioned whether a voter's intent would be "correctly captured, scanned, and accurately counted" and raised "significant issues regarding the auditing of the election system's voting results and ballot processing."  Index at 445.

Georgia's contract with Dominion in 2019 came "at a time when the cybersecurity risks and vulnerabilities of digital election systems had emerged as a major concern of national leadership and as well as prominent computer engineering and cybersecurity experts and academic organizations."  Index at 448.  The court also recognized that "[e]lection systems were now classified as critical national infrastructure."  Index at 448.

The *Curling* plaintiffs presented evidence of three primary security flaws in the Dominion system.  First, because the QR code-based voting system did not provide a mechanism for a voter to verify his/her ballot, the ballot-counting system is "subject to being accessed and manipulated through hacking, unauthorized intrusion into the [ballot-marking device ("BMD")] computer system or its various components…, by USB flash drives…, or by other interfaces with the internet through cyber attacks or applications that may be carrying malware."  Index at 449.  Second, "the BMD system is susceptible to significant cybersecurity risks and manipulation through hacking access to any one of its multiple components. . . ."  Index at 449.  Third, the QR code-based system "is incapable of being meaningfully audited."  Index at 449.

Due to the timing of the court's decision less than a month before the 2020 general election, the *Curling* court did not grant all relief sought by the plaintiffs.  However, the court stated:

> The Court's Order has delved deep into the true risks posed by the new BMD voting system as well as its manner of implementation.  **These risks are neither**

**hypothetical nor remote under the current circumstances.** The insularity of the Defendants' and Dominion's stance here in evaluation and management of the security and vulnerability of the BMD system does not benefit the public or citizens' confident exercise of the franchise. **The stealth vote alteration or operational interference risks posed by malware that can be effectively invisible to detection, whether intentionally seeded or not, are high once implanted, if equipment and software systems are not properly protected, implemented, and audited**. The modality of the BMD systems' capacity to deprive voters of their cast votes without burden, long wait times, and insecurity regarding how their votes are actually cast and recorded in the unverified QR code makes the potential constitutional deprivation less transparently visible as well, at least until any portions of the system implode because of system breach, breakdown, or crashes. Any operational shortcuts now in setting up or running election equipment or software creates other risks that can adversely impact the voting process.

**The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of "might this actually ever happen?" - but "when it will happen," especially if further protective measures are not taken. Given the masking nature of malware and the current systems described here, if the State and Dominion simply stand by and say, "we have never seen it," the future does not bode well.**

Index at 486.  (emphasis added).

### iii.    Texas Refused To Certify Dominion Machines Due To Security Flaws.

On October 2-3, 2019, Dominion presented its Democracy Suite 5.5-A voting system for certification to the State of Texas.  Dominion had previously submitted Democracy Suite 5.5 for certification in January 2019 and was denied; the October test was a second chance for Dominion to have its machines certified for use in the second-most populous state in the Union.  Despite this golden opportunity, Dominion showed up and had trouble installing software on its own machines. And despite having gone through internal logic and accuracy testing, Dominion still had numerous flaws in its system, leading one examiner to ponder, "If Dominion personnel, theoretically the most expert users of this software, can create an election definition with so many glaring errors, how error-prone will the systems be for jurisdictions that opt to create their own election definitions?"  Index at 139.  Although Texas provided detailed reports identifying the reasons for

its previous refusal to certify Dominion's machines, which provided Dominion a roadmap for changes needed to achieve certification, Dominion's machines performed so horribly in the second examination that all five examiners refused to certify Dominion's product for use in Texas. Index at 132, 147, 154, 160, 166.

All five Texas examiners cited specific reasons in their refusals to certify Dominion. One noted that Dominion's system could be connected to the Internet, in addition to numerous other security flaws. Index at 130-32. Another, in addition to finding security vulnerabilities with the system's access to the Internet, noted additional networking and system configuration flaws. Index at 164, 166. A third examiner noted problems with adjudication (whereby humans are called in to determine a voter's intent), installation, misleading messaging to voters, and the ability for an examiner to connect his cell phone to the voting device's USB port without alerting anyone monitoring the voting. Index at 158-60. The fourth likewise noted that an examiner was able to connect his phone to the USB port and that other security vulnerabilities could lead to vote manipulation. Index at 153-54. The final examiner noted the USB security flaw and recommended against certification because Dominion could not meet Texas' requirement that its system be "safe from fraudulent or unauthorized manipulation." Index at 144, 146-47.

>### iv. Dominion's Security Flaws Have Been The Subject Of Extensive Examination And Discussion By Experts And End-Users.

The *Curling* plaintiffs offered several experts who examined Dominion's machines and testified as to their vulnerabilities. Alex Halderman, Ph.D., "is a nationally recognized expert in cybersecurity and computer science in the elections field" who testified before the U.S. Senate's Select Committee hearings on the topic of Russian interference with the 2016 presidential election and whose testimony and work was referenced in that Committee's report. Index at 489. In *Curling*, Dr. Halderman testified that attackers could alter election outcomes under Georgia's

Dominion system in several ways, including causing the machines to print barcodes that do not match the voter's intent or attacks on the scanners that read the printed ballots to change the votes. Index at 4-5.  He testified that this could be done by infecting the equipment with malware, even on non-networked devices.  Index at 6-7.  He noted that "Dominion does not dispute that its products can be hacked by sufficiently capable adversaries."  Index at 8.  Dr. Halderman cited numerous factors contributing to Dominion's vulnerabilities, including the complexity of the software, the outdated software in the off-the-shelf modules used in Dominion's system, the use of barcodes as the only manner of reading voters' choices, and even the fact that Georgia made electronic ballot-marking devices mandatory for all voters, which increases its attractiveness to hackers.  Index at 8-11, 16-17, 25-26, 83-84.  Dr. Halderman found that "the Dominion system was designed without sufficient attention to safety."  Index at 15.  In conclusion, Dr. Halderman found:

> Georgia's BMD-based election system does not achieve the level of security necessary to withstand an attack by…sophisticated adversaries. Despite the addition of a paper trail, it suffers from severe security risks much like those of the [Direct Recording Electronic voting systems ("DREs")]-based election system it replaced.  Like paperless DREs, Georgia's BMDs are vulnerable to attacks that have the potential to change all records of a vote.

Index at 32.

Another expert in *Curling* was Harri Hursti, Ph.D., "a nationally recognized cybersecurity expert…with a particular expertise in the knowledge, observation and prevention of malicious activities in networked environments."  Index at 454.  Dr. Hursti testified that "the role played by Dominion personnel in Fulton County, and other counties with similar arrangements, should be considered an elevated risk factor when evaluating the security risks of Georgia's voting system." Index at 42.  He further testified that the computers running the software were not hardened to reduce vulnerability, which Dr. Hursti called "unacceptable."  Index at 43-45.  Dr. Hursti also

- 22 -

noted vulnerabilities with respect to removeable media, being "naturally prone to human errors," and apparent Internet connectivity, which, according to Dr. Hursti, "has gravely serious implications for the security of the new Dominion system."  Index at 46-48, 50-51.  Dr. Hursti concluded:

> The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access, are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system.
>
> *             *             *
>
> **The voting system is being deployed, configured and operated in Fulton County in a manner that escalates the security risk to an extreme level and calls into question the accuracy of the election results.**

Index at 52, 66 (emphasis added).

In addition to these experts, private citizens have provided affidavits under the penalty of perjury detailing rampant security flaws in Dominion's voting machines.[13]  For example:

- Amy Gilleo, Dominion representative in Wayne County, Michigan, from November 1-4, 2020, testified that, among other things, broken Dominion machines were sent to Republican precincts, large groups of ballots were scanned multiple times, there were flaws in the adjudication system, and that a Dominion machine was connected to the Internet.  Index at 269-71.

- Misty Martin, a Coffee County, Georgia Supervisor of Elections since 2018, testified that, among other things, Dominion's system allows easy vote manipulation during adjudication, ballots can be scanned multiple times, and that poll pads could be connected to the Internet.  Index at 278-80.

- Mellissa Carone, Dominion contractor in Michigan during the 2020 election, testified that, among other things, Dominion machines would rescan ballots (including one batch that was counted 8 times) and making it easy to change votes during adjudication.  Index at 274-75.

---

[13] On information and belief, Dominion, acting like a schoolyard bully, has sent many of these layperson affiants cease and desist letters threatening them with lawsuits if they continue to talk about Dominion.

<strong>v.      Academic Papers Have Detailed Security Flaws.</strong>

The 2019 Def Con 27 report forwarded by Senator Wyden, afterworded by Representative Speier and co-authored by Dr. Hursti, detailed a host of flaws with Dominion's machines, including:

- The ability to access USB and other ports without destructive force (so that the access cannot be readily detected);

- Running software with 20 currently-known medium to high security vulnerabilities, including remote access;

- No digital signing or encryption protecting certain digital files; and

- The ability to remotely manipulate the machine's memory card when connected to a network.

Index at 233-35.

While Georgia did not use Dominion machines in 2018, its switch to Dominion for the 2020 general election was a mere continuation of Georgia's insecure, untrustworthy elections. Even before the 2020 general election debacle, Georgia had been a focal point for its "unfair and insecure" elections for years.  Index at 197.  Researchers found that Georgia's "2018 election produced anomalous results that could have been caused by malfunctioning, misprogrammed, or hacked election technology, including DREs."  Index at 198.  All the way back in 2002, when Georgia first used electronic voting, its results "defied poll predictions."  Index at 202.   And in 2016, a researcher found he could download confidential files from the state's secure election server.  *Id.*  In 2018, researchers found 3 different statistical anomalies that undermined the notion that the DREs were accurate:

- In 2/3 of Georgia's counties, undervotes in the Lieutenant Governor's race "w[ere] much higher among DRE votes…than on (paper) absentee ballots;"

- In Fulton County, undervote rates were higher in predominantly black precincts; and

- 24 -

- In one polling place with seven machines, Democrats won every statewide race on six of the machines; on the seventh machine, however, Republicans won every statewide race.

Index at 396.

On December 27, 2019, Professors Andrew Appel of Princeton, Richard DeMillo of Georgia Tech and Philip Stark of U.C.-Berkeley published a paper entitled "Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters." Index at 168. The authors found these security flaws in Dominion's machines:

- Hackers could easily install vote-stealing software on optical-scan ballots such as Dominion ICE; and

- A feature that allowed a voter to skip the printing of their ballot for review, as this would permit malicious software to change the ballot without the voter ever having a chance to review it.

Index at 189-90. Ultimately, the authors concluded that "BMDs are…subject to hacking, bugs, and misconfiguration of the software that prints the marked ballots [and] there is no way to deter, contain or correct computer hacking in BMDs. These are the essential security flaws of BMDs." Index at 168.

### vi.    Media Reports Have Publicized Security Problems With Electronic Voting Machines, Including Dominion's.

In addition to these representatives from all branches of government, subject matter experts and firsthand witnesses, for more than a decade media reports have publicized the flaws with electronic voting machines generally, and Dominion's specifically. In 2006, Robert Kennedy, Jr. called electronic voting machines "a hacker's dream." Index at 336. In a July 2019 piece, the Pew Charitable Trust decried the lack of federal oversight of electronic voting machines. Index at 304-05. In a common refrain, Pew began with the Democratic dogwhistle of Russians trying to influence the 2016 presidential election, then excoriated House Republicans for not signing on to

the Democrats' election security bill, and then discussed the problems in Georgia (described above) in an effort to imply that Republicans were at fault for the security flaws with electronic voting machines.  Index at 304-05, 307-08.

A March 17, 2021, piece on The Federalist's website pointed out the hypocrisy by the media (and, by extension, Dominion) when it comes to criticism of Georgia's voting system.  The New York Times wrote a piece about the 2020 primary election saying Georgia's "voting system…suffered 'a spectacular collapse'" and questioned whether Georgia's Republican Secretary of State was to blame.  Index at 312.  Politico in 2019 said that Georgia was going to buy "insecure voting machines" from Dominion, despite warnings about security issues.  *Id*.  The Atlanta Journal-Constitution in 2019 pointed out that Georgia's new Dominion system would still be vulnerable to hacking.  *Id*.  The Washington Post and The New York Times piled on with stories decrying the insecurity of Dominion's machines in Georgia.  Index at 313.

So at least four high-profile, left-leaning publications published stories about the security flaws inherent in Dominion's machines.  But Dominion has not sued them.

In January 2020, NBC News published a piece pointing out that electronic voting machines, including those from Dominion, can be connected to the Internet, which renders them susceptible to hacking.  Index at 323-24, 326.  In November 2020, an article on www.defyccc.com described additional flaws with Dominion's voting machines, specifically, back-end software that allows a user to manually alter election results.  Index at 298.  A December 8, 2020, piece in The Epoch Times details a connection between Dominion and Smartmatic, a voting software company founded in Venezuela.  Index at 282, 290.  Each of these provides additional support for Lindell's statements regarding Dominion.

**vii.    Experts Have Determined That Dominion Nefariously Impacted The 2020 Presidential Election.**

There can be no reasonable debate that Dominion's machines are flawed and vulnerable to attack.  But did hackers exploit the flaws in Dominion machines to illicitly influence the 2020 general election?  Several researchers have used data analysis to show that is exactly what happened.

On November 21, 2020, www.fraudspotters.com published an article using statistical analysis to show that the results were approximately 1.5% higher for Joe Biden and 1.5% lower for Donald Trump than expected in the counties using Dominion voting systems for the 2020 general election.  Index at 364-65.

In the highly publicized case of vote switching in Antrim County, Michigan, where the initial vote tally had Biden in the lead 7,769 to 4,509 and, after several revisions, a final tally of Trump 9,748 to Biden 5,960 was certified, Allied Security Operations Group ("ASOG") conducted a forensic audit and issued a report on December 13, 2020 analyzing the role of Dominion's machines in voting problems in the county.  Index at 340-41.   ASOG's report painstakingly goes through its methods and findings, which led it to conclude:

> We conclude that the Dominion Voting System is intentionally and purposefully designed with inherent errors to create systemic fraud and influence election results. The system intentionally generates an enormously high number of ballot errors. The electronic ballots are then transferred for adjudication. The intentional errors lead to bulk adjudication of ballots with no oversight, no transparency, and no audit trail. This leads to voter or election fraud. Based on our study, we conclude that The Dominion Voting System should not be used in Michigan.   We further conclude that the results of Antrim County should not have been certified.

Index at 340.

More recently, Douglas Frank, Ph.D., who has been published in leading scientific journals, investigated statistical anomalies with vote totals in the 2020 general election.  Index at 398, 400-25.  More from Dr. Frank can be seen at lindelltv.com in the Scientific Proof and

Absolute Interference docu-movies.  In a nutshell, he plotted census data for a series of counties and compared the population, eligible voter population, number of registered voters and number of ballots cast, and he determined that the ratios lined up almost perfectly.  Index at 404.  So perfectly, in fact, that after he found the "key" – the set of ratios for a particular state (described by a sixth-order polynomial) – Dr. Frank was able to accurately predict the voting demographics in every county using only the turnout combined with the U.S. Census population or the registration rolls. According to Dr. Frank, such a result would not be possible without an algorithm being employed to manipulate vote tallies.  This led Dr. Frank to conclude **"that ballots are being harvested at the precinct level, regulated at the county level, and determined at the state level…confirm[ing] that algorithms had access to voting databases and voting activity before, during and following the November 3, 2020 election."**  *Id*. (emphasis added).

All of these experts confirm the conclusions in Absolute Proof – Lindell's docu-movie that is the basis for Plaintiffs' claims in their Complaint ¶ 165(y).  Dominion may disagree with the sources Lindell relied upon and the statements Lindell made, but its mere disagreement does not mean that any of these individuals were incorrect or that Lindell acted with actual malice in relying on them.

### b.     Mike Lindell Has Never Wavered In His Convictions.

Dominion's allegations regarding Lindell's refusal to retract his statements do not establish a reasonable inference of actual malice.  In fact, Lindell's refusal to retract and continued publication in the face of Dominion's denials and threats undercuts Dominion's allegation that Lindell could have "subjective doubt" with respect to any of Lindell's statements that Dominion claims are defamatory.  *Jankovic*, 822 F.3d at 589; *see also Connelly v. Nw. Publ'ns, Inc.*, 448 N.W.2d 901, 905 (Minn. Ct. App. 1989) (citing *St. Amant*, 390 U.S. at 732).

Dominion first threatened Lindell with litigation on December 23, 2020, at which point Lindell had made 7 of the 27 allegedly defamatory statements. Compl. at ¶165 (a-g) and Ex. 266. Despite Dominion's threat, Lindell continued to tell the world about the malfeasance conducted through Dominion's machines, resulting in a second cease and desist letter from Dominion on January 8, 2021. Compl. at ¶165 (h-n) and Ex. 269. In the January 8 letter, Dominion made the point of telling Lindell that it had sued Sidney Powell, apparently to show Lindell its willingness to quell speech and weaponize the court system. Compl. Ex. 269. Undeterred and unwavering in his belief, Lindell continued to use his platform to speak out against Dominion, which resulted in yet a third threatening letter on February 4, 2021. Compl. at ¶165 (o-w) and Ex. 314.

Mike Lindell has overcome a lot of obstacles in his life, and he was not about to allow himself to be bullied by Dominion, a company who has positioned itself as a gatekeeper of American democracy despite rampant, known security flaws that have been shown to have been exploited in the 2020 general election. Just as he promised to do, on February 5, 2020, Lindell released Absolute Proof detailing the role of Dominion's machines in undermining the 2020 presidential election. Compl. at 103. And despite being sued for $1.3 billion, Lindell has continued to make media appearances talking about the role Dominion's machines played in the 2020 election and to release additional evidence of election manipulation as it becomes known. For example, https://www.lindelltv.com (last visited April 23, 2021) has a series of video appearances by Lindell, including an appearance Lindell made on the Eric Metaxas podcast after the release of Absolute Proof and a video entitled Scientific Proof, which was the first follow-up to Absolute Proof. On April 20, 2021, Lindell published Absolute Interference, a docu-movie detailing China's role in hacking electronic voting machines, including Dominion's machines, and

its impact on the outcome of the 2020 election.  And Lindell has promised to release additional content.

The sheer volume of content that Lindell produces – and the evidence he discusses regarding the role that electronic voting machines, including Dominion's, played in the hacking and changing votes in the 2020 election – is fatal to Dominion's claim.  There is simply no way for Dominion to meet its burden to plausibly plead that Mike Lindell has a shred of doubt about the statements he has made, because he has no doubt whatsoever.

**B.      The Court Should Also Dismiss Dominion's MDTPA Claim.**

In an obvious attempt to avoid the stringent First Amendment impediments to its defamation claim, Dominion has also sued Lindell under the Minnesota Deceptive Trade Practices Act, MINN. STAT. § 325D.44 (the "MDTPA"), for the exact same conduct underlying its defamation claims.  Under the MDTPA, "[a] person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person: . . . (8) disparages the goods, services, or business of another by false or misleading representation of fact[.]"  MINN. STAT. § 325D.44, subd. 1(8).  Thus, the conduct that Dominion complains of under its MDTPA claim mirrors that of its defamation claim – that Lindell made allegedly false statements.

Dominion cannot avoid the "daunting" First Amendment defamation requirements simply by pleading an MDTP claim on the exact same conduct.  "A plaintiff may not use related causes of action to avoid the constitutional requisites of a defamation claim." *Moldea v. New York Times Co.*, 22 F.3d 310, 319 (D.C. Cir. 1994); *see also Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017); *Farah v. Esquire Magazine,* 736 F.3d 528, 540 (D.C. Cir. 2013).  Dominion's MDTPA claim is improper gamesmanship and should be dismissed.

Moreover, money damages are not recoverable by a private plaintiff under the MDTPA, and the sole statutory remedy[14] is injunctive relief to prevent prospective harm. *Id.* at § 325D.45; *Nelson v. Am. Family Mut. Ins. Co.*, 262 F. Supp. 3d 835, 862 (D. Minn. 2017), *aff'd*, 899 F.3d 475 (8th Cir. 2018). So why bring a claim for the same conduct under a statute that only permits injunctive relief but fail to seek a temporary injunction to stop Lindell from making further allegedly false statements (when he has shown no signs of stopping his statements)? Obviously, Dominion wants an avenue to its attorneys' fees, which are not allowed for defamation. The MDTPA, however, "was not intended to afford the 'back-door' attorney-fee relief" to tort claimants, and "[a] party may not assert a [M]DTPA claim for the sole purpose of receiving attorney fees." *Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*, 603 N.W.2d 336, 340 (Minn. Ct. App. 1999).

**C.    The Court Should Dismiss This Case For Lack Of Personal Jurisdiction Pursuant To Federal Rule Of Civil Procedure 12(b)(2).**

The Complaint should also be dismissed for lack of personal jurisdiction under FED. R. CIV. P. 12(b)(2). Lindell is not subject to this Court's general or specific personal jurisdiction. The purported connection between this lawsuit and Lindell's presence in D.C. is attenuated, at best, when considering the claims at issue. The District's long-arm statute does not reach Lindell, and the Due Process Clause of the Constitution protects Lindell from being hauled into this Court. *See Int'l Shoe Co. v. State of Wash., Off. of Unemp't Comp. & Placement*, 326 U.S. 310, 313 (1945) (citing the Fourteenth Amendment of the U.S. Constitution).

---

[14] The district court has discretion to award attorney fees to a prevailing party. MINN. STAT. § 325D.45, subd. 2.

1.      **The Legal Standard To Determine Jurisdiction.**

A federal court sitting in the District of Columbia may exercise personal jurisdiction only to the extent of a court of general jurisdiction in the District.  FED. R. CIV. P. 4(k)(1)(A); *Fay v. Humane Soc'y of the U.S.,* No. 20-CV-1893 (RCL), 2021 WL 184396, at *3 (D.D.C. Jan. 19, 2021).  Personal jurisdiction can be satisfied by demonstrating that the court has general jurisdiction pursuant to D.C. CODE § 13-422, *or* that the court has personal jurisdiction pursuant to the District of Columbia long-arm statute, D.C. CODE § 13-423.  *Burman v. Phoenix Worldwide Indus.,* 437 F. Supp. 2d 142, 147 (D.D.C. 2006).  "A defendant is subject to general jurisdiction when the defendant's affiliations with the forum State are so continuous and systematic as to render the defendant 'at home' in the forum State.  Specific jurisdiction, on the other hand, arises out of or relates to the defendant's contacts with the forum."  *Ashhab-Jones v. Cherokee Nation Strategic Programs, LLC*, No. 1:19-CV-00089 (CJN), 2020 WL 6262090 at *5 (D. D.C. Oct. 23, 2020) (Nichols, J.).

Dominion bears the burden of establishing jurisdiction over each defendant.  *See Crane v. N.Y. Zoological Soc'y,* 894 F.2d 454, 456 (D.C. 1990) (hereafter *N.Y. Zoological Soc'y*) (holding that the plaintiff had established a *prima facie* case of jurisdiction for his libel claim because he suffered the injury where he lived—in D.C.).  They "must allege specific acts connecting [each] defendant with the forum."  *Second Amendment Found. v. U.S. Conf. of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001) (quoting *First Chi. Int'l v. United Exch. Co.,* 836 F.2d 1375, 1378 (D.C. Cir. 1988)) (holding that the plaintiffs did not establish personal jurisdiction in D.C. by relying on one (non-conspiratorial) meeting that the defendants had there).  To survive a motion to dismiss for lack of personal jurisdiction, Dominion must make a *prima facie* showing of the pertinent jurisdictional facts.  *See Lewy v. S. Poverty L. Ctr., Inc.*, 723 F. Supp. 2d 116, 118 (D.D.C. 2010).  When reviewing a challenge to personal jurisdiction, a court may review declarations and consider

other matters outside of the pleadings. *See, e.g., United States v. Philip Morris Inc*., 116 F. Supp. 2d 116, 120 n. 4 (D.D.C. 2000) (holding that there was not personal jurisdiction under § 13-423(a)(4)).  Although factual discrepancies must be resolved in favor of the plaintiff, conclusory statements or bare allegations regarding a defendant's action do not satisfy a plaintiff's burden. *Ashhab-Jones*, 2020 WL 6262090 at *3 (holding that the court could not exercise personal jurisdiction against Oklahoma employer in a discrimination suit because neither the defendant nor the injury were located in D.C.).  Even if Plaintiffs satisfy the long-arm statute (which they cannot do), they must still satisfy the Due Process Clause by showing that Lindell has "minimum contacts" with the forum such that "maintenance of the suit does not offend traditional notions of fair play and substantial justice."  *Id.* at *5 (quoting *GTE New Media Servs., Inc. v. BellSouth Corp.,* 199 F.3d 1343, 1347 (D.C. Cir. 2000)).

### 2. This Court Does Not Have Personal Jurisdiction Over Lindell.

Plaintiffs allege personal jurisdiction pursuant to only three subsections of D.C.'s long arm statute, D.C. CODE §§ 13-423(a)(1), (a)(3), and (a)(4).  Compl. at ¶ 12.  When jurisdiction over a person is predicated on any of these sections, "only a claim for relief arising from acts enumerated in this section may be asserted against him."  D.C. CODE § 13-423(b).  Lindell is not subject to personal jurisdiction under any of the three theories of personal jurisdiction asserted.

### a. Lindell Did Not "Transact Business" In The District Of Columbia.

First, Lindell did not "transact business" necessary for this Court to assert personal jurisdiction under § 13-423(a)(1).  The law is clear: "[N]ot even the *in-state* commission of a tort is defined as doing business in D.C. under the long-arm statute."  *IMAPizza LLC v. At Pizza, Ltd.,* 334 F. Supp. 3d 95, 111 (D.D.C. 2018) (emphasis in original).  Defamation is a tort claim. *Lapointe v. Van Note*, No. CIV.A. 03-2128(RBW), 2004 WL 3609346, at *5 (D.D.C. Nov. 9, 2004) (granting motion to dismiss defamation action against out-of-state defendant under

subsections (a)(1), (a)(3), and (a)(4).  Thus, Lindell did not "transact business" by committing alleged defamation, and the first assertion of personal jurisdiction—transacting business—under section (a)(1) may be easily disposed of in Lindell's favor.

Even if Lindell is determined to have transacted business in D.C. for purposes of this suit (which he has not done), asserting personal jurisdiction over him for only one appearance on December 12, 2020, would offend the constitutional notions of fair play and justice.  "[A] plaintiff must show not only that the defendant transacted business in the District of Columbia and that the claim arose from the business transacted in the District of Columbia, but also 'that the defendant had minimum contacts with the District of Columbia such that the Court's exercise of personal jurisdiction would not offend traditional notions of fair play and substantial justice.'" *Burman*, 437 F. Supp. 2d at 148 (quoting *Dooley v. United Techs. Corp.,* 786 F. Supp. 65, 71 (D.D.C. 1992)).  "[S]ection 13–423(a)(1) is coextensive in reach with the personal jurisdiction allowed by the due process clause of the United States Constitution."  *Philip Morris*, 116 F. Supp. 2d at 128 (quoting *Shoppers Food Warehouse v. Moreno,* 746 A.2d 320, 329 (D.C. 2000)).  Dominion alleges that Lindell only mentioned My Pillow one time in D.C.  *See* Compl. at ¶ 51.  One isolated remark about his business during one appearance is insufficient to subject Lindell to the personal jurisdiction of this Court.  *See Lewy*, 723 F. Supp. 2d at 129 (finding that four trips to the District and several phone calls to the District by the individual, out-of-state defendant, even though some were allegedly in connection with the defamation allegations, did not rise to the requisite level for personal jurisdiction); *The Urb. Inst. v. FINCON Servs.*, 681 F. Supp. 2d 41, 47-48 (D.D.C. 2010) (finding that three unsuccessful trips to solicit business in the District did not rise to the requisite level); *Burman,* 437 F. Supp. 2d at 153-54 (finding that attendance by defendants' employees at "continuing education programs, seminars, and conferences" in the District did not satisfy the

plaintiff's burden); *Am. Ass'n of Cruise Passengers v. Cunard Line, Ltd.,* 691 F. Supp. 379, 381 (D.D.C. 1987) (finding that "sporadic attendance at trade association meetings" in the District was insufficient for personal jurisdiction).  Thus, Plaintiffs' first theory of personal jurisdiction fails.

> **b.     Dominion Did Not Suffer Any Injury, Especially Not In The District Of Columbia.**

The next jurisdictional hook attempted by Plaintiffs is also inapplicable.  Section 13–423(a)(3) requires that "both act and injury occur in the District of Columbia."  *Burman*, 437 F. Supp. 2d at 152 (quoting D.C. CODE § 13-423(a)(3)).  Courts in this District have recognized that defamation implicates two types of injury:  reputational and economic.  *Mar-Jac Poultry, Inc. v. Katz*, 773 F. Supp. 2d 103, 112 (D.D.C. 2011) (citing Restatement (Second) of Conflict of Laws, § 150, comment f (1971)).  As the Restatement (Second) of Conflict of Laws § 150 explains, "A state, which is not the state of the plaintiff's domicile, may be that of most significant relationship if it is the state where the defamatory communication caused plaintiff the greatest injury to his reputation."  *See also Mastro v. Potomac Elec. Pwr. Co.*, 447 F.3d 843, 857-58 (D.C. Cir. 2006) (holding that D.C. law applied in a defamation case where the plaintiff was a resident of Maryland but suffered injury in D.C. where he was employed and where the defamation hurt his reputation with co-workers).  Thus, the alleged reputational injury must be in a state where the alleged defamation has caused Dominion the most injury – which is obviously not D.C., where Dominion had no voting machines during the 2020 Election.[15]  As for economic injury:  "Quite clearly, economic loss resulting from defamation is most likely to be felt in one's place of business whatever the locus of its publication."  *N.Y. Zoological Soc'y*, 894 F.2d at 457-58 (finding personal

---

[15] According to Verified Voting, a non-partisan, non-profit organization with no financial interest in voting equipment manufacturers, in the 2020 General Election, D.C. used ES&S Ballot Marking Devices               and               Optical               Scanners.               *See* https://verifiedvoting.org/verifier/#mode/navigate/map/ppEquip/mapType/normal/year/2018/state/11 (last visited April 23, 2021).

jurisdiction was where the D.C.-resident plaintiff resided).  Plaintiffs, whose U.S. headquarters are in Colorado or Ontario, did not suffer any alleged economic injury in D.C.  "Courts here have found that a defamation plaintiff suffers injury where he lives and works." *Corsi v. Stone*, No. CV 19-324 (TJK), 2020 WL 999053, at *3 (D.D.C. Mar. 1, 2020) (dismissing the defamation claim for improper venue because the defendant did not make any of the defamatory statements in D.C., despite that the statements were allegedly targeted to a D.C. audience for purposes of influencing a D.C. criminal case).  At the very least, the purported injury suffered by Dominion is not in D.C. because Dominion had no voting machines, no offices, and no relevant business contracts in D.C. Thus, Dominion's second theory of personal jurisdiction over Lindell also fails.

### c.      No "Plus Factor" Applies.

Plaintiffs' third attempt to establish personal jurisdiction also cannot survive.  Subsection (a)(4) allows for personal jurisdiction if the conduct occurs *outside* the District, but the injury occurred *inside* the District, so long as one of the 'plus' factors also applies.  As explained above, the injury to Plaintiffs (if any) did not occur in D.C.  Even if it did, none of subsection (a)(4)'s "plus" factors apply.  The "plus" factors "regularly doing or soliciting business, engaging in persistent conduct, or deriving substantial revenue—are meant to filter out cases in which the in-forum impact is an isolated event and the defendant has no, or scant, affiliations with the forum." *Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 48 (D.D.C. 2018) (dismissing claims against the individual, out-of-state defendant who had not received substantial revenue from the defamatory comments she made to The Washington Post); *see also Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987) (remanding defamation case because the lower court's findings were insufficient to show the requisite amount of contacts or nexus between the "outside act" and "inside impact").  This District has previously found that the "plus" factors had not been satisfied to assert personal jurisdiction over: (i) a president of a nonprofit association who traveled to D.C. allegedly

to further his defamatory intentions, *Lewy*, 723 F. Supp. 2d at 124; (ii) an out-of-state defendant based on his "sporadic attendance at trade association meetings held in the District of Columbia," *Am. Ass'n of Cruise Passengers*, 691 F. Supp. at 381; or (iii) an out-of-state lobbyist who had dozens of contacts with D.C. but only three promotional visits to D.C. in the relevant time frame, *Akhmetshin v. Browder*, 983 F.3d 542, 557 (D.C. Cir. 2020) (remanding for further discovery on the third plus factor). Similarly, Lindell has scant affiliations with D.C. Therefore, Lindell cannot be said to have "regularly conducted business" in D.C. or have engaged in "persistent conduct" in D.C.

Furthermore, "substantial revenue," in the context of section (a)(4), "means enough revenue to indicate a commercial impact in the forum, such that a defendant fairly could have expected to be hauled into court there. The test for substantial revenue looks both at the absolute amount and at the percentage of total sales, and determines what is substantial on the facts of each case." *Burman*, 437 F. Supp. 2d at 153 (cleaned up). Dominion has failed to allege that Lindell, himself, has gained substantial revenue derived from the statements that he made in D.C. about the election. *See Vasquez*, 302 F. Supp. 3d at 49 ("Even if the court accepts that [the company defendant] derived substantial revenue from the investigation [into the plaintiffs], it would not necessarily follow that [the individual defendant, who was an employee of the company] did so as well."). Therefore, this Court cannot exercise personal jurisdiction over Lindell under D.C. CODE §13-423 (a)(4).

### d. Jurisdiction Over Lindell Would Offend Traditional Notions Of Fair Play And Substantial Justice.

Even if the Court were to determine that the most expansive application of one of the three subsections of the long-arm statute *might* apply to Lindell, the Due Process Clause of the Constitution would bar such application based on the protections of fair play and substantial

justice.  *See Int'l Shoe,* 326 U.S. at 316.  This Court should not exercise personal jurisdiction over

Lindell because Lindell does not reside in the District and because, as discussed above, "the harm

at the core" of Dominion's defamation claim did not occur in D.C.  *See Ashhab-Jones*, 2020 WL

6262090, at \*4.  Lindell's sporadic, attenuated appearances in D.C., when considered in relation

to the totality of the circumstances and the claims at issue here, do not meet the requisite threshold

to drag him into this Court.  *See Lewy*, 723 F. Supp. at 129 (holding that the individual defendant's

"travel to the District is too infrequent to provide a basis for jurisdiction); *Lapointe*, 2004 WL

3609346, at \*5 (holding that personal jurisdiction could not stem solely from the defendant's

membership in a D.C. trade organization); *Margoles v. Johns*, 483 F.2d 1212, 1218 (D.C. Cir.

1973) (granting motion to dismiss for lack of personal jurisdiction against a Wisconsin reporter

who telephoned and made the alleged defamatory statements to a Congressman's office in D.C.);

*see also Copeland-Jackson v. Oslin*, 555 F. Supp. 2d 213, 216 (D.D.C. 2008) (holding that the

ability of D.C. residents to access Ohio-based newspaper on the Internet did not qualify for

personal jurisdiction over Ohio-based reporter).  Therefore, this Court should decline to exercise

personal jurisdiction over Lindell.

**D.**     **In The Alternative, The Court Should Transfer This Case To The District Court For the District of Minnesota Pursuant To 28 U.S.C. § 1404(a).**

Dominion's political motivations are obvious based on its choice of venue.  The fact that

this lawsuit is wholly motivated by political aggression and the suppression of a dissenting voice

can be the only reasonable explanation for Plaintiffs' choice to file in the District of Columbia

where none of the Plaintiffs, their voting machines, Defendants, any of the primary witnesses, nor

any parties' records reside.  In its 115-page Complaint, Dominion scoured the country—and the

Internet—for any and all of Lindell's speech to which it could attempt to draw some strained

connection to D.C.  As the allegations show, the weak string tying this case to D.C. breaks under

the pressure of mere facial scrutiny.  Even though a *de minimus* amount of Lindell's speech occurred in this District, when Dominion's allegations are whittled down to their substantive core, the relevant facts show that the United States District Court for the District of Minnesota is the more appropriate venue for this case.

Section 1404(a) provides: "For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented."  28 U.S.C. § 1404(a) (West 2019).  District courts have broad "discretion to 'adjudicate motions to transfer according to individualized, case-by-case consideration of convenience and fairness." *Sierra Club v. Flowers*, 276 F. Supp. 2d 62, 65 (D.D.C. 2003) (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 27 (1988)).  The purpose of transfer under § 1404(a) "is to prevent the waste 'of time, energy and money' and 'to protect litigants, witnesses and the public against unnecessary inconvenience and expense.'"  *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964). When deciding whether to transfer a case under Section 1404(a), district courts employ a two-step analysis.  *Caluyo v. DaVita, Inc.*, 938 F. Supp. 2d 67, 70 (D.D.C. 2013).  First, the moving party must show that the transferee forum is one in which the action might have been brought.  *Id*. Second, once the moving party has shown that the case could have been filed in the target forum, the Court must proceed by determining "whether the movant has shown that the 'convenience of the parties and witnesses' and the 'interest of justice' weigh in favor of transfer.'"  *Id*.

### 1.     This Case Could Have Been Brought In The District of Minnesota.

The first prong of the transfer analysis is whether the transferee court could have originally heard the case, which involves a three-part test: the Court must determine whether the transferee court (a) has subject matter (*i.e.*, diversity) jurisdiction, (b) has personal jurisdiction

over Lindell, and (c) is a proper venue.  *See Virts v. Prudential Life Ins. Co. of Am.*, 950 F. Supp.

2d 101, 104 (D.D.C. 2013) (citing *Relf v. Gasch,* 511 F.2d 804, 807 (D.C. Cir. 1975)).

### a.      The District Of Minnesota Has Diversity Jurisdiction.

The U.S. District Court for the District of Minnesota has subject matter jurisdiction because

of the parties' diversity pursuant to 28 U.S.C. § 1332(a)(1), a fact that Plaintiffs concede.  Compl.

at ¶ 11.  Thus, the District of Minnesota has subject matter jurisdiction, and the first part of the

three-part test is satisfied.

### b.      The District Of Minnesota Has Personal Jurisdiction.

The U.S. District Court for the District of Minnesota has personal jurisdiction over Lindell

because he is a citizen of Minnesota.  FED. R. CIV. P. 4(k)(1)(A); *United States v. Yennie*, No. 18-

CV-3268 (WMW/SER), 2019 WL 3325862, at *2 (D. Minn. Apr. 30, 2019), *report and

recommendation adopted*, 2019 WL 3325439 (D. Minn. July 24, 2019).  Thus, the U.S. District

Court for the District of Minnesota has subject matter and personal jurisdiction in this case.

### c.      The District Minnesota Is A Proper Venue.

Venue is proper in the U.S. District Court for the District of Minnesota. *See generally*

28 U.S.C. § 1391. The applicable statute provides that

> A civil action may be brought in— (1) a judicial district in which any defendant
> resides, if all defendants are residents of the State in which the district is located;
> (2) *a judicial district in which a substantial part of the events or omissions giving
> rise to the claim occurred, or a substantial part of property that is the subject of
> the action is situated*; or (3) if there is no district in which an action may otherwise
> be brought as provided in this section, any judicial district in which any defendant
> is subject to the court's personal jurisdiction with respect to such action.

*Id.* at § 1391(b) (emphasis added).  To determine whether venue is proper under § 1391(b)(2), the

court "undertake[s] a 'commonsense appraisal' of the 'events having operative significance in the

case.'" *Exelon Generation Co. v. Grumbles,* 380 F. Supp. 3d 1, 11 (D.D.C. 2019).  The District

of Minnesota is the proper venue because it is the "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(a).  Both Defendants reside in Minnesota, and Plaintiffs are attacking Lindell both personally and professionally, on account of his status as CEO of My Pillow (which is based in Minnesota), because of conduct by Lindell in Minnesota. *See* Compl. at ¶¶ 61 and 165 (complaining of statements that Lindell made from his home state). Therefore, the three-part test of the first prong of the venue transfer analysis weighs in favor of transferring to Minnesota.

> **2.     Both Considerations Of Convenience And The Interest Of Justice Weigh In Favor Of Transfer To The U.S. District Court For The District Of Minnesota.**

The second prong of the 1404(a) transfer analysis is whether the court should transfer the case after weighing factors of convenience and justice.  To do so, courts weigh a number of "public"and "private" factors to determine whether transfer is warranted.  *See*, *e.g.*, *Brannen v. Nat'l R.R. Passenger Corp.*, 403 F. Supp. 2d 89, 92 (D.D.C. 2005); *Sierra Club*, 276 F. Supp. 2d at 65.

> **a.     The Private Interests Weigh In Favor Of Transfer.**

The six "private interest  factors" are: "(1) the plaintiff's choice of forum; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses of the plaintiff and defendant; and (6) the ease of access to sources of proof."  *Sierra Club*, 276 F. Supp. 2d at 65 (citing *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 16 (D.D.C. 1996)).

**Plaintiffs' Choice**.  Because Plaintiffs filed their lawsuit outside of their home forum, their choice of forum is given less weight than is typical.  "When the home forum has been chosen, it is reasonable to assume that this choice is convenient.  When the plaintiff is foreign,

however, this assumption is much less reasonable." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255–56 (1981); *see also Plackett v. Washington Deluxe Bus, Inc.*, No. 1:19-CV-00794 (CJN), 2020 WL 376511, at *3 (D.D.C. Jan. 23, 2020) (Nichols, J.).

**Defendant's Choice**.  "A defendant's choice of forum must be accorded some weight if the defendant presents legitimate reasons for preferring to litigate the case in the transferee district." *Gulf Restoration Network v. Jewell*, 87 F. Supp. 3d 303, 313 (D.D.C. 2015) (internal quotation omitted).  Lindell is a Minnesota citizen, so it is substantially more convenient for him to litigate in Minnesota.  Furthermore, Plaintiffs blamed Lindell for seeking to turn a profit when he spoke out against Dominion, and that profit, as alleged by Plaintiffs, was shown in the sales of My Pillow.  Thus, the records of My Pillow, which has its headquarters in Minnesota, are highly relevant to the claims and defenses in this case.  The second factor weighs in favor of transfer to Minnesota.

**Where the Claims Arose**.  Dominion expressly admits that at least one of its claims—an alleged violation of the MDTPA—arose in Minnesota.  Compl. at ¶ 174.  As explained above, Dominion's defamation claim hinges on the same facts.  *See id.* at ¶ 175 (stating that "Lindell willfully made [the alleged defamatory statements] in the course of his business as the CEO of My Pillow because he and his company could derive… financial benefits from making those [alleged] false statements").  Therefore, Dominion's claims arose in Minnesota, not D.C.

**Parties' Convenience**.  Minnesota is significantly more convenient to at least two of the three parties because both Defendants are residents of that state.  *See* Compl. at ¶¶ 9, 10.  Further, D.C. is not more convenient for Plaintiffs because Plaintiffs reside in Colorado or Ontario, not D.C.  *See id.* at ¶¶ 6 - 8.

**Witnesses' Convenience**.  The primary witness in this case is Lindell.  Therefore, his convenience is critical to this factor.  Even if the other witnesses are scattered across the nation, upon weighing the priority of the witnesses, Minnesota is the state that is most convenient for all the parties and witnesses.

**Access to Sources of Proof**.  Dominion repeatedly points to Lindell's dealings through My Pillow to allege violations of the MDTPA and defamation law.  Thus, the records of My Pillow are the primary sources of proof for Dominion's MDTPA claim, and Lindell's personal records of travel and his business and political dealings are the sources of proof for the defamation claim.  Thus, the majority of the private interest factors weigh in favor of transferring this case to Minnesota.

### b.      The Public Interests Weigh In Favor of Transfer.

The three public interest factors also support transfer.  "The public interest factors include: (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the transferee and transferor courts; and (3) the local interest in deciding local controversies at home." *Sierra Club*, 276 F. Supp. 2d at 65 (citing *Trout Unlimited*, 944 F. Supp. at 17). If, after considering all of the private interest and public interest factors, the balance of those factors weigh in favor of transferring the case to the transferee venue, then the Court should order the case to be transferred to that venue pursuant to 28 U.S.C. § 1404(a).  *See id.*

**Transferee Court's Familiarity with the Law**.  Minnesota is the most familiar with its own state laws, and Plaintiff has made a claim under the MDTPA.  Thus, this factor weighs in favor of transfer to Minnesota.

**Transferee Court's Congestion**.   Official, federal judicial reports as recently as September 30, 2020, show that Minnesota's federal courts are not nearly as congested as this

- 43 -

District.  Index at 377, 384.  By way of example, Minnesota had 312 cases commenced in 2020, down from 353 in 2019.  Index at 384.  The District Court in the District of Columbia, on the other hand, had 590 cases commenced in 2020, up from 560 in 2019.  Index at 377.  Therefore, the U.S. District Court for the District of Minnesota is better suited to hear this case.

**Transferee Court's Interest**.  Minnesota has a heightened interest in deciding this case for several reasons, not the least of which is that Plaintiffs seek to bring a claim under Minnesota's DTPA.  Minnesota also has a higher interest to adjudicate defamation claims against its own citizens.  Thus, upon evaluation of all the relevant private and public interest factors, transferring this case to Minnesota is simply the most convenient and just decision.

### III.     LINDELL SHOULD BE AWARDED HIS ATTORNEYS' FEES

In *Abbas v. Foreign Policy Group*, the D.C. Circuit held that D.C.'s law penalizing "Strategic Lawsuits Against Public Participation" – known as the Anti-SLAPP Act – does not authorize the award of attorneys' fees in federal court because D.C. courts would not, in similar circumstances, apply D.C. law.  783 F.3d 1328, 1332 (D.C. Cir. 2015).  Since then, however, opinions from the D.C. Court of Appeals and district judges have suggested that the Court of Appeals might revisit the D.C. Circuit's *Abbas* holding and authorize the award of attorneys' fees against plaintiffs who bring defamation lawsuits that violate the protection afforded by *New York Times.  See Competitive Enter. Inst. v. Mann*, 150 A.3d 1213 (D.C. 2016); *Fridman v. Bean LLC*, No. CV 17-2041 (RJL), 2019 WL 231751, at *1 (D.D.C. Jan. 15, 2019).  This Court should apply D.C.'s Anti-SLAPP Act and award attorneys' fees to Lindell.

### IV.     CONCLUSION

For the foregoing reasons, the Court should dismiss this lawsuit and award Defendant Michael J. Lindell his attorneys' fees, or in the alternative, transfer it to the United States District

Court for the District of Minnesota.  Lindell prays for all other such relief to which he is justly

entitled.

Dated: April 23, 2021

Respectfully submitted,


_____/s/ Trey Mayfield_____
Earl N. "Trey" Mayfield, III (D.C. Bar No. 459998)
JURIS DAY, PLLC
10521 Judicial Drive, Suite 200
Fairfax, Virginia 22030
Telephone: (703) 268-5600
tmayfield@jurisday.com

Douglas A. Daniels*
TX Bar No. 00793579
Heath A. Novosad*
TX Bar No. 24037199
DANIELS & TREDENNICK PLLC
6363 Woodway Dr., Suite 700
Houston, TX 77057-1759
(713) 917-0024 Telephone
(713) 917-0026 Facsimile
Email: doug.daniels@dtlawyers.com
Email: heath.novosad@dtlawyers.com

* D.D.C. Bar Admissions Pending

*Counsel for Defendant Michael J. Lindell*


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served upon
all parties of record through the Court's CM ECF system on April 23, 2021.

/s/ *Trey Mayfield*_____
Trey Mayfield