# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

US DOMINION, INC., DOMINION      )
VOTING SYSTEMS, INC., and        )
DOMINION VOTING SYSTEMS          )
CORPORATION                      )
c/o Cogency Global               )
1025 Vermont Ave, NW, Ste. 1130  )
Washington, DC 20005,            )
                                 )
    Plaintiffs,             )
                                 )
    v.                      )    Case No. 1:21-cv-00445-CJN
                                 )
MY PILLOW, INC. and              )
MICHAEL J. LINDELL               )
343 E 82nd Str #102              )
Chaska, MN 55318,                )
                                 )
                                 )
    Defendants.             )
                                 )

## EXHIBITS TO MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANT MICHAEL J. LINDELL'S MOTION
## <u>TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE</u>

**JURIS DAY, PLLC**
Earl N. "Trey" Mayfield, III (D.C. Bar No. 459998)
10521 Judicial Drive
Suite 200
Fairfax, Virginia 22030
Telephone: (703) 268-5600
tmayfield@jurisday.com

*Counsel for Defendant Michael J. Lindell*

**DANIELS & TREDENNICK, PLLC**
Douglas A. Daniels (TX Bar No. 00793579)*
Heath A. Novosad (TX Bar No. 2407199)*
6363 Woodway Drive, Suite 700
Houston, TX 77057-1759
Telephone: (713) 917-0024
doug.daniels@dtlawyers.com
heath.novosad@dtlawyers.com

* D.D.C. Bar Admission Pending

*Counsel for Defendant Michael J. Lindell*

## INDEX OF EXHIBITS

EXHIBIT A:  Declaration of J. Alex Halderman (Aug. 19, 2020)……………..…………   1

EXHIBIT B:  Declaration of Harri Hursti……………………………………………..……   33

EXHIBIT C:  Declaration of J. Alex Halderman (Oct. 4, 2019)……………………….……   81

EXHIBIT D:  *Summary of Testimony from December 3, 2020 Hearing, Chairman's Report of the Election Law Study, Subcommittee of the Standing Senate Judiciary Comm*., 2019 Legislature, 155th Session, (Ga. Dec. 17, 2020) (William T. Ligon, Chairman of the Election Law Study Subcommittee), available at http://www.senatorligon.com/THE_FINAL%20REPORT.PDF (last visited Apr. 15, 2021)……………………………………………………………...   93

EXHIBIT E:  Letter from William T. Ligon, Member, Judiciary Comm., Ga. Gen. Assembly, to President Donald J. Trump, Request for Assistance under the DHS Cyber Hunt and Incident Response Teams Act of 2019, (Jan. 2, 2021)..   109

EXHIBIT F:  Letters from Elizabeth Warren, Amy Klobuchar, & Ron Wyden, United States Senators, and Mark Pocan, United States Representative, to the co-CEOs of H.I.G. Capital, LLC, the Chairman of McCarthy Group, LLC, and the Managing Directors of Staple Street Capital Group, LLC (Dec. 6, 2019), available at https://www.warren.senate.gov/imo/media/doc/H.I.G.%20McCarthy,%20&%20Staple%20Street%20letters.pdf (last visited Apr. 15, 2021)……………   112

EXHIBIT G:  BRANDON HURLEY, INSPECTION OF THE DOMINION VOTING SYSTEMS' DEMOCRACY SUITE 5.5-A CONDUCTED ON OCTOBER 2 AND 3, 2019 (TEX. SEC. OF STATE, Nov. 4, 2019), available at https://www.sos.texas.gov/elections/forms/sysexam/oct2019-hurley.pdf (last visited Apr. 15, 2021)……………………………………………...........   128

EXHIBIT H:  BRIAN MECHLER, VOTING SYSTEM EXAMINATION OF DOMINION VOTING SYSTEMS DEMOCRACY SUITE 5.5-A (TEX. SEC. OF STATE, Nov. 3, 2019), available at https://www.sos.texas.gov/elections/forms/sysexam/oct2019-mechler.pdf (last visited Apr. 15, 2021)…………………………………...   134

EXHIBIT I:  CHUCK PINNEY, DOMINION VOTING SYSTEMS – DEMOCRACY SUITE 5.5-A VOTING SYSTEM EXAMINATION (TEX. SEC. OF STATE, Nov. 4, 2019), available at https://www.sos.texas.gov/elections/forms/sysexam/oct2019-pinney.pdf (last visited Apr. 15, 2021)……………………………………   149

EXHIBIT J:  JAMES SNEERINGER, VOTING SYSTEM EXAMINATION DOMINION VOTING SYSTEMS DEMOCRACY SUITE 5.5-A (TEX. SEC. OF STATE, Nov. 3, 2019),

available at https://www.sos.texas.gov/elections/forms/sysexam/oct2019-sneeringer.pdf (last visited Apr. 15, 2021)..................................... 155

EXHIBIT K:    TOM WATSON, DEMOCRACY SUITE 5.5A (TEX. SEC. OF STATE, Oct. 2019), available at https://www.sos.texas.gov/elections/forms/sysexam/oct2019-watson.pdf (last visited Apr. 15, 2021)............................................. 161

EXHIBIT L:    Andrew W. Appel, Richard A. DeMillo & Philip B. Stark, *Ballot-Marketing Devices (BMDs) Cannot Assure the Will of the Voters*, 19 ELECTION LAW JOURNAL 3, at 432 (Sep. 17, 2020), available at https://www.liebertpub.com/doi/10.1089/elj.2019.0619 (last visited Apr. 15, 2021)............................................................................ 167

EXHIBIT M:    Kellie Ottoboni & Philip B. Stark, *Election Integrity and Electronic Voting Machines in 2018 Georgia, USA* (Jul. 24, 2019), E-VOTE-ID 2019 PROCEEDINGS, available at https://ssrn.com/abstract=3426250 (last visited Apr. 20, 2021)........................................................................ 196

EXHIBIT N:    Matt Blaze, et al., *Def Con 27 Voting Machine Hacking Village* (Aug. 5, 2019), https://media.defcon.org/DEF%20CON%2027/voting-village-report-defcon27.pdf (last visited Apr. 15, 2021)........................................ 213

EXHIBIT O:    Affidavit of Amy Gilleo.................................................... 268

EXHIBIT P:    Affidavit of Mellissa A. Carone........................................... 273

EXHIBIT Q:    Declaration of Misty Martin............................................... 277

EXHIBIT R:    Bowen Xiao, *A History of Foreign Ties Behind Voting Machines Used in US*, THE EPOCH TIMES (Dec. 8, 2020), https://www.theepochtimes.com/foreign-ties-behind-dominion-smartmatic-voting-machines-including-to-an-adversary_3602603.html .......................... 281

EXHIBIT S:    SCIENCE DEFIES POLITICS, *Dominion Voting Systems Is Caught* (Nov. 13, 2020), https://defyccc.com/dominion-voting-systems-is-caught/ ............. 297

EXHIBIT T:    Matt Vasilogambros, *Feds Don't Regulate Election Equipment, So States Are On Their Own*, STATELINE, (Jul. 10, 2019).................................. 303

EXHIBIT U:    Mollie Ziegler Hemingway, *Media's Entire Georgia Narrative Is Fraudulent, Not Just the Fabricated Trump Quotes*, THE FEDERALIST, (Mar. 17, 2021), available at https://thefederalist.com/2021/03/17/medias-entire-georgia-narrative-is-fraudulent-not-just-the-fabricated-trump-quotes/ ......... 310

EXHIBIT V:    Kevin Monahan, Cynthia McFadden & Didi Martinez, *'Online and Vulnerable': Experts Find Nearly Three Dozen U.S. Voting Systems*

*Connected to Internet*, NBC NEWS, (Jan. 10, 2020), available at https://www.nbcnews.com/politics/elections/online-vulnerable-experts-find-nearly-three-dozen-u-s-voting-n1112436 ....................................................... 322

EXHIBIT W:   Robert F. Kennedy, Jr., *Will the Next Election Be Hacked?*, ROLLINGSTONE, (Sep. 21, 2006), available at https://www.rollingstone.com/politics/politics-news/will-the-next-election-be-hacked-69421 (last visited Apr. 20, 2021)…………………………………………………………………… 331

EXHIBIT X:   Russell Ramsland, *Antrim Michigan Forensics Report, Revised Preliminary Summary, v2*, ALLIED SECURITY OPERATIONS GROUP, (Dec. 13, 2020), available at https://www.depernolaw.com/uploads/2/7/0/2/27029178/antrim_michigan_forensics_report_[121320]_v2_[redacted].pdf (last visited Apr. 15, 2021)….. 339

Exhibit Y:   Ben Turner, *Statistical Evidence of Dominion Election Fraud? Time to Audit the Machines*, FRAUDSPOTTERS, (Nov. 21, 2020), available at https://www.fraudspotters.com/statistics-about-dominion-election-fraud/ (last visited Apr. 15, 2021)……………………………………………….. 363

Exhibit Z:   UNITED STATES COURTS JUDICIAL BUSINESS, U.S. COURT OF APPEALS— SOURCES OF APPEALS, ORIGINAL PROCEEDINGS AND MISCELLANEOUS APPLICATIONS COMMENCED, BY CIRCUIT, DURING THE 12-MONTH PERIOD ENDING SEPTEMBER 30, 2016 THROUGH 2020, Table B-3, (Sep. 30, 2020), available at https://www.uscourts.gov/sites/default/files/data_tables/jb_b3_0930.2016.pdf ....................................................................................................... 376

Exhibit AA:  Alexa Corse, *Dominion Sues MyPillow, CEO Mike Lindell Over Election Claims*, WALL STREET JOURNAL, Feb. 22, 2021…………………………… 388

Exhibit BB:  *Not Used*……………………………………………………………….. 393

Exhibit CC:  Douglas G. Frank, Ph.D., Resume, available at https://www.depernolaw.com/uploads/2/7/0/2/27029178/ex_4.pdf (last visited April 23, 2021)………………………………..................................... 397

Exhibit DD:  Frank, Douglas G, Ph.D., NINE MICHIGAN COUNTIES, COLLECTED DEMOGRAPHICS FOR POPULATIONS, REGISTRATIONS, & BALLOTS WITH STATISTICAL CONFIRMATION OF ALGORITHM USE, NOVEMBER 2020 UNITED STATES GENERAL ELECTION, (Apr. 6, 2021), available at https://www.depernolaw.com/uploads/2/7/0/2/27029178/ex_1-3.pdf (last visited April 23, 2021)…………………………………………………….. 399

Exhibit EE:  Arizona State Senate Republican Caucus, Senate Chooses Qualified Auditing Firm to Conduct Forensic Audit of Maricopa County Election

Results, (Jan. 29, 2021), https://www.azsenaterepublicans.com/post/senate-chooses-qualified-auditing-firm-to-conduct-forensic-audit-of-maricopa-county-election-results ................................................................................... 426

Exhibit FF:   Chad Groening, *Dominion Gets Caught Shorting GOP Candidates*, ONENEWSNOW.COM, (Mar. 5, 2021), https://onenewsnow.com/politics-govt/2021/03/05/dominion-gets-caught-shorting-gop-candidates ................... 429

Exhibit GG:   Scott Bauer, Wisconsin Assembly OKs Investigation into 2020 Election, Fox6 News Milwaukee, (Mar. 23, 2021), https://www.fox6now.com/news/wisconsin-assembly-approves-election-investigation ........................................................................................... 431

Exhibit HH:   M.D. Kittle, *Emails: Green Bay's 'Hidden" Election Networks*, WISCONSIN SPOTLIGHT (Mar. 21, 2021), https://wisconsinspotlight.com/emails-green-bays-hidden-election-networks/ ……………………………………………… 434

Exhibit II:   *Curling v. Raffensperger*, 493 F. Supp. 3d 1264 (N.D. Ga. 2020) ………….. 439

# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **DECLARATION OF**<br>**J. ALEX HALDERMAN IN**<br>**SUPPORT OF MOTION FOR**<br>**PRELIMINARY INJUNCTION**<br><br>**Civil Action No. 1:17-CV-2989-AT** |

Pursuant to 28 U.S.C. § 1746, J. ALEX HALDERMAN declares under penalty of perjury that the following is true and correct:

1. I hereby incorporate my previous declarations as if fully stated herein. I have personal knowledge of the facts in this declaration and, if called to testify as a witness, I would testify under oath to these facts.

**Georgia's Current Election Technology**

2. Georgia recently deployed new voting equipment and software manufactured by Dominion Voting Systems, Inc. ("Dominion"). These components include ImageCast X Prime ("ICX") ballot marking devices ("BMDs"), ImageCast Precinct ("ICP") precinct-count scanners, ImageCast Central ("ICC") central-count scanners, and the Democracy Suite election management system ("EMS"). Georgia

Secretary of State Brad Raffensperger certified these components in August 2019,[1]
and they were first used statewide during the June 20, 2020 election.[2]

3.      Under this new system (the "BMD-based Election System"), Georgia
generally requires all in-person voters to select candidates on Dominion ICX BMDs.
These devices are computer tablets connected to off-the-shelf laser printers. They do
not record votes but instead print paper records that are supposed to contain the
voter's selections in both human-readable text and as a type of machine-readable
barcode called a QR code. Voters insert these printouts into Dominion ICP optical
scanners, which read the barcodes and count the votes encoded in them.[3]

4.      Absentee voters do not use BMDs but instead complete hand-marked
paper ballots ("HMPBs"), which are tabulated at central locations by Dominion ICC
scanners. While Georgia's precinct-based ICP scanners have the capability to count
hand-marked paper ballots,[4] the State only uses them to count BMD printouts.

---

[1] Georgia Dominion certification (Aug. 9, 2019),
https://sos.ga.gov/admin/uploads/Dominion_Certification.pdf.
[2] Mark Niesse, "How Georgia's new voting machines work," *The Atlanta Journal-Constitution* (June 9, 2020), https://www.ajc.com/news/state--regional-govt--politics/how-georgia-new-electronic-voting-machines-work/RyIOJuHYQgktcCNGL9sEoK/.
[3] Decl. of Dr. Eric Coomer, Dckt. 658-2, at 10.
[4] *Id* at 9.

5.     Pre- and post-election procedures in the BMD-based election system closely parallel those under the old DRE-based election system. Before every election, the Secretary of State's office prepares election programming files using Dominion EMS software, which is a collection of client and server programs that run on commercial-off-the-shelf (COTS) computers and servers. The Secretary of State transmits the election programming files to county officials, who use another instance of the Dominion EMS to prepare memory cards and USB sticks for every scanner and ballot marking device used in the county. These removable media contain the ballot design, including the names of the races and candidates, and rules for counting the ballots. Election workers install a memory card or USB stick into each BMD and ICP scanner prior to the start of voting.

6.     After polls close, election workers remove the memory cards from every ICP scanner and return them to the county. At that point, the memory cards contain a digital image of each scan as well as the scanner's interpretation of the votes contained in the barcode. County workers use the Dominion EMS to retrieve data from the cards and prepare the final election results based on the barcode readings.

**Attacks Against the BMD-based Election System**

7.     Attackers could alter election outcomes under Georgia's BMD-based election system in several ways:

(a)  Attacks on the BMDs could cause them to print barcodes that differ from voters' selections. These changes would be undetectable to voters, who cannot read the encrypted barcodes. Since the barcodes are the only thing the scanners count, the impact would be a change to the election results. The only known safeguard that can reliably detect such an attack is to rigorously audit both the human-readable portion of the printouts and the barcodes, which Georgia does not currently do.

(b)  Attacks on the BMDs could also change *both* the barcode and the human-readable text on some of the printouts. Research shows that few voters carefully review their BMD printouts, and, consequently, changes to enough printouts to change the winner of a close race would likely go undetected. No audit or recount could detect this fraud, since both the digital and paper records of the votes would reflect the same selections but not the ones the voters intended.

(c)  Attacks on the scanners could also cause fraudulent election results by changing the digital records of the votes. The only known safeguard that can reliably detect such an attack is a sufficiently rigorous manual audit or recount of the paper records, which Georgia does not currently require.

8.     One way that attackers could carry out attacks against the BMD-based election system is by infecting the election equipment with malicious software ("malware"). Malware could potentially be introduced in several ways, including: (a) with physical access to any of the many electronic components that compose the system, (b) through an attack on the hardware or software supply-chain, or (c) by spreading virally via the election management systems to polling place equipment during routine pre-election procedures.

9.     Components of Georgia's election system that are not directly connected to the Internet might nonetheless be targeted by attackers. Nation-state attackers have developed a variety of techniques for infiltrating non-Internet-connected systems, including by spreading malware on removable media that workers use to copy files in and out.[5] Attackers could employ this method to infect the state or county EMS and spread from there to scanners and BMDs when workers program them for the next election. In this way, an attack could potentially spread from a single point of infection to scanners and BMDs across entire counties or the whole

---

[5] A well-known example of this ability, which is known as "jumping an air gap," is the Stuxnet computer virus, which was created to sabotage Iran's nuclear centrifuge program by attacking factory equipment that was not directly connected to the Internet. Kim Zetter, "An Unprecedented Look at Stuxnet, the World's First Digital Weapon," *Wired* (Nov. 3, 2014), https://www.wired.com/2014/11/countdown-to-zero-day-stuxnet/.

state, in the same way that malware could have spread through the old DRE system, which was not effectively air-gapped or otherwise reasonably secured.

10.    The BMD-based election system is at further heightened risk of attack because of the legacy of poor security in Georgia's old DRE-based election system and its associated computers and networks. If attackers infiltrated the DRE-based system, they likely did so by first infiltrating components such as the Secretary of State's computer network, the voter registration database software developed by PCC, Inc., or the non-"air gapped" computers and removable media used by state and county workers and outside contractors to transfer data into and out of the EMS. The record in this matter contains abundant evidence about vulnerabilities in all these components, some of which were unmitigated for years and may still be unmitigated. Responsibility for their security continues to rest with many of the same technicians and managers who oversaw the security of the old system and were unable or unwilling to implement effective security measures.

11.    These components continue to be used with the new voting system, including to process data that is copied to polling-place equipment. If attackers breached any of them to attack the DRE-based system, those attackers may continue to have such access under the BMD-based system. Technologies that the State has highlighted as key defenses for these legacy components, such as anti-malware

scans, anti-virus scans, and endpoint protection, provide little defense against sophisticated attackers like hostile foreign governments.

12.   Importantly, apart from the examinations Fortalice conducted that found significant vulnerabilities with the Secretary of State's information technology infrastructure including components of the election management network, there is no indication that Georgia has ever forensically or otherwise rigorously examined the current election system, including components from the prior DRE-based system that are used with the current BMD-based system. In an environment of advanced persistent threats to both election systems, coupled with the critical known vulnerabilities with those systems, the lack of any such examination raises serious concerns about the reliability of the current system and election outcomes.

**Georgia's New Dominion Equipment has Critical Security Flaws**

13.   Dominion does not dispute that its products can be hacked by sufficiently capable adversaries.[6]

14.   One reason why this is true is the complexity of the software, which far exceeds the complexity of the DRE-based system. The Dominion software used in

---

[6] Decl. of Dr. Eric Coomer, Director of Product Strategy and Security for Dominion ¶ 13, Dckt. No. 658-2 ("all computers can be hacked with enough time and access").

Georgia contains nearly 2.75 million lines of source code (equivalent to about 45,000 printed pages), excluding the Windows and Android operating systems and other off-the-shelf software packages.[7] The ICP scanner alone contains about 475,000 lines of source code, and its software is written in C/C++,[8] a programming language that is particularly susceptible to some of the most dangerous types of vulnerabilities.

15.  Software of the size and complexity of the Dominion code inevitably has exploitable vulnerabilities. As a source-code review team working for the California Secretary of State concluded in a study of a voting system with only 10% as much code as Dominion's, "If the [system] were secure, it would be the first computing system of this complexity that is fully secure."[9] Nation-state attackers often discover and exploit novel vulnerabilities in complex software.[10]

---

[7] SLI Compliance, "Dominion Democracy Suite 5.10 Voting System Software Test Report for California Secretary of State" (Aug. 2019), https://votingsystems.cdn.sos.ca.gov/vendors/dominion/dvs510software-report.pdf.
[8] *Id.*
[9] Joseph A. Calandrino, Ariel J. Feldman, J. Alex Halderman, David Wagner, Harlan Yu, and William Zeller, "Source Code Review of the Diebold Voting System," in *California Secretary of State's Top-to-Bottom Review of Voting Systems* (July 20, 2007), https://votingsystems.cdn.sos.ca.gov/oversight/ttbr/diebold-source-public-jul29.pdf.
[10] Andrew Springall, *Nation-State Attackers and their Effects on Computer Security* (2019), Ph.D. dissertation, University of Michigan, https://deepblue.lib.umich.edu/handle/2027.42/143907.

16. In addition to its complexity, the Dominion software used in Georgia utilizes a wide range of outdated off-the-shelf software modules, including some that perform essential security functions, such as the operating system and modules that process files an attacker might have manipulated.[11] The oldest third-party software components appear not to have been updated in more than 15 years. This is unfortunately consistent with the DRE-based system, which relied on software so out of date that the manufacturer stopped providing updates and patches more than a decade ago.

17. Outdated software components are a security risk because they frequently contain known, publicly documented vulnerabilities that have been corrected in later versions. Old or outdated software used in Georgia's Dominion equipment includes a version of Microsoft SQL Server dating from 2016, Adobe Acrobat from around 2015, barcode scanner software from 2015, μClinux operating system software from 2007, COLILO bootloader software from 2004, and a version of the Apache Avalon component framework dating from 2002. Georgia's BMDs

---

[11] SLI Compliance, "Dominion Voting Systems Democracy Suite 5.5-A Certification Test Plan" 16-19 (Dec. 2018), https://www.eac.gov/sites/default/files/voting_system/files/DVS_Democracy_D-Suite_5.5-A_Modification_Test_Plan_v1.2.pdf.

use the Android 5.1.1 operating system,[12] which is almost six years old and has not received security updates since March 2018; as of August 2020, it contained 254 documented vulnerabilities.[13]

18.   Georgia certified the Dominion system without performing its own security testing or source-code review. The certification was preceded by tests that were limited to checking functional compliance with Georgia requirements.[14] The test report states that the testing "was not intended to result in exhaustive tests of system hardware and software attributes."[15] The term "security" does not appear in the report.

19.   Several months before Georgia certified the Dominion system, the State of Texas performed its own certification tests. The Texas certification was more comprehensive and included test reports from five examiners appointed by the Texas

[12] Certificate of Conformance, Dominion Voting Systems Democracy Suite 5.5-A (Jan. 30, 2019) at pp. 3-4, https://www.eac.gov/file.aspx?A= TQycVTA%2BOLpxoCbwCFjQJmJdRP1dq9sFO3oVUWJl5u4%3D.
[13] CVE Details, "Google Android 5.1.1 Security Vulnerabilities," https://www.cvedetails.com/vulnerability-list/vendor_id-1224/product_id-19997/version_id-186573/Google-Android-5.1.1.html (last visited Aug. 19, 2020).
[14] Pro V&V, "Test Report: Dominion Voting Systems D-Suite 5.5-A Voting System Georgia State Certification Testing" (Aug. 7, 2019), https://sos.ga.gov/admin/uploads/Dominion_Test_Cert_Report.pdf.
[15] *Id*. at 3.

Secretary of State.[16] All of the examiners highlighted deficiencies with the Dominion system, including issues affecting its reliability, accessibility, and security. These problems led Texas to deny certification of the Dominion system in 2019.[17]

20. Several of the serious deficiencies noted by the Texas examiners affect system components used in Georgia, including the BMDs. One examiner noted that "the ICXs [BMDs] are built with a [commercial off-the-shelf] tablet and printer. The Android OS versions used on the tablets are several years old[;] therefore they do not have the latest security feature [*sic*.] as later Android releases."[18] A second examiner found that "[t]he doors covering data and power ports on the [BMD] tablets do not provide sufficient protection. […] a bad actor could add a USB device to the tablet while powered down that could remain undetected until after the election had ended."[19] A third examiner concluded that "[t]he ICX [BMD] also presented problems during the accessibility testing portion of the exam which demonstrate that it may not be suitable as an accessible voting system."[20]

---

[16] "Examiner Reports of Dominion Voting System Democracy Suite 5.5" (Jan. 16-17, 2019), https://www.sos.state.tx.us/elections/laws/jan2019_dominion.shtml.
[17] "Report of Review of Dominion Voting Systems Democracy Suite 5.5" (June 20, 2019), https://www.sos.state.tx.us/elections/forms/sysexam/dominion-democracy-suite-5.5.pdf
[18] Report of Texas examiner Tom Watson.
[19] Report of Texas examiner Brian Mechler.
[20] Report of Texas examiner Chuck Pinney.

21.   Around the same time that Georgia certified the Dominion system, the State of California performed tests on a more recent version of the Dominion software, version 5.10, as part of its own certification process.[21]

22.   In contrast to Georgia's tests, California's included some source code review and security testing. Like all security testing, the California tests were necessarily limited in scope and could not be expected to find all exploitable vulnerabilities. Nevertheless, they did uncover several serious flaws. These problems very likely apply to the version of the Dominion system used in Georgia given that it precedes the version tested in California.

23.   The California testers found that attackers could modify the Dominion software installation files and believed that "it would be possible to inject more lethal payloads into the installers given the opportunity."[22] This implies that attackers could modify the Dominion installation files to infect election system components with malicious software.

---

[21] SLI Compliance, "Dominion Democracy Suite 5.10 Security and Telecommunications Test Report" (Aug. 2019), https://votingsystems.cdn.sos.ca.gov/vendors/dominion/dvs510security-report.pdf ("California Certification Security and Telecomm Test Report").
[22] *Id*. at 25.

24.    Furthermore, the California testers found that the Dominion system's antivirus protection was insufficient or non-existent. "[O]n the EMS server, the AVAST Antivirus (AV) File Shield (the real time AV monitor) was only able to detect and clean one of the four [test] files. This potentially leaves the system open to zipped and double zipped viruses as well as infection strings in plain text."[23] Moreover, the ICX BMD and ICP scanner have no antivirus software at all.[24] As a result, malware that infected the Dominion components could evade antivirus detection.

25.    One of the ways that attackers might affect election equipment is by physically accessing the devices. In the case of the Dominion BMD, the California source code reviewers found a vulnerability that can be exploited with physical access to the USB port that "would be open to a variety of actors including a voter, a poll worker, an election official insider, and a vendor insider."[25] This implies that no passwords or keys would be needed to exploit the problem, given physical access. California testers also found that "the ICX device does not provide monitoring of

---

[23] *Id*. at 19-20.
[24] *Id*. at 20.
[25] California Secretary of State's Office of Voting Systems Technology Assessment, "Dominion Voting Systems Democracy Suite 5.10 Staff Report" (Aug. 19, 2019) at 29,
https://votingsystems.cdn.sos.ca.gov/vendors/dominion/dvs510staff-report.pdf.

physical security,"[26] and that, for all the polling place devices, including the ICX, "[s]ecurity seals, locks, and security screws can be circumvented."[27]

26.  Other weaknesses found in the California tests include that "a number of passwords were able to be recovered that were stored in plain text,"[28] that the network switch used to connect EMS clients and servers was "determined to have twelve medium [severity] vulnerabilities and four low [severity] vulnerabilities,"[29] and that, if an authentication device used by poll workers and administrators was lost or stolen shortly before an election, revoking its access would require a logistically difficult process to reprogram the election files for the polling place devices throughout the jurisdiction.[30] These problems indicate that the Dominion system was designed without sufficient attention to security.

27.  Although California ultimately permitted the Dominion system to be used, its certification requirements impose much more stringent security conditions

---

[26] California Certification Security and Telecomm Test Report at 11.
[27] *Id*. at 17.
[28] *Id*. at 15.
[29] *Id.* at 30.
[30] *Id.* at 15.

than those in Georgia, and no California jurisdiction uses Dominion BMDs for all voters as Georgia does.[31]

28.   Dominion's response to Georgia's RFP lists among "key personnel" a "Chief Security Officer" (CSO) whose responsibilities for the voting system project were to be "Oversight of key security development and implementation."[32] Appointing a C-level executive to oversee a company's security posture is widely regarded as an industry best practice. However, at the time of the RFP, the CSO position was vacant, and to my knowledge Dominion has yet to fill the role.

## BMDs and Ballot Barcodes Create Elevated Hacking Risks

29.   Georgia's optical scanners use barcodes as the exclusive means of reading voters' choices. This increases the likelihood that attackers will be able to manipulate election results. The use of barcodes makes it possible for attackers to change how votes are recorded by hacking *either* the scanners or the BMDs. This

---

[31] California Secretary of State, "Conditional Approval of Dominion Voting Systems, Inc. Democracy Suite Version 5.10 Voting System" (Oct. 18, 2019), https://votingsystems.cdn.sos.ca.gov/vendors/dominion/ds510-cert.pdf.
[32] See "Original\0-4 Org Structure_Dominion and KNOWiNK - Redacted .pdf" at 3 *available at* https://sos.ga.gov/admin/uploads/Dominion.zip (last visited Aug. 19, 2020).

increases the "attack surface" of the election system: with two potentially vulnerable components to target instead of just one, attackers are more likely to succeed.

30.   Georgia's Dominion ICX BMDs are computers, they run outdated and vulnerable software, and they must be programmed using the State's election management system before every election. Attackers could potentially infect Georgia's BMDs with malware in several ways, including by spreading it from the election management system (EMS).

31.   An attacker who infected the BMDs with malware could change a fraction of the printouts so that the barcodes encoded fraudulent votes but the human-readable text showed the voters' true selections.

32.   Voters would have no way to detect this attack. They cannot read the Dominion barcodes, which are encrypted, so it is impossible for them to verify whether the barcodes really match their selections. However, when the Dominion scanners tabulate BMD printouts, they ignore the printed text entirely and count only the votes encoded in the barcodes. This means that voters cannot verify the portion of their ballots that gets counted.

33.    Such barcode attacks cannot be reliably detected using pre-election testing or parallel testing.[33] An attacker could decide which votes to modify based on a very large number of variables, including the time of day, the number of ballots cast, the voter's selections, and whether the voter used options such as a large font size or an audio ballot. It is impossible for any practical amount of testing to examine all sets of conditions under which attackers might choose to cheat.

34.    In principle, a sufficiently rigorous audit that compared the human-readable portion of the printouts to the barcodes could detect such an attack. However, since attackers might choose to target any race in any election, every race and every election would need to be rigorously audited to rule out barcode-based fraud.

35.    To my knowledge, Georgia has not announced plans to perform any kind of audit that would compare the barcodes and the printed text, nor what specific measures would be taken to render any potential audit sufficiently comprehensive and reliable.

36.    Even if officials did detect that some ballots showed different choices in the barcode than in the text, there might be no way to determine the correct election

---

[33] *See* Philip B. Stark and Ran Xie, "Testing Cannot Tell Whether Ballot-Marking Devices Alter Election Outcomes" (2020), https://arxiv.org/pdf/1908.08144.pdf.

results. If the discrepancies resulted from an attack, this would cast doubt on *both* the barcodes and the ballot text. An attacker who was able to alter the barcode would be equally capable of altering the ballot text. Malware might be designed to sometimes alter only the barcode and sometimes only the text. This means that officials could not simply ignore the barcodes and count only the text if they suspected the BMDs had been compromised.

37.    BMDs do not need to use barcodes. Several kinds of modern, EAC-certified BMDs deployed in other states do not use barcodes to encode votes. These include the Clear Ballot ClearAccess system[34] and the Hart Verity Touch Writer.[35] Instead of a barcode for vote tabulation, these systems print a ballot that looks like a hand-marked paper ballot but has scan targets filled in for the selected candidates.

38.    In Dominion's response to the State's request for proposals, the company represented that an upcoming version of its BMD software would not need to print barcodes on ballots.[36] Instead, the BMDs would produce (and the scanners

---

[34] *See* Clear Ballot, "ClearAccess Accessible Voting," https://clearballot.com/products/clear-access.
[35] *See* Hart Intercivic, "Verity Touch Writer Ballot Marking Device," https://www.hartintercivic.com/wp-content/uploads/VerityTouchWriter.pdf.
[36] "Clarification Questions\MS 16-1 Supply Chain_Dominion and KNOWiNK Final.docx" *available at* https://sos.ga.gov/admin/uploads/Dominion.zip (last visited Aug. 19, 2020).

would count) an entirely human-readable ballot capable of verification by the voter. However, this option is described as an "upgrade" available only after "certification is complete at the EAC."

39.   The Secretary of State's office and Dominion portray Georgia's BMDs as having this ability to print such a human-readable, "full-face" ballot. A video portraying such a capability is part of the "Important Voter Information" available to the public on the Secretary of State's elections security web page.[37] The video portrays a voter making her selections on a BMD displaying a mock ballot using Georgia state and local races and constitutional questions or referenda. At the end of the video, the voter selects "Print Ballot," and the attached printer produces a double-sided ballot with a darkened oval appearing next to the voter's selections.[38]

40.   Dominion's in-precinct optical scanners already are capable of and certified to read such full-face paper ballots that do not encode votes using barcodes.

---

[37] https://www.dropbox.com/s/u0lc21u82ye2qpg/ICX%20BMD%20Cart.mp4, available through "Voting Cart" hyperlink at https://sos.ga.gov/securevoting (last visited Aug. 18, 2020).
[38] *Id.*

**BMDs Limit the Effectiveness of Voter Verification**

41.    Even if Georgia were to implement rigorous post-election audits, BMDs make it possible for an attacker to compromise the auditability of the ballots and thereby undermine the primary goal of the paper trail. To do so, malware would cause the BMDs to sometimes print fraudulent selections in *both* the barcode and the human-readable text. This attack would be impossible to detect by auditing the printouts, because all records of the voter's intent would be wrong. Pre-election testing and parallel testing also cannot reliably detect such cheating.

42.    Unlike the security of hand-marked paper ballots, the security of BMDs relies critically on voters themselves. The only practical way to discover a BMD attack that altered both the barcodes and the printed text would be if enough voters reviewed the printouts, noticed the errors, and alerted election officials. Yet several recent studies, including my own peer-reviewed research, have concluded that few

voters carefully review BMD printouts.[39,40,41] As a result, the BMD paper trail is not a reliable record of the votes expressed by the voters, and changes to enough printouts to change the winner of a close race would likely go undetected.

43.   Even if some voters did notice that their selections were misprinted, these voters would have no way to prove that the BMDs were at fault. From an election official's perspective, the reporting voters might be mistaken or lying. Many voters would need to report that the BMDs misprinted their ballots before officials could be sure there was a systemic problem.

44.   There are no protocols or policies in Georgia that I have found that address how many voter complaints, or other conditions, involving BMDs would be required within or across polling places to support a finding—or even a robust investigation—of a systemic problem. Moreover, it would be virtually impossible

---

[39] R. DeMillo, R. Kadel, and M. Marks, "What voters are asked to verify affects ballot verification: A quantitative analysis of voters' memories of their ballots" (2018). Available at https://ssrn.com/abstract=3292208.
[40] Matthew Bernhard, Allison McDonald, Henry Meng, Jensen Hwa, Nakul Bajaj, Kevin Chang, and J. Alex Halderman, "Can Voters Detect Malicious Manipulation of Ballot Marking Devices?" in *Proceedings of the 41st IEEE Symposium on Security and Privacy* (Jan. 2020), https://jhalderm.com/pub/papers/bmd-verifiability-sp20.pdf.
[41] Philip Kortum, Michael D. Byrne, and Julie Whitmore, "Voter Verification of BMD Ballots Is a Two-Part Question: Can They? Mostly, They Can. Do They? Mostly, They Don't" (Mar. 2020), https://arxiv.org/ftp/arxiv/papers/2003/2003.04997.pdf.

for officials to recognize the subtle signs of a BMD misprinting attack during a chaotic election in which there were widespread equipment malfunctions and other problems, as occurred in Georgia during the June 9, 2020 primary.[42]

45.    Even if officials did suspect that the BMDs had been attacked, there would be no straightforward way to respond or recover. One possible response would be to delay certifying the election results and conduct a forensic analysis to understand why ballots were misprinted and how many BMDs and votes were affected. Such an analysis might take months and would not be guaranteed to uncover a sophisticated attack. Yet if an attack were confirmed, there is little chance that its effects could be undone. The only recourse might be to rerun the election, which could be statewide involving millions of voters across Georgia.

46.    Election officials are unlikely to take disruptive actions, like a protracted and expensive forensic investigation, unless a large enough fraction of BMD voters report problems. Suppose officials would launch an investigation if more than 1% of BMD voters reported a problem. If outcome-changing fraud occurred in an election with a 1% margin of victory, voters would need to verify their ballots so

---

[42] Richard Fausset, Reid J. Epstein, and Rick Rojas, "'I Refuse Not to Be Heard': Georgia in Uproar Over Voting Meltdown," *The New York Times* (June 9, 2020), https://www.nytimes.com/2020/06/09/us/politics/atlanta-voting-georgia-primary.html.

carefully that they would report 67% of the modified BMD printouts. This is *ten times* greater than the rate of error reporting measured in my peer-reviewed research.

### Reserving BMDs for Voters Who Request Them Would Strengthen Security

47.    When BMDs are used by all in-person voters, as in Georgia, there is a high risk that attackers could manipulate enough BMD votes to change the outcome of a close election without detection. Georgia is an outlier in adopting BMDs for all voters. As of December 2019, only 403 counties in the United States planned to do so, and almost 40% of them were in Georgia.[43] In contrast, the majority of election jurisdictions across the U.S. (representing nearly two-thirds of registered voters) provide BMDs exclusively for voters who request them (e.g., those with certain disabilities),[44] which is much safer.

48.    Georgia can greatly strengthen the security of future elections through a straightforward procedural change. Rather than directing all in-person voters to use BMDs, the State could have in-person voters mark paper ballots by hand and reserve BMDs for voters who request to use them. This approach would require no additional equipment and would result in no loss in accessibility. Hand-marked

---

[43] Decl. of Warren Stewart, Dckt. 681-2.
[44] Verified Voting, *The Verifier*, https://verifiedvoting.org/verifier/#mode/navigate/map/ppEquip/mapType/normal/year/2020 (last visited Aug. 18, 2020).

paper ballots are already used in Georgia for absentee voting, and so they are prepared and printed for every ballot style in every election. The state's new Dominion scanners are already capable of counting hand-marked ballots. BMDs would continue to be available for voters who need them. Yet the risk that election outcomes could be hacked would be far less than under Georgia's planned system.

49.    Securing against misprinting attacks is much easier if only a small fraction of voters uses BMDs (without barcodes) and the rest use hand-marked paper ballots. This is because an attacker would be forced to cheat on a much larger fraction of BMD ballots in order to achieve the same level of fraud. In Maryland, which uses hand-marked paper ballots but makes BMDs available to voters who request them, about 2% of voters use BMDs. If only 2% of voters used BMDs in the scenario above (¶ 46), 1% of BMD voters would report a problem even if voters noticed only 3.8% of errors. Empirical studies suggest that voters really do achieve this modest rate of verification accuracy, even though it is unlikely they can achieve the far greater accuracy required to detect fraud when all voters use BMDs.

50.    Using BMDs for all voters has no practical security advantages compared to reserving BMDs for voters who request them. On the contrary, it makes BMDs a much more attractive target for attackers and leads to greatly increased risks

for all voters—including the disabled—that their right to vote will be subverted by an attack on the BMDs. And regardless, there is no need for barcodes at all.

**Georgia's Audits Provide Insufficient Protection**

51.     Rigorous post-election audits are necessary in order to reliably prevent attacks that compromise election results by manipulating ballot scanners. A rigorous audit would also serve to correct errors caused by scanners misreading ballots, to the extent that these errors resulted in an incorrect election outcome. However, as I have explained, post-election audits are not sufficient to detect attacks against BMDs, since such attacks could change both the printed and electronic records of the votes.

52.     For an audit to reliably detect outcome-changing attacks, several requirements must be met. Among them are: (i) the paper ballots being audited must correctly reflect voters' selections; (ii) the audit needs to be conducted manually, by having people inspect the ballots without reliance on potentially compromised electronic systems or records; (iii) the auditors need to inspect sufficiently many ballots to ensure that the probability that outcome-changing fraud could go undetected is low. In general, the closer the election result in a particular race, the more ballots need to be audited in order to confidently rule out fraud. Audits that constrain the probability that the reported outcome differs from the outcome that

would be obtained by a full manual recount to no more than a pre-defined level (the "risk limit") are called risk-limiting audits ("RLAs").[45]

53.    I understand that Georgia statute requires a state-wide post-election audit to be conducted no later than the November 2020 election.[46] However, that audit is not required to be risk-limiting. If it is not, and there are close races in which an attacker changes the outcome by hacking the election equipment, there is a high probability that the audit will fail to uncover the attack.

54.    A proposed rule change recently noticed by the State Elections Board would require all counties to participate in a risk-limiting audit, but only following November general elections in even-numbered years.[47] Other elections, including state-wide primaries and runoffs, are not included in the requirement. Moreover, under the proposed rule, the RLA would target only one contest, which would be selected by the Secretary of State. Adversaries could choose to attack any race in

---

[45] *See* Mark Lindeman and Philip B. Stark, "A Gentle Introduction to Risk-limiting Audits," in *IEEE Security and Privacy* (2012), https://www.stat.berkeley.edu/~stark/Preprints/gentle12.pdf.
[46] *See* O.C.G.A. § 21-2-498(b).
[47] Georgia State Elections Board, "Notice of Intent to Post a Rule of the State Election Board, Title 183-1, *Rules of State Election Board*, Chapter 183-1-15, *Returns of Primaries and Elections* and Notice of Public Hearing" (Aug. 11, 2020), https://sos.ga.gov/admin/files/SEB%20Rule%20183-1-15-.02(2)%20and%20.04%20-%20To%20Post%20For%20Public%20Comment.pdf.

any election, and an attack would likely not be detected if it occurred in a contest that was not the target of the RLA or during an election for which no RLA was conducted. Even for the one contest every two years that would be audited, the proposed rule does not describe the auditing procedure in enough detail to evaluate its sufficiency. The specific process that election superintendents would follow to carry out the audit is yet to be defined.

55. No matter what auditing procedures Georgia applies, the state's widespread use of BMDs makes it possible for an attacker to undermine the integrity of the paper trail. Malware could cause the BMDs to print fraudulent selections, both in the barcode and the human-readable text. Such an attack would be impossible to detect by auditing the ballots, even with an RLA, because all records of the voter's intent would be wrong.

**Hand-Marked Paper Ballots Are Much More Secure**

56. Hand-marked paper ballots (HMPBs) are the most widely used voting technology in the United States. More than 65% of voters live in jurisdictions that use HMPBs as their primary in-person voting technology,[48] and all 50 states, including Georgia, use them for absentee voting. When used with modern precinct-

---

[48] Verified Voting, *The Verifier.*

count optical scanners and rigorous RLAs, HMPBs can provide much stronger security than BMD-printed ballots, especially those based on barcodes.

57.   Virtually every class of attack that affects HMPBs also affects BMDs, but BMDs—especially those that use barcodes—additionally suffer from the serious possibility that malicious software will alter the voter's choices without detection. In contrast, HMPBs can be well secured using existing election technology and procedural controls.

58.   It is true that voters using hand-marked paper ballots sometimes make errors. However, modern ballot scanners, such as Georgia's Dominion ICPs, can be programmed to detect the most common types of errors by voters, such as overvotes and undervotes. Where ballots are scanned in-precinct, and the scanners are programmed correctly, voters then have the opportunity to correct their ballots once the scanners report the errors. Scanners also sometimes misread voters' marks, but such errors—to the extent that they affected an election outcome—would be detected and corrected during risk-limiting audits, which are necessary in any event in order to safeguard against outcome-changing attacks.

**Georgia Elections Continue to be Threatened by Sophisticated Adversaries**

59.   Georgia's election system continues to face a high risk of being targeted by sophisticated adversaries, including Russia and other hostile foreign

governments. These adversaries could attempt to hack the election system to achieve a variety of goals, including undermining the legitimacy of the democratic process and causing fraudulent election outcomes.

60.    The Mueller Report recently outlined the scale and sophistication of Russia's efforts to interfere in the 2016 election, leaving no doubt that Russia and other adversaries will strike again.[49] The Special Counsel concluded principally that "[t]he Russian government interfered in the 2016 presidential election in sweeping and systematic fashion."[50] The report further explained that foreign actors "sought access to state and local computer networks by exploiting known software vulnerabilities on websites of state and local governmental entities."[51] The report also found that these foreign agents were successful in attacking at least one state and that their activities involved "more than two dozen states."[52] As noted prior to the Special Counsel's final report, Georgia was among the states that Russia targeted.[53]

---

[49] Special Counsel Robert S. Mueller III, *Report on the Investigation into Russian Interference in the 2016 Presidential Election (Volume I of II)*, United States Department of Justice (Mar. 2019), https://www.justice.gov/storage/report.pdf.
[50] *Id.* at 1.
[51] *Id.* at 50.
[52] *Id.*
[53] *See* Indictment ¶ 75, *United States v. Netyksho*, No. 1:18-cr-00215-ABJ, (D.D.C. July 13, 2018), ECF No. 1.

61.    Russia has sophisticated cyber-offensive capabilities, and it has shown a willingness to use them to hack elections elsewhere even before 2016. For instance, according to published reports, during the 2014 presidential election in Ukraine, attackers linked to Russia sabotaged Ukraine's vote counting infrastructure, and Ukrainian officials succeeded only at the last minute in defusing vote-stealing malware that would have caused the wrong winner to be announced.[54]

62.    Russia and other foreign governments continue to threaten Georgia's elections in 2020. As recently as this month, the U.S. Intelligence Community assessed that foreign threats to the 2020 election include "ongoing and potential activity" from Russia, China, and Iran, concluding that "[f]oreign efforts to influence or interfere with our elections are a direct threat to the fabric of our democracy."[55] These adversarial governments may "seek to compromise our election infrastructure

---

[54] Mark Clayton, "Ukraine election narrowly avoided 'wanton destruction' from hackers," *The Christian Science Monitor* (June 17, 2014), https://www.csmonitor.com/World/Passcode/2014/0617/Ukraine-election-narrowly-avoided-wanton-destruction-from-hackers.
[55] Office of the Director of National Intelligence, "Statement by NCSC Director William Evanina: Election Threat Update for the American Public" (Aug. 7, 2020), https://www.dni.gov/index.php/newsroom/press-releases/item/2139-statement-by-ncsc-director-william-evanina-election-threat-update-for-the-american-public.

for a range of possible purposes, such as interfering with the voting process, stealing sensitive data, or calling into question the validity of the election results."[56]

63.   Georgia's BMD-based election system does not achieve the level of security necessary to withstand an attack by these sophisticated adversaries. Despite the addition of a paper trail, it suffers from severe security risks much like those of the DRE-based election system it replaced. Like paperless DREs, Georgia's BMDs are vulnerable to attacks that have the potential to change all records of a vote.


I declare under penalty of the perjury laws of the State of Georgia and the United States that the foregoing is true and correct and that this declaration was executed this 19th day of August, 2020 in Rushland, Pennsylvania.



_____

J. ALEX HALDERMAN

---

[56] *Id.*

# EXHIBIT B

Case 2:20-cv-00455-WN EDocument 1345-2 Filed 06/28/21 Page 39 of 502
Case 1:17-cv-02989-AT Document 809-30 Filed 08/24/20 Page 2 of 48
Case 1:21-cv-00445-CJN

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **DONNA CURLING, ET AL.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **CIVIL ACTION** |
| **vs.** | ) | |
| | ) | **FILE NO. 1:17-cv-2989-AT** |
| **BRAD RAFFENSPERGER,** | ) | |
| **ET AL.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>DECLARATION OF HARRI HURSTI</u>

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

1.      My name is Harri Hursti.  I am over the age of 21 and competent to give this testimony.  The facts stated in this declaration are based on my personal knowledge, unless stated otherwise.

2.      My background and qualifications in voting system cybersecurity are set forth in my December 16, 2019 declaration.  (Doc. 680-1, pages 37 *et seq*).  I stand by everything in that declaration and in my August 21, 2020 declaration. (Doc. 800-2).

1

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.613 Filed 08/25/20 Page 3 of 48
Case 1:21-cv-02489-VM Document 3-9 Filed 08/24/20 Page 9 of 50
Case 1:21-cv-00445-CJN

3.      I am also an expert in ballot scanning because of extensive background in digital imaging prior by work researching election systems. In addition, in 2005 I started an open source project for scanning and auditing paper ballots from images. As a result, I am familiar with different scanner types, how scanner settings and image processing features change the images, and how file format choices affect the quality and accuracy of the ballots.

4.      I am engaged as an expert in this case by Coalition for Good Governance.

5.      In developing this declaration and opinion, I visited Atlanta to observe certain operations of the June 9, 2020 statewide primary, and the August 11 runoff. During the June 9 election, I was an authorized poll watcher in some locations and was a public observer in others.  On August 11, I was authorized as an expert inspecting and observing under the Coalition for Good Governance's Rule 34 Inspection request in certain polling places and the Fulton County Election Preparation Center. As I will explain below in this declaration, my extensive experience in the area of voting system security and my observations of these elections lead to additional conclusions beyond those in my December 16, 2019 declaration.  Specifically:

Case 2:20-cv-13134-LVM-RSW ECF No. 1-16, PageID.1272 Filed 08/25/20 Page 4 of 48
Case 1:17-cv-02989-AT Document 809-30 Filed 08/24/20 Page 4 of 48
Case 1:21-cv-00445-CJN

a) the scanner and tabulation software settings being employed to determine which votes to count on hand marked paper ballots are likely causing clearly intentioned votes not to be counted;

b) the voting system is being operated in Fulton County in a manner that escalates the security risk to an extreme level; and

c) voters are not reviewing their BMD printed ballots, which causes BMD generated results to be un-auditable due to the untrustworthy audit trail.

**Polling Place Observations**

6. <u>Election observation on Peachtree Christian Church.</u> The ballot marking devices were installed so that 4 out of 8 touchscreen devices were clearly visible from the pollbook check in desk. Voter's selections could be effortlessly seen from over 50 ft away.

7. Over period of about 45 minutes, I only observed one voter who appeared to be studying the ballot after picking it up from the printer before casting it in the scanner. When voters do not fully verify their ballot prior to casting, the ballots cannot be considered a reliable auditable record.

8. The scanner would reject some ballots and then accept them after they were rotated to a different orientation. I noted that the scanner would vary in the amount of time that it took to accept or reject a ballot. The delay varied between 3

3

and 5 seconds from the moment the scanner takes the ballot until the scanner either accepts the ballot or rejects it. This kind of behavior is normal on general purpose operating systems multitasking between multiple applications, but a voting system component should be running only a single application without outside dependencies causing variable execution times.

9.    Further research is necessary to determine the cause of the unexpected scanning delays.   A system that is dedicated to performing one task repeatedly should not have unexplained variation in processing time.  As security researcher, we are always suspicious about any unexpected variable delays, as those are common telltale signs of many issues, including a possibility of unauthorized code being executed. So, in my opinion changes of behaviors between supposedly identical machines performing identical tasks should always be investigated.

When ballots are the same and are produced by a ballot marking device, there should be no time difference whatsoever in processing the bar codes. Variations in time can be the result of many things - one of them is that the scanner encounters an error reading the bar code and needs to utilize error correcting algorithms to recover from that error.   Further investigation is

4

Case 2:20-cv-13134-LVP-RSW ECF No. 1-2, PageID.600 Filed 06/25/20 Page 6 of 48
Case 1:17-cv-02989-AT Document 809-30 Filed 08/24/20 Page 43 of 502
Case 1:21-cv-00445-CJN

necessary to determine the root cause of these delays, the potential impact of the error correcting algorithms if those are found to be the cause, and whether the delay has any impact upon the vote.

10.  Election observation in Central Park Recreation Center. The Poll place manager told me that no Dominion trained technician had reported on location to help them that morning.

11.  The ballot marking devices were originally installed in a way that voter privacy was not protected, as anyone could observe across the room how people are voting on about 2/3 devices.

12.  The ballot scanner took between 4 and 6 seconds to accept the ballot. I observed only one ballot being rejected.

13.  Generally, voters did not inspect the ballots after taking it from the printer and casting it into the scanner.

14.  Election observation in Fanplex location. Samantha Whitley and Harrison Thweatt were poll watchers at the Fanplex polling location.  They contacted me at approximately 9:10am about problems they were observing with the operation of the BMDs and Poll Pads and asked me to come to help them

Case 2:20-cv-13134-LVP-RSW ECF No. 1-5, PageID.604 Filed 08/24/20 Page 7 of 48
Case 1:21-cv-02589-AJN Document 30-5 Filed 06/24/21 Page 7 of 50
Case 1:21-cv-00445-CJN

understand the anomalies they were observing.  I arrived at FanPlex at approximately 9:30am.

15.    I observed that the ballot scanner located by a glass wall whereby standing outside of the building observe the scanning, would take between 6 and 7 seconds to either accept or reject the ballot.

16.    For reasons unknown, on multiple machines, while voters were attempting to vote, the ballot marking devices sometimes printed "test" ballots.  I was not able to take a picture of the ballot from the designated observation area, but I overheard the poll worker by the scanner explaining the issue to a voter which was sent back to the Ballot-Marking Device to pick up another ballot from the printer tray. Test ballots are intended to be used to test the system but without being counted by the system during an election. The ballot scanner in election settings rejects test ballots, as the scanners at FanPlex did. This caused confusion as the voters needed to return to the ballot-marking device to retrieve the actual ballot. Some voters returned the test ballot into the printer tray, potentially confusing the next voter.  Had voters been reviewing the ballots at all before taking them to the scanner, they would have noticed the "Test Ballot" text on the ballot.  I observed no voter really questioning a poll worker why a "Test" ballot was printed in the first place.

6

Case 2:21-cv-00445-JCM-EJY Document 345-2 Filed 06/28/21 Page 8 of 48
Case 1:17-cv-02989-AT Document 809-30 Filed 08/24/20 Page 8 of 50
Case 1:21-cv-00445-CJN

17.    Obviously, during the election day, the ballot marking device should not be processing or printing any ballot other than the one the voter is voting. While the cause of the improper printing of ballots should be examined, the fact that this was happening at all is likely indicative of a wrong configuration given to the BMD, which in my professional opinion raises another question: Why didn't the device print only test ballots? And how can the device change its behavior in the middle of the election day? Is the incorrect configuration originating from the Electronic Pollbook System? What are the implications for the reliability of the printed ballot and the QR code being counted?

18.    Election observation Park Tavern. The scanner acceptance delay did not vary as it had in previous locations and was consistently about 5 seconds from the moment the scanner takes the ballot, to the moment the scanner either accepts the ballot or rejects it. The variation between scanners at different locations is concerning because these are identical physical devices and should not behave differently while performing the identical task of scanning a ballot.

19.    The vast majority of voters at Park Tavern did not inspect the ballots after taking them from the printer and before casting them in the scanner.

7

Case 2:20-cv-13134-LVP-RSW ECF No. 1-5 PageID.668 Filed 11/25/20 Page 9 of 48
Case 1:17-cv-02989-AT Document 809-30 Filed 08/24/20 Page 9 of 50
Case 1:21-cv-00445-CJN

**Fulton Tabulation Center Operation-Election Night, August 11, 2020**

20.     In Fulton County Election Preparation Center ("EPC") on election night I reviewed certain operations as authorized by Rule 34 inspection.

21.     I was permitted to view the operations of the upload of the memory devices coming in from the precincts to the Dominion Election Management System ("EMS") server. The agreement with Fulton County was that I could review only for a limited period of time; therefore, I did not review the entire evening's process. Also, Dominion employees asked me to move away from the monitors containing the information and messages from the upload process and error messages, limiting my ability to give a more detailed report with documentation and photographs of the screens.  However, my vantage point was more than adequate to observe that system problems were recurring and the Dominion technicians operating the system were struggling with the upload process.

22.     It is my understanding the same EMS equipment and software had been used in Fulton County's June 9, 2020 primary election.

23.     It is my understanding that the Dominion technician ("Dominic") charged with operating the EMS server for Fulton County had been performing

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.247 Filed 09/21/20 Page 10 of 48
Case 1:17-cv-02989-AT Document 809-3 Filed 08/24/20 Page 41 of 88
Case 1:21-cv-00445-CJN

these duties at Fulton County for several months, including during the June 9 primary.

24.     During my August 11 visit, and a follow-up visit on August 17, I observed that the EMS server was operated almost exclusively by Dominion personnel, with little interaction with EPC management, even when problems were encountered. In my conversations with Derrick Gilstrap and other Fulton County Elections Department EPC personnel, they professed to have limited knowledge of or control over the EMS server and its operations.

25.     Outsourcing the operation of the voting system components directly to the voting system vendors' personnel is highly unusual in my experience and of grave concern from a security and conflict of interest perspective. Voting system vendors' personnel have a conflict of interest because they are not inclined to report on, or address, defects in the voting systems.   The dangers this poses is aggravated by the absence of any trained County personnel to oversee and supervise the process.

26.     In my professional opinion, the role played by Dominion personnel in Fulton County, and other counties with similar arrangements, should be considered an elevated risk factor when evaluating the security risks of Georgia's voting system.

9

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.655 Filed 06/25/20 Page 11 of 48
Case 1:17-cv-02989-WHA Document 809-3 Filed 08/24/20 Page 11 of 48
Case 1:21-cv-00445-CJN

27.    Based on my observations on August 11 and August 17, Dell computers running the EMS that is used to process Fulton county votes appeared not to have been hardened.

28.    In essence, hardening is the process of securing a system by reducing its surface of vulnerability, which is larger when a system performs more functions; in principle it is to the reduce the general purpose system into a single-function system which is more secure than a multipurpose one. Reducing available ways of attack typically includes changing default passwords, the removal of unnecessary software, unnecessary usernames or logins, grant accounts and programs with the minimum level of privileges needed for the tasks and create separate accounts for privileged operations as needed, and the disabling or removal of unnecessary services.

29.    Computers performing any sensitive and mission critical tasks such as elections should unquestionably be hardened. Voting system are designated by the Department of Homeland Security as part of the critical infrastructure and certainly fall into the category of devices which should be hardened as the most fundamental security measure. In my experience, it is unusual, and I find it unacceptable for an EMS server not to have been hardened prior to installation.

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.666 Filed 06/25/20 Page 12 of 48
Case 1:17-cv-02989-WT Document 809-3 Filed 08/24/20 Page 12 of 48
Case 1:21-cv-00445-CJN

30.     The Operating System version in the Dominion Election Management computer, which is positioned into the rack and by usage pattern appears to be the main computer, is Windows 10 Pro 10.0.14393.  This version is also known as the Anniversary Update version 1607 and it was released August 2, 2016.  Exhibit A is a true and correct copy of a photograph that I took of this computer.

31.     When a voting system is certified by the EAC, the Operating System is specifically defined, as Windows 10 Pro was for the Dominion 5.5-A system. Unlike consumer computers, voting systems do not and should not receive automatic "upgrades" to newer versions of the Operating System. without undergoing tests for conflicts with the new operating system software.

32.     That computer and other computers used in Georgia's system for vote processing appear to have home/small business companion software packages included.  Exhibits B and C are true and correct copies of photographs that I took of the computer located in the rack and the computer located closest to the rack on the table to the right. The Start Menu shows a large number of game and entertainment software icons.   As stated before, one of the first procedures of hardening is removal of all unwanted software, and removal of those game icons and the associated games and installers  alongside with all other software which is not absolutely needed in the computer for election processing purposes would be

11

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.667 Filed 11/25/20 Page 13 of 48
Case 1:17-cv-02989-WT Document 809-3 Filed 08/21/21 Page 13 of 88
Case 1:21-cv-00445-CJN

one of the first and most basic steps in the hardening process. In my professional opinion, independent inquiry should be promptly made of all 159 counties to determine if the Dominion systems statewide share this major deficiency.

33. Furthermore, when I asked the Dominion employee Dominic assigned to the Fulton County election server operation about the origin of the Windows operating system, he answered that he believed that "it has been provided by the State."

34. Since Georgia's Dominion system is new, it is a reasonable assumption that all machines in the Fulton County election network had the same version of Windows installed. However, not only the two computers displayed different entertainment software icons, but additionally one of the machines in Fulton's group of election servers had an icon of computer game called "*Homescapes*" which is made by Playrix Holding Ltd., founded by Dmitry and Igor Bukham in Vologda, Russia. Attached as Exhibit C is a true and correct copy of a photograph that I took of the Fulton voting system computer" Client 02". The icon for Homescapes is shown by the arrow on Exhibit C.

35. The *Homescapes* game was released in August 2017, one year after Fulton County's operating system release. If the *Homescapes* game came with the operating system it would be unusual, because at the time of the release of

12

Case 2:21-cv-12154-MFL-EAS ECF No. 1-13, PageID.251 Filed 08/23/21 Page 14 of 48
Case 1:21-cv-02589-WTL Document 30-9 Filed 06/24/21 Page 14 of 48
Case 1:21-cv-00445-CJN

Homescapes, Microsoft had already released 3 major Microsoft Windows 10
update releases after build 14393 and before the release of that game. This calls
into question whether all Georgia Dominion system computers have the same
operating system version, or how the game has come to be having a presence in
Fulton's Dominion voting system.

36. Although this Dominion voting system is new to Georgia, the
Windows 10 operating system of at least the 'main' computer in the rack has not
been updated for 4 years and carries a wide range of well-known and publicly
disclosed vulnerabilities. At the time of this writing, The National Vulnerability
Database maintained by National Institute of Standards and Technology lists 3,177
vulnerabilities mentioning "Windows 10 Pro" and 203 vulnerabilities are
specifically mentioning "Windows 10 Pro 1607" which is the specific version
number of the build 14393 that Dominion uses.

37. Even without internet connectivity, unhardened computers are at risk
when those are used to process removable media. It was clear that when Compact
Flash storage media containing the ballot images, audit logs and results from the
precinct scanners were connected to the server, the media was automounted by the
operating system. When the operating system is automounting a storage media, the
operating system starts automatically to interact with the device. The zero-day

13

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.662 Filed 08/25/20 Page 15 of 48
Case 1:21-cv-02985-WN Document 009 30 Filed 06/24/21 Page 15 of 48
Case 1:21-cv-00445-CJN

vulnerabilities exploiting this process has been recurringly discovered from all operating systems, including Windows. Presence of automount calls also into question presence of another setting which is always disabled in hardening process. It is autorun, which automatically executes some content on the removable media. While this is convenient for consumers, it poses extreme security risk.

38.    Based on my experience and mental impression observing the Dominion technician's activities, Fulton County's EMS server management seems to be an *ad hoc* operation with no formalized process. This was especially clear on the manual processing of the memory cards storage devices coming in from the precincts on election night and the repeated access of the operating system to directly access filesystem, format USB devices, etc. This kind of operation in naturally prone to human errors. I observed personnel calling on the floor asking if all vote carrying compact flash cards had been delivered from the early voting machines for processing, followed by later finding additional cards which had been overlooked in apparent human error. Later, I heard again one technician calling on the floor asking if all vote carrying compact flashes had been delivered. This clearly demonstrates lack of inventory management which should be in place to ensure, among other things, that no rogue storage devices would be inserted into the computer.  In response, 3 more compact flash cards were hand-delivered. Less

Case 2:21-cv-02594-WN-EST Name-4-13-P2-eFiled-07/04/21/21-1 Page 253 of 497 216 of 48
Case 1:17-cv-02958-WN-Document-369-3-Filed-06/24/21-Page 16 of 48
Case 1:21-cv-00445-CJN

than 5 minutes later, I heard one of the county workers say that additional card was found and was delivered for processing. All these devices were trusted by printed label only and no comparison to an inventory list of any kind was performed.

39.    In addition, operations were repeatedly performed directly on the operating system. Election software has no visibility into the operations performed directly on the operating system, and therefore those are not included in election system event logging. Those activities can only be partially reconstructed from operating system logs – and as these activities included copying election data files, election software log may create false impression that the software is accessing the same file over a period of time, while in reality the file could had been replaced with another file with the same name by activities commanded to the operating system. Therefore, any attempt to audit the election system operated in this manner must include through analysis of all operating system logs, which complicates the auditing process.  Unless the system is configured properly to collect file system auditing data is not complete. As the system appears not to be hardened, it is unlikely that the operating system has been configured to collect auditing data.

40.    A human error when operating live election system from the operating system can result in a catastrophic event destroying election data or even rendering the system unusable.  Human error is likely given the time pressure involved and,

at least in Fulton County, no formal check lists or operating procedures were followed to mitigate the human error risk. The best practice is to automate trivial tasks to reduce risk of human error, increase the quality assurance of overall operations and provide auditability and transparency by logging.

41.    Uploading of memory cards had already started before I arrived at EPC. While one person was operating the upload process, the two other Dominion employees were troubleshooting issues which seemed to be related to ballot images uploads. I repeatedly observed error messages appearing on the screen of the EMS server. I was not able to get picture of the errors on August 11th, I believe the error was the same or similar that errors recurring August 17th as shown on Exhibit D and discussed later in this declaration.  Dominion employees were troubleshooting the issue with 'trial-and-error' approach.  As part of this effort they accessed "Computer Management" application of Windows 10 and experimented with trouble shooting the user account management feature. This demonstrates that they had complete access to the computer.  This means there are no meaningful access separation and privileges and roles controls protecting the county's primary election servers. This also greatly amplifies the risk of catastrophic human error and malicious program execution.

16

Case 2:20-cv-13134-LVP-RSW ECF No. 1-3, PageID.678 Filed 11/25/20 Page 18 of 48
Case 1:21-cv-02936-WTL-DML Document 1-3 Filed 08/24/20 Page 18 of 48
Case 1:21-cv-00445-CJN

42.     I overheard the Dominion technician's conversation that they had issues with file system structure and "need 5 files out of EMS server and paste. Delete everything out of there and put it there."  To communicate the gravity of the situation to each other they added "Troubleshooting in the live environment". These conversations increased the mental image that they were not familiar the issue they were troubleshooting.

43.     After about 45 minutes of trying to solve the issue by instructions received over the phone, the two Dominion employees' (who had been troubleshooting) behavior changed. The Dominion staff member walked behind the server rack and made manual manipulations which could not be observed from my vantage point. After that they moved with their personal laptops to a table physically farther away from the election system and stopped trying different ways to work around the issue in front of the server, and no longer talked continuously with their remote help over phone.

44.     In the follow-up-calls I overheard them ask people on the other end of the call to check different things, and they only went to a computer and appeared to test something and subsequently take a picture of the computer screen with a mobile phone and apparently send it to a remote location.

17

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.873 Filed 06/24/20 Page 19 of 48
Case 1:21-cv-00445-CJN    Document 1-3    Filed 06/23/21    Page 19 of 48

Case 1:21-cv-00445-CJN

45.    Based on my extensive experience, this all created a strong mental impression that the troubleshooting effort was being done remotely over remote access to key parts of the system. Additionally, new wireless access point with a hidden SSID access point name appeared in the active Wi-Fi stations list that I was monitoring, but it may have been co-incidental. Hidden SSIDs are used to obscure presence of wireless networking from casual observers, although they do not provide any real additional security.

46.    If in fact remote access was arranged and granted to the server, this has gravely serious implications for the security of the new Dominion system. Remote access, regardless how it is protected and organized is always a security risk, but furthermore it is transfer of control out of the physical perimeters and deny any ability to observe the activities.

47.    I also observed USB drives marked with the Centon DataStick Pro Logo with no visible inventory control numbering system being taken repeatedly from the EMS server rack to the Fulton managers' offices and back.  The Dominion employee told me that the USB drives were being taken to the Election Night Reporting Computer in another office.  This action was repeated several times during the time of my observation. Carrying generic unmarked and therefore unidentifiable media out-of-view and back is a security risk – especially when the

18

Case 2:20cv-13134v1-09945011 E CTRN no4-13v62s FiD,c6704/23/21 1 Pa5257 GFa0220 of 48
Case 1:17-cv-02989 WTN Document 909 3c Filed 06/24/20 1 Page 20 of 98
Case 1:21-cv-00445-CJN

exact same type of devices was piled on the desk near the computer. During the election night, the Dominion employees reached to storage box and introduced more unmarked storage devices into the ongoing election process. I saw no effort made to maintain a memory card inventory control document or chain of custody accounting for memory cards from the precincts.

48.     I also visited the EPC on August 17.  During that visit, the staff working on uploading ballots for adjudication experienced an error which appeared similar to the one on election night. This error was repeated with multitude of ballots and at the time we left the location, the error appeared to be ignored, rather that resolved. (EXHIBIT D - the error message and partial explanation of the error being read by the operator.).

49.     The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access, are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system.

50.     Such a risk could be overcome if the election were conducted using hand marked paper ballots, with proper chain of custody controls.  For elections conducted with hand marked paper ballots, any malware or human error involved

19

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.673 Filed 11/25/20 Page 22 of 48
Case 1:17-cv-02989-AT Document 809-3 Filed 08/24/20 Page 21 of 48
Case 1:21-cv-00445-CJN

in the server security deficiencies or malfunctions could be overcome with a robust audit of the hand marked paper ballots and in case of irregularities detected, remedied by a recount. However, given that BMD ballots are computer marked, and the ballots therefore unauditable for determining the result, no recovery from system security lapses is possible for providing any confidence in the reported outcomes.

**Ballot Scanning and Tabulation of Vote Marks**

51.     I have been asked to evaluate the performance and reliability of Georgia's Dominion precinct and central count scanners in the counting of votes on hand marked paper ballots.

52.     On or about June 10th, Jeanne Dufort and Marilyn Marks called me to seek my perspective on what Ms. Dufort said she observed while serving as a Vote Review Panel member in Morgan County.  Ms. Dufort told me that she observed votes that were not counted as votes nor flagged by the Dominion adjudication software.

53.     Because of the ongoing questions this raised related to the reliability of the Dominion system tabulation of hand marked ballots, I was asked by Coalition Plaintiffs to conduct technical analysis of the scanner and tabulation accuracy. That analysis is still in its early stages.

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.676 Filed 06/23/21 Page 22 of 48
Case 1:21-cv-02900 Document 30-3 Filed 06/24/21 Page 22 of 48
Case 1:21-cv-00445-CJN

54.     Before addressing the particulars of my findings and research into the accuracy of Dominion's scanning and tabulation, I will address the basic process by which an image on a voted hand marked paper ballot is processed by scanner and tabulation software generally. It is important to understand that the Dominion scanners are Canon off the shelf scanners and their embedded software were designed for different applications than ballot scanning which is best conducted with scanners specifically designed for detecting hand markings on paper ballots.

55.     Contrary of public belief, the scanner is not taking a picture of the paper.  The scanner is illuminating the paper with a number of narrow spectrum color lights, typically 3, and then using software to produce an approximation what the human eye would be likely to see if there would had been a single white wide-spectrum light source. This process takes place in partially within the scanner and embedded software in the (commercial off the shelf) scanner and partially in the driver software in the host computer. It is guided by number of settings and configurations, some of which are stored in the scanner and some in the driver software. The scanner sensors gather more information than will be saved into the resulting file and another set of settings and configurations are used to drive that part of the process. The scanners also produce anomalies which are automatically removed from the images by the software. All these activities are performed

21

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.678 Filed 06/24/21 Page 23 of 48
Case 1:21-cv-02489-WMR Document 369-3 Filed 06/24/21 Page 23 of 48
Case 1:21-cv-00445-CJN

outside of the Dominion election software, which is relying on the end product of this process as the input.

56.     I began reviewing Dominion user manuals in the public domain to further investigate the Dominion process.

57.     On August 14, I received 2 sample Fulton County August 11 ballots of high-speed scanned ballot from Rhonda Martin, who stated that she obtained them from Fulton County during Coalition Plaintiff's discovery. The image characteristics matched the file details I had seen on the screen in EPC. The image is TIFF format, about 1700 by 2200 pixels with 1-bit color depth (= strictly black or white pixels only) with 200 by 200 dots per square inch ("dpi") resolution resulting in files that are typically about 64 or 73 kilo bytes in size for August 11 ballots. With this resolution, the outer dimension of the oval voting target is about 30 by 25 pixels.  The oval itself (that is, the oval line that encircles the voting target) is about 2 pixels wide.  The target area is about 450 pixels; the area of the target a tight bounding box would be 750 pixels and the oval line encircling the target is 165 pixels. In these images, the oval itself represented about 22% value in the bounding box around the vote target oval.

58.     Important image processing decisions are done in scanner software and before election software threshold values are applied to the image.  These

Case 2:21-cv-01334-JNE-STR Name 4-13-42-9-FiledFiled 06/24/21 Page 24 of 48
Case 1:17-cv-02989-WN Document 809-3 Filed 06/24/21 Page 24 of 48
Case 1:21-cv-00445-CJN

scanner settings are discussed in an excerpt Dominion's manual for ICC operations
My understanding is that the excerpt of the Manual was received from Marilyn
Marks who stated that she obtained it from a Georgia election official in response
to an Open Records request. Attached as Exhibit E is page 9 of the manual. Box
number 2 on Exhibit E shows that the settings used are not neutral factory default
settings.

59.     Each pixel of the voters' marks on a hand marked paper ballot will be
either in color or gray when the scanner originally measures the markings. The
scanner settings affect how image processing turns each pixel from color or gray to
either black or white in the image the voting software will later process. This
processing step is responsible for major image manipulation and information
reduction before the election software threshold values are calculated. This process
has a high risk of having an impact upon how a voter mark is interpreted by the
tabulation software when the information reduction erases markings from the
scanned image before the election software processes it.

60.     In my professional opinion, any decision by Georgia's election
officials about adopting or changing election software threshold values is
premature before the scanner settings are thoroughly tested, optimized and locked.

61.    The impact of the scanner settings is minimal for markings made with
a black felt pen but can be great for markings made with any color ballpoint pens.
To illustrate this, I have used standard color scanning settings and applied then
standard conversion from a scanned ballot vote target with widely used free and
open source image processing software "GNU Image Manipulation Program
version 2.10.18" EXHIBIT G shows the color image being converted with the
software's default settings from color image to Black-and-White only. The red
color does not meet the internal conversion algorithm criteria for black, therefore it
gets erased to white instead.

62.    Dominion manual for ICC operations clearly show that the scanner
settings are changed from neutral factory default settings. EXHIBIT H shows how
these settings applied different ways alter how a blue marking is converted into
Black-and-White only image.

63.    The optimal scanner settings are different for each model of scanner
and each type of paper used to print ballots. Furthermore, because scanners are
inherently different, the manufacturers use hidden settings and algorithms to cause
neutral factory settings to produce similar baseline results across different makes
and models. This is well-studied topic; academic and image processing studies
published as early as 1979 discuss the brittleness of black-or-white images in

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.680 Filed 06/24/21 Page 26 of 48
Case 1:17-cv-02989-AT Document 809-3 Filed 08/24/20 Page 26 of 48
Case 1:21-cv-00445-CJN

conversion. Subsequently, significance for ballot counting has been discussed in academic USENIX conference peer-reviewed papers.

64.     On the August 17th at Fulton County Election Preparation Center Professor Richard DeMillo and I participated in a scan test of August 11 test ballots using a Fulton County owned Dominion precinct scanner. Two different ballot styles were tested, one with 4 races and one with 5 races. Attached as Exhibits I and J show a sample ballots with test marks.

65.     A batch of 50 test ballots had been marked by Rhonda Martin with varying types of marks and varying types of writing instruments that a voter might use at home to mark an absentee ballot. Professor DeMillo and I participated in marking a handful of ballots.

66.     Everything said here concerning the August 17 test is based on a very preliminary analysis. The scanner took about 6 seconds to reject the ballots, and one ballot was only acceptable "headfirst" while another ballot only "tail first." Ballot scanners are designed to read ballots "headfirst" or "tail first," and front side and backside and therefore there should not be ballots which are accepted only in one orientation. I observed the ballots to make sure that both ballots had been cleanly separated from the stub and I could not identify any defects of any kind on the ballots.

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.264 Filed 11/25/20 Page 27 of 48
Case 1:17-cv-02989-AT Document 809-3 Filed 08/24/20 Page 27 of 48
Case 1:21-cv-00445-CJN

67.     There was a 15 second cycle from the time the precinct scanner accepted a ballot to the time it was ready for the next ballot.  Therefore, the maximum theoretical capacity with the simple 5 race ballot is about 4 ballots per minute if the next ballot is ready to be fed into the scanner as soon as the scanner was ready to take it.  In a real-world voting environment, it takes considerably longer because voters move away from the scanner, the next voter must move in and subsequently figure where to insert the ballot. The Dominion precinct scanner that I observed was considerably slower than the ballot scanners I have tested over the last 15 years. This was done with a simple ballot, and we did not test how increase of the number of races or vote targets on the ballot would affect the scanning speed and performance.

68.     Though my analysis is preliminary, this test reveals that a significant percentage of filled ovals that would to a human clearly show voter's intent failed to register as a vote on the precinct count scanner.

69.     The necessary testing effort has barely begun at the time of this writing, as only limited access to equipment has been made available. I have not had access to the high-volume mail ballot scanner that is expected to process millions of mail ballots in Georgia's upcoming elections. However, initial results suggest that significant revisions must be made in the scanning settings to avoid a

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.265 Filed 06/24/20 Page 28 of 48
Case 1:17-cv-02989-WN Document 809-3 Filed 08/24/21 Page 23 of 28
Case 1:21-cv-00445-CJN

widespread failure to count certain valid votes that are not marked as filled in ovals. Without testing, it is impossible to know, if setting changes alone are sufficient to cure the issue.

**Scanned Ballot Tabulation Software Threshold Settings**

70.     Georgia is employing a Dominion tabulation software tool called "Dual Threshold Technology" for "marginal marks." (See Exhibit M) The intent of the tool is to detect voter marks that could be misinterpreted by the software and flag them for review. While the goal is admirable, the method of achieving this goal is quite flawed.

71.     While it is compelling from development cost point of view to use commercial off the shelf COTS scanners and software, it requires additional steps to ensure that the integration of the information flow is flawless. In this case, the software provided by the scanner manufacturer and with settings and configurations have great impact in how the images are created and what information is removed from the images before the election software processes it. In recent years, many defective scanner software packages have been found. These software flaws include 'image enhancement' features which have remained enabled even when the feature has been chosen to be disabled from the scanner software provided by the manufacturer. An example of dangerous feature to keep

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.266 Filed 06/24/21 Page 29 of 48
Case 1:17-cv-02989-AT Document 309-6 Filed 06/23/20 Page 29 of 48
Case 1:21-cv-00445-CJN

enabled is 'Punch Hole Removal', intended to make images of documents removed from notebook binders to look more aesthetically pleasing. The software can and in many cases will misinterpret a voted oval as a punch hole and erase the vote from the image file and to make this worse, the punch holes are expected to be found only in certain places near the edge of the paper, and therefore it will erase only votes from candidates whose targets are in those target zones.

72.    Decades ago, when computing and storage capacity were expensive black-and-white image commonly meant 1-bit black-or-white pixel images like used by Dominion system. As computer got faster and storage space cheaper during the last 2-3 decades black-and-white image has become by default meaning 255 shades of gray grayscale images. For the purposes of reliable digitalization of physical documents, grayscale image carries more information from the original document for reliable processing and especially when colored markings are being processed. With today's technology, the difference in processing time and storage prices between grayscale and 1-bit images has become completely meaningless, and the benefits gained in accuracy are undeniable.

73.    I am aware that the Georgia Secretary of State's office has stated that Georgia threshold settings are national industry standards for ballot scanners (Exhibit K). This is simply untrue. If, there were an industry standard for that, it

would be part of EAC certification. There is no EAC standard for such threshold settings. As mentioned before, the optimal settings are products of many elements. The type of the scanner used, the scanner settings and configuration, the type of the paper used, the type of the ink printer has used in printing the ballots, color dropout settings, just to name few. Older scanner models, which were optical mark recognitions scanners, used to be calibrated using calibration sheet – similar process is needed to be established for digital imaging scanners used this way as the ballot scanners.

74.     Furthermore, the software settings in Exhibit E box 2 show that the software is instructed to ignore all markings in red color ("Color drop-out: Red"), This clearly indicates that the software was expecting the oval to be printed in Red and therefore it will be automatically removed from the calculation. The software does not anticipate printed black ovals as used in Fulton County. Voters have likely not been properly warned that any pen they use which ink contains high concentration of red pigment particles is at risk of not counting, even if to the human eye the ink looks very dark.

75.     I listened to the August 10 meeting of the State Board of Elections as they approved a draft rule related to what constitutes a vote, incorporating the following language:

29

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.675 Filed 06/25/21 Page 31 of 48
Case 1:17-cv-02989-AT Document 809-3 Filed 08/24/21 Page 61 of 68
Case 1:21-cv-00445-CJN

*Ballot scanners that are used to tabulate optical scan ballots marked by hand shall be set so that:*

*1. Detection of 20% or more fill-in of the target area surrounded by the oval shall be considered a vote for the selection;*

*2. Detection of less than 10% fill-in of the target area surrounded by the oval shall not be considered a vote for that selection;*

*3. Detection of at least 10% but less than 20% fill-in of the target area surrounded by the oval shall flag the ballot for adjudication by a vote review panel as set forth in O.C.G.A. 21-2-483(g). In reviewing any ballot flagged for adjudication, the votes shall be counted if, in the opinion of the vote review panel, the voter has clearly and without question indicated the candidate or candidates and answers to questions for which such voter desires to vote.*

76.     The settings discussed in the rule are completely subject to the scanner settings. How the physical marking is translated into the digital image is determined by those values and therefore setting the threshold values without at the same time setting the scanner settings carries no value or meaning. If the ballots will be continuing to be printed with black only, there is no logic in having any drop-out colors.

77.     Before the State sets threshold standards for the Dominion system, extensive testing is needed to establish optimal configuration and settings for each step of the process. Also, the scanners are likely to have settings additional configuration and settings which are not visible menus shown in the manual excerpt. All those should be evaluated and tested for all types of scanners approved for use in Georgia, including the precinct scanners

30

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.606 Filed 06/25/20 Page 32 of 48
Case 1:17-cv-02989-AT Document 809-9 Filed 08/24/20 Page 32 of 48
Case 1:21-cv-00445-CJN

78.     As temporary solution, after initial testing, the scanner settings and configuration should be locked and then a low threshold values should be chosen. All drop-out colors should be disabled. This will increase the number of ballots chosen for human review and reduce the number of valid votes not being counted as cast.

**Logic and Accuracy Testing**

79.     Ballot-Marking Device systems inherits the same well-documented systemic security issues embedded in direct-recording electronic (DRE) voting machine design. Such design flaws eventually are causing the demise of DRE voting system across the country as it did in Georgia. In essence the Ballot Marking Device is a general-purpose computer running a general-purpose operating system with touchscreen that is utilized as a platform to run a software, very similar to DRE by displaying a ballot to the voter and recording the voter's intents. The main difference is that instead of recording those internally digitally, it prints out a ballot summary card of voter's choices.

80.     Security properties of this approach would be positively different from DREs if the ballot contained only human-readable information and all voters are required to and were capable of verifying their choices from the paper ballot summary. That of course is unrealistic.

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13 PageID.643 Filed 06/25/21 Page 233 of 48
Case 1:17-cv-02989-WNT Document 809-3 Filed 08/24/20 Page 33 of 98
Case 1:21-cv-00445-CJN

81.     When voter fails to inspect the paper ballot and significant portion of the information is not in human readable from as a QR barcode, Ballot-Marking Device based voting effectively inherits most of the negative and undesirable security and reliability properties directly from DRE paradigm, and therefore should be subject to the same testing requirements and mitigation strategies as DREs.

82.     In response to repeating myriad of issues with DREs, which have been attributed to causes from screen calibration issues to failures in ballot definition configuration distribution, a robust Logic & Accuracy testing regulation have been established. These root causes are present in BMDs and therefore should be evaluated in the same way as DREs have been.

I received the Georgia Secretary of State's manual "Logic and Accuracy Procedures "Version 1.0 January 2020 from Rhonda Martin. Procedure described in section D "Testing the BMD and Printer" is taking significant shortcuts, presumably to cut the labor work required. (Section D is attached as Exhibit L) These shortcuts significantly weaken the security and reliability posture of the system and protections against already known systemic pitfalls, usability predicaments and security inadequacies.

Case 2:21-cv-11134-VAR-RSW ECF No. 4-13 52 PageID.631 631271 Filed 06/24/21 Page 34 of 48
Case 1:21-cv-02589-WJM Document 309-3 Filed 06/24/21 Page 34 of 48
Case 1:21-cv-00445-CJN

## CONCLUSIONS

83.    The scanner software and tabulation software settings and configurations being employed to determine which votes to count on hand marked paper ballots are likely causing clearly intentioned votes not to be counted as cast.

84.    The method of using 1-bit images and calculated relative darkness values from such pre-reduced information to determine voter marks on ballots is severely outdated and obsolete. It artificially and unnecessarily increases the failure rates to recognize votes on hand-marked paper ballots. As a temporary mitigation, optimal configurations and settings for all steps of the process should be established after robust independent testing to mitigate the design flaw and augment it with human assisted processes, but that will not cure the root cause of the software deficiency which needs to be addressed.

85.    The voting system is being deployed, configured and operated in Fulton County in a manner that escalates the security risk to an extreme level and calls into question the accuracy of the election results. The lack of well-defined process and compliance testing should be addressed immediately using independent experts. The use and the supervision of the Dominion personnel operating Fulton County's Dominion Voting System should be evaluated.

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.676 Filed 06/24/21 Page 35 of 48
Case 1:17-cv-02989-AT Document 809-3 Filed 08/24/21 Page 35 of 48
Case 1:21-cv-00445-CJN

86.     Voters are not reviewing their BMD printed ballots before scanning and casting them, which causes BMD-generated results to be un-auditable due to the untrustworthy audit trail. Furthermore, because BMDs are inheriting known fundamental architectural deficiencies from DREs, no mitigation and assurance measures can be weakened, including but not limited to Logic and Accuracy Testing procedures.

This 24th day of August 2020.

Harri Hursti

Case 2:20-cv-13134-LVP-RSW ECF No. 4-13, PageID.606 Filed 06/24/20 Page 36 of 48
Case 1:17-cv-02989-AT Document 809-3 Filed 08/23/21 Page 36 of 48
Case 1:21-cv-00445-CJN

EXHIBIT A:



Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.694 Filed 04/23/21 Page 37 of 48
Case 1:21-cv-02989-WMR Document 5-9 Filed 06/24/21 Page 37 of 48
Case 1:21-cv-00445-CJN

EXHIBIT B:



Case 2:25-cv-02134-WMA-CDE Document 1-13 Filed 09/23/21 Page 275 of 502 238 of 48
Case 1:21-cv-02969-WJM Document 309-3 Filed 06/24/21 Page 38 of 48
Case 1:21-cv-00445-CJN

EXHIBIT C:



Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.608 Filed 08/25/21 Page 239 of 48
Case 1:21-cv-02989-WTL Document 369 39 Filed 06/24/21 Page 39 of 48
Case 1:21-cv-00445-CJN

EXHIBIT D:



Case 2:21-cv-01344-WBS-JDP Document 1-1 Filed 01/25/21 Page 40 of 48
Case 1:21-cv-02069-WJM-STV Document 305-3 Filed 06/24/21 Page 40 of 46
Case 1:21-cv-00445-CJN

EXHIBIT E:



EXHIBIT F:



Case 2:20-cv-13134-LVP-RSW ECF No. 4-13, PageID.606 Filed 06/25/20 Page 42 of 48
Case 1:17-cv-02989-WN Document 809-3 Filed 06/24/20 Page 42 of 48
Case 1:21-cv-00445-CJN

EXHIBIT G:



EXHIBIT H:



Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.698 Filed 11/25/20 Page 44 of 48
Case 1:17-cv-02989-AT Document 809-3 Filed 08/24/21 Page 44 of 48
Case 1:21-cv-00445-CJN

EXHIBIT I:



Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.609 Filed 11/25/20 Page 45 of 48
Case 1:21-cv-02989-WJM Document 009-3 Filed 06/23/21 Page 45 of 48
Case 1:21-cv-00445-CJN

EXHIBIT J:



Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.70 Filed 05/31/21 Page 46 of 48
Case 1:17-cv-02989-AT Document 809-3 Filed 08/24/20 Page 46 of 48
Case 1:21-cv-00445-CJN

EXHIBIT K:



**Gabriel Sterling**
@GabrielSterling

Replying to @MarilynRMarks1 @rahulbali and 9 others

Again, all Central scanners were set at the industry standard 0-13% is not a mark (the oval is 5%) 14-28% is the ambiguous level to be checked by review panels, 29%+ is a mark. You ar pointing out the inherent issues with HMPBs that we don't see with BMD marked ballots.

8:02 PM · Jun 13, 2020 from Georgia, USA · Twitter for iPhone

45

EXHIBIT L:



- Create a voter card from Poll Pad for each unique ballot style within the designated Polling Location
  - Recommend labels be placed on card identifying what ballot style will be displayed by BMD once card is inserted
  - BMD removes the activation code from the Voter Card once used, therefore create the card again from Poll Pad after each use by a BMD

### D. Testing the BMD and Printer

Use a combination of Poll Worker Card with Ballot Activation Codes for the polling location, and Voter Cards created from a Poll Pad loaded with the LA/Advance Voting dataset to bring up ballots on the BMD

- Produce at least one printed ballot from each BMD assigned to the polling location
- Produce a test deck from the BMDs assigned to the polling location for each unique ballot style within the polling location. The test deck must contain at least one vote for each candidate listed in each race within the unique ballot style
  - **Example**: Ballot from BMD 1 contains a vote for only the first candidate in each race listed on Ballot Style 1, Ballot from BMD 2 contains a vote only for the second candidate in each race on Ballot Style 1, and continue through the line of devices until all candidates in all races within the unique ballot style have received a single vote
  - **If Number of BMDs outnumber the number of vote positions on the unique ballot style**, start the vote pattern over until all BMDs have produced one printed ballot
  - **If Number of unique ballot styles in the polling place is greater than 1**, once the vote pattern is complete for a unique ballot style, proceed to the next BMD in line to start the review of the next unique Ballot Style
  - **All unique ballot styles do not have to be tested on each BMD**
- Review BMD-generated Test Deck and confirm the vote content before placing in the designated Polling Place Scanner

### E. Testing the Polling Place Scanner

- Scan the BMD-generated Test Deck into the Polling Place Scanner
- Scan one blank optical scan ballot style(s) associated to the Polling Place to verify the Polling Place Scanner will recognize the ballot style in case of emergency
- Verify Scanner(s) shows a number of Ballot Cast equal to the number of ballots in the BMD-generated test deck plus the scanned blank Optical Scan ballot styles
- Firmly place the Security Key Tab in the Security Key Slot
- Touch Close Polls
- Enter the passcode
- Touch Enter
- Touch Yes
- Touch No for additional tapes (Scanner will automatically produce 3 copies of the closing tape)

Case 2:20-cv-13134-LVP-RSW ECF No. 1-13, PageID.708 Filed 11/25/20 Page 48 of 48
Case 1:21-cv-02909-WMR Document 565-3 Filed 06/24/21 Page 48 of 48
Case 1:21-cv-00445-CJN

**EXHIBIT M:**



From its early beginnings, Dominion Voting has emphasized the use of digital scanning, and continues to set the standard in digital image acquisition and analysis in the tabulation of digitally scanned ballots. When a ballot is fed into an ImageCast® tabulator – at the precinct level or centrally – a complete duplex image is created and then analyzed for tabulation by evaluating the pixel count of a voter mark. The pixel count of each mark is compared with two thresholds (which can be defined through the Election Management System) to determine what constitutes a vote. If a mark falls above the upper threshold, it's a valid vote. If a mark falls below the lower threshold, it will not be counted as a vote.

However, if a mark falls between the two thresholds (known as the "ambiguous zone"), it will be deemed as a marginal mark and the ballot will be returned to the voter for corrective action (please see diagram below). With this feature, the voter is given the ability to determine his or her intent, not an inspection or recount board after the fact, when it is too late. The chart below illustrates the Marginal Mark threshold interpretation.





DUAL THRESHOLD TECHNOLOGY

47

# EXHIBIT C

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

|  |  |
|---|---|
| **DONNA CURLING, ET AL.,**<br>**Plaintiffs,**<br><br>**v.**<br><br>**BRAD RAFFENSPERGER, ET AL.,**<br>**Defendants.** | **DECLARATION OF**<br>**J. ALEX HALDERMAN IN**<br>**SUPPORT OF MOTION FOR**<br>**PRELIMINARY INJUNCTION**<br><br>**Civil Action No. 1:17-CV-2989-AT** |

Pursuant to 28 U.S.C. § 1746, J. ALEX HALDERMAN declares under penalty of perjury that the following is true and correct:

1.      I hereby incorporate my previous declarations as if fully stated herein. I have personal knowledge of the facts in this declaration and, if called to testify as a witness, I would testify under oath to these facts.

2.      Under the State of Georgia's planned adoption of a paper-based voting system using ballot-marking devices ("BMDs"), in-precinct optical scanners, and other components provided by the State's vendor, Dominion Voting Systems, Inc. ("Dominion"), BMDs will print barcodes on each ballot, which the optical scanners will read to interpret a voter's selections and to provide election results for all ballots scanned on each scanner (the "Proposed Election System").

3.     Despite the purchase and deployment of new equipment for the Proposed Election System, important databases, files, computers, and personnel will carry forward from the current election system (the "GEMS/DRE System"). This means that vulnerabilities in these aspects of the GEMS/DRE System will also affect the security of the Proposed Election System. If attackers have already infiltrated the GEMS/DRE System, then these points of continuity could provide a foothold from which to attack elections conducted under the Proposed Election System.

4.     There are several ways attackers could subvert the Proposed Election System or any other system making use of computerized or Internet-connected components, several of which I have described in my prior declarations. BMDs are computers, meaning they are susceptible to hacking and interference.

**Ballot Barcodes Create Elevated Hacking Risks**

5.     In the Proposed Election System, the optical scanners use the barcode on the paper ballot as the exclusive means of interpreting the voter's choices. This increases the likelihood that attackers will be able to compromise election results. Although the optical scanners themselves might be hacked as a way of producing fraudulent results, the use of barcodes makes it possible for attackers to commit difficult-to-detect fraud by hacking *either* the scanners or the BMDs. This increases

the "attack surface" of the election system: with two potentially vulnerable components to target instead of just one, attackers are more likely to succeed.

6.      Under one plausible attack scenario, an attacker could infect BMDs with malicious code that causes them to print barcodes that encode votes for candidates other than the voter's intended selections. This malicious software would leave the human-readable text of the ballot unchanged. Since voters cannot read barcodes unaided, they would be unable to detect the deviation between the text and the barcode. However, since the optical scanners ignore the human-readable text and count only the barcodes, the election results would reflect the fraudulent selections.

7.      In principle, a sufficiently rigorous audit of the human-readable portion of the ballots could detect and correct such an attack. However, since attackers might choose to target any race in any election, every race and every election would need to be rigorously audited in order to rule out barcode-based fraud. Although a growing number of U.S. jurisdictions are implementing risk-limiting audits, to my knowledge no jurisdiction has announced plans to routinely perform RLAs that cover every race to high statistical confidence.

8.      Moreover, Georgia law does not contemplate, let alone provide for, audits of sufficient frequency, scope, or reliability to confirm barcode-based totals. Act 24 provides only for pilots of risk-limiting audits by the end of 2021, does not

mandate their adoption if the pilots are successful, and does not apply to every race in every election. This audit regime, even if implemented, cannot detect error or fraud in races that are not audited.

9.      In Dominion's response to the State's request for proposals, it contemplated an update to its BMDs such that they would not need to print barcodes on ballots.[1] Instead, the BMDs would produce (and the scanners would count) an entirely human-readable ballot capable of verification by the voter. However, this option is described as an "upgrade" available only after "certification is complete at the EAC."

10.     The Secretary of State's office and Dominion portray Dominion Image Cast X BMDs as having this ability to print such a human-readable, "full-face" ballot. A video portraying such a capability is part of the "Important Voter Information" available to the public on the Secretary of State's elections security web page.[2] The video portrays a voter making her selections on a BMD displaying a mock ballot using Georgia state and local races and constitutional questions or referenda. At the

---

[1] *See* "Clarification Questions\MS 16-1 Supply Chain_Dominion and KNOWiNK Final.docx" *available at* https://sos.ga.gov/admin/uploads/Dominion.zip (last visited Sept. 18, 2019).

[2] https://www.dropbox.com/s/u0lc21u82ye2qpg/ICX%20BMD%20Cart.mp4, available through "Voting Cart" hyperlink at sos.ga.gov/securevoting (last visited Sept. 19, 2019).

end of the video, the voter selects "Print Ballot," and the attached printer produces a double-sided ballot with a darkened oval appearing next to the voter's selections.[3]

11.    Dominion's in-precinct optical scanners already are capable of and certified to read such full-face paper ballots. Dominion's contemplated update to the BMDs, if deployed, would reduce the risk of hacking owing to the use of an illegible barcode that is incapable of voter verification.

### BMDs Limit the Effectiveness of Voter Verification

12.    Even if the BMDs produced human-readable ballots to the exclusion of barcodes, the voter would still need to read the ballot carefully enough (and recall all of her selections well enough) to verify it. It is possible, for example, that a BMD could be maliciously programed or otherwise malfunction such that the ballot printed by the BMD does not match the voter's intended selections. If voters do not reliably detect when their paper ballots are wrong, no amount of post-election auditing can detect or correct the problem.

13.    Collaborators and I at the University of Michigan recently ran experiments to determine how often voters fail to notice that their BMD-printed ballots differ from their on-screen selections. We set up a realistic mock polling place

---

[3] *Id.*

at a city library and had 241 library patrons vote using BMDs and an optical scanner. My research assistants programmed the BMDs so that every printed ballot would contain one race (chosen at random) where the vote was different from the voter's selection. We recorded how many of the voters noticed the error and reported it to a poll worker or on an exit survey.

14.  Our results (which are currently undergoing peer review) suggest that voters do not reliably verify BMD-printed ballots unless prompted to do so in very specific ways.[4] When not given any prompting, only 6.5% of participants noticed that their votes had been changed by the BMD.

15.  In an election with a 1% margin of victory, an attacker could change the outcome by altering as few as 0.5% of the ballots. If only 6.5% of voters whose ballots are affected notice and report the problem, then there will be one complaint for every 3000 voters, or less than one per precinct on average. This rate is so low that poll workers would be unlikely to notice that there was a systemic problem. However, both the electronic count from the optical scanners and the set of paper ballots would

---

[4] We also tested a variety of possible interventions to see whether they increased the rate of voter verification. Several had no effect, including signage and variations in ballot layout. Two showed significant promise: (i) having a poll worker instruct voters approaching the scanner to carefully check their ballots, and (ii) ensuring voters started with a written slate of candidates that they could easily compare to the printed ballot. Further research and testing are necessary to establish whether interventions such as these would be effective in real elections.

6

reflect a fraudulent election outcome. Even if the problem were recognized, the only remedy would be to rerun the election.

16.    It is true that voters using hand-marked paper ballots also make errors. However, for the most part, human errors in hand-marked paper ballots tend to be random. Errors that favor a candidate tend to be largely canceled out by errors that disfavor that candidate. This has a tendency to equalize the effect of errors across parties or ideologies. In contrast, maliciously engineered software—of the kind to which BMDs and other computerized components of a voting system are susceptible—is capable of systematically pushing an election results toward or away from a given candidate, party, or ideology.

17.    Furthermore, modern optical scanners can be programmed to detect the most common types of errors by voters, such as overvotes and undervotes. Where ballots are scanned in-precinct, and the scanners are programmed correctly, the voter then has the opportunity to correct their ballot once the scanner reports the error. The Dominion optical scanners that the State intends to deploy offer this capability.

**Dominion Voting Equipment has Serious Deficiencies**

18.    I have reviewed the Test Report issued by Pro V & V, Inc. containing the results of their functionality certification testing of the Dominion Voting Systems

D-Suite 5.5-A Voting System,[5] referred to elsewhere in this Declaration as the Proposed Election System. I have also reviewed similar reports issued by five examiners appointed to conduct testing of the Dominion Voting System on behalf of the State of Texas ("Texas Reports").[6]

19.     All five Texas examiners highlighted deficiencies with the Dominion system, including issues affecting its reliability, accessibility, and security. These problems led Texas to deny certification of the Dominion system in June 2019.[7]

20.     Several of the serious deficiencies noted by the Texas voting system examiners affect system components slated for use in Georgia, including:

(a)     "Multiple paper jams occurred on the ICP [optical scanner] during the examination. […] This happened two times with only 60 ballots processed."[8]

---

[5] "Test Report, Dominion Voting Systems D-Suite 5.5-A Voting System Georgia State Certification Testing" (August 7, 2019) *available at* https://sos.ga.gov/admin/uploads/Dominion_Test_Cert_Report.pdf (last visited Oct. 2, 2019).

[6] "Examiner Reports of Dominion Voting System Democracy Suite 5.5" (Jan. 16-17, 2019) *available at* https://www.sos.state.tx.us/elections/laws/jan2019_dominion.shtml (last visited Oct. 2, 2019).

[7] "Report of Review of Dominion Voting Systems Democracy Suite 5.5" (June 20, 2019) *available at* https://www.sos.state.tx.us/elections/forms/sysexam/dominion-democracy-suite-5.5.pdf (last visited Oct. 2, 2019).

[8] Report of Texas examiner Tom Watson.

(b)  "Due to the frequency of paper jams, the ICP does not sufficiently preserve the secrecy of the ballot. The mechanism required to clear the paper jams does not keep the system safe from fraud or unauthorized manipulation."[9]

(c)  "Another major concern is the quality of the scanned ballot images. Write-in selections written in ballpoint pen were illegible. Even the scanned images of ballots generated by Dominion's own ballot marking devices were of poor quality."[10]

(d)  "[H]aving the printer tray ajar during the voting process caused the system, after all the races are voted, to wipe out all selections and require the voter to start over after the print tray is fixed."[11]

(e)  "The ICXs [BMDs] are built with a [commercial off-the-shelf] tablet and printer. The Android OS versions used on the tablets are several years old, therefore they do not have the latest security feature [*sic*.] as later Android releases."[12]

---

[9] Report of Texas examiner Brandon Hurley.

[10] Report of Texas examiner Brian Mechler.

[11] Report of Texas examiner Brandon Hurley.

[12] Report of Texas examiner Tom Watson.

9

(f) "The doors covering data and power ports on the [BMD] tablets do not provide sufficient protection. […] a bad actor could add a USB device to the tablet while powered down that could remain undetected until after the election had ended."[13]

(g) "The ICX [BMD] also presented problems during the accessibility testing portion of the exam which demonstrate that it may not be suitable as an accessible voting system."[14]

21.    The Pro V & V Test Report revealed an additional dysfunction: the ICP scanner lacks a memory-management unit ("MMU"). The immediate effect of the absence of an MMU was that the ICP needed rebooting after scanning approximately 4,000 ballots. More broadly, the absence of an MMU in the ICP scanner suggests that the scanner is based on hardware and software that is significantly out of date and out of step with current computer engineering practice.

22.    Likewise, Dominion's response to the State's request for proposals stated that the latest federally certified version of the Image Cast X BMD software

---

[13] Report of Texas examiner Brian Mechler.

[14] Report of Texas examiner Chuck Pinney.

used the Android 5.1 operating system.[15] This fifth major version of Android is more than four years old and has not received security updates since March 2018. The *tenth* major version of Android became available in 2019. This is unfortunately consistent with the GEMS/DRE system, which relies on software so out of date that the manufacturer stopped providing updates and patches more than a decade ago.

I declare under penalty of the perjury laws of the State of Georgia and the United States that the foregoing is true and correct and that this declaration was executed this 2nd day of October, 2019 in Bregenz, Austria.

J. ALEX HALDERMAN

---

[15] Certificate of Conformance, Dominion Voting Systems Democracy Suite 5.5-A (Jan. 30, 2019) at pp. 3-4, *available at* https://www.eac.gov/file.aspx?A=TQ ycVTA%2BOLpxoCbwCFjQJmJdRP1dq9sFO3oVUWJl5u4%3D (last visited Oct. 2, 2019).

# EXHIBIT D

# THE CHAIRMAN'S REPORT OF THE ELECTION LAW STUDY SUBCOMMITTEE OF THE STANDING SENATE JUDICIARY COMMITTEE

## SUMMARY OF TESTIMONY FROM DECEMBER 3, 2020 HEARING

Honorable William T. Ligon, Chairman
Senator, District 3

Honorable John Kennedy
Senator, District 18

Honorable Bill Heath
Senator, District 31

Honorable Blake Tillery
Senator, District 19

Honorable Michael Rhett
Senator, District 33

Honorable Elena Parent
Senator, District 42

I.   INTRODUCTION

II.  EXECUTIVE SUMMARY

III. ORAL TESTIMONY

IV.  FINDINGS

V.   RECOMMENDATIONS

## I.    INTRODUCTION

The charge assigned to the Election Law Study Subcommittee of the Standing Senate Judiciary Committee was to examine the recent election cycle, the recount process, the audit process, the current investigations taking place, the litigation that is moving forward, as well as address issues relating to the upcoming runoffs. In the matter of the law itself, we were to also consider Georgia's election laws as they have impacted and are impacting the current election cycle. This Report may be further amended prior to the 2021 Georgia Legislative Session.

This Subcommittee met once at the Georgia State Capitol on Thursday, December 3, 2020. The hearing was open to the public, and there was an open invitation for citizens to speak before the committee. Subcommittee members also expressed stories they had heard from their constituents. Other committee meetings have also been hearing testimony which should be considered to present an even broader understanding. At this time, the additional committees which have met and received testimony are the Senate Governmental Affairs Committee and the House Governmental Oversight Committee. Many who could not testify due to lack of time have recorded their own testimonies online and shared their written speeches with this committee; the Subcommittee received many affidavits under oath.

This Report by the Subcommittee Chair has not been formally approved by the Subcommittee or the standing Judiciary Committee.  It is submitted for informational purposes to be a part of the record at the request of the Judiciary Chair.  It is a summary of testimony given in person and by affidavit.  For more information, please refer to the video record of the hearing and the affidavits submitted.

## II.    EXECUTIVE SUMMARY

The November 3, 2020 General Election (the "Election") was chaotic and any reported results must be viewed as untrustworthy.  The Subcommittee took evidence from witnesses and received affidavits sworn under oath.  The Subcommittee heard evidence that proper protocols were not used to ensure chain of custody of the ballots throughout the Election, after the opening of ballots prior to the Election, and during the recounts. The Subcommittee heard testimony that it was possible or even likely that large numbers of fraudulent ballots were introduced into the pool of ballots that were counted as voted; there is no way of tracing the ballots after they have been separated from the point of origin. The Subcommittee heard testimony of pristine ballots whose origin looked suspicious or which could not be verified and the inability of poll workers to distinguish between test ballots and absentee ballots. Signatures were not consistently verified according to law in the absentee balloting process.

Poll watchers on Election Night testified that they had noted that ballots were not secured, that seals and security tags were not used, and the chain of custody was often lax or non-existent. During the recount process, the monitors observed similar patterns of unsecured ballots that had broken seals and open cases of ballots laying around for hours or overnight in unsecured

locations. There was a lack of enforcement of the law, sloppy handling of the ballots by those counting, deliberate covering-up of voting numbers by workers, lack of following the process during the recount, unsafe handling of military ballots, and insecure data such as on laptops and flash drives. According to submitted testimony, there were also many equipment failures when ballots would not go through the machines and other times when ballots were counted more than once.

A great deal of testimony supported evidence of a coordinated effort to prevent a transparent process of observing the counting of ballots during the absentee ballot opening period and on Election Night. Witnesses testified to hostility to Republican poll workers during the recount – directional signage was unavailable, doors were locked, and Republican poll watchers were sent home early or given menial assignments.

Monitors throughout the state were often kept at an unreasonably long distance – some social distancing was understandable, but monitors were blocked from having the visual ability to see what was written on the ballots or to have any meaningful way to check the counting or to double-check that what was counted was actually assigned to the right candidate. They also could not observe what was entered into the ARLO system, nor could they be told the count that was being entered into ARLO. Instead, they were told that those numbers would be totaled and come back from the Secretary of State's Office. They were also told not to take pictures, film, or have other means of acquiring proof of the process that they were experiencing based on a rule from the State Elections Board.  That rule contravenes the spirit and purpose of the election law.

The Secretary of State's Office was unresponsive to its hotline. It has been unresponsive to many who wonder if their vote ever really counted. The office has turned a blind eye to fraud to the point that it ought to be considered gross negligence.

The Subcommittee did not have time to investigate the numerous publicly reported issues with the Dominion voting machines. The Subcommittee takes notice of the various publicly reported functions of the machines and heard evidence that the machines can duplicate fraudulent ballots to the point that not even trained personnel can tell the difference between a test ballot and a real ballot. Testimony also suggested that the system responds wirelessly to being reset from an unknown location as happened with the poll books. The Subcommittee also heard that Dominion machines can be programmed with algorithms that reallocate votes between candidates. In addition, the Dominion machines are programmed to count votes using percentages of whole numbers rather than actual votes, which is a feature incompatible with the actual voting process.  The Subcommittee learned that the history and control of the company that owns the Dominion voting system is unclear and provides serious implications of foreign interference in the U.S. election.

Case 1:21-cv-00445-CJN

## III.    ORAL TESTIMONY

**Violation of Ballot/Computer Security Procedures During Early Voting and on Election Day**

■ Bridget Thorne, who has nine years' experience as a poll worker/precinct manager in Fulton County, worked for five and a half days during early voting as a technician in the temporary warehouse in the Georgia World Congress Center. Because of positive COVID tests among Fulton County elections employees, Dominion Software was selected to run the warehouse. Thorne was disturbed at the lack of ballot security. Test ballots were printed on the same type of paper (official Rolland Voting paper) as real ballots, but test ballots were not routinely marked as such or destroyed. Thorne testified she saw a stack of these ballots almost eight inches tall.

On October 30, when early voting finished at State Farm Arena in Fulton County (the "State Farm Arena"), Thorne observed 40-50 scanners being brought into the arena and tens of thousands of ballots being scanned in by random people pulling ballots from random places – no formal procedure, no oaths, no chain of custody. When Thorne objected to this haphazard process, a Dominion employee replied, "It's fine, we have been doing this all week." When Thorne left that night, she observed unsecured suitcases of ballots next to the scanners.

Upon arriving at the State Farm Arena the following morning, Thorne saw that suitcases of ballots had been piled in a corner and sealed. But there was no restricted access, so anyone could have removed one or more suitcases. In addition, anyone could have opened them and resealed them" because "seals were easily accessible." During the day, employees brought Thorne other ballots that were found in the warehouse, asking if they were real or test. She had no way of knowing.

The following night, when Thorne was again working at the warehouse, she observed a Dominion employee and an Election Group Consultant printing "test ballots" but doing so incorrectly. She realized then that "<u>anyone </u>in the warehouse had access to printing real ballots."

Before Election Day, Thorne attempted to report her concerns about these insecure ballot operations to the Secretary of State (SOS) office and to the State Board of Elections; she received no response.

Since giving her testimony to the Senate Subcommittee, Bridget Thorne has been fired by a consultant working for Fulton County.

Case 1:21-cv-00445-CJN

**Recount: Counting Votes Without Monitoring, or Without Meaningful Monitoring**

- Election Day – Video from State Farm Arena in Fulton County showed a Fulton County Election worker approaching the media and poll monitors. After a brief exchange, the media and monitors packed up and left. This coincided with media reports that everyone was told to leave State Farm Arena around 10 p.m. on Election Night; workers testified they were told that tabulation was stopping for the night and would resume the next morning. Instead, video from State Farm Arena revealed that about six workers stayed behind. What happened next revealed a coordinated effort by election workers to deliberately conceal their continued counting of ballots out of public view, in direct violation of the law. This incident was premeditated. Those workers pulled out four concealed cases of ballots from under a table and continued counting for another two hours. During those two hours there were multiple machines running, each of which could process up to 3000 ballots per hour.  A "representative" of The Secretary of State's office claimed that it had a representative present during that period, and the media reported that statement widely; it was not true.  The representative admitted he was not present during that time period and is not evident on the video.

- David Cross, though unable to speak at the hearing due to time constraints, submitted written testimony with graphs, one of which appears to enhance the significance of what took place with the change in vote totals just after the late-night activities took place at State Farm Arena. Due to its significance to the State Farm Arena video seen by the committee, his graph is included with this Report. It shows that 136,155 votes suddenly appeared in Biden's vote column at 1:59 a.m., November 4, 2020.

- Scott Hall of Fulton County is an experienced poll watcher who testified that there was a secured "lunch area" but when he bought lunch for workers, they were not permitted to use that area.  There were no cameras in that area, yet tables were set up for counting, and poll watchers were excluded.  He has photographs of the area.  He also testified that there were stacks and stacks of unsecured blank ballots ("checks," as he called them) that were in the open.

- Mr. Hall noted a limitation of one monitor per 10 recounting tables as being an inadequate ratio to be truly effective.  He was constantly engaged in the recount, even being called to go to the World Congress Center at ridiculous hours, such as 10 p.m., for more counting.  He was adamant that something was seriously wrong with how Fulton County was handling the ballots.

- Mark Amick reported that in DeKalb County, only one monitor was allowed per 10 tables of 16 recounters.  He testified that monitors were kept six feet away and could not see the totals entered on the computer screens.

- At State Farm Arena at the end of the recount day on November 14, Susan Voyles of Sandy Springs observed pallets of ballots remaining to be counted beginning the following day. When she arrived the next morning, November 15, those pallets were gone.

- On November 15, Voyles and her partner with whom she had traveled to State Farm Arena (also identified as a Republican), were given only 60 ballots to review, even though other tables had thousands. Voyles and her partner, as well as other Republican monitors, were told at 10 a.m. there was nothing else for them to do, so they should leave. Since giving her testimony to the Senate Subcommittee, Susan Voyles has been fired by a consultant working for Fulton County.

- Tony Burrison of Savannah and a military veteran served as one of very few recount observers during the recount in Chatham County. He described the process as "disgusting" – stacks of ballots were being counted with no oversight or accountability. Based on what he observed, he believed there is a major problem with voting integrity due to tampering with the vote.

- Nancy Kain of DeKalb reported that she was kept too far from the counting to verify any votes.

- Hal Soucie of Smyrna, a poll watcher at State Farm Arena, testified that he was told that he was not supposed to be close enough to see batch numbers.

**No Chain of Custody**

- Annette Davis Jackson, a Gwinnett monitor, saw broken locks on the bins containing paper backup ballots.

- Scott Hall of Fulton County was told to leave the World Congress Center after he tried to document and photograph nine unsecured bags of ballots. He testified he "cried" over the incidents he saw.

- Dana Smith, a Republican poll watcher in Hart County, testified that she observed the paper backup ballots being placed in unlocked canvas bags for transport to the county office of the Elections Supervisor. The precinct manager finally (at Smith's insistence) obtained locks before transporting the bags in her car, but she refused to complete chain-of-custody forms. Smith also testified that there was open access to the special paper used to print the paper backup ballots.

- Hal Soucie observed the recount process in two counties, Cobb and Fulton. At State Farm Arena in Fulton County, he reported "suitcases" full of ballots "all over the place," with no chain-of-custody procedures, no time and no date information. He observed people taking ballots out of the cases, counting, and putting them right back into the cases. No one checked him in as a credentialed observer, and one man handed him a stack of ballots without knowing who he was or where the ballots came from.

**Suspicious "Pristine" Absentee Ballots**

- At the State Farm Arena recount on November 14, Susan Voyles – who has 20 years' experience managing election precincts in Fulton County – reviewed a stack of 110 absentee ballots [ballots are normally placed in stacks of 100] and noticed they were "pristine." They had not been folded, and they did not appear worn as though voters and election workers had handled them. Each ballot was "bubbled in" with exactly the same marking, which showed a small crescent of white in the bubble. It appeared as though one ballot had been marked and then reproduced over 100 times. In addition, one of these ballots bore the distinctive ink markings of having been pulled from a printer too soon. Almost all of these ballots were votes for Vice President Biden; only two were for President Trump. In her 20 years of election experience, Voyles had never seen any ballots like these. As noted above, Ms. Voyles has been fired from her position as a poll manager with Fulton County, presumably for her honest testimony.

- Hal Soucie, who was also at the State Farm Arena, verified that he saw the pristine ballots mentioned by Ms. Voyles.

- During the recount, Scott Hall of Fulton County saw large quantities of ballots at the World Congress Center that appeared to have been machine-produced. He stated that he saw this "over and over." The Subcommittee received evidence that other poll workers throughout the State reported similar instances of "pristine" ballots with no explicable origin.

**Duplication of Ballots Without Oversight**

- Nancy Kain, a naturalized citizen in DeKalb County, volunteered as a poll watcher for Advance Voting at lower Roswell Road, served as a poll monitor during processing of absentee ballots and as a poll watcher on Election Day. At 10 a.m. on November 5, at the State Farm Arena, she was not asked for credentials and noticed that many people did not even have credentials. She observed a young man with paper ballots putting in selections on a ballot on a voting machine and wondered why it was not going through the scanner. The supervisor explained that the military ballots are transcribed in proper format and ballots come in that they were trying to salvage because of damage, thus they were just transferring them to a new ballot, and that was the process. Yet, no one was there to verify what the young man was doing. He was the brother of the

supervisor. Technically, he was voting for someone else on a voting machine. She took video and photographs and recorded her conversation with the supervisor.

■ Mark Amick observed the processing of Provisional, Military and UOCAVA ballots in Fulton County on November 6 from early morning until 10:15 p.m. The only "oversight" provided was from a Secretary of State (SOS) employee who was not seen in the area before mid-morning, and who spent much of day not observing the duplication and tabulation process but rather sitting in the back of the room and leaving the room while on his phone. The first time Amick saw the SOS employee on the counting/sorting floor was 5:53 p.m. By 6:02 p.m. he had returned to his chair at the back of the room, and he did not go back onto the counting/sorting floor by the time Amick left at 10:15 p.m.

**Denial of Entry to Election Day Poll Watchers and During Recount**

■ Mark Amick, a credentialed Statewide Poll Watcher in Milton (Fulton County), was denied entry into the Birmingham Falls Elementary School precinct despite his statewide credentials. The Subcommittee has also received evidence from monitors that some of them were denied entrance during the recount.

**Hostility**

■ Hale Soucie of Symrna testified that Cobb County was using an electronic counting machine on the first day to count ballots, which was not the approved way to do the recount. The next day, it was the hand count process. He stated that on his second day he immediately observed that the first auditor made three mistakes in two minutes calling three ballots marked for Trump as Biden votes, but the second auditor caught those mistakes. He noticed another table that was not even doing a double-check at all. When he sought to observe, he was met with great hostility and vulgar name calling directed at him. The Subcommittee received other evidence of hostility against the monitors.

**Wildly Disparate Vote Totals from the Recount**

■ While observing the recount at the DeKalb County Board of Elections on November 15, Mark Amick saw that a box of ballots was recorded as 10,707 votes for Biden and 13 votes for President Trump. He flagged this obvious disparity to the election workers, who discussed among themselves how it came to be. Two election officials with whom he engaged about this issue became agitated with Amick for his continued monitoring of the situation. They finally agreed to recount the box, resulting in a revised total of 1,081 votes for Vice President Biden and 13 for President Trump – still statistically disparate, but 9,626 votes less so.  Amick was not certain if the corrected count was actually entered into the final recount totals.

- At State Farm Arena during the recount, Susan Voyles also noted a stack of absentee ballots with only two votes for President Trump.

- Hal Soucie of Smyrna, while monitoring in State Farm Arena, noticed stacks of ballots quite high, such as eight inches high for Biden, yet not a single Trump vote. He stated that he works with data and marketing, and anytime figures start reaching the 90th percentile, that type of consumer data is suspect, and when it gets to 100 percent that is passing the level of improbable to impossible.

**Ballots Counted from Ineligible Voters**

- Mark Davis analyzed data from U.S. Postal Service change-of-address (COA) forms and compared it to voters who voted in their former precincts. For example, he discovered that 14,980 out-of-state movers still voted in the Georgia General Election. Another 40,279 moved across county lines more than 30 days prior to the election, yet still voted in their former county precincts, a violation of Georgia law. He also noted that about 1,000 voters had voted twice in the Primary, inferring that the same pattern could have existed in the General Election.

**Constitutional Violations of Duly Passed Law**

- Dr. John C. Eastman, former Professor of Law and former Dean of the Chapman University Fowler School of Law and current Fellow at the Claremont Institute, testified regarding the plenary authority of the legislative body of the States to set the "Times, Places and Manner" of elections involving Federal officials, including with respect to the selection of Electors for the Electoral College in the presidential election, citing Article I, Section 4 and Article II, Section 1 of the U.S. Constitution. He noted that when States have vested that authority in the people of their States that they are bound to follow the people's choice in a free and fair election, but where fraud and failure to follow the law as passed by the legislative body is evident, that authority can be withdrawn. The legislature then can exercise its plenary authority to choose the electors in a presidential contest. He referenced both *Bush v. Gore* and *McPherson v. Blacker* as authoritative.

  Professor Eastman further explained that the failure of State election officials to follow the manner of conducting the election according to the statutes duly passed by the legislative body can annul an election. The U.S. Constitution clearly gives State legislatures under Article I, Section 4 the duty to determine the "manner" of federal elections, and that power rests solely with the State legislatures unless Congress passes its own laws that preempt State election laws. There is no provision which allows any Executive branch member to modify, set aside, enhance, or otherwise create policies or procedures which undermine or contravene those laws.

He noted various ways State election officials had failed to follow the statutes in conducting the election. He reiterated failures such as counting the votes of approximately 66,000 underage individuals, the 2,500 felons whose votes were unlawfully counted, the votes of those who had no verifiable residences within the State, and the "biggest" of all he believed was the March 2020 settlement agreement that was entered into with Georgia's Secretary of State and "certain democrat committee challengers that effectively altered the signature verification process" with regard to Absentee Ballots, an agreement that was contrary to State law.  He further noted that the "intermingling of legal and illegal ballots" also meant that the election cannot legally be certified. "The State has failed to make a choice on Election Day in accordance with the manner" the legislature prescribed. In light of the failures, the fraud, and the unconstitutional agreement, Dr. Eastman opined that it was the duty of the legislative body to choose the State's Electors for the presidential election.

**Data Analysis in General and Dominion Issues**

- Russell J. Ramsland, Jr., a cybersecurity expert from Texas, testified that his team had compared data from Dominion voting machines in those places where they were used around the nation. They discovered that with Dominion machines, Vice President Biden outperformed what he was statistically expected to receive by an "amazing" 5%. He also outperformed statistical expectations when the analysis was run by county, with Vice President Biden picking up 78% of Dominion counties but only 46% of counties using machines from other manufacturers. Depending on the type of analysis performed, Ramsland estimated that these anomalies translated to between 123,000 and 136,000 extra votes for Vice President Biden in Georgia.

  Ramsland also found that the rejection rate for absentee ballots in Georgia was much lower in 2020 (0.2%) than in 2016 (6.4%). He also identified over 96,000 phantom votes, meaning that they had been counted, but there was no record of the counties recording those ballots as "received."

- Phil Waldron**,** a former U.S. Army information officer with expertise in electronic warfare, identified a "pretty significant information warfare campaign" conducted across the country during the Election. He described the history of the Dominion and other voting machines, with the operating software sharing the same "DNA" going back to Smartmatic, which was created to help steal elections in Venezuela.

  Waldron analyzed these machines in Michigan and found them extremely insecure. He said a good hacker could get into them within two minutes, while an elementary-school student could probably do it in twelve. There are 12 avenues of attack. Dominion also sends voter data outside the United States.

Waldron discussed fractional voting. Waldron testified that the Dominion software used in the Georgia machines assigns a fractional value to each vote; there is no legitimate purpose in assigning an elector's vote as a fractional vote.  That feature can allow the manipulation of election results.

Waldron said federal law (USC Title 46) requires that the ballot images within the machine are required to be preserved for 22 months, but only a forensic analysis would show if this was done. Each machine can record 2,000-3,000 ballots per hour.  His Michigan analysis showed "huge breaches in chain of custody" with respect to the machines and to absentee ballots. In Georgia, there was an unexplained upload of ballots at 3:36 a.m. on November 4.

Waldron urged a full forensic audit of the machines and of absentee ballots (for example, ink analysis would show if ballots were mass-produced).

- Scott Hall of Fulton County stated that when he worked at the English Street facility that he had concerns about the contractors hired there. He noted that every vote in Fulton County ends up on thumb drives that eventually find their way to the English Street location. He said, "I have photographs of pallet loads of basically signed checks." "So you've got every single vote, you've got currency, and now you just need someone to do it." He said he hired one of his own guys to determine if a fraudulent vote could be recorded on the Dominion machines at that point in the process.  "Now, I've got all these votes that have not been uploaded anywhere. And he actually wrote me a paper, and he said that it was the 'stupidest, simplest thing I've ever seen.' He said, 'Dominion's own documentation shows how you take an entire batch, swipe it off, and then swipe on a new batch, before you put it into the real-time reader that uploads." He summed up the voter fraud by using the analogy that the referee got paid off to call the game and something is very wrong.

**Outside Influence Over Governmental Election Functions**

- Scott Walter from the Capitol Research Group testified about Mark Zuckerberg's Center for Technology and Civic Life (CTCL), a progressive advocacy group that seeks to influence elections via voter "education" and get-out-the-vote efforts. In the 2020 election, CTCL made grants to individual counties, in Georgia and elsewhere, ostensibly to help run safe elections during COVID. But county boards could use the money for whatever they wanted, and the bulk of the grants (95% of total funding) went to counties that voted for Clinton in 2016 and for Biden in 2020. In fact, nine of the 10 Georgia counties that experienced the largest shifts toward Democrats in 2020 received CTCL grants -- $4.38-$10.47 spent per each man, woman, and child in those counties. Georgia should not allow "privatized" elections via the organization that the Washington Post has called the "Democratic Party's Hogwarts for digital wizardry."

**Voters Unable to Verify Votes Counted**

- Grace Lennon, a student at Georgia Tech, hoped to early vote on October 23. When she arrived, she was told that she had been sent an absentee ballot.  She never received an absentee ballot. She had to sign an affidavit saying that she had not requested nor had she received an absentee ballot. She was then given a voter card to vote on the machine. However, the next day, she learned that someone had voted absentee in her name on October 7th.  She was not able to verify that her vote actually counted for the one she chose to select in the election or whether the absentee ballot counted instead. Senator Greg Dolezal confirmed that most all the Senators had heard many similar stories.

## V.   FINDINGS

1- The November 3, 2020 election was chaotic and the results cannot be trusted.

2- The Secretary of State and the State Elections Board failed to enforce the law as written in the Georgia Code, and furthermore, created policies that contravened State law. As Senator Matt Brass concluded at the December 3 hearing, "We have heard evidence that State law was not followed, time after time after time."

3- The Secretary of State failed to have a transparent process for the verification of signatures for absentee ballots, for the counting of votes during the subsequent recount and audit, and for providing the type of guidance and enforcement necessary to ensure that monitors and other observers had meaningful access to the process.

4- The Secretary of State instituted an unconstitutional gag order so that monitors were told not to use photography or video recording devices during the recount.

5- Election officials at all levels failed to secure test ballots and actual ballots. Many reports indicate that proper procedures were not followed, and there was systematic failure to maintain appropriate records of the chain of custody for these ballots, both prior to and after voting and throughout the recount.

6- The Secretary of State and Election Supervisors failed to stop hostile behavior of workers toward citizen volunteer monitors during the recount process.

7- The events at the State Farm Arena are particularly disturbing because they demonstrated intent on the part of election workers to exclude the public from viewing the counting of ballots, an intentional disregard for the law. The number of votes that could have been counted in that length of time was sufficient to change the results of the presidential election and the senatorial contests. Furthermore, there appears to be coordinated illegal activities by election workers themselves who purposely placed fraudulent ballots into the final election totals.

8- Grants from private sources provided financial incentives to county officials and exerted influence over the election process.

9- The oral testimonies of witnesses on December 3, 2020, and subsequently, the written testimonies submitted by many others, provide ample evidence that the 2020 Georgia General Election was so compromised by systemic irregularities and voter fraud that it should not be certified.

Case 1:21-cv-00445-CJN

## VI.   RECOMMENDATIONS

### A.  Absentee Ballots

In addition to following the law as already written by the legislature, such as not opening absentee ballots until Election Day, additional steps should be taken to ensure that only legal absentee votes are counted.

At a minimum, these recommendations include requiring photo identification, following signature match procedures faithfully, allowing absentee ballots to be used only upon demonstration of need, mailing absentee ballots out only upon the request of the registered voter, and although already illegal, expressly prohibiting drop boxes.

### B.  Secure Chain of Custody and Additional Security Measures

Procedures should be established to ensure proper chain of custody for all ballots, whether they are test ballots, new unused ballots, spoiled ballots, cast BMD-generated ballots, absentee ballots, and even the specialty paper that is used to print the ballots.

Penalties should be clearly known and enforced for any violations.

There should be complete security when workers go on the job, with sign-in of their names and a time stamp, when they go in and when they go out.

Cameras should also be on-site to monitor the process at all times, as well as all the entrances to the buildings where ballots and the ballot paper are stored.

### C.  Meaningful Access for Poll Watchers and Monitors

Citizens who are seeking to ensure the integrity of the vote need to be able to truly see the process. They should be able to ensure that people are reading their ballots before they are cast. They should be able to inspect the signature match process when ballots are opened. They should be able to write down seal information so they can ensure proper custody is in place. They should be close enough to see the names on the ballots during any recounts, the counts written on recount report sheets, the counts going into the ARLO system, the counts written on ballot containers, the process of the seals being broken as the ballots are entering the process, and so forth.

More poll watchers and monitors should be allowed to participate since the ratio needs to be improved. Objections by monitors should be addressed immediately on-site to ensure access and transparency.

Hostile actions by election workers toward volunteers should be immediately addressed and should be cause for dismissal.

### D.  No Unconstitutional Gag Orders

There is no reason to ban cameras when tabulation is taking place or when recounts and audits are taking place.

Furthermore, there is no reason to ban cameras at the polling booth as long as voters have privacy while voting.

The State Board of Elections should not ban cameras and recording equipment. They must fulfill their duty to ensure a transparent election process. Furthermore, citizens have a right to share those photos, recordings, and thoughts about what they observe.

### E.  Unqualified Voters Should Be Purged from the System

No underage voters should be in the system to allow their votes. No felons should be in the system to allow their votes.

Other categories of voters, such as the deceased and those who have moved out of state, should also be examined as to their continued presence on the voter rolls.

### F.  Violations of State Election Laws Must Be Prosecuted

The Georgia Bureau of Investigation ("GBI") and the Attorney General should aggressively investigate and prosecute those who violate election laws, including those conspiring to place fraudulent ballots into the system and the 1,000 persons identified by the Secretary of State who voted twice in the 2020 primaries. If prosecutions do not happen, violations will recur.

The GBI should establish an independent office for the investigation of all claims of voter fraud. That office should report regularly to the Judiciary Committee and, except in the case of investigations involving the Secretary of State or its personnel, the office of the Secretary of State.

The GBI should investigate the cases where many affidavits already exist regarding election fraud in the 2020 General Election.

**G.  Forensic Audits of Ballots and Machines**

The Legislature must determine if ballot marking devices (BMDs) have been manipulated to provide a fraudulent result and without regard to whether the forensic audits can actually identify the manipulation of votes and the authenticity of the ballots that are in the ballot boxes, either generated by the BMDs or those that are absentee ballots.

Independent third-party auditors should review the fiducials on all ballots types (absentee, military, machine generated), audit the absentee ballot results from the last election, confirm the number of external envelopes in each county, and the number of ballots for each county.

Such audits should help ensure that phantom ballots and other fraudulent ballots are not counted in election results, and that legal votes are the only votes counted.

**H.  For Rectifying the 2020 General Election Results**

The Legislature should carefully consider its obligations under the U.S. Constitution.  If a majority of the General Assembly concurs with the findings of this report, the certification of the Election should be rescinded and the General Assembly should act to determine the proper Electors to be certified to the Electoral College in the 2020 presidential race.  Since time is of the essence, the Chairman and Senators who concur with this report recommend that the leadership of the General Assembly and the Governor immediately convene to allow further consideration by the entire General Assembly.

Respectfully submitted this the 17th day of December 2020.

_William T. Ligon Jr._

Honorable William T. Ligon, Chairman
Senator, District 3

15

# EXHIBIT E

Case 1:21-cv-00445-CJN

**William Ligon**
District 3
158 Scranton Connector
Brunswick, Georgia 31525
Office: 912.261.2263
Email: william@senatorligon.com

121-E State Capitol
Atlanta, Georgia  30334
Phone: 404.463.1383

William.Ligon@senate.ga.gov



**Committees**

Banking and Financial Institutions, Chairman
Ethics, Vice Chairman
Reapportionment and Redistricting,
Vice Chairman
Appropriations
Health and Human Services
Judiciary

## Georgia Senate

January 2, 2021

President Donald J. Trump
The White House
1600 Pennsylvania Ave.
Washington, DC 20500

      Re:    *Request for Assistance under the DHS Cyber Hunt And Incident
Response Teams Act of 2019*

Dear Mr. President:

      In accordance with DHS Cyber Hunt And Incident Response Teams Act of
2019, as Chairman of the Georgia Senate Judiciary Subcommittee on Elections (the
"Committee"), I request that you immediately send an outside team of cyber experts
to investigate potential hacking and other irregularities associated with Dominion
Voting Systems, Inc.'s ("Dominion") scanners, ballot marking devices, ballots and
polling pads used in the 2020 general election in Georgia.

      On December 30, 2020, the Committee held a hearing investigating potential
fraud and other irregularities during Georgia's 2020 general election. The Committee
first unanimously approved a report dated December 17, 2020 discussing a myriad of
voting irregularities and potential fraud in the Georgia 2020 general election (the
"Report") discussed in an earlier hearing held on December 3, 2020.  Notably, the
Committee stated in the Executive Summary that "[t]he November 3, 2020 General
Election (the 'Election') was chaotic and any reported results must be viewed as
untrustworthy."[1]

      The Committee then heard additional testimony concerning voting
irregularities during the 2020 general election, including testimony and a real time
test demonstrating serious irregularities with Dominion's voting machines.  Three
events discussed at this hearing stand out, and require a forensic audit of the
Dominion voting machines in Georgia be immediately conducted.

---

[1] *See* http://www.senatorligon.com/THE_FINAL%20REPORT.PDF

Page Two
January 2, 2021

First, the Dominion voting machines employed in Fulton County had an astounding 93.67% error rate in the scanning of ballots requiring a review panel to "adjudicate" i.e. "determine" the voter's intent in over 106,000 ballots out of a total 113,130 ballots. The national average for such an error rate is far less at 1.2%. The source of this astronomical error rate must be identified to determine if these machines were set up or designed to allow for a third party to disregard the actual ballot cast by the registered voter.

Second, there is clear evidence that tens of thousands of votes were switched from President Trump to former Vice President Biden in several counties in Georgia. For example, in Bibb County, President Trump was reported to have 29,391 votes at 9:11 pm EST while simultaneously former Vice-President Joe Biden was reported 17,218 votes. Minutes later at the next update, these vote numbers switched with President Trump now having 17,218 votes and Mr. Biden having 29,391 votes, a 12,173 switch to Mr. Biden's favor. No rational explanation has been put forth demonstrating a legitimate reason for this switch in the vote tally.

Third, during this hearing, a presenter, Jovan Hutton Pulitzer, demonstrated that a Dominion poll pad could be hacked into real-time because it was connected to the internet. This demonstration proved that these machines could allow votes to be siphoned off or added during the voting process because they are connected to the internet. Cyber security experts agree that voting machines should not be connected to the internet at any time.

Former Vice President Biden leads in Georgia only by a margin of 11,779 votes. An immediate forensic audit of an appropriate sampling of Dominion's voting machines and related equipment is critical to determine the level of illegal or fraudulent ballots improperly counted in Georgia during the 2020 general election, and to safeguard future elections from such vulnerabilities. As of the date of this letter, a forensic audit of the Dominion voting machines has not occurred in Georgia. We, therefore, turn to you for relief at this critical moment in our Republic.

Sincerely,

William T. Ligon, Chairman
Senate Judiciary Subcommittee
on the Election

# EXHIBIT F

# Congress of the United States
## Washington, DC 20510

December 6, 2019

Sami Mnaymneh
Founder and Co-Chief Executive Officer
H.I.G. Capital, LLC
1450 Brickell Avenue 31st Floor
Miami, FL 33131

Tony Tamer
Founder and Co-Chief Executive Officer
H.I.G. Capital, LLC
1450 Brickell Avenue 31st Floor
Miami, FL 33131

Dear Messrs. Mnaymneh and Tamer:

We are writing to request information regarding H.I.G. Capital's (H.I.G.) investment in Hart InterCivic Inc. (Hart InterCivic) one of three election technology vendors responsible for developing, manufacturing and maintaining the vast majority of voting machines and software in the United States, and to request information about your firm's structure and finances as it relates to this company.

Some private equity funds operate under a model where they purchase controlling interests in companies and implement drastic cost-cutting measures at the expense of consumers, workers, communities, and taxpayers. Recent examples include Toys "R" Us and Shopko.[1] For that reason, we have concerns about the spread and effect of private equity investment in many sectors of the economy, including the election technology industry—an integral part of our nation's democratic process. We are particularly concerned that secretive and "trouble-plagued companies,"[2] owned by private equity firms and responsible for manufacturing and maintaining voting machines and other election administration equipment, "have long skimped on security in favor of convenience," leaving voting systems across the country "prone to security problems."[3] In light of these concerns, we request that you provide information about your firm, the portfolio

---

[1] Atlantic, "The Demise of Toys 'R' Us Is a Warning," Bryce Covert, July/August 2018 issue, https://www.theatlantic.com/magazine/archive/2018/07/toys-r-us-bankruptcy-private-equity/561758/; Axios, "How workers suffered from Shopko's bankruptcy while Sun Capital made money," Dan Primack, "How workers suffered from Shopko's bankruptcy while Sun Capital made money," June 11, 2019, https://www.axios.com/shopko-bankruptcy-sun-capital-547b97ba-901c-4201-92cc-6d3168357fa3.html.
[2] ProPublica, "The Market for Voting Machines Is Broken. This Company Has Thrived in It.," Jessica Huseman, October 28, 2019, https://www.propublica.org/article/the-market-for-voting-machines-is-broken-this-company-has-thrived-in-it.
[3] Associated Press News, "US Election Integrity Depends on Security-Challenged Firms," Frank Bajak, October 28, 2019, https://apnews.com/f6876669cb6b4e4c9850844f8e015b4c.

companies in which it has invested, the performance of those investments, and the ownership and financial structure of your funds.

Over the last two decades, the election technology industry has become highly concentrated, with a handful of consolidated vendors controlling the vast majority of the market. In the early 2000s, almost twenty vendors competed in the election technology market.[4] Today, three large vendors—Election Systems & Software, Dominion Voting Systems, and Hart InterCivic— collectively provide voting machines and software that facilitate voting for over 90% of all eligible voters in the United States.[5] Private equity firms reportedly own or control each of these vendors, with very limited "information available in the public domain about their operations and financial performance."[6] While experts estimate that the total revenue for election technology vendors is about $300 million, there is no publicly available information on how much those vendors dedicate to research and development, maintenance of voting systems, or profits and executive compensation.[7]

Concentration in the election technology market and the fact that vendors are often "more seasoned in voting machine and technical services contract negotiations" than local election officials, give these companies incredible power in their negotiations with local and state governments. As a result, jurisdictions are often caught in expensive agreements in which the same vendor both sells or leases, and repairs and maintains voting systems–leaving local officials dependent on the vendor, and the vendor with little incentive to substantially overhaul and improve its products.[8] In fact, the Election Assistance Commission (EAC), the primary federal body responsible for developing voluntary guidance on voting technology standards, advises state and local officials to consider "the cost to purchase or lease, operate, and maintain a voting system over its life span … [and to] know how the vendor(s) plan to be profitable" when signing contracts, because vendors typically make their profits by ensuring "that they will be around to maintain it after the sale." The EAC has warned election officials that "[i]f you do not manage the vendors, they will manage you."[9]

Election security experts have noted for years that our nation's election systems and infrastructure are under serious threat. In January 2017, the U.S. Department of Homeland Security designated the United States' election infrastructure as "critical infrastructure" in order to prioritize the protection of our elections and to more effectively assist state and local election

---

[4] Bloomberg, "Private Equity Controls the Gatekeepers of American Democracy," Anders Melin and Reade Pickert, November 3, 2018, https://www.bloomberg.com/news/articles/2018-11-03/private-equity-controls-the-gatekeepers-of-american-democracy.
[5] Penn Wharton Public Policy Initiative, "The Business of Voting," July 2018, https://publicpolicy.wharton.upenn.edu/live/files/270-the-business-of-voting.
[6] Id.
[7] Id.
[8] Brennan Center for Justice, "America's Voting Machines at Risk," Lawrence Norden and Christopher Famighetti, 2015, https://www.brennancenter.org/sites/default/files/publications/Americas_Voting_Machines_At_Risk.pdf; Penn Wharton Public Policy Initiative, "The Business of Voting," July 2018, https://publicpolicy.wharton.upenn.edu/live/files/270-the-business-of-voting.
[9] U.S. Election Assistance Commission, "Ten Things to Know About Selecting a Voting System," October 14, 2017, https://www.eac.gov/documents/2017/10/14/ten-things-to-know-about-selecting-a-voting-system-cybersecurity-voting-systems-voting-technology/.

officials in addressing these risks.[10] However, voting machines are reportedly falling apart across the country, as vendors neglect to innovate and improve important voting systems, putting our elections at avoidable and increased risk.[11] In 2015, election officials in at least 31 states, representing approximately 40 million registered voters, reported that their voting machines needed to be updated, with almost every state "using some machines that are no longer manufactured."[12] Moreover, even when state and local officials work on replacing antiquated machines, many continue to "run on old software that will soon be outdated and more vulnerable to hackers."[13]

In 2018 alone "voters in South Carolina [were] reporting machines that switched their votes after they'd inputted them, scanners [were] rejecting paper ballots in Missouri, and busted machines [were] causing long lines in Indiana."[14] In addition, researchers recently uncovered previously undisclosed vulnerabilities in "nearly three dozen backend election systems in 10 states."[15] And, just this year, after the Democratic candidate's electronic tally showed he received an improbable 164 votes out of 55,000 cast in a Pennsylvania state judicial election in 2019, the county's Republican Chairwoman said, "[n]othing went right on Election Day. Everything went wrong. That's a problem."[16] These problems threaten the integrity of our elections and demonstrate the importance of election systems that are strong, durable, and not vulnerable to attack.

 H.I.G. reportedly owns or has had investments in Hart InterCivic, a major election technology vendor. In order to help us understand your firm's role in this sector, we ask that you provide answers to the following questions no later than December 20, 2019.

1. Please provide the disclosure documents and information enumerated in Sections 501 and 503 of the *Stop Wall Street Looting Act*.[17]

2. Which election technology companies, including all affiliates or related entities, does H.I.G. have a stake in or own? Please provide the name of and a brief description of the services each company provides.

---

[10] Department of Homeland Security, "Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector," January 6, 2017, https://www.dhs.gov/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical.
[11] AP News, "US election integrity depends on security-challenged firms," Frank Bajak, October 29, 2018, https://apnews.com/f6876669cb6b4e4c9850844f8e015b4c; Penn Wharton Public Policy Initiative, "The Business of Voting," July 2018, https://publicpolicy.wharton.upenn.edu/live/files/270-the-business-of-voting.
[12] Brennan Center for Justice, "America's Voting Machines at Risk," Lawrence Norden and Christopher Famighetti, 2015, https://www.brennancenter.org/sites/default/files/publications/Americas_Voting_Machines_At_Risk.pdf.
[13] Associated Press, "AP Exclusive: New election systems use vulnerable software," Tami Abdollah, July 13, 2019, https://apnews.com/e5e070c31f3c497fa9e6875f426ccde1.
[14] Vice, "Here's Why All the Voting Machines Are Broken and the Lines Are Extremely Long," Jason Koebler and Matthew Gault, November 6, 2018, https://www.vice.com/en_us/article/59vzgn/heres-why-all-the-voting-machines-are-broken-and-the-lines-are-extremely-long.
[15] Vice, "Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials," Kim Zetter, August 8, 2019, https://www.vice.com/en_us/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials.
[16] New York Times, "A Pennsylvania Country's Election Day Nightmare Underscores Voting Machine Concerns," Nick Corasaniti, November 30, 2019, https://www.nytimes.com/2019/11/30/us/politics/pennsylvania-voting-machines.html.
[17] Stop Wall Street Looting Act, S.2155, https://www.congress.gov/bill/116th-congress/senate-bill/2155.

a. Which election technology companies, including all affiliates or related entities, has H.I.G. had a stake in or owned in the past twenty years? Please provide the name of and a brief description of the services each company provides or provided.

b. For each election technology company H.I.G. had a stake in or owned in the past twenty years, including all affiliates or related entities, please provide the following information for each year that the firm has had a stake in or owned this company and the five years preceding the firm's investment.
  i. The name of the company
  ii. Ownership stake
  iii. Total revenue
  iv. Net income
  v. Percentage of revenue dedicated to research and development
  vi. Total number of employees
  vii. A list of all state and local jurisdictions with which the company has a contract to provide election related products or services
  viii. Other private-equity firms that own a stake in the company

3. Has any election technology company, including all affiliates or related entities, in which H.I.G. has an ownership stake or has had an ownership stake in the last twenty years, been found to have been in noncompliance with the EAC's Voluntary Voting System Guidelines? If so, please provide a copy of each EAC noncompliance notice received by the company and a description of what steps the company took to resolve each issue.

4. Has any election technology company, including all affiliates or related entities, in which H.I.G. has an ownership stake or has had an ownership stake in the last twenty years, been found to have been in noncompliance with any state or local voting system guidelines or practices? If so, please provide a list of all such instances and a description of what steps the company took to resolve each issue.

5. Has any election technology company, including all affiliates or related entities, in which H.I.G. has an ownership stake or has had an ownership stake in the last twenty years, been found to have violated any federal or state laws or regulations? If so, please provide a complete list, including the date and description, of all such violations.

6. Has any election technology company, including all affiliates or related entities, in which H.I.G. has an ownership stake or has had an ownership stake in the last twenty years, reached a settlement with any federal or state law enforcement entity related to a potential violation of any federal or state laws or regulations? If so, please provide a complete list, including the date and description, of all such settlements.

4

7. Has any election technology company, including all affiliates or related entities, in which H.I.G. has an ownership stake or has had an ownership stake in the past twenty years, reached a settlement with any state or local jurisdiction related to a potential violation of or breach of contract? If so, please provide a complete list, including the date and description, of all such settlements.

Thank you for your attention to this matter.

Sincerely,

Elizabeth Warren
United States Senator

Amy Klobuchar
United States Senator

Ron Wyden
United States Senator

Mark Pocan
Member of Congress

5

Case 1:21-cv-00445-CJN

# Congress of the United States
## Washington, DC 20510

December 6, 2019

Michael McCarthy
Chairman
McCarthy Group, LLC
1601 Dodge Street, Suite 3800
Omaha, NE 68102

Dear Mr. McCarthy:

We are writing to request information regarding McCarthy Group, LLC's (McCarthy Group) investment in Election Systems & Software (ES&S), one of three election technology vendors responsible for developing, manufacturing and maintaining the vast majority of voting machines and software in the United States, and to request information about your firm's structure and finances as it relates to this company.

Some private equity funds operate under a model where they purchase controlling interests in companies and implement drastic cost-cutting measures at the expense of consumers, workers, communities, and taxpayers. Recent examples include Toys "R" Us and Shopko.[1] For that reason, we have concerns about the spread and effect of private equity investment in many sectors of the economy, including the election technology industry—an integral part of our nation's democratic process. We are particularly concerned that secretive and "trouble-plagued companies,"[2] owned by private equity firms and responsible for manufacturing and maintaining voting machines and other election administration equipment, "have long skimped on security in favor of convenience," leaving voting systems across the country "prone to security problems."[3] In light of these concerns, we request that you provide information about your firm, the portfolio companies in which it has invested, the performance of those investments, and the ownership and financial structure of your funds.

Over the last two decades, the election technology industry has become highly concentrated, with a handful of consolidated vendors controlling the vast majority of the market. In the early

---

[1] Atlantic, "The Demise of Toys 'R' Us Is a Warning," Bryce Covert, July/August 2018 issue, https://www.theatlantic.com/magazine/archive/2018/07/toys-r-us-bankruptcy-private-equity/561758/; Axios, "How workers suffered from Shopko's bankruptcy while Sun Capital made money," Dan Primack, "How workers suffered from Shopko's bankruptcy while Sun Capital made money," June 11, 2019, https://www.axios.com/shopko-bankruptcy-sun-capital-547b97ba-901c-4201-92cc-6d3168357fa3.html.
[2] ProPublica, "The Market for Voting Machines Is Broken. This Company Has Thrived in It.," Jessica Huseman, October 28, 2019, https://www.propublica.org/article/the-market-for-voting-machines-is-broken-this-company-has-thrived-in-it.
[3] Associated Press News, "US Election Integrity Depends on Security-Challenged Firms," Frank Bajak, October 28, 2019, https://apnews.com/f6876669cb6b4e4c9850844f8e015b4c.

2000s, almost twenty vendors competed in the election technology market.[4] Today, three large vendors—ES&S, Dominion Voting Systems, and Hart InterCivic—collectively provide voting machines and software that facilitate voting for over 90% of all eligible voters in the United States.[5] Private equity firms reportedly own or control each of these vendors, with very limited "information available in the public domain about their operations and financial performance."[6] While experts estimate that the total revenue for election technology vendors is about $300 million, there is no publicly available information on how much those vendors dedicate to research and development, maintenance of voting systems, or profits and executive compensation.[7]

Concentration in the election technology market and the fact that vendors are often "more seasoned in voting machine and technical services contract negotiations" than local election officials, give these companies incredible power in their negotiations with local and state governments. As a result, jurisdictions are often caught in expensive agreements in which the same vendor both sells or leases, and repairs and maintains voting systems—leaving local officials dependent on the vendor, and the vendor with little incentive to substantially overhaul and improve its products.[8] In fact, the Election Assistance Commission (EAC), the primary federal body responsible for developing voluntary guidance on voting technology standards, advises state and local officials to consider "the cost to purchase or lease, operate, and maintain a voting system over its life span … [and to] know how the vendor(s) plan to be profitable" when signing contracts, because vendors typically make their profits by ensuring "that they will be around to maintain it after the sale." The EAC has warned election officials that "[i]f you do not manage the vendors, they will manage you."[9]

Election security experts have noted for years that our nation's election systems and infrastructure are under serious threat. In January 2017, the U.S. Department of Homeland Security designated the United States' election infrastructure as "critical infrastructure" in order to prioritize the protection of our elections and to more effectively assist state and local election officials in addressing these risks.[10] However, voting machines are reportedly falling apart across the country, as vendors neglect to innovate and improve important voting systems, putting our

---

[4] Bloomberg, "Private Equity Controls the Gatekeepers of American Democracy," Anders Melin and Reade Pickert, November 3, 2018, https://www.bloomberg.com/news/articles/2018-11-03/private-equity-controls-the-gatekeepers-of-american-democracy.

[5] Penn Wharton Public Policy Initiative, "The Business of Voting," July 2018,
https://publicpolicy.wharton.upenn.edu/live/files/270-the-business-of-voting.

[6] Id.

[7] Id.

[8] Brennan Center for Justice, "America's Voting Machines at Risk," Lawrence Norden and Christopher Famighetti, 2015, https://www.brennancenter.org/sites/default/files/publications/Americas_Voting_Machines_At_Risk.pdf;
Penn Wharton Public Policy Initiative, "The Business of Voting," July 2018,
https://publicpolicy.wharton.upenn.edu/live/files/270-the-business-of-voting.

[9] U.S. Election Assistance Commission, "Ten Things to Know About Selecting a Voting System," October 14, 2017, https://www.eac.gov/documents/2017/10/14/ten-things-to-know-about-selecting-a-voting-system-cybersecurity-voting-systems-voting-technology/.

[10] Department of Homeland Security, "Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector," January 6, 2017,
https://www.dhs.gov/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical.

2

Case 1:21-cv-00445-CJN

elections at avoidable and increased risk.[11] In 2015, election officials in at least 31 states, representing approximately 40 million registered voters, reported that their voting machines needed to be updated, with almost every state "using some machines that are no longer manufactured."[12] Moreover, even when state and local officials work on replacing antiquated machines, many continue to "run on old software that will soon be outdated and more vulnerable to hackers."[13]

In 2018 alone "voters in South Carolina [were] reporting machines that switched their votes after they'd inputted them, scanners [were] rejecting paper ballots in Missouri, and busted machines [were] causing long lines in Indiana."[14] In addition, researchers recently uncovered previously undisclosed vulnerabilities in "nearly three dozen backend election systems in 10 states."[15] And, just this year, after the Democratic candidate's electronic tally showed he received an improbable 164 votes out of 55,000 cast in a Pennsylvania state judicial election in 2019, the county's Republican Chairwoman said, "[n]othing went right on Election Day. Everything went wrong. That's a problem."[16] These problems threaten the integrity of our elections and demonstrate the importance of election systems that are strong, durable, and not vulnerable to attack.

McCarthy Group reportedly owns or has had investments in ES&S, a major election technology vendor. In order to help us understand your firm's role in this sector, we ask that you provide answers to the following questions no later than December 20, 2019.

1. Please provide the disclosure documents and information enumerated in Sections 501 and 503 of the *Stop Wall Street Looting Act*.[17]

2. Which election technology companies, including all affiliates or related entities, does McCarthy Group have a stake in or own? Please provide the name of and a brief description of the services each company provides.

    a. Which election technology companies, including all affiliates or related entities, has McCarthy Group had a stake in or owned in the past twenty

---

[11] AP News, "US election integrity depends on security-challenged firms," Frank Bajak, October 29, 2018, https://apnews.com/f6876669cb6b4e4c9850844f8e015b4c; Penn Wharton Public Policy Initiative, "The Business of Voting," July 2018, https://publicpolicy.wharton.upenn.edu/live/files/270-the-business-of-voting.

[12] Brennan Center for Justice, "America's Voting Machines at Risk," Lawrence Norden and Christopher Famighetti, 2015, https://www.brennancenter.org/sites/default/files/publications/Americas_Voting_Machines_At_Risk.pdf.

[13] Associated Press, "AP Exclusive: New election systems use vulnerable software," Tami Abdollah, July 13, 2019, https://apnews.com/e5e070c31f3c497fa9e6875f426ccde1.

[14] Vice, "Here's Why All the Voting Machines Are Broken and the Lines Are Extremely Long," Jason Koebler and Matthew Gault, November 6, 2018, https://www.vice.com/en_us/article/59vzgn/heres-why-all-the-voting-machines-are-broken-and-the-lines-are-extremely-long.

[15] Vice, "Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials," Kim Zetter, August 8, 2019, https://www.vice.com/en_us/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials.

[16] New York Times, "A Pennsylvania County's Election Day Nightmare Underscores Voting Machine Concerns," Nick Corasaniti, November 30, 2019, https://www.nytimes.com/2019/11/30/us/politics/pennsylvania-voting-machines.html.

[17] Stop Wall Street Looting Act, S.2155, https://www.congress.gov/bill/116th-congress/senate-bill/2155.

years? Please provide the name of and a brief description of the services each company provides or provided.

    b. For each election technology company McCarthy Group had a stake in or owned in the past twenty years, including all affiliates or related entities, please provide the following information for each year that the firm has had a stake in or owned this company and the five years preceding the firm's investment.
- i. The name of the company
- ii. Ownership stake
- iii. Total revenue
- iv. Net income
- v. Percentage of revenue dedicated to research and development
- vi. Total number of employees
- vii. A list of all state and local jurisdictions with which the company has a contract to provide election related products or services
- viii. Other private-equity firms that own a stake in the company

3. Has any election technology company, including all affiliates or related entities, in which McCarthy Group has an ownership stake or has had an ownership stake in the last twenty years, been found to have been in noncompliance with the EAC's Voluntary Voting System Guidelines? If so, please provide a copy of each EAC noncompliance notice received by the company and a description of what steps the company took to resolve each issue.

4. Has any election technology company, including all affiliates or related entities, in which McCarthy Group has an ownership stake or has had an ownership stake in the last twenty years, been found to have been in noncompliance with any state or local voting system guidelines or practices? If so, please provide a list of all such instances and a description of what steps the company took to resolve each issue.

5. Has any election technology company, including all affiliates or related entities, in which McCarthy Group has an ownership stake or has had an ownership stake in the last twenty years, been found to have violated any federal or state laws or regulations?  If so, please provide a complete list, including the date and description, of all such violations.

6. Has any election technology company, including all affiliates or related entities, in which McCarthy Group has an ownership stake or has had an ownership stake in the last twenty years, reached a settlement with any federal or state law enforcement entity related to a potential violation of any federal or state laws or regulations? If so, please provide a complete list, including the date and description, of all such settlements.

7. Has any election technology company, including all affiliates or related entities, in which McCarthy Group has an ownership stake or has had an ownership stake in the

4

past twenty years, reached a settlement with any state or local jurisdiction related to a potential violation of or breach of contract? If so, please provide a complete list, including the date and description, of all such settlements.

Thank you for your attention to this matter.

Sincerely,

Elizabeth Warren
United States Senator

Amy Klobuchar
United States Senator

Ron Wyden
United States Senator

Mark Pocan
Member of Congress

5

# Congress of the United States
## Washington, DC 20510

December 6, 2019

Stephen D. Owens
Managing Director
Staple Street Capital Group, LLC
1290 Avenue of the Americas, 10th Floor
New York, New York 10104

Hootan Yaghoobzadeh
Managing Director
Staple Street Capital Group, LLC
1290 Avenue of the Americas, 10th Floor
New York, New York 10104

Dear Messrs. Owens and Yaghoobzadeh:

We are writing to request information regarding Staple Street Capital Group, LLC's
(Staple Street) investment in Dominion Voting System (Dominion) one of three election
technology vendors responsible for developing, manufacturing and maintaining the vast majority
of voting machines and software in the United States, and to request information about your
firm's structure and finances as it relates to this company.

Some private equity funds operate under a model where they purchase controlling interests in
companies and implement drastic cost-cutting measures at the expense of consumers, workers,
communities, and taxpayers. Recent examples include Toys "R" Us and Shopko.[1] For that
reason, we have concerns about the spread and effect of private equity investment in many
sectors of the economy, including the election technology industry—an integral part of our
nation's democratic process. We are particularly concerned that secretive and "trouble-plagued
companies,"[2] owned by private equity firms and responsible for manufacturing and maintaining
voting machines and other election administration equipment, "have long skimped on security in
favor of convenience," leaving voting systems across the country "prone to security problems."[3]
In light of these concerns, we request that you provide information about your firm, the portfolio

---

[1] Atlantic, "The Demise of Toys 'R' Us Is a Warning," Bryce Covert, July/August 2018 issue,
https://www.theatlantic.com/magazine/archive/2018/07/toys-r-us-bankruptcy-private-equity/561758/; Axios, "How
workers suffered from Shopko's bankruptcy while Sun Capital made money," Dan Primack, "How workers suffered
from Shopko's bankruptcy while Sun Capital made money," June 11, 2019, https://www.axios.com/shopko-
bankruptcy-sun-capital-547b97ba-901c-4201-92cc-6d3168357fa3.html.
[2] ProPublica, "The Market for Voting Machines Is Broken. This Company Has Thrived in It.," Jessica Huseman,
October 28, 2019, https://www.propublica.org/article/the-market-for-voting-machines-is-broken-this-company-has-
thrived-in-it.
[3] Associated Press News, "US Election Integrity Depends on Security-Challenged Firms," Frank Bajak, October 28,
2019, https://apnews.com/f6876669cb6b4e4c9850844f8e015b4c.

companies in which it has invested, the performance of those investments, and the ownership and financial structure of your funds.

Over the last two decades, the election technology industry has become highly concentrated, with a handful of consolidated vendors controlling the vast majority of the market. In the early 2000s, almost twenty vendors competed in the election technology market.[4] Today, three large vendors—Election Systems & Software, Dominion, and Hart InterCivic—collectively provide voting machines and software that facilitate voting for over 90% of all eligible voters in the United States.[5] Private equity firms reportedly own or control each of these vendors, with very limited "information available in the public domain about their operations and financial performance."[6] While experts estimate that the total revenue for election technology vendors is about $300 million, there is no publicly available information on how much those vendors dedicate to research and development, maintenance of voting systems, or profits and executive compensation.[7]

Concentration in the election technology market and the fact that vendors are often "more seasoned in voting machine and technical services contract negotiations" than local election officials, give these companies incredible power in their negotiations with local and state governments. As a result, jurisdictions are often caught in expensive agreements in which the same vendor both sells or leases, and repairs and maintains voting systems–leaving local officials dependent on the vendor, and the vendor with little incentive to substantially overhaul and improve its products.[8] In fact, the Election Assistance Commission (EAC), the primary federal body responsible for developing voluntary guidance on voting technology standards, advises state and local officials to consider "the cost to purchase or lease, operate, and maintain a voting system over its life span … [and to] know how the vendor(s) plan to be profitable" when signing contracts, because vendors typically make their profits by ensuring "that they will be around to maintain it after the sale." The EAC has warned election officials that "[i]f you do not manage the vendors, they will manage you."[9]

Election security experts have noted for years that our nation's election systems and infrastructure are under serious threat. In January 2017, the U.S. Department of Homeland Security designated the United States' election infrastructure as "critical infrastructure" in order to prioritize the protection of our elections and to more effectively assist state and local election

---

[4] Bloomberg, "Private Equity Controls the Gatekeepers of American Democracy," Anders Melin and Reade Pickert, November 3, 2018, https://www.bloomberg.com/news/articles/2018-11-03/private-equity-controls-the-gatekeepers-of-american-democracy.

[5] Penn Wharton Public Policy Initiative, "The Business of Voting," July 2018, https://publicpolicy.wharton.upenn.edu/live/files/270-the-business-of-voting.

[6] Id.

[7] Id.

[8] Brennan Center for Justice, "America's Voting Machines at Risk," Lawrence Norden and Christopher Famighetti, 2015, https://www.brennancenter.org/sites/default/files/publications/Americas_Voting_Machines_At_Risk.pdf; Penn Wharton Public Policy Initiative, "The Business of Voting," July 2018, https://publicpolicy.wharton.upenn.edu/live/files/270-the-business-of-voting.

[9] U.S. Election Assistance Commission, "Ten Things to Know About Selecting a Voting System," October 14, 2017, https://www.eac.gov/documents/2017/10/14/ten-things-to-know-about-selecting-a-voting-system-cybersecurity-voting-systems-voting-technology/.

officials in addressing these risks.[10] However, voting machines are reportedly falling apart across the country, as vendors neglect to innovate and improve important voting systems, putting our elections at avoidable and increased risk.[11] In 2015, election officials in at least 31 states, representing approximately 40 million registered voters, reported that their voting machines needed to be updated, with almost every state "using some machines that are no longer manufactured."[12] Moreover, even when state and local officials work on replacing antiquated machines, many continue to "run on old software that will soon be outdated and more vulnerable to hackers."[13]

In 2018 alone "voters in South Carolina [were] reporting machines that switched their votes after they'd inputted them, scanners [were] rejecting paper ballots in Missouri, and busted machines [were] causing long lines in Indiana."[14] In addition, researchers recently uncovered previously undisclosed vulnerabilities in "nearly three dozen backend election systems in 10 states."[15] And, just this year, after the Democratic candidate's electronic tally showed he received an improbable 164 votes out of 55,000 cast in a Pennsylvania state judicial election in 2019, the county's Republican Chairwoman said, "[n]othing went right on Election Day. Everything went wrong. That's a problem."[16] These problems threaten the integrity of our elections and demonstrate the importance of election systems that are strong, durable, and not vulnerable to attack.

Staple Street reportedly owns or has had investments in Dominion, a major election technology vendor. In order to help us understand your firm's role in this sector, we ask that you provide answers to the following questions no later than December 20, 2019.

1. Please provide the disclosure documents and information enumerated in Sections 501 and 503 of the *Stop Wall Street Looting Act*.[17]

2. Which election technology companies, including all affiliates or related entities, does Staple Street have a stake in or own? Please provide the name of and a brief description of the services each company provides.

---

[10] Department of Homeland Security, "Statement by Secretary Jeh Johnson on the Designation of Election Infrastructure as a Critical Infrastructure Subsector," January 6, 2017, https://www.dhs.gov/news/2017/01/06/statement-secretary-johnson-designation-election-infrastructure-critical.
[11] AP News, "US election integrity depends on security-challenged firms," Frank Bajak, October 29, 2018, https://apnews.com/f6876669cb6b4e4c9850844f8e015b4c; Penn Wharton Public Policy Initiative, "The Business of Voting," July 2018, https://publicpolicy.wharton.upenn.edu/live/files/270-the-business-of-voting.
[12] Brennan Center for Justice, "America's Voting Machines at Risk," Lawrence Norden and Christopher Famighetti, 2015, https://www.brennancenter.org/sites/default/files/publications/Americas_Voting_Machines_At_Risk.pdf.
[13] Associated Press, "AP Exclusive: New election systems use vulnerable software," Tami Abdollah, July 13, 2019, https://apnews.com/e5e070c31f3c497fa9e6875f426ccde1.
[14] Vice, "Here's Why All the Voting Machines Are Broken and the Lines Are Extremely Long," Jason Koebler and Matthew Gault, November 6, 2018, https://www.vice.com/en_us/article/59vzgn/heres-why-all-the-voting-machines-are-broken-and-the-lines-are-extremely-long.
[15] Vice, "Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials," Kim Zetter, August 8, 2019, https://www.vice.com/en_us/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials.
[16] New York Times, "A Pennsylvania Country's Election Day Nightmare Underscores Voting Machine Concerns," Nick Corasaniti, November 30, 2019, https://www.nytimes.com/2019/11/30/us/politics/pennsylvania-voting-machines.html.
[17] Stop Wall Street Looting Act, S.2155, https://www.congress.gov/bill/116th-congress/senate-bill/2155.

3

    a. Which election technology companies, including all affiliates or related entities, has Staple Street had a stake in or owned in the past twenty years? Please provide the name of and a brief description of the services each company provides or provided.

    b. For each election technology company Staple Street had a stake in or owned in the past twenty years, including all affiliates or related entities, please provide the following information for each year that the firm has had a stake in or owned this company and the five years preceding the firm's investment.
        i. The name of the company
        ii. Ownership stake
        iii. Total revenue
        iv. Net income
        v. Percentage of revenue dedicated to research and development
        vi. Total number of employees
        vii. A list of all state and local jurisdictions with which the company has a contract to provide election related products or services
        viii. Other private-equity firms that own a stake in the company

3. Has any election technology company, including all affiliates or related entities, in which Staple Street has an ownership stake or has had an ownership stake in the last twenty years, been found to have been in noncompliance with the EAC's Voluntary Voting System Guidelines? If so, please provide a copy of each EAC noncompliance notice received by the company and a description of what steps the company took to resolve each issue.

4. Has any election technology company, including all affiliates or related entities, in which Staple Street has an ownership stake or has had an ownership stake in the last twenty years, been found to have been in noncompliance with any state or local voting system guidelines or practices? If so, please provide a list of all such instances and a description of what steps the company took to resolve each issue.

5. Has any election technology company, including all affiliates or related entities, in which Staple Street has an ownership stake or has had an ownership stake in the last twenty years, been found to have violated any federal or state laws or regulations? If so, please provide a complete list, including the date and description, of all such violations.

6. Has any election technology company, including all affiliates or related entities, in which Staple Street has an ownership stake or has had an ownership stake in the last twenty years, reached a settlement with any federal or state law enforcement entity related to a potential violation of any federal or state laws or regulations? If so, please provide a complete list, including the date and description, of all such settlements.

7.  Has any election technology company, including all affiliates or related entities, in which Staple Street has an ownership stake or has had an ownership stake in the past twenty years, reached a settlement with any state or local jurisdiction related to a potential violation of or breach of contract? If so, please provide a complete list, including the date and description, of all such settlements.

Thank you for your attention to this matter.

Sincerely,

Elizabeth Warren
United States Senator

Amy Klobuchar
United States Senator

Ron Wyden
United States Senator

Mark Pocan
Member of Congress

# EXHIBIT G

# BRANDON HURLEY, ESQ.

4122 Mapleridge Drive
Grapevine, Texas 76051
(817) 454-3142
brandon.hurley@outlook.com

November 4, 2019

Mr. Keith Ingram
Director of Elections
Texas Secretary of State
Elections Division
208 East 10th Street
Austin, Texas 78711

Re:    Inspection of the Dominion Voting Systems' Democracy Suite 5.5-A conducted on October 2 and 3, 2019

Dear Mr. Ingram:

Pursuant to my appointment by the Texas Secretary of State as a voting systems examiner under TEXAS ELECTION CODE § 122.035, please allow this letter to serve as my report concerning the above referenced examination. I, along with the other statutory examiners and staff from the Secretary of State's office, examined the Democracy Suite 5.5-A voting system presented by Dominion Voting Systems ("**Democracy 5.5-A System**") on October 2 and 3, 2019, at the offices of Elections Division of the Texas Secretary of State in Austin, Texas.

At the outset, it should be noted that the Democracy 5.5-A System is a derivation of the 5.5 System that Dominion previously submitted for examination in February of 2019. The examiners reports (including mine) pointed out multiple concerns with the 5.5 System. Dominion officials made clear that the only substantive change to the 5.5-A System from the 5.5 System was a change in the wording of the straight ticket voting language that has been one of the points raised in the examiners previous reports. Dominion expressed that other issues raised in the examiners' previous reports were a result of potentially damaged equipment, misunderstandings between the examiners and the previous Dominion officials that presented the 5.5 System and things that could not be explained since the Dominion presenters of the 5.5-A System were not present at the 5.5 System examination. ***It should be noted that Dominion removed the DRE device that was included in the 5.5 System from the 5.5-A System.***

I reviewed the written materials for the 5.5-A System before the October examination. These documents appear to be substantially similar to the documentation for the 5.5 System. As was the case with the 5.5 System documents, Dominion submitted updated versions of some of the documents before the examination.

Although I was not present on the first day of the examination when the 5.5-A System was built and installed, it appears Dominion had difficulties accomplishing the task. As a result, Dominion officials had to re-install the operating system on some of its equipment and ran into difficulties in getting the build completed.

At the beginning of the second day of the examination, the vendor provided a general overview of the Democracy 5.5-A System. It is a complete voting system that includes ballot marking devices, ballot scanners, election tabulation and management software and supporting devices for accessibility needs. The 5.5-A System does not include a DRE device. The primary hardware and software components of the 5.5-A System are the same as the previously reviewed 5.5 System.

### ACCESSIBILITY TESTING

Officials from the Secretary of State's office tested the physical equipment of the Democracy 5.5-A System for accessibility compliance with the applicable state laws and regulations. These tests confirmed that the new components in the Democracy 5.5-A System complied with the accessibility requirements of Texas law; however, officials from the Secretary's office noted that while using the non-audio voting portion of the system (i.e.- reading items on a screen), only audio instructions were available and no written instructions were on the screen. This raises issues with voters that want written instructions on the screen as part of their voting experience. This same problem existed with the 5.5 System.

### TESTING OF HARDWARE AND SOFTWARE

On October 3rd, the examiners and Secretary of State staff tested each piece of equipment and software for security, functionality and accuracy. The examiners and staff cast a script of ballots on each voting machine and paper ballots were fed into the optical scanners that were marked by the ICX being used as a ballot marking n device and hand-marked ballots. The mock votes were tabulated and sorted with the election software included in the Democracy 5.5-A System.

### SPECIFIC ISSUES RAISED DURING THE INSPECTION

1.  As was the case with THE 5.5 System, some of the hardware in the Democracy 5.5-A System can be connected to the internet through Ethernet ports.

2.  The foldable ballot box offered with the Democracy 5.5 System could now be used in early voting because Dominion has developed a process to add a second lock to it that would mean two separate keyed locks would secure the box as required by Texas law.

3.  In the 5.5 System examination, the rolling ballot box dividers for provisional or disputed ballot storage were not present. At that time, the vendor claimed such dividers were available. However, at the October examination of the 5.5-A System, Dominion officials explained that there was not a separate divider or

location within the ballot box for provisional ballots, so those ballots would need to be segregated in a separate envelope at the polling location.

4.    Tamper seals and locks exist on the equipment; however, Dominion officials stated that the end-user (i.e. - Texas counties and other voting jurisdictions) had to implement procedures to make sure these security measures were effective.

5.    As several questions arose during the examination, Dominion officials referred to a "best practices" document that was not part of the documentation provided to the examiners.   Dominion officials claimed that the majority of the security concerns raised by the examiners were addressed by this document, but it was ultimately the responsibility of the end-users to make decisions and implement security measures they deemed appropriate.

6.    Although more appropriate for the technical examiners to address, the server and other portions of the hardware and software used by the Dominion officials during the exam were not part of the equipment/programs listed in the certification application. However, it appears that these items may be necessary for a complete system that would be sold to Texas election end-users.  This creates a conundrum concerning exactly what is being certified and what is being sold.

7.    As was the case with the 5.5 System, the use of non-sequential numbered paper ballots as required by the Texas Constitution cannot be created within the Democracy 5.5-A System.  Instead, the only way to comply with this requirement of the law would be to hand-write and/or pre-print paper with serial numbers in a range for the selected precinct and then manually intermingle the ballots so their numbers are not sequential.

8.    The problems with the adjudication portion of the tabulation process in the 5.5 System were dismissed by Dominion officials as a "bad path"; however, Dominion never showed why the bad path occurred or how it could be avoided end users.  Also, the previous poor resolution on the scanner for some of the printed wording on the ballots was dismissed either as damaged equipment or a setting issue.

## GENERAL OBSERVATIONS

A. While the previous examination of the 5.5 System and the current examination of the 5.5-A System are separate and distinct, it is clear that the two systems overlap in the sense that the issues with the 5.5 System should be addressed (or at least adequately explained) in the 5.5-A System examination.   I do not think this was completely done.   Dominion officials dismissed several questions from the previous examination that were once again raised at the 5.5-A System examination by stating "since we were not at the previous

inspection, I am not sure I can speak to that issue." Several of these issues were of critical concern.

B. The build and installation process problems suggest that the 5.5-A System is complicated and may not be easily built and installed by the end-users. There was a discussion of purchased the 5.5-A System already installed; however, that was not demonstrated to the examiners and, as presented, the on-site installation would be required. The problems encountered by Dominion staff indicate that the same problems may occur in the field. This leads to the potential conclusion that the 5.5-A System is may not be suitable for its intended purpose.

C. Without question, one or more of the components of the 5.5-A System can be connected to an external communication network and this can only be avoided if the end-user takes the proper precautions to prevent such a connection.

D. Many of the security features of the 5.5-A System are not automatic, but again depend on the end-user following the best practices promoted by Dominion. I believe that Texas law requires safety measures that protects against fraud or unauthorized manipulation that provides the best possible protection. In my opinion, leaving these security measures to the local jurisdiction is not in alignment with this standard.

E. As with the 5.5 System, The issues identified above could be corrected, but those corrections should be made and the System represented before the hardware and software components can be recommended for certification.

## **RECOMMENDATION**

Based on the foregoing observations and my examination of the Democracy 5.5-A System, its accompanying literature and the presentation made by Dominion officials both in its literature and at the examination, I cannot recommend that the Democracy 5.5-A System be certified as compliant with the requirements of the TEXAS ELECTION CODE and the TEXAS ADMINISTRATIVE CODE. While the applicable code and statutes provide that "conditions" can be suggested as a prerequisite to certification, I do not believe that the listing of conditions that need to be addressed with the 5.5-A System would be appropriate since the conditions, if listed, would require such a substantial re-work of the 5.5-A System that it would not be practical.

This report should not be construed as a tacit or implied comment on any of the technical aspects of the Democracy 5.5-A System except as expressly stated herein. In the event any of the equipment, software or security devices examined are altered, changed or decertified by any accrediting agency (other than a "minor modification qualified for administrative certification process" as that term is defined in § 81.65 of the Texas Administrative Code), this report should be considered withdrawn.

Thank you for the opportunity to serve as an examiner and participate in this important process that ensures robust and safe voting systems in the State of Texas.

Sincerely,

Brandon T. Hurley

# EXHIBIT H

# Voting System Examination of Dominion Voting Systems Democracy Suite 5.5-A

Brian Mechler, Technical Examiner
Exam Dates: October 2-3, 2019
Report Date: November 3, 2019

## Background

An examination of the Dominion Voting Systems Democracy Suite (D-Suite) 5.5-A was conducted at the Texas Secretary of State Elections Division offices on October 2-3, 2019. D-Suite 5.5-A is a comprehensive voting system which consists of the following components [1][2]:

- Election Management System (EMS) – the set of client and server applications and hardware used to define and manage elections including the tabulation and reporting of results.

- Adjudication – EMS server and client components responsible for ballot adjudication as well as reporting and generation of adjudicated result files.

- ImageCast Central (ICC) - A ballot scan tabulator and associated ballot processing application for use in central elections offices.

- ImageCast Precinct (ICP) - An optical scan ballot tabulator for use at polling places.

- ImageCast X (ICX) Ballot Marking Device (BMD) – Commercial off-the-shelf (COTS) hardware and operating system, which utilizes custom applications to act as a BMD.

The Election Assistance Commission (EAC) certification includes tables that describe in detail the voting system software components, voting system platforms, and hardware components. [3].

On June 20, 2019, the State of Texas denied certification of Dominion Voting Systems D-Suite 5.5 [4]. This denial was based on findings from the January 16-17, 2019 examination for which I was present [5]. Development of D-Suite 5.5-A was already complete by the time Dominion received feedback from the January exam of D-Suite 5.5. Thus, none of the changes in D-Suite 5.5-A were intended to address the issues raised during the January exam. The following is the complete list of changes between D-Suite 5.5-A and 5.5 [6]:

- "Modification to ICX straight party behavior to show a modal pop-up window when a voter attempts to undervote a partisan contest after selecting a partisan choice in the straight party contest; the pop-up clarifies that the voter needs to remove their straight-party vote and manually vote all partisan contests if they wish for one or more of those contests affected by the straight party vote to be undervoted"

- "Updated default ICX localizations to change wording of final voter session wording to reflect that the ballot is being printed rather than cast"

- "Removed the ICX DRE configuration as it was not required by the State of Pennsylvania"

- "Removed the ICX Classic 15" model for marketing purposes"

- "Used MCF v5.5.10.19 (EMS 5.5 default configuration file for the ICX) as changes to MCF v5.5.10.20 from D-Suite 5.5 were related to VVPAT printer component and not relevant to the 5.5-A system configuration"

In addition to the above changes, D-Suite 5.5-A significantly reduced the number of hardware configurations available compared to D-Suite 5.5.

- The Express EMS hardware configuration is not offered, only the Standard client-server configuration.

- The ICX Prime BMD is the only available voting machine; all ICX Classic platforms, ICX Prime DRE, and ICX Prime DRE with VVPAT are not within the scope of certification for D-Suite 5.5-A.

The Secretary of State Elections Division obtained the software and firmware (FW) images used in the EAC certification directly from the EAC. Dominion personnel used those same files to perform installation under the supervision of the technical examiners. In [7], Dominion provides instructions for the identification and verification of the components included in D-Suite 5.5-A.

The examination also consisted of an accessibility test, vendor presentations and demos, a mock election, and a free-form session where examiners could ask follow-up questions and use the voting equipment in an unscripted manner.

I was not present for the accessibility portion of the exam. ADA compliance will be presented in the legal examiners' reports. A detailed description of the Texas Secretary of State examination, including my observations, concerns, and recommendations, is presented in the sections that follow.

# Election Management System

The EMS is the set of client and server hardware and associated software used in pre-voting and post-voting activities.

The Standard EMS configuration is the only one available in D-Suite 5.5-A. The Standard configuration consists of a Dell PowerEdge R640 Server and one or more Dell Precision 3431 Workstations [8]. The server uses Microsoft Windows Server 2012 R2 as its OS and the workstations run on Microsoft Windows 10 Professional.

The server is configured with dual 1-TB hard drives in RAID 1 mode and four 1-TB hard drives in RAID 10 mode for data redundancy.

The server, EMS workstations, and ICC workstation communicate over a network switch that is provided by Dominion. The server host operates a DHCP server with a static pool of IP addresses. The

Case 1:21-cv-00445-CJN

EMS system must be operated within its own isolated private network (i.e. not connected to any public or other internal networks). It should connected only to other components of the certified configuration.

The EMS system creates media for the voting and tabulating equipment. CFast cards are used to load election definitions on to the ImageCast Precinct. USB thumb drives are used to load election definitions on to the ICX BMD.  The EMS system also creates iButton keys and SmartCards for two-factor authentication.

Backend applications and services are installed on the server hardware, and end-user applications (and some supporting services) are installed on the client workstations. In [2], Dominion describes the major software components:

- EMS Adjudication - "Server and client components responsible for adjudication, including reporting and generation of adjudicated result files from ImageCast Central tabulators."

- EMS AIMS Data Translator - "End-user application that transfers election definitions  from Democracy Suite to EMS to AIMS, enabling users to program AutoMARK devices  for ImageCast ballots."

- EMS Application Server - "Server side application responsible for executing long running processes, such as rendering ballots, generating audio files and election files, etc."

- EMS Audio Studio - "End-user helper application used to record audio files for a given election project. As such, it is utilized during the pre-voting phase of the election cycle."

- EMS Data Center Manager - "System level configuration application used in EMS back-end data center configuration."

- EMS Database Server - "Server side RDBMS repository of the election project database which holds all the election project data, including pre-voting and post-voting data."

- EMS Election Data Exchange Station (EDES) - "End-user helper application used to program the memory cards and iButton security keys required to properly operate the ImageCast series of counting devices. As such, it is utilized during the pre-voting phase of the election cycle."

- EMS Election Data Translator - "End-user application used to export election data  from election project and import election data into election project."

- EMS Election Event Designer - "Integrates election definition functionality together with ballot styling capabilities and represents  a main pre-voting phase end-user application."

- EMS File System Service - "Stand-alone service that  runs on client machines, enabling access to low level operating system API for partitioning CF cards, reading raw partition on ICP CF card, etc."

- EMS NAS Server - "Server side file repository of the election project file based artifacts, such as ballots, audio files, reports, log files, election files, etc."

- EMS Results Tally and Reporting - "Integrates election results acquisition, validation, tabulation, reporting, and publishing capabilities and represents a main post-voting phase end-user application."

- EMS Result Transfer Manager - "Stand-alone application used to transfer result files from the remote locations to one or more central locations where the results can be tallied and reported on."

- EMSLogger - "a stand-alone application that runs on client or server machines and is used to gather diagnostics for troubleshooting."

- Smart Card Helper service - "Installed on a workstation or laptop at the polling place, and provides required data format for programming smart cards for ImageCast devices, or, for jurisdiction's voting registration system in case of integration."

- ImageCast Voter Activation application - Installed on a workstation or laptop at the polling place, that allows the poll workers to program smart cards for voters. The smart cards are used to activate voting sessions on ImageCast X."

Version numbers for the D-Suite 5.5-A EMS software components are the same as those included with D-Suite 5.5 [3][9].

## 2.1  Observations

The use of most of the EMS software components was not directly observed by examiners during the mock election and free-form portion of the exam. The following subsections will cover the installation process and components which were directly observed or responsible for issues during the exam.

### 2.1.1     Installation

Examiners witnessed Dominion personnel install the server and client software components. The installation process is very complex and requires the manual entry of certain paths and host names. Dominion provides a custom installation helper application which allows the user to navigate to and launch installers for individual components. Those components are not necessarily presented in order within the installation helper application. There is a point during the install process where the user must divert from using Dominion's custom installer to install certain 3rd party prerequisites from DVD. Users must take great care to follow the exact installation instructions provided by Dominion. Though hyperlinks are provided in the documentation to help the user navigate from one step to the next, instructions are not presented in order within the documentation and, in fact, are spread across multiple documents.

A problem was encountered during the installation of Adjudication Services on the server. The only way to resolve this issue was to wipe the server clean with a fresh installation of the operating system (as well as all of the prerequisites up to that point). According to Dominion personnel, the server hardware should have been rebooted prior to installing Adjudication services. As a result of missing that step, the installation of the EMS was delayed by hours.

### 2.1.2      Election Event Designer (EED)

The Secretary of State's office provided Dominion with election data for the mock election portion of the exam. Prior to the exam, Dominion used EED to create paper ballots as well as election definitions for the ICC, ICP, and ICX. The election definition for the ICX includes the touchscreen representation of the ballot.

Aside from the misspelling of one candidate's name, there were no issues with the paper ballot. However, the touchscreen ballot had multiple errors beyond the simple spelling mistake. Party affiliations were not listed next to candidate's names, voting instructions specific to each contest were missing, and ballot proposition language was missing. In addition, the wording of the instruction on the final screen of the ballot instructed the voter to "cast" their ballot instead of printing it. Note that this was one of the very small number of changes that was supposed to have been picked up in this revision of D-Suite.

When asked, Dominion stated that this election definition had been put through an internal logic and accuracy (L&A) test prior to the exam. Yet none of these issues were caught.

After the mock election portion of the exam, Dominion personnel created a new election definition to show that they could fix all of the errors and misconfigurations, and it appeared that they did.

Similar to the install process, it appears that EED is overly complex and fragile. Many troubling questions come to mind. If Dominion personnel, theoretically the most expert users of this software, can create an election definition with so many glaring errors, how error-prone will the system be for jurisdictions that opt to create their own election definitions? What level of service will jurisdictions receive if they outsource the creation of election definitions to Dominion? One would assume that a certification exam sets the benchmark for the quality of service vendors provide to jurisdictions.

### 2.1.3      Adjudication

Examiners adjudicated hand marked ballots scanned on the ImageCast Central. The Adjudication user interface displays the scanned ballot image and highlights the machine interpretation of voter intent in green (see Figure 1). These green bars were occasionally offset from where the chosen candidates appeared on the ballot creating a confusing and frustrating user experience (see Figure 2). The highlighting feature can be disabled should users find it to be counterproductive.

In the January exam of D-Suite 5.5, examiners witnessed a crash of Adjudication Services due ostensibly to a misconfigured path. The crash of Adjudication Services required the readjudication of all previously adjudicated ballots. This issue did not occur during the exam of D-Suite 5.5-A. However, since there were no changes made to the Adjudication software, this issue could arise again.



*Figure 1: Properly Aligned Visual Aid*



*Figure 2: Misaligned Visual Aid*

### 2.1.4  Results Tally and Reporting (RTR)

RTR was used to tally votes and produce reports from the mock election. No issues were observed. Votes were tallied and reported accurately.

## Scanners

D-Suite 5.5-A includes two ballot scanners. The ImageCast Central (ICC) is for use at the jurisdiction's central office and is typically used to scan mail-in ballots. ImageCast Precinct (ICP) is a polling place scanner. The ICC and ICP can both process hand-marked and machine-marked ballots.

## 3.1  ImageCast Central

The ICC utilizes a COTS Canon DR-G1130 scanner connected to a Dell Optiplex 3050 AIO Workstation. The workstation runs Windows 10 (64-bit) Professional edition as its OS. The ICC workstation can be connected over the isolated private network to the EMS server. If connected to the server, the ICC can be configured to save scanned ballot images and cast vote records (CVRs) on both the ICC workstation and the EMS server.

Case 1:21-cv-00445-CJN

The Canon DR-G1130 has a feeder capacity of 500 sheets. It can scan one hundred 8.5"x11" pages per minute. Ballot stock in lengths ranging from 11" to 22" can be used.

An iButton security key is required for two-factor authentication, decryption of election files, and encryption of results files.

The ICC can be configured to reject ballots that have issues, such as ambiguous marks and under/over votes.

### 3.1.1      Observations

Examiners observed the installation of the ICC workstation software and there were no notable issues with this process.

During the mock election, examiners observed the processing of ballots through the ICC. The ICC properly rejected ballots that did not meet the criteria of the loaded configuration. There is some latency between the scanning of the ballot and the detection of an issue. As a result, a handful of ballots are scanned subsequent to the problem ballot. However, the ICC workstation application correctly informs the user of how many ballots need to be rescanned. The ICC jammed once during the processing. When the ICC encounters a paper jam, the entire batch must be rescanned.

## 3.2  ImageCast Precinct

The ICP is a custom hardware device with a scanner, integrated thermal printer, and LCD touchscreen. When a voter is finished marking their ballot (either by hand or using the ICX BMD), they insert it into the ICP where it is scanned and deposited into the ballot box. The ICP can read ballots in any orientation. It can be configured to reject ballots that have issues such as ambiguous marks and under/over votes.

Firmware is loaded from a CFast card along with an iButton Administrator key for authentication. Different iButton keys are required for other roles and actions. The iButton Administrator key is provided by Dominion and color-coded so that it is not accidentally confused with keys that are reprogrammed across elections.

Election definitions are loaded via CFast cards and stored in internal memory. CVRs and scanned images are stored on two CFast cards for data redundancy. Redundancy between the two cards is checked after each file write and if the cards ever fall out of sync, the ICP will cease to operate as a tabulator until the issue is resolved.

### 3.2.1      Observations

Examiners witnessed the installation of ICP firmware. The installation required the use of an iButton Administrator key. The PIN associated with the iButton Administrator key is only 1-digit long and cannot be changed. Dominion should at the very least make the PIN more complex and preferably issue keys protected by unique PINs.

The FW installer provides an option to install older versions of the ICP FW. According to Dominion, this feature exists to support the recount of an election conducted under an older version. The problem

Case 1:21-cv-00445-CJN

with this feature is that jurisdictions would have the ability to install FW that has not received certification in Texas. This is an unnecessary convenience that risks the use of a non-certified system in an election. If jurisdictions have purchased older, certified versions of D-Suite, they should already have the FW install files for that particular version. Alternately, they should be able to obtain those files from Dominion.

During the free-form session of the exam, one of the examiners scanned a paper ballot with an ambiguous ballot mark. The ICP properly rejected the ballot, but the error messaged flashed so quickly across the LCD screen that examiners could not easily determine the reason for rejection. When a ballot is rejected, the error message should persist on the LCD screen so the voter and/or poll worker can determine what went wrong and resolve the issue.

Two different ballot box configurations were demonstrated. Both configurations provided adequate ballot security.

Two identical ICP scanners were in use during this exam. Though D-Suite 5.5-A uses the same ICP FW and HW as D-suite 5.5, examiners did not encounter issues with paper jams and poor quality images this time around. Dominion's best guess for the poor performance during the D-Suite 5.5 exam was that the ICP unit used was defective or damaged during shipping.

# ImageCast-X Ballot Marking Device

The ICX BMD consists of custom software running on COTS hardware (Avalue HID-21V-BTX). The Avalue tablet runs the Android 5.1 OS. The tablet is connected to a HP M402dne COTS printer and optionally an audio-tactile controller and LED indicator light.

Two-factor authentication is role-based and accomplished via ACOS-6-64 SmartCards. The SmartCards authenticate one of three roles; Technician, Poll Worker, and Voter.

Technician cards are used when loading the ICX applications on the tablet and when loading the election definition files. Election definition files are stored on USB thumb drives; the election definition files are not transferred to the tablet's internal memory. EED is capable of programming Technician cards. A Technician card does not grant access to election day related functions.

Poll Worker cards are programmed by EED. They give poll workers the ability to open/close polls, extract audit logs, perform diagnostics tests, and manually activate voting sessions for voters. Election definitions are encrypted when first loaded. Poll Worker cards hold the decryption key which decrypts the election definition upon their first use. Every time a Poll Worker card is used, it verifies the digital signature of the loaded election definition.

The Voter card is typically programmed at the polling place by poll workers using an ImageCast Voter Activation workstation (a piece of hardware that is outside the scope of this certification exam). The Voter card is provided to voters so they can activate their own voting sessions. The Voter card only activates the ballot specific to the voter's precinct. After it has been used to print a ballot, the Voter card cannot be used again until it has been reprogrammed by a poll worker.

## 4.1 Observations

Installation of the ICX application by Dominion personnel was witnessed by the examiners. A Technician card is required to install the ICX application. A Technician card is not required to install other applications. The technician must manually put the ICX tablet in kiosk mode after installing the ICX application. If one has access to ICX data ports, kiosk mode the only thing preventing someone from installing non-certified software. Only a user with Technician card credentials can take the ICX out of kiosk mode. In this exam, and in the January D-Suite 5.5 exam, Dominion personnel failed to place voting machines in kiosk mode after installing the ICX application. This critical step needs to receive greater focus in Dominion's internal training.

Examiners used the ICX BMD to mark ballots during the mock election. The touchscreen user interface is intuitive and easy to navigate. Any difficulty experienced marking a ballot was due to the misconfigured election definition (detail provided in Section 2.1.2).

In my report of the D-Suite 5.5 exam, I found that hasp seals insufficiently secured the doors protecting data and network ports. During the 5.5-A exam, Dominion recommend the use of tamper-evident adhesive seals to secure the doors. This is a very good recommendation. In fact, the same recommendation can be found in the ICX System Operation Procedures manual [12]. However, the ICX User Guide [13] is vague on whether adhesive seals should be used in addition to hasp seals. With regard to securing the doors, the Democracy Suite System Security Specification [14] simply refers the reader to the COTS manual [15]. The Avalue HID-21V-BTX manual only recommends hasp seals to secure the doors. Dominion needs to provide consistent guidance across all of their documentation regarding physical security of ICX devices.

A new hardware peripheral in the form of a COTS LED indicator light was demonstrated. The LED indicator provides voting system status to poll workers without violating the privacy of voters. In theory this would be a welcome feature. Unfortunately, this new peripheral exposed a secured USB port. The LED light is controlled by a detachable USB-C cable (see Figure 3). In [16], Dominion recommended two mitigation options (I recommend the latter):

- "Seal the connection between the LED light and the USB cable"

- "Remove the LED light from the Texas configuration altogether"

One issue with relying heavily on COTS equipment in the polling place is that often the end-use is not envisioned by the original COTS product designers. The Avalue tablet is a good example of this disconnect. Door 3 of the device secures DC in/out ports, the power button, and a USB port. Due to the presence of the USB port, this door must be sealed at all times during an election. During early voting, poll workers will have to break and replace this seal at the beginning of each day to power on the device.

It was discovered during an informal test that if a USB peripheral were added while the Avalue device was powered off, users of ICX (even those with Poll Worker card access) would not be made aware of the configuration change. The "Hardware Details" diagnostic provided by the Poll Worker menu only checks the status of defined peripherals (i.e. the printer, LED, and audio-tactile interface). Audit logs can be viewed on-screen, but those logs do not contain the level of detail necessary to discover the

presence of a non-certified device. Only the system logs capture enough detail to detect the addition of non-certified USB devices. The system logs are not typically exported and examined each day during early voting.

In the 5.5-A configuration, the ICX can only be operated in BMD mode; thus it does not create or store CVRs. It's unlikely someone could significantly alter the outcome of an election via this vulnerability (assuming voters carefully review their marked ballots). However, voter confidence in elections systems is a critical component of democracy. Evidence of tampering on even one system undermines this confidence. After this discovery, Dominion recommended the use of a serialized port lock or a non-residue tape seal to secure the USB port behind Door 3 [16].



# 5    ImageCast Voter Activation (ICVA)

ICVA is an application that runs on a laptop or workstation located at the polling place. It is used to program Voter SmartCards that can activate voting sessions on ICX devices.

## 5.1  Observations

The ICVA software and hardware are not within the scope of this certification exam. My observations of this component will have no bearing on my recommendations regarding D-Suite 5.5-A. Nevertheless, examiners witnessed the installation and use of this application. No issues were observed. In general, voter activation stations such as ICVA can allow for a more streamlined polling place and reduce the burden on poll workers.

# 6    Conclusions

Multiple major issues are present in D-Suite 5.5-A (enumerated below):

1.  Complexity and fragility of the EMS installation process

2.  Complexity and fragility of the Election Event Designer revealed by multiple errors in the Dominion generated election definition file for the ICX BMD

3.  Inability to gracefully recover from a crash of Adjudication Services (no crashes were witnessed in this exam, but this EMS software component is identical to the one in D-Suite 5.5)

4.  Easily cracked PIN on Technician iButton key

5.  ICP installer allows installation of non-certified firmware

6.  ICP's unclear and buggy behavior in response to an ambiguous mark on a hand-marked ballot

7.  ICX LED indicator exposes an otherwise secured data port

8.  Unclear and insufficient guidance in technical data package regarding physical security of ICX

In aggregate, Issues 1-3 and prevent D-Suite 5.5-A from meeting Texas Voting System General Requirement 122.001(a)(2): "Must be suitable for the purpose for which it is intended."

In aggregate, Issues 1-3 and Issue 5 prevent D-Suite 5.5-A from meeting Texas Voting System General Requirement 122.001(a)(3): "Operates safely, efficiently, and accurately and complies with the voting system standards adopted by the EAC."

If operated properly, D-Suite 5.5-A could be a system that operates safely, efficiently, and accurately. However, we have not yet witnessed that even Dominion's own subject matter experts can operate the system properly. To be clear, the above statement is not an indictment of Dominion personnel. I found the representatives at the exam to be courteous, professional, knowledgeable, and eager to answer examiners' questions and resolve issues. It is the EMS system itself that is difficult to work within.

Issues 4, 7, and 8 prevent D-Suite 5.5-A from meeting Texas Voting Systems General Requirement 122.001(a)(4): "Is safe from fraudulent or unauthorized manipulation."

Case 1:21-cv-00445-CJN

Many of these issues could be resolved by placing conditions on the certification of D-Suite 5.5-A.

- Require that Dominion deliver EMS to customers on pre-imaged drives (resolves Issue   1)

- Require that Administrator iButton key be protected by sufficiently complex PIN (resolves Issue   4)

- Remove non-certified firmware versions from ICP installer (resolves Issue   5)

- Remove the ICX LED peripheral from the Texas certification (resolves Issue   7)

- Update documentation to provide clear and consistent guidance regarding physical security best practices (resolves Issue   8)

Ultimately, this set of conditions is too large to be considered de minimis. I recommend against certification of Dominion Voting Systems Democracy Suite 5.5-A.

# References

[1]     Application for Texas Certification of Voting System – Form 100, Signed Aug-28 2019

[2]     Democracy Suite System Overview, Version 5.5-A::155, Dec-12 2018

[3]     United States Election Assistance Commission Certificate of Conformance Dominion Voting
        Systems Democracy Suite 5.5-A, EAC Certification Number DVS-DemSuite5.5-A, Jan-30 2019
        URL: https://www.eac.gov/voting-equipment/democracy-suite-55-a-modification/

[4]     J. A. Esparza, "Report of Review of Dominion Voting Systems Democracy Suite 5.5", Jun-20 2019,
        URL: https://www.sos.state.tx.us/elections/forms/sysexam/dominion-democracy-suite-5.5.pdf

[5]     B. J. Mechler, "Voting System Examination of Dominion Voting Systems Democracy Suite 5.5", Feb-15
        2019, URL: https://www.sos.state.tx.us/elections/forms/sysexam/jan2019-mechler.pdf

[6]     Democracy Suite System Change Notes, Version 5.5-A::155, Dec-13 2018

[7]     Democracy Suite System Identification Guide, Version: 5.5-A::334, Dec-19 2018

[8]     D-Suite 5.5-A (TX) Component List, Oct-18 2019

[9]     United States Election Assistance Commission Certificate of Conformance Dominion Voting
        Systems Democracy Suite 5.5, EAC Certification Number DVS-DemSuite5.5, Sept-18 2018
        URL: https://www.eac.gov/voting-equipment/democracy-suite-55/

[10]    Democracy Suite ImageCast Central Functionality Description, Version 5.5-A::180, Dec-12 2018

[11]    Democracy Suite ImageCast Precinct Functionality Description, Version 5.5-A::176, Dec-12 2018

[12]    Democracy Suite ImageCast X System Operations Procedures, Version 5.5-A::85, Dec-12 2018

[13]    Democracy Suite ImageCast X User Guide, Version 5.5-A::252, Dec-12 2018

[14]    Democracy Suite System Security Specification, Version 5.5-A:563, Dec-12 2018

[15]    Avalue HID-21V-BTX-A1R User Manual, Avalue Technology Inc., Feb-2 2018

[16]    Texas Certification Response, Correspondence from Dominion Voting Systems to Charles Pinney,
        Oct-30 2019

# EXHIBIT I

# The State of Texas



Elections Division
P.O. Box 12060
Austin, Texas 78711-2060
www.sos.state.tx.us

Phone: 512-463-5650
Fax: 512-475-2811
Dial 7-1-1 For Relay Services
(800) 252-VOTE (8683)

## Secretary of State

## MEMORANDUM

| TO: | Keith Ingram, Director of Elections, Texas Secretary of State |
| --- | --- |
| FROM: | Chuck Pinney, Staff Attorney, Elections Division, Texas Secretary of State |
| DATE: | November 4, 2019 |
| RE: | Dominion Voting Systems – Democracy Suite 5.5-A Voting System Examination |

In accordance with my appointment by the Texas Secretary of State as a voting system examiner under Tex. Elec. Code §122.067, I present my report on the voting system examination which took place on October 2-3, 2019, in the offices of the Texas Secretary of State at the James E. Rudder Building, 1019 Brazos, Austin, Texas 78701.

On October 2-3, 2019, the examiners appointed by the Texas Secretary of State and the Texas Attorney General examined Democracy Suite 5.5-A, a voting system that was presented by Dominion Voting Systems ("Dominion") for certification in Texas. The following hardware and software components were examined at the Office of the Secretary of State:

| Component | Version | Previous Texas Certification Date |
| --- | --- | --- |
| EMS – Election Management System | 5.5.12.1 | None |
| ADJ – Adjudication | 5.5.8.1 | None |
| ICC – ImageCast Central | 5.5.3.0002 | None |
| ICX – ImageCast X BMD | 5.5.10.30 | None |
| ICP – ImageCast Precinct | 5.5.3-0002 | None |

For the reasons outlined below, I am unable to recommend that this system be certified by the Texas Secretary of State under Tex. Elec. Code §§122.031 and 122.039.

## Background

Dominion Voting Systems previously sought certification in Texas for the Democracy Suite 5.5 voting system in January 2019. That certification was denied in June 2019.

The voting system that was the subject of this examination, Democracy Suite 5.5-A, was certified by the U.S. Election Assistance Commission ("EAC") on January 30, 2019.

**Summary of the Examination**

The examination of Democracy Suite 5.5-A took place on October 2-3, 2019.

The first day of the exam involved the installation of the software and firmware for Democracy Suite 5.5-A using of the trusted build provided to our office by the testing lab.

During the installation of the Adjudication software on the EMS server, the installation failed multiple times.  As a result, the system needed to be fully wiped and required a full reinstallation of all EMS software, including the Windows operating system.  The installation failed again on the first attempt after the full reinstallation, but succeeded on the second attempt.

Before the beginning of the vendor presentation on the second day of the exam, I conducted the accessibility testing and tested the visually impaired functions, the sip-and-puff controller, and the paddle controller.  The system performed well during the accessibility testing and presented no issues.

On the second day of the exam, the vendor provided a presentation of the software and the updates involved in the current version of Democracy Suite.  The vendor noted that the only difference between Democracy Suite 5.5 (which was denied certification in June 2019) and Democracy Suite 5.5-A was an update to an instruction relating to straight-party voting on the ICX Prime BMD.  No other changes from Democracy Suite 5.5 were included in the update to 5.5-A.

After the vendor presentation, the examiners tested the equipment by voting a series of test ballots and comparing the results of those test ballots.  The examiners also conducted additional testing on various components of the system.

**Analysis**

The standards for a voting system in Texas are outlined in Texas Election Code Chapter 122.  Specifically, the system may only be certified for use in Texas if it satisfies each of an enumerated list of requirements contained in Texas Election Code §122.001.  Because the system does not satisfy each of those requirements, I would recommend against certification of this system.

In the examination for Democracy Suite 5.5 that took place in January 2019, myself and the other examiners noted a number of issues that led to each of us recommending that certification for that system be denied.  The system that we reviewed in this examination, Democracy Suite 5.5-A, did not contain any changes that addressed the issues identified in those examiner reports.  The system that we reviewed in this examination was certified by the EAC on January 30, 2019, which was approximately two weeks before our examiner reports from the previous examination were completed on February 16, 2019.  Therefore, it is impossible for this system to have addressed any issues in response to the issues raised in those examiner reports because this version was finalized and certified by the EAC before those reports were ever published.

Some of the issues we encountered in the previous exam could be attributed to errors in presentation or configuration in the previous exam and were not reproduced in this exam. The issue with image quality generated by the ImageCast Precinct in the previous exam did not occur in this exam, and the vendor indicated that the issue that occurred in the previous exam may have been caused by damage to that device in transit to the exam or due to the use of image compression settings that were not enabled in this exam. Similarly, the printer tray issue that occurred with the ICX Prime BMD in the previous exam did not occur in this exam, and the device properly provided an error message that allowed the poll worker to fix the printer tray issue without losing the voter's cast ballot.

However, many of the general concerns about the system's ability to be implemented by counties with low technical expertise due to the complexity of the configuration and installation process are still present. The fact that the only change between Democracy Suite 5.5 and Democracy Suite 5.5-A was a change to a straight-party instruction message indicates that these issues and other issues highlighted in the examiners' reports were not addressed in this version of the software.

Regardless of what occurred during the previous exam and the concerns that were raised during that process, there were several issues that occurred during this exam that support my recommendation against certification of this system:

- The installation process for the EMS software (including Adjudication) is incredibly complicated and is not intuitive for the user. The technician performed the install using the installation guide that was included in the vendor's documentation. That documentation provided guidance on how to perform the installation, but the design of the system and the documentation was not intuitive.

  The system required the technician to manually install every component of the system (including individual system fonts) in a very specific order, but the design of the installer makes this a fairly confusing process for the technician. For example, at one point, the technician is required to install the second item on the install list, then the first, then the third for the system in that exact sequence for the installation to function properly. This is a questionable design choice that is indicative of several similar choices that creates unnecessary complications that are likely to confuse users and result in incorrect installation of system components.

  During the installation the system also generated default file pathways which the user was required to change to a different pathway identified in the installation documentation. The vendor indicated that there was no situation in which the default pathway provided by the installer would be used. While this is a relatively minor issue, it raises questions as to why the system did not generate the correct pathway by default, or why the installer would generate an incorrect pathway instead of leaving the field blank. This is just another example of a design choice that is unintuitive and could lead to configuration errors during setup by a political jurisdiction.

- The installation of the Adjudication software failed on several occasions during the examination process. In an effort to address those failures, the technician referred to troubleshooting documentation and consulted with engineers from the vendor. These troubleshooting attempts included editing the system registries and other steps that could present issues for a user without substantial technical expertise. The vendor stated that the troubleshooting documentation used during this process was not part of the vendor's Technical Data Package and is an internal document.

  After the first few failures, the vendor chose to wipe the software and operating system off the server system and conduct a full reinstallation of the Windows operating system and EMS software. The installation failed again one more time after the full reinstallation, but succeeded on the second attempt. The system took approximately 10-15 minutes to complete the phase of the installation that had failed on previous attempts after the same amount of time.

  The vendor stated that this installation error occurred because a reboot step was skipped in the initial installation. The vendor also indicated that this part of the installation process takes a long time and that the system may have timed out during the previous attempts. The issues experienced in this part of the process by the vendor's own technical personnel raise concerns about the reliability of the system in general as well as the difficulty in installing and configuring this software.

- The ICX Prime BMD included an LED light to alert pollworkers to potential issues. That LED light was connected to the system via USB. During the examination process, one of the examiners was able to disconnect the LED light from the USB cable that connected it to the system without having to break any of the seals preventing physical access to the USB ports. The examiner was able to connect his cell phone to the voting machine using that exposed cable connection.

  It is unclear whether the system would have allowed any transferring of data or other malicious access to that device over that connection. The system did record that event in its audit logs, so there was at least a record of the incident occurring. However, it is concerning that the connection itself was available to expose the system to such access.

  The vendor recommended two possible forms of mitigation for this vulnerability, (1) that the connection between the LED light and the USB cable be sealed to prevent it from being disconnected, or (2) that the LED light be removed from the Texas configuration.

  If the system were certified, I would recommend that it be made conditional on the fact that this USB LED light or any similar device with an exposed connection cannot be used with the system.

- The ImageCast Precinct (ICP) has a few concerning issues. The firmware is installed using a 1 character pin code along with a physical technician key, and the pin code cannot be changed. While the physical key requirement alleviates part of the problem, it seems like an unnecessary security vulnerability to have such a rudimentary password requirement for a firmware installation.

The ICP also allows for the installation of firmware from prior versions of Democracy Suite which are not certified for use in Texas.  This would theoretically allow a jurisdiction to install an uncertified version of the voting system during the firmware installation process.  This feature should be removed, and any certification of this system should be made conditional on the vendor's removal of that feature through an administrative modification process before that device could be used in Texas elections.

The examiners also experienced an issue when trying to scan a ballot with an ambiguous mark through the ICP.  The device correctly rejected the ballot, but the error message was only available while the ballot was still touching the portion of the scanner that catches the ballot, which only occurred in one of five tests.  In the other tests, when the ballot was rejected the scanner pushed the ballot out so far that it was no longer touching that portion and the error message would disappear instantly.  This design could create situations where voters' ballots are rejected without the voter having an opportunity to view the relevant error message and find out what needed to be corrected.

- The system does not provide a software solution to address the ballot numbering requirements of Texas law.  If certification were granted for this system, it would have to be made conditional on the jurisdiction's use of hand-numbering devices or pre-printed ballot stock that complies with the ballot numbering requirements.

In theory, this system could be certified for use in Texas with a hefty list of conditions.  However, there would still be significant concerns with the reliability of the system and the ability of Texas jurisdictions to configure and install the required software.  Ultimately, I cannot recommend a system that would require a long list of conditions in order for a jurisdiction to adopt the system and still comply with Texas law and voting system standards.

The flaws and questionable design choices that were identified through this exam that indicate that the system is not suitable for the purpose for which it is intended and therefore cannot be certified for use in Texas under Texas Election Code 122.001(a)(2).  In addition, the potential security vulnerabilities that were identified in the exam indicate that the system may not be safe from fraudulent or unauthorized manipulation, and therefore cannot be certified for use in Texas under Texas Election Code 122.001(a)(4).

**Conclusion and Recommendation**

For the reasons outlined above, I am unable to recommend certification of this system.

If the system is certified, then that certification will need to be made conditional based on the vendor's and the jurisdiction's compliance with several different conditions.  However, the conditions that would need to be imposed are so numerous and affect so many fundamental aspects of the system that I am unable to recommend even a conditional certification of this system.

# EXHIBIT J

# Voting System Examination
# Dominion Voting Systems
# Democracy Suite 5.5-A

Prepared for the
Secretary of State of Texas

James Sneeringer, Ph.D.
Designee of the Attorney General

This report conveys the findings of the Attorney General's designee from an examination of the equipment listed below.

**Examination Date**     October 2-3, 2019
**Report Date**     November 3, 2019

## Components Examined

| | Version | EAC/NASED Qualification Number | Date |
|---|---|---|---|
| EMS - Election Management System | 5.5.12.1 | DVS-DemSuite5.5-A | 1/30/2019 |
| ADJ - Adjudication | 5.5.8.1 | DVS-DemSuite5.5-A | 1/30/2019 |
| ICC - ImageCast Central | 5.5.3.0002 | DVS-DemSuite5.5-A | 1/30/2019 |
| ICP - ImageCast Precinct | 5.5.3.0002 | DVS-DemSuite5.5-A | 1/30/2019 |
| ICX - ImageCast X BMD | 5.5.10.30 | DVS-DemSuite5.5-A | 1/30/2019 |

The Democracy Suite 5.5-A (or D-Suite 5.5-A) is a modern voting system that is new to Texas, although D-Suite is in use in other states. A distinguishing feature is the extensive use of commercial off-the-shelf components, or COTS components, to use the industry parlance. COTS components are standard hardware or software products, as opposed to custom-made components.

For example, the D-Suite voting terminals are commercially available Android tablets that include the stand and the smart-card reader used for voter authentication. Similarly, the PCs, networking gear, hard drives, printers, and some scanners are COTS components.

## D-Suite Components

ImageCast X (or ICX) is the name of the line of voting stations, which all share identical software. The *X* in the name highlights the interchangeability of the software and, in one case, even the tablet hardware.

For this examination, Dominion is only seeking certification of one member of the ICX line – the ImageCast X BMD. (BMD stands for ballot-marking device.) When a voter is finished making his or her selections, the BMD prints the ballot on the attached printer but does not save the voter's choices on the device. Since these devices do not tabulate at all, they do not need zero-tapes, precinct tallies, or the like. The printed ballot must then be scanned before it is counted. Each ballot contains the cast-vote record in two formats: a QR code (for use by the scanner) and a

printed, human-readable list (which can be visually verified by the voter).  If there should be a question about whether the two match, it can be easily verified by scanning the QR code on the ballot and visually checking that it corresponds to the printed votes.

The voting stations are COTS Android tablets; they must be placed in kiosk mode, which prevents access to the Android features during voting.

Election setup, tabulation, and other related tasks are done with mostly COTS components and the proprietary EMS software.  Most of the components are on a LAN (local area network), and no other devices are to be connected to that LAN.

All election data and results are stored on self-encrypting hard drives and are also encrypted by the database software, Microsoft SQL Server.  The hard drives are redundant (RAID 10), meaning that each piece of data is stored on two separate hard drives, so nothing is lost even if one hard drive fails.  There are two configurations, one that allows multiple client computers connected to a single server computer, and one where everything is on the same computer.  We tested only the former, so the single-computer setup is not being certified.  These computers run a hardened Windows operating system.

## Voting

**Election Setup.**  Election setup (such as entering races and assigning candidates to them) is done using a GUI (graphical user-interface) that is part of the Election Management System.

**Authentication for election setup and central-count administration.**  D-Suite uses two-factor authentication for administration. Access is granted only after both entering the correct PIN and presenting a token, which will be either an iButton (see photos) or a smart card, depending on the device.  According to the vendor, an iButton is more durable than a smart card, but they serve the same purpose.  In either case, the electronic token is created and encoded on the iButton or smart card using the Election Management System.



**Zero-total report.**  Zero totals are automatically printed by the scanners on paper tape.  Note that no zero report is needed for the ballot-marking devices (BMDs).

**Ballot selection.**  Authorization to vote and ballot selection are done using smart cards generated by the Election Management System.  A poll worker enters the ballot style, and the software writes it on a smart card in a secure way.  The voter then takes the smart card to any voting station to vote. The voter cards are automatically cleared after voting, so they cannot be reused.  Also, as a backup, a poll-worker card can be inserted into the voting station to allow manual selection of the ballot style.



**Voting.**  Voting is done on the touch screen of the ImageCast X BMD, or ballots can be marked manually.

**Transfer Results.**  Vote totals are transferred from the ICP precinct scanner to central count using a removable memory device.

**Print precinct results.**  Precinct results are printed by the precinct scanner on paper tape.

**Straight party / crossover.**  Straight-party voting and crossover voting both work properly.

**Accessibility.**  Verification of accessibility is performed independently by the office of the Secretary of State, but the examiners had the opportunity to see the accessibility components.

## Comments

The use of many COTS components should reduce the cost of D-Suite significantly.  If this savings is passed on to the jurisdictions, then that's a very significant advantage.

The optical scanner has a clever feature that appends to each ballot image an "audit mark" that records in plain text how the ballot was interpreted by the scanner.

Although D-Suite can accommodate jurisdictions of all sizes, the client-server configuration submitted for certification has a minimum of one server and one workstation.  We did not examine the single-computer configuration, which would be more appropriate for small counties.

## Problems Identified in the Prior Exam on January 16-17, 2019

**Crossover Votes.**  In the January exam we saw a problem with handling crossover votes after a straight-party selection.  Dominion has fixed that problem.

**Adjudication results can be lost.**  In the January exam, during adjudication of the ballots in the test election, one of the Dominion representatives made a series of mistakes that caused the entire batch of adjudication results to be lost.  We did not see this problem again during this exam, but the adjudication system is unchanged, so this vulnerability is still present.

*Recommendation:*  Certification should be denied.

**DRE station failure.**  Examiner Brian Mechler discovered in January that simply unplugging and reconnecting the cord that supplies power to the VVPAT from the Android tablet will usually cause the tablet to fail.  Since Dominion is not submitting their DRE station for certification, this problem is not relevant to this exam.

**Voter May have to Start Over.**  In January the printer tray became ajar during voting, and the system did not notice until the voter attempted to cast his ballot.  The system would not accept the ballot and all the voter's choices were lost.  A poll worker card was required to clear the problem.  In this exam, we were unable to reproduce this problem, so perhaps it was fixed by the software upgrade.

Case 1:21-cv-00445-CJN

# Concerns

1. **Installation is complex, error prone, and tedious.**  I counted 184 steps in their installation manual before deciding to estimate the remaining steps. I estimate a total of about 500 steps are required to install the software.  I did not count steps that merely said something like "Click OK" or "Click Next."  This installation manual is 412 pages long with an additional 23 pages of front matter -- contents, lists of figures, and the like.

Some of these steps were quite simple, but some were lengthy with several "if" clauses.  Here is a sample step:

> In the Command Prompt, run the following command, where X is the drive letter of the DVD-ROM drive where the Windows installation media is located:
>
> > Dism /online /enable-feature /featurename:NetFx3 /All /Source:X:nsourcesnsxs /LimitAccess

According to the Dominion representatives, there are eight Windows services that must be started in a certain order; however, the order that steps must be done is not the same as the order they appear on the menus of the Dominion product.

The installation we witnessed took all day.  Apparently, a mistake was made (accidently skipping one of the reboot steps) and the Dominion representatives, although clearly knowledgeable, were not able to recover before we broke for lunch.  This was despite telephone consultations with other Dominion experts and the use of a troubleshooting guide that Dominion declined to make available to the examiners.  Over lunch they decided to start the installation over, and it was successful the second time, finishing before the end of the day.  Altogether, the installation took about 8 hours.

*Recommendation:*  Certification should be denied.

2. **Test Voting.**  During our voting test, we discovered that some party names and proposition text were not displayed, and one scanner was not accepting some ballots.  These all turned out to be errors Dominion made in setting up the standard test election used by the Secretary of State.  In the case of the scanner, it had accidently been configured not to accept machine-marked ballots.  The other problems were caused by leaving some fields empty during election setup, something that the EMS software should not allow, or at least highlight.

*Recommendation:*  Certification should be denied.

3. **Misleading Message.**  The ballot-marking devices incorrectly informed voters that they were *casting* their ballots, when in fact they were only *printing* them.  The ballots are not be counted until they were scanned on a different device.

*Recommendation:*  Certification should be denied.

4. **Disappearing Message.**  At one point while scanning ballots, something flashed on the display so briefly we could not read it.  After several attempts to re-scan the ballot, we were able to discern that it was a message reading "Ambiguous Marks" that was displayed for a second or less.  It then reverts to the "System Ready" message.  The voter has no way of knowing what, if anything, is wrong since the error message does not persist long enough to read it.

Furthermore, the message is confusing.  It would be better to say something like "Cannot read ballot."

*Recommendation:*  Certification should be denied.

5. **USB Port Vulnerability.**   The ICX ballot-marking device has an indicator light on top to show poll workers when the station is in use.  That light is connected by a USB port.



When Brian Mechler's phone was attached to the USB port, the ICX scanned the files on his phone and did not complain, although Dominion later showed that the event was logged.  When a USB drive with files was inserted, the ICX sometimes complained and sometimes did not, apparently according to the content of the USB drive and whether it was present when the ICX was first powered up or inserted later.

*Recommendation:*  Certification should be denied unless either (a) the indicator light is removed from the certified configuration or (b) a way is found to secure the USB connection to the light.

## Conclusion

I like the idea of using COTS components to save taxpayer money, and Dominion has done a good job of finding COTS components and minimizing the number of custom components.

Nevertheless, I cannot recommend certification.  Computer systems should be designed to prevent or detect human error whenever possible and minimize the consequences of both human mistakes and equipment failure.  Instead the Democracy Suite 5.5-A is fragile and error prone.  In my opinion it should not be certified for use in Texas.

If certification should be granted, it should be with the condition that all open network and USB ports be sealed.

# EXHIBIT K

# Democracy Suite 5.5A

The Dominion Voting Systems Democracy Suite 5.5A election system (DVS) was re-examined in Austin on October 2-3, 2019. The same system was examined in January 2019, but failed to achieve certification at that time.

There were minor changes to the ICX firmware as outlined in the change notes. There were updates to the messaging for staigh-tparty crossover and the button text. Another firmware change was related to the removal of the ICX DRE configuration and it's VVPAT. None of the changes were material to the functionality or security of the system.

There were hardware changes. Notably, the ICX DRE and  the ICX 15" tablet were removed. The hardware and software considered for certification for this examination are listed in the following table.

Proprietary/COTS Hardware/Software Components

| Name | Version/Firmware # | Hardware |
|------|--------------------|----------|
| Election Management System (EMS) | 5.5.12.1 | Dell PowerEdge R640 Server |
| Adjudication Services (ADJ) | 5.5.8.1 | Dell Precision 3431 Workstation |
| ImageCast Central  (ICC) | 5.5.3.0002 | Dell Optiplex 3050 AIO Workstation |
| ICC Scanner | DR-G1130 driver - version 1.2 SP6 | Canon DR-G1130 |
| ImageCast Precinct (ICP) | 5.5.3-0002 | PCOS-320C (proprietary device) |
| ICP Ballot Box | BOX-330A and BOX-341C | Stackable Molded Plastic and Foldable Coroplast Plastic |
| ImageCast X BMD | 5.5.10.30 - Android 5.1 | Avalue HID-21V-BTX (21.5 in. screen-Prime) |
| ICX BMD Printers | 402dn | HP LaserJet |
| ICP Ballot Box | BOX-330A and BOX-341C | Stackable Molded Plastic and Foldable Coroplast Plastic |

For a complete detailed listing of the hardware and software components used in the 5.5A system, please refer to the EAC certification Scope of Certification here.

## Findings

The findings listed below are in addition to the findings reported on the first examination of the 5.5A system. Rather than repeat many of those here, the reader should review the report for the first examination. If a finding for the second examination of a particular issue is different from the first examination, it will be pointed out in this report. Some of the key findings are repeated in this report.

- The Technical Data Package (TDP) documentation provided appears to be accurate and complete. However, there is documentation for devices and other features which were not part of the Texas configuration. This could cause confusion for a jurisdiction.

- The pre-marked and the manually voted test ballots were recorded and tallied correctly.

- * There was a problem installing the Dominion software. A fresh install of the MS-Windows operating system software was required after the failure. Since the Dominion experts had difficulty installing their system, Dominion should be required to do the installation, or the installation program must be improved.

  Eventually, the software was built successfully. The release numbers on the devices and the EMS were verified to match the releases that were used for the EAC (U.S. Elections Assistance Commission) testing.

- There are methods a jurisdiction can use to verify the integrity of the software/firmware programs (using hash codes). The methods are described in the document *SystemIDGuide-5.5* for each device, and the EMS.

  The method that Dominion provides to generate the hashes for the EMS programs on the server should be improved. It would be preferable that a read-only CD is provided that has a program to both generate and compare the hashes. The hashes generated by the testing lab should also be on the CD. This would simplify the operation so a jurisdiction could easily validate the software before and after each election.

  * Because it is difficult to verify, a jurisdiction may choose not to before and after an election.

- The ICP precinct scanner can utilize either a plastic collapsible ballot box or a rolling plastic ballot box. They both have 3 bins: regular, write-in, and emergency. The ballot box styles have locks and two places to use security seals.

  The cardboard collapsible ballot box with the punch-out emergency slot was not included in this examination and should not be sold as part of the system.

- The ICC scanner jammed when scanning a batch. The batch must be redone whenever this occurs.

- No paper jams occurred on the ICP during the examination even though an attempt was made to cause one.

- **\*** The messages on ICP display were visible only for about three seconds. One message said to press the "More" button for more information, but it quickly disappeared and the button could not be pressed. Messages should display until the user acknowledges.

- **\*** It was not necessary to get the Canon drivers for the ICC from Canon site. No explanation was given why this was necessary for the first examination.

- The two ICX machines used in this examination were configured as BMD's. The DRE configuration for an ICX was removed from the scope of certification.

- Straight-party voting can be turned off in the EMS when creating the election definition. This will be necessary when the law eliminating straight-party selection is in effect.

- The ICX BMD produces a printed summary ballot of the voter's choices. The ballot 2D barcode is read by the ICP precinct scanner. A ballot image of the text of the voter choices is also created. The images can be used for an election audit.

- Voter activation can be done on the ICX BMD by a poll worker, or on a standalone laptop using a pollbook application to create the voter activation cards.

- The ICX BMD system warns a voter that there is a problem if the laser printer paper tray is ajar. The warning instructs the voter to seek help from a poll worker.

- The ICX BMD can be used for curbside voting on a cart. It has an arm that can be used to extend the tablet into a vehicle. **\*** However, using it for curbside voting would be difficult and could damage the machine if the pathway to the curb is not very smooth.

- The ICP precinct scanner and ICX BMD can be used for a voting center. They are capable of providing all ballot styles. The collapsible ballot box is not appropriate for early voting because there is no cover to secure it at the end of the day.

- When voting on the ICX BMD during the examination, some screens had only one race; other screens had two races. Because of this, it was not clear that there was a second race on the page. It would be clearer if the layout was consistent (i.e. one race per screen). The ballot designer in the EMS has an option for this.

- **\*** The ballot on the ICX BMD screens did not have the party affiliation next to the candidate names. It also did not translate the race names (i.e. Senator). The system is capable of providing both so it is not clear how this occurred.

  The audio ballot did have the race names which presumably came from the same data entered in the ballot designer. It is odd that the information was not displayed on the screen. An operator should be alerted to this by the ballot designer software even though it is likely to be discovered before election day.

- **\*** The ethernet port is active on the ICX BMD during an election. It should be disabled when the machine is put into voting mode by the poll worker. This is an unnecessary open port during the voting period and could be used as an attack vector. An additional safeguard would be to automatically put the ICX in kiosk mode whenever the machine is open for voting.

Case 1:21-cv-00445-CJN

- The ICP and ICC machines required an iButton dongle and the correct passcodes to access the poll worker and technician functions. Each type of iButton is programmed for a specific role.

  The ICX BMD machine requires a smart card and passcode. Session activation for the ICX is also done by a smart card. Each type of card is programmed for a specific role. Digital signatures are verified to match the signature in the election definition when the poll worker card or voter activation card is inserted.

- No problems were encountered during the adjudication testing. The wrong path error which happened during the previous examination did not occur. A better design would be to include all important paths in the election definition to eliminate human error.

  \* During the previous examination, the system could not recover from the wrong path error and adjudication had to be redone. This is unacceptable. At the very least, the system should recover gracefully.

- \* The Auditmark program keeps a record of all changes to a ballot during adjudication. Red boxes around a race indicates that the race needs to be adjudicated. The boxes were slightly offset from the race. It was necessary to look at the AuditMark view to verify the selection. This is unacceptable. The operator may not view the AuditMark record and adjudicate the wrong ballot and/or miss a ballot that need to be adjudicated.

- The images from the ICP scanner were much clearer and were easy to read during adjudication. Dominion offered that reason the ICP images from the previous exam were unreadable was that 1) they were compressed, or 2) the scanner was damaged. The system should not have an option to compressed images if it renders them unreadable. Also, it does not seem likely that the unreadable images were caused by a damaged scanner. \* There was not a definitive root cause given for the problem, so it could occur again.

- Substantial training is essential to successful operation of the system. Dominion stated that training is customized for each customer. \* The Dominion experts had difficulty operating the system at times, training and experience is critical to prevent errors during the election. Therefore, significant training should be included in a purchase contract.

- The server used for the examination was a rack mounted server. A rack mounted server would typically be in a room other than a room used for the central count. This could be a potential security risk since it is out of sight.

  A tower server can be purchased with the same internal chipset and disk storage as the rack mounted server used for the examination. This is preferred since it can operate in the same room as the scanner and workstations.

  The EMS software will run without the hardening script being applied. The following statement is from section 6.1.8 of the DemocracySuite System Security Specification document: "*No other component with the Democracy Suite platform is ever connected to a public or County network, and procedures for malicious software protection are specific and differ from regular IT systems*" . \* However, the firewalls on the various central site

machines are not configured as part of the hardening procedures. This is left to the jurisdiction and since many jurisdictions do not have the expertise, the machines could be vulnerable to a rogue operator on a machine if the election LAN is not confined to just the machines used for the election. The machines should be configured to only allow networking between the server, central scanners, and the workstations use for the election system. No internet access or other machines should have access to the LAN.

- The voting devices logs and ballot images, and the EMS logs contain the necessary information to audit an election.

  \* However, when a second USB drive was inserted into the ICX BMD, it was not logged. It was explained that the second drive would not be read by the software and therefore was not a risk of infecting the machine. The second USB drive may be ignored by the election software, but a non-DVS drive should not be allowed as the disk could contain a rogue program that could access the election files directly.

  Text from the security document (4.4 Monitoring System Access and Use) states:
  *From the initial state of the election project, until the deactivation state, the EMS system maintains an activity log within the EMS Database. This activity log contains every action that any of the users have performed within the system and represents a detailed audit log that can be analyzed and printed in the form of an audit report. The audit record information cannot be modified or permanently deleted **using the EMS client applications.***

  \* This implies that the log could be modified by a SQL tool. The integrity of the audit log is essential. Therefore, it is important that no database access tools, other than the election software, be installed on the EMS server. The database and the log files are encrypted which helps to prevent unauthorized, unlogged editing, but they could be deleted.

## Conclusion

This examination went better overall than the last examination of the system, but many of the problems remain that caused it to fail certification previously. There have only been de minimis changes to the software since the previous examination. This is reflected by the same release number. The de minimis changes and the removal of the ICX DRE device did not correct all the problems stated in this and the previous report.

The Dominion experts still had problems installing the software. Therefore, installation cannot be assumed to be correct when installed by a jurisdiction. There are too many problems (see \* above) installing and operating the system that cannot be mitigated by documentation and training. Dominion should implement the improvements that have been suggested. It is disappointing that the problems documented in the previous examination's report were not read, or not taken seriously.

The Dominion Democracy Suite 5.5A system does not meet the standards required by the Texas Election Code. I **do not** recommend that it be certified.

Tom Watson - Examiner

# EXHIBIT L

# Ballot-Marking Devices (BMDs) Cannot Assure the Will of the Voters

Andrew W. Appel[†]
*Princeton University*

Richard A. DeMillo[†]
*Georgia Tech*

Philip B. Stark[†]
*Univ. of California, Berkeley*

December 27, 2019

### Abstract

The complexity of U.S. elections usually requires computers to count ballots—but computers can be hacked, so election integrity requires a voting system in which paper ballots can be recounted by hand. However, paper ballots provide no assurance unless they accurately record the vote as the voter expresses it.

Voters can express their intent by indelibly hand-marking ballots, or using computers called ballot-marking device (BMDs). Voters can make mistakes in expressing their intent in either technology, but only BMDs are also subject to hacking, bugs, and misconfiguration of the software that prints the marked ballots. Most voters do not review BMD-printed ballots, and those who do often fail to notice when the printed vote is not what they expressed on the touchscreen. Furthermore, there is no action a voter can take to demonstrate to election officials that a BMD altered their expressed votes, nor is there a corrective action that election officials can take if notified by voters—there is no way to deter, contain, or correct computer hacking in BMDs. These are the essential security flaws of BMDs.

Risk-limiting audits can assure that the votes recorded on paper ballots are tabulated correctly, but no audit can assure that the votes on paper are the ones expressed by the voter on a touchscreen: Elections conducted on current BMDs cannot be confirmed by audits. We identify two properties of voting systems, *contestability* and *defensibility*, necessary for audits to confirm election outcomes. No available EAC-certified BMD is contestable or defensible.

---

[†]Authors are listed alphabetically; they contributed equally to this work.

Electronic copy available at: https://ssrn.com/abstract=3375755

# 1   Introduction: Criteria for Voting Systems

Elections for public office and on public questions in the United States or any democracy must produce outcomes based on the votes that voters *express* when they indicate their choices on a paper ballot or on a machine. Computers have become indispensable to conducting elections, but computers are vulnerable. They can be hacked—compromised by insiders or external adversaries who can replace their software with fraudulent software that deliberately miscounts votes—and they can contain design errors and bugs—hardware or software flaws or configuration errors that result in mis-recording or mis-tabulating votes. Hence there must be some way, *independent* of any software in any computers, to ensure that reported election outcomes are correct, i.e., consistent with the expressed votes as intended by the voters.

Voting systems should be *software independent*, meaning that "an undetected change or error in its software cannot cause an undetectable change or error in an election outcome" [29, 30, 31]. Software independence is similar to tamper-evident packaging: if somebody opens the container and disturbs the contents, it will leave a trace.

The use of software-independent voting systems is supposed to ensure that if someone fraudulently hacks the voting machines to steal votes, we'll know about it. But we also want to know *the true outcome* in order to avoid a do-over election.[1] A voting system is *strongly software independent* if it is software independent and, moreover, a detected change or error in an election outcome (due to change or error in the software) can be corrected using only the ballots and ballot records of the current election [29, 30]. Strong software independence combines tamper evidence with a kind of resilience: there's a way to tell whether faulty software caused a problem, and a way to recover from the problem if it did.

*Software independence* and *strong software independence* are now standard terms in the analysis of voting systems, and it is widely accepted that voting systems should be software independent. Indeed, version 2.0 of the Voluntary Voting System Guidelines (VVSG 2.0) incorporates this principle [10].

But as we will show, these standard definitions are incomplete and inadequate, because in the word *undetectable* they hide several important questions: *Who* detects the change or error in an election outcome? How can a person *prove* that she has detected

---

[1]Do-overs are expensive; they may delay the inauguration of an elected official; there is no assurance that the same voters will vote in the do-over election as voted in the original; they decrease public trust. And if the do-over election is conducted with the same voting system that can only detect but not correct errors, then there may need to be a do-over of the do-over, *ad infinitum.*

Electronic copy available at: https://ssrn.com/abstract=3375755

an error? *What happens* when someone detects an error—does the election outcome remain erroneous? Or conversely: How can an election administrator *prove* that the election outcome not been altered, or prove that the correct outcome was recovered if a software malfunction was detected? The standard definition does not distinguish evidence available to an election official, to the public, or just to a single voter; nor does it consider the possibility of false alarms.

Those questions are not merely academic, as we show with an analysis of ballot-marking devices. Even if some *voters* "detect" that the printed output is not what they expressed to the BMD—even if some of *those* voters report their detection to election officials—there is no mechanism by which the *election official* can "detect" whether a BMD has been hacked to alter election outcomes. The questions of *who detects, and then what happens,* are critical—but unanswered by the standard definitions.

We will define the terms *contestable* and *defensible* to better characterize properties of voting systems that make them acceptable for use in public elections.[2]

A voting system is *contestable* if an undetected change or error in its software that causes a change or error in an election outcome can always produce *public* evidence that the outcome is untrustworthy. For instance, if a voter selected candidate A on the touchscreen of a BMD, but the BMD prints candidate B on the paper ballot, then this A-vs-B evidence is available to the individual voter, but the voter cannot demonstrate this evidence to anyone else, since nobody else saw—nor should have seen—where the voter touched the screen.[3] Thus, the voting system does not provide a way for the voter who observed the misbehavior to prove to anyone else that there was a problem, even if the problems altered the reported outcome. Such a system is therefore not *contestable*.

While the definition of software independence might allow evidence available only to individual voters as "detection," such evidence does not suffice for a system to be contestable. Contestibility is software independence, plus the requirement that "detect" implies "can generate public evidence." "Trust me" does not count as public evidence. If a voting system is not contestable, then problems voters "detect" might never see the light of day, much less be addressed or corrected.[4]

---

[2]There are other notions connected to contestability and defensibility, although essentially different: Benaloh et al. [6] define a *P-resilient canvass framework, personally verifiable P-resilient canvass framework,* and *privacy-preserving personally verifiable P-resilient canvass frameworks.*

[3]See footnote 18.

[4]If voters are the only means of detecting and quantifying the effect of those problems—as they are for BMDs—then in practice the system is not strongly software independent. The reason is that, as we will show, such claims by (some) voters *cannot* correct software-dependent changes to other voters' ballots, and *cannot* be used as the basis to invalidate or correct an election outcome. Thus, BMD-based

Electronic copy available at: https://ssrn.com/abstract=3375755

Similarly, while strong software independence demands that a system be able to report the correct outcome even if there was an error or alteration of the software, it does not require *public evidence* that the (reconstructed) reported outcome is correct. We believe, therefore, that voting systems must also be *defensible*. We say that a voting system is defensible if, when the reported electoral outcome is correct, it is possible to generate convincing public evidence that the reported electoral outcome is correct—despite any malfunctions, software errors, or software alterations that might have occurred. If a voting system is not defensible, then it is vulnerable to "crying wolf": malicious actors could claim that the system malfunctioned when in fact it did not, and election officials will have no way to prove otherwise.

By analogy with *strong software independence*, we define: A voting system is *strongly defensible* if it is defensible and, moreover, a detected change or error in an election outcome (due to change or error in the software) can be corrected (with convincing public evidence) using only the ballots and ballot records of the current election.

In short, a system is contestable if it can generate public evidence of a problem whenever a reported outcome is wrong, while a system is defensible if it can generate public evidence whenever a reported outcome is correct—despite any problems that might have occurred. Contestable systems are publicly tamper-evident; defensible systems are publicly, demonstrably resilient.

Defensibility is a key requirement for *evidence-based elections* [38]: defensibility makes it possible in principle for election officials to generate convincing evidence that the reported winners really won—if the reported winners did really win. (We say an election *system* may be defensible, and an *election* may be evidence-based; there's much more *process* to an election than just the choice of system.)

**Examples.**   The only known practical technology for contestable, strongly defensible voting is a system of *hand-marked paper ballots*, kept demonstrably physically secure, counted by machine, audited manually, and recountable by hand.[5] In a hand-marked paper ballot election, ballot-marking software cannot be the source of an error or change-of-election-outcome, because no software is used in marking ballots. Ballot-scanning-and-counting software can be the source of errors, but such errors can be

_____

election systems are not even (weakly) software independent, unless one takes "detection" to mean "somebody claimed there was a problem, with no evidence to support that claim."

[5]The election must also generate convincing evidence that physical security of the ballots was not compromised, and the audit must generate convincing public evidence that the audit itself was conducted correctly.

Electronic copy available at: https://ssrn.com/abstract=3375755

detected and corrected by audits.

That system is *contestable:* if an optical scan voting machine reports the wrong outcome because it miscounted (because it was hacked, misprogrammed, or miscalibrated), the evidence is *public*: the paper ballots, recounted before witnesses, will not match the claimed results, also witnessed. It is *strongly defensible:* a recount before witnesses can demonstrate that the reported outcome is correct, or can find the correct outcome if it was wrong—and provide public evidence that the (reconstructed) outcome is correct.

Some other paper-based systems such as Prêt-à-Voter [32] and Scantegrity [9] are also contestable and strongly defensible (provided the marked ballots are kept demonstrably secure through tabulation and posting). Scantegrity inherits these properties from the fact that it amounts to a cryptographic enhancement of hand-marked paper ballots. Prêt-à-Voter has these properties if the blank ballots are audited appropriately before the election.

Paper-based systems that rely on the "Benaloh challenge"—to ensure that the encryption of the vote printed on the ballot (by an electronic device) is correct—generally are neither contestable nor defensible.[6] The reason is that, while the challenge can produce public evidence that a machine did not accurately encrypt the plaintext vote on the ballot, if the machine prints the wrong plaintext vote and a correct encryption of that incorrect vote, there is no evidence the voter can use to prove that to anyone else. STAR-Vote [5] is an example of such a system.

Over 40 states now use some form of paper ballot for most voters [18]. Most of the remaining states are taking steps to adopt paper ballots. But *not all voting systems that use paper ballots are equally secure*.

Some are not even software independent. Some are software independent, but not strongly software independent, contestable, or defensible. In this report we explain:

- *Hand-marked paper ballot* systems are the only practical technology for contestable, strongly defensible voting systems.
- *Some ballot-marking devices (BMDs)* can be software independent, but they not strongly software independent, contestable, or defensible. Hacked or misprogrammed BMDs can alter election outcomes undetectably, so elections conducted using BMDs cannot provide public evidence that reported outcomes are correct. If BMD malfunctions are detected, there is no way to determine who

---

[6]Nor are they strongly software independent.

Electronic copy available at: https://ssrn.com/abstract=3375755

really won. Therefore BMDs should not be used by voters who are able to mark an optical-scan ballot with a pen.

- *All-in-one BMD or DRE+VVPAT voting machines* are not software independent, contestable, or defensible. They should not be used in public elections.

# 2    Background

We briefly review the kinds of election equipment in use, their vulnerability to computer hacking (or programming error), and in what circumstances risk-limiting audits can mitigate that vulnerability.

### Voting equipment

Although a voter may form an intention to vote for a candidate or issue days, minutes, or seconds before actually casting a ballot, that intention is a psychological state that cannot be directly observed by anyone else. Others can have access to that intention through what the voter (privately) *expresses* to the voting technology by interacting with it, e.g., by making selections on a BMD or marking a ballot by hand.[7] Voting systems must accurately record the vote as the voter *expressed* it.

With a *hand-marked paper ballot optical-scan* system, the voter is given a paper ballot on which all choices (candidates) in each contest are listed; next to each candidate is a *target* (typically an oval or other shape) which the voter marks with a pen to indicate a vote. Ballots may be either preprinted or printed (unvoted) at the polling place using *ballot on demand* printers. In either case, the voter creates a tamper-evident record of intent by marking the printed paper ballot with a pen.

Such hand-marked paper ballots may be scanned and tabulated at the polling place using a *precinct-count optical scanner* (PCOS), or may be brought to a central place to

---

[7]We recognize that voters make mistakes in expressing their intentions. For example, they may misunderstand the layout of a ballot or express an unintended choice through a perceptual error, inattention, or lapse of memory. The use of touchscreen technology does not necessarily correct for such user errors, as every smartphone user who has mistyped an important text message knows. Poorly designed ballots, poorly designed touchscreen interfaces, and poorly designed assistive interfaces increase the rate of error in voters' expressions of their votes. For the purposes of this report, we assume that properly engineered systems seek to minimize such usability errors.

Electronic copy available at: https://ssrn.com/abstract=3375755

be scanned and tabulated by a *central-count optical scanner* (CCOS). Mail-in ballots are typically counted by CCOS machines.

After scanning a ballot, a PCOS machine deposits the ballot in a secure, sealed ballot box for later use in recounts or audits; this is *ballot retention*. Ballots counted by CCOS are also retained for recounts or audits.[8]

Paper ballots can also be hand counted, but in most jurisdictions (especially where there are many contests on the ballot) this is hard to do quickly; Americans expect election-night reporting of unofficial totals. Hand counting—i.e., manually determining votes directly from the paper ballots—is appropriate for audits and recounts.

A *ballot-marking device* (BMD) provides a computerized user interface that presents the ballot to voters and captures their expressed selections—for instance, a touchscreen interface or an assistive interface that enables voters with disabilities to vote independently. Voter inputs (expressed votes) are recorded electronically. When a voter indicates that the ballot is complete and ready to be cast, the BMD prints a paper version of the electronically marked ballot. We use the term *BMD* for devices that mark ballots but do not tabulate or retain them, and *all-in-one* for devices that combine ballot marking, tabulation, and retention into the same paper path.

The paper ballot printed by a BMD may be in the same format as an optical-scan form (e.g., with ovals filled as if by hand) or it may list just the names of the candidate(s) selected in each contest. The BMD may also encode these selections into barcodes or QR codes for optical scanning. We discuss issues with barcodes later in this report.

An *all-in-one touchscreen voting machine* combines computerized ballot marking, tabulation, and retention in the same paper path. All-in-one machines come in several configurations:

- DRE+VVPAT machines—direct-recording electronic (DRE) voting machines with a voter-verifiable paper audit trail (VVPAT)—provide the voter a touchscreen (or other) interface, then print a paper ballot that is displayed to the voter under glass. The voter is expected to review this ballot and approve it, after which the machine deposits it into a ballot box. DRE+VVPAT machines do not contain optical scanners; that is, they do not read what is marked on the paper ballot; instead, they tabulate the vote directly from inputs to the touchscreen or other interface.

---

[8]Regulations and procedures governing custody and physical security of ballots are uneven and in many cases inadequate, but straightforward to correct because of decades of development of best practices.

Electronic copy available at: https://ssrn.com/abstract=3375755

- BMD+Scanner all-in-one machines[9] provide the voter a touchscreen (or other) interface to input ballot choices and print a paper ballot that is ejected from a slot for the voter to inspect. The voter then reinserts the ballot into the slot, after which the all-in-one BMD+scanner scans it and deposits it into a ballot box. Or, some BMD+Scanner all-in-one machines display the paper ballot behind plexiglass for the voter to inspect, before mechanically depositing it into a ballot box.

*Opscan+BMD with separate paper paths.* At least one model of voting machine (the Dominion ICP320) contains an optical scanner (opscan) and a BMD in the same cabinet,[10] so that the optical scanner and BMD-printer are not in the same paper path; no possible configuration of the software could cause a BMD-marked ballot to be deposited in the ballot box without human handling of the ballot. We do not classify this as an *all-in-one* machine.

## Hacking

There are many forms of computer hacking. In this analysis of voting machines we focus on the alteration of voting machine software so that it miscounts votes or mismarks ballots to alter election outcomes. There are many ways to alter the software of a voting machine: a person with physical access to the computer can open it and directly access the memory; one can plug in a special USB thumbdrive that exploits bugs and vulnerabilities in the computer's USB drivers; one can connect to its WiFi port or Bluetooth port or telephone modem (if any) and exploit bugs in those drivers, or in the operating system.

"Air-gapping" a system (i.e., never connecting it to the Internet nor to any other network) does not automatically protect it. Before each election, election administrators must transfer a *ballot definition* into the voting machine by inserting a *ballot definition cartridge* that was programmed on election-administration computers that may have been connected previously to various networks; it has been demonstrated that vote-changing viruses can propagate via these ballot-definition cartridges [17].

Hackers might be corrupt insiders with access to a voting-machine warehouse; corrupt insiders with access to a county's election-administration computers; outsiders who can gain remote access to election-administration computers; outsiders who can

---

[9]Some voting machines, such as the ES&S ExpressVote, can be configured as either a BMD or a BMD+Scanner all-in-one. Others, such as the ExpressVoteXL, work only as all-in-one machines.

[10]More precisely, the ICP320 optical scanner and the BMD audio+buttons interface are in the same cabinet, but the printer is a separate box.

Electronic copy available at: https://ssrn.com/abstract=3375755

gain remote access to voting-machine manufacturers' computers (and "hack" the firmware installed in new machines, or the firmware updates supplied for existing machines), and so on. Supply-chain hacks are also possible: the hardware installed by a voting system vendor may have malware pre-installed by the vendor's component suppliers.[11]

Computer systems (including voting machines) have so many layers of software that it is impossible to make them perfectly secure [23, pp. 89–91]. When manufacturers of voting machines use the best known security practices, adversaries may find it more difficult to hack a BMD or optical scanner—but not impossible. Every computer in every critical system is vulnerable to compromise through hacking, insider attacks or exploiting design flaws.

## Election assurance through risk-limiting audits

To ensure that the reported electoral outcome of each contest corresponds to what the voters expressed, the most practical known technology is a *risk-limiting audit* (RLA) of trustworthy paper ballots [34, 35, 22]. The National Academies of Science, Engineering, and Medicine, recommend routine RLAs after every election [23], as do many other organizations and entities concerned with election integrity.[12]

The *risk limit* of a risk-limiting audit is the maximum chance that the audit will not correct the reported electoral outcome, if the reported outcome is wrong. "Electoral outcome" means the political result—who or what won—not the exact tally. "Wrong" means that the outcome does not correspond to what the voters expressed.

A RLA involves manually inspecting randomly selected paper ballots following a rigorous protocol. The audit stops if and when the sample provides convincing evidence that the reported outcome is correct; otherwise, the audit continues until every ballot has been inspected manually, which reveals the correct electoral outcome if the paper trail is trustworthy. RLAs protect against vote-tabulation errors, whether those errors are caused by failures to follow procedures, misconfiguration, miscalibration, faulty

---

[11]Given that many chips and other components are manufactured in China and elsewhere, this is a serious concern. Carsten Schürmann has found Chinese pop songs on the internal memory of voting machines (C. Schürmann, personal communication, 2018). Presumably those files were left there accidentally—but this shows that malicious code *could* have been pre-installed deliberately, and that neither the vendor's nor the election official's security and quality control measures discovered and removed the extraneous files.

[12]Among them are the Presidential Commission on Election Administration, the American Statistical Association, the League of Women Voters, and Verified Voting Foundation.

Electronic copy available at: https://ssrn.com/abstract=3375755

engineering, bugs, or malicious hacking.[13]

The risk limit should be determined as a matter of policy or law. For instance, a 5% risk limit means that, if a reported outcome is wrong solely because of tabulation errors, there is at least a 95% chance that the audit procedure will correct it. Smaller risk limits give higher confidence in election outcomes, but require inspecting more ballots, other things being equal. RLAs never revise a correct outcome.

RLAs can be very efficient, depending in part on how the voting system is designed and how jurisdictions organize their ballots. If the computer results are accurate, an efficient RLA with a risk limit of 5% requires examining just a few—about 7 divided by the margin—ballots selected randomly from the contest.[14] For instance, if the margin of victory is 10% and the results are correct, the RLA would need to examine about $7/10\% = 70$ ballots to confirm the outcome at 5% risk. For a 1% margin, the RLA would need to examine about $7/1\% = 700$ ballots. The sample size does not depend much on the total number of ballots cast in the contest, only on the margin of the winning candidate's victory.

RLAs assume that a full hand tally of the paper trail would reveal the correct electoral outcomes: the paper trail must be trustworthy. Other kinds of audits, such as *compliance audits* [6, 22, 38, 36] are required to establish whether the paper trail itself is trustworthy. Applying an RLA procedure to an untrustworthy paper trail cannot limit the risk that a wrong reported outcome goes uncorrected.

Properly preserved hand-marked paper ballots ensure that expressed votes are identical to recorded votes. But BMDs might not record expressed votes accurately, for instance, if BMD software has bugs, was misconfigured, or was hacked: BMD printout is not a trustworthy record of the expressed votes. Neither a compliance audit nor a RLA can possibly check whether errors in recording expressed votes altered election outcomes. RLAs that rely on BMD output therefore cannot limit the risk that an incorrect reported election outcome will go uncorrected.

A paper-based voting system (such as one that uses optical scanners) is systematically more secure than a paperless system (such as DREs) *only if the paper trail is trustworthy and the results are checked against the paper trail using a rigorous method such as an RLA or full manual tally*. If it is possible that error, hacking, bugs, or mis-

---

[13]RLAs do not protect against problems that cause BMDs to print something other than what was shown to the voter on the screen, nor do they protect against problems with ballot custody.

[14]Technically, it is the *diluted margin* that enters the calculation. The diluted margin is the number of votes that separate the winner with the fewest votes from the loser with the most votes, divided by the number of ballots cast, including undervotes and invalid votes.

10

Electronic copy available at: https://ssrn.com/abstract=3375755

calibration caused the recorded-on-paper votes to differ from the expressed votes, an RLA or even a full hand recount cannot not provide convincing public evidence that election outcomes are correct: such a system cannot be *defensible*. In short, paper ballots provide little assurance against hacking if they are never examined or if the paper might not accurately reflect the votes expressed by the voters.

# 3   (Non)Contestability/Defensibility of BMDs

**A BMD-generated paper trail is not a reliable record of the vote expressed by the voter.**   Like any computer, a BMD (or a DRE+VVPAT) is vulnerable to bugs, misconfiguration, hacking, installation of unauthorized (fraudulent) software, and alteration of installed software.

If a hacker sought to steal an election by altering BMD software, what would the hacker program the BMD to do? In cybersecurity practice, we call this the *threat model*.

The simplest threat model is this one: In some contests, not necessarily top-of-the-ticket, change a small percentage of the votes (such as 5%).

In recent national elections, analysts have considered a candidate who received 60% of the vote to have won by a landslide. Many contests are decided by less than a 10% margin. Changing 5% of the votes can change the margin by 10%, because "flipping" a vote for one candidate into a vote for a different candidate changes the difference in their tallies—i.e., the margin—by 2 votes. If hacking or bugs or misconfiguration could change 5% of the votes, that would be a very significant threat.

Although public and media interest often focus on top-of-the-ticket races such as President and Governor, elections for lower offices such as state representatives, who control legislative agendas and redistricting, and county officials, who manage elections and assess taxes, are just as important in our democracy.  Altering the outcome of smaller contests requires altering fewer votes, so fewer voters are in a position to notice that their ballots were misprinted. And most voters are not as familiar with the names of the candidates for those offices, so they might be unlikely to notice if their ballots were misprinted, even if they checked.

Research in a real polling place in Tennessee during the 2018 election, found that half the voters *didn't look at all* at the paper ballot printed by a BMD, even when they were holding it in their hand and directed to do so while carrying it from the BMD to the optical scanner [13]. Those voters who did look at the BMD-printed ballot

11

Electronic copy available at: https://ssrn.com/abstract=3375755

spent *an average of 4 seconds* examining it to verify that the eighteen or more choices they made were correctly recorded. That amounts to 222 milliseconds per contest, barely enough time for the human eye to move and refocus under perfect conditions and not nearly enough time for perception, comprehension, and recall [27]. A study by other researchers [7], in a simulated polling place using real BMDs deliberately hacked to alter one vote on each paper ballot, found that only 6.6% of voters told a pollworker something was wrong.[15][16] The same study found that among voters who examined their hand-marked ballots, half were unable to recall key features of ballots cast moments before, a prerequisite step for being able to recall their own ballot choices. This finding is broadly consistent with studies of effects like "change blindness" or "choice blindness," in which human subjects fail to notice changes made to choices made only seconds before [19].

Suppose, then, that 10% of voters examine their paper ballots carefully enough to even *see* the candidate's name recorded as their vote for legislator or county commissioner. Of those, perhaps only half will remember the name of the candidate they intended to vote for.[17]

Of those who notice that the vote printed is not the candidate they intended to vote for, what will they think, and what will they do? Will they think, "Oh, I must have made a mistake on the touchscreen," or will they think, "Hey, the machine is cheating or malfunctioning!" There's no way for the voter to know for sure—voters do make mistakes—and there's *absolutely* no way for the voter to prove to a pollworker or election official that a BMD printed something other than what the voter entered on the

---

[15]You might think, "the voter really *should* carefully review their BMD-printed ballot." But because the scientific evidence shows that voters *do not* [13] and cognitively *cannot* [16] perform this task well, legislators and election administrators should provide a voting system that counts the votes *as voters express them*.

[16]Studies of voter confidence about their ability to verify their ballots are not relevant: in typical situations, subjective confidence and objective accuracy are at best weakly correlated. The relationship between confidence and accuracy has been studied in contexts ranging from eyewitness accuracy [8, 12, 40] to confidence in psychological clinical assessments [14] and social predictions [15]. The disconnect is particularly severe at high confidence. Indeed, this is known as "the overconfidence effect." For a lay discussion, see *Thinking, Fast and Slow* by Nobel economist Daniel Kahnemann [20].

[17]We ask the reader, "do you know the name of the most recent losing candidate for county commissioner?" We recognize that some readers of this document *are* county commissioners, so we ask those readers to imagine the frame of mind of their constituents.

Electronic copy available at: https://ssrn.com/abstract=3375755

screen.[18][19]

Either way, polling-place procedures generally advise voters to ask a pollworker for a new ballot if theirs does not show what they intended. Pollworkers should void that BMD-printed ballot, and the voter should get another chance to mark a ballot. Anecdotal evidence suggests that many voters are too timid to ask, or don't know that they have the right to ask, or are not sure whom to ask. Even if a voter asks for a new ballot, training for pollworkers is uneven, and we are aware of no formal procedure for resolving disputes if a request for a new ballot is refused. Moreover, there is no sensible protocol for ensuring that BMDs that misbehave are investigated—nor can there be, as we argue below.

Let's summarize. If a machine alters votes on 5% of the ballots (enabling it to change the margin by 10%), and 10% of voters check their ballots carefully and 50% of the voters who check notice the error, then optimistically we might expect $5\% \times 10\% \times 50\%$ or 0.25% of the voters to request a new ballot and correct their vote.[20] This means that the machine will change the margin by 9.75% and get away with it.

In this scenario, 0.25% of the voters, one in every 400 voters, has requested a new ballot. You might think, "that's a form of *detection* of the hacking." But it isn't, as a practical matter: a few individual voters may have detected that there was a problem, but there's no procedure by which this translates into any action that election administrators can take to correct the outcome of the election. Polling-place procedures *cannot correct or deter hacking, or even reliably detect it,* as we discuss next. This is essentially the distinction between a system that is merely software independent and one that is contestable: a change to the software that alters the outcome might generate evidence for an alert, conscientious, individual voter, but it does not generate public evidence that an election official can rely on to conclude there is a problem.

**Even if some voters notice that BMDs are altering votes, there's no way to correct the election outcome.**   That is, BMD voting systems are *not contestable*, *not defen-*

---

[18] You might think, "the voter can prove it by showing someone that the vote on the paper doesn't match the vote onscreen." But that won't work. On a typical BMD, by the time a paper record is printed and ejected for the voter to hold and examine, the touchscreen no longer shows the voter's choice. You might think, "BMDs should be designed so that the choices still show on the screen for the voter to compare with the paper." But a hacked BMD could easily alter the on-screen choices to match the paper, *after* the voter hits the "print" button.

[19] Voters should *certainly not* videorecord themselves voting! That would defeat the privacy of the secret ballot and is illegal in most jurisdictions.

[20] This calculation assumes that the 10% of voters who check are in effect a random sample of voters: voters' propensity to check BMD printout is not associated with their political preferences.

Electronic copy available at: https://ssrn.com/abstract=3375755

*sible* (and therefore *not strongly defensible*), and *not strongly software independent*.
Suppose a state election official wanted to detect whether the BMDs are cheating, and
correct election results, based on actions by those few alert voters who notice the error.
What procedures could possibly work against the manipulation we are considering?

1. How about, "If at least 1 in 400 voters claims that the machine misrepresented
   their vote, void the entire election."[21] No responsible authority would implement
   such a procedure. A few dishonest voters could collaborate to invalidate entire
   elections simply by falsely claiming that BMDs changed their votes.
2. How about, "If at least 1 in 400 voters claims that the machine misrepresented
   their vote, then investigate." Investigations are fine, but then what? The only
   way an investigation can ensure that the outcome accurately reflects what voters
   expressed to the BMDs is to void an election in which the BMDs have altered
   votes and conduct a new election. But how do you know whether the BMDs
   have altered votes, except based on the claims of the voters?[22] Furthermore, the
   investigation itself would suffer from the same problem as above: how can one
   distinguish between voters who detected BMD hacking or bugs from voters who
   just want to interfere with an election?

This is the essential security flaw of BMDs: few voters will notice and promptly
report discrepancies between what they saw on the screen and what is on the BMD
printout, and even when they do notice, there's nothing appropriate that can be done.
Even if election officials are convinced that BMDs malfunctioned, *there is no way to
determine who really won*.

Therefore, BMDs should not be used by most voters.

**Why can't we rely on pre-election and post-election logic and accuracy testing, or
parallel testing?**   Most, if not all, jurisdictions perform some kind of *logic and accu-
racy testing* (LAT) of voting equipment before elections. LAT generally involves voting
on the equipment using various combinations of selections, then checking whether the

---

[21]Note that in many jurisdictions, far fewer than 400 voters use a given machine on election day:
BMDs are typically expected to serve fewer than 300 voters per day. (The vendor ES&S recommended
27,000 BMDs to serve Georgia's 7 million voters, amounting to 260 voters per BMD [33].) Recall also
that the rate 1 in 400 is tied to the amount of manipulation. What if the malware flipped only one vote
in 50, instead of 1 vote in 20? That could still change the margin by 4%, but—in this hypothetical—
would be noticed by only one voter in 1,000, rather than one in 400. The smaller the margin, the less
manipulation it would have taken to alter the electoral outcome.

[22]Forensic examination of the BMD might show that it *was* hacked or misconfigured, but it cannot
prove that the BMD *was not* hacked or misconfigured.

14

Electronic copy available at: https://ssrn.com/abstract=3375755

equipment tabulated the votes correctly. As the Volkswagen/Audi "Dieselgate" scandal shows, devices can be programmed to behave properly when they are tested but misbehave in use [11]. Therefore, LAT can never prove that voting machines performed properly in practice.

Parallel or "live" testing involves pollworkers or election officials using some BMDs at random times on election day to mark (but not cast) ballots with test patterns, then check whether the marks match the patterns. The idea is that the testing is not subject to the "Dieselgate" problem, because the machines cannot "know" they are being tested on election day.[23] As a practical matter, the number of tests required to provide a reasonable chance of detecting outcome-changing errors is prohibitive: it would leave no time for actual voting [37]. Moreover, it would require additional staff, infrastructure, and other resources.

Suppose, counterfactually, that it was practical to perform enough parallel testing to guarantee a large chance of detecting a problem if BMD hacking or malfunction altered electoral outcomes. Suppose, counterfactually, that election officials were required to conduct that amount of parallel testing during every election, and that the required equipment, staffing, infrastructure, and other resources were provided. Even then, the system would not be *strongly defensible*; that is, if testing detected a problem, there would be no way to to determine who really won. The only remedy would be a new election.

**Don't voters need to check hand-marked ballots, too?**   It is always a good idea to check one's work, but there is a substantial body of research (e.g., [28]) suggesting that preventing error as a ballot is being marked is a fundamentally different cognitive task than detecting an error on a previously marked ballot. In cognitively similar tasks, such as proof reading for non-spelling errors, ten percent rates of error detection are common [28, pp 167ff], whereas by carefully attending to the task of correctly marking their ballots, voters apparently can largely avoid marking errors.

A fundamental difference between hand-marked paper ballots and ballot-marking devices is that, with hand-marked paper ballots, voters are responsible for catching and

---

[23]BMDs do "know" their own settings and other aspects of each voting session, so malware can use that information to target sessions that use the audio interface, increase the font size, use the sip-and-puff interface, set the language to something other than English, or take much longer than average to vote. (Voters who use those settings might be less likely to be believed if they report that the equipment altered their votes.) For parallel testing to have a good chance of detecting all outcome-changing problems, the tests must have a large chance of probing *every* combination of settings and voting patterns that includes enough ballots to change any contest result. It is not practical.

Electronic copy available at: https://ssrn.com/abstract=3375755

correcting *their own errors*, while if BMDs are used, voters are also responsible for catching *machine errors, bugs, and hacking*. Voters are the *only* people who can detect such problems with BMDs—but, as explained above, if voters do find problems, there's no way they can prove to poll workers or election officials that there were problems and no way to ensure that election officials take appropriate remedial action.

# 4   Other tradeoffs, BMDs versus hand-marked opscan

Supporters of ballot-marking devices advance several other arguments for their use.

- **Mark legibility.** A common argument is that a properly functioning BMD will generate clean, error-free, unambiguous marks, while hand-marked paper ballots may contain mistakes and stray marks that make it impossible to discern a voter's intent. However appealing this argument seems at first blush, the data are not nearly so compelling. Experience with statewide recounts in Minnesota and elsewhere suggest that truly ambiguous handmade marks are very rare.[24] For instance, 2.9 million hand-marked ballots were cast in the 2008 Minnesota race between Al Franken and Norm Coleman for the U.S. Senate. In a manual recount, between 99.95% and 99.99% of ballots were unambiguously marked.[25] [26] In addition, usability studies of hand-marked bubble ballots—the kind in most common use in U.S. elections—indicate a *voter* error rate of 0.6%, much lower than the 2.5–3.7% error rate for machine-marked ballots [16].[27] Moreover, modern image-based opscan equipment (*digital scan* machinery) is better than older

---

[24]States do need clear and complete regulations for interpreting voter marks.

[25]"During the recount, the Coleman and Franken campaigns initially challenged a total of 6,655 ballot-interpretation decisions made by the human recounters. The State Canvassing Board asked the campaigns to voluntarily withdraw all but their most serious challenges, and in the end approximately 1,325 challenges remained. That is, approximately 5 ballots in 10,000 were ambiguous enough that one side or the other felt like arguing about it. The State Canvassing Board, in the end, classified all but 248 of these ballots as votes for one candidate or another. That is, approximately 1 ballot in 10,000 was ambiguous enough that the bipartisan recount board could not determine an intent to vote." [1] See also [25]

[26]We have found that some local election officials consider marks to be ambiguous if *machines* cannot read the marks. That is a different issue from *humans* being unable to interpret the marks. Errors in machine interpretation of voter intent can be dealt with by manual audits: if the reported outcome is wrong because machines misinterpreted handmade marks, a RLA has a known, large chance of correcting the outcome.

[27]Better designed user interfaces (UI) might reduce the error rate for machine-marked ballots below the historical rate for DREs; however, UI improvements cannot keep BMDs from printing something other than what the voter is shown on the screen.

Electronic copy available at: https://ssrn.com/abstract=3375755

"marksense" machines at interpreting imperfect marks. Thus, mark legibility is not a good reason to adopt BMDs for all voters.

- **Undervotes, overvotes.** Another argument offered for BMDs is that the machines can alert voters to undervotes and prevent overvotes. That is true, but modern PCOS systems can also alert a voter to overvotes and undervotes, allowing a voter to eject the ballot and correct it.

- **Bad ballot design.** Ill-designed paper ballots, just like ill-designed touchscreen interfaces, may lead to unintentional undervotes [24]. For instance, the 2006 Sarasota, Florida, touchscreen ballot was badly designed. The 2018 Broward County, Florida, opscan ballot was badly designed: it violated three separate guidelines from the EAC's 2007 publication, "Effective Designs for the Administration of Federal Elections, Section 3: Optical scan ballots." [39] In both of these cases (touchscreens in 2006, hand-marked optical-scan in 2018), undervote rates were high. The solution is to follow standard, published ballot-design guidelines and other best practices, both for touchscreens and for hand-marked ballots [3, 24].

- **Low-tech paper-ballot fraud.** All paper ballots, however they are marked, are vulnerable to *loss*, *ballot-box stuffing*, *alteration*, and *substitution* between the time they are cast and the time they are recounted. That's why it is so important to make sure that ballot boxes are always in multiple-person (preferably bipartisan) custody whenever they are handled, and that appropriate physical security measures are in place. Strong, verifiable chain-of-custody protections are essential.

  Hand-marked paper ballots are vulnerable to alteration by anyone with a pen. Both hand-marked and BMD-marked paper ballots are vulnerable to substitution: anyone who has poorly supervised access to a legitimate BMD during election day can create fraudulent ballots, not necessarily to deposit them in the ballot box immediately (in case the ballot box is well supervised on election day) but with the hope of substituting it later in the chain of custody.[28]

  All those attacks (on hand-marked and on BMD-marked paper ballots) are fairly low-tech. There are also higher-tech ways of producing ballots indistinguishable from BMD-marked ballots for substitution into the ballot box if there is inadequate chain-of-custody protection.

- **Accessible voting technology.** When hand-marked paper ballots are used with PCOS, there is (as required by law) also an accessible voting technology available in the polling place for voters unable to mark a paper ballot with a pen. This

---

[28]Some BMDs print a barcode indicating when and where the ballot was produced, but that does not prevent such a substitution attack against currently EAC-certified, commercially available BMDs. We understand that systems under development might make ballot-substitution attacks against BMDs more difficult.

Electronic copy available at: https://ssrn.com/abstract=3375755

is typically a BMD or a DRE. When the accessible voting technology is not the same as what most voters vote on—when it is used by very few voters—it may happen that the accessible technology is ill-maintained or even (in some polling places) not even properly set up by pollworkers. This is a real problem. One proposed solution is to require all voters to use the same BMD or all-in-one technology. But the failure of some election officials to properly maintain their accessible equipment is not a good reason to adopt BMDs for *all* voters. Among other things, it would expose all voters to the security flaws described above.[29] Other advocates object to the idea that disabled voters must use a different method of marking ballots, arguing that their rights are thereby violated. Both HAVA and ADA require reasonable accommodations for voters with physical and cognitive impairments, but neither law requires that those accommodations must be used by all voters. To best enable and facilitate participation by all voters, each voter should be provided with a means of casting a vote best suited to their abilities.

- **Ballot printing costs.** Preprinted optical-scan ballots cost 20–50 cents each.[30] Blank cards for BMDs cost up to 15 cents each, depending on the make and model of BMD.[31] But optical-scan ballots must be preprinted for as many voters as *might* show up, whereas blank BMD cards are consumed in proportion to how many voters *do* show up. The Open Source Election Technology Institute (OSET) conducted an independent study of total life cycle costs[32] for hand-marked paper ballots and BMDs in conjunction with the 2019 Georgia legislative debate regarding BMDs [26]. OSET concluded that, even in the most optimistic (i.e., lowest cost) scenario for BMDs and the most pessimistic (i.e, highest cost) scenario for hand-marked paper ballots and ballot-on-demand (BOD) printers—which can print unmarked ballots as needed—the total lifecycle costs for BMDs would be higher than the corresponding costs for hand-marked paper ballots.[33]

- **Vote centers.** To run a vote center that serves many election districts with different ballot styles, one must be able to provide each voter a ballot containing

---

[29]Also, some accessibility advocates argue that requiring disabled voters to use BMDs compromises their privacy since hand-marked ballots are easily distinguishable from machine marked ballots. That issue can be addressed without BMDs-for-all: Accessible BMDs are already available and in use that mark ballots with marks that cannot easily be distinguished from hand-marked ballots.

[30]Single-sheet (one- or two-side) ballots cost 20-28 cents; double-sheet ballots needed for elections with many contests cost up to 50 cents.

[31]Ballot cards for ES&S ExpressVote cost about 15 cents. New Hampshire's (One4All / Prime III) BMDs used by sight-impaired voters use plain paper that is less expensive.

[32]They include not only the cost of acquiring and implementing systems but also the ongoing licensing, logistics, and operating (purchasing paper stock, printing, and inventory management) costs.

[33]BOD printers currently on the market arguably are best suited for vote centers, but less expensive options suited for polling places could be developed. Indeed, BMDs that print full-face ballots could be re-purposed as BOD printers for polling place use, with modest changes to the programming.

18

Electronic copy available at: https://ssrn.com/abstract=3375755

the contests that voter is eligible to vote in, possibly in a number of different languages. This is easy with BMDs, which can be programmed with all the appropriate ballot definitions. With preprinted optical-scan ballots, the PCOS can be programmed to *accept* many different ballot styles, but the vote center must still maintain *inventory* of many different ballots. BOD printers are another economical alternative for vote centers.[34]

- **Paper/storage.** BMDs that print summary cards rather than full-face ballots can save paper and storage space. However, many BMDs print full-face ballots—so they do not save storage—while many BMDs that print summary cards (which could save storage) use thermal printers and paper that is fragile and can fade in a few months.[35]

Advocates of hand-marked paper ballot systems advance these additional arguments.

- **Cost.** Using BMDs for all voters substantially increases the cost of acquiring, configuring, and maintaining the voting system. One PCOS can serve 1200 voters in a day, while one BMD can serve only about 260 [33]—though both these numbers vary greatly depending on the length of the ballot and the length of the day. OSET analyzed the relative costs of acquiring BMDs for Georgia's nearly seven million registered voters versus a system of hand-marked paper ballots, scanners, and BOD printers [26]. A BMD solution for Georgia would cost taxpayers between 3 and 5 times more than a system based on hand-marked paper ballots. Open-source systems might eventually shift the economics, but current commercial universal-use BMD systems are more expensive than systems that use hand-marked paper ballots for most voters.
- **Mechanical reliability and capacity.** Pens are likely to have less downtime than BMDs. It is easy and inexpensive to get more pens and privacy screens when additional capacity is needed. If a precinct-count scanner goes down, people can still mark ballots with a pen; if the BMD goes down, voting stops. Thermal

---

[34]Ballot-on-demand printers *may* require maintenance such as replacement of toner cartridges. This is readily accomplished at a vote center with a professional staff. Ballot-on-demand printers may be a less attractive option for many small precincts on election day, where there is no professional staff—but on the other hand, they are less necessary, since far fewer ballot styles will be needed in any one precinct.

[35]The California Top-To-Bottom Review (TTBR) of voting systems found that thermal paper can also be covertly spoiled wholesale using common household chemicals https://votingsystems.cdn.sos.ca.gov/oversight/ttbr/red-diebold.pdf, last visited 8 April 2019. The fact that thermal paper printing can fade or deteriorate rapidly might mean it does not satisfy the federal requirement to preserve voting materials for 22 months. http://uscode.house.gov/view.xhtml?req=granuleid:USC-prelim-title52-section20701&num=0&edition=prelim, last visited 8 April 2019.

19

Electronic copy available at: https://ssrn.com/abstract=3375755

> printers used in DREs with VVPAT are prone to jams; those in BMDs might have similar flaws.

These secondary pros and cons of BMDs do not outweigh the primary security and accuracy concern: BMDs, if hacked or erroneously programmed, can change votes in a way that is not correctable. BMD voting systems are not contestable or defensible. Audits that rely on BMD printout cannot make up for this defect in the paper trail: they cannot reliably detect or correct problems that altered election outcomes.

## Barcodes

A controversial feature of some BMDs allows them to print 1-dimensional or 2-dimensional barcodes on the paper ballots. A 1-dimensional barcode resembles the pattern of vertical lines used to identify products by their universal product codes. A 2-dimensional barcode or QR code is a rectangular area covered in coded image *modules* that encode more complex patterns and information. BMDs print barcodes on the same paper ballot that contains human-readable ballot choices. Voters using BMDs are expected to verify the human-readable printing on the paper ballot card, but the presence of barcodes with human-readable text poses some significant problems.

- **Barcodes are not human readable.** The whole purpose of a paper ballot is to be able to recount (or audit) the *voters'* votes in a way independent of any (possibly hacked or buggy) computers. If the official vote on the ballot card is the barcode, then it is impossible for the voters to verify that the official vote they cast is the vote they expressed. Therefore, before a state even *considers* using BMDs that print barcodes (and we do not recommend doing so), the State must ensure by statute that recounts and audits are based *only* on the human-readable portion of the paper ballot. Even so, audits based on untrustworthy paper trails suffer from the verifiability the problems outlined above.
- **Ballot cards with barcodes contain two different votes.** Suppose a state does ensure by statute that recounts and audits are based on the human-readable portion of the paper ballot. Now a BMD-marked ballot card with both barcodes and human-readable text contains two different votes in each contest: the barcode (used for electronic tabulation), and the human-readable selection printout (official for audits and recounts). In few (if any) states has there even been a discussion of the legal issues raised when the official markings to be counted differ between the original count and a recount.
- **Barcodes pose technical risks.** Any coded input into a computer system— including wired network packets, WiFi, USB thumbdrives, *and barcodes*—pose

20

Electronic copy available at: https://ssrn.com/abstract=3375755

the risk that the input-processing software can be vulnerable to attack via deliberately ill-formed input. Over the past two decades, many such vulnerabilities have been documented on *each* of these channels (including barcode readers) that, in the worst case, give the attacker complete control of a system.[36]  If an attacker were able to compromise a BMD, the barcodes are an attack vector for the attacker to take over an optical scanner (PCOS or CCOS), too. Since it is good practice to close down all such unneeded attack vectors into PCOS or CCOS voting machines (e.g., don't connect your PCOS to the Internet!), it is also good practice to avoid unnecessary attack channels such as barcodes.

## End-to-End Verifiable BMDs

In all BMD systems currently on the market, and in all BMD systems certified by the EAC, the printed ballot or ballot summary is the only channel by which voters can verify the correct recording of their ballots, independently of the computers. The analysis in this paper applies to all of those BMD systems.

There is a class of voting systems called "end-to-end verifiable" (E2E-V), which provide an alternate mechanism for voters to verify their votes [2]. Some E2E-V systems incorporate BMDs, for instance STAR-Vote[37] [5]. As we discuss above in Section 1, such systems are not contestable, defensible, or strongly software independent. In any event, no E2E-V system is currently certified by the EAC, nor to our knowledge is any such system under review for certification, nor are any of the 5 major voting-machine vendors offering such a system for sale.[38]

---

[36]An example of a barcode attack is based on the fact that many commercial barcode-scanner components (which system integrators use to build cash registers or voting machines) treat the barcode scanner using the same operating-system interface as if it were a keyboard device; and then some operating systems allow "keyboard escapes" or "keyboard function keys" to perform unexpected operations.

[37]The STAR-Vote system is actually a DRE+VVPAT system with a smart ballot box, rather than a BMD system: voters interact with a device that captures their votes electronically and prints a paper record that voters can inspect, but the electronic votes are held "in limbo" until the paper ballot is deposited in the smart ballot box. The ballot box does not read the votes from the ballot; rather, depositing the ballot tells the system that it has permission to cast the vote that it had already recorded from the touchscreen.

[38]Some vendors, notably Scytl, have sold systems advertised as E2E-V in other countries. Those systems were not in fact E2E-V. Moreover, serious security flaws have been found in their implementations. See, e.g., [21].

Electronic copy available at: https://ssrn.com/abstract=3375755

# 5   Insecurity of All-in-One BMDs

Some voting machines incorporate a BMD interface, printer, and optical scanner into the same cabinet. Other DRE+VVPAT voting machines incorporate ballot-marking, tabulation, and paper-printout retention, but without scanning. These are often called "all-in-one" voting machines. To use an all-in-one machine, the voter makes choices on a touchscreen or through a different accessible interface. When the selections are complete, the BMD prints the completed ballot for the voter to review and verify, before depositing the ballot in a ballot box attached to the machine.

Such machines are especially unsafe: like any BMD described in Section 3 they are not contestable or defensible, but in addition, if hacked they can print votes onto the ballot *after* the voter last inspects the ballot.

- The ES&S ExpressVote (in all-in-one mode) allows the voter to mark a ballot by touchscreen or audio interface, then prints a paper ballot card and ejects it from a slot. The voter has the opportunity to review the ballot, then the voter redeposits the ballot into the same slot, where it is scanned and deposited into a ballot box.
- The ES&S ExpressVoteXL allows the voter to mark a ballot by touchscreen or audio interface, then prints a paper ballot and displays it under glass. The voter has the opportunity to review the ballot, then the voter touches the screen to indicate "OK," and the machine pulls paper ballot up (still under glass) and into the integrated ballot box.
- The Dominion ImageCast Evolution (ICE) allows the voter to deposit a hand-marked paper ballot, which it scans and drops into the attached ballot box. *Or*, a voter can use a touchscreen or audio interface to direct the marking of a paper ballot, which the voting machine ejects through a slot for review; then the voter redeposits the ballot into the slot, where it is scanned and dropped into the ballot box.

In all three of these machines, the ballot-marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box. This opens up a very serious security vulnerability: the voting machine can mark the paper ballot (to add votes or spoil already-cast votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box without the possibility of detection.

Vote-stealing software could easily be constructed that looks for *undervotes* on the ballot, and marks those unvoted spaces for the candidate of the hacker's choice. This is very straightforward to do on optical-scan bubble ballots (as on the Dominion ICE) where undervotes are indicated by no mark at all. On machines such as the ExpressVote

189 of 497

Electronic copy available at: https://ssrn.com/abstract=3375755

and ExpressVoteXL, the normal software indicates an undervote with the words NO SELECTION MADE on the ballot summary card. Hacked software could simply leave a blank space there (most voters wouldn't notice the difference), and then fill in that space and add a matching bar code after the voter has clicked "cast this ballot."

An even worse feature of the ES&S ExpressVote and the Dominion ICE is the *auto-cast* configuration setting (in the manufacturer's standard software) that allows the voter to indicate, "don't eject the ballot for my review, just print it and cast it without me looking at it." If fraudulent software were installed in the ExpressVote, it could change *all* the votes of any voter who selected this option, because the voting machine software would know *in advance of printing* that the voter had waived the opportunity to inspect the printed ballot. We call this auto-cast feature "permission to cheat" [4].

Regarding these all-in-one machines, we conclude:

- Any machine with ballot printing in the same paper path with ballot deposit is not *software independent*; it is *not* the case that "an error or fault in the voting system software or hardware cannot cause an undetectable change in election results." Therefore such all-in-one machines do not comply with the VVSG 2.0 (the Election Assistance Commission's Voluntary Voting Systems Guidelines). Such machines are not contestable or defensible, either.
- All-in-one machines on which all voters use the BMD interface to mark their ballots (such as the ExpressVote and ExpressVoteXL) *also* suffer from the same serious problem as ordinary BMDs: most voters do not review their ballots effectively, and elections on these machines are not contestable or defensible.
- The auto-cast option for a voter to allow the paper ballot to be cast without human inspection is particularly dangerous, and states must insist that vendors disable or eliminate this mode from the software. However, even disabling the auto-cast feature does not eliminate the risk of undetected vote manipulation.

**Remark.**   The Dominion ImageCast Precinct ICP320 is a precinct-count optical scanner (PCOS) that also contains an audio+buttons ballot-marking interface for disabled voters. This machine can be configured to cast electronic-only ballots from the BMD interface, or an external printer can be attached to print paper optical-scan ballots from the BMD interface. When the external printer is used, that printer's paper path is *not* connected to the scanner+ballot-box paper path (a person must take the ballot from the printer and deposit it into the scanner slot). Therefore this machine is as safe to use as any PCOS with a separate external BMD.

Electronic copy available at: https://ssrn.com/abstract=3375755

# 6   Conclusion

**Ballot-Marking Devices** produce ballots that do not necessarily record the vote expressed by the voter when they enter their selections on the touchscreen: hacking, bugs, and configuration errors can cause the BMDs to print votes that differ from what the voter entered and verified electronically. Because outcome-changing errors in BMD printout do not produce public evidence, BMD systems are not *contestable*. Because there is no way to generate convincing public evidence that reported outcomes are correct despite any BMD malfunctions that might have occurred, BMD systems are not *defensible*. Therefore, BMDs should not be used by voters who can hand mark paper ballots.

**All-in-one voting machines**, which combine ballot-marking and ballot-box-deposit into the same paper path, are even worse. They have all the disadvantages of BMDs (they are not contestable or defensible), and they can mark the ballot after the voter has inspected it. Therefore they are not even *software independent*, and should not be used by those voters who are capable of marking, handling, and visually inspecting a paper ballot.

When computers are used to record votes, the original transaction (the voter's expression of the votes) is not documented in a verifiable way.[39] When pen-and-paper is used to record the vote, the original expression of the vote *is* documented in a verifiable way (if demonstrably secure chain of custody of the paper ballots is maintained). Audits of elections conducted with hand-marked paper ballots, counted by optical scanners, can ensure that reported election outcomes are correct. Audits of elections conducted with BMDs *cannot* ensure that reported outcomes are correct.

# References

[1] A.W. Appel. Optical-scan voting extremely accurate in Minnesota. *Freedom to Tinker*, January 2009. https://freedom-to-tinker.com/2009/01/21/optical-scan-voting-extremely-accurate-minnesota/.

---

[39]It is conceivable that cryptographic protocols like those used in E2E-V systems could be used to create BMD-based systems that are contestable and defensible, but no such system exists, nor, to our knowledge, has such a design been worked out in principle. Existing E2E-V systems that use a computer to print (encrypted) selections are neither contestable nor defensible, as explained in Section 1.

Electronic copy available at: https://ssrn.com/abstract=3375755

[2] A.W. Appel.   End-to-end verifiable elections.   *Freedom to Tinker*, November 2018.   https://freedom-to-tinker.com/2018/11/05/end-to-end-verifiable-elections/.

[3] A.W. Appel. Florida is the Florida of ballot-design mistakes. *Freedom to Tinker*, November 2018.   https://freedom-to-tinker.com/2018/11/14/florida-is-the-florida-of-ballot-design-mistakes/.

[4] A.W. Appel.   Serious design flaw in ESS ExpressVote touch-screen: "permission to cheat".   *Freedom to Tinker*, September 2018.   https://freedom-to-tinker.com/2018/09/14/serious-design-flaw-in-ess-expressvote-touchscreen-permission-to-cheat/.

[5] J. Benaloh, M. Byrne, B. Eakin, P. Kortum, N. McBurnett, O. Pereira, P.B. Stark, , and D.S. Wallach. Star-vote: A secure, transparent, auditable, and reliable voting system. *JETS: USENIX Journal of Election Technology and Systems*, 1:18–37, 2013.

[6] J. Benaloh, D. Jones, E. Lazarus, M. Lindeman, and P.B. Stark. SOBA: Secrecy-preserving observable ballot-level audits. In *Proceedings of the 2011 Electronic Voting Technology Workshop / Workshop on Trustworthy Elections (EVT/WOTE '11)*. USENIX, 2011.

[7] Matthew Bernhard, Allison McDonald, Henry Meng, Jensen Hwa, Nakul Bajaj, Kevin Chang, and J. Alex Halderman. Can voters detect malicious manipulation of ballot marking devices? In *41st IEEE Symposium on Security and Privacy*, page (to appear). IEEE, 2020.

[8] R. K. Bothwell, K.A. Deffenbacher, and J.C. Brigham. Correlation of eyewitness accuracy and confidence: Optimality hypothesis revisited. *Journal of Applied Psychology*, 72:691–695, 1987.

[9] D. Chaum, A. Essex, R.T. Carback III, J. Clark, S. Popoveniuc, A.T. Sherman, and P. Vora. Scantegrity: End-to-end voter verifiable optical-scan voting. *IEEE Security & Privacy*, 6:40–46, 2008.

[10] Election Assistance Commission.   Voluntary voting systems guidelines 2.0, September 2017.   https://www.eac.gov/assets/1/6/TGDC_Recommended_VVSG2.0_P_Gs.pdf.

[11] Moritz Contag, Guo Li, Andre Pawlowski, Felix Domke, Kirill Levchenko, Thorsten Holz, and Stefan Savage. How they did it: An analysis of emission defeat devices in modern automobiles. In *2017 IEEE Symposium on Security and Privacy*, pages 231–250. IEEE, 2017.

Electronic copy available at: https://ssrn.com/abstract=3375755

[12] K. Deffenbacher.  Eyewitness accuracy and confidence: Can we infer anything about their relation? *Law and Human Behavior*, 4:243–260, 1980.

[13] R. DeMillo, R. Kadel, and M. Marks.  What voters are asked to verify affects ballot verification: A quantitative analysis of voters' memories of their ballots, November 2018.  https://ssrn.com/abstract=3292208.

[14] S.L. Desmarais, T.L. Nicholls, J. D. Read, and J. Brink. Confidence and accuracy in assessments of short-term risks presented by forensic psychiatric patients. *The Journal of Forensic Psychiatry & Psychology*, 21(1):1–22, 2010.

[15] D. Dunning, D.W. Griffin, J.D. Milojkovic, and L. Ross.  The overconfidence effect in social prediction. *Journal of Personality and Social Psychology*, 58:568–581, 1990.

[16] S.P. Everett. *The Usability of Electronic Voting Machines and How Votes Can Be Changed Without Detection*.  PhD thesis, Rice University, 2007.

[17] A.J. Feldman, J.A. Halderman, and E.W. Felten. Security analysis of the Diebold AccuVote-TS voting machine.  In *2007 USENIX/ACCURATE Electronic Voting Technology Workshop (EVT 2007)*, August 2007.

[18] Verified Voting Foundation.  The verifier – polling place equipment – november 2018, November 2018.  https://www.verifiedvoting.org/verifier/.

[19] P. Johansson, L. Hall, and S. Sikstrom.  From change blindness to choice blindness. *Psychologia*, 51:142–155, 2008.

[20] D. Kahnemann. *Thinking, fast and slow*.  Farrar, Straus and Giroux, 2011.

[21] S. J. Lewis, O. Pereira, and V. Teague.   Ceci n'est pas une preuve: The use of trapdoor commitments in Bayer-Groth proofs and the implications for the verifiabilty of the Scytl-SwissPost Internet voting system,   2019.    https://people.eng.unimelb.edu.au/vjteague/UniversalVerifiabilitySwissPost.pdf.

[22] M. Lindeman and P.B. Stark. A gentle introduction to risk-limiting audits. *IEEE Security and Privacy*, 10:42–49, 2012.

[23] National Academies of Sciences, Engineering, and Medicine. *Securing the Vote: Protecting American Democracy*.  The National Academies Press, Washington, DC, September 2018.

Electronic copy available at: https://ssrn.com/abstract=3375755

[24] L. Norden, M. Chen, D. Kimball, and W. Quesenbery. Better Ballots, 2008. Brennan Center for Justice, http://www.brennancenter.org/publication/better-ballots.

[25] Office of the Minnesota Secretary of State. Minnesota's historic 2008 election, 2009. https://www.sos.state.mn.us/media/3078/minnesotas-historic-2008-election.pdf.

[26] E. Perez. Georgia state election technology acquisition: A reality check. OSET Institute Briefing, March 2019. https://trustthevote.org/wp-content/uploads/2019/03/06Mar19-OSETBriefing_GeorgiaSystemsCostAnalysis.pdf.

[27] K. Rayner and M.S. Castelhano. Eye movements during reading, scene perception, and visual search, 2009. Q J Experimental Psychology, 2009, August 62(8), 1457-1506.

[28] J. Reason. *Human Error (20th Printing)*. Cambridge University Press, New York, 2009.

[29] R.L. Rivest and J.P. Wack. On the notion of software independence in voting systems, July 2006. http://vote.nist.gov/SI-in-voting.pdf.

[30] Ronald L Rivest. On the notion of 'software independence' in voting systems. *Philosophical Transactions of the Royal Society A: Mathematical, Physical and Engineering Sciences*, 366(1881):3759–3767, 2008.

[31] Ronald L Rivest and Madars Virza. Software independence revisited. In *Real-World Electronic Voting*, pages 19–34. Auerbach Publications, 2016.

[32] P.Y.A. Ryan, D. Bismark amnd J. Heather, and S. Schneiderand Z. Xia. The prêt à voter verifiable election system. *IEEE Transactions on Information Forensics and Security*, 4:662–673, 2009.

[33] Election Systems and Software. State of Georgia Electronic Request for Information New Voting System Event Number: 47800-SOS0000035, 2018. http://sos.ga.gov/admin/files/ESS%20RFI%20-%20Final%20-%20Redacted.pdf.

[34] P.B. Stark. Conservative statistical post-election audits. *Annals of Applied Statistics*, 2:550–581, 2008.

Electronic copy available at: https://ssrn.com/abstract=3375755

[35] P.B. Stark. Risk-limiting post-election audits: *P*-values from common probability inequalities. *IEEE Transactions on Information Forensics and Security*, 4:1005–1014, 2009.

[36] P.B. Stark. An introduction to risk-limiting audits and evidence-based elections, 2018. Testimony prepared for the California Little Hoover Commission, https://www.stat.berkeley.edu/~stark/Preprints/lhc18.pdf.

[37] P.B. Stark. There is no reliable way to detect hacked ballot-marking devices. https://arxiv.org/abs/1908.08144, 2019.

[38] P.B. Stark and D.A. Wagner. Evidence-based elections. *IEEE Security and Privacy*, 10:33–41, 2012.

[39] U. S. Election Assistance Commission. Effective designs for the administration of federal elections, June 2007. https://www.eac.gov/assets/1/1/EAC_Effective_Election_Design.pdf.

[40] J.T. Wixted and G.L. Wells. The relationship between eyewitness confidence and identification accuracy: A new synthesis. *Psychological Science in the Public Interest*, 2017.

Electronic copy available at: https://ssrn.com/abstract=3375755

# EXHIBIT M

# Election Integrity and Electronic Voting Machines in 2018 Georgia, USA

Kellie Ottoboni[1][0000−0002−9107−3402] and Philip B. Stark[1][0000−0002−3771−9604]

Department of Statistics, University of California, Berkeley, CA, USA

**Abstract.** Direct recording electronic (DRE) voting systems have been shown time and time again to be vulnerable to hacking and malfunctioning. Despite mounting evidence that DREs are unfit for use, some states in the U.S. continue to use them for local, state, and federal elections. Georgia uses DREs exclusively, among many practices that have made its elections unfair and insecure. We give a brief history of election security and integrity in Georgia from the early 2000s to the 2018 election. Nonparametric permutation tests give strong evidence that something caused DREs not to record a substantial number of votes in this election. The undervote rate in the Lieutenant Governor's race was far higher for voters who used DREs than for voters who used paper ballots. Undervote rates were strongly associated with ethnicity, with higher undervote rates in precincts where the percentage of Black voters was higher. There is specific evidence of DRE malfunction, too: one of the seven DREs in the Winterville Train Depot polling place had results that appear to be "flipped" along party lines. None of these associations or anomalies can reasonably be ascribed to chance.

**Keywords:** Permutation testing, anomaly detection, DREs

**Acknowledgements.** We are grateful to Marilyn Marks and Jordan Wilkie for helpful conversations and suggestions.

## 1 Introduction

The state of Georgia was a focal point in the civil rights movement of the twentieth century. It also has a history of election problems: systematic voter suppression, voting machines that are vulnerable to undetectable security breaches, and serious security breaches of their data systems.

The 2018 midterm election returned Georgia to the national spotlight. Civil rights groups alleged that then Secretary of State Brian Kemp—who was running for Governor against Stacey Abrams, a Black woman—closed polling places, deleted voters from the rolls, and challenged voter signatures—disproportionately in Black neighborhoods [9,18,22]. A federal lawsuit against the Secretary of State demanded that Georgia replace paperless direct recording electronic (DRE) voting machines with optically scanned voter-marked paper ballot (opscan) voting systems [34]. While the judge accepted the plaintiffs' argument that DREs (and

Electronic copy available at: https://ssrn.com/abstract=3426250

2      Kellie Ottoboni and Philip B. Stark

Georgia's election management) have serious security problems, defendants successfully argued that they were unable to replace their equipment in time for the election. Ultimately, in-person voting in Georgia's 2018 election was on DREs. The 2018 election produced anomalous results that could have been caused by malfunctioning, misprogrammed, or hacked election technology, including DREs. The accuracy of DRE results cannot be checked (for instance by a risk-limiting audit) because the DREs used in Georgia do not produce a voter-verifiable paper record. There has been no forensic investigation of the DREs used in the 2018 election, although the (continuing) suit seeks to conduct one.

This paper begins with a short history of recent election integrity issues in Georgia. We summarize known security flaws of DRE voting systems and what took place in the months leading up the 2018 election. We analyze public election results and poll tapes photographed by a volunteer, finding strong statistical evidence that DREs were the source of these anomalies: that something caused DREs to miss votes in the Lieutenant Governor's contest and to "flip" votes for one party into votes for another.

## 2   DRE Voting Machines

Congress passed the Help America Vote Act (HAVA) in 2002 after the problems in Florida in the 2000 presidential election. HAVA requires states to allow provisional voting and to build statewide voter registration databases, and provided funds for states to upgrade voting systems for accessibility. To receive funding, states were required to replace punchcard and lever voting systems and to provide at least one accessible voting machine per polling place [14].

Two types of systems were on the market: optical scanners (opscan), which primarily used hand-marked paper ballots, and DREs. DREs eliminate the need to print and store paper ballots, can present ballots in multiple languages, and satisfied the accessibility requirement [14].[1] DREs and in-precinct opscan systems also make it easier to report results faster than central opscan systems. While HAVA only required one accessible machine per polling place, some states opted to use DREs exclusively [43]. In 2002, four voting machine manufacturers offered DREs: Diebold Election Systems, Election Systems and Software (ES&S), Hart InterCivic, and Sequoia Voting Systems. This paper focuses on Diebold (now Premier), the lone DRE provider in Georgia.

In the following year, newly-adopted DREs caused serious problems. In the 2002 Florida primaries, some machines in Miami-Dade county failed to turn on, creating long lines that prevented some would-be voters from voting. In New Mexico, faulty programming caused machines to drop a quarter of the votes. In Virginia, the software on 10 machines caused one vote to be subtracted for every 100 votes cast for a particular candidate [40].

In 2007, studies sponsored by the Secretaries of State of California (the Top-to-Bottom Review, TTBR) and Ohio (the EVEREST study) gave conclusive

---

[1] There is ample evidence that the systems are not very usable in practice by voters with disabilities [33], yet they satisfy the legal requirement.

Electronic copy available at: https://ssrn.com/abstract=3426250

evidence that the DREs on the market had fundamental security flaws. The TTBR found physical and technological security flaws with Premier Election Systems' (formerly Diebold) DREs, including vulnerabilities that would allow someone to install malicious software that records votes incorrectly or miscounts them; susceptibility to viruses that propagate from machine to machine; unprotected information linked to individual votes that could compromise ballot anonymity; access to the voting system server software, allowing an attacker to corrupt the election management system database; "root access" to the voting system, allowing attackers to change the settings of any device on the network; and numerous physical security holes that would allow an attacker to disable parts of the device using standard office tools [5]. EVEREST found that the software for Premier DREs was "unstable" and lacked "sound software and security engineering practices" [17]. California decertified DREs from Premier, Hart InterCivic, and Sequoia, and the EVEREST study prompted Ohio to move to optical scanners.

White-hat hackers have found even more security flaws. In 2005 and 2006, Finnish computer scientist Harri Hursti demonstrated that Diebold's optical scanners could be hacked to change vote totals, and uncovered security flaws with Diebold's AccuVote-TSx machines that render "the voting terminal incurably compromised" [12,13]. In 2017, the annual DEF CON hacker conference held a "Voting Village" and supplied participating hackers with over 25 pieces of election equipment used in the United States. While EVEREST restricted the types of hacks that could be deployed against the machines, there were no such restrictions at DEF CON. Within minutes, hackers with little prior knowledge of voting systems penetrated several DREs, including the Premier AccuVote-TSx used in Georgia. They uncovered serious hardware vulnerabilities, including chips installed in sockets instead of being soldered in place to prevent removal and tampering [2]. The Voting Village has become a regular part of DEF CON as voting system vulnerabilities persist: the organizers reported in 2018, "while, on average, it takes about six minutes to vote, machines in at least 15 states can be hacked with a pen in two minutes" [3].

Security experts recommend that jurisdictions using DREs conduct forensic audits both before and after every election. An examination of the software and machines done by an independent, neutral party might detect tampering, bugs, or hacking, and would help discourage malicious attacks [35]. (However, forensic investigation is not guaranteed to detect all hacking: for instance, malware can be programmed to erase itself after doing its damage.) But historically, it has been illegal to examine voting machine software because it is considered proprietary information [24]. Without a forensic audit or a reliable paper trail against which to check reported results, there is no way to know whether a DRE accurately captured and tallied votes.

To make DREs more secure, printers can be added to create a "voter-verifiable paper audit trail" (VVPAT) displayed behind glass, so the voter can check whether their vote was cast as intended. The paper record can be used in a post-election audit, and serves as a back-up in case the device's electronic mem-

Electronic copy available at: https://ssrn.com/abstract=3426250

4        Kellie Ottoboni and Philip B. Stark

ory fails. The NIST Auditability Working Group found that the only satisfactory way to audit DREs is with a trustworthy paper record such as a VVPAT [20].

However, VVPATs can be compromised. If the printer malfunctions, the paper record is incomplete. VVPATs are difficult to audit: they are typically printed on continuous, flimsy, uncut rolls of paper, which need to be unrolled and segmented to count votes. Most VVPATs are thermal paper, which degrades quickly when exposed to heat, light, human touch [20], or household chemicals [5].

*Verifiable* does not imply *verified*: voters might not check a VVPAT effectively or at all. Research has shown that voters don't review their selections effectively. Voters often walk away from DREs before an electronic review screen is displayed. Errors in votes occur at the same rate whether a review screen is shown or not. In experiments where the wrong candidate was marked on an electronic review screen, only 37% of study participants noticed the error on the review screen, though 95% reported that they had checked their ballot either somewhat or very carefully [7]. A report by the Pennsylvania State Department found that when voters were shown VVPATs displayed behind glass, the glare and edges of the glass cage obstructed their selections [33]. VVPATs may not reflect voter intent, even if voters claim to review them.

Many states have been phasing out paperless DREs. In 2006, nearly 40% of voters used DREs to cast their vote. In 2016, 28 states used DREs in some capacity, but most jurisdictions had some paper record, either opscan or an electronic method with a paper backup [40]. Only five states still use paperless DREs exclusively: Delaware, Georgia, Louisiana, New Jersey, and South Carolina.

## 3   Voter Suppression in Georgia

Georgia faced heightened scrutiny under the Voting Rights Act of 1965 due to a history of discrimination in elections. Sections 4(b) and 5 of the 1965 Voting Rights Act required jurisdictions with prior evidence of racial discrimination to get "preclearance" from the federal government before changing their election policies. In 2013, the Supreme Court ruled in *Shelby County v. Holder* that these sections were unconstitutional because they placed undue burden on some states based on outdated evidence of discrimination against minority voters [30].

The ruling revitalized efforts to disenfranchise minority voters: without federal oversight, some states that were previously subject to the preclearance rule of the Voting Rights Act reinstated some discriminatory policies. States began to close polling places and create stricter voter registration laws. Previously, counties and states would have had to show that these changes would not differentially disenfranchise minority voters. After *Shelby County v. Holder*, Arizona, Louisiana, and Texas made changes that affect a large number of registered voters, disproportionately Black and Latino [36].

Strategically closing polling places can reduce voter turnout for specific demographic groups. It can force voters to travel farther to vote and create long lines in remaining polling places. Since the ruling, nearly a thousand polling places in the United States have been closed, many which served African Amer-

Electronic copy available at: https://ssrn.com/abstract=3426250

ican communities [36]. Since 2012, election officials in Georgia have closed 214 precincts—nearly 8% of the state's polling places [22]. Officials claim that consolidating low-turnout polling places is purely a cost-saving measure [38]. However, 39 of the 159 counties in Georgia where polling places were closed have poverty rates above the state average and 30 of them served significant African American populations [22]. These closures would not have been permissible prior to 2013 under the Voting Rights Act's preclearance rule.

Under Secretary of State Kemp, over 1.4 million voter registrations were cancelled in "routine maintenance" of the voter rolls, eliminating those marked inactive according to the law. Kemp implemented the first "exact match" law in 2010 with preclearance from the federal government, requiring a name on a registration application to exactly match the voter's legal name. The law made it harder for voters whose registrations were removed to get back on the voter rolls. The law was dismantled after it was found unconstitutional in 2016 [32]. It was replaced in 2017 by a new exact match law. Any discrepancy between the name on the application and legal name—as innocuous as a missing hyphen— renders the registration "pending." Civil rights groups argue that, though they are eligible, having a pending application discourages people from voting. Over 53,000 voter registration applications were pending leading up to November 2018. Nearly 70% of pending applications were from Black voters, more than double the 32% Black population percentage in the state [18].

Kemp denies he has attempted to suppress minority voting, claiming that the decision to close a precinct is up to county election officials. However, in 2015 his office provided a document giving county officials guidance on why and how to close polling places [22]. Kemp blames the racial disparity in pending voter registration applications is on sloppy voter registration efforts and poorly trained canvassers, in particular the New Georgia Project, a voter registration group (founded by Kemp's gubernatorial opponent Stacey Abrams) that targeted African American voters and used primarily paper registration forms [18].

## 4   Georgia After HAVA

Georgia was the first state to adopt DREs statewide in the wake of HAVA: in November 2002, just days after HAVA was passed, the state signed a $54 million contract with Diebold Election Systems to use the AccuVote-TS/TSx DREs [43].

During the summer of 2002, Diebold began preparing more than 20,000 DREs to be used in Georgia for the November election. A former Diebold employee alleged that during this time, before the machines had been delivered to counties, employees were asked to install three software patches on all of the DREs that would be used statewide that year. These patches did not undergo the federal certification process for voting equipment [41]. Another former Diebold employee reported that the president of Diebold's election unit, Bob Urosevich, came to the warehouse himself to order the installation of uncertified software patches on about 5,000 machines used in DeKalb and Fulton, two historically Democratic counties [15].

Electronic copy available at: https://ssrn.com/abstract=3426250

6        Kellie Ottoboni and Philip B. Stark

This raised eyebrows when key contests in Georgia's 2002 election defied poll predictions. Longtime Democratic Senator Max Cleland was predicted to beat Republican opponent Saxby Chambliss by 3%, but in fact lost his seat by a 7% margin. Democratic incumbent Governor Roy Barnes was predicted to win 51% to 40%, but in fact lost to Republican candidate Sonny Perdue by 6% [8,24]. These Republican victories were a surprise in a historically Democratic state: Perdue was Georgia's first Republican governor in 130 years. There is no way to tell whether the outcome resulted from faulty programming or hacking, because the DREs left no paper trail.

Diebold has used political connections to ensure they remained the sole voting machine provider in Georgia. Former Secretary of State Cathy Cox, who signed the 2002 contract with Diebold, had strong ties to the company. The election director she appointed, Kathy Rogers, helped kill house bills that would have required paper records. In 2006, she resigned and took a job as Government Liaison at Diebold [6]. Cox's successor as Secretary of State, Karen Handel, started as a vocal supporter of paper trails and acknowledged publicly that she would not interact with Rogers as Diebold's liaison due to the conflict of interest. Later, Handel reversed her position on paper ballots, and the media revealed that she had received $25,000 in campaign contributions from employees connected with Diebold's lobbying firm, Massey & Bowers [37]. Members of the state government have ignored security experts who pointed out problems with Diebold's touchscreen machines.

Georgia's election security issues reach beyond voting machines. In 2016, a cybersecurity researcher at Oak Ridge National Laboratory, Logan Lamb, discovered that he could download files from the state's "secure" election server. Among these files were the entire voter registration database for the state of Georgia, including sensitive personal information, instructional PDFs with passwords for poll workers to sign into a central server on Election Day, and software files for the state's ExpressPoll pollbooks that are used to verify voters' eligibility [44]. This intrusion would have allowed Lamb to alter entries in the voter registration database or the pollbooks, preventing some voters from casting their ballots. Lamb's concern about malicious hacking was not a purely theoretical: an NSA investigation found that Russian hackers targeted 39 states in the summer and fall leading up to the 2016 presidential election [26].

These were not the only security concerns at the state's Center for Election Services (CES), housed at Kennesaw State University under a long-standing contract with the Secretary of State. For instance, CES was using an outdated version of their content management software, Drupal, which would allow hackers to seize control of their websites. A software patch had been available since 2014, but CES had not installed it. Lamb notified the executive director of CES, Merle King, of the problems; King agreed to fix them and allegedly pressed Lamb not to talk to the media or other officials about the security issues [42].

CES did not secure their server, nor did they inform anyone about Lamb's breach. In March 2017, another cybersecurity researcher found that CES still had not secured its files properly. The issue was elevated to authorities above

Electronic copy available at: https://ssrn.com/abstract=3426250

King, and it was the first time that the Secretary of State's office heard about the breach. In response to this poor management, the Secretary of State office signed a new agreement with Kennesaw State University to transfer CES to its own offices [42].

In July 2017, state voters and The Coalition for Good Governance filed a lawsuit against Georgia Secretary of State Kemp, alleging that he had ignored evidence that the state's electoral system is vulnerable to fraud and hacking. The plaintiffs demanded that the state use paper ballots in future elections to guard against interference [34,35]. They requested to examine the CES servers at Kennesaw State University for evidence. Four days after the group filed the lawsuit, IT employees at CES wiped their servers of all prior election data. They later degaussed two remaining servers: key evidence was permanently erased. There is no proof that CES deliberately destroyed evidence, and the Secretary of State's office claims that the servers were wiped before they were officially served with the lawsuit in late July. However, Kemp's office was alerted about the lawsuit and declined to comment in the days between when the suit was filed and when the CES wiped its servers [27].

## 4.1   The November 2018 Election

The lawsuit, *Curling v. Kemp*, continued into September 2018, just before the midterm elections (and is ongoing at the time of writing). Testimony from the plaintiffs centered on two issues: security issues with DREs and the state's procedures and data handling before and after Election Day. The current director of CES testified that the server that each county uses to construct its ballots is "air-gapped" from the Internet, but that he uses thumb drives, email, and an online repository to store and move data—all of which expose voting systems to malware. A county official testified that they use analog phone lines to transmit results to the Secretary of State. Computer scientists have testified that these are all vulnerable channels [19].

The state's rebuttal did not seriously address the security concerns, but argued that there was not enough time before the election to switch to paper ballots. Kemp had convened the Secure, Accessible, & Fair Elections (SAFE) Commission in 2017 to select a new voting system in time for the 2020 election. Ultimately, U.S. District Judge Amy Totenberg ruled that the trade-off between election integrity and the feasibility of making changes before the impending election tipped in favor of continued use of DREs for the 2018 election. Judge Totenberg ruled that the plaintiffs provided sufficient evidence that DRE voting has the potential to cause irreparable harm to voters, but that the burden of switching to paper ballots so close to the election could cause even more harm to voters by causing bureaucratic confusion.

> Ultimately, any chaos or problems that arise in connection with a sudden rollout of a paper ballot system with accompanying scanning equipment may swamp the polls with work and voters—and result in voter frustration and disaffection from the voting process. There is nothing like

Electronic copy available at: https://ssrn.com/abstract=3426250

8        Kellie Ottoboni and Philip B. Stark

bureaucratic confusion and long lines to sour a citizen. And that de-
scription does not even touch on whether voters themselves, many of
whom may never have cast a paper ballot before, will have been pro-
vided reasonable materials to prepare them for properly executing the
paper ballots.

Judge Totenberg also noted that the evidence and testimony "indicated that the
Defendants and State election officials had buried their heads in the sand" [34].

Secretary of State Kemp refused to recuse himself from overseeing the election
in which he ran for Governor, a clear conflict of interest [39]. Election Day voting
in November 2018 was conducted on paperless DREs. Machines in four polling
places in Gwinnett County malfunctioned, forcing voters to use paper ballots,
which caused some voters to wait four hours to cast their vote [16]. Reported
vote totals were anomalous: the rate of undervotes in the Lieutenant Governor
(LG) contest was unusually high compared to historical LG races and compared
to other statewide contests on the ballot, and the undervote rate was far higher
for DREs than for paper ballots. The Coalition for Good Governance brought
another lawsuit against the Georgia Secretary of State, calling for a redo of the
LG contest [29]. Statistical evidence of anomalies in this election, presented in
that lawsuit, is discussed below in Section 5.

After the election, Kemp's office planned to certify the election results six
days before state law required it, omitting nearly 27,000 provisional ballots.
Provisional ballots are cast by voters whose registration or identification is in
question; deliberately omitting provisional ballots is one way to disenfranchise
voters. It would have ensured that the margin between Kemp and his opponent
Stacey Abrams remained large enough to avoid a runoff election [4]. A civil rights
group sued to delay the certification, and Judge Totenberg ruled against Kemp,
ordering election officials to review the provisional ballots.

The SAFE Commission was scheduled to recommend a new voting system in
January, 2019. In early January, the Democratic Party of Georgia called on Kemp
to delay any decision to purchase new voting systems as more misbehavior came
to light: now-Governor Kemp appointed Charles "Chuck" Harper, chief lobbyist
for ES&S (the voting machine company that eventually acquired Diebold), as
Deputy Chief of Staff in the Governor's office [23].

## 5   Evidence of Malfunctioning DREs in 2018

While the results of the controversial governor's race did not have obvious anoma-
lies, the results of the LG race did. Shortly after the November 2018 election, The
Coalition for Good Governance filed another lawsuit against the new Secretary
of State, demanding a redo of the LG vote. The plaintiffs blamed malfunctioning
DREs for an unusually high number of undervotes in the LG race, but not in
others [29]. The judge overseeing the case initially agreed to let the plaintiffs
examine the memory, but not the programming, of machines in three counties.
She eventually dissolved this agreement and dismissed the case [45].

Electronic copy available at: https://ssrn.com/abstract=3426250

The plaintiffs did not specify the cause of the malfunction—faulty programming, poor electronic ballot design, hacking, or something else [29]. Numerous voters reported irregularities when attempting to cast their vote for LG on DREs, including many who reported that the race did not appear on their ballot until they were shown the review screen. Without forensic evidence, it is impossible to determine exactly what happened.

This section gives three lines of statistical evidence that DREs did not record every vote properly in this election. First, in 101 of Georgia's 159 counties, the rate of undervotes in the LG race was much higher among DRE votes (those cast on Election Day and advance in-person) than on (paper) absentee ballots. (For other statewide contests, the undervote rates are similar across modes of voting in nearly all counties.) Second, in Fulton County, higher differential undervote rates tended to occur in precincts where a larger percentage of registered voters were Black. Third, on six of seven machines in the Winterville Train Depot polling place in Clarke County, Democrats got the majority of votes in every statewide contest, matching the overall results at the polling place. On the seventh machine, Republican candidates got a majority in every statewide contest.

Permutation tests show that these three anomalies are implausible unless something went wrong. Permutation tests require a minimum of assumptions, which can make them appropriate and convincing in situations where standard parametric tests require unrealistic or counterfactual assumptions, for instance, assumptions that voter preferences follow a parametric model, such as multinomial logistic. In contrast, the permutation tests we use treat one characteristic, such as the mode by which a ballot containing an undervote was cast or the machine on which a ballot was cast, as an arbitrary label that might as well have been assigned at random. Software implementing the tests reported here can be found at https://github.com/pbstark/EvoteID19-GA.

### 5.1   Undervotes for Lieutenant Governor

Undervotes occur when a voter selects fewer candidates in a contest than the contest rules allow, for instance, not voting for any candidate in a winner-take-all contest. The rate of undervotes tends to increase for "down-ticket" contests compared to major contests such as presidential and gubernatorial contests. In Georgia in 2018, the LG race had a 4% undervote rate, while the next contest on the ballot had an undervote rate of 1.4%. Moreover, this pattern appeared only in votes cast on DREs—Election Day votes and advance in-person votes.

Data were downloaded from Clarity Elections, the private sector vendor that reports official election results on behalf of the Georgia Secretary of State.[23] Data included the total number of ballots cast in each county and the number cast by each mode of voting (e.g. by mail) for each candidate by county. The file

---

[2] The fact that this crucial election function is outsourced without oversight might give the reader pause.

[3] https://results.enr.clarityelections.com/GA/91639/222278/reports/detailxml.zip, downloaded in January 2019.

Electronic copy available at: https://ssrn.com/abstract=3426250

10      Kellie Ottoboni and Philip B. Stark

did not report ballots cast in each county by mode of voting. In order to calculate
the number of undervotes, we assumed that the total number of ballots cast by
county and mode of voting equalled the maximum number of votes cast in *any*
contest for that county and mode of voting.

While political preferences might differ systematically between voters who
vote by mail (on paper) and those who vote in person (on DREs), there is no
reason to think that interest in a *contest* should differ across those groups. The
usability literature suggests that DREs ought to help people of disparate edu-
cation and ethnicities vote correctly, in which case, the undervote rate on DREs
should be *lower* than the rate for paper ballots [31]. If so, then it is reasonable
to treat the mode of voting as a label assigned randomly to ballots in such a
way that the number of ballots cast on DREs and the number cast on paper is
fixed (conditioned to be equal to the actual numbers). The number of undervotes
in a contest among DRE votes then has a hypergeometric distribution. Under the
alternative that undervotes are more likely on DREs, we would expect to see
more undervotes on DREs (and fewer on paper ballots) than the hypergeometric
distribution predicts.

In 101 of 159 Georgia counties, the difference in undervote rates between mail
votes and DRE votes in the LG race is statistically significant at level 0.01%. 
In contrast, in the 8 statewide contests further down the ballot, the difference is
statistically significant in no more than 5 counties. Table 1 shows the counts.

**Table 1.** Counties with statistically significant ($p < 0.0001$) disparities in undervote
rates between paper ballots and DREs.

| Contest | Counties with significant undervote rate disparities |
|---|---|
| Lt. Governor | 101 |
| Secretary of State | 4 |
| Attorney General | 4 |
| Commissioner of Agriculture | 5 |
| Commissioner of Insurance | 4 |
| State School Superintendent | 5 |
| Commissioner of Labor | 2 |
| Public Service Commission District 3 | 4 |
| Public Service Commission District 5 | 4 |

### 5.2   Undervotes and Race in Fulton County

Undervote rates on touchscreen voting machines were reported to be higher in
predominantly Black precincts across the state [10]. If so, that is evidence that
security and usability issues with DREs disparately impact historically disad-
vantaged groups. We investigated this issue in Fulton County, which includes
most of the capital, Atlanta, and had over 424,000 voters in November 2018.

Electronic copy available at: https://ssrn.com/abstract=3426250

Election Integrity and Electronic Voting Machines in 2018 Georgia, USA        11

Precinct-level reported vote totals were downloaded from the Clarity Election site that reports official results for the Georgia Secretary of State.[4] Data included total votes cast for each candidate by each mode of voting, in each precinct within Fulton County. As with the statewide data, we estimated the number of undervotes by subtracting the votes from the maximum number of votes in any contest, by mode of voting and precinct.

Voter turnout data were downloaded from the Secretary of State's website.[5] From these data, we computed the percentage of registered voters who were Black in each precinct.

A permutation test was used to assess the correlation between the difference in undervote rates between voters who used paper ballots and voters who voted electronically and the percentage of registered voters who were Black. Of the 373 precincts in Fulton County, we restricted analysis to the 302 precincts in which at least 10 people voted electronically and at least 10 voted on paper.

The undervote rate was substantially lower for voters who used paper ballots than for voters who voted electronically, by an amount that—on average—was larger in precincts with a larger percentage of Black registered voters. Table 2 shows the correlation between the difference in undervote rates and the percentage of registered voters who are Black. $p$-values are for randomized permutation tests with 10,000 replications, carried out using the Python `permute` package.[6] Small $p$-values for multiple statewide contests could explained by voter behavior; prior research suggests that Black voters may intentionally undervote at a higher rate than other voters, and may cast valid votes at a rate that is lower than the rate for the general electorate [11,31]. However, it is notable that the correlation for the Lieutenant Governor's contest is more than twice what it is for any other contest.

### 5.3   Party Preferences in Winterville Train Depot Polling Place

A citizen photographed printed poll tapes from the seven DRE machines in the Winterville Train Depot polling place in Clarke County. The photographs were transcribed to CSV and double checked by a second person.[7]

The Winterville Train Depot polling place is just one polling place in Georgia where a member of the public photographed poll tapes posted at the precinct after the polls closed. It was not selected at random, but neither was there particular reason to suspect problems there. There is no reason to believe that problems are confined to this polling place—where then-Secretary of State Kemp himself voted—but even if they were, any anomaly is of concern.

The DREs in the precinct recorded comparable numbers of voters (117, 135, 131, 133, 135, 144, 135). In this polling place, Democratic candidates won a

---

[4] https://results.enr.clarityelections.com/GA/Fulton/91700/221530/reports/detailxml.zip, downloaded in January 2019.

[5] http://sos.ga.gov/admin/uploads/PRECINCT_Nov_2018.zip, downloaded in January 2019.

[6] http://statlab.github.io/permute

[7] The data were submitted as evidence in [29].

Electronic copy available at: https://ssrn.com/abstract=3426250

12      Kellie Ottoboni and Philip B. Stark

**Table 2.** Correlation between the difference in undervote rates and percentage of registered voters who are Black, for the 10 statewide contests in Georgia in November 2018, in Fulton County.

| Contest | correlation | p-value |
|---|---|---|
| Governor | -0.134 | 0.9903 |
| Lt. Governor | 0.557 | 0.0001 |
| Secretary of State | 0.092 | 0.0582 |
| Attorney General | 0.078 | 0.0902 |
| Commissioner of Agriculture | 0.207 | 0.0003 |
| Commissioner of Insurance | 0.246 | 0.0001 |
| State School Superintendent | 0.154 | 0.0050 |
| Commissioner of Labor | 0.041 | 0.2376 |
| Public Service Commission District 3 | 0.042 | 0.2329 |
| Public Service Commission District 5 | 0.125 | 0.0145 |

majority in all ten statewide contests. Every DRE reported a majority of votes for the Democratic candidate in every statewide contest except machine 3, which reported a majority for the Republican candidate in every statewide contest.

If voters were directed to DREs as if at random, then the number of voters who used different machines should be roughly equal, as should the percentage of votes for each candidate. Conditional on the number of ballots on each machine and the total number of votes for each candidate across machines, all permutations of votes across machines are equally likely under the null hypothesis. We performed a two-sided permutation test using the difference between the expected and actual fraction of Republican votes in each contest as the test statistic. Permutations were done using the `cryptorandom` pseudo-random number generator for Python[8]. The p-values for different contests were combined using Fisher's combination function to obtain a global p-value on the assumption that the distribution of Fisher's combining function under the null hypothesis is chi-square. That would be true if votes in different contests were independent; however, voters tend to vote along party lines. If ballot-level data were available, a Fisher's combining function could be calibrated to take that correlation into account. However, the poll tapes give only totals by contest. Hence, while p-values for individual contests are on a firm statistical footing, the global p-value should be viewed as suggestive rather than precise.

On the assumption that voters were directed to DREs as if at random, the chance any of the seven machines would show disparities as large as machine 3 did in individual contests ranges from less than 1% to approximately 15%. Seven of the ten values are significant at level 5% or below; see Table 3. The global p-value for the ten tests is 0.00009%.[9]

---

[8] http://statlab.github.io/cryptorandom

[9] As mentioned above, the assumptions under which Fisher's combining function has a chi-square distribution may not hold, so the global p-value should be viewed as suggestive.

Electronic copy available at: https://ssrn.com/abstract=3426250

**Table 3.** Consistency of results across DREs in Winterville Train Station Polling Place and consistency of results if D and R were flipped on machine 3.

| Contest | $p$-value | $p$-value if machine 3 were flipped |
|---|---|---|
| Governor | 0.114 | 0.464 |
| Lt. Governor | 0.025 | 0.795 |
| Secretary of State | 0.018 | 0.450 |
| Attorney General | 0.151 | 0.543 |
| Commissioner of Agriculture | 0.026 | 0.734 |
| Commissioner of Insurance | 0.030 | 0.604 |
| State School Superintendent | 0.097 | 0.807 |
| Commissioner of Labor | 0.008 | 0.797 |
| Public Service Commission District 3 | 0.046 | 0.280 |
| Public Service Commission District 5 | 0.025 | 0.939 |

These results are entirely driven by the results on machine 3. If the Democratic and Republican party labels were flipped on that machine, the anomaly disappears, and the global $p$-value for the ten contests becomes 97%. For individual contests, no $p$-value is then below 0.280, compared with values as small as 0.008 (and seven values below 5%) for the actual poll tapes. See Table 3.

These tests strongly suggest that machine 3 had some software or hardware problem: misconfiguration, error, defect, hack, or malfunction. The most plausible explanation is that misconfiguration caused votes for Republican candidates to be recorded as votes for Democratic candidates, and vice versa.

## 6   Conclusion

The 2018 midterms demonstrated that election integrity in Georgia remains fraught. In the weeks leading up to the election and for weeks after, citizens challenged the Secretary of State's treatment of provisional ballots and voter registrations, alleging that these practices were intended to disenfranchise minority voters. Touchscreen DRE voting machines were used statewide, even after security experts voiced their concerns and a nonprofit organization sued the state to replace DREs with hand-marked paper ballots. There is evidence that some DREs malfunctioned in the election; statistical anomalies suggest that DREs failed to record a large percentage of votes cast in the Lieutenant Governor's race, and that "missing votes" were more frequent in jurisdictions with large African American populations [10]. The Secretary of State has refused to investigate these issues. Some particular anomalies (i.e., the Winterville Train Depot data) are most easily explained by "vote flipping," in which the DRE recorded votes for one candidate as votes for the candidate's opponent.

Lawmakers are poised to replace the state's DREs with a new system: either hand-marked paper ballots with optical scanners, using touchscreen ballot-marking devices (BMDs) for accessibility, or BMDs for all voters. In February

Electronic copy available at: https://ssrn.com/abstract=3426250

14     Kellie Ottoboni and Philip B. Stark

2019, the state legislature voted to purchase BMDs statewide [21]. While BMDs do produce a paper record, they are more expensive than opscan systems,[10] and they are neither as reliable nor as secure as hand-marked paper ballots and opscan systems. Among other issues, BMD malfunctions can prevent voting on Election Day; inadequate provisioning of equipment can produce long lines; there is evidence that voters cannot and do not reliably verify their BMD selections; and BMDs require the same trust in software as DREs, with no practical recourse if machines malfunction and little possibility that outcome-changing errors will be detected [1,28]. The SAFE Commission's only security expert, Prof. Wenke Lee, warned against BMDs.

House Minority Leader Bob Trammell expressed his stance on the evidence for hand-marked paper ballots [21]:

> It's unequivocally clear that cybersecurity experts have expressed concerns about the ballot-marking devices. It comes down to whether you think the opinion of election officials . . . is more important than the issue of credentialed experts in the field talking about a material risk to the voting process.

## References

1. Appel, A., DeMillo, R., Stark, P.B.: Ballot-marking devices (BMDs) cannot assure the will of the voters. Social Science Research Network (2019), https://www.ssrn.com/abstract=3375755
2. Blaze, M., Braun, J., Hursti, H., Hall, J.L., MacAlpine, M., Moss, J.: DEFCON 25 Voting Village report. Tech. rep., DEFCON (2017), https://www.defcon.org/images/defcon-25/DEFCON%2025%20voting%20village%20report.pdf
3. Blaze, M., Braun, J., Hursti, H., Jefferson, D., MacAlpine, M., Moss, J.: DEFCON 26 Voting Village report. Tech. rep., DEFCON (2018), https://www.defcon.org/images/defcon-26/DEF%20CON%2026%20voting%20village%20report.pdf
4. Blinder, A.: Federal Judge Delays Certification of Georgia Election Results. The New York Times (2018), https://nyti.ms/2DiWDzx
5. Bowen, D.: Top-to-Bottom Review of voting machines certified for use in California. Tech. rep., California Secretary of State (2007), https://www.sos.ca.gov/elections/voting-systems/oversight/top-bottom-review/
6. Chronicle, T.A.: Voting machine maker hires former state election chief. The Augusta Chronicle (2006), https://www.augustachronicle.com/article/20061224/NEWS/312249946
7. Everett, S.P.: The Usability of Electronic Voting Machines and How Votes Can Be Changed Without Detection. Ph.D. thesis, Rice University, Houston, Texas (2007), https://scholarship.rice.edu/handle/1911/20601
8. Freeman, S.F., Bleifuss, J.: Was the 2004 Presidental Election Stolen?: Exit Polls, Election Fraud, and the Official Count. Seven Stories Press (2006)

---

[10] The State of Georgia has claimed otherwise, but their analysis was deeply flawed, omitting costs associated with BMDs and overstating the cost of printing ballots, among other things. See [25].

Electronic copy available at: https://ssrn.com/abstract=3426250

Election Integrity and Electronic Voting Machines in 2018 Georgia, USA        15

9. Harnik, A., Press, A.: Officials Scrap Plan To Cut Most Polling Places In Majority Black Ga. County. WABE (2018), https://www.wabe.org/officials-scrap-plan-to-cut-most-polling-places-in-majority-black-ga-county/

10. Harriot, M.: Thousands of Black Votes in Georgia Disappeared. The Root (2019), https://www.theroot.com/exclusive-thousands-of-black-votes-in-georgia-disappea-1832472558

11. Herron, M.C., Sekhon, J.S.: Overvoting and representation: An examination of overvoted presidential ballots in broward and miami-dade counties. Electoral Studies **22**(1), 21–47 (2003)

12. Hursti, H.: Critical security issues with Diebold optical scan design. Tech. rep., Black Box Voting (2005)

13. Hursti, H.: Critical security issues with Diebold TSx. Tech. rep., Black Box Voting (2006)

14. Jones, D.W., Simons, B.: Broken Ballots: Will Your Vote Count? CSLI Publications (2012)

15. Kennedy, R.J.: Will the Next Election Be Hacked? Electronic Voting Machines Can't be Trusted. Rolling Stone (2006), https://www.organicconsumers.org/news/robert-kennedy-jr-will-next-election-be-hacked-electronic-voting-machines-cant-be-trusted

16. Lockhart, P.R.: Voting hours in parts of Georgia extended after technical errors create long lines. Vox (2018), https://www.vox.com/policy-and-politics/2018/11/6/18068492/georgia-voting-gwinnett-fulton-county-machine-problems-midterm-election-extension

17. McDaniel, P., Blaze, M., Vigna, G.: EVEREST: Evaluation and validation of election-related equipment, standards and testing. Tech. rep., Ohio Secretary of State (2007), http://siis.cse.psu.edu/everest.html

18. Nadler, B.: Voting rights become a flashpoint in Georgia governor's race. AP News (2018), https://apnews.com/fb011f39af3b40518b572c8cce6e906c

19. Nakashima, E.: In Georgia, a legal battle over electronic vs. paper voting. The Washington Post (2018), https://wapo.st/2QADbm8

20. National Institute of Standards and Technology Auditability Working Group: Report of the auditability working group. Tech. rep., NIST (2015), https://www.eac.gov/assets/1/28/AuditabilityReport_final_January_2011.pdf

21. Niesse, M.: Bill to buy new Georgia voting machines clears committees. The Atlanta Journal-Constitution (2019), https://www.myajc.com/news/state--regional-govt--politics/new-georgia-voting-machines-approved-house-committee/avz21tiapWPwM1Qx4bq3AP/

22. Niesse, M., Prabhu, M.T., Elias, J.: Voting precincts closed across Georgia since election oversight lifted. The Atlanta Journal-Constitution (2018), https://www.myajc.com/news/state--regional-govt--politics/voting-precincts-closed-across-georgia-since-election-oversight-lifted/bBkHxptlim0Gp9pKu7dfrN/

23. Party, G.D.: Breaking: Democratic Party of Georgia Calls on SAFE Commission to Delay Vote Following News That Voting Machine Lobbyist Is Longtime Kemp Crony (2019), https://www.georgiademocrat.org/2019/01/breaking-democratic-party-of-georgia-calls-on-safe-commission-to-delay-vote-following-news-that-voting-machine-

24. Peha, J.: Touch-and-Go Elections: The perils of electronic voting. The Nation (2006), https://www.thenation.com/article/touch-and-go-elections-perils-electronic-voting/

25. Perez, E., Miller, G.A.: Georgia State Election Technology Acquisition: A Reality Check. Tech. rep., OSET Institute (2018)

Electronic copy available at: https://ssrn.com/abstract=3426250

16      Kellie Ottoboni and Philip B. Stark

26. Riley, M., Robertson, J.: Russian Hacks on U.S. Voting System Wider Than Previously Known. Bloomberg (2017), https://www.bloomberg.com/news/articles/2017-06-13/russian-breach-of-39-states-threatens-future-u-s-elections

27. Stahl, J.: Georgia Destroyed Election Data Right After a Lawsuit Alleged Its Voting System Was a Mess. Why? Slate Magazine (2017), https://slate.com/technology/2017/10/georgia-destroyed-election-data-right-after-a-lawsuit-alleged-the-system-was-vulnerable.html

28. Stark, P.B.: Ballot-marking devices (BMDs) are not secure election technology (2019), https://www.stat.berkeley.edu/~stark/Preprints/bmd19.pdf

29. Superior Court of Fulton County, State of Georgia: Coalition for Good Governance, Martin, Duval, and Dufort v. Crittenden (2019), 2018-CV-3134-18

30. Supreme Court of the United States: Shelby County v. Holder (2013), 12-96

31. Tomz, M., van Houweling, R.P.: How does voting equipment affect the racial gap in voided ballots? American Journal of Political Science **47**(1), 46–60 (2003)

32. Torres, K.: Federal lawsuit alleges Georgia blocked thousands of minority voters. The Atlanta Journal-Constitution (2016), https://www.myajc.com/news/state--regional-govt--politics/federal-lawsuit-alleges-georgia-blocked-thousands-minority-voters/EKb979oRoBe4yJ3Uo1nDfP/

33. Torres, R.: Report Concerning the Examination Results of Election Systems and Software EVS 6021 with DS200 Precinct Scanner, DS450 and DS850 Central Scanners, ExpressVote HW 2.1 Marker and Tabulator, ExpressVote XL Tabulator and Electionware EMS. Tech. rep., Commonwealth of Pennsylvania Department of State (2018)

34. United States District Court for the Northern District of Georgia, Atlanta Division: Curling v. Kemp (2018), 1:17-CV-2989-AT (Order Denying Motion to Dismiss)

35. United States District Court for the Northern District of Georgia, Atlanta Division: Curling v. Kemp (2018)

36. Vasilogambros, M.: Polling Places Remain a Target Ahead of November Elections. Stateline (2018), https://pew.org/2MCsiBT

37. Voters Organized for Trusted Election Results in Georgia: Georgia Unverifiable Voting System Chronology. VOTER GA (2014), https://voterga.org/history/

38. Whitesides, J.: Polling places become battleground in U.S. voting rights fight. Reuters (2016), http://reut.rs/2cKzOaZ

39. Williams, V.: Georgia groups call on GOP gubernatorial nominee Brian Kemp to step down as the state's elections chief. The Washington Post (2018), https://wapo.st/2MrHZHP

40. Wofford, B.: How to Hack an Election in 7 Minutes. POLITICO Magazine (2016), https://politi.co/2K2OGOv

41. Zetter, K.: Did E-Vote Firm Patch Election? Wired (2003), https://www.wired.com/2003/10/did-e-vote-firm-patch-election/

42. Zetter, K.: Will the Georgia Special Election Get Hacked? POLITICO Magazine (2017), http://politi.co/2heBRW2

43. Zetter, K.: The Crisis of Election Security. The New York Times (2018), https://nyti.ms/2N3hoAh

44. Zetter, K.: Was Georgia's Election System Hacked in 2016? POLITICO Magazine (2018), https://politi.co/2moAWUS

45. Zetter, K.: Georgia voting irregularities raise more troubling questions about the state's elections. POLITICO (2019), https://politi.co/2SOlvas

Electronic copy available at: https://ssrn.com/abstract=3426250

# EXHIBIT N



# DEF CON 27 VOTING MACHINE HACKING VILLAGE

AUGUST 2019

**REPORT CO-AUTHORED BY:**

MATT BLAZE, GEORGETOWN UNIVERSITY
HARRI HURSTI, NORDIC INNOVATION LABS
MARGARET MACALPINE, NORDIC INNOVATION LABS
MARY HANLEY, UNIVERSITY OF CHICAGO
JEFF MOSS, DEF CON
RACHEL WEHR, GEORGETOWN UNIVERSITY
KENDALL SPENCER, GEORGETOWN UNIVERSITY
CHRISTOPHER FERRIS, GEORGETOWN UNIVERSITY

# Table of Contents

Foreword: Senator Ron Wyden                                                              3

Introduction                                                                            5

Executive Summary                                                                       6

Equipment Available at the Voting Village                                               10

Overview of Technical Issues Found or Replicated by Participants                        13

    ES&S ExpressPoll Tablet Electronic Pollbook                     13

    ES&S AutoMARK                                                   16

    Dominion Imagecast Precinct                                     20

    AccuVote-OS Precinct Count                                      22

    EVID                                                            24

    ES&S M650                                                       25

Recommendations                                                                         26

DARPA Secure Hardware Technology Demonstrator                                           28

Conclusion                                                                              29

Concluding Remarks: Representative John Katko                                           30

Afterword: Representative Jackie Speier                                                 33

Acknowledgments                                                                         35

Appendix A: Voting Village Speaker Track                                                36

# FOREWORD
# BY SENATOR RON WYDEN

As one of the longest-tenured members of the Senate Select Committee on Intelligence, I've seen a staggering array of threats to the United States. I don't know that any threat poses more of a menace to the core of American democracy than an attack against our election system.

American democracy depends on the notion that elected representatives are chosen in elections that are free and fair, so that the government reflects the will of the people. Anything that undermines confidence in that principle strikes at the heart of our national security and identity.

And yet, nearly three years after Russia showed it was willing and able to penetrate our election systems, the hacking community at this year's Voting Village again demonstrated, our election infrastructure is still far too vulnerable to attacks.

The volunteer hackers and security researchers at the Voting Village are contributing tremendously to public understanding of how easy it is to hack our elections. Whether it is e-poll books, paperless voting machines, or ballot marking devices that  print unverifiable  barcode ballots, far too much of the equipment that American democracy depends is fundamentally insecure.

It doesn't have to be that way.

Congress needs to set mandatory federal security standards for our election infrastructure, from voter registration databases, to election day equipment, to election-night reporting websites. Otherwise, we're leaving state and county officials on their own against the full might of foreign government hackers. That's not a fight they should be expected to win.

In the short term, there are a handful of steps we can take to vastly improve election security. The first is reducing our dependence on insecure election equipment. Maybe, someday, there will be electronic voting machines that can stand up against dedicated hacking campaigns. That day certainly won't arrive in time for the 2020 elections, or the 2022 elections, for that matter.

As I said during my Voting Village visit last month, "We need paper ballots, guys."

Experts agree that handmarked paper ballots and post-election, risk-limiting audits provide the foundations of a secure election system. If our government takes action in the coming months,

216 of 497

Case 1:21-cv-00445-CJN

there will still be time to dramatically improve our election security by 2020. The House has already passed a bill to ensure every voter can vote with a hand-marked paper ballot. And the Senate companion to the SAFE Act does even more to secure every aspect of our election infrastructure.

The danger is real. The solutions are well-known and overwhelmingly supported by the public. And yet the Trump Administration and Senate Majority Leader Mitch McConnell refused to take any meaningful steps to secure our elections. It's an appalling dereliction of duty that leaves American democracy at risk. These politicians need to hear the message that Americans won't accept doing nothing as the response to the serious threat of foreign interference in our elections.

The hackers at DEF CON's Voting Village did their job. Now it's time for the Senate and the president to do theirs.



# INTRODUCTION

The Voting Machine Hacking Village (Voting Village) returned to DEF CON in August 2019 with a dramatic expansion in election equipment research and evaluation. DEF CON, the world's largest and best-known hacker conference, brings together a wide range of attendees including hackers; cybersecurity professionals; journalists; academics; lawyers; and local, state and federal government leaders. The Voting Village, now in its third year, saw a dramatic increase in attendance and participation, particularly from state, local, and federal government officials.

Since its launch in 2017, the Voting Village has served as an open forum to identify vulnerabilities within the U.S. election infrastructure and to consider solutions to mitigate these vulnerabilities. This year, the Voting Village demonstrated the role that hackers and other cybersecurity experts can, and should, have in the national endeavor to improve election security.

Over the course of two and a half days, hackers, technologists, academics, and other experts had full access to over 100 Voting-Village-owned voting machines to study, as well as the opportunity to attend talks and panels on topics ranging from the challenges involved in reporting on election security to the types of risk-limiting audits.

***The clear conclusion of the Voting Village in 2019 is that independent security experts and hackers are stepping into the breach - providing expertise, answers, and solutions to election administrators, policymakers, and ordinary citizens where few others can.***

While the discovery and replication of voting system security vulnerabilities are critical tasks for which the Voting Village plays an important role, that is not, in our view, its main contribution. Hundreds of security experts passed through the doors over the course of the weekend, many of whom had no previous experience with the particular problems and risks inherent to election technology. It is vital that we expand the pool of security experts equipped with the specialized knowledge required to evaluate, and ultimately improve, voting system security. We are especially proud of the success of the Voting Village in this essential education and outreach role.

From the outset, the mission of the Voting Village has been to highlight vulnerabilities in election equipment used in the United States and throughout the world and to serve as a resource for those whose goal is to improve the state of election security. As Voting Village organizer Harri Hursti emphasized, "As always we welcome everyone, but especially we welcome officials. We are here to help and get everyone informed - and let everyone experiment to verify the facts."

218 of 497



# EXECUTIVE SUMMARY

### 1. Commercially-Available Voting System Hardware Used in the U.S. Remains Vulnerable to Attack

As in previous years, the 2019 Voting Village presented a range of currently marketed touch-screen direct recording electronic (DRE), optical scan paper voting devices, paper ballot marking devices (BMDs) and electronic poll books (e-poll books). While the Village did not attempt to (and could not) provide samples of every piece of voting equipment currently in use throughout the United States, every piece of equipment at the Village is currently certified for use in at least one U.S. jurisdiction.

And once again, Voting Village participants were able to find new ways, or replicate previously published methods, of compromising every one of the devices in the room in ways that could alter stored vote tallies, change ballots displayed to voters, or alter the internal software that controls the machines. In many cases, the DEF CON participants tested equipment they had no prior knowledge of or experience with, and worked with any tools they could find - in a challenging setting with far fewer resources (and far less time) than a professional lab (or even the most casual attacker) would typically have. In most cases, vulnerabilities could be exploited under election conditions surreptitiously by means of exposed external interfaces accessible to voters or precinct poll workers (or to any other individual with brief physical access to the machines). In particular, many vectors for so called "Advanced Persistent Threat (APT)" attacks continue to be found or replicated. This means that an attack that could compromise an entire jurisdiction could be injected in any of multiple places during the lifetime of the system.

As disturbing as this outcome is, we note that it is at this point an unsurprising result. It is well known that current voting systems, like any hardware and software running on conventional general-purpose platforms can be compromised in practice. However, it is notable - and especially disappointing - that many of the specific vulnerabilities reported over a decade earlier (in the California and Ohio studies, for example), are still present in these systems today.*

---

* See California Top-to-Bottom Review (2007): "Top-to-Bottom Review." California Secretary of State. Accessed September 26, 2019. https://www.sos.ca.gov/elections/ovsta/frequently-requested-information/top-bottom-review/.  and
Ohio EVEREST (2007): McDaniel, Patrick, Matt Blaze, Giovanni Vigna, Joseph Lorenzo Hall, Laura Quilter, Kevin Butler, William Enck, et al. "EVEREST: Evaluation and Validation of Election- Related Equipment, Standards, and Testing." Secretary of State of Ohio, December 7, 2007. https://www.eac.gov/assets/1/28/EVEREST.pdf.

*2. There is an Urgent Need for Paper Ballots and Risk-Limiting Audits*

It is beyond the current and foreseeable state of the art to construct computerized (software and hardware based) voting devices that effectively resist known, practical forms of malicious tampering. However, this need not mean that elections must forever be vulnerable to compromise. Certain classes of voting equipment, including some (but not all) of the devices displayed at the Voting Village, can still be used to conduct high-integrity elections— in spite of their vulnerabilities — by conducting statistically rigorous post-election audits. Whether this is possible depends on the specific category of voting technology in use and, critically, whether a properly designed post-election audit process is routinely performed as a part of every election.

Systems that use paper ballots, such as optical scan voting devices, are physically designed to preserve a voter-marked record of each voter's intended choices (the original paper ballots themselves) which cannot be altered by even the most maliciously compromised software. These paper ballots are a prerequisite for the use of routine post-election Risk Limiting Audits (RLAs), which are a state-of-the-art, statistically rigorous technique for comparing (by human eye) a sample of ballots with how they were recorded by machine. This allows us to reliably determine the correct outcome of even an election conducted with compromised machines.

In particular, we emphasize that these audits can only be performed on paper-ballot-based systems.  DRE ("touchscreen") voting devices cannot be used to conduct reliable or auditable elections in this way, because the stored vote tallies (as well as the ballot display) are under the control of precinct voting machine software that can be maliciously altered (in both theory and practice). The experience of the Voting Village strongly reinforces the widely understood risk that these machines might be compromised under election conditions in practice. The authors strongly endorse the recommendations of the National Academies 2018 consensus report, Securing the Vote,** that DRE voting machines, which do not have the capacity for independent auditing, be phased out as quickly as possible. This is an increasingly urgent matter, especially as foreign state actors (which may be highly motivated to disrupt our elections and which enjoy especially rich resources) are recognized as part of the threat to U.S. election integrity.

Unfortunately, the recommended practice of auditable paper ballots coupled with routine post-election risk limiting audits remains the exception, rather than the rule, in U.S. elections. While a growing number of states are already implementing paper ballots, legislation requiring routine risk-limiting audits has so far been advanced in only a few states.*** We strongly urge all states to adopt legislation mandating routine post-election risk-limiting audits. This is especially important because current optical scan paper ballot scanners (including those at the Voting Village) are known to be vulnerable in practice to compromise. Post-election audits are the only known way to secure elections conducted with imperfect hardware and software (as all modern computer-based hardware ultimately is).

** National Academies of Sciences, Engineering, and Medicine, Securing the Vote: Protecting American Democracy (Washington, DC: The National Academies Press, 2018). https://doi.org/10.17226/25120.
*** "Post-Election Audits." National Conference of State Legislatures, August 5, 2019. http://www.ncsl.org/research/elections-and-campaigns/post-election-audits635926066.aspx.

### 3. New Ballot Marking Device (BMD) Products are Vulnerable

One of the most vigorously debated voting technology issues in 2019 is the appropriate role of paper ballot marking devices (BMDs) and how they relate to widely recognized requirements for software independence and compatibility with meaningful risk-limiting audits. Originally, BMDs were conceived of narrowly, specifically for use by voters with disabilities to assist them in marking optical scan paper ballots, bringing such systems into compliance with Help America Vote Act (HAVA) requirements for accessible voting. However, certain recent voting products greatly expand the use of BMD technology, integrating a BMD into the voting process for all voters, whether they require assistive technology or not.

As a relatively new technology, ballot marking devices have not been widely studied by independent researchers and have been largely absent from practical election security research studies. In the Voting Village this year, we had two ballot marking devices, representing two commercial models of  this technology: a traditional ballot-marking device and a hybrid device. The findings only underscore the need for more comprehensive studies.

Participants in the Voting Village found that both BMD models were vulnerable to practical attack. In particular:

1. The hybrid machine outwardly appears to be a separate ballot-marking device and ballot optical scanner as two units physically integrated but architecturally separate. However, it was found that the ballot-marking device was connected to the ballot-scanning device over an internal network, and in fact was an active device in vote processing. This means that hacking the ballot marking device enables altering votes at the scanning stage.
2. Both devices stored information that could allow an attacker to compromise the secrecy of individual ballots.

The weaknesses in the current generation of ballot marking devices raises broad questions about their security and impact on overall election integrity if they were to be put into general use in elections. Aside from their potential to be maliciously configured to subtly mis-record voter choices, current ballot marking devices also offer potential avenues for election disruption via denial-of-service attacks. Voting Village participants observed that clearing many simple error situations (including those that could be deliberately induced by an attacker) required rebooting the device. This can easily create long lines at a polling place, since, as we also observed, it can take up to 15-20 minutes for these devices to complete a reboot cycle.

### 4. Infrastructure and Supply Chain Issues Continue to Pose Significant Security Risks

The Voting Village explored threats to election security from the supply chain. Participants continued to observe a wide array of hardware component parts of foreign origin, as well as other aspects of the supply chains for software and operational software maintenance. For example, participants found in one machine a hard-wired IP address pointing to an overseas address block.

The exact purpose and nature of whatever underlying feature used this address remains undetermined, but it underscores questions about foreign control over voting system supply chains, which should be understood to include not just the sourcing of physical hardware, but also of software and cloud-based and other remote services.

There are also significant practical issues of local election administration and resources. Local election offices are, overwhelmingly, under-resourced and under-funded, especially relative to the threats they face. Many county and local voting jurisdictions have no full-time IT staff, and many rely on outside contractors for election system configuration and maintenance. This reliance on outsourcing means that election officials often lack internal tools and other capabilities to effectively manage, understand and control their election infrastructure and as a consequence are without direct control over the security of their IT environment. With rapid deployment of new IT technology into the election infrastructure, election offices are especially exposed to remote attack (including by hostile state actors). Unfortunately, very few election offices have the resources to effectively counter this increasingly serious type of threat.

It is important to recognize that IT and cybersecurity are distinct disciplines with only a partial overlap in expertise. To promote discussion and collaboration between election officials and security specialists, the Voting Village conducted the first "Unhack the Ballot" initiative to create an opportunity for election officials to connect with, ask questions, and find answers from security specialists. This "off the record session" was held for the first time in a private room at the Voting Village.

# EQUIPMENT AVAILABLE AT THE VOTING VILLAGE

**Direct-Recording Electronic Voting Machines**

A direct-recording electronic (DRE) voting machine allows voters to electronically cast their ballots by manually touching their choice of candidate on a screen, monitor, or other similar device. The DRE records and tallies the votes directly into its computer memory, without a paper ballot. Only some DRE models feature a Voter-Verified Paper Audit Trail (VVPAT).

*Dominion: Premier/Diebold AccuVote TSx*

The AccuVote TSx is a DRE voting machine manufactured by Premier Voting Solutions, later acquired by Dominion Voting Systems. The product line currently belongs to ES&S.

As of 2018, the AccuVote TSx was in use in 18 states.*

*Dominion: AVC Edge*

The AVC Edge is an electronic voting machine manufactured by Sequoia Voting Systems, later acquired by Dominion Voting Systems. It is a touch-screen machine with direct-recording electronic capabilities. It is activated by a smart card, and records votes on internal flash memory. Each unit contains a slot for a vote activation card. After the voter's ballot is cast, the smart card is deactivated to prevent multiple votes from being cast. Votes are subsequently documented. When polls close, the votes recorded in each machine are either physically or electronically transmitted to election headquarters.

As of 2018, the AVC Edge was in use in 10 states.**

*ES&S: iVotronic DRE*

The iVotronic DRE is an electronic voting system that allows voters to make their choices on a touch screen interface and records and tabulates votes in internal memory.

As of 2018, the iVotronic DRE was in use in 16 states.***

---

* "Polling Place Equipment - November 2018." The Verifier. Verified Voting. Accessed September 26, 2019. https://www.verifiedvoting.org/verifier/#/year/2018/.

** According to survey of publicly available information conducted by DEF CON Voting Village.

*** "Polling Place Equipment." The Verifier. Verified Voting. Accessed September 26, 2019. https://www.verifiedvoting.org/verifier/.

**Electronic Poll Books**

An electronic poll book, also commonly called an e-poll book, is typically either a dedicated device with embedded software or a standard commercial laptop/tablet with a software application that allows election officials to review, maintain, and/or enter voter register information for an election, functions that had traditionally been handled using a paper-based system. These systems are limited to the check-in process and do not participate in counting the votes. The usual functions of an e-poll book include voter lookup, verification, identification, precinct assignment, ballot assignment, voter history update and other registry maintaining functions such as name change, address change and/or redirecting voters to correct voting location. In the states that allow same-day registration, e-poll books are also used to enter new voter information and interact with statewide voter registration systems.

*ES&S: Diebold ExpressPoll-5000*

The Diebold ExpressPoll-5000 is an e-poll book, designed for use by individual poll workers. It is used in precincts to check voters in before they are permitted to vote. The product line currently belongs to ES&S, but the ones used at DEF CON were models running Diebold/Premier-branded software, which is also still in use in several places in the U.S. Its operating system is a version of Windows CE, a system built by Microsoft for embedded applications.

*ES&S: ExpressPoll Pollbook Tablet with Integrated Pollbook Stand*

ExpressPoll Pollbook Tablet is an e-poll book designed for use by individual poll workers and is used in precincts to check voters in before they are permitted to vote. This product was introduced to the market in 2015 and consists of a Toshiba Encore 2 standard 10-inch tablet running Windows 8.1 operating system. It is mounted to an integrated stand which has an internal USB hub for connected peripheral devices like a printer, smart card reader, ethernet, extra battery and magnetic stripe reader.

**Ballot Marking Devices**

Ballot marking devices (BMDs) are machines that allow voters to make choices on a screen and then print out a paper ballot with the voter's choices, which is the ballot of record. The paper ballot is then hand counted or tabulated using an optical scanner (see description below). In general, BMDs should neither store nor tabulate votes, but only allow the voter to record votes on ballots that are then stored and tabulated elsewhere. Some BMDs produce paper print-outs of barcodes or QR codes instead of a voter-verifiable paper ballot, which has become a source of much controversy.

The first ballot marking devices emerged in the late 19th century, but were only widely used in the last few decades. Today, electronic BMDs have come into widespread use as assistive devices in the context of optical scan voting systems to provide compliance with HAVA, though in recent years vendors have proposed that the devices be used by all voters.

*ES&S AutoMARK*

The AutoMARK is an optical scan ballot marker that is designed for use by voters who are unable to personally mark an optical scan ballot. The AutoMARK works in conjunction with an optical scanner. It was developed by Vogue Election Systems and the product line was purchased by ES&S. The machine features several features to enhance accessibility for voters with physical impairments or language barriers.

As of 2018, the AutoMARK was in use in 28 states.^

## Optical Scanners

Optical scanners are digital scanning devices that tabulate paper ballots that have been marked by the voter. Ballots are either scanned at the precinct (in a precinct count system) or at a central location (in a central count system).

*Diebold AccuVote OS*

The AccuVote OS is an optical scan voting system. It can be used by precinct count systems and central count systems. Voters cast their ballots by inserting them into the AccuVote OS system, where votes are digitally tabulated, recorded, and stored. Originally marketed as the Unisys ES-2000, the machine later became known as the Global Election Systems AccuVote-OS Precinct Count (AVOS-PC) paper ballot scanner. In recent years, the machine has also been marketed and/or supported under the brands Diebold, Premier, ES&S, and Dominion.

As of 2018, the AccuVote OS was in use in 26 states.^

*ES&S: M650*

The M650 is an electronic ballot scanner and tabulator manufactured by ES&S. The ES&S M650 is used for counting both regular and absentee ballots. It launches ballots through an optical scanner to tally them, and keeps count on an internal 128 MB SanDisk Flash Storage card (pictured below). Election staff are responsible for configuring the M650 for each election.

As of 2018, the M650 was in use in 23 states.^

## Hybrid Systems

*Dominion: ImageCast Precinct*

The Dominion ImageCast Precinct is an optical scanner paper integrated with DRE ballot marking device. It scans human-marked ballots, allows voters with disabilities and other voters requiring assistance to use the ballot-marking device to mark and review their ballots, and stores ballots for tabulation after the election period.

As of 2018, the ImageCast Precinct was in use in 10 states.^^

^ "Polling Place Equipment." The Verifier. Verified Voting. Accessed September 26, 2019. https://www.verifiedvoting.org/verifier/.
^^ According to survey of publicly available information conducted by DEF CON Voting Village.



# OVERVIEW OF TECHNICAL ISSUES FOUND OR REPLICATED BY PARTICIPANTS

## ES&S: ExpressPoll Tablet Electronic Pollbook



Picture: ES&S Electronic Pollbook System on an integrated stand with built-in printer, smart card reader, and other integrated peripheral devices.

The ES&S ExpressPoll Tablet Electronic Pollbook is an e-poll book which uses a standard commercial unencrypted Toshiba tablet held in place to a dock by a rubber locking mechanism. The specific model of the tablet was a Toshiba Encore 2 with Intel Atom CPU and running Windows 8.1 32-bit operating system.

The tablet can be popped out of its dock, exposing an SD port and a USB port of the tablet itself. Additionally, a USB hub is built into the mounting stand, which exposes additional USB ports. All these ports are active. The ports outside the mount are accessible to voters and poll workers without any physical locks or mechanical support for tamper-evident seals.   226 of 497



Picture: Internal electronics of the e-poll book stand. Internal USB hub visible is also directly connected to externally exposed USB connector. The researchers in the Village were able to print out with the voter permission slip directly by connecting into external USB.

While the SD card, which contains voter data, is encrypted, all keys are stored in plain text in a standard xml file allowing all data to be easily accessed and modified, thereby rendering encryption meaningless.

A card or USB device may be placed into the machine directly even when the dock is locked; the locking mechanism does not prevent access to the externally exposed ports on either on the tablet or on the stand.



None of the BIOS passwords were set. This allows unrestricted access to all system settings. By default, the device booted from a USB first without any password required.

The supervisor maintenance password is stored in plaintext on this device. In this case, the password for the tablet was "ESS".

Security features supported by the underlying commercial hardware were turned off or not activated. The tablet supported Secureboot, a common security feature designed to check to see if the system has been tampered with and prevent the machine from running code of unknown origin. This was disabled by default on the tablet, allowing the e-poll book to load unsigned code from any source.

Picture: Externally exposed USB port on the side of the Electronic Pollbook Stand. The port does not get locked when the stand is locked and it does not have a lid or hook on which to place a seal.

As the Toshiba tablet is a standard off-the-shelf consumer general-purpose device, it is supported by a wide range of general-purpose operating systems. This machine can be booted from a version of Linux using, for example, the external USB port and USB memory stick. Booting from Linux allows an attacker to access data on the device without encountering any Windows operating system-based defenses. Voting Village participants confirmed that an attacker would then be able to freely access data and run custom software, including software that would allow extraction of voter data. An attacker could also change or delete any voter registration data (like party registration) stored on the machine once the machine has been accessed.

The e-poll book operating system stack lacked any attempt to perform even the most rudimentary platform hardening. In fact, none of the bloatware that would come with a standard Toshiba tablet was removed. Apps for Netflix, Hulu, and Amazont were present in the e-poll book.

The lack of hardening is especially dangerous given that for one of the recommended deployments the system is intended to communicate over WiFi with wireless internet access to either Amazon Web Services or Microsoft Azure-based cloud services. Given that the operating system is unhardened and given that the standard bloatware provided by the vendor is present on the machine, there is an extremely wide, unprotectable, exposed attack surface.

**ES&S AutoMARK**



Picture: ES&S AutoMARK Ballot-Marking Device

The ES&S Automark is a ballot marking device that allows keyboard and ethernet ports to be plugged in after removing the top of the machine's case. The casing is closed only by 3 screws and does not include any tamper-evident seals. Immediate root access to the device was available simply by hitting the Windows key on the keyboard.

The lock to this device can be picked manually, allowing root and physical access to the unencrypted drive.

A RJ45 jack appears to be hidden behind a sticker on the front of the machine, accessible by removing the sticker without any tools.

The ES&S AutoMARK runs Windows CE Embedded Operating System 5.0. The application software in the machine appears to be last updated around the end of 2007, and the system appears to have been last used in a special election in late 2018.



Picture: Election database manifest file from the AutoMARK showing details of the last election for which it was used.



Picture: AutoMARK software version screen.

Operating system implementation has not been hardened, or unneeded elements removed to minimize attacking surface. For example, Internet Explorer is present on this device.

Because the operating system is not hardened, an attacker can, before the machine boots up, drop malware onto the device after holding the "screen" button for five seconds.

Collectively, a few people were able to change the group IDs of political parties still stored in the device from the previous election. However, this triggered a warning screen, indicating some form of integrity-checking for the stored data.

The embedded Windows operating system has special feature "Allow data connections on device when connected to PC" to enable Windows Mobile Device Center to allow the general purpose Windows version communicate with embedded windows. This feature was turned on.

The machine used several passwords/pins which were very simple, including passwords listed as default passwords in online manuals. These codes include "1111" as the pin code to replace the entire firmware of the device.

Participants were able to adjust the load address which caused the voting applications software to consistently crash. In this instance, the reason for the machine crashing would not be obvious to nontechnical people, such as the volunteers helping to run the polls, thereby creating an effective denial of service attack which would be hard to remotely diagnose.

Additionally, the administrator password was stored in the clear in the configuration file and participants were able to use it to enter admin mode. This enabled them to look at the binaries and replace the header on the voting machine with one of their choosing. Nick Bishop was one of the participants responsible for these discoveries, and has willingly identified himself.

231 of 497



Picture: AutoMARK firmware function enabling automated extraction of the whole system image.

Participants managed to place the DEF CON logo in the header portion of the screen and were able to edit the registry. Using a screwdriver to open up the machine, participants were able to plug a keyboard into an exposed USB port and operate the voting machine as a standard Windows CE machine after exiting the specialized voting software.

Participants Minoo Hamilton and William Baggett also discovered the default system maintenance password by searching on Google, revealing "admin" as the identification name and "vogue" as the password. This allowed both of them to gain access to the securities section on the machine, enabling them to make changes and access vital information. From the securities section they were able to run a remote integrity check that displayed the files and the integrity of each file. Mr. Baggett discussed potential implications for these risks for issues involving a forensic change of evidence. Depending on the protocol adopted by an election office, it is possible that if an attacker modified the access database or central tabulator after hacking their way in, the integrity of the modified data would not be checked against the centralized system.

**Dominion Imagecast Precinct**
Case 1:21-cv-00445-CJN



Picture: Dominion ImageCast Precinct with Ballot-Marking Device screen turned to
face the scanner (back) side of the machine.

The Dominion ImageCast Precinct is an integrated hybrid voting equipment. It combines an
optical paper ballot scanner and ballot marking device and allows for nonvisual accessibility for
the blind and visually impaired, in compliance with HAVA. This machine provides voters with
disabilities the same opportunities for access and participation as other voters.

This device integrates the devices and the ballot box to store the cast ballots into one unit, but
has a single locking mechanism that holds the entire ballot box together. If picked, ballots could
easily be stolen using common items such as a standard trash picker.

Participants were able to access USB, RJ45, and CF slots on this machine without using destructive
force.

The system also runs Busybox Linux 1.7.4, which has twenty currently known medium to high level
vulnerabilities including the ability to allow remote attackers to allow a DNS through
CPU/bandwidth consumption via a forged NTP packet which triggers a communication loop with
the effect of Denial-of-Service attacks.*

Boot settings also allow for the system to be booted from an external USB on startup.

Importantly, the CF card and card readers on the front and back of the machine are physically exposed, and could be replaced.

Additionally there is an internal USB port that is not exposed and an external CF slot that is covered by a tiny door. Either slot can be used to load the OS. Boot order is USB then CF.

The door opens by unscrewing one of the screws. The screws in question were so-called secure screws. Participants made a quick run to a nearby electronics store to purchase "Security Bits Set with Ratchet Driver" for under $28 which was used to open all 'security screws' used in any of the machines.



Picture: Small unmarked lid on the side of the machine for accessing CF card slot inside of the machine. So-called "secure screw" tips can be commonly purchased from any electronic store.

When participants removed the CF card on the front of the machine, they found scanned ballots and the configuration file in the clear. In the absence of other protections, modifying configuration data could allow an attacker to edit which X/Y locations on the scanned ballots matched with which candidate. Participants found no digital signing or encryption protecting those digital files.

Participants responsible for much of the work on this machine identified themselves willingly: Zander Work, Lyell Read, Cody Holiday, Andrew Quach, Steven Crane, Henry Meng, and Nakul Bajaj. As a group, they were able to boot an operating system of their choice and play video games on the voting machine, including a popular game called "Pong". These participants averred that by bringing a simple screwdriver and CF card into the voting area, an attacker could use a screwdriver to access the machine's intended CF card and swap it with the card they brought, allowing the attacker to boot an arbitrary operating system and take control over the machine.

The group was able to browse the file system on the CF card, proving that the filesystem was unencrypted and unprotected.

**AccuVote-OS Precinct Count**   Case 1:21-cv-00445-CJN



Picture: Originally marketed as Unisys ES-2000 later become Global Election Systems AccuVote-OS Precinct Count (AVOS-PC) paper ballot scanner. Later also marketed/supported under brands Diebold, Premier, ES&S and Dominion.

Participants also discovered a set of previously undocumented functions in the Dominion/Diebold/Premier/ES&S AccuVote, enabling remote manipulation of the machine's memory card when the machine is connected to a network — without any physical access to the memory card, and without breaking or circumventing any physical seals. Researchers confirmed the existence of these features with a person who has previously been involved with the maintenance of these machines, and an election official who had encountered the feature before. The investigation of these functions and possible mitigations is ongoing at the time of this report.

The Voting Village acquired two dozen devices from the same jurisdiction. From the circumstantial evidence of documents in the travel cases, it appears that the machines were put in use and subsequently retired together. However, the devices did not have the same software version installed. Despite possibly having been used in the same elections, some of the machines had software version 1.96.6, whereas others were running 1.96.4, an older version.

In this device, the software is installed on a socketed EPROM microchip. EPROM stands for Erasable Programmable Read-Only Memory and it is a type of programmable read-only memory (programmable ROM) that can be erased and reused. This type of chip has to be physically removed from the circuit board, placed into a separate programmer device, and completely erased before it can be reprogrammed. Erasing the chip is done by shining an intense ultraviolet light through a window through which the silicon chip is visible. The erasing window must be kept covered with an opaque label to prevent accidental partial or unstable erasure by the UV by sunlight or camera flashes and therefore the window is always covered by a sticker as seen in the picture.

235 of 497



Picture: AVOS circuit board with socketed EPROM chip containing election software. Software upgrades to this machine are installed by physically replacing the chip; as the chip is socketed, this can be done in a matter of seconds. The chip inside a socket is a SmartWatch CMOS real time clock with an NVRAM controller circuit and an embedded lithium energy source.

This machine was originally developed in 1986 and first introduced to market in 1989, and it is believed to have been used for the first time in U.S. general elections in Minnesota in 1990. The CPU of the system is NEC V25, which was the microcontroller version of the NEC V20 processor. The V20 was a processor made by NEC that was a reverse-engineered, pin-compatible version of the Intel 8088 with an instruction set compatible with the Intel 80186. It has 16-bit internal architecture and 8-bit external data bus. The V20 was introduced in 1982 and V25 was officially phased out in early 2003. The EPROM containing the programming was 128KBytes in size and the system had two RAM chips 128KBytes each.

```
NC...BOOT OK.....1.96.6.  NU
LL DEVICE?.NUL0.  LCD DISPLA
Y?.LCD0.BUILTIN PRINTER?.PTR
0. MAIN SIO PORT?.COM0.  AUX
SIO PORT?.COM1.38400.19200.
9600.2400.   INSTALL. MEMO
RY  CARD..  SUPERVISOR.  F
UNCTIONS ?.. Accu-Vote 2000.
** SETUP MODE **.. TESTING B
ALLOT.    READER..  SYSTEM
 TEST.***   PASSED  ***..
INSTALL. MEMORY  CARD..MEMO
RY CARD BAD. PLEASE REMOVE..
```

Picture: Human readable strings from the chip contained in the programming. As is typical for embedded systems of the era, the programming contains a lot of clear text strings. In this era of technology, compression and encryption were things of the future.

236 of 497

**EVID**



Picture: VR System EViD electronic poll book system.

Participants confirmed  that the hardware for this machine is a normal general purpose PC hardware which is very low-end by today's standards. There was no BIOS password set on the machine. Consequently, participants were able to boot an arbitrary operating system off a live CD, which had the ability to run on 32-bit and limited to 128M RAM. Ultimately, the device was used as an entertainment device, amusing visitors with Nyan Cat.

**ES&S M650**



Picture: Inside of ES&S M650 Optical Paper Ballot scanner. Storage devices and other electronics are quick and easy to replace in a card rack in the upper left. Note the overpowered for the purpose electric motor for moving the paper ballots.

Last year, the Village made accessible to participants two M650 units which had been used in Oregon. This year, the Voting VIllage acquired an additional unit used in the state of Washington. Based on documentation, all three devices were from the same year and same hardware revision. Based on that, the researchers were surprised to discover that the hardware and the features between the devices were not identical. It is unclear who had carried out the modifications.

The paper maintenance log inside the machine did not answer that question, but showed that maintenance personnel periodically have physical access to the inside of the machine. With physical access, this type of machine has no security protections against any kind of modifications.

# RECOMMENDATIONS



While the DEF CON Voting Village is heavily focused on the technical aspects of the election infrastructure, the Unhack the Ballot initiative underlined the importance of all levels of the human factor aspects in an election ecosystem. Election officials need more training and better access to parties who can help them to navigate the consequences of technological choices around them. Bearing in mind that at the moment many of those choices take place in the long out-sourcing supply chains of the ecosystem and election officials are left into the tail-end of the process to design mitigation strategies into deployments which they were not participating in design. Election officials also need help to train their own staff to be more security-minded and to gain the 'muscle memory' instincts to protect day-to-day operations, both during election cycles and between them.

The security implications of ballot marking devices should be further studied. This calls for multi-disciplined research looking into the various aspects of the election process from integrity and security to usability and reliability. Current and proposed next-generation ballot marking devices have not been designed with security considerations in mind. They open the door for various methods to attack the election process. In the simplest end are denial-of-service attacks and attacks to compromise the secrecy of the ballot. Depending on the deployment strategy, the ballot-marking device will know a lot about the voter and therefore ballot-marking devices can be hacked specifically to, for example, disenfranchise vulnerable populations: voters who use audio interface, sip-and-puff, large fonts, non-English language ballots, or who take a long time to vote. The discussion about 'detecting' hacked devices is dangerous, because in the absence of remedies even if irregularities are reported there is almost no way to properly investigate. Ballot-marking devices as currently deployed have an insurmountable security design and delegation flaw: the protocols make voters responsible for checking whether devices are performing correctly, and voters cannot get any evidence to prove to others that a malfunction occurred and therefore even if voter detects and reports an error, it would often be the only remaining course of action for poll workers to assume a mistake on the voter's part.

The use of barcodes should be carefully analyzed from various security aspects. Malicious fraudulent advanced barcodes have been causing a lot of problems to Point-of-Sale systems and utilizing bar codes in elections opens a new avenue for injection and scripting type of attacks. The

239 of 497

election integrity, auditability and transparency especially of using barcodes are even more important. Paper ballots have been promoted because they make those various methods of audits possible. This is true only if the significant record of the vote is human readable. At this point in time, we have to recognize that there are two aspects: technological soundness and the public trust. In elections, it is important that the losing parties and their supporters accept the results as fair. Any method of voting which is not completely transparent and understandable by everyone can be contested in the court of public opinion.

Hybrid machines, which offer users the option of inspecting their ballot before printing, should be avoided because they increase the risk of undetectable attacks. Because the machine knows which ballots are inspected and which are not, it can modify only those that are not inspected — essentially undermining the purpose of voter-verifiable ballots. Such attacks would be very hard to detect exactly because the attacked ballots are those not inspected. With today's razor-thin margins of victory in elections, even the ability to modify a small percentage of the votes undetectably can have a huge impact.

Inspection of newer models of e-poll books further underlines the absence of security design both in software, hardware and physical security aspects. E-poll books are inherently networked devices to synchronize across all devices at a polling place and to avoid cabling, which is often done wirelessly. Furthermore, many new makes and models of the e-poll books actively communicate in real-time over the Internet to back-end servers hosted in commodity cloud services. So far, the e-poll books studied in the Voting Village have been utilizing general-purpose operating systems on commercial off-the-shelf hardware with no special hardening or security measures.

Historically, security measures provided by the hardware / low-level programming have been systematically turned off in all classes of devices used as part of the election infrastructure. Unfortunately, this was found to be true also with newer generations of voting equipment in the Village. These practices greatly simplify paths to attack the machines and also place increased to unbearable burdens to physical security and chain-of-custody management of the machines over the entire lifetime of the devices.

Election reporting was increasingly an area of concern in the Village discussions. With the election night beginning of the process happening over the internet as well as the end of the process as reporting happening over the Internet, discussions in the Village were drawn into similar information flow designs in other industries and how irregularities in those setting had managed to go unnoticed when the ends of the process are seemingly matching. There needs to be a process in place to verify that the reporting truly is sum-of-its-parts.

240 of 497

# DARPA SECURE HARDWARE TECHNOLOGY DEMONSTRATOR

Since December 2017, DARPA has been working to build next-generation secure hardware through its System Security Integrated Through Hardware and Firmware (SSITH) program. This new hardware was unveiled for the first time to the public in the Voting Village.

The SSITH program develops methodologies and designs tools that enable the use of hardware advances to protect systems against software exploitation of hardware vulnerabilities. To evaluate progress on the program, DARPA has incorporated the secure processors researchers are developing into a very early prototype application of a secure voting ballot box. At the Voting Village this year, they turned the system loose for public review by thousands of hackers and DEF CON community members. The purpose of this application is solely to provide a demonstration system that facilitates open challenges. To be clear, the SSITH program will not produce a voting system, nor will it provide a specific solution to election system security issues for use during elections.

During DEF CON 2019, the SSITH system demonstrator consisted of a set of RISC-V processors that the research teams will modify to include their SSITH security features. Since SSITH's research is still in the early stages, only one prototype version of the 15 processors in development was available for evaluation. DEFCON 27 was the first small step on a path to evaluate the hardware design. In 2020, DARPA plans to return to DEF CON with an entire demonstrator system, which will incorporate fixes to the issues discovered during this year's evaluation efforts.

241 of 497



# CONCLUSION

As in previous years, this year's Voting Village demonstrated vulnerabilities inherent in the election environment and highlighted the enormity of the task of securing our nation's elections. Among the many issues highlighted at the Voting Village this year, particularly on machines previously unavailable to the hacker community, three serious vulnerabilities stood out:

1. Widespread use of current ballot-marking device architectures poses new systemic security risks
2. Previously studied commercial election equipment continues to surprise with new weaknesses
3. Many systems are shipped with basic security features disabled

If we as a nation are serious, as we must be, about improving election security in the United States, particularly ahead of the 2020 presidential election, the Voting Village recommends that the following as urgent priorities:

I.    Nationwide deployment of mandatory post-election risk-limiting audits
II.   Nationwide deployment of voter-marked paper ballot systems
III.  Dramatically increased funding and other resources to help local election officials protect their IT infrastructure from foreign state actors and other threats.

Without taking these steps to support election administrators at the frontlines of this clear national security threat, we fear that the 2020 presidential elections will realize the worst fears only hinted at during the 2016 elections: insecure, attacked, and ultimately distrusted.

242 of 497



# CONCLUDING REMARKS BY REP. JOHN KATKO

*The following is a transcript from Representative John Katko's remarks at the Voting Village Report release on September 26, 2019.*

Good afternoon, everybody. Oh wake up, come on, I know it's not bad. Good afternoon. *[Audience responds: Good afternoon]*

Thank you for being here and, I never thought I would be saying this, I know the media is here and some others, but for those of you who are hackers, I guess I say 'welcome.' And I know there's a few here and you definitely serve an important part of this endeavor we're trying to work on.

I want to thank Congresswoman Speier for inviting me to speak, I really appreciate that, so thank you, Jackie.

I want to thank Matt Blaze for helping start the Voting Village and for discussing election security with me last week. We had a great discussion.

You know, as chair of the - or ranking member of the Homeland Security Cyber subcommittee you are trying to keep up with the pace of the bad guys and you are trying to keep up with the pace of our vulnerabilities. And that is a very daunting task.

It's clear from my discussion with Matt, it's clear from my time on the subcommittee, that it is, this is probably the number one threat to our country right now, is our cyber vulnerabilities.

And everything from cyber hygiene to offensive cyber capabilities  if necessary, has to be discussed and has to be examined.

Election -  elections are at the, strike at the fundamental heart of our democratic system. Elections are what we, we as a people founded our democracy upon. And it's clear that the bad guys are trying to hit our elections.

So, some things I figured out by talking to Matt, and others, and many others, that are fundamentally clear to me: we are not gonna be able to do a system that is 100% fool proof no matter what we do. And that's a sobering reminder of the vulnerabilities, but we have to accept that.

So what do we do?

There's really kind of three pillars that I see, that we can do.

Is, number one, the voting machines themselves. And, number two, is the infrastructure that surrounds the voting machines, within it, like board of elections in New York State, for example.

And then what can we do to probe the systems to make sure they're good, and that's called risk limiting audits.

So, the voting machines themselves. After the 2000 debacle, the hanging chads and everything, we kind of tended to drift away from paper ballots, but now they're back. And they're back for a reason. Because we have to have a paper back-up to the electronic voting mechanisms that we have, just in case there's, something happens. I think it's critically important.

In New York state where I am it took 'em forever to get to that change but now we have a, a very good system where you fill out a sheet of paper and they scan it into the machine. And I remember it well because when I first ran for reelection I filled my ballot out wrong. I had to be reminded with the cameras all there that I filled my ballot out wrong.

So, maybe I was nervous, I don't know, but we have that now. It's not everywhere across this country, so we have to have those stand alone machines Those machines cannot be connected to the internet. They have to be stand alone machines.

Then you talk about the infrastructure around that. You talk about the board of elections, you talk about how they get the information from the machine and then tabulate all the votes. How do you do that? And how do you make sure you don't affect those machines themselves.

I think that's very important. That's going to take money. A lot of these states and municipalities, they have terrible decisions to make. Do we fix the potholes, or do we fix our election machines? And what's more tangible looking to them?

So it's hard and I think there's a role the government can play in providing that funding. And we need to do that.

And then the third thing is, and perhaps, I think, the most important thing, that Matt and Harri told me, and others, is doing the risk based auditing, if you will. And taking the machines even though you don't know there's anything wrong, go back over every once in a while and make sure by spot checks, I'll just give some background, in spot checking they have a hand recount,

244 of 497

retabulate - make sure that what's being reported is actually accurate. And that takes money, too. Those are the things, I think, the roles the federal government can play in election security.

And obviously getting the counties the best practices, but also getting them the money, so they can get the right machines, get the right security procedures in place, and get the right risk-limiting auditing procedures in place.

Those are the three biggest things that I see and everything that Matt's been doing here with the Voting Village and the DEF CON, all that stuff's really important because it helps us expose the vulnerabilities. We can never ever let our guard down, but if we can do those three things that I articulated and, believe me, I have other ideas but I am not going to articulate them here, that will go a long way toward it.

So whatever legislation that we come up with, it should most definitely deal with all three of those things. And anything I can do to help that, the Congresswoman or others, I would absolutely do.

And as always, I need input from you. Matt knows I listen to him and I will listen to others because you know I by far am not the expert on this.

One thing I have learned in homeland security is, as we get our defenses better, the bad guys get their offensive capabilities in that much more in tune.

I'll tell you because when I started out it took much more than something like this to take out an airplane and now this is all you need. *[holding up cell phone]*

So the bad guys are trying to perfect bombs, they're trying to perfect offensive terrorist capabilities, and they're trying to perfect offensive cyber terrorism capabilities. We have to be - never let our guard down. So that's why what you're doing here is so important.

We appreciate it very much and I'll just close with, get the information to us. Please, if you have ideas, no idea is outlandish. The only idea that is a bad idea is one I don't hear about. We can sift through what we think is good.

But the pillars that I think of are the stand alone machines, spot checking them, and having good infrastructure around them and good people around them is critically important and we can play a role in that.

So with that I'll say thank you very much and God bless. Have a good afternoon.

# AFTERWORD
# BY REP. JACKIE SPEIER

In 2016, we faced an unprecedented attack on our election by the Russian government, with criminal interference and disinformation poisoning our public discourse. Fortunately, the nuts-and-bolts administration of the election, from registering voters to tallying their ballots, was not, as far as we know, demonstrably affected.

This was not for lack of effort, however, and we must not breathe a sigh of relief.

I felt fear in my heart when I heard Special Counsel Mueller, testifying before me and the House Intelligence Committee in July, state without any equivocation:

"It wasn't a single attempt, they're doing it as we sit here, and they expect to do it during the next campaign. … Many more countries are developing capabilities to replicate what the Russians have done."

To my question about the ultimate takeaway, Special Counsel Mueller told us to focus on "that aspect of [his] investigation that would have long-term damage to the United States that we need to move quickly to address," and that his report was a "living message . . . for those of us who have some responsibility."

As citizens, we all bear this responsibility. The call to action has been answered by the grassroots efforts of the Voting Village and the patriotic hackers that have dedicated their talents to improving our election infrastructure. It is time for Congress to answer that call as well.

Former FBI Director Mueller's alarm joined a chorus of alarms that have been blaring loudly about the security of our elections for over three years. Just recently, the Senate Committee on Intelligence released a redacted report that found that "[t]he Russian government directed extensive activity . . . against U.S. election infrastructure."

In response to this terrifying threat, the House of Representatives passed two landmark bills that would guard our elections from malevolent interference. H.R. 1, the For the People Act, would harden our election security by enhancing federal support for the most secure voting systems, such as paper ballots, increase oversight over vendors, and develop a national strategy to protect democracy. H.R. 2722, the Securing America's Federal Elections (SAFE) Act, would provide financial support and enhanced security for election infrastructure, including $600 million for paper ballots and paper auditing systems and a commitment to future funding for election infrastructure.

246 of 497

Case 1:21-cv-00445-CJN

Yet Republicans in the Senate and the administration have not taken up these crucial House bills or done much of anything to address this ongoing threat. Instead, they seek to undermine our intelligence communities and any efforts to fortify our election security. One has to ask oneself why that is—what could they possibly gain?

Having represented Silicon Valley for decades, I appreciate that the spirit of exploration and innovation, which can be used to disrupt and interfere, can also lead to a more vibrant and resilient society.

I believe that American ingenuity is up to the task of addressing the enormity of the problems we face. There are many vulnerabilities from a voter's registration to the tally. Voter rolls that are used to verify voters' identities as they enter the polls could be manipulated. The apparent technological ease of direct-recorded, entry touchscreen systems has been warmly embraced by many. But these systems also open up new avenues for interference.

Vulnerabilities in election systems strike not only at the infrastructure itself. Public awareness of these vulnerabilities also undermines confidence in elections and erodes trust in our system of government. Elections are the core of citizen participation, and when people feel their voice is silenced, increased apathy threatens to hollow out our government. It is a nightmare scenario – our votes – a sacred right which women and people of color in particular have had to fight and even die for – could be stolen from us. This is not an esoteric issue of ones and zeros, this is the frontline in what makes us Americans.

Voting Village's engagement with Congress has been a bright spot in the twilight zone of inactive agitation that typifies Capitol Hill. I urge my colleagues to join me and embrace engagement with election officials, security experts, and our patriot citizens who have answered the call to action for the benefit of us all.

247 of 497

# ACKNOWLEDGMENTS

A number of individuals contributed to the success of the DEF CON Voting Village and the production of this report. A special thanks to:

- The organizers, subject matter experts, and partners who collaborated to make the Voting Village concept a reality and helped to author this report;
- The speakers and moderators of the Voting Village speaker track, including Senator Wyden, Representative Eric Swalwell, representatives of the U.S. Department of Homeland Security, the Defense Advanced Research Projects Agency (DARPA), and many others;
- The state and local election administrators who attended the Voting Village to share their wealth of experience and learn from the hacker community about the latest election system security concerns;
- The outstanding support and contributions of Jake Braun, Phil Stupak, Morgan Ryan, Jaclyn Houser, Analiese Wagner, Casey Dolen, Claire Martin, and Caroline Hymel;
- The indispensable legal advice and guidance provided by Kendra Albert, Sunoo Park, and Thomas Hopkins of the Cyberlaw Clinic at the Berkman Klein Center for Internet & Society, Harvard Law School; and
- Verified Voting and the Michael and Paula Rantz Foundation, for their generous support of this work.



# APPENDIX A: VOTING VILLAGE SPEAKER TRACK

This year's Voting Village speaker track spanned all three days of the conference and featured members of Congress, representatives from the Department of Homeland Security and the Department of Defense, private sector pioneers, academics, researchers, and hackers of all stripes. Below is an overview of each day's talks, as well as each speaker's biographical information.

## Friday, August 9, 2019

**Welcome and Voting Village Kick-off Remarks**

- **Harri Hursti, *Co-Founder, DEF CON Voting Village; Founding Partner, Nordic Innovation Labs***
  Harri Hursti is among the world's leading authority in data and election voting security, critical infrastructure, and network security systems. Beginning his career as one of the minds behind the first commercial, public email and online forum system in Scandinavia, he went on to cofound EUnet-Finland. Hursti has authored many studies on election security and vulnerability in both academic and corporate publications. He worked for Black Box Voting where he performed voting machine hacking tests, which became known as the Hursti Hacks. These tests were filmed and later turned into the acclaimed HBO documentary Hacking Democracy.

- **Matt Blaze, *Co-Founder, DEF CON Voting Village; Professor of Law and McDevitt Chair for the Department of Computer Science, Georgetown University***
  Matt Blaze holds the McDevitt Chair of Computer Science and Law at Georgetown University. His research focuses on the architecture and design of secure systems based on cryptographic techniques, analysis of secure systems against practical attack models, and on the intersection of computing and communication technology and public policy. In addition to his position at Georgetown University, he sits on the board of directors of the Tor Project. Blaze received his PhD in Computer Science from Princeton University.

- **Jake Braun, *Co-Founder, DEF CON Voting Village; Executive Director, University of Chicago Harris Cyber Policy Initiative***
  Jake Braun serves as the Executive Director for the University of Chicago Harris School of Public Policy's Cyber Policy Initiative where he works at the center of politics, technology, and national

security to advance the field of cyber policy. Prior to joining CPI, Braun was appointed White House Liaison to the Department of Homeland Security (DHS) by President Obama where he was instrumental in the passage of the unprecedented Passenger Name Record (PNR) Agreement, one of the largest big data agreements in history. In addition, he worked on the development and implementation of the Homeland Security Advisory Council's Task Force on CyberSkills. Braun is also a fellow at the Council on CyberSecurity and is a strategic advisor to DHS and the Pentagon on cybersecurity.

**Remarks by CISA Director Chris Krebs**

- **Christopher Krebs,** *Director, Department of Homeland Security's Cybersecurity and Infrastructure Security Agency*
  Christopher Krebs serves as the first director of the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency (CISA). Mr. Krebs joined DHS in March 2017, first serving as Senior Counselor to the Secretary, where he advised DHS leadership on a range of cybersecurity, critical infrastructure, and national resilience issues. Prior to coming to DHS, he was a member of Microsoft's U.S. Government Affairs team as the Director for Cybersecurity Policy, where he led Microsoft's U.S. policy work on cybersecurity and technology issues.

**DARPA SSITH Program at DEF CON**

- **Linton Salmon,** *Program Manager, Defense Advanced Research Projects Agency (DARPA)*
  Dr. Linton Salmon joined the Defense Advanced Research Projects Agency as a program manager in September 2014. Prior to joining DARPA, Dr. Salmon spent 15 years in executive roles directing development of CMOS technology at GlobalFoundries, Texas Instruments and Advanced Micro Devices. Before joining Advanced Micro Devices, Dr. Salmon was vice president for Research and Technology Transfer at Case Western Reserve University and an associate professor of electrical engineering and physics at Brigham Young University (BYU), where his research areas included CMOS processes, micro-battery research, packaging and MEMS.

**What Role Can Journalists Play in Securing Elections?**

- **Maggie MacAlpine** *(moderator), Co-Founder, Nordic Innovation Labs*
  Margaret MacAlpine is an election auditing specialist and system testing technologist. She has worked on a variety of projects that include electronic testing of voting registration systems, election security and election fraud for a variety of countries, states and counties. Ms. MacAlpine has served as an advisor for the office of the Secretary of State of California for the Risk Limiting Audit Pilot Program 2011-2012, and is widely regarded as an expert on the use of high-speed scanners for conducting post-election audits.

- **Kevin Collier,** *Reporter, CNN*
  Kevin Collier is a reporter who covers the intersection of cybersecurity and national security, including efforts to safeguard election integrity. He has previously worked for BuzzFeed News, Vocativ, and the Daily Dot.

250 of 497

- **Kim Zetter,** *Longtime cybersecurity/national security reporter for various publications including WIRED, Politico and The New York Times Magazine and author of the book Countdown to Zero Day: Stuxnet and the Launch of the World's First Digital Weapon*

  Kim Zetter is a longtime cybersecurity and national security reporter for various publications including Wired, Politico and the New York Times Magazine and author of the book Countdown to Zero Day: Stuxnet and the Launch of the World's First Digital Weapon. She has broken numerous national stories over the years about NSA surveillance, digital warfare, Wikileaks and the hacker underground, and has been one of the nation's leading journalists covering voting machine and election security since 2003.

- **Eric Geller,** *Cybersecurity Reporter, Politico*

  Eric Geller is a journalist on Politico's cybersecurity team. His primary beat consists of cyber policymaking at the White House, the Justice Department, the State Department, and the Commerce Department, but he also regularly covers election security, data breaches, malware outbreaks, and other cyber issues affecting the government, the private sector, and society at large.

**While the Bots Distracted You: Hacking the Electorate**

Omelas and White Ops provide the most comprehensive ever look at the day to day tactics of Russian disinformation campaigns against elections. Using Omelas' subject matter expertise and AI, we show the extent of Russian propaganda shared on Reddit in the lead up to an election, the performance of different narratives and different domains, and the sentiment expressed in articles compared to the sentiment induced in the audience in comments. White Ops's state-of- the-art bot detection demonstrates how Russia has automated the process of spreading these narratives, the added reach attributable to bots, and the techniques employed by bots.

- **Evanna Hu,** *CEO and Partner, Omelas*

  Evanna Hu is CEO and Partner of Omelas and non-resident Senior Fellow at the Atlantic Council. Omelas is a cutting edge technology company that exposes imminent risks among digital data. By utilizing machine learning/ artificial intelligence and data analytics, Omelas focuses on physical threats and identifies online campaigns of adversarial state and non-state actors. Evanna is also an expert in Counter-terrorism and Countering Violent Extremism, with fieldwork in Syria, Iraq, Afghanistan, Gaza, and Sweden, working on Neo-Nazi and Islamist violent extremists.

- **Ben Dubow,** *CTO and President, Omelas*

  Ben Dubow is the CTO and President of Omelas. Ben began his career tracking the online propaganda of jihadists, Shiite extremists, white supremacists, and the militia movement before joining Google where he aided YouTube in detecting ISIS content, helped to develop Project SHIELD, and provided subject matter expertise for the Redirect Method. In 2017, Ben co-founded Omelas with the mission to stop the weaponization of the internet by providing precise data and analysis on how state actors and foreign terrorist organizations manipulate the web to achieve their geopolitical goals.

251 of 497

**Trustworthy Elections: Evidence and Dispute Resolution**

Suitably designed and operated paper-based voting systems can be strongly software independent, contestable, and defensible, and they can make risk-limiting audits and evidence-based elections possible. (These terms will be defined.) Not all paper-based voting systems have these properties. Systems that rely on ballot-marking devices and voter verifiable paper audit trails produced by electronic voting machines generally do not, because they cannot provide appropriate evidence for dispute resolution, which has received scant attention. An ideal system allows voters, auditors, and election officials to provide public evidence of any problems they observe--and can provide convincing public evidence that the reported electoral outcomes are correct despite any problems that might have occurred, if they are correct.

- **Philip Stark,** *Professor of Statistics and Associate Dean of Mathematical and Physical Sciences, University of California, Berkeley*
  Philip B. Stark is Professor of Statistics and Associate Dean of Mathematical and Physical Sciences at the University of California, Berkeley. He works on inference and uncertainty quantification in many applications including the census, elections, information retrieval, and Internet filters. He also studies foundational questions in the philosophy of science and statistics. He developed "risk limiting audits" as a method to check election results, which are now in law in six states and required by pending federal legislation. Stark currently serves on the Board of Advisors of the U.S. Election Assistance Commission. He has testified as an expert witness in a range of civil and criminal cases on issues including antitrust, elections, employment, equal protection, food safety, intellectual property, product liability, and vaccines.

**Keynote Remarks: Senator Ron Wyden (D-OR)**

- **Senator Ron Wyden**
  Senator Ron Wyden is the foremost defender of Americans' civil liberties in the U.S. Senate, and a tireless advocate for smart tech policies. Years before Edward Snowden blew the whistle on the dragnet surveillance of Americans, Wyden warned that the Patriot Act was being used in ways that would leave Americans shocked and angry, and his questioning of NSA Director James Clapper in 2013 served as a turning point in the secret surveillance of Americans' communications.
  Since then, Wyden has fought to protect Americans' privacy and security against unwanted intrusion from the government, criminals and foreign hackers alike. He has opposed the government's efforts to undermine strong encryption, proposed legislation to hold companies accountable for protecting their users' data, and authored legislation with Rand Paul to protect Americans' Fourth Amendment rights at the border.
  Wyden is a senior member of the Senate Select Committee on Intelligence and the top Democrat on the Senate Finance Committee. He lives in Portland, Oregon.

**If the Voting Machines are Insecure, Let's Just Vote on Our Phones!**

Despite the consensus that Russian actors targeted multiple points of U.S. election infrastructure, there are persistent calls for voting over internet-connected devices. This is not new: 31 states and

252 of 497

the District of Columbia allow military and overseas voters send voted materials to their home counties via the internet, including by fax and email. Now, several jurisdictions are piloting another internet system that allows voters to send their votes via a mobile application which stores those votes in a blockchain. Such programs undermine the efforts made since 2016 to secure the election administration offices from attacks. Our military and overseas voters need to successfully cast their ballots on time – but we owe it to them to find ways that do not increase the security risk.

This talk will take a look at the current landscape of election security leading into 2020, examining the implications that technologies like blockchain could have on our elections and what the role of responsible technology looks like on our voting infrastructure.

- **Marian Schneider, *President, Verified Voting***

  Marian Schneider is the president of Verified Voting, a role to which she brings a strong grounding in the legal and constitutional elements governing voting rights and elections, as well as experience in election administration at the state level. Immediately before becoming President of Verified Voting, Marian served as Special Advisor to Pennsylvania Governor Tom Wolf on Election Policy. Previously, Governor Wolf appointed her as the Deputy Secretary for Elections and Administration in the Pennsylvania Department of State where she served from February 2015 until May 2017.

  Throughout her legal career, Marian has focused on the intersection of civil rights and election law. Formerly, she was a Senior Attorney with Advancement Project's Voter Protection program and was trial counsel in Applewhite v. Commonwealth, successfully challenging Pennsylvania's restrictive photo ID law on behalf of voters as an unconstitutional infringement on the fundamental right to vote.

  Marian received her J.D. from The George Washington University, where she was a member of the Law Review, and earned her B.A. degree cum laude from the University of Pennsylvania.

**State and Local Preparations on Election Security in the Aftermath of the Mueller Report**

- **Eric Geller *(moderator), Cybersecurity Reporter, Politico***

  Eric Geller is a journalist on Politico's cybersecurity team. His primary beat consists of cyber policymaking at the White House, the Justice Department, the State Department, and the Commerce Department, but he also regularly covers election security, data breaches, malware outbreaks, and other cyber issues affecting the government, the private sector, and society at large.

- **Alex Padilla, *Secretary of State of California***

  Alex Padilla was sworn in as California's Secretary of State on January 5, 2015. He is committed to modernizing the office, increasing voter registration and participation, and strengthening voting rights.

  Padilla previously served in the California State Senate from 2006 to 2014 where he chaired the Committee on Energy, Utilities, and Communications. As chair, he shepherded legislation to combat climate change and create a greener and more sustainable economy. In 1999, at the age of 26, Padilla was elected to the Los Angeles City Council to represent the same east San

253 of 497

Fernando Valley community where he grew up, and his colleagues elected him to the first of three terms as Council President, becoming the youngest member and the first Latino to serve in this capacity.

- **Noah Praetz,** *Election Consultant; former Director of Elections, Cook County, Illinois*

  Noah is an election consultant and the former Director of Elections for Cook County, Illinois. In this capacity he was responsible for the overall management of elections in one of the largest election jurisdictions in the country.

  Noah is an adjunct professor at DePaul University College of Law teaching Election Law and sits on the advisory board of the University of Chicago Harris Cyber Policy Initiative. Noah has presented extensively on Election Security, Sustainability, Election Day Management, Voter Registration Modernization and other Election Related items. He has also published articles on cyber security, election day administration and referendum law in Illinois.

- **Barb Byrum, Ingham County Clerk, Ingham County, Michigan**

  Barb Byrum is currently in her second term as Ingham County Clerk, serving as the county's chief elections official. As Clerk of one of the most populous counties in the State of Michigan, Byrum has successfully conducted 21 elections, 4 union elections, and the 2016 Presidential Recount. Byrum currently serves on Michigan's Election Security Commission, the Secretary of State's team of advisors tasked with strengthening and better securing elections in the state.

  Byrum has been a consistent advocate for the voting rights of qualified registered voters, with a focus on voting rights of military and overseas voters. Byrum serves on the Overseas Voting Initiative, which is a joint effort by the Federal Voting Assistance Program and Council of State Governments.

  Byrum graduated from Michigan State University with a Bachelor of Science degree in agribusiness management. She also holds a law degree from the MSU College of Law. Byrum previously served three terms as a Michigan State Representative. During her time in the Legislature, Byrum served as the ranking Democrat on the House Committee on Redistricting and Elections.

- **Amber McReynolds, Executive Director, National Vote at Home Institute**

  Amber McReynolds is the Executive Director for the National Vote At Home Institute and is the former Director of Elections for the City and County of Denver, Colorado. As one of the country's leading experts on election administration and policy, she has proven that designing pro-voter policies, voter-centric processes, and implementing technical innovations will improve the voting process for all voters. During her time in Denver, the Elections office was transformed into a national and international award-winning election office. Amber was also recognized as a 2018 Top Public Official of the Year by Governing Magazine for her transformational work to improve the voting experience in Denver and across Colorado. She is now focused on improving the voting experience across the country.

254 of 497

**2020: Ready? Or Not?**

- **Sherri Ramsay, *Senior Advisor, CyberPoint International; Senior Advisor: Cyber & NSA, Cambridge Global Advisors; former Director of the National Security Agency/Central Security Service Threat Operations Center (NTOC)***

  Sherri Ramsay is a consultant, engaged in cybersecurity strategy development and planning, cyber assessments, leadership, partnership development, and marketing & development of cybersecurity tools and security operations centers.

  Ms. Ramsay is the former Director of the National Security Agency's (NSA) Threat Operations Center. She led discovery and characterization of threats to national security systems, provided situational awareness for those threats, and coordinated actionable information to counter those threats with the Department of Defense, Department of Homeland Security, and Federal Bureau of Investigation. She also served as a senior leader in NSA's Signals Intelligence Directorate, Technology Directorate, and Information Assurance Directorate.

  Ms. Ramsay holds a Bachelor of Science degree from the University of Georgia, a Master of Science Degree from Johns Hopkins University, and Master's Degree from the Industrial College of the Armed Forces, National Defense University. She is on the Board of Advisors for Virginia Tech's Hume Research Center, the University of Chicago Cyber Policy Initiative, and TruSTAR Technology.

**Beyond the Voting Machine: Other High Value Targets in Today's Election System**

Since the U.S. Presidential election in 2016, there has been a heightened interest in election hacking. While electronic voting machines have been the primary focus, there are other high value targets could topple our election system if they were manipulated or compromised.

Brian will share his years of research into election systems to give you an insider's view of these high value targets and how and why they could be used by an adversary.  In addition to a technical analysis of the components of an electronic voting machine, he will discuss the potential weaknesses of other key pieces of today's election system that many have overlooked.

- **Brian Varner, *Special Projects Researcher, Symantec Cyber Security Services***

  Since 2010 Brian Varner has been a special projects researcher on Symantec's Cyber Security Services team, leading the company's CyberWar Games and emerging technologies development. He previously worked at the National Security Agency as a tactical analyst.

  Brian holds a bachelor's degree in Computer Science from Florida Southern and master's degree in Information Assurance from Norwich University. Since early 2016, Brian has researched electronic voting machines and campaign security issues and is often called on by peers and media for his unique perspective on the potential threats facing today's election systems.

**Putting Voters First: Expanding Options to Vote**

- **Amber McReynolds, *Executive Director, National Vote at Home Institute***

  Amber McReynolds is the Executive Director for the National Vote At Home Institute and is the former Director of Elections for the City and County of Denver, Colorado. As one of the country's

255 of 497

Case 1:21-cv-00445-CJN

leading experts on election administration, and she has proven that designing pro-voter policies, voter-centric processes, and implementing technical innovations will improve the voting process for all voters. During her time in Denver, the Elections office was transformed into a national and international award-winning election office. Amber was also recognized as a 2018 Top Public Official of the Year by Governing Magazine for her transformational work to improve the voting experience in Denver and across Colorado. She is now focused on improving the voting experience across the country.

**Thirty Years Behind the Ballot Box: A firsthand look at the multiple factors preventing fair, effective and secure elections in America**

- **Ion Sancho,** *former Supervisor of Elections, Leon County, Florida*

  Ion Sancho served 28 years as Supervisor of Elections of Leon County, Florida. Elected in November of 1988, Sancho was sensitized to problems in elections when 5,000 voters were disenfranchised in a 1986 state and local primary election due to the misprogramming of the voting machines. Sancho was candidate in that election, and since then has dedicated his professional career to properly administering elections in Leon County, working for fair, accessible and verifiable elections nationwide.

  Concerned by voting machine security, Supervisor Sancho sanctioned a number of red team attacks on  his voting system in the spring and summer of 2005, captured in HBO's 2007 Emmy-nominated documentary "Hacking Democracy", showing how the system could be hacked to alter the outcome of any election without being detected unless the paper ballots themselves were audited.

  Ion Sancho retired after the 2016 presidential election. He has remained active in the elections field, appearing as an expert witness in election cases and working with public and private entities heightening awareness to the threat of foreign intrusion to the American voting process, particularly the critical need for audits.

**UnclearBallot: Automated Ballot Image Manipulation**

As paper ballots and post-election audits gain increased adoption in the United States, election technology vendors are offering products that allow jurisdictions to review ballot images---digital scans produced by optical-scan voting machines---in their post-election audit procedures. Jurisdictions including the state of Maryland rely on such image audits as an alternative to inspecting the physical paper ballots.We show that image audits can be reliably defeated by an attacker who can run malicious code on the voting machines or election management system. Using computer vision techniques, we develop an algorithm that automatically and seamlessly manipulates ballot images, moving voters' marks so that they appear to be votes for the attacker's preferred candidate. Our implementation is compatible with many widely used ballot styles, and we show that it is effective using a large corpus of ballot images from a real election. We also show that the attack can be delivered in the form of a malicious Windows scanner driver, which we test with a scanner that has been certified for use in vote tabulation by the U.S. Election Assistance Commission. These results demonstrate that post-election audits must inspect physical ballots, not merely ballot images, if they are to strongly defend against computer-based attacks on widely used voting systems.

256 of 497

Case 1:21-cv-00445-CJN

- **Kart Kandula, *Graduate Student, University of Michigan***

  Kart Kandula received his B.S.E. degree in computer science engineering from the University of Michigan in 2019 and is currently pursuing an M.S.E in the same area. He conducts research in the UM-Security lab under the supervision of Professor J. Alex Halderman. Currently, his research interest lies in problems affecting society and public policy, specifically election security. He has held internships at Microsoft and J.P. Morgan in the past.

- **Jeremy Wink, *Undergraduate Student, University of Michigan***

  Jeremy Wink is an undergraduate student at the University of Michigan currently pursuing a BSE in Computer Science. He has taken multiple security courses and has spent time researching topics surrounding election cybersecurity under J. Alex Halderman.

## Saturday, August 10, 2019

**Organizational Cybernetics: A Key to Resilience for the Digital Village**

- **Kimberly Young-McLear, *Assistant Professor, U.S. Coast Guard Academy***

  Lieutenant Commander Kimberly Young-McLear is currently an Assistant Professor at the U.S. Coast Guard Academy. She holds engineering and technical degrees from Florida A & M, Purdue, and The George Washington University, including a Ph.D in Systems Engineering. She has taught a breadth of courses including Operations and Project Management, Crisis Mapping & Cybernetics, and Cybersecurity Risk Management. She has been instrumental in enhancing the inclusion of cybersecurity training and education program at the Academy for cadets and faculty. Lieutenant Commander Young-McLear was a key thought leader for the development of the Coast Guard Academy's first cyber undergraduate major. Furthermore as Vice Chair, she leads a multidisciplinary faculty Cyber Council to advance cyber curriculum and research at the Academy. Her research niche is focused on protecting critical infrastructure from cyber threats in the Maritime Domain. LCDR Young-McLear is also the program developer for NET21, a middle school outreach program, designed to systematically close STEM gaps amongst underrepresented students and teachers of color in the field of cybersecurity.

**Ideas Whose Time Has Come: CVD, SBOM, and SOTA**

From their origins in general purpose computing, Coordinated Vulnerability Disclosure (CVD), Software Bill of Materials (SBoM), and Secure Over-The-Air (SOTA) updates have been implemented or considered in safety sectors including industrial control systems, medical device manufacturing, and ground transportation. These common software security practices are becoming widespread global norms, turning up in public policy, international standards, and national law (often in sector-specific safety regulation). This talk will briefly review the practices (what), provide examples of successful implementations and supporting information (how), and (why).

- **Katie Trimble, *Section Chief, Vulnerability Management and Coordination, U.S. Cybersecurity and Infrastructure Security Agency, Department of Homeland Security***

  Katie Trimble currently serves as the Section Chief of the Vulnerability Management and

Coordination section of the Cyber Threat & Risk Analysis (CTRA) branch of the Department of Homeland Security's National Cybersecurity and Communications Integration Center (NCCIC). In that capacity, she leads the Department's primary operations arm for coordination of the responsible disclosure and mitigation of identified cyber vulnerabilities in control systems and enterprise hardware and software used in the 16 critical infrastructure sectors and all levels of U.S. government organizations. Ms. Trimble started her career as an intelligence analyst with the United States Air Force, specializing in counterinsurgency, antiterrorism & force protection, counter explosive devices and communications systems. Ms. Trimble holds a Bachelors of Arts in International Relations & Global Studies from Antioch University Seattle.

- **Art Manion,** *Vulnerability Analysis Technical Manager, CERT Coordination Center, Software Engineering Institute, Carnegie Mellon University*
  Art Manion is the Vulnerability Analysis Technical Manager at the CERT Coordination Center, part of the Software Engineering Institute at Carnegie Mellon University. He has studied software security and coordinated responsible disclosure efforts since joining CERT in 2001. Having gaining mild notoriety for saying "Don't use Internet Explorer" and "Replace CPU hardware" in public, Manion now focuses on policy, advocacy, and rational tinkering approaches to software security, including standards development in ISO, OASIS, and FIRST. Prior to joining CERT, Manion was the Director of Network Infrastructure at Juniata College.

**Incident Lifecycle and Incident Response Management Planning**

In the past few years, the volume, types, and quality of cybersecurity - related attacks in elections have become more damaging and disruptive, and new types of security-related incidents have emerged. This white paper describes the best-known method for analyzing the stages of cybersecurity incidents and identifies actions that can be taken to avoid or minimize impacts at each incident lifecycle stage. We discuss the overarching workflow for elections security incident response and management and describe the Point and Line analysis approach, which considers factors such as attack vectors, motives, probability, and imp act to develop a set of Incident Response Templates in this paper. In addition, we include reusable templates for analyzing cybersecurity Incident Lifecycle and Incident Response Management, which can be customized for specific needs of any election jurisdiction in this paper.

- **Rahul K. Patel,** *Elections Information Security Officer, Office of the Cook County Clerk and Chicago Board of Elections Commissioners*
  Rahul Patel is a seasoned Cyber & Information Security professional with over 25 years of experience defending the availability, confidentiality, and integrity of information assets. He is presently leading elections information security and risk management efforts at the office of the Cook County Clerk and Chicago Board of Elections Commissioners as an Elections Information Security Officer. Patel holds a PhD from Northcentral University, an M.B.A. from DePaul University, and an M.S. from Illinois Institute of Technology

- **Tonya Rice,** *Director of Elections, Cook County, Illinois*
  Tonya Rice was appointed Director of Elections by Cook County Clerk Karen A. Yarbrough in 2019,

258 of 497

Case 1:21-cv-00445-CJN

in which capacity she supports one of the nation's largest election jurisdictions in the country. Rice began her career in elections in 2005 as a political science graduate student at the University of Michigan, where she was a National Science Foundation Graduate Research Fellow, specializing in public opinion on voting technology and post-election audits, as well as the political participation of language minority citizens. Rice holds a J.D. from Northwestern University School of Law and B.A. from Northwestern University.

**Assessing Election Infrastructure**

- **Jason Hill,** *Chief, National Cybersecurity Assessments and Technical Services (NCATS)*
  Jason Hill is the Chief of the National Cybersecurity Assessment and Technical Services (NCATS) Branch of the Cybersecurity and Infrastructure Security Agency (CISA). In this capacity Jason has primary responsibility to deliver quality security testing and analysis to customers that include the Federal government, State, Local, Tribal and Territorial governments, as well as Private Sector/Critical Infrastructure stakeholders. Mr. Hill has worked with several tech companies creating and teaching red team course work and conducting penetration testing in the commercial industry and DOD. Jason also spent 22 years as a US Army National Guardsmen for the Commonwealth of Virginia. As Master Sergeant of the 91st Cyber Brigade he led the Cyber Opposition Forces which provides red team & pen testing capabilities. He has achieved certifications for the Offensive Security Certified Professional and the Certified Ethical Hacker trainings.

- **Genevieve Marquardt,** *IT Specialist, National Cybersecurity Assessments and Technical Services (NCATS)*
  Genevieve Marquardt serves as a member of the National Cybersecurity Assessments and Technical Services (NCATS) Cyber Hygiene team which is responsible for continuously assessing the "health" of external stakeholders' endpoints reachable via the internet and maintaining an updated enterprise view of the cyber security posture of their systems to drive proactive mitigation of vulnerabilities and reduce risk. Genevieve provides technical support pertaining to public IP scans and testing of .gov public facing networks for stakeholders.

- **Derrick Thornton,** *Federal Lead, National Cybersecurity Assessments and Technical Services (NCATS)*
  Derrick Thornton joined the National Cybersecurity Assessments and Technical Services (NCATS) team in June 2017 as an Information Security Specialist. Derrick serves as a Federal Lead leading NCATS RVA teams conducting two week penetration tests. An 11-year veteran of the U.S. Air Force, Derrick was stationed at Robins Air Force Base, Georgia and at White Sands Missile Range, New Mexico while also serving 2 tours in the Middle East. The 4 years of military service at White Sands Missile Range was an assignment to the National Reconnaissance Office, which led to a 21-year career within the NRO. Derrick has a Bachelor of Science in Technical Management from DeVry University.

**Securing America: How DHS, States, and Cybersecurity Startups are Working Together Before the 2020 Presidential Election**

In 2016, 50 states' election systems were targeted by Russian nation-state hackers. Russian actors visited election websites, tested vulnerabilities by trying to exploit SQL database vulnerabilities, and even managed to access voter registration files and a county ballot. DHS deemed US election infrastructure "critical" and now CISA, DHS' critical infrastructure office, is actively providing scanning technology and technical assistance to states. States, which have direct authority over the issue, are doing a great job with their own efforts including working with the National Guard, looking public-private partnerships to provide DDoS mitigation and in some cases trying bug bounties and working with ethical hackers to keep elections secure. However, there is still much to be done to secure our democratic/election systems before 2020 - we need YOU. Election security will require a united effort with the scale and vigilance of a crowd of top talent. How are states innovating before the 2020 Presidential Election? How can hackers help?

- **Joseph Marks** *(moderator), Reporter, The Washington Post*
  Joe Marks is a reporter for The Washington Post, where he writes The Cybersecurity 202 newsletter focused on the policy and politics of cybersecurity. Before joining The Washington Post, Marks covered cybersecurity for Politico and Nextgov. He also covered patent and copyright trends for Bloomberg BNA and federal litigation for Law360. Marks began his career at Midwestern newspapers covering city and county governments, crime, fires and features. He spent two years at the Grand Forks Herald in North Dakota and is originally from Iowa City.

- **Rita Gass,** *CIO, California Secretary of State's Office*
  Rita established her career and progressed throughout the roles to become a chief information officer in 2008 with CCC. Remaining in this role for eight years, she eventually moved to the same role with California Secretary of State (SOS), where she continues to work now.

- **Wayne Thorley,** *Deputy Secretary for Elections, Nevada Secretary of State's Office*
  Wayne Thorley is the Deputy Secretary of State for Elections for the Nevada Secretary of State's office and is responsible for administering the Nevada's election process including enforcing state and federal election laws and procedures and the Help America Vote Act.

- **Trevor Timmons,** *CIO, Colorado Secretary of State's Office*
  Trevor Timmons has served the Colorado Secretary of State as Chief Information Officer since 2007, after eight years as Deputy CIO and Director of Software Development. Mr. Timmons has served under several Secretaries of State, during which time Colorado has gained a national reputation in several areas, including elections administration and cybersecurity operations.

- **Alex Joves,** *Regional Director, Region V, Cybersecurity and Infrastructure Security Agency*
  Alex Joves is the Regional Director for Region V of the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency. He has served in various roles for DHS since 2007, including Regional Supervisor of Chemical Facility Anti-Terrorism Standards and Director of the National Infrastructure Coordinating Center. Prior to joining DHS, Mr. Joves was an

Associate Attorney at Perkins Coie LLP. He has a JD from The George Washington University Law School and a Bachelor of Science in Government from the U.S. Coast Guard Academy.

- **Josh Benaloh, *Senior Cryptographer, Microsoft Research***

  Josh Benaloh is a Senior Cryptographer at Microsoft Research and has worked on verifiable election technologies for more than thirty years. His 1987 doctoral dissertation at Yale University, entitled "Verifiable Secret-Ballot Elections", introduced the use of homomorphic encryption as a means to enable public verifiability in elections.

  Dr. Benaloh served seventeen years on the Board of Directors of the International Association for Cryptologic Research and currently serves on the Coordinating Committee of the Election Verification Network. He has published and spoken extensively and testified before Congress on election technologies and was an author of the 2018 National Academies of Science, Engineering, and Medicine report "Securing the Vote – Protecting American Democracy".

- **Alissa Starzak, *Head of Policy, Cloudflare***

  Alissa Starzak is the Head of Public Policy at Cloudflare, an Internet performance and security company that is on a mission to help build a better Internet.

- **Jay Kaplan, *Co-Founder and CEO, Synack***

  Jay co-founded Synack after serving in several security-related capacities at the Department of Defense, including the DoD's Incident Response and Red Team.

**Bootstrapping Vulnerability Disclosure for Election Systems**

Seven months. It look seven months to make contact with a major city after discovering a critical vulnerability in their election registration website, which could have exposed (or worse, modified) information of millions of voters. As seen in the Mueller report, election systems are under active attack by foreign adversaries. Yet while vulnerability disclosure policies are becoming the norm in most industries, exactly zero states or election vendors have established vulnerability disclosure policies to allow reporting vulnerabilities in election systems. In a time where accepting feedback from the public is the best defense against these attacks, the lack of vulnerability disclosure policies hinders improvements in securing systems. In a talk by security researcher Jack Cable and Katie Trimble from the Department of Homeland Security's Cybersecurity and Infrastructure Security Agency, learn industry best practices for vulnerability disclosure and how election systems can benefit from additional public scrutiny. Hear Jack's experiences disclosing critical vulnerabilities in several major election registration systems, and how this can be channeled to protect our nation ahead of the 2020 elections.

- **Jack Cable, *Security Researcher and Student, Stanford University***

  Jack Cable is a coder turned white hat hacker and a rising sophomore at Stanford University. Jack is a top ranked hacker on the HackerOne bug bounty platform, having identified over 350 vulnerabilities in companies including Google, Facebook, Uber, Yahoo, and the U.S. Department of Defense. After placing first in the Hack the Air Force challenge, Jack began working this past summer at the Pentagon's Defense Digital Service. At Stanford, Jack studies computer science and launched Stanford's bug bounty program, one of the first in higher education.

- **Katie Trimble,** *Section Chief, Vulnerability Management and Coordination, U.S. Cybersecurity and Infrastructure Security Agency, Department of Homeland Security*

  Katie Trimble currently serves as the Section Chief of the Vulnerability Management and Coordination section of the Cyber Threat & Risk Analysis (CTRA) branch of the Department of Homeland Security's National Cybersecurity and Communications Integration Center (NCCIC). In that capacity, she leads the Department's primary operations arm for coordination of the responsible disclosure and mitigation of identified cyber vulnerabilities in control systems and enterprise hardware and software used in the 16 critical infrastructure sectors and all levels of U.S. government organizations. Ms. Trimble started her career as an intelligence analyst with the United States Air Force, specializing in counterinsurgency, antiterrorism & force protection, counter explosive devices and communications systems. Ms. Trimble holds a Bachelors of Arts in International Relations & Global Studies from Antioch University Seattle.

- **Trevor Timmons,** *CIO, Colorado Secretary of State's Office*

  Trevor Timmons has served the Colorado Secretary of State as Chief Information Officer since 2007, after eight years as Deputy CIO and Director of Software Development. Mr. Timmons has served under several Secretaries of State, during which time Colorado has gained a national reputation in several areas, including elections administration and cybersecurity operations.

**"The Election System: Can We Fix It?" "YES WE CAN!"**

As the previous DEF CON Voting Villages have proved, our voting equipment and infrastructure are very vulnerable to multiple types of attacks. Instead of focusing on problems and broken things, this talk will focus on simple fixes that vendors and governments can put into action right now.

Starting with the machines themselves, then moving through parts of the entire system, BiaSciLab will offer suggestions on how simple practices and changes in thinking and hiring can improve the security of the entire system.

Last year at r00tz BiaSciLab was one of the first to hack the mock election reporting system set up by the Voting Village. Some have pointed out that this was a purposely flawed system designed for the the kids to break. However, as outlined in the Mueller report, Russian hackers used the same SQL injection technique to break into an election reporting system. If our systems are so secure, how was this able to happen? Lack of secure coding practices and both peer and outside review. If proper coding review and application testing had happened, this SQL injection vulnerability would have been found and fixed.

Breaking down these flaws and offering real solutions for each one, BiaSciLab will bring hope in the face of this daunting and complex security problem.

- **BiaSciLab,** *Founder and CEO, Girls Who Hack*

  BiaSciLab is a 12 year old hacker and maker. She was the youngest speaker at the Hackers on Planet Earth conference and has spoken at DEF CON previously in both the Bio Hacking Village and the r00tz Asylum kids con. She received national attention when she hacked the voting reporting system at DEF CON 26. BiaSciLab is alsothe Founder and CEO of Girls Who Hack, an organization focused on teaching girls the skills of hacking so that they can change the future.

262 of 497

**Securing Voting Systems (Beyond Paper Ballots)** Case 1:21-cv-00445-CJN

While much "headline hacking" is devoted to exposing vulnerabilities on voting machines themselves, there is more to election systems security than simply popping shells on old, unsupported kiosks. In this session, attendees will learn what real world IT personnel in the 3071 counties and parishes across the U.S. face on and around Election Day, beyond the voting machine.

- **Tod Beardsley, *Director of Research, Rapid7***

  Tod Beardsley is the Director of Research at Rapid7. He has over 30 years of hands-on security experience, stretching from in-band telephony switching to modern Internet of Things implementations. He has held IT Operations and Security positions in large organizations such as 3Com, Dell, and Westinghouse, as both an offensive and defensive practitioner.

**Machine Voting: The Bulgarian Experience**

First machine voting experiments in Bulgaria started in 2009. Since then machine voting found its place in legislation with the usage of offline DRE kiosks with VVPAT. Latest developments in information security and the rising threads require flexible technical approach with still lagging legislation. The talk will pass through our machine voting experience, problems and solutions we came up with. We'll share detailed security requirements for voting machines and their implementation in practice. Special emphasis will be put on latest European parliament elections, held in May 2019 and upcoming municipal elections in October 2019.

- **Alex Stanev, *CTO, Information Services JSC***

  Alex started as a software developer in late 90s working on a wide range of projects – from specialized hardware drivers to large scale information systems for private and public sectors, including e-government services, elections management and smart cities.

  Since 2003 Alex has been leading computer processing of all election results and referendum projects in Bulgaria. As a consultant for the Central Election Commission of Bulgaria Alex is the primary author of technical and security requirements for election machines used in Bulgaria. As a security consultant, Alex has lead penetration test audits in Europe, America and Africa for financial and government institutions.

  Currently Alex serves as CTO in the largest Bulgarian systems integrator - Information Services JSC.

**Addressing the election security threats posed by Very Small Jurisdictions**

While most election administrators in the US are working in jurisdictions with populations in the tens or hundreds of thousands, there are states with jurisdictions as small as a dozen or so voters. In these Very Small Jurisdictions, the local interface with the state election system can be as crude as a Windows XP computer directly connected to an ISP and used by an Election Administrator with little computer experience or understanding of anti-social engineering practices. These are administrators with direct user access to statewide election systems containing voter roles and responsible for posting official election results. And while there are creative approaches to improving election worker training to offset social engineering threats underway in several states, they are virtually all designed for the more typical "macro" jurisdiction level (country-level

263 of 497

jurisdictions) and are not scaleable to these major levels, leaving secretaries of state to run generalized safety trainings with little follow-up and few options for addressing these vulnerabilities. The talk will briefly explore the threat and why creating public logical network structures are best suited not just to mitigate the problem, but to potentially make these jurisdictions even more secure than their larger counterparts.

- **John Odum, *CMC, CEH, CNDA, MCP, CIW; City Clerk, Montpelier, Vermont***
  John Odum has been the elected City Clerk of Vermont's Capital, Montpelier, for 7 years. In this capacity he also serves as the the Election Administrator for Montpelier. Prior to being elected clerk, John worked in communications and IT for non-profits and political campaigns. His work has been published on websites of The Guardian, Governing, Huffington Post, as well as numerous Vermont area publications.

**The Devil Went Down to Georgia. Did He Steal Souls? (Georgia's Electronic Voting Saga)**

- **Marilyn Marks, *Executive Director, Coalition for Good Governance***
  In 2009, after a narrow loss to become the Mayor of Aspen, Marilyn Marks recognized the vulnerabilities in Colorado's election systems and chose to devote herself full time to election integrity litigation and lobbying efforts for more transparent and verifiable elections. She successfully litigated the effort to make Colorado ballots open public records for postelection reviews, followed by more than 25 election-related cases involving election transparency or voter privacy. She is currently the driving force behind the legal challenge to Georgia's unverifiable electronic voting system.

- **Rich DeMillo, *Professor of Computer Science and Executive Director, Center for 21st Century Universities, Georgia Tech***
  Richard DeMillo is the Charlotte B. and Roger C. Warren Chair of Computer Science and Professor of Management at Georgia Tech,  where he founded and now directs the Center for 21st Century Universities. The Center is Georgia Tech's living laboratory for fundamental change in higher education. He is responsible for educational innovation at Georgia Tech and is a national leader and spokesman in the online revolution in higher education. Under his leadership, Georgia Tech has developed a pipeline of 50 Massive Open Online Courses that together enroll a million learners.

- **Logan Lamb, *Cybersecurity researcher***
  Logan Lamb is a Senior Security Engineer at Bird. Previously he has served as a Cyber Security Researcher at Bastille Networks and Oak Ridge National Laboratory. He has Master of Science and Bachelor of Science degrees in Computer Engineering, both from the University of Tennessee, Knoxville.

- **Jordan Wilkie, *Freelance journalist covering election integrity***
  Jordan Wilkie is pursuing a career as an investigative journalist covering criminal and social justice by combining data-driven reporting with long-form, narrative storytelling. My expertise to-date is in incarcerated juvenile and LGBTQ populations.

- **Robert McGuire,** *Attorney for Coalition plaintiffs*

  Robert McGuire is the attorney for the National Election Defense Coalition plaintiffs in their current  legal challenge to Georgia's unverifiable electronic voting system. His previous experience includes serving as a Senior Associate at Allen & Overy LLP, as a lecturer at the University of Denver's Sturm College of Law, and as a law clerk for the U.S. Court of Appeals for the Eighth Circuit. He earned his JD from Yale Law School.

- **Susan Greenhalgh** *(moderator), Vice President of Policy and Programs, National Election Defense Coalition*

  Susan Greenhalgh is Vice President for Programs at National Election Defense Coalition. Susan performs extensive research, assembling and reviewing documents that may influence and impact state and federal policy regarding election verifiability and security. She also works with cyber security experts and advisors on the federal level to bridge the gap between national cyber security policy and election administration. Susan has a bachelor's degree from the University of Vermont in chemistry.

## Sunday, August 11, 2019

### Exploring Voter Roll Manipulation and Fraud Detection with Voter Files

Qualified Voter Files are published by states and contain information on registered voters. These files are used by political campaigns and analysts to gather data on registered voters. The public nature of these files also makes it easier for the public to detect voter fraud and can be used by third parties to help detect large scale voter registration attacks. The data contained in these files, however, could be used by attackers to impersonate voters and update or delete a voter's registration information and subsequently prevent the targeted voters from exercising their right to vote. Use of Qualified Voter Files could also inform attackers on what scale voters' information could be changed without raising suspicion.

- **Nakul Bajaj,** *High School Researcher, University of Michigan*

  Nakul Bajaj is a rising high school senior at The Harker School. He is interested in computer science and public policy, and frequently participates in hackathons and debate competitions to learning more about each of these fields. Previously, he has done analysis on election datasets, finding patterns between race and income and voter turnout. In addition, he has worked on projects dealing with a combination of law and computer science, having built an expert system that helps inventors file their own patents. This summer, he is helping conduct research in Professor J. Alex Halderman's lab at the University of Michigan regarding electronic voting machines and other election security topics with help from PhD candidate Matthew Bernhard.

### Defending Democracy: Working with Election Officials to Improve Election Security

Four years after documented foreign interference in the 2016 presidential election put election security in the headlines, cybersecurity experts and election officials still face challenges in working together. The need for collaboration is clear - especially in smaller and less well-resourced jurisdictions - so how can we bridge the gap? Hear from current and former election officials and election security advocates about how successful partnerships have moved the needle, and what to do if you want to engage your local election office.

- **Liz Howard, Counsel, *Democracy Program, Brennan Center for Justice***
  Liz Howard currently serves as Counsel for the Brennan Center's Democracy Program, with a focus on cybersecurity and elections. Prior to joining the Brennan Center, Ms. Howard was Deputy Commissioner for the Virginia Department of Elections. During her tenure overseeing election modernization projects in Virginia, she coordinated the state's decertification of all paperless voting systems, implementation of the e-Motor Voter program, and adoption of online, paperless absentee ballot applications. Ms. Howard earned her J.D. from the William & Mary School of Law in 2009.

- **Justin Burns, *Chief Information Security Officer, Washington Secretary of State***
  Justin Burns joined the elections security community in January, as CISO for the Washington Secretary of State. Prior to this, he served as a Solutions Architect and Technical Assistant to the Washington State CIO.

- **Trevor Timmons, *Chief Information Officer, Colorado Secretary of State***
  Trevor Timmons became Chief Information Officer for the Colorado Secretary of State in 2007, after eight years as Deputy CIO and Director of Software Development. During this time, Mr. Timmons served under several Secretaries of State and Colorado gained a national reputation in several areas, including elections administration and cybersecurity operations.

- **Jared Dearing, *Executive Director, Kentucky State Board of Elections***
  Jared Dearing is the Executive Director of the Kentucky State Board of Elections and has worked in the elections space for over ten years. Jared has public and private sector experience working both at the local and state level, including working for the City of Louisville as well as the Office of California Governor Jerry Brown. His private sector work includes several tech startups located in the Bay Area and Boston. He is a graduate of the University of California, Berkeley where he studied public policy and engineering.

- **Monica Childers *(moderator), Product Manager for Risk-Limiting Audits, VotingWorks***
  Monica Childers is a civic technologist with a background in digital product design and project management. As Product Manager at the VotingWorks she champions collaborative design, partnering with state and local election officials to build low cost, flexible tools for election administration. Over the past decade she has designed online voter engagement platforms, vote-by-mail ballot tracking systems, text & email election reminders, and a national trouble-ticket system for reporting problems with election mail. Having served as the project manager for Colorado's post-election audit software for the past year, she is currently working with election officials implementing risk-limiting audits (RLAs) and is helping shepherd the development of nationwide RLA software.

**Securing Your Election Infrastructure: Plan and Prepare to Defend Your Election Systems, People, and Processes**
Robert Anderson will provide some background of Election Security and the threat research that is on-going for Election Security. An overview for election teams to plan and prepare to defend their

Case 1:21-cv-00445-CJN

Election Systems, People, and Processes. Provide and update your Security Policies and Incident Response Plan.  Help election teams understand their Attack Surface and where your election systems are most vulnerable.  Review the primary Threat Actors poised to attack your election systems. Then review several approaches that could be deployed to protect Election Security Assets, and direct to some organizations that could support election teams.

- **Robert Anderson,** *Chief Cyber Security Practitioner and President, Preying Mantis*
  Robert Anderson is a highly trained IT & Cyber Security professional with over 25 years of experience in a variety of cybersecurity domains. As a former Intelligence Officer working in the Middle East, he brings a unique perspective to security operations and incident response. Robert has deployed and led over 500 security programs and projects to Fortune 500 companies, federal, state, and local governments, and NATO. Robert has over 15 years hacking experience and is a Certified Ethical Hacker. He is an expert in Cyber Threat Intelligence and Information Warfare and has led Incident Response Teams during many high-profile breaches.

**Keynote Remarks: Representative Eric Swalwell (CA-15)**

- **Representative Eric Swalwell (CA-15)**
  In 2012 Eric Swalwell was elected to represent California's Fifteenth Congressional District, which includes a large part of the East Bay. Now in his fourth term, he's working hard to bring new energy, ideas, and a problem-solving spirit to Congress, with a focus on advancing policies that support equality, opportunity, and security.
  Congressman Swalwell serves on the House Permanent Select Committee on Intelligence, and believes protecting Americans is Congress' most solemn duty. He chairs the Intelligence Modernization and Readiness Subcommittee, which oversees overall management of the Intelligence Community: the policies and programs focused on making sure that all 17 U.S. intelligence agencies have the workforce, infrastructure and services they need to succeed. This involves fostering greater collaboration and better use of resources across the entire Intelligence Community in personnel management, security clearance reform, information technology modernization, and other areas.

# EXHIBIT O

Case 1:21-cv-00445-CJN

**AFFIDAVIT OF AMY GILLEO**

My name is Amy Gilleo. I was a contract worker for Advanced Imaging Solutions of Baton Rouge, Louisiana. AIS provides personnel to Dominion Voting System at election time. During the Presidential election in November 2020, I was assigned to represent Dominion in Wayne County, Michigan. I was there from November 1 to November 4. I worked November 3, 2020, Election Day.

In Michigan, all early voting ballots, mail-in ballots and in-person Election Day ballots appeared to be essentially identical. They are all paper ballots which are fed into and read by machines, either at the voter's precinct or at vote counting centers.

On Election Day, I was a rover going from precinct to precinct to solve problems with Dominion's vote counting equipment by cleaning, repairing or replacing the machines. Starting around 5 or 6 p.m., I was stationed at a place in Dearborn used to count in-person and mail-in ballots. I worked there until 4:30 a.m. the next morning. While out at the precincts and at the Dearborn counting center, I became very concerned about some of the things I witnessed. For a few days after the election, I pondered what to do and felt compelled to come forward.

Dominion uses one type of voting machine to scan ballots at the precinct level. That machine scans one ballot at a time. Dominion uses a larger capacity vote counting machine at a counting center. This equipment scans ballots in groups of 50.

Early on Election Day, I encountered an unexpected problem out in the precincts. A number of machines broke down right at the beginning of the day. This seemed to happen almost exclusively in Republican precincts. Breakdowns of these machines are rare according to my training through Dominion. It seemed clear to me that the machines were already broken and were sent out to the precincts anyway and assigned to Republican precincts. At these precincts, there were lines of voters waiting to cast their ballots. If anyone drove by any of these precincts, they could have been easily discouraged from coming in, because it was obvious you would be in for a wait. It appeared to me that broken or malfunctioning machines were intentionally sent to these precincts. I took photos recording the serial numbers of malfunctioning machines.

PROBLEMS IN THE PRECINCTS

1. SUPPRESSION OF REPUBLICAN VOTERS — broken machines were sent to some Republican precincts, creating long lines and discouraging voters from trying to vote there.

269 of 497

Case 1:21-cv-00445-CJN

**Amy Gilleo affidavit • Page 2 of 4 Pages**

After spending Election Day out in the field replacing and repairing Dominion machines, I arrived at the Dearborn counting center around 5 or 6 p.m. and worked there for the next 11 hours. During that time, more than 43,000 votes were counted, 30,000 of which were attributed to Joe Biden. During my time at the Dearborn center, I observed many problems that I feel resulted in significant discrepancies between the votes cast legally and the votes that were reported.

PROBLEMS AT DEARBORN COUNTING CENTER
16901 Michigan Avenue, Dearborn, Michigan 48126

1. COUNTING ROOM SEALED OFF FROM THE PUBLIC WITH WINDOWS COVERED AND NO EFFECTIVE OVERSIGHT — all doors to the counting room were locked, and the windows were covered so no one could see in. 43,000 ballots were counted at the Dearborn counting center but neither Republicans nor others were allowed to effectively see what was going on or to object to the procedures. Basically, one party controlled the counting of ballots with no oversight at all from anyone else.

2. MAIL-IN BALLOTS NOT CHECKED FOR A SIGNATURE — as mail-in ballots were opened, the envelopes were not checked for voter signatures. The ballots were simply removed and sent to be counted. As I understand it, by law, all ballots must have a valid signature of the voter.  Without a signature, there is obviously no way to confirm that the ballot is from a real voter. Without a signature, you cannot compare the signature to the person's original signature when he registered to vote. Over the 11 hours I was there, more than 43,000 ballots apparently were counted but I saw no effort to compare the names of the voters with the voter registration lists or to determine if the person had already voted.

3. LARGE GROUPS OF BALLOTS SCANNED OVER AND OVER AGAIN — there were numerous problems with the scanning of ballots. The same ballots were run through the scanning machine repeatedly. I was responsible for keeping the machines working, and I observed large numbers of ballots being counted over and over. I was able to secretly take a photograph of a man inserting 50 ballots in the scanning equipment over and over again. There was a discrepancy with accepting the batch or discarding the batch. At 10 p.m. I spoke by phone with Jordan Hawkes of Dominion, who told me they were working on a "work around program" to "fix" the issue of workers overscanning ballots.  I have a text message on this.  The work around was a change in their computer program.  My impression was they could fix almost anything by changing the computer program.  How could they "fix" this if their machines weren't connected to the Internet?

4. "ADJUDICATED" BALLOTS WHICH WERE CHANGED AT THE SOLE DISCRE-TION OF ONE OR TWO PEOPLE and with no oversight by the Republican Party or

**Amy Gilleo affidavit • Page 3 of 4 Pages**

anyone else. Ballots are "adjudicated" by election workers after being scanned and kicked aside by the computer. The adjudicator is supposed to determine "the intent of the voter." There were three adjudication stations. Often there was only one person at a station making changes. I never saw any votes challenged.  Poll Challengers were not allowed close enough to review that process. Many ballots were pulled and adjudicated. I was not able to see how the votes were adjudicated or changed, because I was not in close enough proximity to this process to observe the changes made. The most important thing is that if the person adjudicating the ballot wanted to change it, he just changed it at his discretion.

5. LARGE NUMBERS OF BALLOTS MAGICALLY ARRIVE — by 10 p.m. activity had slowed down and poll workers were sitting around. At 11 p.m. I was told there were only 2,000 ballots out of 24,000 left to scan and that we could get ready to leave. I know that around 10 p.m. there were only a couple of mail trays of ballots. However, after the lull, workers began opening and scanning more ballots. By the early morning hours, a total of 43,000 votes were recorded.  Where the other apparent 19,000 ballots came from I do not know.

6. A SECLUDED ROOM WHERE A DOMINION COMPUTER RECEIVED AND TRANSMITTED VOTE TOTALS. THE DOMINION COMPUTER APPEARED TO BE CONNECTED TO THE INTERNET — as the only Dominion representative at the counting center, I was trusted. At 3:45 a.m., near the end of the long evening, "Tracy" who was with the Clerk's office, did not know how to proceed.  I called Jordan Hawkes, a Dominion official.  He told me to assist her by wrapping up the adjudications and transfering everything to the USB. That was not part of my job, and I had been instructed not to do that.  But because Tracy could not proceed, I followed Jordan Hawkes' instructions. While on the phone with him, I downloaded the data from the adjudication computer to a zip drive.  Tracy then escorted me into a secure room without windows. I had not been in there before. While still on the phone with Jordan, at 3:56 a.m. we Face-timed and I transferred the information from the zip drive to the Dominion computer in this secure room and then transferred that same data to the computer Tracy had.  Those two computers were next to one another and were connected to one another.  The data was then transferred by Internet to the Secretary of State's office.  The Dominion computer was connected to the Internet either directly or through the computer it was connected to.

7. A FLAW IN THE DOMINION MACHINES THAT DOMINION WAS WELL AWARE OF — Sharpie pens are recommended by Dominion because the ink doesn't smear. Many other pens do smear. The ballots are scanned by a roller within the machine. The ink from the ballot builds up on the roller and can cause the scanner to read the smear instead of the candidate marked on the ballot. The way the ballot was set up, Biden

Amy Gilleo affidavit · Page 4 of 4 Pages

was just above Trump. This could have caused many Trump votes to be counted for Biden. This was obvious by observing the cleaning wipes provided by Dominion. The wipes recorded the length of the smear running down from Biden to Trump on the roller. Almost all rejected ballots were caused by failing to frequently clean the machine and remove the buildup of ink on the roller. I believe some Trump votes were misread as being for Biden. While this may appear to be accidental, Dominion is well aware of this flaw in their equipment. Instead of fixing the flaw or pulling their equipment, they simply sit back and let people think it is an honest count, probably well aware that it was helping the candidate at the top of the ballot, Joe Biden. Because of constant smearing, the results from the Dominion machines are not reliable.

After everything I saw on November 3, 2020, I have no confidence whatsoever in the results of the Presidential election in Michigan.  Based on my observations, the system in place was designed to defraud the voters of a fair and honest election.


Amy Gilleo


STATE OF LOUISIANA
PARISH OF EAST BATON ROUGE

Sworn to and subscribed to before me, Diane A. Jenkins, this 2nd day of December, 2020.


Diane A. Jenkins
Notary Public
My commission expires at death.
Bar # 07252

# EXHIBIT P

## AFFIDAVIT

The Affiant, Mellissa A. Carone, being the first duly sworn, hereby deposes and states as follows:

1. My name is Mellissa A. Carone, I was contracted by Dominion Voting Services to do IT work at the TCF Center for the November 3, 2020 election, and I am a resident of Wayne County.

2. I arrived at the TCF Center at approximately 6:15 AM November 3, 2020 and worked until 4:00 AM November 4, 2020. I went home to get some sleep, then arrived back at the TCF Center at 10:00 AM in which I stayed until 1:45 PM. During this time, I witnessed nothing, but fraudulent actions take place.

3. The counters (which were trained very little or not at all), were handed a "batch" (stack of 50) mail-in ballots in which they would run through the tabulator. The tabulators would get jammed 4-5 times an hour, when they got jammed the computer would then put out an error that tells the worker the ballot number that was jammed and gives an option to either discard the batch or continue scanning at which the counter should discard the entire batch, put the issue ballot on top of the batch and rescan the batch. I witnessed countless workers rescanning batches of ballots without discarding them first which resulted in ballots being counted 3-4 times each- possibly more than that.

4. At about midnight I was called over to assist one of the counters with a paper jam and noticed his PC had several over 400 ballots scanned- which means that one batch was counted over 8 times. This happened numerous times while I was at the TCF Center. I confronted my manager, Nick Hawaimeh to inform him of this issue and how important it was. He told me we were there to assist with IT work, not to run their election.

    xBt x Mc        IKonomakis

5. The Adjudication process, from my understanding there is supposed to be one republican and one democrat judging each ballot. I overheard several workers talking during shift change in which well over 20 machines had two democrats judging the ballots-resulting in an unfair process.

6. Next, I want to describe what occurred during shift change, it was a chaotic disaster. It took over two hours for workers to arrive at their "assigned areas", over 30 workers were taken upstairs and told they did not have a job for them to do. These people were chosen to be counters, in which 6 workers admitted to me that that received absolutely no training whatsoever.

7. The night shift workers were free to come and go as they pleased from the counting room. This is illegal, as there were boxes and stacks of ballots everywhere, anyone could



BOBBY TENORIO
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WASHTENAW
My Commission Expires February 19, 2021
Acting in the County of Wayne

have taken some out or brought some in and no one was paying attention- no one was watching.

8.  There were two vans that pulled into the garage of the counting room, one on day shift and one on night shift. These vans were apparently bringing food into the building for the workers because they only had enough food for 1/3 of the workers. I never saw any food coming out of these vans, coincidently it was announced on the news that Michigan had discovered over 100,000 more ballots not even two hours after the last van left the building.

9.  When a worker had a ballot that they either could not read or it had something spilled on it, they would go to a table that had blank ballots on it and fill the ballot out. They were supposed to be filling the ballot out to match exactly what the voter had intended but this was not the case at all. These workers were also signing the names of the person the original ballot belonged to-clearly there is nothing legal about that.

10. Samuel Challandes and one more young man in his mid-20's was responsible for submitting the final ballot numbers into the main computer. They had absolutely no overhead, Nick Hawatmeh was on the main floor assisting with IT most of the time.

11. There was a time I overheard Samuel talking to Nick about losing tons of data, they all got on their phones and stepped to the side of the stage. I asked Nick what was going on, in which he told me it was taken care of and not to worry about it. I fully believe that this was something extremely crucial that they covered up.

12. I was the only republican working for Dominion Voting Systems, I heard nothing but awful remarks coming from coworkers and Detroit city workers on the stage where we all sat at while we weren't assisting with issues on the floor. I did not give out any indication that I was a republican, I have a family at home and knew I was going to have to walk to my car at the end of my shift, If anyone was wearing an American flag on their shirt/mask, they were automatically deemed to be Trump supporters.

13. I called the FBI and made a report with them on November 5, 2020. I was told I will be getting a call back after the file is reviewed and assigned to an agent.

14. I am doing my very best to make sure something is done about this; I was there and witnessed these events take place.

On this 9th day of November, 2020, before me personally appeared Mellissa A. Carone, who in my presence did execute the foregoing affidavit, and who, being duly sworn, deposes and states that she has read the foregoing affidavit by her subscribed and knows the contents thereof, and that the same is true of her own knowledge and belief, except as to those matters

11/9/2020

BOBBY TENORIO
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WASHTENAW
My Commission Expires February 19, 2021
Acting in the County of Wayne

she states to be on information and behalf, and as to those matters she believes them to be true.

X _____ 11/09/2020    Date

Notary Public, _Washtenaw_ County, Michigan

My commission Expires: _Feb 19 2021_

_Bobby Tenorio 11/9/2020_

BOBBY TENORIO
NOTARY PUBLIC - STATE OF MICHIGAN
COUNTY OF WASHTENAW
My Commission Expires February 19, 2021
Acting in the County of _Wayne_

# EXHIBIT Q

**Declaration of (Misty Martin)**

Pursuant to 28 U.S.C Section 1746, I, (Misty Martin), make the following declaration.

1. I am over the age of 21 years and I am under no legal disability, which would prevent me from giving this declaration.

2. I have been employed with Coffee County Elections and Registration since January 9, 2012. I was hired as the Election Assistant. I have been the Supervisor of Elections since 2018.

3. I reside at 6658 Sinkhole Rd, Ambrose, Ga. 31512

4. My affidavit highlights the vulnerabilities of the Dominion Voting System.

5. On the Election Management System, you can access games. I was looking for a file I saved on the EMS and I found the section with the games. So, I decided to check and see what it was, that is where I found Solitaire, and a few more games. This is allowing vulnerability for the outside world to hack the EMS.

6. During the June Primary, I found, by mistake, during adjudication that I could choose to change the vote of a voter by mistakenly clicking on the wrong name within the race. At, this point I asked one of my board members to see what I did, and to witness along with the 2 representatives that I made the mistake and corrected my mistake. I wanted more eyes to see that I chose the vote of the voter's intent.

That is when I really noticed how vulnerable Dominion Voting system really is, and how a dishonest person could change the voter's vote.

For example, Dominion Voting system allows the administrator who is controlling the EMS, to set up the parameters of their choice (Ambiguous Mark, Blank Ballot, Blank Contest, Overvote, Undervote, Write-in, or ALL BALLOTS) in which the administrator wants to adjudicate. There is **no** reason to adjudicate for blank ballot, blank contest, or undervote, so these choices should not be available. The administrator could "vote" any blank race on the ballot, in which the voter did not vote, or even vote a blank ballot. During the Adjudication an administrator could change the vote of any voter.   NO administrator should have the **Ability** to change any vote of a voter. This is why I chose in Coffee County to do the adjudication the old fashion way, Where I have 3 people, witness, agree, and sign the top tab of the ballot in which I am transferring the voter's intent to. These perimeters should be the same across the state.   Every County should handle adjudication the same way.

7. Ballots can be scanned thru the ICP or the ICC more than one time, and the Dominion system does not tell you the ballot has already been cast.

I was testing the ICP and ICC and I ran 20 ballots thru the ICC and ICP 6 times.  And after running the reports, the ICC and the ICP accepted and tallied the ballots.  On each ballot I voted for one

candidate in each race, and the reports showed the candidate had 240 votes.  120 from the ICC and 120 from the ICP

8. Another feature that is unsafe is the fact that on the Poll Pads, which are from the company KnowInk, you can connect to the internet.  After connecting to the internet, you can go to any site you wish.

I know this because at a polling place, my poll manager's laptop died, so the poll manager connected the poll pad to her hotspot and pulled up the ElectionNet system that each county office uses for the voter registration. After my poll manager told me she could access the internet on the Poll Pad, I decided to see what else I could access. At this point I went to the Apple Play Store, then I checked to see if it would allow you to use google, yes you could go to Google on the Poll Pad.  Next, I decided to see if I could go to Netflix.  The poll pad would not only allow me to go to Netflix, it also allowed me to watch a movie on the poll pad.

x _Misty Martin_

Misty Martin
February 05, 2021
Douglas, Ga.

# EXHIBIT R

# THE EPOCH TIMES



Smartmatic's office in Boca Raton, Fla., on Dec. 2, 2020. (The Epoch Times)

**ELECTION INTEGRITY** **PREMIUM**

# A History of Foreign Ties Behind Voting Machines Used in US

BY BOWEN XIAO | December 8, 2020  Updated: December 28, 2020

A A  Print

Behind a significant portion of voting machines used in the United States lies a history of foreign ties, hidden ownership structures, and transparency concerns with the software itself. There is also a connection between two major voting systems companies, Smartmatic and Dominion Voting Systems, through the acquisition of Sequoia Voting Systems.

Information from lawsuits, public records, and witness interviews helps to

A History of Foreign Ties Behind Voting Machines Used in US    Case 1:21-cv-00445-CJN    Document 34-2    Filed 04/23/21    Page 288 of 502    3/17/21, 4:37 PM

Case 1:21-cv-00445-CJN

untangle this web. The Epoch Times spoke with an intelligence source knowledgeable on Venezuela and its criminal activities, a former CIA official who is an expert in Latin American politics and counterterrorism, and a former director of Venezuela's National Electoral Council who was fired for exposing election fraud in the country. Two of the sources requested anonymity so they could speak freely on the matter.

Smartmatic has in recent years focused on project management and consulting for elections, rather than providing software or machines.

Dominion's voting technology is currently used in 28 U.S. states and Puerto Rico, according to the firm's official website. More than 40 percent of American voters cast their ballots through the Dominion system in general elections, including 65 of Michigan's 83 counties, all 159 counties in Georgia, and 2.2 million voters in Maricopa, Arizona's largest county, among others.

## Smartmatic Origins

Smartmatic's history in Venezuela goes back to 1997, when they were known as the "Research and Development Unit of Panagroup in Venezuela," according to a 2004 archived post on Smartmatic's website. Panagroup's main goal "was to provide smart connectivity and information technologies to the automation and industrial control market," according to the post.

Smartmatic was officially incorporated in Delaware in April 2000 and headquartered in Boca Raton, Florida. In April 2003, the company unveiled a prototype election automation machine. It was developed in-house and included the integration of hardware and software from design to deployment. The company moved its main headquarters to Amsterdam in 2004 and then London in 2012.

Although a little-known company at the time, Smartmatic was chosen by

A History of Foreign Ties Behind Voting Machines Used in US    Case 1:21-cv-00445-CJN    Document 34-2    Filed 04/23/21    Page 289 of 502    3/17/21, 4:37 PM

Case 1:21-cv-00445-CJN

Venezuela's regime for a 2004 referendum that socialist leader Hugo Chávez would win. It was also used in subsequent elections. Prior to that, Smartmatic was part of a consortium that included a software company partly owned by a Venezuelan government agency. At the time, there was a wide array of allegations of fraud in the referendum by media organizations and observers.

Smartmatic allegedly has 30 anonymous investors and silent partners who are mainly upper-class Venezuelans, including defense minister Jose Vicente Rangel and Chávez mentor Luis Miquelina, and others, according to a July 20, 2006, State Department diplomatic cable that was leaked to Wikileaks.

The company publicly acknowledged that Venezuela's government manipulated the results of the country's 2017 Constitutional Assembly election. Smartmatic said the turnout figures were overstated by at least 1 million votes, Reuters reported.

"We know, without any doubt, that the turnout of the recent election for a National Constituent Assembly was manipulated," Smartmatic CEO Antonio Mugica said at a news briefing in London in 2017. "We estimate the difference between the actual participation and the one announced by authorities is at least 1 million votes."

Chávez's successor, Nicolás Maduro, who is allied with the Chinese Communist Party and Russia, was indicted by the Trump administration in March on charges of "narco-terrorism." Cuba's Fidel Castro also mourned the death of Chávez, who called him a "father, a comrade," according to a 2005 interview with Cuban Communist Party newspaper Granma.

# 'Manipulated' Results

In Venezuela, Ana Mercedes Díaz was appointed deputy director general of the country's National Electoral Council in 1991. Then, in 2003—just before the

A History of Foreign Ties Behind Voting Machines Used in US   Case 1:21-cv-00445-CJN   Document 34-2   Filed 04/23/21   Page 290 of 502   3/17/21, 4:37 PM

Case 1:21-cv-00445-CJN

referendum—she was appointed director general of political parties of the council. (The electoral council is one of the five branches of Venezuela's government responsible for overseeing its elections and referendums.)

Díaz was fired in 2004 after she published information on electoral fraud occurring in Venezuela's referendum. She said that what's happening in the United States mirrors the issues with Smartmatic in Venezuela.



Ana Mercedes Díaz, former director general of political parties for Venezuela's National Electoral Council. (Courtesy of Ana Mercedes Díaz)

"It was admitted by Smartmatic that the results can be manipulated," Díaz alleged in an interview with The Epoch Times. "Smartmatic later came out of Venezuela, but it's been proven that this type of fraud goes wherever they go. What's happening in the United States is exactly the same thing."

"This change is almost impossible to detect," Díaz alleged.

After her firing, Díaz says someone who still worked for the council sent a copy of the contract the government signed with Smartmatic. She alleges that it was negotiated in only three days and thought it strange the government chose a company with no previous history or experience in elections, despite that being one of the criteria of the council's selection.

Díaz later emigrated to the United States. Since Venezuela's 2004 referendum until his death in 2013, Chávez won all of the country's elections through a "fraudulent system," she said.

Díaz noted other parallels and similarities between issues in this year's election and what she saw in Venezuela. Many American poll watchers and challengers have submitted sworn affidavits saying they couldn't see the actual ballots being counted, due to obstruction. She said in Venezuela, "observers were also not allowed to see the votes."

"In Venezuela, the opposition was winning, the light went off, and when it came back, the results were flipped. I was following the U.S. election and there came a moment where information stopped … nobody knew what had happened," she said.

"There was nothing for a few hours—it's exactly, exactly, exactly how Smartmatic operated in Venezuela."

According to Díaz, Venezuela is exporting its voting machines to other Latin and Asian countries so they can influence elections across the globe. The U.S. government has repeatedly sanctioned officials of Maduro's regime who were involved in public corruption or undermining democracy.

Smartmatic "is thought to be backing out of Venezuelan electoral events, focusing now on other parts of the world, including the United States via its subsidiary, Sequoia," according to the leaked 2006 State Department cable.

"Smartmatic is a riddle. The company came out of nowhere to snatch a multimillion-dollar contract in an electoral process that ultimately reaffirmed Chavez's mandate and all-but destroyed his political opposition," the cable continues. "The perspective we have here, after several discussions … is that the

A History of Foreign Ties Behind Voting Machines Used in US   Case 1:21-cv-00445-CJN   Document 34-2   Filed 04/23/21   Page 292 of 502   3/17/21, 4:37 PM

Case 1:21-cv-00445-CJN

company is de facto Venezuelan and operated by Venezuelans."

A former CIA official who's an expert in Latin American politics and counterterrorism said his team found through an investigation that Chávez started to focus on voting machines to ensure victory as early as 2003, when more than 20 percent of Venezuelans signed a recall referendum to remove him as president.

"[Chávez] started talking to a company called Indra, a Spanish company which [ran] elections" in Venezuela at that time, he said.

After deciding that Indra's voting machines weren't "flexible" enough, Chávez contacted Smartmatic, according to the official. Smartmatic says that Chavez didn't contact the company but that the process went through the National Election Council; Smartmatic later won the bid over Indra, and the five-member Venezuelan electoral council, dominated by Chávez supporters, awarded a $91 million contract to Smartmatic for the referendum.

"At midnight on Election Day, the machine stopped counting," the official said, noting that Chávez was losing at that point. "By 3 a.m., Chavez had won by 10 percent."

Smartmatic spokesperson Samira Saba said that results aren't available in real time.

In 2005, Smartmatic bought Sequoia Voting Systems, a much larger and more established company based in Oakland, California. At the time, Sequoia had installed voting equipment in 17 U.S. states and Washington.

Concerns that Smartmatic had ties to Chávez were so widespread at the time that the U.S. government began investigating the takeover of the company a year after the purchase, The New York Times reported at the time. The probe was conducted by the Committee of Foreign Investment in the United States

A History of Foreign Ties Behind Voting Machines Used in US
Case 1:21-cv-00445-CJN    Document 34-2    Filed 04/23/21    Page 293 of 502    3/17/21, 4:37 PM
Case 1:21-cv-00445-CJN

conducted by the Committee of Foreign Investment in the United States (CFIUS), which reviews deals by foreign acquirers for potential national security risks.

Among the points for concern was Smartmatic's convoluted business structure.

Smartmatic's office in Boca Raton, Fla., on Dec. 2, 2020. (The Epoch Times)

"Smartmatic has claimed to be of U.S. origin, but its true owners—probably elite

A History of Foreign Ties Behind Voting Machines Used in US    Case 1:21-cv-00445-CJN    Document 34-2    Filed 04/23/21    Page 294 of 502    3/17/21, 4:37 PM

Case 1:21-cv-00445-CJN

Venezuelans of several political strains—remain hidden behind a web of holding companies in the Netherlands and Barbados," according to the State Department cable.

In 2006, Treasury Secretary John Snow had inquired whether the Venezuelan government could use Sequoia to manipulate U.S. elections. Then-Rep. Carolyn Maloney (D-N.Y.), another high-profile politician who raised similar concerns, was the first to voice the need for an investigation of the Sequoia deal.

Before it sold Sequoia, Smartmatic had refused to undergo such a review by the U.S. government, claiming all the allegations were simply rumors.

"It seems [Smartmatic] could not overcome the cloud of doubt surrounding this deal—had they been able to, we would not be talking about a sale of Sequoia today," Maloney said in a 2006 statement. "As I said in May, it seems that a CFIUS review was in fact the proper course."

Smartmatic attempted to respond to those concerns, but in 2007, ended up selling Sequoia to what the company described in a statement as "a group of private U.S. investors comprised by Sequoia's current executive management team, led by Sequoia President & CEO Jack Blaine and the company's chief financial officer, Peter McManemy."

Such private equity firms, as well as Dominion, were named in a scathing 2019 release by Sens. Elizabeth Warren (D-Mass.), Amy Klobuchar (D-Minn.), and Ron Wyden (D-Ore.), and Rep. Mark Pocan (D-Wis.), who had raised concerns about the poor condition and vulnerabilities of voting machines and other election equipment, along with a lack of transparency, in letters to these firms.

A year after Smartmatic sold Sequoia, the name of Sequoia's new owner was revealed through a 2008 lawsuit: "SVS Holdings." Court arguments uncovered that Smartmatic was still the owner of Sequoia's intellectual property.

A History of Foreign Ties Behind Voting Machines Used in US    Case 1:21-cv-00445-CJN    Document 34-2    Filed 04/23/21    Page 295 of 502    3/17/21, 4:37 PM

Case 1:21-cv-00445-CJN

# Dominion Voting Systems

Some Smartmatic employees later joined Dominion Voting Systems, which was founded in Toronto, in 2002 and also has offices in the United States and Serbia. In 2010, Eric Coomer, former Smartmatic vice president of engineering, joined Dominion.

According to a Dominion statement that has since been all but scrubbed from the internet, aside from a file saved by journalist Brad Friedman, the company announced on June 4, 2010, that it had "acquired the assets of Sequoia Voting Systems, a major U.S. provider of voting solutions serving nearly 300 jurisdictions in 16 states."

"As part of the transaction, Dominion has acquired Sequoia's inventory and all intellectual property, including software, firmware and hardware, for Sequoia's precinct and central count optical scan and DRE voting solutions, including BPS, WinEDS, Edge, Edge2, Advantage, Insight, InsightPlus and 400C systems," the release states.

Case 1:21-cv-00445-CJN

The building housing the Toronto office of Dominion Voting Systems. (The Epoch Times)

The Denver office of Dominion Voting Systems, which appears to have been abandoned, on Nov. 30, 2020. (The Epoch Times)

---

"Dominion will also retain Sequoia's facilities in Denver, Colorado, and San Leandro, California, and will consolidate Sequoia's Jamestown, New York, facility with Dominion's existing Jamestown facility," the release continues. "Dominion has hired Sequoia's customer service and technical personnel to ensure capable, experienced, and responsive customer service for all current Sequoia jurisdictions."

The release notes that Dominion's acquisition of Sequoia's assets was reviewed by the Justice Department and nine state attorneys general. It was also reviewed and approved by CFIUS.

According to a July 2009 press release distributed by Business Wire, Sequoia and Dominion at one point also signed a temporary contract with New York state "for the purchase of voting equipment and related services to Dominion Voting, with Dominion assuming all of Sequoia's obligations under the contract."

The release states the financial details of the transaction "are not being disclosed by the parties; however both Sequoia and Dominion are pleased with the outcome of this agreement."

In 2012, the connection between Dominion and Smartmatic was highlighted again in a lawsuit. Smartmatic filed the suit in the Delaware Court of Chancery against Dominion for the "company's alleged breach of a licensing agreement and tortious interference with Smartmatic's business," according to a company

statement.

"The lawsuit is seeking compensation from Dominion for allegedly withholding technology and services that had been licensed to Smartmatic, and for Dominion's intentional actions to denigrate Smartmatic's brand and undermine its relationship with customers and prospects," the release states.

The case reportedly was settled out of court.

In 2009, Dominion and Smartmatic entered into a contract in which Dominion provided Smartmatic with optical scanning machines used in the 2010 Philippines election, which at the time was "the biggest automated election run by a private company." Glitches on Smartmatic machines also took place in the Philippines election, as detailed in one report by ABS-CBN.

"Both companies' reputations suffered as a result of heavily publicized litigation relating to a software glitch that was resolved just before the 2010 election and that litigation rumbled on to partly affect the mid-term elections in 2013," according to a report published in Accesswire.

This history suggests that Dominion and Smartmatic each owned Sequoia at different points in time, and that the intellectual property of Smartmatic remains with Sequoia. It's unclear whether Dominion used Sequoia software in the recent U.S. elections.

A number of Venezuelan individuals who worked for Sequoia also allegedly worked for Smartmatic and Dominion and had become contractors for each of the companies.

"They are moving around in there," an intelligence source knowledgeable on Venezuela and its alleged criminal activities told The Epoch Times.

"Smartmatic machines allowed them to mirror the system, they can see live how

Smartmatic machines allowed them to mirror the system, they can see live how much they were losing by," the source asserted. "They tell you you would need to produce 30,000 votes and it has the ability to switch votes. Then, you balance it on your own."

There have also been numerous issues with Sequoia's voting software reported by a number of news outlets over the years. One of the problems took place in October 2006, when Sequoia, then a Denver voting machine contractor, had to send letters to 44,000 voters warning of a mistake on absentee ballots after they found the "yes" and "no" boxes on a ballot question were transposed.

Staple Street Capital, a private equity firm located in New York, purchased Dominion in 2018, according to a press release.

The securities firm that arranged the transaction, UBS Securities LLC, is a division of UBS Americas Inc., which ultimately falls under UBS Group AG, a company listed on the SIX Swiss stock exchange.

Three out of four board members of UBS Securities LLC are Chinese, at least one of whom appears to reside in Hong Kong, according to Bloomberg. UBS says it was one of the "first international banks to have a local presence" in China in the 1990s. In 2012, it formed the current company, UBS Securities Co. Ltd., which it says is the "first foreign-invested fully-licensed securities firm in China."

Officials with Dominion didn't immediately respond to a request by The Epoch Times for comment. On its website, Dominion has information under a specific subhead refuting any connection between Dominion, Smartmatic, and Sequoia.

"Dominion and Smartmatic are two separate companies that make electronic voting systems. Dominion does not use or license Smartmatic software. Smartmatic has also refuted such claims. Dominion did NOT acquire Smartmatic and/or its software from Sequoia," the website states.

John R. Mills, former director of cybersecurity policy, strategy, and international affairs at the Office of the Secretary of Defense, told The Epoch Times: "There is this interesting intersection with legacy software or firmware developers in Venezuela and the current slate of voting machines including Dominion.

"Venezuela has a solid footprint of Chinese, Russian, and Iranian activities for influence operations in the Americas. For these to not have an intersection would be odd."

Smartmatic spokesperson Saba told The Epoch Times that the company has "nothing to add" aside from the statements published on its website, "because those statements are the facts."

Its website refutes any connections with Dominion or Sequoia. One bullet point the spokesperson lists in an email is that the company's role in the 2020 U.S. election was "limited to the county of Los Angeles."

Saba said in an email to another reporter: "There are no ties between Dominion Voting Systems and Smartmatic—plain and simple. No ownership ties, no software leasing, no business at all between them. In 2009, Smartmatic licensed scanning machines from Dominion for use in The Philippines for a Smartmatic election project.

"That short-lived contract was the first and last time that Smartmatic and Dominion tried to do business together. … Smartmatic sold election technology and services in Venezuela from 2004 until 2017."

The Epoch Times visited Dominion offices in Denver and Toronto, which both appeared to be abandoned; the news outlet was denied entry to Smartmatic's office in Florida.

*Correction: A previous version of this article incorrectly stated the year*

*Smartmatic was founded. The Epoch Times regrets the error.*

*Follow Bowen on Twitter: @BowenXiao_*



**Help us spread the truth. Share this article with your friends.**

# EXHIBIT S

# Science Defies Politics

# Dominion Voting Systems is Caught

🕐 November 13, 2020    📁 -d, Big Tech, cybersecurity, dems, Dominion, elections fraud, L0    🏷 -, extra, long

==Dominion Voting Systems' Democracy Suite has features that allow for election results manipulation. The back-end software has an elections results editor, called *Results Tally and Reporting* (*RTR*). Its users are election officials. RTR is an equivalent of Microsoft Excel, but for election results. The software allows its users to enter "election results" from removable memory cards, local file system, and network. It allows you to merge multiple election results files. It allows the users to manually edit election result files. It allows users to reject election results files. In other words, it allows arbitrary change of results.==

RTR runs not on a voting machine, but on an ordinary Windows laptop, which can be connected to the Internet, and even controlled remotely.

The Dominion's training video (https://www.dominionvoting.com/training/rtr/index.html) has a subsection *Flexible management of results after the election occurred* (starting at 4:20). Look at a few screenshots from it:

Dominion Voting Systems is Caught

Case 1:21-cv-00445-CJN







Various suspicious options (Election Project, Manual Entry, Reject, Delete, Open Document Management etc.) are highlighted.

299 of 497



Yes, you read it right: Managing Election Result Files (~8:40)



Such software likely allows running arbitrary scripts changing election result files, even remotely.

Dominion's Manual (**Democracy Suite® EMS Results Tally & Reporting User Guide, Version: 5.11-CO::7, May 28, 2019, available at Colorado Secretary of State**) openly explains how to use Dominion's software to alter election results:

> "*The following Result States exist:*
>
> - *Initial: this is the first Result State that is assigned once a Result File is loaded or manually entered into the system. In this state Write-in resolution is allowed. If the result file is manually entered, the result data is still editable. Result files in this state can be deleted by the user. …*"

The Manual repeats: a result file can be loaded or manually entered. The result data is editable. Results files can be deleted. In the Dominion's old words, "*choose from a number of unique tools to custom build your perfect election.*"

On the other hand, Dominion's systems also contain a log file for each result file. If the system works as promised, it would show where in the workflow the votes were switched, deleted, or added. Correctly identifying the source of fraud is not less important than recounting votes.

Dominion Voting Systems is a Canada-based company (possibly re-registered in the US), which develops much of its software in Serbia. Between September 6 and September 16, Dominion deleted a lot of information from its website, including the names and bios of the management. These actions do not increase public trust.

# Dominion's Reaction

Dominion's response, which is continuously changing, is highly unusual. It is aggressive, desperate, and contains obvious falsehoods.

On November 13, Dominion updated its response, moved to their homepage, and wrote it in huge capital letters: "*DOMINION VOTING SYSTEMS CATEGORICALLY DENIES FALSE ASSERTIONS ABOUT VOTE SWITCHING ISSUES WITH OUR VOTING SYSTEMS.*"

The statement continues: *"First and foremost, Dominion Voting Systems categorically denies any claims about any vote switching or **alleged software issues** with our voting systems."*

No software company can guarantee that its software has no issues, especially voting software that has never been used on such a large scale. An innocent company would express trust in its software and either promise to investigate or assure the public that it had already investigated and found no significant problems. It would also apologize for any minor problems.

Instead, the company is publishing rants and making patently

false statements like "*THERE WERE NO DOMINION SOFTWARE GLITCHES*". This statement is simply not true, as evidenced by the multiple witnesses and recounting actions of multiple counties and some states. Another sentence refers to the Georgia Secretary of State as saying that all votes were accurately counted, despite the fact that he just announced a manual recount.

Further, no company issues categorical denials, essentially shifting blame onto its government customers. Also, businesses usually keep their statements very short in situations when "everything you say can and will be used against you."

Here are a couple of snapshots from earlier versions of Dominion's statements (Nov 12 and Nov 11).

**Dominion Voting Systems Series**
Part I
Part II
Part III (this)

———

**Related**

| Dominion Voting in California | 2020 Elections Fraud Updates | Shocking History of Dominion Voting |
|---|---|---|
| November 16, 2020 | December 14, 2020 | November 10, 2020 |
| In "-n" | In "-n" | In "-h" |

*4 thoughts on "Dominion Voting Systems is Caught"*

November 20, 2020 at 11:41 am

# EXHIBIT T

Stateline

# Feds Don't Regulate Election Equipment, So States Are On Their Own

**STATELINE ARTICLE**    July 10, 2019    By: Matt Vasilogambros    Topics: Politics and Campaigns & Homeland Security

Read time: 6 min



A Philadelphia investigator demonstrates new voting machines. Pennsylvania is one of several states replacing election equipment before the 2020 presidential election.

Matt Rourke/The Associated Press

Behind nearly every voter registration database, voting machine and county website that posts results on Election Day, there's an election technology company that has developed those systems and equipment.

By targeting one of those private vendors, Russia, China or some other U.S. adversary could tamper with voter registration rolls, the ballot count or the publicly released results,

Case 1:21-cv-00445-CJN Document 34-2 Filed 04/23/21 Page 310 of 502

Case 1:21-cv-00445-CJN

potentially casting doubt on the legitimacy of the final tally.

Nevertheless, there are no federal rules requiring vendors to meet security standards, test equipment for vulnerabilities or publicly disclose hacking attempts. With the 2020 presidential election approaching, security experts, lawmakers and even election vendors themselves are calling for more rigorous testing of election equipment and stricter security standards for the private companies that provide election-related services.

"The lack of vendor regulation in the election technology space is a big gap that needs to be addressed," said Edgardo Cortés, an election security expert at the Brennan Center for Justice at New York University Law School.

One of the many revelations from special counsel Robert Mueller's report on foreign interference in the 2016 presidential election was that Russian military intelligence officers targeted employees of an election vendor that develops software that U.S. counties use to manage voter registration rolls.

Russians, according to the report, successfully installed malware on that company's network. The name of the company was redacted, though according to reporting from *The Intercept*, the company was VR Systems, which maintains voter registration systems in eight states. The company has denied that Russians infiltrated its systems.

The threat did not stop after 2016, according to Maurice Turner, a senior technologist at the nonprofit Center for Democracy and Technology in Washington, D.C.

"The Mueller report is proof that targeting vendors is no longer a theoretical route," said Turner, who worries that election technology companies are not rising to the challenge.

For example, election security experts have criticized Elections Systems & Software (ES&S), one of the largest election technology companies in the country, for installing software on 300 jurisdictions' systems between 2000 and 2006 that was vulnerable to hackers. (The company will not disclose which jurisdictions were impacted.)

But the company notes that the vulnerable software hasn't been used in more than a decade. It now submits its equipment to the U.S. Election Assistance Commission — a federal agency that serves as a resource for election administrators and vendors — for testing and certification. It also contracts with the Idaho National Lab, to assess whether its equipment can be penetrated, and the U.S. Department of Homeland Security, to scan its public-facing website.

4/7/2021 Case 1:21-cv-00445-CJN Document 34-2 Filed 04/23/21 Page 311 of 502
Feds Don't Regulate Election Equipment, So States Are on Their Own | The Pew Charitable Trusts

Case 1:21-cv-00445-CJN

ES&S is in a "very strong position going into 2020" said Kathy Rogers, its senior vice president of government relations. But there should be even more testing, she said.

"People say there isn't enough testing," she told *Stateline*. "We agree."

Hart InterCivic, another top election vendor, denied an interview to *Stateline*, but it pointed to an April letter it sent to Congress emphasizing that "protecting the integrity of elections is at the core of everything we do" and calling for more federal funding for election security.

But Richard DeMillo, a professor of computing at Georgia Tech University, says vendors that boast about taking new steps to secure their systems "are being disingenuous."

"What they're doing is giving the appearance of a company that is concerned about security," he said, "but it doesn't take much digging to see that they're not."

As an example, DeMillo pointed to last September's Def Con hackers conference in Las Vegas, when ES&S lambasted researchers for publicly testing the company's voting machines and publishing their vulnerabilities. The company at the time said foreign spies may have infiltrated the event. Researchers found several bugs in the software that left machines hackable.

Computing experts like DeMillo say independent public testing is essential to preventing foreign hacking in future elections.

Rogers of ES&S said her company is open to further testing, but that industry leaders, government officials and security experts should collaborate on hackathons.

## Voluntary Security Requirements

Since 2017, the federal government has considered election systems to be critical infrastructure, just like nuclear facilities and public utilities.

While there are no federal mandates for election vendors, many states require vendors to follow voluntary guidelines from the U.S. Election Assistance Commission.

States can set security requirements during contract talks for new equipment. According to a 2018 analysis by the National Conference of State Legislatures, 38 states require some element of federal testing and certification of election systems before installing them in their state. In eight states, officials do not require that sort of testing or certification.

At the federal level, Republicans have resisted tougher regulations.

In June, the Democratic-led U.S. House passed an election-security bill that would, among other measures, require backup paper ballots for all federal elections and add cybersecurity safeguards for election equipment and systems. The bill also would authorize $600 million in additional funding to states to boost security.

It garnered only one Republican vote, from U.S. Rep. Brian Mast of Florida. And GOP Senate Majority Leader Mitch McConnell of Kentucky has signaled his unwillingness to take up election security measures, long believing elections should remain a states' issue.

Brennan's Cortés, who served as Virginia's commissioner of elections for four years until 2018, said that if the federal government won't act, states and counties should push for security requirements in their contracts with private vendors.

A few days before the November midterms, Wayne County, which encompasses Detroit, said it would no longer use a vendor that failed to fix delays and accuracy issues that occurred in the primary.

And in February, Maryland announced it was cutting ties with an election vendor connected to a Russian oligarch. After investigating the company and its ties to Russia last year, the Department of Homeland Security found no evidence of foreign interference in the state's election systems.

But Cortés acknowledged that many smaller counties lack the leverage to demand tougher security requirements for election vendors, in part because the industry is dominated by three companies: ES&S, Dominion Voting Systems and Hart InterCivic get 90% of the business.

Some critics have noted the close ties between these companies and election officials. The companies have covered travel expenses for industry meetings and formed customer advisory boards comprised of state and local election officials.

Rogers, at ES&S, said the procurement process is governed by "strict laws" at the federal and state levels, and the company makes sure they are "100 percent within those boundaries."

## Georgia Controversy

Similar criticisms have arisen in Georgia this year as the state decides which voting machines to use for future elections and which vendor will provide them.

Republican Gov. Brian Kemp signed a law in April to begin a search for a new statewide voting system. Georgia soon will be the only state in the country to conduct all its voting on touch-screen ballot-marking devices, which print a paper record.

Feds Don't Regulate Election Equipment, So States Are On Their Own | The Pew Charitable Trusts

But this has drawn the ire of a large contingent of election security experts, who say those machines are vulnerable to hacking and bugs that can alter votes. It is "impossible to make them perfectly secure," DeMillo wrote in a recent paper.

Democratic state Sen. Elena Parent has been an outspoken critic not only of the "insecure" voting machines Georgia is preparing to purchase, but also of the contract process, which she said has been driven by "cronyism" and well-placed lobbyists. It leaves her with "a lot outstanding questions."

"There's a strong concern when it comes to something as fundamental as election security," Parent told *Stateline*. "And anyone poo-pooing that is doing a disservice to the people that they represent."

Until the $150 million contract for 27,000 new voting machines is awarded, Georgia officials have been tight-lipped on any special security measures they'll negotiate with a vendor.

Tess Hammock, press secretary for Republican Secretary of State Brad Raffensperger, would not comment on questions related to the contract process nor on the importance of security standards in election administration. She referred questions to the office's Request for Proposals document, which requires that any new hardware "must ensure security."

The document mandates that suppliers provide a detailed overview of the company's security protocols, software and cyber defenses of the products. The state also would have the power to conduct post-election audits using the new equipment, the document stipulates.

Beyond this, DeMillo said, there are no security requirements for software testing and notification of malicious breaches.

Georgia likely will announce its new election vendor in the next month, Hammock said. Four companies — Dominion Voting, ES&S, Hart InterCivic and Smartmatic — have submitted bids.

Meanwhile, a lawsuit seeking to change Georgia's voting system to hand-marked paper ballots is moving forward in federal court. The plaintiffs in the suit, individual voters and a group called the Coalition for Good Governance allege the touch-screen voting machines are hackable.

‹ Top State Stories 7/9                    Top State Stories 7/10 ›

**AUTHORS**



[Matt Vasilogambros](#)
Staff Writer
Stateline

**RELATED**

Topics    [Politics and Campaigns](#), [Homeland Security](#)

Places    [United States](#)

**EXPLORE MORE FROM STATELINE**

| explore by place | ⌄ |
|---|---|

| explore by topic | ⌄ |
|---|---|

---

**About Stateline**

Stateline provides daily reporting and analysis on trends in state policy.

[About Stateline →](#)

**Media Contact**

**Grace Jensen-Moran**

Senior Associate, Communications

[202.540.6804](#)

✉

SIGN UP

**Sign up for our daily update— original reporting on state policy, plus the day's five top reads from around the Web.**

| Email address | SUBMIT |
|---|---|

# EXHIBIT U

*our latest*

*most popular*

*contributors*

*subscribe*

*Search ...*



Case 1:21-cv-00445-CJN

MEDIA

# Media's Entire Georgia Narrative Is Fraudulent, Not Just The Fabricated Trump Quotes

*The fake quotes, bad as they were, are just one of many ways the media have done a horrible job of covering election disputes in the state.*

The Washington Post was busted for publishing fabricated quotes from an anonymous source, attributing them to a sitting president, and using those quotes as a basis to speculate the president committed a crime. The invented Donald Trump quotes, which related to a fight over election integrity in Georgia, were cited in Democrats' impeachment brief and during the Senate impeachment trial.

But the fake quotes, bad as they were, are just one of many ways the media have done a horrible job of covering election disputes in the state.

According to the media narrative, the Georgia presidential election was as perfectly run as any election in history, and anyone who says otherwise is a liar. To push that narrative, the media steadfastly downplayed, ignored, or prejudiciously dismissed legitimate concerns with how Georgia had run its November 2020 election and complaints about it.

That posture was the complete opposite of how they were reporting on Georgia elections prior to Democrats performing well in them. In the months prior to November, some media sounded a bit like Lin Wood when they wrote about Secretary of State Brad

311 of 497

Raffensperger, Dominion Voting Systems, legal challenges in the state, and Georgia election integrity in general.

## How Media Talked About Georgia Before Biden Won

"Georgia's Election Mess: Many Problems, Plenty of Blame, Few Solutions for November," read the June 10, 2020, New York Times headline of a story by Richard Fausset and Reid Epstein about the "disastrous primary election" in June that was "plagued by glitches, but Democrats also saw a systemic effort to disenfranchise voters."

Citing irregularities with absentee ballots and peculiarities at polling sites, the authors said Georgia's "embattled election officials" were dealing with a voting system that suffered a "spectacular collapse." They said it was unclear whether the problems were caused by "mere bungling, or an intentional effort" by Raffensperger and his fellow Republicans in the secretary of state's office.

"Georgia's troubled system" would be exacerbated by voting by mail and the increased burden of handling absentee ballots, the article said. The "trouble that plunged Georgia's voting system into chaos" was related to its Dominion Voting Systems, "which some elections experts had been sounding alarm bells about for months." Indeed they had!

"Georgia likely to plow ahead with buying insecure voting machines," wrote Politico's Eric Geller in March 2019 about the plan to replace voting machines. He said cybersecurity experts, election integrity advocates, and Georgia Democrats had all warned about the security problems of the new machines, which would be electronic but also spit out a marked paper ballot.

"Security experts warn that an intruder can corrupt the machines and alter the barcode-based ballots without voters or election officials realizing it," he wrote. It was alleged that a "meaningful audit" was "impossible."

When Georgia picked Dominion Voting Systems in August 2019, the Atlanta Journal-Constitution warned "critics say the system will still be vulnerable to hacking," citing high-profile hacks of Capital One and Equifax, as well as the online attacks on Atlanta and Georgia courts. "Election officials will have to be on guard against malware, viruses, stolen passwords and Russian interference," the article continued. Yes, Russians.

"Georgia in Uproar Over Voting Meltdown," The New York Times proclaimed in a June 9, 2020, story, citing problems with Dominion Voting Systems and Raffensperger's management of the election. "The machines bought by the state last year were instantly controversial. Security experts said they were insecure. Privacy experts worried that the screens could be seen from nearly 30 feet away. Budget hawks balked at the price tag. And one of Dominion Voting Systems' lobbyists, Jared Samuel Thomas, has deep connections to Gov. Brian Kemp, the Republican who defeated Ms. Abrams in 2018," the article read.

Washington Post went with "As Georgia rolls out new voting machines for 2020, worries about election security persist," which said, "election security experts said the state's newest voting machines also remain vulnerable to potential intrusions or malfunctions — and some view the paper records they produce as insufficient if a verified audit of the vote is needed."

If critics on the right were to restate these complaints now, it is likely that tech platforms would ban them or otherwise constrain their free discussion. The same media outlets would likely characterize these claims and concerns as unfounded.

## 'Sue and Settle' Smuggles In Major Change to Mail-In

Democrats use various strategies to implement changes to voting laws in order to limit election integrity or make it more difficult for election overseers and observers to detect election fraud. One of the approaches is termed "sue and settle."

Perkins Coie, the law firm that also ordered what became the Russia collusion hoax against Trump in 2016, runs an extremely well-funded and highly coordinated operation to alter how U.S. elections are run. The firm will sue states and get them to make agreements that alter their voting practices.

Marc Elias, well known for his role in the Russia collusion hoax and other Democrat operations, runs the campaign to change voting laws and practices to favor Democrats. Perkins Coie billed the Democrat Party at least $27 million for its efforts to radically change voting laws ahead of the 2020 election, more than double what they charged Hillary Clinton and the Democratic National Committee for similar work in 2016. Elias was sanctioned in federal court just yesterday for some shenanigans related to a Texas election integrity case.

3/31/2021     Case 1:21-cv-00445-CJN   Media's Entire Georgia Narrative Is Fraudulent, Not Just Trump Quotes   Document 34-2   Filed 04/23/21   Page 319 of 502

Case 1:21-cv-00445-CJN

In March, Raffensperger voluntarily agreed to a settlement in federal court with various Democrat groups, which had sued the state over its rules for absentee voting. The end result was a dramatic alteration in how Georgia conducted the 2020 election.

Republicans were not party to the agreement, despite their huge interest in the case. The agreement explicitly states that neither Raffensperger nor the Democratic groups who sued him take a position on whether the laws and procedures being changed were constitutional or not.

Democrats' high-powered attorneys introduced several significant changes, such as the opportunity to "cure" ballots. That means that when an absentee ballot comes in with problems that would typically lead it to be trashed, the voter is instead given a chance to "cure" or correct the ballot. It also said Democrats would offer training and guidance on signature verification to county registrars and absentee ballot clerks.

Most importantly, the settlement got rid of any meaningful signature match. The law had previously required signatures to match the signature on file with the Georgia voter registration database. But the settlement allowed the signature to match *any* signature on file, including the one on the absentee ballot application. That meant a fraudulently obtained ballot would easily have a signature match and no way to detect fraud.

The ballot also could only be rejected if a majority of registrars, deputy registrars, and ballot clerks agreed to it, another burden that made it easier to just let all ballots through without scrutiny. It made a huge difference in how many ballots were rejected.

Raffensperger's decision to voluntarily agree to such a dramatic change in the rules of the game without input from the Republican Party of Georgia, much less the Republican National Committee, angered many Republicans, including Sens. Kelly Loeffler and David Perdue, as they learned about it following the November 2020 election. Other Republicans felt he harmed election integrity by mailing out millions of absentee ballot applications, ostensibly because of health concerns related to COVID-19.

## Election Day Drama

This brings us to election day. Because so many people had voted by mail or otherwise early, the in-person voting was fairly routine with just a few problems here and there. But one major problem was with counting votes.

314 of 497

3/31/2021    Case 1:21-cv-00445-CJN   Media's Entire Georgia Narrative Is Fraudulent, Not Just The Fabricated Trump Quotes    Page 320 of 502

Case 1:21-cv-00445-CJN

A major processing center in Fulton, the state's most populous county, claimed at one point to have trouble counting ballots in the evening because of a burst pipe or even, some officials said, a water main break. It turned out it was actually a minor urinal leak that had occurred that morning and hadn't really disrupted anything.

Things only got weirder. That night, an election official curiously announced that they were closing up shop for the evening, even though there were tons of ballots left to count. As workers closed their counting operations and many began to leave, the news media and other election observers left. The news media reported they'd been told the ballot counting would stop.

But even though Fulton publicly said they were stopping the count, they didn't stop counting ballots. Republicans who were already frustrated that they weren't near enough to properly observe the counting were outraged and cried foul when they discovered they'd been misled and encouraged to leave.

Election officials denied wrongdoing. A video came out corroborating the claims of Republican poll watchers and the media about being told the counting would stop. The video also showed ballots being pulled out from under a table, and other suspicious actions that led many observers to question the integrity of the operation. Fulton County and Georgia secretary of state officials pooh-poohed the concerns or claimed, without providing a report or substantive rebuttal, that they'd looked into the situation and found nothing problematic.

For context, the shutdown — or not — of the counting of ballots was at the point in the evening when people nationwide were realizing that the media's polls purporting to show that Biden would win the election significantly and easily were false. Trump had won Florida big. He had won Ohio big. He had won Iowa big. He was performing better than the polls had told people he'd perform. And he was up big in Georgia, too.

Many days after election day, with ballots taking an extremely long time to count, Biden began taking a small lead in the Georgia race. A "secret," "well-funded cabal" of left-wing groups, as Time magazine would later describe them, had told allies in the media to prepare for a situation where Trump was ahead bigly on election night but Biden pulled ahead as the days dragged on. It was part of the Democrat strategy.

315 of 497

But for Republicans, already concerned about the inherent lack of election integrity associated with mail-in ballots, the questionable security and chain of custody problems associated with rampant use of ballot drop-boxes, the large outside funding of vote processes by tech oligarchs, and all the other problems wrought by voting and counting ballots over a period of many weeks, if not months, the situation was deeply alarming.

Even without all these changes, average Americans' ability to trust an election is free and fair is one of the most important and basic things that preserves the republic. In 2020, election officials who were introducing radical changes at the same time scrutiny was being done away with were playing with fire.

All that being said, Biden was looking like he won Georgia by enough of a margin to make any challenges a heavy lift.

## A Serious Lawsuit Is Filed

While conspiracy theories about election fraud went wild during this time — ranging from The New York Times' claim that there was no election fraud anywhere in the entire country to dramatic claims of a global conspiracy involving Venezuela and voting machines — the Trump campaign's official claims in its lawsuit filed on Dec. 4, 2020, were sober and serious. They weren't alleging foreign meddling or outside hacking, as The New York Times, Washington Post, Politico, and Atlanta Journal-Constitution warned just months earlier were serious concerns.

The Georgia Supreme Court had previously ruled that challengers to an election don't need to show definitive fraud with particular votes, just that there were enough irregular ballots or violations of election procedures to place doubt in the result. Judges never want to overturn the results of an election, but under Georgia law, the remedy for showing enough problems to cast doubt was that a new election be held. One was already scheduled for early January for Senate runoff races. Trump's lawsuit argued that it appeared votes had come from:

- 2,560 felons,
- 66,247 underage registrants,
- 2,423 people who were not on the state's voter rolls,
- 4,926 voters who had registered in another state after they registered in Georgia, making them ineligible,

https://thefederalist.com/2021/03/17/medias-entire-georgia-narrative-is-fraudulent-not-just-the-fabricated-trump-quotes/

- 395 people who cast votes in another state for the same election,
- 15,700 voters who had filed national change of address forms without re-registering,
- 40,279 people who had moved counties without re-registering,
- 1,043 people who claimed the physical impossibility of a P.O. Box as their address,
- 98 people who registered after the deadline, and, among others,
- 10,315 people who were deceased on election day (8,718 of whom had been registered as dead before their votes were accepted).

Unlike so much of the Trump campaign's legal efforts, outside observers agreed that this lawsuit was serious:

> The 64-page complaint is a linear, cogently presented description of numerous election-law violations, apparently based on hard data. If true, the allegations would potentially disqualify nearly 150,000 illegal votes in a state that Biden won by only 12,000.

But as legitimate as the lawsuit was, it entered a Kafka-esque world where it couldn't get heard.

The election code in Georgia requires that an election contest has to be served to defendants by the sheriff. The clerk is supposed to quickly give special notice to the relevant sheriffs that it needs to be served, since election lawsuits need extremely quick resolution and require a hearing within 20 days.

Lawyers for Trump had to keep asking the clerk to give that special notice to the sheriffs where the defendants lived. In one case, a county sheriff waited until the end of January of 2021 before asking if he should serve it.

At the same time, all sorts of attorneys associated with Elias and Perkins Coie began filing pro hac vice requests,  where you ask to appear in court for a particular trial, even though you're not admitted to the bar in that state. The powerhouse attorneys began filing all sorts of special motions to dismiss, even before they were given permission. The Trump attorneys were responding anyway, just in case a court took those requests seriously.

Fulton County Judge Constance Russell, assigned by lottery to the case, turned out to be ineligible because the law says the judge hearing the case can't be an active sitting judge from the county where the suit is filed. But before she left the case, she entered an

3/31/2021　Case 1:21-cv-00445-CJN　Media's Entire Georgia Narrative Is Fraudulent, Not Just The Fabricated Trump Quotes　Document 34-2　Is Filed 04/23/21　Page 323 of 502

Case 1:21-cv-00445-CJN

interim order that the case was going to go on a normal procedural course, "which means it will not be resolved any time soon," as the Journal-Constitution put it.

The Trump team had filed their lawsuit with an emergency temporary restraining order request to prevent certification of the election. When Raffensperger certified the election, the Trump team withdrew their motion and filed a new emergency motion to decertify.

With no hearing in sight, the Trump team — desperate to get to a court date before the Electoral College convened — appealed to the Georgia Supreme Court, asking it to grant immediate review of that interim order slow-walking the case, as well as the judge. That court said they couldn't do anything about the interim order because they lacked final jurisdiction.

They did get a liberal senior judge from Cobb County, Adele Grubbs, to handle the case. She set a date for a hearing of Jan. 8, which was of no help to the Trump team as it was after Jan. 6, when Congress would process the Electoral College vote.

In the midst of all this, the Trump team also had a federal case before Judge Mark Cohen on Jan. 5. That case dealt with the Trump team's view that they had not gotten their day in Fulton County Superior Court, which they perceived as a due process violation.

While he dismissed the case, noting that they'd soon have a hearing before Grubbs, Cohen also noted that the power and authority to do anything about the election dispute lies with Congress, not the court. All the lawsuits being filed over the country were being turned away by courts and dismissed for lack of standing, but this judge provided some direction by saying the power regarding contesting the 2020 election lay with Congress, and not the courts.

Following Trump's phone call with Raffensperger's team on Jan. 2, counsel for Raffensperger sent a letter saying that if the Trump team wanted access to the state's data in order to determine the merits of their claims about improper voting, they would have to drop their lawsuit.

"[W]e are still willing to cooperatively share information with you outside the pending litigation on the condition that all currently pending suits against the Governor, the Secretary of State, and/or the members of the State Election Board be voluntarily

3/31/2021    Case 1:21-cv-00445-CJN's Entire Georgia Narrative Is Fraudulent, Not Just the Fabricated Trump Quotes 324 of 502

Case 1:21-cv-00445-CJN

dismissed. Absent dismissal, we have no choice but to remain in a litigation posture and to continue resolving these disputes in court," wrote Christopher Anulewicz.

The Trump team discussed whether to accept the offer. They decided to opt for access to the information. A letter from a Trump attorney said the offer was accepted and that "[w]e look forward to working and meeting with" staff to "receive the heretofore withheld November 3, 2020 election data," specifically mentioning expert reports, official election records, voter registration records, applications for absentee ballots, investigative reports, and other relevant data and information. The team suggested making a joint statement that the contest had been settled.

Raffensperger's team opened the email immediately but waited several hours to respond, and when they did, they claimed they'd never made an offer to share information, just that they wouldn't even consider discussing the matter unless the case was dropped.

## Finally … The Phone Calls

This brings us back to the phone calls.

We now know that the account of Trump's call to an investigator was based on false quotes. Another call with Raffensperger was also leaked to the press to harm those who opposed Raffensperger's handling of the election, days before another pivotal election.

Much of the angst over the calls was about Trump saying he needed the secretary of state to "find" votes. This was always characterized as him asking Raffensperger to commit fraud or do something unethical. It even made it into the article of impeachment that Democrats supported.

Anyone familiar with the lawsuit knew Trump was saying his team had *already* "found" nearly 150,000 irregular or fraudulent votes and simply needed the secretary of state's office to agree. He was saying they didn't need to agree that all 150,000 were bad, just that fewer than 10 percent of them were problematic.

The secretary of state and his team kept asserting that Trump's figures were wrong. Trump's legal team kept asking Raffensperger to provide the state data and information that would enable them to see for themselves. For some reason, Raffensperger and his team have never been willing to share their data or reports.

Case 1:21-cv-00445-CJN Document 34-2 Filed 04/23/21 Page 325 of 502

Case 1:21-cv-00445-CJN

Fox News' Martha MacCallum asked Raffensperger directly if he authorized the leak of the second call, and he repeatedly refused to answer the question. The leak happened just days before a close Senate race that Republicans would lose, and Raffensperger admitted to MacCallum that it coincided with his anger at Republican Sen. David Perdue, whom he blamed for animosity directed at his wife after Perdue called for him to resign.

Jordan Fuchs, the deputy secretary of state, has also been fingered as being involved in both of those leaks, and the Washington Post said she agreed to be named as the source of the quotes on the former call. Fuchs has no background in election management or experience running a large organization, but she was Raffensperger's campaign manager in 2018.

That might explain why she has run the office more as a campaign shop. Even the mildest of criticisms of her boss and their office meet brutal pushback, which has caused a serious deterioration with the legislature and many Republicans, even before the last few months.

Fuchs's Twitter account isn't quite as unhinged as Jen Rubin's or Bill Kristol's, but it's pretty close. There are few NeverTrumpist arguments she avoids, and she shares the media's newfound talking point that election fraud is a "big lie." It doesn't exactly build confidence that she knows what she's doing, is able to separate her emotions from her work, or is capable of understanding legitimate complaints with how she manages elections.

For months, the Trump team tried desperately to get a hearing in court to make their case, and the court dockets prove that. In fact, they kept getting into trouble for how aggressively they were trying to get a hearing. Trump attorneys were on record saying they wanted the hearing so they might get access to Raffensperger's information. The information was really what they were after.

They issued a statement after the leak to the Washington Post saying Raffensperger's office "has made many statements over the past two months that are simply not correct and everyone involved with the efforts on behalf of the President's election challenge has said the same thing: show us your records on which you rely to make these statements that our numbers are wrong."

Raffensperger's office finally said, after that infamous phone call, that they'd share state data and information "on the condition" that the Trump team drop their lawsuit. They agreed to that. Instead of turning over the data that would settle the issue, Fuchs and Raffensperger issued a press release that said, "on the eve of getting the day in court they supposedly were begging for, President Trump and Chairman David Shafer's legal team folded Thursday and voluntarily dismissed their election contests against Secretary of State Brad Raffensperger rather than submit their evidence to a court and to cross-examination."

It showed just how political Raffensperger and Fuchs are. While the media strongly support Raffensperger, at least until such time as a Republican wins in Georgia again, the concern about the integrity of the election remains.

Perhaps Raffensperger is completely and totally correct. But it would behoove him to share the data that proves that rather than issue antagonistic and uncharitable press releases while sitting on the information that could settle the issue.

As for the media, they're doing what they always do — advancing a political agenda. Believing their characterization of lawsuits, phone calls, or anything else they report on is unwise.

But it wasn't just the quotes they got wrong about Georgia. It was pretty much everything.

*Update: This piece was updated to correct spelling, and that the Secretary of State's office mailed ballot applications out to millions of Georgians.*

> *Mollie Ziegler Hemingway is a senior editor at The Federalist. She is Senior Journalism Fellow at Hillsdale College and a Fox News contributor. She is the co-author of Justice on Trial: The Kavanaugh Confirmation and the Future of the Supreme Court. Follow her on Twitter at @mzhemingway*

Copyright © 2021 The Federalist, a wholly independent division of FDRLST Media, All Rights Reserved.

# EXHIBIT V

WATCH LIVE: Derek Chauvin trial, Day 3 ›

VOTE WATCH

## 'Online and vulnerable': Experts find nearly three dozen U.S. voting systems connected to internet

A team of election security experts used a "Google for servers" to challenge claims that voting machines do not connect to the internet and found some did.



Jan. 10, 2020, 5:36 PM CST

**By Kevin Monahan, Cynthia McFadden and Didi Martinez**

It was an assurance designed to bolster public confidence in the way America votes: Voting machines "are not connected to the internet."

Then Acting Undersecretary for Cybersecurity and Communications at the Department of Homeland Security Jeanette Manfra said those words in 2017, testifying before Congress while

3/31/2021     Online vulnerable: Experts find nearly three dozen U.S. voting systems connected to internet
Case 1:21-cv-00445-CJN    Document 34-2    Filed 04/28/21    Page 329 of 502

Case 1:21-cv-00445-CJN

she was responsible for the security of the nation's voting system.

So many government officials like Manfra have said the same thing over the last few years that it is commonly accepted as gospel by most Americans. Behind it is the notion that if voting systems are not online, hackers will have a harder time compromising them.

But that is an overstatement, according to a team of 10 independent cybersecurity experts who specialize in voting systems and elections. While the voting machines themselves are not designed to be online, the larger voting systems in many states end up there, putting the voting process at risk.

That team of election security experts say that last summer, they discovered some systems are, in fact, online.

"We found over 35 [voting systems] had been left online and we're still continuing to find more," Kevin Skoglund, a senior technical advisor at the election security advocacy group National Election Defense Coalition, told NBC News.

—— Kevin Skoglund, senior technical advisor at the National Election Defense Coalition.    NBC News

"We kept hearing from election officials that voting machines were never on the internet," he said. "And we knew that wasn't true. And so we set out to try and find the voting machines to see if we could find them on the internet, and especially the back-end systems that voting machines in the precinct were connecting to to report their results."

Skoglund and his team developed a tool that scoured the internet to see if the central computers that program voting machines and run the entire election process at the precinct level were online. Once they had identified such systems, they contacted the relevant election officials and also provided the information to reporter Kim Zetter, who published the findings in Vice's Motherboard in August.

The three largest voting manufacturing companies – Election Systems &Software, Dominion Voting Systems and Hart InterCivic – have acknowledged they all put modems in some of their tabulators and scanners. The reason? So that unofficial election results can more quickly be relayed to the public. Those modems connect to cell phone networks, which, in turn, are connected to the internet.

The largest manufacturer of voting machines told NBC News their systems are protected by firewalls and are not on the "public internet." But both Skoglund and Andrew Appel, a Princeton computer science professor and expert on elections, said such firewalls can and have been breached.

"AT&T and Verizon and so on try and protect as best they can the security of their phone network from the rest of the internet, but it's still part of the internet," Appel explained. "There can still be security holes that allow hackers to get into the phone network."

The 35 systems Skoglund's team found represent a fraction of total voting systems nationwide, though he believes they only captured a portion of the systems that are or have been online. Earlier this week, Skoglund showed NBC three election systems were still online even after officials had been told they were vulnerable.

For election systems to be online, even momentarily, presents a serious problem, according to Appel.

"Once a hacker starts talking to the voting machine through the modem, the hacker cannot just change these unofficial election results, they can hack the software in the voting machine and make it cheat in future elections," he said.

The National Institute of Standards and Technology, which provides cybersecurity frameworks for state and local governments and other organizations, recommends that voting systems should not have wireless network connections.

Skoglund said that they identified only one company among the systems they detected on line, ES&S. ES&S confirmed they had sold scanners with wireless modems to at least 11 states. Skoglund says those include the battleground states of Michigan, Wisconsin and Florida.

While the company's website states that "zero" of its voting tabulators are connected to the internet, ES&S told NBC News 14,000 of their DS200 tabulators with online modems are currently in use around the country.

New questions about voting machines as 2020 election approaches



## 'Vulnerable to hacking'

With the 2020 presidential election only ten months away, Appel and Skoglund believe all modems can and should be removed from election systems.

“Modems in voting machines are a bad idea,” said Appel. “Those modems that ES&S [and other manufacturers] are putting in their voting machines are network connections, and that leaves them vulnerable to hacking by anybody who can connect to that network.”

The state of Michigan is currently grappling with this issue. Since the 2016 election, Michigan authorized $82 million dollars to upgrade its election systems. Some of that money was spent on tabulators with wireless modems. But now, some state officials worry that the machines may pose a security risk and are pushing to have the modems removed.

Others are not so sure, and the state has set up an advisory committee.

Jake Rollow, director of communications for the Michigan Department of State, said in a statement to NBC News, “Even though the results are unofficial, if these unofficial results were disrupted or manipulated, it could still cause confusion on Election Day.”

"The department will consider the advisory commission’s recommendations to improve the security of the process," Rollow continued. "The specific steps taken would depend on the recommendation and the timeline required to make changes effectively."

3/31/2021

Case 1:21-cv-00445-CJN    Online vulnerable experts find nearly three dozen U.S. voting systems connected to internet    Document 34-2    Filed 04/28/21    Page 332 of 502

Case 1:21-cv-00445-CJN

Oregon officials say vote-by-mail system improves security and turnout



Last fall, when ES&S gave NBC News an exclusive tour at its headquarters in Omaha, Neb., Chief Executive Officer Tom Burt defended using modems when asked about the Sprint and Verizon modems seen in ES&S's testing area.

"There's a small percentage of jurisdictions in the country -- a lot of them are in Florida -- who have decided they want to modem unofficial results to the election office," he said. "Generally speaking, the media in those locations are kinda clamoring to get unofficial results as quickly as possible."

When asked if the desire for speed was at odds with accuracy and security, Burt said, "it's not my place to judge that."

NBC News reached out to the Department of Homeland Security, which declined to comment on the topic of modem security in voting machine tabulators and scanners.

## 'Inviting trouble'

Critics also argue ES&S has mislead jurisdictions into thinking their DS200 tabulators with modems are certified by the U.S. Election Assistance Commission, a claim they say is grounds for an investigation.

Case 1:21-cv-00445-CJN Document 34-8 Filed 04/28/21 Page 333 of 502

Online-invulnerable-experts-find-nearly-three-dozen-U.S.-voting-systems-connected-to-internet
Case 1:21-cv-00445-CJN

In a letter obtained by NBC News sent to the EAC on Tuesday, the nonprofit public interest group Free Speech for People and the National Election Defense Coalition asked the agency to look into whether ES&S violated agency regulations by implying that DS200 voting machines with modems are EAC certified.

"ES&S has repeatedly advertised its DS200 with internal modem – a critical component to ES&S's voting systems – as being EAC certified when, in fact, it is not," the letter said. "We therefore again respectfully request that EAC investigate and take action to correct this serious issue."

**Manufacturers who make voting machines testify before Congress**



"Once you add that modem, you are de-certifying it," Skoglund said. "It is no longer federally certified. And I don't know that all these jurisdictions are aware of that because ES&S is advertising otherwise."

But Skogland points to some good news. He believes there is time to make real change before the 2020 election.

"We should be unplugging all of these machines from the internet," Skoglund said. "Even for elections nights."

3/31/2021

Appel agreed. "We can not make our computers perfectly secure," he said. "What we should do is remove all of the unnecessary, hackable pathways, such as modems. We should not connect our voting machines directly to the computer networks. That is just inviting trouble."

These two tech experts also agree on the path forward, saying they are comforted by the fact that most Americans will vote this year on hand-marked paper ballots which are counted by machine and can be recounted by hand if the situation warrants.

The machines America votes on seem to be capturing the interest of some in Congress. The House Committee on Administration held a congressional hearing yesterday which was the first time the heads of the three major vendors, representing at least 80 percent of U.S. voting machines, appeared together for questioning. While lawmakers questioned them about foreign influence in their supply chains and whether they would comply with more federal reporting requirements, the presence of modems in some of their tabulators was mentioned but not pursued.

**EDITOR'S NOTE** (Feb. 7, 2020, 11:15 p.m.): A previous version of this article stated that Kevin Skoglund and his team had found election systems using ES&S scanners with wireless modems connected to the internet in 11 states and the District of Columbia. The coalition says it is no longer certain that the number of states is correct, so the figure has been removed from the article.

---

Kevin Monahan

 

Kevin Monahan is a producer for the NBC News Investigative Unit.

---



Cynthia McFadden

Cynthia McFadden is the senior legal and investigative correspondent for NBC News.

---



Didi Martinez



Didi Martinez is an associate producer with the NBC News Investigative Unit.

---

ABOUT

CONTACT

CAREERS

PRIVACY POLICY

DO NOT SELL MY PERSONAL INFORMATION

© 2021 NBC UNIVERSAL

CA NOTICE

TERMS OF SERVICE

NBCNEWS.COM SITE MAP

ADVERTISE

AD CHOICES

# EXHIBIT W

PRINTER FRIENDLY

URL: http://www.rollingstone.com/politics/story/11717105/robert_f_kennedy_jr__will_the_next_election_be_hacked

**Rollingstone.com**

Back to  Robert F. Kennedy Jr. -- Will The Next Election Be Hacked?

# Will The Next Election Be Hacked?

*Fresh disasters at the polls -- and new evidence from an industry insider -- prove that electronic voting machines can't be trusted*

**ROBERT F. KENNEDY JR.**

>>*Post your thoughts about the threats to fair voting, in the National Affairs blog. Plus, read Robert F. Kennedy Jr.'s "Was the 2004 Election Stolen?" -- his report on Republican methods for keeping more than 350,000 Ohio voters from casting ballots or having their votes counted.*

The debacle of the 2000 presidential election made it all too apparent to most Americans that our electoral system is broken. And private-sector entrepreneurs were quick to offer a fix: Touch-screen voting machines, promised the industry and its lobbyists, would make voting as easy and reliable as withdrawing cash from an ATM. Congress, always ready with funds for needy industries, swiftly authorized $3.9 billion to upgrade the nation's election systems - with much of the money devoted to installing electronic voting machines in each of America's 180,000 precincts. But as midterm elections approach this November, electronic voting machines are making things worse instead of better. Studies have demonstrated that hackers can easily rig the technology to fix an election - and across the country this year, faulty equipment and lax security have repeatedly undermined election primaries. In Tarrant County, Texas, electronic machines counted some ballots as many as six times, recording 100,000 more votes than were actually cast. In San Diego, poll workers took machines home for unsupervised "sleepovers" before the vote, leaving the equipment vulnerable to tampering. And in Ohio - where, as I recently reported in "Was the 2004 Election Stolen?" [RS 1002], dirty tricks may have cost John Kerry the presidency - a government report uncovered large and unexplained discrepancies in vote totals recorded by machines in Cuyahoga County.

Even worse, many electronic machines don't produce a paper record that can be recounted when equipment malfunctions - an omission that practically invites malicious tampering. "Every board of election has staff members with the technological ability to fix an election," Ion Sancho, an election supervisor in Leon County, Florida, told me. "Even one corrupt staffer can throw an election. Without paper records, it could happen under my nose and there is no way I'd ever find out about it. With a few key people in the right places, it would be possible to throw a presidential election."

Chris Hood remembers the day in August 2002 that he began to question what was really going on in Georgia. An African-American whose parents fought for voting rights in the South during the 1960s, Hood was proud to be working as a consultant for Diebold Election Systems, helping the company promote its new electronic voting machines. During the presidential election two years earlier, more than 94,000 paper ballots had gone uncounted in Georgia - almost double the national average - and Secretary of State Cathy Cox was under pressure to make sure every vote was recorded properly.

Hood had been present in May 2002, when officials with Cox's office signed a contract with Diebold - paying the company a record $54 million to install 19,000 electronic voting machines across the state. At a restaurant inside Atlanta's Marriott Hotel, he noticed the firm's CEO, Walden O'Dell, checking Diebold's stock price on a laptop computer every five minutes, waiting for a bounce from the announcement.

Hood wondered why Diebold, the world's third-largest seller of ATMs, had been awarded the contract. The company had barely completed its acquisition of Global Election Systems, a voting-machine firm that owned the technology Diebold was promising to sell Georgia. And its bid was the highest among nine competing vendors. Whispers within the company hinted that a fix was in.

"The Diebold executives had a news conference planned on the day of the award," Hood recalls, "and we were instructed to stay in our hotel rooms until just hours before the announcement. They didn't want the competitors to know and possibly file a protest" about the lack of a fair bidding process. It certainly didn't hurt that Diebold had political clout: Cox's predecessor as secretary of state, Lewis Massey, was now a lobbyist for the company.

The problem was, Diebold had only five months to install the new machines - a "very narrow window of time to do such a big

election," says Hood. "We had 350 people that Diebold brought into the state. Diebold opened and closed the polls and tabulated the votes. Diebold convinced Cox that it would be best if the company ran everything due to the time constraints, and in the interest of a trouble-free election. We let them do it."

Then, one muggy day in mid-August, Hood was surprised to see the president of Diebold's election unit, Bob Urosevich, arrive in Georgia from his headquarters in Texas. With the primaries looming, Urosevich was personally distributing a "patch," a little piece of software designed to correct glitches in the computer program. "We were told that it was intended to fix the clock in the system, which it didn't do," Hood says. "The curious thing is the very swift, covert way this was done."

Georgia law mandates that any change made in voting machines be certified by the state. But thanks to Cox's agreement with Diebold, the company was essentially allowed to certify itself. "It was an unauthorized patch, and they were trying to keep it secret from the state," Hood told me. "We were told not to talk to county personnel about it. I received instructions directly from Urosevich. It was very unusual that a president of the company would give an order like that and be involved at that level."

According to Hood, Diebold employees altered software in some 5,000 machines in DeKalb and Fulton counties - the state's largest Democratic strongholds. To avoid detection, Hood and others on his team entered warehouses early in the morning. "We went in at 7:30 a.m. and were out by 11," Hood says. "There was a universal key to unlock the machines, and it's easy to get access. The machines in the warehouses were unlocked. We had control of everything. The state gave us the keys to the castle, so to speak, and they stayed out of our way." Hood personally patched fifty-six machines and witnessed the patch being applied to more than 1,200 others.

The patch comes on a memory card that is inserted into a machine. Eventually, all the memory cards end up on a server that tabulates the votes - where the patch can be programmed to alter the outcome of an election. "There could be a hidden program on a memory card that adjusts everything to the preferred election results," Hood says. "Your program says, 'I want my candidate to stay ahead by three or four percent or whatever.' Those programs can include a built-in delete that erases itself after it's done."

It is impossible to know whether the machines were rigged to alter the election in Georgia: Diebold's machines provided no paper trail, making a recount impossible. But the tally in Georgia that November surprised even the most seasoned political observers. Six days before the vote, polls showed Sen. Max Cleland, a decorated war veteran and Democratic incumbent, leading his Republican opponent Saxby Chambliss - darling of the Christian Coalition - by five percentage points. In the governor's race, Democrat Roy Barnes was running a decisive eleven points ahead of Republican Sonny Perdue. But on Election Day, Chambliss won with fifty-three percent of the vote, and Perdue won with fifty-one percent.

Diebold insists that the patch was installed "with the approval and oversight of the state." But after the election, the Georgia secretary of state's office submitted a "punch list" to Bob Urosevich of "issues and concerns related to the statewide voting system that we would like Diebold to address." One of the items referenced was" Application/Implication of '0808' Patch." The state was seeking confirmation that the patch did not require that the system "be recertified at national and state level" as well as "verifiable analysis of overall impact of patch to the voting system." In a separate letter, Secretary Cox asked Urosevich about Diebold's use of substitute memory cards and defective equipment as well as widespread problems that caused machines to freeze up and improperly record votes. The state threatened to delay further payments to Diebold until "these punch list items will be corrected and completed."

Diebold's response has not been made public - but its machines remain in place for Georgia's election this fall. Hood says it was "common knowledge" within the company that Diebold also illegally installed uncertified software in machines used in the 2004 presidential primaries - a charge the company denies. Disturbed to see the promise of electronic machines subverted by private companies, Hood left the election consulting business and became a whistle-blower. "What I saw," he says, "was basically a corporate takeover of our voting system."

The United States is one of only a handful of major democracies that allow private, partisan companies to secretly count and tabulate votes using their own proprietary software. Today, eighty percent of all the ballots in America are tallied by four companies - Diebold, Election Systems & Software (ES&S;), Sequoia Voting Systems and Hart InterCivic. In 2004, 36 million votes were cast on their touch-screen systems, and millions more were recorded by optical-scan machines owned by the same companies that use electronic technology to tabulate paper ballots. The simple fact is, these machines not only break down with regularity, they are easily compromised - by people inside, and outside, the companies.

Three of the four companies have close ties to the Republican Party. ES&S;, in an earlier corporate incarnation, was chaired by Chuck Hagel, who in 1996 became the first Republican elected to the U.S. Senate from Nebraska in twenty-four years - winning a close race in which eighty-five percent of the votes were tallied by his former company. Hart InterCivic ranks among its investors GOP loyalist Tom Hicks, who bought the Texas Rangers from George W. Bush in 1998, making Bush a millionaire fifteen times over. And according to campaign-finance records, Diebold, along with its employees and their families, has contributed at least $300,000 to GOP candidates and party funds since 1998 - including more than $200,000 to the Republican National Committee. In a 2003 fund-raising e-mail, the company's then-CEO Walden O'Dell promised to deliver Ohio's electoral votes to Bush in 2004. That year, Diebold would count the votes in half of Ohio's counties.

in tabulated there for delivery to whom Election Systems the firm had acquired by Diebold. Two months after the election, an internal memo from Talbot Iredale, the company's senior programmer, blamed the problem on a memory card that had been improperly "counted manually." There is always the possibility," Iredale conceded, "that the 'second memory card' or 'second upload' came from an unauthorized source."

Amid the furor over hanging chads and butterfly ballots in Florida, however, the "faulty memory card" was all but forgotten. Instead of sharing culpability for the Florida catastrophe, voting-machine companies used their political clout to present their product as the solution. In October 2002, President Bush signed the Help America Vote Act, requiring states and counties to upgrade their voting systems with electronic machines and giving vast sums of money to state officials to distribute to the tightknit cabal of largely Republican vendors.

The primary author and steward of HAVA was Rep. Bob Ney, the GOP chairman of the powerful U.S. House Administration Committee. Ney had close ties to the now-disgraced lobbyist Jack Abramoff, whose firm received at least $275,000 from Diebold to lobby for its touch-screen machines. Ney's former chief of staff, David DiStefano, also worked as a registered lobbyist for Diebold, receiving at least $180,000 from the firm to lobby for HAVA and "other election reform issues." Ney - who accepted campaign contributions from DiStefano and counted Diebold's then-CEO O'Dell among his constituents - made sure that HAVA strongly favored the use of the company's machines.

Ney also made sure that Diebold and other companies would not be required to equip their machines with printers to provide paper records that could be verified by voters. In a clever twist, HAVA effectively pressures every precinct to provide at least one voting device that has no paper trail - supposedly so that vision-impaired citizens can vote in secrecy. The provision was backed by two little-known advocacy groups: the National Federation of the Blind, which accepted $1 million from Diebold to build a new research institute, and the American Association of People with Disabilities, which pocketed at least $26,000 from voting-machine companies. The NFB maintained that a paper voting receipt would jeopardize its members' civil rights - a position not shared by other groups that advocate for the blind.

Sinking in the sewage of the Abramoff scandal, Ney agreed on September 15th to plead guilty to federal conspiracy charges - but he has already done one last favor for his friends at Diebold. When 212 congressmen from both parties sponsored a bill to mandate a paper trail for all votes, Ney used his position as chairman to prevent the measure from even getting a hearing before his committee.

The result was that HAVA - the chief reform effort after the 2000 disaster - placed much of the nation's electoral system in the hands of for-profit companies. Diebold alone has sold more than 130,000 voting machines - raking in estimated revenues of at least $230 million. "This whole undertaking was never about voters," says Hood, who saw firsthand how the measure benefited Diebold's bottom line. "It was about privatizing elections. HAVA has been turned into a corporate-revenue enhancement scheme."

No case better demonstrates the dangers posed by electronic voting machines than the experience of Maryland. As in Georgia, officials there granted Diebold control over much of the state's election systems during the 2002 midterm elections. (In the interests of disclosure, my sister was a candidate for governor that year and lost by a margin consistent with pre-election polls.) On Election Night, when Chris Hood accompanied Diebold president Bob Urosevich and marketing director Mark Radke to the tabulation center in Montgomery County where the votes would be added up, he was stunned to find the room empty. "Not a single Maryland election official was there to retrieve the memory cards," he recalls. As cards containing every vote in the county began arriving in canvas bags, the Diebold executives plugged them into a group of touch-screen tabulators linked into a central server, which was also controlled by a Diebold employee.

"It would have been very easy for any one of us to take a contaminated card out of our pocket, put it into the system, and download some malicious code that would then end up in the server, impacting every other vote that went in, before and after," says Hood. "We had absolute control of the tabulations. We could have fixed the election if we wanted. We had access, and that's all you need. I can honestly say that every election I saw with Diebold in charge was compromised - if not in the count, at least in the security."

After the election, Maryland planned to install Diebold's AccuVote-TS electronic machines across the entire state - until four computer scientists at Johns Hopkins and Rice universities released an analysis of the company's software source code in July 2003. "This voting system is far below even the most minimal security standards applicable in other contexts," the scientists concluded. It was, in fact, "unsuitable for use in a general election."

"With electronic machines, you can commit wholesale fraud with a single alteration of software," says Avi Rubin, a computer-science professor at Johns Hopkins who has received $7.5 million from the National Science Foundation to study electronic voting. "There are a million little tricks when you build software that allow you to do whatever you want. If you know the precinct demographics, the machine can be programmed to recognize its precinct and strategically flip votes in elections that are several years in the future. No one will ever know it happened."

In response to the study, Maryland commissioned two additional reports on Diebold's equipment. The first was conducted by Science Applications International Corporation - a company that, along with Diebold, was part of an industry group that promotes electronic voting machines. SAIC conceded that Diebold's machines were "at high risk of compromise" - but

them into software that could enable a hacker to hide unauthorized code in the system. William Arbaugh, of the University of Maryland, gave the Diebold team an "A" - with the possibility of raising it to A+ "for extra credit - that is, if they follow the recommendations we gave them."

But according to recent e-mails obtained by *Rolling Stone*, Diebold not only failed to follow up on most of the recommendations, it worked to cover them up. Michael Wertheimer, who led the RABA study, now serves as an assistant deputy director in the Office of the Director of National Intelligence. "We made numerous recommendations that would have required Diebold to fix these issues," he writes in one e-mail, "but were rebuffed by the argument that the machines were physically protected and could not be altered by someone outside the established chain of custody."

In another e-mail, Wertheimer says that Diebold and state officials worked to downplay his team's dim assessment. "We spent hours dealing with Diebold lobbyists and election officials who sought to minimize our impact," he recalls. "The results were risk-managed in favor of expediency and potential catastrophe."

During the 2004 presidential election, with Diebold machines in place across the state, things began to go wrong from the very start. A month before the vote, an abandoned Diebold machine was discovered in a bar in Baltimore. "What's really worrisome," says Hood, "is that someone could get hold of all the technology - for manipulation - if they knew the inner workings of just one machine."

Election Day was a complete disaster. "Countless numbers of machines were down because of what appeared to be flaws in Diebold's system," says Hood, who was part of a crew of roving technicians charged with making sure that the polls were up and running. "Memory cards overloading, machines freezing up, poll workers afraid to turn them on or off for fear of losing votes."

Then, after the polls closed, Diebold technicians who showed up to collect the memory cards containing the votes found that many were missing. "The machines are gone," one janitor told Hood - picked up, apparently, by the vendor who had delivered them in the first place. "There was major chaos because there were so many cards missing," Hood says. Even before the 2004 election, experts warned that electronic voting machines would undermine the integrity of the vote. "The system we have for testing and certifying voting equipment in this country is not only broken but is virtually nonexistent," Michael Shamos, a distinguished professor of computer science at Carnegie Mellon University, testified before Congress that June. "It must be re-created from scratch."

Two months later, the U.S. Computer Emergency Readiness Team - a division of the Department of Homeland Security - issued a little-noticed "cyber-security bulletin." The alert dealt specifically with a database that Diebold uses in tabulating votes. "A vulnerability exists due to an undocumented backdoor account," the alert warned, citing the same kind of weakness identified by the RABA scientists. The security flaw, it added, could allow "a malicious user [to] modify votes."

Such warnings, however, didn't stop states across the country from installing electronic voting machines for the 2004 election. In Ohio, jammed and inoperable machines were reported throughout Toledo. In heavily Democratic areas of Youngstown, nearly 100 voters pushed "Kerry" and watched "Bush" light up. At least twenty machines had to be recalibrated in the middle of the voting process for flipping Kerry votes to Bush. Similar "vote hopping" was reported by voters in other states.

The widespread glitches didn't deter Secretary of State J. Kenneth Blackwell - who also chaired Bush's re-election campaign in Ohio - from cutting a deal in 2005 that would have guaranteed Diebold a virtual monopoly on vote counting in the state. Local election officials alleged that the deal, which came only a few months after Blackwell bought nearly $10,000 in Diebold stock, was a violation of state rules requiring a fair and competitive bidding process. Facing a lawsuit, Blackwell agreed to allow other companies to provide machines as well. This November, voters in forty-seven counties will cast their ballots on Diebold machines - in a pivotal election in which Blackwell is running as the Republican candidate for governor.

Electronic voting machines also caused widespread problems in Florida, where Bush bested Kerry by 381,000 votes. When statistical experts from the University of California examined the state's official tally, they discovered a disturbing pattern: "The data show with 99.0 percent certainty that a county's use of electronic voting is associated with a disproportionate increase in votes for President Bush. Compared to counties with paper ballots, counties with electronic voting machines were significantly more likely to show increases in support for President Bush between 2000 and 2004." The three counties with the most discrepancies - Broward, Palm Beach and Miami-Dade - were also the most heavily Democratic. Electronic voting machines, the report concluded, may have improperly awarded as many as 260,000 votes to Bush. "No matter how many factors and variables we took into consideration, the significant correlation in the votes for President Bush and electronic voting cannot be explained," said Michael Hout, a member of the National Academy of Sciences.

Charles Stewart III, an MIT professor who specializes in voter behavior and methodology, was initially skeptical of the study - but was unable to find any flaw in the results. "You can't break it - I've tried," he told *The Washington Post*. "There's something funky in the results from the electronic-machine Democratic counties."

Questions also arose in Texas in 2004. William Singer, an election programmer in Tarrant County, wrote the secretary of state's office after the vote to report that ES&S; pressured officials to install unapproved software during the presidential

hard to recruit in their normal message prevents voters from competing their tabulations in elight, with early voting in local elections only a week away, officials across the state were scrambling to receive the programming from ES&S; needed to assemble machine... Orleans City, Calling bulk stations, complete with operators and backup. Pittsburg, Texas director of elections Ann McGeehan authorized local officials to create temporary ballots" as a backup. "We regret the unacceptable position that many political subdivisions are in due to poor performance by their contracted vendor," McGeehan added.

In October 2005, the government Accountability Office issued a damning report on electronic voting machines. Citing widespread irregularities and malfunctions, the government's top watchdog agency concluded that a host of weaknesses with touch-screen and optical-scan technology "could damage the integrity of ballots, votes and voting-system software by allowing unauthorized modifications." Some electronic systems used passwords that were "easily guessed" or employed identical passwords for numerous systems. Software could be handled and transported with no clear chain of custody, and locks protecting computer hardware were easy to pick. Unsecured memory cards could enable individuals to "vote multiple times, change vote totals and produce false election reports."

An even more comprehensive report released in June by the Brennan Center for Justice, a nonpartisan think tank at the New York University School of Law, echoed the GAO's findings. The report - conducted by a task force of computer scientists and security experts from the government, universities and the private sector - was peer-reviewed by the National Institute of Standards and Technology. Electronic voting machines widely adopted since 2000, the report concluded, "pose a real danger to the integrity of national, state and local elections." While no instances of hacking have yet been documented, the report identified 120 security threats to three widely used machines - the easiest method of attack being to utilize corrupt software that shifts votes from one candidate to another.

Computer experts have demonstrated that a successful attack would be relatively simple. In a study released on September 13th, computer scientists at Princeton University created vote-stealing software that can be injected into a Diebold machine in as little as a minute, obscuring all evidence of its presence. They also created a virus that can "infect" other units in a voting system, committing "widespread fraud" from a single machine. Within sixty seconds, a lone hacker can own an election.

And touch-screen technology continues to create chaos at the polls. On September 12th, in Maryland's first all-electronic election, voters were turned away from the polls because election officials had failed to distribute the electronic access cards needed to operate Diebold machines. By the time the cards were found on a warehouse shelf and delivered to every precinct, untold numbers of voters had lost the chance to cast ballots.

It seems insane that such clear threats to our election system have not stopped the proliferation of touch-screen technology. In 2004, twenty-three percent of Americans cast their votes on electronic ballots - an increase of twelve percent over 2000. This year, more than one-third of the nation's 8,000 voting jurisdictions are expected to use electronic voting technology for the first time.

The heartening news is, citizens are starting to fight back. Voting-rights activists with the Brad Blog and Black Box Voting are getting the word out. Voter Action, a nonprofit group, has helped file lawsuits in Arizona, New York, Pennsylvania, Colorado and New Mexico to stop the proliferation of touch-screen systems. In California, voters filed suit last March to challenge the use of a Diebold touch-screen system - a move that has already prompted eight counties to sign affidavits saying they won't use the machines in November.

It's not surprising that the widespread problems with electronic voting machines have sparked such outrage and mistrust among voters. Last November, comedian Bill Maher stood in a Las Vegas casino and looked out over thousands of slot machines. "They never make a mistake," he remarked to me. "Can't we get a voting machine that can't be fixed?"

Indeed, there is a remarkably simple solution: equip every touch-screen machine to provide paper receipts that can be verified by voters and recounted in the event of malfunction or tampering. "The paper is the insurance against the cheating machine," says Rubin, the computer expert.

In Florida, an astonishing new law actually makes it illegal to count paper ballots by hand after they've already been tallied by machine. But twenty-seven states now require a paper trail, and others are considering similar requirements. In New Mexico, Gov. Bill Richardson has instituted what many consider an even better solution: Voters use paper ballots, which are then scanned and counted electronically. "We became one of the laughingstock states in 2004 because the machines were defective, slow and unreliable," says Richardson. "I said to myself, 'I'm not going to go through this again.' The paper-ballot system, as untechnical as it seems, is the most verifiable way we can assure Americans that their vote is counting."

==Paper ballots will not completely eliminate the threat of tampering, of course - after all, election fraud and miscounts have occurred throughout our history. As long as there has been a paper trail, however, our elections have been conducted with some measure of public scrutiny. But electronic voting machines are a hacker's dream. And today, for-profit companies are being given unprecedented and frightening power not only to provide these machines but to store and count our votes in secret, without any real oversight.==

You do not have to believe in conspiracy theories to fear for the integrity of our electoral system: The right to vote is simply too important - and too hard won - to be surrendered without a fight. It is time for Americans to reclaim our democracy from

*For additional reporting on the threat posed by electronic voting machines, visit the RFK blog.*

Posted Sep 21, 2006 1:23 PM

# EXHIBIT X

# Allied Security Operations Group

### Antrim Michigan Forensics Report

### REVISED PRELIMINARY SUMMARY, v2

### Report Date 12/13/2020

**Client:**     **Bill Bailey**

**Attorney:**     **Matthew DePerno**

## A.     WHO WE ARE

1.     My name is Russell James Ramsland, Jr., and I am a resident of Dallas County, Texas.  I hold an MBA from Harvard University, and a political science degree from Duke University.  I have worked with the National Aeronautics and Space Administration (NASA) and the Massachusetts Institute of Technology (MIT), among other organizations, and have run businesses all over the world, many of which are highly technical in nature.  I have served on technical government panels.

2.     I am part of the management team of Allied Security Operations Group, LLC, (ASOG).  ASOG is a group of globally engaged professionals who come from various disciplines to include Department of Defense, Secret Service, Department of Homeland Security, and the Central Intelligence Agency.  It provides a range of security services, but has a particular emphasis on cybersecurity, open source investigation and penetration testing of networks.  We employ a wide variety of cyber and cyber forensic analysts.  We have patents pending in a variety of applications from novel network security applications to SCADA (Supervisory Control and Data Acquisition) protection and safe browsing solutions for the dark and deep web. For this report, I have relied on these experts and resources.

## B.     PURPOSE AND PRELIMINARY CONCLUSIONS

1.     The purpose of this forensic audit is to test the integrity of Dominion Voting System in how it performed in Antrim County, Michigan for the 2020 election.

2.     We conclude that the Dominion Voting System is intentionally and purposefully designed with inherent errors to create systemic fraud and influence election results. The system intentionally generates an enormously high number of ballot errors. The electronic ballots are then transferred for adjudication. The intentional errors lead to bulk adjudication of ballots with no oversight, no transparency, and no audit trail. This leads to voter or election fraud. Based on our study, we conclude that The Dominion Voting System should not be used in Michigan. We further conclude that the results of Antrim County should not have been certified.

1

Case 1:21-cv-00445-CJN

3.     The following is a breakdown of the votes tabulated for the 2020 election in Antrim County, showing different dates for the tabulation of the same votes.

| Date | Registered Voters | Total Votes Cast | Biden | Trump | Third Party | Write-In | TOTAL VOTES for President |
|------|-------------------|------------------|-------|-------|-------------|----------|---------------------------|
| Nov 3 | 22,082 | 16,047 | 7,769 | 4,509 | 145 | 14 | 12,423 |
| Nov 5 | 22,082 | 18,059 | 7,289 | 9,783 | 255 | 20 | 17,327 |
| Nov 21 | 22,082 | 16,044 | 5,960 | 9,748 | 241 | 23 | 15,949 |

4.     The Antrim County Clerk and Secretary of State Jocelyn Benson have stated that the election night error (detailed above by the vote "flip" from Trump to Biden, was the result of human error caused by the failure to update the Mancelona Township tabulator prior to election night for a down ballot race. We disagree and conclude that the vote flip occurred because of machine error built into the voting software designed to create error.

5.     Secretary of State Jocelyn Benson's statement on November 6, 2020 that "[t]the correct results always were and continue to be reflected on the tabulator totals tape . . . ." was false.

6.     The allowable election error rate established by the Federal Election Commission guidelines is of 1 in 250,000 ballots (.0008%). We observed an error rate of 68.05%. This demonstrated a significant and fatal error in security and election integrity.

7.     The results of the Antrim County 2020 election are not certifiable. This is a result of machine and/or software error, not human error.

8.     The tabulation log for the forensic examination of the server for Antrim County from December 6, 2020consists of 15,676 individual events, of which 10,667 or 68.05% of the events were recorded errors. These errors resulted in overall tabulation errors or ballots being sent to adjudication. This high error rates proves the Dominion Voting System is flawed and does not meet state or federal election laws.

9.     These errors occurred after The Antrim County Clerk provided a re-provisioned CF card with uploaded software for the Central Lake Precinct on November 6, 2020. This means the statement by Secretary Benson was false. The Dominion Voting System produced systemic errors and high error rates both prior to the update and after the update; meaning the update (or lack of update) is not the cause of errors.

2

Case 1:21-cv-00445-CJN

10.    In Central Lake Township there were 1,222 ballots **reversed** out of 1,491 total ballots cast, resulting in an 81.96% rejection rate. All reversed ballots are sent to adjudication for a decision by election personnel.

11.    It is critical to understand that the Dominion system classifies ballots into two categories, 1) normal ballots and 2) adjudicated ballots. Ballots sent to adjudication can be altered by administrators, and adjudication files can be moved between different Results Tally and Reporting (RTR) terminals with no audit trail of which administrator actually adjudicates (i.e. votes) the ballot batch. This demonstrated a significant and fatal error in security and election integrity because it provides no meaningful observation of the adjudication process or audit trail of which administrator actually adjudicated the ballots.

12.    A staggering number of votes required adjudication. This was a 2020 issue not seen in previous election cycles still stored on the server. This is caused by intentional errors in the system. The intentional errors lead to bulk adjudication of ballots with no oversight, no transparency or audit trail. Our examination of the server logs indicates that this high error rate was incongruent with patterns from previous years. The statement attributing these issues to human error is not consistent with the forensic evaluation, which points more correctly to systemic machine and/or software errors. The systemic errors are intentionally designed to create errors in order to push a high volume of ballots to bulk adjudication.

13.    The linked video demonstrates how to cheat at adjudication:

https://mobile.twitter.com/KanekoaTheGreat/status/1336888454538428418

14.    Antrim County failed to properly update its system. A purposeful lack of providing basic computer security updates in the system software and hardware demonstrates incompetence, gross negligence, bad faith, and/or willful non-compliance in providing the fundamental system security required by federal and state law. There is no way this election management system could have passed tests or have been legally certified to conduct the 2020 elections in Michigan under the current laws. According to the National Conference of State Legislatures – Michigan requires full compliance with federal standards as determined by a federally accredited voting system laboratory.

15.    Significantly, the computer system shows vote adjudication logs for prior years; but all adjudication log entries for the 2020 election cycle are missing. The adjudication process is the simplest way to manually manipulate votes. The lack of records prevents any form of audit accountability, and their conspicuous absence is extremely suspicious since the files exist for previous years using the same software. Removal of these files violates state law and prevents a meaningful audit, even if the Secretary wanted to conduct an audit. We must conclude that the 2020 election cycle records have been manually removed.

Case 1:21-cv-00445-CJN

16.  Likewise, all server security logs prior to 11:03 pm on November 4, 2020 are missing. This means that all security logs for the day after the election, on election day, and prior to election day are gone. Security logs are very important to an audit trail, forensics, and for detecting advanced persistent threats and outside attacks, especially on systems with outdated system files. These logs would contain domain controls, authentication failures, error codes, times users logged on and off, network connections to file servers between file accesses, internet connections, times, and data transfers. Other server logs before November 4, 2020 are present; therefore, there is no reasonable explanation for the security logs to be missing.

17.  On November 21, 2020, an unauthorized user unsuccessfully attempted to zero out election results. This demonstrates additional tampering with data.

18.  The Election Event Designer Log shows that Dominion ImageCast Precinct Cards were programmed with new ballot programming on 10/23/2020 and then again after the election on 11/05/2020. These system changes affect how ballots are read and tabulated, and our examination demonstrated a significant change in voter results using the two different programs. In accordance with the Help America Vote Act, this violates the 90-day Safe Harbor Period which prohibits changes to election systems, registries, hardware/software updates without undergoing re-certification. According to the National Conference of State Legislatures – Michigan requires full compliance with federal standards as determined by a federally accredited voting system laboratory.

19.  The only reason to change software after the election would be to obfuscate evidence of fraud and/or to correct program errors that would de-certify the election. Our findings show that the Central Lake Township tabulator tape totals were significantly altered by utilizing two different program versions (10/23/2020 and 11/05/2020), both of which were software changes during an election which violates election law, and not just human error associated with the **Dominion Election Management System.** This is clear evidence of software generated movement of votes. The claims made on the **Office of the Secretary of State** website are false.

20.  The Dominion ImageCast Precinct (ICP) machines have the ability to be connected to the internet (see Image 11). By connecting a network scanner to the ethernet port on the ICP machine and creating Packet Capture logs from the machines we examined show the ability to connect to the network, Application Programming Interface (API) (a data exchange between two different systems) calls and web (http) connections to the Election Management System server. Best practice is to disable the network interface card to avoid connection to the internet. This demonstrated a significant and fatal error in security and election integrity. Because certain files have been deleted, we have not yet found origin or destination; but our research continues.

4

343 of 497

Case 1:21-cv-00445-CJN

21. Because the intentional high error rate generates large numbers of ballots to be adjudicated by election personnel, we must deduce that bulk adjudication occurred. However, because files and adjudication logs are missing, we have not yet determined where the bulk adjudication occurred or who was responsible for it. Our research continues.

22. Research is ongoing. However, based on the preliminary results, we conclude that the errors are so significant that they call into question the integrity and legitimacy of the results in the Antrim County 2020 election to the point that the results are not certifiable. Because the same machines and software are used in 48 other counties in Michigan, this casts doubt on the integrity of the entire election in the state of Michigan.

23. DNI Responsibilities: President Obama signed Executive Order on National Critical Infrastructure on 6 January 2017, stating in Section 1. Cybersecurity of Federal Networks, "The Executive Branch operates its information technology (IT) on behalf of the American people. The President will hold heads of executive departments and agencies (agency heads) accountable for managing cybersecurity risk to their enterprises. In addition, because risk management decisions made by agency heads can affect the risk to the executive branch as a whole, and to national security, it is also the policy of the United States to manage cybersecurity risk as an executive branch enterprise." President Obama's EO further stated, effective immediately, each agency head shall use The Framework for Improving Critical Infrastructure Cybersecurity (the Framework) developed by the National Institute of Standards and Technology." Support to Critical Infrastructure at Greatest Risk. The Secretary of Homeland Security, in coordination with the Secretary of Defense, the Attorney General, the Director of National Intelligence, the Director of the Federal Bureau of Investigation, the heads of appropriate sector-specific agencies, as defined in Presidential Policy Directive 21 of February 12, 2013 (Critical Infrastructure Security and Resilience) (sector-specific agencies), and all other appropriate agency heads, as identified by the Secretary of Homeland Security, shall: (i) identify authorities and capabilities that agencies could employ to support the cybersecurity efforts of critical infrastructure entities identified pursuant to section 9 of Executive Order 13636 of February 12, 2013 (Improving Critical Infrastructure Cybersecurity), to be at greatest risk of attacks that could reasonably result in catastrophic regional or national effects on public health or safety, economic security, or national security (section 9 entities);

This is a national security imperative. **In July 2018, President Trump strengthened President Obama's Executive Order to include requirements to ensure US election systems, processes, and its people were not manipulated by foreign meddling, either through electronic or systemic manipulation, social media, or physical changes made in hardware, software, or supporting systems.** The 2018 Executive Order. Accordingly, I hereby order:

344 of 497

Section 1. (a) Not later than 45 days after the conclusion of a United States election, the Director of National Intelligence, in consultation with the heads of any other appropriate executive departments and agencies (agencies), shall conduct an assessment of any information indicating that a foreign government, or any person acting as an agent of or on behalf of a foreign government, has acted with the intent or purpose of interfering in that election. The assessment shall identify, to the maximum extent ascertainable, the nature of any foreign interference and any methods employed to execute it, the persons involved, and the foreign government or governments that authorized, directed, sponsored, or supported it. The Director of National Intelligence shall deliver this assessment and appropriate supporting information to the President, the Secretary of State, the Secretary of the Treasury, the Secretary of Defense, the Attorney General, and the Secretary of Homeland Security.

We recommend that an independent group should be empaneled to determine the extent of the adjudication errors throughout the State of Michigan. This is a national security issue.

24. Michigan resident Gustavo Delfino, a former professor of mathematics in Venezuela and alumni of University of Michigan, offered a compelling affidavit [Exhibit 2] recognizing the inherent vulnerabilities in the SmartMatic electronic voting machines (software which was since incorporated into Dominion Voting Systems) during the 2004 national referendum in Venezuela (see attached declaration). After 4 years of research and 3 years of undergoing intensive peer review, Professor Delfino's paper was published in the highly respected "Statistical Science" journal, November 2011 issue (Volume 26, Number 4) with title "Analysis of the 2004 Venezuela Referendum: The Official Results Versus the Petition Signatures." The intensive study used multiple mathematical approaches to ascertain the voting results found in the 2004 Venezuelan referendum. Delfino and his research partners discovered not only the algorithm used to manipulate the results, but also the precise location in the election processing sequence where vulnerability in machine processing would provide such an opportunity. According to Prof Delfino, the magnitude of the difference between the official and the true result in Venezuela estimated at 1,370,000 votes. Our investigation into the error rates and results of the Antrim County voting tally reflect the same tactics, which have also been reported in other Michigan counties as well. This demonstrates a national security issue.

## C.   PROCESS

We visited Antrim County twice: November 27, 2020 and December 6, 2020.

On November 27, 2020, we visited Central Lake Township, Star Township, and Mancelona Township. We examined the Dominion Voting Systems tabulators and tabulator roles.

Case 1:21-cv-00445-CJN

On December 6, 2020, we visited the Antrim County Clerk's office. We inspected and performed forensic duplication of the following:

1. **Antrim County Election Management Server** running **Dominion Democracy Suite** 5.5.3-002;

2. **Compact Flash** cards used by the local precincts in their **Dominion ImageCast Precinct;**

3. **USB memory sticks** used by the **Dominion VAT** (Voter Assist Terminals); and

4. **USB memory sticks** used for the Poll Book.

**Dominion** voting system is a Canadian owned company with global subsidiaries. It is owned by Staple Street Capital which is in turn owned by UBS Securities LLC, of which 3 out of their 7 board members are Chinese nationals. The Dominion software is licensed from Smartmatic which is a Venezuelan owned and controlled company. Dominion Server locations have been determined to be in Serbia, Canada, the US, Spain and Germany.

## D.   CENTRAL LAKE TOWNSHIP

1. On November 27, 2020, part of our forensics team visited the Central Lake Township in Michigan to inspect the **Dominion ImageCast Precint** for possible hardware issues on behalf of a local lawsuit filed by Michigan attorney Matthew DePerno on behalf of William Bailey. In our conversations with the clerk of **Central Lake Township** Ms. Judith L. Kosloski, she presented to us "two separate paper totals tape" from Tabulator ID 2.

   • One dated "Poll Opened Nov. 03/2020 06:38:48" (Roll 1);

   • Another dated "Poll Opened Nov. 06/2020 09:21:58" (Roll 2).

2. We were then told by Ms. Kosloski that on November 5, 2020, Ms. Kosloski was notified by Connie Wing of the County Clerk's Office and asked to bring the tabulator and ballots to the County Clerk's office for re-tabulation. They ran the ballots and printed "Roll 2". She noticed a difference in the votes and brought it up to the clerk, but canvasing still occurred, and her objections were not addressed.

3. Our team analyzed both rolls and compared the results. Roll 1 had **1,494** total votes and Roll 2 had **1,491** votes (Roll 2 had 3 less ballots because 3 ballots were damaged in the process.)

4. "Statement of Votes Cast from Antrim" shows that only **1,491** votes were counted, and the **3** ballots that were damaged were not entered into final results.

5.  Ms. Kosloski stated that she and her assistant manually refilled out the three ballots, curing them, and ran them through the ballot counting system - but the final numbers do not reflect the inclusion of those **3** damaged ballots.

6.  This is the most preliminary report of serious election fraud indicators. In comparing the numbers on both rolls, *we estimate 1,474 votes changed* across the two rolls, between the first and the second time the exact same ballots were run through the County Clerk's vote counting machine - *which is almost the same number of voters that voted in total.*

    •  *742 votes were added to* **School Board Member for Central Lake Schools (3)**

    •  *657 votes were removed from* **School Board Member for Ellsworth Schools (2)**

    •  **7** votes were added to the total for **State Proposal 20-1 (1)** and out of those there were **611** votes moved between the Yes and No Categories.

7.  There were incremental changes throughout the rolls with some significant adjustments between the 2 rolls that were reviewed. This demonstrates conclusively that votes can be and were changed during the second machine count after the software update. That should be impossible especially at such a high percentage to total votes cast.

8.  For the **School Board Member for Central Lake Schools (3)** [Image 1] there were **742 votes** added to this vote total. Since multiple people were elected, this did not change the result of both candidates being elected, but one does see a change in who had most votes. If it were a single-person election this would have changed the outcome and demonstrates conclusively that votes can be and were changed during the second machine counting. That should be impossible.

    [Image 1]:



9.   For the **School Board Member for Ellsworth Schools (2)** [Image 2]

  • Shows *657 votes being removed* from this election.

  • In this case, only **3** people who were eligible to vote actually voted. Since there were **2** votes allowed for each voter to cast.

  • The recount correctly shows **6** votes.

But on election night, there was a major calculation issue:

[Image 2]:



10.  In **State Proposal 20-1 (1)**, [Image 3] there is a major change in votes in this category.

  • There were **774 votes for YES** during the election, to **1,083 votes for YES** on the recount a change of **309 votes**.

  • **7** votes were added to the total for **State Proposal 20-1 (1)** out of those there were **611** votes moved between the Yes and No Categories.

[Image 3]:



11. **State Proposal 20-1 (1)** is a fairly technical and complicated proposed amendment to the Michigan Constitution to change the disposition and allowable uses of future revenue generated from oil and gas bonuses, rentals and royalties from state-owned land. Information about the proposal: https://crcmich.org/publications/statewide-ballot-proposal-20-1-michigan-natural-resources-trust-fund

12. A Proposed Initiated **Ordinance to Authorize One (1) Marihuana (sic) Retailer Establishment Within the Village of Central Lake (1)**. [Image 4]

   • On election night, it was a tie vote.

   • Then, on the rerun of ballots 3 ballots were destroyed, but only one vote changed on the totals to allow the proposal to pass.

   When **3 ballots were not counted** and **programming change on the tabulator was installed** the proposal **passed with 1 vote being removed from the No** vote.

   [Image 4]:



13.  On Sunday December 6, 2020, our forensics team visited the Antrim County Clerk. There were two USB memory sticks used, one contained the software package used to tabulate election results on November 3, 2020, and the other was programmed on November 6, 2020 with a different software package which yielded significantly different voting outcomes. The election data package is used by the **Dominion Democracy Suite** software & election management system software to upload programming information onto the Compact Flash Cards for the **Dominion ImageCast Precinct** to enable it to calculate ballot totals.

14.  This software programming should be standard across all voting machines systems for the duration of the entire election if accurate tabulation is the expected outcome as required by US Election Law. This intentional difference in software programming is a design feature to alter election outcomes.

15.  The election day outcomes were calculated using the original software programming on November 3, 2020. On November 5, 2020 the township clerk was asked to re-run the Central Lake Township ballots and was given no explanation for this unusual request. On November 6, 2020 the Antrim County Clerk, Sheryl Guy issued the second version of software to re-run the same Central Lake Township ballots and oversaw the process. This resulted in greater than a 60% change in voting results, inexplicably impacting every single election contest in a township with less than 1500 voters. These errors far exceed the ballot error rate standard of 1 in 250,000 ballots (.0008%) as required by federal election law.

•  The original election programming files are last dated 09/25/2020 1:24pm

•  The updated election data package files are last dated 10/22/2020 10:27 am.

Case 1:21-cv-00445-CJN

16. As the tabulator tape totals prove, there were large numbers of votes switched from the November 3, 2020 tape to the November 6, 2020 tape. This was solely based on using different software versions of the operating program to calculate votes, not tabulate votes. This is evidenced by using same the Dominion System with two different software program versions contained on the two different USB Memory Devices.

17. The Help America Vote Act, Safe Harbor provides a 90-day period prior to elections where no changes can be made to election systems. To make changes would require recertification of the entire system for use in the election. The Dominion User Guide prescribes the proper procedure to test machines with test ballots to compare the results to validate machine functionality to determine if the **Dominion ImageCast Precinct** was programmed correctly. If this occurred a ballot misconfiguration would have been identified. Once the software was updated to the 10/22/2020 software the test ballots should have been re-run to validate the vote totals to confirm the machine was configured correctly.

18. The November 6, 2020 note from **The Office of the Secretary of State Jocelyn Benson** states: "The correct results always were and continue to be reflected on the tabulator totals tape and on the ballots themselves. Even if the error in the reported unofficial results had not been quickly noticed, it would have been identified during the county canvass. Boards of County Canvassers, which are composed of 2 Democrats and 2 Republicans, review the printed totals tape from each tabulator during the canvass to verify the reported vote totals are correct."

   - Source:  https://www.michigan.gov/sos/0,4670,7-127-1640_9150-544676--,00.html

19. The **Secretary of State Jocelyn Benson's** statement is false. Our findings show that the tabulator tape totals were significantly altered by utilization of two different program versions, and not just the **Dominion Election Management System.** This is the opposite of the claim that the **Office of the Secretary of State** made on its website. The fact that these significant errors were not caught in ballot testing and not caught by the local county clerk shows that there are major inherent built-in vulnerabilities and process flaws in the **Dominion Election Management System**, and that other townships/precincts and the entire election have been affected.

20. On Sunday December 6, 2020, our forensics team visited the Antrim County Clerk office to perform forensic duplication of the **Antrim County Election Management Server** running **Dominion Democracy Suite** 5.5.3-002.

21. Forensic copies of the **Compact Flash** cards used by the local precincts in their **Dominion ImageCast Precinct** were inspected, **USB memory sticks** used by the **Dominion VAT** (Voter Assist Terminals) and the **USB memory sticks** used for the Poll Book were forensically duplicated.

22.   We have been told that the ballot design and configuration for the **Dominion ImageCast Precinct** and VAT were provided by **ElectionSource.com** which is which is owned by MC&E, Inc of Grand Rapids, MI.

### E.   MANCELONA TOWNSHIP

1.   In Mancelona township, problems with software versions were also known to have been present.   Mancelona elections officials understood that ballot processing issued were not accurate and used the second version of software to process votes on 4 November, again an election de-certifying event, as no changes to the election system are authorized by law in the 90 days preceding elections without re-certification.

2.   Once the 10/22/2020 software update was performed on the Dominion ImageCast Precinct the test ballot process should have been performed to validate the programming.   There is no indication that this procedure was performed.

### F.   ANTRIM COUNTY CLERK'S OFFICE

1.   Pursuant to a court ordered inspection, we participated in an onsite collection effort at the Antrim County Clerk's office on December 6, 2020. [Image 5]:



Among other items forensically collected, the Antrim County Election Management Server (EMS) with Democracy Suite was forensically collected. [Images 6 and 7].

Case 1:21-cv-00445-CJN



The EMS (Election Management Server) was a:

    Dell Precision Tower 3420.

    Service Tag: 6NB0KH2

The EMS contained 2 hard drives in a RAID-1 configuration. That is the 2 drives redundantly stored the same information and the server could continue to operate if either of the 2 hard drives failed. The EMS was booted via the Linux Boot USB memory sticks and both hard drives were forensically imaged.

At the onset of the collection process we observed that the initial program thumb drive was not secured in the vault with the CF cards and other thumbdrives. We watched as the County employees, including Clerk Sheryl Guy searched throughout the office for the missing thumb drive. Eventually they found the missing thumb drive in an unsecured and unlocked desk drawer along with multiple other random thumb drives. This demonstrated a significant and fatal error in security and election integrity.

## G.   FORENSIC COLLECTION

We used a built for purpose Linux Boot USB memory stick to boot the EMS in a forensically sound mode. We then used Ewfacquire to make a forensic image of the 2 independent internal hard drives.

Ewfacquire created an E01 file format forensic image with built-in integrity verification via MD5 hash.

We used Ewfverify to verify the forensic image acquired was a true and accurate copy of the original disk. That was done for both forensic images.

## H.   ANALYSIS TOOLS

14

Case 1:21-cv-00445-CJN

**X-Ways Forensics:** We used X-Ways Forensics, a commercial Computer Forensic tool, to verify the image was useable and full disk encryption was not in use. In particular we confirmed that Bit locker was not in use on the EMS.

**Other tools used:** PassMark – OSForensics, Truxton - Forensics, Cellebrite – Physical Analyzer, Blackbag-Blacklight Forensic Software, Microsoft SQL Server Management Studio, Virtual Box, and miscellaneous other tools and scripts.

## I.  SERVER OVERVIEW AND SUMMARY

1. Our initial audit on the computer running the Democracy Suite Software showed that standard computer security best practices were not applied. These minimum-security standards are outlined the 2002 HAVA, and FEC Voting System Standards – it did not even meet the minimum standards required of a government desktop computer.

2. The election data software package USB drives (November 2020 election, and November 2020 election updated) are secured with bitlocker encryption software, but they were not stored securely on-site. At the time of our forensic examination, the election data package files were already moved to an unsecure desktop computer and were residing on an unencrypted hard drive. This demonstrated a significant and fatal error in security and election integrity. Key Findings on Desktop and Server Configuration: - There were multiple Microsoft security updates as well as Microsoft SQL Server updates which should have been deployed, however there is no evidence that these security patches were ever installed. As described below, many of the software packages were out of date and vulnerable to various methods of attack.

   a)  Computer initial configuration on 10/03/2018 13:08:11:911

   b)  Computer final configuration of server software on 4/10/2019

   c)  Hard Drive not Encrypted at Rest

   d)  Microsoft SQL Server Database not protected with password.

   e)  Democracy Suite Admin Passwords are reused and share passwords.

   f)  Antivirus is 4.5 years outdated

   g)  Windows updates are 3.86 years out of date.

   h)  When computer was last configured on 04/10/2019 the windows updates were 2.11 years out of date.

   i)  User of computer uses a Super User Account.

Case 1:21-cv-00445-CJN

3.   The hard drive was not encrypted at rest – which means that if hard drives are removed or initially booted off an external USB drive the files are susceptible to manipulation directly. An attacker is able to mount the hard drive because it is unencrypted, allowing for the manipulation and replacement of any file on the system.

4.   The Microsoft SQL Server database files were not properly secured to allow modifications of the database files.

5.   The Democracy Suite Software user account logins and passwords are stored in the unsecured database tables and the multiple Election System Administrator accounts share the same password, which means that there are no audit trails for vote changes, deletions, blank ballot voting, or batch vote alterations or adjudication.

6.   Antivirus definition is 1666 days old on 12/11/2020. Antrim County updates its system with USB drives. USB drives are the most common vectors for injecting malware into computer systems. The failure to properly update the antivirus definition drastically increases the harm cause by malware from other machines being transmitted to the voting system.

7.   Windows Server Update Services (WSUS) Offline Update is used to enable updates the computer – which is a package of files normally downloaded from the internet but compiled into a program to put on a USB drive to manually update server systems.

8.   Failure to properly update the voting system demonstrates a significant and fatal error in security and election integrity.

9.   There are 15 additional updates that should have been installed on the server to adhere to Microsoft Standards to fix known vulnerabilities. For the 4/10/2019 install, the most updated version of the update files would have been 03/13/2019 which is 11.6.1 which is 15 updates newer than 10.9.1

   **This means the updates installed were 2 years, 1 month, 13 days behind the most current update at the time. This includes security updates and fixes. This demonstrated a significant and fatal error in security and election integrity.**

   • Wed 04/10/2019 10:34:33.14 - Info: Starting WSUS Offline Update (v. 10.9.1)

   • Wed 04/10/2019 10:34:33.14 - Info: Used path "D:\WSUSOFFLINE1091_2012R2_W10\cmd\" on EMSSERVER (user: EMSADMIN)

   • Wed 04/10/2019 10:34:35.55 - Info: Medium build date: 03/10/2019

16

- Found on c:\Windows\wsusofflineupdate.txt

- *WSUS Offline Update (v.10.9.1) was created on 01/29/2017

*WSUS information found here https://download.wsusoffline.net/

10. Super User Administrator account is the primary account used to operate the **Dominion Election Management System** which is a major security risk. The user logged in has the ability to make major changes to the system and install software which means that there is no oversight to ensure appropriate management controls – i.e. anyone who has access to the shared administrator user names and passwords can make significant changes to the entire voting system.  The shared usernames and passwords mean that these changes can be made in an anonymous fashion with no tracking or attribution.

## J.   ERROR RATES

1. We reviewed the Tabulation logs in their entirety for 11/6/2020. The election logs for Antrim County consist of 15,676 total lines or events.

- Of the 15,676 there were a total of 10,667 critical errors/warnings or a 68.05% error rate.

- Most of the errors were related to configuration errors that could result in overall tabulation errors or adjudication. These 11/6/2020 tabulation totals were used as the official results.

2. For examples, there were 1,222 ballots **reversed** out of 1,491 total ballots cast, thus resulting in an 81.96% rejection rate. Some of which were reversed due to "Ballot's size exceeds maximum expected ballot size".

- According to the NCSL, Michigan requires testing by a federally accredited laboratory for voting systems. In section 4.1.1 of the Voluntary Voting Systems Guidelines (VVSG) Accuracy Requirements a. **All systems shall achieve a report total error rate of no more than one in 125,000**.

- https://www.eac.gov/sites/default/files/eac_assets/1/28/VVSG.1.1.VOL.1.FINAL1.pdf

- In section 4.1.3.2 Memory Stability of the VVSG it states that **Memory devices used to retain election management data shall have demonstrated error free data retention for a period of 22 months**.

- In section 4.1.6.1 Paper-based System Processing Requirements sub-section a. of the VVSG it states "The ability of the system to produce and receive electronic signals from the scanning of the ballot, perform logical and numerical operations upon these data, and reproduce the contents of memory when required **shall** be sufficiently free of **error** to enable

17

356 of 497

satisfaction of the system-level accuracy requirement indicated in Subsection 4.1.1."

- These are not human errors; this is definitively related to the software and software configurations resulting in error rates far beyond the thresholds listed in the guidelines.

3. A high "error rate" in the election software (in this case 68.05%) reflects an algorithm used that will weight one candidate greater than another (for instance, weight a specific candidate at a 2/3 to approximately 1/3 ratio). In the logs we identified that the RCV or Ranked Choice Voting Algorithm was enabled (see image below from the Dominion manual). This allows the user to apply a weighted numerical value to candidates and change the overall result. The declaration of winners can be done on a basis of points, not votes. [Image 8]:

choice voting results are evaluated on a district per district basis and each district has a set number of points (100). Elimination and declaration of winners is done on basis of points, not votes.



Figure 11-3: RCV Profile screen

4. The Dominion software configuration logs in the Divert Options, shows that all write-in ballots were flagged to be diverted automatically for adjudication. This means that all write-in ballots were sent for "adjudication" by a poll worker or election official to process the ballot based on voter "intent". Adjudication files allow a computer operator to decide to whom to award those votes (or to trash them).

5. In the logs all but two of the Override Options were enabled on these machines, thus allowing any operator to change those votes. [Image 9]:

Case 1:21-cv-00445-CJN



6.    In the logs all but two of the Override Options were enabled on these machines, thus allowing any operator to change those votes.   This gives the system operators carte blanche to adjudicate ballots, in this case 81.96% of the total cast ballots with no audit trail or oversight. [Image 10]:

7.    On 12/8/2020 Microsoft issued 58 security patches across 10+ products, some of which were used for the election software machine, server and programs. Of the 58 security fixes 22, were patches to remote code execution (RCE) vulnerabilities. [Image 11]:

19



8.  We reviewed the Election Management System logs (EmsLogger) in their entirety from 9/19/2020 through 11/21/2020 for the Project: Antrim November 2020. There were configuration errors throughout the set-up, election and tabulation of results. The last error for Central Lake Township, Precinct 1 occurred on 11/21/2020 at 14:35:11 System.Xml.XmlException System.Xml.XmlException: The ' ' character, hexadecimal value 0x20, cannot be included in a name. Bottom line is that this is a calibration that rejects the vote (see picture below). [Image 12]:



**Notably 42 minutes earlier on Nov 21 2020 at 13:53:09 a user attempted to zero out election results. Id:3168 EmsLogger - There is no permission to {0} - Project: User: Thread: 189. This is direct proof of an attempt to tamper with evidence.**

9.    The Election Event Designer Log shows that Dominion ImageCast Precinct Cards were programmed with updated new programming on 10/23/2020 and again after the election on 11/05/2020. As previously mentioned, this violates the HAVA safe harbor period.

Source: C:\Program Files\Dominion Voting Systems\Election Event Designer\Log\Info.txt

- Dominion Imagecast Precinct Cards Programmed with 9/25/2020 programming on 09/29/2020, 09/30/2020, and 10/12/2020.

- Dominion Imagecast Precinct Cards Programmed with New Ballot Programming dated 10/22/2020 on 10/23/2020 and after the election on 11/05/2020

Excerpt from 2020-11-05 showing "ProgramMemoryCard" commands.



21



10.     Analysis is ongoing and updated findings will be submitted as soon as possible. A summary of the information collected is provided below.

    10|12/07/20 18:52:30| Indexing completed at Mon Dec 7 18:52:30 2020
    12|12/07/20 18:52:30| INDEX SUMMARY
    12|12/07/20 18:52:30| Files indexed: 159312

Case 1:21-cv-00445-CJN

12|12/07/20 18:52:30| Files skipped: 64799
12|12/07/20 18:52:30| Files filtered: 0
12|12/07/20 18:52:30| Emails indexed: 0
12|12/07/20 18:52:30| Unique words found: 5325413
12|12/07/20 18:52:30| Variant words found: 3597634
12|12/07/20 18:52:30| Total words found: 239446085
12|12/07/20 18:52:30| Avg. unique words per page: 33.43
12|12/07/20 18:52:30| Avg. words per page: 1503
12|12/07/20 18:52:30| Peak physical memory used: 2949 MB
12|12/07/20 18:52:30| Peak virtual memory used: 8784 MB
12|12/07/20 18:52:30| Errors: 10149
12|12/07/20 18:52:30| Total bytes scanned/downloaded: 1919289906


Dated: December 13, 2020

_____

Russell Ramsland

# EXHIBIT Y

# FRAUDSPOTTERS

Leads for insurance SIU via our proprietary algorithms



**NOVEMBER 21, 2020 BY BEN TURNER**

## Statistical Evidence of Dominion Election Fraud? Time to Audit the Machines.

### Overview

Statistical analysis of past presidential races supports the view that in 2020, in counties where Dominion Machines were deployed, the voting outcomes were on average

Statistics about Dominion Election Fraud | Election Voting Machine Fraud | Stop

(nationwide) approximately 1.5% higher for Joe Biden and 1.5% lower for Donald Trump after adjusting for other demographic and past voting preferences. Upon running hundreds of models, I would say the national average effect appears to be somewhere between 1.0% and 1.6%.

For Dominion to have switched the election from Trump to Biden, it would have had to have increased Biden outcomes (with a corresponding reduction in Trump outcomes) by 0.3% in Georgia, 0.6% in Arizona, 2.1% in Wisconsin, and 2.5% in Nevada. The apparent average "Dominion Effect" is greater than the margin in Arizona and Georgia, and close to the margin for Wisconsin and Nevada. It is not hard to picture a scenario where the actual effect in Wisconsin and Nevada was greater than the national average and would have changed the current reported outcome in those two states.

Assuming the "Dominion Effect" is real, it is possible that an audit of these machines would overturn the election.

These results are scientifically valid and typically have a p-value of less than 1%, meaning the chances of this math occurring randomly are less than 1 in 100. This article, and its FAQ, shows many ways to model the "Dominion Effect."

**The best way to restore faith in the system is to audit the Dominion voting machines in Arizona, Georgia, Nevada, and Wisconsin.**

## Study Design

In 2008, although Dominion was in many counties in New York and had an insignificant presence in Wisconsin, it had no presence in the rest of the USA.

Dominion built up its presence in 2012, increased it in 2016, and increased it further in 2020.

The following images, taken from verifiedvoting.org, show the build up from a geographic perspective.



*Dominion Voting Machines 2008*



*Dominion Voting Machines 2012*



*Dominion Voting Machines 2016*



*Dominion Voting Machines 2020*

We wish to know if Dominion affects elections so we will test election results from 2008, when Dominion was not present, against 2020 when Dominion was fully present and alleged to have committed fraud. We will exclude New York from this analysis because Dominion already had a presence there in 2008. We also will exclude Alaska for lack of county specific data.

Our study is as follows:

- Null hypothesis: Dominion machines are not associated with change in voter outcomes
- Alternative hypothesis: The presence of Dominion machines affects election outcomes.

To do this study, we will link results from 2008 to 2020 by each county, parish, or in some cases city. Since this is usually based on county, we will refer to it as county in this article.

By comparing the county to itself, we are constructing the test similar to how a drug company would test the effects of its proposed therapy. In this case, we have 3,050 counties that do not have Dominion in 2008. In 2020, 657 of the counties have Dominion while 2,388 do not. If we assume that the same societal forces are acting upon all of these counties equally, then in comparing the average change from 2008 to 2020 for Dominion counties versus non Dominion counties, we should have a similar change in voter share. In this regard, it is as if Dominion is the proposed treatment, and non-Dominion is the placebo.

When doing this analysis, we do NOT see a change that is constant across counties. In fact, below are the results comparing 2008 to 2020. A verbal description is "the average US county's percentage of vote for the Democrat presidential candidate was 8.4 percentage points less Democrat in 2020 (Biden vs. Trump) than in 2008. (Obama vs.

McCain). However, despite this same point decrease, Dominion counties only decreased 6.4% points, while the non-Dominion counties decreased 9.0% points."

### Dominion Counties vs. Non-dominion Counties

| Dominion | Number of Counties | Average of Difference |
| --- | --- | --- |
| No | 2,393 | -9.0% |
| Yes | 657 | -6.4% |
| Total | 3,050 | -8.4% |

Incidentally, you may be surprised that the country trended Republican as a whole. This is not surprising when you realize that we are comparing the outcome of Obama vs. McCain which was not close vs the Biden vs. Trump election which is closer.

Are these results statistically significant?

Yes. We can run a simple linear regression using ordinary least squares, obtaining the following results. Note: a p-value indicates the likelihood of this occurring randomly.

### Simple Linear Regression: Ordinary Least Squares

| Variable | Coefficient | P-value |
| --- | --- | --- |
| Intercept | -8.98% | 0.000% |
| Dominion | 2.55% | 0.000% |

You can verify this yourself by running an ordinary least squares against this dataset.

A pure academician would say, "You are not correcting for heteroscedasticity. Unless you account for this, the results are not valid." (For purposes of this article, heteroscedasticity is when the error of our model varies by the size of the county.) However, we can correct for this by applying heteroscedasticity-consistent standard errors. By applying this technique, we obtain the following significant results.

### Simple Linear Regression: Ordinary Least Squares, Two types of P-values

| Variable | Coefficient | P-value | P-value Consistent |
| --- | --- | --- | --- |

| Variable | Coefficient | P-value | P-Value Consistent |
|----------|-------------|---------|--------------------|
| Intercept | -8.98% | 0.000% | 0.000% |
| Dominion | 2.55% | 0.000% | 0.000% |

A pure academician would now say, "You are treating each county the same regardless of its size. You are treating a large place like L.A. County the same as a very thinly populated county."

We can also correct for this. We can weight each observation by the total number of Republican and Democratic presidential combined votes for 2008 and 2020. Statistically, we will apply the underlined weighted least squares technique.

Furthermore, in addition to using the standard approach, we can use heteroscedastic-consistent error term estimation like we did above. Doing this yields the following results. (You'll notice that the p-value for Dominion using the weighted-least squares and heteroskedastic consistent approach is 0.26%. This means that this technique gives a 0.26 out of 100 chance that this occurred randomly, which is still considered "statistically significant.")

### Simple Linear Regression: Weighted Least Squares, Two types of P-values

| Variable | Coefficient | P-value | P-value Consistent |
|----------|-------------|---------|--------------------|
| Intercept | -1.72% | 0.00% | 0.00% |
| Dominion | 1.96% | 0.00% | 0.26% |

This analysis can be seen in an Excel workbook here.

Alternatively, this analysis can be performed in R using this R code and CSV file.

If you would like to verify the data, the assembling of the data can be seen in this sheet.

I obtained data from three sources: 1) Prior election data from: MIT Election Data Science Lab, 2) Current election data from: Politico , and 3) Dominion data from: VerifiedVoting.Org.

2/9/2021                     Statistics about Dominion Election fraud | Documented election fraud down to the machine using support
Case 1:21-cv-00445-CJN Document 34-2 Filed 04/28/21 Page 375 of 502
Case 1:21-cv-00445-CJN

Does this prove Dominion is associated with changing election outcomes? No. For
example, it could simply mean that the counties adopting Dominion corresponded to
counties that were trending less Republican anyway; their lack of trending Republican is
statistically significant, independent of Dominion. In fact, I believe this is true, but after
controlling for other variables we can eliminate this issue.

## Can we control for other factors?

Unlike a drug company's test of a new treatment, our counties were not randomly selected
to be "treated" by Dominion. These counties chose to install Dominion.  Was there
selection bias? We should control for other factors to see if the presence of Dominion still
significantly affects results.

We can obtain demographic data on a county level basis from the U.S. department of
agriculture. By attaching this data on a county basis to our already existing dataset, and
running multiple linear regression, we obtain the following results. You'll notice that
Dominion's p-value became more significant as we controlled for other variables.  In some
cases Dominion is more significant than the control variables.

Multiple Linear Regression: Ordinary Least Squares, Two types of P-values

| Variable | Coefficient | P-value | P-value Consistent |
|---|---|---|---|
| Intercept | -8.93% | 0.00% | 0.00% |
| RuralUrbanContinuumCode2013 | -0.52% | 0.00% | 0.00% |
| ManufacturingDependent2000 | -1.02% | 0.00% | 0.00% |
| HiAmenity | 1.92% | 0.00% | 0.00% |
| HiCreativeClass2000 | 6.67% | 0.00% | 0.00% |
| Low_Education_2015_update | 2.41% | 0.00% | 0.00% |
| PopChangeRate1019 | 0.09% | 0.00% | 0.00% |
| Net_International_Migration_Rate _2010_2019 | 0.53% | 0.00% | 0.00% |

https://www.fraudspotters.com/statistics-about-dominion-election-fraud/

| Variable | Coefficient | P-value | P-value Consistent |
|----------|-------------|---------|---------------------|
| Dominion | 1.65% | 0.00% | 0.00% |

Multiple Linear Regression: Weighted Least Squares, Two types of P-values

| Variable | Coefficient | P-value | P-value Consistent |
|----------|-------------|---------|---------------------|
| Intercept | -5.36% | 0.00% | 0.00% |
| RuralUrbanContinuumCode2013 | -0.83% | 0.00% | 0.00% |
| ManufacturingDependent2000 | -2.69% | 0.00% | 0.00% |
| HiAmenity | -0.51% | 0.00% | 27.41% |
| HiCreativeClass2000 | 5.74% | 0.00% | 0.00% |
| Low_Education_2015_update | 3.00% | 0.00% | 0.00% |
| PopChangeRate1019 | 0.19% | 0.23% | 0.00% |
| Net_International_Migration_Rate _2010_2019 | 0.18% | 0.34% | 29.70% |
| Dominion | 1.55% | 0.00% | 0.11% |

To provide a basic interpretation, look at the sign of the coefficient. It is telling you whether the demographic factor increased or decreased Democratic presidential voter percentage. So, from 2008 to 2020:

- The more rural, the less the Democratic share
- The more manufacturing dependent, the less the Democratic share
- The more a county is considered a "high natural amenity," the more the Democratic share if we consider counties equally weighted but not if we give larger counties more weight. Note this variable has a less significant p-value than some of the others.
- The more a county is considered "high creative class," the more the Democratic share
- The more a county is considered "low education," the more the Democratic share
- The more the population increased, the more the Democratic share
- The more international immigration, the more the Democratic share, although one measure had this value with a questionable p-value.
- And most importantly, if Dominion was installed, there was approximately a 1.5%-point increase in Democratic share which also corresponds to a 1.5%-point Republican

decrease, so a total swing of 3% points.

If you wish to see this work in Excel, please download this excel file.

If you wish to verify in R, please run this R code.

If you believe specific variables should be tested, maybe we already did. Please see the FAQ. Of note, since publishing this article, we have done many more models. Most of them show the Dominion coefficient to be above 1.5% and p-values that are below 1%. One model shows the Dominion coefficient at 1.42%, and I put that particular model's entire results in the FAQ. If you run hundreds of models, there is a range of estimated Dominion Effects that are typically between 1.0% and 1.6%.

## If the "Dominion Effect" is real, would it have affected the election?

This article showed a range of estimates for the "Dominion Effect," the more persuasive being from the multiple linear regression analysis:

- Multiple Linear Regress: Ordinary Least Squares: 1.65%
- Multiple Linear Regress: Weighted Least Squares: 1.55%

I find the weighted least square model the most persuasive and refer to it often in the FAQ.

If there is a Dominion Effect, it adds that percentage to Democrat presidential vote and subtracts from Republican. If the Dominion Effect is real, it may have affected this close election. For Dominion to have switched the election from Trump to Biden, it would have had to increase Democratic presidential outcomes by 0.3% and reduced Republican outcomes by 0.3% in Georgia. The factors for the other states are 0.6% in Arizona, 2.1% in Wisconsin, and 2.5% in Nevada. Click here to see the math.

If you believe the Dominion Effect is real, it is not hard to believe that this effect would be greater in swing states and could have swung these four states into Biden's column, putting the electoral college in his favor.

## What does this mean?

It means that Arizona, Georgia, Nevada, and Wisconsin should allow the Republicans to audit the machines.

Let me pose these questions to the following individuals/entities:

Future President Joe Biden: Do you want a significant portion of the population to believe your presidency was only won through Dominion voting systems?

Dominion Corporation: Do you want a significant portion of the population to distrust you and demand that your machines are not used?

Arizona, Georgia, Nevada, and Wisconsin election officials: Do you want a significant portion of your constituents to believe you are part of a conspiracy?

**Transparency is the key to solving this**. Although there will always be a fringe group that will never believe the results of such an audit, why not prove them wrong? They are already alleging fraud and doing it in such a way that a significant portion of society already knows about it. Here is a good underline{example} from comedian JP Sears: this information is making its way through society.

And I just showed you statistics that will be used to allege conspiracy.

If you think ignoring this will make it go away, I believe you are mistaken.

Do we want another four years where one side of the political divide continually argues that the election was not valid? Will that help our society?

### How should we talk about this?

Feel free to use this data and analysis as you see fit. If you find that I did something wrong, please politely tell me, and I'll gladly update my post.

I do not wish to be a part of any sort of misinformation, which is why I am being fully transparent in showing my data sources, methods, and identity. I wish to have cordial dialogue with those who disagree. Please note, I have a FAQ page to respond to questions about this analysis. It is always possible for statistical models to show something different than what one thinks they are showing, and I can readily admit that. If my analysis and/or data have issues, I want to know about it and I want to correct this post.

We are all fellow citizens, and I recommend we become united in our effort to support transparency as it pertains to democracy.

**I recommend we audit the machines.**

## Author Biography

Ben Turner has spent most of his career as an actuary in the insurance industry. From 2006 to 2016 he was with Texas Mutual, serving the last several years as SVP and Chief Actuary. In 2016 he accepted a position at Windhaven, working as the president to help a struggling insurance company. Although unable to prevent the company from going into run-off, his experience required a deep dive into the fraud industry that caused Windhaven's demise. Since then, Ben has dedicated his career to understanding the mathematics of fraud. In 2020, Ben Turner created FraudSpotters, a company providing software for insurance companies to help them identify fraud rings. In addition to his experience, he is a member of the American Academy of Actuaries, an Associate in the Casualty Actuarial Society, an inactive member of the California bar, a graduate of the BYU MBA program, and a graduate of BYU law school.

The best way to reach him is via Linked-In.

## Why I did this research.

On 11/19/2020, at the RNC, Sydney Powell alleged that our vote has been improperly altered by Dominion machines.

RNC press conference, 11/19/2020

I don't know how to process these allegations. They sound so extreme and far-fetched that they are easy to blow off as ridiculous.

On the other hand, HBO has an excellent documentary called Kill Chain: The Cyber War on America's Elections. I've seen it and can recommend. Here is a link to a review at Mother Jones.

I decided I should substantiate or disprove what I was hearing. My goal was to write an article either showing "nothing to see here" or explaining why more auditing/investigation

**374 of 497**

should occur.

**I recommend we audit the machines.**

By the way, if you have read this far, there is more interesting work shown at the FAQ. I recommend you check it out.

📁 **EMPLOYEE BLOG**

\# **DOMINION, ELECTION FRAUD, ELECTION MACHINES, SYDNEY POWELL**

# EXHIBIT Z

Case 1:21-cv-00445-CJN

**Table B-3.**
**U.S. Courts of Appeals–Sources of Appeals, Original Proceedings, and Miscellaneous**
**Applications Commenced, by Circuit, During the 12-Month Periods Ending September 30, 2016 through 2020**

| Source | Commenced | | | | |
|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 |
| **Total** | **60,357** | **50,506** | **49,276** | **48,486** | **48,190** |
| U.S. District Courts | 39,373 | 38,138 | 37,488 | 36,937 | 35,194 |
| Bankruptcy | 757 | 729 | 658 | 635 | 621 |
| Administrative Agencies, Total | 6,469 | 6,153 | 6,089 | 5,929 | 7,105 |
| IRS | 180 | 164 | 149 | 162 | 158 |
| Labor | 15 | 22 | 17 | 18 | 18 |
| FCC | 59 | 35 | 79 | 55 | 60 |
| FERC | 116 | 46 | 112 | 47 | 192 |
| NLRB | 370 | 213 | 232 | 190 | 230 |
| EPA | 190 | 171 | 88 | 79 | 105 |
| BIA | 5,215 | 5,210 | 5,158 | 5,112 | 6,067 |
| Other Administrative Agencies | 324 | 292 | 254 | 266 | 275 |
| Original Proceedings and Miscellaneous Applications | 13,758 | 5,486 | 5,041 | 4,985 | 5,270 |
| **DC Circuit** | **1,197** | **951** | **1,034** | **908** | **1,118** |
| U.S. District Courts | 546 | 517 | 590 | 560 | 590 |
| NY,W | - | - | - | - | 1 |
| Bankruptcy | 3 | 2 | 3 | 1 | 1 |
| Administrative Agencies, Total | 493 | 343 | 345 | 252 | 456 |
| IRS | 13 | 27 | 13 | 21 | 10 |
| NLRB | 112 | 69 | 83 | 62 | 66 |
| BIA | 1 | 0 | - | 1 | 19 |
| Other Administrative Agencies | 367 | 247 | 249 | 168 | 361 |
| Original Proceedings and Miscellaneous Applications | 155 | 89 | 96 | 95 | 70 |

Case 1:21-cv-00445-CJN

**Table B-3. (September 30, 2020 —Continued)**

| Source | Commenced | | | | |
|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 |
| **1st Circuit** | **1,704** | **1,296** | **1,245** | **1,342** | **1,284** |
| ME | 117 | 116 | 102 | 103 | 97 |
| MA | 499 | 377 | 464 | 486 | 448 |
| NH | 86 | 90 | 82 | 78 | 67 |
| RI | 45 | 87 | 71 | 66 | 65 |
| PR | 461 | 372 | 284 | 376 | 329 |
| Bankruptcy | 28 | 33 | 39 | 40 | 45 |
| Administrative Agencies, Total | 105 | 88 | 100 | 88 | 122 |
| IRS | 4 | 2 | 3 | 0 | 1 |
| NLRB | 8 | 6 | 3 | 3 | 8 |
| BIA | 83 | 68 | 84 | 76 | 106 |
| Other Administrative Agencies | 10 | 12 | 10 | 9 | 7 |
| Original Proceedings and Miscellaneous Applications | 363 | 133 | 103 | 105 | 111 |
| **2nd Circuit** | **4,640** | **4,337** | **4,062** | **4,260** | **4,698** |
| CT | 304 | 345 | 317 | 313 | 307 |
| NY,N | 340 | 331 | 379 | 317 | 289 |
| NY,E | 704 | 684 | 652 | 637 | 534 |
| NY,S | 1,434 | 1,385 | 1,370 | 1,585 | 2,080 |
| NY,W | 232 | 250 | 266 | 308 | 282 |
| VT | 65 | 43 | 42 | 71 | 39 |
| Bankruptcy | 77 | 158 | 63 | 68 | 46 |
| Administrative Agencies, Total | 794 | 754 | 694 | 677 | 802 |
| IRS | 12 | 12 | 13 | 10 | 14 |
| NLRB | 23 | 19 | 21 | 12 | 22 |
| BIA | 743 | 705 | 641 | 638 | 753 |
| Other Administrative Agencies | 16 | 18 | 19 | 17 | 13 |
| Original Proceedings and Miscellaneous Applications | 690 | 387 | 279 | 284 | 319 |

**Table B-3. (September 30, 2020 —Continued)**

| Source | Commenced | | | | |
|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 |
| **3rd Circuit** | **3,618** | **2,941** | **2,941** | **3,503** | **2,877** |
| DE | 110 | 103 | 96 | 118 | 136 |
| NJ | 574 | 565 | 499 | 1,088 | 525 |
| PA,E | 821 | 705 | 780 | 722 | 609 |
| PA,M | 442 | 396 | 464 | 439 | 376 |
| PA,W | 387 | 382 | 338 | 344 | 397 |
| VI | 34 | 42 | 39 | 42 | 35 |
| Bankruptcy | 63 | 43 | 44 | 45 | 50 |
| Administrative Agencies, Total | 244 | 336 | 312 | 341 | 393 |
| IRS | 5 | 8 | 9 | 7 | 2 |
| NLRB | 15 | 11 | 23 | 22 | 21 |
| BIA | 202 | 284 | 264 | 294 | 342 |
| Other Administrative Agencies | 22 | 33 | 16 | 18 | 28 |
| Original Proceedings and Miscellaneous Applications | 943 | 369 | 369 | 364 | 356 |

Case 1:21-cv-CJN

**Table B-3. (September 30, 2020 —Continued)**

| Source | Commenced | | | | |
|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** |
| **4th Circuit** | **6,411** | **4,497** | **4,261** | **4,517** | **4,680** |
| MD | 596 | 580 | 510 | 462 | 460 |
| NC,E | 669 | 539 | 543 | 574 | 698 |
| NC,M | 265 | 237 | 216 | 233 | 261 |
| NC,W | 347 | 291 | 305 | 306 | 335 |
| SC | 575 | 536 | 604 | 690 | 580 |
| VA,E | 928 | 980 | 891 | 812 | 863 |
| VA,W | 241 | 264 | 222 | 323 | 241 |
| WV,N | 136 | 139 | 110 | 171 | 146 |
| WV,S | 96 | 106 | 113 | 133 | 138 |
| Bankruptcy | 65 | 46 | 27 | 66 | 62 |
| Administrative Agencies, Total | 230 | 246 | 226 | 203 | 250 |
| IRS | 16 | 15 | 9 | 14 | 16 |
| NLRB | 11 | 7 | 7 | 5 | 11 |
| BIA | 168 | 183 | 166 | 146 | 195 |
| Other Administrative Agencies | 35 | 41 | 44 | 38 | 28 |
| Original Proceedings and Miscellaneous Applications | 2,263 | 533 | 494 | 544 | 646 |

**Table B-3. (September 30, 2020 —Continued)**

| Source | Commenced | | | | |
|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 |
| **5th Circuit** | **8,664** | **7,099** | **7,566** | **7,020** | **6,401** |
| LA,E | 473 | 495 | 766 | 435 | 309 |
| LA,M | 134 | 132 | 138 | 170 | 163 |
| LA,W | 468 | 303 | 352 | 352 | 330 |
| MS,N | 89 | 106 | 95 | 82 | 88 |
| MS,S | 266 | 311 | 261 | 265 | 232 |
| TX,N | 1,373 | 1,401 | 1,582 | 1,367 | 1,175 |
| TX,E | 469 | 482 | 480 | 496 | 464 |
| TX,S | 1,954 | 1,523 | 1,547 | 1,343 | 1,031 |
| TX,W | 1,283 | 1,038 | 1,046 | 1,144 | 1,065 |
| Bankruptcy | 58 | 69 | 94 | 75 | 66 |
| Administrative Agencies, Total | 438 | 411 | 476 | 561 | 765 |
| IRS | 10 | 15 | 16 | 15 | 14 |
| NLRB | 67 | 16 | 11 | 7 | 14 |
| BIA | 311 | 352 | 403 | 495 | 708 |
| Other Administrative Agencies | 50 | 28 | 46 | 44 | 29 |
| Original Proceedings and Miscellaneous Applications | 1,659 | 828 | 729 | 730 | 713 |

**Table B-3. (September 30, 2020 —Continued)**

| Source | Commenced | | | | |
|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** |
| **6th Circuit** | **5,242** | **4,591** | **4,221** | **4,243** | **4,306** |
| KY,E | 339 | 318 | 378 | 355 | 409 |
| KY,W | 195 | 169 | 150 | 149 | 154 |
| MI,E | 836 | 842 | 789 | 803 | 666 |
| MI,W | 538 | 492 | 459 | 415 | 417 |
| OH,N | 546 | 598 | 520 | 589 | 534 |
| OH,S | 462 | 388 | 324 | 335 | 386 |
| TN,E | 254 | 292 | 225 | 235 | 253 |
| TN,M | 219 | 235 | 218 | 206 | 195 |
| TN,W | 254 | 312 | 245 | 252 | 219 |
| Bankruptcy | 45 | 24 | 41 | 32 | 51 |
| Administrative Agencies, Total | 261 | 247 | 260 | 219 | 303 |
| IRS | 10 | 6 | 10 | 9 | 6 |
| NLRB | 24 | 22 | 19 | 14 | 26 |
| BIA | 194 | 196 | 202 | 172 | 239 |
| Other Administrative Agencies | 33 | 23 | 29 | 24 | 32 |
| Original Proceedings and Miscellaneous Applications | 1,293 | 674 | 612 | 653 | 719 |

Case 1:21-cv-00445-CJN

**Table B-3. (September 30, 2020 —Continued)**

| Source | Commenced | | | | |
|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** |
| **7th Circuit** | **3,382** | **2,787** | **2,814** | **2,622** | **2,609** |
| IL,N | 872 | 921 | 911 | 808 | 693 |
| IL,C | 289 | 330 | 288 | 302 | 341 |
| IL,S | 251 | 221 | 227 | 189 | 174 |
| IN,N | 234 | 201 | 206 | 154 | 214 |
| IN,S | 300 | 280 | 334 | 330 | 329 |
| WI,E | 278 | 262 | 285 | 248 | 270 |
| WI,W | 160 | 128 | 179 | 185 | 190 |
| Bankruptcy | 50 | 33 | 46 | 46 | 12 |
| Administrative Agencies, Total | 114 | 107 | 78 | 99 | 121 |
| IRS | 8 | 6 | 4 | 8 | 14 |
| NLRB | 17 | 9 | 13 | 12 | 11 |
| BIA | 64 | 69 | 47 | 67 | 72 |
| Other Administrative Agencies | 25 | 23 | 14 | 12 | 24 |
| Original Proceedings and Miscellaneous Applications | 834 | 304 | 260 | 261 | 265 |

**Table B-3. (September 30, 2020 —Continued)**

| Source | Commenced | | | | |
| --- | --- | --- | --- | --- | --- |
| | 2016 | 2017 | 2018 | 2019 | 2020 |
| **8th Circuit** | **3,665** | **2,957** | **2,844** | **2,812** | **2,766** |
| AR,E | 393 | 399 | 354 | 330 | 321 |
| AR,W | 135 | 137 | 127 | 121 | 111 |
| IA,N | 194 | 186 | 188 | 164 | 203 |
| IA,S | 221 | 213 | 203 | 263 | 299 |
| MN | 337 | 323 | 352 | 353 | 312 |
| MO,E | 345 | 360 | 323 | 313 | 292 |
| MO,W | 436 | 433 | 421 | 418 | 371 |
| NE | 163 | 167 | 156 | 165 | 157 |
| ND | 99 | 80 | 97 | 73 | 83 |
| SD | 125 | 133 | 130 | 128 | 139 |
| Bankruptcy | 15 | 20 | 13 | 24 | 16 |
| Administrative Agencies, Total | 168 | 155 | 143 | 137 | 126 |
| IRS | 12 | 11 | 9 | 9 | 4 |
| NLRB | 20 | 9 | 10 | 4 | 5 |
| BIA | 113 | 104 | 111 | 118 | 103 |
| Other Administrative Agencies | 23 | 31 | 13 | 6 | 14 |
| Original Proceedings and Miscellaneous Applications | 1,034 | 351 | 337 | 323 | 336 |

**Table B-3. (September 30, 2020 —Continued)**

| Source | Commenced | | | | |
|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 |
| **9th Circuit** | **11,473** | **11,096** | **10,566** | **10,106** | **10,400** |
| AK | 66 | 77 | 83 | 106 | 95 |
| AZ | 718 | 688 | 718 | 716 | 794 |
| CA,N | 784 | 924 | 811 | 778 | 781 |
| CA,E | 795 | 778 | 708 | 709 | 636 |
| CA,C | 1,874 | 1,894 | 1,773 | 1,492 | 1,363 |
| CA,S | 534 | 497 | 435 | 463 | 390 |
| HI | 115 | 118 | 133 | 129 | 169 |
| ID | 133 | 152 | 123 | 125 | 151 |
| MT | 210 | 180 | 219 | 217 | 208 |
| NV | 526 | 629 | 619 | 635 | 661 |
| OR | 388 | 374 | 336 | 337 | 337 |
| WA,E | 140 | 123 | 146 | 135 | 135 |
| WA,W | 399 | 470 | 417 | 444 | 475 |
| GUAM | 14 | 14 | 7 | 7 | 10 |
| NMI | 11 | 11 | 16 | 8 | 6 |
| Bankruptcy | 240 | 217 | 197 | 161 | 160 |
| Administrative Agencies, Total | 3,236 | 3,117 | 3,023 | 2,869 | 3,210 |
| IRS | 59 | 42 | 41 | 42 | 41 |
| NLRB | 56 | 35 | 28 | 36 | 33 |
| BIA | 3,063 | 2,980 | 2,878 | 2,699 | 3,048 |
| Other Administrative Agencies | 58 | 60 | 76 | 92 | 88 |
| Original Proceedings and Miscellaneous Applications | 1,290 | 833 | 802 | 775 | 819 |

**Table B-3. (September 30, 2020 —Continued)**

| Source | Commenced | | | | |
|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 |
| **10th Circuit** | **2,338** | **1,856** | **1,830** | **1,757** | **1,737** |
| CO | 459 | 413 | 495 | 446 | 436 |
| KS | 292 | 269 | 255 | 244 | 241 |
| NM | 224 | 208 | 188 | 189 | 179 |
| OK,N | 127 | 104 | 110 | 98 | 107 |
| OK,E | 68 | 69 | 61 | 61 | 77 |
| OK,W | 252 | 270 | 192 | 187 | 177 |
| UT | 185 | 173 | 184 | 169 | 130 |
| WY | 116 | 81 | 94 | 83 | 65 |
| Bankruptcy | 33 | 15 | 24 | 17 | 25 |
| Administrative Agencies, Total | 82 | 67 | 83 | 124 | 155 |
| IRS | 7 | 7 | 10 | 8 | 7 |
| NLRB | 2 | 1 | 1 | 3 | 2 |
| BIA | 47 | 40 | 54 | 92 | 135 |
| Other Administrative Agencies | 26 | 19 | 18 | 21 | 11 |
| Original Proceedings and Miscellaneous Applications | 500 | 187 | 144 | 139 | 145 |

**Table B-3. (September 30, 2020 —Continued)**

| Source | Commenced | | | | |
|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** |
| **11th Circuit** | **8,023** | **6,098** | **5,892** | **5,396** | **5,314** |
| AL,N | 224 | 236 | 244 | 243 | 242 |
| AL,M | 137 | 146 | 124 | 149 | 143 |
| AL,S | 121 | 121 | 81 | 119 | 103 |
| FL,N | 431 | 424 | 405 | 332 | 333 |
| FL,M | 1,380 | 1,445 | 1,305 | 1,120 | 1,117 |
| FL,S | 1,461 | 1,410 | 1,406 | 1,194 | 1,048 |
| GA,N | 684 | 689 | 671 | 663 | 642 |
| GA,M | 238 | 251 | 210 | 266 | 254 |
| GA,S | 229 | 227 | 214 | 179 | 172 |
| Bankruptcy | 80 | 69 | 67 | 60 | 87 |
| Administrative Agencies, Total | 304 | 282 | 349 | 359 | 402 |
| IRS | 24 | 13 | 12 | 19 | 29 |
| NLRB | 15 | 9 | 13 | 10 | 11 |
| BIA | 226 | 229 | 308 | 314 | 347 |
| Other Administrative Agencies | 39 | 31 | 16 | 16 | 15 |
| Original Proceedings and Miscellaneous Applications | 2,734 | 798 | 816 | 712 | 771 |

NOTE: This table does not include data for the U.S. Court of Appeals for the Federal Circuit. Administrative agency appeals previously reported as appeals of decisions by the Immigration and Naturalization Service (INS) are now shown as appeals of decisions by the Board of Immigration Appeals (BIA). Appeals of decisions by the U.S. Tax Court are shown as Internal Revenue Service (IRS) appeals. Beginning in March 2014, data include miscellaneous cases not included previously.

# EXHIBIT AA

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

https://www.wsj.com/articles/dominion-sues-mypillow-ceo-mike-lindell-over-election-claims-11613996104

ELECTION 2020

# Dominion Sues MyPillow, CEO Mike Lindell Over Election Claims

The voting-machine maker's lawsuit alleges defamation, seeks more than $1.3 billion in damages



Mike Lindell, CEO of Minnesota-based MyPillow, outside the West Wing of the White House on Jan. 15.
PHOTO: STAR TRIBUNE/ZUMA PRESS

*By* *Alexa Corse*
Updated Feb. 22, 2021 11:36 am ET



**Listen to this article**
5 minutes

WASHINGTON—One of the largest makers of voting machines in the U.S. on Monday sued a prominent supporter of former President Donald Trump, alleging that the businessman had defamed the company with false accusations that it had rigged the 2020 election for President Biden.

Dominion Voting Systems sued Mike Lindell, chief executive of Minnesota-based MyPillow Inc., and his company in the U.S. District Court for the District of Columbia, seeking more than $1.3 billion in damages.

389 of 497

In its complaint, the company cites a number of statements made by Mr. Lindell, including in media appearances, social-media posts, and a two-hour film claiming to prove widespread election fraud. Mr. Lindell said he helped produce the film, which he released online in early February.

The complaint alleges that Mr. Lindell made false claims about the integrity of Dominion's voting machines and that he knew no credible evidence supported his claims that the company had stolen the election from Mr. Trump—what Dominion has called the "Big Lie."

"He is well aware of the independent audits and paper ballot recounts conclusively disproving the Big Lie," the complaint states. "But Lindell...sells the lie to this day because the lie sells pillows."

---

SHARE YOUR THOUGHTS

*Are you concerned that Americans have lost faith in the electoral system? If so, what steps could leaders take to bolster trust? Join the conversation below.*

---

The suit also names MyPillow as a defendant.

In an interview Monday, Mr. Lindell said he was "very, very happy" to learn of the lawsuit.

"I have all the evidence on them," he said. "Now this will get disclosed faster, all the machine fraud and the attack on our country."

Dominion's lawsuit accuses Mr. Lindell of repeatedly and falsely alleging that algorithms in Dominion's voting machines had stolen votes from Mr. Trump. It said he had undertaken a marketing campaign for the pillow company based on his support for Mr. Trump and the former president's claims that the election had been stolen from him.

Dominion says the allegations by Mr. Lindell and others have irreparably damaged its reputation, jeopardized its contracts with state and local governments, and prompted death threats and harassment against employees. The company says it supplies election equipment used by more than 40% of U.S. voters.

Federal and state officials have said there is no evidence that any voting system deleted or changed votes in the November election. Election officials have recounted and audited

https://www.wsj.com/articles/dominion-sues-mypillow-ceo-mike-lindell-over-election-claims-11613996104?mod=searchresults_pos2&page=1

millions of paper ballots in multiple states, which have affirmed the outcomes tabulated by Dominion's machines. Those states include Georgia, which Mr. Biden carried by less than 12,000 votes out of roughly 5 million.

Last month, Dominion filed defamation suits against Rudy Giuliani, Mr. Trump's personal attorney, and pro-Trump attorney Sidney Powell . Mr. Giuliani has said he would use the lawsuit to investigate Dominion and that the suit represented an attempt to censor him. Ms. Powell has said that she didn't publish any statement she knew was false and that she has credible evidence.

### ELECTION AFTERMATH

- Voting-Machine Company Smartmatic Sues Fox News Over Election Claims (Feb. 4)
- Dominion Voting Systems Sues Rudy Giuliani Over Claims of Rigged Election (Jan. 25)
- New York State Bar Association Weighs Stripping Giuliani of Membership (Jan. 11)
- Sidney Powell Is Sued by Voting-Machine Company Dominion for Defamation (Jan. 8)
- Voting Machine Supplier Criticized by Trump in Spotlight on Election Integrity (Nov. 17, 2020)

Lawyers for Dominion have sent letters to multiple media outlets and others that the attorneys allege spread false claims of election fraud, seeking retractions or instructing them to preserve records related to the 2020 election in case of potential litigation, The Wall Street Journal has reported.

Another voting-machine company, Smartmatic USA Corp., sued Fox Corp.'s Fox News, seeking $2.7 billion in damages for what it alleges were defamatory on-air comments about the company's products. The network has said it is proud of its 2020 election coverage and has asked the court to dismiss the suit. Fox Corp. and Wall Street Journal parent News Corp share common ownership.

Dominion Chief Executive John Poulos told reporters on Monday, "Despite repeated warnings and efforts to share the facts with him, Mr. Lindell has continued to maliciously spread false claims about Dominion, each time giving empty assurances that he would come forward with overwhelming proof."

Mr. Lindell has said that a number of retailers have stopped selling his pillow company's products since he began promoting the election-fraud claims. A spokeswoman for Kohl's Corp. said that it had decided to stop buying additional inventory but said that the decision was because of decreased customer demand. Similarly, a Bed Bath & Beyond Inc. spokesman said the company dropped the brand because of poor sales, not politics.

Twitter Inc. permanently suspended Mr. Lindell's account in January for repeatedly violating its civic-integrity policy, a Twitter spokesman said.

**Write to** Alexa Corse at alexa.corse@wsj.com

*Appeared in the February 23, 2021, print edition as 'MyPillow, CEO Sued Over Vote Claims.'*

Copyright © 2021 Dow Jones & Company, Inc. All Rights Reserved

This copy is for your personal, non-commercial use only. To order presentation-ready copies for distribution to your colleagues, clients or customers visit https://www.djreprints.com.

Case 1:21-cv-00445-CJN

# EXHIBIT BB

## (Not Used)

*Intentionally Left Blank*

*Intentionally Left Blank*

*Intentionally Left Blank*

# EXHIBIT CC

Douglas G Frank, PhD
7444 Misty Woods Ct
Morrow, OH  45152

Dr Frank has approximately sixty peer-reviewed scientific publications, including feature and cover articles in the leading scientific journals in the world (e.g. *Science, Nature, Naturwissenschaften*). During his graduate and postdoctoral work he discovered and developed a new type of microscopy capable of producing three-dimensional images of molecules resting on metal surfaces. This gave him international credibility in the area of Low Energy Electron Diffraction (LEED) and Auger electron spectroscopy and microscopy, and his work is prominently featured in college textbooks and handbooks on the subjects.

Dr Frank left university academics in 1996, and began consulting, developing and manufacturing surface analytical devices for national defense (DARPA) and various industries, especially the cleaning products industry and bowling ball manufacturers, where his custom electronics, software, inventions and products continue to be widely used as industrial standards. Much of his work is protected by non-disclosure agreements.

During the 1990's, Dr Frank helped to establish The Schilling School for Gifted Children in Cincinnati, Ohio. Schilling is a K-12 school for extraordinarily gifted youngsters, and Dr Frank continues to teach a couple of their most advanced math and science classes each year, and continues to serve as the Math & Science Department Chair.

| 1990 | PhD | Surface Electroanalytical Chemistry, Univ of Cincinnati |
| 1986 | | University of California, Santa Barbara. Completed all requirements for PhD before relocation to Univ. of Cincinnati as part of the Ohio Eminent Scholar program. |
| 1983 | BA | Chemistry, Westmont College, Santa Barbara CA |

# EXHIBIT DD

# Nine Michigan Counties

*Collected Demographics for*
Populations, Registrations, & Ballots

*with Statistical Confirmation of Algorithm Use*

November 2020 United States General Election

Douglas G Frank, PhD
4/6/2021

*© 2021 Douglas G Frank, all rights reserved.*

*Proprietary and confidential analysis.*

*Requires prior written permission for use.*

# Sources

- ***Data shown in the graphs are compiled from THREE <u>different</u> databases.***
- Population data are from census.gov *(estimates as of July, 2019)*
- State registration database is labeled October, 2020, downloaded November 6th.
- State voter database is from January, 2021

- Current official registration values are from vote.michigan.gov/VoterCount/Index

*Custom extraction, collation, and graphing software prepared by Douglas G Frank, PhD*

# Michigan Counties Included

- Antrim
- Barry
- Charlevoix
- Grand Traverse
- Kent
- Livingston
- Macomb
- Oakland
- Wayne

*(List provided by Matt DePerno)*

# General Conclusions

- Voter registration is consistently near, or exceeding county population demographics.

- There are over 66,000 ballots recorded that are not associated with a registered voter in the October database.

- The ability to predict ballot demographics with such remarkable precision (average correlation coefficient of **R = 0.997**) demonstrates the activity of a regulating algorithm.

- This confirms, as seen in several other states, that ballots are being harvested at the precinct level, regulated at the county level, and determined at the state level.

- The degree of precision observed confirms that algorithms had access to voting databases and voting activity before, during, and following the November 3, 2020 election.

# Notes

- For a ballot to count as a ballot in the following graphs, not only must it be *listed* in the voter database, but the voter ID must *match* a voter ID in the registration database.

- As indicated in the following table, there were 66,196 ballots tallied from these counties with a voter ID not found in the October registration database.

- A list of these voters can be provided upon request.

# Antrim is the only county where registrations have dropped since the election.

| | Wayne County | Oakland County | Macomb County | Kent County | Livingston County | Grand Traverse County | Barry County | Charlevoix County | Antrim County |
|---|---|---|---|---|---|---|---|---|---|
| *Total Population* | 1,749,284 | 1,257,532 | 873,922 | 656,900 | 191,938 | 93,030 | 61,489 | 26,089 | 23,266 |
| *Total 18+ Population* | 1,339,405 | 999,630 | 694,156 | 500,078 | 152,390 | 74,536 | 48,094 | 21,337 | 19,22~ |
| *Current Registered (4/6/2021)* | 1,383,669 | 1,016,125 | 685,385 | 492,643 | 159,774 | 79,954 | 49,724 | 23,57~ | 21,935 |
| *Total Registrations (October Database)* | 1,365,392 | 1,011,669 | 670,592 | 489,234 | 157,667 | 79,537 | 48,628 | 23,27~ | 24,118 |
| *Total Ballots in Database* | 840,810 | 750,232 | 477,718 | 348,880 | 123,642 | 57,888 | 34,913 | 16,574 | 14,0~ |
| *Ballots not found in October Database* | 20,124 | 17,551 | 13,596 | 8,782 | 3,240 | 1,295 | 914 | 380 | 312 |

# Total Unregistered Ballots Tallied = 66,194

*(Ballot voter ID not found in October registration database)*





# *"Correlation Coefficient, R"*

*A statistical value that indicates how well a
set of values predicts a target set of data.*

**R = 1.000**     *The target set is precisely correlated*

**R = 0.000**     *The target set is not correlated at all (random)*

**R = -1.000**     *The target set predicts the opposite result*

***Correlations involving human behavior rarely have R values greater than 0.8***

# *Predicting Ballots with the Registration Key*

## *(In decreasing order by population)*



| R | County Name |
|---|---|
| 0.999 | Wayne County |
| 0.999 | Oakland County |
| 1.000 | Macomb County |
| 0.999 | Kent County |
| 0.999 | Livingston County |
| 0.996 | Grand Traverse County |
| 0.996 | Barry County |
| 0.995 | Charlevoix County |
| 0.993 | Antrim County |

"That ain't natural, buddy."

**0.997  *Average Correlation***



*Let's have a closer look
at each county...*

*Each graph shows the POPULATION by age (from the US Census),*

*Registrations (from the state registration database),*

*Ballots (from the state voter database),*

*and the predicted ballots (based upon the algorithm)*



























# The Citizen Primer

© Dr Douglas G Frank, 2021

© 2021 Douglas G Frank, all rights reserved.

Proprietary and confidential analysis.

Requires prior written permission for use.

# EXHIBIT EE

Case 1:21-cv-00445-CJN



OFFICIAL WEBSITE OF THE ARIZONA STATE SENATE

**REPUBLICAN CAUCUS**

  

Remain Hea
Reopen Ariz
Restore Confi

NEWS　　SENATORS　　SESSION & LEGISLATION　　STATE GOVERNMENT　　ACCOMPLISHMENTS　　ABOUT US　　CONTACT　　COVID-19　　COVID

All Posts　　BLOG　　News

Log in / Sign up

Arizona Senate Republicans ♛ | Jan 29 | 2 min read

## Senate chooses qualified auditing firm to conduct forensic audit of Maricopa County election results

**Friday, January 29, 2021**
**FOR IMMEDIATE RELEASE**



### Senate chooses its own qualified auditing firm to conduct forensic audit of Maricopa County election results

*Today Senate President Fann announced that the Arizona State Senate has hired an independent, qualified, forensic auditing firm to analyze 2020 election results in Maricopa County.*

**President Fann:** "There are two primary reasons we have determined the Senate needed to retain its own independent auditing firm. The Senate has consistently called for an auditor certified by the U. S. Election Assistance Commission (EAC). We have now learned the EAC does not certify auditors as such. The other primary reason is that the scope of the audit must be broader than the one proposed by the County's vendors. Our firm will perform everything we have required in the subpoenas. We must bring back confidence that the election results reported are how votes were legally cast. Th

Let's Chat!

Senate's forensic audit will add a big step in our efforts to conduct forensic audit of Maricopa county's election results

Senate's forensic audit will add a big step in our process, and with that restore integrity to the election process."

**Senate Judiciary Chairman Warren Petersen**:  "Maricopa County has chosen two companies to audit their election.  Unfortunately, their limited scope does not fulfill the demand of our subpoena, which called for a deep forensic audit.  We need to do more than make basic checks on the machines to make sure they were working.  We need to check the ballots and ballot scans for abnormalities.  We need to look at the machines to see if there was any manipulation.  We need to make sure there was no remote or local access that made changes to the results.  I'm grateful the President has chosen a firm that will do that work.  Only then will our voters feel confident about the results of the election."

### 



News

2,792 views    12 comments                                                                    20 ♥

## Recent Posts                                                                                      See All

Statement from Senator Vince Leach on the signing...

👁 65    💬 0                           ♡

Governor signs bill establishing regulatory...

👁 71    💬 0                           ♡

Governor signs bill providing COVID liability protections t...

👁 48    💬 6                           ♡

## 12 Comments                                                                      Sort by: Newest ⌄

○    Write a comment...

○    **gmoore**
     Jan 31

     When is the Senate's forensic audit scheduled to begin?

     An article on maricopa.gov at https://tinyurl.com/y4lzss5s talks about two audits schedul
     by the Maricopa Board of Supervisors, using the firms Pro V&V and SLI Compliance.

Let's Chat!

428 of 497

# EXHIBIT FF

# Dominion gets caught shorting GOP candidates

Friday, March 5, 2021  |  Chad Groening (OneNewsNow.com)

**A tea party leader says he is pleased that New Hampshire officials want to thoroughly investigate voting irregularities regarding Dominion-owned voting machines.**

The hand recount recently conducted for a New Hampshire state representative race in which Democrat Kristi St. Laurent came within 24 votes of winning revealed that the four Dominion-owned voting machines in the town of Windham had shorted her Republican challenger by 99 votes. Three other Republicans there were also shorted 6% by the machines that were used in 85% of towns throughout the state.

"New Hampshire was like one of the biggest successes for Republicans in the whole 2020 election," recalls Tom Zawistowski, president of the tea party-affiliated We the People Convention. "They flipped the House and the Senate in New Hampshire and really had big gains, and yet Trump still lost in a very close race."

This particular recount was observed by dozens of people, and according to one report, "everyone was mystified by the results." Zawistowski says the audit was revealing.

"It's just like every single one of the Republicans, when they did the hand count of the paper ballots, every one of them wound up with 300 more votes," the conservative reports. "They didn't do any other races, [but] now they're doing an audit of all their machines. After they announced they were going to try to do this audit, the attorney general and secretary of state of New Hampshire told them that they want to take possession, they want to confiscate all the machines in that county."

The New Hampshire Senate voted 24-0 on Monday to order a complete audit, and Republican Governor Chris Sununu said that the state will not let the Windham voting irregularity "slip by."

# EXHIBIT GG

Watch Live

# Wisconsin Assembly OKs investigation into 2020 election

**By** Scott Bauer  |  **Published** March 23  |  2020 Election  |  FOX6 News Milwaukee  |  Wisconsin & Local Milwaukee News WITI

**MADISON, Wis. (AP) -** The Republican-controlled Wisconsin Assembly passed a resolution Tuesday, March 23 to authorize an investigation into the 2020 presidential election that President Joe Biden narrowly won in the state.

The resolution, opposed by Democrats, is needed to give the committee authorization if it decides to issue subpoenas to compel testimony and gather documents, said Rep. Joe Sanfelippo. He is vice-chairman of the Assembly elections and campaign committee that would conduct the probe.

President Biden defeated incumbent Donald Trump by fewer than 21,000 votes in Wisconsin. The election outcome was affirmed by a partial recount and several lawsuits brought by Trump and his allies alleging wrongdoing were rejected by state and federal courts, including the U.S. Supreme Court. No significant problems were found with the state's voting machines after audits and recounts in both 2016 and in 2020.

The resolution authorizing the investigation passed on a 58-35 party line vote, with all Republicans in support and all Democrats against. It passed after Republicans last month ordered an audit of the election results.

**FREE DOWNLOAD: Get breaking news alerts in the FOX6 News app for iOS or Android.**

SIGN UP TODAY                                                                          ✕

**Sign up to receive FOX6 News daily headlines via email**

Let FOX6 News bring the daily headlines to your email inbox. Sign up today!

432 of 497

undermining the public's faith in elections and insulting election clerks, poll workers and others who ran the election.

Earlier this month, Republicans raised new questions about how the election was administered in Green Bay. The Assembly elections committee held a hearing on those issues, but did not invite any election officials accused of wrongdoing to testify. Green Bay Mayor Eric Genrich called it a "Stalinist show trial" and defended his city's handling of the election.

Sanfelippo said at a news conference Tuesday that he hoped the committee would not need to subpoena anyone to testify, a power that hasn't been used by a legislative committee in at least half a century. He said it was in everyone's best interests to be open and forthcoming.

Assembly Republicans have also introduced a series of election-related bills that would address many of the issues raised by Trump and his supporters. The bills would limit the number of ballot drop boxes; require absentee voters to provide an ID for every election; limit who can automatically receive absentee ballots for every election; prohibit election officials from completing missing information on the certification envelopes returned by voters that contain absentee ballots. and create more paperwork for those who vote early in clerk's offices.

**Gun reform debate rekindled among Wisconsin lawmakers**
Wisconsin lawmakers on Tuesday, March 23 responded to questions about legislative options to enact gun reform in the state.

SIGN UP TODAY     ✕

**Sign up to receive FOX6 News daily headlines via email**
Let FOX6 News bring the daily headlines to your email inbox. Sign up today!

# EXHIBIT HH



# WISCONSIN SPOTLIGHT

UPDATED
WEDNESDAY,
APRIL 21ST, 2021



MARCH 21ST, 2021 | 5:02 PM | UPDATED

# EMAILS: GREEN BAY'S 'HIDDEN' ELECTION NETWORKS

By M.D. Kittle

MADISON — A former Democratic operative intricately involved in Green Bay's November election was given access to "hidden" identifiers for the internet network at the hotel convention center where ballots were counted, according to new emails obtained by Wisconsin Spotlight.

Green Bay city officials insist the presidential election was "administered exclusively by City staff." But the emails show Michael Spitzer-Rubenstein, Wisconsin State lead for the National Vote at Home Institute, had a troubling amount of contact with election administration.

"I'll have my team create two separate SSID's for you," Trent Jameson, director of Event Technology at Green Bay's Hyatt Regency and KI Convention Center, where the city Central Count was located on Election Day, wrote to Spitzer-Rubenstein.

SSID stands for Service Set Identifier. It's an internet network's name. Open up the list of Wi-FI networks on your laptop or phone, the list of SSIDs will pop up. Wireless router or access points broadcast SSIDs so nearby devices can find and display any available networks.

SSID hiding keeps the network name from being publicly broadcast. The SSID won't immediately pop up in the display, although the network name remains available for use.

"One SSID will be hidden and it's: 2020vote. The reason for this is that nobody can see or find this one and it should only be used for the sensitive machines that need to be connected to the internet," Jameson wrote in his Oct. 27 email to Spitzer-Rubenstein. He in turn forwarded the email to Celestine Jeffreys, Mayor Eric Genrich's chief of staff, on Oct. 30.

Also on the email were, Amaad Rivera-Wagner, the mayor's community liaison; Jaime Fuge, Green Bay's chief election inspector at the time; Shelby Edlebeck, multimedia communications specialist; and Mike Hronek, the city's Information Technology Services administrator.

"The other SSID will be: gbvote and that one can be seen in the settings app of your phone or laptop under 'networks' and should be used for the poll workers who need internet," Jameson wrote.

Jameson told Spitzer-Rubenstein there would be a third SSID, which was to be used by media or other guests "not part of your team."

Why would a guy who has been described as a consultant or adviser to the city need to have hidden SSIDs? Why would the city want him to have knowledge of Service Set Identifers for "sensitive machines"? He was brought in to provide technical support, but why would Spitzer-Rubenstein receive such sensitive information before the city's IT director and the clerk's office?

Genrich, Green Bay's mayor, did not return Wisconsin Spotlight's call seeking comment.

As Wisconsin Spotlight first reported, Spitzer-Rubenstein and his National Vote at Home Institute were heavily involved in Green Bay's election process.

The National Vote at Home Institute, was one of several private, left-leaning groups, funded largely by Facebook CEO Mark Zuckerberg. Spitzer-Rubenstein, with an impressive political resume working for Democratic politicians and campaigns, had significant influence over the administration of the presidential election in Green Bay and, it appears, in Milwaukee. The Chicago-based Center for Tech and Civic Life received hundreds of millions of dollars in funding from Zuckerberg and his wife, money they pumped out in big grants to to cities in the name of "safe elections."

Spitzer-Rubenstein appears to have played point man for the coordinated effort between the "Wisconsin 5," Milwaukee, Madison, Green Bay, Kenosha and Racine — which received a combined $6.3 million in Zuckerberg money.

Emails show Spitzer-Rubenstein offered to correct or "cure" ballots in Green Bay, and he told the city's clerk that he had come up with a similar process for Milwaukee.

And despite the city's assertions that Spitzer-Rubenstein did not have the keys to the KI Center where the absentee ballots were, a hotel contract obtained by Wisconsin Spotlight shows the keys were to be delivered to Spitzer-Rubenstein.

"Michael Spitzer-Rubenstein will be the onsite contact for the group," the hotel instructions state.

Emails show him inside the KI Center asking city officials about where the ballots would be located.

"Are the ballots going to be in trays/boxes within the bin? I'm at KI now, trying to figure out whether we'll need to move the bins throughout the day or if we can just stick them along the wall and use trays or something similar to move the ballots between stations," Spitzer-Rubenstein wrote to city officials two days before the election.

There's much more.

Sandy Juno, former Brown County clerk who has accused the city of Green Bay of going "rogue" in its handling of the election, said she found the use of the secretive internet access points "unusual." Spitzer-Rubenstein is shown in photos working on a laptop by a printer at central count on election night.

"I'm not sure what the need was for all of those different (Service Set) IDs, but the one that bothered me most was for the 'sensitive machines,' Juno said.



**ELECTION SCANDAL: ROOTS
IN RACINE**

436 of 497

READ MORE >>



**DOT'S DIVERSITY AND
INCLUSION RULES**

READ MORE >>



**ELECTION SCANDAL
RECUSAL**

READ MORE >>



ELECTION SCANDAL: ROOTS IN RACIN

APRIL 21, 2021

READ MORE



**WISCONSIN
SPOTLIGHT**

4/21/2021                    Case 1:21-cv-00445-CJN: Document 34-2: election networks | Wisconsin spotlight          Case 1:21-cv-00445-CJN    Filed 04/23/21   Page 443 of 502

Case 1:21-cv-00445-CJN



CLICK HERE
TO VISIT



COPYRIGHT © 2020 EMPOWER WISCONSIN FOUNDATION.

# EXHIBIT II

Motions granted in part and denied in part.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by DONNA CURLING, ET AL v. DAVID WORLEY, ET
AL., 11th Cir., October 29, 2020

493 F.Supp.3d 1264
United States District Court, N.D. Georgia, Atlanta
Division.

Donna CURLING, et al., Plaintiffs,
v.
Brad RAFFENSPERGER, et al.,
Defendants.

CIVIL ACTION NO. 1:17-cv-2989-AT
|
Signed 10/11/2020

**Synopsis**

**Background:** Advocacy organization and individual
voters brought § 1983 action alleging that state election
officials' mode of implementation of new voting system
and their ongoing use of software, data systems, policies,
and practices burdened and impeded voters' exercise of
their First and Fourteenth Amendment rights to cast ballot
votes that would be reliably counted. Plaintiffs moved for
preliminary injunction.

**Holdings:** The District Court, Amy Totenberg, J., held
that:

[1] voters failed to establish any burden on their First
Amendment right to vote as result of state's use of
oversize touchscreens at polls;

[2] voters failed to establish likelihood of success on merits
of their claim that precinct scanners' recordation of
timestamp information violated their right to ballot
secrecy;

[3] voters were likely to succeed on merits of their claim
that use of arbitrary 10% threshold on ballot scanners to
discard voter ballot markings violated their rights; and

[4] preliminary injunctive relief requiring state to conduct
expanded review of optical scan hand-marked ballots in
connection with adjudication software before next
election cycle was warranted.

West Headnotes (22)

**[1]** **Injunction** ← **Extraordinary or unusual nature of
remedy**

Preliminary injunction is extraordinary remedy
designed to prevent irreparable harm to parties
during lawsuit's pendency before final decision
on merits can be rendered.

**[2]** **Injunction** ← **Nature of remedy in general**

Request for equitable relief invokes district
court's inherent equitable powers to order
preliminary relief in order to assure availability
of permanent relief.

**[3]** **Injunction** ← **Grounds in general;  multiple
factors**

To support preliminary injunction, plaintiffs
must present evidence that clearly establishes:
(1) substantial likelihood of success on merits on
their claims; (2) substantial threat of irreparable
injury if injunction were not granted; (3) that
threatened injury to plaintiffs outweighs harm
that injunction may cause defendants; and (4)
that granting injunction would not be adverse to
public interest.

**[4]** **Injunction** ← **Pleadings and affidavits as
evidence**
**Injunction** ← **Hearsay**

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

**Injunction**🗝Standard of proof in general

At preliminary injunction stage, district court need not find that evidence positively guarantees final verdict in plaintiff's favor, and may rely on affidavits and hearsay materials that would not be admissible evidence for permanent injunction, if evidence is appropriate given injunctive proceeding's character and objectives.

[5]  **Equity**🗝Grounds of jurisdiction in general

Federal courts possess broad discretion to fashion equitable remedy.

[6]  **Federal Courts**🗝Equity jurisdiction in general

When federal law is at issue and public interest is involved, federal court's equitable powers assume even broader and more flexible character than when only private controversy is at stake.

[7]  **Constitutional Law**🗝Voters, candidates, and elections

Under *Anderson-Burdick* test, when deciding whether state election law violates due process rights guaranteed by Fourteenth Amendment, court must weigh character and magnitude of the burden that state's rule imposes on those rights against interests that state contends justify that burden, and consider extent to which state's concerns make burden necessary. U.S. Const. Amend. 14.

[8]  **Election Law**🗝Constitutionality and validity

Level of scrutiny to which election laws are subject varies with burden they impose on constitutionally protected rights: law that severely burdens right to vote must be narrowly drawn to serve compelling state interest, but reasonable, nondiscriminatory restrictions that impose minimal burden may be warranted by state's important regulatory interests.

[9]  **Election Law**🗝Constitutionality and validity

Even when law imposes only slight burden on right to vote, relevant and legitimate interests of sufficient weight still must justify that burden.

[10]  **Constitutional Law**🗝Voting rights and suffrage in general

Right to vote derives from right of individuals to associate for advancement of political beliefs that is at First Amendment's core and is protected from state infringement by Fourteenth Amendment. U.S. Const. Amends. 1, 14.

[11]  **Constitutional Law**🗝Voting rights and suffrage in general

First and Fourteenth Amendments afford voters right to associate for advancement of political beliefs by exercising franchise at voting booth and to cast their votes effectively. U.S. Const. Amends. 1, 14.

[12]  **Election Law**🗝Nature and source of right

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

**Election Law**⬦Political Activity and Associations

Right to vote in any manner and right to associate for political purposes through ballot are not absolute; rather, states retain power to regulate their elections to provide fairness, honesty, and order in democratic process.

[13]   **Federal Courts**⬦State or federal matters in general

When state exercises power wholly within domain of state interest, it is insulated from federal judicial review, but such insulation is not carried over when state power is used as instrument for circumventing federally protected right.

[14]   **Constitutional Law**⬦Conduct of Elections

Equal Protection Clause guarantees opportunity for equal participation by all voters in election regardless of which method they choose to cast their vote. U.S. Const. Amend. 14.

[15]   **Injunction**⬦Conduct of elections

District courts must exercise great restraint in considering grant of injunctive relief that requires new rules on cusp of election where court's order could cause electoral disruption and voter confusion.

[16]   **Injunction**⬦Conduct of elections

Voters failed to establish any burden on their First Amendment right to vote as result of state's use of oversize touchscreens at polls, as required to establish their entitlement to preliminary injunction barring use of touchscreens in upcoming election, even if touchscreens were clearly visible from 30 to 50 feet away, where state election officials had undertaken measures to instruct local election officials on proper polling place layout and arrangement of touchscreens to maintain voter privacy, and there was no evidence from any voter claiming that publication of their vote selections subjected them to threats, harassment, reprisals, or other chilling of free exercise of franchise from either government officials or private parties. U.S. Const. Amend. 1.

[17]   **Injunction**⬦Conduct of elections

Voters failed to establish likelihood of success on merits of their claim that ability of precinct scanners used by state during election to record timestamp information directly onto digital cast vote record created when ballot was scanned violated their First Amendment right to ballot secrecy, as required to establish their entitlement to preliminary injunction barring use of touchscreens in upcoming election, even if it was possible to identify voter by comparing scanned cast vote records ordered by timestamps with order in which voters were observed going through voting process; there was no evidence of election official going to such lengths to discover how someone voted, and ballots scanned on precinct scanner included randomized sequence number that preserved voter anonymity. U.S. Const. Amend. 1.

[18]   **Election Law**⬦In General;  Right of Suffrage

Voters themselves have independent responsibility to proceed with care and caution when exercising franchise.

**[19]    Election Law**⟜**Constitutionality and validity**

In resolving challenge to state's election laws, court must weigh burden on right to vote against precise interests put forward by state as justifications for burden imposed by its rule, taking into consideration extent to which those interests make it necessary to burden plaintiff's rights.

**[20]    Injunction**⟜**Conduct of elections**

Voters were likely to succeed on merits of their claim that state election officials' use of arbitrary 10% threshold on ballot scanners to discard voter ballot markings for candidates or initiatives that were obvious to human eye resulted in violation of fundamental right of each voter to have his or her vote accurately recorded and counted, for purposes of determining their entitlement to preliminary injunctive relief, in light of evidence that ballots on which voter placed checkmark or "X" to indicate voter's selection—which had been deemed sufficient in previous elections—fell below 10% threshold. Ga. Code Ann. § 21-2-438; Ga. Comp. R. & Regs. 183-1-15.02(2)(2).

**[21]    Injunction**⟜**Conduct of elections**

Pre-election injunctions are permissible where constitutional violations are significant, and relief is not adverse to public interest.

**[22]    Injunction**⟜**Conduct of elections**

Preliminary injunctive relief requiring state to conduct expanded review of optical scan hand-marked ballots in connection with adjudication software before next election cycle was warranted in voters' action alleging that state election officials' use of arbitrary 10% threshold on ballot scanners to discard ballot markings that were obvious to human eye resulted in violation of their right to have their votes accurately recorded and counted; it appeared that adjudication software could be used to review ballot images flagged with blank contests to verify that no clearly discernable ballot marks were present on ballot images that had not been recognized by scanner software as falling within designated threshold to constitute vote. Ga. Code Ann. § 21-2-438; Ga. Comp. R. & Regs. 183-1-15.02(2)(2).

**Attorneys and Law Firms**

David D. Cross, Eileen M. Brogan, Pro Hac Vice, John P. Carlin, Lyle F. Hedgecock, Pro Hac Vice, Mary G. Kaiser, Robert W. Manoso, Veronica Ascarrunz, Catherine L. Chapple, Jane P. Bentrott, Marcie Brimer, Pro Hac Vice, Morrison & Foerster, LLP, Washington, DC, Robert Alexander McGuire, III, Pro Hac Vice, Robert McGuire Law Firm, Seattle, WA, Adam Martin Sparks, Halsey G. Knapp, Jr., Krevolin & Horst, LLC, Bruce P. Brown, Bruce P. Brown Law, Cary Ichter, Ichter Davis, LLC, Atlanta, GA, William Brent Ney, Ney Hoffecker Peacock & Hayle, LLC, Lawrenceville, GA, for Plaintiffs Donna Curling, Donna Price, Jeffrey Schoenberg.

David R. Brody, Pro Hac Vice, Ezra David Rosenberg, Pro Hac Vice, Jacob Paul Conarck, John Michael Powers, Lawyers' Committee for Civil Rights Under Law, Washington, DC, Robert Alexander McGuire, III, Pro Hac Vice, Robert McGuire Law Firm, Seattle, WA, Bruce P. Brown, Bruce P. Brown Law, Cary Ichter, Ichter Davis, LLC, Atlanta, GA, William Brent Ney, Ney Hoffecker Peacock & Hayle, LLC, Lawrenceville, GA, for Plaintiff Coalition for Good Governance.

Robert Alexander McGuire, III, Pro Hac Vice, Robert McGuire Law Firm, Seattle, WA, Bruce P. Brown, Bruce

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

P. Brown Law, Cary Ichter, Ichter Davis, LLC, Atlanta, GA, John Michael Powers, Lawyers' Committee for Civil Rights Under Law, Washington, DC, William Brent Ney, Ney Hoffecker Peacock & Hayle, LLC, Lawrenceville, GA, for Plaintiffs Laura Digges, William Digges, III, Ricardo Davis, Megan Missett.

Alexander Fraser Denton, Joshua Barrett Belinfante, Kimberly K. Anderson, Brian Edward Lake, Carey Allen Miller, Vincent Robert Russo, Jr., Robbins Ross Alloy Belinfante Littlefield, LLC, Bryan Francis Jacoutot, Bryan P. Tyson, Diane Festin LaRoss, James A. Balli, Jonathan Dean Crumly, Sr., Loree Anne Paradise, Robert Dalrymple Burton, Taylor English Duma LLP, Atlanta, GA, for Defendants David J. Worley, Rebecca N. Sullivan, Seth Harp, Brad Raffensperger.

Bryan P. Tyson, Diane Festin LaRoss, James A. Balli, Jonathan Dean Crumly, Sr., Loree Anne Paradise, Robert Dalrymple Burton, Taylor English Duma LLP, Vincent Robert Russo, Jr., Robbins Ross Alloy Belinfante Littlefield, LLC, Atlanta, GA, for Defendant Ralph F. (Rusty) Simpson.

Alexander Fraser Denton, Joshua Barrett Belinfante, Kimberly K. Anderson, Brian Edward Lake, Carey Allen Miller, Vincent Robert Russo, Jr., Robbins Ross Alloy Belinfante Littlefield, LLC, Bryan P. Tyson, Diane Festin LaRoss, James A. Balli, Jonathan Dean Crumly, Sr., Loree Anne Paradise, Robert Dalrymple Burton, Taylor English Duma LLP, Atlanta, GA, for Defendant The State Election Board.

Cheryl Ringer, David R. Lowman, Kaye Woodard Burwell, Office of the Fulton County Attorney, Atlanta, GA, for Defendants Richard Barron, Mary Carole Cooney, Vernetta Nuriddin, David J. Burge, Aaron Johnson, The Fulton County Board of Registration and Elections.

Cheryl Ringer, Office of Fulton County Attorney, Atlanta, GA, for Defendants Mark Wingate, Kathleen D. Ruth.

## OPINION AND ORDER

Amy Totenberg, United States District Judge

## I. Introduction and Overview

In the 1983 film Groundhog Day, weather man Phil Connors is doomed to repeat the same day over and over again: "I wake up every day, right here, right in Punxsutawney, and it's always February 2nd, and there's nothing I can do about it." The Court can relate; it feels like it's February 2nd in Punxsutawney. But quite likely, the Court is not alone in this sentiment in many respects. Amidst the many other serious concerns facing the public in this challenging era, issues surrounding election system security, reliability, fairness, and the correct counting of votes continue on the forefront of citizen concerns. And so too, in turn, does voting litigation perforce continue.

Now in Act 4, this voting case raising fundamental First Amendment and Fourteenth Amendment constitutional claims is before the Court on Plaintiffs'[1] current Motions for Preliminary Injunction seeking relief before the November 3, 2020 general election. The Court held three days of hearings on Plaintiffs' motions and has reviewed the parties' extensive briefs and evidentiary submissions. The Plaintiffs' motions are identified and described below.

(a) The Curling Plaintiffs' August 19, 2020 Motion for Preliminary Injunction [Doc. 785] seeks to require Defendants "to conduct in-person voting in elections by a hand-marked paper ballot system" in combination with "provisions for pre-certification, post-election, manual tabulation audits of paper ballots and to independently check the accuracy of equipment and procedures used to tabulate votes ... based on well-accepted audit principles that assure a high probability that incorrect outcomes will be detected and remedied"; and

(b) The Coalition Plaintiffs' August 24, 2020 Motion for Preliminary Injunction on BMDs, Scanning and Tabulating, and Auditing [Doc. 809] seeks to require the State Defendants to: (i) refrain from forcing in-person voters to use ballot marking devices ("BMDs") and instead cause voters to use hand-marked paper ballots as the standard method for in-person voting; (ii) adopt scanning threshold settings for the Dominion optical scanners and vote review procedures that will ensure all voter marks on mailed and hand-marked paper ballots are counted; and (iii) require election superintendents to conduct meaningful, effective pre-certification audits of scanned hand-marked paper ballots to ensure the correctness of election outcomes.

The Coalition Plaintiffs' Motion for Preliminary Injunction on Paper Pollbook Backups also sought related

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

relief requiring the Secretary of State to direct county election superintendents to use paper backups of the electronic pollbook at each precinct polling location to facilitate issuance of regular or emergency ballots on election day in the event of voting machine breakdowns and mishaps, power outages, and associated long voter lines. (Doc. 800.) This Court's Order of September 28, 2020 (Doc. 918) addressed these issues at length and granted that separate motion.

Plaintiffs' motions challenge the State Defendants' mode of implementation of a new voting system enacted by the Georgia Legislature on April 2, 2019[2] and their ongoing use of software, data systems, policies and practices that allegedly burden and impede Plaintiffs' exercise of their First and Fourteenth Amendment rights to cast ballot votes that will be reliably counted. The Plaintiffs allege that Defendants have failed to implement a constitutionally acceptable election system by requiring all in-person voters to use a BMD system that, as a whole, in its design and operation, is not voter-verifiable, secure, or reliable. They contend this system suffers from some of the same major cybersecurity vulnerabilities posed by Defendants' deeply flawed, outdated Direct Recording Electronic ("DRE") Voting System addressed by the Court's lengthy Order of August 15, 2019 that granted injunctive relief.[3] (Doc. 579.) Plaintiffs' challenge embraces an array of associated issues involving the electronic voting process that impact if an individual's vote (whether recorded from a scanned BMD-generated barcode or a hand-marked paper ballot) will be correctly captured, scanned, and accurately counted.[4] Their claims thus also raise significant issues regarding the auditing of the election system's voting results and ballot processing.

First and foremost, Plaintiffs' challenge focuses on the Defendants' implementation of the new statewide BMD system, pursuant to the terms of the State's 2019 contract with Dominion Voting Systems.[5] The software and hardware system purchased provides for each citizen's BMD ballot vote selections to be printed on a paper ballot generated by a printer connected to the BMD. But the tabulation of the vote is actually based on the ballot's non-encrypted QR barcode on the ballot – designed to summarize the voter's ballot selections in code – that by itself is not voter reviewable or verifiable. Thus, Plaintiffs contend that the system precludes direct voter verification of the QR barcode of votes cast on the ballot. The printed ballot is fed into an ImageCast optical scanner that tabulates the ballot votes solely based on the QR code – and not based on the human readable text on the printed ballot. Plaintiffs challenge the constitutionality of the State Defendants' implementation of a barcode-based system for all in-person voting, based on (1) this alleged fundamental vote verification defect; (2) the system's purported known and demonstrated risk vulnerabilities to access and manipulation identified by national cybersecurity experts; and (3) the inherent problems posed in properly auditing votes tallied based on QR barcodes that cannot be verified by voters.[6]

Additionally, the Coalition Plaintiffs press their separate but related claim for relief based on the alleged intrusion on voters' free exercise of their right to cast a secret ballot at the polls. The nature of this claim is two-fold. First, the Coalition Plaintiffs assert that in-person voters are required to make their ballot selections on oversized voting touchscreens that are not shielded and that expose the voter's ballot choices to easy viewing by other people in the precinct voting location. Second, they assert that a timestamping feature on the precinct scanner could be used to identify voters to reveal their vote choices.

As a whole, the State Defendants have steadfastly denied the factual and legal merits of Plaintiffs' constitutional claims. They argue that Plaintiffs have not carried their high burden of proof to show they are substantially like to prevail on their claims or their entitlement to relief under the rigorous legal standards for grant of a preliminary injunction.[7] Defendants have also urged the Court to per se deny all relief on the grounds that it would interfere with the State Defendants' authority and responsibility for oversight of election process and procedures, unfettered by burdens and confusion that can be caused by Court ordered changes to state election procedures or requirements on the eve of an election under *Republican Nat'l Comm. v Democratic Nat'l Com.*, —— U.S. ——, 140 S. Ct. 1205, 1207, 206 L.Ed.2d 452 (2020) and *Purcell v. Gonzalez*, 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006).

The General Election will be held on November 3, 2020. In-person early voting will proceed in select polling locations in every Georgia county from October 12, 2020 through October 30, 2020. While early voting in counties is done on BMD machines, the state still denominates these votes as "absentee" ballots. Under Georgia law, counties are authorized to begin sending out traditional paper absentee ballots this year on September 15, 2020 and to continue to do so thereafter in the weeks ahead prior to the election. The last date for submitting an application for an absentee mail paper ballot in Georgia is October 30, 2020. October 5, 2020 is the deadline for voter registration.[8]

Faced with this looming timeline, the Secretary of State just two weeks discovered a system-wide ballot display issue on the BMD touchscreen voting machines for the

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

U.S. Senate special election with 20 candidates in the race. The Secretary of State designed the ballot using a two-column display to ensure that all 20 candidates appeared at the same time to voters on a single screen. Because BMDs primarily display candidates in a single column list, the two-column display is not a typical setup. Logic and Accuracy testing performed on the BMDs by two counties in the last week of September revealed that the second column of candidates did not appear in some instances. Dominion engineered a software modification as a fix and within a few days the Secretary of State began distribution of the new software to counties for installation on all 30,000 plus BMDs before the start of early voting. Dominion submitted its application to the U.S. Election Assistance Commission ("EAC") for approval for the software engineering change on October 5, 2020 and secured the EAC's approval in a one sentence letter issued on October 9, 2020. EAC approval was secured after the modified software had been installed throughout the state.

Not surprisingly, the parties take wildly different positions on the magnitude of the problem and its impact on the general election. The State Defendants characterize this as a very minor issue and the fix as a de minimis change to the voting system software. Plaintiffs assert instead that the State is undertaking substantial changes to the election equipment two weeks before early voting begins without adequate testing that further jeopardizes the reliability and security of the Dominion voting machines. These unforeseen circumstances, Plaintiffs insist, justify an emergency switch to hand-marked paper ballots.

Given the complex findings and analysis already covered by the Court's review of several lengthy preliminary injunction motions and issuance of related procedural orders over the last two years of intensive litigation, the Court refers the reader to its earlier orders for a further overview of the course of proceedings, relevant legal context, rulings, and factual findings. (*See, e.g.*, Doc. 309, September 17, 2018 Order (denying motion to dismiss and motion for preliminary injunction); Doc. 579, August 15, 2019 Order (granting in part preliminary injunction motions); Doc. 751, July 30, 2020 Order (granting in part and denying in part Defendants' most recent motion to dismiss including new BMD claims); Doc. 768, August 7, 2020 Order (denying without prejudice Plaintiffs' initial motions for preliminary injunction, Docs. 619 and 540, that facially challenged the BMD system and were filed in October, 2019, long prior to the 2020 election cycle, and summarizing case history).)

Finally, the Court notes that it has already addressed and rejected the State Defendants' renewed contention that several of Plaintiffs' requests for relief fall outside the bounds of the case as pled and presented to this Court. (*See, e.g.*, Order on Motion to Dismiss, Doc. 751 at 20-25; August 15, 2019 Order, Doc. 579 at 88-89.) Portions of the relief requested by Plaintiffs are clearly associated with their contentions regarding the Defendants' non-implementation of some of the relief granted in the Court's August 15, 2019 Order, as discussed in the Court's Opinion and Order issued on September 28, 2020. (Doc. 918.) Similarly, Plaintiffs have repeatedly advocated in their amended and supplemental complaints, motions, and briefs as well as at court hearings for the relief addressed in the current preliminary injunction motions before this Court.

## II. Legal Standards

### A. Preliminary Injunction Standard

[1] [2] [3] [4] A preliminary injunction is an "extraordinary remedy" designed to prevent irreparable harm to the parties during the pendency of a lawsuit before a final decision on the merits can be rendered. *See Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 24, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008). "A request for equitable relief invokes the district court's inherent equitable powers to order preliminary relief ... in order to assure the availability of permanent relief." *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995); *Federal Trade Comm'n v. United States Oil and Gas Corp.*, 748 F.2d 1431, 1433–34 (11th Cir. 1984). To support a preliminary injunction, Plaintiffs must present evidence that clearly establishes: (1) a substantial likelihood of success on the merits on their claims; (2) a substantial threat of irreparable injury if the injunction were not granted; (3) that the threatened injury to the plaintiffs outweighs the harm an injunction may cause the defendants; and (4) that granting the injunction would not be adverse to the public interest. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). At the preliminary injunction stage, a district court "need not find that the evidence positively guarantees a final verdict in plaintiff's favor," and may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is "appropriate given the character and objectives of the injunctive proceeding." *Levi Strauss & Co.*, 51 F.3d at 985 (quoting *Asseo v. Pan American Grain Co.*, 805 F.2d 23, 26 (1st Cir. 1986)); *McDonald's Corp.*, 147 F.3d at

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

1306 (11th Cir. 1998).

[5] [6]Federal courts "possess broad discretion to fashion an equitable remedy." *Black Warrior Riverkeeper, Inc. v. U.S. Army Corps of Engineers*, 781 F.3d 1271, 1290 (11th Cir. 2015); *Castle v. Sangamo Weston, Inc.*, 837 F.2d 1550, 1563 (11th Cir. 1988) ("The decision whether to grant equitable relief, and, if granted, what form it shall take, lies in the discretion of the district court."). "Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, —— U.S. ——, 137 S. Ct. 2080, 2087, 198 L.Ed.2d 643 (2017) (per curiam); *Kansas v. Nebraska*, 574 U.S. 445, 456, 135 S.Ct. 1042, 191 L.Ed.2d 1 (2015) (noting that a court of equity may " 'mold each decree to the necessities of the particular case' and 'accord full justice' to all parties"). In formulating the appropriate remedy, "a court need not grant the total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case." *Int'l Refugee Assistance Project*, 137 S. Ct. at 2087 (citation omitted). And the Supreme Court has repeatedly advised, "[w]hen federal law is at issue and 'the public interest is involved,' a federal court's 'equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.' " *Kansas v. Nebraska*, 574 U.S. at 456, 135 S.Ct. 1042 (citing *Porter v. Warner Holding Co.*, 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946) and *Virginian R. Co. v. Railway Employees*, 300 U.S. 515, 552, 57 S.Ct. 592, 81 L.Ed. 789 (1937)).

### B. Standard for Challenging Constitutionality of State Election Laws/Systems

[7] [8] [9]When considering the constitutionality of an election law, the Court applies the framework established by the Supreme Court in *Anderson v. Celebrezze* and *Burdick v. Takushi*. Under this framework, referred to as the *Anderson-Burdick* test, when deciding whether a state election law violates the due process rights guaranteed by the Fourteenth Amendment, the Court must weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997); *Burdick v. Takushi*, 504 U.S. 428, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 103 S.Ct. 1564, 75 L.Ed.2d 547 (1983). "[T]he level of the scrutiny

to which election laws are subject varies with the burden they impose on constitutionally protected rights." *Stein v. Alabama Sec'y of State*, 774 F.3d 689, 694 (11th Cir. 2014). A law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest. *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059; *Democratic Exec. Comm. of Florida v. Lee*, 915 F.3d 1312, 1318 (11th Cir. 2019). But "reasonable, nondiscriminatory restrictions" that impose a minimal burden may be warranted by "the State's important regulatory interests." *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009) (citing *Anderson*, 460 U.S. at 788, 103 S.Ct. 1564). "And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Lee*, 915 F.3d at 1318-19; *Billups*, 554 F.3d at 1352.

### III. Discussion of Claims and Relief Issues

#### A. Background Context

Georgia's new 2019 Election Code mandates that "all federal, state, and county general primaries and general elections as well as special primaries and special elections in the State of Georgia shall be conducted with the use of scanning ballots marked by electronic ballot markers and tabulated by using ballot scanners for voting at the polls and for absentee ballots cast in person, unless otherwise authorized by law; provided, however, that such electronic ballot markers shall produce paper ballots which are marked with the elector's choices in a format readable by the elector." O.C.G.A. § 21-2-300(a)(2). The legislation places the responsibility of selecting the equipment for the new voting system with the Secretary of State. *See* O.C.G.A. § 21-2-300(a). The law expressly requires that the "equipment used for casting and counting votes in county, state, and federal elections shall be the same in each county of this state and shall be *provided to each county by the state, as determined by the Secretary of State.*" O.C.G.A. § 21-2-300(a)(1) (emphasis added).

The Election Code further requires the Secretary of State to certify the new BMD voting system as "safe and practicable for use" in compliance with the Rules of the Georgia State Election Board prior to authorizing its implementation in state, federal, and county elections in the State. O.C.G.A. § 21-2-300(a)(2); *see also* Ga. Comp. R. & Reg. 590-8-1-.01(d). It also requires that the state furnished uniform electronic ballot system "be certified

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

by the United States Election Assistance Commission prior to purchase, lease, or acquisition." O.C.G.A. § 21-2-300(a)(3). The Election Code tasks the Georgia State Election Board with promulgating rules and regulations governing audit procedures and requires that "[t]he procedures prescribed by the State Election Board shall include security procedures to ensure that collection of validly cast ballots is complete, accurate, and trustworthy throughout the audit." O.C.G.A. § 21-2-498(b)&(d).

The legislation enacted in April 2019 was adopted on the heels of a number of public events revolving around Georgia's outdated DRE election system: a widely publicized breach of the State's election server maintained by the State's election services contractor, Kennesaw State University, that exposed voluminous voter data, as well as sensitive software applications and passwords that triggered the transfer of the University's Center for Election Services election operations directly to the Secretary of State's office from its contractor after December 31, 2017;[9] a prior failed effort to pass election legislation during the winter legislative session of 2018 to phase out the old DRE voting machines and State Global Election Management Systems ("GEMS") that dated back to 2001; and this Court's Order in September 2018 on the Plaintiffs' Motions for Preliminary Injunction declining to enter the injunctive relief requested but finding that the Plaintiffs had demonstrated a likelihood of prevailing on the merits of their claim that the outdated DRE system as implemented was constitutionally not sustainable.[10]

The State commenced replacement of the DRE/GEMS system with Dominion's BMD system beginning in the summer of 2019 after conclusion of the request for proposals and contracting processes. This voting system change, targeted for completion in time for full implementation in 2020, was a major shift and undertaking. Dominion plays a large role in all dimensions of the implementation of the new voting system in partnership with the Secretary of State's Office.[11] The contract was entered at a time when the cybersecurity risks and vulnerabilities of digital election systems had emerged as a major concern of national leadership and as well as prominent computer engineering and cybersecurity experts and academic organizations. Election systems were now classified as critical national infrastructure. Voter-verified ballots and hand-marked ballots in particular were deemed important tools for protecting the security of voting systems by leaders in the academic cybersecurity field, including the sole information technology and cybersecurity expert on the Commission[12] appointed by the Secretary of the State to provide recommendations regarding the replacement of the DRE System. (See August 15, 2019 Order, Doc. 579

at 35-42; September 17, 2018 Order, Doc. 309 at 11-12.)

Georgia is the only state using the Dominion barcode-based BMD system statewide as the mandatory voting method for all in-person voters. (See Decl. of Dr. Eric Coomer, Doc. 658-2 ¶ 5) ("Dominion's ImageCast X BMD system is currently used by Cook County and the City of Chicago, Illinois, several jurisdictions within the States of Michigan and Pennsylvania, and will be used by several California counties including San Francisco, Alameda, Riverside, Contra Costa, and San Diego in the upcoming 2020 election cycle."). According to a study by Verified Voting, Georgia and South Carolina[13] are the only states that require the use of BMDs as the primary method for all voters. (Decl. of Warren Stewart,[14] Doc. 681-2; Decl. of Dr. Alex Halderman, Doc. 785-2 ¶ 47; Decl. of Dr. Alex Halderman, Doc. 855-1 at ¶ 3.) The majority of election jurisdictions across the U.S. use hand-marked paper ballots as the primary method of voting and provide BMDs exclusively for voters who request them for accessibility (e.g., those with certain disabilities) or upon voter request.[15]

The Secretary of State's Office contracted with Dominion for all equipment and software components of the system (the BMD touchscreens, attached ballot printers, ImageCast optical scanners that tabulate ballot votes, and the KnowInk PollPads) but continued to use its ENET voter registration database system. The ENET system provides the voter data foundation for the PollPads used for voter check-in at the polls.

In entering into the Dominion contract, the Secretary of State proceeded with an agreement for the current level of capacity of Dominion's ImageCast optical scanner to tabulate votes based on the scanned image of the QR barcode encoded with the voter's designated ballot selections. The Dominion ImageCast optical scanners used by Georgia in tandem with the BMDs are capable of scanning and tabulating votes without a QR barcode. (Decl. of Dr. Eric Coomer, Doc. 658-2 ¶ 9; Decl. of Dr. Alex Halderman, Doc. 785-2 ¶¶ 4, 37-40.) In response to the State's request for proposals during the procurement process, Dominion represented that an upcoming version of its BMD software would not need to print barcodes on ballots.[16] The BMDs under the prospective option would instead produce a human-readable ballot that would be counted by the optical scanner/tabulators based on voters' electronic vote designations on the ballot by reading particular target areas associated with the voter selections, similar to how they are programmed to read hand-marked paper ballots. (Decl. of Dr. Eric Coomer, Doc. 658-2 ¶ 9; Decl. of Dr. Alex Halderman, Doc. 785-2 ¶ 37.) This option is described as an "upgrade" available only after

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

"certification is complete at the EAC."[17] The Court assumes that cost considerations, among others, may have played a role in this purchasing decision, as it was currently available through some other vendors.[18] However, the State's actual option in the long run of upgrading the system to one that tabulates from the voter designations, and not a QR barcode is potentially relevant.[19] When that might occur is another question, as the EAC has apparently yet to certify Dominion's upgrade option, and in any event, it may entail costs the State might not be willing to incur.

The Court focuses in this Order on the salient evidence that Plaintiffs have presented in support of their Motions to demonstrate the constitutional infirmity of the system because of its alleged impact on voters' exercise of the right to vote and whether their votes will be counted as cast or at all.

The Court recognizes from the outset that the State Defendants did face significant challenges in implementing a new statewide voting system in barely 15 months and that early elections and primaries would occur prior to the ultimate election date of November 3, 2020. The Covid-19 pandemic further complicated that challenge. While this fact does not in any way erase the issues raised by Plaintiffs, especially in the context of the particular record in this case, the Court still bears this pragmatic reality in mind.

The Court divides its discussion below of the motions before it as follows. Section B addresses the evidence presented in conjunction with the Curling Plaintiffs' Motion for Preliminary Injunction and a portion of the Coalition Plaintiffs' Motion for Preliminary Injunction on BMDs, Scanners and Tabulators and Audits. Section C addresses the Coalition Plaintiffs' Motion related to the issue of ballot secrecy. Section D addresses that portion of the Coalition's Motion as to Scanners and Tabulators focused on the review and counting of hand-marked ballots, including absentee ballots, provisional ballots, and finally, some portion of emergency ballots cast.[20]

**B. Claims Relating to BMDs, Scanners/Tabulators, and Audits**

**1. Cybersecurity Risks and Reliability Issues Presented by Implementation of the BMD System**

The evidence, expert opinion testimony, and argument

Plaintiffs offer in support of their challenge to the constitutionality of the State Defendants' implementation of a barcode-based system for all in-person voting falls into three main areas. They contend that the evidence shows:

(1) The QR barcode-based BMD voting system does not produce a voter-verifiable paper record of the votes cast. Therefore, voters will be unable to conduct any verification of the information encoded in the non-human readable barcode, will have no way of knowing what votes they are actually casting, and will instead be forced to trust that the barcode accurately conveys their intended ballot selections. Both the QR barcode recording of votes and the text summary of ballot selections are subject to being accessed and manipulated through hacking, unauthorized intrusion into the BMD computer system or its various components (scanner, printer, etc.), by USB flash drives (or similar devices), or by other interfaces with the internet through cyber attacks or applications that may be carrying malware (whether intentionally or not).

(2) The QR barcode-based BMD voting system poses major security and fidelity of vote issues because the BMD system is susceptible to significant cybersecurity risks and manipulation through hacking access to any one of its multiple components (BMD, printer, scanner) and through untraceable manipulation or alteration of code. The QR barcode is not encrypted and may also be a vector of data system manipulation.

(3) The QR barcode-based BMD voting system is incapable of being meaningfully audited for a variety of reasons: (a) the QR code cannot itself be verified by a voter; (b) the length and complexity of many ballots and the printed ballot text's condensed mode of summarizing the voter's ballot selections (identifying solely the candidate selected by office or condensed constitutional amendment summaries identified by question number or by a few words); and (c) research reflecting that most voters do not review these printed ballot summaries, and those that do, will not detect errors in ballots presented for verification based solely on their memories.

Plaintiffs presented multiple expert witnesses to address their assessment of the Dominion system's cyber risk vulnerabilities and incapacity to provide a voter verifiable or auditable vote.[21] Plaintiffs' experts testifying at the hearing or by affidavit included: Dr. Andrew W. Appel, Dr. Richard DeMillo, Dr. J. Alex Halderman, Mr. Harri Hursti, Mr. Vincent Liu, Mr. Kevin Skoglund, and Dr. Philip B. Stark.

Defendants have contested Plaintiffs' cybersecurity, vote

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

fidelity, and voting system evidence through cross-examination as well as through the testimony of the State's witnesses and Dr. Eric Coomer, Director of Product Strategy and Security for Dominion Voting Systems, and the testimony of Jack Cobb, the Director of Pro V&V, the United States EAC accredited private laboratory retained by the Georgia Secretary of State to assess and test Dominion's Democracy Suite 5.5-A voting system software and associated components[22] and the KnowInk electronic pollbook as deployed in Georgia for EAC certification. Although Mr. Cobb's affidavits addressed cybersecurity related matters, his testimony at the injunction hearing plainly indicated that he actually claims no specialized knowledge or background in cybersecurity engineering and did not himself perform any security risk analysis of the BMD system. Defendants did not introduce any evidence from Fortalice Solutions, the cybersecurity consulting firm that previously has performed security analysis regarding the Secretary of State's information technology system, as discussed in the Court's Order of August 15, 2019 and which conducted a confidential initial evaluation of the BMD system in November 2019 at Defendants' counsel's request on behalf of the Secretary of State. Thus, the State Defendants did not present any independent cybersecurity expert to directly address the cybersecurity issues and risk vulnerabilities of Dominions' QR code voting system raised by Plaintiffs. Instead, State Defendants relied on Dr. Coomer's testimony, to address – based on his professional experience[23] – some of the significant cybersecurity issues raised by Plaintiffs. The State Defendants also provided expert testimony regarding the issue of whether a QR code based voting system, where votes are recorded and tabulated based on a scanner/tabulator's reading of the QR code, can be properly subject to a risk-limiting audit as to the outcome of any specific election in response to the extensive testimony provided by Plaintiffs' experts on this subject.

Plaintiffs' substantive evidence regarding the Defendants' implementation or usage of the BMDs, scanner/tabulators, and audits is the most complex, expert-intense evidence presented in this case. Indeed, this array of experts and subject matter specialists provided a huge volume of significant evidence regarding the security risks and deficits in the system as implemented both in witness declarations and live testimony at the preliminary injunction hearing.[24] As authorized discovery only commenced shortly before the preliminary injunction hearing, no expert or other depositions had been conducted.

While Plaintiffs' experts provided illuminating evidence, this evidence still had its own constraints. *First*, security information from the Secretary of State's office was limited. The Secretary of State's response to Plaintiffs' authorized expedited discovery requests indicated that its cybersecurity consultant, Fortalice Solutions, had not generated any consulting studies, audits, or assessments of data system security issues since August 1, 2019 when the State commenced its early work on implementation of the Dominion system, other than a November 2019 report requested by Defendants' counsel and withheld based on attorney work product privilege.[25] (*See* September 2, 2020 Order, Doc. 858 (approving non-disclosure based on assertion of privilege and in turn, granting on limited terms Plaintiffs' request for inspection of BMD equipment); *see also*, August 15, 2019 Order, Doc. 579 at 73-90 (discussing the focus of Fortalice evaluations of security and software issues prior to August 2019).) *Second*, while some of Plaintiffs' experts had accessed other related BMD models and Dominion software previously, the specific BMD model and software variation (along with the optical scanners/tabulators programed with Dominion's proprietary software) used in Georgia was not accessible to the Plaintiffs and their cybersecurity expert, Dr. Halderman, until Friday, September 4, 2020 at 5:30 p.m. – and then, only by Court Order.[26] This was just days before the preliminary injunction hearing commenced on September 10, 2020. Upon the Plaintiffs' filing of a discovery dispute notice regarding their access issue, the Court ordered the swift production of a BMD and related ImageCast precinct scanner for Plaintiffs' testing and assessment, subject to various confidentiality provisions and other terms.[27] (As the Dominion system uses an off-the-shelf printer, the Plaintiffs provided their own new printer of the same model used by the Defendants.)

Dr. Halderman's testing of the equipment and software occurred over the short period of time before the scheduled hearing.[28] His evaluation in this abbreviated time frame yielded some supplemental results that supported the Plaintiffs' cybersecurity analysis of the malware vulnerability risks of this specific BMD system. In particular, Dr. Halderman's testing indicated the practical feasibility through a cyber attack of causing the swapping or deletion of specific votes cast and the compromise of the system through different cyber attack strategies, including through access to and alteration or manipulation of the QR barcode.[29] As the National Academies of Sciences, Engineering, and Medicine, found in its seminal report, Securing the Vote: Protecting American Democracy 42, 80 (National Academies Press, 2018)("National Academies Report" or "NAS Report"):

[A]ll digital information – such as ballot definitions, voter choice records, vote tallies, or voter registration lists – is subject to malicious alteration; there is no

technical mechanism currently available that can ensure that a computer application – such as one used to record or count votes – will produce accurate results; testing alone cannot ensure that systems have not been compromised; and any computer system used for elections – such as a voting machine or e-pollbook – can be rendered inoperable.

(Doc. 285-1, Ex. 1.)

Dr. Halderman had physical access to the BMD system when conducting his tests, which expedited his experimentation and intrusion into the software system. Evidence presented in this case overall indicates the possibility generally of hacking or malware attacks occurring in voting systems and this particular system through a variety of routes – whether through physical access and use of a USB flash drive or another form of mini-computer, or connection with the internet. As discussed in the declarations and testimony of the proffered national cybersecurity experts in this case, a broad consensus now exists among the nation's cybersecurity experts recognizing the capacity for the unobserved injection of malware into computer systems to circumvent and access key codes and hash values to generate fraudulent codes and data. In these experts' views, these risk issues are in play in the operation of Dominion's Democracy Suite 5.5-A GA, and take on greater significance because the system is one that does not provide a verifiable and auditable ballot record because it relies on the QR code for vote tabulation and that code itself cannot be read and verified by the voter. (*See, e.g.*, Declaration of Vincent Liu, Doc. 855-2 at 6-8; Tr. Vol. II at 59, 64; Declaration of Dr. Andrew Appel, Doc. 855-3 at 6; Declarations of Dr. Alex Halderman, Doc. 682 at 4-11, Doc. 785-2; *see also* Appel, A.W., R. DeMillo, and P.B. Stark,[30] Ballot-Marking Devices Cannot Ensure the Will of the Voters, Election Law Journal (2020), Doc. 619-10.) Hacking alterations of the barcodes and/or predicate text, security keys, or hash values renders tracing or auditing of the fraudulent change in voting data difficult or impossible in their viewpoint – and in turn impacts the capacity to conduct appropriate auditing of ballot data or to implement corrective "re-count" measures.

Dr. Halderman's empirical evaluation of the Georgia programmed BMD voting equipment and software was partial and incomplete due to the short time allocated for the examination prior to the injunction hearing. And Dr. Halderman indicated that he would need more time with the equipment and software to conduct further testing of the software and modeling of other malware that could attack any component of the BMD system and infect the system and recording of votes or cause other mayhem. Dr.

Halderman provided directly relevant information to a demonstration of the risks facing this specific voting system. However, his evaluation and testing of the system was limited as described and not fully subject to being itself examined in depth by Dominion's own cyber security staff given the last moment nature of the testing.[31]

That said, Dr. Halderman has also offered other core relevant testimony in this case in open and sealed hearings as well as in sworn declarations. (*See, e.g.*, Doc. 785-2.) He as well as other cybersecurity experts testifying on behalf of Plaintiffs here have provided evidence credibly explaining how malware can mask itself when inserted in voting software systems or QR codes, erase the malware's tracks, alter data, or create system disruption. And while some attacks can be detected, their results often are not susceptible to full correction. For all these reasons, Dr. Halderman and Plaintiffs' other cybersecurity expert witnesses testified that heightened proactive protection measures are needed beyond what the current Dominion system as implemented in Georgia provides[32] or alternatively, are simply not feasible given the system's central reliance on a humanly unverifiable QR code.

Plaintiffs' voluminous expert testimony describes an interrelated range of systemic software and operational practices that define and impact the functioning of the voting system. The Plaintiffs maintain that the BMD system and software design as well State Defendants' identified practices independently and as a whole undermine the integrity, security, and functionality of the voting system and in turn, adversely impact whether citizens' votes will be counted as intended or counted at all. The Court has considered this challenge on its merits because a voting system, procedure, or practice can in reality subvert or impair citizens' exercise of the franchise and the counting of their votes. Still, the Court notes from the outset that the voting system challenged here is a new system for Georgia,[33] replacing the outdated DRE system that was dependent on totally obsolete software and defective usage practices that patently made it unreliable. Whatever the new BMD system's flaws in design, age, and reliability of components, or implementation – some of which may be significant – the evidence would at this early point in time have to be highly compelling to justify the Court's considering enjoining on a wholesale basis the State's use of the a BMD voting system approved by the Secretary of State, pursuant to his authority under a state law enacted as recently as 2019.

The issues and alleged practices identified by Plaintiffs as a basis for enjoining the system include:

• the BMD QR code's lack of encryption, that opens

voting data up to breach, alteration, and other security weaknesses;

• cybersecurity risk management and practices that allegedly render the voting system vulnerable to compromise and breach, and alteration or loss of votes;

• alleged major shortcuts taken in state protocols now used for conducting Logic and Accuracy testing ("L & A") of voting machines required under Georgia law preceding each election, even though L & A testing constitutes a fundamental threshold standard to verify the correct functioning and accurate output of the BMD system and its component parts;

• the alleged impossibility or inadequacy of using Risk-Limiting Audit methodology meaningfully to audit BMD ballots and votes tallied based on a scanned QR code, where evidence indicates that only a fraction of voters review their printed ballot;

• scanning software, practices, and settings that allegedly result in voters' ballot selections on paper ballots (whether cast as absentee, provisional, or emergency ballots) being interpreted as blank and not counted, though clearly appearing on the hand-marked ballots cast by voters;

• the alleged failure to protect the confidentiality of the voting process by the use of timestamps on scanners that trace back to the voters at the precinct and by the large BMD screens that expose the voter's selection choices to other individuals in the precinct and burdening their free exercise of the franchise.

## 2. Encryption & Risk Exposure

The Court at some length described in its August 15, 2019 Order the changed landscape of cybersecurity in which election systems operate. More evidence emerging in the past year has added to this picture of heightened security concerns. The Court does not further delve into this reality here because the Defendants do not appear to actually dispute that cybersecurity risks are significant in the electoral sphere. Dr. Halderman's voting machine testing exercise in the 2020 preliminary injunction hearing – as in 2019 – showed how this might play out. As several of Plaintiffs' national cybersecurity and engineering experts explained in their testimony, the issues presented for any cyber electoral system is how to

fortify the system's protection against unauthorized intrusion or accessing of software and databases, the system's detection and limitation of the impact of malware, and minimization of risk overall, including through active auditing procedures.[34]

The State Defendants presented the BMD system's cybersecurity as reliable and fortified both based on the testimony of Dr. Coomer as Dominion's Director of Product Strategy and Security and the testimony of Mr. Jack Cobb, the Laboratory Director for Pro V&V.[35] The Secretary of State retained Pro V&V to perform a review of its newly adopted BMD voting system, as required for EAC certification purposes, for submission to the EAC for approval. Pro V&V originally certified the Dominion Democracy Voting's Democracy Suite 5.5-A system in August 2019 and has certified a modified version since that time – once in November 26, 2019 and once on October 2, 2020.[36] Mr. Cobb represented in his affidavits filed by Defendants that the Dominion system's security was fortified by the encryption of the QR code and accompanying digital signature code as well as various other security measures such as use of a built in security feature that generates SHA-256 hash values. (Doc. 821-6 at 4.)

Mr. Cobb testified at the injunction hearing that he had fourteen years of experience in testing voting machines, but as became apparent in the course of these proceedings, he does not have any specialized expertise in cybersecurity testing or analysis or cybersecurity risk analysis. Further, Mr. Cobb had not personally done any of the security testing referenced in his affidavits.

In his first affidavit, Mr. Cobb stated that the BMD printed ballot's QR codes are signed and encrypted. (Doc. 821-6 at 4.) When Plaintiffs' experts disputed this encryption claim, Mr. Cobb in his second affidavit pointed to Dominion's own documentation as the source of his prior statement that the encoded QR codes and digital signature were encrypted.[37] And at the injunction hearing, Mr. Cobb conceded that he accepted such representations on face value rather than on any testing that he had actually done. (Tr. Vol. II at 243.) The evidence plainly contradicts any contention that the QR codes or digital signatures are encrypted here, as ultimately conceded by Mr. Cobb and expressly acknowledged later by Dr. Coomer during his testimony. (Tr. Vol. II at 123, 146, 237, 243.) In his second affidavit, Mr. Cobb averred that his prior description of the QR code as encrypted as opposed to "encoded" was just a difference in verbiage because he is not an academic. As discussed later below in connection with Mr. Vincent Liu's testimony, this is simply not correct. Similarly,

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

during cross examination, after conceding that malware could affect hash value generation, Mr. Cobb indicated he was not familiar with the fact that malware could defeat or disable the hash values[38] – a concern addressed by all of Plaintiffs' cybersecurity specialists who provided declarations or testimony in this case.

Mr. Cobb's first affidavit discloses that Pro V&V did not itself conduct any form of penetration or security testing of the 5.5-A software version specifically to be used in Georgia (certified by Dominion in August 2019) but relied on another company's security testing of earlier versions of the Dominion Democracy Suite software.[39] (Doc. 865-1 at 5; Tr. Vol. II, at 233.)[40] Dr. Coomer testified that there is a difference between the 5.5 and 5.5-A Dominion Democracy Suite versions – a change to the ICX software that was not deemed de minimis. (Tr. Vol. II at 138.) Pro V&V's assessment of the modified software version in November 2019 ("5.5.A GA" update) (classified as de minimis) was performed by an employee no longer with the company. Mr. Cobb's affidavit did not indicate that he actually had personal familiarity with that specific testing or actually any specific testing, as he testified he did not engage in this type of activity. (Tr. Vol. II at 243.) At the injunction hearing, he indicated that Pro V&V had never tried or tested alteration of the QR code in Dominion version 5.5-A, though he had previously declared in effect that this could not be done. (Tr. Vol. II at 238.) While Mr. Cobb's affidavits addressed cybersecurity matters and criticisms of Plaintiffs' cybersecurity and engineering expert affidavits, he was candid in his testimony at the injunction hearing that he actually had no specific expertise in cybersecurity testing.

Mr. Vincent Liu, is a leading international cybersecurity analyst and consultant. He has focused on the "offensive side of security for 21 years," starting with the National Security Agency as a global network exploitation analyst and moving from there to work at Ernst & Young in their advanced security centers. He subsequently led the global penetration team for Honeywell International and in 2005 co-founded the cybersecurity firm of Bishop Fox of which he is CEO. As he describes, "we are hired by some of the most sophisticated, largest companies in the world to perform product security testing, application security testing, penetration testing, code reviews, red teaming. Essentially, companies hire us to find vulnerabilities within their system to identify weaknesses."[41] (Liu Testimony, Tr. Vol. II at 54.)

Mr. Liu addressed head-on the inaccuracy of any contention that the QR code or signature utilized in the Dominion BMD system in Georgia is encrypted. Mr. Liu testified at the injunction hearing that based on his and his firm's examination of the QR codes, the codes were not encrypted. "And the process that we undertook to perform the verification was to develop code that read the QR code. Wherein, we were able to extract the raw data and determine ... whether or not it was encrypted. And our conclusion was that it was not." (Liu Testimony, Vol. II at 56.) Mr. Liu further explained that encryption and encoding have fundamentally different meanings. "The use of encryption implies that there is an algorithm that confers some measure of security to the system .... [A] way to think about it is encryption is used to provide security. Encoding is intended for usability. It is to make information more easily accessible, which is oftentimes counter to, say, encryption, which is something more secret .... [I]t is a concept that is very, very fundamental." (Id. at 57.) QR codes, in short, are made to facilitate access, not to conceal the code.

Mr. Liu also addressed whether the digital signature in the Dominion QR code provided security for the QR code:

> [T]ypically when you are thinking about digital signatures you are referring to the use of public-key cryptography. And the intention is to provide for integrity. In this case, public-key cryptography was not being used with QR codes. And so the implication is that with the BMDs and the generation of the QR codes the QR codes themselves -- the implication with the design of the Dominion BMD system is that any device that has necessary keys to operate would be able to generate a fake QR code. And you would not be able to determine which machine generated it, whether it was the EMS, the BMD, the ICP, or any other system that had that key loaded on to it.

(Id. at 58.)

Mr. Liu goes on to dismiss Pro V&V's and Dominion's reliance on hash values as a central software security protective device. "[I]f you have an infected BMD that has been compromised [by malware], it can just tell you whatever value that it wants." (Id. at 59.) "[A]s it is deployed within the Dominion devices, it does not appear to be used in a fashion that could be considered secure. It can easily be circumvented." (Id. at 64.) Liu similarly addresses the insecurity of the encryption key and other gateways to the system that he states can be bypassed by malware to allow access to QR codes (and faking of such). (Id. at 60-61, 63; Liu Decl., Doc. 855-2 at 5-8.)

On cross-examination, Mr. Liu explained that while he had not personally physically examined the BMD system in Georgia because it has not been accessible for independent evaluation, he had used established standard cybersecurity evaluation practices for assessing the

453 of 497

vulnerability of software. Liu reviewed the architecture and documentation regarding this specific BMD system (including certification documentation) and considered the outdated Android operating system[42] and principles of how relevant checksum software works, his knowledge of applicable technology and software principles and cybersecurity vulnerabilities. (*Id.* at 63-67.) He also considered the system's use of USB devices and portals which in his view generally are "fraught with security concerns." (*Id.* at 69-70.) Liu concluded that in his view, the design of the security of the BMD system is not secure and "require[s] a more in-depth review." (*Id.* at 68.)

In contrast, Defendants contend that Plaintiffs' evidence boils down to hypothetical speculation by Dr. Halderman about what "could" happen based on his experience with other electronic voter systems, and review of Dominion documentation, rather than a studied evaluation of the Dominion 5.5-A GA system or its implementation. They argue that the Plaintiffs' experts have never actually seen malware that would actually alter a ballot on the Dominion voting system. The State Defendants also question Dr. Halderman's mode of testing the BMD system when the Court ordered the equipment made available for confidential testing in early September[43] and assessment of the vulnerability of the system's design.

Given the Court's assessment of the limitations in Mr. Cobbs' and Pro V&V's evaluation of cybersecurity elements of Georgia's BMD system and affidavit accuracy issues, the Court looks to Dr. Coomer's testimony for a fuller picture. Dr. Coomer averred in his November 2019 affidavit, "while all computers can be hacked with enough time and access, Dominion is not aware of any situation where an individual used the barcode on one of its units to launch software or to affect the operation of the unit." (Doc. 852-1 at 8.) In his court testimony, Dr. Coomer describes Dominion's Democracy Suite system as a protected "end-to-end" election management system that is a "self-contained, self-functioning election management system and tallying tabulation system." (Tr. Vol. II at 117.)

Dr. Coomer represents that the servers and work-stations are "hardened" to meet benchmarks set by NIST, the National Institute of Standards Technology. And he represented to the Court that the NIST benchmarks do not address whether other software applications – i.e., game applications that Mr. Hursti observed on servers in Georgia county voting offices – must be removed to ensure that servers are securely hardened and protected.[44] Dr. Coomer testified that one of the strong assets of the system's touchscreen interface is that voters cannot cast

overvotes (more than one vote in a single race) and that undervotes (no vote cast) are clearly indicated to the voter on the screen, thereby addressing "a lot of the voter intent issues you have with hand-marked ballots." (*Id.* at 119.) And in this connection, he commented on the clarity of the touchscreens that do not have the calibration problems posed by legacy voting systems. (*Id.* at 121.)

Dr. Coomer testified at the injunction hearing that Dominion did not intend to encrypt the QR barcode. He also testified regarding the use of digital signatures, secure keys in the system "that are part of the system and the standard SHA-256 hashing algorithm" as protective security architecture for the software system and the QR codes.[45] (Tr. Vol. II at 123.) Responding to State Defendants' question regarding what would be necessary to generate a valid (but false) QR code accepted by the ICP scanner, Dr. Coomer discussed how *all* physical and software defenses of the system would have to be defeated and source code accessed, which his testimony as a whole suggests he did not think likely. (Tr. Vol. II. at 124.) He also in his 2019 affidavit testified that as the BMD touch-screen tablets run the Dominion Voting Systems software in Kiosk mode (in a mode only showing the Touchscreen voting display), "this prevents any access to software or features outside of the certified installed program." (Doc. 821-1 at 2-3.) Finally, Dr. Coomer's affidavit represents that "the BMD has no physical component that would allow for wireless transmissions."[46] (Id.) Dr. Coomer acknowledged on cross examination, however, that the Democracy Suite software works on an Android operating system that is separate from the software and hardware, and that is not written by Dominion. (Tr. Vol. II at 86-87.) He further acknowledged the potential for compromise of the operating system, by exploiting a vulnerability, that could allow a hacker to take over the voting machine and compromise the security of the voting system software. (Id.)

<mark>The evidence of actual implementation presented by Harri Hursti's testimony suggest a very different picture as to the system's implementation at this juncture. Mr. Hursti is a nationally recognized cybersecurity expert who has worked in security-oriented IT technology for over 30 years, with a particular expertise in the knowledge, observation and prevention of malicious activities in networked environments. Mr. Hursti also has an expertise in optical scanning. (Doc. 680-1 at 37; Doc. 853-2; Tr. Vol. I at 120-121.) Mr. Hursti is the co-founder and organizer of one of the largest annual cybersecurity and hacker community meetings, attracting over 30,000 participants in Las Vegas in the four years prior to the Covid-19 pandemic. He also organized the 2018 Voting</mark>

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

Machine Hacking Village for which he was awarded a Cyber Security Excellence Award and has engaged in other organized efforts to work with local election officials to assist them in gaining security expertise.

In response to the State Defendants' critique of his specific qualifications, Mr. Hursti indicates that "there are only a few independent voting system researchers with more hands-on experience than I have with key components of the Dominion Voting System elements. To my knowledge, no jurisdiction has permitted, and Dominion has not permitted, independent research, academic or otherwise, to be conducted on its systems, which greatly limits the number of people with any experience with the Dominion systems." (Doc. 853-2 at 2.) He notes that the Voting Machine Hacking Village issued its 2019 annual report that addressed security weaknesses, vulnerability, and exploitations discovered by the participants regarding an array of computing systems, including a different hybrid piece of Dominion voting equipment, the ImageCast Precinct with Ballot-Marking Device.[47] (*Id.* at 3.) The report intentionally did not provide a public disclosure of how the exploits were conducted but instead a high-level overview. Hursti states that he was actively engaged with the underlying work and that the discoveries were intentionally not included in the annual report for protective security reasons. He has evaluated BMD-type devices during the DEF CON conference and otherwise. He has also conducted in-person observations of electoral operations and scanning in Georgia precincts and county offices during the last year since the introduction of Dominion's BMD system.

Mr. Hursti testified at the September 2020 injunction hearing and through several declarations regarding his observations made while visiting county facilities where voting activity was transpiring in the August 2020 elections and in other sites both before and after the August observations. Based on his cybersecurity expertise and in-depth knowledge hacker strategies, Hursti identified concerns regarding the security of these systems. He found that in the two county election offices he visited, election servers enabled unsafe remote access to the system through a variety of means, extending from frequent use of flash drives and accessing of the internet to the use of outside unauthorized applications (such as game programs) residing on election management and tabulation servers and other practices. Mr. Hursti testified that these practices drive a hole through the essential cybersecurity foundation requirement of maintaining a "hardened"[48] server (and associated computers) as well as air gapped secure protection of the system. Without these basic protections, malware can far more easily penetrate

the server and the operative BMD system software in turn.

Hursti found that in one of the counties, server logs were not regularly recording or updated in full and that Dominion's technical staff maintained control over the logs and made deletions in portions of the logs. Yet secure and complete logs, Hursti testified, are essential as the most basic feature of system security as they provide the detailed activity trail necessary for the identification of security threats and server activity and are required for purposes of conducting a sound audit.[49] (*See* Hursti Decl., Doc. 853-2; Tr. Vol. II at 117-169.)

In sum, at the preliminary injunction hearing, Mr. Hursti succinctly presented his opinion that given the irregularities that he observed as a cybersecurity expert he had serious doubt that the system was operating correctly and that "when you don't have an end-to-end chain of the voter's intent" and when a system could be maliciously or unintentionally compromised, there is no capability of auditing the system results.

### 3. Other Issues: Software Changes and Installation

In addition to the above issues, approximately two weeks after the last day of the injunction hearing in this case, a new development or crisis (depending on which party's perspective) was brought to the Court's attention. Logic and Accuracy testing in at least two counties demonstrated an unpredictable defect or bug in the presentation on the ballot of the 20 candidates for one of Georgia's U.S. Senate seats. A column of the senatorial candidates erratically would disappear from the ballot. Dominion conducted expedited testing to identify the source of the bug. At first it determined it would have to replace the database system wide across Georgia to address the issue. On the afternoon of September 25, 2020, Chris Harvey, the Director of Elections for the Secretary of State's Office, issued a written notice to all County election directors regarding a ballot problem that had arisen that might require replacement of the entire voting database. He therefore directed that all county election offices cease Logic & Accuracy testing until further notice. Georgia's 159 counties thus temporarily halted all Logic and Accuracy testing preparation of voting equipment for the elections.

Plaintiffs' counsel notified the Court over the ensuing weekend of this significant new election system problem. The Court held a phone conference with counsel along with Dr. Coomer regarding the issues raised on

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

September 28th. The Court was at that time advised that Dominion had now determined after further testing that the issue should be addressed by a software modification to run on the ICX BMD Touchscreen voting machines that would have to be installed in each of these BMD voting machines across the state. Meanwhile, Dominion sent a modified version of the software for running the election on the operative ICX BMD Touchscreen voting equipment to Pro V&V for independent testing.[1] Although as it turns out, Pro V&V had not started their testing of the software modification (or so it seems) aimed at remedying the issue at the time of the September 28th phone call, Dr. Coomer initially advised the Court then that "so the testing lab has already deemed the change de minimis" – an instantaneous conclusion that bears consequences and raises questions, as later discussed here. (Tr., Sept. 28, 2020, Doc. 926 at 38.) Dr. Coomer then responded to the Court's question of when therefore did the testing actually occur. He further responded that Pro V&V first analyzed the code change to determine if the change was "de minimis" pursuant to EAC standards and then, based on that finding, would conduct testing, which was proceeding on that day, Monday, September 28th.[50] By Tuesday at latest, Pro V&V had given its full approval of the software modification, though it had yet to issue a written testing report. By that Tuesday afternoon or evening (or earlier), Pro V&V had transmitted the modified software to the State Elections Division for review, use, and distribution to counties on Wednesday. (Doc. 928-1.) The State in turn transmitted on Wednesday, September 30th one flash drive to each county elections office for mass reproduction in hundreds of flash drives for installation of replacement software on all BMDs.

At the time it was distributed to the counties, the Dominion software modification had not yet been reviewed or approved by the Election Assistance Commission.[51] The State contends it could immediately legally proceed without such approval and has now launched and apparently completed the process of Counties' (whether by county staff or Dominion staff or contract employees) removal of the prior software and installation of the new modified software in thousands of voting machines across the state. At conferences held by the Court on September 28th and October 1st, the State Defendants' counsel maintained that the State did not need EAC approval to implement newly modified software essential to running all critical aspects of the voting machines as state law only requires that the BMD system be "certified by the United States Election Assistance Commission prior to purchase, lease, or acquisition." O.C.G.A. § 21–2–300(a)(3). (Tr. of Sept. 28, 2020 hearing, Doc. 925.) The State Defendants filed at the

Court's directive the Pro V&V written testing documentation on October 2, 2020 and represented in the same filing that the Pro V&V summary letter had been submitted to the EAC. However, Dominion did not in fact submit the software modification for approval to the EAC as a de minimis change until Monday, October 5, 2020 and then re-submitted its engineering change order request on Tuesday evening, October 6, 2020, a day after installation of new software statewide in BMDs across the state's 159 counties was completed.[52] (Doc. 959-5.) And on Wednesday, October 7, 2020, upon the EAC's request, Pro V&V submitted the engineering change order to the EAC verifying that it viewed the software change as de minimis and did not require further testing. (Doc. 959-5 at 11.) The EAC notified Dominion of its approval on Friday, October 9, 2020 in a one-line sentence. (Doc. 960-1.) The Court is certainly not in the position to second guess the EAC's approval. But it does delineate here the entire sequence of events and review to make transparent that the EAC review process and associated independent private laboratory review process does not offer exactly a firm protective shield as the EAC functions on a voluntary cooperation basis and does not exercise independent regulatory authority.

EAC Certification requirements specify that pre-approval of software program modifications is necessary, even if considered "de minimis" because of the potential systemic impacts of software changes. Section 3.4.3 of the EAC Certification Manual (revised November 19, 2019) provides: "Manufacturers who wish to implement a proposed de minimis change must submit it for VSTL review and EAC approval. A proposed de minimis change may not be implemented as such until it has been approved in writing by the EAC." The EAC Manual regulatory revision at 3.4.3.1. (3) specifies that a Voting System Test Laboratory (VSTL) (in this case, Pro V&V) must review and assess the proposed change and among other requirements, detail "the basis for its determination that the change will not alter the system's reliability, functionality, or operation." It also must determine whether the change meets the definition or instead "requires the voting system to undergo additional testing as a system modification." Section 3.4.3.1(7). In turn, if the VSTL endorses the proposed change as de minimis and provides requisite documentation, EAC "has sole authority to determine whether the VSTL endorsed change constitutes a de minimis change under this section." Section 3.4.3.3. If the EAC determines that the proposed de minimis change cannot be approved, "the proposed change will be considered a modification and require testing and certification" consistent with the requirements of the EAC manual. The Manual provision goes on to delineate six types of features of a proposed

456 of 497

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

software change that should be reviewed in determining whether a change is de minimis or a modification that requires more testing.

The Plaintiffs maintain that the software changes are far more than de minimis and can have broad systemic impact. Three of their cybersecurity experts submitted affidavits regarding the issues raised by the new software and its testing, thus far. The Plaintiffs' experts' affidavits address the EAC delineated characteristics for determining if a software change is de minimis and conclude that the VSTL (Pro V&V) failed to implement requisite testing measures and analysis to determine the impact of the proposed software code changes on overall system software functionality, as required for assessment of whether a software change is "de minimis." They further contend that Pro V&V conducted a rubber-stamp highly abbreviated testing review of the software changes that failed to test the software changes properly to determine (a) the source of the bug or that the software modification actually fixed the actual source of the bug or (b) how or if the new modified code included in the software would impact the structure and function of other code in the software or functionality of the software as a whole. (Pro V&V Testing Report, Doc. 939; Declarations of Dr. Halderman and Kevin Skoglund, Docs. 941, 943.)

Other substantive concerns were also raised in Plaintiffs' experts' affidavits regarding the nature of the Pro V&V testing, review, and issues posed by the software change. Pro V&V reproduced the bug on a mock election panel database it had created and ran Dominion's new software version on that sample to determine the bug did not reappear. However, as Pro V&V was never able to reproduce the flickering on/off appearance of one column of the 20 candidate screen on a copy of Douglas' County's actual database that first demonstrated the bug, there is no indication that Pro V&V actually identified the root cause of the bug or that Pro V&V actually verified that the new software fixed the bug or fixed it without impacting other portions of the software. Finally, Plaintiffs' two experts discuss how in their experience, rushed, last minute software code changes without assessment of their impact on the functionality of software and code as a whole constitutes an enormous functionality and security risk for the election system.[53] Mr. Skoglund additionally states that Logic and Accuracy testing, that should follow the new software installation process in every county, will not be able to catch the range of errors and software functionality problems potentially created by the new software. (Skoglund Decl., Doc. 943.)

Additionally, Plaintiffs have offered an affidavit from cybersecurity expert Harri Hursti who witnessed on October 1, 2020 some of the initial installation of the software now proceeding on approximately 3,300 of Fulton County's ballot marking device touchscreen units to ICX software version 5.5.10.32 in the Fulton County Election Preparation Center. (Doc. 942.) He describes in detail how 14 Dominion technicians en masse engaged in removal of the old software and installation of the new software in disorganized, rushed, and careless form – without consistent implementation of various required steps and Dominion directives for installation of the software or any evident security standards or tracking of flash drives containing sensitive information. In Hursti's view, the entire hasty and unprofessional software swap out and installation process is itself cause for grave concern as to the future security and consistent functionality of the new system.

### 4. Logic and Accuracy Testing

Pre-election Logic and Accuracy Testing (L & A) is an important operations verification practice and standard in jurisdictions across the nation that use any form of computerized voting equipment. L & A testing is required under the 2019 Georgia statutory provisions enacted as part of the adoption of legislation approving the statewide usage of the BMD system. As discussed below, L & A testing is designed to verify pre-election that all voting equipment, BMD touchscreens, printers, scanners, and PollPads are properly configured and functioning. L & A testing should also confirm that the voting system tabulators are accurately tabulating cast ballots going into the election. The testing gives election staff an opportunity to identify basic errors in election and ballot configuration and related vote attribution in scanning and ballot printing as well as to address other basic functionality problems.

O.C.G.A. § 21-2-379.25(c) provides:

On or before the third day preceding a primary or election, including special primaries, special elections, and referendum elections, the superintendent shall have **each electronic ballot marker tested to ascertain that it will correctly record the votes cast for all offices and on all questions and produce a ballot reflecting such choices of the elector in a manner that the State Election Board shall prescribe by rule or regulation.** Public notice of the time and place of the test shall be made at least five days prior thereto; provided, however, that, in the case of a runoff, the public notice shall be made at least three days prior

thereto. Representatives of political parties and bodies, news media, and the public shall be permitted to observe such tests.

(Emphasis added). The language of Georgia's 2019 statutory provision appears transparent: Each County superintendent shall have each electronic ballot marker machine (i.e., BMD and its components) tested to ascertain that "it will correctly record the votes cast for all offices and on all questions and produce a ballot" for such offices. O.C.G.A. § 21-2-379.25(c) (emphasis added). This provision was adopted simultaneous to the Legislature's enactment of O.C.G.A. § 21-2-300, authorizing the Secretary of State's mandatory statewide implementation of the BMD system. O.C.G.A. § 21-2-379.25(c) in essence, defines the pre-election standard operational verification process required to implement the BMD election system specified in O.C.G.A. § 21-2-300.

Dr. Coomer, Dominion's Director of Product Strategy and Security, "absolutely" agreed in his hearing testimony "that one of the goals of logic and accuracy testing and equipment is to do some measure of confirmation that that the equipment is working properly." (Tr. Vol. II at 83.) His affidavit submitted earlier by Defendants both in 2019 and 2020 summarized in more detail the purpose and function of pre-election L & A testing in connection with the Dominion voting systems used in Georgia:

> Dominion's optical scanners (ICP) can be used with BMD-marked paper ballots or hand-marked paper ballots. The ICP units do not interpret the human-readable (text) portion of either type of ballot. Instead, the ICP units are programmed to read the QR Code for the BMD ballot or particular coordinates on hand-marked ballot.... The target locations are then correlated to individual choices represented on the ballot. Pre-Logic and Accuracy Testing (Pre-LAT) is performed each election on every machine to verify that the target locations on hand-marked ballots, and the barcodes on BMD-marked ballots correspond correctly to the choices represented on the ballots and the digital cast-vote-records.

(Doc. 821-1 at 6.)

The Georgia State Election Board in early 2020 adopted a new Logic and Accuracy Testing Rule, SEB Rule 183-1-12.08.[54] This Rule requires:

> During the public preparation and testing of the electronic poll books, electronic ballot markers, printers, and ballot scanners to be used in a particular primary or election, the election superintendent shall cause each electronic ballot marker and scanner to be programmed with the election files for the precinct at

which the electronic ballot marker and ballot scanner unit will be used. The superintendent shall cause the accuracy of the components to be tested by causing the following tasks to be performed:

A. Check that the electronic poll books accurately look up and check-in voters via both the scanning function and manual lookup and create a voter access card that pulls up the correct ballot on the electronic ballot marker for every applicable ballot style.

B. Check that the touchscreen on the electronic ballot marker accurately displays the correct selections and that the touchscreen accurately reflects the selected choices.

C. Check that the printer prints a paper ballot that accurately reflects the choices selected on the touchscreen and immediately mark all printed paper ballots as "test" ballots.

D. Check that the ballot scanner scans the paper ballot, including both ballots marked by electronic ballot markers and ballots marked with a pen, and that the ballot scanner scans ballots regardless of the orientation the ballot is entered into the scanner.

E. Check that the tabulation contained in the ballot scanner memory card can be accurately uploaded to the election management system, and that the tabulated results match the selections indicated on the paper ballot.

Ga. Comp. R. & Regs, 183-1-12-.08(3)(A)-(E).

Yet the Secretary of State's January 20, 2020 published procedures for conducting L & A testing give an instruction for a fraction of the testing required under O.C.G.A. § 21-2-379.25(c) and its implementing regulation. (Doc. 809-4 at 25; Doc. 809-5 at 2-8.) The procedure's provision for "Testing the BMD and Printer" requires testing of only one candidate race per BMD for each ballot style (i.e., one designated vote for the presidential race and no other races or one designated vote for another office and nothing else). It also provides that "[a]ll unique ballot styles do not have to be tested on each BMD." (Id.) The published procedure gives this example for how to conduct the BMD machines' ballot testing: "Example: Ballot from BMD 1 contains a vote for only the first candidate in each race listed in Ballot style 1. Ballot from BMD 2 contains a vote only for the second candidate in each race on Ballot 1, and continue through the line of devices until all the candidates in all races within the unique ballot style will have received a single vote." (Doc. 809-4 at 25.) In other words, the testing instructions do not provide for a review of whether each

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

BMD machine in the precinct can correctly produce candidate selections on the touchscreens, and aligned ballot results in turn on scanners and printers for all elective offices on the ballot. But whether a BMD machine or scanner may be able to accurately relay a vote designation for one office does not mean that it properly does so for all other races and offices listed on the ballot.

At the October 1, 2020 follow-up hearing to address the State's implementation of the brand new software modification on the BMDs, the Court explored whether the software change would impact the scope of L & A testing procedures. The Court heard from Michael Barnes, Director of the Secretary's Center for Election Systems, who conducted acceptance testing on the BMD system prior to distribution of the software update to the 159 counties on or about September 29, 2020. The Court learned that Mr. Barnes was involved in the development of the logic and accuracy testing procedures, though Mr. Harvey, as Director of Elections, rather than Mr. Barnes apparently directly oversees their implementation. Mr. Barnes indicated that the counties were instructed to follow the original L & A protocols after verifying the new hash signature for the new version of the ICX software application. (October 1, 2020 Tr. at 35.) Mr. Barnes described a procedure for L & A testing that does not mirror the written instructions in the Secretary of State's January 2020 Procedures manual. Mr. Barnes has not been in the field to observe how counties are conducting the L & A testing pursuant to the instructions provided by the Secretary of State's Office. (*Id.* at 43.) Therefore, it is not clear what practices the counties are using in conducting their L & A testing, and it is entirely possible different counties employ different testing protocols or that they are implementing the narrow process delineated by Mr. Harvey and the January 2020 procedures guide. Even though the process as Mr. Barnes understands it is more expansive than the written guidance provided to the counties by the Secretary of State's Office, it is still incomplete when compared to the requirements of the statutory or regulatory provisions in terms of providing a full scope of testing of all ballot contests on every piece of the voting equipment.

Putting aside the intent and specifications of the L & A statutory provision, the Court looks at the basic purpose and function of L & A testing as a preliminary threshold standard for testing and ensuring the functionality of every voting machine to be used in an election by voters and capacity to produce pre-election an accurate record and tabulation of votes for candidates appearing on the ballot. First, the Court has considered Dr. Coomer's explanation above that describes the baseline functional examination that L & A provides of voting balloting

equipment – and how this translates into correct operation of voting machines, production of ballot results that correlate with ballot position, and vote tabulation. Next, it considers the testimony of Plaintiffs' expert, Mr. Kevin Skoglund, on this subject that goes into greater detail, along the same lines.

Mr. Skoglund, a cybersecurity expert with significant consulting experience with public jurisdictions, testified regarding the Secretary of State's L & A testing directive issued in January 2020. He explained that L & A testing is aimed at "verifying that every piece of equipment is going to operate properly and record votes properly on election day. And so we're crafting a set of questions to ask in advance to try and ascertain if that is true .... you would want to test every ballot style because you want every ballot style to work properly. And you want to check every contest. At a minimum, you want to make sure that every candidate is able to receive a vote .... But you also have to make sure that the votes aren't being swapped, that they are not crisscrossing." (Tr. Vol. III at 128.) Mr. Skoglund further clarified that this involves checking to make sure that "whatever you do on the screen is reflected in what is output in the end. On a tabulator, you're validating that when you take the input of the ballot into the tabulator that the totals that come out at the end match correctly. In both cases, you are looking to see if what goes in gives you what you expect to come out the other side." (*Id.* at 131-132.) Finally, he explained how as an election consultant as well as when he has served as a poll manager/voting adjudicator in his home state of Pennsylvania, he has seen some dramatic systematic vote tallying failures that could have been prevented if the L & A testing had properly been handled and identified the issue causing these results that had to be reversed.[55] The tabulation for some races on a ballot also could be totally correct while for others, they were wrong and there were candidates who received zero votes. (*Id.* at 132-133.) In summary, "[i]f you are only auditing one race, you are only going to detect problems in one race. Once you test, the scope of your testing determines whether you will find the problems. If you don't look, you can't find problems." (*Id.* at 130.)

The Secretary of State's Director of Elections, Mr. Chris Harvey, provides an affidavit in this case that addresses the Secretary of State's L & A testing policy. He states the Secretary of State's Office designed the current L & A testing process "in consultation with Dominion and local election officials, and considered the best practices in doing so." (Doc. 834-3 ¶ 7.) In his opinion, the Coalition Plaintiffs' proposal that all races within the unique ballot style be tested is "overly burdensome and require[s] a test deck that is extremely large for each BMD." (*Id.* ¶ 6.)

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

According to Mr. Harvey, the State/Dominion/local election officials group therefore concluded that the "increase in burden on local elections officials" would be "dramatic" and "unnecessary" if it conducted any more extensive L & A testing of the ballot than what is required in the January 2020 election procedures manual. *However, Dr. Coomer testified at the injunction hearing that he was not aware that the Georgia Secretary of State now is only requiring testing of one vote position on each ballot.* (Tr. Vol. II at 84.)

The Court understands Mr. Harvey's concern as to the testing burden. But the current state procedure slices and dices standard L & A protocols and objectives in testing for each voting machine (and scanner and printer) to only a small fraction of the electoral races for offices on the ballots to be run on each machine in each County precinct. This is a serious short cut that truncates L & A testing's basic objective of checking on a pre-election basis the voting equipment and software's functionality as well as logic and accuracy in producing a useable, proper ballot printout and vote count, as discussed both by Mr. Skoglund and Dr. Coomer, and anticipated under Georgia law. This makes no sense when the goal is for the system to run smoothly on election day and produce ballots that accurately reflect citizens' votes cast on the BMD system tabulators.

The Court respects that the Secretary of State and Georgia State Election Board are vested with considerable discretion in implementing the mandate of O.C.G.A. § 21-2-379.25(c). However, the Secretary of State's January 2020 Procedures Manual is plainly inconsistent with the state statutory objective and requirements. The issue before the Court, though, is not whether any particular set of procedures is in full compliance with state law or a mere error in judgment by the Secretary of State's Office. Voters do not have a First or Fourteenth Amendment constitutional right to perfect implementation of state statutory provisions guiding election preparations and operations. But they do have the right to cast a ballot vote that is properly counted on machinery that is not compromised or that produces unreliable results. L & A testing is not complex. It is tedious – but it is essential homework that protects the system and voters as the elections commence.

Recognizing that early voting starts on October 12, 2020 and the imminence of the November 3, 2020 general election, the Court must defer to the Secretary of State's Office and State Board of Elections determination of whether additional measures are pragmatically feasible at this juncture to strengthen the scope of L & A preparations for a general election with a huge anticipated

turnout. As L & A testing has already commenced on BMD equipment to be deployed at early voting locations, the Court is not prepared to issue a ruling on the L & A testing issue purely standing on its own. Accordingly, the Court recommends that the Secretary of State and State Election Board expeditiously review in conjunction with Dominion: (1) the adequacy of the current January 2020 procedures, particularly in light of evidence of prevailing protocols used in states nationwide for conducting for logic and accuracy tests; (2) what modifications can and will be made by the time of the January 2021 elections runoffs and thereafter, or beforehand (if at all feasible). The Court further recommends that the process for evaluation and change in procedures shall be made public on a timely basis and that the results of such evaluation and any changes be made public on a timely basis.[56]

### 5. Audits

Plaintiffs assert that the Dominion BMDs should not be used in Georgia's elections because unlike hand-marked paper ballots the BMDs are unauditable. In conjunction with their request to enjoin the use of BMDs and to require hand-marked paper ballots as the primary voting method for in-person voting, Plaintiffs request that the State be required to adopt more robust election audit procedures based on generally accepted audit principles. Specifically, the Coalition Plaintiffs' motion seeks an order "commanding the State Defendants to issue rules requiring meaningful pre-certification audits of election results, focusing on contested candidate races and ballot questions, with such auditing to be based on application of well-accepted audit principles in order to establish to a scientifically appropriate level of confidence that any incorrect outcomes will be detected in time to be remedied prior to certification of results." (Doc. 809.) The Curling Plaintiffs similarly request that the Court order Defendants to file "a plan providing specific steps the Defendants intend to take to ... institute pre-certification, post-election, manual tabulation audits of the paper ballots to verify election results, in sufficient detail for the Court to evaluate its adequacy." (Doc. 785.)

Plaintiffs presented expert testimony from Dr. Philip Stark, a preeminent renowned statistician and original inventor and author of the risk-limiting audit ("RLA") statistical methodology for auditing election outcomes embraced by the National Academies of Sciences, Engineering, and Medicine, et al. *Securing the Vote: Protecting American Democracy* at 109 (National Academies Press, 2018) ("National Academies Report" or "NAS Report").[57] (*See* Declarations of Dr. Philip A. Stark,

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

Docs. 296; 640-1 at 40-45; 680-1 at 2-24; 809-2; 853-1.) A risk-limiting audit is a "particular approach to catching and correcting incorrect election outcomes before they become official." (Stark Decl., Doc. 296 ¶ 27.)

As Dr. Stark explains, a RLA "offers the following statistical guarantee: if a full manual tally of the complete voter verifiable paper trail would show a different electoral outcome, there is a known, predetermined minimum chance that the procedure will lead to a full manual tally." (*Id.*) If the RLA "does lead to a full manual tally, the result of that manual tally replaces the reported outcome, thereby correcting it." (*Id.* ¶ 28.) In a RLA, "the 'outcome' means the political result: the candidate(s) or position that won, or the determination that a run-off is needed, not the exact vote totals." (*Id.* ¶ 29.) "The maximum chance that the procedure will not lead to a full manual tally if that tally would show a different outcome is called the *risk limit.*" (*Id.* ¶ 30.) In other words, "the risk limit is the largest chance that the audit will fail to correct an outcome that is incorrect, where 'incorrect' means that a full manual tally of the voter-verifiable paper trail would find different winner(s)." (*Id.*) For example, a RLA with "a risk limit of 5% has at least a 95% chance of requiring a full manual tally, if that tally would show an outcome that differs from the reported outcome." (*Id.* ¶ 31.)

According to Dr. Stark the "simplest risk-limiting audit is an accurate full hand tally of a reliable audit trail: Such a count reveals the correct outcome." Lindeman, M. and Stark, P., *A Gentle Introduction to Risk-Limiting Audits*, IEEE SECURITY AND PRIVACY, SPECIAL ISSUE ON ELECTRONIC VOTING (2012) at 1. Because a full hand count is administratively burdensome and time consuming, Dr. Stark designed the RLA as a method of examining far fewer ballots that "can provide strong evidence that the outcome is correct," where the "ballots are chosen at random by suitable means." *Id.* RLAs provide "statistical efficiency" because a RLA of an election "with tens of millions of ballots may require examining by hand as few as several hundred randomly selected paper ballots. A RLA might determine that more ballots need to be examined, or even that a full hand recount should be performed, if the contest is close or the reported outcome incorrect." NAS Report at 95.

The RLA methods Dr. Stark designed "conduct an 'intelligent' incremental recount that stops when the audit provides sufficiently strong evidence that a full hand count would confirm the original (voting system) outcome. As long as the audit does not yield sufficiently strong evidence, more ballots are manually inspected, potentially progressing to a full hand tally of all the ballots."[58] *Id.* Whether the evidence is "sufficiently strong" is "quantified by the risk limit, the largest chance that the audit will stop short of a full hand tally when the original outcome is in fact wrong, no matter why it is wrong, including 'random' errors, voter errors, configuration errors, bugs, equipment failures, or deliberate fraud."[59] *Id.*

Risk-limiting audits "do not guarantee that the electoral outcome is right, but they have a large chance of correcting the outcome if it is wrong" but they do "guarantee that if the vote tabulation system found the wrong winner, there is a large chance of a full hand count to correct the results." Lindeman and Stark (2012) at 6. In order to provide this guarantee, a RLA must be based on a reliable and trustworthy audit trail produced by a voting system that is software independent. *Id.* at 1. (*See also* Stark Suppl. Decl., Doc. 680-1 ¶ 4; Stark Suppl. Decl. 640-1 at 42 ¶ 10.)

RLAs involve manually examining and interpreting randomly selected portions of an audit trail of ballots that voters had the opportunity to verify recorded their selections accurately. Lindeman and Stark (2012) at 1. The consensus among voting system experts is that the best audit trail is voter-marked paper ballots; voter-verifiable paper records printed by voting machines are not as good. *Id.*; *see also* NAS Report at 94-95.[60]

A voting system is strongly software independent "if an undetected change or error in its software cannot cause an undetectable change or error in an election outcome, and moreover, a detected change or error in an election outcome (due to change or error in the software) can be corrected without re-running the election." (Stark Suppl. Decl., Doc. 640-1 at 42 ¶ 10.) "Systems based on optically scanning hand-marked paper ballots (with reliable chain of custody of the ballots) are strongly software independent, because inspecting the hand-marked ballots allows an auditor to determine whether malfunctions altered the outcome, and a full manual tabulation from the paper ballots can determine who really won, without having to re-run the election." (*Id.*) Therefore, a risk-limiting audit of an election conducted using hand-marked paper ballots "can guarantee a large chance of correcting the outcome if the outcome is wrong." (*Id.*)

Dr. Stark's affidavits and hearing testimony address the impossibility of conducting a reliable audit of ballots and voting totals derived from QR codes for purposes of verifying the accuracy or integrity of election results or processes. In Dr. Stark's view, the risk-limiting audit methodology cannot be properly utilized to assess the

accuracy of election results in the context of a BMD system where ballots are tabulated based on a humanly non-readable QR code that is not voter verifiable and where the computer voting system is vulnerable to data hacking or manipulation that can alter votes cast in untraceable ways – including in the votes actually shown on the ballots that are audited.

In his December 15, 2019 declaration, Dr. Stark explains,

> The most compelling reason for post-election audits is to provide public evidence that the reported outcomes are correct, so that the electorate and the losers' supporters have reason to trust the results. Audits that cannot provide evidence that outcomes are correct are little comfort. A transparent, full hand count of a demonstrably trustworthy paper record of votes can provide such evidence. So can a risk-limiting audit of a demonstrably trustworthy paper record of votes.

(Stark Suppl. Decl., Doc. 680-1 ¶ 3.) But if "there is no trustworthy paper trail, a true risk-limiting audit is not possible, because an accurate full manual recount would not necessarily reveal who won." (*Id.* ¶ 4.) Unlike voting systems using optical scan hand-marked paper ballots, BMD based voting systems are not strongly software independent. (Stark Suppl. Decl., Doc. 640-1 at 42 ¶ 10.) According to Dr. Stark, a BMD "by its nature, erases all direct evidence of voter intent." (Tr. Vol. I at 46.) There is no way to tell from a BMD printout what the voter actually saw on the screen, what the voter did with the device, or what the voter heard through the audio interface. (*Id.*) For this reason, there is no way to establish that a BMD printout is a trustworthy record of what the BMD displayed to the voter or what the voter expressed to the BMD. (Stark Suppl. Decl., Doc. 680-1 ¶ 10.) Because a BMD printout cannot be trusted to reflect voters' selections, auditors can only determine whether the BMD printout was tabulated accurately, not whether the election outcome is correct. (Stark Suppl. Decl., Doc. 640-1 at 42 ¶ 10.) Nor can auditors determine the correct outcome under these circumstances. (*Id.*) Therefore, because a BMD printout is not trustworthy, "applying risk-limiting audit procedures to [a] BMD printout does not yield a true risk-limiting audit." (*Id.* ¶ 4.)

Plaintiffs provided additional affidavits, testimony, and evidence from other nationally recognized experts that addressed their similar views that the QR code based voting system does not produce a reliable voter-verifiable audit trail that can be audited consistent with established RLA standards and foundation principles. (*See* Decls. of Dr. Andrew W. Appel, Doc. 681-3, Doc. 855-3; Decls. of Dr. Alex Halderman, Doc. 619-2, Doc. 682, Doc. 692-3; Decls. of Dr. Richard A. DeMillo, Doc. 680-1 at 45-56, Doc. 716-1; *see also* Doc. 615-2, Wenke Lee, Ph.D.,

Secure, Accessible & Fair Elections Commission, *Basic Security Requirements for Voting Systems* (October 8, 2018); Andrew A. Appel, Richard A. DeMillo, Philip B. Stark, *Ballot-marking devices (BMDs) cannot assure the will of the voters* (April 21, 2019); Doc. 692-3 at 8-23, Bernhard, M., A. McDonald, H. Meng, J. Hwa, N. Bajaj, K. Chang, and J.A. Halderman Can Voters Detect Malicious Manipulation of Ballot Marking Devices? IEEE Proc. Security & Privacy, 1, 679-694 (2020)).

Dr. Halderman has explained the many ways a BMD could be maliciously programed or otherwise malfunction such that the ballot printed by the BMD does not match the voter's intended selections. He also attests that "if voters do not reliably detect when their paper ballots are wrong, no amount of post-election auditing can detect or correct the problem." (Halderman Decl., Doc. 619-2 ¶ 12.) Dr. Halderman, along with others at the University of Michigan, conducted experiments to determine how often voters fail to notice that their BMD printed ballots differ from the selections made on the touchscreen voting machines. (*Id.* ¶ 13.) When not given any prompting to review their ballots, only 6.5% of participants in the study noticed their votes had been changed by the BMD. (*Id.* ¶ 14.)

Between November 2018 and March 2019, Dr. Appel conducted a research collaboration with Dr. DeMillo of Georgia Tech and Dr. Stark, leading to the publication of a joint paper, Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters. After analyzing the consequences of a study of whether voters review ballot cards produced by BMDs, their research concluded:

> Risk-limiting audits of a trustworthy paper trail can check whether errors in tabulating the votes as recorded altered election outcomes, but there is no way to check whether errors in how BMDs record expressed votes altered election outcomes. The outcomes of elections conducted on current BMDs therefore cannot be confirmed by audits.

(Appel Decl., Doc. 681-3 ¶¶ 11, 13, 21.)

Dr. Wenke Lee, the only cybersecurity expert appointed to the Georgia Secretary of State's "Secure, Accessible & Fair Elections Commission," echoed Dr. Stark's opinions in advising the Commission on basic security requirements for voting systems:

> In order to support risk-limited - auditing, paper ballots must be easily and clearly readable and manually countable. In particular, a paper ballot must show each and every vote exactly as cast by the voter. It cannot be just a summary of the votes (e.g., only a tally, or only the presidential ballot and not the down ballots). A

manual count absolutely cannot rely upon a barcode, QR code, or any other kind of encoding scheme that is readable only by a machine because the cyber system that reads those codes also can be compromised and lie to the voter or auditor. In short, during a manual review, a human must be able to clearly see evidence of the voter's original act.
(Doc. 615-2 at 3.)

In the face of this consensus as to the role of voter verification and auditing in ensuring voters' ballots are properly and accurately counted, and that the voting tallies are reliable, the State Defendants presented two rebuttal expert witnesses regarding the viability of conducting a valid risk-limiting audit of a QR code based voting system. Both Dr. Gilbert and Dr. Adida's declarations focused on the RLA as the essential tool for protecting against voting system mishaps in the implementation of a BMD system. (Doc. 834-2 at 7; Doc. 658-3 at 13-14, 20-21.)

Professor Juan Gilbert, Professor and Chair of the Computer & Information Science & Engineering Department of the University of Florida and leader of the Department's Human Experience Research Lab[61] testified regarding his views as to the value and reliability of RLA as part of the BMD system, which he endorses. Dr. Gilbert's research currently focuses on human use of technology and access to voting systems as opposed to issues involving cybersecurity issues or statistical methodology. He described the access benefits of the BMD system and addressed why in his view, voters will verify their printed ballots and therefore enable a meaningful RLA audit which he saw as a vital protective device. Dr. Gilbert has himself not performed any studies of voter review of ballots at the polls. The Court notes that Dr. Halderman has recently published an article on this very subject.[62] Dr. Gilbert's risk/benefit assessment of the vote integrity or manipulation risks entailed in a QR code BMD system clearly differed from Plaintiffs' experts – and specifically Dr. Appel, Dr. Halderman, and Dr. Stark's views regarding the risks posed by the BMD system's reliance on tabulating votes based on a humanly unverifiable QR code.

Dr. Benjamin Adida is co-founder and Executive Director of VotingWorks, a non-profit vendor of election auditing technology and more recently, voting systems in the United States, including accessible ballot-marking devices and hand-marked ballots.[63] Dr. Adida holds a PhD in cryptography and information security from MIT and has significant experience in the private and public sector. While his academic background is impressive, Dr. Adida's background and expertise is not specifically in statistics.[64]

VotingWorks contracts with multiple jurisdictions, assisting in the design and implementation of RLAs. According to Dr. Adida, "[t]he deployment of RLAs is challenging" and highly variable between jurisdictions. To date Georgia has contracted with VotingWorks for guidance in the development and implementation of a RLA in Georgia of one major statewide race every two years to be selected by the Secretary of State, under new rules adopted by the State Board of Elections. Ga. Comp. R. & Regs. 183-1-15-.04. Georgia is the only state so far that VotingWorks has contracted with that uses BMDs for all in-person voting.[65] (Tr. Vol. II at 285.)

Dr. Adida's methodology contained the inherent assumption of voter ballot verification. Dr. Adida testified that "[i]f the paper ballots have a chance to be verified by the voter, they can be used in a RLA whether they were BMD-produced or hand-marked produced." (Id. at 284.) Under the State's audit procedures, the RLA is conducted on the human readable text of the BMD ballot printout, not on the QR code. (Id. at 294; Adida Decl., Doc. 934-2 ¶ 12.) Therefore, according to Dr. Adida, "[a]s long as voters verify the text, and as long as RLAs are conducted on the basis of the same ballot text, then potential QR code mismatches are caught just like any other tabulation mistake might be caught. A successful RLA thus provides strong evidence that, if there were QR code mismatches, they did not affect the outcome of the election." (Adida Decl., Doc. 934-2 ¶ 12.)

Dr. Stark has submitted two affidavits in which he severely criticizes the premise of Dr. Adida's position that a valid RLA or valid RLA results can be conducted in the context of a BMD election in which there is no meaningful audit trail and voters cannot verify the QR code, among other things.[66]

First, despite Dr. Adida's assumption that BMD voters will review and verify their ballot selections on the ballot printout, the overwhelming evidence from actual studies of voter behavior "suggests that less than ten percent of voters check their printouts and that voters who do check often overlook errors." (Stark Suppl. Decl., Doc. 680-1 ¶¶ 14, 30(d); Stark Suppl. Decl., Doc. 891 ¶¶ 9-10, 12.) In an actual election, there is no way to know how many voters checked their BMD printouts for accuracy. (Stark Suppl. Decl., Doc. 891 ¶ 16.) "The fact that a voter has the opportunity to check the BMD printout does not make a BMD printout trustworthy." (Id. ¶ 7.)

Second, Dr. Stark categorically disagrees with Dr. Adida's position that a post-election RLA can

demonstrate that BMDs function correctly during elections. According to Dr. Stark – whose opinions are affirmed by other experts – audits of BMD-marked ballot printouts cannot reliably detect whether malfunctioning BMDs printed the wrong votes or omitted votes or printed extra votes (whether due to bugs, configuration errors, or hacking).[67] And "this is true even if the malfunctions were severe enough to make losing candidates appear to win." (*Id.* ¶ 5.) Dr. Stark testified that "[t]here is no audit procedure that can be conducted on the output of ballot-marking devices to confirm that the outcome of a contest is correct in the sense that it reflects what the voters actually did on the BMD or saw on the screen or heard through the audio." (Tr. Vol. I at 68.) "[U]nless virtually every voter diligently checks the printout before casting it, there is no reason to believe that an accurate tabulation of BMD printouts will show who really won." (Stark Suppl. Decl., Doc. 680-1 ¶ 13.)

The fundamental disagreement between Dr. Stark and Dr. Adida boils down to the purpose and function of a risk-limiting audit. Dr. Adida testified at the hearing that the "point of a RLA is to check the tabulation of the votes matches what the voters saw on the paper ballot" and that the "most important function" of a RLA "is to make sure that bugs, malfunctions, dust on the scanner, [or] nation state attacks do not corrupt that function." (Tr. Vol. II at 292.) According to Dr. Stark, ballot polling risk-limiting audits, the audit method piloted and planned in Georgia, do not check the tabulation of votes, per se.[68] (Stark Suppl. Decl., Doc. 809-2 ¶ 12.) They do not check whether the votes were recorded or tabulated correctly. (*Id.* ¶¶ 12, 13(b).) Ballot-polling risk limiting audits do not check the tabulation of any individual BMD ballot or any group of ballots, except in the sense that they check whether the reported total was wrong by more than the reported margin. (*Id.* ¶ 13(c).) Ballot-polling audits only check whether a hand count of the BMD printout would find the same winners by checking whether the paper trail has more votes for the reported winner than for any other candidate. "The tabulators could misread every single vote and still find the correct winner" and a ballot-polling audit would not detect this because the outcome could be "correct despite the complete mistabulation." (*Id.* ¶ 12; Stark Suppl. Decl., Doc. 680-1 ¶¶ 20-21.) For this reason, "it is incorrect to consider ballot-polling RLAs to be checks of the tabulation system." (Stark Suppl. Decl., Doc. 891 ¶ 15; Stark Suppl. Decl., Doc. 680-1 ¶¶ 20-21.)

A ballot-polling audit of a contest conducted on a BMD system cannot confirm the reported outcomes are correct because it cannot show that the BMDs functioned correctly. (Stark Suppl. Decl., Doc. 680-1 ¶ 21.) All such

an audit can do is provide statistical evidence that a full manual tabulation of the BMD printouts would find the same winner that was reported in the audited contest.[69] (*Id.*) "If the BMD printouts contained outcome-changing errors, the audit would have no chance of detecting that, nor of correcting the reported outcomes." (*Id.*)

This is essentially what the pilot audits Georgia has conducted accomplish and what the planned audit for the selected contest in the November 2020 election will accomplish.[70] However, this does not serve the purpose and function of a true risk-limiting audit as designed by Dr. Stark. To statistically guarantee that the audit will produce a large chance of correcting the election outcome if the reported outcome is wrong.[71]

Additionally, the Court pursued a range of questions with Dr. Adida when he testified about VotingWorks' application of the RLA for the first time in a state of Georgia's size in solely one race under these circumstances. The Court cannot say that it got close to understanding the rationale or specific contours of the sampling methodology to be used by Voting Works.

Suffice it to say, the experts here are in hot debate and approach these issues from different backgrounds and areas of expertise. The Court recognizes that the RLA is deemed by all of the experts as a control valve essential to election integrity. The question they differ on is whether a RLA can be validly implemented in the context of Georgia's QR code BMD voting system. While the Plaintiffs have marshalled a formidable amount of evidence that casts serious doubt on the validity of the use of the RLA with the current system (including the specific RLA methodology that VotingWorks is pursuing here), unless the Court determines that the BMDs must be enjoined from use in Georgia's upcoming elections, the requested remedy appears irrelevant. Absent such an injunction, there is no audit remedy that can confirm the reliability and accuracy of the BMD system, as Dr. Stark has stressed. Plaintiffs do not request, and have not offered, any other proposed audit procedures to accomplish the goal of the RLA. Nor is the Court in a position to reach a judgment regarding whether the Secretary of State's plan to conduct a single RLA assessment in one statewide race under these circumstances provides any meaningful protection or guidance regarding the accuracy of tabulation of the overall voting results (or system). The Court has some major doubts, given the entirety of the evidence discussed here. But under O.C.G.A. § 21-2-498(e) the Secretary of State will be required to implement risk-limiting auditing for all statewide elections "beginning not later than November 1, 2024." The Secretary and State Election

Board still have the opportunity to consider other options for effectuating a somewhat more meaningful RLA process – i.e., by at very least strengthening voting protocols for the 2022 election cycle to encourage voters' ballot verification and expanding the number of electoral contests audited. That said, the specific relief Plaintiffs ask for ultimately rises or falls on whether the evidence as a whole establishes the Plaintiffs' likelihood of success on their challenge of the current QR barcode-based BMD system. And the auditing issues considered are relevant to this central claim.

**6. Analysis of Preliminary Injunction Standards as Applied to Plaintiffs' Primary BMD Vote Related Claims**

The Court has in Section II A. above discussed the standards the Court must weigh and apply in determining the Plaintiffs' entitlement to preliminary injunctive relief. The Court must first consider whether Plaintiffs have established a substantial likelihood of prevailing on the merits of their claims and related to that, "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment." *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564.

The interest Plaintiffs seek to vindicate now is the same interest at stake when they brought this litigation under the old voting system in 2017. As the Court first recognized in its August 2018 Order, the Constitution affords Plaintiffs an interest in transparent, fair, accurate, and verifiable election processes that guarantee each citizen's fundamental right to cast an accountable vote. Plaintiffs assert they will suffer immediate and irreparable harm to this interest if required by the State to cast a ballot on the BMD system that cannot be confirmed or verified as reflecting their actual vote choices because the votes are tabulated solely from a computer generated QR barcode that is not human-readable and is vulnerable in the current system to failure or breach. They further assert that this injury is exacerbated because votes cast by BMDs pose the significant risk of having the votes altered, diluted, or effectively not counted.[72] Plaintiffs have shown demonstrable evidence that the manner in which Defendants' alleged mode of implementation of the BMD voting system, logic and accuracy testing procedures, and audit protocols deprives them or puts them at imminent risk of deprivation of their fundamental right to cast an effective vote (i.e., a vote that is accurately counted).

[10] [11]The Court views the burden and the threatened deprivation as significant under the *Anderson/Burdick* balancing framework. The right to vote derives from the right of individuals to associate for the advancement of political beliefs that is at the core of the First Amendment and is protected from state infringement by the Fourteenth Amendment. *E.g., Williams v. Rhodes*, 393 U.S. 23, 30–31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *NAACP v. Button*, 371 U.S. 415, 430, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). "Writing for a unanimous Court in *NAACP v. Alabama* [357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)], Justice Harlan stated that it 'is beyond debate that freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech.' " *Anderson*, 460 U.S. at 786-87, 103 S.Ct. 1564 (internal citation omitted). As discussed in both the Court's September 28, 2020 Order and this Order, the individual Plaintiffs have a strong preference to cast votes in person and do not want to be shunted out of the regular exercise of the shared political experience of voting with their fellow citizens at their local precinct location. The First and Fourteenth Amendments afford them this right to associate for the advancement of political beliefs by exercising the franchise at the voting booth and to cast their votes effectively. *See generally, Anderson*, 460 U.S. at 788, 103 S.Ct. 1564; *Williams v. Rhodes*, 393 U.S. 23, 30-31, 89 S.Ct. 5, 21 L.Ed.2d 24 (1968); *Reynolds v. Sims*, 377 U.S. 533, 563, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

[12] [13]"Since the right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Reynolds*, 377 U.S. at 562, 84 S.Ct. 1362. "It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Burdick v. Takushi*, 504 U.S. 428, 433, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). "Although these rights of voters are fundamental, not all restrictions imposed by the States ... impose constitutionally-suspect burdens on voters' rights to associate or to choose among candidates." *Anderson*, 460 U.S. at 788, 103 S.Ct. 1564. Rather, the Supreme Court has recognized that States retain the power to regulate their elections to provide fairness, honesty, and order in the democratic process. *Id.* The right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system. *Anderson*, 460 U.S. at 788, 103 S.Ct. 1564. "To achieve these necessary objectives, States have enacted comprehensive and sometimes complex election codes." *Id.* Election laws "invariably impose some burden upon

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

individual voters," whether they govern the "registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself," and such laws "inevitably affect[ ] — at least to some degree — the individual's right to vote and his right to associate with others for political ends." *Id.*; *Burdick*, 504 U.S. at 433, 112 S.Ct. 2059. But, "cumbersome election machinery can effectively suffocate the right of association, the promotion of political ideas and programs of political action, and the right to vote." *Williams*, 393 U.S. at 39, 89 S.Ct. 5 (Douglas, concurring). And, "[w]hen a State exercises power wholly within the domain of state interest, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right." *Reynolds*, 377 U.S. at 566, 84 S.Ct. 1362 (quoting *Gomillion v. Lightfoot*, 364 U.S. at 347, 81 S.Ct. 125).

Georgia's Election Code mandates the use of the BMD system as the uniform mode of voting for all in-person voters in federal and statewide elections. O.C.G.A. § 21-2-300(a)(2). The statutory provisions mandate voting on "electronic ballot markers" that: (1) use "electronic technology to independently and privately mark a paper ballot at the direction of an elector, interpret ballot selections, communicate such interpretation for elector verification, and print an elector verifiable paper ballot;" and (2) "produce paper ballots which are marked with the elector's choices in a format readable by the elector" O.C.G.A. § 21-2-2(7.1); O.C.G.A. § 21-2-300(a)(2).

Plaintiffs and other voters who wish to vote in-person are required to vote on a system that does none of those things. Rather, the evidence shows that the Dominion BMD system does not produce a voter-verifiable paper ballot or a paper ballot marked with the voter's choices in a format readable by the voter because the votes are tabulated solely from the unreadable QR code. Thus, under Georgia's mandatory voting system for "voting at the polls"[73] voters must cast a BMD-generated ballot tabulated using a computer generated barcode that has the potential to contain information regarding their voter choices that does not match what they enter on the BMD (as reflected in the written text summary), or could cause a precinct scanner to improperly tabulate their votes.

[14]As a result, each of the Plaintiffs attest that they are forced to forego their right to full and unfettered participation in the political process and to alternatively exercise their right to vote using Georgia's absentee ballot regime which carries its own burdensome procedures, though they may be minimal as compared to the burdens created by the BMDs.[74] Absentee voting itself has been

the subject of much constitutional litigation where the implementation of these procedures resulted in the rejection of absentee ballots and voter disenfranchisement. To avoid being denied the ability to verify their votes on the BMD system, Plaintiffs must trade one unfavorable burden for another. Plaintiffs are left with the choice of having to run another gauntlet of the absentee voting process because of potential uncertain postal delivery issues, untimely processing by the registrar's office, signature matches, etc. As discussed in Section III D herein, Plaintiffs have shown a significant burden resulting from the accuracy and voter invalidation issues that affect Dominion's scanner/tabulators and adjudication software used for determining voter intent and tallying hand-marked absentee ballots. A choice between two evils is no choice at all; the Equal Protection Clause guarantees the opportunity for equal participation by all voters in the election regardless of which method they choose to cast their vote.

That Plaintiffs and other voters have the alternative of casting an absentee hand-marked paper ballot does not lessen or absolve the State of the burdens imposed by the State's chosen, preferred, primary voting system, in which it invested hundreds of millions of taxpayer dollars. The State opposes a court-ordered switch to hand-marked paper ballots for in-person voters at the polls. The State does not wish to be forced into an administratively burdensome system of carrying out an election using hand-marked ballots and voters do not wish to be forced into an absentee regime that contains its own distinct array of burdens and uncertainties associated with whether the ballot will be accepted and counted.

While the Court recognizes Plaintiffs' strong voting interest and evidentiary presentation that indicate they may ultimately prevail in their claims, the Court must perforce address the posture of this case as a whole as well as the Plaintiffs' burdens "against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S.Ct. 1364, 137 L.Ed.2d 589 (1997); *New Georgia Project v. Raffensperger*, 976 F.3d. 1278, 1280-81 (11th Cir. 2020).

[15]In election cases, the Supreme Court and Eleventh Circuit have made ever more abundantly clear the mandate that district courts must exercise great restraint in considering the grant of injunctive relief that requires new rules on the cusp of an election where the Court's Order could cause electoral disruption and voter confusion. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006); *Republican National Committee v.*

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

*Democratic National Committee*, —— U.S. ——, 140 S.Ct. 1205, 1207, 206 L.Ed.2d 452 (2020); *Republican Nat'l Comm. v. Common Cause R.I.*, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 4680151, at *1 (U.S. Aug. 13, 2020); *Merrill v. People first of Alabama*, —— U.S. ——, —— S.Ct. ——, —— L.Ed.2d ——, 2020 WL 3604049 (U.S. July 2, 2020); *New Georgia Project v. Raffensperger*, 976 F.3d at 1282. The Court expressed its concerns anew to Plaintiffs' counsel about this timing issue when Plaintiffs filed a renewed motion for preliminary injunction in August 2020, shortly after the denial without prejudice of their initial October, 2020 preliminary injunction motions targeting the BMD system and other voting practices.[75] The timing of the relief sought plays a paramount role in the evaluation of the practicality of granting the requested remedy at this point.

Litigation since Plaintiffs' amendment of their claims to include a challenge to the BMD system as a whole has stretched on since October 2019, with plenty of delays occurring. But these delays were not attributable to any lack of litigation diligence or aggressiveness on Plaintiffs' counsel's part. For a variety of reasons, including multiple motions to dismiss that stalled discovery, the Court's own schedule especially after the advent of the Covid-19 pandemic, and challenges posed by the difficulty of the case as a whole, Plaintiffs' motions for preliminary injunction were not heard until September in this Presidential election cycle year. Some evidentiary challenges at that point reared their heads. Due to Dominion's own historic unwillingness to provide independent cybersecurity researchers with access to the Dominion Suite software and equipment package (through sale or otherwise), Plaintiffs obtained only last-minute, court-ordered access to the Dominion system for hands-on testing. Finally, as State Defendants have not maintained a practice of regular independent cybersecurity testing and evaluation of vulnerability issues in their own systems impacting the elections realm and had asserted work product privilege over the one extant report, these types of reports were not available to the parties or Court when the hearing was about to commence.

Plaintiffs have presented a massive and complex record in this matter for the Court's review that has consumed its attention for long swaths of time. Plaintiffs also in the course of their hearing preparation presented an expanded array of expert affidavits as well as voter and election evidence, collected primarily from the June and August 2020 statewide primary and runoff elections. These elections produced more substantive empirical evidence and helped to bring into sharper focus the evidentiary issues in this case.

Defendants also have presented substantive evidence in support of their overarching legal defense. They generally minimize the claims, concerns, and risk threats documented in Plaintiffs' challenge. At core, the State Defendants' counsel argue that Plaintiffs' legal claims boil down to their disagreement with the policy choices legally vested in the Secretary of State and State Election Board's purview. In turn, they contend that Plaintiffs have suffered no cognizable threat of harm or burden in their exercise of their First and Fourteenth Amendment rights. Defendants also maintain that they have taken sufficient proactive measures in implementation of the new voting system to ensure its security and reliability.

The preliminary injunction hearing started on September 9, 2020 and concluded on September 13, 2020. But that was not the end, by any means, of the parties' continuing supplemental submissions to the Court. And record developments such as the State Defendants and Dominion's last-minute introduction of a modified system-wide software change to the voting system and dealings with the EAC continued to roll out before the Court – some of which was directly relevant to the evidentiary issues before the Court. Early voting in Georgia with the use of BMD voting machines, will commence now in one day, on October 12, 2020.

Some of Plaintiffs' claims pursued involved discrete and limited relief that do not upset the election apple cart. The Court has considered relief in two instances where there was strong evidence of state-imposed burdens to Plaintiffs' First Amendment constitutionally protected exercise of the franchise as well as narrowly tailored relief that was fully consistent with state law. The Court in those instances balanced the state's interests and burdens as well as relief issues relative to the operation of the elections before granting any form of narrowly tailored relief or delaying such relief until after the election. Indeed, the Court's Pollbook relief[76] was expressly framed based on the State's emergency ballot voting statutory and regulatory provisions to ensure that these emergency procedures could pragmatically be implemented on Election Day, November 3, 2020, if necessary so as to mitigate the severe burdens experienced by Plaintiffs and other voters in casting votes in the new BMD-equipped system during the June and August 2020 elections.

By comparison, the Plaintiffs' BMD systemic injunctive challenge and request for replacement of the system with hand-marked paper ballots pose relief issues of an entirely different, more expansive scope. After reviewing all of the evidence in scrupulous detail, the Court must step

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

back at this juncture, despite the persuasive evidence that Plaintiffs have provided. Plaintiffs' central claim seeks statewide relief, requesting that the Court enjoin implementation of the State's newly designated BMD voting system under O.C.G.A. § 21-2-300 and require instead the state's implementation of a hand-marked ballot system in its 159 counties. The problems posed obviously go beyond whatever the State's and counties' purported capacity issues are in connection with the purchase of ballot paper stock or printing arrangements. The requested relief would entail a fundamental modification in the election system that the Secretary of State and county election offices are not now equipped or prepared to administer. The Court has already seen in the record of this case enough election chaos, operational deficiencies, and challenges on all levels, plus stress in the system spiked further by Covid-19 complications, that the Court cannot embrace a rosy view of the simplicity of moving to a total, comprehensive paper ballot system with so little time to prepare for such a major transition. And this would likely have been true also even if such relief had been ordered on September 15th, the day after the injunction hearing concluded, based on election operations evidence presented in connection with the hearing. The substantial risks and long-run threats posed by Georgia's BMD system, at least as currently configured and implemented, are evident. However, the Court – especially after reviewing evidence regarding election staff management and operations challenges in the June and August 2020 elections – cannot envision that state and county elections staff (including paid temporary contract personnel) would be equipped to move the system and voters through such a major operational change without chaotic disruptions occurring anew.

Risks are posed both by a sudden shift to a statewide hand-marked paper system and proceeding with the BMD system. Ultimately, the Court must find that imposition of such a sweeping change in the State's primary legally adopted method for conducting elections at this moment in the electoral cycle would fly in the face of binding appellate authority and the State's strong interest in ensuring an orderly and manageable administration of the current election, consistent with state law. So, for this reason alone, despite the strength of Plaintiffs' evidence, the Court must decline the Plaintiffs' Motions for Preliminary Injunction.

### C. Coalition Plaintiffs' Claims Relating to Ballot Secrecy

The Coalition Plaintiffs seek to enjoin the use of BMDs

on the basis that they severely burden the fundamental right to vote by depriving voters of secrecy of the ballot. They assert two theories as to how BMDs result in the deprivation of ballot secrecy: (1) the large size of the BMD touchscreens, if not configured to shield the screens from public view, permit anyone in the polling place to observe how a voter is voting; and (2) the precinct scanners record timestamp information such that a voted BMD ballot card can be traced back to the individual in-person voter by comparing the timestamps on the scanned cast vote records with the order in which voters used the machines.

[16]In support of their first challenge, the Coalition Plaintiffs presented declaration testimony from 7 individuals who served as poll watchers in the June and August elections that the BMD touchscreens were clearly visible to the public from 30 to 50 feet away during the voting process. Additionally, there was some affidavit evidence of voter discomfort at the perception of the exposure of the voting process. (*See* Doc. 853-4 at 25.) Despite these observations, Plaintiffs have not established a resulting First Amendment injury where there is no evidence from any Plaintiff or any other voter claiming that the publication of their vote selections subjected them to threats, harassment, reprisals, or other "chilling" of the free exercise of the franchise from either Government officials or private parties. *See Buckley v. Valeo*, 424 U.S. 1, 64, 74, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 343, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (noting that the "respected tradition of anonymity in the advocacy of political causes ... is perhaps best exemplified by the secret ballot, the hard-won right to vote one's conscience without fear of retaliation"); *Citizens United v. Federal Election Comm'n*, 558 U.S. 310, 366-67, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010).

For Plaintiffs, this is an all or nothing proposition, as they seek to enjoin the BMDs outright and do not propose other solutions to the ballot secrecy problems posed by the oversize BMD touchscreens. However, it is not necessary to scrap the new voting machines where a less burdensome fix exists. Georgia's Election Code places the responsibility of arranging voting equipment at polling places to ensure voter privacy with "the governing authority of each county and municipality." O.C.G.A. § 21-2-267. The Secretary of State's Office has undertaken measures to instruct local election officials on proper polling place layout and arrangement of BMDs to maintain voter privacy. (Harvey Decl. ¶ 3, Doc. 834-3; Ex. 1 to Harvey Decl., Doc. 834-3 at 7-11) ("The Secretary of State's office has provided guidance to county election officials about the setup of precincts so

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

that [touch]screens will not be visible to other voters when they are being used by a voter."). If the counties fail to follow the requirements of O.C.G.A. § 21-2-267 and the guidance provided by the Secretary of State and voter privacy rights are violated, the State Election Board can undertake an investigation and/or enforcement action as necessary.

In support of their second contention, Plaintiffs assert that the "Dominion precinct scanners record timestamp information directly onto the digital cast vote record that is created when a ballot is scanned, with the result that a voted BMD ballot card can easily be connected afterward with the individual voter who cast that ballot by simply comparing the scanned cast vote records (ordered by timestamps) with the order in which voters are observed going through the voting process." (Br. Supp. Mot., Doc. 809-1 at 32-33.)

[17]The Coalition Plaintiffs have not offered a single instance of actual infringement of voter anonymity as a result of the use of digitally recorded scanner timestamp records. And despite the lack of evidence of any local election official going to such great lengths to discover how someone voted, the evidence in the record describing and illustrating how the precinct scanners actually operate does not bear this out.

Instead, the Coalition Plaintiffs rely on scanned ballot images from Fulton County bearing timestamps recorded by the ICC central count scanner used to tabulate absentee and provisional ballots by election personnel at the county election office. The timestamp recorded on the digital record of ballots tabulated by the ICC correlates to the time the ballot is run through the scanner by an election official and has no demonstrated correlation to the individual voter having marked an absentee ballot at home (or a voter having marked a provisional ballot at the precinct). See O.C.G.A. § 21-2-386 (providing that "[t]he process for opening the inner envelopes of and tabulating absentee ballots on the day of a primary, election, or runoff as provided in this subsection shall be a confidential process to maintain the secrecy of all ballots). The Coalition Plaintiffs have not offered any theory to suggest that absentee and provisional ballots can be linked back to individual voters using the timestamp recorded in the digital record by the ICC central scanner.

Unlike the ICC central scanner, the ICP precinct scanner does not record a digital timestamp on the ballots of in-person voters. Rather, ballots scanned on the ICP precinct scanner/tabulator includes a "randomized sequence number" that "preserves voter anonymity as there is no way to correlate the sequence number to either an individual voter, or a specific point in time that the ballot was cast. When results and images are stored on the removable memory (Compact Flash cards), no date-timestamp information is included which prevents the ability to recreate the sequence of how the ballots were cast thus preserving voter anonymity." (Coomer Decl. ¶ 10; Doc. 821-1; see also Ex. 19-A to Decl. of Marilyn Marks, Doc. 853-4 at 6 (showing ballot image from ICP scanner without any timestamp).) Dr. Coomer confirmed this again at the September 11 hearing, stating that there is no timestamp associated with ballot images scanned and stored in the digital cast vote records created by the ICP precinct scanner/tabulator. (Tr. Vol. II at 91-92.)

Accordingly, the Coalition Plaintiffs have failed to establish a likelihood of succeeding on the merits of their claim that the BMD system violates their right to ballot secrecy.

### D. Hand-Ballot Scanning and Its Impact on Counting of the Vote

The Coalition Plaintiffs request that the Court require the State Defendants "to adopt scanning threshold settings for the Dominion scanners and vote review procedures that will ensure all voter marks on mailed and hand marked paper ballots are counted." (Br. Supp. Mot., 809-1 at 10.) They assert that the Dominion scanner and tabulation software and equipment are failing to count all legal votes as defined under Georgia law, resulting in an unconstitutional denial of review of the ballot before arbitrarily discarding perceptible ballot votes containing such marks. Plaintiffs contend that Defendants' challenged practices in connection with scanning and tabulation of such hand ballot votes violate Georgia law, which requires votes to be counted if the intent behind a voter's mark can be ascertained upon review. See O.C.G.A. §§ 21-2-438(b)& (c); see also O.C.G.A. § 21-2-483(g) (requiring manual review by the vote review panel of any overvote detected by the central tabulator).[77] And Plaintiffs also argue the current system and its configuration is a violation of equal protection because in-person voters who use BMD voting machines are not subject to having their votes rejected by a scanner due to faint marks. Each of the individual Plaintiffs additionally have submitted affidavits in this case indicating that while they strongly prefer to vote in person, they have felt compelled to vote by absentee ballot because of their concerns about whether their ballots would be accurately counted in the State's BMD and prior DRE systems. (Decl. of Donna A. Curling, Doc. 785-3; Decl. of Donna

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

Price, Doc. 785-4; Decl. of Jeffrey H. Schoenberg, Doc. 785-5; Decl. of Megan Missett, Doc. 640-1 at 149-154; Decl. of William Digges, III, Doc. 640-1 at 167-170; Decl. of Laura Digges, Doc. 640-1 at 162-65; Decl. of Ricardo Davis, Doc. 640-1 at 156-160.)

The Coalition Plaintiffs have presented ballot images that they assert are evidence of clear voter disenfranchisement. The 5 ballot images shown below depict actual unadjudicated ballot images from Fulton County's August 11, 2020 election, showing the ICC scanner interpreted as a "blank contest" several voter marks that indicate a clear visible selection for the candidate[78]:





(Pls.' Hrg. Ex. 7; *see also* Decl. of Marilyn Marks ¶ 17, Doc. 809-5; Ex. 19-D to Decl. of Marilyn Marks, Doc. 853-4 at 41.)

The State Defendants assert in opposition to Plaintiffs' motion that "[t]he only possible burden on a voter arising from the scanner-threshold settings is if the voter disregards the instructions that come with the ballot. That is not a burden on the right to vote — it is a voter choosing to not follow the required regulatory structure of the state." (State Defs.' Resp., Doc. 834 at 25.) In essence, the State Defendants contend that a voter who marks their absentee paper ballot with a check mark or an X, rather than filling in the oval to the left of the candidate name, does not have a right to have their vote counted. (*See* Suppl. Decl. of Chris Harvey, Doc. 834-3 ¶¶ 4-5) ("The instructions for absentee ballots instruct voters to fill in the bubble next to the preferred candidate name and instructs voters not to make check marks or X to mark their ballot. Tabulating absentee ballots where voters do not follow the instructions takes additional time for county election officials."). Defendants' litigation position, as explained below, is not in line with the requirements of Georgia's Election Code and the State Election Board's regulation providing that if the voter "has marked his or her ballot in such a manner that he or she has indicated clearly and without question the candidate for whom he or she desires to cast his or her vote, his or her ballot shall be counted, notwithstanding

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

the fact that the elector in indicating his or her choice may have marked his or her ballot in a manner other than as prescribed.'"[79] Ga. Comp. R. & Reg. r. 183-1-15-.02(2)(2).

## 1. Operation of the Scanners

The Dominion precinct (ICP)[80] and central count (ICC)[81] scanners do not interpret the text of a hand marked paper ballot.[82] (Decl. of Dr. Eric Coomer ¶ 9, Doc. 658-2.) Instead, the scanners detect votes by reading particular coordinates on the ballot, what is known as a "target area" inside an oval next to a voter's choice as shown below:



(Coomer Decl. ¶ 9; Ex. A to Coomer Decl., doc. 658-2 at 9.) The target areas correlate to the voter choices represented on the ballot. (*Id.*) According to Dominion's documentation,

> When a ballot is fed into an ImageCast tabulator – at the precinct level or centrally – a complete duplex image is created and then analyzed for tabulation by evaluating the pixel count of a voter mark. The pixel count of each mark is compared with two thresholds (which can be defined through the Election Management System) to determine what constitutes a vote. If a mark falls above the upper threshold, it's a valid vote. If a mark falls below the lower threshold, it will not be counted as a vote.

(Ex. M to Decl. of Harri Hursti, Doc. 809-3 at 48.) However, if a mark falls between the two thresholds, in what is known as the "ambiguous zone," it will be deemed as a "marginal mark"[763] and the ballot should be flagged for review by a vote review panel – either manually or using Dominion's vote adjudication software application. (*Id.*) The default scanner threshold settings in Democracy Suite 5.5A for both the ICP and ICC are 12% for the low-end and 35% for the high-end. (Defs.' Hrg. Ex. 4 at 1, Doc.

887-4 at 2.) Dominion's "Democracy Suite 5.5A is not designed to register voter intent from a hand-marked ballot if the vote target area (oval to the left of the choice) is not marked in some manner" and does not meet or exceed the high-end threshold setting. (*Id.*) A visual representation of the threshold interpretation of voter marks is shown below:



(Doc. 809-3 at 48.)

For all elections conducted on the new Dominion voting system to date, including the June 2020 primary and August 2020 runoff elections, the ICP and ICC scanners were set to the default threshold settings. Using these default settings, when a ballot is scanned by either the ICP or ICC scanners, the scanners are programmed to interpret voter marks as follows: (a) any mark deemed by the scanner to be less than 12% darkened within the vote target areas (i.e., ovals) is designated as a blank vote for the given contest; (b) any mark deemed by the scanner to be equal to or greater than 35% darkened within the target ovals is designated as a vote for the choice associated to the target area marked; and (c) any mark deemed by the scanner to be equal to 12% or less than 35% darkened within the vote target ovals is designated as an ambiguous mark. (Defs.' Hrg. Ex. 4 at 1, Doc. 887-4 at 2.) Any ambiguous mark within a vote target oval does not count toward the vote total. (*Id.*) Instead, "[i]t is anticipated that ballots isolated by the ICP or ICC scanners containing scanner-deemed ambiguous marks are adjudicated manually or electronically by the designated election official in order to determine the voter intent that is in question by the ICP or ICC scanners." (*Id.*)

According to the Coalition Plaintiffs' expert Harri Hursti, Dominion's precinct and central count scanners cannot be relied upon to accurately count all votes using the default threshold settings and the current configuration for image resolution. (Tr. Vol. I at 125.) In addition to the use of arbitrary default threshold settings, Hursti criticizes Dominion's configuration of the ICC central count

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

scanner to intentionally downgrade the resolution quality of the scanned image. Hursti testified that the ICC central count scanner "can be configured to capture higher quality and more information retaining images" and is capable of producing images of a significant higher order of magnitude than it currently produces based on Dominion's programming. (*Id.* at 126, 133-34.) As Hursti explained, "the way the scanner is used in this environment is like driving your sports car locked on the first gear." (*Id.* at 134.) The central count scanner is recording a lower quality image than it is capable of because "as part of the configuration, that scanner is instructed to produce low quality images with a reduced amount of information." (*Id.*) For example, the image produced by the ICC is only 200 dots per inch ("DPI") which is "a fraction of what the scanner is capable" of producing and the image "has been reduced to have only black or white pixels based on algorithms and so-called business logic and the scanner itself is capable of producing color images and gray scale images." (*Id.* at 135-36.) Dominion also configured the ICC scanner to "drop out" or ignore red pigment from the scanned image. (*See* Ex. E to Hursti Decl., Doc. 809-3 at 40.) As a result, any red markings do "not meet the internal algorithm criteria for black, therefore [red] gets erased to white instead." (Hursti Decl. ¶ 61, Doc. 809-3.)

During the September 10, 2020 injunction hearing, Mr. Hursti explained that he would have expected the ICC scanner to have counted the clear voter marks shown in the ballot images of the Fulton County August 11 election interpreted by the ICC as "blank" contests. (Tr. Vol. I at 136.) The problem according to Hursti is that "the scanner is reducing all information to either black or white and that predetermination tells what the image is recording. And after that, a mathematical algorithm is applied which is only blindly counting how many black and white pixels it sees and based on that make[s] a determination if there is a vote or not. So based on that reduced information, the system didn't cross the threshold to see [those markings] as a vote or even as ambiguous mark[s]." (*Id.* at 137.) An ambiguous mark means "that the system sees something, which it says that it is not clear whether it is a mark or not. And that would have then gone to the human [ballot review] process." (*Id.* at 138.) But in the case of the Fulton County ballot images in Plaintiffs' Hearing Exhibit 7, "the system didn't even see that there would be a mark requiring a human observation." (*Id.*)

The Coalition Plaintiffs conducted an examination of test ballots scanned on the ICP precinct scanner/tabulator using test ballots with various types of markings and different colors of pens. (*See* Pls.' Hrg. Ex. 7.1, Doc. 888-6.) Plaintiffs' Hearing Exhibit 7.1 illustrates two

images of the same ballot produced by two different image resolutions and qualities and the scanner's resulting interpretation of the voter markings from the lower quality scan.[84] According to Mr. Hursti, the visible differences in the two images are "hallmarks of bad quality scanning and bad quality technology." (Tr. Vol. I at 139.) The poor quality of the ballot image scanned on the ICP does not even show the ovals that would be filled in by the voter. (*Id.*) Mr. Hursti believes that for the ICC scanner, the DPI level could be increased from the current 200 DPI configuration to 300 DPI, which is the standard setting for commercial off-the shelf scanners in order to improve the quality of the image of the ballots scanned for interpretation by the system software threshold settings.[85]

During the court-authorized testing of the Dominion equipment supplied by Fulton County, Coalition member Jeanne Dufort marked and scanned a series of test ballots to see how the marks were interpreted and tabulated by the scanner. To replicate the various ways voters might feed paper ballots into the scanner, Dufort scanned the same ballot multiple times "top side up, top first and then bottom first, and bottom side up, top first, and then bottom first to see if it made any difference in how the scanner saw the vote." (*Id.* at 178.) As Dufort described at the September 10 hearing, the test ballot "had five contests on it. Three were races, and two were questions. When I put it through, the first thing I did was put it through each of the four possible ways to feed it. And each time, I got a different message from the scanner. It would return it with an error saying there were ambiguous marks, but it never pointed out the same ambiguous marks." (*Id.* at 179.) More specifically, she testified that "the first time when we put it in face up like you see first, it told us that one SPLOST race, one of the contests on the backside, was ambiguous. The second time when I put it in bottom first, it told me that the liquor sale vote was what was ambiguous and it didn't tell me anything about the SPLOST. The third time when I turned it over and put it backside facing up top end, it told me the SPLOST and one of the judge races was ambiguous. Then the fourth time when I put it backside bottom in, it told me the SPLOST and the liquor sales was in there." (*Id.*) Each of the four times Dufort fed the same ballot through the scanner, she got four different responses from the scanner. (*Id.* at 179-80.) Dufort repeated the experiment again, this time feeding the ballot in the same direction five separate times and still each time she got a different response from the scanner. (*Id.* at 180-81.)

Dr. Eric Coomer, the Director of Security for Dominion Voting Systems disagrees with Plaintiffs' contention that the Dominion scanners either discard or disregard valid

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

votes or do not count certain marks as a vote even though the marks are obvious to the human eye as indications of a vote. (Tr. Vol. II at 73, 77.) According to Dr. Coomer, the system is simply scanning the image and detecting the percentage fill of the target area. Based on the settings, it will automatically say whether it is a valid counted vote, whether it is an ambiguous mark, or whether the system does not characterize it as any. "There are further processes in the system, mainly adjudication, which allows secondary review – voter review for voter intent issues, which is integral to the system, which is where you can apply voter intent guidelines and processes to essentially characterize a vote that the system is not automatically specifying as a vote." (Id. at 73.)

During the hearing on September 11, 2020, Dr. Coomer was shown the Fulton County ballot images in Plaintiffs' Hearing Exhibit 7. Although Dr. Coomer disagrees with the contention that the scanners do not count certain marks that are visible to the human eye as votes, he admits that the mark shown by candidate Theodore "Ted" Jackson's name on the first page of Plaintiffs' Hearing Exhibit 7 looked like a vote to him but that according to the AuditMark created at the time of scanning, the ICC did not recognize the mark as a vote and did not count it as a vote. (Id. at 73-74.) Dr. Coomer also admitted that if a voter's mark is below the low-end threshold, it does not register as either an ambiguous mark or a vote. (Id. at 77.) According to Dr. Coomer's hearing testimony, the AuditMark created at the time of scanning, which contains the text indicating how the scanner interpreted the voter mark, does not indicate whether the ballot fell within the ambiguous threshold required for adjudication. (Id. at 75.) Therefore, one cannot tell from the AuditMark for the ballot image at page one of Plaintiffs' Hearing Exhibit 7 whether the ballot was flagged for adjudication. (Id.) Dr. Coomer stated that the "AuditMark simply shows everything that was counted as a vote. There is additional metadata in the cast vote record, which is the electronic record, that includes information about ambiguous marks. And that is the data that is used to determine whether it is sent to adjudication." (Id. at 78.) But then when asked "[i]f the ballot in this particular case had been adjudicated to be a vote, would that adjudication show up on this AuditMark?," Dr. Coomer replied "Yes, it would." (Id.) And again, he was asked "if it had been adjudicated in the course of a normal election process, you would have seen that on the AuditMark in front of us; right?," Dr. Coomer responded, "Yes. Yes."[86] (Id. at 79.) But the AuditMark on this ballot – Hearing Exhibit 7 – did not reflect that it had been flagged for adjudication.

Dr. Coomer also disagrees with Mr. Hursti, testifying that the accuracy of the ICP and ICC scanners "has absolutely nothing to do with the scanner resolution, the DPI setting." (Id. at 72.) According to Dr. Coomer, because the "Dominion scanners capture the percentage fill of the targets for every mark that is made on the ballot, that has absolutely nothing to do with the scanner resolution, the DPI setting, whether a mark is characterized as a ballot vote, an ambiguous mark, or not a vote is wholly dependent on the threshold settings of the lower and upper threshold limits as well as the percentage fill of the target detected by the system." (Id.) He went on to "categorically state that going from the current 200 DPI to some higher level of 300 DPI does not improve the accuracy of the system." (Tr. Vol. II at 147.) Referring back to the ballot images in Plaintiffs' Hearing Ex. 7, Dr. Coomer explained that "just to put it simply, we have all seen the images. And the images clearly show the voter's mark ... if you had a physical ballot and you had some mark on there and then you showed the [scanned ballot] image and that mark wasn't there, then we could talk about DPI. But the fact is we're looking at the image. The mark is there" so the issue is "not the fact that the image is not, you know, sufficiently fine enough resolution to capture that." (Id. 147-48.) But, the ballot images in Plaintiffs' Ex. 7.1 show the exact scenario Dr. Coomer admits might indicate a problem with low DPI resolution. In these side-by-side images of the same ballot, the first image scanned at high resolution shows clearly the voter marks while the second image scanned on the ImageCast shows several of the voter marks having been erased by the system and some portions of the ballot printing totally distorted due to the poor image quality.

Dr. Coomer also attempted to explain why Jeanne Dufort experienced inconsistent results when she scanned the same ballot through the ICP scanner multiple times. According to Dr. Coomer, "the scanners have what is called a CIS array. It is contact image sensor array. That is what is used to actually digitize the image of the ballot. And those inherently, like all electronic systems, have some variability, plus or minus ten percent. So on one scan you could certainly have a target area that registers 12.5 percent and you round that up to 13. And on the next scan it could be 11.9 percent. There is inherent variability in all electronic systems ... that is irrespective of the resolution setting that's on the system. (Tr. Vol. II at 148-149.)

### 2. Vote Review Panel Evidence

The Coalition Plaintiffs presented testimony from individuals who either served on or observed vote review panels. According to Coalition member Jeanne Dufort,

who testified at the September 10 hearing and serves on the adjudication panel in Morgan County, the vote review panel "makes up for the limits of technology. We take ballots that can't be scanned or ballots that have marks that the scanner can't interpret, and we put human eyes on them. So I like to think of us as backstop to make sure that every vote ... where voter intent is clear gets counted." (Tr. Vol. I at 171.) Under the new system, counties have the option to use the Dominion adjudication software to review scanned ballot images cued up on a computer screen. (Id.)

Adam Shirley served on the Clarke County Vote Review Panel for the June 9, 2020 Presidential Preference Primary and General Primary. (Decl. of Adam Shirley, Doc. 809-7.) Out of approximately 15,000 scanned absentee ballots, about 350 were flagged for adjudication by the software. When adjudicating a ballot, a scanned image of the complete ballot was displayed on the screen. The software indicated the flagged contests for human review by outlining them in red. The software used highlighting to indicate how it had interpreted the voter's mark. This highlighting was used for the entire ballot, not only the contests that were flagged for adjudication. Green highlighting indicated the software recognized the mark as a vote and counted it unless it was also flagged as an overvote. Yellow highlighting indicated the software categorized the mark as ambiguous and would not be counted until there was a vote review panel adjudication. When at least one oval in a contest was darkened sufficiently to be categorized as "ambiguous," the software highlighted the ambiguous option(s) in yellow, outlined the contest in red, and sent the entire ballot to an adjudication queue. Below is an example illustrative of the adjudication screen:



(Exhibit 2 to Shirley Decl., Doc. 809-7 at 12.)
The most common reason for ballots to be flagged as ambiguous was the voter having marked their intent with check marks or X marks. The Clarke County review panel adjudicated vote marks categorized as "ambiguous" to count votes that were clear as to voter intent. The panel took the approach that for any votes flagged for adjudication, the vote should be counted if voter intent was clear from the on-screen image. In its review, the panel attempted to answer two questions: (1) could the voter's intent be discerned?; and (2) what was that intent? While only a simple majority was required, the bipartisan vote review panel's decision on each ballot reviewed was unanimous.

In the course of reviewing the entire ballot to inform their adjudication of flagged contests, the panel discovered clear ballot markings made by the voter that had not been highlighted by the software for adjudication. These markings were not counted as a vote (and therefore were not highlighted in green by the software) nor were they categorized as ambiguous (and therefore were not highlighted in yellow by the software). Below is the scanned image on one such marked ballot.

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

(Ex. 3 to Shirley Decl., Doc. 809-7 at 13.) The top and middle contests bear the red box flagging them for adjudication and yellow highlighting showing marks the software has classified as ambiguous. The bottom contest, though clearly marked by the voter, bears no red box or highlighting of any kind. This shows the software did not count that vote and was programmed not to send such a ballot to adjudication. The system seemed to simply ignore such votes.

In every instance the panel encountered where the system had not counted such votes (or flagged them for adjudication), the review panel agreed without question that the voter had made their intent clear though the vote had not been counted. The panel therefore instructed the software to count the previously-ignored votes on the ballots, although the software had not flagged these particular votes for adjudication by the panel. Based on his review of hundreds of ballots, it is Shirley's opinion that it is possible that there were ballots with uncounted votes that would never be corrected by human review because no other marks on those ballots triggered flagging for adjudication.

The vote review panel expressed these concerns to elections staff, Election Director Charlotte Sosebee, and the Board of Elections. In response to these concerns, the Board of Elections ordered a pre-certification partial recount of only the absentee ballots for 5 of Clarke County's 24 precincts. The partial recount took place on June 17. The Election Board was not authorized by statute or rule to conduct a recount using any method other than what had been used for the first count. In the recount, 2,665 absentee ballots were re-scanned and 76 ballots were flagged for adjudication. For those 76 ballots, the vote review panel unanimously agreed that 35 individual votes had not been counted by the software. Those votes were spread across 12 separate ballots. A Dominion technician confirmed the software was programmed to classify votes in one of three ways: a normal vote (highlighted in green), an ambiguous mark (highlighted in yellow), and an uncounted vote (which the system recognized, quantified, but was programmed not to count and not to be flagged for review).

As a voter, Shirley finds such a high rate of missed votes – nearly 16% of the adjudicated ballots – to be alarming. He also found concerning the procedures followed by the review panel in not providing a paper audit trail, not verifying the record of changes made to vote tallies, and not referencing the original ballot to determine if the low quality image was an accurate depiction of the voter-marked ballot. Shirley also found troubling that there was no attempt to reconcile the votes added to the vote tally before and after the adjudication process,

leaving the opportunity for unauthorized changes to the tallies by others with access to the system.

Jeanne Dufort, served on the Vote Review Panel for the Morgan County Board of Elections and Registration for the combined Presidential Preference and General Primaries in June 2020. (Decl. of Jeanne Dufort, Doc. 809-6.) When she arrived at 8pm on June 9 for her duties, the elections office was still in the process of opening absentee ballots. Dufort assisted the team in opening the remainder of approximately 3,000 mail ballots. Ballots were scanned from 10pm to 2am. Dufort noticed voters marking their choices in a number of ways, including filling in the oval, circling the oval, making X or check marks, and one who made smiley faces in the oval to mark their selection.

The Vote Review Panel convened on the afternoon of June 10. Morgan County used the adjudication software provided by Dominion. The Election Supervisor Jennifer Doran instructed the Dominion technician to pull up all ballots with overvote and ambiguous marks. There were about 150 out of 3,000 ballots to review. The Morgan County review panel used the same procedure described by Adam Shirley.

The first time the panel encountered a contest with no highlights (meaning it was deemed blank by the software), but with a clearly marked vote, Dufort asked the on-site Dominion technician whether that vote was counted, and he said "of course, that's a vote," and assured the panel it was counted. The panel moved on to the next ballot. This time Dufort asked the Dominion technician to show her the cast vote record for the ballot. It showed "blank contest" for the race with no highlights, despite the presence of a clear vote. By unanimous agreement, the panel adjudicated that contest to show the vote, overriding the inaccurate tabulator software. The panel returned to the previous ballot and did the same. During the course of review of about 150 ballots, Dufort estimates the panel found and adjudicated about 20 votes that were clearly marked by the voters, but the software had interpreted as a "blank contest."

Dufort attended the Morgan County Election Board meeting on June 11, and spoke about her concerns as a review panel member and the need to expand the adjudication process to determine whether other votes had been rejected by the system. The Morgan County Election Board denied the motions of board member Helen Butler to expand the adjudication process to review the remaining 2,700 mail ballots to see if there were additional uncounted votes.

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

Coalition member Rhonda Martin observed somewhat similar adjudication procedures at the Fulton County Elections Preparation Center on August 14, 2020. (Decl. of Rhonda J. Martin, Doc. 809-4.) The adjudication process took place entirely on a low resolution black and white on-screen image, without looking at the original paper ballot. Based on her observation of the two vote review panels used by the Fulton County elections office, the panel members quickly clicked here and there and switched from one view to another as they examined the ballot images, without making a record of who approved each vote change or why the decision was made. Martin also observed that at times, the panel members appeared to almost forget to confer with one another and confirm that they agreed on the interpretation of the vote because they were so focused on operating the adjudication software.

Of the ten ballots Martin observed being adjudicated, three appeared to be completely blank with no votes marked anywhere on the ballot. The first review panel to encounter a blank ballot with no single vote shown paused to ask the Registrations Chief, Ralph Jones, what to do. After waiting for a while for Mr. Jones to finish up with the second review panel, the first review panel decided to accept the blank ballot so they could continue adjudicating other ballots. They did not request to see the original paper ballot to confirm that it was, in fact, blank. While not impossible, Martin found it odd that a voter would go to the trouble of returning a ballot with no vote marks at all.

### 3. The Secretary of State's Center for Election Systems Study on Scanner Settings

When Plaintiffs filed their motion in August 2020, the State Election Board was considering proposed revisions to the regulation providing for "the definition of a vote" to designate specific settings for the ballot scanners used to tabulate optical scan ballots marked by hand. Plaintiffs' expert Harri Hursti asserted that before the State sets threshold standards for the Dominion system, extensive testing is needed to establish optimal configuration and to identify a setting that will not have the widespread effect of discarding at least some valid votes. (*See* Hursti Decl. ¶ 77, Doc. 809-3.) At that time, neither Mr. Hursti nor the Plaintiffs were aware of a study undertaken by the Center for Election Systems of the Secretary of State's Office in July of 2020 to determine "how various reductions to the default, ambiguous mark threshold setting within Democracy Suite 5.5A would impact the scanning and interpretation of ambiguously marked ballot samples" on

the ICC central count scanner. (Defs.' Ex. 4 at 1, Doc. 887-4 at 2.) "The examination was done in an effort to increase absentee ballot scanning efficiency and reduce the need to adjudicate ballots that reflect a clear voter intent." (*Id.*) A draft copy of the report prepared by CES's Michael Barnes was subsequently produced during expedited discovery prior to the injunction hearing.

As further explained in the draft report, CES undertook an examination to determine whether "the high-end setting of 35% is forcing election officials to review ballots that should instead be processed as marked by the ICC scanner on the initial read by the IC scanner" and counted as a valid vote. (Defs.' Ex. 4 at 2, Doc. 887-4 at 3.) Because "Democracy Suite 5.5A gives the end user the ability to adjust ambiguous mark threshold settings used by the Dominion scanners to interpret voter intent on hand-marked optical scan ballots," CES ran ballot test decks through the ICC scanner using various threshold settings. (Defs.' Ex. 4 at 1, Doc. 887-4 at 2.)

At the start of the examination, a "test deck of 100 hand-marked optical scan ballots was prepared. The instructions at the top of the ballot instruct the voter to fill in the oval next to the candidate of their choice. The filling in of the oval (vote target area) is designed to provide a clear intent for the ICC scanner to interpret." (Defs.' Ex. 4 at 2, Doc. 887-4 at 3.) To examine the various ways the scanner might interpret different marks, the testers did not fill in the vote target areas as instructed. Instead, "testers placed a variety of marks that only darkened a portion of the vote target areas" on the deck of test ballots. "Testers also used differing marking devices (i.e., blue ink, black ink, red ink, pencil, etc.) and marking pressures." On some ballots, testers marked outside the vote target area (by circling or underlining the candidate name rather than filling in the oval) "to confirm that marks [placed] outside the vote areas would not be recognized" by the scanner. (*Id.*)

Each test ballot had three contests with a total of 6 vote target areas (two ovals per contest). "Testers used the same type of variable mark within each of three contests when marking a ballot in an attempt to simulate how an individual voter would most likely mark each oval on their ballot in the same manner throughout." (*Id.*) As described in the CES draft report, the scanner will interpret a marked ballot in one of three ways: (1) Marked – the scanner will "interpret the mark within all vote target areas on the ballot and increment vote totals and ballots cast total forward" (the mark falls above the high-end threshold and is counted as a vote); (2) Blank – the scanner "will interpret the vote area as not including a mark and would not increment vote total forward, but

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

would increment the ballots cast forward" (the mark falls below the low-end threshold and is not counted as a vote in the vote totals); and (3) Ambiguous – the scanner will "not be able to determine marks and set the ballot aside for review" (the mark falls below the high-end threshold to count as a vote but above the low-end threshold to register as a blank). (*Id.*)

After marking the test ballots, the test deck was scanned a total of two times on an ICC scanner configured with the default low-end 12% and the high-end 35% settings. This process created two batches collected by the ICC scanner, each batch containing 100 ballots. Each batch was then loaded into Dominion's Adjudication Client application. The Adjudication Client application was set to review all ballots within the batch and isolate any ballots containing Ambiguous Marks, Blank Ballots, and Overvotes (the standard Adjudication Client settings). The testers created 6 criteria into which each ballot could fall under for

review: (1) Marked – all contests on ballot contained a single interpretable mark; (2) 1/3 Ambiguous – one of the three contests on the ballot contained a mark requiring review; (3) 2/3 Ambiguous – two of the three contests on the ballot contained a mark requiring review; (4) Ambiguous – all three contests on the ballot contained a mark requiring review; (5) Blank Ballot – all three contests on the ballot contained no interpretable marks; and (6) Overvote – all contests on ballot contained multiple interpretable marks. (Defs.' Ex. 4 at 2-3, Doc. 887-4 at 3-4.)

Upon completing the review of each scanned batch within the Adjudication Client software, the testers documented the following results:

| | |
|---|---|
| • Marked | 53 |
| • 1/3 Ambiguous | 15 |
| • 2/3 Ambiguous | 11 |
| • Ambiguous | 12 |
| • Blank | 9 |
| • Overvote | 0 |

(Defs.' Ex. 4 at 3, Doc. 887-4 at 4.) A total of 47 ballots required some level of review after being processed by the ICC. The testers were concerned that nearly half of the test deck required additional review to determine voter intent.

In an effort to assess what impact a reduction in the high-end setting level would have on potential ambiguous marked ballots being registered on the ICC, testers reduced the default high-end setting 3 times: from 35% to

30%, from 30% to 25%, and finally from 25% to 20%. (Defs.' Ex. 4 at 3-5, Doc. 887-4 at 4-6.) In the third test pass, the testers ran the test deck through the scanner following the same protocol but the ICC scanner was configured with the low-end default setting of 12% but the high-end setting was reduced from 35% to 20%. (Defs.' Ex. 4, Doc. 887-4 at 5.) Using a high-end setting of 20%, testers documented the following results for each batch within the Adjudication Client software:

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

- Marked                                                                                  70

- 1/3 Ambiguous                                                                      10

- 2/3 Ambiguous                                                                      8

- Ambiguous                                                                            1

- Blank                                                                                      10

- Overvote                                                                               1

(Defs.' Ex. 4 at 4-5, Doc. 887-4 at 5-6.) With a low-end 12% and high-end 20% setting, there was a 36% reduction in the number of ballots (47 to 30) after scanning needing further review, in relation to the original default setting. (Defs.' Ex. 4 at 5, Doc. 887-4 at 6.) The adjustment of the high-end setting down to 20% also resulted in 17 more ballots being processed as marked (an increase of 53 to 70) and voter intent being registered and tabulated without need of further review or adjudication. The reduction to 20% also resulted in a potential overvote being detected in the test deck that had previously been undetected using the higher high-end settings. This reduction in the high-end setting from 35% to 20% also decreased the number of ballots with all three contests registering ambiguous marks from 12 ballots down to 1 ballot. The reduction did not eliminate the presence of ambiguous marks, but it does appear to reduce the number

of instances where the review of all contests on a ballot would be needed. (*Id.*)

In an effort to reveal if there were any additional ambiguous marks that could be detected and made available for review to users, the testers reduced the low-end threshold setting from 12% to 10% (keeping the high-end at the adjusted 20% threshold). (*Id.*) The testers ran the test deck through the scanner following the same protocol described above, but the ICC scanner was configured with the low-end at 10% and the high-end at 20%. Using this configuration, testers documented the following results upon reviewing the test ballots within the Adjudication Client software:

- Marked                                                                                  71

- 1/3 Ambiguous                                                                      13

- 2/3 Ambiguous                                                                      6

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

- Ambiguous                                    2

- Blank                                        7

- Overvote                                     1

(*Id.*) With the low-end 10% and high-end 20% settings, there was a 38% reduction in the number of ballots (47 to 29) after scanning needing further review, in relation to the original default setting. This configuration reduced the number of instances of ambiguous (12 to 2) and blank ballots (9 to 7) from the original default settings. Under these settings, 29 ballots remained as needing some physical review. (Defs.' Ex. 4 at 6, Doc. 887-4 at 7.) Of those 29, 7 ballots were seen by the ICC as completely blank. Upon physical review of the 7 ballots, 5 ballots contained no physical mark anywhere within the vote target oval, but did have the candidate name circled or underlined. The remaining 2 ballots seen as blank by the ICC, upon visual review, did have discernable marks within the vote target area, however, the mark was made with red ink. While it did not remove the detection of ambiguous marks or blank ballots, it does appear the combination of these settings eliminated the need to review some ballots and reduced the number of contests per ballot needing review when a ballot review was detected. (Defs.' Ex. 4 at 5, Doc. 887-4 at 6.)

During the assessment, the testers made note of whether the type and placement of marks in and around the vote target oval had an impact on the scanner's interpretation. (Defs.' Ex. 4 at 6, Doc. 887-4 at 7.) In addition to partial filling in of the vote target oval, the ICC scanner registered various types of marks, including an X, checkmark, dash, and dots, when they were placed within the vote target oval. The darker the mark within the vote target area, the easier the ICC registered the mark. These findings indicate that instructions to voters should inform the voter to fill in the oval next to the candidate name and to avoid circling, underlining, or placing checkmarks or Xs, or otherwise marking the candidate name outside the vote target oval. Voters should also be warned to NOT use red ink.

**4. Georgia's Election Code and Regulations Pertaining to Optical Scan Ballots**

Based on the results of the CES study in July 2020, the State Election Board proposed a rule adopting the adjusted threshold settings that was. The regulation, approved by the Board on September 10, 2020 now provides:

> Ballot scanners that are used to tabulate optical scan ballots marked by hand shall be set so that:
>
> 1. Detection of 20% or more fill-in of the target area surrounded by the oval shall be considered a vote for the selection;
>
> 2. Detection of less than 10% fill-in of the target area surrounded by the oval shall not be considered a vote for that selection;
>
> 3. Detection of at least 10% but less than 20% fill-in of the target area surrounded by the oval shall flag the ballot for adjudication by a vote review panel as set forth in O.C.G.A. 21-2-483(g). In reviewing any ballot flagged for adjudication, the votes shall be counted if, in the opinion of the vote review panel, the voter has clearly and without question indicated the candidate or candidates and answers to questions for which such voter desires to vote.

Ga. Comp. R. & Regs. 183-1-15-.02(2)(k).

The State Election Board's regulation providing for the definition of a vote, states that for optical scan paper ballots, the voter must "fill in the oval" to mark their vote choice. Ga. Comp. R. & Regs. 183-1-15-.02(2)(a). Where an optical scan ballot marked by hand has been

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

rejected by the scanner/tabulator as containing an overvote in accordance with O.C.G.A. § 21-2-483(g), in reviewing such a ballot: (1), if "it appears that there is a properly cast vote and what is clearly a stray mark which has caused the ballot scanner to read the vote for such office as an overvote, the properly cast vote shall be counted and the stray mark shall be ignored;" and (2) if "a voter marks his or her ballot in a manner other than that specified by law and this rule, the votes shall be counted if, in the opinion of the vote review panel as provided in O.C.G.A. § 21-2-483(g)(2)(B), the voter has clearly and without question indicated the candidate or candidates and answers to questions for which such voter desires to vote." Ga. Comp. R. & Regs. 183-1-15-.02(2)(c)&(d). Under O.C.G.A. § 21-2-483(g)(1), "[t]he central tabulator shall be programmed to reject any ballot, including absentee ballots, on which an overvote is detected and any ballot so rejected shall be manually reviewed by [a] vote review panel ... to determine the voter's intent as described in subsection (c) of Code Section 21-2-438." O.C.G.A. § 21-2-438(c) in turn provides that "if the elector has marked his or her ballot in such a manner that he or she has indicated clearly and without question the candidate for whom he or she desires to cast his or her vote, his or her ballot shall be counted and such candidate shall receive his or her vote, notwithstanding the fact that the elector in indicating his or her choice may have marked his or her ballot in a manner other than as prescribed by this chapter."

Similarly, "[i]f, in reviewing an optical scan ballot marked by hand, a discrepancy is found between the voter's mark on the ballot that clearly and without question indicated the voter's intent and the result tabulated by the ballot scanner, the voter's mark shall control and be counted." Ga. Comp. R. & Regs. 183-1-15-.02(2)(2)(e). Finally, "[w]hen an optical scan ballot marked by hand contains stray marks or marks which prevent the ballot scanner from properly recording valid votes as determined under this rule and by law, the ballot shall be duplicated in accordance with law to correct such problems and the duplicate shall then be tabulated." Ga. Comp. R. & Regs. 183-1-15-.02(2)(2)(f). The regulation further provides that "[n]othing herein shall be deemed to disallow the use of ballot scanners for tabulation of ballots." Ga. Comp. R. & Regs. 183-1-15-.02(2)(2)(e).

### 5. Plaintiffs' Proposed Remedy

Coalition Plaintiffs seek from this Court "[a]n order commanding the State Defendants to standardize required settings of Dominion precinct and central ballot scanners and related tabulation software to ensure that all perceptible votes written on mailed and hand marked paper ballots are either counted as votes or flagged for human review by a Vote Review Panel, and requiring that Dominion scanner sensitivity settings and tabulation software be uniform across all counties." (Mot., Doc. 809 at 2). According to their motion, the full problem with the ballot scanners will not be solved by the State's new rule, but it can be solved by restraining the State from requiring scanner settings that automatically discard any degree of perceptible voter markings. In response, the State Defendants assert that Plaintiffs do not propose any solution beyond ensuring every single stray mark on every hand-marked ballot is reviewed by a human.

For the reasons that follow, the court will not grant the requested relief for the November general election based on pragmatic timing considerations where absentee voting has already begun and alteration of the scanner settings would require changes to the election system database and would result in disruption of the ongoing administration of the election by the State and the Counties. Instead, the Court has directed the State to itself explore and determine whether a solution exists for the discounting of votes resulting from system deficiencies in the tabulator/scanning and the potential implementation of remedial measures in time for any runoffs in January 2021.

There is no question that the default scanner settings used in elections conducted to date on the Dominion system caused certain voter marks to register as blank and therefore prevented some valid votes on hand-marked ballots from being counted. (See ballot images at Doc. 809-5.) The testimony of the vote review panelists clearly establish the differences between the scanner's perception and human perception of voter intent. In addition, the ballots provided in the record show that different results were reached by the scanners and the vote review panel members about whether voter markings counted. Dr. Coomer acknowledged that the scanners will not count marks that fall below the low-end threshold setting. It is also evident that the State's adjustment of the Dominion default settings (used to date) pursuant to the SEB's newly promulgated regulation will not cause the scanner software to capture all perceptible ballot vote markings and count them as votes in the upcoming November election. (See Defs.' Ex. 4 at 6, Doc. 887-4 at 7) (noting that even after the adjustment, 7 out of 100 test ballots were seen by the ICC as completely blank though voter markings could be discerned upon physical human review).

480 of 497

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

The scanners are programmed to flag overvotes[87] for review and adjudication. They are not, however, programmed to flag undervotes (i.e., blank contests) for review. As evidenced by the Fulton County ballots shown in Plaintiffs' Exhibit 7, the result is that some votes are not recorded by the scanners and are not counted. Under the current procedures used with the Dominion system, these votes escape any review before being rejected – resulting in irreversible voter disenfranchisement.[88] It appears that prior to the use of the Dominion system and introduction of the adjudication software, no voter's ballot choices were getting kicked out based on their visible designations of candidate choices with an X or check mark, as these markings are recognized under Georgia's Election Code as clear manifestations of voter intent. These circumstances are quite troubling and present an opportunity to potentially disenfranchise older voters in particular – based on their historical experience voting under the State's prior systems – at a greater percentage than younger voters.

To decide whether Plaintiffs have established a substantial likelihood of prevailing on the merits of their claim related to the scanner settings, the Court must first "consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendment." *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564. The Court must then "weigh the character and magnitude of the burden the State's rule imposes on those rights against the interests the State justify that burden and consider the extent to which the State's concerns make the burden necessary." *Timmons*, 520 U.S. at 358, 117 S.Ct. 1364.

Here the asserted injury is that Plaintiffs and other absentee mail voters face a risk of suffering a diminished ability to participate fully in the democratic process and to elect the candidates of their choosing if the scanners do not recognize their ballot markings as valid votes. To echo the late Congressman John Lewis, "The vote is precious. It is the most powerful non-violent tool we have in a democratic society, and we must use it." As this Court has repeatedly recognized in this case, "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds*, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). This right carries with it the right not only to cast a ballot but to have it counted. *United States v. Classic*, 313 U.S. 299, 315, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941); *Democratic Exec. Comm. of Florida v. Lee*, 915 F.3d at 1315 ("of course, voting alone is not enough to keep democracy's heart beating. Legitimately cast votes must then be counted"). The loss

of a vote cast is permanent.[89] The significance of the indelible nature of the injury cannot be overstated.

**[18]** It is precisely because of the character and magnitude of the interest at stake that voters themselves have an independent responsibility to proceed with care and caution when exercising the franchise. Georgia has implemented a voting system that relies on the efficiencies afforded by technology. The State Election Board has adopted a regulation for processing and tabulating hand marked ballots using optical scanners that requires the voter to "fill in the oval" to mark their vote choice. *Ga. Comp. R. & Regs. 183-1-15-.02(2)(a)*. Under the regulation, markings that trigger "detection of 20% or more fill-in of the target area surrounded by the oval shall be considered a vote for the selection," while markings that trigger "detection of less than 10% fill-in of the target area surrounded by the oval shall not be considered a vote for that selection." *Ga. Comp. R. & Regs. 183-1-15-.02(2)(k)*. The burden on voters to read and follow the instructions for marking their absentee, provisional, or emergency ballots is minimal.[90] The burden to do so in a manner consistent with the regulation's adopted scanner settings to ensure their vote is automatically accepted by the scanner software is a different matter. Certain well-informed voters may be aware of this new regulation adopted just weeks ago. Other voters may have read recent news articles documenting the problems with Georgia's scanners in failing to recognize certain types of voter markings during the June primary elections. The average voter, however, is likely unaware that their failure to adequately darken the oval to a certain percentage may cause their vote to be rejected by the scanner and in turn, not counted altogether. The Court therefore finds this burden to be more than minimal but less than severe and will apply an intermediate level of scrutiny.

**[19]** The Court must weigh the burden on the right to vote against " 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration the 'extent to which those interests make it necessary to burden the plaintiff's rights.' " *Burdick*, 504 U.S. at 434, 112 S.Ct. 2059 (quoting *Anderson*, 460 U.S. at 789, 103 S.Ct. 1564); *see also People First of Alabama v. Sec'y of State for Alabama*, 815 Fed.Appx. 505, 512 (11th Cir. 2020) (Rosenbaum, J. & Pryor, J., concurring) ("But whatever the burden, no matter how slight, 'it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation.' ") (internal citations omitted).

State Defendants assert that any burden on the right to vote created by the 10% threshold for discarding voter

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

marks is justified by the regulatory interests of the State as outlined by the Secretary of State's Director of Elections, Chris Harvey. Mr. Harvey attested that "[r]equiring a manual review of every stray mark that happens to be in a target area would require significant time by county officials and would result in delays of finalizing results, certifying results, and conducting audits." (Decl. of Chris Harvey, Doc. 834-3 ¶ 9.) According to Harvey, "[u]sing a 10% threshold for scanners minimizes the burden on election officials while still ensuring that ambiguous marks are properly evaluated." (*Id.* ¶ 10.)

The Court understands that the State does not want to make the standard so low that it sweeps in thousands of ballots with actual blank contests and some truly errant marks for adjudication panel review because it might lead to an unreasonably inefficient process and become potentially unmanageable in the timeframe permitted under Georgia law for finalizing the results of the election. However, there is no evidence in the record of any burden on the Counties were the Court to grant some form of relief to address the ballot scanner settings. No evidence has been presented from any county election official to support Mr. Harvey's supposition that changes to the scanner, tabulation, and adjudication software to ensure that all perceptible votes written on mailed and hand marked paper ballots are either counted as votes or flagged for human review by a Vote Review Panel would create an undue administrative burden on county officials and would "result in delays of finalizing results, certifying results, and conducting audits." And notably, Fulton County's response to Plaintiffs' motion is silent on the issue of the ballot scanner settings.

Each county election superintendent must certify the county's consolidated election results not later than 5:00 P.M. on the second Friday following the date of the election (i.e., Friday, November 13, 2020) and immediately transmit the certified returns to the Secretary of State, "provided, however, that such certification date may be extended by the Secretary of State in his or her discretion if necessary to complete a precertification audit." O.C.G.A. § 21-2-493(k). The Secretary of State must certify the election results not later than 5:00 P.M. on the seventeenth day following the date of the election, in this year that date falls on Thursday, November 20, 2020. O.C.G.A. § 21-2-499(b). Prior to final certification, Georgia's election code requires the Secretary of State "[u]pon receiving the certified returns of any election from the various superintendents ... shall immediately proceed to tabulate, compute, and canvass the votes cast," prior to certifying the returns. *Id.* § 21-2-499(a). "In the event an error is found in the certified returns presented to

the Secretary of State or in the tabulation, computation, or canvassing of votes ... the Secretary of State shall notify the county submitting the incorrect returns and direct the county to correct and recertify such returns. Upon receipt by the Secretary of State of the corrected certified returns of the county, the Secretary of State shall issue a new certification of the results." *Id.*

Under these provisions, the counties have ten days to tabulate and certify their results to the Secretary of State,[91] who in turn has an additional seven days to certify the election after a thorough review of the returns. The State Defendants' fear of an unsupported and unquantified "delay" in certification caused by review of additional ballots by a Vote Review Panel is outweighed by the burden on voters. *See Common Cause Georgia v. Kemp*, 347 F. Supp. 3d 1270 (N.D. Ga. 2018) (rejecting the State's argument that remedy requiring measures to ensure proper counting of provisional ballots would delay certification of election under statutory timeline for certification); *Doe v. Walker*, 746 F. Supp. 2d 667, 678–80 (D. Md. 2010) (finding that Maryland's statutory deadline for the receipt of absentee ballots imposed a severe burden on the absent uniformed services and overseas voters that was not justified by the state's interest in certifying election results).

[20]The Court finds that Plaintiffs have satisfied the first two prerequisites for preliminary injunctive relief. Plaintiffs have presented enough evidence to establish a substantial likelihood of success on the merits of their claim that the State Defendants' use of an arbitrary threshold on its ballot scanners to discard voter ballot markings for specific candidates or initiatives that are obvious to the human eye results in a violation of the fundamental right of each voter to have his or her vote accurately recorded and counted. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 451, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (holding that state and local laws that unconstitutionally burden the right to vote are impermissible); *Democratic Exec. Comm. of Florida v. Lee*, 915 F.3d at 1321 (characterizing disenfranchisement by signature mismatch rules as imposing a serious burden on the right to vote); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) ("[E]ven one disenfranchised voter—let alone several thousand—is too many.") The threat of this injury is substantial and irreparable if relief is not granted before the election. *See Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion) (The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018) ("The

Court finds that [p]laintiffs have established irreparable injury as a violation of the right to vote cannot be undone through monetary relief and, once the election results are tallied, the rejected electors will have been disenfranchised without a future opportunity to cast their votes."); *see also League of Women Voters of N.C.*, 769 F.3d at 247 ("Courts routinely deem restrictions on fundamental voting rights irreparable injury ... [because] once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin the law.").

[21]The Court must now consider the requested relief in connection with the two remaining requirements for granting a preliminary injunction: whether the threatened injury to the Plaintiffs outweighs the harm an injunction may cause the Defendants and whether granting the injunction is in the public interest. The Court considers these last two factors "in tandem ... as the real question posed in this context is how injunctive relief at this eleventh-hour would impact the public interest in an orderly and fair election, with the fullest voter participation possible...." *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1326 (N.D. Ga. 2018), *aff'd in part, appeal dismissed in part*, 761 F. App'x 927 (11th Cir. 2019); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4, 127 S.Ct. 5, 166 L.Ed.2d 1 (2006). Indeed, the Supreme Court has recognized that there are special considerations involved with impending elections and the critical issues at stake. In *Reynolds v. Sims*, the Court stated:

> [O]nce a State's [election-related] scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan. However, under certain circumstances, such as where an impending election is imminent and a State's election machinery is already in progress, equitable considerations might justify a court in withholding the granting of immediately effective relief in a legislative apportionment case, even though the existing apportionment scheme was found invalid. In awarding or withholding immediate relief, a court is entitled to and should consider the proximity of a forthcoming election and the mechanics and complexities of state election laws, and should act and rely upon general equitable principles.

377 U.S. at 585, 84 S.Ct. 1362. The Court notes, however, that *Reynolds* is not an inviolable commandment against pre-election injunctions where the constitutional violations are significant, and the relief is not adverse to the public interest.

Plaintiffs' requested relief is based on proposed solutions

of their cybersecurity and scanner expert, Harri Hursti.

First, in his August 24, 2020 declaration, Mr. Hursti called for extensive testing before choosing mandated threshold settings. The Secretary of State's Center for Election Systems conducted an assessment of various scanner settings before landing on the low-end 10% and high-end 20% threshold settings. But the CES did not test or assess thresholds lower than 10%. CES's assessment resulted in a significant increase in the number of marks recognized by the ICC as valid votes and a corresponding decrease in the number of marks characterized as blank votes as well as significant decrease in the number of marks flagged as ambiguous requiring further adjudication. Despite this notable improvement, this one adjustment alone does not address the outstanding injury experienced by a significant number of voters who cast hand marked ballots (and votes) that will continue to be excluded from "counting" although they manifest the voter's electoral designation intent. Based on the results of the CES study as well as other evidence in the record, clearly evident ballot vote markings will not be detected by the Dominion tabulators, and such marks will not be counted as votes absent further exercise of human judgment in review of improved images of the ballots or the original ballots or alternatively, improved screening by the adjudication software. While the precise scope of the affected ballots is unknown, the evidence reviewed indicates that there remains a sufficient volume of impacted voters post implementation of the State's new 10% bottom threshold rule, that these incidents are not errant, isolated cases that can be simply ignored as the incidental vote counting errors or irregularities that can be expected in a large election. Nor are they just "incidental" or accidental "errors" to the extent that the software operates to exclude voting marks that clearly manifest the intent of the voter and therefore must be considered as a vote under Georgia law.

Second, for the ICC central count scanner Mr. Hursti proposes that the current configuration be modified "to allow the scanner to capture the images with a higher resolution and higher amount of information, meaning either color or gray scale images" and to adjust the DPI from 200 to the "current minimum standard of office technology" of 300 DPI.[92] (Vol. I at 143.) He recommends as a stop-gap measure and mitigation for the November 2020 election that the State undertake an examination of the necessary changes to ensure that every vote is counted. (*Id.* at 161-62.)

As previously discussed, Dr. Coomer testified, scanner threshold settings for the Dominion Democracy Suite 5.5-A are not set on each individual scanner. Instead,

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

scanner threshold settings are set when the voting database is built. (Tr. Vol II at 83.) While Dr. Coomer acknowledged that the settings on the central count scanners could be changed before the project is built, he stated that as of September 11, 2020, Dominion is in the midst of building the project for the November election. (*Id.* at 84.)

Accordingly, the Court must consider remedies that go beyond the 10 to 20 percent threshold standard recently adopted by the Secretary of State, while balancing the potential for administrative confusion and serious vote mishaps by any course of action that is not deliberate and properly researched. The Court is not prepared to direct the State to make additional adjustments to the settings prior to the November election because it is not feasible under the circumstances where the voting database has already been built, has been rolled out to the counties, and has already or soon will be undergoing logic and accuracy testing. There are additional challenges of implementing manageable relief where the evidence is not clear that the resolution can be fixed on the software in time or moreover, whether a software fix of ballot image resolution quality would be effective or not in increasing the number of ballot markings that will be automatically read and counted as votes by the scanner/tabulators.

The current adjustments of the default settings adopted by the State in time for the November election lowers the gateway and allows more paper ballots with voter marks such as Xs or checks (rather than oval fill-ins) to be counted or referred for adjudication of voter intent. This change in settings used in the 2019 pilots and the 2020 primary elections, while an incomplete remedy, should be an improved mechanism to address the issue of lost scanned hand marked ballot votes in the voting tabulation in the November election. Plaintiffs as well as the Defendants or County Boards of Election may of course revisit the question of additional relief related to the ballot scanners if there turns out to be more evidence after the election and if huge swaths of voters' absentee, provisional, or emergency paper ballot votes did not count.[93]

That said, the evidence supports a finding that the modified scanner settings may well still result in the rejection of valid votes and ballots falling through the identified crack in the system by failing to flag visibly clear voter marks for adjudication by a review panel. Although the Court will not require further changes to the scanner settings prior to the November election, another potential measure may allow for an expanded review of optical scan hand-marked ballots in connection with the adjudication software. Ballot contests flagged for human

review by the adjudication software appear on the review screen with a red box outline around the contest. The adjudication software assigns green highlighting to voter marks that meet the high-end threshold setting to count as a vote and assigns yellow highlighting to voter marks that fall between the high and low-end threshold settings and deemed by the scanner as ambiguous. Currently, the adjudication software does not assign any highlighting to voter marks that are deemed blank because they fall under the low-end threshold setting.[94] Because the adjudication software is capable of isolating ballot marks flagged as ambiguous, it would make sense that the software could similarly be configured to isolate ballot marks interpreted as "blank." It therefore appears likely that the adjudication software can be used to review ballot images flagged with blank contests to verify that no clearly discernable ballot marks are present on the ballot images that have not been recognized by the scanner software as falling within the designated threshold to constitute a vote.[95] As the vote review panel testimony indicates, the adjudication software allows the reviewer to quickly scan and move through the flagged ballot images on the review screen.[96] The Court recognizes the potential for a large number of ballots with truly blank contests (those where a voter intentionally chose not to mark a vote for a particular candidate or ballot question) are swept in for review. For this reason, a thorough examination of the feasibility of using the adjudication software for this purpose may reveal that any material increase in burden on election officials to perform this additional review measure weighs against its consideration as a potential method of relief in future elections after November.

[22]Accordingly, the Court **GRANTS** relief that is narrowly tailored to address the specific voter disenfranchisement by operation of the optical scanners/tabulators in tandem with the BMD adjudication software raised in Plaintiffs' motion. The Court finds that injunctive relief is warranted but based on the testimony and evidence in the record, recognizes that there will not be an "instant fix" of this issue, though in any event, remedial measures should be in place by the next election cycle following the January 2021 election cycle, or if feasible, by the January 2021 runoff elections.

The Court has reviewed the Coalition Plaintiffs' requested relief (Docs. 809, 817) and finds that the relief identified is at once broader than what is called for to address the specific injury identified[97] and on the other hand, insufficiently precise. Accordingly, the Court **DIRECTS** Plaintiffs to submit a proposed injunctive relief order that delineates the specific measures or course of action they are seeking that the Court adopt to address this vote counting issue **by October 26, 2020**. In that connection

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

the Court recognizes the State Election Board and Secretary's staff and/or Plaintiffs may likely need to conduct a further review with Dominion and other potential experts of some additional suitable options to address the issues raised here and to run sample tests to further assess such options; to consider the remedy of red outlined vote target ovals on hand marked ballots as used in other jurisdictions contracting with Dominion that facilitate the reading of a fuller range of voter markings; and the schedule for proceeding if programming changes must be made to implement the chosen option(s) in conjunction with the build of the ballot database for the election in question, as Dr. Coomer indicated would be necessary for some changes. This is how Dominion proceeded with the build of the database for the current election while a proposed regulation for modified threshold percentages was pending before the State Election Board.

In a rational world, the parties' representatives would sit down and discuss these matters together to discuss alternative remedial courses of action and further review. The Court would be more than willing to facilitate this by modifying timelines. In any event, the expanded method(s) to address the scanner/tabulator and adjudication software's per se "blank" exclusion of marks that may reasonably be considered by an adjudication panel as indicating voter intent must be in place no later than the next election cycle following the conclusion of the January 2021 runoffs. The Court will enter a further relief order upon receipt of Plaintiffs' proposed remedy by October 26, 2020 and Defendants' response within 14 days of receipt of the Plaintiffs' proposal.

**IV. Conclusion**

The Constitution's preamble speaks first of "We, the People," and then of their elected representatives. The judiciary is third in line and it is placed apart from the political fray so that its members can judge fairly, impartially, in accordance with the law, and without fear about the animosity of any pressure group.

In Alexander Hamilton's words, the mission of judges is "to secure a steady, upright, and impartial administration of the laws." I would add that the judge should carry out that function without fanfare, but with due care. She should decide the case before her without reaching out to cover cases not yet seen. She should be ever mindful, as Judge and then Justice Benjamin Nathan Cardozo said, "Justice is not to be taken by

storm. She is to be wooed by slow advances."[98]

Plaintiffs' challenge to the State of Georgia's new ballot marking device QR barcode-based computer voting system and its scanner and associated software presents serious security vulnerability and operational issues that may place Plaintiffs and other voters at risk of deprivation of their fundamental right to cast an effective vote that is accurately counted. While these risks might appear theoretical to some, Plaintiffs have shown how voting equipment and voter registration database problems during the 2019 pilot elections and again in the June and August 2020 primary elections caused severe breakdowns at the polls, severely burdening voters' exercise of the franchise. (*See* September 28, 2020 Order, Doc. 918.)

Established Supreme Court authority recognizes that States retain the authority and power to regulate their elections and the voting process itself, subject to the preservation of citizens' fundamental First and Fourteenth Amendment rights. And the Supreme Court has repeatedly emphasized in the last months the principle that district courts must exercise great restraint in considering the grant of injunctive relief that requires major new electoral rules on the cusp of an election where a court's order could cause electoral disruption and potential voter confusion. The posture of this case collides with this latter principle. The sweeping injunctive relief that Plaintiffs seek would require immediate abandonment of the ballot marking device voting system enacted by the Georgia Legislature in 2019 that is in its first year of implementation by the Secretary of State pursuant to his authority under Georgia law. Though major difficulties have arisen during the course of this new system's rocky first year, the Court recognizes that the staff of the Secretary of State's Office and county election offices have worked hard to roll out the system in short order during a Covid-19 pandemic era that presents unique hurdles. That hard work though does not answer the fundamental deficits and exposure in the system challenged by Plaintiffs.

Thus, although Plaintiffs have put on a strong case indicating they may prevail on the merits at some future juncture, the Court must exercise real caution in considering the grant of their request for extraordinary injunctive relief, given its obligation to follow governing Supreme Court and Eleventh Circuit authority. Despite the profound issues raised by the Plaintiffs, the Court cannot jump off the legal edge and potentially trigger major disruption in the legally established state primary process governing the conduct of elections based on a preliminary evidentiary record. The capacity of county election systems and poll workers, much less the

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

Secretary of State's Office, to turn on a dime and switch to a full-scale hand-marked paper ballot system is contradicted by the entire messy electoral record of the past years. Implementation of such a sudden systemic change under these circumstances cannot but cause voter confusion and some real measure of electoral disruption. As with any systemic change, implementation of a statewide hand-marked paper ballot system as the State's primary electoral system would require long term planning and advanced poll worker training. Accordingly, based on the binding appellate legal authority, the State's strong legal interest in ensuring an orderly and manageable administration of the current election, and the Court's assessment of the operational realities before it, the Court must deny the Plaintiffs' Motions for Preliminary Injunctive Relief in so far as they request immediate replacement of the current BMD system with a statewide hand-marked paper ballot system.[99]

But the Court cannot part with that message alone. The Court's Order has delved deep into the true risks posed by the new BMD voting system as well as its manner of implementation. These risks are neither hypothetical nor remote under the current circumstances. The insularity of the Defendants' and Dominion's stance here in evaluation and management of the security and vulnerability of the BMD system does not benefit the public or citizens' confident exercise of the franchise. The stealth vote alteration or operational interference risks posed by malware that can be effectively invisible to detection, whether intentionally seeded or not, are high once implanted, if equipment and software systems are not properly protected, implemented, and audited. The modality of the BMD systems' capacity to deprive voters of their cast votes without burden, long wait times, and insecurity regarding how their votes are actually cast and recorded in the unverified QR code makes the potential constitutional deprivation less transparently visible as well, at least until any portions of the system implode because of system breach, breakdown, or crashes. Any operational shortcuts now in setting up or running election equipment or software creates other risks that can adversely impact the voting process.

The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of "might this actually ever happen?" – but "when it will happen," especially if further protective measures are not taken. Given the masking nature of malware and the current systems described here, if the State and Dominion simply stand by and say, "we have never seen it," the future does not bode well.

Still, this is year one for Georgia in implementation of this new BMD system as the first state in the nation to embrace statewide implementation of this QR barcode-based BMD system for its entire population. Electoral dysfunction – cyber or otherwise – should not be desired as a mode of proof. It may well land unfortunately on the State's doorstep. The Court certainly hopes not.

The Court recognizes the major challenges facing the Secretary of State's Office in rapidly implementing a new statewide voting system. Yet the vital issues identified in this case will not disappear or be appropriately addressed without focused State attention, resources, ongoing serious evaluation by independent cybersecurity experts, and open-mindedness. The Secretary of State and Dominion are obviously not without resources to tackle these issues. And at very least, the Court cannot fathom why, post-election, the State and Dominion would not at least be moving toward consideration of the software upgrade option Dominion originally promised, allowing voters to cast ballots that are solely counted based on their voting designations and not on an unencrypted, humanly unverifiable QR code that can be subject to external manipulation and does not allow proper voter verification and ballot vote auditing.

Time will tell whether Act V here can be still avoided or at least re-written.

For the foregoing reasons, the Court **DENIES** the Curling Plaintiffs' Motion for Preliminary Injunction [Doc. 785] and **DENIES IN PART AND GRANTS IN PART** the Coalition Plaintiffs' Motion for Preliminary Injunction on BMDs, Scanners, and Tabulators, and Audits [Doc. 809].

**IT IS SO ORDERED** this 11th day of October, 2020.

**All Citations**

493 F.Supp.3d 1264

Footnotes

1    The two sets of Plaintiffs in this case are represented by separate counsel and seek overlapping but somewhat differently articulated, equitable relief. Donna Curling, Donna Price, and Jeffrey Schoenberg are referred to as the "Curling Plaintiffs." The Coalition for Good Governance ("Coalition"), Laura Digges, William Digges III, Ricardo Davis, and Megan Missett are referred to as

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.      47

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

the "Coalition Plaintiffs."

2    *See* O.C.G.A. § 21–2–300(a)(2); O.C.G.A. § 21–2–2(7.1); O.C.G.A. § 21–2–300(a)(2); Ga. Comp. R. & Reg. r. 590–8–1–.01(d).

3    The Court summarized the three-year background history surrounding this case in its Order of August 7, 2020 (Doc. 768) that denied without prejudice Plaintiffs' earlier facial challenge of the BMD system, filed in October 2019, before any elections using the system had been held.

4    Plaintiffs in this connection present evidence of the votes on some hand-marked ballots being treated as blank votes because the optical scanner failed to recognize the hand-made mark that did not fully fill in the vote bubble, although the hand votes still demonstrated the voter's ballot intent through a check or X or otherwise, and therefore would satisfy the requirement of Georgia law for being counted. The State Board of Elections has recently approved some modifications in the scanning program settings that may result in more of these "blank" votes being flagged and referred to county adjudication panels for review. The Coalition Plaintiffs have offered expert testimony that other scanner adjustments can be made that would more completely address this ballot scanning issue. Defendants dispute this.

5    Dominion Voting Systems, Inc.'s contract with the Georgia Secretary of State calls for Dominion's provision of all equipment and software components of the BMD system as well as training and technical assistance. (Doc. 786.)

6    As detailed in the Court's Order of September 28, 2020, Plaintiffs' challenge also addresses dysfunctions in the voter registration information database system and the pollbook voter check-in system, both of which they contend fundamentally impact the voting process and voter access to the ballot. (Doc. 918.)

7    Although Defendant Fulton County has also taken an active role in the defense of this litigation the State Defendants' counsel have assumed by far the primary role in presentation of the defense. Representatives of both the State Defendants and Fulton County at various points have acknowledged some of the genuine challenges and major problems experienced in the first statewide in person election for a large array of offices that was held on June 9, 2020 using the new BMD system. (The March 24, 2020 presidential primary election was postponed twice – once until May 19, 2020 and then until June 9, 2020. Some voters cast absentee mail ballots and absentee in-person "early voting" ballots before the March primary was postponed.)

8    *See generally*, O.C.G.A. § 21-2-384, § 21-2-385(a); *see also* Georgia Secretary of State's web posting, Elections and Voter Registration Calendar, https://sos.ga.gov/admin/files/2020% 20Revised% 20Short% 20Calendar.pdf (last visited September 17, 2020).

9    As found in the Court's 2018 and 2019 Orders, the Secretary of State contracted with Kennesaw State University from 2002 to December 2017 to maintain the central server and provide critical related election services for the State at a unit in the University called the Center for Election Services ("CES"). Evidence reviewed in detail by the Court showed that the central server was accessible via the internet from at least between August 2016 and March 2017. After an information security engineer KSU's Information Security Office performed a scan of the server on March 4, 2017, it was immediately taken down. The FBI was contacted and took temporary possession of the elections server. Prior to returning it to KSU, the FBI made two forensic images of the server. KSU destroyed the original server and backup server soon after the news of the breach was publicized and after Plaintiffs' lawsuit was served on Defendants.

10   *Curling v. Kemp*, 334 F.Supp.3d 1303 (N.D. Ga. 2018).

11   The leadership of the Secretary of State's Elections Division and Center for Elections Systems (transferred from Kennesaw) has remained intact throughout.

12   Dr. Wenke Lee, Professor of Computer Science at Georgia Tech University and Co-Executive Director of the Institute for Information Security, was the sole computer scientist appointed to the Secretary of State's Secure Accessible Fair Elections ("SAFE") Commission.

13   In 2019, South Carolina began using the ExpressVote ballot marking system developed and marketed by ES&S.

14   Warren Stewart is a Senior Editor and Data Specialist at Verified Voting.

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

15   *See* Verified Voting, The Verifier, https://verifiedvoting.org/verifier/#mode/navigate/map/ppEquip/mapType/normal/year/2020 (last visited Aug. 18, 2020). (*See also* Ex. 1 to Stewart Decl., Doc. 681-2 at 6-14.)

16   "Clarification Questions\ MS 16-1 Supply Chain Dominion and KnowInk Final.docx" *available at* https://sos.ga.gov/admin/uploads/Dominion.zip.

17   EAC is the acronym for the U.S. Election Assistance Commission.

18   Other manufacturers offer EAC-certified non-barcode BMDs, including the Clear Ballot ClearAccess system and the Hart Verity Touch Writer. Instead of a barcode for vote tabulation, these systems print a ballot that looks like a hand-marked paper ballot but has scan targets filled in for the selected candidates. (Decl. of Dr. Alex Halderman, Doc. 785-2 ¶ 37.)

19   If the referenced Dominion software upgrade moved forward and was purchased, this would also allow an independent audit's capacity to track voting back to scanned ballots that are counted by a scanner based on human text identified voter selections that serve as the actual basis for the scanner/tabulators' tallying of ballot votes.

20   For a variety of reasons, local precinct polling stations end up sending emergency ballots to their Counties' election office for scanning and tabulation rather than handling this themselves. Local precincts in the past have treated emergency ballots like provisional ballots that must be sent to the County office for a determination to be made of voter eligibility. However, consistent with current state regulations, precincts processing emergency ballots are authorized to allow voters to cast and scan their own emergency ballots, assuming voting equipment is operational.

21   State Defendants requested that some of the Plaintiffs' expert testimony be presented in sealed proceedings and affidavits to ensure the protection of Dominion's intellectual property and the security of the voting system. The Court preliminarily granted these requests by and large so as to rapidly move proceedings forward as it could not predict precisely what matters would be covered in the testimony or the import of information in advance. Plaintiffs preserved their objections to the sealing. The Court will reconsider these sealing decisions, if appropriate, upon a properly supported motion.

22   According to Mr. Cobb's first affidavit, "Georgia certified the Dominion Voting's Democracy Suite 5.5-A in August 2019. Pro V&V did not test this specific version of the voting system for the EAC, but had previously engaged in testing the baseline system (D-Suite 5.5)," apparently for another client. (Doc. 821-6 at 3-4.) Later, in 2020, another modification was made to the software relating to scanner software (denominated 5.5-A GA) and approved on April 13, 2020 by EAC. Georgia conducted pilot elections in 2019 and some early voting during the March 2020 primary (before it was postponed and combined with the statewide primary) on the system while this certification was pending.

23   Dr. Coomer previously served as Vice President of U.S. Engineering for Dominion and prior to that was the Vice President of Research and Development for Sequoia Voting Systems. He has worked in product development for election systems since 2005. He obtained his Masters degree and Ph.D. in nuclear physics and plasma physics from the University of California, Berkeley and a bachelor of science degree in engineering physics from Rensselaer Polytechnic Institute. (Tr. Vol. II at 99-100.) He additionally testified that he had designed the vote adjudication system used by Dominion, had written code for various election components, and provides primary election support for major Dominion customers.

24   Additionally, witness declarations and testimony given in connection with earlier preliminary injunction motions was available for consideration to the extent that it was relevant and filed in the record.

25   The Court's August 15, 2019 Order provided this explicit remedial relief: "The Secretary of State's Office should work with its consulting cybersecurity firm to conduct an in-depth review and formal assessment of issues relating to exposure and accuracy of the voter registration database discussed here as well as those related issues that will migrate over to the State's database or its new vendor's handling of the EPoll voter database." (Doc. 579 at 150.) The consulting firm referenced is Fortalice.

26   Other cybersecurity experts such as Mr. Hursti also appear to have also consulted with Dr. Halderman in this process.

27   The Defendants sought this confidentiality for two purposes: to protect the confidentiality and secrecy of this portion of the election system's functioning as well as to protect Dominion's confidential intellectual property pursuant to its contract with the

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

State.

28    Dr. Halderman is a Professor of Computer Science and Engineering and Director of the University of Michigan Center for Computer Security and Society. He is a nationally recognized expert in cybersecurity and computer science in the elections field. He testified before the United States Senate Select Committee hearings held on the topic of on Intelligence held on Russian interference in the 2016 U.S. Elections. His testimony and work was referenced in the Senate Committee's report. Professor Halderman has testified multiple times in this case.

29    The Defendants disputed this evidence and implied the existence of other possible factors. Given that Dr. Halderman's testimony was presented under seal, the Court only describes this portion of the evidence in a general manner.

30    As will be discussed further later in this Order, Dr. Stark serves on the Advisory Board of the U.S. Election Assistance Commission and as a member of the EAC's cybersecurity committee. (Doc. 296-6.) Dr. Appel is the Eugene Higgs Professor of Computer Science at Princeton University and has over 40 years' experience in computer science and 15 years if experience in studying voting machines and elections. He has served as Editor in Chief of ACM Transactions on Programming Languages and Systems, the leading journal in his field. (Doc. 681-3). Dr. DeMillo is the Chair of Computer Science at Georgia Tech University. He previously served as the Director of the Georgia Tech Center for Information Security and Chief Technology Officer for Hewlett-Packard. (Doc. 548 at 74; Doc. 579 at 34.) Dr. DeMillo has conducted research relating to voting system and election security since 2002. He helped write guidelines for using electronic voting machines for use by the Carter Center. He has also served on the advisory boards of Verified Voting and the Open Source Election Technology Institute. (*Id.*)

31    The Court makes this point not as a criticism of Dr. Halderman but simply to point out that due to a variety of circumstances and the timing of the Court's ruling on the Defendants' motion to dismiss the BMD claims at a late date, discovery did not proceed here until the eleventh hour – and only then on a highly expedited, curtailed basis prior to the preliminary injunction motion.

32    There was some back and forth in the parties' submissions regarding one of Dr. Halderman's affidavits pointing to a 2019 finding of one or more of the Texas Secretary of State's examiners' determining that Dominion's Democracy Suite 5.5-A version was substantively deficient and did not meet certification standards. Dr. Coomer dismissed the significance of that one report in his affidavit in this case. Ultimately, on January 24, 2020, the Texas Secretary of State's Office, based on the multiple reports of different Texas examiners on varied technical and substantive issues, concluded along lines quite close to Dr. Halderman's ultimate opinion in this case that certification should be denied. The Texas Secretary of State's Office found this same Dominion 5.5-A version should be denied certification for use in Texas elections on this basis: "The examiner reports identified multiple hardware and software issues that preclude the Office of the Texas Secretary of State from determining that the Democracy Suite 5.5-A system satisfies each of the voting-system requirements set forth in the Texas Election Code. Specifically, the examiner reports raise concerns about whether the Democracy Suite 5.5-A system is suitable for its intended purpose; operates efficiently and accurately; *and is safe from fraudulent or unauthorized manipulation.* Therefore, the Democracy Suite 5.5-A system and corresponding hardware devices do not meet the standards for certification prescribed by Section 122.001 of the Texas Election Code." https://www.sos.texas.gov/elections/laws/dominion.shtml (last visited September 25, 2020) (emphasis added). The Court also notes, though, that there are other jurisdictions that have approved the certification of the 5.5-A system, as Defendants assert. As noted in the affidavit of Jack Cobb, Defendant's witness who is the Laboratory Director for Pro V & V, the State of Pennsylvania has certified Dominion's Democracy Suite 5.5-A for usage. The Report of the Pennsylvania Commonwealth of Pennsylvania Department of State approving the usage of Democracy Suite 5.5. and 5.5A (in Pennsylvania jurisdictions choosing to utilize it), highlights that the approval is given "**provided the voting system is implemented with the conditions listed in Section IV**" of the Report. Commonwealth of Pennsylvania, Department of State, Report Concerning the Examination Results of Dominion Voting Systems Democracy Suite 5.5A With ImageCast X Ballot Marking Device (ICX-BMD), ImageCast Precinct Optical Scanner (ICP), ImageCast Central Station (ICC), and Democracy Suite EMS (EMS), *available at* https://www.dos.pa.gov/VotingElections/Documents/Voting% 20Systems/Dominion% 20Democracy% 20Suite% 205.5-A/Dominion% 20Democracy% 20Suite% 20Final% 20Report% 20scanned20with% 20signature% 20011819.pdf (emphasis in original.) These conditions are substantive, addressing items ranging from system security and prohibition of the connection of the system's components with any interface with modems or networks, to requirements for manual statistical audits, robust Logic and Accuracy testing on each device, voter education and warnings, needed voter instruction changes, and a host of other proactive substantive measures. Pennsylvania's review indicates that jurisdictions using the Dominion system do so in principal part with a *hand-marked ballot* based version of the system in tandem with scanners for vote tabulation. However, all voters are given the opportunity to use the ADA compliant marking device feature of the Democracy Suite 5.5 A. System.

33    However, as Plaintiffs' experts Mr. Liu and Dr. Halderman testified in their respective affidavits in connection with the instant motions, BMDs use an Android operating system that is more than five years old and outdated.

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

34   *See generally*, Mr. Liu testimony, Tr. Vol. II, Mr. Liu Declaration at Doc. 855-2; Dr. Halderman testimony, Tr. Vol II and Vol. III (and in conjunction with both preceding preliminary injunction hearings and related filings); Dr. Halderman Declarations at Docs. 785-2, 855-1; Mr. Skogland testimony, Tr. Vol. III; Mr. Skoglund Declarations at Docs. 853-5, 853-6; Dr. Appel Declaration, Doc. 855-3; Mr. Hursti testimony, Tr. Vol. I; Hurti Declarations at Docs. 809-3, 800-2, 680-1; Dr. DeMillo Declarations, Docs. 285, 716-1; Dr. Stark testimony, Tr. Vol. I; Dr. Stark Declaration, Doc. 809-2.

35   Pro V&V, Inc., a private company, is a National Institute of Standards Technology (NIST) Accredited Voting Systems Test Laboratory (VSTL) and a United States Election Assistance Commission Accredited Voting Systems Laboratory.

36   Pro V&V similarly was previously retained by the Secretary of State and certified Georgia's DRE system in 2012 to the EAC. (Tr. Vol. II at 233.) The company's last October 2, 2020 report is addressed later in this Order. The EAC has as of the date of this Order not approved or acted upon this last recommendation.

37   Mr. Cobb's second affidavit referenced the basis of his earlier statements regarding encryption as Dominion documentation about digital signing and encrypting. "My statement about digital signing and encrypting … come directly from Dominion Voting 2.2 – Democracy Suite System Overview Version 5.5:146 Dated August 18, 2018 Section 2.6.1 Electronic Mobile Ballot" that describes QR barcode encoded data as encrypted." (Doc. 865-1.)

38   Tr. Vol. II at 236.

39   Pro V&V had conducted an assessment of an earlier version of the Dominion Democracy Suite software.

40   Pro V&V's August 2019 certification documentation indicates that "[t]he state certification test was not intended to result in exhaustive tests of system hardware and software attributes." (*See* discussion of this in Dr. Halderman's affidavit, Doc. 785-2 at 10.)

41   Mr. Liu further explained that his firm performs this consulting work for 8 of the top technology companies in the world, 10 of the top 20 retailers, 5 of the 10 top media companies. (Tr. Vol. II at 54; Liu Decl., Doc. 855-2.) At Honeywell, Mr. Liu led the penetration testing team for Honeywell International's global security team, "where our mission was to assess and breach the security of Honeywell's IT infrastructure and applications." (Doc. 855-2 at 2.)

42   Mr. Liu indicated that the Android system in use was over half a decade out of date, with known vulnerabilities. (Tr. Vol. II at 68.) Similarly, Dr. Halderman noted that the Android OS versions used on the Dominion BMDs do not have the latest security features of later Android releases. (Halderman Decl., Doc. 785-2 at 9-11.)

43   Dr. Halderman suggests that the "test mode" that the equipment was "on" when delivered was designed to limit his testing capacity. And on the other hand, Defendants imply in their questioning that Dr. Halderman may have modified the equipment in some other fashion. The Court sees no value in such guessing now.

44   As discussed later, Mr. Hursti testified based on his cybersecurity experience and observations, that a host of the game and other applications on the servers and equipment he observed as well as internet connectivity created an obvious source for injection of malware.

45   Mr. Liu's and Dr. Halderman's testimony and declarations, addressed earlier, discussed their views of the fallibility of this approach.

46   The Court's Opinion and Order of September 28, 2020 (Doc. 918) addressed in depth issues relating to the PollPads and the continuation of prior issues involving the ENET database and program. The Court therefore does not revisit these issues here.

47   Voting Machine Hacking Village 2019 Annual Report, pp. 17-18, media.defcon.org > voting-village-report-defcon27 (last visited October 8, 2020). (*See* Doc. 619-3.)

48   "Hardening is the standard basic security practice under the well-accepted principle that a general-purpose device when used with a lot of software for different purposes is more vulnerable than a limited system which has [includes only] the minimum

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

necessary to accomplish the task." This is accomplished by "eliminating and removing all unnecessary services, and removing all drivers to make it the bare bone minimum needed for the task. And that is by reducing using the attack surface making it inherently more secure." (Hursti testimony, Tr. Vol. 1 at 126-27.) "In essence, hardening is the process of securing a system by reducing its surface of vulnerability, which is larger when a system performs more functions; in principle it is to the reduce the general purpose system into a single-function system which is more secure than a multipurpose one. Reducing available ways of attack typically includes changing default passwords, the removal of unnecessary software, unnecessary usernames or logins, grant accounts and programs with the minimum level of privileges needed for the tasks and create separate accounts for privileged operations as needed, and the disabling or removal of unnecessary services." (Hursti Decl., Doc. 809-2 ¶ 28.) "Computers performing any sensitive and mission critical tasks such as elections should unquestionably be hardened. Voting system are designated by the Department of Homeland Security as part of the critical infrastructure and certainly fall into the category of devices which should be hardened as the most fundamental security measure." (Id. ¶ 29.) Hursti's personal first-hand observations and review of server log entries "confirmed that services which would have been disabled in the hardening process are running on the server." (Hursti Decl., Doc. 853-2 ¶ 6.) And he testified that it was visibly evident that "this system was not hardened both based on icons observed" and on "logs showing all programs running, all drivers running, and software installed. And that list is comprehensively proving that the system has been not hardened." (Tr. Vol. 1 at 127.)

49      "The most basic security practice is never to let the operators have privileges to delete or alter log events, because that makes supervision impossible and performing forensics difficult, if not impossible. In addition, trustworthy logs are essential to detect and deter malicious software or intrusion." (Doc. 853-2 at 12.)

50      Based on the sudden change in circumstances, the Court issued an express directive that the State Defendants file information and documentation as to the timing of the production of the testing documents to Pro V&V and the EAC. (See Doc. 957.)

51      HAVA authorized the creation of the Election Assistance Commission as an independent, bipartisan organization, to establish minimum election administration and equipment standards in the administration of federal elections. (Issues with Florida's election machines in the 2000 presidential election were one of the triggers for Congress's creation of the Commission.) While state participation in EAC's review and approval regime is voluntary, once a state has elected to do so as in Georgia's case, the EAC treats state compliance with its standards and procedures as required. There is no provision for half compliance or half participation in EAC's review procedures. On the other hand, the EAC is not vested with actual coercive regulatory authority and thus relies on state cooperation in connection with compliance with its standards and determinations.

52      Given the nature of the communications between counsel reflected in Plaintiffs' filing of October 6, 2002, the Court does not know what documents precisely were filed with the EAC.

53      Both Dr. Halderman and Mr. Skoglund's affidavits discuss a host of problems that they have seen arise with last minute software fixes that are not thoroughly tested and evaluated for impact on the rest of the software system and in connection with use on a copy of the actual database. Dr. Halderman discusses the analogy – i.e., worst case scenario – of what happened with Boeing's late "minor" software fix in its Boeing 737 Max plane. Halderman and Skoglund's affidavits also discuss the security risks posed by last minute installation of software in voting machines in their experience.

54      Ga. Comp. R. & Regs, 183-1-12-.08, new Rule adopted January 23, 2020, eff. Feb. 12, 2020; amended March 2, 2020 and eff. March 22, 2020.

55      The county voting machines involved were not the ones now used in Georgia.

56      State Defendants' counsel has pointed to two counties' successful flagging of the U.S. Senate ballot problem through their L & A testing. The Court agrees – this was a positive net result of the testing. For that very reason, though, thorough L & A testing, consistent with standard protocols across the country and Georgia law, would seem to be essential.

57      Dr. Stark is a Professor of Statistics and Associate Dean of Mathematical and Physical Sciences at the University of California, Berkeley, a faculty member in the Graduate Program in Computational Data Science and Engineering, a co-investigator at the Berkeley Institute for Data Science, and was previously the Chair of the Department of Statistics and Director of the Statistical Computing Facility. (Decl. of Philip B. Stark, Doc. 296.) He has published hundreds of articles and books and has served on the editorial boards of academic journals in physical science, applied mathematics, computer science, and statistics and is a coauthor on a number of papers on end-to-end cryptographically verifiable voting systems, including being on the development team for the STAR-Vote system for Travis County, Texas. (Id.; Tr. Vol. I at 57.) Dr. Stark has consulted for many government agencies and

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

currently serves on the Advisory Board of the U.S. Election Assistance Commission and its cybersecurity subcommittee. He also served on former California Secretary of State Debra Bowen's Post-Election Audit Standards Working Group in 2007. In addition to testifying as an expert in statistics in both federal and state courts, Dr. Stark has testified before the U.S. House of Representatives Subcommittee on the Census and the State of California Senate Committee on Elections, Reapportionment and Constitutional Amendments, and before California Little Hoover Commission about election integrity, voting equipment, and election audits. Dr. Stark's statistical "risk-limiting audits" approach to auditing elections has been incorporated into statutes in several states including California, Colorado, Rhode Island, and in some respects in Georgia's new Election Code. (Doc. 296; Doc. 640-1; Tr. Vol. I at 83.) Dr. Stark pioneered the introduction of RLAs in state sponsored studies and elections in California and Colorado. (Stark Decl., Doc. 296; Stark Suppl. Decl., Doc. 680-1 ¶ 17.)

58    Smaller risk limits require stronger evidence that the outcome is correct: All else equal, the audit examines more ballots if the risk limit is 1% than if it is 10%. Lindeman and Stark (2012) at 1. Similarly, smaller (percentage) margins require more evidence, because there is less room for error. *Id.*

59    RLAs therefore "address limitations and vulnerabilities of voting technology, including the accuracy of algorithms used to infer voter intent, configuration and programming errors, and malicious subversion." Lindeman and Stark (2012) at 1. This is one reason why the NAS has endorsed the use of risk-limiting audits of human-readable, voter-verifiable paper ballots. NAS Report at 94-95.

60    Dr. Stark's auditing principles are in line with the recommendation of the NAS:

An evidence-based election would produce not only a reported (or initial) election outcome, but also evidence that the reported outcome is correct. This evidence may be examined in a "recount" or in a "post-election audit" to provide assurance that the reported outcome indeed is the result of a correct tabulation of cast ballots.

Voter-verifiable paper ballots provide a simple form of such evidence provided that many voters have verified their ballots. The ability of each voter to verify that a paper ballot correctly records his or her choices, before the ballot is cast, means that the collection of cast paper ballots forms a body of evidence that is not subject to manipulation by faulty hardware or software. These cast paper ballots may be recounted after the election or may be selectively examined by hand in a post-election audit. Such an evidence trail is generally preferred over electronic evidence like electronic cast-vote records or ballot images. Electronic evidence can be altered by compromised or faulty hardware or software.

Paper ballots are designed to provide a human-readable recording of a voter's choices. The term "paper ballot'' here refers to a "voter-verifiable paper ballot," in the sense that voters have the opportunity to verify that their choices are correctly recorded before they cast their paper ballots. The voter may mark the ballot by hand, or the marked ballot may be produced by a voting machine. In the current context, the human-readable portion of the paper ballot is the official ballot of record that acts as the record of the voter's expressed choices. Rather than, for example, an electronic interpretation of the paper ballot or a non-human readable barcode appearing on a ballot.

(NAS Report at 94-95.)

61    Dr. Gilbert also was a member of the National Academies of Science, Engineering and Medicine Committee on the Future of Accessible Voting: Accessible Reliable, Verifiable Technology, among other leadership and publishing accomplishments. (*See* Doc. 658-2.) Dr. Gilbert's research currently focuses on human use of technology and access to voting systems rather than cybersecurity or cyber engineering issues. His testimony focused on the comparative benefits of the BMD system, its broad human accessibility, its automated generation of a paper ballot that voters have the opportunity to review, and how and if the system's use of a QR code impacts its auditability. Dr. Gilbert's background and expertise is not in the field of statistics.

62    Dr. Halderman and Matthew Bernhard co-authored their research in a May 2020 published article, "Can Voters Detect Malicious Manipulation of Ballot Marking Devices?" A number of the experts referenced the paper, which discusses low rates of voter verification of ballots and the degree to which that may be increased by different voter prompts It also constitutes part of the research literature that bears on the issues of the validity of RLAs where BMDs are used that tabulate the vote based on a QR code rather than the readable information that voters might review.

63    VotingWorks is a vendor of barcoded ballot-marking devices just like the Dominion system. (Tr. Vol. II at 281.)

64    In response to the Court's question about the methodology of the Arlo software which incorporates Dr. Stark's statistical algorithm, Dr. Adida admitted, "I'm going to tell you my best understanding of it and admit that there is a level of statistics that goes a little bit outside of my expertise ... And exactly how that is done, that is where my expertise stops and Dr. Stark's begins." (Tr. Vol. II at 302-303.)

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

---

65   Most of the states where VotingWorks has assisted in conducting RLAs primarily use hand-marked paper ballots with BMDs used only for voters with accessibility needs. These include Virginia, Michigan, Missouri, and Rhode Island. In California, and Pennsylvania, the majority of the voters in the state use hand-marked paper ballots and only certain jurisdictions in those States use BMDs for all voters. In Ohio, there is no uniform voting system; instead roughly half of the jurisdictions use hand-marked paper ballots, a handful use DREs with voter verified paper audit trails, and a handful use BMDs. *See* Verified Voting, The Verifier, *available at* https://verifiedvoting.org/verifier/#mode/navigate/map/ppEquip/mapType/normal/year/202 0.

66   Other criticisms raised focused on the statistical invalidity of auditing only one race and the absence of any meaningful audit trail.

67   According to the NAS Report:
     RLAs can establish high confidence in the accuracy of election results—even if the equipment that produced the original tallies is faulty. This confidence depends on two conditions: (1) that election administrators follow appropriate procedures to maintain the chain-of-custody and secure physical ballots—from the time ballots are received, either in-person or by mail, until auditing is complete; and (2) that the personnel conducting the audit are following appropriate auditing procedures and the equipment and software used to audit the election are independent of the equipment and software used to produce the initial tallies. In the latter case, this not only requires that the software be independent of the software used to tally votes, but also that the software's specifications/algorithms, inputs, and outputs are transparent to permit members of the public to reproduce the software's operation.
     (NAS Report at 96.) As Dr. Stark has attested, the BMDs are not software independent and therefore cannot establish high confidence in the accuracy of the results "even if the equipment that produced the original tallies is faulty."

68   There are two general types of risk-limiting audits: ballot-polling audits and comparison audits (either ballot-level comparison or batch comparison). Lindeman and Stark (2012) at 2, 6. Ballot-polling audits are a bit like exit polls, but instead of asking randomly selected voters how they voted, they manually inspect randomly selected cast ballots to see the votes they contain. (Doc. 680-1 ¶ 18.) They require knowing who reportedly won, but no other data from the tabulation system. Lindeman and Stark (2012) at 2. Ballot-polling audits are the best method "when the vote tabulation system cannot export vote counts for individual ballots or clusters of ballots or when it is impractical to retrieve the ballots that correspond to such counts," i.e., systems like Georgia's that use precinct level tabulators that apply randomization to scanned ballots to protect voter anonymity. *See id.* In a ballot-polling RLA, "if a large enough random sample of ballots shows a large enough majority for the reported winner(s), that is strong statistical evidence that the reported winner(s) really won. It would be very unlikely to get a large majority for the reported winner(s) in a large random sample of ballots if the true outcome were a tie, or if some other candidate(s) had won. There is deep mathematics behind proving out how large is "large enough" to control the risk to a pre-specified level, such as five percent. However, the calculations that determine when the audit can stop examining more ballots are relatively simple." (Doc. 680-1 ¶ 18.)

69   Somewhat confusingly, Dr. Stark also testified that "[t]he sense in which a risk-limiting audit may still be worth doing is that it can catch – it can detect whether errors in the tabulation of a particular pile of ballots was large enough to alter the reported outcome of one or more contests. But what it can't do is determine whether that particular pile of paper is a trustworthy representation of what voters did, saw, or heard." (*Id.* at 68-69.) In other words, "[a]pplying risk-limiting audit (RLA) procedures to securely curated BMD printouts can check the accuracy of the tabulation of the printouts. It can provide confidence that if errors in scanning and tabulation were large enough to change the reported winner(s), that fact would be detected and corrected. But such an audit does nothing to check whether the BMDs printed incorrect votes, omitted votes, or printed extra votes. Risk-limiting audit procedures check the *tabulation of BMD printouts*; they do not check the *functioning of the BMDs*. They cannot confirm the outcome of elections conducted using BMDs." (Doc. 680-1 ¶¶ 6-7.) Similarly, he remarked that "[r]igorous audits can ensure (statistically) that tabulation errors did not alter the reported outcomes. But they cannot ensure that errors in BMD printouts did not alter the reported outcomes." (*Id.* ¶ 12.) While there appears to be some disconnect between the use of RLAs to check tabulations, it is possible Dr. Stark is referring to ballot-level or batch comparison RLAs here which, unlike ballot-polling audits, check outcomes by comparing a manual interpretation of ballots selected at random to the voting system's interpretation of those ballots counts.

70   In conjunction with Dr. Adida's organization, VotingWorks, the State of Georgia consulted with the Verified Voting Foundation when it conducted a RLA pilot of two election contests in Cartersville in November 2019. (680-1 ¶ 17.) Dr. Stark was on the Board of Directors of Verified Voting for years until he resigned after the President of Verified Voting declined to clarify publicly that the Cartersville pilot audit did not "confirm outcomes" or show that the voting system worked correctly. (*Id.* ¶ 23.) Since that time, Verified Voting's official positions on RLAs and BMDs have for the most part realigned with Dr. Stark's findings and opinions. (Tr.

---

Vol. I at 80.) *See* Statement on Ballot Marking Devices and Risk-Limiting Audits, *available at* https://verifiedvoting.org/statement-on-ballot-marking-devices-and-risk-limiting-audits/.

71    Again, Dr. Stark invented virtually every extant method for performing risk limiting audits, including ballot-polling risk-limiting audits. Dr. Stark was the first person to pilot a ballot-polling risk-limiting audit, in Monterey, CA, in May, 2011. Dr. Stark published the first software tool to conduct ballot-polling risk-limiting audits which was the official tool used by the State of Colorado for its ballot-polling risk-limiting audits and is referenced in Colorado election regulations. (Doc. 809-2 ¶ 10.) The VotingWorks Arlo software to be used in Georgia's audit incorporates Dr. Stark's algorithm, and Stark understands that VotingWorks benchmarked the Arlo software against his to confirm Arlo is a correct implementation of the algorithm. (*Id.* ¶ 11.) Understandably, Dr. Stark strenuously disagrees with any attempts to redefine the RLA methodology so that it only corrects some kinds of errors or to modify its application for use on systems with an untrustworthy paper trail because such measures go against the whole principle the RLA was designed to fulfill and weakens the concept to a degree that it destroys the fundamental property that the audit has a large chance of correcting the election outcome if it is wrong. (Tr. Vol. I at 80-83.)

72    In addition to a burden on the fundamental right to vote, Plaintiffs also assert in-person voters are subject to unequal treatment as compared to provisional and absentee voters whose paper ballots are capable of being meaningfully recounted, reviewed against an independent record to verify the accuracy of the vote tabulation, and may have discrepancies detected and corrected through audits.

73    O.C.G.A. § 21-2-300(a)(2) (effective April 2, 2019) (mandating a new uniform statewide voting system that provides for "the use of scanning ballots marked by electronic ballot markers and tabulated by using ballot scanners for voting at the polls and for absentee ballots cast in person").

74    Georgia law permits a registered voter to vote via absentee ballot for any reason. *See* O.C.G.A. § 21-2-380. Voters under age 65 must submit separate, distinct applications for each election (i.e. primary, general, runoff) sufficiently early to their county registrar's office to ensure timely receipt of their absentee ballot. O.C.G.A. § 21-2-381(a)(1)(A); O.C.G.A. § 21-2-381(a)(1)(G). Absentee ballot applications may be denied if the registrar determines that the information provided by the voter in the application does not match the voter's information on file with the registrar's office or if the voter's signature on the absentee ballot envelope does not match the signature on their voter registration card. O.C.G.A. § 21-2-381(b)(2)(3). Once received and completed, voters must sign an oath on their absentee ballot envelope and personally mail or deliver their ballot to the board of registrars or absentee ballot clerk or to a dropbox. O.C.G.A. § 21-2-385(a). Georgia does not provide pre-paid postage for the return of the absentee ballot, and thus, voters must pay for their own return postage to vote by mail. The State of Georgia does not count mail ballots received after the closing of polls at 7:00 p.m. on Election Day. *See* O.C.G.A. § 21-2-386(a)(1)(F). This is true even if a ballot arrives late for reasons objectively outside the voter's control, and even if the ballot was postmarked weeks before Election Day or alternatively, on Election Day. Absentee ballots will be rejected if not received by election day or "[i]f the elector has failed to sign the oath, or if the signature does not appear to be valid, or if the elector has failed to furnish required information or information so furnished does not conform with that on file ... or if the elector is otherwise found disqualified to vote[.]" O.C.G.A. § 21-2-386(a)(1)(C).

75    The first initial motions for preliminary injunction seeking to enjoin the BMD system, filed in October 2019 (Docs. 619, 640), were denied without prejudice in August 2020. At that juncture, the Court viewed the evidence as presented as closer to a quasi-facial challenge rather than one that was rooted, at least in part, in the record evidence involving the actual use of the BMD machines and associated Dominion equipment and attached KnowInk registration check-in PollPad tablets at voting precincts. Covid-19 pandemic ramifications triggered major election scheduling delays and changes that resulted in the March presidential primary being moved ultimately to early June 2020.

76    *See* Court's Opinion and Order of September 28, 2002. (Doc. 918.)

77    Sections (b) and (c) of O.C.G.A. § 21-2-438 provide as follows:
      (b) At elections, any ballot marked by any other mark than a cross (X) or check (√) mark in the spaces provided for that purpose shall be void and not counted; provided, however, that no vote recorded thereon shall be declared void because a cross (X) or check (√) mark thereon is irregular in form. A cross (X) or check (√) mark in the square opposite the names of the nominees of a political party or body for the offices of President and Vice President shall be counted as a vote for every candidate of that party or body for the offices of presidential elector.
      (c) Notwithstanding any other provisions of this chapter to the contrary and in accordance with the rules and regulations of the State Election Board promulgated pursuant to paragraph (7) of Code Section 21-2-31, if the elector has marked his or her ballot in

such a manner that he or she has indicated clearly and without question the candidate for whom he or she desires to cast his or her vote, his or her ballot shall be counted and such candidate shall receive his or her vote, notwithstanding the fact that the elector in indicating his or her choice may have marked his or her ballot in a manner other than as prescribed by this chapter.

78   According to the Dominion contract, for each ballot scanned, a corresponding ballot image is created and stored for audit purposes, that consists of two parts: (1) the scanned image of the ballot; and (2) machine generated text showing each mark that the scanner interpreted for that particular ballot, referred to as the AuditMark. (Doc. 619-8 at 57.)

79   A potential explanation for the phenomenon of some voters marking their absentee ballots without filling in the designated oval is two-fold. Hand marked ballots, where votes were cast with an X or check, were used prior to the introduction of the DRE system in Georgia in 2002. And this may be found in Georgia's existing election regulation that contains different provisions for vote tabulation in statewide versus municipal elections. *See* Rule 183-1-15-.02(2)(2)&(3). The Dominion BMD/optical scan system is required to be used in all statewide elections. But Georgia still allows for other voting systems to be used in non-statewide "municipal" elections (*see* provisions of rule that still pertain to lever systems, Rule 183-1-15-.02(2)(1) and non-optical scan, i.e., hand counted paper ballots, Rule 183-1-15-.02(2)(3)). For optical scan paper ballots, the voter must "fill in the oval" to mark their vote choice. Rule 183-1-15-.02(2)(2)(a). But for non-optical scan paper ballots, the voter must "place an X, a check, or other similar mark" in a square to mark their vote choice. Rule 183-1-15-.02(2)(3)(a). This might account for why a number of voters are placing either an X or a check in the oval rather than filling it in and may create a problem if the ICP and ICC scanners in operation disregard these types of markings on the optical scan ballots without further review. Further, the Court notes, that prior to the instant 2020 ballot cycle, a vote with an X or check on an absentee or provisional ballot would not have been subject to adjudication software review programmed to kick out marks that were too light to register on the scanner, but to the human eye were visible as an X or check vote designation.

80   The ImageCast Precinct Scanner and Tabulator is an optical scan ballot tabulator used to scan marked paper ballots and interpret voter marks on the paper ballot. It is a proprietary Dominion product. (Tr. Vol. II at 81.)

81   The ImageCast Central Scanner consists of a Canon DR-G1130 commercial off-the-shelf digital high-speed document scanner configured to work with the ImageCast Central Software for high speed ballot tabulation.

82   The scanner does not work like a camera – it does not take a picture of the paper ballot. (Tr. Vol. I at 140-41.)

83   According to Dr. Coomer, when an in-person voter scans a hand-marked paper ballot (i.e., an emergency ballot) on the precinct scanner, the scanner will alert the voter if the ballot is rejected as having contained an ambiguous mark and that voter will have the opportunity to correct the ballot. (Tr. Vol. II at 75-76; *see also* Ex. M to Hursti Decl., Doc. 809-3 at 48.) However, because of the configuration of the ICP scanner in Georgia, if the voter marked a selection, but the scanner did not recognize that as a vote, the voter would not be alerted if an undervote is detected for a particular contest. (Tr. Vol. II at 75.) The ICP will only alert an in-person voter if the ballot is completely blank for all races. (*Id.* at 76.)

84   As shown in Exhibit 7.1, the ballot image on the left illustrates what the ballot looks like to the human eye when voted. The ballot image on the right shows the ballot recorded by the ICP scanner and is the image that is tabulated for vote counting.

85   To be fair to his testimony, Mr. Hursti opined that in order to maximize the accuracy of the ICC tabulation scanner, the ICC should be configured to capture additional information from the images, such as gray scale or color, in addition to an increase in the DPI.

86   This is consistent with the representations made in the Dominion contract that "[a]fter a ballot is adjudicated, the ballot image is appended with a record of that decision including the user's name, action taken by the user, and date and time of the action. This adjudication AuditMark is appended to the ballot image under the original AuditMark, which was manifested during tabulation." (Doc. 619-8 at 54.)

87   An overvote occurs when the scanner/tabulator registers more than one legible vote for a single contest.

88   This is the result unless they can be discovered in a subsequent manual recount, like the one conducted by Clarke County that recovered some of these types of lost votes by allowing full examination of the ballots with "blanks" in the 5 districts where such re-counting was allowed. The panel's bipartisan members agreed on all of the vote determinations.

Curling v. Raffensperger, 493 F.Supp.3d 1264 (2020)

89    *See* *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976) (plurality opinion) (The "loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018) ("The Court finds that [p]laintiffs have established irreparable injury as a violation of the right to vote cannot be undone through monetary relief and, once the election results are tallied, the rejected electors will have been disenfranchised without a future opportunity to cast their votes."); *see also* *League of Women Voters of N.C.*, 769 F.3d at 247 ("Courts routinely deem restrictions on fundamental voting rights irreparable injury ... [because] once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin the law.").

90    Although the burden is minimal, the evidence indicates the instructions are not effective or are ignored by a number of voters.

91    This deadline can be extended by the Secretary of State, if necessary, in order to perform an audit.

92    On the other hand, during his September 10th testimony before this Court, Mr. Hursti seemed to indicate that no other system configuration adjustments could be made to increase the accuracy of the ICP tabulators used at precinct locations. Instead, his proposed solution for the ICP precinct scanner is to provide better instructions to voters carefully to fill the whole oval and provide all voters with black felt ink pens for marking paper ballots by hand. (Tr. Vol. I at 141, 159, 168.) According to Mr. Hursti, the evidence demonstrates that many voters do not follow the existing written instructions printed on the absentee/provisional/emergency paper ballots – an indication that the instructions have not been effective. (*Id.* at 159.) The CES study similarly concluded that instructions to voters should be modified to inform the voter to fill in the oval next to the candidate name and to avoid circling, underlining, or placing checkmarks or Xs, or otherwise marking the candidate name outside the vote target oval. The CES study also determined that voters should be warned to not use red ink when marking ballots. The Court takes judicial notice that the Secretary of State has revised the written instructions on its paper ballots to incorporate these recommendations from the CES study, though its revised ballot instructions removed the visual illustration showing how to blacken in the oval. And the Secretary of State's guidance on the use of emergency paper ballots for in-person voting specifies that precincts provide only the two pens approved by Dominion Voting – the Sharpie Fine Point black pen and the Paper Mate Flair M Medium Point black pen.[92] (*See* Pls.' Ex. 11.) The casting of hand marked emergency ballots in prior elections in the 2020 election cycle appears to have been fairly rare based on the evidence before the Court. However, as the Secretary of State's Office and County Registrar's Offices should be providing more training to county poll workers on the State's emergency ballot options and process prior to the 2020 general election, a focus upon scanning issues impacting the scanning of hand marked ballots at the precinct level, where scanners produce even less refined images, would be sensible.

93    The Court recognizes that some counties have indicated they do not plan to use the adjudication software and will proceed according to their established procedures to systematically review scanned hand marked ballots along with the original ballots, consistent with the penultimate "voter intent" standard established under Georgia law.

94    Dr. Coomer, however, testified that the scanner software (not the adjudication software) is programmed to provide an alert where a ballot is scanned that registers as completely blank.

95    Every hand-marked paper ballot has a unique corresponding ballot ID number printed at the bottom that is recorded by the scanner/tabulator and reflected on the AuditMark associated with the ballot image. The AuditMark that indicates the disposition of the candidate choices on each scanned ballot contains a record of the ballot ID from the paper ballot. The AuditMark on the scanned ballot image is therefore traceable to the original paper ballot. As a result, the original paper ballots can be compared, as needed under the circumstances, to the AuditMark to confirm that voter intent has been accurately recorded by the scanners.

96    To the extent questions arise whether voter marks are clearly discernible on the scanned image, the Vote Review Panels can review the original paper ballots if necessary. Every hand-marked paper ballot has a unique corresponding ballot ID number printed at the bottom that is recorded by the scanner/tabulator and reflected on the AuditMark associated with the ballot image. The AuditMark that indicates the disposition of the candidate choices on each scanned ballot contains a record of the ballot ID from the paper ballot. The AuditMark on the scanned ballot image is therefore traceable to the original paper ballot. As a result, the original paper ballots can be compared, as needed under the circumstances, to the AuditMark to confirm that voter intent has been accurately recorded by the scanners.

97    *See, e.g.*, Paragraph (a) of proposed Order at Doc. 809-17.

98      Justice Ruth Bader Ginsburg – Opening Remarks to Senate Judiciary Committee in her 1993 Senate Confirmation Hearing.

99      For the reasons discussed in Section III D, the Coalition Plaintiffs' Motion is **GRANTED IN PART** in connection with the scanner/tabulator settings in tandem with Dominion's adjudication software that as currently configured allow certain voter marks on hand-marked absentee and provisional ballots to disregarded and not be counted.

---

**End of Document**                                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

WESTLAW   © 2021 Thomson Reuters. No claim to original U.S. Government Works.                    58