**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 1:21-cv-00445-CJN |
| v. | ) ) | Judge Carl J. Nichols |
| MY PILLOW, INC. and MICHAEL J. LINDELL, | ) ) ) | |
| Defendants. | ) ) ) | |

**DOMINION'S OMNIBUS OPPOSITION**
**TO DEFENDANTS' MOTIONS TO DISMISS**

## TABLE OF CONTENTS

I.    The Complaint states a claim for defamation against MyPillow and its CEO. ...........3

    A.    Dominion can bring a defamation claim. ...............................................................4

    B.    The Complaint alleges actual malice. ...................................................................5

        1.    Defendants' accusations are so inherently improbable that only a reckless person would have published them. ........................................................9

        2.    Defendants intentionally disregarded evidence and relied on unreliable sources even though Defendants had obvious reasons to doubt their sources' veracity. ....................................................................................12

        3.    Defendants peddled a false preconceived narrative that the election had been stolen from Trump because Lindell believed it would sell MyPillows to Trump supporters. ....................................................................................16

    C.    Defendants' assertions of good faith must be pressure tested by a jury. ...............21

    D.    Lindell was acting as MyPillow's agent. ............................................................23

II.   The Complaint states a claim for deceptive trade practices. ......................................25

III.  Defendants are subject to personal jurisdiction in the District of Columbia ............26

    A.    D.C.'s long-arm statute confers personal jurisdiction over Defendants. ...............27

        1.    This Court has jurisdiction under D.C.'s long-arm statute because Defendants transacted business in Washington, D.C. ................................................27

        2.    This Court has jurisdiction under D.C.'s long-arm statute because Defendants caused tortious injury in Washington, D.C. by acts within the District. ...31

        3.    This Court has jurisdiction under D.C.'s long-arm statute because Defendants caused tortious injury in Washington, D.C. by acts outside the District, while engaging in a persistent course of conduct in D.C. ........................33

    B.    Jurisdiction is proper under the Due Process Clause. .............................................35

IV.   Venue is proper and the case should not be transferred ............................................36

V.    Defendants are not entitled to attorneys' fees. .........................................................40

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbas v. Foreign Policy Grp.*,
    783 F.3d 1328 (D.C. Cir. 2015)............................................................................2, 40, 41

*Am. Assoc. of Cruise Passengers v. Cunard Line, Ltd.*,
    691 F. Supp. 379 (D.D.C. 1987)...............................................................................34

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ....................................................................................................6

*Burman v. Phoenix Worldwide Indus., Inc.*,
    437 F. Supp. 2d 142 (D.D.C. 2006).........................................................................30

*Catalyst & Chem. Servs., Inc. v. Global Ground Support*,
    350 F. Supp. 2d 1 (D.D.C. 2004).............................................................................25

*Celle v. Filipino Rep. Enters. Inc.*,
    209 F.3d 163 (2d Cir. 2000) ......................................................................................6

*Cohane v. Arpeja-California, Inc.*,
    385 A.2d 153 (D.C.),
    *cert. denied*, 439 U.S. 980 (1978) ..........................................................................35

*Competitive Enter. Inst. v. Mann*,
    150 A.3d 1213 (D.C. 2016),
    *as amended* (Dec. 13, 2018) ......................................................................21, 40, 41

*Connelly v. Nw. Publ'ns, Inc.*,
    448 N.W.2d 901 (Minn. Ct. App. 1989) ..................................................................22

*Corsi v. Caputo*,
    No. 19-cv-1573, 2020 WL 1703934 (D.D.C. Apr. 7, 2020) ....................................31

*Crane v. N.Y. Zoological Soc'y*,
    894 F.2d 454 (D.C. Cir. 1990)..................................................................................33

*Daley v. Alpha Kappa Alpha Sorority, Inc.*,
    26 A.3d 723 (D.C. 2011)...........................................................................................35

*Eramo v. Rolling Stone, LLC*,
    209 F. Supp. 3d 862 (W.D. Va. 2016)..................................................................6, 22

*Exelon Generation Co. v. Grumbles*,
    380 F. Supp. 3d 1 (D.D.C. 2019) ................................................................. 37

*Fisher v. Bander*,
    519 A.2d 162 (D.C. 1986) ........................................................................... 26

*Flowers v. Carville*,
    310 F.3d 1118 (9th Cir. 2002) ................................................................... 16

*Ford Motor Co.v. Mont. Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021) ............................................................................... 30

*Gertz v. Robert Welch, Inc.*,
    680 F.2d 527 (7th Cir. 1982) ................................................................. 7, 17

*Gilmore v. Jones*,
    370 F. Supp. 3d 630 (W.D. Va. 2019) ........................................................ 17

*Goldwater v. Ginzburg*,
    414 F.2d 324 (2d Cir. 1969) ....................................................................... 17

*Gottwald v. Sebert*,
    No. 2020-01908, 2021 WL 1567070 (N.Y. App. Div. Apr. 22, 2021) ........ 5

*Greenberg v. CBS Inc.*,
    69 A.D.2d 693 (N.Y. App. Div. 1979) ......................................................... 5

*GTE New Media v. BellSouth Corp.*,
    199 F.3d 1343 (D.C. Cir. 2000) .................................................................. 36

*GTSI Corp. v. Wildflower Int'l, Inc.*,
    Case No. 1:09-cv-123, 2009 WL 10687969 (E.D. Va. Nov. 17, 2009) ........ 4

*Harris v. City of Seattle*,
    152 F. App'x 565 (9th Cir. 2005) ..................................................... 7, 17, 20

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
    491 U.S. 657 (1989) .................................................................................. 6, 7

*Herbert v. Lando*,
    441 U.S. 153 (1979) ..................................................................................... 6

*Holland v. ACL Transp. Servs., LLC*,
    815 F. Supp. 2d 46 (D.D.C. 2011) .............................................................. 39

*Hourani v. Psybersolutions, LLC*,
    164 F. Supp. 3d 128 (D.D.C. 2016) ............................................................ 31

*Howser v. Pearson*,
   95 F. Supp. 936 (D.D.C. 1951) ..................................................................... 32

*Hutchinson v. Proxmire*,
   443 U.S. 111 (1979) ....................................................................................... 22

*IMAPizza, LLC v. At Pizza Ltd.*,
   334 F. Supp. 3d 95 (D.D.C. 2018) ........................................................... 28, 29

*In re Domestic Airline Travel Antitrust Litig.*,
   221 F. Supp. 3d 46 (D.D.C. 2016) ................................................................. 10

*Int'l Shoe Co. v. Washington*,
   326 U.S. 310 (1945) ....................................................................................... 36

*Jankovic v. Int'l Crisis Grp.*,
   593 F.3d 22 (D.C. Cir. 2010) ............................................................. 21, 22, 25

*Johns v. Newsmax Media, Inc.*,
   887 F. Supp. 2d 90 (D.D.C. 2012) ................................................................. 37

*Kaelin v. Global Commc'ns Corp.*,
   162 F.3d 1036 (9th Cir. 1998) ................................................................... 7, 22

*Keeton v. Hustler*,
   465 U.S. 770 (1984) ....................................................................................... 32

*Lapointe v. Van Note*,
   No. 03-cv-2128, 2004 WL 3609346 (D.D.C. Nov. 9, 2004) ........................... 32

*Lawrence v. Bauer Publ'g & Printing Ltd.*,
   459 U.S. 999 (1982) ....................................................................................... 22

*Lewy v. S. Poverty L. Ctr., Inc.*,
   723 F. Supp. 2d 116 (D.D.C. 2010) ....................................................... 29, 33, 34

*Mangan v. Corp. Synergies Grp., Inc.*,
   834 F. Supp. 2d 199 (D.N.J. 2011) ................................................................. 23

*Mastro v. Potomac Elec. Power Co.*,
   447 F.3d 843 (D.C. Cir. 2006) ....................................................................... 31

*McKee v. Cosby*,
   586 U.S. ___ (2019) ......................................................................................... 4

*Menoken v. Dhillon*,
   975 F.3d 1 (D.C. Cir. 2020) ........................................................................... 10

*Milkovich v. Lorain J. Co.*,
  497 U.S. 1 (1990) ....................................................................................................5

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ................................................................................3, 4, 5, 6, 21

*Nader v. Toledano*,
  408 A.2d 31 (D.C. 1979) ........................................................................................21

*Navab-Safavi v. Broad. Bd. of Governors*,
  650 F. Supp. 2d 40 (D.D.C. 2009) .........................................................................31

*Oetiker v. Jurid Werke, G.m.b.H.*,
  556 F.2d 1 (D.C. Cir. 1977) ...................................................................................35

*Palin v. N.Y. Times Co.*,
  940 F.3d 804 (2d Cir. 2019) .....................................................................6, 7, 8, 17, 23

*Phillips v. Mabus*,
  894 F. Supp. 2d 71 (D.D.C. 2012) ...........................................................................4

*Poling v. Farrah*,
  131 F. Supp. 2d 191 (D.D.C. 2001) ........................................................................35

*Project Veritas v. N.Y. Times Co.*,
  No. 63921/2020 (N.Y. Sup. Ct. Mar. 18, 2021) .....................................................17

*Quality Air Servs., L.L.C. v. Milwaukee Valve Co.*,
  567 F. Supp. 2d 96 (D.D.C. 2008) ..........................................................................28

*Reuber v. United States*,
  750 F.2d 1039 (D.C. Cir. 1984) ..............................................................................32

*Schiavone Constr. Co v. Time, Inc.*,
  847 F.2d 1069 (3d Cir. 1988) ...................................................................................6

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
  559 U.S. 393 (2010) ...............................................................................................40

*Sharon v. Time, Inc.*,
  599 F. Supp. 538 (S.D.N.Y. 1984) .....................................................................7, 16

*Sheraton Operating Corp. v. Just Corp. Travel*,
  984 F. Supp. 22 (D.D.C. 1997) ...............................................................................39

*Shoppers Food Warehouse v. Moreno*,
  746 A.2d 320 (D.C. 2000) ..........................................................................28, 35, 36

*Solano v. Playgirl, Inc.,*
    292 F.3d 1078 (9th Cir. 2002) ...................................................................6, 7, 20

*St. Amant v. Thompson,*
    390 U.S. 727 (1968) ...................................................................7, 9, 12, 21, 22

*Steinberg v. Int'l Crim. Police Org.,*
    672 F.2d 927 (D.C. Cir. 1981)............................................................34, 35

*Stewart v. Azar,*
    308 F. Supp. 3d 239 (D.D.C. 2018)............................................................38

*StopLoss Specialists, LLC v. VeriClaim, Inc.,*
    340 F. Supp. 3d 1334 (N.D. Ga. 2018)............................................................23

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.,*
    330 F.3d 1110 (9th Cir. 2003) ...................................................................7, 16

*Tah v. Global Witness,*
    991 F.3d 231 (D.C. Cir. 2021)...................................................................13, 17, 40

*Thayer/Patricof Educ. Funding v. Pryor Res.,*
    196 F. Supp. 2d 21 (D.D.C. 2002)............................................................39

*The Urban Inst. v. FINCON Servs.,*
    681 F. Supp. 2d 41 (D.D.C. 2010)............................................................29

*Unker v. Joseph Markovits, Inc.,*
    643 F. Supp. 1043 (S.D.N.Y. 1986) ............................................................24

*Vasquez v. Whole Foods Market,*
    302 F. Supp. 3d 36 (D.D.C. 2018)............................................................34

*VECC, Inc. v. Bank of Nova Scotia,*
    296 F. Supp. 2d 617 (D.V.I. 2003)............................................................24

*Von Kahl v. Bureau of Nat'l Affairs, Inc.,*
    934 F. Supp. 2d 204 (D.D.C. 2013)............................................................7, 23

*Walden v. Fiore,*
    571 U.S. 277 (2014) ............................................................36

*Wash. Gas-Light Co. v. Lansden,*
    172 U.S. 534 (1889) ............................................................23, 25

*Wash. Post v. Keogh,*
    365 F.2d 965 (D.C. Cir. 1966)............................................................6

vi

*White v. Fraternal Order of Police*,
 909 F.2d 512 (D.C. Cir. 1990)................................................................25

*Wilderness Soc'y v. Babbitt*,
 104 F. Supp. 2d 10 (D.D.C. 2000)...........................................................37

*World-Wide Volkswagen v. Woodson*,
 444 U.S. 286 (1980) ...............................................................................36

*Wormley v. United States.*,
 601 F. Supp. 2d 27 (D.D.C. 2009).............................................................31

*Zerangue v. TSP Newspapers, Inc.*,
 814 F.2d 1066 (5th Cir. 1987) ............................................................7, 22

*Zimmerman v. Al Jazeera Am., LLC*,
 246 F. Supp. 3d 257 (D.D.C. 2017)...............................7, 10, 16, 22, 23

**Statutes**

28 U.S.C. § 1391 ...............................................................................37

D.C. Code § 13-423.........................................................27, 30, 31, 33, 35

Minn. Stat. § 325D.45 ...............................................................................25

**Rules**

Fed. R. Civ. P. 12.........................................................................3, 26, 36, 41

**Other Authorities**

1 Rodney Smolla, Law of Defamation § 3:71 (2d ed.)...............................7

Restatement (Second) of Torts § 580A ..............................................7, 16

For months on end, MyPillow, Inc. and its CEO Mike Lindell have been making the demonstrably false claim that Dominion committed election fraud and stole the 2020 U.S. Presidential Election as part of a vast international conspiracy and cover-up involving foreign countries, Democrats, bipartisan elected officials across the country, and agencies of the United States government led by Trump appointees including then-Attorney General Bill Barr.  In support of their lies, Defendants have put forward a fake spreadsheet with fake IP/MAC addresses and a low-budget cartoon showing "votes" (*i.e.*, cartoon images of files) zooming around a world map. Now, MyPillow claims that "the MyPillow Guy" was not speaking for MyPillow when he gave speeches at MyPillow-sponsored rallies in Washington, D.C. or when he otherwise exploited election lies to market MyPillow products—which could be purchased on MyPillow's website using promo codes like "FightforTrump," "QAnon," "Q," and "Proof."

Because MyPillow and its CEO simply cannot defend the fake evidence they featured while exploiting election lies to promote MyPillow, they now seek to justify their lies by pointing to new evidence.  Of course, the Court cannot consider Defendants' new evidence or draw inferences and resolve factual disputes in Defendants' favor at this stage.  But even if it could, Defendants' new evidence consists of irrelevant documents and relies on the work of cybersecurity experts who have forcefully rebutted Defendants' lies, publicly announcing that "no credible evidence has been put forth that supports a conclusion that the 2020 election outcome in any state has been altered through technical compromise."

In ruling on the motions filed by MyPillow and its CEO, the Court faces four issues:

- **Actual malice**.  The United States Supreme Court has recognized that actual malice may be shown where a defendant's accusations are so inherently improbable that only a reckless person would have put them in circulation.  In addition to the fact that Defendants' accusations are inherently improbable on their face, the Complaint also alleges that MyPillow's CEO intentionally disregarded his own knowledge of the circumstances that caused the numerical "deviations" in which Trump's early apparent leads were overtaken by Democratic-leaning mail-in ballots, and that he also intentionally disregarded his own knowledge that then-Attorney General Bill Barr, the Department of Justice ("DOJ"), the Department of Homeland Security ("DHS"), the Cybersecurity & Infrastructure Security Agency ("CISA"), and cybersecurity experts determined that there was no credible evidence of machine fraud in the election.  Courts have also recognized that relying on facially unreliable sources, attempting to make evidence conform to a preconceived narrative, having a financial motive to lie, and refusing to retract are all evidence of actual malice.  The Complaint alleges that MyPillow's CEO relied on and put forward conspiracy theorists and fake evidence—despite the fact that he had actual knowledge of glaring red flags and problems with those sources and evidence—because he wanted to promote the preconceived narrative that the election had been stolen from Trump, not because he was foolish enough to actually believe it, but because he thought it would be good for MyPillow's bottom line: his prior experience had taught him that MyPillow could successfully deploy deceptive marketing practices, that MyPillow's advertising to conservative viewers had paid handsome returns, and that his vocal support for Trump in the past had won MyPillow a valuable Trump endorsement and been very good for MyPillow's business.  The Complaint also alleges that even after Defendants were put on written notice of publicly available evidence rebutting their false claims, they continued doubling down on them (and have done so even to this day, after the Complaint was filed, continuing to put the lives of Dominion employees in danger).  Does the Complaint plausibly allege that MyPillow and its CEO acted with actual malice?

- **Personal jurisdiction and venue**.  This Court may exercise personal jurisdiction over persons who—directly or by an agent—transact business in D.C. or cause tortious injury in D.C. by acts inside or outside D.C.  MyPillow's CEO and spokesman traveled to D.C., spoke at MyPillow-sponsored rallies, told lies about Dominion while meeting with then-President Trump and Sidney Powell, and waged a defamatory marketing campaign against Dominion from within D.C., and MyPillow sold products to residents of D.C.  Are jurisdiction and venue proper in D.C.?

- **Deceptive trade practices**.  The D.C. Circuit has recognized that the underlying conduct for a defamation claim can also support a claim for a second tort, and Minnesota's Deceptive Trade Practices Act expressly provides that its remedies are in addition to remedies otherwise available against the same conduct under the common law.  Does the Complaint state a claim for deceptive trade practices?

- **The D.C. Anti-SLAPP Act**.  In a controlling decision that remains good law, the D.C. Circuit held that the D.C. Anti-SLAPP Act does not apply in federal court.  *See Abbas v. Foreign Policy Grp.*, 783 F.3d 1328, 1334, 1337 (D.C. Cir. 2015) (B. Kavanaugh).  Are Defendants entitled to their attorneys' fees under the D.C. Anti-SLAPP Act?

## ARGUMENT

**I.     The Complaint states a claim for defamation against MyPillow and its CEO.**

In urging the Court to dismiss Dominion's defamation claim pursuant to Rule 12(b)(6), Defendants advance three main arguments.

***First***, Defendants argue that the Complaint fails to plead actual malice.  But the Complaint more than satisfies the standard for pleading actual malice:

- On their face, the defamatory accusations at issue in this case are so ***inherently improbable*** that only a reckless person would have published them.

- The Complaint alleges that, despite being presented with independent evidence disproving their defamatory accusations, Defendants ***ignored the truth*** and not only ***refused to retract*** their demonstrably false statements, but affirmatively produced, broadcast, and promoted them in a defamatory docu-movie featuring ***facially unreliable sources*** and fake evidence, even though Defendants were subjectively aware of reasons to doubt the veracity of their sources and evidence.

- The Complaint also alleges dozens of facts from which a reasonable jury could infer that Defendants knowingly and intentionally pushed a false ***preconceived narrative*** that the 2020 Presidential Election had been stolen, not because they actually believed it, but in order to ***profit*** by promoting MyPillow products to Trump supporters.

***Second,*** Defendants contend that Dominion's defamation claim should be dismissed because Lindell believes the defamatory accusations.  (MyPillow Mem. at 11-12; Lindell Mem. at 14-15.)  As an initial matter, even if Lindell did not actually know that his statements were false, actual malice may be shown if he recklessly disregarded their falsity.  *See N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964) (defining "actual malice" as including "reckless disregard" of whether a statement was false).  Moreover, Dominion is entitled to prove Lindell's subjective state of mind through circumstantial evidence, and it is up to the factfinder to determine whether Lindell is lying about what he claims to believe.

***Third,*** MyPillow argues that it cannot be held liable for Lindell's statements.  (MyPillow Mem. at 19-20.)  Not so.  The law is clear that corporations can be held liable for the defamatory

statements their employees make within the scope of their employment and in furtherance of the company's business. And the Complaint plainly alleges facts from which a jury could infer that Lindell—who is to this day the president, CEO, and spokesman of MyPillow and who is widely known as "the MyPillow Guy"—was acting as the company's agent when he exploited lies about Dominion to market MyPillow products.

In sum, the Complaint more than plausibly alleges a defamation claim against both Lindell and MyPillow, and the Court should deny Defendants' motions to dismiss.

### A. Dominion can bring a defamation claim.

As a threshold matter, MyPillow is mistaken that the First Amendment somehow categorically bars Dominion's defamation claim. MyPillow claims that *New York Times v. Sullivan* held that the Constitution "***bars***" "damages for libel in actions brought by public officials ***against critics of their official conduct***." (MyPillow Mem. at 8 (emphasis added).) In fact, the case did ***not*** hold that the Constitution bars such actions, but that a public official cannot "recover damages for a defamatory falsehood relating to his official conduct ***unless*** he proves that the statement was made with 'actual malice.'" *Sullivan*, 376 U.S. at 279-80. Nor is there any rule barring companies from bringing defamation claims simply because they are government contractors that sell goods or services to the government; to the contrary, government contractors regularly bring defamation claims. *See, e.g.*, *Phillips v. Mabus*, 894 F. Supp. 2d 71, 96-97 (D.D.C. 2012); *GTSI Corp. v. Wildflower Int'l, Inc.*, Case No. 1:09-cv-123, 2009 WL 10687969, at *3 (E.D. Va. Nov. 17, 2009).

While the actual malice standard applies to "public officials" and "public figures" in defamation actions, there is no separate standard applicable to "governmental actors." *Cf. McKee v. Cosby*, 586 U.S. ___ (2019) (Thomas, J., concurring) (noting the history of the actual malice standard and arguing that it should not apply even to public officials or public figures). Instead, it

appears that MyPillow asks this Court to gratuitously find that Dominion is a "governmental actor" so that MyPillow can exploit that finding in support of its meritless retaliatory section 1983 claims that Dominion violated MyPillow's constitutional rights.  *See MyPillow, Inc. v. US Dominion, Inc.*, Case No. 0:21-cv-01015-PJS-DTS (D. Minn. Apr. 19, 2021); MyPillow Mem. at 8.

As a factual matter, Dominion is not a "governmental actor" or a "public official."  As the Complaint alleges, "Dominion is a for-profit company that provides local election officials with tools they can use to run elections."  (Compl. ¶ 157.)  Dominion does not administer elections; election officials administer the elections using technology and devices purchased from Dominion. *See id.*  Moreover, Dominion did not "thrust itself" to the forefront of a public controversy.  (*See* MyPillow Mem. at 10; Lindell Mem. at 3.)  The "public relations campaign" MyPillow references (at 10) was in ***response*** to the lies that Defendants and their allies spread; as such, it cannot be cited as a basis for concluding that Dominion is a public figure or limited-purpose public figure. *See Gottwald v. Sebert*, No. 2020-01908, 2021 WL 1567070, at *3-4 (N.Y. App. Div. Apr. 22, 2021) ("A person may generally not be made a public figure through the unilateral acts of another"); *Greenberg v. CBS Inc.*, 69 A.D.2d 693, 705 (N.Y. App. Div. 1979) ("those charged with defamation cannot, by their own conduct, create their own defense").

**B.  The Complaint alleges actual malice.**

In any event, the Court need not decide if Dominion is a public official, public figure, or limited-purpose public figure, because Dominion has alleged that Defendants acted with actual malice.  Under settled Supreme Court precedent, public officials and public figures may proceed on defamation claims based on false statements about matters of public concern, provided that they plead that the defendant acted with actual malice.  *See Sullivan*, 376 U.S. at 280 (establishing the "actual malice" standard); *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (an "'opinion' on a

matter of public concern can be actionable where it "reasonably implies false and defamatory facts" about a public figure).

At the pleadings stage, the "actual malice" standard does not require a plaintiff to prove that the defendant knew his statements were false; rather, a complaint pleads actual malice where it alleges facts giving rise to a plausible inference that the defendant knew or recklessly disregarded that his statements were false. *See Sullivan*, 376 U.S. at 280; *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Wash. Post v. Keogh*, 365 F.2d 965, 967 (D.C. Cir. 1966) (actual malice "is ordinarily inferred from objective facts"); *Palin v. N.Y. Times Co.*, 940 F.3d 804, 814-16 (2d Cir. 2019) (vacating dismissal of a complaint that plausibly alleged actual malice); *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) ("'Malice may be proved inferentially[.]'").

Because defamation defendants "are prone to assert their good-faith belief in the truth of their publications," *Herbert v. Lando*, 441 U.S. 153, 170 (1979), plaintiffs are "entitled to prove the defendant's state of mind through circumstantial evidence." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989); *see also Palin*, 940 F.3d at 815; *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 871 (W.D. Va. 2016); *Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1087 (9th Cir. 2002); *Schiavone Constr. Co v. Time, Inc.*, 847 F.2d 1069, 1090 (3d Cir. 1988).

As the Supreme Court has explained:

> The existence of actual malice may be shown in many ways. As a general rule, any competent evidence, either direct or circumstantial, can be resorted to, and all the relevant circumstances surrounding the transaction may be shown, provided they are not too remote, including threats, prior or subsequent defamations, subsequent statements of the defendant, circumstances indicating the existence of rivalry, ill will, or hostility between the parties, facts tending to show a reckless disregard of the plaintiff's rights.

*Herbert*, 441 U.S. at 164 n.12.

Relevant here, a defamation defendant is not likely to prevail when his allegations are so "inherently improbable" that only a reckless person would have published them. *See St. Amant v.*

6

*Thompson*, 390 U.S. 727, 732 (1968).  In addition, "evidence establishing obvious reasons to doubt the veracity of a defendant's source can support a finding of reckless disregard on its own." *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 281-83 (D.D.C. 2017) (citing *St. Amant*, 390 U.S. at 732).  Circumstantial evidence of a financial motive to defame is also evidence of actual malice.  *See Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1136 (9th Cir. 2003); *Connaughton*, 491 U.S. at 668; *Solano*, 292 F.3d at 1086; *Kaelin v. Global Commc'ns Corp.*, 162 F.3d 1036, 1042 (9th Cir. 1998).  In addition, evidence "that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story" is evidence of actual malice and "may often prove to be quite powerful evidence.'"  *Harris v. City of Seattle*, 152 F. App'x 565, 568 (9th Cir. 2005) (quoting 1 Rodney Smolla, Law of Defamation § 3:71 (2d ed.)); *accord Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 539 (7th Cir. 1982); *Sharon v. Time, Inc.*, 599 F. Supp. 538, 576 (S.D.N.Y. 1984).  Finally, a defendant's refusal to retract is also evidence of actual malice.  *See Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987); Restatement (Second) of Torts § 580A cmt. d.

At the pleadings stage, a plaintiff's burden in alleging actual malice is not high.  For example, in *Von Kahl v. Bureau of Nat'l Affairs, Inc.*, this Court denied a motion to dismiss a defamation claim where the complaint alleged that the plaintiff put the defendant on notice that the accusation was false and that the defendant nonetheless published an allegedly false clarification.  934 F. Supp. 2d 204, 218 (D.D.C. 2013).  Likewise, in *Zimmerman*, this Court denied a motion to dismiss a defamation claim where the complaint alleged that the publisher had relied on unreliable sources and disregarded information that the plaintiff had provided.  246 F.Supp. 3d at 270.  And in *Palin*, the Second Circuit vacated the dismissal of former Governor Sarah Palin's

defamation complaint where—even though the *New York Times* had made a correction within one day of publication of the defamatory editorial—the complaint plausibly alleged actual malice by pleading that the author had a predetermined argument that he wanted to make based on his personal connection to the story and his personal bias against Palin's political positions, and that the reporter had previously reviewed, edited, and approved articles rebutting the false claim).  940 F.3d at 814-15, 817.

Here, the Complaint alleges dozens of facts supporting a plausible inference that Defendants published their statements with actual malice.  (*See* Compl. ¶¶ 1-4, 33-35, 38, 40, 42-44, 49-51, 56, 59, 63-65, 69-76, 79, 84, 91-93, 96, 98, 99, 101-05, 110-16, 120, 123-27, 129-31, 160-61, 164.)  In summarizing those detailed factual allegations, the Complaint alleges:

> As set forth above in detail, in the course of his business as MyPillow's CEO and agent, Lindell published false statements about Dominion with actual malice. By December 12, 2020 at the very latest, Lindell knew or recklessly disregarded that his statements about Dominion rigging the election and using algorithms to manipulate vote counts were false. Intentionally disregarding Trump's tweets discouraging his supporters from voting by mail and CISA's and Attorney General Bill Barr's determination that there was no evidence to support the Defendants' false claims, Lindell set out to make the facts conform to a false preconceived narrative that the election had been stolen from Trump. Lindell pushed this false narrative even though there was no evidence to support it because he had learned from his knowledge of game theory and prior experience—scoring Trump's endorsement for MyPillow, getting great returns on ad dollars spent on conservative media platforms, and profiting from deceptive ads making claims unsupported by evidence—that lying about Dominion would be good for MyPillow's bottom line and would lead to other benefits… In search of "evidence" to bolster MyPillow's defamatory marketing campaign, Lindell teamed up with Sidney Powell and Lin Wood, two facially unreliable sources who misrepresented, manufactured, and cherry-picked evidence to put on their fundraising website and whose sham litigation had all been dismissed—and whose sources were judicially determined to be "wholly unreliable"—by December 9, 2020. By January 8, 2021, Lindell actually knew that his statements about Dominion using algorithms to manipulate vote counts were false because, in addition to the above evidence, his allies in the media (including networks where MyPillow advertises heavily) had de-platformed Powell and Giuliani for making those claims and purported to "clarify" their previous reporting on the Big Lie; in addition, Dominion had sent Lindell a letter and a copy of the Powell complaint and exhibits, specifically directing Lindell to

> the publicly available facts and evidence disproving the Big Lie. And, by February 4, 2021, Lindell actually knew—from Dominion's letter—that the "raw data analytics" from The American Report conspiracy theory blog and the so-called "forensics report" from conspiracy theorist Russell Ramsland were riddled with red flags and glaring errors.

(Compl. ¶ 164.)   Then, despite repeatedly being put on specific written notice of the publicly available facts and evidence disproving their claims and the obvious reasons to doubt the veracity of their sources, Defendants continued making false and defamatory statements about Dominion that had been rebutted by the evidence that had been sent to them.  (Compl. ¶ 165.)  In sum, this is one of the clearest cases of actual malice imaginable.

### 1. Defendants' accusations are so inherently improbable that only a reckless person would have published them.

Defendants falsely claimed that Dominion committed the "biggest crime ever committed in election history against our country and the world" and stole the 2020 U.S. Presidential Election by using an algorithm to flip and weight votes in its machines; that Dominion's voting machines are "corrupt" and were "built to cheat" and "steal elections;" that Trump received so many votes that all the algorithms broke at 11:15 on election night; that a fake spreadsheet with fake IP/MAC addresses is really "a cyber footprint from inside the machines," proving that they were hacked by foreign countries; and that the vast international conspiracy was kept under wraps because the DOJ and DHS had not really investigated claims of election fraud because Trump appointee and then-Attorney General Bill Barr was "corrupt" and had been "compromised."  (Compl. ¶¶ 103, 114, 165(e)(p)(x), 170.)  The Complaint therefore alleges actual malice because Defendants' outlandish allegations are, on their face, "so inherently improbable that only a reckless man would have put them in circulation."  *See St. Amant*, 390 U.S. at 732.

In trying to make their claims seem less inherently improbable, Defendants invite the Court to accept the truth of statements in documents outside the pleadings and to draw the inference in

Defendants' favor that Defendants in fact relied on those sources as the basis for their claims about Dominion.  (*See* MyPillow Mem. at 2-3, 15-17; Lindell Mem. at 16-28.)  The law prohibits the Court from accepting that invitation.  *See, e.g.*, *Menoken v. Dhillon*, 975 F.3d 1, 8 (D.C. Cir. 2020) ("[i]n considering claims dismissed pursuant to Rule 12 (b)(6), we accept a plaintiff's factual allegations as true and draw all reasonable inferences in a plaintiff's favor. … the district court erred by relying on two documents outside the complaint …"); *In re Domestic Airline Travel Antitrust Litig.*, 221 F. Supp. 3d 46, 71-72 (D.D.C. 2016) (declining to take judicial notice of articles, government filings from other litigation, and a government press release because "Defendants provide[d] the documents in order to present new factual allegations to counter the factual allegations underlying Plaintiffs' claim," which is improper at the motion to dismiss stage); *Zimmerman*, 246 F. Supp. 3d at 285 (rejecting defendants' attempt to rebut the complaint's allegations of fact and denying defendants' motion to dismiss defamation claim).

But even if the Court could accept the contents of matters outside the pleadings and draw inferences and resolve factual disputes in Defendants' favor at this stage (it cannot), the materials Defendants reference do not support their false claims.  Dozens of them do not even mention Dominion.  (Lindell Mem. Exs. M, W, Z, CC, DD, GG, and HH; MyPillow Mem. Appendix Entries I.1, I.2, II.1, II.2, II.3, III.1, III.2, III.7, III.9, III.17, III.25, III.27, III.31, III.32, III.33 III.34, III.36, III.38, III.40, III.41, III.43, III.44, III.45, III.49, III.50, III.55, III.65, III.67, III.68, III.69, III.73, III.76, III.77, III.78, III.79, III.80, III.82, III.86, III.88.)  Others reflect the fact that more than half of Americans now believe that cheating likely affected the outcome of the election (MyPillow Mem. at 17) and others point to post-election investigations launched in coordination with or because of Defendants and the allies Lindell helped bankroll, such as the Arizona "audit" being led by a QAnon supporter who has retweeted support for the lies promoted by Lindell and

his allies.  Plainly, such materials reflect the damage that Defendants helped cause; they do not retroactively provide a factual basis for Defendants to have made inherently improbable claims in the first place.

Defendants also invoke and take out of context Texas's certification decision and pre-election security concerns raised by the plaintiffs' cybersecurity experts in *Curling v. Raffensperger* and the cybersecurity experts quoted in two articles cited in a letter from Senator Elizabeth Warren, Senator Amy Klobuchar, Senator Ron Wyden, and Congressman Mark Pocan. As an initial matter, nothing about any of those materials provides a factual basis for Defendants' false claims that Dominion committed "election fraud" and "stole" the 2020 U.S. Presidential Election by using an "algorithm" to flip and weight votes in its machines, that Dominion had been "intentionally and purposely designed with inherent errors to create systemic fraud," and that Defendants' fake spreadsheet is really "a cyber footprint from inside the machines" proving that they were in fact hacked.  (Compl. ¶¶ 103, 165(x), (y).)

More importantly, ***before Defendants began making the defamatory statements at issue in this case***, the very people whom ***Defendants*** now invoke as "cybersecurity experts" in their materials outside the pleadings—*e.g.*, Dr. J. Alex Halderman, Dr. Andrew W. Appel, Dr. Kevin Skoglund, Dr. Richard DeMillo, Dr. Philip B. Stark, and Mr. Harri Hursti—had, along with dozens of other specialists in cybersecurity, publicly announced that "no credible evidence has been put forth that supports a conclusion that the 2020 election outcome in any state has been altered through technical compromise."  (Compl. ¶ 41(b).)  That conclusion, publicly espoused by the very people whom Defendants now invoke to justify their falsehoods, fundamentally rebuts Defendants' defamatory statements.  Far from helping Defendants' arguments, their new evidence further demonstrates their actual malice—*i.e.*, their knowledge or reckless disregard of the facts.

Although Defendants' claims were inherently improbable from the get-go, they became more and more inherently improbable with every passing day, as they were publicly rebutted by specialists in election security, Trump appointee and then-Attorney General Bill Barr, DOJ, DHS, CISA, bipartisan elected officials, independent audits, and hand recounts of paper ballots.  (Compl. ¶¶ 2, 3, 33-34, 40, 71, 72, 92, 167.)  But Defendants were undeterred.  Indeed, even after being put on specific written notice of the fact that Bill Barr had announced that DOJ and DHS had found no evidence to substantiate the assertion that the machines had been programmed to skew election results (Compl. ¶ 71), Defendants sought to discredit that fact by broadcasting the inherently improbable claim that there had been a massive cover-up.  (Compl. ¶ 114.)  As such, the Complaint plausibly alleges actual malice because a reasonable jury could conclude that Defendants' "allegations are so inherently improbable that only a reckless man would have put them in circulation."  *See St. Amant*, 390 U.S. at 732.

### 2. Defendants intentionally disregarded evidence and relied on unreliable sources even though Defendants had obvious reasons to doubt their sources' veracity.

The Complaint further alleges actual malice by detailing how Defendants have more than doubled down on their defamatory statements and intentionally disregarded the independent evidence disproving their false claims.  In the months leading up to the 2020 Election, while Democrats were encouraging people to vote by mail, Lindell retweeted two of Trump's tweets discouraging his supporters from voting by mail, showing that Lindell was subjectively aware of the circumstances that caused the numerical "deviations" in which Trump's early leads in swing states were overtaken by Democratic-leaning mail-in ballots.  (Compl. ¶¶ 28-33.)  But Defendants intentionally disregarded that fact and falsely claimed that the "deviations" were not mail-in votes, but evidence of "algorithms" in "rigged" Dominion machines.  (Compl. ¶¶ 112, 165(aa).)

12

Defendants also became aware of the contents of Dominion's letter to Lindell's ally Sidney Powell by January 8 at the latest, and Dominion sent Defendants letters on January 8 and February 4, along with copies of Dominion's heavily-footnoted defamation complaints against Sidney Powell and Rudy Giuliani (including the supporting exhibits). (Compl. ¶¶ 59, 69, 71, 101; Exs. 3, 269, 314.) After receiving those materials, Defendants continued repeating false claims that had been rebutted by the evidence cited in the materials that Dominion had sent to them. (Compl. ¶¶ 61-62, 70, 112-115, 119-121, 126-129, 165.)

MyPillow tries to dismiss Dominion's letters by citing *Tah v. Global Witness* (MyPillow Mem. at 14), but that decision simply affirms the commonsense rule that while a publisher need not accept simple denials that fail to contest the defamatory falsehoods, a letter that contains readily verifiable evidence does provide "obvious reasons" for a publisher "to doubt the veracity" of his claims—*i.e.*, evidence of actual malice. 991 F.3d 231, 242 (D.C. Cir. 2021). Unlike the simple denials in *Tah*, Dominion's letters and enclosed materials contained citations and hyperlinks to independent sources and publicly available court decisions that could be readily verified and that provided obvious reasons to doubt both the veracity of the claims that Defendants were making and the sources they were relying on and promoting. (Compl. ¶¶ 59, 69, 101; Exs. 3, 269, 314.)

Through the citations to evidence cited in the materials Dominion had sent, Defendants were made subjectively aware that 59 specialists in election security and Trump appointees from DOJ, DHS, and CISA had found no credible evidence of machine fraud in the election.[1] They also knew that bipartisan elected officials in Michigan, Arizona, and Georgia had found no evidence of

---

[1] (Compl. ¶¶ 41(b), 69, 101; Exs. 47, 269, 314 (reflecting that Dominion sent Lindell a copy of its defamation complaint against Giuliani, citing Tony Adams, Prof. Andrew W Appel, et al., *Scientists say no credible evidence of computer fraud in the 2020 election outcome, but policymakers must work with experts to improve confidence*, Matt Blaze (Nov. 16, 2020), https://www.mattblaze.org/papers/election2020.pdf.).)

fraud and that independent audits and hand recounts of paper ballots had repeatedly verified the accuracy of the vote counts in Dominion machines.  (Compl. ¶¶ 69, 101; Exs. 269, 314.)

Dominion also notified Defendants—with citations to readily verifiable evidence in the public domain—of numerous obvious reasons to doubt the veracity of their sources, including that Sidney Powell's and Lin Wood's team (which Lindell helped bankroll) had doctored evidence, manufactured a declaration that the witness later admitted was "misleading," and put forward "expert reports" from people like Russell Ramsland of Allied Security Operations Group ("ASOG") who were judicially determined to be "wholly unreliable;" that Powell's and Wood's sham litigations had all been dismissed by December 9, 2020; that the Trump Campaign had publicly disavowed Powell and had, along with Giuliani, *not* been willing to advance Powell's fraud claims against Dominion in court.  (*Id.*)  Defendants also learned that Ramsland was a discredited "Deep State" conspiracy theorist whose "forensic report" on Antrim County, Michigan had been publicly debunked.  (*Id.*)  Defendants also knew from Dominion's correspondence that there were numerous red flags and flaws in the fake spreadsheet.  (Compl. ¶ 101; Ex. 314.)

Yet despite the fact that Defendants were made subjectively aware of the above evidence and the obvious reasons to doubt the veracity of their sources and evidence, Defendants continued making false claims about Dominion and putting forward facially unreliable sources that had been discredited by the independent evidence referenced in the materials Dominion had sent.  (Compl. ¶¶ 59, 165(c)-(aa).)  For example, although Defendants knew that Trump appointees and bipartisan election officials had found no evidence of fraud and had verified the machine counts through independent audits and hand recounts of paper ballots, they continued falsely claiming that the Dominion machines had used an algorithm and been hacked to manipulate vote counts, and they produced and broadcast in their docu-movie the false claim that "we have not had one audit" of

the election.   (Compl. ¶ 165(y).)   Although Defendants knew from the evidence cited in Dominion's correspondence that Ramsland and his work had been discredited and that the initial error in the unofficial tally in Antrim County, Michigan had been caused by a human error by the Republican county clerk, Defendants broadcast a docu-movie falsely holding Ramsland out as a "forensic expert" and publishing Ramsland's false claim that Dominion had been "intentionally and purposely designed with inherent errors to create systemic fraud and influence election results" and that Dominion machines had flipped votes in Antrim County, Michigan.  (*Id.*)

Although Defendants knew from Dominion's correspondence that there were glaring red flags and flaws in the fake spreadsheet—and that Dominion had offered to review any of Defendants' other evidence "so that we can point out the red flags and other obvious errors that have plagued all of the other purported 'evidence' that has been put forward against Dominion"— in their docu-movie, Defendants proceeded to feature that fake spreadsheet and a fake world map cartoon (which they purposefully avoided giving Dominion an opportunity to review beforehand), falsely claiming that they were sourced from "cyber security experts" and were "a cyber footprint from inside the machines" that constituted "absolute proof" that Dominion's machines had been hacked, that there was "machine election fraud," and that Dominion machines had flipped votes and changed the outcome of the 2020 election.  (*Id.*)

In sum, even after being put on specific written notice of the independent evidence disproving their false claims, Defendants not only refused to retract, but went to extraordinary efforts to spread their lies to the broadest possible audience: they planned, produced, broadcast, and relentlessly promoted a defamatory docu-movie featuring fake evidence, which they manufactured in coordination with and based on interviews of sources whom they knew were not reliable.  Defendants' refusal to retract—and their continued reliance on unreliable sources and

fake evidence after having been notified of the obvious reasons to doubt their veracity—is clear evidence of actual malice. *Zimmerman*, 246 F. Supp. 3d at 281-83 ("evidence establishing obvious reasons to doubt the veracity of a defendant's source can support a finding of reckless disregard on its own."); *Suzuki Motor*, 330 F.3d at 1135 (evidence that the defendant "rigged" its test to conclude plaintiff's vehicle rolled over too easily was sufficient to prove malice); Restatement (Second) of Torts § 580A cmt. d (refusal to retract is evidence of actual malice). Defendants cannot immunize their false claims by pointing to Ramsland and the fake spreadsheet; Defendants had information debunking Ramsland's assertions and the fake spreadsheet but recklessly disregarded it. *See Flowers v. Carville*, 310 F.3d 1118, 1130 (9th Cir. 2002) ("if someone knows that the news story is false, he can't sanitize his republication by purporting to rely on the news source. Nor can he claim immunity if he has conflicting information from another source and recklessly disregards it."). In fact, Defendants' misrepresentations of Ramsland as a "forensic expert on these particular machines" and their misrepresentation that the fake spreadsheet was from "cyber forensic experts" are further evidence of actual malice. *Sharon*, 599 F. Supp. at 582 (finding evidence of actual malice sufficient to raise a material question of fact where, "[b]y [wrongly] attributing its version of the Bikfaya meeting to the Commission's appendix, Time qualitatively transformed it from a news magazine's view of the facts into a finding by a widely respected, quasi-judicial body.").

### 3. Defendants peddled a false preconceived narrative that the election had been stolen from Trump because Lindell believed it would sell MyPillows to Trump supporters.

The Complaint also properly pleads actual malice by alleging facts from which a jury could conclude that Defendants peddled a false preconceived narrative in order to make a profit. Evidence "that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story is evidence of actual

malice, and may often prove to be quite powerful evidence.'" *Harris*, 152 F. App'x at 568 (internal citation omitted); *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 539 (7th Cir. 1982) (same); *Palin v. N.Y. Times Co.*, 940 F.3d 804, 813 (2nd Cir. 2019) (reversing decision granting motion to dismiss and finding that complaint adequately pleaded actual malice in part because it alleged that editor "had a 'pre-determined' argument he wanted to make in the editorial"); *Goldwater v. Ginzburg*, 414 F.2d 324, 337 (2d Cir. 1969) (a jury "might reasonably find" actual malice based on "a predetermined and preconceived plan" to malign the plaintiff's character); Order at 13, *Project Veritas v. N.Y. Times Co.*, No. 63921/2020 (N.Y. Sup. Ct. Mar. 18, 2021) (denying motion to dismiss in part because complaint pleaded "every 'hallmark' of actual malice recognized by the law—including setting out with a preconceived narrative"); *Gilmore v. Jones*, 370 F. Supp. 3d 630, 678 (W.D. Va. 2019) (denying a motion to dismiss and finding that the complaint adequately pleaded actual malice where it alleged that "Defendants 'twisted' elements of [plaintiff's] personal and professional history to fit a pre-conceived narrative").  MyPillow seeks to sidestep the Complaint's allegations of a preconceived narrative by quoting from the D.C. Circuit's decision in *Tah*, 991 F.3d at 242.  But *Tah* did not hold that having a preconceived narrative was not evidence of actual malice; it simply found that where an international human rights organization had conducted a lengthy investigation into suspicious payments made in connection with an oil deal and ***then*** concluded toward the ***end*** of that investigation that there had been bribery, there was no support for the notion that the storyline had been preconceived.  *Id.*

Here, the Complaint alleges that Lindell—widely known as "the MyPillow Guy"—is a talented salesman who personally starred in MyPillow infomercials and built MyPillow into a successful company with hundreds of millions of dollars in revenue.  (Compl. ¶¶ 15, 19, 34.) Lindell is so gifted at numbers, percentages, ratios, and odds that he was previously a professional

card counter who, while faking a drunken stupor, would solve real-time mathematical equations and calculate his bets based on patterns he observed while hundreds of different number combinations ran through his mind like a "computerized algorithm."  Lindell is a student of game theory—the idea that success in making choices depends on understanding the choices of others— and his success is due in part to his aptitude for understanding what can motivate people to buy MyPillow products.  (Compl. ¶ 26.)

Before launching MyPillow's deceptive marketing campaign against Dominion, Defendants had profited from deceptive ads making claims unsupported by evidence, scored and touted Trump's endorsement for MyPillow, and gotten great returns on ad dollars spent on conservative media platforms like Fox News.  (Compl. ¶¶ 15-23.)  As MyPillow's CEO publicly acknowledged *before* launching MyPillow's defamatory marketing campaign against Dominion, his vocal support for Trump over the years had been "very good for business."  (Compl. ¶ 22.)  Although MyPillow now seeks to distance itself from the defamatory marketing campaign featuring statements by its founder, CEO, infomercial star, and namesake, during the defamatory marketing campaign at issue in this case, the company used promo codes like "FightforTrump," "QAnon," "Q," and "Proof."  (Compl. ¶¶ 67, 70.)

In sum, the Complaint alleges numerous facts from which a jury could reasonably conclude that MyPillow's CEO was not actually fooled by the cartoonish fake evidence and obviously unreliable characters he falsely put forward as experts, but that he is a math savant and cunning salesman who, despite harboring subjective doubts as to the truth of his inherently improbable claims, concluded that continuing to vocally support Trump—including Trump's false claim that the election had been stolen from him—would continue to be good for MyPillow's business, just as it had been in the past.

To be sure, before Dominion brought this case, certain retailers had dropped MyPillow because of Defendants' lies about the election.  (Compl. ¶ 111.)  As the Complaint alleges, Defendants' defamatory docu-movie about Dominion opened with a MyPillow pitch dressed up as a grievance that Lindell and MyPillow were being "boycott[ed]" and "attacked" "relentlessly," the obvious implication of which was that viewers should buy MyPillow products to stick it to "cancel culture."  (*Id.*)  Many people took the bait and bought MyPillow products because of the defamatory marketing campaign.  (Compl. ¶¶ 132-139.)  Indeed, a little more than a month into the defamatory marketing campaign, Lindell publicly boasted that MyPillow sales were up 30% to 40% and that MyPillow was the busiest it had ever been.  (Compl. ¶¶ 67, 70, 140.)

While MyPillow recently filed a retaliatory lawsuit in another jurisdiction falsely claiming that Dominion harmed MyPillow's business to the tune of $1.6 billion, Lindell himself admitted— three weeks after Dominion filed this suit—that lots of customers had been buying products directly from MyPillow and that MyPillow had expanded its workforce to keep up with demand.[2] Marketing experts have predicted that the "bad press" following MyPillow's defamatory marketing campaign may ultimately boost business for MyPillow and that "[t]o save the MyPillow brand, Lindell must hyper-focus on the portion of his conservative audience not turned off by his conspiracies…"[3]  That appears to be MyPillow's strategy, given that, after Dominion filed this suit and notified Lindell that he was putting the lives of Dominion employees in danger, "the MyPillow Guy" produced and broadcast two additional defamatory docu-movies and repeatedly doubled

---

[2] Grace Dean, *MyPillow CEO Mike Lindell says he hasn't been to his Minnesota home for 2 months over safety concerns, instead moves between 'undisclosed locations,'* Business Insider (Mar. 16, 2021), https://www.businessinsider.com/mypillow-mike-lindell-minnesota-home-trump-dominion-lawsuit-safety-2021-3.

[3] Grace Dean, *Bad press around founder Mike Lindell may ultimately boost business for MyPillow, analysts say*, Business Insider (Apr. 11, 2021), https://www.businessinsider.com/mike-lindell-mypillow-bad-press-sales-revenue-business-trump-election-2021-4.

down on his false claims about Dominion, admitting on April 1, 2021 that, "[w]ith our branding, we are just doing stuff that works."[4]

MyPillow argues that Exhibit 230 to the Complaint demonstrates that Lindell's statements "resulted in a loss of business." (MyPillow Mem. at 14.) In fact, that exhibit is an article for which Lindell was interviewed and admitted that, notwithstanding the loss of certain retailers, Lindell "anticipated they would return to selling his products" and that "The people on the left, the Democrats, they're buying the same amount of product they always buy from me, and the people supporting me standing up to cancel culture are buying more." (Compl. at Ex. 230.) Only time and discovery will tell whether Lindell was lying when he said that and whether the increase in direct sales from MyPillow's website will ultimately result in a net gain against the loss of MyPillow sales at certain retailers.

But what matters is not the ultimate success or failure of the defamatory marketing campaign, but whether Lindell believed—correctly or incorrectly—that falsely accusing Dominion of stealing the election would increase MyPillow's sales. The Complaint plausibly alleges that he did: Lindell repeatedly marketed MyPillow while defaming Dominion and every time he was called out for making false claims about Dominion, MyPillow's business would go up because, as Lindell himself explained, "everybody on the Right buys more, they buy more to support the cause." (Compl. ¶ 140.) A reasonable jury could certainly conclude from the facts alleged that Defendants acted with actual malice by "conceiv[ing] a story line in advance" "and then consciously set[ting] out to make the evidence conform to the preconceived story" in order to promote MyPillow sales. *Harris v. City of Seattle*, 152 F. App'x 565, 568 (9th Cir. 2005); *see also Solano v. Playgirl, Inc.*, 292 F.3d 1078, 1086 (9th Cir. 2002) (evidence that defendant

---

[4] *Id.*

misrepresented plaintiff to promote sales of its products was sufficient to satisfy the actual malice standard).

### C.  Defendants' assertions of good faith must be pressure tested by a jury.

MyPillow argues that Lindell believed that his statements about Dominion were "true" and that the Complaint fails to plead actual malice because it does not allege that Lindell "expressed or demonstrated any doubt of the truth of his statements or any acknowledgement that they were made recklessly."  (MyPillow Mem at 6, 11.)  If Defendants' argument were accepted, it would gut the law of defamation by allowing defendants to defeat defamation claims by merely asserting a good faith belief in the truth of their statements.  For good reason, courts have rejected this notion, both at the pleadings stage and at summary judgment: defamation defendants cannot automatically ensure a favorable verdict "by testifying that [they] published with a belief that the statements were true;" rather, self-serving assertions about a defendant's state of mind raise questions of fact that must be resolved by a jury.  *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *see also Nader v. Toledano*, 408 A.2d 31, 53-54 (D.C. 1979) (denying motion for summary judgment even though journalist claimed he believed in the truth of his statement when he published it); *Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1258 (D.C. 2016), *as amended* (Dec. 13, 2018) (denying special motion to dismiss and explaining that defendant's state of mind was a question of fact properly resolved by the jury).

Even if the jury ultimately credits Lindell's self-serving assertion that he did not know his claims were false, it could nevertheless conclude that he acted with actual malice by making those claims "with reckless disregard of whether [they were] false or not."  *Sullivan*, 376 U.S. at 280. Lindell's argument that his refusal to retract and continued publication of his defamatory statements undercut Dominion's allegation that he had "subjective doubt," (Lindell Mem. at 28) falls flat because, as the Court in *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576 (D.C. Cir. 2016),

stated, a plaintiff can show "subjective doubt" by offering evidence that it was highly probable that the story was so inherently improbable that only a reckless person would have put it into circulation. *Id.* at 589. As explained above, the Complaint alleges facts more than adequate to make this showing. Moreover, although the court in *Connelly v. Nw. Publ'ns, Inc.*, 448 N.W.2d 901, 902 (Minn. Ct. App. 1989), found that based on the particular facts in that case, the defendants' decision not to retract provided some evidence that they reasonably believed the plaintiff had not been defamed, there are many cases clearly holding that refusal to retract can in fact be evidence of actual malice. *See, e.g., Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987). Such is the case here.

As the Supreme Court has repeatedly admonished, because "proof of 'actual malice' calls a defendant's state of mind into question," this element "does not readily lend itself to summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979); *Lawrence v. Bauer Publ'g & Printing Ltd.*, 459 U.S. 999, 1003-04 (1982). Rather, "[t]he finder of fact must determine whether the publication was indeed made in good faith." *St. Amant*, 390 U.S. at 732; *see also Kaelin*, 162 F.3d at 1042 ("[S]tatements of [] subjective intention are matters of credibility for a jury.").

Dominion is afforded "the benefit of the aggregate of the evidence" and "can prove the defendant's subjective state of mind through the cumulation of circumstantial evidence, as well as through direct evidence." *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 258 (D.D.C. 2017); *see also Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 875 (W.D. Va. 2016) (denying defendants' summary judgment motion and explaining that while "a reasonable jury could find that none of the evidence presented independently supports a finding of actual malice… taken as a whole, however, a jury could conclude otherwise"). The Complaint far exceeds what is required

to plausibly allege actual malice at the pleadings stage. *See, e.g., Von Kahl v. Bureau of Nat'l Affairs, Inc.*, 934 F. Supp. 2d at 218 (denying motion to dismiss defamation claim for failure to plead actual malice); *Zimmerman*, 246 F. Supp. 3d at 281-83 (same); *Palin* , 940 F.3d at 814-15, 817 (vacating dismissal of defamation claim for failure to plead actual malice).

### D.  Lindell was acting as MyPillow's agent.

MyPillow claims it cannot be held liable for the defamatory statements because none of the statements can be attributed to MyPillow.  (MyPillow Mem. at 19.)  MyPillow argues that the Complaint does not allege that its board of directors directed, authorized, or ratified any of Lindell's statements about Dominion.  (*Id.*)  But as the Supreme Court made clear in *Washington Gas-Light Co. v. Lansden*, 172 U.S. 534 (1889), one of the cases MyPillow cites, board approval is not required:

> The corporation can be held responsible for acts which are not strictly within the corporate powers, but which were assumed to be performed for the corporation, and by the corporate agents who were competent to employ the corporate powers actually exercised.  There need be no written authority under seal nor vote of the corporation constituting the agency or authorizing the act.  But in the absence of evidence of this nature, there must be evidence of some facts from which the authority of the agent to act upon or in relation to the subject-matter may be fairly and legitimately inferred by the court or jury.

*Id.* at 544.  As MyPillow acknowledges (MyPillow Mem. at 19), corporations can be held liable for the defamatory statements their employees make within the scope of their employment and in furtherance of the company's business.  *See Palin*, 940 F.3d at 815 (complaint stated a claim for defamation against *The New York Times* where complaint alleged facts giving rise to a plausible inference that the paper's agents recklessly disregarded the truth); *Mangan v. Corp. Synergies Grp., Inc.*, 834 F. Supp. 2d 199, 202-04 (D.N.J. 2011) (complaint stated a claim for defamation against a corporation where CEO made allegedly defamatory statements); *StopLoss Specialists, LLC v. VeriClaim*, Inc., 340 F. Supp. 3d 1334, 1356 (N.D. Ga. 2018) (corporation could be liable

for defamatory email sent by its agent); *Unker v. Joseph Markovits, Inc.*, 643 F. Supp. 1043, 1049 (S.D.N.Y. 1986) ("A corporation may be held liable for defamatory utterances made by its officer or agent, acting within the scope of his authority."); *VECC, Inc. v. Bank of Nova Scotia*, 296 F. Supp. 2d 617, 622 (D.V.I. 2003) (complaint stated a claim for defamation against a corporation where complaint alleged that corporation's agent made defamatory remarks).

MyPillow also asserts that the Complaint does not allege "that any statement was made by any MyPillow spokesman or in any MyPillow advertisement" or that Lindell's statements "were within the scope of his role as President and CEO of MyPillow." (MyPillow Mem. at 19-20.) These are puzzling assertions. In addition to alleging that Lindell was acting as MyPillow's agent at all relevant times, the Complaint alleges that: (1) Lindell is commonly known as "the MyPillow Guy;" (2) Lindell personally stars in MyPillow advertisements; (3) Lindell was repeatedly identified as MyPillow's CEO in media appearances where he marketed MyPillow while defaming Dominion; (4) Lindell was given a platform to defame Dominion at rallies in Washington, D.C. because MyPillow had sponsored the events; (5) Lindell received creduluous favorable coverage on Fox News—including when he lied about Dominion—because MyPillow is one of Fox's biggest sponsors; (6) MyPillow accepted promo codes like "FightforTrump," "QAnon," "Q," and "Proof;" and (7) many people bought MyPillow products because of the defamatory marketing campaign. (Compl. ¶¶ 1, 19-20, 34, 34-36, 55, 57, 70, 96, 132-140.) Moreover, this case is not about an off-the-cuff remark by a renegade CEO whose board of directors does not know what he is up to, but a highly publicized months-long defamatory marketing campaign—including a defamatory docu-movie that opens with a MyPillow pitch—that MyPillow's board has not stopped even to this day. In sum, MyPillow is liable for the statements that the MyPillow Guy made while using defamatory falsehoods to market MyPillow because there are ample "facts from which the

24

authority of the agent to act upon or in relation to the subject-matter may be fairly and legitimately inferred by the court or jury." *Lansden*, 172 U.S. at 544.  The Court should deny Defendants' motions to dismiss Dominion's defamation claim.

## II.    The Complaint states a claim for deceptive trade practices.

Defendants argue that Dominion's claim for deceptive trade practices fails because, Defendants claim, it repackages Dominion's defamation claim to "do an end run around the First Amendment." (MyPillow Mem. at 20-21; Lindell Mem. at 30-31.)  The Defendants' cases stand for the unremarkable proposition that a plaintiff cannot bring a deceptive trade practices claim without meeting the constitutional requirements, like actual malice, that would apply to a defamation claim based on the same conduct.  (MyPillow Mem. at 20-21; Lindell Mem. at 30-31.) Defendants' cases have no bearing here because, as set forth above, Dominion has properly pled a claim for defamation and more than plausibly alleged actual malice.

Moreover, the deceptive trade practices act itself makes clear that the relief it provides is "in addition to remedies otherwise available against the same conduct under the common law…" Minn. Stat. § 325D.45.  The D.C. Circuit has similarly recognized that the underlying conduct for a defamation claim can also support a claim for a second tort.  *See, e.g.*, *Jankovic*, 593 F.3d at 29 (finding that plaintiff could state a claim for defamation and false light based on same predicate facts); *White v. Fraternal Order of Police*, 909 F.2d 512, 522 (D.C. Cir. 1990) (same); *see also Catalyst & Chem. Servs., Inc. v. Global Ground Support*, 350 F. Supp. 2d 1, 21 (D.D.C. 2004) (considering a claim for defamation and unfair competition based on the same predicate facts).  As such, Dominion is entitled to seek damages for the defamation, as well as injunctive relief and

attorneys' fees under the deceptive trade practices act.[5]   The Court should therefore deny Defendants' motions to dismiss the deceptive trade practices claim.

### III.   Defendants are subject to personal jurisdiction in the District of Columbia.

Defendants ask the Court to dismiss Dominions' claims under Rule 12(b)(2) for lack of personal jurisdiction.  But jurisdiction over Defendants is proper under the District's long-arm statute and the Due Process Clause.

Acting as MyPillow's agent, Lindell travelled to Washington, D.C. and embarked on a defamatory campaign during which he marketed MyPillow while defaming Dominion.  Indeed, MyPillow sponsored four rallies in Washington, D.C.; Lindell gave defamatory speeches at three of those rallies in Washington, D.C. because MyPillow had sponsored them; MyPillow sponsored a defamatory bus tour (complete with a MyPillow advertisement on the side of the bus) that physically parked in front of the White House in Washington, D.C.; and Lindell gave at least two defamatory interviews from within Washington, D.C.  (Compl. ¶¶ 12, 36, 51, 52, 65, 70, 165(a), (b), (k), (m), (n).)

In furtherance of and arising out of that Washington, D.C.-based defamatory marketing campaign, Defendants also transacted business within Washington, D.C., including by, among other things, financially sponsoring the rallies held in D.C., marketing MyPillow at those rallies in D.C. to people in D.C., advertising MyPillow at other events and through radio, television, and internet ads, and by selling MyPillow products directly to D.C. residents.  (Compl. ¶ 12.)  These contacts—and others alleged in the Complaint—demonstrate that Defendants purposefully availed themselves of numerous privileges in D.C. and that jurisdiction is proper here.  *See Fisher v. Bander*, 519 A.2d 162, 164 (D.C. 1986) ("when out-of-state actors avail themselves of the benefits

---

[5] Lindell mistakenly argues that the Complaint does not request injunctive relief.  (Lindell Mem. at 31.)  In fact, the Complaint does so.  (Compl. ¶ 177, pg. 115.)

of contact within the forum state, fairness requires that they be held accountable therein for the consequences of such activities.").

###### A.   D.C.'s long-arm statute confers personal jurisdiction over Defendants.

The District of Columbia's long-arm statute provides for "personal jurisdiction over a person, who acts directly *or by an agent*, as to a claim for relief arising from the person's" (1) transacting any business in the District of Columbia; (2) contracting to supply services in the District of Columbia; (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; or (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered, in the District of Columbia.  D.C. Code § 13-423(a)(1)-(4).

Because Lindell was acting as MyPillow's agent when he regularly exploited defamatory falsehoods about Dominion to market MyPillow in the District of Columbia, the D.C. long-arm statute explicitly authorizes jurisdiction over both Lindell and MyPillow.  Specifically, Defendants are subject to this Court's jurisdiction under D.C.'s long-arm statute under the first, third, and fourth prongs of the statute.

###### 1.   This Court has jurisdiction under D.C.'s long-arm statute because Defendants transacted business in Washington, D.C.

Defendants are subject to this Court's jurisdiction because they transacted business in the District, and Dominion's claims arise out of those transactions.  *See* D.C. Code § 13-423(a)(1). Subsection (a)(1) "permits the exercise of personal jurisdiction to the full extent authorized by the Due Process Clause of the Constitution" and "a single act may be sufficient to constitute transacting business, so long as that contact is voluntary and deliberate, rather than fortuitous."

*Quality Air Servs., L.L.C. v. Milwaukee Valve Co.*, 567 F. Supp. 2d 96, 100 (D.D.C. 2008) (internal citations and quotations omitted).

MyPillow admits that it sells products to residents in D.C. (MyPillow Mem. at 24.) While it attempts to downplay the amount of revenue from such sales, "[e]ven a small amount of in-jurisdiction business activity is generally enough to permit the conclusion that a nonresident defendant has transacted business here." *Shoppers Food Warehouse v. Moreno*, 746 A.2d 320, 331 (D.C. 2000) (internal citation and quotation omitted).

But Defendants' business transactions within Washington, D.C. extend well beyond pillow sales. In fact, the Complaint alleges that MyPillow sponsored four defamatory rallies that were held in Washington, D.C.: the Women for America First "March for Trump" rally, the Jericho March, the Moms for America "Save the Republic Rally," and the "March for Trump" rally. (Compl. ¶¶ 34, 51, 52, 55, 57, 65.) And because MyPillow was a sponsor, Lindell himself was given a platform to speak and—after being explitly identified as as MyPillow's CEO or founder—made defamatory statements about Dominion at three of those rallies in Washington, D.C. (Compl. ¶¶ 51, 52, 55, 57, 165(a)-(b), (k).) Lindell regularly traveled to and from D.C., both to speak at defamatory rallies and to make other defamatory media appearances. (Compl. ¶¶ 165 (a), (b), (k), (m), (n).) In addition, Lindell has been exploiting his relationship with President Trump to market his products from within D.C. for years—including during a July 2017 White House event and an August 2020 speech in the Rose Garden. (Compl. ¶¶ 22, 23.)

Despite all of these business transactions in D.C., Lindell argues that he did not transact business in this District, or in the alternative, that his contacts were insufficient because he only mentioned MyPillow once while in D.C. (Lindell Mem. at 33-34.) Lindell misapprehends the law. Lindell cites *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 111 (D.D.C. 2018), to

support his argument that he "did not 'transact business' while committing alleged defamation." (Lindell Mem. at 33-34.)  But the court in *IMAPizza* recognized that "advertising in the District" and a transaction as minimal as traveling to the District and making a purchase at a restaurant can constitute a business transaction for jurisdictional purposes.  *See* 334 F. Supp. 3d at 111.  By sponsoring four rallies, Defendants did at least that; indeed, Lindell took advantage of multiple opportunities to advertise MyPillow in D.C.  (Compl. ¶¶ 51, 55, 57, 165 (a), (b), (k).)  Moreover, Lindell traveled to and from D.C. regularly, appeared for interviews from within the Trump International Hotel in D.C. (where he made defamatory statements giving rise to this case), and was physically present in D.C. on multiple days during the time at issue.  (Compl. ¶¶ 12, 70, 165 (m), (n).)

Defendants' other cases also fail to support their position.  For example, in *Lewy v. S. Poverty L. Ctr., Inc.*, 723 F. Supp. 2d 116, 118, 129 (D.D.C. 2010) and *The Urban Inst. v. FINCON Servs.*, 681 F. Supp. 2d 41, 46-47 (D.D.C. 2010), the court declined to exercise personal jurisdiction where Defendants had visited D.C. only three or four times over a lengthy period and Defendants had no other business transactions inside the District.  Here, by contrast, Lindell traveled to and was regularly present in D.C. over a three-month period and engaged in multiple other business transactions while in D.C.  Moreover, the court in *Lewy* found that it ***did have personal jurisdiction over the corporate defendant*** because it, among other things, maintained an interactive website available to D.C. residents where donations could be made.  723 F. Supp. 2d at 126.  These are the types of business contacts that Defendants had with D.C.—residents of D.C. were directed to go to the MyPillow website and purchase MyPillow products.  (Compl. ¶¶ 12, 55, 57.)

In *Burman v. Phoenix Worldwide Industries, Inc.*, 437 F. Supp. 2d 142, 155 (D.D.C. 2006), the court declined to exercise personal jurisdiction under section 13-423(a)(1) where the defendant's only contacts with D.C. were telephone conversations and mailings that were required under a contractual relationship and had nothing to do with the District of Columbia. Here, on the other hand, Lindell personally visited D.C. multiple times, engaged in the defamatory campaign in person at multiple rallies in the District, and engaged in other business transactions in the District.

Finally, Defendants also argue that Dominion's claims do not arise out of or relate to Lindell's business transactions within the District. (Lindell Mem. at 33; MyPillow Mem. at 25.) First, as discussed below, because "Defendants' alleged business transactions can support personal jurisdiction under the Due Process Clause, they necessarily satisfy the 'arising from' requirement in § 13-423(b) as well." *IMAPizza*, 334 F. Supp. 3d at 113. Second, as the Supreme Court recently held, a court can exercise specific jurisdiction in cases that sufficiently "relate to" a defendant's forum contacts, ***even in the absence of a causal link***. *See Ford Motor Co.v. Mont. Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021). The Defendants fail to grapple with many of the jurisdictional facts alleged in the Complaint, including that Lindell was given the microphone to defame Dominion at rallies in Washington, D.C. because MyPillow had sponsored those rallies. (Compl. ¶¶ 34-36, 51, 52, 55, 57, 65, 66, 165 (a), (b), (k).)

Here, at a minimum, Lindell's defamatory statements "relate to" MyPillow's sponsorship of the rallies at which those defamatory statements were made.

2. **This Court has jurisdiction under D.C.'s long-arm statute because Defendants caused tortious injury in Washington, D.C. by acts within the District.**

Defendants are also subject to this Court's jurisdiction for the additional and independently sufficient reason that they caused tortious injury in Washington, D.C. by actions taken inside of Washington, D.C.  *See* D.C. Code § 13-423(a)(3).

After Lindell traveled to Washington, D.C., where Defendants availed themselves of the public forum and gatherings taking place at the MyPillow-sponsored rallies in Washington, D.C., MyPillow's CEO and agent defamed Dominion while pitching and advertising MyPillow. Defendants now argue that it would be improper for them to be haled back to D.C. because, they claim, Dominion was not injured here.  Defendants are mistaken, both legally and factually.

*First*, to satisfy the "act or omission in the District of Columbia" element of Section 13-423(a)(3), "it is enough that defendants were physically within the District when they took the alleged actions giving rise to" a plaintiff's claims.  *Navab-Safavi v. Broad. Bd. of Governors*, 650 F. Supp. 2d 40, 52 (D.D.C. 2009); *see also Wormley v. United States.*, 601 F. Supp. 2d 27, 33 (D.D.C. 2009) (finding jurisdiction under Section 13-423(a)(3) and the due process clause satisfied where defendants "were physically within the District when they took the alleged actions"). Indeed, Defendants fail to cite any cases in which a D.C. court held that it lacked jurisdiction over a defendant who committed a tort while physically present in D.C.; instead, Defendants rely on cases where—unlike here—the tort was committed outside D.C.  *See Hourani v. Psybersolutions, LLC*, 164 F. Supp. 3d 128 (D.D.C. 2016) (conduct occurred in London); *Corsi v. Caputo*, No. 19-cv-1573, 2020 WL 1703934 (D.D.C. Apr. 7, 2020) (conduct occurred in New York).  (MyPillow Mem. 27; Lindell Mem. 35.)  Defendants' reliance on *Mastro v. Potomac Electric Power Company* is likewise misplaced.  447 F.3d 843, 857-58 (D.C. Cir. 2006).  In that case, the court affirmed

dismissal of a defamation claim based on plaintiff's failure to plead around the common interest privilege—not because it did not have jurisdiction over the defendant.

**Second**, while Dominion was harmed worldwide, Dominion was certainly injured in Washington, D.C., including when Lindell spoke to hundreds of people at rallies on December 12 and January 5, and during in-person interviews from within Washington, D.C. (Compl. ¶¶ 51, 52, 65, 165 (a), (b), (k), (n).) It is axiomatic that defamatory statements cause injury where they are published, even if the injury is not restricted to that jurisdiction. *See, e.g.*, *Howser v. Pearson*, 95 F. Supp. 936, 938 (D.D.C. 1951) ("Libel and slander take place where the defamatory statement is communicated"); *Lapointe v. Van Note*, No. 03-cv-2128, 2004 WL 3609346, at *6 (D.D.C. Nov. 9, 2004) ("An injury by libel occurs at the site of publication"); *Reuber v. United States*, 750 F.2d 1039, 1049 n.12 (D.C. Cir. 1984) (quoting *Keeton v. Hustler*, 465 U.S. 770, 777 (1984) ("The reputation of the libel victim may suffer harm even in a state in which he has hitherto been anonymous.").

Dominion's injuries are not restricted to New York simply because it is majority-owned there, nor are its injuries restricted to Colorado simply because it has headquarters there. As the Complaint alleges,

> Dominion has been unfairly subjected to the hatred, contempt, and distrust of tens of millions of American voters, and the elected officials who are Dominion's actual and potential customers have received emails, letters, and calls from their constituents demanding that they avoid contracting with Dominion or using Dominion machines. As a result, elected officials, insurers, and potential investors have been deterred from dealing with Dominion, putting Dominion's contracts in more than two dozen states and hundreds of counties and municipalities in jeopardy and significantly hampering Dominion's ability to win new contracts.

(Compl. ¶ 159.)

### 3. This Court has jurisdiction under D.C.'s long-arm statute because Defendants caused tortious injury in Washington, D.C. by acts outside the District, while engaging in a persistent course of conduct in D.C.

This Court also has jurisdiction under D.C. Code § 13-423(a)(4), which provides specific jurisdiction over non-resident defendants whose tortious acts outside Washington, D.C. cause injury in the District if defendants also "regularly do or solicit business, engage in any other persistent course of conduct, or derive substantial revenue from … services rendered, in the District of Columbia." *Lewy*, 723 F. Supp. 2d at 123.  This test is met here.  After launching the defamatory marketing campaign at rallies in Washington, D.C., Defendants continued to harm Dominion in D.C. by making defamatory statements about Dominion to those same D.C.-based audiences, such as when Lindell "tagged" Trump—then a resident of the District of Columbia— in a defamatory post and appeared on shows that Trump and his allies watch.  (Compl. ¶¶ 62, 165(c), (d), (e), (f), (g), (j), (o), (p), (u), (v).)

All this was in addition to Defendants' business transactions in the District and Defendants' repeated tortious conduct against Dominion in D.C. set forth above.  As with the harm caused to Dominion from the defamatory statements made inside the District, Dominion was similarly injured in the District by Defendants' defamatory statements made outside of the District.  *See Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 457 (D.C. Cir. 1990) ("libel occurs in the place where published, but the injuries that may flow from libel are not necessarily restricted to the place of publication.").

Importantly, to satisfy subsection (a)(4)'s requirement of a persistent course of conduct within the District, "a defendant's contacts need not be great," and they need not even be "related to the tortious act outside the forum that causes the injury."  *Lewy*, 723 F. Supp. 2d at 124. Defendants' D.C.-based defamatory campaign and related (and unrelated) business transactions in the District are more than sufficient to establish jurisdiction under subsection (a)(4).

The cases Lindell cites are readily distinguishable. (Lindell Mem. at 34-35.)  Specifically, in *Lewy*, the defendant only traveled to D.C. four times over four years and had no other business contacts with the District.  Likewise, in *American Association of Cruise Passengers v. Cunard Line, Ltd.*, 691 F. Supp. 379, 381 (D.D.C. 1987), the defendant only attended trade association meetings held in the District and had no other business contacts with the District.  Defendants' reliance on *Vasquez v. Whole Foods Market, Inc.* is similarly misplaced because, unlike here, in *Vasquez*, "the Plaintiffs offer no 'specific facts' to support their contention" that the individual defendant was involved in a persistent course of conduct in D.C.  302 F. Supp. 3d 36, 48-49 (D.D.C. 2018).  Unlike each of those cases, the Complaint alleges that Lindell, while acting as MyPillow's agent, made multiple trips to D.C. over a three-month period and was physically present in D.C. on multiple days during the time at issue, and that Defendants engaged in multiple business transactions within the District.

The D.C. Circuit previously reversed a dismissal for lack of personal jurisdiction in a defamation case where the out-of-state defendant had far fewer contacts with D.C. than Defendants in this case.  *See Steinberg v. Int'l Crim. Police Org.*, 672 F.2d 927, 932 (D.C. Cir. 1981).  In that case, Interpol—acting from France—allegedly defamed a Florida resident by publishing a single document in the United States and in 125 other countries.  *Id.* at 931.  After the district court dismissed the case for lack of personal jurisdiction, the D.C. Circuit reversed, holding that the district court could exercise personal jurisdiction over Interpol pursuant to subsection (a)(4) because, in addition to publishing defamatory material from France to a global audience, Interpol regularly sent information to and received information from a liaison in D.C.  *Id.*  Notably, the "'persistent course of conduct' need not be related to the act that caused the injury," and "all that is required is 'some other reasonable connection' between the defendant and the forum."  *Id.*  That

requirement is more than satisfied in this case where, in addition to MyPillow sponsoring the defamatory rallies held in Washington, D.C., Lindell traveled to Washington, D.C. multiple times, engaged in the defamatory marketing campaign for MyPillow, and conducted numerous business transactions relating to that campaign, and where MyPillow sells products to residents of D.C.

Finally, even if the Court did not have jurisdiction over Defendants' out-of-district statements pursuant to subsection (a)(4), it would nevertheless have jurisdiction over those statements because it has jurisdiction over Defendants' in-district statements under subsection (a)(3). D.C.'s long-arm statute, once satisfied, "does not require that the scope of the claim be limited to activity within this jurisdiction." *Cohane v. Arpeja-California, Inc.*, 385 A.2d 153, 159 (D.C.), *cert. denied*, 439 U.S. 980 (1978); *see also Steinberg*, 672 F.2d at 931 n.8 ("The District of Columbia Court of Appeals, however, has noted that the concept of cause of action or claim for relief (in [§ 13-423](b)) should be broadly construed to cover an entire transaction so that, when possible, the entire dispute may be settled in a single litigation."); *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 728 (D.C. 2011) (quoting *Shoppers Food Warehouse*, 746 A.2d at 326) ("'[o]nce ... the claim is related to acts in the District, § 13–423 does not require that the scope of the claim be limited to activity within this jurisdiction.'"). Furthermore, the Court can also exercise jurisdiction as to all of the claims because they all arise from the same core operative facts—namely, Defendants' defamatory marketing campaign. *See Poling v. Farrah*, 131 F. Supp. 2d 191, 194 (D.D.C. 2001) (citing *Oetiker v. Jurid Werke, G.m.b.H.*, 556 F.2d 1, 4-5 (D.C. Cir. 1977)).

## B. Jurisdiction is proper under the Due Process Clause.

The exercise of jurisdiction over Defendants is proper under the Due Process Clause because Defendants' regular travel to and repeated contacts with D.C. more than satisfy the "minimum contacts" requirement such that "the maintenance of the suit does not offend traditional

notions of fair play and substantial justice." *GTE New Media v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).   In particular, Defendants' "physical entry into the [jurisdiction]—***either by the defendant in person or through an agent***, ***goods***, ***mail***, or some other means—is certainly a relevant contact." *Walden v. Fiore*, 571 U.S. 277 (2014).  Here, Lindell physically entered the District multiple times over a three-month period, defaming Dominion and marketing MyPillow to residents of the District. (Compl. ¶¶ 51, 52, 55, 65, 70.)  Finally, Defendants do not and cannot dispute that MyPillow advertises and sells products in D.C.

In sum, Defendants' contacts were not "random, fortuitous, accidental, or attenuated," but were "of such quality and nature that they manifest a deliberate and voluntary association with" the District. *Shoppers Food Warehouse*, 746 A.2d at 331 (internal citation omitted).  Defendants "purposefully availed [themselves] of the privilege of conducting activities within the District and should reasonably have anticipated being haled into court in the District." *Id.* (citing *World-Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980)).  In other words, MyPillow regularly profits off D.C. residents, and MyPillow's CEO came to D.C. to engage in acts giving rise to this case. Haling Defendants back to D.C. does not offend traditional notions of fair play and substantial justice.  The Court should deny Defendants' Rule 12(b)(2) motions.

## IV.    Venue is proper and the case should not be transferred.

Defendants also argue that venue is improper and the Court should transfer the case to the District of Minnesota.  (MyPillow Mem. at 27-28; Lindell Mem. at 38-44.)  But Lindell, in his personal capacity and as an agent for MyPillow, traveled to, spoke at, and advertised MyPillow during multiple rallies in Washington, D.C., he appeared at the White House for press conferences and other events, and participated in defamatory interviews from within Washington, D.C. (Compl. ¶¶ 12, 22, 23, 51, 52, 65, 70.)  Venue is therefore proper in the District of Columbia under

28 U.S.C. § 1391(b)(2) because "a substantial part of the events … giving rise to the claim occurred" here. *Id.*

Defendants also contend that venue is improper here because, they claim, the District of Minnesota is the better venue. (Lindell Mem. 38-44; MyPillow Mem. 28-30.)  They are wrong on both the legal standard and the facts.  On the law, "the question is not which district is the 'best' venue" or which "has the most significant connection," the question is "whether the district the plaintiff chose had a substantial connection to the claim."  *Exelon Generation Co. v. Grumbles*, 380 F. Supp. 3d 1, 11 (D.D.C. 2019); *Johns v. Newsmax Media, Inc.*, 887 F. Supp. 2d 90, 96 (D.D.C. 2012).  Here, because a significant and substantial part of the events giving rise to Dominion's claims occurred in the District of Columbia, venue is proper.  On the facts, D.C. is the better venue for this case, as set forth below.

Five relevant factors weigh against transferring this case to the District of Minnesota.  **First**, Dominion's choice of forum is to be accorded deference because there is a substantial "nexus" between the claims and the District of Columbia.  *See, e.g., Wilderness Soc'y v. Babbitt*, 104 F. Supp. 2d 10, 13 (D.D.C. 2000) (holding that venue was appropriate in the district and that the degree of deference accorded to plaintiff's choice of forum depends on the nexus of the forum and the dispute).  This case arises out of a defamatory campaign that was centered in Washington, D.C.

**Second**, it is no more convenient for the parties and witnesses to litigate in the District of Minnesota than in Washington, D.C.  As Lindell acknowledges, key witnesses are scattered across the country, not clustered in the District of Minnesota.  And Lindell has made clear that he has no difficulty whatsoever traveling to D.C. and does so routinely.  (Compl. ¶ 12.)

**Third**, although this case does involve a secondary claim under Minnesota's Deceptive Trade Practices Act, the primary cause of action is for defamation.  The defamation claim is not governed by Minnesota law.  As such, the District of Minnesota will have no more familiarity with the governing law than this Court.

**Fourth**, Lindell argues that the Minnesota federal courts are less congested than the District of Columbia.  (Lindell Mem. at 43-44.)  But that argument is based on a flawed premise.  While it is true that more cases were initiated in D.C. than in Minnesota last year, D.C. also has more judges to handle the caseload; indeed, counting judges that have taken senior status, Minnesota has 13 judges compared to 22 in D.C.[6]  The appropriate comparison is the number of new cases on a *per judge* basis, and that difference is immaterial: 24 in Minnesota to 26.8 in D.C.  Moreover, while the median time between filing and trial is somewhat faster in the District of Minnesota, the median time from filing to disposition is much faster in the District of Columbia (5.8 months) than in District of Minnesota (14.3 months), further weighing against transfer.[7]

**Fifth**, Washington, D.C. has a "local interest" in deciding this case.  *Stewart v. Azar*, 308 F. Supp. 3d 239, 249 (D.D.C. 2018).  Lindell is a Minnesota resident, to be sure.  Sidney Powell has houses in North Carolina and Texas.  And Rudy Giuliani is a New Yorker.  But they all traveled to and converged in Washington, D.C. to collaborate and advance the defamatory campaign, not fortuitously or by accident, but because D.C. was the center of the action where they sought—and got—in-person audiences with then-President Trump and where people physically gathered to hear

---

[6] *Judges*, U.S. Dist. Ct., District of Columbia, https://www.dcd.uscourts.gov/judges; *Chambers Contact Info.*, U.S. Dist. Ct., District of Minnesota, https://www.mnd.uscourts.gov/chambers-contact-information.

[7] *United States District Courts – National Judicial Caseload Profile*, U.S. Courts https://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile0930.2020.pdf   (last visited Apr. 7, 2021).

them and their allies tell lies about Dominion and the 2020 election.  (Compl. ¶¶ 51, 52, 65.)  And the MyPillow-sponsored January 6 rally from which attendees marched to storm the United States Capitol to halt the certification of the "stolen" election could not have occurred anywhere else but Washington, D.C.; had that rally occurred in Minnesota, attendees could not have marched from the rally to the Capitol.

*Finally*, the fact that MyPillow filed a retaliatory suit in the District of Minnesota ***after*** this case was filed—and now tries to use that case as a hook for this Court to transfer this first-filed case—does not help its position.  *See Holland v. ACL Transp. Servs., LLC*, 815 F. Supp. 2d 46, 55 (D.D.C. 2011) (denying a motion to transfer, in part because "the longstanding first-filed rule militates against transfer, as the first of these two cases was filed here.").  Indeed, because there are already two related actions pending before this Court—both of which share substantial factual predicates and have been pending since January—judicial efficiency would be promoted by denying the motion to transfer venue.  *See Dominion v. Powell*, No. 21-cv-00040 (D.D.C. Jan. 8, 2021) and *Dominion v. Giuliani*, No. 21-cv-00213 (D.D.C. Jan. 25, 2021).

In sum, having sponsored D.C. rallies and having traveled to Washington, D.C. to conduct business, sell MyPillows, and wage the defamatory campaign giving rise to this case, Defendants should not be heard to complain that they cannot return to Washington, D.C. to litigate the consequences of their conduct.  Their motion to transfer venue should be denied.  *See Thayer/Patricof Educ. Funding v. Pryor Res.*, 196 F. Supp. 2d 21, 35 (D.D.C. 2002) (defendant's choice to travel to D.C. weighed against transfer); *Sheraton Operating Corp. v. Just Corp. Travel*, 984 F. Supp. 22, 27 (D.D.C. 1997) (defendant's choice to do business in D.C. weighed against transfer).

**V.      Defendants are not entitled to attorneys' fees.**

Defendants claim they are entitled to attorneys' fees under the District of Columbia's Anti-SLAPP Act.  (MyPillow Mem. at 21-22; Lindell Mem. at 44.)  There are at least four reasons why Defendants' request for attorneys' fees must be denied.

*First*, the special motion to dismiss provision of the D.C. Anti-SLAPP Act does not apply in federal court because it conflicts with Federal Rules of Civil Procedure 12 and 56, which are valid under the Rules Enabling Act.  *Abbas v. Foreign Policy Grp.*, 783 F.3d 1328, 1334, 1337 (D.C. Cir. 2015) (B. Kavanaugh); *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393 (2010).   As now-Justice Kavanaugh explained when writing for the D.C. Circuit in *Abbas*: "The Act does not purport to make attorney's fees available to parties who obtain dismissal by other means, such as under Federal Rule 12 (b)(6)."  783 F.3d at 1337.

*Second*, although Defendants do not mention it, the D.C. Circuit recently confirmed in March of this year—in a case on which Defendants heavily rely elsewhere in their briefing—that "*Abbas* remains circuit law and controls this case."  *Tah*, 991 F.3d 231, 239 (D.C. Cir. 2021).

*Third*, to the extent there is any conflict between *Abbas* and *Competitive Enterprise Institute v. Mann*, 150 A.3d 1213 (D.C. 2016), it is limited to whether the standard to be employed by the court in deciding whether to grant a special motion to dismiss under the D.C. Anti-SLAPP Act is "substantively the same" or "different from and more difficult" than the standard to be employed in deciding a motion for *summary judgment*.  *Mann*, 150 A.3d 1238 n.32.  The motions before the Court are not motions for summary judgment but motions to dismiss.  And there is no question that, by imposing a "likely to succeed" standard requiring that the plaintiff present *evidence* (not simply allegations) that is legally sufficient to permit a jury to reasonably find in the plaintiff's favor, the D.C. Anti-SLAPP Act imposes a "more demanding" burden than Rule

12(b)(6), which requires that all factual allegations be accepted as true and construed in the plaintiff's favor.

*Fourth*, even if the D.C. Anti-SLAPP Act applied here in federal court (it does not), Defendants' motions would be denied.  The decision of the D.C. Court of Appeals in *Mann* is instructive.  *Mann* arose out of "Climategate," a public controversy of the utmost public concern: whether climate change is real or is a hoax perpetrated by politically-motivated scientists who falsify and manipulate data.  In that case—like this one—the plaintiff was accused of committing fraud and manipulating data to reach a politically-motivated outcome.  Also, like this case, governmental agencies investigated and found no evidence of fraud.  *Mann*, 150 A.3d at 1252.  As in this case, the defendants accused the plaintiff of fraud and discounted the investigation by saying it involved a "cover up" by a "corrupt" institution.  *Id.* at 1248.  On a special motion to dismiss, the *Mann* defendants cited reports and other documents supporting their own conclusions and asserted that they believed the truth of their statements, just as Defendants have done here.  *Id.* at 1255.  Yet even under the "more demanding" "likely to succeed" standard that does ***not*** apply here in federal court, *see Abbas*, the D.C. Court of Appeals affirmed the denial of Defendants' motion, explaining that "the ***fact-finder*** must consider assertions of good faith in view of all the circumstances." *Id.* at 1252.  So too here.  The Court should deny Defendants' motions and reject their request for attorneys' fees.

## CONCLUSION

Mike Lindell is a savvy former professional card counter and mathematical savant who is smart enough to tell the difference between real evidence and the amateurish fake evidence he promoted while hawking MyPillow at MyPillow-sponsored D.C. rallies and on television.  He is also an exceptionally talented salesman who built a three-hundred-million-dollar MyPillow empire on deceptive marketing practices, ads to conservative viewers, and vocal support for Donald

Trump, which has been very good for MyPillow's business.  The Complaint more than plausibly alleges facts from which a reasonable jury could conclude that MyPillow and its founder, CEO, spokesman, and namesake promoted the inherently improbable Big Lie that the election had been stolen from Trump because they thought their defamatory marketing campaign would dupe Trump supporters into buying MyPillows.  Defendants' motions should be denied.

Dated:  May 28, 2021

Justin A. Nelson (D.C. Bar No. 490347)
SUSMAN GODFREY LLP
1000 Louisiana Street, #5100
Houston, Texas 77002
(713) 651-9366
jnelson@susmangodfrey.com

Stephen Shackelford, Jr. (*pro hac vice*)
(NY Bar No. 5393657)
Elisha Barron (NY Bar No. 5036850)
SUSMAN GODFREY LLP
1301 6th Avenue
New York, NY 10019
(212) 336-8330
sshackelford@susmangodfrey.com
ebarron@susmangodfrey.com

Davida Brook (*pro hac vice*)
(CA Bar No. 275370)
Emily Cronin (*pro hac vice*)
(CA Bar No. 322683)
Brittany Fowler (*pro hac vice*)
(CA Bar No. 332375)
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
(310) 789-3100
dbrook@susmangodfrey.com
ecronin@susmangodfrey.com
bfowler@susmangodfrey.com

Respectfully submitted,

By:   */s/ Megan L. Meier*

Thomas A. Clare, P.C. (D.C. Bar No. 461964)
Megan L. Meier (D.C. Bar No. 985553)
Dustin A. Pusch (D.C. Bar No. 1015069)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
(202) 628-7400
tom@clarelocke.com
megan@clarelocke.com
dustin@clarelocke.com

*Attorneys for Plaintiffs*

Stephen E. Morrissey (*pro hac vice*)
(WA Bar No. 44710)
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, WA  98101
(206) 516-3880
smorrissey@susmangodfrey.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 28th day of May, 2021, I will electronically file the foregoing document with the Clerk of the Court using the CM/ECF system, which I understand will serve counsel for the parties.

/s/ Megan L. Meier
Megan L. Meier