**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION c/o Cogency Global 1025 Vermont Ave, NW, Ste. 1130 Washington, DC 20005, | ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:21-cv-00445-CJN |
| MY PILLOW, INC. and MICHAEL J. LINDELL 343 E 82nd Str #102 Chaska, MN 55318, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**REPLY IN SUPPORT OF DEFENDANT MICHAEL J. LINDELL'S MOTION**
**TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE**

# TABLE OF CONTENTS

I.    ARGUMENT AND AUTHORITY ................................................................................2

    A.   DOMINION FAILED TO PROPERLY PLEAD (AND CANNOT PLEAD) ACTUAL MALICE. ........4

        1.   *Lindell Has No Subjective Doubt As To The Truth Of His Statements.*......................4

        2.   *Only Minnesota Or District Of Columbia Law Applies In This Case.* ......................7

        3.   *Dominion Is A State Actor Subject To An "Actual Malice" Standard.* ....................7

        4.   *Actual Malice Is A High Standard, Even At The Pleadings Stage.* ..........................9

            a.   Actual Malice Is Subjective, Not Objective. ....................................................10

            b.   Lindell's Statements Were Not "Inherently Improbable" Or Obviously False. ..............................................................................................................14

            c.   Allegations Of Profit Motive Cannot Independently Support A Finding Of Actual Malice..............................................................................................15

            d.   Dominion's Preconceived Narrative Assertion Is Unavailing. .........................16

    B.   THE COURT SHOULD ALSO DISMISS DOMINION'S MDTPA CLAIM. .............................17

    C.   THE COURT SHOULD DISMISS THIS CASE FOR LACK OF PERSONAL JURISDICTION. .......18

        1.   *D.C.'s Long Arm Statute Does Not Reach Lindell.* .................................................19

            a.   Lindell Did Not "Transact Business" In The District. .....................................19

            b.   No Tortious Injury Occurred In The District.....................................................21

            c.   Dominion Fails To Show That Any "Plus Factor" Applies. .............................21

        2.   *The Due Process Clause Precludes Jurisdiction.*....................................................22

    D.   IN THE ALTERNATIVE, THE COURT SHOULD TRANSFER THIS CASE TO THE DISTRICT COURT FOR THE DISTRICT OF MINNESOTA PURSUANT TO 28 U.S.C. § 1404(A). ...........23

        1.   *Lindell's Actions Were Not "Centered" In The District.*........................................23

        2.   *The District Of Minnesota Is More Convenient.* ....................................................24

        3.   *There Is No "Primary Cause Of Action" Governed By D.C. Law.*.........................24

        4.   *Dominion Admits The District Of Minnesota Is Less Congested.* ..........................24

    5.   *D.C. Does Not Have a Preeminent Local Interest In This Case.*............................24

  E.  LINDELL SHOULD ALSO BE AWARDED HIS ATTORNEYS' FEES. ....................................25

II.   CONCLUSION.................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Abbas v. Foreign Policy Grp., L.L.C. (Abbas II)*,
 783 F.3d 1328 (D.C. Cir. 2015) ...................................................................................7, 25

*Arpaio v. Cottle*,
 404 F. Supp. 3d 80 (D.D.C. 2019) ..............................................................................7, 14

*Ashhab-Jones v. Cherokee Nation Strategic Programs, LLC*,
 1:19-CV-00089 (CJN), 2020 WL 6262090 (D.D.C. Oct. 23, 2020) ...................................21

*Bose Corp. v. Consumers Union of U.S., Inc.*,
 466 U.S. 485 (1984) ....................................................................................................13, 14

*Brentwood Academy v. Tenn. Secondary School Athletic Ass'n*,
 531 U.S. 288 (2001) ...........................................................................................................8

*Britton v. Koep*,
 470 N.W. 2d 518 (Minn. 1991) ..........................................................................................7

*Bullock v. Carter*,
 405 U.S. 134 (1972) ...........................................................................................................8

*BYD Co. Ltd. v. VICE Media LLC*,
 No. 20-cv-3281 (ASN), 2021 WL 1225918 (S.D.N.Y. Mar. 31, 2021).................................17

*Competitive Enter. Inst. v. Mann*,
 150 A.3d 1213 (D.C. 2016), *as amended* (Dec. 13, 2018) .......................................................25

*Crane v. N.Y. Zoological Soc'y*,
 894 F.2d 454 (D.C. Cir. 1990) ..........................................................................................21

*Curling v. Raffensperger*,
 493 F. Supp. 3d (N.D. Ga. 2020) ........................................................................................2

*Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*,
 603 N.W.2d 336 (Minn. App. 1999) ..................................................................................18

*Deripaska v. Associated Press*,
    282 F. Supp. 3d 133 (D.D.C. 2017)........................................................................15

*Elkharwily v. Mayo Holding*,
    823 F.3d 462 (8th Cir. 2016), *cert. denied*, __ U.S. __, 137 S. Ct. 481 (2016).........................7

*Eramo v. Rolling Stone LLC, et al.*,
    Cause No. 3:15-cv-00023, in the Western District of Virginia ...............................10

*Farah v. Esquire Magazine*,
    736 F.3d 528 (D.C. Cir. 2013) ...............................................................................15

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*,
    141 S. Ct. 1017 (2021).............................................................................................20

*Fridman v. Orbis Business Intelligence Ltd.*,
    229 A.3d 494 (D.C. 2020), *cert. denied*, 141 S. Ct. 1074, 208 L. Ed. 2d 534 (2021)................7

*IMAPizza LLC v. At Pizza, Ltd.*,
    334 F. Supp. 3d 95 (D.D.C. 2018) .................................................................... 19, 20

*Jankovic v. Int'l Crisis Grp. (Jankovic III)*,
    822 F.3d 576 (D.C. Cir. 2016) ........................................................................passim

*Jankovic v. Int'l Crisis Grp.*,
    72 F. Supp. 3d 284 (D.D.C. 2014), *aff'd*, 822 F.3d 576 (D.C. Cir. 2016)..............................10

*Lohrenz v. Donnelly*,
    350 F.3d 1272 (D.C. Cir. 2003) .............................................................................13

*Lugar v. Edmonson Oil Co., Inc.*,
    457 U.S. 922 (1982) ..................................................................................................8

*McDougal v. Fox News Network LLC*,
    489 F. Supp. 3d 174 (S.D.N.Y. 2020) ...................................................................17

*McFarlane v. Esquire Magazine*,
    74 F.3d 1296 (D.C. Cir. 1996) .................................................................................9

*McFarlane v. Sheridan Square Press, Inc.*,
   91 F.3d 1501 (D.C. Cir. 1996) .......................................................................................passim

*McKee v. Laurion*,
   825 N.W.2d 725 (Minn. 2013) ................................................................................................7

*Moldea v. New York Times Co.*,
   22 F.3d 310 (D.C. Cir. 1994) ................................................................................................17

*OAO Alfa Bank v. Center for Public Integrity*,
   387 F. Supp. 2d 20 (D.D.C. 2005) ............................................................................10, 12, 13

*Palin v. N.Y. Times Co.*,
   940 F.3d 804 (2d Cir. 2019) ............................................................................................16, 17

*Parsi v. Daioleslam*,
   890 F. Supp. 2d 77 (D.D.C. 2012) ..................................................................................13, 14

*Philadelphia Newspapers, Inc. v. Hepps*,
   475 U.S. 767 (1986) ..............................................................................................................10

*Rush v. Savchuk*,
   444 U.S. 320 (1980) ........................................................................................................19, 22

*Secord v. Cockburn*,
   747 F. Supp. 779 (D.D.C. 1990) ......................................................................................12, 13

*Smith v. Allwright*,
   321 U.S. 649 (1944) ................................................................................................................8

*Song fi, Inc. v. Google, Inc.*,
   72 F. Supp. 3d 53 (D.D.C. 2014) ............................................................................................7

*St. Amant v. Thompson*,
   390 U.S. 727 (1968) ..........................................................................................................9, 11

*Steinberg v. Int'l Criminal Police Org.*,
   672 F.2d 927 (D.C. Cir. 1981) ..............................................................................................22

*Stewart v. Azar*,
  308 F. Supp. 3d 239 (D.D.C. 2018)....................................................................24

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*,
  330 F.3d 1110 (9th Cir. 2003)........................................................................11

*Tah v. Global Witness Publishing, Inc.*,
  991 F.3d 231 (D.C. Cir. 2021) ...............................................................passim

*Tavoulareas v. Piro*,
  817 F.2d 762 (D.C. Cir. 1987) ...........................................................10, 11, 16

*Terry v. Adams*,
  345 U.S. 461 (1953) ........................................................................................8

*Vasquez v. Whole Foods Mkt., Inc.*,
  302 F. Supp. 3d 36 (D.D.C. 2018) ..................................................................21

*Waldbaum v. Fairchild Pubs.*,
  627 F.2d 1287 (D.C. Cir. 1980) .......................................................................9

*Walden v. Fiore*,
  571 U.S. 271 (2014) ......................................................................................22

*West v. Atkins*,
  487 U.S. 42 (1988) ..........................................................................................8

*Zimmerman v. Al Jazeera America, LLC*,
  246 F. Supp. 3d 257 (D.D.C. 2017)........................................................11, 13, 14

**Statutes**

D.C. Code §13-423 .............................................................................................19

Dominion does not dispute that its voting machines, like all electronic voting machines, can be hacked to manipulate or alter votes.  These security flaws have been discussed by left-leaning politicians, experts and media for years.  For example, then-Senator Kamala Harris (D-CA) said at a Senate Judiciary Committee Hearing on June 12, 2018: "I actually held a demonstration for my colleagues here at the Capitol, where we brought in folks who, before our eyes, hacked election machines."[1]  Before the November 2020 election, Dominion neither challenged nor sued any of the cyber experts, politicians, or others who stated publicly that Dominion's voting machines can be, or have been, hacked.

Here, Dominion has not met its burden under the law in this Circuit to plausibly plead that Mike Lindell made any allegedly defamatory statements with actual malice regarding the hacking of Dominion's voting machines in the November 2020 general election.  Nor does Dominion's repetition of its "Big Lie" mantra (29 times in 24 paragraphs of its Complaint) in its attempt to chant away the idea that its voting machines were hacked in the 2020 general election remedy this deficiency.

It is clear that Dominion's defamation lawsuits, along with the over 150 cease-and-desist letters it has sent through its counsel, are nothing more than an improper attempt to silence anyone who questions, or puts forth evidence concerning, the hacking of electronic voting machines in the in the 2020 general election.  Dominion has not met its incredibly high burden to plead (and to be clear, it will never be able to prove) that Mike Lindell knew any of his allegedly defamatory statements were false or that Lindell harbored any doubt - much less substantial doubt - as to the truth of the statements about which Dominion complains.  The Court should dismiss this lawsuit.

---

[1] *Senate Judiciary Committee Hearing*, C-SPAN (June 12, 2018), at 1:18:54 (https://www.c-span.org/video/?446920-1/justice-homeland-security-officials-testify-election-security).

# I.   ARGUMENT AND AUTHORITY

Dominion's products create ballots, offer the means by which Americans vote and tabulate and transmit the results to centralized state tabulation centers to determine who is named the winner in elections from coast to coast.  The role its machines play is of paramount importance to our democratic republic:  safe and secure elections are essential to the functioning of a free society.

Unfortunately for Americans, Dominion's systems are rife with security vulnerabilities that leave them susceptible to hacking and manipulation.  These security flaws have been discussed *ad nauseum* by left-leaning politicians, experts and media for years.  For example, in addition to then-Senator Kamala Harris's statement that "we brought in folks who, before our eyes, hacked election machines," Dominion remained silent in the face of all of the warnings and pleadings from Senators Amy Klobuchar (D-MN) and Elizabeth Warren (D-MA), security experts Hari Hursti, Ph.D. and J. Alex Halderman, Ph.D., the court in *Curling v. Raffensperger*, 493 F. Supp. 3d 1264 (N.D. Ga. 2020), the examiners in Texas that declined to certify Dominion machines – twice – in 2019, the documentaries *Hacking Democracy* (2006) and *Kill Chain:  The Cyber War on America's Elections* (2020), and the countless other legislators, experts and media beating the drum about how easy it is to hack electronic voting machines.

But everything changed after November 3, 2020.   All the Democratic senators, representatives and now vice president who had been deriding electronic voting machines fell mute.  Liberal media outlets who had run countless articles up to the election (presumably to delegitimize a second victory by President Trump) decided that, despite the years of warnings, electronic voting machines were now completely secure.  Outspoken computer scientists who had written numerous academic papers and signed affidavits in litigation detailing security vulnerabilities changed their tunes.  Because Joe Biden was named the victor of the 2020 election,

electronic voting machines that were so incredibly flawed prior to the election magically produced "the most secure election in history." Particularly in light of all the information in the public debate prior to the election, this unverified claim cannot be taken at face value.

That complete about-face by left-leaning critics of electronic voting machines emboldened Dominion to no longer sit idly by while people complained about its flawed machines. It was now time for Dominion, with cover from the liberal media and friendlies in office, to wage a campaign to silence any and all critics of the 2020 election. It sent more than 150 "cease-and-desist" letters attempting to extort critics into silence. And it filed lawsuits against its more deeply-pocketed foes who refused to back down, including Mike Lindell. Not a single outspoken democrat or left-leaning voice challenging Dominion's flawed machines pre-election has been sued.

Dominion's Opposition contains the same conflation, obfuscation and misdirection as its Complaint. It refuses to claim any particular law applies to its defamation claim, because it wants the benefit of ostensibly lesser pleading standards from jurisdictions other than the District of Columbia. Dominion claims it is not a state actor but admits that the proper pleading standard for its defamation claims is "actual malice."

Dominion's arguments supporting its assertion that it adequately pleaded actual malice are unavailing. A defendant does not exhibit actual malice by refusing to retract allegedly defamatory statements based on nothing more than the *ipse dixit* of the plaintiff. While the "cease-and-desist" letters Dominion sent Lindell derided his sources and provided opposing views supporting Dominion's position, Dominion gave Lindell no actual, verifiable proof that what he said was incorrect, which is ultimately fatal to its argument. Moreover, the pervasive and continued controversies related to the 2020 general election belie Dominion's conclusory allegations that Lindell's statements were inherently improbable on their face. And allegations of preconceived

narratives and profit motive are insufficient to show actual malice under applicable law.  Moreover, Dominion's improper Minnesota Deceptive Trade Practices Act ("MDTPA") claim should be dismissed.  And this Court does not have personal jurisdiction over Lindell, and even if it did, the Court should transfer this case to the District of Minnesota for the convenience of the parties.

**A.**       **Dominion Failed To Properly Plead (And Cannot Plead) Actual Malice.**

Dominion has pleaded nothing to suggest that Mike Lindell *subjectively* knew that his allegedly defamatory statements were false or that he harbored substantial doubt as to the truth of the statements.  They cannot, because he did not then, and does not now.

**1.**       **Lindell Has No Subjective Doubt As To The Truth Of His Statements.**

In 2020, before the general election, liberal bastion HBO released a documentary detailing the dangers of electronic voting machines.   KILL CHAIN: THE CYBER WAR ON AMERICA'S ELECTIONS (Home Box Office 2020).  This was but one of the countless left-leaning propaganda created to undermine public confidence in electronic voting machines and explain the myriad vulnerabilities such machines suffer.  One of the key figures in *Kill Chain* is Hari Hursti, the cyber-expert cited in Lindell's Memorandum in support of his motion to dismiss (Dkt. No. 34-1, at 2, 16, 22-24).  *Kill Chain* goes through a detailed analysis of electronic voting machines and the fatal flaws from which they suffer.  It also discusses a previous documentary called *Hacking Democracy*, which details voting machines Dr. Hursti investigated in 2005.   HACKING DEMOCRACY (Home Box Office 2006).

While Dominion did nothing in response to its critics prior to the 2020 election, after Lindell put out evidence that Dominion's voting machines were hacked in the 2020 election, it suddenly began its censorship crusade.  Dominion's current crusade mirrors the response *Hacking Democracy* received: "When *Hacking Democracy* was released [in 2006], the manufacturer called

the hack a sham and attempted to stop the film's distribution." KILL CHAIN: THE CYBER WAR ON

AMERICA'S ELECTIONS (Home Box Office 2020), title card at 9:18.  As Dr. Hursti explained,

> The first reaction was to shoot the messenger, to try to use any legal means possible
> to cause a chilling effect.  I mean there was a huge amount of resources used just
> to stop the communications, just to stop people discovering the vulnerabilities.
> There was a huge amount of lobbying, advertising, marketing to assure customers
> everything is fine when it was not.

Hari Hursti, Ph.D., *Id.* at 9:26 – 9:59.  Like the manufacturer in *Hacking Democracy*, Dominion

prefers to spend its resources trying to silence its critics, but only in connection with the November

2020 election. The real question is: Why did Dominion wake up now?

Lindell cited a plethora of examples of legislative, judicial and executive branch complaints

about electronic voting machines, along with academic papers, subject matter experts, end-users,

academic papers and journalists who decried the reliability of the machines.  (Mem. at 15-26 and

Exhibit Nos. A-W, II).  All of these publicly-available media support a valid belief among many

cyber experts and the public, including Lindell, that electronic voting machines, including those

used in 2020, can be, and were, easily hacked and election results manipulated or altered.  "The

same machine that Hursti hacked in 2005 is slated for use in 20 states for the 2020 election." KILL

CHAIN: THE CYBER WAR ON AMERICA'S ELECTIONS (Home Box Office 2020), title card at 10:26

(citing Verified Voting, November 2019).

Because of the onslaught of persistent warnings about the ease with which electronic voting

machines can be hacked, it is no wonder that when Lindell was presented evidence that Dominion's

machines were compromised and used to switch votes in the 2020 general election, he trumpeted

those claims to anyone who would listen.  Lindell's Memorandum details just some of the expert

analyses of Dominion's performance in the 2020 election that determined that Dominion's

machines were compromised.  (Mem. at 27-28, Exhibit Nos. X, Y, CC, DD).

Lindell has not only refused to retract his statements, but he has also continued with a persistent series of actions and statements that make clear his unwavering belief in the truth that Dominion's machines were compromised.  While Dominion claims Lindell's failure to retract is some evidence of actual malice, it has never provided Lindell (or anyone else) specific, irrefutable evidence of the sanctity of its machines.  No source code.  No logs.  Nothing but their conclusory claims and the opinions of other third parties that the election was secure.  Lindell is not legally obligated to take the fox's word that the henhouse is safe and secure.

After Dominion filed its Opposition, Lindell has continued to press for an overhaul to America's voting infrastructure based on Dominion's failures.  On June 3, 2021, Lindell released his fourth docu-movie detailing the hacks on the 2020 election entitled "Absolutely 9-0."  Mike Lindell, *Absolute 9-0*, MIKE LINDELL TV (Jun. 3, 2021) (https://lindelltv.com/mike-lindell-presents-absolutely-90/).  That same day, Lindell filed suit against Dominion and three Smartmatic entities, alleging causes of action for abuse of process, conspiracy, and multiple civil rights violations stemming from their efforts to threaten and sue him into silence.  A courtesy copy of Lindell's complaint in Minnesota is attached hereto as Exhibit A and is incorporated by reference as if fully set forth herein.

Thus, Dominion has not plausibly pled any facts, as it must under the law in this Circuit, that Lindell *subjectively* harbored substantial doubt as to the truth of the statements he made about Doninion's voting machines.  Nor can it.  Indeed, as recently as June 15, 2021, Politico ran an article discussing Lindell's "…absolute certainty that cyberattacks threw the November election to Joe Biden."[2]  It is no wonder Dominion asks the Court to apply an (improper) objective standard

---

[2] David Siders, *Why Mike Lindell Can't Stop*, POLITICO, Jun. 15, 2021 (https://www.politico.com/news/magazine/2021/06/15/mike-lindell-mypillow-trump-election-conspiracy-494302).

of actual malice (*see* §I.A.4.a below): *subjectively*, Mike Lindell has no doubts as to the truth of his claims about Dominion.  Dominion cannot plead or prove otherwise.

> **2.      Only Minnesota Or District Of Columbia Law Applies In This Case.**

Dominion has not alleged a specific state's law for its defamation claim.  Lindell maintains that Minnesota law governs this action, not only because Dominion asserts a claim under the MDTPA (Comp. at ¶¶ 173-178), but also because pursuant to the District of Columbia's choice-of-law rules, Minnesota has the most significant relationship to the dispute.  *See Abbas v. Foreign Policy Grp., L.L.C. (Abbas II)*, 783 F.3d 1328, 1338 n. 6 (D.C. Cir. 2015).  For purposes of this Motion, however, there is no meaningful difference between the defamation law of Minnesota and the District of Columbia.  *Compare McKee v. Laurion*, 825 N.W.2d 725, 729-30 (Minn. 2013) (elements of defamation under Minnesota law); *Elkharwily v. Mayo Holding*, 823 F.3d 462, 468 (8th Cir. 2016), *cert. denied*, __ U.S. __, 137 S. Ct. 481 (2016) (same); *with Fridman v. Orbis Business Intelligence Ltd.*, 229 A.3d 494, 504 (D.C. 2020), *cert. denied*, 141 S. Ct. 1074, 208 L. Ed. 2d 534 (2021) (elements of defamation under D.C. law); *Arpaio v. Cottle*, 404 F. Supp. 3d 80, 83-84 (D.D.C. 2019) (same).  Further, for purposes of the analysis of actual malice, Minnesota law is consistent with *New York Times v. Sullivan* and its progeny.  *See Britton v. Koep*, 470 N.W. 2d 518, 521 (Minn. 1991) (noting that the Supreme Court cited Minnesota as following a rule similar to the constitutional standard adopted in *New York Times*).  In the absence of a true conflict, the District of Columbia choice-of-law principles compel the application of District of Columbia law by default.  *Song fi, Inc. v. Google, Inc.*, 72 F. Supp. 3d 53, 61 (D.D.C. 2014).

> **3.      Dominion Is A State Actor Subject To An "Actual Malice" Standard.**

Dominion's claim that it is not a governmental actor is absurd on its face and evidences Dominion's willingness to take any position to shield itself from liability for its unsecure voting

machines.  (Opp'n at 5).  Dominion's claim is especially specious in light of its acknowledgement that its defamation claims are subject to the standard of actual malice.  (*Id.* at 2, 5).

The Supreme Court has found ostensibly private organizations to be state actors when they are joint participants with the state or its agents or when they have "been delegated a public function by the State."  *Brentwood Academy v. Tenn. Secondary School Athletic Ass'n*, 531 U.S. 288, 296 (2001) (citing *Lugar v. Edmonson Oil Co., Inc.*, 457 U.S. 922, 941 (1982) (private party held to be a state actor when it jointly participated with the state in seizing disputed property)); *West v. Atkins*, 487 U.S. 42, 56 (1988) (a physician providing medical care to a prisoner was performing a state function)).  The Supreme Court has consistently held that private parties who run elections are, in effect, the state.  *Terry v. Adams*, 345 U.S. 461, 468-70 (1953); *Smith v. Allwright*, 321 U.S. 649, 662-66 (1944).

As a result of Dominion's contracts with government entities, it is delegated responsibility to administer public elections, including the election of individuals to serve in constitutionally prescribed offices—a core governmental function.  *See Bullock v. Carter*, 405 U.S. 134, 148-49 (1972) ("Viewing the myriad governmental functions supported from general revenues, it is difficult to single out any of a higher order than the conduct of elections at all levels to bring forth those persons desired by their fellow citizens to govern.").  In at least one jurisdiction in the November 2020 election, Maricopa County, Arizona, county officials did not even possess the administrator passwords to the Dominion voting machines—meaning only Dominion could program and operate the machines on behalf of the county.[3]  Whether Dominion is found to be conducting elections *with* the states or *for* the states, it is a governmental actor/all-purpose public

---

[3] *See* Vaughan Jones, *Maricopa Audit Attorney Threatens Maricopa County Board of Supervisors With Subpoenas*, KJZZ, (Jun. 15, 2021) (https://kjzz.org/content/1681602/maricopa-audit-attorney-threatens-maricopa-county-board-supervisors-subpoenas).

figure whose defamation allegations must rise to the level of "actual malice."  *Waldbaum v. Fairchild Pubs.*, 627 F.2d 1287, 1294-95 (D.C. Cir. 1980) ("When someone steps into the public spotlight, or when he remains there once cast into it, he must take the bad with the good.").

### 4.     Actual Malice Is A High Standard, Even At The Pleadings Stage.

Despite Dominion's protestations to the contrary, its burden to allege facts that would support a plausible inference of actual malice is "famously daunting," even at the pleadings stage. (Opp'n at 7); *Tah v. Global Witness Publishing, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021) (quoting *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1308 (D.C. Cir. 1996)).  Dominion purports to mischaracterize the standard for establishing actual malice as something more objective than the unquestionably subjective test. (Opp'n at 6-7).  Actual malice is proven only when a defendant actually knew that what it published was false, or when it publishes the information with "reckless disregard" for the truth.  *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 279-80 (1964)).

Dominion seizes on the term "reckless" and repeats it – 21 times! – throughout its brief, presumably believing that if it says "reckless" or "recklessly" enough, its pleading standard will have been met.  But reckless disregard is not established by simply drawing an inference from what Dominion argues Lindell purportedly should have known.  (Opp'n at 7).  Nor is reckless disregard measured by "whether a reasonably prudent man would have published or would have investigated before publishing."  *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).  Rather, reckless disregard requires that the defendant "in fact entertained serious doubts as to the truth of its publication" or acted with "a high degree of awareness of its probable falsity."  *Id.*; *Tah*, 991 F.3d at 240; *Jankovic v. Int'l Crisis Grp. (Jankovic III)*, 822 F.3d 576, 589 (D.C. Cir. 2016); *McFarlane*, 91 F.3d at 1508.  It is not enough to show that a defendant should have known better; the plaintiff must instead allege facts that support an inference that the defendant "harbored

subjective doubt." *Jankovic III*, 822 F.3d at 589.  Indeed, actual malice requires the defendant to have "come close to wil[l]fully blinding itself to the falsity of its utterance." *Tavoulareas v. Piro*, 817 F.2d 762, 776 (D.C. Cir. 1987) (en banc) (quoting *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 783 (1986) (Stevens, J., dissenting)).  Incredibly, Dominion uses the term "doubt" only once, "substantial" only 3 times and "subjective" not at all in their entire 115-page complaint, and even when they are used, they are not describing Lindell's state of mind.  (Compl. at ¶¶ 12-14, 118).  This is utterly insufficient under D.C. law.  *See Jankovic III*, 822 F.3d at 589; *Tah*, 991 F.3d at 240; *see also Eramo v. Rolling Stone LLC, et al.*, Cause No. 3:15-cv-00023, in the Western District of Virginia, at Dkt. No.s 14-1, 14-2 (defamation case filed by Dominion's attorneys that is replete with allegations of substantial, subjective doubt).

Because the actual malice inquiry is subjective, any plausible inference must be drawn solely upon the basis of the information available to and considered by Lindell prior to publication. *McFarlane*, 91 F.3d at 1508.  In only three scenarios may circumstantial evidence of subjective intent be so powerful that it could establish actual malice: where the story is (1) "fabricated"; (2) "so inherently improbable that only a reckless man would have put [it] in circulation"; or (3) "based wholly on a source that the defendant had obvious reasons to doubt." *OAO Alfa Bank v. Center for Public Integrity*, 387 F. Supp. 2d 20, 50 (D.D.C. 2005) (citations omitted); *see also Jankovic v. Int'l Crisis Grp.*, 72 F. Supp. 3d 284, 309-10 (D.D.C. 2014), *aff'd*, 822 F.3d 576 (D.C. Cir. 2016); *Tavoulareas*, 817 F.2d at 790.  Dominion's Complaint meets none of these.

### a.      Actual Malice Is Subjective, Not Objective.

Dominion relies on cases from other Circuits that suggest that objective facts may circumstantially support a plausible inference of actual malice.  (Opp'n at 6-7).  However, those Circuits depart from the well-established law of this Circuit that a finding of reckless disregard still depends on proof of the speaker's subjective state of mind; that is, the speaker must have

harbored subjective, serious doubt as to the truth of his statements. *Compare McFarlane*, 91 F.3d at 1508; *Jankovic III*, 822 F.3d at 589-90 *with Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1134 (9th Cir. 2003).

By contrast, the Ninth Circuit applies two tests for reckless disregard. *Suzuki Motor Corp.*, 330 F.3d at 1134. The Ninth Circuit's test for reckless disregard in the absence of direct proof conflicts with this Circuit's requirement that the speaker harbored subjective doubt. *See McFarlane*, 91 F.3d at 1508-09; *Tavoulareas*, 817 F.2d at 789; *Jankovic III*, 822 F.3d at 589-90. By relying on circumstantial evidence of "obvious reasons to doubt" the veracity of the statements and the "reasonable" actions of the defendant in dispelling those doubts, the Ninth Circuit embraces an objective test that improperly "turns the inquiry away from the publisher's state of mind and to inquire instead whether the publisher satisfied an objective standard of care." *See McFarlane*, 91 F.3d at 1509; *see also St. Amant*, 390 U.S. at 731 ("reckless conduct is not measured by whether a reasonably prudent man would have published").

Dominion seems to recognize this conflict by its selective quoting of the *Zimmerman* court. (Opp'n at 7); *Zimmerman v. Al Jazeera America, LLC*, 246 F. Supp. 3d 257, 282-83 (D.D.C. 2017). Even that court recognized that it was "evidence that *a defendant had* an obvious reason to doubt the veracity of a source" which may be quite significant to the actual malice inquiry. *Id*. at 283-84 (emphasis added) (finding an obvious reason to doubt a source who clearly and unequivocally recanted his statement pre-publication). Accordingly, an allegation of reckless disregard in support of actual malice still turns upon Lindell's state of mind and not the purported "obviousness" of any external reasons to doubt his statements. *See id*.; *St. Amant*, 390 U.S. at 731; *Tah*, 991 F. 3d at 240; *McFarlane*, 91 F.3d at 1509. For the reasons discussed below, even in the aggregate, Dominion's allegations fail to meet its burden of supporting a plausible

inference that Lindell subjectively harbored serious doubts as to the veracity of his statements. *See Tah*, 991 F. 3d at 240; *Jankovic III*, 822 F.3d at 589.

Dominion's allegations of actual malice rely heavily upon its January 8, 2021, letter to Lindell (the "Letter"). (Opp'n at 8-9, 12-16). Dominion argues that because it provided Lindell with Dominion's preferred catalog of news reports and criticisms of Lindell's statements and sources, Lindell intentionally disregarded evidence of the falsity of his claims, and that he had obvious reasons to doubt the truth of his claims. *Id*. Not surprisingly, the Letter omits the plethora of countervailing public facts and evidence showing that electronic voting machines are easily hackable. Yet, the only permissible inference of actual malice must be drawn solely from information that was available to and *considered by Lindell* before his statements were made. *See McFarlane*, 91 F.3d at 1508. Accordingly, Dominion's preferred narrative in the Letter does not plausibly support any allegations that Lindell had knowledge or subjective doubt about the truth of his allegedly defamatory statements *prior to* January 8, 2021—much less after that date when even more facts have come to light showing the 2020 election was hacked and the results manipulated. *See id*.; *see also* Exhibit A, at ¶¶ 93-105.

Furthermore, Dominion's criticisms of Lindell's sources in no way diminish Dominion's legal burden to plausibly allege subjective doubt. Even when a source "of potentially libelous material is a person of questionable credibility," the defendant does not have a duty to corroborate that material. *OAO Alfa Bank*, 387 F. Supp. 2d at 54 (quoting *McFarlane*, 91 F.3d at 1508). Instead, "The plaintiff must establish that even in relying upon an otherwise questionable source the defendant actually possessed subjective doubt." *McFarlane*, 91 F.3d at 1508 (quoting *Secord v. Cockburn*, 747 F. Supp. 779, 794 (D.D.C. 1990)).

Dominion relies heavily on *Zimmerman v. Al Jazeera America LLC* to argue that a motion to dismiss is improper where the publisher relied upon unreliable sources and disregarded information provided by the plaintiff, but *Zimmerman* is factually distinguishable; there, the primary source for the publisher's story unequivocally recanted prior to publication. 246 F. Supp. 3d at 283-284. Dominion may disagree with Lindell's sources, but that fact does not support an inference that Lindell harbored subjective doubt as to the veracity of those sources' information. *See Lohrenz v. Donnelly*, 350 F.3d 1272, 1284 (D.C. Cir. 2003) (citation omitted) (holding that just because the defendants "acted on the basis of a biased source and incomplete information does not demonstrate" actual malice); *McFarlane*, 91 F.3d at 1508; *OAO Alfa Bank*, 387 F. Supp. 2d at 54; *Secord*, 747 F. Supp. at 789. To require Lindell to not only investigate his sources but actually corroborate them, as Dominion suggests, would be to turn the inquiry away from Lindell's state of mind and to inquire, instead, whether he satisfied an objective standard of care. *See McFarlane*, 91 F.3d at 1509 (holding that the court "cannot" "impose upon" the speaker a "duty to corroborate"); (Opp'n at 14-15).

Nor is Lindell under any duty to take Dominion at its word. A publisher's knowledge of "denials, however vehement" does not show actual malice. *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 92 (D.D.C. 2012) (that defendant ignored a cease-and-desist letter that put him on notice that his stories were false did not show actual malice); *Tah*, 991 F.3d at 242 (quoting *Lohrenz*, 350 F.3d at 1285). Dominion's Complaint and Letter repeatedly point out numerous claims Lindell made that Dominion argues are false, but Dominion's arguments do not establish knowledge of falsity or reckless disregard of truth as required for actual malice. *See Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 & n. 30 (1984). The Letter provides no independent means to verify that Dominion provided a secure electronic voting system – no source code, no activity

logs, nothing verifiable.  (Compl. Exhibit 269).  Dominion did not disclose any information about its software, machines, and the purported security it provides for electronic voting in response to Lindell's criticisms.  *Id*.; *see Zimmerman*, 246 F. Supp. 3d at 283.  The Letter does not put forth evidence within easy reach or make obvious effort to correct Lindell's beliefs; it merely condescends.  *Id.*  In the absence of evidence supporting a speaker's subjective reason to doubt *and* failure to examine evidence within easy reach or obvious contact, there is no support for an inference of reckless disregard.  *See id.*  Accordingly, the Letter does not support any plausible inference that Lindell harbored subjective doubt.  *Tah*, 991 F. 3d at 240 (quoting *Jankovic III*, 822 F. 3d at 589); *Parsi*, 890 F. Supp. 2d at 92.

### b.  Lindell's Statements Were Not "Inherently Improbable" Or Obviously False.

Dominion argues in conclusory fashion that Lindell's statements are outlandish and inherently improbable "on their face."  (Opp'n at 9).  This argument does not establish actual malice because there is nothing self-evidently false about Lindell's statements.  *See Arpaio*, 404 F. Supp. 3d at 85.  To the contrary, Lindell's statements are consistent with statements regarding Dominion's unsecure and easily hackable voting machines that were publicly made well before the 2020 general election.  (Mem. at Exhibit Nos. A-W, II).  Dominion would have the Court review its allegations in a vacuum where the only information Lindell had was that provided by Dominion, which self-servingly claims that the 2020 general election was secure and anyone who disagrees cannot be believed.  Not so.

There was a vigorous public debate about the security and reliability of electronic voting machines, including Dominion's, leading up to the 2020 general election.  Lindell's Memorandum discusses that debate and offers examples of information disagreeing with Dominion's characterization of the election.  Lindell does not invite the Court to draw any impermissible

inferences from his Exhibits, but without commenting or relying upon the truth of any assertion in

in the Exhibits, the Court may take judicial notice of the existence of a vigorous debate involving

Dominion and election integrity prior to November 2020.  *See Farah v. Esquire Magazine*, 736

F.3d 528, 534 (D.C. Cir. 2013) (citing FED. R. EVID. 201(b)) ("Judicial notice is properly taken of

publicly available historical articles such as were attached to [defendant]'s motions to dismiss.");

*Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140 (D.D.C. 2017).  The *Curling* experts and

the Texas certification decision were not taken out of context, Opp'n at 11, but are entirely within

the proper context: others have expressed significant misgivings about Dominion's software and

machines.  This controversy involving Dominion pre-dates the conduct complained about in

Dominion's Complaint and precludes any plausible inference that Lindell's statements were

"inherently improbable" or that he had "obvious reasons to doubt the veracity" of his statements.

### c. Allegations Of Profit Motive Cannot Independently Support A Finding Of Actual Malice.

Dominion takes up considerable space in its brief expounding its theory that Lindell makes

these purportedly false statements to sell pillows and improve MyPillow's bottom line.  (Opp'n at

16-21).  This ignores the fact that MyPillow products have been removed from numerous retailers,

including Bed Bath and Beyond, Kohl's, QVC, JC Penny's and Wayfair.[4]  And in nearly five pages

of briefing, it relies on not a single case from this Circuit.  Instead, Dominion quickly attempts to

distinguish *Tah v. Global Witness Publishing, Inc.*, the most recent case on point, after citing

numerous cases from the Ninth and Second Circuits.  (Opp'n at 16-21).  It is well-settled in this

Circuit that evidence of ill will or profit motive is "insufficient by itself to support a finding of

---

[4] *See, e.g.*, Kate Taylor and Mary Meisenzahl, *Retailers like Kohl's and Bed Bath and Beyond have ditched MyPillow – see the full list of which major stores dropped it and which still sell it*, (Jan. 27, 2021) (https://www.businessinsider.com/where-to-buy-mypillow-and-what-companies-cut-ties-2021-1).

actual malice." *Tah*, 991 F.3d at 243 (quoting *Tavoulareas*, 817 F.2d at 795). To recover for defamation, Dominion cannot "ground [its] claim on a showing of intent to inflict harm," but must show an "intent to inflict harm through falsehood." *Tavoulareas*, 817 F.2d at 795 (citation omitted). "[T]he mere presence of some ulterior motive—whether a profit motive … or a personal desire to harm the subject of a story—is not enough to support a finding of actual malice." *Jankovic III*, 822 F.3d at 596. The risk of chilling sincerely-believed speech by admission of ill-will evidence is only outweighed under certain circumstances, specifically when the evidence of ill-will is combined with "other, more substantial evidence of a defendant's bad faith." *See Tavoulareas*, 817 F.2d at 795. Dominion has failed to allege facts that support a plausible inference that Lindell's alleged profit motives induced him to lie knowingly or otherwise "inflict harm through falsehood," and for the reasons discussed above, its other allegations fail to buttress its claim that Lindell subjectively spoke in bad faith. *See id*.

### d.    Dominion's Preconceived Narrative Assertion Is Unavailing.

Dominion's "preconceived narrative" argument is based on the false premise that (a) Lindell held a preconceived belief that Dominion stole the 2020 election with no factual basis; (b) the only information Lindell had about Dominion's performance in the 2020 election was the information Dominion itself provided, which gave Lindell "facts" showing that Dominion's machines were secure and performed perfectly; and (c) Lindell ignored the only information he had (that came from Dominion) and made defamatory statements due to his preconceived notion. This argument is both legally irrelevant and factually dishonest.

In this Circuit, a preconceived narrative by itself is not antithetical to the truthful presentation of facts, and it does "little to show actual malice." *Tah*, 991 F.3d at 241 (quoting *Jankovic III*, 822 F.3d at 597). Dominion's heavy reliance on *Palin v. N.Y. Times Co.*, 940 F.3d 804 (2d Cir. 2019), for the proposition that a preconceived narrative is sufficient to establish actual

malice is misplaced.  *See BYD Co. Ltd. v. VICE Media LLC*, No. 20-cv-3281 (ASN), 2021 WL 1225918, at *8 (S.D.N.Y. Mar. 31, 2021).  The facts of *Palin* are the exact opposite of those in this case.  In *Palin*, a New York Times editor was accused of defaming Governor Palin by claiming that an advertisement run by her political action committee with crosshairs on several congressional districts was linked to Jared Loughner's shooting of Congressman Gabby Giffords. *Palin*, 940 F3d at 808.  That editor had held editorial positions both at the New York Times and The Atlantic during times when those publications ran stories disavowing any link between the ads and the Giffords shooting.  *Id*. at 813-15.  In other words, the allegedly defamatory statements in *Palin* were directly contradicted with knowledge the alleged defamer actually held.

Here, however, Lindell's allegedly defamatory statements are backed up by years of evidentiary support.  (Mem. at 15-26 and Exhibit Nos. A-W, II).  Dominion asks the Court to ignore Lindell's exhibits, because the only factual information they want the Court to consider are the self-serving letters and supporting documentation Dominion sent to Lindell.  But that ignores more than a decade of intense public debate surrounding the security of electronic voting machines in general, and Dominion's machines specifically.  Dominion's allegations fail to support any plausible inference that Lindell had reason to lie (he had none).  *See VICE Media*, 2021 WL 1225918, at *9-10; *McDougal v. Fox News Network LLC,* 489 F. Supp. 3d 174, 187 (S.D.N.Y. 2020).

**B.**    **The Court Should Also Dismiss Dominion's MDTPA Claim.**

The conduct forming the basis of Dominion's MDTPA claim mirrors that of its defamation claim, and Dominion cannot "use related causes of action to avoid the constitutional requisites of a defamation claim."  *Moldea v. New York Times Co.*, 22 F.3d 310, 319-20 (D.C. Cir. 1994). Dominion's MTDPA claim thus fails for the same reasons as its defamation claim.

Dominion is also using the MDTPA improperly as a "back-door" for attorneys' fees, which is prohibited under Minnesota law.  *See Dennis Simmons, D.D.S., P.A. v. Modern Aero, Inc.*, 603 N.W.2d 336, 340 (Minn. App. 1999).   Under the MDTPA, an award of injunctive relief is a condition precedent to recovery of attorneys' fees under the MDTPA.  *Modern Aero*, 603 N.W.2d at 339-40.   Dominion could have brought a claim for injunctive relief in conjunction with its defamation claim, but it chose not to.  This is because it is not really concerned with the injunctive relief, but with recovery of its attorneys' fees, which would not be available if it had pursued injunctive relief in that manner in connection with its defamation claim.  Dominion also does not seek emergency (or temporary) injunctive relief to prevent Lindell from making any further allegedly false statements.  If Lindell's statements regarding Dominion were so harmful as to merit permanent injunctive relief, why would Dominion not seek immediate, temporary relief to prevent further alleged damage in the meantime?  The only plausible answer is Dominion's impermissible attempt to win attorneys' fees.

## C.     The Court Should Dismiss This Case For Lack Of Personal Jurisdiction.

Dominion conflates the personal jurisdiction analysis for the two Defendants, Lindell and MyPillow, because that is the only way it can try to finagle a reason to drag Lindell into this Court. Lindell was not acting as an agent of MyPillow, and Dominion's attempt to confuse their contacts is impermissible.  Lindell, as an individual, is not subject to this Court's jurisdiction.  Dominion simply cannot overcome the due process protections that prevents it from dragging Lindell into D.C. court based on only a handful of statements he made in the District, which post-date similar statements he made elsewhere.   (*Compare* Compl. at ¶35 n. 5 (quoting a Lindell tweet from November 29, 2020), ¶43 (interview on *America First* when Lindell was in Texas), ¶50 (interview on the *Conservative Business Journal* when Lindell was in Pennsylvania) *with* Compl. at ¶¶ 165

(a, b, k, m, n – the only 5 statements Dominion sues over that were made in the District, which were made on December 12, 2020, and January 5, 6 and 7, 2021)).

### 1.   D.C.'s Long Arm Statute Does Not Reach Lindell.

Dominion still fails to establish that personal jurisdiction over Lindell is proper under the long-arm statute.  He did not "transact business" in the District when he committed the alleged defamation.  The alleged tortious injury did not occur in the District.  And Lindell certainly does not have sufficient contacts with the District to warrant the last-ditch effort to exert personal jurisdiction under D.C. Code §13-423(a)(4).

### a.   Lindell Did Not "Transact Business" In The District.

Lindell did not "transact business" in D.C. for purposes of personal jurisdiction, and Lindell's comments *cannot* amount to "transacting business" because defamation is a tort. *IMAPizza LLC v. At Pizza, Ltd.*, 334 F. Supp. 3d 95, 111 (D.D.C. 2018).  Dominion ignores that reality and relies on a misplaced theory of "agency" to conclude that because MyPillow allegedly "transacted business" in D.C., so did Lindell.  That is not how jurisdiction works, and certainly not in a defamation case like this one.  *See Rush v. Savchuk*, 444 U.S. 320, 332 (1980) (holding that jurisdiction over employees cannot be judged according to their employer's activities in forum). Otherwise, any CEO who travels to a state for pleasure can be haled into that state's court just because his company does business there.  Dominion cites no case law to support that conclusion.

Dominion points to rallies to show that Lindell "transacted business" in D.C. but provides no case law to support its premise that advocating for social and political justice in D.C. amounts to "transacting business" there.  And it cannot do so.  Lindell's mere physical presence when he stated his personal political views in D.C. were (a) made outside of the scope of his employment and (b) not "transacting business."  Dominion tries to distinguish *IMAPizza* (Opp'n at 28), but the reason why the one-time "purchase at a restaurant" in *IMAPizza* (which Dominion downplays in

its Opposition) was highly relevant was because when the defendants made the purchase at IMAPizza's restaurant, they were actually scouting their competition while strategizing how to infringe IMAPizza's trademarks. *IMAPizza, LLC.*, 334 F. Supp. at 114. No such transaction occurred here.

Not only does Dominion fail to properly allege that Lindell personally transacted business, it ignores the fact that this controversy does not arise out of any conceivable business transactions to which Lindell was a party within the District. Dominion misapplies *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.,* 141 S. Ct. 1017 (2021). That case held that Ford, by operating within Montana through 36 dealerships and selling 2,000 used Crown Victorias of the same production year inside the state, could not escape personal jurisdiction in Montana when a malfunctioning Crown Victoria sold outside the state caused an accident in Montana. *Id.* at 1029-130. Lindell, unlike Ford, has not personally made thousands of deals within the forum, and he certainly cannot be perpetually present in 36 locations inside of D.C. simultaneously. Dominion reads the requirement that a defendant's contacts "relate to" the underlying case in *Ford Motor Co.* so expansively as to leap over specific personal jurisdiction and create general jurisdiction in its stead. Dominion seeks to eliminate the relationship between the contacts and the cause of action as a limit to specific personal jurisdiction and replace it with a mere aggregation of contacts. Neither *Ford Motor Co.* nor any other case stands for this proposition.

Dominion also makes presumptive claims like Lindell "engaged in multiple other business transactions while in D.C." and "engaged in other business transactions within the District" while providing absolutely no facts to back that up. (Opp'n at 29-30). This ambiguous, conclusory language is insufficient to defeat a Motion to Dismiss and should be discarded as such. *Ashhab-*

*Jones v. Cherokee Nation Strategic Programs, LLC*, 1:19-CV-00089 (CJN), 2020 WL 6262090, at \*3 (D.D.C. Oct. 23, 2020) (slip copy).

### b.      No Tortious Injury Occurred In The District.

Dominion cannot refute the facts that it has no voting machines, no offices, and no contracts in D.C. that would form the only basis for showing that injury occurred there.  Again, economic injury suffered by defamation "is most likely felt in one's place of business whatever the locus of its publication," which would be Ontario or Colorado.  *See Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 457-58 (D.C. Cir. 1990).  Dominion alleges no facts showing that it suffered reputational or economic injury here.

### c.      Dominion Fails To Show That Any "Plus Factor" Applies.

Dominion outright fails to show a "plus factor" applies for the third jurisdictional hook. As before, Dominions relies on baseless, vague statements like "Lindell … conducted numerous business transactions relating to that [defamatory marketing] campaign" but alleges no concrete facts to back up that statement.  (Opp'n at 35).  Dominion even *concedes* that it cannot establish jurisdiction under this third prong, so it points the Court back to its arguments under the second prong.  *See id.* (saying that "even if the Court did not have jurisdiction over Defendants' out-of-district statements pursuant to subsection (a)(4), it would nevertheless have jurisdiction … under subsection (a)(3).").  The long-arm statute's plus factors required under subsection (a)(4) exist in order to protect non-citizens from jurisdictional overreach.  Dominion is asking the Court to ignore the high bar the statute sets.  Again, the plus factors "are meant to filter out cases in which the in forum impact is an isolated event and the defendant [like Lindell] has no, or scant, affiliations with the forum."  *Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 48 (D.D.C. 2018) (internal citation omitted).

Dominion rests the majority of its argument on *Steinberg*, a 1981 defamation case against Interpol.  But *Steinberg* had no explanation for why the *individual* plaintiff, the Secretary General of Interpol, was subject to personal jurisdiction.  Rather, the entire opinion focuses on the court's jurisdiction over Interpol in D.C., where the court reasoned Interpol had a "constant liaison with the nation's capital" and "longstanding ties to this forum."  *Steinberg v. Int'l Criminal Police Org.*, 672 F.2d 927, 931 (D.C. Cir. 1981).  That is simply not the case here.  The *Steinberg* court *did not* address the *individual defendant's* ties to the forum.  Rather, the court—without explanation— lumped in the Secretary General with its decision about Interpol in only the final paragraph of the decision.  Therefore, *Steinberg* is inapposite to Lindell's arguments that Dominion has failed to satisfy the "plus factors" to establish personal jurisdiction over him, individually, under (a)(4). Lindell has not been a "constant liaison with the nation's capital" nor does he have such "longstanding ties to this forum" comparable in any way to Interpol.

### 2.      The Due Process Clause Precludes Jurisdiction.

Dominion's due process arguments unsurprisingly sidestep the heart of this case, the United States Constitution.  Dominion must establish that *each* Defendant had sufficient contacts with the forum to satisfy Due Process.  *Rush*, 444 U.S. at 332.  Dominion seeks to contravene Constitutional constraints on personal jurisdiction by aggregating Lindell and MyPillow's purported contacts with the forum.  Dominion uses the collective "Defendants" seven times in their Due Process argument.  Dominion does not name Lindell or MyPillow that many times combined.  Instead, Dominion conveniently lumps Lindell and MyPillow together as "Defendants" and hopes this will satisfy the requirements of Due Process.  It does not.

Dominion also conflates Lindell's contacts with D.C. in his corporate and personal capacity.  Dominion cites *Walden v. Fiore*, 571 U.S. 271 (2014), emphasizing the language "in person," "through an agent" and "goods."  (Opp'n at 36).  Rather than parse how these types of

potential contacts apply to the complex issues of corporations, agents, and individuals, Dominion

obfuscates what contacts are jurisdictionally relevant for MyPillow and which are relevant for

Lindell.  An individual is not amenable to suit simply because the corporation he or she works for

is amenable.  Nor is a corporation amenable by way of personal jurisdiction over one of its agents

if that agent was acting in their individual capacity.  Dominion simply does not meet its duty to

untangle this knot.  Instead, it leaves the jurisdictional strands bound together, shrugs, and says

"good enough."

**D.      In The Alternative, The Court Should Transfer This Case To The District Court For the District of Minnesota Pursuant To 28 U.S.C. § 1404(a).**

Since the 2020 general election, Lindell has traveled to D.C. less than a half-dozen times.

In fact, most of Dominion's allegations of defamatory statements occurred outside of the District,

and several of the allegedly defamatory statements occurred *before* Lindell spoke in the District.

Even Dominion's "five factors" show why a balancing of the considerations of convenience and

the interest of justice weigh in favor of transferring this lawsuit to Minnesota.

**1.      Lindell's Actions Were Not "Centered" In The District.**

Dominion alleges that the "defamatory campaign was centered in Washington, D.C."

(Opp'n at 37).  Dominion offers no support for that conclusion.  On the contrary, as stated *supra*

and in all parties' prior briefings, the vast majority of the controversial statements, the parties'

travels, Dominion's business in the 2020 general election, and the parties' principal places of

business—and all of the subject voting machines—are not located in the District.  Thus, the case

is not "centered in the District," and Dominion's "first factor" lacks foundation.

2.      **The District Of Minnesota Is More Convenient.**

It is not more convenient for anyone *except Dominion's attorneys* to litigate this matter in D.C.  In fact, placing venue in Minnesota is *more* convenient for everyone in this litigation except, perhaps, for Dominion's counsel.  Thus, Dominion's "second factor" fails.

3.      **There Is No "Primary Cause Of Action" Governed By D.C. Law.**

Dominion's MDTPA claim is not derivative of its defamation claim, thus its conclusion that its MDTPA claim (based on Minnesota law) should be ignored in favor of keeping the suit in D.C. because its defamation claim is its "the primary cause of action" is baseless.  (Opp'n at 38).  Dominion cites no authority for this proposition.  Aside from the absurdity of designating a "primary cause of action," this approach ignores the case law supporting that Minnesota should be the forum because its law governs at least half of the claims at issue.   (Mem. at 38-44).

4.      **Dominion Admits The District Of Minnesota Is Less Congested.**

Dominion splits hairs by saying that the fact that the District of Minnesota has only 52% of D.C.'s caseload (in 2020) is "immaterial" because D.C. has more judges (including those on senior status).  (Opp'n at 44).  Dominion does not acknowledge that Minnesota's caseload decreased by 11% in 2020, while D.C.'s caseload *increased* by 5% the same year.  Even so, Dominion is obliged to admit that the District of Minnesota is less congested overall and its courts have "a faster median time between filing and trial." *Id.*

5.      **D.C. Does Not Have a Preeminent Local Interest In This Case.**

Dominion seeks to keep this case in D.C. because, it claims, D.C. has a "local interest" in its outcome based on the January 6, 2021 rally.[5]  (Opp'n at 38-39).  But Lindell did not even

---

[5] The only case that Dominion cites for this assertion is *Stewart v. Azar*, 308 F. Supp. 3d 239 (D.D.C. 2018), but that case is inapposite because it clearly centered in D.C. where "the federal decisionmaking" at issue, regarding a Medicaid plan promulgated by the Federal DHHS, "happened in the District by D.C.-based officials." *Id.* at 250.

speak at that rally; thus, no defamation could have arisen therefrom.  This Motion to Dismiss has

been filed by one man because Dominion sued that one man, a non-resident, in this District based

on sparse statements he made in this District.  Any "local interest" that D.C. might have is

drowned out by all the other factors that weigh in favor of transferring to Minnesota, where both

of the Defendants reside and whose law governs at least one of Dominion's claims.

**E.     Lindell Should Also Be Awarded His Attorneys' Fees.**

At this time, Lindell recognizes that D.C.'s law penalizing "Strategic Lawsuits Against

Public Participation" – known as the Anti-SLAPP Act has been determined by the D.C. Circuit to

be inapplicable in federal cases.  *See Abbas II*, 783 F.3d at 1333–34.  Although the D.C. Circuit

has not changed course on this issue, Lindell argues that application of the D.C. Anti-SLAPP Act

is substantive, and not procedural, in nature and, thus, the Court should apply the act and award

attorneys' fees to Lindell in this case.  *See Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1238,

n. 32 (D.C. 2016), *as amended* (Dec. 13, 2018) (recognizing circuit courts which have held similar

statutes to be substantive in nature).

## II.     <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss this lawsuit and award Defendant

Michael J. Lindell his attorneys' fees, or in the alternative, transfer it to the United States District

Court for the District of Minnesota.  Lindell prays for all other such relief to which he is justly

entitled.

Dated: June 18, 2021

Respectfully submitted,


*/s/ Douglas A. Daniels*
Douglas A. Daniels
D.C. Bar ID: TX0205
Heath A. Novosad
D.C. Bar ID: TX0207
DANIELS & TREDENNICK PLLC
6363 Woodway Dr., Suite 700
Houston, TX 77057-1759
(713) 917-0024 Telephone
(713) 917-0026 Facsimile
Email: doug.daniels@dtlawyers.com
Email: heath.novosad@dtlawyers.com

Earl N. "Trey" Mayfield, III
D.C. Bar No. 459998
JURIS DAY, PLLC
10521 Judicial Drive, Suite 200
Fairfax, Virginia 22030
Telephone: (703) 268-5600
tmayfield@jurisday.com

*Counsel for Defendant Michael J. Lindell*


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served upon all parties of record through the Court's CM ECF system on June 18, 2021.

*/s/ Douglas A. Daniels*
Douglas A. Daniels

- 26 -