<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2

 3   US DOMINION, INC., et al,              Washington, DC
                                            June 24, 2021
 4            Plaintiff,

 5        vs.

 6   SIDNEY POWELL, et al,                  21-CV-040

 7   RUDOLPH W. GIULIANI,                   21-CV-213

 8   MY PILLOW, INC, et al                  21-CV-445

 9

10            Defendants.
     _____/
11

12             TRANSCRIPT OF IN-PERSON MOTIONS HEARING
               BEFORE THE HONORABLE CARL J. NICHOLS
13                  UNITED STATES DISTRICT JUDGE

14
     APPEARANCES:
15
     For the Plaintiff:      THOMAS CLARE
16                           MEGAN MEIER
                               CLARE LOCKE LLP
17                             10 Prince Street
                               Alexandria, VA 22314
18                             (202) 628-7401

19                           STEPHEN SHACKELFORD, JR.
                             DAVIDA BROOK
20                           JUSTIN NELSON
                               SUSMAN GODFREY L.L.P.
21                             1301 Ave of the Americas, 32nd Fl
                               New York, NY 10019
22                             212-729-2012

23   For Defendant Powell:   HOWARD KLEINHENDLER
                               HOWARD KLEINHENDLER ESQUIRE
24                             369 Lexington Avenue, 12th Floor
                               New York, NY 10017
25                             917-793-1188
</pre>

```
1    For Defendant DTR:        LAWRENCE J. JOSEPH
                                 LAW OFFICE OF LAWRENCE J. JOSEPH
2                                1250 Connecticut Avenue, NW
                                 Suite 700-1A
3                                Washington, DC 20036
                                 (202)355-9452
4
     For Defendant Giuliani:   JOSEPH D. SIBLEY, IV
5                                CAMARA & SIBLEY LLP
                                 1108 Lavaca St
6                                Suite 110263
                                 Austin, TX 78701
7                                713-966-6789

8    For Defendant Lindell:    DOUGLAS A. DANIELS
                               HEATH NOVOSAD
9                                DANIELS & TREDENNICK PLLC
                                 6363 Woodway Drive, Suite 700
10                               Houston, TX 77057
                                 713-917-0024
11

12   For Defendant MyPillow:    ANDREW D. PARKER
                                 PARKER DANIELS KIBORT LLC
13                               123 North 3rd Street, Suite 888
                                 Minneapolis, MN 55401
14                               612-355-4100

15                               NATHAN LEWIN
                                 LEWIN & LEWIN, LLP
16                               888 17th Street, NW, 4th Floor
                                 Washington, DC 20006
17                               (202) 828-1000

18

19
     Reported By:        LORRAINE T. HERMAN, RPR, CRC
20                       Official Court Reporter
                         U.S. District & Bankruptcy Courts
21                       333 Constitution Avenue, NW
                         Room 6720
22                       Washington, DC 20001

23

24

25
```

1              **P R O C E E D I N G S**

2              THE COURT:  Good afternoon.

3              COURTROOM DEPUTY:  Good afternoon, Your Honor.

4   This is Civil Case year 2021-040, US Dominion, Incorporated,

5   et al versus Sidney Powell, et al; Civil Case 21-213, US

6   Dominion Incorporated, et al versus Rudolph W. Giuliani; and

7   Civil Case 21-445 US Dominion, Incorporated, et al versus

8   MyPillow, et al.

9              Counsel, please come forward to the lectern and

10  introduce yourselves for the record, beginning with the

11  Plaintiff.

12             MR. CLARE:  Good afternoon, Your Honor.

13             THE COURT:  I should have said this.  Sorry.  In

14  terms of the speaking, here, I think it is justifying if

15  whoever is at the lectern takes off his or her mask; that

16  should be fine.

17             And I have a particular order of operations that

18  I'd like to do the hearing in, but first let's have counsel

19  state their appearances, just so I know who will be standing

20  up on behalf of the various parties, and then I can lay out

21  how I would like the argument to go.  Please introduce

22  yourselves and then we will do that.

23             MR. CLARE:  Very well.  Thank you, Your Honor.

24             My name is Tom Clare from Clare Locke, LLP,

25  appearing on behalf of the Plaintiffs in all three of these

1    matters.  With me at counsel table and arguing today is my

2    partner Megan Meier.  And then from the Susman Godfrey firm,

3    we have Justin Nelson, Stephen Shackelford, Ms. Davida

4    Brook; and also at counsel table, but not arguing today, is

5    Dean Rodney Smolla, the dean of the Delaware Law School of

6    Weidner University.

7             I'd also like to introduce to the Court our

8    client, founder and CEO of Dominion, Mr. John Poulos, who

9    will be observing today.

10             THE COURT:  Good afternoon and thank you,

11   Mr. Clare.

12             MR. PARKER:  Good afternoon, Your Honor.  Andrew

13   Parker of Parker Daniels Kibort, representing MyPillow,

14   Inc., and with me at counsel table today are Joe Pull from

15   our office and Nathan Lewin, who is part of our legal team.

16             In addition, on the line, because he was unable to

17   travel due to surgery not long ago, in a directive from his

18   doctor not to, is Alan Dershowitz, part of the MyPillow

19   legal team.

20             THE COURT:  Good afternoon.

21             MR. PAKER:  Thank you, Your Honor.

22             THE COURT:  Thank you.

23             MR. DANIELS:  Good afternoon, Your Honor.  This is

24   Doug Daniels from -- not to be confused with Parker Daniels.

25   I am with Daniels and Tredennick in Houston, Texas.  We are

1    counsel for Mr. Lindell individually.  With me at counsel

2    table, who will be taking part in part of the argument, is

3    Mr. Heath Novosad.  And, Your Honor, I would like to

4    introduce to the Court, Mr. Mike Lindell, founder and CEO of

5    MyPillow.

6              THE COURT:  Good afternoon.

7              MR. DANIELS:  Good afternoon.

8              THE COURT:  Thank you, Counsel.

9              MR. DANIELS:  Thank you, Your Honor.

10             MR. SIBLEY:  Good afternoon, Your Honor.  I am Joe

11   Sibley on behalf of Defendant, Rudolph Giuliani, with the

12   law firm of Camara and Sibley from Houston Texas.  It is

13   just me this afternoon.

14             THE COURT:  Good afternoon.  Anyone else?  Yes, of

15   course.

16             MR. KLEINHENDLER:  Good afternoon, Your Honor.  My

17   name is Howard Kleinhendler.  I represent Sidney Powell and

18   Sidney Powell, PC.  I would also like to point out to the

19   Court that Ms. Powell is here.  Thank you very much.

20             THE COURT:  Good afternoon.

21             MR. JOSEPH:  I think I am the last one, Your

22   Honor.  Larry Joseph or Lawrence Joseph, I should say.

23   Office of Lawrence Joseph.  I've appeared for all three

24   Powell Defendants, but I will be arguing today for Defending

25   the Republic.

1          THE COURT:  Thank you.  Good afternoon, Counsel.

2          So as I mentioned, whoever is going to be

3     speaking, please come to the podium.  You are free to remove

4     your mask to do so.  As people may know, we have an overflow

5     courtroom and some people on the line, and I think that will

6     facilitate their understanding of what is going on today.

7          We are here on various motions to dismiss.  I

8     reviewed all of the papers.  I am very familiar with both

9     the relevant legal standards and the arguments the parties

10    have made.

11         Here is how I would like to proceed today.

12    Obviously, these are Defendants' motions, but I think for my

13    purposes I'd like to essentially bifurcate the hearing.  And

14    I want to start, first, with what I would consider to be the

15    12(b)(6) arguments, the defamation arguments.

16         I, actually, have a particular order in which I

17    think those should go.  I intend to hear from the Defendants

18    first.  I think I would like to hear first from Ms. Powell

19    and -- I will call them the Powell Defendants' -- lawyer or

20    lawyers who will argue the arguments that those Defendants

21    make; then the Lindell, MyPillow, Defendants; and then the

22    Giuliani arguments, which I think are different and, I

23    think, unique to the particular Plaintiff that we have here.

24    I will then hear from Plaintiff's counsel, whether it is one

25    or more, in response to those 12(b)(6) arguments,

1      essentially.  And then I will give the Defendants an

2      opportunity for a short reply.

3              At that point, we would go to the second part of

4      the bifurcated hearing, which is essentially, in my view at

5      least, the personal jurisdiction and venue arguments, which

6      are not made by Mr. Giuliani

7              So at that point I would expect to hear from

8      Lindell and MyPillow Defendants.  I don't particularly care

9      in which order those two defense groups, essentially,

10     present their arguments, but then again, we will turn to the

11     Plaintiffs for their opposition and back to the Defendants

12     for their reply.

13             Depending on how long we go, it may be that we

14     take a brief recess in between the bifurcated sections, but

15     it may not be necessary.  As I said, I am quite familiar

16     with the various arguments, the allegations, the case law

17     and the like.  While I have some very specific questions, as

18     you can imagine, I don't think people need to reargue every

19     point that's made in their briefs.  This is designed to

20     focus on the points you think are most important for you to

21     make to me or for me to ask you about.

22             With that, I would like to start with, as I said,

23     the defamation arguments and to begin with the Powell

24     Defendants.  My sense is that means you, Mr. Kleinhendler.

25             MR. KLEINHENDLER:  Yes, Your Honor.  Good

1    afternoon.

2            I would like to mark an exhibit, which I point --

3    which I sent to the Court's clerk this morning.  It is

4    simply the full Complaint and exhibits from the case we

5    filed in Georgia, which was referred to in our brief.  I

6    thought it would be handy if we can just have it in font of

7    us.  It will figure into the argument.

8            THE COURT:  Okay.  Plaintiffs have any objection

9    to marking an exhibit, for what it's worth, on a Motion to

10   Dismiss?

11           MR. CLARE:  Your Honor, we would certainly object

12   to the Court considering receiving exhibits or other

13   potential materials outside of the four corners of the

14   complaint for purposes of the 12(b)(6) motion.

15           THE COURT:  Thank you.

16           Certainly, I am happy to accept the exhibit; and

17   that's why I said, "I will accept it for what it's worth,"

18   which I think is also true with respect to other evidence

19   that at least some Defendants have submitted in connection

20   with their Motions to Dismiss.

21           MR. KEINHENDLER:  Thank you, Your Honor.  This is

22   Defendant's Exhibit 1.

23           Your Honor, I start with a reference to the *Kahl*

24   case, 856 F3d. 106, which says, "A Motion to Dismiss in a

25   defamation case should be quickly weeded out."

1          So while 12(b)(6), there is certain deference to

2     the pleadings, but defamation cases, as this Court has

3     recognized, are different.

4          Now, there is no dispute from the Plaintiff that

5     they are a public person within the context of New York --

6     *Sullivan versus New York Times*.  They don't dispute it.

7     What that does is, it brings into play here an obligation by

8     the Plaintiffs to show with clear and convincing evidence

9     that Ms. Powell acted with malice.

10          Malice, Your Honor, has been recently decided --

11     has been recently discussed in the *Tah* case.  I will be

12     referring to the *Tah* -- and that is T-a-h -- *versus Global*

13     *Witness* 991 F3d. 231; that's the D.C. Circuit, decided on

14     March 19th, 2021.  Your Honor --

15          THE COURT:  I'm familiar with it.

16          MR. KLEINHENDLER:  Yes.  There, Your Honor, in

17     order to establish malice, the Plaintiff must show with

18     clear and convincing evidence that the speaker made the

19     statements at issue with knowledge of its falsity or with

20     reckless disregard as to whether it was false or not.

21          And, Your Honor, it has to be a high degree of

22     awareness of probable falsity.  And then I quote one more

23     line, as the standard, and that is, "the speaker's failure

24     to meet an objective standard of reasonableness is

25     insufficient.  Rather, the speaker must have actually

1    harbored subjective doubt."  I am reading to you, Your

2    Honor, from Page 240 of the opinion.

3            So, now, as we pointed out in our papers -- and I

4    take issue with Plaintiffs' counsel when he says that the

5    pleadings Ms. Powell filed in other states are not in the

6    case.  It simply is not true, as we point out in Page 33 of

7    our moving brief, these complaints are referred to at

8    Paragraphs 6, 77, 82, 85, 87, 89 of the Complaint.

9            Further, this Court is well aware that it can take

10   judicial notice of publicly-filed documents, which are all

11   available on PACER.

12           There is also no question before this Court that

13   these documents, Your Honor, were not only on PACER but they

14   were published on the DTR website so that anybody would have

15   access to them.

16           So now the question before this court is, can the

17   Plaintiffs make out a case of actual malice in the face of

18   an attorney filing an amalgam --

19           THE COURT:  Do you agree that there are statements

20   that Dominion says are defamatory that Ms. Powell never said

21   in litigation and don't relate to litigation or things that

22   were said in litigation.  Correct?

23           MR. KLEINHENDLER:  No.  I'm sorry.  I'm only aware

24   of two statements, and I will get to them.

25           THE COURT:  Let's focus on those, why don't we?

1          MR. KLEINHENDLER:  Sure.  So the first thing --

2     and I apologize, when I refer to exhibits, just look at the

3     tabs in the binder because some of the exhibit tabs are off.

4          If you look at Exhibit 6 in the binder, which it's

5     filed document 1 sic, if you look at the top.  And then go

6     to the second page, Your Honor.  I am holding this up for

7     you to see.  They allege that this document from the State

8     of Georgia, Office of the Secretary of State, they say this

9     is not an authentic document.  By saying that, they are

10     alleging that Ms. Powell acted with malice.

11          There are two very simple answers.  Number one,

12     there is nothing on the face of this that says it is

13     inauthentic; however, even if you accept their position that

14     it is inauthentic, it is not defamatory.  This document

15     talks about how good and valid the Dominion systems are.  If

16     you just read it, it says that these systems -- I am in the

17     middle of the page -- have been thoroughly examined and

18     tested and found to be in compliance with the applicable

19     provisions of the Georgia Election Code.  This is a document

20     that says Dominion is the best thing since sliced bread.

21          THE COURT:  I don't think you are focusing on the

22     same statements that I am focusing on.

23          For example, Dominion relies on a November 17,

24     2020 News Max interview, where Ms. Powell is quoted, as

25     alleged in the Complaint saying, We got the evidence from

1    the mouth of the guy who founded the company.  The founder

2    of the company admits he can change a million votes, no

3    problem at all.  She is asked by the interviewer, The

4    founder of Dominion admitted a long time ago, recently to

5    you?  Tell us more, please.  Powell says, Publicly, I will

6    Tweet out the video later and I will tag you in it.

7          You, I think, do not contest for purposes of the

8    Motion to Dismiss that those statements were false; that

9    it's alleged those statements are false in the Complaint and

10   you don't contest that.  What you say is that those

11   statements, either no reasonable juror could conclude they

12   are anything other than opinion or they can't evidence

13   actual malice.

14          To my knowledge, at least, that statement does not

15   reference any evidence or declaration or information that

16   was in litigation.  Correct?

17          MR. KLEINHENDLER:  Partly incorrect.  The

18   statements as to Mr. Coomer are set forth at length in the

19   Michigan Complaint.  I didn't bring the Michigan Complaint,

20   but the Michigan Complaint has paragraph after paragraph

21   after paragraph of quotes and Facebook posts and Twitter

22   posts of Mr. Coomer alleging that he could fix the election;

23   that Mr. Trump is a horrible human being.  There is a lot of

24   profanity there.  I cite that to you on Page 33, Note 7.  So

25   it is before you.

1        What we didn't say is, though the notion of a

2   million votes -- so there is in the evidentiary record in

3   the cases filed, paragraph after paragraph about Mr. Coomer

4   saying he could rig this election.  He did not say the words

5   "a million votes", and I don't believe the words "I have a

6   video" are mentioned in the Complaint; however, the sum and

7   substance of that statement, Your Honor, that the head of

8   Dominion basically had the ability to change the votes, that

9   is front and center of the Michigan Complaint filed the same

10  day as the Georgia Complaint I brought you.

11        THE COURT:  Is that a proveably true statement?

12  You argue it's not.  You argue no reasonable juror could

13  conclude it is not anything but a statement of opinion.

14        MR. KLEINHENDLER:  I will make two arguments.  And

15  I want to focus on this, when I say no reasonable juror

16  would believe it as fact, I based it on the *Keohane* case and

17  its progeny; that says when you lay bare, that which we have

18  done in four lawsuits --

19        THE COURT:  Was there a video laid bare somewhere?

20        MR. KLEINHENDLER:  No.  No.  No.

21        THE COURT:  So there is no fact laid bare on which

22  the opinion, in your view, was based on.  Even if it is a

23  statement of opinion, cases are pretty clear that if the

24  opinion suggests that they are based on actual facts that

25  have been put out there and those facts either don't exist

1    or are untrue, that those statements of opinion are still

2    actionable.

3              MR. KLEINHENDLER:  I want to point out, we have

4    never conceded that what we have said is untrue.  That is

5    not the case.

6              THE COURT:  I have not said you conceded it.  You

7    have to assume that Dominion's allegation that every

8    statement made by your client was false.  They allege that

9    and you can't argue otherwise for purposes of your Motion to

10   Dismiss.

11             MR. KLEINHENDLER:  That's correct.  However, what

12   I would argue to you on this line of questioning, which is

13   out of 124 paragraphs, it's the only line more or less that

14   isn't in a lawsuit.  What I would argue to you, Your Honor,

15   is look at the Michigan lawsuit -- I would be happy to

16   provide it to you -- and see at what lengths we quote

17   Mr. Coomer, and the fact that we are missing a video or the

18   fact that we don't say "a million votes" --

19             THE COURT:  Is it your view if someone makes

20   patently false statements in a lawsuit and then repeats them

21   to the press, that those are not -- the statements to the

22   press -- are not actionable?

23             MR. KLEINHENDLER:  They cannot be assumed to be

24   patently false --

25             THE COURT:  Not assuming.  I am saying if they are

1   patently false, statements that are made in litigation and

2   then are repeated to the press, in your view, are they not

3   actionable because the speaker is talking about something

4   that was stated in litigation?

5           MR. KLEINHENDLER:  It depends.  When you get to

6   what a speaker says, and when it is something in litigation,

7   you have to get to, was there a malicious intent?  These are

8   public figures.  You can't get away from the malicious

9   intent.  So you have to reach the conclusion that Ms. Powell

10  knowingly or with a reckless disregard looked at the sworn

11  affidavits.

12          Now, Judge, we are not talking about pleadings.

13  We are not talking about a Rule 11 level of candor.  We are

14  talking about the sworn affidavits.  The moving complaint.

15  What the company by affidavits and declarations, not even

16  Rule 26(d) expert reports, which are just signed.

17          These are sworn documents by individuals that set

18  forth in detail the basis of their analysis.  These aren't

19  just gossip.  These were people that set forth the basis

20  with screenshots, with discussions of website URLs that they

21  found.

22          In order for this case to be actionable, you must

23  conclude, contrary to what I believe the *Tah* case says and

24  what the *St. Amant* case says, the Supreme Court case, is

25  that she, a lawyer, had a very -- had a subjective doubt

1    about the truthfulness of the documents that she put in,

2    which were sworn.  Sworn, sir.

3              THE COURT:  I don't have to conclude anything at

4    this point.  All I'm asked to do is decide whether Dominion

5    has adequately alleged facts from which a juror could

6    conclude that she had either the intent or reckless

7    disregard.

8              MR. KLEINHENDLER:  That's correct.

9              THE COURT:  You have to assume that for purposes

10   of this motion all of their well-pleaded allegations are

11   true.

12             MR. KLEINHENDLER:  Correct.

13             THE COURT:  You rely on a lot of cases that single

14   out particular things like motive or inherent improbability

15   about a particular statement, and it is true that lots of

16   cases say those things -- like an allegation of ill will is

17   insufficient by itself to plead reckless disregard or

18   intent.

19             Here Dominion argues, at least, and I will

20   certainly ask them some questions about it, that you have

21   various indicia or various factors that together demonstrate

22   at least that a reasonable juror could conclude that

23   Ms. Powell had at least reckless disregard for the truth of

24   her statements.

25             MR. KLEINHENDLER:  And *Tah* says that everything

1     that Dominion says doesn't add up to a claim.  So let's just

2     look at it.

3              *Tah* says there was suspicion that the parties

4     approached the report that they made about the Liberian

5     executives who were accused of taking a bribe.  They said

6     the Defendant approached with suspicion; that's what

7     Dominion says.  The Court says, It doesn't matter.

8              Dominion says, They failed to credit denials.  The

9     Court says in *Tah*, It doesn't matter.  Even the dissent, the

10    dissent there, Your Honor, says the only reason he was going

11    to credit the denials is because the Defendant in *Tah* had no

12    evidence supporting its claim that these people received a

13    bribe from --

14             THE COURT:  Dominion alleges that Ms. Powell

15    intentionally lied about evidence that doesn't exist; that

16    wasn't the case in the D.C. Circuit opinion.

17             MR. KLEINHENDLER:  That's a nice statement.  What

18    is the evidence?

19             THE COURT:  I will certainly ask them that, but it

20    seems to me that I just identified an allegation that there

21    was a video.  You just conceded there is no such video or

22    her statements didn't rely on such a video.

23             MR. KLEINHENDLER:  Your Honor, again, I don't want

24    to concede anything.  All I'm saying is the video which was

25    referred to here was not included as an exhibit to any of

1   the claims we filed.

2           Second, even if she claims there was a video, you

3   would have to conclude that she did that, when not believing

4   at the time she said it that there was no video.

5           In other words, if she stands up --

6           THE COURT:  Again, I am not concluding anything.

7   The question is whether they pushed this complaint over the

8   12(b)(6) standard for purposes of a Motion to Dismiss where

9   I have to assume every single fact they pleaded is true,

10  including her financial motive for doing what she did, for

11  the statements that she made, they allege all sorts of

12  specific financial motives that Ms. Powell had for purposes

13  of making the statements.  They alleged she had a motive in

14  her representation of Mr. Flynn.

15          Again, I am not saying any of this is actually

16  true.  I am saying, they allege it.  And they are specific

17  facts, and I have to assume they are true for purposes of

18  the Motion to Dismiss.

19          MR. KLEINHENDLER:  Fine.  Let's talk about Flynn.

20  The facts have to relate to the defamatory conduct.  Her

21  defense of Flynn has nothing to do --

22          THE COURT:  They said that she made the statements

23  for the purposes of getting a pardon.  They allege that.  I

24  don't know it's true.  Do they not allege it?

25          MR. KLEINHENDLER:  They allege it, Your Honor.

1          THE COURT:  Are you saying it is an implausible

2     allegation?

3          MR. KLEINHENDLER:  Yes.

4          THE COURT:  You don't argue that in your brief.

5          MR. KLEINHENDLER:  Well, Your Honor, what we argue

6     in our brief is that an attorney who files lawsuits and

7     talks about the lawsuits and maybe sometimes might

8     exaggerate one or two points that at least in essence around

9     the lawsuits, but in the political arena she might have

10    said, Well, he could flip a million votes.  The words "a

11    million votes" may have been an opinion, but the fact of the

12    matter is, we are talking about what is defamatory language

13    here.

14         When you have an attorney that files -- in the

15    four separate lawsuits, Your Honor, we counted it up, there

16    are 170 separate sworn affidavits/declarations from experts,

17    from just plain men and women who are observers or monitors.

18    You cannot reach a conclusion that there was a sufficient

19    malice in order to sustain even at the pleading stage.

20    Again, I go back to what I started at, defamation claims are

21    different.

22         THE COURT:  What more, in your view, would

23    Dominion have had to plead to get past a Motion to Dismiss

24    for actual malice?  To have Ms. Powell on video saying, I

25    knew this was false, or what short of that would they --

1          MR. KLEINHENDLER:  They would have to say, This

2     was false.  They say it on an information and belief.  They

3     don't even allege pro haec verba in this complaint that Ms.

4     Powell knew that what she was saying was false.  I don't

5     believe it's in here.  It's on information and belief.  I

6     think what they would have to have to bring this case and

7     sustain it is they would have to have a witness.

8          THE COURT:  If they put in here, she knew or acted

9     with reckless disregard because -- and had all of the facts

10    they alleged here -- would that have been sufficient?

11         MR. KLEINHENDLER:  No.

12         THE COURT:  What more would they have had to

13    plead?

14         MR. KLEINHENDLER:  I think they would have had to

15    bring in one of the witnesses and say, This affidavit that

16    Ms. Powell put forward, it's a lie.  I never signed it.  I

17    never said those statements.  She paid me to lie to the

18    Court.  None of that is here.

19         In other words, you can never -- no lawyer is safe

20    in a case that he or she brings under Dominion's view of the

21    world, because if they don't like the allegations, all they

22    have to do is walk in here and say, The allegations are

23    false.  That cuts across the holding of *Tah,* which says that

24    not heeding denials is not a basis to show malice.

25         Effectively, what Dominion is doing to this Court

1   is a dressed up denial.  Deny, deny, deny and here is why we

2   deny.  But when it is based on sworn affidavits that set

3   forth all of the bases for what she is saying, a lot of her

4   statements, Your Honor, that they quote, if you listen to

5   the whole statement, she says in those statements, I have

6   evidence.  I have an affidavit.  I have a whistleblower.

7   She refers in the statements to the basis of what she is

8   saying.

9           There are two ways to cut those arguments.  One

10  argument is that because the affidavits and the statements

11  are in the public view under Colorado, very clear-cut

12  precedent; that's opinion.  Not because she doesn't believe

13  it's true.  It's opinion because the reader can go and look

14  it up and figure out for him or herself whether it's true.

15          Even if you were to reject that argument --

16          THE COURT:  Now that you are on the question of

17  opinion versus statement of fact, just to pick out a

18  different allegation in the Complaint, Dominion alleges that

19  Ms. Powell stated that Dominion was "created to produce

20  altered voting results in Venezuela for Hugo Chavez, and

21  then shipped internationally to manipulate votes for

22  purchase in other countries, including this one," Paragraph

23  181(e) or (c).

24          MR. KLEINHENDLER:  Yep.

25          THE COURT:  Your position is that no reasonable

1    juror could conclude that that was a statement of fact.

2              MR. KLEINHENDLER:  Because that statement was

3    based on an affidavit, which is before you as Exhibit 2 in

4    your binder.  It is redacted, but in the Georgia court we

5    submitted the unredacted version.  But even what is publicly

6    available through the redaction, the sworn affidavit says

7    exactly --

8              THE COURT:  What if the affidavit is false?

9              MR. KLEINHENDLER:  Even if the affidavit is false

10   --

11             THE COURT:  We are not talking about mens rea.  We

12   are on the question of whether it is provably false or an

13   opinion.  If she says, I have a declaration that Judge

14   Nichols committed a felony last year and she, in fact, has a

15   declaration that says that, and the declaration is untrue,

16   is her statement that Judge Nichols committed a felony last

17   year, is that a provably false statement or is that an

18   opinion?

19             MR. KLEINHENDLER:  I would argue to you, Your

20   Honor, under the law, unless she had a bad motive --

21             THE COURT:  No -

22             MR. KLEINENDLER:   -- it is an opinion because she

23   is setting forth the basis of what she is saying.  These are

24   -- Your Honor, if I say that John Doe is a thief because I

25   have evidence that he is a thief, here is a forged document,

1    and show the world the forged document, even if the document

2    is not credible, I have stated an opinion, that's what the

3    law says.

4              THE COURT:  If you say Judge Nichols is a thief,

5    false stop --

6              MR. KLEINHENDLER:  If I just said, Judge Nichols

7    is a thief.  Stop.  It's defamatory.  If I said, Judge

8    Nichols is a thief because I have an affidavit from his law

9    clerk who says, I witnessed him stealing, and it turns out

10   that that law clerk was lying, I have stated an opinion,

11   Your Honor.

12             THE COURT:  Did Ms. Powell make that November 13th

13   statement qualified with based on a declaration --

14             MR. KLEINHENDLER:  Many times.  I lost track of

15   time and dates, but every time she referred to that line she

16   said, I have a whistleblower affidavit.  I have a

17   whistleblower affidavit.  This is what she was talking

18   about.  That is why I urge you, Your Honor, before you come

19   to a conclusion, just take a look at Exhibit 2 in the

20   binder.  Look at what this man says, and look at what his

21   basis for saying it is and he swears to it.

22             It's not a one-word but an eight-page affidavit

23   with a lot of details.  It, basically says exactly that,

24   that Dominion -- if you go through the affidavit, it says in

25   sum and substance, sometimes pro haec verba that Dominion

1   was using the software that was created by Smartmatic.  And

2   Smartmatic was created for the sole purpose of manipulating

3   the Venezuelan elections.  And that is right here in the

4   affidavit and she referred to it every single time and

5   provided it to the public.  Therefore, it is an opinion

6   based on Colorado Supreme Court law, which Your Honor, I

7   believe, governs.

8           THE COURT:  The things that are not supported by

9   declarations, what is your opinion?

10          MR. KLEINHENDLER:  Again, the only thing I see in

11  the Complaint not supported by declaration are the two

12  issues.  One is the Georgia document, which I have shown you

13  is Exhibit 6, in this binder.  And it's not a defamatory

14  statement because that document says how great Dominion is;

15  so that is just an irrelevant issue.  The only other issue

16  you have is in connection with Mr. Coomer.

17          Yes, we don't have an allegation that says exactly

18  those words, but we have allegations that basically add up

19  to the same thing.  So on that I would argue it's an

20  opinion.  It's bit of a hyperbolic statement.  It's a

21  hyperbolic characterization for factual allegations set

22  forth in the Complaint that are backed up by xx Mr. Consum's

23  Facebook posts, which he tried to erase, which we pulled, by

24  his various statements.  And I urge you to review that.

25  When you just knock out the Georgia document and knock out

1    the million votes statement, everything else is embedded in

2    these lawsuits.  And unless there are -- you can't just say,

3    We think Ms. Powell is a bad guy.  We think Ms. Powell

4    didn't believe in what she was saying.  That is not enough.

5    It's not enough even on a Rule 8 plating stage and that's

6    what *Tah* says.  You need to be able to show clear facts.

7    And under these circumstances, Your Honor, they can't get

8    there.

9         I know 12(b)(6), I get it, but here it is a much

10   heightened standard.  It's like a Rule 9(b) analysis.  If

11   you don't have the what, when, where and how in the

12   pleading, they don't get to first base even on a 12(b)(6).

13        THE COURT:  Thank you.  I would like to hear from

14   either Mr. Lindell's or MyPillow's counsel.  I think they

15   have similar issues, especially on mens rea.  Thank you.

16        Mr. Parker.

17        MR. PARKER:  Your Honor, Counsel, in

18   representation of MyPillow I would say, first, that I don't

19   think that many of the issues in the Sidney Powell case are

20   the same as the issues as they relate to MyPillow.  Some of

21   them are.  They do overlap.  But we argue, certainly,

22   independent of the arguments made by Sidney Powell.

23        THE COURT:  Certainly, the statements are

24   different.  The allegations relating to reckless disregard

25   or knowledge are different.  But your client, just like

1      Ms. Powell, is arguing that the Complaint, as to your

2      client, does not accurately allege actual malice.

3                   MR. PARKER:  It does not allege actual malice;

4      that's correct.

5                   THE COURT:  Does not allege actual malice.

6                   So why isn't this case a lot different -- for

7      example, the recent D.C. Circuit opinion or other cases

8      where, perhaps, one type of allegation, the allegation of

9      ill will or motive, is insufficient without more to get past

10     a Motion to Dismiss?

11                  Again, I will hear from Dominion about this, where

12     they say, We have inherent and probability.  We've alleged

13     that.  We've alleged a motive.  We've alleged other reasons

14     to at least plausibly conclude that Mr. Lindell had reckless

15     disregard.  So we are not relying, essentially, on one piece

16     of evidence.  It is the whole piece or all of the pie, and

17     with all of the allegations we are putting together a

18     reasonable juror could conclude -- not would but could

19     conclude -- that Mr. Lindell at least acted with reckless

20     disregard.  Including the recent D.C. Circuit opinion.

21                  MR. PARKER:  It's not different at all.  The *Tah*

22     case, the *Jankovic* case, the *McFarlane versus Sheridan*

23     *Square* case, the *Lohrenz* case, the *Fairbanks* case -- in

24     particular the *Fairbanks,* the smaller case -- *Parsi, Arpaoi*

25     *versus Zooker.*  All of them.

1          And on the other side, by the way, all of them

2    dismissed.  All of them had multiple interlocking claims and

3    allegations, just like Plaintiff's counsel put in their

4    complaint.  And the reason they put that in their complaint

5    is they do defamation law.  They do it all of the time.

6    They are aware of these cases and they are trying to plead

7    around the cases, but they can't do it.  And they haven't

8    done it here.

9          As it relates to *McFarlane versus Sheridan* in

10   particular, Your Honor, there there was reliance by the

11   Defendant on questionable sources.  That's what it is

12   alleged.  Also, they had -- the Defendant, on the other

13   hand, had some reason to believe that what he was saying was

14   true.  Investigation by government entities defeated the

15   claim of inherent improbability.

16         Your Honor, there are investigations going on in

17   this country right now regarding the very issues that Mike

18   Lindell raised on the election.

19         Again, *McFarlane versus Sheridan Square,*

20   investigation by government entities defeats the claim of

21   inherent improbability, as it should be.  The context of

22   this case is important.  It's important because something

23   that is inherently improbable at one time might not be

24   inherently improbable at all at another time.

25         For example, if you were to say Ford Motor Company

1    puts cars out on the road, which in a fender bender they

2    blow up.  That would be defamatory today.  But if you said

3    it back in the Corvair or the Ford Pinto era, it might not

4    be defamatory at all.  It wouldn't meet the actual malice,

5    reckless disregard standard.

6            Inherently implausible.  Gee, it is entirely

7    implausible that the Wuhan virology lab could have been the

8    origin of COVID-19.  In fact, you get deplatformed if you

9    say such a thing and get fired; that was a few months ago.

10   Today that's not the case at all.  Now it is becoming widely

11   recognized.

12           So this concept of inherent improbability has been

13   rejected, rejected, rejected.  What is remarkable, Your

14   Honor, is that Plaintiffs are unable to identify virtually

15   any case in this jurisdiction that supports their standard

16   of the law on 12(b)(6) as it relates to reckless disregard.

17           The *Zimmerman* case also gives us a clear picture

18   as to what the boundaries of *New York Times versus Sullivan*

19   are all about.  You go through all of the cases I cited, all

20   of them dismissed, all of them had interlocking theories

21   including --

22           THE COURT:  Were they all Motions to Dismiss?

23           MR. PARKER:  Not all of them.  Half were Motions

24   to Dismiss and half Summary Motion on Judgment.  At least

25   half of them were Motions to Dismiss.

1    *Zimmerman* was a case that went the other way and

2 found, this is enough.  You ask the question, Well, what

3 would enough would be?  It is a good example of what good

4 enough would be.  We don't have that in this case.

5    THE COURT:  In your view, in this case, what more

6 would Dominion have had to plead to survive a Motion to

7 Dismiss?

8    MR. PARKER:  I don't think that they could have

9 pled anything, because they cannot get actual malice.  No

10 matter what they plead.  They could amend their complaint

11 until the cows come home.  Actual malice doesn't exist in

12 this case.

13    Now, if they had a case -- which they don't -- in

14 which somebody signed an affidavit and then recanted

15 publicly that affidavit and then after that somebody came

16 out and relied on the affidavit after it had been recanted,

17 then you might have actual malice.  If they had a witness

18 that said, MyPillow came to me and said, the things Mike

19 Lindell are saying are completely false and he knows it.

20 There is none of that.  This case doesn't even come close,

21 really, at all, to the line that this jurisdiction has

22 established for proving actual malice.  They haven't alleged

23 anywhere near where that line is.

24    You've got cases involving -- preconceived story

25 line, which is what they allege; highly unreasonable conduct

1    or a departure of what would be normal to investigate, which

2    they allege.  Ill will, profit motive.  Several of these

3    cases have profit motive involved.  Not enough.  None of

4    these cases are enough.

5            THE COURT:  I agree there are cases that say that

6    is not sufficient by itself.  Do you have a case where a

7    complaint did not survive a Motion to Dismiss where the

8    Plaintiff alleged questionable sources, inherent

9    improbability, preconceived story line, ill will and profit

10   motive?  Is there a case where a court has said, even though

11   the Plaintiff alleges those five categories of evidence of

12   mens rea, we think that it does not adequately allege actual

13   malice?

14           MR. PARKER:  I think you should look at *Tah*.  You

15   should look at *Fairbanks,* as well as *Lohrenz* and *Parsi*.

16           THE COURT:  Which is your best case and why?  It's

17   not very helpful just to tell me the case names.  I need to

18   know, are they a Motion to Dismiss, which of the factors

19   were relevant there and what did the Court say about why the

20   allegations were not sufficient.

21           MR. PARKER:  *Fairbanks*' Motion to Dismiss was

22   granted.  The Court stated the complaint must present clear

23   and convincing evidence of actual malice.  Plaintiff claimed

24   in that case that Defendant, even there, that the Defendant

25   knew the statement was false.  So that allegation -- which

1   Plaintiffs here don't even rely on.  They are really focused

2   on reckless disregard.  In that case Plaintiff claimed

3   Defendant knew the statement was false.  In addition,

4   Defendant was alleged to have unreasonably taken extreme

5   departure from professional standards.

6        In that case, there were allegations of an elicit

7   motive, which I would argue could either be illegal, could

8   be profit motive.  I believe in that case it was illegal

9   motive.

10       Something else Plaintiffs have raised, failure to

11  retract.  And the Court stated in that case, especially

12  given the public debate, a very important clause, Your

13  Honor.  Especially given the public debate regarding the

14  okay hand gesture, which is what was at issue in the

15  *Fairbanks* case.  At the time, Plaintiff's allegations do not

16  provide clear and convincing evidence with actual malice

17  with all of those put together.  In fact, the Court stated

18  in *Fairbanks,* Your Honor, that all of those things put

19  together, "do not come close to meeting the actual malice

20  standard".  If that case does not come close, this case is a

21  distance even further down the path.

22       And I think it's worth noting -- and I underscored

23  it a minute ago, "especially given the public debate" -- I

24  underlined as what the clause that the Court set forth in

25  *Fairbanks*, or used.

1          Because of that, because you have such a public

2     debate on this issue, millions of people on each side of the

3     issue, investigations going on, audits going on around the

4     country related to this issue.  For years Dominion election

5     system's hackability and questionability as to its integrity

6     has been challenged in the public.

7          In fact, US Senators have repeatedly stated that

8     this is of grave concern.  The *Curling* case in Georgia, a

9     federal district court judge took hours and hours of

10    testimony and wrote a 50-page opinion about Dominion

11    election system, who comes in here, like a paragon on a

12    white horse or white steed.  As this paragon of honesty and

13    integrity in the election system and tries to make Mike

14    Lindell out to be a wild-eyed crazy guy.

15         You've got a federal district court judge that

16    wrote pages about the hackability and the lack of security

17    of Dominion election systems.  You have US Senators, Amy

18    Klobuchar, on Meet the Press just a couple years ago saying

19    21 states were hacked, and they didn't know about it for a

20    full year.

21         THE COURT:  Dominion is not arguing that it would

22    have been defamatory to say that Dominion is at risk of

23    being hacked or that there is a risk of election systems

24    generally being hacked.  They are saying what is defamatory

25    is that your client says, we intentionally aided in election

1    fraud.  That is way different than saying, we are at risk of

2    being hacked.

3            MR. PARKER:  Is it reckless disregard to say that

4    in light of all of the facts --

5            THE COURT:  I'm saying, the public debate about

6    election security and statements by various people that

7    there are concerns about election security are not the same

8    as saying a particular company intentionally committed voter

9    fraud.  So you can't rely, in my view, on general concerns

10   about election security that other people are stating to get

11   at the question of whether someone claims that the Plaintiff

12   was engaged in intentional voter fraud, whether that is

13   defamatory and whether that was stated with actual malice.

14   I'm not saying that that solves -- that that answers the

15   problem.  I just think that these are wildly different kinds

16   of statements.

17           MR. PARKER:  Your Honor, I want to suggest another

18   way to look at that.  I am not saying that the statements

19   made prior to this election are statements that

20   categorically support a specific statement that was made.

21           What I am saying is all of that is context upon

22   which the statements that were made and whether or not they

23   are made with reckless disregard.  You have to look at that.

24   And that goes back to the Corvair/Ford Pinto.  If there are

25   none of those facts, then maybe it is a wild-eyed statement.

1       But with all of this history, then you fast forward to after

2       the election and have a number of other facts upon which

3       Mr. Lindell relied, you have affidavits that were submitted,

4       including from a Dominion representative who said things

5       were scanned multiple times and was allowed to happen

6       through the Dominion system, you have algorithms that were

7       analyzed.

8               Whether they want to claim that they were analyzed

9       by cybersecurity people who had been debunked and smeared,

10      well, that doesn't get by the necessary allegation to

11      establish it was therefore made in reckless disregard.  If

12      that were the case, then any disagreement would place

13      subjective intent on the part of the Defendant.  This is

14      about his subjective state of mind.  It is not about some

15      argument that Plaintiffs might have regarding how bad this

16      expert is or that expert is.

17              So it's -- he's got support for that, as well as,

18      since the election, government agencies, legislators and

19      legislatures, have called for investigations.

20      Investigations into these sorts of allegations and claims.

21      Those investigations are going on right now.  There is

22      nothing that they could plead to get by a Rule 12(b)(6)

23      motion because of that.  It is that kind of public debate,

24      Your Honor.  It is that kind of hurly burly in the

25      marketplace of ideas that this country is grounded on; that

1    the foundation of the First Amendment was written for.

2           *New York Times versus Sullivan* fully recognized

3    it.  It now gets handed off to this Court to be the

4    gatekeeper, the guardian of the First Amendment, which is

5    one of our most cherished principles.  And you can't allow

6    the case to continue, even one step beyond the 12(b)(6)

7    motion, Your Honor, for fear that the First Amendment will

8    chill and muzzle anyone who wants to step up to speak

9    because they will see, Oh, my God!  You will get sued.

10   Can't talk to him.  Can't say this.  Can't say that.  We

11   will become a society where opinions will be shut down.

12   That's how important this motion is.  Not some future

13   motion.  This motion.

14          Thank you, Your Honor.

15          THE COURT:  Let me just pause you there.  Your

16   client, unlike Ms. Powell, does not argue that the

17   statements attributed to Mr. Lindell are a non-actionable

18   opinion.

19          MR. PARKER:  Correct.  We do not argue that on

20   12(b)(6).  We don't concede it but we are just saying it's

21   not a basis for 12(b)(6).  The statements by Mike Lindell

22   are true.  He knows them to be true and will prove it,

23   whether it is in this courtroom or not.  It should not be in

24   this courtroom but it should be in the marketplace of ideas.

25          THE COURT:  Thank you.

1          MR. PARKER:  Thank you, Your Honor.

2          THE COURT:  Mr. Daniels.

3          MR. DANIELS:  Your Honor, Mr. Parker has covered a

4    great deal of what I would otherwise say so I will not waste

5    the Court's time repeating that.  Despite the fact that I

6    had a great-sounding argument in my head.

7          THE COURT:  To me too.

8          MR. DANIELS:  I will spare the Court that.

9          A couple points that we touch on in our brief, one

10   is that the Supreme Court -- and we cite these cases -- have

11   consistently held that private parties who run elections are

12   in effect the state.

13         The *New York Times versus Sullivan* makes very

14   clear, Your Honor, that if you are criticizing the

15   government as an entity or a subset of the government as a

16   group, as opposed to an individual within the government,

17   that is not actionable.  That constitutes prosecution for

18   libel on government, which no court in this land has ever

19   countered nor could they under the First Amendment.

20         We would submit to you that that is an additional

21   reasonable to dismiss because Dominion in this context is

22   the government, because they are administering the

23   elections.

24         THE COURT:  So your opinion is not merely that

25   they have to satisfy the actual malice standard, but they

1    have -- even if Mr. Lindell knew that his statements were

2    false and made all of them knowing that, Dominion still

3    couldn't proceed here because it's a public figure in the

4    sense that you are saying?

5            MR. DANIELS:  They are the government.  It's more

6    than that.  What happened in *New York Times versus Sullivan*

7    is Mr. Sullivan was the commissioner of the police in

8    Montgomery, Alabama.  The ad in question in the New York

9    Times didn't mention him by name or the police commission.

10   They said the police are abusing people's rights -- I am

11   paraphrasing -- in Montgomery, Alabama.  He tried to make

12   the argument that that's about me.  And the Court

13   specifically went out of its way to say, We can't say it is

14   about you, because it's about government as a whole.  It

15   would be to basically shoehorn an argument libel against the

16   government, which we are not going to do.  We are not saying

17   that Mr. Lindell -- well, if they are a public figure, at a

18   minimum they have to meet the actual malice standard.  No

19   question at all.  If they are the government, then they

20   can't be defamed at all.

21           THE COURT:  What is the best case for that

22   proposition?

23           MR. DANIELS:  The best case is for the private

24   parties who run elections, being the government, I can cite

25   two, Your Honor.  One is *Terry versus Adams*, 345 US 461, US

1    Supreme Court, from 1953; and *Smith versus Allwright*, 321 US

2    649 from 1944.  That was just one point I wanted to add to

3    what Mr. Parker said.

4            It is with some trepidation that I disagree with

5    Mr. Parker because I thought he did a very good job of

6    laying out the arguments.  The best case for us on dismissal

7    -- so Iqbal versus Twombly -- the Court is very familiar

8    what those standards, and I won't bore the Court with that.

9    What I would submit to the Court is nowhere is that standard

10   more rigorously applied than in First Amendment cases

11   because the courts have an additional gatekeeping function.

12   Mr. Lindell, as a practical matter, is not the only one in

13   court today.  Any American who ever intends to voice their

14   opinion about matters as important as election security are

15   here today.  This Court's decision will set precedent.

16           So the line of cases from New York Times *versus*

17   *Sullivan* on say, We are not only not going to punish people

18   or make them face the inspector for liability saying things

19   they have no reason to believe are false about public

20   figures, we are not even going to make them second guess

21   that and second guess their right to express their views on

22   matters of public concern, for the sake of having to worry

23   about if they are going to have to defend themselves in

24   court or not.

25           This is not just a securities fraud case.  This is

1    the First Amendment.  They exist to protect and every lawyer

2    in this courtroom took an oath to defend.  So it is a high

3    standard and it should be.

4            I submit the best case is the *Tah* case because in

5    the *Tah* case you had allegations of a preconceived

6    narrative.  You had publication in the face of outright

7    denials from some people who were involved in the

8    transaction there.  It had to do with allegations of bribery

9    and the awarding of certain offshore Liberia concessions.

10           You had allegations that there was improper

11   motive, that there was ill will harbored by the group

12   publishing the report against Exxon, and specific facts

13   about certain recipients of the alleged bribes, the payments

14   that were just omitted that would have, perhaps, raised

15   question about the veracity of the story.  In the face of

16   all of that, Senior Judge Collyer, from this court's sister

17   court, dismissed that case and the D.C. Circuit affirmed

18   that.

19           I think that, again, the *Fairbanks* case is very

20   strong case but I think *Tah* is at least as strong.

21           I think that is probably all that I need to

22   address that Mr. Parker has not already addressed.  I would

23   just reiterate what Mr. Parker said, that Mr. Lindell not

24   only believes those statements that he made are true, he

25   intends to prove they are true either here or in some other

1    court.

2              THE COURT:  Thank you.

3              MR. DANIELS:  Thank you.

4              THE COURT:  Mr. Sibley?

5         Mr. Giuliani has made a unique set of arguments,

6    so I thought on the defamation question it would make sense

7    for you to go third or fourth, I guess.  The podium is

8    yours.

9              MR. SIBLEY:  Your Honor, our motion is not very

10   long.  We basically made three points.  The points are,

11   number one, in this circuit, what are the types of damages

12   that are cognizable for a corporate libel Plaintiff?  We

13   believe that *Martin-Marietta* and the cases that interpret

14   Martin Marietta very clearly state that the only damages

15   recoverable by a corporate libel Plaintiff are lost profits.

16        Actually, there was a case that was put in a

17   notice of supplemental authority yesterday, it is called

18   *Solers versus Doe*.  I think it is a good case for that

19   argument for us because that was a case where somebody had

20   reported a copyright infringement to a third party, and so

21   there was a lawsuit against John Doe.  It was an anonymous

22   speech issue.  And the Court in that case basically looked

23   at that and said, I will only allow the subpoena to go

24   forward if I can see a plausible claim here under,

25   basically, Rule 8.  The appeals court basically says, That's

1    the correct analysis and cites *Martin-Marietta.*  You have to

2    show special harm in this circuit.  But the Court didn't do

3    the analysis under Rule 9(g), because under Rule 12(b)(6)

4    the Court --

5           THE COURT:  Let's assume that a corporate

6    defamation Plaintiff is limited to lost profits or some

7    other measure of corporate pecuniary harm --

8           MR. SIBLEY:  Special damages.

9           THE COURT:  Well, you say that, but what's your --

10   why are lost profits a form of damages that have to be

11   pleaded specially under 9(g)?  This courthouse is rife with

12   complaints where companies seek lost profits and 9(g) is not

13   typically applied to the allegations of lost profits.  So

14   how do you link lost profits as the measure of corporate

15   damages to the requirement that they be pled in compliance

16   with 9(g)?

17          MR. SIBLEY:  Your Honor, I think *Martin-Marietta*

18   relies on a case that's called -- I believe --

19          THE COURT:  I agree Martin-Marietta says that

20   corporate defendants -- I'm sorry -- corporate defamation

21   Plaintiffs can only recover lost profits.  It doesn't even

22   hold that but I agree it says that.

23          MR. SIBLEY:  I agree with you, Your Honor, but

24   subsequent cases have interpreted it to be the law of the

25   circuit --

1          THE COURT:  There are a lot of cases in this

2     courthouse, District and Court of Appeals, that have at

3     least said that.

4          MR. SIBLEY:  Agreed, Your Honor.  Well, one of the

5     cases that *Martin-Marietta* relies on to reach this

6     conclusion is called *Golden Palace versus National*

7     *Broadcasting Company.*  It was a case where the case was

8     dismissed for failure to allege particularized damages.

9     There is another case I think is important and that is

10    called *Art Metal.*  We cited it in our motion, Your Honor.

11         THE COURT:  Yes.

12         MR. SIBLEY:  It is a case that is interesting

13    because it talks about the distinction, to the extent there

14    is any, between corporate, libel and injurious falsehood.

15    Of course, injurious falsehood is where you disparage

16    somebody's product as opposed to the reputation.  It

17    basically says there is essentially no difference.  When you

18    are a corporate libel Plaintiff, you can prove reputational

19    harm but only measured by lost profits.  If you have a claim

20    for injurious falsehood, you have to claim lost profits

21    based on the disparaging statement about the product.

22         THE COURT:  Are you aware of any case that has

23    held, in the defamation context, corporate Plaintiff's

24    pleadings of lost profits are subject to 9(g)?

25         MR. SIBLEY:  Yes, Your Honor.  I believe we cited

1    -- I'll look at the motion again, but I believe we cited --

2    I believe the Golden Palace case fits that criteria, Your

3    Honor, because it was clearly a defamation case.  I believe

4    there are others.  I would have to go back and look at the

5    brief.  I feel very confident that in the context of special

6    damages, lost profits stemming from a defamation claim that

7    that would qualify as special damages under Rule 9(g).

8              Let's assume it doesn't.  Let's assume you don't

9    have to plead particularized special harm.

10             THE COURT:  Fair enough.

11             MR. SIBLEY:  I still think there is a problem with

12   how they pleaded their complaint, because there is nothing

13   to compartmentalize what Plaintiff has had what loss.  Even

14   the sort of boilerplate jurisdictional allegation, it

15   doesn't say each Plaintiff has suffered more than $75,000 in

16   harm.  It just says the amount in controversy is greater

17   than 75,000.  So when you look at the damages allegation,

18   everything is done as Dominion.  Dominion had these losses.

19   Dominion had these losses.  I am not trying to be cute here,

20   but how would a Canadian subsidiary, for example, have been

21   harmed by Giuliani's statements?  Maybe they were and had

22   some allegations, but it would involve something like the

23   government of Manitoba broke a contract with us because they

24   listened to Giuliani's podcast or something like that.

25   Right?

1          They also have to plead a causal connection.

2    Right?  Like, How did this happen?  Even if the Court

3    doesn't agree with me that lost profit damages have to be

4    pleaded with a specificity required by 9(g), I think there

5    is a general problem under 12(b)(1) that they had a burden

6    to come back and show --

7          THE COURT:  Why isn't it clear that at least one

8    of the three Plaintiffs has adequately pleaded damages of

9    more than $75,000?  The damages in the complaint are above

10   600 million; so that would get you across the diversity

11   threshold.  Then as to the other two Plaintiffs, I could

12   exercise supplemental jurisdiction.

13         MR. SIBLEY:  Well, Your Honor, I think assuming

14   there is not a specialized requirement under 9(g) --

15         THE COURT:  You've been very clear and I'm not --

16   I well understand that you are making that assumption for

17   purposes of the question.

18         MR. SIBLEY:  Then I still think -- Your Honor,

19   let's suppose it is 600 million for one Dominion company and

20   $10 for the other two, you certainly can't aggregate claims

21   together as Plaintiffs to satisfy the controversy

22   requirement.  I think if that's the case, they could plead

23   for the Court's supplemental jurisdiction in that case.  But

24   as the pleadings stand right now, we don't know.  We don't

25   know who has the lost profits.  We don't know who had to

1    engage in the supposed security measures to protect

2    employees.  We don't know who has what lost profits.

3            The other problem here, Your Honor, and obviously

4    I am not -- you have to look at the face of the complaint,

5    but the general way a holding company and subsidiaries work

6    is, the subsidiaries generate the income and funnel it up to

7    the holding company.  Whose losses really are these?  Does

8    the parent company even have standing to sue for contracts

9    that may have been lost by the subsidiaries?  I think there

10   has to be more.  We just have to know more.  Even under Rule

11   8 it doesn't satisfy the basic pleading requirements to

12   demonstrate what injury and what Plaintiff has suffered.

13           THE COURT:  I clearly understand that argument.

14   Let's go back to the assumption that you were making.  Let's

15   assume there has to be specificity, substantial specificity,

16   whether 9(g) or otherwise, for the kinds of damages that are

17   lost profits or lost profit like by a corporation defamation

18   Plaintiff.  Why hasn't Dominion alleged them here?  We had

19   to incur a number of extra costs because of the defamatory

20   statements.  I think it's at least plausible to think that

21   the extra costs would have an effect on profits or would

22   create lost profits or effect their bottom line, and they

23   also allege the future diminution in profits or corporate

24   value as a result of defamation.  They may not have a

25   laundry list of contracts that they've lost or contracts

1    they would have procured but did not, but that's because we

2    are only a few months out from the allegedly defamatory

3    statements.  What more are they supposed to plead, even if

4    more specificity of the kind you are talking about is

5    required?

6         MR. SIBLEY:  Well, assuming I am correct about

7    lost profits being the only form of damages, then they may

8    not have it.  It may not be ripe as to the contractship.  If

9    they are just projecting, we think people are not going to

10   contract with us, that's speculative.  That seemingly is the

11   right you have to plead it with specificity under Rule 9(g),

12   because when you have speculative harm, which is

13   consequential damages, you have to state with specificity, I

14   lost customer X.  I lost consumer Y.  Right?  That's the

15   kind of business they are running.  It is not an online

16   sales program where they make money on a daily basis.

17   Surely they have to have contracts with specific state

18   governments --

19        THE COURT:  Why wouldn't that just be the subject

20   of discovery and expert testimony?

21        MR. SIBLEY:  It certainly would and seems like

22   something they would have to disclose in their initial

23   disclosures.  I think they have a pleading requirement to

24   show that this Court has subject matter jurisdiction and

25   they satisfy the pleading requirements by specifying what

1       those damages are with respect to each particular Plaintiff

2       at this stage of the litigation.  If they don't have

3       contracts that have been broken, if they don't have

4       customers or governments that have refused to contract with

5       them, then they should not be allowed to plead an enormous

6       amount of damages.

7              By the way, Your Honor, I don't know how a loss of

8       enterprise value is a cognizable damages theory for

9       defamation.  Right?  It would be one thing if what they were

10      complaining about is disparagement of the product, because

11      you disparaged my product, now I have lower market value.

12      What they are complaining about is defamation.  You said our

13      company ran badly, dishonest.  Well, if somebody comes in

14      and buys the company and presumably won't run it dishonest,

15      there shouldn't be any enterprise value lost there.  The

16      problem is with management.  I don't know that that's even a

17      cognizable theory for defamation.  It sounds more like

18      injurious falsehood.

19             THE COURT:  I will ask Dominion this question, but

20      it seems to me that there are a lot of statements in this

21      courthouse, as I said -- I mean, *Martin-Marietta* is a

22      District Court case from almost 50 years ago.  In any event,

23      it has been relied on.  A lot of cases have said in passing,

24      at least, but sometimes with some focus on the question that

25      corporate defamation Plaintiffs are limited to lost profits.

It's not even totally clear to me that that's anything other than, as distinguished from the kind of damages that an individual Plaintiff can get, which are damages related to dignity, overall sort of reputation without a clear pecuniary harm in it.  It's not clear to me that those cases are excluding the possibility of other corporate measures of pecuniary loss.

I think your point still is or at lease could have legs, which is, corporations are limited in the kinds of damages they can seek.  Right?  They can't seek sort of a harm to dignity, like an individual Plaintiff can, but they still have to allege corporate damage with specificity required by 9(g) or at least that is your position.

MR. SIBLEY:  Your Honor, I think you can read *Martin-Marietta* and the interpretive cases.  They use the term "lost profits."  I think you can take it as far as special damages.  Because, basically, what you have to allege is as a consequence to the damage to my reputation I have actual pecuniary harm as opposed to the soft damages you might get in a defamation per se case as an individual.

THE COURT:  Can I pause you right there because it is an important point.  You said "as a result of harm to my reputation."  I think that is an important way of thinking about it, which is the corporate defamation Plaintiff says defamatory statement harms my reputation as a corporation;

1    that has an effect on the business; that one effect could be

2    that I lost profits.  There might be other measures of that

3    effect, but the harm is harm to reputation but as measured

4    by a quantifiable corporate measure; that's how you think

5    about it.

6         MR. SIBLEY:  That's how I read *Martin-Marietta* and

7    that line of cases.  For example, even in the case of --

8    Martin Marietta was actually a case that would have to be

9    defamation per se because it is accusation of crime.  Same

10   thing in *Solers.*  It is an accusation of copyright

11   infringement.  So those are clearly cases in the species of

12   -- and I think defamation per se has two components.  One

13   component is you can look at the statement, and without

14   looking at extrinsic evidence you can say it is defamatory.

15   The other aspect of it is, with respect to a private

16   individual, reputational harm is presumed.  It's a

17   rebuttable presumption, but you have that presumption.

18        What I think *Martin-Marietta* and that line of

19   cases do is take away the second part of that, which is you

20   don't have the presumption of reputational injury.  In fact,

21   you can't get just reputational injury.  You have to measure

22   it by lost profits.  That's the way I interpret that, Your

23   Honor.

24        THE COURT:  Thank you, Counsel.

25        I would like to hear from Dominion on all of the

1    arguments that have been presented.  I don't know if you are

2    intending to split up the argument, but I'm happy to hear

3    from you in whatever order.  Mr. Clare.

4              MR. CLARE:  Thank you, Your Honor.

5              There is an awful lot to unpack.  I will try to do

6    it in an organized way.  You will hear from several of us,

7    and I want to make sure that the Court has all of your

8    questions answered.  I will lay out a roadmap and then we

9    can dive into the specific issues.

10             THE COURT:  Thank you.

11             MR. CLARE:  At a very fundamental level, a lot of

12   the arguments that you've just heard from all of these

13   Defendants rest upon a flawed characterization of our

14   claims.  This is not about whether electronic voting

15   machines may, in some hypothetical sense, be vulnerable to

16   cybersecurity attack.  It's not about advocacy on either

17   side about whether it is a good or bad idea to use machines.

18             It is defamation base on specific, factual

19   allegations.  Specific statements that Dominion did, in

20   fact, rig the 2020 election with algorithms designed to and

21   did, in fact, flip votes from Mr. Trump to Mr. Biden.  It is

22   about specific false statements that Dominion was formed in

23   Venezuela for the purpose of rigging elections for Hugo

24   Chavez -- and Your Honor read the full statement -- and then

25   that was exported to other countries by Dominion for the

1    purpose of rigging votes in other countries, and specific

2    false statements that in connection with covering up this

3    crime, Dominion paid bribes and kickbacks to elected

4    officials.

5            So this notion of a policy debate, the notion this

6    is the marketplace of ideas, that's not our complaint.  Our

7    complaint is based on specific allegations of fact.  These

8    are statements of fact, not opinion.  Mr. Shackelford will

9    be addressing those issues to the Court.

10           These are not statements made in court

11   proceedings, as we heard from Ms. Powell's lawyers.  We are

12   are not at this time bringing claims for allegations that

13   were made in court.  These were statements that were made in

14   press conferences, in rallies, on social media, on

15   television, including after the very lawsuits that they are

16   referencing to the Court were dismissed and after United

17   States District Courts told the world, but these Defendants

18   in particular, that the sources of those allegations were

19   wholey unreliable.  It certainly speaks to the Defendant's

20   state of mind when those things occur.  I will be addressing

21   the actual malice argument.

22           The Defendants are inviting the Court to disregard

23   the Rule 12(b)(6) pleading standards under *Iqbal* and *Twombly*

24   and effectively hold a mini trial at the Motion to Dismiss

25   stage using materials outside of the pleadings on the

1    fact-intensive question of actual malice.

2           Along the way they oversimplify, overstate and

3    misapply the actual malice standard.  Our Complaints in all

4    of these actions allege an encyclopedia of facts -- these

5    are detailed factual allegations with dates, times and

6    quotes -- across virtually every category of direct and

7    circumstantial evidence.  The courts say, We'll sustain a

8    finding of actual malice.  And they overwhelmingly clear the

9    12(b)(6) standard for actual malice by a mile.

10          Mr. Nelson will be addressing Mr. Giuliani's

11   argument about damages.  So I'm happy to take that up in

12   whatever order you'd like.

13          THE COURT:  Why don't you start, since you're at

14   the podium.  We will do actual malice and go to opinion

15   versus falsity.

16          MR. CLARE:  I want to clear up one statement that

17   was made early in the argument about the standards here.  I

18   know the Court is familiar from the questions based on the

19   pleading standard, but there was a reference to 9(b).

20          There is no heightened pleading requirement for

21   defamation actions.  The First Amendment doesnt require it,

22   the Rules of Civil Procedure do not require it and the local

23   rules of this court do not require it.  It is the familiar

24   standards of Rule 12(b)(6), as interpreted by *Iqbal* and

25   *Twombly;* that is the framework we are operating under.

1          THE COURT:  With the overlay that your burden is

2     ultimately proved by clear and convincing evidence that the

3     Defendant acted with actual malice and so the allegations,

4     if assumed to be true, would have to clear that hurdle.

5          MR. CLARE:  With the understanding that that

6     ultimately has to be proved at trial.

7          THE COURT:  Absolutely.  Yes.

8          MR. CLARE:  That is correct.  There has to be

9     specific, factual allegations giving rise to a plausible

10    inference that the Defendant knew or recklessly disregarded

11    the statements to be false.

12         The Supreme Court has said repeatedly, recognizing

13    the position of defamation Plaintiffs, because it is no

14    surprise, defendants in defamation cases never take the

15    stand and say, I knew it to be false.  They all say, I

16    believe it.  What the Supreme Court says, is that you are

17    permitted to demonstrate actual malice.  And at this

18    pleading stage you are entitled to plead it based on

19    circumstantial evidence.  This is the *Herbert v. Lando* case

20    where the Court said, the existence of actual malice may be

21    shown in many ways.  Any competent evidence, direct or

22    circumstantial, can be resorted to and all relevant

23    circumstances may be shown, including threats, prior or

24    subsequent defamation, subsequent statements of the

25    Defendant -- that's important because there is a temporal

1    component to actual malice.  That's why we have gone to

2    great lengths in our Complaint to plead the chronology of

3    events here, from beginning to end, at the time of the

4    Complaints being filed.  Because the Defendant's subsequent

5    conduct, the Supreme Court tells us and lower courts as

6    well, informs the Defendant's state of mind, even at the

7    time they published the statement.  So a refusal to retract,

8    for instance, is a good example of a subsequent thing that

9    can happen that informs the finding of actual malice; that's

10   been with regard to all of these Defendants.

11          And I want to come back to the Tah case in

12   particular.  It is a key distinction here between what they

13   call the denials in that case versus the specific notice and

14   refusal to retract and doubling down that we have seen from

15   these Defendants.  To continue, the Supreme Court says, all

16   of those things, including circumstances about rivalry, ill

17   will or hostility, all tend to show that circumstantially.

18          And this court, in the *Zimmerman* case, has said

19   that defamation Plaintiffs like Dominion are entitled to the

20   benefit of the aggregate of this evidence and can prove

21   Defendant's subjective state of mind through the cumulation

22   of circumstantial evidence.

23          So too in the *Eramo versus Rolling Stone* case

24   where Judge Conrad in the Western District of Virginia said,

25   While a reasonable jury could find that none of the evidence

1    presented independently supports finding of actual malice,

2    the evidence taken as a whole, however, a jury could

3    conclude otherwise.

4            And so, at the 12(b)(6) stage, Your Honor is, of

5    course, required to accept all of the allegations in the

6    Complaint is true, and look at the aggregate of the

7    circumstancial evidence that we have mounted.  In all of

8    these different categories, the Supreme Court has come up

9    with a non-exclusive list of things --

10           THE COURT:  Right.  Obviously, I ask defense

11   counsel about their reliance on cases that I think or at

12   least some cases where the court says, evidence of X, ill

13   will, motive or something like that is not sufficient to get

14   past the pleading stage.  So I asked about, you know, your

15   allegation of various facts that go into the various

16   categories I think you just identified.  The defense

17   counsel's response is, Hey, there are decisions from this

18   district, in which there are multiple categories of

19   allegations, and the cases are still dismissed.

20           They cited *Fairbanks* and *McFarland*, at least.  Can

21   you talk to me about those two cases in particular?

22           MR. CLARE:  Well, sure.  I would say more

23   generally, each one these complaints must be evaluated on

24   their own merits.

25           THE COURT:  Of course.

1          MR. CLARE:  And the one of many distinctions

2     between this case and that case is we have alleged in our

3     Compliant that evidence -- the very same evidence that has

4     been touted in press releases, et cetera -- as supporting

5     the false allegations and giving comfort to the public that

6     there is something behind the rhetoric, the false

7     statements, because these are false statement of fact, the

8     evidence was, in fact, created and doctored and exaggerated

9     by these very Defendants.

10          So in all of the cases that were cited, there was

11     no evidence of the creation or doctoring of evidence.  And

12     it's important because it's not about, at this stage of the

13     case, whether they did or the circumstances of the doctoring

14     and the like.  What it does is it informs the Court's view

15     of the Defendant's state of mind.

16          If you have to doctor evidence, if you have to cut

17     the date off of a government form that says, this is the

18     date on it, in order to make your point, it is at least a

19     plausible inference that you knew what you were going to say

20     wasn't true and that you knew you had to rig the evidence in

21     order to convince people that it was true.  That is the

22     *Suzuki Motors* case, which says that rigging the evidence

23     that you claim support the false statement is and will

24     sustain a finding of actual malice in and of itself.

25          If you want to look the all of the other ways we

1     can distinguish those cases, I would say that is the most

2     important difference that exists here.

3             I want to talk briefly about the *Tah* case, because

4     it's gotten a lot of air time today.  It is a recent case

5     for sure, but it is like all of the cases, it must be

6     evaluated on its own merits.  The Complaint in that case

7     versus the factual allegations in this case, and it is

8     distinguishable in multiple ways, but I want to spend a

9     little bit of time talking about it because Defendants rely

10    so heavily on it.

11            First of all, I want to go to the inherent

12    improbability of the allegations, which the courts have said

13    is one of the factors that can be considered in trying to

14    prove a Defendant's state of time.

15            In *Tah* -- and I know Your Honor is familiar with

16    the facts of the case --

17            THE COURT:  Yes.

18            MR. CLARE: -- cash payments were made to Liberian

19    government officials in the aftermath of an oil transaction.

20    There were, in fact, cash payments.  Nobody disputed that.

21    The only question is whether this report, by the

22    non-governmental actor, is a bribe?  Is it a bonus?  How do

23    we characterize these cash payments that everybody admits

24    were made?

25            Now, bribery in a Liberian oil deal is not an

1    inherently improbable thesis to have put forward.  In fact,

2    the Court described the way it was portrayed there, not even

3    as a straight defamation claim.  They described it as a

4    defamation by implication, which is one step more derivative

5    than what we pleaded here.

6            Now, Dominion, in our claims against these

7    Defendants, present a much different situation.  What these

8    factual statements -- the ones that I alluded to a moment

9    ago, this is the greatest crime in American history.  A

10   nationwide or a global conspiracy across multiple

11   jurisdictions, local governmental officials of all parties,

12   to rig an election for Joe Biden.  The machines that were

13   independently selected and administered by local officials

14   from both parties were, in fact, secretly all created in

15   Venezuela to rig votes for Hugo Chavez.

16           THE COURT:  Can I ask you a question about the

17   inherent improbability type of allegation?  Do I have to

18   credit that allegation as true or is that the kind of

19   conclusionary allegation that has to be backed up by

20   specific factual allegations?

21           I am really trying to figure out for my purposes

22   how I think through the question at 12(b)(6) about whether a

23   statement is inherently improbable.

24           MR. CLARE:  Sure.

25           THE COURT:  Is it enough for you to allege it?  Do

1      I have to ask myself, Could a reasonable juror conclude it

2      was inherently improbable when made or is there another test

3      I should be applying at this stage?

4                  MR. CLARE:  At this stage I would say, Your Honor,

5      it is the latter.  First of all, it's not what we have done.

6      We have just not pleaded in a conclusary way that the

7      allegations were inherently plausible.  I have facts to back

8      them up.  I am happy to walk you through why we think they

9      were.

10                 To answer your question at this stage is, could a

11     reasonable juror use this fact, look at these allegations

12     and say they are inherently improbable, and use it in the

13     way that the Supreme Court says?

14                 THE COURT:  To draw an inference.

15                 MR. CLARE:  To draw an influence that informs the

16     Defendant's state of mind.  If it checks that box, it is in

17     for purposes of our pleading standard at this stage.

18                 So the inherent improbability that the U.S.

19     Attorney General of the United States, Bill Barr, is in on

20     it because he didn't investigate and didn't blow the whistle

21     on Dominion, which is one of the facts that we pleaded

22     makes it inherently improbable that these Defendants have

23     pointed to or that Dominion paid kickbacks to the Georgia's

24     Secretary of State based on the doctored certification.

25                 Unlike the *Tah* case, the allegations here are, on

1    their face, meet the *St. Amant* standard; that they are so

2    inherently improbable and so reckless that only a reckless

3    person would utter them.  And we will argue that to the jury

4    and they can reject the inference.  The point of today is,

5    of course, we have met our pleading standard in establishing

6    just that one indicia.  There are many, many others.

7          THE COURT:  Can I pause you just again on *Tah* and

8    on inherent improbability?  Maybe the Court didn't discuss

9    this but just thinking about the allegations in *Tah,* should

10   a Court, in your view, have concluded there that no

11   reasonable juror could conclude that those statements were

12   inherently improbable?

13         MR. CLARE:  I think inherent improbablity in the

14   *Tah* case was one factor that went into the mix.  So I don't

15   think the Court had to reach that question.

16         The notion of the denials seemed to predominate

17   the Court's reasoning about why the denials -- in that

18   particular case they said the Plaintiffs did not need to

19   credit them; and that's another critical distinguishing

20   factor.  I don't believe the D.C. Circuit addressed in a

21   clear way the inherent improbablity.  My point in

22   distinguishing it to Your Honor is that we are told that *Tah*

23   is the greatest thing --

24         THE COURT:  I understand.  I am just thinking

25   through -- because one could argue that in *Tah,* in theory, a

1    reasonable juror could have concluded, possibly, that the

2    statements therein were inherently improbable.  I am not

3    sure that that argument was ever made, but it put a little

4    bit of focus on exactly what the standard is I am applying

5    here on inherent improbability.

6         MR. CLARE:  It's unclear what was in the Court's

7    mind, and it was not in the opinion.  It does stand to

8    reason, as I argued a moment ago, that bribery in a Liberian

9    oil deal versus this global conspiracy are two very

10   different quantum or quality allegations.

11        I want to talk about the denials -- if I've

12   satisfied the Court about that.

13        THE COURT:  Yes.  Yes.

14        MR. CLARE:  So the majority opinion in *Tah* said

15   the denials contained "no evidence that could be readily

16   verified of the sort that would provide obvious reasons to

17   doubt the veracity of the statement."  In fact, the majority

18   said that the denials there fail even to contest the facts.

19   The denials were included in the report that was issued by

20   the Defendant.

21        Now, when the majority says that the denials did

22   not provide any evidence that could be readily verified,

23   that in and of itself distinguishes the specific, detailed

24   written notices that Dominion repeatedly provided to all of

25   these Defendants over a period of time, rejecting and

1    dismantling each one of those three factual assertions that

2    I ran through at the top of my argument, but providing

3    chapter and verse as to why it was false, providing chapter

4    and verse about the 100 percent hand counts of ballots in

5    multiple jurisdictions, demonstrating that it was false,

6    putting them on notice of the statement of the United States

7    Attorney General, the cybersecurity infrastructure security

8    administration, the Court decisions that rejected them.

9         So our exhibits to our Complaint, which we put in

10   there for this exact reason, are not mere denials that fail

11   to even contest the facts.  They context the ultimate fact

12   in a way that the Plaintiff in *Tah* could not.  Because the

13   ultimate fact in *Tah* is, Were the cash payments made or not?

14   They were.  The question is, How do we characterize them?

15   Here we are saying, We didn't flip votes.  It's a boolean

16   equation.  You either did or you didn't.  And here we are

17   saying we didn't and here are the million reasons why.

18        In the exhibits that we have attached to the

19   Complaint, Exhibit 3 in Powell --

20        THE COURT:  That was just a note and I apologize,

21   the madam court reporter may need a break.

22        Here is what I would suggest, if it is okay with

23   the court reporter, why don't we finish with the actual

24   malice, then we will take the recess I was anticipating

25   before.  We will pick up with Dominion's arguments on the

1  other topics.  We will do the reply for the Defendants,

2  short, hopefully, and roll into personal jurisdiction and

3  venue.  So rather than bifurcate, we will do it in a

4  slightly different way.

5        MR. CLARE:  At your pleasure.

6        THE COURT:  Is that okay?

7        MR. CLARE:  I will try to wrap up, but I want to

8  get Your Honor's questions answered.

9        You will see in these exhibits, for Lindell it is

10  Exhibit 3, 266, 269, 314.  These are all attached to the

11  Complaint for the purpose of demonstrating that we put

12  Mr. Lindell, Ms. Powell, all of the Defendants on specific

13  written notice so there would be no misunderstanding that

14  they knew that the underlying facts were false; that's the

15  second way in which *Tah* is distinguishable.

16        Then, of course, the third way is the allegations

17  that we made of doctored and inherently unreliable evidence.

18  It's not present in *Tah* at all, where we presented detailed

19  allegations in our Complaint about Ms. Powell having

20  doctored the Secretary of State's certification, having

21  falsified credentials of declarants, the military

22  intelligence official who came out and said, I never worked

23  in military intelligence, and who said after the fact, The

24  declaration that I was supposedly -- is misleading and I am

25  trying to back away.  So we have the recantation from the

1    various sources.  These are the kinds of facts that have led

2    courts and local officials all around the country to reject

3    these allegations.  So in that important respect as well,

4    *Tah* does not address nor do any of the other cases cited by

5    Mr. Parker address this notion of manufactured evidence.

6         Finally, I want to address preconceived story

7    line, because it was also a debate in *Tah* in a materially

8    different situation here.  In *Tah* the assertion of

9    preconceived story line was that the Defendant in that case

10   came to the Plaintiff at the end of a reporting process, and

11   said, Hey, we are about ready to publish this report.  Our

12   reporting seems to show that this cash payment looks like a

13   bribe.  What say you, Plaintiff?  That was the allegation

14   that gave us the preconceived story line, because they did

15   the investigation.  They asked the question about the bribe.

16   They got the denial and they published it.

17        Here is a materially, materially different

18   situation.  We've alleged in detail how Ms. Powell, on

19   election day, before any of the election returns were in,

20   reached and staked out the position that the Democrats were

21   stealing the election by flipping votes by electronic means.

22        So it's the exact opposite of what happened in

23   *Tah.*  The conclusion comes first and then the evidence gets

24   conformed to that later; and that's what we see in

25   Ms. Powell's conduct.  In the falsification of the

1    certification, in the distortion of the credentials in the

2    affidavits, in the disregard -- in the repeated, repeated

3    willful disregard of the demand letter, the detailed demand

4    letter, and disregard of decisions of courts, the disregard

5    of the United States Congress to certify the election

6    results, the disregard of President Biden being sworn in,

7    the statements of the Attorney General, the experts, dozen

8    of experts, all of those things in the aggregate inform her

9    state of mind when she makes those statements.

10           I want to address --

11           THE COURT:  Can you briefly address your argument

12   that you have also adequately or that you have alleged that

13   Mr. Lindell was acting according to a preconceived story

14   line?  Becaue, at a minimum, the allegations are different.

15           MR. CLARE:  That's correct, Your Honor.  So

16   Mr. Lindell's statements that we've laid out in

17   chronological order in our Complaint, the first statement

18   that we sue upon is in Paragraph 165(a), dated December

19   12th.  At that point in time --

20           THE COURT:  Okay.  So he, unlike Ms. Powell, at

21   least in this one respect, was not making statements before

22   or right at the time of the election; that's more than a

23   month after the election.

24           MR. CLARE:  That's correct.  There were statements

25   that Mr. Lindell made on social media.  We elected not to

1    sue on them for the specific reason because we have to

2    demonstrate to a jury that there was a quantum of

3    information available to him, that he had specific knowledge

4    of at the time he made these statements.

5           By the time of the December 12th statement, the

6    first one that we've sued on, he had specific knowledge and

7    disregarded the November 12th statement by President Trump's

8    appointee, Chris Krebs, and cybersecurity administration

9    that found no evidence of electronic voting flipping.

10          The November 16th statement of 59 election experts

11   who came out and said, No evidence.  The certifications that

12   had been done in Arizona and three hand counts validating

13   the results of Dominion's tabulations, the last of those was

14   complete on December the 7th, and Attorney General Barr's

15   statement on December 1st.  We looked.  We followed up on

16   the Complaints, and found no evidence that this had

17   occurred.

18          So Mr. Lindell's statements, when you read them in

19   sequence in the Complaint -- and I would invite Your Honor's

20   attention to do so -- he forms the preconceived notion that

21   the election was stolen.  Doesn't know how but I know the

22   election was stolen.

23          As you see the sequence of statements unfold it

24   is, Well, it must have been the Dominion machines that did

25   it.  They must have been the thing that had stolen it.

1    Regardless of all of the evidence that had come out.

2            Including his disregard of the Court finding that

3    the sourcing with Ms. Powell -- because a lot of his

4    statements derive from Ms. Powell's public statements.  So

5    his state of mind -- you know, I don't want to say inherits,

6    but he is relying on the same discredited set of materials

7    that Ms. Powell is.

8            He has a different financial motive, certainly.

9    Runs a company.  Used promotional codes in the same breath

10   that he was defaming Dominion to sell products.  And

11   Ms. Powell, obviously, had her own separate financial motive

12   that we have pleaded.

13           We have sued on 27 statements by Mr. Lindell.

14   There were 4 separate retraction demands that were made that

15   are in our Compliant, described in Paragraphs 59, 63, 69,

16   71, 101, where he had actual knowledge of the falsity.  It

17   is hard to disclaim knowledge when you put it right in front

18   in black and white, hand counts confirming the accuracy.

19   And then something started to happen where other people, not

20   just Dominion, started to push back on Mr. Lindell.  He was

21   repeatedly cut off from media appearances and social media

22   platforms.  We have alleged that in Paragraphs 61, 95, 98.

23   A news anchor on the News Max channel literally walked off

24   the set, rather than being associated with the comments,

25   because Mr. Lindell was continuing to double down and triple

1    down on these allegations.

2         So Mr. Lindell, at this point, does what the

3    preconceived narrative line of cases say you can't do, which

4    is conform evidence to reach the conclusion that you are

5    trying to reach.

6         He takes a fake spreadsheet, which we've described

7    in detail and debunked with specificity in the written

8    demands that we made to him in Paragraph 101 and Exhibit

9    314, with fake IP addresses and fake Mac addresses -- these

10   are computer code signatures -- and a fake world map, which

11   he describes as proof, absolute proof, in his feature length

12   movie, doubling and tripling down on these false

13   allegations.

14        To this day -- I mean, you heard it here in the

15   courtroom from his very counsel, and there have been many

16   statements since we filed our Complaint, he is doubling and

17   tripling down with all of this knowledge, with the aggregate

18   knowledge.  So going back to my point at the beginning about

19   the temporal component.  Actual malice, we have more than

20   pleaded the 12(b)(6) *Iqbal* and *Twombly* standard.

21        I have one last important point before we give the

22   court reporter a well-deserved break.  It is absolutely

23   critical that Your Honor understand this notion of

24   government actor, that Dominion is falsely accused of being

25   the government.  That is a nonsensical argument with respect

1      to my brother lawyer.  It is, in fact, misdirecting the

2      Court.

3              There is no such concept in a defamation action as

4      a government actor.  There are public officials; that's *New*

5      *York Times versus Sullivan*.  *New York Times versus Sullivan*,

6      in fact, says public officials can recover for defamation as

7      long as you satisfy the actual malice standard.  But the

8      concept here is, Are you a public official or are you a

9      public figure?  There isn't a concepted defamation of

10     government actor.

11             What they are trying to do, respectfully, is

12     trying to get the Court to apply a standard that falsely

13     characterized Dominion as a government actor, because it

14     helps them in their 1983 action that they filed in

15     Minnesota, which is a collateral attack on this Court's

16     jurisdiction.

17             At best it would have been a compulsory

18     counterclaim, but they would rather try to litigate that

19     there.  But this notion they are trying to tag us falsley

20     with the lable of a government actor, the cases that they

21     have cited -- and I would urge the Court to review them --

22     have nothing to do with this particular situation.

23     Complaint Paragraph 157, Dominion is a for-profit company

24     that provides local election officials tools they can use to

25     run elections.  Dominion doesn't administer elections.

1    Election officials do, using tools that they made from

2    Dominion.  So in that way they may be a government

3    contractor, but they are not the government.

4         In the cases they cited to Your Honor have nothing

5    to do with suggesting otherwise.  The two cases they cited

6    involved state primaries run by political parties.  So the

7    allegations in this particular case is not that Dominion

8    runs the elections, they don't.  The local officials are the

9    government.  Dominions supplies goods and in some instances

10   services to these local entities.  I don't want the Court to

11   be led down an incorrect legal framework.

12        THE COURT:  I don't think there is a risk to that.

13        MR. CLARE:  Thank you, Your Honor.

14        THE COURT:  Thank you, Mr. Clare.

15        Let's take a 15-minute recess.  That means we will

16   be back on at approximately 4:10.  Thank you, Counsel.

17        (Break.)

18        MR. SHACKELFORD:  Stephen Shackelford for the

19   Dominion Plaintiff.

20        I am here start with what we agree on.  The Powell

21   defendants agree that under whatever law applies -- and we

22   don't think Colorado law applies, but Your Honor doesn't

23   need to reach that for these purposes.  The question for the

24   Court is functionally the same.  Does the challenge

25   statement contain a provably false factual connotation?  The

1    Powell Defendants also agree that it is a reasonable person

2    test.  Could any reasonable person conclude that the

3    challenge statements were conveying facts, whether

4    explicitly or implicitly.

5         Your Honor said it yourself when Your Honor was

6    hearing from the Powell Defendant's attorneys.  The question

7    at the 12(b)(6) stage, for this fact opinion distinction,

8    the only way the Court can dismiss the case on a fact

9    opinion distinction at the 12(b)(6) stage is to hold that no

10   reasonable juror could conclude that the challenge statement

11   was anything other than opinion.  So that's the legal

12   framework.  And then the Defendants also set out to test,

13   under Colorado law, but it's not materially different under

14   the other jurisdictions, inclucing the District of Columbia.

15   A statement of opinion is only completely immunized under

16   the First Amendment if, one, the Court first asks whether

17   the statement is sufficiently factual to be susceptible of

18   being proved true or false -- that's the first question the

19   Court asks.  And that's conceded here for purposes of the

20   12(b)(6) motion, that all of these statements in the Powell

21   complaint are sufficiently susceptible of being true or

22   false.

23        The second part of the test is whether reasonable

24   people would conclude the assertion as one of fact.  Again,

25   the Powell Defendants identify the different factors that

1    Colorado looks at but they are, again, not that different

2    from the factors that D.C. or New York or other

3    jurisdictions look at, which includes how the assertion is

4    phrased, the context of the entire statement, and the

5    circumstances surrounding the assertion, including the

6    medium through which the information is disseminated and

7    audience to whom the statement is directed.  That is from

8    the *Keohane* case.

9          Now, Your Honor, the test does look at the overall

10   context of the statements, but it also focuses specifically

11   on the language that the speaker uses, both in the allegedly

12   defamatory statement and in the context of the entire

13   communication, in which the defamatory statement appears,

14   and that's where the Defendants don't even try to conduct

15   the analysis that they have to conduct on a Motion to

16   Dismiss.  They don't analyze any specific language in any of

17   the statements; and that's fatal to their motion from the

18   get-go.  Every single case the parties cite on this fact

19   opinion distinction, every single case, analyzes the

20   specific language that was used, in addition, potentially,

21   to contextual factors.  And failing to do that here means

22   the Defendants cannot prevail at a 12(b)(6) stage.

23         Now, Your Honor can understand why they don't

24   analyze the specific language.  If you look at the actual

25   language, the Powell Defendants used what they said, they

1    were making factual statements and assertions.  The language

2    is clear.  The Court does not even need to consider the case

3    law on opinions because the statements were assertion of

4    cold hard fact.  They are false, to be sure, but they are

5    assertions of fact.

6            In all of these 40 different statements, Your

7    Honor, on our count, Paragraph 181, Sidney Powell is

8    definitive.  She is unequivocal.  There is no wishy-washy

9    language.  There is no conditional statements, this might

10   have happened.  It is always specific factual assertions.

11   To be clear, as the Court knows, adding I think to the

12   beginning of a factual assertion, it's not a First Amendment

13   escape hatch.  It doesn't get you off the hook.  The

14   *Milkovich* case and many other cases teach that.  You can't

15   transform the statement "John is a liar" into "I think John

16   is a liar."

17           Here, the Powell Defendants didn't even do that.

18   They didn't even put in conditional language in these

19   statements that we've sued on.  The statements, when you

20   look at the statements, they were meant to convince the

21   listener that there is no doubt that there is only one truth

22   and that Ms. Powell is the one conveying that factual truth.

23           And then, as counsel for Ms. Powell explained,

24   Ms. Powell sometimes made references to evidence or to

25   videos or to witnesses and those references further bolster

1    the factual nature of the assertions she was making.  As

2    Your Honor likely knows, I have evidence, I have here in my

3    hand in this binder -- that's a favorite tool of demigods to

4    try to bolster the nature of their assertions.

5         Now, the Powell Defendants argue that saying, I

6    have evidence or I have witnesses who will say this that

7    that somehow transforms her statements into opinions; that's

8    not the law.  It's black letter law, that repeating someone

9    else's defamatory statement is actionable.  It's not

10   converted to an opinion because you said so-and-so told me

11   this.  In fact, it would be completely contrary to black

12   letter law.  It would be sort of Alice in Wonderland to say

13   the magic words, evidence, affidavit convert any factual

14   assertion, defamatory factual assertion into an opinion,

15   make it immune.  It's not the law.

16        Your Honor pointed out in the questioning of the

17   Powell Defendants' attorney one way in which it is not the

18   law.  Every jurisdiction at issue here, from *Milkovich* down

19   to Colorado, D.C., et cetera, holds clearly, even if you

20   claim the statement as an opinion statement, but the

21   supposed opinion is based on false facts.  If it's based on

22   false facts, it's still actionable, that's *Milkovich*.  In

23   Colorado, that's *Bucher versus Roberts;* and that's the

24   *Teilhaber* case.  In the District of Columbia that's the

25   *Moldea* case.  Statements of opinion can be actionable if

1    they imply a false fact that is mixed opinion, or rely upon

2    stated facts that are provably false.  So there's no

3    get-out-of-jail-free card for the Powell Defendants, just

4    because they invoke evidence.  In fact, it makes the

5    statements more actionable.  It makes them actionable as

6    mixed opinion.  Because she wasn't presenting those facts.

7              THE COURT:  Do I need to go through the 40 or so

8    statements that Dominion alleges are defamatory or for which

9    it seeks damages at the Motion to Dismiss stage and analyze

10   each one to see if the statement gets past the opinion

11   versus statement of fact threshold or is it enough, if I

12   were to conclude that there were one or two that were

13   statements of fact, and the way we are talking about now.

14   Of course, I am assuming no other barriers to the Complaint

15   going forward.

16             Is that enough for me to deny the Motion to

17   Dismiss, and sort of leave for another day, the question of

18   which of the 40, other than the two in my hypothetical, are

19   truly statements of facts?

20             MR. SHACKELFORD:  Your Honor could do that.  I

21   believe it is within your discretion to do that.  The

22   lawsuit can't be dismissed if there is one actionable

23   defamatory statement still existing in the case.

24             I will say, Your Honor, that was the job of the

25   Defendants.  The Defendants were supposed to go through and

1   explain how this language, in this context, through each

2   statement is not -- no reasonable juror could conclude it

3   was a statement of fact.  The fact that they didn't do that,

4   I think, makes your job even easier.  It's not up to you to

5   go through and conuct the analysis without any help from the

6   moving party.

7                    THE COURT:  What, in your view, are the strongest

8   statements, in this regard, for your client?

9                    MR. SHACKELFORD:  Your Honor, I can go through a

10  pretty long list.  I will give you some examples.

11                   THE COURT:  Start with maybe just two or three.

12                   MR. SHACKELFORD:  Let's start with the very first

13  statement, the November 8th statement to Maria Bartiromo.

14  Ms. Bartiromo asks Ms. Powell about Dominion's software.

15  Ms. Powell said, That is where the fraud took place, where

16  they were flipping votes in the computer system or adding

17  votes that did not exist.  It's not a statement of opinion,

18  Your Honor.  She's not referencing a bunch of underlying

19  facts.  It is a flat statement that this is what happened.

20                   I will also give you the statement that Your Honor

21  quoted from subparagraph (e) of the count, with Lou Dobbs

22  Ms. Powell said, I can hardly wait to put forth all of the

23  evidence we've collected on Dominion.  Starting with the

24  fact it was created to produce altered voting results in

25  Venezuela for Hugo Chavez and then shipped internationally

1      to manipulate votes for purchases in other countries

2      including this one.  She says it's a fact in that statement,

3      Your Honor.

4            I will give you another one.  Your Honor also

5      identified the statement of the alleged video of the founder

6      of Dominion.  I just want to point out for the Court Eric

7      Coomer is not the founder of Dominion.  Mr. Poulos, who is

8      in the courtroom today, is the founder of Dominion.  That

9      statement was a statement, a completely false, entirely

10     umsupported statement about John Poulos, not about Eric

11     Cumer.  I am not sure where counsel was going with that.

12     Again, that was a statement asserting as fact both that Mr.

13     Poulos is on tape admitting he can change a million votes

14     and that she has such tape, and that's a false statement,

15     Your Honor.

16           THE COURT:  Dominion relies, at least in its

17     papers -- by which I mean not the Complaint, the briefs --

18     on statements that Ms. Powell made to Dinesh D'Souza after

19     this Complaint was filed.  I can't rely on those statements,

20     can I?

21           MR. SHACKELFORD:  You don't need to, Your Honor.

22     The point of citing that -- and we can amend the Complaint

23     to add it.  The point of citing that is to show the

24     particular slipperiness here of the Powell Defendants where

25     they come in and tell this Court nobody could possibly take

what I am saying as fact, no reasonable person, and they go back on the air to say, This is the fact.  I am not walking it back at all.  This is what happened.  We don't need Your Honor to take judicial notice of that appearance.  We can amend the Complaint to add that.

Again, Your Honor, Subparagraph (q), the evidence I am compiling is overwhelming that this software tool was used to shift millions of votes.  Subparagraph (r), There is no doubt that the software was created and used in Venezuela and we are just continuing to be inundated by evidence.  Subparagraph (z), on December the 10th, which is the day after the last of Ms. Powell's lawsuits was dismissed with prejudice, We are finding reams and reams of actual documents from Smartmatic and Dominion, including evidence that they planned and executed all of this.  We have evidence of how they flipped the votes, how it was designed to flip the votes, and that all of it has been happening just as we have been saying it has been.

Subparagraph (ee), she calls it absolutely irrefutable.  Subparagraph (hh), certainly -- this is an interesting one, (hh) Your Honor -- in (hh), on December 29th the Powell Defendants state, I am pretty sure they ran the algorithm to flip 2.7 percent of the votes from Trump to Biden almost everywhere across the country.  Certainly they did it everywhere on Dominion.

1          So, Your Honor, there is no conditional language

2    -- and this is why the Powell Defendants could not analyze

3    the statements one by one, because the language itself is

4    fatal to any argument that no reasonable listener could have

5    considered these to be statements of facts.

6          Instead of going statement by statement, the

7    Powell Defendants advance a couple of high-level arguments.

8    They argue first that there is some sort of blanket immunity

9    for a political speech or advocacy speech.  They basically

10   argue both in their opening brief and reply, that given the

11   political context, a hotly-contested election, lots of

12   people angry, none of her statements are actionable, no

13   matter what words she used.  No matter what she said, that

14   is the argument.

15         There is no such doctrine, Your Honor.  There is

16   no case that says the Court can ignore the language of the

17   statement, ignore the context of the statement in the entire

18   communication and solely rule based on some broader context.

19         In fact, the cases say the opposite.  The cases

20   say the Court, and ultimately the jury, has to look at all

21   of the different elements, including the specific language

22   used.  There is no advocacy exception.  There is no

23   political question exception.  There is no propaganda

24   exception.  You don't get a free pass to say whatever you

25   want, even if you know it's false, just because you are

1     trying to represent a view.

2             And, in fact, if that were the law, a lot of very

3     famous cases would have come out the other way, including

4     *New York Times versus Sullivan.*  There, the allegedly

5     defamatory statements were in an advertisement signed by the

6     committee to defend Martin Luther King and the struggle for

7     freedom in the south.  They were obviously advocates.  And

8     the Supreme Court recognized the profound national

9     commitment to the principle that debate on public issues

10    should be uninhibited, robust and wide open.  But the Court

11    did not hold that no reasonable reader of that advertisement

12    could have thought that this was a statement, that those

13    were asserting facts.  The Court instead created the actual

14    malice standard; that's the way the Court protects

15    potentially innocent defamatory statements.  So there is no

16    advocacy exception to the general, actual malice standard to

17    the Supreme Court and the state's jurisprudence on

18    defamation.

19            The other high-level argument they make is, Well,

20    all of these claims were related to litigation.  The Powell

21    Defendants were simply stating the same sorts of things they

22    eventually put into their lawsuits.  Now, they didn't file a

23    lawsuit.  Sidney Powell did not file a lawsuit until

24    November the 25th.  The last of those lawsuits that are

25    referenced in their papers was dismissed on December the

1    9th.  So that doctrine wouldn't apply on either side of

2    that, if it were a doctrine, but it's not a doctrine.

3              There is something called the litigation

4    privilege, which does protect statements made in court or

5    statements made in court pleadings.  It does not reach

6    out-of-court speech like this.  In fact, there is a Colorado

7    case that we cite the *Seidl versus Greentree Mortgage* case

8    that specifically says litigation privilege, you are not --

9    a lawyer is not immune from defamation actions for

10   statements made at a press conference or to the press.  They

11   are very narrow.  Colorado has stretched the litigation

12   privilege slightly to cover things like demand letters that

13   you might have to do in order to initiate a litigation, but

14   it doesn't cover this.

15             As the Colorado appellate court said, An attorney

16   who wishes to litigate her case in the press and via the

17   internet does so at her own risk.  And Your Honor put your

18   finger on this with one of your questions to counsel for the

19   Powell Defendants.  Your Honor asked, If statements made in

20   in a litigation are repeated in the press, are they

21   actionable?  As Your Honor heard, counsel said it depends on

22   malicious intent.  Exactly.  There is no general immunity

23   for those sorts of statements, and we now have on record

24   counsel conceding that.

25             In fact, invoking the fact that you are filing

1    lawsuits is another way to bolster the supposed factual

2    appeal of the defamatory statements that a lawyer makes.

3    Lawyers are generally thought to have to be more factual.

4    We are are held to a higher standard.  And Ms. Powell is a

5    former federal prosecutor, who I dare say is held to an even

6    higher standard.

7            Just this morning the New York enforcement board

8    in temporarily suspending the law license of Mr. Giuliani

9    wrote, As officers of the court, attorneys are an intimate

10   and trusted, essential part of the machinery of justice.  In

11   other words, they are perceived by the public to be in a

12   position of knowledge, and therefore, a crucial source of

13   information and opinion.

14           So the fact that occasionally Ms. Powell may have

15   referred to lawsuits, it does not immunize here.  In fact,

16   it further shows she was trying to convey factual

17   information to the listener.

18           Your Honor, in sum, having failed to go through

19   the statements, statement by statement, having presented to

20   the Court two doctrines that don't exist, the advocacy

21   exception and the litigation exception to statements out of

22   court, there is no argument left.  The Powell Defendants

23   have not met their burden, and the Court should not dismiss

24   any of the statements in the count.

25           THE COURT:  Thank you very much.

1        Mr. Nelson?  Do I have that right?

2        MR. NELSON:  Yes, Your Honor.  Justin Nelson from

3   Susman Godfrey.

4        Your Honor asked a number of questions including

5   whether there's been any case about a court dismissing on

6   general damages.  We have not been able to find anything.

7   In fact, we believe that we have not found any case where a

8   Court has held that a corporation is barred from a per se

9   claim or from general damages.

10       The one case Giuliani cites, *Martin-Marietta,* is,

11   we think, quite distinguishable -- we will get to that in a

12   couple seconds -- and it did not hold, of course, about per

13   se damages.  It was about the actual malice standard and the

14   way --

15       THE COURT:  What, in Dominion's view, are the

16   types of harm cognizable for a corporate defamation

17   Plaintiff?

18       MR. NELSON:  The types of harm cognizable,

19   basically, are everything except for individual type

20   reputational damages, including business reputation.  And

21   for this I am going to quote some guy named Smolla, which is

22   cited in our papers.

23       THE COURT:  Yes.

24       MR. NELSON:  The damages recoverable by a

25   corporation in a defamation action include both economic and

1    non-economic harms, and are akin to the damages recoverable

2    for a natural person, with the exclusion of internal

3    emotional distress or anguish.

4          THE COURT:  What kind of non-economic harm does a

5    corporation suffer?  Can a corporation suffer non-economic

6    harm?

7          MR. NELSON:  There is some debate, Your Honor,

8    about, for example, for repuation itself or on brand, is

9    that specific and cognizable as an actual pecuniary loss or

10   does it go to reputation and to brand?  If I may, can we

11   turn on the ELMO for one second?  This is the restatement.

12   It's cited in the Solers case.  The top, obviously, is one

13   who publishes defamatory matter concerning a corporation is

14   subject to liability to it, A, if the corporation is one for

15   profit and the matter tends to prejudice it in the conduct

16   of business or to deter others in dealing with it.

17         It explains in comment, on Clause A, a corporation

18   for profit has a business reputation and may therefore be

19   defamed in this respect.  Thus, a corporation may maintain

20   an action for defamatory words that discredit it and tend to

21   cause loss to it in the conduct of its business without

22   proof of special harm resulting to it.

23         To Your Honor's question, we are not saying it is

24   a non-business harm.  We are saying that it is non-economic

25   in the way that it is not a special category of damages that

1    has to be itemized and pled under Rule 9.

2         THE COURT:  Right.  Which is really the ultimate

3    question in Mr. Giuliani's motion, whether there is a

4    heightened pleading standard for the damages alleged here

5    and whether you've satisfied it.  Part of this is my trying

6    to understand, frankly, the background principles for

7    corporate defamation Plaintiffs and what the types of harms

8    that are available and then to -- once I've sort of figured

9    that out -- to understand there is a 9(g) requirement and,

10   of course, whether you've satisfied it.

11        MR. NELSON:  There are going to be some really

12   interesting damages questions that come up in expert

13   reports, including Mr. Giuliani mentioned, his lawyer

14   mentioned, enterprise value.  We believe that it is a

15   recoverable harm.  He says it's only recoverable if there is

16   a product disparagement.  We can get to that at the

17   appropriate time.

18        But where we are right now is that there is a Rule

19   8 standard.  *Solers* talks about the Rule 8 standard.  It

20   talks specifically about the commercial reputation of that.

21   And there is a limitation, Your Honor, on general damages.

22   The limation is that we need to plead and prove actual

23   malice.  So it's not that we can just willy nilly assert

24   some claim to general damages.

25        But in this case, Mr. Giuliani is not arguing that

1   we have failed to meet our actual malice standard.  He

2   doesn't challenge here that statements are demonstratively

3   false.  The question, simply, is whether we have pleaded

4   sufficient enough detail to get by an allegation of $75,000

5   in actual damages.

6        This Court, in the *Szymkowicz* case says, the sum

7   claimed by the Plaintiff controls if the claim is made in

8   good faith.  And once the Plaintiff makes a good faith

9   claim, dismissal is warranted only if it is apparent to a

10   legal certainty that the Plaintiff cannot recover the amount

11   claimed.  And we have more than met that standard.

12        And, by the way, I think there was a huge

13   concession by Mr. Giuliani in his opening statement, which

14   is that what *Martin-Marietta* really meant when talking about

15   lost profits was all types of special damages.  And even --

16   I think I heard even reputation could be a type of special

17   damages, which needs to be specifically proven.  And if

18   that's true, we've met that too.  We go into detail into the

19   Complaint in Paragraphs 126, Paragraphs 128, Paragraphs 135

20   about how specifically we have been harmed, to the penny,

21   about what it is.

22        Now, some are perspective, because these contracts

23   operate on multi-year bases.  And if what Mr. Giuliani --

24   and that's pleaded to.  If what Mr. Giuliani says is true,

25   there really could never be any type of defamation claim, in

1    federal court at least, where there are multi-year

2    contracts.  But that is simply not the law.  It is

3    recognized by *Solers.*

4           Now, we can talk about Martin-Marietta all we

5    want.  *Solers* is more under D.C. law.  *Solers* is a

6    controlling D.C. appellate decision post-dating

7    *Martin-Marietta* assuming it is right.  And not just right

8    but as broad as Mr. Giuliani says, we still have *Solers*

9           In fact, *Solers,* I think, is consistent with our

10   understanding of how we explain *Martin-Marietta* in the

11   briefs, which is that there are types of damages that are

12   special damages that include things that you can actually

13   document.  As Mr. Giuliani states, those are lost profits.

14   But more than lost profits, they would include expenditures.

15   Right?  The fact that we had to pay for security as a result

16   of Mr. Giuliani's statements, that is literally off the

17   bottom line.

18          So we have that.  And it's not a bar on per se

19   damages.  The case just doesn't talk about that.  The case

20   is really about whether *Rosenbloom,* which is the Supreme

21   Court case prior to *Gertz,* whether that private/public

22   figure or standard applies to corporations.  And the Court

23   holds, in language that I don't think is actually consistent

24   with subsequent developments in commercial speech like

25   *First National Bank versus Bellotti* and *44 Liquormart,* et

1   cetera.

2         The Court holds that there is a difference between

3   a natural person private Plaintiff and a corporation

4   Plaintiff.  Under the *Martin-Marietta* Court's view, not a

5   single corporation can ever be a private figure; so,

6   therefore, the actual malice standard applies to all

7   corporations

8         There is, by the way, at least a circuit split on

9   that question.  Okay?  We don't get into it.  There is the

10  *Snead* case.  Right on point.  Goes the other direction.  It

11  is a very interesting legal question, but that's not this

12  case.  And what the *Martin-Marietta* -- may we put the ELMO

13  back on for just one second, please -- it talks about this

14  very point.  It first says, as is more fully explained

15  below, the Court finds that where a libel action is brought

16  by a corporation, the rule announced in Metro Media --

17  that's *Rosenbloom* -- remains the proper standard for

18  determining the applicability of The New York Times actual

19  malice standard.  And then there is some more language about

20  the same.  And then there is this sentence that is the basis

21  really for the Giuliani entire motion.

22         Right after this it talks about exactly what we

23  are talking about here.  It is the personal reputation.

24  There is a business reputation as well.  Giuliani mentioned

25  the *Golden Palace* case.  The *Golden Palace* case is right on

point and talks about the very distinction between business

and corporate reputation.  This is the *Golden Palace* case

from the relevant language quoted in *Martin-Marietta.*  It

has no personal reputation and may be libeled only by

amputation about its financial soundness or business ethics,

which is exactly what we have here.  Where corporate libel

suits have been upheld.  The defamation in question has

involved the financial integrity or honesty of the company.

Now, it is dismissed because the statement there

related to employees leaving the restaurant and nothing

more.  But it does not have to do with the Rule 8/Rule 9

distinction we have been talking about here.

The cases are really uniform from all of the

treatises, from all of the jurisdictions, that corporation

can plead general damages; and that that allegation of

general damages to include brand or reputation by itself.

Now, for each of the three Dominion entities by itself, puts

us over the line of $75,000.  And the Court can stop there.

If we need to go on, then Mr. Giuliani has

conceded now that all types of special damages is what

*Martin-Marietta* meant, and then we still go into detail

about that.  By any stretch, we have met any good faith

allegation here to meet our jurisdictional burden.

THE COURT:  One point of just clarification.  I

understand the argument.  Are lost profits -- to use a term

1    of art maybe -- are they special damages?

2           MR. NELSON:  Lost profits are special damages.  We

3    believe enterprise value are special damages.  Those are

4    types of specific, pecuniary harm that we have detailed, and

5    I think that's in Paragraph 135 of our Complaint, Paragraphs

6    126 and 128 go to the expenditures.

7           But, yeah, so that is an additional reason.  Even

8    if we are somehow wrong about general damages, the fact that

9    we have pleaded them specifically get us in by Rule 9.

10          THE COURT:  What is your response to the arguments

11   that -- paraphrasing -- the Dominion Plaintiffs have

12   basically aggregated their harm together, and they need for

13   either diversity jurisdiction purposes or even for Rule 8 to

14   separate out the harm?

15          MR. NELSON:  Well, let's start where we agree,

16   which is that each Plaintiff does have to separately meet

17   the $75,000 standard.  I mean, that's black letter law and

18   we accept that.  What we have done is plead that.  Those

19   damages do go to each of the three.  And I think this is

20   where the point of divergence is.  We pleaded, especially

21   under the good faith allegation standard that we just talked

22   about, that the sum claimed by the Plaintiff controls.  They

23   go to each of the three Plaintiffs, each of the three

24   Dominion entities.  And Mr. Giuliani, when he defamed

25   Dominion, was not so careful to specify which entity he was

1    defaming.

2           When he said Dominion, he didn't say US Dominion,

3    Inc. or the Canadian Dominion company.  And by the way,

4    there is harm there.  We are able to recover worldwide harm

5    for defamation.  And the damage to enterprise value, the

6    damage to reputational harm, those are all going to every

7    single one of each of the three individual corporate

8    Plaintiffs that we have here, which more than satisfies our

9    standard under Rule 8 or Rule 9.

10          THE COURT:  Thank you.

11          MR. NELSON:  Thank you, Your Honor.

12          THE COURT:  So here is how I would like to conduct

13   the rest of the hearing.

14          Mr. Giuliani has, obviously, the argument around

15   the damages question that we've just been discussing, but

16   then has not made a personal jurisdiction or venue argument.

17   So I would like to hear from Mr. Giuliani's counsel on that

18   limited question.

19          Then I will go to defense counsel, and defense

20   counsel for the other Defendants will have an opportunity to

21   do a short reply, if they would like, on the argument that

22   we did before the break, but also to then do the personal

23   jurisdiction or venue arguments as well, just to make it a

24   little bit more streamlined.

25          So we will, essentially, go Mr. Giuliani, then

1    counsel for the other Defendants to do a reply to what we

2    have already discussed, plus the jurisdictional argument.

3    We will go to Dominion counsel to address personal

4    jurisdiction and venue only, and then if necessary a short

5    reply.

6         I know there are some questions about when I was

7    intending to be done.  I certainly hope that we can be

8    finished by 5:30.  I don't think have to spend a ton of time

9    on personal jurisdiction and venue.  Not because they are

10   not important questions but because I understand the issues.

11   We obviously deal with D.C. long-arm statute here a lot.  So

12   there's not anything difficult there.  It's just a question

13   of the allegations.

14        So that's how I would like to proceed.

15   Mr. Sibley?

16        MR. SIBLEY:  Your Honor, just a few points.  The

17   *Solers* case actually recognizes that *Martin-Marietta's*

18   interpretation of what damages are recoverable is correct.

19        Now, what they did was cited to a comment in the

20   statement that was cited, but that wasn't adopted as the law

21   of the District of Columbia.  And the other important thing

22   about that case, and I think we talked about it a little bit

23   earlier, that was a threshold -- did you meet Rule 8 to

24   plead a plausible claim to get a subpoena to a John Doe,

25   basically.

1        And the Court didn't get into the question if John

2   Doe had showed up and said, Hey, you didn't plead special

3   damages with specificity.  I don't think there is any

4   question that is dismissed under Rule 9(g).  And that's the

5   question the Court asked earlier as to whether there are any

6   cases that we have the held Rule 9(g) applicable to special

7   damages in a defamation setting.  I gave you the case of

8   *Golden Palace.*  In that case, Your Honor, Rule 9(g) is not

9   specifically referenced, but it basically gives the skeletal

10  outline of it, which is, you have to show loss of customers

11  or before and after profits.

12       There are multiple other cases and very recently.

13  It's a case called -- we did cite this in our brief -- it's

14  *Szymkowicz versus Frisch.*  It's just from last year.  In

15  Footnote 8 it talks about how the Plaintiff failed to

16  satisfy Rule 9(g) by pleading special damages in a

17  defamation case.  And it cites, actually, a Supreme Court

18  case, *FAA versus Cooper,* which we also cited in our brief,

19  which very clearly outlines the difference between per se

20  and per quod is that you have to show special harm.

21       Even if it were the case that you could have

22  damages in this circuit as a corporation that were not

23  special damages, they still haven't met the Rule 9(g)

24  standard for the special damages they have.  They haven't

25  adequately stated the lost profits as far as, What contracts

1    have you lost?  What is your before and after?  They just

2    haven't met the standard, it's very clear.  Not to mention

3    they haven't told us which Plaintiff supposedly has these

4    losses.

5         With all due respect, Your Honor, we are not

6    claming that you can't recover for reputational injury as a

7    corporate libel Plantiff in this circuit.  What we are

8    claiming is you can only measure that damage to the your

9    reputation in the form of special damages.

10         Now, *Martin-Marietta* says lost profits.  I've left

11   open the possibility that you could probably make an

12   argument -- I think His Honor was suggesting that somehow

13   these other costs might factor into profits.  I am not going

14   to limit it to specifically one type of special damages.  I

15   do think you could probably make that argument.  But you

16   certainly don't get some sort of fuzzy reputational injury

17   that you would ordinarily get.

18         Your Honor, we focused on these elements for our

19   motion, but we obviously think there are other problems with

20   their Complaint, we just haven't raised those at this point.

21              THE COURT:  I understand.  Thank you.

22              MR. NELSON:  And, Your Honor, may I be excused?

23              THE COURT:  You may be.

24              MR. NELSON:  Thank you, Your Honor.

25              THE COURT:  Thank you, Counsel.

1      I am now happy to take the rest of the Defendants

2 in whatever order they would like to proceed.  Obviously, we

3 started at the beginning with Ms. Powell or the Powell

4 Defendants.  I am happy to do it in that order, but if you

5 prefer to invert it, it's fine with me.

6      MR. PARKER:  Your Honor, Counsel, in response to

7 the 12(b)(6) arguments made by Dominion, I want to start

8 with the overarching issue, which was commented on.  The

9 standard that was articulated really is, Well, we have a

10 12(b)(6) motion here and a defamation claim, and if we make

11 out the defamation elements in the claim, because all of the

12 facts have to be accepted as true, we get by the 12(b)(6)

13 motion.  I mean, that is just not what the standard is here

14 today.

15      As the Court indicated, Well, but there is an

16 overlay of actual malice.  Yeah.  It's not just an overlay.

17 It is the centerpiece of at least the Motion to Dismiss for

18 MyPillow and I believe for Mike Lindell as well.

19      If you look at *New York Times versus Sullivan,*

20 there you had several ad claims that were false.  They were

21 admitted, known to be false, when the Court issued its

22 ruling and when the statements were made.  So you had

23 defamatory comments.  That is not the issue here today.  We

24 don't believe they are at all.  We believe they are

25 completely true.  It will be proven in the marketplace in

1    the public square that they are true.  But for purposes of

2    the judiciary and the judiciary's responsibility to the

3    constitution, the question becomes, was there actual malice

4    and where is that line drawn?

5            And the way to determine where that line is drawn,

6    at least in this jurisdiction, is to look at cases in

7    precedent, as the Court and I talked about when I was up

8    here a minute ago.  And I think those seven, eight, nine

9    cases in D.C. really do draw the line.  Even the summary

10   judgment cases, Your Honor.  The reason I say "even the

11   summary judgment cases" is while a summary judgment standard

12   was applied in those cases, even when all the facts were put

13   in front of the Judge, it couldn't make out a claim.

14           And so even though summary judgment cases are very

15   important -- and if you read through all of the cases, this

16   complaint simply comes nowhere near what is necessary.

17           THE COURT:  What is your response to Dominion's

18   argument that it's either a distinguishing factor between

19   this case and others or even perhaps just sufficient as a

20   matter of law to plead that the Defendant fabricated

21   evidence, which is at least enough for a juror to reasonably

22   conclude, indicates reckless disregard of knowledge about

23   falsity?

24           MR. PARKER:  My response to that is, if you had

25   facts to support and allege those facts, that the Defendant

1    fabricated information, you might be able to meet actual

2    malice.  That is not the case here.  It is a bald-faced

3    assertion, with not a single fact.  It is simply a

4    fabricated -- in fact, when it was raised by counsel, I was

5    a little surprised to hear it, because it is so buried in

6    the Complaint as a bald-faced allegation.  Nothing more.

7    There is no evidence of that whatsoever.  And the most

8    evidence that they could have is to suggest that Defendant

9    relied on a cyberstudy that made certain accusations that

10   they claim were fabricated.  That is yet another step

11   removed from what is necessary under the actual malice

12   constitutional standard.

13        The Court asks a question about inherent

14   improbability.  And it raises -- it kind of begs the

15   question of how outlandish does something have to be

16   inherently improbable?  Can a Plaintiff simply write a

17   115-page complaint and throw in a bunch of allegations and

18   say, Look at how crazy this is?  Could they have done that

19   as it relates to the Wuhan virology lab several months ago

20   and gotten somebody on defamation?  Maybe not this Plaintff

21   but another Plaintiff and said, Look at how crazy this is.

22   Front page of newspapers:  Debunked theory expressed by --

23   and people deplatformed.  It is not for this Court to make

24   those types of assessments unless there are specific facts

25   such has occurred in *Zimmerman.*  I would even go so far as

1    what occurred in *Palin.*  It's not in this circuit.  It's in

2    the second circuit, but there you had somebody where there

3    was evidence, a writer, an author, Bennett, where there was

4    evidence that he knew that what he was writing was false.

5          THE COURT:  Give me an example of a statement that

6    is inherently improbable, in your view, for purposes of a

7    Motion to Dismiss; so that it would at least allege enough

8    to let a jury conclude that the Defendant acted with

9    knowledge or reckless disregard.

10          MR. PARKER:  Well, *St. Amant* --

11          THE COURT:  Give me one in this case that is

12    related to the facts of the election.

13          MR. PARKER:  I don't think there are any in this

14    case that are completely inherently improbable.

15          THE COURT:  You can't think of a statement that

16    someone would have made that would be so inherently

17    improbable that a juror would get to decide whether it was

18    stated with actual malice?

19          MR. PARKER:  Well, it could be something like --

20    um -- they prevented Mr. Smith from going to the polls; and

21    the fact is, Mr. Smith had passed away a week before, and so

22    that was inherently implausible.  But I think the

23    hypotheticals articulated in *St. Amant* --

24          THE COURT:  That is more inherently improbable

25    than some of the statements that Mr. Lindell made here?

1          That is what you are asking me to conclude?

2               MR. PARKER:  Yes, that would be more.  If somebody

3     knows that someone had passed away and they said that they

4     had gone to vote and were prevented from voting --

5               THE COURT:  If all they said, Mr. Smith was

6     prevented from voting on Tuesday.  What is inherently

7     improbable about that?

8               MR. PARKER:  Well, if he passed away a week

9     earlier --

10              THE COURT:  I'm not saying that.  Inherit

11    improbability focuses on the statement.  My question is,

12    What is inherently improbable at a statement that Mr. Smith

13    was prohibited from voting on Tuesday?

14              MR. PARKER:  I think *St. Amant* gives us a little

15    instruction on this point.  And the Supreme Court identified

16    some hypotheticals.  Those hypotheticals simply, you know,

17    don't apply here.  If somebody indicates that something that

18    is not possible, and they know about it, that would be

19    inherently improbable, in fact, beyond the standard of

20    improbability.  If somebody said, you know, that car can fly

21    to the moon, that would be inherently improbable.

22              But there are things -- listen, the standard is

23    very broad, as it has to be.  Albert Einstein has shown us

24    that.  As things that were not known at all, he discovered,

25    that are absolute truths now that are accepted.

1          THE COURT:  But don't I have to conclude, at least

2   focusing on inherent improbability, that no reasonable juror

3   could conclude that statement X, whatever it is, was

4   inherently improbable?

5          I am not being asked for my own view.  I am posing

6   the standard of whether a juror could reach that conclusion.

7   So at a Motion to Dismiss stage, to ignore statements as not

8   inherently improbable, I have to conclude that all of those

9   statements are ones that no reasonable juror could conclude

10  were inherently improbable.

11         MR. PARKER:  That's correct, Your Honor.  But the

12  courts in this jurisdiction have given you guidance in that

13  regard.

14         THE COURT:  Sure.

15         MR. PARKER:  And there are several cases in which

16  all you need is some evidence on which you rely.  And if a

17  bunch of other people don't, and they think, Oh, you are

18  crazy, this is actually the way it happened, doesn't mean it

19  is inherently improbable.

20         So when you look at the evidence in this case, the

21  record, I should say, in this case, you have to look at the

22  Complaint.  But we have asked you to take judicial notice of

23  a number of facts that establish the context, which I have

24  already talked about, but also a number of facts which

25  support the very statements that Mr. Lindell made that

1       people are claiming are outlandish.

2              At Lindell Index, Pages 364, 365, November 21, a

3       report was put out by Ben Turner concluding that Dominion

4       machines used algorithms nationwide to adjust votes, one and

5       a half percent in favor of Biden and one and a half percent

6       lower for Trump.

7              Second, Lindell Index 427, 428, 430 and 432,

8       following the election, legislators from Arizona, New

9       Hampshire and Wisconsin all initiated investigations of the

10      2020 election, focusing particularly on Dominion machines.

11      Lindell Index 96, Georgia Standing Senate Judiciary

12      Committee, a legislative committee in Georgia, expressed

13      concern that Dominion machines can be programmed with

14      algorithm that reallocate votes between candidates.  That's

15      a quote.  Russell Ramsland issued a report.  They claim he's

16      been debunked, et cetera.  That's their view of it.  People

17      can believe something different.  And his report showed an

18      enormous error rate in the use of algorithms in Michigan.

19      Jovan Pulitzer hacked real time, at the Georgia Senate

20      Judiciary Committee, into a Dominion machine.  And the

21      committee wrote a letter discussing this hack and also

22      stating that in Fulton County they had an astounding 93.67

23      error rate.  This is a committee letter.  A legislative

24      committee letter.  Dr. Doug Frank --

25              THE COURT:  So, Mr. Parker, I apologize.  Not to

1  suggest this isn't important, but I want to make sure we get

2  to the personal jurisdiction arguments.  I think I

3  understand, for sure, the actual malice arguments.  And, you

4  know, I've read the papers and certainly will look at the

5  pages you've cited.

6  　　　　　　　MR. PARKER:  Thank you, Your Honor.

7  　　　　　　　THE COURT:  I think it would be good to argue why

8  you don't think there is personal jurisdiction here as to

9  your clients.

10  　　　　　　　MR. PARKER:  Your Honor, one comment that responds

11  to a statement made that is off of actual malice, as it

12  relates to Mike Lindell's statements, in any event,

13  MyPillow, very importantly, cannot be imputed because this

14  is a subjective state of mind element, cannot be imputed

15  with the subjective state of mind of Mike Lindell.  And that

16  is a matter of law in this jurisdiction under the *Secord*

17  case, as well as the McFarlane v. Esquire Magazine case.

18  The only way to impute liability when dealing with a

19  subjective state of mind standard is if they can establish

20  respondeat superior scope of employment.

21  　　　　　　　And nowhere in the Complaint are the words

22  "respondeat superior" stated.  Nowhere in the Complaint are

23  the words "scope of employment" used.  So this Complaint is

24  deficient as it relates to MyPillow, specifically related to

25  that.  And even if they were going to get around their

1    failure in pleading to try to argue, Well, this was all part

2    of his job, we have put in -- well, the fact is that when

3    you become a CEO, that doesn't mean that you check your

4    entire life and liberty and your personal opinions and views

5    at the door.  You don't.  You have the right to go out and

6    do.  And the company does not have direction and control

7    over Mr. Lindell in that regard and they never have.  And

8    there is no evidence or allegation to the contrary.

9            As it relates to jurisdiction; first, there is a

10   lack of minimum contact as it relates specifically to

11   MyPillow.  Sales in this jurisdiction are less than .1

12   percent.  You look at the *Burman* case, .15 percent was not

13   sufficient as contacts.  The number of events or advertising

14   that's been done, the word "extensive" keeps being used.

15   That is just a conclusionary statement.  In fact, we would

16   characterize it to very little to near none.

17           THE COURT:  I totally get your point about the

18   relationship between MyPillow and Mr. Lindell.  If

19   Mr. Lindell's statements can be imputed on whatever theory

20   to MyPillow, do you agree that those statements are then

21   relevant to both the defamation analysis and the personal

22   jurisdiction analysis?

23           MR. PARKER:  No.  There is a different analysis.

24   The analysis as it relates to liability and actual malice

25   requires a subjective state of mind element to be

1    established.  Therefore, it is a heightened standard which

2    has, again, come nowhere near being met by the Plaintiffs

3    and *Secord* and the McFarlane/Esquire case lead with that

4    point.  Now dealing with jurisdiction --

5            THE COURT:  Let's focus on Mr. Lindell for

6    personal jurisdiction purposes.  I get the distinction

7    between MyPillow and Mr. Lindell.

8            Are you aware of any case that has held that there

9    is not personal jurisdiction over an individual Defendant

10   who travels to a district multiple times and makes multiple

11   statements in person from that district that are alleged to

12   be defamatory?

13           MR. PARKER:  Well, first I would leave it to Mr.

14   Lindell's counsel to respond specifically as it relates to

15   individual, and the fact that I haven't fully researched

16   that issue because, you know, we believe that whatever he

17   did, they don't have jurisdiction over us.

18           THE COURT:  It doesn't flow to MyPillow either.

19   Right?

20           MR. PARKER:  Precisely.

21           But I would say that as it relates to the activity

22   of MyPillow and the district, sponsorship of the events in

23   question is insufficient.  This was not -- these were not

24   events that MyPillow put on.  These were not events where

25   MyPillow was the sponsor of.  They were a sponsor.  This is

1       not where there were numerous, long, pervasive series of

2       such events.  There were three different days.  That's it.

3       If you look at the *Citadel* case, you know, that indicates

4       that you are not responsible for those sorts of contacts or

5       you don't have jurisdiction with just that number of

6       contacts.

7            The *Burman v. Phoenix* case had traveled to D.C.

8       for continuing education programs numerous times, placed

9       1300 calls to the District of Columbia, provided accounting

10      services for a number of clients in the District of

11      Columbia, and still was not sufficient.  It was also the

12      case where only .15 percent of their revenue was found to be

13      in the district.

14           So the only way that they can tie MyPillow to this

15      case is by tying Mike Lindell as MyPillow.  And as we have

16      put in through affidavit, indicating that there was no

17      authorization, MyPillow has never made a political statement

18      about anybody.  None has ever been authorized or ratified.

19      Mr. Lindell has never been directed to make any such

20      statements.  These statements are his, and they were made on

21      his own.  The mere fact that the statements may have

22      redounded to a monetary benefit to the company does not

23      change any of that.  In fact, if it did, we are on a very

24      dangerous slippery slope where, for example, the Progressive

25      auto lady, who is the spokesperson for Progressive, and

1      everybody knows it.  Whatever she says or does and if she

2      gets sued and becomes a lot of notoriety and Progressive

3      ends up making a lot of money, can they end up getting sued?

4      No.

5              THE COURT:  Has MyPillow ever directed Mr. Lindell

6      to stop mentioning MyPillow when he talks about the

7      election?

8              MR. PARKER:  It's not in the record as ever having

9      occurred one way or the other but, again, Your Honor, this

10     was over a very short period of time.  And MyPillow doesn't

11     engage in silencing its employees.

12             THE COURT:  Well, but there is a difference

13     between silencing your employees and saying, Don't talk

14     about our company when out doing political activities.  Have

15     they ever said that to Mr. Lindell?  Have they ever said, We

16     don't want to silence your political activities in your

17     individual capacity but don't mention the company because

18     you are not supposed to be out there representing us?

19             MR. PARKER:  How could they say that when they are

20     out sponsoring the event?  They don't -- it doesn't mean

21     that they are supporting the statements that he has made.

22             THE COURT:  Thank you.  Thank you, Counsel.

23             I think it would be helpful to talk about

24     Mr. Lindell in personal jurisdiction.  I understand the

25     venue arguments and they are related.  I think those are

1          crystal clear.  Thank you, Mr. Parker.

2                    Mr. Daniels.

3                    MR. DANIELS:  Your Honor, ever so briefly.  And if

4          I am still speaking in 60 seconds, I expect a hearty scowl

5          from the Court, barring any questions.

6                    First, just as a reminder, the Court has the

7          unenviable task of not looking at all of the statements in a

8          generalized way that Ms. Powell is alleged to have made,

9          that Mr. Giuliani is, that Mr. Lindell is.  You have to look

10         at each one.  There are three separate lawsuits here.  So

11         each statement has to to be analyzed as to whether it raises

12         a sufficient, a plausible -- not possible but plausible

13         inference of actual malice.

14                   I wanted to answer the Court's question, because I

15         had the benefit of a few minutes of reflection on what would

16         have been an inherently improbable statement here.  I think

17         an inherently improbably statement or example of one, which

18         has not been alleged or made, would be that if aliens from

19         Mars came down and reprogrammed the machines or that the

20         machines are somehow used to take over the minds of the

21         voters before they cast their votes.  Those are two examples

22         of inherently improbable statements.  With that I will turn

23         the podium over to my colleague, Mr. Novosad, to argue the

24         personal jurisdiction.

25                   THE COURT:  Very well.  Thank you, Mr. Daniels.

1          MR. NOVOSOD:  Good afternoon, Your Honor.

2          THE COURT:  Good afternoon.

3          MR. NOVOSAD:  I will start by answering the

4     question you asked Mr. Parker.  I am unaware of any case

5     where a Defendant came and made several statements and that

6     was found not enough.  But our argument on (a)(3) and (a)(4)

7     really focuses more on the damage side than the conduct.

8     Because you have to show damage in the district for either

9     (a)(3) or (a)(4) to apply.

10         THE COURT:  Which, by the way, is one of the

11    reasons I was exploring earlier the question of the Giuliani

12    argument around the pleading of the harm and the damage,

13    because I knew it was also relevent to the long-arm statute

14    analysis.

15         MR. NOVOSAD:  Right.  And that is where I want to

16    begin.  First of all, Dominion doesn't have any voting

17    machines in the district.  There are no allegations that

18    they have anyone who votes here on their machines or any

19    evidence of any contracts.

20         So when they plead in Paragraph 159 of the

21    Compliant, against MyPillow and Mr. Lindell, that they've

22    lost investors or contracts or insurance, none of that ties

23    into the district.  You have to have a loss in the district.

24    When you add in the *Martin-Marietta* no reputational harm

25    that doesn't lead back to lost profits, they don't get to

1    say that we had reputational harm in the district and that's

2    enough.

3            THE COURT:  See, that's where you and Mr. Giuliani

4    now differ.  He conceds that reputational harm is cognizable

5    for corporations.  He just says there is a particular way to

6    measure it.  It's either lost profits or something else.  He

7    actually conceded, I think quite clearly, that corporations

8    can't pursue claims for reputational harm in defamation

9    cases.

10           MR. NOVOSAD:  I think that's right and I think

11   that that's correct, but it has to be measured in the sense

12   of lost profits.  There has to be a measurement.

13           THE COURT:  So Dominion alleges it suffered

14   reputational harm in the district.  That's not implausible

15   to me.  Hypothetically, at least, where you've had

16   statements made in the district that were heard by the

17   executive branch officials, Congress, and the like, and all

18   of the residents of the district, Dominion said it caused us

19   reputational harm here, like it did in 50 other places.  The

20   result of that was lost profit, but we suffered reputational

21   harm in the district and 50 other places.

22           MR. NOVOSAD:  I don't think they've alleged that

23   specifically with harm in the district.  The reputational

24   harm has to be measured by something definite like lost

25   profits or some other measure of damages, and that can be

1    suffered in the district, but they haven't alleged that.

2    And they haven't alleged lost profits here because they have

3    no contracts here.

4              THE COURT:  In your view, Dominion suffered

5    reputational harm in those districts -- again,

6    hypothetically -- where it lost contracts or didn't get

7    contracts or could prove it had specific lost profits in

8    that district?

9              MR. NOVOSAD:  I believe they have to show that

10   at some point.  And they can't do it in the district because

11   they have no contracts here, and there's been no allegation

12   that they tried to get any and haven't gotten them.  I think

13   that is on (a)(3) and (a)(4).

14             THE COURT:  So how about (a)(1)?

15             MR. NOVOSAD:  (a)(1), it comes back to -- there is

16   a dual conflation that Dominion is attempting.  They want to

17   use Mike Lindell as the agent of MyPillow for the statements

18   he made and use MyPillow for the agent of Mike Lindell for

19   their advertisements and sponsorship of events in D.C.  I

20   don't think you can do either one.

21             Mike Lindell, as Mr. Parker said, is the CEO but

22   is also the person who made personal political statements

23   that he believes.  He wasn't transacting business when he

24   made those statements.  And if there was any business he

25   transacted, whether it is renting a hotel room or eating

1    out, you have Subsection (b) that also requires the action,

2    the cause of action, to arise out of that business that he

3    conducted.

4         THE COURT:  If a competitor goes to another

5    district and defames its competitor, lies about the

6    competitor's business or something, are those statements

7    transacting business?

8         MR. NOVOSAD:  It could be.  If a competitor goes

9    to a different jurisdiction, though.  Now we are back under

10   423(a)(4).

11        THE COURT:  No, I am just asking really whether

12   defamatory statements made by another or by A, for the

13   purpose of -- I will put it this way -- improving its

14   business prospects -- in my hypothetical it is by defaming a

15   competitor -- is that transacting business, making those

16   statements?

17        MR. NOVOSAD:  I don't think so, Your Honor.

18        THE COURT:  Okay.

19        MR. NOVOSAD:  I think under the heightened

20   requirements for actual malice, it's not.  And that *IMAPizza*

21   case talks about how committing a tort is not doing

22   business.  So if you are defaming and that's your claim for

23   doing business, that's not enough.

24        THE COURT:  Thank you.

25        MR. NOVOSAD:  Can I talk --

1           THE COURT:  Please.

2           MR. NOVOSAD:  I have a couple points on venue.

3           THE COURT:  Oh, sure.  Of course.

4           MR. NOVOSAD:  On venue, Your Honor, I think from

5    the pleadings this case is transferable to Minnesota.  And

6    based on the concessions and really Dominion's brief, eight

7    of the nine factors lead to the conclusion that Minnesota is

8    the more appropriate court.

9           Just a couple of quick points.  Dominion relies on

10   two cases, *Exelon* and *Johns*, for the proposition that it's

11   not Your Honor's job to determine which is a more

12   appropriate venue.  They are actually right about that.

13   Those cases stand for that proposition but that was both

14   made in the context of a 12(b)(3) Motion to Dismiss for

15   improper venue.  We don't make that argument.  We are

16   seeking a 1404 transfer, which inherently requires a

17   comparative analysis.

18           And here, going back to the fact that they have no

19   machines in D.C., if you look at the transferee court's

20   interest, Minnesota not only has an interest in policing its

21   citizens, like MyPillow and Mr. Lindell, but there are

22   actually jurisdictions in Minnesota that used Dominion

23   machines in the 2020 election.  So I think the transferee

24   court's interest greatly outweighs any interest in D.C.

25           The last one is the transferee court's familiarity

1    with the law.  There is a curious argument that Dominion has

2    made between a primary and a secondary claim.  If they are

3    right about that designation, then they are admitting that

4    their DTPA claim is just an end run around the First

5    Amendment protections the defamation claim has or it's an

6    improper attempt to get attorneys fees when defamation

7    doesn't allow for those.  In that case, the DPTA claim

8    should be dismissed.

9          If they are truly two independent claims, then you

10   have a situation where, as we briefed, the defamation law

11   under D.C. or Minnesota, substantially similar, so that

12   would be a neutral factor.  But if the DTPA claim exists and

13   survives, then a Minnesota court is going to have more

14   familiarity with that claim than a D.C. court.

15         MR. NOVOSAD:  Thank you, Your Honor.

16         THE COURT:  Thank you, Counsel.

17         MR. KLEINHENDLER:  Your Honor, I do want to reply

18   to the defamation, but I just want to pick up on an issue

19   that you were raising.

20         Dominion cannot, as a matter of law, allege injury

21   in this district because the law is clear.  And I cite to

22   you the *Blumenthal versus Drudge* case, 992 F.Supp. 44, DDC

23   1998.  Injury of a defamation as a matter of law only occurs

24   where the Plaintiff lives and works.  Period.  They live and

25   work in Colorado.  They do not live and work here.

1          THE COURT:  I suspect that's a choice of law case,

2     and I haven't read it, and there is a lot of choice of law

3     analysis that determines where the Plaintiff's injury is

4     suffered.  It's not clear to me that that's right when you

5     are talking about harm to reputation.

6          MR. KLEINHENDLER:  Your Honor, harm to reputation

7     can only -- your reputation exists under this line of case

8     law, where you live.

9          THE COURT:  So you disagree with counsel that

10    Dominion could suffer lost profits wherever it loses a

11    contract?  You think Dominion can only suffer lost profits

12    in Colorado?

13         MR. KLEINHENDLER:  Dominion can only allege

14    defamatory injury.  Again, this is not -- if they had an

15    unfair competition claim, we could talk about that.

16         THE COURT:  I understand.  But your colleague, I

17    think, conceded that Dominion can suffer harm in multiple

18    fora.  It just has to be fora where specific things happen.

19    You are now arguing that's not right.

20         MR. KLEINHENDLER:  Right.

21         THE COURT:  You are saying that Dominion can only

22    suffer injury in one location.

23         MR. KLEINHENDLER:  From defamatory conduct.

24         THE COURT:  Right.

25         MR. KLEINHENDLER:  I disagree whole heartedly, and

1    I am pointing you to the law.  And there is a whole line of

2    cases on Page 12.  When you defame somebody and hurt their

3    reputation, they only are injured where they live.  Period.

4    That's the law.  And, I believe, therefore we said even if

5    you allowed them to amend, it won't help them, because they

6    are in Colorado.  They are not in the District of Columbia.

7    Period.

8         And that goes right to the jurisdictional argument

9    here, and I don't really have to add a lot to what they said

10   other than Ms. Powell and the rest of her Defendants are not

11   here.  And if you look at --

12        THE COURT:  Well, it's really only relevant under

13   the long-armed provisions (a)(3) and (a)(4).  It's not

14   relevant under (a)(1).

15        MR. KLEINHENDLER:  Correct.  And under (a)(1),

16   Your Honor, you need a systemic and sustained level of

17   business in the district.  They haven't come close.  They

18   haven't come within 100 miles of alleging that.  She came

19   in, made a couple press announcements.

20        I referred you to the *Butowsky* case, where the

21   Court ticked off all of the things the person did and said,

22   That's not enough.  Especially, when you are doing press

23   conferences that are going to the whole world.  And even her

24   website on the DTR.  The DTR website, it's not an

25   interactive website, and they make a point of that.

1          So I would just refer you to the papers.  But the

2     point I really want to make is there is no way they can

3     allege an injury here, and that ends the inquiry on the

4     judicial analysis.

5          Now, let me just get back to -- I want to kick it

6     off, Judge, because I know we are in a rush.  Okay?

7          So the first lawyer got up and said, Well, this

8     isn't about the lawsuits.  This is about a claim that

9     election -- the election voting machines were subject to

10    vulnerability and they were algorithms embedded in the

11    machines.

12         Your Honor, again, I refer you to the lawsuits.

13    And specifically Exhibit 9 -- sorry, Exhibit 10, which is

14    the Russell Ramsland affidavit.  He goes through at length

15    why there were algorithms.  And I will just read to you from

16    Paragraph 13, after multiple, extremely detailed and erudite

17    analyses, "This is consistent with our findings in Michigan

18    on Dominion machines where it is clear the RCV algorithm was

19    used to allocate votes instead of the winner being decided

20    by the votes themselves."

21         And they go through it at length here.  So this

22    notion that there were algorithms in the machine is based on

23    a sworn affidavit by a very, very reputable person, which

24    Ms. Powell was allowed to rely upon.  And there is no way

25    they can come to the heightened standard that this was

1    something that was done with malice.  Now, yeah, it's not

2    9(b), but malice requires a certain level of heightened

3    pleading; that's number one.

4         Now, number two, they say it is crazy to argue

5    that the problems with the machines were formalized in

6    Venezuela.  Okay.  Let's just go to the Venezuelan

7    affidavit, Exhibit 2 in front of you, and I would refer you,

8    Your Honor, to Paragraph 22, among the many paragraphs.  I

9    am just going to read it briefly.  "Dominion and Smartmatic

10   did business together.  The software, hardware and system

11   have the same fundamental flaws which allow multiple

12   opportunities to corrupt the data and mask the process in a

13   way that the average person cannot detect any fraud of

14   manipulation."

15        He goes on and on and he says, "The software

16   itself is the one that changes the information

17   electronically to the result that the operator of the

18   software and vote counting system intends to produce that

19   counts."

20        I would refer you, simply, to Paragraph 26.  "I am

21   alarmed because of what is occurring in plain sight during

22   this 2020 election for President of the United States," and

23   I am skipping.

24        "What happened in the United States was that the

25   vote counting was abruptly stopped in five states using

1    Dominion software.  At the time the vote counting was

2    stopped, Donald Trump was significantly ahead in the votes.

3    Then during the wee hours of the morning, when there was no

4    voting occurring and the vote count recording was off line,

5    something significantly changed.  When the vote reporting

6    resumed the very next morning, there was a very pronounced

7    change in voting in favor of the opposing candidate, Joe

8    Biden."

9         Now, we could talk about plausibility all day, and

10   I realize you have a difficult job.  However, *Tah* gives you

11   the roadmap.  And here we are not alleging out of thin air

12   that the voting machines changed votes.  We are not alleging

13   out of thin air that there was irregularity.  Here we are.

14   We are showing you some smoke.  They stopped the voting

15   count late, after 92 percent of the votes were counted.

16   Stopped in various cities that are very pro-democratic,

17   stopped for multiple hours, and then all of a sudden the

18   voting changes.

19        We have experts giving you statistical analysis.

20   Giving you analysis based on hard data that these changes in

21   the votes; that these anomalies, were not normal.  And Mr.

22   Ramsland goes on to say they were 99 percent statistically

23   abnormal, 99 percent statistically abnormal in detail.

24   Okay?

25        So the notion that Ms. Powell was saying things,

1    and even the quotes that we will refer to you, concede she

2    is saying, I have evidence.  I am going to show you

3    evidence.  Evidence is mounting.  Well, Judge, here is the

4    evidence.

5              THE COURT:  What is your response to Dominion's

6    argument that they've alleged that Ms. Powell falsified

7    evidence and that allegation is -- it's an allegation in the

8    Complaint; and that would be enough for a reasonable juror

9    to infer malice?

10             MR. KLEINHENDLER:  Let's talk about it.  They

11   talked about it on two matters.  So let's talk about it.

12   The first one we went through this morning -- sorry, earlier

13   this afternoon, that's Exhibit 6 in your book.  They are

14   claiming that this document, from the Secretary of State,

15   which talks about how great Dominion is, are falsified.

16             I argue to you that is not a defamatory statement.

17   It could not have been intentionally manipulated because it

18   counters the whole narrative.  Why would she manipulate,

19   falsely or knowingly submit a manipulated document that says

20   Dominion is the best machine and best thing since sliced

21   bread?  It makes no sense.  You can't make that inference.

22             The other challenge, Your Honor -- let's talk

23   about it -- is to the affidavit, which is not in your book,

24   of someone we refer to as Spider.  This man -- and it's

25   based on a Washington Post article.  The entire

1    falsification here is in one sentence.  Okay?  It's in

2    Paragraph 2.  It says, "I was an electronic intelligent

3    analyst under 305 military intelligence, with experience

4    gathering SANT missile system electronic intelligence."  He

5    says that sentence.  Then he goes on to all of his other --

6         It turns out, and this is after the fact, that he

7    did complete a seven-month course with the 305th, but that

8    afterwards he transferred.  Okay?  It's not technically

9    false, because he did finish his training course there.  And

10   if you look at the rest of his 10 or 11 pages, 18 pages, he

11   goes through in detail with backup as to why he believes

12   that the voting systems that Dominion have -- and let me

13   just read one important line here that he sums up.  I am on

14   Page 16 of his affidavit the end of Paragraph 21, Your

15   Honor.

16        He's talking about Dominion, "By using servers and

17   employees connected with rouge actors and hostile foreign

18   influences, combined with the numerous, easily discoverable,

19   leaked credentials, these organizations neglectfully allowed

20   foreign adversaries to access data and intentionally

21   provided access to their infrastructure, in order to monitor

22   and manipulate elections, including the most recent election

23   in 2020."

24        This conclusion, Your Honor, is based on 15 pages

25   of detailed analysis.  And it really doesn't matter if he

1   spent seven months with the 305th or seven years, because

2   the analysis is set forth in detail and this is sworn to.

3   There are no other allegations in this Complaint of

4   falsifying anything.  Moreover, I would just point to you,

5   they said that Ms. Powell had a preconceived notion of the

6   problem even before the election.

7          Okay.  Let's look at Exhibit 23, Your Honor.

8   Exhibit 23, in the book, is a statement by the Secretary of

9   State of Texas; and it's dated the 24th of January, 2020.

10  And they go through there why Dominion's voting system is no

11  longer being used in Texas.

12          If you go to the bottom of Page 2.  Your Honor, I

13  am going into the second full sentence on Page 2 of this

14  exhibit.  "Specifically, the examiner who looked at this,

15  reports raise concerns about whether the Democracy Suite,"

16  that's their system, "is suitable for its intended purposes,

17  operates efficiently and accurately and is safe from

18  fraudulent or unauthorized manipulation.  Therefore, the

19  Democracy Suite system and corresponding hardware devices do

20  not meet the standards for certification of the Texas

21  Election Code."

22          This was in early 2020.  So there was a basis to

23  doubt whether these machines were functioning effectively in

24  the election.  And this is straight from the State of Texas.

25          And, Your Honor, do you know who was one of the

consultants in the State of Texas in this analysis?  It was

Mr. Ramsland; and that's in the Michigan papers.  And,

again, I just want to correct -- the amended Complaint is

Michigan, which was filed four days after the original

Complaint, is where we have a lot of the allegations.

And Mr. Ramsland, in that proceeding, in his

Michigan affidavit, goes through at length all of the

efforts made in 2018 to show the principles, the elected

officials in Texas, that the Dominion systems were

vulnerable.  And it was Mr. Ramsland who came back here and

put forward his affidavit that we just went through.

So, Your Honor, we can go through -- you know,

they have 40 paragraphs.  And I would -- you know, if you

want, we are happy to submit supplemental briefing, if you

feel it is necessary, and take every one of the 40

statements and show you how it is in one of the pleadings.

And the last point I wanted to make on this is

counsel said, Well, she started talking about this on

November 8th, and yet she didn't file her Complaint until

weeks later.  It takes time to prepare a Complaint.  I would

refer you, Your Honor, to the *NAACP* case.  And this is

*NAACP versus Button,* 37 US at 436, where it specifically

stated, "broadly curtailing group activity leading to

litigation may easily become a weapon of oppression."

It then goes on to say, "it would pose the gravest

1    danger of smothering all discussion looking to the eventual

2    institution of litigation on behalf of the rights of the

3    members of unpopular minority."  Okay.  There it was

4    "unpopular minority."

5            But the point is statements made in anticipation

6    of litigation, when you actually do show up with the

7    pleadings, is part of the litigation privilege, especially

8    since the statements referred to here refer to evidence,

9    refer to what was ultimately placed before the public.

10           And unless you have any questions, that would be

11   it.

12           THE COURT:  Thank you, Counsel.

13           Madam Court Reporter, can we keep going just to

14   finish?

15           COURT REPORTER:  Yes, Your Honor.

16           THE COURT:  Thank you.

17           Very briefly, I would like to turn to Dominion.

18           MR. JOSEPH:  I am DTR.

19           THE COURT:  Please.  No, Please.

20           MR. JOSEPH:  I'm not sure I should be allowed to

21   do this but I am going to try because -- Dominion wasn't

22   formed until December 2nd, I believe, and some of this

23   happened in November.

24           THE COURT:  You mean DTR was not formed.

25           MR. JOSEPH:  DTR.  Right.  Sorry.

1          So Paragraph 92 of their Complaint says that, on

2     information and belief Powell would or someone reporting to

3     them doctored the document.  That doesn't say that Powell

4     did it.  So the notion that they've accused her of doctoring

5     evidence is close, but it's just a minor point that they

6     don't actually accuse her.

7          So the DTR points are pretty minor, and I will be

8     quick.  So under the (a)(3), (a)(4) and to some extent

9     (a)(1), they mention the address, the website and employees.

10    We submitted evidence that employees are contract employees

11    of counsel, at some firms, means a senior associate that is

12    an employee.  But that is not what it means according to

13    D.C. bar, ethics opinions 247, 255 and 338.

14         It basically means you're associationally tied for

15    imputed conflict purposes.  And there is a concern about

16    misrepresentation, if you allege an association you don't

17    have.  You don't have to be an employee.  So the fact that

18    these two contract employees use of counsel somewhere

19    doesn't make them employees.  So they didn't have employees

20    in the district.  We put in evidence to that effect.

21         THE COURT:  These two people were not DTR

22    employees.

23         MR. JOSEPH:  Correct.  And then there is a

24    declaration to that effect and it's not rebutted.  The

25    address was a mail drop.  The cases in this district say

1      you've got to look to what actually happened.  You can't

2      just say, Oh, they have an address.  You have to look to

3      what actually happened.  There is no pleading about

4      anything, because DTR doesn't do anything in the district.

5      And there is a declaration to that effect, unrebutted, and

6      they haven't alleged that we do.

7              The website is, as Mr. Keinhendler said,

8      non-interactive.  But even if it were interactive, that's

9      like if I am selling something from Guam here that is

10     poisoned or deleterious in some way, then the person, if I

11     have a sufficient market share into this district, can maybe

12     have a due process analysis that brings me here.  But that's

13     -- it's not 423(b).  Whatever DTR did on the website has no

14     real connection to the harms that they are alleging.

15             And, basically, they just define the three Powell

16     entities -- I shouldn't have said that -- Powell, Powell PC

17     and DTR, they just sort of define them as one without

18     breaking down the allegations as to each.  They don't really

19     make an alterego claim.  There is an agency claim that they

20     allude to, but there is no allegations about the scope of

21     the agency.

22             There is also a temporal problem there because

23     what actually happened in D.C. was in November before DTR's

24     formation.  Whatever the scope of Powell's agency

25     relationship with DTR, it clearly didn't exist when the D.C.

1    allegations of the press conference and the communicating

2    with the media while in D.C, that wasn't while DTR was on

3    the table.

4              THE COURT:  Thank you, Counsel.

5              MR. JOSEPH:  Thank you.

6              MS. MEIER:  Good afternoon, Your Honor.  Megan

7    Meier for Dominion.

8              THE COURT:  Ms. Meier.  Yes, thank you for the

9    reminder.

10             MS. MEIER:  I will be addressing some of the venue

11   and personal jurisdiction arguments with respect to

12   Ms. Powell, Defending the Republic and Ms. Powell's lawfirm.

13   My colleague, Davida Brook, will be handling those arguments

14   with respect to MyPillow and its founder, CEO and

15   spokesperson, Mike Lindell.

16             There is a reason why Sidney Powell, her client,

17   General Michael Flynn, Rudy Giuliani, Patrick Byrne and

18   MyPillow's spokesperson and their allies did not converge in

19   Texas or Minnesota to wage the defamatory campaign giving

20   rise to this case.

21             They came to Washington, D.C. because Washington,

22   D.C. was the center of the action.  Washington, D.C. was the

23   place where they could get in-person audiences with members

24   of the Trump campaign, with the Republican National

25   Committee, with Mr. Trump in his capacity as a candidate.

1  Washington, D.C. was the place where Powell could become a

2  household name by hosting a defamatory press conference

3  aside the President's attorney, Rudy Giuliani, in the

4  National Committee Headquarters, just a couple miles away

5  from here.

6          The very object of their defamatory campaign was

7  not who should rightfully reside in the Governor's mansion

8  in Texas or Minesota, but who should rightfully reside in

9  the White House here in Washington, D.C.  Washington, D.C.

10 was the only place where they could hold marches and rallies

11 within striking distance of the United States Capitol, where

12 the certification of the 2020 United States presidential

13 election was delayed because people marched through

14 Washington, D.C. from a MyPillow-sponsored rally, at which

15 Rudy Giuliana had spoken defamatory lies about Dominion, and

16 those people marched through Washington, D.C. to the United

17 States Capitol to disrupt that vote.

18         And in their briefing, the Defendants have the

19 temerity to argue that the fact that this court is congested

20 from the events of January 6th, means that this court should

21 not be the one to resolve these cases?  If anything, the

22 events of January 6th and the fact that those people were

23 fooled by the Defendants' lies, shows why this is the court

24 that must resolve these cases.

25         Now, I heard opposing counsel say that there's no

1    jurisdiction because Dominion is not in D.C. and therefore

2    it can't be injured in D.C.; that's contrary to black letter

3    law.

4            In the *Steineberg versus Interpol* case, which was

5    a case about personal jurisdiction arising under (a)(4), the

6    prong of the D.C. long-arm statute requiring injury in the

7    district, a Florida Plaintiff, was able to bring a

8    defamation claim against Interpol, which acted from France,

9    which never set foot in the district, which sent a single

10   defamatory document to its liaison here in D.C.  This court,

11   DDC, dismissed the case for lack of jurisdiction and the

12   D.C. Circuit reversed.  The Plaintiff does not need to be a

13   resident of D.C. to be harmed here to satisfy the

14   jurisdictional inquiry under the fourth prong of D.C.'s

15   long-armed statute.

16           Now, the contacts in this case far exceed, far

17   exceed, the limited contacts that Interpol sent a piece of

18   mail into D.C.  Defending the Republic receives mail here,

19   as confirmed by the affidavit of its one-time CEO Patrick

20   Byrne, who we now understand has resigned as CEO after less

21   than a month.  DTR receives mail here.

22           THE COURT:  Do you concede there isn't personal

23   jurisdiction over DTR unless Ms. Powell's conduct is --

24           MS. MEIER:  Absolutely not.

25           THE COURT:  So what did DTR do to injure Dominion

1      in the district, independent of Ms. Powell's conduct?

2              MS. MEIER:  Independent of Ms. Powell's conduct?

3              THE COURT:  Yeah.

4              MS. MEIER:  Defending the Republic posted on its

5      own website defamatory statements at issue in this case, not

6      just of the lawsuits and so forth.  The media appearances,

7      multiple media appearances that Powell gave from here within

8      the district Defending the Republic put them on its website

9      where it raises funds.  That also injuries Dominion in the

10     District of Columbia and everywhere else.

11             THE COURT:  Were those actions by DTR transacting

12     business or tortious acts taken in the district or are those

13     acts that were taken outside of the district that you say

14     "injured Dominion in the district"?

15             MS. MEIER:  Those actions were taken within the

16     district.  We allege Powell was here -- she was here in the

17     district.

18             THE COURT:  I'm trying --

19             MS. MEIER:  And she controls the contents of

20     Defending the Public's website.  She is the one controlling

21     what is happening, what is going on the DTR website, and she

22     was here in DC at the time.  She is here in the district

23     controlling what is being put on Defending the Republic's

24     fundraising website.

25             THE COURT:  Go ahead.

1            MS. MEIER:  It's late so I am going to pause and

2     ask if Your Honor has any questions for me on jurisdiction

3     or venue or the DTPA claims.  If not, I will hand it over to

4     my colleague, Davida Brook.

5            THE COURT:  Certainly not on venue.  I think it

6     would be helpful for one or the other view to briefly

7     address this question about where a corporate Plaintiff --

8     there is some limitation, we all agree, on the kinds of harm

9     or the kinds of damages it can recover.  Where does a

10    corporate defamation Plaintiff suffer harm for purposes of

11    thinking about the D.C. long-arm statute and did Dominion do

12    so in D.C.?

13           MS. MEIER:  Absolutely, Your Honor.

14           So I think there are two different things going on

15    here.  There is the question, as you said, there is a choice

16    of law question about where brunt of injury is felt, and

17    which state has the most significant relationship, and where

18    is the brunt of the injury felt?  That's not the question

19    here.  The question is, is there an injury to a corporate

20    brand when someone comes into D.C. and tells influential

21    D.C. audiences, with enormous Twitter followings, lies about

22    that company knowing and foreseeing that lies would be

23    republished by the influential DC-based audience.

24           Dominion's reputation was irrevocably damaged to

25    very influential people here in D.C. because while

1    physically here in D.C. they heard these Defendants defaming

2    Dominion and saying lies about the company, saying that the

3    company was found to rig elections and so on and so forth.

4    In the minds of those people right there in D.C., hearing

5    those lies, Dominion's brand is damaged.  Its ability to get

6    new contracts and win new contracts is impaired everywhere,

7    including in D.C.

8              THE COURT:  One other question.  Does Dominion

9    allege that Ms. Powell engaged in fundraising for DTR when

10   she was physically located in Washington, in this district?

11             MS. MEIER:  I'm sorry.  I want to make sure I

12   understand the question.  You are asking, Did she fundraise

13   for Defending the Republic while she was in D.C.?

14             THE COURT:  Yes.

15             MS. MEIER:  Yes.  Let me point you to specific

16   allegations in our Complaint.  So, for example, these are

17   just examples -- there are a lot.

18             On December 7th on News Max, Ms. Powell went on a

19   News Max program, defamed Dominion, directed traffic to the

20   Defending the Republic website, then posted that defamatory

21   media appearance on the website as well.

22             On December 10th, Ms. Powell, from within

23   Washington, D.C. appeared on the Lou Dobbs program, defaming

24   Dominion and directing people to the Defending the Republic

25   website, when posted that defamatory media appearance on the

1    Defending the Republic website.

2            On December 13th, Ms. Powell appeared on an Epoch

3    Times -- did an appearance with the Epoch Times, defamed

4    Dominion, directed people to the Defending the Republic

5    website, and of course, posted it to the Defending the

6    Republic website.  The citations for each of those are

7    Paragraph 181(x) of our Complaint; Exhibit 26; Paragraph 85

8    of our Complaint; Paragraph 181(z); Exhibit 27 of our

9    Complaint; and Paragraph 181(aa); and Exhibit 28 of our

10   Complaint.  There are other examples.  I don't want to be

11   here all night.  They are in our Complaint.  I can continue

12   if you'd like.

13           THE COURT:  No, that's fine.  Thank you,

14   Ms. Meier.

15           MS. MEIER:  I will hand it off to my colleague,

16   Davida Brook, unless you have other questions.

17           THE COURT:  No, that's great.  Ms. Brook.

18           MS. BROOK:  Good afternoon, Your Honor.

19           My colleague is putting up a slide presentation.

20   Brittany, I will just take the clicker when you are ready.

21           I am here to address the arguments relating to

22   person jurisdiction and venue as to MyPillow and

23   Mr. Lindell.  I will try to be concise.  I have three main

24   points, three ancillary points as to jurisdiction.

25           Lindell's and MyPillow's argument for why they

1    shouldn't be subject to personal jurisdiction in this

2    district basically come down to three main arguments.  The

3    first one is they simply ignore the allegations in the

4    Complaint and say that we haven't adequately pled the

5    substantial ties with this district.  That's false.  And I

6    will show why.

7           The second is sort of a reverse finger-pointing.

8    Right?  Lindell says he's not responsible for MyPillow.

9    MyPillow says he's not responsible for Mr. Lindell.  And

10   therefore everyone gets off the hook.  That's incorrect and

11   I will explain why.  So I will briefly touch on that.

12          Regarding the allegations in the Complaint, we

13   submitted a slide deck to the Court earlier today.  It's

14   going up now.  I won't take the time to go through it in

15   detail, though I invite the Court to do it at its leisure.

16   Essentially, the point of it is --

17          Do you have the clicker?  Ms. Fowler, you can

18   start scrolling through it as I talk.

19          Lindell says in its Complaint one isolated remark

20   about his business during one appearance is insufficient to

21   subject Lindell to personal jurisdiction of this court.

22   It's obviously not what we allege.  We allege many, many,

23   many, remarks about MyPillow from Mr. Lindell in this

24   jurisdiction.

25          Similarly, MyPillow writes, "Other than a vague

1    allegation that MyPillow advertises and sells its products

2    in the District of Columbia, Dominion has not identified any

3    specific contact of MyPillow itself in the district."

4    That's also wrong.  We talked about the four rallies that

5    MyPillow hosted in this district including rallies in front

6    of the Capitol building, rallies in front of the White

7    House, et cetera.

8            So that framework for their analysis that we have

9    not alleged that they came here and that they advertised

10   here, that they used promo codes here, that they met with

11   key figures here, received endorsements for their products

12   here, is simply not true.

13           The second argument, again, is that I am not

14   responsible for him.  He's not responsible for me.  On that

15   one, again, the slide show goes through the complete overlap

16   between these two, the individual and the entity.  Right?

17           Every single time Mike Lindell appears, he is

18   identified as the CEO and founder of MyPillow.  In fact,

19   when Mr. Lindell's counsel introduced him to the Court, he

20   made sure to point out that he is the cofounder and CEO of

21   MyPillow.

22           I'll let the Court go through these slides in more

23   detail on its own, but I want to direct it, in particular,

24   to two important citations, regarding MyPillow's

25   responsibilities for Mr. Lindell's actions.  We've talked a

1   lot today about reasonable men in the inference standard.

2   The case *Washington Gas-Light Co. v. Lansden,* which is cited

3   in our briefs and in their bries says the following about

4   the agency test:  "If different inferences might fairly be

5   drawn from the evidence by reasonable men, then the jury

6   should be permitted to choose for themselves."  That is at

7   pincite 545.

8              I submit to the Court when you look at all of the

9   evidence in the Complaint, of advertisements of MyPillow

10  being put right alongside Mr. Lindell's statements.  This is

11  the first clip almost of Mr. Lindell's Absolute Proof video,

12  which he begins by talking about how he's been canceled.

13  His company has been canceled by all of these other

14  companies.  Of course, many, many, many of the defamatory

15  statements come linked with promo codes from MyPillow, that

16  MyPillow of course accepted.  Those worked.  Someone at

17  MyPillow made it possible for you to enter Mike or QAnon, or

18  Fight for Trump, et cetera.

19             THE COURT:  What is your response to the MyPillow

20  argument that Mr. Lindell was never authorized by the Board

21  to engage in these activities or at least to engage in these

22  activities on MyPillow's behalf?

23             MS. BROOK:  It's the same case, Your Honor.  It's

24  the *Washington Gas-Light Co.* case, which they cite and which

25  we cite back at them, which says in no uncertain terms, that

1    you don't need explicit written board authorization to do

2    so.

3          The question is whether we put forth allegations

4    sufficient for a reasonable person to infer that that

5    authority was granted.  I submit we have an abundance.  In

6    fact, I can't think of a case where you could have more

7    allegations showing that the company has stood by what the

8    CEO has said, sponsored the rallies over and over and over

9    again.  They let him speak at rallies, over and over and

10   over again.  They accepted the promo codes over and over and

11   over again.

12         So I think that question, at a minimum, regarding

13   the reverse finger pointing whether or not Lindell is

14   responsible for MyPillow, the case cite there is the

15   *IMAPizza* case, which we've talked about a little bit

16   throughout the day.  And the quote is, "Similarly, the

17   fiduciary shield rule does not protect corporate agents who

18   were not mere employees, but high-ranking officers

19   responsible for the corporate policies that gave rise to the

20   Plaintiff's claims."

21         That's what we have alleged here.  Right?  This

22   isn't some random employee who was off on his personal time

23   engaging in personal activities.  This was the CEO, founder,

24   inventor and spokesperson for the company, who we allege had

25   every authority from the company to be taking the actions

1    that he was taking.

2         We also allege, just to be clear, that besides the

3    profits to MyPillow, he benefited from it personally.  Those

4    allegations are in Paragraph 93 of the Complaint, where

5    Mr. Lindell is quoted as talking about what he is going to

6    do with the profits.  He says, I am going to use the profits

7    for good.  He says it on Inauguration Day.

8         Paragraph 152 of the Complaint, we talk about how

9    he used this marketing campaign to sell his own books.

10         Paragraph 153 of the Complaint, we talked about

11    how he used this defamatory marketing complaint to secure an

12    endorsement from Trump for what would be gubernatorial run

13    in Minnesota.

14         And then Paragraph 95 of the Complaint is a great

15    example of how this, "I am not responsible for him, he is

16    not responsible for me" argument collapses.  That talks

17    about how just days after Twitter banned Mr. Lindell from

18    posting to that website.  It had to ban MyPillow, because

19    Mr. Lindell had circumvented the ban by simply using the

20    MyPillow Twitter account that he clearly had control over to

21    make postings there.  That is the second argument, the

22    nobody-is-responsible argument.

23         Regarding injury, the original argument that both

24    Defendants made in their briefs was the one that my

25    colleague, Ms. Meier, addressed.  Right?  That injury can

1    only be felt in the place where the Plaintiff is domiciled.

2    I think the Court hit that square on the head.  It is a

3    choice of law analysis.  It's not an injury analysis and

4    there are multiple cases, including the *Steinberg* one my

5    colleague spoke about, as well as *Keeton v. Hustler* the

6    Supreme Court case they say that that is not true.  In fact,

7    under the single publication rule, the firm awards damages

8    for injury in all states, and that's how defamation law is

9    treated.

10          So they've pivoted a little bit in argument today

11   to two other arguments.  The second argument that they are

12   now advancing, which is a relatively new one, is that

13   Dominion doesn't have contracts in this district.  As the

14   Court pointed out numerous times today, we allege that we

15   are are likely to lose perspective contracts in this

16   district and, frankly, nationwide.  That's in the Lindell

17   and MyPillow Complaints at Paragraph 159.

18          And then you have the third, and second new

19   argument that they've advanced today, which is *Marietta.*  I

20   think what happened, there was a failed got you moment.

21   *Marietta* was not cited by Lindell or MyPillow in their

22   briefs.  It came up over the past 24 hours in the parties'

23   correspondence with the Court.  They saw it.  They grasped

24   on to it as an opportunity to argue that we could not

25   possibly be injured in this district because we are a

1    corporate Defendant.  As Mr. Giuliani's counsel conceded,

2    that's not what *Marietta* stands for.  So they've, in fact,

3    now kind of conceded we have been injured in this district,

4    sufficient to satisfy (a)(3) or (a)(4).  I think they are

5    out on a limb there as well.

6           Also, I just want to draw the Court's attention

7    there that the *Solers* case and the Me MedX case, group case

8    that we talked about today, the Plaintiffs there are not

9    D.C. based corporations.  They were both foreign

10   corporations, Virginia and I believe Florida.

11          So those are the three main points, their three

12   main arguments.  I think they all fail.  I think we clearly

13   have jurisdiction under (a)(1), (a)(3) and (a)(4).  As the

14   Court well knows, we only need it under any one of them.

15          Three minor points, they've used an argument a lot

16   in their briefing, and it goes to the venue analysis as

17   well, that only 25 percent of the statements are alleged to

18   have taken place in this district.

19          First of all, obviously, one statement would be

20   enough to find personal jurisdiction, that's the *Steinberg*

21   case, amongst others, but I want to clarify something so the

22   Court doesn't get led down the wrong path.  We were very

23   conservative and careful in our pleading.  We felt confident

24   alleging that 25 percent of the statements were made in this

25   district.  We don't say the other ones were made in

1    Minnesota and neither do they.  None of their declarations

2    or affidavits say, you know, I, Mike Lindell, was sitting on

3    my couch in my house in Minnesota when I said X, Y and Z

4    statement.

5            The second small, distinguishing factor is the

6    Flo/Progressive points.  We are obviously not trying to say

7    if Mike Lindell is out on a personal vacation and he says

8    something not having anything to do with MyPillow or the

9    company, that MyPillow gets dragged into court.

10           I think we can all recognize that if Flo were to

11   say something in a Progressive commercial that Progressive

12   had produced and blessed and never retracted, that that is a

13   statement that would be imputed to Progressive.

14           The two cases are my last point that they cite,

15   *Citadel* and *Burman.  Citadel*, of course, talks about trade

16   shows, which is incredibly different than sponsorship of the

17   rallies, the four rallies we have issue here.

18           The *Burman* case, as the Court knows from reading

19   that case, it is a very different situation where the

20   Defendant was operating on behalf of a sort of secondary

21   Defendant.  So there weren't direct allegations of actions

22   in this district.

23           On transfer, I will be really brief, unless the

24   Court has any questions.  There's five factors.  It comes

25   back to the same blinders that I've been talking about for

1   the last five minutes or so.  The question is not whether or

2   not they prefer to be in Minnesota or here.  The question is

3   where a substantial part of the events took place.  A

4   substantial part of the events took place in this district.

5   So that weighs in favor of keeping this action here.

6   Minnesota is no more convenient than Washington.  They talk

7   about all of the witnesses and all of the documents that are

8   in Minnesota, but they don't actually list any or cite any.

9   As is evident from this courtroom today, the key defendants

10   and faces in this action are spread out all over the

11   country.  And as also evident in this courtroom today, they

12   have no problem traveling to Washington, D.C. in order to

13   prosecute and defend this case.

14        Michigan law does control the primary cause of

15   action here.  We have been at this for three-plus hours, and

16   I don't believe Minnesota law has come up once.  I think

17   that speaks for itself.

18        And as my colleague, Ms. Meier, pointed out, the

19   median time from filing to disposition is essentially the

20   same.  And to the extent there is a difference, it is in

21   some ways attributed to the actions that are at issue in

22   these cases.  So we would contend that D.C. has the local

23   interest and that Your Honor should keep them here.

24        THE COURT:  Thank you, Counsel.

25        I don't think I need a reply on the personal

1    jurisdiction venue points.  I certainly get the arguments,

2    and we have been at this for quite a while now.

3             I thank everyone for the argument this afternoon.

4    I am taking all of the motions under advisement.  It's a 99

5    percent likelihood that I will write an opinion on the

6    motions.  I guess I should say opinion or opinions,

7    depending on whether I decide to do opinions that are

8    case-specific or if I just do one omnibus one.

9             What that means, I think, is I won't be conducting

10   another hearing to do an oral disposition or ruling.  It

11   will be written.  It also means that very likely the next

12   time you hear from me will be through that opinion and a set

13   of orders.  And, obviously, depending on whether I am

14   granting in part or not the motions or in whole, that will

15   effect the rest of the case as it is here.

16            So unless there are other non-Motion to Dismiss

17   topics we should discuss -- and I don't want to hear

18   anything more on the substance.  I think we have been at it

19   long enough on that.  If there are no other topics, I think

20   we can adjourn, and then you will just hear from me.  But if

21   someone has something that does not relate to the motions,

22   feel free.  Counsel?

23            UNIDENTIFIED SPEAKER:  We just have a housekeeping

24   matter.  We would like to present a hard copy and electronic

25   copy of our slide deck.

1              THE COURT:  That's fine.  In fact, I would invite

2    everyone who had a slide deck to hand it to Ms. Lesley, hard

3    or electronic or both, if you haven't already.  That's just

4    fine.  Any other issues, housekeeping or otherwise, we

5    should discuss, Counsel?

6              [No response]

7              Thank you.

8              COURTROOM DEPUTY:  Court is adjourned.

9              (Proceeding concluded at 6:10 p.m.)

1                    **C E R T I F I C A T E**

2

3              I, **Lorraine T. Herman, Official Court**

4     **Reporter,** certify that the foregoing is a true and correct

5     transcript of the record of proceedings in the

6     above-entitled matter.

7

8

9

10

11      _____**July 2, 2021**_____          ___**/s/**_____
                **DATE**                        **Lorraine T. Herman**
12

13

14

15

16

17

18

19

20

21

22

23

24

25