# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| US DOMINION, INC., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:21-cv-00445-CJN |
| | ) | |
| MY PILLOW, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## DEFENDANT MY PILLOW, INC.'S ANSWER TO COMPLAINT AND COUNTERCLAIM AGAINST ALL PLAINTIFFS

Defendant My Pillow, Inc. ("Defendant" or "MyPillow"), as and for its Answer to the Complaint of Plaintiffs U.S. Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation (collectively, "Plaintiffs" or "Dominion") in the above-entitled matter, denies each and every allegation contained therein, unless otherwise admitted or qualified herein, and states and alleges as follows:

1.      The subheadings in the complaint are not numbered paragraphs pursuant to Fed. R. Civ. P. 10(b) and do not require a response. To the extent that a response is required, the subheadings are denied.

2.      MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 1 about Michael Lindell personally, and such allegations are denied. My Pillow denies all allegations in Paragraph 1 that are directed to MyPillow. MyPillow expressly denies all wrongdoing alleged in the Complaint, including

all allegations of defamation, defamation *per se,* deceptive trade practices, and punitive damages. MyPillow affirmatively states that Michael Lindell did not make any statements concerning the 2020 election as an agent of MyPillow.

3.      The allegations in paragraphs 2 and 3 are denied.

4.      The allegations in paragraph 4 are denied.

5.      The allegations in paragraph 5 are denied.

## PARTIES

6.      MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 6.

7.      MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 7.

8.      MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 8.

9.      MyPillow admits the allegations in Paragraph 9.

10.     Regarding the allegations in Paragraph 10, MyPillow admits only that Michael Lindell is the founder and CEO of MyPillow and a resident of Minnesota. All other allegations in Paragraph 10 are denied.

## JURISDICTION AND VENUE

11.     The allegations in Paragraph 11 are admitted.

12.     The allegations in Paragraph 12 are denied.

13.     The allegations in Paragraph 13 are denied.

14.     The allegations in Paragraph 14 are denied.

## FACTUAL ALLEGATIONS

15.     Regarding the allegations in Paragraph 15, My Pillow admits that Michael Lindell founded a company in 2004 that became MyPillow, Inc., and he personally appeared in MyPillow commercials. MyPillow admits that rather than fight the allegations against MyPillow, MyPillow made a business decision to prevent long and costly litigation, pay a fine, and move on. The remaining allegations in Paragraph 15 are denied. The allegations in Paragraph 15 regarding another lawsuit have no relationship to Plaintiffs' claims and violate Fed. R. Civ. P. 8(a)(2) as immaterial and impertinent.

16.     Regarding the allegations in Paragraph 16, MyPillow admits that rather than fight the allegations against MyPillow, MyPillow made a business decision to prevent long and costly litigation, pay a fine, and move on. The remaining allegations in Paragraph 16 are denied. The allegations in Paragraph 16 have no relationship to Plaintiffs' claims and violate Fed. R. Civ. P. 8(a)(2) as immaterial and impertinent.

17.     Regarding the allegations in Paragraph 17, MyPillow admits that rather than fight the allegations against MyPillow, MyPillow made a business decision to settle the litigation and move on. MyPillow was disappointed that BBB lowered its rating of MyPillow. The remaining allegations in Paragraph 17 are denied. The allegations in Paragraph 17 have no relationship to Plaintiffs' claims and violate Fed. R. Civ. P. 8(a)(2) as immaterial and impertinent.

18.     Regarding the allegations in Paragraph 18, MyPillow admits its revenue exceeded $300 million in 2019. The remaining allegations in Paragraph 18 are denied. The allegations in Paragraph 18 violate Fed. R. Civ. P. 8(a)(2) as immaterial and impertinent.

19.     Regarding the allegations in Paragraph 19, the first, third, and fourth sentences are denied. The second sentence is admitted. MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in the last sentence, and such allegations are accordingly denied. MyPillow affirmatively alleges three footnotes in Paragraph 19 cite nonexistent pages (pages "351-54") of a book by Michael Lindell which ends at page 325.

20.     Regarding the allegations in Paragraph 20, MyPillow admits Michael Lindell has appeared on Fox News's *Tucker Carlson Tonight*. MyPillow admits Tucker Carlson has introduced Lindell on one of his shows. The remaining allegations in Paragraph 20 are denied. The allegations in Paragraph 20 violate Fed. R. Civ. P. 8(a)(2) as immaterial and impertinent. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 20 as an agent of MyPillow.

21.     The allegations in Paragraph 21 are denied. The allegations in Paragraph 21 violate Fed. R. Civ. P. 8(a)(2) as immaterial and impertinent.

22.     Regarding the allegations in Paragraph 22, MyPillow admits Michael Lindell met President Trump at a White House event in July 2017 where President Trump complimented MyPillow's pillow. MyPillow admits Lindell has been a vocal supporter of President Trump. MyPillow denies that Paragraph 22 accurately quotes Donald Trump's statement. MyPillow denies that Michael Lindell spoke the words attributed to him in Paragraph 22. The remaining allegations in Paragraph 22 are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 22 as an agent of MyPillow.

23.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 23, and such allegations are accordingly denied. The allegations in Paragraph 23 violate Fed. R. Civ. P. 8(a)(2) as immaterial and impertinent. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 23 as an agent of MyPillow.

24.     Regarding the allegations in Paragraph 24, MyPillow admits Michael Lindell is "good at math," and that "numbers came easy to him," including "percentages, ratios, [and] odds." The remaining allegations in Paragraph 24 are denied. The allegations in Paragraph 24 violate Fed. R. Civ. P. 8(a)(2) as immaterial and impertinent.

25.     Regarding the allegations in Paragraph 25, MyPillow admits Michael Lindell was a professional card player and at times feigned being intoxicated at the card table. The remaining allegations in Paragraph 25 are denied. The allegations in Paragraph 25 violate Fed. R. Civ. P. 8(a)(2) as immaterial and impertinent.

26.     Regarding the allegations in Paragraph 26, MyPillow admits Michael Lindell loved game theory. The remaining allegations in Paragraph 26 are denied. The allegations in Paragraph 26 violate Fed. R. Civ. P. 8(a)(2) as immaterial and impertinent.

27.     Regarding the allegations in Paragraph 27, MyPillow admits Michael Lindell is a numbers guy. The remaining allegations in Paragraph 27 are denied. The allegations in Paragraph 27 violate Fed. R. Civ. P. 8(a)(2) as immaterial and impertinent.

28.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 28 and such allegations are accordingly denied.

29.     Regarding the allegations in Paragraph 29, MyPillow affirmatively states that Michael Lindell no longer has access to his Twitter account and cannot confirm the accuracy of the tweet referenced in Paragraph 29. Therefore, MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 29 and such allegations are accordingly denied.

30.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 30, and such allegations are accordingly denied.

31.     The allegations in Paragraph 31 are denied.

32.     The allegations in Paragraph 32 are denied.

33.     Regarding the allegations in Paragraph 33, MyPillow admits the quote from the CISA Joint Statement is correctly stated. The remaining allegations of Paragraph 33 are denied.

34.     The allegations in Paragraph 34 are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 34 as an agent of MyPillow.

35.     The allegations in Paragraph 35 are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 35 as an agent of MyPillow.

36.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 36 and such allegations are accordingly denied.

37.     The allegations in Paragraph 37 are denied.

38.     The allegations in Paragraph 38 are denied.

6

39.     The allegations in Paragraph 39 are denied.

40.     Regarding the allegations in Paragraph 40, MyPillow admits the quotation from then-U.S. Attorney General William Barr in the referenced article is correctly stated. The remaining allegations in Paragraph 40 are denied.

41.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 41, and such allegations are accordingly denied.

42.     The allegations in Paragraph 42 are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 42 as an agent of MyPillow.

43.     Regarding the allegations in Paragraph 43, MyPillow admits Michael Lindell appeared on *America First* with Sebastian Gorka, was trying to get Dominion machines and open them up, and was trying to get the word out about election fraud. The remaining allegations in Paragraph 43 are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 43 as an agent of MyPillow.

44.     Regarding the allegations in Paragraph 44, the first sentence is denied. MyPillow admits the MyPillow logo, website, and phone number were displayed for viewers during the program. The remaining allegations in Paragraph 44 are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 44 as an agent of MyPillow.

45.     The allegations in Paragraph 45 are denied.

46.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 46 and such allegations are accordingly denied.

47.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 47 and such allegations are accordingly denied.

48.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 48 and such allegations are accordingly denied.

49.     The allegations in Paragraph 49 are denied.

50.     Regarding the allegations in Paragraph 50, MyPillow admits Michael Lindell appeared on the Conservative Business Journal. MyPillow admits the transcript attached to the Complaint as Exhibit 237 reflects Michael Lindell saying "1.3 to Biden and 0.7 to the President." MyPillow denies the remaining allegations in Paragraph 50. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 50 as an agent of MyPillow.

51.     Regarding the allegations in Paragraph 51, MyPillow admits that MyPillow sponsored the Women for America First rally on December 12, 2020, in Washington, D.C., and Michael Lindell spoke at the rally. MyPillow admits the rally was broadcast on C-SPAN and C-SPAN chose to identify Lindell as the CEO of MyPillow as part of its broadcast. MyPillow admits Michael Lindell said the words quoted in Paragraph 51, but the words lack necessary context which affects their meaning. The remaining allegations in Paragraph 51 are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 51 as an agent of MyPillow.

52.     The allegations in Paragraph 52 are admitted. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 52 as an agent of MyPillow.

53.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 53 and such allegations are accordingly denied.

54.     The allegations in Paragraph 54 violate Fed. R. Civ. P. 8(a)(2) as immaterial and impertinent.

55.     Regarding the allegations in Paragraph 55, MyPillow admits only that a MyPillow advertisement in which Michael Lindell appeared was shown on RSBN during the broadcast of the Jericho March. MyPillow lacks knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 55 and such allegations are accordingly denied.

56.     Regarding the allegations in Paragraph 56, MyPillow admits Michael Lindell appeared at the Jericho March and stated the words quoted, although Paragraph 56 omits important context for the words. MyPillow lacks knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 56 and such allegations are accordingly denied. MyPillow affirmatively states that Michael Lindell did not make any statements at the Jericho March as an agent of MyPillow.

57.     Regarding the allegations in Paragraph 57, MyPillow admits only that a MyPillow advertisement in which Michael Lindell appeared was shown on RSBN during the broadcast of the Jericho March. MyPillow lacks knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 57 and such allegations are accordingly denied.

58.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 58 and such allegations are accordingly denied.

The allegations in Paragraph 58 violate Fed. R. Civ. P. 8(a)(2) as immaterial and impertinent.

59.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 59 and such allegations are accordingly denied.

60.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 60 and such allegations are accordingly denied.

61.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 61 and such allegations are accordingly denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 61 as an agent of MyPillow.

62.    Regarding the allegations in Paragraph 62, MyPillow affirmatively states that Michael Lindell no longer has access to his Twitter account and cannot confirm the accuracy of the tweets referenced in Paragraph 62. Therefore, MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 62 and such allegations are accordingly denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 62 as an agent of MyPillow.

63.    Regarding the allegations in Paragraph 63, MyPillow admits the letter was sent. MyPillow denies any false claims about Dominion were made. MyPillow affirmatively states the letter was sent by email at 10:45 p.m. two days before Christmas and the company lacks knowledge concerning when or whether it was ever read at that time.

64.     Regarding the allegations in Paragraph 64, MyPillow affirmatively states that Michael Lindell no longer has access to his Twitter account and cannot confirm the accuracy of the tweet referenced in Paragraph 64. Therefore, MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 64 and such allegations are accordingly denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 64 as an agent of MyPillow.

65.     MyPillow admits Lindell appeared at the rally and spoke the words quoted, although Paragraph 65 omits important context for the words. MyPillow denies the remaining allegations in Paragraph 65. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 65 as an agent of MyPillow.

66.     Regarding the allegations in Paragraph 66, MyPillow denies the first sentence. The remainder of Paragraph 66 distorts Michael Lindell's Facebook post and mischaracterizes controversial events which have no relevance to Dominion's claims and is also accordingly denied. The allegations in Paragraph 66 violate Fed. R. Civ. P. 8(a)(2) as immaterial, inflammatory, and impertinent. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 66 as an agent of MyPillow.

67.     The allegations in Paragraph 67 are denied.

68.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 68 and such allegations are accordingly denied.

69.     Regarding the allegations in Paragraph 69, MyPillow admits the letter was sent. MyPillow denies the remaining allegations in the paragraph. MyPillow affirmatively states the letter was received by email at 12:54 a.m. on Saturday, January 9, 2021, and the

company lacks knowledge concerning when or whether the email was ever read at that time.

70.    The allegations in Paragraph 70 are denied.

71.    Regarding the allegations in Paragraph 71, MyPillow denies the first sentence of the paragraph. MyPillow lacks knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 71 and such allegations are accordingly denied.

72.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 72 and such allegations are accordingly denied. The allegations in Paragraph 72 violate Fed. R. Civ. P. 8(a)(2) as immaterial, inflammatory, and impertinent.

73.    The allegations in Paragraph 73 are denied.

74.    The allegations in Paragraph 74 are denied.

75.    Regarding the allegations in Paragraph 75, MyPillow affirmatively states that Michael Lindell no longer has access to his Twitter account and cannot confirm the accuracy of the tweet referenced in Paragraph 75. Therefore, MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 75 and those allegations are accordingly denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 75 as an agent of MyPillow.

76.    The allegations in Paragraph 76 are denied.

77.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 77 and such allegations are accordingly denied.

78.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 78 and such allegations are accordingly denied.

79.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 79 and such allegations are accordingly denied.

80.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 80 and such allegations are accordingly denied.

81.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 81 and such allegations are accordingly denied.

82.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 82 and such allegations are accordingly denied.

83.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 83 and such allegations are accordingly denied.

84.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 84 and such allegations are accordingly denied.

85.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 85 and such allegations are accordingly denied.

86.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 86 and such allegations are accordingly denied.

87.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 87 and such allegations are accordingly denied.

88.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 88 and such allegations are accordingly denied.

89.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 89 and such allegations are accordingly denied.

90.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 90 and such allegations are accordingly denied.

91.     Regarding the allegations in Paragraph 91, MyPillow denies the allegations in the first sentence and fourth sentences. MyPillow admits that NBC reported the statement alleged in the third sentence. MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in the second sentence and such allegations are accordingly denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 91 as an agent of MyPillow.

92.     The allegations in Paragraph 92 are denied.

93.     Regarding the allegations in Paragraph 93, MyPillow admits Lindell appeared in the interview and spoke the words quoted, although Paragraph 93 omits important context for the words. MyPillow admits the promo code was offered. MyPillow denies the remaining allegations in Paragraph 93.

94.     Regarding the allegations in Paragraph 94, MyPillow admits Lindell appeared in the interview and the words quoted were spoken, although Paragraph 94 omits important context for the words. MyPillow denies the remaining allegations in Paragraph 94. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 94 as an agent of MyPillow.

95.     Regarding the allegations in Paragraph 95, MyPillow admits only that Michael Lindell's Twitter account was banned and its Twitter account was banned. MyPillow lacks knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 95 and such allegations are accordingly denied.

96.     The allegations in Paragraph 96 are denied.

97.     MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 97 and such allegations are accordingly denied.

98.     Regarding the allegations in Paragraph 98, MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 98 directed at Newsmax and such allegations are accordingly denied. To the extent Paragraph 98 contains factual allegations directed at MyPillow, the allegations are denied.

99.     The allegations in Paragraph 99 are denied.

100.    Regarding the allegations in Paragraph 100, MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 100 and such allegations are accordingly denied.

101.    Regarding the allegations in Paragraph 101, MyPillow admits the letter was sent. MyPillow denies the assertions made in the letter and denies the remaining allegations in Paragraph 101. MyPillow affirmatively states the letter was sent by email at 10:34 p.m. and the company lacks knowledge concerning when or whether it was read at that time.

102.    Regarding the allegations in Paragraph 102, MyPillow admits Michael Lindell appeared in the interview and the words quoted were spoken, although Paragraph

102 omits important context for the words. MyPillow denies the remaining allegations in Paragraph 102.

103.    Regarding the allegations in Paragraph 103, MyPillow admits Lindell appeared in the interview and the words quoted were spoken, although Paragraph 103 omits important context for the words. MyPillow denies the remaining allegations in Paragraph 103.

104.    Regarding the allegations in Paragraph 104, MyPillow admits Lindell is an executive producer of ABSOLUTE PROOF and it posted on his website michaeljlindell.com on February 5, 2021. MyPillow admits that prior to ABSOLUTE PROOF's release it was advertised on Newsmax and FlashPoint. MyPillow admits it accepted a discount code "Proof" on its website. MyPillow denies the remainder of the allegations in Paragraph 104.

105.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 105 and such allegations are accordingly denied. MyPillow affirmatively states that Michael Lindell did not make any statements or take any actions alleged in Paragraph 105 as an agent of MyPillow.

106.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 106 and such allegations are accordingly denied.

107.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 107 and such allegations are accordingly denied.

108.    Regarding the allegations in Paragraph 108, MyPillow admits Michael Lindell's film is titled "Absolute Proof: Exposing Election Fraud and the Theft of America by Enemies Foreign and Domestic."

109.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 109 and such allegations are accordingly denied.

110.    Regarding the allegations in Paragraph 110, MyPillow admits Michael Lindell's words were broadcast on the media alleged, are accurately though incompletely quoted, and are taken out of context. MyPillow denies the remainder of the allegations in Paragraph 110.

111.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 111 and such allegations are accordingly denied.

112.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 112 and such allegations are accordingly denied.

113.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 113 and such allegations are accordingly denied.

114.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 114 and such allegations are accordingly denied.

115.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 115 and such allegations are accordingly denied.

116.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 116 and such allegations are accordingly denied.

117.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 117 and such allegations are accordingly denied.

118.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 118 and such allegations are accordingly denied.

119.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 119 and such allegations are accordingly denied.

120.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 120 and such allegations are accordingly denied.

121.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 121 and such allegations are accordingly denied.

122.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 122 and such allegations are accordingly denied.

123.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 123 and such allegations are accordingly denied.

124.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 124 and such allegations are accordingly denied.

125.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 125 and such allegations are accordingly denied.

126.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 126 and such allegations are accordingly denied.

127.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 127 and such allegations are accordingly denied.

128.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 128 and such allegations are accordingly denied.

129.    The allegations in Paragraph 129 are denied.

130.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 130 and such allegations are accordingly denied.

131.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 131 and such allegations are accordingly denied.

132.    The allegations in Paragraph 132 are denied.

133.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 133 and such allegations are accordingly denied.

134.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 134 and such allegations are accordingly denied.

135.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 135 and such allegations are accordingly denied.

136.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 136 and such allegations are accordingly denied.

137.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 137 and such allegations are accordingly denied.

138.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 138 and such allegations are accordingly denied.

139.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 139 and such allegations are accordingly denied.

140.    The allegations in Paragraph 140 are denied.

141.    Regarding the allegations in Paragraph 141, MyPillow denies the allegation concerning Michael Lindell. MyPillow lacks knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 141 and such allegations are accordingly denied.

142.    Regarding the allegations in Paragraph 142, MyPillow admits Michael Lindell said he wanted Dominion to sue him. MyPillow lacks knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 142 and such allegations are accordingly denied.

143.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 143 and such allegations are accordingly denied.

144.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 144 and such allegations are accordingly denied. MyPillow affirmatively states that Michael Lindell did not make any statements or take any actions alleged in Paragraph 144 as an agent of MyPillow.

145.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 145 and such allegations are accordingly denied.

146.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 146 and such allegations are accordingly denied.

147.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 147 and such allegations are accordingly denied.

148.    Regarding the allegations in Paragraph 148, MyPillow denies the allegation concerning Michael Lindell. MyPillow lacks knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 148 and such allegations are accordingly denied.

149.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 149 and such allegations are accordingly denied.

150.    Regarding the allegations in Paragraph 150, MyPillow denies the allegation directed toward MyPillow. MyPillow lacks knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 150 and such allegations are accordingly denied.

151.    Regarding the allegations in Paragraph 151, MyPillow denies the allegation concerning Michael Lindell. MyPillow lacks knowledge and information sufficient to form a belief about the truth of the remaining allegations in Paragraph 151 and such allegations are accordingly denied.

152.    The allegations in Paragraph 152 are denied.

153.    The allegations in Paragraph 153 are denied.

154.    The allegations in Paragraph 154 are denied.

155.    The allegations in Paragraph 155 are denied.

156.    The allegations in Paragraph 156 are denied.

157.    MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 157.

158.    The allegations in Paragraph 158 are denied.

159.   The allegations in Paragraph 159 are denied.

160.   Regarding the allegations in Paragraph 160, MyPillow admits Michael Lindell said the two quoted sentences. The remaining allegations in Paragraph 160 are denied.

161.   The allegations in Paragraph 161 are denied.

162.   Regarding the allegations in Paragraph 162, MyPillow admits that facts matter and truth matters. The remaining allegations in Paragraph 162 are denied.

163.   Regarding the allegations in Paragraph 163, MyPillow incorporates by reference its responses in the foregoing paragraphs as if set forth fully herein.

164.   The allegations in Paragraph 164 are denied.

165.   The allegations in Paragraph 165 are denied.

(a) Regarding the allegations in Paragraph 165(a), MyPillow admits Michael Lindell appeared at the Women for America First rally and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(a) as an agent of MyPillow.

(b) Regarding the allegations in Paragraph 165(b), MyPillow admits Michael Lindell appeared at the Jericho March and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that

Michael Lindell did not make any statements alleged in Paragraph 165(b) as an agent of MyPillow.

(c) Regarding the allegations in Paragraph 165(c), MyPillow admits Michael Lindell appeared on the Newsmax program *Stinchfield* and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(c) as an agent of MyPillow.

(d) Regarding the allegations in Paragraph 165(d), MyPillow affirmatively states that Michael Lindell no longer has access to his Twitter account and cannot confirm the accuracy of the tweet referenced in Paragraph 165(d). Therefore, MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 165(d) and such allegations are accordingly denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(d), if such statements were made, as an agent of MyPillow.

(e) Regarding the allegations in Paragraph 165(e), MyPillow affirmatively states that Michael Lindell no longer has access to his Twitter account and cannot confirm the accuracy of the tweet referenced in Paragraph 165(e). Therefore, MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 165(e) and such allegations are accordingly denied. MyPillow affirmatively states

that Michael Lindell did not make any statements alleged in Paragraph 165(e), if such statements were made, as an agent of MyPillow.

(f) Regarding the allegations in Paragraph 165(f), MyPillow affirmatively states that Michael Lindell no longer has access to his Twitter account and cannot confirm the accuracy of the tweet referenced in Paragraph 165(f). Therefore, MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 165(f) and such allegations are accordingly denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(f), if such statements were made, as an agent of MyPillow.

(g) Regarding the allegations in Paragraph 165(g), MyPillow admits Michael Lindell appeared on the Newsmax program *Greg Kelly Reports* and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(g) as an agent of MyPillow.

(h) Regarding the allegations in Paragraph 165(h), MyPillow admits Michael Lindell appeared on the Victory Channel's *FlashPoint* and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(h) as an agent of MyPillow.

24

(i)  Regarding the allegations in Paragraph 165(i), MyPillow admits Michael Lindell appeared on the ThriveTime Show and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(i) as an agent of MyPillow.

(j)  Regarding the allegations in Paragraph 165(j), MyPillow affirmatively states that Michael Lindell no longer has access to his Twitter account and cannot confirm the accuracy of the tweet referenced in Paragraph 165(j). Therefore, MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 165(j) and such allegations are accordingly denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(j), if such statements were made, as an agent of MyPillow.

(k)  Regarding the allegations in Paragraph 165(k), MyPillow admits Michael Lindell appeared at the Moms for America Save the Republic Rally and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(k) as an agent of MyPillow.

(l)  Regarding the allegations in Paragraph 165(l), MyPillow admits Michael Lindell appeared in an interview with Roy Fields and spoke the words

quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(l) as an agent of MyPillow.

(m) Regarding the allegations in Paragraph 165(m), MyPillow admits Michael Lindell posted a live video to his Facebook page and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(m) as an agent of MyPillow.

(n) Regarding the allegations in Paragraph 165(n), MyPillow admits Michael Lindell appeared for an interview and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(n) as an agent of MyPillow.

(o) Regarding the allegations in Paragraph 165(o), MyPillow admits Michael Lindell appeared in an interview on RSBN with Brian Glenn and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(o) as an agent of MyPillow.

(p) Regarding the allegations in Paragraph 165(p), MyPillow admits Michael Lindell appeared in an interview on RSBN and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(p) as an agent of MyPillow.

(q) Regarding the allegations in Paragraph 165(q), MyPillow admits Michael Lindell appeared on the Victory Channel's *FlashPoint* and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(q) as an agent of MyPillow.

(r) Regarding the allegations in Paragraph 165(r), MyPillow admits Michael Lindell appeared on Steve Bannon's *War Room: Pandemic* and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(r) as an agent of MyPillow.

(s) Regarding the allegations in Paragraph 165(s), MyPillow admits Michael Lindell appeared on The JoePags Show and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that

Michael Lindell did not make any statements alleged in Paragraph 165(s) as an agent of MyPillow.

(t) Regarding the allegations in Paragraph 165(t), MyPillow affirmatively states that Michael Lindell no longer has access to his Twitter account and cannot confirm the accuracy of the tweet referenced in Paragraph 165(t). Therefore, MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 165(t) and such allegations are accordingly denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(t), if such statements were made, as an agent of MyPillow.

(u) Regarding the allegations in Paragraph 165(u), MyPillow admits Michael Lindell appeared on Fox News's *Tucker Carlson Tonight* and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(u) as an agent of MyPillow.

(v) Regarding the allegations in Paragraph 165(v), MyPillow admits Michael Lindell appeared on Newsmax and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(v) as an agent of MyPillow.

(w) Regarding the allegations in Paragraph 165(w), MyPillow admits Michael Lindell appeared on Worldview Weekend Broadcast Network and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(w) as an agent of MyPillow.

(x) Regarding the allegations in Paragraph 165(x), MyPillow admits Michael Lindell appeared on *FlashPoint* and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(x) as an agent of MyPillow.

(y) MyPillow lacks knowledge and information sufficient to form a belief about the truth of the allegations in Paragraph 165(y) and such allegations are accordingly denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(y), if such statements were made, as an agent of MyPillow.

(z) Regarding the allegations in Paragraph 165(z), MyPillow admits Michael Lindell appeared in an interview with Steve Bannon and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that

Michael Lindell did not make any statements alleged in Paragraph 165(z) as an agent of MyPillow.

(aa)   Regarding the allegations in Paragraph 165(aa), MyPillow admits Michael Lindell appeared on the St. George News radio show *The Kate Dalley Show* and spoke the words quoted, although the paragraph omits important context for the words. The remaining allegations are denied. MyPillow affirmatively states that Michael Lindell did not make any statements alleged in Paragraph 165(aa) as an agent of MyPillow.

166.   The allegations in Paragraph 166 set forth legal conclusions as to which no admission or denial is required.

167.   The allegations in Paragraph 167 are denied.

168.   The allegations in Paragraph 168 set forth legal conclusions as to which no admission or denial is required.

169.   The allegations in Paragraph 169 set forth legal conclusions as to which no admission or denial is required.

170.   The allegations in Paragraph 170 are denied.

171.   The allegations in Paragraph 171 are denied.

172.   The allegations in Paragraph 172 are denied.

173.   Regarding the allegations in Paragraph 173, MyPillow incorporates by reference its responses in the foregoing paragraphs as if set forth fully herein.

174.   The allegations in Paragraph 174 set forth legal conclusions as to which no admission or denial is required.

175.    The allegations in Paragraph 175 are denied.

176.    The allegations in Paragraph 176 are denied.

177.    The allegations in Paragraph 177 are denied.

178.    The allegations in Paragraph 178 are denied.

Paragraphs (a), (b), (c), (d), and (e) of the Prayer for Relief of the Complaint are a request for relief, which do not require an admission or denial. In any event, MyPillow denies that Plaintiffs are entitled to recover and/or receive any of the relief sought in paragraphs (a), (b), (c), (d), and (e). To the extent that paragraphs (a), (b), (c), (d), and (e) contain factual allegations, MyPillow denies them.

Plaintiffs' request for a jury trial does not require an admission or denial.

## DEFENSES

Subject to the responses above, MyPillow alleges and asserts the following defenses in response to the allegations, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein. In addition to the defenses described below, subject to its responses above, MyPillow specifically reserves all rights to allege additional defenses that become known through the course of discovery.

1.    Plaintiffs cannot recover because Lindell believed his allegedly defamatory statements were true when the statements were made.

2.    Plaintiffs cannot recover because the allegedly defamatory statements were substantially true.

31

3.      Plaintiffs' claims are barred because the allegedly defamatory statements were made without malice.

4.      The statements alleged in the Complaint are protected by the First Amendment to the United States Constitution and by law. Plaintiffs are constitutionally and legally barred from recovering on their claims.

5.      MyPillow bears no responsibility for the statements alleged in the Complaint to be defamatory because MyPillow neither made nor endorsed any of the statements. When the statements were made, they were not made by or on behalf of MyPillow, they cannot be attributed to MyPillow, and MyPillow bears no liability for the statements.

6.      Plaintiffs' claims are barred in whole or in part by the applicable statute of limitations and/or the single publication rule.

7.      Plaintiffs' claims are barred in whole or in part because the allegedly defamatory statements are of and concerning Plaintiffs in their roles as governmental actors, which deprives them of standing to sue and/or creates an absolute privilege for the statements.

8.      Plaintiffs suffered no damages.

9.      Plaintiffs failed to mitigate any alleged damages.

10.     Plaintiffs have failed to name and join necessary parties who are responsible for any alleged damages.

11.     Plaintiffs failed to plead special damages such as lost profits under the heightened pleading requirements of Fed. R. Civ. P. 9(g).

12.     Plaintiffs' claims are barred in whole or in part because some and/or all of any alleged damages suffered by Plaintiffs were not caused by the statements made by Lindell and were, in fact, caused by intervening and/or supervening causes independent of Lindell's conduct.

13.     By their actions, activities, omissions, and/or words, Plaintiffs assumed the risk of any damages they suffered. By entering the public arena of providing goods and services for, and by partnering with and/or actually running elections, Plaintiffs assume the risk of criticism and public debate.

14.     Plaintiffs' complaint fails to state any claim upon which relief may be granted.

15.     Plaintiffs are barred from recovery by their own illegal and inequitable conduct.

16.     Plaintiffs are estopped from recovering under their claims.

17.     Plaintiffs have waived any right to recovery for their claims.

18.     Plaintiffs' claims are barred by Plaintiffs' own fraud.

19.     Plaintiffs are barred from recovery by their unclean hands.

20.     The Court lacks personal jurisdiction over MyPillow.

21.     Plaintiffs' claims are barred in whole or in part because the District of Columbia is not the proper venue for Plaintiffs' claims.

22.     Plaintiffs' claims are barred in whole or in part by Plaintiffs' contributory negligence in failing to secure Plaintiffs' voting systems from attack after becoming aware that Plaintiffs' voting systems were vulnerable to hacking.

23.     Plaintiffs' claims are barred in whole or in part because Plaintiffs lack Article III standing to assert some of the allegations Plaintiffs make and prudential standing to assert the alleged injuries of third parties, including other Plaintiffs.

24.     Plaintiffs' claims are barred in whole or in part by the incremental harm doctrine because Lindell's statements failed to cause incremental harm to Plaintiffs and are, therefore, nonactionable.

25.     Plaintiffs' claims are barred in whole or in part by the libel proof plaintiff doctrine because Lindell's statements failed to cause Plaintiffs harm as their reputation had already been damaged beyond repair by numerous years of negative press and statements made prior to the 2020 election.

26.     Plaintiffs' claims are barred in whole or in part because the landmark decision in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) creates an absolute privilege.

## RESERVATION OF RIGHTS

MyPillow reserves the right to revise, supplement, or amend its Answer and Defenses, including reserving all defenses permitted under the Federal Rules of Civil Procedure, and/or at law or in equity, that may now exist or may in the future be available based on discovery and/or further investigation in this case.

WHEREFORE, MyPillow respectfully prays for an order and judgment of this Court in its favor against Plaintiffs as follows:

1. Dismissing Plaintiffs' Complaint with prejudice and on the merits.

2. That Defendant be awarded its costs and reasonable attorneys' fees incurred in

the defense of this action.

3. Awarding Defendant such other and further relief as the Court deems just and equitable.

## COUNTERCLAIMS

Pursuant to Federal Rules of Civil Procedure 13 and 20, Counterclaimant My Pillow, Inc. ("MyPillow") asserts by way of counterclaim against Counterclaim-Defendants US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation (collectively, "Dominion" or "Counterclaim-Defendants") as follows:

## PARTIES

1. MyPillow is a Minnesota corporation with its principal place of business in Chaska, Minnesota.

2. Counterclaim-Defendant US Dominion, Inc. is a Delaware corporation with its principal place of business in Denver, Colorado.

3. Counterclaim-Defendant Dominion Voting Systems, Inc. is a Delaware corporation with its principal place of business in Denver, Colorado.

4. Counterclaim-Defendant Dominion Voting Systems Corporation is an Ontario corporation with its principal place of business in Toronto, Ontario.

## JURISDICTION AND VENUE

5. Jurisdiction in this matter arises under 28 U.S.C. § 1331. MyPillow brings claims under laws of the United States. Supplemental jurisdiction over Plaintiff's state law claims arises under 28 U.S.C. § 1367(a). The state law claims are so related to the federal

law claims as to form part of the same case or controversy. Jurisdiction also arises under 28 U.S.C. § 1332 because there is complete diversity of citizenship between the parties, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

6.      Dominion has accepted personal jurisdiction of this Court over Dominion by bringing claims in this Court against MyPillow. The Court has ruled that it has personal jurisdiction over MyPillow. MyPillow reserves its position that the District of Columbia lacks personal jurisdiction over MyPillow, but MyPillow presents these Counterclaims in compliance with the Court's rulings.

7.      As a result of rulings of this Court, the District of Columbia is an appropriate venue, while Dominion's claims against MyPillow remain pending. MyPillow reserves its objection to the venue of this proceeding in the District of Columbia and reserves the right to transfer venue back to the District of Minnesota, where MyPillow's claims were originally filed, in the event Dominion's claims are dismissed.

## FACTUAL ALLEGATIONS

8.      Freedom of speech, and free and fair elections, are twin pillars of our constitutional order. Intersection of the two – debate in the public square about elections – is therefore a matter of grave constitutional concern. Discussion of election integrity must receive the highest protection under the First Amendment. That is what this case is about.

### Free and Fair Elections

9.      Evidence of problems with "electronic election equipment" (electronic voting machines; electronic ballot scanning, counting, and tabulating machines; and

electronic integrated voting systems), including Dominion's, has been accumulating for over a decade.

10.    Election security experts including University of Michigan professor J. Alex Halderman have testified before legislative committees and in sworn court statements that the electronic equipment used in American elections can be manipulated by intruders, and votes changed. [1] Other experts have testified similarly.

11.    Dr. Halderman testified to the Senate Intelligence Committee on June 21, 2017, "our highly computerized election infrastructure is vulnerable to sabotage and even to cyber attacks that could change votes. These realities risk making our election results more difficult for the American people to trust. I know America's voting machines are vulnerable because my colleagues and I have hacked them, repeatedly, as part of a decade of research studying the technology that operates elections and learning how to make it stronger. We've created attacks that can spread from machine to machine like a computer virus and silently change election outcomes. We've studied touch screen and optical scan systems and in every single case we've found ways for attackers to sabotage machines and to steal votes."[2]

12.    Dr. Halderman stated in a sworn declaration dated September 21, 2021 that Dominion election equipment used in sixteen states has "security vulnerabilities" that would "allow attackers to install malicious software," and these vulnerabilities are not

---

[1] *See* C-SPAN2, *Senate Intelligence Committee Hearing on Russian Election Interference* (Jun. 21, 2017) (https://www.youtube.com/watch?v=AmivIHUAy8Q beginning at 2:15:15).
[2] *Id.*

"theoretical problems" but "rather specific flaws" for which he was "prepared to demonstrate proof-of-concept malware that can exploit them to steal votes."[3]

13.    The 2020 election cycle only accelerated the accumulation of evidence that electronic election equipment can be manipulated to change votes, with the discovery of evidence that Dominion's systems actually were hacked in the 2020 election. Questions and concerns are growing, not subsiding. The adverse impact of electronic voting and vote tabulating systems on the 2020 election was significant. A prudent, robust democracy cannot afford to ignore this evidence if it hopes to survive.

14.    Some states, like Texas, excluded Dominion electronic election equipment from use in the 2020 election after examining its vulnerability to hacking. Others, like Arizona, found cause to order post-election forensic audits of electronic election equipment – including Dominion's – to attempt to "restore integrity to the election process."[4] The New Hampshire Senate voted 24-0 to conduct a complete examination of Dominion-supplied election equipment after suspicious shorting of votes was discovered.[5] Pennsylvania Senate President Pro Tempore Jake Corman announced that the Pennsylvania Senate would "conduct a thorough forensic audit of recent elections," which would "go much further than previous reviews mandated by state law, which have focused on whether

---

[3] Decl. of J. Alex Halderman ¶¶ 2, 5, Doc. 1177-1 (Sept. 21, 2021), *Curling v. Raffensperger*, No. 1:17-cv-02989-AT (U.S. District Ct., N.D. Ga.).
[4] Press Release, Ariz. Senate Republicans, *Senate chooses qualified auditing firm to conduct forensic audit of Maricopa County election results* (Jan. 29, 2021) (https://www.azsenaterepublicans.com/post/senate-chooses-qualified-auditing-firm-to-conduct-forensic-audit-of-maricopa-county-election-results).
[5] *See* Windham, NH Board of Selectmen Minutes of March 1, 2021 (https://www.windhamnh.gov/AgendaCenter/ViewFile/Minutes/_03012021-1610).

the reported counts are 'accurate.'"[6]  "The goal of the Senate's investigation will not be to conduct a recount, but to find any flaws in the system that could be exploited by bad actors and take action to correct those flaws through legislative changes to our Election Code."[7] During a December 30, 2020 live-streamed hearing held by the Georgia Senate Judiciary Subcommittee on Elections, an expert witness testified that an active Dominion polling pad had been hacked and the intrusion was being maintained even as he was speaking.[8] Every county in Georgia was required to use Dominion electronic election equipment for the 2020 elections.

15.    On July 12, 2021, Dr. Halderman stated in a sworn declaration filed in federal court, "I have been attempting since January . . . to meet with Dominion to confidentially discuss the vulnerabilities in my report. However, Dominion has yet to agree to meet."[9]

**Free Speech**

16.    MyPillow's founder and CEO, Michael Lindell, has spoken in his personal capacity accurately about these issues of great public concern. He has presented evidence backed by expert analysis to raise public awareness of election integrity issues— particularly relating to the hacking of electronic election equipment like Dominion's. For

---

[6] Jake Corman, *Op-Ed: Careful, Thoughtful Investigation is Necessary to Restore Faith in Our Elections* (Aug. 23, 2021) (https://www.senatorcorman.com/2021/08/23/op-ed-careful-thoughtful-investigation-is-necessary-to-restore-faith-in-our-elections/).
[7] *Id.*
[8] Hearing of Georgia Senate Judiciary Subcommittee on Elections, Dec. 30, 2020 (https://www.youtube.com/watch?v=D5c034r0RlU beginning at 4:07:58).
[9] Decl. of J. Alex Halderman ¶ 8, Doc. 1133 (July 13, 2021), *Curling v. Raffensperger*, Case No. 1:17-cv-02989-AT (U.S. Dist. Ct., N.D. Ga.).

those actions, Dominion sued him baselessly alleging defamation and seeking a headline grabbing, fictitious $1.3 billion in damages.

17.     Dominion has engaged in a scorched earth campaign, debasing the legal system through a practice that has become known as "lawfare." Dominion's purpose is to silence debate; to eliminate any challenge to the 2020 presidential election; and to cancel and destroy anyone who speaks out against Dominion's work on behalf of the government in administering the election.

18.     However, Dominion's true purpose is not simply to silence Michael Lindell, but to silence anyone else who might speak out on election fraud. Thus, Dominion also sued the company Michael Lindell founded, MyPillow, and hence its hundreds of employees, some of whom are co-owners. Dominion did not sue MyPillow because MyPillow made statements about Dominion. MyPillow made no such statements. Instead, by suing MyPillow, Dominion seeks to punish MyPillow's CEO, Michael Lindell, for *his* statements. Dominion also seeks to send a message to others: "Shut up or else."

19.     That is why Dominion's campaign also included bragging publicly about sending threatening letters to over 150 individuals demanding they not comment on the election or Dominion.[10] Among the recipients of these shotgun-style attack letters are everyday citizens – not public figures – who volunteered as poll watchers in the 2020 election and signed sworn statements about election irregularities they witnessed.

---

[10] Hannah Knowles and Emma Brown, *Dominion threatens MyPillow CEO Mike Lindell with lawsuit over 'false and conspiratorial' claims*, Washington Post (Jan. 18, 2021) (https://www.washingtonpost.com/politics/2021/01/18/dominion-mike-lindell-mypillow/).

Dominion found out who they were and dispatched its lawyers to send them threatening cease-and-desist letters, falsely claiming they had defamed Dominion when these private citizens never mentioned Dominion. Dominion then illegally demanded these private citizens preserve all communications, emails, texts – private or otherwise – and a host of other materials. Dominion's and its lawyers' widespread intimidation tactics of ordinary citizens may be routine in a Third World country – but they are abhorrent in America. "[T]here is no justification for harassing people for exercising their constitutional rights." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982).

20.     However, Dominion did not stop there. To give its letters further intimidating weight, Dominion's campaign extended to suing several news networks, like Fox News, and individuals for billions of dollars. These lawsuits were amplified by a high-powered, well-orchestrated publicity campaign designed to spread their allegations to as many people as possible. Dominion intends for its media blitzkrieg to inflict a crippling fear of becoming the next target for destruction if one dares to raise any question about the use and integrity of voting machines during elections.

21.     In a highly publicized interview, Dominion's CEO threatened that the lawsuit Dominion brought against MyPillow was "definitely not the last" lawsuit and that Dominion is "not ruling anyone out." Dominion's message is clear: be silent and fall in line—or you will be next to be taken down under its relentless attack. Harkening back to some of the worst days in our history, Dominion has taken a page out of Joseph McCarthy's playbook by creating a blacklist for public scorn leading to both reputational and economic

destruction. From high-powered news organizations to regular citizens and private home-bedding companies, no one is safe.

22.     Having never commented on the election or Dominion, MyPillow has nonetheless borne the full wrath of Dominion's illegal campaign of intimidation. By this action, MyPillow seeks to hold Dominion accountable for the extreme and destructive consequences of its bullying and wrongful tactics which have directly harmed MyPillow and its employees.

23.     Far beyond harassment, MyPillow has been intentionally targeted and greatly damaged by Dominion. MyPillow employees live in fear. Their lives have been threatened. They have been canceled and shut down. They have been compelled to self-censor. In addition, MyPillow has lost numerous major customers who ended their long-term relationships to sell MyPillow's product line due to Dominion's highly publicized attacks.

24.     Dominion is using the legal process as a weapon to suppress free speech. In contrast, MyPillow brings these counterclaims to *open* debate and *expand* free speech. Indeed, MyPillow would move this entire debate to the public square for a full airing of all facts and opinions on the subject. These counterclaims are brought in support of the marketplace of ideas and to remedy the grave harm that has been suffered by MyPillow as a result of Dominion's suppression of speech and attacks on the Company.

**A.     After 2002, Most States Adopted Electronic, Computer-Based Voting Systems.**

25.     Prior to 2002, states conducted their elections overwhelmingly using relatively secure and auditable paper-based systems. However, following passage of the

Help America Vote Act in 2002,[11] billions of federal dollars were spent to move from such paper-based systems to electronic, computer-based systems.

26.     As a result, by 2020 most elections in the United States were conducted using a handful of computer-based election management systems. These systems are created, maintained, and administered by a small number of companies having little to no transparency to the public, producing results that are far more difficult to audit than paper-based systems, and lack any meaningful federal standards or security requirements beyond what individual states may choose to certify.

27.     This small cadre of companies supplies the hardware and software for the electronic election equipment, in some cases manages the voter registration rolls, maintains the voter records, partially manages the elections, programs the vote counting, and reports the election results.

28.     In the lead-up to the 2020 elections, three companies together provided more than ninety percent of the "voting machine market" – (1) Election Systems & Software, (2) Dominion Voting Systems, and (3) Hart InterCivic.[12]  All these providers' electronic election equipment is vulnerable to hacking, as has been published and presented to various congressional committees. All can be, and at various steps in the voting, counting, tabulation, and/or reporting process are designed to be, connected to the internet directly or indirectly.

---

[11] 52 U.S.C. § 20901 *et seq.*
[12] Pam Fessler & Johnny Kauffman, *Trips to Vegas and Chocolate-Covered Pretzels: Election Vendors Come Under Scrutiny*, NPR (May 2, 2019) (https://www.npr.org/2019/05/02/718270183/trips-to-vegas-and-chocolate-covered-pretzels-election-vendors-come-under-scruti).

29.     After votes are tabulated at the county level using one of the electronic election management systems, the vote tallies are uploaded over the internet to an election reporting system. The reporting systems are owned and controlled by Scytl, GCR, VR Systems, and Arikkan. For its part, the Clarity system, used in 28 states, is wholly owned by Scytl, a multi-national company headquartered in Barcelona, Spain that reportedly stored its election vote data on servers in Frankfurt, Germany.

30.     In short, over the last two decades the United States has transitioned from a safe, secure, auditable paper-based system to an inherently vulnerable, internet-exposed electronic equipment-based system. The transition to increased reliance on electronic systems and computer technology has brought with it the very real specter of hacking, election tampering, and electronic voting fraud.

31.     Increasingly, jurisdictions have chosen to outsource to corporate contractors their obligations under Article 1, Section 4, Clause 1 of the Constitution to administer elections.

32.     By the time of the 2020 election, at least 3,143 counties across the United States had outsourced constitutional election-related obligations to privately owned contractors.

**B.     Dominion Sells and Administers Electronic Voting and Vote Tabulation Machines and Services.**

33.     Dominion manufactures, distributes, and maintains electronic voting and vote tabulation hardware and software – electronic election equipment.

34.     Dominion designs public election processes with its hardware and software products at the center and provides administrative services for public elections.

35.     Dominion was founded in 2003 and provides electronic election equipment in 28 different states and Puerto Rico, including "9 of the top 20 counties" and "4 of the top 10 counties" in the United States.[13]

36.     By its own account Dominion provides an "End-To-End Election Management System" that "[d]rives the entire election project through a single comprehensive database." Its tools "build the election project," and its technology provides "solutions" for "voting & tabulation," "tallying & reporting," and "auditing the election."[14]

37.     Dominion supplies various types of electronic election equipment including devices on which voters mark votes ("ballot marking devices," or "BMDs"), machines that tabulate votes at the precinct level, machines that receive and tabulate precinct results ("centralized tabulation"), and systems for transmitting results from BMDs to precinct tabulators to central tabulators to, ultimately, the official government authority responsible for certifying the election results.

38.     Dominion provides, updates, and maintains software to create ballots for voters to mark, and software to run the election equipment Dominion supplies.

39.     Dominion executes software updates, fixes, and/or patches for its voting machines and/or vote tabulating machines.

40.     Through internet connections to voting and/or vote tabulating machines it has distributed, Dominion causes changes to the software on the machines.

---

[13] https://www.dominionvoting.com/about/
[14] DEMOCRACY SUITE® ELECTION MANAGEMENT SYSTEM,
 https://www.dominionvoting.com/democracy-suite-ems/ (last visited Nov. 29, 2021).

41.   On the day before the 2020 general election in the United States, Dominion executed software updates, fixes and/or patches for electronic election equipment that it had distributed and that was later used in the 2020 general election in the United States.

42.   When a jurisdiction uses Dominion electronic election equipment to administer an election, Dominion provides many hours of support services before election day, on election day at voting precincts, and after election day. While polls are open, Dominion employees stand by to provide troubleshooting and support when election equipment supplied by Dominion malfunctions, among other election services.

43.   For the 2020 general election, Dominion provided thousands of hours of support services to the jurisdictions that contracted with Dominion in the administration of their elections.

44.   Vulnerabilities or weaknesses in Dominion's systems cast doubt upon the integrity and reliability of election results coming from those jurisdictions.

45.   Dominion also audits the performance of its electronic election equipment and elections.

46.   In jurisdictions where Dominion's election equipment is used, Dominion bears responsibility for constitutional obligations of States and partially controls administration and conduct of the elections.

**C.   Dominion Ran the 2020 Election in Numerous States.**

47.   Dominion has contracts with over 1,300 governmental jurisdictions around the United States to provide and support electronic equipment used to administer elections.

48.   Dominion's activities make it an administrator of elections.

49.     For the 2020 election, Dominion provided its electronic election equipment and services in more than half of the United States.

50.     Many of the states in which Dominion provided electronic election equipment and services, such as Arizona, Nevada, Wisconsin, Michigan, Georgia, Florida, and Pennsylvania, have been referred to as battleground or swing states because their voters are equally divided (or nearly equally divided) in their degree of support for the two primary political parties.

**Georgia**

51.     The State of Georgia awarded a Master Solution Purchase and Service Agreement ("Agreement") to Dominion on July 29, 2019, to implement electronic election equipment prior to the 2020 election.[15]

52.     Georgia required that one company alone be responsible for all election administration. Every county in Georgia was required to use Dominion's election equipment and services for the 2020 general election.

53.     As part of the Agreement, Georgia and Dominion agreed that the "State has relied, and will rely on, [Dominion's] experience and expertise in installing, implementing, and servicing the Solution purchased under this Agreement."[16]

---

[15] *See* Master Solution Purchase and Services Agreement, by and between Dominion Voting Systems, Inc., and Secretary of State of the State of Georgia (July 29, 2019) (https://gaverifiedvoting.org/pdf/20190729-GA-Dominion-Contract.pdf).
[16] *Id*. at § 4.1.1.

54.     Dominion's core responsibilities under the Agreement were the administration, collection, counting, recording, and auditing of ballots and election results with the help of thousands of hours of support.[17]

55.     The Agreement cost the State of Georgia roughly $90,000,000 upfront. Dominion later charged counties in Georgia additional "service" bills.

56.     In Fulton County, Georgia alone, for six weeks of "service" beginning the "week ending on October 25" and going through the "week ending November 29," 2020, Dominion billed $1,297,260.00. Fulton County paid Dominion this amount.[18]

57.     In addition to the $1,297,260.00 invoice, Dominion billed, and Fulton County paid, $407,000.00 and $261,000.000 for "on-site services" related to the 2020 general election.[19]

58.     Dominion's contracts with many other jurisdictions across the United States gave Dominion responsibilities of administration, collection, counting, recording, and auditing of ballots and election results, and providing thousands of hours of employee election support.

**Arizona**

59.     Dominion had contracts with jurisdictions in Arizona giving it responsibilities of administration, collection, counting, recording, and auditing of ballots and election results, and providing employee election support.

---

[17] *See id.* § 2 & Ex. B.
[18] Fulton County, Georgia, Invoice No. DVS138565R1 (March 31, 2021).
[19] Fulton County, Georgia Invoice Nos. DVS139582 and DVS139583 (Jan. 31, 2021).

60.     During the November 2020 general election, Maricopa County, Arizona, county officials did not even possess the administrator passwords to the election equipment provided by Dominion. Only Dominion could, and did, program and operate the equipment on behalf of Maricopa County.

**San Francisco**

61.     During the 2020 general election, Dominion exercised exclusive control over the election equipment it supplied for San Francisco. City employees could not access the equipment.[20]

62.     Critics questioned why, instead of Dominion's "black box" voting machines, open-source technology providing "transparency and accountability for all" was not used.[21] Open-source technology would allow city employees to work with vendors on election equipment software.[22]

63.     On information and belief, Dominion also exercised exclusive control during the 2020 general election over election equipment Dominion supplied to other states and jurisdictions in addition to Arizona and San Francisco. Public officials in these other states and jurisdictions lacked passwords to access themselves, without assistance from Dominion, the election equipment supplied by Dominion.

---

[20] Jeff Elder, *How One Company Came to Control San Francisco's Elections*, San Francisco Examiner (Nov. 15, 2021) (https://www.sfexaminer.com/news/how-one-company-came-to-control-san-franciscos-elections/).
[21] *Id.*
[22] *Id.*

**D.      Dominion Is a State Actor.**

64.      As a result of Dominion's contracts with government entities, Dominion is delegated responsibility to administer public elections, including the election of individuals to serve in constitutionally prescribed offices – a core governmental function.

65.      In jurisdictions that use Dominion election equipment, Dominion willfully participates in joint activity with the state during voting, providing on behalf of the state core governmental services and functions. There is pervasive entwinement between Dominion and the state.

66.      By contracting with governmental jurisdictions to take responsibility for States' constitutional obligations under Article 1, Section 4, Clause 1 and provide comprehensive voting solutions for public elections, which is a traditionally exclusive public function, and "driv[ing] the entire election," Dominion acts as an arm of the state and becomes a state actor.

**E.      Well before the 2020 election, a broad spectrum of evidence showed Dominion's election equipment was wide open to being hacked, and a multitude of government officials and media sources publicized this vulnerability.**

67.      For many years serious security and technology problems have dogged Dominion's election equipment and systems.

68.      From roughly 2002 to 2009, Diebold Election Systems was one of two vendors that dominated the market for electronic election equipment in the United States.

69.      After technical problems sullied Diebold's reputation and a series of studies publicized its unreliable security and accuracy, Diebold changed the name of its election

systems business to Premier Election Solutions ("Premier") in 2007. The name change was motivated by the desire to create a fresh public image.[23]

70.     In September 2009, parent company Diebold sold the Premier business unit to Election Systems & Software ("ES&S") for roughly $5 million, reporting a loss over $45 million.[24] The acquisition of Premier gave ES&S nearly 70% of the market share for electronic voting systems in the United States.

71.     Anti-trust concerns quickly led to ES&S being forced to divest itself of Premier.

72.     In May 2010, ES&S sold Premier to Dominion, then a Canadian company with only about 5% of the United States market for electronic voting systems.

73.     Dominion acquired Premier's "primary assets," including "all intellectual property, software, firmware and hardware for Premier's current and legacy optical scan, central scan, and touch screen voting systems, and all versions of the GEMS election management system."[25]

74.     The Diebold GEMS technology Dominion obtained from Premier had a long and troubled track record.

---

[23] Allison St. John, *Diebold Voting Machine Company Changes Name to Improve Image*, KPBS (Aug. 21, 2007) (https://www.kpbs.org/news/2007/aug/21/diebold-voting-machine-company-changes-name-to/).

[24] Ryan Paul, *Diebold impeaches e-voting unit, sells it off for $5 million*, ARS TECHNICA (Sept. 4, 2009) (https://arstechnica.com/tech-policy/2009/09/diebold-elects-to-get-out-of-the-voting-machine-business/).

[25] *Dominion Voting Systems, Inc. Acquires Premier Election Solutions Assets from ES&S*, Benzinga (May 20, 2010) (https://www.benzinga.com/press-releases/10/05/b292647/dominion-voting-systems-inc-acquires-premier-election-solutions-assets-).

a.  In 2003, it was discovered that Diebold had left approximately 40,000 files that made up its foundational e-voting security software code, GEMS, entirely unprotected on a publicly accessible website.[26]

b.  Following the discovery that the GEMS code was publicly available, computer programmers around the world began probing and testing it. In 2012, a Harper's Magazine article titled "How to Rig an Election," summarized, "GEMS turned out to be a vote rigger's dream. According to [one investigator's] analysis, it could be hacked, remotely or on-site, using any off-the-shelf version of Microsoft Access, and password protection was missing for supervisor function. Not only could the multiple users gain access to the system after only one had logged in, but unencrypted audit logs allowed any trace of vote rigging to be wiped from the record."[27]

c.  In 2004, a team of computer scientists from Johns Hopkins University and Rice University concluded about the GEMS code: "this voting system is far below even the most minimal security standards applicable in other contexts . . . . [It] is unsuitable for use in a general election." [28] More broadly, the team wrote, "The model where individual vendors write proprietary code to run our elections appears to be unreliable, and if we do not change the process of

---

[26] Victoria Collier, *How to Rig an Election*, Harper's Magazine (Nov. 2012) (https://harpers.org/archive/2012/11/how-to-rig-an-election/).
[27] *See id*.
[28] Takayoshi Kohno, Adam Stubblefield, Aviel D. Rubin, and Dan S. Wallach, *Analysis of an Electronic Voting System, IEEE Symposium on Security and Privacy and Privacy 2004*, IEEE Computer Society Press, May 2004 (https://avirubin.com/vote.pdf) (Ex. 1)

designing our voting systems, we will have no confidence that our election results will reflect the will of the electorate. We owe it to ourselves and to our future to have robust, well-designed election systems to preserve the bedrock of our democracy."[29]

d.   In 2006, a team of computer scientists at Princeton University analyzed the security of the Diebold AccuVote-TS voting machine, then one of the most widely-deployed electronic voting platforms in the United States. They found, "Malicious software running on a single voting machine can steal votes with little risk of detection. The malicious software can modify all of the records, audit logs, and counters kept by the voting machine, so that even careful forensic examination of these records will find nothing amiss. . . . Anyone who has physical access to a voting machine, or to a memory card that will later be inserted into a machine, can install said malicious software using a simple method that takes as little as one minute. . . . AccuVote-TS machines are susceptible to voting machine viruses – computer viruses that can spread malicious software automatically and invisibly from machine to machine during normal pre- and post-election activity."[30]

e.   The Princeton team prepared a video demonstration showing how malware could shift votes cast for one candidate to another.[31] In the video, mock

---

[29] *See id.*
[30] Ariel J. Feldman, *et al.*, *Security Analysis of the Diebold AccuVote-TS Voting Machine* (https://www.usenix.org/legacy/event/evt07/tech/full_papers/feldman/feldman_html/index.html) (Ex. 2).
[31] *See Security Demonstration of DieBold AccuVote-TS Electronic Voting Machine*

election votes were cast in favor of George Washington by a 4 to 1 margin, but the paper print-out that reported the results showed Benedict Arnold prevailing by a margin of 3 to 2. Malicious vote-stealing malware was the sole reason for reallocation of votes from Washington to Arnold, and the malware deleted itself after the election, leaving no evidence that the voting machine was ever hijacked or any votes stolen.[32]

75.     Despite the multitude of security weaknesses in GEMS, Dominion wasted no time incorporating GEMS into its election equipment after acquiring the technology in 2010. By 2011, Dominion Voting Systems was selling election equipment that had updated GEMS software at its heart.[33]

76.     Even before Dominion acquired the GEMS system, Dominion's election equipment was riddled with problems globally. In a 2009 New York congressional election, Dominion's software had problems, including that it allowed voters to vote for more than one candidate, and its faulty hardware froze during operation due to insufficient memory.[34] In the 2010 Philippines general election, allegations of technical problems and offers of vote manipulation were rampant.[35] Dominion products were used in more than

---

(Nov. 30, 2016) (https://www.youtube.com/watch?v=B8TXuRA4IQM&t =20s).
[32] *See id*.
[33] Ken Detzner, *Voting System Qualification Test Report: Dominion Voting Systems, Inc. GEMS Release 1.21.6, Version 1*, Fla. Dep't of State (Mar. 2012) (https://files.floridados.gov/media/697908/dominion-gems-release-1216-version-1-test-report.pdf) (Ex. 3).
[34] ABS-CBN News, *Dominion also handled 2009 NY congressional poll* (May 7, 2010) (https://news.abs-cbn.com/nation/05/07/10/dominion-also-handled-2009-ny-congressional-poll).
[35] *See, e.g.*, Reuters, *Aquino unfazed by Philippine poll fraud allegations* (May 27, 2010) (https://www.reuters.com/article/idINIndia-48840420100527).

2,200 local municipalities, and a "glitch" caused Dominion software to incorrectly read ballots.[36] To repair the glitch, Dominion had to adjust configurations in 76,000 compact flash cards and distribute the repair to municipalities within a few days immediately prior to the election.[37]

77.     Dominion continued selling and leasing the troubled AccuVote-TSx voting machine as recently as 2017.

78.     Dominion electronic election equipment reliant on GEMS was used in the 2020 general election.

**F.     A Federal Judge in Georgia in 2020 finds Dominion's voting systems are highly vulnerable to malicious manipulation.**

79.     Following the 2017 runoff election in a Georgia congressional race, a left-leaning advocacy organization and individual voters filed an action in Georgia seeking to set aside the results, in which the Republican candidate had prevailed. The plaintiffs alleged the election "took place in an environment in which sophisticated hackers – whether Russian or otherwise – had the capability and intent to manipulate elections in the United States" and had "easy access" to do so.[38]

80.     After their action was removed to the United States District Court for the Northern District of Georgia, and after two years of litigation, the plaintiffs asked the court

---

[36] Ina Reformina, *Source code firm Dominion sheds light on voting glitch*, ABS-CBN News (May 7, 2010) (https://news.abs-cbn.com/nation/05/07/10/source-code-firm-dominion-sheds-light-voting-glitch).

[37] *See id.*

[38] Verified Am. Election Contest & Compl. p.4, *Curling v. Kemp*, no. 2017CV292233 (Fulton Cty., Ga.) (Ex. 4).

to enter a preliminary injunction barring Georgia in the 2020 general election from using Dominion's ballot marking devices.[39]

81.     On October 11, 2020, just three weeks before the 2020 general election, Judge Amy Totenberg[40] issued an order regarding the Dominion voting system's security risks and the potential for fraud or irregularities.[41] Judge Totenberg found substantial evidence that the Dominion system was plagued by security risks and the potential for votes to be improperly rejected or misallocated. She wrote, "The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually ever happen?' – but 'when it will happen,' especially if further protective measures are not taken."[42]

82.     Judge Totenberg's findings reflected many of the <u>same issues</u> which had existed more than ten years earlier with Diebold's system, ultimately purchased by Dominion:

- "[H]uge volume of significant evidence regarding the security risks and deficits in the [Dominion] system as implemented . . ."

- "Evidence presented in this case overall indicates the possibility generally of hacking or malware attacks occurring in voting systems and this particular system through a variety of routes – whether through physical access and use of a USB flash drive or another form of mini-computer, or connection with the internet."

---

[39] *See Curling v. Raffensperger*, 493 F.Supp.3d 1264, 1267-69 (N.D. Ga. 2020) (Ex. 5).
[40] Given the hyper-partisan nature of the allegations and assertions set forth in Dominion's Complaint, it is worth noting that Judge Totenberg was nominated to the federal bench by President Obama in January of 2011.
[41] *Curling*, 493 F.Supp.3d at 1340-42.
[42] *Id*. at 1342.

- "[E]vidence credibly explaining how malware can mask itself when inserted in voting software systems or QR codes, erase the malware's tracks, alter data, or create system disruption."

- "Defendants [including Dominion] do not appear to actually dispute that cybersecurity risks are significant in the electoral sphere."

- Dominion's Director of Product Strategy and Security "acknowledged the potential for compromise of the [Dominion] operating system, by exploiting a vulnerability, that could allow a hacker to take over the voting machine and compromise the security of the voting system software."

- "[F]ormidable amount of evidence that casts serious doubt on the validity of the use of the [risk-limiting audit statistical method for auditing election outcomes] with the current [Dominion] system." [43]

83.    Judge Totenberg declined to enter a preliminary injunction because she felt bound by Eleventh Circuit precedent, and there was not enough time before the election to implement the requested relief – switching to paper ballots. Yet she expressed profound concern regarding the Dominion voting system, and Dominion's less-than-transparent actions:

> The Court's Order has delved deep into the true risks posed by the new [Dominion] voting system as well as its manner of implementation. These risks are neither hypothetical nor remote under the current circumstances. The insularity of the Defendants' and Dominion's stance here in evaluation and management of the security and vulnerability of the BMD system does not benefit the public or citizens' confident exercise of the franchise. The stealth vote alteration or operational interference risks posed by malware that can be effectively invisible to detection, whether intentionally seeded or not, are high once implanted. . . .

> The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually ever happen?' — but 'when it will happen,' especially if further protective measures are not taken. Given the masking nature of malware and the current systems described here, if the

---

[43] *Id*. at 1278, 1280, 1281, 1283, 1287, 1306.

State and Dominion simply stand by and say, "we have never seen it," the future does not bode well. [44]

84.    Importantly, there is not a single case where a court has ruled on the merits of Dominion's voting machine integrity after having had a *full opportunity* to review the evidence. The *Curling* decision comes the closest to a judicial review of Dominion.

85.    The *Curling* litigation continues to this day. Recently, expert witness Dr. Halderman filed a declaration in the suit detailing the serious security vulnerabilities of Dominion's voting technology. Dr. Halderman stated:

> My July 1, 2021, expert report describes numerous security vulnerabilities in Georgia's Dominion ICX BMDs. These include flaws that would allow attackers to install malicious software on the ICX, either with temporary physical access (such as that of voters in the polling place) or remotely from election management systems. They are not general weaknesses or theoretical problems, but rather specific flaws in the ICX software, and I am prepared to demonstrate proof-of-concept malware that can exploit them to steal votes cast on ICX devices.
>
> . . .
>
> My analysis also concludes that the ICX is very likely to contain other, equally critical flaws that are yet to be discovered. Jurisdictions can mitigate this serious risk through procedural changes, such as reserving BMDs for voters who need or request them. Election officials cannot make an informed decision about such urgent policy changes or any other mitigations until they have assessed the technical findings in my report.
>
> . . .
>
> Nor do these problems affect Georgia alone. In 2022, the ICX will be used in parts of 16 states. Nevada will use it as the primary method of in-person voting in certain areas of the state. Louisiana is slated to use it for early voting in a DRE

---

[44] *Id*. at 1341-42.

configuration where there is not even a paper trail. It will be used for accessible voting in Alaska and large parts of Arizona, California, Colorado, and Michigan. It will also see some use in parts of Illinois, Kansas, Ohio, Missouri, New Jersey, Pennsylvania, Tennessee, and Washington State. Officials in these jurisdictions too must act to update the software and their procedures, but they cannot do so without information about the problems. Continuing to conceal those problems from those who can-and are authorized to-address them, to the extent possible, serves no one and only hurts voters (and heightens the risk of compromise in future elections).[45]

86.    In July 2021, Dr. Halderman stated under oath that he had been attempting to meet with Dominion regarding the security vulnerabilities in its election equipment since January 2021, yet Dominion had not agreed to do so.[46] Dominion's refusal to accept Dr. Halderman's offer reflects the same hubris with which Dominion treats any person who dares to label its machines as less than 100% secure.

## G.    Democratic lawmakers identify problems with Dominion's voting systems.

87.    Within a year prior to the 2020 election, on December 6, 2019, four Democratic Members of Congress – Senator Elizabeth Warren, Senator Amy Klobuchar, Senator Ron Wyden, and Congressman Mark Pocan – published an open letter concerning major voting system manufacturers, including Dominion.[47] In the letter, they identified numerous problems:

---

[45] Decl. of J. Alex Halderman ¶¶ 2, 4, 5, Doc. 1177-1 (Sept. 21, 2021), *Curling v. Raffensperger*, No. 1:17-cv-02989-AT (U.S. District Ct., N.D. Ga.).

[46] Decl. of J. Alex Halderman ¶ 8, Doc. 1133 (July 13, 2021), *Curling v. Raffensperger*, Case No. 1:17-cv-02989-AT (U.S. Dist. Ct., N.D. Ga.).

[47] Letter from Senators Warren, Klobuchar, and Wyden and Congressman Pocan to Steve D. Owens and Hootan Yaghoobzadeh (Dec. 6, 2019) (https://www.warren.senate.gov/imo/media/doc/H.I.G.%20McCarthy,%20&%20Staple%20Street%20letters.pdf) (Ex. 6).

- "trouble-plagued companies" responsible for manufacturing and maintaining voting machines and other election administration equipment, "have long skimped on security in favor of convenience," leaving voting systems across the country "prone to security problems."

- "the election technology industry has become highly concentrated ... Today, three large vendors – Election Systems & Software, Dominion, and Hart InterCivic – collectively provide voting machines and software that facilitate voting for over 90% of all eligible voters in the United States."

- "Election security experts have noted for years that our nation's election systems and infrastructure are under serious threat. . . . voting machines are reportedly falling apart, across the country, as vendors neglect to innovate and improve important voting systems, putting our elections at avoidable and increased risk. . . . Moreover, even when state and local officials work on replacing antiquated machines, many continue to 'run on old software that will soon be outdated and more vulnerable to hackers.'"

- "[J]urisdictions are often caught in expensive agreements in which the same vendor both sells or leases, and repairs and maintains voting systems-leaving local officials dependent on the vendor, and the vendor with little incentive to substantially overhaul and improve its products.[]"[48]

88.   Senator Warren, on her website, identifies an additional problem: "These vendors make little to no information publicly available on how much money they dedicate to research and development, or to maintenance of their voting systems and technology. They also share little or no information regarding annual profits or executive compensation for their owners."[49]

---

[48] *Id.*

[49] Elizabeth Warren: United States Senator for MA, *Warren, Klobuchar, Wyden, and Pocan Investigate Vulnerabilities and Shortcomings of Election Technology Industry with Ties to Private Equity* (Dec. 10, 2019) (https://www.warren.senate.gov/oversight/letters/ warren-klobuchar-wyden-and-pocan-investigate-vulnerabilities-and-shortcomings-of-election-technology-industry-with-ties-to-private-equity).

89.     In August 2018, Senator Klobuchar stated on nationally broadcast, *Meet the Press*, "I'm very concerned you could have a hack that finally went through. You have 21 states that were hacked into, they didn't find out about it for a year."[50]

90.     Senator Wyden, also in the lead up to the 2020 election, explained during an interview, "[T]oday, you can have a voting machine with an open connection to the internet, which is the equivalent of stashing American ballots in the Kremlin. . . . [As] of today, what we see in terms of foreign interference in 2020 is going to make 2016 look like small potatoes. This is a national security issue! . . . The total lack of cybersecurity standards is especially troubling . . . But the lack of cybersecurity standards leads local officials to unwittingly buy overpriced, insecure junk. Insecure junk guarantees three things: a big payday for the election-tech companies, long lines on Election Day, and other hostile foreign governments can influence the outcome of elections through hacks."[51]

**H.     After a thorough audit review, Dominion's systems fail to obtain certification.**

91.     After failing certification in Texas in January 2019, on October 2-3, 2019, Dominion presented its Democracy Suite 5.5-A voting system in Texas again for examination and certification.[52] Again it failed the test.

---

[50] NBC News, *Meet the Press: Amy Klobuchar: Concerned That A 2018 Election Hack Could Succeed* (Aug. 5, 2018) (https://www.youtube.com/watch?v=9wtUxqqLh6U).
[51] Mark Sullivan, *Senator Ron Wyden: The GOP is 'making a mockery' of election security*, Fast Company (Feb. 19, 2020) (https://www.fastcompany.com/90465001/senator-ron-wyden-the-gop-is-making-a-mockery-of-election-security).
[52] Jose A. Esparza, *Report of Review of Dominion Voting Systems Democracy Suite 5.5A*, Tex. Sec'y of State (Jan. 24, 2020) (https://www.sos.texas.gov/elections/forms/sysexam/dominion-d-suite-5.5-a.pdf) (Ex. 7).

92.     "The examiner reports identified multiple hardware and software issues . . . .
Specifically, the examiner reports raise concerns about whether the Democracy Suite 5.5-
A system is suitable for its intended purpose; operates efficiently and accurately; and is
safe from fraudulent or unauthorized manipulation."[53]

93.     On January 24, 2020, the Texas Secretary of State denied certification of the
system for use in Texas elections. Texas's designated experts who evaluated Democracy
Suite 5.5-A flagged risk from the system's connectivity to the internet despite "vendor
claims" that the system is "protected by hardening of data and IP address features."[54, 55]
"[T]he machines could be vulnerable to a rogue operator on a machine if the election LAN
is not confined to just the machines used for the election . . . The ethernet port is active on
the ICX BMD during an election. . . . This is an unnecessary open port during the voting
period and could be used as an attack vector."[56] Other security vulnerabilities found by
Texas include use of a "rack mounted server" which "would typically be in a room other
than a room used for the central count" and would present a security risk "since it is out of
sight."[57]

94.     Texas Attorney General Ken Paxton later explained, "We have not approved
these voting systems based on repeated software and hardware issues. It was determined

---

[53] *Id.*
[54] Letter from Brandon Hurley to Keith Ingram (Feb. 19, 2019) (Ex. 8).
[55] James Sneeringer, *Voting System Examination: Dominion Voting Systems Democracy
Suite 5.5-A* 2, 5 (https://www.sos.texas.gov/elections/forms/sysexam/oct2019-
sneeringer.pdf).
[56] Tom Watson, TX Sec. of State Elections Div., *Democracy Suite 5.5A* 4-5
(https://www.sos.texas.gov/elections/forms/sysexam/oct2019-watson.pdf).
[57] *Id.*

they were not accurate and that they failed — they had a vulnerability to fraud and unauthorized manipulation."[58]

## I.   Media reports and government findings expose longstanding, fundamental vulnerabilities in electronic voting systems.

95.    Election officials and voting system manufacturers have publicly denied that their election equipment is connected to the internet and, therefore, asserted the equipment is not susceptible to attack via the internet.[59]

96.    Dominion's CEO, John Poulos, testified in December 2020 that Dominion's election systems are "closed systems that are not networked meaning they **are not connected to the internet**." This is false.

97.    In a May 2016 interview, Dominion Vice President Goran Obradovic stated, "All devices of the ImageCast series have additional options such as modems for wireless and wired transfer of results from the very polling place...."[60]

98.    Vice reported in 2019, "[A] group of election security experts have found what they believe to be nearly three dozen backend election systems in 10 states connected to the internet over the last year, including some in critical swing states. These include

---

[58] Brad Johnson, *Texas Rejected Use of Dominion Voting System Software Due to Efficiency Issues*, The Texan (Nov. 19, 2020) (https://thetexan.news/texas-rejected-use-of-dominion-voting-system-software-due-to-efficiency-issues/).

[59] Kim Zetter, *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials*, Vice (Aug. 8, 2019) (https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials).

[60] Economy & Business, *Interview: How do the others do this? A technological solution exists for elections with complete security, privacy, and transparency* pp.30, 31 (May 2016)(https://ekonomijaibiznis.mk/ControlPanel/Upload/Free_Editions/wZ0X5bz60KCg pcvFcEBvA/maj%202016%20ENG/mobile/index.html#p=31).

systems in nine Wisconsin counties, in four Michigan counties, and in seven Florida counties. . . . [A]t least some jurisdictions were not aware that their systems were online[.] . . . Election officials were publicly saying that their systems were never connected to the internet because they didn't know differently."[61]

99.     In 2020, a team of election security experts found more than 35 voting systems were online. NBC reported that election equipment was in fact connected to the internet, making it susceptible to hacking, and "The three largest voting manufacturing companies — Election Systems & Software, Dominion Voting Systems and Hart InterCivic — have acknowledged they all put modems in some of their tabulators and scanners. . . . Those modems connect to cell phone networks, which, in turn, are connected to the internet . . . . 'Once a hacker starts talking to the voting machine through the modem . . . they can hack the software in the voting machine and make it cheat in future elections,' [a Princeton computer science professor and expert on elections] said."[62]

---

[61] Kim Zetter, *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials*, Vice (Aug. 8, 2019) (https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems-have-been-left-exposed-online-despite-official-denials).
[62] Kevin Monahan, Cynthia McFadden, and Didi Martinez, *'Online and Vulnerable': Experts find nearly three dozen U.S. voting systems connected to internet*, NBC News (Jan. 10, 2020) (https://www.nbcnews.com/politics/elections/onlinevulnerable-experts-find-nearly-three-dozen-u-s-voting-n1112436).



100.    In a 2019 story about the DEFCON Hacking Conference, NBC News reported that Dominion avoided participation in the conference; that hackers can target voting systems with ease; and that Dominion's election equipment is connected to the internet.[63]



101.    In 2017, Dominion refused to respond to CNNTech's request for comment about its hackable election equipment. CNNTech also asked Jake Braun, a former security advisor for the Obama administration and organizer of the DEFCON Hacking Conference,

---

[63] NBC News, *How Hackers Can Target Voting Machines* (Aug. 12, 2019) (https://www.youtube.com/watch?v=QtWP0KDx2hA).

"Do you believe that right now, we are in a position where the 2020 election will be hacked?" Braun answered, "Oh, without question. I mean the 2020 election will be hacked no matter what we do. . . ."[64]



102.     The Congressional Task Force on Election Security's Final Report in January 2018 identified the vulnerability of U.S. elections to foreign interference:[65] "According to DHS, Russian agents targeted election systems in at least 21 states, stealing personal voter records and positioning themselves to carry out future attacks. . . media also reported that the Russians accessed at least one U.S. voting software supplier . . . in most of the targeted states officials saw only preparations for hacking . . . [but] in Arizona and Illinois, voter registration databases were reportedly breached. . . If 2016 was all about preparation, what more can they do and when will they strike? . . . [W]hen asked in March about the prospects

---

[64] CNN Business, *We watched hackers break into voting machines* (Aug. 11, 2017) (https://www.youtube.com/watch?v=HA2DWMHgLnc).
[65] CONGRESSIONAL TASK FORCE ON ELECTION SECURITY, FINAL REPORT (2018) (https://homeland.house.gov/imo/media/doc/TFESReport.pdf) (Ex. 9).

for future interference by Russia, then-FBI Director James Comey testified before Congress that: '[T]hey'll be back. They'll be back in 2020. They may be back in 2018.'"[66]

103.   The Congressional Task Force on Election Security report also stated, "many jurisdictions are using voting machines that are highly vulnerable to an outside attack," in part because "many machines have foreign-made internal parts." Therefore, "'[A] hacker's point-of-entry into an entire make or model of voting machine could happen well before that voting machine rolls off the production line.'"[67]

104.   In 2016, "Russian agents probed voting systems in all 50 states, and successfully breached the voter registration systems of Arizona and Illinois."[68] The Robert Mueller report and a previous indictment of twelve Russian agents confirmed that Russian hackers had targeted vendors that provide election software, and Russian intelligence officers "targeted employees of [REDACTED], a voting technology company that developed software used by numerous U.S. counties to manage voter rolls, and installed malware on the company network."[69]

105.   A 2015 report issued by the Brennan Center for Justice listed two and a half-pages of instances of issues with voting machines, including a 2014 post-election investigation into machine crashes in Virginia which found "voters in Virginia Beach

---

[66] *Id*. at 6-7.

[67] *Id*. at 25.

[68] Jordan Wilkie, '*They think they are above the law': the firms that own America's voting system*, The Guardian (Apr. 23, 2019) (https://www.theguardian.com/us-news/2019/apr/22/us-voting-machine-private-companies-voter-registration).

[69] Robert S. Mueller, III, *Report On The Investigation Into Russian Interference In The 2016 Presidential Election*, vol. 1, p. 51 (Mar. 2019) (https://www.justice.gov/archives/sco/file/1373816/download).

observed that when they selected one candidate, the machine would register their selection for a different candidate."[70] The investigation also found that the Advanced Voting Solutions WINVote machine, which is Wi-Fi-enabled, "had serious security vulnerabilities" because wireless cards on the system could allow "an external party to access the [machine] and modify the data [on the machine] without notice from a nearby location," and "an attacker could join the wireless ad-hoc network, record voting data or inject malicious [data.]"[71]

106.   HBO's documentary *Kill Chain: The Cyber War on America's Elections* details the vulnerability of election equipment, including Dominion's. In the film, Harri Hursti, a widely recognized data security expert, shows that he hacked digital election equipment to *change votes* in 2005. According to Hursti, the same Dominion machine that he hacked in 2005 was slated for use in 20 states for the 2020 election.[72]

107.   In *Kill Chain*, Marilyn Marks, Executive Director of the Coalition of Good Governance, states, "In Georgia, we ended up seeing the strangest thing. In a heavily democratic precinct, there was one machine out of a seven-machine precinct that showed heavy republican wins, while the precinct itself and all of the other machines were showing heavy democratic wins." Dr. Kellie Ottoboni, Department of Statistics, UC Berkeley,

---

[70] Lawrence Norden and Christopher Famighetti, *America's Voting Machines at Risk*, Brennan Center for Justice p.13 (Sep. 15, 2014) (https://www.brennancenter.org/sites/default/files/2019-08/Report_Americas_Voting_Machines_At_Risk.pdf) (Ex. 10).
[71] *Id.* at 12.
[72] Simon Ardizzone, Russell Michaels, and Sarah Teale, *Kill Chain: The Cyber War on America's Elections*, HBO (Mar. 26, 2020) (https://play.hbomax.com/feature/urn:hbo:feature:GXk7d3QAJHI7CZgEAACa0?reentered=true&userProfileType=liteUser Profile).

stated the likelihood of this happening is "an astronomically small chance," less than one in a million.[73]



108.    In December 2020, the Department of Homeland Security's Cybersecurity & Infrastructure Agency ("CISA") revealed that malicious hackers had compromised and exploited SolarWinds Orion network management software products.[74] On April 15, 2021, the White House announced imposition of sanctions on Russia in response to Russian "malicious cyber activities, such as the SolarWinds incident."[75]

109.    Dominion CEO John Poulos stated that Dominion did not use SolarWinds.

110.    Dominion in fact did use SolarWinds.

---

[73] Screenshot from
https://www.facebook.com/KillChainDoc/videos/2715244992032273/.
[74] CISA, *CISA issues emergency directive to mitigate the compromise of SolarWinds Orion network management products* (Dec. 14, 2020) (https://www.cisa.gov/news/2020/12/13/cisa-issues-emergency-directive-mitigate-compromise-solarwinds-orion-network).
[75] The White House, *Fact Sheet: Imposing Costs for Harmful Foreign Activities by the Russian Government* (Apr. 15, 2021) (https://www.whitehouse.gov/briefing-room/statements-releases/2021/04/15/fact-sheet-imposing-costs-for-harmful-foreign-activities-by-the-russian-government/).

111.    Dominion's website formerly displayed a SolarWinds logo, but that logo was removed.[76]



112.    Dominion refuses to provide access to experts to forensically investigate its "proprietary" software, machines, and systems, to determine whether its election equipment has been hacked.

## J.    Evidence shows that Dominion's electronic election equipment was manipulated in connection with the 2020 elections.

113.    On Monday, November 2, 2020, the day before the 2020 election, Dominion uploaded software updates into election equipment that Dominion had supplied in the United States.[77]

114.    These software uploads were unplanned and unannounced.

115.    In some counties in Georgia, Dominion's software update caused election equipment to malfunction the next day during the election.[78] The supervisor of one County

---

[76] Zachary Stieber, *Dominion Voting Systems Uses Firm That Was Hacked*, The Epoch Times (Dec. 14, 2020) (https://www.theepochtimes.com/mkt_app/dominion-voting-systems-uses-firm-that-was-hacked_3617507.html).
[77] Kim Zetter, *Cause of Election Day Glitch in Georgia counties Still Unexplained*, Politico (Nov. 12, 2020, 10:28 PM)
(https://www.politico.com/news/2020/11/04/Georgia-election-machine-glitch-434065).
[78] *See id*.

Board of Elections stated that Dominion "uploaded something last night, which is not normal, and it caused a glitch," and "[t]hat is something that they don't ever do. I've never seen them update anything the day before the election."[79]

116.   Dominion had earlier publicly denied that any updates just prior to election day were made and that its election equipment was connected to the internet—both of which were false statements.[80]

117.   During the 2020 election Dominion election equipment across the country was connected to the internet when it should not have been.[81]

118.   A Dominion representative in Wayne County, Michigan stated that during the voting in the 2020 election there were irregularities with Dominion's election equipment, including that equipment was connected to the internet and equipment had scanning issues.

119.   In Wisconsin, during the voting in the 2020 election, Dominion election equipment that was not supposed to be connected to the internet was connected to a "hidden" Wi-Fi network.[82] Michael Spitzer-Rubenstein, acting on behalf of a political party, was given access to a hidden Wi-Fi network at an election center where votes were

---

[79] *Id.*

[80] *Dominion Voting Machines Were Updated Before Election, Georgia Official Confirms*, The Epoch Times (Dec. 4, 2020) (https://www.theepochtimes.com/dominion-voting-machines-were-updated-before-election-georgia-official-confirms_3604668.html).

[81] Aff. of Patrick J. Colbeck, *Costantino v. City of Detroit*, no. 20-014780-AW (Wayne Co., Mich. Cir. Ct. Nov. 8, 2020).

[82] M.D. Kittle, *Emails: Green Bay's 'Hidden' Election Networks*, Wisconsin Spotlight (Mar. 21, 2021) (https://wisconsinspotlight.com/emails-green-bays-hidden-election-networks/).

being counted.[83] Spitzer-Rubenstein received an email from Trent Jameson, director of event technology at Green Bay's Central Count location, which stated, "One SSID [for a Wi-Fi network] will be hidden and it's: 2020vote. There will be no passwords or splash page for this one and it should only be used for the sensitive machines that need to be connected to the internet."

120.   Attorneys representing an unsuccessful Democratic candidate in a 2020 New York congressional election filed a brief identifying Dominion election equipment errors and election issues, arguing, "discrepancies between the number of votes cast and the number of votes tabulated have been pervasive in the counting of ballots for this race . . . In addition to the table-to-machine count discrepancies of which the parties are aware, there have also been procedural inconsistencies that question the integrity of the process . . . [T]he audit results revealed 'unexplained discrepancies' but failed to provide any explanation . . . what caused those discrepancies or if they were ever resolved . . . In this case, there is reason to believe that voting tabulation machines misread *hundreds* if not *thousands* of valid votes as undervotes . . ."[84]

121.   Following the 2020 election, lawmakers in multiple states initiated investigations and audits of the results, often directing particular attention to Dominion's voting systems.

---

[83] M.D. Kittle, *Democrats' Operative Got Secret Internet Connection at Wisconsin Election Center, Emails Show*, Daily Signal (Mar. 23, 2021) (https://www.dailysignal. com/2021/03/23/democrats-operative-got-secret-internet-connection-at-wisconsin-election-center-emails-show/).
[84] Mem. in Supp. of Prop. Ord. to Show Cause of Resp. Anthony Brindisi 2, 6, 7, 10, *Tenney v. Oswego Cty. Bd. of Elections*, No. EFC-2020-1376 (Oswego Cty., N.Y., Feb. 1, 2021).

a. Congressman Paul Gosar called for a special session of the Arizona legislature to investigate the accuracy and reliability of the Dominion ballot software.[85] The Arizona senate hired a team of forensic auditors consisting of four companies to review Maricopa's election process.[86] A week later, attorneys sent each of those four companies a threatening cease-and-desist letter, improperly attempting to influence the reviews.[87] A partial audit report was issued on September 24, 2021, incomplete because the auditors were denied access to necessary information.[88] The report's findings included the following: (1) "None of the various systems related to elections had numbers that would balance and agree with each other. In some cases, these differences were significant"; (2) "Files were missing from the Election Management System (EMS) Server"; (3) "Logs appeared to be intentionally rolled over, and all the data in the database related to the 2020 General Election had been fully cleared"; (4) "Software and patch protocols were not

---

[85] Hannah Bleau, *Rep. Paul Gosar Calls on Arizona Officials to 'Investigate the Accuracy' of the Dominion Ballot Software After Reports of 'Glitches,'* Breitbart (Nov. 7, 2020) (https://www.breitbart.com/politics/2020/11/07/rep-gosar-calls-on-az-officials-investigate-the-accuracy-of-the-dominion-ballot-software-after-reports-of-glitches/).

[86] *Arizona Senate hires auditor to review 2020 election in Maricopa County* (Mar. 31, 2021) (https://www.azsenaterepublicans.com/post/arizona-senate-hires-auditor-to-review-2020-election-in-maricopa-county) (Ex. 11).

[87] Letter from Sara Chimene-Weiss, James E. Barton II, Roopali H. Desai, and Sarah R. Gonski to Cyber Ninjas, CyFir, Digital Discovery, and Wake Technology Services (Apr. 6, 2021) (https://www.democracydocket.com/wp-content/uploads/2021/04/Protect-Democracy-Letter.pdf) (Ex. 12).

[88] *Maricopa County Forensic Election Audit, Volume III* p.60 (Sept. 24, 2021) (https://c692f527-da75-4c86-b5d1-8b3d5d4d5b43.filesusr.com/ugd/2f3470_d36cb5eaca56435d84171b4fe7ee6919.pdf).

followed"; (5) basic cyber security best practices and guidelines from the CISA were not followed; (6) "Legislation should be considered that would prohibit connecting tabulators, or the Election Management System Servers or other similar equipment from being connected to the internet or any other mechanism that could allow remote access to these systems."[89]

b.  In Antrim County, Michigan, where Dominion voting machines were used, 6,000 votes were discovered to have been wrongly switched between Presidential candidates, due to a failure reported as a "glitch."[90]  In ensuing litigation surrounding that switch, evidence was presented that Dominion voting machines are connected to the internet, either by Wi-Fi or a LAN wire; there are multiple ways election results could be modified and leave no trace; and the same problems have been around for 10 years or more.[91]

c.  On April 12, 2021, New Hampshire Governor Christopher Sununu announced he had signed legislation appointing an audit of a Rockingham County race. The county had relied upon Dominion voting machines after suspicious uniform shorting of vote tallies for four candidates was

---

[89] *Maricopa County Forensic Election Audit, Volume I,* pp.1-3 (Sept. 24, 2021) (https://c692f527-da75-4c86-b5d1-8b3d5d4d5b43.filesusr.com/ugd/2f3470_a91b5cd3655445b498f9acc63db35afd.pdf).
[90] Jack Windsor, *Votes for Trump Went to Biden in Antrim County, Michigan*, The Michigan Star (Nov. 7, 2020) (https://themichiganstar.com/2020/11/07/votes-for-trump-went-to-biden-in-antrimcounty-michigan/).
[91] Pl.'s Collective Resp. to Defs.' and Non-Party Counties' Mots. to Quash and for Protective Orders at Exs. 7-8 (April 9, 2021), *Bailey v. Antrim County*, No. 20-9238 (Antrim Cty., Mich., Apr. 8, 2021).

uncovered. The resulting report found issues with the Dominion machines used to count absentee ballots.

d. On March 23, 2021 the Wisconsin Assembly ordered an investigation into the 2020 election.[92] Wisconsin used Dominion electronic election equipment in the election.

e. During a December 30, 2020 live-streamed hearing held by the Georgia Senate Judiciary Subcommittee on Elections, an expert witness testified that an active Dominion polling pad had been hacked and the intrusion was being maintained even as he was speaking.[93] Legislators were also shown replays of real-time news reports that tens of thousands of votes were switched from Donald Trump to Joe Biden in several counties in Georgia. For example, in Bibb County, Trump was reported to have 29,391 votes at 9:11 pm EST while simultaneously Biden was reported to have 17,218 votes. A minute later at the next update, these vote numbers switched, with Trump now having 17,218 votes and Biden having 29,391—a 12,173-vote switch in Biden's favor. YouTube removed this news video after the switch was revealed.[94]

---

[92] Scott Bauer, *Wisconsin Assembly OKs investigation into 2020 election*, FOX6 News Milwaukee (Mar. 23, 2020) (https://www.fox6now.com/news/wisconsin-assembly-approves-election-investigation).

[93] Hearing of Georgia Senate Judiciary Subcommittee on Elections, Dec. 30, 2020 (https://www.youtube.com/watch?v=D5c034r0RlU beginning at 4:07:58).

[94] *See Georgia Data Show Over 30,000 of Trump's Votes Removed, Another 12,173 Switched to Biden: Data Scientists*, The Epoch Times (Jan. 2, 2021) (https://www.theepochtimes.com/georgia-election-data-shows-17650-votes-switched-from-trump-to-biden-data-scientists_3640670.html).

      f.   Investigations into the 2020 election are ongoing in Pennsylvania and Wisconsin, states which also used Dominion voting machines.

122.    In April 2021, the Biden administration announced sanctions against Russia for election interference and hacking in the 2020 United States presidential election.[95]

123.    Dominion also provides numerous and continuous updates to the software on the electronic election equipment it distributes.

124.    During one such update in May 2021, Dominion deleted 2020 election related data, and continues to do so through additional updates.

**K.    Michael Lindell Speaks out about the 2020 elections**

125.    Michael Lindell, the CEO of MyPillow, has spoken out in his personal capacity about Dominion, electronic election equipment, and issues of election integrity. Lindell made speeches, gave interviews, and posted his thoughts and opinions on social media.

126.    In making these statements, Lindell spoke for himself, not MyPillow. MyPillow has not engaged in discussion about the 2020 election. However, as an American company supporting American constitutional values, MyPillow unreservedly supports Lindell's right to exercise his First Amendment freedoms concerning matters of critical public concern, like election matters.

---

[95] *See, e.g.*, Natasha Truak and Amanda Macias, *Biden administration slaps new sanctions on Russia for cyberattacks, election interference*, CNBC (Apr. 16, 2021) (https://www.cnbc.com/2021/04/15/biden-administration-sanctions-russia-for-cyber-attacks-election-interference.html).

**L.      Dominion attacks Lindell and MyPillow.**

127.    Dominion aggressively pushed a narrative that there should be no concern regarding the integrity of the election. Dominion took equally aggressive action to demand no criticism. In response to Lindell's exercise of his First Amendment free speech rights, Dominion launched its "lawfare" campaign against both Lindell and MyPillow. Lawfare is the use of the legal system as part of wrongful scheme to attack another person and inflict extra-judicial harm upon them. Here, Dominion's scheme is wrongful because Dominion's purpose is to punish and deter important constitutionally-protected activity – free expression about a matter of public concern.

128.    In furtherance of this scheme, Dominion had threatening lawyer letters delivered, filed enormous lawsuits against MyPillow (and others), sensationalized the lawsuits through a large media campaign, and threatened to file additional lawsuits against anyone who exercises their constitutionally protected right to free expression in a matter contrary to the interests of Dominion and its allies. Dominion has issued a general threat to all ("our legal team is looking at frankly everyone, and we're not ruling anybody out") and sharpened that threat by delivering it to specific individuals ("Litigation regarding these issues is imminent") – sometimes accompanied by copies of lawsuits Dominion already filed.

129.    MyPillow and its employees have suffered severe extra-judicial harm from Dominion's scheme.

**M.    Dominion is using the legal process to censor, attack, and destroy anyone who questions the 2020 election and voting machine hacking and manipulation.**

130.    Through aggressive litigation, threats of litigation, and publicization of these activities, Dominion seeks to stop criticism of electronic election equipment and suppress information about how equipment that it supplied has been hacked in American elections. This campaign of lawfare is intended to stifle *any* and *all* public debate about the reliability of the election results, whether such speech is related to Dominion or not.

131.    Dominion has filed a $1.3 billion lawsuit against Sidney Powell. Dominion has filed a $1.3 billion lawsuit against Rudy Giuliani. Dominion has filed a $1.3 billion lawsuit against Patrick Byrne. Dominion has filed a $1.6 billion lawsuit against Fox News. Dominion has filed a $1.3 billion lawsuit against MyPillow and its CEO. Dominion has filed a $1.73 billion lawsuit against One America News Network. And Dominion has filed a $1.73 billion lawsuit against Newsmax Media, Inc. Yet Dominion's annual revenues are only about $90 million.[96] Dominion's exaggerated lawsuits are not about any damages it has suffered; they are designed to intimidate those who exercise their right to free speech about the election.

132.    Dominion amplifies the effect of its exaggerated lawsuits by threatening letters and a publicity campaign.

---

[96] "The entire sector generates only about $300 million in revenue annually, according to Harvard professor Stephen Ansolabehere, who studies elections and formerly directed the Caltech/MIT Voting Technology Project," and "Dominion, [] has about 30% of the market." Jessica Huseman, *The Market for Voting Machines Is Broken. This Company Has Thrived in It.* (Oct. 28, 2019) (https://www.propublica.org/article/the-market-for-voting-machines-is-broken-this-company-has-thrived-in-it).

a.  Dominion has sent at least 150 attorney letters, threatening the recipients with legal action. Some of these letters include copies of Dominion's legal papers in its lawsuits. The clear message of these letters is that anyone who comments publicly about Dominion will be ruined.[97]

b.  Dominion sent threatening letters to numerous individuals who signed sworn affidavits that were used in litigation about the election process. In many cases, the individuals' affidavits did not include any statement about Dominion or the election. But Dominion's campaign is total; it seeks to deter *any public expression* about the election. Dominion's clear threats that it will sue witnesses who testify about election irregularities or fraud does not threaten just the individual witnesses; it threatens the integrity of the justice system as a whole.

c.  In one instance, Dominion sent an intimidating letter to *the uncle* of an attorney involved in litigation about the 2020 election. The uncle himself had no involvement, but for the circumstance of being related to someone investigating Dominion and the election, Dominion accused him of disseminating misinformation and making false accusations. Its letter threatened, "Litigation regarding these issues is imminent."

---

[97] *See Cooper v. US Dominion, Inc.*, Case No. 1:21-cv-02672-STV (U.S. Dist. Ct., Dist. of Colo.).



d. Another individual, an actuary, performed statistical analyses, inquiring whether the presence of Dominion voting machines affected election outcomes. He found nonrandom differences in counties that used Dominion machines. Dominion mailed him a box, pictured below, full of legal papers, which included lawsuits filed against other citizens along with a threatening demand letter.



133.    To further amplify the impact of its legal letters and exaggerated lawsuits, Dominion has bragged about and widely publicized them, seeking to ensure that everyone – not just the recipients of its attorney letters – knows they will be punished if they speak against Dominion, and anyone could be the next victim of a Dominion billion-dollar lawsuit. For example:

      a.  In a nationally televised interview, Dominion CEO John Poulos announced, **"Our legal team is looking at frankly everyone, and we're not ruling anybody out."** He said Dominion's previous lawsuit was "definitely not the last lawsuit" it would be filing.



b. Dominion's website prominently displays its lawsuits, even ahead of its own products, and statements from its attorneys. The website boasts, "Dominion has also sent preservation request letters to Powell, Giuliani, Fox, OAN, and Newsmax, as well as more than 150 other individuals and news organizations. Stay tuned to this page for updates."[98]

134. The substantial expense of litigation in defamation lawsuits brought by state actors (like Dominion) against their critics has an enormous chilling effect on speech.

135. Dominion's use of lawfare tears at the fabric of our constitutional order. If successful, the scheme will cripple our system's ability to ferret out and stop electoral manipulation, as well as cut a wide hole in the First Amendment.

**N.     Dominion's wrongful attack against MyPillow and the damaging fallout.**

136. Dominion's campaign descends from a long and sad history in this country, the McCarthy era in which lives and organizations were destroyed, and families torn apart, for being labeled a Communist. Just as during that era being *associated* with a suspected

---

[98] DOMINION VOTING, *Legal Updates* (https://www.dominionvoting.com/legal-updates-learn-how-we-are-defending-dominion/) (last visited Nov. 30, 2021).

Communist could end a professional career,[99] so too today, those who, like MyPillow are merely associated with a critic of Dominion and the integrity of the 2020 election, face expulsion from public life in large parts of America. Dominion is using today's cancel culture to eliminate dissent and to cover up the election issues that compromised the 2020 result.

137.   Even giant, publicly traded retailers are not immune from public opinion and political pressures. Fearing retribution in the marketplace, many of MyPillow's commercial suppliers and buyers have as a direct result of Dominion's crusade terminated longstanding relationships with MyPillow which were projected to grow.

     a.  Directly following Dominion's publicized threats to sue MyPillow's CEO, as promoted through national media, a nationwide retailer canceled a significant purchase order with MyPillow.

     b.  Directly following Dominion's filing of its lawsuit against MyPillow, MyPillow lost another significant nationwide-retailer customer.

     c.  A third retailer cited the coverage in the media of Dominion's campaign as the reason for cutting ties with MyPillow.

     d.  Numerous others have cut ties as well, for the same reasons.[100]

138.   MyPillow has suffered the loss of access to marketing media as a result of Dominion's highly publicized lawfare campaign.

---

[99]  James E. Moliterno, *Politically Motivated Bar Discipline*, 83 WASH. U. L. Q., 725, 729 (2005).
[100] Justin Barclay, *The Official List of Every Business That Has Dropped MyPillow,* West Michigan Live Blog (Feb. 10, 2021) (https://woodradio.iheart.com/content/2021-02-10-the-official-list-of-every-business-that-has-dropped-mypillow/).

a. Following Dominion's lawsuit against MyPillow, a radio station representing a key advertising stream canceled its relationship with MyPillow.

b. Many of MyPillow's social media platforms have been limited, restricted, or removed altogether. Immediately following, and as a direct result of Dominion's legal threats and media attacks against MyPillow, MyPillow was deplatformed from a major social media outlet, which significantly harmed the company and the brand.

139.   MyPillow has suffered from attacks on the employees on whom it relies to accomplish its production and sales.

a. MyPillow employees are subjected to daily hateful and barbaric calls, emails, and comments on the company's social media platforms.

b. MyPillow employees have been subjected to ridicule in their personal lives, and death threats necessitating protection from local law enforcement. Dominion's actions have seeped into nearly every aspect of their personal lives, including their ability to use social media freely and feel comfortable in their homes, neighborhoods, and workplace.

c. MyPillow employees have been forced to limit (and even remove) private social media posts, profile pictures, information, and accounts for fear of harassment by Dominion and those it stirs up.

140.   All this damage to MyPillow and its employees was intentionally caused by Dominion. MyPillow has not made a single statement about Dominion prior to Dominion's

lawsuit. Dominion nonetheless targeted MyPillow and its employees with one of the largest defamation lawsuits in history and encouraged a firestorm of media coverage in order to punish MyPillow for the free speech of its founder—and to send a message to others to stay silent.

141.    MyPillow has never entered the public debate about the 2020 election; again, it has made no statement about Dominion whatsoever. Yet Dominion, an agent of the government, has intentionally and wrongfully inflicted great harm upon MyPillow and its employees.

142.    In the context of election integrity—so crucial to the functioning and survival of a republican form of government—no litigant should be able to weaponize the courts and the litigation process while hiding behind legal doctrines originally intended and developed to *protect* constitutional rights, such as the right to petition the government, and the right to a full and fair opportunity to be heard in a court of law.

143.    Dominion may attempt to hide behind legal doctrines (like the *Noerr-Pennnington* doctrine or the "absolute privilege" protecting statements made in the course of judicial proceedings) to *deprive* Lindell and other litigants of their sacrosanct right of freedom of speech. Through its campaign to suppress political dissent, Dominion has pitted the right to petition the government against the right to free speech. Dominion's actions have abused the right to petition the government in an effort to suppress Lindell's and others' lawful and proper exercise of their freedom of speech. MyPillow has been harmed as a result and brings these counterclaims to recover for that harm and bring an end the

defendants' reign of litigation terror and conspiracy to deprive Lindell and others of their constitutionally protected freedom of political expression.

144.   In short, MyPillow brings these counterclaims to put an end to Dominion's campaign of "Lawfare" against those who criticize its electronic election equipment, or who question its role in the indisputably suspect conduct of the 2020 Presidential Election. MyPillow's claims rise above any protections the defendants may assert to wage their lawfare campaign, because those protections do not and should not immunize state actors from weaponizing the judicial system and the litigation process to silence dissent or unpopular beliefs.

## CAUSES OF ACTION

### Count 1
### 42 U.S.C. § 1983
### First Amendment Violations
### (Lawfare)

145.   MyPillow repeats and realleges all allegations set forth above as if they were stated in full and incorporated herein.

146.   Counterclaim-Defendants, at all times relevant hereto, were performing and fulfilling a traditional and exclusive state governmental function of administering public elections, pursuant to state statutes, ordinances, regulations, customs, rules and policies established thereunder, and as such, were acting under color of state law.

147.   As detailed above, Counterclaim-Defendants, in their role as agents administering public elections, have conducted an expansive illegal campaign which was designed to, and did, punish and silence any voice that criticized or questioned Counterclaim-Defendants' actions or products.

148.   Counterclaim-Defendants' illegal campaign to punish and silence their critics violates the guarantee of free speech and expression provided by the First Amendment and, as applied against state and local government entities, the Fourteenth Amendment.

149.   Counterclaim-Defendants intended to harm MyPillow as part of their illegal campaign, because of MyPillow's affiliation with its CEO Michael Lindell, who publicly expressed opinions that Counterclaim-Defendants wrongfully sought to suppress and punish.

150.   Counterclaim-Defendants' illegal campaign to punish and silence their critics violated the First Amendment rights of MyPillow by (a) intentionally seeking, through threats, intimidation, and litigation, to deter MyPillow from exercising its free speech rights, thereby chilling the future exercise of its Constitutional rights; (b) intentionally seeking, through threats, intimidation, and litigation, to deter MyPillow from expressing in the future any idea or opinion disliked by Counterclaim-Defendants in MyPillow's advertising and promotional materials, including the use of particular words as coupon codes.

151.   Counterclaim-Defendants' deprivation of MyPillow's Constitutional rights, both directly and as a third party, caused injury to MyPillow, including, but not limited to, loss of long-standing business relationships, loss of customer and supplier contracts, loss of promotional access in media, expenditure of attorney fees, emotional distress of employees resulting from threats and verbal attacks, diversion of employee time and

attention away from MyPillow, and the chilling of MyPillow's Constitutional right to free speech and expression.

## Count 2
## 42 U.S.C. § 1983
## Reprisal

152.    MyPillow repeats and realleges all allegations set forth above as if they were stated in full and incorporated herein.

153.    Counterclaim-Defendants, at all times relevant hereto, were performing and fulfilling a traditional and exclusive state governmental function of administering public elections, pursuant to state statutes, ordinances, regulations, customs, rules and policies established thereunder, and as such, were acting under color of state law.

154.    Counterclaim-Defendants intended to harm MyPillow as part of their illegal campaign, because of MyPillow's affiliation with its CEO Michael Lindell, who publicly expressed opinions that Counterclaim-Defendants wrongfully sought to suppress and punish.

155.    Counterclaim-Defendants' reprisal actions were motivated, at least in part, by Lindell's and MyPillow's exercise of free speech rights under the First Amendment and, as applied against state and local government entities, the Fourteenth Amendment.

156.    Counterclaim-Defendants' reprisal actions would chill a person of ordinary firmness from continuing in the constitutionally protected activity, and indeed, Counterclaim-Defendants' reprisal actions have chilled MyPillow from exercising its First Amendment free speech rights.

157.    Counterclaim-Defendants' deprivation of MyPillow's Constitutional rights, both directly and as a third party, caused injury to MyPillow, including, but not limited to, loss of long-standing business relationships, loss of customer and supplier contracts, loss of promotional access in media, expenditure of attorney fees, emotional distress of employees resulting from threats of verbal attacks, diversion of employee time and attention away from MyPillow, and the chilling of MyPillow's Constitutional right to free speech and expression.

**Count 3**
**42 U.S.C. § 1983**
**Fourteenth Amendment Violations**

158.    MyPillow repeats and realleges all allegations set forth above as if they were stated in full and incorporated herein.

159.    Counterclaim-Defendants, at all times relevant hereto, were performing and fulfilling a traditional and exclusive state governmental function of administering public elections, pursuant to state statutes, ordinances, regulations, customs, rules and policies established thereunder, and as such, were acting under color of state law.

160.    As detailed above, Counterclaim-Defendants, in their role as agents administering public elections, have conducted an expansive illegal campaign which was designed to, and did, punish and silence any voice that criticized or questioned Counterclaim-Defendants' actions or products – in part by creating public pressure on MyPillow's commercial counterparties to terminate their relationships with MyPillow.

161.    Counterclaim-Defendants intended to harm MyPillow as part of their illegal campaign, because of MyPillow's affiliation with its CEO Michael Lindell, who publicly

expressed opinions that Counterclaim-Defendants wrongfully sought to suppress and punish.

162.   As the result of Counterclaim-Defendants' actions, and as expected and intended by them, MyPillow suffered the loss of substantial property interests, including, but not limited to, loss of long-standing business relationships, loss of supplier contracts, and loss of access to promotional access in media.

163.   MyPillow was not provided due process in connection with the loss of its property interests caused by Counterclaim-Defendants.

164.   In the alternative, Counterclaim-Defendants illegally created a danger of injury to MyPillow, and MyPillow was then injured in its property interests through the danger source created by Counterclaim-Defendants.

    a.   MyPillow was a member of a limited, precisely definable group, specifically, individuals and entities targeted by Counterclaim-Defendants on the basis of their expression of ideas that Counterclaim-Defendants desired to suppress or their affiliation with someone who expressed ideas that Counterclaim-Defendants desired to suppress.

    b.   Counterclaim-Defendants' conduct put MyPillow at a significant risk of serious, immediate and proximate harm. Specifically, Counterclaim-Defendants' campaign of threats, litigation, and public vilification created, and was intended to create, a significant risk that contract partners, suppliers, media sources, and others in the marketplace would terminate MyPillow's supply relationships, sales channels, and marketing avenues. Counterclaim-

Defendants sought to, and did, stir up the ostracization and termination of MyPillow from its commercial connections.

c. The risk of this outcome was obvious and known to Counterclaim-Defendants, because their public campaign was intended to turn the marketplace against MyPillow, as part of Counterclaim-Defendants' plan to punish and silence their critics and those associated with their critics.

d. Counterclaim-Defendants acted recklessly and in conscious disregard of the risk to MyPillow, intentionally pursuing their campaign of threats, litigation, and public vilification.

e. Counterclaim-Defendants' conduct shocks the conscience because it was motivated by an intent to harm MyPillow, or at minimum was pursued with deliberate indifference to injuries to MyPillow that would likely result from Counterclaim-Defendants' campaign against Michael Lindell.

165.   Counterclaim-Defendants are liable to MyPillow pursuant to 42 U.S.C. § 1983 for the injury inflicted under color of law by them upon MyPillow, through the deprivation of rights, privileges, and immunities secured by the Constitution, by depriving MyPillow of property without due process of law in violation of the Fourteenth Amendment.

166.   Counterclaim-Defendants' deprivation of MyPillow's Constitutional rights, both directly and as a third party, caused injury to MyPillow, including, but not limited to, loss of long-standing business relationships, loss of supplier contracts, loss of promotional access in media, expenditure of attorney fees, emotional distress of employees resulting

from threats of verbal attacks, diversion of employee time and attention away from MyPillow, and the chilling of MyPillow's Constitutional right to free speech and expression.

## Count 4
### Tortious Interference with Prospective Economic Advantage

167.   MyPillow repeats and realleges all allegations set forth above as if they were stated in full and incorporated herein.

168.   Counterclaim-Defendants intentionally and improperly interfered with MyPillow's prospective contractual relations by falsely maligning MyPillow in public, thereby inducing many of MyPillow's commercial suppliers and buyers to terminate their long-standing relationships with MyPillow so that MyPillow lost the benefit of its expected future sales to and from these entities.

169.   As detailed in the allegations above, Counterclaim-Defendants have intentionally and improperly made false statements about MyPillow, including, but not limited to, false statements regarding MyPillow's position on controversial political issues and false statements that MyPillow authorized and recognized numerous promotional codes that supported various terroristic ideals, groups, or organizations. Counterclaim-Defendants also intentionally and improperly filed and widely publicized a frivolous $1.3 billion lawsuit against MyPillow and publicly threatened to bring additional similar lawsuits against others.

170.   As Counterclaim-Defendants knew or expected would happen, their intentional and improper actions stirred up public controversy and fear surrounding MyPillow that caused MyPillow's commercial suppliers and buyers to dread corresponding

controversy and damage to their own reputations if they continued to engage in business with MyPillow. The sense of negative publicity stirred up by Counterclaim-Defendants caused MyPillow's existing commercial customers, suppliers and buyers, and potential customers, suppliers and buyers, to conclude that MyPillow was too reputationally toxic to engage in business transactions with. Further, Counterclaim-Defendants' frivolous $1.3 billion lawsuit against MyPillow caused MyPillow's current and prospective commercial customers, suppliers and buyers, and potential customers, suppliers and buyers to fear MyPillow would be unable to continue in its ordinary course of business. Further, Counterclaim-Defendants' false publicity campaign caused media companies to terminate Counterclaim-Defendants' access to their broadcast and publishing services.

171.    The commercial relationships that MyPillow lost as a result of Counterclaim-Defendants' wrongful acts taken without legal justification were in many cases longstanding relationships that MyPillow had every reasonable expectation would continue to MyPillow's economic advantage, absent the acts of Counterclaim-Defendants.

172.    Counterclaim-Defendants knew of MyPillow's business, its manufacturing, and its sales, and knew or should have known MyPillow had existing commercial customer, supplier and buyer relationships that MyPillow expected to continue. Yet Counterclaim-Defendants intentionally engaged in their tortious and wrongful acts that Counterclaim-Defendants knew or should have known would cause the loss of MyPillow's expected economic advantages through continued commercial supply and sales transactions.

173.    Absent Counterclaim-Defendants' wrongful acts, MyPillow's longstanding successful commercial customer, supplier and buyer relationships would have continued indefinitely.

174.    Counterclaim-Defendants' wrongful acts have injured MyPillow, including but not limited to MyPillow's loss of customer, supplier, and public good will, loss of long-standing business relationships, loss of supplier contracts, and loss of access to promotional access in media. These injuries have caused substantial pecuniary harm to MyPillow.

## Count 5
## Abuse of Process

175.    MyPillow repeats and realleges all allegations set forth above as if they were stated in full and incorporated herein.

176.    On February 22, 2021, Counterclaim-Defendants filed a lawsuit against MyPillow in the United States District Court for the District of Columbia (the "D.C. Action"), asserting meritless claims that sought to impose liability on MyPillow for personal political statements protected by the First Amendment that had been made by MyPillow's CEO, Michael Lindell. MyPillow made no statements.

177.    Counterclaim-Defendants had an ulterior purpose in filing their D.C. Action against MyPillow. The D.C. Action was brought to support a much larger campaign described above by Counterclaim-Defendants who have intentionally sought to intimidate the American public and deter anyone from publicly discussing and commenting on Counterclaim-Defendants' services, products, and administration of the 2020 election in any way that was unfavorable to Counterclaim-Defendants. Counterclaim-Defendants' ulterior purpose was wrongful and improper.

178.    By filing and pursuing the D.C. Action, Counterclaim-Defendants intentionally sought to make an example of MyPillow, so that all who learned of the action would fear similar actions being brought against themselves and would not criticize Counterclaim-Defendants. Dominion's CEO John Poulos threatened on national television that the D.C. Action against MyPillow was "definitely not the last lawsuit" and that Dominion is "not ruling anyone out."

179.    After filing the D.C. Action, Counterclaim-Defendants mailed copies of the D.C. Action, and other actions they had filed against other parties, to specific individuals whom they sought to intimidate from making statements or providing testimony or sworn statements about the 2020 elections. Counterclaim-Defendants widely publicized the D.C. Action in interviews and on their website, also for intimidation effect. Counterclaim-Defendants filed their action against MyPillow in part to deter the public from speaking freely about Counterclaim-Defendants and to create litigation papers that Counterclaim-Defendants could mail out as part of their campaign to block commentary and evidence about the 2020 elections unfavorable to Counterclaim-Defendants.

180.    Deterrence of public commentary, deterring individuals from providing evidence related to public elections, and deterrence of criticism of Counterclaim-Defendants are not proper objectives for the filing of a lawsuit and are not results within the scope of a civil lawsuit. Yet Counterclaim-Defendants filed, served, and are pursuing the D.C. Action for the intended malicious purpose of accomplishing these results.

181.    Counterclaim-Defendants' abuse of the litigation process for these ends is particularly egregious in light of Counterclaim-Defendants' governmental role of

administering presidential and congressional elections. The sunlight of public discussion, scrutiny, and evidence-gathering is necessary to ensure votes are collected and counted fairly, and to hold those entrusted with administering the process accountable to a high standard of accuracy, security, and reliability.

182.    Counterclaim-Defendants' abuse of the litigation process has caused extensive injury to MyPillow, including, but not limited to, loss of long-standing business relationships, loss of supplier contracts, loss of access to promotional access in media, and expenditure of attorney fees defending against the D.C. Action.

183.    Counterclaim-Defendants are liable to MyPillow for the injuries it has sustained as a result of Counterclaim-Defendants' abuse of process.

## JURY TRIAL DEMANDED

184.    Under Rule 38 of the Federal Rules of Civil Procedure, MyPillow demands a trial by jury of all issues so triable in this action.

## VI.    PRAYER FOR RELIEF

MyPillow requests the following relief:

1.    Entry of judgment in favor of MyPillow against Dominion on Counts 1-5 in this Counterclaim, in an amount to be determined at trial, but at least in an amount that exceeds the jurisdictional limits of this Court;

2.    An award of damages to MyPillow for Dominion's unlawful conduct as set forth herein, including a reasonable multiple of enterprise value, exceeding $1.6 billion;

3.    An award of damages to MyPillow for the suppression and deprivation of its constitutional rights as set forth herein;

4.     An injunction prohibiting any further suppression of speech regarding Dominion's handling of the 2020 election or the integrity of its voting systems;

5.     An award of attorneys' fees, costs, expenses, and disbursements;

6.     An award of pre-judgment and post-judgment interest on all damages owed to MyPillow; and

7.     Such other and further relief as is just and proper.


Dated: December 2, 2021                    **LEWIN & LEWIN, LLP**

                                           By */s/  Nathan Lewin*
                                               Nathan Lewin (D.C. Bar No. 38299)
                                               888 17th Street NW
                                               Fourth Floor
                                               Washington, DC 20006
                                               Telephone: (202) 828-1000
                                               nat@lewinlewin.com


Dated: December 2, 2021                    **PARKER DANIELS KIBORT LLC**

                                           By */s/  Andrew D. Parker*
                                               Andrew D. Parker (MN Bar No. 195042)*
                                               Joseph A. Pull (D.C. Bar No. 982468)
                                               Abraham S. Kaplan (MN Bar No. 399507)*
                                               Ryan P. Malone (MN Bar No. 0395795)*
                                               888 Colwell Building
                                               123 N. Third Street
                                               Minneapolis, MN 55401
                                               Telephone: (612) 355-4100
                                               Facsimile: (612) 355-4101
                                               parker@parkerdk.com
                                               pull@parkerdk.com
                                               kaplan@parkerdk.com
                                               malone@parkerdk.com

                                               *admitted *pro hac vice*

                                           *Attorneys for My Pillow, Inc.*