# EXHIBIT 4

# IN THE SUPERIOR COURT OF FULTON COUNTY
## STATE OF GEORGIA

DONNA CURLING, an individual;                )
                                             )
COALITION FOR GOOD                           )
GOVERNANCE, a non-profit corporation         )
organized and existing under Colorado        )
Law;                                         )
                                             )
DONNA PRICE, an individual;                  )
                                             )
JEFFREY SCHOENBERG, an individual;           )
                                             )
LAURA DIGGES, an individual;                 )
                                             )
WILLIAM DIGGES III, an individual;           )
                                             )
RICARDO DAVIS, an individual;                )
                                             )
     Plaintiffs,                           )
                                             )
     v.                                    )          CIVIL ACTION
                                             )          FILE NO.: 2017CV292233
BRIAN P. KEMP, in his individual             )
capacity and his official capacity as        )
Secretary of State of Georgia and            )
Chair of the STATE ELECTION BOARD;           )          **DEMAND FOR**
                                             )          **JURY TRIAL**
DAVID J. WORLEY, REBECCA N.                   )
SULLIVAN, RALPH F. "RUSTY"                    )
SIMPSON, and SETH HARP, in their             )
individual capacities and their official     )
capacities as members of the STATE           )
ELECTION BOARD;                              )

THE STATE ELECTION BOARD;                              )
                                                       )
RICHARD BARRON, in his individual                      )
capacity and his official capacity as                  )
Director of the FULTON COUNTY                          )
BOARD OF REGISTRATION AND                              )
ELECTIONS;                                             )
                                                       )
MARY CAROLE COONEY, VERNETTA                           )
NURIDDIN, DAVID J. BURGE, STAN                         )
MATARAZZO, AARON JOHNSON,                              )
and MARK WINGATE, in their individual                  )
capacities and official capacities as                  )
members of the FULTON COUNTY                           )
BOARD OF REGISTRATION AND                              )
ELECTIONS;                                             )
                                                       )
THE FULTON COUNTY BOARD OF                             )
REGISTRATION AND ELECTIONS;                            )
                                                       )
MAXINE DANIELS, in her individual                      )
capacity and her official capacity as                  )
Director of the DEKALB COUNTY                          )
BOARD OF REGISTRATION AND                              )
ELECTIONS;                                             )
                                                       )
MICHAEL P. COVENY, ANTHONY                             )
LEWIS, LEONA PERRY, SAMUEL                             )
E. TILLMAN, and BAOKY N. VU                            )
in their individual capacities and official            )
capacities as members of the DEKALB                    )
COUNTY BOARD OF REGISTRATION                            )
AND ELECTIONS;                                         )
                                                       )

THE DEKALB COUNTY BOARD OF       )
REGISTRATION AND ELECTIONS;      )
                                 )
JANINE EVELER, in her individual )
capacity and her official capacity as )
Director of the COBB COUNTY      )
BOARD OF ELECTIONS AND           )
REGISTRATION;                    )
                                 )
PHIL DANIELL, FRED AIKEN, JOE    )
PETTIT, JESSICA BROOKS, and      )
DARRYL O. WILSON in their individual )
capacities and official capacities as )
members of the COBB COUNTY       )
BOARD OF ELECTIONS AND           )
REGISTRATION;                    )
                                 )
THE COBB COUNTY BOARD OF         )
ELECTIONS AND REGISTRATION;      )
                                 )
MERLE KING, in his individual capacity )
and his official capacity as Executive )
Director of the CENTER FOR ELECTION )
SYSTEMS AT KENNESAW STATE        )
UNIVERSITY; and                  )
                                 )
      Defendants.                )
_____)
                                 )
KAREN HANDEL and                 )
THOMAS JONATHAN OSSOFF           )
                                 )
Candidates in Contested Election. )
_____)

**VERIFIED AMENDED ELECTION CONTEST AND
COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF,
DAMAGES, AND WRITS OF MANDAMUS**

COMES NOW, Plaintiffs, named above, to show this Honorable Court the following for their Complaint against the above-named Defendants:

## I.     INTRODUCTION

Georgia's 6th Congressional District voters can never know who was legitimately elected on June 20, 2017 to become their Representative to the 115th United States Congress. They know only the output of an undeniably compromised voting system that—according to Plaintiffs and many of the nation's most qualified experts—generated a result that cannot reasonably be relied upon. To declare that result to be will of the voters—as Defendants have done—is to engage in farce.

The high-profile June 20, 2017 Runoff Election between Karen Handel and Thomas Jonathan "Jon" Ossoff for Georgia's 6th Congressional District ("Runoff") took place in an environment in which sophisticated hackers—whether Russian or otherwise—had the capability and intent to manipulate elections in the United States. These hackers not only had the capability, but they also had easy access. From at least August 2016 through early March 2017, all the computer files that a bad actor would need to manipulate the Runoff and all of Georgia's elections—including tabulation database programs, voting system passwords,

programs used to create voting machine memory cards, and voter registration information—were left out in the open on the internet, without requiring so much as a password to obtain. Without solving these known issues, Defendants willfully conducted the Runoff almost entirely on illegal, unverifiable electronic ballots for which discrepancies cannot be corrected, providing perfect cover for electronic manipulation.

The speculative nature of the Runoff's purported result was caused by Defendants' willful violation of numerous mandatory requirements of Georgia's Election Code, O.C.G.A. Title 21, Chapter 2 ("Election Code"). These requirements prohibited the use of the voting systems that were employed and the resulting certification of their results. Furthermore, Defendants abridged electors' statutory rights of recanvass—rights the electors invoked to attempt to address suspected irregularities in the post-election process prior to the certification of the election results.

This action seeks to set aside the purported result of the Runoff to ensure that 6th Congressional District electors have the free and fair elections to which they are entitled pursuant to the federal Constitution, federal statutory civil rights law, the Georgia Constitution, Georgia statutory law, and Georgia regulations governing elections. It also seeks injunctive relief to ensure that upcoming elections meet statutory and constitutional guarantees.

## II.    PARTIES

### A.    PLAINTIFFS

1.

Plaintiff DONNA CURLING ("Curling") is an elector of the State of Georgia and a resident of Fulton County and the 6th Congressional District of the State of Georgia. Curling is a member of the COALITION FOR GOOD GOVERNANCE. Curling is a Georgia elector who requested that Secretary of State Brian P. Kemp ("Secretary Kemp") reexamine Georgia's Voting System.[1] Curling is an "aggrieved elector who was entitled to vote" for a candidate in the Runoff under Georgia Code Section 21-2-521. Furthermore, the Optical Scanning System[2] under which she cast her vote substantially burdens her right to vote as the system was fundamentally insecure during the Runoff, is not compliant with applicable statutes, and cannot be reasonably relied upon to have properly recorded and counted her vote or the votes of other electors. Curling experienced considerable inconvenience to cast her vote by paper absentee ballot so as to ensure that her vote was permanently recorded on an independent record that could be recounted in an election contest and to avoid the risk of voting on non-

---

[1] "Georgia's Voting System" is defined below in Section IV.B.1, ¶ 55.  Georgia's Voting System includes both a DRE system and an optical scanning system that share certain underlying components but are governed by separate statutory schemes, as discussed below.

[2] "Optical Scanning System" is defined below in Section IV.B.1, ¶¶ 55; 59 – 60.

compliant Direct Recording Electronic ("DRE") machines used in Georgia's DRE System.[3] Curling intends to vote in the upcoming November municipal elections in the City of Roswell and wishes to vote in her neighborhood precinct on election day. Without the intervention of this Court, Curling will be forced to cast her ballots under a system that substantially burdens her right to vote as Georgia's Voting System is fundamentally insecure, illegally employed, and cannot be reasonably relied upon to record and count properly her votes or the votes of other electors. As such, she has standing to bring her claims.

2.

Plaintiff COALITION FOR GOOD GOVERNANCE ("CGG") (formerly Rocky Mountain Foundation) is a non-profit corporation organized and existing under the laws of the State of Colorado. CGG's purpose is to advance the constitutional liberties and individual rights of citizens, with an emphasis on elections. CGG is a membership organization and its membership includes Curling, Donna Price, Ricardo Davis, and other electors of the State of Georgia who reside in, variously, Fulton County, Cobb County, DeKalb County, the 6th Congressional District of the State of Georgia, and various municipalities that will conduct elections in November 2017. Several of CGG's Georgia elector members voted in the Runoff, with some using the DRE System and some using the Optical

---

[3] "DRE System" is defined below in Section IV.B.1, ¶¶ 55 – 57.

Scanning System. Depending on the method of voting, members were subjected to a system that provided unequal treatment and differing weights to their votes and that abridged their rights to recanvass.

3.

Plaintiff CGG has associational standing to bring this complaint on behalf of CGG's Georgia individual elector members because (1) those members would otherwise have standing to sue in their own right; (2) the interests CGG seeks to protect are germane to CGG's purpose; and because (3) with the exception of Counts VI and VII, the relief requested herein does not require the participation of CGG's individual Georgia elector members in the lawsuit.

4.

Plaintiff DONNA PRICE ("Price") is an elector of the State of Georgia and a resident of DeKalb County. Price is a Georgia elector who requested that Secretary Kemp reexamine Georgia's Voting System. She plans to vote in all future elections for which she is an eligible elector. Without the intervention of this Court, Price will be forced to cast her ballots under a system that substantially burdens her right to vote as Georgia's Voting System is fundamentally insecure, illegally employed, and cannot be reasonably relied upon to record and count properly her votes or the votes of other electors. As such, she has standing to bring her claims.

5.

Plaintiff JEFFREY SCHOENBERG ("Schoenberg") is an elector of the State of Georgia and a resident of DeKalb County and the 6th Congressional District of the State of Georgia. Schoenberg is an "aggrieved elector who was entitled to vote" for a candidate in the Runoff under O.C.G.A. § 21-2-521. Furthermore, the DRE System under which he cast his vote substantially burdens his right to vote as the system is fundamentally insecure, illegally employed, and cannot be reasonably relied upon to have recorded and counted properly his vote or the votes of other electors. He is a registered elector in the City of Dunwoody and plans to vote in the November 2017 municipal election. Without the intervention of this Court, Schoenberg will be forced to cast his ballots under a system that substantially burdens his right to vote as Georgia's Voting System is fundamentally insecure, illegally employed, and cannot be reasonably relied upon to record and count properly his votes or the votes of other electors. As such, he has standing to bring his claims.

6.

Plaintiff LAURA DIGGES ("L. Digges") is an elector of the State of Georgia and a resident of Cobb County and the 6th Congressional District of the State of Georgia. L. Digges is an "aggrieved elector who was entitled to vote" for a candidate in the Runoff under Georgia Code Section 21-2-521. Furthermore, the

Optical Scanning System under which she cast her vote substantially burdens her right to vote as the system is fundamentally insecure, not compliant with applicable statutes, and cannot be reasonably relied upon to have recorded and counted properly her vote or the votes of other electors. L. Digges experienced considerable inconvenience to cast her vote by paper absentee ballot to ensure that her vote was permanently recorded on an independent record that could be recounted in an election contest. L. Digges plans to vote in all future elections in which she is eligible. Without the intervention of this Court, L. Digges will be forced to cast her ballots under a system that substantially burdens her right to vote as Georgia's Voting System is fundamentally insecure, illegally employed, and cannot be reasonably relied upon to record and count properly her votes or the votes of other electors. As such, she has standing to bring her claims.

7.

Plaintiff WILLIAM DIGGES III ("W. Digges") is an elector of the State of Georgia and a resident of Cobb County and the 6th Congressional District of the State of Georgia. W. Digges is an "aggrieved elector who was entitled to vote" for a candidate in the Runoff under Georgia Code Section 21-2-521. Furthermore, the Optical Scanning System under which he cast his vote substantially burdens his right to vote as the system is fundamentally insecure, not compliant with applicable statutes, and cannot be reasonably relied upon to have recorded and counted

properly his vote or the votes of other electors. W. Digges experienced

considerable inconvenience to cast his vote by paper absentee ballot to avoid the

risk of a DRE ballot and ensure that his vote was permanently recorded on an

independent record that could be recounted in an election contest. W. Digges plans

to vote in all future elections in which he is eligible. Without the intervention of

this Court, W. Digges will be forced to cast his ballots under a system that

substantially burdens his right to vote as Georgia's Voting System is

fundamentally insecure, illegally employed, and cannot be reasonably relied upon

to record and count properly his votes or the votes of other electors. As such, he

has standing to bring his claims.

8.

Plaintiff RICARDO DAVIS ("Davis") is an elector of the State of Georgia

and a resident of Cherokee County. Davis is a Georgia elector who requested that

Secretary Kemp reexamine Georgia's Voting System. Davis plans to vote in all

future elections in which he is eligible. Without the intervention of this court,

Davis will be forced to cast his ballots under a system that substantially burdens

his right to vote as Georgia's Voting System is fundamentally insecure, illegally

employed, and cannot be reasonably relied upon to record and count properly his

votes or the votes of other electors. As such, he has standing to bring his claims.

## B.     DEFENDANTS

9.

Defendant BRIAN P. KEMP ("Kemp" or "Secretary Kemp") is the Secretary of State of Georgia and, in that role, is also Chair of the State Election Board. Secretary Kemp is and was, for the Runoff, responsible for the orderly and accurate administration of Georgia's electoral processes. This responsibility includes the duty to approve the use of legally compliant voting systems and to conduct any reexaminations of Georgia's DRE System and Optical Scanning System currently in use, upon request or at his own discretion. See O.C.G.A. § 21-2-379.2(a)-(c); O.C.G.A. § 21-2-368(a)-(c); O.C.G.A. § 21-2-50.

10.

Defendants DAVID J. WORLEY, REBECCA N. SULLIVAN, RALPH F. "RUSTY" SIMPSON, and SETH HARP ("Members of the State Election Board") are members of the State Election Board in Georgia. As members, they are, and were for the Runoff, responsible for (1) promulgating rules and regulations to ensure the legality and purity of all elections, (2) investigating frauds and irregularities in elections, and (3) reporting election law violations to the Attorney General or appropriate district attorney. See O.C.G.A. § 21-2-31.

11.

Defendant STATE ELECTION BOARD ("State Board") is, and was for the Runoff, responsible for (1) promulgating rules and regulations to ensure the legality and purity of all elections, (2) investigating frauds and irregularities in elections, and (3) reporting election law violations to the Attorney General or appropriate district attorney. See O.C.G.A. § 21-2-31.

12.

Defendant RICHARD BARRON ("Barron") is the Director of the Fulton County Board of Registration and Elections. As such, he was responsible for conducting the April 18, 2017 Special Election for Georgia's 6th Congressional District ("Special Election") and Runoff in Fulton County and continues to have such responsibility for upcoming elections.

13.

Defendants MARY CAROLE COONEY, VERNETTA NURIDDIN, DAVID J. BURGE, STAN MATARAZZO, AARON JOHNSON and MARK WINGATE ("Members of Fulton County Board of Registration and Elections") are members of the Fulton County Board of Registration and Elections, other than Stan Matarazzo, who, on information and belief, was a member of the Fulton County Board of Registration and Elections until he was replaced by Mark Wingate. As members, they (other than Mark Wingate) were responsible for

conducting the Special Election and Runoff in Fulton County, and they (other than Stan Matarazzo) continue to have such responsibility for future elections in Fulton County.

14.

Defendant FULTON COUNTY BOARD OF REGISTRATION AND ELECTIONS ("Fulton Board") is and was, for the Special Election and the Runoff, responsible for conducting elections in Fulton County.

15.

Defendant MAXINE DANIELS ("Daniels") is the Director of the DeKalb County Board of Registration and Elections for DeKalb County. As such, she is, and was for the Special Election and the Runoff, responsible for conducting the elections in DeKalb County.

16.

Defendants MICHAEL P. COVENY, ANTHONY LEWIS, LEONA PERRY, SAMUEL E. TILLMAN, and BAOKY N. VU ("Members of DeKalb County Board of Registration and Elections") are members of the DeKalb County Board of Registration and Elections. As members, they were responsible for conducting the Special Election and Runoff in DeKalb County and continue to have such responsibility for future elections in DeKalb County.

17.

Defendant DEKALB COUNTY BOARD OF REGISTRATION AND
ELECTIONS ("DeKalb Board") is, and was for the Special Election and the
Runoff, responsible for conducting elections in DeKalb County.

18.

Defendant JANINE EVELER ("Eveler") is the Director of the Cobb County
Board of Elections and Registration. As such, she is, and was for the Special
Election and the Runoff, responsible for conducting the elections in Cobb County.

19.

Defendants PHIL DANIELL, FRED AIKEN, JOE PETTIT, JESSICA
BROOKS, and DARRYL O. WILSON ("Members of Cobb County Board of
Elections and Registration") are members of the Cobb County Board of Elections
and Registration. As members, they were responsible for conducting the Special
Election and Runoff in Cobb County and continue to have such responsibility for
future elections in Cobb County.

20.

Defendant COBB COUNTY BOARD OF ELECTIONS AND
REGISTRATION ("Cobb Board") is, and was for the Special Election and the
Runoff, responsible for conducting elections in Cobb County.

21.

Defendant MERLE KING ("King") is Executive Director of the Center for Election Systems at Kennesaw State University. As such, he was responsible for overseeing, managing, and securing the electronic election infrastructure for the State of Georgia, including portions of both the DRE System and the Optical Scanning System, and creating Georgia's ballots used in both the Special Election and the Runoff. King is expected to have these responsibilities for the remainder of 2017 and some part of 2018.

## C.  CANDIDATES

22.

Candidate KAREN HANDEL ("Handel") was certified the winner of the Runoff on June 26, 2017 and was sworn into the United States House of Representatives on that date. Under the provisions of Georgia Code Section 21-2-524(f), Handel is deemed to be a litigant in this action.

23.

Candidate THOMAS JONATHAN "JON" OSSOFF ("Ossoff") was a candidate in the Runoff. Under the provisions of Georgia Code Section 21-2-524(f), Ossoff is deemed to be a litigant in this action.

## III.   JURISDICTION AND VENUE

24.

Plaintiffs bring claims under the United States Constitution, the Georgia Constitution, and the laws, rules, and regulations of the State of Georgia. This Court has jurisdiction based upon Georgia Code Sections 9-4-1 to -10 to grant declaratory relief; based on Georgia Code Sections 9-5-1 to -11 to grant injunctive relief; and based upon Georgia Code Sections 9-6-20 to -28 to grant relief by way of issuing writs of mandamus. The Fulton County Superior Court has jurisdiction to hear the election contest contained herein based upon Georgia Code Section 21-2-523. Id. ("A contest case governed by this article shall be tried and determined by the superior court of the county where [a] defendant resides.")

25.

Venue in this Court is proper under Georgia Code Section 9-10-30 because Fulton County is the county of residence of at least one of the Defendants against whom substantial equitable relief is prayed. The principal office of the Secretary of State's Elections Divisions is located at 2 Martin L. King Jr. Drive SE, Suite 1104, Atlanta, Fulton County, Georgia, 30334. As such, jurisdiction and venue are proper in this Court.

## IV. FACTUAL BACKGROUND

### A. Georgia's Voting System Was Breached and Its Systems Exposed for at Least Seven Months.

26.

In August of 2016 Logan Lamb ("Lamb"), a professional cybersecurity expert was curious about the Center for Election Systems at Kennesaw State University ("CES"), an entity, directed by King, that served as an agent for the Secretary of State, responsible for overseeing, maintaining, and securing the electronic election infrastructure for the state of Georgia. Lamb discovered that he was able to access key parts of Georgia's electronic election infrastructure through CES's public website on the internet, without so much as entering a password. (See, generally, Affidavit of Logan Lamb, June 30, 2017, attached as "Exhibit A.")

27.

In accessing these election files, Lamb discovered numerous critical vulnerabilities. For one, CES, under King's direction, had improperly configured its server and also failed to patch a security flaw, publicly known since 2014, that could execute, create, copy, modify, or delete anything on CES' server. (See Exhibit A, ¶ 5.) These vulnerabilities allowed anyone to access the internal executable files and election information stored on CES's servers such as the following:

- Global Election Management Systems ("GEMS") server databases;

- Executable files;

- PDFs with instructions and passwords for election workers to sign in to a central server on Election Day; and

- a database containing registration records, including private, personally identifying information for the state's voters.

(See id., ¶4.) On information and belief, Lamb also discovered software files for the state's electronic pollbooks and county election databases used to prepare paper and electronic ballots, tabulate votes, and produce summaries of vote totals.

28.

In addition, the documents Lamb discovered included training videos, at least one of which "instructed users to first download files from the elections.kennesaw.edu website, put those files on a memory card, and insert that card into their local county voting systems." (Exhibit A, ¶11.) This would be a serious security concern, allowing malicious software to be uploaded to voting machines in Georgia simply through the public portal that Lamb had easily accessed.

29.

The files that Lamb discovered constituted everything a bad actor (such as a hacker) would need in order to interfere with the election and manipulate its outcome.

30.

It is unknown how long King had left this data exposed before Lamb discovered it.

31.

Lamb immediately alerted King to the serious security vulnerabilities that he had discovered, advising King that CES should "[a]ssume any document that requires authorization has already been downloaded without authorization." (Exhibit A, ¶5.)

32.

King did not remediate the vulnerabilities to secure CES' system. (Exhibit A, ¶7.)

33.

Seven months after Lamb was able to access critical information concerning Georgia's Voting System via CES's publicly available website on the internet, another cybersecurity expert was able to do the same. On or about March 1, 2017, Chris Grayson ("Grayson"), a colleague of Lamb's, discovered that King had not fixed all of the security issues identified by Lamb in August 2016. That is, from at least August of 2016 to March of 2017—a time period that overlapped with known attempts by Russia to hack elections in the United States—King left exposed for anyone on the internet to see and potentially manipulate: election-related

applications, passwords for the central server, and private voter registration records.[4]

34.

On information and belief, King had failed to patch the known security flaw from 2014 on CES' server despite the FBI's explicit recommendation that responsible parties "[e]nsure all software and applications … are fully patched." (Email Brian D. Newby, Executive Director, Election Assistance Commission to Kemp et al., August 23, 2016, attached as "Exhibit B," p 5.)

35.

Lamb confirmed Grayson's findings. Lamb then determined that he was still able to download information he had accessed in August 2016, as well as new information, including more recent database files and passwords. (Exhibit A, ¶8.)

36.

On information and belief, when Lamb notified King of the issue in August 2016, King told him, "It would be best if you were to drop this now," and warned

---

[4] Kim Zetter, Will the Georgia Special Election Get Hacked, Politico, June 14, 2017, http://www.politico.com/magazine/story/2017/06/14/will-the-georgia-special-election-get-hacked-215255 (last visited July 27, 2017).

that, if Lamb talked, "the people downtown, the politicians … would crush [him]."[5]

### 37.

This time, in March 2017, rather than notifying King directly, Grayson notified Andrew Green, a colleague and a faculty member at Kennesaw State University ("KSU"). (See email chain from Merle King to Stephen Gay, dated March 1, 2017, attached as "Exhibit C.") Mr. Green then notified KSU's University Information Technology Services ("UITS") Information Security Office, which in turn notified King. (Id.) KSU's UITS Information Security Office is not directly affiliated with CES. (See KSU UITS Information Security Office, "Incident Report," April 18, 2017, attached as "Exhibit D.")

### 38.

Within an hour of Grayson's notification, the KSU UITS Information Security Office established a firewall to isolate CES's server. (See Exhibit D, pp. 1-2.) King took no such action after Lamb's notification in August 2016.

### 39.

The day after Grayson's notification, the KSU UITS Information Security Office seized CES's server to preserve evidence "for later analysis and handoff to

---

[5] Kim Zetter, Will the Georgia Special Election Get Hacked, Politico, June 14, 2017, http://www.politico.com/magazine/story/2017/06/14/will-the-georgia-special-election-get-hacked-215255 (last visited July 27, 2017).

federal authorities." (Exhibit D, p. 2.) King took no such action after Lamb's notification in August 2016.

40.

Two days after Grayson's notification, the FBI was alerted and took possession of the server. (See Exhibit D, p. 1.) King took no such action after Lamb's notification in August 2016.

41.

The KSU UITS Information Security Office physically removed the backup server. (See Exhibit D.) King took no such action after Lamb's notification in August 2016.

42.

The KSU UITS Information Security Office also noted the presence of a wireless access point in the CES facility and live access to an external network in the private network closet. (See Exhibit D, pp. 3 – 4.)

43.

Although system security was a key responsibility of King and CES, the "Incident Report" also found that no security assessment had been performed on the supposedly isolated CES network. (See Exhibit D, p. 4.)

44.

While KSU UITS Information Security Office was attempting to correct the multiple security failures at CES, King was, on information and belief, bringing its backup server online. (See email chain from Michael Barnes, Director CES, to King, dated March 4, 2017, attached as "Exhibit E.") On March 3, 2017, King brought the CES backup server online, and, on March 4, 2017, KSU UITS Information Security Office discovered that, in doing so, King had again exposed confidential information. (See id.)

45.

The backup server hosted election databases and programs similar to those Lamb and Grayson had accessed, all available without authentication or authorization to people on the campus network. (See Exhibit E, pp. 2 – 3.)

46.

On March 4, 2017, shortly after discovering that the backup server was on line, KSU UTIS requested that the server be shut down until further assessment could be made and sensitive data protected. The server was reportedly shut down approximately one and a half hours later, at about 7:00 pm. (See Exhibit E.)

47.

This at least seven-month long security breach constituted just one example of the irregularities and misconduct preceding and associated with the Runoff, as

detailed below. Further, even if the security breaches resulted in no detectable manipulation of the Runoff election process, the DRE system employed did not and can never meet Georgia's statutory requirements. Nevertheless, on June 20, 2017, the Runoff was held to fill a vacancy left by the previous incumbent, Congressman Tom Price, and was conducted as if such security failures had not occurred. On the evening of June 26, 2017, within minutes of the certification of the result from DeKalb County, the final county to certify the result, Secretary Kemp, fully aware of the security failures, certified Handel as the winner of the election.[6] As noted below, the Runoff and certification of Handel were undertaken in violation of Plaintiffs' constitutional and statutorily protected rights.

## B. Defendants Violated Plaintiffs' Right To Vote in the Runoff on Systems That Would Correctly Count Their Votes.

48.

The right to vote is the foundation of our democracy. It is how we ensure that our government has the consent of the governed. It is enshrined in the

---

[6] Kemp Certifies June 20 Runoff, Office of the Secretary of State of the State of Georgia, June 27, 2017, http://sos.ga.gov/index.php/general/kemp_certifies_june_20_runoff (last visited July 3, 2017).

O.C.G.A. § 21-2-524 requires that "A petition to contest the result of a primary or election shall be […] within five days after the official consolidation of the returns of that particular office or question and certification thereof by the election official having responsibility for taking such action under this chapter." This would place the filing deadline on Saturday July 1, 2017. O.C.G.A. § 1-3-1(d)(3) ("When the period of time prescribed is less than seven days, intermediate Saturdays, Sundays, and legal holidays shall be excluded in the computation.") Thus, the deadline for filing a challenge to the Runoff was July 3, 2017.

Constitution of the United States and in the Constitution of the State of Georgia. Electors have the right to vote, the right to do so by a legally constructed ballot, the right to have their ballots accurately tabulated, and the right to be assured that their votes will be counted and recorded accurately and in compliance with Georgia law. When electors have a factual basis not to trust that their votes will be accurately counted and recorded, it has a chilling effect and violates those rights. When, as in the Runoff, votes are not properly recorded or counted—or cannot be independently audited and verified, with discrepancies corrected—then those rights have been violated. In fact, the Georgia Constitution at Article II, Section I, provides an unusual measure of protection for the purity of elections and Georgia electors' rights by incorporating the requirement for election officials to comply with all election statutes in the State Constitution.

49.

Plaintiffs are electors who are residents of Georgia, including residents of Georgia's 6th Congressional District, as well as an association that includes among its members electors of the State of Georgia, who are concerned about the integrity, credibility, security, and reliability of the electoral process.

50.

Georgia's 6th Congressional District spans portions of Fulton, Cobb, and DeKalb counties.

51.

Defendants Secretary Kemp, Members of the State Election Board, and the State Board ("Statewide Election Officials") used, and instructed the use of, Georgia's DRE System and Optical Scanning System to conduct the Special Election and Runoff in Georgia's 6th District.

52.

Defendants Barron, Members of Fulton County Board of Registration and Elections, and the Fulton Board ("Fulton County Election Officials") used Georgia's DRE System and Optical Scanning System to conduct the Special Election and Runoff in Fulton County.

53.

Defendants Daniels, Members of DeKalb County Board of Registration and Elections, and the DeKalb Board ("DeKalb County Election Officials") used Georgia's DRE System and Optical Scanning System to conduct the Special Election and Runoff in DeKalb County.

54.

Defendants Eveler, Members of Cobb County Board of Elections and Registration, and the Cobb Board ("Cobb County Election Officials")[7] used

---

[7] The Fulton County Election Officials, Dekalb County Election Officials, and Cobb County Election Officials are collectively referred to as "County Election Officials."

Georgia's DRE System and Optical Scanning System to conduct the Special

Election and Runoff in Cobb County.

### 1.  Georgia's Voting System Has Fundamental Flaws.

55.

To conduct its elections, Georgia employs more than one "system," as that

term is defined by statute. Thus, as used herein, "Georgia's Voting System" refers

to the totality of the physical, electronic, and legal infrastructure related to the

processes and procedures of voting, counting votes, and conducting elections in

general. Georgia's Voting System is primarily comprised of a "DRE System,"

governed by Georgia Code Sections 21-2-379.1 to -379.12, and an "Optical

Scanning System" governed by Georgia Code Sections 21-2-365 to -379.

Georgia's DRE System did not and can never meet Georgia's statutory

requirements. On the other hand, the Optical Scanning System, although non-

compliant in the Runoff because of security breaches, can be brought into

compliance with Georgia law in future elections.

56.

For in-person voting, including election day voting, Georgia primarily uses

voting computers, referred to as DRE voting machines, along with various voting

and tabulation programs, that, when working properly, directly record an elector's

vote on an electronic medium ("DRE System"). See O.C.G.A. §§ 21-2-379.1 to -

379.12; see also Ga. Comp. R. & Regs. 183-1-12.01. The DRE voting machines used in Georgia, unlike other voting methods, do not allow voters to verify that their votes have been correctly recorded and do not create auditable paper records of votes cast. (See Affidavit of Edward W. Felten ¶¶ 5 – 6, attached as "Exhibit F.") This absence of a paper trail is the reason "computer scientists and cybersecurity experts typically recommend against the use of DREs." (Id., ¶7.)

57.

On information and belief, Georgia's DRE System, currently in use in all 159 of Georgia's counties in various configurations, consists of the following components and related firmware and software:

- Touch Screen: R6 – Ballot Station 4.5.2! and TSx – Ballot Station 4.5.2!;

- ExpressPoll: ExpressPoll 4000 and 5000 running software; EZRoster; 2.1.2 and Security Key 4.5+ with Card Writer 1.1.4;

- Election Management System: GEMS 1.18.22G!; and

- Honeywell barcode scanner: MK1690-38-12-ISI, used with ExpressPoll pollbooks.

This configuration, referenced herein as the "DRE System," was used to accept and process the majority of votes in the Runoff despite the fact that its use does not comply with Georgia statutes for DRE systems provided for in Georgia Code Section 21-2-379.

58.

Georgia Code Section 21-2-379.2(c) prohibits the use, in any primary or election, of any kind of DRE voting system that the Secretary of State has not certified can be "safely or accurately used." The intent of this rule is to ensure that "hardware, firmware, and software have been shown to be reliable, accurate, and capable of secure operation before they are used in elections in the state." Ga. Comp. R. & Regs. 590-8-1-.01(a)(3). On information and belief, the Secretary of State never approved of or certified the DRE System as safe and accurate in its current form, nor is it possible that he can do so in the future because the DRE System cannot be brought into compliance with the provisions of Section 21-2-379.

59.

For absentee ballots, Georgia primarily uses Optical Scanning voting machines, along with various tabulation and report generation programs ("Optical Scanning System"). See O.C.G.A. §§ 21-2-365 to -379; see also Ga. Comp. R. & Regs. 183-1-12.01.

60.

On information and belief, Georgia's Optical Scanning System, as currently used in Georgia's elections consists of the following configuration of components and related firmware and software:

- Optical Scanner: AccuVote OS 1.94W and

- Election Management System: GEMS 1.18.22G!.

61.

Georgia Code Section 21-2-368(c) prohibits the use, in any primary or election, of any kind of Optical Scanning System that the Secretary of State has not certified can be "safely or accurately used." The intent of this rule is to ensure that "hardware, firmware, and software have been shown to be reliable, accurate, and capable of secure operation before they are used in elections in the state." Ga. Comp. R. & Regs. 590-8-1-.01(a)(3). On information and belief, the Secretary of State never approved of or certified the Optical Scanning System as safe and accurate in its current form and as was used in the Runoff.

62.

County Election Officials likewise had a duty to certify the equipment used in the Optical Scanning System. Georgia Code Section 21-2-368(d) states that, "[a]t least ten days prior to any primary or election, including special primaries, special elections, and referendum elections, the election superintendent shall verify and certify in writing to the Secretary of State that all voting will occur on equipment certified by the Secretary of State." On information and belief, County Election Officials did not do so for the Runoff. By so failing, the County Election

Officials violated the Election Code and the rights of the electors in their respective counties.

63.

Georgia's DRE System and Optical Scanning System are fifteen years old, run on an insecure operating system that is years past its support life, and rely on the same tabulation software and server, GEMS, that was exposed by the security failures at CES.

64.

Security researchers have repeatedly demonstrated that the hardware and software of the types used by Georgia are vulnerable to hacking. (See Exhibit F.) For example, in 2006, security researchers from Princeton, including Edward W. Felten, the former Deputy U.S. Chief Technology Officer, were able to hack an AccuVote TS, the primary DRE machine in use in Georgia, in less than four minutes using just $12 worth of tools.[8] This hack allowed them to infect a single AccuVote TS machine in a way that would spread to the total election result when the device's memory card was used to tabulate the result.[9] The researchers were

---

[8] Daniel Turner, How to Hack an Election in One Minute, MIT Technology Review, September 18, 2016, https://www.technologyreview.com/s/406525/how-to-hack-an-election-in-one-minute/ (last visited June 30, 2017).

[9] Id.

able to prove that these machines could be physically hacked in a matter of minutes, that malicious software could be installed, and that malicious software could then spread.[10] (See also Exhibit F.) Since these machines do not provide a voter-verified paper ballot, there is no independent method to confirm that votes were counted, and counted as cast.

65.

Because of accuracy concerns, several states have decertified these voting machines and/or the software running on them. For example, in 2006 Maryland's House of Delegates voted unanimously to stop using these machines,[11] North Carolina has banned the use of DRE machines that do not produce voter-verifiable paper ballots, like those used in Georgia's DRE System, beginning in 2018,[12] and in 2009 the Secretary of State for the State of California decertified the code running on them, GEMS 1.18.19.[13] The version of GEMS that California decertified was only three minor revisions earlier than the version of GEMS now

---

[10] Id.

[11] Common Sense in Maryland, New York Times, March 23, 2006, http://www.nytimes.com/2006/03/23/opinion/common-sense-in-maryland.html?mcubz=1 (last visited June 30, 2017).

[12] See N.C. Gen. Stat. §§ 163-165.1. to -165.10.

[13] Withdrawal of Approval of Premier Election Solutions, Inc./Diebold Election Systems, Inc., GEMS 1.18.19, Office of the Secretary of State of the State of California, March 30, 2009, http://votingsystems.cdn.sos.ca.gov/vendors/premier/premier-11819-withdrawal-approval033009.pdf (last visited June 30, 2017).

being used in Georgia in both its DRE System and its Optical Scanning System,

GEMS 1.18.22.G!.

66.

These problems are exacerbated by the fact that Georgia uses DRE machines

(voting computers) that run on antiquated software that is programmed by and

downloaded from one central location: CES. (Exhibit F, ¶26.) This makes Georgia

far easier to infiltrate than states that use multiple systems that are distributed and

managed at the county level across the state, as only one vulnerable site in Georgia

(CES) needs to be exploited to manipulate the entire state's elections. On

information and belief, due to press reports of Lamb's and Grayson's access of

CES as well as an earlier lawsuit, these security vulnerabilities were known to

Defendants.

67.

The fact that the electronic infrastructure, including all election management

data and programs, is centralized at a single location, CES, provides a tempting

and vulnerable target. Since CES exposed passwords to the server, exposed code,

left key rooms unlocked, and permitted unauthorized internet access, the election

tabulation programming and election data were left open to manipulation by

malicious hackers. (See Exhibits A and D.) Such security failures would impact

both the DRE System and the Optical Scanning System, since both use the same

tabulation program. In other states, a single point of failure would not render the entire state's election suspect as most use decentralized systems.

68.

Furthermore, would-be hackers can gain physical access to the hardware, firmware, and software with relative ease, given lax storage policies. On information and belief, the physical security of DRE voting equipment used in Georgia's DRE System has been inadequate during pre- and post-election machine storage, leaving the machines vulnerable to attack and compromise. During the Runoff (and in past elections), the security practices and procedures did not comply with the statutory requirements for storage of DRE units.

As Dr. Felten notes:

> Because of the vulnerability of the DRE voting machines to software manipulation, and because of the intelligence reports about highly skilled cyber-attackers having attempted to affect elections in the United States, [stringent] precautions appear to be indicated for the CES systems. In the absence of stringent precautions to find and expel potential intruders in the CES systems, the ability of voting-related systems that have been in the CES facility to function correctly and securely should be viewed with greater skepticism. (Exhibit F, ¶ 29.)

69.

A further vulnerability of Georgia's Voting System derives from the fact that, on information and belief, on all election nights, Fulton County transmits ballot data from touchscreen machine memory cards to the GEMS tabulation

server via a modem in an unauthorized configuration that does not use adequate encryption. Applicable voting system standards require that security of data transmission be assured. The lack of security in electronic transmission exposes both the memory cards and the GEMS system to, and invites, attack.

70.

On information and belief, the physical security of DRE voting equipment used in Georgia's DRE System has been inadequate during pre- and post-election machine storage, in violation of Georgia Code Section 21-2-379.9 and the rules and regulations promulgated thereunder. See Ga. Comp. R. & Regs. 183-1-12.02(2). These security failures have left and continue to leave the machines, and thus the entire DRE System, vulnerable to attack and compromise.

71.

On information and belief, Georgia's Voting System does not meet minimum standards, including mandatory audit capacity standards, required by the Help America Vote Act, 52 U.S.C. § 21081.

72.

There are additional significant security and accuracy violations that prevented Georgia's Voting System, including the DRE System and the Optical Scanning System, from being used safely and accurately in the Runoff. Such violations and non-compliance prevent the certification and use of Georgia's DRE

System. (See Exhibits A; D; F; Affidavit of Duncan Buell, attached as "Exhibit G"; Declaration of Barbara Simons, attached as "Exhibit H.")

### 2. Defendants Failed to Heed Warnings of Outside Threats to Georgia's Voting System.

73.

According to then-Director of the Federal Bureau of Investigation ("FBI"), James Comey, hackers were "scanning" election systems in the lead-up to the election in the fall of 2016.[14] Subsequent reporting has suggested that as many as 39 states were targeted.[15] Secretary Kemp, through his spokesman, has denied that Georgia was one of the states so targeted.[16]

---

[14] Kristina Torres, Georgia Not One of 20 States Targeted by Hackers Over Election Systems, Atlanta Journal-Constitution, September 30, 2016, (http://www.ajc.com/news/state--regional-govt--politics/georgia-not-one-states-targeted-hackers-over-election-systems/FvCGGjulVUm7VNMp8a9vuO/ (last visited June 30, 2017).

[15] Michael Riley and Jordan Robertson, Russian Cyber Hacks on U.S. Electoral System Far Wider Than Previously Known, BloombergPolitics, June 13, 2017, https://www.bloomberg.com/news/articles/2017-06-13/russian-breach-of-39-states-threatens-future-u-s-elections (Last visited June 30, 2017).

[16] Kristina Torres, State Considers Dropping Election Data Center, Atlanta Journal-Constitution, June 14, 2017, http://www.myajc.com/news/state--regional-govt--politics/state-considers-dropping-election-data-center/YLERatmHYmLEqnOjUng2GL/ (last visited June 30, 2017).

74.

In August 2016 the Department of Homeland Security ("DHS") offered
assistance to any state that wanted help securing its electronic election
infrastructure.[17] Secretary Kemp refused the offer.[18]

75.

Around the same time, on August 23, 2016, the Election Assistance
Commission ("EAC") sent to various state election officials, including Secretary
Kemp, an email sharing an alert from the FBI. (See Exhibit B.) This email attached
a copy of the FBI's August 18, 2016 alert number T-LD10004-TT, which provided
detailed information on the cybersecurity threats facing the nation's election
systems and recommended specific steps that should be taken to reduce the risk.
(See id.)

76.

Despite the warnings from DHS, the FBI, and the EAC, on information and
belief, no entity or responsible official, including Secretary Kemp, King, or any
election official, took meaningful action to ensure the security of Georgia's Voting

---

[17] DHS Press Office, Readout of Secretary Johnson's Call With State Election Officials on
Cybersecurity, Department of Homeland Security, August 15, 2016,
https://www.dhs.gov/news/2016/08/15/readout-secretary-johnsons-call-state-election-officials-
cybersecurity (last visited June 30, 2017).

[18] Marshall Cohen and Tom LoBianco, Hacking the Election? Feds Step in as States Fret Cyber
Threats, CNN, September 23, 2016, http://www.cnn.com/2016/09/23/politics/ohio-pennsylvania-
election-2016-hack/index.html, (last visited June 30, 2017).

System or acted to bring it into compliance with Georgia's statutes and regulations. Press reports indicate that Georgia was the only state to refuse all federal assistance to help ensure the security of its election infrastructure.[19]

77.

After the CES security breach had been reported, Defendants received more warnings of the need to secure Georgia's Voting System. For example, on March 15, 2017, a group of over 20 experts in the field of computer security and voting systems sent a letter to Secretary Kemp expressing their concerns with the security of Georgia's election systems. (See letter from various experts to Secretary Kemp dated March 15, 2017, attached as "Exhibit I," pp. 1-2.) And on March 16, 2017, the Democratic Party of Georgia, also responding to those reports, wrote Kennesaw State University, copying Secretary Kemp, expressing concerns over the security of the election.[20]

---

[19] Massimo Calabresi, Inside the Secret Plan to Stop Vladimir Putin's U.S. Election Plot, Time, July 20, 2017, http://time.com/4865982/secret-plan-stop-vladimir-putin-election-plot/ (last visited July 27, 2017).

[20] Letter from Chairman DuBose Porter, Democratic Party of Georgia to President Samuel S.Olens, Kennesaw State University, March 16, 2017, http://www.georgiademocrat.org/wp-content/uploads/2017/03/KSU-Letter-of-Request-031617.pdf (last visited June 30, 2017).

78.

As with the warnings from DHS, the FBI, and EAC, none of these warnings appear to have resulted in any meaningful remedial action on the part of any of the Defendants, demonstrating their misconduct and abuse of discretion.

### 3. Stolen Electronic Pollbooks Escalated Risk of Compromised Election.

79.

On April 15, 2017, an additional known security breach occurred when four electronic pollbooks containing a voter registration database and software to program voter access cards were stolen from an election worker's truck.[21] The Chairman of the Cobb County GOP was quoted as saying that, "The theft could just be a random thing, but the timing makes it much more worrisome, […] I think there is cause to be concerned about the integrity of the elections."[22] Pollbooks are used to confirm a voter's name and address and to create a voter access card for the DRE machine. Once chain of custody of a pollbook is lost, officials must presume that black market copies exist and will be used for illicit purposes.

---

[21] Christopher Wallace, New details emerge in theft of Ga. Voting machines, Fox News April 18, 2017, http://www.foxnews.com/politics/2017/04/18/new-details-emerge-in-theft-ga-voting-machines.html, (last visited June 30, 2017).

[22] Id.

80.

On information and belief, this theft of electronic pollbooks did not motivate

Secretary Kemp and other Defendants to take adequate remedial action.

### 4.    Special Election Irregularities Were Recklessly Minimized.

81.

Technical problems arose during the April 18th Special Election. For

example, Fulton County voters were being improperly sent from one precinct to

another to vote due to glitches in the electronic pollbook software. In addition, the

Special Election experienced technical problems caused by Fulton County's

uploading of improper and unauthorized memory cards—something the system is

not supposed to allow—resulting in errors and delays in uploading election

results.[23]

82.

On information and belief, unconventional procedures, including deleting

precinct voting results in the database, were used to attempt to correct the error

caused by Fulton County's uploading of improper and unauthorized memory cards,

but the purported corrections themselves lacked a verifiable audit trail.

---

[23] Arielle Kass, 'Rare Error' Delays Fulton County Vote Counts in 6th District Race, Atlanta
Journal-Constitution, April 19, 2017, http://www.ajc.com/news/local-govt--politics/rare-error-
delays-fulton-county-vote-counts-6th-district-race/dleYXJvjL1R9gSsw1swwAJ/ (last visited
June 30, 2017).

83.

On May 24, 2017, after becoming aware of the database breach, pollbook theft, and problems with the electronic tabulation of the votes cast in Fulton County in the Special Election, sixteen computer scientists wrote Secretary Kemp to express profound concerns about the lack of verifiability and unacceptable security of Georgia's Voting System. (See Letter from various experts to Secretary Kemp dated May 24, 2017, attached as "Exhibit J.") The computer scientists urged Secretary Kemp to treat the breach at CES "as a national security issue with all seriousness and intensity." (Id., p 1.) They stated that "a truly comprehensive, thorough and meaningful forensic computer security investigation likely would not be completed in just a few weeks." (Id.) They warned that the error that occurred in Fulton County during the Special Election could indicate a corrupted database that must be investigated, and urged the use of paper ballots. (Id., p. 2.)

84.

These errors were sufficiently severe that Secretary Kemp called for an investigation into them.[24] No results from this investigation have been announced, nor has the public been told that it has been completed. Yet with that pending investigation ongoing and warnings from credible sources, Defendants improperly

---

[24] Aaron Diamant and Berndt Petersen, State Opens Investigation into Issues With 6th District Race, WSBTV, May 26, 2017, http://www.wsbtv.com/news/local/atlanta/state-opens-investigation-into-issues-with-6th-district-race/514213222 (last accessed June 30, 2017).

instructed that the Runoff be conducted on the compromised voting systems, which

constitutes official misconduct, abuse of discretion, and election irregularity.

### 5. Defendants Were Authorized to Use Only Certified Elections Systems That Would Ensure Plaintiffs' Votes Were Properly Counted.

85.

Prior to the Runoff, Kemp and King were aware of the multiple security

breaches at CES, the unresolved theft of the electronic pollbooks, pollbook

problems in the Special Election, Fulton County memory card issues, the non-

compliance with Georgia election statutes, and the security issues raised in Curling

v Kemp (Case No. 2017CV290630).

86.

Georgia law explicitly allows the Secretary of State to, "at any time, in his or

her discretion," reexamine the voting systems used in Georgia, and to prevent their

use if they "can no longer be safely or accurately used." O.C.G.A. § 21-2-368;

O.C.G.A. § 21-2-379.2. Despite this, Secretary Kemp allowed the Special Election

and Runoff to be run on compromised systems with the knowledge that they could

not be presumed to be able to be "safely or accurately used by electors." Id.

87.

Georgia Code Section 21-2-379.2(a) grants to any ten or more concerned

electors the right to require the Secretary of State "at any time" to conduct a

reexamination of a previously examined and approved DRE voting system.

Specifically, Section 21-2-379.2(a) reads as follows:

> (a) Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any direct recording electronic voting system may request the Secretary of State to examine the system. Any ten or more electors of this state may, at any time, request the Secretary of State to reexamine any such system previously examined and approved by him or her. Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination. The Secretary of State may, at any time, in his or her discretion, reexamine any such system.

Id. The clear intent of the statute is to permit a timely reexamination of a voting system in question prior to a pending election.

88.

Georgia Code Section 21-2-379.2(b) provides that, upon receiving such a request for reexamination from ten or more electors, the Secretary of State has a duty to reexamine the DRE voting system. The statute reads as follows:

> (b) The Secretary of State shall thereupon examine or reexamine such direct recording electronic voting system and shall make and file in his or her office a report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion, the kind of system so examined can be safely and accurately used by electors at primaries and elections as provided in this chapter. If this report states that the system can be so used, the system shall be deemed approved; and systems of its kind may be adopted for use at primaries and elections as provided in this chapter.

Id.

89.

Importantly, Section 21-2-379.2(c) makes clear that if a DRE voting system has not been certified by the Secretary of State, then it may not be "used at any primary or election." O.C.G.A. § 21-2-379.2(c) provides that:

> (c) No kind of direct recording electronic voting system not so approved shall be used at any primary or election and if, upon the reexamination of any such system previously approved, it shall appear that the system so reexamined <u>can no longer be safely or accurately used</u> by electors at primaries or elections as provided in this chapter because of any problem concerning its ability to accurately record or tabulate votes, <u>the approval of the same shall immediately be revoked by the Secretary of State</u>; and <u>no such system shall thereafter be purchased for use or be used in this state</u>.

Id. (emphasis added).

90.

Likewise, Georgia Code Section 21-2-368(a) authorizes the Secretary of State "at any time" to conduct a reexamination of a previously examined and approved optical scanning voting system. Specifically, Section 21-2-368(a) reads as follows:

> (a) Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any optical scanning voting system may request the Secretary of State to examine the optical scanning voting system. Any ten or more electors of this state may, at any time, request the Secretary of State to reexamine any optical scanning voting system previously examined and approved by him or her. Before any

such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination. The Secretary of State may, at any time, in his or her discretion, reexamine any optical scanning voting system.

Id. The clear intent of the statute is to permit a timely reexamination of a voting system in question prior to a pending election.

91.

Georgia Code Section 21-2-368(b) provides that, upon determining that a reexamination is needed, the Secretary of State has a duty to reexamine the optical scanning voting system. The statute reads as follows:

(b) The Secretary of State shall thereupon examine or reexamine such optical scanning voting system and shall make and file in his or her office a report, attested by his or her signature and the seal of his or her office, stating whether, in his or her opinion, the kind of optical scanning voting system so examined can be safely and accurately used by electors at primaries and elections as provided in this chapter. If this report states that the optical scanning voting system can be so used, the optical scanning voting system shall be deemed approved; and optical scanning voting systems of its kind may be adopted for use at primaries and elections as provided in this chapter.

Id.

92.

Section 21-2-368(c) provides that, if reexamination shows that an optical scanning voting system "can no longer be safely or accurately used," then the approval of that system "shall immediately be revoked by the Secretary of State;

and no such system shall thereafter … be used in this state." (emphasis added). The

statute reads as follows:

> (c) No kind of optical scanning voting system not so approved
> shall be used at any primary or election and if, upon the
> reexamination of any such system previously approved, it shall
> appear that the optical scanning voting system so reexamined can
> no longer be safely or accurately used by electors at primaries or
> elections as provided in this chapter because of any problem
> concerning its ability to accurately record or tabulate votes, the
> approval of the same shall immediately be revoked by the
> Secretary of State; and no such system shall thereafter be
> purchased for use or be used in this state.

Id. Importantly, Section 21-2-368(c) makes clear that if an optical scanning voting

system has not been certified as safe and accurate by the Secretary of State, then it

may not be "used at any primary or election."

93.

On information and belief, Georgia began using a DRE System to conduct

its elections in 2002. The devices used were certified for use by the then Secretary

of State, Cathy Cox ("Secretary Cox"). (Certification of Election Systems for use

in Georgia, attached as "Exhibit K.") Secretary Cox again certified these systems

in 2003, 2004, 2005, and 2006. (Id.) Her successor, Karen Handel, certified the

DRE System that was used in 2007 and 2008.[25] (Id.) On information and belief,

this is the last time a Georgia Secretary of State certified a DRE voting system for

---

[25] Although the certification was expressly for the DRE System, certain optical scanning
components were included in the certifications from 2004 to 2008.

use in Georgia—and even then, it was without explicitly opining on the safety and

accuracy of the system, as is further required by § 21-2-379.2(b).

94.

On information and belief, Secretary Kemp has never—in the past seven

years of his two terms in office as Secretary of State—certified that Georgia's DRE

System "can be safely and accurately used by electors at primaries and elections,"

as required by Georgia law. O.C.G.A. § 21-2-379.2(b). The most recently certified

system has been subject to material modifications since its certification in 2008—

almost ten years ago. Kemp himself penned a 2015 op-ed stating that, "Each time a

component is changed, the entire system is retested to ensure there are no

unintended consequences."[26] Yet, Kemp and King negligently avoided undertaking

such testing and re-certification in advance of the Special Election and Runoff

even after being requested to do so by electors.

95.

On information and belief, Secretary Kemp has also never certified that

Georgia's Optical Scanning System "can be safely and accurately used by electors

at primaries and elections," as required by Georgia law. O.C.G.A. § 21-2-368(b).

---

[26] Brian Kemp, Georgia's Voting System in Great Shape, Atlanta Journal-Constitution, October 29, 2015, http://www.myajc.com/news/opinion/georgia-voting-system-great-shape/T49mQ6KNioWWLUJUYQg68L/ (last visited August 2, 2017).

96.

Given the known vulnerabilities in the system, the security breaches, and—
most importantly—the DRE System's inability to meet statutory requirements (as
detailed in Section IV.E.), Secretary Kemp would have been unable to make a
good faith determination that the DRE System or the Optical Scanning System
could be "safely and accurately used." O.C.G.A. § 21-2-379.2(b); O.C.G.A. § 21-
2-368(b).

97.

On May 10, 2017, based on the publicly available information, and fearing
that the Runoff could be compromised, a group of Georgia electors, including
Davis, exercised their rights under O.C.G.A. § 21-2-379.2(a) by requesting that
Georgia's Voting System be reexamined and listing a number of security concerns.
On May 17, 2017, a second letter was sent explaining the irreversible security
issues in the system in support of the request that Georgia's Voting System be
immediately reexamined. Two additional letters followed, on May 19 and June 2,
each requesting a timely response. No answer was received until after the electors
filed suit on May 25, 2017 against Secretary Kemp over his failure to reexamine
the system. See Curling v. Kemp, Case No. 2017CV290630.

97.

The Secretary of State's Office did not respond to the electors' requests until June 5, 2017. It indicated that it would complete the reexamination in approximately six months, putting the completion date after the date of elections that will be held in November. (See letter from C. Ryan Germany to various electors dated June 5, 2017, attached as "Exhibit L.")

98.

Pending the reexamination, Secretary Kemp declined to use his authority under Georgia Code Section 21-2-379.2 to prevent the use of the unsecure DRE System for the Runoff and declined to use his authority under Section 21-2-368 to prevent the use of the Optical Scanning System for the Runoff—despite the fact that Georgia law allows for voting to be done by paper ballot if the voting system is unusable.

99.

Georgia's election laws contemplate that elections normally required to be conducted using voting equipment may instead be conducted using paper ballots if circumstances so require. O.C.G.A. § 21-2-281. The County Election Officials maintain the authority and responsibility for making the decision to employ paper ballots when "the use of voting equipment is impossible or impracticable." O.C.G.A. § 21-2-334. Moreover, Georgia Code Section 21‑2, Article 11, Part 2,

provides the detailed procedures that are required to be used in precincts that conduct primaries and elections using paper ballots. County Election Officials abused their discretion by failing to exercise this authority to order the use of paper ballots.

### C.     Improper Certification of the Election Results

100.

To provide for election transparency and citizen oversight of Georgia elections, Georgia election regulations provide for citizen-initiated recanvassing of any precincts that seem to have erroneous results from the DRE-voting machines. Ga. Comp. R. & Regs. 183-1-12.02(7). These regulations permit citizens to choose any or all precincts to demand recanvassing of the votes, by having the memory cards reread by the tabulation server and conducted by the election officials prior to the county-level certification of results.

101.

Members of CGG (then Rocky Mountain Foundation) and other citizens wrote to DeKalb Board and Cobb Board prior to county-level certification, specifying the precincts they believed may contain erroneous results and requesting a recanvassing prior to the certification. (See letters to DeKalb Board and Cobb Board by various electors, attached as "Exhibit M.") On information and belief, and in each case, a board discussion was held and Defendants Barron,

Daniels, Cobb Board, DeKalb Board, Members of Cobb County Board of Elections and Registration, and Members of DeKalb County Board of Registration and Elections affirmatively denied the electors' properly submitted requests for recanvassing, constituting an irregularity and misconduct on the part of these Defendants.

102.

Prior to each county election board meeting, on behalf of its members who are eligible electors in the 6th Congressional District, CGG filed letters requesting that Fulton Board, Cobb Board, and DeKalb Board (collectively "County Boards") deny certification of the election because of the numerous violations of law occurring during the conduct of the election. (See letters to County Boards by CGG (then Rocky Mountain Foundation), attached as "Exhibit N.") On information and belief, these letters (and the concerns expressed) were not discussed at any of the County Boards. Instead, the County Boards simply rubberstamped the results without concern about the legality or accuracy of the returns or violations of the Election Code in the conduct of the Runoff. The County Boards' and their individual members' and Directors' refusal to consider the alleged illegal aspects of the election constitute irregularities, misconduct and abuse of discretion.

103.

On information and belief, Secretary Kemp almost immediately certified the

consolidated return for the Runoff after the last certification, the DeKalb Board

certification, had taken place, despite the fact that he had been informed that the

County Boards had violated electors' rights to seek a recanvass of precincts that

appeared to show irregularities or questionable results. Certification of the

consolidated return with valid pending requests for recanvass and known system

security failures constitutes an irregularity and misconduct on the part of Secretary

Kemp.

**D.    Irreparable Harm/Inadequate Remedy at Law**

104.

Georgia electors who cast their votes in person during the Runoff were

required to cast their votes on voting computers using the DRE System in early

voting locations or on June 20, 2017 in their neighborhood precincts.

105.

Georgia electors who cast their votes by absentee ballot during the Runoff

were required to cast their votes using the Optical Scanning System.

106.

Georgia's DRE System could not be safely and accurately used by electors

voting in the Runoff. Georgia's DRE System violates numerous provisions of the

Election Code, is demonstrably vulnerable to undetectable malfunctions and malicious manipulation that cannot be corrected on a timely or reasonable basis, and results in electors' casting ballots that cannot be independently audited or verified.

107.

Georgia's Optical Scanning System could not be safely and accurately used by electors voting in the Runoff. Georgia's Optical Scanning System, as configured for the Runoff, violated numerous provisions of the Election Code and was demonstrably vulnerable to undetectable malfunctions and malicious manipulation that could not be detected or corrected on a timely or reasonable basis.

108.

Each Plaintiff who cast a vote in the Runoff and the Georgia 6th Congressional District elector members of Plaintiff CGG were harmed in the exercise of their constitutional fundamental right to vote in the Runoff because Georgia used an illegal, unsafe, unsecure, and uncertified DRE System and Optical Scanning System that were subjected to undetected, unauthorized access and potential manipulation. Experts concur in the conclusion that the systems and their components had to be considered compromised and unreliable for the determination of the result. (See Exhibits A, F, G, and H.)

## E.    Georgia's DRE System Violates the Election Code.

### 109.

Election officials, including all Defendants, are responsible for willful, substantive violations of the Election Code, causing the votes cast by the majority of voters to be cast as illegal ballots on the unauthorized, non-compliant DRE System.

### 110.

All Defendants conducted the election by employing procedures that violate mandatory and essential security provisions of the Election Code. Such violations include but are not limited to the following:

### 111.

First, the DRE voting machines were not evaluated and cannot be evaluated to determine whether they meet the requirement of Georgia Code Section 21-2-379.1(8): "It shall, when properly operated, record correctly and accurately every vote cast."

### 112.

Second, the superintendents did not and cannot meet the requirement of Georgia Code Section 21-2-379.6(a) to determine that the DRE machines have no votes recorded at the opening of the polls. The State's testing methods cannot

determine whether there are votes recorded on the machine before voting is authorized.

113.

Third, superintendents failed to meet basic, reasonable security of machines in the polling place prior to and after the operation of the polls, as mandated by Georgia Code Section 21-2-379.6(a) in a manner to prevent the operation of the "counting machinery" before such operation is authorized. Machines used in the Runoff have been frequently left unattended in public hallways, as they were during the Runoff, with inadequate physical locks and seals, subjecting the "counting machinery" to undetectable manipulation. Id.

114.

Fourth, the State Board and Secretary Kemp have failed to perform their duty to promulgate adequate security regulations to protect the DRE machines from intrusion and manipulation pursuant to Georgia Code Section 21-2-379.6(a).

115.

Fifth, the DRE machines (voting computers) do not and cannot meet the mandatory testing standard provisions of Georgia Code Section 21-2-379.6(c), which require that the machines be tested to determine whether they count votes accurately. Testing conducted by the state's Logic and Accuracy Testing did not

and cannot determine whether the machines correctly count the votes in the Runoff.

116.

Sixth, the DRE machines did not and cannot meet the mandatory provisions of Georgia Code Section 21-2-379.7(b) requiring that machines be "thoroughly tested" and certified as to their ability to work properly and to ensure that no votes are recorded in the machine before the opening of the polls. Officials did not and cannot verify whether the DRE machines are "working properly." Id.

117.

Seventh, in violation of Georgia Code Section 21-2-379.7(c), the superintendents and poll managers failed to provide adequate protection against "molestation and injury" to the machines when they were stored at polling places. The State Board and Secretary Kemp failed to provide adequate rules to assure reasonable security of the equipment, causing the equipment to be stored in public places with minimal and ineffective security. Under such circumstances, the machines must be presumed to have been compromised, generating an unreliable result.

118.

Eighth, the tabulation mechanisms on the DRE machines were not secured by the poll managers during the machines' use on election day as mandated by

Georgia Code Section 21-2-379.7(d)(3). Such security requirements became impossible to meet after the CES system was open to the internet as described in ¶¶ 26 – 47.

119.

Ninth, the DRE units have not been maintained in secure storage when not in use as required by Georgia Code Section 21-2-379.9(b), nor have the DRE machines been stored in compliance with Ga. Comp. R. & Regs 183-1-12-.02(2)(b). As a result, the machines have been subjected to significant unknown risks, leaving no practical way to evaluate whether the machines were compromised.

120.

Tenth, Georgia Code Section 21-2-379.9(b) requires that the DRE "related equipment" for the operation of the election (such as the GEMS servers, memory cards, and electronic pollbooks) be secured. However, conditions at CES, as well as in each County Election Official's location, were such that the "related equipment" was not properly secured, which exposed the components and voting system to significant risk. (See Exhibit D.) It was impossible for County Election Officials to determine the impact of this long-term exposure to significant risk and whether the system was compromised to operate improperly.

121.

Eleventh, any new voting system deployed after April 17, 2005 is required to meet the certification standards in Ga. Comp. R. & Regs. 590-8-1-.01. That regulation requires compliance with the most recent EAC voting standards for certification of a new voting system or substantive change in a previously certified system. On information and belief, Secretary Kemp has not attempted to certify the DRE System to those mandatory state standards, nor has he certified that it meets those standards although the current equipment configuration constitutes a new system deployed after April 17, 2005. In fact, because inherent weaknesses render it incapable of meeting statutory requirements, the DRE System cannot be legally certified, approved, or utilized. It is impossible for the DRE System to meet the requirements of the Election Code. Yet, on information and belief, Secretary Kemp and King have knowingly made misleading public claims that the voting system was "federally and state certified."

### F.    Georgia's Optical Scanning System Violates the Election Code.

122.

All Defendants are responsible for willful substantive violations of the Election Code, causing the votes cast by the majority of absentee votes to be cast as illegal ballots on the unauthorized, non-compliant Optical Scanning System.

123.

All Defendants conducted the election employing procedures that violate essential provisions of the Election Code. Such violations include but are not limited to the following:

124.

First, the Optical Scanning machines were not evaluated prior to the Runoff to determine whether they meet the requirement of Georgia Code Section 21-2-365(8): "It shall, when properly operated, record correctly and accurately every vote cast."

125.

Second, the Optical Scanning System did not meet the mandatory testing standard provisions of Georgia Code Section 21-2-374(b), which require that the optical scanning tabulators be tested prior to an election to determine whether they count votes accurately. Testing conducted by the state's Logic and Accuracy Testing did not and could not determine whether the tabulator correctly counted the votes in the Runoff. Only a hand count supervised by this court can make that determination.

126.

Third, in violation of Georgia Code Section 21-2-375(b) and § 21-2-374(a), the superintendents and poll managers failed to provide adequate protection against

"molestation and injury" to the machines when they ordered and accepted

programming from CES, whose system they knew to be compromised. The State

Board and Secretary Kemp failed to provide adequate rules to assure reasonable

security of the equipment and its software, causing the CES equipment and system-

wide Optical Scan software and related GEMS programming and databases to be

maintained in lax conditions with minimal and ineffective security. Such

equipment and programs must be presumed to have been compromised, generating

an unreliable result.

127.

Fourth, the tabulation mechanism on the Optical Scanning machines were

not secured in compliance with the intent of Georgia Code Section 21-2-377 given

the security failures involved in the Optical Scan machine programming. Such

security requirements became impossible to meet after the CES system was open

to the internet as described in ¶¶ 26 – 47.

128.

Fifth, any new voting system deployed after April 17, 2005 is required to

meet the certification standards in Ga. Comp. R. & Regs. 590-8-1-.01. That

regulation requires compliance with the most recent Election Assistance

Commission ("EAC") voting standards for certification of a new voting system or

substantive change in a previously certified system. On information and belief,

Secretary Kemp has not attempted to certify the system in use to those mandatory state standards, nor has he certified that it meets those standards although the current equipment configuration constitutes a new voting system deployed after April 17, 2005. Yet, on information and belief, Secretary Kemp and King have made misleading public claims before the Runoff that the voting system was "federally and state certified."

### G.    Irreparable Harm

129.

Plaintiffs and the Georgia elector members of Plaintiff CGG cannot be adequately compensated for these harms in an action at law for money damages. At equity, Plaintiffs seek–and can obtain only–nominal compensatory relief.

## VI.   COUNTS

## COUNT I: VIOLATION OF ARTICLE II, SECTION I, PARAGRAPH I, OF THE GEORGIA CONSTITUTION OF 1983

### (All Plaintiffs against All Defendants in their Individual Capacities, except State Board, Fulton Board, DeKalb Board, and Cobb Board)

### Declaratory and Injunctive Relief
### O.C.G.A. § 9-4-2 and O.C.G.A. § 9-4-3

### Enjoining Use of Georgia's DRE System and Optical Scanning System

130.

The allegation of paragraphs 1 through 129 above are hereby incorporated as the allegations of this paragraph 130 of Count One of this complaint.

131.

Article II, Section 1, Paragraph 1 of the Georgia Constitution provides, "Elections by the people shall be by secret ballot and shall be conducted in accordance with procedures provided by law."

132.

Elections must be conducted in accordance the statutes and regulations of the State of Georgia.

133.

The Runoff was not conducted in accordance with the "procedures provided by law" because the DRE System was in violation of Georgia Code Section 21-2-379.1(8) at the time of the Runoff. O.C.G.A. § 21-2-379.1(8) provides that DRE Systems "shall, when properly operated [by an elector], register or record correctly and accurately every vote cast." The Optical Scanning System was similarly in violation of Section 21-2-365(8), which provides that Optical Scanning Systems "shall, when properly operated, record correctly and accurately every vote cast."

134.

In addition, the DRE System did not and cannot meet additional statutory requirements for safety and accuracy of the equipment. See O.C.G.A. § 21-2-379(b); § 21-2-379.6 (a); § 21-2-379(6)(c); § 21-2-379.7(b); § 21-2-379.7(c); § 21-2-379.7(d)(3); § 21-2-379.9(b). Similarly, the Optical Scanning System did not meet additional statutory requirements for safety and accuracy because of the CES system compromise. See O.C.G.A. § 21-2-365(8); § 21-2-374(a); § 21-2-377. Therefore, Kemp, Members of the State Board, individual County Elections Officials, and King were and are required to remove this equipment from service.

135.

On information and belief, these Defendants knew that these voting systems had been unsecured, breached, and compromised, could not be presumed to be safe, and were materially non-compliant with applicable Election Code statutes and governing regulations. These Defendants were aware of numerous expert opinions advising against the use of these systems in the Runoff election because they were neither safe nor accurate and should have been presumed to be compromised.

136.

Additionally, the Runoff was not conducted in accordance with the "procedures provided by law" because the DRE System used was in violation of Georgia Code Section 21-2-379.2. Georgia Code Section 21-2-379.2(a) requires the Secretary of State to reexamine the DRE voting system, if "[a]ny ten or more electors of this state request the Secretary of State to reexamine any such system previously examined and approved by him or her." Id. Likewise, the Optical Scanning System used was in violation of Georgia Code Section 21-2-368(a). Georgia Code Section 21-2-368(a) requires the Secretary of State to reexamine the optical scanning voting system, if "[a]ny ten or more electors of this state request the Secretary of State to reexamine any such system previously examined and approved by him or her." Id.

137.

That was not done here. Concerned about the known system security compromises, Georgia electors repeatedly requested Secretary Kemp to reexamine Georgia's Voting System prior to the Runoff on four separate occasions: on May 10, 17, and 19, and June 2, 2017. Secretary Kemp's office responded on June 5, 2017, stating that reexamining the systems would cost the requesting citizens $10,000 and take six months. Despite his knowledge of the recent CES system security failures, the stolen pollbooks, the warnings from the FBI, EAC, and DHS, and numerous computer scientists, as well as an escalated risk environment, Secretary Kemp refused to reexamine Georgia's Voting System prior to the Runoff or any currently scheduled 2017 elections.

138.

On July 17, 2017 Secretary Kemp's office responded, agreeing to waive the previously requested $10,000 fee, but did not agree to reexamine the equipment under the current standards controlling the examination and certification of voting systems. He also did not agree to a timely reexamination prior to Georgia's November 2017 municipal elections, exposing such elections to being illegally conducted and contested.

139.

After a request to examine or reexamine a DRE voting system and the Secretary of State conducts such an examination, "no kind of [DRE] voting system" not approved "shall be used at any primary or election." O.C.G.A. § 21-2-379.2(c). After a request to examine or reexamine an optical scanning voting system and the Secretary of State conducts such an examination, "no kind of [optical scanning] voting system" not so approved "shall be used at any primary or election." O.C.G.A. § 21-2-368(c). Furthermore, Georgia's voting systems must be certified, to ensure that "hardware, firmware, and software have been shown to be reliable, accurate, and capable of secure operation before they are used in elections in the state." Ga. Comp. R. & Regs. 590-8-1-.01(a)(3). Georgia's DRE System and Optical Scanning System did not meet these legal requirements, and, further, the DRE System cannot be brought into compliance with these requirements.

140.

Upon reexamination, should it "appear that the [DRE] system… can no longer be safely or accurately used by electors" as provided under the Georgia Code "because of any problem concerning its ability to accurately record or tabulate votes," then the Secretary of State should "immediately" revoke his approval. O.C.G.A. § 21-2-379.2(c); see also O.C.G.A. § 21-2-368(c) (similar provision governing Optical Scanning Systems). Indeed, given the knowledge

Secretary Kemp and other identified Defendants had of the material non-compliance and insecurity of these systems, Defendants had the duty and authority to act to sideline the compromised systems long before the electors requested system reexamination.

141.

Despite the request for reexamination and the known security failures, the DRE System and Optical Scanning System were used during the Runoff. Secretary Kemp was aware that the security of both systems had been compromised and, for numerous reasons, did not meet certification requirements, statutory requirements, nor be approved as safe or accurate. By choosing to move forward in using the non-compliant system, he willfully and negligently abrogated his statutory duties and abused his discretion, subjecting voters to cast votes on an illegal and unreliable system—a system that must be presumed to be compromised and incapable of producing verifiable results.

142.

Furthermore, when a ballot does not follow a mandate from the Georgia Constitution or the Georgia Code, the ballot is "illegal." See Count VII; Mead v. Sheffield, 278 Ga. 268, 269 (2004). Such was the case in the Runoff and is expected to be the case in future elections without the intervention of this Court.

143.

Additionally, the identified Defendants violated their duty to recanvass votes under Ga. Comp. R. & Regs. 183-1-12-.02(7)(a), which states that:

> The election superintendent shall, either of his or her own motion, or upon petition of any candidate or political party or three electors of the county or municipality, as may be the case, order a recanvass of all the memory cards (PCMCIA cards) for a particular precinct or precincts for one or more offices in which it shall appear that a discrepancy or error, although not apparent on the face of the returns, has been made.

See also Count IV.

144.

These Defendants also violated state equal protection guarantees, as provided in Georgia Constitution's Art. I, Sec. I, Para. II. See Count III. They also violated state due process guarantees. See Count II.

145.

Since these Defendants individually and collectively did not act to ensure the Runoff complied with the "procedures provided by law," as alleged above, they violated the Georgia Constitution, in addition to other applicable Georgia law.

146.

Georgia's DRE System and Optical Scanning System also cannot be legally used in the upcoming Georgia 2017 municipal elections or other future Georgia elections for reasons alleged throughout this Amended Complaint.

147.

On information and belief, despite their knowledge that the DRE System and Optical Scanning System do not comply with the Election Code, these Defendants willfully and knowingly plan to continue to use the non-compliant DRE System and Optical Scanning System in upcoming elections.

148.

Accordingly, pursuant to Georgia Code Section 9-4-2, Plaintiffs pray that this court will declare that these Defendants have violated the Georgia Constitution. Pursuant to Georgia Code Section 9-4-3, Plaintiffs also pray that this court will void *ab initio* the Runoff and the certification of its result because accurate results tabulated in accordance with Georgia law cannot be determined and order a new election to be held as the only just relief available under the laws of Georgia. This court should also enjoin these Defendants' illegal use in future elections of Georgia's DRE System and the illegal use of the Optical Scanning System as it is currently programmed and configured. Finally, this Court should award nominal compensatory relief in the amount of $1 in recognition of these Defendants' violation of the Georgia Constitution and, as subsequent causation, the rights of Plaintiffs.

**COUNT II: VIOLATION OF 42 USC § 1983 – DUE PROCESS**

**VIOLATION OF 42 USC § 1983,**

**DUE PROCESS AND FIRST AMENDMENT**

**(All Plaintiffs against All Defendants in their Official and Individual**

**Capacities except State Board, Fulton Board, DeKalb Board, and Cobb**

**Board)**

**Declaratory, Injunctive, and Monetary Relief, and Attorneys' Fees**

**O.C.G.A. § 9-4-2 and O.C.G.A. § 9-4-3**

**42 USC § 1983; Fourteenth Amendment; First Amendment**

149.

The allegations of paragraphs 1 through 148 above are hereby incorporated

as the allegations of this paragraph 149 of Count Two of this complaint.

150.

42 U.S.C. § 1983 provides that "[e]very person who, under color of any

statute, ordinance, regulation, custom, or usage, of any State or Territory or the

District of Columbia, subjects, or causes to be subjected, any citizen of the United

States or other person within the jurisdiction thereof to the deprivation of any

rights, privileges, or immunities secured by the Constitution and laws, shall be

liable to the party injured in an action at law, suit in equity, or other proper

proceeding for redress … ."

151.

The failure to comply with the Georgia Constitution and the Georgia Code

concerning elections is a violation of federal due process when the patent and

fundamental fairness of the election is called into question.

152.

Patent and fundamental fairness of an election is called into question when

allegations go well beyond an ordinary dispute over the counting and marking of

ballots. Such is the case here, where patent and fundamental unfairness arises from

egregious and substantive violations of the Georgia Code and Constitution, causing

the election result to be indeterminable.

153.

Elected Georgia government officials—and those they control—denied the

electorate the right granted by the Georgia Constitution to choose their elected

official in accordance with the procedures provided by state law. Ga. Const. Art. II,

§ 1, ¶ 2. These state officials include Defendants Secretary Kemp, Members of the

State Board, Barron, Members of the Fulton Board, Daniels, Members of the

DeKalb Board, Eveler, Members of the Cobb Board, and King.

154.

These Defendants violated Georgia Code Section 21-2-379.1(8), which

provides that any DRE system used in Georgia must, when properly operated by

the elector, "record correctly and accurately every vote cast." Consistent with

experts who state that Georgia's DRE System (and, by logical extension and

inference, the Optical Scanning System) must be presumed to have been

compromised, it is more than probable that it was compromised prior to the Runoff

and that the system could not correctly or accurately count every vote during the

Runoff. As a result, the tabulation of the voters' intent cannot reasonably be

known. Central to the franchise of voting is that a vote cast by the elector's ballot

be the vote actually counted. That vote should be reviewable to correct

discrepancies in the recording or tabulation process. Even in the contentious case

of Bush v. Gore, the entirety of the Supreme Court appeared to agree on this

fundamental principle, even as they disagreed on whether procedures that existed

in those circumstances violated that principle. See, generally, Bush v. Gore, 531

U.S. 98 (2000) (holding manual recounts ordered by Florida Supreme Court,

without specific standards to implement its order to discern "intent of the voter,"

did not satisfy minimum requirement for non-arbitrary treatment of voters
necessary, under Equal Protection Clause, to secure fundamental right to vote).

155.

Instead, despite receiving multiple warnings that the DRE System and
Optical Scanning System had been compromised—and knowing that that
documents capable of enabling a malicious attack were accessed multiple times
and downloaded from CES without authorization—Secretary Kemp refused to
initiate a review of either system and publicly stated "our system's secure."[27]
These actions amount to a purposeful and willful substantial burdening of the
fundamental right to vote and misconduct on his part.

156.

Voters who wish to protect their rights by voting on verifiable paper ballots
that are reviewable must undertake burdensome efforts to do so. For example,
voters who use paper ballots (absentee ballots) cannot vote in their nearby
convenient neighborhood precincts. Voters wishing to vote by paper must take the
additional steps to complete an application, receive the application in the mail and
fill it out, and mail it several days before an election to ensure receipt on election

---

[27] Kristina Torres, Georgia's Voting Machines Face Criticism, but State Says They're Secure,
Atlanta Journal Constitution, June 12, 2017, http://www.myajc.com/news/state--regional-govt--
politics/georgia-voting-machines-face-criticism-but-state-says-they-
secure/rcxCNafPMorse73l6Gu75M/ (last visited August 2, 2017).

day or travel to the county election office to cast an election-day ballot. Voters

wishing to vote with paper ballots with the most timely candidate information

available on election day must hand-deliver their ballots to the election office,

sometimes involving considerable transportation effort and time, as Curling

experienced. Furthermore, those who wish to ensure timely receipt must take the

ballot to a county office, not merely mail it. Finally, County and Secretary of State

websites do not contain information on deadlines for requesting absentee ballots,

making it difficult to learn the process for obtaining and casting absentee ballots.

In summary, voting by absentee ballot can involve significant hardship and

inconvenience.

### 157.

Georgia's DRE System and Optical Scanning Systems must be properly

certified, reexamined, and approved by the Secretary of State prior to any election,

when so requested by ten or more electors. O.C.G.A. § 21-2-379.2(a); § 21-2-

368(a); see also Ga Comp. R. & Regs. 590-8-1.01. Here, the Secretary of State did

not certify, reexamine or approve the system in compliance with applicable

statutes. See Counts I and VIII.

### 158.

By violating the Georgia Constitution, Georgia's election officials

distributed to electors in Georgia's 6th Congressional District an illegal ballot,

precluding their right to vote on a legal ballot in the Runoff. See Counts VI and

VII, respectively.

159.

In addition, various board member Defendants who functioned as election

"superintendents" violated their duty to recanvass votes upon the request of the

electorate. See Count IV.

160.

These Defendants, by burdening the right to vote, violated the Due Process

Clause of the Fourteenth Amendment of the U.S. Constitution and the Georgia

Constitution's analogue. U.S. Const. Amend. XIV § 1; Georgia Constitution's Art.

I, § 1, ¶ 1.

161.

By burdening the right to vote, these Defendants violated the First

Amendment of the U.S. Constitution. U.S. Const. Amend. I.

162.

Under the circumstances alleged above, relief under 42 U.S.C. § 1983 is

warranted. Accordingly, Plaintiffs ask this Court to declare that these Defendants

violated the fundamental rights to vote and due process, as well as rights afforded

by the Georgia Constitution and Code, of Plaintiffs, declare the Runoff and the

certification of its result void *ab initio*, and order a new election to be held as the

only just relief available under the laws of Georgia. This court should also enjoin

these Defendants' use of Georgia's DRE System for future elections and the use of

the Optical Scanning System until such time as the Optical Scanning System can

be fully examined, unauthorized software eliminated, authorized software

reinstalled, and the system properly secured. In addition, this Court should award

nominal compensatory relief in the amount of $1, in recognition of these

Defendants' violation of applicable federal and state laws and, as subsequent

causation, the rights of Plaintiffs. Finally, this Court should award attorneys' fees

and costs, as per 42 U.S.C. § 1988, for Defendants' causation of concrete injury to

Plaintiffs, whose fundamental right to have their vote counted as cast was

thwarted. See also Farrar v. Hobby, 506 U.S. 103 (declaratory, injunctive, and

nominal compensatory relief can give rise to attorneys' fees under Section 1988,

with courts ultimately "obligated to give primary consideration to the amount of

damages awarded as compared to the amount sought") (internal citation omitted).

# COUNT III: VIOLATION OF 42 USC § 1983 AND EQUAL PROTECTION

**(All Plaintiffs against All Defendants in their Official and Individual Capacities, except State Board, Fulton Board, DeKalb Board, and Cobb Board)**

**Declaratory, Injunctive, and Monetary Relief, and Attorneys' Fees**

**O.C.G.A. § 9-4-2 and O.C.G.A. § 9-4-3**

**42 USC § 1983; Fourteenth Amendment**

163.

The allegations of paragraphs 1 through 162 above are hereby incorporated as the allegations of this paragraph 163 of Count Three of this complaint.

164.

42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be

liable to the party injured in an action at law, suit in equity, or other proper

proceeding for redress … .”

165.

The Equal Protection Clause of the Fourteenth Amendment mandates that

“[n]o State shall … deny to any person within its jurisdiction the equal protection

of the laws.” U.S. Const. amend. XIV § 1.

166.

The Plaintiffs who voted using the DRE System are all similarly situated to

other registered electors in the Runoff who voted by Optical Scanning System.

Furthermore, all Plaintiffs may vote or seek to vote in future Georgia elections

using the DRE System and would be similarly situated in such elections to other

registered electors who vote by Optical Scanning System.

167.

The Secretary of State and County Boards allowed electors using the Optical

Scanning System[28] to vote in the Runoff to vote using verifiable, reviewable, and

---

[28] Plaintiffs contend the Optical Scanning System is clearly superior to the DRE System. The Optical Scanning System is, in theory, able to be verified by manual recount, while the DRE System leaves no paper trail at all. As such, it is a superior system, and those who voted using it were permitted to vote in a manner superior to those who were not able to vote using the Optical Scanning System. Plaintiffs note that the Optical Scanning System, while superior to the DRE System, is still illegally deployed and subject to external manipulation, especially when the electronic infrastructure is exposed, as it was in the lead up to the Runoff. The Optical Scanning System is the lesser of two evils, and those who used it were harmed less than those who were forced to use the DRE System.

recountable ballots, although they were cast and tabulated on compromised equipment. These ballots are verifiable and recountable because they can be counted manually in an election contest rather than counted electronically, in a manner necessarily exposed to irregularity, especially given the security failures and non-compliance of the voting systems used. The voters who voted by optical scanning ballots were able to vote in the election using verifiable, recountable ballots, which can be counted, reviewed, and discrepancies corrected under the supervision of this Court, while votes cast in the DRE System are not reviewable against an independent record–thus creating two unequal classes of electors. The Optical Scanning System produces an electronic representation of the ballot, which can be checked against the voter-marked ballot. The DRE System produces only an electronic representation of a vote, with no independent reference document. The voters of the respective ballots have their votes unequally weighted, with greater weighting given to those who voted by optical scanning ballot, whose votes can be verified and errors identified and corrected.

168.

Furthermore, the favorable tabulation and post-election review treatment afforded to those voting through the Optical Scanning System can be accessed only by those who overcome additional hurdles to mitigate their risk of an unverifiable ballot, as compared to those voting by the DRE System. See Count II. Ultimately,

absentee optical scanning ballots and ballots by the DRE-machines are substantially dissimilar in the manner in which they are recorded, processed, counted, and reviewed in Georgia's electoral scheme.

169.

Comparatively, the above-identified Defendants forced electors using the DRE machines in the Runoff to vote unwittingly on ballots for which the tabulation cannot be reviewed or discrepancies corrected by the court in this election contest. These Defendants include Secretary Kemp, Members of the State Board, Barron, Members of the Fulton Board, Daniels, Members of the DeKalb Board, Eveler, Members of the Cobb Board, and King.

170.

As alleged above (see ¶ 155), Secretary Kemp misled the electors, effectively encouraging them to vote on the DRE System on which their votes carried less weight than paper ballot votes

171.

It was "impracticable" to safely use the DRE System given its well-understood multiple violations of the DRE System requirements at § 21-2-379 *et seq*.

172.

In this case, these Defendants had two readily available choices authorized by the Election Code to avoid using an irreparably illegal DRE system. These Defendants could have remediated the existing security issues, properly certified the Optical Scanning System, and then fully employed the Optical Scanning System as authorized by Georgia Code Sections 21-2-366 to -379 or they could have employed hand-counted paper ballots as authorized by Section 21-2-281.

173.

These actions by these Defendants amount to purposeful and willful substantial burdening of the right to vote. See SECSYS, LLC v. Vigil, 666 F.3d 678, 686 (10th Cir. 2012) (Gorsuch, J.) (in Section 1983 action, holding that "[e]ven generally applicable laws initially enacted with entirely proper (non-discriminatory) purposes can themselves later become tools of intentional discrimination in the course of their enforcement.")

174.

The use of unverifiable, illegal, and improperly constructed ballots in Georgia's DRE System severely infringed upon these Plaintiffs' fundamental right to vote by not providing the opportunity to cast a lawful and verifiable vote in accordance with the Georgia Constitution or Code and by Defendants' misleading the electors with false claims of DRE System security and legal compliance.

175.

The burdens and infringements imposed upon these fundamental rights were differentially imposed upon Optical Scanning System (paper ballot) voters and DRE System (voting computer) voters during the Runoff without justification by any substantial or compelling state interest that could not have been accomplished by other less restrictive means. As the United States Supreme Court has noted, "The right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise. Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." Bush, 531 U.S. at 104-105 (2000) (citing Harper v. Virginia Bd. of Elections, 383 U.S. 663, 665 (1966) ("[O]nce the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment.") The Supreme Court continued, "It must be remembered that 'the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.'" Id. (quoting Reynolds v. Sims, 377 U.S. 533, 555 (1964)). In this case, Georgia law authorized two alternative systems—(1) the Optical Scanning System, if properly remediated, certified, and implemented or (2) hand-counted paper ballots—that could have been utilized to ensure equal protection of voters.

176.

Even under a rational basis standard, there is no rational basis for unequal treatment of electors predicated on actions in violation of the Georgia Constitution and Code.

177.

Defendant's conduct described herein violated the Fourteenth Amendment right of these Plaintiffs to enjoy equal protection of the law.

178.

In violating the Fourteenth Amendment, Defendant's conduct also violated the Georgia Constitution's Art. I, § 1, ¶ 2, equal protection guarantees, which "are substantially equivalent of equal protection of the laws under the U. S. Constitution." Grissom v. Gleason, 262 Ga. 374, 381 (1992) (emphasis omitted) (citation omitted).

179.

Plaintiffs ask this Court to declare that these Defendants have violated the fundamental right to equal protection of these Plaintiffs and enjoin Defendants from conducting future elections with Georgia's Voting System as currently configured, declare the Runoff and certification of its result void *ab initio*, and order a new election to be held as the only just relief available under the laws of Georgia. Plaintiffs also ask the Court to prohibit the use of Georgia's DRE System

in future elections. In addition, this Court should award nominal compensatory relief in the amount of $1 in recognition of these Defendants' violation of applicable federal and state laws and, as subsequent causation, the rights of Plaintiffs. Finally, this Court should award attorneys' fees and costs, as per 42 U.S.C. § 1988, for these Defendants' causation of concrete injury to Plaintiffs, whose fundamental right to have their vote counted as cast was and continues to be thwarted.

## COUNT IV: FAILURE TO RECANVASS VOTES

**(Plaintiff CGG against Defendants Secretary Kemp, Members of State Board, State Board, Daniels, Members of the DeKalb Board, DeKalb Board, Eveler, Members of the Cobb Board, and Cobb Board in their Individual and Official Capacities)**

### Declaratory and Injunctive Relief
### O.C.G.A. § 9-4-2 and O.C.G.A. § 9-4-3

### Ga. Comp. R. & Regs. 183-1-12

180.

The allegations of paragraphs 1 through 179 above are hereby incorporated as the allegations of this paragraph 180 of Count Four of this complaint.

181.

Georgia election rules state: "The election superintendent shall, either of his or her own motion, or upon petition of any candidate or political party or three electors of the county or municipality, as may be the case, order a recanvass of all the memory cards (PCMCIA cards) for a particular precinct or precincts for one or more offices in which it shall appear that a discrepancy or error, although not

apparent on the face of the returns, has been made." Ga. Comp. R. & Regs. 183-1-12-.02(7)(a).

182.

For the reasons alleged above, Georgia's DRE System must be presumed to have caused substantial discrepancies or errors in returns, even if not apparent on the face of the returns. Given the fundamental insecurity and lack of auditability of the DRE System, direct evidence of manipulation is not required to establish the substantial likelihood that discrepancies or errors did, in fact, occur in these particular returns.

183.

Plaintiff CGG includes members that petitioned the DeKalb Board and the Cobb Board to recanvass certain precincts in both counties. (See Exhibit M.) The precincts in which recanvassing was sought were selected based on anomalous-appearing results–including extreme swings between purported absentee Optical Scanning System results and purported results.

184.

Defendants Daniels, Members of the DeKalb Board, the DeKalb Board, Eveler, Members of the Cobb Board, and the Cobb Board, despite being presented with a recanvass request which explicitly informed them of their obligation to recanvass the requested precincts, refused to recanvass these precincts. Their

knowing refusal to recanvass represents willful misconduct and abuse of discretion.

### 185.

On information and belief, Secretary Kemp was informed of these proper requests for recanvassing and the denials of the requests, did not act to permit such recanvassing, and certified the election result, despite his knowledge that voters had concerns about anomalies in identified precincts and voters' rights to recanvass prior to certification had been violated.

### 186.

Defendants Daniels, Members of the DeKalb Board, the DeKalb Board, Eveler, Members of the Cobb Board, and the Cobb Board willfully violated their duty under Ga. Comp. R. & Regs. 183-1-12-.02(7)(a). Concurrently, these Defendants and Defendant Kemp violated the citizen's right of oversight and review.

### 187.

Plaintiff CGG prays this court declare that Defendants Daniels, Members of the DeKalb Board, the DeKalb Board, Eveler, Members of the Cobb Board, and the Cobb Board are in violation of their duty to recanvass these precincts permitting electors to explore presumed discrepancies and propose their correction prior to election certification. Plaintiff CGG also prays that this court will void *ab*

*initio* the Runoff and certification of its result, and declare a new election to be held as the only just relief available under the laws of Georgia.

## COUNT V: LACK OF CERTIFICATION OF DRE SYSTEM AND OPTICAL SCANNING SYSTEM

**(All Plaintiffs against Defendant Secretary Kemp, in His Individual Capacity)**

**Declaratory and Injunctive Relief**

**O.C.G.A. § 9-4-2 and O.C.G.A. § 9-4-3 and O.C.G.A. § 21-2-379.2**

**Ga. Comp. R. & Regs. 590-8-1-.01**

188.

The allegation of paragraphs 1 through 187 above are hereby incorporated as the allegations of this paragraph 188 of Count Five of this complaint.

189.

Under Georgia law, the Secretary of State is responsible for approving Georgia's voting systems as safe and accurate under the provisions of Georgia Code Section 21-2-379.2 (regarding DRE System) and Section 21-2-368 (regarding Optical Scanning System) certifying Georgia's voting systems under

89

Ga. Comp. R. & Regs. 590-8-1-.01(d)(7). The purpose of the certification process is to ensure that "hardware, firmware, and software have been shown to be reliable, accurate, and capable of secure operation before they are used in elections in the state." Id. at (a)(3).

190.

Compliance with the specific provisions of Ga. Comp. R. & Regs. 590-8-1-.01 is required for all voting systems implemented after April 17, 2005, and also for all systems implemented before April 17, 2005 if there has been "a modification to the hardware, firmware, or software of the voting system." Id. at (b)(4). In such circumstances, under Georgia regulations, the previous State certification becomes invalid. Id.

191.

On information and belief, Secretary Kemp has not properly tested Georgia's DRE System in its current configuration although significant changes to the system have been implemented since the system was last certified in 2008. Moreover, he has not certified the DRE System in its current form, and the DRE System does not comply with the mandatory requirements of Ga. Comp. R. & Regs. 590-8-1-.01.

192.

The DRE voting system used in Georgia was last certified in May 2008 by then-Secretary Handel. Because various key components and software have been added and modified since, without the required new system certification, the system in use is not certified and, therefore, was not and cannot be used legally.

193.

On information and belief, neither Secretary Kemp nor any previous Secretary of State has ever certified that Georgia's Optical Scanning System "can be safely and accurately used by electors at primaries and elections," as required by Georgia law. O.C.G.A. § 21-2-368(b).

194.

By law, Secretary Kemp must certify any new system configuration, tested as an integrated whole, before it can be used in any election. He has not. Under the provisions of Ga. Comp. R. & Regs. 590-8-1-.01(d), the system must meet current voting systems standards promulgated by the EAC. It does not. Georgia's DRE System and Optical Scanning System as deployed during the Special Election and Runoff were, therefore, illegal. Secretary Kemp, on information and belief, intends to allow the State's election officials continued use of these uncertified systems, including in the upcoming November 2017 municipal elections.

195.

Moreover, Plaintiffs Curling, Price and CGG (then-named Rocky Mountain Foundation) sued Secretary Kemp in this court (2017CV290630) and at the June 7, 2017 hearing, Secretary Kemp produced the history of voting system certifications. A review of that file showed that no certification existed for Georgia's DRE System at the time of the Special Election or Runoff. (See Exhibit K.) Further, the documents of voting system approvals and certifications produced show no approval of the current DRE System declaring that it can be "safely and accurately used" as required by § 21-2-379.2. Additionally, when asked in an open records request to provide documentation of either federal or state certification of the system in use for the Runoff, CES stated that there were no responsive records.

196.

Accordingly, pursuant to Georgia Code Section 9-4-2, Plaintiffs pray that this court will declare that Secretary Kemp has not certified or approved Georgia's DRE System or Optical Scanning System as "safe and accurate" or certified it for use in its present form, a violation of Georgia law. Pursuant to Section 9-4-3, Plaintiffs also pray that this court will enjoin (1) Defendants' use of any configuration of Georgia's DRE System because it cannot meet the previously listed statutory requirements and (2) the use of the Optical Scanning System until such system and its software has been verified and its compliance with Georgia

statutory and constitutional requirements assured via applicable certification and approval.

## COUNT VI: ELECTION CONTEST DUE TO MISCONDUCT AND IRREGULARITY -- USE OF ILLEGAL, UNSECURED AND/OR UNCERTIFIED VOTING SYSTEMS

**(By all Plaintiffs, except Davis, Price, and CGG, against all Defendants in their Official Capacity, except King)**

**Declaratory and Injunctive Relief**
**O.C.G.A. § 9-4-2 and O.C.G.A. § 9-4-3**

**O.C.G.A. § 21-2-520**

197.

The allegations of paragraphs 1 through 196 above are hereby incorporated as the allegations of this paragraph 197 of Count Six of this complaint.

198.

Under Georgia Code Section 21-2-521, a Contestant is entitled to "contest the result of any primary or election."

199.

A Contestant can be "any aggrieved elector who was entitled to vote" in an election. O.C.G.A. § 21-2-521. The above-named Plaintiffs were all aggrieved electors in the Runoff. On June 26, 2017, Karen Handel was certified as the winner of the Runoff.

200.

An aggrieved elector has the right to contest the election by naming as a defendant in a lawsuit the "election superintendent or superintendents who conducted the contested primary or election." O.C.G.A. § 21-2-520(c). Election superintendents include either "the county board of elections [or] the county board of elections and registration," as the case may be. O.C.G.A. § 21-2-2(35)(A). Additionally, it can include the Secretary of State. See Dawkins-Haigler v. Anderson, 799 S.E.2d 180 (2017). Here, these Plaintiffs named such appropriate defendants.

201.

Since the State and County Boards and their members are "superintendents" under the meaning of this statute, by statute, Defendants State Board, Fulton Board, DeKalb Board, Cobb Board–as well as their respective individual members, including Secretary Kemp as Chair of the State Board, as well as Defendants

Barron, Daniels, and Eveler–lack immunity to an election contest claim. O.C.G.A.

§ 21-2-520.

202.

The result of any election may be contested if, among other reasons, there is

"misconduct, fraud, or irregularity" on the part of any "election official or officials

sufficient to change or place in doubt the result." O.C.G.A. § 21-2-522(1).

203.

Here, the Runoff produced tabulations that are speculative and based on the

illogical theory that the non-compliant and undeniably unsecured voting system

produced accurate results. The use of Georgia's DRE System and Optical Scanning

System, given their compromised security, material and pervasive non-compliance

with the Election Code, and unverifiability of the results, and lack of certification

of Georgia's Voting System as currently configured, amount to an "irregularity"

that, at a minimum, "place[s] in doubt" the result of this election. O.C.G.A. § 21-2-

522(1); see also Counts I; V (regarding lack of voting system certification for DRE

System and Optical Scanning System).

204.

Because the GEMS tabulation server itself was compromised, the tabulation

of all ballots has been compromised and the result has been placed in substantial

doubt. Moreover, the vast majority of the votes are not capable of verification or

correction of discrepancies. Although the Optical Scanning System ballots, as with the DRE ballots, were improperly counted through electronic means of the Optical Scanning System, they can be recounted and any discrepancies corrected by verifiable means in this proceeding. However, those ballots constitute a small minority of total votes cast. In the Runoff, 260,455 ballots were cast. Of those ballots, approximately 232,712 were cast using the DRE machines. The remaining 27,742 votes were cast by Optical Scanning ballot. 232,712 is significantly greater than the margin of victory in the Runoff – 9,702. Thus, given the extensive use of illegal ballots for which the tabulation cannot be verified, the result of the election is not only placed in substantial doubt, but there is no ability for this court to determine an accurate DRE vote count, recount the DRE ballots, or correct the DRE discrepancies.

205.

Testimony of experts demonstrate their universal agreement that Georgia's DRE System (and, by logical inference and extension, the Optical Scanning System) should not have been used in the Runoff, and cannot be relied on to produce accurate results, placing the election results in significant doubt. (See Exhibits F, G, and H)

206.

Accordingly, these Plaintiffs file this petition to contest the Runoff election result, in addition to their other claims herein. These Plaintiffs pray this court declare this election and the certification of its result void *ab initio* and order a new election to be held as the only just relief available under the laws of Georgia.

## COUNT VII - ELECTION CONTEST DUE TO IRREGULARITY – USE OF ILLEGAL BALLOTS AND ILLEGAL PROCEDURES

**(By All Plaintiffs, except Davis, Price, and CGG, against All Defendants in their Official Capacity, except King)**

**Declaratory and Injunctive Relief**

**O.C.G.A. § 9-4-2 and O.C.G.A. § 9-4-3**

**O.C.G.A. § 21-2-520**

207.

The allegations of paragraphs 1 through 206 above are hereby incorporated as the allegations of this paragraph 207 of Count Seven of this complaint.

208.

Electors in the Runoff used illegal ballots. DRE ballots are illegal because the DRE System on which they were cast is not certified and is in violation of the statutory requirements for such a system and they cannot be cast and tabulated in accordance with the statutory requirements of the Election Code. See O.C.G.A. §§ 21-2-379.1 to -379.12. Absentee ballots used in the Runoff were also illegal because the Optical Scanning System through which they were cast is not certified and is in violation of the statutory requirements for such a system. See O.C.G.A. §§ 21-2-365 to -379. Issuance of illegal ballots are an "irregularity" ordered by "an election official or officials." O.C.G.A. § 21-2-522(1).

209.

When illegal ballots are used, elector's choices on the illegal ballots and their purported tabulation is irrelevant. Mead, 278 Ga at 272.

210.

Instead, the question is whether the number of illegal ballots used is "sufficient to change or place in doubt the result" of the election. The number of illegal ballots is sufficient enough to change or place in doubt the result of the election when the amount used by electors to cast their votes is greater than the margin of victory. See Mead 278 Ga. 271.

211.

Because the GEMS tabulation server itself was compromised, the tabulation of ballots has been compromised and the entire results have been placed in doubt.

212.

Moreover, the vast majority of the votes are not capable of verification or subject to the correction of discrepancies. Although the Optical Scanning ballots, as with the DRE ballots, were improperly counted through electronic means, they can be recounted and any discrepancies corrected by verifiable means in this proceeding. However, those ballots constitute a small minority of total votes cast. As stated above, given the extensive use of illegal DRE ballots that cannot be verified, the result of the election is not only placed in substantial doubt, but there is no ability for this court to determine an accurate vote count, to recount the ballots, or to correct discrepancies.

213.

The DRE ballots and the Optical Scanning ballots used in the Runoff were illegal because they did not substantially adhere to the Georgia Constitution or Code. When a ballot does not follow a mandate from the Georgia Constitution or the Georgia Code the ballot is "illegal." See Mead, 278 Ga. at 269.

214.

Defendants State Board, Fulton Board, DeKalb Board, Cobb Board, as well as their respective individual members, including Secretary Kemp as Chair of the State Board, and Defendants Barron, Daniels, and Eveler, bear statutory responsibility, as "superintendents," for allowing illegal ballots to be issued, cast and counted under the DRE System and Optical Scanning System. O.C.G.A. § 21-2-520(2)(C). They do not have sovereign or qualified immunity to preclude this claim.

215.

Since the Runoff used illegal ballots in sufficient number to place the election in doubt, including the misconduct and irregularities alleged above, and these Defendants refused to recanvass the votes, the above-named Plaintiffs file this petition to contest the Runoff election result, in addition to their other claims herein. These Plaintiffs pray this court declare the Runoff election and the certification of its result void *ab initio* and declare a new election to be held as the only just relief available under the laws of Georgia.

## COUNT VIII: WRIT OF MANDAMUS

**(All Plaintiffs against Defendant Secretary Kemp)**

**Writ of Mandamus**

**O.C.G.A. § 9-4-3 and O.C.G.A. § 9-4-2; O.C.G.A. § 9-6-20**

**Requiring Exercise of the Public Duty to Reexamine Georgia's DRE System Established by O.C.G.A. § 21-2-379.2(b) and to Use Optical Scan or Paper Ballots in Lieu of DRE Machines to Comply with "Safe or Accurate" Requirements for Voting Machines**

216.

The allegation of paragraphs 1 through 215 above are hereby incorporated as the allegations of this paragraph 216 of Count Eight of this complaint.

217.

Mandamus is a remedy for "government[al] inaction – the failure of a public official to perform a clear legal duty." Southern LNG, Inc. v. MacGinnitie, 294 Ga. 657, 661 (2014).

218.

Mandamus is warranted when (1) a public official has a clear legal duty to perform an official act (as requested); (2) that the requesting party has a clear legal right to the relief sought or that the public official has committed a gross abuse of discretion; and (3) that there is no other adequate legal remedy. See Bland Farms, LLC v. Georgia Dept. of Agriculture, 281 Ga. 192, 193 (2006); SJN Props., LLC v. Fulton County Bd. of Assessors, 296 Ga. 793, 800 (2015).

219.

The Georgia General Assembly has the power to determine the Secretary of State's clear legal duties. See Ga Const. Art. V, § 3, ¶ 5 ("[T]he General Assembly shall prescribe the powers, duties, compensation, and allowances of… executive officers..."). The General Assembly did so under Georgia Code Section 21-2-50, which requires the Secretary of State to "perform such other duties as may be prescribed by law," including duties of approving the form of ballots, and developing, programming, and reviewing DRE and Optical Scanning ballots.

220.

One clear duty of the Secretary of State, as prescribed by law, is that "The Secretary of State may, at any time, in his or her discretion, reexamine any [DRE] system." O.C.G.A. § 21-2-379.2(a). The clear purpose Secretary of State's power to reexamine any DRE system at his discretion is to ensure that the DRE System

can be "safely and accurately used by electors at primaries and elections."
O.C.G.A. § 21-2-379.2(b). The Secretary of State has the same power, and
discretion, to reexamine any Optical Scanning system, with the same purpose of
ensuring that such a system be safely and accurately used. O.C.G.A. § 21-2-368.

221.

Although Secretary Kemp was aware of numerous security breaches and
statutory non-compliance of the DRE System, he violated his legal obligations by
not reexamining Georgia's DRE System before the Runoff in response to the
repeated requests of electors pursuant to Georgia Code Section 21-2-379.2(a)—or
abused his discretion by not initiating the reexamination process *sua sponte* before
the Runoff pursuant to Section § 21-2-379.2. Secretary Kemp, likewise, violated
his legal obligations by not reexamining Georgia's Optical Scanning System
before the Runoff in response to the repeated requests of electors—or abused his
discretion by not initiating the reexamination process *sua sponte* before the Runoff.
O.C.G.A. § 21-2-368.

222.

Secretary Kemp also violated his duty ultimately upon reexamination –
whether requested by electors or *sua sponte* – to remove from commission the
DRE System and the Optical Scanning System. If upon reexamination, should it
"appear that the system … can no longer be safely or accurately used by electors"

as provided under the Georgia Code "because of any problem concerning its ability to accurately record or tabulate votes," then the Secretary of State should "immediately" revoke his approval. O.C.G.A. § 21-2-379.2(c); see also O.C.G.A. § 21-2-368(c) (similar provision with respect to Optical Scanning System). Georgia's DRE System was not and is not safe or accurate, and its approval for use should have been revoked, if such approval was ever given[29]; the same is true of the Optical Scanning System. When Secretary Kemp, faced with knowledge of a substantially non-compliant system, failed to take action to revoke and replace Georgia's Voting System, his inaction left county election officials without a District-wide policy or directive to deploy a legally compliant voting system.

223.

Abuse of discretion is found when a public official acts in an "arbitrary, capricious, and unreasonable" manner. Burke Cty. V. Askin, 291 Ga. 697, 701 (2012) (citing Massey v. Georgia Bd. Of Pardons & Paroles, 275 Ga. 127, 128(2) (2002)). This includes acting in such an arbitrary, capricious way that their abuse

---

[29] That Secretary Kemp never examined the DRE System or the Optical Scanning System in the first place (see Count V) provides no refuge here. The Secretary is obligated to ensure that "No kind of direct recording electronic voting system not so approved shall be used at any primary or election." O.C.G.A. § 21-2-379.2(c); see also O.C.G.A. § 21-2-368(c) (similar provision with respect to Optical Scanning System). That Kemp failed to properly certify the systems makes his failure to examine in the face of the request and the information about the vulnerability of the systems an even greater abuse of his discretion.

of discretion "amounts to a failure on the part of the officer to exercise his

discretion at all." S. View Cemetery Ass'n v. Hailey, 199 Ga. 478, 483 (1945).

224.

Here, well before the Runoff, Secretary Kemp was informed of at least three

breaches into CES system, and was warned by DHS, the FBI, and the EAC that

foreign actors were probing multiple states' election systems, and such agencies of

the US government offered specific protective measures for Secretary Kemp to

undertake. He was warned repeatedly that Georgia's DRE System (and, by logical

inference and extension, the Optical Scanning System) was highly susceptible to

attack based on the allegations stated throughout this Complaint. He was warned

by experts at the June 7 hearing (See Curling v. Kemp, Case No. 2017CV290630)

that the system could not be used "safely and accurately," and could not be relied

on for accurate results. Although Secretary Kemp admitted that "anything is

possible"[30] when it comes to Russians tampering with Georgia's Voting System, he

refused to examine the DRE System or the Optical Scanning System for security

and compliance.

---

[30] Kim Zetter, Will the Georgia Special Election Get Hacked, Politico, June 14, 2017, http://www.politico.com/magazine/story/2017/06/14/will-the-georgia-special-election-get-hacked-215255 , (last visited June 30, 2017).

225.

Despite these repeated warnings and breaches, Secretary Kemp, the only top state election official in the nation to do so, refused assistance from the Department of Homeland Security to help protect Georgia's Voting System in August 2016. He did so because he did not "necessarily believe" that hacking of Georgia's elections is a real threat. About the issue he stated, "I think it was a politically calculated move by the [Obama] administration."[31] His rationale for his belief: "The question remains whether the federal government will subvert the Constitution to achieve the goal of federalizing elections under the guise of security. … Designating voting systems or any other election system as critical infrastructure would be a vast federal overreach, the cost of which would not equally improve the security of elections in the United States."[32]

226.

Such beliefs are arbitrary. They are based on a solely personal belief, unreasonable in that they are not rooted in fact, and contrary to empirically supported concerns expressed to him repeatedly by his constituents, cybersecurity

---

[31] Paul Waldman, How Democratic Timidity May Have Helped Trump Get Elected, Washington Post, June 23, 2017, https://www.washingtonpost.com/blogs/plum-line/wp/2017/06/23/how-democratic-timidity-may-have-helped-trump-get-elected/?utm_term=.d36b828f5d08 (last visited July 3, 2017).

[32] Allya Sternstein, At Least One State Declines Offer For DHS Voting Security, NextGov, August 25, 2016, http://www.nextgov.com/cybersecurity/2016/08/some-swing-states-decline-dhs-voting-security-offer/131037/ (last visited July 3, 2017).

experts, voting system experts, the EAC, the FBI, and DHS. His beliefs and reckless decision not to review the system are so arbitrary, capricious, and unreasonable that they "amount[] to a failure on the part of the officer to exercise his discretion at all." S. View Cemetery Ass'n, 199 Ga. at 483.

227.

Georgia's DRE System and Optical Scanning System were used in the 2016 General Election, as well as the Special Election, and the Runoff. On information and belief, Secretary Kemp plans to use the systems again in remaining 2017 elections and beyond – despite being more than aware of the burden the systems impose on Georgia electors' right to vote and of the fact that the systems do not comply with numerous provisions of the Election Code.

228.

The Secretary of State is clearly charged with ensuring the safety and accuracy of Georgia's Voting System. Yet, Secretary Kemp willfully ignores known threats to Georgia's election process against the informed counsel of the Federal Government, security experts, voting system experts, and his constituents. His misinformation—and the false assurances he has delivered to the public and elected officials—likely caused voters to use DRE machines based on their mistaken understanding that the DRE System was secure and would properly record their votes. Secretary Kemp essentially did nothing to fulfill his duty to

ensure the legal compliance, safety, and accuracy of Georgia's Voting System but, instead, willfully misled electors by making false claims about the security and certification of the systems in question here. Such reckless inaction and campaign of misinformation constitutes an abuse of discretion. See S. View Cemetery Ass'n., 199 Ga. at 483.

229.

Where the question is one of public right and the object is to procure the enforcement of a public duty, no legal or special interest need be shown, but it shall be sufficient that a plaintiff is interested in having the laws executed and the duty in question enforced. O.C.G.A. § 9-6-24.

230.

The Court has full and complete power to issue mandamus under Georgia Code Section 9-6-20, which provides, "All official duties should be faithfully performed; and whenever, from any cause, a defect of legal justice would ensue from a failure to perform or from improper performance, the writ of mandamus may issue to compel a due performance, if there is no other specific legal remedy for the legal rights."

231.

Apart from this Court's issuance of the writ of mandamus, Plaintiffs have no other legal remedy to compel enforcement of Secretary Kemp's official, public

duty to conduct the reexamination required by Georgia Code Sections 21-2-379.2(b) or 21-2-368(b), nor do they have any other remedy to compel enforcement of Secretary Kemp's duties to remove from commission voting machines that are non-compliant and replace them with a safe, accurate and legally compliant system. Various electors, including Davis, have attempted multiple times to have Secretary Kemp reevaluate the system. However, he has resisted their requests and imposed impractical fees and timelines, when he initially responded, as a reason not to reevaluate. Although he has recently waived the fees to be charged to the requesting electors, he remains unwilling to take timely action. Additionally, Secretary Kemp can act on his own accord. Electors cannot force Secretary Kemp to act in that capacity to fulfill his duties. Only the Court can.

232.

For the reasons provided, Plaintiffs respectfully ask this Court to issue a writ of mandamus for Secretary Kemp to fulfill his public duty to timely reexamine the DRE System and the Optical Scanning System and approve for future elections a legally compliant voting scheme, which, given DRE system's lack of safety and accuracy, must be an optical scan-based system or hand-counted paper ballots.

# COUNT IX: WRIT OF MANDAMUS

**(All Plaintiffs against Defendants Members of State Board, State Board, Daniels, Members of the DeKalb Board, DeKalb Board, Eveler, Members of the Cobb Board, Cobb Board, Barron, Members of the Fulton Board, and Fulton Board, in their Official Capacities)**

**Writ of Mandamus**

**O.C.G.A. § 9-4-3 and O.C.G.A. § 9-4-2; O.C.G.A. § 9-6-20**

**Requiring Exercise of the Public Duty to Use Optical Scan or Paper Ballots in Lieu of DRE Machines to Comply with "Practicable" Requirements**

233.

The allegation of paragraphs 1 through 236 above are hereby incorporated as the allegations of this paragraph 237 of Count Nine of this complaint.

234.

Mandamus is a remedy for "government[al] inaction – the failure of a public official to perform a clear legal duty." Southern LNG, Inc. v. MacGinnitie, 294 Ga. 657, 661 (2014).

235.

Mandamus is warranted when (1) a public official has a clear legal duty to perform an official act (as requested); (2) that the requesting party has a clear legal right to the relief sought <u>or</u> that the public official has committed a gross abuse of discretion; and (3) that there is no other adequate legal remedy. <u>See</u> <u>Bland Farms, LLC v. Georgia Dept. of Agriculture</u>, 281 Ga. 192, 193 (2006); <u>SJN Props., LLC v. Fulton County Bd. of Assessors</u>, 296 Ga. 793, 800 (2015).

236.

State Board, County Board, and County Election Officials abrogated a duty to remove from use machines that are not practicable. O.C.G.A. § 21-2-334. Again, these Defendants had two readily available choices authorized by the Election Code: they could have fully employed a compliant optical scanning voting system authorized by Georgia Code Section 21-2-366, or they could have used hand-counted paper ballots as authorized by Section 21-2-281. They failed to perform their duty during the Runoff, and without the intervention of his court, such failure is subject to repetition for upcoming elections.

237.

Where the question is one of public right and the object is to procure the enforcement of a public duty, no legal or special interest need be shown, but it

shall be sufficient that a plaintiff is interested in having the laws executed and the

duty in question enforced. O.C.G.A. § 9-6-24.

238.

The Court has full and complete power to issue mandamus under Georgia

Code Section 9-6-20, which provides, "All official duties should be faithfully

performed; and whenever, from any cause, a defect of legal justice would ensue

from a failure to perform or from improper performance, the writ of mandamus

may issue to compel a due performance, if there is no other specific legal remedy

for the legal rights."

239.

Apart from this Court's issuance of the writ of mandamus, Plaintiffs have no

other legal remedy to compel enforcement of State Board, County Board, and

County Election Officials' official, public duty to remove from commission voting

machines that are not "practicable," and replace them with a safe, accurate and

legally compliant system.

240.

For the reasons provided, Plaintiffs respectfully ask this Court to issue a writ

of mandamus ordering State Board, County Board, and County Election Officials

to discontinue the use of the DRE System and either utilize a fully compliant and

certified optical scanning voting system, pursuant to Georgia Code Section 21-2-366, or, pursuant to Section 21-2-281, use hand-counted paper ballots.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully ask this court:

- to grant declaratory relief deeming that Defendants have violated the Georgia Constitution, 42 U.S.C. § 1983, the Election Code, including Georgia's system certification regulations and provisions, and tabulation, recanvassing and results certification provisions; and declaring the certification of result of the Runoff and the Runoff election itself void *ab initio*;

- to grant declaratory relief deeming that Defendants Daniels, Members of the DeKalb Board, the DeKalb Board, Eveler, Members of the Cobb Board, and the Cobb Board are in violation of their duty to recanvass these precincts permitting electors to explore presumed discrepancies and propose their correction prior to election certification;

- to grant injunctive relief requiring Defendants to conduct a new election as the only just relief available under the laws of Georgia and enjoining all future use of Georgia's DRE System and the future use of the Optical Scanning System as currently configured;

- to issue a writ of mandamus for Secretary Kemp to fulfill his public duty to timely reexamine the DRE System and the Optical Scanning System and approve for future elections a legally compliant voting scheme, which, given DRE system's lack of safety and accuracy, must be an optical scan-based system or hand-counted paper ballots;

- to issue a writ of mandamus for State Board, County Board, and County Election Officials to discontinue the use of the DRE system and either utilize a fully compliant and certified optical scanning voting system or hand-counted paper ballots;

- to grant nominal compensatory damages in the amount of $1, in recognition of Defendants' violation of applicable federal and state laws, which have caused harm to Plaintiffs;

- to award attorneys' fees and costs for the deprivation of civil rights arising from alleged Defendants' patent and fundamental unfairness in conducting elections on Georgia's Voting System, causing a Section 1983 violation; and

- to grant all other relief this court deems proper.

Respectfully submitted this 4th day of August 2017.

/s/ Bryan M. Ward
Bryan Ward, Esq.
Georgia Bar No. 736656
Marvin Lim, Esq.
Georgia Bar No. 147236
Holcomb + Ward LLP
3399 Peachtree Rd NE, Suite 400
Atlanta, GA 30326
(404) 601-2803 (office)
(404) 393-1554 (fax)
Bryan.Ward@holcombward.com
Marvin@holcombward.com