**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., AND DO-MINION VOTING SYSTEMS CORPORATION,<br>      *Plaintiffs/Counter-Defendants*,<br><br>v.<br><br>MY PILLOW, INC. AND MICHAEL J. LINDELL,<br>      *Defendants/Third-Party Plaintiffs*,<br><br>v.<br><br>SMARTMATIC USA CORP., SMART-MATIC INTERNATIONAL HOLDING B.V., SGO CORPORATION LIMITED, AND HAMILTON PLACE STRATE-GIES, LLC,<br>      *Third-Party Defendants*. | Case No. 1:21-cv-00445-CJN |

**THIRD-PARTY PLAINTIFF MICHAEL J. LINDELL'S**
**<u>MEMORANDUM IN OPPOSITION TO SMARTMATIC'S MOTION TO DISMISS</u>**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................. ii

TABLE OF AUTHORITIES .......................................................................................... iv

I. INTRODUCTION .......................................................................................................1

II. LEGAL STANDARD.................................................................................................2

III. ARGUMENT ............................................................................................................3

A.   Lindell Pled Sufficient Facts Showing Smartmatic Violated his First, Fifth, and Fourteenth Amendment Rights Under 42 U.S.C. § 1983......................................................................3

  1.   Lindell sufficiently alleged facts showing a violation of a right secured by the Constitution and laws of the United States....................................................................4

  2.   Lindell sufficiently alleged facts showing violations committed by a person acting under color of state law, i.e., as a state actor ............................................................5

     a.   Lindell pled sufficient facts showing LA County delegated its obligations under state law and the Constitution to Smartmatic ....................................5

     b.   Lindell pled sufficient facts to show Smartmatic is a state actor because it acted together with or obtained significant aid from state officials or because its conduct is otherwise chargeable to the state .........................................10

  3.   Elections and their administration are a traditionally exclusive public function of the government.....................................................................................11

  4.   The cases Smartmatic cites do not relieve it of liability under § 1983 .................12

B.   Lindell Sufficiently Pled a Claim for Civil Conspiracy Against Smartmatic...................14

  1.   Lindell sufficiently alleged an agreement between Defendants ...........................15

  2.   Lindell alleged sufficient facts showing Smartmatic engaged in a conspiracy with Dominion, HPS, and Clare Locke to violate 42 U.S.C. §§ 1983 and 1985 and RICO...................................................................19

C.   Lindell pled sufficient facts to allege RICO claims against Smartmatic ..........................19

  1.   The Complaint Adequately Alleged Racketeering Activity ..................................20

  2.   The Complaint Adequately Alleged Smartmatic's Conduct and Participation .....31

  3.   The Complaint Adequately Alleged A RICO Enterprise ......................................31

    4.    The Complaint Adequately Alleged a RICO Conspiracy......................................35

D.    Lindell Pled Sufficient Facts of Smartmatic's to state a claim under
42 U.S.C. § 1985(3) ..................................................................................................36

    1.    The history of § 1985(3) supports its application ...................................37

    2.    Lindell sufficiently pled the existence of a conspiracy.........................40

    3.    The Support or Advocacy Clause is not limited to conspiracies involving violent or
physical force ..........................................................................................40

    4.    The Support or Advocacy Clause provides a substantive right; therefore an under-
lying federal right and state action are not required ...............................43

IV.  CONCLUSION...................................................................................................................45

V.  REQUEST FOR ORAL ARGUMENT...............................................................................45

## TABLE OF AUTHORITIES

**CASES**

*Ashcroft v. Iqbal*
    556 U.S. 662 (2009) ................................................................. 2-3

*Baldwin v. Escanaba Dealer's Ass'n,*
    130 N.W. 214 (Mich. 1911) ............................................................ 41

*Barber v. D.C. Gov't,*
    394 F. Supp. 3d 49 (D.D.C. 2019) .................................................... 15

*Barr v. Essex Trades Council*,
    30 A. 881 (N.J.Ch. 1894) ............................................................... 41

*Bell Atl. Corp. v. Twombly*
    550 U.S. 544 (2007) ........................................................... 2-3, 15-16

*Bois v. Marsh,*
    801 F.2d 462 (D.C. Cir. 1986) ......................................................... 39

*\*Boyle v. U.S.,*
    556 U.S. 938 (2009) .................................................................. 32-34

*Bray v. Alexandria Women's Health Clinic*,
    506 U.S. 263 (1993) ....................................................................... 39

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008) ....................................................................... 27

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ............................................................................. 5

*Calabrese v. CSC Holdings, Inc.*,
    No. 2:02-CV-5171 JS ARL, 2004 WL 3186787 (E.D.N.Y. July 19, 2004) ..................... 20

*Carpenters & Joiners of Am. v. Scott*,
    463 U.S. 825 (1983) ....................................................................... 37

*\*Chevron Corp. v. Donziger,*
    871 F. Supp. 2d 229 (S.D.N.Y. 2012) ................................... 20, 22-23

*Cleveland v. U.S.,*
    531 U.S. 12 (2000) ......................................................................... 28

*Cockrum v. Donald J. Trump for President, Inc.*,
  365 F. Supp. 3d 652 (E.D. Va. 2019) ..............................................................39

*Crowe v. Henry*,
  43 F.3d 198 (5th Cir. 1995) ...........................................................................36

*Daniels v. Williams*,
  474 U.S. 327 (1986)..........................................................................................4

*Deck v. Engineered Laminates*,
  349 F.3d 1253 (10th Cir. 2003) .....................................................................21

*E. Sav. Bank, FSB v. Papageorge*,
  31 F. Supp. 3d 1 (D.D.C. 2014), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015)................... 21-22

*Estelle v. Gamble*,
  429 U.S. 97 (1976).............................................................................................4

*Evan v. Newton*,
  382 U.S. 296 (1966).........................................................................................11

*Feld Ent. Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*,
  873 F. Supp. 2d 288 (D.D.C. 2012).........................................................24, 28

*FindTheBest.com v. Lumen View Tech. LLC*,
  20 F. Supp. 3d 451 (S.D.N.Y. 2014)......................................................... 21-22

*Flagg Bros., Inc. v. Brooks*,
  436 U.S. 149 (1978)...........................................................................................4

*Freedom Watch, Inc. v. Google, Inc.*,
  368 F. Supp. 3d 30 (D.D.C. 2019) ................................................................13

*Gentile v. Brunswick Cty. Sheriff's Dep't*,
  No. 7:13-CV-81-FL, 2014 WL 1331159 (E.D.N.C. Apr. 2, 2014) ................................23

*George v. Urban Settlement Services*,
  833 F.3d 1242 (10th Cir. 2016) .....................................................................31

*G-I Holdings, Inc. v. Baron & Budd*,
  179 F. Supp. 2d 233 (S.D.N.Y. 2001)............................................................24

*Gill v. Farm Bureau Life Inc. Co. of Missouri*,
  906 F.2d 1265 (11th Cir. 1990) .....................................................................43

*Great American Federal Savings & Loan Association v. Novotny*,
    442 U.S. 366 (1979)................................................................................................43

*Griffin v. Breckenridge*,
    403 U.S. 88 (1971)..................................................................................................39

*\*Halberstam v. Welch*,
    705 F.2d 472 (D.C. Cir. 1983) ......................................................................... 15-16

*Hall Am Ctr. Assocs. Ltd. P'ship v. Dick*,
    726 F. Supp. 1083 (E.D.Mich. 1989)......................................................................21

*Hartman v. Moore*,
    547 U.S. 250 (2006)..................................................................................................3

*Haynesworth v. Miller*,
    820 F.2d 1245 (D.C. Cir. 1987) ..............................................................................3

*Hao Liu v. Hopkins City*,
    No. 14-cv-1762 (TSC), 2015 WL 4978682 (D.D.C. Aug. 20, 2015) ..............................33

*\*In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*,
    906 F.2d 432 (9th Cir. 1990) ........................................................................... 17-18

*In re Outlaw Lab'ys, LP Litig.*,
    352 F. Supp. 3d 992 (S.D. Cal. 2018)......................................................................30

*In re Sumitomo Copper Litigation*,
    995 F. Supp. 451 (S.D.N.Y.1998) ...........................................................................30

*In re Yelverton*,
    No. 09-00414, 2014 WL 7141938 (Bankr. D.D.C. Dec. 12, 2014)................................33

*Jackson v. Metropolitan Edison Co.*,
    419 U.S. 345 (1974)................................................................................................11

*Kurd v. Republic of Turkey*,
    374 F. Supp. 3d 37 (D.D.C. 2019) ..........................................................................15

*Kush v. Rutledge*,
    460 U.S. 719 (1983)................................................................................................39

*La Suisse, Societe D'Assurances Sur La Vie v. Kraus*,
    No. 06 CIV. 4404 CM GWG, 2014 WL 3610890 (S.D.N.Y. July 21, 2014)...................20

*League of United Latin American Citizens v. Public Interest Legal Foundation,
No. 1:18-cv-00423, 2018 WL 3848404 (E.D. Va. 2018) ...................................44

Lemelson v. Wang Laboratories Inc.,
874 F. Supp. 430 (D. Mass. 1994) ...................................................................29

Lohse Patent Door Co. v. Fuelle,
114 SW 997 (Mo. 1908) ..................................................................................41

Love-Wilson v. NOCO Motor Fuel, Inc.,
263 F.3d 208 (2nd Cir. 2001)...........................................................................42

Lugar v. Edmondson Oil Co.,
457 U.S. 922 (1982)............................................................................... 4, 10-11

*Manhattan Community Access Corporation v. Halleck,
139 S.Ct. 1921 (2019).......................................................................3-4, 11-12

Marsh v. State of Ala.,
326 U.S. 501 (1946)..........................................................................................11

Mattiaccio v. DHA Grp., Inc.,
20 F. Supp. 3d 220 (D.D.C. 2014) ...................................................................15

McAndrew v. Lockheed Martin Corp.,
206 F.3d 1031 (11th Cir. 2000) ........................................................................25

McCord v. Bailey,
636 F.2d 606 (D.C. Cir. 1980) .........................................................................38

Mendenhall v. Carter,
17 F. Cas. 12 (W.D.N.C. 1872) ...................................................................... 40

Mitsui O.S.K. Lines Ltd. v. Sea Master Logistics, Inc.,
871 F. Supp. 2d 933 (N.D. Cal. 2012) .............................................................34

Nader v. McAuliffe,
593 F. Supp. 2d 95 (D.D.C. 2009) ...................................................................14

*Nat'l Coal. on Black Civic Participation v. Wohl,
498 F. Supp. 3d 457 (S.D.N.Y. 2020)...............................................36-37, 41-44

*Nat'l Coal. on Black Civic Participation v. Wohl,
512 F. Supp. 3d 500 (S.D.N.Y. 2021)...............................................................42

*Nat'l Collegiate Athletic Association v. Tarkanian*,
  488 U.S. 179 (1988)......................................................................................... 13-14

*Nat'l Conservative Political Action Committee v. Kennedy*,
  563 F. Supp. 622 (D.D.C. 1983) ...........................................................................42

*Neitzke v. Williams,*
  490 U.S. 319 (1989)................................................................................................2

*Nixon v. Condon*,
  286 U.S. 73 (1932)........................................................................................... 11-12

*Odom v. Microsoft Corp.,*
  486 F.3d 541 (9th Cir. 2007) ...............................................................................34

*Oki Semiconductor Co. v. Wells Fargo Bank, Nat'l Ass'n*,
  298 F.3d 768 (9th Cir. 2002) ...............................................................................35

*Parrot v. Taylor*,
  451 U.S. 527 (1981)................................................................................................4

*\*Paynes v. Lee*,
  377 F.2d 61 (5th Cir. 1967) .................................................................................44

*Perez v. DirecTV Grp. Holdings, LLC*,
  No. 816CV01440JLSDFM, 2019 WL 6362471 (C.D. Cal. July 23, 2019).....................29

*Philadelphia Reserve Supply Company v. Nowalk & Associates, Inc*.,
  Civ. A. No. 91–0449, 1992 WL 210590 (E.D.Pa. Aug. 25, 1992)...................24

*Pitzer v. Russell*,
  4 Or. 124 (1871)...................................................................................................40

*Rainey v. Allstate Ins. Co.*,
  370 F.3d 1086 (11th Cir. 2004) ...........................................................................21

*Reisinger v. Perez*,
  08-C-708, 2009 WL 10711114 (E.D. Wis. Oct. 8, 2009)..................................5

*Rendell-Baker v. Kohn*,
  457 U.S. 830 (1982)..............................................................................................11

*Richmark Corp. v. Timber Falling Consultants, Inc.*,
  730 F. Supp. 1525 (D. Or. 1990) ........................................................................26

*Safe Streets All. v. Hickenlooper*,
   859 F.3d 865 (10th Cir. 2017) ............................................................ 19-20, 31

*Salinas v. U.S.*,
   522 U.S. 52 (1997) .................................................................................... 35

*Scheidler v. Nat'l Org. for Women, Inc.*,
   537 U.S. 393 (2003) .................................................................................. 23

*Schmuck v. U.S.*,
   489 U.S. 705 (1989) .................................................................................. 27

*Schwartz v. Laws. Title Ins. Co.*,
   970 F. Supp. 2d 395 (E.D. Pa. 2013) ....................................................... 33

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985) .................................................................................. 20

*Sekhar v. U.S.*,
   570 U.S. 729 (2013) .................................................................................. 23

*Shahin v. Darling*,
   606 F. Supp. 2d 525 (D. Del. 2009) .......................................................... 27

*Sheikh v. Wheeler*,
   790 F. App'x 793 (7th Cir. 2019) ............................................................. 33

*Smiley v. Holm*,
   285 U.S. 355 (1932) ................................................................................ 6-7

*Smith v. Allwright*,
   321 U.S. 649 (1944) .............................................................................. 11-12

*Terry v. Adams*,
   345 U.S. 461 (1953) .............................................................................. 11-12

*The Pen v. D.C. Radio Assets, LLC*,
   181 F. Supp. 3d 49 (D.D.C. 2014) ............................................................ 12

*U.S. v. Applins*,
   637 F.3d 59 (2d Cir. 2011) ....................................................................... 32

*U.S. v. Beaty*,
   288 F.2d 653 (6th Cir. 1961) .................................................................... 42

*U.S. v. Bruce,*
    353 F.2d 474 (5th Cir. 1965) ..................................................................42

*U.S. v. Castillero,*
    67 U.S. (2 Black) 17 (1863)...................................................................40

*U.S. v. Coughlin,*
    610 F.3d 89 (D.C. Cir. 2010) .................................................................30

*U.S. v. Eiland,*
    738 F.3d 338 (D.C. Cir. 2013) ...............................................................35

*U.S. v. Eisen,*
    974 F.2d 246 (2d Cir.1992).....................................................................29

*U.S. v. Han,*
    280 F. Supp. 3d 144 (D.D.C. 2017) .......................................................28

*U.S. v. Int'l Longshoremen's Ass'n,*
    518 F. Supp. 2d 422 (E.D.N.Y. 2007) ....................................................23

*U.S. v. Janotti,*
    673 F.2d 573 (3rd Cir. 1982) ..................................................................22

*U.S. v. McLeod,*
    385 F.2d 734 (5th Cir. 1967) ..................................................................42

*U.S. v. Morrison,*
    98 F.3d 619 (D.C. Cir. 1996) .................................................................25

*U.S. v. Pendergraft,*
    297 F.3d 1198 (11th Cir. 2002) ..............................................................21

*U.S. v. Philip Morris Inc.,*
    116 F. Supp. 2d 131 (D.D.C. 2000) .......................................................32

*U.S. v. Philip Morris USA Inc.,*
    566 F.3d 1095 (D.C. Cir. 2009) .............................................................29

*U.S. v. Stockheimer,*
    157 F.3d 1082 (7th Cir. 1998) ................................................................28

*U.S. v. Tobin,*
    155 F.3d 636 (3d Cir.1998).....................................................................20

*U.S. v. Turkette*,
  452 U.S. 576 (1981)..............................................................................................32, 35

*U.S. v. Welch*,
  327 F.3d 1081 (10th Cir. 2003) ..............................................................................28

*Vegelahn v. Guntner*,
  44 N.E. 1077 (Mass. 1896) .....................................................................................41

*Vemco Inc. v. Camardella*,
  23 F.3d 129 (6th Cir. 1994) ....................................................................................21

*Walther v. Patel*,
  No. CIV.A. 10-706, 2011 WL 382752 (E.D. Pa. Feb. 4, 2011) .........................34

*West v. Atkins*,
  487 U.S. 42 (1988).........................................................................................3-5, 7, 9-11

*White v. Walsh*,
  649 F.2d 560 (8th Cir. 1981) ..................................................................................16

*Wiggins v. Philips Morris, Inc.*,
  853 F. Supp. 458 (D.D.C. 1994)..............................................................................43

*Workers Unions and Employers Midwest Health Benefits Fund v. Walgreen Co.*,
  719 F.3d 849 (7th Cir. 2013) ..................................................................................36

**CONSTITUTION**

U.S. Const. art. I, § 4, cl. 1..............................................................................................6, 9

**STATUTES**

18 U.S.C. § 1341 .............................................................................................................27

18 U.S.C. § 1512 .....................................................................................................23-25, 27

18 U.S.C. § 1961 .........................................................................................................31-32

18 U.S.C. § 1962..................................................................................................20, 31, 35

18 U.S.C. § 1964..........................................................................................................19, 31

42 U.S.C. § 1983 ........................................................................................ 12, 19, 34-35, 45

42 U.S.C. § 1985 ....................................................................................................19, 36-45

52 U.S.C. § 10308 ...........................................................................................................27

Cal. Elec. Code §§ 1–23004 ...............................................................................6

**Rules**

D.C. Loc. R. 7 .................................................................................................45

Fed. R. Civ. P. 8 ...............................................................................................2

Fed. R. Civ. P. 9 .............................................................................................30

Fed. R. Civ. P. 12 .............................................................................................2

**Law Review Articles**

Mark Fockele, *A Construction of Section 1985(c) in Light of Its Original Purpose*,
   46 U. CHI. L. REV. 402 (1979)....................................................................38

*Richard Primus & Cameron O. Kistler, *The Support-or-Advocacy Clauses*,
   89 Fordham L. Rev. 145 (2020)..................................................................44

**The Support or Advocacy Clause of § 1985(3)*,
   133 Harv. L. Rev. 1389 (2020) ........................................................ 37-38, 44

Wentong Zheng, *A Knowledge Theory of Tacit Agreement*,
   9 Harvard Bus. L. Rev. 399 (2009) ............................................................17

**Legislative History**

Cong. Globe, 42d Cong., 1st Sess. 244 (1871)............................................38

# I.
## __INTRODUCTION__

Smartmatic[1]—working in conjunction with Dominion[2] and HPS[3]—is using the judicial system as a weapon to stifle criticism and legitimate public debate. As insidious as this perversion of our legal system is on its face, it is made even more pernicious by the fact that Smartmatic and Dominion, by virtue of their roles running elections, are state actors who are now using the courts to silence critics—but only critics on one side of the political aisle.

This unprecedented misuse of the courts must stop. Unfortunately, standing up to the government is a monumental task most Americans either cannot afford or are unwilling to do. Lindell fits neither of those. Instead, he is determined to put an end to Defendants' Lawfare efforts to silence him and his fellow Americans. Accordingly, on December 1, 2021, Lindell filed his claims against Smartmatic[4] in this case to streamline two cases on this Court's docket, just as the Court instructed.[5] On December 8, 2021, Smartmatic moved to dismiss Lindell's claims against it.

---

[1] "Smartmatic" refers collectively to Third-Party Defendants Smartmatic USA Corp., Smartmatic International Holding B.V. and SGO Corporation Limited.

[2] "Dominion" refers collectively to Plaintiffs/Counter-Defendants U.S. Dominion, Inc.; Dominion Voting Systems, Inc.; and Dominion Voting Systems Corporation.

[3] "HPS" refers to Third-Party Defendant Hamilton Place Strategies, LLC. HPS, Smartmatic and Dominion are at times collectively referred to as "Defendants."

[4] Lindell's Third-Party Complaint against Smartmatic at Dkt. No. 87 is referenced in body text as "Complaint" and in all citations as "Compl." All references to docket entries herein refer to filing in the captioned matter unless otherwise specified.

[5] Smartmatic's "Procedural History" ignores three key points from this Court's November 15 Order and docket entries. First, the Court ordered Lindell to file his "affirmative claims" into this action. *See* Dkt. 85; Case No. 21-cv-2296, Dkt. 84 at ¶ 2. Second, the Court said it would dismiss the entire case containing Lindell's affirmative claims against Smartmatic. *See* Dkt. 85; Case No. 21-cv-2296, Dkt. 84 at n.1. Lastly, the Court notified the parties that both "affirmative claims" and counterclaims were due by 12/2/2021. *See* Case No. 21-cv-2296 at Nov. 15, 2021 entry. Clearly, Lindell has complied with the Court's orders and the Federal Rules of Civil Procedure.

Lindell's factual allegations—which the Court must accept as true at this stage of the proceedings—support each cause of action he pled. Smartmatic does not dispute that Lindell has sufficiently pled his 42 U.S.C. § 1983 claims other than to deny its status as a state actor, which Lindell addresses at length with well-pled and legally sufficient allegations in his Complaint. Lindell sufficiently pled a civil conspiracy, detailing the agreement between Smartmatic and Dominion to intimidate Lindell by committing acts violating statutes that caused Lindell reputational and financial injury. Likewise, Lindell sufficiently pled facts to support each element of a RICO claim—conduct of an enterprise through a pattern of racketeering activity that caused him harm. And Lindell pled Smartmatic engaged in a conspiracy to intimidate and threaten him for engaging in lawful activity regarding a federal election, which is sufficient to support his 42 U.S.C. § 1985(3) Support or Advocacy claim. Because Lindell sufficiently pled facts in support of each of his legally-cognizable causes of action, Smartmatic's Motion should be denied.

## II.
## LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint include "a short and plain statement of the claim showing the pleader is entitled to relief" so the defendant has "fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (internal citations omitted). This Court must assume all "allegations in the complaint are true, even if doubtful in fact." *Id.*; *see also Neitzke v. Williams,* 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations"). To survive a motion to dismiss, a complaint is not required to allege "detailed factual allegations;" instead, the complaint must only contain sufficient facts which, if accepted as true, "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*citing Twombly*, 550 U.S. at 555, 570). A claim is "facially plausible" if it

includes facts which sufficiently allow a court to reasonably infer the defendant is liable for the alleged misconduct. *Id*. (citing *Twombly*, 550 U.S. at 557).   "A motion to dismiss should be granted only when it appears beyond doubt that, under any reasonable reading of the complaint, the plaintiff will be unable to prove any set of facts that would justify relief." *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987), *abrogated on other grounds by Hartman v. Moore,* 547 U.S. 250 (2006).

### III.
### ARGUMENT

**A.    Lindell Pled Sufficient Facts Showing Smartmatic Violated his First, Fifth, and Four-teenth Amendment Rights Under 42 U.S.C. § 1983.**

Lindell alleged sufficient facts to state a claim against Smartmatic for violations of his First, Fifth, and Fourteenth Amendment rights under 42 U.S.C. § 1983. Compl. ¶¶ 6, 16, 36, 39–40, 43, 50, 53–54, 63, 137–39, 169–79. Contrary to its hyperbolic bluster, Smartmatic apparently agrees, as it fails to address Lindell's specific causes of action under § 1983 and instead only argues (incorrectly) that it is not a state actor rendering the underlying constitutional violations irrelevant. As Lindell specifically pled, a private entity may be deemed a state actor when the government has outsourced one of its constitutional obligations to it, *West v. Atkins*, 487 U.S. 42, 56 (1988), or when a private entity conducts a "traditional, exclusive public function," *Manhattan Cmty. Access Corp. v. Halleck*, 139 S.Ct. 1921, 1945 (2019); Compl. ¶¶ 54, 169–79. Smartmatic subjected itself to liability under § 1983 when it publicly boasted it was going to sue Lindell for defamation and disparagement for speech related to the 2020 General Election. Compl. ¶¶ 16, 169–79; *see also* Dkt. 81-1 at 3 n.2; Cause No. 1:21-cv-02296, Motion at 1-2 n.3.

Lindell sufficiently pled facts showing Smartmatic is a state actor under the tests from *West* and *Halleck*. Lindell has pled sufficient facts to meet the test under *West*, by showing: (1) the violation of a right secured by the Constitution and laws of the United States; (2)(a) the deprivation

of Lindell's right is based on 2(a)(i) a rule or privilege created by the state; 2(a)(ii) a rule of conduct imposed by the state; or 2(a)(iii) because the state was responsible for Smartmatic; and (2)(b) Smartmatic is a state actor because (2)(b)(i) it is a state official; (2)(b)(ii) it acted together with or obtained significant aid from state officials; or (2)(b)(iii) because its conduct is otherwise chargeable to the state. *West*, 487 U.S. at 54. As noted by the Supreme Court, while (2)(a) and (2)(b) above appear related, they are not the same principle. *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 937 (1982). "They collapse into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the State to his decisions." *Id*. "The two principles diverge when the constitutional claim is directed against a party without such apparent authority, *i.e.*, against a private party." *Id*.

Lindell has likewise pled sufficient facts to meet the test under *Halleck* by showing that Smartmatic performed a traditionally and exclusively public function of the government. *See Halleck*, 139 S.Ct. at 1928–1929.

### 1. Lindell sufficiently alleged facts showing a violation of a right secured by the Constitution and laws of the United States.

Under the first part of the *West* test, "[t]o state a claim under § 1983, a plaintiff must allege the violations of a right secured by the Constitution and laws of the United States . . ." *West*, 487 U.S. at 48 (citing *Parrot v. Taylor*, 451 U.S. 527, 535 (1981) (overruled in part on other grounds, *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986)); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978)). The Court in *West* found the obligation met under the first part of the test by alleging that West's Eighth Amendment rights were violated by the private party's indifference to his medical needs. *Id*. (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)).

Here, Lindell sufficiently pled facts sufficient to show Smartmatic violated his First, Fifth, and Fourteenth Amendment rights through participating and initiating a Lawfare campaign to

silence discussion of a specific class of voter regarding voting machines and the results of the 2020 General Election. Compl. ¶¶ 16, 169–79. "[T]he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." *Buckley v. Valeo*, 424 U.S. 1, 48–49 (1976). Specifically, Smartmatic threatened to sue Lindell and seek "sanctions against him for fighting back against the coordinated campaign to stifle dissenting speech" and even filed these threats directly with this Court. Compl. ¶¶ 16, 36, 39, 169–79; *see also* Cause No. 1:21-cv-02296, Dkt. 81-1 at 3 n.2, Motion at 1–2 n.3; *see also Reisinger v. Perez*, 08-C-708, 2009 WL 10711114, at *1 (E.D. Wis. Oct. 8, 2009) (holding threatening letters actionable under § 1983).

## 2. Lindell sufficiently alleged facts showing violations committed by a person acting under color of state law, *i.e.*, as a state actor.

Under the second part of the *West* test, Lindell pled sufficient facts showing the deprivation of his rights occurred because of (a) a (2(a)(i)) rule or privilege created by the state, (b) a (2(a)(ii)) rule of conduct imposed by the state, or (c) (2(a)(iii)) because the state was responsible for the private entity. *West*, 487 U.S. at 54; Compl. ¶¶ 16, 54, 169–79. Lindell also pled sufficient facts showing Smartmatic is a state actor under (a) (2(b)(i)) because it is a state official, (b) (2(b)(ii)) because it has acted together with or has obtained significant aid from state officials, or (c) (2(b)(iii)) because its conduct is otherwise chargeable to the state. *See id.*

### a. Lindell pled sufficient facts showing LA County delegated its obligations under state law and the Constitution to Smartmatic.

Lindell alleged sufficient facts showing a deprivation under (a) or (b) above. Lindell pled Smartmatic was expressly granted authority to administer, collect, count, record, and audit ballot results by California state law through the Constitution, which is a rule or privilege created by the

state or a rule of conduct imposed by the state.[6] Compl. ¶ 54. The Supreme Court has held the

language found in Article 1, Section 4, Clause 1 of the Constitution to be all encompassing, provid-

ing a complete code for congressional elections to protect fundamental rights:

> The subject-matter is the "times, places and manner of holding elections for sena-
> tors and representatives." It cannot be doubted that these comprehensive words em-
> brace authority to provide a complete code for congressional elections, not only as
> to times and places, but in relation to notices, registration, supervision of voting,
> protection of voters, prevention of fraud and corrupt practices, counting of votes,
> duties of inspectors and canvassers, and making and publication of election returns;
> in short, to enact the numerous requirements as to procedure and safeguards which
> experience shows are necessary in order to enforce the fundamental right involved.

*Smiley v. Holm*, 285 U.S. 355, 366 (1932). California enacted 21 divisions of law containing

23,004 sections related to elections within the state. CAL. ELEC. CODE §§ 1–23004. Given the con-

stitutional requirements under Article 1, Section 4, Clause 1, California enacted a "complete code

for congressional elections." *Smiley*, 285 U.S. at 366; CAL. ELEC. CODE §§ 1–23004.

Based on California's Election Code (a rule or privilege created by California), LA County

approved the contract with Smartmatic in 2018 for an eye-popping $282,097,321. Compl. ¶ 54;

*see also* June 12, 2018, LA County Board of Supervisors Adoption of Smartmatic Contract, at-

tached hereto as Exhibit A and incorporated by reference as if fully set forth herein. The quarter-

billion-dollar investment by LA County "comprised of hardware manufacturing, software, engi-

neering, implementation (including integration, certification, training, and help desk services),

maintenance and support." *Id*. at .pdf p. 6. It also included "Additional Goods and Services" total-

ing $28,419,598 which required "dedicated support by [Smartmatic] for Vote Centers up to and

during elections." *Id*. at .pdf p. 286.

---

[6] Smartmatic does not disagree in its Motion that it "administers, collects, counts, records, and
audits ballot elections" for LA County. Motion at 5.

Smartmatic's actions for the 2020 General Election, as detailed by its own website, clearly demonstrates it was a state actor: "Engineered and manufactured the BMD hardware; Programmed and installed the BMD software; Led the California certification process; Created the backend software to manage the devices; Provided systems integration services; Built the VSAP operations center; Handled logistics and setup/breakdown of the vote centers; Oversaw real-time data management for deployment; and Supplied Help Desk services on Election Day."[7] *Los Angeles County 2020–Present: VSAP Modernizes Elections*, SMARTMATIC (Nov. 11, 2020) (https://www.smartmatic.com/us/case-studies/article/los-angeles-county-2020-present-vsap-modernizes-elections/). Additionally, "Smartmatic had, at times, as many as 200 staffers supporting the project" and provided "800+ [e]lection workers hired and trained by Smartmatic for the County." *Id*.

Much like in *West*, where the state was required to provide medical care to inmates under the Eighth Amendment, states are required to provide a complete code for both state and federal elections under the Constitution. *West*, 487 U.S. at 55; *Smiley*, 285 U.S. at 366. Also like in *West,* where the state deferred to a private party's professional judgment to satisfy this obligation, LA County deferred to Smartmatic's professional judgment to administer, collect, count, record, and audit ballot results to satisfy its obligations under California's Election Code and the Constitution. *West*, 487 U.S. at 55. Further, like in *West* where the only medical treatment inmates could receive was from the state, in LA County, citizens could only use Smartmatic's machines to vote. *See id*. Accordingly, LA County, through the State of California, exercised its authority to regulate elections by contracting with Smartmatic and deprived its citizens a venue independent of Smartmatic to cast their votes. *See id*. And Smartmatic's role did not end on November 3, 2020. Smartmatic's

---

[7] This clearly contradicts Smartmatic's argument in n.10 of its Motion. Smartmatic conspicuously failed to address its ties to Venezuela or corruption and fraud. And for good reason—Smartmatic's history should give pause to any who considers it or its products and services trustworthy.

contract with LA County extends through the March 31, 2027, with 2-year option periods extending it further through potentially March 31, 2033. Exhibit A at .pdf p. 1. When the 2020 General Election ended, Smartmatic did not pack up and go home. Its job was just beginning. *See id.*

Smartmatic's business is elections. Smartmatic meets its business obligations by supplying LA County[8] with voting equipment, software, and thousands of hours of personal support and services. *Id.* Unlike an individual with a personal reputation and life involving many aspects beyond work, Smartmatic's reputation is based on administering, collecting, counting, recording, and auditing ballot results. Smartmatic's entire existence involves partnering with states and countries to provide elections needs.

Well before the election, Smartmatic made a business decision to fight what it deemed to be "fake news." In furtherance of this, Smartmatic released a crisis handbook to election officials that stated, in part: "Spreading disinformation breeds confusion and distrust and undermines our democratic process." *Communications in the Age of Fake News–A Crisis Handbook for Election Commissions*, SMARTMATIC (Jan. 22, 2020), https://www.smartmatic.com/us/media/article/-smartmatic-publishes-communications-handbook-for-election-officials/. Smartmatic began waging a war to protect the integrity of the 2020 General Election well before any election took place. Then after the election, imbued with power conferred on it by a rule or privilege created by the State of California, Smartmatic threatened, including Lindell, sent cease and desist letters, and

---

[8] Smartmatic also bids on jurisdictions other than Los Angeles County to supply election needs. *See Smartmatic Response to eRFI–New Voting System*, SMARTMATIC (Aug. 24, 2018) (https://sos.ga.gov/admin/files/Smartmatic%20RFI_Redacted.pdf). Smartmatic also runs elections in countries such as Mexico, the Netherlands, Venezuela, Taiwan, the Dutch Antilles, the Philippines, Argentina, Brazil, Bolivia, Zambia, India, Colombia, Belgium, the United Kingdom, Haiti, Ecuador, Chile, Sierra Leone, Kyrgyzstan, Uganda, Oman, Armenia, Italy, Norway, and Estonia. *Our history*, SMARTMATIC, https://www.smartmatic.com/us/about/our-history/.

filed lawsuits, all in violation of Lindell's First, Fifth, and Fourteenth Amendment rights under 42 U.S.C. § 1983. Compl. ¶¶ 6, 16, 36, 39–40, 43, 50, 53–54, 63, 137–39, 169–79.

Smartmatic also meets section 2(a)(iii) of the *West* test because it deprived Lindell of his First, Fifth, and Fourteenth Amendment rights when California was responsible for Smartmatic's conduct. In *West*, the state outsourced its constitutional obligations under the Eighth Amendment to a private party and state became responsible for the private party when it entered into an employment contract with him to provide medical care to inmates. *West*, 487 U.S. at 55. "The State bore an affirmative obligation to provide adequate medical care to West [under the Eighth Amendment]; the State delegated that function to respondent Atkins; and respondent voluntarily assumed that obligation by contract." *Id*. at 56. The state could not relieve itself of its constitutional duty by contracting out its medical care. *Id*.

Here, California and LA County outsourced their constitutional obligations to Smartmatic. Exhibit A. As discussed above, LA County assumed responsibility for Smartmatic by entering into a contract under which Smartmatic would administer, collect, count, record, and audit ballot results through voting equipment, software, and thousands of hours of personal support to satisfy California's constitutional obligations. Exhibit A; Compl. ¶ 54. Just like in *West*, for example, California is required under Article 1, Section 4, Clause 1 of the Constitution to regulate local and federal elections. *West*, 487 U.S. at 55. LA County delegated that function to Smartmatic through a contract under which Smartmatic voluntarily assumed California and LA County's obligation. *See id*.; Compl. ¶ 54. Generally, therefore, California is responsible for Smartmatic regarding its election services and actions taken in furtherance of elections, such as waging a war to protect the 2020 General Election outcomes. Compl. ¶¶ 6, 16, 36, 39–40, 43, 50, 53–54, 63, 137–39, 169–79.

      **b.**    **Lindell pled sufficient facts to show Smartmatic is a state actor because it acted together with or obtained significant aid from state officials or because its conduct is otherwise chargeable to the state.**

Lindell also sufficiently plead facts showing he met 2(b) because Smartmatic acted together with or received significant aid from state officials (satisfying 2(b)(ii)) or its conduct is otherwise chargeable to a state (satisfying 2(b)(iii)). *West*, 487 U.S. at 50. Accordingly, Smartmatic is "clothed with authority of state law" and "may fairly be said to be a state actor." *Id.* at 55. The court in *West* found the conduct that satisfied section 2(a) for Atkins also satisfied this element, as the test began to collapse in on itself. *Id.* at 56–57. For example, in *West*, because the state deferred to the private party's professional judgment to carry out its obligations under the Eighth Amendment and the private party voluntarily assumed this obligation when the private party misused his power in treating West, he satisfied both parts of the test, and the Court found the private party to be a state actor. *West*, 487 U.S. at 54–55. Finding different conduct that meets both tests becomes difficult when the conduct is that of the state. *See Lugar*, 457 U.S. at 937.

LA County contractually delegated authority to Smartmatic to administer, collect, count, record, and audit ballot results. Compl. ¶¶ 54, 169–79. Through the contract, Smartmatic received significant aid from California. In a monetary sense, Smartmatic signed a contract with LA County worth more than a quarter of a billion dollars. Compl. ¶ 54; Exhibit A. With regard to aid in the physical sense, Smartmatic confers a benefit on election officials by administering, collecting, counting, recording, and auditing ballot results. For example, Smartmatic repairs or troubleshoots machines and resolves issues with voter registration and transferring ballot results to the Secretary of State for LA County officials. Smartmatic also provides thousands of hours of technical support and services. Compl. ¶¶ 37–43; *Los Angeles County 2020–Present: VSAP Modernizes Elections, Smartmatic*, (Nov. 11, 2020) (https://www.smartmatic.com/us/case-studies/article/los-angeles-county-2020-present-vsap-modernizes-elections/). Because of the above, Smartmatic was

"clothed with the authority of state law" when it violated Lindell's First, Fifth, and Fourteenth Amendment rights. *West*, 487 U.S. at 54–55; Compl. ¶ 54, 169–79. Smartmatic is, therefore, "a person who may fairly be said to be a state actor." *Id*.; *see also Lugar*, 457 U.S. at 937.

### 3. Elections and their administration are a traditionally exclusive public function of the government.

Lindell also pled sufficient facts to show Smartmatic is a state actor because elections are a "traditional, exclusive public function." Compl. ¶¶ 6, 16, 36, 39–40, 43, 50, 53–54, 63, 137–39, 169–79; *Halleck*, 139 S.Ct. at 1928–1929. The test in *Halleck* relies heavily on a fact intensive investigation to determine if the private entity performed a historically state function. *Halleck*, 139 S.Ct. at 1928–1929. According to the Court in *Halleck*, a traditional, exclusive public function must meet the following criteria:

> It is not enough that the federal, state, or local government exercised the function in the past, or still does. And it is not enough that the function serves the public good or the public interest in some way. Rather, to qualify as a traditional, exclusive public function within the meaning of our state-action precedents, the government must have traditionally *and* exclusively performed the function.

*Id*. (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982)) (emphasis in original); *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352–53 (1974); *Evan v. Newton*, 382 U.S. 296, 300 (1966)). "Under the Court's cases, those functions include, for example, running elections and operating a company town." *Id*. at 1929 (citing *Terry v. Adams*, 345 U.S. 461, 468–470 (1953) (holding independent political party, operating outside of any state law, conducting primaries, and excluding people based on race was performing a state action under the Fourteenth Amendment and thus violated the Fifteenth Amendment) ; *Marsh v. State of Ala.*, 326 U.S. 501, 505–09 (1946); *Smith v. Allwright*, 321 U.S. 649, 662–66 (1944); *Nixon v. Condon*, 286 U.S. 73, 84–89 (1932)).

Like the Court in *Terry* noted, Smartmatic's partnership with California and LA County "has become an integral part, indeed the only effective part, of the elective process that determines

who shall rule and govern." *See Terry*, 345 U.S. at 469. Because of the Help America Vote Act, companies like Smartmatic effectively stand in the shoes of local county election officials at precincts leading up to, during, and after an election providing the required support and services. Compl. ¶¶ 37–43. The transition from mechanical machines to complex software–based systems requiring advanced degrees changed the fundamental nature of elections. Compl. ¶¶ 37–43. Now, states *must* partner with companies to conduct elections. Elections are a traditional, exclusive public function. *Halleck*, 139 S. Ct. at 1929; *Terry*, 345 U.S. at 468–70; *Allwright*, 321 U.S. at 662–66; *Nixon*, 286 U.S. at 84–89. Because Smartmatic is a state actor and has taken it upon itself to wage a Lawfare campaign designed to silence what it deems "fake news" by sending cease and desist letters, filing lawsuits, and threatening Lindell with defamation litigation and ruinous sanctions, it violated Lindell's First, Fifth, and Fourteenth Amendment rights. *See, e.g., id*.; Compl. ¶¶ 6, 16, 36, 39–40, 43, 50, 53–54, 63, 137–39, 169–79.

### 4.    The cases Smartmatic cites do not relieve it of liability under § 1983.

Smartmatic misstates the law by suggesting a private company can never be a state actor. *See* Motion at 21. If Smartmatic's proposition that no private company could ever be a state actor were to be adopted by the Court, then over a hundred years of jurisprudence related to § 1983, and § 1983 itself, would be eviscerated in one stroke.

Smartmatic cites cases neither applicable to nor persuasive for its argument that Lindell did not sufficiently pled the state action requirement. In one case, the *pro se* plaintiff failed to allege any facts showing the defendant-owners of private radio stations were state actors. *The Pen v. D.C. Radio Assets, LLC*, 181 F. Supp. 3d 49, 51 (D.D.C. 2014); *see also* Plaintiff's Amended Complaint, Case No. 1:12-cv-01798-BJR, Dkt. 9 ¶¶ 6–14 (Dec. 19, 2012). Meanwhile, Lindell affirmatively pleads facts sufficient to show Smartmatic is a state actor in all actions it takes in

furtherance of its authority to administer and run elections. *See, e.g.*, Compl. ¶¶ 6, 16, 39–40, 43, 50, 53–54, 63, 137–39. In another case Smartmatic cited, the plaintiff brought violations of the Sherman Act, D.C.'s Human Rights Act, and the First Amendment against Google, Facebook, Twitter, and Apple. *Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 34 (D.D.C. 2019). The complaint only alleged defendants were "quasi-state actors" because they "create[], operate, and control public platforms that are for public use and public benefit." *Id*. at 35. Here, however, Lindell never suggests Smartmatic is a "quasi-state actor" and instead affirmatively pleads facts showing Smartmatic's state action. *See, e.g.*, Compl. ¶¶ 6, 16, 39–40, 43, 50, 53–54, 63, 137–39. Nor can Smartmatic plausibly allege that companies like Google, Facebook, Twitter, and Apple, who have immunity for "blocking and screening offensive material" on their platforms under 47 U.S.C. § 230 are in any way comparable to Smartmatic, a company whose sole objective is the administration, collection, counting, recording, and auditing of ballot results and one who did so in LA County for the 2020 General Election. Compl. ¶ 54.

In *National Collegiate Athletic Association v. Tarkanian*, a state university—"without question" a state actor—suspended the plaintiff for violating rules and recommendations of the NCAA, a private party. 488 U.S. 179 (1988). In *Tarkanian*, the NCAA propagated rules onto state and private universities. Those rules were the issue before the Court. As *West* clearly demonstrated, however, the rules must be propagated from the state, not a private party. Lindell does not allege that Smartmatic created a rule of privilege that made it a state actor. To the contrary, Lindell is clear that LA County's delegation of its constitutional obligations to Smartmatic is what caused it to become a state actor. Compl. ¶ 54. The Court suggests the outcome would be different if the state actor either adopted the private party's rules as state rules or delegated authority to it. *Id*. at 193–95. In *Tarkanian*, however, the state university did neither, and the private party had no

authority to take specific action against any university employee. *Id*. at 195–96. Unlike in *Tarkanian*, here the state government enacted an election code and delegated state authority to a private party thereby transforming that party into a state actor whose subsequent conduct in exercising that authority directly harmed Lindell. Also, unlike *Tarkanian*, Smartmatic's actions—made possible only through the state's delegation of authority—caused the complained-of harm.

Smartmatic's analysis of *Nader v. McAuliffe* is also misleading. 593 F. Supp. 2d 95 (D.D.C. 2009). Smartmatic states the *Nader* court "dismiss[ed] § 1983 claims notwithstanding whether elections are exclusive public function because 'the allegedly unconstitutional conduct here consisted of filing' ballot eligibility challenges '*rather than actually conducting or regulating an election*.'" Motion at 26 (emphasis in original). However, rather than Smartmatic's short cite, "[t]he plaintiffs make much of the fact that the act of conducting and regulating an election has been held to be an exclusively public function[], but because the allegedly unconstitutional conduct here consisted of filing challenges to eligibility for office rather than actually conducting or regulating an election, that authority is not on point." *Nader*, 593 F. Supp. 2d at 102 n.5. Lindell clearly alleges Smartmatic actually conducted and/or administered the 2020 General Election in LA County, and in connection with its authority to do so, threatened Lindell with ruinous litigation and sanctions in violation of his First, Fifth, and Fourteenth Amendment rights. Compl. ¶¶ 6, 16, 39–40, 43, 50, 53–54, 63, 137–39, 169–79.

**B.    Lindell Sufficiently Pled a Claim for Civil Conspiracy Against Smartmatic.**

Lindell alleged sufficient facts to state a claim against Smartmatic for civil conspiracy. Compl. ¶¶ 1, 15–17, 20–21, 36, 50, 55–67, 112, 126, 129, 136, 137–40, 166. In his Complaint, Lindell alleges: (1) Smartmatic and Dominion agreed to intimidate Lindell into silence through threatening, then actually initiating, abusive litigation regarding election integrity and political matters, Compl. ¶ 9–12, 15–17, 20–21, 36, 50, 55–67, 112, 125–40, 145–46, 156–60, 166, 173,

183; (2) this conduct was unlawful pursuant to various statutes, Compl. ¶ 152–61, 162–79, 183;

(3) Smartmatic and Dominion's actions injured Lindell's reputation, subjected him to death

threats, and financially injured him through lost business and litigation costs, Compl. ¶ 36, 125–

27, 138–39, 145–46, 151, 161, 166, 183, 185; and (4) these acts were committed in furtherance of

Defendants' common scheme to intimidate Lindell into silence, Compl. ¶¶ 9–12, 20–21, 36, 50,

125–40, 145, 156, 166, 173, 183.

To survive a motion to dismiss, a complaint alleging civil conspiracy must allege sufficient

facts showing: "(1) an agreement between two or more persons; (2) to participate in an unlawful

act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act

performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common

scheme." *Mattiaccio v. DHA Grp., Inc.*, 20 F. Supp. 3d 220, 230 (D.D.C. 2014). The Court may

infer the existence of a conspiracy from indirect evidence. *Kurd v. Republic of Turkey*, 374 F.

Supp. 3d 37, 52 (D.D.C. 2019).

### 1.    Lindell sufficiently alleged an agreement between Defendants.

Courts may infer the existence of an agreement if the plaintiff alleges facts showing co-

conspirators engaged in parallel conduct and had a preexisting relationship. *Id.* (citing *Twombly*,

550 U.S. at 557)). A plaintiff need not allege explicit or implicit communications among co-con-

spirators. *Id*. "[A]llegations concerning the defendants' proximity to each other and parallel activ-

ities alone" can justify inferring "an agreement or meeting of the minds amongst the defendants."

*Barber v. D.C. Gov't,* 394 F. Supp. 3d 49, 66 (D.D.C. 2019).

"Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement."

*Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). The *Halberstam* court elaborated, "[t]he

circumstances of the wrongdoing generally dictate what evidence is relevant or available in decid-

ing whether an agreement exists. Factors like the relationship between the parties' acts, the time

and place of their execution, and the duration of the joint activity influence the determination." *Id.* at 486. Thus, this Court may rely on indirect or circumstantial evidence at the motion to dismiss stage to infer a conspiracy. Other jurisdictions do as well. *See White v. Walsh*, 649 F. 2d 560, 561 (8th Cir. 1981) ("It is unlikely that a plaintiff in a conspiracy case will be able to provide direct evidence of a conspiratorial agreement. Thus, such evidence is not necessary to prove that a civil conspiracy existed."). At the pleading stage, plausible—not probable—grounds must exist to infer an agreement was made. A complaint includes plausible grounds of an agreement when the facts alleged "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. The factual allegations in the Complaint meet this standard.

Smartmatic, Dominion, and HPS engaged in a parallel and calculated pattern of litigation that Smartmatic does not dispute. *See* Motion at 2. Both Smartmatic and Dominion are key members of an unofficial cartel of electronic voting services companies that run American elections. Unlike their fellow cartel members, Smartmatic and Dominion have made a business of litigation against Lindell and others, filing suit for much more than either company is worth. Compl. ¶¶ 11, 125, 129, 131, 137, 145, 165. This pattern—plotted and launched by two companies who run our elections—harmed and continues to harm Americans, specifically including Lindell, who are entitled to make and hear speech from every side of a controversy and speak freely about issues which gravely impact our country. Compl. ¶¶ 40, 60, 63.

Dominion, HPS, Clare Locke, and Smartmatic sent increasingly aggressive cease-and-desist letters to Lindell and others, enacted an all-encompassing media campaign to intimidate and silence speech, and then filed lawsuits against numerous individuals and corporations, including Lindell. Compl. ¶¶ 11, 125-26, 129, 131, 136, 137, 145, 165. Smartmatic then came to this Court and specifically threatened to sue Lindell and seek "sanctions against him for fighting back against

the coordinated campaign to stifle dissenting speech." Compl. ¶¶ 16; *see also* Cause No. 1:21-cv-02296, Dkt. 81–1 at 3 n.2, Motion at 1, 2 n.3. Both Defendants threatened Lindell with expensive litigation and sanctions for criticizing their voting machines and their penetrable voting software. In combination with their preexisting relationship, discussed below, Lindell's Complaint alleged sufficient facts to establish an agreement between Smartmatic and Dominion.

Courts have found a tacit agreement when parties engage in parallel conduct supported by "facilitating practices," *i.e.*, "specific actions taken by firms to make coordination easier or more effective without the need for an explicit agreement." Wentong Zheng, *A Knowledge Theory of Tacit Agreement*, 9 HARVARD BUS. L. REV. 399, 410 (2009). For example, in *In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*, the plaintiffs alleged oil companies illegally conspired to raise or stabilize prices for oil products. 906 F.2d 432 (9th Cir. 1990). The defendants had a practice of publicly announcing price changes in press releases, suggesting this practice tended to show a price-fixing conspiracy. *Id*. at 445–46. The Ninth Circuit agreed, writing that "evidence concerning the purpose and effect of price announcements, when considered together with the evidence concerning the parallel pattern of price restorations, is sufficient to support a reasonable and permissible inference of an agreement, whether express or tacit, to raise or stabilize prices." *Id*. at 446–47.

Here, like the oil companies in *Petroleum Products* who announced price changes via press release, Smartmatic and Dominion engage in a "facilitating practice" through which they coordinate their abuses of the legal process on their websites. Smartmatic and Dominion *both* maintain a "legal update" or "lawsuit update" webpage specifically broadcasting and informing the public of their respective lawsuits regarding the 2020 General Election. Compl. ¶¶ 17, 133. Both companies make filed complaints, demand letters, and public statements readily available on these

webpages—like the oil companies in *Petroleum Products*—to signal and coordinate their strategy without explicit communication.

In addition to their parallel conduct, Lindell alleged facts showing Smartmatic and Dominion's shared corporate history and prior business relationship preceded the current conspiracy. In 2007, Smartmatic Corporation, Sequoia Voting Systems, Inc. ("SVS"), and SVS Holdings, Inc. ("SVS Holdings") entered into a Stock Purchase Agreement (the "Purchase Agreement") whereby Smartmatic sold SVS to SVS Holdings (which was wholly owned by Smartmatic's U.S. executives). Compl. ¶ 14–15.  In the Purchase Agreement, Smartmatic expressly carved out from the sale its "Proprietary Intellectual Property," which included certain technology used in e-voting systems (*e.g.*, "the Edge II Plus" and "Hybrid Activator, Accumulator & Transmitter (HAAT)"). *See* Compl. ¶¶ 15, 17. Dominion purchased SVS from SVS Holdings in 2010. *See id.*, at ¶ 60.

Although Smartmatic denies connections to Dominion, Motion at 6–7, Dominion licenses, or at the very least uses, Smartmatic's intellectual property in its voting systems. In 2013, Dominion bid on Colorado's voting system contract and stated its proposed "project" and voting "system" included Smartmatic's Proprietary Intellectual Property, specifically the "Edge 2 + … and the HAAT" systems. Compl. ¶ 17. Dominion stated it "continues to support and improve this system," meaning Smartmatic's intellectual property, "today." Compl. ¶ 17. Smartmatic and Dominion's shared use of Smartmatic's intellectual property evidences a symbiotic relationship between the two entities within which communication and coordination between Smartmatic and Dominion must occur, making conspiracy plausible.

In addition to shared histories and past business transactions, the parties share employees. Dominion's Vice President of Marketing, Vice President of Operations, Senior Technical Sales Engineer, and U.S. Sales employee all had or have Smartmatic email addresses. Compl. ¶ 62.

Dominion employees' access to and use of Smartmatic email accounts alone is sufficient to infer these critical Dominion employees acted on behalf of or in concert with Smartmatic.

> **2.    Lindell alleged sufficient facts showing Smartmatic engaged in a conspiracy with Dominion, HPS, and Clare Locke to violate 42 U.S.C. §§ 1983 and 1985 and RICO.**

Lindell has sufficiently pled facts establishing an unlawful act, injury caused by the act, in furtherance of a common scheme as described in Sections III.A, III.C, and III.D.  Lindell has also pled facts sufficient to establish an unlawful act, an injury caused by the fact, in furtherance of a common scheme as discussed in Sections III. A, B, and C. As discussed in Section III.A above, Smartmatic is a state actor. As a state actor, Smartmatic conspired with Dominion, HPS, and Clare Locke in activity which violates Lindell's constitutional rights. Lindell's Complaint alleged sufficient facts showing both Smartmatic's status as a state actor and its violation of Lindell's First, Fifth, and Fourteenth Amendment rights under 42 U.S.C. § 1983. As discussed at Section III.C below, Lindell alleged sufficient facts to show Smartmatic's actions, in conspiracy with Dominion, HPS, and Clare Locke, are in violation of the Support or Advocacy Clause of 42 U.S.C. § 1985(3). Lastly, as discussed at Section III.D below, Lindell alleged sufficient facts to show Smartmatic's action, in conspiracy with Dominion, HPS, and Clare Locke, constitute predicate acts in violation of RICO.[9]

## C.    Lindell pled sufficient facts to allege RICO claims against Smartmatic.

Lindell's 18 U.S.C. § 1964 RICO claim likewise survives Smartmatic's Motion to Dismiss because he plausibly alleged all elements of RICO. "RICO is to be read broadly." *Safe Str. All. v.*

---

[9] Smartmatic's entire argument otherwise is based on a hypothetical:  "If the Court dismisses Lindell's underlying claims against Smartmatic and Dominion, his civil conspiracy claim must also fail." Because Dominion has not yet moved to dismiss those underlying claims, however, Smartmatic's argument is futile.

*Hickenlooper*, 859 F.3d 865, 881 (10th Cir. 2017) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985)). To maintain a cause of action under § 1964(c), a plaintiff must plead and ultimately prove that: (1) the defendant violated § 1962; (2) the plaintiff's' business or property was injured; and (3) the defendant's' violation is the cause of that injury. *Id.* A plaintiff asserting a § 1964(c) claim for a violation of § 1962(c) must plausibly allege the defendants "each (1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id.* at 882 (citing, *e.g.*, 18 U.S.C. § 1962(c)).

### 1. The Complaint Adequately Alleged Racketeering Activity.

Lindell adequately alleged facts showing extortion as one of the predicate acts for his RICO claim. Smartmatic broadly proclaims "litigation cannot be the basis for extortion for purposes of RICO." Smartmatic is wrong. "[C]ase law recognizes that *litigation may constitute extortion* where the 'victim of the extortionate activity had a preexisting right to be free from the threats invoked.'" *La Suisse, Societe D'Assurances Sur La Vie v. Kraus*, No. 06 CIV. 4404 CM GWG, 2014 WL 3610890, at *9 (S.D.N.Y. July 21, 2014) (quoting *United States v. Tobin,* 155 F.3d 636, 640 (3d Cir.1998)) (emphasis added). Lindell's allegations show a scheme of extortion much broader than mere threats of litigation.

Courts have consistently found extortion is adequately pled as a RICO predicate act when defendants collectively engage in an ongoing scheme to attempt to extort their victims into monetary acquiescence—including by threatening litigation. *See*, *e.g.*, *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 249 (S.D.N.Y. 2012) (finding Chevron's allegations extended "far beyond" mere frivolous litigation to include a widespread scheme "for the purpose of coercing Chevron into paying to stop the campaign against it"); *Calabrese v. CSC Holdings, Inc.*, No. 2:02-CV-5171 JS ARL, 2004 WL 3186787, at *6 (E.D.N.Y. July 19, 2004) (holding defendants' association for

purpose of extracting monies from plaintiffs, including "institut[ing] baseless lawsuits," was sufficient allegation of extortion to constitute predicate act under RICO).

The cases Smartmatic cites do not hold otherwise. *See E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 13 (D.D.C. 2014), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015); *FindTheBest.com v. Lumen View Tech. LLC*, 20 F.Supp. 3d 451 (S.D.N.Y. 2014).[10] For example, Lindell's allegations extend far beyond the threat of mere meritless litigation. In *East Savings Bank*, the court held that plaintiff's allegations of abusive litigation were not a sufficient RICO predicate act of extortion because all of the conduct occurred in connection with pending lawsuits, and specifically distinguished cases, such as this one, where "the plaintiff alleged predicate acts outside the conduct of litigation, such as harassment of third parties…." *E. Sav. Bank*, 31 F.Supp.3d at 14 n. 4 (*citing Hall Am. Ctr. Assocs. Ltd. P'ship v. Dick*, 726 F.Supp. 1083, 1097 (E.D. Mich. 1989). That is exactly what Lindell has alleged here—a wide-spread scheme against hundreds of victims to intimidate them into silence with threats of devastating litigation and economic exposure, *in addition to* filing suit against him and My Pillow. Similarly, in *FindTheBest.com*, the court held the RICO claim was not adequately pled because "[t]he predicate acts [were] conclusory identified" as a "scheme to extort" and nothing else. *FindTheBest.com v. Lumen View Tech. LLC*, 20 F. Supp. 3d 451, 454 (S.D.N.Y. 2014).

---

[10] The other cases cited by Smartmatic on this point are distinguishable because, like *E. Savings Bank*, the predicate acts alleged there were limited to threatening or filing litigation against the RICO plaintiff, not any other racketeering activity outside the conduct of litigation. *See Raney v. Allstate Ins. Co.*, 370 F.3d 1086, 1088 (11th Cir. 2004) (alleging "conspiracy to extort money through the filing of malicious lawsuits"); *Deck v. Engineered Laminates*, 349 F.3d 1253, 1256 (10th Cir. 2003) ("The RICO allegations center on the state-court action, which Plaintiff contends was filed without a sound basis in fact or law"); *U.S. v. Pendergraft*, 297 F.3d 1198, 1205 (predicating RICO claim on mere threat to file lawsuit); *Vemco, Inc. v. Camardella*, 23 F.3d 129, 134 (6th Cir. 1994) (threatening litigation for failure to perform contract).

By contrast to the allegations in *E. Sav. Bank* and *FindTheBest.com*, the allegations in the Complaint are robust; they do not merely involve basic actions in furtherance of litigation. Defendants' scheme is to silence free speech, and their scheme does not stop with threatened or actual litigation. Lindell's RICO counterclaim allegations specify that Defendants' Lawfare campaign also includes labeling Lindell a "big liar" and threatening witnesses into silence who might otherwise come forward with evidence to corroborate Lindell's claims and public statements. Lindell alleges painstaking details about the intertwined history and the mission of Defendants to silence their mutual critics and hide flaws in their voting systems and technology. Compl. ¶¶ 55–62, 126, 129, 137–38. As the *FindTheBest.com* court expounded, a RICO claim *is properly pled* if "the facts of the extortionate scheme" go "beyond the filing of meritless litigation." *Id.* at 458 (discussing *Chevron Corp.,* 871 F.Supp. 2d 229 (S.D.N.Y. 2012)).

Smartmatic's argument that because Lindell did not allege he "transferred property" to Dominion or Smartmatic, "these deficiencies doom" Lindell's pleadings of extortion, Motion at 30, is legally incorrect. A victim of extortion need not pay money in response to a threat *before* he can assert a Hobbs Act violation; such a requirement would create an absurd outcome and eliminate the entire concept of inchoate offenses. *See, e.g.*, *U.S. v. Janotti*, 673 F.2d 573, 592 (3rd Cir. 1982) ("The Hobbs Act, by its own terms, encompasses the inchoate offenses of attempt and conspiracy to extort."). Instead, "[t]he Hobbs Act proscribes *attempted extortion*" as well." *Chevron Corp.*, 871 F. Supp. 2d at 248 (emphasis added). Lindell alleges Smartmatic and Dominion are "seeking to instill fear of consequences more unpalatable than" monetary damages. *See id.* (denying motion to dismiss where pleadings allege attempted extortion as predicate act under RICO). "The fact that the RICO Defendants have not succeeded in obtaining the desired payoff is

immaterial to the question whether [the complaint] sufficiently has alleged Hobbs Act extortion as a RICO predicate act." *Id.*

The cases Smartmatic cites are inapposite because they do not involve "the wrongful use of actual or threatened force, violence, or fear (including fear of economic loss)" to *attempt* to take the plaintiff's property, as was the case in *Donziger.* 871 F. Supp. 2d at 248 *cf.c United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 422, 483 (E.D.N.Y. 2007) (election and contract rigging schemes did not involve actual or threatened force, violence, or fear); *Sekhar v. United States*, 570 U.S. 729, 730 (2013) ("attempting to compel a person to recommend that his employer approve an investment" did not involve actual or threatened force, violence, or fear); *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 394 (2003) ("interference and disruption [with] goal of shutting down an abortion clinic" did not involve actual or threatened force, violence, or fear); *Gentile v. Brunswick Cty. Sheriff's' Dep't*, No. 7:13-CV-81-FL, 2014 WL 1331159, at *17–18 (E.D.N.C. Apr. 2, 2014) (police harassment of private investigator effectively putting him out of business did not involve actual or threatened force, violence, or fear).

By contrast, Lindell alleged Defendants' extortion scheme included threats of litigation *in order to wrongfully obtain property* from Lindell and others. Compl. ¶¶137–38. Here, Lindell adequately pled Defendants *attempted* to induce Lindell to consent to relinquish his property (*i.e.*, monetary damages) through Defendants' wrongful use of actual and threatened force, violence, and fear—including fear of economic harm.  Compl. ¶¶137–38.

Lindell also alleged facts sufficient to show Dominion, Smartmatic, and HPS violated 18 U.S.C. § 1512 (witness tampering and intimidation). The facts allege the Dominion/Smartmatic/HPS Enterprise ("the Enterprise") sent cease and desist letters "threatening the recipients with ruinous litigation unless they recant their previous statements and cease further public

expression regarding questions of evidence of fraudulent manipulation of voting machines or their use in tampering with and altering the outcome of the 2020 Presidential Election in certain jurisdictions." Compl. ¶¶ 158–59.

Smartmatic mischaracterizes Lindell's allegations, contending "abusive or sham litigation does not constitute witness tampering under § 1512 . . ." Motion at 30. Lindell does not allege the Enterprise is tampering with and intimidating witnesses by abusive or sham litigation. Compl. ¶ 158. Rather, Lindell alleges the witnesses are being tampered with and intimidated by letters containing false allegations and threats of "imminent litigation" if the witnesses come forward with information about the irregularities observed during the 2020 General Election or, in the case of Lindell and others, if they speak publicly about the vulnerabilities of electronic voting machines and software to hacking and manipulation. Compl. ¶ 158.

The cases Smartmatic cites involved pleadings where the only conduct alleged was the filing of fraudulent or baseless litigation. By contrast, where other misconduct was also part of the scheme, Courts have held allegations including sham or baseless litigation adequately allege a RICO predicate act. *See, e.g., Feld Ent. Inc. v. Am. Soc'y' for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 318 (D.D.C. 2012) (holding plaintiff's allegations of sham litigation sufficient where they also alleged entire lawsuit was based on bribery of lead plaintiff and witness). Lindell alleges the threatening letters to witnesses demanding their silence constitute intimidation and tampering with witnesses in violation of §1512, not merely that the Enterprise filed frivolous or sham litigation. *See* Compl. ¶ 158.

Smartmatic cites to *G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233 (S.D.N.Y. 2001). That case and the earlier decision it relies on, *Philadelphia Reserve Supply Company v. Nowalk & Associates, Inc.*, Civ. A. No. 91–0449, 1992 WL 210590 (E.D. Pa. Aug. 25, 1992), are

inapposite. *G-I Holdings* relies heavily on *Nowalk*, but in *Nowalk*, the plaintiff threatened to sue the RICO defendant, and the RICO defendant threatened to counter-sue. The Court held this threat of a countersuit could not constitute a violation of § 1512. Here, by contrast, the Complaint alleges concerned citizens like Lindell and others publicly voiced concerns about election fraud involving electronic voting machines and other election irregularities—speech protected by the First Amendment—and in response, Dominion and Smartmatic sent threatening letters demanding their silence and threatening ruinous litigation. *See* Compl. ¶132. The Court can reasonably infer from Lindell's allegations that the threats of litigation made by the Enterprise were made with a corrupt purpose, thus violating § 1512. *See McAndrew v. Lockheed Martin Corp*., 206 F.3d 1031, 1040 (11th Cir. 2000) ("Section 1512(b) …also makes it a crime to try to deter such testimony through sheer persuasion without the use of physical or economic threat, as long as one does so with a corrupt purpose.").

Nor is Lindell required to plead the existence of any official proceeding or investigation for the witness intimidation to rise to the level of a RICO predicate act.

> Conviction for corruptly persuading another person with intent to influence testimony in official proceeding does not require proof that proceeding in question actually was pending or about to be instituted at time of attempted obstruction; it requires only that defendant feared that such a proceeding had been or might be instituted and corruptly persuaded persons with intent to influence their possible testimony in such a proceeding.

*United States v. Morrison,* 98 F.3d 619, 619 (D.C. Cir. 1996) (citing 18 U.S.C. § 1512(b). The facts Lindell alleged show widespread suspicion that electronic voting machines and software were hacked or manipulated to alter the results of the 2020 General Election, and also the existence or likelihood of imminent proceedings and investigations involving the role of that technology in such hacking and manipulation. *See* Compl. ¶¶ 5, 70–124, 158. Even if the Enterprise's threats did

not mention testifying in any official proceeding, the clear intimation of the threats is that speaking out about election irregularities would subject the speaker to ruinous litigation. *See* Compl. ¶ 158.

Lindell also adequately alleged facts to support the reasonable inference that the Enterprise's threats of ruinous litigation led directly to Lindell's property and business losses. Compl. ¶¶ 138, 158, 166. In the Complaint, Lindell alleged injury to his business and economic interests such as his store, MyPillow, and his new online store, MyStore, as a result of the Enterprise's actions. Compl. ¶¶ 9, 138, 158, 161. The Court can reasonably infer the Enterprise's witness intimidation and tampering directly caused injuries to Lindell's business because others who witnessed suspicious and fraudulent activity by the Enterprise in the 2020 General Election cannot now come forward to confirm Lindell's findings and statements. Witnesses afraid to corroborate the truth of Lindell's election findings and statements caused Lindell to be perceived as a "big li[ar]" by "big-box" stores, media outlets, advertising platforms, and would-be consumers. Compl. ¶¶ 126, 136, 138. This has adversely affected his business and economic interests. The Court can reasonably infer from the facts alleged, that being "canceled" across the nation for being a "liar" led to the drop in Lindell's business. *See* Compl. ¶ 138. Additionally, the facts allege Lindell was personally threatened with and subjected to litigation by the Enterprise for continuing to speak out about election fraud. Compl. ¶¶ 9, 16, 138, 158. As with extortion, the fact that the Enterprise's attempted witness intimidation and tampering was not, in Mike Lindell's case, successful does not make such attempts any less a violation of the statute or a predicate act under RICO. *Richmark Corp. v. Timber Falling Consultants, Inc.*, 730 F. Supp. 1525, 1532 (D. Or. 1990) (holding attempted tampering and bribery of witness to be predicate acts under RICO). Lindell is burdened to bear the scarlet letter—"big liar"—in part because corroborating witnesses have been

intimidated into silence by the Enterprise's violation of § 1512, and this has directly and negatively impacted his business and economic interests. *See* Compl. ¶¶ 16, 138, 158.

Smartmatic blatantly mischaracterizes Lindell's allegations of witness tampering and intimidation as being limited to the Pennsylvania Senate ballot audit. Motion at 30–31. The Complaint explicitly states the purpose of the § 1512 violation was to impede the investigation of 2020 General Election's manipulation in general, not just the Pennsylvania Senate ballot audit, which was cited as one example in the Complaint. *See* Compl. ¶ 158. For this reason, *Shahin v. Darling*, 606 F. Supp. 2d 525, 537 (D. Del. 2009), and the other unreported opinions Smartmatic cites, are inapposite. Lindell alleges the evidence concerning the General Election is kept in the dark through witness intimidation tactics by the Enterprise and by Smartmatic specifically. *See* Compl. ¶ 158. The Complaint suggests the potential of a federal offense—the interference with a presidential election—52 U.S.C. § 10308—and the Enterprise's efforts to intimidate witnesses not to come forward with evidence of it. *See* Compl. ¶¶ 5, 70–124, 158.

Lindell also sufficiently alleged the racketeering activity of mail fraud. "RICO provides a private right of action for treble damages to any person injured in his business or property by reason of the conduct of a qualifying enterprise's affairs through a pattern of acts indictable as mail fraud." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008). "Mail fraud, in turn, occurs whenever a person, 'having devised or intending to devise any scheme or artifice to defraud,' uses the mail 'for the purpose of executing such scheme or artifice or attempting to do so.'" *Id.* (quoting 18 U.S.C. § 1341). "The gravamen of the offense is the scheme to defraud, and any 'mailing that is incident to an essential part of the scheme satisfies the mailing element' … even if the mailing itself 'contains no false information.'" *Id.* (quoting *Schmuck v. United States*, 489 U.S. 705, 712 & 715 (1989)).

And while the object of the scheme to defraud must be "property in the victim's hands," *Cleveland v. United States*, 531 U.S. 12 (2000), "[m]ail fraud lies whether or not the perpetrator ends up with the victim's property or money." *Feld Ent. Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 318 (D.D.C. 2012); *see also United States v. Han*, 280 F. Supp. 3d 144, 153 (D.D.C. 2017) ("Unlike the common-law fraud, which has an essential element that the defendant actually obtain or cause another to lose property, the focus in wire fraud is on the intent and purpose.") (citations and quotations omitted); *United States v. Welch*, 327 F.3d 1081, 1106 (10th Cir. 2003) ("We likewise reject Defendants' argument that the mail and wire fraud counts must allege an intent to achieve personal gain."); *United States v. Stockheimer*, 157 F.3d 1082, 1087–88 (7th Cir. 1998) ("An intent to defraud [for mail fraud] does not turn on personal gain … all that matters is that he intended to inflect a loss.").

Lindell alleged the scheme to defraud was the Enterprise's use of abusive cease-and-desist letters and sham litigation to injure Lindell financially, and eventually extract billions of dollars from him using the judicial process. *See* Compl. ¶ 137. The scheme was not only designed to coerce Lindell's silence through baseless threats of financial ruin but was also calculated to injure his business and property. While one purpose of the conspiracy here was to silence Lindell from speaking on the election, the Complaint alleged he has incurred and is incurring millions of dollars to defend himself against Dominion's $1.3 billion lawsuit simply because Dominion, HPS, and Clare Locke want to use the litigation process to silence him." Compl. ¶ 137. As a member of and participant in the Enterprise, Smartmatic is part of that conspiracy.  The Complaint alleged Defendants' collective motive to injure Lindell for speaking out about their faulty voting machines by attempting to extract money from him through the litigation process. Compl. ¶ 137 ("Smartmatic and Dominion have embarked on a concerted, collective enterprise to extort silence from

their dissenters or bring financial ruin on any and all who persist in speaking their minds."). Further demonstrating Defendants' intent to defraud, the Complaint alleged "Dominion recently directed HPS to place a story with the Business Insider detailing potential ways that Dominion will own MyPillow after litigation has ended." Compl. ¶ 145; *see United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1118 (D.C. Cir. 2009) ("A person's state of mind is rarely susceptible of proof by direct evidence, so specific intent to defraud may be, and most often is, inferred from the totality of the circumstances, including indirect and circumstantial evidence.").

Courts have found mail and wire fraud violations arising out of litigation-related activities where there are additional allegations of extortion or some other pattern of racketeering activity. *See United States v. Eisen*, 974 F.2d 246, 251–54 (2d Cir.1992) (finding mail and wire fraud were RICO predicate acts in scheme by law firm to extract money from civil defendants and liability insurers by fraudulent lawsuits, bribery and intimidation of witnesses, and falsified evidence); *Lemelson v. Wang Laboratories Inc.*, 874 F. Supp. 430, 434 (D. Mass. 1994) (mail and wire fraud violations were RICO predicate acts through pattern of litigation and subsequent settlement over fraudulent patents). Thus, Smartmatic's argument that the cease-and-desist letters are insufficient predicate acts for mail fraud is unavailing.

In *Perez v. DirecTV Grp. Holdings, LLC*, the court held the plaintiffs stated a valid RICO claim predicated on mail fraud where defendants mailed bogus settlement demands. Civ. Act. No. 816CV01440JLSDFM, 2019 WL 6362471, at *3 (C.D. Cal. July 23, 2019). Specifically, the scheme to defraud involved signing commercial customers to residential satellite television plans, facilitating unwitting violations of the Federal Communications Act, then extracting settlement money from them for the violation. *Id.* The defendants used threats of negative credit reporting and sham litigation to procure the settlements. *Id.* Similarly here, Defendants' scheme includes

attempting to extract outrageous sums of money from Lindell and others using groundless assertions that Lindell defamed them, all with the common purpose of silencing political speech about election integrity.

Smartmatic's argument that Lindell does not meet the particularity requirement of Rule 9(b) is likewise without merit. The Complaint explained the scheme to defraud, setting forth how Defendants weaponized the litigation process to financially cripple Lindell through sham litigation. Compl. ¶ 138. The Complaint further set out how specific Defendants committed mail fraud, with references to specific communications, dates, senders and recipients. Compl. ¶ 132–35. The Complaint also specified numerous false assertions by Dominion, including that its voting machines were not connected to the internet during the 2020 General Election, its voting machines are not hackable, and accusing Lindell of lying. Compl. ¶¶ 96, 138.

Contrary to Smartmatic's assertions, the mailings themselves do not have to contain false statements if the mailings are in furtherance of a scheme to defraud. "The law is clear that innocent mailings—ones that contain no false information—may supply the mailing element." *United States v. Coughlin*, 610 F.3d 89, 98 (D.C. Cir. 2010); *In re Outlaw Lab'ys, LP Litig.*, 352 F. Supp. 3d 992, 1002 (S.D. Cal. 2018) ("Counterclaimants are not required to allege that a particular false statement was either made within the demand letters, or without, to sustain a pleading for a scheme to defraud."); *In re Sumitomo Copper Litigation,* 995 F. Supp. 451, 456 (S.D.N.Y. 1998) (noting that "a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications, is sufficient to satisfy Rule 9(b)" in cases in which the communications are not themselves misleading).

2.     **The Complaint Adequately Alleged Smartmatic's Conduct and Participation.**

To maintain a § 1964(c) claim against, Lindell need only allege "facts plausibly demonstrating that [Defendants] conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs. This, in turn, requires a showing that [Defendants] participate[d] in the operation or management of the enterprise itself." *Safe St. All. v. Hickenlooper*, 859 F.3d 865, 883 (10th Cir. 2017) (cleaned up, quoting 18 U.S.C. § 1962(c) and *George v. Urban Settlement Services*, 833 F.3d 1242, 1251 (10th Cir. 2016)). Moreover, Lindell need *not* allege or prove any Defendant had "primary responsibility for the enterprise's affairs, a formal position in the enterprise, or significant control over or within the enterprise" to maintain his RICO claim. *Id.* (internal quotations omitted). "[A] plaintiff can easily satisfy [the RICO] operation and management test by showing that an enterprise member played some part—even a bit part—in conducting the enterprise's affairs." *Id.* at 884 (quoting *George*, 833 F.3d at 1252).

Smartmatic played a part in conducting the enterprise's affairs by not only suing individuals and entities including FOX News, One America News, Newsmax, etc. but also threatening lawsuits against others who have spoken out about their flawed e-voting technology. *See, e.g.*, Compl. ¶¶ 137–38. Dominion *did the same thing* by conducting its own Lawfare on different battle fronts, sending over 150 cease and desist letters to not only media outlets, but also to individual persons who had the courage to speak out about observed voting weaknesses. Compl. ¶¶ 127–34.

3.     **The Complaint Adequately Alleged A RICO Enterprise.**

Lindell adequately pled an "association in fact" enterprise. "RICO broadly defines 'enterprise' as 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *Safe Streets*, 859 F.3d at 882 (quoting *George*, 833 F.3d at 1248, and 18 U.S.C. § 1961(4)). As the Supreme Court stated,

there is "no restriction upon the associations embraced by the definition" of "enterprise." *United States v. Turkette*, 452 U.S. 576, 580 (1981). The statute reaches "*any* union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added); *see also Boyle v. United States*, 556 U.S. 938, 944 (2009) ("The term 'any' ensures that the definition has a wide reach."). Association-in-fact enterprises share three "structural features": (1) a purpose, (2) "relationships among those associated with the enterprise," and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.*, at 946. The Enterprise as alleged in the Complaint satisfies each requirement.

First, Lindell alleged Defendants' Enterprise has a common purpose of "suppressing dissent to protect their commercial and financial interests shown by their coordinated attack on dissenting speech …." Compl. ¶ 156 at 124. These "activities were coordinated to serve common goals, and that is all that is required" to satisfy *Boyle*'s purpose requirement. *United States v. Applins*, 637 F.3d 59, 78 (2d Cir. 2011).

Smartmatic's assertion that Lindell "must spell out the mechanics or logistics of the enterprise is unsupported by the case law." *See United States v. Philip Morris Inc.*, 116 F. Supp. 2d 131, 152 (D.D.C. 2000) (plaintiff adequately pled existence of RICO enterprise when it alleged defendant tobacco companies had a common purpose of maximizing profits in the cigarette market). In *Phillip Morris*, the court denied dismissal of RICO claims where the plaintiffs alleged the "defendants decided on a joint objective to preserve and expand the market for cigarettes to maximize their profits and agreed that the strategy they were implementing was a long term one that required the defendants to act in concert with each other on the current health controversy, as well as issues that would face them in the future." *Id.* (internal quotations omitted).

"[T]here is no need for a plaintiff to prove," much less plead, "each conspirator had contact with all other members." *Schwartz v. Laws. Title Ins. Co.*, 970 F. Supp. 2d 395, 404 (E.D. Pa. 2013) ("The fact that there is no claim that the title agents were aware of each other's role in the enterprise does not undermine the viability of the hierarchical enterprise."). Smartmatic's district court cases that purportedly require Lindell plead specific communications between the members of the enterprise (almost all of which involve plaintiffs proceeding pro se)[11] are readily distinguishable. *See In re Yelverton*, No. 09-00414, 2014 WL 7141938, at *13 (Bankr. D.D.C. Dec. 12, 2014) ("Yelverton alleges that the enterprise here is the Bankruptcy Estate, a legal entity. This makes no sense."); *Sheikh v. Wheeler*, 790 F. App'x 793, 796 (7th Cir. 2019) (dismissing *pro se* litigant's RICO claims because he failed to plead the existence of a common purpose).

Here, the Enterprises' common purpose is Dominion and Smartmatic's attempt to protect their flawed technology against legitimate and important scrutiny and criticism protected by the First Amendment and use fear and falsehood to intimidate into silence any who dare speak publicly about those flaws. Compl. ¶ 156. As Lindell's Complaint notes, Defendants are doing so because they fear speech critical of their shared technology will harm their commercial and financial interests. *Id.* These common financial motivations are sufficient to meet the "common purpose" requirement under the law of this Circuit.

Second, Lindell has alleged facts demonstrating relationships between those associated with the Enterprise, particularly Smartmatic and Dominion. As the Supreme Court noted in *Boyle*, "the existence of an association-in-fact is oftentimes more readily proven by what it does, rather

---

[11] *See e.g.*, *Hao Liu v. Hopkins Cty.*, No. 14-CV-1762 (TSC), 2015 WL 4978682, at *1 (D.D.C. Aug. 20, 2015) ("The Complaint is barely comprehensible, but as best the court can discern, Liu alleges that he lost a homestead tax exemption under Texas state law as a result of malfeasance and/or nonfeasance by city and county authorities.").

than by abstract analysis of its structure." *Boyle*, 556 U.S. at 946. Under *Boyle*'s "undemanding standard, the enterprise need not have formal mechanisms for controlling the enterprise's affairs, and can be an entity where decisions are made on an ad hoc basis." *Walther v. Patel*, No. CIV.A. 10-706, 2011 WL 382752, at *5 (E.D. Pa. Feb. 4, 2011). Courts applying *Boyle* have found far "looser" relationships to constitute an enterprise than that which Smartmatic challenges here. *See, e.g.*, *Mitsui O.S.K. Lines Ltd. v. Sea Master Logistics, Inc.*, 871 F. Supp. 2d 933, 942 (N.D. Cal. 2012) (companies that allegedly issued false invoices for inland shipping formed an enterprise— "[w]hile [plaintiff] does not allege that the partners are bound by any formal agreement or structure, they are not required to do so").

As Lindell pointed out in the Complaint, Dominion and Smartmatic share an intertwined corporate history owing to Dominion's acquisition of SVS from Smartmatic in 2010. *See* Compl. ¶ 60. The two companies have exchanged high-level employees, with certain Dominion employees retaining Smartmatic email addresses. Compl. ¶ 62. Furthermore, Dominion has licensed Smartmatic's intellectual property for its voting systems. Compl. ¶ 17. Contractual agreements between companies with respect to their products have served as evidence that those companies are an "ongoing organization," and thus a RICO enterprise. *See, e.g.*, *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007) (contract in which Best Buy agreed to promote Microsoft's products while Microsoft agreed to promote Best Buy's online store was evidence that the two were an ongoing organization for RICO purposes).

Dominion and Smartmatic have not only shared technology per a licensing agreement or agreements but are also now working together for the express purpose of silencing by fear and intimidation anyone who publicly criticizes that technology or seeks to expose the vulnerability it creates in elections. This ongoing business relationship between Dominion and Smartmatic, which

has existed since at least 2010, is sufficient to meet the "relationship" requirement of an associa-tion-in-fact enterprise.

Lindell also adequately alleged the longevity component for a RICO "enterprise" because his pleadings show the enterprise existed continuously since November 2020 and continues to this day. Longevity is present where an enterprise exists for a time sufficient to permit its members to accomplish the enterprise's purpose. *See Turkette*, 452 U.S. at 583. Here, the Enterprise's purpose is to silence critics and protect the reputation (and revenues) of Defendants' e-voting technology. The Enterprise has acted in furtherance of these goals for almost two years, which is sufficient to establish longevity under binding D.C. Circuit precedent. *See United States v. Eiland*, 738 F.3d 338, 360 (D.C. Cir. 2013) ("Rashawn Briggs testified he was dealing drugs with Eiland and Miller between 2000 and 2002. Thus, the enterprise continued for a period "sufficient to permit the asso-ciates to pursue the enterprise's purpose.").

**4.      The Complaint Adequately Alleged a RICO Conspiracy.**

Lindell's allegations of a RICO conspiracy satisfy Rule 12(b)(6) as outlined below and at Section III.B. above.  Section 1962(d) makes it unlawful to conspire to violate subsections (a), (b), or (c) of § 1962. 18 U.S.C. § 1962(d). The crux of a § 1962(d) violation is the agreement to violate the substantive portions of § 1962. *Oki Semiconductor Co. v. Wells Fargo Bank, Nat'l Ass'n*, 298 F.3d 768, 774 (9th Cir. 2002) ("It is the mere agreement to violate RICO that § 1962(d) forbids …"). The Supreme Court clarified that although the conspirator need not agree to commit or facil-itate every part of the substantive offense, he must "intend to further an endeavor which, if com-pleted, would satisfy all of the elements of a substantive criminal offense ….." *Salinas v. United States*, 522 U.S. 52, 65 (1997). Therefore, to state a claim under § 1962(d), the plaintiff must allege the existence of an "agreement to participate in an endeavor which, if completed, would constitute

a violation" of the RICO statute. *Workers Unions and Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 856 (7th Cir. 2013). This requires the plaintiff to make a two-part showing that the defendant agreed: (1) to facilitate the operation of an enterprise through a pattern of racketeering activity; and (2) that someone (not necessarily the defendant) would commit at least two predicate acts. *Crowe v. Henry*, 43 F.3d 198, 206 (5th Cir. 1995). Lindell has done so.

**D.      Lindell Pled Sufficient Facts of Smartmatic's to state a claim under 42 U.S.C. § 1985(3).**

Lindell alleges sufficient facts to state a claim against Smartmatic for violation of the Support or Advocacy Clause under 42 U.S.C. § 1985(3),[12] which provides in part:

> if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his *support or advocacy* in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States;  to injure any citizen in person or property on account of such support or advocacy;

42 U.S.C. § 1985(3) (emphasis added). While most cases interpret § 1985(3) under the Equal Protection Provision, *see Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 486 (S.D.N.Y. 2020), Lindell asserts his claim under the Support or Advocacy Clause. Compl. ¶¶ 162–68.

A Section 1985(3) claim brought under the Support or Advocacy Clause requires: (1) a conspiracy; (2) the purpose of which is to force, intimidate, or threaten; (3) an individual legally entitled to vote who is engaging in lawful activity related to voting in federal elections. *Wohl*, 498

---

[12] Litigants like Smartmatic have long confused § 1985(3)'s Equal Protection Provision (which is the first clause) and Support or Advocacy Clause (which is the second clause) to require elements of one for the other.  Lindell has not pled that Smartmatic violated the Equal Protection Provision under § 1985(3).

F. Supp. 3d at 487.[13] Here, Lindell properly alleges facts supporting those elements. *See, e.g.*, Compl. ¶¶ 9–12, 16, 19, 20–22, 125–40, 166–67.

Smartmatic offers four challenges: (1) Lindell's reliance on the Support or Advocacy Clause is unprecedented; (2) Lindell failed to allege a conspiracy between Smartmatic and Dominion; (3) Lindell failed to allege facts showing use of "force, intimidation, or threat" against him; (4) Lindell failed to allege facts showing a violation of an underlying federal right including state action. None of these arguments have merit.

### 1.    The history of § 1985(3) supports its application.

The Reformation Act of 1871 ("Act") was not only intended to address racial discrimination. Rather, after receiving reports of violence and intimidation from Republican citizens in the Reconstruction South, President Grant sought legislation to "effectively secure life, liberty, and property, and the enforcement of law in all parts of the United States." *The Support or Advocacy Clause of § 1985(3)*, 133 HARV. L. REV. 1389 (2020) (quoting CONG. GLOBE, 42d Cong., 1st Sess. 244 (1871) (hereinafter "HARV. L. REV.").

During Congressional debates, many Republican Congressmen and Senators heavily emphasized the political nature of the problems Americans faced in the south. Their commentary suggested the Reformation Act intended to stop both racial and political terrors. For example, Congressman Ellis H. Roberts presented various anecdotes of citizens who were victimized, noting, "the victims whose property is destroyed, whose persons are mutilated, whose lives are sacrificed, are always Republicans." *Id.* at 412. Furthermore, Senator George F. Edmunds noted § 1985(3) would reach a conspiracy formed against a man, "because he was a Democrat … or

---

[13] Lindell's claims differ from the elements for a claim under § 1985(3) in *Carpenters & Joiners of Am. v. Scott* which dealt with the Equal Protection Provision, not the Support or Advocacy Clause. 463 U.S. 825, 829 (1983).

because he was a Methodist, or because he was a Vermonter …." Cong. Globe, 42nd Cong., 1st Sess., 567 (1871).

The "Act was not an antidiscrimination statute. Its drafters intended to proscribe conspiracies having the object or effect of frustrating the constitutional operations of government through assaults on the person, property, and liberties of individuals." Mark Fockele, *A Construction of Section 1985(c) in Light of Its Original Purpose*, 46 U. Chi. L. Rev. 402, 403 (1979); *see also McCord v. Bailey*, 636 F.2d 606, 615 (D.C. Cir. 1980) ("[C]ongressional concerns encompassed more than racial equality or personal rights. The operation of government, especially the federal government, was threatened. Civil survival was at stake."). Furthermore, the Support or Advocacy Clause was not included in the original version of the bill introduced in the House of Representatives. Harv. L. Rev. at 1390–91. It was later added by Senator Edmunds after nine days of Congressional debate. *Id.* During debate, Representative Burton Cook also explained that a citizen supporting or advocating for a federal candidate is "exercising a right secured to him clearly by the fundamental law of this nation. Hence a combination to deprive the citizen of that right, or to punish him for its exercise, is an offense against the United States, and may be so declared and punished by national law." *Id.* at 1392 (quoting Cong. Globe, 42nd Cong. 1st Sess., 486 (1871)). As a later addition to the proposed bill, the Support or Advocacy Clause is clearly separate from the Equal Protection Provision.

The first case Smartmatic cites in support of its claim that the invocation of the Support or Advocacy Clause is "unprecedented" is *Cockrum v. Donald J. Trump for President, Inc.* 365 F. Supp. 3d 652, 660-61 (E.D. Va. 2019). *Cockrum*, however, was brought under the Support or

Advocacy Clause, and the court did not say use of the Clause was unprecedented. Motion at 12.[14]

Smartmatic creates a strawman by including standards not found in the statute and then claims Lindell failed to meet them by arguing "no public-interest, egalitarian motive animates [Lindell's] case." *Id*. at 13. The statute simply does not include these standards. Smartmatic appears to be applying standards for the Equal Protection Provision onto the Support or Advocacy Clause.

Similarly, hoping to draw a distinction from this case, Smartmatic cites *Griffin v. Breckenridge*, where the plaintiffs were physically harmed due to their race. 403 U.S. 88, 103 (1971). *Griffin* does not apply here because it was brought under § 1985(3)'s Equal Protection Provision, *not* the Support or Advocacy Clause. *Id.* Unlike plaintiffs suing under the Equal Protection Provision of § 1985(3), a plaintiff who files suit under the Support or Advocacy Clause does not need to prove defendants acted with discriminatory, class-based animus. *See Kush v. Rutledge*, 460 U.S. 719, 726 (1983) (rejecting argument that discriminatory animus requirement, which "arose under the *first clause* of [§] 1985(3)," should be extended to the remaining portions of § 1985 (emphasis added)); *see also Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 281 n.13 (1993) (emphasizing connection between the "animus requirement" and equal protection language in § 1985(3)). Moreover, as discussed below, physical force is not required to properly plead a claim under the Support or Advocacy Clause.

Smartmatic claims Lindell's lawsuit does not seek to "'safeguard voting rights' and strengthen our democracy," Motion at 13, yet that is the very purpose of this lawsuit—to safeguard voting rights and strengthen democracy from those who seek to weaken it by conspiring to silence

---

[14] Curiously, Smartmatic cites to Judge Wald in *Bois v. Marsh*, 801 F.2d 462, 475 (D.C. Cir. 1986) to explain the history of the statute. *Bois* also does not apply here as it addressed whether intramilitary damage actions are available under § 1985(3) and held they are not. *Id. Bois* also involved an Equal Protection Provision violation argument, which is not at issue here. *Id.*

speech, dissent, and opposition to the use of electronic voting machines in the 2020 General Election and the machines' vulnerability to cyber-attacks and election tampering. Compl. ¶ 1.

### 2. Lindell sufficiently pled the existence of a conspiracy.

Here, and as discussed in detail above in Section III.B, Lindell alleges Defendants knowingly agreed to intimidate supporters of President Trump, including Lindell, into silence regarding the 2020 General Election by sending hundreds of cease-and-desist letters, threatening to file lawsuits, and filing abusive lawsuits against them, and that these acts were unlawful under § 1985(3)'s Support or Advocacy Clause. Compl. ¶¶ 9–12, 16, 19, 20–22, 125–40, 166–67.

### 3. The Support or Advocacy Clause is not limited to conspiracies involving violent or physical force.

The Support or Advocacy Clause proscribes conspiracies that prevent participation in federal elections by "force, intimidation, or threat." 42 U.S.C. § 1985(3). "Force" is only one of three alternate means of deterrence prohibited by the statute. The statute does not contain words limiting coverage to physical violence only. Moreover, neither "intimidation" nor "threat" requires physical or violent force or threat of force. Smartmatic's proposed limitation is not only unsupported by the statute's language and history, it also stands to undermine the statute's purpose.

In 1871, when the Support or Advocacy Clause was drafted, "intimidation" included any action that reasonably inspires fear in another. At that time, courts frequently used the words "intimidate" or "intimidation" in actions involving economic coercion not only with allegations of use or threat of force. *See, e.g.*, *United States v. Castillero*, 67 U.S. (2 Black) 17, 91 (1863) (threat to expose legal documents); *Mendenhall v. Carter*, 17 F. Cas. 12, 14 (W.D.N.C. 1872) (No. 9426) (threat to file proceedings in bankruptcy court); *Pitzer v. Russell*, 4 Or. 124, 127 (1871) (accumulation of costs in legal proceedings). In the following decades, courts explicitly held that statutes proscribing "intimidation" were not limited to actions involving use or threat of force but also

applied to economic coercion. *See, e.g.*, *Vegelahn v. Guntner*, 44 N.E. 1077 (Mass. 1896) (intimidation not limited to threats of violence or physical injury); *Baldwin v. Escanaba Dealer's Ass'n*, 130 N.W. 214, 219 (Mich. 1911) (same); *Lohse Patent Door Co. v. Fuelle*, 114 SW. 997, 1004 (Mo. 1908) (same); *Barr v. Essex Trades Council*, 30 A. 881, 888 (N.J. Ch. 1894) (same). Here, Lindell pleads Smartmatic and Dominion threatened him with economically ruinous litigation. Compl. ¶¶ 11, 16.

The Southern District of New York recently interpreted "threat" or "intimidation" under both § 1985(3)'s Support or Advocacy Clause and the Voting Rights Act explaining, "the threat of severe nonbodily harm can engender as much fear and disruption as the threat of violence." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 479 (S.D.N.Y. 2020). In *Wohl*, the trial court granted a temporary restraining order and preliminary injunction and later denied a motion to dismiss—both relating to claims under the Support or Advocacy Clause and Voting Rights Act—finding plaintiffs pled sufficient facts regarding "force, intimidation, or threat." *Id*. at 485 (granting temporary restraining order ("TRO") and preliminary injunction); *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 512 (S.D.N.Y. 2021) (denying motion to dismiss). The *Wohl* plaintiffs alleged the defendants disseminated threatening robocalls warning recipients against voting by mail and of the potential release of personal information to police departments, debt collectors, and the CDC if they chose to do so. *Wohl*, 498 F. Supp. 3d at 465. The robocalls did not threaten physical violence in any way. *See id*.

The *Wohl* court examined plaintiffs' allegations of intimidation and threats under the Voting Rights Act claim under the Support or Advocacy Clause. *Id*. at 488 ("The Court has identified no authority indicating that the terms 'intimidation' and 'threat' bear a different meaning in the [] Act than they do in the [Voting Rights Act]. The court will therefore interpret these terms

consistent with the discussion above ….").[15] The *Wohl* court soundly rejected defendants' argument that non-physical threats are outside the purview of § 1985(3). *See id*. Specifically, the court applied the "whole code canon," which instructs courts to construe identical terms consistently across different actors or titles of the U.S. Code and emphasized use of the words "intimidate" or "threaten" elsewhere in the Code. *Id*. at 481. The court concluded, "[c]ommunicating the prospect of adverse legal consequences, including arrest or prosecution, may rise to the level of an unlawful threat or intimidation." *Id*. (citing *United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967) (interpreting provision of the 1957 Civil Rights Act prohibiting intimidation, threats, or coercions for the purpose of interfering with the right to vote) and (*Love-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 222–23 (2d Cir. 2001) (interpreting employer's threat to address employee's behavior through legal channels as unlawful threat under ADA)). Such threats and intimidation must be viewed objectively from "the minds of reasonable voters," not subjectively. *Id*. at 467, 477–80.

The court further determined "[e]conomic pressure may also be considered a form of intimidation." *Id*. at 481–82 (citing *United States v. Beaty,* 288 F.2d 653, 654–57 (6th Cir. 1961) (applying the Civil Rights Act of 1957 and holding that eviction of sharecroppers as punishment for registering to vote constitutes unlawful intimidation) and *United States v. Bruce*, 353 F.2d 474, 476–77 (5th Cir. 1965) (finding unlawful intimidation when a landowner restricted an insurance collector's access to landowner's property due to insurance collector's efforts to register voters)).[16]

---

[15] The *Wohl* court's analysis of "intimidation" and "threat" in its TRO decision was incorporated into its later decision denying the motion to dismiss on Section 1985(3) Support or Advocacy Clause. *See Wohl*, 512 F. Supp. 3d at 512.

[16] Smartmatic relies on cases that do not involve extraordinary Lawfare or sham litigation resulting in the significant level of financial intimidation or death threats directed at Lindell. *See, e.g., National Conservative Political Action Committee v. Kennedy*, 563 F. Supp. 622, 627 (D.D.C. 1983) (rejecting allegations where congressmen advised broadcasters to not accept National Conservative Political Action Committee's advertisements and possibly sent written memoranda advising

Accordingly, the Complaint included sufficient facts to support a conspiracy to "prevent by force, intimidation, or threat" because a claim under the Support or Advocacy Clause does not require violent or physical force. Smartmatic's threat to sue Lindell and seek sanctions against him clearly communicates the prospect of adverse legal consequences through sham litigation and rises to the level of intimidation or threat as contemplated by the case law. Compl. ¶ 16. Defendants' actions also applied economic pressure on Lindell (through business losses and the threat of ruinous litigation and resulting cost of defending against that litigation) that amounts to intimidation. An ordinary, reasonable recipient familiar with the context of the communication would interpret it as a threat. *Id.* at 479. Because of the conspiracy furthered by Smartmatic, Lindell is the subject of a significant, $1.3 billion lawsuit and sham litigation; received death threats; and suffered economic losses in defending against sham litigation. Compl. ¶¶ 125–40, 166–67. These facts, included in Lindell's Complaint, show the significant intimidation and threats Smartmatic directed towards Lindell.

4.  **The Support or Advocacy Clause provides a substantive right; therefore an underlying federal right and state action are not required.**

Smartmatic further incorrectly argues Lindell's claim under the Support or Advocacy Clause fails because Lindell did not show a violation of an underlying federal right. Motion at 17. In support, Smartmatic cites to *Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 372 (1979) and *Wiggins v. Philips Morris, Inc.*, 853 F. Supp. 458, 466–67 (D.D.C. 1994) (applying *Novotny*). Both cases are inapplicable here because, once again, they were filed

---

broadcasters to reject advertisements as not rising to level of "force, intimidation, or threat"); *Gill v. Farm Bureau Life Inc. Co. of Missouri*, 906 F. 2d 1265 (11th Cir. 1990) (rejecting allegations where insurance agent's contract with insurer was canceled after he fundraised for a congressional candidate running against an incumbent supported by insurers as not rising to level of "force, intimidation, or threat").

under the Equal Protection Provision, which is remedial, meaning it "provides causes of action to vindicate federal rights created elsewhere." *See* Richard Primus & Cameron O. Kistler, *The Support-or-Advocacy Clauses*, 89 FORDHAM L. REV. 145, 177, 181–90 (2020) ("It is well established that those equal protection clauses [in 1985(3)] are remedial."). The Support or Advocacy Clause, however, provides a substantive—not remedial—right. *See Wohl*, 498 F. Supp. 3d at 486 n. 30 ("While the Equal Protection Clause thus requires a violation of a separate constitutional right, *Novotny*, 442 U.S. at 372, the Support or Advocacy Clause gives rise to an independent substantive right—the right to vote and participate in voting-related activities (citation omitted)"); *League of United Latin American Citizens (LULAC) v. Public Interest Legal Foundation*, No. 1:18-cv-00423, 2018 WL 3848404, at *6 (E.D. Va. 2018) (denying defendant's motion to dismiss and holding plaintiffs properly stated a claim under § 1985(3)'s Support or Advocacy Clause which does not require a violation of a separate substantive right).

Furthermore, in *Paynes v. Lee*, the Fifth Circuit recognized the Support or Advocacy Clause provides a stand-alone, substantive right. 377 F.2d 61, 64 (5th Cir. 1967). There, the plaintiff was permitted to seek damages against defendants who allegedly attempted to intimidate the plaintiff from registering to vote. *Id.* at 63. The Fifth Circuit distinguished the Support or Advocacy Clause from the Equal Protection Provision, explaining "[t]he interference with a Federally protected right to vote ... had the specific attention of Congress," as demonstrated by the Act's creation of a "Federal *right* ... to recover damages for interfering with Federal voting rights." *Id.* at 64. This right to vote was to be construed broadly: "The right to be free from threatened harm and the right to be protected from violence for an attempted exercise of a voting right are no less protected than the right to cast a ballot on the day of the election." *Id.; see also* HARV. L. REV. at 1399–400 ("The

Fifth Circuit has recognized the Support or Advocacy Clause as providing a freestanding substantive right.").

Accordingly, because Lindell asserts a claim under § 1985(3)'s Support or Advocacy Clause—which is a substantive right—Lindell need not assert a separate federal right. Likewise, Smartmatic's argument that Lindell's § 1985(3) claim fails because a First Amendment right requires state action (Motion at 18) also fails because where no underlying federal right must be plead, no state action must be plead. In the event the Court treats the Support or Advocacy Clause as a remedial right, thereby requiring allegations of an underlying federal right, the Lindell pled sufficient facts showing violations of his First, Fifth, and Fourteenth Amendment rights as well as Smartmatic's state action as discussed above at Section III.A, regarding Lindell's 42 U.S.C. § 1983 claims.

## IV.
## CONCLUSION

Mike Lindell filed a well-pled Third-Party Complaint against Smartmatic. Taking his factual allegations as true and indulging all reasonable inferences in Lindell's favor—which the Court must at the motion to dismiss stage—Lindell pled sufficient facts supporting his causes of action for violations of 42 U.S.C. § 1983, 42 U.S.C. § 1985(3), RICO, and civil conspiracy. Accordingly, the Court should deny Smartmatic's Motion to Dismiss.

## V.
## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7(f), Lindell requests oral argument on Smartmatic's Motion to Dismiss.

Dated: December 20, 2021                    Respectfully submitted,

                                            */s/ Douglas A. Daniels*
                                            Douglas A. Daniels

D.C. Bar No. TX0205
Heath A. Novosad
D.C. Bar No. TX0207
DANIELS & TREDENNICK PLLC
6363 Woodway Dr., Suite 700
Houston, TX 77057-1759
(713) 917-0024 Telephone
(713) 917-0026 Facsimile
Email: doug.daniels@dtlawyers.com
Email: heath.novosad@dtlawyers.com

Earl N. "Trey" Mayfield, III
D.C. Bar No. 459998
JURIS DAY, PLLC
10521 Judicial Drive, Suite 200
Fairfax, Virginia 22030
Telephone: (703) 268-5600
tmayfield@jurisday.com

*Counsel for Defendant Michael J. Lindell*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served upon all parties of record through the Court's CM ECF system on December 20, 2021.

*/s/ Douglas A. Daniels*
Douglas A. Daniels