**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION,

    *Plaintiffs/Counter-Defendants*,

  vs.

MY PILLOW, INC., *Defendant/Counter-Claimant*.

MICHAEL J. LINDELL, *Defendant/Counter-Claimant/Third-Party Plaintiff*,

  vs.

SMARTMATIC USA CORP., SMARTMATIC INTERNATIONAL HOLDING B.V., SGO CORPORATION LIMITED, and HAMILTON PLACE STRATEGIES, LLC,

    *Third-Party Defendants*.

Case No. 21-cv-445-CJN

---

**SMARTMATIC DEFENDANTS' REPLY IN SUPPORT OF THEIR**
**<u>MOTION TO DISMISS</u>**

## **<u>TABLE OF CONTENTS</u>**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 1

I.  Mr. Lindell has no Section 1983 claim. ................................................................. 1

II  Mr. Lindell has no civil conspiracy claim. ........................................................... 6

III.  Mr. Lindell has no Section 1985(3) claim. ........................................................... 9

    A.  Mr. Lindell fails to allege an actionable conspiracy under Section
       1985(3). ...................................................................................................... 9

    B.  Mr. Lindell fails to allege the requisite "force, intimidation, or
       threat." ....................................................................................................... 10

    C.  Mr. Lindell fails to allege the requisite state action to support his
       particular theory of Section 1985(3) liability. ......................................... 14

IV.  Mr. Lindell has no RICO claim. .......................................................................... 16

    A.  Mr. Lindell fails to allege any "racketeering activity.". ......................... 16

    B.  Mr. Lindell fails to allege the requisite "conduct." ................................ 21

    C.  Mr. Lindell fails to allege an "enterprise." ............................................. 22

    D.  Smartmatic did not conspire to violate RICO. ....................................... 25

CONCLUSION ................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Acosta Orellana v. CropLife Int'l*,
  711 F. Supp. 2d 81 (D.D.C. 2010) ........................................................................7

*\*Barber v. D.C. Gov't*,
  394 F. Supp. 3d 49 (D.D.C. 2019) ................................................................6, 7, 8

*\*Bates v. Nw. Hum. Servs., Inc.*,
  466 F. Supp. 2d 69 (D.D.C. 2006) ..........................................................20, 21, 22

*Boyle v. United States*,
  556 U.S. 938 (2009)............................................................................................24

*\*Browning v. Flexsteel Indus., Inc.*,
  955 F. Supp. 2d 900 (N.D. Ind. 2013) .....................................................22, 23, 25

*Calabrese v. CSC Holdings, Inc.*,
  No. 2:02-CV-5171, 2004 WL 3186787 (E.D.N.Y. July 19, 2004).......................17

*Carpenters v. Scott*,
  463 U.S. 825 (1983)............................................................................................14

*Cheeks v. Fort Myer Const. Corp.*,
  216 F. Supp. 2d 146 (D.D.C. 2016) .....................................................................25

*Chevron Corp. v. Donziger*,
  871 F. Supp. 2d 229 (S.D.N.Y. 2012)..................................................................17

*Cisneros v. Petland, Inc.*,
  972 F.3d 1204 (11th Cir. 2020) ...........................................................................23

*Cockrum v. Donald J. Trump for President, Inc.*,
  365 F. Supp. 3d 652 (E.D. Va. 2019) ..................................................................15

*Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*,
  No. 11 Civ. 7801, 2012 WL 1231775 (S.D.N.Y. Apr. 12, 2012)...........................24

*D'Addario v. D'Addario*,
  901 F.3d 80 (2d Cir. 2018)..................................................................................23

*Dodd v. Infinity Travel*,
  90 F. Supp. 2d 115 (D.D.C. 2000) .......................................................................24

*Doe v. State of Israel,*
        400 F. Supp. 2d 86 (D.D.C. 2005) .......................................................................24

*\*E. Sav. Bank v. Papageorge,*
        31 F. Supp. 3d 1 (D.D.C. 2014) ...........................................................16, 18, 19

*Elemary v. Philipp Holzmann A.G.,*
        533 F. Supp. 2d 116 (D.D.C. 2008) .....................................................................22

*Federer v. Gephardt,*
        363 F.3d 754 (8th Cir. 2004) ...............................................................................16

*Feld Ent. Inc. v. Am. Soc'y for the Prevention of Cruelty to Animals,*
        873 F. Supp. 2d 288 (D.D.C. 2012) ................................................................18, 20

*FindTheBest.com, Inc. v. Lumen View Tech. LLC,*
        20 F. Supp. 3d 451 (S.D.N.Y. 2014).....................................................................16

*Freedom Watch, Inc. v. Google, Inc.,*
        368 F. Supp. 3d 30 (D.D.C. 2019) .......................................................................16

*\*G-I Holdings, Inc. v. Baron & Budd,*
        179 F. Supp. 2d 233 (S.D.N.Y. 2001).....................................................................18

*George v. Urb. Settlement Servs.,*
        833 F.3d 1242 (10th Cir. 2016) ...........................................................................22

*\*Gill v. Farm Bureau Life Ins. Co. of Mo.,*
        906 F.2d 1265 (8th Cir. 1990) ................................................................... *passim*

*Gross v. Waywell,*
        628 F. Supp. 2d 475 (S.D.N.Y. 2009)...............................................................21, 22

*Harpole Architects, P.C. v. Barlow,*
        668 F. Supp. 2d 68 (D.D.C. 2009) .......................................................................22

*Hobley v. Burge,*
        No. 03 C 3678, 2004 WL 2658075 (N.D. Ill. Oct. 13, 2004)................................19

*\*Kurd v. Republic of Turk.,*
        374 F. Supp. 3d 37 (D.D.C. 2019) ....................................................................7, 8

*Kush v. Rutledge,*
        460 U.S. 719 (1983).............................................................................................9

*La Suisse, Societe D'Assurances Sur La Vie v. Kraus,*
        No. 06 CIV. 4404, 2014 WL 3610890 (S.D.N.Y. July 21, 2014) ..........................17

*Langan v. Smith*,
    312 F. Supp. 3d 201 (D. Mass. 2018) ...................................................................................18

*Lawson v. Rubin*,
    No. 17-CV-6404 (BMC), 2018 WL 2012869 (E.D.N.Y. Apr. 29, 2018)................................19

*\*LeFande v. Mische-Hoeges*,
    712 F. App'x 9 (D.C. Cir. 2018) .............................................................................................3

*Lemelson v. Wang Lab'ys, Inc.*,
    874 F. Supp. 430 (D. Mass. 1994) .......................................................................................20

*Liu v. Hopkins Cnty.*,
    No. 14-cv-1762, 2015 WL 4978682 (D.D.C. Aug. 20, 2015).................................................23

*Manhattan Cmty. Access Corp. v. Halleck*,
    139 S. Ct. 1921 (2019)..........................................................................................................4

*Mattiaccio v. DHA Grp., Inc.*,
    20 F. Supp. 3d 220 (D.D.C. 2014) ...................................................................................6, 7, 8

*McAndrew v. Lockheed Martin Corp.*,
    206 F.3d 1031 (11th Cir. 2000) ...........................................................................................19

*Moss v. BMO Harris Bank, N.A.*,
    258 F. Supp. 3d 289 (E.D.N.Y. 2017) ..................................................................................24

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    498 F. Supp. 3d 457 (S.D.N.Y. 2020)..............................................................12, 13, 14, 15

*\*Nat'l Conservative Pol. Action Comm. (NCPAC) v. Kennedy*,
    563 F. Supp. 622 (D.D.C. 1983) ................................................................................ *passim*

*Nixon v. Condon*,
    286 U.S. 73 (1932)................................................................................................................5

*Nixon v. Herndon*,
    273 U.S. 536 (1927)..............................................................................................................5

*Odom v. Microsoft Corp.*,
    486 F.3d 541 (9th Cir. 2007) ...........................................................................................24, 25

*Paynes v. Lee*,
    377 F.2d 61 (5th Cir. 1967) ...........................................................................................12, 15, 16

*Perez v. DirecTV Grp. Holdings, LLC*,
    No. 8:16-cv-1440, 2019 WL 6362471 (C.D. Cal. July 23, 2019) ..........................................20

*Quick v. EDUCAP, Inc.*,
    318 F. Supp. 3d 121 (D.D.C. 2018) ................................................................24

*Rendell-Baker v. Kohn*,
    457 U.S. 830 (1982) ...........................................................................................5

*Reves v. Ernst & Young*,
    507 U.S. 170 (1993) .........................................................................................21

*Safe Streets All. v. Hickenlooper*,
    859 F.3d 865 (10th Cir. 2017) ..................................................................21, 22

*\*Scheidler v. Nat'l Org. for Women, Inc.*,
    537 U.S. 393 (2003) .........................................................................................18

*Sheikh v. Wheeler*,
    790 Fed. Appx. 793 (7th Cir. 2019) ...............................................................23

*Smith v. Allwright*,
    321 U.S. 649 (1944) ...........................................................................................5

*Stankevich v. Kaplan*,
    156 F. Supp. 3d 86 (D.D.C. 2016) ..................................................................23

*\*Terry v. Adams*,
    345 U.S. 461 (1953) .......................................................................................5, 6

*United States v. Eisen*,
    974 F.2d 246 (2d Cir. 1992) ............................................................................20

*West v. Atkins*,
    487 U.S. 42 (1988) .........................................................................................2, 3

*Wiggins v. Philips Morris, Inc.*,
    853 F. Supp. 458 (D.D.C. 1994) ....................................................................14

*Zamora v. Fit Int'l Grp. Corp.*,
    834 F. App'x 622 (2d Cir. 2020) ....................................................................23

**Statutes**

18 U.S.C. § 1512 ....................................................................................................18, 19

42 U.S.C. § 1983 ...........................................................................................1, 2, 5, 6

42 U.S.C. § 1985 ................................................................................................. *passim*

## INTRODUCTION

Mr. Lindell has no claim against Smartmatic. Inspired by a term from Wikipedia, Mr. Lindell ostensibly brought this suit to protect "speech, dissent, and opposition to the use of electronic voting machines in the 2020 General Election and the machines' vulnerability to cyber-attacks and election tampering." (Lindell's Mem. in Opp. to Smartmatic's Mot. to Dismiss ("Opp."), ECF No. 104 at 38–39.) His case, in other words, is an extension of his political views. He wanted to "fight back" against the companies he has villainized for lawsuits they filed or "threatened" to file against him. (Compl. ¶¶ 36, 138.) But his method to "fight back" — a federal lawsuit — is not a genuine attempt to obtain redress for a cognizable claim. His case is a stunt.

This conclusion is inescapable upon the slightest scrutiny of his causes of action. Mr. Lindell either makes no effort to allege facts necessary to sustain them, or they are premised on legal theories foreclosed by existing law. Mr. Lindell has now had two attempts to plead a viable claim. He not only failed, but has given the Court no reason to believe he can cure the deficiencies that pervade his pleading. His Complaint should be dismissed with prejudice.

## ARGUMENT

### I.   Mr. Lindell has no Section 1983 claim.

A claim under 42 U.S.C. § 1983 requires the defendant to deprive the plaintiff of constitutional rights while wielding the authority of state law. Mr. Lindell brings a § 1983 claim against Smartmatic despite having never interacted with Smartmatic beyond *this* case *he* filed. Lacking interaction outside the present litigation, he now relies on *two footnotes* in Smartmatic's Motion to Dismiss brief against his prior complaint. (ECF No. 81-1, at 2–3 nn. 1, 2, Case No. 21-cv-2296.) Smartmatic noted that it will be filing suit against Mr. Lindell for his defamatory out-of-court statements and seeking sanctions against him under Fed. R. Civ. P. 11 in this Court. Mr. Lindell cites the footnotes to argue that Smartmatic: (a) is clothed with the authority of California

law in perpetuity, even in its private conduct; (b) violated his rights under the First, Fifth, and Fourteenth Amendments to the U.S. Constitution; and (c) owes him damages under § 1983. (Opp. at 5, 8–9.) Regardless of what Mr. Lindell bases his claims upon, they remain deficient.

*First*, even if Smartmatic acted under color of state law when delivering services to Los Angeles County, Mr. Lindell fails to connect those services to any deprivation of his constitutional rights. This deficiency cannot be overcome. Mr. Lindell tries to forge a nexus between Smartmatic's role in Los Angeles County and its alleged "lawfare" against him by claiming that Smartmatic was "imbued with [state] power," when it "threatened" him with litigation and sanctions. (Opp. at 8.) Nonsense. Mr. Lindell must know, given the U.S. Supreme Court case law he cites, that his assertion is frivolous.

Take *West v. Atkins*, 487 U.S. 42 (1988) as an example. There, the Court held that a physician whom the State employed in a prison "acted under color of state law for purposes of § 1983 when undertaking his duties in treating [the plaintiff-prisoner's] injury."[1] *Id.* at 54. The Court explained that the doctor was "authorized and obliged to treat prison inmates, such as [plaintiff]," and therefore "[did] so clothed with the authority of state law." *Id.* at 55. But nothing in *West* suggests that the doctor would be acting under color of state law when he left the facility and treated private patients, or, more to the point, if he sued a third-party from another state who falsely accused him of corruption and committing crimes in his medical practice. In those private activities, the doctor would *not* be "undertaking" the "duties" the State assigned to him, and his conduct would *not* be "fairly attributable to the State." *Id.* at 59.

---

[1] Throughout this memorandum, all emphasis has been added, and internal citations, alterations, and quotation marks have been omitted, unless otherwise noted.

*West* and the rest of the Supreme Court's jurisprudence on state action annihilates Mr. Lindell's claim because he cannot possibly attribute Smartmatic's private litigation decisions to the State of California. (*See* Opp. at 3 (citing *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1934 (2019) (finding corporation inadequately alleged to be a state actor while stressing that "[e]xpanding the state-action doctrine beyond its traditional boundaries would expand governmental control while restricting individual liberty and private enterprise")); *see also LeFande v. Mische-Hoeges*, 712 F. App'x 9, 10 (D.C. Cir. 2018) (reversing and remanding denial of sanctions and fees in § 1983 action where defendant-officer "reported [plaintiff] to the police" for stalking because as "a stalking complainant, she was an officer acting *in the ambit of her personal pursuits* and thus plainly excluded from section 1983 liability").

*Second*, Smartmatic does not qualify as a "state actor." To cast Smartmatic as such, Mr. Lindell packs his brief with unpled facts and attaches Smartmatic's Los Angeles County contract. (Opp. at 3–14.) The Court should not consider these new facts outside his Complaint, but if it does, they doom Mr. Lindell's argument anyway. He alleges that during "the 2020 election, Smartmatic administered, collected, counted, recorded, and audited the ballot results for Los Angeles County, California." (Compl. ¶ 54.) But the sources he cites for this assertion (*id.* ¶ 54 n.83) say otherwise:

> L.A. County's Dean Logan said his *office will be in full control of new election hardware and software developed by Smartmatic, not the company*.
>
> "They're building the equipment based on our design our blueprints our plans," said Logan. "And at the end of the day, once that equipment is built and the system exists, it will belong to L.A. County," he said. "*Smartmatic won't be running our elections*."[2]

---

[2] Saul Gonzalez, *The Company Behind LA's New Election Infrastructure*, KCRW (Oct. 5, 2018), https://www.kcrw.com/news/articles/the-company-behind-las-new-election-infrastructure; *Voting Solutions for All People*, Smartmatic (last visited Dec. 29, 2021),

The contract Mr. Lindell attaches specifies the services Smartmatic provided and further belies his state action theory. The Los Angeles County Registrar-Recorder/County Clerk engaged Smartmatic as an independent contractor to: manufacture devices that mark paper ballots for the County; integrate those devices into the County's broader voting system; help get the voting system certified; and provide technical support, training, and coordination, so the County could run efficient, secure elections on County-owned and operated equipment. (ECF No. 104-1, at 1–8, 17–22, 50, 87–340 (the "Contract").) Absent from the Contract is any language addressing Smartmatic's rights against those who defame and harass it. And the Contract denies Smartmatic any role beyond its independent contractor work. (*Id.* at 50 ("This Contract…is not intended, and shall not be construed, to create the relationship of agent, servant, employee, partnership, joint venture, or association, as between the County and the Contractor.").) Mr. Lindell thus has no basis to assert, "Generally, therefore, California is responsible for Smartmatic regarding its election services and actions taken in furtherance of elections…." (Opp. at 9.) The few facts he alleges and the Contract he submits contradict his portrayal of Smartmatic as a state actor.

Nor do the additional facts and Contract show that Smartmatic performed a traditional, exclusive government function. *Halleck*, 139 S. Ct. at 1929. Smartmatic did *not* run Los Angeles County's elections, and the Contract did *not* delegate to it California's authority to do so. (Compl. ¶ 54 n.83; ECF No. 104-1.) At most, Smartmatic was a state contractor. It is black-letter law that state contractors are not state actors merely because of the contract, even if they depend entirely on state contracts. *See Halleck*, 139 S. Ct. at 1932 ("If [government contracts] sufficed to transform

---

https://www.smartmatic.com/en/elections/e-voting/los-angeles-vsap-solution/ ("The machine features a vote tally system, *developed, owned and operated by the county*.").

a private entity into a state actor, a large swath of private entities in America would suddenly be turned into state actors and be subject to a variety of constitutional constraints on their activities. As this Court's many state-action cases amply demonstrate, that is not the law."); *Rendell-Baker v. Kohn*, 457 U.S. 830, 840–41 (1982) (noting that acts of "private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts," such as to "build roads, bridges, dams, ships, or submarines for the governments").

The elections cases Mr. Lindell cites (Opp. at 11–12) from the Supreme Court also undermine his claim. *See Nixon v. Herndon*, 273 U.S. 536 (1927); *Nixon v. Condon*, 286 U.S. 73 (1932); *Smith v. Allwright*, 321 U.S. 649 (1944); *Terry v. Adams*, 345 U.S. 461 (1953). Those actions challenged Jim Crow-era use of state authority to bar people of color from voting. In the cases preceding *Terry*, the Court held that: (1) Texas could not statutorily bar people of color from voting in Democratic Party primaries (*Herndon*); (2) the Texas Democratic Party, to which Texas delegated control of who could vote in primaries, could not bar people of color from voting (*Condon*); and (3) the Texas Democratic Party convention, to which Texas effectively delegated control of who could vote in primaries, could not bar people of color from voting (*Allwright*). Then, in *Terry*, the Court held that a racial exclusion by a Texas political party, the Jaybird Democratic Association, violated the Fifteenth Amendment, even though "the state [did] not control that part of th[e] elective process which it [left] for the Jaybirds to manage." 345 U.S. at 463, 469. The Court explained that "[t]he Jaybird primary ha[d] become… the only effective part[] of the elective process" because "the whole procedure, Jaybird primary plus Democratic primary plus general election," was designed to do "precisely that which the Fifteenth Amendment forbids—strip [people of color] of every vestige of influence in selecting the officials who control [] local county matters…." *Id.* at 469–70.

Neither *Terry* nor any of the other Supreme Court elections cases has any relevance here. Mr. Lindell does not allege that Smartmatic deprived him of any constitutional right in its delivery of election technology to Los Angeles County. Mr. Lindell did not vote in Los Angeles County and alleges no voting irregularities there. Mr. Lindell thus has no basis to analogize what the Jaybirds did in *Terry*, or what any of the defendants did in the other election cases, to Smartmatic pursuing litigation against him. His Section 1983 claims are frivolous and must be dismissed.

## II.     Mr. Lindell has no civil conspiracy claim.

Mr. Lindell failed to address several basic flaws in his civil conspiracy claim. *First*, he ignores that it is self-defeating. Mr. Lindell alleges a civil conspiracy between private companies "to deprive [him] of his constitutional rights under the First Amendment." (Compl. ¶¶ 181, 183.) Such a conspiracy is impossible because the Defendants were neither state actors nor acting under color of law when filing their defamation lawsuits and sending cease-and-desist letters. Mr. Lindell alleges no governmental participation in the alleged conspiracy.

*Second*, Mr. Lindell concedes that the only agreement he can identify between Smartmatic and Dominion is a decade-old licensing deal. That deal, of course, fails to establish an unlawful agreement *about Mike Lindell in 2021* and provides no support for his claim. *See Barber v. D.C. Gov't*, 394 F. Supp. 3d 49, 66 (D.D.C. 2019) (dismissing § 1985(3) conspiracy claim where "nothing in the complaint even hints at the existence of any events, conversations, or documents indicating that there was ever an agreement or meeting of the minds to violate [the plaintiff's] rights"); *accord Mattiaccio v. DHA Grp., Inc.*, 20 F. Supp. 3d 220, 230 (D.D.C. 2014).

Recognizing that he failed to allege an agreement, Mr. Lindell pivots to an antitrust analogy and argues that Smartmatic and Dominion "engaged in a parallel and calculated pattern of litigation" pursuant to a "tacit agreement." (Opp. at 16–17.) But Mr. Lindell's parallel-conduct theory is exactly how the Supreme Court defined implausibility in *Twombly*:

> [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a *conclusory allegation of agreement at some unidentified point* does not supply facts adequate to show illegality. Hence, when allegations of parallel conduct are set out in order to make [an antitrust conspiracy] claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that *could just as well be independent action.*

*Twombly*, 550 U.S. at 557. Courts in this circuit have followed *Twombly* and refused to credit conspiracy allegations that are not supported by specific facts showing how an agreement formed. *See, e.g.*, *Kurd v. Republic of Turk.*, 374 F. Supp. 3d 37, 52 (D.D.C. 2019) (dismissing § 1985(3) conspiracy claim where "[p]laintiffs merely pled parallel conduct that could just as well be independent action"); *Acosta Orellana v. CropLife Int'l*, 711 F. Supp. 2d 81, 114 (D.D.C. 2010).

Every post-*Twombly* decision Mr. Lindell cites dismissed a conspiracy claim for failure to allege an agreement. In *Kurd*, the plaintiffs were attacked by Turkish security forces and civilians while protesting a diplomatic visit. 374 F. Supp. 3d at 41. They alleged that the defendants conspired to commit battery because they "broke through the police cordon in a 'coordinated' fashion," "stood together shouting similar slurs," one defendant "called on the pro-Erdogan group to line up in the street," and defendants "had the same goal in attacking the protesters." *Id.* at 52. Quoting *Twombly*, the Court dismissed the conspiracy claim for lack of agreement because the plaintiffs "merely pled 'parallel conduct that could just as well be independent action.'" *Id.* Similarly, in *Barber*, a D.C. administrative law judge alleged that the defendants declined to promote her because of her race and retaliated against her for reporting discrimination. 349 F. Supp. 3d 55. Though different defendants engaged in similar discrimination and retaliation, the Court dismissed her § 1985(3) claim for lack of conspiracy because no "events, conversations, or documents" showed an agreement to violate her rights. *Id.* at 66. Finally, in *Mattiaccio*, the Court dismissed a conspiracy claim because there was "no indication of when or how" an agreement formed. 20 F. Supp. 3d at 230. Although the defendants allegedly communicated, no

facts about the communication supported "a reasonable inference that there was an *agreement*…between the parties." *Id.* at 231 (emphasis in original). Like the plaintiffs in *Kurd*, *Barber*, and *Mattiaccio*, Mr. Lindell provides no facts to show that Defendants brokered any agreement about him.

The "historical connections" Mr. Lindell identifies further underscore the absence of an agreement. Dominion's execution of a licensing agreement with Smartmatic in 2009, acquisition of Sequoia in 2010 (*years after* Smartmatic divested from it), and use of Sequoia's assets in 2014 do not plausibly establish an agreement *about Mike Lindell in 2021*. (Compl. ¶¶ 17, 58, 60.)[3] And while Mr. Lindell alleges (falsely) that Smartmatic and Dominion share four employees, as shown by email addresses from "public internet searches," he fails to connect those "shared" employees to any agreement, let alone an agreement to do something *unlawful to him in 2021*.

The only reasonable inference to draw from the Complaint is that Mr. Lindell and certain non-parties have forced Smartmatic and Dominion to defend themselves with "lawful parallel conduct" — seeking redress in the courts to protect their reputations — or lose everything. *See Twombly*, 550 U.S. at 556. As election technology companies, Smartmatic and Dominion cannot survive without the public's trust. Following the 2020 election, Mr. Lindell (and others) threatened their existence by falsely claiming that they rigged the 2020 election in an international criminal conspiracy to destroy American democracy. That Smartmatic and Dominion have independently

---

[3] Mr. Lindell claims that Dominion uses Smartmatic's intellectual property "today" through Sequoia. (Compl. ¶ 17.) But his source for this allegation states that Dominion replaced Sequoia's technology in 2015. (*Id.* ¶ 17 n.37); *see* Dominion Voting Systems, Inc., *State of Colorado Uniform Voting System Request for Proposal, RFP # CDOS-UVS-2013-01*, at 17–18 (Dec. 4, 2013) ("It is projected for 2015 our customers will…*replace* [Sequoia's] *older legacy equipment with Dominion's newest technology*."). Regardless, Dominion's use of Sequoia's technology in 2014 has no bearing on an any alleged agreement between the Defendants *about Mike Lindell in 2021*.

pursued their separate interests to mitigate further harm and recover for damage suffered creates

no inference of a conspiratorial agreement. *See id.* at 566 (finding agreement inadequately alleged

where "there is no reason to infer that the companies had agreed among themselves to do what was

only natural anyway"). Nor does Mr. Lindell allege facts to show that Smartmatic and Dominion

ever agreed to take any lawful (or unlawful) actions *toward him*. Because Mr. Lindell cannot

plausibly show an unlawful agreement, his conspiracy claim must be dismissed.

### III.    Mr. Lindell has no Section 1985(3) claim.

#### A.    Mr. Lindell fails to allege an actionable conspiracy under Section 1985(3).

The "conspiracy" Mr. Lindell alleges is not actionable under the Support or Advocacy

Clause of Section 1985(3). As he acknowledges, this statute was enacted to quell the Ku Klux

Klan's "campaign of political terrorism" that followed the Civil War. *See The Support or Advocacy*

*Clause of § 1985(3)*, 133 HARV. L. REV. 1389, 1389 (2020) (quoting CONG. GLOBE, 42d Cong.,

1st Sess. 244 (1871) (noting that "[r]eports of mob violence, torture, and intimidation of Black and

Republican citizens prompted President Grant" and Congress to "draft legislation implementing

the promises of Reconstruction")). This historical backdrop is reflected in the plain language of

the Support or Advocacy Clause: it prohibits conspiracies "to prevent by force, intimidation, or

threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal

manner, *toward or in favor of the election of any lawfully qualified person* as an elector for

President or Vice President, or as a Member of Congress of the United States; or to injure any

citizen in person or property on account of *such support or advocacy*." 42 U.S.C. § 1985(3); *see*

*also Kush v. Rutledge*, 460 U.S. 719, 724 (1983) (The Support or Advocacy Clause "proscribe[s]

conspiracies that interfere with…*the right to support candidates in federal elections....*").

The "conspiracy" in Mr. Lindell's Complaint is *not* the kind Section 1985(3) outlaws. Mr.

Lindell alleges that Smartmatic and Dominion "had a meeting of the minds" to seek relief in court

and send cease-and-desist letters with "the common purpose of silencing speech, dissent, and opposition *to the use of electronic voting machines in the 2020 Presidential Election and the exposure of such machines' vulnerability to cyber-attacks and election tampering*." (Comp. ¶ 166.) Even if this fictitious "meeting of the minds" occurred, Mr. Lindell states no violation of the Support or Advocacy Clause. He does not allege that anyone "prevent[ed]" him from voting or supporting or advocating for "the election of" former President Trump. Nor does Mr. Lindell allege that the defendants "injure[d]" him "on account of such support or advocacy." Rather, Mr. Lindell tries to tie his political allegiances to his opposition to election technology and to his defamatory statements about Dominion and Smartmatic. But no authority supports extending Section 1985(3) beyond the "support or advocacy" of "candidates in federal elections." The conspiracy Mr. Lindell has concocted is not within the scope of Section 1985(3). He has no claim under this statute.

## B.   Mr. Lindell fails to allege the requisite "force, intimidation, or threat."

The "conspiratorial" acts Mr. Lindell identifies — filing defamation suits and sending cease-and-desist letters — do not "rise to the level of 'force, intimidation, or threat'" necessary to sustain a Section 1985(3) claim. *See Nat'l Conservative Pol. Action Comm. (NCPAC) v. Kennedy*, 563 F. Supp. 622, 627 (D.D.C. 1983), *aff'd*, 729 F.2d 863 (D.C. Cir. 1984). *Kennedy* is the sole case the parties cite from this District that analyzes what "force, intimidation, or threat" means under Section 1985(3). The *Kennedy* plaintiffs alleged a conspiracy between television and radio stations and Democratic officials to prevent the broadcast of critical advertisements. *Id.* at 623–25. They alleged that the Democratic officials interfered with their "vote-related advocacy" by "warn[ing]" the broadcasters that they "could be liable for defamatory statements made within the [plaintiffs'] advertisements." *Id.* at 623, 625. But the court found these allegations insufficient and dismissed the claim. The court reasoned that the "warnings" of defamation liability failed to "rise to the level of 'force, intimidation, or threat,' which is a necessary element of a claim under the

advocacy and voting provisions of section 1985(3)." *Id.* at 627; *accord Gill v. Farm Bureau Life Ins. Co. of Mo.*, 906 F.2d 1265, 1269 (8th Cir. 1990) (dismissing Support or Advocacy Clause claim where the "shortcoming…which first leap[ed] to the eye [was] the lack of 'force, intimidation, or threat,'" as "the Ku Klux Klan Act obviously meant to its framers…something much more serious and terrifying" than "economic injury" (such as cancelling a contract)).

Mr. Lindell has no answer to cases like *Kennedy* and *Gill*, other than to say they "do not involve extraordinary Lawfare or sham litigation…." (Opp. at 42 n. 16.) But this argument exposes the folly in Mr. Lindell's claim. He tries to distinguish *Kennedy* for its lack of "Lawfare," yet cites *no instance* in which a lawsuit or cease-and-desist letter supported a Support or Advocacy Clause claim. Mr. Lindell also misses the forest for the trees: although cases like *Kennedy* and *Gill* are not specifically about cease-and-desist letters, they subsume "Lawfare" by holding more broadly that causing or threatening economic "injury" is insufficient.

What is more, Mr. Lindell cites authority that *agrees* the KKK Act was designed to stop and provide redress for acts or threats of violence, not economic harm. *See, e.g.,* Opp. at 37 (quoting CONG. GLOBE, 42d Cong., 1st Sess. 244 (1871) ("Three facts combine to show the necessity for a bill substantially like that now under consideration. First, the violence and lawlessness, for which it is proposed to provide a remedy, occur in many widely separated districts; second, the character of the victims selected and the methods of outrage, indicate a common source and purpose, an organized conspiracy; and, third, the organization to which they are traced is political in its origin and aims, and is military in form. But one rule never fails: the victims whose property is destroyed, whose persons are mutilated, whose lives are sacrificed, are always Republicans."); *see also Paynes v. Lee*, 377 F.2d 61, 63 (5th Cir. 1967) (reversing dismissal of Section 1985(3) claim where the plaintiff alleged that several "white men" came to his house "in

the nighttime and threatened to destroy or to annihilate [him], his possessions and his family should he again attempt to become a registered voter").

To be sure, courts applying *other statutes* have interpreted the words "intimidate" and "threaten" to extend beyond acts or threats of violence. But the legislative context and the statute in which those words appear matter. Mr. Lindell offers no reason why the Court should ignore precedent like *Kennedy* and *Gill* — which apply the statutory clause he invokes — in favor of cases from the 1800s that adjudicated bankruptcy and common law claims. (*See* Opp. at 40–41.)

The primary Section 1985(3) case Mr. Lindell relies upon to avoid dismissal, *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 479 (S.D.N.Y. 2020), is distinguishable, and he materially mischaracterizes it. In *Wohl*, the plaintiffs, thousands of U.S. voters, obtained a temporary restraining order ("TRO") against Jacob Wohl and other defendants for robocalls "containing false information intended to scare recipients from voting by mail in violation of Section 11(b) of the Voting Rights Act" and Section 1985(3). *Id.* at 463. In both its TRO opinion and later denial of a motion to dismiss, the court focused on Section 11(b). *See generally id.*; 512 F. Supp. 3d 500 (S.D.N.Y. 2021). It provides that: "No person…shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." The court found that the plaintiffs "plausibly state[d]" a Section 11(b) claim because "actions or communications that inspire fear of economic harm, legal repercussions, privacy violations, and even surveillance can constitute unlawful threats or intimidation *under that statute*." *Id.* at 509–10 (citing "the few cases that interpret Section 11(b)" and "other civil rights statutes — the Fair Housing Act ("FHA") and Americans with Disabilities Act ("ADA") — [that] use analogous language and encompass subtle forms of intimidation"). As for the plaintiffs'

§ 1985(3) claim, the court "s[aw] no reason to interpret [the] terms ["intimidation" and "threat"] differently for purposes of the KKK Act, and Defendants provid[ed] none." *Id.* at 512.

*Wohl* is narrower than Mr. Lindell portrays and not a panacea for his Section 1985(3) claim. First, *Wohl* does not support expanding Section 1985(3) to encompass claims that exclusively allege a threat of economic harm. Mr. Lindell asserts that "[t]he robocalls did not threaten physical violence in any way" (Opp. at 41), so his Support or Advocacy claim should stand too, despite the lack of violence or threat thereof. But the *Wohl* plaintiffs *did allege* that the defendants threatened physical harm. *See* 512 F. Supp. 3d at 505–06, 511–12. The robocalls warned that (1) "police will use vote-by-mail information to track persons with outstanding warrants"; and (2) "the Center for Disease Control and Prevention [was] seeking access to vote-by-mail information to conduct mandatory vaccinations." 512 F. Supp. 3d at 505–06. Based on these warnings, the court rejected the defendants' argument that their robocalls lacked a "threat of physical harm." *Id.* at 511. Indeed, the court found the "Defendants' assertion that [their robocalls] [did] not communicate a threat of arrest *astonishing*." *Id.* The court also found that the threat of mandatory vaccinations would have "a chilling effect on mail-in voting," "given the alleged historical mistrust of the medical community among Black populations." *Id.* at 512. Mr. Lindell misstated what happened in *Wohl* because the plaintiffs' allegations of physical harm undercut his Section 1985(3) claim.

Second, *Wohl* never addressed the precedent from other jurisdictions, including that of the District Court of Columbia, which have cabined Section 1985(3) to cases alleging physical force or the threat thereof. Nor did *Wohl* analyze the legislative history or intent of the Ku Klux Klan Act of 1871 or the U.S. Supreme Court's application of it. *See Gill*, 906 F.2d at 1269–71 (citing *Carpenters v. Scott*, 463 U.S. 825, 836–39 (1983), for the proposition "that economic injury [is] not the type of wrong for which § 1985(c) provides a remedy"). Instead, the *Wohl* court analogized

13

the terms "intimidate" and "threaten" in Section 11(b) of the Voting Rights Act to similar language in anti-discrimination statutes (the FHA and the ADA). *Id.* at 509–10. But, as Mr. Lindell agrees, the Ku Klux Klan Act "was *not* an antidiscrimination statute. Its drafters intended to proscribe conspiracies having the object or effect of frustrating the constitutional operations of government through *assaults* on the person, property, and liberties of individuals." (Opp. at 38.) *See also Carpenters*, 463 U.S. at 837 (noting that the "central concern" of Section 1985(3) was to "combat[] the violent and other efforts of the Klan and its allies to resist and to frustrate the intended affects of the Thirteenth, Fourteenth, and Fifteenth Amendments"). That the *Wohl* defendants failed to raise precedent like *Carpenter*, *Kennedy*, and *Gill* renders *Wohl*'s analysis of "force, intimidation, and threat" incomplete. Courts that have examined these terms within Section 1985(3), like the District Court of Columbia in *Kennedy* and the Eighth Circuit in *Gill*, refrained from extending the Support or Advocacy Clause to cases like Mr. Lindell's, which solely allege economic injury. Mr. Lindell's inability to allege violence or the threat thereof defeats his Section 1985(3) claim.

**C.    Mr. Lindell fails to allege the requisite state action to support his particular theory of Section 1985(3) liability.**

Mr. Lindell misunderstands his claim. He contends (a) that the Support or Advocacy Clause "provides a substantive—not remedial—right," and (b) that he "need not assert a separate federal right" because he alleges a violation of the Support or Advocacy Clause. (Opp. at 44–45.) In making these arguments, Mr. Lindell commits several errors.

*First*, Mr. Lindell ignores the law from this District that rejects his first contention. Mr. Lindell asserts that certain cases, such as *Wiggins v. Philips Morris, Inc.,* 853 F. Supp. 458, 466–67 (D.D.C. 1994), "are inapplicable" because the plaintiffs in those suits sued under the Equal Protection provision of Section 1985(3). But Mr. Lindell is overlooking authority like *Kennedy*. The plaintiffs there alleged a conspiracy "to interfere with or deprive them of their constitutional

rights to the free exercise of speech (in the advocacy of a candidate's election) *and* equal protection of laws" in violation of Section 1985(3). 63 F. Supp. at 626. The court did not differentiate between the Support or Advocacy Clause and the Equal Protection provision when positing that Section 1985(3) "provides a remedy, in the form of a civil action for damages, for the deprivation of various federal rights," but "*does not create any rights of itself*." *Id.* The court's understanding of the statute was dispositive because (1) the plaintiffs "suffered no deprivation of federal rights with respect to their underlying claim," and (2) they insufficiently alleged a separate violation of federal law (via the First Amendment) to state a Support or Advocacy claim. *Id.* at 626–27; s*ee also Cockrum v. Donald J. Trump for President, Inc.*, 365 F. Supp. 3d 652, 663–65 (E.D. Va. 2019) (rejecting the notion that Section 1985(3) "creates its own substantive right to 'support or advocate' for a political candidate" in light of the "formidable arsenal of countervailing Supreme Court authority" to the contrary). Thus, under the precedent of this District, Mr. Lindell must allege an underlying violation of a federal right to plead a Support or Advocacy claim.

*Second*, even if this Court followed the jurisdictions that recognize a substantive right in the Support or Advocacy Clause, Mr. Lindell does not allege a violation of *that right*. It allows the recovery of "*damages for interfering with Federal voting rights*." *See Wohl*, 498 F. Supp. 3d at 486–88 n. 30 (finding that plaintiffs alleged Support or Advocacy claim because defendants' robocalls "deliberate[ly] interfer[ed] with [plaintiffs'] rights to cast their ballots in any legal manner they choose"); *Paynes*, 377 F.2d at 64 ("The interference with a Federally protected right to vote is something more and something different…By the sometimes called Ku Klux Act, a Federal right was created to recover damages for interfering with Federal voting rights…."). Mr. Lindell has alleged no interference with his voting rights. Thus, even if Section 1985(3) established "a Federal Right," *Paynes*, 377 F.2d at 64, Mr. Lindell has alleged no deprivation of it.

Instead, Mr. Lindell bases his Section 1985(3) claim upon the deprivation of a different right: his freedom of speech under the First Amendment. (*See* Compl. ¶ 166 (predicating Mr. Lindell's Support or Advocacy claim upon an alleged conspiracy to "silenc[e] speech, dissent, and opposition to the use of electronic voting machines in the 2020 Presidential Election and the exposure of such machines' vulnerability to cyber-attacks and election tampering"). "[B]ecause the substantive federal right that [Mr. Lindell] wishes to vindicate is a First Amendment right, state action is required." *See Federer v. Gephardt*, 363 F.3d 754, 760 (8th Cir. 2004) (dismissing Section 1985(3) claim that was "based upon a First Amendment claim" because "no state or federal government action [was] properly alleged"); *Gill*, 906 F.2d at 1270 (same, as "a First Amendment claim [can]not be actionable in the absence of State Action"); *cf. Freedom Watch, Inc. v. Google, Inc.*, 368 F. Supp. 3d 30, 40 (D.D.C. 2019). As set forth in Section I, Mr. Lindell failed to allege that any state action violated his First Amendment rights. He has thus suffered no violation of an underlying federal right, and his Section 1985(3) claim should be dismissed for this reason too.

## IV.    Mr. Lindell has no RICO claim.

### A.    Mr. Lindell fails to allege any "racketeering activity."

***No extortion.***  "Abusive or sham litigation does not constitute a RICO predicate act." *E. Sav. Bank v. Papageorge*, 31 F. Supp. 3d 1, 13 (D.D.C. 2014); *FindTheBest.com, Inc. v. Lumen View Tech. LLC*, 20 F. Supp. 3d 451, 457 (S.D.N.Y. 2014). Disregarding this precedent, Mr. Lindell argues that litigation activities can be extortion when they "extend far beyond the threat of mere meritless litigation." (Opp. at 21.) But he alleges no unlawful conduct here beyond actual or "threatened" litigation, so he cannot establish criminal extortion.

The cases Mr. Lindell cites show how "far beyond" meritless litigation a defendant must go to commit criminal extortion. In *Chevron Corp. v. Donziger*, the plaintiff alleged "a multi-faceted, extortionate scheme" with not only sham litigation, "but also intimidating of Ecuadorian

judges, fabricating evidence, making false statements to U.S. courts, Congress, the SEC, and the media, and bringing false criminal charges[.]" 871 F. Supp. 2d 229, 249 (S.D.N.Y. 2012). Similarly, in *Calabrese v. CSC Holdings, Inc.*, the plaintiffs alleged "much more than the mere institution of baseless litigation," including that the defendants "formed an association for the purpose of compelling individuals to pay monies to them" using "misrepresentations, threats and lawsuits," despite having no "legal entitlement" to the money. No. 2:02-CV-5171, 2004 WL 3186787, at *6 (E.D.N.Y. July 19, 2004). Finally, in *La Suisse, Societe D'Assurances Sur La Vie v. Kraus*, the defendant-insurance broker repeatedly lied to the plaintiff-insurance company about policies he sold and began paying premiums on policies himself to collect benefits, and only then filed a domestic lawsuit and "approximately 50 lawsuits in Switzerland and Israel" against the plaintiff to extort payment. No. 06 Civ. 4404, 2014 WL 3610890, at *4–*6 (S.D.N.Y. July 21, 2014). By contrast, the *only* unlawful conduct Mr. Lindell alleges is litigation or the threat of litigation in cease-and-desist letters. Even if the Defendants instituted or threatened to institute sham litigation, he alleges no unlawful conduct "beyond" that conduct, let alone "far beyond."

Mr. Lindell's attempt to show additional wrongdoing disproves itself. He refers to a "scheme of extortion much broader than mere threats of litigation." (Opp. at 20.) But the "scheme" is more of the same: an alleged plot "against hundreds of victims to intimidate them into silence with threats of devastating *litigation* and economic exposure," plus a lawsuit against him and MyPillow. (*Id.* at 21.) These allegations do not show extortion or any other predicate act.

Mr. Lindell's inchoate-extortion argument is also flawed. First, he never alleges that Smartmatic demanded any property from him. (Compl. ¶¶ 137–38). Nor do the cease-and-desist letters he cites demand any transfer of property. Mr. Lindell thus fails to allege any "attempt to *obtain*" transferrable property necessary to show attempted extortion. *Scheidler v. Nat'l Org. for*

*Women, Inc.*, 537 U.S. 393, 405, 409 (2003). Second, Dominion's complaint against Mr. Lindell seeks nothing other than the lawful prosecution of its case against Mr. Lindell—the opposite of a wrongful attempt to obtain property. (Opp. at 23 (arguing that Defendants are attempting to obtain "*monetary damages*" through litigation).)  And finally, even if a defendant demanded settlement money from Mr. Lindell, *the demand and a subsequent transfer would not be extortion*, meaning the demand attempt is not inchoate extortion. *See Langan v. Smith*, 312 F. Supp. 3d 201, 205–06 (D. Mass. 2018) ("Federal courts have *overwhelmingly rejected* attempts to base extortion claims on litigation conduct, even when that conduct is abusive or undertaken in bad faith," because "the threat of a lawsuit (*or, similarly, a settlement demand*) [does not] constitute[] the 'wrongful use of actual or threatened force, violence, or fear' for purposes of" § 1951).

    *No witness intimidation*. Mr. Lindell fails to allege "the use of threats, physical force, intimidation or corrupt persuasion" needed to establish a criminal violation of 18 U.S.C. § 1512. He maintains that "witnesses are being tampered with and intimidated by letters containing false allegations and threats of 'imminent litigation'…." (Opp. at 24.)  But cases such as *E. Sav. Bank*, 31 F. Supp. 3d at 13–15 from this District, and others like *G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233, 266 (S.D.N.Y. 2001), are unequivocal: initiating or threatening litigation "is not 'force, intimidation or threat'" and thus does not violate Section 1512.

    Mr. Lindell responds to this authority by asserting that "a RICO predicate act" may lie "where other misconduct was also part of [a] scheme" involving "sham or baseless litigation." (Opp. at 24.) But his sole case, *Feld Ent. Inc. v. Am. Soc'y' for the Prevention of Cruelty to Animals,* 873 F. Supp. 2d 288, 318 (D.D.C. 2012), is about bribery, not witness tampering. Nor is *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031 (11th Cir. 2000) relevant. *See id.* at 1040

(plaintiff stated Section 1512 violation against former employer for "threaten[ing] him with job-related sanctions" if he testified before a federal grand jury).

Mr. Lindell fails to rebut other defects in his witness tampering accusation as well. First, he concedes that no qualifying federal "proceeding" exists and contends instead that he need not plead a "proceeding" because of the "likelihood of imminent proceedings." (Opp. at 25.) But he cites no instance where an unidentified, speculative "proceeding" propped up a witness tampering charge. Courts encountering similar theories demand that the proceeding be plausible and foreseeable. Mr. Lindell alleges no facts to support either. *See, e.g., Lawson v. Rubin*, No. 17-CV-6404 (BMC), 2018 WL 2012869, at *10 (E.D.N.Y. Apr. 29, 2018) (rejecting Section 1512 violation because "there must be some possible [federal] 'prosecution or proceeding' and plaintiffs have not identified one"); *Hobley v. Burge*, No. 03 C 3678, 2004 WL 2658075, at *11 (N.D. Ill. Oct. 13, 2004) (same, where "[t]here [was] no allegation that Defendants' purpose and intent…was to obstruct [the] potential later federal proceedings, nor could it be logically inferred from the allegations in the complaint that it was").

Second, Mr. Lindell still cannot establish causation between his alleged damages and any witness tampering. He now contends that the Defendants' cease-and-desist letters caused him to suffer damages because "others who witnessed suspicious and fraudulent activity by the Enterprise in the 2020 General Election cannot now come forward to confirm [his] findings and statements." (Opp. at 26.) This contention is as speculative as can be, and he provides no facts to support it. No plausible causal connection exists.  *See E. Sav. Bank*, 31 F. Supp. 3d at 12.

***No mail fraud***. Mr. Lindell makes two concessions that eliminate mail fraud as an alleged predicate act. First, he accepts that litigation activities are not mail fraud without "additional allegations of extortion or some other pattern of racketeering activity." (Opp. at 28, 29.) Mr.

Lindell contends that the Defendants perpetrated a "scheme to defraud" by using "abusive cease-and-desist letters and sham litigation to injure [him] financially, and eventually extract billions of dollars from him using the judicial process." (*Id.* at 28.) Once again, Mr. Lindell repackaged the same conduct (litigation activities) and labeled it a crime (this time, mail fraud). The cases Mr. Lindell offers as examples of mail fraud require much more than litigation or cease-and-desist letters. *See United States v. Eisen*, 974 F.2d 246, 254 (2d Cir. 1992) (scheme of "mail fraud and witness bribery by pursuing counterfeit claims and using false witnesses in personal injury trials"); *Feld*, 873 F. Supp. 2d at 318 (scheme involving "over 1000 predicate acts which varied in nature: bribery, illegal gratuity, mail fraud, wire fraud, money laundering, and obstruction of justice"); *Lemelson v. Wang Lab'ys, Inc.*, 874 F. Supp. 430, 434 (D. Mass. 1994) (scheme using "mails and…wires" to "extort[] millions of dollars in settlement monies through a pattern of litigation involving infringement claims based on fraudulently obtained patents"); *Perez v. DirecTV Grp. Holdings, LLC*, No. 8:16-cv-1440, 2019 WL 6362471, at *4 (C.D. Cal. July 23, 2019) (scheme to deceive businesses into "unwitting violation of" federal law and threaten them with "credit reporting and sham litigation unless they pay outrageous sums of money" using mail and wires).

*Second*, Mr. Lindell concedes that he must satisfy Rule 9(b), which he cannot do. *See Bates v. Nw. Hum. Servs., Inc.*, 466 F. Supp. 2d 69, 89 (D.D.C. 2006). Mr. Lindell asserts that the Defendants' lawsuits are "sham," but he identifies no particular misrepresentations or explains how they "furthered the fraudulent scheme." *Id.* Mr. Lindell also contends that he and others received cease-and-desist letters and that, without them, other individuals "*might*" have corroborated his "claims and public statements" that the 2020 election was rigged. (Opp. at 22.) But, again, he fails to connect whatever that harm is to any property loss, and it lacks particularity.

**B.      Mr. Lindell fails to allege the requisite "conduct."**

"Congress did not intend to extend RICO liability under § 1962(c) beyond those who participate in the *operation or management* of an enterprise[.]" *Reves v. Ernst & Young*, 507 U.S. 170, 184 (1993). Mr. Lindell does not dispute that the "conduct" element requires Smartmatic to have "some part in directing the enterprise's affairs." *Id.* at 179. He tries to meet this requirement by arguing that "Smartmatic played a part in conducting the enterprise's affairs by not only suing individuals and entities…but also threatening lawsuits against others." (Opp. at 31.) But Mr. Lindell fails to explain how Smartmatic conducted the affairs of the "*enterprise*," as opposed to its own affairs. *See Bates*, 466 F. Supp. 2d at 86; *Gross v. Waywell*, 628 F. Supp. 2d 475, 498 (S.D.N.Y. 2009). Nor does Mr. Lindell identify any facts to show the "directive role" Smartmatic played in the purported enterprise. He does not allege that Smartmatic or Dominion had any "part" in each other's private litigation decisions, or any facts that would permit such an inference.

Neither of the Tenth Circuit cases Mr. Lindell offers to illustrate "conduct" under *Reves* supports his claim. He cites *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 883 (10th Cir. 2017), for the proposition that an enterprise member need only play "a bit part" in conducting the enterprise's affairs. (Opp. at 31.) But Mr. Lindell identifies no "part" Smartmatic played in any "enterprise" decision. He fails to allege how Smartmatic had any "responsibility," "position in the enterprise" (formal or informal), or "control over or within the enterprise." (*See id.*) Mr. Lindell is silent on these details that inform whether a person conducts the enterprise's affairs.

By contrast, in *Safe Streets Alliance*, the plaintiffs satisfied *Reves* because the defendants, a group of marijuana growers, "admit[ted] that they all agreed to grow marijuana for sale at the facility adjacent to the [plaintiffs'] property." 859 F.3d at 884. The court found, without explanation, that "[t]his plausibly allege[d] that the Marijuana Growers each conducted the enterprise's affairs." *Id.* Mr. Lindell's allegations are incomparable to those in *Safe Street Alliance*.

Smartmatic and Dominion have not pooled resources together or achieved economies of scale to sell contraband or violate federal law. They filed separate lawsuits to obtain redress for harm they respectively suffered. *George v. Urb. Settlement Servs.*, 833 F.3d 1242 (10th Cir. 2016), is similarly distinguishable. *See id.* at 1253 ("conduct" shown for entity that schemed with bank to fraudulently deny federal mortgage relief where entity, *inter alia*, "created internal systems for receiving and processing borrower documents, communicating with borrowers, and dispersing received documents…to make it appear that borrowers failed to provide requested documents," "steer[ed]" borrowers, and denied relief applications to meet enterprise quotas).

More persuasive, analogous precedent lies in the decisions from this District and others that have dismissed RICO claims, like Mr. Lindell's, that "naked[ly] alleg[e]" the defendant "played a part in directing [the enterprise's] affairs." *See, e.g., Harpole Architects, P.C. v. Barlow*, 668 F. Supp. 2d 68, 75 (D.D.C. 2009); *Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 116, 140 (D.D.C. 2008); *Bates*, 466 F. Supp. 2d at 86; *Gross*, 628 F. Supp. 2d at 498. Mr. Lindell's RICO claim should be dismissed for lack of "conduct."

### C.      Mr. Lindell fails to allege an "enterprise."

Separate companies pursuing litigation for themselves do not form a RICO enterprise. For the Court to find an association-in-fact enterprise in this case, Mr. Lindell agrees that (i) a common purpose, (ii) relationships among those associated with the enterprise, and (iii) longevity must exist. His RICO claim fails because it lacks each of these structural features.

***No common purpose***.  Mr. Lindell distorts what he needs to allege to show a common purpose. It is a goal that alleged RICO participants must work together to accomplish; pursuing similar goals independently is insufficient. *See Browning v. Flexsteel Indus., Inc.*, 955 F. Supp. 2d 900, 913 (N.D. Ind. 2013) (dismissing RICO claim where the plaintiffs did not plead how "shared interests" like "concealing evidence of environmental crimes" are "*truly common* interests, rather

than *parallel* interests"); *accord Stankevich v. Kaplan*, 156 F. Supp. 3d 86, 94 (D.D.C. 2016); *Cisneros v. Petland, Inc*., 972 F.3d 1204, 1211 (11th Cir. 2020); *Zamora v. Fit Int'l Grp. Corp*., 834 F. App'x 622, 625 (2d Cir. 2020); *Sheikh v. Wheeler*, 790 Fed. Appx. 793, 796 (7th Cir. 2019). Here, "nothing suggests that" Smartmatic and Dominion "c[a]me together to pursue by common, coordinated efforts what they could not do on their own." *Browning*, 955 F. Supp. 2d at 913. Smartmatic and Dominion sued some of the same entities because some of the same entities defamed them. The Complaint identifies no common goal the Defendants coordinated to achieve.

Additional gaps in Mr. Lindell's allegations show the absence of a common purpose. Mr. Lindell asserts that he need not "spell out the mechanics or logistics of the enterprise," or prove that "each conspirator had contact with all other members." (Opp. at 32–33.) But Smartmatic never contended he had to make such a showing. What he must allege are "concrete facts giving rise to the inference" that Defendants united to achieve a common purpose. *Cisneros*, 972 F.3d at 1211. Such facts may include interactions between the defendants regarding the criminal conduct of the enterprise. *See Liu v. Hopkins Cnty*., No. 14-cv-1762, 2015 WL 4978682, at *4 (D.D.C. Aug. 20, 2015); *D'Addario v. D'Addario*, 901 F.3d 80, 102 (2d Cir. 2018). But Mr. Lindell cannot identify a single interaction between Smartmatic and any other defendant regarding him or to coordinate their litigation activities. Also relevant is whether the enterprise members had any "purposeful involvement" in each other's affairs in the enterprise. *Cisneros*, 972 F.3d at 1213.  Mr. Lindell has alleged no such involvement here. His Complaint offers nothing to show a common purpose.

***No RICO relationship***.  Mr. Lindell does not dispute that his Complaint lacks the hallmarks of a RICO "relationship." The crux of his case is that Smartmatic and Dominion have pursued or threatened litigation against him because he made false and defamatory statements about them and their role in the 2020 U.S. election. But within this narrative, he presents no allegations that suggest

Smartmatic and Dominion operated or made decisions together, issued orders to one another, or functioned as a unit in any way concerning him. The Complaint thus provides no information from which this Court can infer the "mutually dependent relationships" RICO requires. *See, e.g.*, *Quick v. EDUCAP, Inc*., 318 F. Supp. 3d 121, 142 (D.D.C. 2018); *Doe v. State of Israel*, 400 F. Supp. 2d 86, 119–20 (D.D.C. 2005); *Dodd v. Infinity Travel*, 90 F. Supp. 2d 115, 117 (D.D.C. 2000).

Mr. Lindell counters that "formal mechanisms for controlling the enterprise's affairs" are unnecessary under the "undemanding standard" in *Boyle v. United States*, 556 U.S. 938 (2009). (Opp. at 34). Whatever standard Mr. Lindell wishes to apply, his Complaint fails to meet it. Courts post-*Boyle* still require allegations that the RICO defendants "functioned as a unit," *Cont'l Petroleum Corp. v. Corp. Funding Partners, LLC*, No. 11 Civ. 7801, 2012 WL 1231775, at *5–*6 (S.D.N.Y. Apr. 12, 2012), and "coordinate[d] their activities so as to advance a collective goal outside of their own discrete pecuniary objectives." *Moss v. BMO Harris Bank, N.A*., 258 F. Supp. 3d 289, 301 (E.D.N.Y. 2017). Mr. Lindell's allegations show the opposite: separate persons acting independently to obtain relief for themselves, not for each other.

The cases Mr. Lindell cites to demonstrate *Boyle* show how deficient his claim is. For instance, in *Odom v. Microsoft Corp.*, the plaintiffs sufficiently alleged that Microsoft and Best Buy formed an "ongoing organization" when they executed a cross-marketing contract and "established mechanisms for transferring [customers'] personal and financial information from Best Buy to Microsoft. That information then allowed Microsoft to activate plaintiffs' Internet accounts without their knowledge or permission" and "bill [them] improperly for…services[.]" 486 F.3d 541, 552 (9th Cir. 2007) (applying pre-*Boyle* law). Unlike the "historical" licensing agreements Mr. Lindell identifies in his Complaint, the contract between the enterprise members in *Odom* facilitated their alleged criminal conduct. They also collaborated to enrich each other.

Mr. Lindell makes no comparable allegations against Dominion and Smartmatic. Their past interactions (a 2009 licensing deal, the 2010 Sequoia acquisition, and an alleged subsequent licensing agreement) create no mechanisms for unlawful conduct and shed no light on the alleged "enterprise." Nor does Mr. Lindell's allegation of four "shared" employees show how Defendants formed a criminal relationship. His allegations are insufficient no matter how he spins them.

*No longevity*. Smartmatic and Dominion lack any relationship, let alone one that has "persist[ed] long enough to accomplish the 'purpose' of the enterprise." *Browning*, 955 F. Supp. 2d at 912. Mr. Lindell argues that the enterprise has "existed continuously since November 2020 and continues to this day." (Opp. at 35.) But he alleges no facts connecting Smartmatic and Dominion to a common course of criminal conduct. One-off, business interactions from 2009 do not show otherwise. Mr. Lindell also pegs the beginning of the enterprise to the election, which was *before* any defendant filed suit or sent a cease-and-desist letter. Mr. Lindell is making up his claim on the fly. It should be dismissed.

### D.     Smartmatic did not conspire to violate RICO.

Mr. Lindell does not dispute that, if the Court dismisses his substantive RICO claim, his RICO conspiracy claim also fails. Additionally, "[t]o plead a RICO conspiracy, plaintiffs must allege agreements—agreements to commit RICO offenses and agreements to further the endeavor to commit RICO offenses." *Cheeks v. Fort Myer Const. Corp.*, 216 F. Supp. 2d 146, 162 (D.D.C. 2016). As with civil conspiracy, Mr. Lindell failed to allege any agreement about him, let alone an agreement to commit a federal crime. His Section 1962(d) claim should be dismissed.

### <u>CONCLUSION</u>

For the foregoing reasons, the Smartmatic Defendants respectfully request that the Court dismiss all of Mr. Lindell's third-party claims against them (ECF No. 87) with prejudice.

Dated: January 7, 2022

/s/ J. Erik Connolly
J. Erik Connolly
   D.C. Bar No. IL0099
   Email: econnolly@beneschlaw.com
Nicole E. Wrigley
   D.C. Bar No. IL 00101
   Email: nwrigley@beneschlaw.com
Martin V. Sinclair, Jr.
   D.C. Bar No. IL0097
   Email: msinclair@beneschlaw.com
BENESCH, FRIEDLANDER, COPLAN &
   ARONOFF LLP
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone: 312.212.4949

*Counsel for Defendants Smartmatic USA Corp.,*
*Smartmatic International Holding B.V., and*
*SGO Corporation Limited*

## CERTIFICATE OF SERVICE

I hereby certify that on this 7th day of January, 2022, the foregoing Smartmatic Defendants' Reply in Support of Their Motion to Dismiss was served on all parties through the Court's ECF system.

Dated: January 7, 2021

/s/ *J. Erik Connolly*
J. Erik Connolly
   D.C. Bar No. IL0099
      Email: econnolly@beneschlaw.com
71 South Wacker Drive, Suite 1600
Chicago, Illinois 60606-4637
Telephone:  312.212.4949

*Counsel for Defendants Smartmatic USA Corp.,*
   *Smartmatic International Holding B.V., and*
   *SGO Corporation Limited*

27