**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION, | ) ) ) ) ) | |
| Plaintiffs/Counter-Defendants, | ) ) | |
| v. | ) ) | |
| MYPILLOW, INC. and MICHAEL J. LINDELL, | ) ) ) | |
| Defendants/Counter-Plaintiffs/Third-Party Plaintiffs, | ) ) ) | Case No. 1:21-cv-0445-CJN |
| v. | ) ) | |
| SMARTMATIC USA CORP., SMARTMATIC INTERNATIONAL HOLDING B.V., SGO CORPORATION LIMITED, and HAMILTON PLACE STRATEGIES, LLC. | ) ) ) ) ) | |
| Third-Party Defendants. | ) ) | |

<u>**DOMINION'S AND HAMILTON'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS LINDELL'S AND MYPILLOW'S COUNTERCLAIMS AND LINDELL'S THIRD-PARTY CLAIMS**</u>

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

BACKGROUND AND SUMMARY OF ARGUMENT ....................................................2

ARGUMENT .......................................................................................................................6

    I.       LEGAL STANDARD ..............................................................................6

    II.      LINDELL AND MYPILLOW FAIL TO STATE CLAIMS FOR ABUSE OF PROCESS ........................................................................7

          A.    District of Columbia Law Applies to the Abuse of Process Claims ................................................................................7

          B.    Abuse of Process Claims Are Subject to a Restrictive Standard ................8

          C.    Lindell's and MyPillow's Abuse of Process Claims Fail Because They Are Based on the Filing of This Lawsuit ...........................9

          D.    Lindell and MyPillow Cannot Save Their Abuse of Process Claims by Rewriting Them .......................................................10

    III.    LINDELL'S DEFAMATION CLAIM IS BARRED BY THE ABSOLUTE PRIVILEGE ....................................................................13

    IV.    LINDELL'S RICO CLAIM FAILS ....................................................15

          A.    RICO Claims May Not Be Based on Litigation or Litigation-Related Activity ..............................................................15

          B.    Lindell Fails to Adequately Allege the Existence of a RICO Enterprise ................................................................17

               1.    Lindell Fails to Allege That Smartmatic Acted With Any Other Member of the Alleged Enterprise For a Common Purpose ...............................................18

               2.    Lindell Fails to Allege "Distinctiveness" Among Any Of the Other Members of the Alleged Enterprise ...............................20

          C.    Lindell Does Not Adequately Allege Any RICO Predicate Act ...............21

               1.    Lindell Fails to Adequately Allege Extortion ...............................22

               2.    Lindell Fails to Adequately Allege Witness Tampering ...............24

               3.    Lindell Fails to Adequately Allege Mail Fraud ...............................26

ii

V.      LINDELL FAILS TO ADEQUATELY ALLEGE A VIOLATION OF
        THE SUPPORT OR ADVOCACY CLAUSE .......................................................27

        A.      Lindell Does Not Allege That Anyone Was Prevented From
                Supporting or Advocating for the Election of a Candidate.......................27

        B.      Lindell Fails to Allege the Existence of a Conspiracy...............................29

VI.     LINDELL'S AND MYPILLOW'S SECTION 1983 CLAIMS FAIL .................31

        A.      All of the Section 1983 Claims Fail Because Neither Lindell Nor
                MyPillow Has Plausibly Alleged State Action..........................................32

                1.      Lindell's and MyPillow's Claims Are Based on Purely
                        Private Conduct...............................................................................32

                2.      Dominion's Role in Providing Voting Equipment,
                        Support Services, and Software Licenses To State and
                        Local Governments Does Not Render It A State Actor................37

        B.      Lindell and MyPillow Fail to State Valid Constitutional Claims
                On the Merits ............................................................................................39

                1.      Lindell and MyPillow Fail to Allege First Amendment
                        Retaliation Claims.........................................................................39

                2.      Lindell Fails to Allege an Equal Protection Claim .......................41

                3.      Lindell and MyPillow Fail to Adequately Allege
                        Viewpoint Discrimination Claims .................................................43

                4.      Lindell and MyPillow Fail to Adequately Allege
                        Substantive Due Process Claims....................................................45

VII.    MYPILLOW FAILS TO ALLEGE TORTOIUS INTERFERENCE
        WITH PROSPECTIVE ECONOMIC ADVANTAGE .........................................46

        A.      Minnesota Law Governs the Claim for Tortious Interference
                With Prospective Economic Advantage .....................................................46

        B.      The Tortious Interference With Prospective Economic
                Advantage Claim Fails...............................................................................47

VIII.   LINDELL FAILS TO ALLEGE CIVIL CONSPIRACY......................................51

CONCLUSION..................................................................................................................52

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
526 U.S. 40 (1999)........................................................................................36

*Ancier v. Egan*,
2014 WL 6872977 (D. Haw. Dec. 4, 2014).................................................12

*Ashcroft v. Iqbal*,
556 U.S. 662 ...................................................................................................7

*Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*,
383 F. Supp. 2d 32 (D.D.C. 2005) ...........................................................8, 9, 13

*Barber v. District of Columbia*,
394 F. Supp. 3d 49 (D.D.C. 2019) ...............................................................30

*Bates v. Nw. Hum. Servs., Inc.*,
466 F. Supp. 2d 69 (D.D.C. 2006) ......................................................... *passim*

*Bates v. Nw. Hum. Servs., Inc.*,
583 F. Supp. 2d 138 (D.D.C. 2008) ......................................................32, 33, 36

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................................................................................7, 30

*Bown v. Hamilton*,
601 A.2d 1074 (D.C. 1992) .........................................................................8, 13

*Boyle v. United States*,
556 U.S. 938 (2009)....................................................................................17, 18

*Brentwood Acad. v. Tenn. Sec. Sch. Athl. Ass'n*,
531 U.S. 288 (2001)....................................................................................33, 36

*Brown v. Collins*,
402 F.2d 209 (D.C. Cir. 1968) .....................................................................14

*Brown v. Hill*,
174 F. Supp. 3d 66 (D.D.C. 2016) ...............................................................52

*Burnett v. Sharma*,
511 F. Supp. 2d 136 (D.D.C. 2007) ............................................................30, 51

*Busby v. Cap. One, N.A.*,
  932 F. Supp. 2d 114 (D.D.C. 2013) ................................................................51

*Bush v. Butler*,
  521 F. Supp. 2d 63 (D.D.C. 2007) ..................................................................51

*Calabrese v. CSC Holdings, Inc.*,
  2004 WL 3186787 (E.D.N.Y. July 19, 2004) ...................................................23

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001) ...............................................................................17, 20

*Chevron Corp. v. Donziger*,
  871 F. Supp. 2d 229 (S.D.N.Y. 2012) ...........................................................23

*Cisneros v. Petland, Inc.*,
  972 F.3d 1204 (11th Cir. 2020) ....................................................................19

*Cleveland v. United States*,
  531 U.S. 12 (2000) ......................................................................................26

*Collins v. City of Harker Heights*,
  503 U.S. 115 (1992) .....................................................................................45

*Cornelius v. NAACP*,
  473 U.S. 788 (1985) .....................................................................................43

*Cunningham Lindsey U.S. Inc. v. Crawford & Co.*,
  2018 WL 6307865 (D. Colo. Dec. 3, 2018) ....................................................49

*Dep't of Admin. v. State Pers. Bd. of State*,
  703 P.2d 595 (Colo. App. 1985) ...................................................................14

*Dickerson v. Alachua Cty. Comm'n*,
  200 F.3d 761 (11th Cir. 2000) .....................................................................31

*Discon, Inc. v. NYNEX Corp.*,
  93 F.3d 1055 (2d. Cir. 1996), *rev'd on other grounds*, 525 U.S. 128 (1998).........................21

*Doe v. D.C.*,
  796 F.3d 96 (D.C. Cir. 2015) ........................................................................40

*Dr. R.C. Samanta Roy Inst. of Sci. & Tech. v. The Star Trib. Co.*,
  2005 WL 1661514 (D. Minn. July 15, 2005) ..............................................48, 49

*Dunham v. Roer*,
  708 N.W.2d 552 (Minn. Ct. App. 2006) ..........................................................9

v

*E. Sav. Bank FSB v. Papageorge,*
   31 F. Supp. 3d 1 (D.D.C. 2014), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015).......................*passim*

*Engelhardt v. Qwest Corp.,*
   918 F.3d 974 (8th Cir. 2019) ...................................................48

*Est. of Phillips v. D.C.,*
   455 F.3d 397 (D.C. Cir. 2006)...................................................45

*Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.,*
   749 A.2d 724 (D.C. 2000) .......................................................51

*Fagen, Inc. v. Exergy Dev. Grp. of Idaho, LLC,*
   2016 WL 5660418 (D. Minn. Sept. 29, 2016)...................................50

*Farah v. Esquire Mag.,*
   736 F.3d 528 (D.C. Cir. 2013) ..................................................48

*Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.,*
   774 A.2d 332 (D.C. 2001), *overruled in part on other grounds, McNair
   Builders, Inc. v. Taylor,* 3 A.3d 1132 (D.C. 2010) .................................14

*Forsyth v. HP Inc.,*
   2021 WL 1391501 (N.D. Cal. Apr. 13, 2021) .....................................12

*Fox v. Int'l Conf. of Funeral Serv. Examining Boards,*
   242 F. Supp. 3d 272 (S.D.N.Y. 2017)............................................33

*Frederick Douglass Found., Inc. v. D.C.,*
   531 F. Supp. 3d 316 (D.D.C. 2021)...........................................42, 44

*Fredin v. Middlecamp,*
   2018 WL 4616456 (D. Minn. Sept. 26, 2018)......................................7

*Generations L. Off., Ltd. v. Thomas,*
   2019 WL 114211 (Minn. Ct. App. Jan. 7, 2019)...................................50

*George v. Pacific-CSC Work Furlough,*
   91 F.3d 1227 (9th Cir. 1996) .................................................36, 37

*Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.,*
   844 N.W.2d 210 (Minn. 2014)...............................................*passim*

*Gill v. Farm Bureau Life Ins. Co.,*
   906 F.2d 1265 (8th Cir. 1990) ..................................................29

*Greenway Nutrients, Inc. v. Blackburn,*
   33 F. Supp. 3d 1224 (D. Colo. 2014)............................................51

*Hales Mach. Tool, Inc. v. Doosan Infracore Am. Corp.*,
2016 WL 11518312 (D. Minn. May 24, 2016) .................................................................... 49

*Hall v. Hollywood Credit Clothing Co.*,
147 A.2d 866 (D.C. 1959) .................................................................................................... 7

*Hao Liu v. Hopkins Cty.*,
2015 WL 4978682 (D.D.C. Aug. 20, 2015), *aff'd sub nom. Hao Liu v.
Hopkins Cty. Sulphur Springs, Texas*, 672 F. App'x 23 (D.C. Cir. 2016) ............................ 19

*Harris Grp., Inc. v. Robinson*,
209 P.3d 1188 (Colo. App. 2009) ....................................................................................... 48

*Hemi Grp., LLC v. City of New York*,
559 U.S. 1 (2010) .......................................................................................................... 15, 16

*Hewitt v. Rice*,
154 P.3d 408 (Colo. 2007) ................................................................................................... 7

*Hoai v. Vo*,
935 F.2d 308 (D.C. Cir. 1991) ........................................................................................... 34

*Hoppe v. Klapperich*,
28 N.W.2d 780 (Minn. 1947) .............................................................................................. 7

*\*Houlahan v. World Wide Ass'n of Specialty & Schools*,
677 F. Supp. 2d 195 (D.D.C. 2010) .......................................................................... *passim*

*In re Acacia Media Techs. Corp.*,
2005 WL 1683660 (N.D. Cal. July 19, 2005) ..................................................................... 11

*\*In re Ellipso, Inc.*,
2011 WL 482726 (Bankr. D.D.C. Feb. 7, 2011) ........................................................... 21, 31

*Johnson v. F.C.C.*,
829 F.2d 157 (D.C. Cir. 1987) ........................................................................................... 39

*\*Kerik v. Tacopina*
64 F. Supp. 3d 542 (S.D.N.Y. 2014) ....................................................................... 16, 22, 23

*Kim v. Kimm*,
884 F.3d 98 (2d Cir. 2018) ................................................................................................. 16

*King v. Barbour*,
240 F. Supp. 3d 136 (D.D.C. 2017) .................................................................................... 14

*Kopff v. World Rsch. Grp.*,
519 F. Supp. 2d 97 (D.D.C. 2007) ....................................................................................... 9

*Kowal v. MCI Commc'ns Corp.*,
  16 F.3d 1271 (D.C. Cir. 1994) ...................................................................6

*Kroll OnTrack, Inc. v. Devon IT, Inc.*,
  2015 WL 13766880 (D. Minn. Mar. 20, 2015) ......................................50

*Kurd v. Republic of Turk.*,
  374 F. Supp. 3d 37 (D.D.C. 2019) ...........................................................30

*Kush v. Rutledge*,
  460 U.S. 719 (1983) ...................................................................................28

*LaRouche v. Fowler*,
  152 F.3d 974 (D.C. Cir. 1998) .................................................................39

*Lemon v. Kramer*,
  270 F. Supp. 3d 125 (D.D.C. 2017) ...........................................................7

*Libre By Nexus v. Buzzfeed, Inc.*,
  311 F. Supp. 3d 149 (D.D.C. 2018) .........................................................13

*Manhattan Cmty. Access Corp. v. Halleck*,
  139 S.Ct. 1921 (2019) ..........................................................................34, 39

*Marsh v. Hollander*,
  339 F. Supp. 2d 1 (D.D.C. 2004) .............................................................14

*Matthis v. Kennedy*,
  67 N.W.2d 413 (Minn. 1954) ....................................................................14

*Mattiaccio v. DHA Grp.*,
  20 F. Supp. 3d 220 (D.D.C. 2014) ...........................................................47

*McManus v. District of Columbia*,
  530 F. Supp. 2d 46 (D.D.C. 2019) ...........................................................30

*McNally v. United States*,
  483 U.S. 350 (1987) ...................................................................................26

*Mehari v. District of Columbia*,
  268 F. Supp. 3d 73 (D.D.C. 2017) ...........................................................31

*Mobile Satellite Commc'ns, Inc. v. Intelsat USA Sales Corp.*,
  646 F. Supp. 2d 124 (D.D.C. 2009) .........................................................47

*Moody v. InTown Suites*,
  2006 WL 8431638 (N.D. Ga. Feb. 1, 2006) ...........................................31

*Morin v. Trupin*,
   711 F. Supp. 97 (S.D.N.Y. 1989).................................................................................17

*Morowitz v. Marvel*,
   423 A.2d 196 (D.C. 1980) .................................................................................8, 13

*Moss v. BMO Harris Bank, N.A.*,
   258 F. Supp. 3d 289 (E.D.N.Y. 2017) .......................................................................19

*\*Nader v. McAuliffe*,
   593 F. Supp. 2d 95 (D.D.C. 2009).............................................................................35

*Nixon v. Condon*,
   286 U.S. 73 (1932)..................................................................................................38

*Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*,
   311 F. Supp. 2d 1048 (D. Colo. 2004).......................................................................46

*Nyambal v. Alliedbarton Sec. Servs., LLC*,
   153 F. Supp. 3d 309 (D.D.C. 2016)................................................................46, 49, 50

*Nygard v. City of Orono*,
   2021 WL 3552251 (D. Minn. Aug. 11, 2021) ...............................................................8

*Parks v. Edward Dale Parrish LLC*,
   452 P.3d 141 (Colo. Ct. App. 2019) ............................................................................8

*Propst v. Ass'n of Flight Attendants*,
   546 F. Supp. 2d 14 (E.D.N.Y. 2008) .........................................................................18

*Quick v. EduCap, Inc.*,
   318 F. Supp. 3d 121 (D.D.C. 2018) ..........................................................................18

*Rajaratnam v. Motley Rice LLC*,
   449 F. Supp. 3d 45 (E.D.N.Y. 2020) .........................................................................27

*Rendell–Baker v. Kohn*,
   457 U.S. 830 (1982)................................................................................................32

*Republic of Kazakhstan v. Stati*,
   380 F. Supp. 3d 55 (D.D.C. 2019), *aff'd sub nom. Republic of Kazakhstan,*
   *Ministry of Just. v. Stati*, 801 F. App'x 780 (D.C. Cir. 2020).....................................15

*Rilley v. MoneyMutual, LLC*,
   329 F.R.D. 211 (D. Minn. 2019)................................................................................51

*Rockwell Cap. Partners, Inc. v. CD Int'l Enterprises, Inc.*,
   311 F. Supp. 3d 52 (D.D.C. 2018) ....................................................................8, 9, 10

ix

*Scheidler v. Nat'l Org. for Women, Inc.*,
    537 U.S. 393 (2003)............................................................................23

*Scott v. District of Columbia*,
    101 F.3d 748 (D.C. Cir. 1996) ...........................................................8

*Sekhar v. United States*,
    570 U.S. 729 (2013)............................................................................22

*Shahin v. Darling*,
    606 F. Supp. 2d 525 (D. Del. 2009)...................................................24

*Shenandoah Assocs. Ltd. P'ship v. Tirana*,
    182 F. Supp. 2d 14 (D.D.C. 2001) .....................................................47

*Sherr v. HealthEast Care Sys.*,
    999 F.3d 589 (8th Cir. 2021) .............................................................13

*Slate v. Pub. Def. Serv. for the D.C.*,
    31 F. Supp. 3d 277 (D.D.C. 2014) .....................................................12

*Smith v. Allwright*,
    321 U.S. 649 (1944)............................................................................38

*Spiller v. District of Columbia*,
    362 F. Supp. 3d 1 (D.D.C. 2019) .......................................................8

*Stevens v. Mulay*,
    2021 WL 1153059 (D. Colo. Mar. 26, 2021) ....................................9

*Swanson v. Howard Univ.*,
    249 F. Supp. 3d 255 (D.D.C. 2017) ...................................................6

*Terry v. Adams*,
    345 U.S. 461 (1953)............................................................................37

*United States v. Gianelli*,
    585 F. Supp. 2d 186 (D. Mass. 2008) ................................................25

*United States v. Morrison*,
    98 F.3d 619 (D.C. Cir. 1996) .............................................................25

*US Dominion, Inc., et al. v. MyPillow, Inc., et al.*,
    No. 21-7103, Doc. #1931566 (D.C. Cir. Jan. 20, 2022).................1, 34

*Viehweg v. City of Mount Olive*,
    559 F. App'x 550 (7th Cir. 2014) .......................................................45

*Vietnam Veterans of Am. v. Shinseki*,
    599 F.3d 654 (D.C. Cir. 2010) ...................................................................................12

*West v. Atkins*,
    487 U.S. 42 (1988) ..............................................................................................32, 37

*United States ex rel. Williams v. Martin-Baker Aircraft Co.*,
    389 F.3d 1251 (D.C. Cir. 2004) .................................................................................26

*Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*,
    93 F.3d 910 (D.C. Cir. 1996) .....................................................................................42

*Woytowicz v. George Washington Univ.*,
    327 F. Supp. 3d 105 (D.D.C. 2018) ...........................................................................52

*Zimmer Spine, Inc. v. EBI, LLC*,
    2011 WL 4089535 (D. Colo. Sept. 14, 2011) ............................................................50

**Statutes**

18 U.S.C. § 1341 ...............................................................................................................26

18 U.S.C. § 1343 ...............................................................................................................26

18 U.S.C. § 1512 ...............................................................................................................24

18 U.S.C. § 1512(b) .....................................................................................................24, 26

18 U.S.C. § 1512(d) .....................................................................................................24, 26

18 U.S.C. § 1515(a)(1) ......................................................................................................24

18 U.S.C. § 1951(b)(2) ......................................................................................................22

18 U.S.C. § 1961(1)(A) .....................................................................................................25

18 U.S.C. § 1961(4) ...........................................................................................................17

18 U.S.C. § 1962(c) ...................................................................................................*passim*

42 U.S.C. § 1983 .......................................................................................................*passim*

42 U.S.C. § 1985(3) ...................................................................................................*passim*

Co. Rev. Stat. § 18-8-707 ..................................................................................................25

Minn. Stat. Ann. § 548.06 ................................................................................................41

Minn. Stat. § 609.498 ........................................................................................................25

**Rules**

Fed. R. Civ. P. 9(b) ....................................................................................................26

Fed. R. Civ. P. 12(b)(6)...............................................................................................6

**Constitutional Provisions**

U.S. Const. amend. I ............................................................................................ *passim*

U.S. Const. amend. XIV ..................................................................................32, 34, 42

**Treatises**

Restatement (Second) of Conflict of Laws § 156 Comment b ....................................47

Restatement (Second) of Torts § 682 Comment b..................................................9, 12

**Other Authorities**

Richard Primus & Cameron O. Kistler, *The Support-Or-Advocacy Clauses*, 89
    Fordham L. Rev. 145 (2020)...................................................................................28

Rodney Smolla, Law of Defamation (2021 update edition).........................................41

## INTRODUCTION

This case is about Mike Lindell's exploitation of the "Big Lie." After securing a valuable endorsement from Donald Trump for his company MyPillow, Lindell promoted, on MyPillow's behalf, the lie that Dominion had stolen the 2020 U.S. Presidential Election. Despite knowing full well otherwise (or recklessly disregarding the truth), Lindell claimed: that Dominion's voting machines were "built to cheat" and "steal elections"; that Dominion stole the election by using an algorithm to flip and weight votes in its machines; that a fake spreadsheet with fake IP and MAC addresses proved that Dominion's machines were hacked; that Dominion's plot was kept under wraps because then-Attorney General William Barr had been "compromised"; and that Dominion committed the "biggest crime ever committed in election history against our country and the world." Those lies caused, and continue to cause, enormous reputational and financial harm to Dominion.

In response, Dominion did exactly what it was supposed to do. It identified for Lindell and MyPillow the precise statements that were defamatory and the evidence disproving those false claims. It explained to Lindell and MyPillow that their lies were endangering the lives of Dominion employees. It demanded that Lindell and MyPillow retract their statements. But Lindell and MyPillow did nothing of the sort. Instead, Lindell doubled down on his lies, stating, "I dare Dominion to sue me, because then it will get out faster." Dominion had no choice but to sue. And since filing suit and laying out the lies that Lindell has told—as MyPillow's CEO, for MyPillow's benefit—Dominion successfully opposed Lindell's and MyPillow's motions to dismiss, as well their appeals of the Court's denial of those motions. *See* ECF No. 54; *US Dominion, Inc., et al. v. MyPillow, Inc., et al.*, No. 21-7103, Doc. #1931566 (D.C. Cir. Jan. 20, 2022).

To Lindell and MyPillow, however, Dominion's attempts to hold them accountable in court—what they call a campaign of "lawfare"—are *illegal*. According to their counterclaims,

1

Dominion must simply endure the harms caused by their lies, and is legally prohibited from availing itself of the judicial system. Lindell's counterclaims even seek to punish Dominion's public relations firm, and name Dominion's current counsel as a co-conspirator (though he does not sue the law firm). The proverbial "schoolyard bully who can't take a punch" is not even the right analogy. Lindell and MyPillow are bullies who, after attacking their victim in the schoolyard, claim that the victim is forbidden from going to the nurse to dress his wounds, or to the principal's office to have them held accountable.

It is no stretch to say that these counterclaims threaten the rule of law. If allowed to proceed, they would impose liability on innumerable parties engaging in ordinary, day-to-day acts of litigation. They would deter future litigants from bringing their disputes to court in the first place. And they would encourage parties with legitimate grievances to resort not to the judicial system, where disputes are intended to be peaceably resolved, but to self-help. That cannot be the law.

Fortunately, it is not. The claims that Lindell and MyPillow assert are wide ranging—they include common-law torts, constitutional claims, and even a claim for violation of the civil RICO statute. Each fails. The next section will delineate, on a claim-by-claim basis, the precise reasons why, but the common thread is that these counterclaims are without precedent. Courts vigorously protect the integrity of the judicial system so that it may operate as a forum in which parties can freely settle their differences. The counterclaims threaten that vital function. They should not be allowed to stand.

## BACKGROUND AND SUMMARY OF ARGUMENT

The factual allegations in the counterclaims are mostly irrelevant to the claims that Lindell and MyPillow assert. Each set of counterclaims provides a long and inaccurate account of the history of voting technology in the United States, from 2002 leading up to the 2020 U.S. Presidential Election. *See, e.g.*, ECF No. 87 ("Lindell Counterclaims") ¶¶ 50–109; ECF No. 90

("MyPillow Counterclaims") ¶¶ 25–112. Each also doubles down on their already-disproven lies about Dominion's voting systems and the 2020 U.S. Presidential Election. *See, e.g.*, Lindell Counterclaims ¶¶ 110–124; MyPillow Counterclaims ¶¶ 113–124. But none of those allegations have anything to do with the ways in which Dominion,[1] its public relations firm Hamilton Place Strategies ("Hamilton"), or Dominion's competitor Smartmatic,[2] allegedly harmed Lindell or MyPillow.

The allegations detailing the conduct on which Lindell and MyPillow sue can be found in approximately five paragraphs of the counterclaims—paragraphs nearly word-for-word identical as between the two pleadings. *Compare* Lindell Counterclaims ¶¶ 130–135 *with* MyPillow Counterclaims ¶¶ 130–135. Stripped of hyperbole, the alleged conduct on which Lindell and MyPillow sue fall into three basic categories. *First*, Lindell and MyPillow complain about Dominion sending "at least 150 attorney letters, threatening the recipients with legal action." Lindell Counterclaims ¶ 132(a); MyPillow Counterclaims ¶ 132(a). Most of the letters that they complain about were sent to *other* individuals; only three were sent to Lindell and MyPillow. *See* Lindell Counterclaims ¶ 136 (citing Exhibits 15 through 17).[3] *Second,* Lindell and MyPillow base

---

[1] The term "Dominion" refers to the three Dominion entities named as Counter-Defendants: U.S. Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation. Neither Lindell nor MyPillow draws any distinction between the three entities in their counterclaims.

[2] The term "Smartmatic" refers to the three Smartmatic entities Lindell names as Third-Party Defendants: Smartmatic USA Corp., Smartmatic International Holding B.V., and SGO Corporation Limited. Smartmatic has separately moved to dismiss Lindell's counterclaims against it. *See* ECF No. 94.

[3] Though MyPillow did not attach the letters sent to Lindell to its counterclaims, Lindell at least attempted to. Lindell states that "Exhibits 15 through 17 are the increasingly aggressive 'cease and desist letters sent by Dominion . . . seeking to silence Lindell's criticism." Lindell Counterclaims ¶ 136. Lindell, however, attached no exhibit to his counterclaims with a number higher than 11. *See* ECF No. 87-1–87-11. Presumably he intended to attach what had been attached as Exhibits 15 through 17 to the Complaint Lindell filed in *Lindell v. US Dominion, Inc.*, et al., 21-cv-2296, ECF

their claims on Dominion's filing of this lawsuit. *See* Lindell Counterclaims ¶ 131; MyPillow Counterclaims ¶ 131. Lindell and MyPillow also appear to premise their claims on Dominion's filing lawsuits against other individuals and entities, though it is unclear how those suits could have harmed Lindell or MyPillow. *See id.* And *third*, Lindell and MyPillow protest Dominion's "publiciz[ing]" of its lawsuits, specifically citing an interview conducted by Dominion's CEO the day after this lawsuit was filed and Dominion's referencing of the lawsuits on its website. *See* Lindell Counterclaims ¶ 133; MyPillow Counterclaims ¶ 133. Collectively, Lindell and MyPillow label these actions a "campaign of lawfare." *See, e.g.*, MyPillow Counterclaims ¶ 130; Lindell Counterclaims ¶ 130.

Based on that conduct, Lindell and MyPillow assert a slew of counterclaims, ranging from common-law torts to constitutional claims to a RICO claim. Some claims are brought by both Lindell and MyPillow, while others are not. And the claims are asserted against various permutations of entities. For the Court's convenience, Dominion and Hamilton have prepared the below table summarizing all of the counterclaims:

| Counterclaim | Asserted By | Asserted Against |
|---|---|---|
| (1) Abuse of Process | Lindell (Count 1)<br>MyPillow (Count 5) | Dominion |
| (2) Defamation | Lindell (Count 2) | Dominion |
| (3) RICO | Lindell (Count 3) | Dominion<br>Hamilton<br>Smartmatic |
| (4) Support or Advocacy Clause | Lindell (Count 4) | Dominion<br>Hamilton<br>Smartmatic |
| (5) Section 1983: First Amendment Retaliation | Lindell (Count 6)<br>MyPillow (Counts 1, 2) | Dominion<br>Smartmatic (by Lindell only) |
| (6) Section 1983: Equal Protection | Lindell (Count 5) | Dominion<br>Smartmatic |

Nos. 1-15–1-17, and which the Court ordered him to refile as counterclaims in this lawsuit. *See* ECF Nos. 85 ¶ 2. Those three exhibits are attached as Exhibits 1–3 to the accompanying Declaration of Zachary B. Savage.

| (7) Section 1983: Viewpoint Discrimination | Lindell (Count 5) MyPillow (Counts 1, 2) | Dominion Smartmatic (by Lindell only) |
|---|---|---|
| (8) Section 1983: Substantive Due Process | Lindell (Count 5) MyPillow (Count 3) | Dominion Smartmatic (by Lindell only) |
| (9) Tortious Interference with Prospective Economic Advantage | MyPillow (Count 4) | Dominion |
| (10) Civil Conspiracy | Lindell (Count 7) | Dominion Hamilton Smartmatic |

All ten counterclaims should be dismissed. The following is a thumbnail sketch as to why:

- **(1)** *Abuse of Process:* An abuse of process claim may not be based on the filing of a lawsuit itself, but that is exactly the conduct on which Lindell's and MyPillow's abuse-of-process claims are based. If either tries to argue that the claim is based on Dominion's cease-and-desist letters or statements to the media about this lawsuit, that argument fails because none of that conduct can be considered an improper use of judicial process.

- **(2)** *Defamation*: The defamation claim is based on statements that Dominion made in this lawsuit. A statement made by a party in a judicial proceeding is absolutely privileged.

- **(3)** *RICO*: *First*, RICO claims cannot be based on conduct related to allegedly meritless litigation. A RICO claim thus by definition cannot be based on conduct related to an ongoing lawsuit that has survived a motion to dismiss. *Second*, Lindell has not alleged the existence of a RICO enterprise. *Third*, Lindell has not alleged any of the following predicate acts:

  - **Extortion:** Extortion requires an attempt to obtain transferable property. Lindell has not alleged that the supposed RICO enterprise sought to obtain property from anyone. A lawsuit demanding money damages, or a threat of such a lawsuit, is not extortion.

  - **Witness Tampering:** Lindell has identified no official proceeding that has allegedly been tampered with.

  - **Mail Fraud**: Lindell does not identify any misrepresentation in any use of the mail. Nor does he allege that the supposed enterprise sought to obtain property.

- **(4)** *Support or Advocacy Clause***:** The Support or Advocacy Clause prohibits conspiracies to prevent, or seek to prevent, citizens from supporting or advocating for candidates in federal elections. Lindell alleges no such conspiracy.

- **(5–8)** *Section 1983 Claims***:** Neither Lindell nor MyPillow adequately alleges state action. The conduct on which the counterclaims are based—the so-called "lawfare" campaign— has no plausible connection to any state actor. And even if the counterclaims were based on Dominion's role in elections (they are not), Dominion is not a state actor in that role

either. Dominion is an ordinary government contractor, supplying goods and services to state and local officials, and the counterclaims do not suggest otherwise. In any event, each of the Section 1983 claims fails on the merits:

- **First Amendment Retaliation:** A claim for First Amendment retaliation requires that the retaliatory act be made in response to First Amendment protected speech. As the Court already explained in its motion to dismiss order, Dominion cannot and will not recover against the defendants for any speech protected by the First Amendment.

- **Equal Protection**: Though Lindell claims there are similarly-situated "left-leaning" individuals that Dominion should have, but did not, sue or threaten to sue, none of those individuals made statements remotely similar to the ones made by Lindell on which Dominion has sued.

- **Viewpoint Discrimination**: The counterclaims are incoherent as a viewpoint discrimination claim, as they do not allege that Dominion restricted any speech in any forum.

- **Substantive Due Process:** A substantive due process claim requires that the relevant conduct be so egregious and outrageous that it shocks the conscience. The filing of meritorious lawsuits, and taking related preparatory steps, falls well short of this standard.

- **(9) Tortious Interference With Prospective Economic Advantage**: A tortious interference claim requires that the underlying conduct be independently unlawful. MyPillow has identified no such conduct.

- **(10) Civil Conspiracy**: Lindell has alleged no underlying illegal acts, nor has he made any non-conclusory allegations of an agreement between the alleged co-conspirators.

## ARGUMENT

## I.   LEGAL STANDARD

"When considering a motion to dismiss under Rule 12(b)(6), the Court is bound to construe a complaint liberally in the plaintiff's favor" but "the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions." *Swanson v. Howard Univ.*, 249 F. Supp. 3d 255, 257 (D.D.C. 2017) (citing *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994)). Therefore, to survive Dominion's motion to dismiss, the counterclaims "must contain sufficient

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## II.  LINDELL AND MYPILLOW FAIL TO STATE CLAIMS FOR ABUSE OF PROCESS

### A.  District of Columbia Law Applies to the Abuse of Process Claims

There are three potentially relevant jurisdictions whose law may apply to the abuse of process claim: the District of Columbia, Minnesota, and Colorado. But there are no meaningful differences between those three jurisdictions' laws—the elements of the tort are materially identical in all three. In the District of Columbia, the "essential elements" of the tort are: "'(1) the existence of an ulterior motive; and (2) an *act* in the use of process other than such as would be proper in the regular prosecution of that charge.'" *Houlahan v. World Wide Ass'n of Specialty & Schools*, 677 F. Supp. 2d 195, 199 (D.D.C. 2010) (quoting *Hall v. Hollywood Credit Clothing Co.*, 147 A.2d 866, 868 (D.C. 1959) (emphasis in original)). Similarly, in Minnesota, the elements of the tort are: "'[1] the existence of an ulterior purpose, and [2] the act of using the process to accomplish a result not within the scope of the proceeding in which it was issued, whether such result might otherwise be lawfully obtained or not.'" *Fredin v. Middlecamp*, 2018 WL 4616456, at *5 (D. Minn. Sept. 26, 2018) (quoting *Hoppe v. Klapperich*, 28 N.W.2d 780, 786 (Minn. 1947)). And "[i]n Colorado, abuse of process requires proof of (1) an ulterior purpose in the use of judicial proceedings; (2) willful actions by a defendant in the use of process that are not proper in the regular conduct of a proceeding; and (3) damages." *Hewitt v. Rice*, 154 P.3d 408, 414 (Colo. 2007) (citation omitted).

Accordingly, under District of Columbia choice-of-law principles—which apply here because this is a diversity action—District of Columbia law applies by default. *See Lemon v. Kramer*, 270 F. Supp. 3d 125, 143 n.13 (D.D.C. 2017).

### B.   Abuse of Process Claims Are Subject to a Restrictive Standard

Under that law (or under Minnesota or Colorado law, which are the same), Lindell's and MyPillow's abuse of process claims fail. As noted, the elements of abuse of process are: "(1) the existence of an ulterior motive; and (2) an act in the use of process other than such as would be proper in the regular prosecution of that charge." *Houlahan*, 677 F. Supp. 2d at 199 (internal quotation marks and emphasis omitted).[4] This standard, which courts characterize as "restrictive," is intended to preserve "'unfettered access to the courts'" and "avoid[] any 'chilling and inhibitory effect on would-be litigants of justiciable issues.'" *Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*, 383 F. Supp. 2d 32, 46 n.10 (D.D.C. 2005) (citing *Bown v. Hamilton*, 601 A.2d 1074, 1079–80 (D.C. 1992) and *Morowitz v. Marvel*, 423 A.2d 196, 198–99 (D.C. 1980)).

The mere filing of a lawsuit—*i.e.*, the "mere issuance of process" itself—"is not actionable [as an abuse of process claim], no matter what ulterior motive may have prompted" the lawsuit. *Rockwell Cap. Partners, Inc. v. CD Int'l Enterprises, Inc.*, 311 F. Supp. 3d 52, 55 (D.D.C. 2018) (quoting *Morowitz*, 423 A.2d at 198). Rather, "the gist of the action li[es] in the improper use [of process] *after* issuance." *Id.* (quoting *Morowitz*, 423 A.2d at 198 (emphasis in original)); *see also Bannum*, 383 F. Supp. 2d at 46 (same); *Nygard v. City of Orono*, 2021 WL 3552251, at *6 (D. Minn. Aug. 11, 2021) ("The act of initiating a lawsuit cannot be the basis for an abuse of process claim." (applying Minnesota law)); *Parks v. Edward Dale Parrish LLC*, 452 P.3d 141, 145 (Colo. Ct. App. 2019) ("[B]ringing a . . . case and carrying it to its natural end to obtain a result such an action is designed to achieve doesn't constitute an improper use of process, no matter the motive.").

---

[4] Sometimes the second element of the tort is phrased as an act in "perversion of the judicial process." *Spiller v. District of Columbia*, 362 F. Supp. 3d 1, 6 (D.D.C. 2019) (quoting *Scott v. District of Columbia*, 101 F.3d 748, 756 (D.C. Cir. 1996)). However phrased, courts interpret the second element the same.

Moreover, an abuse of process claim cannot be based on the "unhappy" harms that naturally flow from litigation. Those non-cognizable harms include "reputational costs," *Rockwell*, 311 F. Supp. 3d at 56 n.3, "harassment," *Kopff v. World Rsch. Grp.*, 519 F. Supp. 2d 97, 100 (D.D.C. 2007), and "significant inconvenience and loss of resources," *Bannum*, 383 F. Supp. 2d at 47. Rather, "[t]he usual case of abuse of process is one of some form of extortion, using the process to put pressure upon the other to compel him to pay a different debt or to take some other action or refrain from it." *Houlahan*, 677 F. Supp. 2d at 201 (quoting Restatement (Second) of Torts § 682 cmt. b); *see also Dunham v. Roer*, 708 N.W.2d 552, 571 (Minn. Ct. App. 2006) ("Mere indirect injury to a person's name or reputation is insufficient to constitute abuse of process."); *Stevens v. Mulay*, 2021 WL 1153059, at *1 (D. Colo. Mar. 26, 2021) ("incidental effects of litigation" such as "financial hardship and emotional upheaval" are "insufficient to substantiate a viable claim for abuse of process").

## C. Lindell's and MyPillow's Abuse of Process Claims Fail Because They Are Based on the Filing of This Lawsuit

Lindell's and MyPillow's abuse of process claims are based on the same basic act: Dominion's filing of this lawsuit against them. The theory of their claims is that Dominion sued not to recover for the harms that Lindell and MyPillow caused to Dominion, but for the "ulterior purpose" of "silencing" and retaliating against them for speaking out about alleged vulnerabilities of Dominion's election machines.

Lindell, for example, asserts (directly under "Count One: Abuse of Process") that Dominion "*brought suit* against Lindell as part of a widespread 'lawfare' campaign." Lindell Counterclaims ¶ 145 (emphasis added). He also premises his abuse of process claim on Dominion having allegedly "willfully *plead[ed]* gross mischaracterizations"; on the alleged purpose of "[s]uch *allegations*," and on Dominion's "alleged [] quantum of damages." *Id.* (emphasis added).

Similarly, MyPillow asserts (directly below "Count 5, Abuse of Process") that Dominion "filed a lawsuit against MyPillow" in this Court; that Dominion "had an ulterior purpose in filing" this lawsuit against MyPillow; and that "*[t]he D.C. Action was brought* to support a much larger campaign." MyPillow Counterclaims ¶¶ 176–178 (emphasis added).

Even assuming the truth of Lindell's and MyPillow's theory as to Dominion's motives for suing (to be clear, their characterization of those motives is false), the abuse of process claims fail under basic, blackletter law. Again, the "issuance of process"—*i.e.*, the filing of a lawsuit—simply "is not actionable" as an abuse of process claim. *Rockwell* 311 F. Supp. 3d at 55. Lindell's and MyPillow's abuse of process counterclaims are based on Dominion's filing of this suit. The claims should therefore be dismissed.

### D.   Lindell and MyPillow Cannot Save Their Abuse of Process Claims by Rewriting Them

If Lindell or MyPillow attempt to rewrite their abuse of process claims and change the act on which they are premised, such an attempt would fail, too.

*First*, they cannot ground their abuse of process claims on letters that Dominion sent before this lawsuit. *See* Lindell Counterclaims ¶¶ 132, 136; MyPillow Counterclaims ¶ 132. "An action for abuse of process 'lies in the improper use *after* issuance'"; as such, "acts that [Dominion] engaged in prior to the filing" of the lawsuit are irrelevant. *Houlahan*, 677 F. Supp. 2d at 201 n.7 (emphasis in original). Obviously, the letters—which demanded that Lindell retract his false claims about Dominion, and warned that failure to do so could result in this lawsuit—were sent before the lawsuit was filed and process was issued. They are dated December 23, 2020, January 8, 2021, and February 4, 2021; this lawsuit was filed on February 22, 2021. *See* Exs. 1, 2, 3. As a matter of law (and basic logic), one cannot abuse process if the process has not yet been issued.

*Second*, the abuse of process claims cannot be based on alleged statements that Dominion made to the media about this or other suits. *See, e.g.*, Lindell Counterclaims ¶ 133 (discussing Dominion's efforts to "publicize[]" various lawsuits); MyPillow ¶ 133 (same).

To begin with, a statement to the media about a pending or future lawsuit is not an act in the use of judicial process. "The essence of the tort lies in the misuse of the power *of the court*." *In re Acacia Media Techs. Corp.*, 2005 WL 1683660, at *6 (N.D. Cal. July 19, 2005) (emphasis added). When a court's authority is not invoked—such as when a party speaks to the press—there is no use (or misuse) of judicial process. *Id.* ("Statements (or misstatements) to the media . . . do not abuse judicial process.").

Moreover, even if a statement to the media could be considered a use of judicial process, the media statement on which Lindell and MyPillow focus relates to *unfiled* lawsuits. Lindell and MyPillow object to a statement Dominion's CEO made in an interview on February 23, 2021—one day after this suit was filed. *See* Lindell Counterclaims ¶ 133(a); MyPillow Counterclaims ¶ 133(a); Exhibit 4 at 1. But the statement in the interview that Lindell and MyPillow protest does not even relate to this lawsuit, which had been on file for precisely one day. Instead, Lindell and MyPillow's complaint seems to be that Dominion was considering whether to file *other* lawsuits against *other* people or entities. Lindell Counterclaims ¶ 133(a) (quoting, in bold, Poulos's statement that Dominion's legal team was "not ruling anybody out," and further quoting Poulous's statement that Dominion's suit against Lindell and MyPillow was "not the last lawsuit" it would bring); MyPillow Counterclaims ¶ 133(a) (same). One cannot abuse judicial process if no process has yet issued.

And even if the Court were to construe the abuse of process claims as based on Dominion's statements to the media about *this* lawsuit; and even if such statements were considered a "use" of

judicial process, it is implausible to suggest that any statement to which Lindell or MyPillow have pointed constitutes an "improper use" or "perversion" of judicial process. The only statement to which Lindell or MyPillow point is the interview of Dominion's CEO, Mr. Poulos, referenced in the previous paragraph. Lindell and MyPillow selectively quoted from it in the counterclaims; Dominion has attached the full transcript here as Exhibit 4.[5] As courts often remark, "[t]he usual case of abuse of process is one of extortion." *Houlahan*, 677 F. Supp. 2d at 201 (quoting Restatement (Second) of Torts § 682 cmt. b). Nothing about Mr. Poulos's discussion of this lawsuit, which Dominion encourages the Court to review in full, could remotely be construed as such. *See also Ancier v. Egan*, 2014 WL 6872977, at *7 & n.6 (D. Haw. Dec. 4, 2014) (observing "publicity, standing alone and without an element of coercion, is not a wilful act [for an abuse of process claim] given that civil actions are themselves public" and collecting cases from jurisdictions across the country).

*Third*, the Court should reject any attempt by Lindell or MyPillow to ground their abuse of process claims based on process Dominion purportedly issued and abused against *other people*. It is a bedrock principle of Article III of the Constitution that, with limited exceptions not relevant here, "one can not have standing in federal court by asserting an injury to someone else." *Vietnam Veterans of Am. v. Shinseki*, 599 F.3d 654, 662 (D.C. Cir. 2010). Nor should the Court allow Lindell and MyPillow to evade that basic rule by asserting that, as a result of process that Dominion issued against other people, they themselves have suffered harm to their businesses and reputations. Not only would such a theory be extraordinarily speculative, but it would represent a

---

[5] [5] The Court can take judicial notice of the interview transcript because the interview is repeatedly referenced and quoted in the complaint. *See Slate v. Pub. Def. Serv. for the D.C.*, 31 F. Supp. 3d 277, 287–88 (D.D.C. 2014); *Forsyth v. HP Inc.*, 2021 WL 1391501, at *4 (N.D. Cal. Apr. 13, 2021) ("[C]ourts may take judicial notice of transcripts of television news interviews and similar documents.").

dramatic expansion of this tort. Abuse of process claims may not be based on the "unhappy" natural incidents of litigation—such as reputational harms and loss of resources—even when those harms result from process issued against the plaintiff (or counter-plaintiff). To allow Lindell and MyPillow to proceed on non-actionable harms, based on process issued against *other* people, would stretch the tort beyond recognition. And it would "chill[]" and "inhibit[]" litigants from filing suit based on legitimate grievances, undermining the goal of "allowing unfettered access to the courts." *Bannum*, 383 F. Supp. 2d at 46 n.10 (citing *Bown*, 601 A.2d at 1080 and *Morowitz*, 423 A.2d at 197–98 (alterations omitted)).

## III.    LINDELL'S DEFAMATION CLAIM IS BARRED BY THE ABSOLUTE PRIVILEGE

Next, Lindell—though not MyPillow—claims defamation. *See* Lindell Counterclaims at p. 122 (Count Two).

To state a claim for defamation, one must identify the statement or statements alleged to be defamatory. *See Libre By Nexus v. Buzzfeed, Inc.*, 311 F. Supp. 3d 149, 154 (D.D.C. 2018); *Sherr v. HealthEast Care Sys.*, 999 F.3d 589, 597–98 (8th Cir. 2021) (applying Minnesota law). Lindell identifies those statements in precisely one paragraph of his counterclaims. That paragraph reads:

> The Dominion Defendants have defamed Plaintiff Lindell *per se* by calling him a "liar" and a purveyor of "the Big Lie" ***in the D.C. Lawsuit***. In fact, everything Lindell has publicly stated about the vulnerability of voting machines to cyberattacks and hacking (including the Dominion Defendants' voting machines) is substantively true, and the Dominion Defendants know it.

Lindell Counterclaims ¶ 150 (emphasis added). In other words, Lindell claims Dominion made two defamatory statements: (1) that Lindell is a "liar"; and (2) that Lindell is a purveyor of "the Big Lie." He concedes that both statements were made in this lawsuit.

13

That concession dooms his claim. To be clear: Lindell *has* lied about Dominion, and he *is* a purveyor of the Big Lie that the 2020 U.S. Presidential Election was stolen. *See generally* Complaint. Many of those lies undergird Dominion's defamation claims against Lindell and MyPillow. But for purposes of Lindell's defamation claim against Dominion, none of that matters. What matters is that the statements on which Lindell brings his defamation claim are statements that Lindell concedes Dominion made in this lawsuit.

Statements made within the context of judicial proceedings are protected by the absolute privilege. *See Finkelstein, Thompson & Loughran v. Hemispherx Biopharma, Inc.*, 774 A.2d 332, 338 (D.C. 2001), *overruled in part on other grounds by McNair Builders, Inc. v. Taylor*, 3 A.3d 1132, 1142 (D.C. 2010).[6] As the name implies, the privilege is "absolute"; it bars all defamation claims based on material published in judicial proceedings, even where the material is "false and defamatory." *Marsh v. Hollander*, 339 F. Supp. 2d 1, 8 (D.D.C. 2004) (quoting *Brown v. Collins*, 402 F.2d 209, 212 n.3 (D.C. Cir. 1968). The privilege is intended to "ensure that [participants in judicial proceedings] can communicate as freely as possible in efforts to resolve their disputes without being constrained by the threat of a defamation charge." *Id.* at 6. And it applies to "the range of potential participants in a legal proceeding," including, parties. *Id.* at 8; *see also King v.*

---

[6] Minnesota and Colorado law are the same on the absolute privilege. *See Matthis v. Kennedy*, 67 N.W.2d 413, 417 (Minn. 1954) ("[D]efamatory matter published in the due course of a judicial proceeding is absolutely privileged and will not support a civil action for defamation although made maliciously and with knowledge of its falsehood. It extends to the protection of the judge, the jury, the party or parties, counsel, and witnesses."); *Dep't of Admin. v. State Pers. Bd. of State*, 703 P.2d 595, 597–98 (Colo. App. 1985) ("Generally, statements made in the course of judicial or quasi-judicial proceedings, even if the remarks are false or defamatory and made with knowledge of their falsity, are absolutely privileged if they bear some relation or reference to the subject of the inquiry.") Accordingly, no choice of law analysis is necessary, and the law of the District of Columbia applies by default. *See supra*, at Section II.A.

*Barbour*, 240 F. Supp. 3d 136, 141 (D.D.C. 2017) (absolute privilege barred defamation counterclaims "based entirely on statements Plaintiff made in his Complaint in this action").

There is no easier case for the application of the absolute privilege than this. Lindell identifies only two allegedly defamatory statements, and he concedes that they were made in this case. Lindell even acknowledges the existence of the absolute privilege. *See* Lindell Counterclaims ¶ 139 (predicting that Dominion "will attempt to hide behind . . . the 'absolute privilege' protecting statements made in the course of judicial proceedings"). He makes no argument, however, as to why it should not apply. It does, and it bars his defamation claim.

## IV.    LINDELL'S RICO CLAIM FAILS

Lindell's next claim is for violating the civil RICO statute, 18 U.S.C. § 1962(c). *See* Lindell Counterclaims ¶¶ 152–161. To state a claim under the RICO statute, Lindell must adequately allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *E. Sav. Bank FSB v. Papageorge*, 31 F. Supp. 3d 1, 11 (D.D.C. 2014), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015). He must also allege that the RICO predicate offense (*i.e.*, the racketeering conduct in question) was the "proximate cause" of his injury. *Id.* This means that there must be a "direct relation between the injury asserted and the injurious conduct alleged," and that "the compensable injury flowing from a RICO violation necessarily [must be] the harm caused by the predicate acts." *Id.* at 11–12 (quoting *Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 13 (2010)). Lindell's RICO claim fails on several counts.

### A.    RICO Claims May Not Be Based on Litigation or Litigation-Related Activity

First, Lindell's RICO claim fails because it is based on litigation and litigation-related activity. Courts routinely recognize that, "as a matter of law," "litigation related activity" "does not constitute a RICO predicate act." *E. Sav. Bank FSB*, 31 F. Supp. 3d at 13; *see also Republic of Kazakhstan v. Stati,* 380 F. Supp. 3d 55, 61 (D.D.C. 2019), *aff'd sub nom. Republic of Kazakhstan,*

*Ministry of Just. v. Stati*, 801 F. App'x 780 (D.C. Cir. 2020) ("Numerous other circuit courts and district courts across the country have concluded that wrongful litigation activities cannot serve as RICO predicate acts."). This rule applies even to "abusive," "sham," and "meritless" litigation, and it is based on the common-sense notion that "recognition of litigation activity as a predicate for RICO violations would subject almost any unsuccessful lawsuit to a colorable extortion (and often a RICO) claim." *E. Sav. Bank FSB*, 31 F. Supp. 3d at 13 (internal quotation marks omitted); *see also Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018) ("[If] litigation activity were adequate to state a claim under RICO, every unsuccessful lawsuit could spawn a retaliatory action, which would inundate the federal courts with procedurally complex RICO pleadings." (internal quotation marks and alterations omitted)).

If a RICO claim cannot even be based on activity related to "abusive," "sham," "meritless," and "unsuccessful" litigation, then a RICO claim premised on activity related to an *ongoing lawsuit that has survived a motion to dismiss* cannot support a RICO claim either. And activity related to this litigation is indeed the basis for Lindell's RICO claim. As he explains, the supposed RICO enterprise engaged in racketeering activity by "issu[ing] . . . over 150 'cease and desist' letters threatening companies and individuals" with "ruinous litigation." Lindell Counterclaims ¶ 158. Presumably, the letters to which Lindell is referring are the three letters discussed above that were sent to Lindell, *see supra*, at Section II.D, since it is unclear what letters sent to *other* individuals or businesses could have to do with him or how they could cause him harm.[7] But letters concerning

---

[7] If Lindell's RICO claim is based on alleged injuries he suffered due to letters that supposed enterprise sent to *other* individuals or businesses, that claim cannot possibly satisfy RICO's proximate causation requirement. *See Hemi Grp., LLC v. City of New York*, 559 U.S. 1, 10 (2010) (rejecting RICO theory of causation because it "requires us to move well beyond the first step"). Nor does he have standing to bring such claims in the first place. *See, e.g.*, *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 561 (S.D.N.Y. 2014) (plaintiff did not have standing to bring RICO claim based on allegations that defendant extorted other people).

a future lawsuit—one which has now survived a motion to dismiss—cannot sustain a RICO claim. *E. Sav. Bank FSB*, 31 F. Supp. 3d at 13–14 ("[T]he vast majority of the plaintiff's litany of woes . . . cannot, as a matter of law, form the basis of a RICO complaint, since they are all directly related to ongoing, non-frivolous litigation."); *Morin v. Trupin*, 711 F. Supp. 97, 105–106 (S.D.N.Y. 1989) (demand letter sent by attorneys could not constitute RICO predicate act). Accordingly, the Court need not examine the predicate crimes on which Lindell's RICO claim is based, because the factual basis for Lindell's RICO claim is not actionable.

## B.    Lindell Fails to Adequately Allege the Existence of a RICO Enterprise

The Court need not analyze the alleged predicate crimes for another reason, too: Lindell does not adequately allege the existence of a RICO "enterprise."

As discussed above, the existence of an "enterprise" is an essential element of a RICO claim. *See supra*, at Section IV; *see also* 18 U.S.C. § 1961(4) (defining "enterprise" for RICO). Here, Lindell claims the existence of an "association-in-fact" enterprise. *See* Lindell Counterclaims ¶¶ 155–156. An association-in-fact enterprise is a "continuing unit that functions with a common purpose," and it "must have at least three structural features: 'a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" *Boyle v. United States*, 556 U.S. 938, 946, 948 (2009). Moreover, under the language of the RICO statute, which requires a "person" to be associated with an "enterprise," 18 U.S.C. § 1962(c), the members of a RICO enterprise must be "distinct"—that is, "one must allege . . . *two distinct entities*: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Bates v. Nw. Hum. Servs., Inc.* ("*Bates I*"), 466 F. Supp. 2d 69, 80 (D.D.C. 2006) (quoting *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001)) (emphasis in original). The enterprise that Lindell claims—

allegedly comprised of Dominion, Smartmatic, Hamilton, and Dominion's attorneys at Clare Locke—fails these basic requirements.

1.     **Lindell Fails to Allege That Smartmatic Acted With Any Other Member of the Alleged Enterprise For a Common Purpose**

As for Smartmatic, Lindell alleges nothing close to the requisite common purpose between Smartmatic and any of the other members of the alleged enterprise. Lindell claims that Smartmatic and the other members of the enterprise acted in furtherance of the purpose of "suppressing speech and dissent" and "suppressing demands for investigations" about electronic voting machines and their use in the U.S. Presidential Election. Lindell Counterclaims ¶ 156. But Lindell alleges no facts to support that conclusory allegation. He does not claim that Smartmatic communicated, met, or otherwise coordinated with Dominion, Hamilton, or Clare Locke in furtherance of this supposed purpose. Nor does he offer any facts from which to infer a "continuing unit that functions with a common purpose." *Boyle*, 556 U.S. at 948.

At most, he alleges that Smartmatic and the other members of the alleged enterprise engaged in "independent, albeit similar, activities," such as sending separate cease and desist letters to and filing separate defamation lawsuits against some of the same individuals.[8] *Propst v. Ass'n of Flight Attendants*, 546 F. Supp. 2d 14, 25 (E.D.N.Y. 2008). But allegations of "independent, albeit similar, activities" are not enough. Lindell must allege facts showing that the members of the enterprise "joined together as a group to achieve their purposes." *Id.*; *see also, e.g.*, *Quick v. EduCap, Inc.*, 318 F. Supp. 3d 121, 142 (D.D.C. 2018) ("Individuals who act independently and without coordination, however, cannot constitute a RICO enterprise."). Because

---

[8] Of course, the only reason that Smartmatic and Dominion are both parties to this lawsuit, which Dominion filed, is because *Lindell* asserted third-party claims against Smartmatic. *See* ECF No. 87 (Lindell's Answer, Counterclaims against Dominion, and Third-Party Complaint against Smartmatic and Hamilton).

he has not done so, Smartmatic cannot be considered part of the alleged enterprise. *See, e.g.*, *Hao Liu v. Hopkins Cty.,* 2015 WL 4978682, at *4 (D.D.C. Aug. 20, 2015), *aff'd sub nom. Hao Liu v. Hopkins Cty. Sulphur Springs, Texas*, 672 F. App'x 23 (D.C. Cir. 2016) (enterprise inadequately alleged because "[t]here are no facts to suggest that any single Defendant ever communicated in any way with any other Defendant about Plaintiff"); *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 301 (E.D.N.Y. 2017) (enterprise inadequately alleged because there are "no alleged facts that support an inference that the . . . entities were acting in any way but in their own independent interests").

Lindell's repeated assertion that Smartmatic and Dominion share an "intertwined corporate history and a shared 'DNA'" does not change the analysis. Lindell Counterclaims ¶¶ 17, 50; *see id.* ¶ 62. All that underlies this conclusory—and false—allegation are supposed facts that do not support the allegation and have no connection to the alleged purpose of the enterprise. For example, Lindell focuses on two employees who he contends formerly worked for Smartmatic and were hired by Dominion. *Id.* ¶ 62. Even if true, Lindell concedes that the employees were hired by Dominion in 2010, and he makes no allegation about how these employees played any role in the enterprise which he contends began "shortly after the 2020 Presidential Election." *Id.* ¶¶ 62, 160. Similarly absent from the counterclaims is any explanation as to how the "four additional employees" whom "public internet searches identify as" Dominion employees with "@smartmatic email addresses" played any role in coordinating between the two companies.[9] *Id.* ¶ 62. Nor does Lindell explain how a 2009 licensing agreement between Smartmatic and Dominion, or how the

---

[9] Lindell does not allege—and it is not plausible to infer—that these individuals work for *both* Smartmatic and Dominion. If Lindell means to suggest that its undisclosed "public internet searches" show that these four individuals are former employees of Smartmatic who now work for Dominion, then of course there is "nothing . . . particularly suspicious" about that. *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1213 (11th Cir. 2020).

sale of Sequoia Voting Systems by an entity called SVS Holdings (allegedly formed by Smartmatic and Sequoia's management in late 2007 or early 2008) to Dominion in June 2010, shows that the two "joined together" after the 2020 election to "suppress dissent." *Id.* ¶¶ 58–61. To be sure, Smartmatic and Dominion, which are competitors operating in similar markets, may each have interests in holding bad actors like Lindell accountable for defamation. But nothing about such a common interest renders them an enterprise for RICO purposes. Lindell must allege that the two "joined together" to further an illegal purpose, and he fails to do so.

2.    **Lindell Fails to Allege "Distinctiveness" Among Any Of the Other Members of the Alleged Enterprise**

With Smartmatic out of the picture, the remaining members of the supposed enterprise are Dominion, Dominion's law firm, Clare Locke, and Dominion's public relations firm, Hamilton. For purposes of RICO, those entities are a single "person," and thus cannot form a RICO enterprise.

As explained above, the RICO statute requires a "person" to be associated with an "enterprise." 18 U.S.C. § 1962(c). The "person" and the "enterprise" must be "distinct"; the "enterprise" cannot "simply [be] the same 'person' referred to by a different name." *Bates I,* 466 F. Supp. 2d at 80 (quoting *Cedric Kushner Promotions*, 533 U.S. at 161). Here, however, the remaining members of the alleged enterprise are just that.

As for Dominion itself, Lindell does not even try to allege that the separate Dominion entities against which he asserts his counterclaims (U.S. Dominion Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation) are distinct for RICO purposes. Dominion simply lumps them together under the defined term "Dominion" (or "Dominion Defendants"), and fails to distinguish between their conduct throughout the counterclaims. *See generally* Lindell Counterclaims. Accordingly, for purposes of Lindell's RICO counterclaim, the three Dominion

entities are a single person. *See Bates I*, 466 F. Supp. 2d at 84–85 (explaining that a Court must "look to the allegations in the complaint to determine whether" related corporate entities are "sufficiently distinct" for RICO purposes, and if a party "cannot separate one defendant's actions from another's, or even if they have simply failed to do so in their complaint, the Court surely cannot . . . conclude . . . that the defendants are distinct legal entities under Section 1962(c).").

And Dominion cannot, as a matter of law, have formed a RICO enterprise with Clare Locke or Hamilton. Clare Locke and Hamilton are Dominion's agents, and the acts that they supposedly took in furtherance of the RICO enterprise were at Dominion's direction, within the scope of that agency relationship. *See, e.g.*, Lindell Counterclaims ¶ 156 ("*At the direction of Dominion*, [Hamilton] carried out a vast and never-ending public relations campaign . . . ") (emphasis added); *id.* ("*Also at the direction of Dominion*, Clare Locke sent hundreds of cease and desist letters . . .") (emphasis added). When a corporation's agent, such as a law firm or public relations firm, is "operating with[in] the scope of its agency," it is "not distinct enough to constitute an enterprise separate from the corporate defendant for RICO purposes." *In re Ellipso, Inc.*, 2011 WL 482726, at *14 (Bankr. D.D.C. Feb. 7, 2011) (citing with approval *Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d. Cir. 1996), *reversed on other grounds*, 525 U.S. 128 (1998)); *see also Discon*, 93 F.3d at 1064 (holding that if "attorneys, accountants and other agents" were acting "on behalf of the corporation" and within "the scope of their agency," they could not create a RICO enterprise). Lindell has failed to allege anything other than a single "person" for RICO purposes, and his RICO claim fails.

## C.    Lindell Does Not Adequately Allege Any RICO Predicate Act

Because the Court can dismiss Lindell's RICO claim for either of the two reasons described above, *supra* at Sections IV.A, IV.B, it need not analyze each of the predicate crimes that Lindell claims support his RICO claim. But if the Court were inclined to consider the elements of the

predicate crimes he has alleged—extortion, witness tampering, and mail fraud—Lindell fails to adequately allege any one of them.

### 1.   Lindell Fails to Adequately Allege Extortion

The first predicate crime that Lindell relies on is extortion. *See* Lindell Counterclaims ¶ 158. The federal crime[10] of extortion is defined as "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." 18 U.S.C. § 1951(b)(2). The property that is sought to be "extorted must . . . be *transferable*—that is, capable of passing from one person to another." *Sekhar v. United States*, 570 U.S. 729, 734 (2013) (emphasis added).

Lindell's extortion predicate fails because he does not allege that Dominion obtained, or sought to obtain, transferable property. What Lindell claims Dominion sought to obtain is "silence." Lindell Counterclaims ¶ 137 (describing a "collective enterprise to extort silence"). Put differently, Lindell says that the enterprise sent letters to Lindell and others demanding that they "recant their previous statements and cease further public expression" about the use of voting machines in the 2020 presidential election. *Id.* ¶ 158. It is simply incoherent to characterize those letters (or "threats," as Lindell calls them), as attempts to obtain transferable property. The letters do not demand property of any kind.

Courts routinely dismiss extortion claims for failure to adequately allege this element. In *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 551, 560–61 (S.D.N.Y. 2014), for example, the plaintiff alleged that the defendant, who was the plaintiff's former attorney, "extorted" third-party journalists by threatening the journalists with frivolous defamation lawsuits to stop them from

---

[10] Lindell makes clear in his opposition to Smartmatic's motion to dismiss this same counterclaim that he is relying on federal Hobbs Act extortion, not some other, unspecified state crime of extortion. *See* ECF No. 104 at 20–23 (citing cases on Hobbs Act extortion).

writing unfavorable articles about the attorney. The court dismissed the extortion claim for failing to allege that the defendant sought to obtain "property." *Id.* at 561.[11] "[T]he only 'property' that the defendant plausibly could be said to have extorted from the third parties," the court explained, "was their intangible right to publish an article about him." *Id.* So too here: Lindell has not alleged any transferable property that Dominion supposedly demanded. Because "there is no 'transferable' item of value being passed," the allegations do not plausibly state a claim of extortion or attempted extortion. *Id.*; *see also Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 405 (2003) (violent threats by anti-abortion protesters intimidating women and staff from going to abortion clinics did not constitute extortion because the protesters "neither pursued nor received something of value from respondents that they could exercise, transfer, or sell" (internal quotation marks omitted)).

And the Court should reject any attempt to analogize this case to *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229 (S.D.N.Y. 2012). Not only did the alleged scheme there go far beyond what Lindell has alleged here—there, it included intimidation of judges, fabrication of evidence, false statements being made to U.S. courts, Congress, and the SEC, and the bringing of false criminal charges—the entire scheme in *Donziger* was "all for the purpose of coercing Chevron 'into *paying* [money] to stop the campaign against it.'" *Id.* at 249 (emphasis added); *compare also Calabrese v. CSC Holdings, Inc.*, 2004 WL 3186787, at *6 (E.D.N.Y. July 19, 2004) (claims that went beyond "merely alleg[ing] that Defendants instituted baseless lawsuits" stated valid extortion predicate because they "formed an association for the purpose of compelling individuals to *pay monies* to them" (emphasis added)). That difference is crucial. None of the

---

[11] The court also dismissed the extortion predicate because "[t]he plaintiff plainly [did] not have standing to bring a RICO claim on the grounds that the defendant extorted other people." *Kerik*, 64 F. Supp. 3d at 561. If Lindell's extortion claim is based on supposed threats to people other than him, the claim fails for this reason, too.

letters cited in Lindell's counterclaims seek money from Lindell of any kind; instead, they demanded that Lindell cease making defamatory statements and issue retractions. Even on Lindell's telling, the purpose of Dominion's so-called "lawfare" campaign is not to obtain money from him, but to "extort silence." Lindell Counterclaims ¶ 137; *see also id.* ¶ 145 (claiming that Dominion's alleged quantum of damages "bears no conceivable connection to any possible harm" it has suffered and reveals that the allegations in this lawsuit are "instead meant only to intimidate and silence"). To be clear, Dominion does seek significant monetary compensation in this lawsuit from Lindell—for the enormous harm that Lindell's defamatory statements have caused. But that is not extortion. It is the essence of a functioning civil legal system.

2.    **Lindell Fails to Adequately Allege Witness Tampering**

Lindell's theory of "witness tampering" is even less coherent than his theory of extortion. The federal witness tampering statute covers interference with testimony in an "official proceeding." 18 U.S.C. § 1512; *see* Lindell Counterclaims ¶ 159 (quoting 18 U.S.C. § 1512(b), (d)). An "official proceeding" is defined as, among other things, a proceeding before a U.S. court, a proceeding before Congress, or a proceeding before a federal agency. *See* 18 U.S.C. § 1515(a)(1).

Lindell does not even identify what official proceeding has allegedly been interfered with. The proceeding on which he premises his claims is a state proceeding. *See* Lindell Counterclaims ¶ 19 (alleging that unnamed individuals "cannot participate" in the Pennsylvania Senate's "forensic audit of recent elections" (citation omitted)). But the federal witness tampering statute "is limited to tampering that affects an official federal proceeding or investigation." *Shahin v. Darling*, 606 F. Supp. 2d 525, 537 (D. Del. 2009).[12] The failure to identify a qualifying official

---

[12] The Minnesota and Colorado witness tampering statutes that Lindell references in his counterclaims, *see* Lindell Counterclaims ¶ 159 (citing Minn. Stat. § 609.498 and Co. Rev. Stat. § 18-8-707), are not even actionable as RICO predicates. *See* 18 U.S.C. § 1961(1)(A) (limiting the

proceeding dooms his claim. *See, e.g.*, *United States v. Gianelli*, 585 F. Supp. 2d 186, 193 (D. Mass. 2008) (dismissing witness tampering count where it was unclear what proceeding defendant was alleged to have interfered with).

If Lindell defends his failure to identify a relevant proceeding by invoking *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996)—like he did in response to Smartmatic's motion to dismiss, *see* ECF No. 104 at 25—the Court should reject such an argument. In response to Smartmatic's motion, Lindell relies on the *Morrison* case to assert that he is not "required to plead the existence of any official proceeding or investigation." *Id*. That is a gross mischaracterization of that case. *Morrison* explained that witness tampering "does not require proof that the proceeding in question [be] pending or about to be instituted at the time of the attempted obstruction." 98 F.3d at 630. But *Morrison* did not absolve the government (or, in this case, Lindell) from identifying "the proceeding in question." There, there could have been no question about what the relevant proceeding was, as the proceeding with which the defendant allegedly interfered was *his own criminal trial*. Here, however, Lindell identifies no "official proceeding" with which the enterprise interfered, so the witness tampering predicate fails.

And even if Lindell could identify some qualifying proceeding, he has failed to allege that the supposed enterprise has "tampered" with it. To state a claim for witness tampering under the provisions that Lindell invokes, one must allege that the defendant has intimidated, threatened, corruptly persuaded, misled, or harassed a witness. *See* Lindell Counterclaims ¶ 159 (quoting 18 U.S.C. §§ 1512(b), (d)). Dominion has never engaged in such conduct, and Lindell makes no allegation to the contrary. *See, e.g.*, *E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 15 (D.D.C.

---

state crimes on which a RICO violation may be predicated to "act[s] or threat[s] involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical").

2014), *aff'd*, 629 F. App'x 1 (D.C. Cir. 2015) (dismissing witness tampering predicate because plaintiff made no allegation that defendant "killed, threatened, corruptly persuaded, intimidated, or intentionally harassed a witness"). Dominion welcomes all public testimony, made under oath, about it and the 2020 U.S Presidential Election.

### 3. **Lindell Fails to Adequately Allege Mail Fraud**

Lindell's allegation of a "mail fraud" predicate fails as well. An allegation of mail fraud "must satisfy two essential elements: (1) a scheme to defraud; and (2) use of the mails or wires for the purpose of executing the scheme." *Bates I*, 466 F. Supp. 2d at 89 (internal quotation marks and citations omitted); *see also* 18 U.S.C. §§ 1341, 1343. "It is well-settled . . . that where acts of mail . . . fraud constitute the alleged predicate racketeering activity, these acts are subject to the heightened pleading requirement of Federal Rule of Civil Procedure 9(b)." *Id.* at 88 (alterations omitted). Accordingly, Lindell must "'state the time, place and content of the false misrepresentations, the fact misrepresented, and what was retained or given up as a consequence of the fraud.'" *Id.* at 89 (quoting *United States ex rel. Williams v. Martin-Baker Aircraft Co*., 389 F.3d 1251, 1256 (D.C. Cir. 2004) (alterations omitted)).

Lindell fails to do so. To state a valid scheme to defraud, Lindell must allege that the supposed enterprise sought to procure some property from him. The Supreme Court has long explained that "the federal mail fraud statute is 'limited in scope to the protection of property rights,'" which "requires the object of the fraud to be 'property' in the victim's hands." *Cleveland v. United States*, 531 U.S. 12, 18, 26 (2000) (quoting *McNally v. United States*, 483 U.S. 350, 360 (1987)). But as explained above in the context of extortion, Lindell makes no allegation—aside from seeking damages in this very lawsuit—that the enterprise sought to obtain money or other property from him. *See supra*, at Section IV.C.1. And as also explained above, the filing of an ongoing lawsuit cannot sustain a mail fraud predicate. *See supra* at Section IV.C.3; *see also*

*Rajaratnam v. Motley Rice LLC*, 449 F. Supp. 3d 45, 69 (E.D.N.Y. 2020) (noting "the overwhelming weight of authority that bars a civil RICO claim based on the use of the mail or wire to conduct allegedly fraudulent litigation activities as predicate racketeering acts"). Lindell's mail fraud predicate therefore fails.

Lindell also does not come close to alleging the fraudulent scheme with particularity. Presumably, the mailings on which Lindell is relying for the basis of his mail fraud claim are the cease-and-desist letters that Dominion sent before this lawsuit. *See* Lindell Counterclaims ¶ 158. But nowhere in the counterclaims does Lindell assert that those letters contained a misrepresentation—let alone state, with particularity, the content of the alleged misrepresentation and the fact allegedly misrepresented. *See E. Savings Bank FSB*, 31 F. Supp. 3d at 14 (dismissing mail fraud predicate where plaintiff "ha[d] not stated, nor even implied, that the claims made in the letters . . . were untrue or how those letters meet the standard for mail fraud). The Court can dismiss the mail fraud predicate for this independent reason as well.

## V.    LINDELL FAILS TO ADEQUATELY ALLEGE A VIOLATION OF THE SUPPORT OR ADVOCACY CLAUSE

### A.    Lindell Does Not Allege That Anyone Was Prevented From Supporting or Advocating for the Election of a Candidate

Lindell's next claim is for violating the Support or Advocacy Clause of 42 U.S.C. § 1985(3). He claims that Dominion, Smartmatic, and Hamilton collectively violated that clause by "silencing speech, dissent, and opposition to the use of electronic voting machines in the 2020 Presidential Election. . . ." Lindell Counterclaims ¶ 166. The claim fails, however, because Lindell does not allege conduct within the Support or Advocacy Clause's scope.

In full, the Support or Advocacy Clause provides:

**[I]f two or more persons conspire to prevent** by force, intimidation, or threat, **any citizen** who is lawfully entitled to vote, **from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for**

27

**President or Vice President, or as a Member of Congress of the United States**; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3) (emphasis added). In other words, the statute applies to conspiracies that "prevent" citizens from "giving [their] support or advocacy in a legal manner, toward or in favor of the *election* of any lawfully qualified person as an elector for President or Vice President." *Id.* (emphasis added). And that focus on elections makes sense. The Support or Advocacy Clause was enacted as part of the Civil Rights Act of 1871—also known as the Ku Klux Klan Act—to combat the Klan's use of organized violence to prevent African Americans and their white Republican allies from gaining political power. *See* Richard Primus & Cameron O. Kistler, *The Support-Or-Advocacy Clauses*, 89 Fordham L. Rev. 145, 151–52 (2020); *see also Kush v. Rutledge*, 460 U.S. 719, 724 (1983) (noting that the Support or Advocacy Clause "proscribe[s] conspiracies that interfere with . . . the right to support candidates in federal elections").

Lindell's counterclaims, however, make no allegation that any member of the supposed conspiracy interfered, or tried to interfere with, his (or anyone else's) ability to support a candidate in the 2020 U.S. Presidential Election. Indeed, such a claim would be nonsensical, as the conduct on which the counterclaims are based took place *after* the election. Lindell makes this point clear in the opening paragraphs of his counterclaims. In summarizing his claims, he alleges that Dominion threatened him "[i]n response to [his] public statements about the evidence he gathered"—public statements he made "*[f]ollowing the 2020 General Election.*" Lindell Counterclaims ¶¶ 8–9. He also acknowledges that Dominion hired Hamilton—which supposedly "devised [the] plan to weaponize the legal process"—"*after the 2020 General Election.*" *Id.* ¶ 10.

28

The earliest cease-and-desist letter he cites in his counterclaims is dated December 23, 2020—more than six weeks after the election was complete and after "various news outlets [had] declared Joe Biden the winner." *See* Ex. 1; ECF No. 54 at 3. And the media statements that Lindell relies on are from January 2021 and later. *See, e.g.*, Lindell Counterclaims at nn. 21–22 (articles dated January 18, 2021 and February 7, 2021).

And it is unsurprising that Lindell does not rely on any conduct that occurred in the lead-up to or during the 2020 election. The entire premise of his baseless counterclaims is that Dominion, Smartmatic, and Hamilton conspired to stop him from speaking out about the way the 2020 election was conducted. In other words, the alleged conduct about which Lindell spoke out, which led to the supposed "lawfare" campaign, *had not even occurred at the time votes were cast for the 2020 election*. Lindell's Support or Advocacy claim is logically incompatible with the entire theory of his counterclaims. As such, his claim should be dismissed. *See, e.g.*, *Gill v. Farm Bureau Life Ins. Co.*, 906 F.2d 1265, 1270 (8th Cir. 1990) (dismissing Support or Advocacy Clause claim where insurance company terminated relationship with agent due to agent's support of Congressional candidate because agent failed to allege that the company's actions "deterred [him] from voting by any 'force, intimidation, or threat'").

### B.      Lindell Fails to Allege the Existence of a Conspiracy

Lindell's Support or Advocacy Clause claim also fails because he does not adequately allege the existence of a conspiracy.

A Support or Advocacy Clause claim requires an allegation of a conspiracy. *See* 42 U.S.C. § 1985(3) ("[I]f two or more persons *conspire to* prevent by force . . . .") (emphasis added). "The elements of civil conspiracy are '(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and

in furtherance of the common scheme.'" *Burnett v. Sharma*, 511 F. Supp. 2d 136, 143 (D.D.C.

2007). "[T]he essence of a conspiracy" is "an actual *agreement* amongst the defendants." *Barber*

*v. District of Columbia*, 394 F. Supp. 3d 49, 66 (D.D.C. 2019) (emphasis in original). And Lindell

must offer "more than just conclusory allegations of an agreement," *McManus v. District of*

*Columbi*a, 530 F. Supp. 2d 46, 74 (D.D.C. 2019), or claims that the alleged co-conspirators

engaged in "parallel conduct." *Kurd v. Republic of Turk.*, 374 F. Supp. 3d 37, 52 (D.D.C. 2019).

Instead, he must allege the existence of some events, conversations, or documents indicating that

there was an "agreement" or a "meeting of the minds" among the alleged co-conspirators. *See*

*Burnett*, 511 F. Supp. 2d at 143.

Lindell does nothing of the sort. As discussed above, the only connections alleged between

Dominion and Smartmatic are minor, obsolete, and irrelevant to an alleged conspiracy to inhibit

citizens from supporting or advocating for candidates in the 2020 presidential election. *See supra*,

at Section V.A. The counterclaims point to nothing—no event, no conversation, no document—

suggesting that Dominion and Smartmatic reached any sort of "agreement." At most, Lindell

alleges that the two competitors engaged in parallel conduct—and then slaps on the "agreement"

label. That is not enough. *See Kurd*, 374 F. Supp. 3d at 52 (dismissing § 1985(3) conspiracy claim

where "[p]laintiffs merely pled 'parallel conduct that could just as well be independent action'"

(quoting *Twombly*, 550 U.S. at 557)).

And as for the remaining alleged co-conspirators—Dominion, Hamilton, and Clare

Locke—any allegation of a conspiracy must fail. Again, Lindell does not attempt to disaggregate

the three separate Dominion entities or suggest that they independently entered into a conspiracy.

Thus, they must be treated as a single entity for purposes of his claims. *See Bates*, 466 F. Supp. 2d

at 85 ("[I]f the plaintiffs cannot separate one defendant's actions from another's, or even if they

30

have simply failed to do so in their complaint, the Court surely cannot be expected to conclude from the complaint as pled that the defendants are distinct legal entities."). Moreover, under the intracorporate conspiracy doctrine, which recognizes that "a corporation and its agents constitute a single legal entity that cannot conspire with itself," US Dominion, Inc. is legally incapable of conspiring with its two subsidiaries, Dominion Voting Systems, Inc. and Dominion Voting Systems Corporation. *Mehari v. District of Columbia*, 268 F. Supp. 3d 73, 80 (D.D.C. 2017) ("[D]istrict courts in this Circuit have consistently applied the intracorporate conspiracy doctrine to Section 1985 conspiracy claims."); *see also Moody v. InTown Suites*, 2006 WL 8431638, at *76 (N.D. Ga. Feb. 1, 2006) (parent and subsidiaries could not legally conspire under § 1985(3)); *Dickerson v. Alachua Cty. Comm'n*, 200 F.3d 761, 767 (11th Cir. 2000) ("The reasoning behind the intracorporate conspiracy doctrine is that it is not possible for a single legal entity consisting of the corporation and its agents to conspire with itself, just as it is not possible for an individual person to conspire with himself."). And Clare Locke and Hamilton—as Dominion's agents, acting within the scope of their agency relationships—cannot have conspired with Dominion either. *See In re Ellipso, Inc.,* 2011 WL 482726, at *22 (Bankr. D.D.C. Feb. 7, 2011) ("[U]nder the intracorporate conspiracy doctrine, Ellipso could not be found to having conspired with its attorneys." (collecting cases)).

## VI.   LINDELL'S AND MYPILLOW'S SECTION 1983 CLAIMS FAIL

Both Lindell and MyPillow assert various claims under 42 U.S.C. § 1983, which provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." Both Lindell and MyPillow bring First

Amendment claims, Equal Protection claims, and Substantive Due Process Claims. *See* Lindell Counterclaims ¶¶ 169–179; MyPillow Counterclaims ¶¶ 145–151, 158–166. All of the claims fail.

## A.     All of the Section 1983 Claims Fail Because Neither Lindell Nor MyPillow Has Plausibly Alleged State Action

First, they fail because neither Lindell nor MyPillow plausibly alleges state action. In arguing for state action, Lindell and MyPillow focus on Dominion's role in elections, but that election-related conduct is irrelevant to the analysis because it is not the conduct on which their claims are based. Instead, their claims are based on the so-called "lawfare" campaign, which cannot possibly be attributed to any state actor. In any event, Dominion is not a state actor even with respect to its limited role in elections. Dominion is an ordinary government contractor— supplying goods and services to the officials who administer the elections—and no allegation in the counterclaims suggests otherwise.

### 1.     Lindell's and MyPillow's Claims Are Based on Purely Private Conduct

"'[T]o state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law.'" *Bates v. Nw. Hum. Servs., Inc.* ("*Bates II*"), 583 F. Supp. 2d 138, 143–144 (D.D.C. 2008) (quoting *West v. Atkins*, 487 U.S. 42, 47 (1988)). The requirement that a person "act under color of State . . . law 'has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment.'" *Id.* at 144 (quoting *Rendell–Baker v. Kohn*, 457 U.S. 830, 842 (1982)). This means that "'the deprivation alleged . . . must be caused by the exercise of some right or privilege created by the State or by a person for whom the State is responsible, and the party charged with the deprivation must be a person who may fairly be said to be a state actor.'" *Id.* (quoting *West*, 487 U.S. at 49) (alterations omitted)).

When conducting the state action analysis, "courts must begin by identifying the specific conduct of which the plaintiff complains." *Id.* This is "because the defendant must not merely be a state actor in some general capacity, but rather must be a state actor when performing the specific acts alleged in the complaint." *Id.* at 145. In other words, there is no such thing as a "transitive theory of state action," by which a private party's status as a state actor as to some conduct renders that party a state actor for other conduct—even if the two sets of conduct are related. *Id.* Rather, state action may be found "if, though only if, there is such a close nexus between the State and *the challenged action* that seemingly private behavior may be fairly treated as that of the state itself." *Brentwood Acad. v. Tenn. Sec. Sch. Athl. Ass'n*, 531 U.S. 288, 295 (2001) (emphasis added and internal quotation marks omitted); *see also Fox v. Int'l Conf. of Funeral Serv. Examining Boards*, 242 F. Supp. 3d 272, 281 (S.D.N.Y. 2017) ("To establish that a private actor's conduct is to be deemed state action, a § 1983 plaintiff must demonstrate that the state was involved in the specific activity giving rise to his or her cause of action.").

Here, the "specific conduct of which [Lindell and MyPillow] complain[]" has nothing to do with any State. Rather, the conduct underlying the constitutional claims (and all of the counterclaims, for that matter) is entirely attributable to private activity. Both Lindell and MyPillow make clear that the basis for their claims is the so-called "lawfare" campaign they allegedly conducted—*i.e.*, sending cease-and-desist letters, filing lawsuits, and discussing those lawsuits in the media. *See, e.g.*, Lindell Counterclaims ¶ 173 (alleging that Dominion has "attempted . . . to suppress Lindell's freedom of speech" through "use of the courts and the litigation process"); *id.* ¶ 179 (alleging that Dominion "engaged in First Amendment retaliation by sending hundreds of cease and desist letters, filing lawsuits, threatening to sue, and/or waging Lawfare against Lindell"); MyPillow Counterclaims ¶ 127 (alleging that "[i]n response to Lindell's

exercise of his First Amendment free speech rights, Dominion launched its 'lawfare' campaign against both Lindell and MyPillow."); ¶ 148 (asserting that "[Dominion's] illegal campaign to punish and silence their critics violates the guarantee of free speech and expression provided by the First Amendment and, as applied against state and local government entities, the Fourteenth Amendment."). But neither Lindell nor MyPillow allege that any state actor had any involvement with the actions comprising that so-called "campaign," nor do they argue that those actions somehow constitute an exclusive government function. Instead, each expressly concedes that the so-called "lawfare" campaign was conducted by private actors. *See, e.g.*, Lindell Counterclaims ¶ 140 ("Lindell brings this lawsuit to put an end to *Dominion's and Smartmatic's* campaign of 'Lawfare. . . .'" (emphasis added)); MyPillow Counterclaims ¶ 17 ("*Dominion* has engaged in . . . a practice that has become known as 'lawfare.' (emphasis added)).

In arguing for state action, both Lindell and MyPillow focus on Dominion's role in elections. And they invoke a smattering of theories as to how that conduct renders Dominion a state actor. Lindell, for example, invokes the "exclusive public function" line of cases, arguing that Dominion's is a state actor "by virtue of [its] role running elections in the United States." Lindell Counterclaims ¶ 6; *see also Manhattan Cmty. Access Corp. v. Halleck*, 139 S.Ct. 1921, 1929 (2019) ("[T]o qualify as a traditional, exclusive public function within the meaning of our state-action precedents, the government must have traditionally *and* exclusively performed the function." (emphasis in original)). MyPillow also invokes the exclusive public function theory, *see* MyPillow Counterclaims ¶ 66, and separately appears to invoke a "joint action" theory, based on Dominion's alleged "provi[sion] on behalf of the state core governmental services and function" in jurisdictions that "use Dominion election equipment," *id.* ¶ 65; *see also Hoai v. Vo*, 935 F.2d

34

308, 313 (D.C. Cir. 1991) ("[T]he 'joint activity' theory of section 1983 liability continues to require, at a minimum, some overt and significant state participation in the challenged action.").

But those allegations are irrelevant for these counterclaims. As explained above, the "specific conduct" about which Lindell and MyPillow complain is *not* election-related conduct. Rather, their claims are based on Dominion's implementation of the so-called "lawfare" campaign, which is purely private activity.

*Nader v. McAuliffe*, 593 F. Supp. 2d 95 (D.D.C. 2009) is instructive. There, political candidates and their supporters asserted Section 1983 claims against private organizations, including the Democratic National Committee, alleging that those organizations' filing of ballot access challenges in the 2004 presidential election constituted a public function because the defendants had "exercised power over the electoral process." *Id.* at 101 (alterations omitted). But, focusing on the specific conduct underlying the plaintiffs' claims, the court dismissed the claims for lack of state action. *Id.* at 103–04. As for the conduct underlying the claims—the filing of ballot access challenges—the plaintiffs had made no allegations plausibly suggesting that conduct was a function "exclusively reserved to the States." *Id.* at 102. And though the plaintiffs had "ma[d]e much of the fact that the act of conducting and regulating an election has been held to be an exclusively public function," that authority was "not on point" because that conduct was not the conduct on which the plaintiffs' claims were based. *Id.* at 102 n.5. So too here. The counterclaims are not based on Dominion's role in elections, so the "exclusive public function" and "joint action" cases Lindell and MyPillow invoke are irrelevant.

And it is no answer to say that the conduct on which the claims are based—Dominion's sending of cease-and-desist letters, and the like—is causally related to Dominion's role in elections. Lindell and MyPillow cannot bootstrap what would otherwise be private conduct into

state action, as such arguments would flout "the instructions of the Supreme Court and the District of Columbia Circuit that the determination of whether an act is fairly attributable to the state should be based upon 'the challenged action,' . . . and the 'specific conduct of which the plaintiff complains, . . . rather than the defendant's general status." *Bates II*, 583 F. Supp. 2d at 145–46 (quoting *Brentwood*, 531 U.S. at 295, and *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 51 (1999)).

In *Bates II*, for example, the plaintiffs brought Section 1983 claims against private entities that had been certified by the District of Columbia's Department of Mental Health ("DMH") to provide mental health rehabilitation services to D.C. residents. Though the defendants were nominally private entities, they provided services through the DMH as its agents; there was no dispute that, acting in that capacity, the providers were state actors. *Id.* at 140–41. The court rejected plaintiffs' theory of state action, however, because the conduct on which the plaintiffs' claims were based was not conduct that the defendants undertook in their role as DMH-certified providers. Instead, the plaintiffs' claims were based on conduct that defendants undertook in their role as Social Security Administration-appointed "representative payees," receiving (and allegedly misusing) benefit payments on their behalf. *Id.* at 145–46. It did not matter, in the court's view, that defendants were certified to serve as "representative payees" only because they had been certified by the DMH as mental health-services providers—a certification that rendered them state actors for purposes of that role. *Id.* The plaintiffs' theory of state action was a "transitive theory of state action" that failed to focus on "the challenged action." *Id.* And nothing about "the challenged action" was attributable to any State.

Even closer to the facts here is *George v. Pacific-CSC Work Furlough*, 91 F.3d 1227 (9th Cir. 1996). In that case, a former employee of a private prison brought a Section 1983 action

against the facility, arguing that it had violated his First Amendment rights by terminating him in retaliation for his voicing of concerns about the facility's safety and security. *Id.* at 1229. The facility conceded that incarceration was a traditionally exclusive public function, but the court still affirmed the dismissal of the plaintiff's claims for lack of state action. *Id.* at 1230. It explained that "[a]n entity may be a state actor for some purposes but not for others," and that the role in which the facility took the challenged action—acting as an employer, terminating the plaintiff—was not state action. *Id.* It made no difference that the topics about which the plaintiff spoke out, and for which he was allegedly retaliated against, related to the concededly traditional, exclusive public function of incarceration. *Id.* at 1231–32. The court required that there be a *direct* relationship between the challenged action and the government function. *See id.* at 1232 (rejecting plaintiff's reliance on *West v. Atkins*, 487 U.S. 42 (1988), because his "termination relate[d] only indirectly to [the facility's] obligations pursuant to its government function"). Because there was no such relationship—just as no such relationship has been alleged here—Lindell and MyPillow have failed to allege state action.

2. **Dominion's Role in Providing Voting Equipment, Support Services, and Software Licenses To State and Local Governments Does Not Render It A State Actor**

Even if Lindell and MyPillow's claims were based on Dominion's role in providing voting equipment, support services, and software licenses to state and local government—which they are not—their counterclaims would still fail to adequately allege state action.

Lindell and MyPillow repeatedly and falsely incant that Dominion "runs elections," invoking a series of decisions known as the White Primary Cases, in which the Supreme Court struck down a measures by nominally private political organizations to exclude minority voters from their nomination processes. *See, e.g.*, Lindell Counterclaims ¶¶ 6–7, 20, 48–49, 63; MyPillow at 46; *see also* Lindell Opp'n to Smartmatic Motion to Dismiss at 11–12 (citing, *inter alia*, *Terry*

37

*v. Adams*, 345 U.S. 461 (1953); *Smith v. Allwright*, 321 U.S. 649 (1944); *Nixon v. Condon*, 286 U.S. 73 (1932)). Dominion does not run elections, and neither party offers any non-conclusory assertions supporting that false characterization. Rather, the counterclaims make clear that Dominion is an ordinary private contractor, supplying election systems and related support services to state and local governments, which remain in charge of the electoral processes.

For example, both Lindell and MyPillow rely on a contract between Dominion and Georgia to support their claim that Dominion "runs elections." Lindell Counterclaims ¶ 46; MyPillow Counterclaims ¶¶ 51–53. But even a cursory examination of that contract makes clear that Georgia, not Dominion, was in charge of "running the election." On the cover page, the contract identifies Dominion as the "Contractor." Ex. 5 at 1. The contract further states that Georgia selected Dominion as its contractor because the services Dominion offered were "capable of enabling *State* [*i.e.,* Georgia] and all other State Entities to accurately and securely administer elections throughout the State of Georgia." *Id.* § 1.2. And the contract provides that Dominion is an "independent contractor," and that "nothing in [the] Agreement shall be construed to create a partnership, joint venture, or agency relationship between the parties." *Id.* § 17.15. Similarly, though Lindell and MyPillow assert that Dominion exercises "total" or "exclusive" control over elections in San Francisco, *see* Lindell Counterclaims ¶ 48, MyPillow Counterclaims ¶¶ 61–63, the article that both parties rely on for this assertion states, unsurprisingly, that San Francisco's Elections Director "oversee[s]" the city's elections. Ex. 6 at 5.

In short, there is nothing in either party's counterclaims to suggest that Dominion acts as anything but an ordinary government contractor, providing election equipment, software licenses, and support services to local and state governments under those contracts. As the Supreme Court recently explained, it "is not the law" that "government contracts . . . transform a private entity

into a state actor." *Halleck*, 139 S.Ct. at 1932. Were it otherwise, "a large swath of private entities in America would suddenly be turned into state actors and be subject to a variety of constitutional constraints on their activities." *Id.* And the fact that Dominion's government contracts relate to elections, specifically, makes no difference. Dominion is aware of no case holding that a private company's provision of voting systems and services to state or local governments renders it a state actor. Nor do the White Primary Cases suggest otherwise. Those cases concerned whether the acts of political parties or related organizations to exclude minority voters from the parties' nomination processes qualified as state acts. Even on their broadest reading, the White Primary Cases suggest that such private election-related acts may qualify as state action only where the actor has exercised "the power to determine part of the field of candidates from which the voters must choose." *LaRouche v. Fowler*, 152 F.3d 974, 991 (D.C. Cir. 1998); *see also Johnson v. F.C.C.*, 829 F.2d 157, 165 (D.C. Cir. 1987) (explaining that *Terry v. Adams*, 345 U.S. 461 (1953) was "concerned with banishment of candidates and voters from the political arena"). It is beyond implausible to suggest that, by supplying election systems and related support services to state and local governments, Dominion somehow affected the field of candidates from which voters could choose in the 2020 U.S. Presidential Election.

> **B.     Lindell and MyPillow Fail to State Valid Constitutional Claims On the Merits**

Even if the Court determined that either Lindell or MyPillow adequately alleged state action, their § 1983 claims still fail on the merits.

> **1.     Lindell and MyPillow Fail to Allege First Amendment Retaliation Claims**

The primary constitutional claim that Lindell and MyPillow advance is a First Amendment retaliation claim. Such a claim requires that they allege that they "engaged in [First Amendment] protected conduct, (2) that the government took some retaliatory action sufficient to deter a person

of ordinary firmness in plaintiff's position from speaking again; and (3) that there exists a causal link between the exercise of a constitutional right and the adverse action." *Doe v. D.C.*, 796 F.3d 96, 106 (D.C. Cir. 2015) (internal quotation marks omitted). Lindell and MyPillow claim that, in response to expressing their views about theoretical vulnerabilities in Dominion's voting equipment, Dominion retaliated against them by filing this lawsuit and engaging in the supposed "lawfare" campaign described above. *See* Lindell Counterclaims (Count 6) ¶ 179 (alleging that Dominion engaged in First Amendment retaliation by "waging Lawfare against Lindell for his constitutionally protected speech concerning election integrity and security"); MyPillow Counterclaims (Count 1) ¶ 148 (alleging that Dominion engaged in an "illegal campaign to punish" its critics); *id.* (Count 2) ¶ 155 (alleging that Dominion engaged in "reprisal actions" that "were motivated . . . by . . . MyPillow's exercise of free speech rights under the First Amendment").

This claim fails, however, because—as the Court has already explained—Dominion's claims are not and cannot be based on any First Amendment protected activity. In moving to dismiss Dominion's claims, MyPillow argued that it was entitled to dismissal of this entire suit— and of Dominion's defamation claim in particular—because the First Amendment granted it some sort of "blanket immunity" for the statements on which this suit is premised. ECF No. 54 at 15 n. 8; *see also* MyPillow Brief (ECF No. 30-1) at 1–2, 10 (arguing that the suit should be dismissed under the First Amendment because it is "part of a broader campaign" of "lawfare" by which Dominion seeks to "destroy those who do not fall in line and to threaten those who consider speaking their mind"). But the Court easily disposed of this argument because the governing law *already bakes in* First Amendment protections. As the Court explained, the First Amendment "safeguards our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open,' by limiting defamation claims to provably false statements

made with actual malice." ECF No. 54 at 15–16 n.8 (internal citation omitted). In other words, the Court held, the only speech on which Dominion could prevail is speech that is *not* entitled to First Amendment protection—*i.e.*, provably false statements made with actual malice. This suit cannot retaliate against Lindell or MyPillow because it cannot be based on any First Amendment-protected speech.

And if the suit itself cannot violate the First Amendment, then the other components of the so-called "lawfare" campaign—the sending of cease-and-desist letters, and Dominion's discussion of this suit in the media—does not give rise to a First Amendment violation either. It is implausible to suggest that those acts could cause First Amendment harm independent of the lawsuit. Indeed, as for the cease-and-desist letters, many states, including Minnesota, statutorily require some form of notice of the alleged defamation and a demand for a correction or retraction, either as a pre-requisite to bringing suit or as an incentive to demand a retraction. *See, e.g.*, Minn. Stat. Ann. § 548.06 (limiting a plaintiff's damages in a libel action against a newspaper unless a retraction is demanded and refused); *see also* Rodney Smolla, Law of Defamation, §§ 9:70 – 9:74 (2021 update edition) (explaining that prelitigation defamation retraction, correction, and notice statutes exist in at least 33 states). If the suit itself cannot give rise to a First Amendment violation, then a party cannot be liable for a First Amendment violation by taking steps that it is legally required to take in advance of the suit either.

### 2. Lindell Fails to Allege an Equal Protection Claim

Next, Lindell (though not MyPillow) asserts an Equal Protection Claim. The theory of this claim is that Dominion engaged in unequal treatment as between "conservatives" and "liberals." In particular, he contends that Dominion favored "left-leaning" individuals over those with a "conservative political viewpoint," like himself, by failing to sue (or threaten to sue) liberals who had "publicized the role of Dominion voting machines in election fraud." Lindell Counterclaims

41

¶ 173; *see also id.* ¶¶ 88–91, 100, 105 (alleging that Dominion failed to sue or threaten to sue the *New York Times*, Senator Elizabeth Warren, Senator Amy Klobuchar, Senator Ron Wyden, NBC News, and the Brennan Center for Justice).

This claim fails spectacularly. The Equal Protection Clause requires only that "similarly situated persons must be treated alike." *Frederick Douglass Found., Inc. v. D.C.*, 531 F. Supp. 3d 316, 339 (D.D.C. 2021) (citing *Women Prisoners of D.C. Dep't of Corr. v. District of Columbia*, 93 F.3d 910, 924 (D.C. Cir. 1996)). "Dissimilar treatment of dissimilarly situated persons, on the other hand, does not violate equal protection." *Id.* (internal quotation marks and citation omitted). "The threshold inquiry in evaluating an equal protection claim is, therefore, to determine whether a person is similarly situated to those persons who allegedly received favorable treatment." *Id.* (internal quotation marks and citation omitted).

Lindell does not come close to identifying a similarly situated "left-leaning" person that Dominion should have sued or threatened to sue. As the Court is well aware, Dominion's suit against Lindell is based on dozens of provably false statements that he made with actual malice. In its opinion on Lindell's motion to dismiss, the Court summarized just some of those "inherently improbable" statements:

- [T]hat Dominion committed the "biggest crime ever committed in election history against our country and the world" and stole the 2020 election by using an algorithm to flip and weight votes in its machines;
- [T]hat Trump received so many votes that that algorithm broke on election night; that Dominion's voting machines were "built to cheat" and "steal elections";
- [T]hat a fake spreadsheet with fake IP and MAC addresses was "a cyber footprint from inside the machines" proving that they were hacked; and
- [T]hat Dominion's plot was kept under wraps because the government had not really investigated claims of election fraud (due to then-Attorney General Bill Barr becoming "corrupt" and having been "compromised").

42

ECF No. 54 at 24–25. Dominion further alleged, the Court went on, that Lindell had "rel[ied] on obviously problematic sources to support a preconceived narrative he had crafted for his own profit"; that "the evidence on which Lindell did rely contains glaring discrepancies rendering it wholly unreliable;" and that Lindell had "failed to acknowledge the validity of countervailing evidence." *Id.* at 25–26.

Lindell alleges nothing of the sort with respect to the supposed comparators. The statement attributed to Senator Warren, for example, discusses the amount of information that is publicly available about Dominion's operations. *See* Lindell Counterclaims ¶ 89. The statements attributed to Senator Klobuchar, Senator Wyden, and to the *New York Times do not even mention Dominion at all.[13] See id*. ¶¶ 88, 90, 91. And none of the statements even discuss the 2020 U.S. Presidential Election election, let alone allege that Dominion "stole" it by using an algorithm to "flip" votes and then covered up its scheme. In short, the comparators' statements to which Lindell points do not remotely resemble the statements on which Dominion's claims are based. His Equal Protection claim boils down to a complaint about "[d]issimilar treatment of dissimilarly situated persons." It therefore fails.

3. **Lindell and MyPillow Fail to Adequately Allege Viewpoint Discrimination Claims**

Lindell and MyPillow also assert what appears to be viewpoint discrimination First Amendment claims. A claim for viewpoint discrimination is, in essence, a claim that the

---

[13] Lindell "quotes" the New York Times article as stating: "Much of the trouble that plunged Georgia's voting system into chaos Tuesday was specific to the state, stemming from the rollout of new [Dominion] voting machines and an electronic voter check-in system." Lindell Counterclaims ¶ 88 (brackets in original). The reference to "Dominion" is Lindell's addition; the article itself does not mention Dominion by name once. See Ex. 7. Yet even with Lindell's addition, the article does not make any of the same false statements about Dominion that Dominion has sued Lindell for making.

government has "denie[d] access to a speaker solely to suppress the point of view [the speaker] espouses on an otherwise includible subject." *Cornelius v. NAACP*, 473 U.S. 788, 806 (1985).

It is unclear whether the viewpoint discrimination claims are distinct from the retaliation or equal protection claims discussed above. Lindell, for example, blends viewpoint discrimination and equal protection concepts, asserting that Dominion "engage[d] in viewpoint-discrimination" by "disfavor[ing] the conservative political viewpoint of Plaintiff Lindell over those of left-leaning or Democrat-supporting individuals. . . ." Lindell Counterclaims ¶ 173. MyPillow's counterclaims contain similar language. *See, e.g.*, MyPillow Counterclaims ¶ 150 (alleging that Dominion sought to deter MyPillow from "expressing in the future any idea or opinion disliked" by Dominion); *id.* ¶ 154 (alleging that Lindell "publicly expressed opinions that [Dominion] wrongfully sought to suppress"). But if either or both is asserting a standalone viewpoint discrimination claim, that claim would fail.

First, the claim would fail because neither Lindell nor MyPillow can plausibly allege that the First Amendment protects the speech in question. The first step of a viewpoint discrimination analysis is "determining whether the First Amendment protects the speech at issue." *Frederick Douglass Found.*, at 531 F. Supp. 3d at 329 (internal quotation marks omitted). As discussed above, the Court has already made clear that Dominion's claims cannot be premised—and are not premised—on any First Amendment-protected speech. *See supra*, at Section VI.B.1. The viewpoint discrimination claim thus fails at the first step.

Though there is no need to proceed to the second step, that step lays bare that the viewpoint discrimination claims are simply incoherent. At the second step of the viewpoint discrimination analysis, a court analyzes the "forum" in which the speech regulation has been applied; regulations of speech in "public" fora are subject to a stricter standard than regulations in "nonpublic" fora.

*See Frederick Douglass Found.,* at 531 F. Supp. 3d at 329. But Lindell and MyPillow make only generalized references to "public debate"; neither of them identifies any forum in which Dominion purportedly regulated speech. That is because the claims they assert are fundamentally not viewpoint discrimination claims. A claim for viewpoint discrimination is a claim that a speaker has been "denie[d] access" to some forum. Dominion has not denied anyone access to any forum.

        4.      **Lindell and MyPillow Fail to Adequately Allege Substantive Due Process Claims**

The final constitutional claim that Lindell and MyPillow allege is a substantive due process claim. *See* Lindell Counterclaims ¶ 174; MyPillow Counterclaims ¶¶ 162–164. This claim fails on the merits as well.

"In determining whether a plaintiff states a substantive due process claim, the United States Supreme Court has 'always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended.'" *Est. of Phillips v. D.C.*, 455 F.3d 397, 403 (D.C. Cir. 2006) (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992)). "It is therefore important . . . to focus on the allegations in the complaint to determine how petitioner describes the constitutional right at stake and what the [government] allegedly did to deprive [the plaintiff] . . . of that right." *Id.* (internal quotation marks omitted). "To constitute a substantive due process violation, the defendant official's behavior must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* (internal quotation marks omitted). "[T]he conscience-shock inquiry is a threshold question." *Id.* (internal quotation marks omitted).

It is simply not plausible that the acts of: (1) filing this lawsuit; (2) sending cease-and-desist letters in anticipation of this lawsuit; and (3) discussing this lawsuit in the media shock the contemporary conscience. Courts reject substantive due process claims based on the filing of

frivolous lawsuits. *See, e.g.*, *Viehweg v. City of Mount Olive*, 559 F. App'x 550, 553 (7th Cir. 2014) (frivolous lawsuit did not shock the conscience because the defendant "had available to him—as part of that very litigation—remedies to protect him from a vexatious suit"). If frivolous lawsuits do not shock the conscience, then an ongoing suit that has already survived a motion to dismiss (and related conduct) does not either. The only thing conscience-shocking about this lawsuit are Lindell's and MyPillow's egregious lies about Dominion.

## VII.   MYPILLOW FAILS TO ALLEGE TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Next, MyPillow alleges tortious interference with prospective economic advantage.

### A.   Minnesota Law Governs the Claim for Tortious Interference With Prospective Economic Advantage

On this claim, the Court should conduct a choice-of-law analysis. That is because the elements of this tort differ between potentially the relevant jurisdictions (the District of Columbia, Colorado, and Minnesota). In the District of Columbia, the tort has four elements.[14] In Colorado, it has three.[15] And in Minnesota, it has five.[16]

---

[14] *See Nyambal v. Alliedbarton Sec. Servs., LLC*, 153 F. Supp. 3d 309, 315 (D.D.C. 2016) ("(1) the existence of a valid business relationship or expectancy, (2) knowledge of the relationship or expectancy on the part of the interferer, (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy, and (4) resultant damage).

[15] *See Nobody in Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.*, 311 F. Supp. 2d 1048, 1118 (D. Colo. 2004) ("(1) improper conduct with (2) the intention to induce or cause a third party not to enter into or continue business relations with the plaintiff, and (3) defendant actually induced or caused such result").

[16] *See Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014) ("1) The existence of a reasonable expectation of economic advantage; 2) Defendant's knowledge of that expectation of economic advantage; 3) That defendant intentionally interfered with plaintiff's plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation; 4) That in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and 5) That plaintiff sustained damages.")

46

The choice-of-law analysis is simple, however, and it requires application of Minnesota law. To arrive at the appropriate source of law, the Court should conduct a "governmental interest analysis," the goal of which is to "determine the jurisdiction with 'the most significant relationship' to the issue in dispute." *Mattiaccio v. DHA Grp.*, 20 F. Supp. 3d 220, 228 (D.D.C. 2014). "Generally, for tort claims the jurisdiction in which the injury occurred has the most significant relationship." *Id.* (citing Restatement (Second) of Conflict of Laws § 156 cmt. b (1971)). And for tortious interference claims in particular, courts understand the alleged injury to have occurred in the jurisdiction where the plaintiff (or, here, the counter-plaintiff) resides. *See, e.g.*, *Mobile Satellite Commc'ns, Inc. v. Intelsat USA Sales Corp.*, 646 F. Supp. 2d 124, 131, 135 (D.D.C. 2009); *Shenandoah Assocs. Ltd. P'ship v. Tirana*, 182 F. Supp. 2d 14, 18–19, 21–22 (D.D.C. 2001). MyPillow is a Minnesota corporation with its principal place of business in Minnesota. MyPillow Counterclaims ¶ 1. Minnesota law therefore applies.

### B.     The Tortious Interference With Prospective Economic Advantage Claim Fails

Under Minnesota law, MyPillow's interference claim fails. Again, the elements of a claim for tortious interference with prospective economic advantage are:

> 1) The existence of a reasonable expectation of economic advantage;
>
> 2) Defendant's knowledge of that expectation of economic advantage;
>
> 3) That defendant intentionally interfered with plaintiff's reasonable expectation of economic advantage, and the intentional interference is either independently tortious or in violation of a state or federal statute or regulation;
>
> 4) That in the absence of the wrongful act of defendant, it is reasonably probable that plaintiff would have realized his economic advantage or benefit; and
>
> 5) That plaintiff sustained damages.

!

*Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014). MyPillow fails to allege at least three elements of this claim.[17]

*First*, MyPillow's claim fails because Dominion's alleged interference is not "either independently tortious or in violation of a state or federal statute or regulation." *Id.* The conduct underlying MyPillow's tortious interference claim is the same as the conduct underlying the rest of MyPillow's claims. That is, MyPillow alleges that Dominion interfered with its expectation of economic advantage by "fil[ing] . . . [a] lawsuit against MyPillow," by making "false statements about MyPillow" in public (though it does not identify those allegedly false statements), and by "threaten[ing] to bring additional similar lawsuits against others." MyPillow Counterclaims ¶ 169. But, for the reasons explained above, none of that conduct is independently tortious or violative of a state or federal statute. Courts applying Minnesota law routinely dismiss claims for interference with prospective economic advantage where the underlying conduct is not independently illegal. *See, e.g.*, *Engelhardt v. Qwest Corp.*, 918 F.3d 974, 982 (8th Cir. 2019) (affirming dismissal of Minnesota tortious interference with prospective economic advantage claim "[b]ecause [defendants] have not violated federal or state law, and because their interference was not independently tortious" (citing *Gieseke*, 844 N.W.2d at 219–20)); *Dr. R.C. Samanta Roy Inst. of Sci. & Tech. v. The Star Trib. Co.*, 2005 WL 1661514, at *5 (D. Minn. July 15, 2005) (dismissing claim for tortious interference with prospective economic advantage because plaintiff's underlying defamation claim failed).[18] MyPillow's claim should be dismissed for that same reason.

---

[17] Though the elements of the claim are different in Colorado and the District of Columbia, it would still fail under those jurisdictions' laws for similar reasons.

[18] *See also Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1197 (Colo. App. 2009) ('[W]rongful means' are those that are 'intrinsically wrongful—that is, conduct which is itself capable of forming the basis for liability of the actor."); *Farah v. Esquire Mag.*, 736 F.3d 528, 540 (D.C. Cir. 2013) (holding that because the plaintiffs' defamation claim failed, "so do their other tort claims based upon the same allegedly defamatory speech," including tortious interference).

*Second*, MyPillow has failed to adequately allege the "economic advantage" it has lost. Though MyPillow refers generically to "commercial suppliers and buyers" who allegedly "terminated longstanding relationships" and "marketing media" to which it allegedly "los[t] . . . access," those allegations are insufficiently specific. Under Minnesota law, "a plaintiff must specifically identify a third party with whom the plaintiff had a reasonable probability of a future economic relationship." *Gieseke*, 844 N.W.2d at 221. A "projection of future business with unidentified customers . . . is insufficient." *Id.* at 221–22; *see also, e.g.*, *Hales Mach. Tool, Inc. v. Doosan Infracore Am. Corp.*, 2016 WL 11518312, at *25 (D. Minn. May 24, 2016) ("[V]ague, generalized references to '[plaintiff's] customers' and 'existing contractual commercial commitments' cannot sustain a claim for tortious interference with prospective economic advantage."); *Dr. R.C. Samanta Roy Inst. of Sci. & Tech. v. The Star Trib. Co.*, 2005 WL 1661514, at *5 (D. Minn. July 15, 2005) (allegation of "interference with unspecified customers" insufficient to state claim for tortious interference with business expectancy).[19] MyPillow's failure to identify the third parties is particularly noteworthy given that Lindell publicly complained about numerous retailers terminating relationships with MyPillow well before Dominion filed suit.  *See* ECF No. 2-100 (January 19, 2021 article reporting on Lindell's claims that "his products have been dropped by major retailers . . . after his repeated false claims of voter fraud in the presidential election"); Complaint (ECF No. 1) ¶ 111 (screenshot from Lindell's documentary "ABSOLUTE PROOF," broadcast on February 5, 2021, showing logos of several retailers that had allegedly "dropped

---

[19] *See also Cunningham Lindsey U.S. Inc. v. Crawford & Co.*, 2018 WL 6307865, at *6 (D. Colo. Dec. 3, 2018) (dismissing interference with prospective advantage claim because plaintiff had neither "identified any particular third parties with which it had existing or prospective business relationships, nor ha[d] it detailed what those business relationships are"); *Nyambal*, 153 F. Supp. 3d at 316 ("[T]ortious interference claims are routinely dismissed where the plaintiff fails to name specific contractual relationships that the defendant allegedly interfered with, or to identify any facts related to future contracts compromised by the alleged interferer.").

MyPillow"). MyPillow's failure to identify a single third party with whom Dominion allegedly interfered dooms its interference claim.

*Third*, even if MyPillow had adequately alleged the economic advantage with which Dominion supposedly interfered, it certainly has not alleged Dominion's "knowledge of that expectation of economic advantage." *Gieseke*, 844 N.W. 2d at 219. MyPillow makes no allegation that Dominion was aware of the relationships it allegedly lost—nor could it, as it does not even name the relationships in the first place. That failure is independently fatal to MyPillow's claim. *See, e.g.*, *Generations L. Off., Ltd. v. Thomas*, 2019 WL 114211, at *4 (Minn. Ct. App. Jan. 7, 2019) (affirming dismissal of interference claim because plaintiff offered no reason to suggest that defendants knew, or should have known, about the potential contract with which they allegedly interfered); *Fagen, Inc. v. Exergy Dev. Grp. of Idaho, LLC*, 2016 WL 5660418, at *11 (D. Minn. Sept. 29, 2016) (dismissing interference claim because plaintiff had not shown that the defendant "had any knowledge of" the plaintiff's expectation of a deal with the third party).[20] And that failure is also unsurprising, given how far afield MyPillow's claim is from the purpose of this tort. The purpose of a tortious interference claim is to "encourage[], foster[], and protect[]" "lawful competition." *Kroll OnTrack, Inc. v. Devon IT, Inc*., 2015 WL 13766880, at *6 (D. Minn. Mar. 20, 2015) (citing *Gieseke*, 844 N.W.2d at 218). Dominion and MyPillow are not competitors— they do not operate in remotely similar markets. There is thus no reason why Dominion would or should have known about MyPillow's suppliers, buyers, or other commercial relationships.

---

[20] *See also Zimmer Spine, Inc. v. EBI, LLC*, 2011 WL 4089535, at *2 (D. Colo. Sept. 14, 2011) (requiring plaintiff to show that "the defendant knew of the contract or prospective relationship"); *Nyambal*, 153 F. Supp. 3d at 316 ("[The plaintiff] has not pled facts alleging [the defendant] had knowledge of the business relationships it compromised.").

## VIII.   LINDELL FAILS TO ALLEGE CIVIL CONSPIRACY

Finally, Lindell alleges civil conspiracy. Lindell Counterclaims ¶¶ 180–83. It appears—though it is not entirely clear—that Lindell is asserting a common-law claim for civil conspiracy, and not a conspiracy to violate his constitutional rights under 42 U.S.C. § 1985(3). Either way, the claim fails.

*First*, the conspiracy claim fails because Lindell has not alleged an underlying illegal act. "[T]here is no recognized independent tort action for civil conspiracy." *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000). Rather, civil conspiracy "is a means for establishing vicarious liability for the underlying tort." *Id.*[21] Similarly, "[t]here can be no recovery under § 1985(3) [for a conspiracy to deprive a person of his constitutional rights] absent a violation of a substantive federal right." *Bush v. Butler*, 521 F. Supp. 2d 63, 68 (D.D.C. 2007). Because Lindell has alleged no underlying tort or constitutional violation, the conspiracy claim fails.

*Second*, the conspiracy claim fails because Lindell has failed to allege an agreement. Whether understood as a common-law conspiracy claim or a § 1985(3) conspiracy claim, Lindell must allege "an agreement between two or more persons." *Busby v. Cap. One, N.A.*, 932 F. Supp. 2d 114, 141 (D.D.C. 2013); *see also Burnett*, 511 F. Supp. 2d at 143 (same for § 1985(3) conspiracy). As discussed above in the context of the Support or Advocacy Clause claim, Lindell has made no non-conclusory allegations of a meeting of the minds as between Dominion and Smartmatic, and the remaining actors of the supposed conspiracy cannot conspire with each other. *See supra*, at Section V.B. The conspiracy claim must be dismissed for this reason, too. *See, e.g.*,

---

[21] *See also Rilley v. MoneyMutual, LLC*, 329 F.R.D. 211, 217 (D. Minn. 2019) ("Civil conspiracy is not an independent claim and is instead a theory of liability premised on an underlying tortious act."); *Greenway Nutrients, Inc. v. Blackburn*, 33 F. Supp. 3d 1224, 1251 (D. Colo. 2014) ("[U]nder Colorado law . . . [c]ivil conspiracy is a derivative cause of action that is not independently actionable." (citations omitted)).

*Busby*, 932 F. Supp. 2d at 141 (dismissing civil conspiracy claim where plaintiff offered only conclusory allegations of an agreement); *Burnett*, 511 F. Supp. 2d at 143 (same for § 1985(3) conspiracy claim).

*Finally*, if Lindell is asserting a conspiracy claim under 42 U.S.C. § 1985(3), that claim fails for lack of state action. "[A] plaintiff who alleges conspiracy to interfere with [constitutional] rights under § 1985(3) must also sufficiently plead that defendants were governmental actors." *Woytowicz v. George Washington Univ.*, 327 F. Supp. 3d 105, 120 (D.D.C. 2018); *see also Brown v. Hill*, 174 F. Supp. 3d 66, 74 (D.D.C. 2016) ("[C]ollusion between private entities is not state action."). As discussed above, *supra*, at Section VI.A, Lindell has failed to allege state action. Accordingly, he cannot make out a § 1985(3) conspiracy claim.

## CONCLUSION

For the foregoing reasons, Lindell's and MyPillow's counterclaims against Dominion and third-party claims against Hamilton should be dismissed.

Dated: January 31, 2022

Respectfully submitted,

/s/ *Zachary B. Savage*
Justin A. Nelson (D.C. Bar No. 490347)
Laranda Walker (D.C. Bar No. TX0028)
Florence T. Chen (D.C. Bar No. TX0025)
Brittany Fowler (*admitted pro hac vice*)
SUSMAN GODFREY LLP
1000 Louisiana Street, #5100
Houston, Texas 77002
(713) 651-9366
jnelson@susmangodfrey.com
lwalker@susmangodfrey.com
fchen@susmangodfrey.com
bfowler@susmangodfrey.com

Stephen Shackelford, Jr.
(D.C. Bar No. NY0443*)*
Elisha Barron (*admitted pro hac vice*)
Zachary B. Savage (*admitted pro hac vice*)
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Fl
New York, NY 10019
(212) 336-8330
sshackelford@susmangodfrey.com
ebarron@susmangodfrey.com
zsavage@susmangodfrey.com

Davida Brook (D.C. Bar No. CA00117*)*
Jordan Rux (D.C. Bar No. CA00135)
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
(310) 789-3100
dbrook@susmangodfrey.com
jrux@susmangodfrey.com

Stephen E. Morrissey (*admitted pro hac vice)*
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, WA  98101
(206) 516-3880
smorrissey@susmangodfrey.com

Thomas A. Clare, P.C. (D.C. Bar No. 461964)
Megan L. Meier (D.C. Bar No. 985553)
Dustin A. Pusch (D.C. Bar No. 1015069)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
tom@clarelocke.com
megan@clarelocke.com
dustin@clarelocke.com

Rodney Smolla (Bar No. 6327)
4601 Concord Pike
Wilmington, DE 19803
rodsmolla@gmail.com
(864) 373-3882

*Attorneys for Plaintiffs/Counter-Defendants US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation; and Third-Party Defendant Hamilton Place Strategies, LLC*