# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

US DOMINION, INC., DOMINION
VOTING SYSTEMS, INC., and
DOMINION VOTING SYSTEMS
CORPORATION,

      Plaintiffs/Counter-Defendants,

      v.

MY PILLOW, INC. and
MICHAEL J. LINDELL,

      Defendants/Counter-Plaintiffs/
      Third-Party Plaintiffs.

      v.

SMARTMATIC USA CORP.,
SMARTMATIC INTERNATIONAL
HOLDING B.V., SGO CORPORATION
LIMITED, and HAMILTON PLACE
STRATEGIES, LLC

      Third-Party Defendants.

Case No. 1:21-cv-00445-CJN
Judge Carl J. Nichols

## MY PILLOW, INC'S MEMORANDUM  IN OPPOSITION TO COUNTER-DEFENDANTS'  MOTION TO DISMISS COUNTERCLAIMS

**PARKER DANIELS KIBORT LLC**
Andrew D. Parker (D.C. Bar No. 63279)
Joseph A. Pull (D.C. Bar No. 982468)
888 Colwell Building
123 N. Third Street
Minneapolis, MN 55401
Telephone: (612) 355-4100
parker@parkerdk.com
pull@parkerdk.com

*Counsel for My Pillow, Inc.*

**LEWIN & LEWIN, LLP**
Nathan Lewin (D.C. Bar No. 38299)
888 17th Street NW, Fourth Floor
Washington, DC 20006
Telephone: (202) 828-1000
nat@lewinlewin.com

*Counsel for My Pillow, Inc.*

Alan Dershowitz (MA Bar No. 121200)
1575 Massachusetts Avenue
Cambridge, MA 02138

*Of Counsel for My Pillow, Inc.*

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iii

INTRODUCTION.......................................................................................................... 1

I.     DOMINION'S ARGUMENTS FAIL BECAUSE THEY ASSUME THE
      ALLEGATIONS IN THE COUNTERCLAIMS ARE FALSE. ................................. 1

II.    MYPILLOW'S COUNTERCLAIMS SATISFY THE STATE  ACTION
      ELEMENT OF § 1983. ........................................................................................ 4

      A.    Public Election Administration Is a Quintessential State Activity,
          Making Dominion a State Actor. ......................................................... 4

          1.    Under Longstanding Law, an Entity That Administers Elections
               Is a State Actor. ....................................................................... 5

          2.    Dominion's Denial of the Allegations in the Counterclaims
               Provides No Basis for Dismissal............................................... 7

          3.    Dominion Fails to Offer Any Reason to Except It from the
               Governing Law.......................................................................... 9

      B.    Dominion's Wrongful Conduct Is Part of Its State Activity........................... 11

          1.    A State Actor's Retaliation for Criticism of State Action Is State
               Action. .................................................................................... 11

          2.    Dominion's Operations Are Symbiotic and Fundamentally
               Intertwined with Public Functions........................................... 13

           3.    Consideration of All Relevant Factors Demonstrates That
               Dominion Is Subject to Constitutional Limitations on Retaliation
               Against Critics of Its Election-Related Equipment and Services. ...... 14

          4.    Dominion's Attempts to Evade Responsibility for Its Conduct Are
               Without Merit........................................................................... 15

III.   MYPILLOW'S FIRST AND SECOND COUNTERCLAIMS PLEAD THAT
      DOMINION'S TORTIOUS CONDUCT WAS MOTIVATED BY LINDELL'S
      EXPRESSION PROTECTED BY THE FIRST AMENDMENT. ............................. 18

      A.    Dominion's Contradiction of the Counterclaim Allegations Provides No
          Basis for Dismissal. .......................................................................... 20

**B.**     **Dominion's Mischaracterization of the Counterclaims Provides No Basis for Dismissal.** ............................................................. 20

**IV.**     **MYPILLOW'S THIRD COUNTERCLAIM PLEADS A VIABLE CLAIM FOR DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS.** .............................. 22

**V.**     **MYPILLOW'S FOURTH COUNTERCLAIM PLEADS A VIABLE TORTIOUS INTERFERENCE CLAIM.** ................................................................. 24

    **A.**     **The TIPEA Claim Alleges Independently Wrongful Acts by Dominion.** ....... 25

    **B.**     **The TIPEA Claim Alleges the Economic Advantage MyPillow Has Lost.** ..... 25

    **C.**     **The TIPEA Claim Alleges Dominion's Knowledge of MyPillow's Expectation of Economic Advantage.** ................................................. 27

**VI.**     **MYPILLOW'S FIFTH COUNTERCLAIM PLEADS A VIABLE ABUSE OF PROCESS CLAIM.** ......................................................................... 28

**VII.**     **DOMINION'S "VIEWPOINT DISCRIMINATION" STRAWMAN PROVIDES NO BASIS FOR DISMISSAL** ........................................................... 31

**CONCLUSION** .................................................................................. 32

# TABLE OF AUTHORITIES

## Cases

*Armenian Assembly of Am., Inc. v. Cafesjian*, 597 F. Supp. 2d 128 (D.D.C. 2009) ...................... 2

*Barnes v. District of Columbia*, No. 03-2547, 2007 U.S. Dist. LEXIS 40778
    (D.D.C. June 6, 2007) .......................................................................................... 28

*Barrett v. Harrington*, 130 F.3d 246 (6th Cir. 1997) ........................................................ 26

*Bates v. Nw Hum. Servs. Inc.*, 583 F.Supp.2d 138 (D.D.C. 2008) ................................... 19, 20, 21

*Beaulieu v. Stockwell*, No. 16-3586, 2018 U.S. Dist. LEXIS 23852
    (D. Minn. Feb. 14, 2018) ..................................................................................... 32

*Beedle v. Wilson*, 422 F.3d 1059 (10th Cir. 2005)........................................................... 14

*Benison v. Ross*, 765 F.3d 649 (6th Cir. 2014) ................................................................. 25

*Benner v. Oswald*, 592 F.2d 174 (3d Cir. 1979) ............................................................... 16

*Bown v. Hamilton*, 601 A.2d 1074 (D.C. 1992) ............................................................... 34

*Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288 (2001) ............... 5, 7, 10, 15,
    …………………………………………………………………………………………17, 18

*Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961)............................................... 15

*Butera v. District of Columbia*, 235 F.3d 637 (D.C. Cir. 2001) ....................................... 27

*Cf. Bill Johnson's Rests. v. NLRB*, 461 U.S. 731 (1983)................................................... 14

*Chalfant v. Wilmington Inst.*, 574 F.2d 739 (3d Cir. 1978) .............................................. 15

*Clancy v. Vacationaire Estates, Inc.*, No. 18-2249, 2019 U.S. Dist. LEXIS 31272
    (D. Minn. Feb. 27, 2019)...................................................................................... 32

*Cornelius v. NAACP*, 473 U.S. 788 (1985)....................................................................... 38

*Cty. of Sacramento v. Lewis*, 523 U.S. 833 (1998) ........................................................... 28

*Daniels v. Williams*, 474 U.S. 327 (1986) ........................................................................ 27

*Dexon Comput., Inc. v. Modern Enter. Sols,* No. A16-0010, 2016 Minn. App. Unpub. LEXIS
    741 (Aug. 1, 2016) ............................................................................................... 31

*Doe v. N. Homes, Inc.*, No. 20-1974, 2021 U.S. App. LEXIS 25289
    (8th Cir. Aug. 24, 2021) ....................................................................................... 17

*Evans v. Newton*, 382 U.S. 296 (1966)........................................................................ 6, 8, 16

*FOP Dep't of Corr. Labor Comm. v. Williams*, 375 F.3d 1141(D.C. Cir. 2004)........................ 28

*Frederick Douglass Found., Inc. v. District of Columbia*, 531 F. Supp. 3d 316 (D.D.C. 2021).. 38

*Fritz v. Charter Twp. of Comstock*, 592 F.3d 718 (6th Cir. 2010) ................................. 26

*George v. Pacific-CSC Work Furlough*, 91 F.3d 1227 (9th Cir. 1996),...................................... 21

*Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210 (Minn. 2014) 30

*Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d
    26 (2d Cir. 1996)................................................................................................... 25

*Griffin v. Maryland*, 278 U.S. 130 (1964) ....................................................................... 20

*Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422 (8th Cir. 1986)...................... 25

*Hartman v. Moore*, 547 U.S. 250 (2006)........................................................... 14, 23, 37

*Heffernan v. City of Paterson*, 578 U.S. 266 (2016)......................................................... 23

*Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156 (D.C. Cir. 2003)....................... 24

*In re Syngenta Litig.*, 2016 Minn. Dist. LEXIS 6 (Henn. Cty. Dist. Ct. Apr. 7, 2016) ............... 30

*Jackson v. Metro. Edison Co.*, 419 U.S. 345 (1974)...................................................... 5, 11

*Johnson v. F.C.C.*, 829 F.2d 157 (D.C. Cir. 1987) ........................................................... 11

*LaRouche v. Fowler*, 152 F.3d 974 (D.C. Cir. 1998) ...................................................... 11

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982)................................................ 8, 10, 17, 18

*Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921 (2019).................................. 5, 10, 38

*Marsh v. Alabama*, 326 U.S. 501 (1946) ............................................................................ 10, 17

*Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701(7th Cir. 2002) ......................................... 27

*Morse v. Republican Party*, 517 U.S. 186 (1996)............................................................ 11

*Nader v. McAuliffe*, 593 F.Supp.2d 95 (D.D.C. 2009) .......................................................... 19, 20

*Nixon v. Condon*, 286 U.S. 73 (1932)................................................................................ 5, 10

*Paisley Park Enterpr. v. Boxill*, 361 F. Supp. 3d 869 (D. Minn. 2019)................................. 30, 31

*Pendleton v. St. Louis Cty.*, 178 F.3d 1007 (8th Cir. 1999)........................................................ 23

*Pow-Bel Constr. Corp. v. Gondek*, 291 Minn. 386, 389, 192 N.W.2d 812 (1971) ............... 34, 35

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992) ............................................................................ 38

*Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742 (9th Cir. 2020) ......................................... 17

*Rocky Mt. Christian Church v. Bd. of Cty. Comm'rs*, 481 F. Supp. 2d 1213
    (D. Colo. 2007)........................................................................................................ 14

*Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819 (1995)............................ 38

*Smith v. Allwright*, 321 U.S. 649 (1944)............................................................................ 6, 10

*Terry v. Adams*, 345 U.S. 461 (1953) ............................................................................... 5, 6, 10

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ................................................................. 1

*United States v. Classic*, 313 U.S. 299 (1941)........................................... 6, 10, 11, 12, 14

*West v. Atkins*, 487 U.S. 42 (1988) .................................................................................... 7, 20

*Zukerman v. United States Postal Serv.*, No. 15-cv-2131, 2021 U.S. Dist. LEXIS 183375,
    (D.D.C. Sep. 24, 2021).......................................................................................... 7

**Statutes**

42 U.S.C. § 1983 ...................................................... 4, 5, 8, 12, 13, 14, 15, 18, 20, 21, 23, 25, 26

**Other Authorities**

Field, Kaplan & Clermont, MATERIALS FOR A BASIC COURSE IN CIVIL PROCEDURE, 305 (13th ed.
    2020)........................................................................................................................ 1

**Rules**

Rule 12(b)(6)...................................................................................................... 3, 18, 24

## INTRODUCTION

Dominion's motion to dismiss MyPillow's counterclaims asks the Court to reject the factual allegations in the counterclaims and accept Dominion's contrary assertions. This, of course, inverts the analysis required by Fed. R. Civ. P. 12(b)(6). Properly accepting the facts pleaded in the counterclaims as true, pursuant to Rule 12(b)(6), causes many of Dominion's arguments to crumble away. What remains is blustery rhetoric about running to the nurse and the principal's office, a sprinkle of name-calling and mischaracterizations about the counterclaims, and a blind eye toward the facts pleaded by MyPillow. Dominion's stylized motion lacks legal substance and should be denied.

## I.

## DOMINION'S ARGUMENTS FAIL BECAUSE THEY ASSUME THE ALLEGATIONS IN THE COUNTERCLAIMS ARE FALSE.

Because Dominion's arguments depend upon the assumption that the facts pleaded in the counterclaims are *not* true, they provide no basis for dismissal on a Rule 12(b)(6) posture.

The function of a Rule 12(b)(6) motion is to weed out claims that will not lead to recovery even if the party proves its facts at trial. Therefore, it is elementary that a Rule 12(b)(6) motion must accept as true the plaintiff's factual allegations. *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006); Field, Kaplan & Clermont, MATERIALS FOR A BASIC COURSE IN CIVIL PROCEDURE, 305 (13th ed. 2020). In the context of a counterclaim, this means accepting the counterclaimant's allegations. *Armenian Assembly of Am., Inc. v. Cafesjian*, 597 F. Supp. 2d 128, 131 (D.D.C. 2009). Dominion's motion may only be granted if the counterclaims cannot lead to recovery notwithstanding the truth of the facts pleaded.

Yet Dominion's memorandum depends heavily on the assumption, recurring with drumbeat regularity, that the Court will for purposes of the pending motion resolve all factual disputes in favor of Dominion.

- "[Dominion] identified for Lindell and MyPillow the precise statements that were defamatory and the evidence disproving those false claims . . . . Lindell doubled down on his lies." Dom. Mem. 1.

- "Each set of counterclaims provides a long and inaccurate account of the history of voting technology..." Dom. Mem. 2.

- "[T]he letters—which demanded that Lindell retract his false claims..." Dom. Mem. 10.

- "[T]his conclusory—and false—allegation…" Dom. Mem. 19.

- "Lindell and MyPillow repeatedly and falsely incant that Dominion 'runs elections…'" Dom. Mem. 37.

- "[T]hat false characterization..." Dom. Mem. 38.

- "Dominion's suit against Lindell is based on dozens of provably false statements..." Dom. Mem. 42.

Dominion's related arguments, dependent on the Court crediting its drumbeat, cannot be accepted on a Rule 12(b)(6) posture.

Dominion compounds its disregard for Rule 12(b)(6) by misunderstanding the Court's previous ruling concerning MyPillow's Rule 12(b)(6) motion to dismiss. Dominion asserts, "[N]either Lindell nor MyPillow can plausibly allege that the First Amendment protects the speech in question" because "the Court has already made clear that Dominion's claims cannot be premised—and are not premised—on any First Amendment-protected speech." Dom. Mem. 44. The Court made no such ruling. Rather, it held that accepting Dominion's factual allegations as

true and drawing "all reasonable inferences" in Dominion's favor, Dominion adequately alleged the elements of a defamation claim. ECF no. 54, at 13, 24, 26-27. Dominion seeks to transmute the Court's previous ruling into findings of fact, but that order found no facts; it merely concluded that Dominion could recover on its claims *if* Dominion later proved its factual assertions.

Rule 12(b)(6) has not changed. The parties' procedural positions with respect to the earlier motion are reversed for purposes of Dominion's present motion to dismiss. For this motion, the Court is obligated to accept as true MyPillow's allegations that Dominion's electronic election equipment is vulnerable to hacking and manipulation, Countercl., ECF no. 90, ¶¶ 67-112, and that evidence shows Dominion's electronic election equipment was manipulated in the 2020 presidential election, ¶¶ 113-124. The Court must disregard Dominion's contrary rhetoric and assess Dominion's legal arguments based on the assumption that MyPillow will prove its factual allegations true at trial.

Dominion's error in this regard is understandable. Dominion's litigation campaign has terrorized observers of this dispute sufficiently that the vast majority of media coverage is comically contorted to virtue-signal that the authors/reporters accept Dominion's account. (Indeed, Dominion's intimidation scheme, as alleged in MyPillow's counterclaims, has already succeeded.) But the Federal Rules of Civil Procedure, not media consensus, govern Dominion's motion. Applying the requisite legal analysis, for purposes of the pending motion (1) Lindell's statements about Dominion's electronic election equipment are supported by evidence; (2) Lindell's statements are protected by the First Amendment; (3) Dominion's control over and administration of elections make it a government actor; (4) Dominion's vindictive response to Lindell's First Amendment speech is intended to silence a critic of the way the government administers public elections and to retaliate against the exposure of its misfeasance or malfeasance; and (5) Dominion's continued pursuit of its meritless action against MyPillow is intended not for the

purpose of recovering against MyPillow but rather for the purpose of generating court papers that Dominion may send to others to intimidate them, to chill them from exercising their First Amendment rights to criticize Dominion, and to extort silence from them.

Dominion's assertions that Lindell's statements were *not* protected by the First Amendment provide no basis for dismissing any of MyPillow's counterclaims.

## II.

### MYPILLOW'S COUNTERCLAIMS SATISFY THE STATE ACTION ELEMENT OF § 1983.

Dominion argues that MyPillow's § 1983 counterclaims fail to plausibly allege "state action," Dom. Mem. 32, but Dominion fails to address the facts pleaded in the counterclaims. The pleaded facts comport with the case law criteria establishing the contours of the category of state actors subject to liability under § 1983.

State action is "a matter of normative judgment" where "the criteria lack rigid simplicity," where "no one fact can function as a necessary condition" nor "is any set of circumstances absolutely sufficient," where "a host of facts" can "bear on the fairness of such an attribution," and where "examples may be the best teachers." *Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 295-96 (2001). The host of facts alleged in MyPillow's counterclaims plead that Dominions is a state actor intentionally inflicting harm upon MyPillow with a close nexus to Dominion's governmental role.

### A. <u>Public Election Administration Is a Quintessential State Activity, Making Dominion a State Actor.</u>

Dominion is a state actor because it administers the function of collecting, recording, counting, and tabulating ballot results in public elections.

**1.   Under Longstanding Law, an Entity That Administers Elections Is a State Actor.**

Private entities that exercise "powers traditionally exclusively reserved to the State" engage in state action. *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974). This is a narrow category of activity, but elections are a quintessential example. *See id*. (citing *Nixon v. Condon*, 286 U.S. 73 (1932) and *Terry v. Adams*, 345 U.S. 461 (1953)); *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928–29 (2019). Elections are of critical constitutional importance, the duties of counting ballots and recording results are taken under authority of state law, and individuals who engage in malfeasance related to the counting of ballots are subject to liability as state actors. *United States v. Classic*, 313 U.S. 299, 307, 325-26 (1941).

Because of the constitutional importance of elections, constitutional principles govern privately conducted activity that affects the outcome of an election. *Smith v. Allwright*, 321 U.S. 649, 662-64 (1944); *Terry*, 345 U.S. 461. Non-public entities that exercise control over the machinery for choosing public officials are treated as state actors. *Id*. "[W]here a State delegates an aspect of the elective process to private groups, they become subject to the same restraints as the State." *Evans v. Newton*, 382 U.S. 296, 299 (1966). "When private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Id.*

MyPillow's counterclaims allege that Dominion manufactures, distributes, maintains, and provides administrative services for electronic election equipment used for voting and vote tabulation in public elections. Countercl. ¶¶ 33-34, 54. In at least some jurisdictions, Dominion possesses sole control over the administrator passwords to the equipment used in the election, so that official government employees do not even have access to these passwords. *Id*. ¶¶ 60, 61, 63. Dominion "drives the entire election project" and provides "solutions" for voting, tabulation, tallying, reporting, and auditing. *Id*. ¶ 36. It provides, updates, and maintains the software on the

electronic election equipment. *Id*. ¶¶ 38-41. In the 2020 general election, Dominion provided "thousands of hours" of support services to the jurisdictions that contracted with Dominion in the administration of their elections. *Id*. ¶ 43, 54. Dominion contracts with over 1,300 governmental jurisdictions in the United States to provide and support electronic equipment used to administer election, and its activities make it an administrator of elections. *Id*. ¶¶ 47-48. Its contracts give it responsibilities of "administration, collection, counting, recording, and auditing of ballots and election results." *Id*. ¶ 58-59.

MyPillow's counterclaims allege specific concrete facts showing that Dominion has been delegated critical aspects of the elective process in many U.S. jurisdictions. The equipment manufactured, programmed, updated, managed, and supported by Dominion carries out election tasks which – in the absence of that equipment – would be carried out by local government employees who would plainly qualify as state actors. Without Dominion's electronic election equipment, counties and cities would pay their own employees to design ballots, hand them out to voters, collect them, count them, tabulate them, and report the results. Replacing human employees of the government with electronic equipment to fulfill the same tasks does not change the essential nature of the tasks as government action. By fulfilling the tasks through its electronic equipment, Dominion becomes a state actor, subject to the same constitutional and legal obligations and limitations that would apply to human beings employed to fulfill these tasks. *Brentwood Acad.*, 531 U.S. at 296 ("nominally private entity" is "state actor" when "it has been delegated a public function by the State"); *Zukerman v. United States Postal Serv.*, No. 15-cv-2131, 2021 U.S. Dist. LEXIS 183375, at *27-28 (D.D.C. Sep. 24, 2021) (contractor paid by Postal Service to print stamps was state actor). It is the "function within the state system, not the precise terms of [] employment that is determinative." *West v. Atkins*, 487 U.S. 42, 42–43 (1988). Dominion functionally stands in

the place of the vote counter, in the same way it would stand in the place of the vote counter if it

supplied large numbers of employees (rather than machines) to gather and tabulate votes, etc.

2. **Dominion's Denial of the Allegations in the Counterclaims Provides No Basis for Dismissal.**

Dominion offers two arguments to support its attempt to escape the implications of this

law and avoid responsibility as a state actor. First, Dominion simply contradicts the facts alleged

in the counterclaims. Dom. Mem. 37 ("Lindell and MyPillow repeatedly and falsely incant that

Dominion 'runs elections'"), 38 ("Dominion does not run elections . . . Dominion is an ordinary

private contractor"), 38 ("Georgia, not Dominion, was in charge of 'running the election'"), 38

("San Francisco's Elections Director 'oversee[s]' the city's elections"). It hardly needs saying that

a defendant's denial of allegations provides no legal basis to dismiss a claim. Moreover, *even if*

*Dominion's contradictions of the allegations in the counterclaims were true*, they would not

prevent Dominion from being a state actor. The presence of a city employee who "oversees" an

election does not transmute the other people and entities who administer the election into non-

government actors. A contractor who administers constitutional functions like vote-counting is not

shielded from liability as a state actor merely because the state that hired the contractor retains

overarching authority over the election process. *Evans*, 382 U.S. at 299 ("[W]here a State delegates

an aspect of the elective process to private groups, they become subject to the same restraints as

the State."). A private entity that engages in "joint activity" with "the State or its agents" is a state

actor under § 1983. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982).

In any event, Dominion's weak arguments that it cannot also be a state actor because

purportedly in two instances someone else was *also* a state actor, Dom. Mem. 38, ignore a

multitude of additional allegations in the counterclaims that establish Dominion as a state actor:

- "During the November 2020 general election, Maricopa County, Arizona county officials
  did not even possess the administrator passwords to the election equipment provided by

Dominion. Only Dominion could, and did, program and operate the equipment on behalf of Maricopa County," Countercl. ¶ 60;

- "During the 2020 general election, Dominion exercised exclusive control over the election equipment it supplied for San Francisco. City employees could not access the equipment," *id*. ¶ 61;

- "By its own account Dominion provides an 'End-To-End Election Management System' that 'drives the entire election through a single comprehensive database" and provides 'solutions' for 'voting & tabulation,' 'tallying & reporting,' and 'auditing the election,' *id*. ¶ 36;

- "When a jurisdiction uses Dominion electronic election equipment to administer an election, Dominion provides many hours of support services before election day, on election day at voting precincts, and after election day. While polls are open, Dominion employees stand by to provide troubleshooting and support . . . among other election services. . . For the 2020 general election, Dominion provided thousands of hours of support services to the jurisdictions that contracted with Dominion in the administration of their elections," *id*. ¶¶ 42-43;

- Dominion "partially controls administration and conduct of the elections," *id*. ¶ 46;

- "In jurisdictions that use Dominion election equipment, Dominion willfully participates in joint activity with the state during voting, providing on behalf of the state core governmental services and functions," *id*. ¶ 65.

Dominion may not escape a counterclaim on a motion to dismiss by baldly denying some of the facts alleged in the counterclaim and then ignoring the rest. Trial, not a motion to dismiss, is the procedure for resolving contradictory assertions of fact.

### 3.   Dominion Fails to Offer Any Reason to Except It from the Governing Law.

Dominion attempts to escape the principles established in the cases cited above by dismissing them as "White Primary Cases," as if that label causes the decisions to cease existence. Dom. Mem. 37-39. The label misses the mark. Many cases fleshing out the law that a nominally private entity can be a state actor had nothing to do with white primaries. *E.g. Classic*, 313 U.S. 299 (alteration and false counting of ballots in private primary election was action under color of state law); *Marsh v. Alabama*, 326 U.S. 501 (1946) (privately owned town was state actor when it infringed upon freedom of press); *Lugar*, 457 U.S. at 941 (private party's joint participation with state officials was state action); *Brentwood Acad.*, 531 U.S. at 298-99 (nominally private association of schools was state actor). Moreover, in *Manhattan Cmty. Access Corp. v. Halleck* the Supreme Court cited the "function[]" of "running elections," not discrimination, as an underlying principle of *Terry v. Adams*, *Smith v. Allwright*, and *Nixon v. Condon*. 139 S. Ct. 1921, 1926, 1929 (2019). Elsewhere the Court has explained, without regard to any white primary, that "the exercise by a private entity of powers traditionally exclusively reserved to the State" makes nominally private action into state action. *Jackson*, 419 U.S. at 352. Dominion's attempt to wave away these principles, which were applied in but not exclusive to the white primary cases, is merely a plea to ignore the law.

Dominion does offer two case citations of its own: *LaRouche v. Fowler*, 152 F.3d 974, 991 (D.C. Cir. 1998) and *Johnson v. F.C.C.*, 829 F.2d 157, 165 (D.C. Cir. 1987). Dom. Mem. 39. Neither supports Dominion's position. The quotation Dominion clips from *LaRouche* ("the power to determine part of the field of candidates from which the voters must choose") is pulled from a discussion of Justice Stevens' opinion in "the splintered majority opinions" in *Morse v. Republican Party*, 517 U.S. 186 (1996), and does not remotely purport to limit the state action doctrine in the context of elections to such a narrow field, notwithstanding Dominion's claim. 152 F.3d at 991.

*LaRouche*, in fact, "assume[d] without deciding that defendants are state actors." *Id*. at 993. Given that assumption, and the lack of relevance of Dominion's quote pulled from context, *LaRouche* does not help Dominion here. *Johnson* concerned a presidential candidate's claim that she was wrongfully excluded from a television debate; it held that exclusion from a television program was not the same as exclusion from a ballot. 829 F.2d at 162, 164-65. *Johnson*'s analysis does not in any way suggest that a private actor's administration of election functions fails to qualify as state action. It does not salvage, or even support, Dominion's arguments.

*Classic* is the case most closely on point with the state actor issue. Dominion's allegations in this action concern statements by Lindell about Dominion's counting and alleged manipulation of ballots in an election. *E.g.* Compl. ¶ 3 (ECF 1). *Classic* held that alleged acts of ballot manipulation and false counting in a primary election were acts committed under color of state law, because they were acts committed by misusing power possessed by virtue of state law. 313 U.S. at 307, 325-26. Dominion's provision of ballot casting, counting, and tabulation services in the 2020 presidential election was action committed by exercise of powers granted by virtue of state law that delegated those tasks to Dominion through its election equipment and support services. In fact, the Supreme Court in *Classic* expressly contemplated that the adoption of voting machines was a development that did not change the essential character of election administration. *Id*. at 324-25 ("If a right secured by the Constitution may be infringed by the corrupt failure to include the vote at a primary in the official count, it is not significant that the primary, *like the voting machine* was unknown when § 19 [18 U.S.C. § 52] was adopted. Abuse of either may infringe the right and therefore violate § 19.") (emphasis added; footnote omitted). Under *Classic*, Dominion's election administration services were plainly state action.

MyPillow's counterclaims allege Dominion carries out the government task of collecting and counting votes and administering elections, both directly through its equipment and through

joint action with local government officials. Ballot manipulation, election administration, and joint action with government officials are all well-established forms of state action by nominally private entities. The counterclaim allegations plead state action sufficient to satisfy the requirements of § 1983.

**B.  Dominion's Wrongful Conduct Is Part of Its State Activity.**

Dominion's lengthiest argument concerning the "state action" aspect of § 1983 is an assertion that the "specific conduct" underlying MyPillow's claims "is entirely attributable to private activity," rather than to state action. Dom. Mem. 33. In substance, this argument attempts to separate Dominion's status as a state actor (an administrator of elections) from the tortious acts alleged in the counterclaims (its campaign against MyPillow), claiming no "close nexus" exists between the two. *Id*. Two factors defeat this attempt. First, MyPillow's counterclaims do allege a close nexus – that an entity bearing responsibility for the core government function of administering elections is intentionally inflicting harm on MyPillow for the purpose of covering up that entity's misfeasance or malfeasance in discharging core government responsibilities. Second, the intertwinement of Dominion's business affairs with core public, constitutional matters subjects Dominion to constitutional restraints.

**1.  A State Actor's Retaliation for Criticism of State Action Is State Action.**

Dominion's campaign against MyPillow has a close nexus to Dominion's state action because the campaign specifically seeks to cover up Dominion's alleged state action misfeasance/malfeasance. A tight and direct nexus exists between a coverup and the conduct intended to be covered up. A scheme to conceal improper conduct of government affairs is closely connected to those affairs. A state actor may not with impunity retaliate against criticism of its official conduct by claiming the retaliation was not part of its official duties. They are inextricably intertwined.

The law is clear that the First Amendment prohibits a state actor from retaliating against an individual in response to the individual's criticism concerning the state actor's conduct. "Official reprisal for protected speech offends the Constitution [because] it threatens to inhibit exercise of the protected right . . . and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (quotation omitted). Reprisal for purposes of § 1983 includes bringing a defamation lawsuit. *Beedle v. Wilson*, 422 F.3d 1059, 1067 (10th Cir. 2005) (plaintiffs stated § 1983 claim based on government actor libel suit maliciously brought against them in retaliation for protected speech); *Rocky Mt. Christian Church v. Bd. of Cty. Comm'rs*, 481 F. Supp. 2d 1213, 1220 (D. Colo. 2007) ("a governmental lawsuit brought with the intent to retaliate against a citizen for the exercise of his First Amendment rights is itself a violation of the First Amendment and provides grounds for a § 1983 suit.") (quoting *Beedle,* 422 F. 3d at 1066. *Cf. Bill Johnson's Rests. v. NLRB*, 461 U.S. 731, 744 (1983) (filing a baseless lawsuit with the intent of retaliating against an employee for the exercise of statutory rights is an unfair labor practice).

If a county official, after being accused of changing markings on ballots, retaliated by intentionally inflicting harm on the person who publicized the accusation, no credence would be given to any suggestion that the county official's tortious conduct did not constitute state action. The retaliation would have a close nexus to the official's wrongful acts as a state government actor, *Classic*, 313 U.S. at 307, 325-26. For purposes of a § 1983 claim based on misfeasant/malfeasant ballot manipulation, a county employee stands in the same place as a company contracted to manage electronic election equipment performing the same election services that would otherwise be performed by a county employee. Dominion's retaliatory campaign against MyPillow, intended to punish and deter First Amendment speech about Dominion's discharge of election

administration responsibilities, has a clear, close nexus to Dominion's actions administering the state government functions of ballot creation, collection, counting, tabulation, and reporting. A state actor's attempts to cover up, silence criticism of, or punish criticism of its alleged official misconduct are part and parcel of the state action misconduct.

> ### 2. Dominion's Operations Are Symbiotic and Fundamentally Intertwined with Public Functions.

Dominion is also a state actor for purposes of MyPillow's § 1983 counterclaims because Dominion's operations are symbiotic, and fundamentally intertwined, with public functions. The Fourteenth Amendment precludes a privately owned business from infringing the constitutional rights of the public when the business becomes entangled with public services and the general usage of the public. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 724 (1961). Where the "nominally private character" of an entity "is overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness in applying constitutional standards to it," the entity is treated as a state actor. *Brentwood Acad.*, 531 U.S. at 298, 302.  No "nexus" need be drawn "between the challenged activity and the state involvement" if an entity is a state actor pursuant to the *Burton* principle. *Chalfant v. Wilmington Inst.*, 574 F.2d 739, 745-46 (3d Cir. 1978). Under those circumstances, "all of the entity's actions are state actions and a nexus between any state regulation and the action need not be shown." *Benner v. Oswald*, 592 F.2d 174, 179 (3d Cir. 1979).

MyPillow's counterclaims allege in detail the degree of Dominion's entwinement, and symbiotic relationship with, state governments throughout the United States. Countercl. ¶¶ 33-39, 42-43, 46-49, 51-66. Dominion is deeply entangled with and dependent upon state actors. Its business model is entirely dependent upon governmental entities paying for its services in the fundamental constitutional responsibility of public election administration and endowing it with the power and responsibility to collect, count, and tabulate votes. "[W]hen private individuals or

groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Evans*, 382 U.S. at 299. This "predominant character and purpose" makes Dominion subject to constitutional limitations. *Id.* at 302. It is hard to imagine how Dominion could be more interconnected with and dependent upon government entities. Its services are public functions, and they are broadly offered to as many jurisdictions as possible to serve the general public in those jurisdictions. All of this activity is done for Dominion's economic advantage.  It is also done for the substantial advantage of county and city governments in those jurisdictions, who shift much of the heavy burden of conducting fair, accurate, constitutional voting activities from themselves to Dominion.

When "the facts justify a conclusion of state action under the criterion of entwinement," this conclusion is "in no sense unsettled merely because other criteria of state action may not be satisfied by the same facts." *Brentwood Acad.*, 531 U.S. at 302. "The more an owner, for his advantage, opens up his property for use by the public in general, the more do his rights become circumscribed by the statutory and constitutional rights of those who use it." *Marsh*, 326 U.S. at 506 (privately held bridges, ferries, turnpikes, and railroads are "essentially a public function"). Dominion opens up its equipment and software for use by public entities in the administration of elections and thereby becomes subject to statutory and constitutional limitations. Just as a privately owned "company town" may not infringe upon the exercise of constitutional rights, including First Amendment rights in connection with its property, *id.* at 509, Dominion may not infringe First Amendment rights in connection with its election equipment and software.

### 3. Consideration of All Relevant Factors Demonstrates That Dominion Is Subject to Constitutional Limitations on Retaliation Against Critics of Its Election-Related Equipment and Services.

The Supreme Court has articulated at least four different "factors or tests" to address the question of whether a nominally private entity is subject to liability as a state actor. *Lugar*, 457

U.S. at 939. "Whether these different tests are actually different in operation or simply different ways of characterizing the necessarily fact-bound inquiry" has never been expressly resolved by the Court. *Id. See also Rawson v. Recovery Innovations, Inc.*, 975 F.3d 742, 747 (9th Cir. 2020); *Doe v. N. Homes, Inc.*, No. 20-1974, 2021 U.S. App. LEXIS 25289, at *14, n.4 (8th Cir. Aug. 24, 2021). The four "factors or tests" are "public function," "state compulsion," "nexus," and "joint action." *Lugar*, 457 U.S. at 939. "[N]o one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient…" *Brentwood Acad.*, 531 U.S. at 295. As set forth above, MyPillow's counterclaims allege a constellation of facts showing Dominion's conduct satisfies the "public function" and "nexus" tests, each of which is independently sufficient to support a finding of state action. Taking these facts together in totality, the finder of fact, "sifting facts and weighing circumstances," may conclude that state action is present as a result of the "true significance" of "nonobvious involvement of the State" in Dominion's conduct. *Lugar*, 457 U.S. at 939 (quoting *Burton*, 365 U.S. at 722). Accordingly, taking the facts pleaded in the counterclaims as true, Dominion's Rule 12(b)(6) motion to dismiss should be denied.

### 4.   Dominion's Attempts to Evade Responsibility for Its Conduct Are Without Merit.

Dominion advances various arguments to escape accountability under § 1983. Dom. Mem. 32-37. Each is without merit.

Dominion first asserts that the "'specific conduct of which [Lindell and MyPillow] complain[]' has nothing to do with any State." Dom. Mem. 33. As discussed above, (1) MyPillow's counterclaims allege a tight nexus between Dominion's state activity, administering elections, and its wrongful conduct, retaliating against and seeking to chill the exercise of First Amendment speech that criticizes Dominion's conduct of administering elections; and (2) Dominion's business existence and identity is so closely symbiotic and intertwined with state activity that it would have

to abide by constitutional restraints even if its conduct did not have such a tight nexus to its state action.

Dominion next repackages this same argument, asserting that it is "irrelevant" that Dominion performs the "exclusive public function" of "running elections," because the "'specific conduct' about which Lindell and MyPillow complain is *not* election-related conduct." Dom. Mem. 34-35. This argument is notable because it implicitly acknowledges that Dominion's election activities are, indeed, exclusive public functions that qualify as state action – but it provides no basis for dismissal of the counterclaims, for the same reasons stated in the paragraph immediately preceding this one.

Dominion next cites *Nader v. McAuliffe*, 593 F.Supp.2d 95 (D.D.C. 2009), as "instructive." Dom. Mem. 35. Claims under § 1983 failed in *Nader* because there the plaintiff sought to hold *political actors* (a former leader of a political party and a leader of a "political organization") liable for filing *ballot eligibility complaints*. *Id*. at 97-98. The *Nader* defendants were not individuals who in any way conducted a "public function" that was "traditionally exclusively reserved to the State." *Id*. at 102. Claims based on political actors conducting political activities are not comparable to claims based an election administrator's commission of election administration activities. *Nader* is neither "instructive" nor even on point. It differs from this case on the very consideration that determined the court's decision in *Nader*.

Dominion moves from *Nader* to the assertion that MyPillow seeks to improperly "bootstrap what would otherwise be private conduct" into state action, relying on *Bates v. Nw Hum. Servs. Inc.*, 583 F.Supp.2d 138 (D.D.C. 2008), as the foundation for this argument. Dom. Mem. 35-36. As an initial matter, parallels with activity "in the private sector" do not prevent an individual's actions from being as state action. *West*, 487 U.S. at 57 n.15 (citing *Griffin v. Maryland*, 278 U.S. 130, 135 (1964)).

Moreover, as with *Nader*, *Bates* differs from this action on precisely the grounds that decided the issue there. In *Bates*, the defendant performed two distinct services, *receiving* federal funds on behalf of the plaintiffs and *providing* mental health services to the plaintiffs. 583 F.Supp.2d at 141, 145. The *Bates* plaintiffs brought claims under § 1983 alleging misuse of the funds *received* on plaintiffs' behalf. *Id*. at 145 (defendants "mismanaged, misappropriated and misused the federal payments"). But they attempted to satisfy the state action component of § 1983 by alleging the defendants were state actors when they *provided* mental health services. *Id*. The Court held that plaintiffs failed to state a claim under § 1983 for violation of the "federally protected right" of "entitlement to federal benefit payments" by alleging *subsequent* state action. *Id* at 145-46. *Bates* thus holds[1] that pleading denial of a federal right (to receive benefit payments) *followed by* alleged state action (providing mental health services) fails to state a § 1983 claim; later state action does not retroactively convert prior private acts into state action. This is not a surprising ruling. MyPillow's counterclaims make no comparable "transitive" claim – MyPillow pleads that Dominion first is a state actor by virtue of its election administration activities, and then to *defend and cover up* its state action Dominion has pursued an illegal campaign against its critics that is part of and inextricable from its state action. Still further, *Bates* did not involve any function "traditionally exclusively reserved to the State," like administering elections, making it fundamentally different from MyPillow's counterclaims at the most basic level. For multiple reasons *Bates* is not on point with MyPillow's counterclaims. *Bates*'s holding and analysis are not applicable, or even relevant, here.

---

[1] The critical analysis in the *Bates* opinion is not completely clear. *Id*. at 145 ("Each of the plaintiffs' arguments fails to establish that the defendants were state actors for the same reason: both improperly focus on the defendants' role as the plaintiffs' DMH-certified mental health rehabilitation services provider instead of their role as representative payee for the plaintiffs' social security disability benefits.").

Dominion concludes its assertions about its status as a state actor by appealing to *George v. Pacific-CSC Work Furlough*, 91 F.3d 1227 (9th Cir. 1996), an employee-termination case. Dom. Mem. 36-37. The reluctance of courts to impose § 1983 liability for every personnel decision made by private prison contractors does not indicate that an administrator of public elections can wage a campaign of retribution and chilling against critics of its election administration. *George* is not comparable to MyPillow's counterclaims or applicable here.

A state may not circumvent constitutional protection for speech about elections merely by contracting the state's election responsibilities out to a private company and then watching from the sidelines as that company retaliates against and chills critics of the election processes. Dominion conducts traditional exclusive government functions, deeply intertwined with a multitude of local government jurisdictions, for the mutual benefit of both Dominion and the jurisdictions.  It is not an "ordinary government contractor," *see* Dom. Mem. 6, 32, 38, but rather the most important determiner of the accuracy and fairness of ballot counts in the jurisdictions it manages. Section § 1983 obligates Dominion to respect the First Amendment's protection of speech concerning its administration of public functions.

### III.

### MYPILLOW'S FIRST AND SECOND COUNTERCLAIMS PLEAD THAT DOMINION'S TORTIOUS CONDUCT WAS MOTIVATED BY LINDELL'S EXPRESSION PROTECTED BY THE FIRST AMENDMENT.

Aside from the state actor issue addressed above, Dominion offers only one argument for dismissal of MyPillow's first and second counterclaims: Dominion argues that its campaign against MyPillow does not cause First Amendment harm. Dom. Mem. 39-41. This argument fails because it relies on two infirm premises: rejection of the factual allegations in the counterclaims, and sophistry urging that bringing an unconstitutional lawsuit that does not ultimately succeed inflicts no constitutional harm.

18

MyPillow's counterclaims allege that Michael Lindell after the 2020 election spoke out "about Dominion, electronic election equipment, and issues of election integrity." Countercl. ¶ 125. He did this in "exercise of his First Amendment free speech rights." *Id.* ¶ 127. In response, to "push[] a narrative that there should be no concern regarding the integrity of the election," and to "demand no criticism," Dominion pursued a wrongful scheme to inflict harm upon Lindell and MyPillow for the purpose of "punish[ing] and "deter[ring] important constitutionally-protected activity – free expression about a matter of public concern." *Id.* ¶¶ 127, 128, 130, 132. Dominion was "motivated" to engage in "reprisal" for the exercise of free-speech rights under the First Amendment. *Id.* ¶ 155.

Based on these factual allegations, MyPillow's first counterclaim alleges Dominion, a government actor, engaged in wrongful threats, intimidation, and litigation that accomplished Dominion's intended purpose of inflicting economic harm upon MyPillow and deterring and chilling the exercise of MyPillow's First Amendment rights. Countercl. ¶¶ 145-151. Therefore, Dominion is liable to MyPillow under 42 U.S.C. § 1983. *Id.* MyPillow's second counterclaim is a conventional First Amendment reprisal claim. *Id.* ¶¶ 152-157. "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman*, 547 U.S. at 256. "This Court repeatedly has held that retaliation against the exercise of First Amendment rights is a basis for section 1983 liability." *Pendleton v. St. Louis Cty.*, 178 F.3d 1007, 1011 (8th Cir. 1999). The principle is so strong that a government actor's intentional infliction of harm on a victim creates liability under § 1983 if the harm was motivated by a desire to retaliate for perceived First Amendment activity, *even if the defendant was mistaken* and the victim did not actually engage in First Amendment activity. *Heffernan v. City of Paterson*, 578 U.S. 266 (2016).

A. **Dominion's Contradiction of the Counterclaim Allegations Provides No Basis for Dismissal.**

In response to the first and second counterclaims, Dominion asserts that its wrongful attempts to inflict harm on MyPillow "are not and cannot be based on any First Amendment protected activity," and "neither Lindell nor MyPillow can plausibly allege that the First Amendment protects the speech in question." *Id*. at 40, 44. Dominion's conclusion that the allegedly defamatory statements were not protected by the First Amendment argument expressly depends on the assumption that Dominion's version of the disputed facts is true. *Id*. at 41.

But as described in Part I above, Dominion's dismissal motion is not evaluated based on *Dominion's* version of the facts in the counterclaims. The motion must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003) (internal quotation omitted). Using the required analysis, the Court must credit the counterclaims' allegations establishing that Lindell's allegedly defamatory statements were supported by evidence, including evidence that Dominion's electronic election equipment was manipulated in connection with the 2020 election. Countercl. ¶¶ 67-124. Accordingly, the counterclaims plead that Lindell's speech cannot be characterized as motivated by "actual malice" and is therefore  protected by the First Amendment. Dominion's *ipse dixit* contradiction of these and other factual allegations in the counterclaims provides no support for dismissal.

B. **Dominion's Mischaracterization of the Counterclaims Provides No Basis for Dismissal.**

Dominion's second infirm premise for its attack on counterclaims one and two merely wraps circular-reasoning sophistry around its defiance of the Rule 12(b)(6) standard. Dominion claims, "the only speech on which Dominion could prevail is speech that is *not* entitled to First Amendment protection . . . This suit cannot retaliate against Lindell or MyPillow because it cannot

be based on any First Amendment-protected speech." Dom. Mem. 41. This argument is logically and factually deficient.

First, a defendant may not justify wrongful action by saying the action against it may not succeed. The fact that MyPillow is forced to defend Dominion's retaliatory lawsuit itself violates the First Amendment, even though MyPillow ultimately prevails. Retaliatory filing and prosecution of litigation offends the First Amendment even if the litigation fails. *See Benison v. Ross*, 765 F.3d 649, 653 (6th Cir. 2014) (genuine dispute of material fact whether decision to file lawsuit was intended as retaliation); *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1428 (8th Cir. 1986) (filing of frivolous claims in retaliation for exercise of constitutional rights supports § 1983 claim); *Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 30 (2d Cir. 1996) ("We think it clear that, at least for a claim of a First Amendment violation arising in the context of litigation, a governmental entity alleged to have chilled a litigant's freedom of speech by filing counterclaims in response to a complaint must be shown to have acted with retaliatory intent"). Dominion may not escape liability for filing a wrongful lawsuit in retaliation for the exercise of First Amendment rights by saying the lawsuit should fail if it is wrongful. Accepting the allegations in the counterclaims as true, Dominion's lawsuit *will* fail, meaning Dominion brought a meritless action against MyPillow for the purpose of retaliating against speech that Dominion does not like, which Dominion *knows* to be non-defamatory. Such a course of conduct causes liability under § 1983.

Second, MyPillow's counterclaim alleges that Dominion orchestrated a wide spectrum of reprisal actions, including *but not limited to* filing its meritless defamation claims. Countercl. ¶¶ 128, 130, 132. Dominion's memorandum attempts to wave these allegations away by characterizing them as a "require[d]" "prerequisite" to bringing a defamation action. Dom. Mem. 41. But no state requires a defamation plaintiff, as a "prerequisite" to sue, to orchestrate a national

campaign of vilification, intimidation, threats to sue, and cancellation of a party's business contracts. Moreover, courts have properly construed a wide variety of retaliatory actions to state claims under § 1983 – including the making of false public accusations and threats. *See Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997) (complaint stated § 1983 claim by alleging defendant judge publicized false accusations that plaintiff was a stalker, in retaliation against plaintiff's criticism of defendant's actions as a judge); *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 725 (6th Cir. 2010) (threatening telephone communications to plaintiff's employer in response to plaintiff's First Amendment activity provided basis for § 1983 claim). MyPillow's counterclaims plead retaliatory action by Dominion that amply surpasses the threshold for a § 1983 claim based on First Amendment retaliation.

Dominion's motion provides no basis upon which MyPillow's first and second counterclaims can be dismissed.

## IV.

### MYPILLOW'S THIRD COUNTERCLAIM PLEADS A VIABLE CLAIM FOR DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS.

MyPillow's third counterclaim alleges that Dominion deprived MyPillow of property without due process of law. Countercl. ¶¶ 158-166. Dominion, acting as a governmental agent administering public elections, conducted an intentional campaign designed to harm MyPillow because Dominion wanted to punish and silence MyPillow's CEO, Lindell, and the campaign succeeded in harming MyPillow. *Id.* ¶¶ 160-62.

Plaintiffs may state "claims for civil rights violations if they allege state action that created, or substantially contributes to the creation of, a danger or renders citizens more vulnerable to danger than they otherwise would have been." *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 708 (7th Cir. 2002). Contrary to Dominion's suggestion, this notion of a "substantive due

process right" is not novel or an expansion, Dom. Mem. 45, but rather has been acknowledged by every circuit court of appeals, "in a range of fact patterns concerning alleged misconduct by State officials." *Butera v. District of Columbia*, 235 F.3d 637, 649-50 (D.C. Cir. 2001). "Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 331 (1986) (emphasis in original). Deliberate decisions intended to deprive MyPillow of property is exactly what the third counterclaim alleges.

The only argument for dismissal that Dominion directs specifically at the third counterclaim is an assertion that Dominion's conduct does not "shock the contemporary conscience." Dom. Mem. 45-46. Dominion advances its argument by mischaracterizing the counterclaim to be based only on Dominion's acts of filing a lawsuit, sending cease-and-desist letters, and "discussing" the lawsuit in the media. *Id.* at 45. The counterclaim alleges far more – a targeted, intentional scheme by Dominion to retaliate against a company associated with a government critic by sensationalizing attacks on the target, generally threatening to sue anyone who exercises constitutional free speech rights in support of the target, specifically mailing out over 150 threatening letters to perceived allies of the target, using these tactics to pressure and coerce commercial partners into severing ties with the target, and stirring up death threats and harassment against the target's employees. Countercl. ¶¶ 19, 128, 132-33, 136-40, 169-70. Deliberate infliction of harm by a government official is judicially well-recognized as conscience-shocking. "It is, on the contrary, behavior at the other end of the culpability spectrum that would most probably support a substantive due process claim; conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998); *FOP Dep't of Corr. Labor Comm. v. Williams*, 375 F.3d 1141, 1145 (D.C. Cir. 2004) (quoting *Lewis,* 523 U.S.

at 849). "An affirmative state act that shocks the conscience would involve 'deliberate decisions of government officials to deprive a person of life, liberty or property.'" *Barnes v. District of Columbia*, No. 03-2547, 2007 U.S. Dist. LEXIS 40778, at *12 (D.D.C. June 6, 2007) (emphasis in original) (quoting *FOP*, 375 F.3d at 1146).

The allegations in the counterclaim, accepted as true, are conscience-shocking: government officials seeking to conceal their own incompetence or malfeasance by pursuing a campaign to punish and harm those who expose their incompetence or malfeasance and extending their campaign to target and damage a company which has not itself criticized them, but which is merely *identified with* a public critic of their administration of government responsibilities. Such a state of affairs severely threatens the ability of the citizen to hold state officials accountable with the disinfectant of sunlight. It undermines the foundations of a free society in which government officials are public servants rather than public masters. It transforms public service into a weapon to be wielded against public oversight, instead of a public trust to be discharged subject to public correction. Deliberate action by public officials to cover up their errors, punish their critics, and perpetuate their control of governmental affairs is a conscience-shocking replacement of free civil society with state oppression and arbitrary power.

Accepting the allegations in the counterclaims as true, the third counterclaim alleges a claim for deprivation of property without due process.

## V.

## MYPILLOW'S FOURTH COUNTERCLAIM PLEADS A VIABLE TORTIOUS INTERFERENCE CLAIM.

MyPillow's fourth counterclaim alleges Dominion intentionally, falsely maligned MyPillow and induced many of MyPillow's commercial suppliers and buyers to terminate long-standing relationships with MyPillow, as Dominion knew or expected would happen. Countercl.

¶¶ 167-74. Dominion argues that this claim fails to meet three elements of a claim for tortious interference with prospective economic advantage ("TIPEA") under Minnesota law. Dom. Mem. 47-50. Dominion is incorrect on all three.

### A.  The TIPEA Claim Alleges Independently Wrongful Acts by Dominion.

Dominion first argues that MyPillow's counterclaim for TIPEA fails to adequately allege conduct by Dominion that is "independently tortious or in violation of a state or federal statute or regulation." Dom. Mem. 48. MyPillow's counterclaims under § 1983, for violation of the First and Fourteenth Amendments and for abuse of process each allege conduct by Dominion that is independently tortious or in violation of state or federal law. MyPillow's TIPEA counterclaim does not fail to meet this element of the tort.

### B.  The TIPEA Claim Alleges the Economic Advantage MyPillow Has Lost.

Dominion argues that MyPillow fails to adequately allege economic advantage it has lost. Dom. Mem. 49. As an initial matter, both federal and state courts in Minnesota have questioned whether a complaint stating a claim for TIPEA must identify a specific business partner or customer by name at the motion to dismiss stage. *Paisley Park Enterpr. v. Boxill*, 361 F. Supp. 3d 869, 881 (D. Minn. 2019) ("It is not clear from the *Gieseke* decision that identifying a specific business partner or customer is necessary to survive a motion to dismiss.") (citing *Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210 (Minn. 2014)); *In re Syngenta Litig.*, 2016 Minn. Dist. LEXIS 6, *51 (Henn. Cty. Dist. Ct. Apr. 7, 2016) ("Even if Plaintiffs were required to identify particular third parties or groups of third parties by name in order eventually to prove the required expectancy under each state's substantive law, Plaintiffs would not necessarily be required to plead such facts in their complaint."). *Gieseke*, the Minnesota Supreme Court decision establishing the elements of TIPEA, addressed the showing the plaintiff had made at trial. 844 N.W.2d at 212.

25

MyPillow's counterclaims provide adequate notice pleading of the economic advantage it has lost. The counterclaims identify MyPillow's longstanding "commercial suppliers and buyers," and advertising relationships with a radio station and social media platforms, as beneficial economic relationships lost due to Dominion's wrongful acts. Countercl. ¶¶ 137-38, 168, 170-71. The counterclaims further provide a link to a website listing many of these economic relationships. *Id.* at ¶137, n.100 (link listing Dollar General, ShopHQ, Mattress Firm, Kohl's, Kroger, BJ's, Wayfair, Bed Bath & Beyond, TSC/The Shopping Channel, H-E-B, Affirm, Fingerhut, Kinney Drugs, Colony Brands, Bluestream, Coborn's, Chewy.com, and JCP). Moreover, Dominion acknowledges it is aware of many of these relationships, Dom. Mem. 49, and Dominion's Complaint in this action also identifies several by name: Kohl's, Wayfair, and Bed Bath & Beyond. *See* ECF no. 1 ¶ 70, n.84.

In *Paisley Park Enterpr.*, the Minnesota district court concluded that an allegation that a recording was "top-selling pre-order on iTunes before Apple removed the song" and "the second best-selling album preorder on Amazon" was sufficient to "identify Apple and Amazon as specific business partners with whom Defendants expected to have an ongoing relationship." 361 F. Supp. 3d at 881. In *Dexon Comput., Inc. v. Modern Enter. Sols.*, the Minnesota Court of Appeals held that a complaint based on the defendant's wrongful acquisition and use of a "customer-leads list" stated a TIPEA claim upon which the plaintiff was likely to succeed, for purposes of granting a temporary restraining order. No. A16-0010, 2016 Minn. App. Unpub. LEXIS 741, at *16-17 (Aug. 1, 2016). The complaints in *Paisley Park Enterpr.* and *Dexon* provided far less information than Dominion has already received, even before discovery, about the plaintiffs' lost economic relationships. MyPillow's counterclaim substantively satisfies the element of alleging lost economic advantages for a TIPEA claim. Moreover, if the Court concluded that more information need be pleaded in the counterclaim to provide Dominion adequate notice, rather than simply

allowing Dominion to obtain more detailed information through discovery, MyPillow manifestly is able to do so and should be permitted to amend the counterclaim. *See Beaulieu v. Stockwell*, No. 16-3586, 2018 U.S. Dist. LEXIS 23852, at *6 (D. Minn. Feb. 14, 2018); *Clancy v. Vacationaire Estates, Inc.*, No. 18-2249, 2019 U.S. Dist. LEXIS 31272, at *24-25 (D. Minn. Feb. 27, 2019).

### C. The TIPEA Claim Alleges Dominion's Knowledge of MyPillow's Expectation of Economic Advantage.

Dominion's final attack on the TIPEA claim is to argue that MyPillow failed to allege Dominion knew about MyPillow's expectation of economic advantage. Dom. Mem. 50. The counterclaim alleges that Dominion "knew or expected" its "intentional and improper actions" would stir up "public controversy and fear" that would cause "MyPillow's commercial suppliers and buyers to dread corresponding controversy and damage to their own reputations if they continued to engage in business with MyPillow," and similarly with "media companies" who "terminate[d]" MyPillow's[2] access to their "broadcast and publishing services." Countercl. ¶ 170. Further, Dominion "knew or should have known MyPillow had existing commercial customer, supplier and buyer relationships" that it expected to continue, but Dominion "intentionally engaged in" its tortious and wrongful acts that Dominion "knew or should have known would cause the loss" of these economic advantages "through continued commercial supply and sales transactions." *Id*. ¶ 172.

MyPillow's TIPEA claim does not allege Dominion tortiously caused the termination of an economic expectancy that was secret or unknown to Dominion. Rather, it alleges that Dominion intentionally sabotaged MyPillow's regular economic relationships, which Dominion knew MyPillow had in place. A TIPEA defendant may not execute a tortious scheme to pressure

---

[2] Paragraph 170 contains a typo; in context, the last reference to "Counterclaim-Defendants' access" to broadcast and publishing services is plainly intended to refer to MyPillow, not Dominion.

commercial actors in the general marketplace into cutting off their economic relationships with a specific target, then avoid liability by pleading strategic ignorance that it didn't *know* the plaintiff depended upon ordinary buyer and seller relationships in the marketplace to conduct its business. The TIPEA claim pleads Dominion's knowledge of the economic relationship that Dominion *intended to destroy* through its cancellation campaign against MyPillow.

At most, Dominion's attempt to escape MyPillow's TIPEA claim shows that the claim could be amended to specifically identify more, rather than just some, of the economic relationships MyPillow lost as a result of Dominion's tortious interference. The TIPEA claim should not be dismissed.

## VI.

## MYPILLOW'S FIFTH COUNTERCLAIM PLEADS A VIABLE ABUSE OF PROCESS CLAIM.

MyPillow's counterclaims allege Dominion is "filing and pursuing" this "meritless" action "to make an example of MyPillow," in order to cause others to "fear similar actions being brought against themselves" and therefore refrain from "criticiz[ing]" Dominion. Countercl. ¶¶ 176, 178, 180. The counterclaims allege Dominion has leveraged its pursuit of this action to "intimidate" others by mailing them copies of the action, and "litigation papers," to "deter the public from speaking freely." *Id*. ¶ 179.

"The essential elements of an action for abuse of process are only two, namely, (a) the existence of an ulterior purpose, and (b) the act of using the process to accomplish a result not within the scope of the proceeding in which it was issued, whether such result might otherwise be lawfully obtained or not." *Pow-Bel Constr. Corp. v. Gondek*, 291 Minn. 386, 389, 192 N.W.2d 812, 814 (1971). "The gist of the action, then, is the misuse or misapplication of legal process to accomplish an end other than that which the process was designed to accomplish." *Id*. *Bown v.*

*Hamilton*, 601 A.2d 1074, 1079 (D.C. 1992) (abuse of process liability lies "where the legal system has been used to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do.") (quotation omitted).

MyPillow's counterclaim alleges facts that, accepted as true, satisfy both elements: Dominion continues to pursue its meritless claims in this action for the ulterior purpose of wrongfully intimidating any would-be critics of Dominion into silence. Because MyPillow's allegations, if proved at trial, would establish Dominion's liability for abuse of process, this counterclaim cannot be dismissed.

Dominion's arguments to the contrary depend on simple mischaracterization of the abuse of process claim.

1.  Dominion claims the abuse of process claim is based on its "filing" of this action. Dom. Mem. 9. But the counterclaim clearly alleges Dominion is abusing process by "pursuing" the action, and by mailing copies of papers from the action to individuals whom Dominion seeks to intimidate. Countercl. ¶¶ 178-80. The continued pursuit of its meritless unconstitutional claims for the purpose of creating court proceedings and papers that can be publicized for threatening and intimidating effect is an abuse of process by Dominion.

2.  Dominion picks apart the abuse of process claim and argues that individual components of the claim – letters sent prior to the lawsuit, statements made to media, threats of additional lawsuits – fail to plead abuse of process. But isolated individual events are not the counterclaim. Rather, the counterclaim alleges an overarching "larger campaign" of intimidation and silencing, Countercl. ¶ 177, in which each of these acts, and Dominion's pursuit of this action, are all parts. These allegations amply meet the

29

"gist" of an abuse of process action – "misuse or misapplication of legal process to accomplish an end other than that which the process was designed to accomplish." *Pow-Bel Constr.*, 192 N.W.2d at 814.

3. Dominion argues "[t]he usual case of abuse of process is one of extortion." Dom. Mem. 12. Extortion is not an element of the tort of abuse of process. Even assuming extortion is the "usual case," that does not make extortion the *only permissible* case. Moreover, MyPillow's counterclaim is that Dominion is using this action to further a scheme to extort – to extort silence from any citizen who might otherwise be tempted to exercise his or her First Amendment right to criticize Dominion.

4. Dominion suggests MyPillow lacks standing to pursue its claim because the injury caused by Dominion's wrongful actions allegedly accrues to others – the ones intimidated into silence. Dom. Mem. 12-13. This argument presents a basic logical fallacy. The fact that Dominion's conduct injures others does not prevent Dominion's conduct from *also* injuring MyPillow. Conduct may injure multiple people in different ways. Dominion's abuse of process has inflicted harm upon MyPillow as a consequence of Dominion's desire to silence others. By analogy, a tortfeasor who steals a car to run over a pedestrian injures both his intended victim – the pedestrian – *and* the person whose car was stolen to accomplish the tort. He cannot defend against a tort claim brought by the owner of the car by saying the "real" injury was inflicted upon the pedestrian.

5. Dominion suggests the abuse of process claim is "based on process issued against *other* people." Dom. Mem. 13. MyPillow's abuse of process claim is based on process used against MyPillow in this action. Countercl. ¶¶ 175-83. Dominion seeks to leverage its process against MyPillow as a means of intimidating others into fearing that they, too,

will be sued, and Dominion has reinforced that threat by bringing several other high-profile actions. But Dominion's abuse of other process, as well, does not justify or eliminate its abuse of process against MyPillow.

MyPillow's counterclaims adequately plead an abuse of process claim against Dominion, and Dominion's motion provides no basis for dismissal.

## VII.

## DOMINION'S "VIEWPOINT DISCRIMINATION" STRAWMAN PROVIDES NO BASIS FOR DISMISSAL

Dominion's memorandum manufactures a "viewpoint discrimination" strawman to knock down. Dom. Mem. 43-45. This argument should be disregarded. MyPillow does not attempt to or need to establish viewpoint discrimination to prevail on its counterclaims.

When introducing the "viewpoint discrimination" claim allegedly pleaded by MyPillow, Dominion calls the argument "unclear." *Id.* at 44. It is "unclear" because MyPillow's counterclaims do not rely on viewpoint discrimination. MyPillow's counterclaims are premised on Dominion's wrongful acts and Dominion's wrongful purpose, as a state actor, to chill and deter Lindell, MyPillow, and others from engaging in criticism of Dominion's administration of elections. The counterclaims do not rely on an allegation that Dominion favored other viewpoints over the views expressed by Lindell. Rather, MyPillow's counterclaims assert a basic violation of the First Amendment, which forbids the government from punishing, chilling, or deterring an individual's speech through retaliatory action. "[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman*, 547 U.S. at 256.[3]

---

[3] While it is not at all necessary for MyPillow to allege facts establishing viewpoint discrimination to state a viable First Amendment claim, the fact that Dominion did target its retaliatory actions based on both the content of the speech at issue as well as the viewpoints expressed by the speaker

The viewpoint-discrimination cases cited by Dominion are therefore inapposite. Those cases concern plaintiffs who were denied access to government-controlled fora that were opened to speakers with differing viewpoints – not outright retaliation by a state actor against individuals for speaking out about the state actor's conduct. *See* Dom. Mem. 44; *Cornelius v. NAACP*, 473 U.S. 788, 790-797 (1985); *Frederick Douglass Found., Inc. v. District of Columbia*, 531 F. Supp. 3d 316, 330-34 (D.D.C. 2021). *See also Halleck*, 139 S. Ct. at 1930 ("When the government provides a forum for speech (known as a public forum), the government may be constrained by the First Amendment, meaning that the government ordinarily may not exclude speech or speakers from the forum on the basis of viewpoint, or sometimes even on the basis of content."). MyPillow's counterclaims are not premised on viewpoint discrimination.

## CONCLUSION

For the foregoing reasons, the motion to dismiss My Pillow, Inc.'s counterclaims should be denied.

Dated: March 11, 2022                    **PARKER DANIELS KIBORT LLC**

By */s/ Andrew D. Parker*
        Andrew D. Parker (D.C. Bar No. 63279)
        Joseph A. Pull (D.C. Bar No. 982468)
        888 Colwell Building
        123 N. Third Street
        Minneapolis, MN 55401
        Telephone: (612) 355-4100
        Facsimile: (612) 355-4101
        parker@parkerdk.com
        pull@parkerdk.com

---

makes Dominion's First Amendment violation particularly egregious. "When the government targets . . . particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) (citing *R.A.V. v. St. Paul*, 505 U.S. 377, 391 (1992)).

**LEWIN & LEWIN, LLP**

By _/s/ Nathan Lewin_
    Nathan Lewin (D.C. Bar No. 38299)
    888 17th Street NW
    Fourth Floor
    Washington, DC 20006
    Telephone: (202) 828-1000
    nat@lewinlewin.com

_Counsel for Defendant My Pillow, Inc._

By _/s/ Alan Dershowitz_
    Alan Dershowitz (MA Bar No. 121200)
    1575 Massachusetts Avenue
    Cambridge, MA 02138

_Of Counsel for Defendant My Pillow, Inc._