**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., AND DOMINION VOTING SYSTEMS CORPORATION, | ) ) ) ) | |
|     *Plaintiffs/Counter-Defendants*, | ) ) | |
| v. | ) ) | |
| MY PILLOW, INC. | ) ) | Case No. 1:21-cv-00445-CJN |
|     *Defendant/Counter-Plaintiff,* AND | ) ) | |
| MICHAEL J. LINDELL, | ) | |
|     *Defendant/Counter-Plaintiff,* | ) | |
|     *Third-Party Plaintiff,* | ) ) | |
| v. | ) ) | |
| SMARTMATIC USA CORP., SMARTMATIC INTERNATIONAL HOLDING B.V., SGO CORPORATION LIMITED, AND HAMILTON PLACE STRATEGIES, LLC, | ) ) ) ) ) | |
|     *Third-Party Defendants.* | ) | |

**THIRD-PARTY PLAINTIFF MICHAEL J. LINDELL'S
MEMORANDUM IN OPPOSITION TO DOMINION'S AND HPS'
MOTION TO DISMISS**

# TABLE OF CONTENTS

I.  LEGAL STANDARD.................................................................................................. 2

II. ARGUMENT ........................................................................................................... 3

    A.  Dominion Violated Lindell's First and Fourteenth Amendment Rights. .......................... 3

        1.  Dominion is a state actor................................................................................. 4

        2.  Dominion violated a right secured by the Constitution and laws of the United
            States. ...................................................................................................... 11

            a.  *Dominion deprived Lindell of his First Amendment rights through
                retaliation*................................................................................... 12

                i.  Lindell's statements receive First Amendment protection. ........................ 12

                ii. Dominion's conduct would chill a person of ordinary firmness................. 15

            b.  *Dominion Deprived Lindell of His Fourteenth Amendment Rights of Equal
                Protection and Due Process of the Law.* ........................................... 17

                i.  Dominion's conduct violated the Equal Protection Clause. ...................... 18

                ii. Dominion's conduct violated the Due Process Clause. .............................. 23

                  1.  *Dominion violated Lindell's substantive due process rights.* ............. 23

                  *2.  Dominion violated Lindell's procedural due process rights.* ............. 25

    B.  Lindell Pled Sufficient Facts to Allege RICO Claims Against Dominion and HPS. ....... 27

        1.  Lindell adequately alleged the existence of a RICO enterprise.............................. 27

        2.  Lindell adequately alleged RICO predicate acts................................................... 34

            a.  *Lindell sufficiently pled extortion* ..................................................... 34

            b.  *Lindell adequately pled witness tampering.*......................................... 37

            c.  *Lindell adequately alleged mail fraud.* ............................................... 40

        3.  Lindell's allegations do not concern "litigation-related activity"............................ 42

    C.  Lindell Properly Stated a Claim under the "Support or Advocacy" Clause. ................... 45

        1.  "Support or Advocacy" for a candidate is not limited to voting or events *prior
            to Election Day.* ....................................................................................... 48

2.   Lindell properly pled the existence of a conspiracy to support a claim under the Support or Advocacy Clause.............................................................. 52

D.   The Absolute Privilege Does Not Bar Lindell's Defamation Claim Against Dominion. ..................................................................................................... 54

E.   Lindell Adequately Pled Abuse of Process Against Dominion. ........................ 57

F.   Lindell Pled Sufficient Facts to Support a Civil Conspiracy Claim Against Dominion and HPS. ......................................................................................................... 58

1.   Lindell alleged underlying illegal acts to support his civil conspiracy claim.......... 59

2.   Lindell sufficiently alleged an agreement between Defendants. ............................ 60

3.   Support or Advocacy Clause is substantive right; underlying federal right is not required. ............................................................................................. 63

4.   Support or Advocacy Clause is substantive right; state action is not required. ....... 64

III. CONCLUSION.............................................................................................. 64

IV. REQUEST FOR ORAL ARGUMENT ................................................................. 65

# INDEX OF AUTHORITIES

**CASES**

*Abels v. Farmers Commodities Corp.*,
259 F.3d 910 (8th Cir. 2001) ............................................... 28

*Aref v. Holder*,
774 F.Supp. 2d 147 (D.D.C.2011) ........................................ 12

*Armenian Assembly of Am., Inc. v. Cafesjian*,
597 F. Supp. 2d 128 (D.D.C. 2009) ...................................... 54

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ............................................................... 2

*Bachellar v. Maryland*,
397 U.S. 564 (1970) ............................................................. 19

*BankCherokee v. Insignia Dev., LLC*,
779 N.W.2d 896 (Minn. Ct. App. 2010) .............................. 39

*Barber v. D.C. Gov't*,
394 F. Supp. 3d 49 (D.D.C. 2019) ....................................... 60

*Bates v. City of Little Rock*,
361 U.S. 516 (1960) ............................................................. 22

*Bates v. Nw. Hum. Servs., Inc.*,
466 F. Supp. 2d 69 (D.D.C. 2006) ....................................... 31

*Beauharnais v. Illinois*,
343 U.S. 250 (1952) ............................................................. 13

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................. 2, 60, 61

*Bennett v. Hendrix*,
423 F.3d 1247 (11th Cir. 2005) ........................................... 16

*Bigelow v. Galway*,
281 N.W.2d 835 (Minn. 1978) ............................................ 57

*Blakeney v. O'Donnell*,
117 F. Supp. 3d 6 (D.D.C. 2015) ......................................... 54

*Bolger v. Youngs Drug Products Corp.*,
463 U.S. 60 (1983) ............................................................... 19

iv

*Boyle v. United States,*
   556 U.S. 938 (2009) ................................................................ 27, 28, 29, 32

*Bridge v. Phoenix Bond & Indem. Co.,*
   553 U.S. 639 (2008) ................................................................ 40

*Brown v. Hill,*
   174 F. Supp. 3d 66 (D.D.C. 2016) .......................................... 64

*Brown v. Louisiana,*
   383 U.S. 131 (1966) ................................................................ 20

*Buckley v. Valeo,*
   424 U.S. 1 (1976) .................................................................... 14, 19

*Burnett v. Sharma,*
   511 F. Supp. 2d 136 (D.D.C. 2007) ........................................ 58

*Bush v. Butler,*
   521 F. Supp. 2d 63 (D.D.C. 2007) .......................................... 64

*Cafeteria & Restaurant Workers Union v. McElroy,*
   367 U.S. 886 (1961) ................................................................ 24

*\*Calabrese v. CSC Holdings, Inc.,*
   2004 WL 3185787 (E.D.N.Y. July 19, 2004) ........................ 36, 43

*Carey v. Brown,*
   447 U.S. 455 (1980) ................................................................ 19

*Carpenters & Joiners of Am. v. Scott,*
   463 U.S. 825 (1983) ................................................................ 46

*Cedric Kushner Promotions, Ltd. v. King,*
   533 U.S. 158 (2001) ................................................................ 31

*Chafoulias v. Peterson,*
   668 N.W.2d 642 (Minn. 2003) ................................................ 15, 56

*\*Chevron Corp. v. Donziger,*
   871 F. Supp. 2d 229 (S.D.N.Y. 2012) .................................... 34, 35, 36, 43

*City Council of Los Angeles v. Taxpayers for Vincent,*
   466 U.S. 789 (1984) ................................................................ 19

*County of Sacramento v. Lewis,*
   523 U.S. 833 (1998) ................................................................ 23, 24, 25

*Creecy v. District of Columbia,*
 No. CIV.A. 10-841 CKK, 2011 WL 1195780 (D.D.C. Mar. 31, 2011) .................................. 57

*Daniels v. Williams,*
 474 U.S. 327 (1986) ................................................................................................................ 24

*Diesen v. Hessburg,*
 455 N.W.2d 446 (Minn. 1990) .............................................................................................. 38

*Discon, Inc. v. NYNEX Corp.,*
 93 F.3d 1055 (2d Cir. 1996) .................................................................................................. 31

*Doe v. D.C.,*
 796 F.3d 96 (D.C. Cir. 2015) ................................................................................................ 12

*Doe v. United States Dep't of Justice,*
 753 F.2d 1092 (D.C. Cir. 1985) ............................................................................................ 26

*Dunlap v. Peco Energy Co.,*
 No. 96-CV-4326, 1996 WL 617777 (E.D. Pa. Oct. 23, 1996) ................................................. 53

*Dunn v. Blumstein,*
 405 U.S. 330 (1972) ................................................................................................................ 18

*E. Sav. Bank FSB v. Papageorge,*
 31 F. Supp. 3d 1 (D.D.C. 2014) ............................................................................................ 42

*\*Edmonson v. Leesville Concrete Co., Inc.,*
 500 U.S. 614 (1991) ......................................................................................................... *passim*

*Estelle v. Gamble,*
 429 U.S. 97 (1976) ................................................................................................................. 12

*Evan v. Newton,*
 382 U.S. 296 (1966) .................................................................................................................. 9

*Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.,*
 749 A.2d 724 (D.D.C. 2000) ................................................................................................ 52

*FCC v. Pacifica Foundation,* 4
 38 U.S. 726 (1978) ................................................................................................................ 19

*Feld Ent. Inc. v. Am. Co'y for the Prevention of Cruelty to Animals,*
 873 F. Supp. 2d 288 (D.D.C. 2012) ...................................................................................... 41

*First Nat. Bank of Boston v. Bellotti,*
 435 U.S. 765 (1978) ................................................................................................................ 22

*Flagg Bros., Inc. v. Brooks*,
 436 U.S. 149 (1978) ................................................................ 12

*Fraternal Order of Police Dep't of Corr. Labor Comm. v. Williams*,
 375 F.3d 1141 (D.C. Cir. 2004) ............................................... 24

*Frederick Douglass Found., Inc. v. D.C.*,
 531 F. Supp. 3d 316 (D.D.C. 2021) ......................................... 20

*Garcia v. City of Trenton*,
 348 F.3d 726 (8th Cir. 2003) ................................................... 15

*Gill v. Farm Bureau Life Ins. Co. of Missouri*,
 906 F.2d 1265 (8th Cir. 1990) ................................................. 50

*Gonzalez v. Bendt*,
 971 F.3d 742 (8th Cir. 2020) ................................................... 15

*Grayned v. Rockford*,
 408 U.S. 104 (1972) ................................................................ 19

*Griffin v. Breckenridge*,
 403 U.S. 88 (1971) .................................................................. 48

*Halberstam v. Welch*,
 705 F.2d 472 (D.C. Cir. 1983) ................................................. 60

*Hall Am. Ctr. Assocs. Ltd. P'ship v. Dick*,
 726 F. Supp. 1083 (E. D. Mich. 1989) ..................................... 42

*Hartman v. Moore*,
 547 U.S. 250 (2006) ................................................................ 12

*Haynesworth v. Miller*,
 820 F.2d 1245 (D.C. Cir. 1987), abrogated on other grounds by *Hartman v. Moore,*
 547 U.S. 250 (2006) .................................................................. 3

*Holy Land Found. For Relief & Dev. v. Ashcroft*,
 333 F.3d 156 (D.C. Cir. 2003) ................................................. 55

*Hustler Magazine, Inc. v. Falwell*,
 485 U.S. 46 (1988) .................................................................. 19

*In re Ellipso, Inc.*,
 2011 WL 482726 (Banrk. D.D.C. Feb. 7, 2011) ....................... 52

*In re EpiPen Direct Purchaser Litig.*,
 20-CV-0827 (ECT/TNL), 2021 WL 147166 (D. Minn. Jan. 15, 2021) ...................... 28, 29, 30

*In re Outlaw Lab'ys, LP Litig.*,
   352 F. Supp. 3d 992 (S.D. Cal. 2018) .......................................................... 40

*In re Sumitomo Copper Litigation*,
   995 F. Supp. 451 (S.D.N.Y. 1998) .............................................................. 41

*Jackson v. Metropolitan Edison Co.*,
   419 U.S. 345 (1974) ...................................................................................... 9

*Johnson v. City of Shelby, Miss.*,
   574 U.S. 10 (2014) ...................................................................................... 23

*Kerik v. Tacopina*,
   64 F. Supp. 3d 542 (S.D.N.Y. 2014) .......................................................... 35

*Kilbride Invs. Ltd. v. Cushman & Wakefield of Pennsylvania, Inc.*,
   294 F. Supp. 3d 369 (E.D. Pa. 2018) .......................................................... 53

*Kim v. Kim*,
   884 F.3d 98 (2d Cir. 2018) .................................................................... 43, 44

*Kurd v. Republic of Turkey*,
   374 F. Supp. 3d 37 (D.D.C. 2019) .............................................................. 60

*Kush v. Rutledge*,
   460 U.S. 719 (1983) ................................................................................ 49, 50

*Lagayan v. Odeh*,
   199 F. Supp. 3d 21 (D.D.C. 2016) .............................................................. 60

*LaRouche v. Fowler*,
   152 F.3d 974 (D.C. Cir. 1998) .................................................................... 19

*League of United Latin American Citizens (LULAC) v. Public Interest Legal Foundation*,
   No. 1:18-cv-00423, 2018 WL 3848404 (E.D. Va. 2018) ............................ 49

*Lee v. Katz*,
   276 F.3d 550 (9th Cir. 2002) ...................................................................... 10

*Lemelson v. Wang Laboratories Inc.*,
   874 F. Supp. 430 (D. Mass. 1994) .............................................................. 43

*Lugar v. Edmondson Oil Co.*,
   457 U.S. 922 (1982) .............................................................................. 3, 6, 11

*Manhattan Cmty. Access Corp. v. Halleck*,
   139 S.Ct. 1921 (2019) .............................................................................. 3, 9

*Marsh v. State of Ala.*,
  326 U.S. 501 (1946) ........................................................................................ 9

*Marshall v. Fenstermacher*,
  388 F. Supp. 2d 536 (E.D. Pa 2005) ............................................................. 53

*Matthis v. Kennedy,*
  67 N.W.2d 413 (1954) ............................................................................... 55, 56

*Mattiaccio v. DHA Grp., Inc.*,
  20 F. Supp. 3d 220 (D.D.C. 2014) ................................................................. 59

*McAndrew v. Lockheed Martin Corp.*,
  206 F.3d 1031 (11th Cir. 2000) ................................................................ 39, 54

*McCutcheon v. Fed. Election Comm'n*,
  572 U.S. 185 (2014) ....................................................................................... 14

*McIntyre v. Ohio Elections Comm'n*,
  514 U.S. 334 (1995) ....................................................................................... 13

*McNair Builders, Inc. v. Taylor,*
  3 A.3d 1132 (D.C. 2010) ................................................................................ 55

*Mills v. State of Ala.*,
  384 U.S. 214 (1966) ............................................................................ 13, 14, 16

*Mitsui O.S.K. Lines Ltd. v. Sea Master Logistics, Inc.*,
  871 F. Supp. 2d 933 (N.D. Cal. 2012) ........................................................... 30

*Monroe v. Pape,*
  365 U.S. 167 (1961), *overruled on other grounds, Monell v. Dept. of Soc. Serv.,*
  436 U.S. 658 (1978) ......................................................................................... 4

*Morin v. Trupin,*
  711 F. Supp. 97 (S.D.N.Y. 1989) .............................................................. 44, 45

*Morowitz v. Marvel,*
  423 A.2d 196 (D.C.1980) .......................................................................... 57, 58

*Mosrie v. Barry,*
  718 F.2d 1151 (D.C. Cir. 1983) ..................................................................... 26

*Moss v. Stockard*,
  580 A.2d 1011 (D.C. Cir. 1990) .................................................................... 15

*Moy v. Adelphi Institute, Inc.,*
  866 F. Supp. 696 (E.D.N.Y.1994) ................................................................. 41

*Nader v. McAuliffe*,
  593 F. Supp. 2d 95 (D.D.C. 2009), aff'd, No. 09-7003, 2009 WL 4250615
  (D.C. Cir. Oct. 30, 2009) ............................................................................................... 2

*Nat'l Coal. on Black Civic Participation v. Wohl*,
  498 F. Supp. 3d 457 (S.D.N.Y. 2020) ..................................................................... 58, 63

*Neitzke v. Williams*,
  490 U.S. 319 (1989) ....................................................................................................... 2

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ................................................................................................. 14, 15

*Nixon v. Condon*,
  286 U.S. 73 (1932) ......................................................................................................... 9

*Odom v. Microsoft Corp.*,
  486 F.3d 541 (9th Cir. 2007) ........................................................................................ 30

*Oparaugo v. Watts*,
  884 A.2d 63 (D.C. 2005) ............................................................................................... 39

*Parrot v. Taylor*,
  451 U.S. 527 (1981), overruled in part on other grounds, *Daniels v. Williams*,
  474 U.S. 327 (1986) ...................................................................................................... 12

*Paul v. Davis*,
  424 U.S. 693 (1976) ...................................................................................................... 25

*Payne v. Government of District of Columbia*,
  559 F.2d 809 (D.C.Cir. 1977) ........................................................................................ 4

*Perry Educ. Ass'n v. Perry Local Educators' Ass'n*,
  460 U.S. 37 (1983) ............................................................................................. 18, 19, 20

*Police Dept. of Chicago v. Mosley*,
  408 U.S. 92 (1972) ........................................................................................................ 19

*Propst v. Ass'n of Flight Attendants*,
  546 F. Supp. 2d 14 (E.D.N.Y. 2008) ............................................................................. 33

*R.A.V. v. City of St. Paul, Minn.*,
  505 U.S. 377 (1992) ......................................................................................... 12, 13, 18, 21

*Rajaratnam v. Motley Rice, LLC*,
  449 F. Supp. 3d 45 (E.D.N.Y. 2020) ............................................................................. 43

*Rendell-Baker v. Kohn*,
   457 U.S. 830 (1982) .......................................................................................... 9

*Republic of Kazakhstan v. Stati*,
   380 F. Supp. 3d 55 (D.D.C. 2019) ................................................................. 43

*Revene v. Charles County Com'rs*,
   882 F.2d 870 (4th Cir. 1989) ............................................................................ 3

*Riverwoods Chappaqua Corp. v. Marine Midland Bank*,
   30 F.3d 339 (2d Cir. 1994) ............................................................................. 32

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
   515 U.S. 819 (1995) ........................................................................................ 19

*Sable Commc'n of Cal., Inc. v. FCC*,
   492 U.S. 115 (1989) ........................................................................................ 13

*Safe Str. All. v. Hickenlooper*,
   859 F.3d 865 (10th Cir. 2017) ........................................................................ 27

*Scarbrough v. Morgan County Bd. of Educ.*,
   470 F.3d 250 (6th Cir. 2006) .......................................................................... 18

*Schmuck v. United States*,
   489 U.S. 705 (1989) ........................................................................................ 40

*Schware v. Board of Bar Examiners*,
   353 U.S. 232 (1957) ........................................................................................ 23

*Schwartz v. Laws. Title Ins. Co.*,
   970 F. Supp. 2d 395 (E.D. Pa. 2013) ............................................................. 29

*Scott Fetzer Co. v. Williamson*,
   101 F.3d 549 (8th Cir. 1996) .......................................................................... 56

*Sedima, S.P.R.L. v. Imrex Co.*,
   473 U.S. 479 (1985) ........................................................................................ 27

*Sekhar v. United States*,
   570 U.S. 729 (2013) ................................................................................. 34, 35

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
   502 U.S. 105 (1991) ................................................................................. 20, 22

*Singleton v. Cecil*,
   155 F.3d 983 (8th Cir. 1998), on reh'g en banc, 176 F.3d 419 (8th Cir. 1999)................. 23, 24

*Smiley v. Holm,*
  285 U.S. 355 (1932) ............................................................................................................ 4

*Smith v. Allwright,*
  321 U.S. 649 (1944) ............................................................................................................ 9

*Smith–Haynie v. District of Columbia,*
  155 F.3d 575 (D.C.Cir.1998) ........................................................................................... 54

*Snyder v. Phelps,*
  562 U.S. 443 (2011) .......................................................................................................... 14

*Stern v. U.S. Gypsum, Inc.,*
  547 F.2d 1329 (1977) ........................................................................................................ 48

*Stromberg v. California,*
  283 U.S. 359 (1931) .......................................................................................................... 20

*Surgidev Corp. v. Eye Tech., Inc.,*
  625 F. Supp. 800 (D. Minn. 1986) ................................................................................... 57

*Swanson v. Howard Univ.,*
  249 F. Supp. 3d 255 (D.D.C. 2017) ................................................................................. 57

*Sykes v. Mel Harris & Associates, LLC.,*
  757 F. Supp. 2d 413 (S.D.N.Y. 2010) ............................................................................. 44

*Tah v. Glob. Witness Publ'g, Inc.,*
  991 F.3d 231 (D.C. Cir. 2021) ......................................................................................... 15

*Tashjian v. Republican Party of Conn.,*
  479 U.S. 208 (1986) ............................................................................................................ 5

*Ted Cruz for Senate v. Fed. Election Comm'n,*
  542 F. Supp. 3d 1 (D.D.C. 2021) ..................................................................................... 13

*Terry v. Adams,*
  345 U.S. 461 (1953) ........................................................................................................ 6, 9

*Tex. v. Johnson,*
  491 U.S. 397 (1989) .......................................................................................................... 19

*Thompson v. Trump,*
  No. 21-cv-00400, 2022 WL 503384 (D.D.C. Feb. 18, 2022) ..................................... 48, 60

*Toolasprashad v. Bureau of Prisons,*
  286 F.3d 576 (D.C.Cir. 2002) .......................................................................................... 12

*Tri County Indus., Inc. v. D.C.,*
104 F.3d 455 (D.C. Cir. 1997) ............................................................. 24

*Turner Broadcasting System, Inc. v. FCC,*
512 U.S. 622 (1994) ............................................................................. 19

*U.S. Term Limits, Inc. v. Thornton,*
514 U.S. 779 (1995) ....................................................................... 4, 5, 6

*U.S. v. Alvarez,*
567 U.S. 709 (2012) ............................................................................. 13

*U.S. v. O'Brien,*
391 U.S. 367 (1968) ............................................................................. 20

*United States v. Applins,*
637 F.3d 59 (2d Cir. 2011) .................................................................. 28

*United States v. Coughlin,*
610 F.3d 89 (D.C. Cir. 2010) .............................................................. 40

*United States v. Eiland,*
738 F.3d 338 (D.C. Cir. 2013) ............................................................ 33

*United States v. Eisen,*
974 F.2d 246 (2d Cir. 1992) ................................................................ 42

*United States v. Han,*
280 F. Supp. 3d 144 (D.D.C. 2017) .................................................... 41

*United States v. Jannotti,*
673 F.2d 578 (3d Cir. 1982) ................................................................ 34

*United States v. Morrison,*
98 F. 3d 619 (D.C. Cir. 1996) .............................................. 37, 38, 40

*United States v. Salerno,*
481 U.S. 739 (1987) ............................................................................. 24

*United States v. Scotto,*
641 F.2d 47 (2d Cir. 1980), cert. denied, 452 U.S. 961 (1981) ...... 31, 32

*United States v. Stockheimer,*
157 F.3d 1082 (7th Cir. 1998) ............................................................ 41

*United States v. Turkette,*
452 U.S. 576 (1981) ....................................................................... 27, 32

*United States v. Welch,*
   327 F.3d 1081 (10th Cir. 2003) ........................................................ 41

*Vacco v. Quill,*
   521 U.S. 793 (1997) ........................................................................ 18

*Village of Willowbrook v. Olech,*
   528 U.S. 562 (2000) ........................................................................ 18

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989) ........................................................................ 20

*Weiler v. Purkett,*
   137 F.3d 1047 (8th Cir. 1998) .......................................................... 23

*West v. Atkins,*
   487 U.S. 42 (1988) ................................................................... *passim*

*White v. Walsh,*
   649 F. 2d 560 (8th Cir. 1981) ........................................................... 61

*Wilcox v. Lyons,*
   970 F.3d 452 (4th Cir. 2020), cert. denied, 141 S. Ct. 2754 (2021) ........ 17

*\*Wisconsin v. Constantineau,*
   400 U.S. 433 (1971) .................................................................. 25, 26

*Wood v. Georgia,*
   370 U.S. 375 (1962) .......................................................................... 2

*Woytowicz v. George Washington Univ.,*
   327 F. Supp. 3d 105 (D.D.C. 2018) .................................................. 64

*Young v. American Mini Theatres, Inc.,*
   427 U.S. 50 (1976) .......................................................................... 19

*Zablocki v. Redhail,*
   434 U.S. 374 (1978) ........................................................................ 18

*Zutz v. Nelson,*
   788 N.W.2d 58 (Minn. 2010) ........................................................... 55

## STATUTES

18 U.S.C. § 1341 ................................................................................ 40

18 U.S.C. § 1951 ................................................................................ 34

18 U.S.C. § 1961 ........................................................................................................ 27

18 U.S.C. § 1962 ........................................................................................................ 27

42 U.S.C. § 1985 ................................................................................................ 45, 58

GA. CODE § 21-2-300(2) ............................................................................................ 5

## OTHER AUTHORITIES

3B FED. PRAC. & INST. § 167:30, Westlaw (database updated Jan. 2022) .................................... 60

*Cantwell v. State of Connecticut*, 310 U.S. 296 (1940) ............................................... 23

## LAW REVIEW ARTICLES

Richard Primus & Cameron O Kistler, *The Support-or-Advocacy Clauses*, 89 Fordham L. Rev. 145, 162 (2020) ............................................................................................... 48, 49

*The Support or Advocacy Clause of § 1985(3)*, 133 HARV. L. REV. 1389 (2020) .................... 64

Wentong Zheng, *A Knowledge Theory of Tacit Agreement*, 9 HARVARD BUS. L. REV. 399 (2009) .................................................................................................................. 62

## LEGISLATIVE HISTORY

Ch. 114, 16 Stat. 140, 141 (1870) ............................................................................... 49

## U.S. CONSTITUTION

U.S. Const. amend. XIV, § 1 .............................................................................. 18, 23

U.S. Const. art. I ......................................................................................................... 4

According to Dominion, because "[f]acts matter[,] [t]he truth matters," it filed its lawsuit against Lindell "so that the truth ... can be proven in a court of law...." Dkt. 1, ¶162. But for months leading up to its lawsuit, Dominion sent almost 200 letters to individuals and entities threatening them to stop all discussions concerning fraud and illegal voting in the 2020 General Election— and how electronic voting machines can be used "to steal votes" in elections on a national scale. Compl. ¶¶ 3, 85-86, 112; Index, Ex. 2.. For those like Mike Lindell who refused to be intimidated into silence, Dominion proceeded to phase two—filing expensive litigation with outlandish damage claims that many in the media and on the left lauded, but that fly in the face of the First Amendment—and, more importantly, the public record. An extension of the ongoing coordinated attempt to stop so-called "disinformation" (read: dissent) regarding the election, the strategy was effective for Dominion in at least one way—it silenced some individuals who otherwise would have offered their direct observations of voting fraud and irregularities in support of Lindell's defense to Dominion's defamation claims against him. Dominion specifically tailored this case to present *its* false narrative— not *the* truth. Public discussion of election processes, results, integrity, and reliability deserves the highest First Amendment protections. State actors responsible for running those elections must never be allowed to engage in coordinated efforts to interfere with that discussion by silencing particular viewpoints. Defendants and Smartmatic, however, collaborated or conspired to shut down discussion of fraud and illegal voting in the 2020 General Election. That discussion is unquestionably a matter of public concern about the very state function these Defendants were paid to perform. Remarkably, before the November 2020 election, these Defendants were silent in this topic even as politicians, computer experts, and movie producers (e.g. *Hacking Democracy* and *Kill Chain*) all warned how electronic voting machines could be and were being used to steal elections. Compl. ¶¶ 99–106. It was only after the 2020 General Election that

Defendants woke up from their slumber to try and initiate a scorched-earth campaign of threats and litigation to intimidate and silence debate on this issue.

No individual or entity is the gatekeeper of truth, especially when the topic is public discussion about elections. A fundamental privilege of living in this country is "the power of free and fearless reasoning and communication of ideas to discover and spread political ... truth." *Wood v. Georgia*, 370 U.S. 375, 388–89 (1962).

## I.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires a complaint include "a short and plain statement of the claim showing the pleader is entitled to relief" so the defendant has "fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007) (internal citations omitted). When evaluating Dominion's and HPS'[1] Rule 12(b)(6) Motion, this Court must assume all "allegations in the complaint are true, even if doubtful in fact." *Id.*; *see also Neitzke v. Williams,* 490 U.S. 319, 327 (1989) ("Rule 12(b)(6) does not countenance … dismissals based on a judge's disbelief of a complaint's factual allegations"). To survive a motion to dismiss, a complaint is not required to allege "detailed factual allegations"; instead, the complaint must only contain sufficient facts, which the Court must accept as true, and "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555, 570); *Nader v. McAuliffe*, 593 F. Supp. 2d 95, 99 (D.D.C. 2009), aff'd, No. 09-7003, 2009 WL 4250615 (D.C. Cir. Oct. 30, 2009).

A claim is "facially plausible" if it includes facts which sufficiently allow a court to reasonably infer the defendant is liable for the alleged misconduct. *Id*. (citing *Twombly*, 550 U.S. at 557). "A motion to dismiss should be granted only when it appears beyond doubt that, under any

---

[1] Dominion and HPS are collectively referred to as "Defendants" throughout this Brief.

reasonable reading of the complaint, the plaintiff will be unable to prove any set of facts that would justify relief." *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987), abrogated on other grounds by *Hartman v. Moore,* 547 U.S. 250 (2006).

## II.   ARGUMENT

### A.   Dominion Violated Lindell's First and Fourteenth Amendment Rights.

Lindell alleged sufficient facts to state a claim against Dominion for violations of his 1st and 14th Amendment rights under 42 U.S.C. § 1983. *See West v. Atkins*, 487 U.S. 42, 56 (1988); *Manhattan Cmty. Access Corp. v. Halleck*, 139 S.Ct. 1921, 1945 (2019); Compl. ¶¶ 6, 8–12, 18– 19, 36, 39–40, 43–51, 64, 68–110, 117–18, 124–39, 169–79. A § 1983 complaint should survive a Rule 12(b)(6) motion to dismiss as long as its legal assertions are supported by the pled facts— even if the legal assertions are conclusory and the factual assertions are equally consistent with a contrary conclusion. *See Revene v. Charles County Com'rs*, 882 F.2d 870, 873 (4th Cir. 1989).

A plaintiff successfully pleads a § 1983 claim if he alleges: (1) the violation of a right secured by the Constitution and laws of the United States; (2) by a person acting under color of state law, meaning the violation "has its source in state authority." *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 620 (1991) (citing *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 939–41 (1982)). State authority may be shown through allegations that the deprivation is based on (i) a rule or privilege created by the state; (ii) a rule of conduct imposed by the state; or (iii) because the state was responsible for the defendant. *West*, 487 U.S. at 54. If a plaintiff alleges a 14th Amendment violation under § 1983, he must show, in addition to the above elements, "state action" through allegations that "the private party charged with the deprivation could be described in all fairness as a state actor." *Edmonson*, 500 U.S. at 620 (citing *Lugar*, 457 U.S. at 941–42). State action may be shown through allegations that the (a) defendant is performing a traditional

governmental function; (b) defendant acted together with or obtained significant aid from state officials; or (c) "the injury caused is aggravated in a unique way by the incidents of governmental authority." *Id.* at 622; *see also West*, 487 U.S. at 42, 49, 54. If a defendant's conduct satisfies the state-action requirement of the 14th amendment, it is also action under color of state law for § 1983 purposes. *Id.* The nature and circumstances of the defendant's act are controlling and must be carefully scrutinized. *Monroe v. Pape,* 365 U.S. 167, 184–87 (1961), *overruled on other grounds, Monell v. Dept. of Soc. Serv.,* 436 U.S. 658 (1978); s*ee also Payne v. Government of District of Columbia,* 559 F.2d 809, 825 n.9 (D.C.Cir. 1977) ("The circumstances surrounding the use of a service revolver, rather than the mere fact of its use, have constitutional relevance....").

### 1.    Dominion is a state actor.

Lindell sufficiently pled facts establishing Dominion's conduct as a state actor. Dominion's involvement in the 2020 General Election, statements Lindell made concerning election integrity, and Dominion's subsequent cease and desist letters and defamation lawsuit were made possible only because of (1) a right or privilege having its source in state authority, (2) extensive use of government procedures with significant aid from the government; and (3) Dominion's authority to perform a traditional an exclusive government function. *Edmonson,* 500 U.S. 614–15; Compl. ¶¶ 43–51, 124–39, 169–79. Lindell also pled sufficient facts showing Dominion is a state actor because (1) it acted together with or obtained significant aid from state officials, *or* (2) its conduct was otherwise chargeable to the state. *See id.*

The Elections Clause gives states the authority "'to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right'" to vote. *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 834 (1995) (quoting *Smiley v. Holm,* 285 U.S. 355, 366 (1932)); U.S. Const. art. I § 4, cl. 1. "The power to regulate the time, place, and manner of elections" however, "does not justify, without more, the abridgment of

fundamental rights." *Tashjian v. Republican Party of Conn.,* 479 U.S. 208, 217 (1986). Due to this constitutional authority to regulate election procedures, the states are said to have an interest in protecting the integrity and regularity of the election process. *Thornton*, 514 U.S. at 835. While a state may outsource a constitutional obligation to a private party to perform, the state remains responsible for that party's performance of the state obligation. *See West*, 487 U.S. at 55 (holding that a state cannot relieve itself of a constitutional obligation through contract with a private party). For example, Georgia's election code mandates:

> all federal, state, and county general primaries and general elections as well as special primaries and special elections in the State of Georgia shall be conducted with the use of scanning ballots marked by electronic ballot markers and tabulated by using ballot scanners for voting at the polls and for absentee ballots cast in person, unless otherwise authorized by law; provided, however, that such electronic ballot markers shall produce paper ballots which are marked with the elector's choices in a format readable by the elector.

GA. CODE § 21-2-300(2); Compl. ¶ 46 n.57. Each state has legislation regulating elections with most states also approving similar language outsourcing various aspects of their election regulatory authority to third parties. *Id*. at ¶ 45. Twenty-eight states, and over 1,300 governmental jurisdictions, outsourced their constitutional obligations under Article 1, Section 4, Clause 1 to Dominion for the 2020 General Election, including many "swing states" and a state-wide contract with Georgia requiring every county to use Dominion's machines and services. *Id*. at ¶¶ 45–46; Dkt. 1, ¶ 157. By virtue of these state contracts, Dominion obtained the authority to administer, collect, count, record, and audit ballot results. Compl. ¶¶ 37–49.

In exercising this authority, Dominion provides the states with "End-To-End Election Management System" that "[d]rives the entire election project through a single comprehensive database." *Id*. at ¶ 47. Dominion builds the election project and provides technology and solutions for voting, tallying, reporting, and auditing the election. *Id*. With contracts in over half of the

United States in 2020, Dominion exercised extensive authority over the administration of "voting systems[,] and services" necessary "to run election operations and programming in a majority of states across the country." Dkt. 1, ¶¶ 71, 157; Compl. ¶¶ 40–51.

While the states may outsource their duty to administer elections to private parties like Dominion and Smartmatic, they retain the obligation to protect the integrity and regularity of the election process through legislation. *See Thornton,* 514 U.S. at 835. But that does not mean a state-obligation that has been outsourced to a third-party like Dominion is no longer subject to the constitutional protections against government abuse through state actions. "Any part of the machinery for choosing officials becomes subject to the Constitution's constraints." *Edmonson*, 500 U.S. at 625 (quoting *Terry v. Adams*, 345 U.S. 461, 481 (1953)).

In *Edmonson v. Leesville Concrete Co.,* the Supreme Court held a private entity's exercise of peremptory challenges was pursuant to a course of state action. *Id*. at 618. The issue was whether a private litigant in a civil case may use peremptory challenges to exclude jurors on account of race. *Id*. at 616. Recognizing that racial discrimination violates the Constitution only when attributed to state action, the Court began a state-action analysis according to the framework established in *Lugar*—(1) "whether the claimed constitutional deprivation resulted from the exercise of a right or privilege having its source in state authority, 457 U.S. at 939–41; and second, whether the private party charged with the deprivation could be described in all fairness as a state actor, *id*., at 941–42." *Id*. at 619–20 (cleaned up).

The Court held that the first part of the *Lugar* test was clearly satisfied. *Id*. at 620. Because peremptory challenges "are permitted only when the government, by statute or decisional law, deems it appropriate to allow parties to exclude a given number of persons" from service on a jury, the Court held that the private party defendant "would not have been able to engage in the alleged

discriminatory acts" without specific government authorization. *Id*. at 620–21. The Court then turned to the second part of the *Lugar* test to determine "whether a private litigant in all fairness must be deemed a government actor in the use of peremptory challenges." *Id*. at 621. In determining this part of the test, the Court held "it is relevant to examine the following: the extent to which the actor relies on governmental assistance and benefits, whether the actor is performing a traditional governmental function, and whether the injury caused is aggravated in a unique way by the incidents of governmental authority." *Id*. at 620–22 (cleaned up).

The Court held that state action exists "when private parties make extensive use of state procedures with overt, significant assistance of state officials." *Id*. at 622 (internal quotations omitted). The Court next held that a traditional function of the government was involved. *Id*. at 624. The Court held that "[i]f a government confers on a private body the power to choose the government's employees or officials, the private body will be bound by" constitutional mandates. *Id* at 625. Because peremptory challenges are used to select the jury that exercises the power of the court and the government (which confers the court's jurisdiction), a private litigant's exercise of peremptory challenges is state action. *Id*. at 624. Here, Dominion also chose the people (or machines) performing essential state functions. Although the private entity lacked a contractual relationship with the government, the Court still held that when the government and private entity "work for the same end," the private entity's involvement in a "unique governmental function" delegated to it by the government is "attributable to the government for purposes of invoking constitutional protections." *Id*. at 627.

Lindell alleged sufficient facts from which this Court may fairly infer Dominion is a state actor. Under the first part of the *Lugar* test, Dominion's discriminatory conduct was possible only because "the government, by statute or decisional law, deem[ed] it appropriate." *Edmonson*, 500

U.S. at 620. Dominion is authorized by various states' statutes to perform the states' obligations to administer elections. Compl. ¶¶ 45–49 Had the states retained the duty to administer the 2020 General Election, then Lindell's statements concerning election integrity, results, and administration would have been directly about the states. *Id*. at ¶¶ 69–71. But because the states outsourced their duty to administer the 2020 General Election to Dominion, Lindell's statements about the exercise of that duty inevitably involved Dominion. Dominion could not administer elections without state authority to do so. *Id*. at ¶¶ 37–49. The states' relationships with Dominion put Dominion in the position to send letters to Lindell and sue him for defamation. *Id*. at ¶¶ 125–39. Said another way, in this scenario, there is no action without state involvement.

Lindell further sufficiently pled facts supporting each factor under the second part of the *Lugar* test. First, Dominion made extensive use of significant government participation both in administering elections and invoking the judicial system to silence viewpoint-based speech regarding the 2020 General Election. *Id*. at ¶¶ 37–49, 125–39; *see also Edmonson*, 500 U.S. at 622. Dominion had contracts with twenty-eight states to administer, collect, count, record, and audit ballot results. Compl. ¶¶ 45, 51. "Those contracts are typically multi-year contracts and range from tens of thousands of dollars to over a hundred million dollars, depending on the jurisdiction and scope of the contract." Dkt. 1, ¶ 157. For example, in Georgia alone, Dominion received $90,000,000 upfront for the state-wide contract and profited from six weeks of "service" provided to Fulton County, Georgia, totaling $1,297,260.00. Compl. ¶ 44. Dominion exerted significant control over the 2020 General Election working in conjunction with state election officials by administering, collecting, counting, recording, and auditing ballot results. *Id*. at ¶¶ 43–49. For example, during the election, only Dominion could program and operate its machines in Maricopa County, Arizona; officials lacked necessary administrative passwords to access the machines. *Id*.

at ¶ 47. Even following the election, Dominion still refused to provide the passwords to County officials so they could conduct an audit. *Id*. at ¶¶ 18, 47. Under the terms of its contract with Dominion, Georgia agreed that the "State has relied, and will rely on, [Dominion's] experience and expertise in installing, implementing, and servicing the Solution purchased under this Agreement." *Id*. at ¶ 46.

Second, Dominion's conduct involves a traditional and exclusive public function—the administration of elections. *Id*. at ¶¶ 6, 8–12, 18–19, 36, 39–40, 43–51, 64, 68–110, 117–18, 124–39, 169–79; *Halleck*, 139 S.Ct. at 1928–29. A function qualifies "as a traditional, exclusive public function within the meaning of our state-action precedents" when "the government … traditionally and exclusively performed the function." *Halleck*, 139 S.Ct. at 1928–29 (citing *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982)); *see also Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352–53 (1974); *Evan v. Newton*, 382 U.S. 296, 300 (1966)). "Under the Court's cases, those functions include, for example, running elections...." *Id*. at 1929 (holding independent political party, operating outside of any state law, conducting primaries, and excluding people based on race was performing a state action under the 14th Amendment and thus violated the 15th Amendment) (citing *Terry*, 345 U.S. at 468–70); *Marsh v. State of Ala.*, 326 U.S. 501, 505–09 (1946); *Smith v. Allwright*, 321 U.S. 649, 662–66 (1944); *Nixon v. Condon*, 286 U.S. 73, 84–89 (1932)).

Dominion's relationship with state and local governments is "an integral part, indeed the only effective part, of the elective process that determines who shall rule and govern." *See Terry*, 345 U.S. at 469. Because of the Help America Vote Act, companies like Dominion provide required election support and services and serve the same role as local county election officials at precincts leading up to, during, and after an election. Compl. ¶¶ 37–43. Dominion executes software updates, fixes, and patches for its voting machines, and it pushes out such software through

means selected at its own discretion, including via the internet. *Id*. at ¶ 43. Dominion designs public election processes centered around its hardware and software products and provides administrative services for public elections. *Id*. at ¶ 44. Dominion also audits the performance of the machines and elections. *Id*.

Because it is part of the "machinery for choosing officials," Dominion is subject to the Constitution's restraints against viewpoint-based discriminatory speech restrictions on matters regarding the election of public officials. *See Edmonson*, 500 U.S. at 625; *see also Lee v. Katz*, 276 F.3d 550, 556 (9th Cir. 2002) (supporting argument that when a private party performs a traditional and exclusive public function, it may not regulate speech regarding that function); Compl. ¶¶ 37–49. Though Dominion's motive for initiating its lawfare campaign and filing suit against Lindell for defamation "may have been to protect a private interest, the objective of" the lawfare campaign was to silence viewpoint-based discriminatory speech restrictions on matters regarding the election. Compl. ¶¶ 125–39, 169–79. Dominion has assumed the state-delegated responsibility to administer public elections, including the election of individuals to serve in constitutionally prescribed offices—a core governmental function. *Id*. at ¶¶ 37–49, 171, 177. Because of that power, Dominion was put in the position to initiate a lawfare campaign with the help of Smartmatic, HPS, and Clare Locke, designed to silence what it deemed election "disinformation" by sending cease and desist letters, filing lawsuits, and threatening Lindell with defamation litigation and ruinous sanctions. *Id*. at ¶¶ 124–39, 169–79. Lindell's Complaint includes even more compelling facts than in *Edmonson* to allege Dominion is a state actor. Unlike *Edmonson,* where the government did not contractually delegate the authority to perform a traditional and exclusive governmental function to the private entity yet the private entity was still held to be a state actor, here multiple state and local governments specifically delegated through contract their traditional and exclusive function

10

to administer elections to Dominion. *Id*. at ¶¶ 37–49, 171, 177. The Court may infer that because Dominion and local governments "work for the same end," Dominion's involvement in administration of elections may be "attributable to the government for purposes of invoking constitutional protections." *Edmonson,* 500 U.S. at 627. Dominion's defamation lawsuit is based on Lindell's statements regarding Dominion's involvement in the 2020 General Election. Compl. ¶¶ 125–39; Dkt. 1. Therefore, Dominion's conduct to silence Lindell's and others' statements expressing similar viewpoints is subject to constitutional protections. *Edmonson*, 500 U.S. at 627; Compl. ¶¶ 125–39, 169–79

Were it not for Dominion's involvement in the election process, there would be no question that the entire scheme to silence speech expressing a particular viewpoint on the 2020 General Election "would constitute state action." *See Edmonson*, 500 U.S. at 626 (holding that "were it not for peremptory challenges, there would be no question that the entire process of determining who will serve on the jury constitutes state action."). As a state actor, Dominion became liable for all actions it took to silence Lindell's constitutionally protected speech on matters regarding the election including sending cease and desist letters to Lindell and filing suit to silence and intimidate him and others who might speak out. Compl. ¶¶ 19, 125–40, 169–79.

Dominion's misuse, through improper viewpoint-based speech restrictions, of the authority given to it by the states caused Lindell's constitutional deprivations. Therefore, Dominion "may fairly be said to be a state actor." *West,* 487 U.S. at 54–55 (citing *Lugar*, 457 U.S. at 937).

## 2.    Dominion violated a right secured by the Constitution and laws of the United States.

In addition to alleging state action, a plaintiff asserting a § 1983 violation must "allege the violations of a right secured by the Constitution and laws of the United States …." *Id.* at 48 (citing *Parrot v. Taylor*, 451 U.S. 527, 535 (1981) (overruled in part on other grounds, *Daniels v.*

*Williams*, 474 U.S. 327, 330–31 (1986))); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978). A plaintiff meets this standard by alleging the defendant's conduct violated specific constitutional rights. *Id.* at 45, 48 (citing *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976)). Here, Lindell pled facts sufficient to show Dominion violated his First and 14th Amendment rights.

### a.    *Dominion deprived Lindell of his First Amendment rights through retaliation.*

To establish a claim for retaliation under the First Amendment, an individual must prove that (1) he engaged in protected conduct, (2) the government "took some retaliatory action sufficient to deter a person of ordinary firmness in the plaintiff's position from speaking again," and (3) there exists "a causal link between the exercise of a constitutional right and the adverse action taken against him." *Doe v. D.C.*, 796 F.3d 96, 106–07 (D.C. Cir. 2015) (cleaned up) (citing *Aref v. Holder,* 774 F.Supp. 2d 147, 169 (D.D.C.2011)); *see Toolasprashad v. Bureau of Prisons,* 286 F.3d 576, 584–85 (D.C.Cir. 2002). A plaintiff sufficiently pleads causation if he alleges his "constitutional speech was the 'but for' cause of the defendants' retaliatory action." *Aref,* 774 F.Supp. 2d at 169 (citing *Hartman v. Moore,* 547 U.S. 250, 256 (2006)).

### i.    Lindell's statements receive First Amendment protection.

Lindell sufficiently pled speech protected by the First Amendment. All speech is protected by the First Amendment unless it falls into one of the few, traditional areas in which the Supreme Court has held speech may be restricted. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 383–85 (1992). Dominion believes its lawsuit based on Lindell's allegedly defamatory statements cannot serve as the basis of Lindell's First Amendment retaliation claim because Dominion survived a motion to dismiss. Mot. at 39–41. Surviving a motion to dismiss, where allegations are accepted by the court as true, proves nothing. As the Supreme Court in *R.A.V.* put it, "[s]uch a simplistic, all-or-nothing-at-all approach to First Amendment protection is at odds with common sense and

with our jurisprudence as well." 505 U.S. at 385. By taking that position, Dominion tries to narrow the full breath and protections of the First Amendment and misconstrues the legal standard necessary to survive a motion to dismiss.

While the Supreme Court has held that defamatory statements are, sometimes, "not within the area of constitutionally protected speech," *Beauharnais v. Illinois,* 343 U.S. 250, 266 (1952), or that the "protection of the First Amendment does not extend" to them, *Sable Commc'n of Cal., Inc. v. FCC,* 492 U.S. 115, 124 (1989),

> [s]uch statements must be taken in context, however, and are no more literally true than is the occasionally repeated shorthand characterizing obscenity "as not being speech at all,".... What they mean is that these areas of speech can, consistently with the First Amendment, be regulated *because of their constitutionally proscribable content* (obscenity, defamation, etc.)—not that they are categories of speech entirely invisible to the Constitution ....

*R.A.V.*, 505 U.S. at 383–84 (cleaned up) (emphasis in original). While defamatory statements may be regulated, "the power to proscribe [speech] on the basis of *one* content element" (*e.g.,* defamation) "does not entail the power to proscribe it on the basis of *other* content elements." *Id.* at 386. When speech concerns public issues yet contains allegedly defamatory statements, the speech is still afforded First Amendment protections. *See e.g., U.S. v. Alvarez,* 567 U.S. 709 (2012).

"Discussion of public issues ... [is] integral to the operation of the system of government established by our Constitution." *McIntyre v. Ohio Elections Comm'n,* 514 U.S. 334, 346 (1995); *Ted Cruz for Senate v. Fed. Election Comm'n*, 542 F. Supp. 3d 1, 7 (D.D.C. 2021). As a result, "there is practically universal agreement that a major purpose of [the First] Amendment was to protect the free discussion of governmental affairs," *McIntyre,* 514 U.S. at 346 (internal citations omitted), which includes discussion on "the manner in which government is operated ... and all such matters relating to political processes." *Mills v. State of Ala.*, 384 U.S. 214, 218–19 (1966).

Such public issue speech is at the core of First Amendment protections. *See id.*; *Buckley v. Valeo,* 424 U.S. 1, 14–15 (1976); *New York Times Co. v. Sullivan,* 376 U.S. 254, 269–70 (1964). "[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 203 (2014) (citing *Buckley,* 424 U.S. at 15). The Court must "err on the side of protecting political speech rather than suppressing it." *Id*. at 209.

Because Lindell's speech—which forms the basis of Dominion's lawsuit against him and therefore Lindell's claim for First Amendment retaliation against Dominion—relates to matters of public concern, it receives the highest protections of the First Amendment. *See id*. Dominion complains of Lindell's public speeches, interviews, tweets, and statements regarding the outcome and reliability of the 2020 General Election results. Dkt. 1, ¶¶ 163–72. Such speech, even if it includes statements Dominion does not like, concerns "the manner in which government is operated ... and all such matters relating to political processes" and is, therefore, afforded the highest First Amendment protection. *See Mills*, 384 U.S. at 218–19; *Buckley,* 424 U.S. at 14–15.

Because Dominion is a state actor running elections in most states, Lindell's statements regarding Dominion directly relate to public concerns about election integrity and the very means of self-government in this country. *Snyder v. Phelps*, 562 U.S. 443, 453 (2011); Compl. ¶¶ 125–39, 175–79. Lindell made these statements very publicly—in speeches, nationally broadcasted interviews, through widely-shared social media platforms, and a docu-movie he produced. *See* Dkt. 1, ¶¶ 163–72. Such broad dissemination of Lindell's statements demonstrates the topic on which he was speaking was in fact "a subject of legitimate news interest [and] a subject of general interest and of value and concern to the public." *See Snyder*, 562 U.S. at 453.

The fact that Dominion survived Lindell's Motion to Dismiss its claims against him does

not mean Lindell's statements are defamatory or that Lindell's statements are not subject to First Amendment protections. Dominion has not proven any of its claims. *See Moss v. Stockard*, 580 A.2d 1011, 1029 (D.C. Cir. 1990) (holding that plaintiff must prove defamatory statements by clear and convincing evidence) (citing *New York Times*, 376 U.S. at 270–80); *Chafoulias v. Peterson*, 668 N.W.2d 642, 648–49 (Minn. 2003). No such showing or finding has been made. Dkt. 54. Dominion's survival only means that the Court concluded Dominion alleged sufficient facts—that the Court was *required* to take as true—to survive a motion to dismiss its complaint. *Id.*

> ii.   Dominion's conduct would chill a person of ordinary firmness.

Lindell further alleges facts showing Dominion's retaliatory conduct in response to his statements would chill a person of ordinary firmness from continuing to discuss the reliability of the 2020 General Election results.

The ordinary firmness test "is an objective one, not subjective. The question is ... [w]hat would a person of ordinary firmness have done in reaction to the [adverse action]," not what the plaintiff himself would have done. *Gonzalez v. Bendt*, 971 F.3d 742, 745 (8th Cir. 2020) (internal quotations omitted); *Garcia v. City of Trenton*, 348 F.3d 726, 729 (8th Cir. 2003). In determining "actual malice," the standard is an entirely subjective one: did the defendant make the statement knowing (subjectively) that it was false or with a "high degree of awareness of probable falsity"? *Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231, 240 (D.C. Cir. 2021) (holding speaker must have actually harbored subjective doubt as to the truth of his statements). Not so for the "ordinary firmness" test. There, the test is purely *objective.* And with good reason. It would be unjust to apply a subjective standard here because it would "allow a defendant to escape liability for a First Amendment violation merely because an unusually determined plaintiff persists in his protected activity

....” *Bennett v. Hendrix,* 423 F.3d 1247, 1251–52 (11th Cir. 2005). “There is no reason to 'reward' government officials for picking on unusually hardy speakers.” *Id.*

An objective test, based on Lindell's allegations, would find a person of ordinary firmness likely to stop discussing election integrity after receipt of Dominion's threats to initiate ligation against him for $1.3 billion. Compl. ¶¶ 125–39, 175–79. Lindell alleged Dominion sent threatening letters to over 150 individuals demanding they cease and desist from commenting on the election or Dominion. Compl. ¶¶ 128, 132. Dominion then filed multiple lawsuits against large media networks and high-profiled individuals seeking similar damages. Compl. ¶¶ 129–132. Lindell was banned from Twitter and censored on Facebook for allegedly spreading “disinformation.” Dkt.1, ¶¶ 95, 98, 137.

A person of ordinary firmness confronted with the power of Dominion and a lawsuit for $1.3 billion would do more than question his previous statements—he likely would self-regulate any additional speech. Compl. ¶ 133–34, 136–38. A person of ordinary firmness would rightfully fear that the defense costs alone, not to mention a possible judgment, in such a lawsuit would ruin his life. *Id*. Under an objective test, Dominion's overblown lawfare campaign imposed an invisible thought prison preventing anyone from questioning the reliability of its voting equipment and results of the 2020 General Election. Compl. ¶¶ 125–39. Such discussion is at the “core of First Amendment protections.” *See Mills*, 384 U.S. at 218–19 (holding that discussions regarding “the manner in which government is operated ... and all such matters relating to political processes” is “core” First Amendment protected speech). From these allegations, the Court may infer Dominion's aggressive litigation, threats of litigation, and publicization of these activities would intimidate a person of ordinary firmness from exercising his constitutional right to freely discuss election voting machines and election integrity. Compl. ¶¶ 125–39, 175–79. Taken as true, Lindell's

allegations that Dominion threatened him with litigation and then sued him for $1.3 billion sufficiently meet the objective, "ordinary firmness" standard. *Galarnyk v. Fraser*, Civil No. 08-3351, 2011 WL 3678433, at *7 (D. Minn. Aug. 22, 2011).

Finally, Lindell sufficiently pleads that but for Dominion's role in the 2020 General Election, Lindell would not have made any of the comments which form the basis of Dominion's lawsuit against him. Compl. ¶¶ 37–49, 64, 69–109. And, further, that but for Lindell's comments, Dominion would not have retaliated against him. Compl. ¶¶ 125–39. Dominion admits as much in its first letter to Lindell on December 23, 2020, where it specifically acknowledged it was sent in response to Lindell's involvement in the "ongoing misinformation campaigns falsely accusing Dominion of somehow rigging or otherwise improperly influencing the outcome of the November 2020 U.S. presidential election." *See* Dkt. 2-65, Ex. 266. Dominion also acknowledges the lawfare campaign was in response to Lindell's statements in its opposition to Lindell's Motion to Dismiss. Dkt. 47 at 5. Accordingly, "but–for" Dominion's role in the election and Lindell's comments regarding Dominion's role, Dominion would not have brought a lawsuit in an attempt to chill Lindell's First Amendment rights.

### b. *Dominion Deprived Lindell of His Fourteenth Amendment Rights of Equal Protection and Due Process of the Law.*

Lindell sufficiently alleges that Dominion's actions violated his right to equal protection and due process of the law under the 14th Amendment. In addition to asserting a pure First Amendment retaliation claim, Lindell alleged facts that Dominion's retaliatory conduct resulted in "disparate treatment on the basis of a classification forbidden by the Equal Protection Clause." *Wilcox v. Lyons*, 970 F.3d 452, 460 (4th Cir. 2020), cert. denied, 141 S. Ct. 2754, 210 L. Ed. 2d 904 (2021) (explaining that allegations that defendant was actually motivated to treat him differently in retaliation for his speech, and that Defendant had no rational basis for treating him differently"—as

opposed to a "pure or generic retaliation claim"—properly asserts Equal Protection Claim and Due Process Clause violations for First Amendment retaliatory conduct).

       i.      <u>Dominion's conduct violated the Equal Protection Clause.</u>

Under the 14th Amendment, "[n]o State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The states cannot make distinctions among citizens that burden the exercise of a fundamental right guaranteed by the Constitution." *Vacco v. Quill,* 521 U.S. 793, 799 (1997); *Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000) (per curiam). The Equal Protection Clause "protects against invidious discrimination among similarly-situated individuals or implicating fundamental rights." *Scarbrough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 260–61 (6th Cir. 2006) (citing *Zablocki v. Redhail*, 434 U.S. 374, 383 (1978)). The First Amendment requires that the states "allow speech on matters of public concern on an equal basis with all other citizens." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Here, Dominion's disparate treatment is based solely on an impermissible classification of speech based upon a particular viewpoint. Compl. ¶¶ 125–39, 169–74.

Lindell alleges facts showing Dominion's conduct both prohibited speech on specific content and a particular viewpoint—two concepts rooted in the First Amendment's bar against censorship. *Perry Educ. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 59 (1983) (Brennan, J., dissenting). "[T]he content neutrality principle is invoked when the government has imposed restrictions on speech related to an entire subject area," while the viewpoint discrimination concept "strike[s] down government restrictions on speech by particular speakers." *Id*. Prohibitions against viewpoint discrimination are at the very core of the First Amendment. *Id.* "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *See R.A.V.,* 505 U.S. at 391. "Viewpoint discrimination

is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger v. Rector & Visitors of Univ. of Virginia,* 515 U.S. 819, 829 (1995) (citing *Perry*, 460 U.S. at 46); *LaRouche v. Fowler*, 152 F.3d 974, 995 (D.C. Cir. 1998). The government may not regulate speech based on its substantive content or message it conveys. *See id.* at 828; *Mosley, 408 U.S. at 96.* Discrimination against speech because of its message is presumed to be unconstitutional. *See Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641–43 (1994).

Lindell's claims of viewpoint discrimination are properly brought as an Equal Protection Clause violation because Dominion's conduct prohibited speech expressing a particular viewpoint while permitting others not expressing that same viewpoint to speak freely. Compl. ¶¶ 20, 63, 81–91, 99–109, 125–39. The right to equal protection of the laws, in the exercise of freedom of speech protected by the First and 14th Amendments, has "a firmer foundation than the whims or personal opinions of a local governing body." *Niemotko v. Maryland*, 340 U.S. 268, 272 (1951). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Tex. v. Johnson*, 491 U.S. 397, 414 (1989); *see*, *e.g., Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 55–56 (1988); *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 804 (1984); *Bolger v. Youngs Drug Products Corp.,* 463 U.S. 60, 65, 72 (1983); *Carey v. Brown,* 447 U.S. 455, 462–63 (1980); *FCC v. Pacifica Foundation,* 438 U.S. 726, 745–46 (1978); *Young v. American Mini Theatres, Inc.,* 427 U.S. 50, 63–65, 67–68 (1976) (plurality opinion); *Buckley,* 424 U.S. at 16–17; *Grayned v. Rockford,* 408 U.S. 104, 115 (1972); *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95 (1972); *Bachellar v. Maryland,* 397 U.S. 564, 567 (1970); *U.S. v. O'Brien,* 391 U.S.

367, 382 (1968); *Brown v. Louisiana,* 383 U.S. 131, 142–43 (1966); *Stromberg v. California,* 283 U.S. 359, 368–69 (1931).

Dominion wrongly suggests Lindell's claim fails because he did not allege a forum in which Dominion regulated his speech. Mot. at 44–45. A forum analysis is necessary in cases alleging a "time, place, or manner" speech regulation. *Ward v. Rock Against Racism*, 491 U.S. 781, 791–92 (1989). Lindell, however, does not claim Dominion's conduct imposed a "time, place, or manner" speech regulation but that it discriminated against a particular viewpoint. Compl. ¶¶ 20, 63, 81–91, 125–39, 169–79. Because the First Amendment, at its core, proscribes against state censorship in the form of viewpoint discrimination in any forum—public or not—no forum analysis is needed. *Perry*, 460 U.S. at 57 (Brennan, J., dissenting); *see also Frederick Douglass Found., Inc. v. D.C.*, 531 F. Supp. 3d 316, 330 (D.D.C. 2021); *Ward*, 491 U.S. at 791–92 (holding that government regulation of speech must be "justified without reference to the content of the regulated speech"). Dominion's justification for sending cease and desist letters to over 150 people and suing Lindell and others including media outlets for defamation was based only on its disagreement with a certain viewpoint expressed. Compl. ¶¶ 125–39, 169–79. Dominion admitted that in letters to Lindell and filings in this Court. Dkt. 47 at p.5. Dominion acted to silence speech expressing a viewpoint with which it disagreed.

Related to viewpoint discrimination, state action also violates the First Amendment if it imposes financial burdens on certain speakers based on the content of their expression. *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991). The purpose of such conduct is to "drive certain ideas or viewpoints from the marketplace," but "this sort of discrimination [is] beyond the power of the government" and violates "individual dignity and choice upon which our political system rests." *Id.* at 116 (internal citations omitted).

Lindell sufficiently alleged facts showing that Dominion's conduct violates the Equal Protection Clause in two ways—through blatant viewpoint discrimination and imposition of improper financial burdens on those expressing that viewpoint. First, Defendants aimed the lawfare campaign directly at one viewpoint regarding the 2020 General Election—that the election results were not reliable. Compl. ¶¶ 10, 12, 19, 125–39. Second, the Lawfare campaign carries with it content-based financial regulations because Dominion threatened expensive litigation only against individuals espousing that viewpoint. *Id*. Said another way, if they continued to question the reliability of the election results, they would have to pay.

Dominion argues it only acted to silence defamatory (i.e., proscribable) speech, but Lindell sufficiently pleads otherwise. Compl. ¶¶ 132–36. When every speaker Dominion targeted shares the same political viewpoint—one with which Dominion obviously disagrees—"a significant danger of idea or viewpoint discrimination exists" with Dominion's actions. *R.A.V.,* 505 U.S. at 388. In *R.A.V.*, the Court provides examples of unconstitutional government conduct similar to Dominion's actions:

> A State might choose to prohibit only that obscenity which is the most patently offensive in its prurience—i.e., that which involves the most lascivious displays of sexual activity. But it may not prohibit, for example, only that obscenity which includes offensive *political* messages. And the Federal Government can criminalize only those threats of violence that are directed against the President, ... since the reasons why threats of violence are outside the First Amendment (protecting individuals from the fear of violence, from the disruption that fear engenders, and from the possibility that the threatened violence will occur) have special force when applied to the person of the President .... But the Federal Government may not criminalize only those threats against the President that mention his *policy* on aid to inner cities.

505 U.S. at 388.

The state cannot prohibit otherwise-actionable speech (like defamation) on the basis of the speaker's viewpoint. *Id*. Dominion's lawfare campaign specifically targeted speech expressing a

particular viewpoint. Compl. ¶¶ 10, 12, 19, 125–39. Dominion as a state actor with an interest in protecting the integrity of elections cannot regulate only conservative criticism of its machines' credibility and, therefore, reliability of the election results. When speakers and subjects are similarly situated, the state may not pick and choose.

Another lawsuit currently pending in United States District Court in Colorado[2] against Dominion clearly shows Dominion's motivating force behind the lawfare campaign was to silence speech questioning election result reliability and not *only* allegedly defamatory statements about the company. *Id*. at ¶ 132. The plaintiffs in that case were poll watchers at various locations during the 2020 General Election. *Id*. at n.203 Following the election, each plaintiff signed an affidavit wherein she detailed her direct observations concerning voting irregularities and potential fraud. *Id*. While none of the named plaintiffs even mentioned Dominion or a related entity in their affidavits, each plaintiff received a "cease and desist" letter from Dominion. *Id*. at ¶ 132. Potentially defamatory statements could not have been the catalyst for Dominion sending these letters; but the fact that these affidavits were included in other lawsuits alleging election fraud and contain facts directly questioning the integrity of the election results clearly was. Such conduct "plainly imposes a financial disincentive only on speech of a particular content." *Simon & Schuster, Inc.*, 502 U.S. at 116. Lindell sufficiently plead facts showing Dominion's actions are a widespread attack to silence a particular "disinformation" viewpoint in violation of the Equal Protection Clause,

Further, because Lindell alleged sufficient facts to state a claim for violations of the Equal Protection Clause, Dominion has the burden to show to existence of a compelling state interest which justifies the restraint on Lindell's right to free speech. *Bates v. City of Little Rock,* 361 U.S. 516, 524 (1960); *First Nat. Bank of Boston v. Bellotti*, 435 U.S. 765, 786 (1978). At this stage of

---

[2] Case No. 1:21-cv-02672-STV, *Cooper v. US Dominion, Inc.*

proceedings, Dominion has not met this burden. Because Lindell's allegations must be taken as true, the Court should deny Dominion's Motion to Dismiss Lindell's § 1983 claim based on violations of the Equal Protection Clause.

ii.      Dominion's conduct violated the Due Process Clause.

The 14th Amendment reads, "No State shall … deprive any person of life, liberty, or property, without due process of law...." U.S. Const. amend. XIV, § 1. The Due Process Clause prevents irrational or arbitrary actions by government officials. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998); *Schware v. Board of Bar Examiners,* 353 U.S. 232, 239 (1957); *Singleton v. Cecil*, 155 F.3d 983, 986 (8th Cir. 1998), on reh'g en banc, 176 F.3d 419 (8th Cir. 1999). Lindell sufficiently alleged facts showing he was deprived of a fundamental right without due process of law in violation of both his substantive and procedural due process rights.[3] *Cantwell v. State of Connecticut*, 310 U.S. 296, 303 (1940) (holding that "[t]he fundamental concept of liberty embodied in [the 14th] Amendment embraces the liberties guaranteed by the First Amendment").

1.      ***Dominion violated Lindell's substantive due process rights.***

To allege a substantive due process violation, a plaintiff must either allege that (1) the state violated a "fundamental" liberty interest without narrowly tailoring that infringement to serve a compelling state interest, or (2) the state's actions either "shock[ed] the conscience" or "offend[ed] [ ] judicial notions of fairness ... or ... human dignity." *Weiler v. Purkett,* 137 F.3d 1047, 1051 (8th Cir. 1998) (en banc) (internal quotation and citation omitted); *see also United States v. Salerno,*

---

[3] While Lindell did not specifically plead a procedural due process clause violation, he plead facts sufficient to show his § 1983 claim has "procedural plausibility." *Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 12 (2014). Plaintiffs do not carry a "heightened pleading" burden when seeking damages for constitutional violations under § 1983. *Id.* at 11.

481 U.S. 739, 746 (1987); *Fraternal Order of Police Dep't of Corr. Labor Comm. v. Williams,* 375 F.3d 1141, 1144–45 (D.C. Cir. 2004).

Under the first test, the standards typically applied to state regulations of viewpoint speech are again applicable here. A plaintiff successfully pleads a substantive due process claim through facts showing the defendant was solely motivated to retaliate against plaintiff based on arbitrary and discriminatory reasons. *Singleton*, 155 F.3d at 986 (cleaned up) (explaining the state violates substantive due process by violating plaintiff's fundamental right on the basis that she is a "Democrat or Methodist"—both classifications protected by the First Amendment's right to association) (citing *Cafeteria & Restaurant Workers Union v. McElroy,* 367 U.S. 886, 898 (1961)). Allegations of arbitrary and discriminatory conduct "fails to pass even the most relaxed scrutiny under substantive due process." *Id.,* 155 F.3d at 986 (cleaned up).

Under the second test, the plaintiff must allege the state action is (1) "conscious shocking, in a constitutional sense," *Lewis*, 523 U.S. at 847; or (2) in totality, "genuinely drastic." *Tri County Indus., Inc. v. D.C.,* 104 F.3d 455, 459 (D.C. Cir. 1997). State "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Lewis*, 523 U.S. at 849 ("Historically, this guarantee of due process has been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property") (emphasis in original) (citing *Daniels v. Williams,* 474 U.S. 327, 331 (1986)).

Lindell alleged sufficient facts establishing Dominion's conduct was both a violation of a fundamental right and conscious shocking. Compl. ¶¶ 37–49, 125–39, 169–79. Because the Court has not yet found otherwise, Lindell's statements, as plead and to be taken as true by this Court, are protected First Amendment speech. Dominion, however, improperly acted to silence one particular viewpoint on the 2020 General Election that it deemed to be "disinformation." Compl. ¶¶

10, 12, 19, 125–39, 169–79. Further, Lindell pled that the totality of Dominion's action was truly conscious-shocking—Dominion sent an overwhelming number of letters to everyone discussing election integrity and attempted to use the litigation process to suppress Lindell's freedom of speech and expression of his disfavored conservative political viewpoint. Compl. ¶¶ 125–139, 169–79; Dkt. 2-65, Ex. 266. Finally, because Dominion has not provided a legitimate state interest justifying its conduct and the Court has not found Lindell's statements defamatory, Dominion's conduct, therefore, "rise[s] to the conscience-shocking level." *Lewis*, 523 U.S. at 849.

### 2. *Dominion violated Lindell's procedural due process rights.*

In addition to substantive due process violations, Lindell's Complaint includes sufficient facts to establish a procedural due process clause violation. The Due Process Clause of the 14th Amendment protects an individual's liberty interest in his "good name, reputation, honor, or integrity" from government interference. *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971). When the state both causes injury to a plaintiff's reputation *and* deprives him of the opportunity to protect his reputation, the state violates that plaintiff's procedural due process guarantees. In *Constantineau,* the court ruled that a law allowing for "posting"—forbidding the sale of alcoholic beverages to persons determined to have become hazards based on their "excessive drinking"— violated due process. *Id*. The law at issue went beyond mere stigma and deprived the plaintiff of a right he previously held under state law—to purchase or obtain liquor in common with everyone else. "[I]t was that alteration of legal status which, combined with the injury resulting from the defamation, justified the invocation of procedural safeguards" in *Constantineau. Paul v. Davis*, 424 U.S. 693, 708–09 (1976) (discussing *Constantineau*). This "stigma-plus" rule is satisfied "where plaintiffs show, in addition to reputational harm, that the government has deprived them of some benefit to which they have a legal right." *Doe v. United States Dep't of Justice,* 753 F.2d

1092, 1108–09 (D.C. Cir. 1985) (cleaned up) (quoting *Mosrie v. Barry,* 718 F.2d 1151, 1161 (D.C. Cir. 1983)) ("Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard are essential." *Constantineau,* 400 U.S. at 437.

Here, Dominion damaged Lindell's reputation in the community at large and interfered with his ability to adequately present his defense to Dominion's claims against him, depriving him of the very opportunity to be heard which is guaranteed to him. *See id.* Dominion filed suit against Lindell for defamation, calling him a liar, calling his integrity into question, claiming he is exploiting and deceiving customers, and publicly painting him as a completely unreliable source of information. Dkt.1 ¶¶ 1, 4, 15–17, 19, 25, 34, 93–94, 103, 105–06, 113, 120; Compl. ¶¶ 138, 147–51. At the same time, Dominion sent letters to over 150 individuals, some of whom, like the poll watchers, have direct eyewitness accounts of potential voter fraud that occurred during the 2020 General Election, threatening that if they continue to speak about the election (not limited to Dominion and its role in the 2020 General Election, but any speech about the 2020 General Election), Dominion will sue. Compl. ¶¶ 124–32, p.112. Dominion's lawfare campaign, meaning these letters, Dominion's wide-spread legal attacks against high-profile individuals and companies for defamation, and the public reception of such lawsuits, has caused people to refuse to participate as potential witnesses in Lindell's defense to Dominion's claims against him. Compl. ¶¶ 132, 134–35, 138, 156–60. This witness testimony is relevant to a defense of truth to Dominion's defamation claims and to preserve Lindell's reputation. As a direct result of its conduct, Dominion has both interfered with Lindell's liberty interest and deprived him of an effective opportunity to protect his reputation and integrity.

**B.      Lindell Pled Sufficient Facts to Allege RICO Claims Against Dominion and HPS.**

Lindell's 18 U.S.C. § 1964 RICO claim survives Defendants' Motion to Dismiss because he plausibly alleged all elements of RICO. "RICO is to be read broadly." *Safe Str. All. v. Hickenlooper*, 859 F.3d 865, 881 (10th Cir. 2017) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985)). To maintain a cause of action under § 1964(c), a plaintiff must plead and ultimately prove that: (1) the defendant violated § 1962; (2) the plaintiff's' business or property was injured; and (3) the defendant's' violation is the cause of that injury. *Id.* A plaintiff asserting a § 1964(c) claim for a violation of § 1962(c) must plausibly allege the defendants "each (1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Id.* at 882 (citing, *e.g.*, 18 U.S.C. § 1962(c)).

**1.      Lindell adequately alleged the existence of a RICO enterprise.**

Lindell adequately pled an "association in fact" enterprise among Defendants. "RICO broadly defines enterprise as any individual, partnership, corporation, association, or other legal entity, and *any* union or group of individuals associated in fact although not a legal entity." *Hickenlooper*, 859 F.3d at 882 (internal citations omitted); 18 U.S.C. § 1961(4)); *see also Boyle v. United States*, 556 U.S. 938, 944 (2009) ("The term 'any' ensures that the definition has a wide reach."). An association in fact enterprise is "simply a continuing unit that functions with a common purpose" with no formal structural requirements. *Boyle*, 556 U.S. at 948 (citing *United States v. Turkette*, 452 U.S. 576, 580 (1981)). For example, a plaintiff is not required to allege "a hierarchical structure or a chain of command," fixed roles for the members, "a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies" to adequately plead an association in fact enterprise. *Id*. at 948. A plaintiff sufficiently alleges an association-in-fact enterprise through facts showing: (1) a purpose, (2) "relationships among

27

those associated with the enterprise," and (3) "longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id*. at 946.

First, Lindell adequately pled Defendants acted together for a common purpose. A plaintiff properly pleads a common purpose through allegations of a mutual benefit or aligned profit motive among the enterprise's members. *In re EpiPen Direct Purchaser Litig.*, 20-CV-0827 (ECT/TNL), 2021 WL 147166, at *8 (D. Minn. Jan. 15, 2021); *see also Abels v. Farmers Commodities Corp.*, 259 F.3d 910, 919 (8th Cir. 2001) (explaining that an aligned profit motive can indicate a common purpose). As Lindell alleges in his Complaint, the enterprise's common purpose is to protect Defendants' flawed technology against legitimate and important viewpoint-based speech protected by the First Amendment and to use fear and falsehood to intimidate into silence any who dare speak publicly about the reliability of Defendants' machines and results generated in the 2020 General Election. Compl. ¶¶ 36, 63, 130, 132 138, 156. As Lindell's Complaint notes, Defendants are doing so because they fear that speech which criticizes their shared technology and questions the results of the elections they administer will harm their commercial and financial interests. Compl. ¶ 56. Clare Locke and HPS both participated in helping Dominion achieve this purpose by sending threatening letters to anyone espousing Lindell's shared viewpoint and publicizing Dominion's threats to intimidate others who share this viewpoint. Compl. ¶¶ 9–12, 19, 21, 126–29, 132–38. And because they could bill for their participation, Clare Locke and HPS also benefitted from the Lawfare campaign. *See In re EpiPen*, 2021 WL 147166, at *8.

While Defendants argue Smartmatic is not a member of the enterprise because it acted independently of the other members, Defendants' "activities were coordinated to serve common goals, and that is all that is required" to meet the common purpose requirement. *United States v. Applins*, 637 F.3d 59, 78 (2d Cir. 2011). Beginning in January 2020 when Smartmatic published

28

its "Crisis Handbook for Election Commissioners" designed "as a planning tool and guide to" counter "false information and protect[] the integrity of the elections process in jurisdictions across the United States," Smartmatic and Dominion have actively participated to achieve the common purpose of the enterprise—to silence viewpoint-based "disinformation," more accurately termed "dissent." Compl. ¶¶ 60–63, 124–40, 158–60. Lindell's allegations show that each member of the purported enterprise stood to benefit from the Lawfare activities; therefore, he sufficiently pled a common purpose among Defendants. *See In re EpiPen*, 2021 WL 147166, at *9.

Second, Lindell alleged facts demonstrating relationships among Dominion, HPS, Smartmatic, and Clare Locke, all of whom are associated with the enterprise. As the Supreme Court noted in *Boyle*, "the existence of an association-in-fact is oftentimes more readily proven by what it does, rather than by abstract analysis of its structure." *Boyle*, 556 U.S. at 946. "[T]here is no need for a plaintiff to prove," much less plead, "each conspirator had contact with all other members." *Schwartz v. Laws. Title Ins. Co.*, 970 F. Supp. 2d 395, 404 (E.D. Pa. 2013) ("The fact that there is no claim that the title agents were aware of each other's role in the enterprise does not undermine the viability of the hierarchical enterprise."). Under *Boyle*'s "undemanding standard, the enterprise need not have formal mechanisms for controlling the enterprise's affairs and can be an entity where decisions are made on an ad hoc basis" such as a "show of strength." *Id.* at 948.

Defendants argue without authority that Smartmatic and Dominion's "shared" DNA is not enough to prove the two acted in concert. Mot. at 19. Lindell, however, alleges Dominion and Smartmatic share a corporate history because of Dominion's acquisition of SVS from Smartmatic in 2010, Compl. ¶ 60; because they share employees, Compl. ¶ 62; and because Dominion licensed Smartmatic's intellectual property for its voting systems. Compl. ¶¶ 17, 61. Contractual agreements between companies with respect to their products have served as evidence that those

companies are an "ongoing organization," and thus a RICO enterprise. *See, e.g., Odom v. Microsoft Corp.,* 486 F.3d 541, 552 (9th Cir. 2007) (contract in which Best Buy agreed to promote Microsoft's products while Microsoft agreed to promote Best Buy's online store was evidence they were an ongoing organization under RICO); *see also In re EpiPen*, 2021 WL 147166, at *9 (plaintiff adequately pleads existence of enterprise through non-conclusory allegations of legitimate business practices among defendants, such as contractual agreements, financial ties, and coordination). Courts applying *Boyle* have found far "looser" relationships to constitute an enterprise than that which Lindell alleges here. *See, e.g.*, *Mitsui O.S.K. Lines Ltd. v. Sea Master Logistics, Inc.*, 871 F. Supp. 2d 933, 942 (N.D. Cal. 2012) (companies that allegedly issued false invoices for inland shipping were association-in-fact enterprise, and "[w]hile [plaintiff] does not allege that the partners are bound by any formal agreement or structure, they are not required to do so."). Lindell alleges sufficient facts from which the Court may infer Defendants joined together to achieve an unlawful goal. Compl. ¶¶ 61–66, 112, 125–37, 158.

Because Lindell adequately alleged Smartmatic's involvement in the enterprise, Defendants' argument that Clare Locke, Dominion, and HPS are a single "person" incapable of forming a RICO enterprise is irrelevant. Mot. at 17. And even if the Court finds otherwise, Lindell adequately pled facts from which the Court may infer that HPS and Clare Locke are sufficiently distinct from Dominion for purposes of the RICO enterprise. Defendants undermine their own argument by citing only cases that assess "distinctness" between parent corporations and their wholly owned subsidiaries. Mot. at 17. Although Lindell does not allege Dominion and its subsidiaries or related entities are the only members in the enterprise, or that HPS and Clare Locke are Dominion's subsidiaries, *Bates I*, cited by Defendants, acknowledges that a parent corporation and its wholly owned subsidiary can, in fact, be a "distinct RICO person and RICO enterprise." *Bates v. Nw.*

*Hum. Servs., Inc.*, 466 F. Supp. 2d 69, 83 (D.D.C. 2006) ("*Bates I*"). A complaint sufficiently pleads "distinctness" among members of a RICO enterprise through allegations that they are separate legal entities whose actions can be separated from one another's. *Id.* at 84; *see also Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 162 (2001) (explaining that a RICO enterprise may exist as long as members are "legally different entit[ies] with different rights and responsibilities due to [their] different legal status[es]. And we can find nothing in the statute that requires more 'separateness' than that."); *cf. Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055, 1064 (2d Cir. 1996) (defendants are not distinct enough to form a RICO enterprise when they are all part of the same "corporate structure" operating with the same "corporate conscious").

Here, Dominion, Clare Locke, and HPS are legally independent organizations not "wholly owned" by each other, are not part of the same "corporate structure," and do not operate with the same "corporate conscious." Compl. ¶¶ 23–31. If a parent company and its wholly owned subsidiary can be sufficiently distinct for RICO purposes, *see Bates I*, 466 F. Supp. 2d at 83, surely Dominion, Clare Locke, and HPS can be as well. Because Clare Locke and HPS are not (1) subsidiaries of, (2) legally identical to, (3) part of the same corporate structure as, or (4) operating with the same corporate conscious as Dominion, Lindell adequately alleged Defendants are sufficiently distinct from each other to be separately named RICO members. *See King*, 533 U.S. at 162; *Discon*, 93 F.3d at 1064.

In addition, agents like Clare Locke and HPS are distinct from the enterprise if (1) they are "enabled to commit the predicate offenses solely by virtue of [their] position in the enterprise or involvement in or control over the affairs of the enterprise, or [(]2) the predicate offenses are related to the activities of that enterprise." *United States v. Scotto,* 641 F.2d 47, 54 (2d Cir. 1980), cert. denied, 452 U.S. 961 (1981). Here, Lindell alleges that HPS and Clare Locke's involvement

as Dominion's agents in the enterprise enabled them to commit the predicate acts of extortion, witness tampering, and mail fraud for the common purpose of silencing viewpoint-based dissent regarding the 2020 General Election. Compl. ¶¶ 9–12, 19, 21, 125–39, 132–38. While "[s]imply committing predicate acts which are unrelated to the enterprise or one's position within it would be insufficient," both Clare Locke and HPS acted to achieve the common purpose of the enterprise and because of their agency relationships with Dominion. *See Scotto,* 641 F.2d at 54. Clare Locke drafted and sent over 150 cease and desist letters while HPS publicized the lawfare campaign, with these actions specifically intended to silence viewpoint-based dissent. Compl. ¶¶ 9–12, 19, 21, 125–39, 132–38. Silencing expression concerning the 2020 General Election is distinct from any action either Clare Locke or HPS would take if participating in Dominion's regular business activities. Clare Locke and HPS participated in the affairs of the enterprise as agents of Dominion, one of the entities responsible for administering the 2020 General Election. Compl. ¶¶ 9–12, 19, 21, 36–49, 125–39. The enterprise is sufficiently distinct from either Smartmatic's or Dominion's "regular affairs." *See Riverwoods Chappaqua Corp. v. Marine Midland Bank,* 30 F.3d 339 (2d Cir. 1994) (where allegations of RICO enterprise which consisted of corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant were insufficient). Smartmatic and Dominion are not privileged to threaten and initiate litigation on a discriminatory basis motivated by the purpose of silencing a particular, dissenting viewpoint concerning their administration of a traditional and exclusive government function.

Third, Lindell sufficiently alleges that the enterprise existed long enough to allow all Defendants to pursue the enterprise's purpose. *See Turkette*, 452 U.S. at 583. There are no specific requirements governing how long an enterprise must continuously operate. *See Boyle*, 556 U.S. at 940, 948 (holding that an enterprise can still exist even though the members engage in "spurts of

activity punctuated by periods of quiescence" and has no "long-term master plan or agreement").

Here, the enterprise's purpose is to silence viewpoint-based "disinformation" criticizing Dominion and Smartmatic's products and integrity of the 2020 General Election results in order to protect the reputation (and thus the revenues) of Defendants' badly flawed e-voting technology. Compl. ¶¶ 10, 20–21, 50, 126, 136, 145, 156, 166, 183. The enterprise has acted in furtherance of these goals for at least two years—since January 2020 when Smartmatic published its "Crisis Handbook for Election Commissioners." Compl. ¶¶ 60–63, 124–40, 158–60. This is a sufficient length of time to establish longevity under binding D.C. Circuit precedent. *See United States v. Eiland*, 738 F.3d 338, 360 (D.C. Cir. 2013) (drug-dealing enterprise which lasted from 2000-2002 continued for a period "sufficient to permit the associates to pursue the enterprise's purpose.").

Defendants severely mischaracterize the facts of *Propst v. Ass'n of Flight Attendants*, 546 F. Supp. 2d 14, 25 (E.D.N.Y. 2008). While Defendants imply the *Propst* court dismissed RICO claims where defendants sent "separate cease and desist letters to and fil[ed] separate defamation lawsuits against the same individuals," Mot. at 18 , *Propst* involved neither cease and desist letters nor defamation lawsuits. Instead, the plaintiffs in *Propst* alleged that defendants were an association-in-fact enterprise because they both allegedly misled the plaintiffs about the same topic. 546 F. Supp. 2d at 19. The plaintiffs, however, had at most "alleged independent, albeit similar, activities by each member of the enterprise" without showing that the members functioned as a unit or were "associated together for a common purpose of engaging in a course of conduct." *Id*. at 25 (citations omitted). Here, Lindell has not merely alleged similar behavior by each Defendant but has also alleged ample facts allowing the Court to reasonably infer that Defendants joined together for a common, unlawful purpose. Compl. ¶¶ 61–66, 112, 125–37, 158; *see also Propst*, 546 F. Supp. 2d at 25 (holding "plaintiffs do not need detailed factual allegations for RICO.").

2.      **Lindell adequately alleged RICO predicate acts.**

a.      *Lindell sufficiently pled extortion*

Lindell adequately alleged facts showing extortion as one of the predicate acts for his RICO claim. The Hobbs Act defines "extortion" as the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right. *United States v. Jannotti*, 673 F.2d 578, 594 (3d Cir. 1982) (quoting 18 U.S.C. § 1951(b)(2)).

Courts recognize that the Hobbs Act also encompasses *attempts* to extort, and as such, Lindell is not required to allege that Defendants actually obtained "transferred property" to sustain his extortion claim, as Defendants claim. Mot. at 22. A victim of extortion need not pay money in response to a threat *before* he can assert a Hobbs Act violation; such a requirement would create an absurd outcome and eliminate the entire concept of inchoate offenses. *See, e.g.*, *Jannotti,* 673 F.2d at 592 ("The Hobbs Act, by its own terms, encompasses the inchoate offenses of attempt and conspiracy to extort."). Instead, "[t]he Hobbs Act proscribes *attempted extortion* as well." *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 248 (S.D.N.Y. 2012) (emphasis added). Lindell alleges Defendants are "seeking to instill fear of consequences more unpalatable than" monetary damages. Compl. ¶¶ 125–40; *see id.* (denying motion to dismiss where pleadings allege attempted extortion as predicate act under RICO). "The fact that the RICO Defendants have not succeeded in obtaining the desired payoff is immaterial to the question whether [the complaint] sufficiently has alleged Hobbs Act extortion as a RICO predicate act." *Id*.

Silence is the ultimate goal of the enterprise; but in conducting the enterprise's affairs through threats of litigation, Defendants sought to obtain transferrable property from Lindell. Compl. ¶¶ 137–38. For this reason, *Sekhar v. United States* is inapposite. Mot. at 22 (citing 570

U.S. 729 (2013)). The petitioner in *Sekhar* was not liable for attempted extortion in violation of the Hobbs Act because the property he extorted—a general counsel's personal right to "render[] sound advice," which the Second Circuit had characterized as a "property right"—was not *obtainable property* under the Hobbs Act. *Id*. at 734, 737. Similarly, in *Kerik v. Tacopina,* cited by Defendants, the only property allegedly extorted was journalists' "intangible right to publish an article." 64 F. Supp. 3d 542, 551, 560–61 (S.D.N.Y. 2014); Mot. at 22–23. The *Kerik* court held this intangible right was not transferable property under the Hobbs Act because it could not be "exercised, transferred, or sold." *Kerik*, 64 F. Supp. 3d at 561. The plaintiff in *Kerik* also failed to allege an extortion against himself—he only alleged extortion against the journalists, leading the court to find he did not have standing to bring a RICO claim. *Id*. at 560.

Unlike *Sekhar* and *Kerik*, Lindell alleges that Defendants attempted to wrongfully obtain monetary damages. Compl. ¶¶ 137–38. Money, unlike the personal right in *Sekhar* or intangible right in *Kerik*, is "capable of passing from one person to another" and can be extorted under the Hobbs Act. *Sekhar,* 570 U.S. at 734, 729. Lindell also specifically alleges that Defendants attempted to personally extort him by threatening ruinous litigation, in conjunction with the extortion of others in furtherance of the enterprise's common purpose, unlike *Kerik* where the plaintiff's RICO claim rested *entirely* on extortion of third parties. Compl. ¶ 125–39, 183; *see also Kerik*, 64 F. Supp. 3d at 560.

While Defendants tried to preemptively distinguish *Chevron Corp. v. Donziger*, it remains controlling. 871 F. Supp. 2d 229. The *Chevron* defendants executed a multifaceted extortion scheme which, in addition to threatening and filing frivolous litigation, included "a wide-ranging campaign of public attacks based on false and misleading statements" and "ongoing harassment and disruptions of business operations." *Id.* at 247. The extortionary scheme involved "the

wrongful use of actual or threatened force, violence, or fear (including fear of economic loss)" to *attempt* to take the plaintiff's property. *Id.* at 248. Lindell likewise alleges an enterprise involving a "disinformation" campaign of public attacks against him including coordinating a public relations campaign to discredit and attack him and other election critics, Compl. ¶¶ 10, 127, 133, 156, and have Lindell publicly vilified as a liar. Compl. ¶¶ 138, 150, 183. Like the scheme in *Chevron* intended to disrupt the plaintiff's business operations, Defendants' extortionary scheme disrupted Lindell's business by interfering with plans to take his online store public. Compl. ¶ 138, 150–51. Lindell has also alleged that the scheme was partially intended to wrongfully obtain property from him in the form of monetary damages. Compl. ¶¶ 137–38. The fact that Defendants' scheme was partially intended to "induce Lindell to consent to relinquish his property," *id.*, makes Defendants' enterprise sufficiently like the association alleged in *Calabrese* that was formed for the purpose of compelling its targets to pay money. *Calabrese v. CSC Holdings, Inc.*, 2004 WL 3185787 at *6 (E.D.N.Y. July 19, 2004) (defendants' association for purpose of extracting monies from plaintiffs, including "institut[ing] baseless lawsuits," was sufficient allegation of extortion to constitute predicate act under RICO).

Lindell's extortion claim survives even though Defendants' threatening letters did not specifically demand money from him. Mot. at 24. *Chevron* makes clear that the Hobbs Act "does not limit the definition of extortion to ... implicit or explicit threats, but instead leaves open the cause of the fear." *Chevron*, 871 F. Supp. 2d at 248. Therefore, a plaintiff adequately alleges extortion if he pleads that the RICO defendants knowingly created a fear of economic harm with the purpose of inducing him to part with his property. *See id*. Here, Lindell alleged facts showing that the enterprise used fear and intimidation techniques through threatening letters in furtherance of its partial goal to "induce Lindell to consent to relinquish his property." Compl. ¶¶ 137–38.

Because Lindell adequately plead that the enterprise sought to obtain transferable property from him, his Complaint contains sufficient facts from which the Court may infer extortion as a predicate RICO act. The Court should, therefore, deny Defendants' Motion on this basis.

### b.  *Lindell adequately pled witness tampering.*

Lindell also alleged facts sufficient to show Defendants violated 18 U.S.C. § 1512 (witness tampering and intimidation). The enterprise sent cease and desist letters "threatening the recipients with ruinous litigation unless they recant their previous statements and cease further public expression regarding questions of evidence of fraudulent manipulation of voting machines or their use in tampering with and altering the outcome of the 2020 Presidential Election in certain jurisdictions." Compl. ¶¶ 125–39,158–59.

*United States v. Morrison*, is controlling here because, as Defendants said, although Lindell does not specifically plead a federal proceeding, from the allegations in his Complaint there is "no question about what the relevant proceeding [is], as the proceeding with which the defendant allegedly interfered was [its] own [civil] trial," *see* Mot. at 25—Dominion's defamation lawsuit against Lindell. *See* 98 F.3d 619 (D.C. Cir. 1996). If the *Morrison* complaint, which failed to specifically identify a federal proceeding, was sufficient, then Lindell's complaint is sufficient. *See* 98 F.3d at 630. Although, like *Morrison*, Lindell does not specifically identify a federal proceeding, he alleges in his Complaint that Defendants (1) threatened him multiple times with defamation litigation, and (2) tampered and intimidated witnesses by letters containing false allegations and threats of "imminent litigation" if the witnesses come forward with information about the irregularities observed during the 2020 General Election or speak publicly about the vulnerabilities of electronic voting machines and software to hacking and manipulation. Compl. ¶¶ 9–12, 125–39, 158; Dkt. 2-65, Ex. 266; Dkt. 2-68, Ex. 269; Dkt. 2-113, Ex. 314.

It is not necessary that the official proceeding be pending at the time of the obstruction, only that it was clearly foreseeable by Dominion that Lindell would call as witnesses at least some of the individuals who received Dominion's letters in its case against him, because these individuals were expressing the same viewpoint as Lindell and could testify regarding their observations of election irregularities in support of Lindell's defense. *See* Compl. ¶ 132; *see Morrison*, 98 F.3d at 630. In December 2020, Clare Locke was informing recipients of Dominion's letters that it was "defamation counsel to US Dominion, Inc.;" that "Dominion is prepared to defend its good name and set the record straight. Litigation regarding these issues is imminent;" and specifically requested retention of all documents related to "all affidavits or declaration you submitted in litigation related to Dominion or the November 2020 presidential election." *See* Compl. ¶ 132, p.111–12. Dominion was obviously aware that different governmental bodies, state and local officials, and the public generally were questioning the integrity of the election results. Compl. ¶¶ 110–24. Dominion was also aware of lawsuits filed by some of these entities and audits in specific states and counties to verify the elections results. Compl. ¶¶ 18–19, 21, 117–18. Dominion, aware of these external threats and with full knowledge that it would be filing this lawsuit and others against its critics, began sending its threatening letters to potential witnesses demanding that the recipients stop talking or prepare to face litigation. Compl. ¶¶ 125–39. Dominion then filed its lawsuit against Lindell for defamation in federal court—an "official proceeding" under 18 U.S.C § 1512. Dkt. 1. From these allegations, the Court may infer that Dominion most likely anticipated Lindell would defend himself against those claims with the affirmative defense of "truth." *See Diesen v. Hessburg*, 455 N.W.2d 446, 449 (Minn. 1990) (holding truth is an affirmative defense to a defamation claim). "[A]n affirmative defense is akin to a plaintiff's original claim" because the party asserting it has the burden to prove it through "affirmative assertion of facts and arguments." *BankCherokee*

*v. Insignia Dev., LLC*, 779 N.W.2d 896, 902 (Minn. Ct. App. 2010); *see also Oparaugo v. Watts*, 884 A.2d 63, 75 (D.C. 2005).

As an example, Suzi Vovles is a 20-year poll manager in Fulton County, Georgia, who is currently running for Congress. *See* https://frankspeech.com/video/brannon-howse-and-suzi-vovles-discuss-ballot-fraud-georgia, at 0:05–0:07. She witnessed numerous irregularities in the 2020 General Election. *Id*. at 0:20–0:24. Ms. Vovles, a potential witness in this action, received one of Dominion's letters, but when asked, she would not identify Dominion by name because she is under the impression that the letter was a restraining order. *Id*. at 2:48–3:22 (Dominion was the only voting system manufacturer used in the 2020 General Election in Georgia). Dominion's preemptive threats against potential witnesses who would testify favorably for Lindell, including both Ms. Vovles and Lindell himself, is witness tampering.

Defendants engaged in witness tampering through intimidating over 150 individuals from discussing potential election irregularities in order to keep evidence of Defendants' alleged misconduct from being brought to the attention of the Court, all in furtherance of the enterprise's overall goal of silencing what it claims to be disinformation regarding the 2020 General Election results. Compl. ¶¶ 125–39, 152–61. The Complaint alleges Lindell and others publicly voiced concerns about election fraud involving electronic voting machines and other election irregularities—speech protected by the First Amendment—and in response, Defendants sent threatening letters demanding their silence and threatening ruinous litigation. *See* Compl. ¶ 125–39. The Court can reasonably infer from these allegations that the enterprise's threats of litigation were made with a corrupt purpose, thus violating § 1512. *See McAndrew v. Lockheed Martin Corp*., 206 F.3d 1031, 1040 (11th Cir. 2000) ("Section 1512(b) … also makes it a crime to try to deter such testimony through sheer persuasion without the use of physical or economic threat, as long as one does

so with a corrupt purpose."). Lindell's Complaint includes sufficient facts from which the Court may infer Defendants were aware of the future defamation proceeding and then tampered with potential witnesses to the proceeding. *See Morrison*, 98 F.3d at 630. The Court should, therefore, deny Defendants' Motion to Dismiss Lindell's RICO claim based on witness tampering.

### c.   *Lindell adequately alleged mail fraud.*

Lindell sufficiently pled mail fraud as a RICO predicate act. Mail fraud occurs when a person, "'having devised or intending to devise any scheme or artifice to defraud,' uses the mail 'for the purpose of executing such scheme or artifice or attempting to do so.'" *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008) (quoting 18 U.S.C. § 1341). Defendants argue that Lindell must state the "time, place and content of the false misrepresentations, the fact misrepresented, and what was retained or given up as a consequence of the fraud." Mot at 26. Lindell, however, is not required to plead the mailings themselves contain false statements if the mailings are in furtherance of a "scheme to defraud." *See United States v. Coughlin*, 610 F.3d 89, 98 (D.C. Cir. 2010) ("[t]he law is clear that innocent mailings—ones that contain no false information— may supply the mailing element."); *In re Outlaw Lab'ys, LP Litig.*, 352 F. Supp. 3d 992, 1002 (S.D. Cal. 2018) ("Counterclaimants are not required to allege that a particular false statement was either made within the demand letters, or without, to sustain a pleading for a scheme to defraud."); *Bridge*, 553 U.S. at 647 ("any 'mailing that is incident to an essential part of the scheme satisfies the mailing element'… even if the mailing itself 'contains no false information.'") (quoting *Schmuck v. United States*, 489 U.S. 705, 712 & 715 (1989)).

When, as here, the plaintiff does not allege the communications themselves are misleading, a complaint satisfies Rule 9(b)'s pleading requirements through "a detailed description of the

underlying scheme and the connection therewith of the mail and/or wire communications."[4] *In re Sumitomo Copper Litigation*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998); *see also Moy v. Adelphi Institute, Inc.,* 866 F. Supp. 696, 703 (E.D.N.Y.1994) (holding that failure to describe particulars is not fatal to a complaint if it "amply details the scheme" and "reveals that harm and injury to Plaintiffs was contemplated by the defendants' plan.").

Lindell's Complaint alleges that Defendants executed a Lawfare campaign aimed to silence viewpoint-based critical speech and to financially cripple Lindell through sham litigation. Compl. ¶¶ 1, 7, 9, 10–12, 125–39, 152–61. Lindell specifically pleads that Dominion and Clare Locke drafted and sent over 150 cease and desist letters, specifically referencing communications, dates, senders, and recipients. Compl. ¶¶ 125–39.

Lindell's Complaint also states facts supporting an inference that Defendants schemed to defraud and ruin him financially by extracting billions of dollars from him, contrary to Defendants' arguments. Compl. ¶¶ 11, 16, 19–22, 125–39; *see* Mot. at 26. A claim for "[m]ail fraud lies whether or not the perpetrator ends up with the victim's property or money." *Feld Ent. Inc. v. Am. Co'y for the Prevention of Cruelty to Animals*, 873 F. Supp. 2d 288, 318 (D.D.C. 2012); *see also United States v. Han,* 280 F. Supp. 3d 144, 153 (D.D.C. 2017) (distinguishing mail fraud from common-law fraud where an essential element is "that the defendant actually obtain or cause another to lose property") (citations omitted); *United States v. Welch,* 327 F.3d 1081, 1106 (10th Cir. 2003) (rejecting defendants' "argument that the mail and wire fraud counts must allege an intent to achieve personal gain"); *United States v. Stockheimer,* 157 F.3d 1082, 1087–88 (7th Cir. 1998) ("An intent

---

[4] In any event, Lindell's Complaint alleges false statements by Dominion including that its voting machines were not connected to the internet during the 2020 General Election and that its voting machines are not hackable. *See* Compl. ¶¶ 69–109.

to defraud [for mail fraud] does not turn on personal gain … all that matters is that he intended to inflect a loss.").

### 3. Lindell's allegations do not concern "litigation-related activity"

Lindell sufficiently alleges predicate acts to support his RICO claim against Defendants. Defendants' argument that the alleged predicate acts, specifically Defendants' threatening letters, are impermissibly based on litigation-related activity because they concern "a future lawsuit," Mot. at 15, 17, incorrectly defines litigation-related activity. For purposes of establishing a RICO predicate act, litigation-related activity means activity "directly related to *ongoing*, non-frivolous litigation" or "conduct in connection with *pending* lawsuits." *E. Sav. Bank FSB v. Papageorge*, 31 F. Supp. 3d 1, 13, 22 n.4 (D.D.C. 2014) (emphasis added). It does not include, for example, "harassment of third parties, interference with a joint venture, [or] an attempt to persuade the United States Attorney to investigate the plaintiff." *Id.* (citing *Hall Am. Ctr. Assocs. Ltd. P'ship v. Dick,* 726 F. Supp. 1083, 1097 (E. D. Mich. 1989)).

Here, the parties actually agree that Defendants' predicate acts occurred in connection with impending—not pending or on-going—litigation. Compl. ¶ 158 (emphasizing that Defendants' letters threatened recipients with *future* litigation unless they ceased viewpoint-based speech); Mot. at 27 ("…letters that Dominion sent before this lawsuit"). Defendants began sending threatening letters to Lindell and others in December 2020 but did not file suit against Lindell until February 22, 2021. *See* Dkt. 1, including ¶ 63. The letters even predate the first lawsuit Dominion filed regarding the election on January 8, 2021, against Powell.

Further, even activities that are considered "litigation-related" can establish a RICO predicate act if the complaint includes additional allegations of extortion or some other pattern of racketeering activity. *See United States v. Eisen,* 974 F.2d 246, 251–54 (2d Cir. 1992) (law firm's

scheme to extract money from civil defendants and liability insurers by fraudulent lawsuits, bribery and intimidation of witnesses, and falsified evidence); *Lemelson v. Wang Laboratories Inc*., 874 F. Supp. 430, 434 (D. Mass. 1994) (pattern of litigation and subsequent settlement over fraudulent patents). Courts have consistently found extortion adequately pled as a RICO predicate act when defendants collectively engage in an ongoing scheme to attempt to extort their victims into monetary acquiescence—including by threatening litigation. *See*, *e.g.*, *Chevron*, 871 F. Supp. at 249 (finding Chevron's allegations extended "far beyond" mere frivolous litigation to include a widespread scheme "for the purpose of coercing Chevron into paying to stop the campaign against it"); *Calabrese*, 2004 WL 3186787, at *6 (defendants' association for purpose of extracting monies from plaintiffs, including "institut[ing] baseless lawsuits," was sufficient allegation of extortion to constitute predicate act under RICO).

Defendants rely on cases where the alleged wrongful litigation activities related only to the "initiation and prosecution of non-frivolous" and on-going litigation with no additional allegations of other unlawful conduct such as bribery and intimidation of witnesses and third parties. *Republic of Kazakhstan v. Stati*, 380 F. Supp. 3d 55, 61, 63 (D.D.C. 2019) ("transmitting pleadings, briefs, witness statements, and other litigation materials during" an arbitration proceeding cannot serve as RICO predicate acts); *Kim v. Kim*, 884 F.3d 98, 104 (2d Cir. 2018) ("Allegations of frivolous, fraudulent, or baseless litigation activities—without more—cannot constitute a RICO predicate act."); *Rajaratnam v. Motley Rice, LLC,* 449 F. Supp. 3d 45, 68–69 (E.D.N.Y. 2020) (where the plaintiff's only allegations of mail fraud were based on defendants' filing false statements in the district court to try to convince the plaintiff to settle).

Unlike the cases Defendants rely on, the allegations in Lindell's Complaint are not limited to mere conduct in furtherance of litigation but also include other unlawful conduct. These

allegations mirror those in *Sykes v. Mel Harris & Associates, LLC*. 757 F. Supp. 2d 413 (S.D.N.Y. 2010). In *Sykes*, the plaintiff alleged defendants used litigation to carry out a "massive scheme" but also "engaged in a variety of other out-of-court actions to further this activity." *Kim,* 884 F.3d at 104 (distinguishing *Sykes* from a claim which was *entirely* based on litigation activity). Like *Sykes*, Lindell alleges threats of litigation and actual litigation plus additional out-of-court actions including extortion of and tampering with witnesses and mail fraud. Compl. ¶¶ 63, 127–30, 132, 137–38, 158, 162.

Specifically, Lindell alleges that Defendants conducted a massive scheme to silence view-point-based political speech by coordinating a mass media campaign to intimidate critics of elec-tion technology, Compl. ¶¶ 63, 127–29, 158, and sending at least 150 letters threatening potential litigation against witnesses, including Lindell. Compl. ¶¶ 128, 132, 158, 168. To further their Law-fare campaign against Lindell, Defendants labelled him as a "big liar" and a deceptive salesman, Dkt.1 at 15–17, 103, 113, and threatened witnesses into silence who might otherwise come forward with evidence to corroborate Lindell's claims and public statements inhibiting him from defending his now tarnished reputation against Defendants' defamation claims. Compl. ¶¶ 126, 129, 130, 132, 137, 138, 158, 162. Defendants engaged in these activities to intimidate the enterprise's tar-gets. Compl. ¶¶ 125–32. The enterprise's litigation-related activities are "perfunctory steps," part of a broader scheme to intimidate and financially injure its targets, and are therefore, actionable under 18 U.S.C. § 1341 as mail fraud.

Although Defendants try to convince the Court that an attorney's demand letter cannot form a RICO predicate act, Mot. at 17 (citing *Morin v. Trupin*, 711 F. Supp. 97, 105-106 (S.D.N.Y. 1989)), the authority they rely on is limited to specific facts not found here. In *Morin*, the court held that "correspondence between attorneys, dealing at arm's length on behalf of their parties,

concerning an issue in pending litigation" cannot be the basis of a RICO predicate act. *Id.* at 105. Here, however, Lindell bases his RICO predicate acts on Clare Locke's letters sent to over 150 individuals and entities, not another party's attorney, during a time when there was no litigation pending. Compl. ¶¶ 36, 125–32, 156–57.

### C.      Lindell Properly Stated a Claim under the "Support or Advocacy" Clause.

Lindell has alleged sufficient facts to state a claim against Dominion and HPS for violation of the Support or Advocacy Clause ("the Clause") under 42 U.S.C. § 1985(3). That statute provides:

> [I]f two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, *from giving his support or advocacy in a legal manner*, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; to injure any citizen in person or property on account of such support or advocacy.

42 U.S.C. § 1985(3) (emphasis added).

A Section 1985(3) claim brought under the Clause requires: (1) two or more persons; (2) who conspire to either (a) prevent by force, intimidation, or threat a citizen lawfully entitled to vote *from giving support or advocacy in a legal manner* toward or in favor of the election of a lawfully qualified elector for President or Vice President, or (b) injure any citizen in person or property on account of her support or advocacy toward or in favor of the election of a lawfully qualified elector for President or Vice President; (3) one or more acts in furtherance of the object of such conspiracy; (4) whereby plaintiff suffers either (a) injury in her person or property, or

(b) deprivation of having and exercising any right or privilege of a citizen of the United States. *See id*.[5]

Lindell alleges facts supporting those elements in the Complaint. Specifically, Defendants and Smartmatic, with the assistance and participation of non-party co-conspirator Clare Locke, had a meeting of the minds to agree on the common purpose of silencing speech, dissent, and opposition to the use of electronic voting machines in the 2020 General Election and the exposure of such machines' vulnerability to cyber-attacks and election tampering. Compl. ¶ 166. At the direction of Dominion, HPS and Clare Locke created a plan to stifle speech and dissent related to the 2020 General Election by sending over 150 cease and desist letters and enacting a public relations campaign designed to intimidate those who supported President Trump in the 2020 General Election. Compl. ¶¶ 10, 166. In particular, Clare Locke sent on behalf of Dominion a cease and desist letter to Lindell as early as December 23, 2020, well before the election was even certified on January 6, 2021. Compl. ¶ 136; Dkt. 2-65, Ex. 266. As part of the conspiracy, Smartmatic followed Dominion's playbook by sending cease and desist letters and filing lawsuits against anyone who dared support President Trump in the 2020 General Election. Compl. ¶ 166. The real purpose of the conspiracy was to silence viewpoint-based dissenting speech from individuals who supported President Trump and advocated for investigations into voting machine fraud (and other types of election fraud). *Id.* Importantly, upon information and belief, not one Democrat or left-leaning media organization has been threatened or sued by Dominion or Smartmatic based on their years of reporting vulnerabilities in election machines and software. *Id.* Defendants and Smartmatic determined to carry out this conspiracy through a coordinated campaign of lawfare—

---

[5] This slightly differs from the elements for a claim under Section 1985(3) in *Carpenters & Joiners of Am. v. Scott*, 463 U.S. 825, 829 (1983) because *Carpenters* dealt with the Equal Protection Provision and not the Clause.

weaponizing the court system and litigation process to threaten, intimidate, and force private citizens like Lindell into silence and retract their public statements regarding opposition to the use of electronic voting machines and their vulnerabilities. Compl. ¶¶ 11–12, 135–137, 140, 166. To that end, Defendants first threatened Lindell with ruinous litigation, then filed an abusive, sham defamation lawsuit against Lindell seeking a $1.3 *billion* recovery with no basis in fact or law. Compl. ¶¶ 11–12, 135–37, 140, 166. HPS' and Smartmatic's actions and Dominion's lawsuit have constituted intimidation and threat by Dominion and HPS and other defendants. Compl. ¶¶ 11–12, 135–37, 140, 166. They have also injured Lindell in his person (reputationally and physically due to threats on his life) and his property (through business losses and the cost of defending against the sham litigation) and has further deprived Lindell of having and exercising his rights as a United States citizen to freedoms of speech and of expression. Compl. ¶¶ 138, 166. Separately, a conspiracy for purposes of Lindell's § 1985(3) claim is shown by the actions of the Dominion, its lawyers at Clare Locke, and HPS who together conspired to send out over 150 baseless cease and desist letters—including to Lindell as early as December 23, 2020—with the express purpose of threatening and intimidating Lindell and others with potential evidence of election fraud in the November 2020 General Election as part of their support or advocacy for President Trump. Compl. ¶¶ 11–12, 136–38, 166, 168; Dkt. 2-65, Ex. 266.

Defendants offer two challenges: (1) Lindell's allegations relating to Defendants had not yet occurred when votes were cast on November 3, 2020, and cannot constitute a claim under the Clause because the allegations occurred after Election Day; and (2) Lindell failed to allege a conspiracy because of the intracorporate conspiracy doctrine. Neither of these arguments has merit.

1. **"Support or Advocacy" for a candidate is not limited to voting or events *prior* to Election Day.**

Defendants incorrectly equate the actual casting of Lindell's vote on Election Day, November 3, 2020, as the only manner in which Lindell could give his "support or advocacy" to candidate President Trump. Mot. at 28-29. This is simply an incorrect inferential leap. The Clause proscribes conspiracies that prevent a citizen who is eligible to vote from giving his "support or advocacy" in favor of the election of the President, Vice President, and members of Congress. Nowhere in the Clause, however, does it provide that voting is the only protected form of "support or advocacy" for a candidate. Nor does the statute limit the timeline for the "support or advocacy" of a candidate as being performed on or before Election Day.

In fact, the Fordham Law Review article cited by Defendants in the Motion addresses this very issue explaining:

> [T]he fact that a conspiracy to deny the right to vote can give rise to a support-or-advocacy claim does not mean that the support-or-advocacy clauses are merely vehicles for asserting claims based on the right to vote. The language of the statute, the statutory context, and the case law all indicate that the support-or-advocacy clauses protect something bigger.

Richard Primus & Cameron O Kistler, *The Support-or-Advocacy Clauses*, 89 Fordham L. Rev. 145, 162 (2020) ("FORDHAM"). Commentators have noted that if Congress had intended to create a remedy for violations of the right to vote, Congress could have drafted the statute to proscribe conspiracies to prevent "any citizen who is lawfully entitled to vote from voting" or "from exercising his right to vote." *Id.* However, Congress chose to write the Clause more broadly to include support or advocacy for federal candidates, *rather than just voting*. *Id.* Likewise, courts when interpreting Section 1985 have noted that the Supreme Court gives Reconstruction-Era statutes "a sweep as broad as [their] language." *Thompson v. Trump*, No. 21-cv-00400, 2022 WL 503384, at

*25 (D.D.C. Feb. 18, 2022); *Stern v. U.S. Gypsum*, Inc., 547 F.2d 1329, 1336 (1977) (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 97 (1971)).

This is also supported by the timing of the legislation passed by the Reconstruction Congress. *See* FORDHAM at 163. First Congress passed the Enforcement Act of 1870, which was also titled, "An Act to Enforce the Right of Citizens of the United States to Vote in the Several States of This Union." Section 4 established both civil and criminal liability for people who conspired to "hinder, delay, prevent, or obstruct, any citizen from doing any act required to be done to qualify him to vote or from voting at any election." *Id.* (quoting ch. 114, 16 Stat. 140, 141 (1870)). The Clause was passed a year later as part of the Enforcement Act of 1871.[6] *Id.* If the Clause in the Enforcement Act of 1871 only related to voting, then it would have been superfluous given the Enforcement Act of 1870's Section 4 that specifically addressed voting. *Id.*

In recent years, courts have applied the Clause to conspiracies to prevent support or advocacy for political candidates. *See, e.g., League of United Latin American Citizens (LULAC) v. Public Interest Legal Foundation*, No. 1:18-cv-00423, 2018 WL 3848404, at *6 (E.D. Va. 2018) (denying defendant's motion to dismiss and holding Latino plaintiffs properly stated a claim under the Clause where plaintiffs alleged media defendants published their names, home addresses, and phone numbers in reports falsely claiming they were guilty of felonies by illegally registering to vote and voting resulting in adverse publicity, intimidation, embarrassment, and fear of harassment associated with their participation in the electoral process as well as the need to combat the false narrative that Latinos who vote are voting illegally).

Defendants cite *Kush v. Rutledge*, 460 U.S. 719 (1983), for the proposition that the Clause does not apply to actions taken after Election Day because those actions could not stop the support

---

[6] *See* Dkt. 104 at 37–38 which provides additional legislative history and background regarding the Enforcement Act of 1871's Support or Advocacy Clause (also referred to as the Reformation Act of 1871).

or advocacy of a candidate in the election that just occurred. Defendants rely on the court's note that § 1985(3) "proscribe[s] conspiracies that interfere with ... the right to support candidates in federal elections." *Id.* at 724. This statement exists in the case, however, merely as a recitation of the history of the section; the case itself does not even parse what it might mean to "support candidates in federal elections." Moreover, *Kush* did not involve a challenge under the Clause, but a claim of conspiracy to intimidate witnesses under § 1985(2). 460 U.S. at 720. Left completely out of the court's discussion of § 1985 is any opinion concerning when actions which would violate the Clause must occur—either before, during, or after the election.

Defendants also incorrectly rely on *Gill v. Farm Bureau Life Ins. Co. of Missouri*, 906 F.2d 1265 (8th Cir. 1990). From *Gill*, they argue that because the conduct of Defendants (attempting through lawfare to prevent Lindell from speaking out about the election and the vulnerability of voting machines) occurred after November 3, 2020, then a Support or Advocacy Clause claim cannot stand. *Gill*, however, is also inapposite here. In *Gill*, an insurer exercised its contractually-held right by terminating its employment relationship with an agent who supported and raised funds for a congressman who opposed the incumbent the insurer favored. *Id.* at 1266. The court commented that the insurance agent was not deterred by any "force, intimidation, or threat." *Id.* The *Gill* court's holding actually turned on the fact that it chose to treat the Clause as a remedial right (requiring a separate cause of action), rather than a substantive, stand-alone right. *Id.* at 1271. The court concluded that because the fired insurance agent had no First Amendment-based cause of action, the trial court's dismissal of the case should be affirmed. *Id.* Lindell's case is entirely different from *Gill*. First, the Clause is a substantive right and not a remedial right.[7] Moreover, even if this court chooses to treat it as a remedial right, Lindell has properly pled a 1st Amendment

---

[7] *See* Dkt. 104 at 43–45 (arguing that the Clause is substantive rather than remedial) and incorporating by reference.

cause of action. *See* II.A.2. Furthermore, Lindell has properly pled the significant "intimidation" and "threat" that he felt due to the extensive conspiracy furthered by the co-defendants by way of aggressive cease and desist letters and a $1.3 billion defamation lawsuit. Compl. ¶¶ 125–40.[8]

Here, while election day was November 3, 2020, the states' electors were not certified until January 6, 2021. Moreover, recall efforts in states such as Arizona and Wisconsin have continued long past that. Compl. ¶¶ 18–19, 45, 47–48, 71, 85, 98, 102, 104, 115, 118, 123. Throughout that time, Lindell has continued to give his support and advocacy to candidate President Trump by publicly sharing information demonstrating that Dominion's voting machines and software were, in fact, the target of cyberattacks in the November 2020 General Election. Therefore, November 3, 2020, was not the cut-off for Lindell's support or advocacy for a candidate.

In turn, Defendants, Smartmatic, and Clare Locke conspired to prevent Lindell's support and advocacy for President Trump by intimidating and threatening Lindell through cease and desist letters and lawfare. This started as early as Dominion's first cease and desist letter, dated December 23, 2020, long before the election was certified and continued through further cease and desist letters and a $1.3 billion defamation lawsuit filed by Dominion. *See* Dkt. 2-65, Ex. 266.

Moreover, even if this Court chooses to apply Defendants' incorrect theory that the only way Lindell could give President Trump support or advocacy is voting, Lindell's claim is still supported by evidence of conspiracy that pre-dated Election Day. Even Time Magazine reported on what can plausibly be labeled a conspiracy amongst many in the private sector and government to stifle dissent—labeled as "disinformation"—regarding the outcome of the 2020 General Election. *See* Compl. ¶ 138, n.207. In addition, long before November 3, 2020, Smartmatic published a pamphlet titled, "Communications in the Age of Fake News—A Crisis Handbook for Election

---

[8] *See* Dkt. 104 at 40–43 (explaining the Clause is not limited to conspiracies involving violent or physical force).

Commissions" and distributed it to election management bodies using their product under the guise of advising them how to "combat fake news" to protect the election. Compl. ¶ 124; Index, Ex. 2. Therefore, the conspiracy to silence particular viewpoints—those like Lindell's that supported and advocated for Donald Trump for President—began long before November 3, 2020.

 2.   **Lindell properly pled the existence of a conspiracy to support a claim under the Support or Advocacy Clause.**

Lindell properly pled the existence of a conspiracy between Defendants, Smartmatic, and Clare Locke to support a claim under the Clause. Compl. ¶¶ 36, 126, 136, 138, 145, 156, 166. Lindell incorporates the civil conspiracy elements and argument, *infra* at II.F.

Defendants also argue under the intracorporate conspiracy doctrine, that US Dominion, Inc. is incapable of conspiring with its two subsidiaries. Mot. at 31. "The intracorporate conspiracy doctrine holds that ... a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 739 (D.D.C. 2000). This argument fails because Lindell did not allege that US Dominion, Inc. conspired with Dominion Voting Systems, Inc. and Dominion Voting Systems Corporations. Lindell repeatedly alleged that the conspiracy is between Dominion, Smartmatic, Clare Locke, and HPS. Compl. ¶¶ 36, 126, 136, 138, 145, 156, 166.

Defendants further argue that the intracorporate conspiracy doctrine prevents Dominion from conspiring with HPS or Clare Locke, who were acting as Dominion's agents. Mot. at 31. Defendants rely on *In re Ellipso, Inc.*, 2011 WL 482726 (Bankr. D.D.C. Feb. 7, 2011). In *Ellipso*, plaintiffs filed suit against a debtor entity, Ellipso, arising out of previous litigation which Ellipso had initiated in bad faith against plaintiffs. *Id.* at *5–6. Amongst others, plaintiffs alleged civil conspiracy to commit RICO violations and claimed Ellipso's attorneys in the previous litigation

were members of the RICO enterprise. *Id*. at *12, 22. The court held that the under the intracorporate conspiracy doctrine, Ellipso could not have conspired with its attorneys. *Id*. at *22.

*Ellipso* does not apply here because Lindell does not allege that these conspiratorial acts were taken by Dominion and its counsel, Clare Locke, alone. Lindell alleges a conspiracy between Dominion, Smartmatic, Clare Locke, and HPS. Compl. ¶¶ 36, 126, 136, 138, 145, 156, 166. For example, Lindell alleges that the cease and desist letters were sent by Dominion and orchestrated with HPS and Clare Locke. Compl. ¶ 136. Courts have held that attorneys lose the protection of the intracorporate conspiracy doctrine when the alleged conspiracy encompasses individuals beyond the scope of the attorney-client relationship. In *Marshall v. Fenstermacher*, the court refused to apply the intracorporate conspiracy doctrine to an alleged conspiracy between an attorney and his client to conceal the client's assets from creditors because the alleged conspiracy had involved third parties, including the transferee of the client's assets. 388 F. Supp. 2d 536, 545 (E.D. Pa. 2005). The court reasoned that the alleged conspiracy, "encompassed individuals other than [the attorney], thereby expanding the alleged conspiratorial activities beyond the attorney-client relationship." *Id*. at 554; *see also Kilbride Invs. Ltd. v. Cushman & Wakefield of Pennsylvania, Inc.*, 294 F. Supp. 3d 369, 384 (E.D. Pa. 2018); *Dunlap v. Peco Energy Co.*, No. 96-CV-4326, 1996 WL 617777, at *3 (E.D. Pa. Oct. 23, 1996) ("By including [a] third party in an otherwise intracorporate endeavor, plaintiffs have pled an actionable 'conspiracy' under § 1985(3).").

Even if the intracorporate conspiracy doctrine could have shielded a conspiracy between Dominion and Clare Locke alone, it does not shield the specific conspiracy alleged by Lindell. The participation of Smartmatic and HPS expanded the conspiracy beyond the scope of the attorney-client relationship, voiding the doctrine's applicability. Similarly, the conspiracy between Dominion and HPS expanded beyond the scope of the companies' agency relationship via the

participation of Smartmatic and Clare Locke. Accordingly, Lindell pled an actionable conspiracy claim against all parties.

Moreover, even if the intracorporate conspiracy doctrine shields a civil conspiracy claim, it does not apply to a Section 1985 claim where the conspiracy claim also alleges defendants conspired to commit criminal conduct. *See Blakeney v. O'Donnell*, 117 F. Supp. 3d 6, 14-16 (D.D.C. 2015) (holding intracorporate conspiracy doctrine did not apply to a § 1985(2) claim that included a "conspiracy alleging criminal activity under civil law" and relying on *McAndrew*); *McAndrew v. Lockheed Martin Corp.,* 206 F.3d 1031, 1035 (11th Cir. 2000) (holding that the intracorporate conspiracy doctrine does not apply to a § 1985(2) claim alleging a conspiracy to deter a person by force, intimidation, or threat from testifying in a federal court proceeding where the plaintiff also alleged criminal conduct in violation of 18 U.S.C. § 1512, the federal witness tampering statute). "The criminal conspiracy exception to the intracorporate conspiracy doctrine promotes the original purpose of the [Reformation Act of 1871] by ensuring that individuals and groups can be prosecuted for their criminal activities regardless of their incorporation." *McAndrew*, 206 F.3d at 1041. Here, like the claim in *McAndrew*, Lindell alleged that the conspiracy involving Dominion, Smartmatic, Clare Locke, and HPS "violated 18 U.S.C. § 1512 and related Minnesota and Colorado law through its illegal Lawfare campaign." Compl. ¶ 183(f) (emphasis added). Because Lindell's civil conspiracy claim alleges criminal activity under civil law, 18 U.S.C. § 1512, the intracorporate conspiracy doctrine does not apply here. *Blakeney*, 117 F.Supp.3d at 15–16.

**D.      The Absolute Privilege Does Not Bar Lindell's Defamation Claim Against Dominion.**

The absolute privilege defense may only be granted when facts giving rise to "the defense are clear from the face of the complaint." *Armenian Assembly of Am., Inc. v. Cafesjian,* 597 F. Supp. 2d 128, 140 (D.D.C. 2009) (citing *Smith–Haynie v. District of Columbia*, 155 F.3d 575, 578

(D.C.Cir.1998)). At this stage in proceedings, the Court must treat the facts as alleged in the Complaint as true and grant Lindell the benefit of all inferences that can be derived therefrom. *See Holy Land Found. For Relief & Dev. v. Ashcroft*, 333 F.3d 156, 65 (D.C. Cir. 2003); Dkt. 54 at 13. The privilege "is not lightly granted and applies only in limited circumstances." *Zutz v. Nelson,* 788 N.W.2d 58, 62 (Minn. 2010). While the privilege protects "conduct in litigation in order to provide litigants (and their attorneys) full and unburdened access to the courts," it should not apply to cases where the interest it intends to protect is outweighed by a competing and more compelling interest. *See Matthis v. Kennedy,* 67 N.W.2d 413, 418 (1954) (denying extension of the privilege to situations where a party or counsel are gratifying private malice by uttering slanderous expressions against another party which have no relation to the cause or subject matter of the inquiry)*.* The privilege should not be applied if doing so would infringe on "the public's interest in the full exercise of First Amendment rights to free speech and to petition for redress of grievances concerning matters of public significance, or the public's need to safeguard against witness intimidation and other tactics ...." *McNair Builders, Inc. v. Taylor,* 3 A.3d 1132, 1139–40 (D.C. 2010). The privilege does not apply, for example, if a party or its counsel is looking to simply "gratify private malice by uttering slanderous expressions" against another party "which have no relation to the cause or subject matter" of the case. *Matthis,* 67 N.W.2d at 418.

Lindell's Complaint does not support application of the absolute privilege. The Complaint is based upon the public's interests in the full exercise of the First Amendment, especially in the context of full and fair elections, and the need to protect against witness intimidation. Compl. ¶¶ 20–22, 125–40, 145, 156–58, 166, 173–74, 179, 183. The Complaint does not support an inference that Dominion has a competing interest, as a state actor, to exercise discriminatory,

viewpoint-based restrictions on public issue speech; in fact, it supports the opposite inference. Compl. ¶¶ 37–49, 125–40, 169–79.

Lindell's Complaint alleges defamation in Dominion's complaint against Lindell in this proceeding. Compl. ¶ 150; Dkt. 1. Throughout Dominion's complaint, it (1) labels Lindell as "deceptive," Dkt.1, ¶ 1; (2) associates him with "con artists," *id*. at ¶ 3; (3) claims he (a) "sells the lie to this day," *id*. at ¶ 1; (b) is "duping people, *id*. at ¶¶ 1, 132; (c) is guilty of deceptive and misleading advertising, *id.* at ¶¶ 15, 16, 17; 73, 140; (d) "exploit[s]" people and "knowing lied" to customers, *id.* at ¶¶ 34, 70, 103; 113, 120; and (e) is a liar, *id*. at ¶¶ 34, 35, 37, 42, 49, 51, 62, 65, 69, 70, 105, 106. Such statements are not related to the subject matter of Dominion's defamation claim against Lindell, which is based on potential election fraud. *See Matthis*, 67 N.W.2d at 418. Instead, the Court may infer that Dominion and its attorney's made these statements simply to "gratify private malice" against Lindell. *See id*.

Additionally, parties and counsel are not absolutely privileged to make defamatory statements to the news media when the news media is unconnected with a judicial or proposed judicial proceeding. *Scott Fetzer Co. v. Williamson*, 101 F.3d 549, 553–54 (8th Cir. 1996) (applying Minnesota law); *see also Chafoulias v. Peterson*, No. C2-01-1617, 2003 WL 23025097, at *3 (Minn. Ct. App. Dec. 30, 2003) ("…courts have held that unless a media outlet is a party to an action, publication to that outlet is not ordinarily sufficiently related to a judicial proceeding to constitute a privileged occasion.") Here, there are sufficient facts within Lindell's Complaint that support or give rise to the reasonable inference that the defamatory statements were made by Dominion and its attorneys to entities such as news outlets with no interest or connection in this underlying litigation. Compl. ¶¶ 110, 127, 128, 130, 133, 138.

E.      **Lindell Adequately Pled Abuse of Process Against Dominion.**

Lindell's Complaint alleges that Dominion's entire lawfare campaign to silence viewpoint-based public issue speech—not just sending cease and desist letters or making statements to the media—were an abuse of process.

A plaintiff properly pleads abuse of process through allegations showing (1) the existence of an ulterior purpose and (2) the act of using the process to accomplish a result not within the scope of the proceeding in which it was issued." *Bigelow v. Galway*, 281 N.W.2d 835, 837 (Minn. 1978).[9] "The critical concern in abuse of process cases is whether process was used to accomplish an end unintended by law, and whether the suit was instituted to achieve a result not regularly or legally obtainable." *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C.1980). A plaintiff may maintain an abuse of process claim when he alleges the process was brought, not merely with an ulterior motive, but to achieve a collateral result. *See Creecy v. District of Columbia*, No. CIV.A. 10-841 CKK, 2011 WL 1195780, at *7 (D.D.C. Mar. 31, 2011) (holding allegations that proceedings were issued against the plaintiff with an ulterior motive, but not "that the criminal proceedings were filed against him for any improper purpose, such as to pressure him to take some action or not take some action" failed to state an abuse of process claim); *Surgidev Corp. v. Eye Tech., Inc.* 625 F. Supp. 800, 805 n. 4 (D. Minn. 1986) ("Absent allegations that plaintiff has willfully made use of process to accomplish a result not within the scope of the proceeding in which it was issued, an abuse of process claim has simply not been established.").

Lindell's abuse of process claim is based not on isolated acts of any one Defendant, but rather upon Dominion, Smartmatic, and HPS' involvement in the overarching Lawfare campaign

---

[9] *See also, Swanson v. Howard Univ.*, 249 F. Supp. 3d 255, 258 (D.D.C. 2017) ("There are two essential elements to an abuse of process claim: (1) the existence of an ulterior motive; and (2) an *act* in the use of process other than such as would be proper in the regular prosecution of the charge.").

to silence viewpoint-based speech of which each individual act is a part. Compl. ¶¶ 125–39, 142–46. Restriction of speech of a particular viewpoint is a "result not regularly or legally obtainable" by state actors like Dominion. *See Morowitz*, 423 A.2d at 198. Like *Creecy*, Lindell alleges the lawfare campaign was motivated by an improper purpose, designed to silence viewpoint-based dissenting speech and intimidate witnesses from coming forward with additional evidence of election irregularities. Compl. ¶¶ 125–39, 142–46. Lindell's Complaint sufficiently pleads facts showing Dominion misused the "legal process to accomplish an end other than that which the process was designed to accomplish," and the Court should deny Defendants' Motion to Dismiss his claim.

**F.    Lindell Pled Sufficient Facts to Support a Civil Conspiracy Claim Against Dominion and HPS.**

Defendants feign confusion regarding Lindell's civil conspiracy claim. Mot. at 51. To be clear—Lindell asserts a common-law claim for civil conspiracy, Compl. ¶¶ 180–83, *and* a claim under the Clause of 42 U.S.C. § 1985(3), Compl. ¶¶ 162–68, which includes conspiracy as an element. *See* 42 U.S.C. § 1985(3) ("if two or more persons conspire ...."); *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 487 (S.D.N.Y. 2020) (explaining elements for claim under the Clause "include: (1) a conspiracy; (2) the purpose of which is to force, intimidate, or threaten; (3) an individual legally entitled to vote who is engaging in lawful activity related to voting in federal elections."); *Burnett v. Sharma*, 511 F. Supp. 2d 136, 143 (D.D.C. 2007) (explaining that an element of § 1985 is the existence of a conspiracy and citing the traditional elements of civil conspiracy). Defendants incorrectly characterize the element of conspiracy as a "conspiracy claim under 42 U.S.C. § 1985(3)." Mot. at 52.

To survive a motion to dismiss a claim of civil conspiracy, "a complaint must allege with some factual support: (1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt

act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme." *Mattiaccio v. DHA Grp., Inc.*, 20 F. Supp. 3d 220, 230 (D.D.C. 2014). Defendants offer two primary challenges that relate to civil conspiracy: (1) Lindell has not alleged an underlying illegal act, and (2) Lindell did not allege an agreement. Mot. at 51. Within their civil conspiracy argument, Defendants also offer two challenges that relate to Lindell's claim under the Clause of 42 U.S.C. § 1985(3): (1) Lindell has not alleged a violation of a substantive, federal right, and (2) Lindell's claim under § 1985(3) fails due to lack of state action. Mot at 51-52. None of these arguments have merit.

1. **Lindell alleged underlying illegal acts to support his civil conspiracy claim.**

Dominion incorrectly argues that Lindell has not alleged an underlying illegal act. In doing so, Dominion relies on the fact that civil conspiracy is a means for establishing vicarious liability for an underlying tort and claims that Lindell has not established an underlying tort or constitutional violation.[10] Mot. at 51. Lindell's Complaint, however, include multiple allegations that Defendants committed tortious acts and violations of his rights in furtherance of Defendants' conspiracy, including (1) abuse of process; (2) defamation; (3) extortion by threatening and then bringing frivolous litigation against him; (4) violating his rights under 42 U.S.C. § 1985(3); (5) violating 42 U.S.C. § 1983 by depriving him of his rights of equal protection, due process, and First Amendment rights by first threatening and then bringing sham litigation motivated by discriminatory animus against his political viewpoint and speech; and (6) violations of 18 U.S.C. § 1512 and related state laws. Compl. ¶ 183. Accordingly, Lindell sufficiently pled underlying illegal acts.

---

[10] Dominion's argument regarding a lack of constitutional violation only relates to claims under 42 U.S.C. § 1985(3); therefore, it will be addressed in the response, *infra*, discussing the § 1985 arguments contained within Dominion's civil conspiracy section.

2.      **Lindell sufficiently alleged an agreement between Defendants.**

Lindell pled sufficient facts to infer an agreement between Defendants to support civil conspiracy. Courts may infer the existence of an agreement if the plaintiff alleges facts showing co-conspirators engaged in parallel conduct and had a preexisting relationship. *Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 52 (D.D.C. 2019) (citing *Twombly*, 550 U.S. at 557)). A plaintiff need not allege explicit or implicit communications among co-conspirators. *Id*. And contrary to Defendants' insistence, there is no "mandatory rule of conspiracy pleading" requiring a plaintiff to an allege an "event, conversation, or document" showing an agreement between the co-conspirators. *Lagayan v. Odeh*, 199 F. Supp. 3d 21, 30 (D.D.C. 2016). Moreover,

> [A] plaintiff 'need not show that the members entered into any express or formal agreement, or that they directly, by words spoken or in writing, stated between themselves what their object or purpose was to be, or the details thereof, or the means by which the object or purpose was to be accomplished.

*Thompson*, 2022 WL 503384, at 30 (quoting 3B FED. PRAC. & INST. § 167:30, Westlaw (database updated Jan. 2022) (quoting federal standard jury instruction for claims brought under § 1985(3)). Instead "allegations concerning the defendants' proximity to each other and parallel activities alone" can justify inferring "an agreement or meeting of the minds amongst the defendants." *Barber v. D.C. Gov't,* 394 F. Supp. 3d 49, 66 (D.D.C. 2019).

"Proof of a tacit, as opposed to explicit, understanding is sufficient to show agreement." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). The *Halberstam* court elaborated, "[t]he circumstances of the wrongdoing generally dictate what evidence is relevant or available in deciding whether an agreement exists. Factors like the relationship between the parties' acts, the time and place of their execution, and the duration of the joint activity influence the determination." *Id*. at 486. Thus, this Court may rely on indirect or circumstantial evidence at the motion to dismiss stage to infer a conspiracy. Other jurisdictions do as well. *See White v. Walsh*, 649 F. 2d 560, 561

(8th Cir. 1981) ("It is unlikely that a plaintiff in a conspiracy case will be able to provide direct evidence of a conspiratorial agreement. Thus, such evidence is not necessary to prove that a civil conspiracy existed."). At the pleading stage, plausible—not probable—grounds must exist to infer an agreement was made. A complaint includes plausible grounds of an agreement when the facts alleged "raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. Therefore, on a motion to dismiss, a plaintiff's burden to establish a conspiracy is lighter than it would be following discovery.

The factual allegations in the Complaint meet the standard for pleading conspiracy at the motion to dismiss stage. Defendants and Smartmatic engaged in a "mutually supportive," parallel, and calculated pattern of litigation. Both Dominion and Smartmatic are key members of an unofficial cartel of electronic voting services companies that run American elections. Unlike their fellow cartel members, Dominion and Smartmatic have made a business of litigation against Lindell and others, filing suit for much more than either company is worth. Compl. ¶¶ 11, 125, 129, 131, 137, 145, 165. This pattern—plotted and launched by two companies who run our elections— harmed and continues to harm Americans, specifically including Lindell, who are entitled to make and hear speech from every side of a controversy and speak freely about issues which gravely impact our country. *Id*. at ¶¶ 40, 60, 63.

Defendants, Clare Locke, and Smartmatic sent increasingly aggressive letters to Lindell and others, enacted an all-encompassing media campaign to intimidate and silence speech, and filed lawsuits against numerous individuals and corporations. *Id*. at ¶¶ 11, 125–26, 129, 131, 136– 37, 145, 165. Smartmatic then came to this Court and specifically threatened to sue Lindell and sought "sanctions against him for fighting back against the coordinated campaign to stifle dissenting speech." *Id*. at ¶ 16; *see also* Cause No. 1:21-cv-02296, Dkt. 118. Dominion and Smartmatic

threatened Lindell with expensive litigation and sanctions for criticizing their voting machines and their penetrable voting software. Lindell's Complaint alleged sufficient facts to establish an agreement between Dominion and Smartmatic. Courts have found a tacit agreement when parties engage in parallel conduct supported by "facilitating practices," *i.e.*, "specific actions taken by firms to make coordination easier or more effective without the need for an explicit agreement." Wentong Zheng, *A Knowledge Theory of Tacit Agreement*, 9 HARVARD BUS. L. REV. 399, 410 (2009).

Here Smartmatic and Dominion engage in a "facilitating practice" through which they coordinate their abuses of the legal process on their websites. Smartmatic and Dominion *both* maintain a "legal update" or "lawsuit update" webpage specifically broadcasting and informing the public of their respective lawsuits regarding the 2020 General Election. Compl. ¶¶ 17, 133. Both companies make filed complaints, demand letters, and public statements readily available on these webpages to signal and coordinate their strategy without explicit communication.

In addition to their mutually supportive and parallel conduct, Lindell alleged facts showing Dominion and Smartmatic's shared corporate history and prior business relationship preceded the current conspiracy. In 2007, Smartmatic Corporation, Sequoia Voting Systems, Inc. ("SVS"), and SVS Holdings, Inc. ("SVS Holdings") entered into a Stock Purchase Agreement (the "Purchase Agreement") whereby Smartmatic sold SVS to SVS Holdings, which was wholly owned by Smartmatic's U.S. executives. *Id.* at ¶¶ 14, 15. In the Purchase Agreement, Smartmatic expressly carved out from the sale its "Proprietary Intellectual Property," which included certain technology used in e-voting systems (*e.g.*, "the Edge II Plus" and "Hybrid Activator, Accumulator & Transmitter (HAAT)"). Compl. ¶¶ 15, 17. Dominion purchased SVS from SVS Holdings in 2010. *Id.* at ¶ 60.

Dominion licenses, or at the very least uses, Smartmatic's intellectual property in its voting systems. In 2013, Dominion bid on Colorado's voting system contract and stated its proposed

"project" and voting "system" included Smartmatic's Proprietary Intellectual Property, specifically the "Edge 2 + … and the HAAT" systems. *Id*. at ¶ 17. Dominion stated it "continues to support and improve this system," i.e., Smartmatic's property, "today." *Id*. at ¶ 17. Dominion and Smartmatic's shared use of Smartmatic's property evidences a symbiotic relationship between the two entities within which communication and coordination between Dominion and Smartmatic must occur, making conspiracy plausible.

In addition to shared histories and past business transactions, the parties share employees. Dominion's Vice President of Marketing, Vice President of Operations, Senior Technical Sales Engineer, and U.S. Sales employee all had or have Smartmatic email addresses. *Id*. at ¶ 62. Dominion employees' access to and use of Smartmatic email accounts alone is sufficient to infer these critical Dominion employees acted on behalf of or in concert with Smartmatic. When considered in their totality, Defendants' symbiotic relationship and mutually supportive, parallel conduct during their lawfare campaign are sufficient evidence to infer a tacit agreements.

### 3.   Support or Advocacy Clause is substantive right; underlying federal right is not required.

Defendants incorrectly attack Lindell's civil conspiracy claim arguing that Lindell's § 1985(3) claim under the Clause fails because Lindell has not alleged a violation of a substantive, federal right. Mot. at 51.

The Support or Advocacy Clause of § 1985(3) grants Lindell a substantive right; therefore, he is not required to allege a separate federal right.[11] *See Wohl*, 498 F. Supp. 3d at 486 (holding "plaintiffs bringing claims under the Support or Advocacy Clause need not identify a violation of a separate constitutional right" because the Clause creates a substantive right to vote and participate

---

[11] *See* Dkt. 104 at 43-45, incorporating by reference argument that Support or Advocacy Clause is substantive rather than remedial.

in voting-related activities). Defendants' reliance on *Bush v. Butler* is misplaced because *Bush* is not a Support or Advocacy Clause case. 521 F. Supp. 2d 63, 68 (D.D.C. 2007). *Bush* involves the Equal Protection Provision of § 1985(3) which has different requirements.[12] In the event the Court treats the Clause as a remedial right, thereby requiring allegations of an underlying federal right, Lindell pled sufficient facts showing violations of his 1st and 14th Amendment rights, Compl. ¶¶ 169–79, 183(e), as well as Dominion's state action as discussed *supra*, II.A.1.

### 4.      Support or Advocacy Clause is substantive right; state action is not required.

Likewise, Defendants' argument that Lindell's § 1985(3) claim fails due to lack of state action, Mot. at 52, also fails because where no underlying federal right must be pled, no state action must be plead. In the event the Court treats the Clause as a remedial right, thereby requiring allegations of an underlying federal right and state action, Lindell pled sufficient facts showing violations of his 1st and 14th Amendment rights, Compl. ¶¶ 169–79, 183(e), as well as Dominion's state action as discussed *supra*, II.A.1. *Woytowicz v. George Washington Univ*., does not apply here because it was brought under the Equal Protection Provision of § 1985(3). 327 F. Supp. 3d 105, 120 (D.D.C. 2018). *Brown v. Hill*, also does not apply because the private entities were charitable organizations who did not perform traditional and exclusive public functions. 174 F.Supp. 3d 66 (D.D.C. 2016); Mot. at 52.

### III.      CONCLUSION

Mike Lindell filed a well-pled Third-Party Complaint against Dominion and HPS. Taking his factual allegations as true and indulging all reasonable inferences in his favor—which the Court

---

[12] Litigants like Dominion have long confused the required elements of § 1985(3)'s Equal Protection Provision (the first clause) and Support or Advocacy Clause (the second clause). *See, e.g., The Support or Advocacy Clause of § 1985(3)*, 133 HARV. L. REV. 1389, 1395 (2020). Lindell did not plead violations under the Equal Protection Provision.

must at this stage—Lindell pled sufficient facts supporting his causes of action against Defendants.

Accordingly, the Court should deny Dominion's and HPS' Motion to Dismiss.

## IV.    REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7(f), Lindell requests oral argument on Smartmatic's Motion to

Dismiss.

Dated: March 11, 2022                          Respectfully submitted,

                                               */s/ Douglas A. Daniels*
                                               Douglas A. Daniels
                                               D.C. Bar No. TX0205
                                               Heath A. Novosad
                                               D.C. Bar No. TX0207
                                               DANIELS & TREDENNICK PLLC
                                               6363 Woodway Dr., Suite 700
                                               Houston, TX 77057-1759
                                               (713) 917-0024 Telephone
                                               (713) 917-0026 Facsimile
                                               Email: doug.daniels@dtlawyers.com
                                               Email: heath.novosad@dtlawyers.com

                                               Earl N. "Trey" Mayfield, III
                                               D.C. Bar No. 459998
                                               JURIS DAY, PLLC
                                               10521 Judicial Drive, Suite 200
                                               Fairfax, Virginia 22030
                                               Telephone: (703) 268-5600
                                               tmayfield@jurisday.com

                                               *Counsel for Defendant Michael J. Lindell*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served upon all parties of record through the Court's CM ECF system on March 11, 2022.

                                               */s/ Douglas A. Daniels*
                                               Douglas A. Daniels