**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION, | ) ) ) ) ) |
| Plaintiffs/Counter-Defendants, | ) ) |
| v. | ) ) |
| MYPILLOW, INC. and MICHAEL J. LINDELL, | ) ) ) |
| Defendants/Counter-Plaintiffs/Third-Party Plaintiffs, | ) Case No. 1:21-cv-0445-CJN ) ) |
| v. | ) ) |
| SMARTMATIC USA CORP., SMARTMATIC INTERNATIONAL HOLDING B.V., SGO CORPORATION LIMITED, and HAMILTON PLACE STRATEGIES, LLC. | ) ) ) ) ) ) |
| Third-Party Defendants. | ) ) |

<u>**DOMINION'S AND HAMILTON'S REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS LINDELL'S AND MYPILLOW'S COUNTERCLAIMS AND LINDELL'S THIRD-PARTY CLAIMS**</u>

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................1

ARGUMENT ...........................................................................................................2

    I.     LINDELL'S AND MYPILLOW'S SECTION 1983 CLAIMS FAIL ...................2

        A.     Neither Lindell Nor MyPillow Alleges State Action...................................2

             1.     Dominion's Election-Related Services Do Not Make It a State Actor ..................................................................................2

             2.     MyPillow's and Lindell's "Human Employee Replacement" Theory Is Baseless and Wildly Overbroad ..................................................................................5

             3.     The Conduct Underlying the Counterclaims Is Not State Action..................................................................................7

        B.     The Section 1983 Claims Fail On The Merits ..........................................10

             1.     First Amendment Retaliation......................................................10

             2.     Substantive Due Process .............................................................12

             3.     Equal Protection..........................................................................13

             4.     Procedural Due Process ..............................................................13

    II.    LINDELL AND MYPILLOW CANNOT SAVE THEIR ABUSE OF PROCESS CLAIMS ..........................................................................................14

    III.   LINDELL'S RICO CLAIM FAILS..................................................................16

        A.     Lindell's RICO Claim Fails Because It is Based On Litigation-Related Activity .......................................................................................16

        B.     Lindell's Fails To Adequately Allege a RICO Enterprise .........................17

        C.     Lindell Fails to Allege a RICO Predicate .................................................19

             1.     Lindell Does Not Allege Extortion...............................................19

             2.     Lindell Does Not Allege Witness Tampering................................21

             3.     Lindell Does Not Allege Mail Fraud ...........................................23

IV.     LINDELL'S SUPPORT OR ADVOCACY CLAIM FAILS .................................23

     A.     Lindell Does Not Allege Conduct Covered by the Support or
           Advocacy Clause ........................................................................................23

     B.     Lindell Fails to Allege the Existence of a Conspiracy..............................26

V.      LINDELL'S   DEFAMATION   CLAIM   IS   BARRED   BY   THE
     ABSOLUTE PRIVILEGE ......................................................................................26

VI.     LINDELL FAILS TO ALLEGE A CIVIL CONSPIRACY CLAIM....................27

VII.    MYPILLOW  FAILS  TO  ALLEGE  TORTIOUS  INTERFERENCE
     WITH PROSPECTIVE ECONOMIC ADVANTAGE .........................................29

CONCLUSION..............................................................................................................................32

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Acosta v. Democratic City Comm.*,
    288 F. Supp. 3d 597 (E.D. Pa. 2018) .......................................................................4

*Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*,
    406 F. Supp. 3d 72 (D.D.C. 2019) .........................................................................23

*Anderson v. USAir, Inc.*,
    818 F.2d 49 (D.C. Cir. 1987) ...................................................................................5

*Athridge v. Aetna Cas. & Sur. Co.*,
    163 F. Supp. 2d 38 (D.D.C. 2001), *aff'd in part, rev'd in part on other grounds*, 351 F.3d
    1166 (D.C. Cir. 2003) .............................................................................................15

*Atl. Recording Corp. v. Raleigh*,
    2008 WL 3890387 (E.D. Mo. Aug. 18, 2008) .......................................................16

*Barnes v. District of Columbia*,
    2007 WL 1655868 (D.D.C. June 6, 2007) .............................................................12

*Bates v. Nw. Hum. Servs., Inc. ("Bates I")*,
    466 F. Supp. 2d 69 (D.D.C. 2006) .........................................................................19

*Bates v. Nw. Hum. Servs., Inc. ("Bates II")*,
    583 F. Supp. 2d 138 (D.D.C. 2008) .......................................................................10

*Beedle v. Wilson*,
    422 F.3d 1059 (10th Cir. 2005) .............................................................................11

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)................................................................................................10

*Benison v. Ross*,
    765 F.3d 649 (6th Cir. 2014) .................................................................................11

*Bennett v. United States Tr. Co. of New York*,
    770 F.2d 308 (2d Cir. 1985)...................................................................................19

*Blum v. Yaretsky*,
    457 U.S. 991 (1982).............................................................................................3, 4

*Burton v. Wilmington Parking Authority*,
    365 U.S. 715 (1961)..................................................................................................5

*Butera v. District of Columbia,*
   235 F.3d 637 (D.C. Cir. 2001) ............................................................................12

*Calabrese v. CSC Holdings, Inc.,*
   2004 WL 3186787 (E.D.N.Y. July 19, 2004) ..................................................20, 21

*Camm v. Kennickell,*
   1990 WL 198621 (D.D.C. Nov. 20, 1990), *aff'd*, 946 F.2d 1563 (D.C. Cir. 1991) ...............15

*Carpenter v. United States,*
   484 U.S. 19 (1987).............................................................................................23

*Chevron Corp. v. Donziger,*
   871 F. Supp. 2d 229 (S.D.N.Y. 2012)...............................................................20, 21

*Deck v. Engineered Laminates,*
   349 F.3d 1253 (10th Cir. 2003) ............................................................................20

*Dexon Computer, Inc. v. Mod. Enter. Sols., Inc.,*
   2016 WL 4069225 (Minn. Ct. App. Aug. 1, 2016) .................................................30

*Dexon Computer, Inc. v. Modern Enter. Solutions, Inc.,*
   2015 WL 9921330 (Minn. Dist. Ct. Dec. 28, 2015) ..........................................30, 31

*Dr. R.C. Samanta Roy Inst. Of Sci. & Tech. v. The Star Trib. Co.,*
   2005 WL 1661514 (D. Minn. July 15, 2005) .........................................................30

*Dun v. Transamerica Premier Life Ins. Co.,*
   2020 WL 4001472 (D.D.C. July 15, 2020)..............................................................13

*Dunlap v. Peco Energy Co.,*
   1996 WL 617777 (E.D. Pa. Oct. 23, 1996)..............................................................29

*E. Sav. Bank FSB v. Papageorge,*
   31 F. Supp. 3d 1 (D.D.C. 2014)........................................................................20, 22

*Eastman v. Thompson,*
   2022 WL 894256 (C.D. Cal. Mar. 28, 2022).........................................................25

*Edmonson v. Leesville Concrete Co., Inc.,*
   500 U.S. 614 (1991)..........................................................................................2, 5

*Est. of Phillips v. D.C.,*
   455 F.3d 397 (D.C. Cir. 2006)..............................................................................12

*Flagg Bros., Inc. v. Brooks,*
   436 U.S. 149 (1978)...................................................................................2, 3, 4, 5

*Fraternal Ord. of Police Dep't of Corrections v. Williams*,
    375 F.3d 1141 (D.C. Cir. 2004)........................................................................12

*Frederick Douglass Found., Inc. v. D.C.*,
    531 F. Supp. 3d 316 (D.D.C. 2021)..................................................................13

*G-I Holdings, Inc. v. Baron & Budd*,
    179 F. Supp. 2d 233 (S.D.N.Y. 2001)...............................................................22

*George v. Pacific-CSC Work Furlough*,
    91 F.3d 1227 (9th Cir. 1996) .........................................................................8, 9

*Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency*,
    77 F.3d 26 (2d Cir. 1996) ...............................................................................11

*Hales Mach. Tool, Inc. v. Doosan Infracore Am. Corp.*,
    2016 WL 11518312 (D. Minn. May 24, 2016)...................................................30

*Harrison v. Springdale Water & Sewer Comm'n*,
    780 F.2d 1422 (8th Cir. 1986) .........................................................................11

*Harvey v. Mohammed*,
    841 F. Supp. 2d 164 (D.D.C. 2012), *aff'd in part as modified, rev'd in part on other grounds sub nom. Harvey v. D.C.*, 798 F.3d 1042 (D.C. Cir. 2015) .......................................................3

*In re EpiPen Direct Purchaser Litigation*,
    2021 WL 147166 (D. Minn. Jan. 15, 2021)......................................................17

*Jackson v. Metropolitan Edison Co.*,
    419 U.S. 345 (1974)..........................................................................................6

*Jarvis v. Vill. Gun Shop, Inc.*,
    805 F.3d 1 (1st Cir. 2015)..................................................................................9

*Johnson v. City of Shelby*,
    574 U.S. 10 (2014)...........................................................................................13

*Kelly v. Palmer, Reifler & Assocs., P.A.*,
    681 F. Supp. 2d 1356 (S.D. Fla. 2010) ............................................................19

*Kerik v. Tacopina*,
    64 F. Supp. 3d 542 (S.D.N.Y. 2014)................................................................17

*Kilbride Invs. Ltd. v. Cushman & Wakefield of Pennsylvania, Inc.*,
    294 F. Supp. 3d 369 (E.D. Pa. 2018)...............................................................29

*Kurd v. Republic of Turkey*,
    374 F. Supp. 3d 37 (D.D.C. 2019)....................................................................28

*League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*,
    2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ................................................................10, 26

*LeFande v. Mische-Hoeges*,
    2018 WL 6620107 (D.D.C. Oct. 22, 2018) ............................................................................8

*Lindell v. Pelosi*,
    No. 22-cv-00028 (D. Minn. Jan. 13, 2022) .........................................................................24

*Lugar v. Edmondson Oil Co., Inc.*,
    457 U.S. 922 (1982) ..............................................................................................................2

*Marshall v. Fenstermacher*,
    388 F. Supp. 2d 536 (E.D. Pa. 2005) ..................................................................................28

*Matthis v. Kennedy*,
    67 N.W.2d 413 (Minn. 1954) ...............................................................................................27

*McAndrew v. Lockheed Martin Corp.*,
    206 F.3d 1031 (11th Cir. 2000) ...........................................................................................22

*Metro. Cont. Co. v. Newman & Herfurth, Inc.*,
    1989 WL 113027 (Minn. Ct. App. Oct. 3, 1989) ................................................................15

*Mitsui OSK Lines Ltd. v. Seamaster Logistics, Inc.*,
    871 F. Supp. 2d 933 (N.D. Cal. 2012) ................................................................................18

*Monroe v. Pape*,
    365 U.S. 167 (1961) ..............................................................................................................6

*Moore v. Hoff*,
    821 N.W.2d 591 (Minn. Ct. App. 2012) .............................................................................30

*Morin v. Trupin*,
    711 F. Supp. 97 (S.D.N.Y. 1989) .......................................................................................16

*Nader v. McAuliffe*,
    593 F. Supp. 2d 95 (D.D.C. 2009) ........................................................................................2

*Naegele v. Albers*,
    110 F. Supp. 3d 126 (D.D.C. 2015), *aff'd*, 672 F. App'x 25 (D.C. Cir. 2016) ....................11

*Nat'l Coalition on Black Civic Participation v. Wohl*,
    512 F. Supp. 3d 500 (S.D.N.Y. 2021) ................................................................................26

*Neal v. Second Sole of Youngstown, Inc.*,
    2018 WL 340142 (N.D. Ohio Jan. 9, 2018) ..................................................................16, 17

*Nixon v. Condon*,
   286 U.S. 73 (1932)..................................................................................4

*Odom v. Microsoft*,
   486 F.3d 541 (9th Cir. 2007) ...............................................................18

*Paisley Park Enterprises, Inc. v. Boxill*,
   361 F. Supp. 3d 869 (D. Minn. 2019)..................................................30

*Parks v. Edward Dale Parrish LLC*,
   452 P.3d 141 (Colo. Ct. App. 2019) ....................................................15

*Pearson v. District of Columbia*,
   377 F. App'x 34 (D.C. Cir. 2010).........................................................14

*Rendell-Baker v. Kohn*,
   457 U.S. 830 (1982)................................................................................3

*Sherlock v. Montefiore Med. Ctr.*,
   84 F.3d 522 (2d Cir. 1996).....................................................................9

*Simms v. District of Columbia*,
   699 F. Supp. 2d 217 (D.D.C. 2010) .......................................................7

*Smith v. Allwright*,
   321 U.S. 649 (1944)................................................................................4

*Stevens v. Cuomo*,
   2021 WL 3165364 (W.D.N.Y. July 27, 2021)........................................4

*Terry v. Adams*,
   345 U.S. 461 (1953)................................................................................4

*Thompson v. Trump*,
   2022 WL 503384 (D.D.C. Feb. 18, 2022) ............................................28

*Trump v. Thompson*,
   20 F.4th 10 (D.C. Cir. 2021).................................................................25

*Turner v. New Jersey State Police*,
   2017 WL 1190917 (D.N.J. Mar. 29, 2017)...........................................22

*United States v. Brockhoff*,
   2022 WL 715223 (D.D.C. Mar. 10, 2022).............................................25

*United States v. Classic*,
   313 U.S. 299 (1941)............................................................................5, 6

*United States v. Miller*,
  2022 WL 823070 (D.D.C. Mar. 7, 2022) (Nichols, J.)..........................................................24

*United States v. Morrison*,
  98 F.3d 619 (D.C. Cir. 1996) .................................................................................................22

*United States v. Pleva*,
  66 F.2d 529 (2d Cir. 1933)........................................................................................................6

*United States v. Scotto*,
  641 F.3d 47 (2d Cir. 1980).......................................................................................................19

*Zukerman v. United States Postal Service*,
  2021 WL 4355426 (D.D.C. Sep. 24, 2021) .........................................................................3, 4

**Statutes**

42 U.S.C. § 1983.................................................................................................................2, 7, 10, 13

42 U.S.C. § 1985(3)...............................................................................................................................26

**Other Authorities**

Wentong Zheng, *A Knowledge Theory of Tacit Agreement,* 9 Harv. Bus. L. Rev. 399 (2019) ....29

# INTRODUCTION

Dominion's opening brief outlined how dangerous it would be for the Court to bless Lindell's and MyPillow's counterclaims. In response, Lindell's and MyPillow's opposition briefs confirm just how radical their counterclaims are. Lindell and MyPillow rely, for example, on a theory of state action that would obliterate the fundamental dichotomy between private and state action, and would subject countless private contractors to constitutional claims. Similarly, MyPillow contends that a party may commit a tort by failing to voluntarily dismiss a lawsuit that has survived a motion to dismiss. Lindell also articulates a RICO standard that could expose private parties to criminal sanctions just for sending a demand letter. These extreme theories, and others discussed below, are fundamentally incompatible with an open judicial system on which parties can rely to resolve their disputes. They also, as discussed below, lack any legal support.

In their opposition briefs, Lindell and MyPillow try to obscure the weakness of their claims by dressing them up with adjectives and labels. They use words like "scheme," "vindictive," "targeted," and "scorched-earth." But on this motion, factual allegations—not conclusory labels— are what matter. And ultimately, neither Lindell nor MyPillow can dispute that the only conduct directed at them on which the counterclaims are based are the three buckets of conduct outlined in Dominion's opening brief: (1) sending three cease and desist letters to Lindell and MyPillow; (2) suing Lindell and MyPillow; and (3) giving a single interview about this lawsuit the day after it was filed and posting materials from the lawsuit on its website. *See* Opening Br. at 3–4. Lindell and MyPillow repeatedly refer to letters Dominion and its agents allegedly sent to *other* people, and to lawsuits Dominion filed against *third parties*, but neither party explains how that conduct could support their claims. In short, the counterclaims are meritless and without precedent. They should be dismissed.

## ARGUMENT

## I.    LINDELL'S AND MYPILLOW'S SECTION 1983 CLAIMS FAIL

### A.    Neither Lindell Nor MyPillow Alleges State Action

The Court should dismiss the Section 1983 claims for failure to allege state action. To satisfy the state action requirement, Lindell and MyPillow must surmount two independent hurdles. First, they must adequately allege that Dominion is a state actor as to its election-related conduct. Second, they must establish that the counterclaims are based on that conduct. They do neither.

### 1.    Dominion's Election-Related Services Do Not Make It a State Actor

First, neither Lindell nor MyPillow adequately allege that Dominion is a state actor as to its election-related conduct.

The distinction between private actors and state officials is among the most fundamental distinctions in American law. The state action requirement is an "essential dichotomy between public and private acts," reflecting the judicial recognition that "most rights secured by the Constitution are protected only against infringement by governments." *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 156, 165 (1978) (citation omitted). "Courts must adhere carefully to the dichotomy between state action and private action, as it 'preserves an area of individual freedom by limiting the reach of federal law and federal judicial power.'" *Nader v. McAuliffe*, 593 F. Supp. 2d 95, 101 (D.D.C. 2009) (quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936 (1982)). The state action requirement also "avoids imposing on the State, its agencies or officials, responsibility for conduct for which they cannot fairly be blamed," allowing "citizens to structure their private relations as they choose subject only to the constraints of statutory or decisional law." *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614, 619 (1991) (internal quotation marks omitted).

Consistent with that "essential dichotomy," courts routinely reject attempts to cast private contractors as public actors, even where the contractor relies primarily or exclusively on public contracts for its business. "Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Rendell-Baker v. Kohn*, 457 U.S. 830, 841 (1982). "Nor does the fact that a private entity is subject to extensive state regulation make the entity a state actor." *Harvey v. Mohammed*, 841 F. Supp. 2d 164, 185 (D.D.C. 2012), *aff'd in part as modified, rev'd in part on other grounds sub nom. Harvey v. D.C.*, 798 F.3d 1042 (D.C. Cir. 2015) (citing *Rendell-Baker*, 457 U.S. at 841). In *Blum v. Yaretsky*, 457 U.S. 991, 1004, 1011 (1982), for example, the Supreme Court held that certain nursing homes were not state actors, even though New York subsidized practically all their operating and capital costs, paid the medical expenses of more than 90% of their patients, and were "extensively regulated." *See also Rendell-Baker*, 457 U.S. at 840 (holding that heavily subsidized, highly regulated private school was "not fundamentally different from many private corporations whose business depends primarily on contracts to build roads, bridges, dams, ships or submarines for the government"). It is only where the private contractor has exercised "a power traditionally exclusively reserved to the State" that state action may be found. *Flagg Bros., Inc.*, 436 U.S. at 157–58 (internal quotation marks and citation omitted).

And a private entity does not become a state actor by merely contracting with a government actor that is carrying out a traditionally exclusive government function. The private contractor must actually exercise control over the traditional, exclusive function in question. *Zukerman v. United States Postal Service*, 2021 WL 4355426 (D.D.C. Sep. 24, 2021), a case that MyPillow cites, proves the point. MyPillow falsely implies that the plaintiff-contractor in *Zukerman* was held a state actor simply because it contracted with the USPS to "print stamps." MyPillow Br. at 6. Not

so. In fact, *Zukerman* expressly distinguished USPS contractors that "print[ed] stamps" from the plaintiff; the mere printing of stamps was *not* an exclusive government function, while exercising control over what content would appear on stamps—what the plaintiff did—*was* a traditional exclusive government function. *Id.* at *8 & n.8. *See also, e.g.*, *Stevens v. Cuomo*, 2021 WL 3165364, at *3 (W.D.N.Y. July 27, 2021) (private corporation that contracted with prison to provide telephone and Wi-Fi services not a state actor). The relevant inquiry thus asks whether "the private entity has exercised powers that are traditionally the exclusive prerogative of the State." *Blum*, 457 U.S. at 1005 (internal quotation marks omitted).

Lindell's and MyPillow's attempt to make this showing misses the mark. They contend that Dominion's services fall into the so-called "running elections" line of cases. *See* Lindell Br. at 9-11; MyPillow Br. at 5-7. Not so. The "scope" of those cases "is carefully defined," and "encompasses only . . . elections conducted by organizations which in practice produce the uncontested choice of public officials." *Flagg Bros.*, 436 U.S. at 158 (citing *Terry v. Adams*, 345 U.S. 461 (1953); *Smith v. Allwright*, 321 U.S. 649 (1944); and *Nixon v. Condon*, 286 U.S. 73 (1932)); *see also Acosta v. Democratic City Comm.*, 288 F. Supp. 3d 597, 629 (E.D. Pa. 2018) ("Courts have declined to extend the holdings of these Supreme Court cases . . . in other contexts."). Lindell and MyPillow do not argue that Dominion's acts satisfy that demanding standard. And even if Lindell and MyPillow were merely required to show that Dominion "runs elections"—as opposed to "produce the uncontested choice of public officials"—they make no non-conclusory allegations suggesting that Dominion does that, either. Rather, as discussed in Dominion's opening brief, the counterclaims simply allege that Dominion carried out the work of an ordinary private contractor, supplying states and local governments with voting equipment, software licenses, and support services under contracts. Opening Br. at 38. Indeed, the contracts

which Lindell and MyPillow cite say that the *states*, not Dominion, run the elections. *Id.* at 38. Lindell and MyPillow offer no response to this point. *Id.*[1]

> ### 2.     MyPillow's and Lindell's "Human Employee Replacement" Theory Is Baseless and Overbroad

With no caselaw on their side, MyPillow and Lindell offer the following, circuitous argument: Because the "counting" or "reporting" of votes is a traditional, exclusive government function; and because states and municipalities could, in theory, use their own human employees to "count" or "report" votes; Dominion, by allowing states to replace those theoretical human employees with its voting equipment, has taken on a traditional, exclusive government function and become a state actor. *See* MyPillow Br. at 6; Lindell Br. at 7. This novel theory fails on multiple levels.

First, there is no case holding that the mere "counting" or "reporting" of votes—whether by a human being or a computer—is a traditional exclusive government function. As discussed above, the White Primary Cases define the scope of the traditional exclusive government test in the election context, and they are limited to conduct that "in practice produce[s] the uncontested choice of public officials." *Flagg Bros.*, 436 U.S. at 158.

*United States v. Classic*, 313 U.S. 299 (1941), MyPillow's leading authority, does not say otherwise. *Classic* concerned whether Louisiana county election officials, who were required by

---

[1] The Court should give no weight to MyPillow's reliance on the "symbiotic relationship test" of *Burton v. Wilmington Parking Authority*, 365 U.S. 715 (1961). *See* MyPillow Br. at 13–14. The holding of *Burton*, which involved a state agency that depended on rent payments from a private restaurant for its continued financial viability, was "explicitly limited to the facts." *Anderson v. USAir, Inc.*, 818 F.2d 49, 56 (D.C. Cir. 1987). Nor is their any merit to Lindell's analogy to *Edmonson v. Leesville Concrete Co., Inc.*, 500 U.S. 614 (1991), which concerned the use of race-based peremptory challenges, and which expressly distinguished private litigation conduct. *See* Lindell Br. at 10–11; *Edmonson*, 500 U.S. at 622 ("[P]rivate use of state-sanctioned private remedies or procedures does not rise, by itself, to the level of state action.").

state law to count and certify election results, could have acted "under color of" state law even though their wrongful conduct (falsely counting ballots and certifying the results) violated the state law they were charged with administering. *Id.* at 326. The Court held—anticipating the modern rule adopted sixteen years later in *Monroe v. Pape*, 365 U.S. 167 (1961)—in the affirmative, explaining that "[m]isuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law, is action taken 'under color of' state law." *Classic*, 313 U.S. at 326. But *Classic* said nothing about whether the "counting" or "reporting" of votes is a traditional exclusive government function that would transform a private citizen into a state actor. And that makes sense: The defendants in *Classic* were *public officials*. There was thus no need to analyze whether their actions satisfied the "traditional exclusive government function" test. The traditional exclusive government function test was not even recognized as a distinct test for another thirty years. *See Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 352 (1974) (citing the White Primary Cases, *not Classic*). Instead, the traditional exclusive government function test, in the election context, is defined by the White Primary Cases, whose requirements Lindell and MyPillow cannot satisfy.[2]

And at a more basic level, MyPillow's "human employee replacement" theory is wildly overbroad and contravenes the basic dichotomy between state and private actors. It would transform a broad range of obviously private conduct into government action, as just a moment's reflection reveals. If, for example, IBM contracted with the State of Georgia to supply it with

---

[2] *Classic*'s reference to "voting machines" relates to the unremarkable point, established by *United States v. Pleva*, 66 F.2d 529 (2d Cir. 1933), that the false certification of votes violates the Constitution, no matter if the false certification is accomplished with paper ballots or voting machines. *Classic*, 313 U.S. at 324–25. It in no way stands for the broader proposition that the provision of voting machines that replace human employees who might otherwise count ballots establishes state action.

computers to perform tax audit calculations—calculations that Georgia *could* have had its own employees perform with paper and pencil—is IBM subject to Section 1983 liability? If Maricopa County leases an asphalt paver from Caterpillar to fix potholes—potholes that the county *could* have had its own employees fill in with shovels and rakes—has Caterpillar become a state actor? If a vendor sells the State of Michigan handheld devices on which its state troopers generate traffic tickets—tickets that the officers *could* write by hand—is that vendor subject to constitutional strictures? The list goes on. The mere allegation that states and municipalities could have used human employees to count votes by hand, but chose to use equipment and technology they obtained from a private company, has no relevance to the state action inquiry.

### 3.    The Conduct Underlying the Counterclaims Is Not State Action

Even if Dominion's provision of election services and equipment rendered it a state actor as to that conduct, the state action theory would still fail. That is because the counterclaims are based not on Dominion's election-related conduct but on the so-called "lawfare" campaign.

As neither Lindell nor MyPillow dispute, the state action inquiry focuses on "the specific conduct of which the plaintiff complains." *Simms v. District of Columbia*, 699 F. Supp. 2d 217, 224 (D.D.C. 2010) (internal quotation marks and alterations omitted). That is because—again, as neither Lindell nor MyPillow contests—Dominion "must not merely be a state actor in some general capacity, but rather must be a state actor when performing the specific acts alleged in the complaint." *Id.* at 225 (internal quotation marks omitted). And Lindell and MyPillow concede that the specific conduct of which they complain is the so-called "lawfare" campaign—filing lawsuits, sending cease and desist letters, and the like—rather than any conduct that Dominion undertook in allegedly "running" elections. *See, e.g.*, MyPillow Br. at 15 (acknowledging that the "tortious acts alleged in the counterclaims" are "Dominion's campaign against MyPillow"); Lindell Br. at

10 (asserting that Dominion is "liable for all actions it took to silence Lindell[] . . . including sending cease and desist letters to Lindell and filing suit").

MyPillow tries to salvage its 1983 claims and transform the supposed "lawfare" campaign into state conduct by inventing a special rule for retaliation claims. It argues that, even though the alleged campaign underlying the counterclaims is not part of Dominion's role in elections, Dominion is converted into a state actor for the "lawfare" campaign too, because it mounted this supposed campaign in response to criticism of its election-related conduct. MyPillow Br. at 11–13. Its source? A single, citation-free, hypothetical:

> If a county official, after being accused of changing markings on ballots, retaliated by intentionally inflicting harm on the person who publicized the accusation, no credence would be given to any suggestion that the county official's tortious conduct did not constitute state action.

MyPillow Br. at 12 (citing nothing). The hypothetical is flawed on multiple counts.

To begin with, not only is the hypothetical irrelevant (Dominion is not the equivalent of a "county official," as explained above), its premise is false. Whether the official's tortious conduct would be attributed to the state would depend on the facts—*i.e.,* how the official "intentionally inflict[ed]" the harm, and whether he did so within the scope of his official duties. *See LeFande v. Mische-Hoeges*, 2018 WL 6620107, at *2 (D.D.C. Oct. 22, 2018) ("[A]cts committed . . . even while on duty and in uniform are not under color of state law unless they are in some way related to the performance of [official] duties." (internal quotation marks omitted)). If the county official inflicted the harm in a purely private capacity, the retaliation would not constitute state action. MyPillow's hypothetical provides no such details, so it is impossible to evaluate in the abstract.

More to the point, *George v. Pacific-CSC Work Furlough,* 91 F.3d 1227 (9th Cir. 1996) directly refutes MyPillow's ruminations about how state action should work. That case involved a private prison—exercising a concededly traditional exclusive government function—that

retaliated against an employee who had spoken out about the prison's operations by terminating the employee. *Id.* at 1229–30. The court held that the prison's retaliatory act did not qualify as state action because the conduct was not part of the prison's "obligations pursuant to its government function." *Id.* at 1232.[3] The same is true here: The so-called "lawfare" campaign is in no way part of Dominion's "[alleged] obligations pursuant to its [alleged] government function." *Id.* MyPillow does not even attempt to engage with that sound reasoning. Instead, it simply tries to wish *George* away by suggesting it was motivated by policy considerations found nowhere in the opinion, *see* MyPillow Br. at 18, and by relying on half-baked, authority-free hypotheticals.

Lindell, for his part, barely addresses this fundamental flaw in the state action theory. His only response to Dominion's argument is to repeat what is, in effect, a but-for test: "The states' relationships with Dominion," he claims, "put Dominion in the position to send letters to Lindell and sue him for defamation." Lindell Br. at 8; *see also id.* ("[T]here is no action without state involvement."); *id.* at 10 ("Because of that power, Dominion was put in the position to initiate a lawfare campaign . . . by sending cease and desist letters, filing lawsuits, and threatening Lindell with defamation litigation."). Not only does Lindell's but-for argument make no sense— Dominion, like any other private entity, had the power to sue Lindell regardless of its election-related services—it is flatly contradicted by the governing law. A but-for test would obliterate the essential dichotomy between state and private action; it would flip the result of virtually every case in which a government contractor has been held a private actor. "[B]ut-for causation is simply insufficient to conjure a finding of state action." *Jarvis v. Vill. Gun Shop, Inc.*, 805 F.3d 1, 13 (1st

---

[3] *See also, e.g.*, *Sherlock v. Montefiore Med. Ctr.*, 84 F.3d 522, 527 (2d Cir. 1996) (no state action where medical institution providing medical services at correctional facility terminated employee in retaliation for whistleblowing).

Cir. 2015); *see also Bates v. Nw. Hum. Servs., Inc. ("Bates II")*, 583 F. Supp. 2d 138, 145 (D.D.C. 2008) (rejecting "but for" theory of state action).

**B.     The Section 1983 Claims Fail On The Merits**

Because neither Lindell nor MyPillow allege state action, the Court can stop its analysis of the Section 1983 claims here. But even if the Court were to consider Lindell's and MyPillow's Section 1983 claims on the merits, they would fail.

**1.     First Amendment Retaliation**

As Dominion explained in its opening brief, the First Amendment retaliation claims cannot get off the ground because the conduct on which the alleged retaliation is based is not, as a matter of law, protected by the First Amendment. *See* Opening Br. at 39–41. This is not an argument, as MyPillow asserts, that depends on whether MyPillow is ultimately found liable for defamation. *See* MyPillow Br. at 20. It is an argument based on the substance of First Amendment law, which the Court correctly laid out in its prior ruling. And the substance is this: Dominion's defamation suit and related pre-litigation activity cannot cause First Amendment harm to Lindell and MyPillow because their First Amendment protected activity is already carved out from the tort of defamation. In other words, the only speech on which Dominion could prevail is speech that is *not* entitled to First Amendment protection—*i.e.*, provably false statements made with actual malice. *See* Opening Br. at 39–41.

In response, MyPillow and Lindell argue that the Court must simply accept the counterclaims' assertions that Dominion's lawsuit is meritless, retaliatory, and causes them First Amendment harm. Lindell Br. at 14–15; MyPillow Br. at 20–21. Not so. Though the Court should accept the counterclaims' well-pleaded factual allegations, it need not accept the counterclaims' *legal* conclusions, and it still must assess whether "[t]he claim to relief [is] plausible on its face." ECF No. 54 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Nor should the Court,

as MyPillow and Lindell suggest, blind itself to its opinion allowing Dominion's claims to proceed. In evaluating motions to dismiss, courts regularly take judicial notice of their own dockets and prior rulings. *See Naegele v. Albers,* 110 F. Supp. 3d 126, 131 (D.D.C. 2015), *aff'd*, 672 F. App'x 25 (D.C. Cir. 2016).

In light of those principles, the cases MyPillow cites involving First Amendment retaliation claims based on the filing of lawsuits are nothing like this one. For example, MyPillow cites *Beedle v. Wilson*, 422 F.3d 1059, 1065–66 & n.3 (10th Cir. 2005), but the retaliation claim there was based on a state-law libel suit that had been dismissed because the defendant, a political subdivision, was barred from bringing libel claims—a finding the defendant did not even contest. MyPillow also relies on *Harrison v. Springdale Water & Sewer Comm'n*, 780 F.2d 1422, 1428 (8th Cir. 1986), but that case did not even involve a claim for First Amendment retaliation.[4] Neither Lindell nor MyPillow cites a single case in which a court has allowed a First Amendment retaliation claim to proceed against a private party for bringing a defamation suit—much less one where the private party's claims have already survived a motion to dismiss. Such a claim is simply not plausible.[5]

---

[4] MyPillow's other cases are even further afield. In *Benison v. Ross*, 765 F.3d 649 (6th Cir. 2014), the plaintiff conceded that the conduct that allegedly prompted the allegedly retaliatory lawsuit was First Amendment protected speech. *Id.* at 658. And *Greenwich Citizens Comm., Inc. v. Ctys. of Warren & Washington Indus. Dev. Agency*, 77 F.3d 26, 30 (2d Cir. 1996) reversed a judgment finding local government entities liable for filing allegedly retaliatory counterclaims.

[5] Both MyPillow and Lindell have confirmed that they are not asserting standalone First Amendment viewpoint discrimination claims. MyPillow Br. at 31 ("MyPillow does not attempt to or need to establish viewpoint discrimination to prevail on its counterclaims."); Lindell Br. at 19 ("Lindell's claims of viewpoint discrimination are properly brought as an Equal Protection Clause violation.")

### 2.     Substantive Due Process

Defendants' substantive due process claims also fail. Neither party disputes that, to establish a substantive due process claim, it must allege that the conduct "be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Est. of Phillips v. D.C.*, 455 F.3d 397, 403 (D.C. Cir. 2006). But neither points to any allegations that come close that standard.

If anything, the cases that Lindell and MyPillow cite illustrate just how difficult of a standard the "conscience shocking" threshold is to meet, and how far the allegations here are from satisfying it. For instance, MyPillow relies on *Butera v. District of Columbia*, 235 F.3d 637, 650 (D.C. Cir. 2001). MyPillow Br. at 22–23. But that case held that police officers' failure to protect an individual during an undercover drug operation—which resulted in the individual being beaten to death in the process—did *not* state a valid substantive due process claim. *See also, e.g.*, *Barnes v. District of Columbia*, 2007 WL 1655868, at *4 (D.D.C. June 6, 2007) (defendants' alleged failure to prevent escape of convicted criminal from group home, who subsequently shot and killed plaintiff's husband, was not "so egregious as to shock the conscience"); *Fraternal Ord. of Police Dep't of Corrections v. Williams*, 375 F.3d 1141, 1145 (D.C. Cir. 2004) (officials' alleged failure to heed guidance on the appropriate ratio of inmates to prison guards, causing a rise in inmate assaults, "in no way approach[ed] the cognizable level of executive abuse of power as that which shocks the conscience" (internal quotation marks omitted)). In fact, neither MyPillow nor Lindell cite *a single case* affirming a finding of liability for a substantive due process violation—let alone one premised on the filing of a lawsuit and other litigation-related activity. Instead, they litter their briefs with labels and hyperbole—calling Dominion's litigation conduct a "scheme" that was "targeted," "sensationaliz[ed]," and "overwhelming." MyPillow Br. at 23; Lindell Br. at 25. Those labels cannot save their claims.

### 3.  Equal Protection

As for Lindell's equal protection claim (MyPillow asserts no such claim), Lindell fails to address the fatal and obvious flaw: He identifies no similarly-situated "left-leaning" person whom Dominion should have sued or threatened to sue. Dominion's opening brief addressed the supposed left-leaning comparators identified in the counterclaims and explained, one by one, why each was not similar. Opening Br. at 42–43. Lindell does not even try to rebut the argument. Instead, he conclusorily asserts that Dominion engaged in "disparate treatment [] based solely on an impermissible classification of speech based upon a particular viewpoint." Lindell Br. at 18. But disparate treatment means that "similarly situated persons" have not been "treated alike." *Frederick Douglass Found., Inc. v. D.C.*, 531 F. Supp. 3d 316, 339 (D.D.C. 2021). Nowhere in the five pages of Lindell's briefing on this claim does he identify a single-similarly situated person or entity, with a different "viewpoint," that Dominion treated differently. *See* Lindell Br. at 18–23. The claim therefore fails.

### 4.  Procedural Due Process

Finally, neither Lindell nor MyPillow even assert a procedural due process claim in the counterclaims. Lindell (though not MyPillow) first raises this claim in his opposition brief, and attempts to excuse his failure to plead the claim by relying on *Johnson v. City of Shelby*, 574 U.S. 10 (2014). *See* Lindell Br. at 23 n.3. But *Johnson* does nothing for Lindell, as it concerns the failure to include an express citation to Section 1983 in a complaint, not a failure to invoke the constitutional provision on which the party's claims are based. 574 U.S. at 10. Lindell cannot simply add an "additional, independent claim[] for relief" now, particularly where Dominion had "no notice that [Lindell] sought to raise . . . yet *another* claim of substantive liability." *Dun v. Transamerica Premier Life Ins. Co.*, 2020 WL 4001472, at *4 (D.D.C. July 15, 2020) (citing *Johnson*, 574 U.S. at 11) (emphasis in original).

13

And the procedural due process claim fails on the merits for the same reason that the counterclaims gave no notice of it: Lindell's procedural due process theory is simply incoherent. The essence of a procedural due process claim is a failure to "afford[] adequate process." *Pearson v. District of Columbia*, 377 F. App'x 34, 34 (D.C. Cir. 2010). Nowhere in the counterclaims or the opposition brief does Lindell explain what process Dominion, a private company, could or should have given Lindell before suing him. If Lindell wishes to "present his defense to Dominion's claims against him," he has a process in which to present that defense: this lawsuit. Lindell Br. at 26.

## II.    LINDELL AND MYPILLOW CANNOT SAVE THEIR ABUSE OF PROCESS CLAIMS

Next, neither Lindell nor MyPillow points to any conduct that meets the elements of an abuse of process claim. Primarily, the abuse of process claims are based on the filing of this action. Opening Br. at 9–10. But as Dominion explained in its opening brief, an abuse of process claim may not be based on the filing of a lawsuit. *Id.* Dominion also explained how the other potential theories for the abuse of process claims—whether they are based on letters sent before this lawsuit, statements to the media about this suit or other suits, or on process issued against other people— also fail. *Id.* at 10–13.

Lindell simply fails to engage with Dominion's arguments. His only response is to say that his abuse of process claim is "based not on isolated acts," but on the "overarching Lawfare campaign . . . of which each individual act is a part." Lindell Br. at 57–58. But simply aggregating Dominion's conduct and labeling it a "campaign" does not solve the problem. Lindell must identify the act or acts that form the basis for his abuse of process claim, and explain how those acts satisfy the governing legal standard. He does not.

MyPillow makes slightly more of an attempt to fix its abuse of process claim, but its efforts still founder. It concedes that the "filing" of this lawsuit cannot serve as the basis for an abuse of process claim, but argues that its claim is different because it is based on Dominion's "pursuing" of this lawsuit. MyPillow Br. at 29. That distinction makes no difference. Just as the filing of a suit cannot support an abuse of process claim, the prosecution of a lawsuit cannot support such a claim either. *See Athridge v. Aetna Cas. & Sur. Co.*, 163 F. Supp. 2d 38, 54 (D.D.C. 2001), *aff'd in part, rev'd in part on other grounds*, 351 F.3d 1166 (D.C. Cir. 2003) (allowing the "pursuit" of a declaratory judgment action "to be the premise of liability [would] expand[] the tort of abuse of process beyond recognition"); *Camm v. Kennickell*, 1990 WL 198621, at *3 (D.D.C. Nov. 20, 1990) (no abuse of process claim based on allegation that defendants improperly "instituted and continued to prosecute" suit (citation omitted)), *aff'd*, 946 F.2d 1563 (D.C. Cir. 1991).[6] Indeed, the contrary rule would make no sense. Under MyPillow's theory, Dominion would have been insulated from abuse-of-process liability based on the filing of this suit, but somehow became exposed to such liability by failing to voluntarily dismiss the suit and continuing to prosecute it after surviving a motion to dismiss. MyPillow also suggests that its abuse of process claim is meritorious because it is based on the "mailing copies of papers from the action to individuals" *other* than MyPillow. MyPillow Br. at 29. But MyPillow never explains how it has standing to recover for that harm; as it concedes, it does not.[7] *See id.* at 30.

---

[6] *See also Parks v. Edward Dale Parrish LLC*, 452 P.3d 141, 145 (Colo. Ct. App. 2019) ("[B]ringing a . . . case and carrying it to its natural end to obtain a result such an action is designed to achieve doesn't constitute an improper use of process, no matter the motive."); *Metro. Cont. Co. v. Newman & Herfurth, Inc*., 1989 WL 113027, at *2 (Minn. Ct. App. Oct. 3, 1989) (no abuse of process claim where "[r]espondent appears to have done nothing more than diligently pursue its legal rights and remedies").

[7] To the extent MyPillow is suggesting that it suffered reputational or business-related harms as a result of other individuals learning about this lawsuit, such a theory would fail. Not only would that theory depend on a hopelessly speculative causal chain, but those types of harms are the

## III.   LINDELL'S RICO CLAIM FAILS

Next, the Court should dismiss Lindell's RICO claim.

### A.   Lindell's RICO Claim Fails Because It is Based On Litigation-Related Activity

The most straightforward way to dispense with Lindell's RICO claim is by applying the well-established, sensible rule that RICO claims may not be based on litigation-related activity. Courts across the country refuse to allow such claims to proceed; holding otherwise would inundate courts with procedurally complex RICO pleadings, and would deter citizens from petitioning courts to resolve their disputes in the first place. *See* Opening Br. at 15–17. This rule applies with extra force here, given that the lawsuit that underlying Lindell's claim survived a motion to dismiss. *Id.*

Lindell's primary response is to impose a new temporal limitation on that rule. Lindell contends that the rule applies only to conduct *during* the litigation, but not to *pre-litigation* conduct, like the cease and desist letters Dominion sent to him. Lindell Br. at 42. That is wrong. The rule bars RICO actions based on conduct that is "directly related" to litigation, and courts routinely apply it to pre-litigation communications. *See, e.g.*, *Neal v. Second Sole of Youngstown, Inc.*, 2018 WL 340142, at *3 (N.D. Ohio Jan. 9, 2018) (dismissing RICO claim premised on the sending of a demand letter and explaining it would "absurd to think that Congress intended" otherwise); *Atl. Recording Corp. v. Raleigh*, 2008 WL 3890387, at *5 (E.D. Mo. Aug. 18, 2008) (dismissing RICO claim premised on "threats of litigation and demands for settlement"); *Morin v. Trupin*, 711 F. Supp. 97, 105–106 (S.D.N.Y. 1989) (dismissing RICO claim based on demand letter). That makes good sense, as the contrary rule would open the courts to retaliatory RICO

---

"unhappy" incidents of litigation that courts consistently say cannot form the basis for an abuse of process claim. *See* Opening Br. at 9, 12–13.

actions based on *unfiled* lawsuits, and would discourage parties from even engaging in settlement discussions. *See Neal*, 2018 WL 340142, at *3 (N.D. Ohio Jan. 9, 2018) ("Turning every failed lawsuit into a potential criminal case or RICO predicate would certainly have a chilling effect on citizens' ability to petition courts to resolve their disputes. Indeed, 'chilling' is, if anything, too mild a word.")

Lindell also tries to escape the rule by stating that his RICO claim is based on "other unlawful conduct," by which he means document preservation and cease and desist letters sent to other people. *See* Lindell Br. at 43–45. But of course, those letters are related to litigation too, so they still fall within the scope of the rule described above. In any event, Lindell cannot help but concede that he lacks standing to bring RICO claims based on conduct directed to anyone other than himself. *See* Lindell Br. at 35 (attempting to distinguish *Kerik v. Tacopina*, 64 F. Supp. 3d 542, 560–61 (S.D.N.Y. 2014), on the basis that the plaintiff lacked standing to bring RICO claim based on threats against third parties); *see also* Opening Br. at 23 n.11 (citing *Kerik* for the proposition that Lindell lacks standing to bring RICO claim based on supposed threats to people other than him). That concession is correct; he lacks standing to bring such claims. His RICO claim therefore cannot get off the ground.

### B.    Lindell Fails To Adequately Allege a RICO Enterprise

Lindell also fails to rehabilitate the supposed RICO enterprise he allegedly pleaded in his counterclaims. That failure dooms the RICO claim as well.

As Dominion argued in its opening brief, Lindell's allegations of an "intertwined corporate history and shared DNA" between Dominion and Smartmatic in no way suggest that the two companies "joined together" to achieve an alleged illegal purpose. Opening Br. at 18–20. And the cases that Lindell cites to try to rebut that argument only underscore how far his allegations stray from a properly pleaded RICO enterprise. As an example, Lindell relies on *In re EpiPen Direct*

*Purchaser Litigation*, 2021 WL 147166 (D. Minn. Jan. 15, 2021), but that case involved a bribery and kickback scheme between a medical device manufacturer and pharmacy benefit managers. Lindell Br. at 28, 30. It is not hard to see how the entities in that enterprise "joined together": They did so by paying and receiving bribes. Similarly irrelevant is *Odom v. Microsoft*, 486 F.3d 541 (9th Cir. 2007), which involved an allegedly unlawful cross-promotional scheme between Best Buy and Microsoft in which Best Buy employees would register unwitting customers for Microsoft products. Lindell Br. at 30; *see also Mitsui OSK Lines Ltd. v. Seamaster Logistics, Inc.*, 871 F. Supp. 2d 933, 942 (N.D. Cal. 2012) (enterprise among "strategic partnership" of shipping companies that charged ocean shippers for unnecessary or nonexistent routes). Here, by contrast, Lindell makes no allegation that Dominion and Smartmatic did anything to coordinate the supposedly illegal "lawfare" campaign.

In pointing to the companies' alleged shared history, employees, and intellectual property licensing efforts, Lindell misses the point. He contends that these allegations show that Dominion and Smartmatic form an "ongoing organization." Lindell Br. at 30. To be clear, they do not: The alleged history to which Lindell points centers on (and mischaracterizes or worse) conduct that allegedly took place approximately a decade ago, while the counterclaims are based on alleged conduct that occurred after the 2020 election. But whether Smartmatic and Dominion qualify as an "ongoing organization" is beside the point. The point is that Lindell has made no non-conclusory allegation about how the two companies "joined together" to achieve their purpose of suppressing dissent. The supposed history, employees, and contractual ties have nothing to do with this issue.

Lindell also misses the point with respect to Clare Locke and Hamilton. He argues that because "a parent company and its wholly owned subsidiary can be sufficiently distinct for RICO

purposes . . . Dominion, Clare Locke, and [Hamilton] can be as well." Lindell Br. at 31. True, as *Bates I* makes clear, a corporate agent *can* be sufficiently distinct from its principal for RICO purposes, so long as the agent's acts are outside the scope of the agency relationship. *Bates v. Nw. Hum. Servs., Inc.* ("*Bates I*"), 466 F. Supp. 2d 69, 84 (D.D.C. 2006). But the counterclaims contain no allegations that Clare Locke and Hamilton did anything outside the scope of their relationships with Dominion, so they cannot form a RICO enterprise either. *See Kelly v. Palmer, Reifler & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1382–83 (S.D. Fla. 2010) (no RICO enterprise between lawyers and clients because lawyers "were agents of the . . . clients who provided legal and other services").[8]

### C.       Lindell Fails to Allege a RICO Predicate

Because the Court can dispose of Lindell's RICO claim for either of the above reasons, it need not consider the elements of the alleged predicate crimes. But Lindell's opposition brief only confirms the inadequacy of the predicates as well.

#### 1.       Lindell Does Not Allege Extortion

As for extortion, Lindell spends much of his opposition attacking a straw man. He stresses that "the Hobbs Act encompasses *attempts* to extort," but Dominion never argued otherwise. Lindell Br. at 34 (emphasis in original); *see* Opening Br. at 22–24. Instead, Dominion's main argument was, and remains, that Lindell fails to allege any attempt to extort because he has failed

---

[8] *United States v. Scotto*, 641 F.2d 47 (2d Cir. 1980), which Lindell cites several times, is not remotely on point. Lindell Br. at 31–32. That case has nothing to do with the "distinctiveness" requirement for a RICO enterprise—a requirement that was not even recognized by the Second Circuit until five years after *Scotto* was decided. *See Bennett v. United States Tr. Co. of New York*, 770 F.2d 308, 315 & n.2 (2d Cir. 1985). *Scotto* concerns what a plaintiff (or the government) must prove to show that one has "conducted" the activities of an enterprise, and how much of a nexus there must be between the predicate misconduct and the enterprise's conduct. 641 F.2d at 53. That element is not at issue here, particularly since Lindell has not even alleged actionable misconduct (so there is no potential "nexus" to analyze).

to allege an attempt to obtain transferable property. Opening Br. at 22–24. "Silence," the supposed goal of the enterprise, is not transferable property.

Recognizing the flaw with his extortion theory, Lindell now contends that the property Dominion sought to obtain is "monetary damages." Lindell Br. at 35. But that argument fails on a factual and legal level. On a factual level, Lindell makes no allegation that Dominion's cease and desist letters sought money; to the contrary, he recognizes that the letters "did not specifically demand money from him." *Id.* at 36. And legally, he provides no authority suggesting that the threat of litigation in which money damages would ultimately be sought qualifies as extortion. The rule discussed above holds the opposite. *See E. Sav. Bank FSB v. Papageorg*e, 31 F. Supp. 3d 1, 13 (D.D.C. 2014); *see also Deck v. Engineered Laminates*, 349 F.3d 1253, 1258 (10th Cir. 2003) ("Extortion is the antithesis of litigation as a means of resolving disputes. To promote social stability, we encourage resort to the courts rather than resort to force and violence.").

As predicted, Lindell tries to align his counterclaims with the extraordinary facts of *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229 (S.D.N.Y. 2012) and *Calabrese v. CSC Holdings, Inc.*, 2004 WL 3186787 (E.D.N.Y. July 19, 2004). *See* Lindell Br. at 35–37. And as predicted, his attempts fail. Opening Br. at 23–24. As the court explained in *Chevron*, the scheme there was "*all for the purpose of coercing Chevron into paying [money]* to stop the campaign against it.'" 871 F. Supp. 2d at 249 (emphasis added). That is directly at odds with the counterclaims here, which do not cite a single demand for money, and which make clear that the overriding purpose of the supposed "lawfare" campaign was to "suppress and stifle dissent." *See, e.g.*, Lindell Counterclaims ¶ 36; *see also Calabrese v. CSC Holdings, Inc.*, 2004 WL 3186787, at *6 (E.D.N.Y. July 19, 2004) (defendants allegedly "formed an association *for the purpose of compelling individuals to pay monies to them*" (emphasis added)). Moreover, the alleged conduct here is not remotely similar to

the conduct in those cases. *Chevron* involved a scheme that comprised bringing baseless litigation in Ecuador, intimidating judges, fabricating evidence, making false statements to U.S. courts, Congress, SEC, media, and bringing false criminal charges. 871 F Supp. 2d at 249; *see also Calabrese*, 2004 WL 3186787, at *6 (defendants formed an agreement that involved the use of misrepresentations, threats and lawsuits to compel individuals to pay monies whether or not those monies were owed). Once Lindell's inflammatory but content-free labels are stripped away, his attempt to liken the supposed "scheme" here to *Chevron* or *Calabrese* is simply not plausible.

### 2.      Lindell Does Not Allege Witness Tampering

Lindell's next predicate, witness tampering, is even less plausible than extortion. The official proceeding on which Lindell premises his claim, and with which Dominion allegedly interfered, is a Pennsylvania state proceeding. *See* Lindell Counterclaims ¶ 19. But as Dominion pointed out in its opening brief, a state proceeding does not qualify as an "official proceeding" under the federal witness tampering statute, so this predicate must fail. Opening Br. at 24–25.

Lindell has since abandoned his original theory of witness tampering, and now makes the confounding argument that the "official proceeding" with which Dominion interfered is *this lawsuit*. Lindell Br. at 37–38. Of course, no depositions or other testimony have been given in this matter. Nevertheless, the theory appears to be that, before Dominion filed suit, but at a time when Dominion knew it would be filing, it sent threatening letters to individuals who it knew would ultimately be witnesses in the lawsuit, thereby interfering with their future, hypothetical testimony. *Id.*

The theory fails on multiple levels. Most obviously, the theory and its alleged factual underpinnings are absent from the counterclaims. The main witness whose future, hypothetical testimony Lindell claims Dominion interfered with is a Fulton County poll manager named Suzi Vovles. Lindell Br. at 39. But the counterclaims do not discuss Ms. Vovles or any actions that

Dominion took toward her. Lindell also claims that Dominion attempted to tamper with Lindell's own testimony in this case by threatening him . . . with this case. Again, that baffling theory—for which there is no supporting caselaw—appears nowhere in the counterclaims, so the Court should not consider it.

Even if the Court were to consider the unpleaded allegations about Ms. Vovles's and Mr. Lindell's future hypothetical testimony, the witness tampering claim would still fail. Lindell's opposition brief says nothing about the content of the letter Dominion sent to Ms. Vovles; says nothing about how that letter is connected to Ms. Vovles's potential testimony; and says nothing about "what testimony was obtained" from Ms. Vovles. *E. Sav. Bank FSB*, 31 F. Supp. 3d at 15. Ms. Vovles is not even among the 119 individuals and entities listed in Lindell's initial disclosures. *See* Ex. 1.[9] As for Lindell himself, the supposedly "threatening" letters are before the Court, and the Court can easily see that they do not seek to tamper with his future testimony. *See* ECF Nos. 115-3, 115-4, 115-5.

More fundamentally, Lindell's witness tampering claim is barred because "a threat to take legal action cannot constitute witness tampering." *Turner v. New Jersey State Police*, 2017 WL 1190917, at *32 (D.N.J. Mar. 29, 2017); *see also G-I Holdings, Inc. v. Baron & Budd*, 179 F. Supp. 2d 233, 266–67 (S.D.N.Y. 2001) (collecting cases). Neither *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031 (11th Cir. 2000) nor *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996) say otherwise. *McAndrew* involved an employer who threatened its employee with job-related sanctions to deter him from testifying before a federal grand jury. 206 F.3d at 1034. And *Morrison* concerned a criminal defendant's attempts to persuade a witness to lie in court. 98 F.3d at 629–30.

---

[9] Unless otherwise indicated, all exhibits referenced herein are exhibits to the accompanying declaration of Zachary B. Savage.

### 3.    Lindell Does Not Allege Mail Fraud

Finally, Lindell does not even engage with Dominion's primary argument about the mail fraud predicate. As Dominion explained, a "scheme to defraud" requires an allegation that the supposed enterprise sought to procure property. Opening Br. at 26–27. But aside from seeking money damages in this lawsuit, Lindell makes no allegation that the enterprise sought to obtain property. *Id.* The mail fraud predicate therefore fails for the same reason that the extortion predicate fails.

Lindell also fails to explain how he has alleged a scheme to defraud. In fact, he concedes that he "does not allege that the communications themselves"—*i.e.*, Dominion's cease and desist letters or any other mailings sent by the enterprise—"are misleading." Lindell Br. at 40.[10] That concession dooms his claim. Though Lindell is correct that the mailings themselves need not be fraudulent, he still must allege, with particularity, that the scheme involves "false or fraudulent pretenses, representations or promises." *Ambellu v. Re'ese Adbarat Debre Selam Kidist Mariam*, 406 F. Supp. 3d 72, 78 (D.D.C. 2019) (quoting *Carpenter v. United States*, 484 U.S. 19, 27 (1987)). He does nothing of the sort.

## IV.    LINDELL'S SUPPORT OR ADVOCACY CLAIM FAILS

### A.    Lindell Does Not Allege Conduct Covered by the Support or Advocacy Clause

Lindell's next counterclaim is for violating the Support or Advocacy Clause. As Dominion explained in its opening brief, Lindell does not allege conduct that falls within the scope of the

---

[10] Confusingly, in the same breath, Lindell asserts that Dominion falsely stated that its voting machines "were not connected to the internet during the 2020 General Election and that its voting machines are not hackable." Lindell Br. at 41 n.4 (citing 40 consecutive paragraphs of the counterclaims). But neither the counterclaims nor the opposition brief makes any attempt to explain how such a statement could have been part of a scheme to obtain Lindell's property.

Clause. The Clause governs election-related conduct, but the counterclaims are based on the supposed "lawfare" campaign that Dominion allegedly conducted *after* the 2020 U.S. Presidential Election. Opening Br. at 27–29.

In response, Lindell concedes that a Support or Advocacy claim must be based on interference with the support or advocacy for a candidate in an election.[11] Lindell Br. at 51. But in an attempt to save his claim, Lindell makes the galling—though perhaps unsurprising— argument that the 2020 Presidential Election was not actually over until January 6, 2021, when Congress convened to certify the vote count of the Electoral College.[12] Lindell Br. at 46; *see United States v. Miller*, 2022 WL 823070, at *1–2, 5 (D.D.C. Mar. 7, 2022) (Nichols, J.) (discussing the events of January 6, 2021). He claims that one of Dominion's cease and desist letters—the one sent on December 23, 2020—can therefore still fall within the scope of the Clause. Lindell Br. at 46.

But Lindell's argument fails because, as he concedes in the counterclaims themselves, the election was over in November 2020. *See, e.g.*, Lindell Counterclaims ¶ 1 ("Mike Lindell brings this lawsuit to stop [Dominion] from weaponizing the litigation process to silence political dissent and suppress evidence showing voting machines were manipulated to affect outcomes in the *November 2020* General Election."); *id.* ¶ 118 (discussing investigations and audits that occurred

---

[11] Lindell egregiously mischaracterizes Dominion's argument when he states that Dominion "equate[s] the actual casting of Lindell's vote on Election Day . . . as the only manner in which Lindell could give his 'support or advocacy' to candidate President Trump." Lindell Br. at 48. As Dominion made crystal clear, the statute applies to interference with a citizen's "ability to *support* a candidate in the 2020 U.S. Presidential Election." Opening Br. at 28 (emphasis added). But as a matter of basic logic, one cannot support a candidate in an election after that election is over.

[12] According to Lindell, the Select Committee to Investigate the January 6th Attack on the United States Capitol issued a subpoena for Lindell's cell phone records for the period November 1, 2020 to January 31, 2021. *See Lindell v. Pelosi*, No. 22-cv-00028 (D. Minn. Jan. 13, 2022) (ECF No. 9) (Amended Complaint) ¶¶ 1, 3.

"[f]ollowing the 2020 election"); *id.* ¶ 168 (alleging that Support or Advocacy claim is premised on intimidation of individuals who brought forth evidence of election fraud "in the *November 2020 general election*"). Several courts have confirmed as much. *See Trump v. Thompson*, 20 F.4th 10, 17 (D.C. Cir. 2021) ("*On November 3, 2020, Americans elected* Joseph Biden as President, giving him 306 electoral college votes.*" (emphasis added)); *United States v. Brockhoff*, 2022 WL 715223, at *2 (D.D.C. Mar. 10, 2022) ("On January 6, 2021, a joint session of the United States Congress convened to certify the vote count of the Electoral College of the *2020 Presidential Election, which had taken place on November 3, 2020.*" (emphasis added)); *Eastman v. Thompson*, 2022 WL 894256, at *1 (C.D. Cal. Mar. 28, 2022) (discussing President Trump's efforts to encourage state legislators to question the election results "[i]n the months *after the election*" (emphasis added)). Whatever one wants to call Lindell's post-election efforts to challenge the results of the 2020 election, they were not efforts to support or advocate for a candidate in an election. The election was over.

And even if the Court were to expand the 2020 "election" to January 6, 2021, Lindell cannot point to any conduct in that timeframe that could plausibly be seen as inhibiting his support or advocacy for President Trump. In fact, Lindell points to a single letter in that timeframe. And in that letter, Dominion demanded: (1) that Lindell cease and desist making defamatory claims that Dominion somehow rigged or improperly influenced the election in favor of President Biden; and (2) that Lindell preserve and retain his documents relating to Dominion and his campaign against it. *See* ECF No. 115-3. Dominion's sending of that letter to Lindell does not remotely resemble the types of conduct that courts have found to state a Support or Advocacy claim.[13] *See,*

---

[13] Nor could the other cease and desist letters that Dominion sent to Lindell, after January 6, 2021, support a Support or Advocacy claim. *See* ECF Nos. 115-4, 115-5.

*e.g.*, *Nat'l Coalition on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 505–06 (S.D.N.Y. 2021) (robocalls to Black voters falsely asserted that police would use vote-by-mail information to track persons with outstanding warrants; that vote-by-mail information would be used by debt collectors; and that the CDC was seeking access to vote-by-mail information to conduct mandatory vaccinations); *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, 2018 WL 3848404, at *1–2 (E.D. Va. Aug. 13, 2018) (publication of report titled "*Alien Invasion*," which included Latino voters' addresses and other personally identifying information, falsely accused voters of committing felony voting fraud).

### B.     Lindell Fails to Allege the Existence of a Conspiracy

Lindell's Support or Advocacy Clause fails for the separate reason that he does not adequately allege a conspiracy. A violation of the Support or Advocacy Clause requires a conspiracy. Opening Br. at 29 (quoting 42 U.S.C. § 1985(3) ("[I]f two or more persons *conspire* to prevent by force . . . . ") (emphasis added)). For the reasons described in Section VI, Lindell makes no such allegations.[14]

## V.     LINDELL'S DEFAMATION CLAIM IS BARRED BY THE ABSOLUTE PRIVILEGE

Lindell's next claim, for defamation, is unambiguously barred by the absolute privilege. He identifies only two allegedly defamatory statements, and he concedes that each was made in this lawsuit. Opening Br. at 13–15. The absolute privilege, which precludes all defamation claims based on statements made in judicial proceedings, plainly applies.

---

[14] To be clear, Dominion never argued that the Support or Advocacy Clause is purely remedial, nor does it contend that the Clause requires state action. *See* Lindell Br. at 63–64. But the Clause applies only to "conspiracies" that inhibit the support or advocacy for a candidate in an election, and Lindell has not adequately alleged a conspiracy.

In arguing to the contrary, Lindell suggests that the privilege should not govern here because the statements in Dominion's complaint, on which Lindell's defamation claim is based, were made solely to "gratify private malice." (Lindell Br. at 55–56 (quoting *Matthis v. Kennedy*, 67 N.W.2d 413, 418 (Minn. 1954)). To be clear, they were not: Dominion filed this suit to recover for the enormous reputational and financial harm that Lindell has caused. But regardless, Lindell's argument fundamentally misunderstands the absolute privilege. What makes the privilege "absolute" is that it applies *even if* the allegedly defamatory statement is made with malice. *Matthis*, 67 N.W.2d at 417 ("The difference [between qualified and absolute privilege] is that malice destroys the one and does not change the other."). When the privilege applies, "defamatory matter . . . will not support a civil action for defamation *although made maliciously and with knowledge of its falsehood*." *Id.* (emphasis added).

Recognizing the weakness of his argument, Lindell then tries to run away from the counterclaims. He suggests that the statements on which his defamation claim is based are "unconnected with a judicial or proposed judicial proceeding." Lindell Br. at 56. But the Court should take the counterclaims at their word. They make abundantly clear that the statements on which Lindell's defamation claim are based are statements that Dominion made "in the D.C. Lawsuit." Lindell Counterclaims ¶ 150. The defamation claim therefore cannot proceed.

## VI.   LINDELL FAILS TO ALLEGE A CIVIL CONSPIRACY CLAIM

Next, the Court should dismiss Lindell's claims of civil conspiracy. Whether framed as a conspiracy to commit a tort or a conspiracy to violate constitutional rights, Lindell has not pleaded any underlying illegal act. Accordingly, the civil conspiracy claim fails. Opening Br. at 51.

Even if the Court were to find that Lindell has adequately alleged some illegal conduct, the conspiracy claim would still fail because he has alleged no agreement. Opening Br. at 51–52. Indeed, Lindell concedes that he does not allege an express agreement among the supposed

conspirators. He argues, instead, that he has pleaded facts from which a "tacit" agreement between Smartmatic and Dominion can be inferred, because of their "parallel conduct" and "preexisting relationship." Lindell Br. at 60–62. As the cases that Lindell relies on makes clear, that is not enough. *See Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 52, 62 (D.D.C. 2019) (dismissing conspiracy claim where plaintiff merely pled a "common goal" and "parallel conduct that could just as well be independent action" (internal quotation marks omitted)). Whether Lindell alleges an express or a tacit agreement, he must allege that "members of the conspiracy in some way or manner . . . came to a mutual understanding to try to accomplish a common and unlawful plan." *Thompson v. Trump*, 2022 WL 503384, at *30 (D.D.C. Feb. 18, 2022) (internal quotation marks omitted).

Lindell fails to do so. Instead, all Lindell does is point to irrelevant and obsolete alleged connections between Dominion and Smartmatic that have nothing to do with the supposed "lawfare" campaign. *See* Opening Br. at 18–20, 30. In an attempt to prop up his conspiracy allegations, he now deems Dominion and Smartmatic "members of an unofficial cartel," and puts conclusory labels on top of his allegations—words like "calculated," "pattern," and "plotted." Lindell Br. at 61. But those labels do not matter. When one examines the factual allegations themselves, the most that can be said is that Dominion and Smartmatic are competitors with the "common goal" of holding bad actors like Lindell accountable for their lies. That does not state a claim for conspiracy. *Kurd*, 374 F. Supp. 3d at 52, 62.

And Lindell does not rebut Dominion's argument that Clare Locke and Hamilton, as Dominion's agents acting within the scope of their representations, are legally incapable of conspiring with Dominion. Opening Br. at 30–31, 51. Lindell cites *Marshall v. Fenstermacher*, 388 F. Supp. 2d 536, 545 (E.D. Pa. 2005), but that case aligns with Dominion's argument. The

alleged conspiracy there included an attorney who "further[ed] and participat[ed] [in] a fraudulent conveyance," actions which "f[e]ll outside the scope of legitimate representation." Lindell does not cite a single case involving a conspiracy among a client and its corporate agents acting within the scope of their agency relationships.[15]

Confronted with his failure to allege a conspiracy under established law, Lindell contends that Dominion and Smartmatic conspired by engaging in "facilitating practices," a concept he lifts from a law review article on the Sherman Act. Lindell Br. at 62 (citing Wentong Zheng, *A Knowledge Theory of Tacit Agreement*, 9 Harv. Bus. L. Rev. 399 (2019)). Not only do the words "facilitating practices" fail to appear in a single non-antitrust opinion from this District or from the D.C. Circuit, they have zero relevance here. As the author of the law review article explains, a "facilitating practice" is a practice that competitors may engage in to overcome "structural hurdles to effective coordination," making it "unnecessary for [the] competitors to enter into explicit price-fixing agreements." 9 Harv. Bus. L. Rev. at 410. Examples of facilitating practices include arrangements to exchange price information and pricing systems that facilitate collusive outcomes. *Id.* The supposed "facilitating practice" in which Dominion and Smartmatic engaged—publishing updates about public legal proceedings on their websites—is nothing like the types of collusive arrangements the law review article describes.

## VII.   MYPILLOW FAILS TO ALLEGE TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

Finally, the Court should dismiss MyPillow's claim for tortious interference with prospective economic advantage. MyPillow concedes that a claim for tortious interference with

---

[15] For example, Lindell cites *Kilbride Invs. Ltd. v. Cushman & Wakefield of Pennsylvania, Inc.,* 294 F. Supp. 3d 369, 383 (E.D. Pa. 2018), but the conspiracy there involved "independent third parties." *See also Dunlap v. Peco Energy Co.*, 1996 WL 617777, at *3 (E.D. Pa. Oct. 23, 1996) (conspiracy involved employees of two separate companies and no attorneys).

prospective economic advantage requires that the alleged interference be "independently tortious or in violation of a state or federal statute or regulation." MyPillow Br. at 25. For the reasons explained above, none of the conduct underlying this claim—which is the same as the conduct underlying the rest of MyPillow's claims—is independently illegal. The Court should dismiss the tortious interference claim for this reason alone.[16]

Even if the Court found that MyPillow had alleged independently illegal activity, the interference claim would still fail. That is because MyPillow has not adequately alleged the prospective economic relationships it lost, nor has it alleged Dominion's knowledge of those relationships. Opening Br. at 49–50. Though MyPillow claims that it need not identify the lost relationships at the pleading stage, that is incorrect. *See, e.g.*, *Hales Mach. Tool, Inc. v. Doosan Infracore Am. Corp.*, 2016 WL 11518312, at *25 (D. Minn. May 24, 2016) (granting motion to dismiss, with prejudice, for failure to identify specific relationships); *Dr. R.C. Samanta Roy Inst. Of Sci. & Tech. v. The Star Trib. Co.*, 2005 WL 1661514, at *5 (D. Minn. July 15, 2005) (same). It must do so, and the cases it cites do not hold otherwise. *See Paisley Park Enterprises, Inc. v. Boxill*, 361 F. Supp. 3d 869, 881 (D. Minn. 2019) (plaintiff "clearly identif[ied] Apple and Amazon as specific business partners" whose relationships were interfered with); *Dexon Computer, Inc. v. Modern Enter. Solutions, Inc.*, 2015 WL 9921330, at *3 (Minn. Dist. Ct. Dec. 28, 2015) (plaintiff identified, by name, the two potential customers that defendants stole).[17] And it makes no

---

[16] MyPillow's interference claim fails this first element for a separate reason, too: It is based on the communication of information that is "not false." Such communications are "not improper" and therefore do not state a valid tortious interference with prospective economic advantage claim. *Moore v. Hoff*, 821 N.W.2d 591, 596 (Minn. Ct. App. 2012).

[17] MyPillow cites the Minnesota Court of Appeals opinion in *Dexon*, *see* MyPillow Br. at 26, but that opinion, which affirmed the lower court's issuance of a temporary restraining order, does not discuss the level of specificity required to adequately allege the lost economic advantage. *See Dexon Computer, Inc. v. Mod. Enter. Sols., Inc.*, 2016 WL 4069225, at *7 (Minn. Ct. App. Aug.

difference that the counterclaims contain a link to a news article listing businesses that decided to stop selling MyPillow products in their stores. *See* MyPillow Br. at 26. MyPillow must allege that it has lost those particular economic relationships as a result of Dominion's conduct. It makes no such allegation.

Finally, the Court should not indulge MyPillow's request to amend this counterclaim to add allegations of the particular economic relationships it lost. *See* MyPillow Br. at 28. First, if the Court determines that this claim should be dismissed because MyPillow has failed to allege independently illegal conduct, then MyPillow's naming of the lost relationships will make no difference. And even if the Court does not make such a determination, the news article cited in MyPillow's counterclaims makes clear that the retailers that terminated their relationships with MyPillow did so *before* Dominion filed suit. MyPillow Counterclaims ¶ 137 n.100 (article dated February 10, 2021); *see also* ECF No. 2-100 (January 19, 2021 article reporting on Lindell's claims that "his products have been dropped by major retailers . . . after his repeated false claims of voter fraud in the presidential election"); Complaint (ECF No. 1) ¶ 111 (screenshot from Lindell's documentary "ABSOLUTE PROOF," broadcast on February 5, 2021, showing logos of several retailers that had allegedly "dropped MyPillow"). Presumably, MyPillow knows that those retailers did not terminate their relationships because of Dominion's litigation-related activity— which is why it did not name them in its counterclaim in the first place. Accordingly, any attempt to amend would be futile.

---

1, 2016). As the lower court's opinion makes clear, the plaintiff in that case identified the lost customers by name. *Dexon*, 2015 WL 9921330, at *3.

## CONCLUSION

For the foregoing reasons, Lindell's and MyPillow's counterclaims against Dominion and third-party claims against Hamilton should be dismissed.

Dated: April 8, 2022                                Respectfully submitted,

/s/ *Zachary B. Savage*
Justin A. Nelson (D.C. Bar No. 490347)
Laranda Walker (D.C. Bar No. TX0028)
Florence T. Chen (D.C. Bar No. TX0025)
SUSMAN GODFREY LLP
1000 Louisiana Street, #5100
Houston, Texas 77002
(713) 651-9366
jnelson@susmangodfrey.com
lwalker@susmangodfrey.com
fchen@susmangodfrey.com

Stephen Shackelford, Jr. (D.C. Bar No. NY0443)
Elisha Barron (admitted *pro hac vice*)
Zachary B. Savage (D.C. Bar No. NY0465)
SUSMAN GODFREY LLP
1301 Avenue of the Americas, 32nd Fl
New York, NY 10019
(212) 336-8330
sshackelford@susmangodfrey.com
ebarron@susmangodfrey.com
zsavage@susmangodfrey.com

Davida Brook (D.C. Bar No. CA00117)
Jordan Rux (D.C. Bar No. CA00135)
SUSMAN GODFREY LLP
1900 Avenue of the Stars, Suite 1400
Los Angeles, CA 90067
(310) 789-3100
dbrook@susmangodfrey.com
jrux@susmangodfrey.com

Stephen E. Morrissey (admitted *pro hac vice*)
SUSMAN GODFREY LLP
1201 Third Avenue, Suite 3800
Seattle, WA  98101
(206) 516-3880

smorrissey@susmangodfrey.com

Thomas A. Clare, P.C. (D.C. Bar No. 461964)
Megan L. Meier (D.C. Bar No. 985553)
Dustin A. Pusch (D.C. Bar No. 1015069)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Telephone: (202) 628-7400
tom@clarelocke.com
megan@clarelocke.com
dustin@clarelocke.com

Rodney Smolla (Bar No. 6327)
4601 Concord Pike
Wilmington, DE 19803
rodsmolla@gmail.com
(864) 373-3882

***Attorneys for Plaintiffs/Counter-Defendants US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation; and Third-Party Defendant Hamilton Place Strategies, LLC***