**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

US DOMINION, INC., *et al.*,

     *Plaintiffs/Counter-Defendants*,

     v.

MYPILLOW, INC., *et al.*,

     *Defendants/Counter-Plaintiffs*,

     v.

SMARTMATIC USA CORP., *et al.*,

     *Third-Party Defendants*.

Civil Action No. 1:21-cv-0445 (CJN)

<u>**MEMORANDUM OPINION**</u>

Michael Lindell and MyPillow assert various counterclaims and "third-party" claims against U.S. Dominion, Inc. and its related corporate entities, as well as against Smartmatic, its related corporate entities, and Hamilton Place Strategies, LLC.  *See* Lindell's Counterclaims, ECF No. 87; MyPillow's Counterclaims, ECF No. 90.  The counter- and third-party-claim defendants have moved to dismiss the claims lodged against them.  *See* Dominion's Motion to Dismiss ("Dominion's Mot."), ECF No. 115; Smartmatic's Motion to Dismiss ("Smartmatic's Mot."), ECF No. 94.  The Court grants those motions.

## I.     The Relevant Procedural and Factual Background

In early 2021, Dominion filed three separate lawsuits against Sidney Powell and entities related to her, Rudy Giuliani, and Michael Lindell and MyPillow, alleging that they each defamed Dominion in connection with the 2020 presidential election.  *See US Dominion, Inc. v. Powell*,

554 F. Supp. 3d 42, 49 (D.D.C. 2021).  As to Lindell and MyPillow, Dominion alleges *inter alia* that Lindell (the founder of MyPillow) appeared on a Newsmax show and declared that "the biggest fraud is the Dominion machines;" claimed that Dominion machines "were built to cheat" and "steal elections;" and welcomed Dominion to come after him "because he had all the evidence and then they'll finally see it."  *Id.* at 54.  Dominion also alleges that Lindell leveraged MyPillow as a sponsor of several rallies in support of President Trump, while also offering discounts on products using discount codes such as "FightforTrump," "45," and "PROOF."  *Id.*

All defendants moved to dismiss.  *Id.* at 56.  Lindell and MyPillow filed separate motions, providing a variety of arguments as to why Dominion failed to state a single claim for relief.  *Id.*  The Court denied both motions (as well as Powell's and Giuliani's motions) in full.  *See generally id.*  Lindell and MyPillow attempted to appeal the Court's Order.  *See* MyPillow's Notice of Appeal, ECF No. 65; Lindell's Notice of Appeal, ECF No. 66.  As Lindell and MyPillow saw things, the order denying their motions to dismiss was appealable under the collateral-order doctrine.  *See* MyPillow's Notice of Appeal, ECF No. 65; Lindell's Notice of Appeal, ECF No. 66.

While the appeals were pending, the Court ordered Lindell and MyPillow to answer Dominion's Complaint on or before December 2, 2021.  *See* Order, ECF No. 85.  The Court also ordered Lindell and MyPillow to coordinate and refile as counterclaims in the present action the claims they had asserted against Dominion in separate lawsuits.  *See id.*  Lindell and MyPillow filed separate answers and lodged their claims against Dominion as counterclaims.  *See* Lindell's Counterclaims; *see also* MyPillow's Counterclaims.  Meanwhile, the Court of Appeals dismissed Lindell and MyPillow's appeals, *see US Dominion, Inc. v. My Pillow, Inc.*, No. 21-7103, 2022 WL

774080, at *1 (D.C. Cir. Jan. 20, 2022), and the mandate has since issued, *see* Mandate, ECF No. 122.

The allegations supporting Lindell's and MyPillow's claims against Dominion span about five (nearly identical) paragraphs of their separate pleadings. *Compare* Lindell's Counterclaims ¶¶ 130–135 *with* MyPillow's Counterclaims ¶¶ 130–135. According to both Lindell and MyPillow, "Dominion seeks to intimidate those who might dare to come forward with evidence of election fraud, stop criticism of election voting machines, and suppress information about how its machines have been hacked in American elections." Lindell's Counterclaims ¶ 130; *see also* MyPillow's Counterclaims ¶ 130 ("Dominion seeks to stop criticism of electronic election equipment and suppress information about how equipment that it supplied has been hacked in American elections."). Both also allege that "Dominion's exaggerated lawsuits . . . are not about any damages it has suffered; they are designed to intimidate those who exercise their right to free speech about the election." Lindell's Counterclaims ¶ 131; *see also* MyPillow's Counterclaims ¶ 131. Both protest Dominion's decision to send "at least 150 attorney letters, threatening the recipients with legal action;" Lindell's Counterclaims ¶ 132(a); MyPillow's Counterclaims ¶ 132(a); complain about Dominion's decision to file lawsuits against them; Lindell's Counterclaims ¶ 131; MyPillow's Counterclaims ¶ 131; and protest Dominion's "publiciz[ing]" of its lawsuits; Lindell's Counterclaims ¶ 133; MyPillow's Counterclaims ¶ 133.

Lindell asserts eight claims against Dominion: (1) abuse of process, (2) defamation, (3) civil conspiracy, (4) violations of the Racketeer Influenced and Corrupt Organization Act of 18 U.S.C. § 1962 (better known as RICO), (5) violations of the Support or Advocacy Clause of 42 U.S.C. §1985(3), and under 42 U.S.C. § 1983, (6) violations of the Fourteenth Amendment's Equal Protection Clause, (7) violations of the Fourteenth Amendment's Due Process Clause, and (8)

unlawful retaliation and viewpoint discrimination under the First Amendment. *See* Lindell's Counterclaims ¶¶ 142–183. MyPillow asserts five claims against Dominion: (1) abuse of process, (2) tortious interference with prospective economic advantage, and under § 1983, (3) violations of the Fourteenth Amendment's Due Process Clause, (4) unlawful retaliation and viewpoint discrimination under the First Amendment, and (5) reprisal. *See* MyPillow's Counterclaims ¶¶ 145–183.

Lindell has also filed what he styles as a "Third-Party Complaint" against Smartmatic and Hamilton Place. *See generally* Lindell's Counterclaims.[1] Lindell alleges that Dominion's public-relations firm, Hamilton Place, worked with Dominion and "threatened Lindell with financial ruin if he did not stop publicly expressing his political speech regarding the issues surrounding the use of electronic voting machines in the 2020 General Election." *Id.* ¶ 9. He also claims that Smartmatic, together with Dominion and Hamilton Place, has "weaponized the court system and the litigation process in an attempt to silence Lindell's and others' political speech about election fraud and the role of electronic voting machines in it." *Id.* ¶ 36. According to Lindell, Smartmatic, working with Dominion and Hamilton Place, has sought "to punish and deter important constitutionally-protected activity-free expression about a matter of public concern." *Id.* ¶ 136.

---

[1] In Smartmatic's motion to dismiss, Smartmatic argues that Lindell filed "third-party claims" rather than counterclaims against Smartmatic in an effort to get around the Court's prior Orders as well as the Federal Rules of Civil Procedure. *See* Smartmatic's Mot. at 20–21. Lindell, by contrast, claims that he "has complied with the Court's orders and the Federal Rules of Civil Procedure." Lindell's Opp'n to Smartmatic's Mot. to Dismiss ("Lindell's Opp'n"), ECF No. 104 at 13 n.5. For purposes of the pending motions to dismiss, the Court will construe Lindell's claims against Smartmatic and Hamilton Place as third-party claims rather than as counterclaims. *See* Smartmatic's Reply in Support of the Motion to Dismiss ("Smartmatic's Reply"), ECF No. 107 at 31 (requesting that "the Court dismiss all of Mr. Lindell's third-party claims . . . with prejudice"); *see also* Dominion's Mot. at 64 (requesting that the Court dismiss Lindell's "third-party claims against Hamilton").

Lindell asserts three claims against both Smartmatic and Hamilton Place:  (1) civil conspiracy, (2) violations of RICO, and (3) violations of the Support or Advocacy clause.  *See Id.* ¶¶ 142–183.  Lindell also sues Smartmatic (but not Hamilton Place) under § 1983 for (4) violations of the Fourteenth Amendment's Equal Protection Clause, (5) violations of the Fourteenth Amendment's Due Process Clause, and (6) unlawful retaliation and viewpoint discrimination under the First Amendment.  *See id.*

Dominion, Hamilton Place, and Smartmatic (and related entities) have moved to dismiss all of Lindell and MyPillow's claims against them.  *See* Dominion's Mot.; *see also* Smartmatic's Mot.  The Court addresses the claims in turn.

## II.    Legal Standard

Federal Rule of Civil Procedure 12(b)(6) requires dismissal of a complaint if it "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a motion to dismiss filed under Rule 12(b)(6), a plaintiff must plead "facts to state a claim of relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A court treats the "complaint's factual allegations as true and afford[s] the plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Atlas Brew Works, LLC v. Barr*, 391 F. Supp. 3d 6, 11 (D.D.C. 2019) (quotation omitted).  Although the court accepts all well-pleaded facts in the complaint as true, "[f]actual allegations must be enough to raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.  The claim to relief must be "plausible on its face," *id.*, meaning that the plaintiff must have pleaded "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### III.   Lindell's and MyPillow's Claims

### 1.  Lindell's and MyPillow's Abuse of Process Claims

Both Lindell and MyPillow assert abuse of process claims against Dominion (and Dominion alone).  *See* Lindell's Counterclaims ¶ 142; MyPillow's Counterclaims ¶ 175.  At root, Lindell and MyPillow claim that Dominion initiated its lawsuit against them not to recover for the harms that Lindell and MyPillow may have caused Dominion, but rather for the "ulterior purpose" of "silencing" and retaliating against them for speaking out about alleged vulnerabilities of Dominion's election machines.  *See* Lindell's Counterclaims ¶ 144; MyPillow's Counterclaims ¶ 177.  Lindell, for example, alleges that Dominion "brought suit against Lindell as part of a widespread 'lawfare' campaign designed by Dominion . . . not to compensate for any harm to Dominion caused by the public statements by Lindell and others, but to weaponize the judicial system in order to quash political dissent and silence those who would have the citizens of the United States (and the world, for that matter) know the truth about the grave flaws in Dominion's voting machines (as well as the voting machines of others)."  Lindell's Counterclaims ¶ 145.  MyPillow likewise contends that Dominion "filed a lawsuit against MyPillow" so that MyPillow would not "criticize" or at least stop criticizing Dominion for its alleged role in the 2020 election.  MyPillow's Counterclaims ¶ 178.

To state a claim for the tort of abuse of process under District law, a plaintiff must allege "(1) the existence of an ulterior motive; and (2) an *act* in the use of process other than such as would be proper in the regular prosecution of the charge."  *Spiller v. D.C.*, 362 F. Supp. 3d 1, 6 (D.D.C. 2019) (quotation omitted).[2]  An ulterior motive is necessary but not sufficient.  The second

---

[2]   Lindell contends that Minnesota law governs his abuse of process claim.  *See* Lindell's Counterclaims ¶ 144.   Dominion suggests that either Minnesota law, Colorado law, or District law governs the abuse of process claims.  *See* Dominion's Mot. at 19.  The elements of a claim of

element of the tort requires "a perversion of the judicial process and achievement of some end not contemplated in the regular prosecution of the charge." *Spiller*, 362 F. Supp. 3d at 6 (quotation omitted); *Wood v. Neuman*, 979 A.2d 64, 76 (D.C. 2009) (quotation omitted) (noting that the tort of abuse of process "lies where the legal system has been used to accomplish some end which is without the regular purview of the process, or which compels the party against whom it is used to do some collateral thing which he could not legally and regularly be required to do").

The mere initiation of a lawsuit does not satisfy the second element. *Rockwell Cap. Partners, Inc. v. CD Int'l Enterprises, Inc.*, 311 F. Supp. 3d 52, 55 (D.D.C. 2018); *see also Bannum, Inc. v. Citizens for a Safe Ward Five, Inc.*, 383 F. Supp. 2d 32, 46 n.10 (D.D.C. 2005) (safeguarding "unfettered access to the courts" is paramount); *Ammerman v. Newman*, 384 A.2d 637, 639 (D.C. 1978) (noting that the separate and distinct tort of "malicious prosecution" may expose a defendant to liability for initiating a lawsuit "maliciously and without probable cause"). Rather, the tort targets "improper use" of the judicial process "after issuance" of process. *Morowitz v. Marvel*, 423 A.2d 196, 198 (D.C. 1980) (quotation omitted); *see also id.* ("Thus, in addition to ulterior motive, one must allege and prove that there has been a perversion of the judicial process and achievement of some end not contemplated in the regular prosecution of the charge.").

Thus, even assuming that Dominion had an ulterior motive when initiating the lawsuit, Lindell's and MyPillow's abuse of process claims still fail. The "mere issuance of the process is not actionable, no matter what ulterior motive may have prompted it; the gist of the action lies in

---

abuse of process in Minnesota, Colorado, and the District appear to be the same, and the parties do not appear to argue to the contrary. *Compare Stevens v. Mulay*, No. 19-CV-01675-REB-KLM, 2021 WL 1153059, at *1 (D. Colo. Mar. 26, 2021), *with Young v. Klass*, 776 F. Supp. 2d 916, 924 (D. Minn. 2011), *with Hall v. Hollywood Credit Clothing Co.*, 147 A.2d 866, 868 (D.C. 1959). The Court, as a result, will apply District law. *See Lemon v. Kramer*, 270 F. Supp. 3d 125, 144 n.13 (D.D.C. 2017) (quotation omitted) ("Under District of Columbia choice-of-law principles, the absence of a true conflict compels the application of District of Columbia law by default.").

the improper use after issuance." *Kopff v. World Rsch. Grp., LLC*, 519 F. Supp. 2d 97, 99 (D.D.C. 2007) (quotation omitted); *see id.* at 100 ("[S]imply filing a lawsuit is not actionable, regardless of the motive that may have prompted the suit."). Here, Lindell and MyPillow root their abuse of process claims on Dominion's decision to file a lawsuit. *See* Lindell's Counterclaims ¶ 142; MyPillow's Counterclaims ¶ 175. But an abuse of process claim may not be based on the mere filing of a lawsuit. *See Simon v. Navon*, 71 F.3d 9, 15–16 (1st Cir. 1995).

MyPillow essentially concedes that the filing of a lawsuit does not constitute abuse of process but argues that it "clearly alleges Dominion is abusing process by *pursuing* the action, and by mailing copies of papers from the action to individuals whom Dominion seeks to intimidate." MyPillow's Opp'n to Dominion's Mot. to Dismiss ("MyPillow's Opp'n"), ECF No. 126 at 34. But the mere pursuit of a lawsuit, just like the mere filing a lawsuit, does not support an abuse of process claim. *See Camm v. Kennickell*, No. CIV. A. 85-3844(CRR), 1990 WL 198621, at *3 (D.D.C. Nov. 20, 1990), *aff'd*, 946 F.2d 1563 (D.C. Cir. 1991); *see also Kaufmann v. Irvin*, No. 18-CV-02091-JLK, 2019 WL 2544070, at *3 (D. Colo. June 20, 2019) (quotation omitted) ("bringing a . . . case and carrying it to its natural end to obtain a result such an action is designed to achieve doesn't constitute an improper use of process, no matter the motive").

Lindell presents a different argument. In his view, rather than targeting Dominion's lawsuit, his claim targets Dominion's "overarching Lawfare campaign to silence viewpoint-based speech." *See* Lindell's Opp'n to Dominion's Mot. to Dismiss ("Lindell's Dominion Opp'n"), ECF No. 127 at 73. But Lindell fails to identify any *act* that Dominion has taken other than filing and pursuing its lawsuit. His abuse of process claim therefore also fails.

## 2.  Lindell's Claims under RICO

Lindell (and not MyPillow) asserts a RICO claim against Dominion, Smartmatic, and Hamilton Place.  *See* Lindell's Counterclaims ¶ 152.  He claims that Dominion, Smartmatic, and Hamilton Place had the "common purpose of suppressing speech and dissent to the use of electronic voting machines and suppressing demands for investigations into the possible use of electronic voting machines to artificially manipulate voting, vote tabulations, and election results reporting in the 2020 Presidential Election."  *Id.* ¶ 156.

Congress enacted RICO in large part to target "the exploitation and appropriation of legitimate business by corrupt individuals."  *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Loc. Union 639*, 883 F.2d 132, 139 (D.C. Cir. 1989).  To achieve that aim, RICO creates among other things a civil cause of action for "[a]ny person injured in his business or property by reason of a violation" of the Act, § 1964(c); *see also id.* (allowing "[a]ny person injured in his business or property by reason of a violation of section 1962" to bring a civil suit for treble damages, costs, and attorneys' fees).

To state a plausible civil RICO claim, a plaintiff must allege "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity."  *Pyramid Sec. Ltd. v. IB Resol., Inc.*, 924 F.2d 1114, 1116 (D.C. Cir. 1991) (quotation omitted); *E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 11 (D.D.C. 2014) (quotation omitted) (noting that a plaintiff bringing a civil RICO claim must also show a "direct relation between the injury asserted and the injurious conduct alleged" and that the compensable injury flowing from a RICO violation resulted from the defendant's predicate acts).  An "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  *Bates v. Nw. Hum. Servs., Inc.*, 466 F. Supp. 2d 69, 78 (D.D.C. 2006) (quotation

9

omitted).  "Racketeering activity" encompasses any act indictable under a list of numerous state and federal offenses known in RICO parlance as "predicate offenses."  *See RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 329–30 (2016).  And a pattern of racketeering activity involves at least two acts of racketeering activity within the last ten years.  *See Republic of Kazakhstan v. Stati*, 380 F. Supp. 3d 55, 60 (D.D.C. 2019).

Lindell contends that Dominion, Smartmatic, Hamilton Place, and Dominion's attorneys at Clare Locke constitute an "association-in-fact" enterprise.  *See* Lindell's Counterclaims ¶ 156.  An association-in-fact enterprise "is simply a continuing unit that functions with a common purpose."  *Boyle v. United States*, 556 U.S. 938, 946 (2009) (quotation omitted) ("[A]n association-in-fact enterprise is a group of persons associated together for a common purpose of engaging in a course of conduct.").  Such an enterprise "must have at least three structural features:  a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  *Id.*  What's more, the members of a RICO enterprise must be "distinct"—that is, "one must allege and prove the existence of two distinct entities:  (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 158 (2001).

Lindell's RICO claim against Smartmatic fails because he fails to allege that Smartmatic shared the requisite common purpose with Dominion or other members of the alleged RICO enterprise.  Lindell claims that Smartmatic and Dominion acted in furtherance of the purpose of "suppressing speech and dissent" and "suppressing demands for investigations" about electronic voting machines and their use in the 2020 election.  Lindell's Counterclaims ¶ 156.  He also claims that Smartmatic and Dominion shared "a common purpose of suppressing dissent to protect their commercial and financial interests shown by their coordinated attack on dissenting speech, which

is akin to a price fixing scheme." *Id.*   But Lindell alleges no fact raising an inference that Smartmatic worked with Dominion (or anyone else for that matter) "to pursue by common, coordinated efforts what they could not do on their own." *Browning v. Flexsteel Indus., Inc.*, 955 F. Supp. 2d 900, 913 (N.D. Ind. 2013).   He also does not allege that Smartmatic communicated, met, or otherwise coordinated with Dominion or Hamilton Place in furtherance of their supposed "suppressive" aims.   In short, Lindell offers no allegations from which to infer a "continuing unit that functions with a common purpose." *Boyle*, 556 U.S. at 948; *Cisneros v. Petland, Inc.*, 972 F.3d 1204, 1213 (11th Cir. 2020) ("[Lindell has] failed to allege concrete facts from which the inference may plausibly be drawn that [Smartmatic] shared a common purpose to [engage in suppressive and otherwise illegal conduct] with the other participants of the purported association-in-fact enterprise.").

Lindell challenges the conclusion that Smartmatic and Dominion lacked a common purpose because, in his view, the intertwined and "shared corporate history" between the two businesses satisfies the requirement.   *See* Lindell's Dominion Opp'n at 77.   Yet the corporate history between Dominion and Smartmatic in no way suggests that the two companies "joined together" to achieve an alleged illegal purpose.   And Lindell's Complaint contains no allegation that Dominion and Smartmatic did anything to coordinate their supposedly illegal "lawfare" campaign.

As for Lindell's RICO claim against Dominion and Hamilton Place, he fails to allege that Dominion formed a RICO enterprise with its law firm, Clare Locke, or its public-relations firm, Hamilton Place.   Plaintiffs "may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation because a corporation necessarily acts through its agents and employees." *Ray v. Spirit Airlines,*

*Inc.*, 836 F.3d 1340, 1357 (11th Cir. 2016). As courts have repeatedly recognized, a contrary rule would make little sense, because if a corporate defendant were to face RICO liability "for participating in an enterprise comprised only of its agents," then RICO liability "will attach to any act of corporate wrong-doing and the statute's distinctness requirement" between the "person" and the "enterprise" would be "rendered meaningless." *U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205–06 (2d Cir. 2017). Lindell's Complaint acknowledges that Hamilton Place and Clare Locke operated as Dominion's agents. *See* Lindell's Counterclaims ¶ 156 ("At the direction of Dominion, [Hamilton Place] carried out a vast and never-ending public relations campaign . . . "); *id.* ("[A]t the direction of Dominion, Clare Locke sent hundreds of cease and desist letters . . ."). These allegations are entirely inconsistent with the idea that Dominion, Hamilton Place, and Clare Locke formed a RICO enterprise.

Lindell argues that because "a parent company and its wholly owned subsidiary can be sufficiently distinct for RICO purposes, . . . Dominion, Clare Locke, and [Hamilton Place] can be as well." *Id.* at 46. It is true that in some situations a corporate parent can be distinct from a subsidiary for purposes of forming a RICO enterprise. *See Bates v. Nw. Hum. Servs., Inc.*, 466 F. Supp. 2d 69, 84 (D.D.C. 2006). But Lindell's Complaint contains no allegations that Clare Locke or Hamilton Place did anything outside the scope of their relationship with Dominion. *See Kelly v. Palmer, Reifler & Assocs., P.A.*, 681 F. Supp. 2d 1356, 1382–83 (S.D. Fla. 2010) (finding no RICO enterprise between lawyers and clients because lawyers "were agents of the . . . clients who provided legal and other services").

One other note. These claims fail for an additional, independent reason. Litigation-related activity, even if abusive or meritless, does not "constitute a RICO predicate act." *E. Sav. Bank, FSB v. Papageorge*, 31 F. Supp. 3d 1, 13 (D.D.C. 2014). Put differently, "allegations of frivolous,

fraudulent, or baseless litigation activities—without more—cannot constitute a RICO predicate act." *Kim v. Kimm*, 884 F.3d 98, 104 (2d Cir. 2018). A contrary rule "would inundate the federal courts with procedurally complex RICO pleadings," and could "chill litigants and lawyers and frustrate the well-established public policy goal of maintaining open access to the courts because any litigant's or attorney's pleading and correspondence in an unsuccessful lawsuit could lead to drastic RICO liability." *Id.* (quotation omitted). Lindell alleges that the supposed RICO enterprise engaged in racketeering activity when it issued "over 150 'cease and desist' letters threatening companies and individuals" with "ruinous litigation." Lindell's Counterclaims ¶ 158. But those cease-and-desist letters, no matter how threatening, constitute litigation-related activity. Indeed, courts have dismissed RICO actions targeting pre-litigation communications. *See Neal v. Second Sole of Youngstown, Inc.*, No. 1:17-CV-1625, 2018 WL 340142, at *3 (N.D. Ohio Jan. 9, 2018) (dismissing a RICO claim premised on a demand letter).

### 3. Lindell's Claims under the Support or Advocacy Clause

Lindell claims that Dominion, Smartmatic, and Hamilton Place violated the Support or Advocacy Clause of 42 U.S.C. § 1985(3) by "silencing speech, dissent, and opposition to the use of electronic voting machines in the 2020 Presidential Election." Lindell's Counterclaims ¶ 166. He also claims that Dominion, Smartmatic, and Hamilton Place "determined to carry out this conspiracy through a coordinated campaign of lawfare—weaponizing the court system and litigation process to threaten, intimidate, and force private citizens like Lindell into silence and retract their public statements regarding opposition to the use of electronic voting machines and their vulnerabilities." *Id.*

The Support or Advocacy Clause provides in pertinent part that:

[I]f two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a

legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; to injure any citizen in person or property on account of such support or advocacy.

42 U.S.C. § 1985(3); *see also Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 486 (S.D.N.Y. 2020) (noting that courts and commentators refer to clause of § 1985(3) at issue here as the "Support or Advocacy Clause"); Note, *The Support or Advocacy Clause of § 1985(3)*, 133 HARV. L. REV. 1382, 1386 (2020) (remarking that "the Support or Advocacy Clause has received relatively little attention from litigants or scholars"). Congress enacted the statute during the Reconstruction Era to combat the Ku Klux Klan's use of organized violence "to prevent[] African Americans and their white Republican allies from gaining political power in the South." Richard Primus & Cameron O. Kistler, *The Support or Advocacy Clauses*, 89 FORDHAM L. REV. 145, 151–52 (2020).

To state a claim under the Support or Advocacy Clause, a plaintiff must at a minimum allege a conspiracy. *See* 42 U.S.C. § 1985(3) ("[I]f two or more persons conspire to prevent by force . . . .").[3] A conspiracy, of course, requires an agreement among defendants. *See Barber v. D.C. Gov't*, 394 F. Supp. 3d 49, 66 (D.D.C. 2019) (Jackson, K.B., J.); *McManus v. D.C.*, 530 F.

---

[3] The Court need not discuss the other elements required to state a plausible claim under the Support or Advocacy Clause. *See Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 487 (S.D.N.Y. 2020) (mentioning the elements of a claim under the Support or Advocacy Clause); Michael Weingartner, *Remedying Intimidating Voter Disinformation Through § 1985(3)'s Support-or-Advocacy Clauses*, 110 GEO. L.J. ONLINE 83, 104 (2021) (same); Note, *The Support or Advocacy Clause of* § 1985(3), 133 Harv. L. Rev. 1382, 1386–87 (2020) (same).

Supp. 2d 46, 74 (D.D.C. 2007) (quotation omitted) ("A conspiracy is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage."). To survive a motion to dismiss, a plaintiff usually must point to some "events, conversations, or documents" indicating an "agreement or a meeting of the minds" among the alleged co-conspirators. *Burnett v. Sharma*, 511 F. Supp. 2d 136, 143 (D.D.C. 2007) (quotation omitted).

Lindell fails to adequately allege an agreement. *See generally Busby v. Cap. One, N.A.*, 932 F. Supp. 2d 114, 141 (D.D.C. 2013) (dismissing a civil conspiracy claim where plaintiff offered just conclusory allegations of an agreement). Lindell's Complaint points to no event, no conversation, no document—really, nothing at all—to suggest that Dominion, Smartmatic, or Hamilton Place reached any sort of "agreement." *See* Lindell's Counterclaims ¶ 166 (alleging generally that the Defendants "had a meeting of the minds to agree on the common purpose of silencing speech, dissent, and opposition to the use of electronic voting machines in the 2020 Presidential Election and the exposure of such machines' vulnerability to cyber-attacks and election tampering"); *id.* (alleging generally that the Defendants "coordinated [a] campaign of lawfare—weaponizing the court system and litigation process to threaten, intimidate, and force private citizens like Lindell into silence"); *id.* ¶ 168 (alleging that the Defendants "conspired to send out over 150 baseless cease and desist letters—including to Lindell—with the express purpose of threatening and intimidating Lindell and others who brought forth evidence of election fraud in the November 2020 general election as part of their support and advocacy for President Trump"). Nor does Lindell offer allegations from which an agreement could be inferred. *See Kurd v. Republic of Turkey*, 374 F. Supp. 3d 37, 52 (D.D.C. 2019) ("While Courts can infer a

conspiracy from indirect evidence, Plaintiffs have not pled facts that would reasonably allow the Court to make such an inference.").  At best, Lindell alleges that Dominion and Smartmatic engaged in "parallel conduct."  But parallel conduct, without more, does not adequately allege a conspiratorial agreement.  *See Lynn v. Amoco Oil Co.*, 459 F. Supp. 2d 1175, 1182 (M.D. Ala. 2006) ("[E]vidence of parallel conduct alone is insufficient to show a conspiratorial agreement."); *see also In re Rail Freight Fuel Surcharge Antitrust Litig.*, 587 F. Supp. 2d 27, 32 (D.D.C. 2008) (noting the same in the antitrust context).  In short, Lindell has made no non-conclusory allegations of a meeting of the minds or any formation of an agreement among Dominion, Smartmatic, Hamilton Place, or others.

### 4. Lindell's Civil Conspiracy Claims

Lindell (and not MyPillow) claims that he may "recover for common law civil conspiracy" against Dominion, Smartmatic, and Hamilton Place "for their collusion and agreement to the common objective or course of action, acting under color of state law, to deprive Plaintiff Lindell of his constitutional rights under the First Amendment, and their overt acts in connection with that common purpose."  Lindell's Counterclaims ¶ 181.

To state a common-law civil-conspiracy claim, a plaintiff must allege "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or in a lawful act in an unlawful manner; and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement (4) pursuant to, and in furtherance of, the common scheme."  *He Depu v. Oath Holdings, Inc.*, 531 F. Supp. 3d 219, 246 (D.D.C. 2021) (quotation omitted).[4]  Civil conspiracy

---

[4]  Lindell's Complaint suggests that Minnesota law applies to his civil conspiracy claim.  *See* Lindell's Counterclaims ¶ 182.  The Court need not conduct a choice-of-law analysis because under Minnesota law, Colorado law, and District law, a common-law civil-conspiracy claim does not represent a standalone tort claim.  *See Strei v. Blaine*, 996 F. Supp. 2d 763, 795 (D. Minn. 2014) (quotation omitted) ("[A] civil conspiracy claim is merely a vehicle for asserting vicarious

does not represent an independent tort.  *See Ford v. Maryland Att'y Gen.*, No. CV 17-2525 (ABJ),

2018 WL 5251742, at *5 n.4 (D.D.C. Oct. 22, 2018).  Rather, such a claim depends on one co-

conspirator having taken some tortious or criminal act.  *Id.*

Even assuming Lindell adequately alleged some underlying illegal conduct,[5] this claim

fails because, much like his claim under the Support or Advocacy Clause, he does not adequately

allege an agreement.  For a claim of civil conspiracy to survive, the complaint must contain

"enough factual matter (taken as true) to suggest that an agreement was made." *Lagayan v. Odeh*,

199 F. Supp. 3d 21, 30 (D.D.C. 2016) (quotation omitted).  A court may infer such an agreement,

as a "plaintiff need not allege that an express or formal agreement was entered into." *Id.* (quotation

omitted); *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) ("Proof of a tacit, as opposed

to explicit, understanding is sufficient to show agreement.").  But the plaintiff, at a minimum, must

allege that "members of the conspiracy in some way or manner . . . came to a mutual understanding

to try to accomplish a common and unlawful plan." *Thompson v. Trump*, No. 21-CV-00400

---

or joint and several liability, and thus such a claim is dependent upon a valid underlying tort claim."); *Johnstown Feed & Seed, Inc. v. Cont'l W. Ins. Co.*, 641 F. Supp. 2d 1167, 1183 (D. Colo. 2009) ("Under Colorado law, civil conspiracy is a derivative cause of action, not an actionable claim in and of itself."); *Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.*, 749 A.2d 724, 738 (D.C. 2000) (noting that "there is no recognized independent tort action for civil conspiracy in the District of Columbia").

[5]  Lindell claims that he has pleaded underlying illegal acts based on his claims of "(1) abuse of process; (2) defamation; (3) extortion by threatening and then bringing frivolous litigation against him; (4) violating his rights under 42 U.S.C. § 1985(3); (5) violating 42 U.S.C. § 1983 by depriving him of his rights of equal protection, due process, and First Amendment rights by first threatening and then bringing sham litigation motivated by discriminatory animus against his political viewpoint and speech; and (6) violations of 18 U.S.C. § 1512 and related state laws."  Lindell's Dominion Opp'n at 74.  The Court, however, has determined for the reasons explained herein that none of those claims survive past this point.  As a result, Lindell has failed to allege underlying illegal acts to support his common-law civil-conspiracy claim.  *See McMullen v. Synchrony Bank*, 300 F. Supp. 3d 292, 307 (D.D.C. 2018) ("Plaintiff here relies on the underlying fraud claim— which was just deemed insufficient—her conspiracy claim must also founder.").

(APM), 2022 WL 503384, at *30 (D.D.C. Feb. 18, 2022) (quotation omitted). For the reasons discussed above, Lindell fails that requirement here.

Lindell counters that Dominion "and Smartmatic engaged in a 'mutually supportive,' parallel, and calculated pattern of litigation." Lindell's Dominion Opp'n at 76. He claims, too, that Smartmatic and Dominion engaged "in a 'facilitating practice' through which they coordinate their abuses of the legal process." *Id.* at 77. And he points to the "shared histories and past business transactions" between Dominion and Smartmatic. *Id.* at 78. But these are wholly conclusory allegations unsupported by any alleged facts. At best, Lindell claims that Dominion and Smartmatic shared the "common goal" of holding actors like Lindell accountable for allegedly defamatory statements. *See Busby v. Cap. One, N.A.*, 932 F. Supp. 2d 114, 141 (D.D.C. 2013) (noting that "conclusory allegations of an agreement do not suffice; parties must allege facts showing the existence or establishment of an agreement"). That is not enough.

### 5. Lindell's Claims under the Equal Protection Clause

Lindell (and not MyPillow) asserts an Equal Protection Clause claim under 42 U.S.C. § 1983 against Dominion and Smartmatic. *See generally* Lindell's Counterclaims. In particular, Lindell claims that Dominion and Smartmatic violated his "rights under the Equal Protection Clause of the United States Constitution and under the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution." *Id.* ¶ 170. Lindell bases his claim on the theory "that Dominion and Smartmatic disfavored the conservative political viewpoint of [] Lindell over those of left-leaning or Democrat-supporting individuals who also publicized the role of Dominion voting machines in election fraud and election tampering." *Id.* ¶ 173.

Without an express (or an implied cause) of action, a plaintiff cannot seek money damages to vindicate an alleged violation of a constitutional or a federal right. *See Comcast Corp. v. Nat'l*

*Ass'n of Afr. Am.-Owned Media*, 140 S. Ct. 1009, 1015 (2020); *Ziglar v. Abbasi*, 137 S. Ct. 1843,

1869 (2017) (Thomas, J., concurring in part).  *But see Ex parte Young*, 209 U.S. 123, 167–68

(1908) (recognizing a federal court's authority to grant injunctive rather monetary relief);

*Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015).

Section 1983 provides an express cause of action, as it makes liable every "person" who

"under color of" state law "subjects, or causes to be subjected," another person "to the deprivation

of any rights, privileges, or immunities secured by the Constitution."  42 U.S.C. § 1983.  That

provision, however, creates no substantive rights.  It rather "provides a vehicle for vindicating

rights found in the Constitution or another federal law."  *Dibrell v. City of Knoxville, Tennessee*,

984 F.3d 1156, 1160 (6th Cir. 2021); *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1854 (2017) ("[Section

1983] entitles an injured person to money damages if a state official violates his or her

constitutional rights.").  The threshold inquiry under § 1983, then, is to identify a specific federal

or constitutional right at issue.  *Dibrell*, 984 F.3d at 1160.  After that, courts can determine whether

the identified right has been violated.  *Id.*[6]

Lindell claims that Dominion and Smartmatic violated his rights under the Equal Protection

Clause.  The Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within

its jurisdiction the equal protection of the laws."  U.S. Const. Amend. XIV, § 1.  The Equal

Protection Clause guarantees that the states and the federal government will treat similarly situated

individuals in a similar manner.  *See City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432,

439 (1985); *Bolling v. Sharpe*, 347 U.S. 497 (1954) (embracing reverse incorporation to apply the

---

[6]  The Court recognizes that it may not always be necessary to address as a threshold matter whether the identified right has been violated.  Under the doctrine of qualified immunity, *see Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam), courts may consider whether a right "was clearly established" before addressing whether the plaintiff has alleged sufficient facts to make out a violation of a federal right, *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).

Equal Protection Clause of the Fourteenth Amendment to the federal government).  By contrast, "[d]issimilar treatment of dissimilarly situated persons, does not violate equal protection." *Frederick Douglass Found., Inc. v. D.C.*, 531 F. Supp. 3d 316, 339 (D.D.C. 2021) (quotation omitted).  One of the keys, then, in evaluating an equal protection claim is "to determine whether a person is similarly situated to those persons who allegedly received favorable treatment."  *Id.*

Lindell fails to identify a similarly situated person who has allegedly received more favorable treatment than him.  Dominion's suit against Lindell turns on dozens of allegedly false and defamatory statements that Lindell allegedly made with actual malice.  Lindell points to no comparator who bears even a slight resemblance to him.

Lindell's claim against Smartmatic fares no better.  Lindell fails to allege any interaction with Smartmatic until the start of this litigation.  *See Bundy v. Sessions*, 812 F. App'x 1, 2 (D.C. Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)) ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").  Indeed, until this case, "Lindell and Smartmatic had never been parties to the same litigation or had any communication with one another."  Smartmatic's Mot. at 35.  And even if Lindell and Smartmatic had a requisite connection, Lindell does not even attempt to show that Smartmatic treated him differently relative to a similarly situated comparator.

### 6.  Lindell and MyPillow's Claims under the First Amendment

Lindell and MyPillow also assert First Amendment claims under 42 U.S.C. § 1983.  Lindell claims that Dominion and Smartmatic "engaged in First Amendment retaliation by sending hundreds of cease and desist letters, filing lawsuits, threatening to sue, and/or waging Lawfare against Lindell for his constitutionally protected speech concerning election integrity and security and Dominion and Smartmatic's role in the November 2020 Presidential Election."  Lindell's

Counterclaims ¶ 179.  MyPillow likewise contends that Dominion (but not Smartmatic) launched an "illegal campaign to punish and silence their critics violated the First Amendment rights of MyPillow by (a) intentionally seeking, through threats, intimidation, and litigation, to deter MyPillow from exercising its free speech rights, thereby chilling the future exercise of its Constitutional rights."  MyPillow's Counterclaims ¶ 150.

To establish a claim for retaliation under the First Amendment, an individual must prove that (1) he engaged in conduct protected under the First Amendment, (2) that a state actor took some retaliatory action sufficient to deter a person of ordinary firmness in plaintiff's position from speaking again; and (3) a causal link exists between the exercise of a constitutional right and the adverse action taken against him.  *Doe v. D.C.*, 796 F.3d 96, 106 (D.C. Cir. 2015).  To satisfy the causation element, a plaintiff must allege that his "constitutional speech was the 'but for' cause of the defendants' retaliatory action."  *Id.* (quotation omitted).  The causation inquiry, in this context, is a "subjective one," *BEG Invs., LLC v. Alberti*, 144 F. Supp. 3d 16, 22 (D.D.C. 2015), requiring a plaintiff to "demonstrate that the defendants were 'subjectively motivated' to take their allegedly retaliation action because of the plaintiff's protected activity," *id.* (quotation omitted).

A First Amendment retaliation claim requires that the retaliatory act be taken in response to First Amendment protected speech.  But Lindell and MyPillow allege that Dominion has retaliated against them by engaging in pre-litigation activity and by pursuing lawsuits for allegedly defamatory speech (which is not protected by the First Amendment).  The Court finds no support— and Lindell and MyPillow have pointed to none—for the proposition that a First Amendment retaliation claim can proceed against an alleged state actor for filing a defamation suit, much less a defamation suit that has survived a motion to dismiss.  *See US Dominion, Inc. v. Powell*, 554 F.

Supp. 3d 42 (D.D.C. 2021), *appeal dismissed sub nom. US Dominion, Inc. v. My Pillow, Inc.*, No. 21-7103, 2022 WL 774080 (D.C. Cir. Jan. 20, 2022).

As for Lindell's First Amendment unlawful retaliation claim against Smartmatic, Lindell has failed adequately to allege causation.  Recall that to satisfy the causation element, a plaintiff must demonstrate that his "constitutional speech was the 'but for' cause of the defendants' retaliatory action, " *Doe v. D.C.*, 796 F.3d 96, 106 (D.C. Cir. 2015) (quotation omitted), "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive," *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019).  Here, Lindell fails adequately to allege a causal connection because he has pointed to no First Amendment protected speech of his own that Smartmatic targeted out of retaliatory animus.  Smartmatic has allegedly "threatened" Lindell with litigation, but not because of his "constitutionally protected speech concerning election integrity," rather because of his allegedly defamatory statements about Smartmatic and others.

Even assuming that Lindell and MyPillow's allegations plausibly showed that they engaged in conduct protected under the First Amendment and that a causal link exists between the protected activity and the adverse action taken against them, the Court doubts that either Dominion or Smartmatic qualify as state actors with respect to their litigation-related conduct.  *See Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019); *see also* Justin Aimonetti, *Derivative Immunity As Savior from State Actor Status*, 34 REGENT U. L. REV. 107, 119 (2022) (noting that the "Supreme Court has forged several different paths for plaintiffs to allege that a private actor should be categorized as a state actor for purposes of Section 1983," and proceeding to describe those various paths).  It is at least conceivable that Dominion and Smartmatic may qualify as state actors for some purposes, but the Court very much doubts that their litigation-

related activity counts as state action in this case.[7]  Indeed, neither Lindell nor MyPillow allege anything to suggest that the state had involvement with Smartmatic's or Dominion's litigation-related conduct.  And both Lindell and MyPillow's claims focus on Dominion and Smartmatic's "lawfare" litigation campaigns rather than their role in the election.

Two last notes.  First, and though not clear from the pleadings, Lindell and MyPillow assert what appear to be claims of viewpoint discrimination under the First Amendment.  *See* Lindell's Counterclaims ¶ 173 (claiming that "state actor like the Dominion Defendants and Smartmatic Defendants cannot engage in viewpoint-based discrimination in attempting to suppress a private citizen's exercise of its First Amendment right to free speech"); MyPillow's Counterclaims ¶ 150.[8] But neither responds to Dominion's arguments as to why their viewpoint discrimination must be dismissed.  *See* Lindell's Dominion Opp'n; MyPillow's Opp'n to Mot. to Dismiss ("MyPillow's Opp'n"), ECF No. 126 at 36 ("MyPillow does not attempt to or need to establish viewpoint discrimination to prevail on its counterclaims.").  The Court therefore concludes that Lindell and MyPillow have abandoned their claims of viewpoint discrimination.  *See Mosleh v. Howard Univ.*, No. 1:19-CV-0339 (CJN), 2022 WL 898860, at *15 n.6 (D.D.C. Mar. 28, 2022).  Second, MyPillow pleads as Count II a claim for unlawful "reprisal."  *See* MyPillow's Claims ¶¶ 145–

---

[7]  The Court notes that its limited discussion of the state-actor doctrine in this Memorandum Opinion in no way affects whether Dominion, Smartmatic, or any related entity may qualify as public figures for purposes of defamation law.  *See US Dominion, Inc. v. Byrne*, No. 1:21-CV-02131 (CJN), 2022 WL 1165935, at *6 (D.D.C. Apr. 20, 2022) ("Discovery may bear additional fruit on [the question whether Dominion and like entities count as a public officials or as a public figures], which in turn will permit the Court to determine whether the actual malice standard or a negligence standard applies").

[8]  Viewpoint discrimination represents "an egregious form of content discrimination," in which the government favors or restricts certain speech based on the "motivating ideology or the opinion or perspective of the speaker."  *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995).

157.  Although it pleads this in a separate count, MyPillow does not explain how it is any different from the retaliation claim in Count I; indeed, MyPillow treats the two as one and the same in its opposition brief.  *See* MyPillow's Opp'n at 17; *id.* at 24 ("Dominion was 'motivated' to engage in 'reprisal' for the exercise of free-speech rights under the First Amendment.").  The reprisal/retaliation claim fails for the reasons already explained.

### 7.  Lindell and MyPillow's Claims under the "Substantive" Due Process Clause

Both Lindell and MyPillow assert Substantive Due Process Clause claims under 42 U.S.C. § 1983.  Lindell claims that Dominion and Smartmatic "acted under color of state law to engage in conduct that shocks the conscious because it was so disproportionate to the need presented, and so inspired by malice or sadism rather than a merely careless or unwise excess of zeal, that it amounted to brutal and inhumane abuse of official power literally shocking to the conscience." Lindell's Counterclaims ¶ 174.  MyPillow contends that Dominion also deprived it of "due process" when it tried to harm MyPillow as part of its allegedly illegal lawfare campaign. MyPillow's Counterclaims ¶¶ 161–62.

As noted earlier, the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1. For an unenumerated right to be protected under the Substantive Due Process Clause that right must at a minimum be "deeply rooted in this Nation's history and tradition."  *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 768 (2010) (quotation omitted).

Determining what unenumerated rights qualify as deeply rooted is no easy task.  *See Est. of Phillips v. D.C.*, 455 F.3d 397, 403 (D.C. Cir. 2006) (quotation omitted) (noting that the Supreme Court has "always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-

ended").  Indeed, some judges have suggested that inferior courts should not (or should at least be very hesitant to) recognize unenumerated rights because no "thread of principle" can be derived from Supreme Court case law in the area.  *Dronenburg v. Zech*, 741 F.2d 1388, 1391 (D.C. Cir. 1984) (Bork, J.).  Current law, nonetheless, recognizes that a substantive due process violation may occur when "the defendant official's behavior [is] so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Est. of Phillips*, 455 F.3d at 403 (quotation omitted).

But neither Lindell nor MyPillow alleges anything that shocks the conscience.  *See Smothers v. D.C.*, No. CV 19-2632 (ABJ), 2020 WL 5411294, at *6 (D.D.C. Sept. 9, 2020) (quotation omitted) ("For governmental action to be arbitrary and conscience shocking in the constitutional sense, it must violate the decencies of civilized conduct.").  Filing a lawsuit, sending cease-and-desist letters in anticipation of a lawsuit, and discussing a lawsuit with the media all fall well short of satisfying the shock-the-conscience test.  *See Viehweg v. City of Mount Olive*, 559 F. App'x 550, 553 (7th Cir. 2014) ("Forcing a person to defend a pointless suit is objectionable, but [a person in such a scenario has] available to him—as part of that very litigation—remedies to protect him from a vexatious suit.").

### 8.  MyPillow's Claim of Tortious Interference with Prospective Economic Advantage

MyPillow asserts a claim of tortious interference with prospective economic advantage against Dominion (and Dominion alone).  MyPillow claims that Dominion "intentionally and improperly interfered with MyPillow's prospective contractual relations by falsely maligning MyPillow in public, thereby inducing many of MyPillow's commercial suppliers and buyers to terminate their long-standing relationships with MyPillow so that MyPillow lost the benefit of its expected future sales to and from these entities."  MyPillow's Counterclaims ¶ 168.

To recover under Minnesota law for tortious interference with prospective economic advantage,[9] a plaintiff "must plausibly allege:  (1) the existence of a reasonable expectation of economic advantage belonging to the plaintiff; (2) the defendant's knowledge of that expectation; (3) the defendant's wrongful interference with that expectation; (4) a reasonable probability that the plaintiff would have realized the expectation absent the defendant's conduct; and (5) damages." *Marco Techs., LLC v. Midkiff*, No. 19-CV-2323 (PJS/LIB), 2020 WL 12442072, at *8 (D. Minn. Feb. 24, 2020); *see also Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 217 (Minn. 2014) (clarifying "that a cause of action for tortious interference with prospective economic advantage is a viable claim in Minnesota").  The third element—the defendant's wrongful interference with the plaintiff's reasonable expectation of economic advantage—requires that the defendant's intentional interference is either independently tortious or in violation of state or federal law.  *Id.*  That requirement ensures that "fair competition is not chilled."  *Id.* (quotation omitted).

Here, Dominion's alleged interference is neither independently tortious nor in violation of state or federal law.  Recall that MyPillow alleges that Dominion interfered with its expectation of economic advantage by "fil[ing] . . . [a] lawsuit against MyPillow," by making allegedly "false statements about MyPillow" in public, and by "threaten[ing] to bring additional similar lawsuits against others."  MyPillow's Counterclaims ¶ 169.  In other words, and as MyPillow put it in its opposition brief, Dominion committed independently tortious or unlawful conduct when it violated the federal constitution and committed the tort of abuse of process.  *See* MyPillow's Opp'n at 30 ("MyPillow's counterclaims under § 1983, for violation of the First and Fourteenth Amendments

---

[9] The Parties agree that Minnesota law governs MyPillow's claim against Dominion for tortious interference with prospective economic advantage.  *See* Dominion's Mot. at 59; *see also* MyPillow's Opp'n at 30 (analyzing the under Minnesota law).

and for abuse of process each allege conduct by Dominion that is independently tortious or in violation of state or federal law."). But for the reasons discussed above, none of the conduct underlying this claim violates federal or state law or is independently tortious. *See Engelhardt v. Qwest Corp.*, 918 F.3d 974, 982 (8th Cir. 2019) (dismissing a claim of tortious interference with prospective economic advantage under Minnesota law because defendant's conduct neither violated "federal or state law" nor constituted "independently tortious" conduct).

### 9. Lindell's Defamation Claim

Lindell (and not MyPillow) has brought a defamation claim against only Dominion. As Lindell sees it, Dominion has made numerous defamatory statements targeting Lindell during the course of its lawsuit against him. *See* Lindell's Counterclaims. Lindell claims that Dominion has defamed him "by calling him a 'liar' and a purveyor of 'the Big Lie'" in its Complaint against him. *Id.* ¶ 150. In Lindell's view, "[l]abeling a private citizen a 'liar' or purveyor of lies is defamation per se, and therefore Lindell is entitled to monetary relief even in the absence of proof of economic loss or special damages." *Id.* ¶ 151.

State law establishes the elements of a defamation claim. *See Devin G. Nunes v. WP Company LLC*, No. 20-7121, 2022 WL 997826, at *3 (D.C. Cir. Apr. 1, 2022).[10] A privilege may shield an individual or entity from liability for making an allegedly defamatory statement even where a plaintiff may have an otherwise colorable defamation claim. *See US Dominion, Inc., et al., v. Patrick Byrne*, No. 1:21-CV-02131 (CJN), 2022 WL 1165935, at *6 (D.D.C. Apr. 20, 2022).

___

[10] Lindell asserts that Minnesota law governs his defamation claim. *See* Lindell's Claims ¶ 149. Dominion contends, and the Court agrees, that no choice-of-law analysis need be undertaken because Minnesota law, Colorado law, and District law all recognize "absolute privilege" for statements made during the life cycle of a lawsuit. *See* Dominion's Mot. at 26 n.6; *Compare Sturdivant v. Seaboard Serv. Sys., Ltd.*, 459 A.2d 1058, 1060 (D.C. 1983) *with Seidl v. Greentree Mortg. Co.*, 30 F. Supp. 2d 1292, 1313 (D. Colo. 1998), *with Pinto v. Internationale Set, Inc.*, 650 F. Supp. 306, 308 (D. Minn. 1986).

One such privilege is the "judicial-proceedings privilege." *Park v. Brahmbhatt*, 234 A.3d 1212, 1215 (D.C. 2020); *Teltschik v. Williams & Jensen, PLLC*, 748 F.3d 1285, 1287 (D.C. Cir. 2014) (Kavanaugh, J.). Under that privilege, both an attorney and an attorney's client receive "absolute immunity from actions in defamation for communications related to judicial proceedings." *Park v. Brahmbhatt*, 234 A.3d 1212, 1215 (D.C. 2020). Two requirements must be satisfied for the privilege to attach. *Id.* First, the allegedly defamatory statement must have been made in the course of or preliminary to a judicial proceeding. *Id.* Second, the allegedly defamatory statement must be related in some way to the underlying proceeding. *Id.*; *see also id.* (quotation omitted) (noting that statements made preliminary to judicial proceedings relate to the underlying proceeding "so long as an attorney [made the statements] while performing his function as such, there is a reasonable nexus between the publication in question and the litigation under consideration, and the statements had a genuine relationship to potential litigation and were not made as a mere afterthought or [with a] sham rationale").

The judicial-proceedings privilege attaches to Dominion's allegedly defamatory statements. Lindell's defamation claim is based on two allegedly defamatory statements: Dominion called him a "liar" and Dominion labelled him the purveyor of "the Big Lie." Lindell's Counterclaims ¶ 150. Lindell attempts to "supplement" those two statements by referencing additional allegedly defamatory statements. *See* Lindell's Dominion Opp'n at 71 (claiming that Dominion's Complaint further labels Lindell as "deceptive," associates him with "con artists," and claims that he "sells the lie to this day," that he is "duping people," and that he "exploit[s]" people and "knowing lied" to customers). But Dominion made each of these allegedly defamatory statements (including the supplemental ones) during the course of a judicial proceeding, meaning

that the judicial-proceedings privilege attaches.  Indeed, even Lindell admits that Dominion made

the allegedly defamatory statements "in the D.C. Lawsuit."  Lindell's Counterclaims ¶ 150.

Lindell asks the Court to infer "that Dominion and its attorneys made [the allegedly

defamatory] statements simply to 'gratify private malice' against Lindell."  Lindell's Dominion

Opp'n at 71.  Even if the Court were prepared to draw such an inference, what makes the judicial-

proceedings privilege an "absolute" privilege is that it applies even if someone makes an allegedly

defamatory statement with malice.  *See Finkelstein, Thompson & Loughran v. Hemispherx*

*Biopharma, Inc.*, 774 A.2d 332, 339 (D.C. 2001), *overruled on different grounds by McNair*

*Builders, Inc. v. Taylor*, 3 A.3d 1132 (D.C. 2010); *see also Khan v. Yale Univ.*, 511 F. Supp. 3d

213, 220 (D. Conn. 2021) ("The  effect of an absolute privilege in a defamation action . . . is that

damages cannot be recovered for a defamatory statement even if it is published falsely and

maliciously.").

## IV.        Smartmatic's Motion for Sanctions

Smartmatic moves to sanction Lindell and his previous counsel[11] under Federal Rule of

Civil Procedure 11 for filing a "frivolous case."  Smartmatic's Sanction Motion ("Sanction's

Mot."), ECF No. 118; *see* Fed. R. Civ. P. 11(c)(1) ("If, after notice and a reasonable opportunity

to respond, the court determines that Rule 11(b) has been violated, the court may impose an

appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for

the violation.").  In particular, Smartmatic argues that Lindell and his counsel should be sanctioned

for:  (1) "predicat[ing] [Lindell's] claims on allegations that have been disproven by credible,

---

[11]    Douglas A. Daniels and Health A. Novosad had represented Lindell and submitted his
counterclaims in the present action.  *See* Lindell's Counterclaims at 139.  Both Daniels and
Novosad withdrew from this action soon after Smartmatic filed its motions for sanctions.  *See*
Notice of Withdrawal, ECF No. 133.

publicly available sources and rejected by other federal district courts," (2) for filing "claims [that] lack a plausible basis in the law," and (3) for "fil[ing] suit to undermine confidence in the 2020 U.S. election." *Id.* at 8–10. Smartmatic further contends that "Lindell and his counsel must be held jointly and severally liable for the fees Smartmatic has expended defending itself and preparing the instant motion." *Id.* at 47–48. Lindell and his previous counsel oppose the motion for sanctions. *See* Lindell's Opp'n to the Sanctions Motion ("Lindell's Sanctions Opp'n"), ECF No. 119.

The Court will grant Smartmatic's motion in part. The Court agrees with Smartmatic that Lindell has asserted at least some groundless claims. *See* Sanction's Mot. at 18 (contending that Lindell has asserted groundless "factual allegations, accusations of criminality, theories of liability within his existing claims, and causes of action . . . against Smartmatic"). In particular, the Court concludes that at the very least Lindell's claim against Smartmatic under the Support or Advocacy Clause falls on the frivolous side of the line (other claims do too). As a result, the Court orders Lindell and his previous counsel to pay some of the fees and costs Smartmatic has incurred defending itself and moving for sanctions under Rule 11. *See Reynolds v. U.S. Capitol Police Bd.*, 357 F. Supp. 2d 19, 23 (D.D.C. 2004) ("The test under Rule 11 is an objective one: that is, whether a reasonable inquiry would have revealed there was no basis in law or fact for the asserted claim."); *Hickey v. Scott*, 738 F. Supp. 2d 55, 74 (D.D.C. 2010) (concluding that "the appropriate sanction is to require [the offending party] to pay for the 'reasonable attorney's fees'" the opposing party incurred in defending against the sanctionable claims and moving for Rule 11 sanctions). But the Court requires additional briefing on the amount of appropriate costs under the circumstances.

**V.      Conclusion**

For the foregoing reasons, Smartmatic's motion to dismiss is **GRANTED**, and its motion for sanctions is **GRANTED IN PART**.  Dominion and Hamilton Place's motion to dismiss is also **GRANTED**.  Furthermore, the Court **ORDERS** Smartmatic and Lindell to provide briefs of no more than 10 pages discussing the appropriate amount of costs in light of this decision.  Smartmatic shall file its brief on or before May 27, 2022.  Lindell shall file his brief on or before June 3, 2022.  An Order will be entered contemporaneously with this Memorandum Opinion.

DATE:  May 19, 2022

CARL J. NICHOLS
United States District Judge