# EXHIBIT 2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| US DOMINION, INC., DOMINION VOTING SYSTEMS, INC., and DOMINION VOTING SYSTEMS CORPORATION, | ) ) ) ) | |
| *Plaintiffs/Counter-Defendants*, | ) ) | |
| v. | ) ) ) | |
| MY PILLOW, INC., and MICHAEL J. LINDELL, | ) ) ) | |
| *Defendants/Counter and Third- Party Plaintiffs,* | ) ) ) | Civil Case No. 1:21-cv-00445 (CJN) |
| *v.* | ) ) ) | |
| SMARTMATIC USA CORP., SMARTMATIC INTERNATIONAL HOLDING B.V., SGO CORPORATION LIMITED, AND HAMILTON PLACE STRATEGIES, LLC, | ) ) ) ) ) ) | |
| *Third-Party Defendants.* | ) ) | |

## <u>DECLARATION OF JOHN POULOS IN SUPPORT OF PLAINTIFFS' MOTION FOR PROTECTIVE ORDER REGARDING THIRD PARTY SUBPOENAS</u>

I, John Poulos, hereby declare:

1.      I am over the age of 18 and have personal knowledge of the information set forth in this declaration.

2.      I am the President and Chief Executive Officer of Dominion Voting Systems ("Dominion"). I have been the President and Chief Executive Officer since the company's founding in 2003. Dominion is a private corporation. I am very familiar with the goods and services Dominion provides, as well as the information it keeps confidential.

3. Dominion is a leading provider in election support services. Dominion contracts with state and local governments (the "Customer") to provide its voting systems, software licenses, and services in various states across the country.

4. Dominion's contracts provide that Dominion will provide the Customer with voting systems, software license, and support services in connection with elections administered by the Customer. A true and correct copy of the typical type of contract Dominion enters into with its Customers is attached hereto as Exhibit A.

5. Under the agreement, the Customer agrees to protect Dominion's "Confidential Information." *See* Exhibit A, §§ 2.2, 13. Subject to limited exceptions not applicable here, the Customer agrees not to disclose Dominion's Confidential Information to any third party unless disclosure is made "in response to, or because of, an obligation to any federal, state, or local government agency or court with appropriate jurisdiction, or to any person properly seeking discovery before any such agency or court." Exhibit A, § 13.2.

6. Dominion's "Confidential Information" is broadly defined to include "materials, documents, data, and technical information, specifications, business information, customer information, or other information that [Dominion] maintains as trade secrets or confidential," including but not limited to "Dominion Software and associated documentation."

7. "Dominion Software" includes all software and firmware programs which are licensed to the Customer, as well as documentation associated with said software and firmware programs.

8. Dominion is a private company which derives independent economic value from the confidential and proprietary nature of its Confidential Information. If its Confidential Information is publicly released, Dominion will suffer a competitive disadvantage.

9.     Not only are Dominion's software and related materials confidential and proprietary to Dominion, but the federal government has classified them as critical to election infrastructure.

10.     Dominion undertakes reasonable efforts to maintain the secrecy of its Confidential Information, including by prohibiting the Customer from transferring or copying Dominion's software onto any other storage device; reverse engineering, disassembling, decompiling, deciphering, or analyzing the software; or altering or modifying the software or copyright notices in any way or preparing any derivative works of the software or any parts of the software without Dominion's prior written permission. Dominion also requires that once the contract expires or terminates the Customer must return to Dominion all software in its possession or control, or destroy all such software, and certify in writing to Dominion that it has been destroyed. The agreements also provide that each party must be given the ability to defend the confidentiality of its Confidential Information to the maximum extent allowable under the law prior to disclosure by the other Party.

11.     I have been informed that numerous Dominion customers recently received subpoenas from Defendants, MyPillow and Michael J. Lindell, asking them to turn over various documents and materials. As best I can interpret Defendants' requests, at least some of the materials Dominion's customers are being asked to produce are confidential and proprietary to Dominion and would fall within the definition of Confidential Information as used in Dominion's contracts with its Customers. Specifically, Defendants' requests in Item Number 1 for "forensic images," in EnCase format, various drives and other devices used in connection with the November 2020 Election would require Dominion's customers to turn over software and other information that is confidential and proprietary to Dominion. The same is true of Defendants'

request in Item Number 2, which asks for, among other things, "forensic copies" of slog.txt files and .dvd files generated from tabulators and ballot marking devices.

12.     If the types of confidential and proprietary information called for in these requests became public, Dominion's competitors could use this information to imitate or undermine Dominion's intellectual property, among other things, and Dominion will suffer harm.

I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED this 30th day of September, 2022.

John Poulos
Chief Executive Officer
Dominion Voting Systems, Inc.

EXHIBIT A

## VOTING SYSTEM AGREEMENT
### BY AND BETWEEN
### DOMINION VOTING SYSTEMS, INC.
### AND PIKE COUNTY, PA

This Agreement, dated this 1st day of February 2019, (the "Effective Date"), for a voting system, licenses and related services is made by and between the Pike County, PA ("Customer") and Dominion Voting Systems, Inc., a corporation organized under the laws of the State of Delaware ("Dominion"). This Agreement may refer to Dominion and the Customer together as the "Parties," or may refer to Dominion or the Customer individually as a "Party."

WHEREAS, The Customer desires to purchase a voting system, licenses and related services; and

WHEREAS, Dominion designs, manufactures, sells, licenses, and provides ongoing solutions for voting systems;

NOW THEREFORE, in consideration of the mutual covenants contained herein, and in accordance with the terms and conditions set forth herein, Dominion agrees to sell, license and furnish the System (as defined herein) to the Customer.

1. **Composition of Agreement.** Exhibits A and B are attached and incorporated herein by reference and form a part of this Agreement (the "Agreement"). This Agreement consists of the general terms and conditions contained in the following sections, together with the listed Exhibits:

   Exhibit A:    Pricing Summary and Deliverables Description
   Exhibit B:    Software License Terms and Conditions

2. **Definitions.** For the purposes of this Agreement, the following are defined terms:

   2.1.   "Acceptance" and variations thereof, means the successful completion by the Customer of the acceptance testing performed on each component of Dominion Hardware and Software, after delivery in accordance with testing criteria developed and agreed to by the parties, or the occurrence of other events defined in Section 8.

   2.2    "Confidential Information" means those materials, documents, data, and technical information, specifications, business information, customer information, or other information of a Party (the "Disclosing Party") maintains as trade secrets or confidential and which are disclosed to a another Party (the "Receiving Party") in tangible form conspicuously marked as "confidential," or with words having similar meaning, which includes without limitation, Dominion Software and associated documentation.

   2.3.   "Dominion Hardware" means the ImageCast® system hardware as more specifically described in Exhibit A.

2.4.   "Dominion Software" means software and firmware programs licensed to the Customer by Dominion and any associated documentation as more specifically described in Exhibit A.

2.5.   "Election" means a single election event administered by the Customer including any absentee and early voting activity associated with the election event. Election shall not mean any follow-on events occurring after the initial election event, including without limitations, run-offs or recall replacements elections. Any follow on event shall be considered an Election in and of itself.

2.6.   "Election Management System Hardware" or "EMS Hardware" means third party hardware required for operating Dominion Software as used in conjunction with the Dominion Hardware.

2.7.   "License" has the meaning set forth in Section 7.

2.8.   "System" means the combination of Dominion Software, Dominion Hardware and EMS Hardware.

2.9.   "Third Party Software" means manufacturer supplied software, or firmware owned by third parties, which Dominion provides to Customer pursuant to sublicenses or end user license agreements with the owners of such Third Party Software. Third Party Software includes, but is not limited to, various operating systems, software drivers, report writing subroutines, and firmware.

3.   **Term of Agreement.** The Term of this Agreement shall begin on the Effective Date and shall continue until December 31, 2026 unless sooner terminated or extended as provided herein. Subject to possible annual price increases, the licenses or warranties authorized by this Agreement may extend beyond the Term of this Agreement, according to the terms and conditions of such License or warranty.

4.   **Dominion's Responsibilities.** Dominion shall:

4.1.   Deliver the System and installation plan services as described in Exhibit A (Project Configuration and Pricing Summary).

4.2.   Assign a Dominion project manager ("Dominion Project Manager") to oversee the general operations of the project. The Dominion Project Manager will be the primary contact for all project needs. The Dominion Project Manager will be responsible for all deliverables and services including, resource planning and coordination, product delivery, issue resolution and for all administrative matters such as invoices and payments.

4.3.   Provide the Customer with a Dominion Software Use License as described in Exhibit B (Software License Agreement).

4.4.   Provide the Customer with one (1) reproducible electronic copy of the user documentation.

4.5.   Assist in the Acceptance Testing process as required by Section 8 herein.

4.6.   Provide invoices to Customer upon Acceptance of items listed in Exhibit A and pursuant to the payment schedule described in Section 5.1 herein.

5.   **Customer's Responsibilities.** Customer shall:

5.1.   Pay invoices in a timely manner and no later than thirty (30) calendar days from receipt of a Dominion invoice. Payments specified in this Section 5 are exclusive of all excise, sale, use and other taxes imposed by any governmental authority, all of which taxes shall be reimbursed by the Customer. If the Customer is exempt from taxes, Customer shall supply Dominion a tax exemption certificate or other similar in a form demonstrating its exempt status upon request.

5.2.   Assign a Customer project manager ("Customer Project Manager"), who shall be responsible for review, analysis and acceptance of the System and the coordination of Customer personnel, equipment, vehicles and facilities. The Customer Project Manager shall be empowered to make decisions on behalf of the Customer with respect to the work being performed under this Agreement. The Customer Project Manager shall also have direct access to the Customer's top management at all times for purposes of problem resolution.

5.3.   Conduct Acceptance testing process as required by Section 8.

5.4.   Customer shall provide reasonable access and entry into all Customer property required by Dominion to provide the services described in this Agreement. All such access and entry shall be provided at Customer's expense.

5.5   If applicable, for election setup and database creation services as described in Exhibit A, the Customer shall review and approve or identify issues to all Dominion deliverables related to such service within two (2) business days of receipt by the Customer. In the event the Customer discovers an issue, it shall provide written notice to Dominion immediately following the discovery of any issue and Dominion shall rectify the issue at no additional cost to the Customer. In the event the Customer approves the deliverable and subsequent to such approval, request that a change be made to the deliverable, then Dominion may provide the change at an additional cost based upon Dominion's then current published service rates.

6.   **Title and Risk of Loss.**

6.1.   <u>Title to the System, Excluding All Software</u>. Title to the System, or any portion thereof, excluding software and firmware, will pass to Customer upon delivery.

6.2.   <u>Software</u>. Software, including firmware, is licensed not sold. The original and any copies of the Dominion Software, or other software provided pursuant to this agreement, in whole or in part, including any subsequent improvements or updates, shall remain the property of Dominion, or any third party that owns such software.

6.3.   <u>Risk of Loss</u>. Dominion shall bear the responsibility for all risk of physical loss or damage to each portion of the System until such portion is delivered to the Customer. Customer shall provide Dominion with a single location for shipment and Dominion shall not be responsible for shipping to more than one location. To retain the benefit of this clause, Customer shall notify Dominion of any loss or damage within ten (10) business days of the receipt of any or all portions of the System, or such shorter period as may be required to comply with the claims requirements of the shipper, and shall cooperate in the processing of any claims made by Dominion.

**7.   Software License and Use.**

7.1.   <u>License</u>. Upon mutual execution of this Agreement, Dominion grants to the Customer, and the Customer accepts a non-exclusive, non-transferable, license ("License") to use the Dominion Software subject to the terms and conditions of this Agreement and the Software License Terms attached hereto as Exhibit B.

7.2.   <u>Third Party Software</u>. The System includes Third Party Software, the use of which is subject to the terms and conditions imposed by the owners of such Third Party Software. Customer consents to the terms and conditions of the third party License Agreements by Customer's first use of the System.

**8.   Acceptance.**

8.1.   <u>Dominion Software or Dominion Hardware Testing</u>. After delivery of Dominion Software or Dominion Hardware, the Customer will conduct Acceptance testing of such units, in accordance with the Acceptance criteria developed and updated, from time to time, by Dominion. Such Acceptance testing shall occur at a time mutually agreed upon by the Parties, but no later than ten (10) business days after installation.

8.2.   <u>System Acceptance Testing</u>. To the extent not tested as part of the testing pursuant to Subsections 8.1, upon completing the installation of the System, the Customer will conduct system acceptance testing, according to the Acceptance test procedures developed and updated, from time to time, by Dominion. Such Acceptance testing shall occur at a time mutually agreed upon by the Parties, but no later than ten (10) business days after installation of the System.

8.3.   <u>Acceptance/Rejection</u>.   After testing, if the Dominion Software, Dominion Hardware, or the System does not conform to user documentation or Dominion provided Acceptance criteria, Customer will notify Dominion in writing within five

(5) business days.  Dominion will, at its own expense, repair or replace the rejected Dominion Software, Dominion Hardware, or System within thirty (30) days after receipt of Customer's notice of deficiency.  The foregoing procedure will be repeated until Customer finally accepts or rejects the Dominion Software, Dominion Hardware, or System in writing in its sole discretion.

8.4    <u>System Conformance</u>. Customer will not refuse to grant Acceptance of the System, in whole or in part, solely for the reason that it fails to conform with the specifications, requirements and functions set out in the Agreement in a manner that does not affect the performance of the System, in whole or in part, and Dominion shall provide a plan of action to cure such non-conformity with reasonable dispatch.

## 9.    Warranties.

9.1.   <u>Dominion Software Warranty</u>.  The Dominion Software warranty is subject to the terms and conditions of Exhibit B - the Software License Terms.

9.2.   <u>Third Party Products</u>. The warranties in this Sections 9 do not apply to any third party products.  However, to the extent permitted by the manufacturers of third party products, Dominion shall pass through to Customer all warranties such manufacturers make to Dominion regarding the operation of third party products.

9.3.   <u>Dominion Hardware Warranty Terms</u>. Dominion warrants that when used with the hardware and software configuration purchased through or approved by Dominion, each component of Dominion Hardware will be free of defects that would prevent the Dominion Hardware from operating in conformity in all material respects with its specifications as documented by Dominion. The Dominion Hardware Warranty shall remain in effect until one year after Acceptance.

9.4.   <u>Dominion Hardware Warranty Services</u>. If any Dominion Hardware component fails to operate in conformity with its specifications during the warranty period, Dominion shall provide a replacement for the Dominion Hardware component or, at Dominion's sole option, shall repair the Dominion Hardware component, so long as the Dominion Hardware is operated with its designated Dominion Software and with third party products approved by Dominion for use with the Dominion Hardware.  The following conditions apply to the Dominion Hardware warranty:

9.4.1.   Customer shall bear the shipping costs to return the malfunctioning component of Dominion Hardware to Dominion, and Dominion shall bear the costs for standard shipping of the repaired or replaced component of Dominion Hardware to Customer.

9.4.2.   The following services are not covered by this Agreement, but may be available at Dominion's current time and material rates:

9.4.2.1.   Replacement of consumable items including but not limited to batteries, paper rolls, ribbons, seals, smart cards, and removable memory devices, scanner rollers, disks, etc.;

9.4.2.2.   Repair or replacement of Dominion Hardware damaged by of accident, disaster, theft, vandalism, neglect, abuse, or any improper usage;

9.4.2.3.   Repair or replacement of Dominion Hardware modified by any person other than those authorized in writing by Dominion;

9.4.2.4.   Repair or replacement of Dominion Hardware from which the serial numbers have been removed, defaced or changed.

9.5.   <u>No Other Warranties.</u> DOMINION DISCLAIMS ALL OTHER WARRANTIES, AND REPRESENTATIONS, WHETHER WRITTEN, ORAL, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTY BASED ON A COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

**10.   Force Majeure.** Should any circumstances beyond the control of Dominion or Customer occur that delay or render impossible the performance of any obligation due under this Agreement, such obligation will be postponed for the period of any delay resulting from any such circumstances, plus a reasonable period to accommodate adjustment to such extension, or cancelled if performance has been rendered impossible thereby. Such events may include, without limitation, accidents; war, acts of terrorism; natural disasters; labor disputes; acts, laws, rules or regulations of any government or government agency; or other events beyond the control of both Dominion and Customer. Neither Party shall be liable under this Agreement for any loss or damage to the other Party due to such delay or performance failures. Notwithstanding the foregoing, both Parties shall use their best efforts to minimize the adverse consequences of any such circumstances. This Section shall not operate to excuse any Party from paying amounts that are owed pursuant to this Agreement.

**11.   Indemnification.** Dominion, at its sole expense, will indemnify and defend the Customer, its officers, agents and employees from and against any loss, cost, expense or liability (including but not limited to attorney's fees and awarded damages) arising out of a claim, suit or action that the System infringes, violates, or misappropriates a Third Party's patent, copyright, trademark, trade secret or other intellectual property or proprietary rights.

**12.   Limitation of Liability.** DOMINION'S TOTAL AGGREGATE LIABILITY FOR ANY LOSS, DAMAGE, COSTS OR EXPENSES UNDER OR IN CONNECTION WITH THIS AGREEMENT, HOWSOEVER ARISING, INCLUDING WITHOUT LIMITATION, LOSS, DAMAGE, COSTS OR EXPENSES CAUSED BY BREACH OF CONTRACT, NEGLIGENCE, STRICT LIABILITY, BREACH OF STATUTORY OR ANY OTHER DUTY SHALL IN NO CIRCUMSTANCES EXCEED THE TOTAL DOLLAR AMOUNT OF THE AGREEMENT. NEITHER PARTY SHALL BE LIABLE FOR ANY LOSS OF PROFITS, LOSS OF BUSINESS, LOSS OF DATA, LOSS OF USE OR ANY OTHER INDIRECT,

INCIDENTAL, PUNITIVE, SPECIAL OR CONSEQUENTIAL LOSS OR DAMAGE WHATSOEVER, HOWSOEVER ARISING, INCURRED BY THE OTHER PARTY OR ANY THIRD PARTY, WHETHER IN AN ACTION IN CONTRACT, NEGLIGENCE OR OTHER TORT, EVEN IF THE PARTIES OR THEIR REPRESENTATIVES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

**13.  Confidential Information.**

13.1.   Each Party shall treat the other Party's Confidential Information as confidential within their respective organizations and each Party shall be given the ability to defend the confidentiality of its Confidential Information to the maximum extent allowable under the law prior to disclosure by the other Party of such Confidential Information.

13.2.   Subject to the requirements of the Customer's public record laws ("PRL"), neither Party shall disclose the other Party's Confidential Information to any person outside their respective organizations unless disclosure is made in response to, or because of, an obligation to any federal, state, or local governmental agency or court with appropriate jurisdiction, or to any person properly seeking discovery before any such agency or court.

13.3.   Any specific information that Dominion claims to be confidential must be clearly marked or identified as such by the Customer. To the extent consistent with PRL, Customer shall maintain the confidentiality of all such information marked by Dominion as confidential. If a request is made to view such Confidential Information, Customer will notify Dominion of such request and the date the information will be released to the requestor unless Dominion obtains a court order enjoining such disclosure. If Dominion fails to obtain such court order enjoining such disclosure, the Customer will release the requested information on the date specified. Such release shall be deemed to have been made with Dominion's consent and shall not be deemed to be a violation of law or this Agreement.

**14.   Assignment.** Neither Party may assign its rights, obligations, or interests in this Agreement without the written consent of the other Party, providing however that Dominion may assign the proceeds of this Agreement to a financial institution without prior consent of the Customer but with written notice to Customer.

**15.  Termination.**

15.1   <u>For Default</u>.   In the event either Party violates any provisions of this Agreement, the non-violating Party may serve written notice upon the violating Party identifying the violation and a providing a reasonable cure period. Except as otherwise noted herein, such cure period shall be at least thirty (30) days. In the event the violating Party has not remedied the infraction at the end of the cure period, the non-violating Party may serve written notice upon the violating Party of termination, and seek legal remedies for breach of contract as allowed hereunder. If

the breach identified in the notice cannot be completely cured within the specified time period, no default shall occur if the Party receiving the notice begins curative action within the specified time period and thereafter proceeds with reasonable diligence and in good faith to cure the breach as soon as practicable.

15.2  <u>For Non-Appropriation of Funds</u>.   The Customer shall not be obligated for payments hereunder for any future fiscal year unless or until the Customer appropriates funds for this Agreement in Customer's budget for that fiscal year.  In the event that funds are not appropriated, then this Agreement may be terminated by the Customer as the end of the last fiscal year for which funds were appropriated. Termination of this Agreement by the Customer under this Section 15.2 shall not constitute a breach of this Agreement by the Customer.  Customer shall notify Dominion in writing of such non-appropriation at the earliest possible date which, in any event, shall be prior to Dominion performing services during any fiscal year for which an appropriation has not been made.  In the event Customer notifies Dominion that sufficient funds have not been appropriated, or if in fact sufficient funds have not been appropriated, to compensate Dominion in accordance with this Agreement, Dominion may suspend Dominion's performance and terminate all Dominion licenses under this Agreement. Suspension of performance and termination of all Dominion licenses by Dominion in accordance with this section 15.2 shall not constitute a breach of this Agreement by Dominion.

**16.   Legality and Severability.** This Agreement and the Parties' actions under this Agreement shall comply with all applicable federal, state and local laws, ordinances, rules, regulations, court orders, and applicable governmental agency orders. If any term or provision of this Agreement is held to be illegal or unenforceable, the remainder of this Agreement shall not be affected thereby and each term or provision of this Agreement shall be valid and enforceable to the fullest extent permitted by law. The Parties agree that any court reviewing this Agreement shall reform any illegal or unenforceable provision to carry out the express intent of the parties as set forth herein to the fullest extent permitted by law.

**17.   Survival.** The provisions of Sections 2, 9, 10, 11, 12, 13, 16, 18, and 19 shall survive the expiration or termination of this Agreement.

**18.   Choice of Law.** Interpretation of this Agreement shall be governed by the laws of the Customer's State, and the courts of competent jurisdiction located in the Customer's State will have jurisdiction to hear and determine questions relating to this Agreement.

**19.   Waiver.** Any failure of a Party to assert any right under this Agreement shall not constitute a waiver or a termination of that right or any provisions of this Agreement.

**20.   Independent Contractor.** Dominion and its agents and employees are independent contractors performing professional services for the Customer and are not employees of the Customer. Dominion and its agents and employees shall not accrue leave, retirement, insurance, bonding, use of Customer vehicles, or any other benefits afforded to employees of the Customer as a result of this Agreement. Dominion acknowledges that all sums received hereunder are

personally reportable by it for income tax purposes as self-employment or business income and are reportable for self-employment tax.

**21.   Notices.**  All notices required or permitted to be given hereunder shall be given in writing and shall be deemed to have been given when personally delivered or by nationally recognized overnight carrier or mailed, certified or registered mail, return receipt requested, addressed to the intended recipient as follows:

>       If to Dominion:
>
>               Dominion Voting Systems, Inc.
>               Attn: Contracts Administrator
>               1201 18th St., Ste. 210
>               Denver, CO 80202
>
>       If to the Customer:
>
>               Pike County, PA
>               Attn: Nadeen Mazoni, Director of Elections
>               506 Broad Street
>               Milford, PA  18337

**22.   Entire Agreement.**  This Agreement and its Exhibits incorporated herein by reference constitute the entire agreement, understanding and representations between Dominion and the Customer, and supersede and replace all prior agreements, written or oral.  No modifications or representations to the Agreement shall be valid unless made in writing and signed by duly authorized representatives of both the Customer and Dominion and incorporated as an Addendum hereto.

**23.   Third-Party Beneficiary.**  No person shall be a third-party beneficiary pursuant to this Agreement. No obligation of Dominion or Customer may be enforced against Dominion or Customer, as applicable, by any person not a party to this Agreement.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

**DOMINION VOTING SYSTEMS, INC.**

_____
AUTHORIZED SIGNATURE

John Poulos
_____
PRINTED NAME

President & CEO
_____
TITLE

02/22/2019
_____
DATE

**PIKE COUNTY, PA**

_____
AUTHORIZED SIGNATURE

Matthew M. Osterberg
_____
PRINTED NAME

Chairman
_____
TITLE

3/6/19
_____
DATE

**EXHIBIT A**
VOTING SYSTEM AGREEMENT
BY AND BETWEEN DOMINION VOTING SYSTEMS
AND PIKES COUNTY, PA

**PRICING SUMMARY AND DELIVERABLES DESCRIPTION**

1. **Pricing Summary** - Prices of equipment, technical facilities, software, and other related services for voting, vote counting, and result processing. All pricing in U.S. Dollars.

| DESCRIPTION | QTY | UNIT PRICE | EXTENSION |
|---|---|---|---|
| **In-Person Voting Solution: Polling Location Hardware** | | | |
| **ImageCast Precinct (ICP):** Tabulator/Scanner, Internal Battery, Printer w/Paper roll, 2x 4G Flash Memory Cards, 2x I-Buttons | 25 | $ 3,900 | $ 97,500.00 |
| **ImageCast Precinct Collapsible Plastic Ballot Box** | 20 | $ 1,000 | $ 20,000.00 |
| **ImageCast X BMD (21 inch) Kit includes:** ICX software, 21" touchscreen tablet, cables, power cord, 1 8GB flash drive | 25 | $ 3,500 | $ 87,500.00 |
| **Universal Power Supply (UPS) for ICX BMD** | 20 | $ 495 | $  9,900.00 |
| **Audio Tactile Interface (ATI) Accessible Unit** | 20 | $ 375 | $  7,500.00 |
| **Mobile Ballot Printing (MBP) Kit Oki Data C331DN** includes: MBE software, printer, dell laptop, cables | 1 | $ 3,650 | $  3,650.00 |
| **Additional Items** | | | |
| **ICP Tech Key (Blue)** | 5 | $ 25 | $ 125.00 |
| **ICP Memory Cards 8GB** | 5 | $ 100 | $ 500.00 |
| **ICX Voter Cards** | 5 | $ 8 | $ 40.00 |
| **ICX Poll Worker SmartCard** | 5 | $ 8 | $ 40.00 |
| **ICX Technician SmartCard** | 5 | $ 8 | $ 40.00 |
| **ICX Prime BMD Bag Kit** | 25 | $ 120 | $ 3,000.00 |
| Sub-Total: | | | $ 229,795.00 |
| **Election Management Hardware** | | | |
| **Democracy Suite EMS Standard Server - Up to 7 clients** | 1 | $ 17,000 | $ 17,000.00 |
| **EMS Client Workstation Configuration Kit** | 1 | $ 2,500.00 | $ 2,500.00 |
| Sub-Total: | | | $ 19,500.00 |
| **Software** | | | |
| **Democracy Suite Light (EMS) – Initial License Fee** | 1 | $15,000 | $ 15,000.00 |
| **Automated Test Decks – Initial License Fee** | 1 | $ 4,500 | $ 4,500.00 |
| **Mobile Ballot Printing  – Initial License Fee** | 1 | $ 3,000 | $ 3,000.00 |
| Sub-Total: | | | $ 22,500.00 |
| **Implementation Services** | **Days** | | |
| **Project Management** | 5 | $ 2,500 | $ 12,500.00 |
| **Training** | 5 | $ 2,000 | $ 10,000.00 |
| Sub-Total: | 10 | | $ 22,500.00 |
| **Shipping** | | | |
| **Estimated Shipping** | TBD | $ | |
| **Discount** | | | $ (88,289.00) |
| **Purchase - Year 1 Total:** | | | **$ 206,006.00** |

Dominion Voting Systems Inc.
Exhibit A – Pike County, PA

Voting System Purchase Agreement
Page 1 of 8

## ANNUAL SUPPORT SERVICE

| Year 1 - 2019 | QTY | Unit Price | Extension |
|---|---|---|---|
| 3 Day Election On-site Support | 2 | $4,500.00 | $9,000.00 |
| Election Setup (Ballot Layout & Test Deck) Primary & General | 2 | $3,500.00 | $7,000.00 |
| Discount | | | ($924.00) |
| **Total** | | | **$15,076.00** |

| Year 2 - 2020 | QTY | | |
|---|---|---|---|
| 3 Day Election On-site Support | 2 | $4,500.00 | $9,000.00 |
| Election Setup (Ballot Layout & Test Deck) Primary & General | 2 | $3,500.00 | $7,000.00 |
| Discount | | | ($924.00) |
| **Total** | | | **$15,076.00** |

| Year 3 - 2021 | QTY | | |
|---|---|---|---|
| Election Setup (Ballot Layout & Test Deck) Primary & General | 2 | $3,500.00 | $7,000.00 |
| Discount | | | ($924.00) |
| **Total** | | | **$6,076.00** |

| Year 4 - 2022 | QTY | | |
|---|---|---|---|
| Election Setup (Ballot Layout & Test Deck) Primary & General | 2 | $3,500.00 | $7,000.00 |
| Discount | | | ($924.00) |
| **Total** | | | **$6,076.00** |

| Year 5 - 2023 | QTY | | |
|---|---|---|---|
| Election Setup (Ballot Layout & Test Deck) Primary & General | 2 | $3,500.00 | $7,000.00 |
| Discount | | | ($924.00) |
| **Total** | | | **$6,076.00** |

| Year 6 - 2024 | QTY | | |
|---|---|---|---|
| Election Setup (Ballot Layout & Test Deck) Primary & General | 2 | $3,500.00 | $7,000.00 |
| Discount | | | ($924.00) |
| **Total** | | | **$6,076.00** |

| Year 7 - 2025 | QTY | | |
|---|---|---|---|
| Election Setup (Ballot Layout & Test Deck) Primary & General | 2 | $3,500.00 | $7,000.00 |
| Discount | | | ($924.00) |
| **Total** | | | **$6,076.00** |

| Year 8 - 2026 | QTY | | |
|---|---|---|---|
| Election Setup (Ballot Layout & Test Deck) Primary & General | 2 | $3,500.00 | $7,000.00 |
| Discount | | | ($924.00) |
| **Total** | | | **$6,076.00** |

**ANNUAL SOFTWARE LICENSE**
(Beginning on the first anniversary of the Effective Date through the Agreement Term)

| Year 2 - 2020 | QTY | Unit Price | Extension |
|---|---|---|---|
| Democracy Suite Light & Adjudication Application License | 1 | $3,000.00 | $3,000.00 |
| Automated Test Deck Application License | 1 | $900.00 | $900.00 |
| Mobile Ballot Printing Application License | 1 | $600.00 | $600.00 |
| ICP Annual Firmware License | 25 | $228.00 | $5,700.00 |
| ICX-BMD (21") Annual Firmware License | 25 | $95.00 | $2,375.00 |
| Annual Total | | | $12,575.00 |

| Year 3 - 2021 | QTY | Unit Price | Extension |
|---|---|---|---|
| Democracy Suite Light & Adjudication Application License | 1 | $3,150.00 | $3,150.00 |
| Automated Test Deck Application License | 1 | $945.00 | $945.00 |
| Mobile Ballot Printing Application License | 1 | $630.00 | $630.00 |
| ICP Annual Firmware License | 25 | $239.40 | $5,985.00 |
| ICX-BMD (21") Annual Firmware License | 25 | $99.75 | $2,493.75 |
| Annual Total | | | $13,203.75 |

| Year 4 - 2022 | QTY | Unit Price | Extension |
|---|---|---|---|
| Democracy Suite Light & Adjudication Application License | 1 | $3,307.50 | $3,307.50 |
| Automated Test Deck Application License | 1 | $992.25 | $992.25 |
| Mobile Ballot Printing Application License | 1 | $661.50 | $661.50 |
| ICP Annual Firmware License | 25 | $251.37 | $6,284.25 |
| ICX-BMD (21") Annual Firmware License | 25 | $104.74 | $2,618.44 |
| Annual Total | | | $13,863.94 |

| Year 5 - 2023 | QTY | Unit Price | Extension |
|---|---|---|---|
| Democracy Suite Light & Adjudication Application License | 1 | $3,472.88 | $3,472.88 |
| Automated Test Deck Application License | 1 | $1,041.86 | $1,041.86 |
| Mobile Ballot Printing Application License | 1 | $694.58 | $694.58 |
| ICP Annual Firmware License | 25 | $263.94 | $6,598.46 |
| ICX-BMD (21") Annual Firmware License | 25 | $109.97 | $2,749.36 |
| Annual Total | | | $14,557.13 |

| Year 6 - 2024 | QTY | Unit Price | Extension |
|---|---|---|---|
| Democracy Suite Light & Adjudication Application License | 1 | $3,646.52 | $3,646.52 |
| Automated Test Deck Application License | 1 | $1,093.96 | $1,093.96 |
| Mobile Ballot Printing Application License | 1 | $729.30 | $729.30 |
| ICP Annual Firmware License | 25 | $277.14 | $6,928.39 |
| ICX-BMD (21") Annual Firmware License | 25 | $115.47 | $2,886.83 |
| Annual Total | | | $15,284.99 |

| Year 7 - 2025 | QTY | Unit Price | Extension |
|---|---|---|---|
| Democracy Suite Light & Adjudication Application License | 1 | $3,828.84 | $3,828.84 |
| Automated Test Deck Application License | 1 | $1,148.65 | $1,148.65 |
| Mobile Ballot Printing Application License | 1 | $765.77 | $765.77 |
| ICP Annual Firmware License | 25 | $290.99 | $7,274.80 |
| ICX-BMD (21") Annual Firmware License | 25 | $121.25 | $3,031.17 |
| Annual Total | | | $16,049.24 |

| Year 8 - 2026 | QTY | Unit Price | Extension |
|---|---|---|---|
| Democracy Suite Light & Adjudication Application License | 1 | $4,020.29 | $4,020.29 |
| Automated Test Deck Application License | 1 | $1,206.09 | $1,206.09 |
| Mobile Ballot Printing Application License | 1 | $804.06 | $804.06 |
| ICP Annual Firmware License | 25 | $305.54 | $7,638.55 |
| ICX-BMD (21") Annual Firmware License | 25 | $127.31 | $3,182.73 |
| Annual Total | | | $16,851.70 |

**ANNUAL HARDWARE WARRANTY**
(Beginning on the first anniversary of the Effective Date through the Agreement Term)

| Year 2 - 2020 | QTY | Unit Price | Extension |
|---|---|---|---|
| ImageCast Precinct (ICP) | 25 | $ 135.00 | $ 3,375.00 |
| ImageCast - X BMD (21") | 25 | $ 95.00 | $ 2,375.00 |
| Mobile Ballot Printing (MPB Kit - Oki C331DN) | 1 | $1,160.00 | $ 1,160.00 |
| Annual Total | | | $ 6,910.00 |

| Year 3 - 2021 | QTY | Unit Price | Extension |
|---|---|---|---|
| ImageCast Precinct (ICP) | 25 | $ 141.75 | $ 3,543.75 |
| ImageCast - X BMD (21") | 25 | $ 99.75 | $ 2,493.75 |
| Mobile Ballot Printing (MPB Kit - Oki C331DN) | 1 | $1,218.00 | $ 1,218.00 |
| Annual Total | | | $ 7,255.50 |

| Year 4 - 2022 | QTY | Unit Price | Extension |
|---|---|---|---|
| ImageCast Precinct (ICP) | 25 | $ 148.84 | $ 3,720.94 |
| ImageCast - X BMD (21") | 25 | $ 103.74 | $ 2,593.50 |
| Mobile Ballot Printing (MPB Kit - Oki C331DN) | 1 | $1,266.72 | $ 1,266.72 |
| Annual Total | | | $ 7,581.16 |

| Year 5 - 2023 | QTY | Unit Price | Extension |
|---|---|---|---|
| ImageCast Precinct (ICP) | 25 | $ 156.28 | $ 3,906.98 |
| ImageCast - X BMD (21") | 25 | $ 108.93 | $ 2,723.18 |
| Mobile Ballot Printing (MPB Kit - Oki C331DN) | 1 | $1,330.06 | $ 1,330.00 |
| Annual Total | | | $ 7,960.22 |

| Year 6 - 2024 | QTY | Unit Price | Extension |
|---|---|---|---|
| ImageCast Precinct (ICP) | 25 | $ 164.09 | $ 4,102.33 |
| ImageCast - X BMD (21") | 25 | $ 114.37 | $ 2,859.33 |
| Mobile Ballot Printing (MPB Kit - Oki C331DN) | 1 | $1,396.56 | $ 1,396.56 |
| Annual Total | | | $ 8,358.23 |

| Year 7 - 2025 | QTY | Unit Price | Extension |
|---|---|---|---|
| ImageCast Precinct (ICP) | 25 | $ 172.30 | $ 4,307.45 |
| ImageCast - X BMD (21") | 25 | $ 120.09 | $ 3,002.30 |
| Mobile Ballot Printing (MPB Kit - Oki C331DN) | 1 | $1,466.39 | $ 1,466.39 |
| Annual Total | | | $ 8,776.14 |

| Year 8 - 2026 | QTY | Unit Price | Extension |
|---|---|---|---|
| ImageCast Precinct (ICP) | 25 | $ 180.91 | $ 4,522.82 |
| ImageCast - X BMD (21") | 25 | $ 126.10 | $ 3,152.42 |
| Mobile Ballot Printing (MPB Kit - Oki C331DN) | 1 | $1,539.71 | $ 1,539.71 |
| Annual Total | | | $ 9,214.94 |

2. **Payment Schedule** - Dominion shall provide invoices to the Customer as described below. The Customer shall pay invoices in a timely manner and no later than thirty (30) calendar days from receipt of a Dominion invoice.  Payments specified in this Exhibit are exclusive of all excise, sale, use and other taxes imposed by any governmental authority, all of which taxes shall be reimbursed by the Customer.

| ID | Payment Date | Payment Amount |
|---|---|---|
| 1 | Agreement Signing | $ 56,239.00 |
| 2 | January 1, 2020 | $154,843.00 |
| 3 | Shipping | TBD |

3. **Detailed Deliverables Description**

   3.1  ***ImageCast® Precinct Scanner and Tabulator*** is a precinct optical scan ballot tabulator designed to scan marked paper ballots, interpret voter marks on the paper ballot, communicate these interpretations back to the voter and upon acceptance by the voter, deposit the ballots into the ballot box.  Each ImageCast® provided to the Customer shall consist of the following items:

      3.1.1  Two (2) optical imaging scanners for creating a duplex scanned image of each side of the ballot.  Ballots can be fed in all four (4) orientations.

      3.1.2  uClinux Operating System

      3.1.3  Two (2) 4GB flash memory cards. The cards are placed behind two securable doors (Administrator Door and Pollworker Door).

3.1.4   An integrated interactive electronic display in the form of an ultra-high contrast graphical LCD screen, with white background, 5.7" diagonal viewing area, and a built-in touch screen for administration purposes. The LCD display screen is located on the top right side of the machine.

3.1.5   An internal thermal printer and one (1) paper roll for generating reports.

3.1.6   Two (2) security keys (iButton) used with an integrated receptacle (physically attached to the top of the unit and electrically connected to the motherboard) used for a variety of verification and security tasks such control, data confidentiality and integrity functions.

3.1.7   A motorized paper feed mechanism for detecting and moving the ballot within the scanner.  Ballots used with the ImageCast® must be 8.5" wide by a variable length (11", 14", 17" and 22"). The paper feed mechanism is physically capable of moving the ballot forward into the machine, across image sensors, enabling complete image capture of both sides of the ballot.

3.1.8   Power supply module uses 120 Vac, 60 Hz, one phase power. It has a power consumption of 0.07 Amps at 120 Volts AC.

3.1.9   An internal battery which is rated to provide two (2) hours of normal use in the absence of AC power.

3.1.10  Collapsible plastic ballot box.

3.2   **ImageCast® Software.**   The Parties will enter into software licenses for the ImageCast software, substantially in the form of Exhibit B to this Agreement.  The Dominion software includes, without limitation:

3.2.1   AuditMark®. For each ballot that is scanned and accepted into the unit, a corresponding ballot image is created and stored for audit purposes. The image consists of two parts described below.

- The top portion of the image contains a scanned image of the ballot.

- The bottom portion consists of a machine-generated type-out showing each mark that the unit interpreted for that particular ballot. This is referred to as an AuditMark®.

3.3   **ImageCast® X ("ICX")**

3.3.1   Application:  ImageCast X BMD is a touchscreen in-person voting device and ballot marking device. Voting sessions are initiated on the tablet by either a smart card or the entry of a numeric code based on activation. The ballot is loaded directly onto the standalone device.  All voting activity is performed at the tablet, including accessible voting. Accessible voting interfaces connect to the tablet via an Audio Tactile Interface or ATI. For all modes of voting, after the voter reviews the ballot selections, a paper ballot is created for the voter from a printer in the voting booth.  The printed ballot contains a written summary of the voter's choices, as well as a 2D barcode which is read by Dominion's ImageCast Precinct or Central tabulator. No votes are stored on the ImageCast X-BMD unit. All votes can be tabulated and stored on both the ImageCast Central and Precinct Tabulators.

3.3.2   <u>Components</u>: ImageCast X BMD is composed of a 21" Avalue touchscreen, Android OS 4.4.4, DC 19V input, BMD laser printer, 6' cable. 5 smart cards, and 8GB flash drive.

3.4   ***Democracy Suite Light Software*** consists of the following components:

3.4.1   <u>Election File and iButton Creation</u> Customer is authorized to create Election Files and iButtons from EED to load on the ICX and ICP units.

3.4.2   <u>Results, Tally and Reporting (RTR)</u> Client Application is the application used for the tally, reporting and publishing of election results.

3.5   ***Mobile Ballot Printing*** is an application used to search, preview and print ballots via a local printer device. The application makes use of ballot information and PDFs produced by the Election Event Designer application and information provided through the customer voter registration system.

3.6   ***Implementation Services and Training.*** Dominion will provide the following training as described herein.

3.6.1   <u>Project Management Support.</u>  Dominion will provide project management support to oversee the general operations of the project through the Agreement Term.  The project manager shall be responsible for arranging all meetings, visits and consultations between the parties and for all administrative matters such as invoices, payments and amendments.  The Parties shall develop and finalize a project implementation plan including a training and delivery schedule.  The Parties agree that during the course of the implementation, changes to the project schedule may be required.  Any changes to the project schedule must be mutually agreed to by both Parties and such agreement shall not be unreasonably withheld.

3.6.2   <u>ImageCast® X</u> – This training introduces the ImageCast® X system with an emphasis on the operation of the hardware. Students can expect to learn general operations, logic and accuracy testing, Election Day setup and operation, and troubleshooting.

3.6.3   <u>ImageCast® ICP</u> – This training introduces the ImageCast® ICP with an emphasis on the operation of the hardware. Students can expect to learn general operations, logic and accuracy testing, ballot scanning operation, and troubleshooting.

3.6.4   <u>EMS Server Installation, Configuration & Testing.</u>  Dominion will provide a minimum total of one (1) day of direct onsite support for EMS Server installation, configuration & testing.

3.6.5   <u>Democracy Suite® EMS System</u>– This training covers the restoring election project backups, creating ICX, ICP and ICXVA files, tally and reporting.

3.6.6   <u>System Acceptance Testing Support.</u>  Dominion will provide direct onsite training and support during the System Acceptance Testing period

3.6.7 <u>Pollworker Train the Trainer</u> – This provides training to the Customer staff on operations of a polling location including the ImageCast® X, ICX Card activation, testing and troubleshooting.

3.6.8 <u>On-Site Election Day Support.</u> Dominion will provide three (3) days (inclusive of travel) of direct onsite election support for each election defined in section 1 of this Exhibit A.

3.7 **Election Ballot Definition Setup.** Dominion shall provide election setup services and support for the election database creation and ballot each election defined in section 1 of this Exhibit A. Ballot definition services will be provided in English only and will include the following:  Democracy Suite Election project setup, provide the Mail Ballot/Absentee PDF artwork, verification and proofing for each Election, provide audio setup for audio voting using a synthesizer.  Any outside recording charges would be at the Customer's expense.

3.8 **Travel and Expenses included.**  All costs of Dominion transportation, lodging and meal expenses are included during the Agreement Term.

3.9 **Ongoing telephone support**. Telephone support shall be available for Customers during the Term of the Agreement at no additional costs.

3.10 **Other Services, Consumables or Equipment.**  Any other services, consumables or equipment not specifically identified in this Agreement are available for purchase by the Customer at the then current Dominion list price.

3.11 **Disposal of Present Voting Systems.** Dominion and County agree that Dominion shall dispose of the present voting machines possessed by Pike County. Dominion and County agree that Dominion, once in possession of said machines, shall remove all information concerning Pike County and any other information that would be specific to Pike County. Further, as part of the consideration of Pike County receiving a discounted price for the purchase of the new voting machines, Dominion agrees that said old machines shall be destroyed or used as parts for machines that are still in existence in other counties. If the machines are destroyed, the County will be informed by Dominion and provided the Serial Number for said machine(s)."

**EXHIBIT B**

**SOFTWARE LICENSE TERMS AND CONDITIONS**

This Exhibit B is part of the Agreement between Dominion and Customer to which it is attached.

**1.      Definitions.** Capitalized terms used herein have the meaning given in the Agreement unless otherwise defined herein.

1.1.    "Agreement" means the agreement between the Parties for the use of the licensed Software to which this Exhibit B is attached and incorporated into.

1.2.    "Licensee" means Customer, as the term is defined in the Agreement.

1.3.    "Licensor" means Dominion Voting Systems, Inc.

1.4.    "Software" means Dominion Software, as the term is defined in the Agreement.

1.5.    "Specifications" means descriptions and data regarding the features, functions and performance of the Software, as set forth in user manuals or other applicable documentation provided by Licensor.

1.6.    "Third-Party Products" means any software or hardware obtained from third-party manufacturers or distributers and provided by Licensor hereunder.

**2.      License Terms.**

2.1.    License Limitations.   Licensee's use of the Software pursuant to the License granted in the Agreement is subject to the terms herein. Licensee may only use the Software for its own internal business purposes and conducting elections and solely in conjunction with the EMS Hardware.  The License shall only be effective during the Term and cannot be transferred or sublicensed.

2.2.    Print Copyright License.   Subject to the Print Copyright License terms and conditions as defined in Schedule A attached hereto, Licensor grants to Licensee a non-exclusive, non-transferable print copyright license as defined in Schedule A.

2.3.    Third-Party Products. When applicable, Licensor hereby sublicenses any software that constitutes or is contained in Third-Party Products, in object code form only, to Licensee for use during the Term.

2.4.    No Other Licenses. Other than as expressly set forth herein, (a) Licensor grants no licenses, expressly or by implication, and (b) Licensor's entering into the Agreement will not be deemed to license or assign any intellectual property rights of Licensor to Licensee or any third party. Licensee agrees not to use the Software as a service bureau for elections outside the Licensee's jurisdiction and agrees not to reverse engineer or otherwise attempt to derive the source code of the Software. The Licensee shall have no power to transfer or grant sub-licenses for the Software.  Any use of all or any portion of the Software not expressly permitted is strictly prohibited.

2.5.    Intellectual Property Infringement Indemnification.   If a third party claims that the Software or System infringes any United States patent, copyright, trade secret or similar

intellectual property right, Dominion shall defend Licensee against such claim at Dominion's expense and pay all damages that a court finally awards against Licensee. If such a claim is made or appears possible, Dominion shall, within sixty (60) days of such claim, and at its option: (a) secure for Licensee the right to continue to use the infringing portion of the Software or System; or (b) modify or replace the Software and System so that it is non-infringing but retains equivalent functionality.  If neither of the foregoing options is reasonably available, Dominion shall require Licensee to return the Software or System, and Dominion shall refund Licensee amounts calculated pursuant to the Software License fee, on a pro-rate basis. The foregoing notwithstanding, Dominion shall have no obligation to indemnify Licensee for any infringement claim based on Licensee's modification or misuse of the Software, if the claim would have been avoided had the Software not been modified or misused.

**3.     Payment**.  In consideration of the grant of the license, the Licensee shall pay the license fees set forth in the Agreement and Exhibit A of the Agreement.

**4.     Upgrades and Certification**.  During the Term, Licensor may provide upgrades to Licensee under the following terms and conditions.

4.1.    Upgrades.  In the event that Licensor, at its sole discretion, certifies a Software upgrade under the applicable laws and regulations of the Customer's State, Licensor shall make the certified Software upgrade available to the Licensee at no additional cost.

4.2.    Certification Requirement.  Notwithstanding any other terms of this Agreement, Licensor shall not provide, and shall not be obligated to provide under this Agreement any upgrade, enhancement or other software update that has not been certified under the applicable provisions of the election laws and regulations of the Customer's State.

**5.     Prohibited Acts**.  The Licensee shall not, without the prior written permission of Licensor:

5.1.    Transfer or copy onto any other storage device or hardware or otherwise copy the Software in whole or in part except for purposes of system backup;

5.2.    Reverse engineer, disassemble, decompile, decipher or analyze the Software in whole or in part;

5.3.    Alter or modify the Software in any way or prepare any derivative works of the Software or any part of parts of the Software;

5.4.    Alter, remove or obstruct any copyright or proprietary notices from the Software, or fail to reproduce the same on any lawful copies of the Software.

**6.     Return of Software.** Upon termination or expiration of this Agreement, Licensee shall forthwith return to Licensor all Software in its possession or control, or destroy all such Software from any electronic media, and certify in writing to Licensor that it has been destroyed.

**7.**     **Warranties**.  The following warranties will apply to all Software during the Term.

7.1.     <u>Software Warranty Terms</u>. Licensor warrants that the Software will function substantially in accordance with the Specifications during the Term.  The Licensor also warrants that the Software will comply with the voting system certification requirements and laws of the Customer's State (collectively the "Requirements") in effect as of the date the Software is certified by the certification authority of the Customer's State. This provision applies to the initially installed Software as well as any subsequent upgrades pursuant to Section 4 herein.  However, the Licensor will not be required to make modifications to the Software or System as a result of changes in the Requirements. The foregoing warranty will be void in the event of the Software (i) having been modified by any party other than Licensor or (ii) having been used by the Licensee for purposes other than those for which the Software was designed by Licensor.  If Licensor establishes that a failure of the foregoing warranty that is reported by Licensee is not covered by the foregoing warranty, the Licensee shall be responsible for the costs of Licensor's investigative and remedial work at Licensor's then current rates.

7.2.     <u>Corrections</u>. If the Licensee believes that the Software is not functioning substantially in accordance with the Specifications or Requirements, the Licensee shall provide Licensor with written notice of the material failure within thirty (30) days of discovering the material failure, provided that the Licensee can reproduce the material failure to Licensor.  The Licensor shall correct the deficiencies, at no additional cost to the Licensee and incorporate such corrections into the next version certified by the Customer's State.

7.3     <u>Third-Party Products</u>. The warranties herein do not apply to any Third-Party Products.  However, to the extent permitted by the manufacturers of Third-Party Products, Licensor shall pass through to Licensee all warranties such manufacturers make to Licensor regarding the operation of such Third-Party Products.

7.4.     <u>NO OTHER WARRANTIES.</u> EXCEPT AS SET FORTH IN THE AGREEMENT AND HEREIN, LICENSOR DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER WRITTEN, ORAL, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTY BASED ON A COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

**SCHEDULE A**

**PRINT COPYRIGHT LICENSE TERMS AND CONDITIONS**

1.    **Definitions.** For the purposes of this Agreement, the following are defined terms:

    1.1.    "Derivative Works" means any work that is based upon or derived from the Licensor's voting systems' ballots, including without limitation, sample ballots and voting booklets.

    1.2.    "Voting Systems' Ballots" means any ballot created for use with any voting system owned or licensed by the Licensor.

2.    **Print Copyright License and Use.**

    2.1.    <u>Copyright License Grant</u>. Licensor grants to the Licensee a non-exclusive, non-transferable copyright license to print, reproduce, distribute or otherwise copy the Licensor's Voting Systems' Ballots and any Derivative Works (collectively the "Materials") pursuant to the terms and conditions of this Schedule A.

    2.2.    <u>Copyright License Use.</u> Other than as expressly set forth herein, (a) Licensor grants no other licenses, expressly or by implication, and (b) Licensor's entering into and performing the Agreement will not be deemed to license or assign any intellectual property rights of Licensor to Licensee or any third party, (c) the copyright license granted herein cannot be transferred or sublicensed and the Voting Systems' Ballots or Derivative Works cannot be reproduced by any third party without the prior written consent of the Licensor, including without limitation:

        (i)    any commercial or non-commercial printer
        (ii)    any third party vendor using ballot on demand system.

    2.3.    <u>Rights and Interests</u>.  All right, title and interest in the Material, including without limitation, any copyright, shall remain with the Licensor.

3.    **No Copyright Warranties.**  EXCEPT AS SET FORTH HEREIN, LICENSOR DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, WHETHER WRITTEN, ORAL, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTY BASED ON A COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.