**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| US DOMINION, INC., et al. | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 1:21-cv-00445-CJN |
| | ) | Judge Carl J. Nichols |
| v. | ) | |
| | ) | |
| MY PILLOW, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

**Defendants' Memorandum in Opposition to Plaintiff's Motion for Protective Order
Regarding Third Party Subpoenas**

**LEWIN & LEWIN, LLP**
Nathan Lewin (D.C. Bar No. 38299)
888 17th Street NW
Fourth Floor
Washington, DC 20006
Telephone: (202) 828-1000
nat@lewinlewin.com

*Counsel for Defendants*

Alan Dershowitz (MA Bar No. 121200)
1575 Massachusetts Avenue
Cambridge, MA 02138

*Of Counsel for Defendants*

**PARKER DANIELS KIBORT LLC**
Andrew D. Parker (D.C. Bar No. 63279)
Joseph A. Pull (D.C. Bar No. 982468)
888 Colwell Building
123 N. Third Street
Minneapolis, MN 55401
Telephone: (612) 355-4100
parker@parkerdk.com
pull@parkerdk.com

*Counsel for Defendants*

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

I.     Introduction .......................................................................................................1

II.    Factual and Procedural Background .............................................................3

III.   Argument ...........................................................................................................8

    A.  Dominion Lacks Standing to Challenge the Subpoenas Because It Largely Fails to Show a Proprietary Interest in the Materials Sought ..........................9

        1.  The Exemplar Contract Provided by Dominion at Most Gives Dominion Limited Standing..................................................................................9

        2.  Dominion Provides No Evidence of Its Purported Standing Concerning Most Counties...................................................................................10

    B.  The Subpoenas Seek Information That Is Discoverable ...................................12

        1.  Dominion Fails to Show Evidence of a Trade Secret Interest ...................12

        2.  Confidential Information is Discoverable....................................................13

        3.  The Information Sought is Discoverable Because it Relates to the Parties' Claims and Defenses ...............................................................................16

        4.  The Remaining Rule 26(b)(1) Factors Favor Permitting the Subpoenas .18

IV.   Conclusion .......................................................................................................24

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. FBI*, 186 F.R.D. 71, 75 (D.D.C. 1998) .................................................... 12

*Armstrong v. Thompson*, 80 A.3d 177, 183-84 (D.C. App. 2013)…………………………………..1

*Cal. Water Serv. Co. v. Dow Chem. Co.*, no. CIV 473093, 2009 Cal. Super. LEXIS 5270……..15

*Cienfuegos v. Office of the Architect of the Capitol*, 34 F. Supp. 3d 1, 3 (D.D.C. 2014)............ 14

*Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 185 F. Supp. 3d 26 (D.D.C. 2016)……2

*Covad Communs. v. Revonet, Inc.*, 258 F.R.D. 5,  9 (D.D.C. 2009) .................................... 20, 22

*Fenstermacher v. Moreno*, 2010 U.S. Dist. LEXIS 133741, 2010 WL 5071042........................ 19

*FTC v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142, 156 (D.C. Cir. 2015) ..................... 24

*FTC v. Sysco Corp.*, 83 F. Supp. 3d 271, 274 (D.D.C. 2015)........................................... 13, 14, 16

*G&E Real Estate, Inc. v. Avison Young-Washington, D.C., LLC*, 168 F. Supp. 3d 147 (D.D.C.
    2016)........................................................................................................................... 13

*Gilmore v. Jones*, 339 F.R.D. 111 (W.D. Va. 2021)........................................................ 18

*Hoh Co. v. Travelers Indem. Co.* 1991 U.S. Dist. LEXIS 15403 ................................. 21

*Huthnance v. Dist. of Columbia*, 255 F.R.D. 285 (D.D.C. 2008 ..................................... 13

*McArdle v. City of Ocala*, 463 F. Supp. 3d 1288 (M.D. Fla. 2020)................................. 13

*Parsi v. Daioleslam*, 890 F. Supp. 2d 77 (D.D.C. 2012) .................................................. 1

*Premier Election Solutions, Inc. v. Systest Labs, Inc.*, 2009 U.S. Dist. LEXIS 94193 .......... 15, 16

*Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984)................................................. 16

*Sheindlin v. Brady*, Civ. No. 21-CV-01124, 2021 WL 2075483................................. 18

*Smith v. Clinton*, 253 F. Supp. 3d 222, 239 (D.D.C. 2017) ................................................ 1

*Sourgoutsis v. United States Capitol Police*, 323 F.R.D. 100, 105 (D.D.C. 2017) ..................... 11

*St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)........................................................ 17

*Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 249 F. Supp. 3d 516 (D.D.C.
    2017)....…………………………………………………………………………..15

*Suffolk Cty. Water Auth. v. Dow Chem. Co.*, 2022 U.S. Dist. LEXIS 64111, )........................... 15

*United States CFTC v. Whitney*, 441 F. Supp. 2d 61, 71 (D.D.C. 2006)................................... 12

*United States v. All Assets Held at Bank Julius Baer & Co.*, 276 F.R.D. 396 (D.D.C. 2011)...... 21

*United States v. Jae Shik Kim*, 103 F. Supp. 3d 32, 40 (D.D.C. 2015)....................................... 20

*W. Coast Prods. v. Doe*, 275 F.R.D. 9, 16 (D.D.C. 2011) ........................................................ 9, 19

*Wainwright v. Wash. Meto. Area Transit Auth.*, 903 F. Supp. 133, 135 (D.D.C. 1995) ............. 14

*Washington v. Thurgood Marshall Acad.*, 230 F.R.D. 18, 21 (D.D.C. 2005) ........................ 9, 12

*Williams Constr. Co. v. Gorham LLC Co.*, 2018 Tex. Dist. LEXIS 15453................................. 15

**Statutes**

52 U.S.C. § 20701 ............................................................................................................... 23

**Rules**

Fed. R. Civ. P. 26(b)(1)............................................................................................ 14, 19, 21

**I.**

**Introduction**

Plaintiffs ("Dominon") allege in their Complaint that Defendant Michael Lindell made defamatory statements about votes in the 2020 election being changed in Dominion's computerized election equipment, through hacking of this equipment by foreign countries and through the programming of the software on the machines. For this alleged defamation, Dominion seeks compensatory and punitive damages of more than $1.3 billion, and other relief, from Mr. Lindell and his company, My Pillow, Inc. (collectively, "Defendants"). Compl. ¶¶ 164-178 [ECF No. 1].

By alleging Mr. Lindell's statements were false and defamatory, Dominion placed at issue the truth of his statements about Dominion's products and assumed the burden of proving Mr. Lindell's statements were false. *See Smith v. Clinton*, 253 F. Supp. 3d 222, 239 (D.D.C. 2017); *Farah v. Esquire Magazine*, 736 F.R.D. 528, 533 (D.C. Cir. 2013) (claim for defamation under District of Columbia law requires plaintiff to allege "that he was the subject of a false and defamatory statement"); *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 81 (D.D.C. 2012) (where the plaintiff is a public figure, the plaintiff must surpass a "daunting" standard by proving by clear and convincing evidence that the statements were made with actual malice).

To defend themselves, Defendants are allowed in response to collect information to show whether Mr. Lindell's statements were true or false. In this pursuit, Defendants issued subpoenas to a sample of counties (and one state secretary of state's office) across the nation that used Dominion voting machines and software during the 2020 election (the "Subpoenas"). The Subpoenas asked the recipients to produce records of the vote counting in the 2020 election including—at issue here—electronically stored information showing how the Dominion

machines were programmed, how they functioned, and what changes were made to them. This information relates to the truth or falsity of the statements Dominion attributes to Defendants. Dominion "designs, manufactures, sells, licenses, and provides ongoing solutions for voting systems" and sells services for "result processing" and "[m]obile ballot printing." Decl. of John Poulos Ex. A, at 1 & Ex. A, at 1, 3 [ECF No. 145-3] ("Poulos Decl."). Dominion promises that its vote-counting software and firmware "will function substantially in accordance" with what these products are intended to do. *Id.* Ex. B, at § 7.1.

There is a strong factual record supporting the relevance and need for this information from the recipients of the Subpoenas. Since the November 2020 election forensic cybersecurity experts, the Election Assistance Commission ("EAC"), and the Cybersecurity and Infrastructure Security Agency ("CISA") have publicly disclosed findings of, among other things: (i) unauthorized software on Dominion voting equipment; (ii) foreign IP addresses on at least two counties' election management systems ("EMS"); (iii) "erroneous code" on one county's Dominion electronic voting equipment that caused ballots not to be counted, without any subsequent determination by the EAC concerning how the code got there; and (iv) critical security vulnerabilities in Dominion voting systems defined by CISA in a June 3, 2022 advisory which could be exploited to "install malicious code" and "spread malicious code."

The recent arrest of the CEO of Konnech, Inc., a company providing election equipment to many counties throughout the United States, further underscores the importance of Defendants' Subpoenas. The Konnech CEO is accused by Los Angeles prosecutors of storing personal information of thousands of U.S. election workers on servers located in China, contrary to Konnech's legal obligations and its own representations. Parker Decl. ¶ 2 & Ex. A. It is

possible that Konnech's election equipment or software, if compromised, could provide a vector into a county's election management system to accomplish unauthorized changes.

The information sought by the Subpoenas is relevant to determining whether Dominion election equipment was hacked or otherwise programmed to misreport vote totals during the 2020 election, and to the issue of whether such an occurrence is "inherently improbable" or not.

In response to the Subpoenas, Dominion has filed the instant Motion seeking to ban Defendants from obtaining, from the counties who received the Subpoenas, copies of Dominion's software and related data from the 2020 election. Because the information sought is directly related to Dominion's claims and Defendants' defenses, the Motion should be denied. In the alternative, at most, the Court should enter a protective order that permits the requested discovery but limits who is permitted to review any actually confidential materials produced in response to the Subpoenas.

## II.
## Factual and Procedural Background

The Complaint claims Dominion was harmed because Defendants made statements of fact that were "false and defamatory." Compl. ¶ 165. Dominion alleges, and has voluntarily assumed the burden of proving, the following statements were false:

- Operatives from foreign countries, including China, hacked into Dominion's voting machines and either flipped votes from Mr. Trump to Mr. Biden or miscounted the votes to begin with. Compl. ¶ 165(x), (y), (z).

- Dominion's voting machines stole "millions of votes." Compl. ¶ 165(f), (h), (y).

- Dominion's voting machines calculated more than one vote for Joe Biden and less than one vote for Donald Trump for each vote cast, and the votes cast in the election "broke the algorithms" in the Dominion machines. Compl. ¶ 165(a), (b), (c), (e), (h), (i), (j) (k), (*l*), (m), (n), (o), (q), (w), (z), (aa).

- Dominion enabled or committed voter fraud and other crimes. Compl. ¶ 165(g), (h), (i), (j), (k), (*l*), (m), (n), (o), (p), (q), (s), (v), (y), (z).

In discovery, Defendants have pursued, in two ways material to the instant Motion, evidence that relates to Dominion's claims. *First*, Defendants served requests for production upon Dominion on February 11, 2022 (by Mr. Lindell), March 4, 2022 (by Mr. Lindell), March 22, 2022 (by My Pillow, Inc.), and August 5, 2022 (by My Pillow, Inc.). Parker Decl. ¶ 2. To date, Dominion has produced in response to these requests zero pages and zero documents, saying in response to some requests that that it will produce documents when a protective order is in place,[1] and simply objecting to other requests. Parker Decl. ¶ 6.

*Second*, Defendants noticed and issued the Subpoenas. Dominion Mot. for Protective Order Ex. 1 [ECF No. 145-2]. The Subpoenas were issued by Defendants on September 1, 2022, and served shortly thereafter. The Subpoenas each had a compliance date of September 30, 2022. *Id.*

Even without Defendants having the benefit of *any* document production from Dominion to inform their third-party discovery efforts, ample information in the public record supports the conclusion that discovery of county computerized election equipment supplied by Dominion and used in the 2020 election will provide evidence to support the truth and/or inherent probability of the statements put at issue in Dominion's Complaint.

- On June 3, 2022, the federal government's Cybersecurity & Infrastructure Security Agency (CISA) issued ICS Advisory 22-154-01 on "Dominion Voting Systems

---

[1] Dominion did attach a contract with one county to the declaration of its CEO filed in connection with the instant Motion. Poulos Decl. ¶ 4 & Ex. A [ECF No. 145-3]. Because the document was not filed under seal and is available to anyone in the public, Dominion's claim that it needs a protective order before producing *any* documents is dubious. In any event, the Court is currently considering the scope of a protective order governing this discovery. Letter from Andrew Parker to Court (Aug. 26, 2022) [ECF No. 144].

Democracy Suite ImageCast X" which identified nine separate security vulnerabilities that affected at least three versions of the ImageCast X voting equipment distributed by Dominion. The vulnerabilities were ways in which an "attacker" could "install malicious code," "disguise malicious applications," "spread malicious code," "perform privileged actions," or "print an arbitrary number of ballots without authorization." *See* CISA ICSA-22-153-01, available at https://www.cisa.gov/uscert/ics/advisories/icsa-22-154-01; Parker Decl. ¶ 7 & Ex. D.

- On March 31, 2022, the federal government's Election Assistance Commission (EAC) published a "Report of Investigation" concerning the "Dominion Voting Systems D-Suite 5.5-B" system in Williamson County, Tennessee. *See* https://www.eac.gov/sites/default/files/TestingCertification/EAC_Report_of_Investigation_Dominion_Dsuite_5.5_B.pdf; Parker Decl. ¶ 8 & Ex. E. The report described an "anomaly" observed during Williamson County's 2021 election, in which "Close poll reports from 7 of the 18 ICP tabulators used during the election did not match the number of ballots scanned." *Id*. at 2. Subsequent investigation "confirmed and reproduced" the anomaly, "though the root cause of the anomaly was not determined." *Id*. at 3. Later, an analysis submitted to the EAC by Dominion itself stated that "erroneous code is present in the EAC certified D-Suite 5.5-B and D-Suite 5.5-C systems" that caused ballots to be erroneously misread as provisional and not included in close poll report totals. *Id*. at 4.

- A state court complaint by Fulton County, Pennsylvania, dated September 20, 2022, asserts claims against Dominion for breach of contract related to a Dominion electronic voting system. Parker Decl. ¶ 9 & Ex. F. The Fulton County Complaint alleges that Fulton County commissioned Wake TSI, an information technology vendor, to review its

Dominion election system and Wake TSI found "errors in the ballot scanning," "non-certified database tools," and "changes made to the EMS three weeks before the 2020 election." *Id*. ¶¶ 56-57. The Fulton County Complaint further alleges that an analysis of its Dominion system in September 2022 found an unauthorized script installed on the system *after* the certification date of the system, which could "exploit and create any number of vulnerabilities including, external access to the system." *Id*. ¶¶ 70-71. The Fulton County Complaint further alleges that log files on one of the voting system computerized devices showed an improper remote connection to an IP address in Quebec, Canada. *Id*. ¶¶ 73-74.

- A May 2022 primary election in Dekalb County, Georgia returned results in which one candidate, Michelle Long Spears, received zero votes in several precincts, including her home precinct where she and her husband had voted for Long Spears. Neil Vigdor, *A Candidate in Georgia Who Appeared to Get Few Election Day Votes Was Actually in First Place*, N.Y. Times, June 6, 2022, available at https://www.nytimes.com/2022/06/06/us/politics/michelle-long-spears-georgia.html; Parker Decl. ¶ 10 & Ex. G. Follow-up hand counting showed Long Spears had received the most votes in the election, rather than placing third as initially reported, and she had been "shortchanged by 3,792 votes." *Id*. The county attributed the problems to "a computer programming error." *Id*. Dominion provides electronic voting systems statewide in Georgia. *See* https://www.dominionvoting.com/about/#footprint; Parker Decl. ¶ 11 & Ex. H.

- During the 2020 election in Gwinnett County, Georgia, 1,642 ballots were initially not counted "even after Dominion made real time software changes [to the Dominion electronic voting system] and the Gwinnett Board of Elections certified the result,"

according to a declaration filed by an election observer in a lawsuit originally filed in 2017, in the federal district court in the Northern District of Georgia.  Supp. Decl. of Marylin Marks ¶¶ 14-15, *Curling v. Raffensperger*, No. 1:17-cv-2989-AT (N.D. Ga. Feb. 12, 2021), ECF 1071-2; Parker Decl. ¶ 12 & Ex. I. The observer concluded that "the vote count discrepancies created by the batch management software problem were significant enough to change the result of the presidential election" and a "hand count audit . . . [instead] showed President Biden with [the] highest number of votes." *Id.* ¶ 19.

- An IT security professional who reviewed a Dominion voting system from a county in Michigan after the 2020 election found data indicating internet communications between that computer and IP addresses in Taiwan and Germany. Cotton Aff. ¶ 9, *Bailey v. Antrim County*, Case No. 20-9238-CZ (Circuit Ct. for Antrim County Michigan April 8, 2021), Parker Decl. ¶ 13 & Ex. J ¶ 9.

- The CEO of Konnech, Inc. has been arrested and accused by Los Angeles prosecutors of storing personal information of thousands of U.S. election workers on servers located in China, contrary to Konnech's legal obligations and its own representations. Parker Decl. ¶ 2 & Ex. A. Konnech provides election equipment to many counties throughout the United States. *Id.*

These publicly available data provide ample reason for Defendants to expect that discovery of Dominion election equipment used in the 2020 election will yield evidence relevant to the truth and/or inherent probability of the statements placed at issue by the Complaint in this matter.

Each Subpoena recipient either used or is reasonably believed to have used Dominion's election software or equipment during the 2020 election.  Relevant to this Motion, the Subpoenas

directed the recipients to produce forensic images of hard drives that were attached to or affiliated with electronic equipment used to facilitate the counting, tabulation, and reporting of results in the 2020 election; certain peripheral equipment that was inserted into or removed from such devices; and information about three other categories of devices manufactured by Dominion that the identified counties used.  The Subpoenas also required the production of slog.txt and .dvd files generated from tabulators and ballot marketing devices. Dominion Mot. Ex. A [ECF No. 145-2]. Dominion has moved the Court to completely bar this discovery.[2] Mem. in Support of Mot. for Protective Order ("Mem."), at 15-16 ¶¶ 1-2 [ECF No. 145-1].

### III.
### Argument

Dominion's Complaint stated, "Facts matter. The truth matters." Compl. ¶ 162. The Subpoenas accordingly seek to uncover facts and truth. Yet Dominion now asks the Court to prevent discovery of the very thing Dominion claims to seek, requesting a Protective Order completely barring discovery of the contents of Dominion election equipment and software used during the 2020 election.

None of Dominion's arguments provide a basis for the Court to enter such an order. At most, Dominion's arguments might justify production of documents and other materials responsive to the Subpoenas in such a way that they are not publicly disclosed, but Dominion's double standard of trumpeting truth while obstructing inquiry into the facts should not be endorsed by the Court through entry of the requested protective order.

---

[2]  Dominion does not seek a protective order covering any other aspect of the Subpoenas. Dominion Mem. In Support of Mot. for Protective Order, at 15-16 ¶¶ 1-2 [ECF No. 145-1].

**A. Dominion Lacks Standing to Challenge the Subpoenas Because It Largely Fails to Show a Proprietary Interest in the Materials Sought.**

A party to a dispute generally lacks standing to challenge subpoenas sent to third parties. *See Washington v. Thurgood Marshall Acad.*, 230 F.R.D. 18, 21 (D.D.C. 2005) (challenges to a subpoena "should generally be made by the person from whom the documents or things are requested); *see also Goldstein v. FDIC*, 484 B.R. 82, 85-86 (D.D.C. 2013). Because Dominion is not a recipient of any of the Subpoenas, Dominion may only challenge them if it plausibly asserts a proprietary interest in the information requested, a personal right to the information requested, or a claim that the information requested is privileged. *See W. Coast Prods. v. Doe*, 275 F.R.D. 9, 16 (D.D.C. 2011). It fails to substantiate such a proprietary interest.

**1. The Exemplar Contract Provided by Dominion at Most Gives Dominion Limited Standing.**

Dominion asserts that that Subpoenas seek information that is "confidential and proprietary." Mem. at 7. Its sole support for this claim is a document that Dominion's CEO says in his declaration is a "typical type of contract Dominion enters into with its Customers." Poulos Decl. ¶ 4 & Ex. A (the "Exemplar Contract").

The Exemplar Contract generally describes the "Dominion Software, Dominion Hardware and EMS Hardware" provided by Dominion to Pike County, Pennsylvania for use in its elections (the "System"). Poulos Decl. Ex. A. The Exemplar Contract states that "[t]itle to the System, or any portion thereof, excluding software and firmware, will pass to [the county] upon delivery." *Id*. § 6.1. "Software, including firmware, is licensed [and] not sold." *Id*. § 6.2. The Exemplar Contract provides, then, that anything that is not "software" or "firmware" does not belong to Dominion. Dominion lacks standing to challenge any part of the Subpoenas that do not request the production of "software" or "firmware" as defined in the Exemplar Contract.

Further, Dominion's Exemplar Contract requires that purportedly confidential trade secret information be conspicuously marked as "Confidential." Poulos Decl. Ex. A §§ 2.2, 13.3. Other than conclusory allegations, Dominion has made no effort to demonstrate that the information sought by the Subpoenas has been properly designated by Dominion as "Confidential" under any contract.

### 2. Dominion Provides No Evidence of Its Purported Standing Concerning Most Counties.

Even if Dominion's contract with Pike County, Pennsylvania showed that Dominion holds a proprietary interest in Pike County information, Dominion would lack standing to challenge the Subpoenas issued to other counties. Dominion has provided no evidence concerning the other counties.[3] It is true that the declaration from Dominion's CEO asserts that the Exemplar Contract is "typical" of all of Dominion's contracts. Poulos Decl. ¶ 4. However, the declaration notably does **not** say that the same contractual commitments exist between Dominion and the other counties. *See generally* Poulos Decl. Nor does the declaration say that Dominion has the same confidentiality and proprietary rights with respect each of the other counties. *Id*. It appears that Dominion may not say these things because it cannot say them. One of the counties that produced documents in response to a Subpoena, El Paso County, Colorado, produced to Defendants an agreement with Dominion. Even a cursory comparison of that contract with Dominion's Pike County, Pennsylvania contract shows the two are different. *See* Poulos Decl. ¶ 4 & Ex. A; Parker Decl. ¶14 & Ex. K.[4] It cannot reasonably be concluded that Poulos's statement that the Pike County, Pennsylvania contract is "typical" means that the Pike

---

[3] As noted below, Defendants have received copies of Dominion contracts from two other counties in communications from those counties.
[4] Monroe County, Florida, attached its contract with Dominion to a motion to quash the Subpoena it received. Parker Decl. ¶ 15 & Ex. L. That contract is different again from the other two.

County, Pennsylvania contract fairly represents the confidentiality and proprietary terms – if any – in Dominion's contracts with the other counties that received Subpoenas.

There is no evidence upon which the Court can conclude that Dominion possesses a proprietary interest in the subpoenaed information that gives Dominion standing to object to the Subpoenas. Notably, counsel for Defendants repeatedly asked Dominion to produce copies of the contracts with its customers upon which its claims of confidentiality rest, yet Dominion has not produced them. Parker Decl. ¶ 16 & Ex. M ("Defendants insist on receiving copies of the underlying documentation to evidence the contracts with other counties, if Dominion intends to rely on assertions of confidentiality for any proceeding in front of the Court") (Sept. 22, 2022); *id.* ("Dominion must substantiate its claim to a proprietary interest. . . . Unless and until Dominion substantiates its claim, Dominion's assertions of a proprietary interest have no bearing on any subpoena issued by the defendants in this case to other persons or entities. We are willing to meet and confer with you regarding this issue, although the discussion would have much greater potential to bear fruit if Dominion would provide, prior to the conference, the basis upon which Dominion claims a proprietary interest. . . . Again, though, the defendants cannot evaluate, discuss, or meaningfully consider the strength or implications of Dominion's claim to a proprietary interest without first seeing the basis on which Dominion relies to claim that interest.") (Sept. 21, 2022).

Because Dominion has sought a protective order, Dominion bears the burden of proving one is necessary. *See, e.g., Sourgoutsis v. United States Capitol Police*, 323 F.R.D. 100, 105 (D.D.C. 2017) ("The party requesting the protective order bears the burden of showing good cause . . . ." (citation omitted)).  Absent proof that its software and hardware are truly confidential and proprietary, Dominion lacks standing to challenge any of the Subpoenas.

Dominion has failed to supply that proof. Its Motion should be denied entirely on that basis alone.

## B.  The Subpoenas Seek Information That Is Discoverable.

Dominion also fails on the merits to provide any basis for the Court to enter a protective order barring the discovery sought by the Subpoenas. Upon a showing of good cause, Federal Rule of Civil Procedure 26(c)(1) allows a court to enter an order limiting the scope and manner of discovery. Parties like Dominion are faced with a "heavy burden of showing 'extraordinary circumstances' based on 'specific facts'" justifying a protective order. *Washington*, 230 F.R.D. at 21 (quoting *Alexander v. FBI*, 186 F.R.D. 71, 75 (D.D.C. 1998)).

Dominion claims that no recipient of the Subpoenas should produce certain information because the information consists of trade secrets and confidential commercial information, and because the information has been certified by two governmental agencies as "critical election infrastructure." Mem. at 9. Dominion claims it has a "tremendous proprietary interest" in maintaining the confidentiality of the information sought. *Id.* Even if that is true, Dominion's position does not justify denying the discovery sought by the Subpoenas altogether. At best, Dominion is entitled only to a protective order that limits how responsive information can be used.

### 1.  Dominion Fails to Show Evidence of a Trade Secret Interest.

Dominion has not provided evidence that the information sought by the Subpoenas is a trade secret. To prove the existence of a trade secret, Dominion must show that the information "is (1) secret; (2) the value of which derives from the secrecy; and (3) the confidentiality of which the owner makes reasonable effort to secure." *United States CFTC v. Whitney*, 441 F. Supp. 2d 61, 71 (D.D.C. 2006). Dominion acknowledges that a court considers six factors when determining whether information is a trade secret:

     [T]he extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the employer] to guard the secrecy of the information; (4) the value of the information to [the employer] and to his competitors; (5) the amount of effort or money expended by [the employer] in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Mem. at 9.

Dominion fails to provide evidence concerning these factors. The only evidence it provides are a few conclusory allegations in a declaration from its CEO. Poulos Decl. ¶¶ 6-10. Conclusory statements are not enough.  A party "'must do more than offer "conclusory or speculative statements about the need for a protective order and the harm which will be suffered without one.'" *FTC v. Sysco Corp.*, 83 F. Supp. 3d 271, 274 (D.D.C. 2015) (quoting *Huthnance v. Dist. of Columbia*, 255 F.R.D. 285, 296 (D.D.C. 2008)); *see McArdle v. City of Ocala*, 463 F. Supp. 3d 1288, 1289 (M.D. Fla. 2020) ("[g]eneralized concerns, conclusory statements, or unsupported contentions are insufficient reasons for entry of a protective order"). There is a distinction between "that which is legitimately a trade secret" and "information that is simply confidential but not a trade secret, or is publicly available information." *G&E Real Estate, Inc. v. Avison Young-Washington, D.C., LLC*, 168 F. Supp. 3d 147, 166 (D.D.C. 2016) (quotation omitted) (applying Virginia Uniform Trade Secrets Act). Dominion has not demonstrated that the software and data Dominion transferred to the recipients of the Subpoenas qualifies as a trade secret.

### 2. Confidential Information is Discoverable.

Even assuming the Subpoenas seek software and information that is a trade secret of Dominion, this discovery is permissible. Dominion's position is that because Dominion has a financial interest in protecting its software, the recipients of the Subpoenas should not produce information in their possession. Mem. at 7. That is not the law. Federal courts and the attorneys

13

practicing before them are well-accustomed to handling confidential and proprietary information in litigation. *See, e.g.*, Fed. R. Civ. P. 26(c)(1)(G) (expressly that "a trade secret or other confidential research, development, or commercial information" can be disclosed in a way specified by the court). The entry of protective orders where trade secrets are discoverable is routine.  *See, e.g., Cienfuegos v. Office of the Architect of the Capitol*, 34 F. Supp. 3d 1, 3 (D.D.C. 2014) (concerns regarding the confidentiality of information "certainly can be accommodated through the protective order" already entered); *FTC v. Sysco Corp.*, 308 F.R.D. 19, 25 (D.D.C. 2015) (affirming prior protective order that restricted access to "[c]onfidential trade secrets, competitive intelligence or other such proprietary information"); *Alexander*, 186 F.R.D. at 58 ("[a]mple precedent exists for limiting disclosure of highly sensitive, confidential or proprietary information to attorneys and experts" where competitive information could be disclosed (quotation marks omitted)); *Wainwright v. Wash. Meto. Area Transit Auth.*, 903 F. Supp. 133, 135 (D.D.C. 1995) (protective order in place "will adequately protect any legitimate confidentiality interest").

 The Protective Order currently under consideration by the Court includes provisions accepted by both Dominion and the Defendants permitting the production of information subject to restrictions on who may use information and how it may be used. As in the cases cited above, Dominion's concerns about confidential and proprietary information have already been properly addressed.

Dominion admits, as it must, that its Exemplar Contract expressly *allows* the disclosure of confidential information "in response to, or because of an obligation to any federal . . . court with appropriate jurisdiction, or to any person properly seeking discovery before any such . . . court." Poulos Decl. Ex. A, at § 13.2. Dominion's own contract expressly contemplates that the

information sought by the Subpoenas is discoverable. Further, courts have entered protective orders addressing the issue of discovery of information concerning "critical infrastructure," permitting such information to be designated as confidential. *E.g. Standing Rock Sioux Tribe v. United States Army Corps of Eng'rs*, 249 F. Supp. 3d 516, 523 (D.D.C. 2017) (granting protective order to prevent public access to small category of critical infrastructure information while noting "all parties in the case will have access to the full, unredacted administrative record"); *Suffolk Cty. Water Auth. v. Dow Chem. Co.*, No. 17-CV-6980 (NG), 2022 U.S. Dist. LEXIS 64111, at *41 (E.D.N.Y. Apr. 6, 2022) ("if the DEC believes in good faith that the results of contaminant sampling from private wells constitute sensitive information that falls within the definition of 'critical infrastructure information,' the existing Protective Order contains a provision for designating such information as Confidential."); *Williams Constr. Co. v. Gorham LLC Co.*, no. 2018-04815, 2018 Tex. Dist. LEXIS 15453 (Harris Cty. Tex. Apr. 16, 2018); *Cal. Water Serv. Co. v. Dow Chem. Co.*, no. CIV 473093, 2009 Cal. Super. LEXIS 5270 (San Mateo Cty. Cal. July 24, 2009)."

The authority cited by Dominion does not advance its argument.  In *Premier Election Solutions, Inc. v. Systest Labs, Inc.*, Civ. No. 09-CV-01822-WDM-KMT, 2009 U.S. Dist. LEXIS 94193 (D. Colo. Sept. 22, 2009), a subpoena was served on a non-party which was a direct competitor of a party to the litigation. *Id.*, at *2-3. The competitor objected, claiming that disclosing its confidential and proprietary information would provide a "blueprint" for its business. *Id.* at *5. The court noted that "[c]onfidential information that may be used against the company **by a direct competitor** is generally afforded more protection."  *Id.* at *22 (emphasis added). Because the requesting party could not show that the information was relevant or

necessary to the action, the court barred disclosure of the information as protected trade secrets. *See id.* at *25-29 (describing the burden-shifting standard when trade secrets are sought).

This case is doubly different from *Premier Election Solutions*. Defendants are not competitors of Dominion. The additional protection afforded to trade secrets that would otherwise be disclosed to a competitor does not apply. As discussed in detail below, the information Defendants seek is directly related to proving the truth or falsity of the allegedly defamatory statements that form the core of this litigation. *Premier Election Solutions* does not support Dominion's argument that relevant information should not be discoverable by a non-competitor.

The mere fact that the information the Subpoenas seek may constitute commercially sensitive information or trade secrets is not a valid reason to bar discovery.

### 3. The Information Sought is Discoverable Because it Relates to the Parties' Claims and Defenses.

The Federal Rules of Civil Procedure allow any "[p]art[y to] obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or **defense**," Fed. R. Civ. P. 26(b)(1) (emphasis added).  This rule allows for "'liberal' pretrial discovery," a standard which extends to discovery sought from third parties."  *Sysco Corp.*, 308 F.R.D. at 23 (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 34 (1984)). Dominion concedes that "[a] defendant in a defamation case is entitled to seek discovery of information that would prove the truth of the alleged defamatory statements." Mem. at 11. Yet Dominion also argues that the challenged portions of the Subpoenas are not related to the claims or defenses of any party. *Id.* at 12. This position ignores the very heart of the Complaint. Dominion's Complaint takes up the burden of proving false Mr. Lindell's statements about Dominion voting machines changing votes and about foreign countries, including China, hacking into the voting machines to cause them to

16

change or miscount votes. Compl. ¶ 165(f), (g), (h), (i), (j), (k), (l), (m), (n), (o), (p), (q), (s), (v), (x) (y), (aa). Therefore, the parties – including Defendants – are entitled to obtain discovery of whether Dominion voting machines used in the election changed votes or were hacked to cause them to change or miscount votes.

Dominion's claims depend in part upon on the truth, falsity, and inherent probability of the statements alleged in the Complaint about the behavior of voting machines and technology sold by Dominion and used in the 2020 election. *See St. Amant v. Thompson*, 390 U.S. 727, 732 (1968) (plaintiff in a defamation action subject to actual malice standard must show the defamatory statements were both false and either believed by the defendant to be false or not made in good faith, which may be supported by evidence that the statements were "inherently improbable"). So, too, do Defendants' defenses. *See Armstrong v. Thompson*, 80 A.3d 177, 183-84 (D.C. App. 2013) (collecting cases standing for the proposition that substantial truth is a defense to defamation claims).  The truth and/or the inherent probability of the statements alleged in the Complaint about election computers miscounting votes as a result of actions by foreign or domestic persons would be supported by evidence that one or more counties had election computers that contained unauthorized software, malware, or other form of computer code to cause vote miscounting under specified circumstances. The truth and/or the inherent probability of statements alleged in the Complaint would also be supported by evidence that one or more counties' computers had been subject to unauthorized access or programming changes.

The Subpoenas seek precisely this kind of evidence centrally connected to the claims and defenses in this action. The Subpoenas seek forensic images—a defined term—of any drive attached to or affiliated with an EMS Server. Dominion Mot. Ex. A [ECF No. 145-2], at 7 ¶ 1(a). An "EMS" server is a server used by an "Election Management System or any set of electronic

equipment used to facilitate the counting, tabulation, and reporting of results in a public election." *Id.* at 6 ¶ 8. The Subpoenas also seek images of certain ImageCast devices and peripheral equipment once attached to those devices. *Id.* at 7 ¶ 1(b)-(h). These devices are technology provided by Dominion to the recipients of the Subpoenas. The Exemplar Contract expressly states that Dominion provides EMS servers, workstations, and software to its customers. Poulos Decl. Ex. A at 17, 21-23 (ECF pagination). Dominion also distributed its products across the country. Poulos Decl. ¶ 3.

The cases Dominion cites in support of its relevance argument are not germane because, unlike here, in those cases the discovery sought was not sufficiently related to the allegedly defamatory statements stated in the complaints. *Gilmore v. Jones*, 339 F.R.D. 111, 122 (W.D. Va. 2021); *Sheindlin v. Brady*, Civ. No. 21-CV-01124, 2021 WL 2075483, at *3–*5 (S.D.N.Y. May 24, 2021).

In this lawsuit, Dominion must prove its equipment was not hacked to change votes and was not programmed to flip votes. The software and data stored on the election equipment used during the 2020 election may prove or disprove this assertion. The evidence sought by the Subpoenas is at the heart of this case. To prevent the requested discovery would unfairly prejudice Defendants' ability to defend against Dominion's claims. The Court should reject Dominion's claim that the Subpoenas do not seek information relevant to the parties' claims and defenses.

### 4.   The Remaining Rule 26(b)(1) Factors Favor Permitting the Subpoenas.

A court can limit the discovery of relevant evidence in certain ways after considering whether discovery requested is:

> proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in

resolving the case, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1). Presumably with this rule in mind, Dominion halfheartedly mentions several other arguments in support of its motion. Mem. at 11-13. These are equally unavailing.

As an initial matter, even if Dominion has standing to assert confidentiality objections to the Subpoenas, it lacks standing to assert other types of objections. In "

*W. Coast Prods.*, this Court held that other types of objections could only be raised by the recipients of subpoenas, citing a California decision that no standing exists to challenge a subpoena to a third party "based on alleged undue burden." 275 F.R.D. at 16 (citing *Fenstermacher v. Moreno*, No. 1:08-cv-01447-SKO, 2010 U.S. Dist. LEXIS 133741, 2010 WL 5071042, at *3-5 (E.D. Cal. Dec. 7, 2010)).

Dominion's other arguments also fail on the merits. First, Dominion argues the requested discovery should be disallowed because Defendants purportedly do not intend to use the information obtained to defend this case at all. Instead, Dominion guesses that "Defendants plainly intend to use Dominion's lawsuit as a platform to promote their theories that electronic voting machines are vulnerable to cybersecurity attack and should be done away with altogether." Mem. at 11. This is not true. In any event, the parties have already agreed a protective order is appropriate in this case. The Court is currently considering the positions of the parties in a few narrow areas where the parties disagree about the specific terms. Letter from Andrew Parker to Court (Aug. 26, 2022) [ECF No. 144]. When the Court enters the final version of the overarching protective order, that order should eliminate any legitimate concern Dominion could conceivably have about the use of Dominion-originated information.

Second, Dominion claims that a protective order prohibiting the requested discovery is necessary because the information is relevant to counterclaims that have been dismissed. Mem.

19

at 11. The dismissal of some claims does eliminate the relevance of the discovery sought by the Subpoenas to the claims that do remain.

Third, Dominion argues in three boilerplate sentences that the Subpoenas are too broad. Mem. at 12. Dominion cites no evidence to support these claims. It does not explain how Dominion would know the scope of responsive information possessed by the counties who received the subpoenas. It does not explain why the vast amount of damages Dominion seeks are not proportionate to the discovery sought. This paragraph has already run longer than Dominion's entire argument on these points. *See id*.

Fourth, Dominion questions why forensic copies or forensic images of the identified software is needed. Mem. at 12. In part, the purpose of that specification is evidentiary. Electronic data can be changed when it is copied if it is not copied in a forensically sound way. Defendants have asked for the data to be produced in a manner that preserves it unaltered, in the forensic method routinely used when computer drives are imaged for purposes of litigation. *E.g.*, *Covad Communs. v. Revonet, Inc.*, 258 F.R.D. 5,  9 (D.D.C. 2009) ("Covad seeks to make forensic images of Revonet's drives and computers to preserve information as it currently exists. . . . Creating a forensic image is no more burdensome than using the server for everyday business activities"); *United States v. Jae Shik Kim*, 103 F. Supp. 3d 32, 40 (D.D.C. 2015) ("Special Agent Marshall removed the hard drive from Kim's laptop and created a forensic image, or a duplicate copy, of it. . . . To do this, Special Agent Marshall connected a piece of hardware "about the size of a shoebox" to the laptop hard drive: the hardware creates 'an exact copy, reading every single bit, as we call it, every single piece of data on the hard drive and making a copy of that for me to analyze later on.'"). Defendants expect Dominion to object at trial to the admission of evidence responsive to the Subpoenas if the electronic data was not properly

collected. The specification of "forensic copies" and "forensic images" eliminates that evidentiary concern.

Fifth, Dominion cursorily complains about cost responding to the Subpoenas. Mem. at 12. *See* Fed. R. Civ. P. 26(b)(1) (requiring a court to consider "whether the burden or expense of the proposed discovery outweighs its likely benefits"). Dominion has demanded relief that includes a monetary award of more than of $1.3 billion. *See id.* (requiring consideration of the amount in controversy). Dominion's Complaint spans 115 pages and contains hundreds of allegations that Dominion must prove at trial. The information sought by the subpoenas may resolve many of Dominion's allegations. *See id.* (requiring consideration of "the importance of the discovery in resolving" issues in the case). The costs of compliance with the Subpoenas— which Dominion does not attempt to identify—are clearly *de minimis* when compared to the relief Dominion has asked the Court to award.

Sixth, Dominion asserts that because Mr. Lindell has said he has proof supporting his allegedly defamatory statements, Defendants should not be allowed to see data on the Dominion machines used in the 2020 election. Mem. at 12-13. Plainly Dominion disagrees that Mr. Lindell has such proof, and Dominion will attempt to show he does not. Under the discovery rules Mr. Lindell has the right to gather new types of evidence supporting his position. Dominion does not, and cannot, show that Mr. Lindell already has the information sought by the Subpoenas, or anything reasonably comparable. Even if he did, it is well established that "a basic tenet of the current liberal discovery rules is that discovery may be had of issues that are already known to the party seeking discovery." *Hoh Co. v. Travelers Indem. Co.*, No. 87-0274 (RCL), 1991 U.S. Dist. LEXIS 15403, at *8-9 (D.D.C. Oct. 25, 1991). *See also United States v. All Assets Held at Bank Julius Baer & Co.*, 276 F.R.D. 396, 400 (D.D.C. 2011) (holding that the objection that a

party "has, or readily can obtain" the answer to discovery "has been rejected as a basis upon which a party may refuse to fully answer" the discovery); *Covad Communs. Co.*, 258 F.R.D. at 20 (rejecting the principle that a party need not respond to discovery if its opponent has access to the underlying facts of the case).[5]

Seventh, Dominion asserts that the Subpoenas should effectively be quashed because Defendants can seek the same discovery from Dominion itself. Mem. at 13-15.  Defendants previously tried the approach now endorsed by Dominion, by asking Dominion to produce responsive information. Dominion responded by claiming that it does not have election data, but state and local jurisdictions do:

> Dominion objects to this Request to the degree that it implies that Dominion is responsible for all (or any) votes "received, recorded, tallied, or reported" in any jurisdiction that uses its equipment. It is Dominion's understanding that the **jurisdictions conducting the elections are responsible for receiving, recording, tallying, and reporting the vote totals** in their jurisdiction.

Pl. Resp. & Obj. to My Pillow, Inc.'s First Set of Req. for Prod. at 12 (Parker Decl. ¶ 5 & Ex. C). (emphasis added).

> **Dominion is not responsible for conducting elections, and state and local jurisdictions have exclusive custody and control** over the Dominion technology used in those jurisdictions.

Pl. Resp. & Obj. to My Pillow, Inc.'s First Set of Req. for Prod. at 15 (Parker Decl. ¶ 5 & Ex. C). (emphasis added).

---

[5] In a footnote, Dominion complains about the timing of the Subpoenas. Mem. at 13 n.11. If a Subpoena recipient alleges undue burden from the timing of the Subpoenas, Defendants have always expressed a willingness to work with the recipient regarding the timing of its response, without any initial resort to legal proceedings. If and when any recipients file a motion for a protective order asserting inability to timely comply, or if and when Defendants file a motion to compel compliance with one of the Subpoenas, considerations of timing can be considered alongside the specific relevant facts at hand. It is premature and improper to enter a blanket protective order now, in a vacuum, on the basis of Dominion's fact-deficient timing concerns.

> Dominion further objects to this request to the degree that it implies that Dominion is responsible for maintaining data stored by state and local jurisdictions using Dominion technology. **Dominion is not responsible for storing it, ever**. Moreover, **state and local jurisdictions have exclusive custody and control over election data**, and their obligations as to the preservation of that data are established by law.

Pl. Resp. & Obj. to My Pillow, Inc.'s First Set of Req. for Prod. at 18 (Parker Decl. ¶ 5 & Ex. C.) (emphasis added). Defendants are now going to the source that Dominion says possesses the data that Dominion does not – and now Dominion argues that Defendants must instead go back to Dominion to ask for information that Dominion says it does not have.

Dominion apparently does not possess the precise equipment and software that was actually used in the 2020 election. The Subpoena recipients are required by law to retain this information. *See* 52 U.S.C. § 20701 (requiring "[e]very officer of election" to "retain and preserve" certain information "for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President [and] Vice-President . . . are voted for"). Dominion asserts, "it is in fact *Dominion's customer* that administers elections with Dominion's technology—not Dominion." Mem. at 14 (emphasis added).[6]

Moreover, while Dominion may have copies of the software it markets and sells, it is not necessarily true that a copy held by Dominion is identical with the software and data on the counties' election computers actually used for the 2020 election. Indeed, one way of ascertaining

---

[6] In a footnote, Dominion claims the Subpoena recipients may not have certain information because "it is nearly impossible that the machines would still be programmed for the 2020 Election, due to the normal use of the voting system by Election Administrators  through the multiple elections since 2020." Mem., at 14 n.15. *But see* 52 U.S.C. § 20701 (requiring preservation of certain election data for 22 months). In any event, Dominion's speculations concerning whether responsive data exist do not make good cause to issue a protective order.

23

whether a county's election software was hacked during the election would be to compare the county's software with the software version distributed by Dominion.

None of Dominion's conclusory tag-along arguments hold water. The Court should reject these purported justifications for a protective order.

### IV.
### Conclusion

Dominion has placed at issue "Facts" and "The truth." Compl. ¶ 162. The purpose of discovery is to uncover facts. *See FTC v. Boehringer Ingelheim Pharms., Inc.*, 778 F.3d 142, 156 (D.C. Cir. 2015) (describing the "truth-seeking function of discovery"); *Competitive Enter. Inst. v. Office of Sci. & Tech. Policy*, 185 F. Supp. 3d 26, 29 (D.D.C. 2016) (describing "the truth-seeking function of the adversarial process, including the tools available through discovery"). The Subpoenas further that pursuit. The Court should reject Dominion's efforts to shield the very equipment at issue in this case from the sunshine of discovery. Dominion's motion should be denied.

DATED:  October 14, 2022.

**LEWIN & LEWIN, LLP**
By */s/ Nathan Lewin*
  Nathan Lewin (D.C. Bar No. 38299)
  888 17th Street NW, Fourth Floor
  Washington, DC 20006
  Telephone: (202) 828-1000
  nat@lewinlewin.com

**PARKER DANIELS KIBORT LLC**
By */s/ Andrew D. Parker*
  Andrew D. Parker (D.C. Bar No. 63279)
  Joseph A. Pull (D.C. Bar No. 982468)
  123 N. Third Street, Suite 888
  Minneapolis, MN 55401
  Telephone: (612) 355-4100
  parker@parkerdk.com
  pull@parkerdk.com

*Counsel for Defendants My Pillow, Inc. and Michael J. Lindell*

24