# EXHIBIT L

VOTING SYSTEM AGREEMENT
BY AND BETWEEN
DOMINION VOTING SYSTEMS, INC.
AND MONROE COUNTY FL

This Agreement, dated this 5⊥ day of September, 2013 (the "Effective Date"), for a voting system, licenses and related services is made by and between Monroe County FL ("Customer") and Dominion Voting Systems, Inc., a corporation organized under the laws of the State of Delaware ("Dominion"). This Agreement may refer to Dominion and the Customer together as the "Parties," or may refer to Dominion or the Customer individually as a "Party."

WHEREAS, The Customer desires to purchase a voting system, licenses and related solutions; and

WHEREAS, Dominion designs, manufactures, sells and/or licenses, and provides ongoing solutions for voting systems;

NOW THEREFORE, in consideration of the mutual covenants contained herein, and in accordance with the terms and conditions set forth herein, Dominion agrees to license and/or sell and furnish to Customer the System (as defined herein), including the products and services described more fully below:

1. **Composition of Agreement.** Exhibits A and B are attached and incorporated herein by reference and form a part of this Agreement (the "Agreement"). This Agreement consists of the general terms and conditions contained in the following sections, together with the listed Exhibits:

   Exhibit A:   Project Configuration and Pricing Summary
   Exhibit B:   Software License Agreement

2. **Definitions.** For the purposes of this Agreement, the following are defined terms:

   2.1.   "Acceptance" and variations thereof, mean the successful completion of the acceptance testing performed by the Customer on each unit of Dominion Hardware and related Dominion Software, after delivery in accordance with testing criteria developed and updated from time to time by Dominion, or the occurrence of other events defined in Section 8.

   2.2.   "Dominion Software" means software and firmware programs licensed to the Customer by Dominion and any associated documentation including the following:

      2.2.1.   "Democracy Suite® Software," Dominion's election management software associated with the ImageCast® voting system which includes Election Event Designer and Results Tally and Reporting.

      2.2.2.   "ImageCast® Software," the software/firmware designed for use in the ImageCast® voting system.

2.3. "Dominion Hardware" means the ImageCast® Evolution or "ICE," and ImageCast® Central or "ICC," digital scanners and tabulator as more specifically described in Exhibit A.

2.4. "Effective Date" is the date this Agreement and Exhibit B, Software Licensing Agreement is approved by formal action of the Board of County Commissioners.

2.5. "Election Management System Hardware" or "EMS Hardware" means third party hardware required for operating Dominion Software as used in conjunction with the Dominion Hardware.

2.6. "License" has the meaning set forth in Section 7.

2.7. "License Agreement(s)" means the Dominion Software License Agreement contained in Exhibit B.

2.8. "System" means the combination of Dominion Software, Dominion Hardware and EMS Hardware.

2.9. "Third Party Software" means Software, manufacturer supplied software, other software, or firmware owned by third parties, which Dominion provides to Customer pursuant to sublicenses or end user license agreements with the owners of such Third Party Software. Third Party Software includes, but is not limited to, operating systems, software drivers, report writing subroutines, and firmware.

3. **Term of Agreement.** The Term of this Agreement shall begin on the Effective Date, retroactive to September 3, 2013 and shall continue until December 31, 2014, providing however, that Licenses or warranties authorized by this Agreement may extend beyond the Term of this Agreement, according to the terms and conditions of such License or warranty.

4. **Dominion's Responsibilities.** Dominion shall:

4.1. Deliver the System and installation plan services as described in Exhibit A (Project Configuration and Pricing Summary).

4.2. Appoint a Project Manager to oversee the general operations of the project. The project manager shall be responsible for arranging all meetings, visits and consultations between the parties and for all administrative matters such as invoices, payments and amendments. The project manager shall communicate with the Customer as to the status of information, procedures and progress on the tasks as set out in this Agreement and to advise the Customer forthwith upon the occurrence of any material change in such plans.

4.3. Provide the Customer with a Dominion Software use License as described in Exhibit B (Software License Agreement).

4.4. Provide the Customer with one (1) reproducible electronic copy of the user documentation.

4.5. Assist in the Acceptance Testing process as required by Section 8 herein.

4.6. Provide invoices to Customer upon delivery of items listed in Exhibit A and pursuant to the payment schedule described in Section 5.1 herein.

**5.    Customer's Responsibilities.** Customer shall:

5.1. Pay invoices in a timely manner and no later than thirty (30) calendar days from receipt of a Dominion invoice.

    5.1.1. Dominion shall invoice to the Customer an amount equaling fifty percent (50%) of the total System price upon acceptance of the first 38 ImageCast Tabulators

    5.1.2. All remaining invoices shall be issued within ten (10) business days of acceptance of the remaining items or service provided by Dominion to the Customer.

    5.1.4 Payments specified in this Section 5 are exclusive of all excise, sale, use and other taxes imposed by any governmental authority, all of which taxes shall be reimbursed by the Customer. If the Customer is exempt from taxes, Customer shall supply Dominion a tax exemption certificate or other similar in a form demonstrating its exempt status.

5.2. Appoint a Project Manager who shall be responsible for review, analysis and acceptance of the System and the coordination of Customer personnel, equipment, vehicles and facilities. The Project Manager shall be empowered to make decisions on behalf of the Customer with respect to the work being performed under this Agreement. The Project Manager shall also have direct access to the Customer's top management at all times for purposes of problem resolution.

5.3. Conduct Acceptance Testing process as required by Section 8.

**6.    Title and Risk of Loss.**

6.1. Title to the System, Excluding All Software. Title to the System, or any portion thereof, excluding software and firmware, will pass to Customer upon delivery.

6.2. Software. Software, including firmware, is licensed not sold. The original and any copies of the Dominion Software, or other software provided pursuant to this agreement, in whole or in part, including any subsequent improvements or updates, shall remain the property of Dominion, or any third party that owns such software.

6.3. <u>Risk of Loss</u>. Dominion shall bear the responsibility for all risk of physical loss or damage to each portion of the System until such portion is delivered to the "Ship to" address, except to the extent such damage is caused by Customer. Customer shall provide Dominion with a single location for shipment and Dominion shall not be responsible for shipping to more than one location. To retain the benefit of this clause, Customer shall notify Dominion of any loss or damage within ten (10) business days of the receipt of any or all portions of the System, or such shorter period as may be required to comply with the claims requirements of the shipper, and shall cooperate in the processing of any claims made by Dominion.

**7. Software License and Use.**

7.1. <u>License</u>. Upon mutual execution of this Agreement, Dominion grants to the Customer, and the Customer accepts a non-exclusive, non-transferable, license ("License") to use the Dominion Software subject to the terms and conditions of this Agreement and the Software License Agreement attached hereto as Exhibit B.

7.2. <u>Third Party Software</u>. The System includes Third Party Software, the use of which is subject to the terms and conditions imposed by the owners of such Third Party Software. Customer consents to the terms and conditions of the third party License Agreements by Customer's first use of the System.

**8. Acceptance.**

8.1. <u>Dominion Software or Dominion Hardware</u>. After delivery Dominion Software or Dominion Hardware, the Customer will conduct acceptance testing of such units, in accordance with the acceptance criteria developed and updated, from time to time, by Dominion. Such acceptance testing shall occur at a time mutually agreed upon by the Parties, but no later than ten (10) business days after installation.

8.2. <u>System Acceptance Testing</u>. To the extent not tested as part of the testing pursuant to Subsections 8.1, upon completing the installation of the System, the Customer will conduct system acceptance testing, according to the acceptance test procedures developed and updated, from time to time, by Dominion. Such acceptance testing shall occur at a time mutually agreed upon by the Parties, but no later than ten (10) business days after installation of the System.

8.3. <u>System Conformance</u>. Customer will not refuse to grant Acceptance of the System, in whole or in part, solely for the reason that it fails to conform with the specifications, requirements and functions set out in the Agreement in a manner that does not affect the performance of the System, in whole or in part, and Dominion shall provide a plan of action to cure such non-conformity with reasonable dispatch.

9. **Warranties.**

9.1. <u>Dominion Software Warranty</u>. The Dominion Software warranty is subject to the terms and conditions of Exhibit B - the Software License Agreement.

9.2. <u>Third Party Products</u>. The warranties in this Sections 9 do not apply to any third party products. However, to the extent permitted by the manufacturers of third party products, Dominion shall pass through to Customer all warranties such manufacturers make to Dominion regarding the operation of third party products.

9.3. <u>Dominion Hardware Warranty</u>. Dominion warrants that when used with the hardware and software configuration purchased through or approved by Dominion, each component of Dominion Hardware will be free of defects that would prevent the Dominion Hardware from operating in conformity in all material respects with its specifications as documented by Dominion. The Dominion Hardware Warranty shall remain in effect until one year after Acceptance.

9.4. <u>Dominion Hardware Warranty Services</u>. If any Dominion Hardware component fails to operate in conformity with its specifications during the warranty period, Dominion shall provide a replacement for the Dominion Hardware component or, at Dominion's sole option, shall repair the Dominion Hardware component, so long as the Dominion Hardware is operated with its designated Dominion Software and with third party products approved by Dominion for use with the Dominion Hardware. The following conditions apply to the Dominion Hardware warranty:

   9.4.1. Customer shall bear the shipping costs to return the malfunctioning component of Dominion Hardware to Dominion, and Dominion shall bear the costs for standard shipping of the repaired or replaced component of Dominion Hardware to Customer.

   9.4.2. The following services are among those not covered by this Agreement, but may be available at Dominion's current time and material rates:

      9.4.2.1. Replacement of consumable items including but not limited to batteries, paper rolls, ribbons, seals, smart cards, and removable memory devices, disks, etc.;

      9.4.2.2. Repair or replacement of Dominion Hardware damaged by of accident, disaster, theft, vandalism, neglect, abuse, or any improper usage;

      9.4.2.3. Repair or replacement of Dominion Hardware modified by any person other than those expressly authorized in writing by Dominion;

      9.4.2.4. Repair or replacement of Dominion Hardware from which the serial numbers have been removed, defaced or changed;

9.5.  <u>No Other Warranties.</u>  DOMINION DISCLAIMS ALL OTHER REPRESENTATIONS AND WARRANTIES, WHETHER WRITTEN, ORAL, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTY BASED ON A COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

## 10.  Indemnification.

Dominion shall indemnify and hold harmless the County and the Supervisor of Elections, their personnel, Commissioners, directors, agents and representatives from or against any and all claims, damage or expenses arising out of actions or omission of Dominion, its personnel, directors, agents and representatives under this Agreement. The County and Supervisor of Elections to the extent allowed by Florida Statutes 768.28 shall indemnify and hold harmless Dominion, its personnel, directors, agents and representatives under this Agreement for damage arising out of negligence or willful misconduct of Customer with respect to users of the Service.

**11.  Limitation of Liability.** Dominion's total aggregate liability for any loss, damage, costs or expenses under or in connection with this Agreement, howsoever arising, including without limitation, loss, damage, costs or expenses caused by breach of contract, negligence, strict liability, breach of statutory or any other duty shall in no circumstances exceed the total dollar amount of the Agreement. Subject to Florida Statutes 768.28, the County and Supervisor of Elections limitation of liability shall be limited for any loss, damage, costs or expenses under or in connection with this Agreement, arising out of negligence or willful misconduct of Customer on account of or in connection with Customer's use of service under the Agreement. Neither party shall be liable for any loss of profits, loss of business, loss of data, loss of use or any other indirect, incidental, punitive, special or consequential loss or damage, incurred by the other party or any third party, when not arising from the parties negligent or willful misconduct.

11.1  "Non-Waiver of Immunity.  Notwithstanding the provisions of Sec. 768.28, Florida Statutes, the participation of Dominion and the Customer in this Agreement and the acquisition of any commercial liability insurance coverage, self-insurance coverage, or local government liability insurance pool coverage shall not be deemed a waiver of immunity to the extent of liability coverage, nor shall any contract entered into by the Customer be required to contain any provision for waiver."

## 12.  Confidential Information.

12.1.  For purposes of this Agreement, confidential information ("Confidential Information") is defined as those materials, documents, data, and technical information, specifications, business information, customer information, or other information that the disclosing Party maintains as trade secrets or confidential and which are disclosed to a receiving Party in tangible form conspicuously marked as "confidential," or with words having similar meaning or which are expressly identified in this Subsection 12.1. Confidential Information includes, without limitation, Dominion Software source code and associated documentation.

12.2.   Each Party shall treat the other Party's Confidential Information as confidential within their respective organizations, and shall disclose it therein only on a need to know basis.

12.3.   Neither Party shall disclose the other Party's Confidential Information to any person outside their respective organizations unless disclosure is made in response to, or because of, an obligation to any federal, state, or local governmental agency or court with appropriate jurisdiction, or to any person properly seeking discovery before any such agency or court.

12.4    Each Party shall be given the ability to defend the confidentiality of its Confidential Information to the maximum extent allowable under the law prior to disclosure by the other Party of such Confidential Information.

12.5    The parties understand and agree that Customer is a public entity that may be subject to Public Record Laws. Therefore, any covenant of confidentiality given by the Customer shall be governed by provisions of applicable Public Record Laws.

12.6    Any specific information that Dominion claims to be confidential must be clearly identified as such by the Customer. To the extent consistent with Public Record Laws, Customer shall maintain the confidentiality of all such information marked by Dominion as confidential. If a request is made to view such confidential information, Customer will notify Dominion of such request and the date the information will be released to the requestor unless Dominion obtains a court order enjoining such disclosure. If the Dominion fails to obtain such court order enjoining such disclosure, the Customer will release the requested information on the date specified. Such release shall be deemed to have been made with the Dominion's consent and shall not be deemed to be a violation of law or this Agreement.

**13.   Assignment and Right to Subcontract.** Neither Party may assign its rights, obligations, or interests in this Agreement without the written consent of the other Party, providing however that Dominion may subcontract all or any portion of the work without the prior consent of the Customer so long as the Subcontractor agrees in writing to assume Dominion's obligations under this Agreement, and may assign the proceeds of this Agreement to a financial institution without prior consent of the Customer but with written notice to Customer.

**14.   Termination for Default.** In the event either Party violates any provisions of this Agreement, the injured Party may serve written notice upon the violating Party identifying the violation and a providing a reasonable cure period. Except as otherwise noted herein, such cure period shall be at least thirty (30) days. In the event the violating Party has not remedied the infraction at the end of the cure period, the injured Party may serve written notice upon the violating Party of its intent to terminate, and seek legal remedies for breach of contract as allowed hereunder. If the breach identified in the notice cannot be completely cured within the specified time period, no default shall occur if the Party receiving the notice begins curative action within the specified time period and thereafter proceeds with reasonable diligence and in good faith to cure the breach as soon as practicable.

**15. Notices.** All notices required or permitted to be given hereunder shall be given in writing and shall be deemed to have been given when personally delivered or by nationally recognized overnight carrier or mailed, certified or registered mail, return receipt requested, addressed to the intended recipient as follows:

If to the Dominion:

> Dominion Voting Systems, Inc.
> Attn: Contracts Administrator
> 1201 18th St., Ste. 210
> Denver, CO 80202

If to the Customer:

> Monroe County FL
> Attn: Joyce Griffin, Supervisor
> 530 Whitehead Street, Suite 101
> Key West, FL 33040

**16. Survival.** The provisions of Sections 2, 9, 10, 11, 12, 18, 19, and 20 shall survive the expiration or termination of this Agreement.

**17. Force Majeure.** Should any circumstances beyond the control of Dominion or Customer occur that delay or render impossible the performance of any obligation due under this Agreement, such obligation will be postponed for the period of any delay resulting from any such circumstances, plus a reasonable period to accommodate adjustment to such extension, or cancelled if performance has been rendered impossible thereby. Such events may include, without limitation, accidents; war, acts of terrorism; acts of God; labor disputes; acts, laws, rules or regulations of any government or government agency; or other events beyond the control of both Dominion and Customer. Dominion shall not be liable under this Agreement for any loss or damage to the Customer due to such delay or performance failures. Notwithstanding the foregoing, both Parties shall use their best efforts to minimize the adverse consequences of any such circumstances. This Section shall not operate to excuse any Party from paying amounts that are owed pursuant to this Agreement.

**18. Choice of Law.** Interpretation of this Agreement shall be governed by the laws of the State of Florida, and the courts of competent jurisdiction located in the State of Florida will have jurisdiction to hear and determine questions relating to this Agreement. Venue for interpretation of this Agreement shall be in Monroe County, Florida.

**19. Waiver.** Any failure of a Party to assert any right under this Agreement shall not constitute a waiver or a termination of that right or any provisions of this Agreement.

**20. Legality and Severability.** This Agreement and the Parties' actions under this Agreement shall comply with all applicable federal, state and local laws, ordinances, rules, regulations, court orders, and applicable governmental agency orders. If any term or provision of this Agreement is held to be illegal or unenforceable, the remainder of this Agreement shall not be affected thereby and each term or provision of this Agreement shall be valid and enforceable to the fullest extent

permitted by law. The Parties agree that any court reviewing this Agreement shall reform any illegal or unenforceable provision to carry out the express intent of the parties as set forth herein to the fullest extent permitted by law.

**21. Entire Agreement.** This Agreement and its Exhibits incorporated herein by reference constitute the entire agreement, understanding and representations between Dominion and the Customer, and supersede and replace all prior agreements, written or oral. No modifications or representations to the Agreement shall be valid unless made in writing and signed by duly authorized representatives of both the Customer and Dominion, and incorporated as an Addendum hereto.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the date first above written.

**MONROE COUNTY, FL**

_____
Supervisor of Elections

_____
PRINTED NAME

_____
DATE

Attest: Amy Heavilin, CPA, CLERK

By: _____
       Deputy Clerk

Date: _____
(SEAL)

**BOARD OF COUNTY COMMISSIONERS OF MONROE COUNTY, FLORIDA**

By: _____
       Mayor/Chairman

MONROE COUNTY ATTORNEY
APPROVED AS TO FORM/
_____
NATILEENE W. CASSEL
ASSISTANT COUNTY ATTORNEY
Date 9 - 25 - 2013

**DOMINION VOTING SYSTEMS, INC.**

_____
AUTHORIZED SIGNATURE

Michael Frontera
PRINTED NAME

VP & General Counsel
TITLE

9/4/2013
DATE

EXHIBIT A

VOTING SYSTEM AGREEMENT
BY AND BETWEEN DOMINION VOTING
AND MONROE COUNTY, FL

**PRICING SUMMARY AND DELIVERABLES DESCRIPTION**

1. <u>Pricing Summary</u> - Prices of equipment, technical facilities, software, and other related services for voting, vote counting, and result processing. All pricing in U.S. Dollars.

| Description | Quantity | Total Price |
|---|---|---|
| **ImageCast Evolution (ICE) Tabulator System:** <br> *38 accepted and invoiced by 09/15/2013* <br> *38 accepted and invoiced by 12/11/2013* | 76 | $547,200.00 |
| ImageCast Evolution (ICE) Tabulator | 1 | Included |
| 12 Month Hardware Warranty and Software License | | Included |
| 8 GB CF Memory Cards | 2 | Included |
| Ibutton Security Key | 2 | Included |
| Audio Tactile Interface (ATI) | 1 | Included |
| External Analog Modem: Zoom 3095 Modem | 1 | Included |
| ImageCast Evolution Plastic Ballot Box | | Included |
| **Subtotal** | | **$547,200.00** |
| **Precinct Tabulation Accessories:** | | |
| 8 GB CF Memory Cards | 16 | $1,600.00 |
| ibutton Security Key | 16 | $288.00 |
| ICE Paper Roll (5 Pack) | 4 | $100.00 |
| **Subtotal** | | **$1,988.00** |
| **Absentee Ballot Scanning Hardware & Software:** | | |
| ImageCast Central Cannon (Class 1) Central Count System | 2 | $50,000.00 |
| ImageCast Central Cannon Tabulator | 2 | Included |
| 12 Month Hardware Warranty | | Included |
| 12 Month ImageCast Central Software License | | Included |
| Dell PC with Keyboard and Mouse | 1 | Included |

| | | |
|---|---|---|
| ibutton Security Key | 1 | Included |
| CF Memory Card Reader/Writer | 1 | Included |
| ibutton Reader/Writer | 1 | Included |
| Kofax VRS Elite Software | 1 | Included |
| **Subtotal** | | **$50,000.00** |
| **Election Management System Hardware & Software:** | | |
| 12 Month Democracy Suite Application Software License | 1 | $65,000.00 |
| Master EMS Server | 1 | $6,800.00 |
| Dell T310 Tower Server | | Included |
| Windows Server 2008 R2 Standard Edition | | Included |
| Microsoft SQL Server 2008 | | Included |
| Master EMS File Server | 1 | $6,400.00 |
| Dell T310 Tower Server | | Included |
| Windows Server 2008 R2 Standard Edition | | Included |
| Watchguard Firewall Protection | 1 | Included |
| **Subtotal** | | **$78,200.00** |
| **Election Management System Accessories:** | | |
| CF Memory Card Reader/Writer | 2 | $50.00 |
| ibutton Reader/Writer | 2 | $150.00 |
| Digi ConnectPort LTS 8 | 1 | $1,500.00 |
| Serial to RJ45 Cable for Robotics Modems | 8 | $128.00 |
| **Subtotal** | | **$1,828.00** |
| **Onsite Implementation & Project Management Services:** | | |
| Precinct Hardware Acceptance Testing | 76 units | $9,500.00 |
| Central Tabulation Hardware Acceptance Testing | 2 days | $1,000.00 |
| Server Installation, Configuration & Testing | 2 days | $3,150.00 |
| Advanced Hardware & Software Training | 5 days | $9,000.00 |
| **Subtotal** | | **$22,650.00** |
| **Onsite Election Support Services:** | | |
| Onsite Pre-Election Support | 3 days | $4,725.00 |

| Onsite Election Day Support | 1 days | $4,125.00 |
|---|---|---|
| Onsite Election Day Field Support (Precinct Rover) | 3 days | $5,625.00 |
| **Subtotal** | | **$14,475.00** |
| **Other Services:** | | |
| Estimated System Shipping & Insurance (Actual shipping charges will be invoiced at the time of shipping) | 1 | $9,750.00 |
| **Total Solution Cost (excluding shipping):** | | **$716,341.00** |
| **Credits:** | | |
| Legacy EMS Software License Credit | 1 | ($65,000.00) |
| Legacy Inventory Trade-In Credit:  TSX 140, AVOS, 188, OSX 30 | 107 | ($42,800.00) |
| **Total Solution Purchase Price After Discounts (excluding shipping):** | | **$608,541.00** |

### YEAR 2 HARDWARE WARRANTY

| Description | Quantity | Total Price |
|---|---|---|
| ICE Year 2 Hardware Warranty | 76 | $17,860 |
| ICC Year 2 Hardware Warranty | 2 | $3,000 |
| | Total | **$20,860** |

2. Detailed Description

2.1 ***ImageCast® Evolution (ICE) Scanner and Tabulator (Hardware and Software)*** is a precinct-level all in one, digital scanner, ballot marker, and accessible voting tabulator. Each ImageCast® (ICE) provided to the Customer shall consist of the following items:

2.1.1 Two (2) optical imaging heads for creating a duplex scanned image of each side of the ballot.  Ballots can be fed in all four (4) orientations.

2.1.2 Two (2) Compact Flash 8GB memory cards.

2.1.3 An integrated 19" diagonal full color LCD with built-in touch screen.

2.1.4 An internal thermal printer and one (1) paper roll for generating reports.

2.1.5 An integrated inkjet printer for producing marked paper ballot during the accessible voter sessions.

2.1.6   An external wired modem is provided for transmission of data from the ImageCast Evolutions to the EMS system. The external wired modems require analog phone lines in each polling place in order to function as a device for transmission. The external wired modem needs to be connected to a RJ11 port during transmission. The Customer shall be responsible establishing the analog phone line infrastructure required for transmission.

2.1.7   One (1) textured molded plastic ballot box made of a three (3) compartments, costumed designed for use with the ImageCast Evolution.

2.1.8   Two (2) administrative security key (iButton) used with an integrated receptacle (physically attached to the top of the unit and electrically connected to the motherboard) used for a variety of verification and security tasks such control, data confidentiality and integrity functions.

2.1.9   A motorized paper feed mechanism for detecting and moving the ballot within the scanner. Ballots used with the ImageCast® must be 8.5" wide by a variable length (11", 14", 17" and 22"). The paper feed mechanism is physically capable of moving the ballot forward into the machine, across image sensors, enabling complete image capture of both sides of the ballot.

2.1.10  An internal battery which is rated to provide a minimum of two (2) hours of normal use in the absence of AC power.

2.1.11  Audit functionality, known as the AuditMark®. For each ballot that is scanned, interpreted and accepted into the unit, a corresponding ballot image is created and stored for audit purposes. The image consists of two parts described below. These images can be used to audit the unit's interpretation of each individual ballot.

- The top portion of the image contains a scanned image of the ballot.

- The bottom portion consists of a machine-generated type-out showing each mark that the unit interpreted for that particular ballot. This is referred to as an AuditMark®.

2.1.12  The ImageCast Evolution is equipped with an integrated voting feature for voters needing additional assistance. It uses a single ballot path which does not require the voter to have to go to an additional unit to cast the vote. The ImageCast Evolution features several accessible voting interfaces that allow voters with various disabilities to effectively vote, review and cast a paper ballot in a private and independent manner. The ImageCast Evolution offers the following user interfaces - touch screen interface for visual ballot review and ballot casting, accessible ballot marking interface (both audio and visual), assistive input devices for accessible ballot navigation and voting, including an ATI (Audio-Tactile Interface).

2.1.13  One (1) ATI is included with the ImageCast Evolution. The ATI connects to the ImageCast Evolution via the port located on the right side of the unit. A set of headphones (also included) connects directly to the ATI controller. Following

the audio voting process using the ATI controller, the integrated inkjet printer produces a marked paper ballot which serves as the official ballot record.

2.2   <u>Two (2) ImageCast® Central Scanners</u>.  Dominion shall provide two (2) ImageCast® Central Scanners for use by the Customer.  The ImageCast® Central Scanners are commercial off-the-shelf digital scanners configured to work with the ImageCast® Central Software for high speed ballot tabulation. The ImageCast® Central Scanners includes the following components:

2.2.1   Canon DR-X10C high speed document scanner

2.2.2   ImageCast® Central Software including third party Kofax VRS 4.5 software

2.2.3   All-in-One Desktop Workstation with pre-loaded software and 19" monitor

2.2.4   One (1) iButton Reader/Writers used with Democracy Suite to transfer security and election information to the iButtons for use with the ICC.

2.3   ***ImageCast® Evolution and Central Scanner Software***.  This Agreement includes software licenses for the ImageCast Evolution and Central software pursuant to the Software License Terms attached as Exhibit B.

2.4   ***Democracy Suite Software*** platform is a set of applications used for pre-voting, Election Day, and post-voting activities. The Democracy Suite EMS consists of the following components:

2.4.1   <u>Election Event Designer (EED)</u> Client Application is the primary application used for the definition and management of election event.  EED is responsible for the definition of election projects. Each election project is represented as an instance of the election domain database with associated set of election project file based artifacts. The definition of the election project can be initiated by importing the election data from external systems or simply by defining all election project entities without importing external data.  It is important to note that an election project initiated by importing data can be further modified within the EED Client Application.

The system can generate two types of paper ballots:

- Proofing ballots – ballots produced to allow election project stakeholders to proof ballot content and styling. These ballots cannot be processed by the ImageCast® as they don't have proper ballot barcodes. These ballots are overprinted with the text "Proofing Ballots – date/time"

- Official ballots – represent production ready, press ready ballots in PDF format with barcodes and without any overprinting.

2.4.2   <u>Results Tally and Reporting (RTR)</u> Client Application is the application used for the tally, reporting and publishing of election results.

2.4.3  <u>Audio Studio (AS) Client</u> is the utility used for recording audio files for audio ballot presentation for accessible voting.

2.5  ***EMS System Hardware*** Dominion will provide the EMS System Hardware required for operating the Democracy Suite Software system. The EMS System hardware shall consist of the following third party hardware and software components:

2.5.1  One (1) Master EMS Server consisting of Windows Server 2008 R2 Standard Edition, and Microsoft SQL Server 2008.

2.5.2  One (1) Master File Server consisting of a PowerEdge R210II unit, Windows Server 2008 R2 Standard Edition.

2.5.3  One (1) Watchguard Firewall Protection unit.

2.5.4  Server monitor and ancillary hardware (mouse, keyboard, etc.)

2.6  ***The EMS System Accessories*** described below shall be provided.

2.6.1  Two (2) Compact Flash Reader/Writers used with Democracy Suite to upload ballot information to Compact Flashes used with both scanner types. These can also be used to transfer election results data to Democracy Suite.

2.6.2  Two (2) iButton Reader/Writers used with Democracy Suite to transfer security and election information to the iButtons for use with the ICE.

3.  <u>Services Description</u>

3.1  ***Project Management Support.*** Dominion will provide project management support to oversee the general operations of the project through the Agreement Term. The project manager shall be responsible for arranging all meetings, visits and consultations between the parties and for all administrative matters such as invoices, payments and amendments. The project manager shall communicate with the Customer as to the status of information, procedures and progress on the tasks set out in this Agreement and alert of any material change in such plans.

3.1.1  Upon execution of this Agreement, the Parties shall develop and finalize a project implementation plan including a training and delivery schedule. The Parties agree that during the course of the implementation, changes to the project schedule may be required. Any changes to the project schedule must be mutually agreed to by both Parties and such agreement shall not be unreasonably withheld.

3.2  ***Implementation Services.*** During the implementation phase of the Agreement, Dominion shall provide the following services:

3.2.1  ***System Acceptance Testing Support.*** Dominion will provide direct onsite

training and support during the System Acceptance Testing period.

3.2.2 ***EMS Server Installation, Configuration & Testing.*** Dominion will provide a total of two (2) days of direct onsite support for EMS Server installation, configuration & testing.

3.2.3 ***System Training.*** Dominion shall provide a total of five (5) days of direct onsite training for the System.

3.2.4 ***On-Site Pre-Election Support.*** Dominion will provide three (3) days of direct onsite pre-election support for the first election during the implementation period.

3.2.5 ***On-Site Election Day Support.*** Dominion will provide one (1) day of direct onsite election support for the first election during the implementation period.

3.2.6 ***On-Site Election Day Field Support.*** Dominion will provide three (3) technicians for direct onsite Election Day field support for the first election during the implementation period.

3.3 ***Other Services, Consumables or Equipment.*** Any other services, consumables or equipment not specifically identified in this Agreement are available for purchase by the Customer at the then current Dominion list price.

EXHIBIT B
VOTING SYSTEM AGREEMENT
BY AND BETWEEN DOMINION VOTING SYSTEMS, INC.
AND MONROE COUNTY FL

## SOFTWARE LICENSE AGREEMENT

**THIS AGREEMENT** is made on the ___ day of September, 2013 ("Effective Date")

BETWEEN

**DOMINION VOTING SYSTEMS, INC.,** located at 1201 18th Street, Suite 210, Denver, CO 80202 ("Licensor")

AND

**MONROE COUNTY FL,** located at 530 Whitehead St  Key West, FL 33040 ("Licensee")

      **WHEREAS** The Licensee wishes the Licensor to grant to it a license to use the Software as defined in this agreement and the Licensor is agreeable to granting such a license subject to the following terms and conditions:

**NOW IT IS HEREBY AGREED AS FOLLOWS:**

**1.**    **Definitions.**

1.1.    "Party" or "Parties" Licensor and Licensee may hereinafter be referred to individually as a Party and collectively as the Parties.

1.2.    "Software" means software and firmware licensed by Licensor hereunder, in object code form, including all documentation therefore.

1.3.    "Specifications" means descriptions and data regarding the features, functions and performance of the Software, as set forth in user manuals or other applicable documentation provided by Licensor.

1.4.    "Third-Party Products" means any software or hardware obtained from third-party manufacturers or distributers and provided by Licensor hereunder.

**2.**    **Term**. This Agreement is effective as of the Effective Date and expires on the day before the first anniversary of the Effective Date ("Initial Period"), unless earlier terminated or extended as provided herein.  After the Initial Period, Licensee may extend the effectiveness of this Agreement for up to four (4) years ("Software Renewal Term") by paying the Annual Software License Fee set forth in Schedule A of the Agreement within thirty (30) days of receiving an invoice from Licensor.  The period during which this Agreement is in effect is referred to herein as the "Term".  On expiration of the Term (a) the licenses granted in this Agreement will automatically terminate, (b) Licensee shall cease any further use of the Software, and (c) return

the Software pursuant to Section 12 herein. Notwithstanding such expiration or termination, Section 4 (Payment) to the extent any payment is due and Section 7 (Confidential Information) will survive any expiration or termination of this Agreement in accordance to their respective terms. The terms of this Agreement that do not survive expiration or termination will nonetheless be effective in determining the Parties' rights and obligations for events taking place before such expiration or termination.

**3.     License Terms.**

3.1.    <u>License to Software</u>.  Subject to the terms of this Agreement, Licensor grants Licensee a non-exclusive, non-transferrable license to use the Software solely for the Licensee's own internal business purposes and solely in conjunction with the Software and hardware.  This License shall only be effective during the Term and cannot be transferred or sublicensed.  This License includes the types and numbers of copies specified in Schedule A of the Software identified therein.

3.2.    <u>Print Copyright License</u>.  Subject to the Print Copyright License terms and conditions as defined in Schedule B to this Agreement, Licensor grants to Licensee a non-exclusive, non-transferable print copyright license as defined in Schedule B.

3.3.    <u>Third-Party Products</u>.  Subject to the terms of this Agreement and when applicable, Licensor agrees to sublicense any software that constitutes or is contained in Third-Party Products, in object code form only, to Licensee for use during the Term as part of the System for the purposes described in Section 3.1 of this Agreement. This sublicense is conditioned on Licensee's continued compliance with the terms and conditions of the end-user licenses contained on or in the media on which such software is provided.

3.4.    <u>No Other Licenses</u>. Other than as expressly set forth in this Agreement, (a) Licensor grants no licenses, expressly or by implication, and (b) Licensee's entering into and performing the Agreement will not be deemed to license or assign any intellectual property rights of Licensor to Licensee or any third party. Without limiting the foregoing sentence, Licensee agrees to use each copy of the Software outlined in Schedule A hereto, with which the copy is supplied, agrees not to use any Software as a service bureau for elections outside the Licensee's jurisdiction and agrees not to reverse engineer or otherwise attempt to derive the source code of any Software. The Licensee shall have no power to transfer or grant sub-licenses for the Software. Any use of all or any portion of the Software not expressly permitted by the terms of this Agreement is strictly prohibited.

**4.     Payment**.  In consideration of the grant of the license, the Licensee shall pay Licensor the Annual Software License Fee set forth in Schedule A of the Agreement within thirty (30) days of receiving an invoice from Licensor. Licensee is responsible for all sales, excise, personal property or other taxes or duties on the amounts paid or products or services provided under this Agreement. If Licensee is exempt from such taxes or duties, Licensee shall provide Licensor with a tax exemption certificate.

**5.     Upgrades and Certification**.  During the Term, Licensor may provide upgrades to Licensee under the following terms and conditions.

5.1.   Upgrades.  In the event that Licensor, at its sole discretion, certifies a software upgrade under the applicable provisions of the election laws and regulations of the Licensee's State, Licensor may make the certified software upgrade available to the Licensee.  The Customer shall be required to install the Software upgrade within six (6) months of certification unless the extended use of the previous certified version of the Software is approved in writing by the Licensor.5.2.   Certification Requirement.  Notwithstanding any other terms of this Agreement, Licensor shall not provide, and shall not be obligated to provide under this Agreement any upgrade, enhancement or other software update that has not been certified under the applicable provisions of the election laws and regulations of the Licensee's State.

**6.      Warranties**.  The following warranties will apply to all Software during the Term.

6.1     Software.  Licensor warrants that the Software, for a period of one (1) year following delivery to the Licensee, will function substantially in accordance with the Specification.  If the Licensee believes that the Software is not functioning substantially in accordance with the Specifications, the Licensee shall provide Licensor with written notice of the material failure within thirty (30) days of discovering the material failure, provided that the Licensee can reproduce the material failure to Licensor.  The Licensee's exclusive remedy under this warranty shall be, at Licensor's sole option (a) return of the Annual Software License Fee set forth in Schedule A paid by the Licensee (if any) for the Software, or (b) Licensor shall use reasonable efforts to correct the material failure of the Software.  The foregoing warranty shall be void in the event of the Software (i) having been modified by any party other than Licensor or (ii) having been used by the Licensee for purposes other than those for which the Software was designed by Licensor.  If Licensor establishes that the reported material failure is not covered by the foregoing warranty, the Licensee shall be responsible for the costs of Licensor's investigative and remedial work at Licensor's then current rates.

6.2.Third-Party Products.  The warranties in this Section 6 do not apply to any Third-Party Products.  However, to the extent permitted by the manufacturers of Third-Party Products, Licensor shall pass through to Licensee all warranties such manufacturers make to Licensor regarding the operation of such Third-Party Products.

6.3.   NO  OTHER  WARRANTIES.  LICENSOR  DISCLAIMS  ALL  OTHER REPRESENTATIONS AND WARRANTIES, WHETHER WRITTEN, ORAL, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTY BASED ON A COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

**7.      Confidential Information**.   Licensee acknowledges that the Software and related documentation (collectively, the "Information") (i) constitutes confidential and proprietary trade secrets, disclosure of which would materially injure Licensor's business and competitive position, and (ii) is exempt from disclosure under, the terms of any applicable freedom of information, open public records act or similar statute ("FOIA Statute").  Licensee therefore agrees, to the maximum extent permitted by law, to keep confidential and not to disclose any of the Information to any other person or entity, or use such Information for any purpose other than as expressly permitted by this Agreement.  Licensee shall limit disclosure to employees of Licensee having a need to know to perform their duties to Licensee who have agreed in writing to be bound by the restrictions of this Section 7.  Licensee shall take any and all action necessary

or appropriate to assert all applicable or potentially applicable exemptions from disclosure under the FOIA Statute and take all other legally permissible steps to resist disclosure of the Information including, without limitation, commencement or defense of any legal actions related to such disclosure. In the event Licensee receives a request for Information under the FOIA Statute, Licensee shall inform Licensor of such request within ten (10) days of Licensee's knowledge or such shorter period as necessary under the FOIA Statute to avoid prejudice to Licensor's ability to oppose disclosure. In the event Licensee is nonetheless required by law to disclose any of the Information, Licensee shall give written notice to Licensor at the earlier of (i) twenty (20) business days prior to disclosure or (ii) such longer period as may be required by applicable law. Licensee understands that Florida has a broad public records law and agrees that the County 's and Supervisor of Election's responsibility if presented with a public records request is to advise the Licensee in writing at the address for notices listed in the attached Voting System Agreement; and the Licensor shall immediately cooperate and take all relevant action necessary to asset the County or Supervisor of Elections to provide whatever documentation or testimony as required under Florida law to preserve the confidentiality of information under this paragraph.

**8.    Prohibited Acts**.    The Licensee shall not, without the prior written permission of Licensor:

8.1.    Transfer or copy onto any other storage device or hardware or otherwise copy the Software in whole or in part except for purposes of system backup;

8.2.    Reverse engineer, disassemble, decompile, decipher or analyze the Software in whole or in part;

8.3.    Alter or modify the Software in any way or prepare any derivative works of the Software or any part of parts of the Software;

8.4.    Alter, remove or obstruct any copyright or proprietary notices from the Software, or fail to reproduce the same on any lawful copies of the Software.

**9.    Limitation of Liability**

Licensor's total aggregate liability for any loss, damage, costs or expenses under or in connection with this Agreement, howsoever arising, including without limitation, loss, damage, costs or expenses caused by breach of contract, negligence, strict liability, breach of statutory or any other duty shall in no circumstances exceed the total dollar amount of the Agreement. Subject to Florida Statutes 768.28, the County and Supervisor of Elections limitation of liability shall be limited for any loss, damage, costs or expenses under or in connection with this Agreement, arising out of negligence or willful misconduct of Customer on account of or in connection with Customer's use of service under the Agreement. Neither party shall be liable for any loss of profits, loss of business, loss of data, loss of use or any other indirect, incidental, punitive, special or consequential loss or damage, incurred by the other party or any third party, when not arising from the parties negligent or willful misconduct.

9.1    "Non-Waiver of Immunity.    Notwithstanding the provisions of Sec. 768.28, Florida Statutes, the participation of Dominion and the Customer in this Agreement and the acquisition of any commercial liability insurance coverage, self-insurance coverage, or local government liability insurance pool coverage shall not be deemed a waiver of immunity to the extent of

liability coverage, nor shall any contract entered into by the Customer be required to contain any provision for waiver."

**10. Force Majeure**. Licensor's obligations hereunder will be suspended so long as its performance is impeded or prevented by causes beyond Licensor's reasonable control, including acts of God, embargoes, acts of war (including terrorist attacks), labor disturbances and acts or regulations of governmental entities.

**11. Termination for Cause**. If either Party materially breaches this Agreement and does not cure the breach within 30 days after receiving written notice of the breach from the non-breaching Party, the non-breaching Party may terminate this Agreement as of a termination date specified in that notice or in a subsequent notice delivered within the 30-day period. If the breach cannot be completely cured within the 30-day period, no default will occur if the Party receiving the notice begins curative action within the 30-day period and thereafter proceeds with diligence and in good faith to cure the breach as soon as practicable.

**12. Return of Software.** Upon termination or expiration of this Agreement, Licensee shall (i) forthwith return to Licensor all Software in its possession or control, or, if so requested by Licensor, destroy all such Software from any electronic media, and certify in writing to Licensor that it has been destroyed.

**13. Miscellaneous.**

13.1    Assignment. Neither Party may assign any rights or delegate any obligations under this Agreement without the prior written consent of the other Party; provided that Licensor may subcontract Services upon 30 days' prior written notice to Licensee. Any attempted assignment in violation of this Section 13.1 will be null and void.

13.2.    Severability. If any term of this Agreement is held to be unenforceable, the other terms of this Agreement will be enforced to the fullest extent permitted by law.

13.3.    Counterparts. This Agreement may be executed in counterparts, each of which will be deemed an original but all of which together will constitute one and the same instrument.

13.4.    Governing Law. This Agreement will be construed under the laws of the Customer's state identified on Page 1 of this Agreement, and the state and federal courts within the Customer's state shall have non-exclusive jurisdiction for all actions to enforce this Agreement.

13.5    Waiver. No waiver or failure by a Party to assert any right under this Agreement on any one occasion will operate as a waiver of any other right on that occasion or any right on any other occasion.

13.6    Notices. All notices under this Agreement will be delivered personally, sent by nationally recognized express courier or sent by certified or registered U.S. mail, return receipt requested, to the addresses set forth on Page 1. Notices will be deemed effective on personal receipt, receipt of such electronic facsimile confirmation, two days after such delivery by courier or such mailing by U.S. mail.

13.7    Interpretation. This Agreement, including all Schedules, is the complete and final expression of the Parties' agreement regarding its subject matter and supersedes all prior or

contemporaneous communications or agreements, written or oral, by the Parties regarding such subject matter. In the event of any conflict between these Terms and Conditions and any provisions set forth in any other part of this Agreement, these Terms and Conditions will prevail. No amendment or supplement to this Agreement is effective unless in writing and signed by both Parties' authorized representatives. The word "include" (or any of its derivatives) is deemed to be followed in all contexts by the words "without limitation." Headings are included for convenience and will be ignored in interpreting this Agreement.

13.8    No Third Party Beneficiaries.  Licensor and Licensee agree that this Agreement is for the benefit of the parties hereto and is not intended to confer any rights or benefits on any third party, and that there are no third-party beneficiaries of this Agreement or any part or specific provision of this Agreement, and no third party shall have any right to enforce this Agreement or any provision hereof.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed as of the Effective Date.

**DOMINION VOTING SYSTEMS, INC.**

_Michael Frontera_
AUTHORIZED SIGNATURE

Michael Frontera
PRINTED NAME

VP & General Counsel
TITLE

9/4/2013
DATE

**MONROE COUNTY, FLA**

Supervisor of Elections

K Joyce Griffin
PRINTED NAME

Aug 29, 2013
DATE

Attest: Amy Heavilin, CPA, CLERK

By: _____
        Deputy Clerk

Date: _____
(SEAL)

MONROE COUNTY ATTORNEY
APPROVED AS TO FORM:

_Natileene W. Cassel_
NATILEENE W. CASSEL
ASSISTANT COUNTY ATTORNEY
Date 9-25-2013

BOARD OF COUNTY COMMISSIONERS
OF MONROE
COUNTY, FLORIDA

By: _____
        Mayor/Chairman

# SCHEDULE A

## PRICING AND PAYMENT SCHEDULE

Annual Software License Fee

| Product Description | Quantity | Price |
|---|---|---|
| **Year 1 Software License** | | |
| ICE Annual Software License | 76 | Included in the System purchase price as described in Exhibit A |
| ICC Annual Software License | 2 | Included in the System purchase price as described in Exhibit A |
| Democracy Suite Application Software License | 1 | Included in the System purchase price as described in Exhibit A |
| **Year 1 Total** | | Included in the System purchase price as described in Exhibit A |
| **Year 2 Software License** | | |
| ICE Annual Software License | 76 | $17,328 |
| ICC Annual Software License | 2 | $5,150 |
| Democracy Suite Application Software License | 1 | $13,000 |
| **Year 2 Total** | | $35,478 |

Payment Terms:

1. Licensee shall pay the amounts indicated within 30 days from receipt of Licensor's invoice.

2. To the extent this Agreement is extended for an additional year or years pursuant to Section 2 herein, Licensor reserves the right to increase the Annual Software License Fee within five percent (5%) of the previous year's fee. The increase would begin at the start of the contract term.

**SCHEDULE B**

**PRINT COPYRIGHT LICENSE TERMS AND CONDITIONS**

1.    **Definitions.** For the purposes of this Agreement, the following are defined terms:

    1.1.    "Derivative Works" shall mean any work that is based upon or derived from the Licensor's voting systems' ballots, including without limitation, sample ballots and voting booklets.

    1.2.    "Voting Systems' Ballots" shall mean any ballot created for use with any voting system owned or licensed by the Licensor.

2.    **Print Copyright License and Use.**

    a.    Copyright License Grant. Licensor grants to the Licensee a non-exclusive, non-transferable copyright license to print, reproduce, distribute or otherwise copy the Licensor's Voting Systems' Ballots or any Derivative Works (collectively the "Materials") pursuant to the terms and conditions of this Schedule B.

    b.    Copyright License Use. Other than as expressly set forth herein, (a) Licensor grants no other licenses, expressly or by implication, and (b) Licensor's entering into and performing the Agreement will not be deemed to license or assign any intellectual property rights of Licensor to Licensee or any third party, (c) the copyright license granted herein cannot be transferred or sublicensed and the Voting Systems' Ballots or Derivative Works cannot be reproduced by any third party without the prior written consent of the Licensor, including without limitation:

        (i)    any commercial or non-commercial printer
        (ii)   any third party vendor using ballot on demand system.

    2.3.    Rights and Interests. All right, title and interest in the Material, including without limitation, any copyright, shall remain with the Licensor.

3.    **No Copyright Warranties.**  LICENSOR DISCLAIMS ALL REPRESENTATIONS AND WARRANTIES, WHETHER WRITTEN, ORAL, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY WARRANTY BASED ON A COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.