# EXHIBIT 1

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

___________________________________

LISA POSTHUMUS LYONS,
KENT COUNTY CLERK,

Petitioner,

v. File No. 1:22-mc-00107

MY PILLOW, INC., ET AL

Respondents.
____________________________________/

Hearing

Before

THE HONORABLE PHILLIP J. GREEN
United States Magistrate Judge
November 29, 2022

APPEARANCES

For the petitioner: Ms. Madelaine C. Lane
Warner, Norcross & Judd LLP (Grand Rapids)
1500 Warner Building
150 Ottawa Avenue, N.W.
Grand Rapids, MI 49503
(616) 752-2468
mlane@wnj.com

For the respondent: Ms. Alexandria J. Taylor
Taylor Law Firm
19 Clifford Street
Detroit, MI 48226
(313) 960-4339
ataylor@taylawfirm.com

Recorded By: Digitally Recorded

Courtroom Deputy: A. Dozema

Transcribed By: Bonnie L. Rozema, CER 5571

TABLE OF CONTENTS


| WITNESSES: | PAGE |
|---|---|
| None | |

| EXHIBITS: | IDENTIFIED |
|---|---|
| None | |

Grand Rapids, Michigan

Tuesday, November 29, 2022 - 1:01 p.m.

THE COURT: Good afternoon. Please be seated.

MS. LANE: Good afternoon, your Honor.

MS. TAYLOR: Good afternoon.

THE COURT: We are here in the matter of In Re Subpoena of Kent County Clerk, number 21-mc-445 -- I'm sorry, 22-mc-107. This is the date and time set for a hearing on Kent County Clerk's petition to quash a subpoena.

Could I have appearance of counsel, please.

MS. LANE: Thank you, your Honor. Madelaine Lane of Warner, Norcross and Judd on behalf of the Kent County Clerk, Lisa Posthumus Lyons.

THE COURT: All right. Good afternoon, Ms. Lane.

MS. TAYLOR: Good afternoon, your Honor. Alexandria Taylor here on behalf of the defendant. I'm also joined with my law clerk, Hannah Jenkins.

THE COURT: All right, good afternoon to both of you.

MS. JENKINS: Good afternoon, Judge.

THE COURT: All right, Ms. Lane. You have the floor. I have a question -- two questions to begin with, and I'll ask them separately. Since we often criticize

attorneys for asking compound questions, I'll try to avoid that.

Is the subpoena, has it been rendered moot as a result of the election? As I -- if I read your brief correctly, it seemed to me one of the points you were making, look, once we do this election, the information's going to be gone. It's not going to be retained. What is left that the subpoena could acquire?

MS. LANE: Thank you, your Honor. I believe to a large extent it's moot. However, there are additional documents that are not housed on either the -- the election server or the voting machines or ballot tabulators themselves. That -- that can be -- that could be collected. For example, request, I believe it's 4C, requests copies of all documents, reports, or spreadsheets that were created regarding the November 2020 election.

THE COURT: Uh-huh.

MS. LANE: That's the one that caught my attention, because I think the breadth of that is quite significant and would likely encompass anything from campaign finance reports to the names of poll workers' contact information. There are additionally some requests asking for copies of any contracts or agreements we have with vendors regarding cyber security. Any contracts or agreements we have, for example, with Dominion for our

voting equipment. So I do believe that that information would still be available if we were required to respond to the subpoena. And in addition, I don't know standing here what off of the server and network information they would have saved prior to the election.

THE COURT: Okay. My second question. Is the petition timely?

MS. LANE: Yes, your Honor. And this is the reason that we believe so. We, when we received the subpoena on September 6th, we wrote immediately to the defendant's counsel and asked them to explain why they believed we had relevant information, and additionally, asked them to explain why -- what steps they had taken to tailor this to Kent County so that it wasn't an undue burden. We didn't get a response. So then on September 16th we wrote again. We articulated the fact that we believed it was an undue burden and asked them to withdraw the subpoena no later than September 19th. They did not do so, but on September 21st, they wrote us, thanked us for receiving a copy of our objections, and indicated that they had sent similar subpoenas with a September 30th deadline to other counties. I believe that's not only in Michigan, but likely throughout the country. And that they would get back to us after they had collected all of that information to discuss with us the issues and objections. And that

they were not planning on filing a motion to compel.

So the way that we read that was that they expected no further response from us. They had, you know, even though we hadn't articulated objections to specific requests, we had certainly objected to the subpoena overall, and that they were not planning on enforcing the subpoena by the September 30th deadline.

THE COURT: Okay. It is interesting, if not ironic, that seems like you are relying upon Mr. Lindell's statements to qualify your letters as objections. They are required -- they are relying on your statements to characterize them as not objections.

MS. LANE: I think, your Honor, we can -- yes. I agree with you. But I think we can even look past that. I think the second sentence or the last sentence of that letter where they clearly are saying they're not -- they're not moving to compel any additional response, whereas before they discuss our issues and objections, it is really the most important part of that sentence.

We tried our best to reach out and discuss these issues with them, but it just looked -- it appeared to us that they were unwilling to engage in that type of discussion until they had received other responses. I could speculate as to the reasons of that. Perhaps they were hoping another county would give them information that

would render their request to Kent County moot. However, I obviously don't know what was in their head at the time.

THE COURT: Well, the subpoena for the, I guess the clerk in Miami County, is it Miami County? Miami Dade?

MS. LANE: It is in --

THE COURT: Motion --

MS. LANE: Yes.

THE COURT: -- to quash?

MS. LANE: Monroe County.

THE COURT: Okay.

MS. LANE: And that's still pending. I looked it up as of yesterday on Pacer. That's still pending. As well as Dominion's motion for a protective order, which would cover some, but not all of this. The information requested as of at least yesterday was still pending without a hearing date on Pacer.

THE COURT: So as far as you know, that's the only other pending motion to quash?

MS. LANE: Yes, your Honor.

THE COURT: No other court has ruled on this issue?

MS. LANE: I checked on Pacer, ran Mr. Lindell's name, and I believe that this is the only one that I was able to locate that is set for even a hearing.

THE COURT: And there's a pending motion for a

protective order filed by Dominion in the federal court in Minnesota seeking a protective order?

MS. LANE: I think it's pending in the District of Columbia.

THE COURT: Oh, that's right. I'm mixing up with the search warrant case.

MS. LANE: Correct.

THE COURT: Yeah, thank you. Okay. Well, I'm not sure and I will -- I'm going to say this for both counsel's benefit, kind of where I'm coming from, so you guys can adjust your arguments accordingly.

I'm not sure that objections are required and here is why I say that. I'm looking at Rule 45. And Rule 45 is what drives the train here today, okay? Not Rule 26. Rule 26 is a rule that addresses discovery obligations between parties in a lawsuit. Rule 45 addresses protections that are given to third parties, people who are not party to a lawsuit. Under the federal rules, we give greater protection to those who are not parties to a lawsuit, all right? So I don't know that I'm going to be moved at all by references to Rule 26, which as I read, has to do with parties, okay? And if Kent County Clerk was a party to the lawsuit, it would be a very different situation. Kent County is not. The clerk, I should say, of Kent County is not a party, so I have to --

I'm governed by Rule 45.

Rule 45(d)(1) puts a puts a burden on the party serving the subpoena to take reasonable steps to avoid imposing undue burden or expense on the person or party receiving the subpoena, number one.

Where it talks about objections is in 45(d)(2)(B). And what that provision says, in essence, is a party who is receiving a subpoena, subject to the subpoena, may -- may serve objections, and if so, then certain rules kick into play, okay? Under Rule 45(d)(2)(B) subpart (i) and (ii). In other words, if objections are timely served, then the party serving the subpoena can go to court where compliance is required to move to compel or go to court to seek some sort of other relief.

Rule 45(d)(3) addresses motions to quash. I see nothing in 45(d)(3) that requires a third party to first serve objections before moving to quash.

That's where I'm coming from, okay? But I'm happy, I'm assuming, Ms. Lane, you're not going to argue with me, but you're welcome to tell me I'm wrong if you think I am, but and I'll certainly give Ms. Taylor to tell me if I'm wrong and why I'm wrong. But that's where I'm coming from.

So now I understand at least some courts have, in my humble view, somewhat muddied the water, okay?

Because on petitions or motions to quash, they sometimes use language from Rule 26 and they talk about these things. I'm -- my mind is simple, okay? I am simple minded. And so I have to look at things in that way. And so I -- so where I'm coming from, Rule 45 is driving the train.

So but Ms. Lane, what I'd like to hear from you now is as of what's -- well, first, I guess my next question for you, and then I'll ask Ms. Taylor the same question, the time for responding to the subpoena is past.

MS. LANE: Correct.

THE COURT: That subpoena is now a nullity, is it not?

MS. LANE: I --

THE COURT: Are subpoenas valid? How long do they remain valid? I believe once the time for production is past if there's been no motion to compel, I'm not sure that that's a valid subpoena.

MS. LANE: I believe that you're correct, your Honor. That's my understanding of the rules as well.

THE COURT: All right. Well, let's -- assuming that it might be, explain to me what -- how -- what's left, okay? In light of the election and what is left that could be obtained from the subpoena as it was written. Explain to me what is unduly burdensome about producing that.

MS. LANE: Okay. Thank you, your Honor. And I

want to start by -- by looking at the factors that courts review when they look at undue burden. And in the New Products Corp. versus Dickinson Wright matter from 2018 out of the Sixth Circuit that we cited, there are a number of different factors the court can look at. And that includes relevance, the need for the party for the documents, the breadth of the documents required, the particularity to which the documents are described, and burden, amongst others. And I think each of the relevant factors in this case counsel towards quashing the subpoena.

And the reason I say that is this. First, regarding relevance. We're here today because Mr. Lindell refuses to accept that Donald Trump lost the 2020 presidential election. That was two years ago. And despite every investigative agency that's looked into this, including Trump's own Department of Justice, the Republican, at the time Republican led Michigan Senate Oversight Committee that concluded there was no election fraud in Michigan's election -- widespread election fraud in Michigan's election system in 2020, the canvassing from Kent County that occurred that found no fraud, and then the hand --

THE COURT: What is canvassing? I think I saw that in your brief. I'm not sure I understand entirely what that is.

MS. LANE: Your Honor, I'm not sure I could give you the dictionary definition, but it is one of the sort of checks and balances that is immediately gone through after the election to make sure that all of the precincts are accounted for that, you know, the numbers line up. And then after that, under the supervision of the Michigan Bureau of Elections, Kent County then actually does a ballot count where they go back and make sure, hand count a selection of ballots to make sure, again, that there's no indication that there was any sort of fraud or the tabulation machines had had any issues. Again, it's a check and balance in the system so that we don't merely have to rely on those initial reports out from the precinct on the night of the election, if we're lucky, or days later.

THE COURT: I live in a small rural county, all right? We're not nearly as sophisticated as you folks here in Kent County. So when we go to vote, there's a paper ballot, heavy paper ballot, and we take a marking pen and we fill in a circle. Hopefully we do it very neatly so there are no problems. Is that -- is that how voting is done in Kent County?

MS. LANE: That's how voting is done in my precinct in Kent County, yes.

THE COURT: Do you know whether there's any

precinct in Kent County that uses touch screens for voting?

MS. LANE: I don't know off the top of my head, your Honor. I can tell you I have never seen one in Kent County. But -- but that doesn't mean that it doesn't exist.

THE COURT: Okay. So are we talking -- are the machines that Dominion -- I don't know, did Dominion provide the machines or the software or both?

MS. LANE: I believe it's both.

THE COURT: Okay. So the machines we're talking about, are these machines that in which the ballots are submitted and it reads these ballots and registers the votes?

MS. LANE: That's my understanding.

THE COURT: Okay.

MS. LANE: And that's part of what they want. They want all of our network -- they want us essentially to map our network for them so that they know every single device that's connected in any way to the election system. So, for example, if I had a USB, you know, thumb drive that I was able to plug in, they want to know what that end -- that end device is. They want to know all the ballot tabulation information. But what it comes back to is that to-date, Mr. Lindell has failed to articulate any reason he believes that in spite of all the evidence to the contrary,

Kent County -- any of the information he's requested from Kent County will show that Dominion was involved in a conspiracy to manipulate votes and help President Biden somehow steal the 2020 general election. Indeed in his response, he articulates that one of the reasons he's sending subpoenas across the country to various counties that use Dominion software is because he doesn't right now have the evidence to support the public statements he made, and that he is going on what I would say is a picture of an arbitrary fishing expedition to try to find some scintilla of evidence somewhere in this nation to support the public statements that he made when faced with all evidence to the contrary.

THE COURT: So I recognize, and I did read the opinion in In Re Modern Plastics Corp. And again, it's somewhat concerning because, again, it seems to me the courts may be conflating Rule 26 and Rule 45. But given that that's a superior court, I'm certainly not criticizing the opinion, and I recognize -- so what I'm trying to understand is how does relevance, when Rule 45 says that a third party who is the subject of a subpoena can come to court and ask the court to quash the subpoena, it can do so on the basis that it constitutes an undue burden. So seems to me Rule 45 is focused on what is the burden to the third party, not so much on what's the relevance.

Now in Rule 26, again, very different situation. Now we're talking about the court has to balance between the relevance, how relevant is it, is it proportional, what's the, you know, all these sorts of things. Apparently, I have to consider relevance to some extent because the Sixth Circuit tells me I have to and I obey the Sixth Circuit. But how am I supposed to -- how am I supposed to analyze this comparing relative -- and I understand your argument is there's very little relevance here. I think Ms. Taylor takes a different view, and I'm going to hear her. But how do I figure that in? In other words, is it the case that even though I find that there's this tremendous burden, $4.2 million it's going to cost Kent County, that I still might say, well, Kent County, you've got to expend the 4.2 million because this is really relevant?

MS. LANE: I think it's, your Honor, one factor to look at. And I think in this case it's important in light of the other factors, right? So we think that there is a significant chance that there is going to be no useful information for -- for Mr. Lindell in Kent County. And yet, they have sent us a subpoena that is asking for an incredible breadth of information. I mean just looking just at request 4.C. alone, which is asking for all the documents, reports, and spreadsheets regarding that 2020

November election, essentially what they're doing is asking for a blueprint for our election system. And they -- they don't just want to know what the results were. They want to know, you know, who counted those votes, what -- you know, they want to know how were they counted. They want to know, you know, that would suggest to me they want to know information about particular voters. They want to know who voted, how they voted. Did they have provisional ballots, did they fill out a regular ballot?

THE COURT: Well, there'd be no way of finding that out, would there? I mean in other words when I go and vote in my little rural county in my little precinct where everybody knows everybody, I fill out a ballot, it gets inserted in that machine. How is anybody going to know how I voted?

MS. LANE: Well, they're asking -- presumably there are -- there are voter rolls and records regarding, I mean, I'm reading 4.C. pretty broadly because I think I have to. And if it's any spreadsheet, any report, any document created regarding the November 2020 election, I think you could read that -- I would object to it, but you could read that to be the ballots themselves, which I think in and of itself would be unconstitutional.

THE COURT: Well, I would hope nobody in the government could know how I voted.

MS. LANE: I agree with you --

THE COURT: That would be disconcerting.

MS. LANE: -- your Honor. I agree with you and we certainly wouldn't turn that information over. But essentially, at the end of the day, what I think they are asking for is every bit of information about how elections in Kent County are conducted, how votes are counted, who is involved with it, so they can call into question -- they can use that information to try to call into question the integrity of the 2020 election. And not only do we have that sort of substantial concern from a voter perspective, right? But we also have the actual hard costs that come along with that.

And it's, look-it, I think the chances that we have to replace the voting machines are probably slim absent this information somehow getting out into the public and -- and -- but at the same time, you know, our Kent County Director of Elections submitted an affidavit suggesting that it would take approximately 80 hour -- employee hours to just collect the information. We think that the amount of electronic data would probably be 2.5 gigabytes. 250,000 e-mails is about the equivalent. It's not e-mails, but that's the equivalent kind of to look at. I did some quick math, and if you assume we need to do linear review, so look at every document, and it's a

hundred documents an hour at $250 an hour, that's over $600,000 of taxpayer money. And this is 600,000 --

THE COURT: Mr. Lindell going to pay that?

MS. LANE: Well, Mr. Lindell has not yet asked us to pay that. But I think, again, we go back to the larger issue of the integrity of the election. And I do think that it is important to consider who is asking for this information. And I understand that Mr. Lindell and My Pillow are suggesting that a protective order would be sufficient in this case. And I disagree. And the reasons are, are not just because Mr. Lindell continues in the face of every investigative agency and -- you know, everyone that's looked into this repeating the same concern. I believe I even saw him on election night recently with -- indicating that there was -- he had elections concerns in 2022 in Arizona. Again, ironically, a place where a Democrat beat a Republican.

But more importantly, as your Honor alluded to earlier, he has recently been the -- had his cell phone taken, a search warrant executed against him because the Department of Justice was able to prove to a federal magistrate judge that they believed there was probable cause to believe that there was evidence of a crime on that phone. And when Mr. -- not to say that Mr. Lindell committed a crime, but that there was at least potential

for evidence of a crime on that phone. And --

THE COURT: I don't think I can consider any of that, can I? I don't know what's in that affidavit, I don't know what criminal activity is alleged to have been involved in that. I don't know what that has to do with --

MS. LANE: Well, I --

THE COURT: -- this.

MS. LANE: I agree with your Honor, no one outside of the government and the court has seen that affidavit. However, in the government's response, they did articulate that the particular crimes they were looking at were involved, identity theft, breaking into a protected computer, and conspiracy to do the same, I think is the --

THE COURT: Is your point that you would have concerns that Mr. Lindell wouldn't abide by a protective order?

MS. LANE: Correct, your Honor.

THE COURT: Oh, I see.

MS. LANE: Because my under --

THE COURT: Who would issue -- who would have the authority to issue a protective order? Can this Court issue a protective order? I don't think --

MS. LANE: I don't -- this court -- I don't believe this court can issue a protective order that would in a -- in the District of D.C. --

THE COURT: You'd have to go to the --

MS. LANE: -- correct.

THE COURT: -- District of Minnesota. I'm sorry, District of D.C. I don't know why I keep thinking this was in Minnesota.

MS. LANE: Your Honor, just unless your Honor has any other questions, at the end of the day, Mr. Lindell is misusing the subpoena power that he's permitted to under the federal rules. I understand that he is facing a $1.3 billion case, but Kent County is not. And the taxpayers of Kent County expect us to use their money wisely. And in this case, what Mr. Lindell is asking you to do is to allow him to continue on what is clearly an arbitrary fishing expedition, hoping that if he sends enough subpoenas to enough counties that use Dominion software where President Biden won, that he'll find some evidence somewhere to get out from under this defamation lawsuit. And I don't believe, your Honor, that is -- that is a proper use of the subpoena power, and certainly not a good use of taxpayer dollars.

THE COURT: All right, thank you, Ms. Lane.

MS. LANE: Thank you, your Honor.

THE COURT: Ms. Taylor.

MS. TAYLOR: Yes, your Honor.

THE COURT: So let's start with the second

question I asked Ms. Lane. No, I'm sorry, it wasn't the second, maybe it was the third question I asked Ms. Lane. Is the subpoena still valid?

MS. TAYLOR: Yes, your Honor. I would argue that the subpoena is still valid. When we communicated with counsel, those can be akin to providing extensions on it. And so there were communications between counsel concerning the subpoena.

THE COURT: The Kent County Clerk agreed to an extension on the subpoena?

MS. TAYLOR: I'm not sure if there was necessarily an agreement, but there wasn't a disagreement either. So there were communications back and forth saying, okay, hold off. As counsel accurately stated, there was no motion to compel filed. So it's, you know, hold off, let's communicate further. And so I would say that that communication renders the subpoena still valid.

THE COURT: How long is a subpoena valid under those circumstances? Go on indefinitely?

MS. TAYLOR: You know, I think it could be looked at as a reasonable period of time, and so the communications, there were communications in September, I believe at the end of September, and then obviously we had this litigation. And so I would -- I would argue that we are still within a reasonable period of time. I think

there would be a question if you were a year out or more, you know, whether that subpoena's still --

THE COURT: Where is the dividing line? How do I know where -- what's reasonable and what's not reasonable period of time?

MS. TAYLOR: I don't -- I don't think there's anything articulated that I saw in the caselaw about what would be unreasonable, but I would just say here on these set of facts, based upon the communication and the recent communication, this is not an unreasonable period of time here.

THE COURT: Well, absent an explicit agreement to extend the deadline for responding to a subpoena, do you have any caselaw to support the proposition that somehow there's this reasonable period of time that the subpoena remains valid after the return date?

MS. TAYLOR: Not at this moment, your Honor. I would just say --

THE COURT: I'm not aware of any.

MS. TAYLOR: Right.

THE COURT: And I certainly have had cases where there were motions to compel filed after the return date. I denied the motion as moot, finding that the subpoena was no longer valid. There was nothing to compel.

MS. TAYLOR: I do believe it's a case specific

situation. And so here where you had communications specifically saying, okay, hold off, and then no motions to compel were filed, but then you had this motion to quash, and so I would argue, you know, here the motion to quash almost kind of like tolls, if the court did feel like there was a period of time, would toll that because, again, now we're -- we've shifted focus to focus on the motion to quash the subpoena.

THE COURT: All right. Well, I'm not -- I'm not sure I agree with you, but I don't want to belabor the point.

MS. TAYLOR: Yeah.

THE COURT: What I'd like to ask you to begin, and I'm happy to hear whatever you have to say, but one of the things I would like you to address is what efforts did you make or your client make to avoid undue burden or expense on the Kent County Clerk in serving the subpoena, as required by Rule 45(d)(1)?

MS. TAYLOR: So as we articulated, your Honor, in our response, there is no other way to get the information that my client is seeking. And so this isn't a fishing expedition, and really it's not even about Donald Trump because there were five subpoenas, your Honor, that were issued here in Michigan, and some of those counties were counties that President Trump prevailed in. And so --

Case 1:21-cv-01194-CJN Document 156-2 Filed 12/19/22 Page 24 of 42

THE COURT: What relevance is that? I don't -- I don't care who won the election in what county.

MS. TAYLOR: Right.

THE COURT: I'm not here to decide elections. I'm not here to be concerned about the validity of elections. I'm here to determine whether this subpoena poses an undue burden on the clerk of Kent County. So and Rule 45(d)(1) requires anyone serving a subpoena to take reasonable steps, in other words affirmative steps to avoid undue burden. It seems to me at the very least that would require some contact with the clerk of Kent County to initiate some discussion in terms of here's what we're looking for, how can we -- how can we get this.

MS. TAYLOR: Absolutely. And I think one of the major steps, Judge, is just the fact that, you know, our client wasn't filing a motion to compel and saying, you know, you need -- you need to get it by this date or we're filing. We didn't do that. We said okay, let's hold off, let's see -- so we were reasonable in our efforts with the clerk saying, okay, not rushing the clerk to get this information because, I mean, I think the Court will agree if there's a rush to get the information in a short period of time, that's going to cost more money because you're going to have to put more people on it and, you know, her sister counsel talked about the number of hours. So that

would be a heavy burden if my client came with a heavy hand like, I need this information within this timeframe. There's no wiggle room or anything. And that didn't happen. And so I think that --

THE COURT: Well, don't that -- that burden or that responsibility for taking reasonable steps, that's there at the time of serving the subpoena. It's not, well, we're just going to just issue these subpoenas and let things kind of sort out later if there is some sort of a motion and then figure it all out. As I read Rule 45(d)(1), before that subpoena is served, the attorney or party serving that subpoena has to take reasonable steps to protect, to avoid, I'm going to use the language of the Rule, to avoid imposing an undue burden or expense. So I'd like to know, before serving the subpoena on the clerk of Kent County, what reasonable steps were taken to avoid undue burden or expense?

MS. TAYLOR: Your Honor, I'm not sure prior to the subpoena being served, and I don't know even how the caselaw would articulate that prior to something being served. I can only attest to conversations that happened afterwards and the reasonableness of those and, you know, providing latitude, not threatening motions to compel, and being reasonable in that respect, which I think, you know, speaks to reason.

And I know in our response we did focus heavily on 26 because as your Honor articulated, the caselaw kind of interchanges those. And so we kind of read 26 when it says party to mean party upon the, you know, whom the subpoena was served. But I would say that those steps that my client took afterwards, those should speak volumes of saying, okay, let's try to sort this out. And as we stated in our response, even if the court was included to do a protective order which would put some parameters in, lessen that burden upon the clerk.

THE COURT: I don't have the authority to issue a protective order, do I?

MS. TAYLOR: Yes. Well, because that is still pending in D.C., so yes.

THE COURT: Yeah, I mean the District of Columbia would have to do that.

MS. TAYLOR: Which was we don't have a hearing --

THE COURT: Well, let me back you up a minute. So I want to make sure I understand. If I understand you correctly, and when I say you, I'm talking about --

MS. TAYLOR: Yes.

THE COURT: -- your client and whoever is acting on your client's behalf.

MS. TAYLOR: Absolutely, your Honor.

THE COURT: You served similar subpoenas around the country to various county clerks.

MS. TAYLOR: That's correct.

THE COURT: And apparently you had no intention of filing motions to compel in any of those subpoenas.

MS. TAYLOR: I don't want to say that, your Honor. I can't speak to that. As you know, there are other attorneys that are handling those, so I -- I don't want to misstate something on the record.

THE COURT: Okay, well, let's --

MS. TAYLOR: But I just speak to the --

THE COURT: Let's stick to this one.

MS. TAYLOR: Right.

THE COURT: Okay? So you served on the clerk of Kent County a subpoena and you had -- you made it clear to Ms. Lane, counsel for the Kent County Clerk, that your client had no intention of filing a motion to compel, right?

MS. TAYLOR: So what I'm saying is that my client was willing to have discussions and not come in with a heavy hand saying if you don't get this information to us by this deadline we're going to file a motion to compel. Just the reasonableness of knowing this is a lot of information to gather, and being open to those discussions. I can't say if this motion to quash was never filed and

those discussions broke down that they would have never filed a motion to compel, but I'm just saying in that moment.

THE COURT: How could you? I mean it seems to me to the extent you can hang your hat on the proposition that this subpoena has any validity left to it --

MS. TAYLOR: Yes.

THE COURT: -- it would be based upon the fact that Kent County has come in and filed this motion to quash. And I think your argument there is, well, that kind of tolled the response date. Maybe that's true. I'm not sure it is. But giving you the benefit of the doubt, okay. But if they hadn't come in, because basically it seems to me what you're arguing is Kent County shouldn't have come in here and filed this motion to quash because we weren't going to compel right away. And so you were going to, if they hadn't filed this motion to quash, there still would not have been a motion to compel, right?

MS. TAYLOR: So, no. That's not what I'm saying. I'm saying at the outset there were these open discussions back and forth. So that's what I'm saying. But I can't say if there was never a motion to quash that my client would not have filed a motion to compel. I mean I'm sure --

THE COURT: But certainly wouldn't have filed it

by the response date.

MS. TAYLOR: I'm sure something would have been filed. And so --

THE COURT: Response date?

MS. TAYLOR: No, I'm just saying if they -- if discussions had broke down between the parties and, your Honor, I'm sure something would have been filed.

THE COURT: For filing that motion to compel today and you would have gotten nowhere, okay? I can promise you you would have gotten -- that would have been denied at the outset.

MS. TAYLOR: Right, because the --

THE COURT: The subpoena, the response, it's too late, okay? I want to focus, let's -- I want to know specifically after --

MS. TAYLOR: Yes.

THE COURT: -- after Ms. Lane contacted you, as I understand it, you advised that they didn't have to comply by the September 20th, was that the response date?

MS. TAYLOR: I believe it was around the 21st or thereafter, yeah.

THE COURT: Okay, whatever it was. Other than that, putting aside whether you took reasonable steps before you served the subpoena, what, specifically, did you do after being contacted by Ms. Lane to take reasonable

steps to avoid undue burden?

MS. TAYLOR: Well, your Honor, I think that is a step, just providing, saying, okay, you know --

THE COURT: You don't have to respond by the response --

MS. TAYLOR: You don't have to respond by this date.

THE COURT: Okay. What else did you do?

MS. TAYLOR: That was the substance of it, your Honor.

THE COURT: Okay.

MS. TAYLOR: Just providing that flexibility.

THE COURT: Did you respond to the initial letter?

MS. TAYLOR: I am not sure, your Honor, because it wasn't myself --

THE COURT: Did anybody respond?

MS. TAYLOR: -- that was dealing with Ms. Lane. I mean I'm assuming so. There were correspondences that were in the exhibits that were attached on both sides.

THE COURT: Okay, maybe I'm misremembering. I thought Ms. Lane advised me that there was no response to the initial letter that they sent.

MS. TAYLOR: Right. That's what she stated.

THE COURT: Okay. And do you have any evidence

that there was a response?

MS. TAYLOR: I don't have anything right here to the contrary, other than what we attached in our reply.

THE COURT: Now, then, there was a second letter sent?

MS. TAYLOR: Yes.

THE COURT: And what was the response to the second letter?

MS. TAYLOR: I believe Ms. Lane argued about that. There was a second letter and then there was a response. So the second letter, your Honor, was September 16th, and then the response was September 21st.

THE COURT: All right, and that's when somebody representing your client responded?

MS. TAYLOR: That's correct.

THE COURT: Okay. And let's see. Does the September 16th letter, according to Ms. Lane, noted that the subpoena was unduly burdensome, and that if it was not withdrawn, they asked for a meet and confer. Did you engage in a meet and confer with Ms. Lane?

MS. TAYLOR: Someone else in the office may have. I did not personally, your Honor.

THE COURT: Okay, but you don't know?

MS. TAYLOR: I'm not sure.

THE COURT: All right. So I mean how can I not

Case 1:21-cv-00445-CJN Document 25 Filed 12/12/22 Page 32 of 42

grant the motion to quash on that basis alone? I mean if -- if the rule says you have to take reasonable steps to avoid undue burden, nothing was done before the subpoena was served, and the only thing that you can tell me that was done after the subpoena was served is that you or somebody on your client's behalf advised Ms. Lane that her client need not respond by the response date, that's it, right?

MS. TAYLOR: Yeah, there were other discussions. But your Honor, just providing that flexibility in the time and not such with heavy hand lessens the burden. Because again --

THE COURT: Hearing that there were discussions doesn't move the ball, Ms. Taylor. What I need to know is --

MS. TAYLOR: But meet and confer.

THE COURT: -- in the discussions, what was done, okay? What, specifically, was done on your part to address the burden that would be imposed on Kent County through the subpoena?

MS. TAYLOR: Addressing the parameters around the subpoena. And so --

THE COURT: Did you specifically offer to limit the parameters of the subpoena?

MS. TAYLOR: I believe there were discussions

Case 1:21-mc-00145-JEB Document 156-2 Filed 12/12/22 Page 33 of 42

about it, but no meeting of the mind on those discussions.

THE COURT: Ms. Taylor, it doesn't help your cause for you to tell me what you believe. I need to know what happened, not -- not what you believe may have happened.

MS. TAYLOR: Yes.

THE COURT: Do you follow me?

MS. TAYLOR: I do. So they -- they had discussions, your Honor, just like counsel will have discussions on matters, but there was no meeting of the minds because they wanted to --

THE COURT: It doesn't matter whether there was a meeting of the mind.

MS. TAYLOR: Right.

THE COURT: What matters --

MS. TAYLOR: There were --

THE COURT: -- Ms. Taylor, is that efforts on your part were made, reasonable efforts to minimize. So that burden is on you, okay?

MS. TAYLOR: Yes.

THE COURT: So it may be that you or somebody else representing your client were eminently reasonable in your efforts to avoid undue burden --

MS. TAYLOR: Yes.

THE COURT: -- and Ms. Lane was just obstinate,

okay? She just wouldn't agree to anything.

MS. TAYLOR: Okay.

THE COURT: In that case I would find, well, you met your burden. So whether the parties had a meeting of the minds or an agreement is not relevant to this, it's not determinative, at least. What matters is what specific steps were taken by your client to minimize the undue burden.

MS. TAYLOR: So, your Honor --

THE COURT: I don't want to beat a dead horse.

MS. TAYLOR: Yes.

THE COURT: I mean I think you said all that you can say on that.

MS. TAYLOR: No, I will say this, and you know, the last thing on that point, your Honor, is that there was a specific discussion, and I believe Ms. Lane alluded to this about seeing the responses from the various counties and then coming together to reassess. And so I think that that is telling, because again, if we have something else in this county, and maybe we don't need as much as we thought we did, let's reassess at that point. So that is a specific discussion that was had, your Honor.

THE COURT: Okay. Why does Mr. Lindell need all this information? I mean isn't -- it does look like a fishing expedition. I love fishing, but not in litigation.

I mean it seems to me this is as broad based a subpoena as possible. This is the type of subpoena somebody issues when they have no idea really what they're looking for, but they want to make sure they capture everything possible, all right? So tell me why I shouldn't conclude this -- this is a fishing expedition, that a broad net has been thrown out in various counties around the country. Again, I have no idea what happened in the election, what happened in any county office. That's not my job to be concerned about that. But you've cast these huge nets over all these various counties. They don't seem at all to be narrowed to any particular issue.

MS. TAYLOR: So, your Honor, he's seeking information related to the election. And I mean that in itself is a broad term. And so there are only five counties, as I've stated, that Mr. Lindell sought subpoenas in and some were red, like I said, some were blue. But the information that he seeks is in relation to the specific election in 2020. And so how else can you get that information other than this broad subpoena?

THE COURT: I believe I read in your response, and correct me if I'm wrong --

MS. TAYLOR: Yes.

THE COURT: -- one of the alleged false statements that's the subject of the suit in D.C. had to do

with a Michigan county. Am I remembering that correctly? Let me see if I can find it real quick.

MS. TAYLOR: I have our response.

THE COURT: Let's see.

MS. TAYLOR: Yes.

THE COURT: And this would be page five of your response, ECF number 8, page ID 189, the second bullet point -- no, I'm sorry, the first bullet point, which would be I think the second paragraph. An IT security professional who -- now maybe this is not one of the alleged false statements.

MS. TAYLOR: Okay.

THE COURT: But it says an IT security professional who reviewed a Dominion system from a Michigan county after the 2020 election found data indicating Internet communications between that system and IP addresses in Taiwan and Germany. What county is that?

MS. TAYLOR: Hold on a second. It doesn't say which Michigan county.

THE COURT: No, I see that --

MS. TAYLOR: Yeah.

THE COURT: -- doesn't say. That's why I'm asking you --

MS. TAYLOR: I'm not sure, your Honor.

THE COURT: -- what county that is.

MS. LANE: Your Honor, it references Exhibit E.

THE COURT: I'm looking for Exhibit E now.

MS. LANE: I believe it's Antrim County, which is not one of the five Michigan counties that were subpoenaed. I believe Kent, Berrien, Calhoun, Saginaw --

THE COURT: Okay.

MS. LANE: -- and Wayne.

THE COURT: All right, thank you. Why not serve a subpoena there? Of any place, it seems to me that would be the first place you'd subpoena.

MS. TAYLOR: I'm not sure why they didn't subpoena that one.

THE COURT: Okay.

MS. TAYLOR: As I stated, it's the five, and sister counsel just accurately stated, Kent, Berrien, Wayne, Saginaw, and Calhoun. Again, your Honor, they were not seeking to subpoena every county in each state because that would be a bit of a fishing expedition, so.

THE COURT: I get it.

MS. TAYLOR: Yes.

THE COURT: But if one of the allegations in the lawsuit is that Antrim County, that there was actually evidence of a connection with Taiwan, my goodness --

MS. TAYLOR: And I don't --

THE COURT: -- that would be the first place I

would go to look. I wouldn't be looking at Kent County, I'd be -- I would be serving a subpoena first on Antrim County.

MS. TAYLOR: And I can't say there's nothing being done there, I'm just not -- I am not made aware of any litigation that is going on there.

THE COURT: Gotcha. Anything else you want me to consider?

MS. TAYLOR: Nothing else.

THE COURT: All right, thank you.

MS. TAYLOR: Thank you.

THE COURT: Anything further, Ms. Lane?

MS. LANE: Extremely briefly, your Honor. First, referring to the deadline for response to the subpoena, I would just point out to the Court that I don't believe defendants can have it both ways. Either we timely filed this motion to quash because they had somehow extended the subpoena past September 30th, or it's not extended, and therefore, their motion to compel was not timely -- which has not yet been filed is therefore not timely filed and the subpoena is no longer valid.

The only other part I wanted to note, your Honor, is in terms of other discussions, the other discussion that defense counsel referenced was in fact that September 21st letter that was in response to the letters

Matt Nelson from Warner Norcross sent on behalf of Kent County. My understanding is the only other conversation, other reach-out that we have had is a response when I -- when I asked whether they would object to my motion to file a reply brief in this matter. So to the extent that your Honor is inquiring about any follow-up from them or conversation, there was none other than that September 21st letter regarding the merits of the subpoena.

THE COURT: All right, thank you.

MS. LANE: Thank you, your Honor.

THE COURT: All right, this motion to quash the subpoena has been brought under Rule 45(d)(3). Rule 45(d)(3) states on a timely motion the court for the district where compliance is required must quash or modify a subpoena that subjects a person to undue burden. This person, for the record, includes organizations and other parties.

Rule 45(d)(1), as I've already indicated, states, and I quote, "A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction, which may include lost earnings and reasonable attorneys fees, on a party or attorney who fails

to comply."

I am granting the motion to quash. It is eminently demonstrated that the breadth of the subpoena could not be greater. The burden that this imposes on any county would be unduly burdensome. No effort was made that I can discern to narrow the scope of the subpoena to obtain that which may be, and I emphasize may be, relevant to the pending litigation between Mr. Lindell and My Pillows and the Dominion Company.

I have no idea what happened in the election and what happened in these machines and any software. I'm not here to decide any of that. I'm here to decide one thing, whether this subpoena imposed an undue burden on Kent County Clerk. It does unequivocally.

Accordingly, it is quashed to the extent it has any remaining validity.

Moreover, I find that Mr. Lindell and My Pillow, Incorporated, failed to meet its responsibility for taking reasonable steps to avoid imposing unnecessary undue burden or expense. Nothing that I can discern was done before serving the subpoena. Any reasonable person looking at that subpoena had to know it was going to be unduly burdensome. I can't imagine anything that that net would not capture. And to have taken no steps to contact the county to ascertain whether there's some way of reducing

Case 1:21-cv-00445-CJN ECF No. 25, PageID.662 Filed 12/12/22 Page 41 of 42

that burden is a blatant violation of the duty under Rule 45(d)(1).

Accordingly, in addition to quashing the motion and as required as Rule 46 -- 45(d)(1), I must enforce the duty and impose an appropriate sanction. I find that that appropriate sanction will be attorneys' fees.

Ms. Lane, you have 14 days in which to file a petition for fees and costs relating to the motion to quash. Ms. Taylor, your client will have 14 days thereafter to respond.

Is there anything else we need to take up at this time, Ms. Lane?

MS. LANE: No, your Honor.

THE COURT: All right. Ms. Taylor?

MS. TAYLOR: No, your Honor.

THE COURT: All right --

MS. TAYLOR: Thank you for your time.

THE COURT: -- thank you, both.

MS. LANE: Thank you, your Honor.

(At 1:50 p.m., proceedings concluded.)

-oo0oo-

Case 1:21-cr-00445-JNECF No. 25, PageID.663 Filed 12/12/22 Page 42 of 42

CERTIFICATE OF REPORTER

STATE OF MICHIGAN )
) ss.
COUNTY OF KENT )

I, Bonnie L. Rozema, CER, do hereby certify that the foregoing transcript consisting of 42 pages, is a complete, true, and accurate transcript of the proceedings and testimony, to the best of my ability from the audio recording, held in this case held on November 29, 2022.

I do further certify that I prepared the foregoing transcript.

/s/ Bonnie L. Rozema

Bonnie L. Rozema, CER 5571
2700 92nd Street, S.W.
Byron Center, MI 49315
(616) 878-9091

Notary Public in and for
Kent County, Michigan
My commission expires:
March 26, 2025
Acting in the County of Kent