# EXHIBIT A

Ronald J. Logar --State Bar No. 303
Eric Pulver--State Bar No. 7874
LAW OFFICE OF LOGAR & PULVER, PC
225 S. Arlington Ave., Ste. A
Reno , NV  89501
Tel:     (775) 786-5040
Fax:     (775) 786-7544

Michael J. Flynn, Mass. State Bar No.
Philip H. Stillman, California State Bar No. 152861
FLYNN & STILLMAN
224 Birmingham Drive, Suite 1A4
Cardiff, CA 92007
Tel:     (888) 235-4279
Fax:     (888) 235-4279
(*Application for Admission Pro Hac Vice forthcoming*)

Attorneys for Plaintiff DENNIS MONTGOMERY, an individual
and MONTGOMERY FAMILY TRUST,
a California Trust

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| DENNIS MONTGOMERY, an individual; and MONTGOMERY FAMILY TRUST, a California Trust, <br><br> Plaintiff, <br><br> vs. <br><br> eTREPPID TECHNOLOGIES, LLC., a Nevada Limited Liability Company; WARREN TREPP, an individual; and DOES 1 through 10, <br><br> Defendants. | ) CASE NO.: <br> ) <br> ) <br> ) <br> ) **COMPLAINT FOR:** <br> ) <br> ) 1.    COPYRIGHT INFRINGEMENT; <br> ) 2.    COPY RIGHT INFRINGEMENT BY <br> )        DISTRIBUTION; <br> ) 3.    DECLARATORY JUDGMENT; <br> ) 4.    ACCOUNTING; <br> ) 5.    BREACH OF FIDUCIARY DUTY; <br> ) 6.    FRAUD; <br> ) 7.    BREACH OF CONTRACT; <br>  8.    MISAPPROPRIATION OF TRADE <br>         SECRETS; <br>  9.    CONVERSION. |

Plaintiffs, Dennis Montgomery and the Montgomery Family Trust, hereby allege against Defendant, eTreppid Technologies, LLC, and Defendant, Warren Trepp, the following Claims for Relief:

**INTRODUCTION**

1.    This is an action arising out of the unauthorized use of extremely valuable copyrighted computer software technology by Defendant eTreppid Technologies, LLC and Defendant, Warren Trepp. Not content to reap millions of dollars on the technology without a license, the majority shareholder of eTreppid Technologies, Defendant Warren Trepp, used his majority position to squeeze out, dilute and misappropriate vast sums of money from the inventor and fellow shareholder, Dennis Montgomery, and the Montgomery Family Trust. Moreover, as fully stated below, even those breaches of fiduciary duty did not satisfy Mr. Trepp. He went further by trying to obtain plaintiff Montgomery Family Trust's extremely valuable technology through a knowingly false claim that the Montgomery Family Trust's technology was contributed to the company by Mr. Montgomery, then attempting to reverse engineer the software in direct violation of federal copyright laws. Accordingly, in addition to all other remedies, Plaintiff seeks not only a declaration of ownership under the 1976 Copyright Act of the software at issue in this litigation, but injunctive relief against any further use of the technology without a license and an accounting of all profits obtained as a result of the unauthorized exploitation of the copyrights and those derivative works therefrom.

**PARTIES**

2.    Plaintiff, Dennis Montgomery is an individual who resides in Washoe County, Nevada and is the inventor of all technology that is subject to this action. Montgomery is also a minority shareholder in eTreppid Technologies, LLC, Defendant above named.

3.    Plaintiff Montgomery Family Trust (the "Trust") is a California irrevocable trust formed and operated under the laws of the State of California and is the owner of the copyrights at issue in this action.

4.    Defendant, eTreppid Technologies, LLC, (eTreppid), is upon information and belief a Nevada limited liability company, with its principle place of business in Washoe County, Nevada.

-1-

Defendant Warren Trepp ("Trepp") is, upon information and belief, an individual who resides in Washoe County, Nevada and is the majority shareholder in eTreppid Technologies, LLC.

5.     Plaintiffs are presently unaware of the true names and capacities of Defendants sued herein as DOES 1 through 10, inclusive, and therefore sue said Defendants under such fictitious names. Plaintiffs are informed and believe that such fictitious Defendants are responsible in some manner for the events and happenings herein referred to, and proximately caused the damage to Plaintiffs as herein alleged.  Plaintiffs will seek leave to amend this Complaint to allege their true names and capacities when the same have been ascertained.

## JURISDICTION AND VENUE

6.     Plaintiffs  raise a claim under the federal Copyright Act of 1976.  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1338(a) and 1338(b).  The Court also has jurisdiction pursuant to 28 U.S.C. §1331 (federal question jurisdiction)  and over the state law claims pursuant to 28 U.S.C. §1367 (supplemental jurisdiction).  Venue is proper pursuant to 28 U.S.C. §1391(b) and 28 U.S.C. §1400.

## FACTUAL ALLEGATIONS

7.     Dennis Montgomery (Montgomery) is an inventor and software developer.  In or about 1982, Montgomery developed certain pattern recognition software for which the U.S. Copyright Office granted a series of copyrights.  The Montgomery Family Trust (Trust) is the owner of Copyright Registration Nos. TXu-98-018, TXu-98-699, TXu-98-727, TXu-98-728, TXu-98-731, TXu-117-868, TXu-119-540,  TX-1-983-147, TX-1-992-867, TX-2-000-234, TX-2-083-750 and TX-2-095-009 (the "Copyrights").

8.     After the registration of these copyrights, Montgomery developed Derivative Works based on the pattern recognition technology originally copyrighted between 1982 and January 1987 (the "Derivative Works").  Those uniquely important Derivative Works were fully developed prior to 1998 and are the exclusive property of the Trust.

9.     In or about September 1998, Montgomery and Defendant Trepp, formed Intrepid Technologies, LLC, a Limited Liability Company, which name was later changed to eTreppid

-2-

Technologies, LLC (hereafter referred to as eTreppid.)  Pursuant to a "Contribution Agreement" dated September 28, 1998, between Trepp, Montgomery and the Trust, in exchange for a fifty percent interest in eTreppid Technologies, LLC to Montgomery, the Trust contributed specific technology to eTreppid that is identified in paragraph 1.2.1 of the Contribution Agreement.

10.     That Paragraph specifically identifies the contributed technology as "the software compression technology contained on that certain Software Compression Engine Development Program contained on CD No. 1."

11.     Significantly, because the Trust owned other technology, Paragraph 1.3 of the Contribution Agreement states that the Trust is expressly not "contributing, transferring or conveying to eTreppid under this agreement or by any other means, nor is eTreppid acquiring from [the Trust] any other tangible and intangible assets of" the Trust or Montgomery.

12.     Thus, pursuant to the express terms of the Contribution Agreement, Intrepid only acquired the software compression technology contained on CD No. 1 and nothing else.

13.     In particular, the Derivative Works were *not* part of the software compression technology contained on CD No. 1 that is subject to the Contribution Agreement.

14.     Subsequently, Trepp began to dilute Montgomery's share in eTreppid and, used his majority interest in eTreppid to obtain favorable treatment for himself as a majority shareholder at the expense of Montgomery.

15.     In or about 2003, eTreppid began sublicensing the Derivative Works to various entities, including the United States government and collecting licensing fees for the sublicenses. eTreppid was never granted a license to the Derivative Works by,  and failed to pay royalties to, the Trust.

16.     At no time did any of the Defendants have a written license to exploit the Trust's Derivative Works as required by 17 U.S.C. § 204(a).  As a result, at best, eTreppid only can claim (if anything) an oral, non-exclusive license to exploit the Derivative Works.

17.     Although the Trust denies that it granted any oral nonexclusive license to eTreppid, any such oral license was terminated by the Trust on January 19, 2006, orally and by letter dated

January 25, 2006.

18.    eTreppid has failed to and refuses to cease exploitation of the Derivative Works and has so far refused to account for any profits obtained as a result of its unlicensed exploitation of the Derivative works.

19.    Moreover, because of the highly confidential and sensitive nature of the Derivative Works, the Derivative Works are protected from reverse engineering and/or tampering by sophisticated safeguards.  As a result of eTreppid's improper attempts to obtain and reverse engineer the Derivative Works, Defendants have, upon information and belief, destroyed part of the "source code" of the Derivative Works, further harming Plaintiffs.

## FIRST CLAIM FOR RELIEF

### (Copyright Infringement against all Defendants)

20.    Plaintiffs incorporate by reference the foregoing allegations contained in Paragraphs 1 through 19 as though restated herein in full.

21.    The Montgomery Family Trust is the owner of Copyright Registration Nos. TXu-98-018, TXu-98-699, TXu-98-727, TXu-98-728, TXu-98-731, TXu-117-868, and Txu-119-540 and the Derivative Works created therefrom.

22.    Defendants have for the past three years and continuing to the present, exploited the Trust's derivative works without any license therefor and without paying royalties.

23.    Defendant Trepp, as Manager of eTreppid, knowingly and intentionally directed eTreppid's willful infringement on the Trust's copyrights and Derivative works.

24.    As a direct and proximate result of the Defendants' willful infringement on the Trust's Derivative works, the Trust has suffered and continues to suffer damages in an amount to be determined at trial.

25.    Pursuant to the Copyright Act of 1976, the Trust is entitled to actual damages, statutory damages as provided therein, and its reasonable attorney's fees.

## SECOND CLAIM FOR RELIEF

### (Copyright Infringement - Unlawful Distribution of Copyrighted Work - Injunction

**17 U.S.C. §106(3)**)

26.     Plaintiffs incorporate into this claim for relief the allegations contained in each and every preceding paragraph of this Complaint as if the same were set out at length herein.

27.     Plaintiff Trust is the owner and author of the Derivative Works

28.     In doing the acts alleged, Defendants violated the Trust's right and interest to distribute copies of the Derivative Works to the public under 17 U.S.C. § 106(3), and said acts were and are infringements of the Trusts' copyrights.

29.     Plaintiffs have been and are being substantially damaged by said infringement, particularly, upon information and belief, the unauthorized use of  the Derivative Works by Defendants.  Further harm and injury to Plaintiffs is imminent, and Plaintiffs are without adequate remedy at law unless Defendants' infringement is enjoined by the court.

## THIRD CLAIM FOR RELIEF

### (Declaratory Relief)

30.     Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 29 set forth herein.

31.     An actual controversy has arisen and exists among Plaintiffs and Defendants under the Copyright Act of 1976.  The Trust contends that it is the exclusive owner of the Derivative Works at issue in this action.  The Defendants dispute this contention.

32.     Plaintiffs desire a judicial declaration that Plaintiffs are the owners of the Derivative Work and further, that any actual or implied oral nonexclusive license is terminated.

33.     Furthermore, as Plaintiffs  have never validly assigned any interest in the copyrights or the Derivative Works to Defendants, Plaintiffs are entitled to a declaration that the Trust is entitled to 100% of the license fees obtained by the exploitation and sublicensing of the Derivative Works as matter of federal copyright law.

34.     A declaration of rights is necessary and appropriate at this time in order that Plaintiffs may ascertain their rights and duties with respect to Defendants, and with respect to any third parties who may claim an interest in either the Copyrights or the Derivative Works either by license or

alleged sublicense.

## FOURTH CLAIM FOR RELIEF

### (Accounting)

35.     Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 34 set forth herein.

36.     Plaintiff Trust is the exclusive owner of the Copyrights and the Derivative Works.

37.     Defendants have wrongfully exploited the Copyrights and Derivative Works without payment to the Trust therefor.

38.     As a result, the Trust is entitled to an accounting of all income and profits derived from Defendants' exploitation of the Copyrights and the Derivative Works.

## FIFTH CAUSE OF ACTION

### (Breach of Fiduciary Duty)

39.     Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 38 set forth herein.

40.     As the majority shareholder in eTreppid Technologies, Trepp owed a fiduciary duty of utmost loyalty and good faith to Plaintiff Dennis Montgomery, including within that duty, an obligation not to use his majority interest to the detriment of the minority shareholder, and an obligation not to further his own interests at the expense of the minority shareholder, Dennis Montgomery.

41.     In violation of his fiduciary duties to Plaintiff, Trepp improperly used his majority interest in order to among other things, attempt to reduce Montgomery's shares relative to his own, devalue the holdings of Montgomery while at the same time increasing the value of his shares, pay himself exorbitant dividends from the company without paying equal dividends to plaintiff Montgomery, and to misappropriate millions of dollars at Montgomery's expense from the company accounts.

42.     As a direct and proximate result of Trepp's breach of fiduciary duty, Plaintiff Montgomery has suffered and continues to suffer damages in an amount to be determined at trial but

-6-

in any event no less than $6 million.

43.     Because Trepp's actions were willful, malicious, in bad faith and oppressive, Montgomery requests that punitive damages be awarded against Trepp.

## SIXTH CAUSE OF ACTION

### (Fraud against Trepp)

44.     Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 43 set forth herein.

45.     At the time of the formation of eTreppid Technologies, LLC, and the execution by Plaintiffs of the Contribution Agreement, Trepp orally and in writing promised Plaintiffs that Montgomery would be a 50% shareholder in eTreppid Technologies with Trepp.  He further represented that Montgomery would share equally with Trepp in the profits of the company.

46.     At the time that Trepp made the foregoing representations to Montgomery and the Montgomery Family Trust, Trepp knew them to be false.  Moreover, he made said representations in order to induce Plaintiffs to contribute valuable software compression technology to the company.

47.     In reliance on those representations, Montgomery and the Montgomery Family Trust contributed the "software compression technology" to the company in reliance on Trepp's promise to share the profits therefrom.

48.     However, Trepp has failed to share the profits equally and has instead failed to pay equal dividends or royalties.

49.     As a direct and proximate result of Trepp's fraud, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial but in any event no less than $6 million.

50.     Because Trepp's actions were willful, malicious, in bad faith and oppressive, Montgomery requests that punitive damages be awarded against Trepp.

## SEVENTH CAUSE OF ACTION

### (Breach of Contract)

51.     Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 50 set forth herein.

-7-

52. Plaintiffs and Defendant Trepp entered into a written contract titled "Contribution Agreement."

53. In pertinent part, in exchange for Plaintiffs contributing the "software compression" technology to the company, Plaintiff Montgomery was to receive 50% of the company.

54. Plaintiffs performed all obligations under the contract.

55. However, Trepp breached the contract by failing to maintain Montgomery's 50% interest, and instead, attempted to reduce his ownership interest in the company.

56. As a direct and proximate result of Trepp's breach of contract, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial but in any event no less than $6 million.

## EIGHTH CAUSE OF ACTION

### (Misappropriation of Trade Secret)

57. Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 56 set forth herein.

58. The Derivative Works constitute trade secrets of Plaintiffs.

59. By the actions alleged above, Defendants Trepp and eTreppid Technologies have wrongfully attempted to misappropriate and convert Plaintiffs' Derivative Works.

60. As a direct and proximate result of Defendants' misappropriation of Plaintiffs' trade secrets, Plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial.

61. Because Defendants' actions were willful, malicious, in bad faith and oppressive, Montgomery requests that punitive damages be awarded against Trepp.

## NINTH CAUSE OF ACTION

### (Conversion)

62. Plaintiffs reallege and incorporate by reference each and every allegation in paragraphs 1 through 61 set forth herein.

63. Plaintiffs own the Derivative Works currently in the possession of Defendants.

64. Defendants converted Plaintiffs' property for their own use and have failed and

refused to return it to Plaintiffs or give Plaintiffs access to their property.

65.     As a direct and proximate result of Defendants' conversion, plaintiffs have suffered and continue to suffer damages in an amount to be determined at trial but in any event no less than $500 million.

66.     Because Defendants' actions were willful, malicious, in bad faith and oppressive, Montgomery requests that punitive damages be awarded against Defendants.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs hereby demand a jury trial on all issues in the Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray to the court for:

1.     Temporarily and preliminarily enjoin Defendants during the pendency of this action and permanently thereafter as follows:

a.     Prohibit Defendants from infringing, conspiring to infringe, or contributing to or participating in the infringement by others of Plaintiffs' copyrighted and derivative works;

b.     Prohibit Defendants from possessing any of the copyrighted or Derivative Works owned by Plaintiffs Trust, and any Derivative Works thereof, and in this regard, that Defendants be required to deliver upon oath, to be impounded during the pendency of this action, all such copies in their possession, as are alleged to infringe upon Plaintiffs' copyrights together with all recordings, tapes, cds , dvds,  masters, print or digital documents and media, or any other means for recording and storing the Trust's copyrighted and Derivative Works that allow Defendants to make infringing copies, and Writs of Seizure be issued by this court in the manner provided by the Copyright Act and by the rules of the Supreme Court of the United States for Practice and Procedure in Copyright Cases, and that at the conclusion of this action, the court order all such matters be held to be surrendered to Plaintiffs or destroyed under Writs of Destruction, whichever shall seem to the court to be the most just and proper;

c.     Order Defendants to pay Plaintiffs such damages as Plaintiffs have sustained

in consequence of Defendants' infringement of the Trust's copyrights and to account for and pay over to the Trust all the profits that Defendants have derived from their willful infringement of Plaintiffs' copyrights;

         d.    Order Defendants to pay such damages to Plaintiffs as this court shall consider just and proper within the provisions of the Copyright Act; and

         e.    Order Defendants to pay Plaintiffs for Defendants' intentional, willful, and malicious infringement of plaintiff's copyrighted and Derivative Works, such damages as this court shall deem just and proper with the provisions of the Copyright Act, but not less than $150,000 for each separate infringement of Plaintiff's copyright.

2.    Award Plaintiffs their attorneys' fees according to proof and/or as required or permitted by the Copyright Act;

3.    Award Plaintiffs their costs; and

4.    Grant such other and further relief as the court deems just and proper.

DATED this 31st day of January, 2006.

LAW OFFICE OF LOGAR & PULVER, PC


By:_____(RJL)_____
Ronald J. Logar, Esq.
Attorney for Plaintiff Dennis Montgomery
and Plaintiff Montgomery Family Trust
Nevada Bar No. 303
225 S. Arlington Ave. Ste. A
Reno, Nevada 89501
Phone: 775-786-5040
Fax:    775-786-7544
Email: Lezlie@Renofamilylaw.com

-10-

**PROOF OF SERVICE**

I, Lezlie M. Lucas declare:

I am an employee in the City of Reno, County of Washoe, State of Nevada, of the LAW OFFICE OF LOGAR & PULVER, PC, with the business address at 225 S. Arlington Avenue, Suite A, Reno, NV 89501. I am over the age of 18 years old and not a party to this action, and that on the 31st day of January, 2006, I

_X___ deposited for mailing in the U.S. Mail, with sufficient postage affixed thereto via U. S. Regular Mail.

_____ sent via Federal Express or other overnight delivery service

_____ delivered via facsimile machine to fax number:

_____ personally delivered

_____ caused to be delivered via Reno-Carson Messenger Service

the foregoing document addressed to:

| | |
|---|---|
| Jerry M. Snyder, Esq.<br>Hale Lane Peek Dennison and Howard<br>5441 Kietzke Lane<br>Second Floor<br>Reno, NV 89511 | Via: Facsimile 775-786-6179<br>Copy to Follow US Regular Mail |

and

| | |
|---|---|
| Pillsbury Winthrop Shaw Pittman, L.L.P.<br>David A. Jakopin, Esq.<br>Jonathan D. Butler, Esq.<br>2475 Hanover Street<br>Palo Alto, CA 94304-1114<br>Facsimile: 650-233-4545 | Via: Copy Regular US Mail |

_____*(LML)*_____
LEZLIE M. LUCAS
Legal Assistant to the
Law Office of Logar & Pulver, PC

# EXHIBIT B

1    PETER D. KEISLER
     Assistant Attorney General
2    DANIEL G. BOGDEN
     United States Attorney
3    District of Nevada
     GREG ADDINGTON
4    Assistant United States Attorney
     Nevada Bar 6875
5    100 West Liberty, Suite 600
     Reno, Nevada 89501
6    VINCENT M. GARVEY
     Deputy Branch Director
7    CARLOTTA P. WELLS
     Senior Trial Counsel
8    Federal Programs Branch
     Civil Division - Room 7150
9    U.S. Department of Justice
     20 Massachusetts Ave., NW/P.O. Box 883
10   Washington, D.C.  20044

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

12   ETREPPID TECHNOLOGIES, LLC,        )
                                        )
13            Plaintiff,                )
                                        )        CV-N- 06-00145 (BES)(VPC)
14   v.                                 )
                                        )
15   DENNIS MONTGOMERY, et al.,         )
                                        )
16            Defendants.               )
     _____)
17   DENNIS MONTGOMERY, et al.,         )
                                        )
18            Plaintiffs,               )
                                        )        CV-N-06-00056 (BES)(VPC)
19   v.                                 )
                                        )
20   ETREPPID TECHNOLOGIES, INC.,       )
     et al.,                            )
21                                      )
              Defendants.               )
22   _____)

## NOTICE OF MOTION AND MOTION FOR
## PROTECTIVE ORDER BY THE UNITED STATES

        TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: Please take notice that,

pursuant to Federal Rule of Civil Procedure 26(c), defendant, the United States Department of

Defense (DoD), hereby submits its motion for a protective order to prevent disclosure of

information that could harm the national security interests of the United States.  In addition, DoD

moves to stay its discovery obligations during the pendency of its motions to dismiss all claims

against the government in these cases. The motion is based on this notice of motion and motion

and the following memorandum of points and authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF UNITED STATES' MOTION FOR PROTECTIVE ORDER

### INTRODUCTION

The United States seeks a protective order in these cases pursuant to Rule 26(c)[1] to

prevent the disclosure of information relating to (1) the existence or non-existence of any actual

or proposed relationship, agreement, connection, contract, transaction, communication, or

meeting of any kind between an intelligence agency as defined in 50 U.S.C. § 401(a)(4), which

includes intelligence elements of the military services; and (2) any actual or proposed interest in,

application, or use by any intelligence agency, or any current or former official, employee, or

representative thereof, of any technology, software, or source code owned or claimed by any

individuals or entities associated with these lawsuits.  The basis for the protective order is that

the information is protected by the military and state secrets privilege.  That privilege, as properly

asserted by the United States here, acts as an absolute bar when disclosure of the material would

harm national security, regardless of a party's need for the information.  As explained in the

declarations accompanying this motion, because the disclosure of information at issue in this

litigation reasonably could be expected to cause serious, and in some cases exceptionally grave,

damage to national security, see Declaration of John D. Negroponte (Negroponte Dec.), attached

---

[1]   The United States Department of Defense (DoD) has been named a party to this litigation, but has moved to dismiss the claims against it on jurisdictional grounds.  Even if DoD is dismissed as a party, the United States' interest in protecting national security information would remain and, if appropriate, the government could file a statement of interest pursuant to 28 U.S.C. § 517.  That statute provides that "any officer of the Department of Justice, may be sent by the Attorney General to any State or District in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

hereto as Exhibit 1; see also Classified Declaration to be submitted in camera ex parte,[2] the United States' interest in preserving its state secrets is overriding and must be safeguarded, even if a party is thereby precluded from establishing its legal position in these cases.

The assertion of the privilege does not mean that there is actually a relationship between the intelligence community and any individual or entity involved in these cases.  Rather, as Mr. Negroponte explains, in order to protect from disclosure those instances where there is a relationship,  the United States must prevent the disclosure of information that would tend to either confirm or deny that any relationship or connection exists even in cases where there is no such relationship.  See Negroponte Dec. ¶ 12.  To do otherwise would inevitably lead to the compromise of national security information, because if the United States were forced to deny relationships where none existed, the United States' refusal to respond to future allegations in other cases would, as one district court explained, "be tantamount to a confirmation."  See Maxwell v. First National Bank of Maryland, 143 F.R.D. 590, 595 (D. Md. 1992).  For these reasons, the Court should uphold the United States' assertion of the military and state secrets privilege and enjoin the disclosure of any information that might tend to confirm or deny the existence or non-existence of any relationship (including any communication, meeting or transaction) between the U.S. intelligence community and any individual or entity associated with the underlying events giving rise to these suits, as well as any actual or proposed interest in, application, or use by any intelligence agency other than the United States Air Force of any technology, software, or source code owned or claimed by any  individuals or entities associated with these lawsuits.

Further, on June 21, 2006, DoD filed motions to dismiss all of the claims against it as asserted in these cases.  Etreppid filed its notices of non-opposition on July 10, 2006.

_____

[2]  The classified in camera, ex parte declaration can be made available for review by the Court at its convenience.  Because of the declaration's classification level, however, it must be stored at all times, except when being reviewed by appropriate personnel, in a Sensitive Compartmented Information Facility (SCIF).

-3-

Montgomery's opposition were filed, under seal, on September 15, 2006. Defendant has not yet been served with discovery requests, although the deadline for the parties to produce their initial disclosures was, by stipulation of the parties, August 14, 2006. In its motions to dismiss, DoD argued that the Court should dismiss these actions as to DoD for lack of subject matter jurisdiction. If the Court grants the government's motions, it will dispose of the claims against DoD in their entirety. Therefore, in the interests of judicial economy, the Court should exercise its discretion under Rule 26(c) of the Federal Rules of Civil Procedure and stay all discovery relating to DoD pending its ruling on the government's motions to dismiss.[3]

Counsel for the parties conferred in an attempt to reach agreement on the issues raise in this motion, but were unable to do so.

## **BACKGROUND**

A.    <u>Factual Statement</u>

The instant litigation is comprised of two actions, Civil Action No. 06-00056 (hereinafter referred to as the "Federal Case") and Civil Action No. 06-00145 (hereinafter referred to as the "Removed Case"). Dennis Montgomery, et al. (Montgomery) and eTreppid Technologies, Inc. (eTreppid) have filed countersuits relating, *inter alia,* to claims involving copyright infringement, misappropriation of trade secrets, breach of contract, and breach of fiduciary duty. Montgomery also has filed claims against DoD in both suits, seeking declaratory relief in both as well as relief for copyright infringement in the Federal Case. The dispute between the private parties primarily concerns the ownership of source codes and their derivatives, *see* Federal Case Complaint ¶¶ 11-14; Removed Case Complaint ¶¶ 31-33; Removed Case Countercomplaint ¶ 23.

In a complaint originally filed in state court, eTreppid has asserted a claim of entitlement to protect and recover trade secrets from Montgomery. Removed Case Complaint ¶ 35. Montgomery, a former employee, officer, and director of the company, filed a counter-complaint

_____

[3] DoD does not take a position with respect to whether discovery between eTreppid and Montgomery should proceed notwithstanding the pendency of the government's motion to dismiss.

as well as a federal court action, alleging that eTreppid had infringed his copyright interests. Montgomery claims that he is an inventor and software developer who developed software for which he was granted copyrights in 1982. Removed Case Counter-complaint ¶ 8; Federal Case Complaint ¶ 8. Montgomery asserts that, after registration of the copyrights, he developed derivative works based on the copyrighted technology. Removed Case Counter-complaint ¶ 9; Federal Case Complaint ¶ 9. In September 1998, Montgomery and counter-defendant Warren Trepp formed eTreppid. Removed Case Counter-complaint ¶ 10; Federal Case Complaint ¶ 10. Pursuant to an agreement entered into between Montgomery and Trepp, Montgomery alleges he contributed certain technology in exchange for a 50 percent interest in eTreppid. *Id.*

The dispute between Montgomery and eTreppid stems from the issue of the extent to which Montgomery retained the sole interest in the derivative works based on the copyrighted technology. Removed Case Counter-complaint ¶¶ 11-14; Federal Case Complaint ¶¶ 11-14. Montgomery alleges that, in 2003, eTreppid "began sublicensing the Derivative Works to various entities, including the United States government and collecting licensing fees for the sublicenses," without having a license to take such action. Removed Case Counter-complaint ¶¶ 16-18; Federal Case Complaint ¶¶ 16-18. Further, Montgomery claims that, to the extent eTreppid had "an oral nonexclusive license to exploit the Derivative Works," such oral license was terminated in January 2006. Removed Case Counter-complaint ¶¶ 17-18; Federal Case Complaint ¶¶ 17-18. For its part, eTreppid claims that Montgomery has misappropriated trade secrets, violated the terms of his contracts with eTreppid, and improperly converted confidential information for his own use. Removed Case Complaint ¶¶ 36, 43, 46.

Montgomery also has asserted a claim against DoD. Montgomery alleges that he is prevented from fully disclosing the information he needs to present his case because he signed a "secrecy contract" with the United States government relating to the nature of the work that he performed on behalf of the government while associated with eTreppid and that disclosure of such information could subject him to criminal prosecution. Federal Complaint ¶¶ 69, 71;

-5-

Removed Case Counter-complaint ¶ 24. Montgomery claims that he can neither defend against eTreppid's claims nor prosecute his own without revealing the "nature of the technology, the type of work he has performed on the government contracts using his technology versus that of eTreppid, and the capabilities of his technology . . . in performing work for certain government agencies." Federal Case Complaint ¶¶ 71; Removed Case Counter-complaint ¶¶ 24. *Accord* Federal Case Complaint ¶¶ 72; Removed Case Counter-complaint ¶¶ 25. Montgomery therefore seeks, in both cases, a declaration that disclosure of such information will not constitute a violation of the "the contract between Montgomery and the United States to maintain [] secrets, and/or a declaration of immunity for Montgomery from the United States." Federal Case Complaint ¶ 73; Removed Case Counter-complaint ¶ 26.

Montgomery signed a Classified Information Nondisclosure Agreement (Nondisclosure Agreement), which was executed with the Defense Security Service, an agency within the DoD, on September 16, 2003. Exhibit 2. Pursuant to the terms of the Nondisclosure Agreement, Montgomery *inter alia*: (1) accepted certain obligations in exchange for being granted access to classified information (para. 1); (2) agreed never to divulge classified information to anyone unless authorized under the terms of the agreement and to comply with all laws prohibiting the unauthorized disclosure of classified information (para. 3); (3) stated he had been advised that the unauthorized disclosure of classified information could violate certain criminal statutes (para. 4); (4) stated he understood that the United States government may seek any remedy available to it to enforce the terms of the agreement, including but not limited to seeking a court order to prohibit the unauthorized disclosure of classified information (para. 6); (5) stated he understood that the classified information to which he would have or obtain access to was and would remain the property and under the control of the United States government (para. 7); and (6) agreed that the conditions and obligations imposed upon him under the agreement apply unless and until he is relieved of such obligations in writing by an authorized representative of the United States government (para. 8). *Id.*

B.    Terms of the Proposed Protective Order

The proposed protective order (Exhibit 3) states that certain intelligence information that may or may not be relevant to the claims and defenses of the parties to this litigation is subject to the state secrets privilege, the disclosure of which reasonably could be expected to cause serious, and in some cases exceptionally grave, damage to the national security of the United States (para. 1). The proposed order then defines the categories of information that shall not be discussed, mentioned or otherwise subject to discovery or disclosure during all proceedings in this action:

> 2. The parties to these actions shall not serve or take any discovery relating to or questioning the existence or non-existence of any actual or proposed relationship, agreement, connection, contract, transaction, communication, or meeting of any kind between any entity in the intelligence community as defined by the National Security Act of 1947, 50 U.S.C. § 401(a)(4), which includes intelligence elements of the military services [hereinafter referred to as "any intelligence agency"], or any current or former official, employee, or representative thereof, and any individuals or entities associated with these lawsuits, or any current or former officer or employee thereof.
>
> 3. The parties to these actions shall not serve or take any discovery relating to or questioning any actual or proposed interest in, application, or use by any intelligence agency, or any current or former official, employee, or representative thereof, of any technology, software, or source code owned or claimed by any individuals or entities associated with these lawsuits.

*Accord* paragraphs 5 and 6.

In addition, the proposed order (para. 4) delineates issues relating to the parties' interactions with the government that would not be precluded. The areas in which questions or discovery would not be precluded include:

> a. The existence and nature of the "Big Safari" contract [hereinafter referred to as "the contract"] between eTreppid, Inc. and the United States Air Force, including but not limited to the fact that the contract required eTreppid to perform data analysis and the fact that the data analysis eTreppid performed under the contract involved image identification technology;
>
> b. The fact that the contract required employees and/or officers of eTreppid, Inc. to sign secrecy agreements with the Department of Defense;
>
> c. The technical specifications relating to any technology, owned or claimed by any non-government individual or entity associated with these lawsuits, used under the terms of the contract or any other contract, relationship, agreement, connection, contract, transaction, communication, or meeting of any

-7-

kind, unless covered by paras. 2 and 3 above;

        d. Any actual or potential commercial or government applications of any technology owned or claimed by any non-government individual or entity associated with these lawsuits at any time, except to the extent that any application is covered by paragraph 2 and/or 3 above; and

        e. Facts relating to the issue of ownership, by any non-government individual or entity associated with these lawsuite, of any right or interest in the source code, software, or other technology owned or claimed by the parties to these lawsuits, except to the extent that any application is covered by paragraph 2 and/or 3 above.

The proposed order also states that, to the extent information or documents are sought by the private parties that would implicate the information defined in paragraphs 2 and 3 of the proposed order, then such requests shall be deemed, without the need for objection, not to require a response that would include any such information (paras. 7 and 8). The proposed order further sets forth measures by which the United States can ensure that the classified information is protected against disclosure by, for example, requiring service upon attorneys representing the government of all discovery and motions (para. 10), requiring notice to the government's attorneys of all decisions and notices for hearings in this litigation (para 11), authorizing attendance by attorneys for the United States at all depositions and proceedings as well as their right to make objections as necessary to protect national security information (para. 12), and authorizing the participation by attorneys for the United States in any proceeding in this litigation (para. 13).

Finally, as noted above, the proposed protective order also provides that the government is excused from its Rule 26 obligations during the pendency of DoD's motion to dismiss. The obligations that are to be stayed include complying with the obligation to produce initial disclosures as all well as all discovery obligations.

**ARGUMENT**

I.   The Standard Of Review Is A Narrow One, And A Properly Invoked
     Claim Of The State Secrets Privilege Is An Absolute Bar To Disclosure

The military and state secrets privilege is a unique privilege, with constitutional underpinnings,[4] which permits the Government to protect against the unauthorized disclosure in litigation of information that may adversely affect national security interests.  See United States v. Reynolds, 345 U.S. 1, 7-8 (1953); Black v. United States, 62 F.3d 1115, 1118 (8th Cir. 1995), cert. denied, 517 U.S. 1154 (1996); Ellsberg v. Mitchell, 709 F.2d 51, 56 (D.C. Cir. 1983), cert. denied, 465 U.S. 1038 (1984).  The privilege is not limited to military secrets, but is "both expansive and malleable." Ellsberg, 709 F.2d at 57.  Thus, it includes within its scope information that would result in "'impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments.'" Black, 62 F.2d at 1118 (quoting Ellsberg, 709 F.2d at 57).[5]

---

[4] National security information is subject to the exclusive control of the President and the Executive Branch of the U.S. Government, pursuant to the President's powers under Article II of the Constitution.  Department of Navy v. Egan, 484 U.S. 518, 527 (1988).  Justice Stewart observed in his concurring opinion in New York Times Co. v. United States, 403 U.S. 713, 728-29 (1971), as follows:

> If the Constitution gives the Executive a large degree of unshared power in the conduct of foreign affairs and the maintenance of our national defense, then under the Constitution the Executive must have the largely unshared duty to determine and preserve the degree of internal security necessary to exercise that power successfully.

[5] See, e.g., Reynolds, 345 U.S. at 5 (Air Force crash investigation report containing national security information was privileged); Fitzgerald v. Penthouse Int'l, Ltd., 776 F.2d 1236, 1242-43 (4th Cir. 1985) (expert testimony on Navy marine mammal research programs was precluded as privileged);  Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 400-402 (D.C. Cir. 1984) (Department of Defense documents containing national security information, including communications with foreign governments and intra-government letters, were privileged); Halkin v. Helms, 690 F.2d 977, 990, 993 (D.C. Cir. 1982) (information concerning diplomatic relations with foreign governments and intelligence-gathering methods and capabilities was privileged).

The military and state secrets privilege is invoked when the government makes [1] a "formal claim of privilege, [2] lodged by the head of the department which has control over the matter, after [3] actual personal consideration by that officer." Reynolds, 345 U.S. at 7-8 (footnotes omitted); Black, 62 F.3d at 1118. The privilege is asserted to protect against the unauthorized disclosure of information that may adversely affect national security interests, regardless of how the person who has the information or seeks its disclosure is related to the Government. See generally 2 S. Stone & R. Taylor, Testimonial Privileges § 9.12 at 9-37 (2d ed. 1995). Thus, "the privilege may be invoked only by the government and may be asserted even when the government is not a party to the case." Zuckerbraun v. General Dynamics Corp., 935 F.2d 544, 546 (2d Cir. 1991) (citing Fitzgerald, 776 F.2d 1236 (4th Cir. 1985)).

The standard of review of a military and state secrets privilege claim is a "narrow one," and "[c]ourts should accord the 'utmost deference' to executive assertions of privilege upon grounds of military or diplomatic secrets." Halkin v. Helms, 598 F.2d 1, 9 (D.C. Cir. 1978); see also Reynolds, 345 U.S. at 10; Black, 62 F.3d at 1119. The role of the court is to assess the validity of the claim of privilege, satisfying itself that there is a reasonable danger that disclosure will harm national security. Zuckerbraun, 935 F.2d at 546-47. "[T]he government need not demonstrate that injury to the national interest will inevitably result from disclosure; a showing of 'reasonable danger' that harm will ensue is sufficient." Ellsberg, 709 F.2d at 58 (footnote omitted). In this regard, courts have been "willing[] to credit relatively speculative projections of adverse consequences [of disclosure]." Id. at 58 n.35.

In considering the claim of military and state secrets privilege, the court should not "forc[e] a disclosure of the very thing the privilege is designed to protect," Reynolds, 345 U.S. at 8, although it is appropriate for the court to consider in camera and ex parte declarations or other submissions of the Government explaining why a matter should be protected, Black, 62 F.3d at 1119. See, e.g., Kasza v. Browner, 133 F.3d 1159, 1169 (9th Cir. 1998); Farnsworth Cannon,

-10-

1   <u>Inc. v. Grimes</u>, 635 F.2d 268, 281 (4th Cir. 1980) (<u>en banc</u>)); <u>Maxwell</u>, 143 F.R.D. at 595.[6]

2   Likewise, a judicial opinion on a claim of military and state secrets privilege "should not strip the

3   veil from state secrets even if ambiguity results in a loss of focus and clarity." <u>Black</u>, 62 F.3d at

4   1119; <u>see also</u> <u>Ellsberg</u>, 709 F.2d at 59 n.41 (open, detailed discussion by a court of the

5   application of general principles to particular facts is impossible in this area of the law).

6       A properly invoked claim of privilege is an absolute bar to disclosure, no matter how

7   compelling the need for the information, or relevance thereof, to a proper resolution of the case.

8   <u>Reynolds</u>, 345 U.S. at 11; <u>Black</u>, 62 F.3d at 1119; <u>Fitzgerald</u>, 776 F.2d at 1240; <u>Northrop</u>, 751

9   F.2d at 399.  In other words, if the court determines that there exists a showing of harm which

10  might reasonably flow from disclosure, the privilege cannot be overcome by "even the most

11  compelling necessity." <u>Reynolds</u>, 345 U.S. at 11; <u>In re Under Seal</u>, 945 F.2d at 1288 n.2 ("Upon

12  proper invocation by the head of the affected department, the privilege renders the information

13  unavailable regardless of the other party's need in furtherance of the action"); <u>Halkin</u>, 690 F.2d at

14

15  ────────────────

16      [6] In a number of contexts, national security concerns require <u>ex parte</u>, <u>in camera</u> review
    of classified information, including any classified state secrets declarations submitted by the
17  government, to protect such information from unauthorized disclosure. See <u>e.g.</u>, <u>Ellsberg</u>, 709
    F.2d at 61 ("It is well settled that a trial judge called upon to assess the legitimacy of a state
18  secrets privilege claim should not permit the requester's counsel to participate in an in camera
    examination of putatively privileged material.  The rationale for this rule is that our nation's
19  security is too important to be entrusted to the good faith and circumspection of a litigant's
    lawyer (whose sense of obligation to his client is likely to strain his fidelity to his pledge of
20  secrecy) or to the coercive power of a protective order"); <u>In re Eisenberg</u>, 654 F.2d 1107, 1112
    (5th Cir. 1981) ("Our adversarial legal system generally does not tolerate ex parte determinations
21  on the merits of a civil case. . . . An exception to this principle is made when countervailing
    government interests dictate that information sought to be discovered should remain secret.
22  Privilege questions are determined on the basis of in camera, ex parte examinations of the
    evidence."); <u>In re Under Seal</u>, 945 F.2d 1285 (4th Cir. 1991) (classified <u>in camera</u> affidavit
23  reviewed by both the district court and court of appeals without being disclosed to plaintiff's
    counsel); <u>Stillman v. CIA</u>, 319 F.3d 546, 549 (D.C. Cir. 2003) (same); <u>Crater Corp. v. Lucent</u>
24  <u>Technologies, Inc.</u>, 255 F.3d 1361, 1370 n. 4 (Fed. Cir. 2001)(rejecting claims of improper <u>ex</u>
    <u>parte</u> communications between the district court and the government in a case between two
25  private parties but involving classified information).

26

27

28                                          -11-

990.

   If the consequent unavailability of the information precludes either party from establishing its legal position on the ultimate issues in the case, then the case must be dismissed. See Black, 62 F.3d at 1119 (case was properly dismissed where privileged information was at the core of plaintiff's claims); see also Fitzgerald, 776 F.2d at 1241-42 ("in some circumstances sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters"); Farnsworth, 635 F.2d at 281 ("any attempt on the part of the plaintiff to establish a prima facie case would so threaten disclosure of state secrets that the overriding interest of the United States and the preservation of its state secrets precludes any further attempt to pursue this litigation"); Tilden v. Tenet, 140 F. Supp. 2d 623, 627 (E.D. Va. 2000) (case would be dismissed where there was no way in which lawsuit could proceed without disclosing state secrets).[7]

II.   **The United States Has Properly Invoked The Privilege, And The Court Should Issue A Protective Order Barring Disclosure Of The Information In Question**

   The United States has properly asserted the military and state secrets privilege in these cases. The current head of the U.S. Intelligence community, Director of National Intelligence John D. Negroponte, after personal consideration of the matter, has formally invoked the privilege on behalf of the United States with respect to the information described in his declaration. See Reynolds, 345 U.S. at 7-8; Negroponte Dec. ¶¶ 3, 9 (Exhibit 1).[8] As Mr.

_____

[7] Notwithstanding the need to protect certain information from disclosure, the scope of the information that would be protected by the state secrets privilege in these cases is relatively limited in scope. For this reason, the government's proposed protective order specifically identifies issues relating to the parties' interactions with the government that would not be precluded. As a result of the fact that privilege covers only some but not all of the information relating to the government's interactions with eTreppid and Montgomery, it appears at this point that the underlying litigation should be able to proceed in some fashion.

[8] The public declaration is sufficient to establish the United States' military and state secrets privilege claim in this case. See Reynolds, 345 U.S. at 8 (the court should not "forc[e] a disclosure of the very thing the privilege is designed to protect"). Moreover, while "the court should not jeopardize the security which the privilege is meant to protect by insisting upon an

-12-

Negroponte explains, the information to be protected from disclosure includes information concerning the existence or non-existence of any actual or proposed relationship involving any U.S. intelligence agency and any individuals and/or companies associated with these lawsuits and any actual or proposed interest in, application of, discussion of, or use by any intelligence agency of any technology owned or claimed by individuals and/or companies associated with these lawsuits.  Negroponte Dec. ¶ 11.  The disclosure of this information, which may or may not be relevant to the parties' claims and defenses in their lawsuits relating to copyright ownership and trade secrets, could reasonably be expected to damage the national security.  Id. at ¶¶ 9, 12;  see also Classified Declaration submitted in camera ex parte.

Based on the assertion by the head of the United States intelligence community that damage to national security could reasonably be expected to result from any disclosure of information that would tend to confirm or deny the existence or non-existence of any relationship between the United States intelligence community and the private parties as well as the application by a member of the U.S. intelligence community of software or technology that the parties claim to own, the United States' claim of privilege is valid.  It therefore meets the narrow standard of review to which the state secrets claim is subject, and the Court should accord it the utmost deference.  See Halkin v. Helms, 598 F.2d at 9; see also Black, 62 F.3d at 1119.  In view of the United States' showing that unauthorized disclosure of the information described in Mr. Negroponte's declaration could reasonably be expected to cause serious, and in some cases exceptionally grave, damage to national security, whether in response to the parties' discovery requests or otherwise, disclosure of that information is completely barred, no matter how

---

examination of the evidence, even by the judge alone, in chambers," id. at 10, a more detailed description of the national security concerns at issue in this case is contained in a classified declaration which the United States has already prepared.  Because that declaration is classified, it can only be presented for the Court's ex parte, in camera review.  The Department of Justice Security Office can arrange for this Court's ex parte, in camera review of the classified declaration in a secure setting at the Court's convenience.

-13-

compelling any party's alleged need for the information.  <u>Reynolds</u>, 345 U.S. at 11; <u>Northrop</u>, 751 F.2d at 399; <u>Halkin</u>, 690 F.2d at 990.

That the assertion of the military and state secrets privilege might leave a party to litigate "in the dark" is nothing extraordinary or unusual.  Such was the case in <u>Farnsworth</u>, 635 F.2d at 281, where plaintiff's counsel was left unaware of the scope of excluded information, as well as in <u>Maxwell</u>, 143 F.R.D. at 599-600, where plaintiff's counsel was rebuffed in his attempts to discover matters with respect to which the privilege had been asserted.  In such instances, the Government simply has an "overriding interest."  <u>See</u> <u>Farnsworth</u>, 635 F.2d at 281.  Accordingly, the Court should issue a protective order prohibiting the disclosure of the information at issue in these cases.

III.  In the Interest of Judicial Economy, the Court Should Enter a Protective Order Staying <u>Discovery Until Resolution of DoD's Motion to Dismiss.</u>

Courts have broad discretion under the Federal Rules of Civil Procedure to regulate the discovery process, <u>Herbert v. Lando</u>, 441 U.S. 153, 177 (1979), including the discretion to deny discovery.  <u>See</u> Fed. R. Civ. P. 26(c); <u>Jarvis v. Regan</u>, 833 F.2d 149, 155 (9th Cir. 1987) ("A district court's decision to allow or deny discovery is reviewable only for abuse of discretion."); <u>Petrus v. Bowen</u>, 833 F.2d 581, 583 (5th Cir. 1987) ("trial court has broad discretion and inherent power to stay discovery until preliminary questions that may dispose of the case are determined"); <u>B.R.S. Land Investors v. United States</u>, 596 F.2d 353, 356 (9th Cir. 1979) ("A district court may properly exercise its discretion to deny discovery where . . . it is convinced that the plaintiff will be unable to state a claim upon which relief can be granted.").

Exercise of the Court's discretion to stay discovery is especially appropriate where a dispositive motion is pending and the discovery sought is not necessary to resolve the issues raised by that motion.  <u>See</u> <u>Alaska Cargo Transport, Inc. v. Alaska R.R. Corp.</u>, 5 F.3d 378, 383 (9th Cir. 1993) (stay of discovery was proper where the discovery sought was not relevant to "whether or not the court ha[d] subject matter jurisdiction"); <u>Jarvis v. Regan</u>, 833 F.2d at 155 (district court properly stayed discovery that was not needed to resolve motion to dismiss); <u>Wood</u>

-14-

v. McEwen, 644 F.2d 797, 801 (9th Cir. 1981) ("A district court may limit discovery 'for good cause' and may continue to stay discovery when it is convinced that the plaintiff will be unable to state a claim for relief.") (citation omitted). "Indeed, such a procedure is an eminently logical means to prevent wasting the time and effort of all concerned, and to make the most efficient use of judicial resources." Coastal States Gas Corp. v. Department of Energy, 84 F.R.D. 278, 282 (D. Del. 1979).

These are just such cases. Allowing discovery would impose significant and unnecessary burdens on DoD (and potentially the Court, if there are discovery disputes) at a time when significant issues have been raised regarding the Court's jurisdiction over this matter. Discovery is not needed to resolve those jurisdictional issues and, thus, a stay of discovery is warranted in these circumstances. See Jarvis, 833 F.2d at 155 ("Discovery is only appropriate where there are factual issues raised by a Rule 12(b) motion."); Rae v. Union Bank, 725 F.2d 478, 481 (9th Cir. 1984) (district court properly stayed discovery where plaintiff "failed to point to any specific information obtainable through discovery that would have enabled" plaintiff to withstand motion to dismiss). Given the dispositive jurisdictional issues DoD has raised, the principle of judicial economy favors a stay of discovery until the Court has ruled on the pending motions to dismiss.

## CONCLUSION

For the foregoing reasons, the United States' assertion of the military and state secrets privilege should be upheld, discovery involving the government should be stayed pending the disposition of DoD's motions to dismiss, and the government's motion for a protective order should be granted.

DATED: September 25, 2006

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DANIEL G. BOGDEN
United States Attorney
District of Nevada

-15-

GREG ADDINGTON
Assistant United States Attorney
Nevada Bar 6875
100 West Liberty, Suite 600
Reno, Nevada 89501

VINCENT M. GARVEY
Deputy Branch Director


 /s/ Carlotta P. Wells
CARLOTTA P. WELLS
Senior Trial Counsel
Federal Programs Branch
Civil Division - Room 7150
U.S. Department of Justice
20 Massachusetts Ave., NW
P.O. Box 883
Washington, D.C. 20044

Counsel for Counter-Defendant,
United States Department of Defense

IT IS SO ORDERED

Date: _____, 2006        _____
                                    UNITED STATES DISTRICT JUDGE


## CERTIFICATE OF SERVICE

I hereby certify that I am an employee in the office of the United States Department of Justice, Civil Division in Washington DC and I am of such age and discretion as to be competent to serve papers. On September 25, 2006, I served copies of the United States Notice of Motion and Motion for Protective Order, with the accompanying Memorandum of Points and Authorities, by placing said copies in postpaid envelopes addressed to the persons named below at the places and addresses stated below and by depositing said envelopes and contents in the United States mail at the United States Department of Justice, 20 Massachusetts Avenue, Washington D. C. 20001.

-16-

1    Ronald J. Logar, Esq.
     Eric A. Pulver, Esq.
2    LAW OFFICES OF LOGAR & PULVER, PC
     255 S. Arlington Avenue, Suite A
3    Reno, NV 89501

4    Michael J. Flynn, Esq.
     Philip H. Stillman, Esq.
5    FLYNN & STILLMAN
     224 Birmingham Drive, Suite 1A4
6    Cardiff, CA 92007

7    Stephen J. Peek, Esq.
     Jerry M. Snyder, Esq.
8    HALE LANE PEEK DENNISON AND HOWARD
     5441 Kietzke Lane, Second Floor
9    Reno, NV 89511

10

11   David A. Jakopin, Esq.
     Jonathan D. Butler, Esq.
     PILLSBURY WINTHROP SHAW PITTMAN, L.L.P.
12   2475 Hanover Street
     Palo Alto, CA 94304-1114
13

14                                        /s/ Carlotta P. Wells
                                          Carlotta P. Wells
15                                        Senior Trial Counsel
                                          Federal Programs Branch, Civil Division
16                                        United States Department of Justice

17

18

19

20

21

22

23

24

25

26

27

28                              -17-

# EXHIBIT C

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

DENNIS MONTGOMERY and the )
MONTGOMERY FAMILY TRUST )          3:06-CV-00056-PMP-VPC
                                   )          BASE FILE
         Plaintiffs,               )
                                   )          3:06-CV-00145-PMP-VPC
    vs.                            )
                                   )          **ORDER RE PROTECTIVE ORDER**
ETREPPID TECHNOLOGIES, LLC;        )
WARREN TREPP; and the UNITED       )
STATES DEPARTMENT OF DEFENSE,      )
                                   )
         Defendants.               )
_____)
                                   )
AND ALL RELATED MATTERS.           )
_____)

Prior to consolidation of these two related cases, Defendant United States Department of Defense filed Motions for Protective Order (3:06-CV-00056-PMP-VPC, Doc. #83, and 3:06-CV-00145-PMP-VPC, Doc. #51) to prevent disclosure of information that could harm the national security interests of the United States. Specifically, the United States' seeks a protective order pursuant to Federal Rule of Civil Procedure 26(c) to prevent the disclosure of information relating to (1) the existence or non-existence of any actual or proposed relationship, agreement, connection, contract, transaction, communication or meeting of any kind between an intelligence agency as defined in 50 U.S.C. § 401(a)(4), which includes intelligence elements of the military services; and (2) any actual or proposed interest in, application, or use by any intelligence agency, or any current or former official, employee, or representative thereof, of any technology, software, or source code owned or claimed by any individuals or entities associated with these lawsuits.

/ / /

1        The United States' supports its application for protective order under the military

2  and States Secret privilege by the Declaration of John D. Negroponte, formally Director of

3  National Intelligence, and a Classified Declaration which has been reviewed by the Court in

4  camera and ex parte, which demonstrate that disclosure of information at issue in this

5  litigation subject to the proposed protective order could be expected to cause serious, and

6  some cases exceptionally grave damage to national security.

7        Issues relating to whether information subject to a claim of military and states

8  secrets privilege were contained in pleadings, motions, declarations and other materials

9  filed in these consolidated cases as well as in the related in the Search Warrant case (3:06-

10  CV-0263-PMP-VPC), have required considerable attention by the parties and the Court.  In

11  this regard, counsel for Defendant United States' and those authorized to assert the military and

12  states secrets privilege on behalf of Defendant United States' have met with counsel in these

13  related actions as well as with counsel in the related Search Warrant case, and have reviewed

14  copies of all pleadings, motions, documents and exhibits filed in the above referenced cases

15  for the purpose of identifying and redacting those portions subject to a claim of military and

16  state secrets privilege on behalf of Defendant United States.  The Court has reviewed all

17  such papers in camera and ex parte with counsel for Defendant United States' and those

18  authorized to assert the military and states secret privilege on behalf of Defendant United

19  States, and has approved the redaction of material subject to the privilege claim.

20        Defendant United States' Department of Defense Motion for Protective Order

21  has now been fully briefed and on June 12, 2007, the Court conducted a hearing regarding

22  the United States' Motion for Protective Order and other pending motions.

23        On June 21, 2007, Defendant United States' filed a Revised Proposed Protective

24  Order (3:06-CV-00056-PMP-VPC (Doc. #196).  The Court finds that said Protective Order

25  is warranted as to form and content and hereby approves the same.

26  / / /

IT IS THEREFORE ORDERED that Defendant United States Department of Defense Motions for Protective Order (3:06-CV-00056-PMP-VPC, Doc. #83, and 3:06-CV-00145-PMP-VPC, Doc. #51) is GRANTED.

DATED: August 29, 2007.

_____
PHILIP M. PRO
United States District Judge

# EXHIBIT D

1  PETER D. KEISLER
   Assistant Attorney General
2  STEVEN W. MYHRE
   Acting United States Attorney
3  District of Nevada
   GREG ADDINGTON
4  Assistant United States Attorney
   Nevada Bar 6875
5  100 West Liberty, Suite 600
   Reno, Nevada 89501
6  VINCENT M. GARVEY
   Deputy Branch Director
7  CARLOTTA P. WELLS
   Senior Trial Counsel
8  Federal Programs Branch
   Civil Division - Room 7150
9  U.S. Department of Justice
   20 Massachusetts Ave., NW/P.O. Box 883
10 Washington, D.C.  20044
   Telephone: (202)514-4522
11 Facsimile:  (202) 616-8470

12              **UNITED STATES DISTRICT COURT**
                   **DISTRICT OF NEVADA**
13

14 _____
   DENNIS MONTGOMERY, et al.,          )
15                                      )
              Plaintiffs,               )
16                                      )    3:06-CV-00056-PMP-VPC
   v.                                   )    **BASE FILE**
                                        )
17 ETREPPID TECHNOLOGIES, INC.,         )    3:06-CV-00145-PMP-VPC
   et al.,                              )
18                                      )
              Defendants.               )
19 _____)

20              UNITED STATES  **PROTECTIVE ORDER**

21         Pursuant to Federal Rule of Civil Procedure 26, in order to protect the classification,

22 confidentiality and the rights to information and documents developed and disclosed in

23 connection with this litigation, and to facilitate discovery by and among the parties to this

24 action and from third parties, the United States hereby proposes entry of the following

25 protective order.

26

27

28

IT IS HEREBY ORDERED as follows:

1.      Certain information that may or may not be relevant to the claims and/or defenses of eTreppid Technologies, LLC and its current or former officers or employees (hereinafter collectively referred to as "eTreppid"), Warren Trepp, Dennis Montgomery, the Montgomery Family Trust and/or Dennis Montgomery and Brenda Montgomery as trustees of the Montgomery Family Trust (hereinafter collectively referred to as "the Parties"), as delineated in paragraphs 2 and 3 below, is subject to the state secrets privilege, the disclosure of which reasonably could be expected to cause serious, and in some cases exceptionally grave, damage to the national security of the United States.  Such information shall not be subject to discovery or disclosure by any of the Parties during all proceedings in these actions, and shall be excluded from evidence at trial.

2.      The Parties shall not serve or take any discovery relating to or questioning the existence or non-existence of any actual or proposed relationship, agreement, connection, contract, transaction, communication or meeting of any kind between any entity in the intelligence community as defined by the National Security Act of 1947, 50 U.S.C. § 401(a)(4), which includes intelligence elements of the military services, or any current or former official, employee or representative thereof (hereinafter collectively referred to as "intelligence agency") and the Parties.

3.      The Parties shall not serve or take any discovery relating to or questioning any actual or proposed intelligence agency interest in, application of or use of any technology, software or source code owned or claimed by the Parties.

4.      This Order does not preclude the Parties from serving or taking any discovery from other Parties or third parties relating to, or questioning, the following:

a. The existence and nature of the "Big Safari" contract (hereinafter referred to as "the Big Safari Contract") between eTreppid and the Unites States Air Force, including but not limited to the fact that the Big Safari Contract required eTreppid to perform data analysis and the fact that the data analysis eTreppid performed under the Big Safari Contract involved image identification technology;

b. The fact that the Big Safari Contract required employees and/or officers of eTreppid to sign secrecy agreements with the Department of Defense;

c. The computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the Parties ("the Technology");

d. Any contract, relationship, agreement, connection, transaction, communication or meeting of any kind relating to the Technology, unless covered by paragraphs 2 or 3 above;

e. Any actual or potential commercial or government applications of the Technology, unless covered by paragraphs 2 or 3 above;

f. Facts relating to the issue of ownership by the Parties of any right or interest in the Technology, unless covered by paragraphs 2 or 3 above;

g. The revenue, income, expenses, profits and losses of the Parties, unless disclosure of such information would be covered by paragraphs 2 or 3 above; and

h. Any consideration received by any of the Parties relating to the Technology, unless covered by paragraphs 2 or 3 above.

5. The Parties shall not discuss, mention, question or introduce as evidence, either at trial, in any pleading or motion, or in any case-related correspondence, any actual or proposed relationship, agreement, connection, contract, transaction, communication or meeting of any kind between any intelligence agency and any of the Parties.

6.    The Parties shall not discuss, mention, question or introduce as evidence, either at trial, in any pleading or motion, or in any case-related correspondence, any actual or proposed intelligence agency interest in, application of or use of the Technology.

7.    No question and no document request in discovery or at trial shall require a response that would include any information covered by paragraphs 2, 3, 5 or 6 above, but if the responding party believes that a full and complete response could disclose information within the scope of the state secrets privilege, the responding party shall provide timely notice of such belief and the full and complete response to the United States prior to responding, and shall respond only with information that the United States has determined is not subject to the state secrets privilege.

8.    The military and state secrets privilege, the claim that any discovery is covered by paragraphs 2 or 3 above, and the claim that any evidence is covered by paragraphs 2 or 3 above, can only be invoked by the United States.  These claims cannot be asserted by a private individual or entity.

9.    All Parties shall serve the attorneys for the United States with (a) a copy of all notices of depositions, (b) a copy of all requests for discovery and responses thereto, and (c) a copy of all pleadings and motions filed together with supporting memoranda (hereinafter collectively referred to as the "documents"), unless such documents request or relate to information covered by paragraphs 2 or 3 above.  If the documents request or relate to information covered by paragraphs 2 or 3 above, the Parties shall submit the documents to the United States for privilege review prior to service or filing.  All documents filed or sought to be used as evidence by the Parties in this case shall be unclassified.  This requirement applies to all motions, pleadings, briefs, and any other document, including exhibits, correspondence, or anything appended thereto or filed therewith.  If the United States determines that a document or discovery response includes

information covered by paragraphs 2 or 3 above, the United States shall redact the information and provide the parties and Court with a redacted copy of the document or discovery response.

10.     The Clerk of the Court shall send attorneys for the United States a copy of all future decisions and notices for hearings in these cases.

11.     As the United States deems necessary, attorneys for the United States may attend all depositions and proceedings in this case and may make objections as necessary to protect national security information.  If attorneys for the United States assert an objection based on the need to protect national security information with respect to either witness testimony or documents introduced or otherwise relied upon during a deposition, then the witness shall be precluded from testifying with respect to the line of inquiry that engendered the objection, and the document shall be withdrawn from the record pending an order of the Court with respect to the scope of the government's national security objection.

12.     To protect the United States' interests, attorneys for the United States may participate in any proceeding in these cases, including but not limited to motions hearings, all pre-trial proceedings, or trial by making and opposing motions, submitting briefs, and participating in arguments.

13.     The United States shall be excepted from all party discovery during the pendency of its motions to dismiss the claims against the Department of Defense. It is so ordered.

Dated:     August 29, 2007
        _____

                    _____
                    PHILIP M. PRO
                    United States District Judge

-5-

# EXHIBIT E

```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
 2          BEFORE THE HONORABLE VALERIE P. COOKE, MAGISTRATE JUDGE
                             ---o0o---
 3

 4    DENNIS MONTGOMERY and the     :
      Montgomery Family Trust,      :
 5                                  :
                    Plaintiffs,     :  No. 3:06-CV-56-PMP(VPC)
 6                                  :
            -vs-                    :  June 24, 2008
 7                                  :
      ETREPPID TECHNOLOGIES, LLC,   :  Reno, Nevada
 8    WARREN TREPP, and the         :
      UNITED STATES DEPARTMENT OF   :
 9    DEFENSE,                      :
                                    :
10                  Defendants.     :
      _____:
11     AND RELATED CASES _____:

12

13         TRANSCRIPT OF CONTINUED ORDER TO SHOW CAUSE HEARING

14    APPEARANCES:

15    FOR THE PLAINTIFFS:  DEBORAH KLAR and MARK GUNDERSON
                           Attorneys at Law
16

17    FOR THE DEFENDANTS:  J. STEPHEN PEEK, JERRY SNYDER,
                           BRIDGETT ROBB PECK, GREGORY SCHWARTZ and
18                         ANDREW LIESE
                           Attorneys at Law
19

20    FOR INTERESTED       CARLOTTA WELLS and RAPHAEL GOMEZ
      PARTIES:             Assistant U.S. Attorneys
21

22    Reported by:              Margaret E. Griener, CCR #3, RDR
                                Official Reporter
23                              400 South Virginia Street
                                Reno, Nevada 89501
24                              (775)329-9980

25               COMPUTER-ASSISTED TRANSCRIPTION
```

1          RENO, NEVADA, TUESDAY, JUNE 24, 2008, 9:00 A.M.

2                              ---o0o---

3

4              THE CLERK:  This is the date and time set for

5    the continued order to show cause hearing in case number

6    06-CV-0056-PMP(VPC), Dennis Montgomery, et al., versus

7    eTreppid Technologies, et al.

8              Present on behalf of plaintiff, Deborah Klar and

9    Mark Gunderson.

10             Present on behalf of defendants, Stephen Peek, Jerry

11   Snyder, Bridget Robb Peck.

12             Present telephonically on behalf of defendants,

13   Gregory Schwartz and Andrew Liese.

14             Present on behalf of interested party, Carlotta

15   Wells and Raphael Gomez.

16             THE COURT:  Thank you very much.  Please just

17   give me a moment to get my papers in order.

18             This is a continued hearing pursuant to this Court's

19   order to show cause concerning why Dennis Montgomery and the

20   Montgomery Family Trust should not be held in contempt of

21   court for failure to obey a series of discovery orders that

22   were issued in this case.

23             As the parties and counsel well know, we had a

24   day-long hearing on June 10, and it has been continued to

25   today.

Case 1:21-cv-00445-CJN Document 182-41 Filed 08/07/23 Page 45 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 3 of 205

3

1          Just some preliminary matters.  First of all, the

2   Court, during the last -- the June 10th, hearing had several

3   exhibits, and I'm going to admit those into evidence.

4          Do counsel have any objections to those?  I believe

5   those are Exhibits 1 through -- let's see, the Court's

6   exhibits, I believe, were 1 through 16.  Is that correct,

7   Ms. Clerk?

8               THE CLERK:  Your Honor, I show 1 through 18.

9               THE COURT:  Were the court's exhibits?

10              THE CLERK:  Yes.

11              THE COURT:  All right.  Do counsel have any

12   objection to the admission of those exhibits?

13              MR. PEEK:  I don't, your Honor.  I would just

14   like to have a list from the clerk so that we know what we

15   have because I don't think -- I don't think all 18 were

16   actually shown to the witness and identified.

17              THE COURT:  All right.  Ms. Klar?

18              MS. KLAR:  Your Honor, we would like to see a

19   list before we take a position because --

20              THE COURT:  All right.

21              MS. KLAR:  -- Mr. Peek is right, they all were

22   not shown to the witness.

23              THE COURT:  All right.  What I'll do is at one

24   of the breaks we'll go ahead and take care of that, and,

25   Ms. Clerk, if you would provide copies of the exhibit list to

1    counsel, that would be helpful, and then we can take care of

2    that housekeeping matter.

3         The other matter, just for the record, the Court did

4    receive -- was filed at 7:35 p.m. last night docket 696 which

5    is the Montgomery parties' brief for a limitation on subject

6    matter of correspondence required to be produced pursuant to

7    eTreppid's request number 26 in request for production set 2.

8         And the Court notes it was filed but certainly isn't

9    saying any more than that because we're proceeding with this

10   hearing today.  Whether it was filed with the intention that

11   it somehow be considered today, I don't know, but I just

12   wanted to note that the Court is aware it was filed.

13        All right.  When we were last in session, Mr. Peek

14   was examining Mr. Montgomery, and I assume, Mr. Peek, you're

15   ready to proceed?

16             MR. PEEK:  I am ready to proceed, your Honor.

17        I did want to at least -- I don't know that we need

18   to address document 696.  I did receive it, did review it and

19   prepared argument to argue it.

20        And the reason I say that is it may go to at least

21   the good faith or bad faith of Montgomery in connection with

22   one of the productions because I think what he's going to

23   probably say is, well, I didn't understand the order because

24   that's what Ms. Klar says, I didn't understand the order, I

25   think it meant something other than what the request said.

Case 1:21-cv-00445-CJN Document 182-41 Filed 08/07/23 Page 47 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 9 of 205

9

 1             THE COURT:  All right.  Mr. Montgomery, take the

 2    stand, please.

 3             MS. KLAR:  Your Honor, just a housekeeping

 4    matter?

 5             THE COURT:  Yes.

 6             MS. KLAR:  During the recent hearing last week,

 7    status conference, you had requested that Mr. Montgomery

 8    submit a declaration, which he did do.

 9             THE COURT:  Right.

10             MS. KLAR:  Since we have had an opportunity to

11    look at those photographs, we have determined that the -- and

12    we have provided photographs that are Bates stamped 1490

13    through 1599, DM 1490 through 1599, and those are appended, I

14    believe, to Mr. Montgomery's declaration.

15             We would request that those CDs be eliminated from

16    this case because all of those CDs relate to a time before

17    Mr. Montgomery ever became involved with eTreppid.  They are

18    all prior to September of 1998.

19             And given the scope of the search warrant, we're at

20    a loss to understand why these CDs were taken in the first

21    place, but they were, and those are the facts, and we think

22    that those CDs should be eliminated from this record and not a

23    subject of discovery because clearly they have nothing to do

24    with anything that is currently before the Court.

25             THE COURT:  All right.  So, first of all, just

Case 3:06-cv-00645-MPN-PC Document 12-4 Filed 08/07/08 Page 48 of 650
Case 3:06-cv-00645-MPN-PC Document 1273-1 Filed 08/03/08 Page 104 of 265
-104

1  saying to the backup go to all of this.  There was also a list
2  saying do all this, exclude these files.
3       So you're -- when you keep saying list, you're
4  saying generally, but that's not the case.
5  Q    Okay.  The first list then pre-2002 was to go copy
6  everything.
7  A    No.
8  Q    Okay.
9  A    There was never ever a command ever that I know of with
10 that statement that you're giving me.
11 Q    Okay.  Was there a statement of copy everything except
12 those, and then we do that, but not copy those that are open?
13 A    I don't believe it ever copied hidden or system files,
14 and there may be other restrictions because programs change
15 over time, and how they react to files that have attributes on
16 them or not affects the backup.
17 Q    Okay.  So that's pre-2002.  After 2002 you said you
18 created a list.  Am I correct?
19 A    There was some files that were clearly avoided I think.
20 Q    What were those?
21 A    I don't recall specifically.
22 Q    Can you recall generally?
23 A    Certain types of recording files.
24 Q    Such as what?
25 A    Without divulging government information, I think that

1    would be a problem.

2     Q   Well, on Sue Perez's files, would that be a problem?  She

3    wouldn't have any classified information on her computer,

4    would she?

5     A   Well, I don't know if -- you're asking me to answer a

6    question that I may -- I don't want to make a mistake.

7              MR. PEEK:  Go ahead, take the time, your Honor,

8    have him take the time.

9              THE WITNESS:  Okay.

10             MS. KLAR:  Your Honor, I think this just

11   demonstrates how unfair the questioning is.

12             Mr. Peek takes the position that because somebody

13   didn't have top security clearance ipso facto there could be

14   nothing on their files that would fall within these

15   parameters, and I don't think that's a fair conclusion to

16   reach.

17             But, again, it's not relevant, and I don't know why

18   we're spending, you know --

19             MR. PEEK:  Your Honor, he's playing games with

20   us.  This is pure, unmitigated --

21             THE WITNESS:  That's absolutely untrue.

22             MR. PEEK:  -- gamesmanship on the part of

23   Mr. Montgomery; pure unmitigated.

24             Sue Perez is an office clerk who performs accounting

25   tasks from time to time and other clerical stuff.  She never

Case 3:06-cv-00145-MPC-LNP Document 274-1 Filed 08/07/08 Page 50 of 650
Case 3:06-cv-00145-MP-VPC Document 731 Filed 08/03/08 Page 106 of 265
-106-

1   had a top secret clearance, and under no circumstances could

2   anybody have a good faith belief, including Mr. Montgomery,

3   that Sue Perez would have had any classified, state secret

4   information on her computer.

5               THE WITNESS:  Allow me to talk to the government

6   first, then they can answer your question for you.

7               THE COURT:  All right.

8               MR. PEEK:  Take the time to do it, your Honor.

9                  (Discussion held off the record.)

10              THE COURT:  The record will reflect that

11  Mr. Montgomery has now resumed the witness stand and counsel

12  for the United States have also returned.

13        Go ahead, sir.

14              MS. WELLS:  Excuse me, your Honor.

15              THE COURT:  Yes.

16              MS. WELLS:  Based on our conversations with

17  Mr. Montgomery, we would actually request that he not answer

18  the question that Mr. Peek has posed to him under the terms of

19  the United States' protective order.

20        The fact that he may or may not have backed up

21  certain types of files on certain employees' systems could, in

22  fact, implicate the terms of the protective order.

23              MR. PEEK:  I'll respect that and move on, your

24  Honor.

25              THE COURT:  Thank you.

Case 3:06-cv-00645-MPN-VPC Document 182-1 Filed 08/07/08 Page 51 of 650
Case 3:06-cv-00645-MPN-VPC Document 1731 Filed 08/03/08 Page 107 of 265
107

BY MR. PEEK:

Q   Backups are for disaster recovery, are they not?

            MS. KLAR:  Objection, your Honor, relevance.

            MR. PEEK:  Your Honor, may I have a little
latitude here?  I mean, what's the purpose here?  I mean, if
you're going to backup, I mean, there has to be some reason to
do it.

        You don't just -- the CEO says do it, I mean, it's
obviously -- you do it for disaster recovery, and then I want
to go on again, if it's for disaster recovery, what files he
copied, why didn't he copy all the files.

            THE COURT:  All right.  Well, I'll allow -- it's
five to 12:00 so --

            MR. PEEK:  I'm mindful of the time as well.

BY MR. PEEK:

Q   For disaster recovery?

            THE COURT:  All right.  I'm going to go ahead and
overrule the objection, but let's wrap it up.

BY MR. PEEK:

Q   For disaster recovery?

A   That would be one reason.

Q   Okay.  And so you would want to make sure that you
captured, because of the disaster -- a disaster might occur,
all of the work product, if you will, of the employees; is
that correct?

```
 1    A    I guess that could be a reason.

 2    Q    You wouldn't be worried about the temporary Internet

 3   files on a person's computer, would you?

 4    A    I don't really know.

 5    Q    You wouldn't be worried about personal photos either,

 6   would you?

 7    A    Well, I wouldn't say that.

 8    Q    Okay.  Now, with respect to other backups, Mr. Venables

 9   was performing backups on a regular basis on each of the

10   computers, was he not?

11              MS. KLAR:  Objection, asked and answered.

12              MR. PEEK:  No, it wasn't, your Honor.

13              THE COURT:  Well --

14              MR. PEEK:  I asked him what Mr. Venables did, he

15   couldn't tell me what he did.

16         What I'm asking him now, a specific question, was

17   that one of Mr. Venables' jobs to perform backups of a regular

18   basis on each of these computers.  It's a simple yes or no.

19   We can move on.

20              MS. KLAR:  Your Honor, Mr. Peek asked the very

21   same question --

22              MR. PEEK:  Well, then, what was the answer?  If

23   Ms. Klar tells us what the answer was, we can move on.

24              THE COURT:  Well, it may have been asked and

25   answered, Ms. Klar, I just don't remember so just please
```

Case 3:06-cv-00645-LRH-VPC Document 1274 Filed 08/07/08 Page 53 of 650
Case 3:06-cv-00056-MPC-VPC Document 731 Filed 08/03/08 Page 109 of 265

—109

```
 1   answer the question, Mr. Montgomery.
 2              THE WITNESS:  I don't -- ask it again.
 3   BY MR. PEEK:
 4    Q   Was Mr. Venables performing on a regular basis backups of
 5   the computers at eTreppid, including those whose names you
 6   gave us previously?
 7    A   No.
 8    Q   Was he doing it on any -- at any time at all?
 9    A   I can't say -- I don't know if he -- you mean ever?
10    Q   Yes, ever.
11    A   I would have no way of knowing.
12    Q   And wasn't that one of his jobs?
13    A   I don't --
14              MS. KLAR:  Objection, your Honor, we've been
15   through this.
16              THE COURT:  He did -- he apparently -- as I
17   understand Mr. Montgomery's testimony, it wasn't his job.
18   BY MR. PEEK:
19    Q   So it wasn't Mr. Venables' job to do that?
20    A   He backed up the servers in the server facility and in
21   his office, and I don't know -- did he do other people's
22   computers?  He might have from time to time, I don't know.
23    Q   All right.  Now, so you would have been backing up e-mail
24   files, would you not, on these individual computers from time
25   to time unless, of course, the application was open?
```

 1   varying PST files to put them into this text file, did they

 2   not?

 3    A    Not necessarily.

 4    Q    Then how did it get done?  Was it done electronically

 5   with a program?

 6    A    I mean, there isn't only one way this file could have got

 7   created.

 8    Q    Okay.  Tell me --

 9    A    Well, you just named one, I believe.

10    Q    Okay.  Is that the way it happened?

11    A    Not that I recall.

12    Q    How did it happen?

13    A    I don't recall.  You've asked me this --

14    Q    Okay.  You don't know, again.

15            So you or somebody gave it a name, and somebody

16   chose to put into that certain E-mails from the PST files that

17   you had in your possession; is that correct?

18    A    From the -- I can't say that every one of those came from

19   a PST because you've already asked me that question.

20    Q    Okay.

21            THE WITNESS:  Your Honor, I would like to stop

22   for a minute and take a break to use the restroom.

23            THE COURT:  All right.  We're going to take a

24   quick five-minute break until 4:10 --

25            MR. PEEK:  I'm not going to go anywhere, your

Case 3:06-cv-00645-MP-NPC Document 1271 Filed 08/07/08 Page 55 of 650
Case 3:06-cv-00645-MP-NPC Document 731 Filed 08/03/08 Page 214 of 265

214

 1   Honor.

 2              THE COURT:  We'll be in recess for five minutes.

 3                   (A recess was taken.)

 4              MR. PEEK:  Your Honor, I want to apologize to

 5   the Court, to Ms. Klar, I made representations to the Court

 6   there was a defamation claim outstanding.  Mr. Snyder reminded

 7   me there is not.  It will be the subject matter of further

 8   conversation and motion practice as well.

 9              THE COURT:  All right.

10              MR. PEEK:  But I wanted to at least clear that

11   up with the Court and apologize to the Court and Ms. Klar for

12   making that representation which was in fact wrong.

13              THE COURT:  I understand the government wishes

14   to have a sidebar; is that correct?

15              MS. WELLS:  That's correct.

16              THE COURT:  Lawyers, if you're there appearing

17   telephonically, I apologize, but we are not able to hook you

18   in for the sidebar, but all other lawyers please come on over

19   here.

20                   (Following is discussion at sidebar.)

21              THE COURT:  All right.  I understand that the

22   government has concerns about documents appearing in the

23   exhibits that eTreppid is examining Mr. Montgomery on this

24   afternoon.

25              MS. WELLS:  Okay.  We have some concerns about

1   some of the documents that are appearing in Exhibit 8 and

2   Exhibit 6, and what we would like to do is --

3              MR. PEEK:  Eight or 9?

4              MS. WELLS:  Eight.  You have not used 9 yet.

5              MR. PEEK:  I'm using 9 right now.

6              MS. WELLS:  No, we do not have concerns about 9,

7   we have concerns about 8 and 6, and there are pages within

8   those two exhibits that we would like to pull and take back to

9   Washington and make the redactions, and we'll provide copies

10  back to everybody.

11             MR. GOMEZ:  There's also several pages --

12             MS. WELLS:  No, that's Exhibit 6.

13             THE COURT:  Okay.  So what I would propose we

14  do, I know you would like to FedEx these back this evening,

15  correct, sir?

16             MS. WELLS:  Yes.

17             THE COURT:  Okay.  And so -- all right.  So what

18  I propose we do, I understand -- and I'll put this on the

19  record, Ms. Klar, I think you mentioned to my law clerk or my

20  court clerk that Mr. Montgomery's --

21             MS. KLAR:  He's hit the wall.

22             THE COURT:  -- tired.  Anyway, we have some

23  other housekeeping matters to take up.

24             I propose that we continue this and that I send

25  Mr. Gomez and Ms. Wells -- sorry, long day -- into my jury

Case 3:06-cv-00645-MPN-PC Document 1274 Filed 08/07/08 Page 57 of 650
Case 3:06-cv-00645-MPN-PC Document 731 Filed 08/03/08 Page 216 of 265
                                                                    216

 1    room, and you could begin -- we'll just hand over all the

 2    binders now, and you can now get going on that, assured that

 3    what we will do for the balance of the afternoon -- I think

 4    we're going to be wrapping it up pretty quickly.

 5            There were some housekeeping matters that we need to

 6    take care of, we'll do that, and then we will be setting a

 7    continued hearing so you'll need to --

 8            MS. WELLS:  What I would suggest is that maybe

 9    Mr. Ferrera and Mr. Gomez can take the binders and pull these

10    and then they can stay in the courtroom.

11            THE COURT:  All right.

12            MR. GUNDERSON:  What are we going to do with the

13    binders that counsel have?

14                    (Simultaneous indecipherable
                       conversation.)
15            MS. WELLS:  We are just removing the pages which

16    we believe need to be redacted.  We will be giving the

17    remained of the binders back to counsel.

18            THE COURT:  That was Ms. Wells.  Nobody talk.

19        All right.  Thank you.

20            MS. WELLS:  Thank you.

21                    (End of sidebar discussion.)

22            THE COURT:  All right.  The Court has had a

23    sidebar, and I'm going to have Mr. Gomez and the court

24    security officer take possession of -- is it all of the

25    binders; is that correct?

```
1                    MS. WELLS:  No, just binders 1 and 2.

2                    THE COURT:  Take possession of binders 1 and 2,

3    all copies.

4                    MR. PEEK:  Are we done with his examination,

5    your Honor?  Because Exhibit 9 is in my volume 2 so I

6    didn't --

7                    THE COURT:  I think we're finished.  I think

8    that we're going to wrap things up for today.

9              Well, I only have exhibit -- I only have binder 1,

10   volume 1.

11                   MR. GUNDERSON:  Your Honor, the Montgomery

12   parties are going to surrender their volumes 1 and 2 now to

13   the government.

14                   (Discussion held off the record.)

15                   THE WITNESS:  Can I step down or no?

16                   THE COURT:  You may step down.  I'm going to

17   have Mr. Montgomery step down.

18                   MR. PEEK:  Your Honor, I have another volume 1

19   here.

20                   MS. ROBB PECK:  Your Honor, and just for the

21   record, local counsel for both Atiego and Mr. Sandoval have

22   surrendered volumes 1 and 2 as well.

23                   THE COURT:  Thank you.

24              Go ahead and have a seat, Mr. Montgomery.

25                   THE WITNESS:  Okay.
```

Case 3:06-cv-00145-MP-NPC Document 1274 Filed 08/07/08 Page 59 of 650
Case 3:06-cv-00145-MP-NPC Document 1731 Filed 08/03/08 Page 218 of 265

218

1          THE COURT:  All right.  I just want to poll

2     counsel so I'll just go around the room, the courtroom.

3          So, Ms. Klar, have you provided the binders volumes

4     1 and 2 to government counsel?

5          MS. KLAR:  We have, your Honor.

6          THE COURT:  All right.  And Ms. Robb Peck

7     advises on behalf of Atiego and Mr. Sandoval she also did.

8          MS. ROBB PECK:  That's correct, your Honor.

9          THE COURT:  And I've provided volumes 1 and 2 of

10    my exhibits.  Did we have any additional exhibits, Ms. Clerk?

11         THE CLERK:  I did, your Honor, and I provided

12    those as well.

13         THE COURT:  All right.  And, Mr. Peek, have you

14    provided all of your copies that are here in the courtroom

15    to --

16         MR. PEEK:  I have, your Honor, and I've also

17    canvassed my staff to make sure that we didn't have any extras

18    here.

19         THE COURT:  All right, thank you.

20         All right.  So pursuant to the sidebar, the

21    government will be reviewing certain documents that are in

22    those exhibits.

23         And so Mr. Montgomery advised Ms. Klar that he would

24    really -- I think, is tired, and it turns out that -- I think

25    it's making sense to me that we set yet another date for

1   that, sir.  Thank you, though.

2              MR. SCHWARTZ:  Just double checking.  Thank you,

3   your Honor.

4              MR. PEEK:  With respect to Mr. Montgomery, I'm

5   assuming that the two hour is my limit of cross.

6              THE COURT:  Yes.

7              MR. PEEK:  Ms. Klar may have some redirect of

8   him, I don't know.

9         And then with respect to Mr. Karchmer, we would have

10  two hours on direct, I don't know how much cross.

11             THE COURT:  All right.  And then so --

12             MR. PEEK:  And then Mr. Trepp would be an hour

13  and a half at the most.

14             THE COURT:  So that is five and a half hours.

15             MS. KLAR:  Your Honor, that doesn't give me very

16  much time for any kind of rebuttal.

17             THE COURT:  No, it doesn't.  What do you

18  anticipate?  Do you know at this time?

19             MS. KLAR:  I don't.  I'm assuming that I'm going

20  to have to put an expert on to respond to Mr. Karchmer, and I

21  think I also will have to -- I may have to put testimony on in

22  response to Mr. Trepp, and I would assume that I will be

23  cross-examining Mr. Trepp.

24             THE COURT:  All right.  Well -- all right.

25         Oh, please hand that extra exhibit -- the record is

Case 3:21-cv-00945-MMD-CLB   Document 274   Filed 08/07/23   Page 61 of 650
Case 3:06-cv-00645-MMD-NPC   Document 731   Filed 08/03/08   Page 238 of 265

235

 1    reflecting that the law clerk is delivering yet another binder
 2    to Mr. Gomez that he needs to take a look at.
 3            Please make sure, everybody, before you leave today,
 4    I know everybody is doing their best, it's which binders?
 5    One --
 6            MS. WELLS:  1 and 2.
 7            THE COURT:  Binders 1 and 2.  Don't take them.
 8    Make sure when you're packing up, my law clerk will be here,
 9    and we can deliver those to Mr. Gomez and the court security
10    officer.
11            All right.  Well, I'll -- what I'm going to tell --
12    I'm gone, so I'll tell counsel when I'm available.
13            I think what we're going to have to do is this,
14    rather than decide all of this today, I want to give counsel,
15    Mr. Peek and Ms. Klar, an opportunity to consider how you want
16    to proceed at the continued show cause hearing and what time
17    you think you're going to need, and then I think you can
18    submit what your individual proposals are about what you would
19    request from the Court in terms of time.
20            And then what I'll do is either issue an order
21    saying here's when I'm available and this is how much time
22    you're getting and this is when I can be available, but I will
23    tell you -- let's see.  I think next week is out, right?
24            Well, I'm available before July 21, but I guess --
25    and I'm available the week of July 21st on the 24th or the

1    25th.

2            MR. PEEK:  Your Honor, as always, there's a

3    chance that a case could settle the week of the 14th, but I

4    don't --

5            THE COURT:  I'm just -- I understand.  I'm just

6    telling you that I'm available so you know, and I could

7    possibly continue a matter on July 23rd.  So July 23rd, 24th,

8    or 25th, I am out.  The Ninth Circuit conference is the

9    following week and I am gone, and I am gone for part of the

10   next week.

11           So I'm available the week of August 11 on Monday,

12   the 11th, Tuesday, the 12th.  I could revise my schedule to be

13   available the week of August 11 on the 11th, the 12th, 13th,

14   and the 14th.

15           We have on Tuesday, August 19, the status conference

16   with Judge Pro.  I'm available August 20th, could be available

17   the 21st and the 22nd also.  I think that gives you --

18           MR. PEEK:  When would you like us to give

19   you our --

20           THE COURT:  Wait a minute.

21           THE CLERK:  It was moved to Monday, the 18th.

22           THE COURT:  Oh, I'm sorry, I moved it, I moved

23   the hearing to accommodate Judge Pro's schedule.  I apologize,

24   that's now set for Monday, August 18th.

25           MR. PEEK:  Does that make the Court available on

```
 1   the 19th?

 2             THE COURT:  Yes.  So I'm not asking you to do

 3   this today, I want you all to go home and look at your

 4   calendars, and then I want you to contact my court clerk on

 5   the 27th of this -- of June, just say what days you're

 6   available of those dates that I picked.  Talk to one another,

 7   figure out what days you're available.

 8             If we need to set it for two days.  Realistically, I

 9   would rather do that and get it done than keep bringing you

10   all back at expense to your clients.

11             But what I also want, counsel, will it give you

12   adequate time to decide what amount of time you would like to

13   request, if you can do that by Friday, would that be

14   sufficient time, Ms. Klar?

15             MS. KLAR:  Yes, your Honor.

16             THE COURT:  All right.  And, Mr. Peek?

17             All right.  So -- and on the 27th, just file a paper

18   saying requested time and witnesses for evidentiary hearing,

19   and then I'll decide how long it's going to be and what I'm

20   going to do, and then, in the meantime, everybody can just

21   either jointly or separately file a notice of availability and

22   which dates you and your clients are available of the dates

23   that I mentioned.  All right?

24             MR. PEEK:  Thank you, your Honor.

25             MS. KLAR:  Thank you very much, your Honor.
```

Case 3:21-cv-00645-MPN-P Document 1271 Filed 08/07/20 Page 64 of 650
Case 3:06-cv-00645-MPN-PC Document 731 Filed 08/03/08 Page 238 of 265

238

```
 1              THE COURT:  Is there anything else that anyone

 2    has?  Ms. Klar?

 3              MS. KLAR:  No, your Honor.

 4              THE COURT:  All right.  Mr. Peek?

 5              MR. PEEK:  No, your Honor.

 6              THE COURT:  Ms. Robb Peck?

 7              MS. ROBB PECK:  No, your Honor.

 8              THE COURT:  Mr. Schwartz?

 9              MR. SCHWARTZ:  No, your Honor.

10              THE COURT:  Mr. Liese?

11              MR. LIESE:  No, your Honor.

12              THE COURT:  Ms. Wells and Mr. Gomez?

13              MS. WELLS:  No, your Honor.

14              THE COURT:  All right.  Thank you very much,

15    then, we're adjourned for today.

16                          -o0o-

17

18         I certify that the foregoing is a correct
           transcript from the record of proceedings
19         in the above-entitled matter.

20         /s/Margaret E. Griener        07/03/2008
           Margaret E. Griener, CCR #3, RDR, FCRR
21         Official Reporter

22

23

24

25
```

# EXHIBIT F

Case 1:21-cv-00445-CJN Document 182-41 Filed 08/07/23 Page 66 of 650
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/03/08 Page 2 of 226

1

```
1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
2          BEFORE THE HONORABLE VALERIE P. COOKE, MAGISTRATE JUDGE
                             ---o0o---
3

4     DENNIS MONTGOMERY, ET AL.,    :  No. 3:06-cv-056-PMP-VPC
                                    :
5                  Plaintiffs,      :  JUNE 10, 2008
                                    :
6          -vs-                     :  United States District Court
                                    :  400 S. Virginia Street
7     ETREPPID TECHNOLOGIES, ET     :  Reno, Nevada  89501
      AL.,                          :
8                                   :
                   Defendants.      :
9     _____:

10

11

12                   TRANSCRIPT OF MOTION HEARING
            (Re:  Defendants' Motion for Order to Show Cause #634)

13

14    A P P E A R A N C E S:

15    FOR THE PLAINTIFF:        Deborah Klar
                                Tuneen Chisolm
16                              Mark Gunderson
                                Ellyn Garofalo
17                              Attorneys at Law

18    FOR DEFENDANT ETREPPID:   J. Stephen Peek
                                Jerry Snyder
19                              Attorneys at Law

20    FOR DEFENDANT ATIGEO:     Robert Rohde
                                Greg Schwartz
21
      FOR DEFENDANT SANDOVAL:   Bridgett Robb Peck
22                              Attorney at Law

23    FOR DEFENDANT SANDOVAL:   Jacquelyn Beatty
                                Attorney at Law
24
      FOR INTERESTED PARTY:     Carlotta Wells
25                              Raphael Gomez
                                U.S. Dept. Of Justice
```

Case 1:21-cv-00445-CJN Document 183-41 Filed 08/07/23 Page 67 of 650
Case 3:08-cv-00056-PMP-VPC Document 732 Filed 07/03/08 Page 2 of 226

2

1

2

Proceedings recorded by mechanical stenography produced by
3       computer-aided transcript

4

5

6    Reported by:                    KATHRYN M. FRENCH, RPR, CCR
                                      NEVADA LICENSE NO. 392
7                                     CALIFORNIA LICENSE NO. 8536

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:21-cv-00445-CJN Document 182-41 Filed 08/07/23 Page 68 of 650
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 08/08/08 Page 3 of 226

3

```
 1              RENO, NEVADA, TUESDAY, JUNE 10, 2008, 9:00 A.M.

 2                            ---o0o---

 3

 4              THE COURT:  Good morning.  Please be seated.

 5              THE CLERK:  This is the date and time set for

 6    defendant's Motion For Order to Show Cause, number 634, in

 7    case number 3:06-cv-056-PMP-VPC, Dennis Montgomery, and

 8    Montgomery Family Trust, and others, versus eTreppid

 9    Technologies, and others.

10              Present on behalf of plaintiffs, Dennis Montgomery

11    and Montgomery Family Trust, Mark Gunderson, Deborah Klar, and

12    Ellyn Garofalo.

13              Present on behalf defendants eTreppid

14    Technologies and Warren Trepp are Stephen Peek and

15    Jerry Snyder.

16              Present telephonically on behalf of

17    counter-defendant Atigeo, is Greg Schwartz.

18              Present telephonically on behalf of

19    counter-defendant Michael Sandoval is Jacquelyn Beatty.

20              And present on behalf of the  U.S. Department of

21    Justice are Carlotta Wells and Raphael Gomez.

22              THE COURT:  Good morning, again, everyone.

23         I can't see with this display here.  Whose is it?

24              MR. PEEK:  It's mine, Your Honor.  We can take

25    it down.
```

```
 1                 THE COURT:  I can't see, so --
 2                 MR. PEEK:  We can take it down or put it -- I
 3    don't if there's anyplace to move it.  If there isn't,
 4    there's --
 5                 THE COURT:  Why don't we --
 6                 MR. PEEK:  We have big screen as well,
 7    Your Honor.
 8                 THE COURT:  Why don't we move it over here so I
 9    can see.
10                 MR. PEEK:  That's fine.
11                 THE COURT:  Good.  Thank you.
12                 MR. PEEK:  Thank you, Your Honor.  Thanks,
13    Your Honor, for your indulgence.
14                 THE COURT:  All right.  Please just give me a
15    moment to organize my papers.
16                 MS. ROBB PECK:  Your Honor, I apologize for the
17    interruption, but I did want to make sure that my appearance
18    is noted for the record as well.  Bridgett Robb Peck on behalf
19    of both Atigeo and Michael Sandoval local counsel.  There's no
20    room at the inn, so I've been in the gallery.
21                 THE COURT:  All right.  Thank you very much,
22    Ms. Peck.
23           All right.  We are here this morning pursuant to
24    this Court's Order to show cause, docket number 646.  And I'll
25    take a moment, shortly, to review that Order.  But as counsel
```

Case 1:21-cv-00445-CJN Document 182-41 Filed 08/07/23 Page 70 of 650
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 5 of 226

5

1  may know, this morning, I met with Department of Justice

2  counsel because they had requested an in camera meeting.

3  And so I did have that meeting at 8:00 a.m. this morning

4  with them.

5        What I would first like to do, because it's

6  important that counsel, and Mr. Montgomery, who will be

7  testifying, all of us, be mindful of the U.S. Protective Order

8  that is in place in this case, docket number 253.  And that

9  Order contains two paragraphs which outline what is governed

10  by the U.S. Protective Order.  Paragraph 2 says:

11        "The parties shall not serve or take any discovery

12  relating to, or questioning the existence or non-existence of

13  any actual or proposed relationship, agreement, connection,

14  contract, transaction, communication, or meeting of any

15  kind between any entity and the intelligence community

16  as defined by the National Security Act of 1947, 50 USC

17  Section 401(a)(4), which includes intelligence elements of

18  the military services, or any current or former official

19  employee, or representative thereof, hereinafter collectively

20  referred to as intelligence agency and parties."

21        Paragraph 3 states:

22        "The party shall not serve or take any discovery

23  relating to, or questioning, any actual or proposed

24  intelligence, agency, interest in, application of, or use

25  of any technology software or Source Code owned or claimed

Case 1:21-cv-00445-CJN Document 183-41 Filed 08/07/23 Page 71 of 650
Case 3:08-cv-00065-PMP-VPC Document 732 Filed 07/08/08 Page 6 of 226

6

1   by the parties."

2          And so to the extent, and I suspect it would

3   be inadvertent on anyone's part, that someone might

4   inadvertently, as I said, venture into areas covered by the

5   U.S. Protective Order, I've asked Ms. Wells and Mr. Gomez to

6   alert the Court, immediately, as to any problem, so that line

7   of questioning is not pursued.

8          And to the extent, during the hearing, that counsel

9   for the government believes it appropriate to have a side

10  bar with counsel concerning issues that might be relevant to

11  the U.S. Protective Order, they may request a side bar.  And

12  counsel, I guess, will somehow all try to fit ourselves over

13  there.

14         The problem will be for counsel appearing

15  telephonically, you will not be able to hear what's said

16  during that side bar, since it will be on mute.  But, there

17  it is.  That's the state of the technology that we have.

18         So, with that, I would now like to proceed with

19  the Order to Show Cause.  And I should say I think counsel

20  would find it helpful to know that I met with Judge Pro last

21  Thursday, and he is quite familiar with the status of this

22  case and the issues pending, not only today before this Court,

23  but just in general.  And so I thought that would be helpful

24  information for all of you to have.

25         All right.  This Order to Show Cause follows a

Case 3:21-cv-00445-CDN Document 183-4 Filed 08/07/23 Page 72 of 650
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 7 of 226

7

1   series of orders this Court issued concerning a discovery

2   dispute that's origins, really, date back to August of 2006.

3   And it concerns two requests for production of documents.

4   One, as I said, sent back in the summer of 2006.  And another

5   sent more recently, in November 2007.

6          This Court issued a series of orders concerning

7   production of those documents that were requested, and granted

8   the eTreppid's motion to compel production of some of those

9   documents, denied it as to others, and so on.  And the Court

10  is not going to recount the entire chronology of events that

11  leads us here today.  Suffice it to say, that the documents

12  were not produced as ordered by the Court.  And most recently,

13  eTreppid filed a motion for sanctions, which this Court

14  elected to construe as an Order to Show Cause because the

15  failure of the Montgomery parties to comply with the Court's

16  Order is a matter for the Court, as opposed to opposing

17  counsel, or the opposing parties.

18          So, with that, I would ask Mr. Montgomery to please

19  be sworn in and take the witness stand.

20          MR. GUNDERSON:  Your Honor, could I

21  address the Court on one preliminary matter before we

22  swear Mr. Montgomery?

23          THE COURT:  You may.

24          MR. GUNDERSON:  Thank you, Your Honor.  And

25  Mark Gunderson, local counsel, for the record.

Case 1:21-cv-00445-CJN Document 182-41 Filed 08/07/23 Page 73 of 650
Case 3:06-cv-00056-PMP-VPC Document 732 Filed 07/08/08 Page 8 of 226

8

1          About four o'clock last night, I received from

2    Michael Flynn a declaration that he's filed in this case and

3    has been filed, purportedly, in opposition to Deborah Klar's

4    response to the Court's Order.  Mr. Flynn's not a party to

5    this case.  This is a fugitive document.  I would move to

6    strike that document and not have that as a part of the

7    record today.

8          THE COURT:  Well, I'll take that into

9    consideration, sir, your request, and think about it, and

10   decide what I'm going to do before the hearing concludes.

11         MR. GUNDERSON:  Thank you.

12         THE COURT:  So, thank you, sir.

13       Mr. Montgomery, please take the stand, sir.

14

15              **DENNIS L. MONTGOMERY,**
         **was sworn and testified as follows:**

16         THE CLERK:  Please be seated.

17       Please state your full name for the record.

18         THE WITNESS:  Dennis Lee Montgomery.

19         THE CLERK:  Thank you.

20         THE COURT:  Thank you.

21       Good morning, Mr. Montgomery.

22         THE WITNESS:  Good morning.

23         THE COURT:  Mr. Montgomery, I have some

24   questions of you, since you are here pursuant to this Court's

25   Order to Show Cause.  And as my Order to Show Cause indicated,

Case 3:06-cv-00545-MPP-NPC   Document 1872   Filed 08/07/23   Page 74 of 650
Case 3:06-cv-00545-MPP-VPC   Document 732   Filed 06/06/08   Page 161 of 226
-161-

 1   matter -- and I said I looked at it occasionally, but I had

 2   not --

 3    Q    My question is so you said you first looked at it to

 4   review it to determine the 1.3 million files in March of '08.

 5   That's what you just told us.

 6          Did I misunderstand you?

 7    A    No.  I, I think that's probably --

 8    Q    Okay.

 9    A    -- accurate.

10    Q    But you understood, did you not, that you had an

11   outstanding document production of August of '06, and another

12   one in November of '07 that, at least as of November '07, when

13   the stay was lifted, required you to produce documents from

14   that, those two hard drives, or from the hard drives that you

15   say are backup documents.

16    A    I was concerned about the States Secrets Privilege.

17    Q    Okay.  Now, when -- so you didn't furth -- you were

18   concerned about it, but didn't further review that document,

19   the hard drive that you had, or drives that you had, until

20   March of '08?  That's right?

21    A    I can't say I never.  No.  That's not accurate.

22    Q    Well, are you -- have you seen this pleading filed by

23   the United States Government in May 21st, I think of this

24   year, at a May 21st hearing in which Ms. Wells represented

25   in a pleading that she had made two efforts, through your

Case 3:06-cr-00645-MPC-VPC Document 1832 Filed 08/07/08 Page 75 of 650
Case 3:06-cv-00964-MP-VPC Document 732 Filed 06/06/08 Page 162 of 226

162

1  counsel, to meet with you last fall, early winter of '07, '08?

2  A   Are you referring to Mr. Flynn?

3  Q   No.  I'm referring to --

4  A   Oh.

5  Q   -- Ms. Wells saying to this court, on May 21st, that she,

6  through your counsel, Deborah Klar, had made two efforts in

7  November, and I believe December, January of '07, '08, to meet

8  with you.

9  A   I was aware of one of them.

10 Q   You were aware of only one.  You're not aware of two of

11 them?

12 A   That's correct.

13 Q   And what was your response to the inquiry by Ms. Wells to

14 meet with you?

15         MS. KLAR:  Your Honor, I would object to the

16 extent it calls for attorney/client communication.

17         THE COURT:  All right.  Answer the question, if

18 you can, without violating the attorney/client privilege.

19         THE WITNESS:  I don't think I could.

20         MR. PEEK:  Okay.

21 BY MR. PEEK:

22 Q   Are you aware that in a court pleading, Ms. Klar or --

23 excuse me, Ms. Wells has said that Ms. Klar refused to meet,

24 to have you meet with the government on those two occasions?

25 A   I can't answer that without disclosing attorney/client.

Case 3:06-cv-00145-LRH-VPC Document 182-2 Filed 08/07/08 Page 76 of 650
Case 3:06-cv-00145-MP-VPC Document 732 Filed 08/08/08 Page 163 of 226

-163-

1    Q    Okay.  So you didn't see the pleading that Ms. Wells

2    filed?

3    A    I can't say that I didn't see it.

4    Q    And you're saying then, that you did not become aware,

5    and if you became aware, it was only through attorney/client

6    communication, is that right?

7    A    That was the only communication I had with the

8    government.

9    Q    Well, are you aware, today, that Ms. Wells has told this

10   court that she made two efforts to have the government meet

11   with you to review with you the States Secrets Privilege, and

12   your counsel, Ms. Klar, refused?

13              MS. KLAR:  Your Honor, again, I object to the

14   question, to the extent that it calls for attorney/client

15   communications.

16              MR. PEEK:  Aware of anything other than through

17   his attorney.

18              THE COURT:  Right.  Right.

19              As I understand Mr. Peek's question, the question

20   was are you aware that Ms. Wells told the Court that she

21   had attempted to arrange a meeting between you and government

22   officials to review the terms of the U.S. Protective Order

23   on two occasions, and that Ms. Wells told the Court -- so

24   this is what Ms. Wells is telling me, so that's not a

25   attorney/client issue, I don't think -- he's just asking if

Case 3:06-cv-00645-MP-LVPC Document 1242 Filed 08/07/08 Page 77 of 650
Case 3:06-cv-00645-MP-LVPC Document 1732 Filed 08/08/08 Page 164 of 226

-164

1    you knew that.

2              MS. KLAR:  But, Your Honor, to the extent he

3    knew that as a result of a communication with me, it's

4    privileged.

5              MR. PEEK:  I don't think that's even a

6    confidential communication, Your Honor, that would even be

7    covered by the attorney/client privilege.  That's where a

8    court officer had an obligation to tell his or her client.

9              THE COURT:  I don't see how that's covered by

10   the attorney/client privilege.

11         Ms. Klar.

12             MS. KLAR:  Your Honor, any conversations that I

13   have had with Mr. Montgomery with respect to what has occurred

14   in this litigation, and positions that have been taken by

15   other counsel, I view those communications as privileged.  I,

16   to the extent I had such a conversation, assuming I did, it

17   would be covered by the privilege.

18             THE COURT:  All right.  What --

19             MR. PEEK:  I could put Ms. Klar on the stand

20   and ask her if she was at least asked twice, and did she

21   refuse twice.  I'm happy to do that, Your Honor.  Or, she can

22   stipulate that that's what happened.  And then the Court can

23   draw its own inference as to whether or not she fulfilled her

24   obligation to her client of informing him of that.

25             If she's willing to give that stipulation, by

Case 3:06-cv-00645-MPLN-VPC Document 1872-2 Filed 08/07/08 Page 78 of 650
Case 3:06-cv-00645-MPLN-VPC Document 1732 Filed 06/06/08 Page 165 of 226
-165

 1   agreement with Ms. Wells -- I don't want to put Ms. Wells on

 2   the stand.  I accept her pleading.  But I'm trying to at least

 3   prove that this man was given two opportunities to meet with

 4   the government, and did not do so and, therefore, that's why

 5   he now comes before you and says, oh, my gosh, Your Honor, I

 6   have 1.3 million files to review, and I as unaware, and I am

 7   overwhelmed by all of this.  That's the position he is taking

 8   today, and there may be nothing close to that.  He made no

 9   good faith effort to even look at it.  He never made a good

10   faith effort to meet with the government so he would

11   understand what his obligations were.

12             MS. KLAR:  Your Honor, I made a representation

13   to the Court at the May 21st hearing -- and I don't think

14   Ms. Wells disagreed with me -- at the time that we were

15   initially asked to meet with the government, there were

16   certain conditions that we requested that the government

17   would not agree to.  And subsequently, some time in May, we

18   had further discussions, and the government did agree to

19   those terms.  And we have, today, a document that confirms

20   what occurred at that meeting, which is what we were seeking

21   at the time that the initial request was made.

22             Now, to the extent that I have had communications

23   with my client with regard to these issues, in my view, those

24   conversations are clearly privileged.

25             MR. PEEK:  Your Honor, all I know is the Court

Case 3:06-cv-00145-PMP-VPC  Document 1273-2  Filed 08/07/08  Page 79 of 650
Case 3:06-cv-00145-PMP-VPC  Document 732  Filed 06/06/08  Page 166 of 226

166

1  ordered him to meet with the government.  And it wasn't until

2  the Court ordered Mr. Montgomery to meet with the government

3  that he did so.

4                  MS. KLAR:  Your Honor, that is not correct.

5  We agreed to meet with the government before the May 21st

6  hearing.

7                  THE COURT:  Ms. Wells, what was the -- and you

8  may not know this offhand.  I'm trying to search my docket

9  sheet.  I know you filed a statement.  Can you sort of recall

10  when?

11                  MS. WELLS:  I believe there was an Order,

12  Your Honor, before the May 21st hearing, requiring that the

13  government and the eTreppid parties could weigh-in on the

14  subject matter of that hearing --

15                  MR. PEEK:  Your Honor, it's docket 611.

16                  MS. WELLS:  It might have been, if that was on

17  the 21st.

18                  MR. PEEK:  It's actually May 19th.

19                  MS. WELLS:  May 19th, is that --

20                  MR. PEEK:  I'm not sure if that's the one,

21  Your Honor.

22                  THE COURT:  Thank you.  Got it.

23                  MR. PEEK:  Is this the one, Ms. Wells?  It's

24  footnote -- page 4, Your Honor, of that.

25                  THE COURT:  All right.

Case 3:06-cv-00145-LPN-PO Document 1274 Filed 08/07/08 Page 80 of 650
Case 3:06-cv-00145-MP-VPC Document 732 Filed 08/08/08 Page 107 of 226
167

 1                    MR. PEEK:  And you read that -- actually,

 2     I think this became a court exhibit -- no, it didn't,

 3     Your Honor.

 4                    THE COURT:  I don't believe it did.

 5                    MR. PEEK:  That was me.  I apologize.  I turned

 6     it on at the break and didn't turn it off.

 7                    THE COURT:  Everybody else turn off your cell

 8     phones.

 9                    MR. PEEK:  So, all I know is what the pleading

10     says, Your Honor.

11                    THE COURT:  All right.  So why don't you go

12     ahead, sir, and just read that into the record.

13                    MR. PEEK:  On page 4 of docket 611, Ms. Wells, I

14     think, writes on line 8:

15              "As a means of providing assistance to Montgomery

16     in identifying more precisely the information covered either

17     by the United States Protective Order, or the NDA, government

18     counsel reminded Montgomery's counsel that on at least two

19     previous occasions, government counsel had offered to arrange

20     a meeting between Montgomery and appropriate government

21     officials.

22              "The purpose of such a meeting would have been to

23     provide Montgomery with an explanation of the parameters of

24     the United States Protective Order, a conversation that is

25     possible with Montgomery because of his government authorized

```
 1   access to protect the information, but not with his uncleared

 2   counsel."

 3              Then there's a footnote:  With respect to one of

 4   the prior occasions, government counsel offered to meet with

 5   Montgomery in Reno, Nevada, at a convenient time, before or

 6   after the December 2007 Discovery Status Conference, when

 7   such a meeting the government had proposed to counsel for

 8   Montgomery, was held with Warren Trepp."

 9              I don't see anything in here that refers to

10   Ms. Klar's conditions or anything else.  I'm just going by --

11                 THE COURT:  No.  What I recall is that at the

12   May 21 hearing, that is when Ms. Klar stated on the record

13   the discussion about the arrangements that had quite recently

14   been made for the meeting between Mr. Montgomery and

15   government officials and so forth, which took place last

16   week.

17                 MR. PEEK:  I'll move on, Your Honor.

18   BY MR. PEEK:

19    Q   So after, at least, March of 2008, did you conduct any

20   review at all of those disks that you said had kind of gone

21   through car, storage, Michael Flynn, Junior, Senior, Michael

22   Flynn, Junior, yourself, to determine whether or not you had

23   any good faith belief whether there was any United States

24   States Secret privilege on them, or States Secret classified

25   information on them?   Did you do that?
```

Case 3:06-cv-00645-MP-LNPC Document 1274-2 Filed 08/07/08 Page 82 of 650
Case 3:06-cv-00645-MP-LNPC Document 732 Filed 06/06/08 Page 169 of 226
169

1   A   Yes.

2   Q   When did you do that?

3   A   I thought -- sorry.  I thought, I thought it was in March

4   sometime, going forward, February, March.

5   Q   And what did you determine when you reviewed it, in

6   either February or March 2008, as to whether it did or did

7   not contain States Secrets information on it?

8   A   I would say that I was suspicious it might.

9   Q   Okay.  And did you then, at that time, because of your --

10  did you feel there was a good faith belief that there was

11  State Secret Privilege on it?

12  A   I don't -- I don't understand the question.

13  Q   Did you believe that your suspicion was a good faith

14  belief that there was State Secrets Privilege on it?

15  A   I wasn't certain or not, but --

16  Q   Okay.  So when did you conduct a second or further review

17  to determine whether there was or was not States Secret

18  Privilege on there?

19  A   Late March, April.

20  Q   So late March, early April?

21  A   Yes.

22  Q   And what did you determine at that time?

23  A   Well, I wasn't certain what fell into the privilege, so I

24  wasn't -- I mean there's no way to know for certain.

25  Q   Okay.  So when did you then make the determination that

Case 3:06-cv-00645-MP-NPC Document 4872 Filed 08/07/08 Page 83 of 650
Case 3:06-cv-00645-MP-NPC Document 732 Filed 08/08/08 Page 170 of 226
—170

1    there was not States Secret Privilege information on it that

2    you could turn over?  When did you make that determination?

3     A    Regarding the drives?

4     Q    The ones that you turned over May 23rd and May 26th or

5    27th.

6     A    I didn't ever -- I didn't look at all those files to make

7    that determination.

8     Q    But you produced them to us?

9     A    Under the assumption that any work done after

10   January 1st --

11    Q    Correct.

12    A    -- might contain States Secrets.

13    Q    After January 1st of 2003?

14    A    Yes.

15    Q    Okay.  So you made that determination in March or April

16   of 2008?

17    A    I don't remember how it came about, but somebody had

18   determined, and maybe it was the Court documents, that, you

19   know, you can at least segregate the files by some --

20    Q    What court document did you look at that you can point

21   to today, sir?  This only happened a couple of months ago.

22   What court document can you point to where you saw that the

23   date, relevant date was December 31, 2002 and before?

24    A    I don't understand the question.

25    Q    What court pleading did you see?

Case 3:06-cv-00145-MP-NPC Document 1874 Filed 08/07/08 Page 84 of 650
Case 3:06-cv-00145-MP-NPC Document 1732 Filed 06/08/08 Page 1 of 226
171

1    A   I don't know.  I don't know.

2    Q   Well, was it a court pleading?

3    A   I don't know how.  Somebody had passed information on to

4    me saying this is some way --

5              MS. KLAR:  Mr. Montgomery, to the extent that

6    you may be revealing attorney/client communications, I would

7    object.

8              THE WITNESS:  Right.

9    BY MR. PEEK:

10   Q   Somebody passed on information to you, is that correct?

11             MS. KLAR:  Mr. Montgomery -- Your Honor, I would

12   object to the extent it calls for attorney/client

13   communications.

14             MR. GOMEZ:  And, Your Honor, the United States

15   is concerned at this point, when we're talking about dates,

16   that it may involve some information covered by the

17   U.S. Protective Order.  So, we need to be very careful as

18   to further questioning along these lines.

19             THE COURT:  All right.

20             MR. PEEK:  I'm not trying to trick him.

21             THE COURT:  No, no.

22        Here's my observation to everyone is I don't think

23   the parties, typically, intend to disclose information

24   governed by the U.S. Protective Order.  It often occurs

25   inadvertently.  So, Mr. Gomez is reminding us not to be

```
 1   sooner rather than later.
 2               MS. KLAR:  We will get something on file,
 3   Your Honor, by Friday.
 4               THE COURT:  Friday, March -- June, excuse me,
 5   June.  Sorry.
 6               MS. KLAR:  13th.
 7               THE COURT:  By June 13th, 2008.  And any parties
 8   wishing to respond may do so by Wednesday, June 18th.  And
 9   if Montgomery's counsel wants to reply, they may do so by
10   June 20th.
11               MR. PEEK:  Does that include Mr. Flynn, too?
12               THE COURT:  I said -- and Mr. Flynn.
13               MR. PEEK:  Thank you.
14               THE COURT:  All right.
15          All right.  I think that we are concluded for today,
16   and the Court, this hearing will be in recess until June 24th.
17          Oh, wait.  Did the government --
18               MR. GOMEZ:  The government requests a brief side
19   bar with counsel.
20               THE COURT:  All right.
21          And sorry, counsel appearing telephonically, did you
22   hang up.
23               MS. CHISOLM:  No, I'm still here.
24   Tuneen Chisolm.
25               MS. BEATTY:  Jacquelyn Beatty.  I'm still here.
```

```
 1   That other gentlemen, I guess, hung up.

 2                 MR. PEEK:  Mr. Schwartz?

 3                 THE COURT:  Yes.  As I indicated, our electronic

 4   capabilities do not allow you to hear the side bar.  So, I'm

 5   sorry.

 6           (Following is discussion at sidebar.)

 7                 THE COURT:  Mr. Gomez, you had something?

 8                 MR. GOMEZ:  We don't need --

 9                 THE COURT:  Everybody is fine.  We're good.

10                 MR. GOMEZ:   The United States is requesting

11   that the transcript for today's hearing be reviewed by the

12   United States first before it's forwarded to any of the

13   parties, in order to determine whether there is some

14   information that may need to be redacted pursuant to the

15   U.S. Protective Order.  And I don't believe the parties

16   object.

17                 MR. PEEK:  I would ask that that be -- that

18   happen quickly, because we're going to be back here on the

19   24th, and I want to be able to have the transcript before we

20   begin on the 24th.

21                 MR. GOMEZ:  And that should not be a problem for

22   the United States, but I believe that the court reporter may

23   have a scheduling issue.  So, that will have --

24                 MR. PEEK:  How much time do you need?  She

25   should be able to turn it around by Friday.
```

1           THE COURT:  She's in trial.  She leaves tomorrow

2  -- for Las Vegas tonight.  In fact, she leaves really soon.

3           MS. WELLS:  Right.  So depending when she

4  provides the transcript to us, we should be able to do it

5  quickly.

6           THE COURT:  All right.  Thank you.

7      And I take it you wanted this to be over here so

8  that it's not discussed by others.

9      All right.  Thank you.

10          MR. PEEK:  Thank you.

11     (End of sidebar discussion.)

12          THE COURT:  All right.  Thank you all very much.

13  We're adjourned.

14     (Court Adjourned.)

15

16                          -o0o-

17

18      I certify that the foregoing is a correct
        transcript from the record of proceedings
19      in the above-entitled matter.

20    Kathyryn M. French                    6-19-08

21    _____        _____

22    KATHRYN M. FRENCH, RPR, CCR            DATE
      Official Reporter

23

24

25

# EXHIBIT G

Case 3:21-cv-00445-CJN Document 182-4 Filed 08/07/23 Page 89 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 2 of 205
—151

```
 1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
 2        BEFORE THE HONORABLE VALERIE P. COOKE, MAGISTRATE JUDGE
                              ---o0o---
 3

 4    Dennis Montgomery, et al.,     :  No. 3:06-cv-056-PMP-VPC
                                     :
 5                  Plaintiff,       :  August 19, 2008
                                     :
 6          -vs-                     :  United States District Court
                                     :  400 S. Virginia Street
 7    ETreppid Technologies,         :  Reno, Nevada  89501
      et al.,                        :
 8                                   :       VOLUME II
                    Defendant.       :
 9    _____:

10

11

12                           TRANSCRIPT OF
                    CONTINUED SHOW CAUSE HEARING

13

14    A P P E A R A N C E S:

15    FOR THE PLAINTIFF:             Randall Sunshine
                                     Ellyn Garofalo
16                                   Attorneys at Law

17    FOR DEFENDANT ETREPPID:        Stephen Peek
                                     Jerry Snyder
18                                   Attorneys at Law

19    FOR COUNTER-DEFENDANTS:        Bridgett Robb-Peck
                                     Gregory Schwartz
20                                   Attorneys at Law

21    FOR INTERESTED PARTY:          Carlotta Wells
                                     U.S. Department of Defense
22

23

24    Proceedings recorded by mechanical stenography produced by
      computer-aided transcript
25
```

Case 1:21-cv-00445-CJN Document 183-4 Filed 08/07/23 Page 90 of 650
Case 3:08-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 2 of 205

152

1

2    Reported by:                        KATHRYN M. FRENCH, RPR, CCR
                                         NEVADA LICENSE NO. 392
3                                        CALIFORNIA LICENSE NO. 8536

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 1:21-cv-00445-CJN Document 182-14 Filed 08/07/23 Page 91 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 3 of 205

153

```
 1          Reno, Nevada, Tuesday, August 19, 2008, 9:00 a.m.

 2                             ---OoO---

 3

 4               THE COURT:  Thank you.  Please be seated.

 5               THE CLERK:  This is the date and time

 6     set for continued Show Cause Hearing in case number

 7     3:06-cv-056-PMP-VPC, Dennis Montgomery, and others, versus

 8     eTreppid Technologies, and others.

 9               Present on behalf of plaintiff, Ellyn Garofalo and

10     Randall Sunshine.

11               Present on behalf of defendant, Stephen Peek and

12     Jerry Snyder.

13               Present on behalf of counter-defendant,

14     Bridgett Robb-Peck.

15               Present on behalf of interested party,

16     Carlotta Wells.

17               THE COURT:  Good morning everybody.

18               Let the record reflect it is 9:08 a.m.  The Court

19     intends to start promptly nine o'clock a.m.  So I think

20     Mr. Peek may have been here early setting things up, but I

21     expect that we commence at nine o'clock sharp, just for

22     future reference.

23               Counsel.

24               MS. GAROFALO:  Good morning, Your Honor.  I

25     think the eight minutes late may have been well spent.
```

Case 1:21-cv-00445-CJN Document 182-14 Filed 08/07/23 Page 92 of 650
Case 3:08-cv-00036-PMP-VPC Document 834 Filed 07/03/08 Page 4 of 205
154

1    Mr. Peek and I have been discussing what is one of the key

2    issues here, which I think we have reached a resolution on.

3            As the Court knows, there's been much talk about

4    the Glogauer e-mails and PST files, the original PST files.

5    The Glogauer PST files have now been received back from the

6    Washington attorneys, Scatton lawyers, who were using that in

7    the Grand Jury proceedings.  There is an issue with one, at

8    least one, e-mail chain which, in response to a word search,

9    does indicate that there may be some information subject to

10   the State Secret's Privilege on the Glogauer PST.

11           We've talked to Ms. Wells, who will be talking to

12   her client about the best way to handle it.  We've indicated

13   to Mr. Peek that we would prefer Mr. Montgomery remove those

14   files, necessarily open those files.  And we've come up with

15   several alternatives that, hopefully, by the end of the day,

16   we will be able to convey to the Court that we have resolved

17   the issue, and that those hard drives will be produced

18   forthwith to Mr. Peek.

19           THE COURT:  All right.  Very good.

20       Mr. Peek.

21           MR. PEEK:  I have nothing to say.  I appreciate

22   the proffer, Your Honor, and I've accepted.  And, certainly,

23   we're going to be speaking with Ms. Wells and see if we can't

24   find a way to expedite this.

25           THE COURT:  Thank you very much.

Case 1:21-cv-00445-CJN Document 183-4 Filed 08/07/23 Page 93 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 9 of 205

-155-

```
 1                MS. GAROFALO:  Thank you.

 2                THE COURT:  Thank you, counsel.

 3          The other matter, counsel, we're just trying get

 4     exhibits sorted out.  And I understand counsel can do that

 5     later on today, toward the end of the afternoon.

 6                Is that correct, counsel?

 7                MR. SUNSHINE:  Yes, Your Honor.

 8                THE COURT:  Okay.  Very good.

 9          Correct, Mr. Peek?

10                MR. PEEK:  Yes, Your Honor.

11                THE COURT:  All right.  Mr. Peek, by my count,

12     you've got 4 hours and 17 minutes.

13                MR. PEEK:  That's about what I calculated, too,

14     Your Honor.

15                THE COURT:  All right.  So you may proceed, sir.

16                MR. PEEK:  Just need a witness, and we're ready

17     to go.

18                THE COURT:  All right.

19                **DIRECT EXAMINATION (resumed)**

20     BY MR. PEEK:

21      Q   Mr. Montgomery, I wanted to go back and clear up a few

22     things that I hadn't covered yesterday.  And I'm going to

23     start with, at least, the NBC and Wall Street Journal

24     communications.

25                One thing I have not seen in any production at
```

Case 1:21-cv-00445-CJN Document 182-4 Filed 08/07/23 Page 94 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 20 of 265

-176

1    A    No.

2    Q    So this is not a marketing effort on your part?

3    A    No.

4    Q    Not a marketing effort on the part of Opspring, is that

5    your testimony?

6    A    Yes.

7    Q    Is --

8            MR. PEEK:  Your Honor, do I need to offer

9    declarations, Your Honor, that are already part of the record?

10   I'll just refer to them in closing, but if I -- otherwise, I

11   would offer Exhibit 20.

12           THE COURT:  All right.  Well, let's go ahead,

13   since they're exhibits.

14        Do you have any objection, counsel, just to having

15   it admitted?  It's part of the record as --

16           MS. GAROFALO:  No, Your Honor.

17           THE COURT:  All right.  20 is admitted.

18        (Whereupon, exhibit 20 -- a document, was received

19   in evidence.)

20           MR. PEEK:  Thank you.

21   BY MR. PEEK:

22   Q    Now, we covered yesterday your affidavit, or your, excuse

23   me, your declaration that you gave where you said that did not

24   contain any classified information.

25           Do you remember that from yesterday?

Case 1:21-cv-00445-CJN Document 182-4 Filed 08/07/23 Page 95 of 650
Case 3:06-cv-00056-PMP-VPC Document 584 Filed 09/03/08 Page 27 of 265

                                                                        —177

 1   A    Yes.

 2   Q    Okay.  Now you've also made a representation to this

 3   court in pleadings that at least 60 to 80 percent of the

 4   technology data consists of files that are covered by the

 5   U.S. Protective Order.

 6            Do you remember that?

 7   A    Yes.

 8   Q    And is that still your testimony today?

 9   A    I don't know if it -- if it's that high.  But, it's a

10   sizeable number.

11   Q    Okay.  And of that so-called 60 to 80 percent of

12   the technology data, have you provided any of it to the

13   government?

14   A    Yes.

15   Q    Okay.  And that's in the form, I think you said, of two

16   hard drives that you gave up recently?

17   A    Three.

18   Q    Three hard drives very recently.  Okay.

19            And how much data was on that?

20   A    I don't know specifically.  I would think a terabyte or

21   two.

22   Q    You would think.  Okay.  You don't know then?

23   A    Well, one of them was a terabyte.  I think the

24   other two, one was on a 500, and one was on a 750.  That's

25   two-and-a-quarter terabytes, and they weren't all full.  So,

Case 1:21-cv-00445-CJN Document 182-4 Filed 08/07/23 Page 96 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 29 of 265
—178

1    I don't know.

2    Q    And how did you obtain this information, or this

3    information on these drives you gave to the government?

4    A    What do you mean how did I obtain it?

5    Q    Just exactly how did you obtain it?  Did you take it from

6    the eTreppid computers?

7    A    No.

8    Q    How did it come into your possession then, sir?

9    A    Government.

10   Q    Okay.  So the government gave you these hard drives,

11   first of all, and then you copied them from the government

12   onto something, some of your own media, is that correct, your

13   electronic --

14   A    I think so.  Yeah.

15   Q    You think so or you know, sir?

16   A    I -- I don't know specifically.  Are you talking about

17   the drives that I've given to the government?

18   Q    No, no, sir.  I'm not talking about --

19   A    Okay.

20   Q    --  I'm talking about the data on the hard drives.

21   A    Yeah.

22   Q    Did you obtain the data on the hard drives from eTreppid?

23   A    No.

24   Q    Okay.  You said you got it from the government.

25   A    Yes.

Case 1:21-cv-00445-CJN  Document 182-4  Filed 08/07/23  Page 97 of 650
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/03/08  Page 29 of 265

-179

1   Q   Okay.  When did the government give it to you

2   specifically?

3                 MS. WELLS:  Your Honor, I would caution

4   Mr. Montgomery in providing that answer.  To take the terms

5   of the Protective Order into account.

6                 MR. PEEK:  It's just a when.

7                 MS. WELLS:  That could be a problem.

8                 MR. PEEK:  A when has problems.  Okay.

9   BY MR. PEEK:

10   Q   When did you get if from the government?

11   A   When did I what?

12   Q   When did you get it from the government?

13   A   You want -- you say the date?

14   Q   No.  You can't say the date --

15                 MS. WELLS:  No.

16   BY MR. PEEK:

17   Q   -- if it came from a source covered by the State Secrets

18   Privilege?

19   A   You already asked me --

20                 THE COURT:  Stop.

21                 MR. PEEK:  I'll let Ms. --

22                 THE COURT:  Stop.

23                 MS. GAROFALO:  Your Honor, I think we're in

24   direct jeopardy of trespassing on the U.S. Protective Order.

25                 MR. PEEK:  He can --

Case 1:21-cv-00445-CJN Document 182-4 Filed 08/07/23 Page 98 of 650
Case 3:06-cv-00056-PMP-VPC Document 884 Filed 09/03/08 Page 80 of 265
-180-

```
 1                MS. GAROFALO:  If we are going to proceed,
 2    I think we need to take a short break to confer with
 3    Mr. Montgomery.
 4                THE COURT:  All right.
 5                MR. PEEK:  But can Mr. Montgomery confer with
 6    the United States Government, Your Honor, before he answers
 7    that question?
 8                THE COURT:  Let me ask Ms. Wells.  She, as the
 9    attorney for the government, if it is, she who will tell all
10    of us what is covered or not under the Protective Order.
11            So, Ms. Wells, you understand the nature of
12    Mr. Peek's questions.  What do you recommend we do.
13                MS. WELLS:  I would recommend that
14    Mr. Montgomery not answer that question, Your Honor.
15                THE COURT:  All right.  She -- counsel for
16    the United States has directed that, pursuant to the terms
17    of the U.S. Protective Order, Mr. Montgomery not answer that
18    question.
19                MR. PEEK:  Your Honor, may I confer with
20    Ms. Wells for a moment, because there are other agencies that
21    aren't covered by the States Secrets Privilege.
22                THE COURT:  All right.  Why don't you just take
23    a moment and speak privately.  We're not going to take a
24    recess.  Just the two of you can chat.
25                (Mr. Peek and Ms. Wells confer.)
```

Case 1:21-cv-00445-CJN  Document 182-4  Filed 08/07/23  Page 99 of 650
Case 3:06-cv-00056-PMP-VPC  Document 884  Filed 09/03/08  Page 82 of 265

-181

```
 1              (Mr. Schwartz is now joined telephonically.)

 2                   THE CLERK:  Mr. Schwartz, are you there.

 3                   MR. SCHWARTZ:  I am.

 4                   THE COURT:  Thank you.

 5              Good morning, Mr. Schwartz.  This is Judge Cooke.

 6    We have commenced the Continued Order to Show Cause Hearing,

 7    and Mr. Peek is examining Mr. Montgomery.

 8                   Go ahead, Mr. Peek.

 9                   MR. SCHWARTZ:  Thank you.

10    BY MR. PEEK:

11     Q   You've had occasion to meet with the United States

12    Government, so you know which agencies are covered by the U.S.

13    Protective Order, is that correct?

14     A   That's correct.

15     Q   Okay.  Knowing that, and excluding that from the

16    question, did any data on the hard drives you provided to

17    the government come from an agency not covered by the United

18    States Protective Order?

19     A   I'm not certain.

20     Q   Okay.  So I guess if I ask the "when," knowing that

21    they're from an agency not covered by the Protective Order,

22    your answer is also that you're not certain?

23     A   That's correct.

24     Q   I wanted to at least get into the record, at least, where

25    you made the representation to the Court.  So, I'm going to
```

Case 3:21-cv-00445-GPN Document 182-3 Filed 08/07/23 Page 100 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 269 of 265
-413-

1          MR. PEEK:  Thank you.

2          THE COURT:  All right.  What I'm going to advise

3    counsel, we still have a matter of exhibits to attend to.  I

4    expect you to be here tomorrow morning by 8:30 a.m. to meet

5    and confer and work with the clerk of court to figure out

6    what exhibits are admitted or not.  We will begin promptly at

7    nine o'clock a.m.

8          Thank you.  We're in recess.

9          MR. PEEK:  Thank you, Your Honor.

10         (Court Adjourned.)

11

12

13                          -oOo-

14

15         I certify that the foregoing is a correct
           transcript from the record of proceedings
16         in the above-entitled matter.

17    \s\ Kathryn M. French                    August 29, 2008

18    _____        _____

19    KATHRYN M. FRENCH, RPR, CCR                DATE
      Official Reporter

20

21

22

23

24

25

Case 1:21-cv-00445-CJN Document 182-43 Filed 08/07/23 Page 101 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 264 of 265
414

1                          **I N D E X**

2

3    <u>**DEFENSE'S WITNESSES:**</u>                              <u>**PAGE:**</u>

4

     1)  **DENNIS MONTGOMERY (cont')**

5
             Direct Examination By Mr. Peek              155
6
     2)  **JONATHAN KARCHMER**
7
             Direct Examination By Mr. Snyder           214
8            Cross-examination By Ms. Garofalo          270
             Redirect Examination By Mr. Snyder         322
9            Recross-examination By Ms. Garofalo        326

10   3)  **LEONARD GLOGAUER**

11           Direct Examination By Mr. Peek             328
             Cross-examination By Ms. Garofalo          333
12
     4)  **SLOAN VENABLES**
13
             Direct Examination By Mr. Peek             341
14           Cross-examination By Ms. Garofalo          344
             Redirect Examination By Mr. Peek           347
15
     5)  **WARREN TREPP**
16
             Direct Examination By Mr. Peek             348
17           No Cross-examination

18   <u>**PLAINTIFF'S WITNESSES:**</u>

19   1)  **SCOTT COOPER**

20           Direct Examination By Ms. Garofalo         360
             Cross-examination By Mr. Peek              384
21

22

23

24

25

KATHRYN M. FRENCH, RPR, CCR
(775) 786-5584

Case 4:21-cv-00445-GPN Document 182-43 Filed 08/07/22 Page 102 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 269 of 265
415

```
 1              I N D E X   O F   E X H I B I T S

 2

 3   EXHIBIT NUMBER:                  MARKED      RECEIVED

 4   Exhibit 8 -- document                         171

 5   Exhibit 20  -- document                        176

 6   Exhibit 47  -- document          202

 7   Exhibit 45  -- document                        213

 8   Exhibit 48  -- document          222           253

 9   Exhibit 49  -- document                        259

10   Exhibit 50  -- box               268

11

12

13   PLAINTIFF'S EXHIBITS:

14   Exhibits 1 and 2  -- documents         365

15

16

17

18

19

20

21

22

23

24

25
```

# EXHIBIT H

# EXHIBIT "B"

# DECLARATION OF DENNIS L. MONTGOMERY

I, Dennis L. Montgomery, state the following as my declaration pursuant to 28 U.S.C. § 1746:

1. I am a citizen of the United States and resident of the State of Florida.

2. Over the 45 years as a computer scientist, developed software programs, computer hardware, and medical devices.

3. For more than 45 years, I have been engaged in software development and written software focused on developing Data Compression (DC), Anomaly Detection (AD), Pattern Recognition (PR), Object Detection, Identification, and Tracking Technology, and Biometrics in analyzing massive volumes of electronic data.

4. In companies I started, we have developed and then licensed various technologies to the U.S. government intelligence agencies including (CIA), Department of Defense (DOD), SOCOM, Homeland Security (HS), Department of Advanced Naval Research (NAVY), and Air Force (AF).

5. I was issued a TS/SCI security clearance 2004 with case-determined access to SAP programs. I was required to sign a Classified Information Nondisclosure Agreement in connection with my work at eTreppid for the federal government. A true and accurate copy of the nondisclosure agreement that I signed, dated September 16, 2003, is attached

   a. Attached as **Exhibit-01** is a true and correct copy of Dennis Montgomery Security Clearance.

6. I built a myriad of medical technologies. Many are still in use today. I licensed various medical technologies to American Hospital, Baxter Healthcare, Dupont, Corning, Perkin Elmer, the Henley Group, Fisher Scientific, Instrumentation Labs, Kaiser, Siemens, Kodak, among others. I successfully filed multiple medical device registrations with the FDA. I took 3Net Systems Inc. medical company public on Nasdaq August 11, 1992.

7. In addition to these medical technologies, I designed and built programs for GE, Intel, Technicolor, MGM, Hewlett Packard, Novell, IBM, and many others

8. In 1998, I formed eTreppid Technologies, LLC (eTreppid) together with a business partner, Warren Trepp. I was the member of the company who contributed the principal software development capability for the purpose of obtaining contracts with federal government agencies and performing software development services under those contracts.

9. In 2002, eTreppid was approached by representatives of the United States Department of Defense (DOD) and Central Intelligence Agency (CIA), who expressed an interest in various surveillance technologies eTreppid had been developing. These federal government representatives conducted independent tests of eTreppid's technology and then advised us that they had decided to integrate eTreppid's DC, AD, and PR technologies into various programs in the federal government's intelligence community.

   a. Attached as **Exhibit-02** is a true and correct copy of US GOV contract announcement with contract (limited).

10. Following the terrorist attacks of September 11, 2001, eTreppid was awarded contracts with the DoD, U.S. Air Force, CIA, the United State Department of Homeland Security, and other U.S. federal entities to develop and deliver surveillance software technologies. eTreppid fulfilled its obligations under these contracts and delivered intercepted data that enabled the location of foreign terrorists and activities abroad that posed threats to the United States. The work began at our facility in Reno NV. All data collected in our Reno facility was passed on to the intelligence community members in our building and transmitted to the FBI via secure encrypted communication lines at the end of the day. The data was also burned on CDs and couriered weekly by the intelligence officials in our building to their secure facilities in DC.

11. eTreppid Technologies was supplied millions of dollars of hardware by the FBI to begun our surveillance work. Or surveillance work was running on supplied computers by the FBI during my work in Reno NV.

   a. **Attached as Exhibit-03** is a true and correct copy of US GOV supplied surveillance computers.

12. eTreppid Technologies was awarded a surveillance contract by the CIA, DOD, Air Force, and Department of Homeland Security, starting in 2004.

   a. **Attached as Exhibit-04** is a true and correct copy of US GOV contracts (limited pages)

13. Beginning in 2005, I became aware that the CIA and the National Security Agency (NSA) had started using the eTreppid technology that I had developed for locating terrorists abroad to conduct surveillance of citizens of the United States, including members of the Supreme Court of the United States and thousands of other federal and state jurists, members of Congress, state officeholders, numerous public figures and religious leaders in the U.S., and other Americans.

14. On Jan 6, 2006, I separated from Warren Trepp and eTreppid Technologies, which was the very company I started. The separation was related to various business disagreements.

15. In Feb/March 2006, the FBI applied for searched warrants against my home and later storage units. The warrants claimed they were looking for classified documents and various intellectual properties owned by eTreppid. The FBI failed to mention to Magistrate Cooke, who approved the warrants, that I, not eTreppid, owned the intellectual property. It didn't take long for Magistrate Cooke, who issued the search warrant, to figure out how she was duped by the FBI. She realized Agent West took sides in a civil dispute and was there looking for something other than what he listed on the search warrants.

   a. **Attached as Exhibit-05** Copy of FBI Agent West Search warrant affidavit that was handed to me at my house.

16. Eight members of FBI, IRS, and DEA raided Montgomery home and storage units looking for all evidence of FBI/CIA/NSA involvement in operating surveillance programs, foreign and domestic in Nevada that target foreign and domestic individuals, businesses, and elections. The US GOV would only supply the name of SA FBI Agent West. The US GOV refuses to produce the names of the other agents.

2

17. After three months of testimony, Judge Cooke concluded that Montgomery did nothing wrong and that the FBI filed false affidavits, tampered with evidence they collected, made up false information against Montgomery, and that the FBI violated Dennis Montgomery constitutional rights. When Judge Sandoval (later Governor Sandoval) was confronted with illegal FBI/CIA/NSA domestic surveillance programs operating in NV, he recused himself.

    a. **Attached as Exhibit-06** Judge Cooke probable cause ruling.

18. Judge Cooke issues ruling against the FBI concluding FBI violated Dennis Montgomery constitutional rights. Ordered everything returned to Montgomery family despite objections from DOJ. The FBI shredded the documents that they did not want others to see that reflected US GOV bad actors involved in these illegal surveillance programs, including interfering in foreign elections operating off the grid and away from congressional oversight. After this ruling came out, I was forced to hire 24-hour private security for me and my family given the number of death threats we received. For our safety concerns we were forced to leave our home In Reno, NV and move to Seattle. In WA we continued private 24-hour security for 4 years costing us considerable dollars. The US GOV never appealed the Judge Cooke's ruling.

19. On September 8, 2008, after lengthy legal battles, I settled my differences with my partner, Warren Trepp, and began work at Opspring, later called Blxware. Blxware met with members of the White House and Senate Intel Committee members and eventually went under contract for licensing various technologies to the intelligence community similar to eTreppid products.

20. On Jan 13, 2009, Blxware contracted with the us intelligence community to continue our prior work at eTreppid to be conducted at a new facility Fort Washington, Maryland, which was under the direction of James Clapper.

    a. **Attached as Exhibit-7** is a true and correct copy of US GOV contracts (limited pages)

21. When I learned of CIA and NSA's domestic surveillance using the technology I had developed, I filed whistleblower complaints with the Inspectors General of the CIA, Department of Defense (DOD), Department of Justice (DOJ), Air Force, Director of National Intelligence (DNI), Defense Intelligence Agency (DIA), and others. In those complaints, I objected to the misuse of this surveillance technology to monitor the private communications, bank records, attorney client communications, voting information and other private activities of American citizens.

22. During the eTreppid Litigation, the Director of National Intelligence filed a motion asserting on behalf of the United States a state secrets privilege. In response, on August 29, 2007, the court entered a Protective Order that prohibited certain discovery in the eTreppid Litigation.

    a. Attached as **Exhibit-08** is a true and correct copy of the US Protective Order.

23. On June 6, 2008, I was ordered by a federal district judge in Reno, Nevada to go to the DOJ building in Washington DC and meet separately with two groups in a SCIF. DOJ attorneys Carlotta Wells and Raphael Gomez, who were involved in FBI/CIA/NSA domestic surveillance programs I have worked in since the beginning were not allowed in the meeting. I was not allowed to have any attorney present. I was not allowed to have any mobile devices; nothing could be brought into the room or taken out. In the first meeting, I met with DOD, AF, DIA attorneys and personnel. They claimed all my prior work had been validated and wanted to move forward in contract. In the second meeting, only one woman with the CIA was present and she

wanted to know (a) where all the technology and collected data was kept regarding the CIA surveillance work, foreign and domestic including election monitoring and interference and (b) how I got a copy of 35 CIA enhanced interrogation tapes and where the originals were kept. I made it clear that all work was authorized and supervised by George Tenet, Ed Charbonneau, Donald Kerr, and John Brennan and suggested she talk to them. It was not a pleasant experience and I didn't appreciate the threats she directed at me and my family if their surveillance work ever appeared in the public space. I passed on the CIA threats to the court.

    a. Attached as **Exhibit-9 is** an email confirmation I must appear as ordered by the court at the DOJ building in Washington DC.

24. On September 9, 2008, the eTreppid Litigation was terminated by dismissal of all claims and counterclaims pursuant to a stipulation of the parties. At the time of settlement, the federal district court in Reno retained control of all matters regarding compliance with the US Protective Order and the State Secrets Privilege. The Department of Justice has continued to claim that I am still prohibited by the Protective Order from disclosing information related to the FBI/CIA/NSA domestic surveillance contracts in which I played a part.

    a. Attached as **Exhibit-10** is an email confirmation that the Reno Federal court retains compliance matters over the PO and SSP in place.

    b. Attached as **Exhibit-11** is a true and correct copy of October 26, 2020 email correspondence between my attorney and DOJ attorney Greg Addington, in which Mr. Addington states that the Protective Order "**remains in place** to preclude disclosure of the categories of information and related materials described in the order, based on the circumstances giving rise to the protective order."

25. On March 4, 2010, the DOJ and FBI raided the law offices of my attorneys, Liner Law Firm, without a search warrant or any probable cause and seized millions of pages of attorney-client documents, us gov communications, election data collected in FBI/CIA/NSA domestic surveillance programs I worked in, including proof of us gov election surveillance and tampering. Seized documents and electronic media reflected voting machines manufactures vulnerabilities to hacking. Voting machine manufactures communications and intellectual property we hijacked by us gov numerous times over the years I worked in FBI/CIA/NSA surveillance programs, foreign and domestic.

26. The IP that I designed for these surveillance programs was also seized and never been returned to me despite 12 years of requests by me and my attorneys, costing me tens of millions of dollars.

    a. Attached as **Exhibit-12** is an email confirmation of the illegal raid on my attorneys I was not allowed to be present at.

27. On November 18, 2010, the US GOV sent Senior DOJ Attorney Carlotta Wells to my deposition in a bankruptcy proceeding. She was accompanied by two armed agents. During the deposition, Ms. Wells asserted the right to bar me from testifying on matters covered by a protective order entered by the Nevada federal district judge enforcing the state secrets privilege.

    a. Attached as **Exhibit-13** is a relevant portion of my 2010 deposition.

28. In September 2013 after failed neurosurgery in July 2013, I decided to give FoxNews an interview regarding FBI/CIA/NSA domestic surveillance programs I worked in including election surveillance and interference. Carl Cameron, FOXNEWS reporter interviewed me in my home in Seattle and filmed my computers running domestic surveillance programs I licensed to the us gov involved in domestic surveillance programs I worked which involved domestic election monitoring and interference. Carl Cameron filmed computers hacking into voting machines manufactures and their equipment with ease. I only agreed to the interview under the agreement that I would be provided a copy of the interview; to date I never received my copy of the interview despite my many requests. A second film crew returned to my home October 2013 to film domestic voting interference and voting machines vulnerabilities. The film crew recorded election network vulnerabilities in various Secretary of State election networks, specifically in Florida, Georgia, Arizona, and others. The filming was done by Robert Shaffer, Foxnews field producer, Seattle, WA.

    a. Attached as **Exhibit-14** are email exchanges between me an FOXNEWS reporter Carl Cameron regarding his interview and filming at my home in Seattle Sept/Oct 2013.

29. On November 15, 2013, the Maricopa County Sheriff's Office approached me for identity theft information regarding Maricopa County residents. I provided under Arizona State immunity agreement information collected in FBI/CIA/NSA domestic surveillance programs I worked in, including surveillance of Maricopa residents, businesses, and the state election networks. During a court proceeding related to that matter, Raphael Gomez, a senior DOJ attorney, took possession of approximately 50 hard drives that I had provided to the Maricopa Sheriff under an assertion of a state secrets privilege. Those hard drives have not been returned to me.

    a. Attached **Exhibit-15** Article (limited) detailing actions during the court hearing.

30. On August 3, 2014, I met with Federal Judge Royce Lamberth in his office in the Federal Court House in DC with others present and discussed FBI/CIA/NSA domestic surveillance programs I worked in including election tampering and the abuses of high-ranking US GOV officials who directed and supervised this illegal domestic surveillance programs I worked in, first in Reno NV and then at Ft. Washington, MD. I presented information to him to support the claims I was making in my previous whistleblower complaints. I was seeking immunity to allow me to present my evidence of these super-secret surveillance programs I worked in. He reached out first to Senator Grassley and then to FBI general counsel James Baker. I provided Judge Lamberth proof of election interference both foreign and domestic. FBI General counsel James Baker later denied any knowledge of such FBI/CIA/NSA domestic surveillance programs I worked in, but had to walk back those comments in his testimony before a house committee on us gov surveillance matters.

    a. Attached as **Exhibit-16** FBI general counsel James Baker testimony before congress where he had to acknowledge my us gov surveillance work.

31. On September 8, 2014, I had discussions with Senate Select Committee on Intelligence (SSCI) staffers John Dickas and James Wolfe regarding targeting congressional members in FBI/CIA/NSA domestic surveillance programs I worked in.

    a. Attached as **Exhibit-17** email to John Dickas regarding the use of surveillance technology I built foreign surveillance used to target Americans and their businesses.

32. On February 23, 2015, I notified Judge Holmes in my US Tax Court hearing that the IRS had retaliated against me because they were upset over Judge Cooke's ruling against the agents of the FBI, IRS, and DEA who raided my home on an illegal search warrant in 2006. In my court hearing, Judge Holmes took notice of the IRS retaliation against me. Also took notice many bad actors in us gov surveillance programs I worked in that abused the surveillance technology.

   a. Attached as **Exhibit-18** is a true and correct copy of pages from my tax case a search hearing (limited pages).

33. In July 2015, I was contacted by the Department of Justice and asked to cooperate in their investigation of US GOV officials who directed and supervised FBI/CIA/NSA domestic surveillance programs I worked in. I was granted immunity for my cooperation and document production. The DOJ was interested in the use of the "eTreppid/Blxware" technology that could surveil and interfere in elections, foreign and domestic leaving no trace. I provided the data to the FBI and DOJ from 2003-2015 showing the technology (source code), collected data, previous tampered data in election surveillance programs operated in FBI/CIA/NSA domestic surveillance programs I worked in.

   a. Attached as **Exhibit-19** is a true and correct copy of my immunity agreement with the DOJ.

34. August 19, 2015, I met with the FBI at their Miramar, Florida office to turn over the data the DOJ requested as part of my immunity agreement. I produced 47 hard drives, 90TB of data, and software (source code) that I developed and licensed to the US GOV to show the methods and sources of this vast data collection, developed and intended for foreign surveillance but used by some bad actors in the US GOV for domestic surveillance running on computers owned by me and the US GOV. This data was personal data about millions of Americans and businesses. It related to contracts between 2003-2013. The drives also contained proof of us gov involvement in both foreign and domestic elections.

35. On December 3, 2015, only after the US GOV reviewed the data that I had submitted to the FBI on the 47 hard drives, I was interrogated by a senior DOJ lawyer Deborah Curtis, FBI SA Walter Giardina, and FBI SA William Barnett in the FBI's field office in the District of Columbia did the DOJ decide to move forward. As a result of this interview, DOJ granted me immunity, as shown in **Exhibit-20,** to present information about the illegal domestic surveillance program to appropriate authorities. During the 3.5-hour deposition, under oath and videotaped at FBI headquarters in DC, I discussed matters regarding the contents of the data on the drives including the programs I developed for the us gov that involved election surveillance and interference with data going back to 2004. I answered all questions and never took the fifth. I also produced additional data at the time of this interrogation. This December 3rd 2015 I had with FBI was confirmed later by FBI General Counsel James Baker during his congressional testimony October 18, 2018 regarding FBI/CIA/NSA domestic surveillance programs I worked in.

   a. Attached as **Exhibit-20** is a true and correct copy of the DOJ request for my testimony and additional document production I was required to produce at the interview which I did.

36. I have never received the 48 hard drives back from DOJ or the FBI. I have tried to recover possession of them, but DOJ and the FBI refuse to return them. The drives were to be returned to me after they removed any sensitive data from them.

37. From 2006-2022, the us gov has seized or failed to return 1,213 electronic media devices (disk drives, flash drives, DVD, CD, etc. containing proof of FBI/CIA/NSA domestic surveillance I worked in and built technology for. These drives contain personal information on over 25 million Americans and their businesses collected in these illegal surveillance programs I worked in.

38. The 47 hard drives, 90TB, hundreds and millions of pages of documents I provided the FBI and the us gov is holding outlined in this declaration will prove US voting machine manufactures and their employees were hacked several times; collecting documents, electronic communications, and intellectual property in illegal FBI/NSA/CIA surveillance programs I worked in. I provided proof to us law enforcement 2005, 2008, 2010, 2012, and 2015. The data was also provided to the FBI Director James Comey's general counsel James Bakers office on 08/19/2015 and 12/03/2015. The voting machine companies included Election Systems & Software, Inc (ES&S), Clear Ballot Group, Inc., Dominion Voting Systems Corp, Hart InterCivic, Inc., MicroVote General Corp., Smartmatic USA Corporation, VotingWorks, and Unisys Voting Solutions.

39. In 2021, I agreed to convey certain assets that I acquired and developed for eTreppid and Blxware to Mike Lindell Management.

40. In the recent 2020 elections, terabytes of data ("Election Data") comprising internet transmissions sent during 2020 election were collected by the same technology I developed and previously licensed by the us gov. US GOV or their agents continued to use the "election technology" I licensed to them previously. The US GOV has refused to pay license fees associated with technology as they continue to use the technology and have paid for in the past.

41. Because DOJ has asserted that the eTreppid Litigation Protective Order "remains in place" to "preclude disclosure of the categories of information and related materials described in the order," I believed when I owned eTreppid and Blxware, and continue to believe today, that DOJ asserts that the Protective Order applies to the FBI/CIA/NSA domestic surveillance data including Election Data, and that public disclosure of the Election Data would violate the Protective Order and the state secrets privilege.

I certify under penalty of perjury that the foregoing is true and correct.

Executed this 19 day of August, 2022 in _____NAPLES_____, Florida.

_____
Dennis L. Montgomery

# EXHIBIT "4"

## ORDER FOR SUPPLIES OR SERVICES

(Contractor must submit four copies of invoice.)

| | Form Approved OMB No. 0704-0167 Expires June 30, 1997 | PAGE | OF |
|---|---|---|---|
| | | 1 | 2 |

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0167), Washington, DC 20503.

PLEASE DO NOT RETURN YOUR FORM TO EITHER OF THESE ADDRESSES.
SEND YOUR COMPLETED FORM TO THE PROCUREMENT OFFICIAL IDENTIFIED IN ITEM 6.

| 1. CONTRACT/PURCH ORDER NO. | 2. DELIVERY ORDER NO. | 3. DATE OF ORDER | 4. REQUISITION/PURCH REQUEST NO. | 5. PRIORITY |
|---|---|---|---|---|
| H92222-04-D-0006 | 0001 | 16-FEB-2004 | 1S1*50040420100 | DO-C9 |

| 6. ISSUED BY | CODE | H92222 | 7. ADMINISTERED BY (if other than 6) | S0507A | 8. DELIVERY FOB |
|---|---|---|---|---|---|

HQ US Special Operations Command
ATTN: SOAL-KB (Holland)
7701 Tampa Point Blvd
Macdill AFB, FL 33621

DCMA San Francisco Lathrop Office
700 E. Roth Rd
French Camp, CA 95231

X DEST

☐ OTHER

(See Schedule if other)

| 9. CONTRACTOR | CODE | 3C5X0 | FACILITY CODE | | 10. DELIVER TO FOB POINT BY (Date) (YYMMDD) | 11. MARK IF BUSINESS IS |
|---|---|---|---|---|---|---|

NAME AND ADDRESS
eTreppid Technologies, LLC
755 Trademark Dr
Reno, NV 89521

TEL:
FAX:

SEE SCHEDULE

12. DISCOUNT TERMS

☐ SMALL
☐ SMALL DISAD. VANTAGED
☐ WOMEN OWNED

13. MAIL INVOICES TO See Section G

| 14. SHIP TO | CODE | H92222 | 15. PAYMENT WILL BE MADE BY | HQ0339 | |
|---|---|---|---|---|---|

UQ USSOCOM/SOAL-SP (Mohr)
7701 Tampa Point Blvd
MacDill AFB, FL 33621

ATTENTION:    SOAL-SP (Brad Mohr)

DFAS-Columbus - West Entitlement Operations
PO Box 182381
Columbus, OH 43218

MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER

| 16. | DELIVERY | X | This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract |
|---|---|---|---|

TYPE OF ORDER

PURCHASE

Reference your _____ furnish the following on terms specified herein

ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME.

ETREPPID TECHNOLOGIES, LLC
NAME OF CONTRACTOR

_____ SIGNATURE

WARREN TREPP, CEO
TYPED NAME AND TITLE

040216
DATE SIGNED (YYMMDD)

☐ If this box is marked, supplier must sign Acceptance and return the following number of copies.

17. ACCOUNTING AND APPROPRIATION DATA/LOCAL USE
ACRN AA: 974/60300 56SF SD4 52SP 54X000 SP10 525700 F25700    $325,125.00

| 18. ITEM NO. | 19. SCHEDULE OF SUPPLIES/SERVICES | 20. QUANTITY ORDERED/ ACCEPTED* | 21. UNIT | 22. UNIT PRICE | 23. AMOUNT |
|---|---|---|---|---|---|
| | SEE CONTINUATION SHEET | | | | |

*If quantity accepted by the Government is same as quantity ordered, indicate by X. If different, enter actual quantity accepted below quantity Ordered and encircle.

| 24. UNITED STATES OF AMERICA | 25. TOTAL | $325,125 00 |
|---|---|---|
| BY  SUSAN M GRIFFIN    CONTRACTING/ORDERING OFFICER | 26. DIFFERENCES | |

| 26. QUANTITY IN COLUMN 20 HAS BEEN | 27. SHIP NO. | 28. D.O. VOUCHER NO. | 30. INITIALS |
|---|---|---|---|
| ☐ INSPECTED  ☐ RECEIVED  ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED. | ☐ PARTIAL ☐ FINAL | 32. PAID BY | 33. AMOUNT VERIFIED CORRECT FOR |
| | 31. PAYMENT | | 34. CHECK NUMBER |
| _____ DATE  SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | ☐ COMPLETE ☐ PARTIAL ☐ FINAL | | 35. BILL OF LADING NO. |
| 36. I certify this account is correct and proper for payment | | | |
| _____ DATE  SIGNATURE AND TITLE OF CERTIFYING OFFICER | | | |

| 37. RECEIVED AT | 38. RECEIVED BY (Print) | 39. DATE RECEIVED (YYMMDD) | 40. TOTAL CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO. |
|---|---|---|---|---|---|

DD FORM 1155, JUN 94    PREVIOUS EDITION MAY BE USED

Continuation Sheet

1. **CONTRACT LINE ITEMS**:

| ITEM NO | SUPPLIES/SERVICES | MAX QUANTITY | UNIT | UNIT PRICE | MAX AMOUNT |
|---------|-------------------|--------------|------|------------|------------|
| 0001AA | | 1 | Each | $25,000.00 | $25,000.00 |
| | Falconview (PFPS) Maps - Compression | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB: Destination | | | | |
| 0001AB | | 1 | Each | $40.00 | $40.00 |
| | Falconview (PFPS) Maps - Plug-in Decoder | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB: Destination | | | | |
| 0001AC | | 1 | Each | $25,000.00 | $25,000.00 |
| | Still Image Compression | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB: Destination | | | | |
| 0001AD | | 1 | Each | $10.00 | $10.00 |
| | Still Image Decoder | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB: Destination | | | | |
| 0001AE | | 1 | Each | $50,000.00 | $50,000.00 |
| | Video Imagery w/ Audio - Compression | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB: Destination | | | | |
| 0001AF | | 1 | Each | $25.00 | $25.00 |
| | Video Imagery w/ Audio - Decoder | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB: Destination | | | | |
| 0001AN | | 1 | Each | $125,000.00 | $125,000.00 |
| | Generic Data Compression | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB: Destination | | | | |

| 0001AP | | 1 | Each | $50.00 | $50.00 |
|---|---|---|---|---|---|
| | Generic Data Decompressor | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | | | | | |
| | FOB:  Destination | | | | |

| 0001AQ | | 1 | Each | $100,000.00 | $100,000.00 |
|---|---|---|---|---|---|
| | Detection of Human and Non-Human Objects | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | | | | | |
| | FOB:  Destination | | | | |

2. **GOVERNMENT FURNISHED PROPERTY**.

a) The Government will furnish one laptop computer to:
            eTreppid Technologies
            755 Trademark Dr
            Reno NV  89521.

b) Upon receipt of the Government-furnished laptop, the Contractor shall load the software ordered on the task order and return the laptop to:
            HQ USSOCOM
            ATTN: SOAL-SP (Brad Mohr)
            7701 Tampa Point Blvd
            MacDill AFB, FL  33621.

3. **DELIVERY TIMEFRAME**.  The contract shall have 14 days from the receipt of the Government-furnished laptop to load the software and return the laptop to the Government.  If the 14th day falls on a weekend or federal holiday, the due date shall automatically extend to the next business day.

//nothing follows//

ORDER FOR SUPPLIES OR SERVICES

(Contractor must submit four copies of invoice.)

FORM APPROVED
OMB No. 0704-0187
Expires June 30, 1997

PAGE OF 3

Case 3:04-cv-00834-ECR-VPC Document 121-4 Filed 07/07/09 Page 116 of 194

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503.

PLEASE DO NOT RETURN YOUR FORM TO EITHER OF THESE ADDRESSES.
SEND YOUR COMPLETED FORM TO THE PROCUREMENT OFFICIAL IDENTIFIED IN ITEM 6.

| 1. CONTRACT/PURCH ORDER NO. | 2. DELIVERY ORDER NO. | 3. DATE OF ORDER | 4. REQUISITION/PURCH REQUEST NO. | 5. PRIORITY |
|---|---|---|---|---|
| H92222-04-D-0006 | 0004 | 29 Mar 05 / 01 MAR 2004 | ISP50050070100 | DO-C9 |

| 6. ISSUED BY | CODE H92222 | 7. ADMINISTERED BY (if other than 6) | S0507A | 8. DELIVERY FOB |
|---|---|---|---|---|
| HQ US Special Operations Command<br>ATTN: SOAL-KB (Lopez)<br>7701 Tampa Point Blvd<br>Macdill AFB, FL 33621 | | DCMA San Francisco Lathrop Office<br>700 E. Roth Rd<br>French Camp, CA 95231 | | X DEST<br>☐ OTHER<br>(See Schedule if other) |

| 9. CONTRACTOR | CODE 3C5X0 | FACILITY CODE | 10. DELIVER TO FOB POINT BY (Date) (YYMMDD) | 11. MARK IF BUSINESS IS |
|---|---|---|---|---|
| NAME AND ADDRESS | eTreppid Technologies, LLC<br>755 Trademark Dr<br>Reno, NV 89521 | TEL:<br>FAX: | SEE SCHEDULE | ☐ SMALL<br>☐ SMALL DISAD-VANTAGED<br>☐ WOMEN OWNED |
| | | | 12. DISCOUNT TERMS | |
| | | | 13. MAIL INVOICES TO See Section G | |

| 14. SHIP TO | CODE | 15. PAYMENT WILL BE MADE BY | HQ0339 | MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER |
|---|---|---|---|---|
| SEE SCHEDULE<br><br>ATTENTION: | | DFAS COLUMBUS WEST ENTITLEMENT OPERATIONS<br>PO BOX 182381<br>COLUMBUS OH 43218-2381 | | |

| 16. TYPE OF ORDER | DELIVERY X | This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. |
|---|---|---|
| | PURCHASE | Reference your _____ furnish the following on terms specified herein<br>ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME. |

| ETreppid Technologies, LLC | | Warren Trepp, CEO & President | 18 Mar 05 |
|---|---|---|---|
| NAME OF CONTRACTOR | SIGNATURE | TYPED NAME AND TITLE | DATE SIGNED (YYMMDD) |

☐ If this box is marked, supplier must sign Acceptance and return the following number of copies.

17. ACCOUNTING AND APPROPRIATION DATA/LOCAL USE
ACRN AA: 9740100.12SF SG4 52SP SPCP00 01 592 012140 525700 F25700

| 18. ITEM NO. | 19. SCHEDULE OF SUPPLIES/SERVICES | 20. QUANTITY ORDERED/ ACCEPTED* | 21. UNIT | 22. UNIT PRICE | 23. AMOUNT |
|---|---|---|---|---|---|
| | SEE CONTINUATION SHEET | | | | |

| *If quantity accepted by the Government is same as quantity ordered, indicate by X. If different, enter actual quantity accepted below quantity Ordered and encircle. | 24. UNITED STATES OF AMERICA<br>BY SUSAN M. GRIFFIN<br>24 Mar 05<br>CONTRACTING/ORDERING OFFICER | 25. TOTAL<br>$184,147.98 |
|---|---|---|
| | | 29. DIFFERENCES |

| 26. QUANTITY IN COLUMN 20 HAS BEEN | | 27. SHIP NO. | 28. D.O. VOUCHER NO. | 30. INITIALS |
|---|---|---|---|---|
| ☐ INSPECTED ☐ RECEIVED ☐ ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED | | ☐ PARTIAL<br>☐ FINAL | 32. PAID BY | 33. AMOUNT VERIFIED CORRECT FOR |
| | | 31. PAYMENT | | 34. CHECK NUMBER |
| DATE SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | | ☐ COMPLETE<br>☐ PARTIAL<br>☐ FINAL | | 35. BILL OF LADING NO. |
| 36. I certify this account is correct and proper for payment | | | | |
| DATE SIGNATURE AND TITLE OF CERTIFYING OFFICER | | | | |

| 37. RECEIVED AT | 38. RECEIVED BY (Print) | 39. DATE RECEIVED (YYMMDD) | 40. TOTAL CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO. |
|---|---|---|---|---|---|
| | | | | | |

DD FORM 1155, JUN 94          PREVIOUS EDITION MAY BE USED

Continuation Sheet

Line Items

| ITEM NO | SUPPLIES/SERVICES | QTY | UNIT | UNIT PRICE | TOTAL AMOUNT |
|---------|-------------------|-----|------|------------|--------------|
| 0001 | SOFTWARE APPLICATIONS – CONTRACTOR FUNDED (FFP) | 1 | LOT | NSP | NSP |
|  | The Contractor shall furnish the COTS software (license and media) |  |  |  |  |
|  | FOB: Destination |  |  |  |  |
|  | USSOCOM Form 9 Number: ISP50050070100 |  |  |  |  |
| 0001AE | VIDEO IMAGERY w/AUDIO – COMPRESSION (FFP) | 4 | EACH | $30,000 | $120,000.00 |
|  | 1 Each = to be install on 1 CPU furnished as GFP |  |  |  |  |
| 0001AF | VIDEO IMAGERY w/Audio - Decoder(FFP) | 50 | EACH | $15.00 | $750.00 |
|  | 50 Each = to be installed on 1 CPU furnished as GFP |  |  |  |  |
| 0004 | FFP - Fixed Price Task Order | 1 | LOT |  | $63,397.98 |
|  | The contractor shall furnish all materials, equipment, personnel and travel required to perform the requirements of the Statement of Work entitled " Evaluation and Integration of Digital Compression " |  |  |  |  |
|  | FOB: Destination |  |  |  |  |
|  | USSOCOM Form 9 Number: ISP50050070100 |  |  |  |  |
| 0007 |  | 1 | LOT | $0.00 NSP | $0.00 NSP |
|  | Data |  |  |  |  |
|  | FFP |  |  |  |  |
|  | The contractor shall furnish data as required in individual task orders. |  |  |  |  |
|  | FOB: Destination |  |  |  |  |
|  | USSOCOM Form 9 Number: ISP50050070100 |  |  |  |  |

**TOTAL AMOUNT TASK ORDER 0004**      **$184,147.98**

Case 3:06-cr-00056-MMD-VPC Document 182-1 Filed 08/00/20 Page 118 of 650

development, Mr. Montgomery approached Warren Trepp, eTreppid's Chief Executive Officer, and they formed eTreppid Technologies, LLC.

During the first few years, eTreppid remained largely in a Research and Development stage, continuing to refine the technology. The algorithm achieves its remarkable compression ratios by applying multiple passes at the data until a gain in compression is too small to warrant an additional pass. The decompression process, however, is always just one pass. In addition, a compression pass does not have to be completed on the entire data set before a user can have access to that file. It has also been used to compress previously compressed files where its compression strength is apparent.

Due to a large demand for compression of multimedia data, eTreppid worked on developing an initial compression pass that would alter a user-defined amount of the data in an effort to increase compression. The resulting "lossy" compression pass is then followed by multiple "lossless" passes to achieve a typical compression ratio of 400-600 : 1 on video data.

Another benefit of compressing data with eTreppid's technology is that objects within the data can be located and operated on while the data is compressed. This greatly increases the speed of database searches and operations on the objects. For example, objects within a video stream can be accurately identified at rates up to 1000 objects per second at greater than 98% accuracy with virtually no false-positive reports. If desired, the detected object can then have an effect applied such as blurring or color changes without the need to decompress the video frame first. This ability is not restricted to video objects. 3D models, text, audio, numerical data, are all examples of objects that can be operated on.

Today, eTreppid's compression technology has been evaluated or applied in many different industries including real time video surveillance, seismic data analysis, medical imaging, broadcast audio and video, facial and fingerprint identification, mapping applications, and still imaging.

### Deliverables

#### Government Furnished Equipment

USSOCOM will provide eTreppid with the following equipment, information, or access in order for eTreppid to complete its tasks:
- Access to the PSYOP media production center and equipment
  - to gather information required to correctly integrate eTreppid's compression technology into the existing system
  - to gather information required to provide architecture recommendations for integrating eTreppid's compression technology "in-line" or in replacement of existing equipment
- A listing of software formats that are of interest to the US Government
  - to enable eTreppid to enable support for the formats
  - to enable eTreppid to provide estimates on the development of software support for currently unsupported formats
- Technical information on the network interface
  - to enable eTreppid to understand network certification and configuration management requirements for transmission through network firewalls and Microsoft operating system networks
- Computing hardware per eTreppid's specifications
  - to be used inline with existing equipment during Phase 2

#### Other Government Furnished Resources

USSOCOM shall provide the following resources to support this effort:
- Program manager (PM) who shall act as a single point of contact

#### eTreppid Deliverables

eTreppid shall deliver the following items in support of this contract:
- An estimate for the development of software support for any currently unsupported formats
- An architecture diagram providing eTreppid's recommendations on integrating its compression software either "in-line" or in replacement of existing equipment
- Software and/or systems for any procured licenses along with installation assistance, training, technical support and maintenance as described in this document.

#### Other eTreppid Resources

eTreppid shall provide the following resources in support of this contract:
- eTreppid shall provide a Program Manager (PM) who shall act as the single point of contact that is provided at a rate of 10% of the total resource hours for each phase.
  - Program Manager: Patty Gray, eTreppid Technologies, LLC, 755 Trademark Drive, Reno, Nevada 89521, 775-337-6771 (office), 602-421-1453 (mobile), patty@etreppid.com

*The eTreppid compression and object identification technology will at all times remain the sole property of eTreppid Technologies, LLC and all licenses will be granted pursuant to Contract No. H92222-04-D-0006, CLIN 0001, Attachment 2. No data or other rights of any nature in eTreppid's technology will accrue to USSOCOM by virtue of eTreppid performing under this ROM.*



# eTreppid Technologies, LLC

755 Trademark Drive
Reno, NV 89521

www.eTreppid.com

Tel: (775) 337-6771
Fax: (775) 337-1877

January 12, 2004

To whom it may concern,

For about four months eTreppid Technologies, LLC (the "Company") has been providing assistance and information (including that related to the Company's technology, know-how, business and processes) pursuant to an agreement with the CIA (the "Government"). As part of the consideration for providing such assistance and information, the Government agreed that eTreppid Technologies' identity as a contractor and source of the assistance and information as well as the information supplied by the Company would be kept confidential, would only be disclosed to individuals within the government on a need to know basis only, and would not be revealed to the public under the Freedom of Information Act or otherwise. The purpose of this letter agreement is to confirm in writing the understanding between the parties.

It is our current intent to continue to work with the Government with regard to this matter. This will confirm that the U.S. Government agrees not to make any attempt to unilaterally use or otherwise take technology, intellectual property or other property or assets owned by eTreppid Technologies. In addition, the Government agrees that it will negotiate in good faith an agreement that sets forth future services (including technology and intellectual property) to be provided by the Company and the compensation to be paid for such future services as well as services already rendered.

eTreppid Technologies, LLC

By: Warren Trepp, CEO

US Government

By:

**Edward B. Charbonneau**
Associate DDS&T for Technical Operations

Central Intelligence Agency
Washington, DC 20505

(703) 482-4848
Fax: (703) 482-6350

*"bringing digital to life"*

CONFIDENTIAL

OMB Approval 2700-0042

| AWARD/CONTRACT | 1 THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) ▶ | RATING | PAGE | OF | PAGES |
|---|---|---|---|---|---|
| | | | 1 | | 26 |

| 2. CONTRACT (Proc. Inst. Ident.) NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQUEST/PROJECT NO. |
|---|---|---|
| 2004*I111530*000 | 1 April 2004 | |

| 5. ISSUED BY                      CODE | 6. ADMINISTERED BY (If other than Item 5)      CODE |
|---|---|
| Calvin A. Boone<br>P.O. Box 40931<br>Arlington, VA 22204 | Susan B. (703) 790-9442 |

| 7. NAME AND ADDRESS OF CONTRACTOR (No. street, county, state and ZIP Code) | 8. DELIVERY |
|---|---|
| eTreppid Technologies, LLC<br>755 Trademark Drive<br>Reno, NV 89521 | ☐ FOB ORIGIN    ☐ OTHER (See below) |
| | 9. DISCOUNT FOR PROMPT PAYMENT |
| | N/A |
| | 10. SUBMIT INVOICES              ITEM |
| | (4 copies unless other-<br>wise specified) TO THE<br>ADDRESS SHOWN IN: ▶   G-2. |
| CODE                         FACILITY CODE | |

| 11. SHIP TO/MARK FOR              CODE | 12. PAYMENT WILL BE MADE BY      CODE |
|---|---|
| | G-2. |

| 13. AUTHORITY FOR USING OTHER FULL AND OPEN COMPETITION: | 14. ACCOUNTING AND APPROPRIATION DATA |
|---|---|
| ☐ 10 U.S.C. 2304(c)(  )    ☐ 41 U.S.C. 253(c)(  ) | |

| 15A. ITEM NO. | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| | See Page 2<br><br>CL BY: 2025200<br>CL RSN: 1.5(c)<br>DECL ON: X1<br>DRV FRM: CON 1-82 | | | | |
| | **15G. TOTAL AMOUNT OF CONTRACT** ▶ | | | | $ 0 |

### 16. TABLE OF CONTENTS

| (✓) | SEC. | DESCRIPTION | PAGE(S) | (✓) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 20 |
| X | B | SUPPLIES OR SERVICES AND PRICE/COST | 3 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS./WORK STATEMENT | 4 | X | J | LIST OF ATTACHMENTS | 26 |
| X | D | PACKAGING AND MARKING | 5 | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 7 | | K | REPRESENTATIONS, CERTIFICATIONS | |
| X | F | DELIVERIES OR PERFORMANCE | 8 | | | AND OTHER STATEMENTS OF OFFERORS | |
| X | G | CONTRACT ADMINISTRATION DATA | 9 | | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 12 | | M | EVALUATION FACTORS FOR AWARD | |

*CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE*

| 17. ☒ CONTRACTOR'S NEGOTIATED AGREEMENT (Contractor is required to sign this document and return __1__ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.) | 18. ☐ AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number _____, including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary. |
|---|---|

| 19A. NAME AND TITLE OF SIGNER (Type or print) | 20A. NAME OF CONTRACTING OFFICER |
|---|---|
| WARREN TREPP | John S. Tarah |

| 19B. NAME OF CONTRACTOR | 19C. DATE SIGNED | 20B. UNITED STATES OF AMERICA | 20C. DATE SIGNED |
|---|---|---|---|
| *(Signature of person authorized to sign)* | 4/21/04 | BY *(Signature of Contracting Officer)* | 20 Apr 2004 |

| NSN 7540-01-152-8069 | 26-107 | STANDARD FORM 26 (REV. 4-85) |
|---|---|---|
| PREVIOUS EDITION UNUSABLE | Computer Generated | Prescribed by GSA |

CONFIDENTIAL

# EXHIBIT "12"

| From: | Eisenberg, Joseph |
|---|---|
| To: | Terry, Billie |
| Cc: | Dennis |
| Subject: | FW: Review of former counsel files at Liner firm by United States |
| Date: | Monday, May 24, 2010 1:08:10 PM |
| Attachments: | Liner Document Inventory.pdf |
| | Liner Hard Drive Inventory.pdf |
| | Liner CD Inventory.pdf |

-----Original Message-----
From: Gomez, Raphael (CIV) [mailto:Raphael.Gomez@usdoj.gov]
Sent: Monday, May 24, 2010 12:57 PM
To: Ellyn S. Garofalo; Kathleen Goldberg; Eisenberg, Joseph; Michael Flynn
Cc: Wells, Carlotta (CIV); Raya, Sharon M. (CIV)
Subject: Review of former counsel files at Liner firm by United States

Counsel,

As we orally have informed you, the United States has conducted an initial review of the 210 boxes of former counsel files at the Liner firm.  All 210 boxes of materials, minus the documents and media pulled for further security review, require no further review by the United States.

Please find attached an inventory of the hard copies, hard drives, and CD's/DVD's that have been pulled from boxes 101 through 210 (please note that the first 100 boxes were discovery produced by eTreppid to Montgomery in the eTreppid case and were released by the United States in late January 2010).

We will forward a projected date for completion of the review of the pulled hard copies, hard drives and CD's/DVD's.

If you have any questions, please email or call.

Raphael Gomez
Carlotta Wells

202 514-1318
202 514-4522

| CD No. | ADDITIONAL INFO |
|---|---|
| **BOX 101** | |
| CD - 000001 | |
| CD - 000002 | |
| CD - 000003 | |
| CD - 000004 | DVD |
| CD - 000005 | |
| CD - 000006 | |
| CD - 000007 | |
| CD - 000008 | |
| CD - 000009 | |
| CD - 000010 | |
| CD - 000011 | DVD |
| CD - 000012 | DVD |
| CD - 000013 | |
| CD - 000014 | |
| CD - 000015 | DVD |
| CD - 000016 | DVD |
| CD - 000017 | DVD |
| CD - 000018 *Microsoft XP | |
| CD - 000019 *Dancing w/ the stars | DVD |
| CD - 000020 *Dancing w/ the stars | DVD |
| CD - 000021 | |
| CD - 000022 | |
| CD - 000023 | DVD |
| CD - 000024 | DVD |
| CD - 000025 | DVD |
| CD - 000026 | DVD |
| CD - 000027 | DVD |
| CD - 000028 | DVD |
| CD - 000029 | DVD |
| CD - 000030 | DVD |
| CD - 000031 | DVD |
| CD - 000032 | |
| CD - 000033 | |
| CD - 000034 | DVD |
| CD - 000035 | |
| CD - 000036 | |
| CD - 000037 | |
| CD - 000038 | DVD |
| CD - 000039 | DVD |
| CD - 000040 | |
| CD - 000041 | |
| CD - 000042 | DVD |
| CD - 000043 | DVD |
| CD - 000044 | DVD |
| CD - 000045 | |

| | |
|---|---|
| CD - 000046 | |
| CD - 000047 | |
| CD - 000048 | |
| CD - 000049 | |
| CD - 000050 | |
| CD - 000051 | |
| CD - 000052 | |
| CD - 000053 | DVD |
| CD - 000054 | |
| CD - 000055 | DVD |
| CD - 000056 | DVD |
| CD - 000057 | |
| CD - 000058 | |
| CD - 000059 | DVD |
| CD - 000060 | DVD |
| CD - 000061 | DVD |
| CD - 000062 | |
| CD - 000063 | DVD |
| CD - 000064 | DVD |
| CD - 000065 | DVD |
| CD - 000066 | DVD |
| CD - 000067 | DVD |
| CD - 000068 | |
| CD - 000069 | |
| CD - 000070 | DVD |
| CD - 000071 | DVD |
| CD - 000072 | DVD |
| CD - 000073 | DVD |
| CD - 000074 | |
| CD - 000075 | |
| CD - 000076 | DVD |
| CD - 000077 | DVD |
| CD - 000078 | DVD |
| CD - 000079 | DVD |
| CD - 000080 | |
| CD - 000081 | |
| CD - 000082 | |
| CD - 000083 | |
| CD - 000084 | |
| CD - 000085 | DVD |
| CD - 000086 | DVD |
| CD - 000087 | DVD |
| CD - 000088 | DVD |
| CD - 000089 | |
| CD - 000090 | |
| CD - 000091 | DVD |
| CD - 000092 | |

| | |
|---|---|
| CD - 000093 | DVD |
| CD - 000094 | DVD |
| CD - 000095 | DVD |
| CD - 000096 | DVD |
| CD - 000097 | DVD |
| CD - 000098 | |
| CD - 000099 | |
| CD - 000100 | DVD |
| CD - 000101 | DVD |
| CD - 000102 | |
| CD - 000103 | DVD |
| CD - 000104 | DVD |
| CD - 000105 | DVD |
| CD - 000106 | DVD |
| CD - 000107 | DVD |
| CD - 000108 | DVD |
| CD - 000109 | DVD |
| CD - 000110 | DVD |
| CD - 000111 | DVD |
| CD - 000112 | DVD |
| CD - 000113 | DVD |
| CD - 000114 | DVD |
| CD - 000115 | |
| CD - 000116 | DVD |
| CD - 000117 | DVD |
| CD - 000118 | |
| CD - 000119 | |
| CD - 000120 | DVD |
| CD - 000121 | DVD |
| CD - 000122 | |
| CD - 000123 | |
| CD - 000124 | |
| CD - 000125 | |
| CD - 000126 | |
| CD - 000127 | |
| CD - 000128 | |
| CD - 000129 | |
| CD - 000130 | |
| CD - 000131 | |
| CD - 000132 | |
| CD - 000133 | DVD |
| CD - 000134 | |
| CD - 000135 | |
| CD - 000136 | |
| CD - 000137 | |
| CD - 000138 | |
| CD - 000139 | |

| | |
|---|---|
| CD - 000140 | |
| CD - 000141 | |
| CD - 000142 | |
| CD - 000143 | |
| CD - 000144 | |
| CD - 000145 | |
| CD - 000146 | |
| CD - 000147 | |
| CD - 000148 | |
| CD - 000149 | |
| CD - 000150 | |
| CD - 000151 | |
| CD - 000152 | |
| CD - 000153 | |
| CD - 000154 | |
| CD - 000155 | |
| CD - 000156 | |
| CD - 000157 | |
| CD - 000158 | |
| CD - 000159 | |
| CD - 000160 | |
| CD - 000161 | |
| CD - 000162 | |
| CD - 000163 | |
| CD - 000164 | |
| CD - 000165 | |
| CD - 000166 | |
| CD - 000167 | |
| CD - 000168 | |
| CD - 000169 | |
| CD - 000170 | |
| CD - 000171 | |
| CD - 000172 | |
| CD - 000173 | |
| CD - 000174 | |
| CD - 000175 | |
| CD - 000176 | |
| CD - 000177 | |
| CD - 000178 | |
| CD - 000179 | |
| CD - 000180 | |
| CD - 000181 | |
| CD - 000182 | |
| CD - 000183 | |
| CD - 000184 | |
| CD - 000185 | |
| CD - 000186 | |

| | |
|---|---|
| CD - 000187 | |
| CD - 000188 | |
| CD - 000189 | |
| CD - 000190 | |
| CD - 000191 | |
| CD - 000192 | |
| CD - 000193 | |
| CD - 000194 | |
| CD - 000195 | |
| CD - 000196 | |
| CD - 000197 | |
| CD - 000198 | |
| CD - 000199 | DVD |
| CD - 000200 | DVD |
| CD - 000201 | DVD |
| **BOX - 105** | |
| CD - 000223 *Fire Connect | |
| CD - 000224 | |
| CD - 000225 | |
| CD - 000226 | |
| CD - 000227 *Dark City (Movie) | DVD |
| CD - 000228 *School of Rock (Movie) | DVD |
| CD - 000229 *Lost in Trans (Movie) | DVD |
| CD - 000230 *After the Sunset (Movie) | DVD |
| CD - 000231 | DVD |
| CD - 000232 | DVD |
| CD - 000233 | DVD |
| CD - 000234 | DVD |
| CD - 000235 | DVD |
| CD - 000236 *Windows XP | |
| CD - 000237 | DVD |
| CD - 000238 | DVD |
| CD - 000239 *Sync master | |
| CD - 000240 * Windows XP | |
| CD - 000241 | DVD |
| CD - 000242 *Video Capture Software | |
| CD - 000243 *Windows XP | |
| CD - 000244 | DVD |
| CD - 000245 *Video Capture Software | |
| CD - 000246 *Windows XP | |
| CD - 000247 | DVD |
| CD - 000248 | DVD |
| CD - 000249 | DVD |
| CD - 000250 | DVD |
| CD - 000251 | |
| CD - 000252 | DVD |
| CD - 000253 | DVD |

| CD - 000254 | |
| CD - 000255 | |
| CD - 000256 | DVD |
| CD - 000257 | DVD |
| CD - 000258 | DVD |
| CD - 000259 | |
| CD - 000260 | DVD |
| CD - 000261 | DVD |
| CD - 000262 | DVD |
| CD - 000263 | DVD |
| CD - 000264 | DVD |
| CD - 000265 | |
| CD - 000266 | DVD |
| CD - 000267 | |
| CD - 000268 | DVD |
| CD - 000269 | DVD |
| CD - 000270 | DVD |
| CD - 000271 | DVD |
| CD - 000272 | |
| CD - 000273 | |
| CD - 000274 | DVD |
| CD - 000275 | DVD |
| CD - 000276 | |
| CD - 000277 | |
| **BOX 106** | |
| CD - 000219 | |
| **BOX 114** | |
| CD - 000278 | |
| CD - 000279 | DVD |
| CD - 000280 | |
| CD - 000281 | DVD |
| CD - 000282 | |
| CD - 000283* (IBM Commercial) | |
| CD - 000284 | |
| CD - 000285 | |
| CD - 000286 | |
| CD - 000287 | |
| CD - 000288 | DVD |
| CD - 000289 | |
| CD - 000290 | |
| CD - 000291 | |
| CD - 000292 | |
| CD - 000293 | |
| CD - 000294 | |
| CD - 000295 | |
| CD - 000296 | |
| CD - 000297* (Adobe) | |

| | |
|---|---|
| CD - 000298 | |
| CD - 000299 | |
| CD - 000300 | |
| CD - 000301 | |
| CD - 000302 | |
| CD - 000303 | |
| CD - 000304 | |
| CD - 000305 | DVD |
| CD - 000306 | |
| CD - 000307 | |
| CD - 000308 | |
| CD - 000309* (Music) | |
| CD - 000310* (Win 95) | |
| CD - 000311 | |
| CD - 000312 | |
| CD - 000313 | |
| CD - 000314 | |
| CD - 000315 | DVD |
| CD - 000316 | |
| CD - 000317* (WIN 95) | |
| CD - 000318 | DVD |
| CD - 000319 | |
| CD - 000320 | |
| CD - 000321 | |
| CD - 000322 | |
| CD - 000323 | |
| CD - 000324* (Old Windows Upd.) | |
| CD - 000325 | |
| CD - 000326 | |
| CD - 000327 | |
| CD - 000328 | |
| CD - 000329* (Elvis pt. 2) | |
| CD - 000330 | |
| CD - 000331 | |
| CD - 000332 | |
| CD - 000333 | |
| CD - 000334 | |
| CD - 000335 | |
| CD - 000336 | |
| CD - 000337 | |
| CD - 000338 | |
| CD - 000339 | |
| CD - 000340 | |
| CD - 000341 | |
| CD - 000342 | |
| CD - 000343 | |
| CD - 000344 | |

| | |
|---|---|
| CD - 000345 | |
| CD - 000346 | |
| CD - 000347 | |
| CD - 000348 | |
| CD - 000349 | |
| CD - 000350 | |
| CD - 000351 | |
| CD - 000352 | |
| CD - 000353 | |
| CD - 000354 | |
| CD - 000355 | |
| CD - 000356 | |
| CD - 000357 | |
| CD - 000358 | DVD |
| CD - 000359 | |
| CD - 000360** (Unreadable 360-370) | DVD |
| CD - 000361 | |
| CD - 000362 | |
| CD - 000363 | |
| CD - 000364 | |
| CD - 000365 | |
| CD - 000366 | |
| CD - 000367 | DVD |
| CD - 000368 | |
| CD - 000369 | |
| CD - 000370** | |
| CD - 000371* (Dolby Test Files) | |
| CD - 000372 | |
| CD - 000373* (Kodak Frames) | |
| CD - 000374* (Partition Magic 8.02) | |
| CD - 000375 | |
| CD - 000376* (HP) | DVD |
| CD - 000377* (ADP) | |
| CD - 000378 | |
| CD - 000379 | DVD |
| CD - 000380 | |
| CD - 000381* (Win XP) | |
| CD - 000382 | |
| CD - 000383 | DVD |
| CD - 000384* (Mic Office 2003) | |
| CD - 000385* (Mic XP) | |
| CD - 000386* (Dancing w/ Stars) | DVD |
| CD - 000387* (Dancing w/ Stars) | DVD |
| CD - 000388 | DVD |
| CD - 000389 | |
| CD - 000390 | |
| CD - 000391 | DVD |

* - Will be reviewed before copying          CD INVENTORY PAGE 8          DOJ Security Office Boxes 1-3

| | |
|---|---|
| CD - 000392 | DVD |
| CD - 000393 | DVD |
| CD - 000394 | |
| CD - 000395 | |
| CD - 000396* (Symantec) | |
| CD - 000397* (Mic XP) | |
| CD - 000398 | DVD |
| CD - 000399* (Mic Office 2003) | |
| CD - 000400* (Mic XP) | |
| CD - 000401* (Dancing w/ Stars) | DVD |
| CD - 000402* (Dancing w/ Stars) | DVD |
| CD - 000403 | DVD |
| CD - 000404 | |
| CD - 000405 | |
| CD - 000406 | DVD |
| CD - 000407 | DVD |
| CD - 000408 | DVD |
| CD - 000409 | |
| CD - 000410 | |
| CD - 000411* (Symantec) | |
| CD - 000412* (Microsoft XP) | |
| CD - 000413 | DVD |
| CD - 000414* (Mic Office 2003) | |
| CD - 000415* (Mic XP) | |
| CD - 000416* (Dancing w/ Stars) | DVD |
| CD - 000417* (Dancing w/ Stars) | DVD |
| CD - 000418 | DVD |
| CD - 000419 | |
| CD - 000420 | |
| CD - 000421 | DVD |
| CD - 000422 | DVD |
| CD - 000423 | DVD |
| CD - 000424 | |
| CD - 000425 | |
| CD - 000426*(Symantec) | |
| CD - 000427* (Mic XP) | |
| **BOX 117** | |
| CD - 000220 | |
| **BOX 131** | |
| CD - 000217 | |
| **BOX 145** | |
| CD - 000218 | |
| **BOX 165** | |
| CD - 000431 | |
| CD - 000432 | |
| **BOX 180** | |
| CD - 000221 | |

| BOX 181 | | |
|---|---|---|
| CD - 000202 | | |
| CD - 000203 | | |
| CD - 000204 | | |
| CD - 000205 | | DVD |
| CD - 000206 | | DVD |
| CD - 000207 | | |
| CD - 000208 | | DVD |
| CD - 000209 | | |
| CD - 000210 | | |
| CD - 000211 | | |
| CD - 000212 | | DVD |
| CD - 000213 | | DVD |
| CD - 000214 | | |
| CD - 000215 | | |
| CD - 000216 | | |
| CD - 000430 | | DVD |
| BOX 188-1 | | |
| CD - 000222 | | |
| BOX 189 | | |
| CD - 000428 | | |
| BOX 190 | | |
| CD - 000429 | | |
| BOX 207 | | |
| CD - 000433 | | |
| CD - 000434 | | |
| CD - 000435 | | |

**LINER FILES: DOCUMENT INVENTORY**

| Present | BOX | CONTENTS | DESCRIPTION | RELEASED | PULL DETAILS |
|---|---|---|---|---|---|
| N/A | 1 | DISCOVERY | N/A | Y | |
| N/A | 2 | DISCOVERY | N/A | Y | |
| N/A | 3 | DISCOVERY | N/A | Y | |
| N/A | 4 | DISCOVERY | N/A | Y | |
| N/A | 5 | DISCOVERY | N/A | Y | |
| N/A | 6 | DISCOVERY | N/A | Y | |
| N/A | 7 | DISCOVERY | N/A | Y | |
| N/A | 8 | DISCOVERY | N/A | Y | |
| N/A | 9 | DISCOVERY | N/A | Y | |
| N/A | 10 | DISCOVERY | N/A | Y | |
| N/A | 11 | DISCOVERY | N/A | Y | |
| N/A | 12 | DISCOVERY | N/A | Y | |
| N/A | 13 | DISCOVERY | N/A | Y | |
| N/A | 14 | DISCOVERY | N/A | Y | |
| N/A | 15 | DISCOVERY | N/A | Y | |
| N/A | 16 | DISCOVERY | N/A | Y | |
| N/A | 17 | DISCOVERY | N/A | Y | |
| N/A | 18 | DISCOVERY | N/A | Y | |
| N/A | 19 | DISCOVERY | N/A | Y | |
| N/A | 20 | DISCOVERY | N/A | Y | |
| N/A | 21 | DISCOVERY | N/A | Y | |
| N/A | 22 | DISCOVERY | N/A | Y | |
| N/A | 23 | DISCOVERY | N/A | Y | |
| N/A | 24 | DISCOVERY | N/A | Y | |
| N/A | 25 | DISCOVERY | N/A | Y | |
| N/A | 26 | DISCOVERY | N/A | Y | |
| N/A | 27 | DISCOVERY | N/A | Y | |
| N/A | 28 | DISCOVERY | N/A | Y | |
| N/A | 29 | DISCOVERY | N/A | Y | |
| N/A | 30 | DISCOVERY | N/A | Y | |
| N/A | 31 | DISCOVERY | N/A | Y | |
| N/A | 32 | DISCOVERY | N/A | Y | |
| N/A | 33 | DISCOVERY | N/A | Y | |

**LINER FILES: DOCUMENT INVENTORY**

| | | | | | |
|---|---|---|---|---|---|
| N/A | 34 DISCOVERY | N/A | | Y | |
| N/A | 35 DISCOVERY | N/A | | Y | |
| N/A | 36 DISCOVERY | N/A | | Y | |
| N/A | 37 DISCOVERY | N/A | | Y | |
| N/A | 38 DISCOVERY | N/A | | Y | |
| N/A | 39 DISCOVERY | N/A | | Y | |
| N/A | 40 DISCOVERY | N/A | | Y | |
| N/A | 41 DISCOVERY | N/A | | Y | |
| N/A | 42 DISCOVERY | N/A | | Y | |
| N/A | 43 DISCOVERY | N/A | | Y | |
| N/A | 44 DISCOVERY | N/A | | Y | |
| N/A | 45 DISCOVERY | N/A | | Y | |
| N/A | 46 DISCOVERY | N/A | | Y | |
| N/A | 47 DISCOVERY | N/A | | Y | |
| N/A | 48 DISCOVERY | N/A | | Y | |
| N/A | 49 DISCOVERY | N/A | | Y | |
| N/A | 50 DISCOVERY | N/A | | Y | |
| N/A | 51 DISCOVERY | N/A | | Y | |
| N/A | 52 DISCOVERY | N/A | | Y | |
| N/A | 53 DISCOVERY | N/A | | Y | |
| N/A | 54 DISCOVERY | N/A | | Y | |
| N/A | 55 DISCOVERY | N/A | | Y | |
| N/A | 56 DISCOVERY | N/A | | Y | |
| N/A | 57 DISCOVERY | N/A | | Y | |
| N/A | 58 DISCOVERY | N/A | | Y | |
| N/A | 59 DISCOVERY | N/A | | Y | |
| N/A | 60 DISCOVERY | N/A | | Y | |
| N/A | 61 DISCOVERY | N/A | | Y | |
| N/A | 62 DISCOVERY | N/A | | Y | |
| N/A | 63 DISCOVERY | N/A | | Y | |
| N/A | 64 DISCOVERY | N/A | | Y | |
| N/A | 65 DISCOVERY | N/A | | Y | |
| N/A | 66 DISCOVERY | N/A | | Y | |
| N/A | 67 DISCOVERY | N/A | | Y | |

**LINER FILES: DOCUMENT INVENTORY**

| | | | |
|---|---|---|---|
| N/A | 68 DISCOVERY | N/A | | Y |
| N/A | 69 DISCOVERY | N/A | | Y |
| N/A | 70 DISCOVERY | N/A | | Y |
| N/A | 71 DISCOVERY | N/A | | Y |
| N/A | 72 DISCOVERY | N/A | | Y |
| N/A | 73 DISCOVERY | N/A | | Y |
| N/A | 74 DISCOVERY | N/A | | Y |
| N/A | 75 DISCOVERY | N/A | | Y |
| N/A | 76 DISCOVERY | N/A | | Y |
| N/A | 77 DISCOVERY | N/A | | Y |
| N/A | 78 DISCOVERY | N/A | | Y |
| N/A | 79 DISCOVERY | N/A | | Y |
| N/A | 80 DISCOVERY | N/A | | Y |
| N/A | 81 DISCOVERY | N/A | | Y |
| N/A | 82 DISCOVERY | N/A | | Y |
| N/A | 83 DISCOVERY | N/A | | Y |
| N/A | 84 DISCOVERY | N/A | | Y |
| N/A | 85 DISCOVERY | N/A | | Y |
| N/A | 86 DISCOVERY | N/A | | Y |
| N/A | 87 DISCOVERY | N/A | | Y |
| N/A | 88 DISCOVERY | N/A | | Y |
| N/A | 89 DISCOVERY | N/A | | Y |
| N/A | 90 DISCOVERY | N/A | | Y |
| N/A | 91 DISCOVERY | N/A | | Y |
| N/A | 92 DISCOVERY | N/A | | Y |
| N/A | 93 DISCOVERY | N/A | | Y |
| N/A | 94 DISCOVERY | N/A | | Y |
| N/A | 95 DISCOVERY | N/A | | Y |
| N/A | 96 DISCOVERY | N/A | | Y |
| N/A | 97 DISCOVERY | N/A | | Y |
| N/A | 98 DISCOVERY | N/A | | Y |
| N/A | 99 DISCOVERY | N/A | | Y |
| N/A | 100 DISCOVERY | N/A | | Y |
| N/A | 101 OTHER | **1 Pull:** **Pull 1:** CDs that appear to be discovery materials | | Y |

# LINER FILES: DOCUMENT INVENTORY

| | # | Type | Description | |
|---|---|---|---|---|
| N/A | 102 | OTHER | N/A | Y |
| YES | 103 | OTHER | **4 Pulls:** **Pull 1:** 6/19/06 Flynn Email **(001-005)**; **Pull 2:** 7/19/06 Flynn Email **(001-004)**; **Pull 3:** 8/14/06 Flynn Email **(001-014)**; **Pull 4:** 9/26/06 Mongtomery Email **(001-016)** | N |
| YES | 104 | OTHER | **1 Pull:** **Pull 1:** 3/1/06 Flynn Ltr **(001-008)** | N |
| N/A | 105 | OTHER | Hard drives and CDs | N |
| N/A | 106 | OTHER | **1 Pull:** **Pull 1:** CD | Y |
| YES | 107 | PLEADINGS | **6 Pulls:** **Pull 1:** 3/11/06 Dec of Flynn **(001-004)**; **Pull 2:** 3/11/06 Dec of Flynn **(001-004)**; **Pull 3:** 4/3/06 Reply Memo **(001-029)**; **Pull 4:** 4/21/08 Reply Memo **(001-035)**; **Pull 5:** 3/11/06 Dec of Flynn **(001-006)**; **Pull 6:** 4/3/06 Reply Memo **(001-029)** | Y |
| YES | 108 | PLEADINGS | **2 Pulls:** **Pull 1:** Flynn Declaration **(001-007)**; **Pull 2:** 3/17/07 Email **(001-002)** | Y |
| YES | 109 | OTHER | **2 Pulls:** **Pull 1:** 2/26/07 Email **(001)**; **Pull 2:** 2/13/07 Email **(001)** | Y |
| N/A | 110 | OTHER | N/A | Y |
| N/A | 111 | OTHER | N/A | Y |
| N/A | 112 | OTHER | N/A | Y |
| YES | 113 | OTHER | **5 Pulls:** **Pull 1:** 2/13/07 Email **(001-009)**; **Pull 2:** 2/26/07 Email **(001-004)**; **Pull 3:** 3/16/07 Email **(001-012)**; **Pull 4:** 3/16/07 Email **(001-008)**; **Pull 5:** 3/24/07 Email **(001-003)** | N |
| N/A | 114 | OTHER | CDs for review | N |
| N/A | 115 | PLEADINGS | N/A | Y |
| N/A | 116 | OTHER | Hard drives | N |

## LINER FILES: DOCUMENT INVENTORY

| | | | |
|---|---|---|---|
| YES | 117 PLEADINGS | **4 Pulls:** **Pull 1:** 3/11/06 Dec of Flynn; **(001-004)** **Pull 2:** 4/3/06 Reply Mem **(001-029);** **Pull 3:** CD pulled; **Pull 4:** List of T. Pham file pulled **(001-014)** | Y |
| YES | 118 PLEADINGS | **1 Pull:** **Pull 1:** 3/11/06 Dec of Flynn **(001-004)** | Y |
| YES | 119 PLEADINGS | **4 Pulls:** **Pull 1:** 5/21/08Reply Memo **(001-035);** **Pull 2:** 3/11/06 Dec of Flynn **(001-010);** **Pull 3:** 4/3/06 Reply Memo **(001-029);** * **Pull 4:** (001-004) 3/11/06 Dec of Flynn **(001-004)** | Y |
| YES | 120 OTHER | **3 Pulls:** **Pull 1:** 9/26/06 Montgomery Email **(001)** **Pull 2:** 9/26/06 Montgomery Email **(001)** **Pull 3:** 9/26/06 Montgomery Email **(001)** | <u>Y</u> |
| N/A | 121 OTHER | N/A | Y |
| N/A | 122 OTHER | N/A | Y |
| N/A | 123 OTHER | N/A | Y |
| YES | 124 OTHER | **1 Pull:** **Pull 1:** Montgomery Discovery (not Bates labeled by parties) **(001-120)** | |
| YES | 125 OTHER | **20 Pulls:** **Pull 1:** 5/4/07 Flynn Ltr **(001-013);** **Pull 2:** 5/5/07 Flynn Ltr **(001-013);** **Pull 3:** 9/23/06 SF-95.doc **(001-013);** **Pull 4:** 8/24/06 Interrogatories **(001-018);** **Pull 5:** 3/1/06 Draft Rumsfield, et al. Ltr **(001-046);** **Pull 6:** 6/3/07 Flynn Email **(001)** **Pull 7:** 6/3/07 Flynn Email **(001-008)** **Pull 8:** 6/6/07 Flynn Email **(001)** **Pull 9:** 6/10/07 Flynn Email **(001)** **Pull 10:** Exhibit Listing and Description **(001-002)** **Pull 11:** 6/23/07 Flynn Email **(001-004)** **Pull 12:** 6/23/07 Flynn Email **(001-003)** **Pull 13:** 6/23/07 Flynn Email **(001-004)** **Pull 14:** 6/23/07 Flynn Email **(001-002)** **Pull 15:** 4/13/07 Flynn Ltr **(001-010)** **Pull 16:** Draft Flynn Ltr **(001-015)** **Pull 17:** 5/9/07 Flynn Email **(001-003)** | **Pull 18:** 5/9/07 Flynn Email **(001-003)** **Pull 19:** Rumsfeld Ltr **(001-008)** **Pull 20:** 4/9/07 Flynn Email **(001-002)** <br> N |

# LINER FILES: DOCUMENT INVENTORY

| | # | Type | Pulls | | |
|---|---|---|---|---|---|
| YES | 126 | OTHER | **12 Pulls:**<br>**Pull 1:** 5/8/07 Mont Email **(001-002)**;<br>**Pull 2:** 3/1/06 Rumsfeld Ltr **(001-007**;<br>**Pull 3:** Etreppid legal spreadsheet **(001-033)**;<br>**Pull 4:** 6/10/07 Email **(001-003)**;<br>**Pull 5:** 6/10/07 Email **(001-002)**;<br>**Pull 6:** 6/10/07 Email **(001-002)**;<br>**Pull 7:** 6/10/07 Email **(001-002)**;<br>**Pull 8:** 6/10/07 Email **(001-003)**;<br>**Pull 9:** 6/6/07 Email **(001-002)**;<br>**Pull 10:** 6/4/07 Email **(001-003)**;<br>**Pull 11:** 6/3/07 Email **(001-017)**;<br>**Pull 12:** 6/11/07 Montgomery Declaration **(001-004)**;<br>**Pull 13:** 6/10/07 Email **(001-021)**;<br>**Pull 14:** 3/11/06 Declaration **(001-009)**;<br>**Pull 15:** Reply Memo Buckthorne **(001-037)**;<br>**Pull 16:** 4/18/06 Email **(001-004)**;<br>**Pull 17:** Montgomery Objection to DOD (06-cv-056 Dkt# 125) **(001-00)** | N | |
| N/A | 127 | OTHER | Hard drives | N | |
| N/A | 128 | OTHER | N/A | Y | |
| N/A | 129 | OTHER | N/A | Y | |
| N/A | 130 | OTHER | N/A | Y | |
| N/A | 131 | OTHER | **1 Pull:**<br>**Pull 1:** CD | Y | |
| N/A | 132 | OTHER | N/A | Y | |
| N/A | 133 | OTHER | N/A | Y | |
| YES | 134 | OTHER | **4 Pulls:**<br>**Pull 1:** 7/5/06 Email **(001-014)**;<br>**Pull 2:** 5/30/06 Email **(001-002)**;<br>**Pull 3:** Notes **(001-007)**;<br>**Pull 4:** 9/26/06 Flynn Email **(001-008)** | N | |
| YES | 135 | PLEADINGS | **4 Pulls:**<br>**Pull 1:** Montgomery Declaration **(001-004)**<br>**Pull 2:** Response to DOD Motion **(001-202)**<br>**Pull 3:** Montgomery Declaration **(001-023)**<br>**Pull 4:** 10/30/06 Sealed Montgomery Decl. in Response to DOD Motion for Protective Order -Signed- **(001-023)** | | Pull 1:001-004<br>Pull 2: 001-202 |

**LINER FILES: DOCUMENT INVENTORY**

| | | | | |
|---|---|---|---|---|
| YES | 136 OTHER | **4 Pulls:**<br>Pull 1: 7/5/06 Email **(001)**;<br>Pull 2: Contract Documents **(001-010)**;<br>Pull 3: Negroponte Questions **(001-005)**;<br>Pull 4: Montgomery Declaration **(001-022)** | Y | Pull 1: 001-022<br>Pull 2: |
| YES | 137 OTHER | **3 Pulls:**<br>Pull 1: 4/10/06 Park Email **(001-004)**;<br>Pull 2: 3/11/06 Flynn Declaration -Unsigned- **(001-004)**<br>Pull 3: Reply Memo for Return of Property **(001-029)** | Y | Pull 2: 001-004<br>Pull 3: 001-029 |
| YES | 138 PLEADINGS | N/A | Y | |
| YES | 139 OTHER | **30 Pulls:**<br>Pull 1: 2/2007 Flynn Declaration **(001-016)**;<br>Pull 2: 2/2007 Montgomery Declaration **(001-009**;<br>Pull 3: 2/26/2007 Email **(001**;<br>Pull 4: 2/13/2007 Email **(001-003)**;<br>Pull 5: 2/2007 Montgomery Declaration **(001-005)**;<br>Pull 6: 2/2007 Montgomery Declaration **(001-006)**;<br>Pull 7: 2/2007 Flynn Declaration in Supp of Montgomery Opp. to Govt Motion to Strike **(001-018)**;<br>Pull 8: 2/2007 Montgomery Declaration 2 copies -Unsigned-**(001-019)**;<br>Pull 9: 3/2007 Email Chain **(001-011)**;<br>Pull 10: 3/16/07 Email **(001-004)**;<br>Pull 11: Complaint for violation of false claims act **Draft-1 (001-046)**;<br>Pull 12: Complaint for violation of false claims act **Draft-2 (001-047)**;<br>Pull 13: Complaint for violation of false claims act **Draft-3 (001-044)**;<br>Pull 14: Complaint for violation of false claims act **Draft-4 (001-040)**;<br><br>**Pull 15:** Complaint for violation of false claims act Draft-5 **(001-046)**;<br>**Pull 16:** Complaint for violation of false claims act Draft-6 **(001-046)**;<br>**Pull 17:** Flynn Declaration **(001-004)**;<br>**Pull 18:** Flynn Declaration **(001-006)**;<br>**Pull 19:** Motion to Unseal **(001-017)**;<br>**Pull 20:** Flynn Declaration **(001-012)**;<br>**Pull 21:** Flynn Declaration **(001-011)**;<br>**Pull 22:** Negroponte Questions **(001-009)**;<br>**Pull 23:** Negroponte Questions **(001-006)**;<br>**Pull 24:** Negroponte Questions **(001-004)**;<br>**Pull 25:** Negroponte Questions **(001-004)**;<br>**Pull 26:** 2/9/07 Flynn Ltr **(001-005)**;<br>**Pull 27:** 2/9/07 Flynn Ltr **(001-005)**;<br>**Pull 28:** 2/9/07 Flynn Ltr **(001-003)**;<br>**Pull 29:** 3/24/07 Email **(001-002)**<br>**Pull 30:** 1/2007 Montgomery Declaration **(001-007)** | N | |

## LINER FILES: DOCUMENT INVENTORY

| | | Pulls | Description | Y/N | Notes |
|---|---|---|---|---|---|
| YES | 140 OTHER | **7 Pulls:** **Pull 1:** Transcript Excerpt **(001-005);** **Pull 2:** Transcript Excerpt **(001-005);** **Pull 3:** 8/16/06 Sealed Declaration of Montgomery -Unsigned- **(001-009);** **Pull 4:** 8/16/06 Sealed Declaration of Montgomery -Unsigned-**(001-019);** **Pull 5:** 8/16/06 Sealed Declaration of Montgomery -Unsigned- **(001-020);** | **Pull 6:** 10/06 2 Copies Sealed Declaration of Montgomery -Unsigned **(001-045);** **Pull 7:** 11/30/06 Sealed Declaration of Montgomery - Unsigned- **(001-022)** N | | |
| N/A | 141 PLEADINGS | N/A | | Y | |
| N/A | 142 OTHER | N/A | | Y | |
| N/A | 143 OTHER | N/A | | Y | |
| N/A | 144 OTHER | N/A | | Y | |
| N/A | 145 OTHER | **1 Pull:** **Pull 1:** CD | | Y | |
| N/A | 146 PLEADINGS | N/A | | Y | |
| YES | 147 OTHER | **10 Pulls:** **Pull 1:** MONT40-43 **(001-004);** **Pull 2:** MONT 288-296 **(001-008);** **Pull 3:** MONT318-337 **(001-020);** **Pull 4:** 4/13/07 Flynn Ltr **(001-018);** **Pull 5:** 2/9/07 Flynn Ltr (2 copies) **(001-010);** **Pull 6:** 6/22/06 Email **(001-002);** **Pull 7:** 6/22/06 Email **(001-005);** **Pull 8:** 3/1/06 Flynn Ltr **(001-013);** **Pull 9:** 6/23/07 Flynn Email **(001-007);** **Pull 10:** 6/23/07 Flynn Email **(001** | | Y | |
| N/A | 148 OTHER | N/A | | Y | |
| N/A | 149 PLEADINGS | N/A | | Y | |
| YES | 150 PLEADINGS | **2 Pulls:** ==Pull 1: 10/06 Draft Montgomery Response to DOD Motion for Protective Order **(001-044);**== **Pull 2:** 03/22/07 Montgomery Response to DOD Motion for Reconsideration **(001-009)** | | Y | **Pull 1: 001-044** **Pull 2: 001-009** |
| YES | 151 OTHER | **1 Pull:** **Pull 1:** 6/11/07 Montgomery Declaration **(001-004)** | | Y | |
| N/A | 152 PLEADINGS | N/A | | Y | |
| N/A | 153 OTHER | N/A | | Y | |
| N/A | 154 OTHER | N/A | | Y | |
| N/A | 155 OTHER | N/A | | Y | |

# LINER FILES: DOCUMENT INVENTORY

| Status | # | Category | Pulls | Description | Flag |
|---|---|---|---|---|---|
| N/A | 156 | PLEADINGS | N/A | | Y |
| N/A | 157 | PLEADINGS | N/A | | Y |
| YES | 158 | OTHER | **6 Pulls:**<br>**Pull 1:** 4/13/07 Flynn Ltr (**001-018**);<br>**Pull 2:** 2/9/07 Flynn Ltr (**001-010**);<br>**Pull 3:** 6/22/06 Flynn Email (**001-002**);<br>**Pull 4:** 6/22/06 Flynn Email (**001-002**);<br>**Pull 5:** 3/1/06 Flynn Ltr (**001-013**);<br>**Pull 6:** 7/26/06 Flynn Ltr (**001-007**) | | Y |
| N/A | 159 | PLEADINGS | N/A | | Y |
| N/A | 160 | OTHER | N/A | | Y |
| N/A | 161 | PLEADINGS | N/A | | Y |
| N/A | 162 | DISCOVERY | N/A | | Y |
| N/A | 163 | PLEADINGS | N/A | | Y |
| YES | 164 | OTHER | **1 Pull:**<br>**Pull 1:** 4/13/07 Flynn Ltr. (**001-009**) | | Y |
| YES | 165 | OTHER | **2 Pulls:** | **Pull 1:** CD With Document Attached (**001**)<br>**Pull 2:** CD With Document Attached (**001-030**) | Y |
| YES | 166 | OTHER | **3 Pulls:**<br>**Pull 1:** DM2845-2886 (**001-042**);<br>**Pull 2:** DM2987-2998 (**001-012**);<br>**Pull 3:** DM3145-3151 (**001-007**) | | Y |
| N/A | 167 | OTHER | N/A | | Y |
| N/A | 168 | PLEADINGS | N/A | | Y |
| N/A | 169 | OTHER | N/A | | Y |
| N/A | 170 | OTHER | N/A | | Y |
| YES | 171 | OTHER | **1 Pull:**<br>**Pull 1:** Draft Flynn Ltr (**001-008**) | | Y |
| YES | 172 | OTHER | **1 Pull:** | **Pull 1:** Potential witness list with handwritten notations (**001-002**) | Y |
| N/A | 173 | PLEADINGS | N/A | | Y |
| YES | 174 | PLEADINGS | **4 Pulls:**<br>**Pull 1:** 2/27/07 Dec of Flynn (**001-037**);<br>**Pull 2:** 6/2/06 Dec of Michael West (**001-008**);<br>**Pull 3:** 06-cv-0263 Dkt# 125 Transcript (**001-085**);<br>**Pull 4:** 3/3/06 Dec of Michael West (**001-014**) | | Y |
| N/A | 175 | PLEADINGS | N/A | | Y |

DOCUMENT INVENTORY PAGE 9

# LINER FILES: DOCUMENT INVENTORY

| | | | | |
|---|---|---|---|---|
| YES | 176 | OTHER | **2 Pulls:** <br> **Pull 1:** 4/13/07 Flynn Ltr to Cheney **(001-009)**; <br> **Pull 2:** Dec of Flynn **(001-020)** | Y |
| N/A | 177 | PLEADINGS | N/A | Y |
| N/A | 178 | OTHER | N/A | Y |
| YES | 179 | OTHER | **2 Pulls:** <br> **Pull 1:** 6/3/07 Email **(001-012)**; <br> **Pull 2:** 5/8/07 Email **(001)** | Y |
| N/A | 180 | OTHER | **1 Pull:** CD | Y |
| N/A | 181 | OTHER | **5 Pulls:** 5 CDs pulled | Y |
| N/A | 182 | PLEADINGS | N/A | Y |
| N/A | 183 | OTHER | N/A | Y |
| N/A | 184 | OTHER | N/A | Y |
| N/A | 185 | OTHER | N/A | Y |
| N/A | 186 | OTHER | N/A | Y |
| N/A | 187 | OTHER | N/A | Y |
| N/A | 188 | PLEADINGS | **1 Pull:** CD pulled | Y |
| N/A | 189 | OTHER | **1 Pull:** CD pulled | Y |
| N/A | 190 | OTHER | **1 Pull:** CD pulled | Y |
| N/A | 191 | OTHER | **2 Pulls:** 2 Hard drives removed | Y |
| N/A | 192 | OTHER | N/A | Y |
| YES | 193 | PLEADINGS | **2 Pulls:** <br> **Pull 1:** 06-cv-0263 Dkt# 103, MONT318-337 **(001-020)**; <br> **Pull 2:** MONT288-296 **(001-009)**; | Y |
| N/A | 194 | OTHER | N/A | Y |
| YES | 195 | PLEADINGS | **1 Pull:** 3/22/07 Montgomery's Response to DoD's Request for Protection Order **(001-009)** | Y |
| YES | 196 | OTHER | **1 Pull:** <br> **Pull 1:** Prayer for Relief **(001-042)** | Y |
| YES | 197 | PLEADINGS | **1 Pull:** <br> **Pull 1:** 3/11/06 Dec of Flynn **(001-006)** | Y |
| N/A | 198 | DISCOVERY | N/A | Y |
| N/A | 199 | PLEADINGS | N/A | Y |
| N/A | 200 | PLEADINGS | N/A | Y |
| N/A | 201 | OTHER | Hard drives | N |
| N/A | 202 | OTHER | Hard drives | N |

## LINER FILES: DOCUMENT INVENTORY

| | | | | |
|---|---|---|---|---|
| N/A | 203 | OTHER | | N |
| N/A | 204 | OTHER | Hard drives | Y |
| | | | N/A | |
| YES | 205 | OTHER | **8 Pulls:**<br>**Pull 1: 4/10/06 Email (001-004);**<br>**Pull 2: 10/31/07 Email (001-002);**<br>**Pull 3: 3/16-18/07 Email chain (001-004);**<br>**Pull 4: 3/16-18/07 Email chain (001-007);**<br>**Pull 5: 3/16-18/07 Email chain (001-007);**<br>**Pull 6: 6/23/07 Email (001);**<br>**Pull 7: 3/11/06 Dec of Montgomery for Return of Property -Unsigned-& 4/3/06 Reply Memo un Support of Motion for Return of Property (001-033);**<br>**Pull 8: 3/11/06 Dec of Flynn (001-004)** | Y |
| N/A | 206 | OTHER | N/A | Y |
| YES | 207 | PLEADINGS | **6 Pulls:**<br>**Pull 1: 2 CDs**<br>**Pull 2: Cover sheet and Index of Emails in "Inbox" (001-0038)**<br>**Pull 3: Index of Emails in "Sent" (001-015)**<br>**Pull 4: 1 CD**<br>**Pull 5: Index of Emails in "Inbox" (001-037)**<br>**Pull 6: Index of Emails in "Sent" (001-016)** | Y |
| N/A | 208 | OTHER | N/A | Y |
| YES | 209 | PLEADINGS | **3 Pulls:**<br>**Pull 1: Sealed Montgomery Declaration (001-036)**<br>**Pull 2: Working Chronology (001-014)**<br>**Pull 3: Sealed Montgomery Declaration (001-022)** | Y | Pull 3: 001-022 |
| N/A | 210 | OTHER | Hard drives | N |

**LINER FILES: HARD DRIVE INVENTORY**

| HARD DRIVE No. | SERIAL No. | ADDITIONAL INFO | DOJ COPY SERIAL No. | CLIENT COPY SERIAL No. |
|---|---|---|---|---|
| | | <span style="color:blue">BOX 105</span> | | |
| HD - 40 | WMAEH1731597 | Security Bag No. 075287 | | |
| HD - 41 | WCAEP1015275 | Security Bag No.075277 | | |
| HD - 42 | WMAMR1202131 | Security Bag No. 075269 | | |
| HD - 43 | ZFUG712N | Security Bag No.075256; Copy of WMA8C2315047 | | |
| HD - 44 | WMAEH1732002 | Security Bag No. 075292 | | |
| HD - 45 | 9QG8HSDQ | Security Bag No. 075273 | | |
| HD - 46 | WMA9P1151187 | Security Bag No.075284 | | |
| HD - 47 | 9QG8N147 | Security Bag No. 075245; Copy of WMAMR1203238 | | |
| HD - 48 | 6QF462VG | Security Bag No.075279; Copy of WCAEP1015275 | | |
| HD - 49 | WMAEP1123872 | Security Bag No. 075263 | | |
| HD - 50 | 3PM08V7Q | | | |
| HD - 51 | 5QD337JK | | | |
| HD - 52 | WMACK1617687 | Security Bag No. 75261 | | |
| HD - 53 | WMAEP1142476 | Security Bag No. 075286 | | |
| HD - 54 | RG0VEH9A | Security Bag No. 075290: Copy of WMAEH1732002 | | |
| HD - 55 | WMAMR1202248 | Security Bag No. 075260 | | |
| HD - 56 | WMAEH1283328 | Security Bag No.075289 | | |
| HD - 57 | WMAMR1277950 | Security Bag No.075281 | | |
| HD - 58 | WMAEH1202303 | Security Bag No. 075265 | | |
| HD - 59 | 6QF46574 | Security Bag No. 075271; Copy of WMAEH1202303 | | |
| HD - 60 | WCAL75136659 | Security Bag No. 075285 | | |

## LINER FILES: HARD DRIVE INVENTORY

| | | | | |
|---|---|---|---|---|
| HD - 61 | 7BA08HPG | Security Bag No. 075288 | | |
| HD - 62 | WMA8C2315047 | Security Bag No. 075257 | | |
| HD - 63 | WMAMR1068824 | Security Bag No. 075267 | | |
| HD - 64 | WMAMR1203238 | Security Bag No. 075246 | | |
| HD - 65 | | | | |
| HD - 66 | | | | |
| HD - 67 | | | | |
| HD - 68 | | | | |
| HD - 69 | | | | |
| HD - 70 | | | | |
| HD - 71 | | | | |
| HD - 72 | | | | |
| HD - 73 | | | | |
| HD - 74 | | | | |
| HD - 75 | | | | |
| HD - 76 | | | | |
| HD - 77 | | | | |
| HD - 78 | | | | |
| HD - 79 | | | | |
| HD - 80 | | | | |
| HD - 81 | | | | |
| HD - 82 | | | | |
| HD - 83 | | | | |
| HD - 84 | | | | |
| HD - 85 | | | | |
| HD - 86 | | | | |
| HD - 87 | | | | |
| HD - 88 | | | | |
| HD - 89 | | | | |
| HD - 90 | | | | |
| | | **BOX 116** | | |
| HD - 1 | WMA8C4544113 | Security Bag No. 033654517 | | |
| HD - 2 | WCARW0431467 | Security Bag No. 075298; Copy of WMAEH2602257 | | |
| HD - 3 | WCARW0415948 | Security Bag No. 033654510; Copy of WMAEH2694097 | | |
| HD - 4 | WCA8C3998460 | Security Bag No. 033654515 | | |
| HD - 5 | WMAEH2694097 | Security Bag No. 033654518 | | |
| HD - 6 | WCAEP1014382 | Security Bag No. 033654520 | | |

LINER FILES: HARD DRIVE INVENTORY

| | | | | |
|---|---|---|---|---|
| HD - 7 | WMAEH2602257 | Security Bag No. 033654516 | | |
| HD - 8 | WCAEP1003948 | Security Bag No. 033654519 | | |
| HD - 9 | 9QG812MG | | | |
| HD - 10 | 9QJ0RXGJ | | | |
| | | **BOX 127** | | |
| HD - 13 | WMAMR1538581 | | | |
| HD - 14 | WMAMR1612253 | | | |
| HD - 15 | WMAMR1624507 | | | |
| HD - 16 | WMA8C3243070 | | | |
| HD - 17 | WMAD15194737 | | | |
| HD - 18 | WMAD15335294 | | | |
| HD - 19 | 3CK00XXY | | | |
| HD - 20 | WMA8C1223396 | | | |
| HD - 21 | WCAD13691228 | | | |
| HD - 22 | WMAMR1673681 | | | |
| HD - 23 | WMAD16644525 | | | |
| HD - 24 | WMAMR1538197 | | | |
| HD - 25 | 3CK028W3 | | | |
| HD - 26 | WMAMR1538570 | | | |
| HD - 27 | WMAMR1509932 | | | |
| HD - 28 | WMAMR1580671 | | | |
| HD - 29 | WMAA61102098 | | | |
| HD - 30 | 2544801F3NQ0C6 | | | |
| HD - 31 | WMAMR1523649 | | | |
| HD - 32 | WMAMR1580666 | | | |
| HD - 33 | WMAMR1066012 | | | |
| HD - 34 | WMAMR1537929 | | | |
| HD - 35 | WMAMR1539942 | | | |
| HD - 36 | WMAMR1539825 | | | |
| HD - 37 | WCAD16502878 | | | |
| HD - 38 | WMAD15256807 | | | |
| HD - 39 | WMAMR1543003 | | | |
| | | **BOX 191** | | |
| HD - 11 | 9QG7CDDE | Security Bag No. 072755 | | |
| HD - 12 | 6QG31F7K | Security Bag No.072754 | | |
| | | **BOX 201** | | |
| HD - 65 | 3PM0686P | | | |
| HD - 66 | 9QM26YN3 | | | |
| HD - 67 | 9QM3FKKW | | | |
| HD - 68 | 3QD03188 | | | |
| | | **BOX 202** | | |
| HD - 69 | 3QD08W2N | | | |
| HD - 70 | 3QD0L7T0 | | | |
| HD - 71 | 9QJ0WW9R | | | |
| | | **BOX 203** | | |
| HD - 72 | 9QJ16874 | | | |
| HD - 73 | PAG2NLRC | | | |
| HD - 74 | 3QJ01RQ1 | | | |

LINER FILES: HARD DRIVE INVENTORY

| HD - 75 | 3PM0LVN8 | | | |
|---------|----------|---|---|---|
| HD - 76 | 5QG06MMH | | | |
| **BOX 210 *Labeled as defective** | | | | |
| HD - 77 | RBRAPJNA | Security Bag No. 075274; Copy of WMA8C4544113 | | |
| HD - 78 | WCARW0431405 | Security Bag No. 075255; Copy of WCAEP1003948 | | |
| HD - 79 | RG0VEMRA | Security Bag No. 075254; Copy of WMAEP1142476 | | |
| HD - 80 | WCARW0431298 | Security Bag No. 033654504; Copy of WCAEP1014382 | | |
| HD - 81 | R7CRDRKK | Security Bag No. 075293; Copy of WMACK1617687 | | |
| HD - 82 | RG0VAUYA | Security Bag No. 075278; Copy of WMAEH1731597 | | |
| HD - 83 | RG0VEMKA | Security Bag No. 075283; Copy of WCAL75136659 | | |
| HD - 84 | 9QG8LXX5 | Security Bag No. 075295; Copy of WMAMR1277950 | | |
| HD - 85 | 9Q8N28G | Security Bag No. 075248; Copy of WMAMR1202131 | | |
| HD - 86 | N/A | N/A | | |
| HD - 87 | R7CRD72K | Security Bag No. 033654508; Copy of WMAEH1283328 | | |
| HD - 88 | RBRAA9VA | Security Bag No. 033654501; Copy of WCA8C3998460 | | |
| HD - 89 | 9QG8LSVQ | Security Bag No. 075252; Copy of WMAMR1202248 | | |

**LINER FILES: HARD DRIVE INVENTORY**

| | | | | |
|---|---|---|---|---|
| HD - 90 | RG0ZLL8A | Security Bag No. 075262; Copy of WMAEP1123872 | | |

# EXHIBIT I

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

In re:  Dennis and Kathleen    )
Montgomery                     )
                               )
Michael J. Flynn,              )
                               )
          Plaintiff,           )
                               )
          vs.                  ) Case No.:  2:10-bk-18510-bb
                               )
Dennis Lee Montgomery and      )
Brenda Kathleen Montgomery,    )
                               )
          Defendants.          )
_____)

Videotaped Deposition of:   DENNIS LEE MONTGOMERY
Date:                       November 18, 2010
Reported by:                Stephanie P. Borthwick
                            C.S.R. No. 12088

Dennis Lee Montgomery  -  November 18, 2010

```
 1        Deposition of DENNIS LEE MONTGOMERY, taken on

 2   behalf of the Plaintiff, before Stephanie P.

 3   Borthwick, a Certified Shorthand Reporter,

 4   commencing at the hour of 9:20 a.m., Thursday,

 5   November 18, 2010, at the offices of Yates Court

 6   Reporters, 74967 Sheryl Avenue, Palm Desert,

 7   California.

 8   APPEARANCES:

 9        For the Plaintiff:

10            CONANT LAW, LLC

11            Attorneys at Law

12            BY:  CHRISTOPHER J. CONANT, ESQ.

13            730 17th Street

14            Suite 200

15            Denver, Colorado  80202

16            (303) 298-1800

17        For the Defendants:

18            DION-KINDEM & CROCKETT

19            Attorneys at Law

20            BY:  WILLIAM E. CROCKETT, ESQ.

21            LNR Warner Center

22            21271 Burbank Boulevard

23            Suite 100

24            Woodland Hills, California  91367-6667

25            (818) 883-4400
```

Page 2

Dennis Lee Montgomery  -  November 18, 2010

```
 1        For the United States of America:

 2            U.S. DEPARTMENT OF JUSTICE

 3            CIVIL DIVISION

 4            BY:  CARLOTTA P. WELLS, Senior Counsel

 5            Federal Programs Branch

 6            20 Massachusetts Avenue, NW

 7            Room 7150

 8            Washington, DC  20530

 9            (202) 514-4522

10     Also Present:

11            Michael J. Flynn, Esq.

12            Sharon Raya, Paralegal to Ms. Wells

13            Tom (last name withheld), U.S. Government

14            Morgan (last name withheld), U.S.

15            Government

16     Videographer:

17            Jesse Navarro, Orravan Video Litigation

18            Services

19

20

21

22

23

24

25
```

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

| | | |
|---|---|---|
| 09:15:31 | 1 | THE VIDEOGRAPHER:  Good morning.  Here |
| | 2 | begins Media No. 1 in the video deposition of Dennis |
| | 3 | Lee Montgomery in the matter of Michael J. Flynn |
| | 4 | versus Dennis Lee Montgomery, et al., in the |
| 09:19:59 | 5 | United States Bankruptcy Court of California, Case |
| | 6 | No. 2:10-bk-18510-bb. |
| | 7 | Today's date is November 18th, 2010.  The |
| | 8 | time is 9:20 a.m.  This deposition is being taken at |
| | 9 | 74967 Sheryl Avenue, Palm Desert, California, and |
| 09:20:18 | 10 | was made at the request of Mr. Christopher Conant of |
| | 11 | the law offices of Conant Law, LLC. |
| | 12 | The videographer is Jesse Navarro here on |
| | 13 | behalf of Orravan Video Litigation Services, |
| | 14 | Indian Wells, California. |
| 09:20:32 | 15 | Would counsel and all present please |
| | 16 | identify yourselves and state whom you represent. |
| | 17 | MR. CONANT:  Christopher Conant for the |
| | 18 | plaintiff, Michael J. Flynn. |
| | 19 | MR. FLYNN:  And Michael J. Flynn in |
| 09:20:41 | 20 | persona. |
| | 21 | MS. WELLS:  Carlotta Wells on behalf of the |
| | 22 | United States and with the United States Department |
| | 23 | of Justice.  Sharon Raya is with me from my office. |
| | 24 | With me, also, are Morgan and Tom, who are with the |
| 09:20:54 | 25 | government and I can't disclose anything further |

YATES COURT REPORTERS    800.669.1866

      09:20:58    1   because to do so would violate the terms of the

                  2   United States protective order, which all the

                  3   parties to the bankruptcy proceeding have agreed to.

                  4            MR. CROCKETT:  Bill Crockett on behalf of

      09:21:07    5   Dennis Montgomery.

                  6            THE WITNESS:  Dennis Montgomery.

                  7            THE VIDEOGRAPHER:  Would the court reporter

                  8   please swear in the witness.

                  9            THE REPORTER:  Please raise your right

      09:21:12   10   hand.

                 11            Do you solemnly state under penalty of

                 12   perjury that the testimony you will give in this

                 13   matter will be the truth, the whole truth, and

                 14   nothing but the truth?

      09:21:22   15            THE WITNESS:  Yes.

                 16            THE REPORTER:  Thank you.

                 17            MR. CONANT:  Okay.  Thank you.

                 18            Before we start examining the witness, I

                 19   want to state for the record that there are present

      09:21:33   20   in the room four representatives from the U.S.

                 21   Government, two of which apparently have no last

                 22   name.

                 23            We'll ask on the record of Ms. Wells to

                 24   provide their last names and the government agency

      09:21:47   25   that they purportedly work for.

Dennis Lee Montgomery  -  November 18, 2010

09:21:51  1        MS. WELLS:  And I cannot, because to do so

        2   would violate the terms of the United States

        3   protective order.

        4        MR. CONANT:  Ms. Wells, do you have a copy

09:21:57  5   of the protective order in front of you?

        6        MS. WELLS:  I do.  Do you have one?

        7        MR. CONANT:  I have a copy in front of me.

        8   I'd like to actually get it admitted as an exhibit

        9   in this deposition.

09:22:10 10        Let me -- while I work on getting extra

       11   copies to admit as an exhibit, Ms. Wells, can you

       12   review the protective order and identify which

       13   specific portion of the protective order you're --

       14        MS. WELLS:  Am I a witness now?  All I can

09:22:28 15   tell you is it's pretty self-evident from the face

       16   of the United States protective order what's

       17   protected, what isn't.

       18        The information that's protected is set

       19   forth in paragraphs 2 and paragraphs 3.

09:22:42 20        MR. CONANT:  How does those pertain

       21   specifically to the identities of these gentlemen

       22   and why they're here today?

       23        MS. WELLS:  I think it's self-evident and

       24   if you want to read those paragraphs into the

09:22:50 25   record, feel free to.

YATES COURT REPORTERS    800.669.1866

|          |    |                                                      |
|----------|----|------------------------------------------------------|
| 09:22:51 | 1  | MR. CONANT:  I don't -- well --                      |
|          | 2  | MS. WELLS:  Paragraphs 2 and 3 of the                |
|          | 3  | United States protective order, which is             |
|          | 4  | Document 253, District of Nevada Case File 30656.    |
| 09:23:02 | 5  | MR. CONANT:  Ms. Wells, who is making the            |
|          | 6  | decision regarding what is -- why these gentleman    |
|          | 7  | are here?                                            |
|          | 8  | Who in the government made a decision why            |
|          | 9  | these gentlemen are here?  Who in the government     |
| 09:23:07 | 10 | made a decision for these two gentlemen to be here   |
|          | 11 | today?                                               |
|          | 12 | MS. WELLS:  This particular deposition is            |
|          | 13 | being handled in the manner that all information     |
|          | 14 | related to this case has been handled.  It's been a  |
| 09:23:25 | 15 | joint decision between those attorneys representing  |
|          | 16 | the United States' interests and the agencies whose  |
|          | 17 | information we're protecting.                        |
|          | 18 | That's all I'm going to say.                         |
|          | 19 | MR. CONANT:  Were these gentleman at all             |
| 09:23:38 | 20 | involved in any way in the litigation in Nevada?     |
|          | 21 | MS. WELLS:  I'm not going to go any further          |
|          | 22 | than what I've already said.                         |
|          | 23 | MR. CONANT:  Were you meeting with Judge             |
|          | 24 | Pro in the U.S. District Court for the district of   |
| 09:23:49 | 25 | Nevada yesterday?                                    |

Dennis Lee Montgomery - November 18, 2010

09:23:51   1            MS. WELLS:  At Judge Pro's insistence, yes.

           2    We met with him in his chambers yesterday.

           3            MR. CONANT:  Who is "we"?

           4            MS. WELLS:  The people representing the

09:23:57   5    United States Department of Justice and the United

           6    States in this case.

           7            MR. CONANT:  Who were those?  I'm asking

           8    for the identities, Ms. Wells.

           9            MS. WELLS:  All I'm saying is that people

09:24:07  10    from the government met with him and I mean it

          11    actually -- if you really need to know, it was the

          12    four of us here.

          13            MR. CONANT:  Did Judge Pro -- when did

          14    Judge Pro contact you to meet with him?

09:24:20  15            MS. WELLS:  I'm not going to say anything

          16    more other than we're complying with the terms of

          17    the order that Judge Pro entered, I believe it was

          18    October 30th, and we were there because of that

          19    order.

09:24:32  20            MR. CONANT:  What order?

          21            MS. WELLS:  Let's see.

          22            It was the order dated October 28th, 2010,

          23    Docket No. 1172, same case, Montgomery versus

          24    eTreppid Technology.

09:25:00  25            MR. CONANT:  Were there any documents

09:25:01    1    reviewed in connection with your meeting with Judge

            2    Pro that were -- that originated from my client

            3    Michael Flynn?

            4              MS. WELLS:  This is not the subject of this

09:25:12    5    deposition.  We're not here to talk about this.  If

            6    Mr. Flynn wants to have a conversation with me about

            7    this we can have it, but it's not appropriate for

            8    the record.

            9              MR. CONANT:  It is appropriate for the

09:25:21   10    record.  You are --

           11              MS. WELLS:  It does -- what does that have

           12    to do with the information we're here to protect

           13    now?  The long and the short of it is that there

           14    were documents, as you know, from the Order that the

09:25:26   15    court in Montana sent to Judge Pro.

           16              He asked the United States to take a look

           17    at them to determine the extent to which there's

           18    information that may or may not be protected under

           19    the United States protective order.

09:25:35   20              Upon the limited review that we did in his

           21    chambers yesterday, we determined that there was

           22    enough of a question there that we need to take the

           23    documents back with us to Washington to do a more

           24    thorough review.  That's it.

09:25:50   25              MR. CONANT:  What documents did you review?

Dennis Lee Montgomery  -  November 18, 2010

09:25:51     1              MS. WELLS:  The documents that the court in

             2     Montana sent.

             3              MR. CONANT:  What documents were those?

             4              MS. WELLS:  I didn't take a list.  It's not

09:25:59     5     a very big -- it's a small pile, not even an inch

             6     thick.

             7              MR. FLYNN:  This is Michael Flynn.  I'm

             8     going to put a statement on the record.

             9              The documents that were given to David

09:26:08    10     Cotner, counsel for the trustee in the Montana

            11     bankruptcy proceeding, were very limited and I

            12     specifically reviewed them before giving them to

            13     Cotner.

            14              They were apparently subsequently given to

09:26:24    15     Judge Kirscher and they had all been previously

            16     reviewed by the federal government, Department of

            17     Justice, and approved.  And except for the Sandoval

            18     complaint, they are publicly on file in the Nevada

            19     District Court and can be picked up online.

09:26:43    20              So unless documents were added that I don't

            21     know about -- and I don't know about any of the

            22     documents, I don't have the identity of the

            23     documents that were given to Judge Kirscher or

            24     subsequently conveyed to Judge Pro -- there are no

09:26:57    25     documents that do not comply with the US protective

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

09:27:02    1    order in any way.

            2            So if either documents were added by

            3    someone or there has been a change in the position

            4    of the Department of Justice with regard to the

09:27:13    5    scope of the protective order, then there is nothing

            6    in any of the documents given to Cotner, apparently

            7    passed on to Judge Kirscher, which would violate the

            8    terms of the U.S. protective order.

            9            MR. CONANT:  Do you have a copy, Ms. Wells,

09:27:29   10    of the letter or whatever communication there was

           11    between Judge Kirscher and Judge Pro?

           12            MS. WELLS:  No.

           13            MR. CONANT:  Who at the government have you

           14    been talking to regarding the matter involving the

09:27:41   15    letter from Judge Kirscher to Judge Pro?

           16            MS. WELLS:  I'm not here to answer these

           17    questions.  I'm here to enforce the terms of the

           18    United States protective order and only people with

           19    the United States have that authority and the

09:27:53   20    ability to determine what's protected and what isn't

           21    and that's all we're here for.

           22            It's a very limited role that we're

           23    playing, it's a very limited role, and I can tell

           24    you on the record that what we're doing here today

09:28:03   25    is entirely consistent with what we've done ever

YATES COURT REPORTERS    800.669.1866

| | |
|---|---|
|09:28:07| 1 since we first got involved in this case and ever |
|| 2 since Judge Pro acknowledged there was information |
|| 3 to be protected. |
|| 4 That's all I'm going to say and I'll keep |
|09:28:12| 5 saying the same thing over and over again. |
|| 6 MR. FLYNN:  It's completely inaccurate. |
|| 7 For the record, these gentlemen, however nice |
|| 8 gentleman they may be, never participated and never |
|| 9 appeared in courtrooms in any of the Nevada |
|09:28:25| 10 proceedings, Ms. Wells, and you know it and I know |
|| 11 it. |
|| 12 So this four-person deluge from the |
|| 13 Department of Justice in Dennis Montgomery's |
|| 14 deposition is apparently being done for some reasons |
|09:28:40| 15 completely extraneous to the materials in the |
|| 16 protective order, but why don't we get started. |
|| 17 MR. CONANT:  I just want to state one last |
|| 18 thing for the record.  When I deposed Istvan Burgyan |
|| 19 in this very case on September 22nd, the U.S. |
|09:28:54| 20 Government showed no interest in this matter. |
|| 21 I had to call Mr. Gomez at his office in |
|| 22 D.C. halfway through the deposition, because there |
|| 23 became an issue regarding the protective order. |
|| 24 Mr. Gomez was completely indifferent regarding this |
|09:29:08| 25 case and now, for some reason, we have four people |

Dennis Lee Montgomery   -   November 18, 2010

09:29:11    1    here from the US government, two of who, apparently,

            2    have no last names and are from some unidentified

            3    agency with the government.

            4            And for the record, Ms. Wells is not

09:29:22    5    indicating how their involvement is at all

            6    implicated in the protective order.  The protective

            7    order only governs issues concerning intelligence

            8    agencies as defined in the National Security Act and

            9    we have no indication of what agencies these

09:29:39   10    gentlemen are with and whether they're with an

           11    intelligence agency or whether it's an

           12    administrative branch of the government that's not

           13    included within the National Security Act as an

           14    intelligence agency.

09:29:52   15            So we simply don't know what is -- what is

           16    purportedly being protected by the protective order

           17    or not.

           18            MR. FLYNN:  We think -- at this juncture

           19    I'll put on the record that I believe -- I didn't

09:30:07   20    believe it during the Nevada proceedings, I thought

           21    there were legitimate interests to be protected in

           22    terms of identities of intelligence agency

           23    individuals, but at this point I believe that the

           24    Department of Justice has gone far beyond that and

09:30:23   25    is now using, under the guise of national security

YATES COURT REPORTERS     800.669.1866

Dennis Lee Montgomery  -  November 18, 2010

09:30:26    1    for reasons related to the facts that I put in the

            2    emails to you, Carlotta, has gone far beyond the

            3    scope of national security in an effort to cover up

            4    or conceal the fraudulent activities of

09:30:40    5    Mr. Montgomery as I've repeatedly said in emails.

            6              So why don't we just start.

            7                      EXAMINATION

            8    BY MR. CONANT:

            9        Q.    Okay.  All right.  Turning to

09:30:47   10    Mr. Montgomery.  Mr. Montgomery, let's start

           11    something.

           12              Can you state your name for the record.

           13        A.    Dennis Montgomery.

           14        Q.    What's your -- do you have a middle name?

09:30:58   15        A.    Lee.

           16        Q.    Do you understand what it means to take a

           17    deposition, Mr. Montgomery?

           18        A.    Yes.

           19        Q.    What do you understand that to mean?

09:31:04   20        A.    You're going to ask me questions; I'm going

           21    to answer them.

           22        Q.    Do you know -- do you understand that your

           23    testimony today is under the penalty of perjury?

           24        A.    Yes.

09:31:13   25        Q.    Do you understand what that means?

YATES COURT REPORTERS    800.669.1866

16:59:58  1   continue this deposition subject to Judge Bluebon's

2   (phonetic) rulings on the propriety of any refusal

3   to answer in the case that there's no privilege, his

4   refusal to produce documents that we've requested

17:00:15  5   he's hid behind the Fifth Amendment privilege for.

6             THE WITNESS:  Okay.

7             MR. CONANT:  So with that, I think we'll go

8   off the record.

9             THE VIDEOGRAPHER:  This concludes today's

17:00:26  10  proceeding in the video deposition of Dennis Lee

11  Montgomery.  The total number of media used was

12  four.

13            We're going off the record.  The time is

14  5 p.m.

17:00:35  15            THE REPORTER:  Copies?

16            MS. WELLS:  Yes.

17            MR. CROCKETT:  You better send me one.

18            (The deposition was concluded at 5 p.m.)

19

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

```
 1          I hereby declare under penalty of perjury

 2   under the laws of the State of California that I

 3   have read the foregoing deposition and that the

 4   testimony contained therein is a true and correct

 5   transcript of my testimony given at said time and

 6   place.

 7          Dated this _____ day of _____,

 8   2010, at _____, _____.

 9

10

11                        _____

12                             Signature of Witness

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 343

# EXHIBIT J

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

DENNIS L. MONTGOMERY

                Plaintiff,

   v.

JAMES RISEN, ET AL.,

                Defendants.

Civil Action No. 1:15-cv-20782-JEM

---

**<u>DECLARATION OF PLAINTIFF DENNIS MONTGOMERY, IN SUPPORT OF
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION
CHALLENGING FLORIDA JURISDICTION AND VENUE</u>**

Pursuant to 28 U.S.C. §1746, I, Dennis Montgomery, hereby declare under penalty of perjury that the following is true and correct:

1) I am over the age of 18 years old and I make this affidavit on personal knowledge and belief. I am mentally and legally competent to make this affidavit sworn under oath, despite having suffered a brain aneurism and serious related health issues. *See* Exhibits 9, 10, 11, attached to this affidavit.

2) Reporter James Risen of <u>The New York Times</u> and publisher Houghton Mifflin Harcourt Publishing Company published a book <u>Pay Any Price: Greed, Power and Endless War</u> in October 2014 (hereafter "the Book").

3) In Chapter 2 of the Defendants' Book, James Risen and Houghton Mifflin Harcourt Publishing Company lie about me and my work and libel me extensively.

4) Chapter 2 involves me and James Risen focuses almost exclusively on defaming me alone to sell copies of the Book in marketing interviews. Having read the book, I am

its centerpiece, that is, Defendants "punching boy" to sell books. Risen conspicuously ignores the many other events and incidents in the Book and focuses almost exclusively on me when promoting his book for sales in Florida and elsewhere.

5) Whereas, the Defendants, especially Houghton Mifflin Harcourt Publishing Company, have great resources and no doubt have "errors and omissions" insurance to finance their legal defense, I have no money or resources at all. I lost my house in foreclosure. The Defendants will be able to afford to litigate the claims in Florida.

6) My finances, employment, career and business opportunities have been severely devastated and destroyed by the false and misleading statements made by the Defendants, contributing to the loss of my previous house in foreclosure and driving me into poverty just at the time I have also been diagnosed with serious medical problems.

7) The Defendants' published defamatory and false and misleading statements which are not opinion or hyperbole and are not fair reporting of their sources or public records. The defamation is specifically false and misleading in factually verifiable terms, including in that:

   a. Defendants published defamatory material and statements from confidential government sources in the intelligence and military communities. The false and misleading statements did not result from fair reporting of previously published material. They admit this on page ix of the Book stating, "Many people have criticized the use of anonymous sources. Yet all reporters know that the very best stories – the most important, the most sensitive – rely on them. This book would not be possible without the cooperation of may current

2

and former government officials and other individuals who were willing to discuss sensitive matters only on the condition of anonymity." Indeed, this is a big selling point of Defendants' book. It publishes new information, however defamatory, that had not been accessible or published before. This is why the Book is a bestseller in Florida and elsewhere, particularly given that Florida is at the center of U.S. Government counterterrorism military and intelligence operations, as I testify to below.

b.  The Defendants actually know that their U.S. Government sources are the ones who will bear the public blame for their own poor decisions if they do not shift the blame implausibly to me with the Defendants' concerted help.

c.  Defendant James Risen intentionally omitted several important facts while fabricating defamatory statements and stories about me.

d.  The Defendants actually knew that Warren Trepp received most of the money, yet accuse me of fraud to obtain money while excusing politically-connected Warren Trepp who took and kept the money and controlled the company.

e.  The Defendants' falsely and misleadingly state that I fabricated intelligence to make money.  In fact, eTreppid was paid for software work and analysis, not contingent upon results or conditional upon finding any terrorist threats.  Our work was complete and payment due merely for doing the analysis the CIA and other Government officials asked us to do.

f.  My software and technology did work, does work, and is still being used successfully by the U.S. Government today.

g.  The Defendants actually know that Warren Trepp has never paid back any of

the $30 million that eTreppid received from the U.S. Government nor offered to pay any of it back nor has the U.S. Government asked for any of the money back. Therefore, James Risen actually knows that his defamation of me is false and misleading. If eTreppid received $30 million from the U.S. Government for the use of my software and technology that was a purported fraud or a hoax, eTreppid would have to pay the money back to the U.S. Government. But the U.S. Government knows that my software and technology actually worked and works and is valuable, which is why eTreppid does not have to pay any of the $30 million back.

h. In fact, the Defendants ignore and intentionally omit my ten (10) patent applications, which attest to and show my expertise.

i. The U.S. Government independently tested and verified the results of my software and technology and did not rely upon my word alone. The U.S. Government officials sought me and my technology out.

j. The data detected by my software and technology did predict actual terrorist incidents and/or meetings in advance.

k. I could not have fabricated intelligence from my work, as Defendants defame me, without being certain that no one else would independently verify my work in any number of other ways available to the CIA, NSA, and military.

l. I and the companies I worked with had equal or better opportunities to provide my services to private sector companies, and had no need to work for the U.S. Government to make the same amount of money or less.

m. I was motivated by patriotism, not greed, in turning down equivalent

4

Case 2:23-cv-00045-CJN Document 182-4 Filed 08/07/23 Page 171 of 650

opportunities to provide services to the private sector to answer requests for help in the war on terror by the U.S. Government.

n. The Central Intelligence Agency ("CIA") wanted experts to analyze Al Qaeda videos.

o. It was the CIA who proposed to eTreppid that we would analyze Al Qaeda videos. The defamation of me states that I fraudulently sold the CIA and U.S. Government on a fantasy using fabricated intelligence. In fact, the CIA and the U.S. Government approached us with what they wanted analyzed.

p. The Defendants actually knew that Warren Trepp closed the "sales" of contracts by persuading the U.S. Government, yet falsely accuse me of selling a fantasy of fabricated intelligence to the U.S. Government, while excusing Trepp, as a fraudulent scheme to obtain money.

q. Defendants' falsely state that I persuaded the President George W. Bush to ban international passenger aircraft from entering U.S. airspace and nearly shoot down passenger aircraft. However, I never provided any interpretation of what the hidden data we uncovered meant. We merely provided the uncovered data to the U.S. Government experts for their interpretation. Even when pressed, I refused to offer any national security interpretation of the data.

r. As obvious from the records and documents that the Defendants rely upon, the Defendants' so-called sources Michael Flynn, Tim Blixseth, and Warren Trepp went to extraordinary and expensive legal and extra-legal (self help) efforts to furiously get ownership of my work as being extremely valuable,

while simultaneously stating that my work had no value.

s.   Michael Flynn, Tim Blixseth, and Warren Trepp were attempting to invoke

the fraud exception to bankruptcy laws to invalidate my bankruptcy, and

therefore the Defendants knew that they had motives to fabricate or embellish

their false statements against me.

t.   The public records that the Defendants claim to be relying upon – though

voluminous – overwhelmingly contradict the Defendants defamation of me.

u.   On September  28, 1998, I and Warren Trepp co-founded eTreppid

Technologies ("eTreppid") based on  a "Contribution Agreement" of that date

in which we agreed to own the LLC in equal 50% shares. Trepp put up money

and I conveyed his "software compression technology contained on CD No.

1" to eTreppid. The business plan of eTreppid and the application of the

"compression technology" were to compress VHS videotapes used for

surveillance in casinos for archiving and more efficient storage.  Over the

preceding 20 years I developed and copyrighted other types of software

technology, including but not limited to "Object Detection Software" which is

a crucial component of, among other things, colorizing black and white

movies.  In order for the computer to add color, it must be able to recognize

individual objects in the movie which are moving in three dimensions, (that is

moving toward or away from the camera and changing in apparent size),

aspect angle, orientation, etc.  This was not conveyed to eTreppid and which,

per the terms of the "Contribution Agreement", was expressly excluded.

Shortly after the formation of eTreppid, I offered to sell one part of his

6

"Object Detection System" ("ODS") software to Warren Trepp for the sum of $10 million dollars, which Trepp rejected.

v. As reflected in a form SF-95 Attachment A prepared by me with my then attorney Michael Flynn for presentation to the Government, "Beginning on or about November 2002, on behalf of the US Air Force, Montgomery began work on military applications of his technology at Eglin Air Force base [in Florida] to demonstrate the application of his technologies in the war on terror."

w. Defendants make the technically absurd and false statement that "The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers," only by falsely misrepresenting that the data was contained only in the "crawl" at the bottom of the screen. This falsified and misleading misdirection and deception to focus only on the crawl is deceptive. It is patently unbelievable, which Defendant Risen should have known as an expert in national security, that a television signal could not contain such simple data as latitude and longitude coordinates, consisting of only six numbers and two letters (East or West longitude, North or South latitude).

8) I am a citizen of the State of Florida, with a residence in an apartment community in Miami, Florida. I have a Florida telephone number in this district. I am reporting my address and Miami-Dade, Florida phone number under seal.

9) I am registered to vote in Florida, as shown in Exhibit 1, attached to this affidavit. I previously had a temporary address while settling on the permanent address that I

have now.  I have updated my voter registration to reflect my current Miami address.

10) I have reviewed the affidavit of defense counsel Laura Handman attached to the

Defendants' motion stating that I had not registered to vote in Florida.  The

Defendants' affidavit is false.  I am registered to vote in the State of Florida, and am

now updating my voter registration with my new address. I was registered to vote in

Florida when Ms. Handman signed her affidavit. She misled this Court.

11) I found on the website of the publisher Houghton Mifflin Harcourt, that Houghton

Mifflin Harcourt Publishing Company maintains permanent and general offices in

Orlando, Florida at 9400 Southpark Center Loop, Orlando, Florida 32819. Exhibit 2,

attached to this affidavit, which I downloaded from the Defendant publisher's website

at  http://www.hmhco.com/about-hmh/our-offices.  These are statements made by the

Defendants about themselves.

12) On the website of the Florida Department of State Division of Corporations, I found

that Defendant Houghton Mifflin Publishing Company is registered to do business in

Florida through the Florida Department of State Division of Corporations. Exhibit 3,

attached to this affidavit, which I downloaded from the Florida Department of State's

website.

13) As shown in those Florida Government documents, in 2008 Defendant changed its

name from "Houghton Mifflin Harcourt" to "Houghton Mifflin Publishing

Company." *Id.*  These are statements made by Defendants about themselves.

14) My research of the publisher also uncovered that Defendants rely significantly upon

sales in the Southeast of the United States through a company "Amazon" for very

substantial sales over the internet.  Amazon's regional distribution centers or

"fulfillment centers" are located in Ruskin, Florida in Hillsborough County and Lakeland, Florida, in Polk County. *See* Exhibit 4, attached to this affidavit.

15) Much of the defamation which my lawsuit contests is contained within the physical product physically shipped into Florida for sale, the Book written by James Risen and published by Houghton Mifflin Harcourt Publishing Company.

16) In 2012, Edra Blixseth brought Chris Pipes, from the U.S. Special Operations Command ("SOCOM") from MacDill Air Force Base in Florida to our Palm Desert offices. SOCOM was interested in pursuing object tracking, mass surveillance, and research on cloaking technologies. Chris Pipes met at our facility, with a representative of the CIA. While he was in our building, Chris Pipes then received a telephone call from SOCOM in Florida, and then told us that SOCOM could not pursue the technology because of what was written about me in the news media. Exhibit 18, attached to this affidavit.

17) SOCOM is the Unified Combatant Command charged with overseeing the various Special Operations Component Commands of the Army, Air Force, Navy and Marine Corps of the United States Armed Forces. The command is part of the Department of Defense and is the only Unified Combatant Command legislated into being by the U.S. Congress. SOCOM is headquartered at MacDill Air Force Base in Tampa, Florida. *See*, Exhibit 12, attached to this affidavit.

18) U.S. Central Command ("CENTCOM") is a theatre-level Unified Combatant Command of the U.S. Department of Defense, established in 1983. CENTCOM Area of Responsibility includes countries in the Middle East, North Africa, and Central Asia, most notably Afghanistan and Iraq. CENTCOM has been the main American

presence in many military and intelligence operations. It is headquartered in Tampa, Florida. *See*, Exhibit 12, attached to this affidavit.

19) The Defendant author James Risen actually knew or should have known that most of my work was with U.S. Government organizations in Florida and the contracting offices for my work are in Florida. A competent Pulitzer Price winning <u>New York Times</u> reporter who wrote the Book over a four-year period from 2011 through 2014 would have reviewed the <u>Wall Street Journal</u> article from November 1, 2006, attached, which includes the explanation:

### Source of Secret Funds

**One source of secret funds for eTreppid and other companies is the Special Operations Command. Based in Tampa, Fla., the command fields special-operations military and intelligence forces around the globe and is at the forefront of the fight in Iraq and Afghanistan. It has also been rocked by a criminal investigation of a former contracting officer. The investigation is continuing, according to a spokesman for the U.S. attorney in Tampa.**

In a separate inquiry, Pentagon investigators last year found evidence that the command kept special accounts for "unrequested congressional plus-ups," or earmarks. The plus-ups were used to reward lawmakers with projects in their districts, according to declassified investigators' notes reviewed by <u>The Wall Street Journal</u>. The Pentagon's inspector general closed the inquiry after finding that the accounts weren't illegal.

Mr. Trepp said eTreppid won classified work on its merits and already had a number of government contracts before Mr. Gibbons starting making introductions on the company's behalf. Mr. Gibbons's campaign manager, Robert Uithoven, said the congressman has been a strong supporter of new defense technology, particularly after 9/11. But he said there was "no quid pro quo whatsoever" for contributions from contractors. And while some funding was secret, "it was because of the sensitive nature of the work," Mr. Uithoven said, not to avoid public scrutiny.

Case 1:21-cv-00445-CJN   Document 182-1   Filed 08/07/22   Page 177 of 650
Case 1:15-cv-02782-JEM   Document 40-1   Entered on FLSD Docket 04/27/2015   Page 12 of
150

For Mr. Trepp, eTreppid's success at winning multimillion-dollar
federal contracts marks a comeback from his Drexel days. He sat at
Mr. Milken's right arm on the firm's famous X-shaped trading desk
in Beverly Hills, sometimes trading as much as $2 billion in
securities a day. Federal regulators filed a civil securities-fraud
claim against him in 1995, and a Securities and Exchange
Commission administrative judge found that his violations had
been "egregious, recurring and intentional." But she dismissed the
proceeding against him, noting that the allegations were old and he
had left the securities business years earlier. (Emphasis added).

20) This article and dozens of others, as well as court documents, caused Risen to know

or he should have known upon reasonable inquiry over four years that Warren Trepp

was furiously trying to take ownership of my software and technology, which directly

calls into question his self-serving false statements that the software and technology

he was trying to acquire rights to was worthless.  The same article also reports:

Mr. Gibbons also got other, unreported gifts of cash and casino
chips from Mr. Trepp, according to sworn testimony in a civil
lawsuit brought by a former executive at eTreppid, Dennis
Montgomery. The suit, filed in February in federal court in Reno,
involves a dispute between Messrs. Trepp and Montgomery over
the rights to certain software code . . .

The suit has raised alarms in Washington because of concern that
national secrets will be revealed if it goes to trial. For example, one
of the entities that funded eTreppid is code-named Big Safari and
is a classified program, documents in the case show. The nation's
top intelligence official, John D. Negroponte, recently filed a
statement with the court seeking to seal the case. He wrote that
after personally reviewing the matter, he has concluded that
disclosure of some information connected with the case could do
"exceptionally grave damage" to national security.

21) My greatest opportunities for employment, business, and/or an income are at either

Macdill Air Base near Tampa, Florida and Eglin Air Force Base near Fort Walton

Beach, Florida, which is at the center of U.S. Government intelligence and

counterterrorism operations. *See* Exhibit 12, attached to this affidavit.

11

22) As a result, I have settled in Florida not just for professional reasons but also because of my failing health and desire to enjoy Florida at this stage in my life. Florida has no personal income tax as well as a Homestead exception should I buy a home. Florida is a great place to live.

23) In 2011, I incorporated a business with a partner in Florida to contract with the military and U.S. Government at bases in Florida to continue the same type of services and software and technological work that I had performed under eTreppid and BLXWARE. This business was named Alex James LLC, which I incorporated through the "Legal Zoom" service company. I set up the articles of incorporation, paid for and set up this company. Judy Crowhurst is the woman I chose to run it. Exhibit 17, attached to this affidavit.

24) Exhibit 5, attached to this affidavit, presents the papers I processed through the "Legal Zoom" company and my payment information paying for the company in Florida in 2011.

25) As an expert in national security issues, Defendant James Risen knows that the war in Afghanistan was and is run largely from Florida electronically and by drone controllers located in Florida. For instance, following September 11, 2001, General Tommy Franks rarely set foot in Afghanistan and fought the war from U.S. Air Force Bases in Florida, including from SOCOM and CENTCOM. This explains my work with SOCOM and CENTOM in large part and why it continued there.

26) Defendant James Risen also knows that the U.S. military leadership and personnel are concentrated mainly in Florida. Because U.S. military servicemen can choose their state of residence despite being deployed elsewhere, Florida's lack of an income tax

makes Florida a very attractive State for U.S. servicemen, often poorly paid.  As a result, most of the nation's top military leaders, current and former servicemen, chose Florida as their residency.

27) Defendant Risen knew in publishing the Book that Florida is an enormous market as the nation's now third largest State, including Florida's significant military and intelligence and counterterrorism personnel, with many retirees (including retired U.S. Government employees in the military and intelligence fields) with more time to read books than the average American. For instance, former Secretary of Defense Donald Rumsfeld now lives in Florida, as well as former Chairman of the U.S. Senate Intelligence Committee and CIA Director Porter Goss, who lives in Miami.

28) The team on which I worked had contracts directly with the intelligence agencies at the military bases **in Florida**.  I have video showing the work.  The contracting officers are out of those military bases, many of which are classified. I met and worked with CIA officials in Florida at various military bases.  However, I cannot identify here the exact units stationed at those bases, which is classified information. Exhibit 19, attached to this affidavit.

29) We at eTreppid and later BLXWARE did most of our work with units stationed at MacDill Air Force Base and Eglin Air Force Base, whose identity is secret.  *See* February 14, 2004, "Order for Supplies or Services" attached, with the "Ship To" address of UQ USSOCOM/SOAL-SP (Mohr), 7701 Tampa Point Boulevard, MacDill Air Force Base, Florida 33621.

30) Most of the payments for our work, the work I did for eTreppid and later BLXWARE, came out of the CIA offices in Florida and SOCOM, the U.S. Special

Operations Command of the U.S. military at Macdill Air Force Base, Florida.

31) SOCOM of the U.S. military is located at 7701 Tampa Point Boulevard, MacDill Air Force Base, Florida. *See* Exhibit 6, attached to this affidavit.

32) CENTCOM of the U.S. military is located at MacDill Air Force Base near Tampa, Florida. *See* Exhibit 7, attached to this affidavit.

33) Relating to my work conducting surveillance of international communications, major fiber optics cables run from Florida across the ocean, which is partly why my work opportunities for my experience and capabilities are in Florida.

34) I intend to call witnesses who can testify that my defamed software and technology does indeed work and is not a hoax. These witnesses are personnel based at Macdill Air Base near Tampa, Florida and at Eglin Air Force Base near Fort Walton Beach, Florida, where I did a lot of his work. The organizational units housed at Macdill and Eglin used my software, technology, and work extensively during the time period addressed by Defendants' defamation of me. Those witnesses will testify and thus help me prove that the defamatory statements about me are indeed false and misleading.

35) Relevant officials at Macdill and Eglin (and all facilities that my work has provided services to anywhere) make their own contracting decisions and do not rely upon contracting offices in Washington, D.C., nor even at the CIA in Langley, Virginia, the Pentagon in Arlington, Virginia, or the NSA in Fort Meade, Maryland.

36) Many of the witnesses in this case, with whom I have worked, are largely in Florida, including, but not limited to:

Goss, Porter, former Director of CIA, now in Miami, Florida

Johns, Ken, Macdill AFB, Florida

Lyons, XXXXX, Macdill AFB, Florida

Macbeth, W. Rhys, Eglin AFB, Florida

Nazelrod, Craig, Eglin AFB, Florida

Pipes, XXXXX, Macdill AFB, Florida

Roche, James, Macdill, Florida

Rumsfeld, Donald, now in Florida

Stillman, Phillip, Attorney for Dennis Montgomery, now in Miami, Florida

Madden, Tom, Boca Raton, Florida

Olivia, Adrian, Eglin AFB, Florida

Bartholomew, Mary L, Eglin AFB, Florida

Fiamengo, Nicholas A, Eglin AFB, Florida

Freeman, Gregory J, Eglin AFB, Florida

Savage, Cynthia, Eglin AFB, Florida

McCool, John C, Eglin AFB, Florida

Temple, James K, Eglin AFB, Florida

Griffin, Susan M., Macdill AFB, Florida

Russell, Deborah, Macdill AFB, Florida

Nettelhorst, Doug M, Macdill AFB, Florida

Stallworth, Hugh T, Macdill AFB, Florida

Bob McCaskey, Macdill AFB, Florida

Crutchfield, Chris, Macdill AFB, Florida

Melnyk, Michael S., Macdill AFB, Florida

Lopez, Tina M, Macdill AFB, Florida

Cerny, Jeffrey D., Macdill AFB, Florida

Muccio, Anthony B., Eglin AFB, Florida

McKinney, Scott E Lt.Col., Eglin AFB, Florida

Purvis, Brad Civ, Eglin AFB, Florida

'Kirsch, Jim', Eglin AFB, Florida

Hughes, Stacey L, Eglin AFB, Florida (*See* Exhibit 13, attached to this affidavit).

37) Ultimately, I became aware that James Risen had published these false reports in the Book and that Risen was conducting a nationwide publicity campaign to sell the Book.

38) I heard and watched James Risen repeatedly in national  and radio interviews discussing his book but primarily about me, mostly ignoring and intentionally omitting the rest of his Book in those interviews while attacking and defaming me as a private individual.

39) In radio, television, and newspaper interviews, James Risen mainly focused on slandering me in order to sell the Book in Florida and elsewhere.

40) Risen's appearances on radio and television were not just commentary but attempts to stimulate the sale of books inside Florida and elsewhere.

41) Risen was speaking on the radio and television shows in order to move books off of Florida bookstore shelves and to the checkout counters in Florida and elsewhere.

42) The defamation by Defendants of me is not a criticism of the U.S. Government in the District of Columbia, but *excuses* the U.S. Government as an innocent and unsuspecting victim, while blaming me. Therefore, the U.S. Government has not

suffered harm within Washington, D.C.

43) I had relatively little contact with the U.S. Government in Washington, D.C., Maryland or Virginia. It was the companies that I worked under, eTreppid and later BLXWARE, who contracted with regional offices at various U.S. Government bases or facilities. I interacted almost entirely with technical people pursuant to the contracts.

44) It was Warren Trepp and later Edra Blixseth who used their contacts with the U.S. Government to seek and arrange contracts for our work. I did not persuade the U.S. Government to hire me, Trepp and Blixseth did. My own interaction with offices or officials in Washington, D.C. was very limited because I was not the one running the companies nor primarily interacting with the U.S. Government.

45) Starting as early as 2011, I was contacted by James Risen asking about my secret work under contract for the U.S. Government in support of anti-terrorism efforts.

46) I see that in James Risen's Declaration attached to the Defendants' Motion to Dismiss, Risen states that he has been working on the Book since 2011.

47) I continually provided numerous warnings, in writing, to James Risen that the false statements he mentioned and later published in October 2014 in the Book are false.

48) However, James Risen attempted to blackmail me by demanding that I provide classified documents and information to him or else he would publish the false and misleading statements that he later did publish in the Book. That is, when I warned him that the reports were false and misleading, James Risen responded to me by telling me that he would not publish those false statements if instead I provided him with classified information and documents. That is, James Risen demanded that I

commit multiple crimes as the price for Risen not publishing the false and misleading reports about me.  Of course, I refused to be blackmailed into breaking the law as the price for not being defamed.

49) Writers Aram Roston and James Risen were both after John Brennan's information. They both knew that I had worked for John Brennan. Both wanted his emails.

50) Roston and Risen published false and defamatory information about me to try to pressure me into releasing classified information about John Brennan and others in the war on terror to them as the price for them telling the truth.

51) However, Roston and Risen knew that my work was real and legitimate, because they sought to obtain secret and classified information from Brennan from me.

52) Roston and Risen published defamation about me to punish and pressure me for not illegally disclosing classified information and material to them.

53) In both cases, I told Risen and Roston I would have to turn over classified information, a road I wasn't willing to go down. I was never what they were after. They were writing these stories to hurt me so that I would provide classified information about the various administrations. I was just their pawn.

54) Attached to this affidavit as Exhibit 8 are a few of my communications to James Risen informing him in advance of the publication of the Book that his statements were not only false but preposterous and that his sources were clearly unreliable.

55) In fact, on November 1, 2012, discussing the Book that he was then writing, I warned James Risen under the email address "TheAgencyInsider@Hotmail.com" that his reporting was false including because Warren Trepp was the CEO of eTreppid and kept all the money. *See* Exhibit 8, attached to this affidavit.

56) Risen also promised in that same email thread: "If you give us the Brennan emails, we will write a story." *See* Exhibit 8, attached to this affidavit.

57) However, this response was in the context of a long back-and-forth discussion concerning the falsehood of Risen's false and misleading statements against me.

58) Risen also promised in the attached email thread: "As I said on the phone, I protect my sources. I will never divulge the identify of my sources in a leak investigation. But I also have to know that the source is telling me the truth. Jim"

59) So Risen admitted that it was his professional responsibility to determine that the sources he used to defame me are telling the truth. But Risen did not do that. The sources he relied upon were obviously not telling the truth, as is patently obvious.

60) I warned James Risen concerning the falsehood of his reporting in that November 1, 2012, email thread, attached:

> There is a reason the CIA and NSA were there, you must know that.
>
> Do you really think the government invoked the State Secrets Privilege from being embarrassed or conned? Negroponte in his in camera declaration, if ever released, was spell it all of out.
>
> They government never wanted information to come out regarding the other work. The program started out spying on terrorist, and under Obama quickly moved to spying on Americans!! A program which was started by Brennan in 2003 and continues to this day. This technology is being used today to spy on Americans, including candidate Romney.
>
> I don't see you ever publishing that information? *See* Exhibit 8[1],

attached to this affidavit.

---

[1] While my counsel turned over these initial disclosures to Defendants' counsel, Defendants did not turn over initial disclosure documents to my counsel in violation of the Court's Order of April 1, 2015. I have asked my counsel to file a motion for order to show cause.

61) Furthermore, this November 1, 2012, exchange concerning Risen's plans writing the Book which was eventually published on October 14, 2014, was seven (7) months before the revelations by Edward Snowden that mass surveillance of Americans was occurring. Therefore, Risen actually knew in 2013 that I was telling the truth and was being lied about by his so-called sources. My discussions with James Risen on November 1, 2012, were proven true in mid-2013. Therefore, Risen had actual knowledge that I was indeed a whistleblower and that the sources he relied upon were falsely discrediting me to cover up wrong-doing. In this, of course, Pulitzer Prize winning <u>New York Times</u> reporter James Risen intentionally and falsely omitted the real story.

62) I made it clear to James Risen, in the phone call referenced in the email, that the Obama administration used mass surveillance technology to alter the 2012 election *in* **Florida**, and that they will use the technology again in 2016.

63) In June of 2012, in a telephone call, I told James Risen and Eric Lichtblau that their information about me in their 2011 <u>New York Times</u> story was incorrect, and they needed to correct it. I also made it clear that I was under a federal court Protective Order in Nevada, and a State Secrets Privilege order by the Director of National Intelligence not allowing me to discuss my work. In addition, there were sealed documents still in the Nevada case. I also made it clear, that the State secrets privilege was also issued, to protect the work I did on domestic surveillance. I told them I knew they met with my ex attorney Mike Flynn, for several days, in regards to their story, and suggested, he had other motives for his conduct.

64) I also made it clear in June of 2012 that I had a brain aneurysm that was going to be

repaired soon, and a risky procedure, and wanted my name cleared in case I died.

65) Therefore, the Defendants believed they could get away with their defamation because I would probably die in the meantime.

66) In 2013, going over Risen's and Lichtblau's heads, I sent emails directly to the editors of <u>The New York Times</u> telling them their story was wrong and to retract it.

67) I sent an email to the Editors of <u>The New York Times</u>, demanding that they correct the false reporting about me in 2012.

68) I believe that <u>The New York Times</u> conveyed my emails requesting a retraction of the false statements to James Risen.

69) In 2012-2014, on at least 10 different occasions I made it clear to Aram Roston of Playboy that his story was wrong and told him to retract it.

70) Carlotta Wells, a U.S. Department of Justice attorney assigned to matters involving me, told me that if I talk to the press or leaked information, I will be charged with treason for disclosing my work with the NSA and CIA.  She told me when I signed my Top Secret clearance, I forfeited my right to protect my first amendment rights.

71) Carlotta Wells additionally said that "If the US Government wants to leak false information to the press to hide successful work, and to confuse terrorist groups, they will do it irrespective of my rights. Deal with it!"

72) Carlotta Wells also stated to me and Jack Kemp, about my legal matters with the CIA that "I [Carlotta Wells] am just a foot solder doing what I am told of to do from the White House.  I don't agree with their strategy, but that is the way it is."  Jack Kemp replied, "You are a senior litigation attorney for the DOJ, hard for me to believe that you were listening to them."  Carlotta Wells in turn replied "Take it up with you

friend George Bush."

73) I am personally aware that, through my counsel, two separate letters were sent to executives at Houghton Mifflin requesting a retraction of the false and misleading publication.

74) The first letter was sent on January 14, 2015 to Linda K. Zecher, President and Chief Executive Officer and Director of Houghton Mifflin Harcourt, William Bayers, Executive Vice President and General Counsel, and Houghton Mifflin Harcourt located in Boston. *See* Exhibit 14, attached to this affidavit.

75) The second letter was sent on February 13, 2015, pursuant to Florida Statute § 770.02 again requesting a retraction of the false and misleading published statements. *See* Exhibit 15, attached to this affidavit.

76) On January 20, 2015, I, through my counsel, received a letter from David Eber, cc'ing James Risen and William Bayers, declining to redact the false and misleading statements and also declining to meet my counsel to resolve matters amicably. *See* Exhibit 16, attached to this affidavit.

I hereby swear under oath and penalty of perjury that the foregoing facts are true and correct to the best of my personal knowledge and belief:

April 27, 2015

//Dennis Montgomery//

Mr. Dennis Montgomery

# Exhibit 1

State of Florida Voter Lookup | Voter Detail                    Page 1 of 1
Case 1:21-cv-00445-CJN   Document 182-4   Filed 08/07/23   Page 190 of 650
Case 1:15-cv-23732-JEM   Document 40-1   Entered on FLSD Docket 04/27/2019   Page 25 of
150



Voter Registration as of: 4/7/2015     Republican: 4,183,006     Democrat: 4,613,370     Other: 3,212,454     Total: 12,008,830

# Check Your Voter Status

# Verifique su estado como votante

**Below is your voter information as it appears on your voter record.**

**A continuación encontrará sus datos de votante según nuestros registros.**

Full Name
Nombre completo : **DENNIS LEE MONTGOMERY**

Street Address
Dirección : ▮▮▮▮▮▮▮▮▮

City
Ciudad : **MIAMI**

Zip Code
Código postal : ▮▮▮▮

County Name
Condado : **MIAMI-DADE**

Voter Gender
Género del votante : **Male**

Date Of Registration
Fecha de inscripción : **02/23/2015**

Party
Partido : **Republican Party Of Florida**

Voter Status
Calificación como votante : **Active***

**The following 2 links will take you to your County's Supervisor of Elections Website where you can get additional information on:**

**Los siguientes dos vínculos lo conectarán con el Sitio de su Supervisor de Elecciones del Condado para obtener información sobre:**

Your Absentee Ballot Status. /
Estado como votante en ausencia.

Your Precinct Location. /
Localización de su Distrito.

*An active voter refers to a registered voter who is eligible to vote.
*El votante activo es un votante inscripto en el padrón, que cumple con los requisitos necesarios para votar.

New Search / Nueva búsqueda

If you are experiencing a problem with this web site please email BVRS Help for assistance.
Si tiene problemas con esta página web por favor contáctese con correo electrónico BVRS Help con la División de Elecciones.
Florida Department of State Division of Elections Accessibility Privacy Policy Contact Us

# Exhibit 2

Houghton Mifflin Harcourt: Our Offices                                    Page 1 of 2

Case 1:15-cv-20082-CJN   Document 182-4   Filed 08/07/22   Page 192 of 650
Case 1:15-cv-20782-JEM   Document 40-1   Entered on FLSD Docket 04/27/2015   Page 27 of 150



# Corporate Headquarters

**Boston**
222 Berkeley Street
Boston, MA 02116
(617) 351-5000

# United States Offices

**Austin**
10801 North Mopac Expressway
Austin, TX 78759
(512) 721-7000

**Denver**
5680 Greenwood Plaza Blvd
Suite 550
Greenwood Village, CO 80111
(303) 504-9312

**Evanston**
909 Davis St # 300
Evanston, IL 60201
(847) 869-2300

**Geneva**
1900 South Batavia Avenue
Geneva, IL 60134-3399
(630) 232-2550

**Indianapolis**
2700 North Richart Avenue
Indianapolis, IN 46219

**Itasca**
761 District Drive
Itasca, IL 60143

**New York City**
215 Park Ave S # 12
New York, NY 10003-1621
(212) 420-5800

345 Seventh Avenue
New York, NY 10001

**Orlando**
9400 Southpark Center Loop
Orlando, FL 32819
(407) 345-2000

**Portsmouth**
361 Hanover Street
Portsmouth, NH 03801

Houghton Mifflin Harcourt: Our Offices                    Page 2 of 2

Case 1:21-cv-00445-CJN   Document 182-4   Filed 08/07/22   Page 193 of 650
Case 1:15-cv-16782-JEM   Document 401   Entered on FLSD Docket 04/27/2019   Page 28 of 150

**Puerto Rico**
B7 Calle Tabonuco, Suite 1410
Guaynabo, PR 00968-3003
(787) 520-9599/9585

**Rolling Meadows**
3800 Golf Road
Rolling Meadows, IL 60008
(630) 467-7000

**Troy**
465 South Lincoln Drive
Troy, MO 63379
636-528-8110

**Wilmington**
181 Ballardvale Street
Wilmington, MA 01887
(978) 661-1300

# International Offices

**Canada**
4200 Boulevard St. Laurent
Suite 1203
Montreal, Qc H2W 2R2
Tel: (514) 598-0444

**China**
59 A Zhongguancun Street
Haidian District
Room 1004
HMH
Beijing, 100872
Tel: 86 10 62602236

**Dubai**
Standard Chartered Tower, Level 5
PO 35482, Emaar Square,
Downtown Burj Khalifa
Dubai
United Arab Emirates

**Ireland**
152 – 160 Pearse Street
Dublin 2
Ireland
Tel: +353 1 240 5900

**Singapore**
67 Ubi Road 1
#05-08 Bizhub
Singapore 408730
Tel: +65 6635 6825

**South Korea**
#501 KGIT SangAm Center
1601, SangAm-dong
Mapo-gu, Seoul
123-913, S. Korea
Tel: +82 (0)2 6393
5790/5792

# Exhibit 3

Case 1:21-cv-00445-CJN Document 182-4 Filed 08/07/22 Page 195 of 650

Division of Corporations **803695** Page 1 of 1

# Florida Department of State
Division of Corporations
Public Access System

### Electronic Filing Cover Sheet

**Note! Please print this page and use it as a cover sheet. Type the fax audit number (shown below) on the top and bottom of all pages of the document.**

(((H08000044388 3)))



H080000443883ABC2

**Note: DO NOT hit the REFRESH/RELOAD button on your browser from this page. Doing so will generate another cover sheet.**

To:
    Division of Corporations
    Fax Number     : (850)617-6380

From:
    Account Name   : C T CORPORATION SYSTEM
    Account Number : FCA000000023
    Phone          : (850)222-1092
    Fax Number     : (850)878-5926

## OR AMND/RESTATE/CORRECT OR O/D RESIGN

### HOUGHTON MIFFLIN COMPANY

| Certificate of Status | 0 |
|---|---|
| Certified Copy | 0 |
| Page Count | 03 |
| Estimated Charge | $35.00 |

Electronic Filing Menu     Corporate Filing Menu     Help

# PROFIT CORPORATION
## APPLICATION BY FOREIGN PROFIT CORPORATION TO FILE AMENDMENT TO
## APPLICATION FOR AUTHORIZATION TO TRANSACT BUSINESS IN FLORIDA
(Pursuant to s. 607.1504, F.S.)

### SECTION I
(1-3 MUST BE COMPLETED)

8621.95
(Document number of corporation (if known)

1. HOUGHTON MIFFLIN COMPANY
(Name of corporation as it appears on the records of the Department of State)

2. Massachusetts                                    3. 03/27/1930
(Incorporated under laws of)           (Date authorized to do business in Florida)

### SECTION II
(4-7 COMPLETE ONLY THE APPLICABLE CHANGES)

4. If the amendment changes the name of the corporation, when was the change effected under the laws of

its jurisdiction of incorporation? 12/12/2007

5. Houghton Mifflin Harcourt Publishing Company
(Name of corporation after the amendment, adding suffix "corporation," "company," or "incorporated," or
appropriate abbreviation, if not contained in new name of the corporation)

(If new name is unavailable in Florida, enter alternate corporate name adopted for the purpose of transacting
business in Florida)

6. If the amendment changes the period of duration, indicate new period of duration.

(New duration)

7. If the amendment changes the jurisdiction of incorporation, indicate new jurisdiction.

(New jurisdiction)

8. Attached is a certificate or document of similar import, evidencing the amendment, authenticated not more than
90 days prior to delivery of the application to the Department of State, by the Secretary of State or other official
having custody of corporate records in the jurisdiction under the laws of which it is incorporated.

(Signature of a director, president or other officer - if in the hands
of a receiver or other court appointed fiduciary, by that fiduciary)

Kathleen Rideout
(Typed or printed name of person signing)

Ass't Secretary
(Title of person signing)



The Commonwealth of Massachusetts

Secretary of the Commonwealth

State House, Boston, Massachusetts 02133

William Francis Galvin
Secretary of the
Commonwealth

February 14, 2008

TO WHOM IT MAY CONCERN:

I hereby certify that

**HOUGHTON MIFFLIN COMPANY**

appears by the records of this office to have been incorporated under the General Laws of this Commonwealth on May 18, 1908.

I also certify that by Articles of Amendment filed here December 12, 2007, the name of said corporation was changed to

**HOUGHTON MIFFLIN HARCOURT PUBLISHING COMPANY**

I also certify that so far as appears of record here, said corporation still has legal existence.



Processed By crm

In testimony of which,

I have hereunto affixed the

Great Seal of the Commonwealth

on the date first above written.

*William Francis Galvin*

Secretary of the Commonwealth

# Exhibit 4



# Amazon confirms fulfillment centers in Ruskin, Lakeland



**Susan Thurston, Times Staff Writer**

**Tuesday, October 22, 2013 4:56pm**

TAMPA — Online retailer Amazon confirmed Tuesday that it will open a 1-million-square-foot distribution center in Hillsborough County and announced plans for a second, similar warehouse about an hour away in Polk County.

The announcement came nearly two weeks after Hillsborough officials said the retailer had completed a real estate deal for a center in Ruskin, and it ended speculation about whether Amazon wanted two facilities so close to each other.

Amazon said the centers will process different kinds of orders from customers.

The Ruskin center will pick, pack and ship small items, including books, electronics and consumer goods. A center to be located on Lakeland will ship large goods such as kayaks and televisions.

Seattle-based Amazon said it would create more than 1,000 full-time jobs at the centers with health care, stock awards and other benefits. It didn't say when the distribution centers would open or when they would start hiring.

Site work has already begun on the Hillsborough location at Interstate 75 and State Road 674, and at the Lakeland location at 1760 County Line Road.

"We appreciate the state, city and county officials who have worked with us to bring these fulfillment centers to Florida," said a statement from Mike Roth, Amazon's vice president of North America operations. "We're excited to join the community, bringing great jobs and investment to the area."

Gov. Rick Scott announced in June that Amazon would invest $300 million in new warehouses and hire 3,000 people as part of a deal that would eventually require Amazon to charge Florida customers sales tax on purchases. Currently, those taxes are not collected on purchases because Amazon doesn't have a physical presence in the state.

But the issue of online sales taxes is being debated in other states and could be resolved nationally by Congress or courts.

In a statement Tuesday, Scott applauded Amazon for choosing Florida for its new warehouses, known as fulfillment centers.

"I would like to thank Amazon for recognizing that Florida's business-friendly environment we've helped create is the perfect place for their latest expansion," he said.

Amazon confirms fulfillment centers in Ruskin, Lakeland | Tampa Bay Times          Page 2 of 2

Case 1:21-cv-00445-CJN   Document 182-4   Filed 08/07/23   Page 200 of 650
Case 1:15-cv-20782-JEM   Document 401   Entered on FLSD Docket 04/27/2015   Page 35 of 150

Amazon spokeswoman Kelly Cheeseman said the centers combined would employ more than 1,000 full-time workers but didn't have an exact figure. Amazon prefers to hire full-time workers but may employ part-timers who request it, she said.

Thousands more could work at the centers as seasonal employees to handle the holiday shopping rush.

Both Hillsborough and Polk counties lured Amazon with financial incentives. Hillsborough approved $6.4 million in property tax breaks over seven years and $1.1 million in payments to Amazon for bringing 375 above-average paying jobs. Polk okayed a $4.5 million package that would require Amazon to create at least 100 high-paying jobs and make a minimum investment of $10 million.

Founded by Jeff Bezos, Amazon is expected to post $75 billion in revenue this year — but not a lot of profit.

Despite its stock reaching a record high, Amazon lost money last year. Analysts expect another loss when the company releases third-quarter results Thursday.

By contrast, McDonald's restaurants this week reported a $1.52 billion profit for the quarter.

*Information from the New York Times supplemented this report.*

**Amazon confirms fulfillment centers in Ruskin, Lakeland 10/22/13**
**Photo reprints | Article reprints**

© 2015 Tampa Bay Times

80          Tweet   6                    86

Commenting Guidelines    Abuse Policy

Ads by Adblade

# Articles and offers from around the Web

# Exhibit 5

4/20/2015    Case 1:13-cv-20132-JEM   Document 40-1   Entered on FLSD Docket 04/27/2015   Page 37 of QSw
Case 1:13-cv-00445-CJH   Document 182-4   Filed 08/07/22   Page 202 of 650
150



🖶 Print

# *legalzoom*

## RECEIPT

**Order Confirmation Number:**  27340424
**Date of Purchase:**  09-01-2011
**Grand Total:**  $612.00

| Order Summary | Amount |
| --- | --- |
| **Express Gold LLC – Alex James LLC** | $359.00 |
|     Filed Articles of Organization | Included |
|     Operating Agreement | Included |
|     Corporate Kit | Included |
|     Priority Rush Service | Included |
| FL State-required filing fee | $155.00 |
| Tax ID Obtainment | $49.00 |
| Two-Day Delivery (Two Business Days) | $0.00 |
| **30-Day Trial of Business Advantage Pro** | $0.00 |
|     BAP Member Center Access | Included |
|     Access to Forms Library | Included |
| **State Tax ID** | $49.00 |
|     Standard Shipping | $0.00 |
| **Registered Agent Fee (One Month Free)** | $0.00 |
| **Total Charges:** | **$612.00** |

| Contact Info | Shipping Info |
| --- | --- |
| Dennis Montgomery | Dennis Montgomery |
| 760.799.5908 | 760.799.5908 |
| dennis@ncoder.net | dennis@ncoder.net |
| 75180 Mediterranean | 75180 Mediterranean |
| Palm Desert, CA 92211 | Palm Desert, CA 92211 |

## Payments & Credits

| Date | Transaction | Payment Method | Payment Status | Amount |
| --- | --- | --- | --- | --- |
| 9/1/11 | Initial Payment | Charge To Visa Card xxxx0790 | Approved | $612.00 |
| | | | **Total Payment/Credits:** | **$612.00** |
| | | | **Customer Balance Due:** | **$0.00** |

# Exhibit 6

4/27/2015
Case 1:21-cv-00445-CJN Document 182-4 Filed 08/07/23 Page 204 of 650
Case 1:15-cv-20782-JEM Document 40-1 Entered on FLSD Docket 04/27/2015 Page 39 of 150

Search

ABOUT          FORCE & FAMILY          NEWS & PUBS          CARE COALITION          ACQUISITION





### Healing Afghanistan: A Soldier's Story

JUNCTION, Texas – More than 10,000 miles away from home, four Afghan National Army wounded soldiers sit with their sergeant major and some American men and women in the heart land of America for a weeklong seminar, March 31- April 3, 2015, to learn skills that will better enable them to take care of their Afghan brothers wounded in combat.








CULTURAL SUPPORT PROGRAM          THE PARA-COMMANDOS          PRESERVATION OF THE FORCE & FAMILY

    

Headquarters, United States Special Operations Command
7701 Tampa Point Boulevard
MacDill Air Force Base, Florida 33621

SERVICE LINKS
Army | Navy | Air Force | Marines

USSOCOM LINKS
Contact | Employment | FOIA | Accessibility/Section 508 | Privacy Policy

COMMON ACCESS CARD (CAC) REQUIRED LINKS
SOF Portal | USSOCOM Web Mail | Concord Residences | USSOCOM Lessons Learned | SO-P Equipment Help Desk | SOCOM Training Portal

# Exhibit 7

U.S. Central Command | Contact Us                    Page 1 of 2

Case 1:15-cv-20445-CJN   Document 182-4   Filed 08/07/22   Page 206 of 650
Case 1:15-cv-20782-JEM   Document 40-1   Entered on FLSD Docket 04/27/2015   Page 41 of 150

# UNITED STATES CENTRAL COMMAND

EGYPT | IRAN | IRAQ | JORDAN | KAZAKHSTAN | KUWAIT | KYRGYZSTAN
SYRIA | TAJIKISTAN | TURKMENISTAN | U.A.E. | UZBEKISTAN | SAUDI ARABIA

Home | Contact Us

## Contact Us

**U.S. Central Command**

*Address:*

7115 South Boundary Boulevard

MacDill AFB, FL

33621-5101

USA

*MacDill AFB Base Operator*

(813) 828-1110

*MacDill AFB Base Locator:*

(813) 828-2444

**Central Command Communications Integration Public Affairs (CCCI PA)**

*For Public Affairs*

(813) 529-0214

DSN: (312) 529-0214

*For Media Queries*

(813) 529-0220

(813) 529-0213

After hours: (813) 966-8937

*For Community Relations Questions*

(813) 529-0235

(813) 529-0218

**CENTCOM Reserve Affairs**

Army: (813) 529-1074

Air Force: (813) 529-1004

Marine Corps: (813) 529-1088

Navy: (813) 529-1098

**CENTCOM Inspector General**

(813) 529-0275

**MacDill AFB Public Affairs**

(813) 828-2215

**ISAF Public Affairs**

*ISAF HQ Public Affairs Office in Kabul*

pressoffice@hq.isaf.nato.int

+93 (0) 700 13 - 2114 / 2928 / 2482

*ISAF Joint Command Public Affairs Office*

ijc.media@afghan.swa.army.mil

jcmediaopsnu@apod-kaia.isaf.nato.int

+93 (0) 799 51 3999 (Wait For Voice Prompt) 688-4441/4447

+93 (0) 701 13 2000 (Wait For Voice Prompt) 318-449-9244/9153/9154

*NATO Public Information Office*

Media Operations Center

NATO Headquarters

Blvd Leopold III

1110 Brussels, Belgium

moc.web@hq.nato.int

---

**U.S. Department of Defense**

*Public Affairs*

703-697-5131

# Exhibit 8

| From: | james risen |
|---|---|
| To: | Sectec Astronomy |
| Subject: | Re: Agency |
| Date: | Thursday, November 01, 2012 1:44:59 PM |

If you give us the Brennan emails, we will write a story

On Thu, Nov 1, 2012 at 4:34 PM, Sectec Astronomy <theagencyinsider@hotmail.com>
wrote:

Hard to imagine that you guys would ever report on anything negative regarding
Obama?

DM made it clear who was at the building, and why they were all there.  There is a
reason the CIA and NSA were there, you must know that.

Do you really think the government invoked the State Secrets Priviledge from beiing
embarrassed or conned?  Negroponte in his in camera declaration, if ever released,
was spell it all of out.

They governemnt never wanted information to come out regarding the other
work.  The program started out spying on terrorist, and under Obama quickly moved
to spying on Americans!!  A program which was started by Brennan in 2003 and
continues to this day.  This technology is being used today to spy on Americans,
including candidate Romney.

I don't see you ever publishing that information?

---

Date: Thu, 1 Nov 2012 16:07:07 -0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

Hi. As you recall, we had a very long phone conversation recently where we
discussed how it would be good to report on many of the things that we didn't
report on previously. I would like to include all of the points that you have raised in
my book, and also to write about many of these issues in the newspaper. For the
newspaper, I am particularly interested in the issue of Brennan, and his emails and
related documents, which you said when we last talked that you might be willing to
share with me. So I am open to discussing everything with you.
Jim

On Thu, Nov 1, 2012 at 3:58 PM, Sectec Astronomy
<theagencyinsider@hotmail.com> wrote:

You didn't answer my question:

*You reported on FBI documents, as if they were accurate, when that the
Judge tossed out all of the claims in their report. The FBI refused to
produce any of the people in their report for examination by the court.
That include Daniel Bogden, who was reinstated by Obama as the US
Attorney for Nevada.*

*Why did you not mention in your story Judge Cooke scathing report against the Warren Trepp, FBI, and other government officials? Judge Cooke reported that DM had his 4th admendment constituional rights violated?*

How can I ever trust that you will report accurate information when your prior story was based on information provided to you by Mike Flynn my ex attorney?

---

Date: Thu, 1 Nov 2012 15:21:02 -0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

I have tried West and Venables.  I am writing a chapter in my book about all this largely because we weren't able to tell much of the story in the paper. I would like your input, and your voice in the chapter.

On Thu, Nov 1, 2012 at 3:16 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

> DM doesn't need another hachet job on him.  Have you tried Agent West or Sloan Venables?
>
> You reported on FBI documents, as if they were accurate, when that the Judge tossed out all of the claims in their report.  The FBI refused to produce any of the people in their report for examination by the court.  That include Daniel Bogden, who was reinstated by Obama as the US Attorney for Nevada.
>
> Why did you not mention in your story Judge Cooke scathing report against the Warren Trepp, FBI, and other government officials?  Judge Cooke reported that DM had his 4th admendment constituional rights violated?
>
> This is so much you guys missed.

---

Date: Thu, 1 Nov 2012 14:54:31 -0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

Well, I would like to write more about him and everyone else involved in my book now.

On Thu, Nov 1, 2012 at 12:51 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

His role? He is the CEO of eTreppid. He got all of the money. Why was he not in your story?

---

Date: Thu, 1 Nov 2012 12:36:09 -0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

I have tried to talk to Warren Trepp. If you have any information about his role, I would like to talk to you about it.

On Thu, Nov 1, 2012 at 12:18 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

Why have you not chased the money, and contacted Warren Trepp who kept all of the money? I don't get that?

---

Date: Thu, 1 Nov 2012 11:41:01 -0400

Subject: Re: Agency
From: jrisen31@gmail.com
To: theagencyinsider@hotmail.com

Both. We discussed how you have information that would be very good for a story about his involvement.
But I also want to talk to you more generally about your experiences and work during the war on terror.
On Thu, Nov 1, 2012 at 10:55 AM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

Is talking to me or Brennan emails what your after?

What other information are you after?

---

Date: Wed, 31 Oct
2012 23:25:56 -0400

Subject: Re: Agency
From:
jrisen31@gmail.com
To:
theagencyinsider@hotmail.com

I thought what we
discussed before was
really interesting, and I
would like to continue
our discussion. As I
mentioned, I am
writing about it in my
book, and I would like
to talk to you for
that.But I would also
like to talk about what
you said about
Brennan and the White
House.

On Wed, Oct 31, 2012
at 7:06 PM, Sectec
Astronomy
<theagencyinsider@hotmail.com
> wrote:

Regarding?
So DM
get attack
in another
article?

---

Date: Wed,
31 Oct
2012
16:47:58 -
0400

Subject:
Re:
Agency
From:
jrisen31@gmail.com

To:
theagencyinsider@hotmail.com

Hi. Can we talk?
Jim Risen

On Fri, Oct 5, 2012 at 6:51 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

> I guess you can investigate what I disclosed and then decide.
>
> .
>
> Date: Fri, 5 Oct 2012 18:47:34 -0400
>
> Subject: Re: Agency
>
> From: jrisen31@gmail.com
>
> To: theagencyinsider@hotmail.com
>
> As I said on the phone, I

protect my sources. I will never divulge the identify of my sources in a leak investigation. But I also have to know that the source is telling me the truth.

Jim

On Fri, Oct 5, 2012 at 5:51 PM, Sectec Astronomy <theagencyinsider@hotmail.com> wrote:

> Before documents are sent,

you agree that you will protect Dennis Montgomery as a protected source. If the US Government attacks Dennis Montgomery you, and your organization will do everything possible to protect and defend Dennis Montgomery. Agreed.

.

Date: Fri, 5 Oct 2012 17:32:30 -0400

Subject: Re: Agency

From: jrisen31@gmail.com

To:
theagencyinsider@hotmail.com

got
it,
thanks

Jim
Risen


On
Fri,
Oct
5,
2012
at
5:11
PM,
Sectec
Astronomy
<theagencyinsider@hotmail.com
>
wrote:

> This
> is
> my
> email
> address…

Exhibit 9



**SWEDISH** MEDICAL CENTER

May 27, 2014

Re: Dennis Lee Montgomery (DOB 7/11/1953)

To Whom It May Concern:

Mr. Dennis Montgomery underwent aneurysm surgery on 5/16/2014 that was unfortunately complicated by multi-infarct strokes with resultant severe left sided weakness and impaired vision. He is currently on the Swedish inpatient rehab unit and will be here until at least late June 2014. He will not be able to testify out of state as a result of his current disability.

Please feel free to contact me if you have any questions.

Sincerely,

**Paul Chuwn Lim, MD**
Medical Director of Swedish Rehabilitation Services
Swedish Physical Medicine and Rehabilitation
1600 E Jefferson Street, Suite #600 | Seattle, WA 98122
(clinic) 206-320-2600 | (fax) 206-320-4054

# Exhibit 10



**SWEDISH** MEDICAL CENTER

January 6, 2015

Re: Dennis Lee Montgomery  (DOB 7/11/1953)

To Whom It May Concern:

Mr. Dennis Montgomery unfortunately sustained recent multi-infarct strokes with resultant severe left sided weakness and impaired vision.  He completed Swedish inpatient rehab unit under my guidance on 6/21/2014.  He is now in outpatient PT, OT to work on ongoing left sided weakness and speech therapy for stroke related cognitive and memory impairments along with swallowing difficulties.  He has severe left shoulder pain impacting his stroke recovery.  He will also undergo neuropsychological testing to evaluate his cognitive strengths and weakness.

Lastly, he is having false visual imagery related to his stroke and is being followed by neuro-ophthalmology with Dr. Eugen May.

Please feel free to contact me if you have any questions.

Sincerely,

**Paul Chuwn Lim, MD**
Medical Director of Swedish Rehabilitation Services
Swedish Physical Medicine and Rehabilitation
1600 E Jefferson Street, Suite #600 | Seattle, WA 98122
(clinic) 206-320-2600 | (fax) 206-320-4054

# Exhibit 11

# Joe Eskridge, M.D.

Swedish Neuroscience Institute
550 17th Ave #500
Seattle WA 98122
206.320.4144

June 27, 2014

To Whom It May Concern

Dear Sirs,

I, Dr. Joe Eskridge recently treated Dennis Montgomery who is a 60 year old man who suffered from a cerebral aneurysm. His aneurysm was detected in 2011. He does not smoke and does not have any congenital blood vessel diseases that contribute to aneurysm development.

High blood pressure can accelerate aneurysm growth and increase the risk of rupture and stroke. Stress can increase blood pressure and contribute to aneurysm growth. On a more probable than not basis stress related hypertension caused the development and growth of his aneurysm.

I have performed over 5000 brain artery repair and embolization procedures over the past 30 years. I was Professor of Radiology and Neurosurgery at the University of Washington Medical School from 1987-2004.

Sincerely yours,

Joe Eskridge, M.D.

# Exhibit 12

4/27/2018
Case 1:21-cv-00445-CSJ  Document 182-1  Filed 08/07/23  Page 224 of 650
Case 1:15-cv-23782-JEM – Document 401-1 – Entered on FLSD Docket 04/27/2019 – Page 59 of 150

# United States Special Operations Command

From Wikipedia, the free encyclopedia

The United States Special Operations Command (USSOCOM or SOCOM) is the Unified Combatant Command charged with overseeing the various Special Operations Component Commands of the Army, Air Force, Navy and Marine Corps of the United States Armed Forces. The command is part of the Department of Defense and is the only Unified Combatant Command legislated into being by the U.S. Congress. USSOCOM is headquartered at MacDill Air Force Base in Tampa, Florida.

The idea of a unified special operations command had its origins in the aftermath of Operation Eagle Claw, the disastrous attempted rescue of hostages at the American embassy in Iran in 1980. The ensuing investigation, chaired by Admiral James L. Holloway III, the retired Chief of Naval Operations, cited lack of command and control and inter-service coordination as significant factors in the failure of the mission.[2] Since its activation on 16 April 1987, U.S. Special Operations Command has participated in many operations, from the 1989 invasion of Panama to the ongoing Global War on Terrorism.[3][4]

USSOCOM conducts several covert and clandestine missions, such as direct action, special reconnaissance, counter-terrorism, foreign internal defense, unconventional warfare, psychological warfare, civil affairs, and counter-narcotics operations. Each branch has a Special Operations Command that is unique and capable of running its own operations, but when the different special operations forces need to work together for an operation, USSOCOM becomes the joint component command of the operation, instead of a SOC of a specific branch.[5]

## Contents

- 1 History
    - 1.1 Operation Earnest Will
    - 1.2 Somalia
    - 1.3 Iraq
- 2 Current role
    - 2.1 War in Afghanistan
    - 2.2 Global presence
- 3 Subordinate Commands
    - 3.1 Joint Special Operations Command
    - 3.2 Special Operations Command – Joint Capabilities
    - 3.3 Army
    - 3.4 Navy
    - 3.5 Air Force
    - 3.6 Marine Corps
- 4 List of USSOCOM Combatant Commanders
- 5 USSOCOM medal
- 6 See also
- 7 References
    - 7.1 Citations
    - 7.2 Bibliography
- 8 External links



| United States Special Operations Command (USSOCOM) | |
|---|---|
| United States Special Operations Command Emblem | |
| Active | April 16, 1987 – present[1] |
| Country | 🇺🇸 United States of America |
| Type | Special operations |
| Role | Provide fully capable special operations forces to defend the United States and its interests and plan and synchronize operations against terrorist networks[1] |
| Size | 63,000[1] |
| Part of | 🌐 Department of Defense |
| Garrison/HQ | MacDill AFB, Florida, U.S. |
| Nickname | "USSOCOM", "SOCOM" |
| Engagements | Operation Earnest Will Invasion of Panama Persian Gulf War Unified Task Force Operation Gothic Serpent |
| | • Battle of Mogadishu |
| | Operation Uphold Democracy Global War on Terrorism |
| | • War in Afghanistan • Iraq War |
| Commanders | |
| Current commander | General Joseph L. Votel[1] |

## History

The unworkable command and control structure of separate U.S. military special operations forces (SOF), which led to the failure of Operation Eagle Claw in 1980, highlighted the need within the Department of Defense for reform and reorganization. Since the incident, the Army Chief of Staff, General Edward C. "Shy" Meyer, called for a further restructuring of special operations capabilities, eventually helping to create the U.S. Delta Force.[6] Although unsuccessful at the joint level, Meyer nevertheless went on to consolidate Army SOF units under the new 1st Special Operations Command in 1982, a significant step to improve the U.S. Army's SOF.

By 1983, there was a small but growing sense in the Congress for the need for military reforms. In June, the Senate Armed Services Committee (SASC) began a two-year-long study of the Defense Department, which included an examination of SOF spearheaded by Senator Barry Goldwater (R-AZ). With concern mounting on Capitol Hill, the Department of Defense created the Joint Special Operations Agency on 1 January 1984; this agency, however, had neither operational nor command authority over any SOF.[7][8] The Joint Special Operations Agency thus did little to improve SOF readiness, capabilities, or policies, and therefore was insufficient. Within the Defense Department, there were a few staunch SOF supporters. Noel Koch, Principal Deputy Assistant Secretary of Defense for International Security Affairs, and his deputy, Lynn Rylander, both advocated SOF reforms.[9]

At the same time, a few on Capitol Hill were determined to overhaul United States Special Operations Forces. They included Senators Sam Nunn (D-GA) and William Cohen (R-ME), both members of the Armed Services Committee, and Representative Dan Daniel (D-VA), the chairman of the United States House Armed Services Subcommittee on Readiness. Congressman Daniel had become convinced that the U.S. military establishment was not interested in special operations, that the country's

capability in this area was second rate, and that SOF organizational command and control was an endemic problem.[9] Senators Nunn and Cohen also felt strongly that the Department of Defense was not preparing adequately for future threats. Senator Cohen agreed that the U.S. needed a clearer organizational focus and chain of command for special operations to deal with low-intensity conflicts.[7]

In October 1985, the Senate Armed Services Committee published the results of its two-year review of the U.S. military structure, entitled "Defense Organization: The Need For Change."[10] Mr. James R. Locher III, the principal author of this study, also examined past special operations and speculated on the most likely future threats. This influential document led to the Goldwater-Nichols Defense Reorganization Act of 1986.[11][12] By spring 1986, SOF advocates had introduced reform bills in both houses of Congress. On 15 May, Senator Cohen introduced the Senate bill, co-sponsored by Senator Nunn and others, which called for a joint military organization for SOF and the establishment of an office in the Defense Department to ensure adequate funding and policy emphasis for low-intensity conflict and special operations.[13] Representative Daniel's proposal went even further—he wanted a national special operations agency headed by a civilian who would bypass the Joint Chiefs and report directly to the Secretary of Defense; this would keep Joint Chiefs and the Services out of the SOF budget process.[8]


Senator Barry Goldwater, Former Chairman of the Senate Armed Services Committee

Congress held hearings on the two bills in the summer of 1986. Admiral William J. Crowe Jr., Chairman of the Joint Chiefs of Staff, led the Pentagon's opposition to the bills. He proposed, as an alternative, a new Special Operations Forces command led by a three-star general. This proposal was not well received on Capitol Hill—Congress wanted a four-star general in charge to give SOF more clout. A number of retired military officers and others testified in favor of the need for reform.[9] By most accounts, retired Army Major General Richard Scholtes gave the most compelling reasons for change. Scholtes, who commanded the joint special operations task force in Grenada, explained how conventional force leaders misused SOF during the operation, not allowing them to use their unique capabilities, which resulted in high SOF casualties. After his formal testimony, Scholtes met privately with a small number of Senators to elaborate on the problems that he had encountered in Grenada.[14]

Both the House and Senate passed SOF reform bills, and these went to a conference committee for reconciliation. Senate and House conferees forged a compromise. The bill called for a unified combatant command headed by a four-star general for all SOF, an Assistant Secretary of Defense for Special Operations and Low-Intensity Conflict, a coordinating board for low-intensity conflict within the National Security Council, and a new Major Force Program (MFP-11) for SOF (the so-called "SOF checkbook").[15][16] The final bill, attached as a rider to the 1987 Defense Authorization Act, amended the Goldwater-Nichols Act and was signed into law in October 1986. Congress clearly intended to force DOD and the Administration to face up to the realities of past failures and emerging threats. DOD and the Administration were responsible for implementing the law, and Congress subsequently had to pass two additional bills to ensure proper implementation.[9] The legislation promised to improve SOF in several respects. Once implemented, MFP-11 provided SOF with control over its own resources, better enabling it to modernize the force. Additionally, the law fostered interservice cooperation: a single commander for all SOF promoted interoperability among the forces assigned to the same command. The establishment of a four-star Commander in Chief and an Assistant Secretary of Defense for Special Operations and Low Intensity Conflict eventually gave SOF a voice in the highest councils of the Defense Department.[15]


General James Lindsay the first Commander in Chief, Special Operations Command

Implementing the provisions and mandates of the Nunn-Cohen Act, however, was neither rapid nor smooth. One of the first issues to surface was appointing an ASD (SO/LIC), whose principal duties included monitorship of special operations activities and low-intensity conflict activities of the Department of Defense. The Congress even increased the number of assistant secretaries of defense from 11 to 12, but the Department of Defense still did not fill this new billet. In December 1987, the Congress directed Secretary of the Army John O. Marsh to carry out the ASD (SO/LIC) duties until a suitable replacement was approved by the Senate. Not until 18 months after the legislation passed did Ambassador Charles Whitehouse assume the duties of ASD (SO/LIC).[17]

Meanwhile, the establishment of USSOCOM provided its own measure of excitement. A quick solution to manning and basing a brand new unified command was to abolish an existing command. United States Readiness Command (USREDCOM), with an often misunderstood mission, did not appear to have a viable mission in the post Goldwater-Nichols era, and its Commander in Chief, General James Lindsay, had had some special operations experience. On 23 January 1987, the Joint Chiefs of Staff recommended to the Secretary of Defense that USREDCOM be disestablished to provide billets and facilities for USSOCOM. President Ronald Reagan approved the establishment of the new command on 13 April 1987. The Department of Defense activated USSOCOM on 16 April 1987 and nominated General Lindsay to be the first Commander in Chief Special Operations Command (USCINCSOC). The Senate accepted him without debate.[9]

## Operation Earnest Will

USSOCOM's first tactical operation involved SEALs, Special Boat Teams (SBT), and 160th Special Operations Aviation Regiment (Airborne) ("Night Stalkers") aviators working together during Operation Earnest Will in September 1987. During Operation Earnest Will, the United States ensured that neutral oil tankers and other merchant ships could safely transit the Persian Gulf during the Iran–Iraq War. Iranian attacks on tankers prompted Kuwait to ask the United States in December 1986 to register 11 Kuwaiti tankers as American ships so that they could be escorted by the U.S. Navy. President Reagan agreed to the Kuwaiti request on 10 March 1987, hoping it would deter Iranian attacks.[9] The protection offered by U.S. naval vessels, however, did not stop Iran, which used mines and small boats to harass the convoys steaming to and from Kuwait. In late July 1987, Rear Admiral Harold J. Bernsen, commander of the Middle East Force, requested NSW assets. Special Boat Teams deployed with six Mark III Patrol Boats and two SEAL platoons in August.[9] The Middle East Force decided to convert two oil servicing barges, Hercules and Wimbrown VII, into mobile sea bases. The mobile sea bases allowed SOF in the northern Persian Gulf to thwart clandestine Iranian mining and small boat attacks.


MH-60 landing on Hercules

On 21 September, Nightstalkers flying MH-60 and Little Birds took off from the frigate USS Jarrett to track an Iranian ship, the Iran Ajr. The Nightstalkers observed the Iran Ajr turn off its lights and begin laying mines. After receiving permission to attack, the helicopters fired guns and rockets, stopping the ship. As the Iran Ajr's crew began to push mines over the side, the helicopters resumed firing until the crew abandoned ship. Special Boat Teams provided security while a SEAL team boarded the vessel at first light and discovered nine mines on the vessel's deck, as well as a logbook revealing areas where previous mines had been laid. The logbook implicated Iran in mining international waters.[9]

Within a few days, the Special Operations forces had determined the Iranian pattern of activity; the Iranians hid during the day near oil and gas platforms in Iranian waters and at night they headed toward the Middle Shoals Buoy, a navigation aid for tankers. With this knowledge, SOF launched three Little Bird helicopters and two patrol craft to the buoy. The Little Bird helicopters arrived first and were fired upon by three Iranian boats anchored near the buoy. After a short but intense firefight, the helicopters sank all three boats. Three days later, in mid-October, an Iranian Silkworm missile hit the tanker Sea Isle City near the oil terminal outside Kuwait City. Seventeen crewmen and the American captain were injured in the missile attack.[9][18] During Operation Nimble Archer, four destroyers shelled two oil platforms in the Rostam oil field. After the shelling, a SEAL platoon and a demolition unit planted explosives on one of the platforms to destroy it. The SEALs next boarded and searched a third platform 2 miles (3 km) away. Documents and radios were taken for intelligence purposes.

4/27/2015
Case 1:15-cv-20422-JEM Document 104 Entered on FLSD Docket 03/07/2019 Page 61 of 150
Case 1:15-cv-20422-JEM Document 182-4 Filed 08/07/22 Page 226 of 650

On 14 April 1988, 65 miles (100 km) east of Bahrain, the frigate USS Samuel B. Roberts (FFG-58) hit a mine, blowing an immense hole in its hull.[19] Ten sailors were injured. During Operation Praying Mantis the U.S. retaliated fiercely, attacking the Iranian frigate Sahand and oil platforms in the Sirri and Sassan oil fields.[18] After U.S. warships bombarded the Sirri platform and set it ablaze, a UH-60 with a SEAL platoon flew toward the platform but was unable to get close enough because of the roaring fire. Secondary explosions soon wrecked the platform.[9] Thereafter, Iranian attacks on neutral ships dropped drastically. On 3 July 1988, the USS Vincennes shot down an Iranian civilian airliner, Iran Air Flight 655, killing all 290 people on board, including 66 children. On 18 July, Iran accepted the United Nations cease fire; on 20 August 1988, the Iran–Iraq War ended. The remaining SEALs, patrol boats, and helicopters then returned to the United States.[9] Special operations forces provided critical skills necessary to help CENTCOM gain control of the northern Persian Gulf and balk Iran's small boats and minelayers. The ability to work at night proved vital, because Iranian units used darkness to conceal their actions. Additionally, because of Earnest Will operational requirements, USSOCOM would acquire new weapons systems—the patrol coastal ships and the Mark V Special Operations Craft.[9]

## Somalia


One of two Iranian oil platform set ablaze after shelling by American destroyers.

Special Operations Command first became involved in Somalia in 1992 as part of Operation Provide Relief. C-130s circled over Somali airstrips during delivery of relief supplies. Special Forces medics accompanied many relief flights into the airstrips throughout southern Somalia to assess the area. They were the first U.S. soldiers in Somalia, arriving before U.S. forces who supported the expanded relief operations of Restore Hope.[9][20][21] The first teams into Somalia were CIA Special Activities Division paramilitary officers with elements of JSOC. They conducted very high risk advanced force operations prior to the entry of the follow on forces. The first casualty of the conflict came from this team and was a Paramilitary officer and former Delta Force operator name Larry Freedman. Freedman was awarded the Intelligence Star for "extraordinary heroism" for his actions.[22]

The earliest missions during Operation Restore Hope were conducted by Navy SEALs. The SEALs performed several hydro-graphic reconnaissance missions to find suitable landing sites for Marines. On 7 December, the SEALs swam into Mogadishu Harbor, where they found suitable landing sites, assessed the area for threats, and concluded that the port could support offloading ships. This was a tough mission because the SEALs swam against a strong current which left many of them overheated and exhausted. Furthermore, they swam through raw sewage in the harbor, which made them sick.[9] When the first SEALs hit the shore the following night, they were surprised to meet members of the news media. The first Marines came ashore soon thereafter, and the press redirected their attention to them. Later, the SEALs provided personal security for President George Bush during a visit to Somalia.[9][21] In December 1992, Special Forces assets in Kenya moved to Somalia and joined Operation Restore Hope. January 1993, a Special Forces command element deployed to Mogadishu as the Joint Special Operations Forces-Somalia (JSOFOR) that would command and control all special operations for Restore Hope. JSOFOR's mission was to make initial contact with indigenous factions and leaders; provide information for force protection; and provide reports on the area for future relief and security operations. Before redeploying in April, JSOFOR elements drove over 26,000 miles (42,000 km), captured 277 weapons, and destroyed over 45,320 pounds (20,560 kg) of explosives.[9]


Bravo Company, 3rd Battalion of the 75th Ranger Regiment in Somalia, 1993.

In August 1993, Secretary of Defense Les Aspin directed the deployment of a Joint Special Operations Task Force (JSOTF) to Somalia in response to attacks made by General Mohamed Farrah Aidid's supporters upon U.S. and UN forces. The JSOTF, named Task Force (TF) Ranger, was charged with a mission named Operation Gothic Serpent to capture Aidid. This was an especially arduous mission, for Aidid had gone underground, after several Lockheed AC-130 air raids and UN assaults on his strongholds.[9][23][24]

While Marines from the 24th MEU provided an interim QRF (Force Recon Det and helicopters from HMM-263), the task force arrived in the country, and began training exercises. The Marines were asked to take on the Aidid snatch mission, but having the advantage of being in the area for more than two months, decided after mission analysis that the mission was a "no-go" due to several factors, centered around the inability to rescue the crew of a downed helicopter (re: the indigenous forces technique of using RPGs against helicopters and blocking the narrow streets in order to restrict the movement of a ground rescue force). This knowledge was not passed on to the Rangers, due to the Marines operating from the USS Wasp and the Rangers remaining on land. TF Ranger was made up of operators from Delta Force, 75th Ranger Regiment, 160th SOAR, Air Force special tactics units, and SEALs from the Naval Special Warfare Development Group.[9][23] During August and September 1993, the task force conducted six missions into Mogadishu, all of which were successes. Although Aidid remained free, the effect of these missions seriously limited his movements.[24]

On 3 October, TF Ranger launched its seventh mission, this time into Aidid's stronghold the Bakara Market to capture two of his key lieutenants. The mission was expected to take only one or two hours.[23] Helicopters carried an assault and a ground convoy of security teams launched in the late afternoon from the TF Ranger compound at Mogadishu airport. The TF came under increasingly heavy fire, more intense than during previous missions. The assault team captured 24 Somalis including Aidid's lieutenants and were loading them onto the convoy trucks when a MH-60 Blackhawk was hit by a rocket-propelled grenade (RPG).[9][24] A small element from the security force, as well as an MH-6 assault helicopter and an MH-60 carrying a fifteen man combat search and rescue (CSAR) team, rushed to the crash site.[9][23][24] The battle became increasingly worse. An RPG struck another MH-60, crashing less than 1 mile (1.6 km) to the south of the first downed helicopter. The task force faced overwhelming Somali mobs that overran the crash sites, causing a dire situation.[23] A Somali mob overran the second site and, despite a heroic defense, killed everyone except the pilot, whom they took prisoner. Two defenders of this crash site, Master Sergeant Gary Gordon and Sergeant First Class Randall Shughart, were posthumously awarded the Medal of Honor.[9][24] About this time, the mission's quick reaction force (QRF) also tried to reach the second crash site. This force too was pinned by Somali fire and required the fire support of two AH-6 helicopters before it could break contact and make its way back to the base.[9]

The assault and security elements moved on foot towards the first crash area, passing through heavy fire, and occupied buildings south and southwest of the downed helicopter. They fought to establish defensive positions so not to be pinned down by very heavy enemy fire, while treating their wounded, and worked to free the pilot's body from the downed helicopter. With the detainees loaded on trucks, the ground convoy force attempted to reach the first crash site. Unable to find it amongst the narrow, winding alleyways, the convoy came under devastating small arms and RPG fire. The convoy had to return to base after suffering numerous casualties, and sustaining substantial damage to their vehicles.

Reinforcements, consisting of elements from the QRF, 10th Mountain Division soldiers, Rangers, SEALs, Pakistan Army tanks and Malaysian armored personnel carriers, finally arrived at 1:55 am on 4 October. The combined force worked until dawn to free the pilot's body, receiving RPG and small arms fire throughout the night.[9] All the casualties were loaded onto the armored personnel carriers, and the remainder of the force was left behind and had no choice but to move out on foot.[23] AH-6 gunships raked the streets with fire to support the movement. The main force of the convoy arrived at the Pakistani Stadium-compound for the QRF-at 6:30 am,[23] thus concluding one of the bloodiest and fiercest urban firefights since the Vietnam War. Task Force Ranger experienced a total of 17 killed in action and 106 wounded. Various estimates placed Somali casualties above 1,000.[23] Although Task Force Ranger's few missions were successes, the overall outcome of Operation Gothic Serpent was deemed a failure because of the Task Force's failure to complete their stated mission, capturing Mohamed Farrah Aidid.[23] Most U.S. forces pulled out of Somalia by March 1994.

4/27/2013
Case 1:15-cv-01240-JEM Document 182-4 Entered on FLSD Docket 09/07/23 Page 227 of 650
Case 1:13-cv-00445-JEM Document 401 Entered on FLSD Docket 04/17/2015 Page 62 of 150

The withdrawal from Somalia, was completed on March 1995.[9] Even though Operation Gothic Serpent failed, USSOCOM still made significant contributions to operations in Somalia. SOF performed reconnaissance and surveillance missions, assisted with humanitarian relief, protected American forces and conducted riverine patrols. Additionally, they ensured the safe landing of the Marines and safeguarded the arrival of merchant ships carrying food.[9][18]

## Iraq

USSOCOM's 10th Special Forces Group, elements of JSOC and CIA/SAD Paramilitary Officers linked up again and were the first to enter Iraq prior to the invasion. Their efforts organized the Kurdish Peshmerga to defeat Ansar Al Islam in Northern Iraq before the invasion. This battle was for control of a territory in Northeastern Iraq that was completely occupied by Ansar Al Islam, an ally of Al Qaeda. This was a very significant battle and led to the termination of a substantial number of terrorists and the uncovering of a chemical weapons facility at Sargat. These terrorists would have been in the subsequent insurgency had they not been eliminated during this battle. Sargat was the only facility of its type discovered in the Iraq war. This battle may have been the Tora Bora of Iraq, but it was a sound defeat for Al Qaeda and their ally Ansar Al Islam. This combined team then led the Peshmerga against Saddam's northern Army. This effort kept Saddam's forces in the north and denied the ability to redeploy to contest the invasion force coming from the south. This effort may have saved the lives of hundreds if not thousands of coalition service men and women.[25]



At the launch of the Iraq War dozens of 12-member Special Forces teams infiltrated southern and western Iraq to hunt for Scud missiles and pinpoint bombing targets. Scores of Navy SEALs seized oil terminals and pumping stations on the southern coast.[26] Air Force combat controllers flew combat missions in MC-130H Combat Talon IIs and established austere desert airstrips to begin the flow of soldiers and supplies deep into Iraq. It was a far cry from the Persian Gulf war of 1991, where Special Operations forces were kept largely on the sidelines. But it would not be a replay of Afghanistan, where Army Special Forces and Navy SEALs led the fighting. After their star turn in Afghanistan, many special operators were disappointed to play a supporting role in Iraq. Many special operators felt restricted by cautious commanders.[27] From that point, USSOCOM has since killed or captured hundreds of insurgents and Al-Qaeda terrorists. It has conducted several foreign internal defense missions successfully training the Iraqi security forces.[28][29]

Map of the main battle sites during the Battle of Mogadishu.

# Current role

United States Special Operations Command played a pivotal role in fighting the former Taliban government in Afghanistan in 2001[30] and toppling it thereafter, as well as combating the insurgency and capturing Saddam Hussein in Iraq. USSOCOM in 2004 was developing plans to have an expanded and more complex role in the global campaign against terrorism,[31] and that role continued to emerge before and after the killing of Osama bin Laden in Pakistan in 2011.[32][33] In 2010, "of about 13,000 Special Operations forces deployed overseas, about 9,000 [were] evenly divided between Iraq and Afghanistan."[32]

## War in Afghanistan

In the initial stages of the War in Afghanistan, USSOCOM forces linked up with CIA Paramilitary Officers from Special Activities Division to defeat the Taliban without the need for large-scale conventional forces.[34] This was one of the biggest successes of the global War on Terrorism.[35] These units linked up several times during this war and engaged in several furious battles with the enemy. One such battle happened during Operation Anaconda the mission to squeeze life out of a Taliban and Al-Qaeda stronghold dug deep into the Shah-i-Kot mountains of eastern Afghanistan. The operation was seen as one of the heaviest and bloodiest fights in the War in Afghanistan.[36] The battle on an Afghan mountaintop called Takur Ghar featured special operations forces from all 4 services and the CIA. Navy SEALs, Army Rangers, Air Force Combat Controllers, and Pararescuemen fought against entrenched Al-Qaeda fighters atop a 10,000-foot (3,000 m) mountain. Subsequently, the entrenched Taliban became targets of every asset in the sky. According to an executive summary, the battle of Takur Ghar was the most intense firefight American special operators have been involved in since 18 U.S. Army Rangers were killed in Mogadishu, Somalia, in 1993.[37][38][39] During Operation Red Wings on 28 June 2005, four Navy SEALs, pinned down in a firefight, radioed for help. A Chinook helicopter, carrying 16 service members, responded but was shot down. All members of the rescue team and three of four SEALs on the ground died. It was the worst loss of life in Afghanistan since the invasion in 2001. The Navy SEAL Marcus Luttrell alone survived.[40][41] Team leader Michael P. Murphy was awarded the Medal of Honor for his actions in the battle.

A 7th SFG Special Forces medic in Kandahar Province, Afghanistan, in September 2008.

## Global presence

SOC chief Olson said in 2011 that SOCOM "is a microcosm of the Department of Defense, with ground, air, and maritime components, a global presence, and authorities and responsibilities that mirror the Military Departments, Military Services, and Defense Agencies."[33] In 2010, special operations forces were deployed in 75 countries, compared with about 60 at the beginning of 2009.[32] In 2011, SOC spokesman Colonel Tim Nye (Army[42]) was reported to have said that the number of countries with SOC presence will likely reach 120 and that joint training exercises will have been carried out in most or all of those countries during the year. One study identified joint-training exercises in Belize, Brazil, Bulgaria, Burkina Faso, Germany, Indonesia, Mali, Norway, Panama, and Poland in 2010 and also, through mid-year 2011, in the Dominican Republic, Jordan, Romania, Senegal, South Korea, and Thailand, among other nations. In addition, SOC forces executed the high profile killing of Osama bin Laden in Pakistan in 2011.[33]

Wikileaks' releases of cables from the U.S. Embassy, Pakistan, revealed the presence of a detachment of SOCOM (or possibly United States Army Special Operations Command) referred to as SOC(FWD)-PAK (09ISLAMABAD2449, 9 August 2010). This unit or headquarters may be, in full form, Special Operations Command (Forward)-Pakistan. It seems unlikely that the – symbol refers to the minus sign that sometimes means that the unit or headquarters is operating at less than full strength. The unit or headquarters includes a Military Information Support Team (MIST [1] (http://www.africom.mil/getArticle.asp?art=4866)).[43] Another story that reported on JSOC/Blackwater anti-terrorist operations in Pakistan was Jeremy Scahill's "The Secret U.S. War in Pakistan" (http://www.thenation.com/article/secret-us-war-pakistan), in the 7 November 2009, issue of The Nation.

In 2010, White House counterterrorism director John O. Brennan said that the United States "will not merely respond after the fact" of a terrorist attack but will "take the fight to al-Qaeda and its extremist affiliates whether they plot and train in Afghanistan, Pakistan, Yemen, Somalia and beyond." Olson said, "In some places, in deference to host-country sensitivities, we are lower in profile. In every place, Special Operations forces activities are coordinated with the U.S. ambassador and are under the operational control of the four-star regional commander."[32]

The conduct of actions by SOC forces outside of Iraq and Afghan war zones has become the subject of internal U.S. debate, including between representatives of the Bush administration such as John B. Bellinger III, on one hand, and the Obama administration on another. The United Nations in 2010 also "questioned the administration's authority under international law to conduct such raids, particularly when they kill innocent civilians. One possible legal justification – the permission of the country in question – is complicated in places such as Pakistan and Yemen, where the governments privately agree but do not publicly acknowledge approving the attacks," as one report put it.[32]

## Subordinate Commands



Special Operations Command Structure (Media:U.S. Special Operations Command.png).

## Joint Special Operations Command

[44] Joint Special Operations Command is a component command of the USSOCOM and is charged to study special operations requirements and techniques to ensure interoperability and equipment standardization, plan and conduct special operations exercises and training, and develop Joint Special Operations Tactics.[1] It was established in 1980 on recommendation of Col. Charlie Beckwith, in the aftermath of the failure of Operation Eagle Claw.[45]



The Joint Special Operations Command insignia

Units

- The U.S. Army's 1st Special Forces Operational Detachment-Delta, popularly known as Delta Force, is the first of the two primary counter-terrorist units of JSOC and SOCOM.[46] Modeled after the British Special Air Service, Delta Force is regarded as one of the premier special operations forces in the world.[47] This is because of Delta's stringent training and selection process. Delta recruits primarily from the most talented and highly skilled operators in the Army Special Forces and the 75th Ranger Regiment although Delta will take anyone and everyone that can pass their screening.[23][47] Recruits must pass a rigid selection course before beginning training. Delta has received training from numerous U.S. government agencies and other tier one SOF and has created a curriculum based on this training and techniques that it has developed.[47] Delta conducts clandestine and covert operations all over the world.[47] It has the capability to conduct myriad special operations missions but specializes in counter-terrorism and hostage rescue operations.[23][46][48]
- The Naval Special Warfare Development Group (DEVGRU, SEAL Team Six) is the second of the two primary counter-terrorist units of JSOC and SOCOM.[46] DEVGRU is Naval Special Warfare's counterpart to Delta. Like Delta, DEVGRU recruits the best operators from the best units in its branch, the Navy SEALs. DEVGRU is capable of performing any type of special operations mission, but trains especially for counter-terrorist and hostage rescue operations.[23][46]
- The Intelligence Support Activity (ISA, The Activity) is the support branch of JSOC and USSOCOM. Its primary missions are to provide Human Intelligence (HUMINT) and Signal Intelligence (SIGINT) mainly for Delta and DEVGRU's operations.[46][49] Before the establishing of the Strategic Support Branch in 2001, the ISA needed the permission of the CIA to conduct its operations, which sometimes caused it to be less effective in its support of JSOC's primary units.[46][50][51]
- The Air Force 24th Special Tactics Squadron (24th STS) is the AFSOC component of JSOC. The 24th STS usually operates with Delta and DEVGRU because of the convenience of 24th STS ability to synchronize and control the different elements of air power and enhance air operations deep in enemy territory.[23]

Portions of JSOC units have made up the constantly changing special operations task force, operating in the U.S. Central Command area of operations. The Task Force 11, Task Force 121, Task Force 6-26 and Task Force 145 are creations of the Pentagon's post-11 September campaign against terrorism, and it quickly became the model for how the military would gain intelligence and battle insurgents in the future. Originally known as Task Force 121, it was formed in the summer of 2003, when the military merged two existing Special Operations units, one hunting Osama bin Laden in and around Afghanistan, and the other tracking Sadaam Hussein in Iraq.[52][53]

## Special Operations Command – Joint Capabilities

Special Operations Command – Joint Capabilities (SOC-JC) was transferred to USSOCOM from the soon to be disestablished United States Joint Forces Command.[54]

Primary Mission: SOC-JC trains conventional and SOF commanders and their staffs, supports USSOCOM international engagement training requirements, and supports implementation of capability solutions in order to improve strategic and operational Warfighting readiness and joint interoperability. SOC-JC must also be prepared to support deployed Special Operations Joint Task Force (SOJTF) Headquarters (HQ).

As a joint sub-unified command under USSOCOM, SOC-JC's core function is to enhance the interoperability of conventional and Special Operations Forces (SOF) commanders and staffs through robust strategic and operational level joint training. In coordination with the USSOCOM J3, J7/9 and Joint Special Operations University (JSOU), SOC-JC provides excellent training and support to the education for SOF and Conventional Forces (CF) worldwide. Additionally, SOC-JC supports the joint SOF capabilities development process while maintaining the flexibility to support emerging initiatives.

4/27/2015
Case 1:15-cv-00045-GBL   Document 182-4   Filed 08/07/23   Page 229 of 650
Case 1:15-cv-20782-JEM   Document 401-1   Entered on FLSD Docket 04/27/2015   Page 64 of 150

# Army

On 1 December 1989 the United States Army Special Operations Command (USASOC) activated as the 16th major Army command. These special operations forces have been America's spearhead for unconventional warfare for more than 40 years. USASOC commands such units as the well known Special Forces (SF, or the "Green Berets") and Rangers, and such relatively unknown units as the Psychological Operations Group (PSYOP) and Civil Affairs Brigade (CA). These are one of the USSOCOM's main weapons for waging unconventional warfare and counter-insurgency. The significance of these units is emphasized as conventional conflicts are becoming less prevalent as insurgent and guerrilla warfare increases.[55][56]



USASOC patch.

## Units

- The 75th Ranger Regiment (U.S. Army Rangers) is the premier light-infantry unit of the United States Army and is headquartered at Fort Benning, Georgia. The 75th Ranger Regiment's mission is to plan and conduct special missions in support of U.S. policy and objectives.[57] The Rangers are a flexible and rapid-deployable force. Each battalion can deploy anywhere in the world within 18 hours notice. The Army places much importance on the 75th Ranger Regiment and its training; it possesses the capabilities to conduct conventional and most special operations missions. Rangers are capable of infiltrating by land, sea, or air and direct action operations such as conducting raids or assaulting buildings or airfields.[58]

- United States Army Special Forces (SF) aka Green Berets perform several doctrinal missions: unconventional warfare, foreign internal defense, special reconnaissance, direct action and counter-terrorism. These missions make Special Forces unique in the U.S. military, because they are employed throughout the three stages of the operational continuum: peacetime, conflict and war.[59] Foreign internal defense operations, SF's main peacetime mission, are designed to help friendly developing nations by working with their military and police forces to improve their technical skills, understanding of human rights issues, and to help with humanitarian and civic action projects. Special Forces unconventional warfare capabilities provide a viable military option for a variety of operational taskings that are inappropriate or infeasible for conventional forces. Special Forces are the U.S. military's premier unconventional warfare force.[60] Foreign internal defense and unconventional warfare missions are the bread and butter of Special Forces soldiers. For this reason SF candidates are trained extensively in weapons, engineering, communications and medicine. SF soldiers are taught to be warriors first and teachers second because they must be able to train their team and be able to train their allies during a FID or UW mission.[59][61] Often SF units are required to perform additional, or collateral, activities outside their primary missions. These collateral activities are coalition warfare/support, combat search and rescue, security assistance, peacekeeping, humanitarian assistance, humanitarian de-mining and counter-drug operations.[62]

- The 160th Special Operations Aviation Regiment (Night Stalkers) headquartered at Fort Campbell, Kentucky provides aviation support to units within USSOCOM. The Regiment consists of MH-6 and AH-6 light helicopters, MH-60 helicopters and MH-47 heavy assault helicopters. The capabilities of the 160th SOAR (A) have been evolving since the early 1980s. Its focus on night operations resulted in the nickname, the "Night Stalkers."[63] The primary mission of the Night Stalkers is to conduct overt or covert infiltration, exfiltration, and resupply of special operations forces across a wide range of environmental conditions.[64]



Special Forces on a patrol in Afghanistan.

- 4th Military Information Support Group (Airborne) and 8th Military Information Support Group (Airborne) Soldiers use persuasion to influence perceptions and encourage desired behavior.[65][66] PSYOP soldiers supports national objectives at the tactical, operational and strategic levels of operations. Strategic psychological operations advance broad or long-term objectives; global in nature, they may be directed toward large audiences or at key communicators. Operational psychological operations are conducted on a smaller scale. 4th PSYOP Gp is employed by theater commanders to target groups within the theater of operations. 4th PSYOP Gp purpose can range from gaining support for U.S. operations to preparing the battlefield for combat. Tactical psychological operations are more limited, used by commanders to secure immediate and near-term goals. In this environment, these force-enhancing activities serve as a means to lower the morale and efficiency of enemy forces.[67]

- 95th Civil Affairs Brigade (Airborne) specialists identify critical requirements needed by local citizens in war or disaster situations. They also locate civilian resources to support military operations, help minimize civilian interference with operations, support national assistance activities, plan and execute noncombatant evacuation, support counter-drug operations and establish and maintain liaison with civilian aid agencies and other nongovernmental organizations. In support of special operations, these culturally oriented, linguistically capable Soldiers may also be tasked to provide functional expertise for foreign internal defense operations, unconventional warfare operations and direct action missions.[68]

- Sustainment Brigade (Special Operations) (Airborne) (SBSO(A)) has a difficult mission supporting USASOC. In their respective fields, signal and support soldiers provide supplies, maintenance, equipment and expertise allowing Special Operation Forces to "shoot, move and communicate" on a continuous basis. Because USASOC often uses Special Operations Forces-unique items, soldiers assigned to these units are taught to operate and maintain a vast array of specialized equipment not normally used by their conventional counterparts. SBSO(A) also provides the USASOC with centralized and integrated material management of property, equipment maintenance, logistical automation and repair parts and supplies.[69]

- John F. Kennedy Special Warfare Center (USAJFKSWCS) trains USSOCOM and Army Special Operations Forces through development and evaluation of special operations concepts, doctrines and trainings.[70]

# Navy

The United States Naval Special Warfare Command (NAVSPECWARCOM, NAVSOC, or NSWC) was commissioned April 16, 1987, at Naval Amphibious Base Coronado in San Diego as the Naval component to the United States Special Operations Command. Naval Special Warfare Command provides vision, leadership, doctrinal guidance, resources and oversight to ensure component special operations forces are ready to meet the operational requirements of combatant commanders.[71] Today, SEAL Teams and Special Boat Teams comprise the elite combat units of Naval Special Warfare. These teams are organized, trained, and equipped to conduct a variety of

missions to include direct action, special reconnaissance, counter-terrorism, foreign internal defense, unconventional warfare and support psychological and civil affairs operations. Their highly trained operators are deployed worldwide in support of National Command Authority objectives, conducting operations with other conventional and special operations forces.

Units



- United States Navy SEALs have distinguished themselves as an individually reliable, collectively disciplined and highly skilled special operations force. The most important trait that distinguishes Navy SEALs from all other military forces is that SEALs are maritime special operations, as they strike from and return to the sea. SEALs (SEa, Air, Land) take their name from the elements in and from which they operate. SEALs are experts in direct action and special reconnaissance missions. Their stealth and clandestine methods of operation allow them to conduct multiple missions against targets that larger forces cannot approach undetected. Because of the dangers inherent in their missions, prospective SEALs go through what is considered by many military experts to be the toughest training regime in the world.[72][73]

United States Naval Special Warfare Command emblem.

- Naval Special Warfare Development Group (DEVGRU), referred to as SEAL Team Six, the name of its predecessor which was officially disbanded in 1987.
- SEAL Delivery Vehicle Teams are SEAL teams with an added underwater delivery capability who use the SDV MK VIII and the Advanced SEAL Delivery System (ASDS), submersibles that provides NSW with an unprecedented capability that combines the attributes of clandestine underwater mobility and the combat swimmer.[74][75]



- Special Warfare Combatant-craft Crewmen (SWCC) operate and maintain state-of-the-art surface craft to conduct coastal patrol and interdiction and support special operations missions. Focusing on infiltration and exfiltration of SEALs and other SOF, SWCCs provide dedicated rapid mobility in shallow water areas where larger ships cannot operate. They also bring to the table a unique SOF capability: Maritime Combatant Craft Aerial Delivery System—the ability to deliver combat craft via parachute drop.[1] Like SEALs, SWCCs must have excellent physical fitness, highly motivated, combat-focused and responsive in high stress situations.[76]

SEALs emerge from the water during a demonstration.

## Air Force

Air Force Special Operations Command was established May 22, 1990, with headquarters at Hurlburt Field, Florida. AFSOC is one of the 10 Air Force Major Commands or MAJCOMs, and the Air Force component of United States Special Operations Command. It contains the Twenty-Third Air Force and holds operational and administrative oversight of subordinate special operations wings and groups in the regular Air Force, Air Force Reserve Command and the Air National Guard.

AFSOC provides Air Force special operations forces for worldwide deployment and assignment to regional unified commands. The command's SOF are composed of highly trained, rapidly deployable airmen, conducting global special operations missions ranging from precision application of firepower via airstrikes or close air support, to infiltration, exfiltration, resupply and refueling of SOF operational elements.[77] AFSOC's unique capabilities include airborne radio and television broadcast for psychological operations, as well as aviation foreign internal defense instructors to provide other governments military expertise for their internal development.



Air Force Special Operations Command emblem.

The command's core missions include battlefield air operations; agile combat support; aviation foreign internal defense; information operations; precision aerospace fires; psychological operations; specialized air mobility; specialized refueling; and intelligence, surveillance and reconnaissance.[27][78][79]

Units

- Combat Controllers (CCT) are ground combat forces specialized in a traditional pathfinder role while having a heavy emphasis on simultaneous air traffic control, fire support (via airstrikes, close air support and command, control, and communications in covert or austere environments.[80][81]
- Pararescuemen (PJ) are the only Department of Defense specialty specifically trained and equipped to conduct conventional and unconventional personnel recovery operations. A PJ's primary function is as a personnel recovery specialist with emergency trauma medical capabilities in humanitarian and combat environments.
- Special Operations Weather Technicians (SOWT) gather, assess, and interpret weather and environmental intelligence from forward deployed locations, working alongside special operations teams.

Organization

- The 1st Special Operations Wing (1 SOW) is located at Hurlburt Field, Florida. Its mission focus is unconventional warfare: counter-terrorism, combat search and rescue, personnel recovery, psychological operations, aviation assistance to developing nations, "deep battlefield" resupply, interdiction and close air support. The wing's core missions include aerospace surface interface, agile combat support, combat aviation advisory operations, information operations, personnel recovery/recovery operations, precision aerospace fires, psychological operations dissemination, specialized aerospace mobility and specialized aerial refueling.[82] Among its aircraft is the MC-130 Combat Talon II, a low-level terrain following special missions transport that can evade radar detection and slip into enemy territory at a 200-foot (61 m) altitude for infiltration/exfiltration missions, even in zero visibility, dropping off or recovering men or supplies with pinpoint accuracy. It also operates the AC-130 Spooky and Spectre gunships that provide highly accurate airborne gunfire for close air support of conventional and special operations forces on the ground.[46]
- The 24th Special Operations Wing (24 SOW) is located at Hurlburt Field, Florida. It's composed of the 720th Special Tactics Group, 724th Special Tactics Group, Special Tactics Training Squadron and 16 recruiting locations across the United States.[83][84] The Special Tactics Squadrons, under the 720th STG and 724th STG, are made up of Special Tactics Officers, Combat Controllers, Combat Rescue Officers, Pararescuemen, Special Operations Weather Officers and Airmen, Air Liaison Officers, Tactical Air Control Party operators, and a number of combat support airmen which comprise 58 Air Force specialties.[84]

- The 27th Special Operations Wing (27 SOW) is located at Cannon AFB, New Mexico. Its primary mission includes infiltration, exfiltration and re-supply of special operations forces; air refueling of special operations rotary wing and tiltrotor aircraft; and precision fire support. These capabilities support a variety of special operations missions including direct action, unconventional warfare, special reconnaissance, counter-terrorism, personnel recovery, psychological operations and information operations.[85]
- The 193d Special Operations Wing (193 SOW) is an Air National Guard (ANG) unit, operationally gained by AFSOC, and located at Harrisburg International Airport/Air National Guard Station (former Olmsted Air Force Base), Pennsylvania. Under Title 32 USC, the 193 SOW performs state missions for the Governor of Pennsylvania as part of the Pennsylvania Air National Guard. Under Title 10 USC, the 193 SOW is part of the Air Reserve Component (ARC) of the United States Air Force. Its primary wartime and contingency operations mission as an AFSOC-gained unit is psychological operations (PSYOP). The 193 SOW is unique in that it is the only unit in the U.S. Air Force to fly and maintain the Lockheed EC-130J Commando Solo aircraft.

- The 919th Special Operations Wing (919 SOW) is an Air Force Reserve Command (AFRC) unit, operationally gained by AFSOC, and located at Eglin AFB Auxiliary Field #3/Duke Field, Florida. The 919 SOW flies and maintains the MC-130E Combat Talon I and MC-130P Combat Shadow special operations aircraft designed for covert operations.
- The 352d Special Operations Wing (352 SOW) at RAF Mildenhall, United Kingdom serves as the core to United States European Command's standing Joint Special Operations Air Component headquarters. The squadron provides support for three flying squadrons, one special tactics squadron and one maintenance squadron for exercise, logistics, and war planning; aircrew training; communications; aerial delivery; medical; intelligence; security and force protection; weather; information technologies and transformation support and current operations.[86]


Air Force Special Operators on a training mission.

- The 353d Special Operations Group (353 SOG) is the focal point for all U.S. Air Force special operations activities throughout the United States Pacific Command (USPACOM) theater. Headquartered at Kadena AB, Okinawa, Japan the group is prepared to conduct a variety of high-priority, low-visibility missions. Its mission is air support of joint and allied special operations forces in the Pacific. It maintains a worldwide mobility commitment, participates in Pacific theater exercises as directed and supports humanitarian and relief operations.[87]
- The United States Air Force Special Operations School (USAFSOS) at Hurlburt Field, Florida is a primary support unit of the Air Force Special Operations Command. The USAFSOS prepares special operations Airmen to successfully plan, organize, and execute global special operations by providing indoctrination and education for AFSOC, other USSOCOM components, and joint/interagency/ coalition partners.[88]

## Marine Corps

In October 2005, the Secretary of Defense directed the formation of United States Marine Corps Forces Special Operations Command, the Marine component of United States Special Operations Command. It was determined that the Marine Corps would initially form a unit of approximately 2500 to serve with USSOCOM. On February 24, 2006 MARSOC activated at Camp Lejeune, North Carolina. MARSOC initially consisted of a small staff and the Foreign Military Training Unit (FMTU), which had been formed to conduct foreign internal defense. FMTU is now designated as the Marine Special Operations Advisor Group (MSOAG).[89]

As a service component of USSOCOM, MARSOC is tasked by the Commander USSOCOM to train, organize, equip, and deploy responsive U.S. Marine Corps special operations forces worldwide, in support of combatant commanders and other agencies. MARSOC has been directed to conduct foreign internal defense, direct action and special reconnaissance. MARSOC has also been directed to develop a capability in unconventional warfare, counter-terrorism, and information operations. MARSOC deployed its first units in August 2006, six months after the group's initial activation. MARSOC reached full operational capability in October 2008.[90]


United States Marine Corps Forces Special Operations Command emblem

### Units

- Marine Special Operations "Raider" Regiment (MSOR) consists of a Headquarters Company and three Marine Special Operations Battalions, the 1st, 2nd and 3rd MSOB. The Regiment provides tailored military combat-skills training and advisor support for identified foreign forces in order to enhance their tactical capabilities and to prepare the environment as directed by USSOCOM as well as the capability to form the nucleus of a Joint Special Operations Task Force. Marines and Sailors of the MRR train, advise and assist friendly host nation forces – including naval and maritime military and paramilitary forces – to enable them to support their governments' internal security and stability, to counter subversion and to reduce the risk of violence from internal and external threats. MRR deployments are coordinated by MARSOC, through USSOCOM, in accordance with engagement priorities for Overseas Contingency Operations.
- Marine Intelligence Battalion (MIB) trains, sustains, maintains combat readiness, and provides intelligence support at all operational levels in order to support MARSOF training and operations worldwide with mission-specific intelligence capability.
- Marine Special Operations Support Group (MSOSG) trains, equips, structures, and provides specially qualified Marine forces, including, operational logistics, intelligence, Military Working Dogs, Firepower Control Teams, and communications support in order to sustain worldwide special operations missions as directed by Commander, U.S. Marine Corps Forces Special Operations Command (COMMARFORSOC).


DA/SR Operators from 1st SOB (Special Operations Battalion) respond to enemy fire in Afghanistan

- The Marine Special Operations School (MSOS) performs the screening, recruiting, training, assessment and doctrinal development functions for MARSOC. It includes two subordinate Special Missions Training Branches (SMTBs), one on each coast.
  - The Special Mission Training Branch—East provide special operations training in tactics, techniques and procedures, and evaluation and certification of MARSOC forces to specified conditions and standards for SOF. The Marines of MSOS are operators with the training, experience and mature judgment to plan,

coordinate, instruct and supervise development of SOF special reconnaissance and direct action skills.[91]

## List of USSOCOM Combatant Commanders

| No. | Image | Name | Branch | Start of Term | End of Term | Time in office |
|---|---|---|---|---|---|---|
| 1. | | GEN James J. Lindsay | USA | 16 April 1987 | 27 June 1990 | 1,168 days |
| 2. | | GEN Carl W. Stiner | USA | 27 June 1990 | 20 May 1993 | 1,058 days |
| 3. | | GEN Wayne A. Downing | USA | 20 May 1993 | 29 February 1996 | 1,015 days |
| 4. | | GEN Henry H. Shelton | USA | 29 February 1996 | 25 September 1997 | 574 days |
| (Acting) | | RADM Raymond C. Smith, Jr. | USN | 25 September 1997 | 5 November 1997 | 41 days |
| 5. | | GEN Peter J. Schoomaker | USA | 5 November 1997 | 27 October 2000 | 1,087 days |
| 6. | | GEN Charles R. Holland | USAF | 27 October 2000 | 2 September 2003 | 1,040 days |
| 7. | | GEN Bryan D. Brown | USA | 2 September 2003 | 9 July 2007 | 1,406 days |
| 8. | | ADM Eric T. Olson | USN | 9 July 2007 | 8 August 2011 | 1,491 days |
| 9. | | ADM William H. McRaven | USN | 8 August 2011 | 28 August 2014 | 1,116 days |
| 10. | | GEN Joseph L. Votel | USA | 28 August 2014 | Present | days |

## USSOCOM medal

The United States Special Operations Command Medal was introduced in 1994 to recognize individuals for outstanding contributions to, and in support of, special operations. Since it was created, there have been more than 50 recipients, four of which are not American. Some of which includes: General broni Włodzimierz Potasiński (Poland, 2010, posthumously),[92][93] Kaptein Gunnar Sønsteby (Norway, 2008), Generał brygady Jerzy Gut (Poland, June 2014)[94] and Generał dywizji Piotr Patalong (Poland, October 2014).[95]

## See also

4/27/2018
Case 1:15-cv-20782-JEM   Document 182-4   Filed 08/07/23   Page 233 of 650
Case 1:15-cv-20782-JEM   Document 401-1   Entered on FLSD Docket 05/27/2019   Page 68 of 150

## References

### Citations

1. SOCOM Public Affairs (2013). SOCOM Fact Book 2013 (http://www.socom.mil/News/Documents/USSOCOM_Fact_Book_2013.pdf). SOCOM Public Affairs.
2. "Biography of Admiral James L. Holloway III, US Navy (Ret.)" (http://www.history.navy.mil/bios/holloway_j.htm). June 2006. Retrieved 21 March 2008. |first1= missing |last1= in Authors list (help)
3. Rother, Larry (6 December 1996). "With a Bang, Panama Is Erasing House of Horrors". The New York Times.
4. Shanker, Thom (12 February 2004). "Regime Thought War Unlikely, Iraqis Tell U.S". The New York Times.
5. "USSOCOM Posture Statement" (http://web.archive.org/web/20080227010822/http://www.socom.mil/Docs/USSOCOM_Posture_Statement_2007.pdf) (PDF). USSOCOM. 2007. Archived from the original (http://www.socom.mil/Docs/USSOCOM_Posture_Statement_2007.pdf) on 27 February 2008. Retrieved 12 February 2008.
6. Delta: America's Elite Counterterrorist Force. Terry Griswold, D. M. Giangreco. Zenith Imprint, 2005. ISBN 0-7603-2110-8. p. 35
7. Sloan, Stephen (October 1992). Beating International Terrorism: An Action Strategy for Preemption and Punishment. Diane Pub Co. ISBN 1-56806-104-8.
8. Daniel, W.C. (September 1986). "H.R.5109". A bill to establish a National Special Operations Agency within the Department of Defense to have unified responsibility for all special operations forces and activities within the Department.
9. "USSOCOM Command History" (http://fas.org/irp/agency/dod/socom/2007history.pdf) (PDF). Retrieved 12 October 2014.
10. Goldwater, Barry; Sam Nunn. "S.CON.RES.80". A concurrent resolution to authorize the printing of 2,000 additional copies of the Committee Print of the Committee on Armed Services (99th Congress, 1st Session) entitled "Defense Organization: The Need for Change".
11. Nichols, Bill; Barry Goldwater (1986). "H.R.3622". A bill to amend title 10, United States Code, to strengthen the position of Chairman of the Joint Chiefs of Staff, to provide for more efficient and effective operation of the Armed Forces, and for other purposes.
12. Lederman, Gordon Nathaniel (November 1999). Reorganizing the Joint Chiefs of Staff: The Goldwater-Nichols Act of 1986. Greenwood Press. ISBN 0-313-31085-8.
13. Cohen, William (May 1986). "S.2453". A bill to enhance the capabilities of the United States to combat terrorism and other forms of unconventional warfare.
14. Taubman, Philip (5 December 1984). "U.S. Military tries to catch up in fighting terror". New York Times.
15. "Special Operations/Low Intensity Conflict & Interdependent Capabilities (ASD SO/LIC & IC)" (http://www.defenselink.mil/policy/sections/policy_offices/solic/). DoD. Retrieved 19 March 2008. |first1= missing |last1= in Authors list (help)
16. Giles, James E.; Altizer, Harrell B. ; Glass, David V. Parker, Robert W. (March 1989). "Providing Resources for Special Operations Forces: Completing the Transition" (http://stinet.dtic.mil/oai/oai?verb=getRecord&metadataPrefix=html&identifier=ADA210951). Retrieved 19 March 2008.
17. Lewis, Paul (1 July 2001). "Charles S. Whitehouse, 79, Diplomat and C.I.A. Official". New York Times.
18. Andrew Kelley, Stephen (June 2007). "Better Lucky Than Good: Operation Earnest Will as Gunboat Diplomacy" (http://web.archive.org/web/20090318120640/http://www.ccc.nps.navy.mil/research/theses/kelley07.pdf) (PDF). Naval Postgraduate School. Archived from the original (http://www.ccc.nps.navy.mil/research/theses/kelley07.pdf) on 18 March 2009. Retrieved 12 May 2008.
19. Peniston, Bradley (July 2006). No Higher Honor: Saving the USS Samuel B. Roberts in the Persian Gulf. United States Naval Institute Press. ISBN 1-59114-661-5.
20. "A Big Second Step in Somalia". New York Times. 4 May 1993.
21. "Two Tough Tracks in Somalia". New York Times. 10 December 1992.
22. The Book of Honor: Cover Lives and Classified Deaths at the CIA by Ted Gup, 2000
23. Bowden, Mark (2001). Black Hawk Down: A Story of Modern War. Signet. ISBN 0-451-20393-3.
24. Eversmann, Matt; Dan Schilling (July 2006). The Battle of Mogadishu: Firsthand Accounts from the Men of Task Force Ranger. Presidio Press. ISBN 0-345-46668-3.
25. Plan of Attack, Bob Woodward, 2004
26. Dao, James (22 March 2003). "The Commandos; Navy Seals Easily Seize 2 Oil Sites". New York Times.
27. Dao, James (28 April 2003). "Aftereffects: Special Operations Forces; War Plan Drew U.S. Commandos From Shadows". The New York Times.
28. Kruzel, John (26 May 2007). "Navy SEALs share war stories from Anbar province". American Forces Press Service.
29. R. Gordon, Michael (13 June 2003). "After The War: The Allies; In Major Assault, U.S. Forces Strike Hussein Loyalists". New York Times.
30. D. Kozaryn, Linda (14 December 2001). "U.S. Special Operations Forces Change "Face of War" ". American Forces Press Service.
31. Thom Shanker, Eric Schmitt (2 August 2004). "The Reach of War: Military; Special Warriors Have Growing Ranks and Growing Pains in Taking Key Antiterror Role" (http://www.nytimes.com/2004/08/02/world/reach-war-military-special-warriors-have-growing-ranks-growing-pains-taking-key.html). The New York Times. Retrieved 11 March 2008.
32. DeYoung, Karen, and Greg Jaffe, "U.S. 'secret war' expands globally as Special Operations forces take larger role" (http://www.washingtonpost.com/wp-dyn/content/article/2010/06/03/AR2010060304965.html?nav=emailpage), Washington Post, 4 June 2010. Retrieved 5 August 2011.
33. Turse, Nick, "A Secret War in 120 Countries: The Pentagon's New Power Elite" (http://counterpunch.org/turse08042011.html), CounterPunch, 4 August 2011. Retrieved 5 August 2011.
34. Washington Post op-ed, John Lehman former Secretary of the Navy, October 2008
35. Waller, Douglas (3 February 2003). "The CIA Secret Army" (http://www.time.com/time/magazine/article/0,9171,1004145,00.html). Time Magazine (Washington). Retrieved 28 September 2009.
36. "Operation Anaconda" (http://www.time.com/time/covers/1101020318/popup/). Time. 10 March 2002.
37. Garamone, Jim. "The Battle of Takur Ghar" (http://www.defenselink.mil/news/newsarticle.aspx?id=44020). American Forces Press Service.
38. Executive biography of the Battle of Takur Ghar (http://www.defenselink.mil/news/May2002/d20020524takurghar.pdf) (PDF). |first1= missing |last1= in Authors list (help)
39. MacPherson, Malcolm (2006). Roberts Ridge: A Story of Courage and Sacrifice on Takur Ghar Mountain, Afghanistan. Dell. ISBN 0-553-58680-7.
40. Luttrell, Marcus; Patrick Robinson (2007). Lone Survivor: The Eyewitness Account of Operation Redwing and the Lost Heroes of SEAL Team 10. Little, Brown and Company. ISBN 0-316-06759-8.
41. Blumenfield, Laura (11 June 2007). "The Sole Survivor" (http://www.washingtonpost.com/wp-dyn/content/article/2007/06/10/AR2007061001492.html). Washington Post.
42. Naylor, Sean D., "McRaven tapped to lead SOCOM" (http://www.armytimes.com/news/2011/03/military-mcraven-picked-to-lead-socom-030111/), Army Times, 1 March 2011 16:53:04 EST. Retrieved 5 August 2011.
43. http://www.imgc-global.com/testimonials.html. Retrieved February 2012.
44. Risen, James (20 September 1998). "The World: Passing the Laugh Test; Pentagon Planners Give New Meaning to 'Over the Top' ". New York Times.
45. Emerson 1988, p. 26.
46. Emerson, Steven (13 November 1988). "Stymied Warriors". New York Times.
47. L. Haney, Eric (August 2005). Inside Delta Force: The Story of America's Elite Counterterrorist Unit. Delta. ISBN 0-385-33936-4.
48. Mark Mazzetti (13 January 2007). "Pentagon Sees Move in Somalia as Blueprint". New York Times.

49. Smith, Michael (2007). Killer Elite: The Inside Story of America's Most Secret Special Operations Team. New York, New York: St. Martin's Press. ISBN 0-312-36272-2.
50. Gellman, Barton (23 January 2005). "Secret Unit Expands Rumsfeld's Domain". Washington Post.
51. Gerth, Jeff; Philip Taubman (8 June 1984). "U.s. military creates secret units for use in sensitive tasks abroad". New York Times.
52. Schmitt, Eric (19 March 2006). "In Secret Unit's 'Black Room,' a Grim Portrait of U.S. Abuse". New York Times.
53. E. Sanger, David (29 February 2004). "New U.S. Effort Steps Up Hunt For bin Laden". New York Times.
54. SOCJFCOM transitions to USSOCOM and becomes Special Operations Command – Joint Capabilities (http://www.jfcom.mil/newslink/storyarchive/2011/pa050211.html), 2 May 2011
55. "USASOC overview" (http://www.soc.mil/sofinfo/story.html). Retrieved 8 January 2008.
56. Schmitt, Eric; Michael R. Gordon (21 September 2001). "A Nation Challenged: The Military: Top Air Chief Sent". New York Times.
57. "75th Ranger Regiment website" (http://web.archive.org/web/20080127071358/http://www.soc.mil/75thrr/75th_home.htm). Archived from the original (http://www.soc.mil/75thrr/75th_home.htm) on 27 January 2008. Retrieved 12 February 2008.
58. "75th Ranger Regiment website" (http://web.archive.org/web/20080208083040/http://www.soc.mil/75thrr/75thrrfs.html). Archived from the original (http://www.soc.mil/75thrr/75thrrfs.html) on 8 February 2008. Retrieved 12 February 2008.
59. Couch, Dick (March 2007). Chosen Soldier: The Making of a Special Forces Warrior. Three Rivers Press. ISBN 0-307-33939-4.
60. Shanker, Thom (21 January 2002). "A Nation Challenged: Battlefield; Conduct of War Is Redefined By Success of Special Forces". New York Times.
61. Schmitt, Eric; Thom Shanker (2 March 2008). "U.S. Plan Widens Role in Training Pakistani Forces in Qaeda Battle". New York Times.
62. "USASF mission" (http://web.archive.org/web/20071211221352/http://www.soc.mil/SF/mission.htm). Archived from the original (http://www.soc.mil/SF/mission.htm) on 11 December 2007. Retrieved 8 January 2008.
63. "Night Stalkers fact sheet" (http://web.archive.org/web/20071217230457/http://www.soc.mil/160soar/soar_home.htm). Archived from the original (http://www.soc.mil/160soar/soar_home.htm) on 17 December 2007. Retrieved 8 January 2008.
64. "160th SOAR,MH-60 Black Hawk Helicopter Fact Sheet" (http://www.soc.mil/160soar/Blkhawk.html). Retrieved 12 February 2008.
65. "PSYOP Recruiting website" (http://web.archive.org/web/20080204120503/http://www.bragg.army.mil/psyop/psyopintro.htm). Archived from the original (http://www.bragg.army.mil/psyop/psyopintro.htm) on 4 February 2008. Retrieved 12 February 2008.
66. "Army Civil Affairs, Psychological Operations Soldiers Deploy in Support of Tsunami Relief Efforts" (http://www.defenselink.mil/home/articles/2005-01/a010705tj1.html) (Press release). Department of Defense. 7 January 2005. Retrieved 14 March 2008.
67. "PSYOP fact sheet" (http://web.archive.org/web/20080203103530/http://www.soc.mil/psyop/psyop_default.htm). Archived from the original (http://www.soc.mil/psyop/psyop_default.htm) on 3 February 2008. Retrieved 12 February 2008.
68. "95th Civil Affairs Fact Sheet" (http://web.archive.org/web/20080119211325/http://www.soc.mil/ca/ca_default.htm). Archived from the original (http://www.soc.mil/ca/ca_default.htm) on 19 January 2008. Retrieved 21 January 2008.
69. "SOSCOM Home Page" (http://web.archive.org/web/20080119210555/http://www.soc.mil/soscom/soscom_default.htm). Archived from the original (http://www.soc.mil/soscom/soscom_default.htm) on 19 January 2008. Retrieved 12 February 2008.
70. "USAJFKSWCS" (http://web.archive.org/web/20080119211345/http://www.soc.mil/swcs/swcs_default.htm). Archived from the original (http://www.soc.mil/swcs/swcs_default.htm) on 19 January 2008. Retrieved 19 February 2008.
71. "NAVSOC info website" (https://www.navsoc.navy.mil/). Retrieved 8 January 2008.
72. "Official U.S. Navy SEAL Info Website" (http://199.208.208.41/seal/introduction.aspx). Retrieved 11 January 2008.
73. Couch, Dick (October 2001). The Warrior Elite: The Forging of SEAL Class 228. Crown. ISBN 0-609-60710-3.
74. "Navy SEALs insertion/extraction page" (http://www.navyseals.com/insertion-extraction). Retrieved 11 January 2008.
75. Tiron, Roxana (February 2002). "New Mini-Sub Gives SEALs Extra Speed, Range, Payload". National Defense Magazine.
76. "Official U.S. Navy SWCC Info Website" (http://www.seal.navy.mil/swcc/introduction.aspx). Retrieved 11 January 2008.
77. Steven Lee Meyers, Thom Shanker (16 October 2001). "A Nation Challenged: The Offensive; Special Operations Gunship Being Used Against Taliban". New York Times.
78. "AFSOC" (http://www2.afsoc.af.mil/). Retrieved 11 January 2008.
79. Meyers, Steven Lee; Thom Shanker (17 October 2001). "A Nation Challenged: Air War; Pilots Told to Fire at Will in Some Zones". New York Times.
80. "Combat Control Fact Sheet" (http://archive.is/8rCmr). Air Force Special Operations Command. United States Air Force. Archived from the original (http://www.af.mil/information/factsheets/factsheet.asp?id=174) on 21 February 2013. Retrieved 13 January 2013.
81. "Combat Control career description" (http://www.airforce.com/careers/detail/combat-control-males-only/). Retrieved 12 January 2013.
82. "1st SOW Fact Sheet" (http://www2.hurlburt.af.mil/library/factsheets/factsheet.asp?id=3485). AFSOC. Retrieved 20 January 2008.
83. "Air Force launches first special tactics wing" (http://archive.is/Do72). 2012-06-13. Archived from the original (http://www.af.mil/news/story.asp?id=123305724) on December 12, 2012. Retrieved January 15, 2013.
84. "24th SOW Factsheet" (http://www.afsoc.af.mil/library/factsheets/factsheet.asp?id=19566). Retrieved January 15, 2013.
85. "N.M. Delegation Welcomes 27th Special Ops. Wing to Cannon" (http://bingaman.senate.gov/news/record.cfm?id=281393) (Press release). 29 August 2007. Retrieved 21 March 2008.
86. "352nd Fact Sheet" (http://www2.afsoc.af.mil/library/factsheets/factsheet.asp?id=224). AFSOC. Retrieved 21 January 2008.
87. "353rd SOG Fact Sheet" (http://www2.afsoc.af.mil/library/factsheets/factsheet.asp?id=225). AFSOC. Retrieved 21 January 2008.
88. "USAFOS fact sheet" (http://web.archive.org/web/20080109132212/http://www.af.mil/factsheets/factsheet.asp?id=186). Archived from the original (http://www.af.mil/factsheets/factsheet.asp?id=186) on 9 January 2008. Retrieved 21 January 2008.
89. Kenyon, Henry (May 2006). "Marine Corps Special Operations Command Hits the Beach" (http://www.afcea.org/signal/articles/templates/SIGNAL_Article_Template.asp?articleid=1123&zoneid=182). Signal Magazine. Retrieved 10 April 2008.
90. "MARSOC" (http://www.marsoc.usmc.mil/). Retrieved 8 January 2008.
91. "MARSOC, MSOS Info website" (http://web.archive.org/web/20080209195131/http://www.marsoc.usmc.mil/msos.html). Archived from the original (http://www.marsoc.usmc.mil/msos.html) on 9 February 2008. Retrieved 21 January 2008.
92. USSOCOM Medal recipients (http://www.shadowspear.com/the-united-states-special-operations-command-medal-to-lt-gen-wlodzimierz-potasiński.6197/)
93. "NEWS | USSOCOM Commander visits POLSOCOM | Dowództwo Wojsk Specjalnych" (http://www.wojskaspecjalne.mil.pl/45,more,129-ussocom_commander_visits_polsocom.html?ln=en). Wojskaspecjalne.mil.pl. 2010-05-14. Retrieved 2013-04-22.
94. "Amerykańskie dowództwo Operacji Specjalnych docenilo polskiego generała" (http://www.wojsko-polskie.pl/pl/z-zycia-wojska/30655,amerykanskie-dowodztwo-operacji-specjalnych-docenilo-polskiego-generala.html). wojsko-polskie.pl. 2014-06-03. Retrieved 2014-06-03.
95. "Medal USSOCOM dla polskiego generała" (http://mon.gov.pl/aktualnosci/artykul/najnowsze/2014-10-29-medal-dowodztwa-operacji-specjalnych-usa-dla-polskiego-generala/). mon.gov.pl. 2014-10-29. Retrieved 2014-10-29.

Bibliography

- Briscoe, Charles (2001). Weapon of Choice: ARSOF in Afghanistan. Combat Studies Institute Press.
- Couch, Dick (March 2007). Chosen Soldier: The Making of a Special Forces Warrior. Three Rivers Press. ISBN 0-307-33939-4.
- Couch, Dick (2006). Down Range: Navy SEALs in the War on Terrorism. New York, New York: Three Rivers Press. ISBN 1-4000-8101-7.
- Kelley, Stephen Andrew (June 2007). "Better Lucky Than Good: Operation Earnest Will as Gunboat Diplomacy" (http://web.archive.org/web/20090318120640/http://www.ccc.nps.navy.mil/research/theses/kelley07.pdf) (PDF). Naval Postgraduate School. Archived from the original (http://www.ccc.nps.navy.mil/research/theses/kelley07.pdf) on 18 March 2009. Retrieved 12 May 2008.
- Luttrell, Marcus; Patrick Robinson (June 2007). Lone Survivor: The Eyewitness Account of Operation Redwing and the Lost Heroes of SEAL Team 10. Little, Brown and Company. ISBN 0-316-06759-8.
- Pirnie, Bruce R. (August 1998). Assessing Requirements for Peacekeeping, Humanitarian Assistance and Disaster Relief. RAND Corporation. ISBN 0-8330-2594-5.
- Pushies, Fred (2007). U.S. Air Force Special Ops. Osceola, Wisconsin: MBI Publishing Company. ISBN 0-7603-0733-4.
- Smith, Michael (2007). Killer Elite: The Inside Story of America's Most Secret Special Operations Team. New York, New York: St. Martin's Press. ISBN 0-312-36272-2.
- Sweetman, Jack (March 1999). Great American Naval Battles. Naval Institute Press. ISBN 1-55750-794-5.
- David Tucker, Christopher J. Lamb (2007). United States Special Operations Forces. Columbia University Press. ISBN 0-231-13190-9.
- Wise, Harold Lee (May 2007). Inside the Danger Zone: The U.S. Military in the Persian Gulf, 1987–1988. US Naval Institute Press. ISBN 1-59114-970-3.

Web

- USDOD. U.S. DOD Dictionary of Military Terms (http://www.dtic.mil/doctrine/jel/doddict/). United States of America: U.S. Department of Defense. 5 June 2003.
- USDOD. U.S. DOD Dictionary of Military Terms: Joint Acronyms and Abbreviations (http://www.dtic.mil/doctrine/jel/doddict/). United States of America: U.S. Department of Defense. 5 June 2003.
- Talmadge, Eric (27 February 2008). "New US Submarines Trade Nukes for SEALs" (http://www.foxnews.com/wires/2008Feb27/0,4670,StealthatSea,00.html). Fox News. Associated Press.
- Eric Schmitt, Michael R. Gordon (4 February 2008). "Leak on Cross-Border Chases From Iraq" (http://www.nytimes.com/2008/02/04/washington/04rules.html?_r=1&scp=3&sq=Army+Rangers&st=nyt&oref=slogin). New York Times.
- von Zielbauer, Paul (27 April 2007). "Criminal Charges Are Expected Against Marines, Official Says" (http://www.nytimes.com/2007/04/27/world/asia/27abuse.html?scp=1&sq=MARSOC&st=nyt). New York Times.
- Graham, Bradley (2 November 2005). "Elite Marine Unit to Help Fight Terrorism" (http://www.washingtonpost.com/wp-dyn/content/article/2005/11/01/AR2005110102069.html). Washington Post. Retrieved 27 May 2010. Check date values in: |year= / |date= mismatch (help)

## External links

- U.S. Special Operations Command (http://www.socom.mil/)
- Air Force Special Operations Command (http://www2.afsoc.af.mil/)
- U.S. Army Special Operations Command (http://www.soc.mil/)
- U.S. Naval Special Warfare Command (http://www.navsoc.navy.mil/)
- U.S. Marine Corps Forces Special Operations Command (http://www.marines.mil/unit/marsoc/Pages/default.aspx)
- Department of Defense (http://www.defenselink.mil/)
- Joint Special Operations University (https://jsou.socom.mil/)



Wikimedia Commons has media related to United States Special Operations Command.

Retrieved from "http://en.wikipedia.org/w/index.php?title=United_States_Special_Operations_Command&oldid=656910583"

Categories: Special operations commands of the United States Armed Forces │ Military units and formations in Florida │ Counter-terrorism

- This page was last modified on 17 April 2015, at 15:26.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

4/27/2015
Case 1:21-cv-00445-CJN Document 182-4 Filed 08/07/22 Page 236 of 650
Case 1:15-cv-16782-JEM Document 40-1 Entered on FLSD Docket 04/27/2019 Page 71 of 150

# United States Central Command

From Wikipedia, the free encyclopedia

The United States Central Command (USCENTCOM or CENTCOM) is a theater-level Unified Combatant Command of the U.S. Department of Defense, established in 1983, taking over the 1980 Rapid Deployment Joint Task Force (RDJTF) responsibilities.

The CENTCOM Area of Responsibility (AOR) includes countries in the Middle East, North Africa, and Central Asia, most notably Afghanistan and Iraq. CENTCOM has been the main American presence in many military operations, including the Persian Gulf War, the War in Afghanistan (2001–present), and the Iraq War. As of 2015 CENTCOM forces are deployed primarily in Iraq and Afghanistan in combat roles and have support roles at bases in Kuwait, Bahrain, Qatar, the United Arab Emirates, Oman, Pakistan, and central Asia. CENTCOM forces have also been deployed in Jordan, and Saudi Arabia in the past, with a small presence remaining there.as of 2009.

As of 22 March 2013 CENTCOM's commander is General Lloyd J. Austin, U.S. Army.

Of all 6 American regional unified combatant commands CENTCOM is among the three with headquarters outside its area of operations. CENTCOM's main headquarters is located at MacDill Air Force Base, in Tampa, Florida. A forward headquarters was established in 2002 at Camp As Sayliyah in Doha, Qatar, which in 2009 transitioned to a forward headquarters at Al Udeid Air Base in Qatar to serve American strategic interests. On 12 January, 2015, CENTCOM's Twitter and YouTube accounts were hacked.[2]



| United States Central Command | |
|---|---|
| Emblem of the United States Central Command. | |
| Active | 1983–present |
| Country | United States of America |
| Type | Unified Combatant Command |
| Headquarters | MacDill Air Force Base Tampa, Florida, U.S. |
| Nickname | CENTCOM |
| Engagements | Persian Gulf War Iraq War War in Afghanistan |
| Commanders | |
| Combatant Commander | General Lloyd Austin, USA |
| Deputy Commander | Vice Admiral Mark Fox, USN [1] |
| Notable commanders | General David Petraeus Admiral William Fallon General John Abizaid General Tommy Franks General Anthony Zinni General James Mattis |

# Contents

- 1 History
- 2 Structure
  - 2.1 War planning

- 3 Geographic scope
- 4 Commanders
  - 4.1 Unit decorations
- 5 See also
- 6 References
- 7 External links

General Norman Schwarzkopf Insignia

Shoulder sleeve insignia (US Army only)



# History

In 1983, U.S. Central Command was established to succeed the Rapid Deployment Joint Task Force, formed at MacDill AFB, Florida on 1 March 1980, to handle US national security interests in Southwest Asia, Central Asia and the Persian Gulf.[3]

On 17 May 1987, the USS Stark (FFG-31), conducting operations in the Persian Gulf during the Iran-Iraq War, was struck by Exocet missiles fired by an Iraqi aircraft, resulting in 37 casualties. Soon afterward, as part of what became known as the "Tanker War", the Federal government of the United States reflagged and renamed 11 Kuwaiti oil tankers. In Operation Earnest Will, these tankers were escorted by USCENTCOM's Middle East Force through the Persian Gulf to Kuwait and back through the Strait of Hormuz.[3]

With the 1990 Invasion of Kuwait and the subsequent Operation Desert Shield, hundreds of thousands of troops were transferred to Saudi Arabia. Islamists objected to non-Muslim troops in Saudi Arabia, and their use in Operation Desert Storm; this with other attacks on Iraq became a key rallying cry for opposition movements in Saudi Arabia and elsewhere. By the late 1990s, Central Command gradually moved troops to other countries, particularly Bahrain, Kuwait, Qatar, Oman, and the United Arab Emirates.

Exercise Internal Look has been one of CENTCOM's primary planning events. It had frequently been used to train CENTCOM to be ready to defend the Zagros Mountains from a Soviet attack and was held annually.[4] In autumn 1989, the main CENTCOM contingency plan, OPLAN 1002-88, assumed a Soviet attack through Iran to the Persian Gulf. The plan called for five and two-thirds US divisions to deploy, mostly light and heavy forces at something less than full strength (apportioned to it by the Joint Strategic Capability Plan [JSCAP]). The strategy of the original plan called for these five and two-thirds divisions to march from the Persian Gulf to the Zagros Mountains and prevent the Soviet Ground Forces from seizing the Iranian oil fields.[5] After 1990 Norman Schwarzkopf reoriented CENTCOM's planning to fend off a threat from Iraq and the exercise moved to a biennial schedule. The exercise has been employed for explicit war planning on at least two occasions: Internal Look '90, which dealt with a threat from Iraq,[4] and Internal Look '03, which was used to plan what became Operation Iraqi Freedom.

From April to July 1999 CENTCOM conducted Exercise Desert Crossing 1999 centered on the scenario of Saddam Hussein being ousted as Iraq's dictator. It was held in the McLean, Virginia, offices of Booz Allen.[6]:6-7 The exercise concluded that unless measures were taken, "fragmentation and chaos" would ensue after Saddam Hussein's overthrow.

In January 2015, CENTCOM's Twitter feed was reported to have been hacked on 11 January by ISIS sympathizers.[7] for less than one hour. No classified information was posted and "none of the information posted came from CENTCOM's server or social media sites",[8] however, some of the slides came from federally funded Lincoln Laboratory at MIT.[7]

# Structure

CENTCOM headquarters staff directorates include personnel, intelligence, operations, logistics, plans & policy, information systems, training & exercises, and resources, and other functions. The intelligence section is known as Joint Intelligence Center, Central Command, or JICCENT, which serves as a Joint Intelligence Center for the co-ordination of intelligence. Under the intelligence directorate, there are several divisions including the Afghanistan-Pakistan Center of Excellence.

CENTCOM directs four "service component commands" and one subordinate unified command and no fighting units directly subordinate to it:

The United States Army Central (USARCENT), and the United States Air Forces Central Command (USAFCENT), both headquartered at Shaw Air Force Base in South Carolina, the U.S. Marine Forces Central Command (USMARCENT), headquartered at MacDill Air Force Base, Florida and the U.S. Naval Forces Central Command (USNAVCENT), headquartered at Naval Support Activity Bahrain in the Kingdom of Bahrain. MacDill Air Force Base also hosts a Sub-unified command called the Special Operations Command Central (USSOCCENT).

Two major subordinate multi-service commands reporting to Central Command were responsible for Afghanistan: Combined Joint Task Force 180 and Combined Forces Command Afghanistan (CFC-A). CFC-A was disestablished in February 2007.[9] From that point onward, the International Security Assistance Force directed most U.S. forces in Afghanistan, and a U.S. general, General Dan K. McNeill, assumed command of ISAF that same month.[10]

Temporary task forces include the Central Command Forward - Jordan (CF-J), established in Jordan after 2011. The reason for its establishment has been reported as to seize Syrian WMD if necessary.[11]

On 1 October 2008 Combined Joint Task Force - Horn of Africa at Camp Lemonnier in Djibouti was transferred to United States Africa Command (USAFRICOM).[12] The United States Forces – Iraq or USF-I, was a major subordinate multi-service command during the Iraq War order of battle until it was disestablished in 2011.

Elements of other Unified Combatant Commands, especially United States Special Operations Command (USSOCOM), operate in the CENTCOM area. It appears that SOCCENT does not direct the secretive Task Force 77, the ad-hoc grouping of Joint Special Operations Command 'black' units such as Delta Force and Army Rangers, which is tasked to pursue the most sensitive high value targets such as Al Qaeda and the Taliban leadership since 11 September 2001. Rather TF 77, which started out as Task Force 11 and has gone through a number of name/number changes, reports directly to Joint Special Operations Command, part of USSOCOM.

# War planning

The following code names are known to have been associated with was planning per William Arkin:[13]:46

- CENTCOM OPORDER 01-97, Force Protection
- SOCEUR SUPPLAN 1001-90, 9 May 1989
- CENTCOM CONPLAN 1010, July 2003
- CENTCOM CONPLAN 1015-98, possibly support to OPLAN 5027 for Korea, 15 March 1991
- CENTCOM 1017, 1999
- CONPLAN 1020
- CONPLAN 1067, for possible Biological Warfare response
- CENTCOM CONPLAN 1100-95, 31 March 1992

Globalsecurity.org also lists OPLAN 1002 (Defense of the Arabian Peninsula).

# Geographic scope

With the 1983 establishment of CENTCOM Egypt, Sudan, Kenya, Ethiopia, Somalia and Djibouti came within the area of responsibility (AOR). Thus CENTCOM directed the 'Natural Bond' exercises with Sudan, the 'Eastern Wind' exercises with Somalia, and the 'Jade Tiger' exercises with Oman, Somalia, and Sudan. Exercise Jade Tiger involved the 31st Marine Expeditionary Unit with Oman from 29 November 82-8 Dec 82.[13]:404



CENTCOM Area Of Responsibility

The Area of Responsibility extends to 27 countries: Afghanistan, Bahrain, Egypt, Iran, Iraq, Jordan, Kazakhstan, Kuwait, Kyrgyzstan, Lebanon, Oman, Pakistan, Qatar, Saudi Arabia, Syria, Tajikistan, Turkmenistan, United Arab Emirates (UAE), Uzbekistan, and Yemen. International waters included are the Red Sea, Persian Gulf, and western portions of the Indian Ocean.[14] Syria and Lebanon were transferred from the United States European Command on 10 March 2004.

Israel is surrounded by CENTCOM countries but remains in United States European Command (EUCOM). General Norman Schwarzkopf expressed the position over Israel frankly in his 1992 autobiography: 'European Command also kept Israel, which from my viewpoint was a help: I'd have had difficulty impressing the Arabs with Central Command's grasp of geopolitical nuance if one of the stops on my itinerary had been Tel Aviv.'[4]:318

On 7 February 2007, plans were announced for the creation of a United States Africa Command which transferred strategic interest responsibility for all of Africa to the new USAFRICOM, except for Egypt. On 1 October 2008, the Africa Command became operational and Combined Joint Task Force - Horn of Africa, the primary CENTCOM force on the continent, started reporting to AFRICOM at Stuttgart instead of CENTCOM in Tampa.

4/27/2013
Case 1:21-cv-00445-CJN Document 182-4w Filed 08/07/22 Page 240 of 650
Case 1:13-cv-20782-JEM Document 40-1 Entered on FLSD Docket 04/27/2019 Page 75 of 150

The U.S. armed forces use a variable number of base locations depending on its level of operations. With ongoing warfare in Iraq and Afghanistan in 2003, the United States Air Force used 35 bases, while in 2006 it used 14, including four in Iraq. The United States Navy maintains one major base and one smaller installation, with extensive deployments afloat and ashore by U.S. Navy, U.S Marine Corps and U.S. Coast Guard ships, aviation units and ground units.

# Commanders

As of March 2013, GEN Lloyd Austin is commander. He took command from General James Mattis, USMC. Mattis took command from [15][16][17] Lieutenant General John R. Allen, USMC, the deputy commander since July 2008, who took temporary command when the previous commander, General David Petraeus, USA, left to take command of the International Security Assistance Force (ISAF) in Afghanistan on 23 June 2010.[18]

| No. | Image | Name | Service | Start | End | Time in office |
|---|---|---|---|---|---|---|
| 1. | | GEN Robert Kingston | United States Army | 1 January 1983 | 27 November 1985 | 1,061 days |
| 2. | | Gen George B. Crist | United States Marine Corps | 27 November 1985 | 23 November 1988 | 1,092 days |
| 3. | | GEN H. Norman Schwarzkopf | United States Army | 23 November 1988 | 9 August 1991 | 989 days |
| 4. | | Gen Joseph P. Hoar | United States Marine Corps | 9 August 1991 | 5 August 1994 | 1,092 days |
| 5. | | GEN J. H. Binford Peay III | United States Army | 5 August 1994 | 13 August 1997 | 1,104 days |
| 6. | | Gen Anthony Zinni | United States Marine Corps | 13 August 1997 | 6 July 2000 | 1,058 days |

| | | | | | | |
|---|---|---|---|---|---|---|
| 7. | | GEN Tommy Franks | United States Army | 6 July 2000 | 7 July 2003 | 1,096 days |
| 8. | | GEN John Abizaid | United States Army | 7 July 2003 | 16 March 2007 | 1,348 days |
| 9. | | ADM William J. Fallon | United States Navy | 16 March 2007 | 28 March 2008 | 378 days |
| (Acting) | | LTG Martin E. Dempsey | United States Army | 28 March 2008 | 31 October 2008 | 217 days |
| 10. | | GEN David H. Petraeus | United States Army | 31 October 2008 | 30 June 2010 | 607 days |
| (Acting) | | LtGen John R. Allen | United States Marine Corps | 30 June 2010 | 11 August 2010 | 42 days |
| 11. | | Gen James Mattis | United States Marine Corps | 11 August 2010 | 22 March 2013 | 954 days |
| 12. | | GEN Lloyd Austin | United States Army | 22 March 2013 | Incumbent | Expression error: Unexpected number. days |

# Unit decorations

The unit awards depicted below are for Headquarters, US Central Command at MacDill AFB. Award for unit decorations do not apply to any subordinate organization such as the service component commands or any other activities unless the orders specifically address them.

| Award streamer | Award | Dates | Notes |
|---|---|---|---|
| | Joint Meritorious Unit Award | 2 August 1990 – 21 April 1991 | Department of the Army General Order (DAGO) 1991-22 & 1992-34[19] |
| | Joint Meritorious Unit Award | 1 August 1992 – 4 May 1993 | DAGO 1994-12 & 1996-01 |
| | Joint Meritorious Unit Award | 8 October 1994 – 16 March 1995 | DAGO 2001–25 |
| | Joint Meritorious Unit Award | 1 September 1996 – 6 January 1997 | Joint Staff Permanent Order (JSPO) J-ISO-0012-97 |
| | Joint Meritorious Unit Award | 1 October 1997 – 15 July 1998 | JSPO J-ISO-0241-98 |
| | Joint Meritorious Unit Award | 16 July 1998 – 1 November 1999 | JSPO J-ISO-0330-99 / DAGO 2001–25 |
| | Joint Meritorious Unit Award | 2 November 1999 – 15 March 2001 | |
| | Joint Meritorious Unit Award | 11 September 2001 – 1 May 2003 | DAGO 2005–09 |
| | Joint Meritorious Unit Award | 2 May 2003 – 31 December 2005 | |
| | Joint Meritorious Unit Award | 1 January 2006 – 1 March 2008 | JSPO J-ISO-0061-08 |
| | Joint Meritorious Unit Award | 2 March 2008 – 1 July 2010 | |
| | Joint Meritorious Unit Award | 2 July 2010 – 31 July 2012 | |

# See also

- Strategic Army Corps

# References

1. http://www.centcom.mil/en/about-centcom-en/leadership-en

2. "Centcom hacked: This was no more harmful than a teenager's prank" (http://www.telegraph.co.uk/news/worldnews/islamic-state/11342416/Centcom-hacked-This-was-no-more-harmless-than-a-teenagers-prank.html). The Telegraph. Retrieved 12 January 2015.

3. Anthony Cordesman, USCENTCOM Mission and History (http://csis.org/files/media/csis/pubs/uscentcom3%5B1%5D.pdf), Center for Strategic and International Studies, August 1998

4. Norman Schwarzkopf (1993). It Doesn't Take a Hero. Bantam Books paperback edition. pp. 331–2,335–6. ISBN 0-553-56338-6.Harold Coyle's novel Sword Point gives an impression of what such planning envisaged, by a U.S. Army officer who would have had some idea of the general planning approach.

5. Richard Moody Swain, Lucky War: Third Army in Desert Storm, U.S. Army Command and General Staff College Press via Google Books, 6.

6. Michael R. Gordon, Bernard E. Trainor(2012). The Endgame: The Inside Story of the Struggle for Iraq, from George W. Bush to Barack Obama. New York: Pantheon Books. ISBN 978-0-307-37722-7.

7. "U.S. Central Command Twitter feed appears hacked by Islamic State sympathizers" (http://www.reuters.com/article/2015/01/12/us-cybersecurity-centcom-hack-idUSKBN0KL1UZ20150112). Reuters. 12 January 2015. Retrieved 12 January 2015.

8. CHRIS GOOD, JOSHUA COHAN and LEE FERRAN (12 January 2015). "Home> International 'Cybervandalism': ISIS Supporters Hijack US Military Social Media Accounts" (http://abcnews.go.com/International/us-military-twitter-account-apparently-hijacked-isis-supporters/story?id=28170963). ABC (ABC news Internet Venture). Retrieved 12 January 2015.

9. Jan Goldman Ph.D., The War on Terror Encyclopedia: From the Rise of Al-Qaeda to 9/11 and Beyond, 100-101.

10. Auerswald and Saideman, 2014, 96f

11. Nicola Nasser (5 September 2013). "Jordan Invites US Targets for Syrian Retaliation" (http://www.globalresearch.ca/jordan-invites-us-targets-for-syrian-retaliation/5348258). Centre for Research on Globalization.

12. "Africans Fear Hidden U.S. Agenda in New Approach to Africom" (http://www.foxnews.com/story/0,2933,430564,00.html). Associated Press. 2008-09-30. Retrieved 2008-09-30.

13. Arkin, William (25 January 2005). Code Names: Deciphering U.S. Military Plans, Programs and Operations in the 9/11 World (First ed.). Steerforth. ISBN 1586420836.

14. "Central Command" (http://www.globalsecurity.org/military/agency/dod/centcom.htm). Global Security.org. n.d. Retrieved 13 January 2015.

15. "Mattis takes over Central Command, vows to work with Mideast allies in Afghanistan, Iraq" (http://www.foxnews.com/us/2010/08/11/mattis-takes-central-command-vows-work-mideast-allies-afghanistan-iraq/). Fox News Channel. Associated Press. 11 August 2010. Retrieved 15 March 2012.

16. Mitchell, Robbyn (12 August 2010). "Mattis takes over as CentCom chief" (http://www.tampabay.com/news/article1114800.ece). St. Petersburg Times. p. 1. Retrieved 12 August 2010.

17. "Mattis assumes command of CENTCOM" (http://www.centcom.mil/news/mattis-assumes-command-of-centcom). U.S. Central Command. 11 August 2010. Retrieved 12 August 2010.

18. "Lt. Gen. Allen named CENTCOM acting commander" (http://www.centcom.mil/en/press-releases/lt-gen-allen-named-centcom-acting-commander) (Press release). U.S. Central Command. 30 June 2010. Retrieved 2 July 2010.

19. "Department of the Army General Orders" (http://armypubs.army.mil/epubs/da_general_orders_1.html). United States Army Publications Directorate. Retrieved 30 April 2011. (Army Knowledge Online account may be required.)

# External links

- U.S. Central Command official website (http://www.centcom.mil/)
- Multi-National Force – Iraq.com mnf-iraq.com (http://www.mnf-iraq.com) (English)
- Multi-National Force – Iraq (http://www.shurakaal-iraq.com) shurakaal-iraq.com (Arabic)
- Combined Joint Task Force – Horn of Africae official site (http://www.hoa.centcom.mil/)
- Spiegel, Peter (5 January 2007). "Naming New Generals A Key Step In Shift On Iraq" (http://articles.latimes.com/2007/jan/05/nation/na-generals5). Los Angeles Times.
- Foreign Policy, Pentagon Ups the Ante in Syria Fight (http://foreignpolicy.com/2015/03/30/the-pentagon-ups-the-ante-in-syria-fight-iraq-islamic-state-delta-force/)
- http://www.armytimes.com/story/military/pentagon/2014/12/30/iraq-1st-infantry-funk/21062071/ - Combined Joint Forces Land Component Command - Iraq

Retrieved from "http://en.wikipedia.org/w/index.php?title=United_States_Central_Command&oldid=655960119"

Categories: Military units and formations in Florida | Organizations based in Tampa, Florida | Unified combatant commands of the United States Armed Forces | Military units and formations established in 1983 | 1983 establishments in the United States

- This page was last modified on 11 April 2015, at 11:43.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

# Police show off Homeland Security intelligence center

By **Linda Trischitta**
Sun Sentinel

MARCH 20, 2015, 12:15 AM | DORAL

A t a secret location in Miami-Dade County, analysts and investigators tasked with preventing terrorist attacks study tips about possible plots that could be carried out between Key West and Palm Beach.

They are part of the Southeast Florida Fusion Center, one of 78 centers in the United States and Guam, Puerto Rico and the U.S. Virgin Islands that make sure federal and local police agencies talk to one another about pending threats.

On Thursday, the center promoted its "See Something, Say Something" campaign to engage residents of Monroe, Miami-Dade, Broward and Palm Beach counties in its efforts.

Before the Sept. 11, 2001 al-Qaeda attacks when nearly 3,000 died, some of the terrorists trained at Florida air fields before flying jets into the World Trade Center, a field in Pennsylvania and the Pentagon in Washington, D.C.

"There was information out there that wasn't being shared," said Lt. Mario Hernandez of Miami-Dade police, the agency that manages the eight-year-old center. "One agency had a piece of the puzzle, another agency had a piece of the puzzle, nobody had the whole puzzle. We're trying to prevent that from happening again."

Besides crime analysis, they help local authorities prepare for big national events that South Florida frequently hosts and will lend equipment such as cameras to monitor crowds.

The center's director, acting Maj. Janna Bolinger-Heller, of Miami-Dade Police, said she could not disclose most of its success stories or the number of terrorism incidents that have been thwarted.

But officials said they helped investigate Raees Alam Qazi, 22, and his brother Sheheryar Alam Qazi, 32, of Oakland Park, who pleaded guilty March 12 to federal terrorism charges and admitted they plotted a terrorist attack on New York City landmarks.

The center coordinated in 2014 with Miami Gardens police, U.S. Customs and Border Protection and Interpol in an investigation of two Bahamian men here illegally. One was sought in his country for the murder of a U.S. citizen; Bahamian authorities took him into custody. The other man was deported, according to Homeland Security.

An example of what Bolinger-Heller called "unintended benefits" was how the center's cameras that had been lent
ounty Fair helped recover lost children.

ban Beach Week in Miami Beach, a camera placed on a causeway showed police racing to a
and a burglary suspect jumping off a backyard dock into Biscayne Bay, she said. The camera
s to the swimming suspect.

price on the kinds of resources we have here and how we can use them to benefit the

r-Heller said.

SEARCH

SUBSCRIBE    LOG IN

MEMBER CENTER

NEWS

CLASSIFIED

BROWARD

PALM BEACH

SPORTS

ENTERTAINMENT

BUSINESS

LIFESTYLE

HEALTH

TRAVEL

OPINION

WEATHER

SF PARENTING

CARS & TRUCKS

VIDEOS & PHOTO

ort Lauderdale's air show or a Super Bowl, the center will begin its threat assessment months the other centers in the country for intelligence reports, Lt. Margarita Varela said.

cal criminal activity, concerns for police and public safety in their preparations. Regardless of orts, Varela said, "the bottom line for the public is we can't do it alone. We have to work hand rder to prevent criminal activity or a terrorism attack from happening in our hometown. Our e, our families work here, we go to the malls here, we celebrate here."

center's tip lines — iwatchsouthflorida.com, seffc@mdpd.com and 855-352-7233 — to be Stoppers.

ype of person being reported on," Varela said. "Look at the behavior. Was a vehicle or item left ve could walk by and not even challenge those things. In today's society, we can't. Bring this authorities and let us follow up on it."

## gns of Terrorism

one recording or monitoring activities, taking notes, drawing diagrams, marking maps or her visual devices.

or individuals seeking information in person or by mail, phone or email about military es or personnel.

Attempts to measure reaction times by police to security breaches; efforts to go through onitor procedures to assess strengths and weaknesses.

s transactions involving large cash payments, withdrawals or deposits; asking for money for or criminal activities.

ng or stealing explosives, weapons or ammunition; acquiring military uniforms, decals, flight lges or equipment to make them and other items.

eople who don't seem to belong, whether in a workplace, neighborhood, business or at border onation of law enforcement, military or corporate employees.

people in place and moving them according to a plan without actually committing a terrorist is activity includes mapping routes and timing traffic lights and flow.

e and supplies getting into position to commit an act. This is the last chance for someone to e a terrorist event happens.

lorida Fusion Center

Ltrischitta@Tribune.com, 954-356-4233 or Twitter @Linda Trischitta

Copyright © 2015, Sun Sentinel

---

## FROM AROUND THE WEB

Sponsored Links by Taboola

1 Dirty Little Secret To Eliminate 15 Years Of Mortgage Payments
LowerMyBills

7 Outrageous Credit Cards For Those Of Us That Have Excellent Credit
NextAdvisor

This $15 Product is Changing a $13 Billion Industry
Harry's

Ex-Microsoft exec is disrupting the traditional broker model
Yahoo! Finance | Motif Investing

Kate Upton and Tracy Morgan's Super Bowl Touchdown Dance
Vogue

30 Highest Paid Performers In The World
Forbes

Why You Should Be Getting Your Wine Online
Betches Love This | Lot 18

Russell Wilson Disagrees With Aaron Rodgers, Says God Does Care About Football
ThePostGame

Case 1:21-cv-08045-CJN   Document 192-4   Filed 08/07/23   Page 249 of 650



POLITICS

# Sheriff Joe vs. Uncle Sam

Joe Arpaio, America's most flamboyant lawman, hired a private detective to investigate the wife of a federal judge considering whether he was in contempt of court.



Ross D. Franklin / AP

**DAVID A. GRAHAM**
**APR 25, 2015**

Lots of conservatives talk a good game about how citizens should resist federal control and devolve power to local governments. Few of them are willing to put their convictions into action in quite the same way that Sheriff Joe Arpaio is.

The man who calls himself "America's toughest sheriff" was already in trouble with Uncle Sam, on trial for contempt of court in a U.S. district court.

It was only once that was under way that Arpaio and his lawyer apparently had the idea to sic a private investigator on the wife of the federal judge hearing his case. That shows toughness. It shows a willingness to use unorthodox tactics to resist federal interference. It's also not especially bright.

Reporters in the courtroom describe a somewhat shocking scene. Lawyers had completed their questioning when Judge Murray Snow announced he had some questions for Arpaio. After a series of queries, Snow asked: "Are you aware that I've been investigated by anyone?"

The sheriff then admitted that his former attorney had hired the private investigator to look into a tipster's allegation that Snow's wife had told someone at a restaurant that Snow wanted to prevent Arpaio from being reelected. Arpaio's amazing rationalization: "We weren't investigating you. We were investigating some comments that came to our attention."

**RELATED STORY**



Sheriff Joe Arpaio: The Most Lawless Lawman in America

The sheriff was on trial for, well, thumbing his nose at the federal government. In 2011, Judge Murray Snow issued a ruling demanding that Arpaio stop anti-immigration patrols arresting people solely on suspicion of being in the country illegally, while Snow continued to consider whether they

constituted illegal racial profiling. (In 2013, Snow finally ruled that they did, forcing Arpaio to drop the patrols permanently.) Arpaio simply disregarded the order for 18 months—as he now acknowledges. The question is whether that was intentional or not; if the judge decides it's the former, he could find Arpaio in contempt. The sheriff's somewhat improbable explanation is that he simply didn't realize that a federal judge had issued the order.

"I have a deep respect for the courts," Arpaio said. "It really hurts me after 55 years to be in this position. I want to apologize to the judge. I should have known more about these court orders that slipped through the cracks."

There are two problems with that. One is that a deputy testified this week that Arpaio had personally instructed him to continue enforcing federal immigration laws, in defiance of the judge's order. The second is that hiring a PI to investigate the judge who's considering whether you're in contempt of court isn't what most people would consider deep respect.

"It is contemptuous behavior on its face," a former U.S. attorney told The Arizona Republic. "And it is information deserving of further investigation to determine if other criminal misconduct occurred here."

Intimidating or trying to improperly influence a federal judge is in fact a crime. But this isn't the first time Arpaio has pulled a stunt like this—and in fact, he has a long history of launching investigations into political opponents. In 2012, a federal grand jury concluded a three-year investigation into abuse-of-power allegations without charging Arpaio.

The U.S. Department of Justice also has a civil-rights lawsuit pending against the sheriff accusing him of retaliating against critics. In a bizarre Spy vs. Spy moment, Arpaio also admitted to Snow that he had used county funds in 2013 to launch an investigation into ... the Justice Department. Elsewhere during the questioning, Arpaio "conced[ed] that the agency employed

unreliable informants, private investigators and an unknown amount of public funds to investigate Arpaio's political enemies," as the *Republic* put it.

Arpaio's current attorney pushed back on the big revelation after the hearing, telling reporters: "These been no evidence that the sheriff ordered the judge's wife to be investigated." But his client's use of the first-person plural ("we were investigating some comments that came to our attention") would seem to contradict that.

Courts have already found that Arpaio violated the law, and there's no longer any question that other aspects of his behavior—even those not yet adjudicated for legality—are outlandish. The law isn't especially conflicted on many of the issues about which he's outspoken. The federal government has authority to enforce immigration laws; Arpaio's racial profiling was unlawful; intimidating a judge, if that's what he's found to be doing, is unlawful too; and yes, Barack Obama was born in the United States.

## "I have a deep respect for the courts. I want to apologize to the judge. I should have known more about these court orders that slipped through the cracks."

But there's a conflict between rule of law and rule of the people, and between the federal government and local authority. Arpaio has won six elections, never by less than six points. The closest was in 2012, when his legal trouble was already underway and well into his ill-advised birther crusade against Obama, but in 2008 he won by a comfortable 13 points. The point is: Maricopa County voters like Arpaio and have kept returning him to office, even as his M.O. has become abundantly clear. Maybe Washington doesn't want him enforcing federal immigration laws, but a majority of Phoenix-area voters apparently do. Besides, not all of the raps on Arpaio have stuck—

Case 1:15-cv-20782-JEM   Document 40-4   Entered on FLSD Docket 04/27/2015   Page 88 of 150

witness the federal grand jury that didn't charge him (though that may have been mostly because of a challenging burden of proof).

This conflict between federal and local authority, never far from the surface in American history, has seen a resurgence in recent years, as conservative governments—mostly at the state level—have reacted to legislation passed by Democrats and backed by Obama by attempting to nullify or reject federal law. On issues from Obamacare to gun control, state legislators have even tried to write laws that would make enforcing federal statutes illegal. Few of these laws have passed, though, and if they did, they'd have little chance of surviving judicial review.

What's interesting about Arpaio is that unlike lawmakers who have pursued doomed legislative attempts to stop the liberal agenda, the sheriff is fighting back using his own executive authority, mixed with street-fighting moves. And when the federal judiciary has smacked him down, he's simply ratcheted up those efforts.

Perhaps investigating a federal judge's wife will be one step too far and spell his demise. If not, he could run for a seventh time in 2016. There's some precedent for voters punishing anti-federal pols in Arizona—they tossed State Senator Russell Pearce, the major proponent of Arizona's controversial illegal-immigration bill, after he seemed to have gone too far. Don't assume the same rules will apply to Joe Arpaio that apply to everyone else, though—he certainly doesn't think they do.

**ABOUT THE AUTHOR**



**DAVID A. GRAHAM** is a staff writer at *The Atlantic*, where he covers political and global news. He previously reported for *Newsweek*, *The Wall Street Journal*, and *The National*.

🐦 @GrahamDavidA   ✉ Email

4/27/2019
Case 1:21-cv-00445-CJN Document 188-4 Filed 08/07/23 Page 254 of 650
Case 1:15-cv-20782-JEM Document 403-1 Entered on FLSD Docket 04/27/2019 Page 89 of 150

# U.S. Air Force Intel Unit Helped Kill 1,200 People in a Year

## 361st Intelligence, Surveillance and Reconnaissance Group fed information to commandos

by DAVID AXE

A secretive group of U.S. Air Force intelligence specialists flying aboard American spy planes helped U.S. military commandos kill more than a thousand enemy combatants in just a single year back in 2012.

That's one startling revelation in the official annual history for 2012 of the Air Force's Intelligence, Surveillance and Reconnaissance Agency, a heavily-redacted copy of which War Is Boring obtained through the Freedom of Information Act.

Linguists and analysts from the 361st Intelligence, Surveillance and Reconnaissance Group at Hurlburt Field in Florida flew on at least 31,180 combat sorties in 2012, supporting no fewer than 960 separate operations that resulted in Special Operations Forces detaining more than 3,980 people and killing at least 1,210, according to the history.

That single year's kill tally probably makes the 361st one of the deadliest individual organizations in the entire U.S. military.



The 361st began as an aerial mapping unit during World War II. In 2008, the Air Force revived the unit as part of a massive expansion of intel units to support counterterrorism operations and the wars in Iraq and Afghanistan.

Between 2008 and 2012, the Pentagon grew its fleet of spy planes and surveillance drones by 238 percent—until they accounted for half of all Air Force aircraft, according to the ISR Agency history. By 2012 the Defense Department was spending $67 billion a year on intelligence and surveillance.



*Above—a U.S. Air Force MC-12W. At top—airmen from the Air Force's ISR Agency at work. Air Force photos*

Many intel flights require specialists to fly aboard the aircraft to quickly analyze the video the plane is shooting or translate the communications between enemy fighters that the aircraft's receivers pick up.

The intelligence personnel can then pass the information they gather to troops on the ground. The info might include the locations and strength of enemy fighters.

The 361st—which oversees two smaller units of linguists and analysts, the 19th and 25th Intelligence Squadrons—provides the specialists for spy flights supporting Special Operations Forces. The group "is heavily tasked around the world," the Air Force stated in a fact sheet.

Tech. Sgt. Brandi Fast from the 25th Intelligence Squadron was the Defense Department's Language Professional of the Year in 2013. That year she deployed twice to Southwest Asia—Afghanistan, presumably—and helped during a mission to rescue 14 crew from a coalition helicopter that crashed.

*Fast has a 16,000-word vocabulary in three languages, according to the Air Force.*

Lt. Col. John Shirley, the 361st's commander since April 2014, called his people "the best and brightest America and the Air Force has to offer."



*A U.S. Air Force U-28. Air Force photo*

The planes the 361st's specialists ride in could include special commando aircraft belonging to the Air Force or the Army. The Air Force's few public releases concerning the 361st specifically mention U-28 and MC-12W spy planes, which are heavily-modified turboprop transports sporting sophisticated sensors.

The MC-12W was a fixture in Afghanistan until recently. The U-28s spend much of their time in Africa.

The 361st's intel personnel also support drone flights, presumably by sitting in the robot planes' command trailers and analyzing video and communications intercepts the drones pipe in. In 2012, 19 percent of the 31,180 sorties the 361st's people supported were drone flights, according to the ISR Agency history.

*Based on the more than 1,200 people the 361st helped to kill in 2012, the group's work is certainly deadly to the bad guys. But the unit has also suffered casualties of its own.*

On Feb. 18, 2012, a U-28 crashed in Djibouti in East Africa, killing Senior Airman Julian Scholten from the 25th Intelligence Squadron.

And the 361st's Staff Sgt. Richard Dickson, who operated signals-intercepting gear, died in Afghanistan on April 27, 2013, when his MC-12W went down in hostile territory.











## The NSA Listened as Chinese MiGs Shot Down American Warplanes

Declassified docs detail Vietnam War air clashes

medium.com

## The U.S. Is Sending Specialists to Iraq to Keep Tabs on Iran's Agents

Counterintelligence troops help guard against spies

medium.com

## The Pentagon Deployed Scent Warfare in Vietnam

Electronic sniffers literally smelled for the enemy

medium.com

# Exhibit 13

# IN UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 15-cv-20782-Martinez

DENNIS MONTGOMERY,

                Plaintiff,

v.

RISEN, ET AL.

                Defendants.

_____/

## PLAINTIFF'S REVISED INITIAL DISCLOSURE WITNESS LIST

Montgomery, Dennis
Miami, Florida
Software Validation and all issues relevant to the Complaint

Risen, James
Maryland
Book, defamatory statements, actual malice, communications with Dennis Montgomery and all issues relevant to the Complaint

**FRCP Rule 30(b)(6) witnesses of corporate Defendants**

Mr. William Bayers, Esq.
General Counsel
Boston, Massachusetts 02116
Defamation, classified information, asked to correct defamatory statements, no journalistic standards, Florida contacts and sales, fact checking and all issues relevant to the Complaint

Linda K. Zecher
President, Chief Executive Officer and Director
Boston, Massachusetts 02116
Defamation, classified information, asked to correct defamatory statements, fact checking, Florida contacts and sales and all issues relevant to the Complaint

David Eber
Vice President and Associate General Counsel
Boston, Massachusetts 02116
Defamation, classified information, asked to correct defamatory statements, all issues relevant to the Complaint

1

Brook Colangelo
VP Houghton Mifflin Harcourt
White House Network Email and Network Infrastructure
all issues relevant to the Complaint

Houghton Mifflin Harcourt Publishing Company
Boston, Massachusetts 02116
all issues relevant to the Complaint

Rosemary Moseley
Lake Placid, Florida
Purchase of Book in Florida
all issues relevant to the Complaint

Kimberly Hines
Ft. Lauderdale, Florida
Montgomery Reputation, Purchase of Book in Florida
all issues relevant to the Complaint

Goss, Porter
Director of CIA
Miami, Florida
Software Validation, White House and Congressional Briefing
all issues relevant to the Complaint

Johns, Ken
Macdill AFB, Florida
Software Validation, White House and Congressional Briefing, Montgomery Reputation
all issues relevant to the Complaint

Lyons, XXXXX
Macdill AFB, Florida
Software Validation, White House and Congressional Briefing, Montgomery Reputation
all issues relevant to the Complaint

Macbeth, W. Rhys
Eglin AFB, Florida
Software Validation, White House and Congressional Briefing, Montgomery Reputation
all issues relevant to the Complaint

Nazelrod, Craig
Eglin AFB, Florida
Software Validation, White House and Congressional Briefing
all issues relevant to the Complaint

Pipes, XXXXX

2

Macdill AFB, Florida
Reputation Damage
all issues relevant to the Complaint

Roche, James
Macdill, Florida
Software Validation, White House and Congressional Briefing, CIA Visits, eTreppid Visits
all issues relevant to the Complaint

Rumsfeld, Donald
Florida
Software Validation, White House and Congressional Briefing, CIA Visits, Reputation damage
all issues relevant to the Complaint

Stillman, Phillip
Attorney Dennis Montgomery
Miami, Florida
Dennis Montgomery Legal Briefs, Whistleblower complaints
all issues relevant to the Complaint

Madden, Tom
Boca Raton, Florida
Reputation, damage to reputation in FL
all issues relevant to the Complaint

Olivia, Adrian
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Bartholomew Mary L
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Fiamengo, Nicholas A
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Freeman, Gregory J
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Savage Cynthia

Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

McCool John C
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Temple James K
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Griffin Susan M.
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Russell, Deborah
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Nettelhorst Doug M
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Stallworth Hugh T
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Bob McCaskey
Macdill AFB, Florida
Northrop Grumman TASC
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Crutchfield, Chris
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Melnyk, Michael S.

Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Lopez Tina M
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings

Cerny, Jeffrey D.
Macdill AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Muccio Anthony B
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

McKinney Scott E LtCol
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Purvis Brad Civ
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

'Kirsch, Jim'
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Hughes Stacey L
Eglin AFB, Florida
US Government contracts, CIA Briefings, Software Functionality, Congressional Briefings
all issues relevant to the Complaint

Abramson, Jill
Former New York Times Editor in Chief
New York, NY
Dennis Montgomery Reputation, James Risen, Eric Lichtblau
all issues relevant to the Complaint

Anderson, Jesse
Employee eTreppid Technologies

Reno, Nevada
SOCOM work
all issues relevant to the Complaint

Azzinaro, Neil
2006 Search Warrant
Las Vegas, Nevada
2006 Search Warrant
all issues relevant to the Complaint

Bauder, Jim
Employee eTreppid Technologies
Reno, Nevada
SOCOM work
all issues relevant to the Complaint

Blixseth, Edra
Beverly Hills, CA
760-831-1982
Software Works
all issues relevant to the Complaint

Blixseth, Tim
Medina, WA 98004
760-333-9024
Software Works
all issues relevant to the Complaint

Frye, Doug
Malibu, CA
Government Contracts, Montgomery Reputation, eTreppid Bank Accounts
all issues relevant to the Complaint

Sandoval, Michael
Bellevue, WA
Software Functionality, Mass Surveillance Technology, Congressional Briefing, Mike Flynn

Snowden, Edward
Somewhere in Russia
Mass Surveillance Technology, NSA and CIA Briefing
all issues relevant to the Complaint

Trepp, Warren
Reno, NV
US Government contracts, CIA Briefings, Search Warrant, Software Functionality
all issues relevant to the Complaint

Venables, Sloan
Virginia City, NV
US Government contracts, CIA Briefings, Search Warrant, Software Functionality
all issues relevant to the Complaint

Wiedermann, Peter
Contractor USAF
Kirkland, WA
US Government contracts, CIA Briefings, Search Warrant, Software Functionality
all issues relevant to the Complaint

- This is an initial disclosure witness list and Plaintiff reserves the right to supplement it as this case proceeds to discovery and trial.

Dated: April 27, 2015                           Respectfully submitted,

                                                */s/ Larry Klayman*
                                                Larry Klayman, Esq.
                                                Klayman Law Firm
                                                FL Bar No. 246220
                                                7050 W Palmetto Park Rd.
                                                Suite 15-287
                                                Boca Raton, FL 33433
                                                (310) 595-0800
                                                leklayman@gmail.com
                                                Attorney for Plaintiff

# Exhibit 14

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ❖ Telephone: (310) 595-0800 ❖ leklayman@gmail.com

VIA FEDERAL EXPRESS AND CERTIFIED MAIL

January 14, 2015

 **① URGENT**

Linda K. Zecher
President, Chief Executive Officer and Director

William Bayers
Executive Vice President and General Counsel

Houghton Mifflin Harcourt
222 Berkeley Street
Boston, MA 02116

## Re: Defamation of Dennis Montgomery in "Pay Any Price" by James Risen.

Dear Ms. Zecher and Mr. Bayers:

I am counsel for Dennis Montgomery.

My client has brought it my attention that the recent publication of "Pay Any Price," written by James Risen, is defamatory. In a later correspondence, I will outline in detail all of the defamatory statements, which are actionable as libel per se. And because Mr. Montgomery is not a public figure, in fact having worked with various intelligence agencies and The White House, he was "undercover" given his duties and responsibilities in gathering intelligence concerning various matters related to terrorism. Thus, to prove a case for defamation, which we will file in Florida if this matter cannot be resolved, one need not even show malice, although it arises in any event from libel per se.

In Risen's book, as just one example of the defamatory conduct, he writes at pages 32-33:

> Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money.

1

Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it. The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in a series of civil lawsuits involving Montgomery.

It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes.

A former medial technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing scope, he still had die-hard supporters in the government who steadfastly refused to believe the evidence suggesting that Montgomery was a fake, and who rejected the notion that the super-secret computer software that he foisted on the Pentagon and CIA was anything other than America's salvation.

It is therefore clear that Houghton Mifflin Harcourt, in order to fact-check Risen's statements to responsibly exercise due diligence, even assuming that Risen's statements are not defamatory, would have had to have had access to top secret highly classified information. However, for you the publisher, to have access to this information, without the authorization of the government, would constitute crimes.

Thus, I want to understand how you fact checked Risen before you both decided to defame my client and how, after publication of his book, you furthered Risen's continuing defamatory statements in the print, television and radio media. In short, you not only have corporate and personal significant civil liability to my client, but have you also collectively engaged what is in effect a criminal enterprise for profit.

If you would like to discuss this matter before Mr. Montgomery takes other avenues of redress, please contact me immediately. I am available to meet with you at the end of this month if such a meeting could prove productive to try to resolve this serious matter. Let me know if there is an interest by January 20, 2015 to discuss how you fact-checked Risen's statements; otherwise we will contact the Federal Bureau of Investigation and seek other suitable redress.

Although I am representing Mr. Montgomery in my private capacity, as also a public interest advocate, there is a duty and responsibility on my part not to accede to top secret classified

information being strewn all over the public record, particularly given the rise of Islamic terrorism in recent months and the even heightening risks this presents to the this nation and the free world.

Please govern yourselves accordingly.

Sincerely,

Larry Klayman

cc:     Dennis Montgomery
        James Risen

Exhibit 15

# Klayman Law Firm

2020 Pennsylvania Avenue, N.W., Suite 800, Washington, DC 20006-1811 ®    Telephone: (310) 595-0800 ®    leklayman@gmail.com

Via Fax and Mail

February 13, 2015

Mr. William Bayers, Esq.
General Counsel
Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Mr. James Risen
c/o The New York Times
1627 "I" Street N.W., Suite 700
Washington, D.C. 20006-4007

Mr. James Risen
c/o Houghton Mifflin Harcourt Publishing Company
222 Berkeley Street, FL 1-11
Boston, Massachusetts 02116

Re:    **Demand for Retraction of Defamation Pursuant to § 770.02 Florida Statutes (2012)**

Dear Mr. Bayers and Mr. Risen:

I am writing as legal counsel for Mr. Dennis Montgomery, who is the subject of Chapter 2 and other portions of a book published by Houghton Mifflin Harcourt Publishing Company titled "Pay Any Price: Greed, Power and Endless War" authored by James Risen.

This letter is to place you on notice pursuant to § 770.02 Florida Statutes (2012) "Notice condition precedent to action or prosecution for libel or slander" that you have published statements concerning our client Dennis Montgomery which constitute defamation *per se*, general defamation and defamation by inference (hereafter "defamatory statements").

You are now on notice that these materials have resulted in severe damage to Dennis Montgomery personally and in his trade and profession, for which you may be held to account for legally.

Your defamatory statements were first and continue to be published in a book with publication date October 14, 2014, by Houghton Mifflin Harcourt Publishing Company at 215 Park Avenue South, New York, New York 10003, under the title "Pay Any Price: Greed, Power and Endless War" (referred to as "the Book) by author James Risen, Copyright (c) 2014 by James Risen, designated by the Library of Congress by its index system as ISBN 978-0-544-34141-8 (hardback edition).

Retraction Letter
February 13, 2015
Page | 2

    The publication dated October 14, 2014, was the first publication of the book worldwide
in any language and the first printing run of the book. The book was physically printed in the
United States of America. We understand that copies of the Book were distributed to bookstores
and/or the public up to a week or two earlier than the designated date of publication (a book's
designated publication date being primarily of marketing significance, not necessarily the earliest
date of a book's release).

    Apart from the book itself, James Risen on behalf of himself and the publisher also
engaged in a flurry of news interviews and talk show interviews starting in September, and
continuing until the present time, associated with the publication 'roll out' of his book in which
Risen made further statements in addition to the words of the book itself and repeated claims
from the book itself.

    Many of Risen's libelous and slanderous statements were made during written news and
talk show interviews in September 2014, October 2014, and November, 2014, and since then,
some spoken, some in print, surrounding the publication of his book rather than in the book
itself.

    Your defamatory statements against Dennis Montgomery are exceedingly numerous,
extensive, detailed, and often each defamatory in numerous respects. Many statements each
include multiple and overlapping topics of defamation against Dennis Montgomery.

    As a result, we have attached as "Attachment A" to this letter a 28-page restatement,
summary, and analysis of at least 43 examples of defamatory statements. We expect that James
Risen also made other statements during additional radio, television, and print interviews about
the Book.

    You are now on notice that this article resulted in severe damage to Mr. Montgomery
personally and in his trade and profession, for which you all will be held to legally account for.

    We demand that you issue a retraction immediately. In your previous letter of January 20,
2015, you denied that any defamatory statements were made. We strongly suggest that you
reconsider. Please govern yourselves accordingly.


Sincerely,



Larry Klayman


cc: Dennis Montgomery

Case 1:23-cv-20445-CJN Document 182-4 Filed 08/07/23 Page 277 of 650

**ATTACHMENT A**

**LIST OF EXAMPLES OF DEFAMATORY STATEMENTS, COMMENTS**

**DEFAMATION *PER SE***

1.       The following statements are "*defamatory per se,*" recognized under Florida law when statements are so powerful in their ability to hurt someone that Florida law presumes harmful as a matter of law. *Montgomery v. Knox*, 23 Fla. 595, 3 So. 211, 217 (1887), such that a judge will allow damages to be awarded in these cases even if no evidence of harm has been presented. "[T]he law presumes malice in their utterance," *Abraham v. Baldwin*, 52 Fla. 151, 42 So. 591, 592 (1906), where the words are "… of such common notoriety established by the general consent of men, that the courts must of necessity take judicial notice of its harmful effect." *Layne v. Tribune Co.*, 108 Fla. 177, 146 So. 234, 236 (1933).  [1]

2.       **First, on Page 32 of the Book, Risen writes:** [2]

>       **"**Consider the example of Dennis Montgomery.  He provides a perfect case study to explain how during the war on terror greed and ambition have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process."

3.       As libel *per se*, Risen asserted that out of "greed" Montgomery "create[d] a rogue intelligence operation with little or no adult supervision and that he was "someone who has been accused of being a con artist."

---

[1]       Examples of defamation *per se* include those that hurt one's profession, business or trade; falsely state that a person has a socially unacceptable illness or disease;  or falsely state that a person has been involved in some kind of criminal activity.  *Lawnwood Medical Center Inc. v. Sadow*, 43 So. 3d 710, 729 (Fla. 4th DCA 2010).

[2]       Note that several statements may qualify under different theories, but are presented in full for proper context.  Some statements are repeated for that portion of the statement that qualifies under different theories of defamation under Florida law.

4.      **Second, on Page 32 of the Book, the Risen writes:**

"Whatever else he was, Dennis Montgomery was a man who understood how best to profit from America's decade of fear. He saw the post-9/11 age for what it was, a time to make money. Montgomery was the maestro behind what many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic. Once it was over, once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it**.** The Central Intelligence Agency buried the whole insane episode and acted like it had never happened. The Pentagon just kept working with Montgomery. Justice Department lawyers fanned out across the country to try to block any information about Montgomery and his schemes from becoming public, invoking the state secrets privilege in public, a series of civil lawsuits involving Montgomery.  It was as if everyone in Washington was afraid to admit that the Emperor of the War on Terror had no clothes."

5.      As libel *per se*, Risen asserted Montgomery's work "many current and former U.S. officials and others familiar with the case now believe was one of the most elaborate and dangerous hoaxes in American history, a ruse that was so successful that it nearly convinced the Bush administration to order fighter jets to start shooting down commercial airliners filled with passengers over the Atlantic."

6.      As libel *per se*, Risen asserted about the Montgomery that "once the fever broke and government officials realized that they had been taken in by a grand illusion, they did absolutely nothing about it …"

7.      **Third, on Page 33 of the Book, Risen writes:**

"A former medical technician, a self-styled computer software expert with no experience whatsoever in national security affairs, Dennis Montgomery almost singlehandedly prompted President Bush to ground a series of international commercial flights based on what now appears to have been an elaborate hoax. Even after it appeared that Montgomery had pulled off a scheme of amazing

Case 1:15-cv-20782-JEM   Document 40-1   Entered on FLSD Docket 04/27/2015   Page 114 of
150
Case 1:23-cv-20445-CJN   Document 182-4   Filed 08/07/23   Page 279 of 650

scope, he still had die-hard supporters in the government who
steadfastly refused to believe the evidence suggesting that
Montgomery was a fake, and who rejected the notion that the
super-secret computer software that he foisted on the Pentagon and
CIA was anything other than America's salvation."

8.      As libel *per se*, Risen asserted that Montgomery's work "now appears to have

been an elaborate hoax."

9.      As libel *per se*, Risen asserted that "die-hard supporters in the government who

steadfastly refused to believe the evidence suggesting that Montgomery was a fake."

10.     As libel *per se*, Risen asserted that he "that he foisted on the Pentagon and CIA"

super-secret computer software.

11.     **Fourth, on Page 34 of the Book, the Risen writes:**

"Montgomery was an overweight, middle-aged, incorrigible gambler,
a man who liked to play long odds because he was convinced that he
could out-think the house. He once boasted to a business partner that
he had a system for counting an eight-deck blackjack shoe, quite a
difficult feat for even the best card sharks, and he regularly tested his
theories at the El Dorado and the Peppermill Casino in Reno. He
usually came up short but that didn't stop him from playing blackjack
on a nightly basis, racking up unwieldy debts that eventually led to his
2010 arrest for bouncing more than $ 1 million in bad checks at
Caesar's Palace in Las Vegas."

12.     As libel *per se*, Risen asserted about the Montgomery that he was an "incorrigible

gambler," meaning in effect that Montgomery was a gambling addict who was "playing

blackjack on a nightly basis."  Historically, gambling and in particular an uncontrollable

gambling addict is a loathsome social status.

13.     ***Fifth,*** **on Page 36 of the Book, Risen writes:**

"Michael Flynn, Montgomery's former lawyer— who later
concluded that Montgomery was a fraud."

3

14.     As libel *per se*, Risen asserted about the Montgomery that Montgomery's lawyer "concluded that Montgomery was a fraud."

15.     **Sixth, on Page 37 of the Book, Risen writes:**

> "By the spring and summer of 2003, eTreppid was awarded contracts by both the air force and U.S. Special Operations Command. Montgomery was able to win over the government in part by offering field tests of his technology —tests that former employees say were fixed to impress visiting officials. Warren Trepp later told the FBI that he eventually learned that Montgomery had no real computer software programming skills, according to court documents that include his statements to the FBI. Trepp also described to federal investigators how eTreppid employees had confided to him that Montgomery had asked them to help him falsify tests of his object recognition software when Pentagon officials came to visit. Trepp said that on one occasion, Montgomery told two eTreppid employees to go into an empty office and push a button on a computer when they heard a beep on a cell phone. Meanwhile, Montgomery carried a toy bazooka into a field outside eTreppid. He was demonstrating to a group of visiting U.S. military officials that his technology could recognize the bazooka from a great distance."

16.     As libel *per se*, Risen asserted about Montgomery that he committed fraud including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

17.     **Seventh, on Page 37 of the Book, Risen writes:**

> "After he was in place in the field, he used a hidden cell phone to buzz the cell phone of one the eTreppid employees, who then pushed a key on a computer keyboard, which in turn flashed an image of a bazooka on another screen prominently displayed in front of the military officers standing in another room, according to court documents. The military officers were convinced that Montgomery's computer software had amazingly detected and recognized the bazooka in Montgomery's hands. (Montgomery insists that the eTreppid employees lied when they claimed that he had asked them to fix the tests, and also says that the air force issued a report showing that it had verified the tests.)"

4

18. As libel *per se*, Risen asserted about Montgomery that he committed fraud including defrauding the U.S. Government, prohibited under the False Claims Act codified at 31 U.S.C. §§ 3729 – 3733.

19. **Eighth, on Page 40 of the Book, Risen writes:**

> "Montgomery brilliantly played on the CIA's technical insecurities as well as the agency's woeful lack of understanding about al Qaeda and Islamic terrorism. He was able to convince the CIA that he had developed a secret new technology that enabled him to decipher al Qaeda codes embedded in the network banner displayed on the broadcasts of Al Jazeera, the Qatar-based news network. Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks. And only he had the technology to decode those messages, thus saving America from another devastating attack. The CIA— more credulous than Hollywood or Las Vegas— fell for Montgomery's claims. In short, he convinced CIA officials that he could detect terrorist threats by watching television."

20. As libel *per se*, Risen asserted about Montgomery that "Montgomery sold the CIA on the fantasy that al Qaeda was using the broadcasts to digitally transmit its plans for future terrorist attacks."

21. As libel *per se*, Risen asserted about Montgomery that he defrauded the CIA.

22. **Ninth, on Page 42 of the Book, Risen writes:**

> "A CIA official defensively pointed out that the agency did not actually have a contract with eTreppid at the time Montgomery was providing data from the Al Jazeera videotapes. While they were working closely together during the final months of 2003, the CIA had not yet started paying Montgomery, the official said. The agency never finalized a contract with him because agency staff eventually realized they had been conned, according to this official. But that does not diminish the fact that for a few crucial months, the CIA took Montgomery and his technology very seriously."

23. As libel *per se*, Risen asserted about Montgomery that "agency staff eventually realized they had been conned, according to this official."

24.     *Tenth,* **on Page 46 of the Book, the Risen writes:**

"It did not take long for the French firm to conclude that the whole thing was a hoax. The French company said that there were simply not enough pixels in the broadcasts to contain hidden bar codes or unseen numbers. The firm reported back to the French government that the supposed intelligence was a fabrication."

25.     As libel *per se,* Risen asserted about Montgomery that "the whole thing" (Montgomery's work) "was a hoax" and a "fabrication."

26.     *Eleventh,* **on Page 46 of the Book, the Risen writes:**

"The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency. No one involved in promoting Montgomery, in vouching for his information to the president, or in proposing to shoot down planes based on his claims ever faced any consequences."

27.     As libel *per se,* Risen asserted about Montgomery that his work was a hoax.

28.     *Twelfth,* **on Page 47 of the Book, the Risen writes:**

"At the time of the Christmas 2003 scare, John Brennan was head of the newly created Terrorist Threat Integration Center and in charge of distributing terrorism-related intelligence throughout the government. That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration. But Brennan was never admonished for his role in the affair. After Barack Obama became president, Brennan was named to be his top counterterrorism advisor in the White House. He later became CIA director."

29.     As libel *per se,* Risen asserted about Montgomery that "That meant that Brennan's office was responsible for circulating Montgomery's fabricated intelligence to officials in the highest reaches of the Bush administration."

30.     *Thirteenth,* **on Page 50 of the Book, Risen writes:**

"Edra Blixseth was Dennis Montgomery's latest mark. After being introduced to him by a former Microsoft executive and then hearing Montgomery explain his software, she agreed in 2006 to bankroll Montgomery to launch a new company, to be called Blxware.

Montgomery needed new government contracts for Blxware, and Edra Blixseth had the money and contacts to try to make it happen."

31.     As libel *per se*, Risen asserted about Montgomery that "Edra Blixseth was Dennis Montgomery's latest mark," clearly asserting Montgomery to be a con man.

32.     The libel is false, including because Montgomery owed no stock or ownership in BLIXWARE so as to be able to make a "mark" of Edra Blixseth.

33.     **Fourteenth,** on November 6, 2014, James Risen appeared as an interview guest on "The Daily Show with Jon Stewart," by Comedy Central, interviewed by Jon Stewart. Exhibit A, attached. The television interview was taped at The Daily Show's studio 11th Avenue between 51st and 52nd Street, New York (Manhattan), New York, and broadcast for the first time nationwide across the United States of America through cable television and satellite television on "The Comedy Central" channel.

34.     James Risen stated in said television interview for his statements to be broadcast on TV that his favorite story is the story of –

> Dennis Montgomery who is this guy was as a computer software expert, supposed expert. Who convinced the CIA in 2003 that he had the super-secret technology to read Al Jazeera news broadcasts and decipher Al Qaeda codes inside the [interrupted by Jon Stewart]
>
> [Jon Stewart]  An Enigma machine for Al Qaeda...?
>
> [Dennis Montgomery] Right.  And he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that corresponded with flights that Al Qaeda was going to shoot down, knock--- or blow up….
>
> President Bush was so convinced of this that they grounded flights all over the world at Christmas 2003 based on this guy's intelligence or supposed intelligence.  It took the French intelligence service, who had gotten very mad because they grounded flights from Paris to Los Angeles.  And they demanded that the CIA tell them where they were getting this information.   And so they finally [non-verbal

interruption].  They finally got the information.   The French told them this is a hoax.  This is a fabrication.

And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it.  And Montgomery kept getting more contracts after that.

[Other, extended discussion with Jon Stewart on other topics]

There is lots of raw intelligence every day that says there is an attack about to happen.   You really have to be a pretty sophisticated consumer of intelligence after several years to begin to realize what's real and what's not really a credible threat.

35.     As libel *per se*, Risen asserted about Montgomery that "he convinced the CIA in 2003 that he could read numbers and letters hidden in the Al Jazeera broadcasts that corresponded with flights that Al Qaeda was going to shoot down, knock--- or blow up….

36.     As libel *per se*, Risen asserted about Montgomery that "The French told them this is a hoax.  This is a fabrication.  And as soon as the CIA agreed with them, they covered the whole thing up, and refused to ever talk about it.  And Montgomery kept getting more contracts after that."  The statement that "the CIA agreed with them" is Risen's assertion about Montgomery's work that "this is a hoax.  This is a fabrication."

37.     As libel *per se*, Risen asserted about Montgomery that "they covered the whole thing up, and refused to ever talk about it,"  as a way of saying that the CIA had been conned.

38.     **Fifteenth,** on October 13, 2014, James Risen gave a television interview [3] with Judy Woodruff which was broadcast nationwide by the Public Broadcasting System (PBS).   In that interview, James Risen made the following statements for broadcast on television, and Judy Woodruff repeated many points from James Risen's book which Risen agreed with and endorsed.  Much of the interview involved other chapters not relevant here.

---

[3]      http://www.pbs.org/newshour/bb/costs-security-price-high/

JUDY WOODRUFF:  In the next chapter, JAMES RISEN, you write about millions of dollars spent on programs that were completely fraudulent.  One was run by a man named Dennis Montgomery.  He was a, He was a .... I guess he had worked in computer software... but he was a GAMBLER! [4]

JAMES RISEN:  Right.

JUDY WOODRUFF:  And he sold the CIA and the Pentagon on technology that turned out to be not at all what he said it was.

JAMES RISEN:  It is difficult to tell in some of these cases who is scamming who.  If you talk to Montgomery, he argues that the CIA wanted him to do what he was doing.  And so its a fascinating dynamic that's developed in the war on terror, between people who recognize the opportunities for this gold rush and the agencies which are... who have so much money to spend now, they're getting so much more money than they ever had before, that in some cases they don't know what to do with.

In this case, they began to believe, in this sort of war fever, that you could find Al Qaeda messages hidden in Al Jazeera broadcasts.  And so that.. that program, that highly secret program, was used to ground planes all over Europe and the United States

JUDY WOODRUFF:  When actually there was nothing to it.

JAMES RISEN:  Right

JUDY WOODRUFF:  It was a hoax.

JAMES RISEN:  Right.  Right.

JUDY WOODRUFF:  And then there was another part of it where he was saying he had special facial recognition software....

JAMES RISEN:  Right.  Right

JUDY WOODRUFF:  ... used on drones?

JAMES RISEN:  Yeah.  There were cases in which people said that he was fooling the military and the CIA about his operations and how... what kind of techniques and technologies he had.  He would argue that the CIA actually wanted him and or the army believed him

---

[4]     Emphasis, by exclamation in tone of voice, the in original conversation.

and tested it.  So it's this very complicated story about a man
recognizing an opportunity who had never been involved in national
security before and the CIA and the military all just hungry for
whoever could come with the latest idea.

39.     As libel *per se*, Risen asserted about Montgomery that "you write about millions

of dollars spent on programs that were completely fraudulent.  One was run by a man named

Dennis Montgomery," which Risen confirms by saying "Right." (Actually where the discussion

is about "the next chapter" that chapter is exclusively about Dennis Montgomery alone.)

40.     As libel *per se*, Risen asserted about Montgomery that "When actually there was

nothing to it," which Risen confirms by saying "Right." And also "It was a hoax," which Risen

confirms by saying "Right.  Right."

41.     As libel *per se*, Risen asserted about Montgomery that "There were cases in

which people said that he was fooling the military and the CIA about his operations and how...

what kind of techniques and technologies he had."

42.     **Sixteenth,** on October 24, 2014, James Risen gave an audio interview with Lucy

Worsley published on the <u>New York Times</u> website, titled **"Inside The New York Times Book

Review: James Risen's 'Pay Any Price'"** which is accessible at that website address.  [5]  In this

interview  "**Inside <u>The New York Times</u> Book Review**," with Pamela Paul, October 24, 2014,

James Risen stated for national broadcast:

> PAMELA PAUL:   How do we count and account for the costs of the
> government's war on terror.  We'll talk to  James Risen, author of Pay
> Any Price:  Greed, Power, and Endless War.

---

[5]     See:  ArtsBeat: Book Review Podcast: James Risen's 'Pay Any Price', by John Williams,
<u>New York Times</u>, October 24, 2014, http://artsbeat.blogs.nytimes.com/2014/10/24/book-review-
podcast-james-risens-pay-any-price/ , based upon Louise Richardson's book review of Risen's
book.

JAMES RISEN ("tease" audio clip):   It seems to me that what the war on terror had become in thirteen years was a search for cash and a search for power and status.

PAMELA PAUL:   What is the British fascination with murder? Lucy Worsley will explain all joining us to talk with us about her new book:  The Art of the English Murder.

LUCY WORSLEY ("tease" audio clip):  The public used to consume murder in a way that you can still see the modern media doing it today.  Just look at the Pistorius trial.

PAMELA PAUL:   Alexander Alter will be here with Notes from the Publishing world.  And Greg Cole has bestseller news.  This is "Inside the New York Times Book Review."  I am Pamela Paul.

James Risen joins me now.  His new book is Pay Any Price:  Greed, Power, and Endless War.  Hi James.

JAMES RISEN:   Hi, thanks for having me.

PAMELA PAUL:  Thanks for being here. Now this is a book that covers a lot of territory.  Tell us briefly about what it is you set out to write about in the book.

JAMES RISEN:   What I wanted to do was, I'd written one book before about the war on terror, and I wanted to follow up with a new book that kind of looked at where we were 13 years after 9/11 and how we had what started out in the immediate aftermath of 9/11 as kind of a search for justice or a search for retribution or whatever you want to think, say we were doing right after 9/11 as a country.  It seemed to me that what the war had become in 13 years was a search for cash and a search for power and status and that it was becoming an endless war in which we had a new mercenary class of people who were taking advantage of the war on terror.  And that enormous unintended consequences had happened.  And I began to hear about just some really crazy things that were going on.  And so I thought it would make a good story.

[The discussion then covers the Chapter "Rosetta" not relevant here, concerning a lawsuit for 9/11 families against Saudi Arabia, except the ending]

JAMES RISEN [winds up the Chapter on "Rosetta" by saying]:   ....  in the war on terror became so complicated and so difficult to tell what was really going on, to me it was like a case study in how the

war on terror had been turned for other uses, and become a.... something that you could never tell what was the truth and what was not the truth. And that to me was at the heart of the problems with the war on terror, that you could never tell what's real and what was concoction today.

[The discussion then covers how Risen went about researching the book, not relevant here]

PAMELA PAUL:   Did a lot of it arise out of stories that, reporting that you'd originally done for the Times?

JAMES RISEN:   Some of it. For instance, I did a chapter The Emperor of the War on Terror, about Dennis Montgomery who [laughs] who's a strange character, who I'd done a story about him for the New York Times along with Eric Lichtbau my colleague there at the Times. He's one of the most fascinating characters in the war on terror. He... He was a computer software expert who convinced the CIA that he could decipher secret codes from Al Qaeda in the Al Jazeera news broadcasts. And that he could tell the CIA numbers and letters that corresponded with flights that Al Qaeda wanted to attack. And the CIA took this so seriously that they grounded, that the Bush Administration grounded a bunch of international flights in Christmas 2003 based on what this guy was telling them. And when they realized it was a hoax, they covered the whole thing up and never did anything about it. So I had done a story for the Times with.... about that and then expanded on that and got a lot more information for the book.

PAMELA PAUL:   How did you find out about him?

JAMES RISEN:   Well he had been written about a little bit before we wrote about it. But I had also, even before he was written about by other people, I had heard from people in the CIA that there was this crazy operation that nobody wanted to talk about, that they were all embarrassed by. To me that, it was like a case study in just how crazy the war on terror has become. And the only thing that makes sense about why it's gotten so crazy, is I think we kind of have deregulated national security and we took all, you know, Cheney said we're going to take the gloves off. And that means we deregulated national security at the same time we poured hundreds of billions of dollars into counter-terrorism. And so it's had enormous unintended consequences from what is essentially a national security crisis that is kind of like the banking crisis.

12

[The interview discussion then turns to the alleged deregulation of national security on other topics not relevant here.]

43.     As libel *per se*, Risen asserted about Montgomery that "And when they [the CIA] realized it was a hoax, they covered the whole thing up and never did anything about it."

44.     The libel is false, for the reasons identified above, and including that Montgomery never purported to be an expert in intelligence but left interpretation of the data he uncovered to intelligence experts of the U.S. Government.

45.     ***Seventeenth,*** James Risen sat for a nationwide television news interview on the television show ***DEMOCRACY NOW!*** A Daily Independent Global News Hour, with Amy Goodman & Juan González, at 207 W. 25th St., Floor 11, New York, NY 10001 on October 14, 2014.  On this nationwide television news broadcast, the conversation turned to:

> **AMY GOODMAN:** Dennis Montgomery?
>
> **JAMES RISEN:** Dennis Montgomery is a fascinating character, who—he was a computer software person, self-styled expert, who developed what he said was special technology that would allow him to do things with computers that other people couldn't do. One of the things that he developed was this imaging technology that he said he could find images on broadcast network news tapes from Al Jazeera. He said that he could read special secret al-Qaeda codes in the banners on the broadcasts of Al Jazeera. And the CIA believed this. And he was giving them information based on watching hours and hours of Al Jazeera tapes, saying that "I know where the next al-Qaeda attack is going to be based—is going to happen." And the Bush administration and the CIA fell for this.
>
> **AMY GOODMAN:** And it was in the news zipper at the bottom of the Al Jazeera broadcasts?
>
> **JAMES RISEN:** Well, he says it was in the banner. But anyway. And so, it was this great—if you talk to him, he argues, well, they— that's what they were looking for. You know, they convinced him to look for this. You know, it depends on who you talk to. But it was one of the great hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush administration, based on information they

13

were getting from Dennis Montgomery's so-called decryption of Al Jazeera broadcasts.

And then there's a whole number of other things, like Alarbus, which was this covert program at the Pentagon where a Palestinian involved in that was actually trying to use the bank account set up by the secret program, Pentagon program, to launder hundreds of millions of dollars. And the FBI investigated this, but then tried to keep the whole thing quiet.

**AMY GOODMAN:** How much did the U.S. government give to Dennis Montgomery?

**JAMES RISEN:** Millions of dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that. So, it's a strange—to me, the Dennis Montgomery story is one of the strangest, because what it shows is, early on in the war on terror, as I said, the CIA and all these other agencies had so much money to spend on counterterrorism that they were willing to throw it at everything. They were so afraid of the next terrorist attack that they were willing to believe anybody who came up with some idea. And I called that chapter about Montgomery, you know, "The Emperor of the War on Terror," because nobody wanted to say that the emperor had no clothes.

**AMY GOODMAN:** I mean, it had very real effects, aside from spending all that money.

**JAMES RISEN:** Yeah.

**AMY GOODMAN:** For example, planes being sent back.

**JAMES RISEN:** Yes, yes. There were planes grounded. International flights between the United States and Europe and Mexico were grounded. There was talk at the White House even of shooting down planes based on this information.

**AMY GOODMAN:** Because they could be used, as with September 11th, as weapons?

**JAMES RISEN:** Yeah, as missiles or whatever. And so, it was crazy. It was absolutely insane.

**AMY GOODMAN:** And it was only the French government who then did a study?

14

JAMES RISEN: Yes, yes. Yeah, the French government finally—you know, the U.S.—the CIA and the Bush administration didn't want to tell anybody what was really happening, where they were getting this information. You know, "This supersecret information about Al Jazeera, we can't tell you." And finally, the French intelligence service and the French government said, "You know, you're grounding our planes. You've got to tell us where you're getting this information." And they got—they finally shared the information with them, and the French got a French tech firm to look at this, and they said, "This is nuts. This is fabrication." And after a while, the CIA was finally convinced maybe the French were right, and they stopped talking about it. They didn't do anything else. They just like shut it down eventually, but never wanted to talk about what had really happened.

AMY GOODMAN: Then Dennis Montgomery, revealed as a con man—

JAMES RISEN: Yeah, yeah.

AMY GOODMAN: —in jail for that?

JAMES RISEN: Well, no, he's not in jail. But it was a—he actually got more contracts after that, with the Pentagon and other agencies. And he continued to operate for a long time. You know, he kind of went from one agency to the other.

AMY GOODMAN: We're talking to James Risen, Pulitzer Prize-winning investigative journalist for *The New York Times*. His new book, just out today, *Pay Any Price: Greed, Power, and Endless War*. When we come back, war corrupts, endless war corrupts absolutely. Stay with us.

[break]

46.     As libel *per se*, Risen asserted about Montgomery that "But it was one of the great

hoaxes of the war on terror, where they actually grounded planes in Europe, the Bush

administration, based on information they were getting from Dennis Montgomery's so-called

decryption of Al Jazeera broadcasts."

47.     As libel *per se*, Risen asserted about Montgomery when asked "How much did

the U.S. government give to Dennis Montgomery?" Risen answered in reply: "Millions of

dollars. And then he used—he was a heavy gambler and eventually, I think, had a lot of financial problems as a result of that."

48.     As libel *per se*, Risen asserted about Montgomery that "the French got a French tech firm to look at this, and they said, 'This is nuts. This is fabrication.'"

49.     As libel *per se*, Risen asserted about Montgomery when asked "Then Dennis Montgomery, revealed as a con man—" Risen confirmed in reply: "Yeah, yeah."

50.     As libel *per se*, Risen asserted about Montgomery that he should be in jail.

51.     ***Eighteenth***, James Risen gave an interview with "Conversations with Great Minds" of "The Big Picture RT with talk show host Thom Hartmann on October 24, 2014. [6]

> THOM HARTMAN:  ...  [Abrupt change of topic starting at about time 5:27]  ...  There's just this enormous amount of government money.  Let's throw it at the private sector.  They'll make things well.  One of the members of the private sector who came forward and said I've got a secret, I can figure this stuff out, was a guy by the name of Dennis Montgomery.
>
> JAMES RISEN:  Right.  Uh, Dennis Montgomery is one of the best stories in the war on terror.  I think somebody should make a movie about him.  Dennis Montgomery was a computer software expert who said that he had developed technology that basically could find objects hidden in the video on television.  And so he convinced, through a whole series of contacts and meetings that I detail in the book, he was able to get to the CIA  and convince the CIA that he had the technology to decipher Al Qaeda codes that were he said were hidden in Al Jazeera news broadcasts.
>
> THOM HARTMAN:  They were hidden in the Chiron or the --
>
> JAMES RISEN:  In the banner.  In the banner, actually.  He said that he could find numbers and letters that were constantly showing up, or not showing up but were being hidden, embedded deeply in the video.  And he would then give these  numbers and letters to the CIA.  And the CIA, either he told them or they convinced themselves that these numbers and letters corresponded to flights, international airline flights, that Al Qaeda was going to attack.  And so in December, in Christmas

---

[6]      https://www.youtube.com/watch?v=jc_8f4Pp9Zc

16

2003, the Bush Administration and the CIA took this so seriously that they actually grounded a whole series of international flights coming into and out of the United States, and the White House even considered shooting down some of these flights over the Atlantic.

THOM HARTMAN:  Whoa.

JAMES RISEN:   And once the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist and that these supposed Al Qaeda codes weren't really in the Al Jazeera newscasts, the CIA covered the whole thing up and never went public with it  and just tried to act like it never happened.

THOM HARTMAN:  Well we know how aggressively this and particularly the Obama Administration right now has gone after whistleblowers and reporters.  You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison.

JAMES RISEN:  Well, no, he ended up getting more contracts from the military... and the Pentagon.  And he was continuing, he continued to operate for several years.  It's really a remarkable story.

THOM HARTMAN:  Yeah, it really and truly is.

[Topic changes abruptly to discussions of torture in the war on terror]

52.     As libel *per se*, Risen asserted about Montgomery that "the CIA later was convinced by French intelligence that this was all a fabrication and that this kind of technology didn't exist."

53.     As libel *per se*, Risen asserted about Montgomery that he belongs in prison, responding to the question "You would think they would also go after people who had scammed the CIA.  If one of us walked in off the street and said to the CIA, hey have I got a deal for you, and it was just a total lie, and they gave us millions of dollars, which they gave to Dennis Montgomery, you'd think he would end up in prison," by Risen answering in reply:  "Well, no,

17

he ended up getting more contracts from the military... and the Pentagon. And he was continuing, he continued to operate for several years. It's really a remarkable story."

## GENERAL DEFAMATION

54.     In addition, Risen also made additional defamatory statements that are explicit defamation under Florida law.

55.     *Nineteenth,* **on Page 49 of the Book, Risen writes:**

> "Trepp was furious. According to court documents, he told the FBI that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts. As federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real."

56.     As explicit libel, Risen asserted about Montgomery that Montgomery had stolen valuable software – yet also asserted that the software "wasn't real."

## DEFAMATION BY IMPLICATION UNDER FLORIDA LAW

### Analogous to False Light

57.     For defamation by implication: " . . . [L]iterally true statements can be defamatory where they create a false impression. This variation is known as defamation by implication and has a longstanding history in defamation law." *See Jews for Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008). Defamation by implication occurs when a publication states facts that are literally true, but produces a defamatory meaning apparent from a plain reading of the publication in its entirety. See *Chapin v. Knight-Ridder, Inc.* 993 F.3d 1087 (4th Cir. 1993).

58.     Montgomery thus claims here that if the Court finds that any of the statements labeled "First" through "Nineteenth" do not qualify as defamation *per se* or general defamation,

18

then in the alternative Montgomery claims here that any and all such statements not qualifying as defamation *per se* or general defamation are defamation by implication against Montgomery.

59.      Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that Montgomery deceived the U.S. Government as to the meaning, purpose, or interpretation of hidden data and clues that Montgomery uncovered, implying that Montgomery defrauded and conned the U.S. Government.

60.      In fact, Montgomery refused to speculate as to the interpretation or meaning of the data and analyses he uncovered, even when pressed to state what he thought the data might mean, but Montgomery left the role of interpretation to U.S. Government intelligence experts.

61.      Thus, throughout the statements presented herein, Risen libels and slanders Montgomery by implication that Montgomery defrauded and scammed the U.S. Government concerning the meaning of the information Montgomery uncovered, implying that Montgomery obtained millions of dollars by frightening and fooling child-like and gullible CIA officials.

62.      Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that President George W. Bush's alleged decisions to ground and almost shoot down passenger aircraft around Christmas 2003 (which Risen would have no way of knowing about) were a result of Montgomery's fraud and scams, deceptively manipulating the President of the United States and the U.S. national command authority.

63.      Across the many examples of libelous statements from the Book or slanderous interviews, Risen implies that Montgomery should be in jail.

64.      Among the other statements, in particular, the ***First*** example of libel**, on Page 32 of the Book,** states that:

> "Consider the example of Dennis Montgomery.  He provides a perfect case study to explain how during the war on terror greed and ambition

19

have been married to unlimited rivers of cash to create a climate in which someone who has been accused of being a con artist was able to create a rogue intelligence operation with little or no adult supervision. Crazy became the new normal in the war on terror, and the original objectives of the war got lost in the process."

65.     Thus, as libel by implication, Risen implies that Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at any cost.

66.     Among the other statements, in particular, in the ***Eleventh*** example of libel**, on Page 46 of the Book,** states that:

"The CIA never investigated the apparent hoax nor examined how it had been handled inside the agency."

67.     Here, as libel by implication, even if it is true that "The CIA never investigated" what Risen describes as an "apparent hoax," the implication is that Montgomery perpetrated a hoax upon the CIA, and in return for money, which would be both a fraud and a crime.

68.     Similarly, in the ***Sixteenth*** example of slander from an interview, Risen states that "It seemed to me that what the war had become in 13 years was a search for cash and a search for power and status and that it was becoming an endless war in which we had a new mercenary class of people who were taking advantage of the war on terror," implying that Montgomery's work is fraudulent in being merely an effort to get cash.

69.     Among the other statements, in particular, the ***Nineteenth*** example of libel**, on Page 49 of the Book,** states that:

"Trepp was furious. According to court documents, he told the FBI that Montgomery had stolen the software eTreppid had used on secret Pentagon contracts. As federal investigators moved in to investigate the alleged theft of the technology, they heard from Trepp and others that Montgomery's alleged technology wasn't real."

70.     As libel by implication, Risen implies that Montgomery stole valuable software yet at the same time the software was in fact worthless.

71.  In addition, Risen also made additional defamatory statements that are defamation by implication under Florida law.

72.  ***Twentieth,*** **on the Preface Page of the Book, Risen writes:**

> "I've come back," he repeated.  "I was the King of Kafiristan – me and Dravot – crowned Kings we was!  In this office we settled it – you setting there and giving us the books.  I am Peachey – Peachey Taliaferro Carnehan – and you've been setting here ever since – Oh, Lord!"
>
> I was more than a little astonished and expressed my feelings accordingly.
>
> "It's true," said Carnehan, with a dry cackle, nursing his fee, which were wrapped in rags.  "True as gospel.  Kings we were, with crowns upon our head – me and Dravot – poor Dan – oh, poor, poor Dan, that would never take advice, not though I begged of him!"
>
> -- Rudyard Kipling, *The Man Who Would be King.*

73.  As libel by implication, Risen implies that Montgomery (along with others addressed in the book) is a fraud and/or con man as in *The Man Who Would be King.*

74.  ***Twenty-first,*** **in the Prologue on Page xiv of the Book, Risen writes:**

> "The new homeland security-industrial complex operates differently. It is largely made up of a web of intelligence agencies and their contractors, companies that mostly provide secret services rather than large weapons systems and equipment.  These contractors are hired to help Washington determine the scale and scope of the terrorist threat; they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end."

75.  As libel by implication, Risen states "they make no money if they determine that the threat is overblown or, God forbid, if the war on terror ever comes to an end," suggesting that Montgomery's and eTreppid's profits were *contingent* upon results, and false results at that.

76.  ***Twenty-second,*** **in the Prologue on Page xv of the Book, Risen writes:**

"Thus, the creation of a homeland security complex at a time of endless war has bequeathed us with the central narrative of the war on terror – modern tales of greed joined hand in hand with stories of abuse of power. It was inevitable that those wise in the ways of the world would flock to Washington to try to cash in on the war on terror gold rush – and they have. This book offers just a few of those stories. But those trying to monetize America's obsession with terrorism are not the only ones who have sought to exploit 9/11."

"Opportunism comes in many forms and is driven by more than just greed. Ambition and a hunger for power, status, and glory have become great engines of post-9/11 opportunism as well. The more troubling stories here concern abuses of power that have extended across two presidencies for well over a decade. After 9/11, the United States deregulated national security, stripping away the post-Watergate intelligence reforms of the 1970's that had constrained executive power for thirty years. The results are morally challenging – and continue to this day."

77. Thus, as libel by implication, Risen implies that Montgomery committed fraud and went to any lengths motivated by greed, to obtain money at any cost.

78. **Twenty-third,** in the Prologue on Page xvii of the Book, Risen writes:

"Washington's global war on terror is now in its second decade, thanks to the bipartisan veneer it has gained under Bush and Obama. It shows no signs of slowing down, hustlers and freebooters continue to take full advantage, and the war's unintended consequences continue to pile up. All too often, things are not what they seem."

79. As libel by implication, Risen implies that Montgomery – one of the key objects of the Book – is a "hustler" and a "freebooter."

80. **Twenty-fourth,** Part 1 of the Book, including Chapter 2 which is focused entirely on Dennis Montgomery, Risen have labeled "Part 1: Greed"

81. Thus, by placing the chapter focused on Dennis Montgomery under a label for the section of the Book of "Greed," Risen libels Montgomery by implication as being motivated by greed to commit fraud and carry out the alleged hoaxes identified in the rest of the Chapter 2.

82. **_Twenty-fifth,_** Risen have labeled Chapter 2 of the Book which is focused entirely on Dennis Montgomery: "Chapter 2: The Emperor of the War on Terror."

83. By naming the chapter focused on Dennis Montgomery "The Emperor of the War on Terror," Risen libels Montgomery by implication as being the mastermind of the fraud that Risen seeks to portray the war on terror to be.

84. **_Twenty-Sixth,_ on Page 40 of the Book, Risen writes:**

> "The CIA's Science and Technology Directorate, which had largely been stuck on the sidelines of the war on terror, saw in Dennis Montgomery an opportunity to get in the game. The directorate had played an important role in the Cold War, but in the first few years of the war on terror, it was struggling to determine how technology could be leveraged against groups of terrorists who were trying to stay off the grid."

85. As libel by implication, again, Risen blames Montgomery for the decisions of government officials.

86. **_Twenty-Seventh,_ on Page 42 of the Book, Risen writes:**

> "Montgomery was telling the CIA exactly what it wanted to hear. At the time, the Bush Administration was obsessed with Al Jazeera, not only because of the networks' unrelenting criticism of the invasion of Iraq, but also because it had become Osama Bin Laden's favorite outlet for broadcasting his videotaped messages to the world."

87. As libel by implication, Risen implies that Montgomery defrauded and conned the CIA by "telling the CIA exactly what it wanted to hear."

88. **_Twenty-Eighth,_ on Page 42 of the Book, Risen writes:**

> "What remains unclear is how Montgomery was able to convince all of them that he had developed secret software that could decode Al Qaeda's invisible messages. While he had gotten by a few credulous military officers who came to view his demonstrations, he apparently found it just as easy to persuade the CIA as well."

23

89. As libel by implication, Risen implies that Montgomery conned the U.S. Government with a hoax. It would of course be entirely clear "how Montgomery was able to convince all of them" if Montgomery's work and technology are legitimate.

90. ***Twenty-Ninth,*** **on Page 46 of the Book, Risen writes:**

> "Finally the French brought an end to it. Since Air France flights to the United States were among those that had been grounded, French officials had taken a dim view of the entire episode. They began demanding answers from the Americans. The French applied so much pressure on Washington that the CIA was finally forced to reveal to French intelligence the source of the threat information. Once they heard the story of Dennis Montgomery and eTreppid, French officials arranged for a French high-tech firm to reverse-engineer Montgomery's purported technology. The French wanted to see for themselves whether the claims of hidden messages in Al Jazeera broadcasts made any sense."

91. As libel by implication, if not explicit, the passage implies that Montgomery is a fraud and that his work is a scam and a hoax.

92. ***Thirtieth,*** **on Page 52 of the Book, Risen writes:**

> "Montgomery continued to get defense contracts even during the Obama administration. In 2009, Montgomery was awarded another air force contract, and later claimed that he had provided the government with warning of a threatened Somali terrorist attack against President Obama's inauguration. Joseph Liberatore, an air force official who described himself as one of "the believers" in Montgomery and said he had heard from 'various federal agencies thanking us' for the support Montgomery and his company provided during Obama's inauguration. The threat, however, later proved to be a hoax."

93. As libel by implication, Risen implies that Montgomery's ability to continue to receive contracts is due to Montgomery's ability to defraud the government (and stupidity of government officials) rather than an endorsement of the legitimacy of Montgomery's work.

94. ***Thirty-First,*** **on Page 31 of the Book, Risen writes:**

"and a new breed of entrepreneur learned that one of the surest and easiest paths to riches could be found not in Silicon Valley building computers or New York designing clothes but rather in Tysons Corner, Virginia, coming up with new ways to predict, analyze, and prevent terrorist attacks— or, short of that, at least in convincing a few government bureaucrats that you had some magic formula for doing so."

95. As libel by implication, Risen implies that Montgomery engaged in fraud to convince a few government bureaucrats that he had a magic formula as an easy path to riches.

96. ***Thirty-Second,*** **on Page 33 of the Book, Risen writes:**

"Montgomery's story demonstrates how hundreds of billions of dollars poured into the war on terror went to waste. With all rules discarded and no one watching the bottom line, government officials simply threw money at contractors who claimed to offer an edge against the new enemies. And the officials almost never checked back to make sure that what they were buying from contractors actually did any good— or that the contractors themselves weren't crooks. A 2011 study by the Pentagon found that during the ten years after 9/ 11, the Defense Department had given more than $ 400 billion to contractors who had previously been sanctioned in cases involving $ 1 million or more in fraud."

97. As libel by implication, Risen implies that the money provided to Montgomery (among others) went to "waste."

98. ***Thirty-Third,*** **on Page 33 of the Book, Risen writes:**

"The Montgomery episode teaches one other lesson, too: the chance to gain promotions and greater bureaucratic power through access to and control over secret information can mean that there is no incentive for government officials to question the validity of that secret information. Being part of a charmed inner circle holds a seductive power that is difficult to resist."

99. As libel by implication, Risen implies that Montgomery's work was fraudulent.

100. ***Thirty-Fourth,*** **on Page 33 of the Book, Risen writes:**

"How his technology worked was a secret. Dennis Montgomery's computer code became the great treasure behind eTreppid Technologies, the company he and Trepp founded. Later, many of

25

those around Montgomery began to suspect the reason why Montgomery had to guard his technological innovations so carefully. They came to believe that at least some of the technology didn't really exist."

101.     As libel by implication, Risen implies that Montgomery committed fraud.

102.     ***Thirty-Fifth,*** **on Page 35 of the Book, Risen writes:**

"Montgomery was on the lookout for somebody to bankroll him, and had put out the word to his friends at the casinos that he frequented the most. A year later, Montgomery and Trepp were in business together. Trepp was one of the first, but hardly the last, to be beguiled by Montgomery's claims that he had achieved breakthroughs in computer technology of historic significance."

103.     As libel by implication, Risen implies that Montgomery "beguiled" Warren Trepp

by committing fraud.

104.     ***Thirty-Sixth,*** **on Page 39 of the Book, Risen writes:**

"For a few months in late 2003, the technology from Dennis Montgomery and eTreppid so enraptured certain key government officials that it was considered the most important and most sensitive counterterrorism intelligence that the Central Intelligence Agency had to offer President Bush. Senior officials at the CIA's Directorate of Science and Technology began to accept and vouch for Montgomery to officials at the highest levels of the government. Montgomery's claims grew ever more expansive, but that only solidified his position inside the national security arena. His technology became too impossible to disbelieve."

105.     As libel by implication, Risen imply that Montgomery committed fraud and is a

con man.

106.     ***Thirty-Seventh,*** **on Page 40 of the Book, Risen writes:**

"Montgomery persuaded the spy agency that his special computer technology could detect hidden bar codes broadcast on Al Jazeera, which had been embedded into the video feed by al Qaeda. Allegedly, al Qaeda was using that secret method to send messages to its terrorist operatives around the world about plans for new attacks. Montgomery convinced the CIA that his technology had uncovered a series of

hidden letters and numbers that appeared to be coded messages about specific airline flights that the terrorists were targeting.

107.     As libel by implication, Risen imply that Montgomery convinced the CIA of claims that are not (were not) true.

108.     **_Thirty-Eighth,_ on Page 42 of the Book, Risen writes:**

"Based on Montgomery's information, President Bush ordered the grounding of a series of international flights scheduled to fly into the United States. This step caused disruptions for thousands of travelers."

109.     As libel by implication, Risen imply that Montgomery convinced President Bush and the national command authority of conclusions drawn from Montgomery's work.

110.     **_Thirty-Ninth,_ on Page 42 of the Book, Risen writes:**

"One former senior CIA official recalled attending a White House meeting in the week following Christmas to discuss what to do next about the information coming from Montgomery. The official claims that there was a brief but serious discussion about whether to shoot down commercial airliners over the Atlantic based on the intelligence."

111.     As libel by implication, Risen imply that Montgomery convinced President Bush and the national command authority of conclusions drawn from Montgomery's work.

112.     **_Fortieth,_ on Page 47 of the Book, Risen writes:**

"Even more stunning, after the debacle over the bogus Christmas 2003 terrorist threats, Montgomery kept getting classified government contracts awarded through several different corporate entities. Montgomery's problems with the CIA did not stop him from peddling variations of his technology to one government agency after another. The secrecy that surrounded his work once again worked in his favor. CIA officials were reluctant to tell their Pentagon counterparts much about their experiences with Montgomery, so Defense Department officials apparently did not realize that his technology was considered suspect at CIA headquarters."

113.     As libel by implication, Risen implies that Montgomery continued to defraud, con, and scam the government, rather than concluding that the U.S. Government recognized the legitimacy of Montgomery's work.

114.     ***Forty-First,*** **on Page 48 of the Book, Risen writes:**

"He successfully infused a sense of mystery around himself. He was like the Wizard of Oz, but now people were beginning to try to examine the man behind the curtain."

115.     As libel by implication, Risen implies that the Montgomery engaged in fraud and a hoax by keeping details mysterious.

116.     ***Forty-Second,*** **on Page 48 of the Book, Risen writes:**

"The technology didn't meet the requirements for us," said a Special Operations Command spokesman drily. Still, there is no evidence that officials at Special Operations Command ever talked with their counterparts at the CIA to check up on Montgomery before awarding him a contract. Special Operations Command paid a total of $ 9.6 million to eTreppid under its contract with the firm."

117.     As libel by implication, Risen imply that Montgomery again repeated his fraud and hoax against a new government agency.

118.     ***Forty-Third,*** **on Page 54 of the Book, in the Chapter "The New Oligarchs,"**

**Risen writes:**

CHAPTER 3:   The New Oligarchs
Page 54:  "Dennis Montgomery is, of course, an extreme example of the new kind of counterterrorism entrepreneur who prospered in the shadows of 9/11.  But he was hardly alone in recognizing the lucrative business opportunities that the war on terror has presented.  In fact, as trillions of dollars have poured into the nation's new homeland security-industrial complex, the corporate leaders at its vanguard can rightly be considered the true winners of the war on terror."

119.     As libel by implication, Risen implies that Montgomery engaged in fraud and a hoax motivated by greed.

# Exhibit 16



**Houghton Mifflin Harcourt**

David Eber
Vice President
Associate General Counsel

January 20, 2015

VIA U.S. MAIL AND ELECTRONIC MAIL

Larry Klayman
Klayman Law Firm
2020 Pennsylvania Avenue, N.W.
Suite 800
Washington, DC 20006-1811
leklayman@gmail.com

       **Re: *Pay any Price*, by James Risen**

Dear Mr. Klayman:

       We have received your letter dated January 14, 2015, to Linda Zecher and William Bayers at Houghton Mifflin Harcourt Publishing Company ("HMH").

       We deny your allegations that *Pay any Price* contains defamatory statements concerning your client Dennis Montgomery, or that HMH or Mr. Risen engaged in any criminal conduct in preparing and vetting the book. We also decline your invitation to meet to discuss HMH's manuscript review processes.

                               Sincerely,

                               David Eber

cc:    William Bayers
       James Risen

# Exhibit 17

Case 1:21-cv-20445-CJN Document 182-4 Filed 08/07/23 Page 308 of 650

# Electronic Articles of Organization
## For
# Florida Limited Liability Company

L11000101240
FILED 8:00 AM
September 02, 2011
Sec. Of State
jbryan

## Article I

The name of the Limited Liability Company is:

ALEX JAMES LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

1797 N.E. 15TH ST.
FORT LAUDERDALE, FL, US  33305

The mailing address of the Limited Liability Company is:

1797 N.E. 15TH ST.
FORT LAUDERDALE, FL, US  33305

## Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

UNITED STATES CORPORATION AGENTS, INC.
13302 WINDING OAK COURT
SUITE A
TAMPA, FL,  33612

Having been named as registered agent and to accept service of process for the above stated limited liability company at the place designated in this certificate, I hereby accept the appointment as registered agent and agree to act in this capacity. I further agree to comply with the provisions of all statutes relating to the proper and complete performance of my duties, and I am familiar with and accept the obligations of my position as registered agent.

Registered Agent Signature:  MATT PFLEGING, US CORP. AGENTS

Case 1:23-cv-00445-CJN Document 182-4 Filed 08/07/23 Page 309 of 650

## Article V

L11000101240
FILED 8:00 AM
September 02, 2011
Sec. Of State
jbryan

The name and address of managing members/managers are:

Title: MGRM
JUDY CROWHURST
1797 N.E. 15TH ST.
FORT LAUDERDALE, FL. 33305 US

Signature of member or an authorized representative of a member

Electronic Signature: MATT PFLEGING, LEGALZOOM.COM, INC.

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true. I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# Exhibit 18

# SOCOM & CIA
# Visit 03/20/12

## Location:

75180 Mediterranean
Palm Desert, CA 92211



## Chris Pipes SOCOM

# Exhibit 19

Case 1:18-sv-20782-vJEM-Document 182-4 Filed 08/07/23 Page 313 of 650 148 of 150

# ORDER FOR SUPPLIES OR SERVICES

(Contractor must submit four copies of invoice.)

| | | |
|---|---|---|
| Form Approved OMB No. 0704-0187 Expires June 30, 1997 | PAGE 1 | OF 2 |

Public reporting burden for this collection of information is estimated to average 1 hour per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0187), Washington, DC 20503.

**PLEASE DO NOT RETURN YOUR FORM TO EITHER OF THESE ADDRESSES. SEND YOUR COMPLETED FORM TO THE PROCUREMENT OFFICIAL IDENTIFIED IN ITEM 6.**

| 1. CONTRACT/PURCH ORDER NO. H92222-04-D-0006 | 2. DELIVERY ORDER NO. 0001 | 3. DATE OF ORDER 16-FEB-2004 | 4. REQUISITION/PURCH REQUEST NO. 1SP50040420100 | 5. PRIORITY DO-C9 |
|---|---|---|---|---|

| 6. ISSUED BY | CODE H92222 | 7. ADMINISTERED BY (if other than 6) S0507A | 8. DELIVERY FOB |
|---|---|---|---|
| HQ US Special Operations Command ATTN: SOAL-KB (Holland) 7701 Tampa Point Blvd Macdill AFB, FL 33621 | | DCMA San Francisco Lathrop Office 700 E. Roth Rd French Camp, CA 95231 | X DEST □ OTHER (See Schedule if other) |

| 9. CONTRACTOR | CODE 3C5X0 | FACILITY CODE | 10. DELIVER TO FOB POINT BY (Date) (YYMMDD) SEE SCHEDULE | 11. MARK IF BUSINESS IS |
|---|---|---|---|---|
| NAME AND ADDRESS | e'Treppid Technologies, LLC 755 Trademark Dr Reno, NV 89521 | TEL: FAX: | 12. DISCOUNT TERMS | □ SMALL □ SMALL DISAD-VANTAGED □ WOMEN OWNED |
| | | | 13. MAIL INVOICES TO See Section G | |

| 14. SHIP TO | CODE H92222 | 15. PAYMENT WILL BE MADE BY HQ0339 | |
|---|---|---|---|
| UQ USSOCOM/SOAL-SP (Mohr) 7701 Tampa Point Blvd MacDill AFB, FL 33621 ATTENTION: SOAL-SP (Brad Mohr) | | DFAS-Columbus - West Entitlement Operations PO Box 182381 Columbus, OH 43218 | MARK ALL PACKAGES AND PAPERS WITH CONTRACT OR ORDER NUMBER |

| 16 | DELIVERY | X | This delivery order is issued on another Government agency or in accordance with and subject to terms and conditions of above numbered contract. |
|---|---|---|---|
| TYPE OF ORDER | PURCHASE | Reference your | ACCEPTANCE. THE CONTRACTOR HEREBY ACCEPTS THE OFFER REPRESENTED BY THE NUMBERED PURCHASE ORDER AS IT MAY PREVIOUSLY HAVE BEEN OR IS NOW MODIFIED, SUBJECT TO ALL OF THE TERMS AND CONDITIONS SET FORTH, AND AGREES TO PERFORM THE SAME. furnish the following on terms specified herein |

ETREPPID TECHNOLOGIES, LLC
NAME OF CONTRACTOR

SIGNATURE

WARREN TREPP, CEO
TYPED NAME AND TITLE

040216
DATE SIGNED (YYMMDD)

□ If this box is marked, supplier must sign Acceptance and return the following number of copies.

17. ACCOUNTING AND APPROPRIATION DATA/LOCAL USE
ACRN AA: 974/60300 56SF SD4 52SP 54X000 SP10 525700 F25700    $325,125.00

| 18. ITEM NO. | 19. SCHEDULE OF SUPPLIES/SERVICES | 20. QUANTITY ORDERED/ ACCEPTED* | 21. UNIT | 22. UNIT PRICE | 23. AMOUNT |
|---|---|---|---|---|---|
| | SEE CONTINUATION SHEET | | | | |

| "If quantity accepted by the Government is same as quantity ordered, indicate by X. If different, enter actual quantity accepted below quantity Ordered and encircle. | 24. UNITED STATES OF AMERICA BY    SUSAN M GRIFFIN CONTRACTING/ORDERING OFFICER | 25. TOTAL 29. DIFFERENCES | $325,125.00 |
|---|---|---|---|

| 26. QUANTITY IN COLUMN 20 HAS BEEN □ INSPECTED   □ RECEIVED   □ ACCEPTED, AND CONFORMS TO THE CONTRACT EXCEPT AS NOTED | 27. SHIP NO. | 28. D.O. VOUCHER NO. | 30. INITIALS |
|---|---|---|---|
| | □ PARTIAL □ FINAL | 32. PAID BY | 33. AMOUNT VERIFIED CORRECT FOR |
| _____ DATE      SIGNATURE OF AUTHORIZED GOVERNMENT REPRESENTATIVE | 31. PAYMENT □ COMPLETE □ PARTIAL □ FINAL | | 34. CHECK NUMBER |
| 36. I certify this account is correct and proper for payment | | | 35. BILL OF LADING NO. |
| _____ DATE       SIGNATURE AND TITLE OF CERTIFYING OFFICER | | | |
| 37. RECEIVED AT | 38. RECEIVED BY (Print) | 39. DATE RECEIVED (YYMMDD) | 40. TOTAL CONTAINERS | 41. S/R ACCOUNT NUMBER | 42. S/R VOUCHER NO. |

DD FORM 1155, JUN 94    PREVIOUS EDITION MAY BE USED

H92222-04-D-0006
Task Order 0001
Page 2 of 2

Continuation Sheet

1. **CONTRACT LINE ITEMS**:

| ITEM NO | SUPPLIES/SERVICES | MAX QUANTITY | UNIT | UNIT PRICE | MAX AMOUNT |
|---|---|---|---|---|---|
| 0001AA | | 1 | Each | $25,000.00 | $25,000.00 |
| | Falconview (PFPS) Maps - Compression FFP 1 Each = 1 CPU that this software is installed on. FOB: Destination | | | | |
| 0001AB | | 1 | Each | $40.00 | $40.00 |
| | Falconview (PFPS) Maps - Plug-in Decoder FFP 1 Each = 1 CPU that this software is installed on. FOB: Destination | | | | |
| 0001AC | | 1 | Each | $25,000.00 | $25,000.00 |
| | Still Image Compression FFP 1 Each = 1 CPU that this software is installed on. FOB: Destination | | | | |
| 0001AD | | 1 | Each | $10.00 | $10.00 |
| | Still Image Decoder FFP 1 Each = 1 CPU that this software is installed on. FOB: Destination | | | | |
| 0001AE | | 1 | Each | $50,000.00 | $50,000.00 |
| | Video Imagery w/ Audio - Compression FFP 1 Each = 1 CPU that this software is installed on. FOB: Destination | | | | |
| 0001AF | | 1 | Each | $25.00 | $25.00 |
| | Video Imagery w/ Audio - Decoder FFP 1 Each = 1 CPU that this software is installed on. FOB: Destination | | | | |
| 0001AN | | 1 | Each | $125,000.00 | $125,000.00 |
| | Generic Data Compression FFP 1 Each = 1 CPU that this software is installed on. FOB: Destination | | | | |

| 0001AP | | 1 | Each | $50.00 | $50.00 |
|---|---|---|---|---|---|
| | Generic Data Decompressor | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |

| 0001AQ | | 1 | Each | $100,000.00 | $100,000.00 |
|---|---|---|---|---|---|
| | Detection of Human and Non-Human Objects | | | | |
| | FFP | | | | |
| | 1 Each = 1 CPU that this software is installed on. | | | | |
| | FOB:  Destination | | | | |

2.  **GOVERNMENT FURNISHED PROPERTY**.

a) The Government will furnish one laptop computer to:
        eTreppid Technologies
        755 Trademark Dr
        Reno NV  89521.

b) Upon receipt of the Government-furnished laptop, the Contractor shall load the software ordered on the task order and return the laptop to:
        HQ USSOCOM
        ATTN: SOAL-SP (Brad Mohr)
        7701 Tampa Point Blvd
        MacDill AFB, FL  33621.

3.  **DELIVERY TIMEFRAME**.  The contract shall have 14 days from the receipt of the Government-furnished laptop to load the software and return the laptop to the Government.  If the 14th day falls on a weekend or federal holiday, the due date shall automatically extend to the next business day.

//nothing follows//

# EXHIBIT K



February 14, 2023

**VIA PERSONAL SERVICE**
Carlotta Wells
9301 Garden Court
Potomac, MD 20854

*Re:*     *US Dominion, Inc. et al., v. My Pillow, Inc., et al.,*
          Court File No.: 1:21-CV-00445 (CJN)

Dear Ms. Wells:

Enclosed and served upon you is a subpoena issued by The United States District Court for the District of Columbia in connection with a lawsuit brought by US Dominion, Inc. and others against My Pillow, Inc. and Michael Lindell. The enclosed subpoena requires you to present yourself on March 16, 2023, at 9:00 A.M. (Pacific Standard Time) at the Veritext offices, located at 36 S Charles St #2002, Baltimore, MD 21201.

Also attached is a copy of a Protective Order Governing the Production and Exchange of Confidential Information in this matter.

If you have any questions, please contact Jill Thorvig at  thorvig@parkerdk.com.

Sincerely,

*/s/ Andrew D. Parker*

Andrew D. Parker

ANDREW D. PARKER

CHRISTOPHER M. DANIELS

JESSE H. KIBORT

ELIZABETH S. WRIGHT

ALEC J. BECK

LORI A. JOHNSON

MATTHEW R. ESLICK

JOSEPH A. PULL

RYAN P. MALONE

JORDON C. GREENLEE

ABRAHAM S. KAPLAN

GREGORY N. ARENSON

REGINALD W. SNELL


FREDERICK C. BROWN
   OF COUNSEL


888 Colwell Building
123 Third Street North
Minneapolis, MN 55401

parkerdk.com

Tel: 612.355.4100
Fax: 612.355.4101

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| US Dominion, Inc. et al | ) |
|---|---|
| *Plaintiff* | ) |
| v. | ) |
| My Pillow, Inc. et al | ) |
| | ) |
| *Defendant* | ) |

Civil Action No.   1:21-cv-00445-CJN

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:      Carlotta Wells, 9301 Garden Court, Potomac, MD 20854

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place: Veritext, 36 S Charles St #2002, Baltimore, MD 21201 **A video conference link will be provided for remote attendance** | Date and Time: March 16, 2023  at 9:00 am |
|---|---|

The deposition will be recorded by this method:    stenographic transcription and video recording

❑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

Attached to this subpoena are Exhibit 1, an applicable protective order entered by the Court, and Exhibit 2, a statement pursuant to *Touhy v. Regan,* 340 U.S. 462 (1951), if applicable.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   February 14, 2023

| *CLERK OF COURT* | | OR | |
|---|---|---|---|
| | | | s/ Andrew D. Parker |
| *Signature of Clerk or Deputy Clerk* | | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Defendants
Michael J. Lindell and My Pillow, Inc.                                                     , who issues or requests this subpoena, are:

Andrew D. Parker, 123 North Third Street, Suite 888, Minneapolis, Minnesota 55401, parker@parkerdk.com, 612-355-4100

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  1:21-cv-00445-CJN

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00  .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***

   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT 1

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

U.S. DOMINION, INC., et al.,

        *Plaintiffs,*

    v.

MY PILLOW INC., et al.,

        *Defendants*.

    v.

SMARTMATIC USA CORP.,
SMARTMATIC INT'L HOLDING B.V.,
SGO CORPORATION LIMITED, and
HAMILTON PLACE STRATEGIES, LLC,

        *Third-Party Defendants*.

Civil Action No. 1:21-cv-445 (CJN)

---

U.S. DOMINION, INC., et al.,

        *Plaintiffs,*

    v.

RUDOPLH W. GIULIANI,

        *Defendant*.

Civil Action No. 1:21-cv-213 (CJN)

| |
|---|
| U.S. DOMINION, INC., et al., |
| *Plaintiffs*, |
| v. |
| SIDNEY POWELL, et al., |
| *Defendants*. |

Civil Action No. 1:21-cv-40 (CJN)

## **PROTECTIVE ORDER GOVERNING THE PRODUCTION AND EXCHANGE OF CONFIDENTIAL INFORMATION**

Plaintiffs US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corporation (collectively, "Dominion"), Third-Party Defendant Hamilton Place Strategies, and Defendants Michael J. Lindell, MyPillow, Inc., Rudolph W. Giuliani, Sidney Powell, Sidney Powell, P.C., and Defending the Republic, Inc. ("Parties") are engaged in discovery proceedings, which include, among other things, taking depositions, answering interrogatories, and producing documents. The Parties believe that certain information they have produced or will produce may contain information that is proprietary, commercially sensitive, or non-public. Under Rules 5.2 and 26(c) of the Federal Rules of Civil Procedure, this Order Governing the Production and Exchange of Confidential Information (the "Order") will govern the handling of documents, testimony (in any form whether by affidavit, declaration, or deposition), exhibits, transcripts, written discovery requests, interrogatory responses, responses to requests for admission, responses to requests for documents, and any other information or material produced, given, or exchanged, including any information contained therein or derived therefrom

2

("Discovery Material"), by or among any Party or non-Party providing Discovery Material (each a "Producing Party") in the Litigation[1] to the party receiving the Discovery Material ("Receiving Party"). It is **HEREBY ORDERED THAT**:

1. Any Discovery Material produced in the Litigation will be used, except by the Producing Party, solely for purposes of this Litigation and no Receiving Party will provide Discovery Material to any person or entity (including for any other litigation) or make any Discovery Material public except as permitted by this Order and in this Litigation. Notwithstanding the limitations in the preceding sentence, (i) any Party may use Discovery Material lawfully obtained independently of this Litigation for any purpose consistent with any other limitations placed on that Discovery Material; (ii) Dominion may produce Defendants' Discovery Material in *US Dominion, Inc., Dominion Voting Systems, Inc., and Dominion Voting Systems Corp. v. Fox News Network, LLC*, Case No. N21C-03-257 EMD, pending in the Superior Court of the State of Delaware, *US Dominion, Inc. v. Fox Corporation,* Case No. N21C-11-082 EMD, pending in the Superior Court of the State of Delaware, and *US Dominion, Inc. v. Newsmax Media Inc.,* Case No. N21C-08-063 EMD, pending in the Superior Court of the State of Delaware, in response to third-party subpoenas lawfully issued and served on Defendants in those cases; and (iii) Sidney Powell may produce Discovery Material in the Texas

---

[1] "Litigation" refers to the three related actions: *US Dominion Inc., et al. v. My Pillow, Inc., et al.*, No. 1:21-cv-00445-CJN (D.D.C.), *US Dominion, Inc., et al. v. Powell, et al.*, No. 1:21-cv-00040-CJN (D.D.C.), and *US Dominion, Inc., et al. v. Giuliani*, No. 1:21-cv-00213-CJN (D.D.C.). This Order does not cover Third-Party Defendants Smartmatic USA Corp., Smartmatic International Holding B.V., or SGO Corporation Ltd.

The parties reserve the right to move the Court to expand this Order to include the parties in *US Dominion, Inc., et al. v. Byrne*, No. 1:21-cv-02131-CJN (D.D.C.) and *US Dominion, Inc., et al. v. Herring Networks, et al.*, No 1:21-cv-02130-CJN (D.D.C.), if the Court orders the parties in the *Byrne* and *Herring* cases to coordinate for discovery purposes with the parties in the Litigation.

Bar case brought against her, *Commission for Lawyer Discipline v. Sidney Powell*, No. DC-22-02562 (Dist. Ct., Dallas County, TX), but if such Discovery Material is designated "Confidential" or "Attorneys' Eyes Only," then Powell must notify the Court that she intends to produce such Discovery Material and certify in writing that she will not use or produce the Discovery Material for any other purpose.

2.    Any Producing Party may designate any Discovery Material as "Confidential Discovery Material" under the terms of this Order where such Party in good faith believes that such Discovery Material contains Confidential Discovery Material. Confidential Discovery Material is defined as material that consists of non-public customer information or information that is proprietary or otherwise commercially sensitive.

3.    Any Producing Party may designate any Discovery Material as "Attorneys' Eyes Only Discovery Material" under the terms of this Order where such Party in good faith believes that such Discovery Material contains Attorneys' Eyes Only Discovery Material. Attorneys' Eyes Only Discovery Material is defined as material that contains extremely Confidential information such that disclosure other than as permitted under Paragraph 9 of this Order is likely to cause substantial injury to the Producing Party.  The Attorneys' Eyes Only designation includes, but is not limited to, the following categories of information: (i) non-public damages-related and financial information, including confidential pricing, customer, profit, sales, or other financial information; (ii) confidential business, marketing, or strategic plans, including business, marketing, and technical information regarding the future provision of services; and (iii) confidential and commercially sensitive trade secrets or technical information.  To the extent source code is determined to be relevant and discoverable, the Parties will agree to terms and entry of a separate protective order for the source code before any is produced.

4. Notwithstanding any other provision of this Agreement, no Receiving Party may provide Discovery Material designated as Confidential Material or Attorneys Eyes Only Material to any person or entity involved in the Litigation unless and until that person or entity confirms their understanding of, and agreement to, abide by the terms of this Order.

5. The designation of Discovery Material as Confidential Discovery Material or Attorneys' Eyes Only Discovery Material will be made in the following manner:

a. In the case of documents or other written materials, including affidavits and declarations but not pre-trial deposition or other pre-trial testimony: (i) by affixing the legend "Confidential" or "Attorneys' Eyes Only" to each page containing any Confidential or Attorneys' Eyes Only Discovery Material; or (ii) in the case of electronically stored information produced in native format by affixing the legend "Confidential" or "Attorneys' Eyes Only" to the media containing the Discovery Material (e.g., CD, DVD, thumb drive, external hard drive, or secure file transfer).

b. In the case of testimony: (i) by a statement on the record, by counsel, at the time of such disclosure or, in the case of a deposition or other pre-trial oral testimony, before the conclusion of the deposition or pre-trial testimony; or (ii) by written notice, sent to all Parties within 15 business days of receipt of the final deposition transcript or other pre-trial testimony; provided that only those portions of the transcript designated as Confidential or Attorneys' Eyes Only Discovery Material will be deemed Confidential or Attorneys' Eyes Only Discovery Material. Each deposition will be deemed to be Attorneys' Eyes Only Discovery Material until 15 business days after counsel receive a copy of the final transcript,

after which the deposition will be treated in accordance with its confidentiality designation, if any. The Parties may modify this procedure for any particular deposition, through agreement in writing before, or on the record at, such deposition, without further order of the Court.

    c. In the case of any other Discovery Material, by written notice that the Discovery Material constitutes Confidential or Attorneys' Eyes Only Discovery Material.

6. The designation of Discovery Material as Confidential or Attorneys' Eyes Only Discovery Material will constitute a representation that such Discovery Material has been reviewed by an attorney representing the Party making the designation, and that there is a good faith basis for such designation.

7. Inadvertent failure to designate Discovery Material as Confidential or Attorneys' Eyes Only Discovery Material does not constitute a waiver of such claim and may be corrected. A Producing Party may designate as Confidential or Attorneys' Eyes Only any Discovery Material that has already been produced, including Discovery Material that the Producing Party inadvertently failed to designate as Confidential or Attorneys' Eyes Only, (i) by notifying in writing the Receiving Party to whom the production has been made that the Discovery Material constitutes Confidential or Attorneys' Eyes Only Discovery Material, and (ii) providing a replacement copy of the Discovery Material marked in a manner consistent with Paragraph 5. After receiving such supplemental notice, the Parties will treat the Discovery Material so designated as Confidential or Attorneys' Eyes Only Discovery Material, and such Discovery Material will be fully subject to this Order from the date of such supplemental notice forward. The Party receiving such notice will make a reasonable, good-faith effort to ensure that any analyses, memoranda, notes, or other such materials generated that include or are based upon

such newly designated information are immediately treated as containing Confidential or Attorneys' Eyes Only Discovery Material. In addition, after receiving such supplemental written notice, any receiving Party that disclosed the Discovery Material before its designation as "Confidential" or "Attorneys' Eyes Only" will exercise its best efforts to ensure (i) the return or destruction of such Discovery Material, if it was disclosed to anyone not authorized to receive it under Paragraph 8 or Paragraph 9 of this Order, (ii) that any documents or other materials derived from such Discovery Material are treated as if the Discovery Material had been designated as "Confidential" or "Attorneys' Eyes Only" when originally produced, (iii) that such Discovery Material is not further disclosed except in accordance with the terms of this Order, and (iv) that any such Discovery Material, and any information derived therefrom, is used solely in accordance with this Order.

8. Except as otherwise provided in this Order, Confidential Discovery Material may be disclosed, summarized, described, characterized, or otherwise communicated, orally or in writing, or made available in whole or in part, only to the following persons for use in connection with the Litigation and in accordance with this Order:

    a. The Parties' current employees who are assisting with or making decisions concerning this Litigation, to the extent deemed reasonably necessary by counsel of record for the purpose of assisting in the prosecution or defense of the Litigation;

    b. Counsel for the Parties in the Litigation (including in-house counsel), and the partners, associates, paralegals, secretaries, clerical, regular and temporary employees, and service vendors of such counsel (including outside copying and litigation support services) who are assisting with the Litigation;

c.   Subject to Paragraph 4, experts, consultants, or independent litigation support services assisting counsel for the Parties, and partners, associates, paralegals, secretaries, clerical, regular and temporary employees, and service vendors of such experts or consultants (including outside copying services and outside support services) who are assisting with the Litigation;

d.   As to persons not otherwise covered by Subparagraphs 8(a)–(c), a party may disclose material designated as "Confidential" to persons (1) who appear as an author or recipient on the face of the document to be disclosed; or (2) for which a good faith basis exists to believe the potential witness or deponent has knowledge of the contents of a document;

e.   Subject to Paragraph 4, witnesses or deponents, and their counsel, but only to the extent necessary to conduct or prepare for depositions or testimony in the Litigation;

f.   The Court, persons employed by the Court, translators, and videographers and court reporters who are recording and transcribing any hearing, trial, or deposition in the Litigation or any appeal therefrom; and

g.   Any other person only upon (i) order of the Court entered upon notice to the Parties, or (ii) written stipulation or statement on the record of agreement by the Producing Party who provided the Discovery Material being disclosed, provided that such person signs an undertaking in the form attached as Exhibit A hereto.

h.   Any videographer, translator, court reporter, or transcriber who reports, tapes, translates, or transcribes testimony in this Litigation at a deposition will agree by a statement on the record, before recording or transcribing any such testimony

8

constituting Confidential Discovery Materials, that all such testimony and information revealed at the deposition is and will remain confidential and will not be disclosed by such translator, videographer, reporter, or transcriber except to the attorneys for each Party and any other person who is present while such testimony is being given, and that copies of any transcript, reporter's notes or any other transcription records of any such testimony will be retained in confidentiality and safekeeping by such videographer, translator, reporter, or transcriber or will be delivered to the undersigned attorneys.

9.    Except as otherwise provided in this Order, Attorneys' Eyes Only Discovery Material may be disclosed, summarized, described, characterized, or otherwise communicated, orally or in writing, or made available in whole or in part, only to the following persons for use in connection with the Litigation and in accordance with this Order:

     a.  Counsel for the Parties in the Litigation (including in-house counsel), and the partners, associates, paralegals, secretaries, clerical, regular and temporary employees of counsel ("Counsel");

     b.  Service vendors of Counsel for the Parties (including outside copying and litigation support services) who are assisting with the Litigation;

     c.  No more than five corporate designees for the Receiving Party;

     d.  Subject to Paragraph 4, experts, consultants, or independent litigation support services assisting counsel for the Parties, and partners, associates, paralegals, secretaries, clerical, regular and temporary employees, and service vendors of such experts  or consultants (including outside copying services and outside support services) who are assisting with the Litigation;

e. Subject to Paragraph 4, witnesses or deponents, and their counsel, but only to the extent necessary to conduct or prepare for depositions or testimony in the Litigation;

f. Any person indicated on the face of a document or accompanying covering letter, email, or other communication to be the author, addressee, or an actual or intended recipient of the document, or, in the case of meeting minutes and presentations, anyone identified on the document as an attendee of the meeting;

g. The Court, including any clerk, translator, stenographer, videographer, or other person having access to Attorney's Eyes Only Information by virtue of his or her position with the Court, and including the jury at trial or as exhibits to motions; and

h. Any other person only upon (i) order of the Court entered upon notice to the Parties, or (ii) written stipulation or statement on the record of agreement by the Producing Party who provided the Attorneys' Eyes Only Discovery Material being disclosed, and provided that such person signs an undertaking in the form attached as Exhibit A hereto.

i. Any videographer, translator, court reporter, or transcriber who reports, tapes, translates, or transcribes testimony in this Litigation at a deposition will agree by a statement on the record, before recording or transcribing any such testimony constituting Attorneys' Eyes Only Discovery Materials, that all such testimony and information revealed at the deposition is and will remain confidential and will not be disclosed by such translator, videographer, reporter, or transcriber except to the attorneys for each Party and any other person who

10

is present while such testimony is being given, and that copies of any transcript,

reporter's notes or any other transcription records of any such testimony will

be retained in confidentiality and safekeeping by such videographer, translator,

reporter, or transcriber or will be delivered to the undersigned attorneys.

10.    Confidential Discovery Material may be provided to persons listed in Paragraph

8(c) and Attorneys' Eyes Only Discovery Material may be provided to persons listed in

Paragraph 9(d) only to the extent necessary for such expert or consultant to prepare a written

opinion, to prepare to testify, or to assist counsel in the Litigation, provided that such expert or

consultant (i) is not a current or former employee of Dominion subject to a non-disclosure

agreement, (ii) is not a current competitor of Dominion, an employee of a current competitor of

Dominion, or advising or discussing employment with, or a consultant to, a current competitor

of Dominion, (iii) agrees to use, and does use, the Discovery Material solely in connection with

the Litigation and (iv) agrees to be bound by the terms of this Order by signing an undertaking

in the form attached as Exhibit A hereto. Subparagraph (i) above does not apply to any expert or

consultant of Dominion. Counsel for the Party showing, providing, or disclosing Confidential or

Attorneys' Eyes Only Discovery Material to any person required to execute an undertaking under

this Paragraph will be responsible for obtaining such signed undertaking and retaining the

original, executed copy thereof. "Competitors" are persons or entities endeavoring to engage in

the same or similar lines of business, who provide the same or similar services, who sell the

same or similar products, or who operate in the same markets, as well as any persons who are

engaged in any of these activities.

11.    Every person to whom Confidential or Attorneys' Eyes Only Discovery Material

is disclosed, summarized, described, characterized, or otherwise communicated or made

available, orally or in writing, in whole or in part, will be advised that the information is being

disclosed subject to the terms of this Order and may not be disclosed or used for purposes other

than those permitted hereunder. Each such person will maintain the Confidential or Attorneys'

Eyes Only Discovery Material, or information derived therefrom, in a manner reasonably

calculated to prevent unauthorized disclosure. Any Party issuing a subpoena to a non-Party will

enclose a copy of this Order and notify the non-Party that the protections of this Order will apply

to Discovery Materials of such non-Party.

      12.     Any pleading, brief, memorandum, motion, letter, affidavit, declaration, or other

document filed with the Court that discloses, summarizes, describes, characterizes, or otherwise

communicates Confidential or Attorneys' Eyes Only Discovery Materials (a "Confidential

Filing") must be filed with the Court under seal in accordance with Local Rule 5.1(h), along

with a cover page bearing the caption of the Litigation and the title of the Confidential Filing

and stating:

> **YOU ARE IN POSSESSION OF A DOCUMENT FILED IN THE UNITED
> STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA
> THAT IS CONFIDENTIAL AND FILED UNDER SEAL.**
>
> **If you are not authorized by Court Order to view or retrieve this document
> read no further than this page. You should contact the following person:**
>
> **[Filing Attorney's or Party's Name]**
> **[Filing Attorney's Law Firm Name]**
> **[Filing Attorney's or Party's Address]**
> **[Filing Attorney's or Party's Telephone Number]**

No other information should appear on the cover page. Every page of a Confidential Filing will

have a footer stating "THIS DOCUMENT IS CONFIDENTIAL AND FILED UNDER SEAL.

REVIEW AND ACCESS TO THIS DOCUMENT IS PROHIBITED EXCEPT BY PRIOR

COURT ORDER." A Party may omit this footer for voluminous exhibits.

13.     A Party making a Confidential Filing must file a copy of the Confidential Filing for public inspection that omits only the information that the Party has good cause to believe should continue to be sealed.  Notwithstanding the foregoing, the Parties have no obligation to file public versions of any exhibits or attachments to a Confidential Filing, unless otherwise ordered by the Court.

14.     All materials filed pursuant to Paragraph 13 will be released from confidential treatment only upon further order of this Court, either on its own motion or pursuant to the procedure set forth in Paragraph 15 below. The provisions of this paragraph may be waived only with the written consent of the Producing Party.

15.     Any Party who objects to the continued restriction on public access to any Confidential or Attorneys' Eyes Only Filing, or any portion thereof, will give written notice of the objection to the Party that designated the Discovery Material as Confidential or Attorneys' Eyes Only ("the Designating Party"). To the extent that the Designating Party seeks to continue the restriction on public access to the Confidential or Attorneys' Eyes Only Filing, or any portion thereof, the Designating Party will file an application with the Court within seven (7) days for a judicial determination as to whether good cause exists for continued restricted access to the Confidential Filing, or any portion thereof.

16.     If a Party objects to the designation of Discovery Material as Confidential or Attorneys' Eyes Only Discovery Material, that Party ("the Objecting Party") will send written notice to the Designating Party that includes a date and time for a meet and confer to discuss the disputed designation. The Objecting Party and the Designating Party will thereafter meet and confer either at the suggested date and time or, to the extent the Designating Party is unavailable at the suggested date and time, at some other agreed date and time. If the meet and confer

13

procedure does not resolve the dispute, the Objecting Party will, within twenty-one (21) days of the meet and confer, file a motion with the Court to strike the designation. The Producing Party will, within fourteen (14) days, file a response, and the Objecting Party will file a reply within seven (7) days, after which the matter will be fully briefed and ripe for the Court to resolve the dispute. A hearing may be held at the discretion of the Court. While such an application is pending, the Discovery Material or testimony in question will be treated as Confidential or Attorneys' Eyes Only Discovery Material pursuant to this Order. The burden of establishing that any Discovery Material was properly designated as Confidential or Attorneys' Eyes Only Discovery Material is on the Designating Party. If an Objecting Party seeking to challenge any designation of Discovery Material or testimony as Confidential or Attorneys' Eyes Only fails to object and propose a meet and confer as described in Paragraph 16, then the Objecting Party will be deemed to have permanently waived its right to challenge the designation of the disputed Discovery Material as Confidential or Attorneys' Eyes Only.

17.     The Parties reserve the right to apply, under Rules 5.2(e) and 26 of the Federal Rules of Civil Procedure and Local Rule 5.1(h), for an order seeking additional safeguards with respect to the use and handling of Discovery Material or to modify the terms of this Order.

18.     Entering into this Order, or agreeing to or producing or receiving Discovery Material or otherwise complying with the terms of this Order, will not:

   a. prejudice in any way the rights of any Party to (i) seek production of any documents or information in discovery, or (ii) object to the production of any documents or information on the ground that it is not subject to discovery;

   b. operate as an admission by any Party that any particular Discovery Material constitutes Confidential or Attorneys' Eyes Only Discovery Material or contains

14

or reflects trade secrets or any other type of confidential information;

c. prejudice in any way the rights of any Party to (i) petition the Court for a further protective order relating to any purportedly Confidential or Attorneys' Eyes Only Discovery Material, or (ii) seek a determination by the Court whether any Discovery Material or Confidential or Attorneys' Eyes Only Discovery Material should be subject to the terms of this Order;

d. prevent any Producing Party from agreeing in writing to alter or waive the provisions or protections provided herein with respect to their designation of any particular Discovery Material;

e. prejudice in any way the rights of any Party to object to the relevance, authenticity, use, or admissibility into evidence of any document, testimony, or other evidence subject to this Order;

f. preclude any Party from objecting to discovery that it believes to be otherwise improper; or

g. operate as a waiver of any attorney-client, work product, business strategy, trade secret or other privilege.

19. This Order has no effect upon, and will not apply to, a Producing Party's use or disclosure of its own Discovery Material for any purpose. Nothing herein will prevent a Producing Party from disclosing its own Discovery Material.

20. If Discovery Material that is subject to a claim of attorney-client privilege, attorney work product, or any other applicable privilege or ground on which production of that information should not be made to any Party ("Inadvertent Production Material") is inadvertently produced by a Producing Party or Parties, such inadvertent production will in no way prejudice

or otherwise constitute a waiver of, or estoppel as to, any claim of attorney-client privilege, work product, or other applicable privilege.

a. A claim of inadvertent production will constitute a representation by the Party claiming inadvertent production that the Inadvertent Production Material has been reviewed by an attorney for the Party claiming inadvertent production and that there is a good faith basis for the claim of inadvertent production.

b. If a claim of inadvertent production is made under this Order, with respect to Discovery Material then in the custody of another Party, the Party possessing the Inadvertent Production Material will: (i) refrain from any further examination or disclosure of the claimed Inadvertent Production Material; and (ii) if requested, promptly make a good faith effort to destroy all such claimed Inadvertent Production Material (including summaries and excerpts) and all copies thereof, and certify in writing to that fact. Once a claim of inadvertent production is made, no Party may use the Inadvertent Production Material for any purpose until further order of the Court.

c. The Party claiming inadvertent production and a Receiving Party will follow the same procedure set forth in Paragraphs 15 and 16 for challenging the designation of Inadvertent Production Material; while any motion relating to the Inadvertent Production Material is pending, the Inadvertent Production Material in question will be treated in accordance with Paragraph 7. A Receiving Party may not assert as a ground for challenging privilege the fact of the inadvertent production, nor may it include or otherwise disclose in any filing relating to the challenge, as an attachment, exhibit, or otherwise, the Inadvertent Production Material (or any

portion thereof).

21. Nothing herein will be deemed to waive any applicable common law or statutory privilege or work product protection.

22. In the event additional Parties join or are joined in the Litigation, they will not have access to Confidential or Attorneys' Eyes Only Discovery Material until the newly joined Party by its counsel has executed this Order and filed with the Court its agreement to be fully bound by it.

23. Subject to the requirements of Rules 5.2(e) and 26 of the Federal Rules of Civil Procedure and Local Rule 5.1(h), the provisions of this Order will, absent written permission of the Designating Party or further order of the Court, continue to be binding throughout and after the conclusion of the Litigation, including, without limitation, any appeals therefrom, except as provided in Paragraph 24.

24. In the event that any Confidential or Attorneys' Eyes Only Discovery Material is used in open court during any court proceeding or filed, marked, or lodged as a trial exhibit, the material will lose its confidential status and become part of the public record, unless the Designating Party applies for and obtains an order from this Court specifically maintaining the confidential status of particular material. Before any court proceeding in which Confidential or Attorneys' Eyes Only Discovery Material is to be used, counsel will confer in good faith on such procedures that may be necessary or advisable to protect the confidentiality of any such Discovery Material.

25. Within 60 days after receiving notice of the entry of an order, judgment, or decree finally disposing of the Litigation, or any other proceeding in which Confidential or Attorneys' Eyes Only Discovery Material is permitted to be used, including the exhaustion of all possible

appeals, and upon the written request of the Designating or Producing Party, all persons having received Confidential or Attorneys' Eyes Only Discovery Material will either (i) make a good-faith and reasonable effort to return such material and all copies thereof (including summaries, excerpts, and derivative works) to counsel for the Producing Party; or (ii) make a good-faith and reasonable effort to destroy all such Confidential or Attorneys' Eyes Only Discovery Material, and certify to that fact in writing to counsel for the Designating or Producing Party. However, counsel for the Parties will be entitled to retain court papers, trial transcripts, and attorney work product containing Confidential or Attorneys' Eyes Only Discovery Material, provided that such counsel, and employees of such counsel, will maintain the confidentiality thereof and will not disclose such court papers, trial transcripts, or attorney work product containing Confidential or Attorneys' Eyes Only Discovery Material to any person except under a court order or agreement by the Designating and Producing Party or except as otherwise required by law. All materials returned to the Parties or their counsel by the Court likewise will be disposed of in accordance with this paragraph.

26. If any person in possession of Confidential or Attorneys' Eyes Only Discovery Material receives a subpoena or other compulsory process seeking the production or other disclosure of Confidential or Attorneys' Eyes Only Discovery Material the person neither produced nor designated (collectively, a "Demand"), the person will give written notice (by hand, email, or facsimile transmission) to counsel for the Designating and Producing Parties within three business days of receipt of such Demand (or if a response to the Demand is due in less than three business days, at least 24 hours prior to the deadline for a response to the Demand), identifying the Confidential or Attorneys' Eyes Only Discovery Material sought and enclosing a copy of the Demand, and must object to the production of the Confidential or

Attorneys' Eyes Only Discovery Material on the grounds of the existence of this Order. The burden of opposing the enforcement of the Demand will fall on the Designating Party. Nothing herein will be construed as requiring the person receiving the Demand or anyone else covered by this Order to challenge or appeal any order requiring production of Confidential or Attorneys' Eyes Only Discovery Material covered by this Order, or to subject itself to any penalties for noncompliance with any legal process or order, or to seek any relief from this Court or any other court. Compliance by the person receiving the Demand with any court order directing production under a Demand of any Confidential or Attorneys' Eyes Only Discovery Material will not constitute a violation of this Order.

      27.     Absent court order, no person who is not a party to the Litigation who receives Confidential or Attorneys' Eyes Only Discovery Material as permitted under the terms of this Order ("a Non-Party") will reveal any Confidential or Attorneys' Eyes Only Discovery Material, or the information contained therein, to anyone not entitled to receive such Confidential or Attorneys' Eyes Only Discovery Material under the terms of this Order. In the event that Confidential or Attorneys' Eyes Only Discovery Material is disclosed to any person other than in the manner authorized by this Order, or that any information comes to the Non-Party's attention that may indicate there was or is likely to be a loss of confidentiality of any Confidential or Attorneys' Eyes Only Discovery Material, the Non-Party responsible for the disclosure or loss of confidentiality will immediately inform the Designating and Producing Party of all pertinent facts relating to the disclosure or loss of confidentiality, including, if known, the name, address, and employer of each person to whom the disclosure was made. The Non-Party responsible for the disclosure or loss of confidentiality will also make reasonable efforts to prevent disclosure of Confidential or Attorneys' Eyes Only Discovery Material by

each unauthorized person who receives the information.

28.     The Parties agree that the production of any Discovery Material by any non-Party is subject to and governed by the terms of this Order.

29.     If a Party violates this Order by releasing, leaking, or otherwise disclosing Confidential or Attorneys' Eyes Only Discovery Material to persons or entities not entitled to such Discovery Material under this Order, the Court will have authority to impose sanctions under Rule 37(b)(2)(A)(i)-(vi).

30.     This Court will retain jurisdiction over all persons subject to this Order to the extent necessary to enforce any obligations arising hereunder or to impose sanctions for any contempt thereof.

**IT IS SO ORDERED**.

_____
CARL J. NICHOLS
United States District Judge

DATE: December 6, 2022

**Exhibit A to Protective Order**

*U.S. Dominion, Inc., et al. v. Powell, et al.*, **No. 1:21-cv-00040 (CJN)**
*U.S. Dominion, Inc., et al. v. Giuliani*, **No. 1:21-cv-00213 (CJN)**
*U.S. Dominion, Inc., et al. v. Lindell, et al.*, **No. 1:21-cv-00445 (CJN)**

## <u>UNDERTAKING</u>

I have read the Protective Order of _____, \_\_\_, 2022, in this action (the

"Order") and undertake to access and use Discovery Material, Confidential Material, and

Attorneys Eyes Only Material only as the Order permits.


Signed this \_\_\_ day of _____, 2022.

_____
[Name]

21

# EXHIBIT 2

<u>*Touhy* Summary of Information Sought and Relevance to Proceeding</u>

To the extent that the Department of Justice *Touhy* regulations may apply to the attached subpoena, the importance and the relevance of the information the issuing party intends to seek through the deposition of Carlotta Wells is as follows.

The testimony sought from Ms. Wells is of major importance to the defenses of Michael J. Lindell and My Pillow, Inc. in the captioned proceeding, *US Dominion, Inc. et al. v. My Pillow, Inc. et al.*, no. 21-cv-445 in the U.S. District Court for the District of Columbia. The plaintiffs' claims in that action allege that Mr. Lindell made false statements about the 2020 election. One of Mr. Lindell's defenses is that his statements were based in significant part upon information he received from and about a former government contractor named Dennis Montgomery, including information about technology developed by Mr. Montgomery and provided to the Central Intelligence Agency to hack/penetrate electronic election systems, and otherwise gather related internet traffic that could impact election systems. Ms. Wells interacted extensively with Mr. Montgomery concerning his work for the government. Mr. Lindell's and My Pillow, Inc.'s defenses include the defense that the allegedly defamatory statements were true, and the defense that the statements were plausible. Ms. Wells can provide information showing that Mr. Lindell's reliance on Mr. Montgomery and the information he stated he possessed was reasonable.

Ms. Wells's testimony will support the defenses of Mr. Lindell and My Pillow by showing the following:

(1) The United States Government asked a federal district to enter a protective order restricting inquiry into certain information in litigation between Mr. Montgomery and his former employer, *Montgomery v. ETreppid Techs., Inc.*, no. 06-cv-56 (D. Nev. Aug. 29, 2007). *See* attached Exhibit A.

(2) The United States Government seized boxes of documents related to Mr. Montgomery from the offices of Mr. Montgomery's former attorney. *See* attached Exhibit B.

(3) Ms. Wells attended a deposition of Mr. Montgomery together with two federal agents whose names she refused to provide. See attached Exhibit C. Ms. Wells attended the deposition for purposes related to the protective order in *Montgomery v. ETreppid*. At that deposition, Ms. Wells had certain conversations with Mr. Montgomery, not recorded on the transcript, which demonstrate the nature of the work Mr. Montgomery performed for the government, on which the defendants are relying for their defense in the *Dominion v. My Pillow* litigation.

(4) Ms. Wells attended a court hearing in 2008 in which she instructed Mr. Montgomery not to answer several questions on the basis of the state secrets privilege related to work performed by Mr. Montgomery for the United States government. *See* attached Exhibit D.

(5) Ms. Wells attended a court hearing in 2008 in which she asked the district court to allow her to remove and redact information from exhibits related to Mr. Montgomery, on the basis of the state secrets privilege. *See* attached Exhibit E.

(6) Ms. Wells had additional conversations and dealings with Mr. Montgomery in connection with Mr. Montgomery's work for the United States Government.

Importantly, Mr. Lindell and My Pillow do <u>not</u> intend to ask Ms. Wells to disclose the substance of attorney-client communications or work product material generated in the course of her representation of the United States. The information they seek concerns non-privileged matters.

Ms. Wells's testimony will support the Mr. Lindell's and My Pillow, Inc.'s defenses that the information Mr. Lindell received about and from Mr. Montgomery was accurate, credible, and reasonable to rely upon in making the statements for which the Dominion plaintiffs are suing him in the lawsuit for which this subpoena is issued. Ms. Wells's testimony is additionally expected to support the factual conclusions that Mr. Montgomery's account of his past activities is true, that Mr. Montgomery performed work for the United States government, and that Mr. Montgomery's work was relied upon and used by the United States Government.

Lindell and My Pillow, Inc. have a right to gather the evidence of Ms. Wells's knowledge concerning Mr. Montgomery's activities to support their defenses concerning Mr. Lindell's reliance on Mr. Montgomery, and to defend against any attacks the Dominion plaintiffs may assert against Mr. Montgomery's credibility.

Disclosure of Ms. Wells's testimony is appropriate as part of discovery in the *US Dominion Inc. v. My Pillow, Inc.* action, which is open and ongoing. The testimony sought is not privileged, no statute would be violated by disclosure of it, and it would not require disclosure of classified information, reveal any confidential source or investigation, or improperly reveal trade secrets. To the extent Ms. Wells's testimony is deemed sensitive or confidential, the testimony could be designated as confidential under the Protective Order entered by the District Court in this action, attached to the subpoena. Mr. Lindell and My Pillow, Inc. believe that Ms. Wells's testimony concerning Mr. Montgomery can be taken without creating any issue of state secrets, because the testimony concerns events from long ago and because the testimony can be given in a general way as to avoid any lingering concerns over classified information.

Mr. Lindell and My Pillow, Inc. seek testimony that (1) Mr. Montgomery worked on U.S. government programs that involved information protected by the State Secrets Privilege; (2) the federal government undertook active measures to prevent Mr. Montgomery from disclosing state secrets, including seizing documents from his attorney, attending his deposition, and attending court hearings at which he testified; (3) Ms. Wells engaged in conversations with Mr. Montgomery on multiple occasions regarding the State Secrets Privilege and what information Mr. Montgomery was permitted to disclose or prohibited from disclosing; (4) the United States Government's desire to protect State Secret information held by Mr. Montgomery continues today; (5) Exhibits A, B, C, D, and E accurately reflect the events they describe.

# EXHIBIT A

1   PETER D. KEISLER
    Assistant Attorney General
2   DANIEL G. BOGDEN
    United States Attorney
3   District of Nevada
    GREG ADDINGTON
4   Assistant United States Attorney
    Nevada Bar 6875
5   100 West Liberty, Suite 600
    Reno, Nevada 89501
6   VINCENT M. GARVEY
    Deputy Branch Director
7   CARLOTTA P. WELLS
    Senior Trial Counsel
8   Federal Programs Branch
    Civil Division - Room 7150
9   U.S. Department of Justice
    20 Massachusetts Ave., NW/P.O. Box 883
10  Washington, D.C.  20044

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

11

12  ETREPPID TECHNOLOGIES, LLC,            )
                                           )
13              Plaintiff,                 )
                                           )      CV-N- 06-00145 (BES)(VPC)
14  v.                                     )
                                           )
15  DENNIS MONTGOMERY, et al.,             )
                                           )
16              Defendants.                )
    _____    )
17  DENNIS MONTGOMERY, et al.,             )
                                           )
18              Plaintiffs,                )
                                           )      CV-N-06-00056 (BES)(VPC)
19  v.                                     )
                                           )
20  ETREPPID TECHNOLOGIES, INC.,           )
    et al.,                                )
21                                         )
                Defendants.                )
22  _____    )

23              ## NOTICE OF MOTION AND MOTION FOR
                ## PROTECTIVE ORDER BY THE UNITED STATES
24

25          TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD: Please take notice that,

26  pursuant to Federal Rule of Civil Procedure 26(c), defendant, the United States Department of

27  Defense (DoD), hereby submits its motion for a protective order to prevent disclosure of

28  information that could harm the national security interests of the United States.  In addition, DoD

moves to stay its discovery obligations during the pendency of its motions to dismiss all claims against the government in these cases. The motion is based on this notice of motion and motion and the following memorandum of points and authorities.

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF UNITED STATES' MOTION FOR PROTECTIVE ORDER**

**INTRODUCTION**

The United States seeks a protective order in these cases pursuant to Rule 26(c)[1] to prevent the disclosure of information relating to (1) the existence or non-existence of any actual or proposed relationship, agreement, connection, contract, transaction, communication, or meeting of any kind between an intelligence agency as defined in 50 U.S.C. § 401(a)(4), which includes intelligence elements of the military services; and (2) any actual or proposed interest in, application, or use by any intelligence agency, or any current or former official, employee, or representative thereof, of any technology, software, or source code owned or claimed by any individuals or entities associated with these lawsuits. The basis for the protective order is that the information is protected by the military and state secrets privilege. That privilege, as properly asserted by the United States here, acts as an absolute bar when disclosure of the material would harm national security, regardless of a party's need for the information. As explained in the declarations accompanying this motion, because the disclosure of information at issue in this litigation reasonably could be expected to cause serious, and in some cases exceptionally grave, damage to national security, see Declaration of John D. Negroponte (Negroponte Dec.), attached

---

[1] The United States Department of Defense (DoD) has been named a party to this litigation, but has moved to dismiss the claims against it on jurisdictional grounds. Even if DoD is dismissed as a party, the United States' interest in protecting national security information would remain and, if appropriate, the government could file a statement of interest pursuant to 28 U.S.C. § 517. That statute provides that "any officer of the Department of Justice, may be sent by the Attorney General to any State or District in the United States to attend to the interests of the United States in a suit pending in a court of the United States, or in a court of a State, or to attend to any other interest of the United States."

hereto as Exhibit 1; see also Classified Declaration to be submitted in camera ex parte,[2] the United States' interest in preserving its state secrets is overriding and must be safeguarded, even if a party is thereby precluded from establishing its legal position in these cases.

The assertion of the privilege does not mean that there is actually a relationship between the intelligence community and any individual or entity involved in these cases. Rather, as Mr. Negroponte explains, in order to protect from disclosure those instances where there is a relationship, the United States must prevent the disclosure of information that would tend to either confirm or deny that any relationship or connection exists even in cases where there is no such relationship. See Negroponte Dec. ¶ 12. To do otherwise would inevitably lead to the compromise of national security information, because if the United States were forced to deny relationships where none existed, the United States' refusal to respond to future allegations in other cases would, as one district court explained, "be tantamount to a confirmation." See Maxwell v. First National Bank of Maryland, 143 F.R.D. 590, 595 (D. Md. 1992). For these reasons, the Court should uphold the United States' assertion of the military and state secrets privilege and enjoin the disclosure of any information that might tend to confirm or deny the existence or non-existence of any relationship (including any communication, meeting or transaction) between the U.S. intelligence community and any individual or entity associated with the underlying events giving rise to these suits, as well as any actual or proposed interest in, application, or use by any intelligence agency other than the United States Air Force of any technology, software, or source code owned or claimed by any individuals or entities associated with these lawsuits.

Further, on June 21, 2006, DoD filed motions to dismiss all of the claims against it as asserted in these cases. Etreppid filed its notices of non-opposition on July 10, 2006.

---

[2] The classified in camera, ex parte declaration can be made available for review by the Court at its convenience. Because of the declaration's classification level, however, it must be stored at all times, except when being reviewed by appropriate personnel, in a Sensitive Compartmented Information Facility (SCIF).

-3-

Montgomery's opposition were filed, under seal, on September 15, 2006. Defendant has not yet been served with discovery requests, although the deadline for the parties to produce their initial disclosures was, by stipulation of the parties, August 14, 2006. In its motions to dismiss, DoD argued that the Court should dismiss these actions as to DoD for lack of subject matter jurisdiction. If the Court grants the government's motions, it will dispose of the claims against DoD in their entirety. Therefore, in the interests of judicial economy, the Court should exercise its discretion under Rule 26(c) of the Federal Rules of Civil Procedure and stay all discovery relating to DoD pending its ruling on the government's motions to dismiss.[3]

Counsel for the parties conferred in an attempt to reach agreement on the issues raise in this motion, but were unable to do so.

## **BACKGROUND**

A. <u>Factual Statement</u>

The instant litigation is comprised of two actions, Civil Action No. 06-00056 (hereinafter referred to as the "Federal Case") and Civil Action No. 06-00145 (hereinafter referred to as the "Removed Case"). Dennis Montgomery, et al. (Montgomery) and eTreppid Technologies, Inc. (eTreppid) have filed countersuits relating, *inter alia,* to claims involving copyright infringement, misappropriation of trade secrets, breach of contract, and breach of fiduciary duty. Montgomery also has filed claims against DoD in both suits, seeking declaratory relief in both as well as relief for copyright infringement in the Federal Case. The dispute between the private parties primarily concerns the ownership of source codes and their derivatives, *see* Federal Case Complaint ¶¶ 11-14; Removed Case Complaint ¶¶ 31-33; Removed Case Countercomplaint ¶ 23.

In a complaint originally filed in state court, eTreppid has asserted a claim of entitlement to protect and recover trade secrets from Montgomery. Removed Case Complaint ¶ 35. Montgomery, a former employee, officer, and director of the company, filed a counter-complaint

---

[3] DoD does not take a position with respect to whether discovery between eTreppid and Montgomery should proceed notwithstanding the pendency of the government's motion to dismiss.

-4-

1    as well as a federal court action, alleging that eTreppid had infringed his copyright interests.

2    Montgomery claims that he is an inventor and software developer who developed software for

3    which he was granted copyrights in 1982.   Removed Case Counter-complaint ¶ 8; Federal Case

4    Complaint ¶ 8.  Montgomery asserts that, after registration of the copyrights, he developed

5    derivative works based on the copyrighted technology.  Removed Case Counter-complaint ¶ 9;

6    Federal Case Complaint ¶ 9.  In September 1998, Montgomery and counter-defendant Warren

7    Trepp formed eTreppid.  Removed Case Counter-complaint ¶ 10; Federal Case Complaint ¶ 10.

8    Pursuant to an agreement entered into between Montgomery and Trepp, Montgomery alleges he

9    contributed certain technology in exchange for a 50 percent interest in eTreppid.  *Id.*

10         The dispute between Montgomery and eTreppid stems from the issue of the extent to

11   which Montgomery retained the sole interest in the derivative works based on the copyrighted

12   technology.  Removed Case Counter-complaint ¶¶ 11-14; Federal Case Complaint ¶¶ 11-14.

13   Montgomery alleges that, in 2003, eTreppid "began sublicensing the Derivative Works to various

14   entities, including the United States government and collecting licensing fees for the

15   sublicenses," without having a license to take such action.  Removed Case Counter-complaint ¶¶

16   16-18; Federal Case Complaint ¶¶ 16-18.  Further, Montgomery claims that, to the extent

17   eTreppid had "an oral nonexclusive license to exploit the Derivative Works," such oral license

18   was terminated in January 2006.  Removed Case Counter-complaint ¶¶ 17-18; Federal Case

19   Complaint ¶¶ 17-18.  For its part, eTreppid claims that Montgomery has misappropriated trade

20   secrets, violated the terms of his contracts with eTreppid, and improperly converted confidential

21   information for his own use.  Removed Case Complaint ¶¶ 36, 43, 46.

22         Montgomery also has asserted a claim against DoD.  Montgomery alleges that he is

23   prevented from fully disclosing the information he needs to present his case because he signed a

24   "secrecy contract" with the United States government relating to the nature of the work that he

25   performed on behalf of the government while associated with eTreppid and that disclosure of

26   such information could subject him to criminal prosecution.  Federal Complaint ¶¶ 69, 71;

27

28                                              -5-

Removed Case Counter-complaint ¶ 24. Montgomery claims that he can neither defend against eTreppid's claims nor prosecute his own without revealing the "nature of the technology, the type of work he has performed on the government contracts using his technology versus that of eTreppid, and the capabilities of his technology . . . in performing work for certain government agencies." Federal Case Complaint ¶¶ 71; Removed Case Counter-complaint ¶¶ 24. *Accord* Federal Case Complaint ¶¶ 72; Removed Case Counter-complaint ¶¶ 25. Montgomery therefore seeks, in both cases, a declaration that disclosure of such information will not constitute a violation of the "the contract between Montgomery and the United States to maintain [] secrets, and/or a declaration of immunity for Montgomery from the United States." Federal Case Complaint ¶ 73; Removed Case Counter-complaint ¶ 26.

Montgomery signed a Classified Information Nondisclosure Agreement (Nondisclosure Agreement), which was executed with the Defense Security Service, an agency within the DoD, on September 16, 2003. Exhibit 2. Pursuant to the terms of the Nondisclosure Agreement, Montgomery *inter alia*: (1) accepted certain obligations in exchange for being granted access to classified information (para. 1); (2) agreed never to divulge classified information to anyone unless authorized under the terms of the agreement and to comply with all laws prohibiting the unauthorized disclosure of classified information (para. 3); (3) stated he had been advised that the unauthorized disclosure of classified information could violate certain criminal statutes (para. 4); (4) stated he understood that the United States government may seek any remedy available to it to enforce the terms of the agreement, including but not limited to seeking a court order to prohibit the unauthorized disclosure of classified information (para. 6); (5) stated he understood that the classified information to which he would have or obtain access to was and would remain the property and under the control of the United States government (para. 7); and (6) agreed that the conditions and obligations imposed upon him under the agreement apply unless and until he is relieved of such obligations in writing by an authorized representative of the United States government (para. 8). *Id.*

-6-

B.     Terms of the Proposed Protective Order

The proposed protective order (Exhibit 3) states that certain intelligence information that may or may not be relevant to the claims and defenses of the parties to this litigation is subject to the state secrets privilege, the disclosure of which reasonably could be expected to cause serious, and in some cases exceptionally grave, damage to the national security of the United States (para. 1).  The proposed order then defines the categories of information that shall not be discussed, mentioned or otherwise subject to discovery or disclosure during all proceedings in this action:

> 2.  The parties to these actions shall not serve or take any discovery relating to or questioning the existence or non-existence of any actual or proposed relationship, agreement, connection, contract, transaction, communication, or meeting of any kind between any entity in the intelligence community as defined by the National Security Act of 1947, 50 U.S.C. § 401(a)(4), which includes intelligence elements of the military services [hereinafter referred to as "any intelligence agency"], or any current or former official, employee, or representative thereof, and any individuals or entities associated with these lawsuits, or any current or former officer or employee thereof.

> 3.  The parties to these actions shall not serve or take any discovery relating to or questioning any actual or proposed interest in, application, or use by any intelligence agency, or any current or former official, employee, or representative thereof, of any technology, software, or source code owned or claimed by any individuals or entities associated with these lawsuits.

*Accord* paragraphs 5 and 6.

In addition, the proposed order (para. 4) delineates issues relating to the parties' interactions with the government that would not be precluded.  The areas in which questions or discovery would not be precluded include:

> a.  The existence and nature of the "Big Safari" contract [hereinafter referred to as "the contract"] between eTreppid, Inc. and the United States Air Force, including but not limited to the fact that the contract required eTreppid to perform data analysis and the fact that the data analysis eTreppid performed under the contract involved image identification technology;

> b.  The fact that the contract required employees and/or officers of eTreppid, Inc. to sign secrecy agreements with the Department of Defense;

> c.  The technical specifications relating to any technology, owned or claimed by any non-government individual or entity associated with these lawsuits, used under the terms of the contract or any other contract, relationship, agreement, connection, contract, transaction, communication, or meeting of any

kind, unless covered by paras. 2 and 3 above;

        d. Any actual or potential commercial or government applications of any technology owned or claimed by any non-government individual or entity associated with these lawsuits at any time, except to the extent that any application is covered by paragraph 2 and/or 3 above; and

        e. Facts relating to the issue of ownership, by any non-government individual or entity associated with these lawsuite, of any right or interest in the source code, software, or other technology owned or claimed by the parties to these lawsuits, except to the extent that any application is covered by paragraph 2 and/or 3 above.

The proposed order also states that, to the extent information or documents are sought by the private parties that would implicate the information defined in paragraphs 2 and 3 of the proposed order, then such requests shall be deemed, without the need for objection, not to require a response that would include any such information (paras. 7 and 8). The proposed order further sets forth measures by which the United States can ensure that the classified information is protected against disclosure by, for example, requiring service upon attorneys representing the government of all discovery and motions (para. 10), requiring notice to the government's attorneys of all decisions and notices for hearings in this litigation (para 11), authorizing attendance by attorneys for the United States at all depositions and proceedings as well as their right to make objections as necessary to protect national security information (para. 12), and authorizing the participation by attorneys for the United States in any proceeding in this litigation (para. 13).

Finally, as noted above, the proposed protective order also provides that the government is excused from its Rule 26 obligations during the pendency of DoD's motion to dismiss. The obligations that are to be stayed include complying with the obligation to produce initial disclosures as all well as all discovery obligations.

-8-

**ARGUMENT**

I.  The Standard Of Review Is A Narrow One, And A Properly Invoked
    Claim Of The State Secrets Privilege Is An Absolute Bar To Disclosure

The military and state secrets privilege is a unique privilege, with constitutional underpinnings,[4] which permits the Government to protect against the unauthorized disclosure in litigation of information that may adversely affect national security interests.  See United States v. Reynolds, 345 U.S. 1, 7-8 (1953); Black v. United States, 62 F.3d 1115, 1118 (8th Cir. 1995), cert. denied, 517 U.S. 1154 (1996); Ellsberg v. Mitchell, 709 F.2d 51, 56 (D.C. Cir. 1983), cert. denied, 465 U.S. 1038 (1984).  The privilege is not limited to military secrets, but is "both expansive and malleable."  Ellsberg, 709 F.2d at 57.  Thus, it includes within its scope information that would result in "'impairment of the nation's defense capabilities, disclosure of intelligence-gathering methods or capabilities, and disruption of diplomatic relations with foreign governments.'"  Black, 62 F.2d at 1118 (quoting Ellsberg, 709 F.2d at 57).[5]

---

[4] National security information is subject to the exclusive control of the President and the Executive Branch of the U.S. Government, pursuant to the President's powers under Article II of the Constitution.  Department of Navy v. Egan, 484 U.S. 518, 527 (1988).  Justice Stewart observed in his concurring opinion in New York Times Co. v. United States, 403 U.S. 713, 728-29 (1971), as follows:

> If the Constitution gives the Executive a large degree of unshared power in the conduct of foreign affairs and the maintenance of our national defense, then under the Constitution the Executive must have the largely unshared duty to determine and preserve the degree of internal security necessary to exercise that power successfully.

[5] See, e.g., Reynolds, 345 U.S. at 5 (Air Force crash investigation report containing national security information was privileged); Fitzgerald v. Penthouse Int'l, Ltd., 776 F.2d 1236, 1242-43 (4th Cir. 1985) (expert testimony on Navy marine mammal research programs was precluded as privileged);  Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 400-402 (D.C. Cir. 1984) (Department of Defense documents containing national security information, including communications with foreign governments and intra-government letters, were privileged); Halkin v. Helms, 690 F.2d 977, 990, 993 (D.C. Cir. 1982) (information concerning diplomatic relations with foreign governments and intelligence-gathering methods and capabilities was privileged).

-9-

The military and state secrets privilege is invoked when the government makes [1] a "formal claim of privilege, [2] lodged by the head of the department which has control over the matter, after [3] actual personal consideration by that officer." <u>Reynolds</u>, 345 U.S. at 7-8 (footnotes omitted); <u>Black</u>, 62 F.3d at 1118. The privilege is asserted to protect against the unauthorized disclosure of <u>information</u> that may adversely affect national security interests, regardless of how the person who has the information or seeks its disclosure is related to the Government. <u>See generally</u> 2 S. Stone & R. Taylor, <u>Testimonial Privileges</u> § 9.12 at 9-37 (2d ed. 1995). Thus, "the privilege may be invoked only by the government and may be asserted even when the government is not a party to the case." <u>Zuckerbraun v. General Dynamics Corp.</u>, 935 F.2d 544, 546 (2d Cir. 1991) (citing <u>Fitzgerald</u>, 776 F.2d 1236 (4th Cir. 1985)).

The standard of review of a military and state secrets privilege claim is a "narrow one," and "[c]ourts should accord the 'utmost deference' to executive assertions of privilege upon grounds of military or diplomatic secrets." <u>Halkin v. Helms</u>, 598 F.2d 1, 9 (D.C. Cir. 1978); <u>see also</u> <u>Reynolds</u>, 345 U.S. at 10; <u>Black</u>, 62 F.3d at 1119. The role of the court is to assess the validity of the claim of privilege, satisfying itself that there is a reasonable danger that disclosure will harm national security. <u>Zuckerbraun</u>, 935 F.2d at 546-47. "[T]he government need not demonstrate that injury to the national interest will inevitably result from disclosure; a showing of 'reasonable danger' that harm will ensue is sufficient." <u>Ellsberg</u>, 709 F.2d at 58 (footnote omitted). In this regard, courts have been "willing[] to credit relatively speculative projections of adverse consequences [of disclosure]." <u>Id</u>. at 58 n.35.

In considering the claim of military and state secrets privilege, the court should not "forc[e] a disclosure of the very thing the privilege is designed to protect," <u>Reynolds</u>, 345 U.S. at 8, although it is appropriate for the court to consider <u>in camera</u> and <u>ex parte</u> declarations or other submissions of the Government explaining why a matter should be protected, <u>Black</u>, 62 F.3d at 1119. <u>See, e.g.</u>, <u>Kasza v. Browner</u>, 133 F.3d 1159, 1169 (9th Cir. 1998); <u>Farnsworth Cannon</u>,

-10-

Inc. v. Grimes, 635 F.2d 268, 281 (4th Cir. 1980) (en banc)); Maxwell, 143 F.R.D. at 595.[6]

Likewise, a judicial opinion on a claim of military and state secrets privilege "should not strip the

veil from state secrets even if ambiguity results in a loss of focus and clarity." Black, 62 F.3d at

1119; see also Ellsberg, 709 F.2d at 59 n.41 (open, detailed discussion by a court of the

application of general principles to particular facts is impossible in this area of the law).

       A properly invoked claim of privilege is an absolute bar to disclosure, no matter how

compelling the need for the information, or relevance thereof, to a proper resolution of the case.

Reynolds, 345 U.S. at 11; Black, 62 F.3d at 1119; Fitzgerald, 776 F.2d at 1240; Northrop, 751

F.2d at 399.  In other words, if the court determines that there exists a showing of harm which

might reasonably flow from disclosure, the privilege cannot be overcome by "even the most

compelling necessity." Reynolds, 345 U.S. at 11; In re Under Seal, 945 F.2d at 1288 n.2 ("Upon

proper invocation by the head of the affected department, the privilege renders the information

unavailable regardless of the other party's need in furtherance of the action"); Halkin, 690 F.2d at

---

[6] In a number of contexts, national security concerns require ex parte, in camera review
of classified information, including any classified state secrets declarations submitted by the
government, to protect such information from unauthorized disclosure.  See e.g., Ellsberg, 709
F.2d at 61 ("It is well settled that a trial judge called upon to assess the legitimacy of a state
secrets privilege claim should not permit the requester's counsel to participate in an in camera
examination of putatively privileged material.  The rationale for this rule is that our nation's
security is too important to be entrusted to the good faith and circumspection of a litigant's
lawyer (whose sense of obligation to his client is likely to strain his fidelity to his pledge of
secrecy) or to the coercive power of a protective order"); In re Eisenberg, 654 F.2d 1107, 1112
(5th Cir. 1981) ("Our adversarial legal system generally does not tolerate ex parte determinations
on the merits of a civil case. . . . An exception to this principle is made when countervailing
government interests dictate that information sought to be discovered should remain secret.
Privilege questions are determined on the basis of in camera, ex parte examinations of the
evidence."); In re Under Seal, 945 F.2d 1285 (4th Cir. 1991) (classified in camera affidavit
reviewed by both the district court and court of appeals without being disclosed to plaintiff's
counsel); Stillman v. CIA, 319 F.3d 546, 549 (D.C. Cir. 2003) (same); Crater Corp. v. Lucent
Technologies, Inc., 255 F.3d 1361, 1370 n. 4 (Fed. Cir. 2001)(rejecting claims of improper ex
parte communications between the district court and the government in a case between two
private parties but involving classified information).

990.

If the consequent unavailability of the information precludes either party from establishing its legal position on the ultimate issues in the case, then the case must be dismissed. See Black, 62 F.3d at 1119 (case was properly dismissed where privileged information was at the core of plaintiff's claims); see also Fitzgerald, 776 F.2d at 1241-42 ("in some circumstances sensitive military secrets will be so central to the subject matter of the litigation that any attempt to proceed will threaten disclosure of the privileged matters"); Farnsworth, 635 F.2d at 281 ("any attempt on the part of the plaintiff to establish a prima facie case would so threaten disclosure of state secrets that the overriding interest of the United States and the preservation of its state secrets precludes any further attempt to pursue this litigation"); Tilden v. Tenet, 140 F. Supp. 2d 623, 627 (E.D. Va. 2000) (case would be dismissed where there was no way in which lawsuit could proceed without disclosing state secrets).[7]

II.   The United States Has Properly Invoked The Privilege, And The Court Should Issue A Protective Order Barring Disclosure Of The Information In Question

The United States has properly asserted the military and state secrets privilege in these cases.  The current head of the U.S. Intelligence community, Director of National Intelligence John D. Negroponte, after personal consideration of the matter, has formally invoked the privilege on behalf of the United States with respect to the information described in his declaration.  See Reynolds, 345 U.S. at 7-8; Negroponte Dec. ¶¶ 3, 9 (Exhibit 1).[8]  As Mr.

---

[7]  Notwithstanding the need to protect certain information from disclosure, the scope of the information that would be protected by the state secrets privilege in these cases is relatively limited in scope.  For this reason, the government's proposed protective order specifically identifies issues relating to the parties' interactions with the government that would not be precluded.  As a result of the fact that privilege covers only some but not all of the information relating to the government's interactions with eTreppid and Montgomery, it appears at this point that the underlying litigation should be able to proceed in some fashion.

[8]  The public declaration is sufficient to establish the United States' military and state secrets privilege claim in this case.  See Reynolds, 345 U.S. at 8 (the court should not "forc[e] a disclosure of the very thing the privilege is designed to protect").  Moreover, while "the court should not jeopardize the security which the privilege is meant to protect by insisting upon an

-12-

Negroponte explains, the information to be protected from disclosure includes information concerning the existence or non-existence of any actual or proposed relationship involving any U.S. intelligence agency and any individuals and/or companies associated with these lawsuits and any actual or proposed interest in, application of, discussion of, or use by any intelligence agency of any technology owned or claimed by individuals and/or companies associated with these lawsuits. Negroponte Dec. ¶ 11. The disclosure of this information, which may or may not be relevant to the parties' claims and defenses in their lawsuits relating to copyright ownership and trade secrets, could reasonably be expected to damage the national security. Id. at ¶¶ 9, 12; see also Classified Declaration submitted in camera ex parte.

Based on the assertion by the head of the United States intelligence community that damage to national security could reasonably be expected to result from any disclosure of information that would tend to confirm or deny the existence or non-existence of any relationship between the United States intelligence community and the private parties as well as the application by a member of the U.S. intelligence community of software or technology that the parties claim to own, the United States' claim of privilege is valid. It therefore meets the narrow standard of review to which the state secrets claim is subject, and the Court should accord it the utmost deference. See Halkin v. Helms, 598 F.2d at 9; see also Black, 62 F.3d at 1119. In view of the United States' showing that unauthorized disclosure of the information described in Mr. Negroponte's declaration could reasonably be expected to cause serious, and in some cases exceptionally grave, damage to national security, whether in response to the parties' discovery requests or otherwise, disclosure of that information is completely barred, no matter how

examination of the evidence, even by the judge alone, in chambers," id. at 10, a more detailed description of the national security concerns at issue in this case is contained in a classified declaration which the United States has already prepared. Because that declaration is classified, it can only be presented for the Court's ex parte, in camera review. The Department of Justice Security Office can arrange for this Court's ex parte, in camera review of the classified declaration in a secure setting at the Court's convenience.

compelling any party's alleged need for the information.  Reynolds, 345 U.S. at 11; Northrop, 751 F.2d at 399; Halkin, 690 F.2d at 990.

That the assertion of the military and state secrets privilege might leave a party to litigate "in the dark" is nothing extraordinary or unusual.  Such was the case in Farnsworth, 635 F.2d at 281, where plaintiff's counsel was left unaware of the scope of excluded information, as well as in Maxwell, 143 F.R.D. at 599-600, where plaintiff's counsel was rebuffed in his attempts to discover matters with respect to which the privilege had been asserted.  In such instances, the Government simply has an "overriding interest."  See Farnsworth, 635 F.2d at 281.  Accordingly, the Court should issue a protective order prohibiting the disclosure of the information at issue in these cases.

III.   In the Interest of Judicial Economy, the Court Should Enter a Protective Order Staying Discovery Until Resolution of DoD's Motion to Dismiss.

Courts have broad discretion under the Federal Rules of Civil Procedure to regulate the discovery process, Herbert v. Lando, 441 U.S. 153, 177 (1979), including the discretion to deny discovery.  See Fed. R. Civ. P. 26(c); Jarvis v. Regan, 833 F.2d 149, 155 (9th Cir. 1987) ("A district court's decision to allow or deny discovery is reviewable only for abuse of discretion."); Petrus v. Bowen, 833 F.2d 581, 583 (5th Cir. 1987) ("trial court has broad discretion and inherent power to stay discovery until preliminary questions that may dispose of the case are determined"); B.R.S. Land Investors v. United States, 596 F.2d 353, 356 (9th Cir. 1979) ("A district court may properly exercise its discretion to deny discovery where . . . it is convinced that the plaintiff will be unable to state a claim upon which relief can be granted.").

Exercise of the Court's discretion to stay discovery is especially appropriate where a dispositive motion is pending and the discovery sought is not necessary to resolve the issues raised by that motion.  See Alaska Cargo Transport, Inc. v. Alaska R.R. Corp., 5 F.3d 378, 383 (9th Cir. 1993) (stay of discovery was proper where the discovery sought was not relevant to "whether or not the court ha[d] subject matter jurisdiction"); Jarvis v. Regan, 833 F.2d at 155 (district court properly stayed discovery that was not needed to resolve motion to dismiss); Wood

-14-

1   v. McEwen, 644 F.2d 797, 801 (9th Cir. 1981) ("A district court may limit discovery 'for good

2   cause' and may continue to stay discovery when it is convinced that the plaintiff will be unable to

3   state a claim for relief.") (citation omitted). "Indeed, such a procedure is an eminently logical

4   means to prevent wasting the time and effort of all concerned, and to make the most efficient use

5   of judicial resources." Coastal States Gas Corp. v. Department of Energy, 84 F.R.D. 278, 282

6   (D. Del. 1979).

7        These are just such cases. Allowing discovery would impose significant and unnecessary

8   burdens on DoD (and potentially the Court, if there are discovery disputes) at a time when

9   significant issues have been raised regarding the Court's jurisdiction over this matter. Discovery

10   is not needed to resolve those jurisdictional issues and, thus, a stay of discovery is warranted in

11   these circumstances. See Jarvis, 833 F.2d at 155 ("Discovery is only appropriate where there are

12   factual issues raised by a Rule 12(b) motion."); Rae v. Union Bank, 725 F.2d 478, 481 (9th Cir.

13   1984) (district court properly stayed discovery where plaintiff "failed to point to any specific

14   information obtainable through discovery that would have enabled" plaintiff to withstand motion

15   to dismiss). Given the dispositive jurisdictional issues DoD has raised, the principle of judicial

16   economy favors a stay of discovery until the Court has ruled on the pending motions to dismiss.

17                                 **CONCLUSION**

18        For the foregoing reasons, the United States' assertion of the military and state secrets

19   privilege should be upheld, discovery involving the government should be stayed pending the

20   disposition of DoD's motions to dismiss, and the government's motion for a protective order

21   should be granted.

22   DATED: September 25, 2006

23                             Respectfully submitted,

24                             PETER D. KEISLER
                               Assistant Attorney General

25

26                             DANIEL G. BOGDEN
                               United States Attorney
                               District of Nevada

27

28                                    -15-

GREG ADDINGTON
Assistant United States Attorney
Nevada Bar 6875
100 West Liberty, Suite 600
Reno, Nevada 89501

VINCENT M. GARVEY
Deputy Branch Director


 /s/ Carlotta P. Wells
CARLOTTA P. WELLS
Senior Trial Counsel
Federal Programs Branch
Civil Division - Room 7150
U.S. Department of Justice
20 Massachusetts Ave., NW
P.O. Box 883
Washington, D.C.  20044

Counsel for Counter-Defendant,
United States Department of Defense

IT IS SO ORDERED

Date: _____, 2006          _____
                                      UNITED STATES DISTRICT JUDGE


### CERTIFICATE OF SERVICE

I hereby certify that I am an employee in the office of the United States Department of Justice, Civil Division in Washington DC and I am of such age and discretion as to be competent to serve papers.  On September 25, 2006, I served copies of the United States Notice of Motion and Motion for Protective Order, with the accompanying Memorandum of Points and Authorities, by placing said copies in postpaid envelopes addressed to the persons named below at the places and addresses stated below and by depositing said envelopes and contents in the United States mail at the United States Department of Justice, 20 Massachusetts Avenue, Washington D. C. 20001.

-16-

Ronald J.  Logar, Esq.
Eric A. Pulver, Esq.
LAW OFFICES OF LOGAR & PULVER, PC
255 S. Arlington Avenue, Suite A
Reno, NV 89501

Michael J. Flynn, Esq.
Philip H. Stillman, Esq.
FLYNN & STILLMAN
224 Birmingham Drive, Suite 1A4
Cardiff, CA 92007

Stephen J. Peek, Esq.
Jerry M. Snyder, Esq.
HALE LANE PEEK DENNISON AND HOWARD
5441 Kietzke Lane, Second Floor
Reno, NV 89511


David A. Jakopin, Esq.
Jonathan D. Butler, Esq.
PILLSBURY WINTHROP SHAW PITTMAN, L.L.P.
2475 Hanover Street
Palo Alto, CA 94304-1114


/s/ Carlotta P. Wells
Carlotta P. Wells
Senior Trial Counsel
Federal Programs Branch, Civil Division
United States Department of Justice

-17-

UNITED STATES' MOTION FOR
PROTECTIVE ORDER


EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

|  |  |  |
|---|---|---|
| ETREPPID TECHNOLOGIES, LLC, a California Corporation, | ) ) ) | CV-N-06-00415(BES)(VPC) |
| Plaintiff | ) ) | |
| v. | ) ) | |
| DENNIS MONTGOMERY, et. al., | ) ) ) | |
| Defendants. | ) ) | |

|  |  |  |
|---|---|---|
| DENNIS MONTGOMERY, et. al., | ) ) | |
| Plaintiffs | ) ) | CV-N-06-00056(BES)(VPC) |
| v. | ) ) ) | |
| ETREPPID TECHNOLOGIES, INC., et. al. | ) ) ) | |
| Defendants. | ) ) ) | |

### DECLARATION AND FORMAL CLAIM OF STATE SECRETS AND STATUTORY PRIVILEGES BY JOHN D. NEGROPONTE, DIRECTOR OF NATIONAL INTELLIGENCE

I, JOHN D. NEGROPONTE, hereby declare as follows:

1. I am the Director of National Intelligence (DNI) of the United States. I have held this position since April 21, 2005. From June 28, 2004, until my appointment as DNI, I served as the United States Ambassador to Iraq.

From September 18, 2001, until my appointment in Iraq, I
served as the United States Permanent Representative to the
United Nations. I have also served as Ambassador to
Honduras (1981-1985), Mexico (1989-1993), and the
Philippines (1993-1996), and as Deputy Assistant to the
President for National Security Affairs (1987-1989).

2. The statements made herein are based on my
personal knowledge, as well as on information provided to
me in my official capacity as DNI, and on my personal
evaluation of that information. In personally considering
this matter, I have read the information contained in the
separate classified declaration filed *in camera* and *ex
parte* in this case.

3. The purpose of this declaration is to assert
formally, in my capacity as DNI and head of the United
States Intelligence Community, the state secrets privilege
to protect intelligence information ("state secrets
privilege"), as well as a statutory privilege under the
National Security Act, 50 U.S.C. § 403-1(i)(1), to protect
intelligence sources and methods from unauthorized
disclosure. Unauthorized disclosure of information covered
by the state secrets and statutory privileges reasonably
could be expected to cause serious, and in some cases
exceptionally grave damage to the national security of the

United States, and such information should therefore be excluded from any use in this litigation.

I.  STATUTORY AND EXECUTIVE ORDER AUTHORITIES

4.  The position of Director of National Intelligence was created by the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, §§ 1011(a), 1097, 118 Stat. 3638, 3643-63, 3698-99 (2004) (amending sections 102 through 104 of Title I of the National Security Act of 1947).  Subject to the authority, direction, and control of the President of the United States, the DNI serves as the head of the United States Intelligence Community and as the principal advisor to the President, the National Security Council, and the Homeland Security Council for matters related to intelligence and national security.  *See*, 50 U.S.C. § 403 (b)(1),(2).

5.  The "United States Intelligence Community" includes the Office of the Director of National Intelligence; the Central Intelligence Agency; the National Security Agency; the Defense Intelligence Agency; the National Geospatial-Intelligence Agency; the National Reconnaissance Office; other offices within the Department of Defense for the collection of specialized national intelligence through reconnaissance programs; the intelligence elements of the military services, the Federal

3

Bureau of Investigation, and the Department of Energy; the Office of Intelligence and Analysis of the Department of the Treasury; the Drug Enforcement Administration's Intelligence Division; the Bureau of Intelligence and Research of the Department of State; elements of the Department of Homeland Security concerned with the analysis of intelligence information (including the Office of Intelligence of the Coast Guard); and such other elements of any other department or agency as the President may designate, or as may be jointly designated by the DNI and the head of the department or agency concerned, as an element of the United States Intelligence Community. *See*, 50 U.S.C. § 401(a)(4).

6. The responsibilities and authorities of the DNI, enumerated in the National Security Act, as amended, at 50 U.S.C. § 403-1, include ensuring that national intelligence is provided to the President, the heads of the departments and agencies of the Executive Branch, the Chairman of the Joint Chiefs of Staff and senior military commanders, and the Senate and House of Representatives and committees thereof. 50 U.S.C. § 403-1(a)(1). The DNI is also charged with establishing the objectives of, determining the requirements and priorities for, and managing and directing the tasking, collection, analysis, production, and

dissemination of national intelligence by elements of the United States Intelligence Community. 50 U.S.C. § 403-1(f)(1)(A)(i), (ii). The DNI is responsible for developing and determining, based on proposals submitted by heads of agencies and departments within the United States Intelligence Community, an annual consolidated budget for the National Intelligence Program for presentation to the President, and for ensuring the effective execution of the annual budget for intelligence and intelligence-related activities, including managing and allotting appropriations for the National Intelligence Program. *Id.* § 403-1(c)(1)-(5).

7. In addition, the National Security Act of 1947, as amended, provides that "The Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1). Consistent with this responsibility, the DNI establishes and implements the guidelines of the United States Intelligence Community for the classification of information under applicable law, Executive Orders, or other Presidential directives, and access and dissemination of intelligence. *Id.* § 403-1(i)(2)(A), (b). In particular, the DNI is responsible for the establishment of uniform standards and procedures for granting access to Sensitive

Compartmented Information to any officer or employee of any agency or department of the United States and for ensuring consistent implementation of those standards throughout such departments and agencies. *Id.* § 403-1(j)(1),(2).

8. By virtue of my position as the DNI, and unless otherwise directed by the President, I have access to all intelligence related to national security that is collected by any department, agency, or other entity of the United States. Pursuant to Executive Order 12958, as amended,[1] the President has authorized me to exercise original TOP SECRET classification authority. After personal consideration of the matter, I have determined that the classified *ex parte, in camera* declaration which accompanies this assertion of the state secrets privilege and the statutory privilege to protect intelligence sources and methods is properly classified under § 1.3 of E.O. 12958, because the unauthorized public disclosure of information contained in that declaration reasonably could be expected to cause serious, and in some cases exceptionally grave damage to the foreign policy and national security of the United States.

---

[1] Executive Order 12958 was amended by Executive Order 13292. *See* Exec. Order No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003). All citations to Exec. Order No. 12958 are to the Order as amended by Exec. Order No. 13292. *See* Exec. Order No. 12,958, 60 Fed. Reg. 19825 (1995), *reprinted as amended in* 50 U.S.C.A. § 435 note at 180 (West Supp. 2006).

II.  ASSERTION OF THE STATE SECRETS
     AND STATUTORY PRIVILEGES

9.  After careful and actual personal consideration of
the matter, I have determined that the unauthorized
disclosure of certain information that may be implicated by
the parties' claims in this matter, as set forth here and
described in more detail in the classified *ex parte, in
camera* declaration which accompanies this declaration,
reasonably could be expected to cause serious, and in some
cases exceptionally grave damage to the national security
of the United States, and thus must be protected from
disclosure and excluded from this case.  Therefore, I
formally invoke and assert the state secrets privilege to
prevent the disclosure of that information.

10.  Through this declaration, I also invoke and
assert a statutory privilege held by the DNI under the
National Security Act, as amended, to protect the
intelligence sources and methods implicated by this case.
*See*, 50 U.S.C. § 403-1(i)(1).  My assertion of this
statutory privilege for intelligence sources and methods is
coextensive with my state secrets privilege assertion.

11.  With my assertion of the state secrets privilege
and the statutory privilege to protect intelligence sources
and methods, I respectfully ask the Court to prevent any

party from testifying, eliciting testimony, producing,

disclosing, entering into evidence or making any other use

in discovery, at trial, or in any other way in connection

with this case, information concerning: (a) the existence

or non-existence of, any actual or proposed relationship,

agreement, connection, contract, transaction, communication,

or meeting of any kind between any entity in the United

States Intelligence Community, or any current or former

official, employee, or representative thereof, and any

individuals or entities associated with this lawsuit, on

any current or former officer or employee thereof; and (b)

any actual or proposed interest in, application, or use by

any entity in the United States Intelligence Agency, or any

current or former official, employee, or representative

thereof, of any technology, software, or source code owned

or claimed by any individuals or entities associated with

this lawsuit.

    12.   I have determined that any unauthorized

disclosure of the information described in Paragraph 11

reasonably could be expected to cause serious, and in some

case exceptionally grave damage to national security since

the United States can neither confirm nor deny such

information without compromising the effectiveness of

intelligence sources and methods. Public disclosure of

SEP. 19. 2006 11:19AM   Case 1:14-cv-00545-M   Document 162-33   Filed 08/09/25   Page 10 of 10   No. 2322   P. 10

information that confirms the use of particular
intelligence sources and methods compromises the
effectiveness of those sources and methods by alerting
likely targets to their use, while public denial of the use
of particular intelligence sources and methods reveals to
adversaries that some practices are secure.  Any truthful
response to confirm or deny allegations related to
intelligence sources or methods informs hostile foreign
intelligence agencies about the manner in which the United
States collects intelligence information, and could result
in a loss of valuable intelligence when our adversaries are
able to take countermeasures.  Similarly, if the United
States government was required to admit or deny allegations
made in litigation concerning its classified contracting
process, then classified contract relationships could be
exposed, which would cause harm to the national security.
The precise nature of the harm that would ensue from the
disclosure of the information protected by the state
secrets privilege and statutory privilege to protect
intelligence sources and methods is set forth in detail in
the *in camera, ex parte* declaration.

## CONCLUSION

13.   I respectfully request that the Court grant the Department of Defense's motion for a protective order.


I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this _19th_ day of September 2006.


JOHN D. NEGROPONTE
DIRECTOR OF NATIONAL INTELLIGENCE

UNITED STATES' MOTION FOR
PROTECTIVE ORDER

EXHIBIT 3

1    PETER D. KEISLER
     Assistant Attorney General
2    DANIEL G. BOGDEN
     United States Attorney
3    District of Nevada
     GREG ADDINGTON
4    Assistant United States Attorney
     Nevada Bar 6875
5    100 West Liberty, Suite 600
     Reno, Nevada 89501
6    VINCENT M. GARVEY
     Deputy Branch Director
7    CARLOTTA P. WELLS
     Senior Trial Counsel
8    Federal Programs Branch
     Civil Division - Room 7150
9    U.S. Department of Justice
     20 Massachusetts Ave., NW
10   P.O. Box 883
     Washington, D.C. 20044

11                  **UNITED STATES DISTRICT COURT**

12                       **DISTRICT OF NEVADA**

13   ETREPPID TECHNOLOGIES, LLC,          )
                                          )
14              Plaintiff,                )
                                          )
15   v.                                   )        CV-N- 06-00145 (BES)(VPC)
                                          )
16   DENNIS MONTGOMERY,                   )
     et al.,                              )
17                                        )
                Defendants.               )
18   _____ )
                                          )
19   DENNIS MONTGOMERY, et al.,           )
                                          )
20              Plaintiffs,               )
                                          )        CV-N-06-00056 (BES)(VPC)
21   v.                                   )
                                          )
22   ETREPPID TECHNOLOGIES, INC.,         )
     et al.,                              )
23                                        )
                Defendants.               )
     _____ )
24
25              **UNITED STATES' PROPOSED PROTECTIVE ORDER**

26        Pursuant to Federal Rule of Civil Procedure 26, in order to protect the classification,

27   confidentiality and the rights to information and documents developed and disclosed in

28   connection with this litigation, and to facilitate discovery by and among the parties to this action

     and from third parties, the United States hereby proposes entry of the following protective order.

1  IT IS HEREBY ORDERED as follows:

2  1.  Certain intelligence information that may or may not be relevant to the claims and

3  defenses of the parties to this litigation, as delineated in paragraphs 2 and 3 below, is subject to

4  the state secrets privilege, the disclosure of which reasonably could be expected to cause serious,

5  and in some cases exceptionally grave, damage to the national security of the United States. Such

6  information shall not be subject to discovery or disclosure by any of the above-captioned

7  parties during all proceedings in these actions, and shall be excluded from evidence at trial.

8  2.  The parties to these actions shall not serve or take any discovery relating to or

9  questioning the existence or non-existence of any actual or proposed relationship, agreement,

10  connection, contract, transaction, communication, or meeting of any kind between any entity in

11  the intelligence community as defined by the National Security Act of 1947, 50 U.S.C. §

12  401(a)(4), which includes intelligence elements of the military services [hereinafter referred to as

13  "any intelligence agency"], or any current or former official, employee, or representative thereof,

14  and any individuals or entities associated with these lawsuits, or any current or former officer or

15  employee thereof.

16  3.  The parties to these actions shall not serve or take any discovery relating to or

17  questioning any actual or proposed interest in, application, or use by any intelligence agency, or

18  any current or former official, employee, or representative thereof, of any technology, software,

19  or source code owned or claimed by any individuals or entities associated with these lawsuits.

20  4.  This Order does not preclude the parties to these actions from serving or taking any

21  discovery from other parties or non-parties relating to, or questioning, the following:

22  a.  The existence and nature of the "Big Safari" contract [hereinafter referred to as

23  "the contract"] between eTreppid, Inc. and the Unites States Air Force, including but not limited

24  to the fact that the contract required eTreppid to perform data analysis and the fact that the data

25  analysis eTreppid performed under the contract involved image identification technology;

26  b.  The fact that the contract required employees and/or officers of eTreppid, Inc.

27  to sign secrecy agreements with the Department of Defense;

28

1    c. The technical specifications relating to any technology, owned or claimed by

2 any non-government individual or entity associated with these lawsuits, used under the terms of

3 the contract or any other contract, relationship, agreement, connection, contract, transaction,

4 communication, or meeting of any kind, unless covered by paras. 2 and 3 above;

5    d. Any actual or potential commercial or government applications of any

6 technology owned or claimed by any non-government individual or entity associated with these

7 lawsuits at any time, except to the extent that any application is covered by paragraph 2 and/or 3

8 above.

9    e. Facts relating to the issue of ownership, by any non-government individual or

10 entity associated with these lawsuits, of any right or interest in the source code, software, or other

11 technology owned or claimed by the parties to these lawsuits, except to the extent that any

12 application is covered by paragraph 2 and/or 3 above.

13 5. The parties shall not discuss, mention, question, or introduce as evidence, either at

14 trial or in any pleading, or motion, any actual or proposed relationship, agreement, connection,

15 contract, transaction, communication, or meeting of any kind between any intelligence agency,

16 or any current or former official, employee, or representative thereof, and any individuals or

17 entities associated with these lawsuits, or any current or former officer or employee thereof.

18 6. The parties shall not discuss, mention, question, or introduce as evidence, either at

19 trial or in any pleading, or motion, any actual or proposed interest in, application of, or use by

20 any intelligence agency, or any current or former official, employee, or representative thereof, of

21 any technology, software, or source code owned or claimed by any individuals or entities

22 associated with these lawsuits.

23 7. Every question asked and every document requested by the parties in discovery or at

24 trial, whether or not on its face such question or request relates to or concerns any intelligence

25 agency, shall be deemed, without the need for objection, not to require a response that would

26 include any information relating to or implicating the existence or non-existence of any actual or

27 proposed relationship, agreement, connection, contract, transaction, communication, or meeting

28

1  of any kind between any intelligence agency, or any current or former official, employee, or

2  representative thereof, and any individual or entity associated with these lawsuits, or any current

3  or former employees thereof.

4      8. Every question asked and every document requested by the parties in discovery or at

5  trial, whether or not on its face such question or request relates to or concerns any intelligence

6  agency, shall be deemed, without the need for objection, not to require a response that would

7  include any information relating to or implicating any actual or proposed interest in, application

8  of, or use by any intelligence agency, or any current or former official, employee, or

9  representative thereof, of any technology, software, or source code owned or claimed by any

10  individuals or entities associated with these lawsuits.

11      9. The military and state secrets privilege can only be invoked by the United States. It

12  cannot be asserted by a private individual or entity.

13      10. All parties shall serve the attorneys for the United States with (a) a copy of all notices

14  of depositions, (b) a copy of all requests for discovery and responses thereto, and (c) a copy of all

15  pleadings and motions filed together with supporting memoranda [hereinafter collectively

16  referred to as the "documents"], unless such documents request or relate to information covered

17  by paras 2 and 3 herein. If the documents request or relate to information covered by paras. 2

18  and 3 herein, the parties shall submit the documents to the United States for classification review

19  prior to service or filing.

20      11. The Clerk of the Court shall send attorneys for the United States a copy of all future

21  decisions and notices for hearings in these cases.

22      12. As the United States deems necessary, attorneys for the United States may attend all

23  depositions and proceedings in this case and may make objections as necessary to protect

24  national security information. If attorneys for the United States assert an objection based on the

25  need to protect national security information with respect to either witness testimony or

26  documents introduced or otherwise relied upon during a deposition, then the witness shall be

27  precluded from testifying with respect to the line of inquiry that engendered the objection and the

28

1  document shall be withdrawn from the record pending an order of the Court with respect to the

2  scope of the government's national security objection.

3      13.  To protect the United States' interests, attorneys for the United States may participate

4  in any proceeding in these cases, including but not limited to motions hearings, all pre-trial

5  proceedings, or trial by making and opposing motions, submitting briefs, and participating in

6  arguments.

7      14.  The United States shall be excepted from all party discovery during the pendency of

8  its motions to dismiss the claims against the Department of Defense.

9

10  SO ORDERED: _____

11

12                                          _____

13                                          United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT B

| From: | Eisenberg, Joseph |
|---|---|
| To: | Terry, Billie |
| Cc: | Dennis |
| Subject: | FW: Review of former counsel files at Liner firm by United States |
| Date: | Monday, May 24, 2010 1:08:10 PM |
| Attachments: | Liner Document Inventory.pdf |
| | Liner Hard Drive Inventory.pdf |
| | Liner CD Inventory.pdf |

-----Original Message-----
From: Gomez, Raphael (CIV) [mailto:Raphael.Gomez@usdoj.gov]
Sent: Monday, May 24, 2010 12:57 PM
To: Ellyn S. Garofalo; Kathleen Goldberg; Eisenberg, Joseph; Michael
Flynn
Cc: Wells, Carlotta (CIV); Raya, Sharon M. (CIV)
Subject: Review of former counsel files at Liner firm by United States

Counsel,

As we orally have informed you, the United States has conducted an
initial review of the 210 boxes of former counsel files at the Liner
firm. All 210 boxes of materials, minus the documents and media pulled
for further security review, require no further review by the United
States.

Please find attached an inventory of the hard copies, hard drives, and
CD's/DVD's that have been pulled from boxes 101 through 210 (please note
that the first 100 boxes were discovery produced by eTreppid to
Montgomery in the eTreppid case and were released by the United States
in late January 2010).

We will forward a projected date for completion of the review of the
pulled hard copies, hard drives and CD's/DVD's.

If you have any questions, please email or call.

Raphael Gomez
Carlotta Wells

202 514-1318
202 514-4522

| CD No. | ADDITIONAL INFO |
|---|---|
| **BOX 101** | |
| CD - 000001 | |
| CD - 000002 | |
| CD - 000003 | |
| CD - 000004 | DVD |
| CD - 000005 | |
| CD - 000006 | |
| CD - 000007 | |
| CD - 000008 | |
| CD - 000009 | |
| CD - 000010 | |
| CD - 000011 | DVD |
| CD - 000012 | DVD |
| CD - 000013 | |
| CD - 000014 | |
| CD - 000015 | DVD |
| CD - 000016 | DVD |
| CD - 000017 | DVD |
| CD - 000018 *Microsoft XP | |
| CD - 000019 *Dancing w/ the stars | DVD |
| CD - 000020 *Dancing w/ the stars | DVD |
| CD - 000021 | |
| CD - 000022 | |
| CD - 000023 | DVD |
| CD - 000024 | DVD |
| CD - 000025 | DVD |
| CD - 000026 | DVD |
| CD - 000027 | DVD |
| CD - 000028 | DVD |
| CD - 000029 | DVD |
| CD - 000030 | DVD |
| CD - 000031 | DVD |
| CD - 000032 | |
| CD - 000033 | |
| CD - 000034 | DVD |
| CD - 000035 | |
| CD - 000036 | |
| CD - 000037 | |
| CD - 000038 | DVD |
| CD - 000039 | DVD |
| CD - 000040 | |
| CD - 000041 | |
| CD - 000042 | DVD |
| CD - 000043 | DVD |
| CD - 000044 | DVD |
| CD - 000045 | |

| | |
|---|---|
| CD - 000046 | |
| CD - 000047 | |
| CD - 000048 | |
| CD - 000049 | |
| CD - 000050 | |
| CD - 000051 | |
| CD - 000052 | |
| CD - 000053 | DVD |
| CD - 000054 | |
| CD - 000055 | DVD |
| CD - 000056 | DVD |
| CD - 000057 | |
| CD - 000058 | |
| CD - 000059 | DVD |
| CD - 000060 | DVD |
| CD - 000061 | DVD |
| CD - 000062 | |
| CD - 000063 | DVD |
| CD - 000064 | DVD |
| CD - 000065 | DVD |
| CD - 000066 | DVD |
| CD - 000067 | DVD |
| CD - 000068 | |
| CD - 000069 | |
| CD - 000070 | DVD |
| CD - 000071 | DVD |
| CD - 000072 | DVD |
| CD - 000073 | DVD |
| CD - 000074 | |
| CD - 000075 | |
| CD - 000076 | DVD |
| CD - 000077 | DVD |
| CD - 000078 | DVD |
| CD - 000079 | DVD |
| CD - 000080 | |
| CD - 000081 | |
| CD - 000082 | |
| CD - 000083 | |
| CD - 000084 | |
| CD - 000085 | DVD |
| CD - 000086 | DVD |
| CD - 000087 | DVD |
| CD - 000088 | DVD |
| CD - 000089 | |
| CD - 000090 | |
| CD - 000091 | DVD |
| CD - 000092 | |

| CD - 000093 | DVD |
|---|---|
| CD - 000094 | DVD |
| CD - 000095 | DVD |
| CD - 000096 | DVD |
| CD - 000097 | DVD |
| CD - 000098 | |
| CD - 000099 | |
| CD - 000100 | DVD |
| CD - 000101 | DVD |
| CD - 000102 | |
| CD - 000103 | DVD |
| CD - 000104 | DVD |
| CD - 000105 | DVD |
| CD - 000106 | DVD |
| CD - 000107 | DVD |
| CD - 000108 | DVD |
| CD - 000109 | DVD |
| CD - 000110 | DVD |
| CD - 000111 | DVD |
| CD - 000112 | DVD |
| CD - 000113 | DVD |
| CD - 000114 | DVD |
| CD - 000115 | |
| CD - 000116 | DVD |
| CD - 000117 | DVD |
| CD - 000118 | |
| CD - 000119 | |
| CD - 000120 | DVD |
| CD - 000121 | DVD |
| CD - 000122 | |
| CD - 000123 | |
| CD - 000124 | |
| CD - 000125 | |
| CD - 000126 | |
| CD - 000127 | |
| CD - 000128 | |
| CD - 000129 | |
| CD - 000130 | |
| CD - 000131 | |
| CD - 000132 | |
| CD - 000133 | DVD |
| CD - 000134 | |
| CD - 000135 | |
| CD - 000136 | |
| CD - 000137 | |
| CD - 000138 | |
| CD - 000139 | |

| | |
|---|---|
| CD - 000140 | |
| CD - 000141 | |
| CD - 000142 | |
| CD - 000143 | |
| CD - 000144 | |
| CD - 000145 | |
| CD - 000146 | |
| CD - 000147 | |
| CD - 000148 | |
| CD - 000149 | |
| CD - 000150 | |
| CD - 000151 | |
| CD - 000152 | |
| CD - 000153 | |
| CD - 000154 | |
| CD - 000155 | |
| CD - 000156 | |
| CD - 000157 | |
| CD - 000158 | |
| CD - 000159 | |
| CD - 000160 | |
| CD - 000161 | |
| CD - 000162 | |
| CD - 000163 | |
| CD - 000164 | |
| CD - 000165 | |
| CD - 000166 | |
| CD - 000167 | |
| CD - 000168 | |
| CD - 000169 | |
| CD - 000170 | |
| CD - 000171 | |
| CD - 000172 | |
| CD - 000173 | |
| CD - 000174 | |
| CD - 000175 | |
| CD - 000176 | |
| CD - 000177 | |
| CD - 000178 | |
| CD - 000179 | |
| CD - 000180 | |
| CD - 000181 | |
| CD - 000182 | |
| CD - 000183 | |
| CD - 000184 | |
| CD - 000185 | |
| CD - 000186 | |

| CD | |
|---|---|
| CD - 000187 | |
| CD - 000188 | |
| CD - 000189 | |
| CD - 000190 | |
| CD - 000191 | |
| CD - 000192 | |
| CD - 000193 | |
| CD - 000194 | |
| CD - 000195 | |
| CD - 000196 | |
| CD - 000197 | |
| CD - 000198 | |
| CD - 000199 | DVD |
| CD - 000200 | DVD |
| CD - 000201 | DVD |
| **BOX - 105** | |
| CD - 000223 *Fire Connect | |
| CD - 000224 | |
| CD - 000225 | |
| CD - 000226 | |
| CD - 000227 *Dark City (Movie) | DVD |
| CD - 000228 *School of Rock (Movie) | DVD |
| CD - 000229 *Lost in Trans (Movie) | DVD |
| CD - 000230 *After the Sunset (Movie) | DVD |
| CD - 000231 | DVD |
| CD - 000232 | DVD |
| CD - 000233 | DVD |
| CD - 000234 | DVD |
| CD - 000235 | DVD |
| CD - 000236 *Windows XP | |
| CD - 000237 | DVD |
| CD - 000238 | DVD |
| CD - 000239 *Sync master | |
| CD - 000240 * Windows XP | |
| CD - 000241 | DVD |
| CD - 000242 *Video Capture Software | |
| CD - 000243 *Windows XP | |
| CD - 000244 | DVD |
| CD - 000245 *Video Capture Software | |
| CD - 000246 *Windows XP | |
| CD - 000247 | DVD |
| CD - 000248 | DVD |
| CD - 000249 | DVD |
| CD - 000250 | DVD |
| CD - 000251 | |
| CD - 000252 | DVD |
| CD - 000253 | DVD |

| | |
|---|---|
| CD - 000254 | |
| CD - 000255 | |
| CD - 000256 | DVD |
| CD - 000257 | DVD |
| CD - 000258 | DVD |
| CD - 000259 | |
| CD - 000260 | DVD |
| CD - 000261 | DVD |
| CD - 000262 | DVD |
| CD - 000263 | DVD |
| CD - 000264 | DVD |
| CD - 000265 | |
| CD - 000266 | DVD |
| CD - 000267 | |
| CD - 000268 | DVD |
| CD - 000269 | DVD |
| CD - 000270 | DVD |
| CD - 000271 | DVD |
| CD - 000272 | |
| CD - 000273 | |
| CD - 000274 | DVD |
| CD - 000275 | DVD |
| CD - 000276 | |
| CD - 000277 | |
| **BOX 106** | |
| CD - 000219 | |
| **BOX 114** | |
| CD - 000278 | |
| CD - 000279 | DVD |
| CD - 000280 | |
| CD - 000281 | DVD |
| CD - 000282 | |
| CD - 000283* (IBM Commercial) | |
| CD - 000284 | |
| CD - 000285 | |
| CD - 000286 | |
| CD - 000287 | |
| CD - 000288 | DVD |
| CD - 000289 | |
| CD - 000290 | |
| CD - 000291 | |
| CD - 000292 | |
| CD - 000293 | |
| CD - 000294 | |
| CD - 000295 | |
| CD - 000296 | |
| CD - 000297* (Adobe) | |

| | |
|---|---|
| CD - 000298 | |
| CD - 000299 | |
| CD - 000300 | |
| CD - 000301 | |
| CD - 000302 | |
| CD - 000303 | |
| CD - 000304 | |
| CD - 000305 | DVD |
| CD - 000306 | |
| CD - 000307 | |
| CD - 000308 | |
| CD - 000309* (Music) | |
| CD - 000310* (Win 95) | |
| CD - 000311 | |
| CD - 000312 | |
| CD - 000313 | |
| CD - 000314 | |
| CD - 000315 | DVD |
| CD - 000316 | |
| CD - 000317* (WIN 95) | |
| CD - 000318 | DVD |
| CD - 000319 | |
| CD - 000320 | |
| CD - 000321 | |
| CD - 000322 | |
| CD - 000323 | |
| CD - 000324* (Old Windows Upd.) | |
| CD - 000325 | |
| CD - 000326 | |
| CD - 000327 | |
| CD - 000328 | |
| CD - 000329* (Elvis pt. 2) | |
| CD - 000330 | |
| CD - 000331 | |
| CD - 000332 | |
| CD - 000333 | |
| CD - 000334 | |
| CD - 000335 | |
| CD - 000336 | |
| CD - 000337 | |
| CD - 000338 | |
| CD - 000339 | |
| CD - 000340 | |
| CD - 000341 | |
| CD - 000342 | |
| CD - 000343 | |
| CD - 000344 | |

| | |
|---|---|
| CD - 000345 | |
| CD - 000346 | |
| CD - 000347 | |
| CD - 000348 | |
| CD - 000349 | |
| CD - 000350 | |
| CD - 000351 | |
| CD - 000352 | |
| CD - 000353 | |
| CD - 000354 | |
| CD - 000355 | |
| CD - 000356 | |
| CD - 000357 | |
| CD - 000358 | DVD |
| CD - 000359 | |
| CD - 000360** (Unreadable 360-370) | DVD |
| CD - 000361 | |
| CD - 000362 | |
| CD - 000363 | |
| CD - 000364 | |
| CD - 000365 | |
| CD - 000366 | |
| CD - 000367 | DVD |
| CD - 000368 | |
| CD - 000369 | |
| CD - 000370** | |
| CD - 000371* (Dolby Test Files) | |
| CD - 000372 | |
| CD - 000373* (Kodak Frames) | |
| CD - 000374* (Partition Magic 8.02) | |
| CD - 000375 | |
| CD - 000376* (HP) | DVD |
| CD - 000377* (ADP) | |
| CD - 000378 | |
| CD - 000379 | DVD |
| CD - 000380 | |
| CD - 000381* (Win XP) | |
| CD - 000382 | |
| CD - 000383 | DVD |
| CD - 000384* (Mic Office 2003) | |
| CD - 000385* (Mic XP) | |
| CD - 000386* (Dancing w/ Stars) | DVD |
| CD - 000387* (Dancing w/ Stars) | DVD |
| CD - 000388 | DVD |
| CD - 000389 | |
| CD - 000390 | |
| CD - 000391 | DVD |

| | |
|---|---|
| CD - 000392 | DVD |
| CD - 000393 | DVD |
| CD - 000394 | |
| CD - 000395 | |
| CD - 000396* (Symantec) | |
| CD - 000397* (Mic XP) | |
| CD - 000398 | DVD |
| CD - 000399* (Mic Office 2003) | |
| CD - 000400* (Mic XP) | |
| CD - 000401* (Dancing w/ Stars) | DVD |
| CD - 000402* (Dancing w/ Stars) | DVD |
| CD - 000403 | DVD |
| CD - 000404 | |
| CD - 000405 | |
| CD - 000406 | DVD |
| CD - 000407 | DVD |
| CD - 000408 | DVD |
| CD - 000409 | |
| CD - 000410 | |
| CD - 000411* (Symantec) | |
| CD - 000412* (Microsoft XP) | |
| CD - 000413 | DVD |
| CD - 000414* (Mic Office 2003) | |
| CD - 000415* (Mic XP) | |
| CD - 000416* (Dancing w/ Stars) | DVD |
| CD - 000417* (Dancing w/ Stars) | DVD |
| CD - 000418 | DVD |
| CD - 000419 | |
| CD - 000420 | |
| CD - 000421 | DVD |
| CD - 000422 | DVD |
| CD - 000423 | DVD |
| CD - 000424 | |
| CD - 000425 | |
| CD - 000426*(Symantec) | |
| CD - 000427* (Mic XP) | |
| **BOX 117** | |
| CD - 000220 | |
| **BOX 131** | |
| CD - 000217 | |
| **BOX 145** | |
| CD - 000218 | |
| **BOX 165** | |
| CD - 000431 | |
| CD - 000432 | |
| **BOX 180** | |
| CD - 000221 | |

| BOX 181 | | |
|---|---|---|
| CD - 000202 | | |
| CD - 000203 | | |
| CD - 000204 | | |
| CD - 000205 | DVD | |
| CD - 000206 | DVD | |
| CD - 000207 | | |
| CD - 000208 | DVD | |
| CD - 000209 | | |
| CD - 000210 | | |
| CD - 000211 | | |
| CD - 000212 | DVD | |
| CD - 000213 | DVD | |
| CD - 000214 | | |
| CD - 000215 | | |
| CD - 000216 | | |
| CD - 000430 | DVD | |
| BOX 188-1 | | |
| CD - 000222 | | |
| BOX 189 | | |
| CD - 000428 | | |
| BOX 190 | | |
| CD - 000429 | | |
| BOX 207 | | |
| CD - 000433 | | |
| CD - 000434 | | |
| CD - 000435 | | |

# LINER FILES: DOCUMENT INVENTORY

| Present | BOX | CONTENTS | DESCRIPTION | RELEASED | PULL DETAILS |
|---------|-----|----------|-------------|----------|--------------|
| N/A | 1 | DISCOVERY | N/A | Y | |
| N/A | 2 | DISCOVERY | N/A | Y | |
| N/A | 3 | DISCOVERY | N/A | Y | |
| N/A | 4 | DISCOVERY | N/A | Y | |
| N/A | 5 | DISCOVERY | N/A | Y | |
| N/A | 6 | DISCOVERY | N/A | Y | |
| N/A | 7 | DISCOVERY | N/A | Y | |
| N/A | 8 | DISCOVERY | N/A | Y | |
| N/A | 9 | DISCOVERY | N/A | Y | |
| N/A | 10 | DISCOVERY | N/A | Y | |
| N/A | 11 | DISCOVERY | N/A | Y | |
| N/A | 12 | DISCOVERY | N/A | Y | |
| N/A | 13 | DISCOVERY | N/A | Y | |
| N/A | 14 | DISCOVERY | N/A | Y | |
| N/A | 15 | DISCOVERY | N/A | Y | |
| N/A | 16 | DISCOVERY | N/A | Y | |
| N/A | 17 | DISCOVERY | N/A | Y | |
| N/A | 18 | DISCOVERY | N/A | Y | |
| N/A | 19 | DISCOVERY | N/A | Y | |
| N/A | 20 | DISCOVERY | N/A | Y | |
| N/A | 21 | DISCOVERY | N/A | Y | |
| N/A | 22 | DISCOVERY | N/A | Y | |
| N/A | 23 | DISCOVERY | N/A | Y | |
| N/A | 24 | DISCOVERY | N/A | Y | |
| N/A | 25 | DISCOVERY | N/A | Y | |
| N/A | 26 | DISCOVERY | N/A | Y | |
| N/A | 27 | DISCOVERY | N/A | Y | |
| N/A | 28 | DISCOVERY | N/A | Y | |
| N/A | 29 | DISCOVERY | N/A | Y | |
| N/A | 30 | DISCOVERY | N/A | Y | |
| N/A | 31 | DISCOVERY | N/A | Y | |
| N/A | 32 | DISCOVERY | N/A | Y | |
| N/A | 33 | DISCOVERY | N/A | Y | |

**LINER FILES: DOCUMENT INVENTORY**

| | | | | |
|---|---|---|---|---|
| N/A | 34 DISCOVERY | N/A | | Y |
| N/A | 35 DISCOVERY | N/A | | Y |
| N/A | 36 DISCOVERY | N/A | | Y |
| N/A | 37 DISCOVERY | N/A | | Y |
| N/A | 38 DISCOVERY | N/A | | Y |
| N/A | 39 DISCOVERY | N/A | | Y |
| N/A | 40 DISCOVERY | N/A | | Y |
| N/A | 41 DISCOVERY | N/A | | Y |
| N/A | 42 DISCOVERY | N/A | | Y |
| N/A | 43 DISCOVERY | N/A | | Y |
| N/A | 44 DISCOVERY | N/A | | Y |
| N/A | 45 DISCOVERY | N/A | | Y |
| N/A | 46 DISCOVERY | N/A | | Y |
| N/A | 47 DISCOVERY | N/A | | Y |
| N/A | 48 DISCOVERY | N/A | | Y |
| N/A | 49 DISCOVERY | N/A | | Y |
| N/A | 50 DISCOVERY | N/A | | Y |
| N/A | 51 DISCOVERY | N/A | | Y |
| N/A | 52 DISCOVERY | N/A | | Y |
| N/A | 53 DISCOVERY | N/A | | Y |
| N/A | 54 DISCOVERY | N/A | | Y |
| N/A | 55 DISCOVERY | N/A | | Y |
| N/A | 56 DISCOVERY | N/A | | Y |
| N/A | 57 DISCOVERY | N/A | | Y |
| N/A | 58 DISCOVERY | N/A | | Y |
| N/A | 59 DISCOVERY | N/A | | Y |
| N/A | 60 DISCOVERY | N/A | | Y |
| N/A | 61 DISCOVERY | N/A | | Y |
| N/A | 62 DISCOVERY | N/A | | Y |
| N/A | 63 DISCOVERY | N/A | | Y |
| N/A | 64 DISCOVERY | N/A | | Y |
| N/A | 65 DISCOVERY | N/A | | Y |
| N/A | 66 DISCOVERY | N/A | | Y |
| N/A | 67 DISCOVERY | N/A | | Y |

# LINER FILES: DOCUMENT INVENTORY

| | | | | |
|---|---|---|---|---|
| N/A | 68 DISCOVERY | N/A | | Y |
| N/A | 69 DISCOVERY | N/A | | Y |
| N/A | 70 DISCOVERY | N/A | | Y |
| N/A | 71 DISCOVERY | N/A | | Y |
| N/A | 72 DISCOVERY | N/A | | Y |
| N/A | 73 DISCOVERY | N/A | | Y |
| N/A | 74 DISCOVERY | N/A | | Y |
| N/A | 75 DISCOVERY | N/A | | Y |
| N/A | 76 DISCOVERY | N/A | | Y |
| N/A | 77 DISCOVERY | N/A | | Y |
| N/A | 78 DISCOVERY | N/A | | Y |
| N/A | 79 DISCOVERY | N/A | | Y |
| N/A | 80 DISCOVERY | N/A | | Y |
| N/A | 81 DISCOVERY | N/A | | Y |
| N/A | 82 DISCOVERY | N/A | | Y |
| N/A | 83 DISCOVERY | N/A | | Y |
| N/A | 84 DISCOVERY | N/A | | Y |
| N/A | 85 DISCOVERY | N/A | | Y |
| N/A | 86 DISCOVERY | N/A | | Y |
| N/A | 87 DISCOVERY | N/A | | Y |
| N/A | 88 DISCOVERY | N/A | | Y |
| N/A | 89 DISCOVERY | N/A | | Y |
| N/A | 90 DISCOVERY | N/A | | Y |
| N/A | 91 DISCOVERY | N/A | | Y |
| N/A | 92 DISCOVERY | N/A | | Y |
| N/A | 93 DISCOVERY | N/A | | Y |
| N/A | 94 DISCOVERY | N/A | | Y |
| N/A | 95 DISCOVERY | N/A | | Y |
| N/A | 96 DISCOVERY | N/A | | Y |
| N/A | 97 DISCOVERY | N/A | | Y |
| N/A | 98 DISCOVERY | N/A | | Y |
| N/A | 99 DISCOVERY | N/A | | Y |
| N/A | 100 DISCOVERY | N/A | | Y |
| N/A | 101 OTHER | **1 Pull:** Pull 1: CDs that appear to be discovery materials | | Y |

# LINER FILES: DOCUMENT INVENTORY

| | | | |
|---|---|---|---|
| N/A | 102 OTHER | N/A | Y |
| YES | 103 OTHER | **4 Pulls:** **Pull 1:** 6/19/06 Flynn Email **(001-005)** **Pull 2:** 7/19/06 Flynn Email **(001-004)** **Pull 3:** 8/14/06 Flynn Email **(001-014)** **Pull 4:** 9/26/06 Mongtomery Email **(001-016)** | N |
| YES | 104 OTHER | **1 Pull:** **Pull 1:** 3/1/06 Flynn Ltr **(001-008)** | N |
| N/A | 105 OTHER | Hard drives and CDs | N |
| N/A | 106 OTHER | **1 Pull:** **Pull 1:** CD | Y |
| YES | 107 PLEADINGS | **6 Pulls:** **Pull 1:** 3/11/06 Dec of Flynn **(001-004)**; **Pull 2:** 3/11/06 Dec of Flynn **(001-004)**; **Pull 3:** 4/3/06 Reply Memo **(001-029)**; **Pull 4:** 4/21/08 Reply Memo **(001-035)**; **Pull 5:** 3/11/06 Dec of Flynn **(001-006)**; **Pull 6:** 4/3/06 Reply Memo **(001-029)** | Y |
| YES | 108 PLEADINGS | **2 Pulls:** **Pull 1:** Flynn Declaration **(001-007)** **Pull 2:** 3/17/07 Email **(001-002)** | Y |
| YES | 109 OTHER | **2 Pulls:** **Pull 1:** 2/26/07 Email **(001)**; **Pull 2:** 2/13/07 Email **(001)** | Y |
| N/A | 110 OTHER | N/A | Y |
| N/A | 111 OTHER | N/A | Y |
| N/A | 112 OTHER | N/A | Y |
| YES | 113 OTHER | **5 Pulls:** **Pull 1:** 2/13/07 Email **(001-009)**; **Pull 2:** 2/26/07 Email **(001-004)**; **Pull 3:** 3/16/07 Email **(001-012)**; **Pull 4:** 3/16/07 Email **(001-008)**; **Pull 5:** 3/24/07 Email **(001-003)** | N |
| N/A | 114 OTHER | CDs for review | N |
| N/A | 115 PLEADINGS | N/A | Y |
| N/A | 116 OTHER | Hard drives | N |

# LINER FILES: DOCUMENT INVENTORY

| | | | | |
|---|---|---|---|---|
| YES | 117 | PLEADINGS | **4 Pulls:**<br>**Pull 1:** 3/11/06 Dec of Flynn; **(001-004)**<br>**Pull 2:** 4/3/06 Reply Mem **(001-029)**;<br>**Pull 3:** CD pulled;<br>**Pull 4:** List of T. Pham file pulled **(001-014)** | Y |
| YES | 118 | PLEADINGS | **1 Pull:**<br>**Pull 1:** 3/11/06 Dec of Flynn **(001-004)** | Y |
| YES | 119 | PLEADINGS | **4 Pulls:**<br>**Pull 1:** 5/21/08 Reply Memo **(001-035)**;<br>**Pull 2:** 3/11/06 Dec of Flynn **(001-010)**;<br>**Pull 3:** 4/3/06 Reply Memo **(001-029)**; *<br>**Pull 4:** (001-004) 3/11/06 Dec of Flynn **(001-004)** | Y |
| YES | 120 | OTHER | **3 Pulls:**<br>**Pull 1:** 9/26/06 Montgomery Email **(001)**<br>**Pull 2:** 9/26/06 Montgomery Email **(001)**<br>**Pull 3:** 9/26/06 Montgomery Email **(001)** | **Y** |
| N/A | 121 | OTHER | N/A | Y |
| N/A | 122 | OTHER | N/A | Y |
| N/A | 123 | OTHER | N/A | Y |
| YES | 124 | OTHER | **1 Pull:**<br>**Pull 1:** Montgomery Discovery (not Bates labeled by parties) **(001-120)** | |
| YES | 125 | OTHER | **20 Pulls:**<br>**Pull 1:** 5/4/07 Flynn Ltr **(001-013)**;<br>**Pull 2:** 5/5/07 Flynn Ltr **(001-013)**;<br>**Pull 3:** 9/23/06 SF-95.doc **(001-013)**;<br>**Pull 4:** 8/24/06 Interrogatories **(001-018)**;<br>**Pull 5:** 3/1/06 Draft Rumsfield, et al. Ltr **(001-046)**;<br>**Pull 6:** 6/3/07 Flynn Email **(001)**<br>**Pull 7:** 6/3/07 Flynn Email **(001-008)**<br>**Pull 8:** 6/6/07 Flynn Email **(001)**<br>**Pull 9:** 6/10/07 Flynn Email **(001)**<br>**Pull 10:** Exhibit Listing and Description **(001-002)**<br>**Pull 11:** 6/23/07 Flynn Email **(001-004)**<br>**Pull 12:** 6/23/07 Flynn Email **(001-003)**<br>**Pull 13:** 6/23/07 Flynn Email **(001-004)**<br>**Pull 14:** 6/23/07 Flynn Email **(001-002)**<br>**Pull 15:** 4/13/07 Flynn Ltr **(001-010)**<br>**Pull 16:** Draft Flynn Ltr **(001-015)**<br>**Pull 17:** 5/9/07 Flynn Email **(001-003)**<br>**Pull 18:** 5/9/07 Flynn Email **(001-003)**<br>**Pull 19:** Rumsfeld Ltr **(001-008)**<br>**Pull 20:** 4/9/07 Flynn Email **(001-002)** | N |

# LINER FILES: DOCUMENT INVENTORY

| | | | | |
|---|---|---|---|---|
| YES | 126 OTHER | **12 Pulls:**<br>**Pull 1:** 5/8/07 Mont Email **(001-002)**;<br>**Pull 2:** 3/1/06 Rumsfield Ltr **(001-007**;<br>**Pull 3:** Etreppid legal spreadsheet **(001-033)**;<br>**Pull 4:** 6/10/07 Email **(001-003)**;<br>**Pull 5:** 6/10/07 Email **(001-002)**;<br>**Pull 6:** 6/10/07 Email **(001-002)**;<br>**Pull 7:** 6/10/07 Email **(001-002)**;<br>**Pull 8:** 6/10/07 Email **(001-003)**;<br>**Pull 9:** 6/6/07 Email **(001-002)**;<br>**Pull 10:** 6/4/07 Email **(001-003)**;<br>**Pull 11:** 6/3/07 Email **(001-017)**;<br>**Pull 12:** 6/11/07 Montgomery Declaration **(001-004)**;<br>**Pull 13:** 6/10/07 Email **(001-021)**;<br>**Pull 14:** 3/11/06 Declaration **(001-009)**;<br>**Pull 15:** Reply Memo Buckthorne **(001-037)**;<br>**Pull 16:** 4/18/06 Email **(001-004)**;<br>**Pull 17:** Montgomery Objection to DOD (06-cv-056 Dkt# 125) **(001-00)** | N | |
| N/A | 127 OTHER | Hard drives | N | |
| N/A | 128 OTHER | N/A | Y | |
| N/A | 129 OTHER | N/A | Y | |
| N/A | 130 OTHER | N/A | Y | |
| N/A | 131 OTHER | **1 Pull:**<br>**Pull 1:** CD | Y | |
| N/A | 132 OTHER | N/A | Y | |
| N/A | 133 OTHER | N/A | Y | |
| YES | 134 OTHER | **4 Pulls:**<br>**Pull 1:** 7/5/06 Email **(001-014)**;<br>**Pull 2:** 5/30/06 Email **(001-002)**;<br>**Pull 3:** Notes **(001-007)**;<br>**Pull 4:** 9/26/06 Flynn Email **(001-008)** | N | |
| YES | 135 PLEADINGS | **4 Pulls:**<br>**Pull 1:** Montgomery Declaration **(001-004)**<br>**Pull 2:** Response to DOD Motion **(001-202)**<br>**Pull 3:** Montgomery Declaration **(001-023)**<br>**Pull 4:** 10/30/06 Sealed Montgomery Decl. in Response to DOD Motion for Protective Order -Signed **(001-023)** | | Pull 1: 001-004<br>Pull 2: 001-202 |

## LINER FILES: DOCUMENT INVENTORY

| | | | | |
|---|---|---|---|---|
| YES | 136 OTHER | **4 Pulls:**<br>**Pull 1:** 7/5/06 Email **(001)**;<br>**Pull 2:** Contract Documents **(001-010)**;<br>**Pull 3:** Negroponte Questions **(001-005)**;<br>**Pull 4:** Montgomery Declaration **(001-022)** | Y | Pull 1: 001-022<br>Pull 2: |
| YES | 137 OTHER | **3 Pulls:**<br>**Pull 1:** 4/10/06 Park Email **(001-004)**;<br>**Pull 2:** 3/11/06 Flynn Declaration -Unsigned- **(001-004)**<br>**Pull 3:** Reply Memo for Return of Property **(001-029)** | Y | Pull 2: 001-004<br>Pull 3: 001-029 |
| YES | 138 PLEADINGS | N/A | Y | |
| YES | 139 OTHER | **30 Pulls:**<br>**Pull 1:** 2/2007 Flynn Declaration **(001-016)**;<br>**Pull 2:** 2/2007 Montgomery Declaration **(001-009)**;<br>**Pull 3:** 2/26/2007 Email **(001)**;<br>**Pull 4:** 2/13/2007 Email **(001-003)**;<br>**Pull 5:** 2/2007 Montgomery Declaration **(001-005)**;<br>**Pull 6:** 2/2007 Montgomery Declaration **(001-006)**;<br>**Pull 7:** 2/2007 Flynn Declaration in Supp of Montgomery Opp. to Govt Motion to Strike **(001-018)**;<br>**Pull 8:** 2/2007 Montgomery Declaration 2 copies -Unsigned-**(001-019)**;<br>**Pull 9:** 3/2007 Email Chain **(001-011)**;<br>**Pull 10:** 3/16/07 Email **(001-004)**;<br>**Pull 11:** Complaint for violation of false claims act **Draft-1 (001-046)**;<br>**Pull 12:** Complaint for violation of false claims act **Draft-2 (001-047)**;<br>**Pull 13:** Complaint for violation of false claims act **Draft-3 (001-044)**;<br>**Pull 14:** Complaint for violation of false claims act **Draft-4 (001-040)**;<br>**Pull 15:** Complaint for violation of false claims act Draft-5 **(001-046)**;<br>**Pull 16:** Complaint for violation of false claims act Draft-6 **(001-046)**;<br>**Pull 17:** Flynn Declaration **(001-004)**;<br>**Pull 18:** Flynn Declaration **(001-006)**;<br>**Pull 19:** Motion to Unseal **(001-017)**;<br>**Pull 20:** Flynn Declaration **(001-012)**;<br>**Pull 21:** Flynn Declaration **(001-011)**;<br>**Pull 22:** Negroponte Questions **(001-009)**;<br>**Pull 23:** Negroponte Questions **(001-006)**;<br>**Pull 24:** Negroponte Questions **(001-004)**;<br>**Pull 25:** Negroponte Questions **(001-004)**;<br>**Pull 26:** 2/9/07 Flynn Ltr **(001-005)**;<br>**Pull 27:** 2/9/07 Flynn Ltr **(001-005)**;<br>**Pull 28:** 2/9/07 Flynn Ltr **(001-003)**;<br>**Pull 29:** 3/24/07 Email **(001-002)**;<br>**Pull 30:** 1/2007 Montgomery Declaration **(001-007)** | N | |

# LINER FILES: DOCUMENT INVENTORY

| Status | Item | Type | Pulls / Description | Additional | Ind. |
|---|---|---|---|---|---|
| YES | 140 | OTHER | **7 Pulls:** **Pull 1:** Transcript Excerpt **(001-005); Pull 2:** Transcript Excerpt **(001-005); Pull 3:** 8/16/06 Sealed Declaration of Montgomery -Unsigned- **(001-009); Pull 4:** 8/16/06 Sealed Declaration of Montgomery -Unsigned-**(001-019); Pull 5:** 8/16/06 Sealed Declaration of Montgomery -Unsigned- **(001-020);** | **Pull 6:** 10/06 2 Copies Sealed Declaration of Montgomery -Unsigned **(001-045); Pull 7:** 11/30/06 Sealed Declaration of Montgomery - Unsigned- **(001-022)** | N |
| N/A | 141 | PLEADINGS | N/A | | Y |
| N/A | 142 | OTHER | N/A | | Y |
| N/A | 143 | OTHER | N/A | | Y |
| N/A | 144 | OTHER | N/A | | Y |
| N/A | 145 | OTHER | **1 Pull:** **Pull 1:** CD | | Y |
| N/A | 146 | PLEADINGS | N/A | | Y |
| YES | 147 | OTHER | **10 Pulls:** **Pull 1:** MONT40-43 **(001-004); Pull 2:** MONT 288-296 **(001-008); Pull 3:** MONT318-337 **(001-020); Pull 4:** 4/13/07 Flynn Ltr **(001-018); Pull 5:** 2/9/07 Flynn Ltr ( 2 copies) **(001-010); Pull 6:** 6/22/06 Email **(001-002); Pull 7:** 6/22/06 Email **(001-005); Pull 8:** 3/1/06 Flynn Ltr **(001-013); Pull 9:** 6/23/07 Flynn Email **(001-007); Pull 10:** 6/23/07 Flynn Email **(001** | | Y |
| N/A | 148 | OTHER | N/A | | Y |
| N/A | 149 | PLEADINGS | N/A | | Y |
| YES | 150 | PLEADINGS | **2 Pulls:** **Pull 1:** 10/06 Draft Montgomery Response to DOD Motion for Protective Order **(001-044); Pull 2:** 03/22/07 Montgomery Response to DOD Motion for Reconsideration **(001-009)** | **Pull 1: 001-044** **Pull 2: 001-009** | Y |
| YES | 151 | OTHER | **1 Pull:** **Pull 1:** 6/11/07 Montgomery Declaration **(001-004)** | | Y |
| N/A | 152 | PLEADINGS | N/A | | Y |
| N/A | 153 | OTHER | N/A | | Y |
| N/A | 154 | OTHER | N/A | | Y |
| N/A | 155 | OTHER | N/A | | Y |

| | | | | | |
|---|---|---|---|---|---|
| N/A | 156 | PLEADINGS | N/A | | Y |
| N/A | 157 | PLEADINGS | N/A | | Y |
| YES | 158 | OTHER | **6 Pulls:**<br>**Pull 1:** 4/13/07 Flynn Ltr **(001-018)**;<br>**Pull 2:** 2/9/07 Flynn Ltr **(001-010)**;<br>**Pull 3:** 6/22/06 Flynn Email **(001-002)**;<br>**Pull 4:** 6/22/06 Flynn Email **(001-002)**;<br>**Pull 5:** 3/1/06 Flynn Ltr **(001-013)**;<br>**Pull 6:** 7/26/06 Flynn Ltr **(001-007)** | | Y |
| N/A | 159 | PLEADINGS | N/A | | Y |
| N/A | 160 | OTHER | N/A | | Y |
| N/A | 161 | PLEADINGS | N/A | | Y |
| N/A | 162 | DISCOVERY | N/A | | Y |
| N/A | 163 | PLEADINGS | N/A | | Y |
| YES | 164 | OTHER | **1 Pull:**<br>**Pull 1:** 4/13/07 Flynn Ltr. **(001-009)** | | Y |
| YES | 165 | OTHER | **2 Pulls:**<br>**Pull 1:** CD With Document Attached **(001)**<br>**Pull 2:** CD With Document Attached **(001-030)** | | Y |
| YES | 166 | OTHER | **3 Pulls:**<br>**Pull 1:** DM2845-2886 **(001-042)**;<br>**Pull 2:** DM2987-2998 **(001-012)**;<br>**Pull 3:** DM3145-3151 **(001-007)** | | Y |
| N/A | 167 | OTHER | N/A | | Y |
| N/A | 168 | PLEADINGS | N/A | | Y |
| N/A | 169 | OTHER | N/A | | Y |
| N/A | 170 | OTHER | N/A | | Y |
| YES | 171 | OTHER | **1 Pull:**<br>**Pull 1:** Draft Flynn Ltr **(001-008)** | | Y |
| YES | 172 | OTHER | **1 Pull:**<br>**Pull 1:** Potential witness list with handwritten notations **(001-002)** | | Y |
| N/A | 173 | PLEADINGS | N/A | | Y |
| YES | 174 | PLEADINGS | **4 Pulls:**<br>**Pull 1:** 2/27/07 Dec of Flynn**(001-037)**;<br>**Pull 2:** 6/2/06 Dec of Michael West **(001-008)**;<br>**Pull 3:** 06-cv-0263 Dkt# 125 Transcript **(001-085)**;<br>**Pull 4:** 3/3/06 Dec of Michael West **(001-014)** | | Y |
| N/A | 175 | PLEADINGS | N/A | | Y |

## LINER FILES: DOCUMENT INVENTORY

| | | | | |
|---|---|---|---|---|
| YES | 176 | OTHER | **2 Pulls:**<br>**Pull 1:** 4/13/07 Flynn Ltr to Cheney **(001-009)**;<br>**Pull 2:** Dec of Flynn **(001-020)** | Y |
| N/A | 177 | PLEADINGS | N/A | Y |
| N/A | 178 | OTHER | N/A | Y |
| YES | 179 | OTHER | **2 Pulls:**<br>**Pull 1:** 6/3/07 Email **(001-012)**;<br>**Pull 2:** 5/8/07 Email **(001)** | Y |
| N/A | 180 | OTHER | **1 Pull:** CD | Y |
| N/A | 181 | OTHER | **5 Pulls:** 5 CDs pulled | Y |
| N/A | 182 | PLEADINGS | N/A | Y |
| N/A | 183 | OTHER | N/A | Y |
| N/A | 184 | OTHER | N/A | Y |
| N/A | 185 | OTHER | N/A | Y |
| N/A | 186 | OTHER | N/A | Y |
| N/A | 187 | OTHER | N/A | Y |
| N/A | 188 | PLEADINGS | **1 Pull:** CD pulled | Y |
| N/A | 189 | OTHER | **1 Pull:** CD pulled | Y |
| N/A | 190 | OTHER | **1 Pull:** CD pulled | Y |
| N/A | 191 | OTHER | **2 Pulls:** 2 Hard drives removed | Y |
| N/A | 192 | OTHER | N/A | Y |
| YES | 193 | PLEADINGS | **2 Pulls:**<br>**Pull 1:** 06-cv-0263 Dkt# 103, MONT318-337 **(001-020)**;<br>**Pull 2:** MONT288-296 **(001-009)**; | Y |
| N/A | 194 | OTHER | N/A | Y |
| YES | 195 | PLEADINGS | **1 Pull:** 3/22/07 Montgomery's Response to DoD's Request for Protection Order **(001-009)** | Y |
| YES | 196 | OTHER | **1 Pull:**<br>**Pull 1:** Prayer for Relief **(001-042)** | Y |
| YES | 197 | PLEADINGS | **1 Pull:**<br>**Pull 1:** 3/11/06 Dec of Flynn **(001-006)** | Y |
| N/A | 198 | DISCOVERY | N/A | Y |
| N/A | 199 | PLEADINGS | N/A | Y |
| N/A | 200 | PLEADINGS | N/A | Y |
| N/A | 201 | OTHER | Hard drives | N |
| N/A | 202 | OTHER | Hard drives | N |

# LINER FILES: DOCUMENT INVENTORY

| | | | | |
|---|---|---|---|---|
| N/A | 203 OTHER | Hard drives | N | |
| N/A | 204 OTHER | N/A | Y | |
| YES | 205 OTHER | **8 Pulls:**<br>**Pull 1:** 4/10/06 Email **(001-004);**<br>**Pull 2:** 10/31/07 Email **(001-002);**<br>**Pull 3:** 3/16-18/07 Email chain **(001-004);**<br>**Pull 4:** 3/16-18/07 Email chain **(001-007);**<br>**Pull 5:** 3/16-18/07 Email chain **(001-007);**<br>**Pull 6:** 6/23/07 Email **(001);**<br>**Pull 7:** 3/11/06 Dec of Montgomery for Return of Property -Unsigned- & 4/3/06 Reply Memo un Support of Motion for Return of Property **(001-033);**<br>**Pull 8:** 3/11/06 Dec of Flynn **(001-004)** | Y | |
| N/A | 206 OTHER | N/A | Y | |
| YES | 207 PLEADINGS | **6 Pulls:**<br>**Pull 1:** 2 CDs<br>**Pull 2:** Cover sheet and Index of Emails in "Inbox" **(001-0038)**<br>**Pull 3:** Index of Emails in "Sent" **(001-015)**<br>**Pull 4:** 1 CD<br>**Pull 5:** Index of Emails in "Inbox" **(001-037)**<br>**Pull 6:** Index of Emails in "Sent" **(001-016)** | Y | |
| N/A | 208 OTHER | N/A | Y | |
| YES | 209 PLEADINGS | **3 Pulls:**<br>**Pull 1:** Sealed Montgomery Declaration **(001-036)**<br>**Pull 2:** Working Chronology **(001-014)**<br>**Pull 3:** Sealed Montgomery Declaration **(001-022)** | Y | Pull 3: 001-022 |
| N/A | 210 OTHER | Hard drives | N | |

**LINER FILES: HARD DRIVE INVENTORY**

| HARD DRIVE No. | SERIAL No. | ADDITIONAL INFO | DOJ COPY SERIAL No. | CLIENT COPY SERIAL No. |
|---|---|---|---|---|
| BOX 105 | | | | |
| HD - 40 | WMAEH1731597 | Security Bag No. 075287 | | |
| HD - 41 | WCAEP1015275 | Security Bag No.075277 | | |
| HD - 42 | WMAMR1202131 | Security Bag No. 075269 | | |
| HD - 43 | ZFUG712N | Security Bag No.075256; Copy of WMA8C2315047 | | |
| HD - 44 | WMAEH1732002 | Security Bag No. 075292 | | |
| HD - 45 | 9QG8HSDQ | Security Bag No. 075273 | | |
| HD - 46 | WMA9P1151187 | Security Bag No.075284 | | |
| HD - 47 | 9QG8N147 | Security Bag No. 075245; Copy of WMAMR1203238 | | |
| HD - 48 | 6QF462VG | Security Bag No.075279; Copy of WCAEP1015275 | | |
| HD - 49 | WMAEP1123872 | Security Bag No. 075263 | | |
| HD - 50 | 3PM08V7Q | | | |
| HD - 51 | 5QD337JK | | | |
| HD - 52 | WMACK1617687 | Security Bag No. 75261 | | |
| HD - 53 | WMAEP1142476 | Security Bag No. 075286 | | |
| HD - 54 | RG0VEH9A | Security Bag No. 075290: Copy of WMAEH1732002 | | |
| HD - 55 | WMAMR1202248 | Security Bag No. 075260 | | |
| HD - 56 | WMAEH1283328 | Security Bag No.075289 | | |
| HD - 57 | WMAMR1277950 | Security Bag No.075281 | | |
| HD - 58 | WMAEH1202303 | Security Bag No. 075265 | | |
| HD - 59 | 6QF46574 | Security Bag No. 075271; Copy of WMAEH1202303 | | |
| HD - 60 | WCAL75136659 | Security Bag No. 075285 | | |

**LINER FILES: HARD DRIVE INVENTORY**

| | | | | |
|---|---|---|---|---|
| HD - 61 | 7BA08HPG | Security Bag No. 075288 | | |
| HD - 62 | WMA8C2315047 | Security Bag No. 075257 | | |
| HD - 63 | WMAMR1068824 | Security Bag No. 075267 | | |
| HD - 64 | WMAMR1203238 | Security Bag No. 075246 | | |
| HD - 65 | | | | |
| HD - 66 | | | | |
| HD - 67 | | | | |
| HD - 68 | | | | |
| HD - 69 | | | | |
| HD - 70 | | | | |
| HD - 71 | | | | |
| HD - 72 | | | | |
| HD - 73 | | | | |
| HD - 74 | | | | |
| HD - 75 | | | | |
| HD - 76 | | | | |
| HD - 77 | | | | |
| HD - 78 | | | | |
| HD - 79 | | | | |
| HD - 80 | | | | |
| HD - 81 | | | | |
| HD - 82 | | | | |
| HD - 83 | | | | |
| HD - 84 | | | | |
| HD - 85 | | | | |
| HD - 86 | | | | |
| HD - 87 | | | | |
| HD - 88 | | | | |
| HD - 89 | | | | |
| HD - 90 | | | | |
| **BOX 116** | | | | |
| HD - 1 | WMA8C4544113 | Security Bag No. 033654517 | | |
| HD - 2 | WCARW0431467 | Security Bag No. 075298; Copy of WMAEH2602257 | | |
| HD - 3 | WCARW0415948 | Security Bag No. 033654510; Copy of WMAEH2694097 | | |
| HD - 4 | WCA8C3998460 | Security Bag No. 033654515 | | |
| HD - 5 | WMAEH2694097 | Security Bag No. 033654518 | | |
| HD - 6 | WCAEP1014382 | Security Bag No. 033654520 | | |

**LINER FILES: HARD DRIVE INVENTORY**

| | | | | |
|---|---|---|---|---|
| HD - 7 | WMAEH2602257 | Security Bag No. 033654516 | | |
| HD - 8 | WCAEP1003948 | Security Bag No. 033654519 | | |
| HD - 9 | 9QG812MG | | | |
| HD - 10 | 9QJ0RXGJ | | | |
| | | BOX 127 | | |
| HD - 13 | WMAMR1538581 | | | |
| HD - 14 | WMAMR1612253 | | | |
| HD - 15 | WMAMR1624507 | | | |
| HD - 16 | WMA8C3243070 | | | |
| HD - 17 | WMAD15194737 | | | |
| HD - 18 | WMAD15335294 | | | |
| HD - 19 | 3CK00XXY | | | |
| HD - 20 | WMA8C1223396 | | | |
| HD - 21 | WCAD13691228 | | | |
| HD - 22 | WMAMR1673681 | | | |
| HD - 23 | WMAD16644525 | | | |
| HD - 24 | WMAMR1538197 | | | |
| HD - 25 | 3CK028W3 | | | |
| HD - 26 | WMAMR1538570 | | | |
| HD - 27 | WMAMR1509932 | | | |
| HD - 28 | WMAMR1580671 | | | |
| HD - 29 | WMAA61102098 | | | |
| HD - 30 | 2544801F3NQ0C6 | | | |
| HD - 31 | WMAMR1523649 | | | |
| HD - 32 | WMAMR1580666 | | | |
| HD - 33 | WMAMR1066012 | | | |
| HD - 34 | WMAMR1537929 | | | |
| HD - 35 | WMAMR1539942 | | | |
| HD - 36 | WMAMR1539825 | | | |
| HD - 37 | WCAD16502878 | | | |
| HD - 38 | WMAD15256807 | | | |
| HD - 39 | WMAMR1543003 | | | |
| | | BOX 191 | | |
| HD - 11 | 9QG7CDDE | Security Bag No. 072755 | | |
| HD - 12 | 6QG31F7K | Security Bag No.072754 | | |
| | | BOX 201 | | |
| HD - 65 | 3PM0686P | | | |
| HD - 66 | 9QM26YN3 | | | |
| HD - 67 | 9QM3FKKW | | | |
| HD - 68 | 3QD03188 | | | |
| | | BOX 202 | | |
| HD - 69 | 3QD08W2N | | | |
| HD - 70 | 3QD0L7T0 | | | |
| HD - 71 | 9QJ0WW9R | | | |
| | | BOX 203 | | |
| HD - 72 | 9QJ16874 | | | |
| HD - 73 | PAG2NLRC | | | |
| HD - 74 | 3QJ01RQ1 | | | |

**LINER FILES: HARD DRIVE INVENTORY**

| | | | | |
|---|---|---|---|---|
| HD - 75 | 3PM0LVN8 | | | |
| HD - 76 | 5QG06MMH | | | |
| **BOX 210 *Labeled as defective** | | | | |
| HD - 77 | RBRAPJNA | Security Bag No. 075274; Copy of WMA8C4544113 | | |
| HD - 78 | WCARW0431405 | Security Bag No. 075255; Copy of WCAEP1003948 | | |
| HD - 79 | RG0VEMRA | Security Bag No. 075254; Copy of WMAEP1142476 | | |
| HD - 80 | WCARW0431298 | Security Bag No. 033654504; Copy of WCAEP1014382 | | |
| HD - 81 | R7CRDRKK | Security Bag No. 075293; Copy of WMACK1617687 | | |
| HD - 82 | RG0VAUYA | Security Bag No. 075278; Copy of WMAEH1731597 | | |
| HD - 83 | RG0VEMKA | Security Bag No. 075283; Copy of WCAL75136659 | | |
| HD - 84 | 9QG8LXX5 | Security Bag No. 075295; Copy of WMAMR1277950 | | |
| HD - 85 | 9Q8N28G | Security Bag No. 075248; Copy of WMAMR1202131 | | |
| HD - 86 | N/A | N/A | | |
| HD - 87 | R7CRD72K | Security Bag No. 033654508; Copy of WMAEH1283328 | | |
| HD - 88 | RBRAA9VA | Security Bag No. 033654501; Copy of WCA8C3998460 | | |
| HD - 89 | 9QG8LSVQ | Security Bag No. 075252; Copy of WMAMR1202248 | | |

**LINER FILES: HARD DRIVE INVENTORY**

| | | | | |
|---|---|---|---|---|
| HD - 90 | RG0ZLL8A | Security Bag No. 075262; Copy of WMAEP1123872 | | |

# EXHIBIT C

Dennis Lee Montgomery  -  November 18, 2010

---

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA

In re:  Dennis and Kathleen   )
Montgomery                    )
                              )
Michael J. Flynn,             )
                              )
          Plaintiff,          )
                              )
          vs.                 )  Case No.: 2:10-bk-18510-bb
                              )
Dennis Lee Montgomery and     )
Brenda Kathleen Montgomery,   )
                              )
          Defendants.         )
_____)

Videotaped Deposition of:   DENNIS LEE MONTGOMERY
Date:                       November 18, 2010
Reported by:                Stephanie P. Borthwick
                            C.S.R. No. 12088

Page 3

```
 1      For the United States of America:
 2          U.S. DEPARTMENT OF JUSTICE
 3          CIVIL DIVISION
 4          BY:  CARLOTTA P. WELLS, Senior Counsel
 5          Federal Programs Branch
 6          20 Massachusetts Avenue, NW
 7          Room 7150
 8          Washington, DC  20530
 9          (202) 514-4522
10      Also Present:
11          Michael J. Flynn, Esq.
12          Sharon Raya, Paralegal to Ms. Wells
13          Tom (last name withheld), U.S. Government
14          Morgan (last name withheld), U.S.
15          Government
16      Videographer:
17          Jesse Navarro, Orravan Video Litigation
18          Services
19
20
21
22
23
24
25
```

Page 3

---

```
 1      Deposition of DENNIS LEE MONTGOMERY, taken on
 2 behalf of the Plaintiff, before Stephanie P.
 3 Borthwick, a Certified Shorthand Reporter,
 4 commencing at the hour of 9:20 a.m., Thursday,
 5 November 18, 2010, at the offices of Yates Court
 6 Reporters, 74967 Sheryl Avenue, Palm Desert,
 7 California.
 8 APPEARANCES:
 9      For the Plaintiff:
10          CONANT LAW, LLC
11          Attorneys at Law
12          BY:  CHRISTOPHER J. CONANT, ESQ.
13          730 17th Street
14          Suite 200
15          Denver, Colorado  80202
16          (303) 298-1800
17      For the Defendants:
18          DION-KINDEM & CROCKETT
19          Attorneys at Law
20          BY:  WILLIAM E. CROCKETT, ESQ.
21          LNR Warner Center
22          21271 Burbank Boulevard
23          Suite 100
24          Woodland Hills, California  91367-6667
25          (818) 883-4400
```

Page 2

```
 1                    INDEX
 2
 3 Deposition of DENNIS LEE MONTGOMERY
 4      Taken on November 18, 2010
 5
 6 Examination By:                          Page
 7 MR. CONANT                                 24
 8
 9 Information Requested:
10      (None)
11
12 Questions Instructed Not to Answer:  Page Line
13 Q.  Has your attorney, to your           45    3
14     knowledge, been in contact with any
15     agency of the United States
16     government concerning your personal
17     property that's listed on these
18     schedules?
19 Q.  Is it your testimony,                46    9
20     Mr. Montgomery, that you have no
21     personal property that falls within
22     the description of this paragraph
23     here on page 22-9?
24 ///
25 ///
```

Page 4

Dennis Lee Montgomery  -  November 18, 2010

| | | | |
|---|---|---|---|
| 1 | Q. | Have you ever described to anyone in | 53   3 |
| 2 | | any form a noise filtering | |
| 3 | | technology that you had created? | |
| 4 | Q. | You don't recall if it's true or | 77   25 |
| 5 | | not, Mr. Montgomery? | |
| 6 | Q. | You mean to tell me that you met | 82   21 |
| 7 | | with someone in the vice president's | |
| 8 | | office and you can't recall what it | |
| 9 | | was about, Mr. Montgomery? | |
| 10 | Q. | This is about the source code, isn't | 85   15 |
| 11 | | it, Mr. Montgomery? | |
| 12 | Q. | Do you understand the English | 99   19 |
| 13 | | language, Mr. Montgomery? | |
| 14 | Q. | Well, so you visited the vice | 107   12 |
| 15 | | president's office, but you don't | |
| 16 | | recall the nature of the meeting? | |
| 17 | Q. | What would cause your attorney to | 112   16 |
| 18 | | put a statement like that on your | |
| 19 | | bankruptcy schedule? | |
| 20 | Q. | Can you explain to me your | 119   6 |
| 21 | | conversations with Edra Blixseth | |
| 22 | | concerning -- | |
| 23 | Q. | -- the preparation of this document? | 119   11 |
| 24 | /// | | |
| 25 | /// | | |

Page 5

| | | | |
|---|---|---|---|
| 1 | Q. | Have you defrauded Mr. Kennedy in | 144   25 |
| 2 | | connection with his investment in | |
| 3 | | Demaratech, LLC? | |
| 4 | Q. | Did -- Mr. Montgomery, during | 148   10 |
| 5 | | President Obama's inauguration in | |
| 6 | | January of 2009, were you the cause | |
| 7 | | of any form of terror -- heightened | |
| 8 | | terror alert in the Washington, | |
| 9 | | D.C., area? | |
| 10 | Q. | Do you ever monitor PACER in | 150   20 |
| 11 | | Montana, U.S. District Court -- U.S. | |
| 12 | | Bankruptcy Court in the District of | |
| 13 | | Montana? | |
| 14 | Q. | What attorney-client communications | 151   18 |
| 15 | | would lead Mr. Flynn to believe that | |
| 16 | | you were causing terror threats in | |
| 17 | | or around January of 2009? | |
| 18 | Q. | When did Mr. Flynn cease to be your | 152   4 |
| 19 | | attorney? | |
| 20 | Q. | So you're suggesting that you didn't | 157   12 |
| 21 | | write that, Mr. Montgomery? | |
| 22 | /// | | |
| 23 | /// | | |
| 24 | /// | | |
| 25 | /// | | |

Page 7

| | | | |
|---|---|---|---|
| 1 | Q. | Mr. Montgomery, can you please | 123   15 |
| 2 | | explain to me your conversation with | |
| 3 | | Ms. Montgomery concerning the | |
| 4 | | preparation of this document, which | |
| 5 | | is marked as Plaintiff's Exhibit | |
| 6 | | No. 7. | |
| 7 | Q. | Isn't it true, Mr. Montgomery, that | 125   8 |
| 8 | | you worked with Ms. Blixseth to help | |
| 9 | | her kill the sale of the Yellowstone | |
| 10 | | Club to Cross Harbor? | |
| 11 | Q. | Mr. Montgomery, is this statement in | 140   7 |
| 12 | | here regarding -- where it says | |
| 13 | | Dennis Montgomery and Demaratech, it | |
| 14 | | has been their desire from the first | |
| 15 | | contact to try and sell their | |
| 16 | | technology to various institutions | |
| 17 | | of the Israeli government, including | |
| 18 | | Mossad and Army Intelligence -- | |
| 19 | Q. | Is this a true statement, | 141   15 |
| 20 | | Mr. Montgomery, in any sense?  Has | |
| 21 | | it ever been your desire to sell | |
| 22 | | technology to various institutions | |
| 23 | | within the Israeli government?  Is | |
| 24 | | that a true statement, | |
| 25 | | Mr. Montgomery? | |

Page 6

| | | | |
|---|---|---|---|
| 1 | Q. | Why would Edra tell you, "With all | 165   12 |
| 2 | | going on, much of which you | |
| 3 | | encouraged me to move forward with, | |
| 4 | | why are you doing this at this | |
| 5 | | time?" | |
| 6 | Q. | Mr. Montgomery, how does your | 166   2 |
| 7 | | relationship with Edra Blixseth | |
| 8 | | implicate you in any criminal | |
| 9 | | proceeding? | |
| 10 | Q. | Do you know why the Israeli | 171   24 |
| 11 | | government would be? | |
| 12 | Q. | Why would Edra say, "You are the key | 180   5 |
| 13 | | to our success"? | |
| 14 | Q. | Is it hard to recall what a person | 227   25 |
| 15 | | does with $800,000, Mr. Montgomery? | |
| 16 | Q. | You had a plan, because you knew the | 232   5 |
| 17 | | software was always bogus and you | |
| 18 | | knew that the only way to get out | |
| 19 | | from the sanction was to get rid of | |
| 20 | | the litigation so you settled by | |
| 21 | | executing the $25 million judgment. | |
| 22 | | You knew at the time that you could | |
| 23 | | never satisfy the $25 million | |
| 24 | | judgment, so you knew the only way | |
| 25 | | to get out from the $25 million | |

Page 8

2 (Pages 5 to 8)

Dennis Lee Montgomery   -   November 18, 2010

| | | | |
|---|---|---|---|
| 1 | | judgment was to file for bankruptcy. | |
| 2 | | And the whole time before that you | |
| 3 | | knew that the software was | |
| 4 | | fraudulent, yet you're getting paid | |
| 5 | | $1.2 million a year for this | |
| 6 | | fraudulent software.  So the whole | |
| 7 | | time you're hoarding away this cash | |
| 8 | | that you're getting, the | |
| 9 | | $1.2 million a year you're getting, | |
| 10 | | because you know at some -- you know | |
| 11 | | it's all going to collapse when | |
| 12 | | you're discovered that your software | |
| 13 | | is a complete fraud. | |
| 14 | Q. | Didn't you know the whole time the | 233   17 |
| 15 | | software was bogus, that you were | |
| 16 | | pedaling bogus software? | |
| 17 | Q. | The source code that we've been | 234   3 |
| 18 | | referring to all day today in the | |
| 19 | | Plaintiff's Exhibit 3, in these | |
| 20 | | emails, the source code, you knew it | |
| 21 | | was bogus didn't you, | |
| 22 | | Mr. Montgomery? | |
| 23 | /// | | |
| 24 | /// | | |
| 25 | /// | | |

Page 9

| 1 | 7 | December 12, 2007, letter to | 116 |
|---|---|---|---|
| 2 | | Timothy Blixseth on the | |
| 3 | | letterhead of the U.S. | |
| 4 | | Department of Justice | |
| 5 | 8 | 56-page printout of back | 132 |
| 6 | | records for Demaratech, LLC | |
| 7 | 9 | Two-page June 30, 2010, email | 137 |
| 8 | | from Concerned Citizen to | |
| 9 | | Michael.west@ic.fbi.gov re | |
| 10 | | Montgomery | |
| 11 | 10 | February 26, 2009, email | 155 |
| 12 | | string, top email from | |
| 13 | | LearG2@aol.com to | |
| 14 | | dennis@ncoder.net et al., re | |
| 15 | | Blxware | |
| 16 | 11 | Six pages of indictments | 166 |
| 17 | 12 | Email string dated November | 169 |
| 18 | | 11, 2010, between George | |
| 19 | | Birnbaum and Tim Blixseth re | |
| 20 | | Montgomery | |
| 21 | 13 | Email string, top email dated | 175 |
| 22 | | February 26, 2009, from | |
| 23 | | LearG2@aol.com to | |
| 24 | | dennis@ncoder.net, et al., re | |
| 25 | | Installation | |

Page 11

| 1 | Exhibits: | | |
|---|---|---|---|
| 2 | 1 | 36-page U.S. Bankruptcy Court | 33 |
| 3 | | Summary of Schedules filed | |
| 4 | | 7/13/09 | |
| 5 | 2 | Six-page Plaintiff's Second | 49 |
| 6 | | Set of Requests for Production | |
| 7 | | of Documents | |
| 8 | 3 | 23-page Sealed Declaration of | 54 |
| 9 | | Dennis Montgomery in Support | |
| 10 | | of his Oppositions to DOD's | |
| 11 | | and ETreppid's Motions for | |
| 12 | | Protective Orders | |
| 13 | 4 | Six-page Dennis Montgomery's | 61 |
| 14 | | Responses to Plaintiff's | |
| 15 | | Requests for Production of | |
| 16 | | Documents, Set Two | |
| 17 | 5 | Three-page Second Declaration | 90 |
| 18 | | of SA Michael A. West | |
| 19 | 6 | November 8, 2007, redacted | 114 |
| 20 | | letter to Timothy Blixseth on | |
| 21 | | the letterhead of U.S. | |
| 22 | | Department of Justice | |
| 23 | /// | | |
| 24 | /// | | |
| 25 | /// | | |

Page 10

| 1 | 14 | Two-page email from | 177 |
|---|---|---|---|
| 2 | | LearG2@aol.com to | |
| 3 | | dennis@ncoder.net, et al., re | |
| 4 | | Ratheon and other | |
| 5 | | opportunities | |
| 6 | 15 | One-page email string, top | 189 |
| 7 | | email from LearG2@aol.com to | |
| 8 | | dennis@ncoder.net, et al., re | |
| 9 | | Secret Service | |
| 10 | 16 | Six-page article entitled The | 195 |
| 11 | | Man Who Conned the Pentagon | |
| 12 | 17 | Eight-page email and | 201 |
| 13 | | attachment dated August 23, | |
| 14 | | 2007, from Patricia Yarborough | |
| 15 | | to Jory Russell re Dennis | |
| 16 | | Montgomery | |
| 17 | 18 | 143 pages of bank records | 219 |
| 18 | 19 | 15 pages of a Wells Fargo | 285 |
| 19 | | Portfolio Management Account | |
| 20 | | for January 2007 | |
| 21 | 20 | 36 pages of bank records of | 303 |
| 22 | | Istvan Burgyan, Bates | |
| 23 | | Nos. 00349-384 | |
| 24 | /// | | |
| 25 | /// | | |

Page 12

3  (Pages 9 to 12)

| | | Page 13 | |
|---|---|---|---|
| 1 | 21 | 19-page Wells Fargo PMA | 306 |
| 2 | | Package of Istvan Burgyan, | |
| 3 | | Bates Nos. 00552-70 | |
| 4 | 22 | Five pages of Istvan Burgyan's | 309 |
| 5 | | bank records, Bates | |
| 6 | | Nos. 00943-47 | |
| 7 | 23 | Two-page Bank of America | 312 |
| 8 | | statement of Istvan Burgyan, | |
| 9 | | Bates Nos. 00933-34 | |
| 10 | 24 | One page of photocopied | 313 |
| 11 | | documents including a | |
| 12 | | cashier's check paid to | |
| 13 | | Caesar's Casino and Wells | |
| 14 | | Fargo Bank records. | |
| 15 | 25 | 18 pages of MontBleu Resort | 315 |
| 16 | | Memo Reports | |
| 17 | 26 | Three-pages of win/loss | 324 |
| 18 | | documents | |
| 19 | 27 | 37 pages of Customer | 328 |
| 20 | | Transaction Inquiries | |
| 21 | 28 | 11 pages of miscellaneous | 330 |
| 22 | | casino documents | |
| 23 | /// | | |
| 24 | /// | | |
| 25 | /// | | |

Page 13

THE VIDEOGRAPHER: Good morning. Here
begins Media No. 1 in the video deposition of Dennis
Lee Montgomery in the matter of Michael J. Flynn
versus Dennis Lee Montgomery, et al., in the
United States Bankruptcy Court of California, Case
No. 2:10-bk-18510-bb.

Today's date is November 18th, 2010. The
time is 9:20 a.m. This deposition is being taken at
74967 Sheryl Avenue, Palm Desert, California, and
was made at the request of Mr. Christopher Conant of
the law offices of Conant Law, LLC.

The videographer is Jesse Navarro here on
behalf of Orravan Video Litigation Services,
Indian Wells, California.

Would counsel and all present please
identify yourselves and state whom you represent.

MR. CONANT: Christopher Conant for the
plaintiff, Michael J. Flynn.

MR. FLYNN: And Michael J. Flynn in
persona.

MS. WELLS: Carlotta Wells on behalf of the
United States and with the United States Department
of Justice. Sharon Raya is with me from my office.
With me, also, are Morgan and Tom who are with the
government and I can't disclose anything further

Page 14

because to do so would violate the terms of the
United States protective order, which all the
parties to the bankruptcy proceeding have agreed to.

MR. CROCKETT: Bill Crockett on behalf of
Dennis Montgomery.

THE WITNESS: Dennis Montgomery.

THE VIDEOGRAPHER: Would the court reporter
please swear in the witness.

THE REPORTER: Please raise your right
hand.

Do you solemnly state under penalty of
perjury that the testimony you will give in this
matter will be the truth, the whole truth, and
nothing but the truth?

THE WITNESS: Yes.

THE REPORTER: Thank you.

MR. CONANT: Okay. Thank you.

Before we start examining the witness, I
want to state for the record that there are present
in the room four representatives from the U.S.
Government, two of which apparently have no last
name.

We'll ask on the record of Ms. Wells to
provide their last names and the government agency
that they purportedly work for.

Page 15

MS. WELLS: And I cannot, because to do so
would violate the terms of the United States
protective order.

MR. CONANT: Ms. Wells, do you have a copy
of the protective order in front of you?

MS. WELLS: I do. Do you have one?

MR. CONANT: I have a copy in front of me.
I'd like to actually get it admitted as an exhibit
in this deposition.

Let me -- while I work on getting extra
copies to admit as an exhibit, Ms. Wells, can you
review the protective order and identify which
specific portion of the protective order you're --

MS. WELLS: Am I a witness now? All I can
tell you is it's pretty self-evident from the face
of the United States protective order what's
protected, what isn't.

The information that's protected is set
forth in paragraphs 2 and paragraphs 3.

MR. CONANT: How does those pertain
specifically to the identities of these gentlemen
and why they're here today?

MS. WELLS: I think it's self-evident and
if you want to read those paragraphs into the
record, feel free to.

Page 16

4 (Pages 13 to 16)

YATES COURT REPORTERS    800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

1        MR. CONANT:  I don't -- well --
2        MS. WELLS:  Paragraphs 2 and 3 of the
3   United States protective order, which is
4   Document 253, District of Nevada Case File 30656.
5        MR. CONANT:  Ms. Wells, who is making the
6   decision regarding what is -- why these gentleman
7   are here?
8        Who in the government made a decision why
9   these gentlemen are here?  Who in the government
10  made a decision for these two gentlemen to be here
11  today?
12       MS. WELLS:  This particular deposition is
13  being handled in the manner that all information
14  related to this case has been handled.  It's been a
15  joint decision between those attorneys representing
16  the United States' interests and the agencies whose
17  information we're protecting.
18       That's all I'm going to say.
19       MR. CONANT:  Were these gentleman at all
20  involved in any way in the litigation in Nevada?
21       MS. WELLS:  I'm not going to go any further
22  than what I've already said.
23       MR. CONANT:  Were you meeting with Judge
24  Pro in the U.S. District Court for the district of
25  Nevada yesterday?

Page 17

1   reviewed in connection with your meeting with Judge
2   Pro that were -- that originated from my client
3   Michael Flynn?
4        MS. WELLS:  This is not the subject of this
5   deposition.  We're not here to talk about this.  If
6   Mr. Flynn wants to have a conversation with me about
7   this we can have it, but it's not appropriate for
8   the record.
9        MR. CONANT:  It is appropriate for the
10  record.  You are --
11       MS. WELLS:  It does -- what does that have
12  to do with the information we're here to protect
13  now?  The long and the short of it is that there
14  were documents, as you know, from the Order that the
15  court in Montana sent to Judge Pro.
16       He asked the United States to take a look
17  at them to determine the extent to which there's
18  information that may or may not be protected under
19  the United States protective order.
20       Upon the limited review that we did in his
21  chambers yesterday, we determined that there was
22  enough of a question there that we need to take the
23  documents back with us to Washington to do a more
24  thorough review.  That's it.
25       MR. CONANT:  What documents did you review?

Page 19

1        MS. WELLS:  At Judge Pro's insistence, yes.
2   We met with him in his chambers yesterday.
3        MR. CONANT:  Who is "we"?
4        MS. WELLS:  The people representing the
5   United States Department of Justice and the United
6   States in this case.
7        MR. CONANT:  Who were those?  I'm asking
8   for the identities, Ms. Wells.
9        MS. WELLS:  All I'm saying is that people
10  from the government met with him and I mean it
11  actually -- if you really need to know, it was the
12  four of us here.
13       MR. CONANT:  Did Judge Pro -- when did
14  Judge Pro contact you to meet with him?
15       MS. WELLS:  I'm not going to say anything
16  more other than we're complying with the terms of
17  the order that Judge Pro entered, I believe it was
18  October 30th, and we were there because of that
19  order.
20       MR. CONANT:  What order?
21       MS. WELLS:  Let's see.
22       It was the order dated October 28th, 2010,
23  Docket No. 1172, same case, Montgomery versus
24  eTreppid Technology.
25       MR. CONANT:  Were there any documents

Page 18

1        MS. WELLS:  The documents that the court in
2   Montana sent.
3        MR. CONANT:  What documents were those?
4        MS. WELLS:  I didn't take a list.  It's not
5   a very big -- it's a small pile, not even an inch
6   thick.
7        MR. FLYNN:  This is Michael Flynn.  I'm
8   going to put a statement on the record.
9        The documents that were given to David
10  Cotner, counsel for the trustee in the Montana
11  bankruptcy proceeding, were very limited and I
12  specifically reviewed them before giving them to
13  Cotner.
14       They were apparently subsequently given to
15  Judge Kirscher and they had all been previously
16  reviewed by the federal government, Department of
17  Justice, and approved.  And except for the Sandoval
18  complaint, they are publicly on file in the Nevada
19  District Court and can be picked up online.
20       So unless documents were added that I don't
21  know about -- and I don't know about any of the
22  documents, I don't have the identity of the
23  documents that were given to Judge Kirscher or
24  subsequently conveyed to Judge Pro -- there are no
25  documents that do not comply with the US protective

Page 20

5 (Pages 17 to 20)

Dennis Lee Montgomery  -  November 18, 2010

Page 21

1  order in any way.
2        So if either documents were added by
3  someone or there has been a change in the position
4  of the Department of Justice with regard to the
5  scope of the protective order, then there is nothing
6  in any of the documents given to Cotner, apparently
7  passed on to Judge Kirscher, which would violate the
8  terms of the U.S. protective order.
9        MR. CONANT:  Do you have a copy, Ms. Wells,
10 of the letter or whatever communication there was
11 between Judge Kirscher and Judge Pro?
12       MS. WELLS:  No.
13       MR. CONANT:  Who at the government have you
14 been talking to regarding the matter involving the
15 letter from Judge Kirscher to Judge Pro?
16       MS. WELLS:  I'm not here to answer these
17 questions.  I'm here to enforce the terms of the
18 United States protective order and only people with
19 the United States have that authority and the
20 ability to determine what's protected and what isn't
21 and that's all we're here for.
22       It's a very limited role that we're
23 playing, it's a very limited role, and I can tell
24 you on the record that what we're doing here today
25 is entirely consistent with what we've done ever

Page 22

1  since we first got involved in this case and ever
2  since Judge Pro acknowledged there was information
3  to be protected.
4        That's all I'm going to say and I'll keep
5  saying the same thing over and over again.
6        MR. FLYNN:  It's completely inaccurate.
7  For the record, these gentlemen, however nice
8  gentleman they may be, never participated and never
9  appeared in courtrooms in any of the Nevada
10 proceedings, Ms. Wells, and you know it and I know
11 it.
12       So this four-person deluge from the
13 Department of Justice in Dennis Montgomery's
14 deposition is apparently being done for some reasons
15 completely extraneous to the materials in the
16 protective order, but why don't we get started.
17       MR. CONANT:  I just want to state one last
18 thing for the record.  When I deposed Istvan Burgyan
19 in this very case on September 22nd, the U.S.
20 Government showed no interest in this matter.
21       I had to call Mr. Gomez at his office in
22 D.C. halfway through the deposition, because there
23 became an issue regarding the protective order.
24 Mr. Gomez was completely indifferent regarding this
25 case and now, for some reason, we have four people

Page 23

1  here from the US government, two of who, apparently,
2  have no last names and are from some unidentified
3  agency with the government.
4        And for the record, Ms. Wells is not
5  indicating how their involvement is at all
6  implicated in the protective order.  The protective
7  order only governs issues concerning intelligence
8  agencies as defined in the National Security Act and
9  we have no indication of what agencies these
10 gentlemen are with and whether they're with an
11 intelligence agency or whether it's an
12 administrative branch of the government that's not
13 included within the National Security Act as an
14 intelligence agency.
15       So we simply don't know what is -- what is
16 purportedly being protected by the protective order
17 or not.
18       MR. FLYNN:  We think -- at this juncture
19 I'll put on the record that I believe -- I didn't
20 believe it during the Nevada proceedings, I thought
21 there were legitimate interests to be protected in
22 terms of identities of intelligence agency
23 individuals, but at this point I believe that the
24 Department of Justice has gone far beyond that and
25 is now using, under the guise of national security

Page 24

1  for reasons related to the facts that I put in the
2  emails to you, Carlotta, has gone far beyond the
3  scope of national security in an effort to cover up
4  or conceal the fraudulent activities of
5  Mr. Montgomery as I've repeatedly said in emails.
6        So why don't we just start.
7                EXAMINATION
8  BY MR. CONANT:
9        Q.  Okay.  All right.  Turning to
10 Mr. Montgomery.  Mr. Montgomery, let's start
11 something.
12       Can you state your name for the record.
13       A.  Dennis Montgomery.
14       Q.  What's your -- do you have a middle name?
15       A.  Lee.
16       Q.  Do you understand what it means to take a
17 deposition, Mr. Montgomery?
18       A.  Yes.
19       Q.  What do you understand that to mean?
20       A.  You're going to ask me questions; I'm going
21 to answer them.
22       Q.  Do you know -- do you understand that your
23 testimony today is under the penalty of perjury?
24       A.  Yes.
25       Q.  Do you understand what that means?

6 (Pages 21 to 24)

Dennis Lee Montgomery   -   November 18, 2010

Page 25

1    A.    Yes.
2    Q.    What does it mean to you?
3    A.    You've got to tell the truth.
4    Q.    What happens if you don't tell the truth?
5    A.    You get in trouble.
6    Q.    What kind of trouble?
7    A.    Whatever.
8    Q.    What does that mean?
9          MR. CROCKETT:  Calls for speculation.  Next
10   question, Counsel.
11   BY MR. CONANT:
12   Q.    Mr. Montgomery, I'll represent to you that
13   if you do not tell the truth and you unintentionally
14   do not tell the truth you could be prosecuted by the
15   federal government for lying under oath and that
16   carries with it all sorts of criminal penalties,
17   which I'm sure your attorney can advise you about.
18         Mr. Montgomery, have you brought any
19   documents with you today to this deposition?
20   A.    No.
21   Q.    All right.  Mr. Montgomery, are you a
22   United States citizen?
23   A.    Yes.
24   Q.    Can you briefly describe to me your
25   background, your educational background, and your

Page 27

1    Q.    Doing what with computers?
2    A.    Biomedical work.
3    Q.    Mr. Montgomery, what kind of biomedical
4    work with computers were you doing?
5    A.    Electrocardiogram, blood gas analysis,
6    pulmonary function, those kinds of functions.
7    Q.    Functions.
8          How does that relate to -- what would you
9    do with computers?  Would you code software
10   programs?
11   A.    Yes.
12   Q.    And what is your background in software
13   development?
14   A.    Well, I started it then, at that period of
15   time.  The hospital had bought a number of computers
16   and were trying to do at that time, I believe,
17   automated EKG analysis and I was working with a
18   group of cardiologists to do it.
19   Q.    So at some point along the line is it fair
20   to say that you learned how to program computer
21   software?
22   A.    Yes.
23   Q.    How did you learn that?
24   A.    I just learned it.
25   Q.    Did you read books about it?

Page 26

1    work background?
2    A.    Go on?
3          I went to Grossmont College as a -- I got
4    an AA in biomedical technology.
5          Is that what you want, me to go forward
6    from there?
7    Q.    Yeah.  What year did you graduate from
8    Grossmont?
9    A.    I don't recall.  I think '73, '74.
10   Q.    Yeah, please.
11   A.    I went to San Diego State for a year -- I
12   believe, I don't remember the exact time -- and then
13   I began working as a biomedical technician at local
14   hospitals.
15   Q.    Okay.  From what years did you work as a
16   biomedical --
17   A.    I think '73 to, I would say, '76, '77.  I
18   don't recall specifically the exact date.
19   Q.    Okay.  When did you -- what did you do
20   after you worked in the hospital?
21   A.    I went to work as a consultant.
22   Q.    What does that mean, "consultant"?
23   A.    I was just trying to get work.
24   Q.    What kind of work?
25   A.    Computer.

Page 28

1    A.    I mean that's 30 years ago.  Yes, I'm sure
2    I read books.
3    Q.    Do you have any formal training in --
4    A.    I think there were computer programming
5    classes that were offered with the program.  I don't
6    recall at the time, because the PC wasn't available
7    yet.  They didn't come out to '81.
8          MR. FLYNN:  Did you take any of these
9    classes.
10   BY MR. CONANT:
11   Q.    Did you take any of these classes?
12   A.    I don't recall specifically.
13   Q.    So you don't recall whether you've ever
14   taken any class where you can learn how to program
15   computer software?
16   A.    I don't remember the list of classes.  I
17   just don't recall.
18   Q.    Have you ever taken a class?
19   A.    I don't -- at times I had to have, yes,
20   because there were classes that I took -- at the
21   time those computers were Hewlitt Packard.  They
22   were not IBM-based and I know I went to Hewlitt
23   Packard classes.
24   Q.    So you took some classes offered my Hewlitt
25   Packard?

7 (Pages 25 to 28)

Dennis Lee Montgomery   -   November 18, 2010

1      A.    By the people making the computers.
2      Q.    What years were those?
3      A.    Same time frame we discussed, between the
4  time while I was going to Grossmont College and
5  San Diego State and then, I would say, up until even
6  after I left as a consultant.
7      Q.    I'm looking for some specific years.
8      A.    '73 to '80 I guess, let's just say.
9      Q.    Okay.  So how many classes in computer --
10     A.    I'm sorry.
11     Q.    Let me just back up here, so we can get
12 this out on the record for the court reporter
13 it's challenging when we speak over each other, so I
14 will try to not interrupt you, if you could try not
15 to start your answer before I finish my question.
16     A.    All right.
17     Q.    Okay.  So how many classes in software
18 programming have you taken from, say, 2010 until,
19 say, 1970?
20     A.    What do you mean by "classes"?
21     Q.    Were there -- where you had an instructor
22 who's teaching you how to, you know, create software
23 code.
24           MR. CROCKETT:  Question is vague.
25 Ambiguous.  Lacks foundation.
                                            Page 29

1  BY MR. CONANT:
2      Q.    Has any instructor ever taught you how to
3  write computer code, Mr. Montgomery?
4      A.    What do you mean "computer code"?
5           MR. CROCKETT:  I will object to the
6  question on the grounds as vague.
7           MR. CONANT:  I'm objecting to the fact that
8  your client is evading the question.
9           MR. CROCKETT:  Well, if you want to object
10 to your questions, knock yourself out.
11          MR. FLYNN:  Ask him --
12 BY MR. CONANT:
13     Q.    Do you know what source code is,
14 Mr. Montgomery?
15          MR. CROCKETT:  I'm sorry, I want to enter
16 an objection right here.  This gentleman is not
17 admitted as an attorney in the case.  He is the
18 plaintiff.  He's not admitted pro hoc.  He's not
19 licensed in the state of California.
20          Is he asking the questions or --
21          MR. CONANT:  Mr. Crockett, I'll conduct the
22 deposition in the manner I feel appropriate.  He's
23 the plaintiff here.  He can --
24          MR. CROCKETT:  You want to sit in his lap?
25          MR. CONANT:  Let me finish, please.
                                            Page 31

1  BY MR. CONANT:
2      Q.    Do you understand the question,
3  Mr. Montgomery?
4      A.    Well, I'm not certain if you've ever asked
5  me that I ever went to a class on computers.
6      Q.    Yeah, correct.
7      A.    Class meaning one time a week?  I don't --
8      Q.    I don't know.  That's what I'm asking.  I
9  just want to know how much training, formal or
10 informal, you have in programming computer software.
11     A.    What type of computers are you referring
12 to?
13     Q.    I don't know.  I'm not an expert in
14 computers.  I'm a lawyer.  I'm not a -- I'm not a
15 computer guy, so that's why I'm asking.
16          MR. CROCKETT:  Have you --
17          MR. CONANT:  Mr. Crockett, please, let me
18 finish my question.
19          MR. CROCKETT:  Go right ahead.  Is your
20 question finished?
21          Is your question finished?  Is your
22 question finished?
23          You're asking me to wait.
24          MR. FLYNN:  Just ask if any instructor ever
25 taught him how to write code.
                                            Page 30

1           He can participate in this deposition in
2  any manner that I feel appropriate.
3           MR. CROCKETT:  Okay.
4           MR. CONANT:  He's not harassing the
5  witness.  He's not doing anything unethical.
6           I'll conduct the deposition, thank you.
7           MR. CROCKETT:  Is there a question pending?
8  BY MR. CONANT:
9      Q.    Do you know, Mr. Montgomery, what source
10 code is?
11     A.    Yes.
12     Q.    What does the word source code mean to you?
13     A.    A language used by a compiler to generate
14 source code, to generate an executable code.
15     Q.    I don't understand what any of that means.
16 Can you explain to me what a compiler is?
17     A.    It's a program written by a person that
18 makes a development, a system development, for a
19 computer language and gives you a number of tools by
20 which you are to generate programs to run on that
21 platform.
22     Q.    Have you ever had any training in how to
23 develop source code?
24     A.    I'm sure I have.
25     Q.    What is that training?
                                            Page 32

                                    8 (Pages 29 to 32)

Dennis Lee Montgomery  -  November 18, 2010

Page 33

1    A.   I don't recall specifically.
2    Q.   Okay.  So is it fair to say,
3  Mr. Montgomery, that you know how to write source
4  code, but you don't recall how you ever learned to
5  write it?
6        MR. CROCKETT:   Question's vague and
7  ambiguous.  Lacks foundation.  May assume facts not
8  in evidence.
9        You think you can answer it as it's
10  phrased, go ahead.
11        THE WITNESS:   You kind of just learn it
12  over the years.  As the technology develops, so do
13  you kind of with it.  That's my answer.
14        MR. CONANT:   Mr. Montgomery, I'm going to
15  hand to you what will be marked as --
16        You're going to have to help me keep track
17  here.  We'll be on Exhibit 1.
18        I only have three copies here.  I only
19  have -- the suitcase is only so big, so I'll hand
20  one to you; if you want the copy --
21        You'll mark the one that the witness has?
22        THE REPORTER:   Yeah.
23        (Exhibit 1 was marked for identification.)
24        MR. CONANT:   Mr. Crockett.
25        MR. CROCKETT:   Are you starting with 1?

Page 34

1        MS. WELLS:   Can I see a copy, just take a
2  look at it for a second?
3        MR. FLYNN:   We're going to go to the part
4  where the technology is listed.
5        MS. WELLS:   That's fine.
6  BY MR. CONANT:
7    Q.   Mr. Montgomery, can you please review this
8  document that I've handed you.
9    A.   Okay.
10    Q.   Let me know when you're reviewed it to your
11  satisfaction.
12        MR. FLYNN:   I'll mark the technology
13  section for the declaration.
14        MR. CONANT:   Okay.
15        THE WITNESS:   Okay.
16  BY MR. CONANT:
17    Q.   Okay.  Thank you, Mr. Montgomery.  Now
18  before I forget, I just had a few questions I want
19  to ask and then we'll move on to the schedule.
20        Can you tell me the last time you
21  communicated with Edra Blixseth?
22    A.   I think it was in the last week.
23    Q.   What did you communicate with her?
24    A.   I don't recall.
25    Q.   How did you communicate with her?

Page 35

1    A.   I talked on the phone.
2    Q.   On the phone?
3    A.   Yeah.
4    Q.   You talk about this deposition?
5    A.   I don't believe so.
6    Q.   Did you talk about anything regarding
7  Mr. Blixseth, Timothy L. Blixseth?
8    A.   I don't recall.
9    Q.   Anything regarding Mr. Flynn?
10    A.   I don't recall.
11    Q.   So you had a conversation with Ms. Blixseth
12  a week ago, but you don't recall anything about the
13  conversation; is that accurate, Mr. Montgomery?
14    A.   I don't recall specifically what we talked
15  about.
16    Q.   That wasn't it.  That didn't answer my
17  question.
18    A.   Okay.  I'm sorry.
19    Q.   Is it fair to say you talked to
20  Ms. Blixseth a week ago, but you have no idea what
21  you talked to her about?
22        MR. CROCKETT:   That mischaracterizes what
23  he said.  He said he didn't recall.
24        MR. CONANT:   I'm asking him to answer my
25  question.

Page 36

1        THE WITNESS:   I just did.  I already did.
2  I said I don't recall.
3  BY MR. CONANT:
4    Q.   It was a yes-or-no question.
5    A.   Well, if I don't recall I guess the answer
6  is no, I don't recall.
7    Q.   You don't recall.
8        Mr. Montgomery, yesterday you were in
9  Las Vegas, were you not?
10    A.   Yes.
11    Q.   What were you doing in Las Vegas yesterday?
12    A.   I'm going to take the -- I'm going invoke
13  my right to the Fifth Amendment.
14    Q.   Mr. Montgomery, are you aware of any
15  criminal proceedings against you at this time?
16    A.   I'm going to invoke my right under the
17  Fifth Amendment.
18    Q.   Well, I'm not asking you to tell me
19  anything about what you may have done.  I'm asking
20  you are you aware of any criminal proceedings
21  against you at this time?
22        MR. CROCKETT:   Counsel, he has advised you
23  and I will advise you that he is taking his Fifth
24  Amendment privilege and he's not going to answer
25  that question.

9  (Pages 33 to 36)

Dennis Lee Montgomery  -  November 18, 2010

```
 1          And if you have a difficulty with it, I'm
 2  sure we can take it up with a judge.
 3          MR. CONANT:  Did he answer it -- well, did
 4  he answer it by taking the Fifth Amendment,
 5  Mr. Crockett?
 6          MR. CROCKETT:  Did he answer what, the last
 7  question?
 8          MR. CONANT:  My last question.
 9          MR. CROCKETT:  You heard him do that and
10  it's on the record, Counsel.
11  BY MR. CONANT:
12      Q.  Mr. Montgomery, so you're taking the Fifth
13  Amendment -- you're pleading the Fifth Amendment in
14  response to my question about whether you're aware
15  of any criminal proceedings against you: is that
16  correct?
17      A.  I've already answered the question.
18          MR. CROCKETT:  Asked and answered, Counsel.
19  Next question.
20  BY MR. CONANT:
21      Q.  Mr. Montgomery, I understand that you have
22  paid to the Clark County district attorney in Nevada
23  approximately $450,000: is that correct?
24      A.  I'm taking the Fifth Amendment.
25      Q.  Where did you get the money to pay the
```
                                            Page 37

```
 1  Clark County D.A. this approximately $450,000?
 2      A.  I'm asserting my right under the Fifth
 3  Amendment.
 4          MR. FLYNN:  Did you get it from Istvan
 5  Burgyan.
 6  BY MR. CONANT:
 7      Q.  Did you get it from Istvan Burgyan,
 8  Mr. Montgomery?
 9      A.  I'm asserting my right under the Fifth
10  Amendment.
11          MR. FLYNN:  Did you give money to Istvan
12  Burgyan.
13  BY MR. CONANT:
14      Q.  Have you ever given money to Istvan
15  Burgyan?
16      A.  I'm asserting my right under the Fifth
17  Amendment.
18      Q.  Okay. Mr. Montgomery, do you now or have
19  you ever maintained an office in Palm Desert or this
20  general area?
21      A.  I'm asserting my right under the Fifth
22  Amendment.
23      Q.  Mr. Montgomery, you had within this office
24  a large amount of -- strike that.
25          You've had in this office computer
```
                                            Page 38

```
 1  equipment, have you not?
 2          MR. CROCKETT:  Which office are you talking
 3  about?
 4          Which office are you talking about?  I'll
 5  object to the question as vague and ask you to
 6  rephrase it.
 7          MR. FLYNN:  Within 300 yards of here.
 8  BY MR. CONANT:
 9      Q.  Within 300 yards of here, Mr. Montgomery,
10  you've maintained an office, have you not?
11      A.  I'm asserting my right under the Fifth
12  Amendment.
13      Q.  What happened with the equipment that was
14  stored in that office?
15      A.  I'm asserting my right under the Fifth
16  Amendment.
17      Q.  That was computer equipment, was it not,
18  Mr. Montgomery, that you maintained in that office?
19      A.  I'm asserting my right under the Fifth
20  Amendment.
21      Q.  Wasn't that computer equipment that you
22  obtained from Edra Blixseth, Mr. Montgomery?
23      A.  I'm asserting my right under the Fifth
24  Amendment.
25      Q.  Wasn't that equipment you obtained from a
```
                                            Page 39

```
 1  company called Blxware, Mr. Montgomery?
 2      A.  I'm asserting my right under the Fifth
 3  Amendment.
 4          MR. CROCKETT:  Why don't you just sit in
 5  his lap.
 6          MR. CONANT:  Thank you, Mr. Crockett.  I
 7  appreciate you keeping your comments to yourself.
 8  If you're not going to object or advise your client,
 9  then you can keep your comments to yourself.
10          MR. CROCKETT:  I object to him continually
11  asking questions.
12          MR. CONANT:  He's not asking any questions,
13  Mr. Crockett.
14          MR. CROCKETT:  Of course not.
15          A little louder, then he won't have to
16  repeat it.
17  BY MR. CONANT:
18      Q.  Mr. Montgomery, the computer equipment that
19  you took out of this office that's 300 yards away
20  from here, that was computer equipment that you
21  listed on your schedule: isn't that correct?
22          MR. CROCKETT:  Object to the question.
23  Assumes facts not in evidence.
24          Go ahead.
25          THE WITNESS:  I assert my right under the
```
                                            Page 40

                                    10 (Pages 37 to 40)

Dennis Lee Montgomery   -   November 18, 2010

Page 41

```
 1   Fifth Amendment.
 2   BY MR. CONANT:
 3       Q.    Mr. Montgomery, turn with me to your
 4   schedules, which have been marked as Exhibit 1, and
 5   let's go ahead and lay the foundation for these
 6   first.
 7           Mr. Montgomery, do you recognize this
 8   document here that's marked as Exhibit No. 1?
 9       A.    Yeah.  Yes.
10       Q.    What do you recognize this document to be?
11       A.    Looks like my bankruptcy filing.
12       Q.    Can you clarify that for me, your
13   bankruptcy filing?
14       A.    Looks like a document that was used in my
15   bankruptcy filing.
16       Q.    Okay.  Can you turn to the last page for me
17   of Exhibit 1.  Up at the, I guess, the top half of
18   the document purports to be a signature of Dennis
19   Lee Montgomery.
20           Do you see that, Mr. Montgomery?
21       A.    Yes.
22       Q.    Is that your signature?
23       A.    It appears to be.
24       Q.    Do you recall signing a document that
25   looked like this, Mr. Montgomery?
```

Page 42

```
 1       A.    I signed a bankruptcy document.
 2       Q.    Do you recall signing this document?
 3       A.    If this is my bankruptcy document.
 4       Q.    Is that a yes or a no?
 5       A.    Yes.
 6       Q.    Turn with me to -- one, two, three, four --
 7   the fifth page of this, of your bankruptcy
 8   Schedule B.
 9           MR. CROCKETT:  For the record, this would
10   be page 22-5 as it's been handwritten in the lower
11   right-hand corner of the document.
12   BY MR. CONANT:
13       Q.    Turn with me to the --
14           MR. CROCKETT:  Is that correct, Counsel?  I
15   want to make sure we're on the same page.
16           MR. CONANT:  I'm going to clarify this
17   here.
18       Q.    Turn with me to the following page that
19   your counsel just identified to line number 35.  Do
20   you see that down at the bottom, "Other personal
21   property of any kind not already listed"?
22           Do you see that row I'm referring to?
23       A.    Yes.
24       Q.    Do you see that row identifies
25   approximately $38 million worth of personal
```

Page 43

```
 1   property, Mr. Montgomery?
 2       A.    Yes.
 3       Q.    Okay.  Now flip with me to what is
 4   identified down at the bottom right-hand corner as
 5   22-8.  I'm looking at line 20 or Entry No. 22.
 6           It's identified as Patents, Copyright and
 7   other Intellectual Property.  Do you see that,
 8   Mr. Montgomery?
 9       A.    Yes.
10       Q.    Look over at the right-hand column there,
11   there purports to be a value of $10 million.
12           Do you see that?
13       A.    Yes.
14       Q.    Can you explain to me what that $10 million
15   item of intellectual property is, Mr. Montgomery?
16       A.    I'm asserting my right under the Fifth
17   Amendment.
18       Q.    All right.  Flip with me to the following
19   page identified at the bottom right-hand corner as
20   page 22-9.
21           Mr. Montgomery, are you at that page?
22       A.    Yes.
23       Q.    Do you see that bottom paragraph on this
24   page that begins with "In addition"?
25       A.    Yes.
```

Page 44

```
 1       Q.    Can you read that paragraph for the record,
 2   please.
 3           MR. CROCKETT:  Go ahead.
 4           THE WITNESS:  "In addition, Dennis
 5   Montgomery is the holder of certain intellectual
 6   property rights which are subject to the National
 7   Security Act 1947, 11 U.S.C. Section 401(a) et
 8   seq" -- I guess -- I don't know what that means.
 9   BY MR. CONANT:
10       Q.    Et seq.
11       A.    -- "et seq., and is by such Act prohibited,
12   without the express consent of the United States
13   Department of Justice and certain other agencies of
14   the United States of America from making any
15   disclosures with respect thereto.
16           "Any requested information with respect
17   thereto must be directed to Raphael Gomez,
18   United States Department of Justice, Civil Division,
19   Senior Trial Counsel, 950 Pennsylvania Avenue,
20   Northwest, Washington, D.C., 20530, (202) 514-1318."
21       Q.    Thank you.
22           Mr. Montgomery, have you had any
23   discussions within the prior year with any
24   government agency concerning the intellectual
25   property that you just described?
```

11 (Pages 41 to 44)

Dennis Lee Montgomery   -   November 18, 2010

1       A.   I assert my right under the Fifth
2   Amendment.
3       Q.   Has your attorney, to your knowledge, been
4   in contact with any agency of the United States
5   government concerning your personal property that's
6   listed on these schedules?
7           MR. CROCKETT:   I'll object to the question.
8   It's plainly calling for attorney-client
9   communication.
10          Instruct him not to answer.
11          MR. FLYNN:   Have him describe the
12  intellectual --
13  BY MR. CONANT:
14      Q.   Mr. Montgomery, can you briefly describe to
15  me the intellectual property that we're discussing
16  here that you just described in your schedules as
17  being subject to the National Security Act?
18          MR. CROCKETT:   Ms. Wells, do you have any
19  objection to him answering this question?
20          MS. WELLS:   No.
21          MR. FLYNN:   See, we're on the same side.
22          THE WITNESS:   I don't believe -- I
23  didn't -- I don't believe I put this segment on
24  there.   I could be wrong.   I don't recall that
25  specifically.

Page 45

1       Q.   Do you have any personal property that
2   falls within the category of intellectual property
3   that is described here on the bottom paragraph of
4   22-9?
5           MR. CROCKETT:   Well, I'll object to the
6   question again as it assumes facts not in evidence.
7   It may require him to draw a legal conclusion.
8           Why don't you define for him what you mean
9   by intellectual property in context of the question?
10          MR. CONANT:   I'm asking --
11          MR. CROCKETT:   Let me finish, Counsel.
12  Thank you.
13          MR. CONANT:   Are you done?
14          MR. CROCKETT:   Yes.
15          MR. CONANT:   Thank you.
16      Q.   There's a straightforward question here,
17  Mr. Montgomery.   This bottom paragraph of your
18  bankruptcy schedule identifies you as the holder of
19  certain intellectual property.
20          Do you see that, Mr. Montgomery?
21          MR. FLYNN:   Describe intellectual property.
22  Please describe the intellectual property.
23  BY MR. CONANT:
24      Q.   Can you answer the question,
25  Mr. Montgomery?

Page 47

1   BY MR. CONANT:
2       Q.   Mr. Montgomery, you signed these -- you
3   signed your schedules under penalty of perjury, did
4   you not?
5       A.   Yes.
6       Q.   So is it your testimony, Mr. Montgomery,
7   that you have no personal property that is subject
8   to -- I'm sorry, strike that.
9           Is it your testimony, Mr. Montgomery, that
10  you have no personal property that falls within the
11  description of this paragraph here on page 22-9?
12          MR. CROCKETT:   I'll object to the question.
13  It's argumentative.   It assumes facts not in
14  evidence.
15          Would you like to rephrase it, Counsel?
16          MR. CONANT:   No.   I want him to answer the
17  question.
18          MR. CROCKETT:   I'll instruct him not to
19  answer.
20  BY MR. CONANT:
21      Q.   Mr. Montgomery, do you have any personal
22  property that falls within the description --
23          MR. FLYNN:   Intellectual.
24          MR. CONANT:   I'm sorry.   Thank you,
25  Mr. Flynn.

Page 46

1           MR. CROCKETT:   Read the question back,
2   please, would you, Ms. Reporter.
3           MR. CONANT:   I'll just ask the question
4   again.
5       Q.   Mr. Montgomery, do you see this bottom
6   paragraph on the page identified as 22-9?
7       A.   Yes.
8       Q.   Do you see that it says Dennis Montgomery
9   is the holder of certain intellectual property
10  rights?
11          Do you see that, Mr. Montgomery?
12      A.   Yes.
13      Q.   Describe those intellectual property rights
14  to me.
15      A.   I assert my right under the Fifth
16  Amendment.
17          MR. FLYNN:   I'm glad these gentlemen
18  stayed.
19          MR. CROCKETT:   Can we go off the record for
20  a moment, please.   I need to talk to my client.
21          MR. CONANT:   You can go off the record.
22          MR. CROCKETT:   Thanks.
23          THE VIDEOGRAPHER:   Going off the record.
24  The time is 9:56 a.m.
25          (Recess taken.)

Page 48

12 (Pages 45 to 48)

Dennis Lee Montgomery  -  November 18, 2010

Page 49

1        THE VIDEOGRAPHER:  The time is 10 a.m.
2  We're back on the record.
3        MR. CONANT:  All right.  Mr. Montgomery,
4  I'm going to hand you what is going to be marked as
5  Plaintiff's Exhibit 2.
6        You'll want a copy of this, Ms. Wells.
7        Do you need a copy?  I'm sorry, your name
8  again?
9        THE REPORTER:  Stephanie.
10        MR. CONANT:  Stephanie.
11        Do you need a copy, Stephanie, or are you
12  going to get --
13        THE REPORTER:  I can use his if he leaves
14  them there.
15        MR. CONANT:  Okay.
16        THE REPORTER:  Could you identify them for
17  the record as we go through for me, please.  Thanks.
18        MR. CONANT:  Yeah.
19        (Exhibit 2 was marked for identification.)
20  BY MR. CONANT:
21        Q.    Mr. Montgomery, I've handed you what is
22  going to be marked as Plaintiff's Exhibit 2.  These
23  are Plaintiff's Second Set of Requests for
24  Production of Documents that were served on your
25  counsel in this case by me.

Page 50

1        Would you turn to page 2.  It's marked --
2  at the bottom it's actually the third page of the
3  document, but it's labeled as page 2.  Request for
4  Production No. 1 asks you produce the source codes.
5  If you look above Request for Production No. 1
6  you'll see the definition of source codes.
7        Do you see that, Mr. Montgomery, where it
8  defines source codes?
9        A.    Yes.
10        Q.    Can you read that for me where it defines
11  source codes?
12        A.    "Source codes means those computer software
13  codes that you were ordered to produce by the
14  United States District Court for the District of
15  Nevada for which you were sanctioned by the Court in
16  the amount of $2500 per day to compel your
17  production of those codes and which are referenced
18  in Docket Entry No. 815 in Case No. 3:06-cv-0056 in
19  the" United -- "in the U.S. District" for the "Court
20  for the District of Nevada and which is attached
21  hereto as Exhibit 1."
22        Q.    All right.  Can you turn to Exhibit No. 1
23  which is on the back of this document,
24  Mr. Montgomery.
25        Can you review that docket entry, Docket

Page 51

1  Entry No. 815 and let me know when you have reviewed
2  it to your satisfaction.
3        (Witness complies.)
4        THE WITNESS:  All right.  I've read it.
5  BY MR. CONANT:
6        Q.    Thank you, Mr. Montgomery.
7        Now if you recall, Mr. Montgomery, you were
8  sanctioned by the U.S. District Court for the
9  District of Nevada to the tune of $2500 a day until
10  you produced the source code as referenced in
11  Exhibit 1: isn't that correct?
12        A.    I didn't recall that.  I recall there was a
13  sanction of some type.  I don't remember
14  specifically that.
15        Q.    Do you recall the sanction was to compel
16  you to produce the source codes referenced in this
17  Exhibit 1?
18        A.    I thought it was more than that.
19        Q.    What else did you think it involved, the
20  sanction order?
21        A.    I thought it was just a general production.
22        Q.    Did you ever produce the source codes
23  identified in this Exhibit 1, Mr. Montgomery?
24        Let me clarify:  Did you ever produce the
25  source codes as you were ordered to do by the U.S.

Page 52

1  District Court for the District of Nevada?
2        A.    I'm not certain.
3        Q.    You're not certain whether you ever
4  produced them, Mr. Montgomery?  Is that the answer
5  to the question?
6        A.    I'm not certain.  That's my answer.
7        Q.    Did you ever produce noise filtering codes
8  Mr. Montgomery?
9        A.    I don't know what you mean.
10        Q.    Have you ever discussed noise filtering
11  technology to -- let me back up.
12        Have you ever described, in any declaration
13  or affidavit that you've signed, noise filtering
14  technology?
15        A.    I'm not certain.
16        Q.    Now these source codes here, these were
17  source codes for software that purportedly decrypted
18  transmissions being broadcast by Al-Jazeera?
19        MR. CROCKETT:  Is that a question?
20        MR. CONANT:  Yeah.
21        THE WITNESS:  I thought that was a
22  statement you were making.
23  BY MR. CONANT:
24        Q.    Have you ever --
25        MR. FLYNN:  Have you ever described to

13 (Pages 49 to 52)

Dennis Lee Montgomery   -   November 18, 2010

Page 53

```
 1  anyone --
 2  BY MR. CONANT:
 3      Q.   Have you ever described to anyone in any
 4  form a noise filtering technology that you had
 5  created?
 6          MR. CROCKETT:  Technology different from
 7  software?  Object to the question as vague,
 8  ambiguous, not calculated to lead to the discovery
 9  of admissible evidence.
10  BY MR. CONANT:
11      Q.   When I refer to technology, Mr. Montgomery,
12  I refer to the word in the broadest sense, but as
13  relevant here it'll refer primarily to software,
14  computer software.
15          MR. CROCKETT:  What else does it refer to,
16  Counsel?
17          MR. CONANT:  I want Mr. Montgomery to
18  explain.
19          MR. CROCKETT:  Explain --
20          MR. CONANT:  He's represent --
21          MR. CROCKETT:  Excuse me, may I finish?
22          MR. CONANT:  No, let me finish.
23          MR. CROCKETT:  You had finished the
24  question.  You interrupted me, Mr. Conant.
25          MR. CONANT:  Thank you, Mr. Crockett.
```

Page 54

```
 1          MR. CROCKETT:  You're welcome and I'll
 2  continue to speak, if I may, because you're asking
 3  him now to define what you mean by the use of the
 4  word technology and I'll instruct him not to answer
 5  to the extent there's any question pending and ask
 6  you to rephrase.
 7          MR. FLYNN:  That's your copy.  That's their
 8  copy.  I'll make sure we've got the same one.
 9          MR. CONANT:  Is it --
10          MR. FLYNN:  Yeah, that's his.
11          MR. CONANT:  We have four of these.
12          MR. FLYNN:  That's yours, Mr. Crockett.
13  That's yours, Carly.
14          MS. WELLS:  Thank you.
15          MR. CONANT:  Mr. Montgomery, I'm handing
16  you what's going to be marked as Plaintiff's Exhibit
17  No. 3.
18          (Exhibit 3 was marked for identification.)
19  BY MR. CONANT:
20      Q.   Mr. Montgomery, I've handed you what's
21  going to be marked as Plaintiff's Exhibit No. 3.
22  The title of this document is Sealed Declaration of
23  Dennis Montgomery in Support of his Oppositions to
24  DOD's and eTreppid's Motion for Protective Orders.
25          Do you see that on the first page,
```

Page 55

```
 1  Mr. Montgomery?
 2      A.   Yes.
 3      Q.   Turn with me, Mr. Montgomery, to the second
 4  to last page of this document.  Do you see where it
 5  says Dennis Montgomery on the signature line,
 6  Mr. Montgomery?
 7      A.   Yes.
 8      Q.   Is that your signature, Mr. Montgomery?
 9      A.   It appears so.
10      Q.   Mr. Montgomery, turn with me to page No. 4.
11      A.   4 at the bottom or the fourth page?
12      Q.   Page No. 4 at the bottom, meaning the
13  number 4 appears at the bottom the page.
14      A.   Yeah.  Okay.
15      Q.   I'm going to read line No. 1 here beginning
16  with the sentence, "I have."  Please read along with
17  me:  "I have provided the," quote --
18      A.   I'm not on the right page then.  You're
19  talking 4 on the bottom?
20      Q.   Page 4 on the bottom.
21      A.   What line number?
22      Q.   Line No. 1.
23          MR. FLYNN:  You're there.
24          THE WITNESS:  My line says, "The local."
25  ///
```

Page 56

```
 1  BY MR. CONANT:
 2      Q.   I'm starting with the first full sentence.
 3      A.   Oh, I'm sorry.  Okay.
 4      Q.   "I have provided the 'output' from my
 5  decoding programs without compensation to our
 6  government in order to stop terrorist attacks and
 7  save American lives.
 8          "My source codes for this decoding
 9  technology, which derives from my 'ODS' are what
10  Trepp and several government officials were
11  attempting to steal from me when they raided my
12  home."
13          Is that your statement, Mr. Montgomery?
14          MR. CROCKETT:  Document speaks for itself.
15  BY MR. CONANT:
16      Q.   Mr. Montgomery, can you answer the
17  question, please.
18      A.   What's the question?
19      Q.   Is that your statement?
20      A.   It's written on that piece of paper.
21      Q.   Which you signed; is that correct,
22  Mr. Montgomery?
23          MR. CROCKETT:  Counsel, this is really
24  argumentative.  You know that this is a statement
25  out of a declaration that he signed October 30th,
```

14 (Pages 53 to 56)

1 2006.
2 BY MR. CONANT:
3    Q.   Mr. Montgomery, is that a truthful
4 statement on your part?
5        MR. CROCKETT:   At what point in time,
6 Counsel?  The question is vague and ambiguous.
7 BY MR. CONANT:
8    Q.   When you wrote it, Mr. Montgomery.
9        MR. CROCKETT:   That also assumes facts not
10 in evidence.
11       MR. CONANT:   I'm sorry, let me back up.
12    Q.   When you signed this document, was this a
13 truthful statement on your part?
14    A.   I'm going to assert my right under the
15 Fifth Amendment.
16    Q.   Mr. Montgomery, describe what this decoding
17 program is and what you -- sorry.
18        Describe what you mean on this line 1 by
19 "decoding programs."
20    A.   I'm going to assert my right under the
21 Fifth Amendment.
22    Q.   Mr. Montgomery, describe what you mean on
23 line 2, starting with the first full sentence on
24 line 2, quote, "My source codes."
25        Please describe to me what "my source

Page 57

1 out here.
2        THE VIDEOGRAPHER:   Going off the record.
3 The time is 10:13 a.m.
4        (Break in the proceedings.)
5        THE VIDEOGRAPHER:   The time is 10:14 a.m.
6 We're back on the record.
7 BY MR. CONANT:
8    Q.   All right.  Mr. Montgomery, I wanted to
9 back up.  Before we went off the record, I wanted to
10 back up to my questioning pertaining to Exhibit
11 No. 3, which is the Sealed Declaration of Dennis
12 Montgomery in Support of his Oppositions to DOD's
13 and eTreppid's Motions for Protective Order, which
14 is a declaration you signed under penalty of
15 perjury.
16        Turn with me to the page identified at the
17 bottom as page No. 4 of this document.  And, just to
18 clarify, the paragraph I'm reading from begins on
19 line 1, goes to line 4 to 5.
20        MR. CROCKETT:   Actually, the paragraph
21 begins on line 25 of the preceding page, Counsel.
22        MR. CONANT:   I'm reading from line 1 of
23 page 4 at the very beginning of the first full
24 sentence.
25        MR. FLYNN:   Read the entire --

Page 59

1 codes" refers to?
2    A.   I'm going to assert my right under the
3 Fifth Amendment.
4    Q.   These, quote, unquote, "source codes," are
5 they not the same source codes that you identified
6 on your bankruptcy schedules on -- and then turn
7 back to -- we have Plaintiff's Exhibit 1, which is
8 the bankruptcy schedules.
9        MR. FLYNN:   Did you read the whole thing
10 into the record?
11 BY MR. CONANT:
12    Q.   All right.  Before you answer that
13 question, let me go back, Mr. Montgomery.
14    A.   Go back to what?
15    Q.   We're going to go back to Plaintiff's
16 Exhibit --
17        Stephanie, what Plaintiff's exhibit are we
18 on right now?
19        THE REPORTER:   3.
20        MR. CROCKETT:   Are we marking the
21 declaration?
22        MR. CONANT:   Yeah, start marking these
23 things.
24        Let me go -- can we go off the record here
25 for a second so I can get the exhibits straightened

Page 58

1 BY MR. CONANT:
2    Q.   And please follow along, Mr. Montgomery.
3 "I have provided the 'output' from my
4 decoding programs without compensation to our
5 government in order to stop terrorist attacks and
6 save American lives.  My source codes for this
7 decoding technology which derives from my 'ODS' are
8 what Trepp and several government officials were
9 attempting to steal from me when they raided my
10 home.
11        MR. FLYNN:   Did you ever create any source
12 code that was used to stop terrorist attacks?
13 BY MR. CONANT:
14    Q.   Mr. Montgomery, have you ever created any
15 source code that was used to stop terrorist attacks?
16    A.   I'm going to assert my right under the
17 Fifth Amendment.
18        MR. FLYNN:   All right.
19        MR. CONANT:   I'm going to keep going.
20    Q.   All right.  Mr. Montgomery, turn with me
21 back to Plaintiff's Exhibit No. 2.
22        All right.  We'll go look at Request for
23 Production No. 1 where you are requested to produce
24 the source codes.  I'm going to hand you what will
25 be marked as Plaintiff's Exhibit No. --

Page 60

15 (Pages 57 to 60)

Dennis Lee Montgomery   -   November 18, 2010

---

**Page 61**

```
 1          THE REPORTER:  -- 4.
 2     MR. CONANT:  -- 4.
 3          I got it.
 4          All right.  Mr. Montgomery, I've handed you
 5  what's marked as Plaintiff's Exhibit No. 4.  This is
 6  Dennis Montgomery's Responses to Plaintiff's
 7  Requests for Production of Documents, Set Two.
 8          (Exhibit 4 was marked for identification.)
 9  BY MR. CONANT:
10     Q.   Turn with me to what's identified as page 3
11  on the bottom of -- on the bottom of page 3,
12  Response to -- I'm reading, "Response to Request for
13  Production No. 1."
14          Your response, Mr. Montgomery, if you read
15  with me beginning on line 20 says, "Subject to and
16  without waiving the foregoing objections, Defendant
17  responds as follows:  After diligent search and
18  reasonable inquiry, the source codes are not in the
19  possession, custody or control of the Defendant.
20          "Defendant believes the source codes may be
21  in the possession, custody or control of the
22  United States Government."
23          Do you see that, Mr. Montgomery?
24     A.   Yes.
25     Q.   Is that a truthful statement,
```

---

**Page 62**

```
 1  Mr. Montgomery?
 2     A.   Well, there's several statements there.
 3  Which one?
 4          MR. CROCKETT:  I'll object.  Compound.
 5  BY MR. CONANT:
 6     Q.   The source codes are in the possession of
 7  the government.
 8     A.   I turned 12 drives over to the Liner law
 9  firm as part of the discovery order that was issued
10  by Judge Cook.  I believe it was in June of '09.
11          No, excuse me, May of '09.  May of '0- --
12  yes, May of '09, prior to my bankruptcy filing.
13     Q.   Mr. Montgomery, is your testimony that
14  these source codes, which you've identified as worth
15  $500 million, are no longer in your possession?
16          MR. CROCKETT:  Sir, if you're referring to
17  a document or a statement that he's made --
18          THE WITNESS:  I don't --
19          MR. CROCKETT:  -- I'll object.  Assumes
20  facts not in evidence.  Lacks foundation.  Vague.
21  Ambiguous.  And if you'd read it back, I think it's
22  confusing too, but let's read it back.
23          MR. FLYNN:  What is your --
24          MR. CONANT:  As long as he's talking, she
25  can't read the question back, because she's required
```

---

**Page 63**

```
 1  to take down every word that's said in this room,
 2  Mr. Conant.
 3          THE REPORTER:  That I can hear.
 4          MR. CROCKETT:  That you can hear.  Well --
 5  BY MR. CONANT:
 6     Q.   Mr. Montgomery, what is your evaluation --
 7          MR. CROCKETT:  Are you withdrawing the
 8  prior question?
 9          MR. CONANT:  I'm continuing on with the
10  deposition.
11     Q.   Mr. Montgomery, what is your evaluation of
12  these source codes that you refer to here in
13  Response to Request for Production No. 1?
14          MR. CROCKETT:  Well, the question lacks
15  foundation.  It's vague.  It's ambiguous.  It may be
16  compound.
17          Can you answer it as it's phrased or should
18  he rephrase it?
19          THE WITNESS:  I don't understand what
20  you're asking me.
21  BY MR. CONANT:
22     Q.   Mr. Montgomery, these source codes that are
23  referred to in these requests for production of
24  documents, these are included within the
25  intellectual property you identify in your
```

---

**Page 64**

```
 1  bankruptcy schedules, are they not?
 2     A.   I don't understand that question.
 3     Q.   The source codes --
 4          MR. FLYNN:  Start here where he says --
 5          MR. CONANT:  All right.
 6     Q.   All right.  We're going to withdraw the
 7  prior line of questioning.  We'll go back to Exhibit
 8  No. 3.
 9          MR. FLYNN:  Read it into record.
10  BY MR. CONANT:
11     Q.   All right.  Mr. Montgomery, turn to page
12  No. 5 of this document.  I'm looking at the
13  beginning of paragraph No. 8 or labeled as paragraph
14  No. 8.
15          Do you see that, Mr. Montgomery, begins
16  with, "In September 2005"?
17     A.   I see the paragraph.
18     Q.   Okay.  I'm going to read into the record
19  the first sentence of that paragraph.
20          "In September 2005 Trepp told me that the
21  government had appropriated $100 million for the
22  coding technology but he was demanding
23  $500,000,000."
24          Do you see that sentence, Mr. Montgomery?
25     A.   The quote by Trepp?
```

---

16 (Pages 61 to 64)

Dennis Lee Montgomery  -  November 18, 2010

1      MR. CROCKETT:  It's a yes-or-no question.
2 BY MR. CONANT:
3      Q.   The whole sentence that I just read, the
4 whole first sentence of paragraph No. 8,
5 Mr. Montgomery.
6      A.   I see it.
7      Q.   Was that a truthful statement when you made
8 that, Mr. Montgomery?
9      MR. CROCKETT:  So we're clear, are you
10 asking is it truthful that Trepp told him that?
11     MR. CONANT:  I'm asking is the sentence
12 true.
13     MR. CROCKETT:  That in September 2005 Trepp
14 told him the following information?
15     MR. CONANT:  Yes.
16     THE WITNESS:  It's on the declaration.
17     MR. FLYNN:  Where is the decoding
18 technology.
19 BY MR. CONANT:
20     Q.   Where is the decoding technology,
21 Mr. Montgomery?
22     A.   Is this Mr. Flynn asking me or you?
23     Q.   I'm asking you.  There's a question
24 pending.
25          Where is the decoding technology that you

                                        Page 65

1 reference in the sentence that I just read?
2      MR. CROCKETT:  If you know.
3      THE WITNESS:  I don't recall.
4      MR. FLYNN:  Do you have possession of it
5 now.
6 BY MR. CONANT:
7      Q.   Do you have possession of this technology
8 now, Mr. Montgomery?
9      A.   What technology?
10     Q.   The decoding technology referenced in the
11 sentence I just read.
12     A.   That was used in what time frame?
13     MR. CROCKETT:  I'm going to object to the
14 entire line of questioning, because this is all
15 based on decoding technology as described by Warren
16 Trepp in this declaration and perhaps you should ask
17 Mr. Trepp what he meant and get that on the record
18 so we can then have his --
19     MR. FLYNN:  That's false.  The decoding
20 technology was referenced earlier by him.
21     MR. CROCKETT:  If he's Geppetto, what does
22 that make you?
23     MR. FLYNN:  Statement.
24     MR. CONANT:  The document speaks for
25 itself.

                                        Page 66

1      MR. CROCKETT:  Yes, it does.
2      MR. CONANT:  Are you testifying,
3 Mr. Crockett, or is your client testifying?
4      MR. CROCKETT:  Is he asking questions or
5 are you?
6      MR. CONANT:  It doesn't matter,
7 Mr. Crockett.  It frankly doesn't matter.  I don't
8 understand.
9          If you want to get into this whole --
10     MR. FLYNN:  Just ignore him.
11         Do you have any source code technology in
12 your possession as described in your bankruptcy
13 schedule.
14     MR. CONANT:  Let's take a -- we're going to
15 take a brief recess and go off the record here.
16     THE VIDEOGRAPHER:  Going off the record.
17 The time is 10:23 a.m.
18         (Recess taken.)
19     THE VIDEOGRAPHER:  The time is 10:29 a.m.
20 We're back on the record.
21     MR. FLYNN:  Truth always triumphs.
22     THE WITNESS:  Ha ha, from you.
23     MR. FLYNN:  Just depends on the body count
24 to get there.
25 ///

                                        Page 67

1 BY MR. CONANT:
2      Q.   All right.  Mr. Montgomery --
3          We're back on the record, Stephanie?
4          Thank you.
5          Turn with me to Plaintiff's Exhibit No. 3,
6 if you would, page No. 2 and, just to be clear,
7 there's -- going forward on this deposition if
8 there's a document with a page number at the bottom,
9 when I refer to the page number I'm referring to the
10 actual number identified at the bottom of the page.
11         Do you understand, Mr. Montgomery?
12     A.   Yes.  Yes.
13     Q.   Great.
14         Look with me, page No. 2 right between
15 lines 18 and 19.
16     MR. FLYNN:  20, read it.
17 BY MR. CONANT:
18     Q.   I'm going to read here this paragraph that
19 starts, "Multiple software programs developed,
20 owned, possessed and used exclusively by me derived
21 from my 'ODS' between 1984 and December 31, 2002,
22 some of the source codes for which are direct
23 derivative of my copyrights and which, beginning in
24 November 2002, I began to adapt to military
25 applications on behalf of the Department of Defense,

                                        Page 68

                              17 (Pages 65 to 68)

1  the Navy, the Air Force and" redacted, "mostly
2  utilized in the war on terror between March 2003 and
3  the present."
4       MR. FLYNN:  Is that a truthful statement?
5  BY MR. CONANT:
6       Q.  Is that a truthful statement,
7  Mr. Montgomery?
8       MR. CROCKETT:  I'm going to object to the
9  question, because it's compound because there are
10 multiple statements in there.
11      So are you asking him the entirety or you
12 want to break it down?
13      MR. FLYNN:  Any part.
14 BY MR. CONANT:
15      Q.  Is there any part of what I just read
16 that's not true, Mr. Montgomery?
17      A.  Is there any part that's not true?
18      Which -- is there any -- it's like a double
19 negative you're asking me.
20      MR. CROCKETT:  Yeah.
21 BY MR. CONANT:
22      Q.  Is there anything -- is there anything
23 that's not true in there, Mr. Montgomery?
24      You wrote that, I want to know --
25      A.  Actually, Mr. Flynn wrote it; I didn't.

Page 69

1  BY MR. CONANT:
2       Q.  Mr. Montgomery, is any part of that
3  statement untrue which I just read into the record?
4       MR. CROCKETT:  Well, I'll object.
5       THE WITNESS:  I don't know what's redacted.
6  Maybe if you tell me what's redacted I could tell
7  you.
8  BY MR. CONANT:
9       Q.  What I read, is there anything in here
10 that's not true, Mr. Montgomery?
11      A.  Is there anything in here that's not true?
12      MR. CROCKETT:  Are you asking as of today?
13 As of the date it was signed?  What?  It's vague as
14 to time.  It's also compound and I object on that
15 basis.
16 BY MR. CONANT:
17      Q.  When Mr. Montgomery signed this under
18 penalty of perjury --
19      A.  You mean the document that Mr. Flynn wrote.
20      MR. CROCKETT:  Just listen to the question.
21 BY MR. CONANT:
22      Q.  Mr. Montgomery, when you signed that
23 document under penalty of perjury, is there anything
24 in that statement that is untrue?
25      A.  I'm not certain.

Page 71

1       Q.  You signed it.
2       A.  Mr. Flynn wrote it.  Mr. Flynn wrote all of
3  this.  Let's make it clear.
4       Q.  You signed it.
5       A.  Mr. Flynn wrote this.
6       MR. FLYNN:  Just say is any part of it
7  untrue.
8       THE WITNESS:  Mr. Flynn, you wrote it as my
9  attorney.  Did you or did you not write it?
10      He's here.  Let's just --
11 BY MR. CONANT:
12      Q.  He's not --
13      A.  But he has no problem asking questions,
14 have him answer it.  Did you write this?  Did you
15 write this?
16      MR. FLYNN:  Next question.
17      THE WITNESS:  Yeah.
18 BY MR. CONANT:
19      Q.  This is a deposition of you,
20 Mr. Montgomery.  The questions are being asked of
21 you, not of anybody else in here.
22      MR. FLYNN:  Is any part of that untrue --
23      THE WITNESS:  Are you asking the question
24 or your attorney?
25 ///

Page 70

1       MR. FLYNN:  Just read the entire thing.
2  BY MR. CONANT:
3       Q.  All right.  Turn with me to page No. 4,
4  line 16, Mr. Montgomery, and we're again on
5  Plaintiff's Exhibit No. 3.
6       I'm going to start reading from the first
7  full paragraph of line 16, "No person at eTreppid is
8  able" --
9       A.  Oh, wait, I'm sorry.  Page 4?
10      Q.  Correct.
11      A.  I'm sorry, go ahead.
12      Q.  "No person at eTreppid is able, to my
13 knowledge, to create the source codes that I have
14 created having multiple applications in the war on
15 terror and other military uses.
16      "Conclusive proof on this issue is
17 established by the recent interception of the
18 attempts by terrorists operating out of London to
19 blow up jetliners originating in London and bound
20 for the U.S.
21      "I gave the appropriate authorities within
22 the U.S. Government accurate and very specific
23 intelligence regarding this terrorist plot from 'my
24 decoding software,' as I had done in the past, weeks
25 prior to the arrest by the London authorities --

Page 72

18 (Pages 69 to 72)

Dennis Lee Montgomery  -  November 18, 2010

```
 1  without compensation."
 2      I'm going to continue on to paragraph 7.
 3  "Neither Warren Trepp nor eTreppid Technologies nor
 4  any person working there have ever owned, possessed
 5  or processed 'output' from my source codes using the
 6  special government contracts.
 7      "Other eTreppid individuals, as well as
 8  government officials identified herein, had access
 9  to the output only after I had processed it."
10      Moving on to the following paragraph, "In
11  September 2005, Trepp told me that the government
12  had appropriated $100 million for the 'decoding
13  technology' but he was demanding $500 million."
14      MR. FLYNN:  Is any part of that untrue?
15  BY MR. CONANT:
16      Q.  Mr. Montgomery, is any part of what I read,
17  from page 4 starting at line 16 and continuing on to
18  page 5 ending on line 4 and a half, untrue?
19      MR. CROCKETT:  I'll object to the question
20  as assuming facts not in evidence.  It's also
21  argumentative.
22      You've taken statements out of context.
23  You're taking partial statements from a declaration
24  he signed under penalty of perjury and you haven't
25  established the appropriate foundation to do that.
```

Page 73

```
 1      In addition to which the document that is
 2  in front of him is redacted by someone other than us
 3  and I believe, based on his prior testimony, he's
 4  not certain of the statements that have been
 5  redacted and therefore presents a difficult problem
 6  for him to try to answer the question as you phrased
 7  it.
 8      You want to try to rephrase it?
 9      MR. CONANT:  No.  Mr. Crockett, for the
10  record, none of what I just read was redacted from
11  the document.
12      No. 2, I'll remind you your client is
13  testifying, not you.  You're coaching the witness
14  and you're obstructing his testimony, for the
15  record.
16      MR. CROCKETT:  For the record, that's --
17  you've made your statement.
18      THE WITNESS:  I don't know.  What's the
19  question?
20      MR. FLYNN:  Is any part of it untrue.
21      THE WITNESS:  Is he asking it or you?
22      MR. CROCKETT:  For the record, who's asking
23  the questions, Counsel?
24      THE WITNESS:  There's two people asking
25  questions.
```

Page 74

```
 1      MR. CROCKETT:  Which one should we listen
 2  to?
 3  BY MR. CONANT:
 4      Q.  Mr. Montgomery, is any part of that
 5  statement untrue?
 6      MR. CROCKETT:  Any part of what statement,
 7  Counsel?
 8      THE WITNESS:  Which one?
 9      MR. CONANT:  Again, Mr. Crockett --
10      (Simultaneous colloquy.)
11      THE REPORTER:  One at a time, please.
12      MR. CONANT:  For the record, Mr. Montgomery
13  and Mr. Crockett have felt it necessary to raise
14  their voices during this exchange for whatever
15  reason.
16      Now there's a question pending here.  Was
17  any of the statement, which I've identified as
18  beginning on page 4, line 16, continuing to page 5,
19  line 4 and a half, is any of that untrue,
20  Mr. Montgomery?
21      MR. CROCKETT:  The question is vague.  It's
22  ambiguous.
23      MR. CONANT:  You've already objected.
24  Thank you, Mr. Crockett.
25      MR. CROCKETT:  You've interrupted me again
```

Page 75

```
 1  and the next time we'll adjourn the depo, if you
 2  like, and go take this to a judge.  I'd be glad to
 3  put this record in front of a judge and let the
 4  judge decide whether or not what you're doing here
 5  is appropriate.
 6      MR. CONANT:  Very good.
 7      MR. CROCKETT:  Now if you'd like to let me
 8  finish my objection, I will, and if you want to cut
 9  me off, just say so.
10      MR. FLYNN:  Get an answer.
11  BY MR. CONANT:
12      Q.  I want an answer.
13      A.  Is he asking the question or are you?
14      MR. CROCKETT:  Can you read the question
15  back that he's supposed to be answering, please.
16      THE WITNESS:  Yeah.
17      MR. CONANT:  I'll just read it again.
18      Q.  Mr. Montgomery --
19      A.  Starting on what page?
20      Starting on what page?  Bottom of page 4?
21      MR. CROCKETT:  He said he's going to ask
22  the question again.
23  BY MR. CONANT:
24      Q.  Mr. Montgomery, is any part of your
25  statements on page 4, beginning at line 16, and
```

Page 76

19 (Pages 73 to 76)

Dennis Lee Montgomery  -  November 18, 2010

Page 77

```
 1  continuing to page 5, line 4 and a half, untrue?
 2       MR. CROCKETT:  Sorry, the reference again?
 3  Page what to what?
 4       MR. CONANT:  We're looking, again, at
 5  Plaintiff's Exhibit No. 3.
 6       MR. CROCKETT:  I understand the exhibit.  I
 7  want to make sure I've got the right --
 8       MR. CONANT:  For I think the sixth time now
 9  I'll identify the statement made by Mr. Montgomery
10  beginning on page 4, line 16, and going on to page
11  5, line 4 and a half.
12       THE WITNESS:  Well, the statement was made
13  by Mr. Flynn.  I signed the declaration.  This was
14  written by Mr. Flynn.  We got it?
15       MR. CROCKETT:  Just --
16       THE WITNESS:  I don't recall.
17       MR. CROCKETT:  The sentence that starts at
18  page 4, line 16, and you want it ended at
19  paragraph 8 on page 5 at line 7: is that right,
20  Counsel?
21       MR. CONANT:  It's on the record the lines
22  that I want him to identify.
23       THE WITNESS:  Yeah, I don't recall.
24  BY MR. CONANT:
25       Q.   You don't recall if it's true or not,
```

Page 78

```
 1  Mr. Montgomery?
 2       MR. CROCKETT:  That's argumentative.  Don't
 3  answer.
 4  BY MR. CONANT:
 5       Q.   Mr. Montgomery -- okay.  Let's narrow down
 6  the details here.  Did you provide conclusive proof
 7  that -- I'm sorry.  Let me back up.
 8       Did you provide the U.S. Government with
 9  information -- with information concerning attempts
10  by terrorists to blow up jetliners?
11       MR. CROCKETT:  At any point in time?
12  BY MR. CONANT:
13       Q.   With respect to reference to the statement.
14       A.   I don't recall if I did.
15       Q.   The statement where it says, "No person at
16  eTreppid is able, to my knowledge, to create the
17  source codes that I have created," what are these
18  source codes that you have created, Mr. Montgomery?
19       Can you please describe those.
20       A.   In regard to what?  ODS?
21       Q.   Mr. Montgomery, I'm asking -- I'm reading
22  beginning on page 4, line 16, first full sentence
23  beginning on line 16, "No person at eTreppid is
24  able, to my knowledge, to create the source codes
25  that I have created."
```

Page 79

```
 1       Q.   What are those source codes that you have
 2  created that you're referring to right there?
 3       A.   I don't recall specifically.
 4       Q.   You don't recall what those source codes
 5  are, Mr. Montgomery?
 6       A.   Be specific.
 7       Q.   Have you created source codes for use by
 8  the U.S. Government, Mr. Montgomery?
 9       A.   Yes.
10       Q.   Can you describe the source codes that
11  you've created for use by the U.S. Government?
12       A.   During what time frame?
13       MR. FLYNN:  Any time.
14  BY MR. CONANT:
15       Q.   Any time frame.
16       A.   I would have to violate the U.S. protective
17  order to do that.
18       Q.   Mr. Montgomery, according to the U.S.
19  protective order, only the U.S. Government has the
20  right to --
21       A.   Okay, I'm sorry.
22       Q.   -- to invoke protection under the
23  protective order.
24       A.   But if I don't tell the Government I'm
25  going to violate the protective order then I would
```

Page 80

```
 1  violate it, wouldn't I?
 2       Q.   I would want you to answer the question.
 3       A.   I just --
 4       Q.   Continue with your answer.
 5       A.   I've answered it.
 6       Q.   Mr. Montgomery, for the record, the
 7  protective order --
 8       MR. FLYNN:  Don't go there.
 9       MR. CONANT:  All right.
10       MR. FLYNN:  Ask him if he gave --
11       MR. CONANT:  Let me --
12       MR. FLYNN:  -- very specific intelligence
13  regarding decoding -- did he give that information.
14  Did he give that information.
15  BY MR. CONANT:
16       Q.   Read with me, Mr. Montgomery, on page 4,
17  line 21, beginning with the first full sentence.
18       MR. FLYNN:  This the Cheney office.
19  BY MR. CONANT:
20       Q.   "I gave the appropriate authorities within
21  the U.S. Government accurate and very specific
22  intelligence regarding this terrorist plot from my
23  decoding software, as I have done in the past, weeks
24  prior to the arrests by the London authorities --
25  without compensation."
```

Dennis Lee Montgomery   -   November 18, 2010

1          MR. FLYNN:  Did you do that.
2  BY MR. CONANT:
3      Q.   Did you give -- did you give the U.S.
4  Government this -- this very specific intelligence
5  that you're referring to here?
6      A.   I'm going to assert my right under the
7  Fifth Amendment.
8      Q.   Isn't it true, Mr. Montgomery, that this,
9  quote, unquote, "decoding software" that you
10 reference on line 22 is just a complete fraud?
11         MR. CROCKETT:  Hold it.
12         Go ahead.
13         THE WITNESS:  I'm going to assert my right
14 under the Fifth Amendment.
15         I couldn't hear Mr. Flynn's question.
16         MR. CONANT:  That's fine.  I'll repeat it.
17         THE WITNESS:  Okay.
18 BY MR. CONANT:
19     Q.   Beginning on line 21, going to line 24 and
20 a half where you reference this very specific
21 intelligence regarding the terrorist plot that you
22 got from your decoding software regarding these
23 arrests in London, isn't that the same information
24 you and Edra Blixseth provided to a person within
25 Dick Cheney's office?

                                              Page 81

1          I'll object and instruct him not to answer.
2          MR. FLYNN:  Did you give him a CD with the
3  alleged terrorist plots.
4  BY MR. CONANT:
5      Q.   Did you give anyone in Dick Cheney's office
6  a CD regarding alleged terrorist plots?
7          THE WITNESS:  I don't recall.
8          MR. FLYNN:  Did you give it to Tim Blixseth
9  instead?  Did you give the CD to Tim Blixseth?
10 BY MR. CONANT:
11     Q.   Did you give the CD to Tim Blixseth?
12     A.   Is this Mr. Blixseth and you are both
13 Mr. Blixseth's attorneys?  Is this a Blixseth
14 question or a Flynn question?
15     Q.   I'm asking the questions, Mr. Montgomery.
16     A.   Yeah.
17         MR. CROCKETT:  Let's let him get it out on
18 the record.
19         Go ahead.
20 BY MR. CONANT:
21     Q.   Have you given any information about
22 terrorist plots to Tim Blixseth, Mr. Montgomery?
23         MR. CROCKETT:  At any point in time.
24         THE WITNESS:  I don't recall.
25 ///

                                              Page 83

1          MR. CROCKETT:  I'll object to the question.
2  It lacks foundation.  It assumes facts not in
3  evidence.  It may be argumentative, I'm not sure.  I
4  don't know enough about the question.
5          Can you answer it the way it's phrased?
6          THE WITNESS:  No.
7          I don't understand what you're asking me.
8  BY MR. CONANT:
9      Q.   Did you provide -- have you ever talked to
10 anyone within Dick Cheney's office regarding --
11 regarding your decoding software?
12     A.   I went to their office.  I don't recall
13 that specifically.
14     Q.   Can you explain to me what your visit to
15 Dick Cheney's office was about?
16     A.   No.
17     Q.   Why can you not explain it?
18     A.   I can't recall.
19         MR. FLYNN:  Did you give him a CD.
20 BY MR. CONANT:
21     Q.   You mean to tell me that you met with
22 someone in the vice president's office and you can't
23 recall what it was about, Mr. Montgomery?
24         MR. CROCKETT:  Don't answer that question.
25 It's argumentative.

                                              Page 82

1  BY MR. CONANT:
2      Q.   You don't recall if you have or not?
3      A.   That's correct.  That's my answer.
4      Q.   So you've got -- I'm reading this
5  declaration of yours, Mr. Montgomery --
6      A.   The one that Mr. Flynn wrote.
7      Q.   -- you're referencing all this source code.
8          What is the source code all about?  Can you
9  tell me about it?
10     A.   I don't recall specifically.
11     Q.   You don't recall what all this source code
12 is about concerning terrorist attacks?
13         MR. CROCKETT:  Question is argumentative.
14 I'll object.
15         THE WITNESS:  Ever?
16 BY MR. CONANT:
17     Q.   Yes.
18     A.   Ever.  Violates the United States
19 protective order.
20         MR. CONANT:  Ms. Wells, is there anything
21 in my question that would violate the U.S.
22 protective order?
23         MS. WELLS:  Can you please read the
24 question to me.
25 ///

                                              Page 84

Dennis Lee Montgomery   -   November 18, 2010

1  BY MR. CONANT:
2      Q.   Mr. Montgomery, the source code --
3          MR. CROCKETT:   You're withdrawing the prior
4  question?
5          MR. CONANT:   I'm rephrasing it.
6      Q.   Is there anything -- okay.  Let's back up
7  here and stay with me, if you can, Mr. Montgomery.
8      A.   I'll try.
9      Q.   Okay.  There's lots of references in this
10 declaration about your source code, isn't there?
11     A.   You want me to read the whole thing?
12         MR. CROCKETT:   Document speaks for itself.
13 Next question.
14 BY MR. CONANT:
15     Q.   This is about the source code, isn't it,
16 Mr. Montgomery?
17         MR. CROCKETT:   What's "this"?
18         MR. CONANT:   The document I'm referring to.
19 The document, Plaintiff's Exhibit 3.
20         MR. CROCKETT:   The document speaks for
21 itself and the question is argumentative as well.
22         Don't answer it.
23         Ask another one, Counsel.
24 BY MR. CONANT:
25     Q.   Mr. Montgomery, what is the source code

Page 85

1      A.   Did it exist?
2      Q.   Does it exist?
3          MR. CROCKETT:   He's asking you as of today,
4  if you know.
5          THE WITNESS:   To what time are you
6  referring to?
7  BY MR. CONANT:
8      Q.   Does it exist?
9          MR. CROCKETT:   That would be as of today;
10 correct, Counsel?
11         MR. FLYNN:   As referenced in your
12 schedules.
13 BY MR. CONANT:
14     Q.   Yes, today.
15     A.   I don't recall.
16     Q.   You don't recall --
17     A.   You just asked me the question.  I answered
18 it.
19     Q.   Did it ever exist, Mr. Montgomery?
20     A.   It could have.
21         MR. FLYNN:   Is it referenced --
22 BY MR. CONANT:
23     Q.   Is this decoding software referenced in
24 your bankruptcy schedule, Mr. Montgomery?
25     A.   Is the decoding -- I don't know.

Page 87

1  that you refer to throughout this declaration?
2      A.   I would have to read it again.
3      Q.   I just want -- we've read what we already
4  read.
5      A.   You've read 10 lines out of 30 pages.
6      Q.   Is there not -- have we not read
7  representations by you about software --
8          MR. CROCKETT:   Who's raising their voice
9  now, Counsel.
10 BY MR. CONANT:
11     Q.   Is there not --
12         MR. FLYNN:   Decoding software.  Is there
13 any decoding software.
14 BY MR. CONANT:
15     Q.   Mr. Montgomery, let's look at line 22,
16 page 4.
17     A.   I'm there.
18     Q.   All right.  Look at the phrase "decoding
19 software" in quotes.
20     A.   I see it.
21     Q.   Was there any such decoding software?
22     A.   Ever?
23     Q.   Yes.
24     A.   Yes.
25     Q.   Does it exist?

Page 86

1      Q.   What -- what intellectual property is
2  referenced in your bankruptcy schedules?
3      A.   Which exhibit would that be Mr. --
4      Q.   Let's go back to Exhibit No. 1.
5      A.   Okay.
6      Q.   I believe we're back to page 22-9.
7      A.   22-9.  Okay.
8      Q.   All right.  Bottom paragraph that you read
9  previously, "In addition, Dennis Montgomery is the
10 holder of certain intellectual property rights."
11         What is that?  What are those intellectual
12 property rights, Mr. Montgomery?
13     A.   I have to ask a question, because I'm not
14 certain of something.
15         MR. CROCKETT:   Well, on that ground I'll
16 object to the question.  It's vague and ambiguous
17 and assumes facts not in evidence and ask you to
18 rephrase.
19         MR. FLYNN:   What rights you're referring to
20 in your schedule.
21         MR. CONANT:   Yeah.
22     Q.   Mr. Montgomery, describe all intellectual
23 property rights that you're referring to here in
24 your bankruptcy schedule.
25     A.   That's his question or yours?

Page 88

22 (Pages 85 to 88)

Dennis Lee Montgomery  -  November 18, 2010

1  Q.    It's a question to you, Mr. Montgomery.
2  A.    He's the one that said it.
3  Q.    Fine.
4  A.    I'm just wondering how long you're going to
5  parrot what he keeps saying.
6  Q.    As long as I need to.
7  A.    I got it.
8         What -- okay.  So I'm sorry, again, what
9  was -- ask it again, please.
10 Q.    What is this intellectual property that you
11 reference here in your bankruptcy schedule?
12 A.    Okay.  You're referring to the paragraph on
13 the bottom of this document.  Is that what you're
14 referring to?
15 Q.    Correct.
16 A.    Okay.  I would like to ask you a question,
17 because I'm not certain of something.  So I don't
18 remember specifically that paragraph on the bottom
19 of the original document that I filed.  I'm not
20 saying it's not, but I'm not certain.
21 Q.    All right.
22 A.    So if somebody has my original or whatever,
23 I'd like to see it.
24 Q.    What do you mean by --
25 A.    I mean I don't remember that specifically,

Page 89

1  me putting this on there.  Okay.  That's what I'm
2  saying.  I'm not saying it wasn't on there, I'm not
3  saying it wasn't put on there, but I don't remember
4  specifically me putting that on there.
5  Q.    All right.  Would it make sense -- I mean
6  do you have intellectual property, though, that is
7  subject to the National Security Act of 1947?
8         MR. CROCKETT:  It's a yes-or-no question.
9         THE WITNESS:  I'm not certain.
10        MR. FLYNN:  Mark this next exhibit.
11        MR. CONANT:  All right.
12        MR. FLYNN:  Mark it.  Copy for
13 Mr. Crockett.
14        MR. CONANT:  We're going to mark what's
15 going to be identified as Plaintiff's Exhibit No. 5,
16 which is the Second Declaration of SA Michael A.
17 West.
18        (Exhibit 5 was marked for identification.)
19        MR. CONANT:  Do you have a copy for me?
20        MR. FLYNN:  Yeah.
21        Read this entire paragraph into the record.
22        MR. CONANT:  6?
23        MR. FLYNN:  Yeah, read the entire paragraph
24 into the record.  Read it.
25        MR. CROCKETT:  Yeah, yeah, yeah.

Page 90

1         THE WITNESS:  Okay.
2         MR. FLYNN:  All right.  Terrorist regarding
3  Al-Jazeera, ask him.  Ask him if he said -- ask him
4  about the noise.
5  BY MR. CONANT:
6  Q.    All right.  Mr. Montgomery -- well, let me
7  back up.
8         I'll represent this is -- Plaintiff's
9  Exhibit 5 is the Second Declaration of SA Michael A.
10 West.  I understand SA to refer to Special Agent
11 Michael West.  This was a document filed in Case
12 No. -06-263 [sic] in the United States District
13 Court for the District of Nevada, Docket No. 76-2.
14        Mr. Montgomery, turn with me to page 2,
15 paragraph 6, and read along.  "On August 10,
16 2006" --
17 A.    No. 2, I'm sorry.
18        MR. CROCKETT:  Page 2, paragraph 6.
19        THE WITNESS:  Okay.
20 BY MR. CONANT:
21 Q.    "On August 10, 2006, I received a telephone
22 call from Special Agent Gabriel Gunderson of the
23 Seattle FBI office who advised me that his office
24 received information from Azimyth, a company located
25 in Bellevue, Washington, which had discovered

Page 91

1  terrorist threat-related information.
2         "Special Agent Gunderson related that
3  Michael Sandoval, chief executive officer of
4  Azimyth, had contacted a retired Central
5  Intelligence Agency former chief of station residing
6  in Washington and offered to provide the U.S.
7  Government terrorist threat-related information.
8         "Special Agent Gunderson further related
9  that Dennis L. Montgomery was the Azimyth employee
10 who located the information.  Special Agent
11 Gunderson advised me in a subsequent conversation
12 that Mr. Montgomery had reported that he located
13 increased noise in recent Al-Jazeera video
14 transmissions."
15        Do you see that sentence?
16        MR. CROCKETT:  Which sentence?  There are
17 multiple sentences there.
18        MR. CONANT:  I'm sorry.
19 Q.    Did you read that paragraph,
20 Mr. Montgomery?
21 A.    I listened when you read it.
22 Q.    Okay.  Is it true that you reported that
23 you located increased noise in recent Al-Jazeera
24 video transmissions?
25 A.    You'd have to ask Mr. West.  He signed

Page 92

23 (Pages 89 to 92)

Dennis Lee Montgomery   -   November 18, 2010

1  this; I didn't.
2      Q.   I'm asking you.
3      A.   Well, I don't recall.
4      Q.   Have you ever reported to anyone in the
5  United States Government about things you've heard
6  or saw in Al-Jazeera video transmissions?
7          MR. CROCKETT:  That's mischaracterizes
8  what's in this document.  It's also confusing.  It
9  also lacks foundation and it's not limited as to
10  time.
11          With all those objections in place, do you
12  understand the question?
13          THE WITNESS:  You mean noise?  Is that what
14  you mean?  I'd have to take the -- it would violate
15  the U.S. protective order.
16  BY MR. CONANT:
17      Q.   Mr. Montgomery --
18          Ms. Wells --
19          MR. FLYNN:  No.
20          MR. CONANT:  I withdraw the question.
21          MR. FLYNN:  Did you provide at any time
22  after --
23          THE WITNESS:  I can't hear him.  Can you
24  speak up, please.
25          MR. CONANT:  I'll repeat the question.

Page 93

1      A.   I believe it said "noise," didn't it?
2  Noise.
3          MR. CROCKETT:  I think this is a different
4  question.
5  BY MR. CONANT:
6      Q.   My question, Mr. Montgomery.
7      A.   I'm sorry.  I thought you were referring to
8  paragraph 6 again.
9      Q.   My question, Mr. Montgomery.
10      A.   Okay.
11          MR. CONANT:  Can you read my question back
12  for Mr. Montgomery, Ms. Borthwick.
13          MR. FLYNN:  And then did he claim he was
14  decrypting.
15          THE WITNESS:  Can you please speak up.  I
16  can't hear you, Mr. Flynn.  Speak up.
17          THE REPORTER:  Question, "In the summer of
18  2006 did you provide anybody with any information
19  regarding things you were hearing or learning from
20  Al-Jazeera video transmissions?"
21          THE WITNESS:  What's that, I didn't hear
22  you.  Oh.
23          MR. CONANT:  Ms. Borthwick's question.
24          THE WITNESS:  I'm sorry.
25          I can't recall.

Page 95

1          THE WITNESS:  Oh.
2          MR. FLYNN:  -- any information in the
3  summer of 2006 through this -- relating to
4  Al-Jazeera video transmissions.
5  BY MR. CONANT:
6      Q.   In the summer of 2006, Mr. Montgomery --
7      A.   I don't think that's what he just said.
8      Q.   Thank you.
9          Mr. Montgomery, in the summer of 2006 did
10  you advise or contact Special Agent Gunderson
11  regarding any information you got from Al-Jazeera
12  video transmissions?
13          MR. FLYNN:  Did he give it to Sandoval.
14          THE WITNESS:  Is that your question or his?
15  I'm confused.  He just asked did I give it to
16  Sandoval and you asked me a question.  I'm confused
17  as to who I'm supposed to be answering.
18  BY MR. CONANT:
19      Q.   My question, Mr. --
20      A.   Okay.  Well, now I forgot it because he
21  asked me one.
22      Q.   Have you provided -- in the summer of 2006
23  did you provide anybody with any information
24  regarding things you were hearing or learning from
25  Al-Jazeera video transmissions?

Page 94

1          MR. FLYNN:  Did you ever decrypt al-Qaida
2  from Al-Jazeera video.
3  BY MR. CONANT:
4      Q.   Have you ever represented to anyone that
5  you could decrypt Al-Jazeera video transmissions?
6      A.   I don't know what the term "decrypt" means.
7      Q.   Did you ever represent to anyone that there
8  were messages hidden in Al-Jazeera video
9  transmissions?
10      A.   What do you mean "messages"?
11      Q.   The common use.
12      A.   No, what's the common use?  I don't
13  understand.
14      Q.   Messages, Mr. Montgomery.
15          MR. FLYNN:  Or recordings.
16          THE WITNESS:  Is he asking the question or
17  are you?
18  BY MR. CONANT:
19      Q.   Did you represent to anyone that you could
20  identify target coordinates being transmitted in
21  Al-Jazeera?
22      A.   That I, personally, could?  That me could?
23  I don't recall.
24      Q.   All right.  Same question, did you ever
25  represent to anyone that software you had created

Page 96

24 (Pages 93 to 96)

Dennis Lee Montgomery   -   November 18, 2010

1  could find hidden messages within Al-Jazeera video
2  transmissions?
3       MR. CROCKETT:  That's a different question.
4       THE WITNESS:  What do you mean "hidden"?
5       MR. CROCKETT:  We were talking about target
6  coordinates before.  We're back to messages?
7       MR. CONANT:  The question.  The question I
8  just asked.
9       MR. CROCKETT:  I'm just --
10      MR. CONANT:  Mr. Crockett, you are
11  interfering with Mr. Montgomery's testimony.
12      MR. CROCKETT:  No, I'm not.  I'm doing my
13  job, Mr. Conant, and if you don't understand that
14  I'm sorry.  I get to listen to your question, I get
15  to object and I get to finish my objection.
16      If you read the question back, please, I'll
17  file my objections.
18      THE WITNESS:  You want to -- I can't hear,
19  because you're talking too loud, Mr. Flynn.  Please
20  stop.  I can't hear what's going on.  You're
21  interfering with my right -- ability to give an
22  accurate deposition and to do a deposition.
23      Please stop doing what you're doing.  I
24  don't like it.
25      MR. CONANT:  Ms. Borthwick, can you --

Page 97

1       THE REPORTER:  Question, "All right.  Same
2  question, did you ever represent to anyone that
3  software you had created could find hidden messages
4  within Al-Jazeera video transmissions?"
5       MR. CROCKETT:  I'll object to the question
6  on the grounds it assumes facts not in evidence,
7  that it is vague and ambiguous as to the use of the
8  term "messages" in the context of the question.
9       In addition, it is not in the record and
10  there's no evidence providing a foundation as to
11  what you mean by "Al-Jazeera broadcasts."
12 BY MR. CONANT:
13      Q.  Can you answer the question?
14      A.  I'm confused.  No, I'm confused.
15 "Messages," I don't understand what you mean.
16      Q.  What do you understand a message to be,
17 Mr. Montgomery?
18      A.  You tell me.  I'm confused.
19      Q.  Do you understand the English language,
20 Mr. Montgomery?
21      MR. CROCKETT:  It's argumentative.
22  Don't answer.
23      MR. CONANT:  I'm asking him a question.
24      THE WITNESS:  I can't hear him talk,
25 Mr. Flynn, when you keep interrupting and going over

Page 99

1       MR. FLYNN:  We're going to get to the
2  truth, Mr. Montgomery.
3       THE WITNESS:  Unfortunately, your warped
4  perception of the truth to benefit your client,
5  Mr. Tim Blixseth, and violating my attorney-client
6  privileges to do it is outrageous.  That's what's
7  outrageous.
8       MR. CROCKETT:  May we have the question
9  back please, Ms. Reporter.
10      THE WITNESS:  You're a real piece of work.
11      MR. CROCKETT:  Easy.
12      MR. FLYNN:  Target coordinates.
13      THE WITNESS:  I can't -- speak up if you're
14 going to talk.
15      I can't hear him.
16      MR. CROCKETT:  Mr. Flynn, every time --
17      And, Ms. Reporter, I would like you,
18 please, to record as much of Mr. Flynn as you can
19 hear.
20      But, Mr. Flynn, every time you speak she
21 has to stop and start taking down what you're
22 saying.  I'd asked for the question to be read back.
23 Can we have that happen, please.
24      MR. CONANT:  Ms. Borthwick, can you read
25 back my most recent question to Mr. Montgomery.

Page 98

1  his voice.  Please stop it.
2       MR. FLYNN:  The record speaks for itself.
3       THE WITNESS:  I know it does, but I can't
4  hear him when you keep talking to him.
5       What's the question?
6       MR. FLYNN:  Decoding coordinates.
7       THE WITNESS:  I can't hear, Mr. Flynn,
8  when --
9       Go ahead.
10 BY MR. CONANT:
11      Q.  Do you understand the English language,
12 Mr. Montgomery?
13      A.  Yes.
14      Q.  What do you understand the word "message"
15 to mean within the English language?
16      A.  It could mean anything.
17      MR. CROCKETT:  As a noun or a verb?
18 BY MR. CONANT:
19      Q.  So you don't understand.
20      A.  It could mean anything.
21      Q.  That's what I'm asking.
22      A.  I got a message in a bottle.  That could be
23 a message.  I got a message from my wife, a text
24 message.  I got an email.  That could be a message.
25      Q.  Some form of communication then,

Page 100

25  (Pages 97 to 100)

Dennis Lee Montgomery    -    November 18, 2010

Mr. Montgomery?

1    Mr. Montgomery?
2        A.    Some form of communi -- it could be, yes.
3        Q.    That's what you understand a message to be?
4        A.    No.    That's what you told me it meant.
5        Q.    I'm asking you:    Do you understand the word
6    "message" to mean some form of communication?
7        A.    It could mean that, yes.
8        Q.    Now have you ever told anyone that you had
9    software that could decode messages within
10    Al-Jazeera video transmissions?
11        A.    I'd violate the U.S. protective order in
12    answering that.
13            MR. CONANT:    For the record, Ms. Wells
14    raised no objection --
15            THE WITNESS:    Okay.
16            MR. CONANT:    -- to a violation --
17            THE WITNESS:    Okay.
18            MR. CONANT:    -- with respect to the U.S.
19    protective order.
20        Q.    Mr. Montgomery, have you ever told
21    anyone -- strike that.
22            Have you ever told Edra Blixseth that you
23    had software that could decode target coordinates in
24    communicating with an Al-Jazeera broadcast?
25        A.    I don't recall if I did or not.

Page 101

1        Q.    Did you ever -- Mr. Montgomery, did you
2    ever tell Tim Blixseth that you had created software
3    that could decode target coordinates hidden within
4    Al-Jazeera transmissions?
5        A.    I don't recall I did or not.
6            Are you Tim Blixseth's attorney?
7        Q.    Mr. Montgomery, I'm the one asking the
8    questions.
9        A.    I'm just curious.    I'd like to know.
10        Q.    Well, I'm not going to answer that.
11        A.    Okay.
12            I don't recall if I did or not.
13        Q.    All right.    Mr. Montgomery, did you ever
14    tell Michael Sandoval that you had created software
15    that could decode target coordinates hidden within
16    Al-Jazeera transmissions?
17        A.    That's different than the question you just
18    asked me.
19        Q.    That's okay.
20        A.    I don't recall if I did or not.
21        Q.    Did you ever create any software that could
22    detect terrorist communications?
23        A.    I wouldn't know.    What do you mean
24    "terrorist communications"?
25        Q.    Do you know what a terrorist is,

Page 102

1    Mr. Montgomery?
2        A.    No.    Why don't you describe it?
3        Q.    I think you described it.
4        A.    No, I just used the word.
5        Q.    Well, when you used the word -- let's look
6    here.
7            What document are we looking at?
8        Q.    Give me a second, please, Mr. Montgomery.
9            All right.    Let's look at page 4, line 19
10    and a half, of Plaintiff's Exhibit No. 3.
11        A.    Got it.
12            Which page?
13        Q.    Page 4.
14        A.    Yeah.
15            Okay.    Which line?
16        Q.    Let's look at line 19 and a half.
17        A.    Okay.
18        Q.    Let's see -- one, two, three, four -- the
19    fifth word over from the left margin I see the word
20    "terrorist."
21            Do you see that, Mr. Montgomery?
22        A.    Yes.
23        Q.    What do you understand the word "terrorist"
24    to mean, Mr. Montgomery?
25            MR. CROCKETT:    In that sentence --

Page 103

1            THE WITNESS:    I'm confused.    What do you
2    mean?
3            MR. CROCKETT:    -- or are you speaking
4    generally?    I'll object to the question.    It lacks
5    foundation.    It's vague and ambiguous.    It's not
6    clear what you're referring to.
7    BY MR. CONANT:
8        Q.    All right.    Mr. Montgomery, let's ask it
9    both ways since we're confused.    Generally, what do
10    you understand the word "terrorist" to mean?
11        A.    A bad person.
12        Q.    A bad person?
13            Am I a terrorist, Mr. Montgomery?
14            MR. CROCKETT:    Are you asking him to answer
15    that?
16    BY MR. CONANT:
17        Q.    Yes.
18        A.    No.
19        Q.    Now let's look at -- well, let's look now
20    at line 19 and a half, page 4.
21            MR. FLYNN:    Did you uncover terrorist --
22            THE WITNESS:    I can't hear him, Mr. Flynn,
23    when he --
24            MR. CROCKETT:    Be quiet so she can write
25    down what he said.

Page 104

26 (Pages 101 to 104)

Dennis Lee Montgomery   -   November 18, 2010

1    Q.    Now, Mr. Montgomery, can you turn with me
2  to what's going to be marked on my copy as
3  page 3-22 --
4         MR. FLYNN:  On the lower right-hand corner.
5  BY MR. CONANT:
6    Q.    -- on the lower right-hand corner.
7    A.    Okay.
8    Q.    Do you see -- I want to make sure we're on
9  the same page.  It appears we are.
10        Do you see this appears to be,
11 Mr. Montgomery, images of checks written on a
12 Demaratech, LLC, account?
13        Do you see that, Mr. Montgomery?
14   A.    Yes.
15   Q.    Do you see up in the upper left-hand corner
16 Check No. 1520, Mr. Montgomery?
17   A.    Yes.
18   Q.    It says, "Pay to the order of Dennis
19 Montgomery."
20        Do you see that, Mr. Montgomery?
21   A.    Yes.
22   Q.    Is that you, Mr. Montgomery?
23   A.    I believe so.
24   Q.    Do you see that it purports to be a check
25 made out to you in the amount of $12,500?

Page 133

1  you listed on your bankruptcy schedule?
2    A.    I'm going to invoke my right under the
3  Fifth Amendment.
4    Q.    Okay.
5         MR. FLYNN:  Did he get that money for the
6  use of -- that's listed in the bankruptcy schedule.
7  BY MR. CONANT:
8    Q.    Mr. Montgomery, did you receive this
9  $12,500 for using the -- let me strike that.
10        Is this $12,500 that you received some form
11 of compensation for Demaratech using your
12 intellectual property, Mr. Montgomery?
13   A.    I'm going to invoke my right under the
14 Fifth Amendment.
15   Q.    All right.  I'm going to turn now to
16 page 3-29.
17        MR. FLYNN:  Did you say the date of that
18 last check?  Put the date on the record.
19        MR. CONANT:  All right.  For the record,
20 the date of the last check on page dash 3 -- 3-22
21 Check No. 1520 is dated March 3, 2010.
22   Q.    Now if you turn with me, Mr. Montgomery, to
23 page 3-29, if you look on the left-hand column
24 there's a check, Check No. 5038.
25        Do you see that, Mr. Montgomery?

Page 135

1    A.    Yes.
2    Q.    Did you receive that $12,500 from
3  Demaratech?
4    A.    I'm going to invoke my right under the
5  Fifth Amendment.
6    Q.    Mr. Montgomery, can you explain to me what
7  you did at Demaratech, LLC?
8    A.    I'm going to invoke my right under the
9  Fifth Amendment.
10   Q.    When I deposed Mr. Burgyan, I asked him
11 about the source codes -- or intellectual property
12 listed on your bankruptcy schedules and I asked him
13 if Demaratech was using in its business any of that
14 intellectual property that you listed on your
15 bankruptcy schedules.
16        Now, he said no, but he said something
17 curious.  He said that the -- it was derived.  The
18 software that Demaratech was using was derived from
19 your intellectual property.
20        Does that sound accurate to you,
21 Mr. Montgomery?
22   A.    I'm going to invoke my right under the
23 Fifth Amendment.
24   Q.    In what way is the software that Demaratech
25 is using different than the intellectual property

Page 134

1    A.    Yes.
2    Q.    It's made out to Dennis Montgomery.
3         Is that you, Mr. Montgomery?
4    A.    I presume so.
5    Q.    It's made out in the amount of $12,500.
6         Do you see that?
7    A.    Yes.
8    Q.    Did you receive that $12,500?
9    A.    I'm going to invoke my right under the
10 Fifth Amendment.
11   Q.    What did you do with that $12,500?
12   A.    I'm going to invoke my right under the
13 Fifth Amendment.
14   Q.    Isn't that $12,500 money you received
15 compensation for use by Demaratech of the
16 intellectual property you listed on your bankruptcy
17 schedule, Mr. Montgomery?
18   A.    I'm going to invoke my right under the
19 Fifth Amendment.
20   Q.    Mr. Montgomery, are you aware of any
21 efforts by anyone at Demaratech to sell software
22 technology to Israel?
23   A.    I'm going to invoke my right under the
24 Fifth Amendment.
25        MR. CONANT:  I'm going to introduce what's

Page 136

34 (Pages 133 to 136)

Dennis Lee Montgomery  -  November 18, 2010

1  going to be marked as Plaintiff's Exhibit No. 9.
2        (Exhibit 9 was marked for identification.)
3        MR. CROCKETT:  Mr. Conant, we don't need to
4  take a break, but the deponent would like some water
5  and there doesn't appear to be any more in the room.
6        MR. CONANT:  There does not appear.
7        Ms. Wells, you're going to want a copy.
8        MR. FLYNN:  You're not getting mine,
9  Mr. Crockett.
10        MR. CROCKETT:  Not asking for it.
11        Mr. Conant, we don't need to take a break,
12  an adjournment, but the deponent would like to have
13  some water and there isn't any more in the room.
14        MR. CONANT:  We can recess.
15        MR. CROCKETT:  Then we'll take a break and
16  we're getting some water.
17        THE REPORTER:  Mr. Montgomery, your --
18  your --
19        THE WITNESS:  I'm sorry.
20        MR. CROCKETT:  Get some water and come on
21  back.
22        MR. CONANT:  Go off the record.
23        THE VIDEOGRAPHER:  Going off the record.
24  The time is 11:43 a.m.
25        (Break in the proceedings.)

                                          Page 137

1  Birnbaum who is associated with the government of
2  Israel.
3     A.  I'm sorry.  I didn't hear that.  That was
4  my mistake.  What did you say?
5     Q.  Simply describing what this document is,
6  it's an email from Concerned Citizen to Michael
7  West, who is an FBI agent.
8        Concerned Citizen -- the Concerned Citizen
9  email address is the email address of George
10  Birnbaum.
11        MR. CROCKETT:  Do you know the source of
12  this document, counsel?
13        MR. CONANT:  I do.
14        MR. CROCKETT:  What is it?
15        MR. CONANT:  I'm not going to -- I'm not
16  going to state.
17        MR. CROCKETT:  Then any question you ask is
18  going to lack foundation until you can explain where
19  you got this document, which appears to be an email
20  to an FBI agent.
21        MR. CONANT:  We'll continue on.
22        MR. CROCKETT:  We will.
23  BY MR. CONANT:
24     Q.  It says, "Dear Agent West, per my
25  conversation with Tim Blixseth I'm forwarding to you

                                          Page 139

1        THE VIDEOGRAPHER:  The time is 11:45 a.m.
2  We're back on the record.
3  BY MR. CONANT:
4     Q.  All right.  Mr. Montgomery, I don't know if
5  you've had a chance to review Plaintiff's Exhibit 8,
6  but, if you haven't --
7     A.  You mean 9.
8     Q.  I'm sorry, is it Plaintiff's Exhibit 9 now?
9        Do you know who George Birnbaum is?
10     A.  I don't recall the name specifically.
11     Q.  Have you ever contacted -- have you ever
12  been in contact with anyone associated with the
13  government of Israel to sell software?
14     A.  I'm going to invoke my right under the
15  Fifth Amendment.
16     Q.  Can you please review Plaintiff's Exhibit
17  No. 9.
18     A.  I did.
19     Q.  All right.  Now I'm going to read -- I'm
20  going to represent that this, Plaintiff's Exhibit
21  No. 9, is an email dated June 30, 2010, from an
22  email address from Concerned Citizen to Michael
23  West, who's an FBI agent.
24        I'll represent that the Concerned Citizen
25  email is from a gentleman by the name of George

                                          Page 138

1  a brief timeline of the events regarding my contact
2  with Dennis Montgomery and Demaratech.
3        "It has been their desire from the first
4  contact to try and sell their technology to various
5  institutions within the Israeli government,
6  including the Mossad and Army Intelligence."
7        Mr. Montgomery, is this statement in here
8  regarding -- where it says Dennis Montgomery and
9  Demaratech, it has been their desire from the first
10  contact to try and sell their technology to various
11  institutions of the Israeli government, including
12  Mossad and Army Intelligence --
13        MR. CROCKETT:  I'm going to object to the
14  question and any other question relating to this
15  document.  It is -- the questions lack foundation.
16  It appears to be argumentative.
17        This may well be a document that you
18  fabricated for purposes of these depositions and
19  unless and until you can identify the source of the
20  document and provide some basis for us to understand
21  that it's legitimate, you might as well go get a
22  book of fairy tales and ask him questions out of
23  those.
24        I'm going to instruct him not to answer.
25        MR. FLYNN:  I'll authenticate it.  It was

                                          Page 140

Dennis Lee Montgomery   -   November 18, 2010

Page 165

1  authentic communication between you and Edra
2  Blixseth?
3       A.   I don't recall.
4       Q.   You don't recall if you ever had this
5  communication?
6       MR. CROCKETT:  Asked and answered, Counsel.
7       MR. CONANT:  All right.
8       THE WITNESS:  You just keep asking the same
9  question until you get an answer you want.  I've
10  answered it three times.  I don't recall.
11  BY MR. CONANT:
12      Q.   Why would Edra tell you, "With all going
13  on, much of which you encouraged me to move forward
14  with, why are you doing this at this time?"
15      MR. CROCKETT:  Calls for speculation.  I'll
16  instruct him not to answer.
17  BY MR. CONANT:
18      Q.   I'm asking you:  You have a relationship
19  with Edra Blixseth, do you not, Mr. Montgomery?
20      A.   I know Edra Blixseth.
21      Q.   Can you explain to me your prior business
22  relationship with Edra Blixseth?
23      A.   No.
24      Q.   Why can you not --
25      A.   I'll take the Fifth.  I'll assert the right

Page 166

1  under the Fifth.
2       Q.   Mr. Montgomery, how does your relationship
3  with Edra Blixseth implicate you in any criminal
4  proceeding?
5       MR. CROCKETT:  Don't answer that question.
6  BY MR. CONANT:
7       Q.   Mr. Montgomery, you are under indictment by
8  the Clark County D.A. for the state of Nevada, are
9  you not?
10      A.   I'll assert my right under the Fifth
11  Amendment.
12           What, are you upset because I asserted my
13  right?  I'm still going to assert it.
14      MR. FLYNN:  C.J., let's break for lunch.
15      MR. CONANT:  Want to break for lunch?  Let
16  me just finish this last one.
17           I'm going to hand Mr. Montgomery what's
18  going to be marked as Plaintiff's Exhibit No. 11.
19           (Exhibit 11 was marked for identification.)
20      THE WITNESS:  Thank you.
21      MR. CONANT:  All right.  Plaintiff's
22  Exhibit No. 11 is represented to be a Summons issued
23  by the District Court for Clark County, Nevada.  I
24  will represent that I received this document in its
25  form, in the current -- in its current form from

Page 167

1  Mr. Montgomery's counsel Steve Skirvin.
2            Why there appears to be three separate
3  copies of the same indictment, I don't know, but
4  this is the way I received it from Mr. Skirvin.
5       Q.   Mr. Montgomery, isn't it true you are under
6  indictment by the Clark County district attorney for
7  obtaining money under false pretenses?
8       A.   I'll going to assert my right under the
9  Fifth Amendment.
10      Q.   All right.  Theft, Mr. -- are you under
11  indictment by the Clark County DA for theft?
12      A.   I'll assert my right under the Fifth
13  Amendment.
14      Q.   Are you under indictment for drawing and
15  passing a check without sufficient funds in drawee
16  bank with intent to defraud?
17      A.   I'm going to assert my right under the
18  Fifth Amendment.
19      Q.   Are you aware -- okay.  So we're aware of
20  this indictment against you, Mr. Montgomery.
21           Are you aware of any other criminal
22  proceedings against you?
23      A.   I'll assert my right under the Fifth
24  Amendment.
25      Q.   Can you explain to me your current

Page 168

1  relationship with Edra Blixseth?
2       A.   I'll assert my right under the Fifth
3  Amendment.
4       MR. CONANT:  Let's break for lunch.
5       THE VIDEOGRAPHER:  Going off the record.
6  The time is 12:11 p.m.
7            (Luncheon recess.)
8       THE VIDEOGRAPHER:  The time is 1:17 p.m.
9  We're back on the record.
10      MR. CONANT:  All right.  Mr. Montgomery.
11           Can we just -- do we need to swear him back
12  in?
13      THE REPORTER:  No.
14  BY MR. CONANT:
15      Q.   Where do you currently reside,
16  Mr. Montgomery?
17      A.   My address?
18      Q.   Yes.
19      A.   6 Toscana Way West, Rancho Mirage,
20  California.
21      Q.   Where do you currently work?
22      A.   Out of my home.
23      Q.   What do you do, currently?
24      A.   I'm unemployed.
25      Q.   Do you have any form of income right now,

42 (Pages 165 to 168)

Dennis Lee Montgomery   -   November 18, 2010

1  Mr. Montgomery?
2      A.  No.
3      Q.  All right.  All right.  Let's go back and
4  talk about Mr. Birnbaum.
5          Do you remember our discussion with
6  Mr. Birnbaum, Mr. Montgomery?
7      A.  Not really.
8      Q.  Have you ever talked to George Birnbaum?
9          MR. CROCKETT:  Asked and answered.
10  BY MR. CONANT:
11      Q.  So your answer, Mr. Montgomery?
12      A.  Asked and answered.
13          MR. CONANT:  All right.  I'm going to
14  hand -- well, I'll hand it to the court reporter so
15  she can mark it Plaintiff's Exhibit --
16          THE REPORTER:  12.
17          MR. CONANT:  -- 12.
18          (Exhibit 12 was marked for identification.)
19          MR. CONANT:  Copy for you.
20          MR. FLYNN:  Copy for --
21          MS. WELLS:  Is this ours to work with?
22          MR. FLYNN:  C.J., you got something to work
23  with?
24          MR. CONANT:  I'll wing it.
25          Find my copy here.

Page 169

1  would have any reason to understand what this email
2  is about.  It calls for speculation.
3          If you can answer the question, go ahead.
4          THE WITNESS:  I don't recall.
5  BY MR. CONANT:
6      Q.  You don't recall?
7      A.  I don't -- I don't understand this
8  document.
9      Q.  Do you know -- do you know why the Israeli
10  government would be investigating you,
11  Mr. Montgomery?
12          MR. CROCKETT:  Are you representing that
13  they are?
14          THE WITNESS:  You are?
15          MR. CONANT:  I'm asking a question if he
16  knows.
17          MR. CROCKETT:  If he knows why they would
18  be?
19          MR. CONANT:  Yeah.
20          MR. CROCKETT:  That would presume that they
21  are.  Do you know that they are?  Are you
22  representing that they are?
23  BY MR. CONANT:
24      Q.  Do you know why the Israeli government
25  would be?

Page 171

1      Q.  Can you review that email, Mr. Montgomery?
2      A.  Yeah, I did.
3      Q.  All right.  Did you read down at the bottom
4  where -- I'll represent this is an email
5  correspondence between Tim Blixseth and George
6  Birnbaum dated, approximately, November -- well, let
7  me pull up my copy here.
8          All right.  Now at the bottom,
9  Mr. Montgomery, you'll see the email correspondence
10  begins down at the bottom dated November 11, 2010.
11  Tim Blixseth writes to George Birnbaum, "George, he
12  was indicted yesterday.  Best regards, Tim
13  Blixseth."  The subject in this email is
14  "Montgomery."
15          George Birnbaum writes, "Happy days.  The
16  guy is bad news.  I know the Israelis helped Feds
17  here.  One of the reasons I had to go dark on the
18  issue.  All the best."
19          Mr. Montgomery, do you have any reason --
20  do you know why Mr. Birnbaum would be -- would you
21  have knowledge of your involvement with the Israeli
22  government?
23          MR. CROCKETT:  I'll object to the question.
24  There's no foundation for this document.  There is
25  no factual basis that you've established that he

Page 170

1          MR. CROCKETT:  Oh, Lord.  Calls for
2  speculation and it's argumentative.  I'll instruct
3  you not to answer.
4          THE WITNESS:  My attorney said not to
5  answer; I'm not going to answer.
6          MR. CONANT:  Mr. Crockett, you're -- you
7  are, in effect, trying to replace your testimony for
8  Mr. Montgomery's testimony.
9          MR. CROCKETT:  Would you like to adjourn
10  and we'll take this to the judge?  Would you like
11  to?  I'd be delighted to do that.
12          MR. CONANT:  I would like you to stop
13  obstructing --
14          MR. CROCKETT:  I'm going to do what I think
15  I need to do.  Counsel, if you don't like it, you're
16  welcome to take it to the court.
17          MR. CONANT:  You feel it appropriate to
18  obstruct your client from answering.
19          MR. CROCKETT:  Just like the last question
20  that you asked, you are assuming things that aren't
21  true and that you haven't any evidence of.
22          Now if you'd like to ask a question, go
23  ahead.
24          MR. CONANT:  Mr. Crockett, you understand
25  the difference between being in trial and asking a

Page 172

43 (Pages 169 to 172)

Dennis Lee Montgomery  -  November 18, 2010

1  witness questions at trial versus asking a
2  witness --
3      MR. CROCKETT:  Do you have a question for
4  the witness?
5      MR. CONANT:  I'm not done with my
6  statement.
7      Do you understand the difference between
8  examining a witness in trial and examining a witness
9  at a deposition, Mr. Crockett?
10     MR. CROCKETT:  Counsel, I'm not to going to
11  dignify that with a response.  If you have a
12  question, you can ask it.
13     MR. CONANT:  So you have -- you do not
14  understand the difference, Mr. Crockett?
15     MR. CROCKETT:  I understand what I
16  understand.  You need to be asking questions of the
17  witness, not of me, Counsel.
18     MR. CONANT:  Great.
19     MR. CROCKETT:  If you don't understand
20  that, you must not have ever taken a deposition
21  before.
22  BY MR. CONANT:
23     Q.  Okay.  Mr. Montgomery, have you ever had
24  any contact with the Israeli government concerning
25  any form of software that you own?

                                    Page 173

1      Q.  Have you ever discussed Ron Burkle with
2  Edra Blixseth?
3      A.  I just told you I don't who that person is.
4      Q.  Have you ever heard the name Ron Burkle?
5      A.  I don't -- I don't know.
6      MR. CONANT:  All right.  I'm going to --
7  let's see.  I'm going to introduce Plaintiff's
8  Exhibit No. --
9      13?
10     THE REPORTER:  Yes.
11     (Exhibit 13 was marked for identification.)
12     THE WITNESS:  Thanks.
13     THE REPORTER:  Welcome.
14  BY MR. CONANT:
15     Q.  All right.  Mr. Montgomery, I'm going to
16  represent this is a copy of an email that we pulled
17  off of Jory Russell's computer.
18     A.  Okay.
19     Q.  Again, at the top you'll see a From
20  LearG2@aol.com below that the To line
21  denni@ncoder.net below that beginning of a
22  sentence, "In a message dated 2/26/09
23  denni@ncoder.net writes, Joe L., facility
24  installation is scheduled for tomorrow.  He has
25  waited two months for it.  I just told him to cancel

                                    Page 175

1      A.  I'm going to invoke my right under the
2  Fifth Amendment.
3      Q.  Are you aware of any federal investigation
4  of you concerning your attempts to sell software to
5  the Israeli government?
6      A.  I'm going to invoke my right under the
7  Fifth Amendment.
8      Q.  Have you told anyone in the Israeli
9  government in any form of words that you were having
10  your name cleared by the United States government?
11     A.  I'm going to invoke my right under the
12  Fifth Amendment.
13     Q.  Mr. Montgomery, has Edra Blixseth made any
14  effort to connect you to the Israeli government in
15  an effort to sell your software?
16     MR. CROCKETT:  Calls for speculation.
17  Assumes facts not in evidence.  Lacks factual
18  predicate.
19     THE WITNESS:  I'm going to assert my right
20  under the Fifth Amendment.
21  BY MR. CONANT:
22     Q.  And has Ron Burkle had any involvement in
23  you getting connected with the Israeli government in
24  an attempt to sell your software to the government?
25     A.  I don't even know who that is.

                                    Page 174

1  it and I'm going home.
2      "Brian is having a baby (scheduled
3  C-section) tomorrow.  I was going to stay and work
4  on the installation since it has taken two months to
5  get the right people here, but not now."
6      Do you see that, Mr. Montgomery?
7      A.  Yes.
8      Q.  Did you write that, Mr. Montgomery?
9      A.  I don't recall.
10     Q.  Do you understand the context for that --
11  what I just read?
12     A.  Well, if the Brian is my son, that must
13  have been when his son was born, I guess.
14     Q.  So who is the Joe L. that you're referring
15  to?
16     A.  I don't recall writing this.  You just
17  asked me that.
18     Q.  Would it be Joe Libertore?
19     A.  It could be.
20     Q.  What would "facility installation" refer
21  to?
22     MR. CROCKETT:  Are you asking him to
23  speculate?
24     MR. CONANT:  I'm asking him to answer the
25  question, Mr. Crockett.

                                    Page 176

44 (Pages 173 to 176)

Dennis Lee Montgomery   -   November 18, 2010

```
 1        THE WITNESS:  I don't recall.  You asked me
 2  if I wrote this, I said I don't recall.  You're
 3  referencing you got it off a hard drive, so I've
 4  answered it.
 5  BY MR. CONANT:
 6     Q.  Is that not your email address,
 7  denni@ncoder.net?
 8     A.  Yeah.  Sure.  You asked me that, I said
 9  yes.
10     Q.  And then below that paragraph I just
11  wrote -- I just read it says, "Why Dennis?"
12     A.  You asked me if I recall this email.  I
13  said I don't, so why that's on there I don't know.
14     Q.  Do you recognize the "why Dennis" as being
15  from Edra Blixseth?
16     A.  You mean those two words, "Why Dennis?"
17  Ever used in my life, ever, or only in this email?
18     Q.  I'm asking the "Why Dennis," right here in
19  this email?
20     A.  I have no idea.
21        MR. CONANT:  All right.  I'm going to
22  introduce what's going to be marked as Plaintiff's
23  Exhibit 14.
24        (Exhibit 14 was marked for identification.)
25        MR. CONANT:  Actually -- yeah.
                                          Page 177
```

```
 1  BY MR. CONANT:
 2     Q.  Okay.  Now -- so this is an email that you
 3  received from Edra Blixseth; is that correct?
 4     A.  I don't know if I received it or not, but I
 5  see who sent it.
 6     Q.  Do you -- okay.
 7        Now I want to read the first full paragraph
 8  of the text starting with the first full sentence
 9  from Edra, "We are going over numbers and ways to
10  make this start paying for itself."
11     A.  Where is this at?
12        MR. CROCKETT:  What?
13  BY MR. CONANT:
14     Q.  First full paragraph of text in the email,
15  second sentence.
16        MR. CROCKETT:  First full paragraph starts,
17  "Dennis."
18        THE WITNESS:  "Dennis, I wanted to write."
19  BY MR. CONANT:
20     Q.  All right.  Correction, second full
21  paragraph.
22     A.  Okay.
23     Q.  "We are going over numbers and ways to make
24  this start paying for itself.  You, as always, are
25  the key to our success."
                                          Page 179
```

```
 1        I don't have a copy for them.
 2        MR. FLYNN:  You're going to need this;
 3  right?
 4        MR. CONANT:  Uh-huh.
 5     Q.  All right.  Have you had a chance to read
 6  this email, Mr. Montgomery?
 7     A.  No.
 8        MR. FLYNN:  While he's reading it, let them
 9  read.
10        (Witness reads.)
11        THE WITNESS:  Okay.
12  BY MR. CONANT:
13     Q.  All right.
14        All right.  Do you recall -- this is an
15  email that purports to be from LearG2@aol.com and
16  you recognize that's Edra Blixseth's email?
17     A.  Yes.
18     Q.  And it's to denni@ncoder.net.
19        Do you see that, Mr. Montgomery?
20     A.  Yes.
21     Q.  And that's your email address, isn't it?
22     A.  Yes.
23     Q.  It's dated August 27, 2008?
24        MR. CROCKETT:  Document speaks for itself.
25        THE WITNESS:  Yes.
                                          Page 178
```

```
 1        Now above that she says, "Dennis, I wanted
 2  to write as I'm very excited about what might be
 3  doors we can get open now and start monetizing
 4  Blxware."
 5        Why would Edra say, "You are the key to our
 6  success"?
 7        MR. CROCKETT:  Your question by its nature
 8  calls for speculation and is objectionable on that
 9  basis.
10        I'll instruct you not to answer.
11  BY MR. CONANT:
12     Q.  Mr. Montgomery, answer the question,
13  please.
14     A.  My attorney told me not to answer the
15  question.
16     Q.  Mr. Montgomery, have you ever had any
17  conversation with Ms. Blixseth about you being the
18  key to Blxware's success?
19     A.  I don't know.
20     Q.  Why would Edra Blixseth say such a thing to
21  you?
22        MR. CROCKETT:  Calls for speculation.
23  Lacks factual predicate and lacks foundation.
24  BY MR. CONANT:
25     Q.  Mr. Montgomery, please explain to me your
                                          Page 180
```

45 (Pages 177 to 180)

Dennis Lee Montgomery  -  November 18, 2010

```
 1  Cardiac Network, Inc.
 2       Do you see that, Mr. Montgomery?
 3       A.   Yes.
 4       Q.   Do you know why Cardiac Network, Inc.,
 5  would be depositing $200,000 into Istvan Burgyan's
 6  account?
 7       A.   I'm going to assert my right under the
 8  Fifth Amendment.
 9       Q.   Isn't it true that Demaratech was -- well,
10  strike that.
11            Isn't it true that Cardiac Network entered
12  into some arrangement with Istvan Burgyan in
13  exchange for technology that you were -- you had
14  created?
15       A.   I'm going to assert my right under the
16  Fifth Amendment.
17       Q.   Isn't that same technology the same
18  technology listed in your bankruptcy schedule,
19  Mr. Montgomery?
20       A.   I'm going to assert my right under the
21  Fifth Amendment.
22       Q.   Isn't it true that for a number of years
23  you were funneling money to Mr. Burgyan to conceal
24  cash from your creditors, Mr. Burgyan -- I mean
25  Mr. Montgomery?
```

Page 305

```
 1       A.   I'm going to assert my right under the
 2  Fifth Amendment.
 3       Q.   Okay.  All right.  Let's -- let me go --
 4  let's put that one away for now.  That's fine.
 5            Let's go to -- I'm going to hand you
 6  Plaintiff's Exhibit 21.
 7            (Exhibit 21 was marked for identification.)
 8  BY MR. CONANT:
 9       Q.   All right.
10            All right.  Mr. Montgomery, if you look at
11  Bates stamp No. 558 on Plaintiff's Exhibit 21 --
12       A.   558, okay.
13       MS. WELLS:  For the record, are these more
14  bank records?
15       MR. CONANT:  Yeah, for the record.
16       Q.   -- I see a deposit 12/14 into Istvan
17  Burgyan's bank account in the amount of $130,000
18  from Backhouse Fiduciary Services.
19            Do you know -- are you familiar with
20  Backhouse Fiduciary Services, Mr. Montgomery?
21       A.   I'm going to assert my right under the
22  Fifth Amendment.
23       Q.   Isn't Backhouse Fiduciary Services
24  connected with Josh Kennedy?
25       A.   I'm going to assert my right under the
```

Page 306

```
 1  Fifth Amendment.
 2       Q.   And isn't Josh Kennedy a funder of
 3  Demaratech, LLC?
 4       A.   I'm going to assert my right under the
 5  Fifth Amendment.
 6       Q.   Wasn't -- didn't Josh Kennedy invest this
 7  money in Demaratech based on representations by you
 8  that you had software that you could -- you could
 9  sell to a government agency?
10       A.   I'm going to assert my right under the
11  Fifth Amendment.
12            He's very distracting talking on the phone
13  over there.
14            I guess it doesn't matter.
15       Q.   All right.  Mr. Montgomery, can you turn to
16  Bates stamp No. 559.
17       A.   Yeah, okay.
18       Q.   I see a deposit dated 12/15 in the amount
19  of -- I'm sorry, it's a withdrawal in the amount of
20  a hundred thousand dollars.
21       A.   I see that.
22       Q.   Do you see that?
23       A.   Yes.
24       Q.   And the -- the description appears to be
25  David Z. Chesnoff.
```

Page 307

```
 1            Mr. Montgomery, who is David Chesnoff?
 2       A.   I'm going to assert my right under the
 3  Fifth Amendment.
 4       Q.   Isn't he your criminal defense counsel in
 5  Clark County, Nevada?
 6       A.   I'm going to assert my right under the
 7  Fifth Amendment.
 8       Q.   Didn't he appear for you yesterday at your
 9  arraignment, Mr. Montgomery?
10       A.   I'm going to assert my right under the
11  Fifth Amendment.
12       Q.   Speaking of the arraignment yesterday in
13  Clark County, what did the judge give you a two-week
14  extension for?
15       A.   I'm going to assert my right under the
16  Fifth Amendment.
17       Q.   Did he give you an extension to arrange
18  some sort of financing to pay off the DA,
19  Mr. Montgomery?
20       A.   I'm going to assert my right under the
21  Fifth Amendment.
22       Q.   Mr. Montgomery, you've paid the DA
23  $450,000 --
24            We've asked this question.  I'll move on.
25            Now I'm looking back at this 12/15
```

Page 308

77 (Pages 305 to 308)

Dennis Lee Montgomery  -  November 18, 2010

1  withdrawal from Istvan Burgyan's account to what
2  appears to be David Chesnoff who is your criminal
3  counsel.
4        Why would Istvan Burgyan pay a hundred
5  thousand dollars to your criminal counsel?
6     A.  I'm going to assert my right under the
7  Fifth Amendment.
8     Q.  Isn't it true this is really your hundred
9  thousand dollars, Mr. Montgomery?
10    A.  I'm going to assert my right under the
11 Fifth Amendment.
12       MR. CONANT:  All right.  Let's hand you
13 what we've marked as Plaintiff's Exhibit No. 22.
14       (Exhibit 22 was marked for identification.)
15 BY MR. CONANT:
16    Q.  All right.  Mr. Montgomery, who do you --
17 do you pay your mortgage, Mr. Montgomery?
18    A.  Ever you mean?
19    Q.  Who do you have -- who do you currently
20 have -- what banks do you currently have to pay
21 mortgage payments to, Mr. Montgomery?
22    A.  Bank of America.
23    Q.  You just have one mortgage that you pay?
24    A.  No.  Aurora Home Loans, I don't know the
25 name of the bank but --

Page 309

1     Q.  You think it's Aurora Loan Services?
2        THE REPORTER:  Sorry?
3        THE WITNESS:  Aurora.
4  BY MR. CONANT:
5     Q.  Aurora Loan, okay.
6        I'm sorry, Mr. Montgomery, I didn't mean to
7  cut you off.
8        All right.  If you look at me [sic] with
9  Bates stamp No. 944, there is a withdrawal in the
10 amount -- dated June 1, in the amount of $15,000.
11       Do you see that, Mr. Montgomery?
12    A.  Yes.
13    Q.  And the description is wire transfer out,
14 JMBM retainer, and then it says Joseph A.
15 Eisenberg -- or Gisenberg, PC.
16       Do you know who Joseph Gisenberg is,
17 Mr. Montgomery?
18    A.  I'm going to assert my right under the
19 Fifth Amendment.
20    Q.  Isn't he your counsel in your main
21 bankruptcy case, Mr. Montgomery?
22    A.  I'm going to assert my right.
23    Q.  Why would Mr. Burgyan pay $15,000, a
24 $15,000 retainer, to your bankruptcy counsel,
25 Mr. Montgomery?

Page 310

1     A.  I'm going to assert my right under the
2  Fifth Amendment.
3     Q.  Isn't it true that this $15,000 is really
4  your money, Mr. Montgomery?
5     A.  I'm going to assert my right under the
6  Fifth Amendment.
7     Q.  Now you said a minute ago, Mr. Montgomery,
8  that one of your mortgage payments is to Aurora Loan
9  Services.
10    A.  That's correct.
11    Q.  Okay.  I see now, if you look down to
12 June 4 --
13    A.  I see.
14    Q.  -- you have a withdrawal in the amount of
15 $8,104.40.
16       Do you see that, Mr. Montgomery?
17    A.  Yes.
18    Q.  That's to Aurora Loan Services,
19 Mr. Montgomery?
20    A.  Yes.
21    Q.  Isn't that a mortgage payment,
22 Mr. Montgomery, for one of the mortgages that you
23 owe money to?
24       Or -- let me rephrase it.
25       This $8100 payment to Aurora Loan Services,

Page 311

1  isn't that a payment for one of -- on a mortgage
2  payment that you're responsible for, Mr. Montgomery?
3     A.  I'm going to assert my right under the
4  Fifth Amendment.
5     Q.  It's really your -- so Mr. Burgyan is
6  really paying -- strike that.
7        All right.  Let's hand you what we've
8  marked as Plaintiff's Exhibit 23.
9        (Exhibit 23 was marked for identification.)
10 BY MR. CONANT:
11    Q.  All right.  If you look here at the
12 statement Bates stamp No. 934, again this is a
13 checking account of Istvan Burgyan.  Now all of
14 these -- Mr. Burgyan laid the foundation for all
15 these statements in his exam -- or deposition.
16       Could you look at the -- do you see,
17 Mr. Montgomery, a withdrawal in the amount of
18 $30,000 dated August -- August 3?
19    A.  Yes.
20    Q.  Now I see here that it's -- again in the
21 description we have another reference to David Z.
22 Chesnoff and then, again, the last word in this
23 description is Dennis.
24       What was that $30,000 paid for?
25    A.  I'm going to assert my right under the

Page 312

78 (Pages 309 to 312)

Dennis Lee Montgomery  -  November 18, 2010

1  Fifth Amendment.
2      Q.  Isn't it -- those were funds paid to your
3  criminal counsel, are they not, Mr. Montgomery?
4      A.  I'm going to assert my right under the
5  Fifth Amendment.
6      Q.  Isn't that, in fact, your money,
7  Mr. Montgomery, that's going to Mr. Chesnoff?
8      A.  I'm going to assert my right under the
9  Fifth Amendment.
10         We need to stop.  I need to go to the rest
11  room.
12         MR. CONANT:  Okay.
13         THE VIDEOGRAPHER:  This marks the end of
14  Media No. 3.  The time is 4:19 p.m.  We're off the
15  record.
16         (Recess taken.)
17         THE VIDEOGRAPHER:  This marks the beginning
18  of Media No. 4.  The time is 4:23 p.m.  We're back
19  on the record.
20         MR. CONANT:  All right.  Mr. Montgomery,
21  I'm going to hand you what'll be marked as
22  Plaintiff's Exhibit 24.
23         (Exhibit 24 was marked for identification.)
24  BY MR. CONANT:
25      Q.  All right.  Mr. Montgomery, take a second

Page 313

1  cash with it, Mr. Montgomery?
2      A.  I'm going to assert my right under the
3  Fifth Amendment.
4      Q.  What did you do with the cash that you got
5  from the casino, Mr. Montgomery?
6      A.  I'm going to assert my right under the
7  Fifth Amendment.
8      Q.  Do you still have this $50,000 in cash,
9  Mr. Montgomery?
10      A.  I'm going to assert my right under the
11  Fifth Amendment.
12         MR. CONANT:  All right.  I'm going to hand
13  you what we've marked as Plaintiff's Exhibit 25.
14         (Exhibit 25 was marked for identification.)
15         THE WITNESS:  That's it.
16         MR. CONANT:  Sorry.
17  BY MR. CONANT:
18      Q.  Mr. Montgomery, can you tell me what -- can
19  you tell me what casinos you've gambled at since
20  2006?
21      A.  I'm going to assert my right under the
22  Fifth Amendment.
23      Q.  Between 2006 -- within the year 2006, can
24  you tell me how much money you've won gambling or
25  how much you money you've lost gambling?

Page 315

1  to review this document.
2      A.  Okay.
3      Q.  I'm going to represent that this is a --
4  this is a document we got from a casino in relation
5  to a subpoena.
6         Does this -- did you -- is this your
7  cashier's check, Mr. Montgomery, that you -- I'm
8  sorry.  Let me back up.
9         Is this one of the cashier's checks that
10  you got from Wells Fargo Bank on April 25, 2006?
11      A.  I'm going to assert my right under the
12  Fifth Amendment.
13      Q.  What did you do with this -- did you bring
14  this cashier's check and cash it with -- I shouldn't
15  say "cash it."  Let me strike that.
16         Did you submit this cashier's check to
17  Caesar's Casino?
18      A.  I'm going to assert my right under the
19  Fifth Amendment.
20      Q.  What did you do -- what was the purpose of
21  giving Caesar's Casino this $50,000 cashier's check?
22      A.  I'm going to assert my right under the
23  Fifth Amendment.
24      Q.  Didn't you take this money out,
25  Mr. Mont- -- take this check to the casino and get

Page 314

1      A.  I'm going to assert my right under the
2  Fifth Amendment.
3      Q.  I'll ask you the same question for 2007.
4  Can you tell me how much money you won gambling or
5  lost gambling?
6      A.  I'm going to assert my right under the
7  Fifth Amendment.
8      Q.  I'm asking for net.  When I'm asking how
9  much you won, how much you lost, I'm asking net for
10  the year.
11      A.  I'm going to assert my right under the
12  Fifth Amendment.
13      Q.  Isn't it true that -- well, let me back up.
14         For the year 2008 can you tell me how much
15  you won gambling or how much you lost gambling?
16      A.  I'm going to assert my right under the
17  Fifth Amendment.
18      Q.  Same question for 2009.
19      A.  Same answer.
20      Q.  Isn't it true that for the years 2008
21  through 2009 you've won more money gambling than
22  lost?
23      A.  I'm going to assert my right under the
24  Fifth Amendment.
25      Q.  Approximately how much money have you

Page 316

Dennis Lee Montgomery  -  November 18, 2010

1  borrowed in one form or another, Mr. Montgomery,
2  from casinos --
3       A.   I'm going to assert my right under the
4  Fifth Amendment.
5       Q.   Let me finish the question.
6            Between the years 2006, 2009, how much
7  money have you borrowed from casinos,
8  Mr. Montgomery?
9       A.   I'm going to assert my right under the
10  Fifth Amendment.
11       MR. FLYNN:  When he was getting those
12  millions of dollars of cash from Edra Blixseth, was
13  he putting second mortgages on his homes.
14  BY MR. CONANT:
15       Q.   Mr. Montgomery, we just reviewed all your
16  bank statements where you received a large amount of
17  money from Edra Blixseth's entities.
18            During that time period, were you taking
19  out second mortgages on real estate?
20       A.   I'm going to invoke my right under the
21  Fifth Amendment.
22       Q.   What did you do with all the cash you took
23  out on these mortgages on your real estate?
24       A.   I'm going to invoke my right under the
25  Fifth Amendment.

Page 317

1  you --
2       A.   25.
3       Q.   On 25.
4            Can you flip with me to -- it's going to be
5  the -- one, two, three, four, five, six, seven --
6  the eighth page from the back.
7       A.   What's the top say?
8       Q.   Well, MontBleu Resort.
9       A.   How about memo ID, which number is it?
10       Q.   Memo ID 30936.
11       A.   Okay.  I see it.
12       Q.   All right.  On the right-hand column it
13  says, "Memo Title:  Customer robbed.  Memo Text:
14  4/6,"  I assume 4/6/2006, April 6, 2006, "Customer
15  visit today, he was robbed of $300,000 down in Reno.
16  Was not hurt.  Brought in $100K cashier's check to
17  take care of half his outstanding markers.  Says he
18  will pay the remainder within" seven -- I'm sorry,
19  "within three weeks.nan  Tickled remaining" hundred
20  thousand to 5/7/06 [sic].
21            I'll represent to you these are documents
22  that we received in connection with subpoenas we
23  served on the MontBleu Resort.
24            Is that true, Mr. Montgomery?  Did you tell
25  a casino that you were robbed of $300,000 in Reno?

Page 319

1       Q.   All right.  Did you put second mortgages on
2  each piece of real estate that you owned during this
3  time period?
4       A.   I'm going to invoke my right under the
5  Fifth Amendment.
6       Q.   All right.  Mr. Montgomery, do you not want
7  to file your tax returns for '08 and '09 because you
8  don't want to report your wins from gambling?
9       A.   I'm going to assert my right under the
10  Fifth Amendment.
11       Q.   All right.  Let me see here.
12            Have you ever reported to a casino that you
13  were robbed of a large amount of money,
14  Mr. Montgomery?
15       A.   I'm going to assert my right under the
16  Fifth Amendment.
17       Q.   Okay.  Were you, in fact, robbed of any
18  money at any time, Mr. Montgomery?
19       A.   I'm sorry.
20            Are you done?
21       Q.   I'm trying to find it.  It's in here.  I'm
22  just trying to find the exact reference to it,
23  because there's an interesting -- yeah.  I just want
24  to find it.
25            All right.  Mr. Montgomery, on -- are

Page 318

1       A.   Assert my right under the Fifth Amendment.
2       MR. FLYNN:  Here's how he did it, by making
3  it look like --
4  BY MR. CONANT:
5       Q.   How much money -- well, let's go back to --
6  how much money, approximately, were you borrowing?
7            Let me back up.  Do you understand what a
8  marker is in casino parlance?
9       A.   I'm going to assert my right under the
10  Fifth Amendment.
11       Q.   Isn't a marker kind of like a note that the
12  casino advances you money in some manner and you,
13  essentially, have to pay it back?
14       A.   I'm going to assert my right under the
15  Fifth Amendment.
16       Q.   So weren't you taking out markers to
17  gamble, you'd win, but then not pay back the marker?
18       A.   I'm sorry.  Are you done?
19       Q.   I'm done.
20       A.   I'm going to assert my right under the
21  Fifth Amendment.
22       Q.   Now I notice that this memo text, 4/6/2006,
23  this is the same day that you were receiving, I
24  think, based on your records, over a million dollars
25  from Opspring; is it not, Mr. Montgomery?

Page 320

80 (Pages 317 to 320)

Dennis Lee Montgomery   -   November 18, 2010

---

1    THE WITNESS:  I despise that he keeps
2 looking at the government and smiling and winking.
3 It's just annoying.
4    MR. CROCKETT:  Almost done.  Almost done.
5    THE WITNESS:  I'm going to assert my right
6 under the Fifth Amendment.
7 BY MR. CONANT:
8    Q.    So you were robbed -- you were purportedly
9 robbed of $300,000, but at the same time it appears
10 that you still had outstanding markers owed to the
11 casinos.
12    In fact, this memo says brought in -- you
13 brought in a hundred K cashier's check to take care
14 of his -- "to take care of half his outstanding
15 markers."
16    So you had roughly $200,000 in outstanding
17 markers and you paid down a hundred thousand dollars
18 of those, but the very same day you're being paid
19 over a million dollars from -- you receive over a
20 million dollars from Edra's entities.
21    So the question is why didn't you just pay
22 off all your markers with all the money you were
23 receiving from Edra's entities?
24    A.    I'm going to assert my right under the
25 Fifth Amendment.

Page 321

---

1    MR. FLYNN:  He's hired an accountant to go
2 through all of his records to determine what his
3 wins and losses were at the casinos.
4 BY MR. CONANT:
5    Q.    Now, Mr. Montgomery, you said you haven't
6 yet filed your tax returns for '08 or '09.  Have you
7 hired an accountant to help you determine your wins
8 and your losses from the various casinos?
9    A.    I assert my right under the Fifth
10 Amendment.
11    Q.    What I mean hired an accountant, I mean
12 hired an accountant to help you prepare your tax
13 returns?
14    A.    I'm going to going to assert my right under
15 the Fifth Amendment.
16    Q.    All right.  Now, Mr. Montgomery, if you
17 flip to the next page here, September 1, '06, Memo
18 ID 42710, "Memo Text:  Customer requests increase to
19 300k, denied at this point.  Keep at 200k per Mike
20 Jones."
21    Who's Mike -- do you know who Mike Jones is
22 that they're referring to here?
23    A.    I'm going to assert my right under the
24 Fifth Amendment.
25    Q.    Were you asking casinos for extensions of

Page 322

---

1 credit, Mr. Montgomery, during this time period?
2    A.    I'm going to assert my right under the
3 Fifth Amendment.
4    Q.    How much cash -- what is a -- what is a --
5 what is a casino -- how does a casino operate with
6 respect to how much money they're willing to extend
7 to you on credit?
8    MR. CROCKETT:  Calls for speculation.
9 BY MR. CONANT:
10    Q.    In your experience with the casinos,
11 Mr. Montgomery, how do you get -- how did you
12 establish a line of credit with all these casinos,
13 Mr. Montgomery?
14    A.    I'm going to assert my right under the
15 Fifth Amendment.
16    MR. CONANT:  All right.
17    All right.  Just got to get through some of
18 these.  The amount, the volume, of documents here
19 you see from casinos is -- one point just absolutely
20 overwhelming, so we've had to get through some of
21 this.
22    All right.  Mr. Montgomery, I'm going to
23 hand you what will be marked as Plaintiff's Exhibit
24 No. 26.
25    Are we at 26?

Page 323

---

1    THE REPORTER:  Yes.
2    (Exhibit 26 was marked for identification.)
3    MR. CONANT:  All right.  I'll represent
4 these are documents we have received in response to
5 subpoenas.
6    MR. CROCKETT:  When were these subpoenas
7 served, counsel?
8    MR. CONANT:  When?
9    MR. CROCKETT:  Yes.
10    MR. CONANT:  I don't recall.  You received
11 notice of service.
12    MR. CROCKETT:  I don't believe we did.
13    MR. CONANT:  Your firm received notice of
14 service of the subpoenas.
15    MS. WELLS:  Can you identify for the record
16 what these documents are, please.
17    MR. CONANT:  Yeah.  These are letters
18 written to Dennis Montgomery from Caesar's Tahoe
19 asking for his win/loss records.
20    Q.    Mr. Montgomery, I see here on the first
21 page below -- the first page, "Dear Dennis, below is
22 your estimated win and/or loss information per your
23 request for the period September 2005 through
24 December 31, '05," and then it appears that your
25 total win/loss is $83,400.

Page 324

---

81 (Pages 321 to 324)

Dennis Lee Montgomery   -   November 18, 2010

1    Do you recall why you requested this
2  information from the casino, Mr. Montgomery?
3    A.   I'm going to assert my right under the
4  Fifth Amendment.
5    Q.   Did you report this $83,000 win on your
6  2005 tax returns -- or your tax year 2005 tax
7  returns, Mr. Montgomery?
8    MR. CROCKETT:  Sorry, Counsel, all three of
9  these letters are dated September 16th and yet they
10  deal with years 2005, '-6 and '-7 and this is the
11  way they were produced to me.
12    MR. CONANT:  This is the way they were
13  produced to me.  I haven't altered these documents
14  in any way.
15    Q.   Mr. Montgomery?
16    A.   I'm sorry, rephrase the question.
17    MR. CROCKETT:  I'm sorry, read the question
18  back, please.
19  BY MR. CONANT:
20    Q.   Did you report this $83,400 win on your tax
21  year 2005 tax returns?
22    A.   I don't recall.  I don't recall.
23    Q.   Mr. Montgomery, isn't it true that part of
24  your entire scheme was to horde away a bunch of cash
25  and then file bankruptcy and claim that you lost all

Page 325

1  your money gambling, Mr. Montgomery?
2    A.   Assert my right under the Fifth Amendment.
3    Q.   All right.  Mr. Montgomery, I'm looking at
4  the second page of this exhibit here, "Dear Dennis,
5  below is your estimated win and/or loss information
6  per your request for the period January 2006 through
7  December 31, 2006," and then it shows a loss of
8  $132,600.
9    Mr. Montgomery, do you recall why you
10  requested your win/loss record for this -- for the
11  MontBleu Resort?
12    A.   I'm going to assert my right under the
13  Fifth Amendment.
14    Q.   Did you report that $132,000 loss on your
15  taxes, Mr. Montgomery?
16    A.   I'm going to assert my right.
17    Q.   Did you really lose $132,600,
18  Mr. Montgomery?
19    A.   I'm going to assert my right under the
20  Fifth Amendment.
21    Q.   Does that include money that was borrowed?
22  Does the $132,000 included in this lawsuit, does
23  that include money that was borrowed by you from the
24  resort, Mr. Montgomery?
25    A.   I'm going to assert my right under the

Page 326

1  Fifth Amendment.
2    Q.   All right.  And then last page,
3  January '07 through December 31, '07, this document
4  purports to show that you lost 36,800.
5    Is that accurate, Mr. Montgomery?
6    A.   I'm going to assert my right under the
7  Fifth Amendment.
8    Q.   Did you report that loss on any of your tax
9  returns?
10    A.   I'm going to assert my right under the
11  Fifth Amendment.
12    Q.   All right.  Moving on.
13    MR. FLYNN:  Does he have an estimate of how
14  much he lost, how much he lost gambling --
15  BY MR. CONANT:
16    Q.   Mr. -- Mr. Montgomery, do you have an
17  estimate of the net amount of money you've lost
18  gambling between April '06 and March of 2009?
19    A.   I'm going to assert my right under the
20  Fifth Amendment.
21    MR. FLYNN:  Same thing on wins.
22  BY MR. CONANT:
23    Q.   Same question with respect to how much
24  you've won, net, between April '06 and March of
25  2009?

Page 327

1    A.   Same answer.
2    MR. CONANT:  All right.
3    All right.  Okay.  Mr. Montgomery, I'm
4  going to hand you what's going to be marked as
5  Plaintiff's Exhibit 27, I believe.
6    (Exhibit 27 was marked for identification.)
7    THE WITNESS:  Thank you.
8    MR. CONANT:  I don't have an extra copy.
9    All right.  I'll represent this is a
10  printout from -- in response to a subpoena I served
11  on -- unfortunately which casino is not obvious, but
12  I can find the copy here.
13    Yes, Peppermill.  This is in response to a
14  subpoena I served on the Peppermill Resort -- or
15  Casino, I should say.
16    Q.   Now, Mr. Montgomery, I see here that on
17  August 6, 2010, first entry here, says amount
18  $5,000, that they received a payment from you in the
19  amount of $5,000.
20    Do you recall making a payment to any
21  casino in the amount of $5,000 on or about August 6,
22  2010?
23    A.   I assert my right under the Fifth
24  Amendment.
25    Q.   And I see here for July 16 another payment

Page 328

82 (Pages 325 to 328)

YATES COURT REPORTERS   800.669.1866

Dennis Lee Montgomery   -   November 18, 2010

1  in the amount of $5,000.
2      Do you see that, Mr. Montgomery?
3      A.   I see it.
4      Q.   Okay.  Do you recall making that payment,
5  Mr. Montgomery?
6      A.   I assert my right under the Fifth
7  Amendment.
8      Q.   What are -- the source of the funds for
9  that payment, Mr. Montgomery?
10      A.   I assert my right under the Fifth
11  Amendment.
12      Q.   Is this -- is this payment here part of an
13  arrangement with the casino or the DA to prevent
14  being indicted by any casino?
15      A.   I assert my right under the Fifth
16  Amendment.
17      Q.   Does this represent any arrangement with
18  you -- or between you and a casino or the Clark
19  County DA to avoid criminal sanctions,
20  Mr. Montgomery?
21      A.   Assert my right under the Fifth Amendment.
22      Q.   What's the source of these funds that
23  you're making payments with to the casino,
24  Mr. Montgomery?
25      A.   I assert my right under the Fifth

Page 329

1      MS. WELLS:  Do you mind identifying this
2  for the record, please.
3      MR. CONANT:  You'll probably want a copy of
4  this.  It's a -- this is another document that we
5  received in response to a subpoena -- sorry.
6      This one was on, I believe, again, the
7  Peppermill Resort.
8      Q.   All right, Mr. Montgomery looking at a page
9  that --
10      A.   Well, just tell me which one.
11      Q.   I'm trying to see how they identify this
12  here.
13      It says -- on the description says -- well,
14  let me just count it again -- one, two, three -- the
15  fourth page, the fourth page, and the description
16  under the section Additional Remarks begins --
17      A.   This page 4: right?
18      Q.   I believe so.
19      It says, "Last two 5K payments," do you see
20  that, Mr. Montgomery?
21      A.   Yes.
22      Q.   I'll read what's on this page.  "Last two
23  5K payments posted are from checks received from"
24  Dennis Montgomery -- "Dennis's attorney, Scott
25  Freeman.  Mr. Freeman keeps in touch with Rob Erwin

Page 331

1  Amendment.
2      Q.   Aren't these -- aren't these pre funds that
3  you stored away prior to filing for bankruptcy,
4  Mr. Montgomery?
5      A.   I assert my right under the Fifth
6  Amendment.
7      Q.   Okay.
8      MR. FLYNN:  Ask him about the money he got
9  from Edra.
10      MR. CONANT:  Mr. Montgomery, I'm going to
11  hand you what's been marked as Plaintiff's
12  Exhibit 28.
13      (Exhibit 28 was marked for identification.)
14      MR. CROCKETT:  Do you have extra copies of
15  these?
16      MR. CONANT:  I do of this one.
17      MR. CROCKETT:  I'd like a copy of this
18  before we leave.
19      THE WITNESS:  Well, actually --
20      MR. CROCKETT:  There's only one 27 and I'd
21  like a copy of it.
22      THE WITNESS:  Okay.
23  BY MR. CONANT:
24      Q.   Mr. Montgomery, I ask you to flip to the --
25  one, two, three -- I believe the third --

Page 330

1  and let's him know when he is sending a check.
2      "Recently Mr. Freeman told Rob that Dennis
3  is in Europe meeting with companies that may be
4  interested in buying some of his software.  Rob
5  spoke with Dennis's attorney, Scott Freeman," 10 --
6  then we have the number 10/28.
7      "Freeman told Rob that Dennis is currently
8  in Paris signing contracts.  Maybe some money coming
9  to us from this," question mark, question mark.
10      Do you see this description,
11  Mr. Montgomery?
12      A.   Yes.  I see what you read.
13      MR. FLYNN:  Ask him what software he was
14  pedaling.
15  BY MR. CONANT:
16      Q.   Now, the way I read this you've got two
17  dates going down the right-hand column 2/16/2010
18  then -- well, 11/20/09 and then below that 10/21/09
19  and my understanding of how these read is the date
20  for each line in the remarks section, each line
21  corresponds to the date in the right-hand column for
22  that line.
23      So on February 16th, 2010, it appears that
24  an attorney was representing to a representative of
25  this casino that you were in Europe meeting with

Page 332

Dennis Lee Montgomery   -   November 18, 2010

1  companies that may be interested in buying some of
2  your software.
3       Do you see that, Mr. Montgomery?
4    A.  Yes.
5    Q.  Is that an accurate statement,
6  Mr. Montgomery?
7    A.  I'm going to assert my right under the
8  Fifth Amendment.
9    Q.  Were you in Europe trying to sell software?
10   A.  I'm going to assert my right under the
11 Fifth Amendment.
12   Q.  Was that software that was listed in your
13 bankruptcy schedule, Mr. Montgomery?
14   A.  I'm going to assert my right under the
15 Fifth Amendment.
16   Q.  Is this the same software that we saw
17 referred to everywhere in Plaintiff's Exhibit 3, the
18 source code that could detect terrorist attacks,
19 Mr. Montgomery?
20   A.  I'm going to assert my right under the
21 Fifth Amendment.
22   Q.  Is this when you were meeting with Israel
23 to try and sell them software?
24   A.  I'm going to assert my right under the
25 Fifth Amendment.

Page 333

1    A.  I'm going to assert my right under the
2  Fifth Amendment.
3    Q.  Now did you have possession of this
4  software that you were supposedly in Europe meeting
5  with potential buyers?
6    A.  I'm going to assert my right under the
7  Fifth Amendment.
8    Q.  All right.
9       All right.  Turn to the next page.
10   A.  I have to leave at 5 o'clock.
11   Q.  We'll be done by 5 o'clock.
12   A.  Oh, okay.
13      Okay.
14   Q.  All right.  I see here first line under
15 additional remarks first full sentence, "Rob had
16 been told by him he would call Rob to let him know
17 about a payment to Dennis."
18      That was -- I'm sorry.  That was
19 October 21, '09, entry.
20      I'm looking now at September 18, '09,
21 entries.  "We received a call from local attorney
22 Scott Freeman about a month ago.  He said he's
23 working with Dennis's attorney in Las Vegas and
24 wanted to know if we had turned this over to the
25 DA's office.

Page 335

1    Q.  Mr. Montgomery, I'm going to now talk --
2  turn to the part dated November 20, '09.
3    A.  Okay.
4    Q.  "Rob spoke with Dennis's attorney, Scott
5  Freeman.  Freeman told Rob that Dennis is currently
6  in Paris signing contracts."
7       Were you in Paris signing contracts in
8  approximately in November of '09?
9    A.  I'm going to assert my right under the
10 Fifth Amendment.
11   Q.  What contracts would those be referring to?
12   A.  I'm going to assert my right under the
13 Fifth Amendment.
14   Q.  And weren't those contracts associated with
15 property listed on your bankruptcy schedule,
16 Mr. Montgomery?
17   A.  I'm going to assert my right under the
18 Fifth Amendment.
19   Q.  At the same time were you attempting to
20 sell this software to the federal government?
21   A.  I'm going to assert my right under the
22 Fifth Amendment.
23   Q.  And when I mean "software," I mean the
24 software referenced in the dates for February 16,
25 2010.

Page 334

1       "Rob spoke with Scott and sounded as if
2  Dennis may want to make a payment arrangement.
3  Scott was going to get back to us."
4       Is that true, Mr. Montgomery, were you
5  trying to make a payment arrangement with the
6  Peppermill Casino?
7    A.  I'm asserting my right under the Fifth
8  Amendment.
9    Q.  How would you -- how would you make such a
10 payment arrangement, Mr. Montgomery, at this time in
11 September 18 of 2009?
12   A.  I'm asserting my right under the Fifth
13 Amendment.
14   Q.  All right.  Okay.
15      All right.  If you flip with me to -- oh,
16 on the right-hand side dates dated -- remarks dated
17 October of '06, October 16, '06.
18   A.  '06?
19   Q.  Yeah.
20   A.  Which, which period of time?
21      MR. CROCKETT:  Same exhibit.
22      THE WITNESS:  Oh, okay.
23      MR. FLYNN:  1099.
24 BY MR. CONANT:
25   Q.  All right.  Mr. Montgomery, between the

Page 336

Dennis Lee Montgomery   -   November 18, 2010

1  years of -- well, between April '06 and March of
2  2009, how -- what did -- what is reflected as your
3  income in W-2s issued to you by Edra Blixseth's
4  entities?
5      A.   I don't recall.
6      Q.   For any year?
7      A.   I don't recall.
8      Q.   Less than a million dollars or more than a
9  million dollars?
10     A.   For what period?
11     Q.   Let's start with year -- tax year 2006.
12     A.   Tax year or calendar year?
13     Q.   Tax year -- for tax year 2006, what would
14  be reflected in your W-2 for that tax year?
15     A.   I don't recall.
16     Q.   For 2007, would it be -- I'm talking about
17  tax year 2006 now, would it be less than a million
18  dollars or more than a million dollars?
19     A.   I believe we went already went through this
20  same exact question.
21     Q.   I asked you how much --
22     A.   I don't recall.
23     Q.   What would be reflected in your tax year
24  2007 W-2 --
25     A.   I don't recall -- I'm sorry.

Page 337

1  microphone.
2      All right.  Sorry.
3      THE WITNESS:  I'm confused.  I thought the
4  tax year was the next -- the next year that reported
5  the previously year's.
6  BY MR. CONANT:
7      Q.   Right.
8      So your W-2 that reflects your taxes --
9  your income for 2008.  If I'm asking for your tax
10  year 2008 W-2, I want the W-2 --
11     A.   -- for 2007?
12     Q.   No, the W-2 that refers to your 2008
13  income.
14     MR. CROCKETT:  Which would be the one that
15  you would receive by January 31st, 2009.
16     THE WITNESS:  Right.  Right.  Right.
17  Right.
18     I don't recall.
19     What's the previous question you asked me
20  regarding 2007?  I want to -- I may have answered --
21  I want to make sure.
22  BY MR. CONANT:
23     Q.   Sure.
24     A.   Can you repeat it?
25     Q.   Yeah, for tax year 2007, what is reflected

Page 339

1      Q.   -- as your income from Ms. Blixseth's
2  entities?
3      A.   I don't recall.
4      Q.   Less than a million dollars or more than a
5  million dollars?
6      A.   For 2007?
7      Q.   Yes.
8      A.   I would think less.
9      Q.   And for 2008, what would be reflected in
10  your tax year 2008 W-2s?
11     A.   I want to make sure I don't get in trouble.
12     MR. CROCKETT:  I think you've confused both
13  of us.
14     THE WITNESS:  Yeah.  You've changed.  Which
15  one are you talking about?  The easiest way to tell
16  me is just that year.
17     Tax year, isn't that the next year?
18  BY MR. CONANT:
19     Q.   Well, if you're getting a W-2 for tax year
20  2008 --
21     MR. CROCKETT:  For calendar year 2008.
22     THE WITNESS:  You mean calendar year.
23     MR. CONANT:  Calendar year is -- for
24  individuals is same for -- it's the same for --
25     MR. CROCKETT:  Hold on.  I lost my

Page 338

1  on your W-2 for that tax year?
2      A.   I don't recall.
3      MR. FLYNN:  Same question 1099s.
4  BY MR. CONANT:
5      Q.   Did you receive any 1099s from any of
6  Ms. Blixseth's entities?
7      A.   At one point I was getting W-2s and at one
8  point I was getting 1099s.  I don't remember when.
9      Q.   Do you recall how much your income was
10  reflected on any 1099 that you received for any tax
11  year?
12     A.   I don't recall, no.
13     Q.   And when I say -- I'm referring to 1099s
14  issued by Ms. Blixseth's entities.
15     A.   I understood the question.
16     I don't -- I'm not certain.  I don't recall
17  is my point.  I don't recall what I got on either a
18  W-2 or a 1099.
19     Q.   So it's safe to say that with respect to
20  1099s or W-2s for tax years 2006 through 2009 for
21  income you received from Edra Blixseth's entities,
22  you just don't recall what would be on those?
23     A.   I don't have my taxes on them and you've
24  been hitting me for eight straight hours and I'm
25  tired.

Page 340

85 (Pages 337 to 340)

1        MR. CROCKETT:  Answer the question.
2        THE WITNESS:  I don't know.
3        MR. CONANT:  That's all I wanted to know.
4        MR. CROCKETT:  Because the documents are
5    the best evidence anyway.
6        THE WITNESS:  I know.
7        It's 5.  I really need to leave at
8    5 o'clock and it's 5 o'clock.
9        Or is it not maybe.
10       MR. CONANT:  I have two minutes.
11       Anything further?
12       THE WITNESS:  Are these ours to take?
13       THE REPORTER:  No.
14       THE WITNESS:  These are yours?
15       MR. CROCKETT:  These are --
16   BY MR. CONANT:
17       Q.  Mr. Montgomery, the reference that we just
18   saw on these casino records, your attempts to sell
19   your software to countries overseas, did Edra
20   Blixseth have any involvement at all with your
21   efforts in that regard?
22       A.  I've answered the Fifth.
23       MR. CONANT:  It's 5 o'clock.
24   Mr. Montgomery needs to go, as does his attorney.
25   I'm going to hold -- I'll reserve the right to

                                        Page 341

1        I hereby declare under penalty of perjury
2    under the laws of the State of California that I
3    have read the foregoing deposition and that the
4    testimony contained therein is a true and correct
5    transcript of my testimony given at said time and
6    place.
7        Dated this _____ day of _____,
8    2010, at _____, _____.
9
10
11                    _____
12                    Signature of Witness
13
14
15
16
17
18
19
20
21
22
23
24
25

                                        Page 343

1    continue this deposition subject to Judge Bluebon's
2    (phonetic) rulings on the propriety of any refusal
3    to answer in the case that there's no privilege, his
4    refusal to produce documents that we've requested
5    he's hid behind the Fifth Amendment privilege for.
6        THE WITNESS:  Okay.
7        MR. CONANT:  So with that, I think we'll go
8    off the record.
9        THE VIDEOGRAPHER:  This concludes today's
10   proceeding in the video deposition of Dennis Lee
11   Montgomery.  The total number of media used was
12   four.
13       We're going off the record.  The time is
14   5 p.m.
15       THE REPORTER:  Copies?
16       MS. WELLS:  Yes.
17       MR. CROCKETT:  You better send me one.
18       (The deposition was concluded at 5 p.m.)
19
20   ///
21   ///
22   ///
23   ///
24   ///
25   ///

                                        Page 342

1
2                    CERTIFICATE
3                        OF
4              CERTIFIED SHORTHAND REPORTER
5
6        I, Stephanie P. Borthwick, Certified
7    Shorthand Reporter of the State of California, do
8    hereby certify:
9        That the foregoing deposition was taken
10   before me at the time and place therein set forth,
11   at which time DENNIS LEE MONTGOMERY was duly sworn
12   by me;
13       That the testimony of the witness and all
14   objections made at the time of the examination were
15   recorded stenographically by me and thereafter
16   transcribed, said transcript being a true copy of my
17   shorthand notes thereof, and a true record of the
18   testimony given by the witness.
19       In witness whereof, I have subscribed my
20   name this date:  December 7th, 2010.
21
22
23                    _____
24                    STEPHANIE P. BORTHWICK, CSR
25                    Certificate No. 12088

                                        Page 344

# EXHIBIT D

Case 3:01-cv-00445-PMP-VPC   Document 182-4   Filed 08/07/23   Page 455 of 650
Case 3:06-cv-00056-PMP-VPC   Document 634   Filed 09/03/08   Page 1 of 265
151

1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF NEVADA
2          BEFORE THE HONORABLE VALERIE P. COOKE, MAGISTRATE JUDGE
                          ---o0o---
3

4    Dennis Montgomery, et al.,    : No. 3:06-cv-056-PMP-VPC
                                    :
5              Plaintiff,          : August 19, 2008
                                    :
6          -vs-                     : United States District Court
                                    : 400 S. Virginia Street
7    ETreppid Technologies,        : Reno, Nevada  89501
     et al.,                        :
8                                   :    **VOLUME II**
               Defendant.           :
9    _____:

10

11
                           **TRANSCRIPT OF**
12              **CONTINUED SHOW CAUSE HEARING**

13
     A P P E A R A N C E S:
14
     FOR THE PLAINTIFF:            Randall Sunshine
15                                 Ellyn Garofalo
                                   Attorneys at Law
16

17   FOR DEFENDANT ETREPPID:      Stephen Peek
                                   Jerry Snyder
18                                 Attorneys at Law

19   FOR COUNTER-DEFENDANTS:      Bridgett Robb-Peck
                                   Gregory Schwartz
20                                 Attorneys at Law

21   FOR INTERESTED PARTY:        Carlotta Wells
                                   U.S. Department of Defense
22

23

24   Proceedings recorded by mechanical stenography produced by
     computer-aided transcript
25

                    KATHRYN M. FRENCH, RPR, CCR
                          (775) 786-5584

Case 3:01-cv-00445-RCJN-VPC Document 182-4 Filed 08/07/03 Page 456 of 650
Case 3:06-cv-00056-PMP-VPC Document 634 Filed 09/03/08 Page 2 of 265

152

```
 1

 2    Reported by:                   KATHRYN M. FRENCH, RPR, CCR
                                     NEVADA LICENSE NO. 392
 3                                   CALIFORNIA LICENSE NO. 8536

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Case 3:01-cv-00445-RJN Document 182-4 Filed 08/07/23 Page 457 of 650
Case 3:06-cv-00056-PMP-VPC Document 634 Filed 09/03/08 Page 3 of 265
153

```
 1          Reno, Nevada, Tuesday, August 19, 2008, 9:00 a.m.

 2                          ---OoO---

 3

 4              THE COURT:  Thank you.  Please be seated.

 5              THE CLERK:  This is the date and time

 6   set for continued Show Cause Hearing in case number

 7   3:06-cv-056-PMP-VPC, Dennis Montgomery, and others, versus

 8   eTreppid Technologies, and others.

 9              Present on behalf of plaintiff, Ellyn Garofalo and

10   Randall Sunshine.

11              Present on behalf of defendant, Stephen Peek and

12   Jerry Snyder.

13              Present on behalf of counter-defendant,

14   Bridgett Robb-Peck.

15              Present on behalf of interested party,

16   Carlotta Wells.

17              THE COURT:  Good morning everybody.

18              Let the record reflect it is 9:08 a.m.  The Court

19   intends to start promptly nine o'clock a.m.  So I think

20   Mr. Peek may have been here early setting things up, but I

21   expect that we commence at nine o'clock sharp, just for

22   future reference.

23              Counsel.

24              MS. GAROFALO:  Good morning, Your Honor.  I

25   think the eight minutes late may have been well spent.
```

Case 3:21-cv-00445-CMN-VPC Document 182-4 Filed 08/03/23 Page 458 of 650
Case 3:06-cv-00056-PMP-VPC Document 634 Filed 03/03/08 Page 84 of 265

-154

 1    Mr. Peek and I have been discussing what is one of the key

 2    issues here, which I think we have reached a resolution on.

 3              As the Court knows, there's been much talk about

 4    the Glogauer e-mails and PST files, the original PST files.

 5    The Glogauer PST files have now been received back from the

 6    Washington attorneys, Scatton lawyers, who were using that in

 7    the Grand Jury proceedings.  There is an issue with one, at

 8    least one, e-mail chain which, in response to a word search,

 9    does indicate that there may be some information subject to

10    the State Secret's Privilege on the Glogauer PST.

11              We've talked to Ms. Wells, who will be talking to

12    her client about the best way to handle it.  We've indicated

13    to Mr. Peek that we would prefer Mr. Montgomery remove those

14    files, necessarily open those files.  And we've come up with

15    several alternatives that, hopefully, by the end of the day,

16    we will be able to convey to the Court that we have resolved

17    the issue, and that those hard drives will be produced

18    forthwith to Mr. Peek.

19              THE COURT:  All right.  Very good.

20         Mr. Peek.

21              MR. PEEK:  I have nothing to say.  I appreciate

22    the proffer, Your Honor, and I've accepted.  And, certainly,

23    we're going to be speaking with Ms. Wells and see if we can't

24    find a way to expedite this.

25              THE COURT:  Thank you very much.

Case 3:01-cv-00445-RLH-VPC Document 182-4 Filed 08/07/23 Page 459 of 650
Case 3:06-cv-00056-PMP-VPC Document 634 Filed 05/03/08 Page 5 of 265
155

```
1              MS. GAROFALO:  Thank you.

2              THE COURT:  Thank you, counsel.

3         The other matter, counsel, we're just trying get

4    exhibits sorted out.  And I understand counsel can do that

5    later on today, toward the end of the afternoon.

6              Is that correct, counsel?

7              MR. SUNSHINE:  Yes, Your Honor.

8              THE COURT:  Okay.  Very good.

9         Correct, Mr. Peek?

10             MR. PEEK:  Yes, Your Honor.

11             THE COURT:  All right.  Mr. Peek, by my count,

12   you've got 4 hours and 17 minutes.

13             MR. PEEK:  That's about what I calculated, too,

14   Your Honor.

15             THE COURT:  All right.  So you may proceed, sir.

16             MR. PEEK:  Just need a witness, and we're ready

17   to go.

18             THE COURT:  All right.
```

19                    **DIRECT EXAMINATION (resumed)**

```
20   BY MR. PEEK:

21    Q   Mr. Montgomery, I wanted to go back and clear up a few

22   things that I hadn't covered yesterday.  And I'm going to

23   start with, at least, the NBC and Wall Street Journal

24   communications.

25             One thing I have not seen in any production at
```

Case 3:05-cv-00045-RJ-VPC Document 182-4 Filed 08/03/23 Page 460 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 50 of 265

-156-

1  all, is any form of communications, whether it be cell phone

2  record or long distance phone call records of how NBC News was

3  contacted.

4          Did you contact NBC News?

5  A   No.

6  Q   Who did?

7  A   Tim Blixseth.

8  Q   Okay.  Did he do it -- do you know whether he did it by

9  telephone or by e-mail?

10  A   I believe phone.  I don't know for certain, but my

11  understanding was he was the one who had the contact with

12  them.

13  Q   And do you know at whose prompting Mr. Blixseth contacted

14  NBC News?

15  A   No.

16  Q   Was it at yours?

17  A   No.

18  Q   Did you tell Mr. Blixseth that you had certain e-mails

19  that would be of interest to NBC News?

20  A   I don't recall that I did or not.

21  Q   Well, why was it that he would contact NBC News, other

22  than to talk about the Jale Trepp and Glogauer e-mail?

23  A   You would have to ask him.

24  Q   Did you testify tell him about the Len Glogauer e-mail?

25  A   No.

Case 3:01-cv-00445-RJN-VPC Document 182-4 Filed 08/03/23 Page 461 of 650
Case 3:06-cv-00056-PMP-VPC Document 634 Filed 09/03/08 Page 17 of 265
157

1    Q    Did you give him a copy?

2    A    No.

3    Q    Did you tell him about the Jale Trepp e-mail?

4    A    I don't recall if I did or not.

5    Q    The Wall Street Journal, did you contact John Wilke, or

6    did somebody else contact John Wilke?

7    A    I didn't.

8    Q    Okay.  And who did?

9    A    I don't know if it was Tim or Edra.

10   Q    Okay.  One of those two?

11   A    I want to say Tim, but I'm -- I'm not certain.

12   Q    Okay.  And do you know when he did that?

13   A    No.

14   Q    Do you know whether he did it by phone or by e-mail?

15   A    I don't know.

16   Q    And do you know why he did it?

17   A    No.

18   Q    Did you tell him something that caused him to -- that you

19   believe caused him to contact the Wall Street Journal?

20   A    I did talk with him, I think, on one occasion.

21   Q    I mean, for example, did you tell him that you had a

22   Len Glogauer e-mail?

23   A    I don't recall if I said that exactly or not.

24   Q    Did you tell him what you believed about the Jale Trepp

25   e-mail?

Case 3:01-cv-00045-PMP-VPC Document 182-4 Filed 08/03/23 Page 462 of 650
Case 3:06-cv-00056-PMP-VPC Document 634 Filed 03/23/08 Page 3 of 265

158

1   A    I don't recall that one specific instance or not.

2   Q    Did you tell him that you had evidence that Mr. Trepp had

3   given casino chips and cash to Congressman Gibbons?

4   A    I told him I saw it.

5   Q    You told him you saw it.  Okay.

6        And did you tell him you saw it on one, or more than

7   one instance, or more than one instance?

8              MS. GAROFALO:  Your Honor, objection.  Relevance

9   based on the -- objection.  Relevance.

10             THE COURT:  Mr. Peek.

11             MR. PEEK:  Your Honor, what I'm trying to get at

12  is whether there are communications that Mr. Montgomery would

13  have that should have been produced.

14             MS. GAROFALO:  I'll withdraw the objection at

15  this time, Your Honor, but we are here to focus --

16             MR. PEEK:  And I'll do this quickly.  Sorry.

17             MS. GAROFALO:  -- to the core issues.  Not to

18  the underlying merits of the case.

19             THE COURT:  I agree.  Okay.

20        All right.  The Court does concur, to some extent,

21  with Mr. Montgomery's counsel about the focus.

22        So, go ahead, with that comment, Mr. Peek.

23  BY MR. PEEK:

24   Q    Did you provide any communications to Mr. Blixseth via

25  e-mail, for example?

Case 3:01-cv-00445-RCJN-VPC Document 182-4 Filed 08/03/23 Page 463 of 650
Case 3:06-cv-00056-PMP-VPC Document 634 Filed 09/03/08 Page 3 of 265

159

1    A    I don't recall if I did or not.

2    Q    And if you did, those would be where, sir?

3    A    I mean, I don't have them.  If he has them -- maybe he

4    has them.  I don't know.

5    Q    When you say you don't have them, what efforts have you

6    made to look for them?

7    A    I've -- we went through this for four days.  I've looked

8    everywhere for everything you asked for, diligently.

9    Q    And you also told us yesterday that you believe if there

10   were any communications regarding your efforts to transfer,

11   sell, assign the data compression, anomaly detection, pattern

12   recognition, Object Tracking, Source Code, it would have been

13   on your computer, the computer that was seized by the FBI.

14            Do you remember that testimony from yesterday?

15   A    Yes, I -- yes.

16   Q    Okay.  And so that would be the only place that it would

17   be, or would it be other places?

18   A    I mean there could have been another copy of that drive,

19   or I mean --

20   Q    Well, you told us yesterday you thought there was another

21   copy of that drive because the video was on that.

22   A    Right.

23   Q    So was there another copy of that drive?

24   A    Not that I know of, but I've not looked through

25   everything.  There's still five drives left.  I've referred

1   to this before.

2   Q   Okay.  And so it would be somewhere on those five drives?

3   A   It could be.  I mean, I have a number of CDs, which it

4   could have been on those too.

5   Q   Now, after -- well, there are certainly some e-mails that

6   I think you have produced.  I don't know whether you produced

7   them or somebody else produced them, but there are e-mails of

8   communications with respect to the transfer, assignment of the

9   Source Code, correct?

10  A   Yes.

11  Q   You've seen those?

12  A   Yes.

13  Q   Okay.  Now, the other thing that we know is that the

14  FBI seized your material on or about March 1st of 2006,

15  correct?

16  A   Yes.

17  Q   And that we also know from Exhibit 9, which you've seen

18  before, I believe.  I -- let me just make sure I got the right

19  exhibit.

20          Actually, it's exhibit 8.

21          Let me just refer you to Exhibit 8.  That is your

22  response to requests for production that came from Miss Klar,

23  or from the Liner Law Firm to us, on or about May 26th.

24          Do you see that e-mail in the first page of that?

25  A   Yes.

1  Q   And then attached to that are all the documents that are
2  referenced in that e-mail.
3          Do you see that?
4  A   Yes.
5  Q   Okay.  Do you recognize this production as something that
6  you produced on or about May 26th, 2006 -- excuse me, 2008.
7  A   No.  I mean, I -- I don't know that.
8  Q   Okay.  Well, let me just then follow-up.
9          Would you turn to a page that is marked MONT-184.
10 And these are in date numerical, ascending order.
11 A   Mine goes to 182 -- oh, no.  Then it starts with another
12 e-mail.
13         Oh, I see.  I got it.
14 Q   Okay.
15 A   Sorry.
16 Q   Do you see that e-mail there?
17 A   Yes.
18 Q   What's the address of Dennis Montgomery there?
19 A   Dennis@ncoder.net.
20 Q   Now, yesterday, you told us you didn't think you setup
21 that e-mail account in mid 2006.
22         Do you remember that testimony?
23 A   Yes.  Yes.
24 Q   You were wrong?
25 A   Yes.  Obviously.

Case 3:81-cv-00045-PMP-VPC Document 182-43 Filed 08/07/23 Page 466 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 12 of 205
162

1    Q    You were using the Montgomery@ncoder.net in March of

2    2006, were you not?

3    A    I didn't think so, but it may have been.

4    Q    Well, did you get this e-mail that was addressed to

5    Dennis@ncoder.net?

6    A    I'm believing you.  I see it.

7    Q    You don't have to believe me.

8    A    I'm saying I may -- maybe I set it up earlier.  I don't

9    recall.

10   Q    Okay.  But, anyway, this is an e-mail dated March 27th,

11   2006, is it not?

12   A    Yes.

13   Q    It's e-mail that wouldn't be on your home computer,

14   isn't it?

15   A    Correct.

16   Q    Because your e-mail, your e-mail was seized on or about

17   March 1st?

18   A    Yes.

19   Q    So, yesterday, when you told us all of those e-mail

20   communications that would be on your -- with respect to

21   transfer assignment of the Source Code would be on your home

22   computer that was seized by the FBI, that is now in hard drive

23   with the nine one one serial number ending -- do you remember

24   that from yesterday?

25   A    I didn't think I said exactly that.

1  Q  Well, that's what you told us yesterday.  If there were

2  any e-mails, they would be on that hard drive.  You've given

3  me everything.

4  A  I didn't say there wouldn't be any.  I said there would

5  be some.

6  Q  Oh, okay.  So there are some at Dennisencoder.net, are

7  there?

8  A  You keep asking me that.  There are none.

9  Q  There are none.  Well, here's one right here 184, is it

10  not?

11  A  I see that.

12  Q  It's on your e-mail.  It's on your e-mail, isn't it?

13  A  Yeah.  This could have shall be deleted a year ago.

14  Q  Okay.  So you deleted these e-mails?

15  A  No, I didn't.

16  Q  Well, they were deleted, correct?

17  A  I don't have that.  That's correct.

18  Q  Okay.  So these e-mails that you have that were produced,

19  didn't come from you, is that correct?  This e-mail, that

20  is --

21  A  I didn't --

22  Q  -- exhibit --

23  A  I don't -- I didn't have the agreements that I signed.

24  My attorney, Mike Flynn, did.  And he's never given them back

25  to me.  So, I couldn't have produced these signed documents

Case 3:81-cv-00445-CJN Document 182-43 Filed 08/07/23 Page 468 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 84 of 205

-164-

1    because Mr. Flynn is holding my documents -- like many other

2    things.

3    Q    Okay.  But you at least -- and you didn't have the

4    e-mails either that are produced here?  Somebody else did.

5    A    I don't know who produced this particular e-mail.  I

6    mean, I don't know if Mike Flynn produced it.  I don't know.

7    Q    Well, your -- you, through your lawyer, produced it.

8    That's all I know.

9    A    Okay.

10   Q    You don't know how they came into his possession, is that

11   your testimony?

12   A    I can't answer that without giving up attorney/client

13   privileged information.

14   Q    Well, did you provide e-mails to your attorneys that

15   covered the period of March 2006 through April 2006 that refer

16   to your transfer/assignment of the Source Code?

17   A    I didn't think -- the e-mails that I know of --

18   Q    Well --

19   A    Can I answer the question?

20   Q    It's a simple yes or no.

21        Did you or did you not provide --

22   A    I don't know specifically if that happened or not.

23   Q    Okay.  So you don't know whether you did provide these

24   e-mails that were produced by your counsel.

25        Is that your testimony?

Case 3:01-cv-00445-CJN Document 182-43 Filed 08/07/23 Page 469 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 15 of 205

165

```
 1    A    That's correct.

 2    Q    Okay.  And where would those e-mails be today?

 3    A    I believe I gave e-mails between myself and Mike Flynn

 4   that were privileged e-mails.

 5    Q    That's not what I asked.

 6         Where are the e-mails that are referenced here --

 7    A    Oh.

 8    Q    -- in Exhibit 8?

 9    A    I don't know.  I don't know.

10    Q    Okay.  And there are actually, in Exhibit 8, a number of

11   them.  You can look at, you know, MONT-185.

12    A    Yeah, I see them.

13    Q    186.

14    A    Which they all refer to Mike Flynn.

15    Q    Okay.  Did they come from Mike Flynn?

16    A    God, knowing him, I don't know.  I don't know.

17    Q    You don't know the source of these, is that correct?

18    A    No, but I did give the e-mails that were -- I thought

19   I was supposed to give that were e-mails that were between

20   myself and Mike Flynn.

21    Q    Okay.  So you had some of those someplace then?

22    A    Yes, at some point.

23    Q    Where did you have those?

24    A    I think they were burned onto a CD.

25    Q    And so then would that be all of the e-mails you had
```

Case 3:81-cv-00045-ECR Document 182-43 Filed 08/07/23 Page 470 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 16 of 205

-166-

1    between yourself and Mike Flynn that you burned on the CD?

2     A   I believe so.

3     Q   Okay.  And then you must have retained copies of those

4    e-mails in order to burn them onto a CD, is that correct?

5     A   No.  I gave them -- what I had, I burned them onto a CD.

6     Q   Right before you burned them onto a CD, you took them off

7    some other form of electronic media, did you not, sir?

8     A   I think there -- I didn't know what the original source

9    was.  I don't know whether it was a CD or disk drive.

10    Q   Well, how did they -- what source --

11              THE COURT:  Okay.  Stop.  Stop.

12              MR. PEEK:  -- or hard drive --

13              THE COURT:  I just want to admonish both

14   counsel, and you, Mr. Montgomery, the court reporter cannot

15   report accurately if you talk over one another.  So please

16   take care to not do that.

17              Go ahead, sir.  Start again.

18   BY MR. PEEK:

19    Q   From what media source did you obtain the e-mails between

20   you and Mike Flynn that you burned onto either a CD or a hard

21   drive?

22    A   An Outlet file.

23    Q   And where was that outlet file?

24    A   On a hard drive.

25    Q   And on whose hard drive was that?

Case 3:08-cv-00445-CJN Document 182-43 Filed 08/07/23 Page 471 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 17 of 205

167

1    A    Mine.

2    Q    Did the hard drive only save e-mails between you and

3  Mr. Flynn, or did it save all e-mails?

4    A    Just those.

5    Q    So did you setup one program in your computer that it

6  would only save e-mails between you and Mr. Flynn?

7    A    I don't remember if it was setup that way specifically

8  or not.

9    Q    Okay.  But for some reason or another, you kept only the

10  e-mails in your Outlook file between you and Mr. Flynn, but

11  not others, is that correct?

12   A    Yes.  Because Mr. Flynn was very adversarial to me.

13   Q    In 2006 he was?

14   A    Yes.

15   Q    Okay.  And that would be in March of 2006, he was very

16  adversarial to you?

17   A    No.  Not at the beginning.

18   Q    Well, when did you start saving your e-mails between you

19  and Mr. Flynn?

20   A    Well, since I knew Mr. Flynn.

21   Q    Okay.  And those are the only e-mails that you saved, is

22  that correct?  Is that your testimony?

23   A    I -- there were e-mails on Opspring's computers that

24  Michael Sandoval retained.

25   Q    But this is before Mr. Sandoval, in this Exhibit A, is

Case 3:01-cv-00445-CJN Document 182-43 Filed 08/07/23 Page 472 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 18 of 205

168

1   it not?

2    A   Yeah, I know.  But, you're talking about a month before.

3   This is the month of March.

4    Q   I am talking about the month of March.

5    A   I don't recall that, whether I did or not.

6    Q   Okay.  And these were saved on your personal computer

7   where the address is Dennis@ncoder.net, is that your

8   testimony, the ones with Mr. Flynn?

9    A   Yes.

10   Q   And you saved no others than the ones between you and

11  Mr. Flynn, is that your testimony as well?

12   A   I don't recall the others, if I did or not.

13   Q   And where are those e-mails today that -- just the ones

14  that you saved between you and Mr. Flynn?

15   A   My attorneys'.

16   Q   Okay.  And where are the ones that you had between you

17  and others?

18   A   Well, between Opspring, they were on Opspring's

19  computers, of which Mr. Sandoval retained.

20   Q   Okay.  And so Mr. Sandoval would have those?

21   A   I would say that's a good source.

22   Q   Okay.  And what about the others that were not the

23  Opspring e-mails?

24   A   Well, I just told you I had Opspring and Dennis@ncoder --

25   Q   I'm talking about the others that would be at

Case 3:01-cv-00445-MPN-VPC Document 182-4 Filed 08/07/09 Page 473 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 39 of 205

169

1    Dennis@ncoder, where are they?

2    A   I haven't seen them.  I will look for them.

3    Q   Okay.  So you think they may exist?

4    A   I don't think so, but I will surely look.

5    Q   Okay.  Is this -- have you looked before today?

6    A   I've been looking for five months.

7    Q   Have you looked before today?

8    A   Yes, I have.

9    Q   Okay.  And in your search, did you find any e-mails that

10   would be responsive to any requests for production where you

11   had the e-mail address at Dennis@ncoder.net?

12   A   I had looked, but I don't think I found them originally.

13   I mean I haven't seen them.

14   Q   Okay.  You believe they exist?

15   A   There's a possibility.

16   Q   So it's just only a possibility that they may exist?

17   A   I've looked through a lot of information for five months.

18   Q   Okay.  Well the request went out to you in November

19   of '07.  Did you begin looking in November of '07, sir?

20   A   Yes.

21   Q   And?

22   A   And I believe I sent things to my original attorney,

23   Mr. Flynn.

24   Q   Mr. Flynn was not your attorney in November of '07, sir.

25   A   November of '07.

```
 1    Q    That's correct, sir.

 2    A    Okay.  I'm sorry.  I thought I had that wrong.

 3    Q    Well, you did have it wrong.

 4    A    Yeah, I got it wrong.  Yeah.

 5              What was the question?

 6    Q    The question was you've had it since November of '07,

 7    when the request went out to you.  Did you begin looking in

 8    November of '07 when the requests were sent to you?

 9    A    Yes.  And I didn't find any at that time.

10    Q    So then you've been looking since November of '07, and

11    it's now August of '08.  So, that's approximately ten months.

12    Almost nine or ten -- eight, seven or eight months.

13    A    Is that a question?

14    Q    Yeah.  So you haven't found anything in this period of

15    time?

16    A    I have found stuff.

17    Q    November '07 --

18    A    I've produced four million files.  So, I can't say I

19    didn't find anything.  I have found something.

20    Q    Sir, my question was really related to the e-mails.

21    In November of '07, until today, August 19th, have you

22    found any e-mails, other than the ones that are between

23    you  and Mr. Flynn, that would be responsive to the requests

24    for production that would bear the e-mail address at

25    dennisncoder.net?
```

Case 3:08-cv-00045-PMP-VPC Document 182-4 Filed 08/07/09 Page 475 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 21 of 205
-171

1    A    And excluding my current attorneys?

2    Q    Yes, sir.

3    A    No.  I haven't found any.

4    Q    Okay.  And the request also required you to produce them

5    in native format.

6    A    Correct.

7    Q    With PST.  So, you haven't done that either, have you?

8    A    Well, if I find them, and they're in that format, I will

9    produce them.

10                    MR. PEEK:  I would offer exhibit 8, Your Honor.

11                    THE COURT:  Any objection?

12                    MS. GAROFALO:  No, Your Honor.

13                    THE COURT:  All right.  Exhibit 8, defendant's

14    Exhibit 8, is submitted.

15            (Whereupon, exhibit 8 -- document, was received in

16    evidence.)

17    BY MR. PEEK:

18    Q    Now, we talked yesterday about Mr. Visconti.

19            Do you remember that testimony yesterday of

20    Mr. Visconti?

21    A    That was the Chris Shockey e-mail?

22    Q    Yes.  Do you recall attending a meeting with Mr. Shockey

23    in December of 2007, in Bellevue, with yourself, Mr. Shockey,

24    Mr. Rhodes, Mr. Crisman, Mr. Visconti, Mr. Wehnt and

25    Mr. King?

1    A    No.

2    Q    You don't have any recollection of that at all?

3    A    No, I don't recognize the guy's name.

4    Q    You do recognize the other names, Mr. Shockey and

5    Mr. Rhodes, and Mr. Crisman, do you not?

6    A    Yes.

7    Q    And you don't recognize the names Mr. Wehnt and Mr. King

8    then as well?

9    A    No.

10   Q    And did you, during -- well, did you ever make a

11   presentation to Mr. Visconti, Mr. Wehnt, and Mr. King, in

12   which you provided a demonstration of the technology showing

13   a CD quality movie, and what Dennis, what you described, as

14   a 19 to 1 video compression?

15   A    No.

16   Q    You don't ever recall doing that?

17   A    No.

18   Q    Do you have or did you have a demonstration of technology

19   showing the CD quality movie in a 19 to 1 video compression

20   while you were at Opspring?

21   A    No.

22   Q    You did not?

23   A    No.

24   Q    Okay.  Following along with some of those marketing

25   efforts, would you take a moment and look at Exhibit 20.

Case 3:01-cv-00445-CJN Document 182-4 Filed 08/07/23 Page 477 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 23 of 205

173

```
 1                    THE COURT:  What volume, sir?

 2                    MR. PEEK:  It's Volume 5, Your Honor.

 3                    THE WITNESS:  Okay.

 4   BY MR. PEEK:

 5    Q   Do you recognize that?

 6    A   Which number?  Exhibit 20?

 7            I don't know what this --

 8    Q   There's an entire exhibit.  Would you please take a

 9   moment and take a look at it.

10                    THE COURT:  There's a second page.

11   BY MR. PEEK:

12    Q   Do recognize this as the exhibit you submitted?

13    A   Yes, sir.

14    Q   And you signed it under penalty of perjury, didn't you,

15   sir.

16    A   Yes.

17    Q   Now, would you turn to paragraph 12 on page 6 of that

18   exhibit.

19    A   Okay.

20    Q   Declaration number 6.

21    A   Yes, I see it.

22            Which one is it?

23    Q   Paragraph 12.

24    A   Yes, I see it.

25    Q   And you say in your declaration:  "Throughout the summer
```

Case 3:81-cv-00445-CJN Document 182-41 Filed 08/07/23 Page 478 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 24 of 205
174

1    and fall of 2006, up to and including the present, I worked

2    with my current employers to improve my technology.  It is

3    significantly improved, and we have voluntarily used it in the

4    last 60 days to voluntarily provide intelligence information

5    to appropriate officials in, order to save American lives.

6    Even with its current limited use, it has specifically

7    diverted specific terrorist threats."

8              Was that your effort to market the technology to the

9    United States Government?

10   A    No.

11   Q    It was just a voluntary act on your part?

12   A    No.

13   Q    No effort to sell or market your --

14   A    Me?  No.

15   Q    Well, somebody at Opspring?

16   A    I didn't.  I wasn't involved.

17   Q    Did somebody at Opsprings do it, sir?

18   A    Well, you just asked me that question.

19   Q    Did somebody at Opsprings do it, sir; market the

20   technology to the United States Government?

21   A    I don't know if they did that specifically or not.

22   Q    Well, when you were providing these voluntary efforts to

23   the intelligence community of the United States Government,

24   were you doing so on behalf of Opsprings, or yourself, to

25   market the Source Code?

Case 3:01-cv-00445-MPN-VPC   Document 182-43   Filed 08/07/09   Page 479 of 650
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/03/08   Page 25 of 205

175

1   A   No.  I would like the ask the government a question

2   before I answer this.

3   Q   If you want to.  I mean, this has been redacted already

4   by the government.

5   A   So you want me just to answer the question, right?

6   Q   No.  Go ahead and ask the government.

7                   MR. PEEK:  Your Honor, I don't want to --

8                   THE WITNESS:  I'm not sure -- the question you

9   asked me again was what?

10  BY MR. PEEK:

11  Q   The question was when you provided this information

12  described in paragraph 12, was it an effort, by Opspring, to

13  market the technology to the United States Government?

14  A   I don't think so.

15  Q   Why was it done then?

16  A   Uh, we thought it would be helpful.

17  Q   Did you think it would also be helpful to provide them

18  this information in order to show the benefits of the Source

19  Code?

20  A   Well, we weren't giving them the Source Code.  We were

21  just giving the output.

22  Q   Well, sir, the benefits of the Source Code, which would

23  be the outputs, correct?

24  A   No.

25  Q   Right?

Case 3:01-cv-00445-CSN  Document 182-43  Filed 08/07/23  Page 480 of 650
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/03/08  Page 26 of 205

176

1    A    No.

2    Q    So this is not a marketing effort on your part?

3    A    No.

4    Q    Not a marketing effort on the part of Opspring, is that

5    your testimony?

6    A    Yes.

7    Q    Is --

8              MR. PEEK:  Your Honor, do I need to offer

9    declarations, Your Honor, that are already part of the record?

10   I'll just refer to them in closing, but if I -- otherwise, I

11   would offer Exhibit 20.

12             THE COURT:  All right.  Well, let's go ahead,

13   since they're exhibits.

14        Do you have any objection, counsel, just to having

15   it admitted?  It's part of the record as --

16             MS. GAROFALO:  No, Your Honor.

17             THE COURT:  All right.  20 is admitted.

18        (Whereupon, exhibit 20 -- a document, was received

19   in evidence.)

20             MR. PEEK:  Thank you.

21   BY MR. PEEK:

22   Q    Now, we covered yesterday your affidavit, or your, excuse

23   me, your declaration that you gave where you said that did not

24   contain any classified information.

25             Do you remember that from yesterday?

Case 3:01-cv-00445-CIN Document 182-43 Filed 08/07/23 Page 481 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 27 of 205

177

```
1    A    Yes.

2    Q    Okay.  Now you've also made a representation to this

3    court in pleadings that at least 60 to 80 percent of the

4    technology data consists of files that are covered by the

5    U.S. Protective Order.

6              Do you remember that?

7    A    Yes.

8    Q    And is that still your testimony today?

9    A    I don't know if it -- if it's that high.  But, it's a

10   sizeable number.

11   Q    Okay.  And of that so-called 60 to 80 percent of

12   the technology data, have you provided any of it to the

13   government?

14   A    Yes.

15   Q    Okay.  And that's in the form, I think you said, of two

16   hard drives that you gave up recently?

17   A    Three.

18   Q    Three hard drives very recently.  Okay.

19              And how much data was on that?

20   A    I don't know specifically.  I would think a terabyte or

21   two.

22   Q    You would think.  Okay.  You don't know then?

23   A    Well, one of them was a terabyte.  I think the

24   other two, one was on a 500, and one was on a 750.  That's

25   two-and-a-quarter terabytes, and they weren't all full.  So,
```

Case 3:01-cv-00045-CJN Document 182-4 Filed 08/07/23 Page 482 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 28 of 205
178

1    I don't know.

2    Q   And how did you obtain this information, or this

3    information on these drives you gave to the government?

4    A   What do you mean how did I obtain it?

5    Q   Just exactly how did you obtain it?  Did you take it from

6    the eTreppid computers?

7    A   No.

8    Q   How did it come into your possession then, sir?

9    A   Government.

10   Q   Okay.  So the government gave you these hard drives,

11   first of all, and then you copied them from the government

12   onto something, some of your own media, is that correct, your

13   electronic --

14   A   I think so.  Yeah.

15   Q   You think so or you know, sir?

16   A   I -- I don't know specifically.  Are you talking about

17   the drives that I've given to the government?

18   Q   No, no, sir.  I'm not talking about --

19   A   Okay.

20   Q   --  I'm talking about the data on the hard drives.

21   A   Yeah.

22   Q   Did you obtain the data on the hard drives from eTreppid?

23   A   No.

24   Q   Okay.  You said you got it from the government.

25   A   Yes.

Case 3:81-cv-00445-CIN Document 182-4 Filed 08/07/23 Page 483 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 29 of 205

179

```
 1   Q   Okay.  When did the government give it to you

 2   specifically?

 3               MS. WELLS:  Your Honor, I would caution

 4   Mr. Montgomery in providing that answer.  To take the terms

 5   of the Protective Order into account.

 6               MR. PEEK:  It's just a when.

 7               MS. WELLS:  That could be a problem.

 8               MR. PEEK:  A when has problems.  Okay.

 9   BY MR. PEEK:

10   Q   When did you get if from the government?

11   A   When did I what?

12   Q   When did you get it from the government?

13   A   You want -- you say the date?

14   Q   No.  You can't say the date --

15               MS. WELLS:  No.

16   BY MR. PEEK:

17   Q   -- if it came from a source covered by the State Secrets

18   Privilege?

19   A   You already asked me --

20               THE COURT:  Stop.

21               MR. PEEK:  I'll let Ms. --

22               THE COURT:  Stop.

23               MS. GAROFALO:  Your Honor, I think we're in

24   direct jeopardy of trespassing on the U.S. Protective Order.

25               MR. PEEK:  He can --
```

Case 3:81-cv-00445-CJN Document 182-4 Filed 08/07/23 Page 484 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 30 of 205

180

 1                    MS. GAROFALO:  If we are going to proceed,

 2      I think we need to take a short break to confer with

 3      Mr. Montgomery.

 4                    THE COURT:  All right.

 5                    MR. PEEK:  But can Mr. Montgomery confer with

 6      the United States Government, Your Honor, before he answers

 7      that question?

 8                    THE COURT:  Let me ask Ms. Wells.  She, as the

 9      attorney for the government, if it is, she who will tell all

10      of us what is covered or not under the Protective Order.

11            So, Ms. Wells, you understand the nature of

12      Mr. Peek's questions.  What do you recommend we do.

13                    MS. WELLS:  I would recommend that

14      Mr. Montgomery not answer that question, Your Honor.

15                    THE COURT:  All right.  She -- counsel for

16      the United States has directed that, pursuant to the terms

17      of the U.S. Protective Order, Mr. Montgomery not answer that

18      question.

19                    MR. PEEK:  Your Honor, may I confer with

20      Ms. Wells for a moment, because there are other agencies that

21      aren't covered by the States Secrets Privilege.

22                    THE COURT:  All right.  Why don't you just take

23      a moment and speak privately.  We're not going to take a

24      recess.  Just the two of you can chat.

25                    (Mr. Peek and Ms. Wells confer.)

Case 1:01-cv-00045-CJN Document 182-43 Filed 08/07/23 Page 485 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 51 of 205

-181

```
 1            (Mr. Schwartz is now joined telephonically.)
 2                 THE CLERK:  Mr. Schwartz, are you there.
 3                 MR. SCHWARTZ:  I am.
 4                 THE COURT:  Thank you.
 5            Good morning, Mr. Schwartz.  This is Judge Cooke.
 6   We have commenced the Continued Order to Show Cause Hearing,
 7   and Mr. Peek is examining Mr. Montgomery.
 8                 Go ahead, Mr. Peek.
 9                 MR. SCHWARTZ:  Thank you.
10   BY MR. PEEK:
11    Q   You've had occasion to meet with the United States
12   Government, so you know which agencies are covered by the U.S.
13   Protective Order, is that correct?
14    A   That's correct.
15    Q   Okay.  Knowing that, and excluding that from the
16   question, did any data on the hard drives you provided to
17   the government come from an agency not covered by the United
18   States Protective Order?
19    A   I'm not certain.
20    Q   Okay.  So I guess if I ask the "when," knowing that
21   they're from an agency not covered by the Protective Order,
22   your answer is also that you're not certain?
23    A   That's correct.
24    Q   I wanted to at least get into the record, at least, where
25   you made the representation to the Court.  So, I'm going to
```

Case 1:01-cv-00445-CMN Document 182-4 Filed 08/07/23 Page 486 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 92 of 205

182

 1   have you look at, if you would, Document 604, filed in this

 2   proceeding, page 3.

 3              May I approach, Your Honor?

 4                   THE COURT:  You may.

 5                   THE WITNESS:  Is this in this binder?

 6                   MR. PEEK:  It's not in the binder, but it's part

 7   of the court record.

 8                   THE WITNESS:  Okay.

 9   BY MR. PEEK:

10    Q   If you look at the paragraph and the representation you

11   made to this court --

12    A   The one that's highlighted?

13                   MS. GAROFALO:  I'm sorry, Your Honor.  But could

14   Mr. Peek please identify the document.

15                   THE COURT:  Could you, please.

16                   MR. PEEK:  Docket 604.

17   BY MR. PEEK:

18    Q   Could you read the title of it, since you have the title

19   of the document.

20    A   Emergency Request By Montgomery Parties For Status

21   Conference With the Montgomery Parties' Compliance With the

22   Court's Order May 7, 2008 Order.

23    Q   Okay.  And what representation did you make to the Court?

24    A   Do you want me to read it?

25    Q   Yes, sir.

Case 3:81-cv-00045-CIN  Document 182-4  Filed 08/07/23  Page 487 of 650
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/03/08  Page 33 of 205

-183

 1   A   "A substantial percentage, i.e. 60/80 of the technology

 2  data consists of files the Montgomery parties reasonably

 3  believe could fall within the provision of the U.S. Protective

 4  Order, docket number 253, and the Non-Disclosure Agreements

 5  executed by Dennis Montgomery, in connection with works

 6  performed for the government of the protected data."

 7   Q   Okay.  So of that 60, 80 percent -- you don't believe

 8  it's that high today, is that correct?

 9   A   It's probably not that high.

10   Q   Okay.  And have you submitted all of the 60 -- the amount

11  of data to the United States Government for their review?

12   A   No.

13   Q   And in May of 2007, you were telling the Court that

14  it existed.  Why have you not submitted that data to the

15  government in accordance with the procedures set forth in the

16  United States Protective Order?

17   A   Because for the last four months, I've been doing that.

18   Q   And all you found are just the three hard drives, is that

19  correct?

20   A   Yeah, with one million four hundred thousand files on it.

21   Q   Okay.  I understand what your testimony is.  All of

22  which you said was given to you personally by the United

23  States Government.

24   A   I said I believed that.

25   Q   Well, did it or did it not come to you directly from the

Case 3:01-cv-00445-PMP-VPC Document 182-4 Filed 08/07/09 Page 488 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 84 of 205

-184-

1   United States Government?  Or, did it come off of the

2   computers at eTreppid?

3    A    I can't remember right now everything that was on the

4   drive that was given to them, to be certain whether that's

5   correct or not.  I believe it is.  But, I'm not certain.

6    Q    Thank you.

7               Sir, when are you going to comply with the discovery

8   orders and the Protective Order, and deliver all of the data

9   that you believe is covered by the States Secrets Privilege to

10  the United States Government?

11   A    When it's all been segregated.

12   Q    When is that, sir?

13   A    Uh, by the end of the month.

14   Q    By the end of this month?

15   A    Yes.

16   Q    Correct?  Okay.

17              So you will deliver everything to the United States

18  Government, that you believe is covered by the States Secrets

19  Privilege, to the United States Government for their review,

20  on or before August 31st of 2008, is that correct?

21   A    Assuming I'm able to work on it, yes.

22   Q    Well --

23   A    Well, I've been in here.  I'm going to be here tomorrow.

24  I'm going to be here on Thursday.

25   Q    I just want to know the date certain.

Case 3:81-cv-00045-CJN Document 182-43 Filed 08/07/23 Page 489 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 95 of 205
185

1    A    I will surely try by the end of this month.

2    Q    Okay.  And if not by the end the month, what other date

3    would you give us?

4    A    I wouldn't think it would take more than a month to

5    complete everything that's left.

6    Q    Okay.  So that would be on or before September 19th would

7    be the latest date?

8    A    Yes.

9    Q    But you will begin doing it when?

10    A    Well, I've been doing it.

11    Q    When will you begin?

12    A    Can I speak?

13    Q    Okay.

14    A    I've been doing it for the last four months.

15    Q    I'll -- sorry.

16    A    But when I got hit with the second OSC hearing order

17    under the Source Code, I stopped doing that to work on that.

18    Q    Okay.  Let me ask my question again.

19         When will you begin doing the review to provide the

20    government the information that you believe is covered by the

21    States Secrets Privilege?

22    A    As soon as I return home.

23    Q    And when will that be?

24    A    Hopefully on Friday.

25    Q    Okay.  Now, there are also two articles the Wall Street

Case 3:01-cv-00445-CJN Document 182-4 Filed 08/07/23 Page 490 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 96 of 205

-186

1    Journal -- another area I forgot -- one was in November '06

2    and one was in February of '07.

3         Do you remember that?

4    A    No.

5    Q    Okay.  Let me refresh your recollection then.

6         Let me hand the Court exhibits 31 and 32, which are

7    in Volume VI.

8         Do you recognize exhibit 31, sir?  It was an article

9    that appeared in or around --

10   A    Yes.

11   Q    And you recognize Exhibit 32 as an article that appeared

12   in the Wall Street Journal on or about February 15th 2007?

13   A    I don't remember this one, but it's obviously my picture,

14   so -- oh, the Wall Street Journal?

15   Q    Yes.

16   A    No.

17   Q    You don't remember this article as appearing --

18   A    You said the Wall Street Journal, I thought.

19   Q    That's what I'm talking about.  Exhibit 32 is an article

20   in the Wall Street Journal.  The date of it is --

21   A    I was looking at 33, so --

22   Q    Okay.

23   A    Um, no.

24   Q    You don't recall this article?

25   A    No.  I thought there was one.

1   Q   Okay.  And in the article that appears on Exhibit 31,

2   there is no mention of a Jale Trepp e-mail is there?

3   A   Do you want me to read the article?

4   Q   If you need to, sir.

5   A   (Witness reviews document.)

6           No.

7   Q   Okay.  And is there mention of the Glogauer e-mail --

8   A   I didn't --

9           THE COURT:  Let him finish his question, sir.

10  BY MR. PEEK:

11  Q   Is there a mention of the Glogauer e-mail in this article

12  November 1st, 2006?

13  A   I didn't think so.

14  Q   Okay.  Do you know whether there was a second delivery of

15  e-mails to Mr. Wilke regarding Mr. Glogauer and Ms. Trepp

16  after the November 1st, 2006 article appeared?

17  A   I don't think so.

18  Q   Did you have any follow-up communications with Mr. Wilke

19  after the November 1st article appeared?

20  A   I spoke to him.  I -- I spoke to him.

21  Q   After November 1st, 2006, sir?

22  A   Yes.

23  Q   Did you do it by telephone?

24  A   Yes.

25  Q   Okay.

Case 3:81-cv-00445-CJN Document 182-4 Filed 08/07/23 Page 492 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 38 of 205

188

1    A    Um, yes.

2    Q    Did you ever do it personally?

3    A    I think I only met him once.

4    Q    Okay.

5    A    You asked me this -- my nose is bleeding.  I really need

6    to stop for a minute.

7                THE COURT:  All right.

8                THE WITNESS:  I got a tissue.

9                THE COURT:  Do you want to take a recess, sir?

10               THE WITNESS:  Yeah.  Just for a few minutes.

11               THE COURT:  All right.  We'll take about a

12   five-minute recess.  And we will reconvene promptly, and I

13   mean promptly.  So, five minutes.

14               (Recess taken.)

15               THE CLERK:  Court is again in session.

16               THE COURT:  Please be seated.

17               THE WITNESS:  Sorry.

18               THE COURT:  You may proceed, Mr. Peek.

19   BY MR. PEEK:

20    Q    When you spoke to Mr. Wilke after November 1st, and

21   before February 5th, November 1st, 2006 and before November --

22   excuse me, after November 1st, 2006, and before February 15th,

23   2007, did you discuss the existence of e-mails with Mr. -- the

24   Glogauer e-mail and the Jale Trepp e-mail?

25    A    I don't think so.

Case 3:06-cv-00056-PMP-VPC Document 182-4 Filed 08/07/23 Page 493 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 39 of 205

-189-

 1   Q   So it's your testimony that no other e-mails were

 2   provided to Mr. Wilke after November 1st and before

 3   February 15th?

 4   A   I don't know the exact date that he got them, but that's

 5   correct.

 6   Q   Well, did he get them before November 1st --

 7   A   No.

 8   Q   -- 2006?

 9   A   I think I answered that.  I don't know.

10   Q   Well --

11   A   I'm not certain of the exact date because I have said I

12   don't believe I'm the one that gave them to him.

13   Q   I know you say you don't believe that.  But, you don't

14   know for certain whether you did or did not, isn't that

15   correct, sir?

16   A   I don't know.  I guess.

17                 MR. PEEK:  I'd offer 31 and 32, Your Honor.

18                 THE COURT:  Any objection, counsel.

19                 MS. GAROFALO:  Yes.  Hearsay.  They're not

20   authenticated.

21                 MR. PEEK:  They're not being introduced for

22   the truth, Your Honor.  They're just being introduced to

23   show the articles and what was contained in them.  There are

24   e-mails that are referenced only in the February 15th and

25   not the November 1st.  And it shows, again, if you will, the

Case 3:81-cv-00045-CJN Document 182-4 Filed 08/07/23 Page 494 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 40 of 205
-190

1    credibility of this witness.  They're not being introduced for

2    the truth.

3                MS. GAROFALO:  I think, Your Honor, that is

4    for the truth as to whether or not the e-mails were provided

5    or included in the article.  I still -- we still object on

6    hearsay grounds.

7                THE COURT:  Well, the objection is overruled.

8    I think for purposes of this hearing, these e-mails, I don't

9    believe they're being offered for the truth of the matter

10   asserted in the e-mails.  I think it goes to trying to

11   ascertain, for purposes of this Order to Show Cause Hearing,

12   the extent to which documents, Mr. Montgomery and the

13   Montgomery parties have been ordered to produce have been

14   produced.  And it's really serving as a benchmark in the

15   chronology of the events that occurred in this litigation that

16   relate to the document production.

17              Go ahead, Mr. Peek.

18              MR. PEEK:  Thank you.

19   BY MR. PEEK:

20    Q   You still have, I think, Exhibit 20 there, which is in

21   Volume 5, do you not, sir?

22    A   No.  They took the binder.

23              MR. PEEK:  Okay.  She'll get it back for you.

24              Thank you Miss Clerk.

25              THE COURT:  Exhibit 20, Mr. Peek?

Case 3:81-cv-00445-CJN Document 182-4 Filed 08/07/23 Page 495 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 41 of 205
-191

1          MR. PEEK:  Yes, Your Honor.

2          THE COURT:  Thank you.

3   BY MR. PEEK:

4   Q    Would you turn, sir, to page 3, paragraph 6.

5   A    Okay.

6   Q    And the sentence beginning on line 27.

7          Do you have that?

8   A    The one that says, "On that..."?

9   Q    Yes.

10  A    Yeah.

11  Q    And you wrote, at least in this declaration in February

12  of 2007, that:  "On that basis, and because of the failure of

13  our government to utilize my technology after my departure

14  from eTreppid, and because of Warren Trepp's attempts to steal

15  it with the raid on my home, my current employers engaged

16  in multiple meetings and conferences with high level Bush

17  administration officials beginning in May 2006, and continuing

18  to December 2006."

19          Is that correct?

20  A    Yes.

21  Q    And those were efforts to market the technology, were

22  they not?

23  A    No.

24  Q    Okay.  And then it says:  "In July 2006, they arranged a

25  meeting in Vice-President Cheney's office, which I attended

Case 3:81-cv-00445-CMN Document 182-43 Filed 08/07/23 Page 496 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 42 of 205

192

 1   with several individuals for the purpose of educating and

 2   explaining to the Vice-President that much of my work is so

 3   highly compartmentalized within, that it was likely that some

 4   high level official in the administration, even within the

 5   intelligence community, including certain Air Force officials

 6   aligned with Warren Trepp, potentially even the Director

 7   of National Intelligence, John MacHunting (phonetic),

 8   parentheses, whom certain distrusted, close parentheses,

 9   did not know or understand the full scope of its utilization

10   on the war on terror, and/or competing financial interests

11   aligned with Trepp, given this event."

12            That was an effort to market as well, wasn't it?

13   A    No.

14   Q    It was not an effort to license the technology?

15   A    No.

16   Q    Okay.  Now there's an attachment to this exhibit, is

17   there not, which is a letter, Exhibit 1, from Mr. Flynn to

18   Mr. Rumsfeld, Cherchoff, and Alberto Gonzales, is there

19   not?

20   A    Yes.  Well, there was a fourth person but, obviously,

21   it's redacted.

22   Q    And then would you turn to page four of seven of that

23   letter.

24   A    Okay.

25   Q    The bottom of the page.

Case 3:81-cv-00445-CJN Document 182-43 Filed 08/07/23 Page 497 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 43 of 205

193

1    A    Yes.

2    Q    Do you see the sentence beginning, "Mr. Montgomery..."

3    the last sentence there.

4    A    Yes.

5    Q    "Mr. Montgomery desires to enter into an exclusive

6    license agreement with the U.S. government as soon as

7    possible."

8         That's marketing the technology, the Source Code, is

9    it not?

10    A    No.

11    Q    Okay.  The License agreement is not any effort by you to

12    license -- excuse me licensing the technology --

13    A    It's --

14    Q    -- is not an effort to market it?

15    A    This is the day they raided my home.

16    Q    I know that, sir.  I'm just asking --

17    A    Can I finish speaking?

18    Q    Sorry.

19    A    This is the day they raided my home.  And this letter was

20    originally -- Mr. Flynn had originally written the letter that

21    I had seen days, before that, that did not have some of this

22    in there.  He sent this letter the, the day that they were,

23    you know, when they were at my home raiding me.

24    Q    Okay.  I, I understand that.

25    A    So --

Case 3:81-cv-00445-CIN   Document 182-43   Filed 08/07/23   Page 498 of 650
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/03/08   Page 84 of 205

194

1   Q    But are --

2   A    Yeah.

3   Q    -- you telling this Court then that licensing of the

4   technology is not marketing the technology, the Source Code?

5   A    No.  I'm not saying that.  I don't remember -- I just

6   remember a lot was going on on that day.  And why this was

7   sent with those exact words, I can't explain.

8   Q    And there were a number of meetings after March 1st in

9   order to license the technology with the government.

10  A    With me?  No.

11              MS. GAROFALO:  Objection, Your Honor.

12  Relevance.  If this is going to documentation, Mr. Peek

13  should get there.  But it does not appear to be focused on

14  the discovery issue.

15              MR. PEEK:  Your Honor, the discovery issue is

16  any documents with respect to licensing the technology.  It

17  would appear to me that there would be additional documents

18  that would have been utilized by those individuals meeting

19  in that six-month period of time described by, described in

20  the affidavit, or in the declaration by Mr. Montgomery.  He

21  described it.  We don't have any of those so-called documents.

22              MS. GAROFALO:  I would ask the Court to then

23  direct Mr. Peek to focus his questions on what documents

24  exist; whether documents related to these meetings actually

25  exist, rather than explore the nature, the number of

Case 1:01-cv-00445-CMN Document 182-4 Filed 08/07/09 Page 492 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 25 of 205
195

1    participants and so forth at the meetings, which doesn't seem

2    to be relevant to this proceeding.

3                    MR. PEEK:  I have to establish a predicate,

4    Your Honor that it was for the purpose of marketing, in order

5    then to get the documents.

6                    THE COURT:  Right.

7            The objection is overruled.  The Court, of course,

8    is keenly interested in moving things along, but recognizes

9    that part of the request for production that is part of this

10   Order to Show Cause hearing is this particular category of

11   documents.  So the Court, in trying to establish the basis

12   for Mr. Peek's inquiries is part of it, but please move on,

13   sir --

14                   MR. PEEK:  I will.

15                   THE COURT:  -- in your questions.

16   BY MR. PEEK:

17    Q   And then in the last page of the letter, page --

18   actually, second of last page, page 6 of 7 --

19    A   Okay.

20    Q   -- there's another statement there at the end of the

21   sentence where you want to license the software technology of

22   Mr. Montgomery.

23            Do you see that sentence?

24    A   Where is it?

25            Oh, yes, I see it.  I see that.

Case 3:01-cv-00445-CMN Document 182-4 Filed 08/07/23 Page 500 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 46 of 205

-196-

1    Q   And that's another effort to market, is it not?

2    A   Not really, no.  Why Michael put this in there when

3    they're raiding my home, I can't tell you.

4    Q   Okay.  Where are any of the documents relating to the

5    efforts to license the technology, first in March of 2006,

6    and then in that six-month period of time, or whatever period

7    of time it was in your declaration?  Where are those?

8    A   To my knowledge there are none, because no one did.

9    Q   Are you saying you didn't make any presentations --

10   A   I --

11   Q   -- then to the government from May 2006, and continued to

12   December 2006?

13   A   I went to one meeting, one time, in Washington.  That's

14   it.

15   Q   Okay.  And your current employer, that being Opspring,

16   also went on multiple times in May, between May of 2006 and

17   December 2006, did they not?

18   A   I think they only went one time initially.  And they were

19   with me on the one meeting I went to D.C.  To my knowledge,

20   there were no others.

21   Q   Okay.  Well, then when you signed this declaration under

22   penalty of perjury, were you lying?

23   A   Which declaration?

24   Q   The one that's Exhibit 20, where you said that your

25   employers engaged in multiple meetings and conferences with

Case 3:81-cv-00445-CIV Document 182-43 Filed 08/07/23 Page 501 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 47 of 205

197

1   high level Bush administration officials, beginning May of

2   2006, to December 2006?  Is that a lie?

3    A   I just said -- no.  You just asked me multiple.  That's

4   two.  You asked me and I said there were two that I knew of.

5   Maybe they had others.  I can't tell you what Michael Sandoval

6   did.  You can talk to him.

7    Q   Okay.  Thank you.

8        Going back to the computers that you backed up, from

9   time to time.  You said that Mr. Trepp asked you to backup

10  computers as eTreppid, is that right?

11   A   Yes.

12   Q   Did he ask you to back up all the computers at eTreppid?

13   A   No.

14   Q   Or just the employees of eTreppid?

15   A   I don't know if he said all or both.  I don't recall

16  specifically.

17   Q   Well, one of the computers you backed up was

18  John Hughes, was it not?

19   A   Yes.

20   Q   Was John Hughes an employee of eTreppid?

21   A   I wouldn't know if he is or not.  I don't think he was.

22   Q   And why did you backup his computer?

23   A   Because it was failing, and he had to have another

24  laptop, so it had to be taken off his current laptop and put

25  on another laptop.

Case 3:06-cv-00056-PMP-VPC   Document 182-43   Filed 08/07/09   Page 502 of 650
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/03/08   Page 49 of 205

-198

1    Q    And why did you retain the data on that?

2    A    I don't recall why I retained it.

3    Q    You recognize in the production that you made, you

4    provided, we have data related to Mr. Hughes, correct?

5    A    Yes.

6    Q    And that's not responsive to any request at all, is it?

7    A    Well, I wouldn't say that, because how did I know that he

8    didn't have something on his laptop that was responsive?

9    Q    Well, when you searched the data, did you look at

10   the John Hughes data to determine whether or not it was

11   responsive?

12   A    I don't recall if I did or not.

13   Q    Okay.  And then the e-mails, with respect to Jale Trepp,

14   that was on her computer, was it not?

15   A    I don't remember if it was or not, no.  I -- I'm not

16   certain.

17   Q    Well, we had e-mails that just appear to be only on Jale

18   Trepp's e-mail -- Jale Trepp's computer.  And we can go back

19   over that if you like in Exhibit 9.

20   A    Okay.  Go ahead.

21   Q    Okay.  Actually, it's Exhibit 8.  I apologize -- no.

22   It's Exhibit 9.

23        Do you know whether these e-mails that are set forth

24   in Exhibit 8, they're labeled at the top, Jale 1.  And then

25   there's some Jale 1-A, whether they came off of Jale Trepp's

Case 3:21-cv-00445-CJN Document 182-43 Filed 08/07/23 Page 503 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 49 of 205

199

1   e-mail account, on her computer, or off of somebody else's?

2   A   I don't know.  I'm sorry.  I don't recall.

3   Q   Okay.  Did you in fact backup Jale Trepp's e-mail?

4   A   Yes.

5   Q   From her computer?

6   A   I don't -- I don't remember -- the answer is yes.

7   Q   And was that her home computer?

8   A   Yes.

9   Q   Were you directed to do that?

10  A   Yes.

11  Q   By whom?

12  A   Warren.

13  Q   And when were you directed to do that?

14  A   Multiple, multiple times.

15  Q   Okay.  Did he give you reasons why he wanted to do that?

16  A   I don't recall if he did or not.

17  Q   And where did you go to back this up?

18  A   It was at her house.

19  Q   Now you've also testified in this proceeding, have you

20  not, that you did not have access to any of the financial

21  information of eTreppid?

22  A   That's correct.

23  Q   And we have found on, at least your production, that

24  there are QuickBooks on the hard drives that you have

25  produced, are there not?

Case 3:81-cv-00445-CIN Document 182-43 Filed 08/07/23 Page 504 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 504 of 505

-200-

 1   A   Yes.

 2   Q   And those are the financial records of eTreppid that you

 3   say you never had access to, aren't they?

 4   A   Um, there are QuickBooks records on there.  Whether those

 5   are those of eTreppid, I can't tell you.

 6   Q   Well, you testified that you never were given access to

 7   them, correct?

 8   A   Access to what?

 9   Q   To the financial information of eTreppid.

10   A   Yeah.  The paper, paper records.

11   Q   Well, were there -- so you were given the electronic form

12   of them off of Sue Perez's computer, or others in eTreppid's

13   offices that you backed up, correct?

14   A   I don't believe Sue Perez had QuickBooks.

15   Q   All right.  Did anybody have QuickBooks?

16   A   Monica, I believe, did.

17   Q   Okay.  So you backed up Monica?

18   A   Yes.

19   Q   And you had the access to that financial information that

20   was on Monica's computer, did you not?

21   A   I've seen it.  Yes.

22   Q   And it was QuickBooks, was it not?

23   A   I don't remember -- yes.

24   Q   And it contained a record of every receipt and

25   disbursement --

Case 3:06-cv-00056-PMP-VPC Document 182-4 Filed 08/07/23 Page 505 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 51 of 205

201

1    A    Absolutely.

2    Q    -- did it not?

3    A    No.

4    Q    So when you told the Court that you were never given

5    access to any of the financial records of eTreppid, that was

6    a lie, wasn't it?

7    A    Nope.  No it wasn't.

8    Q    But you had, at least, access to all these computers

9    where there was electronic information regarding financials

10   of the company, did you not?

11   A    No.

12   Q    You did not?

13   A    No.

14   Q    Well, you backed it up, didn't you?

15   A    Yeah, but it's password locked.

16   Q    Oh.  All the QuickBooks are password locked?

17   A    I don't remember if all of them were, but one -- the one

18   I tried was.

19   Q    Which one did you dry?

20   A    I don't recall which one it was.

21             MS. GAROFALO:  Objection, Your Honor.

22   Relevance.  This does not seem to be going to documents or

23   the production or the responsiveness of production.  It just

24   seems to be examining Mr. Montgomery on his knowledge of

25   financial information.

Case 1:81-cv-00445-CKN Document 182-4 Filed 08/07/23 Page 506 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 92 of 205
202

```
 1                    MR. PEEK:  I'll move on, Your Honor.

 2                    THE COURT:  All right.  The objection is

 3   sustained.

 4                    MR. PEEK:  This is Exhibit 46, Your Honor.  It's

 5   tabbed so that folks can put it in their binder.

 6                    THE CLERK:  Excuse me, Judge Cooke.  Yesterday,

 7   Mr. Peek remarked defendant's 45 and defendant's 46.

 8                    MR. PEEK:  I apologize.  Then this should be 47.

 9                    THE CLERK:  Yes.

10                    MR. PEEK:  I apologize for that.

11                    THE COURT:  This is 47 then?

12                    MR. PEEK:  Yes, Your Honor.

13              (Whereupon, exhibit 47 -- a document, was marked for

14   identification only.)

15                    MR. PEEK:  Excuse me for the error.

16              Does the witness have it then?

17                    THE CLERK:  Yes.

18   BY MR. PEEK:

19    Q   Mr. Montgomery, this is a letter from your counsel at

20   Liner, the Liner firm.

21              Did you see that?

22    A   You mean Gunderson?

23    Q   Mr. Gunderson then.

24    A   Okay.  Yeah.

25    Q   I apologize.  I thought it was from the -- and in the --
```

Case 3:01-cv-00445-CMN Document 182-4 Filed 08/07/23 Page 507 of 650
Case 3:06-cv-00056-PMP-VPC Document 634 Filed 09/03/08 Page 53 of 205
203

1   this is produced in all those 21 hard drives, is it not?

2    A    I'll believe you.  I don't know.

3    Q    And in the second page of that letter, it says:

4             "I understand these drives contain electronic files

5   responsive to eTreppid's RFP One request, number 16."

6             Do you see that?

7    A    Yes.

8    Q    And that's what you believed when you produced them?

9    A    Yes.

10   Q    Let me show you what is request for production number 16.

11  That's in -- I think it's already a Court document, but I'm

12  going to go ahead and mark it as -- or it's Exhibit 34 in

13  Volume VI.

14            If we could have that for a moment.

15   A    Which number?

16                THE CLERK:  It should be up there.

17                MR. PEEK:  It's 34.  She's going to hand it to

18  you.

19                THE CLERK:  It should be there.

20                THE WITNESS:  No, I think I have it.

21                MR. PEEK:  It's in Volume VI.

22           Do you have it there?

23                THE WITNESS:  Yes.

24  \\\

25  \\\

Case 3:81-cv-00445-CIN Document 182-4 Filed 08/07/23 Page 508 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 84 of 205

204

1    BY MR. PEEK:

2     Q    Why don't you take a moment and look at page 7 of 10 in

3    that.

4     A    I don't -- which page?

5     Q    Page 7 of 10.  It's marked at the bottom.

6     A    That doesn't make sense to me.

7     Q    It's Exhibit 34, please.

8     A    Exhibit 34.  You didn't say which exhibit.

9            Okay.  Okay.  (Witness reviews document.)

10           Okay.  Go ahead.

11    Q    And the request to you is:  "All documents that relate

12   to eTreppid's technology, products and/or research and

13   development efforts, parentheses, including but not limited

14   to any and all marketing documents, business plans,

15   PowerPoint presentations, white papers, correspondence,

16   and/or notes of any customers or potential customers.

17           Do you see that?

18    A    Yes.

19    Q    And these 21 hard drives are only responsive to that

20   request, are they not?

21    A    You mean as a result of all of these?

22    Q    Well, that's what your letter -- that's what your

23   counsel's letter says to me; that they're only responsive to

24   that request number 16.

25    A    I don't know if they're more responsive -- I mean, I

KATHRYN M. FRENCH, RPR, CCR
(775) 786-5584

Case 3:01-cv-00445-CWN Document 182-43 Filed 08/07/09 Page 508 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 95 of 205
-205

1   would have to read every one of these.  I will, if you want.

2   Q   Well, it's only -- I'm just going by the letter.

3   A   Okay.

4   Q   The letter enclosed the hard drives and said they're

5   responsive to request number 16, does it not?

6   A   Yes.

7   Q   Okay.  And are there any documents on that, on those

8   21 hard drives that relate to the efforts by you -- you,

9   the defining term -- to market, or notes of meetings with

10  customers, or potential customers, after March of 2006?

11  A   I don't know if there are or not -- oh, after?  I'm

12  sorry.

13  Q   Yeah, after.

14  A   I don't know if there are or not.

15  Q   You represented that they were though, did you not, when

16  you gave them to us?

17  A   That there are not?

18  Q   No.  You represented that they were; that they did

19  contain marketing documents, business plans, PowerPoint

20  presentations, white papers, correspondence, and/or notes of

21  meetings with customers or potential customers.

22          MS. GAROFALO:  Objection, Your Honor, to the

23  extent that it misstates the document before Mr. Peek.  It's

24  from Mr. Gunderson, not from Mr. Montgomery.

25          MR. PEEK:  Excuse me.  You, as in your lawyer

Case 3:01-cv-00445-CIN Document 182-43 Filed 08/07/23 Page 510 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 96 of 205
206

1    represented that.

2    A    Is that what he wrote in the letter?  You want me to read

3    it?

4    Q    That's what he wrote in the letter.  Yeah.

5    A    Okay.

6    Q    He had to have that information from some source?

7                    MS. GAROFALO:  Objection.

8                    MR. PEEK:  In order to make that representation,

9    did he not?

10                   MS. GAROFALO:  Objection, to the extent that

11   calls for attorney/client communications.

12                   MR. PEEK:  If he represents that in a pleading,

13   Your Honor, or in a letter, then that's a waiver of the

14   privilege.

15                   THE COURT:  Okay.  I don't think -- the

16   objection is overruled.  I don't think Mr. Peek is asking

17   for any inquiry about any attorney/client communication.

18   Logically, one requests production of documents from one's

19   client.  The client responds to document production requests

20   and hands over documents that the client believes are

21   responsive to a particular document production request.  And

22   the attorney, in turn, sends them off to opposing counsel,

23   after having reviewed them.

24            So that's, generally, how it works.  So the attorney

25   has to, one, have relied on the client to have reviewed the

 1    request for production to ascertain what documents or media

 2    might be responsive to the requests; and

 3              Two, upon receipt, the Attorney, generally,

 4    will review whatever is produced, and then pass it on to

 5    counsel.

 6              So --

 7              MS. GAROFALO:  That's generally correct, Your

 8    Honor.  But, in this case, it's a letter from Mr. Gunderson.

 9    There's no foundation as to whether Mr. Montgomery saw this

10    letter.  It may very well be just a typographical error in

11    the letter.  Mr. Gunderson -- at least no basis has been laid

12    for knowledge on Mr. Montgomery's part as to how the documents

13    were characterized by Mr. Gunderson.

14              THE COURT:  Well, that's true.  I suppose you

15    can ask Mr. Montgomery some questions about.

16    MR. PEEK:

17    Q   Well, you provided the hard drives to your counsel, did

18    you not?

19    A   Not to Mr. Gunderson.

20    Q   You provided them to the Liner firm?

21    A   Yes.

22    Q   And when you provided them, you believed they were

23    responsive to request number 16, did you not?

24    A   Yes.

25    Q   Okay.  So Mr. Gunderson's representation came, I guess,

Case 3:81-cv-00045-CjN  Document 182-4  Filed 08/07/23  Page 512 of 650
Case 3:06-cv-00056-PMP-VPC  Document 834  Filed 09/03/08  Page 88 of 205
208

 1  indirectly from you, correct?

 2   A   I can't tell you.

 3   Q   Well, you represented it to your counsel, the Liner

 4  firm, who passed -- must have passed it on to Mr. Gunderson,

 5  correct?

 6   A   I can't say that.

 7              MS. GAROFALO:  Objection, to the extent that

 8  does implicate attorney --

 9              MR. PEEK:  Your Honor, they can't have the

10  games.  They can't have it both ways.  They can't say that

11  they represented to me that it's responsive to request

12  number 16, and then now stand here today in this courtroom

13  and say it's not.  I mean, either it is or it isn't, because

14  there's nothing on the hard drives that refers to post-2006

15  marketing efforts.  There's just more garbage.

16              THE COURT:  The objection is overruled.

17  BY MR. PEEK:

18   Q   Are there any files, any data at all on those 21

19  hard drives that are responsive to request number 16?

20   A   Yes.

21   Q   Okay.  Is there any data on there that is responsive to

22  request number 16 post-March 2006?

23   A   No.

24   Q   Where is that data?

25   A   I wasn't -- I told you that when you asked me that

Case 3:81-cv-00445-CIN Document 182-4 Filed 08/07/23 Page 518 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 89 of 205
209

1    before.  I wasn't involved in marketing business plans.

2    Q    Okay.  So you gave us data that eTreppid already had?

3    A    Well, I was required to give that to you.

4    Q    And is everything on the 21 hard drives related to white

5    papers, correspondence, marketing documents, business plans to

6    customers or potential customers?

7    A    Post?

8    Q    No, pre.

9    A    I wouldn't say everything.  I would say there's a lot.

10   Q    Okay.  How much of that would you say there is?

11   A    I, I have no idea.

12   Q    I mean, one percent of it?

13   A    No.  But, I'm sure you have a number.  I don't know.

14   Q    Okay.

15              MR. PEEK:  I believe that's all, Your Honor.  If

16   I could have just a moment to consult with my client and my

17   colleague.

18              THE COURT:  You may.

19              MR. PEEK:  May I approach?

20              THE COURT:  You may approach.

21              MR. PEEK:  I want to actually talk to Ms. Wells

22   for a minute.

23              THE COURT:  Oh, all right.

24         (Mr. Peek and Ms. Wells confer.)

25   \\\

Case 3:01-cv-00445-CJN Document 182-43 Filed 08/07/23 Page 514 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 60 of 205

210

BY MR. PEEK:

Q    Before you produced the 21 hard drives, did you make any effort to duplicate it?

A    There were two of them, or three of them that were bad and that actually had problems in duplication.  So, the answer is yes.

Q    And what efforts did you make to duplicate files there?

A    Well, the drive was bad.  Since the bad drive was copied, I didn't want to get rid of the bad drives while these hearings were going and someone accuse me of --

Q    Well, there was 21 hard drives.  Did you make an effort with all 21 hard drives to deduplicate?

A    I believe they were all duplicated.

Q    No.  That's not what I asked, sir.

A    Oh.

Q    There are files that are on the drives themselves that are multiple copies of the same thing.

A    That are duplicates, you mean?

Q    Yes.  Did you make any effort to deduplicate that?

A    To deduplicate that?

Q    Yes.

A    No.

Q    Okay.  Thank you.

            MR. PEEK:  That's all I have, Your Honor.

            THE COURT:  As I recall, at the commencement of

Case 3:01-cv-00145-MPV-PC   Document 182-4   Filed 08/07/23   Page 515 of 650
Case 3:06-cv-00056-PMP-VPC   Document 834   Filed 09/03/08   Page 61 of 205
-211

 1    the Order to Show Cause hearing, Ms. Klar did have some brief

 2    direct.  It was quite brief.

 3              Do you wish to ask any questions on redirect?

 4              MS. GAROFALO:  Uh, not at this time, Your Honor.

 5    But, we do reserve the right to recall Mr. Montgomery.

 6              THE COURT:  Okay.  Thank you.

 7              Mr. Montgomery, you may step down, sir.

 8              MR. PEEK:  And, Your Honor, I don't remember

 9    exactly which exhibits were previously marked.  But since they

10    were identified previously, I would like to offer, if I could,

11    or get a list from the court.

12              THE CLERK:  Defendant's exhibits 1, 6, 9, 31,

13    45, 46, and 47 have all been marked.

14              MR. PEEK:  I would offer all of those,

15    Your Honor.

16              THE COURT:  Any objection?

17              MS. GAROFALO:  We have an objection to 45,

18    Your Honor.  It's hearsay, and has not been authenticated.

19    We object on those grounds.

20              Pending 45 admitted, we would ask the Court's

21    indulgence to address the other exhibits immediately after

22    lunch, or after the next break.

23              MR. PEEK:  Forty-five, I think, Your Honor, was

24    the e-mail.

25              THE CLERK:  Yes.

Case 4:21-cv-00445-CDN Document 182-3 Filed 08/07/23 Page 516 of 650
Case 3:06-cv-00056-PMP-VPC Document 854 Filed 09/03/08 Page 269 of 265

-413-

```
1              MR. PEEK:  Thank you.

2              THE COURT:  All right.  What I'm going to advise

3    counsel, we still have a matter of exhibits to attend to.  I

4    expect you to be here tomorrow morning by 8:30 a.m. to meet

5    and confer and work with the clerk of court to figure out

6    what exhibits are admitted or not.  We will begin promptly at

7    nine o'clock a.m.

8              Thank you.  We're in recess.

9              MR. PEEK:  Thank you, Your Honor.

10             (Court Adjourned.)

11

12

13                           -o0o-

14

15        I certify that the foregoing is a correct
          transcript from the record of proceedings
16        in the above-entitled matter.

17        \s\ Kathryn M. French              August 29, 2008

18        _____          _____

          KATHRYN M. FRENCH, RPR, CCR              DATE
19        Official Reporter

20

21

22

23

24

25
```

Case 1:21-cv-00445-CJN Document 182-43 Filed 08/07/23 Page 517 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 264 of 265

-414-

1                        I N D E X

2

3    **DEFENSE'S WITNESSES:**                        **PAGE:**

4

     1)  **DENNIS MONTGOMERY (cont')**
5
             Direct Examination By Mr. Peek          155
6
     2)  **JONATHAN KARCHMER**
7
             Direct Examination By Mr. Snyder        214
8            Cross-examination By Ms. Garofalo       270
             Redirect Examination By Mr. Snyder      322
9            Recross-examination By Ms. Garofalo     326

10   3)  **LEONARD GLOGAUER**

11           Direct Examination By Mr. Peek          328
             Cross-examination By Ms. Garofalo       333
12
     4)  **SLOAN VENABLES**
13
             Direct Examination By Mr. Peek          341
14           Cross-examination By Ms. Garofalo       344
             Redirect Examination By Mr. Peek        347
15
     5)  **WARREN TREPP**
16
             Direct Examination By Mr. Peek          348
17           No Cross-examination

18   **PLAINTIFF'S WITNESSES:**

19   1)  **SCOTT COOPER**

20           Direct Examination By Ms. Garofalo      360
             Cross-examination By Mr. Peek           384
21

22

23

24

25

Case 4:21-cv-00445-GPN Document 182-4 Filed 08/07/22 Page 518 of 650
Case 3:06-cv-00056-PMP-VPC Document 834 Filed 09/03/08 Page 269 of 265

415

1           **I N D E X   O F   E X H I B I T S**

2

3     **EXHIBIT NUMBER:**               **MARKED**     **RECEIVED**

4     Exhibit 8 -- document                   171

5     Exhibit 20  -- document                176

6     Exhibit 47  -- document        202

7     Exhibit 45  -- document               213

8     Exhibit 48  -- document        222     253

9     Exhibit 49  -- document               259

10    Exhibit 50  -- box            268

11

12

13    **PLAINTIFF'S EXHIBITS:**

14    Exhibits 1 and 2  -- documents      365

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT E

1                    UNITED STATES DISTRICT COURT
                          DISTRICT OF NEVADA
2          BEFORE THE HONORABLE VALERIE P. COOKE, MAGISTRATE JUDGE
                             ---o0o---
3

4    DENNIS MONTGOMERY and the      :
     Montgomery Family Trust,       :
5                                   :
                    Plaintiffs,     : No. 3:06-CV-56-PMP(VPC)
6                                   :
         -vs-                       : June 24, 2008
7                                   :
     ETREPPID TECHNOLOGIES, LLC,    : Reno, Nevada
8    WARREN TREPP, and the          :
     UNITED STATES DEPARTMENT OF    :
9    DEFENSE,                       :
                                    :
10                  Defendants.     :
     _____:
11     AND RELATED CASES _____:

12

13        TRANSCRIPT OF CONTINUED ORDER TO SHOW CAUSE HEARING

14   APPEARANCES:

15   FOR THE PLAINTIFFS:  DEBORAH KLAR and MARK GUNDERSON
                          Attorneys at Law
16

17   FOR THE DEFENDANTS:  J. STEPHEN PEEK, JERRY SNYDER,
                          BRIDGETT ROBB PECK, GREGORY SCHWARTZ and
18                        ANDREW LIESE
                          Attorneys at Law
19

20   FOR INTERESTED       CARLOTTA WELLS and RAPHAEL GOMEZ
     PARTIES:             Assistant U.S. Attorneys
21

22   Reported by:             Margaret E. Griener, CCR #3, RDR
                              Official Reporter
23                            400 South Virginia Street
                              Reno, Nevada 89501
24                            (775)329-9980

25             COMPUTER-ASSISTED TRANSCRIPTION

Case 3:01-cv-00445-GJN Document 182-7 Filed 08/07/03 Page 521 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 2 of 265

2

1          RENO, NEVADA, TUESDAY, JUNE 24, 2008, 9:00 A.M.

2                         ---o0o---

3

4          THE CLERK:  This is the date and time set for

5     the continued order to show cause hearing in case number

6     06-CV-0056-PMP(VPC), Dennis Montgomery, et al., versus

7     eTreppid Technologies, et al.

8          Present on behalf of plaintiff, Deborah Klar and

9     Mark Gunderson.

10          Present on behalf of defendants, Stephen Peek, Jerry

11     Snyder, Bridget Robb Peck.

12          Present telephonically on behalf of defendants,

13     Gregory Schwartz and Andrew Liese.

14          Present on behalf of interested party, Carlotta

15     Wells and Raphael Gomez.

16          THE COURT:  Thank you very much.  Please just

17     give me a moment to get my papers in order.

18          This is a continued hearing pursuant to this Court's

19     order to show cause concerning why Dennis Montgomery and the

20     Montgomery Family Trust should not be held in contempt of

21     court for failure to obey a series of discovery orders that

22     were issued in this case.

23          As the parties and counsel well know, we had a

24     day-long hearing on June 10, and it has been continued to

25     today.

Case 3:01-cv-00445-RLH-VPC  Document 182-4 Filed 08/07/23  Page 522 of 650
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 3 of 265

3

1          Just some preliminary matters.  First of all, the

2    Court, during the last -- the June 10th, hearing had several

3    exhibits, and I'm going to admit those into evidence.

4          Do counsel have any objections to those?  I believe

5    those are Exhibits 1 through -- let's see, the Court's

6    exhibits, I believe, were 1 through 16.  Is that correct,

7    Ms. Clerk?

8               THE CLERK:  Your Honor, I show 1 through 18.

9               THE COURT:  Were the court's exhibits?

10              THE CLERK:  Yes.

11              THE COURT:  All right.  Do counsel have any

12   objection to the admission of those exhibits?

13              MR. PEEK:  I don't, your Honor.  I would just

14   like to have a list from the clerk so that we know what we

15   have because I don't think -- I don't think all 18 were

16   actually shown to the witness and identified.

17              THE COURT:  All right.  Ms. Klar?

18              MS. KLAR:  Your Honor, we would like to see a

19   list before we take a position because --

20              THE COURT:  All right.

21              MS. KLAR:  -- Mr. Peek is right, they all were

22   not shown to the witness.

23              THE COURT:  All right.  What I'll do is at one

24   of the breaks we'll go ahead and take care of that, and,

25   Ms. Clerk, if you would provide copies of the exhibit list to

Case 3:06-cv-00145-PMP-VPC Document 182-43 Filed 08/07/23 Page 523 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 80 of 205

-50-

1           MS. KLAR:  My understanding is, is that there is

2    some order which I've never seen because, as you know, I

3    wasn't involved in that proceeding.

4           According to at least counsel for eTreppid,

5    Mr. Montgomery was required to maintain those materials.  But

6    I'm not aware of any order that says he couldn't integrate

7    them with the other materials that he had.

8           MR. PEEK:  Your Honor, there's a -- Judge Pro,

9    when the motion for forensic images was made, issued an order,

10   and that order -- I believe it's March 27, 28, and I'll try to

11   locate it at a break --

12          THE COURT:  Was that in the search warrant

13   proceeding?

14          MR. PEEK:  No, no, it was in this proceeding,

15   your Honor.  You may recall that the FBI on motion by --

16   excuse me.

17          I'm trying to think exactly procedurally, your

18   Honor, what happened on the 41(g), but ultimately Judge Pro

19   ordered the property -- or you ordered the property returned,

20   and Judge Pro affirmed your order, then we made a motion in

21   this proceeding, this consolidated proceeding, to have it -- a

22   forensic image made of it.  Judge Pro denied that request but

23   ordered that it be photographed and that it be preserved and

24   protected.

25          And I believe that order is March -- it was before

Case 3:01-cv-00445-PMP-VPC  Document 182-41  Filed 08/07/23  Page 524 of 650
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 51 of 205

-51-

1    the property was turned over on the 29th.

2                    THE COURT:  Just for counsel appearing

3    telephonically, I'm looking at the docket sheet.

4                    Well, I can't -- I can't recall.

5                    In looking at the docket sheet just quickly, I don't

6    want to delay the proceedings, but I know that Judge Pro

7    issued an order concerning the FBI-seized materials that were

8    returned, but I am not clear on what the language -- what

9    number the language is and what it said.

10                   MS. KLAR:  According to Mr. Peek, it said the

11   materials need to be preserved and protected.  That's not what

12   his question is asking.

13                   His question is asking what did you do to segregate

14   it, and I don't think it's a fair question because I don't

15   think there's any evidence that that was an obligation.

16                   MR. PEEK:  Well, the obligation to preserve,

17   your Honor, would be some method of segregating it so you can

18   preserve its integrity as opposed to commingling it with other

19   items.  That's what he said he did.  That's a clear violation

20   of Judge Pro's order and clear violation of the duty to -- you

21   know, the duty to preserve any evidence, otherwise it

22   constitutes spoliation.

23                   I mean, there's no question about that this was a

24   subject matter of many disputes, so the fact that even if

25   there wasn't an order, there is an obligation on the part of a

Case 3:01-cv-00445-CRB Document 182-43 Filed 08/07/23 Page 525 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 52 of 205

-52-

1    party to preserve evidence.  This is evidence.

2                    THE COURT:  Well, to the extent you're relying

3    on Judge Pro's order for this line of questioning, I think you

4    and Ms. Klar can argue about what the subtext of preserve

5    means.  I need to see -- to review the order to really --

6                    MR. PEEK:  I'll ask the question a different

7    way, your Honor.

8                    THE COURT:  All right.  Thank you.

9                    MR. PEEK:  Thank you.  I'd just like to move on.

10   I don't want to spend --

11                   MS. KLAR:  Your Honor, I would just state for

12   the record I'm not aware of any case law that interprets the

13   word preserved in the manner implied by Mr. Peek.

14          It is evident that action was taken to preserve the

15   evidence.  I don't think that there's any case law that says

16   you can't commingle.

17                   THE COURT:  All right.  Ms. Wells.

18                   MS. WELLS:  Your Honor, I believe the order in

19   question may be 141 in the docket.

20                   THE COURT:  Oh, thank you.

21                   MR. PEEK:  Thank you.  That's why I need my

22   laptop.  May I -- thank you.

23                        (Discussion held off the record.)

24                   THE COURT:  Oh, you're speaking of -- well, this

25   is proposed order 141.  Docket 141 is a proposed order.

Case 3:81-cv-00045-CMN Document 182-41 Filed 08/07/23 Page 526 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 93 of 205

-53-

1          MR. PEEK:  Yeah, but I -- no, the Court did not

2    adopt this order, your Honor, because this is one where we

3    proposed to have it actually forensically copied.

4          THE COURT:  Well, let's go ahead and move on.

5          MR. PEEK:  We'll get it at the break so we can

6    move on, and I'll ask the question in a different manner.

7          THE COURT:  Thank you.  Go ahead, please.

8    BY MR. PEEK:

9    Q   Did you, when you created these six boxes, label the six

10   boxes in any way other than -- label the mixed -- label the

11   other two boxes in any way?

12   A   I don't remember if they were labeled.

13   Q   Okay.  Did you put other electronic media inside any of

14   the six boxes?

15   A   It's possible, yes.

16   Q   Okay.  I'm not asking about possibilities.  Do you know

17   whether you did or did not?  A simple yes or no.

18   A   I believe I did.

19   Q   Okay.  And what other electronic media did you put in

20   there?

21   A   I don't recall specifically.

22   Q   Okay.  And when you moved from Yarrow Point to Rancho

23   Mirage, did you put other electronic media, or do you know

24   whether the movers put other electronic media besides the

25   seized property into their boxes?

Case 3:06-cv-00145-PMP-VPC Document 182-4 Filed 08/07/09 Page 527 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 67 of 205

-67

1    intermingled with other CDs and DVDs you had; is that correct?

2     A   I believe that's correct.

3     Q   So at some time along the way you lost the integrity of

4    what was seized and returned to you and what wasn't seized; is

5    that right?

6            MS. KLAR:  Objection -- objection, your Honor,

7    lacks foundation.  I don't know what it means to lack

8    integrity.

9            There is nothing in Judge Pro's order which says you

10   cannot commingle.  The order is very specific.  It says he's

11   prohibited from destroying, modifying, duplicating,

12   distributing, disseminating, hypothecating, transferring

13   licensing or assigning such property until such further order

14   of the court.

15           This Court has ordered that certain of these

16   documents be produced, and we assume, based on that order,

17   Mr. Montgomery is authorized to duplicate these materials.

18           But, again, we object to this line of questioning.

19   It has absolutely nothing to do with what we are here today

20   for.  We are not prepared to address issues relating to

21   whether or not Mr. Montgomery did or did not violate Judge

22   Pro's order.

23           THE COURT:  Well, the Court has reviewed the

24   order, it's docket number 143 which is the March 23rd, 2007,

25   minute order from a joint hearing between -- that Judge Pro

Case 3:81-cv-00045-CJN Document 182-4 Filed 08/07/23 Page 528 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 69 of 205

68

1    and I presided over concerning matters related to the search

2    warrant proceeding and the civil proceeding.

3          And, as always with minute orders, as counsel are

4    well aware, the minute order is simply that, it's a shorthand

5    order of what occurred at a proceeding, and I suspect that a

6    transcript of that hearing might be very illuminating

7    concerning -- insofar as it may flesh out what Judge Pro meant

8    or didn't mean.

9          I note for the record that just above the paragraph

10   entering the order there's a statement as follows:

11         "Ms. Wells advises the Court" -- pardon me.  Pardon

12   me, wrong section.  It's on page 3, in the middle it says,

13             "Ms. Wells advises the Court today the

14         government has no objections to the items being

15         returned to Mr. Montgomery as he is under an

16         injunction not to disseminate it, use it, share it,

17         or do anything with it except hold it."

18         And it is correct, as Ms. Klar has stated, that the

19   paragraph that she read into the record follows that which

20   states that the items are subject to the preliminary

21   injunction previously entered in this case, and then Judge Pro

22   outlines what is -- what is said in that preliminary

23   injunction until further order of the Court.

24         So I guess that is an issue, but if you could ask

25   your questions, Mr. Peek -- I mean, you're raising -- you're

1    obviously drawing objections by how you characterize things.

2    I think you might have more success if you just reword them.

3                    MR. PEEK:  I will, your Honor.

4                    THE COURT:  All right.

5    BY MR. PEEK:

6     Q    Did you commingle the FBI-seized property with other

7    electronic data?

8     A    Yes.

9     Q    And when did you do that?

10    A    Sometime between the point of which it was returned to

11   me, after that point.

12    Q    Did you take any steps at all to identify what was

13   FBI-seized property and what was being commingled with it?

14    A    I don't understand what you're asking.

15    Q    Well, what efforts, if any, did you -- did you take any

16   efforts to identify what property was FBI-seized property

17   versus what you were putting with the FBI-seized property?

18    A    I put it in a box that was marked that.

19    Q    Okay.  But did you add then other electronic data in the

20   form of CDs or disk drives into those same boxes?

21    A    At some point, yes.

22    Q    And I believe at some point you said the movers did the

23   same thing?

24    A    I believe so.

25    Q    And I think you told us you weren't able to label the

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

Case 3:81-cv-00045-CJN Document 182-4 Filed 08/07/23 Page 530 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 93 of 205

93

```
 1    from the government how to handle that transfer.
 2                 THE COURT:  All right.
 3                 MR. PEEK:  Your Honor, respectfully, this is too
 4    little too late.  We were told on June 10th that the 30 CDs,
 5    that they said that they were going to copy those immediately
 6    and provide to us.  That was two weeks ago.
 7                 MS. KLAR:  Your Honor, given the fact that
 8    eTreppid has yet to produce a single electronic file in
 9    response to discovery, I'm at a loss to understand how
10    Mr. Peek with a straight face can say to the Court it's too
11    little too late.
12            They have the same discovery obligations as
13    Mr. Montgomery, and they told the Court last week that they
14    couldn't get all of this information produced for a couple of
15    months.
16            So we are doing the best we can.  The documents went
17    to -- not the documents, the CDs and the hard drives went to
18    Fulcrum, they are doing the best they can.
19                 THE COURT:  All right.  Well, we'll address
20    these issues.
21                 MR. PEEK:  In final argument.
22                 THE COURT:  Right.  As well, I'll, of course,
23    want the United States counsel to be privy to discussions
24    about the issues that Ms. Klar just raised so we'll just wait
25    until he's finished, Mr. Montgomery has finished speaking with
```

Case 3:81-cv-00445-CIN Document 182-41 Filed 08/07/23 Page 531 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 94 of 205

94

 1    counsel for the government.

 2                    (Discussion held off the record.)

 3                    THE COURT:  Let the record reflect that

 4    Mr. Montgomery has resumed the stand and has apparently

 5    completed his conference with Mr. Gomez and Ms. Wells, counsel

 6    for the United States.

 7                    All right.  You may proceed, sir, Mr. Peek.

 8                    THE WITNESS:  The question was?  I mean, I

 9    forgot it now.

10                    THE COURT:  Ms. Court Reporter, could you please

11    read it back?

12                    (The question was read by the reporter as
                      follows:  Question:  And what conclusion did you draw
13                    from that request?)

14                    THE WITNESS:  The request was for the backup.

15    BY MR. PEEK:

16     Q    The backup of the specific Sue Perez, Warren, Len

17    Glogauer, Patty Gray, not the backup of classified information

18    that we know you gave to Mr. Trepp that he put in the safe,

19    I'm talking about these other backups?

20     A    Whoa, whoa.  I didn't say -- what do you mean give

21    Mr. Trepp and put in the safe?

22     Q    Go ahead, I'm sorry --

23     A    No, no, you're the one that asked.

24     Q    Okay.  Sorry.  What conclusion did you draw?

25     A    Pre-2002 I think he just wanted a copy of it.

Case 1:01-cv-00045-CW Document 182-4 Filed 08/07/08 Page 538 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 85 of 205

95

1  Q   Okay.  What conclusion did you draw from why he wanted a

2  copy out of the building?

3              MS. KLAR:  Objection, your Honor, lacks

4  foundation.

5              THE COURT:  Overruled.  Go ahead and answer the

6  question, sir.

7              THE WITNESS:  I don't recall specifically.  He

8  just wanted one out of the building.

9  BY MR. PEEK:

10  Q   Okay.  You didn't conclude, for example, that he wanted

11  to make sure that he maintained the data, it couldn't get

12  destroyed or lost?

13  A   That would be a reason.

14  Q   Okay.  And if you want to back up data, wouldn't you want

15  to back up all the data on each computer so you wouldn't

16  destroy or lose it?

17  A   That would be one conclusion.

18  Q   And you took the direction from the CEO and, in fact, did

19  back up all of the date on each of the computers?

20  A   Absolutely not.

21  Q   You did not.  Which data did you not back up?

22  A   The files that were open at the time the backup occurred.

23  Q   Okay.  So was that on every computer?

24  A   Whatever --

25              MS. KLAR:  Objection, your Honor, we're back to

Case 4:21-cv-00415-GPN Document 182-1 Filed 08/07/23 Page 533 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 106 of 265
-106-

 1    had a top secret clearance, and under no circumstances could

 2    anybody have a good faith belief, including Mr. Montgomery,

 3    that Sue Perez would have had any classified, state secret

 4    information on her computer.

 5                    THE WITNESS:  Allow me to talk to the government

 6    first, then they can answer your question for you.

 7                    THE COURT:  All right.

 8                    MR. PEEK:  Take the time to do it, your Honor.

 9                        (Discussion held off the record.)

10                    THE COURT:  The record will reflect that

11    Mr. Montgomery has now resumed the witness stand and counsel

12    for the United States have also returned.

13           Go ahead, sir.

14                    MS. WELLS:  Excuse me, your Honor.

15                    THE COURT:  Yes.

16                    MS. WELLS:  Based on our conversations with

17    Mr. Montgomery, we would actually request that he not answer

18    the question that Mr. Peek has posed to him under the terms of

19    the United States' protective order.

20           The fact that he may or may not have backed up

21    certain types of files on certain employees' systems could, in

22    fact, implicate the terms of the protective order.

23                    MR. PEEK:  I'll respect that and move on, your

24    Honor.

25                    THE COURT:  Thank you.

Case 1:21-cv-00445-CJN Document 182-73 Filed 08/07/23 Page 534 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 107 of 265
-107-

1    BY MR. PEEK:

2     Q    Backups are for disaster recovery, are they not?

3                MS. KLAR:  Objection, your Honor, relevance.

4                MR. PEEK:  Your Honor, may I have a little

5    latitude here?  I mean, what's the purpose here?  I mean, if

6    you're going to backup, I mean, there has to be some reason to

7    do it.

8          You don't just -- the CEO says do it, I mean, it's

9    obviously -- you do it for disaster recovery, and then I want

10   to go on again, if it's for disaster recovery, what files he

11   copied, why didn't he copy all the files.

12               THE COURT:  All right.  Well, I'll allow -- it's

13   five to 12:00 so --

14               MR. PEEK:  I'm mindful of the time as well.

15   BY MR. PEEK:

16    Q    For disaster recovery?

17               THE COURT:  All right.  I'm going to go ahead and

18   overrule the objection, but let's wrap it up.

19   BY MR. PEEK:

20    Q    For disaster recovery?

21    A    That would be one reason.

22    Q    Okay.  And so you would want to make sure that you

23   captured, because of the disaster -- a disaster might occur,

24   all of the work product, if you will, of the employees; is

25   that correct?

Case 1:21-cv-00445-CJN Document 182-31 Filed 08/07/23 Page 535 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 219 of 265
-213-

1   varying PST files to put them into this text file, did they

2   not?

3    A   Not necessarily.

4    Q   Then how did it get done?  Was it done electronically

5   with a program?

6    A   I mean, there isn't only one way this file could have got

7   created.

8    Q   Okay.  Tell me --

9    A   Well, you just named one, I believe.

10   Q   Okay.  Is that the way it happened?

11   A   Not that I recall.

12   Q   How did it happen?

13   A   I don't recall.  You've asked me this --

14   Q   Okay.  You don't know, again.

15          So you or somebody gave it a name, and somebody

16  chose to put into that certain E-mails from the PST files that

17  you had in your possession; is that correct?

18   A   From the -- I can't say that every one of those came from

19  a PST because you've already asked me that question.

20   Q   Okay.

21             THE WITNESS:  Your Honor, I would like to stop

22  for a minute and take a break to use the restroom.

23             THE COURT:  All right.  We're going to take a

24  quick five-minute break until 4:10 --

25             MR. PEEK:  I'm not going to go anywhere, your

Case 1:21-cv-00445-CJN Document 182-31 Filed 08/07/23 Page 536 of 650
Case 3:06-cv-00056-PMP-VPC Document 781 Filed 07/03/08 Page 214 of 265

-214-

```
 1    Honor.
 2              THE COURT:  We'll be in recess for five minutes.
 3                   (A recess was taken.)
 4              MR. PEEK:  Your Honor, I want to apologize to
 5    the Court, to Ms. Klar, I made representations to the Court
 6    there was a defamation claim outstanding.  Mr. Snyder reminded
 7    me there is not.  It will be the subject matter of further
 8    conversation and motion practice as well.
 9              THE COURT:  All right.
10              MR. PEEK:  But I wanted to at least clear that
11    up with the Court and apologize to the Court and Ms. Klar for
12    making that representation which was in fact wrong.
13              THE COURT:  I understand the government wishes
14    to have a sidebar; is that correct?
15              MS. WELLS:  That's correct.
16              THE COURT:  Lawyers, if you're there appearing
17    telephonically, I apologize, but we are not able to hook you
18    in for the sidebar, but all other lawyers please come on over
19    here.
20                   (Following is discussion at sidebar.)
21              THE COURT:  All right.  I understand that the
22    government has concerns about documents appearing in the
23    exhibits that eTreppid is examining Mr. Montgomery on this
24    afternoon.
25              MS. WELLS:  Okay.  We have some concerns about
```

1    some of the documents that are appearing in Exhibit 8 and

2    Exhibit 6, and what we would like to do is --

3                 MR. PEEK:  Eight or 9?

4                 MS. WELLS:  Eight.  You have not used 9 yet.

5                 MR. PEEK:  I'm using 9 right now.

6                 MS. WELLS:  No, we do not have concerns about 9,

7    we have concerns about 8 and 6, and there are pages within

8    those two exhibits that we would like to pull and take back to

9    Washington and make the redactions, and we'll provide copies

10   back to everybody.

11                MR. GOMEZ:  There's also several pages --

12                MS. WELLS:  No, that's Exhibit 6.

13                THE COURT:  Okay.  So what I would propose we

14   do, I know you would like to FedEx these back this evening,

15   correct, sir?

16                MS. WELLS:  Yes.

17                THE COURT:  Okay.  And so -- all right.  So what

18   I propose we do, I understand -- and I'll put this on the

19   record, Ms. Klar, I think you mentioned to my law clerk or my

20   court clerk that Mr. Montgomery's --

21                MS. KLAR:  He's hit the wall.

22                THE COURT:  -- tired.  Anyway, we have some

23   other housekeeping matters to take up.

24                I propose that we continue this and that I send

25   Mr. Gomez and Ms. Wells -- sorry, long day -- into my jury

Case 1:21-cv-00445-CJN Document 182-71 Filed 08/07/23 Page 539 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 216 of 265
-216

```
 1   room, and you could begin -- we'll just hand over all the
 2   binders now, and you can now get going on that, assured that
 3   what we will do for the balance of the afternoon -- I think
 4   we're going to be wrapping it up pretty quickly.
 5              There were some housekeeping matters that we need to
 6   take care of, we'll do that, and then we will be setting a
 7   continued hearing so you'll need to --
 8              MS. WELLS:  What I would suggest is that maybe
 9   Mr. Ferrera and Mr. Gomez can take the binders and pull these
10   and then they can stay in the courtroom.
11              THE COURT:  All right.
12              MR. GUNDERSON:  What are we going to do with the
13   binders that counsel have?
14                   (Simultaneous indecipherable
                          conversation.)
15              MS. WELLS:  We are just removing the pages which
16   we believe need to be redacted.  We will be giving the
17   remained of the binders back to counsel.
18              THE COURT:  That was Ms. Wells.  Nobody talk.
19         All right.  Thank you.
20              MS. WELLS:  Thank you.
21                   (End of sidebar discussion.)
22              THE COURT:  All right.  The Court has had a
23   sidebar, and I'm going to have Mr. Gomez and the court
24   security officer take possession of -- is it all of the
25   binders; is that correct?
```

Case 1:21-cv-00445-CJN Document 182-71 Filed 08/07/23 Page 539 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 217 of 265

217

```
1                MS. WELLS:  No, just binders 1 and 2.

2                THE COURT:  Take possession of binders 1 and 2,

3    all copies.

4                MR. PEEK:  Are we done with his examination,

5    your Honor?  Because Exhibit 9 is in my volume 2 so I

6    didn't --

7                THE COURT:  I think we're finished.  I think

8    that we're going to wrap things up for today.

9           Well, I only have exhibit -- I only have binder 1,

10   volume 1.

11               MR. GUNDERSON:  Your Honor, the Montgomery

12   parties are going to surrender their volumes 1 and 2 now to

13   the government.

14                    (Discussion held off the record.)

15               THE WITNESS:  Can I step down or no?

16               THE COURT:  You may step down.  I'm going to

17   have Mr. Montgomery step down.

18               MR. PEEK:  Your Honor, I have another volume 1

19   here.

20               MS. ROBB PECK:  Your Honor, and just for the

21   record, local counsel for both Atiego and Mr. Sandoval have

22   surrendered volumes 1 and 2 as well.

23               THE COURT:  Thank you.

24          Go ahead and have a seat, Mr. Montgomery.

25               THE WITNESS:  Okay.
```

Case 1:21-cv-00445-CJN Document 182-31 Filed 08/07/23 Page 540 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 219 of 265

-218

```
 1                THE COURT:  All right.  I just want to poll
 2   counsel so I'll just go around the room, the courtroom.
 3           So, Ms. Klar, have you provided the binders volumes
 4   1 and 2 to government counsel?
 5                MS. KLAR:  We have, your Honor.
 6                THE COURT:  All right.  And Ms. Robb Peck
 7   advises on behalf of Atiego and Mr. Sandoval she also did.
 8                MS. ROBB PECK:  That's correct, your Honor.
 9                THE COURT:  And I've provided volumes 1 and 2 of
10   my exhibits.  Did we have any additional exhibits, Ms. Clerk?
11                THE CLERK:  I did, your Honor, and I provided
12   those as well.
13                THE COURT:  All right.  And, Mr. Peek, have you
14   provided all of your copies that are here in the courtroom
15   to --
16                MR. PEEK:  I have, your Honor, and I've also
17   canvassed my staff to make sure that we didn't have any extras
18   here.
19                THE COURT:  All right, thank you.
20           All right.  So pursuant to the sidebar, the
21   government will be reviewing certain documents that are in
22   those exhibits.
23           And so Mr. Montgomery advised Ms. Klar that he would
24   really -- I think, is tired, and it turns out that -- I think
25   it's making sense to me that we set yet another date for
```

Case 3:21-cv-00445-CDN Document 182-71 Filed 08/07/23 Page 541 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 219 of 265

-219-

 1    continued hearing, but what I want to -- and we're going to

 2    take care of some housekeeping matters as well.  We aren't

 3    doing a continued hearing yet.

 4         I want to take care of -- it's unfortunate, I've

 5    lost my glasses.

 6              MR. PEEK:  I do that all the time, your Honor.

 7              THE COURT:  I don't know.

 8         Oh, thank you, Ms. Court Reporter.

 9         All right.  The first thing I'd like to do is go

10    over the exhibits.  All right.  I just want to go through the

11    laundry list.

12         I had the clerk of the court review the first

13    transcript of the June 10 hearing to determine which court

14    exhibits were actually discussed and the subject of questions,

15    and I'll just tell counsel what they are if you would like to

16    look at your exhibit list.

17         They were Exhibit 1, Exhibit 2, Exhibit 3,

18    Exhibit 4, Exhibit 5, Exhibit 6, Exhibit 7, and Exhibit 12,

19    and Exhibit 16.  So, in other words, those were the only

20    exhibits on which the Court questioned Mr. Montgomery.

21         I think the other exhibits were included initially

22    with the thought that they might be the subject of inquiry,

23    and if other counsel are interested in having those admitted,

24    but I would like to ask if -- I'd like to admit those

25    exhibits, 1, 2, 3, 4, 5, 6, 7, 12 and 16.  Any comment from

Case 1:21-cv-00415-GPN Document 182-31 Filed 08/07/23 Page 542 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 220 of 265

220

1    counsel?

2                    MR. PEEK:  No objection, your Honor.

3                    MS. KLAR:  Your Honor, we have no objection, but

4    I'm wondering whether you questioned Mr. Montgomery about

5    number 9 which was the Court's May 21, 2008 order.  I don't

6    have independent recollection, but --

7                    THE COURT:  I may have so let's go ahead and

8    include that as part of the record if there's no objection.

9             Hearing none, I'll also include Exhibit 9.

10            And I think some of these other items were never

11   intended to be exhibits, they just found their way somehow on

12   this list.  I don't know how.

13            But, so, any objection to those exhibits with that

14   exception?

15                    MS. KLAR:  No objection, your Honor.

16                    THE COURT:  Thank you very much, Ms. Klar.

17            Mr. Peek.

18                    MR. PEEK:  No objection.

19                    THE COURT:  Ms. Robb Peck?

20                    MS. ROBB PECK:  No, your Honor.

21                    THE COURT:  And Mr. Schwartz?

22                    MS. SCHWARTZ:  No, your Honor.

23                    THE COURT:  Mr. Liese?

24                    MR. LIESE:  Mr. Liese, and no objection, your

25   Honor.

Case 1:21-cv-00445-CJN Document 182-31 Filed 08/07/23 Page 543 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 221 of 265

-221-

1          THE COURT:  All right.  Thank you, sir.  I'm

2    sorry for mispronouncing your name.

3                          (Court's Exhibits 1 through 7, 9, 12 and
                            16 received in evidence.)
4          THE COURT:  All right.  Well, then as to your

5    exhibits, Mr. Peek, I guess we need to have the United States

6    review those exhibits, and then at the continued hearing we

7    can take up admission of those exhibits unless someone has

8    another proposal.

9          MR. PEEK:  I would at least offer Exhibit 9 and

10   Exhibit 31, your Honor.  Exhibit 31 was the second request for

11   production identified by Mr. Montgomery.  Exhibit 9 was the

12   production of the e-mails to the media.

13         THE COURT:  Let me just ask the government

14   before you respond, Ms. Klar, do you have any objections on

15   behalf of the government to admission of either of those

16   exhibits?

17         MS. WELLS:  Certainly not to Exhibit 31, and I

18   would just like to clarify on Exhibit 9, but I don't believe

19   we will, but if we could reserve that, I would appreciate it.

20         MR. PEEK:  I can wait then to offer that, your

21   Honor, just out of an abundance of caution.

22         THE COURT:  All right.  Let's reserve all of

23   those exhibits until such time as they're all reviewed.

24       Ms. Klar, any objection to that?

25         MS. KLAR:  No, your Honor.

Case 3:21-cv-00445-PMP-VPC Document 1827-31 Filed 08/07/23 Page 544 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 222 of 265
222

```
 1                THE COURT:  And, Ms. Robb Peck, any objection?

 2                MS. ROBB PECK:  No, your Honor.

 3                THE COURT:  Mr. Schwartz, any objection, sir?

 4                MR. SCHWARTZ:  No, your Honor.

 5                THE COURT:  Mr. Liese, any objection, sir?

 6                MR. LIESE:  No, your Honor.

 7                THE COURT:  All right, very good.

 8           All right.  Now, the next item -- I can't read my

 9     note, but I know that Ms. Klar wished to be heard on the

10     30(b)(6) deposition.

11           At -- I don't know if it was the June 10th hearing,

12     or if it was at last week's discovery status conference that

13     there was a discussion about 30(b)(6) deposition of eTreppid's

14     person most knowledgeable, and efforts were underway to set a

15     time for that, and, Ms. Klar, what do you have to report?

16                MS. KLAR:  An e-mail went out to all counsel, I

17     think, within a day or two of last week's hearing asking for

18     dates that were convenient during the next two weeks.

19           The response from most counsel was to give us dates.

20     The response from Mr. Peek was that he had yet another

21     vacation planned.

22           We then sent an e-mail to him on Friday saying,

23     Mr. Peek, can you please give us dates subsequent to your

24     return from your vacation, and also asking him to give us

25     dates for all the other vacations he has planned for the
```

Case 1:21-cv-00445-CJN Document 182-31 Filed 08/07/23 Page 545 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 229 of 265

223

1  summer so that we can make sure not to schedule any

2  depositions on those dates.

3       We have not had the courtesy of a response that I'm

4  aware of, and we would like to convene that deposition

5  sometime right after the July 4 holiday which is when, I

6  believe, Mr. Peek returns.

7       THE COURT:  All right.  Mr. Peek, I just recall

8  from -- I think it was the June 10 hearing that you had a

9  holiday, a vacation planned.

10      MR. PEEK:  The 25th through the 5th.  I told

11 Ms. Klar, I told the Court that.

12      THE COURT:  Right, right.

13      MR. PEEK:  So I don't know what this "yet

14 another holiday" is, that's the same one I had.

15      THE COURT:  All right.  Well, so let's set a

16 date.

17      MR. PEEK:  Okay.  And, your Honor, I got the

18 correspondence late Friday.  Frankly, I have not had a chance

19 to get back to Ms. Klar.  I know it is certainly high on her

20 list of priorities.  Certainly today's hearing and preparing

21 for it was high on my list of priorities.

22      I wasn't ignoring her.  I responded very quickly the

23 first time I got the e-mail, I just got a little occupied.

24      And Mr. -- I will just tell the Court two things.

25 One, Mr. Trepp is not available from July 1st through

Case 4:21-cv-00445-GPN Document 182-31 Filed 08/07/23 Page 546 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 224 of 265

-224-

1    July 14th.  I start a jury trial in Las Vegas on July 14th,

2    I'm available the following week, which is the week of July

3    21st, and so is Mr. Trepp.

4            And I also think, your Honor, and this will be the

5    subject matter of a written motion, but I want to at least let

6    the Court know that I think it appropriate that discovery,

7    whether it be on my side or on Ms. Klar's side, in the nature

8    of oral discovery at least be held until such time as there is

9    complete production.

10           My concern is, and I'll put this in papers, is that

11   we start without a complete production by both sides and then

12   somebody comes back and says, oh, you've now given me more

13   documents, I want to take another one, or then there's a third

14   one.

15           And so I'll make that the subject matter of a motion

16   before we have the hearing on the 15th, but I'm available the

17   week of the 21st, your Honor.

18           THE COURT:  All right.  Then counsel are

19   directed to go ahead and schedule -- look at your calendars

20   and make -- please do your best.  I know it is the summer

21   vacation season, that's just -- for people, and there are also

22   special occasions that come during the summer that people have

23   to attend to.

24           So, though, until further order of the Court it is

25   ordered that counsel for the parties meet and confer and

Case 3:21-cv-00445-CDN Document 182-31 Filed 08/07/23 Page 547 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 229 of 265

-225

1    schedule the deposition -- I presume it would be Mr. Trepp is

2    the person most knowledgeable -- for the week of July 21,

3    2008, and that you do so, complete that, make that decision by

4    the end of this week, by June 27, 2008, get the time set, and,

5    Mr. Peek, if you're leaving for a vacation, please do your

6    best.

7             MR. PEEK:  I'll give Mr. Snyder my dates during

8    that week, as well as Mr. Trepp's.

9             THE COURT:  All right.

10            MR. PEEK:  And then the other thing, your Honor,

11   is I would just inquire whether or not Ms. Klar expects us to

12   go beyond one day.

13        We have not had a meet and confer, and I know we

14   need to have that --

15            THE COURT:  Right.

16            MR. PEEK:  -- on whether or not we're going --

17   how long the depositions are going to take place.

18            THE COURT:  Well, I think that's also another

19   subject of -- two issues are arising.  One, is the timing of

20   any oral discovery.  Two, is -- the next question is, of

21   course, how long these will take.

22        So I'm going to ask counsel to discuss that, that

23   should be part of your discussion between now and June 27th,

24   so that you can reach an understanding -- yes, Ms. Wells?

25            MS. WELLS:  Well, I just wanted to clarify, and

Case 1:21-cv-00445-CJN Document 182-31 Filed 08/07/23 Page 548 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 226 of 265

226

1    I know that we have been included in the e-mails to date, but

2    your order only mentioned the parties, that the counsel for

3    the United States be included in the scheduling for this

4    deposition because, given the topic areas to be covered, it

5    does implicate --

6            THE COURT:  Yes, I apologize for that oversight,

7    Ms. Wells.

8            MS. WELLS:  And may I just state for the record,

9    I'm unavailable the week of the 21st, but I'm not sure whether

10    Mr. Gomez would be available.

11           THE COURT:  All right, thank you.

12        Well, we're going to -- please do your best, and --

13           MR. PEEK:  How about counsel, Mr. Schwartz and

14    Mr. Liese?

15           THE COURT:  Well, I want everybody -- we are

16    going to have a chat about that today.

17           MR. PEEK:  Okay.

18           THE COURT:  That's why I'm giving you until the

19    27th to see what you can come up with, and maybe if you want

20    to stay after for a few minutes and discuss it, that's fine

21    with me.

22        Oh, I know.  Ms. Klar, you were going to report on a

23    discussion you had during a recess with counsel from

24    Washington, D.C.

25           MS. KLAR:  Your Honor, I was not able to reach

Case 1:21-cv-00445-CJN  Document 182-31  Filed 08/07/23  Page 549 of 650
Case 3:06-cv-00056-PMP-VPC  Document 731  Filed 07/03/08  Page 227 of 265
-227

1    Mr. Pelchin, he is vacationing in Greece until July 4th, but I

2    was able to speak to the junior associate who is working on

3    this matter, and she will get an e-mail to him and try to

4    contact him tomorrow so I can have a conversation with him --

5                  THE COURT:  All right.

6                  MS. KLAR:  -- and a determination can be made

7    how to proceed with this issue.

8                  Given Mr. Peek's schedule, it would appear that we

9    cannot reconvene this hearing until sometime after July 21st.

10                 So given that fact, I think we will have adequate

11   time, but what I would ask the Court is, if a decision is made

12   to reproduce that PST file, would that run afoul of the

13   Court's order, and the point being, we would reproduce it and

14   have Fulcrum do whatever needs to be done so that they can be

15   available to respond to any questions.

16                 THE COURT:  When you ask how would it run afoul

17   of the Court's order, tell me why you ask that question.

18                 MS. KLAR:  Well, because I don't want to run

19   afoul of your order.

20                 THE COURT:  Right.  Which order?

21                 MS. KLAR:  Well, you ordered us to produce

22   something by a certain date.

23                 THE COURT:  Oh, I see.

24                 MS. KLAR:  And I am basically asking you to do a

25   substitute production, and the reason I'm doing that is

MARGARET E. GRIENER, RDR, CCR NO. 3, OFFICIAL REPORTER
(775) 329-9980

Case 1:21-cv-00415-CPN Document 182-31 Filed 08/07/23 Page 550 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 234 of 265

-234-

```
 1    that, sir.  Thank you, though.
 2                    MR. SCHWARTZ:  Just double checking.  Thank you,
 3    your Honor.
 4                    MR. PEEK:  With respect to Mr. Montgomery, I'm
 5    assuming that the two hour is my limit of cross.
 6                    THE COURT:  Yes.
 7                    MR. PEEK:  Ms. Klar may have some redirect of
 8    him, I don't know.
 9              And then with respect to Mr. Karchmer, we would have
10    two hours on direct, I don't know how much cross.
11                    THE COURT:  All right.  And then so --
12                    MR. PEEK:  And then Mr. Trepp would be an hour
13    and a half at the most.
14                    THE COURT:  So that is five and a half hours.
15                    MS. KLAR:  Your Honor, that doesn't give me very
16    much time for any kind of rebuttal.
17                    THE COURT:  No, it doesn't.  What do you
18    anticipate?  Do you know at this time?
19                    MS. KLAR:  I don't.  I'm assuming that I'm going
20    to have to put an expert on to respond to Mr. Karchmer, and I
21    think I also will have to -- I may have to put testimony on in
22    response to Mr. Trepp, and I would assume that I will be
23    cross-examining Mr. Trepp.
24                    THE COURT:  All right.  Well -- all right.
25              Oh, please hand that extra exhibit -- the record is
```

Case 1:21-cv-00445-CJN Document 182-31 Filed 08/07/23 Page 551 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 239 of 265

-235-

```
 1   reflecting that the law clerk is delivering yet another binder
 2   to Mr. Gomez that he needs to take a look at.
 3           Please make sure, everybody, before you leave today,
 4   I know everybody is doing their best, it's which binders?
 5   One --
 6               MS. WELLS:  1 and 2.
 7               THE COURT:  Binders 1 and 2.  Don't take them.
 8   Make sure when you're packing up, my law clerk will be here,
 9   and we can deliver those to Mr. Gomez and the court security
10   officer.
11           All right.  Well, I'll -- what I'm going to tell --
12   I'm gone, so I'll tell counsel when I'm available.
13           I think what we're going to have to do is this,
14   rather than decide all of this today, I want to give counsel,
15   Mr. Peek and Ms. Klar, an opportunity to consider how you want
16   to proceed at the continued show cause hearing and what time
17   you think you're going to need, and then I think you can
18   submit what your individual proposals are about what you would
19   request from the Court in terms of time.
20           And then what I'll do is either issue an order
21   saying here's when I'm available and this is how much time
22   you're getting and this is when I can be available, but I will
23   tell you -- let's see.  I think next week is out, right?
24           Well, I'm available before July 21, but I guess --
25   and I'm available the week of July 21st on the 24th or the
```

```
 1   25th.
 2            MR. PEEK:  Your Honor, as always, there's a
 3   chance that a case could settle the week of the 14th, but I
 4   don't --
 5            THE COURT:  I'm just -- I understand.  I'm just
 6   telling you that I'm available so you know, and I could
 7   possibly continue a matter on July 23rd.  So July 23rd, 24th,
 8   or 25th, I am out.  The Ninth Circuit conference is the
 9   following week and I am gone, and I am gone for part of the
10   next week.
11            So I'm available the week of August 11 on Monday,
12   the 11th, Tuesday, the 12th.  I could revise my schedule to be
13   available the week of August 11 on the 11th, the 12th, 13th,
14   and the 14th.
15            We have on Tuesday, August 19, the status conference
16   with Judge Pro.  I'm available August 20th, could be available
17   the 21st and the 22nd also.  I think that gives you --
18            MR. PEEK:  When would you like us to give
19   you our --
20            THE COURT:  Wait a minute.
21            THE CLERK:  It was moved to Monday, the 18th.
22            THE COURT:  Oh, I'm sorry, I moved it, I moved
23   the hearing to accommodate Judge Pro's schedule.  I apologize,
24   that's now set for Monday, August 18th.
25            MR. PEEK:  Does that make the Court available on
```

1    the 19th?

2                THE COURT:  Yes.  So I'm not asking you to do

3    this today, I want you all to go home and look at your

4    calendars, and then I want you to contact my court clerk on

5    the 27th of this -- of June, just say what days you're

6    available of those dates that I picked.  Talk to one another,

7    figure out what days you're available.

8                If we need to set it for two days.  Realistically, I

9    would rather do that and get it done than keep bringing you

10   all back at expense to your clients.

11               But what I also want, counsel, will it give you

12   adequate time to decide what amount of time you would like to

13   request, if you can do that by Friday, would that be

14   sufficient time, Ms. Klar?

15               MS. KLAR:  Yes, your Honor.

16               THE COURT:  All right.  And, Mr. Peek?

17               All right.  So -- and on the 27th, just file a paper

18   saying requested time and witnesses for evidentiary hearing,

19   and then I'll decide how long it's going to be and what I'm

20   going to do, and then, in the meantime, everybody can just

21   either jointly or separately file a notice of availability and

22   which dates you and your clients are available of the dates

23   that I mentioned.  All right?

24               MR. PEEK:  Thank you, your Honor.

25               MS. KLAR:  Thank you very much, your Honor.

Case 1:21-cv-00445-CJN Document 182-31 Filed 08/07/23 Page 554 of 650
Case 3:06-cv-00056-PMP-VPC Document 731 Filed 07/03/08 Page 239 of 265

238

```
 1              THE COURT:  Is there anything else that anyone
 2    has?  Ms. Klar?
 3              MS. KLAR:  No, your Honor.
 4              THE COURT:  All right.  Mr. Peek?
 5              MR. PEEK:  No, your Honor.
 6              THE COURT:  Ms. Robb Peck?
 7              MS. ROBB PECK:  No, your Honor.
 8              THE COURT:  Mr. Schwartz?
 9              MR. SCHWARTZ:  No, your Honor.
10              THE COURT:  Mr. Liese?
11              MR. LIESE:  No, your Honor.
12              THE COURT:  Ms. Wells and Mr. Gomez?
13              MS. WELLS:  No, your Honor.
14              THE COURT:  All right.  Thank you very much,
15    then, we're adjourned for today.
16                            -o0o-
17
18         I certify that the foregoing is a correct
           transcript from the record of proceedings
19         in the above-entitled matter.
20         /s/Margaret E. Griener          07/03/2008
           Margaret E. Griener, CCR #3, RDR, FCRR
21         Official Reporter
22
23
24
25
```

# EXHIBIT L

## AFFIDAVIT OF SERVICE

UNITED STATES DISTRICT COURT
District of District of Columbia

Case Number: 1:21-CV-00445-CJN

Plaintiff:
**US DOMINION, INC., ET AL**

vs.

Defendant:
**MY PILLOW, INC., ET AL**

For:
Philip Ekman
PLATINUM COURIER SERVICE
11575 E. Laketowne Drive
Albertville, MN 55301

Received by PLATINUM COURIER SERVICE to be served on **CARLOTTA WELLS, 9301 GARDEN CT, POTOMAC, MD 20854**.

I, Constantine Mckoy, being duly sworn, depose and say that on the **19th day of February, 2023** at **2:20 pm, I:**

**INDIVIDUALLY/PERSONALLY** served defendant by delivering a true copy of the **SUBPOENA TO TESTIFY AT A DEPOSITION, WITNESS FEE CHECK AND SUPPORTING DOCUMENTS** with the date and hour of service endorsed thereon by me, to: **CARLOTTA WELLS** at the address of: **9301 GARDEN CT, POTOMAC, MD 20854**, and informed said person of the contents therein, in compliance with state statutes.

**Description** of Person Served: Age: 60, Sex: F, Race/Skin Color: WHITE, Height: 5'4, Weight: 140, Hair: BLACK, Glasses: Y

Under penalty of perjury, I certify that the above made statements are true. I am over the age of 18, under no legal disabilities and have no interest in the above action. I solemnly affirm under the penalties of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief.

**LISA GARTON**
Notary Public, State of Maryland
County of Frederick
My Commission Expires 1/18/2027

Subscribed and sworn to before me on 2/20/23 by
the affiant who is personally known to me.

_____
Notary Public

_____
**Constantine Mckoy**
Process Server

**PLATINUM COURIER SERVICE**
**11575 E. Laketowne Drive**
**Albertville, MN 55301**
**(612) 221-2254**

Our Job Serial Number: PRS-2023005532

Copyright © 1992-2023 DreamBuilt Software, Inc. - Process Server's Toolbox V8.2m

# EXHIBIT M



**U.S. Department of Justice**

Civil Division
Federal Programs Branch

| **Mailing Address** | **Overnight Delivery Address** |
| --- | --- |
| P.O. Box 883 | 1100 L Street, N.W. |
| Washington, D.C. 20044 | Washington, D.C.  20005 |

---

Cassandra Snyder                                                         (202) 451-7729
Trial Attorney                                                          cassandra.m.snyder@usdoj.gov

March 3, 2023

<u>VIA E-MAIL</u>

Andrew Parker, Esq.
888 Colwell Building
123 N. 3rd St.
Minneapolis, MN 55401
parker@parkerdk.com

   Re: *US Dominion, Inc., et al., v. My Pillow, Inc., et al.,* No. 1:21-cv-00445-CJN (D.D.C.)

Dear Mr. Parker:

   The Department of Justice ("the Department") sets forth below its response and objections to your Rule 45 subpoena of Carlotta Wells, Assistant Branch Director of the Federal Programs Branch in the Civil Division of the Department of Justice, dated February 14, 2023.  Your subpoena seeks Ms. Wells' deposition testimony on the following subjects:

  (1) Mr. Montgomery worked on U.S. government programs that involved information protected by the State Secrets Privilege;

  (2) the federal government undertook active measures to prevent Mr. Montgomery from disclosing state secrets, including seizing documents from his attorney, attending his deposition, and attending court hearings at which he testified;

  (3) Ms. Wells engaged in conversations with Mr. Montgomery on multiple occasions regarding the State Secrets Privilege and what information Mr. Montgomery was permitted to disclose or prohibited from disclosing;

  (4) the United States Government's desire to protect State Secret Information held by Mr. Montgomery continues today; [and]

  (5) Exhibits A, B, C, D, and E accurately reflect the events they describe.

Ex. 2 at 4.

   The Department has considered this request under its *Touhy* regulations, issued pursuant to the Federal Housekeeping Statute, 5 U.S.C. § 301, and *United States ex rel. Touhy v. Ragen,*

340 U.S. 462 (1951), set forth at 28 C.F.R. § 16.21 *et seq*.  Pursuant to these regulations, the Department is empowered to determine whether to permit its employees to testify in cases, such as this one, in which the government is not a party.  *See In re Boeh*, 25 F.3d 761, 763 (9th Cir. 1994); *Swett v. Schenk*, 792 F.2d 1447, 1451 (9th Cir. 1986); *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 29 (D.D.C. 2005).

In determining how to respond to a demand for information such as a deposition, the Department considers a number of factors, including whether the deposition is appropriate under the applicable rules of procedure and whether compliance with the subpoena would involve disclosure of classified or privileged information, or information that is otherwise protected by statute or regulation.  28 C.F.R. § 16.26.  After considering these factors, we decline to authorize Ms. Wells' testimony in the above-referenced litigation and object to your subpoena on numerous grounds.  As explained below, your requested testimony concerns a lawsuit filed seventeen years ago and dismissed over a decade ago, and you have failed to set forth any reasonable, plausible basis that the matters at issue in those court proceedings have any possible bearing on statements regarding 2020 election fraud or Dominion voting machines.  Moreover, you seek testimony that is variously protected from disclosure via court order, testimony of which Ms. Wells has no personal knowledge and for which there exist more convenient sources, and testimony that is subject to privilege.

1. **The Testimony Sought Is Not Relevant to the Above-Referenced Litigation or Proportional to the Needs of the Case.**

First, Defendants' request for testimony is denied because the information Defendants seek is not relevant to the claims or defenses of any party to this litigation, nor proportional to the needs of the case.  *See* Fed. R. Civ. P. 26(b)(1) (providing that all discovery must be relevant to a claim or defense and proportional to the needs of the case); 28 C.F.R. § 16.26(a) ("In deciding whether to make disclosure pursuant to a demand, Department officials and attorneys should consider (1) whether such disclosure is appropriate under the rules of procedure governing the case . . . .").

Dominion filed the underlying defamation action against Mike Lindell and My Pillow, Inc based on numerous statements by Lindell in the wake of the 2020 presidential election, in which Lindell claimed that Dominion voting technology was exploited in various ways to alter votes and election results to the detriment of former-President Donald Trump.  According to Dominion, Lindell's assertions generally centered on the alleged failure and/or exploitation of certain "algorithms" in Dominion voting machines.  *See* Compl. ¶ 164–65, ECF No. 1.  Defendants claim that Ms. Wells' testimony on the above-described topics is relevant to Defendants' defenses, including "the defense that [Defendants'] allegedly defamatory statements were true, and the defense that the statements were plausible."  Ex. 2 at 1.  Specially, Defendants assert that Ms. Wells' testimony will show that "Mr. Lindell's reliance on Mr. Montgomery and the information he stated he possessed was reasonable."  *Id.* at 1.

You have failed to demonstrate any connection between the requested deposition testimony and that showing.  *See Sterne Kessler Goldstein & Fox, PLLC*, 276 F.R.D. at 385 (explaining that asserting that counsel has "non-privileged, factual information without specifying precisely what information is sought or the benefit of that information is insufficient to overcome the potential

2

risks that the Federal Rules were intended to protect against").  The requested testimony concerns Ms. Wells' representation of the United States in *Montgomery v. eTreppid Technologies, Inc.*, No. 06-cv-56 (D. Nev.), a lawsuit in which the United States asserted the state secrets privilege and obtained a Protective Order regarding certain information.  That lawsuit was filed seventeen years ago and dismissed over a decade ago, and you have failed to set forth any reasonable, plausible basis that the matters at issue in those court proceedings, which predate your case by more than a decade and a half, have any possible bearing on statements regarding 2020 election fraud or Dominion voting machines.  *See, e.g.*, *Harrington v. Bergen Cnty.*, No. CV 14-5764 (SRC), 2017 WL 4387373, at *2 (D.N.J. Oct. 3, 2017) (affirming denial of discovery "concerning an unrelated criminal investigation that occurred nearly nine years ago" on the basis of proportionality and undue burden).  On that basis alone, your request is improper.

Moreover, Ms. Wells' only involvement in *eTreppid* was as counsel for the United States in its assertion of the states secret privilege in that case.  To the extent that topics (2) and (3) seek to establish that the government acted to protect certain information in that case, the government's unclassified filings entered on the public record in that case speak for themselves.  Therefore, your request for testimony about the actions the government "undertook" in that case, Ex. 2 at 4, is cumulative and accordingly not relevant or proportional to the needs of the case, *see* Fed. R. Civ. P. 26(b)(2)(C)(i) (limiting discovery when "the discovery sought is unreasonably cumulative or duplicative").

## 2. The Testimony Sought Is Not Authorized to the Extent it Seeks Information Protected from Disclosure by the Protective Order in *eTreppid*.

To the extent your request seeks testimony on subjects covered by the Protective Order in *eTreppid*, your request is denied.  As you know, at the Government's request, the court entered an order in *eTreppid* prohibiting discovery of information relating to (1) "the existence or non-existence of any actual or proposed relationship" between the parties and any U.S. intelligence agency and (2) any "actual or proposed intelligence agency interest in, application of or use of any technology, software or source code owned or claimed by the Parties."  Protective Order ¶¶ 2–3, *eTreppid*, No. 06-cv-56 (D. Nev. Aug. 29, 2007), ECF No. 253.  Your request for testimony concerning topics (1) and (3) regarding whether "Mr. Montgomery worked on U.S. government programs that involved information protected by the State Secrets Privilege" and his conversations with Ms. Wells regarding "what information Mr. Montgomery was . . . prohibited from disclosing" fall squarely within that prohibition.  Ex. 2 at 4.  As you plainly know, both your client and Mr. Montgomery have sought to lift the Protective Order, which remains in effect.  *See* Mot. to Intervene and to Lift Protective Order, *eTreppid*, No. 06-cv-56 (D. Nev. Aug. 29, 2007), ECF No. 1216.  Your request for Ms. Wells' testimony is denied on this additional ground.

## 3. The Testimony Sought Is Not Authorized to the Extent it Seeks Information About Which Ms. Wells Has No Personal Information or for Which There Is a More Convenient Source.

The Department also denies your request to the extent you seek testimony on topics about which Ms. Wells has no personal knowledge.  For example, Ms. Wells cannot testify concerning topic (4) – any desire by the United States "to protect State Secret Information held by Mr.

Montgomery [] today." Ex. 2 at 4. The Government's position on your client's request to lift the Protective Order is a matter of public record in *eTreppid*. *See* U.S.'s Mem. in Opp. to Mot. to Intervene at 1, *eTreppid*, No. 06-cv-56 (D. Nev. Oct. 6, 2022), ECF No. 1232 (opposing the motion on substantive and procedural grounds and noting that "Lindell seeks this relief despite the fact that . . . he has not alleged that the protective order has actually prevented him from obtaining any information he needs"); U.S.'s Mem. in Opp. to Dennis Montgomery's Mot. Filed at ECF No. 1236 at 3, *eTreppid*, No. 06-cv-56 (D. Nev. Dec. 5, 2022), ECF No. 1243 (opposing the motion on substantive and procedural grounds and noting that "the Protective Order entered in this case has nothing to do with the defamation litigation against Lindell"). Ms. Wells has no further information regarding that topic. Ms. Wells also does not have personal knowledge concerning Mr. Montgomery's alleged technology based on her involvement in *eTreppid*, nor any matter concerning the underlying defamation lawsuit. She was simply counsel for the Government in connection with a matter that arose seventeen years ago, and in that role presented the Government's position and information to the court and took appropriate steps to protect the Government's interests when necessary in extrajudicial settings.

The Department also objects on undue burden grounds to providing information that can be more easily sought from another source. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (limiting discovery when that discovery "is obtainable from some other source that is more convenient, less burdensome, or less expensive"). Mr. Montgomery is a more convenient and less burdensome source of information regarding topics (1), (2), and (3) to the extent not prohibited from disclosure by the *eTreppid* Protective Order. *See Sterne Kessler*, 276 F.R.D. at 385 (quashing subpoena of former patent counsel because counsel was not the appropriate source of information regarding patent interview where respondent could instead depose the patent examiner and the patent inventor). Indeed, Defendants have already subpoenaed Mr. Montgomery, and you have provided no explanation for why Ms. Wells' duplicative and more attenuated testimony would be necessary on those topics. *See* Fed. R. Civ. P. 26(b)(2)(C)(i) (limiting discovery when "the discovery sought is unreasonably cumulative or duplicative"). Moreover, the *eTreppid* Protective Order did not preclude the parties in *eTreppid* from serving or taking any discovery from other parties or third parties relating to, *inter alia*, computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the parties. *See* Protective Order ¶ 4(c), *eTreppid*, No. 06-cv-56 (D. Nev. Aug. 29, 2007), ECF No. 253. You have not explained why such sources are insufficient to provide the information you seek. Finally, to the extent that you seek someone to testify as to the "accura[cy]" of Defendants' attachments, topic (5) can be more conveniently established through either Mr. Montgomery or the relevant court reporter. Ex. 2 at 4. For these reasons, your request is unduly burdensome and therefore denied.

### 4. The Testimony Sought Is Not Authorized to the Extent it Seeks Privileged Information.

The Department denies your request to the extent it seeks information that is privileged. The Department's *Touhy* regulations provide that the Department shall consider "[w]hether disclosure is appropriate under the relevant substantive law concerning privilege." 28 C.F.R. § 16.26(a)(2); *see also* Fed. R. Civ. P. 45(d)(3)(A)(iii). Notwithstanding Defendants' assertion that they "do not intend to ask Ms. Wells to disclose the substance of attorney-client communications or work product material generated in the course of her representation of the United States," Ex. 2

at 3, the deposition of trial counsel necessarily requires significant parsing between privileged information and non-privileged information. *See Sterne Kessler*, 276 F.R.D. at 385 ("Clearly a deposition of [counsel] would require diligent efforts to avoid disclosure of attorney-client communications and protected work-product material, a painstaking process that poses risks that other sources of discovery do not."); *United States v. All Assets Held in Acct. No. XXXXXXXX*, No. CV 13-1832 (JDB), 2019 WL 95605, at *8 (D.D.C. Jan. 3, 2019) ("To successfully walk the tightrope between what is discoverable and what is privileged, [counsel] would have to distinguish what he affirmatively disclosed to third parties more than 17 years ago from his own mental impressions of the case.").   Indeed, deposing counsel can lead to the revelation of "'mental impressions, which are protected work product'" in and of themselves. *Mannina v. District of Columbia*, 334 F.R.D. 336, 347 (D.D.C. 2020) (quoting *Coleman v. District of Columbia*, 284 F.R.D. 16, 20 (D.D.C. 2012)); *see also Director, Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1308 (D.C. Cir. 1997) ("[A] lawyer's factual selection reflects his focus; in deciding what to include and what to omit, the lawyer reveals his view of the case.").   In addition, your request appears to seek information based on or related to the state secrets privilege assertion in *eTreppid* and subject to the Protective Order in that case.  Thus, to the extent your subpoena seeks such privileged information, your request is denied on this additional ground.

* * *

For the foregoing reasons, the Department declines to authorize the requested deposition testimony of Ms. Wells.  Please let me know if you have any questions or would like to discuss further.

Sincerely,

*/s/ Cassandra Snyder*
Cassandra Snyder
(202) 451-7729

5

# EXHIBIT N

**UNITED STATES' MOTION FOR
PROTECTIVE ORDER**


**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

|  |  |
|---|---|
| ETREPPID TECHNOLOGIES, LLC, a California Corporation, | ) ) ) |
|  | CV-N-06-00415 (BES) (VPC) |
| Plaintiff | ) ) ) |
| v. | ) |
| DENNIS MONTGOMERY, et. al., | ) ) ) |
| Defendants. | ) ) |
| DENNIS MONTGOMERY, et. al., | ) ) ) |
| Plaintiffs | ) ) |
|  | CV-N-06-00056 (BES) (VPC) |
| v. | ) ) ) |
| ETREPPID TECHNOLOGIES, INC., et. al. | ) ) ) |
| Defendants. | ) ) ) |

DECLARATION AND FORMAL CLAIM OF
STATE SECRETS AND STATUTORY PRIVILEGES
BY JOHN D. NEGROPONTE,
DIRECTOR OF NATIONAL INTELLIGENCE

I, JOHN D. NEGROPONTE, hereby declare as follows:

1.  I am the Director of National Intelligence (DNI) of the United States. I have held this position since April 21, 2005. From June 28, 2004, until my appointment as DNI, I served as the United States Ambassador to Iraq.

From September 18, 2001, until my appointment in Iraq, I
served as the United States Permanent Representative to the
United Nations.  I have also served as Ambassador to
Honduras (1981-1985), Mexico (1989-1993), and the
Philippines (1993-1996), and as Deputy Assistant to the
President for National Security Affairs (1987-1989).

2.  The statements made herein are based on my
personal knowledge, as well as on information provided to
me in my official capacity as DNI, and on my personal
evaluation of that information.  In personally considering
this matter, I have read the information contained in the
separate classified declaration filed *in camera* and *ex
parte* in this case.

3.  The purpose of this declaration is to assert
formally, in my capacity as DNI and head of the United
States Intelligence Community, the state secrets privilege
to protect intelligence information ("state secrets
privilege"), as well as a statutory privilege under the
National Security Act, 50 U.S.C. § 403-1(i)(1), to protect
intelligence sources and methods from unauthorized
disclosure.  Unauthorized disclosure of information covered
by the state secrets and statutory privileges reasonably
could be expected to cause serious, and in some cases
exceptionally grave damage to the national security of the

2

United States, and such information should therefore be excluded from any use in this litigation.

I.    STATUTORY AND EXECUTIVE ORDER AUTHORITIES

4.    The position of Director of National Intelligence was created by the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, §§ 1011(a), 1097, 118 Stat. 3638, 3643-63, 3698-99 (2004) (amending sections 102 through 104 of Title I of the National Security Act of 1947). Subject to the authority, direction, and control of the President of the United States, the DNI serves as the head of the United States Intelligence Community and as the principal advisor to the President, the National Security Council, and the Homeland Security Council for matters related to intelligence and national security. *See*, 50 U.S.C. § 403 (b)(1),(2).

5.    The "United States Intelligence Community" includes the Office of the Director of National Intelligence; the Central Intelligence Agency; the National Security Agency; the Defense Intelligence Agency; the National Geospatial-Intelligence Agency; the National Reconnaissance Office; other offices within the Department of Defense for the collection of specialized national intelligence through reconnaissance programs; the intelligence elements of the military services, the Federal

3

Bureau of Investigation, and the Department of Energy; the
Office of Intelligence and Analysis of the Department of
the Treasury; the Drug Enforcement Administration's
Intelligence Division; the Bureau of Intelligence and
Research of the Department of State; elements of the
Department of Homeland Security concerned with the analysis
of intelligence information (including the Office of
Intelligence of the Coast Guard); and such other elements
of any other department or agency as the President may
designate, or as may be jointly designated by the DNI and
the head of the department or agency concerned, as an
element of the United States Intelligence Community.  *See*,
50 U.S.C. § 401(a)(4).

     6.  The responsibilities and authorities of the DNI,
enumerated in the National Security Act, as amended, at 50
U.S.C. § 403-1, include ensuring that national intelligence
is provided to the President, the heads of the departments
and agencies of the Executive Branch, the Chairman of the
Joint Chiefs of Staff and senior military commanders, and
the Senate and House of Representatives and committees
thereof.  50 U.S.C. § 403-1(a)(1).  The DNI is also charged
with establishing the objectives of, determining the
requirements and priorities for, and managing and directing
the tasking, collection, analysis, production, and

dissemination of national intelligence by elements of the United States Intelligence Community. 50 U.S.C. § 403-1(f)(1)(A)(i), (ii). The DNI is responsible for developing and determining, based on proposals submitted by heads of agencies and departments within the United States Intelligence Community, an annual consolidated budget for the National Intelligence Program for presentation to the President, and for ensuring the effective execution of the annual budget for intelligence and intelligence-related activities, including managing and allotting appropriations for the National Intelligence Program. *Id.* § 403-1(c)(1)-(5).

7. In addition, the National Security Act of 1947, as amended, provides that "The Director of National Intelligence shall protect intelligence sources and methods from unauthorized disclosure." 50 U.S.C. § 403-1(i)(1). Consistent with this responsibility, the DNI establishes and implements the guidelines of the United States Intelligence Community for the classification of information under applicable law, Executive Orders, or other Presidential directives, and access and dissemination of intelligence. *Id.* § 403-1(i)(2)(A), (b). In particular, the DNI is responsible for the establishment of uniform standards and procedures for granting access to Sensitive

Compartmented Information to any officer or employee of any agency or department of the United States and for ensuring consistent implementation of those standards throughout such departments and agencies. *Id.* § 403-1(j)(1),(2).

8. By virtue of my position as the DNI, and unless otherwise directed by the President, I have access to all intelligence related to national security that is collected by any department, agency, or other entity of the United States. Pursuant to Executive Order 12958, as amended,[1] the President has authorized me to exercise original TOP SECRET classification authority. After personal consideration of the matter, I have determined that the classified *ex parte*, *in camera* declaration which accompanies this assertion of the state secrets privilege and the statutory privilege to protect intelligence sources and methods is properly classified under § 1.3 of E.O. 12958, because the unauthorized public disclosure of information contained in that declaration reasonably could be expected to cause serious, and in some cases exceptionally grave damage to the foreign policy and national security of the United States.

---

[1] Executive Order 12958 was amended by Executive Order 13292. *See* Exec. Order No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003). All citations to Exec. Order No. 12958 are to the Order as amended by Exec. Order No. 13292. *See* Exec. Order No. 12,958, 60 Fed. Reg. 19825 (1995), *reprinted as amended in* 50 U.S.C.A. § 435 note at 180 (West Supp. 2006).

II.    ASSERTION OF THE STATE SECRETS
       AND STATUTORY PRIVILEGES

9.    After careful and actual personal consideration of
the matter, I have determined that the unauthorized
disclosure of certain information that may be implicated by
the parties' claims in this matter, as set forth here and
described in more detail in the classified *ex parte, in
camera* declaration which accompanies this declaration,
reasonably could be expected to cause serious, and in some
cases exceptionally grave damage to the national security
of the United States, and thus must be protected from
disclosure and excluded from this case.  Therefore, I
formally invoke and assert the state secrets privilege to
prevent the disclosure of that information.

10.    Through this declaration, I also invoke and
assert a statutory privilege held by the DNI under the
National Security Act, as amended, to protect the
intelligence sources and methods implicated by this case.
*See*, 50 U.S.C. § 403-1(i)(1).  My assertion of this
statutory privilege for intelligence sources and methods is
coextensive with my state secrets privilege assertion.

11.    With my assertion of the state secrets privilege
and the statutory privilege to protect intelligence sources
and methods, I respectfully ask the Court to prevent any

party from testifying, eliciting testimony, producing, disclosing, entering into evidence or making any other use in discovery, at trial, or in any other way in connection with this case, information concerning: (a) the existence or non-existence of, any actual or proposed relationship, agreement, connection, contract, transaction, communication, or meeting of any kind between any entity in the United States Intelligence Community, or any current or former official, employee, or representative thereof, and any individuals or entities associated with this lawsuit, on any current or former officer or employee thereof; and (b) any actual or proposed interest in, application, or use by any entity in the United States Intelligence Agency, or any current or former official, employee, or representative thereof, of any technology, software, or source code owned or claimed by any individuals or entities associated with this lawsuit.

12.    I have determined that any unauthorized disclosure of the information described in Paragraph 11 reasonably could be expected to cause serious, and in some case exceptionally grave damage to national security since the United States can neither confirm nor deny such information without compromising the effectiveness of intelligence sources and methods.  Public disclosure of

8

information that confirms the use of particular
intelligence sources and methods compromises the
effectiveness of those sources and methods by alerting
likely targets to their use, while public denial of the use
of particular intelligence sources and methods reveals to
adversaries that some practices are secure. Any truthful
response to confirm or deny allegations related to
intelligence sources or methods informs hostile foreign
intelligence agencies about the manner in which the United
States collects intelligence information, and could result
in a loss of valuable intelligence when our adversaries are
able to take countermeasures. Similarly, if the United
States government was required to admit or deny allegations
made in litigation concerning its classified contracting
process, then classified contract relationships could be
exposed, which would cause harm to the national security.
The precise nature of the harm that would ensue from the
disclosure of the information protected by the state
secrets privilege and statutory privilege to protect
intelligence sources and methods is set forth in detail in
the *in camera, ex parte* declaration.

## CONCLUSION

13.   I respectfully request that the Court grant the Department of Defense's motion for a protective order.


I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this _19th_ day of September 2006.


JOHN D. NEGROPONTE
DIRECTOR OF NATIONAL INTELLIGENCE

# EXHIBIT O

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

_____ District of _____

| | |
|---|---|
| _____ | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No. |
| _____ | ) |
| | ) |
| *Defendant* | ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To: _____

*(Name of person to whom this subpoena is directed)*

❏  Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place:  Veritext Washington DC 1250 I St NW #350 Washington, DC 20005 | Date and Time: November 22, 2022 at 9:30 am CST |
|---|---|

The deposition will be recorded by this method: _____

❏  *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

Please see documents attached as Exhibit A for the disclosure statement pursuant to *Touhy v. Regan,* 340 U.S. 462 (1951), if applicable.

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  October 7, 2022

|  *CLERK OF COURT* | | |
|---|---|---|
| | OR | |
| _____ | | *s/ Andrew D. Parker* _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____ _____ , who issues or requests this subpoena, are:

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐  I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❐  I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
    **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
    **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
    **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
    **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
    **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
    **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***
    **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
    **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
    **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
    **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
    **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
    **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
    **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
    **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
    **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# **Exhibit A**

### _Touhy_ Summary of Information Sought and Relevance to Proceeding

To the extent that the _Touhy_ regulations of the Office of the Director of National Intelligence apply to the attached subpoena, the importance and the relevance of the information the issuing party intends to seek through the deposition of John Negroponte is as follows:

The testimony sought from Mr. Negroponte is of major importance to the defenses of Michael J. Lindell and My Pillow, Inc. in the captioned proceeding, _US Dominion, Inc. et al. v. My Pillow, Inc. et al._, no. 21-cv-445 in the U.S. District Court for the District of Columbia. The plaintiffs' claims in that action allege that Mr. Lindell made false statements about the 2020 election. One of Mr. Lindell's defenses is that his statements were based in significant part upon information he received from and about a former government contractor named Dennis Montgomery, including information about technology developed by Mr. Montgomery and provided to the Central Intelligence Agency to hack and penetrate electronic election systems. Mr. Lindell's and My Pillow, Inc.'s defenses include the defense that the allegedly defamatory statements were true, and the defense that the statements were plausible. Mr. Negroponte's testimony is anticipated to support these defenses by showing one or more of the following: (1) the technology described by Mr. Montgomery exists; (2) the technology has been tested and works; (3) the technology existed prior to 2020; (4) the technology eventually was

possessed by individuals outside the CIA; (5) the technology was used to manipulate elections outside the United States prior to 2020. Mr. Negroponte's testimony would further support Mr. Lindell's and My Pillow, Inc.'s defenses by showing that Mr. Montgomery's account of his past activities is true, that Mr. Montgomery performed work for the United States government, and that Mr. Montgomery's work was relied upon and used by the United States Government.

There is good reason to conclude that Mr. Negroponte knows the information sought by Mr. Lindell and My Pillow, Inc.  Beginning in 2006, Mr. Montgomery became involved in litigation against his former employer and business partner, in case no. 06-cv-00056 in the United States District Court for the District of Nevada (the "eTreppid Litigation"). ETreppid was a technology company that developed computer software and contracted with the Central Intelligence Agency.[1] Mr. Montgomery had been a software developer at eTreppid. The United States Department of Defense intervened in the eTreppid Litigation and asked the Nevada court to enter a protective order to prevent disclosure of certain information. In support of the Department of Defense's motion, Mr. Negroponte signed and submitted a "Declaration and Formal Claim of State Secrets and Statutory Privileges by John D. Negroponte, Director of National Intelligence,"[2] which was filed in the eTreppid Litigation on September 25, 2006. A copy of the Negroponte Declaration is attached as Exhibit B.  The stated purpose of the Negroponte Declaration

---

[1] A copy of an illustrative agreement between eTreppid and the CIA is attached as Exhibit C.

[2] Mr. Negroponte served as the Director of National Intelligence from 2005-2007.

2

was to "assert formally" as the Director of National Intelligence and "head of the United States Intelligence Community, the state secrets privilege to protect intelligence information" and to "protect intelligence sources and methods from unauthorized disclosure." *Id*. ¶ 3. The Negroponte Declaration stated that it was accompanied by a "classified *ex parte*, *in camera* declaration," *id.* ¶ 8, and that "the unauthorized disclosure of certain information that may be implicated by the parties' claims in this matter, as set forth in more detail in the classified *ex parte*, *in camera* declaration which accompanies this declaration, reasonably could be expected to cause serious, and in some cases exceptionally grave damage to the national security of the United States," *id.* ¶ 9. The Negroponte Declaration asked the Court to "prevent any party from testifying, eliciting testimony, producing, disclosing, entering into evidence or making any other use in discovery, at trial, or in any other way in connection with this case, information concerning: (a) the existence or non-existence of, any actual or proposed relationship, agreement, connection, contract, transaction, communication, or meeting of any kind between any entity in the United States Intelligence Community, or any current or former official·, employee, or representative thereof, and any individuals or entities associated with this lawsuit, on any current or former officer or employee thereof; and (b) any actual or proposed interest in, application, or use by any entity in the United States Intelligence Agency, or any current or former official, employee, or representative thereof, of any technology, software, or source code owned or claimed by any individuals or entities associated with this lawsuit."

From this sequence of events, it is reasonable to conclude that Mr. Negroponte possesses knowledge about Mr. Montgomery's activities at eTreppid performed in connection with the CIA. Lindell and My Pillow, Inc. have a right to gather the evidence of Mr. Negroponte's knowledge concerning Mr. Montgomery's activities to support their defenses concerning Mr. Lindell's reliance on Mr. Montgomery, and to defend against any attacks the plaintiffs may assert against Mr. Montgomery's credibility.

Disclosure of Mr. Negroponte's testimony is appropriate as part of discovery in the *US Dominion Inc. v. My Pillow, Inc.* action, which is open and ongoing. It is not privileged, it is relevant to the defendants' defenses and therefore discoverable under the Federal Rules of Civil Procedure. To Defendants' knowledge, no statute, regulation, executive order, or other provision of law would be violated by disclosure of it, defendants do not know of any non-disclosure agreement that would prohibit it, and it would not require disclosure of intelligence sources or methods, classified information or state secrets, violate any ODNI policy, or interfere with the conduct of ODNI functions. To the extent Mr. Negroponte's testimony is deemed sensitive or confidential, the testimony could be designated as confidential under a protective order to be entered by the Court in the action.[3] Mr. Lindell and My Pillow, Inc. believe that Mr. Negroponte's testimony concerning Mr. Montgomery can be taken without creating any issue of state secrets, because the testimony concerns events from long ago and because the testimony

---

[3] The parties to the lawsuit have stipulated to most of the terms of a protective order and have submitted to the Court a handful of provisions on which they disagree. Once the Court resolves these disputes, the protective order is anticipated to be entered to govern both party and non-party discovery in the action.

can be given in a general way as to avoid any lingering concerns over classified information.

Mr. Lindell and My Pillow, Inc. anticipate that Mr. Negroponte's testimony would be (1) Mr. Montgomery participated in the development of software technology that can be used to penetrate electronic election equipment and manipulate vote totals; (2) this technology was tested and found to work; (3) the technology was developed and was operational prior to 2020; (4) the technology at some point passed into the possession of individuals outside the CIA; (5) the technology was used to manipulate elections outside the United States prior to 2020.

# Exhibit B

**UNITED STATES' MOTION FOR
PROTECTIVE ORDER**

**EXHIBIT 1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEVADA

|  |  |
|---|---|
| ETREPPID TECHNOLOGIES, LLC, a California Corporation, | ) ) ) ) CV-N-06-00415(BES)(VPC) |
| Plaintiff | ) ) |
| v. | ) ) |
| DENNIS MONTGOMERY, et. al., | ) ) |
| Defendants. | ) ) |

|  |  |
|---|---|
| DENNIS MONTGOMERY, et. al., | ) ) |
| Plaintiffs | ) ) |
| v. | ) ) CV-N-06-00056(BES)(VPC) ) |
| ETREPPID TECHNOLOGIES, INC., et. al. | ) ) ) |
| Defendants. | ) ) |

## DECLARATION AND FORMAL CLAIM OF
## STATE SECRETS AND STATUTORY PRIVILEGES
## BY JOHN D. NEGROPONTE,
## DIRECTOR OF NATIONAL INTELLIGENCE

I, JOHN D. NEGROPONTE, hereby declare as follows:

1. I am the Director of National Intelligence (DNI) of the United States. I have held this position since April 21, 2005. From June 28, 2004, until my appointment as DNI, I served as the United States Ambassador to Iraq.

From September 18, 2001, until my appointment in Iraq, I served as the United States Permanent Representative to the United Nations.  I have also served as Ambassador to Honduras (1981-1985), Mexico (1989-1993), and the Philippines (1993-1996), and as Deputy Assistant to the President for National Security Affairs (1987-1989).

2.  The statements made herein are based on my personal knowledge, as well as on information provided to me in my official capacity as DNI, and on my personal evaluation of that information.  In personally considering this matter, I have read the information contained in the separate classified declaration filed *in camera* and *ex parte* in this case.

3.  The purpose of this declaration is to assert formally, in my capacity as DNI and head of the United States Intelligence Community, the state secrets privilege to protect intelligence information ("state secrets privilege"), as well as a statutory privilege under the National Security Act, 50 U.S.C. § 403-1(i)(1), to protect intelligence sources and methods from unauthorized disclosure.  Unauthorized disclosure of information covered by the state secrets and statutory privileges reasonably could be expected to cause serious, and in some cases exceptionally grave damage to the national security of the

2

United States, and such information should therefore be excluded from any use in this litigation.

I.    **STATUTORY AND EXECUTIVE ORDER AUTHORITIES**

4.    The position of Director of National Intelligence was created by the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, §§ 1011(a), 1097, 118 Stat. 3638, 3643-63, 3698-99 (2004) (amending sections 102 through 104 of Title I of the National Security Act of 1947). Subject to the authority, direction, and control of the President of the United States, the DNI serves as the head of the United States Intelligence Community and as the principal advisor to the President, the National Security Council, and the Homeland Security Council for matters related to intelligence and national security. *See*, 50 U.S.C. § 403 (b)(1),(2).

5.    The "United States Intelligence Community" includes the Office of the Director of National Intelligence; the Central Intelligence Agency; the National Security Agency; the Defense Intelligence Agency; the National Geospatial-Intelligence Agency; the National Reconnaissance Office; other offices within the Department of Defense for the collection of specialized national intelligence through reconnaissance programs; the intelligence elements of the military services, the Federal

3

SEP. 19. 2006 1:44AM  Case 3:08-cv-00035-MN-VPC  Document 182-3  Filed 08/07/25  Page 9 of 10  No. 8802  P. 5

Bureau of Investigation, and the Department of Energy; the

Office of Intelligence and Analysis of the Department of

the Treasury; the Drug Enforcement Administration's

Intelligence Division; the Bureau of Intelligence and

Research of the Department of State; elements of the

Department of Homeland Security concerned with the analysis

of intelligence information (including the Office of

Intelligence of the Coast Guard); and such other elements

of any other department or agency as the President may

designate, or as may be jointly designated by the DNI and

the head of the department or agency concerned, as an

element of the United States Intelligence Community. *See*,

50 U.S.C. § 401(a)(4).

6. The responsibilities and authorities of the DNI,

enumerated in the National Security Act, as amended, at 50

U.S.C. § 403-1, include ensuring that national intelligence

is provided to the President, the heads of the departments

and agencies of the Executive Branch, the Chairman of the

Joint Chiefs of Staff and senior military commanders, and

the Senate and House of Representatives and committees

thereof. 50 U.S.C. § 403-1(a)(1). The DNI is also charged

with establishing the objectives of, determining the

requirements and priorities for, and managing and directing

the tasking, collection, analysis, production, and

4

dissemination of national intelligence by elements of the
United States Intelligence Community.  50 U.S.C. § 403-
1(f)(1)(A)(i), (ii).  The DNI is responsible for developing
and determining, based on proposals submitted by heads of
agencies and departments within the United States
Intelligence Community, an annual consolidated budget for
the National Intelligence Program for presentation to the
President, and for ensuring the effective execution of the
annual budget for intelligence and intelligence-related
activities, including managing and allotting appropriations
for the National Intelligence Program.  *Id.* § 403-1(c)(1)-
(5).

7.  In addition, the National Security Act of 1947, as
amended, provides that "The Director of National
Intelligence shall protect intelligence sources and methods
from unauthorized disclosure."  50 U.S.C. § 403-1(i)(1).
Consistent with this responsibility, the DNI establishes
and implements the guidelines of the United States
Intelligence Community for the classification of
information under applicable law, Executive Orders, or
other Presidential directives, and access and dissemination
of intelligence.  *Id.* § 403-1(i)(2)(A), (b).  In particular,
the DNI is responsible for the establishment of uniform
standards and procedures for granting access to Sensitive

SEP. 19. 2006 11:40AM Case 3:06-cv-00545-MNN-VPC Document 182-4 Filed 08/07/25 Page 7 of 50 NO. 322 P. 8

Compartmented Information to any officer or employee of any agency or department of the United States and for ensuring consistent implementation of those standards throughout such departments and agencies. *Id.* § 403-1(j)(1),(2).

8. By virtue of my position as the DNI, and unless otherwise directed by the President, I have access to all intelligence related to national security that is collected by any department, agency, or other entity of the United States. Pursuant to Executive Order 12958, as amended,[1] the President has authorized me to exercise original TOP SECRET classification authority. After personal consideration of the matter, I have determined that the classified *ex parte*, *in camera* declaration which accompanies this assertion of the state secrets privilege and the statutory privilege to protect intelligence sources and methods is properly classified under § 1.3 of E.O. 12958, because the unauthorized public disclosure of information contained in that declaration reasonably could be expected to cause serious, and in some cases exceptionally grave damage to the foreign policy and national security of the United States.

---

[1] Executive Order 12958 was amended by Executive Order 13292. *See* Exec. Order No. 13292, 68 Fed. Reg. 15315 (Mar. 28, 2003). All citations to Exec. Order No. 12958 are to the Order as amended by Exec. Order No. 13292. *See* Exec. Order No. 12,958, 60 Fed. Reg. 19825 (1995), *reprinted as amended in* 50 U.S.C.A. § 435 note at 180 (West Supp. 2006).

## II.   ASSERTION OF THE STATE SECRETS
##        AND STATUTORY PRIVILEGES

9.   After careful and actual personal consideration of the matter, I have determined that the unauthorized disclosure of certain information that may be implicated by the parties' claims in this matter, as set forth here and described in more detail in the classified *ex parte, in camera* declaration which accompanies this declaration, reasonably could be expected to cause serious, and in some cases exceptionally grave damage to the national security of the United States, and thus must be protected from disclosure and excluded from this case.  Therefore, I formally invoke and assert the state secrets privilege to prevent the disclosure of that information.

10.   Through this declaration, I also invoke and assert a statutory privilege held by the DNI under the National Security Act, as amended, to protect the intelligence sources and methods implicated by this case. *See*, 50 U.S.C. § 403-1(i)(1).  My assertion of this statutory privilege for intelligence sources and methods is coextensive with my state secrets privilege assertion.

11.   With my assertion of the state secrets privilege and the statutory privilege to protect intelligence sources and methods, I respectfully ask the Court to prevent any

party from testifying, eliciting testimony, producing, disclosing, entering into evidence or making any other use in discovery, at trial, or in any other way in connection with this case, information concerning: (a) the existence or non-existence of, any actual or proposed relationship, agreement, connection, contract, transaction, communication, or meeting of any kind between any entity in the United States Intelligence Community, or any current or former official, employee, or representative thereof, and any individuals or entities associated with this lawsuit, on any current or former officer or employee thereof; and (b) any actual or proposed interest in, application, or use by any entity in the United States Intelligence Agency, or any current or former official, employee, or representative thereof, of any technology, software, or source code owned or claimed by any individuals or entities associated with this lawsuit.

12.  I have determined that any unauthorized disclosure of the information described in Paragraph 11 reasonably could be expected to cause serious, and in some case exceptionally grave damage to national security since the United States can neither confirm nor deny such information without compromising the effectiveness of intelligence sources and methods.  Public disclosure of

information that confirms the use of particular
intelligence sources and methods compromises the
effectiveness of those sources and methods by alerting
likely targets to their use, while public denial of the use
of particular intelligence sources and methods reveals to
adversaries that some practices are secure. Any truthful
response to confirm or deny allegations related to
intelligence sources or methods informs hostile foreign
intelligence agencies about the manner in which the United
States collects intelligence information, and could result
in a loss of valuable intelligence when our adversaries are
able to take countermeasures. Similarly, if the United
States government was required to admit or deny allegations
made in litigation concerning its classified contracting
process, then classified contract relationships could be
exposed, which would cause harm to the national security.
The precise nature of the harm that would ensue from the
disclosure of the information protected by the state
secrets privilege and statutory privilege to protect
intelligence sources and methods is set forth in detail in
the *in camera, ex parte* declaration.

## CONCLUSION

13.   I respectfully request that the Court grant the Department of Defense's motion for a protective order.


I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this _19th_ day of September 2006.


JOHN D. NEGROPONTE
DIRECTOR OF NATIONAL INTELLIGENCE

Exhibit C



## eTreppid Technologies, LLC

755 Trademark Drive
Reno, NV 89521

www.eTreppid.com

Tel: (775) 337-6771
Fax: (775) 337-1877

January 12, 2004

To whom it may concern,

For about four months eTreppid Technologies, LLC (the "Company") has been providing assistance and information (including that related to the Company's technology, know-how, business and processes) pursuant to an agreement with the CIA (the "Government"). As part of the consideration for providing such assistance and information, the Government agreed that eTreppid Technologies' identity as a contractor and source of the assistance and information as well as the information supplied by the Company would be kept confidential, would only be disclosed to individuals within the government on a need to know basis only, and would not be revealed to the public under the Freedom of Information Act or otherwise. The purpose of this letter agreement is to confirm in writing the understanding between the parties.

It is our current intent to continue to work with the Government with regard to this matter. This will confirm that the U.S. Government agrees not to make any attempt to unilaterally use or otherwise take technology, intellectual property or other property or assets owned by eTreppid Technologies. In addition, the Government agrees that it will negotiate in good faith an agreement that sets forth future services (including technology and intellectual property) to be provided by the Company and the compensation to be paid for such future services as well as services already rendered.

eTreppid Technologies, LLC

By:  Warren Trepp, CEO

US Government

By:

Edward B. Charbonneau
Associate DDS&T for Technical Operations

Central Intelligence Agency            (703) 482-4848
Washington, DC 20505            Fax: (703) 482-6350

*"bringing digital to life"*

# EXHIBIT P

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 1:21-cv-00445-CJN

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* <u>John Negroponte</u> on *(date)* <u>Oct 18, 2022, 2:52 pm</u>.

[X]    I served the subpoena by delivering a copy to the named individual as follows: <u>John Negroponte</u> on *(date)* <u>Wed, Oct 19 2022</u>; or

[ ]    I returned the subpoena unexecuted because: _____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of $ <u>55</u>.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: 10/20/2022

_____
*Server's signature*

LaTisha Palmer
_____
*Printed name and title*

1133 13th Street NW, Suite C4, Washington, DC 20005
_____
*Server's address*

Additional information regarding attempted service, etc.:
1) Successful Attempt: Oct 19, 2022, 12:27 pm EDT at 3100 Cleveland Ave NW, Washington, DC 20008 received by John Negroponte. Age: 65; Ethnicity: Caucasian; Gender: Male; Weight: 230; Height: 5'8"; Hair: Gray; Other: Gray hair Bald in middle ;

DOCUMENTS SERVED: SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION; EXHIBITS

# EXHIBIT Q

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE
OFFICE OF GENERAL COUNSEL
WASHINGTON, DC 20511

November 17, 2022

**VIA ELECTRONIC MAIL**

Andrew D. Parker
123 North Third Street, Suite 888
Minneapolis, Minnesota 55401
parker@parkerdk.com

Re:   *Touhy* **request in** *US Dominion Inc., et al v. My Pillow, Inc, et al*, **Civ. A. No. 21-445-CJN (D.D.C.)**

Dear Counsel:

The Office of the Director of National Intelligence (ODNI) sets forth below its response and objections to your Rule 45 subpoena of former Director of National Intelligence (DNI) John Negroponte, dated October 7, 2022, issued in the above-referenced litigation. The subpoena directed to DNI Negroponte requests testimony from him with respect to information he allegedly received from or about Dennis Montgomery, including information about alleged technology developed by Mr. Montgomery that can purportedly hack and penetrate electronic election systems.

The ODNI has considered this request under its *Touhy* regulations, issued pursuant to the Federal Housekeeping Statute, 5 U.S.C. § 301, and *United States ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951), set forth at 32 C.F.R. Part 1703. Pursuant to these regulations, the ODNI is empowered to determine whether to provide information in matters, such as this one, in which the government is not a party. *See In re Boeh*, 25 F.3d 761, 763 (9th Cir. 1994); *Swett v. Schenk*, 792 F.2d 1447, 1451 (9th Cir. 1986); *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 29 (D.D.C. 2005).

The ODNI's *Touhy* regulations prohibit current and former agency employees from producing documents or information, even in response to a subpoena, without prior approval of the designated ODNI officials. 32 C.F.R. §§ 1703.2, 1703.3(a). In determining how to respond to a demand for information such as a deposition, the ODNI considers a number of factors, including whether the deposition is appropriate under the applicable rules of discovery and procedure; whether compliance with the subpoena would involve disclosure of classified or privileged information, or information that is otherwise protected by statute, regulation, or ODNI policy issuance or instruction; and whether disclosure would unduly interfere with the orderly conduct of ODNI functions. *Id.* § 1703.3(c).

For the reasons outlined below, the ODNI hereby declines to authorize the testimony requested because it is inappropriate under the applicable rules of discovery or

1

procedure, it would impose an undue burden, and it may implicate information subject to privilege.

1. No Extraordinary Circumstances Exist to Compel the Deposition of an Apex Official.

As noted above, the ODNI's *Touhy* regulations provide that the ODNI shall consider whether "[t]he applicable rules of discovery or procedure require production." *Id.* § 1703.3(c)(2). Here, under the applicable discovery rules, the testimony you seek would not be required.

"There is a presumption against deposing high-ranking government officials," *United States v. Newman*, 531 F. Supp. 3d 181, 188 (D.D.C. 2021) (citations omitted), and the general rule against depositions of high-ranking officials applies equally to former government officials. *Id.* (citations omitted). Therefore, as a former senior executive official, DNI Negroponte may not be called to testify "absent extraordinary circumstances." *Simplex Time Recorder Co. v. Sec'y of Lab.*, 766 F.2d 575, 586 (D.C. Cir. 1985) (citing *United States v. Morgan*, 313 U.S. 409, 422 (1941) (*Morgan II*)); *see also In re Cheney*, 544 F.3d 311, 314 (D.C. Cir. 2008) (issuing a writ of mandamus to prevent the forced deposition of the Vice President's Chief of Staff).

To subpoena a former high ranking government official, the official must either have "unique first-hand knowledge related to the litigated claims or [Defendants must establish] that the necessary information cannot be obtained through other, less burdensome or intrusive means." *FDIC v. Galan-Alvarez*, Civ. A. No. 15-MC-00752 (CRC), 2015 WL 5602342, at *3 (D.D.C. Sept. 4, 2015) (citing *Lederman v. N.Y.C. Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013); *In re United States (Holder)*, 197 F.3d 310, 316 (8th Cir. 1999)). When seeking to depose former high ranking government officials, the burden is on the requester to establish these factual prerequisites. *Id.* Here, you do not allege that DNI Negroponte had first-hand knowledge of the topics listed in the subpoena, let alone substantiate such hypothetical allegations. Nor do you allege or substantiate that DNI Negroponte is the only person from whom you can seek this information. Indeed, upon inquiry, DNI Negroponte has confirmed that he has no relevant knowledge or recollection of the listed topics. Accordingly, you have not established that an "extraordinary circumstance" exists to justify his deposition.

2. The Requested Testimony of DNI Negroponte Would Impose an Undue Burden on ODNI.

The ODNI further declines to authorize the subpoena as it would impose an undue burden on the ODNI, which is not a party to the litigation. *See* 32 C.F.R. § 1703.3(c)(7); *Agility Public Warehousing Co. K.S.C.P. v. U.S. Dep't of Defense*, 246 F. Supp. 3d 34, 48 (D.D.C. 2017) (concluding that a government agency is entitled to consider burden that requested discovery would place on it); Fed. R. Civ. P. 45(d)(3)(A)(iv)

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE
OFFICE OF GENERAL COUNSEL
WASHINGTON, DC 20511

As a practical matter, requiring current or former high-ranking officials to appear for depositions threatens to "disrupt the functioning of the Executive Branch." *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 386 (2004). "[H]igh ranking government officials have greater duties and time constraints than other witnesses." *In re F.D.I.C.,* 58 F.3d 1055, 1060 (5th Cir. 1995) (quoting *In re United States*, 985 F.2d 510, 512 (11th Cir. 1993)). As a result, "[i]f courts did not limit the[] depositions [of high-ranking officials], such officials would spend 'an inordinate amount of time tending to pending litigation,'" *Lederman v. New York City Dep't of Parks & Recreation*, 731 F.3d 199, 203 (2d Cir. 2013) (citation omitted), and this would impose a direct and undue burden on the Executive Branch  Indeed, "high level executives and government officials . . . are vulnerable to numerous, repetitive, harassing, and abusive depositions," *Asberry v. Sch. Bd. of Pasco Cnty., Fla.*, Civ. A. No. 18-02222, 2019 WL 12383128, at *1 (M.D. Fla. Aug. 20, 2019), and "[s]ubjecting former officials['] decision-making processes to judicial scrutiny and the possibility of continued participation in lawsuits years after leaving public office would serve as a significant deterrent to qualified candidates for public service," *United States v. Wal-Mart Stores, Inc.*, No. 01-cv-152, 2002 WL 562301 at *3 (D. Md. Mar. 29, 2002); *see also FDIC*, 2015 WL 5602342 at *4 (same). As noted above, DNI Negroponte has no relevant knowledge or recollection of the topics listed in the subpoena, let alone first-hand, exclusive knowledge. Subjecting him to a deposition therefore imposes an unnecessary and undue burden on him, and by extension, the ODNI.

Furthermore, the information sought from DNI Negroponte does not appear to be relevant to the claims against the Defendants or proportional to the needs of this case. *See* Fed. R. Civ. P. 26(b)(1) (all discovery must be relevant to a claim or defense). The *Touhy* summary of information you provided seeks various categories of testimony from former DNI Negroponte based on his role in *Montgomery v. eTreppid Technologies*, Civ. A. Nos. 06-056 & 06-145 (D. Nv.) in which he asserted the state secrets privilege. *See* Exhibit A to Subpoena at 2-4. In that case, Mr. Montgomery asserted a claim against the U.S. Department of Defense that arose from a Classified Information Nondisclosure Agreement that Mr. Montgomery executed in connection with and prior to being given access to classified information. On September 25, 2006, the United States moved for entry of a protective order based on an assertion of the state secrets privilege by DNI Negroponte. *See* ECF Nos. 83-1, 83-2. DNI Negroponte's declaration established that disclosure of certain information at issue in that litigation reasonably could be expected to cause serious, and in some cases exceptionally grave, damage to national security. *Id.* ¶ 12. The United States' motion was also supported by a classified declaration submitted for the Court's *ex parte, in camera* review. *Id.* ¶ 2. There is no reasonable possibility that the *eTreppid* matter, which occurred over 16 years ago, has any relevance to the claims against the Defendants. The instant lawsuit concerns allegations of hacking voting machines in the 2020 election—16 years removed from the *eTreppid* matter. On its face, the request fails to demonstrate any apparent relevance between events that occurred over a decade ago and the instant litigation.

Finally, ODNI objects on undue burden grounds insofar as the information requested can be more easily sought from another source, like Mr. Montgomery himself.

3

OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE
OFFICE OF GENERAL COUNSEL
WASHINGTON, DC 20511

The information requested is knowledge that Mr. Montgomery may possess, and you have failed to demonstrate that any steps have been taken to obtain non-government information from such non-government sources.

3. <u>The Requested Testimony is Not Authorized to the Extent it Seeks Privileged Information.</u>

The ODNI's *Touhy* regulations provide that the ODNI shall consider whether "any relevant privileges are applicable" to the requested disclosure.  32 C.F.R. § 1703.3(c)(1); *see also* Fed. R. Civ. P. 45(d)(3)(A)(iii).  Such privileged information includes, but is not limited to, documents or information protected by the attorney-client, deliberative process, work-product, law-enforcement, and national-security privileges.

Here, to the extent your subpoena requests information based on or related to DNI Negroponte's 2006 state secrets privilege assertion, *see, e.g.,* Exhibit A to Subpoena at 2-4, such information may be classified and subject to the state secrets privilege and the DNI's statutory privilege under the National Security Act of 1947, as amended.  *See* 50 U.S.C. § 3024(i); 32 C.F.R. § 1703.4(c)(5) (stating that the ODNI shall consider whether production "would be inconsistent with the DNI's responsibility to protect intelligence sources and methods, or reveal classified information or state secrets").

For the foregoing reasons, ODNI declines to authorize the requested deposition testimony of former DNI Negroponte.  Please let me know if you have any questions or would like to discuss further.

Respectfully,

/s/ CHRISTOPHER THUMA

Christopher Thuma
Deputy General Counsel

4

# EXHIBIT R

ANDREW D. PARKER, ESQ. (pro hac vice forthcoming)
Arizona Bar No. 028314
E-Mail: parker@parkerdk.com
**PARKER DANIELS KIBORT LLC**
888 Colwell Building
123 N. Third Street
Minneapolis, MN 55401
Telephone: (612) 355-4100
Facsimile: (612) 355-4101


ADAM R. FULTON, ESQ.
Nevada Bar No. 11572
E-mail: afulton@jfnvlaw.com
LOGAN G. WILLSON, ESQ.
Nevada Bar No. 14967
E-mail: logan@jfnvlaw.com
**JENNINGS & FULTON, LTD.**
2580 Sorrel Street
Las Vegas, Nevada 89146
Telephone: (702) 979-3565
Facsimile: (702) 362-2060

*Attorneys for* Proposed Intervenor

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| DENNIS MONTGOMERY, an individual; and MONTGOMERY FAMILY TRUST, a California Trust, | CASE NO.: 3:06-cv-00056-PMP-VPC and 3:06-cv-00145-PMP-VPC |
| Plaintiff, | |
| v. | |
| ETREPPID TECHNOLOGIES, L.L.C., a Nevada Limited Liability Company; WARREN TREPP, an individual; DEPARTMENT OF DEFENSE of the UNITED STATES OF AMERICA; and DOES 1 through 10, | |
| Defendants. | |
| AND ALL RELATED CASE(S) | |

## MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE AND TO LIFT PROTECTIVE ORDER

### Oral Argument Requested

Non-party Michael J. Lindell ("Lindell") hereby seeks to intervene in these actions for the limited purpose of obtaining the lifting of the Court's protective order entered on August 29, 2007 in case no. 06-cv-00056 as Doc. #253 ("Protective Order"). Lindell possesses data ("Data") obtained from party Dennis Montgomery ("Montgomery"), which Lindell seeks to use to defend himself against claims asserted in other litigation, and the Data may be covered by the Protective Order.

### I.
### Factual Background

Lindell is a defendant in US Dominion, Inc. et al. v. My Pillow, Inc. et al., case no. 1:21-cv-00445 in the United States District Court for the District of Columbia ("D.C. Litigation"). The plaintiffs' complaint in that action alleges Lindell defamed them by making various statements about electronic election equipment used in the 2020 presidential election being hacked to manipulate the results of the election. Decl. of Michael Lindell *See Exhibit A* at ¶ 3 & Ex. A ¶ 165 ("Lindell Decl."). In making these statements, Lindell relied in part upon information that originated with Montgomery. *Id.* ¶ 74; Lindell Decl. ¶ 4. Accordingly, Lindell seeks to use testimony and evidence concerning Montgomery's background and his work for U.S. intelligence agencies, and the information from Montgomery itself, to defend the reasonability and veracity of his allegedly defamatory statements in the D.C. Litigation. *Id.* ¶ 5.

The information that Lindell in part relied upon, the Data, comprises internet transmissions sent during the 2020 election that were collected by technology Montgomery developed and previously licensed to the US government. Lindell Decl. ¶ 7; Montgomery

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

*See Exhibit B* at Decl. ¶ 40. Montgomery has gathered extensive data showing that voting machine manufacturers and their employees were hacked several times, and information related to illegal US government surveillance programs that Montgomery worked in. Montgomery Decl. ¶ 38. Lindell agreed to acquire ownership rights to the Data from Montgomery. Lindell Decl. ¶ 6; Montgomery Decl. ¶ 39. The Protective Order entered by this Court prohibits the use or disclosure of information related to Montgomery's work for or relationship with U.S. intelligence agencies. *See* Doc. #253. Montgomery believes the Protective Order remains in place and precludes disclosure of the Data. Montgomery Decl. ¶ 41. Lindell seeks removal of this barrier to him using the Data, and testimony and evidence concerning Montgomery, to defend himself in the D.C. Litigation. Lindell Decl. ¶ 10.

## II.
### Lindell May Intervene in This Action for the Limited Purpose Modifying the Protective Order.

Fed. R. Civ. P. 24(a)(2) grants the right to intervene in an action under specified circumstances. Rule 24(b)(1)(B) grants the ability to intervene in an action on a permissive basis. Lindell can intervene in this action for his intended limited purpose, both permissively under Rule 24(b)(1)(B) and as of right under Rule 24(a)(2).

The "requirements for intervention" are to be "broadly interpreted in favor of intervention," *Kalbers v. United States DOJ*, 22 F.4th 816, 822 (9th Cir. 2021), and "The courts have widely recognized that the correct procedure for a nonparty to challenge a protective order is through intervention for that purpose." *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990) (citing *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 783 (1st Cir. 1988)).

/ / /

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ◆ FAX 702 362 2060

### A.    Lindell May Intervene on a Permissive Basis.

"Generally, permissive intervention under Rule 24(b) requires '(1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the main action.'" *Blum v. Merrill Lynch Pierce Fenner & Smith Inc.*, 712 F.3d 1349, 1353 (9th Cir. 2013) (quoting *Beckman Indus., Inc. v. Int'l Ins. Co.,* 966 F.2d 470, 473 (9th Cir. 1992)). However, "[T]here is ample support for intervenor's argument that courts also recognize Rule 24(b) intervention as a proper method to modify a protective order." *Beckman*, 966 F.2d 470, 472 (9th Cir. 1992). Accordingly,

- "No independent jurisdictional basis is needed" when an intervenor seeks to modify a protective order rather than litigate a claim on the merits, *Beckman*, 966 F.2d at 473; *Pansy*, 23 F.3d at 778, n.3; *EEOC*, 146 F.3d at 1047; *In re "Agent Orange" Prod. Liab. Litig.*, 821 F.2d 139, 145 (2d Cir. 1987);

- "[M]otions to intervene for the purpose of seeking modification of a protective order in long-concluded litigation are not untimely," *Blum*, 712 F.3d at 1353 (citing "the growing consensus among the courts of appeals that intervention to challenge confidentiality orders may take place long after a case has been terminated"); *United Nuclear Corp.,* 905 F.2d at 1427 ("Rule 24(b)'s timeliness requirement is to prevent prejudice in the adjudication of the rights of the existing parties, a concern not present when the existing parties have settled their dispute and intervention is for a collateral purpose."); and

- "There is no reason to require such a strong nexus of fact or law when a party seeks to intervene only for the purpose of modifying a protective order." *Beckman*, 966 F.2d at 474. The requirement that a claim or defense present "common legal or

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

-4-

factual issues" to the main action is interpreted with "considerable breadth." *EEOC*, 146 F.2d at 1046; *Pansy*, 23 F.3d at 778. *See also Advance Loc. Media*, 918 F.3d at 1173 n.12 (when a party seeks to intervene only for the limited purpose of obtaining access to sealed judicial records, there need not be a "strong nexus of fact or law" to the issues in the original case) (quoting *Flynt*, 782 F.3d at 967); *Jessup v. Luther*, 227 F.3d 993, 997-99 (7th Cir. 2000); *Pansy*, 23 F.3d at 778; *In re Estelle*, 516 F.2d 480, 485 (5th Cir. 1975).

Here, all three requirements for permissive intervention are met. Lindell seeks to intervene for the limited purpose of modifying the Court's Protective Order. No independent jurisdictional basis is needed, the motion is not untimely, and there is a common question of law and fact between the grounds that considerations that justified the entry of the Protective Order originally, and whether those grounds still justify any restrictions of the Protective Order upon the Data. *Cf. Beckman* 966 F.2d at 474 ("The issue of interpretation of the policy supplies a sufficiently strong nexus between the district court action and the state actions to satisfy the commonality requirement").

An additional consideration for motions to intervene is whether intervention will "unduly delay or prejudice the adjudication of the original parties' rights." *Blum*, 712 F.3d at 1354. But, again, when the intervention is for the limited purpose of addressing a protective order, this consideration loses force. Where "[t]he existing parties have settled their dispute," intervention has "has little effect on the original parties' underlying rights." *Id.* This action was settled and all claims dismissed in 2009. *See* Order (Feb. 19, 2009) (doc. 100).

-5-

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

All elements for permissive intervention are met, and no part would be prejudiced by Lindell's limited intervention. Lindell should be permitted to intervene under Rule 24(b).

### B. Lindell May Intervene as of Right.

Lindell also can intervene for his limited purpose as of right, pursuant to Fed. R. Civ. P. 24(a)(2). Under Rule 24(a)(2), a non-party may exercise the right to intervene if it "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." The Ninth Circuit has interpreted Rule 24(a)(2) as requiring four things of an intervenor: (1) its intervention motion is "timely"; (2) it "has a significantly protectable interest relating to . . . the subject of the action"; (3) it "is so situated that the disposition of the action may as a practical matter impair or impede [its] ability to protect that interest"; and (4) its "interest is inadequately represented by the parties to the action." *Kalbers v. United States DOJ*, 22 F.4th 816, 822 (9th Cir. 2021) (quotations omitted). Each of those requirements is met here.

**Timeliness**. Timeliness of a motion to intervene "hinges on three primary factors: (1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Kalbers*, 22 F.4th at 822 (quotation omitted). As discussed above, considerations of timeliness have a different meaning in the context of an intervention for the purpose of addressing a protective order, than in the context of affecting the substantive or procedural resolution of the parties' claims and defenses. The core consideration underlying the timeliness requirement is "to prevent prejudice in the adjudication of the rights of the existing parties," a factor that is

"not present when the existing parties have settled their dispute and intervention is for a collateral purpose." *United Nuclear Corp.*, 905 F.2d at 1427 (citing *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 786-87 (1st Cir. 1988) and *Meyer Goldberg, Inc. v. Fisher Foods, Inc.*, 823 F.2d 159, 161-62 (6th Cir. 1987)). "While it is true that an application for intervention must be timely, 'timeliness is to be determined from all the circumstances,' and 'the point to which the suit has progressed . . . is not solely dispositive.'" *United Nuclear Corp.*, 905 F.2d at 1427 (quoting *NAACP v. New York*, 413 U.S. 345, 365-66 (1973))\; *Kalbers*, 22 F.4th at 826 ("stage of proceeding" factor uses a "nuanced, pragmatic approach" and "substance prevails over form" such that "[n]either the formal "stage" of the litigation" nor the "length of time that has passed since a suit was filed" is dispositive).

In this case, there is no possibility that any of the parties could be prejudiced in the adjudication of their rights, for that adjudication has been completed. "[P]rejudice must be connected in some way to the timing of the intervention motion." *Kalbers*, 22 F.4th at 825. Lindell has brought his motion to intervene at an appropriate time, seasonably after he became a defendant in the D.C. Litigation, decided to use the Data in his defense in that action, and realized that the Protective Order might lead to the imposition of penalties or harms if he did. This motion satisfies the timeliness requirement because no possibility of prejudice to any party as a result of the timing of the motion exists.

**Significantly Protectable Interest**. The significantly protectable interest factor is met because a non-party may intervene in an action for the purpose of litigating the substance of a protective order. *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 354 (11th Cir. 1987) ("[A]ppellants have standing to intervene in this action and challenge the propriety of the district court's protective order."). *See also In re Midland Nat. Life Ins.*

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

-7-

*Co. Annuity Sales Pracs. Litig.*, 686 F.3d 1115, 1120 (9th Cir. 2012) (limited purpose intervenor successfully appealed district court order ruling concerning sealing order). Lindell also meets this factor by application of the ordinary test governing application of the factor. A "significantly protectable interest" must be an interest "protectable under some law" and there must be a "relationship between the legally protected interest and the claims at issue." *Kalbers*, 22 F.4th at 827; *Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 837 (9th Cir. 1996). Here, Lindell has a strong interest in using the Data to defend himself against defamation claims, and a First Amendment interest in being free from prior restraint concerning the publication and use of the Data. There is an obvious relationship between Lindell's interests and the Protective Order which may forbid him from using or publishing the Data.

**Impair or Impede the Interest**. The third factor is met because the Protective Order may impair or impede Lindell's ability to publish or use the Data without incurring liability for contempt of court.

**Interest Not Adequately Protected**. The fourth factor is met because no other party to this action has any interest in the Data or in vindicating Lindell's ability to publish or use the data. This factor imposes a "minimal" burden, and is met if the intervenor shows that "representation of his interest *may* be inadequate." *Kalbers*, 22 F.4th at 828.

Lindell satisfies all four requirements for intervention as of right under Rule 24(a)(2).

### III.
### The Court Should Lift the Protective Order

After permitting Lindell to intervene in this action, the Court should lift the Protective Order, for three reasons.

/ / /

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

### A. Lindell Needs to Use the Data to Defend Himself.

Lindell will use the Data to defend the reasonability and veracity of his statements regarding the 2020 election at issue in the D.C. Litigation. Lindell Decl. ¶ 5. The statements were based on information received from Montgomery. *Id*. ¶ 4. The substance of the Data will show Lindell's reliance upon it to be reasonable and that the statements were truthful, both points which are defenses to a defamation claim.

### B. The Protective Order Is Stale.

The Protective Order was entered on August 29, 2007, fifteen years ago. It was based on an assertion that secrecy was needed to protect "national security interests" of the United States. Protective Order at 1-2. The affidavit on which the Protective Order was based stated that disclosure of "particular intelligence sources and methods" or the "classified contracting process" could harm U.S. national security. Decl. of John D. Negroponte ¶ 12 (Doc. 83-2). Those sources, methods, and contracts are now at least fifteen years out of date. Computer capabilities and software – the substance of Montgomery's work for eTreppid at issue in this action, *see* case no. 06-cv-00056 doc. 1 ¶¶ 1,7, 15-19 – that in 2007 were cutting-edge are now obsolete. Any need for secrecy to protect these matters has faded, and the Protective Order is no longer necessary. When the government invokes the state secrets privilege, it is the courts' "obligation to review the [government's claims] with a very careful, indeed a skeptical, eye, and not to accept at face value the government's claim or justification of privilege." *Abilt v. CIA*, 848 F.3d 305, 312 (4th Cir. 2017) (quoting *Al-Haramain Islamic Found., Inc. v. Bush*, 507 F.3d 1190, 1203 (9th Cir. 2007)). At this time, after such a long period of time has passed, any initial justification for the Protective Order no longer justifies its restrictions on Montgomery or his Data.

### C.    The Government's State Secrets Claim Should Be Viewed with a Critical Eye, Where, as Here, It Conceals Constitutional Violations.

Montgomery has reported to the FBI illegal domestic surveillance of Americans by the government in government programs that Montgomery worked in. Montgomery Decl. ¶¶ 30, 34, 38. The Data that Lindell seeks to use is related to Montgomery's work.[1] *Id.* ¶ 40. The government cannot be allowed to conceal its deprivations of constitutional rights through domestic surveillance by invoking the state secrets doctrine. The Court should review the government's professed need for the Protective Order critically to determine whether it is asserting state secrets for on a legitimate basis or whether it is attempting to cover up unconstitutional activities.

### IV.
### CONCLUSION

Lindell should be granted leave to intervene in this action for the limited purpose of obtaining the lifting or modification of the Protective Order, and the Protective Order should be lifted.

DATED: August 20th, 2022                    **JENNINGS & FULTON, LTD.**

By:    */s/ Adam R. Fulton, Esq.*
ADAM R. FULTON, ESQ.
Nevada Bar 11572
E-mail: afulton@jfnvlaw.com
LOGAN G. WILSON, ESQ.
Nevada Bar No. 14967
E-mail: logan@jfnvlaw.com
*Attorneys Michael J. Lindell*

---

[1] Members of Congress have stated that the CIA ran a bulk surveillance program that raises serious concerns about "warrantless backdoor searches of Americans." Senator Ron Wyden Press Release, February 10, 2022, *available at* https://www.wyden.senate.gov/news/press-releases/wyden-and-heinrich-newly-declassified-documents-reveal-previously-secret-cia-bulk-collection-problems-with-cia-handling-of-americans-information. *See also* Dustin Volz, *Secret CIA Bulk Surveillance Program Includes Some Americans' Records, Senators Say*, Wall St. J. (Feb. 10, 2022), *available at* https://www.wsj.com/articles/secret-cia-bulk-surveillance-program-includes-some-americans-records-senators-say-11644549582.

# CERTIFICATE OF SERVICE

Pursuant to N.R.C.P. 5(b), I hereby certify that I am an employee of JENNINGS & FULTON, LTD., and that on the 20th day of August 2022, I caused a true and correct copy of the foregoing **MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE AND TO LIFT PROTECTIVE ORDER** to be served as follows:

\_\_\_\_ by depositing in the United States Mail, first-class postage prepaid, at Las Vegas, Nevada, enclosed in a sealed envelope; or

\_\_\_\_\_ by facsimile transmission, pursuant to E.D.C.R. 7.26, as indicated below; or

\_\_X\_\_ by electronic service, pursuant to N.E.F.C.R. 9 and Administrative Order 14-2, as indicated below:

| | |
|---|---|
| Edmond "Buddy" Miller, Esq.<br>Bar No. 3116<br>STEPTOE & JOHNSON LLP<br>1610 Montclair Avenue, Suite C<br>Reno, NV 89509<br>bmiller@buddyrnillerlaw.com<br>Telephone: (775) 828-9898<br><br>*Attorney for*<br>*ETREPPID TECHNOLOGIES, L.L.C. and*<br>*WARREN TREPP* | Reid H. Weingarten, Esq.<br>Brian M. Heberlig, Esq.<br>Robert A. Ayers, Esq.<br>STEPTOE & JOHNSON LLP<br>1330 Connecticut Avenue, N.W.<br>Washington, D.C. 20036-1795<br>rweingarten@steptoe.com<br>bheberlig@steptoe.com<br>rayers@steptoe.com |
| Dennis L. Kennedy, Esq.<br>Bailey Kennedy<br>8984 Spanish Ridge Avenue<br>Las Vegas, Nevada 89148-1302<br>dkennedv@baileykennedv.com<br>Facsimile: 702-562-8821 | Carlotta P. Wells, Esq.<br>Senior Trial Counsel<br>Federal Programs Branch<br>Civil Division – Room 7150<br>U.S. Department of Justice<br>20 Massachusetts Ave., NW<br>P.O. Box 883<br>Washington, DC 20044<br>Carlotta.Wells@usdoj.gov<br>Fax No. 202-616-8470 |
| J. Stephen Peek, Esq.<br>HOLLAND & HART LLP<br>5441 Kietzke Lane, Second Floor<br>Reno, NV 89511<br>speek@hollandhart.com | Greg Addington, Esq.<br>Assistant U.S. Attorney<br>100 W. Liberty Street, Suite 600<br>Reno, Nevada 89501<br>Greg.Addington@usdoj.gov<br>Facsimile: 784-5181 |

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ◆ FAX 702 362 2060

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ♦ FAX 702 362 2060

1 | Raphael O. Gomez, Esq.
Senior Trial Counsel
2 | Federal Programs Branch
Civil Division – Room 6144
3 | U.S. Department of Justice
20 Massachusetts Ave., N.W.
4 | P.O. Box 883
Washington, DC 20044
5 | Raphael.Gomez@usdoj.gov
6 | Facsimile: 202-616-8470

Roland Tellis, Esq.
Marshall B. Grossman, Esq.
Bingham McCutchen LLP
The Water Garden
1620 26th Street, 4th Floor, North Tower
Santa Monica, CA 90404
rolland.tellis@bingham.com
marshall.grossman@bingham.com
Facsimile: 310-907-2000

7 | Robert E. Rohde, Esq.
8 | Gregory G. Schwartz, Esq.
Rohde & Van Kampen
9 | 1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154
10 | brohde@rohdelaw.com
11 | gschwartz@rohdelaw.com
Facsimile: 206-405-2825

Ronald J. Logar, Esq.
Law Office of Logar & Pulver, PC
225 S. Arlington Avenue, Suite A
Reno, Nevada 89501
Zachary@logarpulver.com

12 |
13 | Amanda J. Cowley, Esq.
Bradley Scott Schrager, Esq.
14 | Gary R. Goodheart, Esq.
Jones Vargas
15 | 3773 Howard Hughes Parkway
Third Floor South
16 | Las Vegas, Nevada 89169
17 | acowley@jonesvargas.com
bschrager@jonesvargas.com
18 | grg@jonesvargas.com

Bridget Robb Peck, Esq.
Lewis and Roca, LLP
50 W. Liberty Street, Suite 410
Reno, Nevada 89501
bpeck@lrlaw.com
Facsimile: 775-823-2929

19 | Michael James Flynn, Esq.
Flynn & Stillman
20 | P.O. Box 690
Rancho Santa Fe, CA
21 | mjfbb@msn.com
22 |
23 |

Debbie Leonard, Esq.
Leigh T. Goddard, Esq.
John J. Frankovich, Esq.
McDonald Carano Wilson LLP
P.O. Box 2670
Reno, Nevada 89505-2670
dleonard@mcdonaldcarano.com
lgoddard@mcdonaldcarano.com
jfrankovich@mcdonaldcarano.com

24 | Ellyn S. Garofalo, Esq.
25 | Liner Yankelevitz Sunshine &
Regenstreif LLP
26 | 1100 Glendon Avenue
Los Angeles, California 90024-3503
27 | egarofalo@linerlaw.com
28 |

Thomas H. Casey, Esq.
The Law Office of Thomas H. Casey, Inc.
22342 Avenida Empresa, Suite 260
Rancho Santa Margarita, California 92688
msilva@tomcaseylaw.com

1   Timothy Ryan O'Reilly, Esq.                    *Via U.S. Mail*
2   O'Reilly Law Group                             Dennis Montgomery
    325 S. Maryland Parkway                        6 Toscana Way W.
3   Las Vegas, Nevada 89101                        Rancho Mirage, CA 92770
    tor@oreillylawgroup.com

4
    *Via U.S. Mail*                                *Via U.S. Mail*
5   The Montgomery Family Trust                    Blxware LLC
    6 Toscana Way W.                               600 106th Avenue NE, Suite 210
6   Rancho Mirage, CA 92770                        Bellevue, WA 98004-5045

7   *Via U.S. Mail*
8   Offspring LLC
    600 106th Avenue NE, Suite 210
9   Bellevue, WA 98004-5045

10

11

12                                                 /s/ Norma Richter
13                                                 *An Employee of*
                                                   JENNINGS & FULTON, LTD.
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

JENNINGS & FULTON, LTD.
2580 SORREL STREET
LAS VEGAS, NEVADA 89146
TELEPHONE 702 979 3565 ● FAX 702 362 2060

# EXHIBIT S

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Director

JAMES R. POWERS
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Email: James.R.Powers@usdoj.gov
Telephone: (202) 353-0543

*Attorneys for the United States of America*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| DENNIS MONTGOMERY, *et al.* | Case No: 3:06-cv-00056-MMD-CSD |
| Plaintiffs, | and |
| | No. 3:06-cv-145-MMD-VPC |
| v. | |
| ETREPPID TECHNOLOGIES, L.L.C., *et al.*, | UNITED STATES' MEMORANDUM IN OPPOSITION TO MOTION TO INTERVENE AND TO LIFT PROTECTIVE ORDER |
| Defendants. | |

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

BACKGROUND ................................................................................................................... 1

I.     This Litigation and the State Secrets Protective Order ............................................ 1

II.    Lindell's Intervention and D.C. Defamation Litigation ........................................... 3

ARGUMENT ......................................................................................................................... 4

I.     THE COURT SHOULD DENY THE MOTION BECAUSE LINDELL LACKS
       STANDING TO INTERVENE. ................................................................................ 5

II.    THE COURT SHOULD DENY THE MOTION TO INTERVENE FOR
       FAILURE TO MEET THE REQUIREMENTS FOR PERMISSIVE
       INTERVENTION OR INTERVENTION OF RIGHT. ............................................ 7

       A.     Lindell Fails to Establish a Basis for Permissive Intervention. ..................... 7

       B.     Lindell Cannot Intervene of Right. ................................................................ 9

III.   IF THE COURT PERMITS INTERVENTION, IT SHOULD DENY LINDELL'S
       MOTION TO LIFT THE PROTECTIVE ORDER. ................................................ 10

       A.     Lindell Has Not Established The Relevance of Information Subject to the
              Protective Order. ........................................................................................ 10

       B.     No Good Cause Exists to Lift or Modify the Protective Order. .................... 12

CONCLUSION ................................................................................................................... 13

## **TABLE OF AUTHORITIES**

## **Cases**

*Aptheker v. Sec'y of State*,
   378 U.S. 500 (1964) ................................................................................................ 12

*Beckman Indus. Inc., v. Int'l. Ins. Co.*,
   966 F.2d 470 (9th Cir. 1992) ............................................................................... 8, 10

*Blum v. Merrill Lynch Pierce Fenner & Smith Inc.*,
   712 F.3d 1349 (9th Cir. 2013) ...................................................................... 7, 8, 10

*Bond v. Utreras*,
   585 F.3d 1061 (7th Cir. 2009) ................................................................................ 6

*Diamond v. Charles*,
   476 U.S. 54 (1986) .................................................................................................. 5

*Foltz v. State Farm Mutual Auto. Ins. Co.*,
   331 F.3d 1122 (9th Cir. 2003) ................................................................... 11, 12, 13

*Haig v. Agee*,
   453 U.S. 280 (1981) .............................................................................................. 12

*In re Alexander Grant & Co. Litig.*,
   820 F.2d 352 (11th Cir. 1987) .............................................................................. 10

*In re Midland Nat. Life Ins. Co. Annuity Sales Pracs. Litig.*,
   686 F.3d 1115 (9th Cir. 2012) .............................................................................. 10

*Kalbers v. U.S. Dep't of Justice*,
   22 F.4th 816 (9th Cir. 2021) ............................................................................. 9, 10

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ................................................................................................ 5

*Mohamed v. Jeppesen Dataplan, Inc.*,
   614 F.3d 1070 (9th Cir. 2010) .............................................................................. 13

*Perry v. Schwarzenegger*,
   630 F.3d 898 (9th Cir. 2011) .................................................................................. 5

*Roman v. Mayorkas*,
   No. EDCV2000768TJHPVC, 2021 WL 6103180 (C.D. Cal. Oct. 15, 2021) ........... 8

*San Jose Mercury News, Inc. v. U.S. Dist. Ct.-N. Dist. (San Jose)*,
   187 F.3d 1096 (9th Cir. 1999) .............................................................................. 10

*Spokeo, Inc. v. Robins*,
   578 U.S. 330 (2016) ........................................................................................ 5

*Steel Co., v. Citizens for a Better Env't.*,
   523 U.S. 83 (1998) .......................................................................................... 5

*Town of Chester, N.Y. v. Laroe Estates, Inc.*,
   137 S. Ct. 1645 (2017) .................................................................................... 5

*United States v. Reynolds*,
   345 U.S. 1 (1953) ..................................................................................... 12, 13

*United States v. Zubaydah*,
   142 S. Ct. 959 (2022) .................................................................................... 13

**INTRODUCTION**

Proposed-intervenor Michael Lindell has been sued in the District of Columbia for alleged defamation based on statements he made about the administration of the 2020 presidential election and his contentions that various forms of fraud and other malfeasance were perpetrated using the voting machines of a company called Dominion. Lindell has determined that it is necessary to intervene in this long-dismissed litigation in Nevada as part of his defense against the defamation claims he faces in D.C. in order to obtain relief from a protective order entered in this case pursuant to the state secrets privilege. *See* Mot. to Intervene and to Lift Protective Order, ECF No. 1216.

Lindell seeks this relief despite the fact that: he is not subject to the protective order entered in this case and that protective order does not apply to any litigation but the above-captioned cases in which it was entered; he has not alleged that the protective order has actually prevented him from obtaining any information he needs; no party or prior party to this litigation is a party to the defamation lawsuit; and neither this litigation nor the United States' motion for protective order have anything at all to do with voting, elections administration, or Dominion. On this last point, a simple look at the calendar shows that Lindell's motion is meritless: the United States sought the challenged protective order over 16 years ago and this lawsuit has been dismissed for over a decade, long predating the events in 2020 giving rise to the defamation litigation that ostensibly provides a basis for Lindell's intervention. For numerous reasons—jurisdictional, procedural, and substantive—the Court should deny Lindell's motion, as he has failed to establish any right to intervene or to obtain relief lifting the protective order entered at ECF No. 253.

**BACKGROUND**

**I.    This Litigation and the State Secrets Protective Order**

This litigation is comprised of two related actions, Civil Action No. 06-00056 (hereinafter referred to as the "Federal Case") and Civil Action No. 06-00145 (hereinafter referred to as the "Removed Case"), both filed in 2006.[1]   In a complaint originally filed in state court, eTreppid

---

[1] Each citation to the "Federal Case" or "Removed Case" are to the docket of Civil Action No. 06-00056 or No. 06-00145 respectively. Citations to the docket that do not specifically reference one of these two identifiers are to the docket of the Federal Case.

Technologies, Inc., asserted claims to protect and recover trade secrets from Dennis Montgomery. Removed Case 3d Am. Complaint ¶ 63 *et seq.*, ECF No. 93. Montgomery, a former employee, officer, and director of eTreppid, filed a counter-complaint as well as a federal court action, alleging that eTreppid had infringed his copyright interests. Montgomery claimed that he is an inventor and software developer who developed certain software for which he was granted copyrights that he contributed in establishing eTreppid. Removed Case Counter-complaint ¶¶ 8–10, ECF No. 1-2; Federal Case 1st Am. Complaint ¶¶ 8–10, ECF No. 7. The dispute between Montgomery and eTreppid largely stemmed from the issue of the extent to which Montgomery retained the sole interest in derivative works based on the copyrighted technology. *See generally* Removed Case Counter-complaint ¶¶ 11–14; Federal Case 1st Am. Compl. ¶¶ 8–20.

Montgomery also asserted a claim in these lawsuits against the U.S. Department of Defense ("DoD"). *See* Removed Case Counter-complaint ¶¶ 22–27; Federal Case 1st Am. Compl. ¶¶ 68–74. This claim arose from a Classified Information Nondisclosure Agreement that Montgomery executed with the Defense Security Service, an agency within DoD, on September 16, 2003. *See* Montgomery Nondisclosure Agreement, Ex. 2, United States' Mot. for Protective Order, ECF No. 83-3. Specifically, Montgomery alleged that he was prevented from disclosing information necessary to his claims and defenses as to eTreppid because of the Nondisclosure Agreement. Removed Case Counter-complaint ¶¶ 22–27; Federal Case 1st Am. Compl. ¶¶ 68–74. Montgomery therefore sought a declaration from the Court that disclosure of information he wished to use in the litigation would not violate his Nondisclosure Agreement with the United States. *Id.*

DoD filed motions to dismiss as to Montgomery's claims against the agency for lack of subject matter jurisdiction.[2] While those motions were pending, on September 25, 2006, the United States moved for the entry of a protective order based on an assertion of the state secrets privilege by Director of National Intelligence John Negroponte. ECF No. 83-1, 83-2. The DNI's declaration established that disclosure of certain information at issue in the litigation reasonably

---

[2] DoD's motions to dismiss were later granted. ECF No. 177.

could be expected to cause serious, and in some cases exceptionally grave, damage to national security.  Negroponte Decl. ¶ 12.  The United States' motion was also supported by a classified declaration submitted for the Court's *ex parte*, *in camera* review.  *Id.* ¶ 2.

The Court entered the requested protective order on August 29, 2007, excluding from "discovery or disclosure" information relating to two categories of information: (1) "the existence or non-existence of any actual or proposed relationship" between the parties and any U.S. intelligence agency and (2) any "actual or proposed intelligence agency interest in, application of or use of any technology, software or source code owned or claimed by the Parties."  Protective Order ¶¶ 2, 3, ECF No. 253.  The Protective Order, however, exempted from its coverage discovery regarding "[t]he computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the Parties," as well as any "actual or potential commercial or government applications of" this technology, so long as it did not relate to the aforementioned categories concerning U.S. intelligence agencies.  *Id.* ¶ 4(c), (e).  The Protective Order's prohibitions applied only to "discovery or disclosure . . . during all proceedings in these actions," *i.e.* the above-captioned consolidated cases.  *Id.* ¶ 1.  Thus, by its terms, the Protective Order applied only to the parties to this litigation, only to discovery or disclosure within this litigation, and only to certain information regarding alleged activities or interests of the United States Government.

The litigation has since been resolved in full.  The claims of Montgomery, eTreppid, and related parties were resolved by settlement and dismissed with prejudice on February 19, 2009.  *See* Order ¶¶ 1, 2, ECF No. 962.  The Court retained jurisdiction to resolve motions related to sanctions by Montgomery's former counsel, to enforce the United States' Protective Order, and to enforce the Parties' settlement agreement.  *See id.* ¶ 3.  The motions for sanctions were later resolved and judgment entered as to them on July 8, 2010.  ECF No. 1171.

## II.    Lindell's Intervention and D.C. Defamation Litigation

Michael Lindell, an entrepreneur and salesman of pillows, has now moved to intervene in this litigation for the purpose of lifting the United States' Protective Order.  Lindell's intervention

is based on a defamation lawsuit filed against him in the District of Columbia by Dominion, a company that "provides local election officials with tools they can use to run elections." Lindell Decl. Ex. A ¶ 157, ECF No. 1216-1 (Compl., *US Dominion, Inc. v. My Pillow, Inc.*, No. 1:21-cv-00445 (D.D.C.) (hereinafter "Defamation Compl." or "defamation litigation"). Dominion's claims are rooted in numerous statements by Lindell in the wake of the 2020 presidential election, in which Lindell claimed that Dominion voting technology was exploited in various ways to alter votes and election results to the detriment of former-President Trump. *Id.* ¶¶ 164, 165. According to Dominion, Lindell's assertions generally centered on the alleged failure and/or exploitation of certain "algorithms" in Dominion voting machines. *See id.*

Lindell claims that he possesses certain "Data" obtained from Montgomery, which he seeks to use in defending himself in the defamation litigation. Lindell Decl. ¶ 6. Specifically, Lindell contends that this "Data compris[es] internet transmissions sent during the 2020 election that were collected by technology developed and previously licensed by Dennis Montgomery." *Id.* ¶ 7. But Lindell asserts that this data may be covered by the Protective Order and, therefore, relief in this Court is necessary. *Id.* ¶ 9. In order to obtain relief lifting the Protective Order, Lindell seeks to intervene in this litigation on one of two bases—permissive intervention pursuant to Rule 24(b)(1)(B) and intervention of right pursuant to Rule 24(a)(2). Mot. at 3–8.

## ARGUMENT

Lindell's motion should be denied for at least three reasons. First, the Court lacks jurisdiction to provide any of the relief Lindell seeks because he lacks standing to pursue it. Second, Lindell has failed to meet the requirements to intervene on either a permissive basis, pursuant to Rule 24(b)(1)(B), or of right, pursuant to Rule 24(a)(2). And third, even if there were jurisdiction and even if intervention were appropriate, Lindell has failed to establish a right to lifting the protective order entered in this litigation; the information subject to the order is utterly irrelevant to the defamation litigation and the United States has significant reliance interests in the order, which was issued on the basis of the state secrets privilege.

## I. THE COURT SHOULD DENY THE MOTION BECAUSE LINDELL LACKS STANDING TO INTERVENE.

Lindell's motion should be denied first and foremost because he lacks standing to pursue it. Parties invoking federal jurisdiction bear the burden of establishing the three elements that constitute the "irreducible constitutional minimum of standing," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)—namely, that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). Standing is necessary for parties to establish the existence of an Article III case or controversy and, thus, to invoke the jurisdiction of the federal courts. *See, e.g.*, *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103–04 (1998).

The standing requirement separately applies to intervenors in at least two circumstances. First, during pending litigation, an intervenor that "seeks additional relief beyond that which the plaintiff requests" must demonstrate standing. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) ("For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right."). And second, an intervenor must also demonstrate standing where it seeks to continue litigation to which no party has any pending claim. *See Diamond v. Charles*, 476 U.S. 54, 68 (1986) ("[A]n intervenor's right to continue a suit in the absence of the party on whose side intervention was permitted is contingent upon a showing by the intervenor that he fulfills the requirements of Art. III."); *see also Perry v. Schwarzenegger*, 630 F.3d 898, 906 (9th Cir. 2011) (explaining that although "[i]n general, an applicant for intervention need not establish Article III standing to intervene," standing is required where the intervenor seeks to appeal a judgment entered against a party in that party's absence).

Consistent with these principles, numerous courts of appeals have held that "an intervenor must establish standing to challenge a protective order after the case has been dismissed." *Bond v. Utreras*, 585 F.3d 1061, 1071–72 (7th Cir. 2009) (citing cases from the First, Third, and Fifth Circuits). That is the scenario presented by this case. The claims of all Plaintiffs and Defendants

5

were resolved by settlement and dismissed with prejudice on February 19, 2009.  *See* Order ¶¶ 1, 2, ECF No. 962.  Lindell must accordingly demonstrate standing to pursue this otherwise dormant litigation.

But here, Lindell cannot establish any of the elements of Article III standing.  To begin, Lindell has not articulated any cognizable injury.  Lindell claims that his injury arises from his understanding that the information he obtained from Montgomery "may be covered by the Protective Order."  Mot. at 2.  But the Protective Order does not bind Lindell in any way as he is not a party to this litigation.  Nor does the Protective Order apply to any litigation but the above-captioned cases.  Protective Order ¶ 1 (Order's prohibitions applied only to "discovery or disclosure . . . during all proceedings in these actions," *i.e.* the above-captioned consolidated cases).  The Protective Order is thus doubly irrelevant to any actions Lindell might take in the defamation litigation.  Moreover, it does not appear that Lindell has actually been prevented from obtaining any information he requires by virtue of the protective order.  Instead, Lindell simply says that he is unable to *use* the information he has already obtained.  Lindell Decl. ¶¶ 6, 9, 10 (stating that Lindell has "agreed to acquire ownership from Montgomery" of "Data" for use in his defense but that he is "concerned that the Protective Order . . . prohibits the use or disclosure of the Data").  That is wrong; the Protective Order does not bind Lindell.

Nor has Lindell shown that the Protective Order governs the kind of information that Lindell says he needs for his defense in the defamation litigation such that any injury would be traceable to the Order.  The Protective Order specifically exempts from its coverage information regarding "[t]he computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the Parties," as well as any "actual or potential commercial or government applications of" this technology.  Protective Order ¶ 4(c), (e).  But that is the only kind of information that Lindell has specifically indicated he needs.  Lindell contends that he wishes to rely on "internet transmissions sent during the 2020 election that were collected by technology developed . . . by Dennis Montgomery."  Lindell Decl. ¶ 7.  The express terms of the Protective Order present no barrier to the use of such information.

The Protective Order also does not injure Lindell on the basis of its effect on Montgomery. Although Montgomery is subject to the Protective Order as a prior party to this litigation, that makes no difference here because, again, the Order only governs the conduct of the above-captioned proceedings, not unrelated litigation involving none of the same parties. To be clear, the Government does not mean to disclaim that Montgomery could be under some other nondisclosure obligation, such as a nondisclosure agreement with the United States. *See, e.g.*, Montgomery Nondisclosure Agreement, ECF No. 83-3. Nor does the Government concede that discovery directed to the United States in relation to the defamation litigation would be appropriate or that the United States would not be entitled to seek protection against discovery or disclosure in that litigation. The point is simply that the Protective Order entered in *this* case from which Lindell seeks relief has no relevant effect on the defamation litigation or his ability to obtain or use any information he needs therein. The motion should therefore be denied for lack of standing.

## II. THE COURT SHOULD DENY THE MOTION TO INTERVENE FOR FAILURE TO MEET THE REQUIREMENTS FOR PERMISSIVE INTERVENTION OR INTERVENTION OF RIGHT.

### A. Lindell Fails to Establish a Basis for Permissive Intervention.

Permissive intervention under rule 24(b) generally requires "(1) an independent ground for jurisdiction; (2) a timely motion; and (3) a common question of law and fact between the movant's claim or defense and the main action." *Blum v. Merrill Lynch Pierce Fenner & Smith Inc.*, 712 F.3d 1349, 1353 (9th Cir. 2013). At minimum, Lindell has failed to satisfy the third prong of this test, a common question of law and fact.

To be sure, a permissive intervenor seeking to lift or modify a protective order based on collateral litigation does not face a high burden in establishing a "common question of law and fact between the movant's claim or defense and the main action." *See Beckman Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 473–74 (9th Cir. 1992). This is because they are not attempting to litigate any claim on the merits in the proceeding to which they intervene. *See id.* Nonetheless, the absence of a high burden is not the absence of any burden at all. For example, in *Beckman*, the Ninth Circuit affirmed the granting of permissive intervention in a case seeking modification of a

protective order on the basis of collateral litigation. *Id.* at 471–72. The collateral litigation involved the same defendant insurance company as the dormant case in which intervention was sought and it concerned interpretation of an insurance policy issued by that defendant. *Id.* The Ninth Circuit affirmed the district court's conclusion that the "importance of access to documents prepared for similar litigation involving the same parties satisfied the commonality requirement." *Id.* at 474 (emphasis added) (further explaining that the "issue of interpretation of the policy supplies a sufficiently strong nexus between the district court action and the state actions"). Thus, the lesson of the Ninth Circuit's *Beckman* decision is that a court evaluating a motion for limited intervention to modify a protective order based on collateral litigation should evaluate the relationship between the two litigations in assessing the "common question of law and fact." *See also Roman v. Mayorkas*, No. EDCV2000768TJHPVC, 2021 WL 6103180, at *2 (C.D. Cal. Oct. 15, 2021) ("The common question of law and fact requirement is satisfied where the proposed intervenor is engaged in similar litigation involving the same parties, and, there is 'a sufficiently strong nexus between the action in which the prospective intervenor seeks to intervene and the parallel action.'" (quoting *Beckman*, 966 F.2d at 474)).

Here, Lindell has failed to show *any* relationship between the defamation litigation and this case. None of the current or former parties to this litigation are party to the defamation litigation. The claims concern various statements about election administration made in and around the year 2020, not anything to do with legal rights or responsibilities of Montgomery or his former business partner during the mid-2000s. *See generally* Defamation Compl. There is simply nothing in the motion to intervene that would show any relationship at all between this litigation and the defamation litigation adequate to show the existence of a "common question of law and fact."

Lindell hardly argues otherwise. His sole support for the existence of this element is that "there is a common question of law and fact between the grounds that considerations that justified the entry of the Protective Order originally, and whether those grounds still justify any restrictions of the Protective Order upon the Data." Mot. at 5. It appears that Lindell is arguing that there is a common question of law and fact between the Government's original motion for a protective

order and his current motion to lift that protective order. That is beside the point. Under *Beckman*, Lindell must show some kind of relationship between the defamation litigation and this litigation to be permitted to intervene. He has not done so.

**B.    Lindell Cannot Intervene of Right.**

The Court should also deny Lindell's request for intervention of right. The Ninth Circuit's test for intervention of right

> requires a prospective intervenor to show that: (1) its motion is timely; (2) it has a significantly protectable interest relating to . . . the subject of the action; (3) it is so situated that the disposition of the action may as a practical matter impair or impede its ability to protect that interest; and (4) its interest is inadequately represented by the parties to the action.

*Kalbers v. U.S. Dep't of Justice*, 22 F.4th 816, 822 (9th Cir. 2021).

Lindell fails to meet, at minimum, the second and third elements of this test. Lindell has not shown *any* interest at all in the subject of this litigation, let alone a "significantly protectable interest." Put simply, Lindell has nothing to do with the business and copyright dispute among these parties that arose and was resolved well over a decade ago.

Lindell contends that his interest in litigating the protective order entered in this case allows him to largely sidestep the requirement to show a significantly protectable interest, asserting that this is met where a non-party "intervene[s] in an action for the purpose of litigating the substance of a protective order." Mot. at 7. This is an erroneously expansive articulation of even the permissive intervention standard as discussed above. And in any event, it has nothing to do with the standard for intervention of right, which requires a relationship between the movant's interests and the claims in the lawsuit to which intervention is sought. *See Kalbers*, 22 F.4th at 827 (explaining that "a proposed intervenor has a significant protectable interest in an action if (1) it asserts an interest that is protected under some law, and (2) there is a relationship between its legally protected interest and the plaintiff's claims" (citation omitted)). Indeed, the cases Lindell cites for his erroneously expansive standard either involved permissive intervention, *see In re Alexander Grant & Co. Litig.*, 820 F.2d 352 (11th Cir. 1987), or did not involve any appeal of a motion to intervene at all, *In re Midland Nat. Life Ins. Co. Annuity Sales Pracs. Litig.*, 686 F.3d

1115 (9th Cir. 2012) (noting motion to intervene was granted but not that any party appealed that decision). Lindell must show a significantly protectable interest in *this* litigation and he has failed to do so.

Nor would disposition of this action "impair or impede" Lindell's ability to protect his interests. To begin, this lawsuit has long since been resolved on the merits. And even if Lindell could show that the protective order provides a hook appropriate to this prong of the intervention inquiry, Lindell is not bound by the protective order for multiple reasons. *See supra* Argument Part I.

Ultimately, Lindell's attempt to invoke intervention of right is an ill fit for a party seeking a limited purpose intervention to litigate the scope of a protective order. The Ninth Circuit accordingly holds that *permissive* intervention is the appropriate vehicle for "[n]onparties seeking access to a judicial record in a civil case." *San Jose Mercury News, Inc. v. U.S. Dist. Ct.--N. Dist. (San Jose)*, 187 F.3d 1096, 1100 (9th Cir. 1999). Indeed, the leading Ninth Circuit cases on limited purpose intervention to litigate a protective order involved permissive intervention, not intervention of right. *Beckman*, 966 F.2d at 471; *Blum*, 712 F.3d at 1353. The motion to intervene of right should be denied.

## III. IF THE COURT PERMITS INTERVENTION, IT SHOULD DENY LINDELL'S MOTION TO LIFT THE PROTECTIVE ORDER.

### A. Lindell Has Not Established The Relevance of Information Subject to the Protective Order.

A collateral litigant seeking to obtain information properly subject to a protective order "must demonstrate the relevance of the protected discovery to the collateral proceedings and its general discoverability therein." *Foltz v. State Farm Mutual Auto. Ins. Co.*, 331 F.3d 1122, 1132 (9th Cir. 2003). A court asked to modify a protective order "should satisfy itself that the protected discovery is sufficiently relevant to the collateral litigation that a substantial amount of duplicative discovery will be avoided by modifying the protective order." *Id.* This relevance determination "hinges on the degree of overlap in facts, parties, and issues between the suit covered by the protective order and the collateral proceedings." *Id.* (citation omitted).

Lindell contends that he must use information subject to the Protective Order to "defend the reasonability and veracity of his statements regarding the 2020 election at issue in the D.C. Litigation." Mot. at 9. Lindell appears to be referencing the Complaint's allegations of defamation with respect to numerous statements by Lindell, all of which allege election and/or voter fraud in the 2020 presidential election through Dominion's voting machines. *See* Defamation Compl. ¶ 165. Lindell asserts that these "statements were based on information received from Montgomery." Mot. at 9.

Lindell's assertions fail to meet the Ninth Circuit's test for relevance for at least three reasons. First, the Protective Order in this litigation was entered over 15 years ago, pursuant to an assertion of the state secrets privilege over 16 years ago. Just simply looking at a calendar shows that the Order had nothing to do with the 2020 election or alleged fraud therein. Second, neither the Protective Order nor the supporting materials submitted by the United States in seeking it had anything to do with voting, elections administration, or voting machines, whether manufactured by Dominion or any other entity.[3] And third, Lindell has not explained what the two categories of information that *are* subject to the Protective Order have to do with the defamation litigation. The closest Lindell comes on this score are statements that Montgomery has information related to purported "illegal US government surveillance programs" using Montgomery's technology that involved the surveillance of, among many others, voting machines manufactured by Dominion. Mot. at 3; Montgomery Decl. ¶ 38, ECF No. 1216-2. But even on its own terms, this baseless claim provides no support to Lindell. That is because Lindell has not explained what these farfetched allegations of surveillance have to do with his contentions that votes in the 2020 election were manipulated by anyone, let alone the United States Government.

In any event, Lindell certainly has not explained how "a substantial amount of duplicative discovery" in the defamation litigation "will be avoided by modifying the protective order" in this case. *See Foltz*, 331 F.3d at 1132. To the contrary, Lindell asserts that he already has the

---

[3] The Government is willing to make the previously submitted Classified Declaration available for the Court's review *ex parte* and *in camera*, should the Court believe it necessary to review the declaration to conclude that the information here is irrelevant to the defamation litigation.

information he seeks.  *See* Lindell Decl. ¶¶ 6, 9, 10.  He only asks for relief from the Court because of his erroneous understanding that the protective order binds his conduct in the defamation litigation.

### B.    No Good Cause Exists to Lift or Modify the Protective Order.

Even where relevance is established, the Court "must weigh the countervailing reliance interest of the party opposing modification" of a protective order.  *Foltz*, 331 F.3d at 1133.  Those reliance interests are at their zenith in the context of the state secrets privilege, which exists to exclude from litigation information where "there is a reasonable danger that compulsion of the evidence will expose . . . matters which, in the interest of national security, should not be divulged." *United States v. Reynolds*, 345 U.S. 1, 6–7, 10 (1953) (describing this privilege as "well established in the law of evidence").  "It is 'obvious and unarguable' that no governmental interest is more compelling than the security of the Nation."  *Haig v. Agee*, 453 U.S. 280, 307–09 (1981) (quoting *Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964)).  And the state secrets privilege is absolute in its effect, requiring exclusion of evidence against even the most compelling showing of need by a litigant.  *United States v. Zubaydah*, 142 S. Ct. 959, 967 (2022) ("[I]n all events, 'even the most compelling necessity cannot overcome the claim of privilege if the court is ultimately satisfied that military secrets are at stake." (quoting *Reynolds*, 345 U.S. at 11)).

The reliance interests of the United States in the Protective Order foreclose Lindell's request to lift the Order.  Indeed, this is demonstrated by the effect of the Court's decision to uphold the state secrets privilege assertion here.  Unlike an ordinary protective order limiting the persons to whom protected information may be disclosed, a protective order entered pursuant to the state secrets privilege causes "the evidence [to be] completely removed from the case."  *Mohamed v. Jeppesen Dataplan, Inc.*, 614 F.3d 1070, 1082 (9th Cir. 2010) (citation omitted); *see also id.* at 1079 ("A successful assertion of privilege under *Reynolds* will remove the privileged evidence from the litigation.").  Thus, this is far from a case where the Court is only being asked to permit an additional party to view and use evidence already available to the other parties to the case. *Compare Foltz*, 331 F.3d at 1133 (approvingly quoting statement that a "legitimate interest" in

"continued secrecy as against the public at large can be accommodated by placing the collateral litigants under the same restrictions on use and disclosure contained in the original protective order" (citation omitted)), *with Mohamed*, 614 F.3d at 1082 (successful invocation of state secrets privilege "completely remove[s]" the information from the case).

Lindell contests the United States' reliance interests on two grounds: that the protective order is "stale" and that it conceals constitutional violations. Mot. at 9–10. Neither assertion has merit. As to the age of the protective order, Lindell cites no authority for the proposition that a state secrets protective order necessarily becomes obsolete with the passage of time. At minimum, the United States is entitled to the protection of its reliance interests in a state secrets protective order against the claims of parties that have demonstrated no necessity in having them lifted and no relationship to the litigation in which they were entered. And Lindell's contention that the Protective Order in this case was entered to conceal violations of constitutional rights is baseless. The unrebutted evidence before the Court is that the Protective Order was sought (and granted) to protect "intelligence sources and methods," the disclosure of which could cause harm to national security. Negroponte Decl. ¶ 12. Lindell's speculations to the contrary are inadequate to support his claim for relief.[4]

## CONCLUSION

For the foregoing reasons, the motion to intervene and to lift the protective order should be denied.

Respectfully submitted this 6th day of October, 2022.

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ANTHONY J. COPPOLINO
Deputy Director

*/s/ James R. Powers*

---

[4] The Court should reject Lindell's motion for the many reasons set forth above. If the Court nonetheless concludes that Lindell is entitled to some relief on the current record, the Court should permit the United States an additional 60 days in which to consider additional steps to protect its interests.

JAMES R. POWERS
Trial Attorney
Civil Division, Federal Programs Branch
U.S. Department of Justice

*Attorneys for the United States of America*

## CERTIFICATE OF SERVICE

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 1100 L Street, NW, Washington, DC 20005. I am not a party to the above-entitled action. On the date set forth below, I caused service of the foregoing document through the Court's electronic filing and notice system (CM/ECF), and by sending a copy of same via ECF notice upon:

Edmond "Buddy" Miller, Esq.
Bar No. 3116
STEPTOE & JOHNSON LLP
1610 Montclair Avenue, Suite C
Reno, NV 89509
bmiller@buddyrnillerlaw.com

*Attorney for ETREPPID TECHNOLOGIES, L.L.C. and WARREN TREPP*

Reid H. Weingarten, Esq.
Brian M. Heberlig, Esq.
Robert A. Ayers, Esq.
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, N.W. Washington, D.C. 20036-1795 rweingarten@steptoe.com bheberlig@steptoe.com rayers@steptoe.com

Dennis L. Kennedy, Esq.
Bailey Kennedy
8984 Spanish Ridge Avenue Las Vegas, Nevada 89148-1302
dkennedv@baileykennedv.com

Carlotta P. Wells, Esq. Senior Trial
Counsel Federal Programs Branch Civil
Division – Room 7150
U.S. Department of Justice 20
Massachusetts Ave., NW
P.O. Box 883
Washington, DC 20044
Carlotta.Wells@usdoj.gov

J. Stephen Peek, Esq.
HOLLAND & HART LLP
5441 Kietzke Lane, Second Floor
Reno, NV 89511
speek@hollandhart.com

Raphael O. Gomez, Esq. Senior
Trial Counsel Federal Programs
Branch Civil Division – Room
6144
U.S. Department of Justice 20
Massachusetts Ave., N.W.
P.O. Box 883
Washington, DC 20044
Raphael.Gomez@usdoj.gov

Roland Tellis, Esq. Marshall B.
Grossman, Esq. Bingham McCutchen
LLP The Water Garden
1620 26th Street, 4th Floor, North Tower
Santa Monica, CA 90404
rolland.tellis@bingham.com
marshall.grossman@bingham.com

Robert E. Rohde, Esq. Gregory
G. Schwartz, Esq. Rohde & Van
Kampen
1001 Fourth Avenue, Suite 4050
Seattle, Washington 98154
brohde@rohdelaw.com
gschwartz@rohdelaw.com

Ronald J. Logar, Esq.
Law Office of Logar & Pulver, PC
225 S. Arlington Avenue, Suite A
Reno, Nevada 89501
Zachary@logarpulver.com

Amanda J. Cowley, Esq. Bradley
Scott Schrager, Esq. Gary R.
Goodheart, Esq.
Jones Vargas
3773 Howard Hughes Parkway
Third Floor South
Las Vegas, Nevada 89169
acowley@jonesvargas.com
bschrager@jonesvargas.com
grg@jonesvargas.com

Bridget Robb Peck, Esq.
Lewis and Roca, LLP
50 W. Liberty Street, Suite 410
Reno, Nevada 89501
bpeck@lrlaw.com

Michael James Flynn, Esq.
Flynn & Stillman
P.O. Box 690
Rancho Santa Fe, CA
mjfbb@msn.com

Debbie Leonard, Esq.
Leigh T. Goddard, Esq.
John J. Frankovich, Esq.
McDonald Carano Wilson LLP
P.O. Box 2670
Reno, Nevada 89505-2670
dleonard@mcdonaldcarano.com
lgoddard@mcdonaldcarano.com
jfrankovich@mcdonaldcarano.com

Ellyn S. Garofalo, Esq.
Liner Yankelevitz Sunshine &
Regenstreif LLP
1100 Glendon Avenue
Los Angeles, California 90024-3503
egarofalo@linerlaw.com

Thomas H. Casey, Esq.
The Law Office of Thomas H. Casey, Inc.
22342 Avenida Empresa, Suite 260
Rancho Santa Margarita, California 92688
msilva@tomcaseylaw.com

Timothy Ryan O'Reilly, Esq.
O'Reilly Law Group
325 S. Maryland Parkway Las
Vegas, Nevada 89101
tor@oreillylawgroup.com

and by US Mail on:

The Montgomery Family Trust 6  Blxware LLC
Toscana Way W.      600 106th Avenue NE, Suite 210
Rancho Mirage, CA 92770   Bellevue, WA 98004-5045


Offspring LLC       Dennis Montgomery
600 106th Avenue NE, Suite 210  6 Toscana Way W.
Bellevue, WA 98004-5045    Rancho Mirage, CA 92770



  I declare under penalty of perjury that the foregoing is true and correct.

  Dated this 6th day of October, 2022.

        */s/James Powers*
        James R. Powers

# EXHIBIT T

# UNITED STATES DISTRICT COURT

# DISTRICT OF NEVADA

DENNIS MONTGOMERY, et al.,

     Plaintiffs

v.

ETREPPID TECHNOLOGIES, LLC, et al.,

     Defendants

Case Nos.: 3:06-cv-00056-MMD-CSD
3:06-cv-00145-MMD-VPC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 1216

     This Report and Recommendation is made to the Honorable Miranda M. Du, Chief United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

     Before the court is a motion to intervene filed by non-party Michael J. Lindell. (ECF Nos. 1216, 1216-1, 1216-2.) The United States filed a response. (ECF No. 1232.) Lindell filed a reply. (ECF No. 1235.)

     After a thorough review, it is recommended that Lindell's motion to intervene be denied.

## I. BACKGROUND

     This litigation involves two related cases, case 3:06-cv-00056-MMD-CSD (the Federal Action), and case 3:06-cv-00145-MMD-VPC (the Removed Action). In the Removed Action, eTreppid Technologies, Inc., asserted claims to protect and recover trade secrets from Dennis Montgomery. (*See* Third Am. Compl., ECF No. 93 in 3:06-cv-00145-MMD-VPC.) Montgomery, who was a former employee, officer, and director of eTreppid, filed counterclaims against eTreppid, and its majority shareholder, Warren Trepp, asserting that Montgomery was the owner of certain copyrights and derivative works he contributed in establishing eTreppid. (ECF No. 1-2 in 3:06-cv-00145-MMD-VPC.) He also included a claim for declaratory relief

against the United States Department of Defense (DoD) regarding his obligations under a non-disclosure agreement and accounting for profits from eTreppid's use of the source code. (ECF No. 1-2.)

Montgomery also filed the Federal Action, asserting copyright infringement, misappropriation of trade secrets and related claims against eTreppid and Trepp. (ECF No. 1 in 3:06-cv-00056-MMD-CSD.) Montgomery then filed an amended complaint in the Federal Action that included a claim against the DoD, including copyright infringement (counts one and two), an accounting of profits derived from the source code (count four), conversion of the source code (count nine) and declaratory relief regarding Montgomery's non-disclosure agreement with the DoD (count ten). (ECF No. 7 in 3:06-cv-00056-MMD-CSD.)

Montgomery's claims against the United States largely related to a Classified Information Nondisclosure Agreement (NDA) Montgomery executed with the Defense Security Service, an agency within DoD, in September of 2003. (*Id.*; *see also* ECF No. 83-3 in 3:06-cv-00056-MMD-CSD.) Montgomery alleged he was prevented from disclosing information necessary to his claims and defenses as to eTreppid because of the NDA. He sought a declaration from the court that disclosure of the information he wanted to use in the litigation would not violate the NDA.

DoD filed motions to dismiss Montgomery's claims for lack of subject matter jurisdiction, which were later granted. (ECF No. 56, in 3:06-cv-000056-MMD-CSD, and ECF No. 39 in 3:06-cv-00145-PMP-VPC, order at ECF No. 177 in 3:06-cv-00056-MMD-CSD.) While the motions were pending, the United States moved for entry of a protective order based on assertion of the state secrets privilege by Director of National Intelligence (DNI) John Negroponte. (ECF No. 83 in 3:06-cv-00056-MMD-CSD.) The DNI asserted that disclosure of

certain of the information at issue could reasonably be expected to cause serious, and even grave, damage to national security.

On March 15, 2007, the Federal Action and the Removed Action were consolidated. (ECF No. 123 in 3:06-cv-00056-MMD-CSD.)

The court entered DoD's requested protective order on August 29, 2007. (ECF Nos. 252, 253.) The order found that certain information may or may not be relevant to the claims was subject to the state secrets privilege, and such information should not be subject to discovery or disclosure by any of the parties during all proceedings in these actions, and should be excluded from evidence at trial. The order excluded from discovery or disclosure two categories of information, including: (1) "the existence or non-existence of any actual or proposed relationship" between the parties and any U.S. intelligence agency and (2) any "actual or proposed intelligence agency interest in, application of or use of any technology, software or source code owned or claimed by the Parties." (ECF No. 196 in 3:06-cv-00056-MMD-CSD.)

The protective order exempted from its coverage discovery of certain information, including "[t]he computer source code, software, programs, or technical specifications relating to any technology owned or claimed by any of the Parties," as well as any "actual or potential commercial or government applications of" this technology, so long as it did not relate to the aforementioned categories concerning U.S. intelligence agencies. The protective order applied to "discovery or disclosure … during all proceedings in these" two actions. (*Id.*)

The Federal and Removed Actions were resolved in full by settlement, and were dismissed with prejudice on February 19, 2009. (ECF No. 962 in 3:06-cv-00056-MMD-CSD.) The court retained jurisdiction over the terms of the protective order. (*Id.*)

3

1      Non-party and proposed intervenor Lindell has been sued in the United States District

2 Court for the District of Columbia, for defamation based on alleged statements he made about

3 the administration of the 2020 presidential election and his contentions that various forms of

4 fraud were perpetrated using the voting machines of a company called Dominion. *See US*

5 *Dominion, Inc. v. My Pillow, Inc.*, case 1:21-cv-00445 (D. D.C.).

6      Lindell argues that he should be granted leave to intervene in this action both

7 permissively, under Rule 24(b)(1)(B), and as of right under Rule 24(a)(2).

8      Lindell seeks to have the protective order in this action lifted so he may use data obtained

9 from Montgomery to defend himself against claims asserted in defamation litigation. He argues

10 the data he seeks to use in his defense may be covered by the protective order issued in this

11 litigation. He asserts that he made the statements at issue in the *Dominion* case relying in part on

12 information he received from Montgomery.

13      He seeks to use testimony and evidence concerning Montgomery's background and his

14 work for U.S. intelligence agencies, and information from Montgomery himself, to defend

15 against the defamation action. He states that the information he relied on is comprised of internet

16 transmissions sent during the 2020 election that were collected by technology Montgomery

17 developed and previously licensed to the United States. Lindell claims that Montgomery's data

18 shows that voting machine manufacturers and their employees were hacked, as well as

19 information related to illegal United States surveillance programs Montgomery worked in.

20 Lindell claims he agreed to acquire ownership rights to Montgomery's data; however, the

21 protective order entered in this case prohibits the use or disclosure of information related to

22 Montgomery's work for or relationship with United States' intelligence agencies.

23

4

The United States opposes Lindell's motion, arguing Lindell lacks standing to intervene and he has not established a basis for either permissive or as of right intervention under Federal Rule of Civil Procedure 24. The United States further argues that if intervention is allowed, then good cause does not exist to lift or modify the protective order. (ECF No. 1232.)

After this motion was fully briefed, Montgomery filed a motion to restrict the application of the state secrets privilege, the protective order, and the NDA. (ECF No. 1236.) The court has recommended denial of that motion in a separate report and recommendation.

## II. DISCUSSION

A. **Intervention under Rule 24**

As is relevant here, a court *must* allow intervention if the person seeking intervention "claims an interest relating to the property or transaction that is the subject of the actin, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(1)-(2).

In addition, a court *may* allow intervention if the person seeking to intervene "has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1)(B). In determining whether to allow permissive intervention, the court must determine whether intervention "will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

**B. Standing**

As a preliminary matter, the United States argues that Lindell must demonstrate he has Article III standing to intervene in this long-closed litigation.

5

"Article III of the Constitution limits the exercise of judicial power to 'Cases' and 'Controversies.'" *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 438 (2017) (citing Article III, § 2, cl. 1). "If a dispute is not a proper case or controversy, the courts have no business deciding it, or expounding the law in the course of doing so." *Id.* (citation and quotation marks omitted). "'Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy.'" *Id.* (quoting *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016)). To have standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo,* 578 U.S. at 338 (citations omitted).

In *Laroe,* the Supreme Court held that a person seeking to intervene as of right under Rule 24(a)(2) "must meet the requirements of Article III if the intervenor wishes to pursue relief not requested by a plaintiff." 581 U.S. at 435. "For all relief sought, there must be a litigant with standing, whether that litigant joins the lawsuit as a plaintiff, a coplaintiff, or an intervenor of right." *Id.* at 439. "Thus, at the least, an intervenor of right must demonstrate Article III standing when it seeks additional relief beyond that which the plaintiff requests." *Id.*; *see also Cal. Dep't of Toxic Substances Control v. Jim Dobbas, Inc.*, 54 F.4th 1078, 1085 (9th Cir. 2022) (intervenors seeking relief broader or different than existing parties must have standing, but those that seek the same relief sought by at least one existing party need not do so).

*Laroe* did not address whether Article III standing is required for permissive intervention. Nor did it address the scenario of intervention by a person seeking to intervene in a settled case for the limited purpose of lifting or modifying a protective order. Moreover, while Lindell seeks to intervene both as of right and permissively, courts have generally held that the procedure for a non-party to challenge a protective order is through permissive intervention. *See Beckman*

6

*Indus., Inc. v. Int'l Ins. Co.*, 966 F.2d 470, 473 (9th Cir. 1992); *see also United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990); *Public Citizen v. Liggett Group, Inc.*, 858 F.2d 775, 783 (1st Cir. 1988); *Meyer Goldberg, Inc. of Lorain v. Fisher Foods*, 823 F.2d 159, 162 (6th Cir. 1987); *Martindell v. Int'l Tel. & Tel. Corp.*, 594 F.2d 291, 294 (2d Cir. 1979); *In re Beef Industry Antitrust Litig.*, 589 F.2d 786, 789 (5th Cir. 1979).

The Seventh Circuit addressed the interplay between Article III standing and Rule 24(b) permissive intervention in a case where permissive intervention was sought by a journalist after a case was settled in order to challenge a protective order that was entered in the case concerning citizen complaints against police officers. *Bond v. Utreas,* 585 F.3d 1061 (7th Cir. 2009). The court commented: "Intervention to challenge a protective order *after* a case has been dismissed interferes even more fundamentally: It revives a concluded case for the purpose of entertaining an outsider's claim of interest in the proceeds of the parties' discovery process." *Id.* at 1071. The Seventh Circuit concluded that the language of Rule 24(b) requiring that the court consider whether intervention will unduly delay or prejudice the adjudication of the original parties' rights "suggests that intervention postjudgment—which necessarily disturbs the final adjudication of the parties' rights—should generally be disfavored." *Id.* at 1071.

The Seventh Circuit held that "when a third party seeks intervention under Rule 24(b) for the purpose of challenging a protective order in a case or controversy that is no longer live—as when the case has been dismissed and none of the original parties has sought this relief postjudgment—the intervenor must meet the standing requirements of Article III in addition to Rule 24(b)'s requirements for permissive intervention." *Id.*

Under *Bond*, the court must first determine whether Lindell is seeking relief that one of the original parties has sought postjudgment, so that he may "piggyback" on their standing, and

1    if he may not, the court must then address whether Lindell has demonstrated independent

2    standing to request this relief.

3    Through the time Lindell's motion to intervene was completely briefed, no party to this

4    action had sought to lift or modify the protective order entered in this action. Instead, it was only

5    *after* the United States filed its response to Lindell's motion raising the standing argument, and

6    more than fifteen years after the protective order was entered, that Montgomery filed a motion to

7    restrict application of the protective order. The fact that Montgomery did not seek to lift or

8    modify the protective order until this point makes the position he now takes relative to the

9    protective order appear contrived. In any event, the court has issued a recommendation that

10   Montgomery's motion be denied. Therefore, the court finds Lindell must independently

11   demonstrate Article III standing to pursue this relief.

12   As the United States points out, the protective order was entered in this case to "protect

13   the classification, confidentiality, and the rights to information and documents developed and

14   disclosed in connection *with this litigation*, and to facilitate discovery by and among the parties

15   to *this action* and from third parties." (ECF No. 253 at 1.) The protective order provides that the

16   information subject to the state secrets privilege "shall not be subject to discovery or disclosure

17   by any of the Parties during all proceedings *in these actions* and shall be excluded from evidence

18   at trial." (*Id*. at 2.) It goes on to preclude discovery or the use in trial of certain information in

19   *this litigation*. (*Id*. at 2-5.) Lindell is not a party to this litigation, and the protective order does

20   not apply to any other litigation. Therefore, it is not the protective order entered in this case that

21   would preclude Lindell from introducing the information he seeks to utilize in his defense in the

22   defamation action. Lindell provides nothing more than speculation that he will somehow be

23   precluded from presenting this information because of the protective order in this litigation. In

8

sum, Lindell has not demonstrated an injury in fact that is traceable to protective order entered in this litigation.

Notwithstanding these findings, there may be other reasons that Montgomery is precluded from disclosing the information Lindell seeks to introduce in his defamation action, such as the NDA between Montgomery and the government. The NDA is between Montgomery and the government, is separate from the protective order entered by the court in this litigation, and the court has no authority to lift or modify the NDA.

For these reasons, Lindell's motion to intervene should be denied.

### III. RECOMMENDATION

IT IS HEREBY RECOMMENDED that the District Judge enter an order **DENYING** Lindell's motion to intervene (ECF No. 1216).

The parties should be aware of the following:

1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to this Report and Recommendation within fourteen days of being served with a copy of the Report and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: May 15, 2023

_____
Craig S. Denney
United States Magistrate Judge

9